# NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

The table below summarizes the total costs estimated to be incurred as a result of the exit activities initiated in 2003, which have met the criteria described in SFAS 146 "Accounting for Costs Associated with Exit or Disposal Activities" ("SFAS 146"), the balance of these accrued expenses as of March 31, 2006 and the movement in the accrual for the three months ended March 31, 2006. These costs are included in the provision balance above for the 2001 Restructuring Plan as of March 31, 2006.

| | Accrued balance as of December 31, 2005 | Costs during the three months ended March 31, 2006 | Payments during the three months ended March 31, 2006 | Adjustments during the three months ended March 31, 2006 | Accrued balance as of March 31, 2006 |
|---|---|---|---|---|---|
| Lease costs[a] . . . . . . | $25 | $— | $(1) | $4 | $28 |

(a) Total estimated costs, net of estimated sublease income, associated with these accruals are $69, of which $25 was drawn down by cash payments of $22 and non-cash adjustments of $3 prior to January 1, 2006.

### 2001 Restructuring Plan — by Segment

The following table outlines special charges incurred by segment for the three months ended March 31:

| | Workforce reduction | Contract settlement and lease costs | Plant and equipment write downs | Total |
|---|---|---|---|---|
| **2001 Restructuring Plan** | | | | |
| Mobility and Converged Core Networks | | | | |
| For the three months ended March 31, 2006 . . . . . . . . . . . . . . | $ 1 | $(1) | $— | $ — |
| Enterprise Solutions and Packet Networks | | | | |
| For the three months ended March 31, 2006 . . . . . . . . . . . . . . | — | (1) | — | (1) |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — |
| Total special charges for the three months ended March 31, 2006 | $ 1 | $(2) | $— | $ (1) |
| Mobility and Converged Core Networks | | | | |
| For the three months ended March 31, 2005 . . . . . . . . . . . . . . | $(1) | $— | $— | $ (1) |
| Enterprise Solutions and Packet Networks | | | | |
| For the three months ended March 31, 2005 . . . . . . . . . . . . . | (2) | — | (8) | (10) |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — |
| Total special charges for the three months ended March 31, 2005 | $(3) | $— | $(8) | $(11) |

As described in note 5, segment Management EBT does not include special charges. A significant portion of Nortel's provisions for workforce reductions and contract settlement and lease costs are associated with shared services. These costs have been allocated to the segments in the table above based generally on headcount.

## 7. Income taxes

During the three months ended March 31, 2006, Nortel recorded a tax expense of $23 on a loss from continuing operations before income taxes, minority interests and equity in net earnings (loss) of associated companies of $160. The tax expense of $23 is primarily related to the drawdown of Nortel's deferred tax assets and current tax provisions in certain taxable jurisdictions and various corporate minimum and other taxes, partially offset by the recognition of R&D related incentives.

During the three months ended March 31, 2005, Nortel recorded a tax expense of $16 on a loss from continuing operations before income taxes, minority interests and equity in net earnings (loss) of associated companies of $77. The tax expense of $16 is primarily related to the drawdown of Nortel's deferred tax assets and current tax provisions in certain taxable jurisdictions and various corporate minimum and other taxes, partially offset by the recognition of R&D related incentives.

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 331

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

As of March 31, 2006, Nortel's net deferred tax assets were $3,885, reflecting temporary differences between the financial reporting and tax treatment of certain current assets and liabilities and non-current assets and liabilities, in addition to the tax benefit of net operating and capital loss carry forwards and tax credit carry forwards.

In accordance with SFAS No. 109, "Accounting for Income Taxes" ("SFAS 109"), Nortel reviews all available positive and negative evidence to evaluate the recoverability of the deferred tax assets. This includes a review of such evidence as the carry forward periods of the significant tax assets, Nortel's history of generating taxable income in its material tax jurisdictions, Nortel's cumulative profits or losses in recent years, and Nortel's forecast of earnings in its material jurisdictions. On a jurisdictional basis, Nortel is in a cumulative loss position in certain of its material jurisdictions. For these jurisdictions, Nortel continues to maintain a valuation allowance against a portion of its deferred income tax assets. Nortel has concluded that it is more likely than not that the remaining deferred tax assets in these jurisdictions will be realized.

Nortel is subject to ongoing examinations by certain tax authorities of the jurisdictions in which it operates. Nortel regularly assesses the status of these examinations and the potential for adverse outcomes to determine the adequacy of the provision for income and other taxes. Nortel believes that it has adequately provided for tax adjustments that are probable as a result of any ongoing or future examinations.

Specifically, the tax authorities in Brazil have completed an examination of prior taxation years and have issued assessments in the amount of $56 for the taxation years of 1999 and 2000. Nortel is currently in the process of appealing these assessments and believes that it has adequately provided for tax adjustments that are probable as a result of the outcome of the ongoing appeals process.

In addition, the tax authorities in France have issued two preliminary notices of proposed assessment in respect of the 2001 and 2002 taxation years. These assessments collectively propose adjustments to taxable income of approximately $800 as well as certain adjustments to withholding and other taxes of approximately $50 plus applicable interest and penalties. Other than the withholding and other taxes, Nortel has sufficient loss carry forwards to absorb the entire amount of the proposed assessment. However, no amount has been provided for these assessments since Nortel believes that the proposed assessments are without merit and any potential tax adjustments that could result from these ongoing examinations cannot be quantified at this time.

Nortel had previously entered into Advance Pricing Arrangements ("APAs") with the taxation authorities of the U.S. and Canada in connection with its intercompany transfer pricing and cost sharing arrangements between Canada and the U.S. These arrangements expired in 1999 and 2000. In 2002, Nortel filed APA requests with the taxation authorities of the U.S., Canada and the United Kingdom ("U.K.") that applied to the taxation years beginning in 2000. The APA requests are currently under consideration but the tax authorities have not begun to negotiate the terms of the arrangements. Nortel has applied the transfer pricing methodology proposed in the APA requests in preparing its tax returns and accounts beginning in 2001.

The outcome of the APA applications is uncertain and possible additional losses, as they relate to the APA negotiations, cannot be determined at this time. However, Nortel does not believe it is probable that the ultimate resolution of these negotiations will have a material adverse effect on its consolidated financial position, results of operations or cash flows. Despite Nortel's current belief, if this matter is resolved unfavorably, it could have a material adverse effect on Nortel's consolidated financial position, results of operations and cash flows.

### 8. Employee benefit plans

Nortel maintains various retirement programs covering substantially all of its employees, consisting of defined benefit, defined contribution and investment plans.

Nortel has four kinds of capital accumulation and retirement programs: balanced capital accumulation and retirement programs (the "Balanced Program") and investor capital accumulation and retirement programs (the "Investor Program") available to substantially all of its North American employees; flexible benefits plan, which includes a group personal pension plan (the "Flexible Benefits Plan"), available to substantially all of its employees in the U.K., and traditional capital accumulation and retirement programs that include defined benefit pension plans (the "Traditional Program") which are closed to new entrants in the U.K. and portions of which are closed to new entrants in the U.S. and Canada. Although these four kinds of programs represent Nortel's major retirement programs and may be

HIGHLY CONFIDENTIAL     

# NORTEL NETWORKS CORPORATION

## Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

available to employees in combination and/or as options within a program, Nortel also has smaller pension plan arrangements in other countries.

Nortel also provides other benefits, including post-retirement benefits and post-employment benefits. Employees in the Traditional Program are eligible for their existing company sponsored post-retirement benefits or a modified version of these benefits, depending on age or years of service. Employees in the Balanced Program are eligible for post-retirement benefits at reduced company contribution levels, while employees in the Investor Program have access to post-retirement benefits by purchasing a Nortel-sponsored retiree health care plan at their own cost.

The following details the net pension expense, all related to continuing operations, for the defined benefit plans for the three months ended:

|  | Three months ended March 31, | |
|  | 2006 | 2005 |
|---|---|---|
| **Pension expense:** | | |
| Service cost | $ 35 | $ 35 |
| Interest cost | 113 | 116 |
| Expected return on plan assets | (113) | (109) |
| Amortization of prior service cost | 1 | 1 |
| Amortization of net losses (gains) | 31 | 23 |
| Curtailment, contractual and special termination losses (gains) | 1 | 12 |
| Net pension expense | $ 68 | $ 78 |

The following details the net cost components, all related to continuing operations, of post-retirement benefits other than pensions for the three months ended:

|  | Three months ended March 31, | |
|  | 2006 | 2005 |
|---|---|---|
| **Post-retirement benefit cost:** | | |
| Service cost | $ 2 | $ 2 |
| Interest cost | 11 | 10 |
| Amortization of prior service cost | (1) | (1) |
| Net post-retirement benefit cost | $12 | $11 |

During the three months ended March 31, 2006, contributions of $91 were made to the defined benefit plans and $7 to the post-retirement benefit plans. Nortel expects to contribute an additional $273 in 2006 to the defined benefit pension plans for a total contribution of $364, including a portion related to a pension funding agreement in the United Kingdom, and an additional $24 in 2006 to the post-retirement benefit plans for a total contribution of $31.

## 9. Acquisitions, divestitures and closures

### Acquisitions

#### Tasman Networks Inc.

On February 24, 2006, Nortel acquired 100% of the common and preferred shares of Tasman Networks for approximately $99 in cash and assumed liabilities. Tasman Networks is an established networking company that provides a portfolio of secure enterprise routers, which will enable Nortel access to low-latency technology to handle packets in secure enterprise environments.

Nortel acquired the assets, certain assumed liabilities and the employees related to the business of Tasman Networks. The aggregate purchase price for Tasman Networks was approximately $99, including estimated costs of acquisition of $6. The preliminary purchase price allocation of $99 includes approximately $101 of goodwill acquired and $2 in net liabilities assumed. The allocation of the purchase price is based on management's current best estimate of the relative

21

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

values of the assets acquired and liabilities assumed in Tasman Networks. However, because a full valuation of those assets and liabilities has not yet been finalized, the final allocation of the purchase price may differ from the current allocation disclosed, and the difference may be material.

The results of operations of Tasman Networks have been consolidated into Nortel as of February 24, 2006, and were not material to Nortel's consolidated results of operations.

### Divestitures
#### Manufacturing operations

In 2004, Nortel entered into an agreement with Flextronics regarding the divestiture of substantially all of Nortel's remaining manufacturing operations and related activities, including certain product integration, testing, repair operations, supply chain management, third party logistics operations and design assets. Nortel and Flextronics have also entered into a four-year supply agreement for manufacturing services (whereby after completion of the transaction, Flextronics will manage approximately $2,500 of Nortel's annual cost of revenues) and a three-year supply agreement for design services. Commencing in the fourth quarter of 2004 and throughout 2005, Nortel completed the transfer to Flextronics of certain of Nortel's optical design activities in Ottawa, Canada and Monkstown, Northern Ireland and the manufacturing activities in Montreal, Canada and Chateaudun, France. On May 8, 2006, Nortel completed the transfer of the manufacturing operations and related assets including product integration, testing, repair and logistics operations of its Calgary, Canada manufacturing operations to Flextronics, representing the final transfer of Nortel's manufacturing and related operations to Flextronics.

The agreement with Flextronics resulted in the transfer of approximately 2,100 employees to Flextronics. Nortel expects gross cash proceeds ranging between $575 and $625, of which approximately $380 has been received as of March 31, 2006, partially offset by cash outflows incurred to date and expected to be incurred in 2006 attributable to direct transaction costs and other costs associated with the transaction. These proceeds will be subject to a number of adjustments, including potential post-closing date asset valuations and potential post-closing indemnity payments. Any net gain on the sale of this business will be recognized once substantially all of the risks and other incidents of ownership have been transferred.

As of March 31, 2006, Nortel had transferred approximately $247 of inventory and equipment to Flextronics relating to the transfer of the optical design activities in Ottawa and Monkstown and the manufacturing activities in Montreal and Chateaudun and recorded deferred income of approximately $64. As Flextronics has the ability to exercise rights to sell back to Nortel certain inventory and equipment after the expiration of a specified period (up to fifteen months) following each respective transfer date, Nortel has retained these assets on its balance sheet to the extent they have not been consumed as part of ongoing operations as at March 31, 2006. Nortel does not expect that rights will be exercised with respect to any material amount of inventory and equipment.

### 10. Long-term debt, credit and support facilities

As a result of the delayed filing of Nortel's and NNL's 2005 Annual Reports and Nortel's and NNL's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2006 (the "2006 First Quarter Reports") with the SEC, Nortel and NNL were not in compliance with their obligations to deliver their respective SEC filings to the trustees under its and NNL's public debt indentures. With the filing of the 2006 First Quarter Reports with the SEC and the delivery of the 2006 First Quarter Reports to the trustees under Nortel's and NNL's public debt indentures, Nortel and NNL will be in compliance with their delivery obligations under the public debt indentures. Approximately $500 of notes of NNL (or its subsidiaries) and $1,800 of convertible debt securities of Nortel were outstanding under such indentures as of March 31, 2006.

### Credit facility

On February 14, 2006, Nortel entered into a new one-year credit facility in the aggregate principal amount of $1,300 ("2006 Credit Facility"). This new facility consists of (i) a senior secured one-year term loan facility in the amount of $850 ("Tranche A Term Loans"), and (ii) a senior unsecured one-year term loan facility in the amount of $450 ("Tranche B Term Loans"). The Tranche A Term Loans are secured equally and ratably with NNL's obligations under the EDC Support Facility and NNL's 6.875% Bonds due 2023 by a lien on substantially all of the U.S. and Canadian

22

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

assets of NNL and the U.S. assets of NNL's indirect subsidiary, Nortel Networks Inc. ("NNI"). The Tranche A Term Loans are also secured equally and ratably with NNL's obligations under the EDC Support Facility by a lien on substantially all of Nortel's U.S. and Canadian assets. The Tranche A Term Loans and Tranche B Term Loans are also guaranteed by Nortel and NNL and NNL's obligations under the EDC Support Facility are also guaranteed by Nortel and NNI, in each case until the maturity or prepayment of the 2006 Credit Facility. The 2006 Credit Facility, which will mature in February 2007, was drawn down in the full amount on February 14, 2006 and Nortel used the net proceeds primarily to repay the outstanding $1,275 aggregate principal amount of NNL's 6.125% Notes that matured on February 15, 2006. Nortel and NNI agreed to a demand right exercisable at any time after May 31, 2006 pursuant to which Nortel would be required to take all reasonable actions to issue senior unsecured debt securities in the capital markets to repay the 2006 Credit Facility. As of the date of this report, the demand right has not been exercised.

At Nortel's option, loans bear interest based on the "Base Rate" (defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 0.5% and the prime commercial lending rate of JPMorgan Chase Bank, N.A., established from time to time) or the reserve-adjusted London Interbank Offered Rate ("LIBOR"), plus the Applicable Margin. Prior to the amendment as described in note 19, "Applicable Margin" was defined as 225 basis points in the case of Tranche A Term Loans that are LIBOR loans (125 basis points if such Tranche A Term Loans are Base Rate loans) and 300 basis points in the case of Tranche B Term Loans that are LIBOR loans (200 basis points if such Tranche B Term Loans are Base Rate loans). Subsequent to March 31, 2006, Nortel entered into an amendment of the 2006 Credit Facility to modify the interest rates applicable to the Tranche A Term Loans and the Tranche B Term Loans. For further information see note 19.

As of March 31, 2006, the Tranche A Loans contained financial covenants that required Nortel to achieve Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA") of not less than $850, $750, $850 and $900 for the twelve-month period ending March 31, 2006, June 30, 2006, September 30, 2006 and December 31, 2006, respectively. Adjusted EBITDA was generally defined as consolidated earnings before interest, taxes, depreciation and amortization, adjusted for certain restructuring charges and other non-recurring charges and gains. As of March 31, 2006, both the Tranche A Term Loans and the Tranche B Term Loans contained a covenant that Nortel's consolidated unrestricted cash and cash equivalents at all times had to be equal or greater than $1,000. In addition, the 2006 Credit Facility contains covenants that limit Nortel's ability to create liens on its assets and the assets of substantially all of its subsidiaries in excess of certain baskets and permitted amounts and limit its ability and the ability of substantially all of its subsidiaries to merge, consolidate or amalgamate with another person. Payments of dividends on the outstanding preferred shares of NNL and payments under the Proposed Class Action Settlement are permitted. NNI is required to prepay the facility in certain circumstances, including in the event of certain debt or equity offerings or asset dispositions of collateral by Nortel, NNL or NNI. As described in note 19, on May 9, 2006, Nortel entered into an amendment and waiver that amended the covenants under the Tranche A Term Loans and the Tranche B Term Loans. See note 19 for additional information.

### *Support facility*

On February 14, 2003, Nortel's principal operating subsidiary, NNL, entered into an agreement with Export Development Canada ("EDC") regarding arrangements to provide for support of certain performance related obligations arising out of normal course business activities for the benefit of Nortel (the "EDC Support Facility"). On December 10, 2004, NNL and EDC amended the terms of the EDC Support Facility by extending the termination date of the EDC Support Facility to December 31, 2006 from December 31, 2005.

Effective October 24, 2005, NNL and EDC amended the EDC Support Facility to maintain the total EDC Support Facility at up to $750, including the existing $300 of committed support for performance bonds and similar instruments, and the extension of the maturity date of the EDC Support Facility for an additional year to December 31, 2007. In connection with this amendment (the "EDC Amendment"), all guarantee and security agreements previously guaranteeing or securing the obligations of Nortel and its subsidiaries under the EDC Support Facility and Nortel's public debt securities of Nortel and its subsidiaries were terminated and the assets of Nortel and its subsidiaries pledged under the security agreements were released in full. EDC also agreed to provide future support under the EDC Support Facility on an unsecured basis and without the guarantees of NNL's subsidiaries provided that, should NNL or its subsidiaries incur or guarantee certain indebtedness in the future above agreed thresholds of $25 in North America and

23

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

$100 outside of North America, equal and ratable security and/or guarantees of NNL's obligations under the EDC Support Facility will be required at that time.

The delayed filing of Nortel's and NNL's 2005 Annual Reports and 2006 First Quarter Reports with the SEC, and delayed delivery of such reports to the trustees under Nortel's and NNL's public debt indentures and EDC, gave EDC the right to (i) terminate its commitments under the EDC Support Facility, relating to certain of Nortel's performance related obligations arising out of normal course business activities, and (ii) exercise certain rights against the collateral pledged under related security agreements or require NNL to cash collateralize all existing support. With the filing and delivery to EDC and the trustees under Nortel's and NNL's public debt indentures, of the 2005 Annual Reports and the 2006 First Quarter Reports and obtaining the waiver and amendment as described in note 19, NNL will be in compliance with its obligations under the EDC Support Facility.

As of March 31, 2006, there was approximately $163 of outstanding support utilized under the EDC Support Facility, approximately $143 of which was outstanding under the revolving small bond sub-facility.

## 11. Guarantees

Nortel has entered into agreements that contain features which meet the definition of a guarantee under FASB Interpretation No. (''FIN'') 45, ''Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others'' (''FIN 45''). FIN 45 defines a guarantee as a contract that contingently requires Nortel to make payments (either in cash, financial instruments, other assets, common shares of Nortel Networks Corporation or through the provision of services) to a third party based on changes in an underlying economic characteristic (such as interest rates or market value) that is related to an asset, a liability or an equity security of the guaranteed party or a third party's failure to perform under a specified agreement. A description of the major types of Nortel's outstanding guarantees as of March 31, 2006 is provided below:

### (a) Business sale and business combination agreements

In connection with agreements for the sale of portions of its business, including certain discontinued operations, Nortel has typically retained the liabilities of a business which relate to events occurring prior to its sale, such as tax, environmental, litigation and employment matters. Nortel generally indemnifies the purchaser of a Nortel business in the event that a third party asserts a claim against the purchaser that relates to a liability retained by Nortel. Some of these types of guarantees have indefinite terms while others have specific terms extending to June 2008.

Nortel also entered into guarantees related to the escrow of shares in business combinations in prior periods. These types of agreements generally include indemnities that require Nortel to indemnify counterparties for loss incurred from litigation that may be suffered by counterparties arising under such agreements. These types of indemnities apply over a specified period of time from the date of the business combinations and do not provide for any limit on the maximum potential amount.

Nortel is unable to estimate the maximum potential liability for these types of indemnification guarantees as the business sale agreements generally do not specify a maximum amount and the amounts are dependent upon the outcome of future contingent events, the nature and likelihood of which cannot be determined.

Historically, Nortel has not made any significant indemnification payments under such agreements and no significant liability has been accrued in the consolidated financial statements with respect to the obligations associated with these guarantees.

In conjunction with the sale of a subsidiary to a third party, Nortel guaranteed to the purchaser that specified annual volume levels would be achieved by the business sold over a ten year period ending December 31, 2007. The maximum amount that Nortel may be required to pay under the volume guarantee as of March 31, 2006 is $10. A liability of $8 has been accrued in the consolidated financial statements with respect to the obligation associated with this guarantee as of March 31, 2006.

### (b) Intellectual property indemnification obligations

Nortel has periodically entered into agreements with customers and suppliers that include intellectual property indemnification obligations that are customary in the industry. These types of guarantees typically have indefinite terms

24

# NORTEL NETWORKS CORPORATION

## Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

and generally require Nortel to compensate the other party for certain damages and costs incurred as a result of third party intellectual property claims arising from these transactions.

The nature of the intellectual property indemnification obligations generally prevents Nortel from making a reasonable estimate of the maximum potential amount it could be required to pay to its customers and suppliers. Historically, Nortel has not made any significant indemnification payments under such agreements. As of March 31, 2006, Nortel had no intellectual property indemnification obligations for which compensation would be required.

### (c)  Lease agreements

Nortel has entered into agreements with its lessors that guarantee the lease payments of certain assignees of its facilities to lessors. Generally, these lease agreements relate to facilities Nortel vacated prior to the end of the term of its lease. These lease agreements require Nortel to make lease payments throughout the lease term if the assignee fails to make scheduled payments. Most of these lease agreements also require Nortel to pay for facility restoration costs at the end of the lease term if the assignee fails to do so. These lease agreements have expiration dates through June 2015. The maximum amount that Nortel may be required to pay under these types of agreements is $43 as of March 31, 2006. Nortel generally has the ability to attempt to recover such lease payments from the defaulting party through rights of subrogation.

Historically, Nortel has not made any significant payments under these types of guarantees and no significant liability has been accrued in the consolidated financial statements with respect to the obligations associated with these guarantees.

### (d)  Third party debt agreements

From time to time, Nortel guarantees the debt of certain customers. These third party debt agreements require Nortel to make debt payments throughout the term of the related debt instrument if the customer fails to make scheduled debt payments. Under most such arrangements, the Nortel guarantee is secured, usually by the assets being purchased or financed. As of March 31, 2006, Nortel had no third party debt agreements that would require it to make any debt payments for its customers.

### (e)  Indemnification of banks and agents under credit facilities and EDC Support Facility

Nortel has agreed to indemnify the banks and agents under its credit facilities against costs or losses resulting from changes in laws and regulations which would increase the banks' costs or reduce their return and from any legal action brought against the banks or agents related to the use of loan proceeds. Nortel has also agreed to indemnify EDC under the EDC Support Facility against any legal action brought against EDC that relates to the provision of support under the EDC Support Facility. This indemnification generally applies to issues that arise during the term of the EDC Support Facility.

Nortel is unable to estimate the maximum potential liability for these types of indemnification guarantees as the agreements typically do not specify a maximum amount and the amounts are dependent upon the outcome of future contingent events, the nature and likelihood of which cannot be determined at this time.

Historically, Nortel has not made any significant indemnification payments under such agreements and no significant liability has been accrued in the consolidated financial statements with respect to the obligations associated with these indemnification guarantees.

Nortel has agreed to indemnify certain of its counterparties in certain receivables securitization transactions. The indemnifications provided to counterparties in these types of transactions may require Nortel to compensate counterparties for costs incurred as a result of changes in laws and regulations (including tax legislation) or in the interpretations of such laws and regulations, or as a result of regulatory penalties that may be suffered by the counterparty as a consequence of the transaction. Certain receivables securitization transactions include indemnifications requiring the repurchase of the receivables if the particular transaction becomes invalid. As of March 31, 2006, Nortel had approximately $286 of securitized receivables which were subject to repurchase under this provision, in which case Nortel would assume all rights to collect such receivables. The indemnification provisions generally expire upon expiration of the securitization agreements, which extend through 2006, or collection of the receivable amounts by the counterparty.

25

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

Nortel is generally unable to estimate the maximum potential liability for these types of indemnification guarantees as certain agreements do not specify a maximum amount and the amounts are dependent upon the outcome of future contingent events, the nature and likelihood of which cannot be determined at this time.

Historically, Nortel has not made any significant indemnification payments or receivable repurchases under such agreements and no significant liability has been accrued in the consolidated financial statements with respect to the obligations associated with these guarantees.

### (f) Other indemnification agreements

Nortel has also entered into other agreements that provide indemnifications to counterparties in certain transactions including investment banking agreements, guarantees related to the administration of capital trust accounts, guarantees related to the administration of employee benefit plans, indentures for its outstanding public debt and asset sale agreements (other than the business sale agreements noted above). These indemnification agreements generally require Nortel to indemnify the counterparties for costs incurred as a result of changes in laws and regulations (including tax legislation) or in the interpretations of such laws and regulations and/or as a result of losses from litigation that may be suffered by the counterparties arising from the transactions. These types of indemnification agreements normally extend over an unspecified period of time from the date of the transaction and do not typically provide for any limit on the maximum potential payment amount. In addition, Nortel has entered into indemnification agreements with certain of its directors and officers for the costs reasonably incurred in any proceeding in which they become involved by reason of their position as directors or officers to the extent permitted under applicable law.

The nature of such agreements prevents Nortel from making a reasonable estimate of the maximum potential amount it could be required to pay to its counterparties and directors and officers. The difficulties in assessing the amount of liability result primarily from the unpredictability of future changes in laws, the inability to determine how laws apply to counterparties and the lack of limitations on the potential liability.

Historically, Nortel has not made any significant indemnification payments under such agreements and no significant liability has been accrued in the consolidated financial statements with respect to the obligations associated with these guarantees.

On March 17, 2006, in connection with the Proposed Class Action Settlement, Nortel announced that Nortel, NNL and the lead plaintiffs reached an agreement on the related insurance and corporate governance matters including Nortel's and NNL's insurers agreeing to pay $228.5 in cash towards the settlement and Nortel and NNL agreeing with their insurers to certain indemnification obligations. Nortel and NNL believe that these indemnification obligations would be unlikely to materially increase their total cash payment obligations under the Proposed Class Action Settlement, as defined in note 18. The insurance payments would not reduce the amounts payable by Nortel or NNL as disclosed in this report. Nortel and NNL also agreed to certain corporate governance enhancements, including the codification or certain of their current governance practices (such as the annual election by their directors of a non-executive Board chair) in their respective Board of Directors written mandates and the inclusion in their respective annual proxy circular and proxy statement of a report on certain of their other governance practices (such as the process followed for the annual evaluation of the Board, committees of the Board and individual directors). The Proposed Class Action Settlement would contain no admission of wrongdoing by Nortel, NNL or any of the other defendants.

### Product warranties

The following summarizes the accrual for product warranties that was recorded as part of other accrued liabilities in the consolidated balance sheets as of March 31, 2006:

| | |
|---|---:|
| Balance as of December 31, 2005 ....................................................... | $208 |
| Payments......................................................................... | (65) |
| Warranties issued ............................................................... | 56 |
| Revisions ........................................................................ | 1 |
| Balance as of March 31, 2006 .......................................................... | $200 |

HIGHLY CONFIDENTIAL                                    NNC-NNL06705393 / 338

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

**12. Commitments**

*Bid, performance related and other bonds*

Nortel has entered into bid, performance related and other bonds associated with various contracts. Bid bonds generally have a term of less than twelve months, depending on the length of the bid period for the applicable contract. Other bonds primarily relate to warranty, rental, real estate and customs contracts. Performance related and other bonds generally have a term of twelve months and are typically renewed, as required, over the term of the applicable contract. The various contracts to which these bonds apply generally have terms ranging from two to five years. Any potential payments which might become due under these bonds would be related to Nortel's non-performance under the applicable contract. Historically, Nortel has not had to make material payments under these types of bonds and does not anticipate that any material payments will be required in the future.

The following table sets forth the maximum potential amount of future payments under bid, performance related and other bonds, net of the corresponding restricted cash and cash equivalents, as of the following dates:

|  | March 31, 2006 | December 31, 2005 |
|---|---|---|
| Bid and performance related bonds[a] | $221 | $222 |
| Other bonds[b] | 42 | 44 |
| Total bid, performance related and other bonds | $263 | $266 |

(a) Net of restricted cash and cash equivalent amounts of $36 and $36 as of March 31, 2006 and December 31, 2005, respectively.

(b) Net of restricted cash and cash equivalent amounts of $28 and $31 as of March 31, 2006 and December 31, 2005, respectively.

*Venture capital financing*

Nortel has entered into agreements with selected venture capital firms where the venture capital firms make and manage investments in start-ups and emerging enterprises. The agreements require Nortel to fund requests for additional capital up to its commitments when and if requests for additional capital are solicited by the venture capital firm. Nortel had remaining commitments, if requested, of $23 as of March 31, 2006. These commitments expire at various dates through to 2012.

**13. Financing arrangements and variable interest entities**

*Customer financing*

Pursuant to certain financing agreements with its customers, Nortel is committed to provide future financing in connection with purchases of Nortel's products and services. Generally, Nortel facilitates customer financing agreements through customer loans, and Nortel's commitment to extend future financing is generally subject to conditions related to funding, fixed expiration or termination dates, specific interest rates and qualified purposes. Where permitted, customer financings may also be utilized by Nortel's customers for their own working capital purposes and may be in the form of equity financing. Nortel's internal credit committee monitors and attempts to limit Nortel's exposure to credit risk. Nortel's role in customer financing consists primarily of arranging financing by matching its customers' needs with external financing sources. Nortel only provides direct customer financing where a compelling strategic customer or technology purpose supports such financing. The following table sets forth customer financing related information and commitments, excluding discontinued operations, as of the following dates:

|  | March 31, 2006 | December 31, 2005 |
|---|---|---|
| Drawn and outstanding — gross | $46 | $51 |
| Provisions for doubtful accounts | (36) | (35) |
| Drawn and outstanding — net[a] | 10 | 16 |
| Undrawn commitments | 50 | 50 |
| Total customer financing | $60 | $66 |

(a) Included short-term and long-term amounts. Short-term and long-term amounts were included in accounts receivable — net and other assets, respectively, in the consolidated balance sheets.

27

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

During the three months ended March 31, 2006 and 2005, net customer financing bad debt expense as a result of settlements and adjustments to other existing provisions was not significant.

During the three months ended March 31, 2006, Nortel did not enter into any new agreements to restructure and/or settle customer financing and related receivables. During the three months ended March 31, 2005, Nortel entered into certain agreements to restructure and/or settle various customer financing and related receivables, including rights to accrued interest. As a result of these transactions, Nortel received cash consideration of approximately $110 ($36 of the proceeds was included in discontinued operations), to settle outstanding receivables with a net carrying value of $100 ($33 of the net carrying value was included in discontinued operations).

During the three months ended March 31, 2006 and 2005, Nortel reduced undrawn customer financing commitments by nil and $5, respectively, as a result of the expiration or cancellation of commitments and changing customer business plans. As of March 31, 2006, all undrawn commitments were available for funding under the terms of the financing agreements.

### *Consolidation of variable interest entities*

Certain lease financing transactions of Nortel were structured through single transaction variable interest entities ("VIEs") that did not have sufficient equity at risk as defined in FASB Interpretation No. ("FIN") 46R "Consolidation of Variable Interest Entities — An Interpretation of ARB No. 51" ("FIN 46R"). Nortel consolidates one VIE for which Nortel was considered the primary beneficiary following the guidance of FIN 46, on the basis that Nortel retained certain risks associated with guaranteeing recovery of the unamortized principal balance of the VIEs debt, which represented the majority of the risks associated with the respective VIEs activities. The amount of the guarantees will be adjusted over time as the underlying debt matures. As of March 31, 2006, Nortel's consolidated balance sheet included $83 of long-term debt and $83 of plant and equipment — net related to this VIE. These amounts represented both the collateral and maximum exposure to loss as a result of Nortel's involvement with the VIE.

Effective April 1, 2005, Nortel began consolidating a VIE for which Nortel was considered the primary beneficiary under FIN 46R. The VIE is a cellular phone operator in Russia. Loans to this entity comprise the majority of the entity's subordinated financial support. No creditor of the VIE has recourse to Nortel. This entity's financial results have been consolidated using the most recent financial information available.

On June 3, 2005, Nortel acquired NGS, a VIE, for which Nortel was considered the primary beneficiary under FIN 46R. The consolidated financial results of Nortel include NGS's operating results from the date of the acquisition.

On November 2, 2005, Nortel formed LG-Nortel Co. Ltd. ("LG-Nortel"), a joint venture with LG Electronics Inc., which is a VIE. Nortel is considered the primary beneficiary under FIN 46R. No creditor of the entity has recourse to Nortel. This entity's financial results have been consolidated from the date of formation.

Nortel consolidates certain assets and liabilities held in an employee benefit trust in Canada, a VIE, for which Nortel was considered the primary beneficiary under FIN 46R.

As of March 31, 2006, Nortel did not have any variable interests related to transfers of financial assets. Nortel has other financial interests and contractual arrangements which would meet the definition of a variable interest under FIN 46R, including investments in other companies and joint ventures, customer financing arrangements, and guarantees and indemnification arrangements. As of March 31, 2006, none of these other interests or arrangements were considered significant variable interests and, therefore, were not consolidated on the basis that they were not material VIE's to Nortel's results of operations and statement of cash flows.

28

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

**14. Earnings (loss) per common share**

The following table details the weighted-average number of Nortel Networks Corporation common shares outstanding for the purposes of computing basic and diluted earnings (loss) per common share for the three months ended:

| | March 31, 2006[a] | March 31, 2005[a] |
|---|---|---|
| *(Number of common shares in millions)* | | |
| Basic weighted-average shares outstanding: | | |
| Issued and outstanding | 4,339 | 4,273 |
| Prepaid forward purchase contracts[b] | — | 65 |
| Basic weighted-average shares outstanding | 4,339 | 4,338 |
| Weighted-average shares dilution adjustments: | | |
| Dilutive stock options | — | — |
| Diluted weighted-average shares outstanding | 4,339 | 4,338 |
| Weighted-average shares dilution adjustments — exclusions: | | |
| Stock options | 292 | 293 |
| 4.25% Convertible Senior Notes[a] | 180 | 180 |

(a) As a result of the net loss from continuing operations for the three months ended March 31, 2006 and 2005, all potential dilutive securities were considered anti-dilutive.

(b) The impact of the minimum number of common shares to be issued upon settlement of the prepaid forward purchase contracts on a weighted-average basis was nil and 65 for the three months ended March 31, 2006 and 2005, respectively. As of December 31, 2005, the remaining 3,840 forward purchase contracts outstanding were settled by the holders.

**15. Comprehensive income (loss)**

The following are the components of comprehensive income (loss), net of tax, for the three months ended:

| | March 31, 2006 | March 31, 2005 |
|---|---|---|
| Net earnings (loss) | $(167) | $(104) |
| Other comprehensive income (loss) adjustments: | | |
| Change in foreign currency translation adjustment | 28 | (67) |
| Unrealized gain (loss) on investments — net[a] | 18 | (7) |
| Minimum pension liability adjustment — net | (1) | 2 |
| Unrealized derivative gain (loss) on cash flow hedges — net[b] | (6) | (8) |
| Comprehensive income (loss) | $(128) | $(184) |

(a) Certain securities deemed available-for-sale by Nortel were measured at fair value. Unrealized holding gains (losses) related to these securities were excluded from net earnings (loss) and were included in accumulated other comprehensive income (loss) until realized. Unrealized gain (loss) on investments was net of tax of nil and nil for the three months ended March 31, 2006 and 2005, respectively.

(b) During the three months ended March 31, 2006 and 2005, $5 and $8 of net derivative gains (losses) were reclassified to other income (expense) — net, respectively. Nortel estimates that $2 of net derivative gains (losses) included in accumulated other comprehensive income (loss) will be reclassified into net earnings (loss) within the next 12 months.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 341

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

**16. Capital stock and stock-based compensation plans**

*Common shares*

Nortel Networks Corporation is authorized to issue an unlimited number of common shares without nominal or par value. The outstanding number of common shares included in shareholders' equity consisted of the following as of the following dates:

| | Number | $ |
|---|---|---|
| *(Number of common shares in thousands)* | | |
| **Common shares:** | | |
| Balance as at December 31, 2005 | 4,339,163 | $33,932 |
| Shares issued pursuant to: | | |
| Stock option plans | 175 | 3 |
| Balance as at March 31, 2006 | 4,339,338 | $33,935 |

*Stock options*

Prior to 2005, Nortel granted options to purchase Nortel Networks Corporation common shares under two existing stock option plans, the Nortel Networks Corporation 2000 Stock Option Plan ("2000 Plan")and the Nortel Networks Corporation 1986 Stock Option Plan As Amended and Restated ("1986 Plan"). Under these two plans, options to purchase Nortel Networks Corporation common shares could also be granted to employees and, under the 2000 Plan, options could be also granted to directors of Nortel. The options under both plans entitle the holders to purchase one common share at a subscription price of not less than 100% of market value on the effective date of the grant. Subscription prices are stated and payable in U.S. dollars for U.S. options and in Canadian dollars for Canadian options. Generally, options granted prior to 2003 vest 33⅓% on the anniversary date of the grant for three years. Commencing in 2003, options granted generally vest 25% each year over a four year period on the anniversary date of the grant. The committee of the Board of Directors of Nortel that administers both plans generally has the discretion to vary the period during which the holder has the right to exercise options and, in certain circumstances, may accelerate the right of the holder to exercise options, but in no case shall the term of an option exceed ten years. Nortel meets its obligations under both plans by issuing Nortel Networks Corporation common shares. Common shares remaining available for grant after December 31, 2005 under the 2000 Plan and the 1986 Plan (and common shares that become available upon expiration or termination of options granted under such plans) have been rolled-over to the Nortel 2005 Stock Incentive Plan ("SIP") effective January 1, 2006.

During 2005, the shareholders of Nortel approved the SIP stock-based compensation plan, which permits grants of stock options, including incentive stock options, stock appreciation rights ("SARs"), performance stock units ("PSUs") and Restricted Stock Units ("RSUs"). Stock options granted under the SIP may be granted only to employees of Nortel. The subscription price for each share subject to an option shall not be less than 100% of the market value on the effective date of the grant. Subscription prices are stated and payable in U.S. dollars for U.S. options and in Canadian dollars for Canadian options. The options to be granted generally vest 25% each year over a four year period on the anniversary date of the grant. The committee of the Board of Directors of Nortel that administers the SIP generally has the discretion to vary the period during which the holder has the right to exercise options, but in no case shall all options granted become exercisable within the first year, and in certain circumstances, may accelerate the right of the holder to exercise options, but in no case shall the exercise period exceed ten years. Nortel meets its obligations under the SIP by issuing Nortel Networks Corporation common shares.

Stand-alone SARs or SARs in tandem with options may be granted under the SIP. Upon the exercise of a vested SAR (and in the case of a tandem SAR, the related option), a holder will be entitled to receive payment of an amount equal to the excess of the market value of a common share of Nortel Networks Corporation on the date of exercise over the subscription or base price under the SAR. On the exercise of a tandem SAR, the related option shall be cancelled. As of March 31, 2006 and December 31, 2005, there were no SARs outstanding.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 342

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

As of March 31, 2006, the maximum number of common shares authorized by the shareholders and reserved for issuance by the Board of Directors of Nortel under each of the 1986 Plan, 2000 Plan and SIP is as follows:

|  | Maximum (Number of common shares in thousands) |
|---|---|
| **1986 Plan** |  |
| Issuable to employees[a] | 469,718 |
| **2000 Plan** |  |
| Issuable to non-employee directors | 500 |
| Issuable to employees | 94,000 |
| **SIP** |  |
| Issuable to employees | 122,000 |

(a) As of March 31, 2006, the maximum number of Nortel Networks Corporation common shares with respect to which options may be granted in any given year under the 1986 Plan is three percent of Nortel Networks Corporation common shares issued and outstanding at the commencement of the year, subject to certain adjustments.

In January 1995, a key contributor stock option program (the "Key Contributor Program") was established that applies to both the 1986 Plan and the 2000 Plan. Under that program, a participant was granted concurrently an equal number of initial options and replacement options. The initial options and the replacement options expire ten years from the date of grant. The initial options have an exercise price equal to the market value of a common share of Nortel Networks Corporation on the date of grant and the replacement options have an exercise price equal to the market value of a common share of Nortel Networks Corporation on the date all of the initial options are fully exercised, provided that in no event will the exercise price be less than the exercise price of the initial options. Replacement options are generally exercisable commencing 36 months after the date all of the initial options are fully exercised, provided that the participant beneficially owns a number of common shares of Nortel Networks Corporation at least equal to the number of common shares subject to the initial options less any common shares sold to pay for options costs, applicable taxes and brokerage costs associated with the exercise of the initial options. No Key Contributor Program options were granted for the three months ended March 31, 2006 and 2005, respectively, under either stock option plan.

During the three months ended March 31, 2006, approximately 385,438 Nortel Networks Corporation common shares were issued pursuant to the exercise of stock options granted under the 1986 Plan and 168,484 Nortel Networks Corporation common shares were issued pursuant to the exercise of stock options granted under the 2000 Plan. There were no stock options granted or exercised under the SIP.

Nortel also assumed stock option plans in connection with the acquisition of various companies. Common shares of Nortel Networks Corporation are issuable upon the exercise of options under the assumed stock option plans, although no further options may be granted under the assumed plans. The vesting periods for options granted under these assumed stock option plans may differ from the SIP, 2000 Plan and 1986 Plan, but are not considered to be significant to Nortel's overall use of stock-based compensation.

The following is a summary of the total number of outstanding stock options and the maximum number of stock options available for grant:

|  | Outstanding options (Thousands) | Weighted-average exercise price | Aggregate Intrinsic value (Thousands) | Available for grant (Thousands) |
|---|---|---|---|---|
| Balance at December 31, 2005 | 302,918 | $ 9.43 | $44,600 | 169,638 |
| Granted options under all stock option plans | — | $ — | $ — | — |
| Options exercised | (572) | $ 2.32 | $ 469 | — |
| Options forfeited | (1,832) | $ 4.12 | $ — | 1,832 |
| Options expired | (8,403) | $16.20 | $ — | 7,937 |
| Balance at March 31, 2006 | 292,111 | $ 9.28 | $42,757 | 179,407 |

31

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 343

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

The aggregate intrinsic value for the exercises under all share-based payment arrangements was nil for the three months ended March 31, 2005.

The following table summarizes information about stock options outstanding and exercisable as of March 31, 2006:

| | Options outstanding | | | | Options exercisable | | |
|---|---|---|---|---|---|---|---|
| Range of exercise prices | Number outstanding (Thousands) | Weighted-average remaining contractual life (In years) | Weighted-average exercise price | Aggregate Intrinsic value (Thousands) | Number exercisable (Thousands) | Weighted-average exercise price | Aggregate Intrinsic value (Thousands) |
| $0.0084 - $2.3900 | 46,089 | 6.6 | $ 2.33 | $33,374 | 34,907 | $ 2.32 | $25,516 |
| $2.3901 - $3.5852 | 78,047 | 8.5 | $ 2.97 | $ 9,383 | 14,618 | $ 3.08 | $ 230 |
| $3.5853 - $5.3779 | 6,933 | 4.9 | $ 5.04 | $ — | 6,924 | $ 5.05 | $ — |
| $5.3780 - $8.0670 | 73,424[a] | 5.5 | $ 6.95 | $ — | 62,218 | $ 6.83 | $ — |
| $8.0671 - $12.1006 | 40,441[a] | 4.4 | $ 9.34 | $ — | 34,415 | $ 9.45 | $ — |
| $12.1007 - $18.1510 | 12,037 | 1.9 | $14.64 | $ — | 11,437 | $14.62 | $ — |
| $18.1511 - $27.2267 | 16,080 | 3.3 | $22.69 | $ — | 15,797 | $22.74 | $ — |
| $27.2268 - $40.8402 | 9,100 | 3.4 | $32.75 | $ — | 9,090 | $32.75 | $ — |
| $40.8403 - $61.2605 | 6,413 | 3.2 | $53.92 | $ — | 6,411 | $53.92 | $ — |
| $61.2606 - $102.2916 | 3,547 | 3.6 | $74.04 | $ — | 3,534 | $74.01 | $ — |
| | 292,111 | 5.9 | $ 9.28 | $42,757 | 199,351[b] | $11.75 | $25,746 |

(a) Included approximately 31,809 stock options granted under the Exchange Program.

(b) Total number of exercisable options for the periods ended March 31, 2006 and December 31, 2005 were 199,351 and 185,470, respectively. As of March 10, 2006, the exercise of otherwise exercisable stock options was suspended, until such time, at the earliest, that Nortel and NNL are in compliance with U.S. and Canadian regulatory securities filing requirements.

The aggregate intrinsic value in the preceding table represents the total pre-tax intrinsic value based on Nortel's closing stock price of $3.05 as of March 31, 2006, which would have been received by the stock option holders had all stock option holders exercised their options as of that date. The total number of in-the-money options exercisable as of March 31, 2006 was 35,613,084.

*Nonvested shares*

Nortel's nonvested share awards consist of options granted under all of Nortel's stock option plans and RSU awards granted under the SIP. The fair value of each nonvested share award is calculated using the stock price at the date of grant. A summary of the status of non-vested share awards as of March 31, 2006 and changes during the quarter ended March 31, 2006 is presented below.

| | Options | | RSU awards | |
|---|---|---|---|---|
| | Shares (Thousands) | Weighted-average grant date fair value | Shares (Thousands) | Weighted-average grant date fair value[a] |
| Nonvested shares at December 31, 2005 | 117,448 | $4.09 | 6,972 | $3.15 |
| Granted | — | $ — | — | $ — |
| Vested | (22,856) | $4.62 | — | $ — |
| Forfeited | (1,832) | $4.12 | — | $ — |
| Nonvested shares at March 31, 2006 | 92,760 | $3.96 | 6,972 | $3.15 |

(a) RSU awards do not have an exercise price therefore grant date weighted average fair value has been calculated.

As of March 31, 2006, there was $140 of total unrecognized compensation cost related to Nortel's non-vested stock options that is expected to be recognized over a weighted average period of 2.7 years.

32

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 344

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

*Restricted stock unit plan and Performance stock units*

RSUs and PSUs can be issued under the SIP. RSUs generally become vested based on employment and PSUs generally become vested subject to the attainment of performance criteria. Each RSU or PSU granted under the SIP generally represents one common share of Nortel Networks Corporation. Vested units will generally be settled upon vesting by delivery of a common share of Nortel Networks Corporation for each vested unit or payment of a cash amount equal to the market value of a common share of Nortel Networks Corporation at the time of settlement, as determined in the discretion of the Compensation and Human Resources Committee (formerly the joint leadership resources committee) ("CHRC").

The number of RSUs (in millions) granted as of periods ended March 31, 2006 and March 31, 2005, were nil and nil, respectively. All of the RSUs awarded to executive officers in 2005 and going forward vest in equal installments on the first three anniversary dates of the date of the award. The RSUs awarded in 2005 under the SIP and going forward, will be settled in shares at the time of vesting or, in the discretion of the CHRC, cash. As at March 31, 2006, there are no PSUs outstanding.

A summary of the total number of outstanding RSU awards granted during the three months ended March 31, 2006 and the changes during the quarter ended March 31, 2006 is presented below:

|  | Outstanding RSU awards granted | Weighted-average grant date fair value[a] | Weighted average remaining contractual life | Aggregate intrinsic value |
|---|---|---|---|---|
|  | (Thousands) |  | (In years) | (Thousands) |
| Balance at December 31, 2005 | 6,972 | $3.15 | 9.7 | $— |
| Granted RSU awards | — | $ — | — | $— |
| Awards exercised | — | $ — | — | $— |
| Awards forfeited | — | $ — | — | $— |
| Awards expired | — | $ — | — | $— |
| Balance at March 31, 2006 | 6,972 | $3.15 | 9.5 | $— |

(a) RSU awards do not have an exercise price therefore grant date weighted average fair value has been calculated.

The aggregate intrinsic value for the RSU awards was nil for the three months ended March 31, 2006, since the weighted average grant date fair value of the RSUs was in excess of Nortel's closing stock price of $3.05 as of March 31, 2006. As of March 31, 2006, there were no vested RSU awards.

*Stock-based compensation*

Effective January 1, 2006, Nortel adopted SFAS 123R, which revises SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"). Nortel adopted SFAS 123R using the modified prospective transition method and accordingly the results of prior periods have not been restated. This method requires that the provisions of SFAS 123R are generally applied only to share-based awards granted, modified, repurchased, or cancelled on January 1, 2006 and thereafter. Nortel voluntarily adopted fair value accounting for share-based awards effective January 1, 2003 (under SFAS 123 as amended by SFAS No. 148 "Accounting for Stock-Based Compensation — Transition and Disclosure an amendment of SFAS 123). Using the prospective method, Nortel measured the cost of share-based awards granted or modified on or after January 1, 2003 using the fair value of the award and began recognizing that cost in the consolidated statements of operations over the vesting period. Nortel will recognize the remaining cost of these awards over the remaining service period following the provisions of SFAS 123R. For those grants prior to January 1, 2003, that are nonvested and outstanding as of January 1, 2006, Nortel will recognize the remaining cost of these awards over the remaining service period as required by the new standard.

Nortel did not accelerate the recognition of expense for those awards that applied to retirement eligible employees prior to the adoption of SFAS 123R, but rather expensed those awards over the vesting period. Therefore, an expense of approximately $1 was recognized during the three months ended March 31, 2006, that would have not been recognized had Nortel accelerated recognition of the expense prior to January 1, 2006, the adoption date of SFAS 123R.

33

HIGHLY CONFIDENTIAL

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

SFAS 123R requires forfeitures to be estimated at the time of grant in order to estimate the amount of share-based awards that will ultimately vest. As share-based compensation expense recognized in the consolidated statement of operations for the three months ended March 31, 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. Prior to the adoption of SFAS 123R Nortel recognized forfeitures as they occurred. Nortel recorded a gain of $9 as a cumulative effect of an accounting change, as a result of the change in accounting for forfeitures under SFAS 123R. In Nortel's pro forma information required under SFAS 123 for the periods prior to fiscal 2006, Nortel accounted for forfeitures as they occurred.

In November 2005, the FASB issued FASB Staff Position ("FSP") No. 123R-3, "Transition Election Related to Accounting for the Tax Effects of Share-Based Payment Awards" ("FSP FAS 123R-3"). Nortel elected to adopt the alternative transition method to SFAS 123R in accounting for the tax effects of share-based payment awards to employees. The elective method comprises a computational component that establishes a beginning balance of the Additional Paid In Capital ("APIC") pool related to employee compensation and a simplified method to determine the subsequent impact on the APIC pool of employee awards that are fully vested and outstanding upon the adoption of SFAS 123R. As of March 31, 2006, the APIC balance was nil, and there were no other material impacts as a result of the adoption of FSP FAS 123R-3.

### Pro forma disclosure

Had Nortel applied the fair value based method to all stock-based awards in all periods, reported net earnings (loss) and earnings (loss) per common share would have been adjusted to the pro forma amounts indicated below for the three months ended:

|  | March 31, 2005 |
|---|---|
| Net earnings (loss) — reported | $ (104) |
| Stock-based compensation — reported | 17 |
| Stock-based compensation — pro forma[a] | (25) |
| Net earnings (loss) — pro forma | $ (112) |
| Basic earnings (loss) per common share: | |
| Reported | $(0.02) |
| Pro forma | $(0.03) |
| Diluted earnings (loss) per common share: | |
| Reported | $(0.02) |
| Pro forma | $(0.03) |

(a) Stock-based compensation — pro forma expense was net of tax of nil.

Nortel estimates the fair value of stock options using the Black-Scholes-Merton option-pricing model, consistent with the provisions of SFAS 123R and SAB 107, and Nortel's prior period pro forma disclosures of net earnings, including share-based compensation. The key input assumptions used to estimate the fair value of stock options include the grant price of the award, the expected term of the options, the volatility of Nortel's stock, the risk-free rate, the annual forfeiture rate and Nortel's dividend yield. The expected term of the options is estimated based on historical grants with similar vesting periods. The expected volatility of Nortel's stock is estimated using the daily historical stock prices over a period equal to the expected term. Nortel believes that the Black-Scholes-Merton option-pricing model utilized to develop the underlying assumptions, is appropriate in calculating the fair values of Nortel's stock options.

As of March 31, 2006, the annual forfeiture rates applied to the Nortel stock option plans and the RSU awards were 13% and 7%, respectively.

34

HIGHLY CONFIDENTIAL

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

Stock-based compensation recorded during the three months ended was as follows:

| | March 31, 2006 | March 31, 2005 |
|---|---|---|
| **Stock-based compensation:** | | |
| Stock option expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $14[b] | $18 |
| RSU expense[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | — |
| DSU expense[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (1) |
| Total stock-based compensation reported — net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . | $16 | $17 |

---

(a) Compensation related to employer portion of RSUs and Director Stock Units ("DSUs") was net of tax of nil in each period.

(b) Includes a reduction of stock option expense of approximately $9, recognized during the three months ended March 31, 2006, to align Nortel's recognition of stock option forfeitures with the adoption of SFAS 123R.

The compensation cost that has been charged against income for Nortel's share-based award plans was $14 for the three months ended March 31, 2006, and $18 for the three months ended March 31, 2005. The total income tax benefit recognized in the statements of operations for stock-based award compensation was nil for the three months ended March 31, 2006 and 2005.

As of March 31, 2006, there was $183 of total unrecognized compensation cost related to Nortel's stock option plans that is expected to be recognized over a weighted average period of 2 years. As of March 31, 2006, there was $18 of total unrecognized compensation cost related to Nortel's RSU awards granted which is expected to be recognized over a weighted average period of 3.2 years.

Cash received from exercise under all share-based payment arrangements was $1 for the three months ended March 31, 2006 and nil for the three months ended March 31, 2005. Tax benefits realized by Nortel related to these exercises were nil and nil, for the three months ended March 31, 2006 and 2005, respectively.

During the three months ended March 31, 2006 and the three months ended March 31, 2005, no stock options or RSUs were granted.

### Suspension of Nortel Stock based compensation plans

As a result of Nortel's March 10, 2006 announcement, that it and NNL would have to delay the filing of its 2005 Annual Reports, Nortel suspended, as of March 10, 2006, the grant of any new equity and exercise or settlement of previously outstanding awards under the SIP; the purchase of Nortel Networks Corporation common shares under the stock purchase plans for eligible employees in eligible countries that facilitate the acquisition of Nortel Networks Corporation common shares; the exercise of outstanding options granted under the 2000 Plan and the 1986 Plan, or the exercise of outstanding options granted under employee stock option plans previously assumed by Nortel in connection with mergers and acquisitions; and the purchase of units in a Nortel Networks stock fund or purchase of Nortel Networks Corporation common shares under defined contribution and investment plans, until such time as, at the earliest, Nortel is in compliance with U.S. and Canadian regulatory securities filing requirements. Nortel intends to lift the suspension of these plans as soon as practicable.

### 17. Related party transactions

In the ordinary course of business, Nortel engages in transactions with certain of its equity-owned investees that are under or are subject to Nortel's significant influence and with joint ventures of Nortel. These transactions are sales and purchases of goods and services under usual trade terms and are measured at their exchange amounts.

35

HIGHLY CONFIDENTIAL     

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

Transactions with related parties for the three months ended March 31 are summarized as follows:

|  | 2006 | 2005 |
|---|---|---|
| Revenues | $ 1 | $— |
| **Purchases:** | | |
| Bookham | $ 3 | $ 4 |
| LG Electronics Inc.[a] | 53 | — |
| Sasken Communications Technology Ltd.[b] | 8 | — |
| Other | 9 | — |
| Total | $73 | $ 4 |

(a) LG Electronics Inc. ("LG"), is a minority interest holder of LG-Nortel. Nortel's purchases relate primarily to certain inventory related items. As of March 31, 2006, accounts payable to LG were $37, compared to $18 as at December 31, 2005.

(b) Nortel currently owns a minority interest in Sasken Communications Technology Ltd. ("Sasken"). Nortel's purchases from Sasken relate primarily to software and other software development related purchases. As of March 31, 2006, accounts payable to Sasken were $3, compared to $2 as at December 31, 2005.

As at March 31, 2006 and December 31, 2005, accounts receivable from related parties were $8 and $8, respectively. As at March 31, 2006 and December 31, 2005, accounts payable to related parties were $45 and $26, respectively.

Nortel purchases certain inventory for its Enterprise Solutions and Packet Networks business from Bookham, Inc. ("Bookham"), a related party due to Nortel's equity interest in Bookham. Bookham is a sole supplier of key optical components to Nortel's optical networks solutions in its Enterprise Solutions and Packet Networks segment. As of March 31, 2006 and December 31, 2005, accounts payable to Bookham were nil and nil, respectively.

Nortel currently relies on Bookham as its sole supplier of key components to Nortel's optical networks solutions in its Enterprise Solutions and Packet Networks segment. On December 2, 2004, Nortel and Bookham entered into a restructuring agreement which, among other changes, extended the maturity date of a senior secured note (the "Series B Note") by one year from November 8, 2005 to November 8, 2006, and eliminated the conversion feature of a senior unsecured note (the "Series A Note"). Bookham also agreed to secure the Series A Note, provide additional collateral for the Series A Note and the Series B Note, and provide Nortel with other debt protection covenants. On January 13, 2006, Nortel received $20 in cash plus accrued interest from Bookham to retire its $20 aggregate principal amount Series A secured note receivable due November 2007. In addition, Nortel sold its $25.9 aggregate principal amount Series B secured note receivable due November 2006 for approximately $26 to a group of unrelated investors.

On January 13, 2006, Nortel announced that it had entered into an agreement with Bookham to amend the current supply agreement and extend certain purchase commitments, which were scheduled to expire on April 29, 2006. Under the terms of the amended supply agreement, Nortel will purchase a minimum of $72 in product from Bookham during the calendar year of 2006. In addition, Nortel has entered into an agreement on the same date as the supply agreements under which Nortel agreed not to sell the approximately 4 million shares of Bookham common stock that it currently owns until after June 30, 2006.

### 18.  Contingencies

Subsequent to the February 15, 2001 announcement in which Nortel provided revised guidance for financial performance for the 2001 fiscal year and the first quarter of 2001, Nortel and certain of its then current officers and directors were named as defendants in more than twenty-five purported class action lawsuits. These lawsuits in the U.S. District Courts for the Eastern District of New York, the Southern District of New York and the District of New Jersey and in courts in the provinces of Ontario, Québec and British Columbia in Canada, on behalf of shareholders who acquired Nortel Networks Corporation securities as early as October 24, 2000 and as late as February 15, 2001, allege, among other things, violations of U.S. federal and Canadian provincial securities laws. These matters have also been the subject of review by Canadian and U.S. securities regulatory authorities. On May 11, 2001, the defendants filed motions to dismiss and/or stay in connection with the three proceedings in Québec primarily based on the factual allegations lacking substantial connection to Québec and the inclusion of shareholders resident in Québec in the class claimed in the Ontario lawsuit. The plaintiffs in two of these proceedings in Québec obtained court approval for discontinuances of their

36

**NORTEL NETWORKS CORPORATION**

**Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)**

proceedings on January 17, 2002. The motion to dismiss and/or stay the third proceeding (the "Québec I Action") was heard on November 6, 2001 and the court deferred any determination on the motion to the judge who will hear the application for authorization to commence a class proceeding. On December 6, 2001, the defendants filed a motion seeking leave to appeal that decision. The motion for leave to appeal was dismissed on March 11, 2002. On October 16, 2001, an order in the U.S. District Court for the Southern District of New York was filed consolidating twenty-five of the related U.S. class action lawsuits into a single case, appointing class plaintiffs and counsel for such plaintiffs (the "Nortel I Class Action"). The plaintiffs served a consolidated amended complaint on January 18, 2002. On December 17, 2001, the defendants in the British Columbia action (the "British Columbia Action") served notice of a motion requesting the court to decline jurisdiction and to stay all proceedings on the grounds that British Columbia is an inappropriate forum. The motion has been adjourned at the plaintiffs' request to a future date to be set by the parties.

On April 1, 2002, Nortel filed a motion to dismiss the Nortel I Class Action on the ground that it failed to state a cause of action under U.S. federal securities laws. On January 3, 2003, the District Court denied the motion to dismiss the consolidated amended complaint for the Nortel I Class Action. The plaintiffs served a motion for class certification on March 21, 2003. On May 30, 2003, the defendants served an opposition to the motion for class certification. Plaintiffs' reply was served on August 1, 2003. The District Court held oral arguments on September 3, 2003 and issued an order granting class certification on September 5, 2003. On September 23, 2003, the defendants filed a motion in the U.S. Court of Appeals for the Second Circuit for permission to appeal the class certification decision. The plaintiffs' opposition to the motion was filed on October 2, 2003. On November 24, 2003, the U.S. Court of Appeals for the Second Circuit denied the motion. On March 10, 2004, the District Court approved the form of notice to the class, which was published and mailed.

On July 17, 2002, a purported class action lawsuit (the "Ontario Claim") was filed in the Ontario Superior Court of Justice, Commercial List, naming Nortel, certain of its current and former officers and directors and its auditors as defendants. The factual allegations in the Ontario Claim are substantially similar to the allegations in the Nortel I Class Action. The Ontario Claim is on behalf of all Canadian residents who purchased Nortel Networks Corporation securities (including options on Nortel Networks Corporation securities) between October 24, 2000 and February 15, 2001. The plaintiffs claim damages of Canadian $5,000, plus punitive damages in the amount of Canadian $1,000, prejudgment and postjudgment interest and costs of the action. On September 23, 2003, the Court issued an order allowing the plaintiffs to proceed to amend the Ontario Claim and requiring that the plaintiffs serve class certification materials by December 15, 2003. On September 24, 2003, the plaintiffs filed a notice of discontinuance of the original action filed in Ontario. On December 12, 2003, plaintiffs' counsel requested an extension of time to January 21, 2004 to deliver class certification materials. On January 21, 2004, plaintiffs' counsel advised the Court that the two representative plaintiffs in the action no longer wished to proceed, but counsel was prepared to deliver draft certification materials pending the replacement of the representative plaintiffs. On February 19, 2004, the plaintiffs' counsel advised the Court of a potential new representative plaintiff. On February 26, 2004, the defendants requested the Court to direct the plaintiffs' counsel to bring a motion to permit the withdrawal of the current representative plaintiffs and to substitute the proposed representative plaintiff. On June 8, 2004, the Court signed an order allowing a Second Fresh as Amended Statement of Claim that substituted one new representative plaintiff, but did not change the substance of the prior claim.

Subsequent to the March 10, 2004 announcement in which Nortel indicated it was likely that it would need to revise its previously announced unaudited results for the year ended December 31, 2003, and the results reported in certain of its quarterly reports for 2003, and to restate its previously filed financial results for one or more earlier periods, Nortel and certain of its then current and former officers and directors were named as defendants in 27 purported class action lawsuits. These lawsuits in the U.S. District Court for the Southern District of New York on behalf of shareholders who acquired Nortel Networks Corporation securities as early as February 16, 2001 and as late as May 15, 2004, allege, among other things, violations of U.S. federal securities laws. These matters are also the subject of investigations by Canadian and U.S. securities regulatory and criminal investigative authorities. On June 30, 2004, the Court signed Orders consolidating the 27 class actions (the "Nortel II Class Action") and appointing lead plaintiffs and lead counsel. The plaintiffs filed a consolidated class action complaint on September 10, 2004, alleging a class period of April 24, 2003 through and including April 27, 2004. On November 5, 2004, Nortel and the Audit Committee Defendants filed a motion to dismiss the consolidated class action complaint. On January 18, 2005, the lead plaintiffs, Nortel and the Audit Committee Defendants reached an agreement in which Nortel would withdraw its motion to dismiss and plaintiffs would dismiss Count II of the complaint, which asserts a claim against the Audit Committee Defendants. On May 13, 2005, the plaintiffs filed a motion for class certification. On September 16, 2005, lead plaintiffs filed an amended consolidated

37

## NORTEL NETWORKS CORPORATION

### Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

class action complaint that rejoined the previously dismissed Audit Committee Defendants as parties to the action. On March 16, 2006, the plaintiffs withdrew their motion for class certification.

On July 28, 2004, Nortel and NNL, and certain of their current and former officers and directors, were named as defendants in a purported class proceeding in the Ontario Superior Court of Justice on behalf of shareholders who acquired Nortel Networks Corporation securities as early as November 12, 2002 and as late as July 28, 2004 (the "Ontario I Action"). This lawsuit alleges, among other things, breaches of trust and fiduciary duty, oppressive conduct and misappropriation of corporate assets and trust property in respect of the payment of cash bonuses to executives, officers and employees in 2003 and 2004 under the Nortel Return to Profitability bonus program and seeks damages of Canadian $250 and an order under the Canada Business Corporations Act directing that an investigation be made respecting these bonus payments.

On February 16, 2005, a motion for authorization to institute a class action on behalf of residents of Québec, who purchased Nortel securities between January 29, 2004 and March 15, 2004, was filed in the Québec Superior Court naming Nortel as a defendant (the "Québec II Action"). The motion alleges that Nortel made misrepresentations about 2003 financial results.

On March 9, 2005, Nortel and certain of its current and former officers and directors and its auditors were named as defendants in a purported class action proceeding filed in the Ontario Superior Court of Justice, Commercial List, on behalf of all Canadian residents who purchased Nortel Networks Corporation securities from April 24, 2003 to April 27, 2004 (the "Ontario II Action"). This lawsuit alleges, among other things, negligence, misrepresentations, oppressive conduct, insider trading and violations of Canadian corporation and competition laws in connection with Nortel's 2003 financial results and seeks damages of Canadian $3,000, plus punitive damages in the amount of Canadian $1,000, prejudgment and postjudgment interest and costs of the action.

On September 30, 2005, Nortel announced that a mediator had been jointly appointed by the two U.S. District Court Judges presiding over the Nortel I Class Action and the Nortel II Class Action to oversee settlement negotiations between Nortel and the lead plaintiffs in these two actions. The appointment of the mediator was pursuant to a request by Nortel and the lead plaintiffs for the Courts' assistance to facilitate the possibility of achieving a global settlement regarding these actions. The settlement discussions before the mediator are confidential and non-binding on the parties without prejudice to their respective positions in the litigation. The mediator, United States District Court Judge the Honorable Robert W. Sweet, is not presiding over either of these actions. On February 8, 2006, Nortel announced that, as a result of this mediation process, Nortel and the lead plaintiffs in the Nortel I Class Action and the Nortel II Class Action reached an agreement in principle to settle these lawsuits (the "Proposed Class Action Settlement").

The Proposed Class Action Settlement would be part of, and is conditioned on, Nortel reaching a global settlement encompassing all pending shareholder class actions and proposed shareholder class actions commenced against Nortel and certain other defendants following Nortel's announcement of revised financial guidance during 2001, and Nortel's revision of its 2003 financial results and restatement of other prior periods, including, without limitation, the Nortel I Class Action, the Nortel II Class Action, the Ontario Claim, the Québec I Action, the British Columbia Action, the Ontario I Action, the Québec II Action and the Ontario II Action. The Proposed Class Action Settlement is also conditioned on the receipt of all required court, securities regulatory and stock exchange approvals. The Proposed Class Action Settlement would contain no admission of wrongdoing by Nortel or any of the other defendants.

The Proposed Class Action Settlement was also conditioned on Nortel and the lead plaintiffs reaching agreement on corporate governance related matters and the resolution of insurance related issues. On March 17, 2006, Nortel announced that it and the lead plaintiff had reached such an agreement with Nortel's insurers agreeing to pay $228.5 in cash towards the settlement and Nortel agreeing with its insurers to certain indemnification obligations. On April 3, 2006, the insurance proceeds were placed into escrow by the insurers. Nortel believes that these indemnification obligations would be unlikely to materially increase its total cash payment obligations under the Proposed Class Action Settlement. The insurance payments would not reduce the amounts payable by Nortel as noted below. Nortel also agreed to certain corporate governance enhancements, including the codification of certain of its current governance practices in its Board of Directors written mandate and the inclusion in its annual proxy circular and proxy statement of a report on certain of its other governance practices.

Under the terms of the proposed global settlement contemplated by the Proposed Class Action Settlement, Nortel would make a payment of $575 in cash, issue 628,667,750 of Nortel Networks Corporation common shares (representing 14.5%

38

HIGHLY CONFIDENTIAL