- potential difficulties in integrating new products, software, internal controls, businesses and operations in an effective and timely manner or at all;
- our customers or customers of the acquired businesses may defer purchase decisions as they evaluate the impact of the acquisitions on our future product strategy;
- potential loss of key employees of the acquired businesses;
- diversion of the attention of our senior management from the operation of our daily business;
- entering new markets in which we have limited experience and where competitors may have a stronger market presence;
- the potential adverse effect on our cash position as a result of all or a portion of an acquisition purchase price being paid in cash;
- potential issuance of equity or equity related securities as a result of all or a portion of an acquisition purchase price being paid with such equity or equity related securities, which could result in the significant dilution of existing equity positions; and
- potential assumption of liabilities.

Our inability to successfully operate and integrate newly acquired businesses appropriately, effectively and in a timely manner could have a material adverse effect on our ability to take advantage of further growth in demand for IP-optimized network solutions and other advances in technology, as well as on our revenues, gross margins and expenses.

Acquisitions are inherently risky, and no assurance can be given that our previous or future acquisitions will be successful and will not materially adversely affect our business, operating results or financial condition. Failure to manage and successfully integrate acquisitions could materially harm our business and operating results.

### Our business may suffer if our strategic alliances are not consummated or are not successful.

We have announced a number of strategic alliances with suppliers, developers and members in our industry to facilitate product compatibility, encourage adoption of industry standards or to offer complementary product or service offerings to meet customer needs, including our joint venture with LG Electronics and our proposed joint venture with Huawei. Our business may be adversely affected if we are not able to reach definite agreements with respect to previously announced strategic alliances in a timely manner or at all. Furthermore, we believe that cooperation between multiple vendors is critical to the success of our communications solutions for both service providers and enterprises. In some cases, the companies with which we have strategic alliances also compete against us in some of our business areas. If a member of a strategic alliance fails to perform its obligations, if the relationship fails to develop as expected or if the relationship is terminated, we could experience delays in product availability or impairment of our relationships with our customers. Our business may also be adversely affected if our choice of strategic alliance collaborators does not enable us to leverage our existing and future product and service offerings in order to capitalize on expected future market trends (such as convergence in the enterprise market).

### If we fail to adequately evolve our financial and managerial control and reporting systems and processes, our ability to manage and grow our business will be negatively affected.

Our ability to successfully offer our products and implement our business plan in a rapidly evolving market depends upon an effective planning and management process. We will need to continue to improve our financial and managerial control and our reporting systems and procedures through initiatives such as our global finance transformation project, which includes the global implementation of SAP, in order to manage our business more effectively in the future. If we fail to continue to implement improved systems and processes, our ability to manage our business and results of operation could be adversely affected.

### Our risk management strategy may be not effective or not commensurate to the risks we are facing.

We maintain global blanket policies of insurance of the types and in the amounts of comparable companies of the same size and in the same industry. We limit our exposure to risk through a combination of levels of self-insurance and the purchase of various insurance coverages. We have retained certain self-insurance risks with respect to certain employee benefit programs such as worker's compensation, group health insurance, life insurance and other types of insurance. Our insurance program is based on various lines and limits of coverage that provides what we think are appropriate levels of retained and insured risks. Insurance is arranged with reliable, financially stable insurance companies as rated by A. M. Best Company, Inc. We combine comprehensive risk management programs and the active management of claims handling and litigation processes by using internal professionals and external technical expertise to manage the risk we retain.

HIGHLY CONFIDENTIAL        NNC-NNL06705393 / 451

If this risk management strategy is not effective or is not commensurate to the risks we are facing, these risks could have a material adverse effect on our business, results of operations, financial condition and liquidity.

**Risks Relating to Our Liquidity, Financing Arrangements and Capital**

> *Cash flow fluctuations may affect our ability to fund our working capital requirements or achieve our business objectives in a timely manner. Additional sources of funds may not be available on acceptable terms or at all.*

Our working capital requirements and cash flows historically have been, and are expected to continue to be, subject to quarterly and yearly fluctuations, depending on such factors as timing and size of capital expenditures, levels of sales, timing of deliveries and collection of receivables, inventory levels, customer payment terms, customer financing obligations and supplier terms and conditions. As of December 31, 2005, our primary source of liquidity was cash and we expect this to continue throughout 2006. Based on past performance and current expectations we do not expect our operations to generate significant cash flow in 2006. In addition, in 2006, we expect our continued transfer of certain manufacturing assets to Flextronics, and the sale of other non-core assets to continue to be a source of cash at similar levels as 2005 amounts. We estimate that as our cash will be sufficient to fund the changes to our business model in accordance with our strategic plan (see ''Business Overview — Our Strategy and Outlook'' in the MD&A section of this report), fund our investments and meet our customer commitments for at least the next twelve month period commencing December 31, 2005, including cash expenditures outlined under ''Liquidity and Capital Resources — Future Uses of Liquidity'' in the ''MD&A'' section of this report. In making this estimate, we have not assumed the need to make any payments in respect of fines or other penalties or judgments or settlements in connection with our pending civil litigation not encompassed by the Proposed Class Action Settlement or regulatory or criminal investigations related to the restatements, which could have a material adverse effect on our business, results of operations, financial condition and liquidity, other than anticipated professional fees and expenses. As more fully discussed under ''Material adverse legal judgments, fines, penalties or settlements, including the Proposed Class Action Settlement, could have a material adverse effect on our business, results of operations, financial condition and liquidity, which could be very significant,'' these payments could materially and adversely affect our cash position, our available cash and cash flow from operations may not be sufficient to pay them, and additional sources of funding may not be available to us on commercially reasonable terms or at all.

We and NNI agreed to a demand right exercisable at any time after May 31, 2006 pursuant to which we will be required to take all reasonable actions to issue senior unsecured debt securities in the capital markets to repay the 2006 Credit Facility. There can be no assurance that we will be able to refinance the 2006 Credit Facility by issuing unsecured debt securities. Any inability to refinance the 2006 Credit Facility would materially adversely affect our liquidity. In addition, we continue to monitor the capital markets for opportunities to refinance upcoming debt maturities, as more fully discussed under ''Our high level of debt could materially and adversely affect our business, results of operations, financial condition and liquidity.'' If we are unable to refinance our existing debt that is coming due in 2007, should we decide to do so, the amount of cash available to finance our operations and other business activities and our ability to pay any judgments, fines, penalties or settlements, if any, would be significantly reduced, which could have a material adverse effect on our business, results of operations, financial condition and liquidity.

Other factors, discussed more fully elsewhere in this section, may also result in our net cash requirements exceeding our current expectations and negatively affect the amount of cash available to finance our operations and other business activities, including:

- a greater than expected slowdown in capital spending by service providers and other customers or other changes to our business model could result in materially lower revenues and cash flows;
- costs incurred in connection with restructuring efforts may be higher than originally planned and may not lead to the anticipated cost savings;
- changes in market demand for networking products, which may require increased expenditures to develop and market different technologies;
- we may need to make larger contributions to our defined benefit plans in North America and the United Kingdom, or U.K., and retirement plans in other countries;
- an increased portion of our cash and cash equivalents may be restricted as cash collateral for customer performance bonds and contracts if the industry or our current condition deteriorates; and
- an inability of our subsidiaries to provide us with funding in sufficient amounts could adversely affect our ability to meet our obligations.

We may seek additional funds from liquidity-generating transactions and other sources of external financing (which may include a variety of debt, convertible debt and/or equity financings), but these financings may not be available to us on

HIGHLY CONFIDENTIAL

acceptable terms or at all. In addition, we may not continue to have access to the EDC Support Facility when and as needed. Our inability to manage cash flow fluctuations resulting from the above factors and the potential reduction, expiry or termination of the EDC Support Facility could have a material adverse effect on our ability to fund our working capital requirements from operating cash flows and other sources of liquidity or to achieve our business objectives in a timely manner. These circumstances could, for example:

- make it more difficult for us to satisfy our obligations under our outstanding debt and other obligations and to pay any judgments, fines, penalties or settlements in connection with our pending civil litigation and investigations;
- require us to delay or reduce capital expenditures or the introduction of new products, sell assets and/or forego business opportunities such as acquisitions, R&D projects or product design enhancements;
- increase our vulnerability to economic downturns, adverse industry conditions and adverse developments in our business, and limit our flexibility in planning for or reacting to such changes; and
- place us at a competitive disadvantage compared to competitors that have greater liquidity.

***Our high level of debt could materially and adversely affect our business, results of operations, financial condition and liquidity.***

In order to finance our business, we have incurred significant levels of debt. As of December 31, 2005, we had approximately $3.9 billion of debt reflected on our consolidated balance sheet, of which $3.6 billion was notes outstanding under our public debt indentures and $162 million was outstanding under the EDC Support Facility. In February 2006, we borrowed $1.3 billion under the 2006 Credit Facility and repaid $1.275 billion of notes issued under our public debt indentures. In the future, we may need to obtain additional sources of funding, which may include debt or convertible debt financing. A high level of debt, arduous or restrictive terms and conditions related to accessing certain sources of funding, or any significant reduction in, or access to, the EDC Support Facility, could materially and adversely affect our ability to fund the operations of our business.

Other effects of our high degree of leverage include the following:

- it could be more difficult for us to satisfy our obligations under our outstanding debt and other obligations;
- we may have difficulty borrowing money in the future or accessing other sources of funding;
- we may have difficulty refinancing our existing debt, should we decide to do so, including the $150 million of outstanding 7.40% Notes due June 15, 2006 issued by an indirect wholly owned finance subsidiary of NNL and the $1.3 billion outstanding under the 2006 Credit Facility due in February 2007;
- we may need to dedicate a substantial portion of our cash and cash flow from operations to debt payments, thereby significantly reducing the availability of our cash and cash flow from operations for other purposes, including payments of judgments, settlements, fines or other penalties and our operational needs (for example, in order to meet our debt service obligations, we may be required to delay or reduce capital expenditures or the introduction of new products, sell assets and/or forego business opportunities such as acquisitions, R&D projects or product design enhancements);
- increase our vulnerability to economic downturns, adverse industry conditions and adverse developments in our business, and limit our flexibility in planning for or reacting to such changes; and
- place us at a competitive disadvantage compared to competitors that have less debt.

***Covenants under the 2006 Credit Facility and the EDC Support Facility impose operating and financial restrictions on us, which may prevent us from capitalizing on business opportunities.***

The agreements governing our credit facilities contain covenants that:

- limit our ability to create liens on our assets and the assets of substantially all of our subsidiaries in excess of certain baskets and permitted amounts;
- limit our ability and the ability of substantially all of our subsidiaries to merge, consolidate, amalgamate with another person;
- require us to maintain a minimum level of Adjusted EBITDA beginning with the twelve-month period ending March 31, 2006 (for more information on Adjusted EBITDA, see "Liquidity an Capital Resources — Future Sources of Liquidity — Credit facilities" in the "MD&A" section of this report);
- require us to maintain at least $1 billion of unrestricted cash at all times; and
- restrict the ability of our subsidiaries to incur funded debt in excess of certain amounts without guaranteeing NNL's obligations under the EDC Support Facility.

39

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 453

In addition, we may in the future incur and guarantee debt with more restrictive covenants (including maintenance financial tests) that impose significant operating and financial restrictions, including restrictions on our ability to engage in other business activities that may be in our best long-term interests.

Failure to comply with the covenants under the credit facilities could materially and adversely affect our business, results of operations, financial condition and liquidity.

> ***Certain provisions in the indentures governing certain of our public debt issues, together with the provisions of the 2006 Credit Facility, severely limit our ability to incur certain types of additional secured debt while the secured loans under the 2006 Credit Facility are outstanding.***

Provisions in the indentures governing certain of our public debt issues require us to grant security to the holders of such debt on an equal and ratable basis with any new secured debt in excess of certain amounts. Because we have granted security to secure a portion of the 2006 Credit Facility without equally and ratably securing all of our outstanding public debt securities, we are currently severely limited in our ability to incur certain types of additional secured debt. Our failure to provide security in accordance with the terms of these indentures upon our incurrence of certain types of additional secured debt would constitute events of default under such indentures, the 2006 Credit Facility and the EDC Support Facility, which could have a significant impact on our liquidity and could adversely affect our ability to conduct business or access the capital markets and could adversely impact our credit ratings.

> ***An increased portion of our cash and cash equivalents may be restricted as cash collateral if we are unable to secure alternative support for certain obligations arising out of our normal course business activities.***

The EDC Support Facility may not provide all the support we require for certain of our obligations arising out of our normal course of business activities. As of December 31, 2005, there was approximately $162 million of outstanding support utilized under the EDC Support Facility, approximately $142 million of which was outstanding under the small bond sub-facility. In addition, bid and performance related bonds with terms that extend beyond December 31, 2007, which, absent any early termination of the EDC Support Facility, is the expiry date of this facility, are currently not eligible for the support provided by the EDC Support Facility. Given that the EDC Support Facility is used to support bid and performance bonds with varying terms, including those with at least 365 days, we may need to increase our use of cash collateral to support these obligations beginning on January 1, 2007 absent a further extension of the facility. Unless EDC agrees to extend the facility or agrees to provide support outside the scope of the facility, we may be required to provide cash collateral to support these obligations. We cannot provide any assurance that we will reach an agreement with EDC on these matters. EDC may also suspend its obligation to issue NNL any additional support if events occur that have a material adverse effect on NNL's business, financial position or results of operations. If we do not have access to sufficient support under the EDC Support Facility, and if we are unable to secure alternative support, an increased portion of our cash and cash equivalents may be restricted as cash collateral, which could adversely affect our ability to fund some of our normal course business activities, capital expenditures, R&D projects and our ability to borrow in the future.

> ***An inability of our subsidiaries to provide us with funding in sufficient amounts could adversely affect our ability to meet our obligations.***

We may at times depend primarily on loans, dividends or other forms of financing from our subsidiaries to meet our obligations to pay interest and principal on outstanding public debt and to pay corporate expenses. If our subsidiaries are unable to pay dividends or provide us with loans or other forms of financing in sufficient amounts, or if there are any restrictions on the transfer of cash between us and our subsidiaries, including commercial limitations on transfers of cash pursuant to our joint ventures commitments, our liquidity and our ability to meet our obligations could be adversely affected.

> ***We may need to make larger contributions to our defined benefit plans in the future.***

We currently maintain various defined benefit plans in North America and the U.K. which cover various categories of employees and retirees, which represent our major retirement plans. In addition, we have smaller retirement plans in other countries. Our obligations to make contributions to fund benefit obligations under these plans are based on actuarial valuations, which themselves are based on certain assumptions about the long-term operation of the plans, including employee turnover and retirement rates, the performance of the financial markets and interest rates. If experience differs from the assumptions, the amounts we are obligated to contribute to the plans may increase. In particular, the

40

HIGHLY CONFIDENTIAL

performance of the financial markets is difficult to predict, particularly in periods of high volatility in the equity markets. If the financial markets perform lower than the assumptions, we may have to make larger contributions in the future than we would otherwise have to make and expenses related to defined benefit plans could increase. Similarly, changes in interest rates can impact our contribution requirements. In a low interest rate environment, the likelihood of required contributions in the future increases. If interest rates are lower in the future than we assume they will be, then we would probably be required to make larger contributions than we would otherwise have to make. In addition, we are currently in discussions with the Trustee of our pension plan in the U.K. to establish a long-term funding agreement, which would increase the level of contributions in 2006 and in subsequent years.

> ***Industry concerns could continue and increase our exposure to our customers' credit risk and the risk that our customers will not be able to fulfill their payment obligations to us under customer financing arrangements.***

The competitive environment in which we operate has required us in the past to provide significant amounts of medium-term and long-term customer financing. Customer financing arrangements may include financing in connection with the sale of our products and services, funding for certain non-product and service costs associated with network installation and integration of our products and services, financing for working capital and equity financing. While we have significantly reduced our customer financing exposure, we expect we may continue in the future to provide customer financing to customers in areas that are strategic to our core business activity.

We expect to continue to hold most current and future customer financing obligations for longer periods prior to any possible placement with third-party lenders, due to, among other factors, recent economic uncertainty in various countries, adverse capital market conditions, our current credit condition, adverse changes in the credit quality of our customers and reduced demand for telecommunications financing in capital and bank markets. In addition, risks generally associated with customer financing, including the risks associated with new technologies, new network construction, market demand and competition, customer business plan viability and funding risks, may require us to hold certain customer financing obligations over a longer term. We may not be able to place any of our current or future customer financing obligations with third-party lenders on acceptable terms.

From time to time, certain of our customers may experience financial difficulties and fail to meet their financial obligations. When this occurs, we may incur charges for provisions related to certain trade and customer financing receivables. Any future financial difficulties experienced by any of our customers could have a material adverse effect on our cash flow and operating results.

> ***Our stock price has historically been volatile and further declines in the market price of our publicly traded securities may negatively impact our ability to make future acquisitions, raise capital, issue debt and retain employees.***

Our publicly traded securities have experienced, and may continue to experience, substantial price volatility, including considerable decreases, particularly as a result of variations between our actual or anticipated financial results and the published expectations of analysts and as a result of announcements by our competitors and us, including our announcements related to our multiple restatements, the Independent Review, the Revenue Independent Review, our management changes, the regulatory and criminal investigations, the Proposed Class Action Settlement, the other civil litigation proceedings and related matters. The proposed issuance of 628,667,750 Nortel Networks Corporation common shares (representing 14.5% of our equity as of February 7, 2006) under the Proposed Class Action Settlement, if finalized and approved, will result in dilution of existing equity positions and may increase volatility in the market price of Nortel Networks Corporation common shares or our other publicly traded securities. Our credit quality, any equity or equity related offerings, operating results and prospects, restatements of previously issued financial statements, any exclusion of our publicly traded securities from any widely followed stock market indices, among other factors, will also affect the market price of our publicly traded securities.

The stock markets have experienced extreme price fluctuations that have affected the market price and trading volumes of many technology and telecommunications companies in particular, with potential consequential negative effects on the trading of securities of those companies. A major decline in the capital markets generally, or an adjustment in the market price or trading volumes of our publicly traded securities, may negatively impact our ability to raise capital, issue debt, secure customer business, retain employees or make future acquisitions. These factors, as well as general economic and geopolitical conditions, and continued negative events within the technology sector, may in turn have a material adverse effect on the market price of our publicly traded securities.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 455

*The proposed share consolidation could result in a lower total market capitalization or adversely affect the liquidity of our common shares. A consolidation could make it more difficult or more expensive for shareholders to sell their shares.*

Numerous factors and contingencies could affect our share price following a share consolidation, including the status of the market for the common shares at the time, our reported results of operations in future periods, and general economic, geopolitical, stock market and industry conditions. Accordingly, the market price of our common shares may not be sustainable at the direct arithmetic result of the consolidation, and may be lower. If the market price of our common shares is lower than it was before the consolidation, our total market capitalization (the aggregate value of all common shares at the then market price) after the consolidation may be lower than before the consolidation.

While a higher share price may help generate investor interest in Nortel Networks Corporation common shares, the proposed consolidation may not result in a per share market price that will attract institutional investors or investment funds and such share price may not satisfy the investing guidelines of institutional investors or investment funds. As a result, the trading liquidity of NNC's common shares may not necessarily improve. If the consolidation is implemented and the market price of NNC's common shares declines, the percentage decline may be greater than would occur in the absence of the consolidation. The market price of NNC's common shares will, however, also be based on our performance and other factors, which are unrelated to the number of common shares outstanding. Furthermore, the liquidity of NNC's common shares could be adversely affected by the reduced number of common shares that would be outstanding after the consolidation.

A consolidation may result in some shareholders owning "odd lots" of less than 100 common shares of NNC on a post-consolidation basis. Odd lots may be more difficult to sell, or require greater transaction costs per share to sell, than shares in "board lots" of even multiples of 100 shares.

**ITEM 1B.**    **Unresolved Staff Comments**

None.

**ITEM 2.**    **Properties**

At December 31, 2005, we operated 189 sites around the world occupying approximately 12.3 million square feet. The following table sets forth additional information regarding these sites:

| | Number of Sites | | |
|---|---|---|---|
| **Type of Site\*** | **Owned** | **Leased** | **Geographic Locations** |
| Manufacturing and repair . . . | 5 | — | Canada, EMEA, CALA and the Asia Pacific region |
| Distribution centers . . . . . . . | — | 8 | United States, EMEA, CALA and the Asia Pacific region |
| Offices (administration, sales and field service) . . . . . . . . . | 4 | 161 | All geographic regions |
| Research and development | 4 | 7 | United States, Canada, EMEA and the Asia Pacific region |
| TOTAL\*\* . . . . . . . . . . . . . . | 13 | 176 | |

\*   Indicates the primary use of the site. A number of our sites are mixed-use facilities.
\*\*   Excludes approximately 6.1 million square feet, consisting primarily of leased and/or vacant property designated as part of a planned square footage reduction in connection with our restructuring activities commenced in 2001. At December 31, 2005 approximately 3.6 million square feet of such property was sub-leased.

At December 31, 2005, our facilities were primarily used, on a consolidated basis, approximately as follows:

- 31% by Global Operations;
- 14% by Carrier Packet Networks;
- 11% by Enterprise Networks;
- 6% by CDMA Networks;
- 8% by GSM and UMTS Networks; and
- 30% by one or more of our reporting segments and/or corporate facilities.

In 2005, we continued to reduce the square footage of our global facilities to better align ourselves with current market conditions. We believe our facilities are suitable and adequate, and have sufficient capacity to meet our current needs. We continue to evaluate our future real estate needs based on the current industry environment and taking into account our business requirements. In 2005, we entered into an agreement to sell our facility in Brampton, Ontario to Rogers

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 456

Communications Inc. The sale, completed on January 4, 2006, includes approximately one million square feet, fixtures and certain personal property located at the facility and 63 acres of land.

## ITEM 3. Legal Proceedings

Subsequent to the February 15, 2001 announcement in which Nortel provided revised guidance for financial performance for the 2001 fiscal year and the first quarter of 2001, Nortel and certain of its then current officers and directors were named as defendants in more than twenty-five purported class action lawsuits. These lawsuits in the U.S. District Courts for the Eastern District of New York, the Southern District of New York and the District of New Jersey and in courts in the provinces of Ontario, Québec and British Columbia in Canada, on behalf of shareholders who acquired Nortel Networks Corporation securities as early as October 24, 2000 and as late as February 15, 2001, allege, among other things, violations of U.S. federal and Canadian provincial securities laws. These matters also have been the subject of review by Canadian and U.S. securities regulatory authorities. On May 11, 2001, the defendants filed motions to dismiss and/or stay in connection with the three proceedings in Québec primarily based on the factual allegations lacking substantial connection to Québec and the inclusion of shareholders resident in Québec in the class claimed in the Ontario lawsuit. The plaintiffs in two of these proceedings in Québec obtained court approval for discontinuances of their proceedings on January 17, 2002. The motion to dismiss and/or stay the third proceeding (the "Québec I Action") was heard on November 6, 2001 and the court deferred any determination on the motion to the judge who will hear the application for authorization to commence a class proceeding. On December 6, 2001, the defendants filed a motion seeking leave to appeal that decision. The motion for leave to appeal was dismissed on March 11, 2002. On October 16, 2001, an order in the U.S. District Court for the Southern District of New York was filed consolidating twenty-five of the related U.S. class action lawsuits into a single case, appointing class plaintiffs and counsel for such plaintiffs (the "Nortel I Class Action"). The plaintiffs served a consolidated amended complaint on January 18, 2002. On December 17, 2001, the defendants in the British Columbia action (the "British Columbia Action") served notice of a motion requesting the court to decline jurisdiction and to stay all proceedings on the grounds that British Columbia is an inappropriate forum. The motion has been adjourned at the plaintiffs' request to a future date to be set by the parties.

On April 1, 2002, Nortel filed a motion to dismiss the Nortel I Class Action on the ground that it failed to state a cause of action under U.S. federal securities laws. On January 3, 2003, the District Court denied the motion to dismiss the consolidated amended complaint for the Nortel I Class Action. The plaintiffs served a motion for class certification on March 21, 2003. On May 30, 2003, the defendants served an opposition to the motion for class certification. Plaintiffs' reply was served on August 1, 2003. The District Court held oral arguments on September 3, 2003 and issued an order granting class certification on September 5, 2003. On September 23, 2003, the defendants filed a motion in the U.S. Court of Appeals for the Second Circuit for permission to appeal the class certification decision. The plaintiffs' opposition to the motion was filed on October 2, 2003. On November 24, 2003, the U.S. Court of Appeals for the Second Circuit denied the motion. On March 10, 2004, the District Court approved the form of notice to the class, which was published and mailed.

On July 17, 2002, a purported class action lawsuit (the "Ontario Claim") was filed in the Ontario Superior Court of Justice, Commercial List, naming Nortel, certain of its current and former officers and directors and its auditors as defendants. The factual allegations in the Ontario Claim are substantially similar to the allegations in the Nortel I Class Action. The Ontario Claim is on behalf of all Canadian residents who purchased Nortel Networks Corporation securities (including options on Nortel Networks Corporation securities) between October 24, 2000 and February 15, 2001. The plaintiffs claim damages of Canadian $5 billion, plus punitive damages in the amount of Canadian $1 billion, prejudgment and postjudgment interest and costs of the action. On September 23, 2003, the Court issued an order allowing the plaintiffs to proceed to amend the Ontario Claim and requiring that the plaintiffs serve class certification materials by December 15, 2003. On September 24, 2003, the plaintiffs filed a notice of discontinuance of the original action filed in Ontario. On December 12, 2003, plaintiffs' counsel requested an extension of time to January 21, 2004 to deliver class certification materials. On January 21, 2004, plaintiffs' counsel advised the Court that the two representative plaintiffs in the action no longer wished to proceed, but counsel was prepared to deliver draft certification materials pending the replacement of the representative plaintiffs. On February 19, 2004, the plaintiffs' counsel advised the Court of a potential new representative plaintiff. On February 26, 2004, the defendants requested the Court to direct the plaintiffs' counsel to bring a motion to permit the withdrawal of the current representative plaintiffs and to substitute the proposed representative plaintiff. On June 8, 2004, the Court signed an order allowing a Second Fresh as Amended Statement of Claim that substituted one new representative plaintiff, but did not change the substance of the prior claim.

Subsequent to the March 10, 2004 announcement in which Nortel indicated it was likely that it would need to revise its previously announced unaudited results for the year ended December 31, 2003, and the results reported in certain of its

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 457

quarterly reports for 2003, and to restate its previously filed financial results for one or more earlier periods, Nortel and certain of its then current and former officers and directors were named as defendants in 27 purported class action lawsuits. These lawsuits in the U.S. District Court for the Southern District of New York on behalf of shareholders who acquired Nortel Networks Corporation securities as early as February 16, 2001 and as late as May 15, 2004, allege, among other things, violations of U.S. federal securities laws. These matters are also the subject of investigations by Canadian and U.S. securities regulatory and criminal investigative authorities. On June 30, 2004, the Court signed Orders consolidating the 27 class actions (the "Nortel II Class Action") and appointing lead plaintiffs and lead counsel. The plaintiffs filed a consolidated class action complaint on September 10, 2004, alleging a class period of April 24, 2003 through and including April 27, 2004. On November 5, 2004, Nortel and the Audit Committee Defendants filed a motion to dismiss the consolidated class action complaint. On January 18, 2005, the lead plaintiffs, Nortel and the Audit Committee Defendants reached an agreement in which Nortel would withdraw its motion to dismiss and plaintiffs would dismiss Count II of the complaint, which asserts a claim against the Audit Committee Defendants. On May 13, 2005, the plaintiffs filed a motion for class certification. On September 16, 2005, lead plaintiffs filed an amended consolidated class action complaint that rejoined the previously dismissed Audit Committee Defendants as parties to the action. On March 16, 2006, the plaintiffs withdrew their motion for class certification.

On July 28, 2004, Nortel and certain of their current and former officers and directors, were named as defendants in a purported class proceeding in the Ontario Superior Court of Justice on behalf of shareholders who acquired Nortel Networks Corporation securities as early as November 12, 2002 and as late as July 28, 2004 (the "Ontario I Action"). This lawsuit alleges, among other things, breaches of trust and fiduciary duty, oppressive conduct and misappropriation of corporate assets and trust property in respect of the payment of cash bonuses to executives, officers and employees in 2003 and 2004 under the Nortel Return to Profitability bonus program and seeks damages of Canadian $250 million and an order under the Canada Business Corporations Act directing that an investigation be made respecting these bonus payments.

On February 16, 2005, a motion for authorization to institute a class action on behalf of residents of Québec, who purchased Nortel securities between January 29, 2004 and March 15, 2004, was filed in the Québec Superior Court naming Nortel as a defendant (the "Québec II Action"). The motion alleges that Nortel made misrepresentations about 2003 financial results.

On March 9, 2005, Nortel and certain of its current and former officers and directors and its auditors were named as defendants in a purported class action proceeding filed in the Ontario Superior Court of Justice, Commercial List, on behalf of all Canadian residents who purchased Nortel Networks Corporation securities from April 24, 2003 to April 27, 2004 (the "Ontario II Action"). This lawsuit alleges, among other things, negligence, misrepresentations, oppressive conduct, insider trading and violations of Canadian corporation and competition laws in connection with Nortel's 2003 financial results and seeks damages of Canadian $3 billion, plus punitive damages in the amount of Canadian $1 billion, prejudgment and postjudgment interest and costs of the action.

On September 30, 2005, Nortel announced that a mediator had been jointly appointed by the two U.S. District Court Judges presiding over the Nortel I Class Action and the Nortel II Class Action to oversee settlement negotiations between Nortel and the lead plaintiffs in these two actions. The appointment of the mediator was pursuant to a request by Nortel and the lead plaintiffs for the Courts' assistance to facilitate the possibility of achieving a global settlement regarding these actions. The settlement discussions before the mediator are confidential and non-binding on the parties without prejudice to their respective positions in the litigation. The mediator, United States District Court Judge the Honorable Robert W. Sweet, is not presiding over either of these actions. On February 8, 2006, Nortel announced that, as a result of this mediation process, Nortel and the lead plaintiffs in the Nortel I Class Action and the Nortel II Class Action have reached an agreement in principle to settle these lawsuits (the "Proposed Class Action Settlement").

The Proposed Class Action Settlement would be part of, and is conditioned on, Nortel reaching a global settlement encompassing all pending shareholder class actions and proposed shareholder class actions commenced against Nortel and certain other defendants following Nortel's announcement of revised financial guidance during 2001, and Nortel's revision of its 2003 financial results and restatement of other prior periods, including, without limitation, the Nortel I Class Action, the Nortel II Class Action, the Ontario Claim, the Québec I Action, the British Columbia Action, the Ontario I Action, the Québec II Action and the Ontario II Action. The Proposed Class Action Settlement is also conditioned on Nortel and the lead plaintiffs reaching agreement on corporate governance related matters and the resolution of insurance related issues. On March 17, 2006 Nortel announced that it and the lead plaintiff had reached such an agreement with Nortel's insurers to certain indemnification obligations. Nortel believes that these indemnification obligations would be unlikely to materially increase its total cash payment obligations under the Proposed Class Action

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 458

Settlement. The insurance payments would not reduce the amounts payable by Nortel as noted below. Nortel also agreed to certain corporate governance enhancements, including the codification of certain of its current governance practices in its Board of Directors written mandate and the inclusion in its annual proxy circular and proxy statement of a report on certain of its governance practices.

Under the terms of the proposed global settlement contemplated by the Proposed Class Action Settlement, Nortel would make a payment of $575 million in cash, issue 628,667,750 of Nortel Networks Corporation common shares (representing 14.5% of Nortel's equity as of February 7, 2006), and contribute one-half of any recovery in Nortel's existing litigation against Messrs. Frank Dunn, Douglas Beatty and Michael Gollogly, Nortel's former senior officers who were terminated for cause in April 2004, seeking the return of payments made to them under Nortel's bonus plan in 2003. In the event of a share consolidation of Nortel Networks Corporation common shares, the number of Nortel Networks Corporation common shares to be issued pursuant to the Proposed Class Action Settlement would be adjusted accordingly. The total settlement amount would include all plaintiffs' court-approved attorneys' fees. As a result of the Proposed Class Action Settlement, Nortel has established a litigation reserve and recorded a charge to its full-year 2005 financial results of $2,474 million, $575 million of which relates to the proposed cash portion of the Proposed Class Action Settlement, while $1,899 million relates to the proposed equity component and will be adjusted in future quarters based on the fair value of the Nortel Networks Corporation common shares issuable until the finalization of the settlement. Any change to the terms of the Proposed Class Action Settlement would likely result in an adjustment to the litigation reserve. Nortel expects to fund its cash contribution to the settlement, if finalized, out of its then available cash balances.

Nortel and the lead plaintiffs in the Nortel I Class Action and the Nortel II Class Action are continuing discussions towards a definitive settlement agreement based on the Proposed Class Action Settlement. At this time, it is not certain that such an agreement can be reached, that each of the actions noted above can be brought into, or otherwise bound by, the proposed settlement, if finalized, that any such definitive settlement agreement would receive the required court and other approvals in all applicable jurisdictions, and the timing of any developments related to these matters is not certain.

In addition to the shareholder class actions encompassed by the Proposed Class Action Settlement, Nortel is also subject to ongoing regulatory and criminal investigations and related matters relating to its accounting restatements, and to certain other class actions, securities litigation and other actions described below. The Proposed Class Action Settlement and the litigation reserve charge taken in connection with the Proposed Class Action Settlement do not relate to these matters. Nortel has not taken any additional reserves at this time for any potential judgments, fines, penalties or settlements that may arise from these other pending investigations or actions (other than for anticipated professional fees and expenses).

On April 5, 2004, Nortel announced that the Securities Exchange Commission (the ''SEC'') had issued a formal order of investigation in connection with Nortel's previous restatement of its financial results for certain periods, as announced in October 2003, and Nortel's announcements in March 2004 regarding the likely need to revise certain previously announced results and restate previously filed financial results for one or more periods. The matter had been the subject of an informal SEC inquiry. On April 13, 2004, Nortel announced that it had received a letter from the staff of the Ontario Securities Commission (the ''OSC'') advising that there is an OSC Enforcement Staff investigation into the same matters that are the subject of the SEC investigation.

On May 14, 2004, Nortel announced that it had received a federal grand jury subpoena for the production of certain documents, including financial statements and corporate, personnel and accounting records, in connection with an ongoing criminal investigation being conducted by the U.S. Attorney's Office for the Northern District of Texas, Dallas Division. On August 23, 2005, Nortel received an additional federal grand jury subpoena in this investigation seeking production of additional documents, including documents relating to the Nortel Retirement Income Plan and the Nortel Long-Term Investment Plan.

On August 16, 2004, Nortel received a letter from the Integrated Market Enforcement Team of the Royal Canadian Mounted Police (the ''RCMP'') advising Nortel that the RCMP would be commencing a criminal investigation into Nortel's financial accounting situation.

A purported class action lawsuit was filed in the U.S. District Court for the Middle District of Tennessee on December 21, 2001, on behalf of participants and beneficiaries of the Nortel Long-Term Investment Plan (the ''Plan'') at any time during the period of March 7, 2000 through the filing date and who made or maintained Plan investments in Nortel Networks Corporation common shares, under the Employee Retirement Income Security Act (''ERISA'') for Plan-wide relief and alleging, among other things, material misrepresentations and omissions to induce Plan participants to

45

continue to invest in and maintain investments in Nortel Networks Corporation common shares in the Plan. A second purported class action lawsuit, on behalf of the Plan and Plan participants for whose individual accounts the Plan purchased Nortel Networks Corporation common shares during the period from October 27, 2000 to February 15, 2001 and making similar allegations, was filed in the same court on March 12, 2002. A third purported class action lawsuit, on behalf of persons who are or were Plan participants or beneficiaries at any time since March 1, 1999 to the filing date and making similar allegations, was filed in the same court on March 21, 2002. The first and second purported class action lawsuits were consolidated by a new purported class action complaint, filed on May 15, 2002 in the same court and making similar allegations, on behalf of Plan participants and beneficiaries who directed the Plan to purchase or hold shares of certain funds, which held primarily Nortel Networks Corporation common shares, during the period from March 7, 2000 through December 21, 2001. On September 24, 2002, plaintiffs in the consolidated action filed a motion to consolidate all the actions and to transfer them to the U.S. District Court for the Southern District of New York. The plaintiffs then filed a motion to withdraw the pending motion to consolidate and transfer. The withdrawal was granted by the District Court on December 30, 2002. A fourth purported class action lawsuit, on behalf of the Plan and Plan participants for whose individual accounts the Plan held Nortel Networks Corporation common shares during the period from March 7, 2000 through March 31, 2001 and making similar allegations, was filed in the U.S. District Court for the Southern District of New York on March 12, 2003. On March 18, 2003, plaintiffs in the fourth purported class action filed a motion with the Judicial Panel on Multidistrict Litigation to transfer all the actions to the U.S. District Court for the Southern District of New York for coordinated or consolidated proceedings pursuant to 28 U.S.C. section 1407. On June 24, 2003, the Judicial Panel on Multidistrict Litigation issued a transfer order transferring the Southern District of New York action to the U.S. District Court for the Middle District of Tennessee (the ''Consolidated ERISA Action''). On September 12, 2003, the plaintiffs in all the actions filed a consolidated class action complaint. On October 28, 2003, the defendants filed a motion to dismiss the complaint and a motion to stay discovery pending disposition of the motion to dismiss. On March 30, 2004, the plaintiffs filed a motion for certification of a class consisting of participants in, or beneficiaries of, the Plan who held shares of the Nortel Stock Fund during the period from March 7, 2000 through March 31, 2001. On April 27, 2004, the Court granted the defendants' motion to stay discovery pending resolution of defendants' motion to dismiss. On June 15, 2004, the plaintiffs filed a First Amended Consolidated Class Action Complaint that added additional current and former officers and employees as defendants and expanded the purported class period to extend from March 7, 2000 through to June 15, 2004. On June 17, 2005, the plaintiffs filed a Second Amended Consolidated Class Action Complaint that added additional current and former directors, officers and employees as defendants and alleged breach of fiduciary duty on behalf of the Plan and as a purported class action on behalf of participants and beneficiaries of the Plan who held shares of the Nortel Networks Stock Fund during the period from March 7, 2000 through June 17, 2005. On July 8, 2005, the defendants filed a Renewed Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint. On July 29, 2005, plaintiffs filed an opposition to the motion, and defendants filed a reply memorandum on August 12, 2005. On March 30, 2006, the defendants filed an additional motion to dismiss raising the jurisdictional challenge that all former Plan participants, including one of the named plaintiffs, lack standing to assert a claim under ERISA. On April 17, 2006, plaintiffs filed a motion to strike this motion to dismiss.

On May 18, 2004, a purported class action lawsuit was filed in the U.S. District Court for the Middle District of Tennessee on behalf of individuals who were participants and beneficiaries of the Plan at any time during the period of December 23, 2003 through the filing date and who made or maintained Plan investments in Nortel Networks Corporation common shares, under the ERISA for Plan-wide relief and alleging, among other things, breaches of fiduciary duty. On September 3, 2004, the Court signed a stipulated order consolidating this action with the Consolidated ERISA Action described above. On June 16, 2004, a second purported class action lawsuit, on behalf of the Plan and Plan participants for whose individual accounts the Plan purchased Nortel Networks Corporation common shares during the period from October 24, 2000 to June 16, 2004, and making similar allegations, was filed in the U.S. District Court for the Southern District of New York. On August 6, 2004, the Judicial Panel on Multidistrict Litigation issued a conditional transfer order to transfer this action to the U.S. District Court for the Middle District of Tennessee for coordinated or consolidated proceedings pursuant to 28 U.S.C. section 1407 with the Consolidated ERISA Action described above. On August 20, 2004, plaintiffs filed a notice of opposition to the conditional transfer order with the Judicial Panel. On December 6, 2004, the Judicial Panel denied the opposition and ordered the action transferred to the U.S. District Court for the Middle District of Tennessee for coordinated or consolidated proceedings with the Consolidated ERISA Action described above. On January 3, 2005, this action was received in the U.S. District Court for the Middle District of Tennessee and consolidated with the Consolidated ERISA Action described above.

On July 30, 2004, a shareholders' derivative complaint was filed in the U.S. District Court for the Southern District of New York against certain current and former officers and directors, of Nortel alleging, among other things, breach of

46

fiduciary duties owed to Nortel during the period from 2000 to 2003 including by causing Nortel to engage in unlawful conduct or failing to prevent such conduct; causing Nortel to issue false statements; and violating the law (the "U.S. Derivative Action"). On February 14, 2005, the defendants filed motions to dismiss the derivative complaint. On April 29, 2005, the plaintiffs filed an opposition to the motions to dismiss. On May 26, 2005, the defendants filed a reply memorandum in support of the motions to dismiss. On August 24, 2005, the Court issued an opinion and order granting the defendants' motions to dismiss the derivative complaint. Since the plaintiffs did not appeal the dismissal and the time to file an appeal has passed, this action is concluded.

On December 21, 2005, an application was filed in the Ontario Superior Court of Justice for leave to commence a shareholders' derivative action on Nortel's behalf against certain current and former officers and directors, of Nortel alleging, among other things, breach of fiduciary duties, breach of duty of care and negligence, and unjust enrichment in respect of various alleged acts and omissions including causing or permitting Nortel to issue alleged materially false and misleading statements regarding expected growth in revenues and earnings for 2000 and 2001 and endorsing or permitting accounting practices relating to provisions not in compliance with GAAP. The proposed derivative action would seek on Nortel's behalf, among other things, compensatory damages of Canadian $1 billion and punitive damages of Canadian $10 million from the individual defendants (the "Proposed Ontario Derivative Action"). In the Proposed Ontario Derivative Action, the defendants are the same and the allegations are substantially similar to the derivative complaint in the U.S. Derivative Action. The Proposed Ontario Derivative Action would also seek an order directing Nortel's Board of Directors to reform and improve Nortel's corporate governance and internal control procedures as the Court may deem necessary or desirable and an order that Nortel pay the legal fees and other costs in connection with the Proposed Ontario Derivative Action. The application for leave to commence the Proposed Ontario Derivative Action has not yet been heard. However, in response to a motion brought by the applicants to preserve potential claims against the possible expiration of potential limitation periods, Nortel consented to an order, entered February 14, 2006, permitting the applicants to file and have issued by the Court, on an interim basis and pending final determination of the application, the Proposed Ontario Derivative Action without prejudice to Nortel's position on the merits of the application itself. The order provides that no further steps shall be taken against the individual defendants in the Proposed Ontario Derivative Action unless the application is granted and if the application is denied the Proposed Ontario Derivative Action is to be discontinued.

On January 31, 2005, a Statement of Claim was filed in the Ontario Superior Court of Justice by Nortel and NNL against Messrs. Frank Dunn, Douglas Beatty and Michael Gollogly, Nortel's former senior officers who were terminated for cause in April 2004, seeking the return of payments made to them under Nortel's bonus plan in 2003.

On April 20, 2006, Mr. Frank Dunn filed a Notice of Action in the Ontario Superior Court of Justice against Nortel and NNL asserting claims for wrongful dismissal, defamation and mental distress, and seeking punitive, exemplary and aggravated damages, out-of-pocket expenses and special damages, indemnity for legal expenses incurred as a result of civil and administrative proceedings brought against him by reason of his having been an officer or director of the defendants, pre-judgement interest and costs. On April 24, 2006, the court granted Mr. Dunn's request for interim relief to seal the file pending return of his motion to stay his action and seal the file. The court's order was without prejudice to defendant's disclosure obligations under applicable securities laws.

Except as otherwise described herein, in each of the matters described above, the plaintiffs are seeking an unspecified amount of monetary damages. Nortel is unable to ascertain the ultimate aggregate amount of monetary liability or financial impact to Nortel of the above matters, which, unless otherwise specified, seek damages from the defendants of material or indeterminate amounts or could result in fines and penalties. With the exception of $2,474 million Nortel has taken as a charge in its 2005 financial results as a result of the Proposed Class Action Settlement, Nortel has not taken any reserves for any potential judgments, fines, penalties or settlements that may result from these actions, suits, claims, proceedings and investigations. Nortel cannot determine whether these actions, suits, claims, proceedings and investigations will, individually or collectively, have a material adverse effect on the business, results of operations, financial condition or liquidity of Nortel. Except for matters encompassed by the Proposed Class Action Settlement, as to which Nortel and the lead plaintiffs are continuing discussions towards a definitive settlement agreement, Nortel intends to defend these actions, suits, claims and proceedings, litigating or settling cases where in management's judgment it would be in the best interest of shareholders to do so. Nortel will continue to cooperate fully with all authorities in connection with the regulatory and criminal investigations. For information on the risks relating to the legal proceedings, see the "Risk Factors" section of this report.

Nortel is also a defendant in various other suits, claims, proceedings and investigations which arise in the normal course of business.

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 461

*Environmental matters*

Nortel's operations are subject to a wide range of environmental laws in various jurisdictions around the world. Nortel seeks to operate its business in compliance with such laws. Nortel is subject to new European product content laws and product takeback and recycling requirements that will require full compliance commencing in July 2006. As a result of these laws and requirements Nortel will incur additional compliance costs. Although costs relating to environmental matters have not resulted in a material adverse effect on the business, results of operations, financial condition or liquidity in the past, there can be no assurance that Nortel will not be required to incur such costs in the future. Nortel is actively working on compliance plans and risk mitigation strategies relating to the new laws and requirements. Although Nortel is working with its strategic suppliers in this regard, it is possible that some of Nortel's products may not be compliant by the legislated compliance date. In such event, Nortel expects that it will have the ability to rely on available exemptions under the new legislation for most of such products and currently does not expects disruption to the distribution of such products to be significant. Nortel intends to manufacture products that are compliant with all applicable legislation and meet its quality and reliability requirements.

Nortel has a corporate environmental management system standard and an environmental program to promote such compliance. Moreover, Nortel has a periodic, risk-based, integrated environment, health and safety audit program. Nortel's environmental program focuses its activities on design for the environment, supply chain and packaging reduction issues. Nortel works with its suppliers and other external groups to encourage the sharing of non-proprietary information on environmental research.

Nortel is exposed to liabilities and compliance costs arising from its past and current generation, management and disposal of hazardous substances and wastes. As of December 31, 2005, the accruals on the consolidated balance sheet for environmental matters were $27 million. Based on information available as of December 31, 2005, management believes that the existing accruals are sufficient to satisfy probable and reasonably estimable environmental liabilities related to known environmental matters. Any additional liabilities that may result from these matters, and any additional liabilities that may result in connection with other locations currently under investigation, are not expected to have a material adverse effect on the business, results of operations, financial condition and liquidity of Nortel.

Nortel has remedial activities under way at 14 sites which are either currently or previously owned or occupied facilities. An estimate of Nortel's anticipated remediation costs associated with all such sites, to the extent probable and reasonably estimable, is included in the environmental accruals referred to above in an approximate amount of $27 million.

Nortel is also listed as a potentially responsible party under the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") at four Superfund sites in the U.S. (at two of the Superfund sites, Nortel is considered a *de minimis* potentially responsible party). A potentially responsible party within the meaning of CERCLA is generally considered to be a major contributor to the total hazardous waste at a Superfund site (typically 10% or more, depending on the circumstances). A *de minimis* potentially responsible party is generally considered to have contributed less than 10% (depending on the circumstances) of the total hazardous waste at a Superfund site. An estimate of Nortel's share of the anticipated remediation costs associated with such Superfund sites is expected to be *de minimis* and is included in the environmental accruals of $27 million referred to above.

Liability under CERCLA may be imposed on a joint and several basis, without regard to the extent of Nortel's involvement. In addition, the accuracy of Nortel's estimate of environmental liability is affected by several uncertainties such as additional requirements which may be identified in connection with remedial activities, the complexity and evolution of environmental laws and regulations, and the identification of presently unknown remediation requirements. Consequently, Nortel's liability could be greater than its current estimate.

## ITEM 4. Submission of Matters to a Vote of Security Holders

Not applicable.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 462

## PART II

**ITEM 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

The common shares of Nortel Networks Corporation are listed and posted for trading on the New York Stock Exchange in the United States and on the Toronto Stock Exchange in Canada. The following table sets forth the high and low sale prices of the common shares as reported on the New York Stock Exchange composite tape and on the Toronto Stock Exchange.

|      |                |  New York Stock Exchange Composite Tape | | Toronto Stock Exchange (Canadian $) | |
|------|----------------|-------|-------|--------|-------|
|      |                | High  | Low   | High   | Low   |
| 2006 | First Quarter  | $3.43 | $2.73 | $ 4.02 | $3.13 |
| 2005 | Fourth Quarter | 3.57  | 2.75  | 4.22   | 3.21  |
|      | Third Quarter  | 3.38  | 2.51  | 4.06   | 3.07  |
|      | Second Quarter | 2.91  | 2.26  | 3.63   | 2.85  |
|      | First Quarter  | 3.62  | 2.62  | 4.40   | 3.23  |
| 2004 | Fourth Quarter | 3.91  | 2.92  | 4.80   | 3.49  |
|      | Third Quarter  | 5.05  | 3.16  | 6.40   | 4.11  |
|      | Second Quarter | 6.33  | 3.01  | 8.35   | 4.16  |
|      | First Quarter  | 8.50  | 4.30  | 11.94  | 5.53  |

On April 17, 2006, the last sale price on the New York Stock Exchange was $2.77 and on the Toronto Stock Exchange was Canadian $3.17.

On April 17, 2006, approximately 189,245 registered shareholders held 100% of the outstanding common shares of Nortel Networks Corporation. This included the Canadian Depository for Securities and the Depository Trust Company, two clearing corporations, which held a total of approximately 97.23% of the common shares of Nortel Networks Corporation on behalf of other shareholders.

### Securities authorized for issuance under equity compensation plans

For a discussion of Nortel's equity compensation plans, please see "Equity compensation plan information" in Item 12, "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters".

### Dividends

On June 15, 2001, Nortel announced that its Board of Directors decided to discontinue the declaration and payment of common share dividends. As a result, dividends have not been declared and paid on Nortel Networks Corporation common shares since June 29, 2001, and future dividends will not be declared unless and until the Board of Directors decides otherwise. On July 26, 2001, the Board of Directors of Nortel suspended the operation of the Nortel Networks Corporation Dividend Reinvestment and Stock Purchase Plan.

### Canadian tax matters
#### Dividends

Under the United States-Canada Income Tax Convention (1980), or the Convention, Canadian withholding tax of 15% generally applies to the gross amount of dividends (including stock dividends) paid or credited to beneficial owners of Nortel Networks Corporation common shares:

- who are resident in the United States for the purposes of the Convention; and
- who do not hold the shares in connection with a business carried on through a permanent establishment or a fixed base in Canada.

The Convention provides an exemption from withholding tax on dividends paid or credited to certain tax-exempt organizations that are resident in the United States for purposes of the Convention. Persons who are subject to the United States federal income tax on dividends may be entitled, subject to certain limitations, to either a credit or deduction with respect to Canadian income taxes withheld with respect to dividends paid or credited on Nortel Networks Corporation common shares.

49

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 463

**Sales or other dispositions of shares**

Gains on sales or other dispositions of Nortel Networks Corporation common shares by a non-resident of Canada are generally not subject to Canadian income tax, unless the holder realizes the gains in connection with a business carried on in Canada. A gain realized upon the disposition of Nortel Networks Corporation common shares by a resident of the United States that is otherwise subject to Canadian tax may be exempt from Canadian tax under the Convention. Where Nortel Networks Corporation common shares are disposed of by way of an acquisition of such common shares by Nortel, other than a purchase in the open market in the manner in which common shares would normally be purchased by any member of the public in the open market, the amount paid by Nortel in excess of the paid-up capital of such common shares will be treated as a dividend, and will be subject to non-resident withholding tax.

**Sales of unregistered securities**

During 2005, Nortel did not issue any common shares under the Nortel Networks/BCE 1985 Stock Option Plan or the Nortel Networks/BCE 1999 Stock Option Plan. Any common shares issued under these plans are deemed to be exempt from registration under the United States Securities Act of 1933, as amended, pursuant to Regulation S. All funds received by Nortel in connection with the exercise of stock options granted under the two Nortel Networks/BCE stock option plans are transferred in full to BCE pursuant to the terms of the May 1, 2000 plan of arrangement, except for nominal amounts paid to Nortel to round up fractional entitlements into whole shares. Nortel keeps these nominal amounts and uses them for general corporate purposes.

50

## ITEM 6.   Selected Financial Data (Unaudited)

The selected financial data presented below was derived from Nortel Networks Corporation's (''Nortel'') audited consolidated financial statements and related notes thereto included elsewhere in this Annual Report on Form 10-K except for the summarized balance sheet data as of December 31, 2003, 2002 and 2001 and summarized results of operations data for the years ended December 31, 2002 and 2001. Readers should note the following information regarding the selected financial data presented below.

As more fully described in note 4 of the audited consolidated financial statements, Nortel has restated its consolidated financial statements (the ''Third Restatement'').

Nortel has restated its previously reported consolidated financial statements for the fiscal years 2004 and 2003 and the quarters ended March 31, June 30 and September 30, 2005 and 2004. The selected data below includes all such restatement adjustments and covers the years ended December 31, 2005, 2004, 2003, 2002 and 2001. The audited restated consolidated balance sheet as of December 31, 2004 and audited restated consolidated statements of operations, statements of changes in equity and comprehensive income (loss) and statements of cash flows for the 2004 and 2003 fiscal years ended December 31, are included elsewhere in this Annual Report on Form 10-K. Nortel has not issued restated financial statements for the 2002 and 2001 fiscal years or a restated consolidated balance sheet as of December 31, 2003 but selected unaudited information about the Third Restatement adjustments for those periods is presented below. The impact to periods prior to 2001 was de minimus.

| | 2005 | 2004 As restated* | 2003 As restated* | 2002 As restated | 2001 As restated |
|---|---|---|---|---|---|
| | | (Millions of U.S. dollars, except per share amounts) | | | |
| **Results of Operations** | | | | | |
| Revenues | $10,523 | $ 9,516 | $9,932 | $10,738 | $ 18,833 |
| Research and development expense | 1,856 | 1,960 | 1,968 | 2,084 | 3,117 |
| Special charges | | | | | |
|    Goodwill impairment | — | — | — | 595 | 11,426 |
|    Other special charges | 170 | 181 | 288 | 1,500 | 3,397 |
| Shareholder litigation settlement expense | 2,474 | — | — | — | — |
| Operating earnings (loss) | (2,671) | (250) | (126) | (3,133) | (25,039) |
| Other income (expense) — net | 303 | 212 | 466 | (6) | (488) |
| Income tax benefit (expense) | 56 | 30 | 83 | 465 | 2,752 |
| Net earnings (loss) from continuing operations | (2,576) | (256) | 122 | (2,958) | (23,270) |
| Net earnings (loss) from discontinued operations — net of tax | 1 | 49 | 183 | (103) | (2,465) |
| Cumulative effect of accounting changes — net of tax | — | — | (12) | — | 15 |
| Net earnings (loss) | (2,575) | (207) | 293 | (3,061) | (25,720) |
| Basic earnings (loss) per common share | | | | | |
|   — from continuing operations | $ (0.59) | $ (0.06) | $ 0.03 | $ (0.77) | $ (7.30) |
|   — from discontinued operations | 0.00 | 0.01 | 0.04 | (0.03) | (0.78) |
| Basic earnings (loss) per common share | $ (0.59) | $ (0.05) | $ 0.07 | $ (0.80) | $ (8.08) |
| Diluted earnings (loss) per common share | | | | | |
|   — from continuing operations | $ (0.59) | $ (0.06) | $ 0.03 | $ (0.77) | $ (7.30) |
|   — from discontinued operations | 0.00 | 0.01 | 0.04 | (0.03) | (0.78) |
| Diluted earnings (loss) per common share | $ (0.59) | $ (0.05) | $ 0.07 | $ (0.80) | $ (8.08) |
| Dividends declared per common share | — | — | — | — | $ 0.0375 |

HIGHLY CONFIDENTIAL           NNC-NNL06705393 / 465

|                                                  | 2005    | 2004<br>As restated* | 2003<br>As restated<br>(Millions of U.S. dollars) | 2002<br>As restated | 2001<br>As restated |
|--------------------------------------------------|---------|----------------------|-------------------------|---------------------|---------------------|
| **Financial Position as of December 31**         |         |                      |                         |                     |                     |
| Total assets ...................................| $18,112 | $17,775              | $17,189                 | $17,330             | $22,126             |
| Total debt[a] ...................................| 3,896   | 3,891                | 4,017                   | 4,225               | 5,079               |
| Minority interests in subsidiary companies .......| 780     | 626                  | 613                     | 631                 | 654                 |
| Total shareholders' equity .......................| 786     | 3,640                | 3,719                   | 2,974               | 4,791               |

(a) Total debt includes long-term debt, long-term debt due within one year and notes payable.

See notes 3, 7, 10, 22 and 23 to the accompanying audited consolidated financial statements for the impact of accounting changes, special charges, acquisitions, divestitures and closures and the shareholder litigation settlement expense related to the proposed class action litigation settlement, respectively, that affect the comparability of the above selected financial data.

* See note 4 to the accompanying consolidated financial statements.

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 466

The following information presents the financial impact of the Third Restatement adjustments on Nortel's previously reported Consolidated Statement of Operations data for the years ended December 31, 2002 and 2001:

### Consolidated Statement of Operations data for the year ended December 31, 2002

| | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| | (Millions of U.S. dollars, except per share amounts) | | |
| Revenues | $11,008 | $ (270) | $10,738 |
| Cost of revenues | 7,103 | (217) | 6,886 |
| Gross profit | $ 3,905 | $ (53) | $ 3,852 |
| Net earnings (loss) from continuing operations | (2,893) | (65) | (2,958) |
| Net earnings (loss) | (2,994) | (67) | (3,061) |
| Basic and diluted earnings (loss) per common share | | | |
| — from continuing operations | $ (0.75) | $(0.02) | $ (0.77) |
| — from discontinued operations | (0.03) | 0.00 | (0.03) |
| Basic and diluted earnings (loss) per common share | $ (0.78) | $(0.02) | $ (0.80) |

### Consolidated Statement of Operations data for the year ended December 31, 2001

| | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| | (Millions of U.S. dollars, except per share amounts) | | |
| Revenues | $ 18,900 | $(67) | $ 18,833 |
| Cost of revenues | 14,612 | (63) | 14,549 |
| Gross profit | $ 4,288 | $ (4) | $ 4,284 |
| Net earnings (loss) from continuing operations | (23,270) | — | (23,270) |
| Net earnings (loss) | (25,722) | 2 | (25,720) |
| Basic and diluted earnings (loss) per common share | | | |
| — from continuing operations | $ (7.30) | 0.00 | $ (7.30) |
| — from discontinued operations | (0.78) | 0.00 | (0.78) |
| Basic and diluted earnings (loss) per common share | $ (8.08) | 0.00 | $ (8.08) |

### Revenues and cost of revenues adjustments

The following table summarizes the revenue recognition adjustments to revenue and cost of revenues (refer to note 4 of the accompanying consolidated financial statements for a description of the nature of the adjustments).

| | Revenues | | Cost of Revenues | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| | (Millions of U.S. dollars) | | | |
| As previously reported: | $11,008 | $18,900 | $7,103 | $14,612 |
| **Adjustments:** | | | | |
| Application of SOP 81-1 | $ (157) | $ (44) | $ (148) | $ (42) |
| Application of SAB 104 and SOP 97-2 | (111) | (34) | (66) | (24) |
| Other revenue recognition adjustments | (2) | 11 | (3) | 3 |
| As restated: | $10,738 | $18,833 | $6,886 | $14,549 |

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 467

**ITEM 7.**    **Management's Discussion and Analysis of Financial Condition and Results of Operations**

Intentionally omitted. Superseded and replaced in its entirety by the Management's discussion and analysis of financial condition and results of operations included in Annex A to this offering memorandum.

**ITEM 7A.**    **Quantitative and Qualitative Disclosures about Market Risk**

Refer to ''Market risk'' in Management's Discussion and Analysis of Financial Condition and Results of Operations.

**ITEM 8.**    **Financial Statements and Supplementary Data**

Intentionally omitted. Superseded and replaced in its entirety by the audited consolidated financial statements as of December 31, 2004 and 2005 and for each year in the three year period ended December 31, 2005 included in Annex A to this offering memorandum.

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 468

**ITEM 9.** **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**ITEM 9A.** **Controls and Procedures**

**Management Conclusions Concerning Disclosure Controls and Procedures**

*All dollar amounts in this Item 9A are in millions of United States, or U.S., dollars unless otherwise stated.*

We carried out an evaluation under the supervision and with the participation of management, including the current CEO and current CFO (Mike S. Zafirovski and Peter W. Currie, respectively), pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, or the Exchange Act, of the effectiveness of our disclosure controls and procedures as at December 31, 2005 (the end of the period covered by this report). The CEO and CFO were appointed to such positions as at November 15, 2005 and February 14, 2005, respectively.

In making this evaluation, the CEO and CFO considered, among other matters:

- our successive restatements of our financial statements, including the Third Restatement;

- the findings of the Independent Review summarized in the "Summary of Findings and of Recommended Remedial Measures of the Independent Review," submitted to the Audit Committee in January 2005 by WilmerHale and Huron Consulting Services LLC, or the Independent Review Summary, included in Item 9A of our 2003 Annual Report;

- the material weaknesses in our internal control over financial reporting that we and our independent registered chartered accountants, Deloitte, have identified (as more fully described below);

- management's assessment of our internal control over financial reporting and conclusion that our internal control over financial reporting was not effective as at December 31, 2004 and 2005, and Deloitte's attestation report with respect to that assessment and conclusion, each pursuant to the requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or SOX 404, included in Item 8 and Item 9A of our 2004 Annual Report and this report;

- the conclusion of the CEO and CFO that our disclosure controls and procedures, as at the end of each quarter in 2005, were not effective, included in each 2005 Quarterly Report;

- the findings of the Revenue Independent Review included in this Item 9A;

- the ongoing Internal Audit Review described more fully below; and

- the remedial measures we have identified, developed and begun to implement to address these issues.

Based on this evaluation, the CEO and CFO have concluded that our disclosure controls and procedures as at December 31, 2005 were not effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required and that it is accumulated and communicated to our management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

In light of this conclusion, we have applied compensating procedures and processes as necessary to ensure the reliability of our financial reporting. Accordingly, management believes, based on its knowledge, that (i) this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report and (ii) the financial statements, and other financial information included in this report, fairly present in all material respects our financial condition, results of operations and cash flows as at, and for, the periods presented in this report.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is intended to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for

231

external purposes in accordance with applicable GAAP. Our internal control over financial reporting should include those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with applicable GAAP, and that receipts and expenditures are being made only in accordance with authorizations of management and the Board of Directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, including the current CEO and current CFO, assessed the effectiveness of our internal control over financial reporting, and concluded that five material weaknesses in our internal control over financial reporting existed, as at December 31, 2005. These material weaknesses, which are the same material weaknesses that existed as at December 31, 2004 and as first reported in our 2003 Annual Report, are:

- lack of compliance with written Nortel procedures for monitoring and adjusting balances related to certain accruals and provisions, including restructuring charges and contract and customer accruals;

- lack of compliance with Nortel procedures for appropriately applying applicable GAAP to the initial recording of certain liabilities, including those described in SFAS No. 5, and to foreign currency translation as described in SFAS No. 52;

- lack of sufficient personnel with appropriate knowledge, experience and training in U.S. GAAP and lack of sufficient analysis and documentation of the application of U.S. GAAP to transactions, including, but not limited to, revenue transactions;

- lack of a clear organization and accountability structure within the accounting function, including insufficient review and supervision, combined with financial reporting systems that are not integrated and which require extensive manual interventions; and

- lack of sufficient awareness of, and timely and appropriate remediation of, internal control issues by Nortel personnel.

For purposes of this Management's Report on Internal Control Over Financial Reporting, the term ''material weakness'' means a significant deficiency (within the meaning of Public Company Accounting Oversight Board Auditing Standard No. 2), or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of our annual or interim financial statements will not be prevented or detected.

In making its assessment of internal control over financial reporting, management used the criteria issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework and PCAOB Standard No. 4. Because of the material weaknesses described above, management believes that, as at December 31, 2005, we did not maintain effective internal control over financial reporting based on those criteria.

Management has excluded from its assessment the internal control over financial reporting of both LG-Nortel, a joint venture formed on November 2, 2005 between Nortel and LG Electronics, Inc., and PEC, a company acquired by Nortel on June 3, 2005 (see "Developments in 2005 and 2006 — Significant Developments — Acquisitions" in the MD&A section of this report).

Our fiscal 2005 consolidated financial statements include the operating results of PEC for approximately 7 months. During this period, PEC's operations generated approximately $142, or 1%, of our 2005 consolidated revenues and contributed $7 of income included in our 2005 net loss. Additionally, PEC's total assets as of December 31, 2005 were approximately $515, or 3% of our 2005 consolidated total assets.

Our fiscal 2005 consolidated financial statements also include the operating results of LG-Nortel for approximately 2 months. During this period, LG-Nortel's operations generated approximately $24, or less than 1%, of our 2005

HIGHLY CONFIDENTIAL                                    NNC-NNL06705393 / 470