consolidated revenues and contributed $12 of our 2005 net loss. Additionally, LG-Nortel's total assets as of December 31, 2005 were approximately $524, or 3% of our 2005 consolidated total assets.

Our independent registered chartered accountants have issued an attestation report expressing an unqualified opinion on management's assessment of the effectiveness of internal control over financial reporting, and an adverse opinion on the effectiveness of internal control over financial reporting as at December 31, 2005, which report appears below.

**Report of Independent Registered Chartered Accountants**

*To the Shareholders and Board of Directors of Nortel Networks Corporation*

We have audited management's assessment, included in the accompanying Management's Report on Internal Control over Financial Reporting, that Nortel Networks Corporation and its subsidiaries ("Nortel") did not maintain effective internal control over financial reporting as of December 31, 2005, because of the effect of the material weaknesses identified in management's assessment based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. As described in Management's Report on Internal Control over Financial Reporting, management excluded from their assessment (1) the internal control over financial reporting at LG-Nortel Co. Ltd. ("LG-Nortel") which was formed on November 2, 2005 and whose financial statements reflect total assets and revenues constituting 3% and less than 1%, respectively, of Nortel's consolidated financial statement amounts as of and for the year ended December 31, 2005 and (2) the internal control over financial reporting at Nortel Government Solutions Incorporated ("Nortel Government Solutions", formerly PEC Solutions Inc.) which was acquired on June 6, 2005 and whose financial statements reflect total assets and revenues constituting 3% and 1%, respectively, of Nortel's consolidated financial statement amounts as of and for the year ended December 31, 2005. Accordingly, our audit did not include the internal control over financial reporting at either LG-Nortel or Nortel Government Solutions. Nortel's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of Nortel's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

HIGHLY CONFIDENTIAL          NNC-NNL06705393 / 471

A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weaknesses have been identified and included in management's assessment:

- Lack of compliance with written Nortel procedures for monitoring and adjusting balances relating to certain accruals and provisions, including restructuring charges and contract and customer accruals;

- Lack of compliance with Nortel procedures for appropriately applying generally accepted accounting principles ("GAAP") to the initial recording of certain liabilities including those described in Statement of Financial Accounting Standards ("SFAS") No. 5, "Accounting for Contingencies", and to foreign currency translation as described in SFAS No. 52, "Foreign Currency Translation";

- Lack of sufficient personnel with appropriate knowledge, experience and training in U.S. GAAP and lack of sufficient analysis and documentation of the application of U.S. GAAP to transactions including, but not limited to, revenue transactions;

- Lack of a clear organization and accountability structure within the accounting function, including insufficient review and supervision, combined with financial reporting systems that are not integrated and which require extensive manual interventions; and

- Lack of sufficient awareness of, and timely and appropriate remediation of, internal control issues by Nortel personnel.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the consolidated financial statements and financial statement schedule of Nortel as of and for the year ended December 31, 2005 and this report does not affect our reports on such financial statements and financial statement schedule.

In our opinion, management's assessment that Nortel did not maintain effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Nortel has not maintained effective internal control over financial reporting as of December 31, 2005, based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with Canadian generally accepted auditing standards and the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2005 of Nortel and our reports dated April 28, 2006 expressed unqualified opinions on those financial statements (which report on the consolidated financial statements includes an explanatory paragraph relating to the restatement of the consolidated financial statements as of December 31, 2004 and for the years ended December 31, 2004 and 2003, and includes a separate report titled Comments by Independent Registered Chartered Accountants on Canadian-U.S. Reporting Differences referring to changes in accounting principles that have a material effect on the comparability of the financial statements) and on the financial statement schedule.

/s/ Deloitte & Touche LLP

Independent Registered Chartered Accountants

Toronto, Canada
April 28, 2006

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 472

## Third Restatement

### Overview

As part of the remediation efforts discussed below in this Item 9A and to compensate for the material weaknesses in our internal control over financial reporting, we undertook intensive efforts in 2005 to enhance our controls and procedures relating to the recognition of revenue. These efforts included, among other measures, extensive documentation and review of customer contracts for revenue recognized in 2005 and earlier periods. As a result of the contract review, it became apparent that certain of the contracts had not been accounted for properly under U.S. GAAP. Most of these errors related to contractual arrangements involving multiple deliverables, for which revenue recognized in prior periods should have been deferred to later periods, under SAB 104 and SOP 97-2.

In addition, based on our review of our revenue recognition policies and discussions with our independent registered chartered accountants as part of the 2005 audit, we determined that in our previous application of these policies, we misinterpreted certain of these policies principally related to complex contractual arrangements with customers where multiple deliverables were accounted for using the percentage-of-completion method of accounting under SOP 81-1, as described in more detail below:

- Certain complex arrangements with multiple deliverables were previously fully accounted for under the percentage-of-completion method of SOP 81-1, but elements outside of the scope of SOP 81-1 should have been examined for separation under the guidance in EITF 00-21; and

- Certain complex arrangements accounted for under the percentage-of-completion method did not meet the criteria for this treatment in SOP 81-1 and should instead have been accounted for using completed contract accounting under SOP 81-1.

In correcting for both application errors, the timing of revenue recognition was frequently determined to be incorrect, with revenue having generally been recognized prematurely when it should have been deferred and recognized in later periods.

Management's determination that these errors required correction led to the Audit Committee's decision on March 9, 2006, to effect a further restatement of our consolidated financial statements. We have restated our consolidated balance sheet as of December 31, 2004, and our consolidated statements of operations, changes in equity and comprehensive income (loss) and cash flows for each of the years ended December 31, 2004 and 2003. The Third Restatement also corrected other miscellaneous accounting errors, as well as the classification of certain items within the consolidated statements of operations and cash flows. The impact of the Third Restatement to periods prior to 2003 was a net increase of $70 to the opening accumulated deficit as of January 1, 2003. The Third Restatement process included the maintenance of a restatement database to track issues and adjustments, the involvement and oversight by senior finance management and open and regular dialogue with Deloitte.

Overall in the Third Restatement, as a result of the adjustments to correct errors related to revenue recognition, we decreased revenues by an aggregate of $261, $312 and $520 in 2003, 2004 and the first nine months of 2005, respectively. These adjustments constituted the recognition of revenues that had previously been improperly recognized in prior periods and should have been deferred to future periods. This also had the effect of reducing previously reported revenues in 2001 and 2002 by approximately $67 and $270, respectively.

### Principal Adjustments

The following are the main categories of the revenue adjustments in 2003 and 2004:

| | Revenues | | Cost of revenues | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| As previously reported ........................................ | $9,828 | $10,193 | $5,750 | $5,852 |
| Adjustments: | | | | |
| Application of SOP 81-1 ...................................... | $ (84) | $ (118) | $ (55) | $ (103) |
| Interaction between multiple revenue recognition accounting standards | (174) | (49) | (127) | (26) |
| Application of SAB 104 and SOP 97-2 .......................... | (38) | (84) | 14 | (36) |
| Other revenue recognition adjustments .......................... | (16) | (10) | (12) | 26 |
| Other adjustments ............................................ | — | — | 4 | 10 |
| As restated ................................................. | $9,516 | $ 9,932 | $5,574 | $5,723 |

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 473

The following table summarizes the main categories of the adjustments for the quarters ended March 31, June 30 and September 30, 2004 and 2005, respectively, and the quarter ended December 31, 2004:

| | 2005 | | | 2004 | | | |
|---|---|---|---|---|---|---|---|
| | Three Months Ended March 31 | Three Months Ended June 30 | Three Months Ended September 30 | Three Months Ended March 31 | Three Months Ended June 30 | Three Months Ended September 30 | Three Months Ended December 31 |
| **Revenues — as previously reported** . . . . . . . . . | $2,536 | $2,855 | $2,655 | $2,444 | $2,590 | $2,179 | $2,615 |
| **Adjustments:** | | | | | | | |
| Application of SOP 81-1 . . . . . . . . . . . . . . . . . . | 82 | (23) | (13) | (22) | (29) | (17) | (16) |
| Interaction between multiple revenue recognition accounting standards . . . . . . . . . . . . . . . . . . . . | (183) | (155) | (70) | (19) | (31) | (49) | (75) |
| Application of SAB 104 and SOP 97-2 . . . . . . . | (53) | (45) | (62) | (37) | (54) | 42 | 11 |
| Other revenue recognition adjustments . . . . . . . . | 7 | (13) | 8 | — | 2 | 4 | (22) |
| **Revenues — as restated** . . . . . . . . . . . . . . . . . | $2,389 | $2,619 | $2,518 | $2,366 | $2,478 | $2,159 | $2,513 |
| | | | | | | | |
| **Net earnings (loss) — as previously reported** | $ (49) | $ 45 | $ (105) | $ 59 | $ 16 | $ (259) | $ 133 |
| **Adjustments:** | | | | | | | |
| Application of SOP 81-1 . . . . . . . . . . . . . . . . . . | 9 | (12) | (6) | (3) | (14) | (3) | (8) |
| Interaction between multiple revenue recognition accounting standards . . . . . . . . . . . . . . . . . . . . | (26) | (12) | (7) | (6) | (7) | (10) | (24) |
| Application of SAB 104 and SOP 97-2 . . . . . . . | (26) | (25) | (22) | (23) | (26) | 2 | (5) |
| Other revenue recognition adjustments . . . . . . . . | (3) | (50) | 6 | (9) | 3 | 2 | — |
| Gain on sale of businesses . . . . . . . . . . . . . . . . . | (21) | 25 | — | (1) | — | — | (6) |
| Health and Welfare Trust . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — | (1) |
| Foreign exchange . . . . . . . . . . . . . . . . . . . . . . . | 2 | 11 | (5) | — | 6 | (34) | (10) |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | (15) | 3 | (2) | (1) | 1 | 23 |
| **Net earnings (loss) — as restated** . . . . . . . . . . | $ (104) | $ (33) | $ (136) | $ 15 | $ (23) | $ (301) | $ 102 |

For additional information concerning adjustments made in the Third Restatement, see note 4 to the accompanying audited consolidated financial statements and ''Restatements: Nortel Audit Committee Independent Review; Material Weaknesses; Related Matters — Third Restatement'' in the MD&A section of this report.

### *Decision Not to Amend Certain Previous Filings*

The Third Restatement involved the restatement of our consolidated financial statements for 2001, 2002, 2003, 2004 and the first nine months of 2005. Amendments to our prior filings with the SEC would be required in order for us to be in full compliance with our reporting obligations under the Securities Exchange Act of 1934. However, any amendments to our 2003 Annual Report and 2004 Annual Report and the Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, June 30, and September 30, 2005 and 2004, respectively, would in large part repeat the disclosure contained in this report. Accordingly, Nortel does not plan to amend these or any other prior filings. Nortel believes that it has included in this report all information needed for current investor understanding.

We have not restated the separate consolidated financial statements of Nortel's indirect subsidiary, Nortel Networks S.A., originally presented in our 2003 Annual Report, or the supplemental consolidating financial information presented in our 2003 Annual Report and 2004 Annual Report (as well as in relevant Quarterly Reports on Form 10-Q during the applicable periods). As certain guarantee and security agreements that gave rise to the requirement to present this information under applicable rules under the Securities and Exchange Act of 1934 were no longer in effect as at December 31, 2005, we are not required to present this information in this report and we believe that the restatement of this information would not be relevant for current investor understanding. The previously filed consolidated financial statements of Nortel Networks S.A. and supplemental consolidating financial information should no longer be relied upon.

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 474

*Internal Audit Review of facts and circumstances surrounding Third Restatement*

Following the announcement of the Third Restatement on March 10, 2006, the Audit Committee directed the Internal Audit group to conduct a review of the facts and circumstances surrounding the Third Restatement principally to review the underlying conduct of the initial recording of the errors and any overlap of items restated in the Third Restatement and the Second Restatement. Internal Audit engaged third party forensic accountants to assist in the review. The work underlying the review is substantially complete. Internal Audit continues to review and assess its work and upon completion, will provide its final findings to the Audit Committee.

## Revenue Independent Review

As described in our 2003 Annual Report, management identified certain accounting practices and errors related to revenue recognition that it determined required adjustment as part of the Second Restatement. In light of the resulting corrections to previously reported revenues totaling approximately $3,400, the Audit Committee determined to review the facts and circumstances leading to the restatement of these revenues for specific transactions identified in the Second Restatement, with a particular emphasis on the underlying conduct. The Audit Committee sought a full understanding of the historic events that required the revenues for these specific transactions to be restated and intended to consider any appropriate additional remedial measures, including those involving internal controls and processes. The Audit Committee engaged WilmerHale to advise it in connection with this review. Because of the significant accounting issues involved in the inquiry, WilmerHale retained Huron Consulting Services LLC, or Huron, to provide expert accounting assistance, and Huron was involved in all phases of WilmerHale's work. The Audit Committee launched the Revenue Independent Review after the Second Restatement was completed and did not seek to have WilmerHale and Huron audit or otherwise review the substantive accuracy of Nortel's restated financial statements or review other aspects of Nortel's accounting practices not adjusted in the Second Restatement.

The Revenue Independent Review focused principally on transactions that accounted for approximately $3,000 of the approximately $3,400 in restated revenue, with a particular emphasis on transactions that accounted for approximately $2,600 in 2000. That emphasis was appropriate because (1) the size of the revenue restatement for 2000 ($2,800 of the total restated revenue of $3,400) and (2) the same types of errors made in 2000 reoccurred in subsequent years. As more fully described in Item 9A of the 2003 Annual Report, the revenue adjustments that were part of the Second Restatement primarily related to certain categories of transactions, and the independent review has examined transactions in each of these categories.

The Revenue Independent Review found that, in an effort to meet internal and external targets, the senior corporate finance management team, none of whom are current employees, changed the accounting policies of the Company several times during 2000, either to defer revenue out to a subsequent period or pull revenue in to the current period. After changing internal accounting policies, senior corporate finance management did not understand relevant U.S. GAAP, misapplied these U.S. GAAP requirements and, in certain circumstances, turned a blind eye to these U.S. GAAP requirements. As a result, Nortel recognized revenue for numerous transactions with disregard for the proper accounting and this conduct was driven by the need to close revenue and earnings gaps.

The findings of the Revenue Independent Review have been presented to the Audit Committee and Board of Directors. The Revenue Independent Review is now complete.

In the Independent Review Summary approved by the Board of Directors and included in our 2003 Annual Report, the Board of Directors adopted a framework of governing remedial principles to prevent recurrence of the inappropriate accounting conduct, to rebuild a finance environment based on transparency and integrity, and to ensure sound financial reporting and comprehensive disclosure. The Board of Directors directed management to implement those principles, through a series of remedial measures, across the company, to prevent any repetition of past misconduct and re-establish a finance organization with values of transparency, integrity, and sound financial reporting as its cornerstone. Management's ongoing implementation efforts are described below and will continue following the filing of this report. The Board of Directors has monitored the implementation efforts to date and will continue to regularly monitor management's implementation efforts.

## Remedial Measures

We have identified, developed and begun to implement remedial measures in light of the findings of the Independent Review and Revenue Independent Review, and of management's assessment of the effectiveness of internal control over

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 475

financial reporting, to strengthen our internal control over financial reporting and disclosure controls and procedures, and to address the material weaknesses in our internal control over financial reporting.

At the recommendation of the Audit Committee, the Board of Directors adopted all of the recommendations for remedial measures contained in the Independent Review Summary. Those governing remedial principles were designed to prevent recurrence of the inappropriate accounting conduct found in the Independent Review, to rebuild a finance environment based on transparency and integrity, and to ensure sound financial reporting and comprehensive disclosure. The governing remedial principles included:

- establishing standards of conduct to be enforced through appropriate discipline;
- infusing strong technical skills and experience into the finance organization;
- requiring comprehensive, on-going training on increasingly complex accounting standards;
- strengthening and improving internal controls and processes;
- establishing a compliance program throughout the Company which is appropriately staffed and funded;
- requiring management to provide clear and concise information, in a timely manner, to the Board of Directors to facilitate its decision-making; and
- implementing an information technology platform that improves the reliability of financial reporting and reduces the opportunities for manipulation of results.

See the Independent Review Summary for further information concerning these governing principles as they relate to three identified categories — people, processes and technology.

The Board of Directors recognized that its adoption of these governing principles was the beginning of a long and vitally important process. It directed management to develop a detailed plan and timetable for the implementation of these remedial measures. Management developed an implementation plan, which was approved by the Board of Directors, and has begun implementation of that plan. Certain remedial measures that management has begun to implement include: the hiring of key senior management including our CFO, Controller and Vice President Audit and Compliance Officer; reorganization of the finance organization to segregate control and planning and forecasting responsibilities; strengthening of the internal audit function; and continual review and improvements to controls around the review and approval of accounting entries. The Board of Directors continues to monitor the ongoing implementation efforts.

In February 2005, the Board of Directors approved a program to transform our finance organization's structure, processes and finance systems to create a more effective organization with segregated functions and clear accountabilities built around global standard processes based on SAP. SAP is a software package that will allow us to consolidate many of our numerous computer systems into an integrated finance system. We expect that the global phased SAP finance implementation will reduce the chance of error, including through a significant reduction in manual journal entries, improve speed of the consolidation process and increase transparency of journal entries to senior management.

Management has also identified, developed and begun to implement a number of measures to strengthen our internal control over financial reporting and disclosure controls and procedures, and to address the material weaknesses in our internal control over financial reporting. These measures include the compensating procedures and processes that we have applied, in light of our material weaknesses and ineffective internal control over financial reporting and disclosure controls and procedures, to ensure the reliability of our financial reporting, including the substantive processes described above under "Restatement of Financial Results". Management also has taken, and will continue to take where appropriate, steps to augment the organization with individuals of requisite skill to address the material weaknesses. We have taken disciplinary action with respect to some employees, including employee terminations where appropriate. Senior management has regularly communicated to our employees, through education sessions, 'town hall' meetings and training, that it will not tolerate accounting conduct that involves the misapplication of U.S. GAAP and will hold employees accountable for their actions and decisions.

*Management Assessment and Observations*

In management's assessment of its internal control over financial reporting, the following observations were made:

- While we have invested significantly in improvements to our internal control environment, this has been a very difficult task, as many of the reasons for weak internal control over financial reporting are pervasive and relate to our infrastructure and organization.

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 476

- Without significant infrastructure changes, including changes to the information systems and finance organizational structure, we will be utilizing short-term, time-consuming workaround solutions to address identified control issues as opposed to streamlining and building sustainable processes that involve the effective execution of stronger and more efficient monitoring and preventative controls.

- In order to fully remediate the identified material weaknesses, we will need to put in place a more rigorous management assessment process while continuing to remedy deficiencies in the process. In addition, we need to ensure that we have sufficient resources to make the necessary improvements to controls as well as further strengthen the training and competencies of our finance personnel and to invest sufficient time to design and evaluate the necessary controls so that they are fully understood, implemented and operate effectively.

- A number of control design deficiencies, including those at the entity level, result in a control environment wherein the design or operation of the internal control components would not reduce to a relatively low level the risk that material misstatements caused by error or fraud may occur and may not be detected within a timely period in the normal course (entity level controls include those controls that have a pervasive effect on the organization). Entity level controls will require significant attention and improvement before a foundation upon which internal controls could be considered effective will exist and upon which controls at the transaction process level could be considered effective and reliable (i.e., result in a sustainable control environment). In general, we noted many control deficiencies at the entity level and a high volume of deficiencies at the transaction process level.

- At the transaction process level, we need to improve upon the balance between detective and preventative controls. We continue to rely heavily on manual and detective controls and experience a high volume of post-close accounting adjustments, including out-of-period adjustments, all in the context of processes that are complex and fragmented.

Management's assessment is that, in our control environment, it would be impractical to categorize each of our extensive control deficiencies as either inconsequential or significant, and therefore, virtually all control deficiencies should be considered as more than inconsequential, and each such deficiency relates closely to, or is a symptom of, one of the material weaknesses identified by management and described above under "Management's Report on Internal Control Over Financial Reporting". The control deficiencies at the transaction process level generally relate more to preventative controls than to detective controls. The control deficiencies directly or indirectly referenced in the material weaknesses or in the observations set forth above, include, among others, those that relate to our whistle-blowing, code of ethics and anti-fraud programs, as well as our segregation of duty requirements such as control over user access to systems, data protection controls and controls with outsource providers.

Deloitte has reported to the Audit Committee on their audit of our internal control over financial reporting, which included observations on management's assessment and conclusion that the internal control over financial reporting was not effective as at December 31, 2005 because of the effect of our five material weaknesses. Management's observations described above under "Management Assessment and Observation" are consistent with Deloitte's reporting to the Audit Committee.

We expect that full implementation of the remedial measures contained in the Independent Review Summary and full remediation of our material weaknesses, our internal control over financial reporting and our disclosure controls and procedures will continue to take significant time and effort, due largely to the complexity and extensive nature of some of the remediation required and a need to increase the co-ordination of remedial efforts within the organization in order to implement one comprehensive remediation plan with a well defined set of objectives and agreed upon timelines. These initiatives were impacted in 2005 and in 2006 to date by the substantial efforts needed to reestablish our current financial reporting in accordance with U.S. and Canadian securities laws, the significant turnover in our finance personnel, changes in our accounting systems and continuing documentation weaknesses. Management continues to assess the internal and external resources that will be needed to continue to implement, support, sustain and monitor the effectiveness of our ongoing and future remedial efforts.

In addition, in part as a result of the compensating procedures and processes that we are applying to our financial reporting process, during the preparation of our financial statements for recent periods (including 2004, 2005 and interim periods in 2005), we have identified a number of adjustments to correct accounting errors related to prior periods, including the errors corrected by the Third Restatement, as more fully described above. We also recorded in the past adjustments that were immaterial to the then current period and to the prior periods in the financial statements for the then current period. As long as we continue to have material weaknesses in our internal control over financial reporting,

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 477

we may in future identify similar adjustments to prior period financial information. Adjustments that may be identified in the future could require further restatement of our financial statements.

### Changes in Internal Control Over Financial Reporting

During the fiscal quarter ended December 31, 2005, the following changes occurred in our internal control over financial reporting that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting:

- The formation of the LG-Nortel joint venture on November 2, 2005, including implementation by the joint venture entity of a separate Oracle financial software system (including general ledger, accounts payable and accounts receivable functions) and an enterprise resource planning system. For more information about the LG-Nortel joint venture, see ''Developments in 2005 and 2006 — Significant Business Developments — Joint Ventures'' in the MD&A section of this report and note 9 of the accompanying audited consolidated financial statements.

- The appointment of a new President and CEO, Chief Legal Officer and Vice President, Global Supply Chain and Quality.

- As part of the remediation efforts discussed above and to compensate for the material weaknesses in our internal control over financial reporting, we undertook extensive documentation and review of customer contracts for revenue recognized in 2005 and earlier periods. This contract review was commenced in the middle of 2005 following the completion of the Second Restatement and the filing of our delayed periodic reports, but was conducted substantially in the fourth quarter of 2005 and the first quarter of 2006.

### ITEM 9B. Other Information

Not Applicable.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 478

## PART III

### ITEM 10.    Directors and Executive Officers of the Registrant

The information required by this item is incorporated herein by reference to Nortel's 2006 proxy circular and proxy statement to be filed with the Commission pursuant to Regulation 14A. Such incorporation by reference shall be deemed not to specifically incorporate by reference the information referred to in Item 402(a)(8) of Regulation S-K, contained under the captions ''Report on Executive Compensation'', ''Shareholder Return Performance Graph'' and ''Report of the Audit Committee of Nortel Networks Corporation''.

### ITEM 11.    Executive Compensation

The information required by this item is incorporated herein by reference to Nortel's 2006 proxy circular and proxy statement to be filed with the Commission pursuant to Regulation 14A. Such incorporation by reference shall be deemed not to specifically incorporate by reference the information referred to in Item 402(a)(8) of Regulation S-K, contained under the captions ''Report on Executive Compensation'', ''Shareholder Return Performance Graph'' and ''Report of the Audit Committee of Nortel Networks Corporation''.

### ITEM 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information required by this item is incorporated herein by reference to Nortel's 2006 proxy circular and proxy statement to be filed with the Commission pursuant to Regulation 14A. Such incorporation by reference shall be deemed not to specifically incorporate by reference the information referred to in Item 402(a)(8) of Regulation S-K, contained under the captions ''Report on Executive Compensation'', ''Shareholder Return Performance Graph'' and ''Report of the Audit Committee of Nortel Networks Corporation''.

### ITEM 13.    Certain Relationships and Related Transactions

#### *Indebtedness of management*

The Company provides relocation assistance to employees who are requested to relocate under the Nortel Networks — International Assignment Relocation program that is designed to minimize the financial exposure to employees as a result of the move. In the past, the assistance has included housing loans, advances on real estate equity, and payments on behalf of employees of direct costs associated with the move. The assistance offered is specific to each employee and is structured to be competitive in the area to which the employee is relocated, subject to the overall relocation policy. Effective July 30, 2002, the Company no longer offers its executive officers housing loans as part of their relocation assistance and neither the Company nor its subsidiaries have given any guarantee, support agreement, letter of credit, or similar arrangement or understanding, to any other entity in connection with indebtedness of current and former directors or executive officers since that time.

As at April 21, 2006, approximately $4.2 million of indebtedness was owed by current and former employees to the Company and its subsidiaries, of which $1.2 million related to housing loans and $3.0 million related to miscellaneous employee receivable such as adjustments to employee reimbursements and advances. Except for a recently appointed officer's indebtedness (set out below), which pre-dates the United States Sarbanes-Oxley Act of 2002, no current or former director or executive officer had any loans outstanding during 2005.

#### Table of Indebtedness of Directors and Executive Officers

| Name and Principal Position | Involvement of Company or Subsidiary | Largest Amount Outstanding January 1, 2005 – December 31, 2005 ($) | Amount Outstanding as at December 31, 2005 ($) | Amount Forgiven January 1, 2005 to December 31, 2005 ($) |
|---|---|---|---|---|
| Kimberly S. Lechner[1] Assistant Controller | Lender | 50,000 | 50,000 | 0 |

(1) A subsidiary of the Company extended a housing loan to Ms. Lechner in February 2000 in connection with a relocation. As long as Ms. Lechner remains a Nortel employee, the loan is due and payable in full in February 2010.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 479

**ITEM 14.  Principal Accountant Fees and Services**

Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu, and their respective affiliates (or, collectively, the Deloitte Entities) are the principal independent registered chartered accountants of the Company and NNL.

In accordance with applicable laws and the requirements of stock exchanges and securities regulatory authorities, the audit committees of the Company and NNL pre-approve all audit and non-audit services to be provided by the Deloitte Entities. In addition, in April 2002, the audit committees of the Company and NNL recommended for approval, and the boards of directors of the Company and NNL approved, a policy that thereafter the Company's and NNL's auditors would be retained solely to provide audit and audit-related services and advice with respect to tax matters, and that the auditors would not be retained to provide consulting services, such as information technology services.

### *Audit Fees*

The Company and NNL prepare financial statements in accordance with United States generally accepted accounting principles (or US GAAP), with a reconciliation to Canadian generally accepted accounting principles (or Canadian GAAP). Deloitte Entities billed the Company and its subsidiaries $59.5 million for 2005, for the following audit services: (i) the audit of the annual consolidated financial statements of the Company and NNL for the fiscal year ended December 31, 2005; (ii) reviews of the financial statements of the Company and NNL in Forms 10-Q for the periods ended March 31, June 30 and September 30, 2005; (iii) audit of internal controls over financial reporting as required under the United States Sarbanes-Oxley Act of 2002 for the fiscal year ended December 31, 2005; (iv) audits of individual subsidiary and other investments statutory financial statements; and (v) comfort letters, attest services, statutory and regulatory audits, consents and other services related to United States Securities and Exchange Commission matters. Deloitte Entities billed $49 million for 2004, previously reported as $46 million, for the following audit services: (i) audits of the annual consolidated financial statements of the Company and NNL for the fiscal year ended December 31, 2004; (ii) reviews of the financial statements of the Company and NNL in Forms 10-Q for the periods ended March 31, June 30 and September 30, 2004; (iii) audit of internal controls over financial reporting as required under the United States Sarbanes-Oxley Act of 2002 for the fiscal year ended December 31, 2004; (iv) audits and reviews of the restated financial statements of the Company and NNL as comparative statements in their respective Form 10-K for the fiscal year ended December 31, 2003; (v) audits of individual subsidiary statutory financial statements; and (vi) comfort letters, attest services, statutory and regulatory audits, consents and other services related to United States Securities and Exchange Commission matters.

### *Audit-Related Fees*

Deloitte Entities billed the Company and its subsidiaries $2.9 million and $3.8 million for 2005 and 2004, respectively, for the following audit-related services: (i) audit of pension plan financial statements; (ii) financial accounting and reporting consultations; (iii) advisory services related to the United States Sarbanes-Oxley Act of 2002; (iv) accounting consultations and audits in connection with acquisitions and dispositions; (v) internal control reviews; and (vi) accounting consultations regarding financial accounting standards for various local business-related transactions.

### *Tax Fees*

Deloitte Entities billed the Company and its subsidiaries $4.9 million and $7.1 million for 2005 and 2004, respectively, for tax compliance services. Tax compliance services are services rendered based upon facts already in existence or transactions that have already occurred to document, compute and obtain government approval for amounts to be included in tax filings and consisted of: (i) assistance in filing tax returns in various jurisdictions; (ii) sales and use, property and other tax return assistance; (iii) research and development tax credit documentation and analysis for purposes of filing amended returns; (iv) transfer pricing documentation; (v) requests for technical advice from taxing authorities; (vi) assistance with tax audits and appeals; and (vii) preparation of expatriate tax returns.

### *All Other Fees*

Deloitte Entities did not bill the Company and its subsidiaries for any other services in 2005 and 2004.

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 480

## PART IV

**ITEM 15. Exhibits, Financial Statement Schedules**

**1. Financial Statements**

The index to the Consolidated Financial Statements appears on page 122.

**2. Financial Statement Schedules**

| | Page |
|---|---|
| Quarterly Financial Data (Unaudited) | 214 |
| Report of Independent Registered Chartered Accountants | 229 |
| II — Valuation and Qualifying Accounts and Reserves, Provision for Uncollectibles | 230 |

All other schedules are omitted because they are inapplicable or not required.

**3. Other Documents Filed as a Part of This Report**

| | |
|---|---|
| Management's Report on Internal Control over Financial Reporting | 231 |
| Report of Independent Registered Chartered Accountants | 123 |

Individual financial statements of entities accounted for by the equity method have been omitted because no such entity constitutes a "significant subsidiary" requiring such disclosure at December 31, 2005.

**4. Exhibit Index**

Pursuant to the rules and regulations of the SEC, Nortel has filed certain agreements as exhibits to this Annual Report on Form 10-K/A. These agreements may contain representations and warranties by the parties. These representations and warranties have been made solely for the benefit of the other party or parties to such agreements and (i) may have been qualified by disclosures made to such other party or parties, (ii) were made only as of the date of such agreements or such other date(s) as may be specified in such agreements and are subject to more recent developments, which may not be fully reflected in Nortel's public disclosure, (iii) may reflect the allocation of risk among the parties to such agreements and (iv) may apply materiality standards different from what may be viewed as material to investors. Accordingly, these representations and warranties may not describe Nortel's actual state of affairs at the date hereof and should not be relied upon.

The items listed as Exhibits 10.2 to 10.8, 10.25 to 10.41, 10.44 to 10.46, 10.52 to 10.62, 10.64 to 10.66 and items 10.68 to 10.76 relate to management contracts or compensatory plans or arrangements.

| Exhibit No | Description |
|---|---|
| *2. | Amended and Restated Arrangement Agreement involving BCE Inc., Nortel Networks Corporation, formerly known as New Nortel Inc., and Nortel Networks Limited, formerly known as Nortel Networks Corporation, made as of January 26, 2000, as amended and restated March 13, 2000 (including Plan of Arrangement under Section 192 of the *Canada Business Corporations Act*) (filed as Exhibit 2.1 to Nortel Networks Corporation's Current Report on Form 8-K dated May 1, 2000). |
| *3.1 | Restated Certificate and Articles of Incorporation of Nortel Networks Corporation (filed as Exhibit 3 to Nortel Networks Corporation's Current Report on Form 8-K dated October 18, 2000). |
| *3.2 | By-Law No. 1 of Nortel Networks Corporation (filed as Exhibit 3.2 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2000). |
| *4.1 | Shareholders Rights Plan Agreement dated as of March 13, 2000 between Nortel Networks Corporation and Montreal Trust Company of Canada, which includes the Form of Rights Certificate as Exhibit A thereto, as amended by the Registration Statement on Form 8-A/A filed on May 1, 2000, as further amended and restated by Registration Statement dated February 14, 2003 (filed as Exhibit 3 to Nortel Networks Corporation's Registration Statement on Form 8-A/A filed on April 25, 2003). |

243

| Exhibit No | Description |
|---|---|
| *4.2 | Indenture dated as of November 30, 1988, between Nortel Networks Limited and The Toronto-Dominion Bank Trust Company, as trustee, related to debt securities authenticated and delivered thereunder, which comprised the 6% Notes due September 1, 2003, and the 6.875% Notes due September 1, 2023 issued by Nortel Networks Limited (filed as Exhibit 4.1 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 1999). |
| *4.3 | Indenture dated as of February 15, 1996, among Nortel Networks Limited, as issuer and guarantor, Nortel Networks Capital Corporation, formerly Northern Telecom Capital Corporation, as issuer, and The Bank of New York, as trustee, related to debt securities and guarantees authenticated and delivered thereunder, which comprised the 7.40% Notes due 2006 and the 7.875% Notes due 2026 (filed as Exhibit 4.1 to Registration Statement on Form S-3 (No. 333-1720) of Nortel Networks Limited and Nortel Networks Capital Corporation). |
| *4.4 | Indenture dated as of December 15, 2000 among Nortel Networks Limited, as issuer and guarantor, Nortel Networks Capital Corporation, as issuer, and Citibank, N.A., as trustee, related to debt securities authenticated and delivered thereunder (filed as Exhibit 4.1 to Registration Statement on Form S-3 (No. 333-51888) of Nortel Networks Limited and Nortel Networks Capital Corporation). |
| *4.5 | First Supplemental Indenture dated as of February 1, 2001 to Indenture dated as of December 15, 2000 among Nortel Networks Limited, as issuer and guarantor, Nortel Networks Capital Corporation, as issuer, and Citibank, N.A., as trustee, related to 6.125% Notes due 2006 (filed as Exhibit 4.1 to Nortel Networks Limited's Current Report on Form 8-K dated February 2, 2001). |
| *4.6 | Instrument of Resignation, Appointment and Acceptance entered into as of December 19, 2002, effective as of January 2, 2003, among Nortel Networks Limited, as issuer and guarantor, Nortel Networks Capital Corporation, as issuer, Citibank, N.A. and Deutsche Bank Trust Company Americas, with respect to the Indenture dated as of December 5, 2000, as supplemented by a First Supplemental Indenture dated as of February 1, 2001 related to debt securities (filed as Exhibit 4.6 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2002). |
| *4.7 | Indenture dated as of August 15, 2001 between Nortel Networks Corporation, Nortel Networks Limited, as guarantor, and Bankers Trust Company, as trustee, related to convertible debt securities and guarantees authenticated and delivered thereunder, which comprised the 4.25% Convertible Senior Notes due 2008 (filed as Exhibit 4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| *10.1 | Third Amended and Restated Reciprocal Credit Agreement dated as of December 19, 2002 between Nortel Networks Corporation, Nortel Networks Limited and the other parties who have executed the agreement (filed as Exhibit 10.1 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2002). |
| *10.2 | Nortel Networks Supplementary Executive Retirement Plan, as amended effective October 18, 2001 and October 23, 2002 (filed as Exhibit 10.2 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2002). |
| *10.3 | Agreement dated April 29, 1997 related to the remuneration of the Chief Legal Officer (termination agreement filed September 7, 2005) (filed as Exhibit 10.3 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2001). |
| *10.4 | Acknowledgement effective as of June 1, 2000 related to the remuneration of the Chief Legal Officer (termination agreement filed September 7, 2005) (filed as Exhibit 10.4 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2001). |
| *10.5 | Statement describing the retirement arrangements of the former President and Chief Executive Officer (filed as Exhibit 10.5 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2001). |
| *10.6 | Nortel Networks Corporation Executive Retention and Termination Plan, as amended and restated, effective from June 26, 2002 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2002). |
| *10.7 | Nortel Networks Corporation Special Retention Plan effective August 1, 2001 and expired on June 30, 2003 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| *10.8 | Purchase Contract and Unit Agreement dated as of June 12, 2002 among Nortel Networks Corporation, Computershare Trust Company of Canada, as purchase contract agent, and Holders (as defined therein) from time to time (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002). |

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 482

| Exhibit No | Description |
|---|---|
| *10.9 | U.S. Guarantee and Security Agreement dated as of the first day of the ''Collateral Period'' (as defined therein) among Nortel Networks Limited, Nortel Networks Inc. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent as terminated by Letter, Termination Agreement and Full and Final Release and Discharge all dated as of October 24, 2005 (filed as Exhibits 99.1, 99.2 and 99.7 respectively to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.10 | Amendment No. 1 dated as of December 12, 2002 to the U.S. Guarantee and Security Agreement dated as of April 4, 2002 among Nortel Networks Limited, Nortel Networks Inc., the Subsidiary Lien Grantors party thereto and JPMorgan Chase Bank, as Collateral Agent, as terminated by Letter, Termination Agreement and Full and Final Release and Discharge all dated as of October 24, 2005 (filed as Exhibits 99.1, 99.2 and 99.7 respectively to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.11 | Canadian Guarantee and Security Agreement dated as of the first day of the ''Collateral Period'' (as defined therein) among Nortel Networks Limited and certain of its subsidiaries and JPMorgan Chase Bank, as Collateral Agent, as terminated by Letter, Termination Agreement and Full and Final Release and Discharge all dated as of October 24, 2005 (filed as Exhibits 99.1, 99.3 and 99.7 respectively to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.12 | Amendment No. 1 dated as of December 12, 2002 to the Canadian Guarantee and Security Agreement dated as of April 4, 2002 among Nortel Networks Limited, Nortel Networks Inc., the Subsidiary Guarantors party thereto and JPMorgan Chase Bank, as Collateral Agent, as terminated by Letter, Termination Agreement and Full and Final Release and Discharge all dated as of October 24, 2005 (filed as Exhibits 99.1, 99.3 and 99.7 respectively to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.13 | Form of Nortel Networks Limited Foreign Subsidiary Guarantee dated as of April 4, 2002 and schedule thereto listing the specific foreign subsidiary guarantees which are not attached as exhibits (filed as Exhibit 10.8 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.14 | Amendment No. 1 dated as of December 12, 2002 to certain Foreign Subsidiary Guarantees dated as of April 4, 2002 among Nortel Networks (Ireland) Limited, Nortel Networks UK Limited, Nortel Networks (Asia) Limited and JPMorgan Chase Bank, as Collateral Agent, as terminated by Letter, Termination Agreements and Full and Final Release and Discharge all dated as of October 24, 2005 (filed as Exhibits 99.1 to 99.7 respectively to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.15 | Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks Limited, the Subsidiary Guarantors party thereto and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.9 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.16 | Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks Limited, Nortel Networks International Corporation and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.10 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.17 | Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks Inc. and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.11 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.18 | Pledge Agreement dated as of April 4, 2002 among Nortel Networks Limited, Nortel Networks International Finance & Holding B.V., Nortel Networks S.A., and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.12 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.19 | Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks International Finance & Holding B.V., Nortel Communications Holdings (1997) Limited, Nortel Networks AB and JPMorgan Chase Bank, as Collateral Agent, together with(a) the Supplementing Pledge Agreement dated as of April 4, 2002 among Nortel Networks International Finance & Holding, B.V. and JPMorgan Chase Bank, as Collateral Agent,(b) the Pledge Agreement Supplement dated as of April 4, 2002 between Nortel Networks Limited and JPMorgan Chase Bank, as Collateral Agent, and(c) the Pledge Agreement Supplement dated as of April 4, 2002 between Nortel Networks U.K. Limited and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.13 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.20 | Foreign Pledge Agreement dated as of April 4, 2002 between Nortel Networks International Finance & Holding B.V. and JPMorgan Chase Bank, as Collateral Agent, together with(a) the Pledge Agreement Supplement, dated as of April 4, 2002 between Nortel Networks Optical Components Limited and JPMorgan Chase Bank, as Collateral Agent, and(b) the Pledge Agreement Supplement dated as of April 4, 2002 between Nortel Networks International Finance & Holding B.V., Nortel Networks Optical Components Limited and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.14 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |

HIGHLY CONFIDENTIAL

| Exhibit No | Description |
|---|---|
| *10.21 | Pledge Agreement Supplement dated as of May 20, 2002 between Nortel Networks Mauritius Ltd and JPMorgan Chase Bank, as Collateral Agent supplementing the Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks International Finance & Holding B.V., Nortel Communications Holdings (1997) Limited, Nortel Networks AB and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002). |
| *10.22 | Pledge Agreement Supplement dated as of May 15, 2002 between Nortel Networks International Finance & Holding B.V. and JPMorgan Chase Bank, as Collateral Agent, supplementing the Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks International Finance & Holding B.V., Nortel Communications Holdings (1997) Limited, Nortel Networks AB and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002). |
| *10.23 | Pledge Agreement Supplement dated as of June 4, 2002 between Nortel Networks Singapore Pte Ltd, and JPMorgan Chase Bank, as Collateral Agent, supplementing the Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks International Finance & Holding B.V., Nortel Communications Holdings (1997) Limited, Nortel Networks AB and JPMorgan Chase Bank, as Collateral Agent (filed as Exhibit 10.7 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002). |
| *10.24 | Pledge Agreement Supplement dated as of May 15, 2002 between Nortel Networks Limited and JPMorgan Chase Bank, as Collateral Agent, supplementing the Foreign Pledge Agreement dated as of April 4, 2002 among Nortel Networks Limited, the Subsidiary Guarantors party thereto and JP Morgan Chase Bank, as Collateral Agent (filed as Exhibit 10.8 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002). |
| *10.25 | Nortel Networks Limited SUCCESS Plan approved on July 25, 2002, as amended and restated on July 28, 2003 with effect from January 1, 2003, as amended on July 28, 2003 with effect from January 1, 2003, as amended on February 26, 2004 with effect from January 1, 2004 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2004). |
| *10.26 | Supplementary Pension Credits Arrangement (filed as Exhibit 10.14 to Nortel Networks Corporation's Registration Statement on Form S-1 (No. 2-71087)). |
| *10.27 | Statements describing the right of certain executives in Canada to defer all or part of their short-term and long-term incentive awards (filed as Exhibit 10.4 to Nortel Networks Limited's Quarterly Report on Form 10-Q for the quarter ended June 30, 2000). |
| *10.28 | Statement describing eligibility for the Group Life Insurance Plan for directors who are not salaried employees of Nortel Networks Corporation (filed as Exhibit 10.30 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2002). |
| *10.29 | Resolutions of the Board of Directors of Nortel Networks Limited dated December 17, 1993, as amended by resolutions of the Board of Directors of Nortel Networks Limited dated February 29, 1996, providing for retirement compensation of directors who are not salaried employees of Nortel Networks Limited or its subsidiaries (filed as Exhibit 10.33 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2002). |
| *10.30 | Agreement between a director of Nortel Networks Corporation and Nortel Networks Limited and the respective companies dated June 22, 2001, setting forth the arrangements with respect to serving as non-executive chairman of each of the board of directors of Nortel Networks Corporation and Nortel Networks Limited (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001). |
| *10.31 | Amended general description of cash bonus for employees and executives of Nortel Networks Corporation and Nortel Networks Limited as originally filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2002 (filed as Exhibit 10.01 to the Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003). |
| *10.32 | Nortel Networks Limited Restricted Stock Unit Plan dated as of January 30, 1997, as amended effective April 29, 1999, September 1, 1999, February 15, 2000, May 1, 2000, November 15, 2000 and January 23, 2003 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2003). |
| *10.33 | Nortel Networks Corporation Directors' Deferred Share Compensation Plan effective January 1, 2002 as amended and restated May 29, 2003, as amended and restated December 18, 2003 effective January 1, 2004 as amended June 29, 2005 effective immediately (filed as Exhibit 10.7 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 484

| Exhibit No | Description |
|---|---|
| *10.34 | Nortel Networks Limited Directors' Deferred Share Compensation Plan effective June 30, 1998 as amended and restated May 1, 2000, as further amended and restated effective January 1, 2002, as amended and restated May 29, 2003, as amended and restated December 18, 2003 effective January 1, 2004 as amended June 29, 2005 effective immediately (filed as Exhibit 10.8 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.35 | Nortel Networks Corporation 1986 Stock Option Plan as Amended and Restated, as amended effective April 30, 1992, April 27, 1995, December 28, 1995, April 8, 1998, February 25, 1999, April 29, 1999, September 1, 1999, December 16, 1999, May 1, 2000 and January 31, 2002 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.36 | Nortel Networks Corporation 2000 Stock Option Plan as amended effective May 1, 2000 and January 31, 2002 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.37 | Nortel Networks NA Inc., formerly known as Bay Networks, Inc., 1994 Stock Option Plan as Amended and Restated, as amended effective May 1, 2000 (filed as Exhibit 4.3 to Post-Effective Amendment No. 2 on Form S-8 to Nortel Networks Corporation's Registration Statement on Form S-4 (No. 333-9066)). |
| *10.38 | Nortel Networks/BCE 1985 Stock Option Plan (Plan of Arrangement 2000) (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2000). |
| *10.39 | Nortel Networks/BCE 1999 Stock Option Plan (Plan of Arrangement 2000) (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2000). |
| *10.40 | Assumption Agreement between Nortel Networks Corporation and Nortel Networks Limited dated March 5, 2001, regarding the assumption and agreement by Nortel Networks Corporation to perform certain covenants and obligations of Nortel Networks Limited under the Nortel Networks Limited Executive Retention and Termination Plan (filed as Exhibit 10.25 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2000). |
| *10.41 | Nortel Networks U.S. Deferred Compensation Plan (filed as Exhibit 4.3 to Post-Effective Amendment No. 1 to Nortel Networks Corporation's Registration Statement on Form S-8 (No. 333-11558)). |
| *10.42 | Master Facility Agreement dated as of February 14, 2003, and amended by Amending Agreement No. 1 dated July 10, 2003, between Nortel Networks Limited and Export Development Canada, and as further amended by letter agreements dated March 29, 2004, May 28, 2004, August 20, 2004, September 29, 2004, October 29, 2004, November 19, 2004, December 10, 2004, January 14, 2005, February 15, 2005, March 15, 2005, April 29, 2005 and May 31, 2005 and amended and restated as of October 24, 2005 (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.43 | Master Indemnity Agreement dated as of February 14, 2003 between Nortel Networks Limited and Export Development Canada, amended and restated as of October 24, 2005 (filed as Exhibit 10.3 to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.44 | Letter dated June 23, 2003 from the former President and Chief Executive Officer of Nortel Networks, to the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited regarding the voluntary return for cancellation of certain stock options to purchase common shares of Nortel Networks Corporation (filed as Exhibit 10.4 to the Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003). |
| *10.45 | Notice of Blackout to Nortel Networks Corporation's Board of Directors and Executive Officers Regarding Suspension of Trading dated March 10, 2004 (filed as Exhibit 99.2 to Nortel Networks Corporation's Current Report on Form 8-K dated March 10, 2004). |
| *10.46 | Summary statement of terms of initial compensation arrangements related to the president and chief executive officer approved by the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited as of April 29, 2004 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2004). |
| *10.47 | Asset Purchase Agreement dated June 29, 2004 among Nortel Networks Limited, Flextronics International Ltd. and Flextronics Telecom Systems, Ltd., amended as of November 1, 2004, February 7, 2005 and August 22, 2005 (filed as Exhibit 99.1 to Nortel Network Corporation's Current Report on Form 8-K dated August 26, 2005). |
| **10.48 | Amended and Restated Master Contract Manufacturing Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems, Ltd., amended as of November 1, 2004 (filed as Exhibit 10.59 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2004). |

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 485

| Exhibit No | Description |
|---|---|
| **10.49 | Master Repair Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems Limited, amended as of February 8, 2005 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| **10.50 | Master Contract Logistics Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems, Ltd., amended as of February 8, 2005 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| **10.51 | Letter Agreement dated June 29, 2004 among Nortel Networks Limited, Flextronics International Ltd. and Flextronics Telecom Systems, Ltd. (filed as Exhibit 10.7 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2004). |
| *10.52 | William A. Owens, President and Chief Executive Officer Employment Letter dated as at August 31, 2004 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004). |
| *10.53 | Letter, dated January 10, 2005, to Mr. Lynton (Red) Wilson, the Chairman of the Board of Nortel Networks Corporation, and modified March 1, 2005 and delivered on August 11, 2005 from certain officers of Nortel Networks Corporation (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated August 18, 2005). |
| *10.54 | Peter Currie, Executive Vice-President and Chief Financial Officer Employment Letter dated January 20, 2005 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| *10.55 | Gary Daichendt, President and Chief Operating Officer Employment Letter dated March 2, 2005 (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| *10.56 | Summary statement of terms of the additional special pension benefits for the Vice-Chairman and Chief Executive Officer approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the Independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on March 22, 2005 (filed as Exhibit 10.8 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| *10.57 | The Nortel 2005 Stock Incentive Plan (as filed with the 2005 Proxy Statement) (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.58 | Summary statement of the interest payable on the special pension benefits for the Vice-Chairman and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on May 27, 2005 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.59 | Form of Indemnity Agreement effective on or as of June 29, 2005 entered into between Nortel Networks Corporation and each of the following Directors: Harry J. Pearce, Ronald W. Osborne, Richard D. McCormick, John A. MacNaughton, James B. Hunt, Jr. and Jalynn H. Bennett (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.60 | Summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Corporation effective June 29, 2005 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.61 | Summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Limited effective June 29, 2005 (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.62 | Forms of Instruments of Grant generally provided to optionees granted options under the Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated or the Nortel Networks Corporation 2000 Stock Option Plan (filed as Exhibit 10.9 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.63 | Proxy Agreement effective as of July 29, 2005 with respect to Capital Stock of Nortel Government Solutions Inc. by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., Nortel Government Solutions Inc., James Frey, Thomas McInerney, Gregory Newbold, and the United States Department of Defense (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005). |

248

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 486

| Exhibit No | Description |
|---|---|
| *10.64 | Escrow Agreement dated as of March 1, 2005 and as entered into on August 11, 2005 between Nortel Networks Corporation, Computershare Trust Company of Canada and certain officers of Nortel Networks Corporation (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005). |
| *10.65 | Form of Instrument of Award in connection with the award of restricted stock units under the Nortel 2005 Stock Incentive Plan (filed as Exhibit 10.1 to Nortel Network Corporation's Current Report on Form 8-K dated September 12, 2005). |
| *10.66 | Termination Agreement dated September 7, 2005 between Nicholas DeRoma, Chief Legal Officer and Nortel Networks Corporation (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005). |
| *10.67 | Agreement and Plan of Merger dated as of April 25, 2005, by and among Nortel Networks Inc., PS Merger Sub, Inc. and PEC Solutions, Inc. (filed as Exhibit 99(d)(1) to Nortel Networks Inc. Current Report on Form SC TO-T dated May 3, 2005 and filed as Exhibit 10.9 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| 10.68 | William A. Owens letter agreement entered into on December 1, 2005, concerning the cessation of Mr. Owens' responsibilities as Vice-Chairman and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited effective November 15, 2005. |
| 10.69 | Nicholas DeRoma, former Chief Legal Officer, Letter Agreement dated December 20, 2005 amending the Termination Agreement dated September 7, 2005. |
| 10.70 | Steve Pusey, Executive Vice-President and President, Eurasia, Letter Agreement dated September 29, 2005 concerning a retention bonus. |
| 10.71 | Summary statement of employment terms and conditions for Mike Zafirovski, President and Chief Executive Officer effective November 15, 2005, as approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the Independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on October 16, 2005. |
| 10.72 | Mike Zafirovski, President and Chief Executive Officer, Indemnity Agreement dated January 18, 2006 with effect from October 31, 2005. |
| 10.73 | Nortel Networks Corporation Directors' Deferred Share Compensation Plan as amended December 7, 2005 and restated on June 29, 2005. |
| 10.74 | Nortel Networks Limited Directors' Deferred Share Compensation Plan as amended December 7, 2005 and restated on June 29, 2005. |
| 10.75 | Pascal Debon letter agreement dated February 21, 2006, concerning the cessation of Mr. Debon's responsibilities as Senior Advisor of Nortel Networks Corporation and Nortel Networks Limited effective December 23, 2005. |
| 10.76 | Brain McFadden letter agreement dated February 21, 2006, concerning the cessation of Mr. McFadden's responsibilities as Chief Research Officer of Nortel Networks Corporation and Nortel Networks Limited effective December 23, 2005. |
| 10.77 | Notice of Blackout to Nortel Networks Corporation's Board of Directors and Executive Officers Regarding Suspension of Trading dated March 10, 2006 (filed as Exhibit 99.2 to Nortel Networks Corporation's Current Report on Form 8-K dated March 10, 2006). |
| 21. | Subsidiaries of the Registrant. |
| 23. | Consent of Deloitte & Touche LLP. |
| 24. | Power of Attorney of certain directors and officers. |
| 31.1 | Rule 13a — 14(a)/15d — 14(a) Certification of the Vice-Chairman and Chief Executive Officer. |
| 31.2 | Rule 13a — 14(a)/15d — 14(a) Certification of the Chief Financial Officer. |
| 32. | Certification of the Vice-Chairman and Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

---

\* Incorporated by Reference
\*\* Certain portions of this Exhibit have been omitted based upon a request for confidential treatment. These portions have been filed separately with the United States Securities and Exchange Commission

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 487

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Brampton, Ontario, Canada on the 1st day of May, 2006.

**NORTEL NETWORKS CORPORATION**

By:    /s/   MIKE S. ZAFIROVSKI

(MIKE S. ZAFIROVSKI, President
and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on the 1st day of May, 2006.

| Signature | Title |
|---|---|
| Principal Executive Officer | |
| /s/ MIKE S. ZAFIROVSKI<br>(MIKE S. ZAFIROVSKI) | President and Chief Executive Officer,<br>and a Director |
| Principal Financial Officer | |
| /s/ PETER W. CURRIE<br>(PETER W. CURRIE) | Executive Vice-President and<br>Chief Financial Officer |
| Principal Accounting Officer | |
| /s/ PAUL W. KARR<br>(PAUL W. KARR) | Controller |

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 488

**Directors**

| | |
|---|---|
| J.H. BENNETT* | J.A. MACNAUGHTON* |
| (J.H. BENNETT) | (J.A. MACNAUGHTON) |
| | |
| M. BISCHOFF* | J.P. MANLEY* |
| (M. BISCHOFF) | (J.P. MANLEY) |
| | |
| R.E. BROWN* | R.D. MCCORMICK* |
| (R.E. BROWN) | (R.D. MCCORMICK) |
| | |
| J.E. CLEGHORN* | R.W. OSBORNE* |
| (J.E. CLEGHORN) | (R.W. OSBORNE) |
| | |
| J.B. HUNT, JR.* | H.J. PEARCE* |
| (J.B. HUNT, JR.) | (H.J. PEARCE) |
| | |
| R.A. INGRAM* | M.S. ZAFIROVSKI* |
| (R.A. INGRAM) | (M.S. ZAFIROVSKI) |

/s/   GORDON A. DAVIES

BY:* (GORDON A. DAVIES, as attorney-in-fact
May 1, 2006.)

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 489

(This page intentionally left blank)

**Annex D:**
**Item 9A ("Controls and Procedures")**
**of the NNC Annual Report on Form 10-K**
**for the Year Ended December 31, 2003**

D-1

**Item 9A.** *Controls and procedures*

In light of the relevance of the findings of the Independent Review to the matters addressed in this Item 9A, this Item 9A first sets forth in full the "Summary of Findings and of Recommended Remedial Measures of the Independent Review," submitted to the Audit Committee by WCPHD and Huron Consulting Services LLC, or the Independent Review Summary. The balance of this Item 9A addresses, among other matters:

- current management's conclusions concerning our disclosure controls and procedures as at December 31, 2003 and January 10, 2005 and certain earlier dates (see "Current Management Conclusions Concerning Disclosure Controls and Procedures");

- information relating to the First Restatement, including a discussion of material weaknesses in internal control over financial reporting identified at the time of the First Restatement (see "Additional Background—First Restatement");

- information relating to the Second Restatement, including a discussion of material weaknesses in internal control over financial reporting identified over the course of the Second Restatement (see "Additional Background—Second Restatement");

- the determination of the Audit Committee to review the facts and circumstances leading to the restatement of revenues, as part of the Second Restatement, for specific transactions during the periods 1999 through 2002, with particular emphasis on the underlying conduct that led to the initial recognition of these revenues, which we refer to as the Revenue Independent Review (see "Revenue Independent Review");

- the current status of our internal control over financial reporting and expectations as to management conclusions and the independent auditor attestation required to be included in our fiscal year 2004 Annual Report on Form 10-K, or the 2004 Form 10-K, pursuant to Section 404 of the Sarbanes-Oxley Act (see "Current Status of Material Weaknesses in Internal Control Over Financial Reporting and Expectations as to Required Management Conclusions and Independent Auditor Attestation Pursuant to Section 404 of the Sarbanes-Oxley Act");

- remedial measures adopted by the Board of Directors pursuant to the recommendations of WCPHD, and remedial measures identified, developed and begun to be implemented by our current management, including pursuant to recommendations from D&T (see "Remedial Measures"); and

- changes in internal control over financial reporting (see "Remedial Measures").

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 492

# SUMMARY OF FINDINGS AND OF RECOMMENDED REMEDIAL MEASURES OF THE INDEPENDENT REVIEW

# SUBMITTED TO THE AUDIT COMMITTEE OF THE BOARDS OF DIRECTORS OF NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED

Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, N.W.
Washington, D.C. 20037

Huron Consulting Services LLC
99 High Street
Boston, Massachusetts 02110

D-3

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 493