In late October 2003, Nortel Networks Corporation ("Nortel" or the "Company") announced that it intended to restate approximately $900M of liabilities carried on its previously reported balance sheet as of June 30, 2003, following a comprehensive internal review of these liabilities ("First Restatement"). The Company stated that the principal effects of the restatement would be a reduction in previously reported net losses for 2000, 2001, and 2002 and an increase in shareholders' equity and net assets previously reported on its balance sheet. Concurrent with this announcement, the Audit Committees of the Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited (collectively, the "Audit Committee" and the "Board of Directors" or "Board," respectively) initiated an independent review of the facts and circumstances leading to the First Restatement. The Audit Committee wanted to gain a full understanding of the events that caused significant excess liabilities to be maintained on the balance sheet that needed to be restated, and to recommend that the Board of Directors adopt, and direct management to implement, necessary remedial measures to address personnel, controls, compliance, and discipline. The Audit Committee engaged Wilmer Cutler Pickering Hale and Dorr LLP ("WCPHD") to advise it in connection with its independent review. Because of the significant accounting issues involved in the inquiry, WCPHD retained Huron Consulting Services LLC ("Huron") to provide expert accounting assistance. Huron has been involved in all phases of WCPHD's work.

## Scope of the independent review

The independent review focused initially on events relating to the establishment and release of contractual liability and other related provisions (also called accruals, reserves, or accrued liabilities) in the second half of 2002 and the first half of 2003, including the involvement of senior corporate leadership. (The review did not include provisioning activity in the first half of 2002 because it was not expected that any such activity could have had a material impact on the results of those quarters in light of the significant losses in those periods.) As the review evolved, its focus broadened to include specific provisioning activities in each of the business units and geographic regions. In light of concerns raised in the initial phase, the Audit Committee expanded the review to include provisioning activities in the third and fourth quarters of 2003.

The Audit Committee expressly directed that requested documents be promptly provided and that employees cooperate with requests for interviews; the Audit Committee instructed senior management to implement these directions throughout the Company. Over the course of the inquiry, more than 50 current and former Nortel employees were interviewed, some more than once. While the independent inquiry did not examine the work of Nortel's external auditor, Deloitte & Touche LLP, several current and former audit engagement partners were interviewed. Hundreds of thousands of hard copy and electronic documents and emails were collected and reviewed from corporate headquarters in Brampton, from company servers, and from key employees in the business units and in the regions.

It was beyond the scope of the independent inquiry to audit or otherwise review the substantive accuracy of Nortel's restated financial statements. As the inquiry progressed, the Audit Committee directed new corporate management to examine in depth the concerns identified by WCPHD regarding provisioning activity and to review provision releases in each of the four quarters of 2003, down to a low threshold. That examination, and other errors identified by management, led to a second restatement of financial results, filed today (the "Second Restatement"). WCPHD and Huron played no role in management's restatement efforts. It was also beyond the scope of the independent inquiry to review other aspects of Nortel's accounting practices. The Second Restatement addresses a number of these practices.

WCPHD and Huron reported regularly to the Audit Committee on the progress of the investigation. Most, or all, of the independent and non-management Board members attended these Audit Committee briefings. The Chairs of the Audit Committee and of the Board of Directors were briefed between Audit Committee meetings to provide them with a "real time" understanding of the progress of the investigation. At the direction of the Audit Committee, WCPHD and Huron met regularly with new management and the Company's external auditors to provide facts developed through the inquiry, so both would have this information as they proceeded through the Second Restatement. WCPHD and Huron also briefed Canadian and U.S. regulators on a regular basis. The Audit Committee has reviewed in detail the findings of the independent review and the recommended remedial measures, and it has adopted those findings and proposed remedial measures in their entirety. This synopsis summarizes those findings and proposed remedial measures.

## Summary of findings of the independent review

The investigation necessarily focused on the financial picture of the Company at the time that decisions were made and actions were taken regarding provisioning activity. Because of significant changes to financial results reflected in the Second Restatement, the restated financial results differ from the historical results that formed the backdrop for this inquiry.

HIGHLY CONFIDENTIAL

In summary, former corporate management (now terminated for cause) and former finance management (now terminated for cause) in the Company's finance organization endorsed, and employees carried out, accounting practices relating to the recording and release of provisions that were not in compliance with U.S. generally accepted accounting principles ("U.S. GAAP") in at least four quarters, including the third and fourth quarters of 2002 and the first and second quarters of 2003. In three of those four quarters—when Nortel was at, or close to, break even—these practices were undertaken to meet internally imposed pro-forma earnings before taxes ("EBT") targets. While the dollar value of most of the individual provisions was relatively small, the aggregate value of the provisions made the difference between a profit and a reported loss, on a pro forma basis, in the fourth quarter of 2002 and the difference between a loss and a reported profit, on a pro forma basis, in the first and second quarters of 2003. This conduct caused Nortel to report a loss in the fourth quarter of 2002 and to pay no employee bonuses, and to achieve and maintain profitability in the first and second quarters of 2003, which, in turn, caused it to pay bonuses to all Nortel employees and significant bonuses to senior management under bonus plans tied to a pro forma profitability metric.

The failure to follow U.S. GAAP with respect to provisioning can be understood in light of the management, organizational structure, and internal controls that characterized Nortel's finance organization. These characteristics, discussed below, include:

- Management "tone at the top" that conveyed the strong leadership message that earnings targets could be met through application of accounting practices that finance managers knew or ought to have known were not in compliance with U.S. GAAP and that questioning these practices was not acceptable;

- Lack of technical accounting expertise which fostered accounting practices not in compliance with U.S. GAAP;

- Weak or ineffective internal controls which, in turn, provided little or no check on inaccurate financial reporting;

- Operation of a complicated "matrix" structure which contributed to a lack of clear responsibility and accountability by business units and by regions; and

- Lack of integration between the business units and corporate management that led to a lack of transparency regarding provisioning activity to achieve internal EBT targets.

Nortel posted significant losses in 2001 and 2002 and downsized its work force by nearly two-thirds. The remaining employees were asked to undertake significant additional responsibilities with no increase in pay and no bonuses. The Company's former senior corporate management asserted, at the start of the inquiry, that the Company's downturn, and concomitant downsizing of operations and workforce, led to a loss of documentation and a decline in financial discipline. Those factors, in their view, were primarily responsible for the significant excess provisions on the balance sheet as of June 30, 2003, which resulted in the First Restatement. While that downturn surely played a part in the circumstances leading to the First Restatement, the root causes ran far deeper.

When Frank Dunn became CFO in 1999, and then CEO in 2001, he drove senior management in his finance organization to achieve EBT targets that he set with his senior management team. The provisioning practices adopted by Dunn and other finance employees were not in compliance with U.S. GAAP, particularly Statement of Financial Accounting Standards Number 5 ("SFAS 5"). SFAS 5, which governs accounting for contingencies, requires, among other things, a probability analysis for each risk before a provision can be recorded. It also requires that a triggering event—such as resolution of the exposure or a change in estimate—occur in the quarter to warrant the release of a provision. Dunn and other finance employees recognized that provisioning activity—how much to reserve for a particular exposure and when that reserve should be released—inherently involved application of significant judgment under U.S. GAAP. Dunn and others stretched the judgment inherent in the provisioning process to create a flexible tool to achieve EBT targets. They viewed provisioning as "a gray area." They became comfortable with the concept that the value of a provision could be reasonably set at virtually any number within a wide range and that a provision release could be justified in a number of quarters after the quarter in which the exposure, which formed the basis for the provision, was resolved. Dunn and others exercised their judgment strategically to achieve EBT targets.

**Third quarter, 2002.**    At the direction of then-CFO Doug Beatty, a company-wide analysis of accrued liabilities on the balance sheet was launched in early August 2002. The CFO and the Controller, Michael Gollogly, learned that this analysis showed approximately $303M in provisions that were no longer required and were available for release. The CFO and the Controller, each a corporate officer, knew, or ought to have known, that excess provisions, if retained on the balance sheet, would cause the Company's financial statements to be inaccurate and that U.S. GAAP would have required either that such provisions be released in that period and properly disclosed, or that prior period financial statements are restated. Instead, they permitted finance employees in the business units and in the regions to release

D-5

HIGHLY CONFIDENTIAL

excess accruals into income over the following several quarters. They acted in contravention of U.S. GAAP by failing to correct the Company's financial statements to account for the significant excess accrued liabilities. Neither the CFO nor the Controller advised the Audit Committee and/or the Board of Directors that significant excess provisions on the balance sheet had been identified and that the Company's financial statements might be inaccurate, nor did either suggest such information should be disclosed in the Company's financial statements.

As a result of this company-wide review, senior finance employees recognized that their respective business unit or region had excess provisions on Nortel's balance sheet, and directed other finance employees to track these excess provisions. Nortel finance employees had their own distinct term for a provision on the balance sheet that was no longer needed—it was "hard." Each business unit developed, in varying levels of detail and over varying periods of time, internal "hardness" schedules that identified provisions that were no longer required and were available for release. Finance employees treated provisions identified on these schedules as a pool from which releases could be made to "close the gap" between actual EBT and EBT targets in subsequent quarters.

**Fourth quarter, 2002.**  By mid-2002, employees throughout the Company were being recruited by other companies and morale was low. Corporate management sought to retain these employees but recognized that other public companies had come under criticism for awarding "stay" bonuses in the face of enormous losses. At management's recommendation, the Board determined to reward employees with bonuses under bonus plans tied to profitability. One plan, the Return to Profitability ("RTP") bonus, contemplated a one-time bonus payment to every employee, save 43 top executives, in the first quarter in which the Company achieved pro forma profitability. The 43 executives were eligible to receive 20% of their share of the RTP bonus in the first quarter in which the Company attained profitability, 40% after the second consecutive quarter of cumulative profitability, and the remaining 40% upon four quarters of cumulative profitability. In order for the RTP bonuses to be paid, pro forma profits had to exceed, by at least one dollar, the total cost of the bonus for that quarter. Another plan, the Restricted Stock Unit ("RSU") plan, made a significant number of share units available for award by the Board to the same 43 executives in four installments tied to profitability milestones. Once a milestone was met, the Board had discretion whether to make the award.

Through the first three quarters of 2002, Nortel experienced significant losses, and management reported to the Board that it expected losses would continue in the fourth quarter. After the initial results for the business units and regions were consolidated, they showed that Nortel unexpectedly would achieve pro forma profitability in the fourth quarter. Frank Dunn, who had been promoted to CEO in 2001, understood that profitability had been attained from an operational standpoint but determined that it was unwise to report profitability and pay bonuses in the fourth quarter because performance for the rest of the year had been poor. He determined that provisions should be taken to cause a loss for the quarter. Over a two day period late in the closing process, the CFO and the Controller worked with employees in the finance organizations in the business units, the regions, and in global operations, to identify and record additional provisions totaling more than $175 million. All of these provisions were recorded "top-side"—that is, by employees in the office of the Controller based on information provided by the business units, regions and global operations—because of the late date in the closing process on which they were made. Nortel's results for the fourth quarter of 2002 turned from an unexpected profit into the loss previously forecasted by management to the Board of Directors. Neither the CEO, the CFO, nor the Controller advised the Audit Committee and/or the Board of Directors of this concerted provisioning activity to improperly turn a profit into a loss. Nortel has since determined that many of these provisions were not recorded in compliance with U.S. GAAP, and has reversed those provisions in the Second Restatement. The loss then reported by Nortel in the fourth quarter meant that no employee bonuses were paid for that quarter.

**First quarter, 2003.**  While Nortel had announced publicly that it expected to achieve pro forma profitability in the second quarter of 2003, Dunn told a number of employees that he intended to achieve profitability one quarter earlier, and he established internal EBT targets for each business unit and for corporate to reach that goal. At Dunn's direction, "roadmaps" were developed to show how the targets could be achieved. These roadmaps made clear that the internal EBT targets for the quarter could only be met through release from the balance sheet of excess provisions that lacked an accounting trigger in the quarter. At the request of finance management in each business unit, finance employees identified excess, or "hard," provisions from the balance sheet, and, together, they determined which provisions to release to close the gap and meet the internal EBT targets. That release activity was supplemented by releases, directed by the CFO and by the Controller, of excess corporate provisions that had been identified in the third quarter of 2002 as available for release. Releases of provisions by corporate and by each business unit and region, including excess provisions, totaling $361M, enabled Nortel to show a consolidated pro forma profit in the first quarter, notwithstanding that its operations were running at a loss. The Finance Vice Presidents of the business units and two of the three regions, the Asia Controller, the CFO, the Controller, and the CEO knew, or ought to have known, that U.S. GAAP did not

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 496

permit the release, without proper justification, of excess provisions into the income statement. Nortel has since determined that many of these releases in this quarter were not in accordance with U.S. GAAP, and has reversed those releases in the First and Second Restatements and restated the releases into proper quarters.

When presenting the preliminary results for the quarter to the Audit Committee, the Controller inaccurately represented that the vast majority of these releases were "business as usual" and in compliance with U.S. GAAP, and that the remaining releases were one time, non-recurring events and in compliance with U.S. GAAP. Further, the CFO and the Controller failed to advise the Audit Committee and/or the Board of Directors that release of excess corporate provisions was required to achieve profitability and make up for the shortfall in operational results; that such releases were needed to cover the cost of the bonus compensation; that no event in the quarter triggered the releases (as required by U.S. GAAP); that the releases implicated Staff Accounting Bulletin 99 (relating to materiality) because they turned a loss for the quarter into a profit; and that they retained a significant amount of excess provisions on the balance sheet to be used, when needed, in a subsequent quarter. In separate executive sessions held by the Audit Committee with the CFO and the Controller, neither the CFO nor the Controller raised quality of earnings issues nor questioned the payment of the RTP bonus. Based on management's representations, the Audit Committee approved the quarterly results, and the Board approved the award of the RTP bonus.

**Second quarter, 2003.** Seeking to continue to show profitability in the second quarter and meet the first RSU milestone and the second tranche of the RTP bonus, senior corporate management developed internal EBT targets to achieve pro forma profitability. As was the case in the first quarter, it became clear during the quarter that operational results would be a loss. At the request of finance management in each business unit, finance employees again identified "hard" provisions from the balance sheet, and, together, they determined which provisions to release to close the gap and achieve the internal EBT targets. Nortel has since determined that many of these releases were not in accordance with U.S. GAAP, and has reversed those releases in the First and Second Restatements and restated the releases into proper quarters. In both the first and second quarters of 2003, the dollar value of many individual releases was relatively small, but the aggregate value of the releases made the difference between a pro forma loss and profit in each quarter.

The CEO, the CFO and the Controller failed to advise the Audit Committee or the Board of Directors that operations of the business units were running at a loss during the second quarter and that the validity of many of the numerous provision releases, totaling more than $370 million, could be questionable. Based on management's representations, the Audit Committee approved the quarterly results, and the Board approved payment of the second tranche of the RTP bonus and awarded restricted stock under the RSU plan.

**Third and fourth quarters, 2003.** In light of concerns raised by the inappropriate accounting judgments outlined above, the Audit Committee expanded its investigation to determine whether excess provisions were released to meet internal EBT targets in each of these two quarters. No evidence emerged to suggest an intent to release provisions strategically in those quarters to meet EBT targets. Given the significant volume of provision releases in these two quarters, the Audit Committee directed management to review provision releases, down to a low threshold, using the same methods used to evaluate the releases made in the first half of the year. This review has resulted in additional adjustments for these quarters, which are reflected in the Second Restatement.

**Governing Principles for Remedial Measures**

The Audit Committee asked WCPHD to recommend governing principles, based on its independent inquiry, to prevent recurrence of the inappropriate accounting conduct, to rebuild a finance environment based on transparency and integrity, and to ensure sound financial reporting and comprehensive disclosure. The recommendations developed by WCPHD and provided to the Audit Committee were directed at:

- Establishing standards of conduct to be enforced through appropriate discipline;

- Infusing strong technical skills and experience into the finance organization;

- Requiring comprehensive, on-going training on increasingly complex accounting standards;

- Strengthening and improving internal controls and processes;

- Establishing a compliance program throughout the Company which is appropriately staffed and funded;

- Requiring management to provide clear and concise information, in a timely manner, to the Board to facilitate its decision-making; and

HIGHLY CONFIDENTIAL        NNC-NNL06705393 / 497

- Implementing an information technology platform that improves the reliability of financial reporting and reduces the opportunities for manipulation of results.

These recommendations were grouped into three categories—people, processes and technology—and are discussed below:

- People

An effective "tone at the top" requires effective policies and procedures, but these alone are not sufficient. Those who manage and lead the Company, and are its officers, must exercise the highest fiduciary duties to the Company and shareholders and must be accountable, both to corporate management and the Board, for accurately reporting financial results.

Based on periodic reports by WCPHD on the progress of the independent inquiry, the Audit Committee recommended, and the Board of Directors approved, termination for cause of the CEO, the CFO, the Controller, and seven additional senior finance employees. The Board of Directors determined that each of these individuals had significant responsibilities for Nortel's financial reporting as a whole, or for their respective business units and geographic regions, and that each was aware, or ought to have been aware, that Nortel's provisioning activity, described above, did not comply with U.S. GAAP. Nortel has formally demanded the return of all bonus compensation paid to each of these individuals in 2003. Once the Board receives responses to this demand, it should determine the appropriate course of action to pursue with each of these ten former employees.

Senior corporate officers, including the four Presidents of the business units during the period covered by this inquiry, the four Presidents of the regions, and the President of Global Operations, now recognize that inappropriate activity involving provisioning occurred "on their watch." While they lacked an understanding that certain provisioning activities in their respective business units were not in compliance with U.S. GAAP, they now recognize that such conduct was instrumental in achieving the reported results in the fourth quarter of 2002 and the first and second quarters of 2003. To demonstrate personal commitment to the governing principles stated above and to lead the Company forward, each of these officers has volunteered to return to the Company the entire RTP bonus that he or she was awarded, net of taxes already paid, and to disclaim any opportunity to receive the third and fourth installments of the RSU bonus, which the Board has accepted. In light of the Board's expectation that senior employees of the Company will lead by example, the Board should decline to award the third and fourth tranches of the RSU plan to the remaining eligible employees, irrespective of whether the profitability metrics for such bonuses are met as a result of the Second Restatement.

The Board of Directors must make clear that it has not tolerated, and will not in the future tolerate, accounting conduct that involves the misapplication of U.S. GAAP. It must further communicate its expectation that every Nortel employee will adhere to the highest ethical standards; will have training and experience commensurate with his or her job responsibilities; and will be held accountable for his or her actions and decisions. The Board of Directors and management should continue to address the issues associated with the inappropriate use of provisions.

Recent experience has shown that the Nortel finance organization lacks sufficient technical accounting expertise. Many finance employees are "career" Nortel employees and learned accounting at Nortel. Whatever basic accounting knowledge is resident within Nortel is largely knowledge of Canadian GAAP, not U.S. GAAP. Nortel reported in accordance with Canadian GAAP until 2000, when it switched to reporting in accordance with U.S. GAAP. High quality finance employees are critical to the soundness of the Company's financial reporting systems and controls so that the results of operations are reported accurately and in a timely manner. The Board of Directors should direct management to recruit, from outside Nortel, individuals with strong accounting and financial reporting skills and a proven record of integrity and ethical behavior to fill key finance positions. The Board should also direct management to review the training and experience of Nortel mid-level finance employees and to supplement this expertise, where appropriate, by hiring individuals from outside Nortel with strong accounting training and background.

Nortel has long had an internal "technical accounting group" to which finance employees were supposed to turn for resolution of difficult accounting questions and for technical accounting interpretations. While this practice is a sound one, the practical application has fallen short. Finance employees did not regularly turn to this group for resolution of an issue, and it was far from clear that this group had the "last word" on such issues. That technical accounting group should be led by a very senior finance executive with in-depth knowledge of, and experience in applying, U.S. GAAP. Management should be directed to conduct a benchmarking study to evaluate whether the technical accounting group is properly organized; its personnel component is consistent with other similar companies; its staff has appropriate and current expertise; and its authority to resolve accounting issues and technical interpretations is clearly defined within the organization.

D-8

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 498

Notwithstanding the enormous time and resources that the Company has devoted to restatement activities for the past year, many employees appear to lack a clear understanding of the accounting issues that gave rise to the restatements. That is perhaps not surprising in light of the lack of basic U.S. GAAP training and expertise in the finance organization. Management has taken significant steps to remedy this deficit by requiring mandatory training, developed by external consultants, and taught by knowledgeable finance employees. These remedial training programs are an important first step, but much more must be done to ensure that the finance organization is fluent in governing accounting standards and principles. Widespread training, by outside experts, at all levels of the finance organization, must continue so that all finance employees receive comprehensive training in U.S. GAAP and in the consequences of failing to follow U.S. GAAP. Going forward, management should develop in depth, on-going continuing education programs that explain continuously evolving complex accounting standards. Management should assess the staffing of its training organization, and the adequacy of its trainers. Every Nortel employee, including each finance employee, must now acknowledge annually, in writing, that he or she has read Nortel's code of conduct and will adhere to that code. The certification for each finance employee should be expanded to include an acknowledgement that each such employee is familiar with all applicable U.S. GAAP requirements. In addition, the Board should consider whether each finance employee should be required to complete a certain number of hours of continuing professional education each year.

### Processes

A basic component of sound corporate oversight is the control structure. Internal controls—the Company's accounting policies, organizational structure, systems, processes, employees, leadership, and culture—working together, foster accurate financial reporting and sound disclosure in a timely manner. While management has recognized weaknesses in existing processes and controls, and has taken steps to remedy these deficiencies, more needs to be done.

Nortel is a multi-national organization that has changed organizational structure over the past several years. One legacy of this changing structure is a matrix organization in which there is no clear assignment of responsibility for assessing the adequacy and usage of contractual liability provisions; even where responsibility is clear, it is unlikely that sufficient monitoring is in place to make sure that provisioning activity is in accord with U.S. GAAP. The need for the matrix organization must be re-examined in light of the risks that it poses to financial discipline and accountability and, if a matrix structure continues to be used, clear accountability must be established.

Historically, finance employees responsible for meeting EBT targets had authority to record and release provisions. That practice must end immediately. The control organization must have sole authority to make these decisions and record these entries. The Board of Directors must insist that the re-engineering of the control organization be a management priority. In addition, the Controller and the control organization, working with the General Counsel, must develop standards of transparency in financial reporting that meet both the letter and the spirit of legal requirements.

Nortel's written accounting policies must be reviewed and, where necessary, rewritten to ensure strict adherence to U.S. GAAP and provide numerous "real life" examples of practical applications. Procedures must be adopted to identify evolving interpretations of accounting standards and best practices under U.S. GAAP and to develop and conform Nortel's policies in a timely manner. Employees charged with responsibility for Nortel's accounting policies must have substantial knowledge of the strengths and weaknesses of the financial organization and knowledge of best practices in similarly situated companies and ensure that accounting practices follow Nortel's policies. These policies must be communicated to finance and control employees, and management must stress the importance of adherence to the policies and impose sanctions if they are not followed.

The internal audit function must be strengthened and must provide an independent check on the integrity of financial reporting. Historically, Nortel's internal auditor focused solely on "operational" reviews and had no role in determining whether Nortel's accounting policies were in compliance with U.S. GAAP or in evaluating whether these policies were properly applied. The Audit Committee has already established new priorities for the internal auditor relating to the evaluation of risk exposures for financial reporting. Internal audit should continue its practice of proposing an annual work plan, and should ensure that the work plan focuses on the new priorities set by the Audit Committee. The Company is currently conducting a search to fill the vacant position of internal auditor. The internal audit function requires a leader with substantial experience in applying U.S. GAAP in a similarly-situated company and great familiarity in applying professional standards issued by the Institute of Internal Auditors. The internal auditor should report to the CEO to remove any potential threat to independence. The internal auditor should continue to have direct and regular access to the Board and the Audit Committee. Staffing of internal audit must be consistent with its mandate.

These governing principles are an effort to forge a framework for rebuilding the Nortel finance environment. Equally important, the Board, the CEO, and the CFO must continue to promote high ethical standards throughout the Company.

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 499

Words announcing adherence to the highest standard of integrity are relatively easy to express, but it is actions, not words, that count. The Board has established the position of a Chief Ethics and Compliance Officer. The Board has also adopted a code of ethical conduct and business practices which outlines principles to guide ethical decision-making and provides practical answers to ethics questions regularly asked in the workplace. The Board should direct management to enhance significantly the existing compliance program. Together, the code and a strengthened compliance program set the tone and the standards of behavior that the Company expects from its employees. Employees must be convinced of the Company's commitment to an ethical climate, and of the central role that they play in ensuring that the Company's code is followed. They must view compliance with the Company's code of conduct, standards, and control systems as a central priority, and understand they will be rewarded for ethical behavior, even if it uncovers some problem that others might prefer to remain undisclosed. On a regular basis, the Board should review the activities of the compliance office, the strength of the compliance program, and the risks it has addressed.

The Board must receive from management, in sufficient time prior to meetings, all materials necessary for it to monitor and act on business risks affecting Nortel and information relating to decisions the Board is being asked to make. The Audit Committee needs clear and concise information relating to Nortel's financial reporting. The Board should implement a process whereby management would provide a quarterly assessment of the overall quality and transparency of Nortel's financial reporting and suggestions for improvements in form and content, which the external auditors would review and comment. The Board's practice of receiving all information respecting Nortel's financial performance on a consolidated basis, and of each of its business units, only from the CFO should change. The heads of each business unit should be expected to take full responsibility for the financial results of their respective businesses and to provide quarterly presentations to the Board with the senior finance employee in that business unit. Periodically, the Audit Committee should have separate, executive sessions with the chief operations and finance employees for each business unit to discuss issues specific to their businesses.

### Technology

Management has announced that it intends to acquire and install a SAP information technology platform to facilitate production of accurate financial results in a timely and cost effective manner. The objectives of any technology platform implemented by Nortel should include identification of existing control procedures that are redundant or inefficient; prevention/detection and correction of errors on a timely basis; prevention or detection of fraud; simplification of systems and increased productivity; reduction of opportunities for manual intervention; ability to trace transactions from start to finish; improved operation of controls; and substantive analysis of results, including both operating and financial metrics. In sum, those responsible for implementing SAP should have a strong focus on re-engineering existing processes so that the control elements intrinsic to the SAP system are effective.

\*\*\*\*\*\*

After thorough consideration, the Audit Committee has recommended, and the Board of Directors has approved, adoption of each of these recommendations. The Board of Directors has directed management to develop a detailed plan and timetable for the implementation of these recommendations and intends to monitor the implementation of these principles by management.

\*\*\*\*\*\* [End of Independent Review Summary]

**Current Management Conclusions Concerning Disclosure Controls and Procedures**

In January 2005, we carried out an evaluation under the supervision and with the participation of management, including the current CEO and current CFO, pursuant to Rule 13a-15 under the Exchange Act, of the effectiveness of our disclosure controls and procedures as at December 31, 2003 (the end of the period covered by this report) and as at January 10, 2005. The CEO and CFO were appointed to such positions as at April 28, 2004, with the CFO having served in such capacity on an interim basis since March 15, 2004.

In making this evaluation, the CEO and CFO considered, among other matters:

- the Second Restatement and the revisions to our preliminary unaudited results for the year ended December 31, 2003;

- the findings of the Independent Review summarized above in the Independent Review Summary;

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 500

- the terminations for cause of our former president and chief executive officer, former chief financial officer, former controller and seven additional senior finance employees during the course of the Independent Review and the reasons therefor as described in the Independent Review Summary;

- the material weaknesses in our internal control over financial reporting that we and our external auditor, D&T have identified (as more fully described below);

- the measures we have identified, developed and begun to implement beginning in November 2003 to remedy those material weaknesses (as more fully described below);

- our omission of 1999 and 2000 selected financial data from this report, and our decision not to amend our 2002 Form 10-K/A and our 2003 quarterly reports (as more fully described below); and

- the decision of the Audit Committee to undertake the Revenue Independent Review (as more fully described below).

Based on this evaluation, the CEO and CFO have concluded that our disclosure controls and procedures, as at December 31, 2003 and January 10, 2005, were not effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required.

In light of this conclusion and as part of the extensive work undertaken in connection with the Second Restatement, we have applied compensating procedures and processes as necessary to ensure the reliability of our financial reporting. Accordingly, management believes, based on its knowledge, that (i) this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report and (ii) the financial statements, and other financial information included in this report, fairly present in all material respects our financial condition, results of operations and cash flows as at, and for, the periods presented in this report.

The Second Restatement and other matters listed above have also resulted in the re-evaluation, in January 2005, of the effectiveness of our disclosure controls and procedures as at December 31, 2002, March 31, 2003, June 30, 2003 and September 30, 2003. Based on these evaluations and in consideration of the Second Restatement and other matters listed above, the CEO and CFO have concluded that our disclosure controls and procedures, as at December 31, 2002, March 31, 2003, June 30, 2003 and September 30, 2003, were not effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required.

These new conclusions are in contrast to conclusions reached as a result of previous evaluations carried out under the supervision and with the participation of management, including the former chief executive officer and former chief financial officer. In particular, these conclusions differ from the conclusions stated in our 2002 Annual Report on Form 10-K and Quarterly Reports on Form 10-Q for the quarters ended March 31, 2003 and June 30, 2003 that our disclosure controls and procedures were so effective as at December 31, 2002, March 31, 2003 and June 30, 2003, respectively. They also differ from the conclusions based upon the re-evaluations carried out in December 2003 under the supervision and with the participation of management, including the former president and chief executive officer and former chief financial officer, as stated in our amended 2002 Annual Report on Form 10-K/A, or the 2002 Form 10-K/A, and amended Quarterly Reports on Form 10-Q for the quarters ended March 31, 2003 and June 30, 2003, or the 2003 Form 10-Q/As, that our disclosure controls and procedures were so effective as at December 31, 2002, March 31, 2003 and June 30, 2003, respectively, after taking into account the First Restatement and the identification of certain material weaknesses. These new conclusions also differ from the conclusions stated in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2003 that our disclosure controls and procedures were so effective as at September 30, 2003, after taking into account the First Restatement and the identification of certain material weaknesses.

******

**Additional Background**

This section provides additional information with respect to the identified material weaknesses and other deficiencies, as well as certain additional background information regarding the First Restatement and the Second Restatement.

In this report, unless otherwise indicated, the terms "material weakness" and "reportable condition" have the meanings as formerly set forth under standards established by the AICPA, which were applicable with respect to 2003. The AICPA

HIGHLY CONFIDENTIAL          NNC-NNL06705393 / 501

then defined a (i) "reportable condition" as a matter that comes to an auditor's attention that represents a significant deficiency in the design or operation of internal control that could adversely affect an entity's ability to initiate, record, process and report financial data consistent with the assertions of management in the financial statements and (ii) "material weakness" as a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.

### First Restatement

#### Overview

In May 2003, we commenced certain balance sheet reviews at the direction of certain members of former management that led to the Comprehensive Review, which resulted in the First Restatement. Each of the former members of management terminated for cause had responsibility for their respective positions at the time of the Comprehensive Review and First Restatement. As disclosed in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2003, the Comprehensive Review was initiated "[I]n light of a period of unprecedented industry adjustment and subsequent restructuring actions, including workforce reductions and asset write-downs .... The amounts under review were recorded when our balance sheet and income statement were much larger. Specifically, what would have been relatively minor amounts in prior periods may be considered to be material to current periods." As noted in the Independent Review Summary, "Nortel posted significant losses in 2001 and 2002 and downsized its work force by nearly two-thirds. The remaining employees were asked to undertake significant additional responsibilities with no additional increase in pay and no bonuses. The Company's former senior corporate management asserted, at the start of the inquiry, that the Company's downturn, and concomitant downsizing of operations and workforce, led to a loss of documentation and a decline in financial discipline. Those factors, in their view, were primarily responsible for the significant excess provisions on the balance sheet as at June 30, 2003, which resulted in the First Restatement. While that downturn surely played a part in the circumstances leading to the First Restatement, the root causes ran far deeper." The root causes of the First Restatement, as identified in the Independent Review, are more fully discussed in the Independent Review Summary.

The Comprehensive Review purported to (i) identify balance sheet accounts that, as at June 30, 2003, were not supportable and required adjustment; (ii) determine whether such adjustments related to the third quarter of 2003 or prior periods; and (iii) document certain account balances in accordance with our accounting policies and procedures. The Comprehensive Review, as supplemented by additional procedures carried out between July 2003 and November 2003 to quantify the effects of potential adjustments in the relevant periods and review the appropriateness of releases of certain contractual liability and other related provisions (also called accruals, reserves or accrued liabilities) in the six fiscal quarters ending with the fiscal quarter ended June 30, 2003, formed the basis for the adjustments made to the financial statements in the First Restatement.

On December 23, 2003, we filed with the SEC the 2002 Form 10-K/A and the 2003 Form 10-Q/As reflecting the First Restatement. As disclosed in those reports, the net effect of the First Restatement adjustments was a reduction in accumulated deficit of $497 million, $178 million and $31 million as at December 31, 2002, 2001 and 2000, respectively. The following were the principal adjustments of the First Restatement:

- Approximately $935 million and $514 million of certain liabilities (primarily accruals and provisions) carried on our previously reported consolidated balance sheet as at December 31, 2002 and 2001, respectively, were released to income in prior periods.

- We determined to correct certain known errors previously not recorded because the amount of the errors was not material to the consolidated financial statements. Specifically, among other items, we made certain revenue adjustments to reflect revenue that should have been deferred instead of recognized in a particular period.

- We made adjustments to correct errors related to deferred income tax assets and foreign currency translation accounts and made reclassification adjustments within the consolidated balance sheet to better reflect the underlying nature of certain items. These reclassifications did not impact our net assets as at the end of any period.

D-12

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 502

*Material Weaknesses and Other Deficiencies in Internal Control over Financial Reporting Identified at the Time of the First Restatement*

In 2003, we, together with D&T, identified a number of deficiencies in our internal control over financial reporting.

On July 24, 2003, D&T first informed the Audit Committee that deficiencies in documentary support for certain accruals and provisions on our balance sheet as at June 30, 2003 constituted a reportable condition, but not a material weakness, in our internal control over financial reporting. In particular, D&T concluded, in respect of this reportable condition, that it was unclear, due to the lack of documentation regarding support for certain provisions and accruals, the passage of time and the turnover of personnel, as to what adjustments, if any, should have been made in prior years. D&T noted that its assessment was based on such information as was available at the date of its communication to the Audit Committee and the materiality of the underlying amounts in the context of 2003 reported results. This conclusion was initially disclosed in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2003.

On November 18, 2003, as part of the communications by D&T to the Audit Committee with respect to D&T's interim audit procedures for the year ended December 31, 2003, D&T informed the Audit Committee that there were two reportable conditions, each of which constituted a material weakness in our internal control over financial reporting. No other reportable conditions were communicated by D&T to the Audit Committee at the time of the First Restatement. These reportable conditions were as follows:

- lack of compliance with established Nortel Networks procedures for monitoring and adjusting balances related to certain accruals and provisions, including restructuring charges; and

- lack of compliance with established Nortel Networks procedures for appropriately applying U.S. GAAP to the initial recording of certain liabilities, including those described in SFAS No. 5, and to foreign currency translation as described in SFAS No. 52.

The foregoing material weaknesses contributed to the need for the First Restatement. Upon completion of our assessment of our internal control over financial reporting as at December 31, 2004 pursuant to Section 404(a) of the Sarbanes-Oxley Act of 2002 and related SEC rules, or SOX 404, we currently expect to conclude that these material weaknesses continue to exist as at December 31, 2004, and we continue to identify, develop and begin to implement remedial measures to address them, as described below.

### Second Restatement

#### Independent Review

In late October 2003, the Audit Committee initiated the Independent Review in order to, as noted in the Independent Review Summary, "gain a full understanding of the events that caused significant excess liabilities to be maintained on the balance sheet that needed to be restated, and to recommend that the Board of Directors adopt, and direct management to implement, necessary remedial measures to address personnel, controls, compliance and discipline." As noted in the Independent Review Summary, "[t]he [Independent Review] focused initially on events relating to the establishment and release of contractual liability and other related provisions ... in the second half of 2002 and the first half of 2003, including the involvement of senior corporate leadership .... As the [Independent Review] evolved, its focus broadened to include specific provisioning activities in each of the business units and geographic regions. In light of concerns raised in the initial phase of the [Independent Review], the Audit Committee expanded the review to include provisioning activities in the third and fourth quarters of 2003."

As discussed more fully above in the Independent Review Summary, the Independent Review concluded that "[i]n summary, former corporate management (now terminated for cause) and former finance management (now terminated for cause) in the Company's finance organization endorsed, and employees carried out, accounting practices relating to the recording and release of provisions that were not in compliance with [U.S. GAAP] in at least four quarters, including the third and fourth quarters of 2002 and the first and second quarters of 2003. In three of those four quarters—when Nortel was at, or close to, break even—these practices were undertaken to meet internally imposed pro-forma earnings before taxes relatively small, the aggregate value of the provisions made the difference between a profit and a reported loss, on a pro forma basis, in the fourth quarter of 2002 and the difference between a loss and a reported profit, on a pro forma basis, in the first and second quarters of 2003."

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 503

*Second Restatement Process*

As noted in the Independent Review Summary, "[a]s the [Independent Review] progressed, the Audit Committee directed new corporate management to examine in-depth the concerns identified by WCPHD regarding provisioning activity and to review provision releases in each of the four quarters of 2003, down to a low threshold. That examination, and other errors identified by management, led to [the Second Restatement]"

In addition to this examination of provisioning activity, management, including our new CFO, undertook various initiatives aimed at ensuring the reliability and integrity of the audited consolidated financial statements included in this report. As part of these efforts, our new CFO encouraged employees across our finance organization to raise any questions or concerns regarding other potential accounting errors that should be reviewed for possible adjustment in the Second Restatement. In addition, as management identified individual customer contracts and transactions for re-examination of the establishment and release of provisions, management also undertook a review of many of those contracts and transactions more generally to understand the broader nature of the original accounting for the contract or transaction. This individual contract and transaction review also identified additional accounting issues. As a result of these initiatives, management, with the assistance of outside consultants, then undertook further detailed reviews of our significant accounting policies, specific transactions and communications and other documents relating to the identified issues. As a result, the Second Restatement included adjustments to correct errors relating to a number of accounting issues other than provisioning.

In particular, management identified various errors involving recognition of revenues. To identify, assess and remedy these errors, management, assisted by outside consultants, reviewed a substantial number of individual transactions as well as significant accounting policies across all of our major product lines and geographical regions. As part of our review of individual contracts, we analyzed the relevant contractual provisions (such as delivery and acceptance terms), delivery and other data from our logistics systems, characteristics of the particular products and customers and the manner in which revenue recognition policies were applied. We also utilized databases within our accounting systems to identify additional contracts that might raise revenue recognition issues. In light of the increasing magnitude of the total revenue adjustments identified by the beginning of November 2004, the Board of Directors directed management to conduct additional focused revenue reviews in selected periods in order to test the conclusions we had reached and identify any potential additional revenue adjustments. Management has completed these reviews.

Overall in the Second Restatement, as a result of adjustments to correct errors related to revenue recognition, we increased revenues by an aggregate of $1,492 million in 2001 and $439 million in 2002. We also increased previously announced 2003 revenues by an aggregate of $386 million. Most of these adjustments constituted the recognition of revenues that had previously been improperly recognized in prior years and should have been deferred (often over a number of years). This also had the effect of reducing previously reported revenues in 1998, 1999 and 2000 by approximately $158 million, $355 million and $2,866 million, respectively. Of these adjustments identified in the Second Restatement, approximately $750 million of revenues had been deferred to years after 2003, while approximately $250 million of revenues was permanently reversed, as described below.

In light of the total magnitude of these revenue adjustments, we present below an overview of the principal revenue adjustments required in the Second Restatement to correct accounting errors related to revenue recognition and the general circumstances that gave rise to them. In addition, as described under "Revenue Independent Review", the Audit Committee has determined to review the facts and circumstances leading to the restatement of these revenues for specific transactions identified in the Second Restatement. The Revenue Independent Review will have a particular emphasis on the underlying conduct that led to the initial recognition of these revenues, and will consider any appropriate additional remedial measures, including those involving internal controls and processes.

### *Title and delivery—An increase of $1,624 million in 2001 and $211 million in 2002.*

Of this amount, we made adjustments of approximately $870 million in 2001 and $200 million in 2002 to correct errors relating to passage of product title or risk of loss. Both employee input and our review of the broader original accounting treatment of certain individual contracts identified a specific customer contract as warranting re-examination of the timing of revenue recognition relative to the timing of passage of product title. Following a detailed review, we determined that revenues had been recorded erroneously before title had passed. We also reviewed other similar contracts and determined that corrections were also required where title or risk of loss had not passed. These corrections principally impacted North American contracts in our Optical and Wireline businesses.

D-14

Some of the adjustments related to title and risk of loss issues described above resulted in a permanent reversal of revenues, rather than a deferral of revenues to later periods. In certain cases, revenues were recognized in error in a particular period (before title had passed and the criteria for revenue recognition had been met) and a bad debt expense was subsequently recorded due to collectibility issues. In such cases, both entries were reversed. Following those corrections, if title in fact never passed or the other criteria were never met, and the customer failed to pay, the revenues were not recognized in subsequent periods but instead permanently reversed. We permanently reversed a total of approximately $150 million of revenues in 2000 and $25 million in 2001 as a result of title and risk of loss adjustments.

We also identified errors related to title and delivery issues in connection with arrangements known as "bill and hold" transactions, in which revenue is recognized before actual delivery of the product. Corrections of these errors resulted in the deferral of revenue into later periods, which had the effect of a net increase to revenues of approximately $760 million in 2001 and $10 million in 2002. Our scrutiny of this issue was similarly prompted by employee input. In this situation, we determined that the relevant accounting policy had been incorrectly applied to a number of contracts, and revenues were recognized where the relevant criteria had not been fully met. In reviewing individual contracts, we examined, among other things: whether significant product returns had occurred in later periods, the accounts receivable history, whether better pricing was provided for the particular purchase order to incent a customer to enter into a bill and hold arrangement, whether purchase orders were eventually placed by the customer and whether third-party corroboration was available as to whether the arrangement was at the request of the customer or Nortel Networks. As a result of our consideration of these factors, we deferred all revenues associated with bill and hold arrangements to subsequent periods. We no longer recognize revenue on bill and hold arrangements before delivery occurs and all other criteria of revenue recognition are fully met.

### *Undelivered elements and liquidated damages—A decrease of $190 million in 2001 and an increase of $45 million in 2002 and $204 million in 2003.*

Another area of review prompted by our review of the broader original accounting treatment of certain individual contracts was related to certain optical product transactions where revenues related to undelivered product elements were erroneously recognized. In these cases, revenues for customer orders were recognized upon delivery of interim product solutions pending the availability of the later generation optical product that the customer had ordered. In this circumstance, revenues for the order should have been deferred until the undelivered element was delivered as we did not have evidence supporting the fair value of the undelivered element. Accordingly, we restated the recorded revenues, deferring recognition to subsequent periods, which had the effect of a net decrease to revenues of approximately $40 million in 2001 and an increase to revenues of approximately $190 million in 2002 and $25 million in 2003.

We also focused on accounting for software revenue recognition more generally, particularly in our Optical business. In Fall 2004, we sought the views of the SEC's Office of the Chief Accountant, or OCA, on one issue with respect to our historical and continuing accounting treatment under U.S. GAAP of revenues recognized on sales of certain optical products containing embedded software. We advised the OCA that we believed our historical accounting treatment of these optical products was appropriate, and we were fully supported in this conclusion by D&T. We, in consultation with D&T, nevertheless decided to obtain the views of the OCA on our analysis and conclusions due to the judgments involved in the applicable accounting analysis and the significant impact a different conclusion could have had on our reported revenues (namely, the deferred recognition of substantial revenues over a number of subsequent years). Following discussions with us, the OCA did not approve or disapprove our accounting in this area, and we concluded that we would not make any adjustments to our accounting treatment of the sales of these optical products as part of the Second Restatement.

We also considered revenue recognition policies related to post-contract support, or PCS, with respect to all business lines, and identified certain Enterprise products that presented issues. For these products, we recognized revenues at the time of delivery of the product but before completion of PCS or other future services agreed to in the contract. Because in some cases we did not have vendor specific objective evidence of fair value for those services (for example, where we made available free software upgrades on our website), U.S. GAAP requires the revenues to be recognized over the PCS period. Accordingly, we corrected this error and deferred the revenues to subsequent periods, resulting in a net decrease to revenues of approximately $140 million in 2001 and $155 million in 2002 and a net increase of approximately $170 million in 2003.

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 505

*Fixed or determinable fees—An increase of $133 million in 2002.*

As a result of our focus on accounting for software revenue recognition more generally as described above, we identified a specific contract for which revenue for sales had been recognized but the criteria for revenue recognition had not been met, including the criteria that contract fees be either fixed or determinable. Accordingly, we corrected this error and deferred the revenues to subsequent periods when customer payments became due and all criteria for revenue recognition were met.

*Reseller transactions—An increase of $151 million in 2001.*

As a result of employee input, we determined that a certain reseller lacked economic substance apart from Nortel Networks at the time of the relevant transaction. In such a case, we should have deferred revenues and recognized them only upon the reseller's sale of the products to an end customer. Accordingly, we corrected this error and deferred the revenues to subsequent periods.

*Reciprocal arrangements—A decrease of approximately $55 million in 2000 and $20 million in 2001.*

In our review of a particular contract in connection with other issues described above, we determined that it also involved a reciprocal arrangement with the customer. Instead of recognizing the full amount of revenues we received on the sale of products or services, the amounts we paid the customer under the reciprocal arrangement should have been treated as a reduction of revenues. Through our review of a substantial number of individual contracts, as noted above, we also identified a limited number of other reciprocal arrangements, which were recorded as permanent reductions in revenue.

*Application of SOP 81-1 and other revenue recognition items—A decrease of approximately $40 million in 2001 and an increase of approximately $80 million in 2002 and $140 million in 2003.*

As we continued to review the application of our accounting policies, as well as specific contracts, we discovered errors related principally to the incorrect application of percentage of completion accounting for certain transactions. Our review also included an analysis of the accounting for product credits, liquidated damages and other incentives. We corrected these errors, which resulted in both deferrals of revenues to subsequent periods and movement of revenues to earlier periods.

Other accounting practices that management examined and adjusted as part of the Second Restatement included, among other things, the following (as described in more detail below):

- our foreign exchange accounting, as part of the plan to address the identified material weakness related to foreign currency translation described above;

- intercompany balances that did not eliminate upon consolidation and related provisions;

- the accounting treatment of the February 2001 acquisition of the 980 NPLC business from JDS and the related OEM Purchase and Sale Agreement;

- special charges relating to goodwill, inventory impairment, contract settlement costs and other charges; and

- the accounting treatment of certain elements of discontinued operations.

In sum, the key components of the Second Restatement process were as follows:

- involvement and oversight by current senior finance personnel, with regular communications to the global finance organization to monitor progress and ensure consistency, and open and regular dialogue with our external auditors;

- maintenance of a restatement database to track issues and adjustments;

- establishment of a process to evaluate certain potential provisions and releases that may not have been fully addressed in the First Restatement, including a review of all First Restatement processes, and enhanced balance sheet reviews at the business unit, regional and statutory entity levels;

- establishment of processes to evaluate certain potential restatement items related to our revenue recognition policies and practices and other accounting issues;

D-16

- validation processes, including detailed review of supporting documentation to ensure adjustments were appropriately substantiated; and

- identification, development and initial implementation of remedial actions, as further described under "Remedial Measures" below.

As discussed above under "Current Management Conclusions Concerning Disclosure Controls and Procedures", as a result of the extensive work undertaken in connection with the Second Restatement, management believes, based on its knowledge, that (i) this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report and (ii) the financial statements, and other financial information included in this report, fairly present in all material respects our financial condition, results of operations and cash flows as at, and for, the periods presented in this report.

*Principal Adjustments*

The following are the principal Second Restatement adjustments:

- An increase of $386 million in previously announced revenues and a decrease of $298 million in previously announced net earnings for the year ended December 31, 2003, with the following adjustments on a quarterly basis:

  - a decrease of $79 million in previously reported revenues and $135 million in previously reported net earnings for the first quarter of 2003, resulting in our reporting a net loss rather than net earnings for the period;

  - a decrease of $53 million in previously reported revenues and $138 million in previously reported net earnings for the second quarter of 2003, resulting in our reporting a net loss rather than net earnings for the period;

  - an increase of $78 million in previously reported revenues and a decrease of $54 million in previously reported net earnings for the third quarter of 2003; and

  - an increase of $440 million in previously announced revenues and $29 million in previously announced net earnings for the fourth quarter of 2003.

- An increase of $439 million in previously reported revenues and a reduction of $272 million in previously reported net loss for the year ended December 31, 2002, with the following adjustments on a quarterly basis:

  - an increase of $244 million in previously reported revenues and a decrease of $101 million in previously reported net loss for the first quarter of 2002;

  - an increase of $132 million in previously reported revenues and a decrease of $115 million in previously reported net loss for the second quarter of 2002;

  - a decrease of $28 million in previously reported revenues and $182 million in previously reported net loss for the third quarter of 2002; and

  - an increase of $91 million in previously reported revenues and $126 million in previously reported net loss for the fourth quarter of 2002.

- An increase of $1,492 million in previously reported revenues and a reduction of $1,433 million in previously reported net loss for the year ended December 31, 2001.

The principal adjustments primarily relate to the following matters (each of which reflects a number of related adjustments that have been aggregated for disclosure purposes):

- Adjustments to revenues and cost of revenues to address various aspects of our revenue recognition policies and practices increased revenues by a total of $439 million in 2002 and $1,492 million in 2001, and increased cost of revenues by a total of $305 million in 2002 and $598 million in 2001. The revenue matters adjusted are discussed in detail above under "Second Restatement Process".

- Foreign exchange adjustments increased our pre-tax loss by a total of $63 million in 2002 and $132 million in 2001. These adjustments resulted from the re-examination of the determination of the functional currency for certain entities and the incorrect treatment of significant long-term inter-company positions, and the incorrect classification of certain foreign exchange gains and losses.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 507

- Correction of certain inter-company balances that did not properly eliminate upon consolidation and related provisions resulted in a decrease of $36 million and an increase of $42 million to pre-tax loss for 2002 and 2001, respectively.

- Adjustments to previously recorded special charges relating to goodwill, inventory impairment, contract settlement costs and other charges resulted in a total decrease to special charges of $78 million in 2002 and $845 million in 2001. These adjustments consisted primarily of the following:

  - goodwill impairment and amortization charges were reduced, and cost of revenues were increased, as a result of the re-examination of the accounting for the deferred consideration associated with our acquisition of the 980 NPLC business from JDS;

  - goodwill recorded from certain acquisitions was reduced due to corrections to purchase accounting allocations, which in turn reduced the subsequent goodwill impairment charges and amortization that were a component of special charges;

  - inventory impairments incorrectly classified as special charges were reclassified to cost of revenues; and

  - contract settlement costs and other items were adjusted primarily due to changes in estimates and/or assumptions that were previously recorded in the incorrect period.

- Corrections to various accruals, provisions or other transactions, primarily due to the incorrect application of U.S. GAAP to the initial recording of such liabilities, or the failure to subsequently adjust such liabilities in the correct period, resulted in a decrease of $314 million and an increase of $59 million in our net loss in 2002 and 2001, respectively.

- Adjustments to the accounting treatment of certain components of discontinued operations, initially recorded by us in June 2001, resulted in an increase of $121 million and a decrease of $529 million to the net loss from discontinued operations—net of tax in 2002 and 2001, respectively.

For additional information concerning adjustments made in the Second Restatement, see notes 3 and 23 to the accompanying audited consolidated financial statements and "—Developments in 2004—Restatements" in the MD&A section of this report.

*Use of Estimates in Financial Reporting; Omission of 1999 and 2000 Selected Financial Data; Decision Not to Amend Certain Previous Filings*

As described above, two material weaknesses in our internal control over financial reporting were identified at the time of the First Restatement. During the Second Restatement process, a number of additional material weaknesses in our internal control over financial reporting were identified, as described below. Due to, among other factors, these material weaknesses, the significant turnover in our finance personnel, changes in accounting systems, documentation weaknesses and the passage of time generally, the Second Restatement involved the efforts of hundreds of our finance personnel and a number of outside consultants and advisors. As described above, the process required the review and verification of a substantial number of documents and communications, and related accounting entries, over multiple fiscal periods.

In addition, the review of accruals and provisions and the application of accounting literature to certain matters in the Second Restatement, including revenue recognition, foreign exchange, special charges and discontinued operations, was complicated by the passage of time, the lack of availability of supporting records and the turnover of finance personnel noted above. As a result of this complexity, estimates and assumptions that impact both the quantum of the various recorded adjustments and the fiscal period to which they were attributed were required in the determination of certain of the Second Restatement adjustments. We believe the procedures followed in determining such estimates were appropriate and reasonable using the best available information.

Also as a result of the above factors, as well as a likely inability to obtain third party corroboration in certain cases due to the substantial industry adjustment in the telecommunications industry beginning in 2001, we believe that extensive additional efforts over an extended period of time would be required to restate our 1999 and 2000 selected financial data. We also believe that selected financial data for these periods would not be meaningful to investors due to this industry adjustment, which significantly impacted our financial results in 2001 and subsequent periods and limits the relevance of financial results in periods prior to 2001 for purposes of analysis of trends in subsequent periods. Given the long delay in filing the Reports, we believed that investor understanding would be better aided by the dedication of our resources to the preparation of the current financial and other information included in this and future reports. As a result, except for

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 508

the selected balance sheet data as at December 31, 2000, financial data for the years ended December 31, 1999 and 2000 has not been restated or presented in the "Selected Financial Data (Unaudited)" section of this report. This omitted data is normally required to be included in an Annual Report on Form 10-K.

A number of our and NNL's past filings with the SEC remain subject to ongoing review by the SEC's Division of Corporation Finance (which could result in the need to amend this or our other filings). In addition, the Second Restatement involved the restatement of our consolidated financial statements for 2001 and 2002 and the first, second and third quarters of 2003. Amendments to our prior filings with the SEC would be required in order for us to be in full compliance with our reporting obligations under the Exchange Act. However, for the same reasons discussed above, we do not believe that it would be feasible for us to amend our 2002 Form 10-K/A. In addition, we believe that amended disclosure in the 2002 Form 10-K/A, 2003 Form 10-Q/As and 2003 Form 10-Q would in large part repeat the disclosure in this report and expected to be contained in the 2004 Form 10-Qs. Accordingly, we do not plan to amend our 2002 Form 10-K/A, 2003 Form 10-Q/As or 2003 Form 10-Q. We believe that we have included in this report all information needed for current investor understanding and will take similar steps in our 2004 Form 10-Qs.

*Material Weaknesses in Internal Control over Financial Reporting Identified During the Second Restatement*

Over the course of the Second Restatement process, we, together with D&T, identified a number of reportable conditions, each constituting a material weakness, in our internal control over financial reporting as at December 31, 2003. In September 2004, management first notified the Audit Committee of the possibility of additional material weaknesses. Over the remainder of the Second Restatement process, management and D&T identified a total of six material weaknesses. On January 10, 2005, D&T confirmed to the Audit Committee that it had identified these six material weaknesses. No other reportable conditions were identified by us or D&T at the time of the Second Restatement. The material weaknesses identified were:

- lack of compliance with written Nortel Networks procedures for monitoring and adjusting balances related to certain accruals and provisions, including restructuring charges and contract and customer accruals;

- lack of compliance with Nortel Networks procedures for appropriately applying applicable GAAP to the initial recording of certain liabilities, including those described in SFAS No. 5, and to foreign currency translation as described in SFAS No. 52;

- lack of sufficient personnel with appropriate knowledge, experience and training in U.S. GAAP and lack of sufficient analysis and documentation of the application of U.S. GAAP to transactions, including, but not limited to, revenue transactions;

- lack of a clear organization and accountability structure within the accounting function, including insufficient review and supervision, combined with financial reporting systems that are not integrated and which require extensive manual interventions;

- lack of sufficient awareness of, and timely and appropriate remediation of, internal control issues by Nortel Networks personnel; and

- an inappropriate 'tone at the top', which contributed to the lack of a strong control environment. As reported in the Independent Review Summary included above, there was a "Management 'tone at the top' that conveyed the strong leadership message that earnings targets could be met through application of accounting practices that finance managers knew or ought to have known were not in compliance with U.S. GAAP and that questioning these practices was not acceptable".

The foregoing material weaknesses contributed to the need for the Second Restatement. Upon completion of our assessment of our internal control over financial reporting as at December 31, 2004 pursuant to SOX 404, we currently expect to conclude that the first five of these six material weaknesses continue to exist as at December 31, 2004, and we continue to identify, develop and begin to implement remedial measures to address them, as described below.

******

D-19

HIGHLY CONFIDENTIAL

**Current Status of Material Weaknesses in Internal Control Over Financial Reporting and Expectations as to Required Management Conclusions and Independent Auditor Attestation Pursuant to Section 404 of the Sarbanes-Oxley Act**

As noted in "MD&A—Risk factors/Forward looking statements", our 2004 Form 10-K must comply with SOX 404, which requires management to assess the effectiveness of our internal control over financial reporting annually and to include in our Annual Report on Form 10-K a management report on that assessment, together with an attestation by our independent registered public accounting firm. As noted above, upon completion of our assessment of our internal control over financial reporting as at December 31, 2004, we currently expect to conclude that the first five of the six material weaknesses in our internal control over financial reporting described immediately above continue to exist as at December 31, 2004 (and also constitute "material weaknesses" as now defined under standards established by the Public Company Accounting Oversight Board). Accordingly, management expects to conclude that our internal control over financial reporting as at December 31, 2004 is ineffective, and D&T has advised us that they expect their report on management's assessment of internal control over financial reporting also to indicate that internal control over financial reporting is ineffective.

******

**Revenue Independent Review**

As more fully described above, over the course of the Second Restatement process, management identified certain accounting practices that it determined should be adjusted as part of the Second Restatement. In particular, management identified certain errors related to revenue recognition and undertook a process of revenue reviews. In light of the resulting adjustments to previously reported revenues, the Audit Committee has determined to review the facts and circumstances leading to the restatement of these revenues for specific transactions identified in the Second Restatement. The Revenue Independent Review will have a particular emphasis on the underlying conduct that led to the initial recognition of these revenues. The Audit Committee will seek a full understanding of the historic events that required the revenues for these specific transactions to be restated and will consider any appropriate additional remedial measures, including those involving internal controls and processes. The Audit Committee has engaged WCPHD to advise it in connection with the Revenue Independent Review.

******

**Remedial Measures**

At the recommendation of the Audit Committee, the Board of Directors adopted all of the recommendations for remedial measures contained in the Independent Review Summary. The Board of Directors has directed management to develop a detailed plan and timetable for the implementation of these recommendations and will monitor their implementation. In addition, we have identified, developed and begun to implement a number of measures to strengthen our internal control over financial reporting and address the material weaknesses identified above, including pursuant to recommendations from D&T. These measures are in the process of being reviewed in light of the recommendations of the Independent Review and certain of these measures may be superseded by the plans for the implementation of the recommendations of the Independent Review. A summary of these measures, as well as previously announced personnel actions, follows.

- Personnel Actions in Response to the First Restatement and Independent Review.

  - We terminated for cause our former president and chief executive officer, former chief financial officer and former controller in April 2004 (the former chief financial officer and former controller having been placed on paid leaves of absence in March 2004).

  - We terminated for cause seven additional senior finance employees with significant responsibilities for our financial reporting as a whole or for their respective business units and geographic regions in August 2004.

- Renewed Commitment to Best Corporate Practices and Ethical Conduct.

  - In August 2004, we adopted a new strategic plan that includes a renewed commitment to best corporate practices and ethical conduct, including the establishment of the office of a chief ethics and compliance officer (which has been filled on an interim basis pending the permanent appointment of Susan E. Shepard, as now announced).

D-20

- Over the course of the Second Restatement, our current CEO and current CFO have communicated to employees the importance of the Second Restatement process, reliable and transparent financial reporting and ethical conduct. Those communications included formal presentations as part of our annual executive conference in November 2004.

- In June 2004 management recommended, the joint leadership resources committee recommended and the Board of Directors subsequently approved that financial accountability be included as a key qualitative factor in the individual leadership performance objectives for determination of incentive cash awards under our annual incentive plan.

- Extended Balance Sheet Reviews.

  - We have developed a plan to extend our balance sheet reviews through the implementation of enhanced review procedures to:

    - require greater frequency of timely statutory and segment balance sheet reviews,

    - clarify responsibilities within Nortel Networks for organizing balance sheet reviews, and

    - establish minimum documentation requirements with respect to balance sheet entries.

  - As part of the initial development of this plan, in the first quarter of 2004, we increased our focus on the review of specific balance sheet accounts.

- Review of Finance Department Organizational Structure. We announced, and began to implement, plans to transform our finance organization, which include a renewed commitment to transparency as a fundamental goal. Measures we have begun to implement include:

  - In the first quarter of 2004, we began to enhance our global technical accounting group and establish global contract review and global finance governance teams.

  - We engaged Accenture, a global management consulting and technology services firm, in the third quarter of 2004 to assess the finance organization's structure, processes and systems, with an expected assessment completion date of March 2005.

  - We established a global corporate finance Sarbanes-Oxley compliance group beginning in the third quarter of 2004.

  - We have hired additional full-time finance personnel (with a focus on qualified accounting professionals) as part of an initiative introduced by the CFO and controller in March 2004.

- Training Initiatives.

  - We re-established our formal training group (led by the global finance governance team described above) to implement ongoing training programs for finance personnel globally. The group's focus includes training with respect to SFAS No. 5; accounting for hedging and derivatives; revenue recognition, accruals and provisions; and SFAS No. 52.

- Internal Audit.

  - In the first quarter of 2004, we modified the mandate of our Internal Audit function to place a greater emphasis on the adequacy of, and compliance with, procedures relating to internal control over financial reporting.

  - In October 2004, we engaged outside consultants to conduct a strategic performance review of the internal audit function. The objective of this review is to ensure that internal audit continues to meet professional internal audit standards and moves towards audit best practices.

- Manual Journal Entry Processes.

  - In the fourth quarter of 2003, we began to modify our manual journal entry processes by implementing new procedures, with a focus on approvals of manual journal entries, more stringent documentation processes and reduction of user access to manual journal entry functions.

As noted above, we continue to identify, develop and begin to implement remedial measures, including the development of a detailed plan and timetable for the implementation of the recommendations of the Independent Review. As part of

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 511