**Table of Contents**

*Continuing or increasing pressure on our business, cash and liquidity could materially and adversely affect our ability to fund and restructure our business operations, react to and withstand the current sustained and expanding economic downturn, as well as the extraordinarily volatile and uncertain market and industry conditions, and develop and implement a comprehensive restructuring plan. Additional sources of funds may not be available.*

Our restructuring measures in recent years have not provided adequate relief from the significant pressures we are experiencing. As global economic conditions dramatically worsened beginning in September 2008, we experienced significant pressure on our business and faced a deterioration of our cash and liquidity, globally as well as on a regional basis, as customers across all businesses suspended, delayed and reduced their capital expenditures. The extreme volatility in the financial, foreign exchange, equity and credit markets globally and the expanding economic downturn and potentially prolonged recessionary period have compounded the situation. We are continuing to experience significant pressure due to global economic conditions and additionally, we are seeing further impact to our business as a result of the Creditor Protection Proceedings.

Historically, we have deployed our cash throughout the corporate group, through a variety of intercompany borrowing and transfer pricing arrangements. As a result of the Creditor Protection Proceedings, cash in the various jurisdictions is generally available to fund operations in the particular jurisdictions, but generally is not freely transferable between jurisdictions or regions, other than as highlighted in "Liquidity and Capital Resources" in the MD&A section of this report. Thus, there is greater pressure and reliance on cash balances and generation capacity in specific regions and jurisdictions. Under a current agreement with EDC, we have continued access under the EDC Support Facility up to May 1, 2009 for up to $30 of support. We and EDC continue to work together to see if a longer term arrangement, acceptable to both parties, can be reached, but there can be no assurance that we will be able to reach agreement on a longer term arrangement.

Access to additional funds from liquidity- generating transactions, debtor- in- possession financing arrangements or other sources of external financing may not be available to us and, if available, would be subject to market conditions and certain limitations including court approvals and other requisite approvals by the Canadian Monitor, the U.K. Administrators or other third parties.

We cannot provide any assurance that our net cash requirements will be as we currently expect and will be sufficient for the successful development, approval and implementation of a comprehensive restructuring plan.

There can be no assurance that any further required court approvals for any future company transactions will be obtained. Furthermore, there can be no assurance that we will be able to continue to maintain ongoing deployment of cash resources throughout the Company in connection with ordinary course intercompany trade obligations. If our subsidiaries are unable to pay dividends or provide us with loans or other forms of financing in sufficient amounts, or if there are any restrictions on the transfer of cash between us and our subsidiaries, including those imposed by courts, foreign governments and commercial limitations on transfers of cash pursuant to our joint ventures commitments, the cash positions of the Canadian Debtors would likely be under great pressure and our liquidity and our ability to meet our obligations would be adversely affected.

21

**Table of Contents**

*We must continue to restructure and transform our business and the assumptions underlying these efforts may prove to be inaccurate. We may not be able to successfully develop, obtain all requisite approvals for, or implement a comprehensive restructuring plan. Failure to obtain the requisite approvals for, or failure to successfully develop and implement our comprehensive restructuring plan within the time granted by the courts would, in all likelihood, lead to the liquidation of all of our assets.*

In order to be successful, we must have a competitive business model that brings innovative products and services to market in a timely way. Pursuant to the ongoing Creditor Protection Proceedings we are working on developing a comprehensive restructuring plan. In order to successfully emerge from the Creditor Protection Proceedings, our senior management will be required to spend significant amounts of time developing a comprehensive restructuring plan, instead of focusing exclusively on business operations.

In connection with the transformation of our business, we have made, and will continue to make, judgments as to whether we should further reduce, relocate or otherwise change our workforce. Costs incurred in connection with workforce reduction efforts may be higher than estimated. Furthermore, our workforce efforts may impair our ability to achieve our current or future business objectives. Any further workforce efforts including reductions may not occur on the expected timetable and may result in the recording of additional charges.

Further, we have made, and will continue to make, judgments as to whether we should limit investment in, exit, or dispose of certain businesses. The Creditor Protection Proceedings and the development of a comprehensive plan of reorganization may result in the sale or divestiture of assets or businesses, but we can provide no assurance that we will be able to complete any sale or divestiture on acceptable terms or at all. Any decision by management to further limit investment in, or exit or dispose of businesses may result in the recording of additional charges. As part of our review of our restructured business, we look at the recoverability of tangible and intangible assets. Future market conditions may indicate these assets are not recoverable based on changes in forecasts of future business performance and the estimated useful life of these assets, and this may trigger further write- downs of these assets which may have a material adverse effect on our business, results of operations and financial condition.

We also must obtain the approvals of the respective courts and creditors, and the Canadian Monitor and U.K. Administrators. We may not receive the requisite approvals and even if we do, a dissenting holder of a claim against us may challenge and ultimately delay the final approval and implementation of a comprehensive restructuring plan. If we are not successful in developing a comprehensive restructuring plan, or if we are successful in developing it but do not receive the requisite approvals, it is unclear whether we would be able to reorganize our businesses and what distributions, if any, holders of claims against us would receive. Should the stay or moratorium period and any subsequent extension thereof not be sufficient to develop and implement a comprehensive restructuring plan or should such plan not be approved by creditors and the courts and, in any such case, the Debtors lose the protection of such stay or moratorium, substantially all of our debt obligations will become due and payable immediately, or subject to acceleration, creating an immediate liquidity crisis that in all likelihood would lead to the liquidation of all of our assets, in which case it is likely that holders of claims would receive substantially less favorable treatment than they would receive if we were able to emerge as a viable, reorganized entity.

*During the pendency of the Creditor Protection Proceedings, our financial results may be volatile and may not reflect historical trends. Also, as a result of the Creditor Protection Proceedings, our internal controls are currently subject to review and modification.*

During the pendency of the Creditor Protection Proceedings, we expect our financial results to continue to be volatile as asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments may significantly impact our consolidated financial statements. As a result, our historical financial performance is likely not indicative of our financial performance following the Petition Date. Further, we may sell or otherwise dispose of assets or businesses and liquidate or settle liabilities, with court approval, for amounts other than those reflected in our historical financial statements. Any such sale or disposition and any comprehensive restructuring plan could materially change the amounts and classifications reported in our historical consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of a comprehensive restructuring plan. As a result of the Creditor Protection Proceedings, we have adopted the American Institute of Certified Public Accountants' Statement of Position 90- 7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" (SOP 90- 7) effective January 14, 2009 and this will require

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 28

**Table of Contents**

certain changes and additional reporting in our financial statements beginning in the quarter ended March 31, 2009. Also, as a result of the Creditor Protection Proceedings, our internal controls are currently subject to review and modification, including with respect to the Canadian Monitor and the U.K. Administrators, and we may implement additional controls to accommodate the adoption of SOP 90- 7 as well as any of the additional reporting requirements relating to our Creditor Protection Proceedings. The implementation of the foregoing may adversely affect the ability to timely file our reports.

*Canadian, U.S. and U.K. laws impair the ability of claimants to take action against us under our existing contracts, including the outstanding notes and related guarantees of us, NNL, NNI and NNCC. Subject to limited exceptions, all actions are stayed and ultimate recoveries cannot be determined at this time.*

Generally, in connection with the Creditor Protection Proceedings, all actions to enforce or otherwise effect payment or repayment of liabilities of any Debtor preceding the Petition Date, as well as pending litigation against any Debtor, are stayed. The U.S. Bankruptcy Code provides for all actions and proceedings against the U.S. Debtors to be stayed while the Chapter 11 Proceedings are pending. In Canada, the initial order from the Canadian Court also provides for a general stay of actions against the Canadian Debtors, officers and directors. Pursuant to a subsequent order of the Canadian Court issued on February 10, 2009, this stay period was extended to May 1, 2009 and is subject to further extension. With limited exceptions, the stays in effect pursuant to the Chapter 11 Proceedings and CCAA Proceedings generally preclude parties from taking any actions against the Debtors. Similarly, under the U.K. Administration Proceedings, subject to limited exceptions as may be approved by the U.K. Administrators or the English Court, no legal process (including legal proceedings, execution, distress and diligence) may be instituted or continued against the EMEA Debtors.

In particular, the rights of the indenture trustees (who represent the holders of debt securities issued or guaranteed by us, NNL, NNI and NNCC) to enforce remedies for defaults under our debt securities and guarantees are subject to the stays, and could be delayed or limited by the restructuring provisions of applicable Canadian, U.S. and U.K. creditor protection legislation. Moreover, we, NNL, NNI and NNCC have not made, and will likely continue not to make, any payments under our various debt securities during the Creditor Protection Proceedings, and holders of our debt securities may not be compensated for any delays in payment of principal, interest and costs, if any, including the fees and disbursements of the trustees.

A comprehensive restructuring plan, if successfully developed and accepted by the requisite majorities of each affected class of creditors and approved by the relevant courts, would be binding on all creditors within each affected class, including those that did not vote to accept the proposal. The ultimate recovery to creditors and security holders, if any, will not be determined until a comprehensive restructuring plan is developed and approved. At this time we do not know what values, if any, will be prescribed pursuant to any such plan to the securities held by each of these constituencies, or what form or amounts of distributions, if any, they may receive on account of their interests.

*An increased portion of our cash and cash equivalents may be restricted as cash collateral if we are unable to secure alternative support for certain obligations arising out of our normal course business activities.*

The EDC Support Facility may not provide all the support we require for certain of our obligations arising out of our normal course of business activities. As of December 31, 2008, there was approximately $189 of outstanding support utilized under the EDC Support Facility, approximately $125 of which was outstanding under the small bond sub- facility. Individual bonds supported under the EDC Support Facility currently expire on the fourth anniversary of such individual bond regardless of the termination date of the EDC Support Facility. As a result of the Creditor Protection Proceedings, EDC had the right to suspend or terminate the EDC Support Facility. EDC may also suspend its obligation to issue NNL any additional support if events occur that have a material adverse effect on NNL's business, financial position or results of operations. On January 14, 2009, Nortel announced that NNL entered into an agreement with EDC to permit continued access by NNL to the EDC Support Facility for an interim period of 30 days for up to a maximum of $30 of support based on Nortel's then- estimated requirements over the period. On February 10, 2009, NNL and EDC reached a further agreement to permit the extension to run through May 1, 2009. Amounts outstanding under the EDC Support Facility are secured by a charge against all of the property of the Canadian Debtors. EDC and Nortel are continuing to work together to see if a longer term arrangement, acceptable to both parties, can be reached; however there can be no guarantee that a satisfactory outcome will be achieved.

23

HIGHLY CONFIDENTIAL

**Table of Contents**

If the EDC Support Facility is terminated or suspended, or if we do not have access to sufficient support under the EDC Support Facility, and if we are unable to secure alternative support, an increased portion of our cash and cash equivalents may be restricted as cash collateral, which would reduce our liquidity, exacerbate the pressure on our cash balances and could have a material adverse effect on our business and our ability to successfully develop, obtain approval for and implement a comprehensive restructuring plan.

*If we are unable to attract and retain qualified personnel at reasonable costs, we may not be able to achieve our business objectives, and our ability to successfully emerge from the Creditor Protection Proceedings may be harmed.*

We are dependent on the experience and industry knowledge of our senior management and other key employees to execute our current business plans and lead the Company, particularly during the Creditor Protection Proceedings and throughout the development and implementation of a comprehensive restructuring plan. Competition for certain key positions and specialized technical and sales personnel in the high- technology industry remains strong. Our deteriorating financial performance, along with the Creditor Protection Proceedings and further workforce reduction announcements create uncertainty that has led to an increase in unwanted attrition, and challenges in attracting and retaining new qualified personnel. We are at risk of losing or being unable to hire talent critical to a successful reorganization and ongoing operation of our business. Our ability to retain and attract critical talent is restricted in part by the Creditor Protection Proceedings that, among other things, limit our ability to implement a retention program or take other measures to attract new hires to the Company or motivate employees to remain with us. We filed a motion with the U.S. Court on February 27 2009, and intend to file with the Canadian Court on March 2, 2009 seeking court approval to implement certain incentive and retention plans; however, there can be no assurance that these approvals will be obtained. Our future success depends in part on our continued ability to hire, assimilate in a timely manner and retain qualified personnel, particularly in key senior management positions. If we are not able to attract, recruit or retain qualified employees (including as a result of headcount reductions), we may not have the personnel necessary to develop and implement a comprehensive restructuring plan, and our business, results of operations and financial condition could be materially adversely impacted.

*Our ability to independently manage our business is restricted during the Creditor Protection Proceedings, and steps or actions in connection therewith may require the approval of the respective courts, the creditors, the Canadian Monitor and the U.K. Administrators.*

Pursuant to the various court orders and statutory regimes to which we are subject during the Creditor Protection Proceedings, some or all of the decisions with respect to our business may require consultation with, review by or ultimate approval of one or all of the respective courts in the several jurisdictions, the U.S. Creditors' Committee, the Bondholder Group, the Canadian Monitor and the U.K. Administrators. In particular, under the U.K. Administration Proceedings, the respective boards of directors of each of the EMEA Debtors have been displaced in favor of the U.K. Administrators who have been appointed by the English Court and empowered to manage the business, affairs and property of the EMEA Debtors. Although we believe that many decision- making powers will be delegated by the U.K. Administrators to current management of the EMEA Debtors, we cannot determine, with any certainty, the extent to which they will be empowered to make and implement decisions without consultation with, review by or ultimate approval of the U.K. Administrators. The lack of independence and the related consulting and reporting requirements are expected to significantly extend the amount of time necessary for the Company to take necessary actions and conclude and execute on decisions, and may make it impossible for us to take actions that we believe are in the best interests of the Company. There can be no assurance that the U.S. Creditors Committee, the Bondholder Group, other creditors, the Canadian Monitor or the U.K. Administrators will support the Debtors' positions on matters presented to the courts in the future, or on any comprehensive restructuring plan, once developed and proposed. Disagreements between us and these various third parties could protract the Creditor Protection Proceedings, negatively impact the Debtors' ability to operate and delay the Debtors' emergence from the Creditor Protection Proceedings.

*Transfers or issuances of our equity, or a debt restructuring, may impair or reduce our ability to utilize our net operating loss carryforwards and certain other tax attributes in the future.*

Pursuant to U.S. tax rules, a corporation is generally permitted to deduct from taxable income in any year net operating losses (NOLs) carried forward from prior years. We have NOL carryforwards in the U.S. of approximately $1,600 as of December 31, 2008. Our ability to utilize these NOL carryforwards could be subject to a significant limitation if we were to undergo an "ownership change" for purposes of Section 382 of the Internal Revenue Code of 1986, as amended, during or as a result of our Chapter 11 Proceedings. During the Creditor Protection Proceedings, the U.S. Court has entered an order that places certain restrictions on trading in NNC common shares and NNL preferred shares. However, we can provide no assurances that these limitations will prevent an "ownership change" or that our ability to utilize our NOL carryforwards may not be significantly limited as a result of our reorganization.

24

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 30

**Table of Contents**

A restructuring of our debt pursuant to the Creditor Protection Proceedings may give rise to cancellation of indebtedness or debt forgiveness (COD), which if it occurs would generally be non-taxable. If the COD is non-taxable, we will be required to reduce our NOL carryforwards and other attributes such as capital loss carryforwards and tax basis in assets, by an amount equal to the non-recognized COD. Therefore, it is possible that, as a result of the successful completion of a comprehensive restructuring plan, we will have a reduction of NOL carryforwards and/or other tax attributes in an amount that cannot be determined at this time and that could have a material adverse effect on our financial position.

*Trading in our securities during the pendency of the Creditor Protection Proceedings is highly speculative, poses substantial risks, and is subject to certain restrictions imposed to protect our NOL carryforwards that are described directly above. NNC common shares have been delisted from the NYSE, which has made our stock significantly less liquid; and the TSX may seek to delist our currently listed NNC common shares and NNL preferred shares.*

NNC and NNL securities may have little or no value. Trading prices are very volatile and may bear little or no relationship to the actual recovery, if any, by the holders under any eventual court-approved comprehensive restructuring plan. In such a plan, our existing securities may be cancelled and holders may receive no payment or other consideration in return, or they may receive a payment or other consideration that is less than the trading price or the purchase price of such securities.

In addition, the U.S. Court has entered an order that places certain limitations on trading in certain of our securities to protect our NOL carryforwards. For this reason, investors need our consent or court approval before effecting any transactions in NNC common shares or NNL preferred shares if they hold, or would as a result of the transaction acquire, at least 4.75% of the outstanding NNC common shares or any series of NNL preferred shares.

Effective February 2, 2009, NNC common shares were delisted by the NYSE. NNC common shares currently continue to trade on the TSX and the "over-the-counter" (OTC) market in the U.S., and their price is quoted on the Pink Sheets Electronic Quotation Service (Pink Sheets) maintained by Pink Sheets LLC. There is no assurance that we will be able to re-list our shares on the NYSE or another U.S. exchange following the Creditor Protection Proceedings.

On January 14, 2009, we received notice that the TSX was reviewing the eligibility for continued listing of NNC common shares and NNL preferred shares. The TSX stopped its review after concluding that the review was stayed by the initial order granted by the Canadian Court pursuant to the CCAA Proceedings. However, the TSX could oppose the stay and seek court approval to delist our securities. If those securities are delisted, there can be no assurance that trading in them will continue (through OTC transactions or otherwise).

OTC transactions involve risks in addition to those associated with transactions on a stock exchange. Many OTC stocks trade less frequently and in smaller volumes than stocks listed on an exchange. Accordingly, OTC-traded shares are less liquid and are likely to be more volatile than exchange-traded stocks. The price of NNC common shares is currently electronically displayed on the Pink Sheets in the U.S., which is a quotation medium that publishes market maker quotes for OTC securities. It is not a stock exchange or listing service and is not owned, operated or regulated by any exchange. Investors are advised that Nortel has not taken any steps to have our securities quoted on the Pink Sheets; there is no relationship, contractual or otherwise, between an issuer whose securities are quoted on the Pink Sheets, and Pink Sheets LLC; and Pink Sheets LLC exercises no regulatory oversight over Nortel. Our status on the Pink Sheets is dependent on market makers' willingness to continue to provide the service of accepting trades of NNC common shares.

*Some or all of the U.S. Debtors could be substantively consolidated.*

There is a risk that an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of NNI, or those of other U.S. Debtors, be substantively consolidated with those of one or more other U.S. Debtors. While it has not been requested to date, we cannot assure you that substantive consolidation will not be requested in the future, or that the U.S. Court would not order it. If litigation over substantive consolidation occurs, or if substantive consolidation is ordered, the ability of a U.S. Debtor that has been substantively consolidated with another U.S. Debtor to make payments required with respect to its debt could be adversely affected. For example, the rights of unsecured debt holders of NNI may be diminished or diluted if NNI were consolidated with one or more entities that have a higher amount of unsecured priority claims or other unsecured claims relative to the value of their assets available to pay such claims.

25

**Table of Contents**

**Risks Relating to Our Business**
*The sustained and expanding financial crisis and economic downturn could continue to have a negative impact on our business, results of operations and financial condition, and our ability to accurately forecast our results, and it may cause a number of the risks that we currently face to increase in likelihood, magnitude and duration.*

We continue to experience significant pressure on our business and deterioration of our cash and liquidity as customers across all our businesses, in particular in North America, respond to increasingly deteriorating macroeconomic and industry conditions and uncertainty by suspending, delaying and reducing their capital expenditures. The extreme volatility in the financial, foreign exchange, equity and credit markets globally has compounded the situation. With this sustained and expanding economic downturn, we expect that we will continue to experience significant pressure on a number of fronts. We are seeing further impact to our business as a result of the Creditor Protection Proceedings. The impact of these events on us going forward will depend on a number of factors, including the recession impacting the U.S., Canadian and global economies, the duration and severity of these events, and whether the recovery period will be brief or prolonged. As a result, we may face new risks as yet unidentified, and a number of risks that we ordinarily face and that are further disclosed in the MD&A section of this report may increase in likelihood, magnitude and duration. These include but are not limited to deferrals or reductions of customer orders, potential deterioration of our customers' ability to pay or obtain financing, losses or impairment charges, reduced revenue, further deterioration in our cash balances and liquidity due to foreign exchange impacts, increased pension funding obligations, and an inability to move funds between different jurisdictions and access the capital markets and other additional sources of funding. The financial crisis and economic downturn continue to affect us during the Creditor Protection Proceedings. In many circumstances, it is difficult for us to distinguish, with any certainty, the impact these various factors are having individually and collectively on our business, because these factors are adversely impacting our ability to accurately forecast our performance, results and cash position.

*We have been and may be further materially and adversely affected by continued cautious capital spending, including as a result of current economic uncertainties, or a change in technology focus by our customers, particularly certain key customers.*

Continued cautiousness in capital spending by service providers and other customers may affect our revenues and operating results more than we currently expect and may require us to adjust our current business model. We have focused on larger customers in certain markets, which provide a substantial portion of our revenues and margin. Reduced spending, or a loss, reduction or delay in business from one or more of these customers, a significant change in technology focus or a failure to achieve a significant market share with these customers, could require us to reduce our capital expenditures and investments or take other measures in order to meet our cash requirements, or could otherwise have a material adverse effect on our business, results of operations, financial condition and liquidity, and our ability to emerge from the Creditor Protection Proceedings. Further, the trend towards the sale of converged networking solutions could also lead to reduced capital spending on multiple networks by our customers as well as other significant technology shifts, including for our legacy products, which could materially and adversely affect our business, results of operations and financial condition.

*Negative developments associated with our suppliers and contract manufacturers, including any inability to maintain stable, normalized relationships with our suppliers on acceptable terms, our reliance on certain suppliers for key optical networking solutions components, and on a sole supplier for the majority of our manufacturing and design functions, as well as consolidation in the industries in which our suppliers operate, may materially and adversely affect our business, results of operations, financial condition and customer relationships.*

Our equipment and component suppliers have experienced, and may continue to experience, consolidation in their industry, and at times financial difficulties, that may result in fewer sources of components or products, increased prices and greater exposure relating to the financial stability of our suppliers. A reduction or interruption in supply of one or more components, or external manufacturing capacity, a significant increase in the price of one or more components, or excessive inventory levels could materially and negatively affect our gross margins and our operating results, and could materially damage customer relationships.

In particular, we currently rely on certain suppliers for key optical networking solutions components, and our supply of these and other components could be materially adversely affected by adverse developments in our supply arrangement with these suppliers. If these suppliers are unable to meet their contractual obligations under our supply arrangements and if we are then unable to make alternative arrangements, it could have a material adverse effect on our revenues, cash flows and relationships with our customers.

26

**Table of Contents**

As part of the transformation of our supply chain from a vertically integrated manufacturing model to a virtually integrated model, we have outsourced substantially all of our manufacturing capacity, and divested associated assets, to contract manufacturers, including Flextronics. As a result, a significant portion of our supply chain is concentrated with Flextronics. Outsourcing our manufacturing capability to contract manufacturers involves potential challenges in designing and maintaining controls relating to the outsourced operations in an effective and timely manner. We work closely with our suppliers and contract manufacturers to address issues such as cost, quality and timely delivery and to meet increases in customer demand, when needed, and we also manage our internal inventory levels as required. However, we may encounter difficulties, including shortages or interruptions in the supply of quality components and/or products in the future, and we may also encounter difficulties with our concentrated supply chain relationships, which could be compounded by further potential consolidation by our key suppliers. Also, certain key elements of our efforts to transform our business require and are reliant on our suppliers meeting their commitments and working cooperatively and effectively on these transformation aspects.

On January 14, 2009, NNL entered into an amendment to arrangements with a major supplier, Flextronics. While we expect this mutually beneficial relationship to continue, there can be no assurance that the current relationship will be maintained on acceptable terms.

There can be no assurance that we will be able to retain, or if necessary, replace this or other major suppliers on acceptable terms, and our supplier relationships may be adversely affected by the Creditor Protection Proceedings. A reduction or interruption in component supply or external manufacturing capacity, untimely delivery of products, a significant increase in the price of one or more components, or excessive inventory levels or issues that could arise in our concentrated supply chain relationships or in transitioning between suppliers could materially and negatively affect our gross margins and our operating results and could materially damage customer relationships.

*We are fully exposed to market risk primarily from fluctuations in foreign currency exchange rates and interest rates. Adverse fluctuations in these markets could negatively impact our business, results of operations and financial condition.*

Our foreign currency exchange exposure arises from the increasing proportion of our business that is denominated in currencies other than U.S. Dollars (primarily the Canadian Dollar, the British Pound, the Euro and the Korean Won). These exposures may change as we change the geographic mix of our global business and as our business practices evolve. Currencies may be affected by internal factors as well as developments globally and in other countries. Any increase in our presence in emerging markets, may see an increase in our exposure to emerging market currencies, such as the Indian Rupee and Brazilian Real.

To manage the risk from fluctuations in foreign currency exchange rates and interest rates, we had entered into various derivative hedging transactions in accordance with our policies and procedures. However, as a result of our Creditor Protection Proceedings, the financial institutions that were our counterparties in these transactions have terminated the related instruments. Consequently, we are now fully exposed to these risks and expect to remain so exposed at least until the conclusion of the Creditor Protection Proceedings. Fluctuations in these or other rates could have an adverse effect on our business, results of operations and financial condition. Similarly, our debt is subject to changes in fair value resulting from changes in market interest rates. Even if these instruments continued to be available to us, if they do not meet the hedge effectiveness designation criteria prescribed by certain accounting rules, or if we choose not to pursue such designation, changes in the fair value of the hedge could result in volatility to our statement of operations or have a negative effect on our results of operations.

*Our business may suffer if our strategic alliances are terminated or are not successful.*

We have a number of strategic alliances with suppliers, developers and members of our industry to facilitate product compatibility, encourage adoption of industry standards or to offer complementary product or service offerings to meet customer needs, including our joint venture with LGE and our alliances with Microsoft and IBM. We believe that cooperation between multiple vendors is critical to the success of our communications solutions for both service providers and enterprises. In some cases, the companies with which we have strategic alliances also compete against us in some of our business areas. If a member of a strategic alliance fails to perform its obligations, if the relationship fails to develop as expected or if the relationship is terminated, we could experience delays in product availability or impairment of our relationships with our customers. Our business may also be adversely affected if our choice of strategic alliance collaborators does not enable us to leverage our existing and future product and service offerings in order to capitalize on expected future market trends (such as convergence in the enterprise market). Furthermore, the uncertainty caused by the Creditor Protection Proceedings could further impact our ability to maintain current relationships with suppliers, developers, reseller partners, joint venture partners and strategic alliance partners.

HIGHLY CONFIDENTIAL                NNC-NNL06001427 / 33

**Table of Contents**

*Our performance may be materially and adversely affected if our expectations regarding market demand for particular products prove to be wrong.*

We expect that data communications traffic will grow at a faster rate than the growth expected for voice traffic and that the use of the Internet will continue to increase. We expect that this in turn will lead to the convergence of data and voice through either upgrades of traditional voice networks to transport large volumes of data traffic or the construction of new networks designed to transport both voice and data traffic. Either approach would require significant capital expenditures by service providers.

The demand for certain technologies may be lower than we currently expect or may increase at a slower pace than we currently anticipate. On a regional basis, growth of our revenues from sales of our networking solutions in developing countries, such as China and India, may be less than we anticipate if current customer demand does not translate into future sales, we are unable to establish strategic alliances in key markets or developing countries experience slower growth or fewer deployments of VoIP and wireless data networks than we anticipate.

The market may also develop in an unforeseen direction. Certain events, including the commercial availability and actual implementation of new technologies, or the evolution of other technologies, may occur, that would affect the extent or timing of anticipated market demand, or increase demand for products based on other technologies, or reduce the demand for those technologies we have invested in. Any such change in demand may reduce purchases of our products by our customers, require increased or more rapid expenditures to develop and market different technologies, or provide market opportunities for our competitors.

Certain key and new product evolutions are based on different or competing standards and technologies. There is a risk that the proposals we endorse and pursue may not evolve into an accepted market standard or sufficient active market demand.

If our expectations regarding market demand and direction are incorrect, or the rate of development or acceptance of our next- generation solutions does not meet market demand and customer expectation, or, if sales of our traditional circuit switching solutions decline more rapidly than we anticipate, or if the rate of decline continues to exceed the rate of growth of our next- generation solutions, or if our next- generation solutions are less profitable than the traditional solutions that they replace, it could materially and adversely affect our business, results of operations and financial condition. Furthermore, these risks could be exacerbated by current economic conditions and uncertainty resulting from the Creditor Protection Proceedings.

*If we fail to protect our intellectual property rights, or if we are subject to adverse judgments or settlements arising out of disputes regarding intellectual property rights, our business, results of operations and financial condition could be materially and adversely affected.*

Our proprietary technology is very important to our business. We rely on patent, copyright, trademark and trade secret laws to protect that technology. Our business is global, and the extent of that protection varies by jurisdiction. The protection of our proprietary technology may be challenged, invalidated or circumvented, and our intellectual property rights may not be sufficient to provide us with competitive advantages.

In particular, we may not be successful in obtaining any particular patent. Even if issued, future patents or other intellectual property rights may not be sufficiently broad to protect our proprietary technology. Competitors may misappropriate our intellectual property, disputes as to ownership may arise, and our intellectual property may otherwise fall into the public domain or similar intellectual property may be independently developed by competitors reducing the competitive benefits of our intellectual property.

Claims of intellectual property infringement or trade secret misappropriation may also be asserted against us, or against our customers in connection with their use of our products or our intellectual property rights may be challenged, invalidated or circumvented, or fail to provide significant competitive advantages. We believe that intellectual property licensed from third parties will remain available on commercially reasonable terms in such cases, however there can be no assurance such rights will be available on such terms and an inability to license such rights could have a material adverse effect on our business. An unfavorable outcome in such a claim could require us to cease offering for sale the products that are the subject of such a claim, pay substantial monetary damages to a third party, make ongoing royalty payments to a third party and indemnify our customers.

Defense or assertion of claims of intellectual property infringement or trade secret misappropriation may require extensive participation by senior management and other key employees and may reduce their time and ability to focus on other aspects of our business. Successful claims of intellectual property infringement or other intellectual property claims against us or our customers, or a

HIGHLY CONFIDENTIAL                NNC-NNL06001427 / 34

**Table of Contents**

failure by us to protect our proprietary technology, could have a material adverse effect on our business, results of operations and financial condition.

*Defects, errors or failures in our products could result in higher costs than we expect and could harm our reputation and adversely affect our business, results of operations and financial condition.*

Our products are highly complex, and some of them can be fully tested only when deployed in telecommunications networks or with other equipment. From time to time, our products have contained undetected defects, errors or failures. The occurrence of defects, errors or failures in our products could result in cancellation of orders and product returns, and the loss of or delay in market acceptance of our products, loss of sales and increased operating or support costs. Further, our customers or our customers' end users could bring legal actions against us, which may be stayed during the Creditor Protection Proceedings, resulting in the diversion of our resources, legal expenses and judgments, fines or other penalties or losses. Any of these occurrences could adversely affect our business, results of operations and financial condition.

We record provisions for estimated costs related to product warranties given to customers to cover defects. These provisions are based in part on historical product failure rates and costs. See "Application of Critical Accounting Policies and Estimates - Provisions for Product Warranties" in the MD&A section of this report. If actual product failure rates or materials replacement, labor or servicing costs are greater than our estimates, our gross margin could be negatively affected.

*We face significant emerging and existing competition, may not be able to maintain our market share and may suffer from competitive pricing practices.*

We operate in a highly volatile industry that is characterized by industry rationalization and consolidation (both in our competitors and our larger customers), vigorous competition for market share and rapid technological development. Competition is heightened in periods of slow or very limited overall market growth and has been impacted by the adverse conditions in the financial markets globally and, in particular, due to the uncertainties arising from our Creditor Protection Proceedings. These factors could result in aggressive pricing practices and growing competition from smaller niche companies and established competitors, as well as well-capitalized computer systems and communications companies that, in turn, could separately or together with consolidation in the industry have a material adverse effect on our gross margins. These competitors may also seek to capitalize on any opportunities presented during the Creditor Protection Proceedings to enhance their business at our expense. Customers may seek to do business with other vendors that can offer more financial stability that would help to assure them of the availability of future upgrades and support. Increased competition could result in price reductions, negatively affecting our operating results and reducing margins, and could potentially lead to a loss of market share.

The more traditional distinctions between communications equipment providers, computer hardware and software providers and service and solutions companies are blurring with increasing competition between these entities and yet we believe that to be successful going forward it will be increasingly necessary for companies to partner with others in this group in order to offer an integrated and broader based solution. As such distinctions blur, there are new opportunities but increasing uncertainty and risk, including the potential that regulatory decisions or other factors may affect customer spending decisions.

Since some of the markets in which we compete are characterized by the potential for rapid growth and, in certain cases, low barriers to entry and rapid technological changes, smaller, specialized companies and start-up ventures are now, or may in the future become, our principal competitors. In particular, we currently, and may in the future, face increased competition from low cost competitors and other aggressive entrants in the market seeking to grow market share.

Some of our current and potential competitors may have substantially greater marketing, technical and financial resources than we do, including access to the capital markets. These competitors may have a greater ability to provide customer financing in connection with the sale of products and may be able to accelerate product development or engage in aggressive price reductions or other competitive practices, all of which could give them a competitive advantage over us. Our competitors may enter into business combinations or other relationships to create even more powerful, diversified or aggressive competitors.

We may also face competition from the resale of used telecommunications equipment, including our own, by failed, downsized or consolidated high technology enterprises and telecommunications service providers.

*Rationalization and consolidation among our customers may lead to increased competition and harm our business.*

29

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 35

**Table of Contents**

Continued rationalization and consolidation among our customers could result in our dependence on a smaller number of customers, purchasing decision delays and reductions by the merged companies and our playing a lesser role, or no longer playing a role, in the supply of communications products to the merged companies, and downward pressure on pricing of our products. This rationalization and consolidation could also cause increased competition among our customers and pressure on the pricing of their products and services, which could cause further financial difficulties for our customers and result in reduced spending. Some of our customers have experienced financial difficulty and have filed, or may file, for bankruptcy protection or may be acquired by other industry participants. A rationalization of customers could also increase the supply of used communications products for resale, resulting in increased competition and pressure on the pricing for our new products.

*We operate in highly dynamic and volatile industries. If we are unable to develop new products rapidly and accurately predict, or effectively react to, market opportunities, our ability to compete effectively in our industry, and our sales, market share and customer relationships, could be materially and adversely affected.*

We operate in highly dynamic and volatile industries. The markets for our products are characterized by rapidly changing technologies, evolving industry standards and customer demand, frequent new product introductions, potential for short product life cycles and, more recently, the convergence of networking and software. Our success and our ability to emerge from the Creditor Protection Proceedings depends, in substantial part, on the timely and successful introduction of timely, cost competitive, innovative and high quality new products and upgrades to replace our legacy products with declining market demand, as well as cost reductions on current products to address the operational speed, bandwidth, efficiency and cost requirements of our customers. Our success will also depend on our ability to comply with emerging industry standards, to sell products that operate with products of other suppliers, to integrate, simplify and reduce the number of software programs used in our portfolio of products, to anticipate and address emerging market trends, to provide our customers with new revenue-generating opportunities and to compete with technological and product developments carried out by others.

The timely development of new, technologically advanced products requires maintaining financial flexibility to react to changing market conditions and significant R&D commitments, as well as the accurate anticipation of technological and market trends. Investments in this environment may result in our R&D and other expenses growing at a faster rate than our revenues, particularly since the initial investment to bring a product to market may be high or market trends could change unexpectedly. We may be unable to continue R&D investment to the same extent and we may not be successful in targeting new market opportunities, in developing and commercializing new products in a timely manner or in achieving market acceptance for our new products, particularly given the limitations imposed as a result of the Creditor Protection Proceedings.

If we fail to respond in a timely and effective manner to unanticipated changes in one or more of the technologies affecting telecommunications and data networking, or our new products or product enhancements fail to achieve market acceptance, our ability to compete effectively in our industry; our sales, market share and customer relationships; and our ability to emerge from the Creditor Protection Proceedings could be materially and adversely affected.

*If we fail to manage the higher operational and financial risks associated with our international operations, it could have a material adverse effect on our business, results of operations and financial condition.*

We operate in international and emerging markets. In many international markets, long-standing relationships between potential customers and their local suppliers and protective regulations, including local content requirements and approvals, create barriers to entry. In addition, pursuing international opportunities may require significant investments for an extended period before returns on those investments, if any, are realized, which may result in expenses growing at a faster rate than revenues. Furthermore, those opportunities could be adversely affected by, among other factors: reversals or delays in the opening of foreign markets to new competitors or the introduction of new technologies into those markets; a challenging pricing environment in highly competitive new markets; exchange controls; restrictions on repatriation of cash; nationalization or regulation of local industry; economic, social and political risks; taxation; challenges in staffing and managing international opportunities; and acts of war or terrorism.

Difficulties in foreign financial markets and economies and of foreign financial institutions, particularly in emerging markets, could adversely affect demand from customers in the affected countries. An inability to maintain our business in international and emerging markets while balancing the higher operational and financial risks associated with these markets could have a material adverse effect on our business, results of operations and financial condition.

*If we are unable to maintain the integrity of our information systems, our business and future prospects may be harmed.*

30

**Table of Contents**

We rely on the security of our information systems, among other things, to protect our proprietary information and information of our customers. If we do not maintain adequate security procedures over our information systems, we may be susceptible to computer viruses, break-ins and similar disruptions from unauthorized tampering with our computer systems to access our proprietary information or that of our customers. Even if we are able to maintain procedures that are adequate to address current security risks, hackers or other unauthorized users may develop new techniques that will enable them to successfully circumvent our current security procedures. The failure to protect our proprietary information could seriously harm our business and future prospects or expose us to claims by our customers, employees or others that we did not adequately protect their proprietary information.

*Changes in regulation of the Internet or other regulatory changes may affect the manner in which we conduct our business and may materially and adversely affect our business, operating results and financial condition.*

The telecommunications industry is highly regulated by governments around the globe, although market-based reforms are taking place in many countries. Changes in telecommunications regulations, product standards and spectrum availability, or other industry regulation in any country in which we or our customers operate could significantly affect demand for and the costs of our products. For example, regulatory changes could affect our customers' capital spending decisions, increase competition among equipment suppliers or increase the costs of selling our products, any of which could have a material adverse effect on our business, results of operation and financial condition.

We are subject to various product content laws and product takeback and recycling requirements that will require full compliance in the coming years. As a result of these laws and requirements, we will incur additional compliance costs. See "Environmental Matters" in the Legal Proceedings section of this report. Although compliance costs relating to environmental matters have not resulted in a material adverse effect on our business, results of operations and financial condition in the past, they may result in a material adverse effect in the future. If we cannot operate within the scope of those laws and requirements, we could be prohibited from selling certain products in the jurisdictions covered by such laws and requirements, which could have a material adverse effect on our business, results of operations and financial condition.

*Our risk management strategy may not be effective or commensurate to the risks we are facing.*

We maintain global blanket policies of insurance of the types and in the amounts of companies of the same size and in the same industry. We have retained certain self-insurance risks with respect to certain employee benefit programs such as worker's compensation, group health insurance, life insurance and other types of insurance. Our risk management programs and claims handling and litigation processes utilize internal professionals and external technical expertise. If this risk management strategy is not effective or is not commensurate to the risks we are facing, these risks could have a material adverse effect on our business, results of operations, financial condition and liquidity.

*We may be required to pay significant penalties or liquidated damages, or our customers may be able to cancel contracts, in the event that we fail to meet contractual obligations including delivery and installation deadlines, which could have a material adverse effect on our revenues, operating results, cash flows and relationships with our customers.*

Some of our contracts with customers contain delivery and installation timetables, performance criteria and other contractual obligations which, if not met, could result in our having to pay significant penalties or liquidated damages and the termination of the contract. Our ability to meet these contractual obligations is, in part, dependent on us obtaining timely and adequate component parts, products and services from suppliers and contract manufacturers. Because we do not always have parallel rights against our suppliers, in the event of delays or failures to timely provide component parts and products, such delays or failures could have a material adverse effect on our revenues, operating results, cash flows and relationships with our customers.

**Other Risks Relating to Our Liquidity, Financing Arrangements and Capital**

*We may need to make larger contributions to our defined benefit plans in the future, which could have a material adverse impact on our liquidity and our ability to meet our other obligations.*

We currently maintain various defined benefit plans in North America and the U.K. covering various categories of employees and retirees, which represent our major retirement plans. In addition, we have smaller retirement plans in other countries. Effective January 1, 2008, accrual for service was discontinued under our North American defined benefit plans. In November 2006, we reached an agreement with the Trustee of our pension plan in the U.K. that had set the levels of contribution through April 2012. Currently, as a result of the U.K. Administration Proceedings, following our latest contribution in January, all further contributions to

31

**Table of Contents**

our U.K. defined benefit pension plan have ceased pursuant to the direction of the U.K. Administrators. Our obligations to make contributions to fund benefit obligations under these plans are based on actuarial valuations, which themselves are based on certain assumptions about the long- term operation of the plans, including employee turnover and retirement rates, the performance of the financial markets and interest rates. If future trends differ from the assumptions, the amounts we are obligated to contribute to the plans may increase. If the financial markets perform lower than the assumptions, we may have to make larger contributions in the future than we would otherwise have to make and expenses related to defined benefit plans could increase. Also, if interest rates are lower in the future than we assume they will be, we may be required to make larger contributions than we would otherwise have to make.

In the second half of 2008, we experienced a significant decline in the value of the assets held in our pension plans due to the adverse conditions in the equity markets globally. As a result, the unfunded status of our defined benefit plans and post- retirement plans as at December 31, 2008, increased. Therefore, we may be required to make larger contributions to our defined benefit plans in the future. However, as a result of the Creditor Protection Proceedings, our current expectation on pension plan funding in 2009 is subject to change and funding beyond 2009 is uncertain at this time. If we are required to make significantly larger contributions, reported results could be materially and adversely affected and our cash flow available for other uses may be significantly reduced.

*Our high level of debt could materially and adversely affect our business, results of operations, financial condition and liquidity.*

In order to finance our business, we have incurred significant levels of debt. A high level of debt, arduous or restrictive terms and conditions related to accessing certain sources of funding, or any significant reduction in, or access to, the EDC Support Facility, could place us at a competitive disadvantage compared to competitors that have less debt and could materially and adversely affect our ability to: fund the operations of our business; borrow money in the future or access other sources of funding; and maintain our flexibility in planning for or reacting to economic downturns, adverse industry conditions and adverse developments in our business; and our ability to withstand such events, and to successfully develop, obtain approval for and implement a comprehensive restructuring plan. As a result of the Creditor Protection Proceedings, we have no access to capital markets and may have no access to debtor- in- possession financing arrangements or other sources of funding.

**ITEM 1B.**　　**Unresolved Staff Comments**

None.

**ITEM 2.**　　**Properties**

In 2008, we continued to reduce the size of our facilities as part of the square footage reduction program associated with our 2007 and 2008 Business Transformation plans, vacating approximately 600,000 square feet of operating space. In addition, we fully disposed of another 600,000 square feet of space, eliminating any direct or contingent liability with respect to that space. We sold our ownership position in our Campinas, Brazil location which will be relocating to San Paulo, netting $11 of proceeds. During 2009, we plan to vacate an additional 300,000 square feet and fully dispose of 600,000 square feet. In addition, in connection with our Creditor Protection Proceedings, we are considering rejecting, repudiating or terminating certain leases so as to vacate additional leased properties, and selling additional Nortel- owned sites. For further information see "Results of Operations - Special Charges" in the MD&A section of this report.

We believe that the facilities we will retain will be suitable, adequate and sufficient to meet the needs of the Company while operating in Creditor Protection Proceedings. Most sites are used by multiple business segments for various purposes. As of December 31, 2008, estimated facilities use by segment was 31% Carrier Networks, 21% Enterprise Solutions, 12% MEN, 17% Global Services, and 19% one or more segments and/or corporate facilities. As of December 31, 2008, we operated 189 sites occupying approximately 10.7 million square feet.

| Type of Site* | Number Owned | Number Leased | Geographic Locations |
|---|---|---|---|
| Manufacturing and repair** | 4 | 1 | EMEA, CALA and the Asia region |
| Distribution centers | - | 7 | U.S., EMEA, CALA and the Asia region |
| Offices (administration, sales and field service) | 2 | 165 | All geographic regions |
| Research and development | 3 | 7 | U.S., Canada, EMEA and the Asia region |
| TOTAL*** | 9 | 180 | |

HIGHLY CONFIDENTIAL　　　　NNC-NNL06001427 / 38

**Table of Contents**

\* Indicates primary use. A number of sites are mixed- use facilities.
\*\* Manufacturing sites in China and Thailand are operated by Nortel joint ventures. The site in China is owned pursuant to land use rights granted by Chinese authorities. Small amounts of integration and test activity are conducted by Nortel in Northern Ireland, Brazil and Turkey.
\*\*\* Excludes approximately 4.2 million square feet designated as part of planned square footage reduction programs, of which approximately 2.7 million square feet was sub- leased.

In connection with the Creditor Protection Proceedings, the Canadian Debtors have granted a charge against some or all of our and their assets and any proceeds from any sales thereof, as follows and in the following priority:

First, the administration charge, in an amount not to exceed CAD$5 in favor of the Canadian Monitor and its counsel and counsel to the Canadian Debtors against all of the property of the Canadian Debtors, to secure payment of professional fees and disbursements before and after the Petition Date;

Second, the Carling facility charges, in favor of NNI as security for amounts owed by NNL and Nortel Networks Technology Corporation (NNTC) to NNI with respect to a post- Petition Date intercompany revolving loan agreement, against the fee simple interest of NNTC and the leasehold interest of NNL in the real property located at 3500 Carling Avenue, Labs 1- 10, Ottawa, Ontario, such charge not to exceed the amount of any such loan plus related interest and fees;

Third, the EDC charge, in favor of EDC against all of the property of the Canadian Debtors as security for new support provided by EDC to NNL under the EDC Support Facility including increases in or renewals or extensions of support existing on the Petition Date;

Fourth, the directors' charge, against all property of the Canadian Debtors in an amount not exceeding CAD$90, as security for their obligation to indemnify their respective directors and officers for all claims that may be made against them relating to any failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations arising during the CCAA Proceedings, and related legal fees and expenses.

Fifth, the intercompany charge, in favor of any U.S. Debtor that has made or may make a post- Petition Date intercompany loan or other transfer (including of goods or services) to one or more of the Canadian Debtors (including amounts owed by NNL to NNI on the Petition Date under a certain intercompany loan agreement) against the property of the Canadian Debtor that receives such loan or transfer, to secure payments or repayments relating thereto, such charge not to exceed the amount of any such loan or transferred goods or services, plus related interest and fees.

In conjunction with the Creditor Protection Proceedings, we established the D&O Trust in the amount of approximately CAD$12. Its purpose is to provide a trust fund for payment of liability claims (including defense costs) that may be asserted against individuals relating to their service as directors and officers of Nortel entities or joint ventures, to the extent not paid by insurance maintained by us and we are unable to indemnify the individual. Such claims would include claims for unpaid statutory payment or remittance of our obligations or those of such other entities for which such directors and officers have personal liability, to the extent such indemnity is not prohibited by law. The D&O Trust may also be used to maintain directors' and officers' insurance in the event NNC fails or refuses to do so.

As a result of the Creditor Protection Proceedings, we are in default with respect to certain contracts, including without limitation certain capital leases of personal property, and certain leases of real property. However, also as a result of the Creditor Protection Proceedings, we believe that all actions against us have been stayed. We may seek to reject, repudiate or terminate certain burdensome contracts as well as leases in connection with our comprehensive restructuring plan.

**ITEM 3.   Legal Proceedings**

Creditor Protection Proceedings: As discussed in "Executive Overview- Creditor Protection Proceedings" in the MD&A section of this report, on January 14, 2009, the Canadian Debtors obtained an order from the Canadian Court for creditor protection and commenced ancillary proceedings under chapter 15 of the U.S. Bankruptcy Code, the U.S. Debtors filed voluntary petitions under

33

**Table of Contents**

Chapter 11 of the U.S. Bankruptcy Code, and each of the EMEA Debtors obtained an administration order from the English Court. After the Petition Date, the Israeli Debtors initiated similar proceedings in Israel. Generally, as a result, all actions to enforce or otherwise effect payment or repayment of liabilities of any Debtor preceding the Petition Date, as well as pending litigation against any Debtor, are stayed as of the Petition Date. Absent further order of the applicable courts and subject to certain exceptions and, in Canada, potential time limits, no party may take any action to recover on pre- petition claims against any Debtor.

Global Class Action Settlement: We entered into agreements to settle two significant U.S. and all but one Canadian class action lawsuits (Global Class Action Settlement) which became effective on March 20, 2007 following approval of the agreements by the appropriate courts. Administration of the settlement claims is now substantially complete. As of December 31, 2008, almost all of the NNC common shares issuable in accordance with the settlement had been distributed to claimants and plaintiffs' counsel, most of them in the second quarter of 2008. The cash portion of the settlement has been distributed by the claims administrator to the approved claimants, net of an amount held in reserve by the claims administrator to cover contingencies and certain settlement costs. The settlement also requires that we contribute to the plaintiffs one- half of any recovery from our litigation referenced below against certain of our former senior officers who were terminated for cause in 2004.

U.S. federal grand jury subpoenas: In May 2004 and August 2005, we received federal grand jury subpoenas for the production of certain documents in connection with a criminal investigation being conducted by the U.S. Attorney's Office for the Northern District of Texas, Dallas Division. We understand that this investigation of NNI and certain former employees has been concluded, and we have been advised that no criminal charges will be filed in the U.S. in connection with this matter.

RCMP charges against former executives: On June 19, 2008, the Royal Canadian Mounted Police (RCMP) announced that it had filed criminal charges against three of our former executives: Frank Dunn, Douglas Beatty and Michael Gollogly. The fraud- related charges include: fraud affecting the public market, falsification of books and documents, and false prospectus. These charges pertain to allegations of criminal activity within Nortel by these former executives during 2002 and 2003. No criminal charges were filed against us, and we are not the target of an investigation by the RCMP.

ERISA lawsuit: Beginning in December 2001, we, together with certain of our then- current and former directors, officers and employees, were named as a defendant in several purported class action lawsuits pursuant to the United States Employee Retirement Income Security Act. These lawsuits have been consolidated into a single proceeding in the U.S. District Court for the Middle District of Tennessee. This lawsuit is on behalf of participants and beneficiaries of the Nortel Long- Term Investment Plan, who held shares of the Nortel Networks Stock Fund during the class period, which has yet to be determined by the court. The lawsuit alleges, among other things, material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan. The court has not yet ruled as to whether the plaintiff's proposed class action should be certified.

Canadian pension class action: On June 24, 2008, a purported class action lawsuit was filed against us and NNL in the Ontario Superior Court of Justice in Ottawa, Canada alleging, among other things, that certain recent changes related to our pension plan did not comply with the *Pension Benefits Act* (Ontario) or common law notification requirements. The plaintiffs seek declaratory and equitable relief, and unspecified monetary damages.

Ontario proposed derivative action: In December 2005, an application was filed in the Ontario Superior Court of Justice for leave to commence a shareholders' derivative action on our behalf against certain of our then- current and former officers and directors. The derivative action alleges, among other things, breach of fiduciary duties, breach of duty of care and negligence, and unjust enrichment in respect of various alleged acts and omissions. If the application is granted, the proposed derivative action would seek on our behalf, among other things, compensatory damages of CAD$1,000 and punitive damages of CAD$10 from the individual defendants. The proposed derivative action would also seek an order directing our Board of Directors to reform and improve our corporate governance and internal control procedures as the court may deem necessary or desirable, and an order that we pay the legal fees and other costs in connection with the proposed derivative action. The application for leave to commence this action has not yet been heard.

Shareholder statement of claim against Deloitte & Touche LLP: On February 8, 2007, a Statement of Claim was filed in the Ontario Superior Court of Justice in the name of Nortel and NNL against Deloitte & Touche LLP. The action was commenced by three

34

**Table of Contents**

shareholders without leave, and without our knowledge or authorization. The three have indicated that they filed the action in anticipation of bringing an application for leave to commence a derivative action on behalf of Nortel against Deloitte under the *Canada Business Corporations Act* (CBCA), and that the three shareholders would be seeking leave on a retroactive basis to authorize their action. The claim alleges, among other things, breach of contract, negligence, negligent misrepresentation, lack of independence, and breach of fiduciary duty. The claim seeks damages and other relief on our behalf, including recovery of payments that we made to class members as part of the Global Class Action Settlement. The Litigation Committee of our Board of Directors has reviewed the matter and has advised the law firm pursuing the derivative action of our position on the proposed claim. On February 6, 2008, an application was filed by the three shareholders for leave to commence a derivative action in the name of Nortel against Deloitte.

Nortel statement of claim against its former officers: In January 2005, we and NNL filed a Statement of Claim in the Ontario Superior Court of Justice against Messrs. Frank Dunn, Douglas Beatty and Michael Gollogly, our former senior officers who were terminated for cause in April 2004, seeking the return of payments made to them under our bonus plan in 2003. One-half of any recovery from this litigation is subject to the Global Class Action Settlement referenced above.

Former officers' statements of claims against Nortel: In April 2006, Mr. Dunn filed a Notice of Action and Statement of Claim in the Ontario Superior Court of Justice against us and NNL asserting claims for wrongful dismissal, defamation and mental distress, and seeking punitive, exemplary and aggravated damages, out-of-pocket expenses and special damages, indemnity for legal expenses incurred as a result of civil and administrative proceedings brought against him by reason of his having been an officer or director of the defendants, pre-judgment interest and costs. Mr. Dunn has further brought an application before the Ontario Superior Court of Justice against us and NNL seeking an order that, pursuant to our bylaws, we reimburse him for all past and future defense costs he has incurred as a result of proceedings commenced against him by reason of his being or having been a director or officer of Nortel.

In May and October 2006, respectively, Messrs. Gollogly and Beatty filed Statements of Claim in the Ontario Superior Court of Justice against us and NNL asserting claims for, among other things, wrongful dismissal and seeking compensatory, aggravated and punitive damages, and pre- and post-judgment interest and costs.

Ipernica: In June 2005, Ipernica Limited (formerly known as QSPX Development 5 Pty Ltd), an Australian patent holding firm, filed a lawsuit against us in the U.S. District Court for the Eastern District of Texas alleging patent infringement. In April 2007, the jury reached a verdict to award damages to Ipernica in the amount of $28. In March 2008, we entered into an agreement to settle all claims, which grants to us a perpetual, world-wide license to various Ipernica patents, and includes a covenant not to sue as well as mutual releases. In connection with this settlement, a payment of $12 was made by NNI to Ipernica in the first quarter of 2008.

Except as otherwise described herein, in each of the matters described above, the plaintiffs are seeking an unspecified amount of monetary damages. We are unable to ascertain the ultimate aggregate amount of monetary liability or financial impact to us of the above matters, which, unless otherwise specified, seek damages from the defendants of material or indeterminate amounts or could result in fines and penalties. We cannot determine whether these actions, suits, claims and proceedings will, individually or collectively, have a material adverse effect on our business, results of operations, financial condition or liquidity. Except for matters encompassed by the Ipernica settlement, we intend to defend the above actions, suits, claims and proceedings in which we are a defendant, litigating or settling cases where in management's judgment it would be in the best interest of shareholders to do so. We will continue to cooperate fully with all authorities in connection with the regulatory and criminal investigations.

We are also a defendant in various other suits, claims, proceedings and investigations that arise in the normal course of business.

*Environmental Matters*

We are exposed to liabilities and compliance costs arising from our past generation, management and disposal of hazardous substances and wastes. As of December 31, 2008, the accruals on the consolidated balance sheet for environmental matters were $11. Based on information available as of December 31, 2008, management believes that the existing accruals are sufficient to satisfy probable and reasonably estimable environmental liabilities related to known environmental matters. Any additional liabilities that may result from these matters, and any additional liabilities that may result in connection with other locations currently under investigation, are not expected to have a material adverse effect on our business, results of operations, financial condition and liquidity and may be affected by our Creditor Protection Proceedings.

We have remedial activities under way at 11 sites that are either currently or previously owned or occupied facilities. An estimate of our anticipated remediation costs associated with all such sites, to the extent probable and reasonably estimable, is included in the environmental accruals referred to above in an approximate amount of $11.

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 41

**Table of Contents**

We are also listed as a potentially responsible party under the U.S. Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) at four Superfund sites in the U.S. (At three of the Superfund sites, we are considered a *de minimis* potentially responsible party). A potentially responsible party within the meaning of CERCLA is generally considered to be a major contributor to the total hazardous waste at a Superfund site (typically 10% or more, depending on the circumstances). A *de minimis* potentially responsible party is generally considered to have contributed less than 10% (depending on the circumstances) of the total hazardous waste at a Superfund site. An estimate of our share of the anticipated remediation costs associated with such Superfund sites is expected to be *de minimis* and is included in the environmental accruals of $11 referred to above.

Liability under CERCLA may be imposed on a joint and several basis, without regard to the extent of our involvement. In addition, the accuracy of our estimate of environmental liability is affected by several uncertainties such as additional requirements which may be identified in connection with remedial activities, the complexity and evolution of environmental laws and regulations, and the identification of presently unknown remediation requirements. Consequently, our liability could be greater than its current estimate.

For a discussion of environmental matters, see note 22, "Contingencies" to the accompanying audited consolidated financial statements.

**ITEM 4.     Submission of Matters to a Vote of Security Holders**
None.

## PART II

**ITEM 5.     Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

On December 11, 2008, the NYSE notified us that NNC common shares had fallen below one of the NYSE's continued listing standards regarding price criteria as a result of our shares having an average closing price of less than one U.S. Dollar per share during the consecutive 30 trading days ended December 9, 2008. On January 14, 2009, the NYSE notified us that it had suspended the listing of NNC common shares on the NYSE as a result of our CCAA Proceedings and Chapter 11 Proceedings. NNC common shares were delisted from the NYSE on February 2, 2009. NNC's common shares are quoted on the Pink Sheets under the symbol "NRTLQ". The Pink Sheets Electronic Quotation Service is a centralized quotation service maintained by Pink Sheets LLC that collects and publishes market maker quotes for OTC securities.

The Company holds all of NNL's outstanding common shares but none of its outstanding preferred shares. NNL's cumulative redeemable class A preferred shares series 5 (NNL series 5 preferred shares) and non- cumulative redeemable class A preferred shares series 7 (NNL series 7 preferred shares, and collectively with the NNL series 5 preferred shares, the NNL preferred shares) are traded on the TSX under the symbols "NTL.PR.F" and "NTL.PR.G", respectively.

Also on January 14, 2009, the TSX notified us that it had begun reviewing the eligibility for continued listing on the TSX of securities of NNC and NNL pursuant to the Toronto Stock Exchange Company Manual. The TSX stopped its review after concluding that the review was stayed by the initial order granted by the Canadian Court pursuant to the CCAA Proceedings.

Since the NYSE suspension, NNC common shares continue to be traded on the TSX and quoted on the Pink Sheets in the U.S. NNL preferred shares continue to be traded on the TSX. See the Risk Factors section of this report.

During the pendency of our Creditor Protection Proceedings, investments in our securities are highly speculative and pose substantial risks. Under any eventual court- approved comprehensive restructuring plan, our existing securities may be cancelled and holders may receive no payment or other consideration in return. Also, the U.S. Court has issued an order imposing certain restrictions and notification procedures on trading in NNC common shares and NNL series 5 preferred shares and NNL series 7 preferred shares (and any other series of NNL preferred shares into which they may be converted) in an effort to prevent an "ownership change" of the Company under the U.S. Internal Revenue Code that could interfere with our ability to utilize our deferred tax assets to reduce our taxable income in the future. See the Risk Factors section of this report.

HIGHLY CONFIDENTIAL                              NNC-NNL06001427 / 42

**Table of Contents**

The following table sets forth the high and low sale prices of NNC common shares as reported on the NYSE composite tape and on the TSX in 2007 and 2008:

|  |  | New York Stock Exchange Composite Tape | | Toronto Stock Exchange (CAD $) | |
|---|---|---|---|---|---|
|  |  | High | Low | High | Low |
| 2008 | Fourth Quarter | $ 2.34 | $ 0.21 | $ 2.49 | $ 0.26 |
|  | Third Quarter | 8.21 | 2.21 | 8.31 | 2.34 |
|  | Second Quarter | 10.58 | 6.78 | 10.83 | 6.91 |
|  | First Quarter | 15.28 | 5.73 | 15.15 | 5.84 |
| 2007 | Fourth Quarter | $ 19.50 | $ 15.05 | $ 18.96 | $ 14.56 |
|  | Third Quarter | 25.15 | 15.32 | 26.38 | 15.33 |
|  | Second Quarter | 26.49 | 22.54 | 28.62 | 25.01 |
|  | First Quarter | 31.79 | 23.68 | 37.35 | 27.33 |

On February 20, 2009, the last sale price for NNC common shares quoted on the Pink Sheets was $0.0840 and on the TSX was CAD$0.1050.
On February 20, 2009, approximately 249,837 registered shareholders held 100% of NNC common shares outstanding. These included the Canadian Depository for Securities and the Depository Trust Company, two clearing corporations, which held a total of approximately 97% of NNC common shares on behalf of other shareholders.

**Dividends**

On June 15, 2001, we announced that our Board of Directors had decided to discontinue the declaration and payment of dividends on NNC common shares. As a result, dividends have not been declared and paid on NNC common shares since June 29, 2001, and future dividends will not be declared unless and until our Board of Directors decides otherwise, and only as permitted under the CBCA. On July 26, 2001, our Board of Directors suspended the operation of the Nortel Networks Corporation Dividend Reinvestment and Stock Purchase Plan.

**Securities Authorized for Issuance Under Equity Compensation Plans**

On February 27, 2009, we obtained an order from the Canadian Court providing for the termination of the Nortel equity- based compensation plans (the Nortel 2005 Stock Incentive Plan, As Amended and Restated, the Nortel Networks Corporation 1986 Stock Option Plan, As Amended and Restated the Nortel Networks Corporation 2000 Stock Option Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, stock appreciation rights, restricted stock units and performance stock units), whether vested or unvested. We made this request given the decreased value of NNC common shares and the administrative and associated costs of maintaining the plans to us as well as the plan participants. See note 20, "Share- based compensation plans", to the accompanying audited financial statements, and the Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters section of this report, for additional information about our equity- based compensation plans.

**Canadian Tax Matters**

*Dividends*

Under the U.S.- Canada Income Tax Convention (1980) (Convention), Canadian withholding tax of 15% generally applies to the gross amount of dividends (including stock dividends) paid or credited to beneficial owners of NNC common shares:

who are resident in the U.S. for the purposes of the Convention and are entitled to benefits under the Convention; and

who do not hold the shares in connection with a business carried on through a permanent establishment or a fixed base in Canada.

The Convention provides an exemption from withholding tax on dividends paid or credited to certain tax- exempt organizations that are resident in the U.S. for purposes of the Convention. Persons who are subject to the U.S. federal income tax on dividends may be

37

**Table of Contents**

entitled, subject to certain limitations, to either a credit or deduction with respect to Canadian income taxes withheld with respect to dividends paid or credited on NNC common shares.

*Sales or Other Dispositions of Shares*

Gains on sales or other dispositions of NNC common shares by a non-resident of Canada are generally not subject to Canadian income tax, unless the holder realizes the gains in connection with a business carried on in Canada. A gain realized upon the disposition of NNC common shares by a resident of the U.S. that is otherwise subject to Canadian tax may be exempt from Canadian tax under the Convention. Where NNC common shares are disposed of by way of our acquisition of such common shares, other than a purchase in the open market in the manner in which NNC common shares would normally be purchased by any member of the public in the open market, the amount paid by us in excess of the paid-up capital of such common shares will be treated as a dividend, and will be subject to non-resident withholding tax.

**Sales of Unregistered Securities**

*Nortel Networks/BCE Stock Option Plans*: During the fourth quarter of 2008, we issued an aggregate of 637 NNC common shares upon the exercise of options granted under the Nortel Networks/BCE 1985 Stock Option Plan and the Nortel Networks/BCE 1999 Stock Option Plan. The NNC common shares issued on the exercise of these options were issued outside of the U.S. to BCE Inc. (BCE) employees who were not U.S. persons at the time of option exercise, or to BCE in connection with options that expired unexercised or were forfeited. The NNC common shares issued are deemed to be exempt from registration pursuant to Regulation S under the U.S. Securities Act of 1933, as amended (Securities Act). All funds we receive in connection with the exercise of stock options granted under the two Nortel Networks/BCE stock option plans are transferred in full to BCE pursuant to the terms of the May 1, 2000 plan of arrangement whereby we were spun off from BCE, except for nominal amounts we receive to round up fractional entitlements into whole shares. We keep these nominal amounts and use them for general corporate purposes.

| Date of Exercise | Number of NNC common shares Issued Without U.S. Registration Upon Exercise of Stock Options Under Nortel/ BCE Plans | Range of Exercise Prices CAD$ |
|---|---|---|
| November 27, 2008 | 637 | CAD$ 419.03 |

*Directors' Deferred Share Compensation Plans*: The following table sets forth the total number of Nortel Networks Corporation/Nortel Networks Limited share units (NNC/NNL share units) credited to accounts of our and NNL's directors, in lieu of cash fees, under the Nortel Networks Corporation Directors' Deferred Share Compensation Plan and Nortel Networks Limited Directors' Deferred Share Compensation Plan (DSC Plans) during the fourth quarter of 2008. These transactions are exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof. See note 23, "Subsequent Events", to the accompanying audited consolidated financial statements and the Executive and Director Compensation section of this report, regarding operation of the DSC Plans during the Creditor Protection Proceedings.

| Date of Grant | Total Number of NNC/NNL Share Units Acquired under DSC Plans in Q4 | Price per Common Share (or Unit) |
|---|---|---|
| December 31, 2008 | 1,567,893.1765(1) | $ 0.28(2) |

(1) NNC/NNL share units issued on the last day of the quarter under the DSC Plans. Pursuant to the DSC Plans, upon election of the director, certain fees payable to our and NNL's directors are paid in the form of NNC/NNL share units, based upon the market price of NNC common shares on the last trading day of the quarter. On the earliest date when a director ceases to be both (i) a member of our and NNL's boards of directors and (ii) employed by us or NNL or our subsidiaries, we and NNL will cause to be purchased on the open market, for delivery to the director, a number of NNC common shares equal to the number of NNC/NNL share units credited to the director's account under the DSC Plans.

(2) Represents share price for NNC common shares of CAD$0.34 as converted into U.S. Dollars using the noon rate of exchange of the Bank of Canada on December 31, 2008.

*Global Class Action Settlement*: In connection with the Global Class Action Settlement, in 2007, we issued 2,646,967 NNC common shares, of the total 62,866,775 NNC common shares to be issued in accordance with the terms of the settlement. As of December 31,

38

HIGHLY CONFIDENTIAL

NNC-NNL06001427 / 44

**Table of Contents**

2008, almost all of the NNC common shares issuable in accordance with the settlement had been distributed to claimants and plaintiffs' counsel, most of them in the second quarter of 2008. The issuance of the 62,866,775 NNC common shares is exempt from registration pursuant to Section 3(a)(10) of the Securities Act.

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 45

**Table of Contents**

**ITEM 6.    Selected Financial Data (Unaudited)**

The selected financial data presented below was derived from Nortel's audited consolidated financial statements and related notes thereto included elsewhere in this 2008 Annual Report except for the summarized balance sheet data as of December 31, 2006, 2005 and 2004 and summarized results of operations data for the years ended December 31, 2005 and 2004.

| (Millions of U.S. Dollars, except per share amounts) | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| **Results of Operations** | | | | | |
| Total revenues | $ 10,421 | $ 10,948 | $ 11,418 | $ 10,509 | $ 9,478 |
| Research and development expense | 1,573 | 1,723 | 1,939 | 1,874 | 1,975 |
| Special charges | 302 | 210 | 105 | 169 | 181 |
| Shareholder litigation settlement expense (recovery) | - | (54) | (219) | 2,474 | - |
| Goodwill impairment | 2,379 | - | - | - | - |
| Operating earnings (loss) | (2,158) | 226 | 282 | (2,709) | (298) |
| Other income- net | 46 | 425 | 199 | 272 | 217 |
| Income tax benefit (expense) | (3,193) | (1,114) | (60) | 81 | 20 |
| Net earnings (loss) from continuing operations | (5,799) | (957) | 19 | (2,611) | (296) |
| Net earnings (loss) from discontinued operations- net of tax | - | - | - | 1 | 49 |
| Cumulative effect of accounting changes- net of tax | - | - | 9 | - | - |
| Net earnings (loss) | (5,799) | (957) | 28 | (2,610) | (247) |
| | | | | | |
| Basic earnings (loss) per common share | | | | | |
| - from continuing operations | $ (11.64) | $ (1.98) | $ 0.06 | $ (6.02) | $ (0.68) |
| - from discontinued operations | - | - | 0.00 | 0.00 | 0.11 |
| Basic earnings (loss) per common share | $ (11.64) | $ (1.98) | $ 0.06 | $ (6.02) | $ (0.57) |
| | | | | | |
| Diluted earnings (loss) per common share | | | | | |
| - from continuing operations | $ (11.64) | $ (1.98) | $ 0.06 | $ (6.02) | $ (0.68) |
| - from discontinued operations | - | - | 0.00 | 0.00 | 0.11 |
| Diluted earnings (loss) per common share | $ (11.64) | $ (1.98) | $ 0.06 | $ (6.02) | $ (0.57) |

| (Millions of U.S. Dollars) | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| **Financial Position as of December 31** | | | | | |
| Total assets | $ 8,837 | $ 17,068 | $ 18,979 | $ 18,135 | $ 17,716 |
| Total debt(a) | 4,585 | 4,546 | 4,500 | 3,896 | 3,891 |
| Minority interests in subsidiary companies | 822 | 830 | 779 | 783 | 624 |
| Total shareholders' equity (deficit) | (3,951) | 2,758 | 1,121 | 763 | 3,612 |

(a) Total debt includes long- term debt, long- term debt due within one year and notes payable.

See notes 3, 7, 10, 17 and 22 to the accompanying audited consolidated financial statements for the impact of accounting changes, special charges, reclassifications, acquisitions, divestitures and closures, capital stock and the shareholder litigation settlement expense related to the Global Class Action Settlement, respectively, that affect the comparability of the above selected financial data. See note 1 for discussion regarding Nortel's ability to continue as a going concern.

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 46