Table of Contents

When a fair value hedging relationship is terminated because the derivative is sold or the hedge relationship is de-designated, the fair value basis adjustment recorded on the hedged item is recognized in the same manner as the other components of the hedged item. For a cash flow hedge that is terminated because the derivative is sold, expired, or the relationship is de-designated, the amount in OCI is to be realized when the hedged item affects net earnings (loss). If a cash flow or fair value hedging relationship is terminated because the underlying hedged item is repaid or is sold, or it is no longer probable that the hedged forecasted transaction will occur, the accumulated balance in OCI or the fair value basis adjustment recorded on the hedged item is recorded immediately in net earnings (loss).

Nortel's policy is to formally document the terms of the relationships between derivative instruments and hedged items to which hedge accounting will be applied. This documentation includes Nortel's risk management objectives and strategy for undertaking various hedge transactions. Where hedge accounting will be applied, this process includes linking all derivatives to specific assets and liabilities on the consolidated balance sheet or to specific firm commitments or forecasted transactions. Nortel also formally assesses, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in designated hedging relationships are highly effective in offsetting changes in fair values or cash flows of hedged items. Nortel may also invest in warrants to purchase securities of other companies as a strategic investment or receive warrants in various transactions. Warrants that relate to publicly traded companies or that can be net share settled are deemed to be derivative financial instruments. Such warrants, however, are generally not eligible to be designated as hedging instruments. In addition, Nortel may enter into certain commercial contracts containing embedded derivative financial instruments. Generally for these embedded derivatives, the economic characteristics and risks are not clearly and closely related to the economic characteristics and risks of the host contract, and therefore the embedded derivatives are separated from the host contract and the changes in fair value each period are recorded in net earnings (loss).

*(v) Share-based compensation*

Nortel employees and directors have been issued share-based awards from a number of share-based compensation plans that are described in note 20.

Effective January 1, 2006, Nortel adopted SFAS No. 123R, "Share-Based Payment" ("SFAS 123R") which revises SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"). Nortel adopted SFAS 123R using the modified prospective transition approach and, accordingly, the results of prior periods have not been restated. Under the modified prospective transition approach, the provisions of SFAS 123R are generally applied only to share-based awards granted, modified, repurchased or cancelled on January 1, 2006 and thereafter. Nortel voluntarily adopted fair value accounting for share-based awards effective January 1, 2003 (under SFAS 123, as amended by SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure-an Amendment of SFAS 123"), using the prospective method. Under this method, Nortel measured the cost of share-based awards granted or modified on or after January 1, 2003 using the fair value of the award and began recognizing that cost in the consolidated statements of operations over the vesting period. Nortel will recognize the remaining previously unrecognized cost of these awards over the remaining service period following the provisions of SFAS 123R.

NNC common shares, deliverable upon the settlement or exercise of awards issued under Nortel's share-based compensation plans, may be new shares issued from treasury or shares purchased in privately negotiated transactions or in the open market.

128

**Table of Contents**

The accounting for Nortel's significant share- based compensation plans under the fair value- based method is as follows:

*Stock options*

The grant date fair value of stock options is estimated using the Black- Scholes- Merton option- pricing model. Compensation cost is recognized on a straight- line basis over the stock option vesting period of the entire award based on the estimated number of stock options that are expected to vest. When exercised, stock options are settled through the issuance of NNC common shares and are therefore treated as equity awards.

*Stock appreciation rights ("SARs")*

Stand- alone SARs or SARs in tandem with options may be granted under the Nortel 2005 Stock Incentive Plan, As Amended and Restated ("2005 SIP"). As of December 31, 2008, no tandem SARs have been granted under the 2005 SIP. SARs that are settled in cash are accounted for as liability awards and SARs that are settled in NNC common shares are accounted for as equity awards. Upon the exercise of a vested stand- alone SAR, a holder will be entitled to receive payment, in cash, NNC common shares or any combination thereof of an amount equal to the excess of the market value of an NNC common share on the date of exercise over the subscription or base price under the SAR. Stand- alone SARs awarded under the 2005 SIP generally vest in equal installments on the first four anniversary dates of the grant date of the award. All SARs currently granted will be settled in cash at the time of vesting and as such have been classified as liability awards based on this cash settlement provision. The measurement of the liability and compensation cost of outstanding SARs is based on the fair value of the awards and is remeasured each period through the date of settlement. Compensation cost is amortized over the requisite service period (generally the vesting period) of the award based on the proportionate amount of the requisite service that has been rendered to date.

*Restricted Stock Units ("RSUs")*

RSUs are settled with NNC common shares and are valued on the grant date using the grant date market price of the underlying shares. This valuation of compensation cost is not subsequently adjusted for changes in the market price of the shares. Each RSU granted under the 2005 SIP represents the right to receive one NNC common share subject to the terms and conditions of the award. Compensation cost is recognized on a straight- line basis over the vesting period of the entire award based on the estimated number of RSU awards that are expected to vest. RSUs were awarded to executive officers beginning in 2005, and employees from January 1, 2007, prospectively vest in equal installments on the first three anniversary dates of the grant of the award. With the exception of RSUs granted in China, all RSUs currently granted have been classified as equity instruments as their terms require that they be settled in NNC common shares. To address country specific rules and regulations RSUs awarded to employees working in China are cash settled awards. Nortel accounts for these cash settled grants as liability awards.

*Performance Stock Units ("PSUs")*

*Relative Total Shareholder Return Metric Awards ("PSU- rTSRs")*

PSU- rTSRs (previously defined as "PSUs" in the Annual Report on Form 10- K for the year ended December 31, 2007 ("2007 Annual Report")) are generally settled with NNC common shares and are valued using a Monte Carlo simulation model. The number of awards expected to be earned, based on achievement of the PSU- rTSR market condition, is factored into the grant date Monte Carlo valuation for the PSU- rTSR award. The grant date fair value is not subsequently adjusted regardless of the eventual number of awards that are earned based on the market condition. Compensation cost is recognized on a straight- line basis over the requisite service period. Compensation cost is reduced for estimated PSU- rTSR awards that will not vest due to not meeting continued employment vesting conditions. All PSU- rTSRs currently granted have been classified as equity instruments as their terms require settlement in shares.

129

Table of Contents

For PSU- rTSRs that may be settled in cash, the award is treated as a liability and compensation cost for the award is remeasured each period based on the fair value of the underlying shares at period end. Compensation cost is then recognized in the same manner as described above.

*Management Operating Margin Metric Awards ("PSU- Management OMs")*

PSU- Management OMs, as described in note 20, vest based on the satisfaction of both a performance condition and a continued service condition. PSU- Management OMs are generally settled in shares and compensation cost for these awards is measured based on the grant date fair value of the underlying NNC common shares that may be issuable based on the terms of the award. Compensation cost is recognized over the requisite service period of the award based on the probable number of shares to be issued by achievement of the performance condition, reduced by the expected awards that will not vest due to not meeting the continued service condition. Compensation cost recognized is adjusted to equal the grant date fair value of the actual shares that vest once known.

For PSU- Management- OMs that may be settled in cash, the award is treated as a liability and compensation cost for the award is remeasured each period based on the fair value of the underlying shares at period end. Compensation cost is then recognized in the same manner as described above.

*Employee stock purchase plans ("ESPP")*

Nortel has stock purchase plans for eligible employees to facilitate the acquisition of NNC common shares at a discount. The discount is such that the plans are considered compensatory under the fair value- based method. Nortel's contribution to the ESPPs, as defined in note 20, is recorded as compensation expense on a quarterly basis as the obligation to contribute is incurred.

*(w) Guarantees*

Nortel has entered into agreements which contain features that meet the definition of a guarantee under FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Other" ("FIN 45"). These arrangements create two types of obligations for Nortel:

    (i)    Nortel has a non- contingent and immediate obligation to stand ready to make payments if certain future triggering events occur. For certain guarantees, a liability is recognized for the stand ready obligation at the inception of the guarantee; and

    (ii)    Nortel has an obligation to make future payments if those certain future triggering events do occur. A liability is recognized when (a) it becomes probable that one or more future events will occur triggering the requirement to make payments under the guarantee and (b) when the payment can be reasonably estimated.

*(x) Recent accounting pronouncements*

    (i)    In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"). SFAS 157 establishes a single definition of fair value, a framework for measuring fair value under U.S. GAAP and requires expanded disclosures about fair value measurements. Nortel partially adopted the provisions of SFAS 157 effective January 1, 2008. The effective date for SFAS 157 as it relates to fair value measurements for non- financial assets and liabilities that are not measured at fair value on a recurring basis has been deferred to fiscal years beginning after December 15, 2008 in accordance with FASB Staff Position ("FSP"), SFAS 157- 2, "Effective Date of FASB Statement No. 157". Nortel plans to adopt the deferred portion of SFAS 157 on January 1, 2009. Nortel does not currently expect the adoption of the deferred portion of SFAS 157 to have a material impact on its

130

**Table of Contents**

results of operations and financial condition, but will continue to assess the impact as the guidance evolves.

(ii)    In September 2007, EITF reached a consensus on EITF Issue No. 07- 1, "Collaborative Arrangements" ("EITF 07- 1"). EITF 07- 1 addresses the accounting for arrangements in which two companies work together to achieve a common commercial objective, without forming a separate legal entity. The nature and purpose of a company's collaborative arrangements are required to be disclosed, along with the accounting policies applied and the classification and amounts for significant financial activities related to the arrangements. Nortel plans to adopt the provisions of EITF 07- 1 on January 1, 2009. The adoption of EITF 07- 1 is not expected to have a material impact on Nortel's results of operations and financial condition.

(iii)    In December 2007, the FASB issued SFAS No. 141R, "Business Combinations" ("SFAS 141R"), replacing SFAS No. 141, "Business Combinations". SFAS 141R revises existing accounting guidance for how an acquirer recognizes and measures in its financial statements the identifiable assets, liabilities, any noncontrolling interests and goodwill acquired on the acquisition of a business. SFAS 141R is effective for fiscal years beginning after December 15, 2008. Nortel plans to adopt the provisions of SFAS 141R on January 1, 2009. The adoption of SFAS 141R will impact the accounting for business combinations completed by Nortel on or after January 1, 2009.

(iv)    In December 2007, the FASB issued SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements- An Amendment of ARB 51" ("SFAS 160"). SFAS 160 establishes accounting and reporting standards for the treatment of noncontrolling interests in a subsidiary. Noncontrolling interests in a subsidiary will be reported as a component of equity in the consolidated financial statements and any retained noncontrolling equity investment upon deconsolidation of a subsidiary will initially be measured at fair value. SFAS 160 is effective for fiscal years beginning after December 15, 2008. Nortel plans to adopt the provisions of SFAS 160 on January 1, 2009. The adoption of SFAS 160 will result in the reclassification of minority interests to shareholders' equity.

(v)    In March 2008, the FASB issued SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities- An Amendment of FASB Statement 133" ("SFAS 161"). SFAS 161 requires expanded and enhanced disclosure for derivative instruments, including those used in hedging activities. For instruments subject to SFAS 161, entities are required to disclose how and why such instruments are being used; where values, gains and losses are reported within financial statements; and the existence and nature of credit risk- related contingent features. Additionally, entities are required to provide more specific disclosures about the volume of their derivative activity. SFAS 161 is effective for fiscal years and interim periods beginning after November 15, 2008. Nortel plans to adopt the provisions of SFAS 161 on January 1, 2009. The adoption of SFAS 161 is expected to impact Nortel's disclosure for derivative instruments starting January 1, 2009.

(vi)    In April 2008, the FASB issued FSP SFAS 142- 3, "Determination of the Useful Life of Intangible Assets" ("FSP SFAS 142- 3"). FSP SFAS 142- 3 provides guidance with respect to estimating the useful lives of recognized intangible assets acquired on or after the effective date and requires additional disclosure related to the renewal or extension of the terms of recognized intangible assets. FSP SFAS 142- 3 is effective for fiscal years and interim periods beginning after December 15, 2008. Nortel plans to adopt the provisions of FSP SFAS 142- 3 on January 1, 2009. The adoption of FSP SFAS 142- 3 is not expected to have a material impact on Nortel's results of operations and financial condition.

(vii)    In June 2008, the EITF reached a consensus on EITF Issue No. 07- 5, "Determining Whether an Instrument (or Embedded Feature) Is Indexed to an Entity's Own Stock" ("EITF 07- 5"). EITF 07- 5 addresses the determination of whether an equity linked financial instrument (or embedded feature) that has all of the characteristics of a derivative under other authoritative U.S. GAAP accounting literature is indexed to an entity's own stock and would thus meet the first part of a scope exception from classification and recognition as a derivative instrument. Nortel plans to adopt the provisions of

131

**Table of Contents**

EITF 07- 5 on January 1, 2009. The adoption of EITF 07- 5 is not expected to have a material impact on Nortel's results of operations and financial condition.

(viii)  In September 2008, the FASB issued FSP 133- 1 and FASB Interpretation Number ("FIN") 45- 4, "Disclosures about Credit Derivatives and Certain Guarantees: An Amendment of FASB Statement No. 133 and FASB Interpretation No. 45; and Clarification of the Effective Date of FASB Statement No. 161" ("FSP 133- 1 and FIN 45- 4"). FSP 133- 1 and FIN 45- 4 amend and enhance disclosure requirements for sellers of credit derivatives and financial guarantees. They also clarify that the disclosure requirements of SFAS No. 161 are effective for quarterly periods beginning after November 15, 2008, and fiscal years that include those periods. FSP 133- 1 and FIN 45- 4 are effective for reporting periods (annual or interim) ending after November 15, 2008. The adoption of FSP 133- 1 and FIN 45- 4 has impacted Nortel's disclosure for financial guarantees. See note 14.

(ix)  In September 2008, the EITF ratified EITF Issue No. 08- 5, "Issuer's Accounting for Liabilities Measured at Fair Value With a Third-Party Credit Enhancement" ("EITF 08- 5"). EITF 08- 5 provides guidance for measuring liabilities issued with an attached third- party credit enhancement (such as a guarantee). It clarifies that the issuer of a liability with a third- party credit enhancement (such as a guarantee) should not include the effect of the credit enhancement in the fair value measurement of the liability. EITF 08- 5 is effective for the first reporting period beginning after December 15, 2008. The adoption of EITF 08- 5 is not expected to have a material impact on Nortel's results of operations and financial condition.

(x)  In November 2008, the FASB ratified EITF Issue No. 08- 6, "Equity- Method Investment Accounting" ("EITF 08- 6"). EITF 08- 6 concludes that the cost basis of a new equity- method investment would be determined using a cost- accumulation model, which would continue the practice of including transaction costs in the cost of investment and would exclude the value of contingent consideration. Equity- method investments should be subject to other- than- temporary impairment analysis. It also requires that a gain or loss be recognized on the portion of the investor's ownership sold. EITF 08- 6 is effective for fiscal years beginning after December 15, 2008. The adoption of EITF 08- 6 is not expected to have a material impact on Nortel's results of operations and financial condition.

(xi)  In November 2008, the EITF ratified EITF Issue No. 08- 7 "Defensive Intangible Assets" ("EITF 08- 7"). EITF 08- 7 requires an acquiring entity to account for defensive intangible assets as a separate unit of accounting. Defensive intangible assets should not be included as part of the cost of the acquirer's existing intangible assets because the defensive intangible assets are separately identifiable. Defensive intangible assets must be recognized at fair value in accordance with SFAS 141R and SFAS 157. EITF 08- 7 will be effective for the reporting period beginning after December 15, 2008. The adoption of EITF 08- 7 is not expected to have a material impact on Nortel's results of operations and financial condition.

(xii)  In November 2008, the FASB ratified EITF Issue No. 08- 8, "Accounting for an Instrument (or an Embedded Feature) with a Settlement Amount that is based on the Stock of an Entity's Consolidated Subsidiary" ("EITF 08- 8"). EITF 08- 8 clarifies whether a financial instrument whose payoff to the counterparty is based on the stock of the reporting entity's consolidated subsidiary could be considered indexed to that reporting entity's own stock in the consolidated financial statements. The adoption of EITF 08- 8 is not expected to have a material impact on Nortel's results of operations and financial condition.

**3. Accounting changes**

*Accounting for Uncertainty in Income Taxes*

In June 2006, the FASB issued FIN 48, clarifying the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes" ("SFAS 109"). The interpretation prescribes a recognition threshold and measurement attribute for the financial

HIGHLY CONFIDENTIAL       NNC-NNL06001427 / 141

Table of Contents

statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides accounting guidance on de- recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. The evaluation of tax positions under FIN 48 is a two- step process, whereby (1) Nortel determines whether it is more likely than not that the tax positions will be sustained based on the technical merits of the position and (2) for those tax positions that meet the more- likely- than- not recognition threshold, Nortel would recognize the largest amount of tax benefit that has a greater than 50% likelihood of being realized upon ultimate settlement with the related tax authority. The adoption of FIN 48 resulted in an increase of $1 to opening accumulated deficit as at January 1, 2007. For additional information, see note 8.

On May 2, 2007, the FASB issued FSP FIN 48- 1, "Definition of Settlement in FASB Interpretation 48" ("FSP FIN 48- 1"). FSP FIN 48- 1 amends FIN 48 to provide guidance on how an enterprise should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits. Nortel applied the provisions of FSP FIN 48- 1 effective January 1, 2007. The adoption of FSP FIN 48- 1 has not had a material impact on Nortel's results of operations and financial condition.

*The Fair Value Option for Financial Assets and Financial Liabilities*

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities- Including an Amendment of FASB Statement No. 115" ("SFAS 159"). SFAS 159 allows the irrevocable election of fair value as the initial and subsequent measurement attribute for certain financial assets and liabilities and other items on an instrument- by- instrument basis. Changes in fair value would be reflected in earnings as they occur. The objective of SFAS 159 is to improve financial reporting by providing entities with the opportunity to mitigate volatility in reported earnings caused by measuring related assets and liabilities differently without having to apply complex hedge accounting provisions. For Nortel, SFAS 159 was effective as of January 1, 2008. See note 11 for further information.

*Fair Value Measurements*

In September 2006, the FASB issued SFAS 157, which establishes a single definition of fair value and a framework for measuring fair value and requires expanded disclosures about fair value measurements. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007. In accordance with FSP SFAS 157- 2, Nortel partially adopted the provisions of SFAS 157 effective January 1, 2008.

In October 2008, the FASB issued FSP 157- 3 "Determining Fair Value of a Financial Asset in a Market That Is Not Active" ("FSP 157- 3"). FSP 157- 3 clarifies the application of SFAS No. 157 in an inactive market by demonstrating how the fair value of a financial asset is determined when the market for that financial asset is inactive. FSP 157- 3 was effective upon issuance, including prior periods for which the condensed consolidated financial statements had not been issued. Nortel has adopted the provisions of SFAS 157- 3 effective September 30, 2008.

There was no material impact on the carrying value of Nortel's assets and liabilities in its consolidated financial statements upon adoption of SFAS 157 in 2008. See note 11 for Nortel's fair value information.

*Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans- an Amendment of FASB Statements No. 87, 88, 106, and 132(R)*

In September 2006, the FASB issued SFAS 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans- an Amendment of FASB Statements No. 87, 88, 106 and 132(R)" ("SFAS 158"). Effective for fiscal years ending after December 15, 2006, SFAS 158 requires an employer to recognize the overfunded or underfunded status of a defined benefit pension and post- retirement plan (other than a multi- employer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which the changes occur through comprehensive income. Based on the funded

HIGHLY CONFIDENTIAL        NNC-NNL06001427 / 142

Table of Contents

status of Nortel's pension and post-retirement benefit plans as of the measurement date of September 30, the adoption of SFAS 158 has had the effect of increasing Nortel's net liabilities for pension and post-retirement benefits and decreasing shareholders' equity by approximately $142, net of taxes as of December 31, 2006.

Effective for fiscal years ending after December 15, 2008, SFAS 158 requires Nortel to measure the funded status of its plans as of the date of its year end statement of financial position, being December 31. Nortel has historically measured the funded status of its significant plans on September 30. SFAS 158 provides two approaches for an employer to transition to a fiscal year end measurement date. Nortel has adopted the second approach, whereby Nortel continues to use the measurements determined for the December 31, 2007 fiscal year end reporting to estimate the effects of the transition. Under this approach, the net periodic benefit cost (exclusive of any curtailment or settlement gain or loss) for the period between the earlier measurement date, being September 30, 2007, and the end of the fiscal year that the new measurement date provisions are applied, being December 31, 2008, shall be allocated proportionately between amounts to be recognized as an adjustment to opening accumulated deficit in 2008 and the net periodic benefit cost for the fiscal year ending December 31, 2008. The adoption has resulted in an increase in accumulated deficit of $33, net of taxes, and an increase in accumulated other comprehensive income of $5, net of taxes, as of January 1, 2008.

For additional information on Nortel's pension and post-retirement plans, see note 9.

**4. Consolidated financial statement details**

The following tables provide details of selected items presented in the consolidated statements of operations and cash flows for each of the three years ended December 31, 2008, 2007 and 2006, and the consolidated balance sheets as of December 31, 2008 and 2007.

*Consolidated statements of operations*

*Selling, general and administrative expense:*

SG&A expense includes bad debt expense (recoveries) of ($3), ($2) and ($5) in the years ended December 31, 2008, 2007 and 2006, respectively.

*Research and development expense:*

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| R&D expense | $ 1,573 | $ 1,723 | $ 1,939 |
| R&D costs incurred on behalf of others[a] | 8 | 7 | 16 |
| Total | $ 1,581 | $ 1,730 | $ 1,955 |

(a)   These costs include R&D costs charged to Nortel customers pursuant to contracts that provided for full recovery of the estimated costs of Nortel related development, material, engineering, installation and other applicable costs, which were accounted for as contract costs.

*Shareholder litigation settlement recovery:*

Nortel recorded a recovery of $54 and $219 for the years ended December 31, 2007 and 2006, respectively, related to an agreement to settle certain shareholder class action litigation. For additional information see note 22.

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 143

Table of Contents

*Other operating expense (income)- net:*

| | 2008 | | 2007 | | 2006 |
|---|---|---|---|---|---|
| Royalty license income- net | $ (31) | $ | (31) | $ | (21) |
| Litigation charges (recovery)- net | 11 | | (2) | | 9 |
| Other- net | 45 | | (2) | | (1) |
| Other operating expense (income)- net | $ 25 | $ | (35) | $ | (13) |

*Other income (expense)- net:*

| | 2008 | | 2007 | | 2006 |
|---|---|---|---|---|---|
| Gain (loss) on sales and write downs of investments | 1 | | (5) | | (6) |
| Currency exchange gains (losses)- net | (38) | | 176 | | (12) |
| Other- net | (25) | | 33 | | 77 |
| Other income (expense)- net | $ (62) | $ | 204 | $ | 59 |

Hedge ineffectiveness related to designated hedging relationships that were accounted for in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities", had no material impact on the net loss for the years ended December 31, 2008, 2007 or 2006.

***Consolidated balance sheets***

*Cash and cash equivalents:*

| | 2008 | | 2007 |
|---|---|---|---|
| Cash on hand and balances with banks | $ 1,073 | $ | 813 |
| Cash equivalents | 1,324 | | 2,719 |
| Cash and cash equivalents at end of year | $ 2,397 | $ | 3,532 |

*Short- term investments:*

Short- term investments as of December 31, 2008 consist of an investment having an original cost of $362 in the Reserve Primary Fund, a money market fund that was originally classified as cash and cash equivalents. Due to financial market conditions during the third quarter of 2008, which resulted in the suspension of trading in the fund's securities, an impairment of $11 was recorded during the year to reflect the decline in the net asset value of the fund. Further, the fund made two redemptions on October 31, 2008 and December 3, 2008 of $184 and $102, respectively. The remaining balance of $65 as at December 31, 2008 has been reclassified as short term based on the maturity profile of the underlying securities. Please see note 23, subsequent events, for further information.

*Accounts receivable- net:*

| | 2008 | | 2007 |
|---|---|---|---|
| Trade receivables | $ 1,930 | $ | 2,277 |
| Notes receivable | 3 | | 12 |
| Contracts in process | 257 | | 356 |
| | 2,190 | | 2,645 |
| Less: provisions for doubtful accounts | (36) | | (62) |
| Accounts receivable- net | $ 2,154 | $ | 2,583 |

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 144

Table of Contents

*Inventories- net:*

|  | 2008 | 2007 |
|---|---|---|
| Raw materials | $ 249 | $ 610 |
| Work in process | 4 | 10 |
| Finished goods | 721 | 800 |
| Deferred costs | 1,130 | 1,698 |
|  | 2,104 | 3,118 |
| Less: provision for inventories | (481) | (907) |
| Inventories- net | 1,623 | 2,211 |
| Less: long- term deferred costs [a] | (146) | (209) |
| Current inventories- net | $ 1,477 | $ 2,002 |

(a)  Long- term portion of deferred costs is included in other assets.

*Other current assets:*

|  | 2008 | 2007 |
|---|---|---|
| Prepaid expenses | $ 98 | $ 152 |
| Income taxes recoverable | 107 | 77 |
| Current investments | 21 | 15 |
| Other | 229 | 223 |
| Other current assets | $ 455 | $ 467 |

*Investments:*

Investments included $73 and $101 as of December 31, 2008 and 2007, respectively, related to long- term investment assets held in an employee benefit trust in Canada, and restricted as to their use in operations by Nortel. In prior years, Nortel classified its auction rate securities as available- for- sale and current assets. In October 2008, Nortel entered into an agreement with the investment firm that sold Nortel a portion of its auction rate securities and as a result Nortel transferred these auction rate securities from available- for- sale to trading investment securities. During the current year, Nortel held $28 in auction rate securities, which after partial redemptions throughout the year and the agreement have been recorded as $16 of trading securities as current assets and $3 as a long term investment as of December 31, 2008. See note 11 for more information.

*Plant and equipment- net:*

|  | 2008 | 2007 |
|---|---|---|
| Cost: |  |  |
| Land | $ 31 | $ 38 |
| Buildings | 991 | 1,137 |
| Machinery and equipment | 1,761 | 2,176 |
| Assets under capital lease | 193 | 215 |
| Sale lease- back assets | 90 | 97 |
|  | 3,066 | 3,663 |
| Less accumulated depreciation: |  |  |
| Buildings | (369) | (395) |
| Machinery and equipment | (1,307) | (1,608) |
| Assets under capital lease | (98) | (107) |
| Sale lease- back assets | (20) | (21) |
|  | (1,794) | (2,131) |
| Plant and equipment- net [a] | $ 1,272 | $ 1,532 |

136

Table of Contents

(a)  Includes assets held for sale with a carrying value of $51 and nil as of December 31, 2008 and December 31, 2007, respectively, related to owned facilities that are being actively marketed for sale.

*Intangible assets- net:*

|  | 2008 | 2007 |
|---|---|---|
| Cost[a] | $ 294 | $ 338 |
| Less: accumulated amortization | (151) | (125) |
| Intangible assets- net | $ 143 | $ 213 |

(a)  Intangible assets are being amortized over a weighted- average period of approximately 5 years ending in 2013. Amortization expense for each of the next five years commencing in 2009 is expected to be $44, $35, $24, $19 and $21, respectively. The majority of amortization expense arising from these assets is denominated in a foreign currency and may fluctuate due to changes in foreign exchange rates.

*Other assets:*

|  | 2008 | 2007 |
|---|---|---|
| Long- term deferred costs | $ 146 | $ 209 |
| Long- term inventories | 22 | 27 |
| Debt issuance costs | 61 | 62 |
| Derivative assets | 126 | 77 |
| Financial assets | 41 | 62 |
| Other | 79 | 118 |
| Other assets | $ 475 | $ 555 |

*Other accrued liabilities:*

|  | 2008 | 2007 |
|---|---|---|
| Outsourcing and selling, general and administrative related provisions | $ 246 | $ 306 |
| Customer deposits | 10 | 52 |
| Product- related provisions | 225 | 126 |
| Warranty provisions (note 14) | 186 | 214 |
| Deferred revenue | 972 | 1,219 |
| Advance billings in excess of revenues recognized to date on contracts[a] | 751 | 1,490 |
| Miscellaneous taxes | 29 | 32 |
| Income taxes payable | 65 | 96 |
| Deferred income taxes | 13 | 15 |
| Tax uncertainties (note 8) | 15 | 21 |
| Interest payable | 112 | 91 |
| Other | 50 | 163 |
| Other accrued liabilities | $ 2,674 | $ 3,825 |

(a)  Includes amounts which may be recognized beyond one year due to the duration of certain contracts.

137

HIGHLY CONFIDENTIAL

**Table of Contents**

*Other liabilities:*

|  | 2008 | 2007 |
|---|---|---|
| Pension benefit liabilities | $ 1,557 | $ 1,109 |
| Post- employment and post- retirement benefit liabilities | 670 | 893 |
| Restructuring liabilities (note 7) | 161 | 180 |
| Deferred revenue | 271 | 400 |
| Tax uncertainties (note 8) | 92 | 71 |
| Derivative liabilities | 62 | 33 |
| Other long- term provisions | 135 | 189 |
| Other liabilities | $ 2,948 | $ 2,875 |

*Minority interests in subsidiary companies:*

|  | 2008 | 2007 |
|---|---|---|
| Preferred shares of NNL (Authorized: unlimited number of Class A and Class B) | | |
| Series 5, issued November 26, 1996 for consideration of Canadian $400 [a] | $ 294 | $ 294 |
| Series 7, issued November 28, 1997 for consideration of Canadian $350 [b] | 242 | 242 |
| Other [c] | 286 | 294 |
| Minority interests in subsidiary companies | $ 822 | $ 830 |

(a) As of December 31, 2008 and 2007, 16 million class A series 5 preferred shares ("Series 5 preferred shares") were outstanding. Effective December 1, 2001, holders of the Series 5 preferred shares are entitled to receive, if declared by NNL's Board of Directors (as permitted under the Canada Business Corporations Act ("CBCA")), a monthly floating cumulative preferential cash dividend based on Canadian prime rates. In November 2008, NNL's Board of Directors suspended the declaration of further dividends on NNL's Series 5 preferred shares following payment on November 12, 2008 of the previously declared monthly dividend on those shares. Dividends on the Series 5 preferred shares are cumulative and holders of those shares will be entitled to receive unpaid dividends, when declared by NNL's Board of Directors as permitted under the CBCA, at such time as Nortel resumes payment of dividends on those shares. As of December 31, 2008 there is $3 of unpaid dividends on Series 5 preferred shares.

(b) As of December 31, 2008 and 2007, 14 million class A series 7 preferred shares ("Series 7 preferred shares") were outstanding. Effective December 1, 2002, holders of the Series 7 preferred shares are entitled to receive, if declared by NNL's Board of Directors (as permitted under the CBCA), a monthly floating non- cumulative preferential cash dividend based on Canadian prime rates. In November 2008, NNL's Board of Directors suspended the declaration of further dividends on NNL's Series 7 preferred shares following payment on November 12, 2008 of the previously declared monthly dividend on those shares. Dividends on the Series 7 preferred shares are non- cumulative and the entitlement of holders of those shares to receive any dividend that has not been declared on such shares within 30 days after NNL's 2008 fiscal year was extinguished effective January 30, 2009.

(c) Other includes minority interests in LG- Nortel and other joint ventures primarily in Europe and Asia.

HIGHLY CONFIDENTIAL  NNC-NNL06001427 / 147

Table of Contents

*Consolidated statements of cash flows*
*Change in operating assets and liabilities excluding Global Class Action Settlement (as defined in note 22)- net:*

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Accounts receivable- net | $ 429 | $ 202 | $ 51 |
| Inventories- net | (20) | (66) | (42) |
| Deferred costs | 568 | 223 | 97 |
| Income taxes | (18) | 23 | (20) |
| Accounts payable | (221) | 42 | (79) |
| Payroll and benefits related, other accrued and contractual liabilities | (415) | (340) | (257) |
| Deferred revenue | (345) | (424) | (229) |
| Advance billings in excess of revenues recognized to date on contracts | (739) | 149 | 120 |
| Restructuring liabilities | 50 | (7) | (21) |
| Other | (198) | (233) | (69) |
| Change in operating assets and liabilities excluding Global Class Action Settlement- net | $ (909) | $ (431) | $ (449) |

*Acquisitions of investments and businesses- net of cash acquired:*

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Cash acquired | $ (2) | $ - | $ (1) |
| Total net assets acquired other than cash | (113) | (85) | (146) |
| Total purchase price | (115) | (85) | (147) |
| Less: |  |  |  |
| Cash acquired | 2 | - | 1 |
| Acquisitions of investments and businesses- net of cash acquired | $ (113) | $ (85) | $ (146) |

*Interest and taxes paid:*

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Cash interest paid | $ 308 | $ 385 | $ 241 |
| Cash taxes paid | $ 138 | $ 91 | $ 43 |

## 5. Goodwill

The following table outlines goodwill by reportable segment:

|  | Enterprise Solutions | Carrier Networks | Metro Ethernet Networks | Global Services | Other | Total |
|---|---|---|---|---|---|---|
| Balance- as of December 31, 2006 | $ 481 | $ 144 | $ 655 | $ 1,078 | $ 171 | $ 2,529 |
| Change: |  |  |  |  |  |  |
| Additions[a] | 2 | 5 | 3 | 8 | - | 18 |
| Foreign exchange | 1 | 3 | 2 | 6 | - | 12 |
| Balance- as of December 31, 2007 | $ 484 | $ 152 | $ 660 | $ 1,092 | $ 171 | $ 2,559 |
| Change: |  |  |  |  |  |  |
| Additions[b] | - | - | - | - | 9 | 9 |
| Foreign exchange | (1) | (1) | (4) | (7) | - | (13) |
| Other | - | - | 2 | 2 | - | 4 |
| Impairment | (483) | (151) | (658) | (1,087) | - | (2,379) |
| Balance- as of December 31, 2008 | $ - | $ - | $ - | $ - | $ 180 | $ 180 |

139

HIGHLY CONFIDENTIAL

NNC-NNL06001427 / 148

**Table of Contents**

(a)  The addition of $18 in 2007 relates to the finalization of the purchase price allocation with respect to the LG- Nortel joint venture.
(b)  The addition of $9 in 2008 relates to the acquisition of Novera (as described in note 10).

*Goodwill Impairment Testing Policy*
Nortel tests goodwill for possible impairment on an annual basis as of October 1 of each year and at any other time if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Circumstances that could trigger an impairment test between annual tests include, but are not limited to:

a significant adverse change in the business climate or legal factors;

an adverse action or assessment by a regulator;

unanticipated competition;

loss of key personnel;

the likelihood that a reporting unit or a significant portion of a reporting unit will be sold or disposed of;

a change in reportable segments;

results of testing for recoverability of a significant asset group within a reporting unit; and

recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.
The impairment test for goodwill is a two- step process. Step one consists of a comparison of the fair value of a reporting unit with its carrying amount, including the goodwill allocated to the reporting unit. Nortel determines the fair value of its reporting units using an income approach; specifically, based on a DCF Model. A market approach may also be used to evaluate the reasonableness of the fair value determined under the DCF Model, but results of the market approach are not given any specific weighting in the final determination of fair value. Both approaches involve significant management judgment and as a result, estimates of value determined under the approaches are subject to change in relation to evolving market conditions and Nortel's business environment.
If the carrying amount of a reporting unit exceeds its fair value, step two of the goodwill impairment test requires the fair value of the reporting unit be allocated to the underlying assets and liabilities of that reporting unit, whether or not previously recognized, resulting in an implied fair value of goodwill. If the carrying amount of the reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss equal to the excess is recorded in net earnings (loss).
The fair value of each reporting unit is determined using discounted cash flows. When circumstances warrant, a multiple of earnings before interest, taxes, depreciation and amortization ("EBITDA") of each reporting unit is calculated and compared to market participants to corroborate the results of the calculated fair value ("EBITDA Multiple Model"). Nortel also considers the sum of the calculated fair values and its enterprise value, being market capitalization plus the estimated value of debt based on interest rates that would be applicable to purchasers ("Market Participants"), adjusted for other items as appropriate under U.S. GAAP. The following are the significant assumptions involved in the application of each valuation approach:

*DCF Model:* assumptions regarding revenue growth rates, gross margin percentages, projected working capital needs, SG&A expense, R&D expense, capital expenditures, discount rates, terminal growth rates, and estimated selling price of assets expected to be disposed of by sale. To determine fair value, Nortel discounts the expected cash flows of each reporting unit. The discount rate used represents the

140

Table of Contents

estimated weighted average cost of capital, which reflects the overall level of inherent risk involved in its reporting unit operations and the rate of return an outside investor would expect to earn. To estimate cash flows beyond the final year of its model, Nortel uses a terminal value approach. Under this approach, Nortel uses the estimated cash flows in the final year of its models and applies a perpetuity growth assumption and discount by a perpetuity discount factor to determine the terminal value. Nortel incorporates the present value of the resulting terminal value into its estimate of fair value. When strategic plans call for the sale of all or an important part of a reporting unit, Nortel estimates proceeds from the expected sale using external information, such as third party bids, adjusted to reflect current circumstances, including market conditions.

*EBITDA Multiple Model:* assumptions regarding estimates of EBITDA growth and the selection of comparable companies to determine an appropriate multiple.

*Interim Goodwill Assessment- September 30, 2008*

At September 30, 2008, in accordance with the provisions of SFAS No. 142, "Goodwill and Other Intangible Assets", Nortel concluded that events had occurred and circumstances had changed that required it to perform an interim period goodwill impairment test for its Enterprise Services ("ES"), Carrier Networks ("CN"), MEN and Global Services ("GS") reporting units. In September 2008, in response to significant pressure resulting from the expanding economic downturn and the unfavorable impact of foreign exchange fluctuations, Nortel announced a revised full year 2008 outlook and estimated revenues to decline between two and four percent compared to 2007. Furthermore, during the quarter ended September 30, 2008, Nortel experienced a material decline in its market capitalization due primarily to the continued challenging market conditions, particularly in the U.S. The average closing price of NNC common shares on the NYSE in the third quarter of 2008 was $5.77 compared to an average of $8.21 in the second quarter of 2008, a decline of approximately 30% and at September 30, 2008, Nortel's market capitalization was less than its book value.

As part of its interim goodwill assessment, Nortel considered economic conditions and trends, estimated future operating results, Nortel's view of growth rates and anticipated future economic conditions. Revenue growth rates inherent in this forecast are based on input from internal and external market intelligence research sources that compare factors such as growth in global economies, regional trends in the telecommunications industry and product evolution from a technological segment basis. Macro economic factors such as changes in economies, product evolutions, industry consolidations and other changes beyond Nortel's control could have a positive or negative impact on achieving its targets.

The results from step one of the two- step goodwill impairment test of each reporting unit indicated that the estimated fair values of the MEN and ES reporting units were less than the respective carrying values of their net assets and as such Nortel performed step two of the impairment test for these reporting units.

In step two of the impairment test, Nortel estimated the implied fair value of the goodwill of each of these reporting units and compared it to the carrying value of the goodwill for each of the MEN and ES reporting units. Specifically, Nortel allocated the fair value of the MEN and ES reporting units as determined in the first step to their respective recognized and unrecognized net assets, including allocations to identified intangible assets. The allocations of fair values of the MEN and ES reporting units also require Nortel to make significant estimates and assumptions, including those in determining the fair values of the identified intangible assets. Such intangible assets had fair values substantially in excess of current book values. The resulting implied goodwill for each of these reporting units was nil; accordingly Nortel reduced the goodwill recorded prior to the assessment by $1,142 to write down the goodwill related to MEN and ES to the implied goodwill amount as of September 30, 2008.

141

Table of Contents

*Annual and December 31, 2008 Goodwill Assessment*

The September 30, 2008 impairment analyses described above were used as a proxy for the annual impairment test performed as of October 1, 2008. Given the proximity of those testing dates, no additional impairment was recognized as a result of the annual test. However, during the fourth quarter, Nortel observed further deterioration in industry conditions, global economic and credit conditions, and its market capitalization that required it to perform an additional interim period goodwill impairment test for the CN and GS reporting units as of December 31, 2008.

As part of the December 31, 2008 goodwill impairment test, Nortel updated its forecasted cash flows for the CN and GS reporting units. This update considered management's view of economic conditions and trends, estimated future operating results, sector growth rates, anticipated future economic conditions, and the Company's strategic alternatives to respond to these conditions, including the likelihood of filing for creditor protection. Forecasts of revenues and profitability were developed to estimate the impact of creditor protection. Mid- to long- range forecasts were developed to reflect strategic alternatives under creditor protection. Revenue growth rates inherent in this forecast are based on input from internal and external market intelligence research sources that compare factors such as growth in global economies, regional trends in the telecommunications industry and product evolution from a technological segment basis. Macro economic factors such as changes in economies, product evolutions, industry consolidations and other changes beyond Nortel's control could have a positive or negative impact on achieving its targets.

The results from step one of the two- step goodwill impairment test indicated that the estimated fair values of the CN and GS reporting units were less than the respective carrying values of their net assets and as such Nortel performed step two of the impairment test for these reporting units.

In step two of the impairment test, Nortel uses the implied fair value calculated in step one as the purchase price in a hypothetical acquisition of the respective reporting unit. The implied fair value of goodwill calculated in step two is calculated as the residual amount of the purchase price after allocations are made to the fair value of net assets, including working capital, plant and equipment and intangible assets, both pre- existing and those identified as part of the purchase price allocation process. Given the margin by which CN and GS failed step one, Nortel concluded that the implied fair value of goodwill for both CN and GS was nil after considering the value that would be allocated to existing tangible and intangible assets and the amounts that would be allocated to new intangible assets identified as part of the allocation process. As a result, Nortel recorded a charge of $1,237 to reduce the value of goodwill accordingly. The allocation discussed above is performed only for purposes of assessing goodwill for impairment; accordingly Nortel did not adjust the net book value of the assets and liabilities on its consolidated balance sheet other than goodwill as a result of this process.

No impairment losses related to Nortel's goodwill were recorded during the years ended December 31, 2007 and 2006.

*Related Analyses*

Prior to the goodwill analysis discussed above, Nortel performed a recoverability test of the long- lived assets in accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long- Lived Assets". Nortel included cash flow projections from operations along with cash flows associated with the eventual disposition of the long- lived assets, where appropriate. The undiscounted future cash flows of the long- lived assets exceeded their net book value and, as a result, no impairment charge was recorded.

142

Table of Contents

**6. Segment information**
*Segment descriptions*
As of December 31, 2008, Nortel's four reportable segments were: CN, ES, GS, and MEN:

The CN segment provides wireline and wireless networks that help service providers and cable operators supply mobile voice, data and multimedia communications services for individuals and enterprises using cellular telephones, personal digital assistants, laptops, soft- clients, and other wireless computing and communications devices. CN also offers circuit- and packet- based voice switching products that provide local, toll, long distance and international gateway capabilities for local and long distance telephone companies, wireless service providers, cable operators and other service providers.

The ES segment provides large and small businesses with reliable, secure and scalable communications solutions including unified communications, Ethernet routing and multiservice switching, IP and digital telephony (including phones), wireless LANs, security, IP and SIP contact centers, self- service solutions, messaging, conferencing, and SIP- based multimedia solutions.

The GS segment provides services for carrier and enterprise customers, offering network implementation services; network support services including technical support, hardware maintenance, equipment spares logistics and on- site engineers; network managed services including monitoring and management of customer networks and hosted solutions; and network application services including applications development, integration and communications- enabled application solutions.

The MEN segment solutions are designed to deliver carrier- grade Ethernet transport capabilities focused on meeting customer needs for higher performance and lower cost, with a portfolio that includes optical networking, Carrier Ethernet switching, and multiservice switching products.

Other miscellaneous business activities and corporate functions, including the operating results of NGS, do not meet the quantitative criteria to be disclosed separately as reportable segments and have been reported in "Other". Costs associated with shared services, such as general corporate functions, that are managed on a common basis are allocated to Nortel's reportable segments based on usage determined generally by headcount. A portion of other general and miscellaneous corporate costs and expenses are allocated based on a fixed charge established annually. Costs not allocated to the reportable segments include employee share- based compensation, differences between actual and budgeted employee benefit costs, interest attributable to Nortel's long- term debt and other non- operational activities, and are included in "Other".

Nortel's president and chief executive officer ("CEO") has been identified as the Chief Operating Decision Maker in assessing segment performance and allocating resources to the segments. The primary financial measure used by the CEO is Management Operating Margin ("Management OM") (previously called Operating Margin (OM) in Nortel's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008). When presented on a consolidated basis, Management OM is not a recognized measure under U.S. GAAP. It is a measure defined as total revenues, less total cost of revenues, SG&A and R&D expense. Comparative information from periods prior to 2008 has been restated to conform to the current presentation as a result of the new primary financial measure used by the CEO. The accounting policies of the reportable segments are the same as those applied to the consolidated financial statements. The CEO does not review asset information on a segmented basis in order to assess performance and allocate resources.

143

HIGHLY CONFIDENTIAL

Table of Contents

*Segments*
The following tables set forth information by segment for the years ended December 31:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| **Revenues** | | | |
| Carrier Networks | $ 4,312 | $ 4,493 | $ 5,157 |
| Enterprise Solutions | 2,402 | 2,620 | 2,292 |
| Global Services | 2,089 | 2,087 | 2,132 |
| Metro Ethernet Networks | 1,393 | 1,525 | 1,591 |
| | | | |
| Total reportable segments | 10,196 | 10,725 | 11,172 |
| Other | 225 | 223 | 246 |
| | | | |
| **Total revenues** | $ 10,421 | $ 10,948 | $ 11,418 |
| **Management Operating Margin** | | | |
| Carrier Networks | $ 867 | $ 840 | $ 477 |
| Enterprise Solutions | (75) | (8) | (45) |
| Global Services | 303 | 385 | 337 |
| Metro Ethernet Networks | (53) | (19) | 55 |
| | | | |
| Total reportable segments | 1,042 | 1,198 | 824 |
| Other | (483) | (797) | (827) |
| | | | |
| **Total Management Operating Margin** | 559 | 401 | (3) |
| Amortization of intangible assets | 46 | 50 | 26 |
| In- process research and development expense | - | - | 22 |
| Special charges | 302 | 210 | 105 |
| Loss (gain) on sales of businesses and assets | (11) | (31) | (206) |
| Shareholder litigation settlement recovery | - | (54) | (219) |
| Regulatory investigation expense | - | 35 | - |
| Goodwill impairment | 2,379 | - | - |
| Other operating expense (income)- net | 25 | (35) | (13) |
| | | | |
| Operating earnings (loss) | (2,182) | 226 | 282 |
| Other income (expense)- net | (62) | 204 | 59 |
| Interest and dividend income | 110 | 221 | 140 |
| Interest expense | (322) | (381) | (340) |
| Income tax expense | (3,193) | (1,114) | (60) |
| Minority interests- net of tax | (152) | (115) | (59) |
| Equity in net earnings (loss) of associated companies- net of tax | 2 | 2 | (3) |
| | | | |
| **Net earnings (loss) from operations before cumulative effect of accounting change** | $ (5,799) | $ (957) | $ 19 |

144

**Table of Contents**

*Product and service revenues*

The following table sets forth external revenues by product and service for the years ended December 31:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| CDMA solutions | $ 2,190 | $ 2,425 | $ 2,311 |
| GSM and UMTS solutions | 1,578 | 1,373 | 2,021 |
| Circuit and packet voice solutions | 2,184 | 2,418 | 2,443 |
| Optical networking solutions | 1,105 | 1,185 | 1,128 |
| Data networking and security solutions | 1,050 | 1,237 | 1,137 |
| Global services | 2,089 | 2,087 | 2,132 |
| Other | 225 | 223 | 246 |
| Total | $ 10,421 | $ 10,948 | $ 11,418 |

Nortel had one customer, Verizon Communications Inc., that generated revenues of approximately 11%, 11%, and 12% of total consolidated revenues for the years ended December 31, 2008, 2007 and 2006, respectively. Although, these revenues were generated primarily within the CN segment, they were also from all of Nortel's other reportable segments.

*Geographic information:*

The following table sets forth external revenues by geographic region based on the location of the customer for the years ended December 31:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| U.S. | $ 4,427 | $ 4,974 | $ 5,092 |
| EMEA | 2,422 | 2,740 | 3,239 |
| Canada | 693 | 822 | 720 |
| Korea | 1,145 | 657 | 411 |
| Asia (excluding Korea) | 1,155 | 1,111 | 1,325 |
| Caribbean and Latin America ("CALA") | 579 | 644 | 631 |
| Total | $ 10,421 | $ 10,948 | $ 11,418 |

*Long-lived assets:*

The following table sets forth long-lived assets representing plant and equipment-net, by geographic region as of December 31:

| | 2008 | 2007 |
|---|---|---|
| U.S. | $ 388 | $ 441 |
| EMEA | 170 | 206 |
| Canada | 525 | 690 |
| Asia and CALA regions | 189 | 195 |
| Total | $ 1,272 | $ 1,532 |

**7. Special charges**

As a result of the Creditor Protection Proceedings, Nortel ceased taking any further actions under the previously announced workforce and cost reduction plans as of January 14, 2009. All actions taken up to January 14, 2009 under previously announced workforce and cost reduction plans will continue to be accounted

145

Table of Contents

for under such plans. As at December 31, 2008, approximately 1,800 net workforce reductions and approximately 200 shifts of positions from higher-cost to lower- cost locations, from previously announced restructuring plans remained unactioned and will be accounted for under the workforce reduction plan announced on February 25, 2009 (see note 23 for additional information). Nortel's contractual obligations are subject to re- evaluation in connection with the Creditor Protection Proceedings and, as a result, expected cash outlays disclosed below relating to contract settlement and lease costs are subject to change.

On November 10, 2008, Nortel announced a restructuring plan that included net workforce reductions of approximately 1,300 positions and shifting approximately 200 additional positions from higher- cost to lower- cost locations. Collectively these efforts are referred to as the "November 2008 Restructuring Plan" (previously referred to as "2009 Restructuring Plan"). Nortel expected total charges to earnings and cash outlays related to workforce reductions to be approximately $130, to be incurred during 2008 and 2009. Approximately $58 of the total charges relating to the net reduction of 550 positions under the November 2008 Restructuring Plan have been incurred as of December 31, 2008. There were no additional workforce reductions under this plan prior to its discontinuance on January 14, 2009.

During the first quarter of 2008, Nortel announced a restructuring plan that included net workforce reductions of approximately 2,100 positions and shifting approximately 1,000 additional positions from higher- cost to lower- cost locations. In addition to the workforce reductions, Nortel announced steps to achieve additional cost savings by efficiently managing its various business locations and further consolidating real estate requirements. Collectively, these efforts are referred to as the "2008 Restructuring Plan". Nortel expected total charges to earnings and cash outlays related to workforce reductions to be approximately $60, including approximately $15 related to fixed asset write- downs. Approximately $148 of the total charges relating to the net reduction of approximately 1,500 positions and real estate reduction initiatives under the 2008 Restructuring Plan have been incurred during the year ended December 31, 2008. There were no additional workforce reductions under this plan prior to its discontinuance on January 14, 2009. The portion of the real estate initiatives that were undertaken prior to January 14, 2009 will continue to be accounted for under the 2008 Restructuring Plan. The real estate provision of $7 as at December 31, 2008 relate to discounted cash outlays, net of estimated future sublease revenues, for leases with payment terms through to 2024.

During the first quarter of 2007, Nortel announced a restructuring plan that included workforce reductions of approximately 2,900 positions and shifting approximately 1,000 additional positions from higher- cost locations to lower- cost locations. In addition to the workforce reductions, Nortel announced additional cost savings by efficiently managing its various business locations and consolidating real estate requirements. Collectively, these efforts are referred to as the "2007 Restructuring Plan". The Company originally expected charges to earnings and cash outlays for the 2007 Restructuring Plan to be approximately $390 and $370, respectively. Approximately $243 of the total charges relating to the net reduction of approximately 2,150 positions and real estate reduction initiatives under the 2007 Restructuring Plan have been incurred as of December 31, 2008. There were no additional workforce reductions under this plan prior to its discontinuance on January 14, 2009. The portion of the real estate initiatives that were undertaken prior to January 14, 2009 will continue to be accounted for under the 2007 Restructuring Plan. The real estate provision of $27 as at December 31, 2008 relates to discounted cash outlays net of estimated future sublease revenues related to leases with payment terms through to 2016.

During the second quarter of 2006, Nortel announced a restructuring plan that included workforce reductions of approximately 1,900 positions ("2006 Restructuring Plan"). Nortel originally estimated the total charges to earnings and cash outlays associated with the 2006 Restructuring Plan to be approximately $100. During 2007, the program was determined to be substantially complete resulting in a total reduction of 1,750 positions with a revised total cost of approximately $84. The cost revisions were primarily due to higher voluntary attrition reducing the number of involuntary actions requiring the payment of benefits.

146

**Table of Contents**

During 2004 and 2001, Nortel implemented work plans to streamline operations through workforce reductions and real estate optimization strategies ("2004 Restructuring Plan" and the "2001 Restructuring Plan"). All of the charges with respect to these workforce reductions have been incurred. The real estate provision of $156 in the aggregate as at December 31, 2008 relates to discounted cash outlays net of estimated future sublease revenues, for leases with payment terms through to 2016 for the 2004 Restructuring Plan and the end of 2013 for the 2001 Restructuring Plan.

During the years ended December 31, 2008, 2007 and 2006, Nortel continued to implement these restructuring work plans. Provision balances recorded for each of the restructuring plans have been summarized below as of December 31, 2008:

| | Workforce Reduction | | Contract Settlement and Lease Costs | | Plant and Equipment Write Downs | | Total |
|---|---|---|---|---|---|---|---|
| November 2008 Restructuring Plan | $ | 53 | $ | - | $ | - | $ | 53 |
| 2008 Restructuring Plan | | 46 | | 7 | | - | | 53 |
| 2007 Restructuring Plan | | 18 | | 27 | | - | | 45 |
| 2006 Restructuring Plan | | - | | - | | - | | - |
| 2004 Restructuring Plan | | - | | 39 | | - | | 39 |
| 2001 Restructuring Plan | | - | | 117 | | - | | 117 |
| Provision balance as of December 31, 2008[(a)] | $ | 117 | $ | 190 | $ | - | $ | 307 |

(a) As of December 31, 2008 and 2007, the short-term provision balances were $146 and $100, respectively, and the long-term provision balances were $161 and $180, respectively.

The following table summarizes the total special charges incurred for each of Nortel's restructuring plans:

| | 2008 | | 2007 | | 2006 | | Total |
|---|---|---|---|---|---|---|---|
| Special Charges by Restructuring Plan: | | | | | | | |
| November 2008 Restructuring Plan | $ | 58 | $ | - | $ | - | $ | 58 |
| 2008 Restructuring Plan | | 148 | | - | | - | | 148 |
| 2007 Restructuring Plan | | 72 | | 171 | | - | | 243 |
| 2006 Restructuring Plan | | (1) | | 17 | | 68 | | 84 |
| 2004 Restructuring Plan | | 11 | | 9 | | 20 | | 40 |
| 2001 Restructuring Plan | | 14 | | 13 | | 17 | | 44 |
| Total | $ | 302 | $ | 210 | $ | 105 | $ | 617 |

Regular full-time ("RFT") employee notifications resulting in special charges for all restructuring plans were as follows:

| | Employees (approximate) | | |
|---|---|---|---|
| | Direct[(a)] | Indirect[(b)] | Total |
| RFT employee notifications by period: | | | |
| During 2006 | 22 | 520 | 542 |
| During 2007 | 217 | 1,654 | 1,871 |
| During 2008 | 160 | 2,309 | 2,469 |
| RFT employee notifications for the three years ended December 31, 2008 | 399 | 4,483 | 4,882 |

(a) Direct employees includes employees performing manufacturing, assembly, test and inspection activities associated with the production of Nortel's products.
(b) Indirect employees includes employees performing management, sales, marketing, research and development and administrative activities.

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 156

Table of Contents

*November 2008 Restructuring Plan*
*Year ended December 31, 2008*

For the year ended December 31, 2008, Nortel recorded special charges of $58 related to severance and benefit costs associated with a workforce reduction of approximately 550 employees, of which approximately 360 were notified of termination during the year ended December 31, 2008. This portion of the workforce reduction was primarily in the U.S., Canada, and EMEA.

The provision for special charges recorded for the November 2008 Restructuring Plan for the year ended December 31, 2008 were as follows:

| | Workforce Reduction | | Contract Settlement and Lease Costs | | Plant and Equipment Write Downs | | Total |
|---|---|---|---|---|---|---|---|
| **November 2008 Restructuring Plan** | | | | | | | |
| Provision balance as of January 1, 2008 | $ | - | $ | - | $ | - | $ | - |
| Other special charges | | 58 | | - | | - | | 58 |
| Revisions to prior accruals | | - | | | | | | |
| Cash drawdowns | | (4) | | - | | - | | (4) |
| Non- cash drawdowns | | (1) | | - | | - | | (1) |
| Foreign exchange and other adjustments | | - | | - | | | | |
| Provision balance as of December 31, 2008 | $ | 53 | $ | - | $ | - | $ | 53 |

*2008 Restructuring Plan*
*Year ended December 31, 2008*

For the year ended December 31, 2008, Nortel recorded special charges of $126 including revisions of ($6) related to severance and benefit costs associated with an involuntary workforce reduction of approximately 1,500 employees, of which approximately 1,410 were notified of termination. The workforce reduction was primarily in the U.S. and Canada.

The provision for special charges recorded for the 2008 Restructuring Plan from January 1, 2008 to December 31, 2008 were as follows:

| | Workforce Reduction | | Contract Settlement and Lease Costs | | Plant and Equipment Write Downs | | Total |
|---|---|---|---|---|---|---|---|
| **2008 Restructuring Plan** | | | | | | | |
| Provision balance as of January 1, 2008 | $ | - | $ | - | $ | - | $ | - |
| Other special charges | | 132 | | 10 | | 9 | | 151 |
| Revisions to prior accruals | | (6) | | 3 | | - | | (3) |
| Cash drawdowns | | (74) | | (6) | | - | | (80) |
| Non- cash drawdowns | | - | | - | | (9) | | (9) |
| Foreign exchange and other adjustments | | (6) | | - | | - | | (6) |
| Provision balance as of December 31, 2008 | $ | 46 | $ | 7 | $ | - | $ | 53 |

148

Table of Contents

### 2007 Restructuring Plan
*Year ended December 31, 2008*

For the year ended December 31, 2008, Nortel recorded special charges of $52 including revisions of ($1) related to severance and benefit costs with respect to the 2007 Restructuring Plan. The involuntary workforce reduction has been approximately 2,150 employees, of which approximately 700 were notified of termination during the year ended December 31, 2008. This portion of the workforce reduction was primarily in the U.S. and Canada, with other reductions being incurred in EMEA.

*Year ended December 31, 2007*

For the year ended December 31, 2007, Nortel recorded special charges of $131 including revisions of ($6), related to severance and benefit costs associated with a workforce reduction of approximately 1,500 employees, of which approximately 1,450 were notified of termination during the year ended December 31, 2007. This portion of the workforce reduction was primarily in the U.S., Canada, and EMEA.

The provision for special charges recorded for the 2007 Restructuring Plan from January 1, 2007 to December 31, 2008 were as follows:

| | Workforce Reduction | | Contract Settlement and Lease Costs | | Plant and Equipment Write Downs | | Total |
|---|---|---|---|---|---|---|---|
| **2007 Restructuring Plan** | | | | | | | |
| Provision balance as of January 1, 2007 | $ | - | $ | - | $ | - | $ | - |
| Other special charges | 137 | | 32 | | 8 | | 177 |
| Revisions to prior accruals | (6) | | - | | - | | (6) |
| Cash drawdowns | (90) | | (7) | | - | | (97) |
| Non-cash drawdowns | (2) | | - | | (8) | | (10) |
| Foreign exchange and other adjustments | 4 | | - | | - | | 4 |
| Provision balance as of December 31, 2007 | $ | 43 | $ | 25 | $ | - | $ | 68 |
| Other special charges | 53 | | 6 | | 7 | | 66 |
| Revisions to prior accruals | (1) | | 7 | | - | | 6 |
| Cash drawdowns | (74) | | (7) | | - | | (81) |
| Non-cash drawdowns | (1) | | (3) | | (7) | | (11) |
| Foreign exchange and other adjustments | (2) | | (1) | | - | | (3) |
| Provision balance as of December 31, 2008 | $ | 18 | $ | 27 | $ | - | $ | 45 |

### 2006 Restructuring Plan
*Year ended December 31, 2008*

Nortel incurred total cash costs related to the 2006 Restructuring Plan of approximately $7 during the year ended December 31, 2008.

*Year ended December 31, 2007*

For the year ended December 31, 2007, Nortel recorded special charges of $17, including revisions of ($8), related to severance and benefit costs associated with a workforce reduction of approximately 940 employees, of which approximately 400 were notified of termination during the year ended December 31, 2007.

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 158

Table of Contents

*Year ended December 31, 2006*

For the year ended December 31, 2006, Nortel recorded special charges of $68, including revisions of ($1) related to severance and benefit costs associated with a workforce reduction of approximately 910 employees, of which 542 were notified of termination during the year ended December 31, 2006. The workforce reduction was primarily in the U.S. and Canada and extended across all of Nortel's segments.

The provision for special charges recorded for the 2006 Restructuring Plan from January 1, 2006 to December 31, 2008 were as follows:

| | Workforce Reduction | | Contract Settlement and Lease Costs | | Plant and Equipment Write Downs | | Total |
|---|---|---|---|---|---|---|---|
| **2006 Restructuring Plan** | | | | | | | |
| Provision balance as of January 1, 2006 | $ | - | $ | - | $ | - | $ - |
| Other special charges | | 68 | | | | 1 | 69 |
| Revisions to prior accruals | | (1) | | - | | | (1) |
| Cash drawdowns | | (28) | | | | | (28) |
| Non-cash drawdowns | | - | | | | (1) | (1) |
| Foreign exchange and other adjustments | | (1) | | | | | (1) |
| Provision balance as of December 31, 2006 | $ | 38 | $ | - | $ | - | $ 38 |
| Other special charges | $ | 25 | $ | | $ | - | $ 25 |
| Revisions to prior accruals | | (8) | | | | | (8) |
| Cash drawdowns | | (48) | | | | | (48) |
| Non-cash drawdowns | | (1) | | | | | (1) |
| Foreign exchange and other adjustments | | 2 | | | | | 2 |
| Provision balance as of December 31, 2007 | $ | 8 | $ | - | $ | - | $ 8 |
| Other special charges | $ | | $ | | $ | | $ |
| Revisions to prior accruals | | (1) | | | | | (1) |
| Cash drawdowns | | (7) | | | | | (7) |
| Non-cash drawdowns | | - | | | | - | - |
| Foreign exchange and other adjustments | | | | | | | |
| Provision balance as of December 31, 2008 | $ | - | $ | - | $ | - | $ - |

150