Table of Contents

consumer goods business, from 1986 to 2003. His positions at Diageo included senior corporate and operational finance roles.

D.J. Carey was appointed as Executive Vice- President, Corporate Operations effective January 2006. Prior to his appointment, Mr. Carey held various leadership positions at Motorola, GE, The Home Depot and AT&T. Mr. Carey was Executive Vice-President, President and Chief Executive Officer, Integrated Electronic Systems at Motorola from November 2002 to November 2005 where he was responsible for the growth and profitability of a portfolio of eight different businesses. He also served as Vice President and General Manager for Corporate Productivity and Mergers and Acquisitions for AT&T and as Executive Vice President for Business Development, Strategy and Corporate Operations for The Home Depot after having been Executive Vice President and Chief Financial Officer.

G.A. Davies was appointed Chief Legal Officer and Corporate Secretary effective January 1, 2009. Prior to this, he served as Deputy General Counsel and Corporate Secretary from November 12, 2007 to December 31, 2008. Mr. Davies previously served as Chief Legal Officer on an interim basis from May 1, 2007 to November 11, 2007. He has also served as Corporate Secretary since December 2004. Mr. Davies previously held various senior positions in the legal department in North America and Europe since 1993.

J. M. Doolittle was appointed Treasurer on June 23, 2008. Prior to his appointment, he served as Chief Financial Officer with CCL Industries, a global company dealing in specialty packaging and labeling solutions for the consumer products and healthcare industries, from January to March 2008. Previously, he also served as Vice- President of Financial Planning and Analysis for Nortel from April 2006 to December 2007 and Vice- President, Tax from October 2002 to March 2006.

D.W. Drinkwater was named Special Advisor for the period January 1, 2009 to March 31, 2009, prior to which he was Chief Legal Officer from December 19, 2005 to December 31, 2008 with the exception of May 1, 2007 to November 11, 2007 when he served as Chief Financial Officer on an interim basis. Prior to joining Nortel in 2005, he carried on a consulting business and held various corporate directorships from August 2004 to December 2005. Mr. Drinkwater was Executive Vice President and Chief Financial Officer of the Ontario Power Generation Inc., a Crown corporation for electricity generation in the Province of Ontario from April 2003 to July 2004. He served as Executive Vice President, Corporate Development and Legal Affairs of the Ontario Power Generation from December 2000 to April 2003. Mr. Drinkwater's background also includes working as a partner in a top- tier Toronto law firm and as Vice President, Law and General Counsel with Bell Canada.

S. Elhage was appointed as President and General Manager, Carrier VoIP and Applications Solutions on January 1, 2009. Prior to his appointment, Mr. Elhage served as Vice- President and General Manager, Carrier VoIP and Applications Solutions from July 2008 to December 2008. From June 2007 to July 2008, Mr. Elhage held the position of Vice President, Corporate Business Operations, following several senior roles with the company's Business Transformation, Enterprise, Metro Optical, Optical Ethernet, Core Data Networks and Broadband Networks business units. Prior to joining Nortel in 1998, Mr. Elhage held several senior management positions with BCE related to strategy, architecture and the introduction of new technologies in BCE networks.

J.G. Flanagan was appointed Senior Vice- President, Global Operations effective September 19, 2007. He joined Nortel in 2006 as Vice-President, Global Order Management. Prior to joining Nortel, Mr. Flanagan had more than 10 years of leadership experience at GE in general management, commercial strategy, supply chain operations and services deployment. From 2002 to 2004, Mr. Flanagan was General Manager of GE's Industrial Controls Business, responsible for the growth and profitability of the Global IEC Industrial Controls business. Most recently prior to joining Nortel, Mr. Flanagan was General Manager, Operations GE Consumer & Industrial EMEA from 2004 to 2006 based in Budapest, Hungary. In this position, he was responsible for the customer service operations, distribution and fulfillment of GE's Consumer & Industrial EMEA Division.

J.J. Hackney, Jr. was appointed as President, Enterprise Solutions effective September 19, 2007. He was Senior Vice- President, Global Operations and Quality from April 2006 to September 2007, prior to which he was

216

**Table of Contents**

Senior Vice- President, Supply Chain and Quality from December 2005 to April 2006. Prior to joining Nortel in 2005, Mr. Hackney had more than 14 years of global leadership experience at GE in roles spanning audit, supply chain, operations, product management and general management. Most recently, Mr. Hackney was Division General Manager GE Consumer & Industrial in Barcelona, Spain from 2001 to 2006. In this position, he was responsible for the growth and profitability of the Global IEC Electrical Components and Systems Division.

P.W. Karr was appointed as Controller in May 2005, prior to which he was Vice- President and Financial Controller of global pharmaceutical company Bristol- Myers Squibb from November 2003 to December 2004. Prior thereto, Mr. Karr held numerous senior positions with GE from February 1994 to October 2003, most recently as Senior Vice- President and Chief Accounting Officer, GE Capital Markets Services during 2003. Prior thereto, Mr. Karr spent over 15 years with Deloitte & Touche, including as National Consultation Partner in 1992 and 1993.

E.S. King was appointed Senior Vice- President, Human Resources effective November 7, 2008. Prior to this appointment she served as Leader, Global Human Resources in an acting capacity from February 2008 to November 2008. Previously, Ms. King held various leadership positions in human resources from December 2002 to November 2008 related to executive compensation, compensation and benefits strategy, and total rewards.

P. Morin was appointed as President, Metro Ethernet Networks in May 2006. From January 2003 to May 2006, Mr. Morin held the position of General Manager, Optical Networks where he helped to ensure Nortel's continued leadership and business momentum in optical networks.

G.A. Riedel was appointed Chief Strategy Officer in February 2006. From March 2003 to February 2006, he was Vice- President, Strategy and Corporate Development at Juniper Networks, an information technology company. In this role, Mr. Riedel was involved in developing and executing a growth strategy to expand Juniper's portfolio and partnerships. He was heavily engaged in a number of Juniper's acquisitions and strategic partnerships. Prior to his position with Juniper, Mr. Riedel held a number of positions during 15 years with the Boston- based management consulting firm McKinsey & Company, the most recent being Director, Australia and Singapore from November 1987 to December 2002.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires directors and executive officers of Nortel to file reports concerning their ownership of equity securities of Nortel with the SEC, the NYSE and Nortel. Based solely on a review of the information received and written representations from the persons subject to Section 16(a), we believe that all of Nortel's directors and executive officers filed their required reports on a timely basis during 2008 except as follows. A Form 4 was filed on December 4, 2008 indicating that additional NNC common shares were sold on Mr. Hackney's behalf on December 12, 2007 as part of the mandatory and automatic open market bulk sale of NNC common shares to pay applicable withholding taxes and any administrative fees upon the vesting of restricted stock units on December 9, 2007. A Form 4 was filed on December 4, 2008 indicating that additional NNC common shares were sold on October 12, 2007 on Mr. Lowe's behalf as part of the mandatory and automatic open market bulk sale of NNC common shares to pay applicable withholding taxes and any administrative fees upon the vesting of restricted stock units on September 28, 2007. A Form 4 was filed on December 22, 2008 indicating that Mr. Doolittle's sponse holds 9 NNC common shares that were inadvertently omitted from his initial Form 3 filed on June 25, 2008. Mr. Doolittle disclaims beneficial ownership of such shares.

**Corporate Governance**

The following corporate governance report has been reviewed by the Nominating and Governance Committee and approved by the Nortel Boards. Copies of the Board mandates, the mandates of each of our Board Committees, our Statement of Governance Guidelines (Governance Guidelines), which include our standards for director independence (Independence Standards), and our Code of Business Conduct, as well as any future amendments to

217

HIGHLY CONFIDENTIAL          NNC-NNL06001427 / 227

**Table of Contents**

any such document, are available free of charge on our website at www.nortel.com or by writing to our Corporate Secretary at Nortel Networks Corporation, 195 The West Mall, Toronto, Ontario, Canada, M9C 5K1.

*Board Composition*

Each of the Nortel Boards has the same non- executive chair and is currently comprised of the same 10 directors. Our Governance Guidelines limit the size of our Boards to a maximum of 15 directors and limit the number of directors who may also be members of management to no more than three directors. It is also required that any person who is invited to stand for election or appointment to the Boards commit to serve for at least five years, provided that a director's tenure generally may not exceed 10 years and that a director who has reached the age of 70 years old will generally not be permitted to stand for re- election. Further, a former chief executive officer of Nortel may not stand for re- election as a director unless the Nortel Boards determine that it would otherwise be in the best interests of Nortel at the relevant time. Governor Hunt turned 70 years of age during 2007. On May 31, 2007, the Nominating and Governance Committee determined that, as a result of, among other things, his strong leadership qualities, Governor Hunt will be permitted to continue to serve on the Nortel Boards for at least five years from the date of his first election on June 29, 2005. Governor Hunt abstained from the assessment and determination of his continued service. For further biographical information on the directors, see above under "Board of Directors".

*Public Board Membership Policy*

Under our public board membership policy, non- management directors are prohibited from sitting on more than four other public boards and the president and chief executive officer is prohibited from sitting on more than two other public boards, unless the Nominating and Governance Committee exercises its discretion to permit public board membership in excess of these limits.

*Interlocking Directorships*

Mrs. Bennett and Mr. Manley also each sit on the Board of Directors of Canadian Imperial Bank of Commerce. The Board does not believe these interlocking board relationships impact on the ability of these directors to act in the best interests of Nortel.

*Independence of Directors*

Our Governance Guidelines require that a majority of our directors be "independent" as defined under the requirements of applicable stock exchanges and securities regulatory authorities and as determined in accordance with the Independence Standards which form part of our Governance Guidelines. They also require that the composition of Committees comply with the applicable requirements of the CBCA, the stock exchanges on which NNC and NNL list their securities and securities regulatory authorities, as adopted or amended and in force from time to time, including the requirements that the Nominating and Governance Committee and the Compensation and Human Resources Committee (CHRC) be composed solely of "independent" directors and that the Audit Committee be composed solely of "independent" and "financially literate" directors.

In accordance with our Independence Standards, the independence definitions under the NYSE listing standards, and applicable SEC and Canadian Securities Administrators (CSA) rules and policies, the Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that except for Mr. Zafirovski, our President and Chief Executive Officer, each director is independent.

In particular, the Nortel Boards have determined that Mr. Manley's association with the Canadian law firm of McCarthy Tétrault LLP, as an independent consultant with the title "Counsel", does not constitute a material relationship with Nortel. McCarthy Tétrault LLP represents a former Nortel executive in connection with certain civil proceedings relating to such individual's association with Nortel. In making this determination, the Boards considered that Mr. Manley is not serving in a managerial position with such firm, Mr. Manley's compensation will not be related in any way to fees paid in respect of the civil proceedings, and Nortel and such firm have each

HIGHLY CONFIDENTIAL

Table of Contents

adopted procedures to protect against potential conflicts of interest in connection with such representation, among other factors.

*Board and Committee Meetings and Director Attendance*

The following minimum number of Board and Committee meetings are required annually, with ad hoc meetings being held as required:

Boards 6
Audit Committees 4
CHRC 1
Nominating and Governance Committee 1
Pension Fund Policy Committee 1

During 2008, all of the directors attended at least 75% of the aggregate of the total number of meetings of the Nortel Boards and the total number of meetings held by all Committees of the Nortel Boards on which each such director served. A detailed record of attendance by directors during 2008 at meetings of the Boards and Board Committees on which they served is set out below.

### Number of Meetings Attended in 2008 [1]

| Director | | Boards(2) Regular | Ad Hoc | Compensation and Human Resources Committee(3) Regular | Ad Hoc | Audit Committees(2) | Regular | Ad Hoc | Nominating and Governance Committee(4) Regular | Ad Hoc | Pension Fund Policy Committee(5) Regular | Ad Hoc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J.H. Bennett | NNC | 7/7 | 13/13 | 4/4 | 5/5 | - | - | - | - | - | 3/3 | 1/1 |
| | NNL | 7/7 | 13/13 | | | | | | | | | |
| Dr. M. Bischoff | NNC | 6/7 | 10/13 | 4/4 | 2/5 | - | - | - | - | - | 2/2 | 1/1 |
| | NNL | 6/7 | 10/13 | | | | | | | | | |
| The Hon. J.B. Hunt, Jr. | NNC | 7/7 | 13/13 | - | - | NNC | 7/7 | 9/9 | 3/3 | - | - | - |
| | NNL | 7/7 | 13/13 | | | NNL | 7/7 | 9/9 | | | | |
| Dr. K.M. Johnson | NNC | 7/7 | 11/13 | 3/4 | 5/5 | - | - | - | - | - | 3/3 | 1/1 |
| | NNL | 7/7 | 11/13 | | | | | | | | | |
| J.A. MacNaughton | NNC | 7/7 | 12/13 | - | - | NNC | 7/7 | 9/9 | 3/3 | - | - | - |
| | NNL | 7/7 | 12/13 | | | NNL | 7/7 | 9/9 | | | | |
| The Hon. J.P. Manley | NNC | 7/7 | 12/13 | 4/4 | 4/5 | - | - | - | - | - | 3/3 | 1/1 |
| | NNL | 7/7 | 12/13 | | | | | | | | | |
| R.D. McCormick | NNC | 7/7 | 11/13 | 4/4 | 4/5 | - | - | - | 3/3 | - | - | - |
| | NNL | 7/7 | 11/13 | | | | | | | | | |
| C. Mongeau | NNC | 7/7 | 13/13 | - | - | NNC | 7/7 | 9/9 | - | - | 3/3 | 1/1 |
| | NNL | 7/7 | 13/13 | | | NNL | 7/7 | 9/9 | | | | |
| H.J. Pearce(6) | NNC | 7/7 | 13/13 | | | | | | | | | |
| | NNL | 7/7 | 13/13 | | | | | | | | | |
| J.D. Watson(7) | NNC | 7/7 | 6/6 | - | - | NNC | 7/7 | 6/6 | 3/3 | - | - | - |
| | NNL | 7/7 | 6/6 | | | NNL | 7/7 | 6/6 | | | | |
| M.S. Zafirovski | NNC | 7/7 | 13/13 | | | | | | | | | |
| | NNL | 7/7 | 13/13 | | | | | | | | | |

(1) Table indicates meetings held at any time during 2008 and attendance of individual directors only while such individual was a director of the Nortel Boards or a member of a Board Committee, as applicable. Table does not include actions taken by written resolutions of the Nortel Boards as follows, each of which were signed by all of the then- current members of the Nortel Boards or applicable Board Committee. Written resolutions were

219

HIGHLY CONFIDENTIAL          NNC-NNL06001427 / 229

**Table of Contents**

    approved by the Nortel Boards on February 8, 2008, June 4, 2008, April 4, 2008 and by the CHRC on April 4, 2008, June 4, 2008, June 13, 2008, August 5, 2008 and December 23, 2008.

(2)   All meetings of the Nortel Boards were held together as joint meetings, except for one meeting of the Board of Directors of NNC held on May 7, 2008 and one meeting of the Board of Directors of NNL held on May 7, 2008. All meetings of the Audit Committees were held together as joint meetings.

(3)   Joint committee of the Boards of Directors of NNC and NNL.

(4)   Committee of the Board of Directors of NNC.

(5)   Committee of the Board of Directors of NNL.

(6)   Mr. Pearce also attended most meetings of the Committees of the Nortel Boards during 2008.

(7)   Mr. Watson resigned from the Nortel Boards effective October 27, 2008.

Pursuant to our Governance Guidelines, directors are generally expected to attend meetings of shareholders in person. At the 2008 annual meeting of NNC's shareholders held on May 7, 2008, all of the nominees for election to the Board were in attendance.

*Executive Sessions*

Executive sessions, without members of management present (including management directors), must be held at every Nortel Board and Committee meeting, whether such meeting is conducted in- person or telephonically. An executive session was held at every Nortel Board and Committee meeting during 2008, except for one ad hoc CHRC meeting that was conducted telephonically. Executive sessions are chaired by the non- executive chair or, in his or her absence, by another outside or non- management director selected by the Boards. The Nortel Boards and Committees also regularly call upon individual members of management to join a portion of the executive sessions. In addition to the executive session held at the end of every Audit Committee meeting without members of management present, the Audit Committees have a practice of having an executive session with the chief financial officer at the beginning of every regularly scheduled Audit Committee meeting to assist in the focus on key items on the agenda for the meeting and to encourage more free flow discussion on certain topics.

*Forward Agenda*

An annual forward agenda is created for each of the Nortel Boards and Board Committees for the year. The annual forward agendas identify the decisions and actions to be presented to the Boards or Committees for the ensuing year. Such forward agendas are prepared in accordance with the applicable Board or Committee mandate.

*Position Descriptions for Board Chair and Committee Chairs*

The role of the chair of the Nortel Boards and the Committee chairs are described in the Governance Guidelines. On an annual basis, the Nortel Boards appoint a chair of the Board from the outside or non- management directors, and the chair serves in a non- executive capacity unless otherwise determined by the Boards to be in the best interest of NNC and/or NNL due to circumstances existing at the time. The chair of the Nortel Boards is responsible for ensuring that the Boards function in a manner that is independent of management, managing meeting schedules and, with the assistance of the secretary to the Boards and in consultation with the appropriate members of senior management, setting agendas, chairing meetings of the Boards and providing advice to senior management. Our Governance Guidelines ensure that the chair of the Nortel Boards has access to adequate support staff to carry out his or her responsibilities.

220

HIGHLY CONFIDENTIAL

Table of Contents

The role of the Committee chairs is described in our Governance Guidelines. The chair of a Committee is responsible for ensuring that the Committee functions in a manner that is independent of management, including managing meeting schedules, chairing meetings of the Committee, acting as a liaison between senior management and the Committee and providing advice to senior management on various matters. The Committee chair, with the assistance of the secretary to the Committee and in consultation with the appropriate members of senior management, sets the agendas for meetings of a Committee. The chair of each Committee also reports on the significant matters considered at a Committee meeting at the next Board of Directors meeting and minutes of Committee meetings are circulated to the Board of Directors for review.

*Position Description for the Chief Executive Officer*

A written position description for Nortel's president and chief executive officer is prepared by the CHRC, in conjunction with the president and chief executive officer, and is generally reviewed annually by the Nortel Boards. The current chief executive officer description is available on our website at http://www.nortel.com/corporate/investor/governance.html.

*Director Orientation and Continuing Education*

New directors receive an in- depth induction package and attend executive briefing sessions to orient them to Nortel, including the role of the directors, the Boards and the Committees, as well as the nature and operation of Nortel's business. In addition, new directors are required to attend formal meetings with our president and chief executive officer, other members of management and the compliance department. It is also recommended that new directors attend all Committee meetings in order to familiarize themselves with our Boards and their responsibilities.

At regularly scheduled meetings of the Nortel Boards, directors receive presentations from senior management on various aspects of Nortel's business, including the industry and competitive environment in which Nortel operates.

The Nortel Boards previously engaged Deloitte & Touche LLP in connection with the development of a formal director education program. A total of 20 director education modules, broken up into two groups, containing high- level overviews of significant accounting and financial topics affecting Nortel were prepared by Deloitte & Touche LLP for the directors to complete.

*Director and Officer Compensation*

The Boards and the Nominating and Governance Committee periodically review the adequacy and form of director compensation (cash and/or share-based) to ensure that such compensation is competitive, reflects market practice and accurately reflects the risks and responsibilities of being an effective director. Director compensation is reviewed on a combined basis in light of Nortel's overall governance structure. In considering matters associated with director compensation, the Nominating and Governance Committee uses information from various independent sources, including compensation surveys of comparator companies and professional associations. At the direction of the Nominating and Governance Committee, the secretary of the Committee obtains compensation surveys of comparator companies and professional associations with respect to director compensation from independent consultants and presents them to the Nominating and Governance Committee for consideration. All compensation for directors must be approved by the Nominating and Governance Committee and the Nortel Boards. Director compensation is described under "Director Compensation for Fiscal Year 2008" in the Executive and Director Compensation section of this report.

For a description of the process by which executive officer compensation, including the role of compensation consultants, is determined, see "Compensation Discussion and Analysis" in the Executive and Director Compensation section of this report.

221

**Table of Contents**

*Board Evaluation*

Our Governance Guidelines require the Nominating and Governance Committee to conduct an annual evaluation of the effectiveness of our Boards, our Board Committees and individual directors, and to report the results to the Nortel Boards. In addition, the mandates of each of the Audit Committees, CHRC and Nominating and Governance Committee require such Committees to conduct annual performance evaluations assessing performance in light of the responsibilities contained in the applicable mandate. The 2008/2009 Board evaluation process included the following questionnaires and interviews.

*Director Effectiveness Questionnaire*

Each director completed the online director effectiveness questionnaire, which included an annual assessment of the performance and effectiveness of the Boards and each of the Committees on which the director serves. The effectiveness of the Board chair and the Committee chairs was also assessed. The questionnaire also included peer review, as well as a request for recommendations for internal or external director education programs and included open- ended questions to provide an opportunity for suggesting improvements. The results of the director effectiveness questionnaire were reported to the Nortel Boards by the Board chair.

*Audit Committee Self- Evaluation*

Each member of the Audit Committees completed the online Audit Committee self- evaluation, which included an assessment of the Audit Committees and their chair. The Audit Committee self- evaluation was in the form recommended by KPMG and also utilized open- ended questions. The results of the Audit Committee self- evaluation were reported to the Audit Committees and the Nortel Boards by the chair of the Audit Committees.

*Director Interviews*

One- on- one interviews were conducted by the chair of the Nominating and Governance Committee with each individual director of the Nortel Boards. Open- ended questions were included in the director interviews. Each director was asked to rate his or her overall effectiveness as a Board/Committee member, as well as the overall effectiveness of each other Board member. The directors were also asked about the relationship between the Nortel Boards and management. The results of the director interviews were reported to the Nortel Boards by the chair of the Nominating and Governance Committee.

Since 2007, the directors have completed the director effectiveness questionnaire online and the members of the Audit Committees have completed the Audit Committee self- evaluation online.

Following the reports by the chairs of the Nortel Boards and Committees, the Nortel Boards assessed the results of the director evaluations. The results of the director evaluations were positive. The Nortel Boards also reviewed the skills matrix and evergreen list. As part of the post- evaluation action plan developed by the Nortel Boards, the Boards intend to update the evergreen list of potential Board candidates with a focus on candidates with technological expertise and international experience.

*Nomination of Directors*

The Nominating and Governance Committee is primarily responsible for identifying candidates for election or appointment to the Board of Directors of NNC. The NNL Board of Directors is informed of Nominating and Governance Committee deliberations and makes determinations on behalf of NNL.

NNC's Board of Directors has directed the Nominating and Governance Committee to seek candidates who, by virtue of their differing skills, areas of expertise, professional and personal backgrounds, industry knowledge, geographic location, and geographic or industry contacts, are best able to contribute to the direction of Nortel's

222

Table of Contents

business and affairs. The Committee maintains a skills matrix which outlines the competencies and skills of members of the Boards, and identifies any gaps. In identifying candidates for election or appointment to the Boards, the Nominating and Governance Committee also considers the interplay of a candidate's skills, expertise, experience and personality with those of other directors on the Boards, and the extent to which a candidate would contribute to building Boards that are effective, collegial and responsive to the needs of Nortel. Along with a broad range of experience (particularly with respect to organizations of similar size and complexity), business acumen and sound judgment, directors are also expected to have integrity, a strong character and reputation and to be committed to Nortel and its business plans and to building shareholder value over the long term.

*Re- Election of Directors*

The Nominating and Governance Committee annually reviews the credentials of its members for re- election to the Nortel Boards. The Committee also considers the following factors:

| | |
|---|---|
| skills and competencies under the skills matrix | age |
| attendance at regularly scheduled Board and Committee meetings | outside interests, including any change in employment |
| public board membership | length of service on the Nortel Boards |

*Nomination of New Directors*

The Nominating and Governance Committee maintains an evergreen list of potential candidates, which it updates from time to time. In identifying potential director nominees, the Nominating and Governance Committee considers Board candidates identified through a variety of methods and sources. These include suggestions from Committee members, other directors, senior management, shareholders and other interested parties in anticipation of director elections and other potential Board vacancies. The Committee has sole authority to retain director search firms, as well as other advisors, to assist in identifying and evaluating possible director nominees. The Nominating and Governance Committee also considers Board candidates recommended by shareholders of NNC. Shareholders who wish to recommend a person for election to NNC's Board of Directors may submit such person's name, background, qualifications, and consent to be named in the proxy circular and proxy statement and to serve as a director if elected, in writing to our Corporate Secretary for consideration by the Nominating and Governance Committee. The Nominating and Governance Committee will consider and evaluate such person as a possible nominee in the same manner as it considers all other potential candidates. To permit sufficient time for such consideration and evaluation, shareholders should make Board candidate submissions by December 31 in each year, prior to the holding of the next shareholders' meeting. On February 10, 2009, the Canadian Court in the CCAA Proceedings granted an order relieving NNC and NNL from the obligation to call and hold annual meetings of shareholders during the CCAA Proceedings. Under the order, NNC and NNL are directed to call shareholder meetings within six months following the termination of the stay period under the CCAA Proceedings. We will provide shareholders with further information on the manner in which they may recommend candidates for consideration for such meetings at a later date. Prior to recommending a new qualified director candidate for election or appointment, the chair and certain members of the Nominating and Governance Committee meet with the candidate to discuss the candidate's interest and ability to devote the time and commitment required to serve on the Nortel Boards. The Committee conducts a background check on the candidate and reviews any potential conflicts, independence concerns or disclosure issues the candidate might have.

*Board Committees*

In accordance with our Governance Guidelines, the Nortel Boards have established a joint Compensation and Human Resources Committee and each of the Nortel Boards has established an Audit Committee. NNC's Board of Directors has also established a Nominating and Governance Committee and NNL's Board of Directors has established a Pension Fund Policy Committee. NNC's Board of Directors has established a Litigation Committee on an ad hoc basis.

HIGHLY CONFIDENTIAL     

**Table of Contents**

Our Governance Guidelines describe generally the responsibilities of our Board Committees and the role of each Committee chair while written Committee mandates adopted by the applicable Nortel Board more specifically set out the duties, responsibilities and expectations of each Committee. The following is a brief summary of the mandate of each Committee of the Nortel Boards.

*Audit Committee*

Each of NNC and NNL has an Audit Committee established in accordance with section 3(a)(58)(A) of the Exchange Act, section 171(1) of the CBCA and section 2.1 of National Instrument 52- 110 Audit Committees. The members of the Audit Committee of each of NNC and NNL are John. A. MacNaughton (Chair), Jalynn H. Bennett, The Hon. James Baxter Hunt, Jr. and Claude Mongeau. In accordance with our Independence Standards, the independence definitions under the NYSE listing standards, and applicable SEC and CSA rules and policies, the Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that each member of the Audit Committees is independent. In accordance with the Governance Guidelines, the financial literacy definitions under the NYSE listing standards, and applicable SEC and CSA rules and policies, the Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that each member of the Audit Committees is financially literate. The Nortel Boards have also determined that at least one member of the Audit Committees meets the NYSE standard of having "accounting or related financial management expertise", and that Mr. Mongeau meets the criteria required by applicable SEC rules for an "audit committee financial expert" (U.S. GAAP). Additionally, the Nortel Boards have determined Mrs. Bennett's simultaneous service on the Audit Committees of NNC, NNL, Canadian Imperial Bank of Commerce and Teck Cominco will not impair her ability to effectively serve on the Audit Committees of NNC and NNL.

As described above under "Board of Directors", each Audit Committee member brings significant skill and experience to their responsibilities. The following sets out the education and experience of the members of the Audit Committee of each of NNC and NNL relevant to the performance of their duties as a member of such Audit Committee:

Jalynn H. Bennett, C.M. has been President of Jalynn H. Bennett and Associates Ltd. since 1989 and was previously associated with Manulife Financial for nearly 25 years. She is a past Commissioner of the Ontario Securities Commission and was a member of the Toronto Stock Exchange Joint Committee on Corporate Governance (The Saucier Committee). She earned a Bachelor of Arts in economics from the University of Toronto. Mrs. Bennett is currently a member of the Audit Committees of Canadian Imperial Bank of Commerce and Teck Cominco.

The Hon. James Baxter Hunt, Jr. has been a member of the law firm of Womble Carlyle Sandridge & Rice, PLLC since 2001. Prior to that, he was Governor of North Carolina for four terms, 1977 to 1985 and 1993 to 2001. He earned a Bachelor of Science in Agricultural Education and a Master of Science in Agricultural Economics from North Carolina State University and a Juris Doctor from the University of North Carolina Law School.

John A. MacNaughton, C.M., is currently the Chairman of the Business Development Bank of Canada and of CNSX Markets Inc. (formerly Canadian Trading and Quotation System Inc.). In prior years, he has held several executive positions, including founding President and Chief Executive Officer of the Canadian Pension Plan Investment Board and President of Nesbitt Burns Inc. Mr. MacNaughton earned a Bachelor of Arts in Economics from the University of Western Ontario. He is currently a member of the Audit Committee of TransCanada Corporation/TransCanada Pipelines Limited.

Claude Mongeau has been Executive Vice- President and Chief Financial Officer of Canadian National Railway Company since 2000. He holds a Bachelor of Arts degree in Psychology from the University of Quebec in Montreal and a Master of Business Administration from McGill University. Mr. Mongeau is also Chairman of the Audit Committee of SNC- Lavalin Group Inc.

224

**Table of Contents**

The Audit Committees assist the Nortel Boards in the oversight of:

the reliability and integrity of the accounting principles and practices, financial statements and other financial reporting, and disclosure principles and practices followed by management of Nortel;

the establishment by management of an adequate system of internal controls and procedures;

the effectiveness of the internal controls and procedures; and

the compliance by Nortel with legal and regulatory requirements.

The Audit Committees also assist the Nortel Boards in monitoring and reviewing the balance sheet strategy and financial structure of Nortel, including the incurrence of long- term indebtedness and the issuance of additional equity or equity- related securities.

In accordance with applicable laws and the requirements of stock exchanges and securities regulatory authorities, the Audit Committees of NNC and NNL must pre- approve all audit and non- audit services to be provided by the independent auditors. In addition, it is the policy of NNC and NNL to retain auditors solely to provide audit and audit- related services and advice with respect to tax matters, but not to provide consulting services, such as information technology services.

Nortel's independent auditors report directly to Nortel's Audit Committees and are ultimately accountable to the Audit Committees and the Nortel Boards as representatives of the shareholders. The Audit Committees have direct access to the internal auditors and independent auditors to discuss and review specific issues as appropriate. The Audit Committees have established complaint procedures, through our compliance group, as well as a hiring policy for current and former employees of the independent auditors. In addition to the executive session held at each meeting of the Audit Committees as described above, separate executive sessions are held by the Audit Committees on a periodic basis with the independent auditors, the internal auditor, the controller and other members of senior management.

*Compensation and Human Resources Committee*

The members of the CHRC are Richard D. McCormick (Chair), Jalynn H. Bennett, Dr. Manfred Bischoff, Dr. Kristina M. Johnson and The Hon. John P. Manley. In accordance with our Independence Standards, the independence definitions under the NYSE listing standards, and applicable SEC and CSA rules and policies, the Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that each member of the CHRC is independent.

The CHRC oversees Nortel's executive compensation programs and is responsible for:

the strategic direction and overall effectiveness of the management of human resources and compensation and advising and providing direction to the Nortel Boards with respect to such matters;

senior management succession planning;

the appointment, responsibilities and compensation of key members of senior management, including executive officers;

assessing Nortel's senior management leadership team, including key members of senior management;

administrative duties specifically delegated to, or required to be performed by, the CHRC under any compensation or benefit plan;

recommending to the Nortel Boards the appointment of officers, corporate performance targets, achievement factors and aggregate award amounts under various incentive plans and the creation, amendment and termination of cash compensation, incentive and benefits plans where approval of the Nortel Boards is required under the terms of such plans; and

preparing the annual report on executive compensation for inclusion in Nortel's publicly filed documents.

As NNC's executive officers are also executive officers of NNL, the CHRC assesses executive compensation on a combined basis. The Nortel Boards have directed that the chief executive officer's compensation is to be

225

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 235

Table of Contents

determined by the independent directors of the Nortel Boards, together with the CHRC, based on the CHRC's assessment of the performance of the chief executive officer. The process by which the CHRC determines executive compensation is described in the Executive and Director Compensation of this report.

In accordance with its mandate, the CHRC may delegate such authority and responsibilities it considers appropriate, provided that it reports all such delegation to the Nortel Boards and provided further that it may not delegate any matters related to the responsibilities, appointment or remuneration of key members of senior management, including the chief executive officer.

The CHRC has sole authority over the engagement of compensation consultants, including over the terms and conditions of such engagements. The CHRC may also request management to undertake studies and report on areas of interest, which may occasionally involve the retention of additional consultants by management. See "The Role of Management and Consultants in Nortel's Named Executive Officer Compensation Program" in the Executive and Director Compensation section below.

*Nominating and Governance Committee*

The members of the Nominating and Governance Committee are The Hon. James Baxter Hunt, Jr. (Chair), John A. MacNaughton and Richard D. McCormick. In accordance with our Independence Standards, the independence definitions under the NYSE listing standards, and applicable SEC and CSA rules and policies, the Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that each member of the Nominating and Governance Committee is independent.

Responsible for annually establishing a formal, comprehensive and written director nomination process which includes:

establishing a methodology or process for director succession planning and reviewing succession plans for directors to ensure qualified persons are or will be available when necessary or desirable and reporting findings and recommendations to the Board;

establishing a director evaluation process, including an assessment of the Board, its Committees, individual directors and the chair; and

recommending candidates for election or appointment to the Board, consistent with the criteria approved by the Board.

The NNL Board of Directors is informed of Nominating and Governance Committee deliberations and makes all corporate governance determinations on behalf of NNL.

*Pension Fund Policy Committee*

The members of the Pension Fund Policy Committee of NNL are The Hon. John P. Manley (Chair), Jalynn H. Bennett, Dr. Manfred Bischoff, Dr. Kristina M. Johnson and Claude Mongeau. In accordance with our Independence Standards, the independence definitions under the NYSE listing standards, and applicable SEC and CSA rules and policies, the Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that each member of the Pension Fund Policy Committee is independent.

The Pension Fund Policy Committee is primarily responsible for the general oversight of the financial administration of certain pension plans maintained by NNL and certain of its subsidiaries. Such oversight includes reviewing and recommending the governance structure and process, reviewing and approving fund actuaries, funding policy and assumptions, asset mix and investment management structure, as well as the appointment and removal of consultants, custodians and trustees.

226

Table of Contents

*Ad Hoc Committees*

Our Boards generally do not establish ad hoc committees, except in limited circumstances. In July 2004, NNC established the Litigation Committee, which continues to investigate, review and evaluate the facts and circumstances relating to allegations that certain current and former directors and officers of NNC breached their fiduciary duties. Mr. Harry Pearce (Chair), Dr. Manfred Bischoff and Mr. Richard D. McCormick are members of the Litigation Committee. The Litigation Committee did not meet during 2008.

Code of Ethics

Nortel's Code of Business Conduct, which is our code of ethical business conduct, provides detailed guidelines on Nortel's approach to competition in the marketplace, the standards of conduct expected of all Nortel directors, officers and employees and the central role integrity must play in daily conduct at Nortel, with an emphasis on honesty and compliance with all applicable laws. Nortel's directors, officers and employees, except as of December 31, 2008, those on leave, transitioning to retirement, or who have been notified that their employment with Nortel is ending and, due to legal requirements, those in France and Germany, are requested to read the Code of Business Conduct and electronically certify, except in the case of directors who certify on paper, that they have read, understood and will comply with the terms of the Code of Business Conduct. Members of the Executive Leadership Team have an additional certification, which was added in 2007. 2008 certification of the Code of Business Conduct has been completed by 98% of Nortel employees (exclusive of those on leave, transitioning to retirement, or who have been notified, and those in France and Germany). All of the current directors and executive officers have completed certification of the Code of Business Conduct. In addition to the certification process, Nortel has various processes for ensuring its ethics requirements are being met, including training on the provisions of the Code of Business Conduct and communications on the need to report violations and suspected violations. In 2008, Nortel did not make any amendments to its Code of Business Conduct. Any future amendments to our Code of Business Conduct will be posted on our website at www.nortel.com. Any waiver of a requirement of our Code of Business Conduct, if granted by the Nortel Boards or any Board Committee, will be posted on our website at www.nortel.com as required by law.

The chief compliance officer is responsible for security, business ethics and compliance, which includes: periodically reporting to the Nortel Boards regarding ethics and compliance matters; preparing periodic communications to our employees regarding compliance and ethical business practices; developing and monitoring policies and procedures relating to business ethics and to compliance; and conducting periodic compliance risk assessments. The chief compliance officer reports to the chief legal officer and the chair of the Audit Committees.

Use of Material Non- Public Information and Insider Trading Policy

All employees, officers, and members of Nortel Boards are subject to insider trading laws generally. In accordance with applicable corporate policy, there are certain individuals who, by virtue of their role, are "deemed insiders". Because they may have knowledge of, or access to, material information, the trading activities of these individuals are restricted by Nortel. Such individuals may not engage in any trading activity for specified periods of time throughout the year, known as "black out periods". These deemed insiders can only trade during prescribed "window periods", and even then, only if they do not have knowledge of any Nortel material non- public information at that time. Generally, deemed insiders are officers, directors, senior executives and other leaders, and employees who frequently have access to material information. In addition, applicable corporate policy generally prohibits deemed insiders from participating in any equity monetization program with respect to securities of NNC and NNL.

Shareholder Communication

Nortel communicates regularly with shareholders through press releases, as well as annual and quarterly reports. Our investor relations department and Corporate Secretary address investor concerns on an on- going basis. Nortel may also address such concerns through our website at www.nortel.com.

227

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 237

Table of Contents

Interested parties, including shareholders and other security holders, may communicate directly with the Boards of NNC and NNL, non- management directors, the chair of the Boards of NNC and NNL or any other individual directors by writing care of the Corporate Secretary, Nortel Networks Corporation, 195 The West Mall, Toronto, Ontario, Canada, M9C 5K1. All correspondence, with the exception of solicitations for the purchase or sale of products and services, communications of an inappropriate nature or similar types of communications, will be forwarded to the directors to whom such correspondence is addressed. In addition, any such communication that relates to accounting, internal accounting controls or auditing matters will also be referred to the chair of the Audit Committees of NNC and NNL, if not already addressed to him or her.

## ITEM 11.     Executive and Director Compensation
### Compensation Discussion and Analysis
### Executive Summary

Nortel is exempt from complying with disclosure requirements concerning executive compensation under Canadian securities laws given that we comply with the rules of the SEC. This Compensation Discussion and Analysis describes the material elements of the compensation paid to the named executive officers.

The CHRC oversees Nortel's named executive officer compensation and reports to the applicable Nortel Board. For further information on the CHRC, see above under "Compensation and Human Resources Committee" in the Corporate Governance section. The CHRC retained Hugessen Consulting Inc. (HCI) effective July 1, 2007 to assist in connection with the review of current and future executive compensation and benefit programs. In determining the amount and form of named executive officer compensation for 2008, the CHRC regularly consulted with HCI. For further information on the role of compensation consultants during 2008, see below under "The Role of Management and Consultants in Nortel's Named Executive Officer Compensation Program".

Our 2008 compensation program for the named executive officers was generally designed to award named executive officers with total target compensation at the 50th percentile range of comparator companies with which we compete for executive talent (the comparator companies). Most of the elements of the compensation program for the named executive officers were considered "at risk" for 2008 and therefore linked compensation with both individual and corporate performance, as well as shareholder value.

As a result of the Creditor Protection Proceedings, our 2009 compensation program will vary significantly from the design of the 2008 program. During the proceedings, the CHRC intends to focus on the importance of continuity of key executive officers during the Creditor Protection Proceedings. In particular, the key objective of our executive compensation program will be to motivate, incentivize and retain executive officers who can successfully lead the comprehensive restructuring plan and to focus performance- based compensation on goals material to the restructuring efforts.

### Objectives of Named Executive Officer Compensation Program
*Competitive Compensation*

During 2008, our goal was to offer a competitive total compensation program. In order to ensure that our named executive officers were competitively compensated for 2008, we benchmarked total target compensation and each component part (base salary, short- term incentives and long- term incentives) against survey data for the comparator companies. The CHRC reviewed the comparator companies based on information provided by management. In selecting the comparator companies, the CHRC considered size (measured by annual revenues or total assets), industry (telecommunications, technology and data industries) and business model (which includes customer base, types of customers, market segments, specific product lines and types of business). In October 2007, the CHRC reviewed the list of comparator companies and concluded that with the exception of the removal of Lucent as a result of its merger with Alcatel, no change to the comparator companies was required in order to maintain a consistent basis for comparison for setting executive compensation. In respect of 2008 compensation, the comparator companies were:

228

## Table of Contents

Accenture                Agilent Technologies      Applied Materials            Avaya
Cisco Systems            Corning                   Electronic Data Systems      EMC
Intel                    Juniper                   Lexmark International        Microsoft
Motorola                 NCR                       Oracle                       Qualcomm
Seagate Technology       Sun Microsystems          Texas Instruments            Unisys
Xerox

In May 2008, management requested that its compensation consultant, Mercer Human Resources Consulting LLC (Mercer), assess the existing comparator companies to ensure their continued appropriateness for use in reviewing executive compensation levels and designing competitive programs. Mercer focused on revenue/size and business focus as the primary considerations. Based on Mercer's analysis, the CHRC revised the comparator companies by the addition of Tyco Electronics, Harris Corporation and Advanced Micro Devices and the deletion of Microsoft, Lexmark International and Accenture.

When 2008 compensation decisions were being considered and total target compensation set in early 2008, survey data with respect to the compensation practices of the comparator companies for the most recently completed fiscal year was obtained by management from a composite of three market survey sources: Towers Perrin Executive Compensation Survey; Radford Executive Compensation Survey; and Pearl Meyer Executive & Senior Management Total Compensation Survey. Management compiled survey data for benchmarking purposes and reviewed the results with Mercer. This data was then used to provide general compensation information to the CHRC. The CHRC used such data, among other things, in making compensation decisions.

While we have generally targeted the 50th percentile range of the comparator companies, total target compensation was not set at precisely the 50th percentile for 2008 compensation. Total targeted compensation for the named executive officers for the 2008 fiscal year was within approximately the 54th to 84th percentile range of the comparator companies. This range is generally attributable to certain employment arrangements that were required in order to recruit qualified executive officers in 2008 and in prior years.

### Align the Interests of Named Executive Officers with the Interests of Shareholders

A further objective of our 2008 compensation program for the named executive officers was to align the interests of named executive officers with the interests of shareholders. Towards this objective, we intended to reward and maximize both individual performance and corporate performance. Performance- based "at risk" compensation included cash incentives, stock options and performance- based stock units, and represented between approximately 61% and 72% of 2008 total target compensation for the named executive officers, except for Mr. Zafirovski whose performance-based "at risk" compensation represented approximately 88% of his 2008 total target compensation reflecting our intent to tie an even more substantial portion of his compensation directly to the performance of Nortel. We imposed share ownership guidelines on named executive officers in 2008 in order to further align their interests with the interests of shareholders.

### Retention

In 2008, we also sought to retain named executive officers in an increasingly competitive global marketplace by providing incentives for continued employment with Nortel. We awarded a mix of long- term incentives each with a total vesting period of at least three years in furtherance of this objective.

### Elements of Compensation

Each element described below was designed to meet at least one objective of our 2008 compensation program for named executive officers.

### Base Salary

Base salary reflects the job scope, complexity and responsibility of the individual's role at Nortel, as well as the number of years over which the responsibilities have been carried out. Base salary also rewards individual

229

**Table of Contents**

performance and individual contribution to Nortel. Base salary represented approximately 17% to 31% of total target compensation for the named executive officers for the 2008 fiscal year, except for Mr. Zafirovski whose base salary represented approximately 12% of his 2008 total target compensation, which reflected our intent to more closely align his compensation with the interests of shareholders. Based on the market survey data we reviewed, the percentage of our named executive officers' total target compensation represented by base salary was similar to the percentage represented by such element for executive officers of the comparator companies. In early 2008, the CHRC reviewed the base salary of the named executive officers as compared to executives holding similar positions at comparator companies and determined that no increases from 2007 were required. None of the named executive officers received a base salary increase in 2008.

Salaries were frozen company- wide for 2009, except for certain limited exceptions. We do not intend to increase the base salaries of the named executive officers in 2009.

*Short- Term Incentives*

Named executive officers are eligible for an annual cash bonus award under the Nortel Networks Limited Annual Incentive Plan (Incentive Plan), which has historically been our vehicle for short- term incentive compensation. Bonuses under the Incentive Plan are designed to reward and maximize individual performance within the context of Nortel's overall performance. Short- term incentives represented approximately 17% to 25% of 2008 total target compensation for the named executive officers. Based on the market survey data we reviewed, the percentage of our named executive officers' total compensation for 2008 represented by short- term incentive compensation was similar to the percentage represented by such element for executive officers of the comparator companies.

Bonuses under the Incentive Plan are based on the achievement of pre- established corporate and individual performance objectives for a given calendar year, subject to the discretion of the CHRC. For 2008, we intended for the amount of an annual cash bonus award under the Incentive Plan to be determined by the following formula:



*Target Percentage*: Individual target percentages are initially determined upon commencement of employment. In setting or revising the target percentages, we benchmark against targets set by the comparator companies for executives holding similar positions. The CHRC historically reviewed benchmarking results prepared by management with respect to target percentages and modifies such percentages as roles and responsibilities change. The target percentage for each of the named executive officers is set out below.

| Name | Target Percentage | Name | Target Percentage |
|---|---|---|---|
| M.S. Zafirovski | 150% | P.S. Binning | 100% |
| D.J. Carey | 100% | S.J. Bandrowczak | 80% |
| W.K. Nelson | 100% | R.S. Lowe | 100% |

*Individual Performance Factor*: The individual performance factor is determined through the annual executive review process described below based on an evaluation of the named executive officer's performance in regard to certain criteria established at the beginning of each year. For the 2008 bonuses under the Incentive Plan, the individual performance factor for the named executive officers could have ranged from 0 to 1.5. There is no specific linear correlation between the achievement of objectives and the individual performance factor.

230

Table of Contents
Certain achievements may be weighted more heavily than others. However, all achievements (or lack thereof) and other subjective considerations play a part in the ultimate determination of the individual performance factor.

*Corporate Performance Factor:* The corporate performance factor is based on certain corporate business and financial goals established at the beginning of the performance period and approved by the CHRC and the NNL Board of Directors. The financial metrics have different weightings applied to them and in addition, there may also be certain qualitative factors such as quality and customer satisfaction that may be included in the overall assessment of corporate performance. The corporate performance factor is deemed to be 1.0 (achievement) throughout the plan period and is then adjusted by the CHRC and the NNL Board of Directors based on their determination of corporate performance. Actual performance with respect to each financial metric will correspond to a factor (the AIP Factor) on the payout slope approved for such financial metric. An AIP Factor can be greater or less than 1.0 and the calculation for correspondence of performance to the AIP Factor can be different for each financial metric. The payout slope is designed to reflect the corporate and business goals for the particular financial metric. Each resulting AIP Factor is then multiplied by the weighting assigned to the applicable financial metric. Different combinations of actual corporate performance under each of the financial metrics could result in achieving the target corporate performance factor of 1.0 and, as a result, the achievement of any one target is not necessarily determinative in calculating a named executive officer's bonus.

In early 2008, the CHRC and the NNL Board of Directors set the following financial metrics and their weightings: revenue (25%); management operating margin (Management OM) (50%); and net cash from (used in) operating activities (25%). These financial metrics and their weightings were determined by the CHRC to best align with Nortel's corporate priorities for 2008. Management OM is not a recognized measure under U.S. GAAP and is defined as total revenues, less total cost of revenues, selling, general and administrative, and research and development expense. The CHRC determined that Management OM would be a meaningful measurement of operating performance and would provide greater transparency to investors with respect to Nortel's performance, as well as supplemental information used by management in its financial and operational decision making. Management OM has been the key measure used for business performance by our management and has historically shown a strong correlation with shareholder value. For additional information concerning Management OM, see the MD&A section of this report. While free cash flow was selected as a financial metric for 2007, net cash from (used in) operating activities was selected for 2008 as it better reflected items that were considered to be generally within management's control. For 2008, there was no minimum corporate performance factor and the maximum corporate performance factor was 2.0.

Based on management's recommendation, on February 19, 2009 the CHRC did not recommend to the NNL Board of Directors a payout under the Incentive Plan for 2008. This recommendation was made given the current circumstances under the Creditor Protection Proceedings and was not based on the level of achievement of financial metrics or individual performance. On February 20, 2009, the NNL Board of Directors determined not to pay any bonuses to employees under the Incentive Plan for 2008 and as a result, none of the named executive officers received a bonus payment under the Incentive Plan for 2008.

We intend to continue the Incentive Plan for 2009. The 2009 Incentive Plan has been designed based on quarterly plan periods, and award determinations and payouts will be made on a quarterly basis. This will provide a more immediate incentive to employees for the achievement of critical shorter- term objectives within the Creditor Protection Proceedings. The corporate performance factor will be determined based on Nortel's performance against metrics established for each quarterly performance period. Based on the CHRC's recommendation, the NNL Board of Directors approved effective February 24, 2009 the following financial and operational metrics and their weightings for the first and second quarters of 2009: revenue (33.3%); cash and cash equivalents and short- term investments (33.3%); and three operational performance metrics (33.3%) being performance to lead time, outage recovery and service impact cases. These operational performance metrics are established internal measures that are not tied to the financial statements but have historically been utilized by management to ensure customer obligations have been met. The objectives for the third and fourth quarters for the 2009 Incentive Plan will be finalized upon completion of the company's business plan.

231

Table of Contents

*Long- Term Incentives*

On February 27, 2009, we obtained Canadian Court approval (the equity termination order) to terminate our equity- based compensation plans (the Nortel 2005 Stock Incentive Plan, As Amended and Restated (2005 SIP), the Nortel Networks Corporation 1986 Stock Option Plan, As Amended and Restated (1986 Plan) and the Nortel Networks Corporation 2000 Stock Option Plan (2000 Plan)) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, stock appreciation rights (SARs), restricted stock units (RSUs) and performance stock units (PSUs)), whether vested or unvested. We obtained the express ability under the initial order in the CCAA Proceedings to repudiate the equity plans; however, for tax reasons primarily related to Section 409A of the U.S. Internal Revenue Code (Code), we sought this approval. We also sought this approval given the decreased value of NNC common shares and the administrative and associated costs of maintaining the plans to both Nortel and the plan participants. Although the equity- based compensation plans and all outstanding equity have been terminated, we have included a discussion of the 2008 equity grants to the named executive officers to explain the analysis behind the 2008 grants.

Historically long- term incentives were awarded as they provided named executive officers with a proprietary future interest in Nortel and thereby encouraged and rewarded performance by aligning compensation with corporate performance. Long- term incentives also promoted retention, and acted as a means towards achieving share ownership guidelines. Based on the intended value, long- term incentives represented approximately 44% to 67% of total target compensation for the named executive officers for the 2008 fiscal year, except for Mr. Zafirovski whose long- term incentives represented approximately 70% of his 2008 total target compensation.

Under the 2005 SIP, long- term incentives were awarded to executive officers in early 2008 in the form of stock options, RSUs or PSUs. The material terms of the 2005 SIP, including a description of the terms and conditions of stock options, RSUs and PSUs awarded under the 2005 SIP, are described in the Equity- Based Compensation Plans section below.

| Long- Term Incentive | Objectives |
|---|---|
| Stock Options | To align compensation with company performance as they would become valuable to the executive only if the share price increased from the date of grant. |
| | To retain executives as they vested over time. |
| RSUs | To encourage the retention of executive officers as they vested over time. |
| PSUs | To further link compensation with Nortel's performance as they were only paid out if certain pre- established performance measures were met. |
| | To encourage retention as they vested over time |

The 2008 long- term incentive strategy was initially approved by the CHRC on January 17, 2008. The CHRC approved an increased use of performance- based long- term incentives for the named executive officers and a reduction in retention based awards. The CHRC approved the following mix for the intended value of long- term incentives: 50% PSUs; 33% stock options; and 17% RSUs. This mix was selected in order to ensure competitiveness with the comparator companies and consistency with Nortel's past granting long- term incentive strategy. In February 2008, management, in consultation with Mercer, completed two elements of the planning for the 2008 long- term incentive awards to be reviewed by the CHRC:

| | |
|---|---|
| The total intended value of the long- term incentives was determined based on a combination of factors | Benchmarking of each component part of total target compensation (base salary, short- term incentives and long- term incentives). |
| | Internal comparison of roles and responsibilities of named executive officers at similar levels. |
| | Specific individual circumstances, including individual performance. |
| The total intended value of the long- term incentives was then converted to the respective number of stock options, RSUs and PSUs | Historically, we used the twenty day average closing price of NNC common shares on NYSE as at a date within a week prior to the review by the CHRC to calculate the number of long- term incentive awards for approval. |
| | During the 2008 planning process, we monitored the twenty day average closing price of NNC common shares and as a result of the declining share |

232

**Table of Contents**

price, a greater number of awards would have been required to fulfill the total intended value.

Given the limited number of NNC common shares available for issuance under the 2005 SIP, financial modeling was completed to determine the appropriate share price to be used for planning purposes in order to try to award the intended value while also recognizing the constraints on the available number of NNC common shares.

$13.05 was established as the optimal share price for planning purposes given these circumstances.

Although we continued to monitor the closing price of NNC common shares on NYSE, we did not adjust the number of units to be awarded.

The number of units awarded was determined based on the $13.05 planning price and therefore we awarded long-term incentives in an amount that was less than originally intended.

The CHRC determined this was appropriate given the weakened share price and the limited number of NNC common shares available for issuance under the 2005 SIP at that time.

In the case of stock options, the Black Scholes option valuation factor was also considered.

In March 2008, the independent members of the Nortel Boards approved awards of long-term incentives for Mr. Zafirovski for 2008 and the CHRC approved awards of long-term incentives for the other named executive officers for 2008 as described in detail below under the "Grants of Plan-Based Awards in Fiscal Year 2008". The Nortel Boards and the CHRC took into account the size and nature of the roles and responsibilities of each named executive officer as well as individual performance considerations when determining the 2008 long-term incentive awards for the named executive officers. Existing equity ownership levels or the share ownership requirements were not considered when determining awards of long-term incentives. For Mr. Zafirovski, an equity mix comprised of an equal distribution of stock options and PSUs, each representing one-half of the total intended value, was approved. No RSUs were approved for Mr. Zafirovski in order to more closely align his compensation with the performance of Nortel and therefore with shareholders interests.

Since 2006, PSUs with relative total shareholder return (PSU- rTSRs) as the performance measure were awarded to the named executive officers. The PSU component of the 2008 long-term incentive strategy was modified from prior years with the introduction of PSUs with Management OM (PSU-Management OMs) as the performance measure. As part of the long-term incentive strategy for 2008, the CHRC began granting an equal distribution of PSU- rTSRs and PSU- Management OMs to the named executive officers. PSUs were to vest at the end of a three year period, subject to the CHRC determining the percentage of target payout, if any, based on the level of achievement of the performance criteria.

PSU- rTSR

rTSR provided a transparent calculation of Nortel's performance relative to a set of peers.

The Dow Jones Technology Titans 30 Index (Tech Titans Index) was selected by the CHRC as the comparator of shareholder return as it presents an objective approach to performance measurement. Nortel's ranking relative to these companies was to determine the percentage payout (between 0% and 200%) received by each named executive officer of his or her performance stock unit award.

For the PSUs granted in 2008, the performance period was January 1, 2008  December 31, 2010. The CHRC was to measure NNC's total shareholder return against performance as of December 31, 2010 of the companies included in the Tech Titans Index at the start of the performance period on January 1, 2008. Index changes during the performance period were not to be taken into account to avoid an upward performance bias. The Tech Titans Index on January 1, 2008 consisted of Alcatel- Lucent, Analog Devices, Apple, Applied Materials, Canon, Cisco Systems, Corning, Dell, Electronic Data Systems, EMC, Ericsson, Fujitsu, Google, Hewlett- Packard, Hon Hai Precision Industry, IBM, Intel,

Microsoft, Motorola, Nokia, Oracle, Qualcomm, Ricoh, Samsung
Electronics, SAP, Sun Microsystems, Taiwan Semiconductor, Texas
Instruments, Xerox and Yahoo. When the Tech Titans Index was

233

Table of Contents

initially selected for these purposes in 2006, NNC was included in the index.

The table below sets out percentage payouts as they correspond to different Nortel
performance rankings compared to these companies. The percentage payout for the
achievement of a ranking between any two of the specified rankings would be
determined on a linear basis.

The CHRC was to measure actual performance and determine relative NNC ranking
and the associated payout to executives at the end of the third year of the performance
period.

| Performance | Percentage Payment of Individual's PSU Award |
|---|---|
| Threshold performance at a rank of 23rd | 50% |
| Target performance at a rank of 16th | 100% |
| Superior performance at a rank of 9th | 150% |
| Maximum performance at a rank of 3rd | 200% |

PSU- Management OM

Performance was to be measured at the end of the one year performance period and
awards were to be settled in NNC common shares at the end of the additional two year
vesting period following the performance period.

Awards of performance shares could have ranged from 0- 200%, subject to the
attainment of the performance criteria as determined by the CHRC which could have
been graduated such that different percentages, which could be greater than or less
than 100% of the target number of PSUs awarded, were to become vested depending
on the extent of satisfaction of the performance criteria.

Management OM was selected as the performance measure for 2008 as this metric
aligned with the strategic goals of Nortel and has historically shown a strong
correlation with shareholder value creation.

For the PSUs granted in 2008, Management OM was required to exceed the minimum
threshold level of US$550 million in accordance with the payout curve for a one year
performance period.

*Special One- Time Awards*

In addition to the main components of our compensation program for named executive officers, we retain the right to make special one- time cash or
equity awards as approved by the CHRC. The purpose of these special one- time awards is generally to retain key executives who have assumed
added responsibilities. We have also awarded special one- time awards to new executive officers in order to offset compensation that was forfeited by
leaving former employment or in order to attract top executive talent.

The employment agreement entered into with Mr. Bandrowczak described under "Material Terms of Employment Agreements and Arrangements
with Named Executive Officers" provides for a special bonus of $700,000, with $200,000 to be paid within 30 days following commencement of
employment and $500,000 to be paid within 30 days following the one year anniversary of the commencement of employment. This bonus was
awarded in order to attract Mr. Bandrowczak to Nortel, to recompense the estimated annual compensation arrangements that he would have received
in 2007 if he had remained with his previous employer and to compensate for the estimated loss in future value from the unvested equity resulting
from his resignation from his previous employer. The $500,000 bonus was paid on July 18, 2008 in accordance with the agreement.

*Other Compensation*

Named executive officers were also provided with other compensation as reflected in the "All Other Compensation" column in the Summary
Compensation Table for Fiscal Year 2008 and as more fully described under "Material Terms of Employment Agreements and Arrangements with
Named Executive Officers" below. The objective of providing other compensation in 2008 was generally to provide executives with the devices to
perform their duties more efficiently.

234

HIGHLY CONFIDENTIAL

**Table of Contents**

*Key Executive Incentive Plan and Key Employee Retention Plan*

We have developed, in co- ordination with Mercer, a key employee incentive and retention program for employees in North America, CALA and Asia. The program consists of an incentive plan for eligible key executives (the KEIP) and a retention plan for eligible key non- executive employees (the KERP). The KEIP was developed in order to provide incentives to the executives to guide Nortel out of the Creditor Protection Proceedings as swiftly as possible, while the KERP is aimed at retaining key employees by providing a degree of job security and preventing attrition of key employees before we have attained a confirmed plan of reorganization. We believe this program will provide a meaningful level of stability, morale and motivation in the workplace. The KEIP and the KERP expire July 14, 2010.

A careful evaluation process was undertaken to select the eligible executives to participate in the KEIP and eligible employees to participate in the KERP. We took into consideration whether such role is critical to accomplish a successful reorganization, the cost and the likelihood of finding a suitable replacement for such employee and the latest performance review of such employee.

Both the Monitor and the U.S. Creditors' Committee support the implementation of the KEIP and the KERP. They were consulted regarding the KEIP and KERP and were offered an opportunity to review and evaluate them. Substantial feedback was received and the KEIP and KERP were modified as a result of this process. The U.S. Creditors' Committee's support of the KEIP with respect to members of the senior leadership team, including the participating named executive officers, is conditioned solely on the delivery by Nortel to the U.S. Creditors' Committee of projections for calendar year 2009 prepared by management acting reasonably in accordance with Nortel's ordinary course business practices, taking into account the performance of the business in light of current global economic conditions as well as specific competitive challenges facing Nortel.

On February 27, 2009, we filed a motion in the Chapter 11 Proceedings concerning U.S. Court approval of the KEIP and KERP in the Chapter 11 Proceedings. We will also seek Canadian Court approval of the KEIP and KERP in the CCAA Proceedings.

Any retention agreements for employees in EMEA will be structured based on market practice in that region and will be designed and approved by the U.K. Administrators.

*KEIP*

The KEIP was designed by taking into account the levels of compensation at other comparable companies. 92 executives of Nortel will participate in the KEIP, including the named executive officers with the exception of Mr. Zafirovski. Mr. Zafirovski is not a participant in the KEIP. Executives participating in the KEIP would be eligible to receive an incentive award equivalent to a percentage of their annual base salaries ranging (ranging from an average award size of 20% to 183% of their annual base salary, depending on the participant's experience and responsibilities). Executives who are participants in the Change in Control Plan (CIC Plan) will be required to waive any entitlement to any claim they may have under the CIC Plan before they become eligible to participate in the KEIP.

The awards under the KEIP will be tied to the achievement of three important milestones: (1) the achievement of North American objectives of Nortel's cost reduction plan; (2) the achievement of certain parameters that will result in a leaner or more focused organization; and (3) the later of the confirmation of our plan of reorganization or the confirmation by the Canadian Court of a plan or plans of restructuring and/or arrangement in Canada. Under the KEIP, 25% of each incentive award would vest upon achievement of the first milestone, 25% would vest upon achievement of the second milestone and 50% would vest upon achievement of the third milestone. In order to receive an award, a participant must be employed on the vesting date; however, awards may be accelerated and paid out under certain circumstances as a result of termination of employment in connection with a divestiture.

*KERP*

The KERP has been tailored to provide incentives to the critical employees to remain with Nortel and to strive for a speedy achievement of the milestones. None of the named executive officers will participate in the KERP. Employees participating in the KERP would be eligible to receive incentive awards equivalent to a percentage of their annual base salaries ranging from 13% to 44% of their annual base salary, depending on the participant's experience and responsibilities.

Under the KERP, incentives shall vest as follows: 25% upon the earlier of June 30, 2009 or the achievement of the first milestone; 25% upon the earlier of December 31, 2009 or the achievement of the second milestone; and 50% upon the earlier of June 30, 2010 or the achievement of the third milestone. In order to receive an award, a participant must be employed on the vesting date; however, awards will be accelerated and paid out as a result of an involuntary termination without cause and under certain circumstances as a result of termination of employment in connection with a divestiture. A pro rated award may also be paid upon death and in certain cases involving leaves of absence.

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 245

Table of Contents

*CIC Plan*

The CIC Plan was adopted to reinforce and encourage the continued attention and commitment of specified executives to their respective duties without distraction arising from the possibility of a change in control. Nortel continues to evaluate its obligations under the CIC Plan in the context of the Creditor Protection Proceedings and as a result Nortel's current expectations regarding such obligations in 2009 are uncertain at this time and are subject to change. We established the CIC Plan in order to provide certain arrangements, including cash payments, accelerated vesting of equity awards, and continuation of health and other benefits, for certain executives whose employment with Nortel is terminated as a result of change in control. In order to reinforce and encourage the continued attention and commitment of executives under potentially disruptive business circumstances, the CIC Plan provides the arrangements noted above to certain executives where both of the following conditions have been met: (i) a change in control of NNC; and (ii) the participant's employment has been terminated or his or her roles and responsibilities have been substantially altered.

The CHRC determined eligibility for the CIC Plan based on the roles and responsibilities of each executive officer. In assessing whether an executive officer should participate under the CIC Plan, the CHRC considered, among other things, the critical nature of the individual's role to the business of Nortel and the importance of retention of the individual. The determination of participation in the CIC Plan by the CHRC was made independent of other compensation considerations, including total target compensation and its component parts. Each of the named executive officers currently participates in the CIC Plan. Mr. Zafirovski participates as President and Chief Executive Officer and is eligible for benefits described for chief executive officer participation. With the exception of Mr. Bandrowczak who was eligible for tier 2 participant benefits, the other named executive officers are eligible for benefits described for tier 1 executive participation. In addition to the CIC Plan, Nortel entered into arrangements with respect to benefits upon termination of employment with Messrs. Zafirovski, Binning, Carey and Nelson. Nortel enters into these additional arrangements where it is necessary to recruit an individual with essential skills and experience for the particular role. For additional information on these arrangements, see "Material Terms of Employment Agreements and Arrangements with Named Executive Officers".

*Indemnification Agreements*

Pursuant to indemnification agreements entered into between NNC, NNL and each Board- appointed officer, including the named executive officers, NNC and NNL have agreed to indemnify and reimburse each officer for all injury, liability, loss, damage, charge, cost, expense, fine or settlement amount reasonably incurred by such officer, including reasonable legal and other professional fees:

> in connection with a claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, investigation, inquiry, hearing or other proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise, made, asserted against or affecting such officer or in which such officer is required by law to participate or in which such officer participates at the request of NNC or NNL or in which such director chooses to participate, if it relates to, arises from, or is based on such individual's service as an officer of NNC or NNL or service as a director or officer of any entity of Nortel or any other entity at the request of NNC or NNL; or

> otherwise related to, arising from or based on such individual's service as an officer of NNC or NNL or service as a director or officer of any entity of Nortel or any other entity at the request of NNC or NNL,

except if such indemnification or reimbursement would be prohibited by the CBCA, or any other applicable law.

The initial order of the Canadian Court in the CCAA Proceedings ordered the Canadian Debtors to indemnify directors and officers for claims that may be made against them relating to failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations. The initial order also included a charge in an aggregate amount not exceeding CAD$90 million as security for such indemnification obligations.

*Enhanced Severance Plan*

The Nortel Networks Enhanced Severance Allowance Plan (the ESAP) provides for a select group of management and highly compensated employees of NNI or any other U.S. subsidiary or affiliate of Nortel to receive severance benefits upon the termination of their employment. Employees with at least three months of service and at the vice-

236

Table of Contents

president level or above as of the date of termination, are eligible to receive benefits if their employment is terminated:

involuntarily for any reason other than for conduct that was not in the best interests of the company or for failure to submit to or to pass a background check required by a customer

by voluntary resignation in direct response to a reclassification of his or her current position, unless the employee is offered and voluntarily accepts a different position with the company or a subsidiary or is offered and refuses a comparable position

as part of a reduction in Nortel's workforces, other than where the employee is offered and accepts another position with the company or an affiliate, or where the employee is offered and refuses a comparable position

Severance benefits under the ESAP are not available to employees who are transferred to new entities as part of a divestiture or spin- off of a business or to employees who are eligible for severance benefits under other Nortel severance plans or individual written agreements. Messrs. Carey, Bandrowczak and Lowe are eligible to participate in the ESAP. Mr. Nelson was eligible to participate in the ESAP until the date of his cessation of employment on December 31, 2008.

Under the ESAP, qualified participants receive a severance allowance of at least twelve months' of his or her base monthly salary (in each case offset by any statutorily required payments), distributed in bi- weekly payments over the duration of the severance allowance period, commencing after termination of employment. Additional severance allowance payments may be paid at the sole discretion of Nortel. The employee is also eligible to continue his or her coverage under the group term life insurance, accidental death and dismemberment insurance, FLEX benefits, and health insurance, all at the contribution rate of active employees.

In order to receive the severance benefits, unless otherwise waived by Nortel, the employee must execute a release of all claims against the company related to his or her employment, and must agree to comply with certain restrictive covenants. If the employee is subsequently reemployed by Nortel while receiving severance benefits, any remaining unpaid benefits cease. While Nortel's obligations arising under the ESAP will continue to be considered in the context of the Creditor Protection Proceedings, currently Nortel is not making payments or benefits under this plan.

*Pension Plans*

Nortel has maintained various employee pension plans in which the named executive officers are eligible to participate. Our employee pension programs have evolved over time in response to competitive market practice and while we continue to maintain a number of plans with active participants, many of these plans are closed to new entrants. In special cases, as with Mr. Zafirovski, we entered into special pension arrangements where we deemed it necessary to attract high- performing senior executives. Nortel continues to evaluate its pension and post retirement benefit obligations in the context of the Creditor Protection Proceedings and as a result, Nortel's current expectations regarding such obligations in 2009 and beyond are uncertain at this time and are subject to change. For information on Nortel's obligations under the pension plans, see the MD&A section of this report and note 9, "Employee benefit plans" of the accompanying audited consolidated financial statements.

**Policies and Guidelines**

The following policies and guidelines apply to the named executive officers, as well as to certain other executive officers and employees.

*Policy on Company Aircraft*

The CHRC had adopted a written policy regarding travel on company aircraft under which Nortel provided the company aircraft primarily for the safe and efficient travel of the president and chief executive officer and his senior management team. Following the Creditor Protection Proceedings, management grounded the company aircraft and on February 19, 2009, the CHRC formally revoked the policy on company aircraft effective January 22, 2009.

Under the policy, the president and chief executive officer had been authorized to use company aircraft for any business travel, travel for commuting purposes and limited personal travel as approved by the chair of the CHRC. The president and chief executive officer (or, at his discretion, his designee) was required to approve the personal

237

HIGHLY CONFIDENTIAL