**Table of Contents**

use of company aircraft for all employees, including the other named executive officers. The CHRC reviewed company aircraft usage on an annual basis and such usage is disclosed in accordance with applicable securities laws as required. Taxable benefits that arose from travel on the company aircraft were calculated and reported in the employee's compensation, as required. Taxable benefits related to travel on company aircraft were grossed up if required in accordance with an employment agreement, under applicable corporate policy or as approved by the CHRC.

*Policy on Award of Equity- Based Compensation*

The CHRC has a written policy on awards of equity- based compensation under which all equity awards approved by the CHRC must be:

approved at a meeting that occurs on or prior to the grant date for the award;

made in accordance with the applicable equity incentive plan, securities law and stock exchange requirements; and

unless otherwise determined by the CHRC: (i) for annual awards, have an effective grant date that is at least two complete business days after the filing by NNC and NNL with the SEC of their Annual Report on Form 10- K and that is otherwise during a window period under our applicable corporate policy; and (ii) for awards made for other valid business reasons, have an effective grant date that is during a window period under our applicable corporate policy.

The CHRC has also delegated authority to the president and chief executive officer to award equity awards to any employee who is not an officer of Nortel in an amount of up to 20,000 stock options and up to 10,000 RSUs or PSUs in any fiscal year. Under the equity policy, such awards must also be approved on or prior to the grant date for the award, must be made in accordance with the applicable equity incentive plan, securities law and stock exchange requirements and, unless otherwise determined by the chair of the CHRC, must comply with the provisions concerning the effective grant date under the equity policy. In addition, the president and chief executive officer must report any grants made pursuant to this delegation to the CHRC on a quarterly basis. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

*Policy on Recoupment of Incentive Compensation*

The CHRC has a written policy regarding the recoupment of incentive compensation. The recoupment policy was adopted in order to establish and reserve the right of Nortel to recoup incentive compensation payments under certain conditions. This right exists in respect of plan years from January 1, 2007 and equity awards granted on or after January 1, 2007, and may be enforced against any employees who have been designated by the CHRC (initially all directors, senior executives and other reporting insiders under Canadian securities laws) in circumstances involving intentional misconduct that contributes, directly or indirectly, to an error in financial information that materially affects the value of such incentive compensation realized by the employee. If the CHRC determines that an employee committed such intentional misconduct, Nortel is entitled to issue proceedings to recover damages against that employee in respect of any losses incurred or as a result of or in connection with that intentional misconduct. Nortel may, under the recoupment policy, recoup any incentive compensation as an advance against such damages, whether or not proceedings are issued by Nortel. Incentive compensation payments that Nortel may recoup include all sales and incentive compensation, equity- based compensation, bonus payments and any matching pension plan payments made by Nortel.

*Share Ownership*

Nortel's share ownership guidelines for senior executives and other reporting insiders for 2008 were intended to ensure that management had the same interests as shareholders in the value of NNC common shares. The settlement of the long- term incentive awards in NNC common shares was intended to serve as a means for management to achieve share ownership guidelines. Executive officers and senior employees have been expected to accumulate and

238

Table of Contents

hold, over a period of five years from the date of their appointment or the date the executive officer or senior employee enters a new salary threshold, NNC shares having a value proportionate to their base salary. On May 31, 2007, the CHRC approved the requirement that executive officers hold 50% of all settled vested equity awards (including stock options, RSUs and PSUs) remaining after the payment of taxes and administrative fees associated with the award and the vesting (including the applicable exercise price) towards the maintenance and achievement of the share ownership guidelines. Nortel has reviewed the guidelines from time to time in order to adjust them to reflect market conditions and competitive practice among the comparator companies. The guidelines for 2008, which have been in place since July 2004, are as follows:

| Base Salary Range in US/CAD Dollars | Percentage of Salary |
|---|---|
| Chief Executive Officer | 500% |
| $400,000 and up | 300% |
| $300,000 to $399,999 | 200% |
| $200,000 to $299,999 | 100% |
| $100,000 to $199,999 | 50% |
| $0 to $99,999 | 0% |

Given the Creditor Protection Proceedings, the decreased value of NNC common shares and the equity termination order, the CHRC acknowledged on February 19, 2009 the current inability of the senior executives and other reporting insiders to meet the share ownership guidelines and determined to revisit the guidelines as appropriate at a later date.

**Tax and Accounting Effects**

Section 162(m) of the Code limits the deductibility from U.S. taxable income of certain types of compensation in excess of $1.0 million paid by a "publicly held corporation" to certain of its executive officers. This limitation generally applies to all compensation other than that which is considered to be "performance- based" for purposes of the Code. This limitation does not apply to awards made under Nortel's stock option plans or certain awards under the 2005 SIP. Certain of our other programs, although based on the performance of Nortel and the individual, may not be considered "performance- based" for purposes of Section 162(m) of the Code. We have determined that it is not appropriate at this time to limit our discretion to design compensation arrangements for executive officers to qualify such compensation for exemption from the deduction limits of Section 162(m) of the Code.

Nortel has been using the fair value method to account for its long- term incentive awards in accordance with FAS 123R (disregarding the estimate of forfeitures related to service- based vesting conditions) since January 1, 2003; however, FAS 123R only became effective as of the first annual period beginning after June 15, 2005. The effective date for Nortel's adherence to FAS 123R was therefore January 1, 2006. All of our long- term incentive awards were subject to the provisions of FAS 123R.

Although the tax and accounting impacts are considered by the CHRC upon approval of compensation planning for the named executive officers, these impacts are not weighted heavily with regard to our compensation decisions.

**Performance Evaluations**

Nortel undertakes corporate- wide individual performance reviews each year generally commencing in the last fiscal quarter. The purpose of the evaluations is to evaluate and reward performance for a given fiscal year, and for compensation planning and development purposes for the next fiscal year. The CHRC, in conjunction with the president and chief executive officer, annually reviews and assesses the performance of all executive officers who report to the president and chief executive officer and reports findings and recommendations to the Nortel Boards. The president and chief executive officer and his delegates review and assess the performance of all other executive officers. Recommendations based on these reviews, including with respect to base salary and short- term and long- term incentive amounts, are presented to the CHRC for approval. The CHRC has full discretion to modify any compensation recommendations.

239

**Table of Contents**

The Nortel Boards have directed that the president and chief executive officer's compensation is to be determined by the independent directors of the Nortel Boards, together with the CHRC, based on the CHRC's assessment of the performance of the president and chief executive officer. The CHRC reviews and approves the corporate goals and/or performance objectives relevant to the compensation of the chief executive officer, evaluates the performance of the president and chief executive officer in light of such goals and objectives and, together with other independent directors of the Nortel Boards, determines and approves the compensation of the chief executive officer based on such evaluation.

For the main elements of the compensation paid to the named executive officers in 2008, performance evaluations factored as follows:

| | |
|---|---|
| Base Salary | Evaluation of 2007 performance was a factor in determining whether to increase base salary for 2008. |
| Short- Term Incentives | Individual performance objectives for the 2008 short- term incentive program were set at the beginning of 2008 and reviewed in early 2009. |
| | While historically individual performance evaluations were taken into account in granting cash bonuses under the Incentive Plan, the CHRC decided not to approve any payout under the Incentive Plan for 2008 under the current circumstances. |
| Long- Term Incentives | The amount of the long- term incentives awarded to the named executive officers in 2008 was determined as a result of an evaluation of their 2007 performance and their personal effectiveness, as well as the size and nature of their roles and responsibilities for 2008. |

**The Role of Management and Consultants in Nortel's Named Executive Officer Compensation Program**

*The Role of Management*

Management prepared various presentations in advance of CHRC meetings held during 2008 and, at the direction of the chair of the CHRC, provided those presentations to HCI. Prior to the CHRC meetings, management met with HCI, where required, in order to address any questions or issues raised by them. Mr. Zafirovski attended all CHRC meetings but was not present when his own compensation was discussed or approved. Mr. Carey and certain other members of senior management were invited to attend CHRC meetings where appropriate. As discussed above, performance evaluations for all executive officers reporting to Mr. Zafirovski, including the named executive officers, were conducted by Mr. Zafirovski and reported to the CHRC. The chair of the Nortel Boards coordinated a performance evaluation by each independent director of the Nortel Boards for Mr. Zafirovski.

*CHRC's Independent Compensation Consultant*

Effective July 1, 2007, the CHRC retained HCI to assist the CHRC in connection with the review of current and future executive compensation and benefit programs of Nortel, including analyzing management proposals and providing related advice and recommendations to the CHRC, consistent with best practices, market trends and the latest legal and regulatory considerations. During 2008, HCI has advised the CHRC on various matters including proposed amendments to the 2005 SIP and stock purchase plans, president and chief executive officer compensation, executive compensation and benefits programs, comparator group review, and the design of the long- term incentive component and compensation levels of executive officer candidates. HCI has not been engaged by Nortel to provide any services other than the services performed as the independent compensation consultant to the CHRC.

HCI attended a majority of the CHRC meetings held during 2008. At the direction of the chair of the CHRC, management provided HCI with various presentations related to their mandates in advance of CHRC meetings. While HCI took directions from the CHRC on performing such services, the CHRC did not direct HCI on the manner or method undertaken by them to reach their independent opinions. Prior to certain CHRC meetings, management and HCI met in order to address any questions or issues raised by management or HCI. From time to time, HCI conferred with Mr. Zafirovski as directed by the chair of the CHRC concerning material compensation matters. Mr. Zafirovski did not provide input in regards to his own compensation to the CHRC or HCI. At the final presentation by management at the CHRC meeting, HCI reported the results of its work and provided its independent opinions to the CHRC notwithstanding any prior consultation with management before such meeting.

240

Table of Contents

Final determinations made by the CHRC have reflected information and consideration in addition to the information and recommendations provided by HCI. HCI earned CAD$129,124 in 2008 for its work related to the executive compensation program.

*Management's Compensation Consultant*

Mercer is engaged by Nortel to provide consulting services to senior management on executive and employee compensation matters. During 2008, Mercer advised management on matters such as market competitive levels of executive remuneration as well as trends in program strategy and design. Mercer worked with management at the 2008 annual meeting of NNC's shareholders in developing the request for additional NNC common shares for issuance under the 2005 SIP and for purchase under the stock purchase plans, reviewed the peer comparator companies, analyzed industry trends in compensation program design and structure and provided ongoing support to the management team in areas related to the administration and design of the compensation program. On May 6, 2008, Mercer presented to the CHRC a review of the comparator companies and proposed changes to the comparator companies, which changes were approved by the CHRC. Aside from the May 6, 2008 meeting, Mercer did not have contact with any members of the Nortel Boards or the CHRC over the course of its work during 2008. Additionally, other than proposed revisions to the comparator companies, Mercer did not directly make any recommendations to the CHRC regarding compensation decisions made by management during 2008. Mercer earned $418,695 in 2008 for its work related to the executive compensation program. In addition, Mercer was engaged by Nortel to provide various services in the areas of employee compensation, retirement and benefits consulting and administration. Further, the Nominating and Governance Committee retained a separate Mercer team to assist in the review of independent director compensation.

Following the Petition Date, Mercer has been providing consulting services to Nortel regarding compensation practices for companies undergoing restructuring. In particular, Mercer is working with management in developing retention and incentive compensation for key eligible employees, as well as the Incentive Plan for 2009.

**Reported Versus Received Pay**

Given the complexity of disclosure requirements concerning executive compensation, and in particular with respect to the standards of financial accounting and reporting related to equity compensation, there is a difference between the compensation that is reported in the "Summary Compensation Table for Fiscal Year 2008" versus that which was actually paid to and received by the named executive officers for 2008. The amounts in the "Summary Compensation Table for Fiscal Year 2008" reflecting Nortel's accounting expense for awards do not correspond to the actual value that would have been realized, if any, by the named executive officers if all outstanding equity awards had not been terminated pursuant to the equity termination order.

As discussed above, the Nortel Boards determined not to pay any bonuses under the Incentive Plan for 2008 to any participating employees, including any named executive officers, and all outstanding equity awards (including stock options, RSUs and PSUs), whether vested or unvested, have been terminated in accordance with the equity termination order. As established in early 2008, the intended value of Mr. Zafirovski's total target compensation for 2008 was approximately $10,675,000. However, with respect to amounts equal to approximately $7,500,000 (representing the intended value of his long- term incentives) and approximately $1,905,000 (representing his projected 2008 bonus under the Incentive Plan), he will realize no actual value. For 2008, Mr. Zafirovski actually realized $1,287,093 in total cash compensation (being his intended base salary of $1,270,000 following currency conversion), which represents approximately 12% of the value of his intended compensation.

241

HIGHLY CONFIDENTIAL

Table of Contents

**Summary Compensation Table for Fiscal Year 2008**

The following table sets forth the compensation awarded to, earned by, or paid to each of Nortel's named executive officers for services rendered by them to Nortel during the 2008 fiscal year. Nortel's obligations concerning named executive officer compensation will continue to be reviewed in the context of Creditor Protection Proceedings.

| Name and Principal Position | Year | Salary($) | Bonus($) | Stock Awards ($)(1) | Option Awards ($)(1) | Non- Stock Incentive Plan Compensation($)(2) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)(3) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| M.S. Zafirovski | 2008 | 1,287,093(5) | - | 3,790,711 | 3,776,410 | - | 455,932 | 378,466(5) | 9,688,612 |
| President and | 2007 | 1,272,941(5) | - | 3,307,423 | 3,116,588 | 1,288,853(5) | 698,714 | 378,559(5) | 10,063,078 |
| Chief Executive Officer | 2006 | 1,198,991(5) | - | 1,873,624 | 2,279,594 | 1,174,263(5) | 690,396 | 1,060,553(5) | 8,277,421 |
| P.S. Binning | 2008 | 643,490(5) | - | 457,110 | 93,977 | - | - | 381,490(5) | 1,576,067 |
| Executive Vice- President, Chief Financial Officer and Chief Restructuring Officer | 2007 | 97,191(5) | - | 38,966 | - | - | - | 17,438(5) | 153,595 |
| D.J. Carey | 2008 | 550,000 | - | 1,199,234 | 901,739 | - | 2,600 | 433,245(5) | 3,086,818 |
| Executive Vice- President, Corporate Operations | 2007 | 550,000 | - | 965,766 | 206,382 | 357,500 | 22,539 | 583,825(5) | 2,686,012 |
| S.J. Bandrowczak Chief Information Officer(6) | 2008 | 425,000 | 500,000(7) | 272,274 | 24,492 | - | - | 1,230,017 | 2,451,783 |
| W.K. Nelson Former Executive Vice- President, Global Sales(8) | 2008 | 524,094(9) | - | 1,449,000 | 215,881 | - | - | 55,985 | 2,244,960 |
| R.S. Lowe | 2008 | 500,000 | - | 944,513 | 677,611 | - | - | 11,122 | 2,133,246 |
| President, Carrier | 2007 | 500,000(10) | - | 864,003 | 836,007 | 250,000 | 346,497(11) | 3,691 | 2,800,198 |
| Networks | 2006 | 494,656(10) | - | 466,544 | 689,196 | 225,000 | 342,821(11) | 9,000 | 2,227,217 |

(1) Amounts set forth in the "Stock Awards" and "Option Awards" columns represent the respective amounts recognized as compensation expense by Nortel for financial statement reporting purposes in fiscal years 2008, 2007 and 2006 with respect to outstanding RSU and PSU awards and stock option awards, respectively, in accordance with FAS 123R. A discussion of the assumptions used in this valuation with respect to awards made in fiscal year 2008 may be found in note 20, "Share- based compensation plans" to the accompanying audited consolidated financial statements. A discussion of the assumptions used in this valuation with respect to awards made in fiscal years 2006 and 2007 may be found in the corresponding notes to the audited consolidated financial statements for the fiscal year in which the award was made. The following table sets forth the amount out of the total in the 2008 "Stock Awards" and "Option Awards" column that is compensation cost related to awards granted in early 2008 and certain specified instances of accelerated compensation cost recognition.

242

Table of Contents

| Name | Year | Stock Awards ($) | Option Awards ($) |
|---|---|---|---|
| M.S. Zafirovski | 2008 | 284,832 | 464,005 |
| P.S. Binning | 2008 | 154,064 | 93,977 |
| D.J. Carey[a] | 2008 | 147,353 | 431,761 |
| S.J. Bandrowczak | 2008 | 40,130 | 24,492 |
| W.K. Nelson[b] | 2008 | 1,449,000 | 215,881 |
| R.S. Lowe[c] | 2008 | 100,398 | 294,365 |

[a]    Compensation cost reported for 2008 and 2007 also reflects accelerated recognition of compensation cost for stock options granted in 2008 and 2007 due to retirement eligibility as of the first fiscal quarter of 2009.

[b]    Compensation cost reported for 2008 reflects accelerated recognition of compensation cost for stock awards and stock options granted in 2008. Mr. Nelson's severance period began effective January 1, 2009. The severance period does not represent a substantive service requirement. As all performance conditions have been completed, compensation costs have been accelerated.

[c]    Compensation cost reported for 2008, 2007 and 2006 also reflects accelerated recognition of compensation cost for stock options granted in 2008, 2007 and 2006, respectively, due to retirement eligibility.

Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

(2)    Represents incentive cash awards earned under the Incentive Plan. No cash awards were paid under the Incentive Plan for 2008.

(3)    Represents the aggregate increase in the actuarial present value of accumulated benefits under the defined benefit and actuarial pension plans (including supplemental plans) from the plan measurement date used for financial statement reporting purposes with respect to the prior completed fiscal year to the plan measurement date used for financial statement reporting purposes with respect to the covered fiscal year. Due to a change in the plan measurement date required by the FASB in SFAS 158, the change in pension value has been calculated as the difference in present value of accrued benefits between September 30, 2007 and December 31, 2008 divided by 1.25, as follows:

| Name | Year | Plan Name | Amount ($) |
|---|---|---|---|
| M.S. Zafirovski | 2008 | Special Pension Benefit Arrangement | 455,932 |
| | 2007 | Special Pension Benefit Arrangement | 698,714 |
| | 2006 | Special Pension Benefit Arrangement | 690,396 |
| D.J. Carey | 2008 | Nortel Networks Retirement Income Plan | (466) |
| | | Nortel Networks Restoration Plan | 3,066 |
| | 2007 | Nortel Networks Retirement Income Plan | 6,219 |
| | | Nortel Networks Restoration Plan | 16,320 |
| R.S. Lowe | 2008 | Nortel Networks Retirement Income Plan | 37,487 |
| | | Nortel Networks Restoration Plan | 51,632 |
| | | Nortel Networks Managerial and Non-Negotiated Pension Plan | (181,582) |
| | | Nortel Networks Excess Plan | 22,328 |
| | | Nortel Networks Transitional Retirement Allowance Plan | (806) |
| | 2007 | Nortel Networks Retirement Income Plan | 16,970 |
| | | Nortel Networks Restoration Plan | 8,630 |
| | | Nortel Networks Managerial and Non-Negotiated Pension Plan | 71,162 |
| | | Nortel Networks Excess Plan | 223,238 |
| | | Nortel Networks Transitional Retirement Allowance Plan | 26,497 |
| | 2006 | Nortel Networks Retirement Income Plan | 42,176 |
| | | Nortel Networks Restoration Plan | 49,763 |
| | | Nortel Networks Managerial and Non-Negotiated Pension Plan | 81,677 |
| | | Nortel Networks Excess Plan | 156,363 |
| | | Nortel Networks Transitional Retirement Allowance Plan | 12,842 |

HIGHLY CONFIDENTIAL

(4) In accordance with the SEC rules, for each named executive officer, the table below sets forth specific amounts for payments or reimbursements by Nortel in 2008 with respect to taxes, contributions to defined contribution

243

**Table of Contents**

plans, severance and perquisites exceeding the greater of $25,000 or 10% of his total perquisites and also identifies all other perquisites, including those having no incremental cost to Nortel:

| | |
|---|---|
| M.S. Zafirovski | financial planning fees ($26,201) and the incremental cost of personal travel on the company aircraft and commercial airlines ($83,391) |
| | tax preparation services, family travel on commercial airlines, business club membership, personal use of ground transportation and extension of work permit |
| | family/guests traveling with Mr. Zafirovski on the company aircraft and adding a personal leg to business travel, in each case at no cost to Nortel |
| | Nortel contributions under the Managerial and Non- Negotiated Pension Plan (Part III) defined contribution pension plan ($19,785) and the Nortel Networks Limited Investment Plan for Employees  Canada ($109,509) |
| | taxes pursuant to the tax- equalization provisions in his employment agreement ($83,298) |
| P.S. Binning | relocation expenses including temporary car lease ($251,336) |
| | tax preparation service and personal use of ground transportation |
| | Nortel contributions under the Managerial and Non- Negotiated Pension Plan (Part III) defined contribution pension plan ($12,826) |
| | taxes pursuant to the permanent relocation program provisions in his employment agreement and taxes paid on his behalf for a car lease benefit and for tax preparation service ($109,370) |
| D.J. Carey | relocation expenses ($62,252) |
| | tax preparation service |
| | Nortel contributions under the Nortel Networks Long- Term Investment Plan ($8,408) and the Nortel Networks Long- Term Investment Restoration Plan ($2,115) |
| | taxes pursuant to the tax- equalization provisions in his employment agreement and taxes paid on his behalf for tax preparation service ($355,836) |
| S.J. Bandrowczak | relocation expenses ($859,220) |
| | Nortel contributions under the Nortel Networks Long- Term Investment Plan ($11,004) and the Nortel Networks Long- Term Investment Restoration Plan ($11,630) |
| | taxes pursuant to the permanent relocation program provisions in his employment agreement ($348,163) |
| W.K. Nelson | Nortel contributions under the Nortel Networks Long- Term Investment Plan ($4,600) and the Nortel Networks Long- Term Investment Restoration |

Plan ($5,077)

payments for accrued and unused vacation ($42,308) and reimbursement of independent legal advice ($4,000) made pursuant to the letter agreement dated November 27, 2008, concerning the cessation of his employment on December 31, 2008 following the commencement of the Creditor Protection Proceedings, no severance payments have been made to Mr. Nelson

R.S. Lowe

Nortel contributions under the Nortel Networks Long- Term Investment Plan ($4,600), and the Nortel Networks Long- Term Investment Restoration Plan ($4,615), and special contribution to the Nortel Networks Long- Term Investment Plan as a result of a class action settlement ($760)

taxes paid on his behalf for tax preparation service ($1,147)

Incremental cost of travel on the company aircraft was calculated based on the total direct (or variable) operating costs (fuel, maintenance labor, parts and materials, outside services, crew expenses, catering and commissary, handling, landing and navigation fees, maintenance reserves and miscellaneous expenses) in month traveled divided by the total flight hours of the aircraft during the month. The cost per flight hour was then multiplied by personal flight hours (including so- called "deadhead flights" resulting from the plane returning empty to its home base after taking the executive to his or her destination, or for the aircraft traveling empty to a destination to pick up the executive).

(5)  Represents the U.S. Dollar equivalent of certain payments actually earned or paid in local currency. Amounts for the incremental cost of air travel in Canadian Dollars have been converted using the month- end exchange rate in effect during the applicable month of travel. Amounts representing relocation expenses and ground travel submitted in local currency have been converted using the exchange rate in effect at the time the expense is submitted for payment. All other compensation paid in Canadian Dollars has been converted using the average of the exchange rates in effect during 2008 equal to US$1.00 = CAD$1.0614, during 2007 equal to US$1.00 = CAD$1.0732 and during 2006 equal to US$1.00 = CAD$1.1343, respectively, other than Mr. Zafirovski's salary from November 13, 2006 until December 31, 2006, which was converted to U.S. Dollars using the average of the month- end exchange rates for November and December 2006 equal to US$1.00 = CAD$1.1455, and Mr. Binning's salary for 2007 which was converted to U.S. Dollars using the average of the month- end exchange rates for November and December 2007 equal to US$1.00 = CADS0.9849. Mr. Zafirovski did not receive a salary increase in 2007 or 2008. Since November 13, 2006, Mr. Zafirovski's base salary has been paid in Canadian Dollars, prior to which it was paid in U.S. Dollars. The increases reflected in the "Salary" column are attributable to this currency conversion.

244

**Table of Contents**

(6)   Effective January 1, 2009, Mr. Bandrowczak accepted a new role to lead Enterprise Sales for the Americas.

(7)   Represents a special bonus pursuant to his employment agreement of which $200,000 was paid within 30 days following commencement of employment on July 16, 2007 and $500,000 was paid within 30 days following the one year anniversary of his commencement of employment. The $500,000 bonus was paid on July 18, 2008 in accordance with the agreement.

(8)   On November 10, 2008, Nortel announced Mr. Nelson's departure effective December 31, 2008.

(9)   Mr. Nelson's base salary was $550,000. This amount reflects the amount earned from his commencement of employment on January 18, 2008 to his employment termination as of December 31, 2008.

(10)  Mr. Lowe's base salary was increased to $500,000 effective March 20, 2006. The difference in base salary showing from 2006 to 2007 reflects that Mr. Lowe did not earn a full year's base salary at this rate in 2006. He did not receive a salary increase in 2007 or 2008.

(11)  For Mr. Lowe, the pension benefit accrual in Nortel's U.S. pension plans (Retirement Income Plan and Restoration Plan) is impacted by his prior service with Nortel in Canada. This prior service was previously not reflected in the fiscal 2006 and 2007 disclosure.

**Material Terms of Employment Agreements and Arrangements with Named Executive Officers**

The following is a summary of the material terms of the employment agreements for the named executive officers. Nortel's obligations under these agreements will continue to be reviewed and considered in the course of the Creditor Protection Proceedings. For more information regarding the named executive officers' pension benefits and other post- employment compensation, see "Pension Benefits for Fiscal Year 2008" and "Potential Payments upon Termination or Change in Control" below.

*Mr. Zafirovski*

Nortel entered into an employment agreement in connection with Mr. Zafirovski's appointment as President and Chief Executive Officer effective November 15, 2005. Mr. Zafirovski's employment agreement provides for tax equalization so that his after- tax compensation will be the same as if he were a resident of the State of Illinois. Compensation for this purpose includes salary, short- term incentive awards, long- term incentives and benefits under Nortel's employee benefit plans (including the Nortel relocation plan) to the extent such benefits shall be considered income for tax purposes and any other similar payments or awards. We agreed to these arrangements in order to offset any negative tax consequences as a result of relocating to Toronto. His employment agreement further provides an annual reimbursement of up to $25,000 for financial planning, as well as tax preparation services. The agreement also provides that Mr. Zafirovski is eligible to participate in the Nortel employee benefit plans, including the Capital Accumulation and Retirement Program (CARP) and the Nortel relocation program, in accordance with the generally applicable terms of such plans, as well as the CIC Plan. As of November 2006, Mr. Zafirovski's relocation to Toronto was completed.

Mr. Zafirovski was eligible for a special lifetime annual pension benefit of $500,000, including a 60% joint and survivor benefit for his spouse. At the June 28, 2006 meeting of the CHRC, Mr. Zafirovski proposed a voluntary 29% reduction of this special lifetime annual pension benefit, in conjunction with changes announced on June 27, 2006 relating to our current pension programs in the United States and Canada. The CHRC accepted Mr. Zafirovski's proposal and recommended it to the Nortel Boards for approval. At a joint meeting of the Boards held on June 28, 2006, the Boards approved the voluntary reduction. As a result, Mr. Zafirovski became eligible for a special lifetime annual pension benefit of $355,000 per year rather than $500,000 per year. Mr. Zafirovski's eligibility for this special pension accrues after five years of active employment. The terms of his special pension benefit provide that the pension is payable monthly following retirement on or after age 60.

245

HIGHLY CONFIDENTIAL          NNC-NNL06001427 / 256

Table of Contents

Mr. Zafirovski's employment agreement provides that the termination of his employment at or after five years will also be treated as a retirement for purposes of the terms of all equity incentive awards granted to Mr. Zafirovski under Nortel's stock option plans.

*Mr. Binning*

Nortel entered into an employment agreement with Mr. Binning in connection with his appointment as Executive Vice- President and Chief Financial Officer effective November 12, 2007. Mr. Binning's employment agreement provides that, in conjunction with Nortel's 2008 annual integrated talent planning cycle, he would receive an award of long- term incentives valued at approximately $2,300,000 using Nortel's prescribed valuation method for equity vehicles applicable to senior executives of Nortel generally, in line with the 2008 long- term incentive program design approved by the CHRC and under and subject to the terms and conditions of the 2005 SIP (or any equivalent plan existing on the date thereof) and Nortel's policies and procedures at the time of grant. The intended value of the grant was converted to 119,900 stock options, 29,950 RSUs, 44,050 PSU- rTSRs and 44,050 PSU- Management OMs, which were awarded on March 3, 2008. The agreement also provides that Mr. Binning is eligible to participate in certain employee benefit plans, the Nortel relocation program and the CIC Plan in accordance with the generally applicable terms of such plans. As of July 2008, Mr. Binning's relocation to Toronto was completed.

*Mr. Carey*

Nortel entered into an employment agreement with Mr. Carey in connection with the change in Mr. Carey's primary business location from Toronto, Ontario to Alpharetta, Georgia effective June 23, 2008. His primary business location was changed after considering both the needs of Nortel and Mr. Carey's personal situation. This agreement updates and replaces the terms and conditions of the previous letter between Nortel and Mr. Carey. Under the agreement, Mr. Carey is eligible to participate in certain employee benefit plans and the CIC Plan in accordance with the generally applicable terms of such plans. All benefits for which Mr. Carey was eligible as a result of his business office being in Toronto, Ontario, including tax equalization, ceased upon the commencement of his primary business office in Alpharetta, Georgia on June 23, 2008.

*Mr. Bandrowczak*

Nortel entered into an employment agreement with Mr. Bandrowczak in connection with his appointment as Chief Information Officer effective July 16, 2007. As described above under "Special One- Time Awards", Mr. Bandrowczak was entitled under the agreement to receive a special bonus of $700,000, with $200,000 to be paid within 30 days following commencement of employment and $500,000 to be paid within 30 days following the one year anniversary of the commencement of his employment. The agreement also provides that Mr. Bandrowczak is eligible to participate in the long- term incentive program and certain employee benefit plans, the Nortel relocation program and the CIC Plan in accordance with the generally applicable terms of such plans.

Effective January 1, 2009, Mr. Bandrowczak accepted a new role to lead Enterprise Sales for the Americas. In connection with this new role, Nortel entered into a new employment agreement which provides for continuation of all existing compensation and benefit arrangements with the exception of his participation in the Incentive Plan. Due to the scope and nature of his new role, Mr. Bandrowczak instead participates in Nortel's Sales Incentive Plan effective January 1, 2009, with a target award of $347,728.

*Mr. Nelson*

Nortel entered into an employment agreement with Mr. Nelson in connection with his appointment as Executive Vice- President, Global Sales as of January 14, 2008. On November 10, 2008, Nortel announced Mr. Nelson's departure effective December 31, 2008. Nortel entered into a letter agreement with Mr. Nelson concerning the cessation of his employment.

Under his original employment agreement, Mr. Nelson was entitled to receive a new hire, one- time grant of RSUs with an intended value of approximately $5,250,000 and a further long- term incentive award valued at no less than approximately $2,200,000 in connection with the 2008 long- term incentive award. Both grants were awarded on March 3, 2008 and were awarded using Nortel's prescribed valuation method for equity vehicles applicable to senior

246

**Table of Contents**

executives of Nortel generally and under and subject to the terms and conditions of the 2005 SIP and Nortel's policies and procedures at the time of grant. The intended value of the new hire grant was converted to a long- term incentive award of 402,250 RSUs with a five year vesting term in order to further encourage retention. In recognition of the potential forfeiture of the annual bonus to be provided by Mr. Nelson's previous employer, Nortel also agreed as a term of the employment agreement to pay an amount up to a maximum of $400,000 in recognition of the forfeiture and an amount up to a maximum of an additional $200,000 in recognition of the forfeiture of the variable component of the annual bonus. These payments were conditioned on commencement of employment, satisfactory evidence of forfeiture and continued satisfactory performance of his employment responsibilities. Mr. Nelson did not provide evidence of forfeiture and the special payments were not paid. Under the terms of the agreement Mr. Nelson was eligible to participate in certain employee benefit plans, the Nortel relocation program and the CIC Plan in accordance with the generally applicable terms of such plans. His original agreement also contained an involuntary separation provision which provided that if Mr. Nelson's separation of employment was initiated by Nortel or if he were to initiate his separation of employment because his responsibilities or authority were involuntarily changed or not substantially equivalent to his current role, he would have been provided in lieu of any other payment or benefit with the following:

the equivalent of 18 months base salary paid bi- weekly; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is enrolled for 18 months following employment termination at active employee rates.

The foregoing payments and benefits would not be provided to Mr. Nelson if his separation of employment arose out of conduct and/or inaction by Mr. Nelson that was not in the best interest of Nortel. All payments and benefits were conditional on Mr. Nelson's execution of a separation agreement. If payments had been made to Mr. Nelson under the CIC Plan as described above, he would have been ineligible for the payments and benefits under this provision of his employment agreement.

The letter agreement concerning the cessation of his employment provides for the following: (i) payment of a severance allowance pursuant to the ESAP from January 1, 2009 through June 30, 2010 paid in a bi- weekly amount of $21,154; (ii) an election to continue to participate in certain health and life insurance benefits for the duration of the severance period provided that Mr. Nelson pay the applicable employee contribution rates; (iii) no eligibility for consideration for future grants of stock options, RSUs or PSUs; (iv) continuation of his rights with respect to those stock options and RSUs previously granted in accordance with the applicable equity plans and instrument of grant/award; (v) forfeiture of all previously granted PSUs; (vi) senior executive outplacement services; (vii) income tax preparation service for the tax years 2008, 2009 and 2010; (viii) determination of his eligibility for an Incentive Plan payment for 2008; and (ix) payment of the cost of independent legal advice relating to this agreement to a maximum of $4,000. The agreement also provides that Nortel will provide indemnification in accordance with applicable Canadian law and NNC's by- laws. Mr. Nelson is subject to certain non- disclosure and non- compete obligations under the terms of the agreement. Following the commencement of the Creditor Protection Proceedings, no severance payments have been made to Mr. Nelson.

*Mr. Lowe*

Mr. Lowe is an experienced executive who has been employed by Nortel since June 1980. He is eligible to participate in certain employee benefit plans and the CIC Plan in accordance with the generally applicable terms of such plans.

247

HIGHLY CONFIDENTIAL

Table of Contents

**Grants of Plan- Based Awards in Fiscal Year 2008**

The following table sets forth information concerning equity awards granted by Nortel to the named executive officers under the 2005 SIP during the 2008 fiscal year and the possible payouts to the named executive officers under the Incentive Plan for the 2008 fiscal year. On February 20, 2009, the NNL Board of Directors determined not to pay any bonuses under the Incentive Plan for 2008 to any participating employee, including any named executive officer, in accordance with the recommendation of the CHRC and management. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. For a description of the material terms of the 2005 SIP, see "Nortel 2005 Stock Incentive Plan" in the Equity- Based Compensation Plans section below. For a description of the material terms of the Incentive Plan see above under "Short- Term Incentives".

| Name | Grant Date/ Corporate Approval Date (2) | Estimated Possible Payouts under Non- Equity Incentive Plan Awards(1) | | Estimated Future Payouts under Equity Incentive Plan Awards(1) | | | All Other Stock Awards: Number of Shares of Stock or Units (#)(1) | All Other Option Awards: Number of Securities Underlying (#)(1) | Exercise or Base Price of Option Awards ($/Sh)(3) | Closing Price on Grant Date ($) | Grant Date Fair Value of Stock and Option ($)(4) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Target ($) | Max ($) | Threshold (#) | Target (#) | Max(#) | | | | | |
| M.S. Zafirovski | March 3 / February 22 | - | - | - | - | - | - | 691,000 | 8.31(5) | 8.05 | 2,326,844 |
| | March 3 / February 22 | - | - | 72,000 | 144,000 | 288,000 | - | - | - | - | 996,912 |
| | March 3 / February 22 | - | - | 14,400 | 144,000 | 288,000 | - | - | - | - | 1,159,200 |
| | - | 1,930,639(6) | 3,861,278(6) | - | - | - | - | - | - | - | - |
| P.S. Binning | March 3 / February 21 | - | - | - | - | - | - | 119,900 | 8.31(5) | 8.05 | 451,335 |
| | March 3 / February 21 | - | - | - | - | - | 29,950 | - | - | - | 241,098 |
| | March 3 / February 21 | - | - | 22,025 | 44,050 | 88,100 | - | - | - | - | 304,958 |
| | March 3 / February 21 | - | - | 4,405 | 44,050 | 88,100 | - | - | - | - | 354,603 |
| | - | 643,490(6) | 1,286,979(6) | - | - | - | - | - | - | - | - |
| D.J. Carey | March 3 / February 21 | - | - | - | - | - | - | 114,700 | 8.31 | 8.05 | 431,761 |
| | March 3 / February 21 | - | - | - | - | - | 28,650 | - | - | - | 230,633 |
| | March 3 / February 21 | - | - | 21,063 | 42,125 | 84,250 | - | - | - | - | 291,631 |
| | March 3 / February 21 | - | - | 4,213 | 42,125 | 84,250 | - | - | - | - | 339,106 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 550,000 | 1,100,000 | | | | | | | | |

248

## Table of Contents

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S.J. Bandrowczak | March 3 / | - | - | - | - | - | - | 31,250 | 8.31 | 8.05 | 117,633 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | - | - | - | 7,800 | - | - | - | 62,790 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | 5,738 | 11,475 | 22,950 | - | - | - | - | 79,441 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | 1,148 | 11,475 | 22,950 | - | - | - | - | 92,374 |
| | February 21 | | | | | | | | | | |
| | - | 340,000 | 680,000 | - | - | - | - | - | - | - | |
| W.K. Nelson [7] | March 3 / | - | - | - | - | - | - | 114,700 | 8.31 | 8.05 | 431,761 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | - | - | - | 430,900 | - | - | - | 3,468,745 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | 21,063 | 42,125 | 84,250 | - | - | - | - | 291,631 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | 4,213 | 42,125 | 84,250 | - | - | - | - | 339,106 |
| | February 21 | | | | | | | | | | |
| | - | 550,000 | 1,100,000 | - | - | - | - | - | - | - | |
| R.S. Lowe | March 3 / | - | - | - | - | - | - | 78,200 | 8.31 | 8.05 | 294,366 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | - | - | - | 19,500 | - | - | - | 156,975 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | 14,363 | 28,725 | 57,450 | - | - | - | - | 198,863 |
| | February 21 | | | | | | | | | | |
| | March 3 / | - | - | 2,873 | 28,725 | 57,450 | - | - | - | - | 231,236 |
| | February 21 | | | | | | | | | | |
| | - | 500,000 | 1,000,000 | - | - | - | - | - | - | - | |

(1) On February 20, 2009, the NNL Board of Directors determined not to pay any bonuses under the Incentive Plan for 2008 to any participating employee, including any named executive officer, in accordance with the recommendation of the CHRC and management. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

(2) Grants were approved by the CHRC at its February 21, 2008 meeting in accordance with the equity policy. The grant to Mr. Zafirovski was approved at the February 22, 2008 Board meeting also in accordance with the equity policy. These grants were approved with a March 3, 2008 effective date provided that the window period open in accordance with applicable corporate policy as a result of the filing of financial statements for the year ended December 31, 2007. All 2008 long- term incentives were awarded in accordance with the 2005 SIP and applicable securities laws and stock exchange requirements.

(3) Stock options were awarded at an option price not less than the "market value" (as determined in accordance with the 2005 SIP) of an NNC common share on the grant date. For a description of the methodology of determining the exercise price, see the Equity- Based Compensation Plans section below.

(4) Aggregate grant date fair values computed in accordance with FAS 123R. For a detailed description of the assumptions made in the valuation of stock options, RSUs and PSUs, see note 20, "Share- based compensation plans" to the accompanying audited consolidated financial statements.

(5) Canadian grants issued with an exercise price of CAD$8.21. Table reflects equivalent U.S. Dollar exercise price converted using the March 3, 2008 Bank of Canada noon rate of exchange rate of US$1.00 = CAD$.9870.

(6) Amounts have been converted using the average of the exchange rates in effect during 2008 equal to US$1.00 = CAD$1.0614.

249

HIGHLY CONFIDENTIAL

NNC-NNL06001427 / 260

Table of Contents

(7)  On November 10, 2008, Nortel announced Mr. Nelson's departure effective December 31, 2008.

**Outstanding Equity Awards at End of Fiscal Year 2008**

The following table sets forth information regarding unexercised options, RSUs that have not vested, and unearned PSUs outstanding for each named executive officer as of December 31, 2008. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($)(1) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($)(2) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(2)(3) |
| M.S. Zafirovski | 300,000 | 200,000(4) | 31.00 | November 14, 2015 | 90,600(5) | 23,556 | - | - |
| | 83,750 | 83,750(6) | 21.20 | June 13, 2016 | - | - | -(7) | - |
| | 67,250 | 201,750(8) | 25.82(9) | March 20, 2017 | - | - | 67,000(10) | 17,420 |
| | - | 592,000(11) | 8.31(12) | March 2, 2018 | - | - | 86,400(13) | 22,464 |
| P. S. Binning | - | - | - | - | 64,800(14) | 16,848 | - | - |
| | - | 119,900(15) | 8.31(12) | March 2, 2018 | 29,950(16) | 7,787 | 26,430S | 6,872 |
| D.J. Carey | 12,500 | 12,500(17) | 21.20 | June 13, 2016 | 22,500(18) | 5,850 | -(7) | - |
| | 12,500 | 37,500(19) | 25.82 | March 20, 2017 | 16,667(20) | 4,333 | 12,500(10) | 3,250 |
| | - | 114,700(21) | 8.31 | March 2, 2018 | 28,650(22) | 7,449 | 25,275S | 6,572 |
| S.J. Bandrowczak | - | 31,250(24) | 8.31 | March 2, 2018 | 15,867(23) | 4,125 | 5,900(10) | 1,534 |
| | - | - | - | - | 7,800(25) | 2,028 | 6,885S | 1,790 |
| W.K. Nelson | - | 114,700(26) | 8.31 | March 2, 2018 | 430,900(27) | 112,034 | 25,275S | 6,572 |
| R.S. Lowe | 1,600 | - | 155.33 | January 27, 2009 | - | - | - | - |
| | 2,666 | - | 71.60 | November 29, 2009 | - | - | - | - |
| | 2,666 | - | 71.60 | January 26, 2010 | - | - | - | - |
| | 1,333 | - | 71.60 | June 28, 2010 | - | - | - | - |
| | 4,000 | - | 71.60 | September 27, 2010 | - | - | - | - |
| | 4,000 | - | 71.60 | January 24, 2011 | - | - | - | - |
| | 15,000 | - | 51.50 | February 27, 2012 | - | - | - | - |
| | 56,250 | 18,750(28) | 31.80 | September 6, 2015 | - | - | - | - |
| | 12,500 | 12,500(29) | 21.20 | June 13, 2016 | 5,834(30) | 1,517 | -(7) | - |
| | 9,600 | 28,800(31) | 25.82 | March 20, 2017 | 12,800(32) | 3,328 | 9,600(10) | 2,496 |
| | - | 78,200(33) | 8.31 | March 2, 2018 | 19,500(34) | 5,070 | 17,235(13) | 4,481 |

(1)  Historical exercise prices have been adjusted to reflect the 1- for- 10 consolidation of NNC's issued and outstanding common shares effective December 1, 2006.

(2)  The market value was computed by multiplying the closing market price of NNC common shares on the NYSE on December 31, 2008 of $0.26 by the number of NNC common shares or units held.

(3)  The number of unearned PSUs is based on a threshold payout. For PSU- Management OMs the threshold payout is 10% of the award. For PSU- rTSRs the threshold

250

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 262

**Table of Contents**

payout is 50% of the award.

(4)   100,000 options were to vest on each of November 15, 2009 and November 15, 2010.

(5)   45,300 RSUs were to vest on each of November 15, 2009 and November 15, 2010.

(6)   41,875 options were to vest on each of June 14, 2009 and June 14, 2010.

(7)   Subject to the CHRC determining the percentage of target payout, if any, PSUs awarded June 14, 2006 and August 8, 2006 were to vest following the completion of the performance period which ended on December 31, 2008. Given that the threshold performance criteria under the 2006 long range incentive program was not achieved, on January 27, 2009 the CHRC approved the cancellation of all outstanding 2006 PSUs granted under such program.

(8)   67,250 options were to vest on each of March 21, 2009, March 21, 2010 and March 21, 2011.

(9)   Canadian grant issued with an exercise price of CAD$29.90. Table reflects equivalent U.S. Dollar exercise price converted using the March 21, 2007 Bank of Canada noon rate of exchange of US$1.00 = CAD$1.1578.

(10)   Subject to the CHRC determining the percentage of target payout, if any, based on the level of achievement of the performance criteria, PSUs were to vest following the completion of the performance period which was to end on December 31, 2009.

(11)   148,000 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.

(12)   Canadian grant issued with an exercise price of CAD$8.21. Table reflects equivalent U.S. Dollar exercise price converted using the March 3, 2008 Bank of Canada noon rate of exchange of US$1.00 = CAD$.9870.

(13)   Subject to the CHRC determining the percentage of target payout, if any, based on the level of achievement of the performance criteria, PSU- Management OMs were to vest on December 31, 2010 and PSU- rTSRs were to vest on January 30, 2011.

(14)   16,200 RSUs were to vest on each of November 15, 2009, November 15, 2010, November 15, 2011 and November 15, 2012.

(15)   29,975 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.

(16)   9,983 RSUs were to vest on each of March 3, 2009 and March 3, 2010 and 9,984 RSUs were to vest on March 3, 2011.

(17)   6,250 options were to vest on each of June 14, 2009 and June 14, 2010.

(18)   22,500 RSUs were to vest on June 14, 2009.

(19)   12,500 options were to vest on each of March 21, 2009, March 21, 2010 and March 21, 2011.

(20)   8,333 RSUs were to vest on March 21, 2009 and 8,334 RSUs were to vest on March 21, 2010.

(21)   28,675 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.

(22)   9,550 RSUs were to vest on each of March 3, 2009, March 3, 2010 and March 3, 2011.

(23)   7,933 RSUs were to vest on August 8, 2009 and 7,934 RSUs were to vest on August 8, 2010.

(24)   7,812 options were to vest on March 3, 2009, 7,813 options were to vest on March 3, 2010, 7,812 options were to vest on March 3, 2011 and 7,813 options were to vest on March 3, 2012.

251

**Table of Contents**
(25) 2,600 RSUs were to vest on each of March 3, 2009, March 3, 2010 and March 3, 2011.
(26) 28,675 options were to vest on each of March 3, 2009 and March 3, 2010. The remaining unvested options were to expire on severance end date.
(27) 90,000 RSUs were to vest on each of March 3, 2009 and March 3, 2010. The remaining unvested RSUs were to expire on severance end date.
(28) 18,750 options were to vest on September 7, 2009.
(29) 6,250 options were to vest on each of June 14, 2009 and June 14, 2010.
(30) 5,834 RSUs were to vest on June 14, 2009.
(31) 9,600 options were to vest on each of March 21, 2009, March 21, 2010 and March 21, 2011.
(32) 6,400 RSUs were to vest on each of March 21, 2009 and March 21, 2010.
(33) 19,550 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.
(34) 6,500 RSUs were to vest on each of March 3, 2009, March 3, 2010 and March 3, 2011.

**Option Exercises and Stock Vested in Fiscal Year 2008**

The following table sets forth information regarding the vesting of RSUs during the 2008 fiscal year for each of the named executive officers on an aggregated basis. None of the named executive officers exercised any options to purchase NNC common shares during the 2008 fiscal year.

| | Option Awards | | Stock Awards | |
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| Name | | | | |
| --- | --- | --- | --- | --- |
| M.S. Zafirovski | - | - | 45,300 | 25,368(1) |
| P.S. Binning | - | - | 16,200 | 9,072(1) |
| D.J. Carey | - | - | 8,333 | 50,831(2) |
| | - | - | 22,500 | 226,125(3) |
| S.J. Bandrowczak | - | - | 7,933 | 47,598(4) |
| W.K. Nelson | - | - | - | - |
| R.S. Lowe | - | - | 6,400 | 39,040(2) |
| | - | - | 5,833 | 58,622(3) |
| | - | - | 10,000 | 25,400(5) |

(1) Restricted stock units vested Saturday November 15, 2008. Based on November 14, 2008 NYSE market close price of $0.56.
(2) Restricted stock units vested on March 21, 2008. Due to market holiday, settlement based on March 20, 2008 NYSE market close price of $6.10.
(3) Restricted stock units vested Saturday June 14, 2008. Based on June 13, 2008 NYSE market close price of $10.05.
(4) Restricted stock units vested on August 8, 2008. Based on August 8, 2008 NYSE market close price of $6.00.
(5) Restricted stock units vested Sunday September 28, 2008. Based on September 26, 2008 NYSE market close

Table of Contents
price of $2.54.

## Pension Benefits for Fiscal Year 2008

The following table sets forth certain information regarding each plan during 2008 that provided for pension benefits to the named executive officers at, following, or in connection with retirement. Nortel continues to evaluate its pension and post retirement benefit obligations in the context of the Creditor Protection Proceedings and as a result, Nortel's current expectations regarding such obligations in 2009 and beyond are uncertain at this time and are subject to change. For further information on Nortel's obligations under the pension plans, see the MD&A section of this report and note 9, "Employee benefit plans" of the accompanying audited consolidated financial statements.

| Name | Plan Name | Number of Years Credited Service(#) | Present Value of Accumulated Benefit($)(1) | Payments During Last Fiscal Year($) |
|---|---|---|---|---|
| M.S. Zafirovski | Special Pension Benefit Arrangement | 3.21 | 1,959,025(2) | - |
| P.S. Binning | | - | - | - |
| D.J. Carey | Nortel Networks Retirement Income Plan | 2 | 14,646(3) | - |
| | Nortel Networks Restoration Plan | 2 | 24,085(3) | - |
| S.J. Bandrowczak | | - | - | - |
| W.K. Nelson | | | | |
| R.S. Lowe | Nortel Networks Retirement Income Plan | 11 | 403,892(3) | - |
| | Nortel Networks Restoration Plan | 11 | 724,981(3) | - |
| | Nortel Networks Managerial and Non- Negotiated Pension Plan | 16.83 | 475,892(4) | - |
| | Nortel Networks Excess Plan | 16.83 | 814,805(4) | - |
| | Nortel Networks Transitional Retirement Allowance Plan | 16.83 | 107,930(4) | - |

(1) The present value of accumulated benefits are estimated amounts based on assumptions, which represent contractual entitlements that may change over time. The method used to determine such estimated amounts will not be identical to the method used by other issuers and, as a result, the figures may not be directly comparable across companies. For the underlying assumptions for Nortel's defined benefit plans, see note 9, "Employee benefit plans" of the accompanying audited consolidated financial statements.

(2) Mr. Zafirovski is eligible for a special pension benefit. He is entitled to a pension of $355,000 per year after five years of service. The pension is to commence at age 60 and is payable as a joint and survivor 60% annuity. As Mr. Zafirovski was hired on October 17, 2005, he had accrued 3.21 years as at the plan measurement date of December 31, 2008. The accumulated benefit is based on the ratio of this period of service to five years. The present value represents this portion of the benefit discounted from the date of commencement back to December 31, 2008, based on a discount rate of 7.09% and post retirement mortality based on the RP2000 Table Projected to 2017.

(3) The following assumptions were used in the calculations of the present value of accumulated benefits under the Nortel Networks Retirement Income Plan (Retirement Income Plan) and the Nortel Networks Restoration Plan (Restoration Plan): Assumed retirement age: pension benefits are assumed to begin at each participant's earliest unreduced retirement age, age 65; Discount rate: the applicable discount rates are 6.26% for the Retirement Income Plan and 6.07% for the Restoration Plan as of September 30, 2007, and 6.37% for the Retirement Income Plan and 6.33% for the Restoration Plan as of December 31, 2008; Future interest crediting rate assumption: Cash Balance amounts are projected to the assumed retirement age based on the future investment crediting rate assumptions of 5.50% as of September 30, 2007 and 1.50% as of December 31, 2008; Pension Service Plan (PSP) amounts are projected to the assumed retirement age based on the future investment crediting rate plan provision of 6.00%. These rates are used in conjunction with the discount rate to estimate the present value amounts. Form of payments: 100% of Cash Balance participants are assumed to receive a single lump sum at retirement, 95% of PSP participants are assumed to receive a single lump sum at retirement and 5% of PSP participants are assumed to receive a single life annuity.

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 265

**Table of Contents**

(4)   The following assumptions were used in the calculations of the present value of accumulated benefits: Discount rate: the applicable discount rates are 7.31% for the Nortel Networks Managerial and Non- Negotiated Pension Plan Part I, 7.07% for the Nortel Networks Excess Plan, 6.67% for the Nortel Networks Transitional Retirement Allowance Plan and 7.09% for the Special Pension Benefit Arrangement; Consumer Price Index: 1.25%; Annual increases of 2.25% to the Income Tax Act (Canada) (ITA) maximum after 2009; Mortality Table: RP2000 Table Projected to 2017. The earliest age the member can retire without benefit reduction has been used as the assumed retirement age. A retirement age of 60 has been used for the Managerial and Non- Negotiated Pension Plan and the Excess Plan for Part I members and an assumed retirement age of 65 has been used for the Transitional Retirement Allowance Plan.

During 2008 Nortel maintained various employee pension plans in the United States and Canada. Commencing January 1, 2008, Nortel introduced a number of changes to its North American pension plans. With the exception of a group of Canadian "Grandfathered Members", pension accruals for employees in defined benefit pension plans have been frozen. Nortel made automatic contributions to defined contribution retirement programs for the non- grandfathered members. Employees already in defined contribution programs remained in defined contribution programs. For those employees who elected to not participate in either the defined benefit or defined contribution programs, effective January 1, 2008, Nortel commenced automatic contributions to the defined contribution program, with the option for these employees to also contribute. Except for Canadian "Grandfathered Members", benefits in the defined benefit pension plans were frozen at December 31, 2007. The matching contributions made by Nortel to the defined contribution plans were also changed as of January 1, 2008.

The following descriptions relate to defined benefit pension plans in which the named executive officers are members. Messrs. Zafirovski, Binning, Bandrowczak and Nelson do not participate in the Nortel defined benefit pension plans.

*Nortel Networks Retirement Income Plan*

A defined benefit pension plan, the Retirement Income Plan, is maintained for eligible employees, including executives, who are employed by NNI and other Nortel controlled group members that are located in the United States. Plan participants receive benefits determined under one of two formulas, depending on elections made by the plan participant: the PSP formula or the Cash Balance Plan formula. Mr. Carey participates in the Cash Balance Plan and Mr. Lowe participates in the PSP.

The PSP formula was available for participants who enrolled in the plan prior to May 1, 2000, and who elected prior to May 1, 2000 to be covered by the PSP formula. As of May 1, 2000, the PSP formula under the Retirement Income Plan was closed to new participants. Effective January 1, 2008, members will no longer be credited with additional accruals under the PSP formula. Accumulated benefits in the PSP were frozen at December 31, 2007.

The PSP formula provides a benefit calculated as percentage pension credits through December 31, 2007, multiplied by average earnings of the best three consecutive years of earnings during the ten- year period ending December 31, 2007. Participants earn pension credits during each year of participation based on age attained in the year and on years of service through December 31, 2007, as follows:

| If age + service years is | The percentage credit for the year is |
|---|---|
| 45 or less | 2% |
| 46 55 | 5% |
| 56 65 | 9% |
| 66 75 | 13% |
| 76 or more | 20% |

Eligible earnings include base salary and, where applicable, incentive awards or bonuses, if any, paid under the Incentive Plan, overtime, off- shift differentials and sales commissions. An employee becomes fully vested after completing four years of vesting service. An employee earns a year of vesting service for each calendar year in which the employee completes at least 1,000 hours of service.

254

Table of Contents

Upon termination of employment or retirement the PSP benefit for service to December 31, 2007, will be determined by the total percentage pension credits multiplied by the final average earnings to arrive at an account balance. The account balance will be increased by 6% per year, compounded annually from January 1, 2008, to the date of termination or retirement. The actual amount of the lump sum value will not be less than the account balance. In some instances, due to government regulations, and depending on prevailing interest rates, the lump sum value may be greater than the account balance.

Effective May 1, 2000, Nortel established the Cash Balance Plan, a defined benefit pension formula, based on pay credits and interest credits. Effective January 1, 2008, members will no longer be credited with additional accruals under the Cash Balance Plan formula.

The Cash Balance Plan formula provides a monthly credit equal to 4% of eligible earnings, with interest being credited monthly based on the month's starting balance. Nortel contributed at this level through December 31, 2007, at which time contributions ceased. The total amount in the Cash Balance Plan account as of December 31, 2007, will be increased by monthly interest credits based on the average T- bill yield for September of the previous year plus 1%, compounded annually to date of termination or retirement.

Eligible earnings include base salary and, where applicable, incentive awards or bonuses, if any, paid under the Incentive Plan, overtime, off- shift differentials and sales commissions earned prior to retirement or other termination of employment for applicable periods. An employee becomes fully vested after completing two years of vesting service.

Normal retirement age is 65. An employee is eligible for early retirement on or after his or her 55th birthday, subject to satisfaction of the vesting requirement. The PSP and Cash Balance Plan benefits can be paid in a lump sum or as an actuarially equivalent annuity.

*Nortel Networks Restoration Plan*

U.S. employees, including executives, may also be members of the Restoration Plan. Messrs. Carey and Lowe participate in the Restoration Plan. The Restoration Plan is a non- qualified deferred compensation plan. The purpose of the Restoration Plan is to provide pension benefits in cases where the compensation exceeds the limitations placed by federal laws on compensation amounts that may be included under a qualified pension plan ($230,000 in 2008) as well as limitations on the total benefit that may be paid from such plans. Pension benefits that are based on compensation amounts below the limit are provided under the Retirement Income Plan and are funded through a qualified pension trust. Pension benefits applicable to compensation that exceeds federal limitations and pension benefits in excess of the limitations on total benefits are paid from the Restoration Plan, and are funded from Nortel Network Inc.'s general assets. All of the material terms and conditions of benefits (including vesting and payment conditions and options) under the Restoration Plan are identical to the participant's tax- qualified plan benefit under the Retirement Income Plan. Effective January 1, 2008, members will no longer accrue additional benefits under the Restoration Plan. Accumulated benefits were frozen at December 31, 2007.

*Nortel Networks Managerial and Non- Negotiated Pension Plan*

The Nortel Networks Managerial and Non- Negotiated Plan (Managerial and Non- Negotiated Plan), a defined benefit pension plan, is maintained for eligible employees, including executives, in Canada. The Managerial and Non- Negotiated Plan has two different formulas, called Part I and Part II. Mr. Lowe participates in the Nortel Canada Part I formula as a result of his prior Canadian service. An employee becomes fully vested after completing two years of pensionable service. Normal retirement age is 65. Effective January 1, 2008, members will no longer accrue additional benefits under the Managerial and Non- Negotiated Plan, with the exception of "Grandfathered Members" who will not be impacted by the changes implemented. Accumulated benefits for members who are not "Grandfathered Members" were frozen at December 31, 2007.

"Grandfathered Members" are Part I or Part II members who, on December 31, 2007:

255

**Table of Contents**

are at least age 60; or

have at least 30 years of pensionable service; or

are at least age 55 with years of age plus pensionable service equaling at least 70.

The Part I formula provides a monthly benefit at retirement based on years of pensionable service as of December 31, 2007, and a pension accrual of 1.3% of the average annual earnings of the best three consecutive years as of December 31, 2007. For "Grandfathered Members" the benefit is calculated based on pensionable service and average annual earnings at retirement date. A member is eligible to retire with an early unreduced pension if the member has attained age 60 at retirement date and the aggregate of the member's years of pensionable service and age equals at least 80. An early retirement reduction of 1/3 of one percent for each month by which the member's age is less than age 60 applies for retirement prior to age 60, subject to a minimum rate of 1.04%. Eligible earnings include base salary and, where applicable, overtime, off- shift differentials and an individual sales commission factor. Effective January 1, 1999, the Part I formula was closed to new participants.

The Part II formula was introduced January 1, 1999. Employees who were participants in Part I could continue to participate in Part I, or move to the new Part II formula, at their election. Part II provides a benefit calculated as pension credits accumulated to December 31, 2007, multiplied by the average annual earnings as of December 31, 2007, for the highest three consecutive years in the last 10 years at December 31, 2007. For "Grandfathered Members" the Part II benefit is calculated at retirement or other termination of employment. Pension credits are earned during each year of participation based on the participant's age attained in the year and on years of service, as follows:

| If age + service years is | The percentage credit for the year is |
|---|---|
| 45 or less | 2% |
| 46 - 55 | 5% |
| 66 - 75 | 9% |
| 56 - 65 | 13% |
| 76 or more | 20% |

Eligible earnings for Part II include base salary and, where applicable, incentive awards or bonuses, if any, paid under the Incentive Plan, overtime, off- shift differentials and sales commissions. Effective May 1, 2000, the Part II defined benefit formula was closed to new participants.

The Part II benefit can be paid in a lump sum or as an actuarially equivalent annuity. Under the annuity option there are reductions for retirement prior to normal retirement age of 65. Certain grandfathering rules exist for employees and executives who were participating in the pension plan as at December 31, 1998.

*Nortel Networks Excess Plan*

Employees, including executives, participating in the Managerial and Non- Negotiated Plan Part I and Part II may also be members of the Nortel Networks Excess Plan (Excess Plan). Mr. Lowe participates in the Excess Plan. The Excess Plan is a non- registered plan under Canadian tax laws. The ITA limits the amount of pension that may be paid under a registered pension plan. Pension benefits in amounts below the ITA limit are paid from a registered pension plan, the Managerial and Non- Negotiated Plan, which is funded through a pension trust. Pension benefits that exceed the ITA limits are paid from the Excess Plan, and are funded from NNL's general assets and the general assets of Nortel Networks Technology Corporation, an affiliate of Nortel. All of the material terms and conditions of benefits (including vesting and payment conditions and options) under the Excess Plan are identical to the participant's registered benefit under the Managerial and Non- Negotiated Plan Part I and Part II.

Effective January 1, 2008, the accumulated benefits of members who are not "Grandfathered Members" were frozen at December 31, 2007.

256

HIGHLY CONFIDENTIAL    

Table of Contents

*Nortel Networks Transitional Retirement Allowance Plan*

The purpose of the Nortel Networks Transitional Retirement Allowance Plan (TRA Plan) is to recognize the long service of employees, including executives, who retire under Part 1 of the Managerial and Non- Negotiated Plan. The TRA Plan is a non- registered plan under Canadian tax laws. The benefits under the TRA Plan are provided for out of Nortel's operating income. Mr. Lowe participates in the TRA Plan.

This benefit is payable to a member only upon retirement and who is eligible and elects to receive an immediate pension. A member' means an individual who retires under Part I after completing 4 or more years of continuous service and whose membership has not been terminated. The TRA Plan is calculated based on two components: (i) a lump sum amount based on age and service calculated according to several tables; and (ii) an earnings and service formula. A member may elect to receive payment as a lump sum, or monthly payments, or in a combination of a lump sum and monthly payments.

Effective January 1, 2008, members will no longer accrue additional benefits under the TRA Plan, with the exception of "Grandfathered Members" who will not be impacted by the changes implemented. Accumulated benefits for those members who were not identified as "Grandfathered Members" were frozen at December 31, 2007.

**Nonqualified Deferred Compensation for Fiscal Year 2008**

The following table sets forth certain information with respect to each defined contribution or other plan that provides for the deferral of compensation on a basis that is not tax- qualified. The plans will continue to be reviewed and considered in the context of the Creditor Protection Proceedings.

| Name | Executive contributions in last FY ($) | Registrant contributions in last FY ($) | Aggregate earnings in last FY ($) | Aggregate withdrawals/ distributions ($) | Aggregate balance at last FYE ($) |
|---|---|---|---|---|---|
| M.S. Zafirovski | - | - | - | - | - |
| P.S. Binning | - | - | - | - | - |
| D.J. Carey | - | 2,115(1) | 5(1) | - | 2,120(1) |
| S.J. Bandrowczak | - | 11,630(1) | (2,138)(1) | - | 9,492(1) |
| | 42,500(1) | | (15,720)(2) | | 36,552(2) |
| W.K. Nelson | - | 5,077(1) | (410)(1) | - | 4,667(1) |
| R.S. Lowe | - | 4,615(1) | (69,530)(2) | 1,701,043(2)(3) | 4,657(1) |
| | | | 42(1) | | (2) |

(1)  Amounts represent participation in the Nortel Networks Long- Term Investment Restoration Plan, which is a non- tax qualified plan. The Nortel Networks Long- Term Investment Plan is a tax qualified plan. The Long- Term Investment Restoration Plan is intended to provide employees with the portion of the company contribution, if any, which cannot be made under the Nortel Networks Long- Term Investment Plan because of the compensation limitations of Section 401(a)(17) of the Code. Nortel contributions to the Long- Term Investment Restoration Plan disclosed in the Nonqualified Deferred Compensation Table were made by Nortel as automatic contributions or, matching contributions, as applicable, with respect to Messrs. Carey, Bandrowczak, Nelson and Lowe's contributions, to the Nortel Networks Long- Term Investment Plan and could not be made by Nortel under the Nortel Networks Long- Term Investment Plan because of the compensation limits of Section 401(a)(17) of the Code. These amounts are also reported in the Summary Compensation Table.

(2)  Amounts represent participation in the Nortel Networks U.S. Deferred Compensation Plan.

(3)  Amount represents a non- scheduled in- service withdrawal paid on November 24, 2008, upon Mr. Lowe's request of October 26, 2008, for deferrals made prior to January 1, 2005 in accordance with the terms of the

257

Table of Contents

Nortel Networks U.S. Deferred Compensation Plan. As this was a non- scheduled withdrawal there was a 10% penalty of $189,005 applied (penalty was applied to the balance at December 31, 2007 of $1,959,578 less $69,530).

### Nortel Networks U.S. Deferred Compensation Plan

Eligibility to participate in the U.S. Deferred Compensation Plan (DCP) is limited to U.S.- based employees above a certain compensation threshold. The DCP is non- tax qualified plan. Participants are unsecured creditors of NNL and the employer with respect to the payments of plan benefits. The threshold is $180,000, which is comprised of base salary plus a percentage of annual bonus. Participants may defer up to 80% of their base salary, 95% of Incentive Plan awards and up to 95% of commissions if they enroll during annual enrollment and up to 80% of base salary if they enroll during mid- year enrollment. The minimum annual deferral is $5,000.

Participants may allocate their deferrals among a variety of different investment crediting options, which are deemed investments in funds in which the participant has no ownership interest. The funds are only used to measure the gains or losses that will be attributed to the participant's deferral account over time. Investment allocation changes can be made as often as monthly, while employed, after termination, retirement or long- term disability.

Investment returns are calculated based on the returns on the funds selected. The funds are designated by a committee composed of individuals appointed by the Board to administer such employee benefit plans, including the CHRC or such other persons or committees of persons who may be designated by the CHRC to carry out responsibilities under the plan, including the administrative committee of the DCP.

To help meet its obligations under the DCP, Nortel purchased two life insurance products from Nationwide Life Insurance Company (Nationwide). The selected funds are wrapped within the life insurance products provided by Nationwide. Nationwide selects the funds that go into each product. Nortel has selected two of these products for the DCP- Nationwide Best of America Corporate Variable Universal Life and Nationwide Best of America Future Corporate Variable Universal Life. Nationwide reviews the fund offerings and manager on a regular basis and makes changes or adds funds within each product to continue to offer the most competitive investment options for its clients. Nortel decided to include all of the investment options offered within each product to participants for notional investment under the DCP. There is an annual review of the funds in the DCP.

Messrs. Bandrowczak and Lowe participated in the DCP. In 2008, Mr. Bandrowczak allocated his account to five of the 104 investment funds offered. The 2008 average rate of return applicable to the five funds was (45.44)%. Mr. Lowe allocated his account to nine of the 104 investment funds offered. The 2008 average rate of return applicable to the nine funds was (20.63)%.

Prior to the beginning of each year, participants in the DCP make an election to receive that year's deferral balance (i) in a future year while the participant is still employed as a scheduled in- service withdrawal or (ii) after the participant's employment ends as a termination payment. Distributions are made in a lump sum or, if available to the participant and elected, in installments of five, ten, or 15 years, the participant must meet certain eligibility requirements based on age, service and size of account balance. Deferrals under the DCP have been suspended for 2009. As a result of the Creditor Protection Proceedings, no distributions are being made under the DCP.

### Nortel Networks Long- Term Investment Restoration Plan

The Nortel Networks Long- Term Investment Restoration Plan (LTI Restoration Plan) is intended to provide employees with the portion of the matching contribution, if any, which cannot be made under the Nortel Networks Long- Term Investment Plan (Investment Plan) because of the compensation limitations of Section 401(a)(17) of the Code. The LTI Restoration Plan is an unfunded and non- tax qualified pension plan.

Under the terms of the LTI Restoration Plan, an "eligible employee" means an employee of NNI or its affiliates who is considered an eligible employee under the Investment Plan and has elected to participate in the Investment Plan. An eligible employee shall become an active participant of the LTI Restoration Plan if such employee's eligible compensation is not fully recognized under the Investment Plan because of the compensation limitations imposed by Section 401(a)(17) of the Code and the employee has made employee contributions to the Investment Plan during the applicable plan year.

258