Table of Contents

Eligible compensation under the LTI Restoration Plan is the annual compensation of a participant that would otherwise be recognized under the Investment Plan for contribution purposes but without regard to the limit on compensation under Section 401(a)(17) of the Code, which was a $230,000 limit in 2008. The eligible compensation under the LTI Restoration Plan includes base pay, overtime pay, sales commissions, merit cash, promotion cash, career development cash, skill block awards, lead pay, shift differential and specific bonuses listed in the plan document.

For each plan year in which an eligible employee makes an employee contribution, Nortel will contribute a Matching Contribution to his or her account equal to the excess of (a) 100% of such active participant's employee contribution up to a maximum of 3% of an active participant's eligible compensation, over (b) the maximum matching company contribution made on his or her behalf under the Investment Plan for the applicable plan year. Beginning in 2008, an Automatic Company contribution of 2% of an active participant's eligible compensation is also made to an eligible employee's account. The Automatic Contribution and the Matching Contributions are added to an employee's account at or about the time such contributions are made to the Investment Plan.

All accounts under the LTI Restoration Plan are credited with notional investment earnings in amounts and at times as determined by the plan administrator based on the actual returns of the funds. The notional investment funds available under the LTI Restoration Plan mirror the 16 funds offered by the Investment Plan. Messrs. Carey, Bandrowczak, Nelson and Lowe currently participate in the LTI Restoration Plan. In 2008, Mr. Carey allocated his account to 3 of the 16 investment funds offered. The 2008 average rate of return applicable to the 3 funds was (34.53)%. Mr. Bandrowczak allocated his account to 3 of the 16 investment funds offered. The 2008 average rate of return applicable to the funds was (26.13)%. Mr. Nelson allocated his account to 1 of the 16 investment funds offered. The 2008 average rate of return applicable to the fund was (26.60)%. Mr. Lowe allocated his account to 1 of the 16 investment funds offered. The 2008 average rate of return applicable to the fund was 4.30%. The payment option for the LTI Restoration Plan is a lump sum payment. Participants are required to take a lump sum distribution at six months after termination. A lump sum is paid out immediately to the designated beneficiary upon death of participant.

**Potential Payments upon Termination or Change in Control**

**CIC Plan**

The CIC Plan was adopted to reinforce and encourage the continued attention and commitment of specified executives to their respective duties without distraction in the face of the potentially disturbing circumstances arising from the possibility of a change in control. Nortel continues to evaluate its obligations under the CIC Plan in the context of the Creditor Protection Proceedings and as a result, Nortel's current expectations regarding such obligations in 2009 and beyond are uncertain at this time and are subject to change.

*Change in Control*

For purposes of the CIC Plan, a change in control is deemed to occur if:

> any person or group acquires beneficial ownership of securities of NNC representing more than 20% of the outstanding securities entitled to vote in the election of directors of NNC, other than in connection with a "permitted business combination" (as defined in the CIC Plan);

> NNC participates in a business combination, including, among other things, a merger, amalgamation, reorganization, sale of all or substantially all of its assets, or plan of arrangement, unless: (i) the business combination only involved NNC, and one and more affiliated entities; or (ii) following the completion of all steps involved in the transaction or transactions pursuant to which the business combination is effected, NNC's common shareholders beneficially owned, directly or indirectly, more than 50% of the then- outstanding voting shares of the entity resulting from the business combination (or of the person that ultimately controls such entity, whether directly or indirectly) and at least a majority of the members of the Board of Directors of the entity resulting from the business combination (or the person that ultimately controls such entity, whether directly or indirectly) were members of the Board of Directors of NNC when

259

**Table of Contents**

the business combination was approved or the initial agreement in connection with the business combination was executed;

the persons who are directors of NNC on the effective date of the CIC Plan (or the incumbent directors) cease (for reasons other than death or disability) to constitute at least a majority of NNC's Board of Directors; provided, that any person who is not a director on the effective date of the CIC Plan is deemed to be an incumbent director if such person is elected or appointed to NNC's Board of Directors by, or on the recommendation of or with the approval of, at least two- thirds of the directors who then qualify as incumbent directors, unless such election, appointment, recommendation or approval was the result of any actual or publicly threatened proxy contest for the election of directors; or

any other event occurs which NNC's Board of Directors determines in good faith could reasonably be expected to give rise to a change in control, resulting from situations such as: (i) any person acquiring a significant interest in NNC; or (ii) the election of a person to the Nortel Board in circumstances in which management has not solicited proxies in respect of such decision.

*Termination Due to Change in Control*

The CIC Plan provides that if Nortel terminates a participant's employment without cause within a period commencing 30 days prior to the date of a change in control of NNC and ending 24 months after the date of a change in control of NNC, or the participant resigns for good reason (including, among other things, a reduction in overall compensation, geographic relocation or reduction in responsibility, in each case without the consent of the participant) within 24 months following the date of a change in control of NNC, the participant will be entitled to certain payments and benefits, including:

the payment of an amount equal to three times (in the case of the chief executive officer), two times (in the case of tier 1 executives) and one and a half times (in the case of tier 2 executives) of the participant's annual base salary;

the payment of an amount equal to 300% (in the case of the chief executive officer), 200% (in the case of tier 1 executives) and 100% (in the case of tier 2 executives) of the participant's target annual incentive bonus; and

subject to the provisions of any stock incentive plan that are contrary to the CIC Plan and which cannot be waived or amended by NNC:

accelerated vesting of all unvested stock options held immediately prior to the termination date for both the chief executive officer and tier 1 and tier 2 executives in accordance with the applicable stock incentive plan, provided that no award under the 2005 SIP become vested earlier than the first anniversary date of the effective date of such award;

continued ability to exercise vested stock options during the period ending on the third year anniversary of the termination date for the chief executive officer, during the period ending on the two year anniversary of the termination date for tier 1 executives, and during the period ending on the eighteen month anniversary of the termination date for tier 2 executives; and

all unvested RSUs, PSUs or other stock based incentive awards that are outstanding immediately prior to the termination date, other than stock options, (i) granted on or after June 1, 2007 deemed to have vested on a pro rata basis as of the termination date and (ii) granted prior to June 1, 2007 deemed to have fully vested at 100% of unvested target amount as of the termination date; provided that payment in settlement of any such RSUs, PSUs or other stock based incentive awards shall be in cash, shares or a combination thereof in accordance with the applicable settlement provisions of the CIC Plan, the applicable stock incentive plan and/or the instrument of award for the particular award.

260

**HIGHLY CONFIDENTIAL**

Table of Contents

Additionally, participants under the CIC Plan also will be entitled to the following in the event of termination due to change in control:

outplacement counseling services of a firm chosen from time to time by the participant, for a period not to exceed 18 months after the payment date;

maintenance of coverage for the maximum extended reporting period available under any directors' and officers' liability insurance that is in place on the termination date, in the event that such policy is cancelled or not renewed;

during the period ending on the three year anniversary of the termination date for the chief executive officer, and the two year anniversary of the termination date for tier 1 executives, and the eighteen month anniversary of the termination date for tier 2 executives, continued coverage under each of the Nortel life insurance, medical, dental, health and disability plans or arrangements in which the specified executive was entitled to participate immediately prior to the earlier of the termination date or the change in control date at a cost to the executive no greater than the actual amount that the executive paid or would have paid for such coverage immediately prior to the earlier of the termination date or the change in control date and otherwise in accordance with the terms of such plans and arrangements as in effect immediately prior to the earlier of the termination date or the change in control date, provided that certain conditions are satisfied; and

if a specified executive participates in any deferred compensation, pension or supplementary retirement plans offered by Nortel, then upon such specified executive's termination due to change in control, and except as otherwise specifically provided in the CIC Plan, such executive shall be entitled to payments under such plans in accordance with the terms of each such plan.

**Potential Payments under the CIC Plan**

If a change in control had occurred on December 31, 2008 and the employment of the named executive officer terminated as a result, the following payments to the named executive officers would have been required under the CIC Plan. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. Any future termination of a named executive officer during the Creditor Protection Proceedings will be dealt with in the course of those proceedings.

| Name | Tier | Salary ($)(1) | Bonus ($)(2) | Stock Options ($)(3)(4) | RSUs ($)(4)(5) | PSUs ($)(4)(6) | Health Benefits Coverage ($)(7) | Other ($)(8) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| M.S. Zafirovski(9) | CEO | 3,861,278 | 5,791,916 | - | 23,556 | 64,220 | 75,000 | 20,000 | 9,835,970 |
| P.S. Binning(9) | 1 | 1,286,979 | 1,286,979 | - | 542 | - | 50,000 | 20,000 | 2,644,500 |
| D.J. Carey | 1 | 1,100,000 | 1,100,000 | - | 10,183 | 11,050 | 50,000 | 20,000 | 2,291,233 |
| S.J. Bandrowczak | 2 | 637,500 | 340,000 | - | 825 | 2,045 | 37,500 | 20,000 | 1,037,870 |
| R.S. Lowe | 1 | 1,000,000 | 1,000,000 | - | 4,845 | 9,542 | 50,000 | 20,000 | 2,084,387 |

(1) Salary payout is equivalent to three times annual salary for Mr. Zafirovski as President and Chief Executive Officer, two times annual salary for the named executive officers identified as tier 1 executives and one and a half times annual salary for Mr. Bandrowczak as a tier 2 executive. Mr. Zafirovski's annual salary of CAD$1,366,120 and Mr. Binning's annual salary of CAD$683,000 have been converted to U.S. Dollars using the 2008 average exchange rate of US$1.00 = CAD$1.0614.

(2) Bonus payout is equivalent to 300% of the annual bonus that Mr. Zafirovski would have been entitled to as Chief Executive Officer and to 200% of the annual bonus that each of the named executive officers identified as tier 1 executives would have been entitled to and 100% of the annual bonus Mr. Bandrowczak would have been entitled to as a tier 2 executive. Bonus entitlement for Mr. Zafirovski and Mr. Binning have been converted to U.S. Dollars using the 2008 average exchange rate of US$1.00 = CAD$1.0614.

HIGHLY CONFIDENTIAL

**Table of Contents**

(3)   Calculated as the intrinsic value per option, multiplied by the number of options that become immediately vested upon change in control. The intrinsic value per option is calculated as the excess of the closing market price on NYSE on December 31, 2008 of $0.26 over the exercise price of the option. If the value is less than zero, it is deemed to be zero for the purpose of this calculation.

(4)   The following number of options, RSUs and PSUs would have immediately vested upon change of control, excluding all options, RSUs and PSUs granted less than one year prior to December 31, 2008:

| Name | Number of Options (#) | Number of RSUs (#) | Number of PSUs (#) |
|---|---|---|---|
| M.S. Zafirovski | 485,500 | 90,600 | 247,000 |
| P.S. Binning | – | 2,086 | – |
| D.J. Carey | 50,000 | 39,167 | 42,500 |
| S.J. Bandrowczak | – | 3,173 | 7,867 |
| R.S. Lowe | 60,050 | 18,634 | 36,700 |

(5)   Calculated as the intrinsic value per restricted stock unit, multiplied by the number of RSUs that become immediately vested. The intrinsic value per restricted stock unit is determined based on the closing market price on NYSE on December 31, 2008 of $0.26.

(6)   Calculated as the intrinsic value per performance stock unit, multiplied by the number of PSUs that become immediately vested. The intrinsic value per performance stock unit is determined based on the closing market price on NYSE on December 31, 2008 of $0.26.

(7)   Based on an estimated annual cost of $25,000. Mr. Zafirovski's payout is based on three year coverage as provided for the chief executive officer under the CIC Plan. Payout for the named executive officers identified as tier 1 executives is based on two year coverage as defined under tier 1 executives under the CIC Plan and payout for Mr. Bandrowczak is based on 18 months coverage as defined under tier 2 executives under the CIC Plan.

(8)   Other coverage includes outplacement counseling estimated at a cost of $20,000 per named executive officer.

(9)   Payment to Mr. Zafirovski under his employment agreement would make him ineligible for these payments and benefits under the CIC Plan. Payment to Messrs. Binning and Carey of these CIC Plan benefits would make them ineligible for the payments and benefits under their respective employment agreements.

**Employment Agreements**

In addition to the CIC Plan, Nortel has agreed to termination provisions with respect to Messrs. Zafirovski, Binning and Carey. These provisions were necessary in recruiting these individuals to Nortel in their respective roles. Additional details of the employment agreements of Messrs. Zafirovski, Binning and Carey are described under "Material Terms of Employment Agreements and Arrangements with Named Executive Officers" above. Any future termination of a named executive officer during the Creditor Protection Proceedings will be dealt with in the course of those proceedings.

*Mr. Zafirovski*

Mr. Zafirovski's employment agreement provides that in the event Nortel initiates his separation of employment as President and Chief Executive Officer or if Mr. Zafirovski initiates his separation of employment because his responsibilities or authority have been involuntarily changed and are not substantially equivalent to his current role, or because his total compensation is involuntarily changed in a manner that is materially inconsistent with other key executive officers, he will be provided in lieu of any other payment or benefit with the following:

the equivalent of two years' base salary paid bi- weekly;

262

**Table of Contents**

the equivalent of two years' Incentive Plan payment at target to be paid in a lump sum; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is then enrolled for two years following employment termination at active employee rates and the continued vesting of outstanding stock options or RSUs during the salary continuance period, other than the new hire stock options and RSUs, which immediately vest on the date of separation.

In addition, in the event any Incentive Plan payment is made to key employees of Nortel in the year of such separation, Mr. Zafirovski is entitled to a pro- rata Incentive Plan payment at target. The foregoing payments and benefits will not be provided to Mr. Zafirovski if his separation of employment arises out of termination for cause, as that term is defined in the CIC Plan. All payments and benefits are conditional on Mr. Zafirovski's execution of a separation agreement. If payments are made to Mr. Zafirovski under this provision of his employment agreement, he will be ineligible for the payments and benefits under the CIC Plan as described above.

*Mr. Binning*

Mr. Binning's employment agreement provides that in the event Nortel initiates his separation of employment or he initiates his separation of employment for Good Reason (as defined in the CIC Plan) he will be provided in lieu of any other payment or benefit with the following:

the equivalent of no less than 18 months' base salary paid bi- weekly; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is enrolled for 18 months following employment termination and active employee rates.

All of the new hire RSUs granted to Mr. Binning will continue to vest for 18 months following employment termination and, immediately prior to the end of this severance period, all of the unvested new hire RSUs will immediately vest. The foregoing payments and benefits will not be provided to Mr. Binning if his separation of employment is for Cause (as defined in the CIC Plan). All payments and benefits are conditional on Mr. Binning's execution of a separation agreement. If payments are made to Mr. Binning under the CIC Plan as described above, he will be ineligible for the payments and benefits under this provision of his employment agreement.

*Mr. Carey*

Mr. Carey's employment agreement provides that if Nortel initiates Mr. Carey's separation of employment or if he initiates his separation of employment because his responsibilities or authority are involuntarily changed or not substantially equivalent to his current role, Mr. Carey will be provided in lieu of any other payment or benefit with the following:

the equivalent of 24 months' base salary paid bi- weekly; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is enrolled for 24 months following employment termination at active employee rates.

The foregoing payments and benefits will not be provided to Mr. Carey if his separation of employment arises out of conduct and/or inaction by Mr. Carey that are not in the best interest of Nortel. All payments and benefits are conditional on Mr. Carey's execution of a separation agreement. If payments are made to Mr. Carey under the CIC Plan as described above, he will be ineligible for the payments and benefits under this provision of his employment agreement.

263

Table of Contents

**Potential Payments under Employment Agreements**

If involuntary termination of employment had occurred on December 31, 2008, the following payments would have been required under the respective employment agreements. Any future termination of a named executive officer during the Creditor Protection Proceedings will be dealt with in the course of those proceedings. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

| Name | Salary Continuance Period (# of Months) | Base Salary ($) | Bonus ($) | Stock Options ($)(1) | RSUs ($)(2) | Health Benefits Coverage ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|
| M.S. Zafirovski | 24 | 2,574,185(4) | 3,861,278(5) | - | 23,556 | 50,000 | 6,509,019 |
| P.S. Binning | 18 | 965,235(4) | - | - | 22,039 | 37,500 | 1,024,774 |
| D.J. Carey | 24 | 1,100,000 | - | - | 15,149 | 50,000 | 1,165,149 |

(1) The dollar value of stock options is calculated as the intrinsic value per stock option multiplied by the number of stock options that become vested. For stock options that would become immediately vested on termination, the intrinsic value per stock option is determined based on the closing market price on NYSE on December 31, 2008 of $0.26. For stock options that would continue to vest during the applicable salary continuance period, the intrinsic value per stock option is estimated based on the closing market price on NYSE on December 31, 2008 of $0.26. See "Potential Payments under Equity Compensation Plans" below. The following number of stock options would have vested if involuntary termination had occurred on December 31, 2008:

| Name | Immediately Vest on Termination (#) | Vest During Applicable Salary Continuance Period (#) |
|---|---|---|
| M.S. Zafirovski | 200,000 | 514,250 |
| P.S. Binning | - | 59,950 |
| D.J. Carey | - | 94,850 |

(2) The dollar value of RSUs is calculated as the intrinsic value per stock option multiplied by the number of RSUs that become vested. For RSUs that would become immediately vested on termination, the intrinsic value per restricted stock unit is determined based on the closing market price on NYSE on December 31, 2008 of $0.26. For RSUs that would continue to vest during the applicable salary continuance period, the intrinsic value per restricted stock unit is estimated based on the closing market price on NYSE on December 31, 2008 of $0.26. See "Potential Payments under Equity Compensation Plans" below. The following number of RSUs would have vested if involuntary termination had occurred on December 31, 2008:

| Name | Immediately Vest on Termination (#) | Vest During Applicable Salary Continuance Period (#) |
|---|---|---|
| M.S. Zafirovski | 90,600 | - |
| P.S. Binning | - | 84,766 |
| D.J. Carey | - | 58,267 |

(3) Based on an estimated annual cost of $25,000.

(4) Mr. Zafirovski's annual salary of CAD$1,366,120 and Mr. Binning's annual salary of CAD$683,000 have been converted to U.S. Dollars using the 2008 average exchange rate of US$1.00 = CAD$1.0614.

(5) Mr. Zafirovski's bonus entitlement has been converted to U.S. Dollars using the 2008 average exchange rate of

264

HIGHLY CONFIDENTIAL

Table of Contents

US$1.00 = CAD$1.0614.

### Potential Payments under Equity Compensation Plans

For a description of the treatment of outstanding stock options, RSUs and PSUs if a named executive officer had been terminated prior to the receipt of the equity termination order, see the Equity- Based Compensation Plans section below.

### Director Compensation for Fiscal Year 2008

The following table sets forth information regarding the compensation of each non- employee director of NNC and NNL for the fiscal year ended December 31, 2008. Mr. Zafirovski, as our President and Chief Executive Officer, does not receive any compensation as a director of NNC or NNL. For information regarding the compensation of Mr. Zafirovski, see "Summary Compensation Table for Fiscal Year 2008" above.

| Name | Fees Earned or Paid in Cash ($)(1)(2)(3) | Stock Awards ($) | Option Awards($) | Non- Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation($)(4) | Total($) |
|---|---|---|---|---|---|---|---|
| J.H. Bennett | 200,000 | - | - | - | - | 273(5) | 200,273 |
| Dr. M. Bischoff | 212,500 | - | - | - | - | 830(6) | 213,330 |
| The Hon. J.B. Hunt, Jr. | 215,000 | - | - | - | - | 1,151(6) | 216,151 |
| Dr. K.M. Johnson | 200,000 | - | - | - | - | 1,151(6) | 201,151 |
| J.A. MacNaughton | 235,000 | - | - | - | - | 273(5) | 235,735 |
| The Hon. J.P. Manley | 215,000 | - | - | - | - | 273(5) | 215,273 |
| R.D. McCormick | 227,500 | - | - | - | - | 1,151(6) | 228,651 |
| C. Mongeau | 200,000 | - | - | - | - | 273(5) | 200,273 |
| H.J. Pearce | 562,500 | - | - | - | - | 1,151(6) | 563,651 |
| J.D. Watson(7) | 164,674(7) | - | - | - | - | 273(5) | 164,974 |

(1) Each non- employee director of NNC and NNL had the right to elect to receive all or a portion of compensation for services rendered as a member of the Nortel Boards, any Committees thereof, and as Board or Committee chair, in the form of share units, in cash or in a combination of share units and cash, under the DSC Plans. For a summary of the applicable director fees, see "Director Compensation Schedule" below. The directors made the following elections for 2008:

| Director | Election Board, Committee and Chair Fees | Election Long- Term Incentive Fees |
|---|---|---|
| J.H. Bennett | 100% share units | 100% share units |
| Dr. M. Bischoff | 100% share units | 100% share units |
| The Hon. J.B. Hunt, Jr. | 100% share units | 100% share units |
| Dr. K.M. Johnson | 50% share units, 50% cash | 100% share units |
| J.A. MacNaughton | 100% share units | 100% share units |
| The Hon. J.P. Manley | 100% cash | 100% share units |
| R.D. McCormick | 100% share units | 100% share units |
| C. Mongeau | 100% share units | 100% share units |

265

**Table of Contents**

| H.J. Pearce | 50% share units, 50% cash | 100% share units |
| | 100% cash, Board chair fees | |
| J.D. Watson | 100% share units | 100% share units |

As part of the relief sought in the CCAA Proceedings, Nortel requested entitlement to pay the directors their compensation in cash on a current basis, notwithstanding any outstanding elections, during the period in which the directors continue as directors in the CCAA Proceedings. Without this relief, the directors would essentially be providing services going forward for no compensation. On the Petition Date, the Canadian Court in the CCAA Proceedings granted an order providing that Nortel's directors are entitled to receive remuneration in cash on a current basis at current compensation levels less an overall $25,000 reduction notwithstanding the terms of, or elections made under, the DSC Plans.

(2)   Share units were credited on a quarterly basis, and the number of share units received was equal to the amount of fees expressed in U.S. Dollars, converted to Canadian Dollars, divided by the market value expressed in Canadian Dollars (as determined in accordance with the DSC Plans) of NNC common shares on the last trading day of each quarter. Generally, share units are settled through open market purchases (net of taxes) on the fourth trading day following the release of Nortel's financial results after the director ceases to be a member of the applicable Board, and each share unit entitles the holder to receive one NNC common share. Nortel pays all administrative fees, including applicable brokers' commissions, under the terms of the DSC Plans. Share units for the fiscal year ended December 31, 2008 were credited based on the following exchange rates and prices:

| 2008 Fiscal Quarter | Last Trading Day of Quarter | Bank of Canada Noon Rate of Exchange | Average of High and Low Prices for a Board Lot of NNC Common Shares on NYSE (expressed in CAD$) |
| --- | --- | --- | --- |
| First quarter | March 31, 2008 | US$1.00 = $1.0279 | 6.88 |
| Second quarter | June 30, 2008 | US$1.00 = $1.0186 | 8.50 |
| Third quarter | September 30, 2008 | US$1.00 = $1.0599 | 2.50 |
| Fourth quarter | December 31, 2008 | US$1.00 = $1.2246 | 0.34 |

(3)   The following table sets forth the number of share units (rounded down to the nearest whole number) received under the DSC Plans by each director during the fiscal year ended December 31, 2008, the total number of share units (rounded down to the nearest whole number) held under the DSC Plans as of the Petition Date and the total market value based on the closing market price of NNC common shares of $0.11 on the NYSE on the Petition Date.

| | Share Units Received in 2008 | | Total Number of Share Units Held as of January 14, 2009 | |
| | Number (#) | Market Value ($) | Number (#) | Market Value ($) |
| Director | --- | --- | --- | --- |
| J.H. Bennett | 214,748 | 23,622 | 230,763 | 25,384 |
| Dr. M. Bischoff | 228,169 | 25,099 | 214,696 | 23,617 |
| The Hon. J.B. Hunt, Jr. | 230,854 | 25,394 | 247,650 | 27,242 |
| Dr. K.M. Johnson | 174,482 | 19,193 | 180,217 | 19,824 |
| J.A. MacNaughton | 252,329 | 27,756 | 270,866 | 29,795 |
| The Hon. J.P. Manley | 134,217 | 14,764 | 151,834 | 16,702 |
| R.D. McCormick | 244,276 | 26,870 | 262,919 | 28,921 |
| C. Mongeau | 214,748 | 23,622 | 225,557 | 24,811 |
| H.J. Pearce | 175,825 | 19,341 | 188,637 | 20,750 |

266

Table of Contents

(4)  All other compensation paid in Canadian Dollars has been converted using the average of the exchange rates in effect during 2008 equal to US$1.00 = CAD$1.0614.

(5)  Represents amounts paid by Nortel for (i) life insurance premiums and (ii) taxes with respect to the life insurance premiums. As of May 7, 2008, Nortel no longer maintains life insurance for active non- employee directors.

(6)  Represents amounts paid by Nortel for (i) life insurance premiums and (ii) taxes with respect to the life insurance premiums and non- resident tax return preparation services. As of May 7, 2008, Nortel no longer maintains life insurance for active non- employee directors.

(7)  Mr. Watson resigned from the Nortel Boards effective October 27, 2008. As of the October 27, 2008 date of his resignation, Mr. Watson had received 47,308 share units under the Plans rounded down to the nearest whole number during 2008. 58,118 total number of share units held by Mr. Watson under the Plans as of the October 27, 2008 date of his resignation were settled by delivery of NNC common shares on November 18, 2008 pursuant to the terms of the DSC Plans.

**Director Compensation Schedule**

The compensation of directors is considered on a combined basis in light of the overall governance structure of NNC and NNL. Director compensation is set solely on an annual fee basis (paid quarterly in arrears) and additional fees are not paid for Board or Committee meeting attendance. During 2008, directors of NNC and NNL, other than Mr. Zafirovski, were entitled to receive the following annual fees:

| | | | | |
|---|---|---|---|---|
| Annual NNL Board retainer | | | | $50,000 |
| Annual Committee membership retainer for serving on: | | | | |
| Nominating and Governance Committee of NNC | | | | $12,500 |
| Audit Committee of NNC | $ | 6,250 | $ | 12,500 |
| Audit Committee of NNL | $ | 6,250 | | |
| Compensation and Human Resources Committee of NNC and NNL | | | | $12,500 |
| Pension Fund Policy Committee of NNL | | | | $12,500 |
| Litigation Committee of NNC | | | | $12,500 |
| Annual fee for the non- executive Chair of the Board of NNC | $ | 180,000 | $ | 360,000 |
| Annual fee for the non- executive Chair of the Board of NNL | $ | 180,000 | | |
| Annual retainer for chairing the: | | | | |
| Nominating and Governance Committee of NNC | | | | $15,000 |
| Audit Committee of NNC | $ | 17,500 | $ | 35,000 |
| Audit Committee of NNL | $ | 17,500 | | |
| Compensation and Human Resources Committee of NNC and NNL | | | | $15,000 |
| Pension Fund Policy Committee of NNL | | | | $15,000 |
| Litigation Committee of NNC | | | | $15,000 |
| Annual NNL long- term incentive fee | | | | $125,000 |

On the Petition Date, upon the request of the Nortel Boards, the court in the CCAA Proceedings granted an order reducing overall director compensation by $25,000. As a result, the annual NNL Board retainer of $50,000 and the annual NNL long- term incentive fee of $125,000 has been converted to an annual cash retainer of $150,000 (paid on a quarterly basis in arrears). In recognition of the Creditor Protection Proceedings and the continued focus on cost reduction, Mr. Pearce, Chair of the Nortel Boards, and Mr. MacNaughton, Chair of the Audit Committees, voluntarily decreased the amount of the Board chair and Audit Committee chair fees, respectively. The Audit Committee chair fee is now the same as other Committee chair fees. Effective the Petition Date, the annual fee for the non- executive chair of the Boards of Directors of NNC and NNL was reduced from an aggregate of $360,000 to $150,000 and the annual retainer for chairing the Audit Committees of NNC and NNL was reduced from an aggregate of $35,000 to $15,000. In addition, Mr. Pearce voluntarily waived his retainer for chairing the Litigation Committee of NNC of $15,000 and his Litigation Committee of NNC membership fee of $12,500. All of the above reduced director compensation will result in a reduction to Mr. Pearce's fees from $562,500 to $300,000.

HIGHLY CONFIDENTIAL

Table of Contents

Directors entitled to the above remuneration are also reimbursed for reasonable travel and living expenses properly incurred by them in attending any meetings of the Nortel boards or their committees or for performing services as directors. In addition, as of December 2007, Nortel provides tax preparation services for non- resident non- employee directors.

Until May 7, 2008 Nortel maintained, at its cost, life insurance for active directors, who were not salaried employees of NNC or NNL. Such insurance coverage was for CAD$100,000. Nortel no longer maintains the life insurance benefit for active directors. Directors are not eligible for retirement compensation or life insurance following retirement.

**Share Ownership Guidelines**

Effective January 1, 2004, the Boards of Directors of NNC and NNL amended share ownership guidelines to require each non- employee director (other than the chair) to own, directly or indirectly, NNC common shares having a fair market value of at least $300,000 within five years from the earlier of the date the director was first elected or appointed to the Nortel Boards. The chair of the Nortel Boards is required to own, directly or indirectly, NNC common shares having a fair market value of at least $1,600,000 within five years from the earlier of the date he or she was first appointed as chair of the Nortel Boards. Directors are expected to continue to comply with these share ownership guidelines during the balance of their tenures as directors. Each of the current non- employee directors of NNC and NNL have been a director for less than the five year threshold under the share ownership guidelines. Share units credited under the DSC Plans are included in the calculation of the number of NNC common shares owned by a director for this purpose. Given the Creditor Protection Proceedings, the decreased value of NNC common shares and the payment of director fees in cash rather than share units, on February 20, 2009, the Nominating and Governance Committee acknowledged the current inability of the directors to meet the share ownership guidelines and determined to revisit the guidelines as appropriate at a later date.

**Indemnification**

Pursuant to indemnification agreements entered into between NNC, NNL and each non- employee director, Nortel has agreed to indemnify and reimburse each director for all injury, liability, loss, damage, charge, cost, expense, fine or settlement amount reasonably incurred by such director, including reasonable legal and other professional fees:

> in connection with a claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, investigation, inquiry, hearing or other proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise, made, asserted against or affecting such director or in which such director is required by law to participate or in which such director participates at the request of Nortel or in which such director chooses to participate, if it relates to, arises from, or is based on such individual's service as a director or officer of Nortel or service as a director or officer of another entity at the request of Nortel; or

> otherwise related to, arising from or based on such individual's service as a director or officer of Nortel or service as a director or officer of another entity at the request of Nortel,

except if such indemnification or reimbursement would be prohibited by the CBCA or otherwise by law.

The initial order of the Canadian Court in the CCAA Proceedings ordered the Canadian Debtors to indemnify directors and officers for claims that may be made against them relating to failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations. The initial order also included a charge in an aggregate amount not exceeding CAD$90 million as security for such indemnification obligations.

**Compensation Committee Interlocks and Insider Participation**

The members of the Compensation and Human Resources Committee of the Nortel Boards are Mr. Richard D. McCormick (Chair), who was appointed to the Committee effective January 18, 2005, Mrs. Jalynn H. Bennett and The Hon. John. P. Manley each of whom was appointed to the Committee effective June 29, 2005, Dr. Manfred Bischoff who was appointed to the Committee effective June 29, 2006 and Dr. Kristina M. Johnson who was appointed to the Committee effective November 30, 2006. No changes to the membership of the Compensation and Human Resources Committee occurred during 2008. No member of the Compensation and Human Resources Committee was an officer (within the meaning of applicable United States securities laws) or employee of Nortel or any of its subsidiaries at any time during 2008.

268

HIGHLY CONFIDENTIAL

Table of Contents

No executive officer of Nortel serves on the Board of Directors or compensation committee of any other entity that has or has had one or more of its executive officers serving as a member of the Nortel Boards.

**Compensation Committee Report**

The Compensation and Human Resources Committee of the Boards of Directors of NNC and NNL has reviewed and discussed with management the "Compensation Discussion and Analysis" required by Regulation S-K Item 402(b). Based on such review and discussion, the Compensation and Human Resources Committee recommended to the Boards of Directors that the "Compensation Discussion and Analysis" be included in this Report. This report has been submitted by Mrs. Jalynn H. Bennett, Dr. Manfred Bischoff, Dr. Kristina M. Johnson, The Hon. John P. Manley and Mr. Richard D. McCormick as members of the Compensation and Human Resources Committee of the Board of Directors of NNC and NNL.

**ITEM 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

**Equity-Based Compensation Plans**

The table below provides information as of December 31, 2008 under the 2005 SIP, the 2000 Plan and the 1986 Plan. Under the equity termination order dated February 27, 2009, our equity-based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

| Plan category | Number of NNC common shares issuable on exercise or settlement of outstanding options, RSUs and PSUs (a) | Weighted average exercise price of outstanding options ($)(1) (b) | Number of NNC common shares remaining available for issuance under equity compensation plans (excluding common shares reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by shareholders(2) | Options: 29,230,676 RSUs: 5,000,036 PSU- rTSRs: 1,553,350 PSU- Management OMs: 1,223,110 | Options: $53.78 | Options, RSUs and PSUs: 22,026,254(3) |
| Equity compensation plans not approved by shareholders(4) | Options: 366,931 | Options: $331.56 | - |
| Total | Options: 29,597,607 RSUs: 5,000,036 PSU- rTSRs: 1,553,350 PSU- Management OMs: 1,223,110 | Options: $57.23 | Options, RSUs and PSUs: 22,026,254(3) |

(1)  Weighted average exercise price of options only. RSUs and PSUs did not have an exercise price.

(2)  Consists of the 2005 SIP, the 2000 Plan and the 1986 Plan.

(3)  Includes NNC common shares previously available for issuance under the 1986 Plan and 2000 Plan which became available for issuance under the 2005 SIP as of January 1, 2006. Of the 22,026,254 NNC common shares that were available for issuance under the 2005 SIP, only 14,115,989 remained available for issuance as RSUs and/or PSUs as of December 31, 2008.

(4)  Plans that were assumed by Nortel in merger, consolidation or other acquisition transactions and under which no subsequent grants may be made. NNC common shares are issued from treasury to satisfy such awards.

269

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 281

**Table of Contents**

**Nortel 2005 Stock Incentive Plan**

The 2005 SIP was approved by the Board of Directors of NNC on April 27, 2005, and approved by shareholders of NNC at our combined 2004 and 2005 annual meeting. On January 1, 2006, in accordance with such approvals, the number of NNC common shares available for grants under the 2000 Plan and the 1986 Plan (Prior Plan Shares), and the number of NNC common shares subject to options outstanding under the 2000 Plan and the 1986 Plan, to the extent such options thereafter expire or terminate for any reason without the issuance of shares, were transferred to the 2005 SIP. No new awards were made under either the 2000 Plan or the 1986 Plan after December 31, 2005. At the annual meeting of Nortel's shareholders held on May 7, 2008, the following amendments to the 2005 SIP were approved by NNC's shareholders in accordance with the rules of the TSX and NYSE and the terms of the 2005 SIP: (i) an increase in the number of NNC common shares issuable under the 2005 SIP by 14 million from 12.2 million to 26.2 million; (ii) the addition of certain additional types of amendments to the 2005 SIP or awards under it requiring shareholder approval; and (iii) amendments to reflect current market practices with respect to blackout periods. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

The 2005 SIP was administered by the CHRC. The CHRC or its designee was authorized to select those key employees to receive awards and, consistent with the provisions of the 2005 SIP, the terms and conditions of such awards. Non- employee directors of the Nortel Boards were not eligible to participate in the 2005 SIP.

*Material Features of the 2005 SIP*

The following summary of the 2005 SIP is qualified in its entirety by the specific language of the 2005 SIP, a copy of which is available free of charge by writing to the Corporate Secretary.

*Awards under the 2005 SIP*

The 2005 SIP permitted grants of stock options, including incentive stock options, SARs, RSUs and/or PSUs.

*Stock Options and SARs*

The normal term for options and SARs was 10 years. The exercise price for each NNC common share subject to an option could not have been less than 100% of the "market value" of the shares on the effective date of the award of such option. The exercise price was stated and payable in Canadian Dollars for Canadian awards and in U.S. Dollars for U.S. awards. The CHRC was permitted to grant stand- alone SARs or SARs in tandem with options granted under the 2005 SIP. Upon the exercise of a vested SAR (and in the case of a tandem SAR, the related option), a participant was entitled to payment equal to the excess of the "market value" of an NNC common share on the date of exercise over the subscription or base price under the SAR.

If a 2005 SIP participant was terminated prior to the expiration of the normal term of an option or SAR, options and/or SARs then held by the participant would have been treated as follows, unless the CHRC determined otherwise.

> *Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 2005 SIP), the participant's unvested options and/or SARs became vested as of the later of (i) the participant's date of retirement or (ii) the first anniversary of the effective date of grant of such options and/or SARs. To the extent vested, the participant had three years following the date of retirement to exercise his or her options and/or SARs.

270

**Table of Contents**

*Death.* If a participant's active employment terminated due to his or her death, all of the participant's unvested options and/or SARs became immediately vested and remained exercisable for two years following the date of the participant's death.

*Involuntary Termination other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 2005 SIP) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested options and/or SARs continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments. During such extended vesting period and for 90 days thereafter, the participant was permitted to exercise vested options and/or SARs. A participant whose active employment was terminated by Nortel other than for cause and who did not receive severance benefits had 90 days following termination to exercise vested options and/or SARs and his or her unvested options and/or SARs were cancelled.

*Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 2005 SIP), any and all outstanding options, whether or not vested, were immediately forfeited and cancelled.

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested options and/or SARs were cancelled, and the participant had 90 days following his or her date of termination to exercise vested options and/or SARs.

*Restricted Stock Units and Performance Stock Units*

Each RSU or PSU granted under the 2005 SIP generally represented the right to receive one NNC common share. Vested units were generally settled upon vesting by delivery of a share for each vested unit or payment of a cash amount equal to the "market value" of a Nortel share at the time of settlement, as the CHRC determined, subject to the CHRC determining with respect to PSUs, the percentage, which could be greater or lesser than 100%, of the PSUs that became vested depending on the extent of satisfaction of the performance criteria.

If a 2005 SIP participant was terminated prior to the vesting of a RSU, RSUs then held by the participant were treated as follows, unless the CHRC determined otherwise.

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 2005 SIP), a pro rata portion of the participant's unvested RSUs vested and the remaining portion was forfeited and cancelled, provided, however, no portion of a RSU award could become vested earlier than the first anniversary of the effective date of the award.

*Death.* If a participant's active employment was terminated due to his or her death, a pro rata portion of the participant's unvested RSUs vested and the remaining portion was forfeited and cancelled, provided, however, no portion of a RSU award could become vested earlier than the first anniversary of the effective date of the award.

*Involuntary Termination Other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 2005 SIP) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested RSUs continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments after which time any unvested RSUs were forfeited and cancelled. If after such severance period, the participant was eligible to retire under applicable laws, a pro rata portion of the then unvested RSUs vested and the remaining portion was forfeited and cancelled.

*Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 2005 SIP), any and all outstanding RSUs were forfeited and cancelled.

271

HIGHLY CONFIDENTIAL

Table of Contents

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested RSUs were forfeited and cancelled.

If a 2005 SIP participant was terminated prior to the vesting of a PSU, PSUs then held by the participant were treated as follows, unless the CHRC determined otherwise.

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 2005 SIP), a pro rata portion of the PSUs to be settled would have vested, subject to the CHRC determining the percentage, which could have been greater or lesser than 100%, of the PSUs that became vested depending on the extent of satisfaction of the performance criteria and provided the participant was a regular full- time employee of Nortel for at least twelve months from the effective date of award of the PSUs, and the remaining portion of such PSUs were forfeited and cancelled.

*Death.* If a participant's active employment was terminated due to his or her death and the participant was a regular full- time employee of Nortel for at least twelve months from the effective date of award of the PSUs, a pro rata portion of the participant's unvested PSUs immediately vested based on the target amount.

*Termination (Involuntary or for Cause).* If a participant's active employment was terminated (including for cause (as defined in the 2005 SIP)), the participant's unvested PSUs immediately forfeited and cancelled for no consideration 45 days after such date of termination.

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested PSUs were forfeited and cancelled for no consideration 45 days after such date of termination.

Notwithstanding the above, the 2005 SIP also provided that any payments made as a result of separation from service (as defined in Section 409A of the Code) to an individual who qualified as a specified employee as defined under Section 409A of the Code in the settlement of RSUs or PSUs could not be made before the date that was six months after the date of separation from service or, if earlier, the date of the individual's death.

*Vesting Conditions*

Vesting of all or any portion of awards granted under the 2005 SIP could be conditioned upon the participant's continued employment, passage of time, satisfaction of performance criteria or any combination thereof, as determined by the CHRC; provided that no portion of an award could become vested prior to the first anniversary of the date such award is granted (except in the event of a participant's death) and vesting conditions based upon achievement of performance objectives must provide for a performance measurement period or periods. In addition (except in the event of a participant's death or retirement, as determined by the CHRC) awards of time based RSUs could not become vested more rapidly than ratably over three years. The CHRC could have accelerated any condition to the vesting of all or any awards granted under the 2005 SIP or, except for performance conditions with respect to awards that were intended to qualify as performance- based compensation under Section 162(m) of the Code, could have waived any performance conditions to vesting, except that the CHRC could not accelerate vesting of any award as of any date before one year from the grant date of the award. In addition, the CHRC could not waive any performance conditions to vesting that would have resulted in the violation of Section 409A of the Code.

*Performance Vesting Conditions for Certain Awards Intended to Qualify as Performance- Based Compensation under Section 162(m) of the Code*

Awards granted under the 2005 SIP could have qualified as "performance- based compensation" under Section 162(m) of the Code in order to preserve federal income tax deductions by Nortel with respect to annual compensation required to be taken into account under Section 162(m) that is in excess of $1 million and paid to one of Nortel's five most highly compensated executive officers, provided that determinations to grant options and other awards under the 2005 SIP had to be made by a committee consisting solely of two or more "outside directors" (as defined under Section 162 regulations). The 2005 SIP's limit on the total number of shares that may be awarded to

272

Table of Contents

any one participant during any five year period also had to be satisfied. To the extent that an award was intended to qualify as "performance-based compensation" under Section 162(m), the performance criteria applicable to such award were based upon one or more of the following "qualifying performance criteria," as determined by the CHRC:

| | |
|---|---|
| Cash Flow | Operating profit or net operating profit |
| Earnings per share | Operating margin or profit margin |
| Earnings before interest, taxes and/or amortization | Return on operating revenue |
| Return on sales | Return on invested capital |
| Total shareholder return | Market segment share |
| Share price performance | Product release schedules |
| Return on capital | New product innovation |
| Return on assets or net assets | Product cost reduction |
| Revenue | Brand recognition/acceptance |
| Income or net income | Product ship targets |
| Operating income or net operating income | Customer satisfaction |

The CHRC would have determined whether the applicable qualifying performance criteria were achieved. The CHRC could adjust any evaluation of performance under the qualifying performance criteria described above to exclude certain events that occur during a performance period, as set forth in the 2005 SIP.

*Definition of Market Value*

Under the 2005 SIP, "Market Value" was defined as the average of the high and low prices for a board lot of NNC common shares traded in Canadian Dollars on the TSX during the relevant day or, if the volume of NNC common shares traded on the NYSE during the relevant day in the U.S. exceeded the volume of NNC common shares traded on the TSX on such relevant day, the average of the high and low prices for a board lot of NNC common shares traded in U.S. Dollars on the NYSE during the relevant day. The market value so determined could have been in Canadian Dollars or in U.S. Dollars. As a result, the market value of a common share covered by a Canadian award was either (a) such market value as determined above, if in Canadian Dollars, or (b) such market value as determined above converted into Canadian Dollars at the noon rate of exchange of the Bank of Canada on the relevant day, if in U.S. Dollars. Similarly, the market value of a common share covered by a U.S. award was either (a) such market value as determined above, if in U.S. Dollars, or (b) such market value as determined above converted into U.S. Dollars at the noon rate of exchange of the Bank of Canada on the relevant day, if in Canadian Dollars. If on the relevant day there was not a board lot trade in the NNC common shares on each of the TSX and the NYSE or there was not a noon rate of exchange of the Bank of Canada, then the market value of an NNC common share covered by a Canadian award and the market value of an NNC common share covered by a U.S. award was determined as provided above on the first day immediately preceding the relevant day for which there were such board lot trades in the NNC common shares and a noon rate of exchange. The market value of an NNC common share was rounded up to the nearest whole cent.

*Transferability*

Awards granted under the 2005 SIP were not transferable other than by testamentary disposition or the laws of intestate succession. The CHRC, however, could permit the transfer of awards without payment of consideration to members of a participant's immediate family or entities controlled by the participant or his or her immediate family members.

*Participants in Jurisdictions Outside of Canada and the United States*

To accommodate differences in local laws, customs and tax practices, awards granted to participants in countries other than Canada and the United States could have been subject to special terms and conditions, including any special supplement that may be added to the 2005 SIP, as the CHRC determined appropriate.

273

HIGHLY CONFIDENTIAL                NNC-NNL06001427 / 285

Table of Contents

*Amendments*

The Board of Directors had the authority to terminate, amend or suspend the 2005 SIP at any time; provided that the prior approval of shareholders was required for any amendment that Nortel determined constituted a material amendment within the meaning of the applicable rules of the NYSE including any amendment that would have:

> increased the maximum number of shares for which awards were granted under the 2005 SIP;

> reduced the exercise price or base price at which options or SARs were granted;

> reduced the exercise price or base price of outstanding options or SARs;

> extended the term of the 2005 SIP or the maximum term of options or SARs granted under the 2005 SIP;

> changed the class of persons eligible for grant of awards under the 2005 SIP;

> increased any other limit with respect to the number of Nortel shares that could be granted with respect to any type of award, a single participant or any group of participants; or

> reduced below one year the minimum period required as a condition to the vesting of any award (other than in the case of a participant's death).

*Adjustments*

In the event of certain events affecting the capitalization of NNC, including a stock dividend, or certain other corporate transactions, the Board of Directors could have adjusted the number and kind of shares available for grant under the 2005 SIP or subject to outstanding awards and the exercise price or base price applicable under outstanding awards.

*United States Federal Income Tax Consequences Relating to the 2005 SIP*

The United States federal income tax consequences to Nortel and its employees of awards under the 2005 SIP are complex and subject to change. The following discussion is only a summary of the general rules and tax consequences applicable to the issuance of options under the 2005 SIP.

As noted above, options granted under the 2005 SIP could have either been incentive stock options or nonqualified stock options. Incentive stock options were options which are designated as such by Nortel and which meet certain requirements under Section 422 of the Code and its regulations. Any option that did not satisfy these requirements was treated as a nonqualified stock option.

*Nonqualified Stock Options*

Nonqualified stock options granted under the 2005 SIP did not qualify as "incentive stock options" and did not qualify for any special tax benefits to the participant. A participant generally did not recognize any taxable income at the time he or she was granted a nonqualified option. However, upon its exercise, the participant recognized ordinary income for federal tax purposes measured by the excess of the then fair market value of the shares over the exercise price. The income realized by the participant was subject to income and other employee withholding taxes.

The participant's basis for determination of gain or loss upon the subsequent disposition of shares acquired upon the exercise of a nonqualified stock option was the amount paid for such shares plus any ordinary income recognized as a result of the exercise of such option. Upon disposition of any shares acquired pursuant to the exercise of a nonqualified stock option, the excess of the sale price over the participant's basis in the shares was treated as a capital gain or loss and generally was characterized as long-term capital gain or loss if the shares have been held for more than one year at their disposition.

In general, there were no federal income tax deductions allowed to Nortel upon the grant or termination of a nonqualified stock option or a sale or disposition of the shares acquired upon the exercise of a nonqualified stock option. However, upon the exercise of a nonqualified stock option, Nortel was entitled to a deduction for federal

274

HIGHLY CONFIDENTIAL          NNC-NNL06001427 / 286

Table of Contents

income tax purposes equal to the amount of ordinary income that a participant is required to recognize as a result of the exercise, provided that the deduction is not otherwise disallowed under the Code.

*Incentive Stock Options*

If an option granted under the 2005 SIP was treated as an incentive stock option, the participant did not recognize any income upon either the grant or the exercise of the option, and Nortel was not be allowed a deduction for U.S. federal tax purposes at such times. Upon a sale of the shares, the tax treatment to the participant and Nortel depended primarily upon whether the participant met certain holding period requirements at the time he or she sold the shares. In addition, as discussed below, the exercise of an incentive stock option could have been subject to alternative minimum tax liability.

If a participant exercised an incentive stock option and did not dispose of the shares received within two years after the date such option was granted or within one year after the transfer of the shares to him or her upon exercise, any gain realized upon the disposition was characterized as long- term capital gain and, in such case, Nortel was entitled to a federal tax deduction.

If the participant disposed of the shares either within two years after the date the option was granted or within one year after the transfer of the shares to him or her upon exercise, such disposition was treated as a disqualifying disposition and an amount equal to the lesser of (1) the fair market value of the shares on the date of exercise minus the exercise price, or (2) the amount realized on the disposition minus the exercise price, was taxed as ordinary income to the participant in the taxable year in which the disposition occurred. (However, in the case of gifts, sales to related parties, and certain other transactions, the full difference between the fair market value of the stock and the purchase price was treated as compensation income). The excess, if any, of the amount realized upon disposition over the fair market value at the time of the exercise of the option was treated as long-term capital gain if the shares were held for more than one year following the exercise of the option. In the event of a disqualifying disposition, Nortel could withhold income taxes from the participant's compensation with respect to the ordinary income realized by the participant as a result of the disqualifying disposition.

The exercise of an incentive stock option could have subjected a participant to alternative minimum tax liability. The excess of the fair market value of the shares at the time an incentive stock option was exercised over the exercise price of the shares was included in income for purposes of the alternative minimum tax even though it is not included in taxable income for purposes of determining the regular tax liability of an employee. Consequently, a participant was obligated to pay alternative minimum tax in the year he or she exercised an incentive stock option.

In general, there were no federal income tax deductions allowed to Nortel upon the grant, exercise, or termination of an incentive stock option. However, in the event a participant sold or otherwise disposed of stock received on the exercise of an incentive stock option in a disqualifying disposition, Nortel was entitled to a deduction for federal income tax purposes in an amount equal to the ordinary income, if any, recognized by the participant upon disposition of the shares, provided that the deduction was not otherwise disallowed under the Code.

*Other Possible Tax Consequences*

*Section 162(m).* Section 162(m) of the Code denies a federal income tax deduction by Nortel with respect to any annual compensation in excess of $1 million paid to any of Nortel's chief executive officer and three other most highly compensated executive officers (other than any person who served as chief financial officer during the year), as applicable. Options granted under the 2005 SIP could have qualified as "performance- based compensation" and so did not count against the $1 million limit. To so qualify, options had to be granted under the 2005 SIP by a committee consisting solely of two or more "outside directors" (as defined under Section 162(m) regulations), be granted with a per share exercise price equal to fair market value of a common share on the date of grant and satisfy the 2005 SIP's limit on the total number of shares that could be awarded to any one participant during any five year period.

275

Table of Contents

*Section 409A.* If granted with a per share exercise price equal to fair market value of a common share on the date of grant and containing no other deferral features, options granted under the 2005 SIP were not subject to Section 409A of the Code.

*Section 280G.* If the exercisability of an option was accelerated due to a change in control of NNC under certain circumstances, the participant may have incurred a 20% excise tax and NNC may have lost a deduction as a result of such acceleration pursuant to under Section 280G of the Code (the so- called "golden parachute" regulation).

**Nortel Networks Corporation 2000 Stock Option Plan and 1986 Stock Option Plan**

Prior to the adoption of the 2005 SIP, the 2000 Plan and the 1986 Plan were the only compensation plans under which equity securities of NNC were authorized for issuance from treasury. The 2005 SIP replaced the 2000 Plan and the 1986 Plan to the extent that no new awards were granted under these stock option plans. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. The following summary of the certain terms of the 2000 Plan and the 1986 Plan is qualified in its entirety by the specific language of the 2000 Plan and the 1986 Plan, copies of which are available free of charge by writing to the Corporate Secretary.

*Terms Relating to 1986 Plan (pre- May 15, 2000)*

If a 1986 Plan participant whose options were granted on or prior to May 15, 2000 was terminated prior to the expiration of the normal term of an option, options then held by the participant were treated as follows, unless the CHRC determined otherwise.

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 1986 Plan), the participant's unvested options became vested on the later of (i) the date of the participant's retirement or (ii) the first anniversary of the effective date of grant of such options. To the extent vested, the participant had 36 months following the date of retirement to exercise his or her options.

*Death.* If a participant's active employment was terminated due to his or her death, all of the participant's unvested options became immediately vested and remained exercisable for 24 months following the date of the participant's death.

*Involuntary Termination Other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 1986 Plan) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested options continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments. During such extended vesting period, the participant was permitted to exercise vested options. A participant whose active employment was terminated by Nortel other than for cause and who did not receive severance benefits had to exercise unvested options before his or her termination date or his or her unvested options were cancelled.

*Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 1986 Plan), all outstanding options were immediately forfeited and cancelled.

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested options were cancelled.

*Terms Relating to 1986 Plan (post May 15, 2000) and 2000 Plan*

If a 2000 Plan participant or a 1986 Plan participant whose options were granted after May 15, 2000 was terminated prior to the expiration of the normal term of an option, options then held by the participant were treated as follows, unless the CHRC determined otherwise.

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 288

Table of Contents

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 1986 Plan and 2000 Plan, as applicable), the participant's unvested options became vested on the later of (i) the date of the participant's retirement or (ii) the first anniversary of the effective date of grant of such options. To the extent vested, the participant had 36 months following the date of retirement to exercise his or her options.

*Death.* If a participant's active employment was terminated due to his or her death, all of the participant's unvested options became immediately vested and remained exercisable for 24 months following the date of the participant's death.

*Involuntary Termination Other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 1986 Plan and 2000 Plan, as applicable) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested options continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments. During such extended vesting period and for 90 days thereafter, the participant was permitted to exercise vested options. A participant whose active employment was terminated by Nortel other than for cause and who did not receive severance benefits had 90 days following termination to exercise vested options and his or her unvested options were cancelled.

*Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 1986 Plan and the 2000 Plan), all outstanding options were immediately forfeited and cancelled.

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested options were cancelled. Options vested on termination could be exercised during the 90 day period following termination.

**Assumed Plans**

As part of the acquisition of certain businesses between 1998 and 2000, Nortel assumed the stock option plans of several entities that it acquired. As a result, the exercise of stock options previously granted under these assumed plans were satisfied through the issuance of NNC common shares. No additional stock options were granted under these assumed plans. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

**Security Ownership of Directors and Management**

The following table shows the number of NNC common shares beneficially owned as of March 2, 2009 by each of Nortel's directors and the individuals named as named executive officers in the Executive Compensation section above, as well as by the directors and executive officers as a group. No director or executive officer has pledged any of his or her NNC common shares as security.

A person is deemed to be a beneficial owner of a common share if that person has, or shares, the power to direct the vote or investment of that common share. Under applicable United States securities laws, a person is also deemed to be a beneficial owner of a common share if such person has the right to acquire the share within 60 days (whether or not, in the case of a stock option, the current market price of the underlying common share is below the stock option exercise price). More than one person may be deemed a beneficial owner of a common share and a person need not have an economic interest in a share to be deemed a beneficial owner. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. As a result, the individuals named in the

277

Table of Contents

following table are not beneficial owners of any stock options or RSUs that would have become exercisable or would vest, respectively, within 60 days after March 2, 2009.

Share units, as referenced in the table below, represent share units issued under the DSC Plans. Each share unit represents the right to receive one NNC common share and is not considered beneficially owned under applicable United States securities laws. The DSC Plans are described under "Director Compensation for Fiscal Year 2008" under the Executive and Director Compensation section above.

| Name of Beneficial Owner | Title of Class of Security | Amount and Nature of Beneficial Ownership (#)(1) |
|---|---|---|
| J.H. Bennett | NNC common shares | - |
| | Share units | 230,763 |
| Dr. M. Bischoff | NNC common shares | |
| | Share units | 241,696 |
| The Hon. J.B. Hunt, Jr. | NNC common shares | - |
| | Share units | 247,649 |
| Dr. K.M. Johnson | NNC common shares | - |
| | Share units | 180,217 |
| J.A. MacNaughton | NNC common shares | 10,000 |
| | Share units | 270,866 |
| The Hon. J.P. Manley | NNC common shares | |
| | Share units | 151,834 |
| R.D. McCormick | NNC common shares | 10,000 |
| | Share units | 262,918 |
| C. Mongeau | NNC common shares | - |
| | Share units | 225,557 |
| H.J. Pearce | NNC common shares | 90,600 |
| | Share units | 188,637 |
| M.S. Zafirovski | NNC common shares | 253,476 |
| P.S. Binning | NNC common shares | 43,794 |
| D.J. Carey | NNC common shares | 31,196 |
| S.J. Bandrowczak | NNC common shares | 5,193 |
| R.S. Lowe | NNC common shares | 47,664 |
| Directors and executive officers as a group (consisting of 24 persons, comprised of the current directors and current executive officers) | NNC common shares | 491,323(2) |
| | Share units | 2,000,137 |

(1)   Except as set forth below, each person has sole investment and voting power with respect to the NNC common shares beneficially owned by such person. As of February 20, 2009, each director and named executive officer individually, and the directors and executive officers as a group, beneficially owned less than 1.0% of the outstanding NNC common shares.

(2)   Includes 270 NNC common shares as to which investment and voting power is shared with one or more other persons.

**Voting Shares**

On February 20, 2009, 497,840,534 NNC common shares were issued and outstanding. Each common share entitles its holder to one vote.

Based on public filings with the SEC, we are not aware of any person or company who, directly or indirectly, beneficially owns or has control or direction over more than 5% of NNC common shares except:

278

## Table of Contents

| Name and Address | Amount and Nature of Beneficial Ownership | Percent of Outstanding NNC Common Shares |
|---|---|---|
| Brandes Investment Partners, L.P.(1) 11988 El Camino Real, Suite 500 San Diego, CA 92130 | 33,719,755(1) | 6.8(1) |
| Dodge & Cox (2) 555 California Street, 40 th Floor San Francisco, CA 94104 | 15,105,986(2) | 3.0%(2) |

(1)   The above information is based solely on the Schedule 13F filed with the SEC on February 12, 2009.

(2)   Dodge & Cox has sole voting power and sole dispositive power in respect of 15,105,986 NNC common shares. The above information is based solely on the Schedule 13G filed with the SEC on February 11, 2009.

**ITEM 13.       Certain Relationships and Related Transactions, and Board Independence**
**Transactions with Related Persons**
On January 19, 2007, the CHRC adopted a written policy regarding related party transactions and related procedures. The related party policy imposes a duty on directors and senior executives of Nortel to disclose any interests they have or their related parties have in certain interested transactions. The term "senior executives" as used in the related party policy means Board appointed officers. The compliance committee, comprised of members of management, will review all material facts of all interested transactions and approve or disapprove of the entry into such transactions (except transactions where related party is a director). The compliance committee will report quarterly to the Audit Committee and to the Nominating and Governance Committee on such approvals and disapprovals. Interested transactions involving directors will be reviewed by the Audit Committee. If the interested transaction could materially affect Nortel, the Audit Committee must review and approve the interested transaction. The related party policy contains standing approval for a list of certain transactions, which can be revised by the Audit Committee at any time. Violations of the related party policy can lead to disciplinary action up to and including termination of employment.
**Board Independence**
For a discussion of the independence of the members of the Nortel Boards and Committees, see "Independence of Directors" in the Corporate Governance section above.

**ITEM 14.       Principal Accountant Fees and Services**
KPMG LLP (KPMG) was appointed as the independent public accountants for NNC and NNL commencing with fiscal year 2007.
In accordance with applicable laws and the requirements of stock exchanges and securities regulatory authorities, the Audit Committees of NNC and NNL must pre- approve all audit and non- audit services to be provided by the independent auditors. In addition, it is the policy of NNC and NNL to retain auditors solely to provide audit and audit- related services and advice with respect to tax matters, but not to provide consulting services, such as information technology services.
**Audit Fees**
NNC and NNL prepare financial statements in accordance with U.S. GAAP. KPMG billed NNC and its subsidiaries $21.6 million and $26.8 million for the following audit services related to fiscal year 2008 and 2007, respectively: (i) the audits of the annual consolidated financial statements of NNC and of NNL included on Form 10- K; (ii) reviews of the financial statements of NNC and of NNL on Forms 10- Q; (iii) the audits of internal controls over financial reporting as required under the United States Sarbanes Oxley Act of 2002; (iv) audits of individual subsidiary and other investments statutory financial statements; and (v) required procedures with respect to securities regulatory filing matters.

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 291

**Table of Contents**

**Audit- Related Fees**

KPMG billed NNC and its subsidiaries $0.7 million and $0.6 million for the following audit- related services related to fiscal year 2008 and 2007, respectively: (i) audit of pension plan financial statements; (ii) finance transformation project and other systems applications testing; (iii) due diligence assistance services; (iv) training and compliance matters; and (v) regulatory audit and assurance services.

**Tax Fees**

KPMG billed NNC and its subsidiaries $0.4 million and $0.9 million for tax compliance services related to fiscal year 2008 and 2007, respectively. Tax compliance services are services rendered based upon facts already in existence or transactions that have already occurred to document, compute and obtain government approval for amounts to be included in tax filings and consisted of: (i) assistance in filing tax returns in various jurisdictions; (ii) sales and use, property and other tax return assistance; (iii) research and development tax credit documentation and analysis for purposes of filing amended returns; (iv) transfer pricing documentation; (v) requests for technical advice from taxing authorities; (vi) assistance with tax audits and appeals; and (vii) preparation of expatriate tax returns.

**All Other Fees**

KPMG has not provided NNC and its subsidiaries any other services in 2008 or 2007.

280

Table of Contents

PART IV

**ITEM 15.     Exhibits and Financial Statement Schedules**
**1. Financial Statements**
The index to the Consolidated Financial Statements appears on page 107.
**2. Financial Statement Schedules**

| | Page |
|---|---|
| Quarterly Financial Data (Unaudited) | 207 |
| Report of Independent Registered Chartered Accountants | 208 |
| Schedule II - Valuation and Qualifying Accounts and Reserves, Provisions for Uncollectibles | 209 |

All other schedules are omitted because they are inapplicable or not required.
**3. Other Documents Filed as a Part of This Report**

| | Page |
|---|---|
| Management's Report on Internal Control over Financial Reporting | 210 |
| Report of Independent Registered Public Accounting Firm | 211 |

Individual financial statements of entities accounted for by the equity method have been omitted because no such entity constitutes a "significant subsidiary" requiring such disclosure at December 31, 2008.
**4. Exhibit Index**
Pursuant to the rules and regulations of the SEC, Nortel has filed certain agreements as exhibits to this report. These agreements may contain representations and warranties by the parties. These representations and warranties have been made solely for the benefit of the other party or parties to such agreements and (i) may have been qualified by disclosures made to such other party or parties, (ii) were made only as of the date of such agreements or such other date(s) as may be specified in such agreements and are subject to more recent developments, which may not be fully reflected in Nortel's public disclosure, (iii) may reflect the allocation of risk among the parties to such agreements and (iv) may apply materiality standards different from what may

281

HIGHLY CONFIDENTIAL

Table of Contents

be viewed as material to investors. Accordingly, these representations and warranties may not describe Nortel's actual state of affairs at the date hereof and should not be relied upon.

The items listed as Exhibits 10.1 to 10.16, 10.19, 10.25 to 10.33, 10.35, 10.36, 10.38 to 10.43, 10.51 to 10.53, 10.56 to 10.61, 10.64 to 10.71, 10.73 to 10.77, 10.81 to 10.85 relate to management contracts or compensatory plans or arrangements.

| Exhibit No | Description |
|---|---|
| *2. | Amended and Restated Arrangement Agreement involving BCE Inc., Nortel Networks Corporation, formerly known as New Nortel Inc., and Nortel Networks Limited, formerly known as Nortel Networks Corporation, made as of January 26, 2000, as amended and restated March 13, 2000 (including Plan of Arrangement under Section 192 of the *Canada Business Corporations Act*) (filed as Exhibit 2.1 to Nortel Networks Corporation's Current Report on Form 8- K dated May 1, 2000). |
| *3.1 | Restated Certificate and Articles of Incorporation of Nortel Networks Corporation dated October 1, 2000, amended and restated on November 9, 2006 (filed as Exhibit 3.3 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2006). |
| *3.2 | By- Law No. 1 of Nortel Networks Corporation (filed as Exhibit 3.2 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2000). |
| *4.1 | Amended and Restated Shareholders Rights Plan Agreement dated as of February 28, 2006 between Nortel Networks Corporation and Computershare Trust Company of Canada, as rights agent (filed as Exhibit 3 to Nortel Networks Corporation's Form 8- A12B/A dated June 29, 2006). |
| *4.2 | Indenture dated as of November 30, 1988, between Nortel Networks Limited and The Toronto- Dominion Bank Trust Company, as trustee, related to debt securities authenticated and delivered thereunder, which comprised the 6% Notes due September 1, 2003, and the 6.875% Notes due September 1, 2023 issued by Nortel Networks Limited (filed as Exhibit 4.1 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 1999). |
| *4.3 | Indenture dated as of February 15, 1996, among Nortel Networks Limited, as issuer and guarantor, Nortel Networks Capital Corporation, formerly Northern Telecom Capital Corporation, as issuer, and The Bank of New York, as trustee, related to debt securities and guarantees authenticated and delivered thereunder, which comprised the 7.40% Notes due 2006 and the 7.875% Notes due 2026 (filed as Exhibit 4.1 to Registration Statement on Form S- 3 (No. 333- 1720) of Nortel Networks Limited and Nortel Networks Capital Corporation). |
| 4.4 | Agreement of Resignation, Appointment and Acceptance, dated as of February 12, 2009 among Nortel Networks Limited, formerly known as Northern Telecom Limited, Nortel Networks Capital Corporation, Northern Telecom Capital Corporation, The Bank of New York Mellon and Law Debenture Trust Company of New York relating to 7.875% Notes due 2026 issued under February 15, 1996 Indenture. |
| *4.5 | Third Supplemental Indenture dated as of May 28, 2008 to Indenture dated as of July 5, 2006 among Nortel Networks Limited as Issuer, Nortel Networks Corporation, Nortel Networks Inc. as Guarantors and The Bank of New York as Trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8- K dated May 28, 2008). |
| *4.6 | Second Supplemental Indenture dated as of May 1, 2007 to Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2007). |
| *4.7 | First Supplemental Indenture dated as of July 5, 2006 to Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.2 to Nortel Networks Corporation's Current Report on Form 8- K dated July 6, 2006). |
| *4.8 | Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8- K dated July 6, 2006). |
| *4.9 | Purchase Agreement dated June 29, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and the representative of the initial purchasers with regards to U.S.$1,000,000,000 Floating Rate Senior Notes due 2011, U.S.$550,000,000 10.125% Senior Notes due 2013, U.S.$450,000,000 10.750% Senior Notes due 2016 (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8- K dated July 6, 2006). |

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 294