**EXHIBIT A**
**David Drinkwater - Outstanding Equity as of February 28, 2009**

| Award | Grant Date | Plan | Number of Units Granted | Number of Units (Outstanding as of Dec 31, 2008) | Strike Price ($CAD) | Vesting Date | Amount | Termination Treatment Date | Vested | Forfeit | Expiry |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PSU- SRs | 14- Jun- 06 | 2005 SIP | 11,500 | 11,500 | n/a | 1- Jan- 09 | 11,500 | | TBD(1) | | n/a |
| | 21- Mar- 07 | 2005 SIP | 13,500 | 13,500 | n/a | 1- Jan- 10 | 13,500 | 14- Apr- 09 (2) | | 13,500 | |
| | 3- Mar- 08 | 2005 SIP | 22,975 | 22,975 | n/a | 31- Jan- 11 | 22,975 | 14- Apr- 09 (2) | | 22,975 | |
| PSU- OMs | 3- Mar- 08 | 2005 SIP | 22,975 | 22,975 | n/a | 1- Jan- 11 | 22,975 | 14- Apr- 09 (2) | | 22,975 | |
| RSU | 19- Dec- 05 | 2005 SIP | 14,200 | | n/a | 19- Dec- 08 | 4,734 | | | | |
| | 14- Jun- 06 | 2005 SIP | 11,500 | 3,834 | n/a | 14- Jun- 09 | 3,834 | 14- Jun- 09 | 3,834 | | n/a |
| | 21- Mar- 07 | 2005 SIP | 13,500 | 9,000 | n/a | 21- Mar- 09 | 4,500 | 21- Mar- 09 | 4,500 | | n/a |
| | | | | | | 21- Mar- 10 | 4,500 | 21- Mar- 10 | 4,500 | | n/a |
| | 3- Mar- 08 | 2005 SIP | 15,600 | 15,600 | n/a | 3- Mar- 09 | 5,200 | 3- Mar- 09 | 5,200 | | n/a |
| | | | | | | 3- Mar- 10 | 5,200 | 3- Mar- 10 | 5,200 | | n/a |
| | | | | | | 3- Mar- 11 | 5,200 | 31- Aug- 10 | | 5,200 | |
| Options | 19- Dec- 05 | 2000 | 10,000 | 10,000 | 37.40 | vested | 7,500 | vested | 7,500 | | 30- Aug- 13 |
| | | | | | | 19- Dec- 09 | 2,500 | 19- Dec- 09 | 2,500 | | 30- Aug- 13 |
| | 14- Jun- 06 | 2005 SIP | 20,000 | 20,000 | 23.60 | vested | 10,000 | vested | 10,000 | | 29- Nov- 10 |
| | | | | | | 14- Jun- 09 | 5,000 | 14- Jun- 09 | 5,000 | | 29- Nov- 10 |
| | | | | | | 14- Jun- 10 | 5,000 | 14- Jun- 10 | 5,000 | | 29- Nov- 10 |
| | 21- Mar- 07 | 2005 SIP | 27,100 | 27,100 | 29.90 | vested | 6,775 | vested | 6,775 | | 29- Nov- 10 |
| | | | | | | 21- Mar- 09 | 6,775 | 21- Mar- 09 | 6,775 | | 29- Nov- 10 |
| | | | | | | 21- Mar- 10 | 6,775 | 21- Mar- 10 | 6,775 | | 29- Nov- 10 |
| | | | | | | 21- Mar- 11 | 6,775 | 31- Aug- 10 | | 6,775 | |
| | 3- Mar- 08 | 2005 SIP | 62,550 | 62,550 | 8.21 | 3- Mar- 09 | 15,637 | 3- Mar- 09 | 15,637 | | 29- Nov- 10 |
| | | | | | | 3- Mar- 10 | 15,638 | 3- Mar- 10 | 15,638 | | 29- Nov- 10 |
| | | | | | | 3- Mar- 11 | 15,637 | 31- Aug- 10 | | 15,637 | |
| | | | | | | 3- Mar- 12 | 15,638 | 31- Aug- 10 | | 15,638 | |
| Total | | | 245,400 | 219,034 | | | | | 104,834 | 102,700 | |

HIGHLY CONFIDENTIAL

**Notes:**

(1)    PSU- SR vesting subject to the CHRC determining the percentage of target payout, if any, based on the level of achievement of the performance

(2)    Upon termination, unvested PSUs remain outstanding and do not forfeit until April 14, 2009 to address the change in control 30 day look back.

Page 10

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 328

# NORTEL



Exhibit 10.73

## Indemnity

In consideration of your service or continued service in any of the following capacities:

as a director of Nortel Networks Limited (the "Corporation");

as an officer of the Corporation;

as a director of any other entity to the extent that you are serving in such capacity at the request of the Corporation or

as an officer of any other entity to the extent that you are serving in such capacity at the request of the Corporation,

such capacities referred to herein as the "Indemnified Capacities", the Corporation with full power and authority to grant an indemnity valid and binding upon and enforceable against it in the terms hereinafter contained, hereby agrees to indemnify you to the full extent contemplated by this agreement.

**1.  Scope of Indemnity**

(a)  The Corporation shall indemnify and hold you harmless for the full amount of any "Cost" (as hereinafter defined) reasonably incurred by you in connection with any "Proceeding" (as hereinafter defined) that may be made or asserted against or affecting you or in which you are required by law to participate or in which you participate at the request of the Corporation or in which you choose to participate (based on your reasonable belief that you may be subsequently named in that Proceeding or any Proceeding related to it) if it relates to, arises from or is based on your service in an Indemnified Capacity, in any case whether or not you have been named (an "Indemnified Claim").

Nortel Networks Limited
195 The West Mall, Toronto, Ontario M9C 5K1 Canada

- 2 -

(b)  Subject to the terms hereof and any applicable policy of the Corporation relating to the reimbursement of expenses, the Corporation shall also indemnify and hold you harmless for the full amount of any other Cost reasonably incurred by you or to which you are subject if it relates to, arises from or is based on your service in an Indemnified Capacity (provided however that you shall not be entitled to indemnification in respect of any tax assessed on your income). Subject to the terms of any applicable policy of the Corporation, the Corporation shall also reimburse you for reasonable legal fees that you incur in connection with your retaining separate counsel in respect of a matter being considered by the board of directors of the Corporation.

(c)  For the purposes of this agreement:

(i)  "Indemnified Amount" means any amount which the Corporation is obliged to pay pursuant hereto;

(ii)  "Cost" means all injury, liability, loss, damage, charge, cost, expense, fine or settlement amount whatsoever which you may reasonably incur, suffer or be required to pay (including, without limitation, all reasonable legal and other professional fees as well as all out- of- pocket expenses for attending discoveries, trials, hearings and meetings); and

(iii)  "Proceeding" means any claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, investigation, inquiry, hearing or proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise.

**2.  Procedure for Making a Claim**

(a)    If you wish to make any claim for payment of an Indemnified Amount to you by the Corporation hereunder, you shall deliver a written notice of such claim for payment to the Corporation, together with reasonable details and supporting documentation with respect to such claim (such written notice, together with such details and documentation, referred to herein as an "Indemnification Notice").

(b)    Subject to obtaining any required court approval, the Corporation shall pay all Indemnified Amounts arising in connection with the matters described in the Indemnification Notice to you (or as you may direct) no later than 30 days after the date on which you deliver an Indemnification Notice on account of any such Indemnified Amount to the Corporation.

(c)    The Corporation shall pay all Indemnified Amounts within the time period contemplated in this Section 2, subject to Section 6 hereof.

**3.      Notice of Claim**

(a)    Notice to Corporation

If you become aware of any Indemnified Claim or reasonably expect that an Indemnified Claim will be made, you will give the Corporation notice in writing promptly of such Indemnified Claim or potential Indemnified Claim.

**HIGHLY CONFIDENTIAL**

- 3 -

(b) <u>Notice to Director or Officer</u>
If the Corporation becomes aware of any Indemnified Claim or reasonably expects that an Indemnified Claim will be made, the Corporation will give you notice in writing promptly of such Indemnified Claim or potential Indemnified Claim.

**4.      Defence of Action**

(a)    <u>By Corporation</u>
The Corporation shall at its expense and in a timely manner contest and defend against any Indemnified Claim (other than an Indemnified Claim brought by the Corporation or any of its subsidiaries) and take all such steps as may be necessary or proper therein to prevent the resolution thereof in a manner adverse to you, including the taking of such appeals as counsel to the Corporation may advise are likely to succeed in the circumstances (which opinion shall be in writing and a copy thereof provided to you). In this regard, the Corporation will keep you fully informed on a timely basis of all steps and developments relating to the foregoing. The Corporation shall not agree to any settlement on your behalf without your written consent.

(b)    <u>By Director</u>
Notwithstanding Section 4(a) hereof, you will be entitled to assume carriage of your own defence relating to any Indemnified Claim (and for greater certainty, the full amount of reasonable expense you incur in connection with such defence shall be an Indemnified Amount) if:

     (i)      the Corporation does not in a timely manner:

         (A)    undertake appropriate action; or

         (B)    take such legal steps as may be from time to time required to properly defend against any such claim; or

     (ii)      in the reasonable opinion of your counsel (which opinion shall be in writing and a copy thereof provided to the Corporation) your interests in respect of the relevant matter conflict with the interests of the Corporation in respect of such matter or with the interests of any other director or officer of the Corporation in respect of whose defence the Corporation has carriage;

provided that:

     (i)      you shall not agree to settle any Indemnified Claim without the prior written consent of the Corporation (unless you have a reasonable belief that the Corporation will not satisfy its obligations to you hereunder if the Indemnified Claim proceeds); and

     (ii)      if the Indemnified Claim would be covered by insurance maintained by the Corporation, you shall comply with the applicable conditions of such

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 331

- 4 -

coverage (provided however, that failure to so comply shall not relieve the Corporation of its obligation to indemnify you hereunder).

**5.      Former Directors and Officers**

(a)   You shall continue to be entitled to indemnification and advances hereunder in accordance with the terms hereof with respect to Indemnified Claims, even though you may no longer be acting in an Indemnified Capacity.

(b)   You and your advisors shall at all times be entitled to review during regular business hours all documents, records and other information with respect to the Corporation or any entity in which you acted in an Indemnified Capacity which are under the Corporation's control and which may be reasonably necessary in order to defend yourself against any Proceeding that relates to, arises from or is based on your service in an Indemnified Capacity, provided that you shall maintain all such information in strictest confidence except to the extent necessary for your defence.

**6.      No Obligation to Pay Indemnities Prohibited by Law**

(a)   Notwithstanding anything contained herein, the Corporation shall not pay any Indemnified Amount hereunder if the payment of such amount would be prohibited under the provisions of the *Canada Business Corporations Act* (the "CBCA") or otherwise by law.

(b)   Without limitation to Section 6(a), you acknowledge that the CBCA prohibits the Corporation from indemnifying you unless you:

    (i)      acted honestly and in good faith with a view to the best interests of the Corporation or, as the case may be, of any other entity to the extent that you are serving as a director or officer of that entity at the request of the Corporation; and

    (ii)     in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, you had reasonable grounds for believing that your conduct was lawful (each of (i) and (ii) a "Condition").

(c)   If the Corporation pays an Indemnified Amount which it is prohibited from paying by law (as determined by a court or administrative tribunal of competent jurisdiction in a final judgment that has become non- appealable), then such amount shall be deemed to have been an advance of Costs by the Corporation to you and upon written request by the Corporation, you shall repay such amounts to the Corporation. For greater certainty, it is acknowledged that the Corporation shall advance Costs to you or on your behalf in connection with an Indemnified Claim prior to the resolution of the merits of any action, provided that if a court or administrative tribunal of competent jurisdiction in a final judgment that has become non-appealable determines that you do not fulfill either of the Conditions, you shall repay such amounts to the Corporation.

**7.      Court Approval**

(a)   If the Corporation is required under applicable law to obtain the approval of the court in order to pay any Indemnified Amount, the Corporation shall seek such approval forthwith upon demand by you for indemnification or advance.

HIGHLY CONFIDENTIAL

- 5 -

(b)   In the event of a dispute under this agreement, the Corporation shall apply to the court to approve a payment under this agreement forthwith upon receiving a written request from you to do so.

**8.      Enurement**

This indemnity and the benefit of the obligations of the undersigned hereunder shall inure to the benefit of you, your heirs, estate, executors and administrators and shall be binding upon the Corporation's successors and assigns.

**9.      Previous Indemnities**

This indemnity supersedes and replaces all prior indemnities entered into between the Corporation and you with respect to the subject matter of this indemnity, provided however, that nothing in this provision shall operate to restrict in any way any indemnity to which you are entitled under the Corporation's by- laws or otherwise at law.

**10.     Jurisdiction**

The courts of the Province of Ontario, Canada shall have exclusive jurisdiction with respect to all matters dealing with the enforcement of or otherwise arising out of or in connection with this indemnity, and by accepting and relying hereon you expressly and irrevocably submit and attorn to the exclusive jurisdiction of, and irrevocably agree to be bound by a judgment of, any such court relating to all such matters.

**11.     Notices**

Any notice permitted or required hereunder shall be made:

      (i)    to the Corporation at: Nortel Networks Limited, 195 The West Mall, Toronto, Ontario, M9C 5K1, Attention: Chief Legal Officer (facsimile: 905.863.7386); and

      (ii)   to you at [            ]

(or at such other address as you or the Corporation may from time to time specify) and shall be sufficiently given if delivered personally, if sent by mail or transmitted by fax and such notice shall be deemed to have been received on the date it is sent (or, if not sent on a day on which the Corporation is open for business at its head office (a "business day"), on the next business day), except for notices sent by mail, which will be deemed to have been received on the fifth business day following the date mailed.

- 6 -

**12.**      **Governing Law**

This indemnity shall in all respects be governed by and construed in accordance with the laws of the Province of Ontario, Canada, and all disputes, claims or matters arising out of or under it shall be governed by such laws.

This indemnity was authorized for execution by the Board of Directors of the Corporation on December 22, 2008.

**NORTEL NETWORKS LIMITED**

by        _____

| | |
|---|---|
| Name: | Gordon A. Davies |
| Title: | Chief Legal Officer and Corporate Secretary |

by        _____

| | |
|---|---|
| Name: | Pavi Binning |
| Title: | Chief Financial Officer |

The undersigned accepts the foregoing indemnity and agrees to comply with the terms and conditions set out above.


_____      _____

        **[Name of Director / Officer]**                 **[Witness]**



Exhibit 10.74

**CONFIDENTIAL SPECIAL HANDLING**
December 28, 2007
William K. Nelson
24 Westcott Drive
Hopkinton, MA
USA 01748
Dear Bill:
I am pleased to offer you the position of Executive Vice- President, Global Sales of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL"), reporting to me, with a suggested starting date of January 14, 2008 at our Billerica, Massachusetts location. You will be employed by Nortel Networks Inc. ("NNI"). NNC and/or NNL and/or, where applicable, any subsidiary thereof, including NNI, are collectively referred to herein as Nortel.

This employment offer is subject to the approval of the Compensation and Human Resources Committee ("CHRC") of the Boards of Directors of NNC and NNL ("Nortel Boards") and your appointment as Executive Vice- President, Global Sales of NNC and NNL is subject to the approval of the Nortel Boards.

The initial key responsibilities and focus of this position have been discussed and communicated to you. We look forward to you playing a key role in this area, and should you have any further questions, I would be pleased to review them with you. Further, it is important for you to realize that if you accept this position that as a senior executive of Nortel you will be expected to perform and represent Nortel at exemplary levels utilizing the highest of standards. You will see examples of these expectations in this offer letter.

All dollar amounts contained herein are expressed in U.S. dollars. The terms of this offer are as follows.

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1101 mikez@nortel.com**

1

**Base Salary**
Your base salary will be $550,000 calculated on a per annum basis and will be paid to you bi- weekly. Generally, salaries are reviewed on an annual basis, typically in the first fiscal quarter, in accordance with various evaluation processes and market- driven guidelines.
**Incentive Award**
You will be eligible to participate in the Nortel Networks Limited Annual Incentive Plan ("AIP") pursuant to its terms and conditions, with a projected target award of 100% of your base salary.
**Long Term Incentives**
You will be eligible to receive long term incentives in Nortel's sole discretion and in accordance with the applicable plan. The current long term incentives available for award include stock options, restricted stock units and/or performance stock units.
The following recommendations are conditioned upon your acceptance of this offer. Upon your acceptance, we intend to put forth these recommendations for approval by the CHRC at the next available award date, as determined by Nortel in its sole discretion.
*Restricted Stock Units*
We will recommend for approval a new hire, one- time grant of restricted stock units with an intended value of approximately $5,250,000 (the "New Hire RSUs") under and subject to the terms and conditions of the Nortel 2005 Stock Incentive Plan ("SIP") and Nortel's policies and procedures at the time of grant. The number of New Hire RSUs shall be determined using Nortel's prescribed valuation method applicable to other senior executives of Nortel generally and will be calculated based on the twenty day average of the closing price of the common shares of NNC on the New York Stock Exchange calculated as at the business day immediately prior to your commencement of employment. We will also recommend that the New Hire RSUs vest equally annually over a five year period.
*Annual Long Term Incentive Awards*
We will recommend for approval as your 2008 long term incentive award ("2008 LTI") in conjunction with Nortel's 2008 annual Integrated Talent Planning cycle, an award of 2008 LTI valued at no less than approximately $2,200,000, using Nortel's prescribed valuation method

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1101 mikez@nortel.com**

2

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 335

for equity vehicles applicable to senior executives of Nortel generally and under and subject to the terms and conditions of the SIP (or any equivalent plan existing on the date thereof) and Nortel's policies and procedures at the time of grant. The 2008 LTI shall also be in accordance with the 2008 long term incentive program design approved by the CHRC, provided that we will recommend to the CHRC that your 2008 LTI equity mix be comprised of a total number of stock options, restricted stock units and performance stock units which respectively, each representing one third of the total intended value of the 2008 LTI calculated using Nortel's prescribed valuation method for equity vehicles applicable to senior executives of Nortel generally.

**Special Payment**

Nortel acknowledges that, having been employed for the full performance period, you may be entitled to a payment under your current employer's annual bonus plan targeted at $400,000 plus a variable component. By accepting this offer letter, you agree to actively seek out payment of your 2007 annual bonus from your current employer. In the event that your current employer does not pay to you your 2007 annual bonus as a result of your acceptance of this offer, Nortel will pay to you:

    an amount up to a maximum of $400,000 in recognition of the forfeiture of your annual bonus payment from your current employer (the "Forfeiture Amount"); and

    an amount up to a maximum of an additional $200,000 in recognition of the forfeiture of the variable component of your annual bonus payment from your current employer (the "Variable Amount").

The Forfeiture Amount and the Variable Amount are each conditioned upon the following: (i) commencement of employment; (ii) you providing Nortel with satisfactory information that your current employer did not pay to you your 2007 annual bonus despite your best efforts to obtain such bonus and evidence satisfactory to Nortel of the amount due from your current employer for the forfeiture amount and the variable amount, and (iii) continued satisfactory performance of your employment responsibilities as determined by Nortel. Nortel will review the information provided by you, and within its sole discretion, determine whether it will pay to you the Forfeiture Amount and the Variable Amount, or any portion thereof. The Forfeiture Amount and the Variable Amount, if any, will be paid to you within 30 days of you providing satisfactory evidence to Nortel of such forfeiture(s).

If your employment with Nortel is terminated within 24 months from the commencement of your employment, you agree to re- pay Nortel, within 10 days of the effective date of your cessation of employment, an amount equal to sum of the Forfeiture Amount and the Variable Amount paid to you, reduced by $1/24$ for each full calendar month of service with Nortel.

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1101 mikez@nortel.com**

3

HIGHLY CONFIDENTIAL        NNC-NNL06001427 / 336

**Recoupment of Incentive Based Compensation**
It is not anticipated in the normal course of events that you will have to re- pay Nortel for any incentive based compensation payments received during your employment tenure with Nortel. However, if the CHRC determines that you have committed intentional misconduct which contributes, directly or indirectly, to an error in financial information that materially affects the value of any incentive compensation realized by you, Nortel is entitled to issue proceedings to recover damages against you in respect of any losses incurred or as a result of or in connection with that intentional misconduct. Nortel may recoup any incentive compensation as an advance against such damages, whether or not proceedings are issued by Nortel. Incentive compensation payments that Nortel may recoup include all sales and incentive compensation, equity- based compensation, bonus payments and any matching pension plan payments made by Nortel. For further information please refer to the CHRC Policy Regarding Recoupment of Incentive Compensation.

**Benefits**
As an employee of Nortel you will be eligible to participate in employee benefit plans in accordance with the terms of those plans upon your commencement of employment. A Benefits Summary is included with this offer. You will also be eligible for 5 weeks of vacation per annum upon your commencement of employment. Vacation is accrued monthly at the rate of 2.08 days per month of employment.
We periodically review benefit plans, as well as compensation programs, and make modifications, including enhancements and reductions, as we deem appropriate. All of our retirement programs are periodically reviewed and changes may result to the programs as currently described.
As soon as possible, please provide your social security number and date of birth. This information is required in order to facilitate your enrollment in payroll and benefit programs.

**Change in Control**
Subject to the approval of the CHRC, you will be eligible to participate in the Nortel Networks Corporation Change in Control Plan ("CIC Plan"). The CIC Plan will provide certain payments in the event that your employment is terminated for a qualifying reason thereunder within 24 months following a change in control (as defined in the CIC Plan). We will recommend to the CHRC that you be eligible for the benefits described for a Tier 1 Executive under the terms and conditions of the CIC Plan. A copy of the CIC Plan is enclosed.

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1101 mikez@nortel.com**

4

HIGHLY CONFIDENTIAL

**Involuntary Separation**

If Nortel initiates your separation of employment or you initiate your separation of employment for Good Reason (as defined in the CIC Plan), you will be provided in lieu of any other payment or benefit, except as otherwise provided herein, with the following:

(i)     the equivalent of no less than 18 months base salary paid bi-weekly; and

(ii)     the opportunity to continue health, life insurance and AD&D benefits coverage in which you are then enrolled for 18 months following your employment termination (the "Severance Period") at active employee rates;

except that the foregoing payments and benefits will not be provided to you if your separation of employment is for Cause (as defined in the CIC Plan). The provision of any such payments and benefits will be conditioned upon your execution of a separation agreement, which will be prepared by Nortel and that will contain, among other things, a full and final release of claims and a covenant not to compete against Nortel or solicit its employees during the Severance Period. Further, the provision of any payments and benefits described above under Change in Control make you ineligible for the payments and benefits described under this heading, Involuntary Separation.

**Tax Conflict Review for Board Appointed Officers**

As a Board appointed officer, you are required to participate in Nortel's Executive Tax Conflict Review Program. Under the terms of this program, your personal income tax return will be prepared and/or reviewed by Nortel's designated tax provider.

**Executive Travel Services**

You will be eligible for executive travel reservation services while in the position of Executive Vice-President, Global Sales. This service is accessible by a dedicated travel telephone #ESN 830-4698, externally (613) 274-4698.

**Senior Executive Duties**

As stated earlier in this offer letter, as a senior executive of Nortel, you are expected to perform your responsibilities at an exemplar level while displaying the highest standards. As a result, during your employment you are expected, by way of example, to:

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905-863-1101 mikez@nortel.com**

5

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 338

(a)   faithfully and diligently perform such duties and exercise such powers consistent with your position as may from time to time be assigned to or vested in you by Nortel or the Nortel Boards;

(b)   comply with all reasonable and lawful requests made by Nortel or the Nortel Boards;

(c)   use your best endeavours to promote and protect and extend the business, reputation, welfare and the interests of Nortel;

(d)   be familiar with and act in a manner consistent with Nortel's Code of Business Conduct (more fully described herein);

(e)   be familiar with and comply with Nortel policies and procedures relevant to your role or your actions as an employee; and

(f)   report to the Nortel Boards any matters of concern that come to your attention, it being your duty to report any acts of misconduct, dishonesty, breach of company rules or breach of any of the rules of any relevant regulatory bodies committed, contemplated or discussed by any Nortel employee or a third party. Nortel will keep confidential whatever is reported save as required by law or a court or authority of competent jurisdiction or on a strict "need to know basis".

**Reporting Insider**

You will be designated a Reporting Insider under applicable Canadian securities legislation and a Section 16 Officer under applicable U.S. securities legislation with respect to trades of securities of NNC. Further details will be sent to you directly by our Insider Reporting Group following your acceptance of this offer.

**Share Ownership Guidelines**

As a senior executive you will be expected under the Share Ownership Guidelines to own common shares of NNC equivalent to 300% of your base salary within five years from the date you commence employment. We strongly believe that it is important for senior executives to have this commitment. As a result, we review progress against these guidelines on a regular basis.

You will also be required to hold 50% of all settled vested equity awards (including stock options, restricted stock units and performance stock units) remaining after the payment of taxes and administrative fees associated with the award and the vesting thereof towards the maintenance and achievement of the Share Ownership Guidelines.

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1101 mikez@nortel.com**

6

HIGHLY CONFIDENTIAL

**Code of Business Conduct**

Nortel's Code of Business Conduct is extremely important. As an industry leader and innovator, we have always strived to take a lead in setting out ethical guidelines for our employees, which we consider essential to the long- term success of Nortel. These guidelines are contained within the Code of Business Conduct, a copy of which is enclosed. By signing this offer letter, you acknowledge that, on joining Nortel, you will be required to sign to confirm you have read and will comply with the Code of Business Conduct and Nortel's policies and procedures.

**Section 409A of the U.S. Internal Revenue Code**

The parties hereto intend that all benefits and payments to be made to you will be provided or paid to you in compliance with all applicable provisions of section 409A of the U.S. Internal Revenue Code of 1986 as amended, and the regulations issued thereunder, and the rulings, notices and other guidance issued by the U.S. Internal Revenue Service.

**Consent to Provide and Disclose Personal Information**

Nortel is required on a periodic basis to obtain and disclose certain personal information of its senior executives in order to comply with various regulatory requirements or for other necessary business purposes. Information that may be obtained includes, but is not limited to, name, home address, place and date of birth, citizenship, residency, passport information and government identification numbers. By accepting this offer of employment, you are consenting to provide Nortel with this information as required, to notify Nortel promptly of any changes to this information, and to Nortel's disclosure of such information for the above purposes.

**Employment Relationship**

Your employment relationship is that of employment at will and therefore such relationship is terminable at the will of either party and there is no employment agreement for a year or any other specified term.

At the commencement of your employment, there will be a number of documents for you to complete, including our standard Employee Agreement as well as an Agreement Related to Intellectual Property and Confidentiality and Conflict of Interests. Also, the employment offer is contingent upon you providing certain legally required documentation such as those required under the Immigration Reform and Control Act of 1986. Further, this employment offer is

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1101 mikez@nortel.com**

7

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 340

contingent upon you consenting to and successfully completing the applicable background and reference check process to Nortel's satisfaction. This employment offer is contingent upon you consenting to and successfully completing the applicable background and reference check process to Nortel's satisfaction.

By your acceptance of this employment offer, you acknowledge that you have made Nortel aware of any fiduciary duties or restrictive agreements that may exist as a result of any former employment relationship. You are reminded of your continued obligations, if any, to any former employers with respect to confidential or proprietary information. Finally, you understand and acknowledge that you will not bring with you to Nortel, disclose to Nortel or use in the performance of your duties at Nortel, any confidential or proprietary information of a former employer which is not generally and lawfully available to the public.

I look forward to you joining Nortel and believe you will find your new position to be a challenging and rewarding experience.

If you are in accord with this offer of employment, please sign and return one copy of this offer letter to me and retain the other for your files.

Sincerely,

- *Signature on File* -

Mike Zafirovski
President and Chief Executive Officer
Accepted this 2 nd day of January, 2008.


/s/ William K. Nelson
William K. Nelson

Confirmed Start Date:                                On or about January 21, 2008

Date of Birth:                                            Xxxxxx x, xxxx

Social Security Number:                               xxx- xx- xxxx

**Mike Zafirovski**
**President and Chief Executive Officer**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1101 mikez@nortel.com**

8

Exhibit 10.75

# N⊘RTEL

**CONFIDENTIAL - SPECIAL HANDLING**

November 27, 2008
Mr. William Nelson
24 Wescott Dr.
Hopkinton, MA
USA 01748
Dear Bill:
This letter ("Agreement") records the arrangements between you and Nortel Networks Inc. concerning the cessation of your employment. The arrangements are as follows:

Cessation of Employment

1.  As used in this Agreement, the term "Corporation" shall mean Nortel Networks Inc., its parent, subsidiaries, affiliates (including, but not limited to, Nortel Networks Corporation and Nortel Networks Limited), predecessors, successors and assigns and all past and present officers, directors, employees and agents (in their individual and representative capacities only) of Nortel Networks Inc., its parent, subsidiaries, affiliates, predecessors, successors and assigns, in every case individually and collectively.

2.  Your employment relationship with the Corporation shall cease on December 31, 2008 ("Employment Termination Date"). All previous external responsibilities which you had will be assumed by a person designated by the Corporation, including any participation in industry or other associations representing the Corporation. You cease to act as an officer and/or director of the Corporation and any of the Corporation's subsidiaries and affiliates on December 31, 2008, and the Corporation will take all necessary steps to remove you from all such positions.

Revocation Clause

3.  You acknowledge that you received this document on or about October 16, 2008, and have been provided at least 45 days commencing on or about October 16, 2008, at your discretion, to consider the terms in this Agreement. In addition, you shall have seven (7) calendar days following your execution of this document to revoke this Agreement by written notice. To be valid, the letter of revocation must be received by the Deputy General Counsel and Corporate Secretary, consistent with the terms of paragraph 11 of this Agreement, not later than the close of business seven (7) calendar days after you sign this Agreement. The terms and conditions of this Agreement shall become operative seven (7) days after you execute and deliver this Agreement to the Deputy General Counsel and Corporate Secretary at 195 The West Mall, Toronto, Ontario, Canada, M9C 5K1, provided that you are in compliance with all terms and conditions of this Agreement as of such date, you have not revoked this Agreement pursuant to the provisions set forth above in this paragraph and the conditions in clauses (i) and (viii) of the first paragraph of paragraph 4



*Confidential Special Handling*

have been satisfied. Further, information concerning the decisional unit and employees invited and not invited to execute a waiver agreement is set forth on Exhibit A hereto. Specifically, Exhibit A contains the following: the identification of the decisional unit from which employees were selected for the reduction in force, the job classifications in the decisional unit, the ages of employees by job classification in the decisional unit, the number of employees selected and not selected by age within applicable job classifications.

Post Termination Payments/Benefits ("PTPB") To Be Provided by the Corporation

4.  The Corporation will provide you the payments and benefits set out in this paragraph 4(a) through (e) below, in addition to the payments and benefits set forth in paragraph 5 of this Agreement, conditional upon (i) completion of the Corporation's governance process, including approval by the Compensation and Human Resources Committee of the Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited, (ii) your signing and returning to the Deputy General Counsel and Corporate Secretary a copy of this Agreement within the time period provided in paragraph 11 of this Agreement; (iii) your compliance with the terms and conditions of this Agreement and the Employee Agreement and other documents such as the Agreement Relating to Intellectual Property (collectively, the "Employment Documents"); (iv) you not revoking this Agreement pursuant to paragraph 3 above; (v) you not soliciting, either directly or indirectly, for employment during the Severance Period any employee(s) currently employed by the Corporation; (vi) you not electing to accept employment with, or serve as a consultant, contractor or representative for, a company in competition with the Corporation, including but not limited to, any of the companies identified on the Corporation's competitor list which was reviewed with you on November 6, 2008 (the "Competitor List"), during the Severance Period, without the written consent of the Deputy General Counsel and Corporate Secretary, which consent shall not be unreasonably withheld or delayed; (vii) your execution on or promptly following the Employment Termination Date, and returning to the Deputy General Counsel and Corporate Secretary, a Release in the Form of Exhibit B, which is attached and made a part of this Agreement and

(viii) the Corporation's execution of this Agreement. So long as you comply with the foregoing provisions, the Corporation will:
*(Severance allowance)*

(a)    pay you severance allowances ("Severance Pay") pursuant to the Nortel Networks Enhanced Severance Allowance Plan ("Severance Plan") from January 1, 2009 through June 30, 2010, ("Severance Period"), paid in a bi- weekly amount of US$21,153.85. Notwithstanding anything to the contrary in this paragraph (a), in the event that you are a "specified employee" (within the meaning of Section 409A(2)(B) of the U.S. Internal Revenue Code) on the Employment Termination Date, then (i) any portion of the payments to be made during the Severance Period that is a "short- term deferral" within the meaning of Treas. Regs. Section 1.409A- 1(b)(4)(i) shall

Page 2



*Confidential Special Handling*

be paid at the times set forth above; (ii) any portion of the payments during the Severance Period that is not a "short- term deferral" (and would otherwise have been payable during the six months following the Employment Termination date) shall be paid on the first business day of the first calendar month that begins after the six- month anniversary of the Employment Termination Date or, if earlier, on the date of death; and (iii) any portion of the payments during the Severance Period that is payable after the six- month anniversary of the Employment Termination Date shall be paid at the times set forth in this paragraph (a).

*(Insurance benefits)*

(b)    allow you to elect to: (i) continue during the Severance Period, all group life insurance (basic and optional employee and optional spouse and dependent), health coverages (medical, dental, vision, hearing, Employee Assistance Program and Health Care Reimbursement Account ("HCRA")) and AD&D coverage in which you and your covered eligible dependents, if any, are enrolled on the Employment Termination Date pursuant to the terms and conditions of such coverages, or (ii) revoke all such coverages. If you elect (i), your coverages will continue at the active employee contribution rate, which shall be deducted from Severance Pay set forth in paragraph 4(a). The Corporation shall have the right to change coverages to the extent that it is generally changing its coverages for employees. Upon termination of coverage, only continued health coverage will be offered, as required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), for a period generally extending for eighteen (18) months from your Employment Termination Date, minus the period of coverage at active contribution rates during the Severance Period. If you elect (ii), your life and AD&D coverages will terminate effective 12:01 a.m. on January 1, 2009, and your health coverages, will terminate at the end of the month in which your employment relationship ceases (December, 2008), with an opportunity for continued health coverage under COBRA. If you decline the opportunity to continue HCRA coverage under COBRA, only eligible expenses incurred on or prior to the Employment Termination Date will be considered for reimbursement. Irrespective if you select (i) or (ii) above, at the time your group life insurance coverages terminate, you may convert appropriate coverages to applicable individual policies. AD&D cannot be converted to an individual policy. Please make your election in the space provided at the end of this Agreement concerning your decision to elect or decline the benefits set forth in this paragraph 4(b);

*(Stock Options, Restricted Stock Unit Awards ("RSUs") and Performance Stock Unit Awards ("PSUs"))*

(c)    consider you ineligible for consideration for any future grant(s) of stock options, RSUs and PSUs. Further, your rights with respect to those stock options and RSUs previously granted to you will be determined in accordance with the applicable equity plans and applicable Instruments of Grant and/or Instruments of Award. Stock options and RSUs previously granted to you will continue to vest during the

Page 3



*Confidential Special Handling*

Severance Period as set forth in Exhibit C in accordance with the provisions of the plan under which the stock options or RSUs were granted and the instrument of grant/award. Subject to any applicable trading restrictions that may restrict your ability to trade the Corporation's securities, you will have the right to exercise any vested stock options or to have any vested RSUs settled in accordance with the terms of the applicable instruments of grant/award, equity plan(s) and any other relevant documents governing the options and RSUs. In addition, you acknowledge that, in certain circumstances, you agree that you will, if required by the Corporation in its sole discretion, pay to the Corporation an amount in cash equal to; (i) the amount by which the market value of the shares on the date of exercise of the options exceeds the exercise price (in the case of options); and (ii) the amount (subject to certain adjustments) equal to the number of RSUs that vested during the applicable period multiplied by the market value of the shares on the applicable settlement date (in the case of RSUs), all in accordance with the terms of the applicable instruments of award/grant and any other documents that govern. All outstanding unvested PSUs previously granted to you shall be forfeited and cancelled for no consideration in accordance with the applicable equity plan and instrument of award. Notwithstanding the foregoing, any vesting and/or settlement, as applicable, pursuant to this paragraph shall be delayed until six months after your Employment Termination Date to the extent necessary to avoid adverse tax treatment under Section 409A of the US Internal Revenue Code. Finally, please see paragraph 6(f) of this Agreement for Stock Insider Obligations;

*(Outplacement assistance)*

    (d)     make available to you, should you elect, senior executive outplacement services in the Billerica, MA area, to assist you in securing new employment and pay the professional fees for such services as are reasonably incurred. All expenses with respect thereto must be submitted for reimbursement on or prior to September 30, 2010;

*(Tax Preparation Services)*

    (e)     provide you with income tax preparation service through a tax preparer as designated by the Corporation, for the tax years 2008, 2009 and 2010;

*(2008 Annual Incentive Plan ("AIP"))*

    (f)     determine your eligibility for any AIP payment for calendar year 2008 in accordance with the terms and conditions of the 2008 AIP. Eligibility shall not be construed as a right to any payment;

Page 4



*Confidential Special Handling*

*(Withholdings)*

   (g)    with respect to any monies or monetary equivalents to be paid hereunder, in its reasonable discretion, withhold appropriate amounts concerning any and all applicable federal, state or local tax withholding; and

*(Independent Legal Advice)*

   (h)    pay the cost of independent legal advice relating to this agreement to a maximum of $4,000.

<u>Benefits and Payments Available to You Without Signing this Agreement</u>

5.    The following payments and benefits shall be provided to you by the Corporation, as applicable, without the requirement that you sign this Agreement:

*(Insurance benefits)*

   (a)    you will be allowed to elect to: (i) continue applicable health coverages, as required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), for a period generally extending for eighteen (18) months following the Employment Termination Date from the Corporation; (ii) convert your group life insurance to an individual policy without a medical examination within thirty- one (31) days of the termination of that coverage; or (iii) if eligible, to commence coverage under the Nortel Networks Retiree Medical Plan and the Nortel Networks Retiree Life Plan pursuant to the terms and conditions of those plans;

*(Stock options, Restricted Stock Unit Awards ("RSUs") and Performance Stock Unit Awards ("PSUs"))*

   (b)    you are ineligible for consideration for any future grant(s) of stock options and RSUs and PSUs. It is understood that if you do not sign this Agreement there will be no Severance Period during which stock options or RSUs granted to you may be exercised or settled, as described in paragraph 4(c). Further, your rights with respect to those stock options and RSUs previously granted to you will be determined in accordance with the applicable equity plans and applicable Instrument(s) of Grant and/or Instrument(s) of Award. In addition, you acknowledge that, in certain circumstances, you agree that you will, if required by the Corporation in its sole discretion, pay to the Corporation an amount in cash equal to: (i) the amount by which the market value of the shares on the date of exercise of the options exceeds the exercise price (in the case of options); and (ii) the amount (subject to certain adjustments) equal to the number of RSUs that vested during the applicable period multiplied by the market value of the shares on the applicable settlement date (in the case of RSUs), all in accordance with the terms of the applicable instruments of award/grant and any other documents that govern. All outstanding unvested PSUs previously granted to you shall be forfeited

Page 5



*Confidential Special Handling*

and cancelled for no consideration in accordance with the applicable instrument of award and grant. Notwithstanding the foregoing, any vesting and/or settlement, as applicable, pursuant to this paragraph shall be delayed until six months after your Employment Termination Date to the extent necessary to avoid adverse tax treatment under Section 409A of the US Internal Revenue Code. Finally, please see paragraph 6(f) of this Agreement for Stock Insider Obligations. The provisions of this paragraph 5(b) shall only apply if you do not execute this Agreement in accordance with paragraph 11 hereof;

*(Nortel Networks Long Term Investment Plan ("LTIP")*

(c)     contributions made by you and any amounts that have vested in your LTIP account or your Long Term Investment Restoration Plan account will be maintained or distributed, pursuant to your direction(s) as permitted by the terms and conditions of the LTIP. Further instructions and information can be obtained by contacting Hewitt at 1- 800- 726- 0026;

*(Deferred Compensation, if applicable)*

(d)     any amounts in your account in the Nortel Networks U.S. Deferred Compensation Plan ("NNDP") will be distributed pursuant to your direction(s) as permitted by the terms and conditions of the NNDP; however, it is agreed and understood that in no event will you receive benefits under the Deferred Compensation Plan earlier than six (6) months from your Employment Termination Date due to your status as a "key employee" under Internal Revenue Code Section 409A. Further instructions and information can be obtained by contacting MullinTBG at 1- 800- 824- 0040; and

*(Vacation benefit)*

(e)     you shall be paid, on or before the first pay period following the Employment Termination Date, a lump sum amount equivalent to your current accrued but unused vacation benefit of 20 days with no further vacation accrual subsequent to the Employment Termination Date.

<u>Obligations of William Nelson:</u>

6.     Your signature at the end of this Agreement is required to receive the PTPB set forth in paragraph 4. Additionally, your signature will confirm the obligations set forth in this paragraph 6. Notwithstanding your signature, you, nonetheless, will be expected to comply with these obligations:

*(Business/Expense Accounts)*

(a)     you shall reconcile and settle your employee expense account, and any advances made to you by the Corporation, as soon as possible, but not later than the Employment Termination Date, and the Corporation shall in the normal course

Page 6



*Confidential Special Handling*

reimburse you for any business expenses incurred by you through the Employment Termination Date;
*(Inventions/Confidentiality)*

(b)    you acknowledge that you continue to be bound by the Employment Documents. You confirm that your entire right, title, and interest to all Inventions as generally described in such agreement with the Corporation are assigned to the Corporation regardless of the exact terms in, or the existence of, such an agreement between you and the Corporation.

With respect to Inventions as described in the above paragraph, you have disclosed or will promptly disclose them in writing to the Corporation, and you will, on the Corporation's request, promptly execute a specific assignment of title to the Corporation or its designee, and do anything else reasonably necessary, at the Corporation's sole expense, to enable the Corporation to secure a patent or other form of protection for such Inventions in the United States and in other countries. Any information pertaining to such an Invention is considered the confidential information of the Corporation unless and until such Invention is patented or published by the Corporation.

Further, you agree that this Agreement is a confidential document as are all the terms and conditions expressed herein, subject to the Corporation's right to disclose this Agreement in accordance with applicable securities laws. Accordingly, unless and until the Corporation publicly discloses this Agreement, you agree that you will not, except as required by law or judicial process, directly or indirectly, disclose, publicize or discuss the terms and/or conditions of this Agreement, with any employee and/or former employee of the Corporation, other than the Deputy General Counsel and Corporate Secretary, myself, the Corporation's attorneys, or any other person, except as applicable, your spouse, your attorney, accountant, financial advisor, outplacement advisor and/or any prospective employer (but with respect to a prospective employer only with respect to the restrictions, or lack thereof, on your activities following termination of employment) beyond what is stated in any press coverage release or disclosure by the Corporation. In the event that you discuss this Agreement with any of the aforementioned individuals, it shall be your duty, responsibility and obligation to advise said individual(s) of the confidential nature of this Agreement and direct them not to discuss the terms and/or conditions of this Agreement with any person.

Also, you shall continue to maintain the confidentiality of all trade secrets and confidential, proprietary, commercial, technical or other information of the Corporation obtained by you during your employment and, specifically, you agree that you shall not at any time during or following your employment with the Corporation, disclose, other than to the Corporation's authorized personnel, or otherwise use for non- Corporation purposes, any confidential or proprietary information or know- how of any nature (whether or not a trade secret) relating to

Page 7



*Confidential  Special Handling*

an activity of the Corporation or to any invention, which is owned or licensed by the Corporation. Further, during the Severance Period, you agree, except as required by law or Judicial process, not to publicly reveal, disclose, or cause to be publicly revealed or disclosed anything with respect to the Corporation that could be reasonably expected to be injurious or harmful to any of its interests. In addition, you shall issue no public statement on the business affairs, policies or the like of the Corporation during the Severance Period without the prior written consent of the Corporation and without limiting the foregoing, from the date of your receipt of this Agreement to and including the last day of the Severance Period you shall not make any public statement that could be reasonably expected to disparage the Corporation.
*(Notice)*

(c)     upon the occurrence of any contingency which affects your rights in or to any subsequent payment or benefit as expressly set forth in clause (vi) of the first paragraph of paragraph 4 hereof, or upon your commencement of coverage under a new employer's benefit plan(s), you shall, within ten (10) days of such occurrence, give written notice to the Corporation of that event. Such notice shall be sent in writing to the Deputy General Counsel and Corporate Secretary;
*(Advice and Assistance)*

(d)     you shall make available to the Corporation advice, assistance and information that shall include, but not be limited to, offering and explaining evidence, providing sworn statements, participation in discovery, critical preparation testimony as may be deemed necessary by the Corporation concerning the Corporation's position in any legal proceedings involving issues brought against or initiated by the Corporation of which you have knowledge. In the event it is necessary for you to provide the aforementioned services, then the Corporation shall reimburse you for authorized, reasonable and documented travel expenses, including, but not limited to, transportation, lodging and meals, but not including attorneys' or other professional fees incurred without the prior approval of the Corporation's Deputy General Counsel and Corporate Secretary (provided that in all events you shall have the benefits of paragraph 9 hereof);
*(Company Property and Information Preservation)*

(e)     prior to your Employment Termination Date and before receiving any monies pursuant to this Agreement, you shall return to the Corporation any and all property of the Corporation currently in your possession and/or subject to your control, whether such material shall be written instruments or tapes in electronic and/or recorded format.
The Corporation's Corporate Procedure 206.01 provides that all data, including personal documents and messages stored on or transmitted through the network

Page 8



*Confidential Special Handling*

resources of Nortel Networks in any form are and remain at all times the property of Nortel Networks. In addition, all work product that you have produced during your employment with the Corporation is the property of the Corporation. Therefore, all information (however recorded or stored) ("Information") in your possession and/or that you have created in the course of your employment with the Corporation (whether or not currently in your possession or control) is the property of the Corporation.

The Corporation is also a party to various civil lawsuits and other investigations and may need access to certain Information for those matters as well. Therefore, you agree to take affirmative steps to preserve all Information in your possession, custody and control (including information controlled by your assistant, if any), will leave all such information in the possession and custody of the Corporation, and will not retain any Information in your possession or custody.

In addition, the Corporation will take possession of your computer and preserve all electronic Information on your computer, as well as any related servers on which you have Information stored, at the time your computer is turned into the Corporation.

The Information will be used by the Corporation for general business purposes and may also be provided by the Corporation to regulatory authorities in response to their requests or disclosed in any relevant private litigation to which the Corporation is a party. Also, the Information may be used by and provided to other entities within the Nortel Networks group and/or the Corporation's external advisors. In some instances, the recipients of this Information will be located outside your geographic area. To the extent that the Information contains any personal information, you consent to the collection, transfer and disclosure of that information by the Corporation to Nortel Networks entities, third parties and regulatory authorities within and outside of your geographic area for the purposes set out above;

*(Stock Insider)*

(f)   you understand and agree that if you have the designation of either "Reporting" or "Non- Reporting" Insider pursuant to Corporate Policy 320.28 of Nortel Networks Corporation (and under applicable Canadian/US securities legislation for Reporting Insiders), you will cease to have this designation effective on the Employment Termination Date. Notwithstanding the fact that you will no longer have this designation, if you are in possession of material non- public information relating to the Corporation, you are prohibited from trading in the Corporation's securities (or informing another person of the material non- public information) in accordance with applicable laws. If you are a "Reporting" Insider, you understand that you are required to amend your insider profile within ten (10) days of your Employment Termination Date on the Canadian System for Electronic Disclosure by Insiders (SEDI) to indicate that you are no longer a "Reporting" Insider of Nortel

Page 9

*Confidential  Special Handling*

Networks. You should contact the Insider Reporting Department at (905) 863- 1220 and fax (905) 863- 8524 for assistance in amending the SEDI profile;

*(Completion of Forms/Paperwork)*

(g)    you agree to complete such documentation/forms and paperwork that may be necessary to commence benefits to be provided under this Agreement;

*(Repayment)*

(h)    you understand and agree that the Corporation may deduct from any payment provided to you under this Agreement any amounts (including, but not limited to, any advance loans, overpayment, tax equalization payments of other monies) that the Corporation determines that you owe the Corporation; and

*(Performance)*

(i)    you acknowledge and agree that until your Employment Termination Date you, as a senior executive of the Corporation, are expected to continue to perform your responsibilities at an exemplar level while displaying the highest professional standards.

<u>Cessation of Benefits</u>

7.    All company benefits not expressly extended to you pursuant to this Agreement shall be terminated effective 12:01 a.m. on the day after the Employment Termination Date.

<u>Change in Control</u>

8.    It is agreed and understood that for the purposes of the Nortel Networks Corporation Change in Control Plan ("CIC Plan"), "Termination Date" as defined in the CIC Plan is December 31, 2008. In the event that in the 30 day period after December 31, 2008, you become eligible for the Entitlements (as defined under the CIC Plan) provided under the CIC Plan, this agreement shall cease and be replaced by the terms and conditions of the CIC Plan.

<u>Indemnification</u>

9.    The Corporation shall indemnify you, and advance any reasonable legal fees and expenses, to the extent permitted by, and in accordance with, section 124 of the Canada Business Corporations Act (the "CBCA") and the Corporation's By- Laws (the "By- Laws"). You shall repay such fees and expenses if and to the extent it is determined that you do not fulfill the conditions set forth in subsection 124(3) of the CBCA or the By- Laws. Subject to and without limiting the foregoing, the Corporation's legal counsel will represent you in respect of any civil, criminal, administrative, investigative (including any internal investigation or independent review being conducted by the Corporation's Board of

Page 10



*Confidential Special Handling*

Directors or a Committee thereof) or other proceeding in Canada, the United States or other applicable jurisdiction in which you are involved (including as a witness) because of your association with the Corporation (hereinafter, the "Matter"). However, in the event that the Corporation's counsel cannot represent you in the Matter because of a conflict, the Corporation agrees to advance monies to pay your reasonable and actual legal expenses in the Matter provided that you will not settle the Matter, retain defense counsel or expert witnesses or consultants, or incur any defense costs without obtaining the prior written consent of the Deputy General Counsel and Corporate Secretary, which consent will not be unreasonably withheld.

<u>RELEASE</u>

10.  IN CONSIDERATION OF THE FOREGOING PAYMENTS AND BENEFITS DETAILED ABOVE, FOR WHICH YOU WOULD OTHERWISE BE INELIGIBLE, YOU HEREBY FULLY AND UNCONDITIONALLY RELEASE AND FOREVER DISCHARGE THE CORPORATION (EXCEPT FOR THE PROMISES AND COMMITMENTS CONTAINED HEREIN) TO THE EXTENT PERMITTED BY LAW, FROM ANY AND ALL CLAIMS, INCLUDING WITHOUT LIMITATION, PROVISIONS FOR SALARY, INCENTIVE COMPENSATION, VACATION PAY, SEVERANCE PAY UNDER THE NORTEL NETWORKS EXECUTIVE MANAGEMENT TEAM SEVERANCE ALLOWANCE PLAN, NORTEL NETWORKS ENHANCED SEVERANCE ALLOWANCE PLAN, NORTEL NETWORKS CORPORATION SPECIAL RETENTION PLAN, COMMISSIONS, PENSION OR OTHER BENEFITS OR OTHER COMPENSATION AND PERQUISITES AND ANY AND ALL REAL OR PRETENDED CLAIMS, CAUSES OF ACTION, OR DEMANDS, INCLUDING, WITHOUT LIMITATION, THOSE FROM RIGHTS UNDER ANY FEDERAL, STATE, AND LOCAL LAW, INCLUDING, WITHOUT LIMITATION, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT ("WARN") AND THOSE PROHIBITING DISCRIMINATION ON ANY BASIS, INCLUDING SEX, AGE, RELIGION, SEXUAL ORIENTATION, DISABILITY, RACE, NATIONAL ORIGIN, AS MAY BE PROHIBITED UNDER SUCH LAWS AS THE AGE DISCRIMINATION ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT (OWEPA), THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT, THE EQUAL PAY ACT AND THE FAMILY AND MEDICAL LEAVE ACT, INCLUDING ANY AMENDMENTS TO THOSE LAWS (INCLUDING, BUT NOT LIMITED TO, YOUR RIGHT TO MAKE A CLAIM IN YOUR OWN RIGHT OR THROUGH A SUIT BROUGHT BY ANY THIRD PARTY ON YOUR BEHALF) OR ANY COMMON LAW CLAIMS OF ANY KIND, INCLUDING, BUT NOT LIMITED TO, CONTRACT, TORT, AND PROPERTY RIGHTS INCLUDING, BUT NOT LIMITED TO, BREACH OF CONTRACT, FRAUD, DECEIT, NEGLIGENCE, NEGLIGENT MISREPRESENTATION, DEFAMATION, NEGLIGENT SUPERVISION, BREACH OF PRIVACY, MISREPRESENTATION, WRONGFUL TERMINATION, INVASION OF PRIVACY, INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, BREACH OF FIDUCIARY DUTY, VIOLATION OF PUBLIC POLICY AND ANY OTHER COMMON LAW CLAIM OF ANY KIND WHATSOEVER AS OF THE DATE OF THIS AGREEMENT WHICH

Page 11



*Confidential Special Handling*

YOU EVER HAD OR NOW HAVE, DIRECTLY OR INDIRECTLY, BASED UPON ANY FACT, MATTER, EVENT OR CAUSE, WHETHER KNOWN OR UNKNOWN, ARISING OUT OF OR RELATING TO YOUR EMPLOYMENT BY CORPORATION AND YOUR SEPARATION THEREFROM, OR YOUR RELATIONSHIP WITH CORPORATION OR THE TERMS OF ANY WRITTEN OR ORAL EMPLOYMENT ARRANGEMENTS OR THE LIKE THAT YOU MAY HAVE ENTERED INTO WITH THE CORPORATION. THIS AGREEMENT MAY NOT BE USED TO INTERFERE WITH YOUR RIGHT TO FILE A CHARGE OR PARTICIPATE IN AN INVESTIGATION OR PROCEEDING CONDUCTED BY THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR ANY OTHER APPROPRIATE AGENCY. HOWEVER, YOU UNDERSTAND AND AGREE THAT THE CORPORATION WILL USE THIS AGREEMENT AS A DEFENSE TO ANY SUCH CHARGE YOU FILE, INVESTIGATION OR PROCEEDING IN WHICH YOU PARTICIPATE, OR REMEDY WHICH YOU SEEK. YOU AGREE THAT THIS RELEASE SHALL BE BINDING UPON YOU AND YOUR HEIRS, ADMINISTRATORS, REPRESENTATIVES, EXECUTORS, SUCCESSORS AND ASSIGNS, AND ITS ENFORCEABILITY SHALL NOT BE CHALLENGED. YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT AND THAT YOU UNDERSTAND ALL OF ITS TERMS AND EXECUTE IT VOLUNTARILY WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE AND THE CONSEQUENCES THEREOF. FURTHER, YOU ACKNOWLEDGE THAT YOU HAVE HAD AN ADEQUATE OPPORTUNITY TO REVIEW AND CONSIDER THE TERMS OF THIS AGREEMENT, INCLUDING AT YOUR DISCRETION, THE RIGHT TO DISCUSS THIS AGREEMENT WITH LEGAL COUNSEL OF YOUR CHOICE. YOU HEREBY ACKNOWLEDGE THAT YOU INTEND TO GRANT TO THE CORPORATION A FULL AND FINAL RELEASE AS SET FORTH HEREIN.

Review Period

11.    The terms and conditions of this Agreement will be open for your review and consideration through the close of business on December 12, 2008. If you have not returned an executed copy of this Agreement to the Deputy General Counsel and Corporate Secretary, at the address referenced in paragraph 3 of this Agreement by the close of business on December 12, 2008, then the terms and conditions set forth in this Agreement shall be withdrawn as of that time and date.

12.    This Agreement constitutes the entire understanding of the parties with respect to your prior employment, including termination thereof, and there are no promises, understandings or representations other than those set forth herein. This Agreement may be modified only with a written instrument duly executed by you and Corporation. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns, heirs (in your case) and assigns.

13.    This Agreement shall be governed by the laws of North Carolina without regard to any provisions concerning conflict of laws. This Agreement may be delivered by facsimile and

Page 12



*Confidential Special Handling*

executed in counterparts, all of which, taken together, shall constitute one and the same original instrument.

14.    The parties agree that should any provision of this Agreement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement.

15.    References to the Deputy General Counsel and Corporate Secretary contained herein shall mean, as applicable, the Deputy General Counsel and Corporate Secretary prior to December 31, 2008 and the Chief Legal Officer after December 31, 2008.

Please acknowledge that the foregoing correctly and completely sets forth your understanding of the arrangements and commitments, and your acceptance thereby, by signing, dating and returning this Agreement to the Deputy General Counsel and Corporate Secretary.

Yours truly,

/s/ Mike S. Zafirovski
Mike S. Zafirovski
IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Agreement as set forth below.


PLEASE INDICATE BELOW YOUR ELECTIONS REGARDING
    Insurance Benefits

I elect the provisions of: (CIRCLE ONE)

paragraph 4(b)(i) OR 4(b)(ii)

    WN
INITIALS

NORTEL NETWORKS INC.                    William Nelson

By:    /s/ Gordon A. Davies              /s/ William Nelson

Title:  Deputy General Counsel and Corporate Secretary        Date: December 11, 2008

Date:  December 12, 2008

Page 13

HIGHLY CONFIDENTIAL                    NNC-NNL06001427 / 354

**EXHIBIT A**

U.S. EMPLOYEES SELECTED / NOT SELECTED FOR THE REDUCTION IN FORCE AND PLAN BENEFITS AND RELEASE

Decisional Unit Reported:                                                CEO Direct Reports
                                                                         Senior Leadership Team

| Job Classification Title | Age | No. Selected | No. Not Selected |
|---|---|---|---|
| Senior Leadership Team | 57, 61, 37, 39, 58, 53, 50 | 2 (age 57 and 53) | 5 |

HIGHLY CONFIDENTIAL

*Confidential Special Handling*

**EXHIBIT B**
**RELEASE**

In consideration of your continued employment through the Employment Termination Date and the payments and benefits as set forth in the letter Agreement between Nortel Networks Inc. and you dated November 8, 2008, none of which are released or waived hereby, you hereby fully and unconditionally release and forever discharge Corporation, as defined in the Agreement (except for the promises and commitments contained in the letter dated November 8, 2008), to the extent permitted by law, from any and all claims, including without limitation, provisions for salary, incentive compensation, vacation pay, severance pay under the Nortel Networks Executive Management Team Severance Allowance Plan, Nortel Networks Enhanced Severance Allowance Plan, Nortel Networks Corporation Special Retention Plan, commissions, pension or other benefits or other compensation and perquisites and any and all real or pretended claims, causes of action, or demands, including, without limitation, those from rights under any federal, state, and local law, including without limitation, the Worker Adjustment and Retraining Notification Act ("WARN") and those prohibiting discrimination on any basis including sex, age, religion, sexual orientation, disability, race, national origin, as may be prohibited under such laws as The Age Discrimination Act of 1967, The Older Workers Benefit Protection Act (OWBPA), the Civil Rights Act of 1964, the Americans With Disabilities Act, The Equal Pay Act and the Family and Medical Leave Act, including any amendments to those laws (including but not limited to, your right to make a claim in your own right or through a suit brought by any third party on your behalf) or any common law claims of any kind, including, but not limited to, contract, tort, and property rights including, but not limited to, breach of contract, fraud, deceit, negligence, negligent misrepresentation, defamation, negligent supervision, breach of privacy, misrepresentation, wrongful termination, invasion of privacy, intentional or negligent infliction of emotional distress, breach of fiduciary duty, violation of public policy and any other common law claim of any kind whatsoever as of the date of this Release which you ever had or now have, directly or indirectly, based upon any fact, matter, event or cause, whether known or unknown, arising out of or relating to your employment by Corporation and your separation therefrom, or your relationship with Corporation or the terms of any written or oral employment arrangements or the like that you may have entered into with the Corporation. This Release may not be used to interfere with your right to file a charge or participate in an investigation or proceeding conducted by the Equal Employment Opportunity Commission or any other appropriate agency. However, you understand and agree that the Corporation will use this Release as a defense to any such charge you file, investigation or proceeding in which you participate, or remedy which you seek. You agree that this Release shall be binding upon you and your heirs, administrators, representatives, executors, successors and assigns, and its enforceability shall not be challenged. You acknowledge that you have read this Release and that you understand all of its terms and execute it voluntarily with full knowledge of its significance and the consequences thereof. Further, you acknowledge that you have had an adequate opportunity to review and consider the terms of this Release, including at your discretion, the right to discuss this Release with legal counsel of your choice. You hereby acknowledge that you intend to grant to the Corporation a full and final release as set forth herein.

|  |  |
|---|---|
| (Signature) | /s/ William Nelson |
|  | William Nelson |
| (Date) | December 11, 2008 |

**HIGHLY CONFIDENTIAL**

*Confidential Special Handling*

**EXHIBIT C**
Bill Nelson - Outstanding Equity as of December 31, 2008

| Award | Grant Date | Plan | Number of Units Granted | Number of Units (Outstanding as of Dec 31, 2008) | | Vesting Date | Vesting Amount | Termination Treatment Date | Vested | Forfeit | Expiry |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PSU- SRs | 3-Mar-08 | 2005 SIP | 42,125 | 42,125 | Strike Price ($USD) n/a | 31-Jun-11 | 42,125 | 14-Feb-09 [1] | | 42,125 | |
| PSU- Oms | 3-Mar-08 | 2005 SIP | 42,125 | 42,125 | n/a | 1-Jan-11 | 42,125 | 14-Feb-09 [1] | | 42,125 | |
| RSUs | 3-Mar-08 | 2005 SIP | 28,650 | 28,650 | n/a | 3-Mar-09 | 9,550 | 3-Mar-09 | 9,550 | | n/a |
| | | | | | | 3-Mar-10 | 9,550 | 3-Mar-10 | 9,550 | | n/a |
| | | | | | | 3-Mar-11 | 9,550 | 30-Jun-10 | | 9,550 | |
| | 3-Mar-08 | 2005 SIP | 402,250 | 402,250 | n/a | 3-Mar-09 | 80,450 | 3-Mar-09 | 80,450 | | |
| | | | | | | 3-Mar-10 | 80,450 | 3-Mar-10 | 80,450 | | |
| | | | | | | 3-Mar-11 | 80,450 | 30-Jun-10 | | 80,450 | n/a |
| | | | | | | 3-Mar-12 | 80,450 | 30-Jun-10 | | 80,450 | n/a |
| | | | | | | 3-Mar-13 | 80,450 | 30-Jun-10 | | 80,450 | n/a |
| Options | 3-Mar-08 | 2005 SIP | 114,700 | 114,700 | 8.31 | 3-Mar-09 | 28,675 | 3-Mar-09 | 28,675 | | 28-Sep-10 |
| | | | | | | 3-Mar-10 | 28,675 | 3-Mar-10 | 28,675 | | 28-Sep-10 |
| | | | | | | 3-Mar-11 | 28,675 | 30-Jun-10 | | 28,675 | |
| | | | | | | 3-Mar-12 | 28,675 | 30-Jun-10 | | 28,675 | |
| Total | | | 629,850 | 629,850 | | | | | 237,350 | 392,500 | |

Notes:

(1)    Upon termination, unvested PSUs remain outstanding and do not forfeit until February 14, 2009 to address the change in control 30 day look back.

HIGHLY CONFIDENTIAL

CONFIDENTIAL- SPECIAL HANDLING



May 11, 2007

Exhibit 10.76

Mr. Steven J. Bandrowczak
28 Darbrook Road
Westport, Connecticut
USA 06880
Dear Steven,

I am delighted to offer you the position of Chief Information Officer of Nortel Networks Corporation (NNC) and Nortel Networks Limited (NNL), reporting to me with a starting date no later than June 25, 2007. As you are aware, while this position is located at our facility in Raleigh, North Carolina, it is agreed that for a period not to exceed 24 months from the date that you commence employment, your office will be at the Nortel offices located in Valhalla, New York, so long as such arrangements are satisfactory to Nortel.

This employment offer is subject to the approval of the Compensation and Human Resources Committee, and your appointment by the Boards of Directors of NNC and NNL as Chief Information Officer. NNC and/or, NNL and/or, where applicable, any subsidiary thereof, are collectively referred to herein as Nortel.

The initial key responsibilities and focus of this position have been discussed and communicated to you. Our hope is to significantly leverage both your considerable commercial experience, in addition to your extensive capabilities in information technology leadership and management. As we have come to know more about you, we believe and anticipate that there are several areas in which you may be able to make a significant contribution that will be both challenging and impactful. These would include not only the basic back office internal and infrastructural issues, but also market and customer focused challenges that will involve you working in proactive collaboration with both our product line and sales organization. We look forward to you playing a key role in this area, and should you have any further questions, I would be pleased to discuss them with you.

The terms of this offer are as follows:

**Salary**
Your base salary will be USD$425,000 calculated on a per annum basis and will be paid to you bi- weekly. Generally, salaries are reviewed on an annual basis, typically in the first fiscal quarter, in accordance with the various evaluation processes and market- driven guidelines.

**Dennis Carey**
**Executive Vice President, Corporate Operations**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1109 dennis@nortel.com**

**Incentive Award**
You will be eligible to participate, upon your commencement of employment in the Nortel Networks Limited Annual Incentive Plan ("Incentive Plan") pursuant to its terms and conditions, with a projected target award of 80% of your base salary. Your participation in the Incentive Plan for 2007 will be on a pro- rata basis in accordance with the terms of the Incentive Plan.

**Special Bonus**
Upon acceptance of this employment offer, and conditioned upon your commencement of employment and continued employment, you will receive a special bonus of US$700,000 to be paid as follows: (i) US$200,000 within 30 days following commencement of your employment, (ii) US$500,000 to be paid within 30 days following the one year anniversary of the commencement of your employment. If you resign from Nortel within 24 months from the commencement of your employment, you agree to re- pay Nortel the sum of US$250,000 within 10 days of resignation.

**Long Term Incentives**
The following recommendations are conditioned upon your acceptance of this offer, commencement of employment and continued employment. Upon your acceptance, we intend to put forth these recommendations for approval at the next available award date, as determined by Nortel in its sole discretion.

New Hire Long Term Incentive Award
*Restricted Stock Units:*
We intend to recommend for approval a new hire, one- time award of 12,000 restricted stock units, subject to the terms and conditions of the Nortel 2005 Stock Incentive Plan ("SIP") and Nortel's policies and procedures at the time of award.

2007 Long Term Incentive Program
*Restricted Stock Units:*
We intend to recommend for approval an award of 11,800 restricted stock units as part of your 2007 long term incentives, under and subject to the terms and conditions of the SIP and Nortel's policies and procedures at the time of award. Under the terms of the SIP, both the new hire and 2007 long term incentive restricted stock units shall vest as to 33% on each anniversary of the effective date of the award, with 100% of such restricted stock units vested on the date that is three years from the effective date of the award.

Generally, two weeks after an award of restricted stock units is approved and processed, the instrument of grant for the restricted stock units will be provided to you for electronic acceptance. A summary of the grant details can be viewed on- line via WebStock, the Nortel intranet connection provides this capability along with a number of other tools and information. For further details, visit WebStock at https://webstock.us.nortel.com:49701/webstock/docs/default.html. Webstock will be available to you upon commencement of your employment.

**Dennis Carey**
**Executive Vice President, Corporate Operations**

HIGHLY CONFIDENTIAL