

Signatories

Executed as a Deed (but not )
delivered until the date )
appearing at the head of page 1) )
on behalf of Nortel Networks )
UK Limited acting by )

Director

Director / Secretary

Executed as a Deed (but not )
delivered until the date )
appearing at the head of page 1) )
on behalf of Nortel Networks )
UK Pension Trust Limited )
acting by )

Director

Director / ~~Secretary~~

23

PC0039733

Signatories

Executed as a Deed (but not          )
delivered until the date             )
appearing at the head of page 1)     )
on behalf of Nortel Networks         )
UK Limited acting by                 )

Director

Director / Secretary


Executed as a Deed (but not          )
delivered until the date             )
appearing at the head of page 1)     )
on behalf of Nortel Networks         )
UK Pension Trust Limited             )
acting by                            )

Director

Director / Secretary

24

PC0039732

PC0039676

14

## SIGNATORIES

Guarantor

EXECUTED AS A DEED by          )
NORTEL NETWORKS LIMITED        )
acting by                     )

By: _____
Name: _____
Title: _____

and

By: _____
Name: _____
Title: _____

Beneficiary

EXECUTED as a deed by          )
NORTEL NETWORKS UK             )
PENSION TRUST LIMITED          )
acting by                     )

Director

Director/Secretary

PC0039731

13

## SCHEDULE 1

### FORM OF DEMAND

To:      Nortel Networks Limited

Guarantee in respect of the Nortel Networks UK Pension Plan dated [●] 2006 (the "Guarantee")

We refer to the Guarantee. Terms defined in the Guarantee shall bear the same meaning in this letter.

We certify that a Trigger Event has occurred.

We demand payment of the sum of £[●] (the "Requested Amount") and confirm that the Requested Amount is equal to or less than the Guaranteed Obligations.

The Requested Amount should be made the following account:

Name: [●]

Bank: [●]

Account number: [●]

Sort Code: [●]


Yours faithfully.


For and on behalf of
Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks UK Pension Plan

PC0039730

PC0039676

12

(b)    The parties agree that the courts of England are the most appropriate and convenient courts to settle any such dispute and accordingly no party will argue to the contrary.

(c)    This Clause is for the benefit of the Beneficiary only. As a result, to the extent permitted by law, a Beneficiary may take:

(i)    proceedings in any other court; and

(ii)    concurrent proceedings in any number of jurisdictions.

## 12.2    Waiver of immunity

The Guarantor irrevocably and unconditionally:

(a)    agrees not to claim any immunity from proceedings brought by a Beneficiary against it in relation to this Agreement and to ensure that no such claim is made on its behalf;

(b)    consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)    waives all rights of immunity in respect of it or its assets.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

11

### 9.2 Tax gross-up

(a)    If the Guarantor is aware that it must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it must promptly notify the Beneficiary.

(b)    If:

       (i)    a Tax Deduction is required by law to be made by the Guarantor or the Beneficiary; and

       (ii)    such Tax Deduction would not have been required to be made if the relevant underlying payment was being made by the Company (and not the Guarantor),

       then the amount of the payment due from the Guarantor will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(c)    If the Guarantor is required to make a Tax Deduction required by law, the Guarantor must make the Tax Deduction and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(d)    Prior to 31 March of the calendar year following either a Tax Deduction or a payment required in connection with a Tax Deduction, the Guarantor must deliver to the Beneficiary evidence satisfactory to the Beneficiary (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

9.3    If the Guarantor pays any such additional amount as is referred to in clause 9.2 in respect of any Tax Deduction and the Beneficiary determines that the Scheme has received a credit or refund for any Tax Deduction, the Beneficiary will (to the extent that it can do so without prejudice to the retention of such credit or refund and to the extent that it is not unlawful or contrary to any official regulation or directive for it to do so and provided that (i) no Seizure Event has occurred and is continuing in respect of the Parent, and (ii) no amount due and payable to the Beneficiary under either this Agreement or the Funding Agreement remains unpaid) reimburse the Guarantor with such amount (if any) as the Beneficiary determines will leave the Guarantor (after such reimbursement) in no better or worse position that it would have been in if the Guarantor had not been required to make such Tax Deduction.

### 10. LANGUAGE

Any notice given in connection with this Agreement must be in English.

### 11. GOVERNING LAW

This Agreement is governed by English law.

### 12. ENFORCEMENT

### 12.1 Jurisdiction

(a)    The courts of England have exclusive jurisdiction to settle any dispute in connection this Agreement (including a dispute regarding the existence, validity or termination of this Agreement).

PC0039728

PC0039676

10

MS T0503005
195 The West Mall
Toronto, Ontario M9C 5K1
Canada

Fax number:   +001 (905) 863-7386
Attention:    General Counsel - Corporate

(b)   The contact details of the Beneficiary are:

Address:    Nortel Networks UK Pension Trust Limited
            Maidenhead Office Park
            Westacott Way
            Maidenhead
            Berkshire
            SL6 3QH
Fax number:   +44 (0)1628 432 872
E-mail:       louischa@nortel.com
with a copy to clive.gilchrist@bestrustees.co.uk
Attention:    Louise Hammond – UK Pensions Manager

8.3   Effectiveness

(a)   Except as provided below, any Demand or communication in connection with this Agreement will be deemed to be delivered or given as follows:

(i)   if delivered in person, at the time of delivery;

(ii)   if posted, five days after being deposited in the post, postage prepaid, registered and with return receipt requested, in a correctly addressed envelope; and

(iii)   if by fax, when received in legible form with transmission confirmed by a generated transmission receipt.

(b)   A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

9.   TAXES

9.1   General

In this Clause:

Tax means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

Tax Deduction means a deduction or withholding for or on account of Tax from a payment under this Agreement.

PC0039727

PC0039676

9

not in part, to any person or persons who may, from time to time and for the time being, be appointed as trustee or trustees of the Scheme pursuant to any appropriate trust deed, or pursuant to any statutory authority (such person being a "Successor Trustee"). The Beneficiary shall promptly thereafter give written notice to the Guarantor of the appointment of the Successor Trustee such notice to be signed by the Beneficiary and the Successor Trustee. With effect from the date of delivery of such notice, the Successor Trustee shall assume all the Beneficiary's rights and obligations under this Agreement and this Agreement shall be construed as if all references to the Beneficiary were replaced by references to the Successor Trustee. The obligations of the Guarantor under this Agreement shall remain unaltered by such transfer and replacement.

6.    SEVERABILITY

If a term of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other term of this Agreement; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other term of this Agreement.

7.    COUNTERPARTS

This Agreement may be executed in any number of counterparts and by the parties to it on separate counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.    NOTICES

8.1    In writing

(a)    Any communication in connection with this Agreement must be in writing and, unless otherwise stated, may be given in person, by post or fax.

(b)    Unless it is agreed to the contrary, any consent or agreement required under this Agreement must be given in writing.

8.2    Contact details

(a)    The contact details of the Guarantor for this purpose are:

Address:       Nortel Networks Limited
               MS T0503010
               195 The West Mall
               Toronto, Ontario, M9C 5K1
               Canada
Fax number:    +001 (905)-863-2486
Attention:     Treasurer.

With a copy to:

Address:       Nortel Networks Limited

PC0039726

8

**4.3    Powers and authority**

The Guarantor has the power to enter into and perform, and has taken all necessary action to authorise the entry into and performance of, this Agreement and the transactions contemplated by this Agreement.

**4.4    Legal validity**

Subject to the Reservations, this Agreement is a legally binding obligation of the Guarantor, enforceable in accordance with its terms.

**4.5    Non-conflict**

The entry into and performance by the Guarantor of, and the transactions contemplated by, this Agreement do not conflict with:

(a)    any law or regulation applicable to the Guarantor; or

(b)    the Guarantor's constitutional documents; or

(c)    any agreement binding on the Guarantor to the extent that such conflict would result in a Material Adverse Effect.

**4.6    No default**

The Guarantor is not in default under any agreement binding on the Guarantor to an extent or in a manner which would result is a Material Adverse Effect.

**4.7    Pari passu ranking**

The Guarantor's payment obligations under this Agreement rank at least pari passu in right of payment with all its other present unsecured payment obligations, except for obligations mandatorily preferred by law.

**4.8    Times for making representations**

The representations set out in this Clause are made by the Guarantor on and as of the date of this Agreement.

**4.9    Undertaking**

The Guarantor undertakes with the Beneficiary that it shall not, in any contractual obligations it enters into in the future with its other unsecured creditors, agree to any explicit contractual term that ranks the Guarantor's payment obligations to such unsecured creditors ahead of the Guarantor's payment obligations under this Agreement, except for such obligations that must be mandatorily preferred by law.

**5.    CHANGES TO THE PARTIES**

(a)    The Guarantor may not assign or transfer any of its rights and obligations under this Agreement other than with the prior written consent of the Beneficiary.

(b)    The Beneficiary may not assign or transfer any of their rights and obligations under this Agreement other than with the prior written consent of the Guarantor save that the Beneficiary's rights under this Agreement may be transferred in their entirety, but

PC0039725

PC0039676

7

(b)     For the avoidance of doubt, provided the requirements of Clause 2.1 of this Agreement have been satisfied when making a Demand and subject to Clause 3.6, it is not necessary for the Beneficiary to have taken court action against the Company to recover the Guaranteed Obligations before such Demand will become payable by the Guarantor.

3.2     **Funds**

Payments under this Agreement to the Beneficiary must be made for value on the due date at such times and in such manner as the Beneficiary may specify to the Guarantor in a Demand.

3.3     **Currency**

Any amount payable under this Agreement is payable in Sterling.

3.4     **No set-off or counterclaim**

All payments made by the Guarantor under this Agreement must be made without set-off or counterclaim.

3.5     **Business Days**

If a payment under this Agreement is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

3.6     **No Double Recovery or Greater Recovery**

(a)     For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor an amount of the Guaranteed Obligations which has been paid by the Company to the Beneficiary, except insofar as payment of the amount concerned by the Company is or is claimed to be, by reason of the operation of any law relating to insolvency, bankruptcy or reorganization, void, voidable, unenforceable, or is otherwise required to be disgorged.

(b)     For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations and any limitations on the Company's liability under the Funding Agreement will equally apply to the Guarantor's liability under this Agreement.

4.     **REPRESENTATIONS AND UNDERTAKING**

4.1     **Representations**

The representations set out in this Clause are made as of the date hereof by the Guarantor to the Beneficiary.

4.2     **Status**

The Guarantor is a corporation, duly incorporated and validly existing under the laws of Canada.

PC0039724

PC0039676

6

### 2.7    Subrogation/Non-competition

Upon payment of any of the Guaranteed Obligations by or on behalf of the Guarantor, the Guarantor (or its nominee) shall thereupon be subrogated to the rights and benefits of the Beneficiary under the Funding Agreement provided that such subrogated rights of the Guarantor (or its nominee) shall be and remain subject and subordinate to the rights of the Beneficiary as provided in this Clause 2.7. Unless:

(a)    all amounts which may be or become payable by the Company to the Beneficiary pursuant to clauses 3 and 4 of the Funding Agreement have been irrevocably paid in full; or

(b)    the Beneficiary otherwise directs,

the Guarantor will not, during a period following the service of a Demand and only while the same Demand remains unsatisfied in full:

(i)    exercise any rights in the nature of subrogation with respect to any rights, security or moneys held, received or receivable by any Beneficiary (or any trustee or agent on its behalf);

(ii)    exercise any right of contribution or indemnity in respect of any payment made or moneys received on account of the Guarantor's liability under this Clause;

(iii)    claim, rank, prove or vote as a creditor of the Company or its estate in competition with the Beneficiary (or any trustee or agent on their behalf) provided however that subject to the final sentence of this Clause 2.7 the Guarantor shall not be prohibited from filing or proving any such claim to the extent (A) that the Guarantor would otherwise be barred from proving or asserting such claim later if application is not made during such period, and (B) the rights of the Guarantor under any such claim are, during such period, subordinate to the rights of the Beneficiary and any distribution received on account of any such claim during such period is held in trust for the benefit of the Beneficiary and transferred to the Beneficiary in accordance with the final sentence of this Clause 2.7; or

(iv)    receive, claim or have the benefit of any payment, distribution or security from or on account of the Company (except as provided in the immediately-preceding sub-clause), or exercise any right of set-off as against the Company.

The Guarantor must hold in trust for and immediately pay or transfer to the Beneficiary any payment or distribution or benefit of security received by it during such period contrary to this Clause or in accordance with any directions given by the Beneficiary under this Clause.

### 3.    PAYMENTS

### 3.1    Due date for payments

(a)    Any payment due from the Guarantor to the Beneficiary following the service of a Demand under this Agreement shall be due within 10 Business Days of the date of delivery of such Demand on the Guarantor by the Beneficiary.

PC0039723

PC0039676

5

without limitation, pursuant to clause 9 had such guarantee obligations not become unenforceable, invalid or illegal (as the case may be).

(c)    For the avoidance of doubt, nothing in this indemnity shall entitle the Beneficiaries to recover (i) any sum from the Guarantor that relates to a Guaranteed Obligation that has ceased to exist or (ii) any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations.

## 2.4 Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of all sums payable by the Company in respect of its Guaranteed Obligations and shall continue in full force and effect until the Expiry Date.

## 2.5 Reinstatement

If any discharge or arrangement is made in whole or in part on the faith of any payment, security or other disposition which is avoided or must be restored on insolvency, liquidation or otherwise without limitation, the liability of the Guarantor under this Clause will continue as if the discharge or arrangement had not occurred.

## 2.6 Waiver of defences

Subject to Clauses 2.2 and 3.6, the obligations of the Guarantor under this Clause will not be affected by any act, omission or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause. This includes:

(a)    any time or waiver granted to, or composition with, any person;

(b)    any release of any person under the terms of any composition or arrangement (other than a release by the Beneficiary of the Company from its obligations under the Funding Agreement);

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any person;

(d)    any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security (other than a failure to present a Demand as required by this Agreement);

(e)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any person;

(f)    any amendment (however fundamental) of the Funding Agreement provided that no such amendment shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly; or

(g)    any unenforceability, illegality, invalidity or non-provability of any Guaranteed Obligation due in any such case to the insolvency, bankruptcy, reorganisation, or liquidation of the Company.

2.    GUARANTEE

2.1    Guarantee

Subject at all times to Clauses 2.2 and 3.6, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary punctual performance by the Company of the Guaranteed Obligations, when due, in the event that:

(a)    a Trigger Event occurs; and

(b)    a Demand is subsequently delivered to the Guarantor.

2.2    Limitations

(a)    The guarantee contained in this Agreement is given subject as follows:

(i)    any Demand made under this Agreement shall be addressed to the Guarantor and shall be delivered if given in person at or sent by registered delivery post, courier or fax to the address or fax number set out in clause 8.2 of this Agreement or such other address or fax number as may be notified in writing by the Guarantor to the Beneficiary from time to time by not less than 7 days' notice. A Demand served by fax shall only be deemed to be received by the Guarantor if the Beneficiary has obtained a successful delivery receipt for the transmission;

(ii)    no amendment of the Funding Agreement, or other agreement between the Company and the Beneficiary, shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof, unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly;

(iii)    no Demand may be made under this Agreement after 11 a.m. (London time) on the Expiry Date; and

(iv)    notwithstanding any other provision of this Agreement, in the event that the Company or any persons connected with or associated to it (as such terms are defined in sections 249 and 435 of the Insolvency Act) (which shall include, for the avoidance of doubt, the Guarantor, NNC and any of NNC's subsidiary companies and corporations) make any contributions to the Scheme under a contribution notice or financial support direction issued by the United Kingdom Pensions Regulator under the provisions of Part 1 Pensions Act, or otherwise, such contributions shall reduce the Guaranteed Obligations on a pound-for-pound basis.

2.3    Supporting indemnity

(a)    In addition to its guarantee under Clause 2.1 (and subject at all times to Clauses 2.2 and 3.6), the Guarantor indemnifies the Beneficiaries against any loss or liability properly suffered by the Beneficiaries if any of the Guarantor's payment obligations under the guarantee contained in Clause 2.1 become unenforceable, invalid or illegal.

(b)    The amount of the loss or liability under this indemnity will be equal to the amount the Beneficiaries would otherwise have been entitled to recover (including, but

PC0039721

PC0039676

3

(i)     assets includes present and future properties, revenues and rights of every description;

(ii)    an authorisation includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration or notarisation;

(iii)   a person includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(iv)    a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which persons to which it applies are accustomed to comply) or any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(v)     a currency is a reference to the lawful currency for the time being of the relevant country;

(vi)    a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(vii)   a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(viii)  a party to this Agreement or any other person includes its successors in title, permitted assigns and permitted transferees; and

(ix)    a time of day is a reference to London time.

(b)     Unless the contrary intention appears, a reference to a month or months is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)     if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)    if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)   notwithstanding subparagraphs (i) and (ii) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)     The headings in this Agreement do not affect its interpretation.

PC0039720

2

(a)     the ability of the Guarantor to perform its payment obligations under this Agreement;

(b)     the validity or enforceability of this Agreement;

(c)     any right or remedy of the Beneficiaries under this Agreement.

NNC means Nortel Networks Corporation, a company registered in Canada with number 375438-3 with a principal place of business at The West Mall, Toronto, Ontario, M9C 5KL.

Pensions Act means the Pensions Act 2004, an Act of Parliament of England & Wales.

Reservations means:

(a)     the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court and damages may be regarded as an adequate remedy;

(b)     the limitation on enforcement as a result of laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws affecting the rights of creditors generally;

(c)     the statutory time-barring of claims;

(d)     defences of set off or counterclaim;

(e)     rules against penalties and similar principles;

(f)     the possibility that an undertaking to assume liability for, or indemnify a person against, non-payment of stamp duty may be void;

(g)     the fact that a court may refuse to give effect to a purported contractual obligation to pay costs imposed upon another person in respect of costs of an unsuccessful litigation brought against that person or may not award by way of costs all of the expenditure incurred by a successful litigant in proceedings brought before that court or that a court may stay proceedings if concurrent proceedings based on the same grounds and between the same parties have previously been brought before another court,

and any other reservations or qualifications of law contained in any legal opinion delivered to the Company, the Beneficiary or the Guarantor in respect of this Agreement.

Scheme means the Nortel Networks UK Pension Plan currently governed by the Consolidated Definitive Trust Deed and Rules made between the Company and the Beneficiary dated 21 August 2003 (as supplemented or amended from time to time).

Seizure Event has the meaning given to it in the Funding Agreement.

Trigger Event means the Company failing to pay any amount payable by it to the Beneficiary when contractually due pursuant to the terms of clauses 3.2, 3.3 and 4.2 of the Funding Agreement within a period of 10 Business Days following receipt of a written notification from the Beneficiary that such payment is overdue.

1.2     Construction

(a)     In this Guarantee, unless the contrary intention appears, a reference to:

PC0039719

PC0039676

1

**THIS GUARANTEE** is dated                                                    2006

BETWEEN:

(1)     Nortel Networks Limited (a company registered in Canada with number 125147-3 and principal place of business at 195 The West Mall, Toronto, Ontario, M9C 5K1 ) (the "Guarantor"); and

(2)     Nortel Networks UK Pension Trust Limited (a company registered in England and Wales with number 2091890 whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH) as trustee of the Nortel Networks UK Pension Plan (the "Beneficiary").

IT IS AGREED as follows:

1.      INTERPRETATION

1.1     Definitions

In this Agreement:

Agreement means this Guarantee.

Business Day means a day (other than a Saturday or a Sunday) on which banks are open for general business in both (i) Toronto, Ontario, Canada and (ii) London, England.

Company means Nortel Networks UK Limited (registered in England and Wales with number 03937799) whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH.

Demand means a written demand made by the Beneficiary to the Guarantor in the form set out at Schedule 1 to this Agreement.

Expiry Date means the earlier of:

(a)     30 June 2012;

(b)     termination (in full or in part) of the Funding Agreement in the circumstances set out in clause 12 of the Funding Agreement; and

(c)     the payment in full of all Guaranteed Obligations.

Funding Agreement means the funding agreement made between the Company and the Beneficiary in respect of the Scheme dated on or about the date of this Agreement.

Guaranteed Obligations means the payment obligations and liabilities of the Company to the Beneficiary under or in connection with clauses 3.2, 3.3 and 4.2 of the Funding Agreement but, for the avoidance of doubt, not including obligations referred to in clauses 5 or 6 of the Funding Agreement.

Insolvency Act means the Insolvency Act 1986, an Act of Parliament of England & Wales.

Material Adverse Effect means a material adverse effect on:

PC0039718

PC0039676

A/C TR21143

CONTENTS

Clause Page

1. Interpretation ..... 1
2. Guarantee ..... 4
3. Payments ..... 6
4. Representations and Undertaking ..... 7
5. Changes to the Parties ..... 8
6. Severability ..... 9
7. Counterparts ..... 9
8. Notices ..... 9
9. Taxes ..... 10
10. Language ..... 11
11. Governing law ..... 11
12. Enforcement ..... 11

Schedules

1. Form of Demand ..... 9

Signatories ..... 10

PC0039717

PC0039676

# GUARANTEE

DATED                2006

BY

NORTEL NETWORKS LIMITED

FOR

NORTEL NETWORKS UK PENSION TRUST LIMITED
AS TRUSTEE OF THE NORTEL NETWORKS UK PENSION PLAN

PC0039716

PC0039676

## Schedule 2

Form of Guarantee to be given by the Parent in favour of the Trustee

22

PC0039715

PC0039676

(j)    a decision by the Company to apply for clearance from the Pensions Regulator on the basis that a Type A event will occur in relation to the Company as described in the guidance issued by the Pensions Regulator on this subject in April 2005

**Part B -- Information to be disclosed to the Trustee**

Commencing with the financial year ending 31 December 2006, the Company shall provide the Trustee with an oral and / or written update on a quarterly basis with the following information:

General update on the financial performance of the Company, the Parent and NNC;

Cash balances for the Company, the Parent and NNC;

Inter-company loan balances for the Company in its capacity as either a lender or a borrower;

Management accounts in relation to the company and public information in relation to the Parent and NNC;

On an annual basis and as and when available, audited accounts for the Company, the Parent and NNC; and

Such other information as is generally provided from time to time to the Nortel Group's banks at the same time as it is provided to the banks.

PC0039714

PC0039676

## Schedule 1

### Information to be provided by the Company to the Trustee

**Part A – Events to be disclosed to the Trustee**

Note that references to the Company in Part A of this Schedule 1 shall, where applicable, be treated as references to the Parent and / or NNC.

(a)    any decision by the Company to take action which will, or is intended to, result in a debt which is or may become due to the Scheme not being paid in full

(b)    a decision by the Company to cease to carry on business in the United Kingdom, or where the Company ceases to carry on business in the United Kingdom without such a decision having been taken, the cessation of business in the United Kingdom by the Company

(c)    where applicable, receipt by the Company of advice that it is trading wrongfully within the meaning of section 214 of the Insolvency Act 1986 (wrongful trading), or circumstances being reached in which a director or former director of the Company knows that there is no reasonable prospect that the Company will avoid going into insolvent liquidation within the meaning of that section, and for this purpose section 214(4) of that Act applies

(d)    any breach by the Company of a covenant in an agreement between the Company and a bank or other institution providing banking services, other than where the bank or other institution agrees with the Company not to enforce the covenant

(e)    any change in the Company's credit rating, or the Company ceasing to have a credit rating

(f)    a decision by the Parent to relinquish control of the Company, or where the Parent relinquishes such control without a decision to do so having been taken, the relinquishing of control of the Company by the Parent

(g)    two or more changes in the holders of the position of Chief Executive and any director or partner responsible in whole or in part for the financial affairs of the Company within a 12 month period

(h)    the conviction of an individual, in any jurisdiction, for an offence involving dishonesty, if the offence was committed while the individual was a director or partner of the Company

(i)    such other events prescribed from time to time under section 69(2)(b) PA 2004.

20

PC0039713

PC0039676

A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

19.     **Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all the counterparts shall together constitute one and the same agreement.

20.     **Governing law**

This Agreement is governed by and is to be construed in accordance with English law.

21.     **Jurisdiction**

21.1    The courts of England have exclusive jurisdiction to settle any dispute in connection this Agreement (including a dispute regarding the existence, validity or termination of this Agreement).

21.2    The parties agree that the courts of England are the most appropriate and convenient courts to settle any such dispute and accordingly no party will argue to the contrary.

22.     **Rights of third parties**

Except as otherwise expressly stated this Agreement does not confer any rights on any person or party (other than the parties to this Agreement) pursuant to the Contracts (Rights of Third Parties Act) 1999. For the avoidance of doubt, the Parent has the right to enforce clause 12.

23.     **Confidentiality**

The Trustee hereby undertakes with the Company that it shall preserve the confidentiality of this Agreement and will not directly or indirectly reveal, report, publish or disclose such information contained in this Agreement other than to its professional advisers unless required by law or required by any regulatory or governmental or other authority or such disclosure is necessary to obtain any relevant tax clearance from any appropriate tax authority or is necessary or customary for communication with members of the Scheme.

This Agreement is executed as a deed by the parties and is delivered and takes effect on the date at the beginning of this Agreement.

19

PC0039712

PC0039676

18.    **Notices**

18.1    Any communication in connection with this Agreement must be in writing and, unless otherwise stated, may be given in person, by post or fax.

18.2    Unless it is agreed to the contrary, any consent or agreement required under this Agreement must be given in writing.

18.3    The contact details of the Company for the purpose of this Agreement are:

    Address:    Nortel Networks UK Limited
                  Maidenhead Office Park
                  Westacott Way
                  Maidenhead
                  Berkshire
                  SL6 3QH

    Fax number:    +44 (0)1628 438416

    E-mail:    cooperm@nortel.com

                  with a copy to jpoos@nortel.com

    Attention:    Mark Cooper, Chairman of the UK Pension Fund Policy Committee

18.4    The contact details of the Trustee for the purpose of this Agreement are:

    Address:    Nortel Networks UK Pension Trust Limited
                  Maidenhead Office Park
                  Westacott Way
                  Maidenhead
                  Berkshire
                  SL6 3QH

    Fax number: 01628 432 872

    E-mail: louiseha@nortel.com

    with a copy to clive.gilchrist@bestrustees.co.uk

    Attention: Louise Hammond, UK Pensions Manager

18.5    Except as provided below, any communication in connection with this Agreement will be deemed to be given as follows:

    (a)    if delivered in person, at the time of delivery;

    (b)    if posted, five days after being deposited in the post, postage pre-paid in a correctly addressed envelope;

    (c)    if by fax, when received in legible form.

PC0039711

PC0039676

13.2  Following the occurrence of an Event of Default (but only while the same is continuing and without the provisions of clause 12 taking effect (other than clause 12.2)), the Trustee shall have the right:

(a)  by written notice to the Company to terminate this Agreement. In the event that this Agreement is so terminated by the Trustee, the Company and the Trustee will use their reasonable endeavours to agree a new funding agreement to remedy the remainder of the Current Deficit in such period and in such manner as the Company and the Trustee may agree acting in good faith and consistent with the provisions of Part 3 of PA 2004; and / or

(b)  obtain an Extraordinary Valuation with an effective date prior to 5 April 2008 without the prior written consent of the Company.

14.  **Non-exclusive**

Nothing contained in this Agreement shall affect or diminish the rights, duties, powers and obligations that any of the parties may have whether arising under the governing trust documentation of the Scheme or otherwise including, without limitation, under PA 1995 and PA 2004.

15.  **Costs and expenses**

Save as otherwise agreed between the Company and the Trustee, the Company shall pay all of the Trustee's:

15.1  reasonable costs and expenses in relation to the negotiation, preparation, execution, performance and implementation of this Agreement and the Guarantee; and

15.2  costs and expenses in relation to the enforcement of this Agreement and the Guarantee.

16.  **Variation**

This Agreement may be varied at any time by the parties subject to the agreement of the Parent in its capacity as guarantor under the Guarantee and any variation of this Agreement is valid only if it is in writing and signed by or on behalf of each party and countersigned by the Parent to confirm that the Guarantee remains in full force and effect notwithstanding such amendment to this Agreement.

17.  **Severance**

If any provision of this Agreement is held to be invalid or unenforceable by any judicial or other competent authority, all other provisions of this Agreement will remain in full force and effect and will not in any way be impaired.

17

PC0039710

PC0039676

reasonable cause to believe that such information will be of material significance in the exercise by the Trustee of any of its functions.

In consideration of the disclosure of such confidential information, the Trustee agrees to be bound by the obligations set out in the confidentiality agreement made between (1) Kenneth Gardener and others (2) the Company and (3) the Parent dated 20 January 2006 and, for the avoidance of doubt, the Trustee shall procure that any individual who shall in the future become a director of the Trustee signs a copy of such confidentiality agreement or an equivalent agreement as soon as reasonably practicable after such appointment but, in any event, prior to the receipt of information set out at Schedule 1.

12. **Partial termination of this Agreement and termination of the Guarantee**

12.1 Unless the Company agrees otherwise acting in its absolute discretion, the Guarantee and Clauses 9 and 10 of this Agreement will immediately cease to have effect if the Trustee commissions the Actuary to undertake an Extraordinary Valuation, with an effective date prior to 5 April 2008, without the prior written consent of the Company (other than in the circumstances contemplated by clause 13.2(b)) and following this neither the Company nor the Parent will have any further liability under such clauses or the Guarantee respectively.

12.2 In the event that any Valuation reveals that the Current Deficit has been reduced to zero, this Agreement and the Guarantee will immediately terminate and neither the Company nor the Parent will have any further liability to the Trustee under this Agreement or the Guarantee respectively.

12.3 Notwithstanding the provisions of clause 22, the Parent shall have the right to enforce this clause 12.

13. **Events of Default and Termination**

13.1 The following circumstances shall be "**Events of Default**" for the purposes of this Agreement:

    (a)    the Company fails to make Past Service Deficit Contributions totalling £186,000,000 by 5 April 2008 and, for this purpose, the payment of £36,000,000 made by the Company to the Scheme for the period between 6 April 2005 and 5 April 2006 shall be taken into account; or

    (b)    the terms of clause 9 are breached by the Company and, if such breach is capable of remedy, the breach has not been remedied within 15 Business Days of the first to occur of (i) the Company becoming aware of such breach or (ii) receipt by the Company of a written notice from the Trustee requiring such breach to be remedied; or

    (c)    a Seizure Event occurs.

16

PC0039709

PC0039676

with entering into such Security Interest, an officer's certificate confirming that all payment obligations of the Company to the Beneficiary under this Agreement have been or shall be secured equally and rateably with such Security Interest.

9.2   In relation to any Security Interest which the Company seeks to classify as a Permitted Security Interest pursuant to any of paragraphs (i), (l) and (m) of the definition of Permitted Security Interest, the Company shall not be entitled to so classify that Security Interest until it has:

(a)   given the Trustee 5 Business Days' prior written notice of its intention to create such Security Interest; and

(b)   provided to the Trustee an officer's certificate which briefly states the basis for the Company classifying such Security Interest as a Permitted Security Interest.

9.3   The Company shall not grant any new guarantees or indemnities in respect of the financial obligations of any of NNC or its Subsidiaries (excluding for these purposes any actual direct or indirect subsidiaries of the Company) after the date of this Agreement (and during the term of this Agreement) unless it has meaningfully consulted with the Trustee for a period of 10 Business Days before doing so, provided that nothing in this clause 9.3 shall require the Company to obtain the consent of the Trustee to the granting of such guarantees or indemnities and the Trustee expressly acknowledges that it will not have the power to delay or impede the granting of such guarantees or indemnities.

10.   Guarantee by the Parent

10.1   The Company will procure that the Parent enters into the Guarantee in favour of the Trustee immediately following the execution of this Agreement.

10.2   The Trustee will seek its own legal opinion confirming that the Guarantee is legal, valid and binding on the Parent.

11.   Financial information and confidentiality

11.1   Notwithstanding the provisions of Regulation 6 of the Occupational Pension Schemes (Scheme Administration) Regulations 1996 (SI 1996/1715), the Company shall to disclose to the Trustee:

(a)   as soon as reasonably practicable the occurrence of an event relating to the Company and, where applicable, the Parent and NNC described at Part A of Schedule 1; and

(b)   at such times and with such frequency the information including but not limited to the list set out at Part B of Schedule 1 to allow the Trustee to assess the financial covenant of the Company where there is

15

PC0039708

PC0039676

statement of funding principles or recovery plan in force, prepare a statement of funding principles and recovery plan or, if there is an existing statement of funding principles and recovery plan in force, review and if necessary revise them to reflect the terms of this clause 8.3 in accordance with sections 223 and 226 PA 2004.

8.4    This clause 8.4 applies if a Valuation reveals on its effective date that the Scheme has insufficient assets to cover its technical provisions (and thus the statutory funding objective for the Scheme has not been met) and the value of the deficit on this basis is more than the value of the outstanding future Past Service Deficit Contributions payable by the Company under this Agreement. In these circumstances, the Company will continue to pay the rate of contributions to the Scheme on a basis no less than that set out in clauses 3 and 4 of this Agreement in order to eliminate the Current Deficit. The additional shortfall in meeting the technical provisions revealed by the Valuation over and above the Current Deficit will be eliminated by the Company within such a period and in such a manner as the Company and the Trustee will agree in accordance with sections 229 (1) PA 2004 having regard to the nature and circumstances of the Scheme and the financial covenant and business plans of the Company at that time. Any such agreement will then be recorded in the Scheme's statement of funding principles as required by section 223 PA 2004, a recovery plan as required under section 226 PA 2004, a schedule of contributions as required by section 227 PA 2004 and, if necessary, a supplemental funding agreement made between the Company and the Trustee.

8.5    This clause 8.5 applies if a Valuation reveals the Scheme has sufficient assets to meet its technical provisions (and thus the statutory funding objective for the Scheme has been met) and the statutory funding objective for the Scheme can be expected to continue to be met for the period for which a schedule of contributions would be in force. In these circumstances and subject to the provisions of Part 3 of PA 2004, the Company will be under no obligation to contribute to the Scheme in respect of past service deficit until the results of the next Valuation are known unless it decides otherwise acting in its absolute discretion.

9.     **Negative pledge by the Company and provision of upstream guarantees**

9.1    The Company undertakes that it will not, without the prior written consent of the Trustee (not to be unreasonably withheld or delayed, it being acknowledged that it shall be reasonable for the Trustee to withhold or delay its consent if the Trustee considers in its absolute discretion that any proposal will, or is likely to, result in the Scheme being materially and adversely affected), create, purport to create or permit to subsist any Security Interest over any of its assets to secure Funded Debt except where either:

(a)    subject to clause 9.2 below, such Security Interest is a Permitted Security Interest; or

(b)    in relation to any Security Interest which is not a Permitted Security Interest, the Company provides to the Trustee, prior to or concurrently

PC0039707

PC0039676

monthly amount calculated as 1/12th of the levy for 12 successive months following the month of receipt of the levy invoice by the Trustee.

7. **Contributions payable by the Company and other participating employers**

For the purposes of clauses 3 to 6 (inclusive), payment may be made by the Company, NNC or any of its Subsidiaries or any other company that is participating in the Scheme from time to time.

8. **Periodic review of the Deficit**

8.1 The Company recognises that, in certain circumstances, the Trustee may obtain an Extraordinary Valuation. Before commissioning an Extraordinary Valuation, with an effective date prior to 5 April 2008, the Trustee shall consult with the Company to provide it with an opportunity to respond to the circumstances of the Scheme at that time pending the next Triennial Valuation. If the Trustee commissions an Extraordinary Valuation, with an effective date prior to 5 April 2008, without the prior written consent of the Company, the provisions of clause 12 will apply. For the avoidance of doubt, the provisions of clause 12 shall not apply if (a) the Trustee obtains an Extraordinary Valuation with an effective date prior to 5 April 2008 with the prior written consent of the Company; (b) the Trustee obtains an Extraordinary Valuation with an effective date on or after 5 April 2008; or (c) the Agreement terminates in accordance with clause 13.

8.2 A Valuation will be undertaken in accordance with Part 3 of the PA 2004 and the actuarial methods and assumptions used to calculate the technical provisions of the Scheme (as defined in section 222 (2) PA 2004) will be as agreed between the Company and the Trustee in accordance with section 229 (1) (a) PA 2004. The Trustee acknowledges that, in accordance with Regulation 5 (4) (d) of the Occupational Pension Schemes (Scheme Funding) Regulations 2005 (SI 2005 No. 3377), where applicable, any change in the actuarial methods and assumptions used to calculate the technical provisions of the Scheme from the actuarial methods and assumptions used by the Actuary to calculate the Deficit must be justified by a change of legal, demographic or economic circumstances.

8.3 This clause 8.3 applies if a Valuation reveals on its effective date that the Scheme has insufficient assets to cover its technical provisions (and thus the statutory funding objective for the Scheme has not been met) but the value of the deficit on this basis is less than the value of the outstanding Past Service Deficit Contributions payable by the Company under this Agreement. In these circumstances, the Company will continue to make contributions to the Scheme on a basis no less than set out in clauses 3 and 4 of this Agreement notwithstanding its ability to eliminate the shortfall in meeting the technical provisions revealed by the Valuation by paying lower contributions to the Scheme for a shorter period or paying reduced contributions to the Scheme over the unexpired portion of the Recovery Period. The Trustee will then revise any schedule of contributions in place and, if there is no existing

13

PC0039706

PC0039676

(a)    such Current Service Contributions to the Scheme during such period shall be equal to £10,000,000 per annum;

(b)    such Current Service Contributions will be paid to the Scheme by quarterly cash instalments in arrears, payable on 4 January, 4 April, 4 July and 4 October of each year, which began on 4 July 2006; and

(c)    each such quarterly instalment shall be a minimum amount of £2,500,000,

provided that the Current Service Contributions payable under this clause 4.2 for the period between the date of this Agreement and the next Valuation shall be no less than the contributions payable by the Company in accordance with the schedule of contributions as required by section 58 PA 1995 in force at the date of this Agreement.

4.3    The Company shall make further Current Service Contributions to the Scheme in the period between 6 April 2008 and 5 April 2012 on such basis as the Company and the Trustee may agree following the results of the next Valuation.

5.    **Prepayment of contributions by the Company**

5.1    Subject to the provisions of the Trust Deed and Rules, the Company may make contributions in any amount without notice or penalty to the Scheme on a discretionary and voluntary basis at any time in order to eliminate the Deficit more quickly than envisaged under this Agreement.

5.2    Any such discretionary or voluntary contributions shall reduce the Current Deficit and reduce or extinguish (as the case may be, depending on their quantum) the next chronological instalment of Past Service Deficit Contributions and/or Current Service Contributions payable by the Company under clauses 3.2, 3.3, 4.2 and 4.3 of this Agreement.

5.3    In the event that the Company or any persons connected with or associated to it (as defined in sections 249 and 435 Insolvency Act 1986) (which shall include, for the avoidance of doubt, NNC and any of its Subsidiaries) make any contributions to the Scheme under a contribution notice or financial support direction issued by the Pensions Regulator under the provisions of Part 1 PA 2004, or otherwise, such contributions shall also reduce the Current Deficit and therefore reduce the Past Service Deficit Contributions payable under clause 3 of this Agreement in such a manner as the Company may determine.

6.    **Payment of PPF levies**

In respect of the risk-based element of the Pension Protection Fund levy each year during the Recovery Period, the Company will promptly pay to the Scheme either (a) a lump sum of the full amount of the levy invoice or (b) a

12

PC0039705

PC0039676

3.2    The Company shall make further Past Service Deficit Contributions to the Scheme in the period between the date of this Agreement and 5 April 2008 on the following basis:

    (a)    such Past Service Deficit Contributions to the Scheme during such period must total no less than £150,000,000;

    (b)    such Past Service Deficit Contributions will be paid to the Scheme by quarterly cash instalments in arrears, payable on 4 January, 4 April, 4 July and 4 October of each year, which began on 4 July 2005; and

    (c)    each such quarterly instalment shall be a minimum amount of £18,750,000,

provided that the Past Service Deficit Contributions payable under this clause 3.2 for the period between the date of this Agreement and 5 April 2008 shall not be less than the contributions payable by the Company in accordance with the schedule of contributions as required by section 58 PA 1995 in force at the date of this Agreement.

3.3    The Company shall make further Past Service Deficit Contributions to the Scheme in the period between 6 April 2008 and 5 April 2012 on the following basis:

    (a)    Past Service Deficit Contributions in quarterly instalments equal to 1/16th (6.25%) of the value of the April 2008 Deficit shall be paid; and

    (b)    such Past Service Deficit Contributions will be paid to the Scheme by quarterly cash instalments in arrears, payable on 4 January, 4 April, 4 July and 4 October of each year, beginning from 4 July 2008 until the April 2008 Deficit is reduced to zero or until this Agreement otherwise terminates,

provided that the Past Service Deficit Contributions payable under this clause 3.3 for the period between 6 April 2008 and 5 April 2012 shall be no less than the contributions payable by the Company in accordance with the schedule of contributions as required by section 58 PA 1995 in force at the date of this Agreement.

4.    **Current Service Contributions for the period between 6 April 2005 and 5 April 2012**

4.1    The Trustee acknowledges receipt of Current Service Contributions by the Company to the Scheme equalling £10,000,000, made in the period between 6 April 2005 and 5 April 2006.

4.2    The Company shall make further Current Service Contributions to the Scheme in the period between the date of this Agreement and the next Valuation on the following basis:

11

PC0039704

PC0039676

of the Trust Deed and Rules with an effective date of no later than 5 April 2008 for the first such valuation and, for the avoidance of doubt, this shall not include an actuarial report commissioned by the Trustee on a yearly basis under section 224 PA 2004;

**"Trust Deed and Rules"**     the Consolidated Trust Deed and Rules made between the Company and the Trustee dated 21 August 2003 (as supplemented or amended from time to time); and

**"Valuation"**     a Triennial Valuation and / or an Extraordinary Valuation.

2.     **Interpretation**

2.1     The clause and paragraph headings used in this Agreement are inserted for ease of reference only and shall not affect construction.

2.2     References in this Agreement to the parties, the Introduction, the Schedules and the clauses are references to the parties, the Introduction, the Schedules to and clauses of this Agreement.

2.3     References to "writing" or "written" includes any other non-transitory form of visible reproduction of words.

2.4     References to the word "include" or "including" (or any similar term) are not to be construed as implying any limitation and general words introduced by the word "other" (or any similar term) shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things.

2.5     Save where the context specifically requires otherwise, words importing one gender shall be treated as importing any gender, words importing individuals shall be treated as importing corporations and vice versa, words importing the singular shall be treated as importing the plural and vice versa and words importing the whole shall be treated as included a reference to any part thereof.

2.6     References in this Agreement (but not the Guarantee) to payments being made quarterly are to be made no later than 10 Business Days after the dues dates for payment.

3.     **Past Service Deficit Contributions for the period between 6 April 2005 and 5 April 2012**

3.1     The Trustee acknowledges receipt of Past Service Deficit Contributions by the Company to the Scheme equalling £36,000,000, made in the period between 6 April 2005 and 5 April 2006.

10

PC0039703

PC0039676

|  |  |
|---|---|
|  | or its equivalent in any other currencies; |
| "Recovery Period" | the seven year period from 6 April 2005 to 5 April 2012; |
| "Scheme" | the Nortel Networks UK Pension Plan; |
| "S&L Properties" | the following properties owned by the Company which it is considering utilising in its real estate value realisation program:<br><br>(a) Ivor Grove, New Eltham, London, United Kingdom (land); and<br><br>(b) Doagh Road, Newtownabbey, Monkstown, Northern Ireland, United Kingdom (office and systems house); |
| "Security Interest" | a mortgage, charge, pledge, lien, encumbrance, assignment, hypothecation, title retention, right of set-off or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect; |
| "Seizure Event" | in respect of the Company or the Parent:<br><br>(a)  the appointment of a receiver or other similar officer in respect of any of its assets; or<br><br>(b)  the enforcement of any Security Interest over any of its assets; or<br><br>(c)  any expropriation, attachment, sequestration, distress or execution (not being defensible or vexatious) affects any of its assets;<br><br>in each case, where the assets in question have an aggregate value in excess of US$250,000,000 and in each case such Seizure Event is not discharged within 20 Business Days of its occurrence; |
| "Subsidiary" | means any subsidiary of NNC and "Subsidiaries" shall be construed accordingly; |
| "Triennial Valuation" | a valuation by the Actuary into the ability of the Scheme to meet its liabilities commissioned by the Trustee during the Recovery Period in accordance with section 224 PA 2004 and pursuant to clause 13 |

9

PC0039702

PC0039676

make funding available to a Subsidiary within the parameters of the regulatory environment in which the relevant Subsidiary operates, (ii) the commercial effect of the arrangement is not materially worse for the Company than if the Company had made financial facilities directly available to the relevant Subsidiary and (iii) the amount of cash, cash equivalents or investment securities so deposited does not exceed 125% of the amount of related Funded Debt being secured by such Security Interest;

(m)     Security Interests arising in connection with any sale-and-leaseback transactions entered into in respect of the S&L Properties provided that such transaction is implemented on terms that are, taken as a whole, within market acceptable parameters for similar arrangements provided to an entity of the same nature and standing as the Company;

(n)     Security Interests created by or resulting from litigation or other proceedings against, or upon property of, the Company, so long as the finality of such judgment or award is being contested and execution thereon is stayed or such Security Interest relates to a final unappealable judgment which is satisfied within 30 days of such judgment or any Security Interest incurred for the purpose of obtaining a stay or discharge in the course of any litigation or other proceeding; and

(o)     any Security Interest granted by the Company and not permitted under any other paragraph of this definition, provided that the total amount of Funded Debt secured pursuant to this paragraph shall not exceed, at the date of incurrence thereof,  £50,000,000,

subject to such Security Interest, and (iii) this permission shall not include any such Security Interests that specifically arise as a result of the Company not having sufficient resources available to it for the payment in full of the relevant underlying obligations;

(h)    any Security Interest entered into in connection with government supply and development obligations, which do not constitute Managed Service Contract Security Interests and which only attach to the assets that are the subject of the underlying governmental supply or development contract (or any improvements thereon);

(i)    any Security Interest arising as a result of any receivable sales programs or securitisations **provided** that such program or securitisation (i) has the commercial result of providing the Company with the benefit of financial facilities available for its own utilisation and (ii) is implemented on terms that are, taken as a whole, within market acceptable parameters for similar facilities provided to an entity of the same nature and standing as the Company;

(j)    any Managed Service Contract Security Interests;

(k)    any Security Interest arising as a result of title retention arrangements arising in the ordinary course of business with suppliers of goods to the Company;

(l)    deposits of cash, cash equivalents or investment securities against which the lender of any Credit Enhanced Subsidiary Debt has a Security Interest or right of set-off, **provided** that (i) such arrangement is entered into by the Company as a means to

7

PC0039700

Company is required to create by any applicable law or in connection with any governmental or regulatory consent, licence or permission;

(f)    any Security Interest created by the Company over an asset as security for payment of the purchase price, construction cost or improvement cost of such asset, or as security for a loan or other financing arrangement (including a lease financing) (in an amount not exceeding 110% of the purchase price, construction cost or improvement cost of such asset) advanced for the purpose of enabling the Company to acquire, construct or improve such asset and which does not secure any other sums, provided that (i) no action is taken to increase the principal amount of the payment obligation that is secured by such Security Interest on or after the date of the relevant asset acquisition, (ii) the Company does not redraw any repaid principal amount of the loan or other financing arrangement against the equity value of any asset that is the subject to such Security Interest, and (iii) this permission shall not include any such Security Interests that specifically arise as a result of the Company not having sufficient resources available to it for the payment in full of the relevant underlying obligations;

(g)    any Security Interest over any asset of the Company which was acquired by the Company subject to such Security Interest provided that (i) no action is taken to increase the amount of the payment obligation that is secured by such Security Interest on or after the date of acquisition, (ii) the Company does not draw any further principal amount of any loan or other financing arrangement against the equity value of such acquired asset that is the

6

PC0039699

PC0039676

| | |
|---|---|
| "PA 2004" | Pensions Act 2004; |
| "Parent" | Nortel Networks Limited, a company registered in Canada with number 125147-3, with a principal place of business at 195 The West Mall, Toronto, Ontario, M9C 5K1, the parent company of the Company at the date of this Agreement; |
| "Past Service Deficit Contributions" | the cash contributions paid or to be paid by the Company to the Scheme, that have been calculated as necessary during the Recovery Period to eliminate the Deficit or the Current Deficit as the context permits by 5 April 2012; |
| "Pension Protection Fund" | the Board of the Pension Protection Fund as established under Part 2 of PA 2004; |

"Permitted Security Interest"

(a) any Security Interest created by the Company or subsisting over any of the Company's assets at the date of this Agreement, together with any Extension, renewal or replacement (or successive Extensions, renewals or replacements) in whole or in part of any such Security Interest;

(b) any netting or set-off arrangement entered into in the ordinary course of the Company's external banking and intra-group funding arrangements for the purpose of netting debit and credit balances, including for the avoidance of doubt, any cash pooling facilities operated by NNC and its Subsidiaries to which the Company may be a party;

(c) any Security Interest arising with respect to assets or the deeds retained in the custody or possession of a bank for safe-keeping, in the ordinary course of the Company's banking arrangements;

(d) any lien or other Security Interest arising by operation of law including, without limitation, repairer's liens or rights of set-off;

(e) any Security Interest which the

5

PC0039698

PC0039676

| | |
|---|---|
| "Events of Default" | those events listed in clause 13.1 of this Agreement; |
| "Extension" | in the context of a Security Interest, means an extension to the repayment date or term applicable to the underlying payment obligation that is secured by such Security Interest, but specifically excluding any contractual increase in the principal amount of the underlying payment obligation that is secured by such Security Interest; |
| "Extraordinary Valuation" | a valuation by the Actuary into the ability of the Scheme to meet its liabilities commissioned by the Trustee during the Recovery Period in accordance with section 224 PA 2004 and under clause 13 of the Trust Deed and Rules with effective dates which are not scheduled triennial valuation dates and, for the avoidance of doubt, this shall not include an actuarial report commissioned by the Trustee on a yearly basis under section 224 PA 2004; |
| "Funded Debt" | financial indebtedness incurred by the Company: (a) in respect of monies borrowed by the Company, and (b) in respect of monies borrowed by NNC and/or any of its Subsidiaries but guaranteed by the Company; |
| "Guarantee" | the agreement in the format set out at Schedule 2 to be made between the Trustee and the Parent whereby the Parent guarantees certain payments to be made by the Company to the Scheme during the Recovery Period under this Agreement; |
| "Managed Service Contract Security Interest" | means any Security Interest in favour of a customer of NNC or any of its Subsidiaries, or in favour of a third-party financing company, that relates to assets that are (i) used by such customer in the conduct of its business; and (ii) managed by NNC or any of its Subsidiaries under a managed services or hosting services contract between NNC or any of its Subsidiaries, such customer and/or such third party financing company; |
| "NNC" | Nortel Networks Corporation, a company registered in Canada with number 375438-3 with a principal place of business at 195 The West Mall, Toronto, Ontario, M9C 5K1 ; |
| "PA 1995" | Pensions Act 1995; |

4

PC0039697

| | |
|---|---|
| "Actuary" | Daniel Harrison of Watson Wyatt Limited or such other actuary as appointed by the Trustee under clause 11 (2) of the Trust Deed and Rules if in relation to duties, powers and responsibilities conferred by PA 1995 or PA 2004 or in relation to all other matters, at the discretion of the Trustee, that individual or the individual or firm appointed under clause 11 (3) of the Trust Deed and Rules; |
| "April 2008 Deficit" | the Current Deficit as at close of business on 5 April 2008; |
| "this Agreement" | this deed including the Introduction and the Schedules; |
| "Business Day" | a day (other than a Saturday or Sunday) on which banks are open for general business in London; |
| "Credit Enhanced Subsidiary Debt" | any Funded Debt of a Subsidiary (including the Company) payable to a financial institution that has (i) sold a participation for cash consideration in the full principal amount of such Funded Debt to NNC or another Subsidiary (including the Company) or (ii) a Security Interest or right of set-off against deposits of cash, cash equivalents or investment securities of the Company; *provided* that, in the case of paragraph (ii) above, the principal amount of such Funded Debt does not exceed the amount of cash, cash equivalents or investment securities so deposited; |
| "Current Service Contributions" | the cash contributions paid or to be paid by the Company to the Scheme that are necessary, together with contributions prospectively payable by active members of the Scheme during the Recovery Period, to fund the accrual of benefits earned by active members after 6 April 2005, plus the expenses of administration payable from the assets of the Scheme; |
| "Current Deficit" | the Deficit, as reduced by all contributions, other than Current Service Contributions made to the Scheme after 6 April 2005 by the Company, NNC or any of its Subsidiaries, measured as at the next Valuation using actuarial methods and assumptions consistent with the actuarial methods and assumptions used by the Actuary to calculate the Deficit; |
| "Deficit" | an amount equal to £356,000,000; |

3

PC0039696

This Agreement is made by way of deed on  21  day of November 2006

Between

Nortel Networks UK Limited (company number 3937799) whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH (the "Company"); and

Nortel Networks UK Pension Trust Limited (company number 2091890) whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH (the "Trustee").

Introduction

(A)     This Agreement is supplemental to the deeds and documents relating to the Scheme and in particular to the Trust Deed and Rules.

(B)     The Trustee is the present trustee of the Scheme and the Company is the current principal employer of the Scheme.

(C)     The last actuarial valuation of the Scheme dated 4 April 2006 was undertaken as at 5 April 2005 and was subject to the minimum funding requirement set out in sections 56 to 61 PA 1995. The valuation revealed a funding shortfall on the Scheme's ongoing basis equal to the Deficit.

(D)     The first actuarial valuation of the Scheme under Part 3 PA 2004 will be undertaken with an effective date of no later than 5 April 2008 and subsequent valuations will be undertaken in accordance with section 224 PA 2004.

(E)     The Company and the Trustee have agreed that the Company will make contributions to the Scheme in order to eliminate the Deficit during the Recovery Period and subject to certain conditions set out in this Agreement.

(F)     The Company has also agreed with the Trustee to enter into a covenant with the Trustee not to create any mortgage, charge, pledge, lien or other security interest over any of its assets without the prior written consent of the Trustee subject to permitted exceptions set out in this Agreement.

(G)     It has further been agreed that the Company will procure that the Parent enters into the Guarantee immediately following the execution of this Agreement.

Operative provisions

1.     Definitions

In this Agreement, except where a different interpretation is necessary in the context, the words and expressions set out below shall have the following meanings:

PC0039695

# Contents

1.   Definitions.........................................................................................2
2.   Interpretation....................................................................................10
3.   Past Service Deficit Contributions...................................................10
4.   Current Service Contributions..........................................................11
5.   Prepayment of contributions by the Company..................................12
6.   Payment of PPF levies.....................................................................12
7.   Contributions payable by the Company and other participating employers ...........13
8.   Periodic review of the Deficit...........................................................13
9.   Negative pledge by the Company and provision of upstream guarantees.............14
10.  Guarantee by the Parent..................................................................15
11.  Financial information and confidentiality.........................................15
12.  Partial termination of this Agreement and termination of the Guarantee............16
13.  Events of Default and Termination...................................................16
14.  Non-exclusive..................................................................................17
15.  Costs and expenses..........................................................................17
16.  Variation.........................................................................................17
17.  Severance........................................................................................17
18.  Notices............................................................................................18
19.  Counterparts....................................................................................19
20.  Governing law..................................................................................19
21.  Jurisdiction......................................................................................19
22.  Rights of third parties......................................................................19
23.  Confidentiality.................................................................................19
Schedule 1.............................................................................................20
Schedule 2.............................................................................................22

PC0039694

PC0039676

We hereby certify that this is a true
and accurate copy of the original
dated this *1* day of *DECEMBER*
*Osborne Clarke* *2006*
Osborne Clarke
2 Temple Back East
Temple Quay
Bristol BS1 6EG

**Funding Agreement in relation to the**

**Nortel Networks UK Pension Plan**

(1)    Nortel Networks UK Limited

(2)    Nortel Networks UK Pension Trust Limited

Dated 21 November 2006

Osborne Clarke

2 Temple Back East
Temple Quay
Bristol
BS1 6EG
Telephone      +44 (0) 117 917 3000
Fax      +44 (0) 117 917 3005

JPH/0906299/B1786436/SGSB

PC0039693

PC0039676

14

# SIGNATORIES

Guarantor

EXECUTED AS A DEED by      )
**NORTEL NETWORKS LIMITED**    )
acting by      )

By: _____
Name: _____
Title: _____

and

By: _____
Name: _____
Title: _____

Beneficiary

EXECUTED as a deed by      )
**NORTEL NETWORKS UK**      )
**PENSION TRUST LIMITED**    )
acting by      )

Director      *Kenneth Rendered.*

Director/Secretary      *[signature]*

PC0039692

PC0039676

14

## SIGNATORIES

Guarantor

EXECUTED AS A DEED by        )
NORTEL NETWORKS LIMITED      )
acting by                   )]

By: William J LaSalle
Name: WILLIAM X. LaSALLE
Title: GENERAL COUNSEL-OPERATIONS

and

By: W.B.Stevenson
Name: K.B. Stevenson
Title: Treasurer

Beneficiary

EXECUTED as a deed by        )
NORTEL NETWORKS UK           )
PENSION TRUST LIMITED        )
acting by                    )

Director

Director/Secretary

PC0039691

13

## SCHEDULE 1

### FORM OF DEMAND

To:   Nortel Networks Limited

Guarantee in respect of the Nortel Networks UK Pension Plan dated [●] 2006 (the "Guarantee")

We refer to the Guarantee. Terms defined in the Guarantee shall bear the same meaning in this letter.

We certify that a Trigger Event has occurred.

We demand payment of the sum of £[●] (the "Requested Amount") and confirm that the Requested Amount is equal to or less than the Guaranteed Obligations.

The Requested Amount should be made the following account:

Name: [●]

Bank: [●]

Account number: [●]

Sort Code: [●]

Yours faithfully

For and on behalf of
Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks UK Pension Plan

PC0039690

PC0039676

12

(b)     The parties agree that the courts of England are the most appropriate and convenient courts to settle any such dispute and accordingly no party will argue to the contrary.

(c)     This Clause is for the benefit of the Beneficiary only. As a result, to the extent permitted by law, a Beneficiary may take:

(i)     proceedings in any other court; and

(ii)     concurrent proceedings in any number of jurisdictions.

## 12.2   Waiver of immunity

The Guarantor irrevocably and unconditionally:

(a)     agrees not to claim any immunity from proceedings brought by a Beneficiary against it in relation to this Agreement and to ensure that no such claim is made on its behalf;

(b)     consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)     waives all rights of immunity in respect of it or its assets.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

PC0039689

PC0039676

11

**9.2    Tax gross-up**

(a)    If the Guarantor is aware that it must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it must promptly notify the Beneficiary.

(b)    If:

        (i)    a Tax Deduction is required by law to be made by the Guarantor or the Beneficiary; and

        (ii)    such Tax Deduction would not have been required to be made if the relevant underlying payment was being made by the Company (and not the Guarantor),

        then the amount of the payment due from the Guarantor will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(c)    If the Guarantor is required to make a Tax Deduction required by law, the Guarantor must make the Tax Deduction and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(d)    Prior to 31 March of the calendar year following either a Tax Deduction or a payment required in connection with a Tax Deduction, the Guarantor must deliver to the Beneficiary evidence satisfactory to the Beneficiary (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

**9.3**    If the Guarantor pays any such additional amount as is referred to in clause 9.2 in respect of any Tax Deduction and the Beneficiary determines that the Scheme has received a credit or refund for any Tax Deduction, the Beneficiary will (to the extent that it can do so without prejudice to the retention of such credit or refund and to the extent that it is not unlawful or contrary to any official regulation or directive for it to do so and provided that (i) no Seizure Event has occurred and is continuing in respect of the Parent, and (ii) no amount due and payable to the Beneficiary under either this Agreement or the Funding Agreement remains unpaid) reimburse the Guarantor with such amount (if any) as the Beneficiary determines will leave the Guarantor (after such reimbursement) in no better or worse position that it would have been in if the Guarantor had not been required to make such Tax Deduction.

**10.    LANGUAGE**

Any notice given in connection with this Agreement must be in English.

**11.    GOVERNING LAW**

This Agreement is governed by English law.

**12.    ENFORCEMENT**

**12.1    Jurisdiction**

(a)    The courts of England have exclusive jurisdiction to settle any dispute in connection this Agreement (including a dispute regarding the existence, validity or termination of this Agreement).

PC0039688

PC0039676

10

MS T0503005
195 The West Mall
Toronto, Ontario M9C 5K1
Canada

Fax number:     +001 (905) 863-7386
Attention:      General Counsel - Corporate

(b)    The contact details of the Beneficiary are:

Address:    Nortel Networks UK Pension Trust Limited
            Maidenhead Office Park
            Westacott Way
            Maidenhead
            Berkshire
            SL6 3QH

Fax number:    +44 (0)1628 432 872
E-mail:        louiseha@nortel.com
with a copy to clive.gilchrist@bestrustees.co.uk
Attention:     Louise Hammond – UK Pensions Manager

### 8.3    Effectiveness

(a)    Except as provided below, any Demand or communication in connection with this Agreement will be deemed to be delivered or given as follows:

(i)     if delivered in person, at the time of delivery;

(ii)    if posted, five days after being deposited in the post, postage prepaid, registered and with return receipt requested, in a correctly addressed envelope; and

(iii)   if by fax, when received in legible form with transmission confirmed by a generated transmission receipt.

(b)    A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

## 9.    TAXES

### 9.1    General

In this Clause:

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under this Agreement.

9

not in part, to any person or persons who may, from time to time and for the time being, be appointed as trustee or trustees of the Scheme pursuant to any appropriate trust deed, or pursuant to any statutory authority (such person being a "Successor Trustee"). The Beneficiary shall promptly thereafter give written notice to the Guarantor of the appointment of the Successor Trustee such notice to be signed by the Beneficiary and the Successor Trustee. With effect from the date of delivery of such notice, the Successor Trustee shall assume all the Beneficiary's rights and obligations under this Agreement and this Agreement shall be construed as if all references to the Beneficiary were replaced by references to the Successor Trustee. The obligations of the Guarantor under this Agreement shall remain unaltered by such transfer and replacement.

6.    **SEVERABILITY**

If a term of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other term of this Agreement; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other term of this Agreement.

7.    **COUNTERPARTS**

This Agreement may be executed in any number of counterparts and by the parties to it on separate counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.    **NOTICES**

8.1    **In writing**

(a)    Any communication in connection with this Agreement must be in writing and, unless otherwise stated, may be given in person, by post or fax.

(b)    Unless it is agreed to the contrary, any consent or agreement required under this Agreement must be given in writing.

8.2    **Contact details**

(a)    The contact details of the Guarantor for this purpose are:

Address:        Nortel Networks Limited
                MS T0503010
                195 The West Mall
                Toronto, Ontario, M9C 5K1
                Canada
Fax number:     +001 (905)-863-2486
Attention:      Treasurer.

With a copy to:

Address:        Nortel Networks Limited

PC0039686

8

### 4.3 Powers and authority

The Guarantor has the power to enter into and perform, and has taken all necessary action to authorise the entry into and performance of, this Agreement and the transactions contemplated by this Agreement.

### 4.4 Legal validity

Subject to the Reservations, this Agreement is a legally binding obligation of the Guarantor, enforceable in accordance with its terms.

### 4.5 Non-conflict

The entry into and performance by the Guarantor of, and the transactions contemplated by, this Agreement do not conflict with:

(a)    any law or regulation applicable to the Guarantor; or

(b)    the Guarantor's constitutional documents; or

(c)    any agreement binding on the Guarantor to the extent that such conflict would result in a Material Adverse Effect.

### 4.6 No default

The Guarantor is not in default under any agreement binding on the Guarantor to an extent or in a manner which would result is a Material Adverse Effect.

### 4.7 Pari passu ranking

The Guarantor's payment obligations under this Agreement rank at least pari passu in right of payment with all its other present unsecured payment obligations, except for obligations mandatorily preferred by law.

### 4.8 Times for making representations

The representations set out in this Clause are made by the Guarantor on and as of the date of this Agreement.

### 4.9 Undertaking

The Guarantor undertakes with the Beneficiary that it shall not, in any contractual obligations it enters into in the future with its other unsecured creditors, agree to any explicit contractual term that ranks the Guarantor's payment obligations to such unsecured creditors ahead of the Guarantor's payment obligations under this Agreement, except for such obligations that must be mandatorily preferred by law.

### 5. CHANGES TO THE PARTIES

(a)    The Guarantor may not assign or transfer any of its rights and obligations under this Agreement other than with the prior written consent of the Beneficiary.

(b)    The Beneficiary may not assign or transfer any of their rights and obligations under this Agreement other than with the prior written consent of the Guarantor save that the Beneficiary's rights under this Agreement may be transferred in their entirety, but

PC0039685

PC0039676

7

(b)    For the avoidance of doubt, provided the requirements of Clause 2.1 of this Agreement have been satisfied when making a Demand and subject to Clause 3.6, it is not necessary for the Beneficiary to have taken court action against the Company to recover the Guaranteed Obligations before such Demand will become payable by the Guarantor.

**3.2    Funds**

Payments under this Agreement to the Beneficiary must be made for value on the due date at such times and in such manner as the Beneficiary may specify to the Guarantor in a Demand.

**3.3    Currency**

Any amount payable under this Agreement is payable in Sterling.

**3.4    No set-off or counterclaim**

All payments made by the Guarantor under this Agreement must be made without set-off or counterclaim.

**3.5    Business Days**

If a payment under this Agreement is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

**3.6    No Double Recovery or Greater Recovery**

(a)    For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor an amount of the Guaranteed Obligations which has been paid by the Company to the Beneficiary, except insofar as payment of the amount concerned by the Company is or is claimed to be, by reason of the operation of any law relating to insolvency, bankruptcy or reorganization, void, voidable, unenforceable, or is otherwise required to be disgorged.

(b)    For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations and any limitations on the Company's liability under the Funding Agreement will equally apply to the Guarantor's liability under this Agreement.

**4.    REPRESENTATIONS AND UNDERTAKING**

**4.1    Representations**

The representations set out in this Clause are made as of the date hereof by the Guarantor to the Beneficiary.

**4.2    Status**

The Guarantor is a corporation, duly incorporated and validly existing under the laws of Canada.

PC0039684

PC0039676

6

### 2.7 Subrogation/Non-competition

Upon payment of any of the Guaranteed Obligations by or on behalf of the Guarantor, the Guarantor (or its nominee) shall thereupon be subrogated to the rights and benefits of the Beneficiary under the Funding Agreement provided that such subrogated rights of the Guarantor (or its nominee) shall be and remain subject and subordinate to the rights of the Beneficiary as provided in this Clause 2.7. Unless:

(a)    all amounts which may be or become payable by the Company to the Beneficiary pursuant to clauses 3 and 4 of the Funding Agreement have been irrevocably paid in full; or

(b)    the Beneficiary otherwise directs,

the Guarantor will not, during a period following the service of a Demand and only while the same Demand remains unsatisfied in full:

     (i)    exercise any rights in the nature of subrogation with respect to any rights, security or moneys held, received or receivable by any Beneficiary (or any trustee or agent on its behalf);

     (ii)    exercise any right of contribution or indemnity in respect of any payment made or moneys received on account of the Guarantor's liability under this Clause;

     (iii)    claim, rank, prove or vote as a creditor of the Company or its estate in competition with the Beneficiary (or any trustee or agent on their behalf) provided however that subject to the final sentence of this Clause 2.7 the Guarantor shall not be prohibited from filing or proving any such claim to the extent (A) that the Guarantor would otherwise be barred from proving or asserting such claim later if application is not made during such period, and (B) the rights of the Guarantor under any such claim are, during such period, subordinate to the rights of the Beneficiary and any distribution received on account of any such claim during such period is held in trust for the benefit of the Beneficiary and transferred to the Beneficiary in accordance with the final sentence of this Clause 2.7; or

     (iv)    receive, claim or have the benefit of any payment, distribution or security from or on account of the Company (except as provided in the immediately-preceding sub-clause), or exercise any right of set-off as against the Company.

The Guarantor must hold in trust for and immediately pay or transfer to the Beneficiary any payment or distribution or benefit of security received by it during such period contrary to this Clause or in accordance with any directions given by the Beneficiary under this Clause.

### 3. PAYMENTS

### 3.1 Due date for payments

(a)    Any payment due from the Guarantor to the Beneficiary following the service of a Demand under this Agreement shall be due within 10 Business Days of the date of delivery of such Demand on the Guarantor by the Beneficiary.

5

without limitation, pursuant to clause 9 had such guarantee obligations not become unenforceable, invalid or illegal (as the case may be).

(c)    For the avoidance of doubt, nothing in this indemnity shall entitle the Beneficiaries to recover (i) any sum from the Guarantor that relates to a Guaranteed Obligation that has ceased to exist or (ii) any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations.

2.4    **Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of all sums payable by the Company in respect of its Guaranteed Obligations and shall continue in full force and effect until the Expiry Date.

2.5    **Reinstatement**

If any discharge or arrangement is made in whole or in part on the faith of any payment, security or other disposition which is avoided or must be restored on insolvency, liquidation or otherwise without limitation, the liability of the Guarantor under this Clause will continue as if the discharge or arrangement had not occurred.

2.6    **Waiver of defences**

Subject to Clauses 2.2 and 3.6, the obligations of the Guarantor under this Clause will not be affected by any act, omission or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause. This includes:

(a)    any time or waiver granted to, or composition with, any person;

(b)    any release of any person under the terms of any composition or arrangement (other than a release by the Beneficiary of the Company from its obligations under the Funding Agreement);

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any person;

(d)    any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security (other than a failure to present a Demand as required by this Agreement);

(e)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any person;

(f)    any amendment (however fundamental) of the Funding Agreement provided that no such amendment shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly; or

(g)    any unenforceability, illegality, invalidity or non-provability of any Guaranteed Obligation due in any such case to the insolvency, bankruptcy, reorganisation, or liquidation of the Company.

PC0039682

4

## 2. GUARANTEE

### 2.1 Guarantee

Subject at all times to Clauses 2.2 and 3.6, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary punctual performance by the Company of the Guaranteed Obligations, when due, in the event that:

(a)    a Trigger Event occurs; and

(b)    a Demand is subsequently delivered to the Guarantor.

### 2.2 Limitations

(a)    The guarantee contained in this Agreement is given subject as follows:

   (i)    any Demand made under this Agreement shall be addressed to the Guarantor and shall be delivered if given in person at or sent by registered delivery post, courier or fax to the address or fax number set out in clause 8.2 of this Agreement or such other address or fax number as may be notified in writing by the Guarantor to the Beneficiary from time to time by not less than 7 days' notice. A Demand served by fax shall only be deemed to be received by the Guarantor if the Beneficiary has obtained a successful delivery receipt for the transmission;

   (ii)    no amendment of the Funding Agreement, or other agreement between the Company and the Beneficiary, shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof, unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly;

   (iii)    no Demand may be made under this Agreement after 11a.m. (London time) on the Expiry Date; and

   (iv)    notwithstanding any other provision of this Agreement, in the event that the Company or any persons connected with or associated to it (as such terms are defined in sections 249 and 435 of the Insolvency Act) (which shall include, for the avoidance of doubt, the Guarantor, NNC and any of NNC's subsidiary companies and corporations) make any contributions to the Scheme under a contribution notice or financial support direction issued by the United Kingdom Pensions Regulator under the provisions of Part 1 Pensions Act, or otherwise, such contributions shall reduce the Guaranteed Obligations on a pound-for-pound basis.

### 2.3 Supporting indemnity

(a)    In addition to its guarantee under Clause 2.1 (and subject at all times to Clauses 2.2 and 3.6), the Guarantor indemnifies the Beneficiaries against any loss or liability properly suffered by the Beneficiaries if any of the Guarantor's payment obligations under the guarantee contained in Clause 2.1 become unenforceable, invalid or illegal.

(b)    The amount of the loss or liability under this indemnity will be equal to the amount the Beneficiaries would otherwise have been entitled to recover (including, but

3

(i)     assets includes present and future properties, revenues and rights of every description;

(ii)    an authorisation includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration or notarisation;

(iii)   a person includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(iv)    a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which persons to which it applies are accustomed to comply) or any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(v)     a currency is a reference to the lawful currency for the time being of the relevant country;

(vi)    a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(vii)   a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(viii)  a party to this Agreement or any other person includes its successors in title, permitted assigns and permitted transferees; and

(ix)    a time of day is a reference to London time.

(b)     Unless the contrary intention appears, a reference to a month or months is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)     if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)    if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)   notwithstanding subparagraphs (i) and (ii) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)     The headings in this Agreement do not affect its interpretation.

PC0039680

PC0039676

2

(a)     the ability of the Guarantor to perform its payment obligations under this Agreement;

(b)     the validity or enforceability of this Agreement;

(c)     any right or remedy of the Beneficiaries under this Agreement.

NNC means Nortel Networks Corporation, a company registered in Canada with number 375438-3 with a principal place of business at The West Mall, Toronto, Ontario, M9C 5KL .

Pensions Act means the Pensions Act 2004, an Act of Parliament of England & Wales.

Reservations means:

(a)     the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court and damages may be regarded as an adequate remedy;

(b)     the limitation on enforcement as a result of laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws affecting the rights of creditors generally;

(c)     the statutory time-barring of claims;

(d)     defences of set off or counterclaim;

(e)     rules against penalties and similar principles;

(f)     the possibility that an undertaking to assume liability for, or indemnify a person against, non-payment of stamp duty may be void;

(g)     the fact that a court may refuse to give effect to a purported contractual obligation to pay costs imposed upon another person in respect of costs of an unsuccessful litigation brought against that person or may not award by way of costs all of the expenditure incurred by a successful litigant in proceedings brought before that court or that a court may stay proceedings if concurrent proceedings based on the same grounds and between the same parties have previously been brought before another court,

and any other reservations or qualifications of law contained in any legal opinion delivered to the Company, the Beneficiary or the Guarantor in respect of this Agreement.

Scheme means the Nortel Networks UK Pension Plan currently governed by the Consolidated Definitive Trust Deed and Rules made between the Company and the Beneficiary dated 21 August 2003 (as supplemented or amended from time to time).

Seizure Event has the meaning given to it in the Funding Agreement.

Trigger Event means the Company failing to pay any amount payable by it to the Beneficiary when contractually due pursuant to the terms of clauses 3.2, 3.3 and 4.2 of the Funding Agreement within a period of 10 Business Days following receipt of a written notification from the Beneficiary that such payment is overdue.

1.2     Construction

(a)     In this Guarantee, unless the contrary intention appears, a reference to:

1

**THIS GUARANTEE** is dated      21 November      2006

BETWEEN:

(1)    **Nortel Networks Limited** (a company registered in Canada with number 125147-3 and principal place of business at 195 The West Mall, Toronto, Ontario, M9C 5K1 ) (the "Guarantor"); and

(2)    **Nortel Networks UK Pension Trust Limited** (a company registered in England and Wales with number 2091890 whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH) as trustee of the Nortel Networks UK Pension Plan (the "Beneficiary").

**IT IS AGREED** as follows:

1.    **INTERPRETATION**

1.1    **Definitions**

In this Agreement:

**Agreement** means this Guarantee.

**Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in both (i) Toronto, Ontario, Canada and (ii) London, England.

**Company** means Nortel Networks UK Limited (registered in England and Wales with number 03937799) whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH.

**Demand** means a written demand made by the Beneficiary to the Guarantor in the form set out at Schedule 1 to this Agreement.

**Expiry Date** means the earlier of:

(a)    30 June 2012;

(b)    termination (in full or in part) of the Funding Agreement in the circumstances set out in clause 12 of the Funding Agreement; and

(c)    the payment in full of all Guaranteed Obligations.

**Funding Agreement** means the funding agreement made between the Company and the Beneficiary in respect of the Scheme dated on or about the date of this Agreement.

**Guaranteed Obligations** means the payment obligations and liabilities of the Company to the Beneficiary under or in connection with clauses 3.2, 3.3 and 4.2 of the Funding Agreement but, for the avoidance of doubt, not including obligations referred to in clauses 5 or 6 of the Funding Agreement.

**Insolvency Act** means the Insolvency Act 1986, an Act of Parliament of England & Wales.

**Material Adverse Effect** means a material adverse effect on:

PC0039678

PC0039676

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Guarantee | 4 |
| 3. | Payments | 6 |
| 4. | Representations and Undertaking | 7 |
| 5. | Changes to the Parties | 8 |
| 6. | Severability | 9 |
| 7. | Counterparts | 9 |
| 8. | Notices | 9 |
| 9. | Taxes | 10 |
| 10. | Language | 11 |
| 11. | Governing law | 11 |
| 12. | Enforcement | 11 |

**Schedules**

| 1. | Form of Demand | 9 |
|---|---|---|

| Signatories | 10 |
|---|---|

PC0039677

PC0039676

We hereby certify that this is a true
and accurate copy of the original
dated this    1    day of *DECEMBER*
                          2006

*Osborne Clarke*
Osborne Clarke
2 Temple Back East
Temple Quay
Bristol BS1 6EG

# GUARANTEE

DATED 21 November 2005

BY

NORTEL NETWORKS LIMITED

FOR

NORTEL NETWORKS UK PENSION TRUST LIMITED
AS TRUSTEE OF THE NORTEL NETWORKS UK PENSION PLAN

PC0039676



Commercial List Court File No:
09-CL-7950

IN THE MATTER OF

THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
- COMMERCIAL LIST

Proceeding commenced at Toronto

---

AFFIDAVIT OF
MICHAEL W. MCCORKLE

---

GOODMANS LLP
Barristers & Solicitors
333 Bay Street, Suite 3400, Toronto, Ontario
M5H 2S7

Benjamin Zarnett LSUC#17247M –
bzarnett@goodmans.ca
Jay Carfagnini LSUC#22293T –
jcarfagnini@goodmans.ca
Jessica Kimmel LSUC#32312W –
jkimmel@goodmans.ca
Joseph Pasquariello LSUC# 38390C –
jpasquariello@goodmans.ca
Peter Ruby LSUC# 38239P –
pruby@goodmans.ca

Tel: 416.979.2211 / Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

---

GOWLING LAFLEUR HENDERSON LLP
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  LSUC#: 21152A –
derrick.tay@gowlings.com
Jennifer Stam LSUC#: 46735J –
jennifer.stam@gowlings.com

Tel:    416.862.5697  /  Fax:    416.862.7661

Lawyers for the Applicants