# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

## AFFIDAVIT OF SHARON HAMILTON SWORN APRIL 11, 2014

## Submitted by the Canadian Allocation Group (including the CCC)

---

[1]      The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**AFFIDAVIT OF SHARON HAMILTON**
**(sworn April 11, 2014)**

I, Sharon Hamilton, of the City of Toronto, in the Province of Ontario, MAKE OATH

AND SAY:

1.      I am a Senior Vice-President of Ernst & Young Inc. ("EYI"), the Monitor of Nortel

Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and the other Applicants

(collectively, the **"Canadian Debtors"**) in the within *Companies' Creditors Arrangement Act*

(the **"CCAA"**) proceedings, and as such have knowledge of the matters hereinafter deposed to.

Unless I state otherwise, the following facts are within my personal knowledge. Where I have

indicated that I have obtained information from other sources, I have stated the source of that

information and I believe such information to be true. I have reviewed a copy of each and every

document that I refer to in my affidavit prior to swearing it.

- 2 -

2.      I swear this Affidavit in connection with the determination to be made by this Court and
the US Bankruptcy Court for the District of Delaware (collectively, the "**Courts**") concerning
the allocation of sale proceeds among the Estates.[1]

## I.      MY BACKGROUND AND INVOLVEMENT WITH THE CASE

3.      I am a Senior Vice-President of EYI and hold a chartered accountant and chartered
professional accountant designation in Canada. I am also a licensed trustee in bankruptcy and a
chartered insolvency and restructuring professional. I have been associated with Ernst & Young
LLP (Canada) for the past 20 years, first in the audit group and subsequently in the Canadian
restructuring practice (whose business is conducted through EYI).

---

[1] As used herein: (i) "**US Debtors**" refers to Nortel Networks Inc. ("**NNI**") and its affiliated debtors in proceedings
pending under Chapter 11 of the United States Bankruptcy Code; (ii) "**Joint Administrators**" refers to Alan Bloom,
Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors,
except for Nortel Networks (Ireland) Limited ("**NN Ireland**"), to which David Hughes (Ernst & Young LLP
Ireland) and Alan Bloom were appointed; (iii)   "**EMEA Debtors**" refers to Nortel Networks UK Limited
("**NNUK**") and its affiliated debtors subject to administration proceedings pending before the High Court of Justice
of England and Wales; (iv) "**Committee**" means the Official Committee of Unsecured Creditors of the US Debtors;
(v) "**Bondholder Group**" means the ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks
Capital Corporation; (vi) "**CCC**" means the ad hoc committee of major creditors having claims only against the
Canadian Debtors; and (vii) "**Estates**" refers collectively to the Canadian Debtors, the US Debtors and the EMEA
Debtors (including the Joint Administrators). References to "**Nortel**" herein refer to NNC and each of its
subsidiaries as a whole.

- 3 -

4.    I have over 17 years of experience as a restructuring professional and have been involved in a number of significant restructurings, including Air Canada, Asset Backed Commercial Paper, Hollinger, Progressive Moulded Products, Northstar Aerospace and Collins & Aikman.

5.    Shortly after the January 14, 2009 insolvency filings in Canada, the United States and England and the appointment of EYI as Monitor, Murray McDonald, the President of EYI, requested that I assist in the fulfillment of the Monitor's mandate. Although I have been involved in a number of different aspects of the matter over the past five years, my principal involvement during the period from early 2009 through mid-2011 was in connection with considering the means by which the maximum value for Nortel's assets would be obtained, including the sales processes for and sales of the various lines of business ("**LOB**") operated by Nortel, as well as the sale process and sale of the residual portfolio of approximately 7000 patents and patent applications remaining following the conclusion of the LOB sales (the "**Residual IP**"). I was also involved on behalf of the Monitor in connection with the Estates' consideration of a patent licensing business called "IP Co." as a possible business that might be carried on.

6.    During the course of my engagement in connection with the sale transactions I had significant interaction with senior management of Nortel, including the former Chief Financial Officer and Chief Restructuring Officer, Paviter (Pavi) Binning, as well as Nortel's senior mergers and acquisitions personnel, including George Riedel (Chief Strategy Officer), Khush Dadyburjor (President of M&A), Atulan Navaratnam and Hyacinth DeAlmeida. I also had significant interaction with representatives of Nortel's financial advisor, Lazard Freres & Co. ("**Lazard**"), and its advisor in connection with the Residual IP, Global IP Law Group, LLC ("**Global IP**") as well as the legal and financial advisors to each of the US Debtors, the Joint

- 4 -

Administrators, the Committee, the Bondholder Group and the CCC. Finally, I also had direct involvement in negotiations with the purchasers and prospective purchasers of the LOBs and the Residual IP.

7.    My present work on behalf of the Monitor primarily focuses on efforts to monetize the remaining assets of the Canadian Debtors and to wind down NNL's direct and indirect subsidiaries for the benefit of the Canadian Debtors.

## II.    NORTEL'S BUSINESS SEGMENTS AND LOBS

8.    As my mandate included studying and being involved in the realization of maximum value for Nortel's assets, I had to learn about the assets and operations that the Canadian Debtors had, and how they interacted with the assets and operations of other Nortel entities.

9.    As at the filing date, Nortel's three core business segments were Carrier Networks, Enterprise Solutions ("**Enterprise**") and Metro Ethernet Networks ("**MEN**"). A fourth business segment, Global Services (essentially Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.

10.    The Carrier Networks segment provided wireless networking solutions that enabled service providers and cable operators to supply mobile voice, data and multimedia communications to individuals and enterprises using mobile phones and other wireless computing and communications devices. The Carrier Networks segment included the code division multiple access ("**CDMA**"), carrier voice over internet protocol applications solutions ("**CVAS**") and global system for mobile communications ("**GSM**") LOBs.

- 5 -

11.     The generations of technology in wireless telecommunications are denoted with a "G", with the earliest technology given the lowest number. At the time, Nortel had customers for its 2G technology (CDMA and GSM), but no 3G technology, having divested its 3G business (known as UMTS) in 2006. Nortel had also invested significantly in the development of 4G long-term evolution (**"LTE"**) wireless technology, seen as the next generation wireless technology that would come to replace the older 2G and 3G technologies; however, Nortel had no customers for its LTE technology as the standard was only starting to be adopted by customers.

12.     The Enterprise segment provided enterprise communications solutions addressing the headquarters, branch and home office needs of large and small businesses globally. Enterprise offered unified communications solutions that helped remove the barriers between voice, email, conferencing, video and instant messaging. A typical example of an Enterprise product was the Nortel telephone and voicemail systems found in many businesses.

13.     The MEN segment provided optical networking and carrier grade ethernet data networking solutions to make carrier and large enterprise customers' networks more scalable and reliable for the high speed delivery of diverse multimedia communications services such as internet video, residential broadcast TV and video on demand. A sub-unit of the MEN segment was the Multi-Service Switch (**"MSS"**) business which was centered on a high reliability multi-service switch that can aggregate and route different kinds of traffic such as data, video, voice and various other protocols for transmission in a combined fashion.

14.     The MEN, Enterprise and CVAS LOBs incurred operating losses for the years 2007 through and including 2009. The CDMA and GSM LOBs were profitable during this period;

- 6 -

however, both were primarily mature 2G businesses and revenue was forecast to decline over the coming years as customers transitioned to 4G LTE.

15.     The LOBs operated across jurisdictional boundaries, in many cases on a world-wide basis. The assets, contracts and employees relevant to the operation of a particular LOB were owned or employed by various individual Nortel legal entities, including NNL, but also including NNI (the US subsidiary of NNL and the principal US Debtor), NNUK (another NNL subsidiary and the principal EMEA Debtor) and numerous other debtor and non-debtor Nortel entities around the globe.

## III.     INITIAL RESTRUCTURING CONSIDERATIONS UPON THE INSOLVENCY FILINGS AND THE DECISION TO SELL THE LOBS

16.     In order to formulate recommendations regarding restructuring options and the best means to realize value for creditors, it was important for me to understand to some extent the reasons for the insolvency filings. The CCAA and other insolvency filings occurred in early 2009, shortly after the Chapter 11 filing of Lehman Brothers and the onset of the financial crisis of late 2008. In light of the financial crisis, access to the capital markets had become severely restricted. The financial crisis had also led to particular difficulties in the telecommunications sector as customers announced plans to cut back or defer capital spending. This contributed to significant operating losses in Nortel's LOBs and increased liquidity pressure.

17.     Two restructuring options were initially considered as a means of maximizing value for creditors. The first involved the sale of all of Nortel's LOBs except the CDMA (2G) wireless business and its next generation (4G) LTE wireless technology. Under this option, a smaller

- 7 -

Nortel would emerge centered on the legacy CDMA business and the potential LTE business. I refer to this strategy in my Affidavit as **"CDMA Co."**.

18.     The second option (and what ultimately occurred) was the sale of all of Nortel's LOBs and other assets, i.e. a liquidating insolvency.

19.     In both cases, the restructuring options considered were consistent with Nortel's pre-filing efforts to restructure its business, which had included the implementation of a strategy to divest its MEN business and efforts to sell itself or merge with another significant telecommunications company.

20.     In the period immediately following the insolvency filings, management was primarily focused on implementing CDMA Co. although it was proceeding on a dual-track to explore both restructuring options and commenced (or in the case of MEN, continued) marketing efforts for its major LOBs.

21.     Following significant review by NNC's then senior management and board of directors and in consultation with Lazard, the Monitor, the US Debtors, the Joint Administrators and the legal and financial advisors to each of the Committee, the Bondholder Group and various Canadian creditors, it was determined in June 2009 that the best means to realize value for creditors would be to sell all of the LOBs and other assets; in short, it was determined there should be a liquidating insolvency.

22.     The rejection of CDMA Co. in favour of a liquidating insolvency was driven by a consideration of the relative viability of both strategies and the expected financial outcomes and returns for creditors. With respect to the relative viability of CDMA Co. as an option, two

- 8 -

developments in the first half of 2009 made it highly unlikely that a restructuring around CDMA Co. could be successfully executed.

23.     First, in February 2009, Verizon Communications, a major CDMA customer and prospective customer for Nortel's LTE technology, advised Nortel it had not been selected as an LTE provider to Verizon. It later advised Nortel that in light of the insolvency filings, Nortel's financial condition and the difficulties experienced by Nortel over the course of the 2000s, it preferred that the CDMA LOB move into "safe hands" (i.e., an experienced telecommunications business with a strong balance sheet), failing which Verizon would direct a disproportionate amount of its CDMA purchases to its other CDMA supplier on a go-forward basis. As a result of these developments, CDMA Co.'s prospective business model was significantly undermined.

24.     Second, over the course of early 2009, it became evident that Nortel would not be able to obtain the funding necessary to restructure around the CDMA Co. model.

25.     On June 19, 2009, Nortel issued a press release announcing that it had entered into a stalking horse agreement to sell its CDMA business and certain LTE assets and that it was advancing in discussions with external parties to sell its other LOBs.[2] Each of the Estates, the Committee, the Bondholder Group and the constituents of the CCC supported this decision and I am not aware of any suggestion from such parties that anything other than the divestiture of the LOBs and other assets was the best strategy to maximize the value of Nortel's assets for the benefit of its creditors.

---

[2] "Nortel to Sell CDMA Business and LTE Assets" dated June 19, 2009 (UCC0015169).

## IV.  THE MRDA AND THE IFSA

26.     The Master R&D Agreement among NNL, NNI, NNUK, Nortel Networks SA and NN Ireland entered into December 22, 2004 with effect from January 1, 2001 (the "**MRDA**") and Nortel's transfer pricing system was first brought to my attention shortly after I became engaged in the file.[3] The MRDA has been a critical document in Nortel's insolvency proceedings. Each of the Estates and their creditor constituents has known about the MRDA since the earliest days of the insolvency filings (and, in fact, prior to them) and its provisions have formed the backdrop for each significant inter-estate settlement, certain of which are described below. No Estate has ever sought to reject or terminate the MRDA and prior to the filing the Joint Administrators specifically requested, and NNL agreed, not to terminate NNUK's participation under the MRDA.

27.     For purposes of Nortel's early restructuring efforts, the MRDA was relevant for two reasons. First, the MRDA contains provisions regarding the ownership and licensing of intellectual property ("**IP**"), the asset that was the main driver of Nortel's business. Second, the MRDA contains provisions regarding Nortel's transfer pricing regime, and in particular the obligation of NNL, NNI and NNUK (among others) to make transfer pricing payments to one another as prescribed by the MRDA. As such, the MRDA implicated the inter-company flow of funds among the Estates and their respective cash positions.

---

[3] Master R&D Agreement dated December 22, 2004 (Ex. 21003). I am aware that the MRDA will be the subject of extensive evidence and argument in the trial and only intend to comment on it from the perspective of how it impacted Nortel's restructuring efforts and the sales which were conducted.

- 10 -

28.     As regards funding issues, NNL, as the Nortel entity that generally performed the most research and development ("**R&D**") activity and also incurred significant corporate overhead expense for the benefit of all members of the group, was a net recipient of payments under the MRDA and Nortel's transfer pricing system. As a result of the insolvency filings, payments to NNL under the MRDA and Nortel's transfer pricing system ceased with the exception of one $30 million payment from NNI in January 2009.

29.     Notwithstanding the cessation of transfer pricing payments, the Canadian Debtors continued to incur significant corporate overhead and R&D costs to preserve the enterprise value of the LOBs and coordinate the global restructuring efforts for the benefit of Nortel's global stakeholders. As a result, NNL began to suffer an increasing and significant cash burn. For instance, during the period April 12 to June 6, 2009, the Canadian Debtors' actual consolidated net cash outflow was $76.6 million. At the time of entering into the IFSA (as defined below), the Canadian Debtors were forecast to incur negative cash flow for the period of June 7 to September 30, 2009 of $266 million.[4] It was a priority of the Monitor to address this funding issue to ensure that the Canadian Debtors would have sufficient funds to continue to operate and implement their restructuring strategy.

30.     On June 9, 2009, NNL, NNI, NNUK and the Joint Administrators (among other parties) entered into the Interim Funding and Settlement Agreement (the "**IFSA**") that resolved these

---

[4] Excluding special items, being $86 million from the proceeds of sale of real property owned by NNL and excluding the $157 million of funding ultimately advanced by NNI to NNL under the IFSA. See, Fifteenth Report of the Monitor dated June 25, 2009 at paras. 22 and 42 (UCC0050386).

- 11 -

funding issues for, as the title suggests, an interim period.[5] Pursuant to the IFSA, NNI agreed to pay $157 million to the Canadian Debtors which, together with the $30 million payment made in January 2009, was in satisfaction of any claims of NNL for corporate overhead and research and development costs, whether pursuant to the MRDA or otherwise, incurred by NNL for the benefit of the US Debtors for the period from the filing date to September 30, 2009.[6] In addition, NNL agreed to pay $20 million to NNUK on a deferred basis, which amount was in full and final settlement of any and all transfer pricing obligations between the Canadian Debtors and the EMEA Debtors for the period from the filing date to December 31, 2009.[7]

31.    Subsequent agreements among the Estates (or certain of them) would also deal with funding issues and otherwise address Nortel's transfer pricing regime. Most notably, pursuant to the Final Canadian Funding and Settlement Agreement dated December 23, 2009 (the "**CFSA**"), NNI made a payment to NNL of approximately $190 million in full satisfaction of its reimbursement obligations in respect of corporate overhead, R&D, and other costs, whether pursuant to the MRDA or otherwise, incurred by any of the Canadian Debtors for the benefit of the US Debtors for the period October 1, 2009 through the end of the CCAA proceedings.[8] Pursuant to the CFSA, NNL agreed to admit a $2.0627 billion claim by NNI in settlement of

---

[5] Interim Funding and Settlement Agreement dated June 9, 2009 (NNC-NNL033801).

[6] IFSA, *ibid*, s. 1 and 3.

[7] IFSA, *ibid*, s.s. 6(b) and (c) and s. 8.

[8] Final Canadian Funding and Settlement Agreement dated December 23, 2009 ("**CFSA**"), s. 1 (NNC-NNL20001869).

- 12 -

(among other things) any transfer pricing overpayments made by NNI to NNL for the period 2001 through 2005 and an outstanding revolving loan.[9]

32.    Following closing of the LOB and Residual IP transactions, on September 8, 2011, the Estates and certain of their affiliates entered into the Q1 2010 Transfer Pricing Settlement Agreement (the "**Q1SA**") and the Agreement on Transfer Pricing Amendments and Certain Other Matters (the "**TPAA**"). Under the Q1SA, the Estates agreed to the settlement of any transfer pricing obligations as between them for the period from January 1, 2010 through March 31, 2010, and that the EMEA Debtors owed NNL $10.6 million for such period.[10] Under the TPAA, it was agreed that as a result of the various divestitures and the resulting wind-down of all active business operations and the cessation of any significant R&D or corporate overhead expense, transfer pricing payments for the period after April 1, 2010 would no longer be required, but that the MRDA would otherwise continue in effect.[11]

33.    Each of the IFSA, CFSA, Q1SA and TPAA were approved by the Courts following joint hearings on motions brought by each of the Canadian Debtors and US Debtors.

34.    The MRDA was also relevant for considering Nortel's restructuring efforts insofar as it contains provisions regarding the ownership and licensing of IP. Pursuant to the MRDA, NNL is the owner of all "NN Technology" as defined under the MRDA, which encompasses virtually all IP (excluding trademarks, almost all of which are also owned by NNL). NNL licensed the NN

---

[9] *Ibid*, s. 10.

[10] Q1 2010 Transfer Pricing Settlement Agreement dated September 8, 2011, at s. 2 and 4 (NNC-NNL06002330).

[11] Agreement on Transfer Pricing Amendments and Certain Other Matters dated September 8, 2011, at s. 1 – 4 (NNC-NNL06002315).

- 13 -

Technology to NNI, NNUK and the other "participants" under the MRDA on an exclusive basis in their respective jurisdictions on the terms and conditions described in the MRDA. NNL also licensed NN Technology on a non-exclusive basis to various Nortel entities that distributed Nortel products pursuant to distribution agreements between NNL and the applicable Nortel entity (the **"Distribution Agreements"**).

35.     The question of how to address the Estates' respective rights with respect to NN Technology under the MRDA in connection with the potential sale of the LOBs was a frequent topic of discussion among the Estates as they considered restructuring options.

36.     It was also a subset of the larger topic of discussion of how to accomplish the LOB sales generally. As noted above, the LOBs were operated on a global basis by a number of different legal entities. As such, significant coordination and cooperation would be required among the Estates and their non-debtor affiliates to negotiate and implement the transactions.

37.     A co-operative, multi-jurisdictional sale of the LOBs was the best (and indeed only) way to maximize the value of the LOBs for the benefit of creditors as it allowed for the LOBs to be sold on a going concern basis such that their enterprise value could be preserved to the extent possible and maximum value achieved. To my knowledge, no Estate or creditor constituent ever proposed a "go it alone" strategy whereby it would attempt to sell or sub-license only its interests or maintain those interests while others sold theirs. Such a strategy would have led to significant and time-consuming litigation and may have significantly impaired the values that were ultimately achieved by selling the LOBs in a cooperative and coordinated fashion.

- 14 -

38.     While considering the LOB sales, the Estates and their constituents also turned their minds to the question of how to allocate the proceeds of such sales, what to do if an agreement on allocation could not be reached, and how to ensure that allocation disputes would not negatively impact the sale processes. No one felt it would be beneficial or practical for any Estate to insist on a particular allocation as a pre-condition to entering into a transaction, and there were concerns that allocation disputes could negatively impact sale processes. Given the level of coordination and cooperation required to effect the LOB transactions and the short timelines to complete them, delays could have materially impaired the value to be achieved in a transaction to the detriment of all parties. The Estates sought to establish a framework which would preclude this possibility so they could focus on achieving maximum value from the LOBs as a whole, while preserving all parties' rights to negotiate or have the allocation issue appropriately resolved at a later date.

39.     The Estates and their constituents had had an opportunity to consider many of these issues very early on in the insolvency proceedings. Prior to the filings, Nortel had been in advanced negotiations to sell the Layer 4-7 business, a relatively discrete product line, to Radware Ltd, ("**Radware**"). As with the subsequent LOB sales, various Nortel entities, including NNL, NNI and certain of the EMEA Debtors were contemplated to be sellers in the sale such that there would be no question that the appropriate bundle of rights and obligations of the Layer 4-7 business could be conveyed and assumed by Radware. Following the insolvency filings, it became necessary to renegotiate certain aspects of the proposed transaction to make the terms consistent with a "bankruptcy" transaction. The Estates worked cooperatively to finalize the negotiations for the Layer 4-7 transaction, execute the sale agreement, and implement a competitive sale process approved by the Courts.

- 15 -

40.    In connection with the Estates' cooperative efforts to finalize the Layer 4-7 transaction, the issue of how to allocate the proceeds of the transaction arose. As the transaction was relatively small and it was becoming apparent that the issue of the allocation of sale proceeds among the Estates would become a much larger issue, the Estates entered into a side agreement whereby they agreed that the proceeds would be paid into escrow pending resolution at a later date through negotiation or the final decision of a court or arbitrator of competent jurisdiction. In the same side agreement, the Estates made other agreements to facilitate the Layer 4-7 sale process and transaction, including pertaining to the auction of the Layer 4-7 LOB, the sharing of any potential break-fee or expense reimbursement payable to the purchaser and the obligation to deliver closing deliverables.[12]

41.    The Layer 4-7 transaction became the prototype for the later LOB transactions and many of the concepts in the Layer 4-7 side agreement, together with certain additional provisions, were incorporated into the sale transaction related provisions of the IFSA that became the framework for completing the sale transactions. In particular, under the IFSA the Estates agreed:

      a)     that their execution of sale documentation or closing of a transaction of material assets would not be conditioned upon reaching agreement on either allocation of the sale proceeds of such sale or a binding procedure for the allocation of such sale proceeds;

      b)     to deposit all sale proceeds of such transactions into escrow, and that there would be no distribution from such escrow in advance of either agreement of all of the

---

[12] Side Agreement dated February 19, 2009 (NNC-NNL11152292).

- 16 -

applicable selling debtors, or in the case where such an agreement was not reached, determination by the relevant dispute resolver(s); and

c)     that to address the issue of the licenses and rights granted by NNL pursuant to the MRDA, the US Debtors and the EMEA Debtors would enter into "Appropriate License Terminations" which would provide for the termination of the licenses and rights granted by NNL under the MRDA for the purpose of facilitating the sale of any materials assets of any of the Canadian Debtors and/or the US Debtors to a third party.[13]

42.     Pursuant to the IFSA, the Estates were also obligated to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of sale proceeds. In addition, following entry into a sale transaction, they were obligated to negotiate in good faith to attempt to reach agreement on the allocation of proceeds from such transaction.[14] These obligations (particularly the former provision) have given rise to extensive negotiation and mediation, but no agreement was ever reached. The present trial process has ensued.

43.     The effect of the IFSA was that each Estate would enter into the sale transactions and, in the case of the US Debtors and the EMEA Debtors, agree to terminate their MRDA licenses, without any guarantee of the allocation it would receive, which was left to be resolved later through either mutual agreement, or determination by the relevant dispute resolver(s) (ultimately

---

[13] IFSA, *supra* note 5, s. 11 and 12.

[14] IFSA, *ibid*, s.s. 12(c) and (d).

- 17 -

determined to be the Courts). Indeed, under the IFSA no Estate was ever required to provide an outline of the amounts or percentages it expected to receive, or would argue for as allocations (for itself or any other Estate), before the sales were agreed to or completed. This framework allowed the Estates to work together cooperatively and focus on achieving maximum value, and avoided the prospect of distracting allocation related disputes and maneuvering. I always believed each of the Estates saw this structure as advantageous – the more money realized, the more each would be entitled to claim against for allocation purposes, while preserving the rights of all parties to ultimately have a dispute resolver (the Courts) decide the allocations if no agreement could be reached.

44.    The parties to the IFSA did agree to a "fiduciary out" type exception to the obligation to enter into the sale transactions which provided that a debtor would not be required to enter into a sale transaction so long as it reasonably determined, acting in good faith and after consultation with the other parties to the IFSA, that such transaction was not in the best economic interest of its creditors generally.[15] No Estate ever exercised such right and each of the LOB and Residual IP transactions was completed consensually, without any agreement or guarantee of allocations.

45.    The sale-related obligations provided for in the IFSA, in particular the obligation of a party not to condition entry or closing of a sale transaction on an allocation entitlement and the obligation to deliver an Appropriate License Termination in connection with a transaction, were subsequently incorporated into the Asia Restructuring Agreement among the Estates and various Nortel affiliates in the Asia-Pacific ("**APAC**") region (among others) dated November 5, 2009 (the "**ARA**"), such that substantially all relevant Nortel entities worldwide were obligated to

---

[15] IFSA, *ibid*, s.s. 12(e).

- 18 -

surrender their license rights in connection with the sale transactions and could not insist on a particular allocation as a precondition to entering into a sale transaction.[16] The ARA was also approved by both Courts following a joint hearing.

46.     In addition to the sale related provisions of the IFSA, the Estates and various other Nortel entities entered into Court-approved "side" agreements in connection with most transactions which provided for, among other things, the sharing (or payment from the sale proceeds) of various transaction costs and for the Estates to cooperate in performing their obligations under the relevant sale agreement and consummating the transaction. These side agreements also confirmed the Estates' obligation to deposit the sale proceeds in escrow until such time as allocation had been agreed or determined as provided for under the IFSA. They further confirmed the Estates' agreement that, except for items specifically agreed to (such as, for instance, the payment of certain transaction costs from the proceeds), nothing in the side agreements would determine, ratify, adopt or have any impact whatsoever on allocation.[17]

V.      **THE LOB SALES**

47.     With the IFSA framework in place, the Estates, in consultation with their creditor constituents, embarked on a process that resulted in a series of sales of the LOBs, which occurred from mid-2009 through late 2010 (with the last LOB transaction, MSS, closing in March 2011). Each of NNL, NNI and (with the exception of the CDMA/LTE transaction) NNUK were named

---

[16] Asia Restructuring Agreement dated November 5, 2009 (NNC-NNL06724463).

[17] See, for instance, Metro Ethernet Networks Side Agreement dated February 26, 2010, at s. 2.4 and s. 4.16 (NNC-NNL06002178).

- 19 -

as "sellers" under the transactions together with various other Nortel entities. Summary details of the significant LOB transactions entered into are set out in the table below.

| LOB | Purchaser | Net Sale Proceeds[18] | Closing Date |
|---|---|---|---|
| CDMA/LTE | Ericsson | $1,087.7 million[19] | November 13, 2009 |
| Enterprise | Avaya | $842.84 million | December 19, 2009 |
| MEN | Ciena | $631.85 million[20] | March 19, 2010 |
| CVAS | Genband | $140.07 million | May 28, 2010 |
| GSM/GSM-R | Ericsson and Kapsch Carrier Com AG | $104.47 million | March 31, 2010 |

48.     In addition, the Estates also entered into a series of smaller transactions over the same timeframe in respect of sub-units of LOBs or a particular technology or product. Although all of these sales are referred to as "LOB" sales for ease of reference, only the Layer 4-7 and MSS transactions involved the sale of what could be characterized as an operating business. Further details in this regard are provided at paragraph 53 of my Affidavit.

---

[18] As at December 31, 2013.

[19] Includes approximately $35 million held in trust for certain Nortel directors and officers.

[20] Including approximately $21.84 million currently held in escrow under agreement with purchaser.

| LOB | Purchaser | Net Sale Proceeds[21] | Closing Date |
|---|---|---|---|
| Layer 4-7 | Radware | $18.1 million | March 31, 2009 |
| NGPC | Hitachi | $10.37 million | December 8, 2009 |
| GSM Retained Contracts | Ericsson | $1.5 million | June 4, 2010 |
| MSS | Ericsson | $46.02 million | March 11, 2011 |

### A.    LOB Sales Processes

49.    Although there were some exceptions, for the most part each sale process leading up to an LOB sale involved the following:

    a)    the involvement of Lazard and the Nortel M&A team;

    b)    a "teaser" information package being sent out to a wide array of prospective strategic and financial purchasers;

    c)    the execution of confidentiality agreements by interested parties, following which access to an electronic data room and other diligence information was provided to such parties;

    d)    the solicitation of expressions of interest from the interested parties;

    e)    negotiation with a sub-set of interested parties on the terms of a potential transaction;

---

[21] As at December 31, 2013.

- 21 -

f)  entry into a "stalking-horse" asset sale agreement with a prospective purchaser, which agreement was subject to higher or better offers being received pursuant to bidding procedures approved by the Courts, which procedures provided for a formal auction; and

g)  the completion of the auction and selection of the highest or otherwise best offer for the LOB; and

h)  the execution of definitive sale documentation with the successful bidder, followed by approval of the transaction by the Courts and closing of the transaction.

50.   In my role as the Monitor's representative in connection with the sales I was actively involved in each of these steps.

### B.   *The LOB Sales*

51.   As the LOBs operated globally and the assets involved were not all owned by one Nortel legal entity (i.e., by NNL or any one of its subsidiaries), it was necessary to identify the bundle of assets, rights and obligations that represented a particular LOB such that the appropriate bundle could be conveyed or transferred (and in some respects as outlined below, licensed) to the purchasers. These identification efforts, together with efforts to separate the LOBs (both operationally and financially) from each other and any other aspects of Nortel so that they could function on a stand-alone basis, were known as the "carve-out" process.

- 22 -

52.    Through the carve-out process it was apparent that each significant LOB would generally

include the following assets, rights and obligations being conveyed or assumed by a purchaser

(which, in fact, is what occurred):

a)    a group of patents "predominantly used" in that LOB, which patents would be

transferred to the purchaser (paragraphs 60 to 62 of my Affidavit discuss what is

meant by patents "predominantly used" in an LOB);

b)    a license for other patents used in that LOB for use in the particular LOB,

ownership of which patents would not be transferred because other LOBs also

used those patents;

c)    the transfer or license of other forms of IP used in the LOB, such as trademarks or

software;

d)    the transfer of tangible assets used in the LOB, such as inventory, R&D

equipment and computer equipment;

e)    the transfer of unbilled or in-process receivables and prepaid expenses related to

the LOB;

f)    the transfer of a significant portion of the workforce employed in connection with

the LOB, including management, R&D personnel and sales and supply chain

personnel;

- 23 -

g)      the assignment of contracts (or portions thereof) related to the LOB, including customer contracts, supply contracts and license agreements with third parties, and including any warranty rights;

h)      the sale, lease or sub-lease of real property (e.g. R&D labs and office space) related to the LOB; and

i)      the assumption of certain liabilities related to the LOB, particularly warranty obligations to customers and all liabilities of the LOB arising after the closing of the transaction.

53.    The two exceptions to the general description set forth above were the NGPC and GSM Retained Contracts sales. The NGPC transaction involved the license of a particular technology and the transfer of the workforce (particularly R&D personnel) and tangible assets associated with the technology. The technology was in the process of coming to market and had no customer contracts or revenue associated with it. The GSM Retained Contracts transaction involved the transfer of "stranded" GSM customer contracts in the CALA (Caribbean/Latin American) region which had not been transferred to either of the purchasers in the GSM/GSM-R transaction.

54.    In accordance with the IFSA, NNI, NNUK and other relevant US Debtors and EMEA Debtors (among others) executed various license termination agreements (i.e., the contemplated Appropriate License Terminations) pursuant to which they surrendered their license rights to

- 24 -

"NN Technology" under the MRDA or the applicable Distribution Agreement in respect of various LOB transactions.[22]

55.    Under the asset sale agreements governing the transactions, the parties to the sale agreed to allocate to the tangible assets sold a portion of the purchase price equal to the net book value of such assets as of the closing date, and to allocate to the intangible assets the balance of the purchase price.[23]

56.    Collectively, the LOBs represented the entirety of the operating business any of the Nortel entities engaged in. With one exception (the relatively small MSS LOB), all of the LOB transactions were closed by mid-2010 such that by this time no Nortel entity had any significant business operations save for the provision of transition services to the LOB purchasers. With the closing of the MSS transaction in March 2011, no Nortel entity had any operating business save for fulfilling its few remaining transition service obligations with a handful of employees.

### C.    *Negotiations with Purchasers*

57.    I was involved directly in many negotiations with purchasers and prospective purchasers of the LOBs. In addition, members of Nortel's M&A team and other Nortel personnel involved in negotiating the transactions reported to me with respect to the progress of negotiations and to consult on various issues.

---

[22] See, for instance, License Termination Agreement (NNC-NNL06002262).

[23] See, for instance, Asset Sale Agreement dated July 24, 2009, s. 6.7(a) (NNC-NNL06001800).

58.     On any transaction, there were a myriad of commercial issues that needed to be addressed; however, there were two key topics of negotiation with purchasers which consistently came up on each transaction: (i) the purchase price to be paid; and (ii) the appropriate bundle of assets and rights to be conveyed to a purchaser such that it was acquiring, and had the ability to operate, the LOB.

59.     With respect to (ii), the key item of negotiation with purchasers (as well as internal consideration by Nortel) was the identification of which intellectual property ("**IP**") rights needed to be conveyed or transferred to the purchaser such that it would have the necessary IP rights to operate the LOB. The particular focus in this regard was which patents were used in the LOB and, once identified, which of the patents would be assigned outright to the purchaser, and which of the patents would be licensed.

     (i)     *Intellectual Property Rights*

60.     From the outset of my involvement in the insolvency proceedings, it was apparent to me that there was a shared view among Nortel management that Nortel's business was driven by R&D and the IP resulting therefrom. In my discussions with purchasers and potential purchasers this view was confirmed, and more so, as they were extremely concerned to ensure they were acquiring the appropriate bundle of IP rights, particularly patent rights, necessary to operate the LOB in question, as well as to achieve whatever synergies or expansion of its business that might be achieved by integrating the LOB and underlying technology into its existing business. As the Nortel sellers (as is common in bankruptcy sales) were not willing to provide representations and warranties which would survive the closing, purchasers conducted significant diligence on the IP issue and often advocated for an expansive definition of "necessary" patents and other IP to be

included in the sales. The Nortel sellers' goal was to ensure that only those patents that were "predominantly used" in the particular LOB were transferred and that IP rights were otherwise appropriately scoped to the LOB in question. As such, aside from purchase price, the IP (and particularly the patents) to be transferred in an LOB transaction was often the most significantly negotiated aspect of a transaction.

61.    The approach taken in the transactions was that patents that were predominantly used in the LOB in question were assigned outright to the purchaser, which I understood to mean ownership of the patents was transferred to the purchaser. With respect to patents that were used in the LOB in question but also in other LOBs, the patent would be licensed to the purchaser for its use in the business and operations of the particular LOB being purchased, thereby preserving NNL's ownership of the patent (as part of the Residual IP) and the ability to license the patent to the purchaser of another LOB for use in the business and operations of that LOB. So, for instance, in the case of a patent that was designated as predominantly used in the products sold by the Enterprise LOB, that patent was assigned to Avaya by NNL. In the case of a patent that had applications to products in both the Enterprise and MEN LOBs, that patent was licensed to each of Avaya and Ciena for use within the Enterprise and MEN LOBs, respectively, but NNL maintained ownership of the patent in question.

62.    In my discussions with purchasers I invariably found them to prefer (and advocate for) ownership of a patent relative to a license and a significant amount of the IP related negotiations focused on whether the ownership of a particular patent or group of patents was to be transferred, or whether they were to be licensed. No purchaser suggested that they would have been content to pay the purchase price they did to receive only a license to patents -- they advocated for

- 27 -

ownership and only accepted licenses for patents when we were able to show them they were
used in other LOBs.

### (ii)   Customer Relationships and Contracts

63.   Many of the customers of the LOBs had existing commercial relationships with the
purchasers of the significant LOBs, each of whom (Ericsson, Avaya, Ciena, Kapsch and
Genband) was an established telecommunications company and had been a competitor of the
LOB being acquired. We were aware in negotiating the LOB sales that the acquisition of an LOB
(and in particular the IP associated with it) would allow the purchasers to expand their offerings
to these customers.

64.   In most cases, the purchaser wished to receive the assignment of existing customer
contracts (or the portions thereof pertaining to a particular LOB). There were, however, a
number of instances, particularly in connection with the Enterprise transaction, in which the
purchaser did not wish to take an assignment of various unprofitable customer contracts (i.e.,
contracts under which the anticipated cost of performance exceeded the revenues to be earned).
In these situations it was important to attempt to cause the purchaser to take the assignment to
ensure that customer contracts were not "stranded" upon the closing of a transaction, leaving the
Nortel entity who was the counter-party to the contract in a situation where it may be unable to
perform the contract and the possibility of a resulting damages claim. As such, when this issue
arose, the Estates sought to cause the purchasers to take the assignment of unprofitable contracts
or otherwise mitigate the potential losses resulting from non-assignment.

- 28 -

## VI.        THE RESIDUAL IP

65.      As described above, the LOB sales involved the transfer of only patents that were predominantly used in a particular LOB to the LOB purchasers. Patents that were shared by multiple LOBs were licensed to the purchasers of the applicable LOBs for use in connection with those LOBs such that NNL retained ownership.

66.      In addition, there was a further category of patents which NNL retained ownership of, namely patents that had not been identified as being used in any products sold by any LOB.

67.      The result was that following the conclusion of the LOB sales, NNL still owned approximately 7000 patents and patent applications.

68.      Even before the LOB sales were completed, it was anticipated that after they were concluded there would be a retained patent portfolio and efforts commenced in early 2010 to consider the means to maximize the value of this portfolio and an IP leadership team (of which I was a member along with representatives of each of the other Estates) was formed to consider the issue.

69.      Two methods were considered: (i) a sale of the Residual IP through a competitive sale process consistent with the sale process for the LOBs as described above at paragraph 49 of my Affidavit; and (ii) the creation of a new licencing business which would seek to license the Residual IP (to the extent not already licensed to the LOB purchasers) to various technology companies believed to be infringing on the Residual IP, backed by the threat and commencement of patent infringement litigation as necessary. This potential licensing business was known in our discussions as "IP Co." Both options were considered in parallel from mid-2009 through early

- 29 -

2011, although with different degrees of focus depending on the particular time period. At no point did any Estate or major creditor group propose any other means of monetizing the Residual IP aside from these options. In particular, at no point was it ever suggested that one or more Nortel entities would attempt to reorganize around the Residual IP as an operating technology company making or selling products or services.

70.     Details of both the potential IP Co. business and the sale process for the Residual IP are provided in the paragraphs that follow. Ultimately, each of the Estates agreed that a sale of the Residual IP was the best way to maximize the value of the Residual IP and following a sale process and auction, a sale was concluded to Rockstar Bidco, LP ("**Rockstar**").

### A.     *IP Co.*

71.     Consideration of IP Co. as a means of maximizing the value of the Residual IP was led by John Veschi, a Nortel employee who was hired only a few months prior to the commencement of the insolvency proceedings to lead efforts to consider ways to monetize the patent portfolio, and continued on and off until early 2011 (after the final LOB sale agreement was executed) when the Estates made a final determination of the best way to monetize the Residual IP.

72.     Detailed structuring discussions regarding the potential IP Co. did not take place, but there were some basic considerations that informed our discussions. One idea was that all of the Residual IP would be transferred to a new company (i.e., the "IP Co."). Another was that NNL would retain ownership of the Residual IP. The principal reason for considering this structure was the possibility of utilizing NNL's tax losses in connection with a licensing business.

- 30 -

Ultimately, consideration never progressed to the point where this issue was considered in significant detail.

73.     Whether through a new company or not, the premise of IP Co. was that the Residual IP would be monetized by attempting to license various patents to technology companies that were suspected of infringing on them in exchange for the payment of royalties. IP Co.'s licensing attempts would be backed by the threat of patent infringement litigation, and ultimately litigation if necessary. In this regard it was considered important that IP Co. not be an operating telecommunications or other technology company as, had that been the case, it would have been susceptible to counter-claims for alleged infringement by technology companies it targeted for licensing or litigation, which would have in turn undercut its ability to generate licensing revenue.

74.     Over the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard and Global IP, prepared various versions of a model that attempted to forecast the revenues that could be earned by IP Co. so that its potential economic benefits could be assessed. The initial IP Co. model had three different sub-models that forecast the revenues of IP Co. based on different scenarios, in particular the amount of litigation that IP Co. would engage in as part of its business model. These were referred to as "Harvest" (very little if any litigation), "Litigation Light" and "Litigation Heavy". The amount of litigation assumed drove the IP Co. model; that is, the greater the litigation assumed, the greater the licensing revenues forecast. However, the greater the litigation assumed, the greater the anticipated start-up and operating cost for IP Co. as well. The IP Co. models also had different forecasts based on specific factors, such as the ability to generate licensing revenue from the Chinese marketplace.

- 31 -

75.    Although Mr. Veschi had a strong desire to move the IP Co. idea forward, the idea was never accepted or implemented by Nortel senior management or any of the Estates, and on a number of occasions Nortel senior management had to reign Mr. Veschi's activities in. For example, Mr. Veschi sent notice letters to potential licensing targets (including Nortel customers) without any significant consultation with Nortel senior management, the Monitor or the legal and financial advisors to the Estates. Mr. Veschi was directed by Nortel management to stop sending these letters. On another occasion, during the period the Estates were focussed almost exclusively on the CDMA/LTE and Enterprise sale processes (the first and largest LOB transactions), Mr. Veschi arranged a meeting with the financial advisors to the Committee and the Bondholder Group to provide a preliminary IP Co. presentation. This presentation had yet to be vetted by Nortel senior management, the Monitor or the Estates' respective advisors. At the request of the Monitor, Pavi Binning (Nortel's CRO), agreed to have Mr. Veschi postpone the meeting.

76.    In addition to IP Co. never moving past the consideration stage, at no point in any discussion or communication I had concerning IP Co. was there ever any consideration let alone agreement regarding: (i) what, if any, ownership or similar interest a particular Estate would have in IP Co., or; (ii) the terms of the transfer of the ownership of the Residual IP from NNL to a new IP Co., and to the best of my knowledge no such discussions or communications ever took place between a representative of the Monitor or the Canadian Debtors, on the one hand, and any other party, on the other.

77.    The Canadian Debtors and Monitor viewed the IP Co. proposal with skepticism for several reasons.

- 32 -

78.     Significantly, the projected cash flow to be generated by IP Co. was largely guesswork as, among other things, Nortel had no experience in operating a licensing business, very little experience in licensing generally, and there were not good precedents available in the market to estimate the cash flow that IP Co. could generate. As described to me by David Descoteaux of Lazard, IP Co. was best viewed as being comparable to a venture capital or start-up investment.

79.     The Canadian Debtors and the Monitor also had significant doubts about the prospect of funding the start-up of IP Co. As noted above, under the IP Co. models, the greater the amount of litigation IP Co. engaged in, the greater the revenues it was forecast to produce. IP Co. would initially commence and sustain this litigation against a number of well-funded technology companies with a view to developing a reputation as a "serious player" that would not be intimidated by the prospect of costly litigation. During this start-up phase (that was expected to last several years), IP Co. would generate little or no revenue and require significant working capital to sustain its litigation efforts. For instance, under the initial "Litigation Heavy" model that generated the highest revenue forecast, estimated costs for the period 2010 through 2013 were approximately $417 million (a significant component of which was litigation costs), and IP Co. would have no revenue until its fourth year of operation (2013), meaning the majority of these costs would need to be funded through start-up capital.[24]

80.     During the process to consider the best way to maximize the value of the Residual IP, the Canadian Debtors and Monitor advised representatives of the other Estates, the Committee and the Bondholder Group that, in light of the risks inherent in IP Co. relative to the immediate monetization of the Residual IP through a sale, the Canadian Debtors had determined they would

---

[24] Strategic and IP Update from George Riedel to Board of Directors dated May 12, 2010 (NNC-NNL06735084).

- 33 -

not be in a position to provide any funding to IP Co. and that if any other Estate or interested party proposed to pursue IP Co., they would need to purchase the Residual IP from NNL to pursue it. No other Estate or interested party ever presented a proposal to me in this regard or otherwise sought to negotiate a purchase of the Residual IP from NNL.

81.     With the completion of the final LOB auction in September 2010, the Estates focused their attention on the best way to maximize the value of the Residual IP, and in particular the need to finally determine whether to pursue IP Co. or sell the Residual IP. At this point, the Estates commenced a sale process for the Residual IP while also continuing to consider IP Co. During the course of discussions concerning a potential sale of the Residual IP to Google Inc. ("**Google**"), Google became aware that the Estates were still considering the possibility of IP Co., and Google insisted as part of the negotiations pertaining to what ultimately became the stalking-horse sale agreement for the Residual IP that Nortel definitively agree to sell the Residual IP to a third party.

82.     Faced with the requirement to make a decision, the Canadian Debtors and Monitor elected to pursue a sale of the Residual IP and terminate consideration of IP Co. The Canadian Debtors' and Monitor's decision was based on an assessment of the prospects of IP Co. relative to a sale of the Residual IP. Of particular consideration were the risks inherent in IP Co.'s business model and its unresolved capital requirements, as compared to a sale of the Residual IP which would immediately monetize its value and have very little, if any, execution risk. Based on these factors and the indicative purchase price for the Residual IP at that point in time (in and around $900 million), the Canadian Debtors and the Monitor concluded that a sale process was the best way to maximize the value of the Residual IP.

- 34 -

83.     Each of the Estates agreed and a joint decision was taken to pursue a sale process for the Residual IP and terminate consideration of IP Co.

84.     This decision was discussed at length with representatives of each of the Estates, the Committee, the Bondholder Group and the CCC and the only party that expressed any potential interest in continuing to pursue the consideration of IP Co. was the Bondholder Group. In light of the demand made by Google, both the Canadian Debtors and the US Debtors provided the legal and financial advisors to the Bondholder Group with an ultimatum to provide a concrete proposal for IP Co., including, in particular, a proposal to fund its start-up costs. No proposal was received and the Estates turned their focus solely to concluding the sale process for the Residual IP.

### B.     *Residual IP Sale Process*

85.     The sale process for the Residual IP was similar to the LOB sale processes described above at paragraph 49. After significant negotiation with two prospective purchasers, on April 4, 2011, NNC, NNL, NNI and NNUK (amongst other Nortel entities) entered into a stalking-horse asset sale agreement with Ranger Inc. ("**Ranger**"), a wholly owned subsidiary of Google Inc. ("**Google**"), to sell the Residual IP for $900 million.[25] Following an auction held at the end of June 2011, the Residual IP was ultimately sold to Rockstar, a single purpose entity backed by a consortium of major technology companies, for $4.5 billion.

86.     The ultimate proceeds of the Rockstar transaction were well in excess of the Estates' and their financial advisors' estimates.

---

[25] See Appendix "A" to Sixty-Third Report of the Monitor – Asset Sale Agreement dated April 4, 2011 (the "**Ranger ASA**") (NNC-NNL11755879).

- 35 -

87.     Based on various news media reports, I understand that Rockstar has sought to monetize the Residual IP through a combination of licensing and sales that could be perceived as similar in nature to IP Co.'s business model. However, I do not believe the value achieved for the Residual IP in the Rockstar transaction had a meaningful relationship to the possible licensing revenue that might have been earned from the Residual IP under the IP Co. approach, and believe it depended significantly more on the dynamic of the auction as a result of its timing and the participants involved, as well as the rights that were ultimately granted to the various technology companies that comprised the Rockstar consortium.

88.     The Residual IP sale process and auction occurred during a period of significant patent litigation. At the time (and continuing today), many of the world's largest technology companies, including Google, Apple, Samsung and Microsoft, among many others, were engaged in significant high-stakes patent infringement litigation with one another.

89.     Nortel and its advisors considered that a patent portfolio of the depth and breadth of the Residual IP (described by Nortel in its press release announcing the sale as "approximately 6000 patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios [...] [touching] nearly every aspect of telecommunications and additional markets as well, including Internet search and social networking") might be extremely attractive to these technology companies in the context of such litigation.[26]

---

[26] http://www.nortel-canada.com/2011/04/nortel-to-sell-patent-portfolio (NNC-NNL11773294).

- 36 -

90.     This was an active item of discussion among the Estates' advisors, and from time to time George Riedel (Nortel's Chief Strategy Officer) would send to me updates on new and current patent litigation from a patent litigation blog (Foss Patents) and we would discuss how this was improving the dynamic for the Residual IP sale process.

91.     By way of example of the potential utility of the Residual IP in patent litigation, I understand from various conversations I had with representatives of Global IP (among others), that a common tactic in patent litigation between technology companies is for the defendant to claim against the plaintiff for infringement of the defendant's own patents. Ownership of the Residual IP would provide a defendant with a significant additional portfolio of patents from which to select in making such an infringement claim. Access to the Residual IP would also provide a greater range of patents upon which to build a defence to an infringement claim.

92.     Consistent with these considerations, upon the execution of the stalking horse agreement Google posted the following rationale for entering into the stalking horse agreement on its public blog:

> The tech world has recently seen an explosion in patent litigation, often involving low-quality software patents, which threatens to stifle innovation. Some of these lawsuits have been filed by people or companies that have never actually created anything; others are motivated by a desire to block competing products or profit from the success of a rival's new technology. The patent system should reward those who create the most useful innovations for society, not those who stake bogus claims or file dubious lawsuits. It's for these reasons that Google has long argued in favor of real patent reform, which we believe will benefit users and the U.S. economy as a whole.

> But as things stand today, one of a company's best defenses against this kind of litigation is (ironically) to have a formidable patent portfolio, as this helps maintain your freedom to develop

new products and services. Google is a relatively young company, and although we have a growing number of patents, many of our competitors have larger portfolios given their longer histories.

So after a lot of thought, we've decided to bid for Nortel's patent portfolio in the company's bankruptcy auction. Today, Nortel selected our bid as the "stalking-horse bid," which is the starting point against which others will bid prior to the auction. If successful, we hope this portfolio will not only create a disincentive for others to sue Google, but also help us, our partners and the open source community—which is integrally involved in projects like Android and Chrome—continue to innovate. In the absence of meaningful reform, we believe it's the best long-term solution for Google, our users and our partners. [27]

### C.    *Residual IP Auction*

93.    There were initially five bidders at the auction for the Residual IP: (i) Apple Inc. ("**Apple**"); (ii) Rockstar (at that time comprised of Ericsson, Microsoft Corporation, Research in Motion Limited (now Blackberry) ("**Blackberry**"), EMC Corporation ("**EMC**") and Sony Corporation ("**Sony**")); (iii) Intel Corporation; (iv) Norpax LLC ("**Norpax**"); and (v) Ranger, the stalking-horse bidder owned by Google.

94.    Each of the participants in the auction was a technology company (or a single purpose entity financially backed by one or more technology companies), many of whom (if not all) were involved in the ongoing patent litigation described above.

95.    By the start of the ninth round of the auction, the purchase price for the Residual IP was up to $3.4 billion, and following various partnerships, only two bidders remained: (i) Ranger (the

---

[27] See http://googleblog.blogspot.ca/2011/04/patents-and-innovation.html (NNC-NNL11773293).

- 38 -

Google owned entity, now partnered with Intel); and (ii) Apple, partnered with Rockstar. In other words, it was Google and Intel, on the one side, versus Apple, Microsoft, Ericsson, Blackberry, Sony and EMC on the other. Over the course of the next 11 rounds of bidding, Ranger and Apple exchanged bids in $100 million increments, driving the price up a further $1.1 billion to the $4.5 billion total, with Apple (in partnership with Rockstar) emerging as the ultimate winner.

96.    Apple adopted the Rockstar structure (i.e., the consortium structure described above, with Apple becoming a member of the Rockstar consortium) for the Residual IP transaction. Under the Rockstar structure, Rockstar obtained ownership of the Residual IP and each of the various technology companies participating in the consortium (Apple, Microsoft, Ericsson, Blackberry, etc.) received a license to the Residual IP.  My business understanding of the Rockstar structure is that it gave Rockstar the ability to exercise all rights of ownership of the Residual IP against third parties, while providing the individual Rockstar consortium members with the defensive benefits of the Residual IP discussed above at paragraph 91 of my Affidavit.

97.    Less than two months after losing the auction for the Residual IP, it was publically reported that Google purchased Motorola Mobility (and its portfolio of approximately 17,000 patents) for $12.5 billion. Google publically advised at the time that, "Motorola Mobility's patent portfolio will help protect the Android [Google's smartphone operating system] ecosystem. Android, which is open-source software, is vital to competition in the mobile device space, ensuring hardware manufacturers, mobile phone carriers, applications developers and consumers all have choice."[28]

---

[28] See http://www.google.com/press/motorola/ (NNC-NNL11773292).

- 39 -

**D.**  *The Residual IP License Termination Agreement and the IP Transaction Side Agreement*

98.  In connection with the Rockstar transaction, the Nortel sellers agreed to terminate all license rights to the Residual IP granted under the MRDA and request that any Nortel affiliate not party to the sale agreement also terminate its license rights pursuant to any other intercompany agreement. In exchange, each of the Nortel entities would receive a grant back license to the Residual IP as necessary for their performance under "Retained Contracts", being contracts that related to wind-down operations.[29]

99.  The origins of these agreements were actually discussions with Google's counsel during the stalking-horse process, who advised their primary rationale for this request was a concern that there be no "back door" way for a Nortel entity to attempt to grant a sub-license to the Residual IP to another party. In my experience dealing with Google, I found them to be extremely concerned about excluding any and all potential liabilities or encumbrances to the Residual IP (in particular existing license encumbrances), regardless of the degree to which a given liability or encumbrance could be characterized as a realistic concern. By way of example, Google required as a condition of the stalking-horse agreement that a significant Court-approved license termination process be conducted to repudiate or reject any "unknown" licenses to the Residual IP (essentially any license to the Residual IP save for licenses known to Nortel and specifically identified and certain identified classes of licenses such as end user license agreements). This process involved the posting of public notices in various national newspapers, the provision of extensive notice to potential license counterparties and the granting of various

---

[29] Asset Sale Agreement dated June 30, 2011, s. 5.13(b) (NNC-NNL06002492). See also Closing Date License Agreement dated July 29, 2009, s. 2.02 (NNC-NNL06002505).

- 40 -

Orders by the Courts to complete. In addition, by the time of the Residual IP sale process the allocation dispute amongst the Estates had been well publicized and, based on conversations I had with representative of Google, was clearly known to them.

100.    Google's request to terminate the license rights granted under the MRDA was a significant point of discussion among the Estates, each of whom wanted to ensure that the status quo with respect to the MRDA and the Estates' respective rights thereunder was preserved, and that the contemplated license termination would have no impact on the allocation dispute among the Estates. To that end, in connection with entering into the Ranger ASA, the Estates entered into an IP Transaction Side Agreement dated April 4, 2011, Section 12 of which provides, in part, as follows:

> The Parties acknowledge that the amendments and modifications to the Transfer Pricing Agreements contemplated by Section 5.13(b) of the Stalking Horse Agreement[30] are being effected at the request of the Purchaser as a condition of the Transaction and that, for purposes of the allocation of the IP Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Nortel Debtors and any other claims or disputes among the Nortel Debtors, such amendments and modifications, and the actions taken as a result thereof, shall have no impact on the rights of the Nortel Parties (i) under or in connection with the Transfer Pricing Agreements, which rights shall continue as they exist immediately prior to the closing of the Transaction, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising

---

[30] That is, the provision agreed to in respect of the requests described above at paragraph 98 of my Affidavit, including the termination of licences under the MRDA.

- 41 -

therefrom or otherwise, and the right to advocate for an allocation of the IP Sale Proceeds, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments (as defined in the FCFSA) pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise. Nothing in Section 5.13(b) of the Stalking Horse Agreement or the amendments and modifications to the Transfer Pricing Agreements resulting therefrom or the actions taken as a result thereof shall bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the IP Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Nortel Parties, and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement.[31]

SWORN before me at the City of Toronto,
on April 11, 2014.

_____

A Commissioner for taking affidavits
Name: CHRIS ARMSTRONG.

Name:  Sharon Hamilton

---

[31] IP Transaction Side Agreement dated April 4, 2011 (NNC-NNL11773287).

# Index

**AFFIDAVIT OF SHARON HAMILTON (sworn April 11, 2014)**

**INDEX**

| Tab | Paragraph Referred to in Affidavit | Trial Exhibit Number | Depo Ex #/Bates # |
|---|---|---|---|
| 1 | Paragraph 25; Footnote 2 | TR49799 | UCC0015169 |
| 2 | Paragraph 26; Footnote 3 | TR21003 | Exhibit 21003 |
| 3 | Paragraph 29; Footnote 4 | TR49809 | UCC0050386 |
| 4 | Paragraph 30; Footnote 5, 6 and 7; Paragraph 31; Footnote 13 Paragraph 32; Footnote 14; Paragraph 44; Footnote 15 | TR43794 | NNC-NNL033801 |
| 5 | Paragraph 31; Footnote 8 and 9 | TR46910 | NNC-NNL20001869 |
| 6 | Paragraph 32; Footnote 10 | TR44194 | NNC-NNL06002330 |
| 7 | Paragraph 32; Footnote 11 | TR44193 | NNC-NNL06002315 |
| 8 | Paragraph 40; Footnote 12 | TR45476 | NNC-NNL11152292 |
| 9 | Paragraph 45; Footnote 16 | TR44749 | NNC-NNL06724463 |
| 10 | Paragraph 46; Footnote 17 | TR44170 | NNC-NNL06002178 |

| 11 | Paragraph 54; Footnote 22 | TR44186 | NNC-NNL06002262 |
| 12 | Paragraph 55; Footnote 23 | TR44138 | NNC-NNL06001800 |
| 13 | Paragraph 79; Footnote 24 | TR44758 | NNC-NNL06735084 |
| 14 | Paragraph 85; Footnote 25 | TR45578 | NNC-NNL11755879 |
| 15 | Paragraph 89; Footnote 26 | TR46863 | NNC-NNL11773294 |
| 16 | Paragraph 92; Footnote 27 | TR46862 | NNC-NNL11773293 |
| 17 | Paragraph 97; Footnote 28 | TR46861 | NNC-NNL11773292 |
| 18 | Paragraph 98; Footnote 29 | TR44220 | NNC-NNL06002492 |
| 19 | Paragraph 98; Footnote 29 | TR44229 | NNC-NNL06002505 |
| 20 | Paragraph 100; Footnote 31 | TR46858 | NNC-NNL11773287 |

6330402