

A

TR49799



**News Release**

www.nortel.com

**FOR IMMEDIATE RELEASE**                                     **June 19, 2009**

For more information:

| Media | Media | Investors |
|---|---|---|
| Jay Barta | Mohammed Nakhooda | (888) 901-7286 |
| (972) 685-2381 | (905) 863-7407 | (905) 863-6049 |
| jbarta@nortel.com | mohammna@nortel.com | investor@nortel.com |

### Nortel To Sell CDMA Business and LTE Assets

### Company Advancing in Its Discussions With External Parties To Sell Other Businesses

- **Enters into a Stalking Horse Sale Agreement for CDMA Business and LTE Access Assets with Nokia Siemens Networks for US$650 million**
- **Sale of Businesses is Best Path for Nortel to Maximize Value While Preserving Innovation, Customer Relationships and Jobs to Greatest Extent Possible**
- **Will Apply to Toronto Stock Exchange to Delist Shares and Expects Creditor Protection Proceedings Will Ultimately Result in Cancellation of Shares**

TORONTO – Nortel* Networks Corporation [TSX: NT | OTC: NRTLQ] today announced that it, its principal operating subsidiary Nortel Networks Limited (NNL) and certain of NNL's subsidiaries, including Nortel Networks Inc., have entered into a "stalking horse" asset sale agreement with Nokia Siemens Networks B. V. (NSN) for the sale of substantially all of its CDMA business and LTE Access assets for US$650 million.

The agreement with NSN specifies that at least 2,500 employees would have the opportunity to continue with NSN. This represents a significant portion of the employees associated with the assets being sold.

In addition to announcing this sale agreement, Nortel announced that it is advancing in its discussions with external parties to sell its other businesses. The company will assess other restructuring alternatives for these businesses in the event it is unable to maximize value through sales. In addition, as discussed in more detail below, Nortel will apply to delist its common shares and the NNL preferred shares from trading on the Toronto Stock Exchange (TSX) and expects that the creditor protection proceedings will ultimately result in the cancellation of these equity interests. Trading in such shares on the TSX is expected to be suspended pending the TSX's decision on the delisting application.

Commenting on the announcements, Nortel President and Chief Executive Officer, Mike Zafirovski said:

"Maximizing the value of our businesses in the face of a consolidating global market has been our most critical priority. We have determined the best way to do this is to find buyers for our businesses who can carry Nortel innovation forward, while preserving employment to the greatest extent possible. This will ensure Nortel's strong assets – technologies, customer relationships, and employees – continue to play an important role in driving the future of communications. The value of Nortel's wireless business is recognized throughout the industry. The agreement we are announcing today is solid proof of that value and represents the best path forward for our other businesses."

Zafirovski continued: "We also believe this will help provide clarity for our customers and employees. Customers have demonstrated consistent support for our products and services, and we want to ensure they continue to benefit from Nortel's technology and know-how. In addition, Nortel's employees are doing a tremendous job under challenging conditions, stabilizing our business and delivering outstanding service to our customers. It is important to provide our employees with a clear sense of direction around their future and potential opportunities with the new companies."

UCC0015169

A                                                                                                    TR49799

The wireless business is the second largest supplier of CDMA infrastructure in the world. It does business with three of the five top CDMA operators globally, including Verizon Wireless, which operates the largest wireless voice and data network in the United States.

Commenting on the wireless business announcement, Richard Lowe, President, Carrier Networks added:

"Seeking a strong and stable buyer is the best path forward for our CDMA business and LTE Access assets. If successfully completed, this transaction would give many of our CDMA customers a clear roadmap for the future evolution of their networks and the opportunity to extend their relationship with a long-term partner. Further, we expect that a significant portion of the employees associated with the assets being sold would be able to continue their innovative work."

Lowe continued, "Nortel has a long track record of wireless innovation which has helped us secure a strong and loyal customer base. Throughout this sale process, our customers will continue to receive the highest quality support for their current networks. If successfully concluded, the buyer would gain access to leading edge technology, know-how, and embedded resources to support this significant customer base."

**Share Value; TSX Delisting**

Based upon today's announcements and Nortel's current assessment of its businesses in the context of its creditor protection proceedings, Nortel does not expect that the Company's common shareholders or the NNL preferred shareholders will receive any value from the creditor protection proceedings and expects that the proceedings will ultimately result in the cancellation of these equity interests. As a result, the Company will apply to delist its common shares and the NNL preferred shares from trading on the TSX. Trading in such shares on the TSX is expected to be suspended (commencing before the opening of trading on Monday, June 22, 2009) with the consent of the Monitor under the Canadian creditor protection proceedings, pending the TSX's decision on the delisting application.

**Details of Sale Process for CDMA Business and LTE Access Intellectual Property Rights**

Nortel will file the stalking horse asset sale agreement with the United States Bankruptcy Court for the District of Delaware along with a motion seeking the establishment of bidding procedures for an auction that allows other qualified bidders to submit higher or otherwise better offers, as required under Section 363 of the U.S. Bankruptcy Code. A similar motion for the approval of the bidding procedures will be filed with the Ontario Superior Court of Justice.

In addition to the bidding process and U.S. and Canadian court approvals, consummation of the CDMA business and LTE Access transaction is subject to the satisfaction of customary and other conditions, including governmental approvals such as in Canada and the United States. The stalking horse asset sale agreement is also subject to purchase price adjustments under certain circumstances.

**About Nortel**

Nortel delivers communications capabilities that make the promise of Business Made Simple a reality for our customers. Our next-generation technologies, for both service provider and enterprise networks, support multimedia and business-critical applications. Nortel's technologies are designed to help eliminate today's barriers to efficiency, speed and performance by simplifying networks and connecting people to the information they need, when they need it. For more information, visit Nortel on the Web at www.nortel.com. For the latest Nortel news, visit www.nortel.com/news.

Certain statements in this press release may contain words such as "could", "expects", "may", "should", "will", "anticipates", "believes", "intends", "estimates", "targets", "envisions", "seeks" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on Nortel's current expectations, estimates, forecasts and projections about the operating environment, economies and markets in which Nortel operates. These statements are subject to important assumptions, risks and uncertainties that are difficult to predict, and the actual outcome may be materially different. Further, actual results or events could differ materially from those contemplated in forward-looking statements as a result of the following: (i) risks and uncertainties relating to Nortel's Creditor Protection Proceedings including: (a) risks associated with Nortel's ability to: stabilise the business and maximize the value of its businesses; obtain required approvals and successfully consummate ongoing and future discussions; successfully conclude ongoing discussions for the sale of Nortel's other assets or businesses; develop, obtain required approvals for, and implement a court approved plan; resolve ongoing issues with creditors and other third parties whose interests may differ from Nortel's; generate cash from operations and maintain adequate cash on hand in each of its jurisdictions to fund operations within the jurisdiction during the Creditor Protection Proceedings; access the EDC Facility given the current discretionary nature of the facility, or arrange for alternative funding; if necessary, arrange for sufficient debtor-in-possession or other financing; continue to have cash management arrangements and obtain any further required approvals from the Canadian Monitor, the U.K. Joint Administrators, the U.S. Creditors' Committee, or other third parties; raise capital to satisfy claims, including Nortel's ability to sell assets to satisfy claims against us; maintain R&D investments; realize full or fair value for any assets or business that are divested; utilize net operating loss carryforwards and certain other tax attributes in the future; avoid the substantial consolidation of NNI's assets and liabilities with those of one or more other U.S. Debtors; attract and retain customers or avoid reduction in, or delay or suspension of, customer orders as a result of the uncertainty caused by the Creditor Protection Proceedings; maintain market share, as competitors move to capitalize on customer concerns; operate Nortel's business effectively in consultation with the Canadian Monitor, and work effectively with the U.K. Joint Administrators in their administration of the European businesses inside U.K. Administration; actively and adequately communicate on and respond to events, media and rumors associated with the Creditor Protection Proceedings that could adversely affect Nortel's relationships with customers, suppliers, partners and employees; retain and incentivize key employees and attract new employees, as may be needed; retain, or if necessary, replace major suppliers on acceptable terms and avoid disruptions in Nortel's supply chain; maintain current relationships with reseller partners, joint venture partners and strategic alliance partners; obtain court orders or approvals with

*respect to motions filed from time to time; resolve claims made against Nortel in connection with the Creditor Protection Proceedings for amounts not exceeding Nortel's recorded liabilities subject to compromise; prevent third parties from obtaining court orders or approvals that are contrary to Nortel's interests; reject, repudiate or terminate contracts; and (b) risks and uncertainties associated with: limitations on actions against any Debtor during the Creditor Protection Proceedings; the values, if any, that will be prescribed pursuant to any restructuring plan to outstanding Nortel securities; the delisting of NNC common shares from the NYSE; and the proposed delisting of NNC common shares and NNL preferred shares from the TSX and the suspension of further trading in such shares by the TSX pending its determination on Nortel's delisting application; and (ii) risks and uncertainties relating to Nortel's business including: the sustained economic downturn and volatile market conditions and resulting negative impact on Nortel's business, results of operations and financial position and its ability to accurately forecast its results and cash position; cautious capital spending by customers as a result of factors including current economic uncertainties; fluctuations in foreign currency exchange rates; any requirement to make larger contributions to defined benefit plans in the future; a high level of debt; arduous or restrictive terms and conditions related to accessing certain sources of funding; the sufficiency of workforce and cost reduction initiatives; any negative developments associated with Nortel's suppliers and contract manufacturers including Nortel's reliance on certain suppliers for key optical networking solutions components and on one supplier for most of its manufacturing and design functions; potential penalties, damages or cancelled customer contracts from failure to meet contractual obligations including delivery and installation deadlines and any deficits or errors in Nortel's current or planned products; significant competition, competitive pricing practices, industry consolidation, rapidly changing technologies, evolving industry standards, frequent new product introductions and short product life cycles, and other trends and industry characteristics affecting the telecommunications industry; any material, adverse affects on Nortel's performance if its expectations regarding market demand for particular products prove to be wrong; potential higher operational and financial risks associated with Nortel's international operations: a failure to protect Nortel's intellectual property rights; any adverse legal judgments, fines, penalties or settlements related to any significant pending or future litigation actions; failure to maintain integrity of Nortel's information systems; changes in regulation of the Internet or other regulatory changes; Nortel's potential inability to maintain an effective risk management strategy.*

*For additional information with respect to certain of these and other factors, see Nortel's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 and Annual Report on Form 10-K for the year ended December 31, 2008 and other securities filings with the United States Securities and Exchange Commission. Unless otherwise required by applicable securities laws, Nortel disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

-end-

*Nortel, the Nortel logo and the Globemark are trademarks of Nortel Networks.

CONFIDENTIAL

UCC0015171



Dec 20 07 03:33p    Janssen Pharmaceutica    201-944-9475    p. 1



## MASTER R&D AGREEMENT

Agreement made and entered into on December 22, 2004, confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the "Effective Date").

BY AND BETWEEN:

**NORTEL NETWORKS LTD.**, a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 ("NNL")

AND:

**NORTEL NETWORKS INC.**, a corporation duly incorporated under the laws of the State of Delaware, having its head office at 4001 East Chapel Hill Nelson Hwy Research Triangle Park, NC 27709 United States of America (including predecessor corporations in interest)

AND:

**NORTEL NETWORKS UK LIMITED**, an entity duly formed under the laws of the United Kingdom having its head office at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, United Kingdom, SL6 3QH

AND:

**NORTEL NETWORKS, S.A.**, an entity duly formed under the laws of France having its head office at Parc d'Activites de Magny-Chateaufort, Chateaufort Cedex 9, France, 78928

AND:

**NORTEL NETWORKS AUSTRALIA**, an entity duly formed under the laws of Australia having its head office at Level 5, 495 Victoria Avenue, Chatswood, New South Wales, Australia, 2067

AND:

**NORTEL NETWORKS IRELAND**, an entity duly formed under the laws of the Republic of Ireland having its

WO 528838.3

HIGHLY CONFIDENTIAL

head office at Mervue Business Park, Mervue, Galway,
Republic of Ireland

(referred to individually as "Participant" or collectively, as "Participants")

WHEREAS legal title to all NN Technology is held in the name of NNL;

WHEREAS each Licensed Participant held and enjoyed equitable and beneficial
ownership of certain exclusive rights under NT Technology for a Specified Territory
pursuant to the Amended Research and Development Cost Sharing Agreement entered
into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the
Licensed Participants continue, as of the effective date of this Agreement, to hold and
enjoy such rights;

WHEREAS each Participant bears the full entrepreneurial risks and benefits for
the Nortel Networks business;

WHEREAS each Participant has performed, in the past, and intends to continue to
perform R&D Activity with respect to the Nortel Products;

WHEREAS each Participant desires to avoid the duplication of R&D Activity;

WHEREAS each Participant believes that it is appropriate that each Participant
should benefit from its contribution to R&D activity commensurate with the value of its
contribution to that R&D activity in the context of the manner in which the Nortel
Networks business is conducted and that the residual profit split methodology (RPSM) is
the best arm's length measure, in the circumstances of NNL and the Participants, of such
contributions with reference to such benefits;

WHEREAS this Agreement reflects the Participants' intent and agreement since
January 1, 2001 to enter a license arrangement with the Licensed Participants, and the
Participants have operated from January 1, 2001 in accordance with the terms set forth
herein;

WHEREAS Participants acknowledge that as a result of a collective review by the
Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK
Inland Revenue (collectively, the "Revenue Authorities") regarding the application of the
RPSM, the calculation of the RPSM as set forth in Schedule A may be amended which
amendments would require the consent of the Participants;

NOW, THEREFORE, in consideration of the premises and of the mutual
covenants of the parties hereto, it is hereby agreed as follows:

WO 328838.3                                  2

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 2

## Article 1 - Definitions

As used herein:

(a)  "**Affiliate**" shall be defined as any Person.

   (1)  more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by a Party;

   (2)  which owns or controls (directly or indirectly) more than fifty percent (50%) of the voting shares or outstanding capital stock of a Party; or

   (3)  more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by an Affiliate (as defined herein) of a Party;

provided, however, such corporation, company or entity shall be deemed to be an Affiliate for purposes of this Agreement only so long as such ownership or control exists.

(b)  "**Admission Eligibility Requirements**" with respect to any NNL Affiliate shall mean an Affiliate that has a level of research and development spending for the three (3) year period prior to the year of admission that exceeds the Threshold Level. The Threshold Level of research and development spending will be determined by mutual agreement of the Participants to this Agreement at the time of consideration for admission of any party.

(c)  "**Eligible Party**" shall mean any Affiliate of NNL provided such Affiliate meets the Admission Eligibility Requirements for admission as a Participant to this Agreement and fully pays any Special Balancing Payment to NNL prior to the effective date of its admission.

(d)  "**Eligible Participant**" shall mean any Participant that is not a party to the Advance Pricing Agreement establishing the transfer price for the R&D Activity provided herein.

(e)  "**Licensed Participant**" shall mean a Participant other than NNL and "**Licensed Participants**" shall mean all Participants other than NNL.

(f)  "**NN Technology**" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.

WO 328838.3                           3

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 3



(g)   "**Products**" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

(h)   "**R&D Activity**" shall mean all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products.

(i)   "**RPSM**" shall mean the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A.

(j)   "**Retirement Allocation**" shall mean an amount mutually determined by NNL and any retiring Participant that represents the fair market value (at the time of retirement) of the Exclusive License provided in Article 5 and any prior License to the NN Technology granted by NNL to such retiring Participant, all rights to which are surrendered by such Participant effective on the date of retirement from this Agreement.

(k)   "**Special Balancing Payment**" shall mean an amount mutually determined by NNL and an Eligible Party to represent the fair market value for an Exclusive License from NNL as provided in Article 5 with respect to NN Technology existing at the time of admission.

(l)   "**Territory**" shall mean with respect to a Licensed Participant, the designated geographic area specified in Schedule B for that Licensed Participant. With respect to NNL, "**Territory**" shall mean the entire world except those geographic areas designated to each of the Licensed Participants in Schedule B.

## Article 2 – Performance of R&D Activity

(a)   Each Participant hereby agrees to use it best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory.

(b)   Each Participant agrees to account for the R&D Activity by disclosing or otherwise making available to each of the other Participants the relevant results, studies etc. resulting from such R&D Activity.

WO 322838.3                         4

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 4

(c)     All costs incurred directly or indirectly by each Participant for R&D Activity shall be borne exclusively by it. Any reimbursement for costs including any other compensation shall be provided to such Participant for its R&D Activity solely as provided in Article 3 below.

## Article 3 – R&D Activity Payments

(a)     For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)     Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Schedule A as representing such Participant's share of the R&D Allocation.

(c)     The R&D Allocation will be computed pursuant Schedule A which sets forth the basis of the RPSM as originally proposed to the Revenue Authorities. The Participants understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. The Participants agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation.

(d)     NNL agrees to administer this Agreement and the determinations under the RPSM as contemplated in this Agreement with respect to its interest and the interests of the Participants, and in particular, to compute the amount of any R&D Allocation to, and payment due from, each Participant on a periodic basis. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any payment to, and payment from, a Participant will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable, whatever the case may be and may be netted pursuant to the standard NNL practice for managing inter-company accounts.

(e)     Each Participant and NNL, in its capacity as described in (d) above, agree to keep clear and accurate records to support the calculations under the RPSM as set forth in Schedule A. Each Participant and NNL, in its capacity as described in (d) above, shall provide to each other, upon request in such form as may reasonably be requested, documentation with respect to the foregoing. Each Participant shall have the right to examine and audit, during normal business hours all such records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable under this Article 3. Prompt adjustment shall be made by the appropriate Participant in order to correct any errors or omissions disclosed by an examination or audit.

WO 328838.3                              5

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 5

  (f)  Any amount owing by a Participant under this Agreement shall be due and payable in U.S. dollars or equivalent.

  (g)  Any amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL. Any amount owed by a Participant that is paid after 90 days after notice of its R&D Allocation from NNL will accrue interest at the short-term applicable federal rate (as determined from time-to-time under section 1274(d) of the U. S. Internal Revenue Code of 1986) for such period commencing with the 91st day after NNL notice of payment until the date that the overdue amount is paid.

## Article 4 – Legal Title to NN Technology

  (a)  Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License with each of the Licensed Participants as set forth in Article 5.

  (b)  Each Licensed Participant shall execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable to give effect to, or perfect the foregoing. For purposes of Article 4, copyrighted works included in NN Technology pursuant to this Agreement shall be considered a "work made for hire" for copyright law purposes as applicable in the relevant jurisdiction.

  (c)  Each Licensed Participant shall, from time to time, promptly upon receipt of NNL request and at NNL's expense, furnish to NNL all available and requested documentation relating to the NN Technology developed by, or for, such Licensed Participant.

  (d)  With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world.

  (e)  Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others.

## Article 5 - Grant of Exclusive Licenses by NNL

  (a)  To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including (i) the right to sublicense, which except as hereinafter

WO 3288578.3    6

HIGHLY CONFIDENTIAL

provided shall be in perpetuity, (ii) rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Territory designated for that Licensed Participant, and (iii) all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License").

(b)    NNL shall, from time to time, promptly upon receipt of a Licensed Participant's request, and at such Licensed Participant's expense, furnish all available and requested documentation and other information relating to the NN Technology.

(c)    The rights granted under this Article shall not relieve any Participant from its obligations in respect of royalty payments to third parties.

### Article 6 – Confidential Information

(a)    The Licensed Participants acknowledge that the NN Technology is proprietary and constitutes a trade secret. Each Licensed Participant shall hold the NN Technology in confidence and only make use of, or disclose it, as permitted by this Agreement.

(b)    During the full term of this Agreement and thereafter for a period of ten (10) years or so long as it remains secret (whichever is longer), each Licensed Participant shall hold secret and not disclose, make known, divulge or communicate to any person (except to such Licensed Participant's employees and permitted licensees and then only under an obligation of secrecy binding upon such employees and licensees) any of the NN Technology.

(c)    Copies or translations of NN Technology made, or permitted to be made in the exercise of a Participant's rights granted pursuant to this Agreement, shall upon reproduction by such Participant contain the same proprietary or confidentiality notices or legends which appear on the NN Technology made available to Participant under this Agreement.

(d)    Notwithstanding the foregoing, each Participant shall have the right:

(i)    to communicate relevant portions of the NN Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by such Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(ii)   to communicate to customers purchasing the Products, such portions of the NN Technology as are reasonably needed by such customers for operating and maintaining the Products; and

WO 328838.3                              7

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 7

(iii)    to communicate to third persons licensing rights to use NN Technology, such portions of the NN Technology as are reasonably needed by such licensees in accordance with the applicable license agreement negotiated;

provided, however, that the recipients of the NN Technology be advised by each Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

(e)    The provisions of this Agreement concerning confidentiality shall survive the expiration or termination of this Agreement, but in no event shall such provisions apply to the extent that:

(i)    NN Technology was independently supplied to any Participant by a third party prior to the effective date of this Agreement without access to NN Technology; or

(ii)    NN Technology becomes known or readily ascertainable by the general public through no fault of a Participant.

### Article 7 - Liability

(a)    No Participant makes any representation with respect to, and does not warrant any R&D Activity provided hereunder or any NN Technology provided to NNL, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, no Participant makes any representation or warranty as to whether or not use of the NN Technology supplied hereunder to NNL or the R&D Activity provided hereunder will infringe any patent or other rights of any other person.

(b)    Each Licensed Participant shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology.

### Article 8 – Force Majeure

No Participant shall be in default or liable for any loss or damage resulting from delays in performance of, or from failure to perform or comply with terms of this Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Participant is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

WO-328838.3        8

HIGHLY CONFIDENTIAL

NNC-NNL06001514 / 8

### Article 9 – Duration and Continuing Rights and Obligations

(a)      This Agreement shall be effective from January 1, 2001 until December 31, 2004, provided however that this Agreement will automatically renew for additional and unlimited one-year terms until terminated by the mutual written consent of all Participants.

(b)      Upon the expiry or termination of this Agreement as provided herein, each Licensed Participant shall be deemed to have acquired a fully paid-up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued.

(c)      The provisions of Article 4 (Legal Title to NN Technology) with respect to NN Technology acquired or developed pursuant to this Agreement from the Effective Date of this Agreement up to and including its expiry or termination date, Article 6 (relating to confidentiality) and Article 7 (relating to liability) shall survive notwithstanding the expiry of this Agreement, or any termination of this Agreement for any cause whatsoever.

(d)      Upon the expiry or termination of this Agreement, all payments accruing under Article 3 for periods prior to such expiry or termination shall become immediately due and payable, and the obligation to pay any outstanding amounts required by Article 3 shall survive notwithstanding the expiry or termination of this Agreement, or any termination of this Agreement for any cause whatsoever.

### Article 10 - Admission of New Participants

(a)      Upon the written request to NNL, an Eligible Party may be admitted as a signatory to this Agreement thereby becoming a Participant to this Agreement provided there is unanimous consent of the Participants existing at the time of the requested admission. Such Eligible Party's admission may be evidenced as an addendum to this Agreement provided however that the Eligible Party agrees to all the terms and conditions of this Agreement (as amended from time-to-time).

(b)      Upon admission, the New Participant will become a Licensed Participant for the NN Technology in a Territory as amended to Schedule B. Accordingly, NNL will grant the New Participant an Exclusive License pursuant to Article 5.

### Article 11 - Retirement of Participants

(a)      Eligible Participants may elect to withdraw from participation in this Agreement (Elective Retirement) effective at the end of any calendar year subsequent to such election, provided however that the retiring Participant provides written notice of its intent to retire to NNL at least 6 months prior to the proposed effective date.

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 9

(b)     On the occurrence of a Defaulting Event, a Participant (or solely an Eligible Participant in the case of a Defaulting Event under (c)(i)) will automatically be terminated from participation in this Agreement (Forced Retirement).

(c)     A Defaulting Event will occur if any of the following provisions apply:

(i)     In the event any Eligible Participant fails to perform any R&D Activity for each of the two previous years,

(ii)     In the event any Participant loses its status as an Affiliate of NNL,

(iii)     In the event any Participant shall be in breach of this Agreement or fail to perform one or more of its material obligations under this Agreement, any other Participant may, by written notice to the Participant in default, require the remedy of the breach or the performance of the obligation and, the defaulting Participant so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, or

(iv)     In the event that any one of the Participants becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or a substantial part of the assets of a Participant, or a controlling interest in the stock of a Participant, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision.

(d)     In the event of an Elective or a Forced Retirement, a retiring Participant's rights in the NN Technology will terminate and any and all NNL Exclusive Licenses with such Participant with respect to the NN Technology will be cancelled as of the effective date of such Participant's retirement, and in consideration therefor, such retiring Participant shall be entitled to a Retirement Allocation from NNL. Any payment due from such retiring Participant pursuant to this Agreement will become immediately payable as of the effective date of retirement and may be offset, in part or in whole, against the Retirement Allocation due from NNL.

(e)     The obligations of a retiring Participant under Article 4 (Legal Title to NN Technology) acquired or developed by such retiring Participant pursuant to this Agreement from the Effective Date of this Agreement up to and including such retiring Participant's retirement date, Article 6 (relating to confidentiality) and of Article 7 (relating to liability) of this Agreement shall survive notwithstanding the retirement of a Participant for any cause whatsoever.

HIGHLY CONFIDENTIAL          NNC-NNL06001514 / 10

## Article 12 - Notices

(a)    Any and all notices or other information to be given by one of the Participants to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to:

    Nortel Networks Ltd.
    8200 Dixie Road, Suite 100
    Brampton, Ontario
    Canada L6T 5P6

    Attention: Secretary

If to:

    Nortel Networks Inc.
    4001 East Chapel Hill Nelson Hwy
    Research Triangle Park, NC  27709
    United States of America

    Attention: Secretary

If to:

    Nortel Networks UK Limited
    Maidenhead Office Park,
    Westacott Way, Maidenhead,
    Berkshire, United Kingdom, SL6 3QH

    Attention: Secretary

If to:

    Nortel Networks, S.A.
    Parc d'Activites de Magny-Chateaufort,
    Chateaufort Cedex 9, France, 78928

    Attention: Secretary

If to:

    Nortel Networks Australia
    Level 5, 495 Victoria Avenue,
    Chatswood, New South Wales, Australia, 2067

    Attention: Secretary

WO 32883.3                         11

HIGHLY CONFIDENTIAL    NNC-NNL06001514 / 11

If to:

     Nortel Networks Ireland
     Mervue Business Park,
     Mervue, Galway, Republic of Ireland

     Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

     (b)     The aforementioned address of any Participant may be changed at any time by giving fifteen (15) business days prior notice to any other Participant in accordance with the foregoing.

     (c)     In the event of a generally-prevailing labor dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

### Article 13 – Relationship of the Participants

     The relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose. In addition, no Participant is a fiduciary, an agent, a servant, or a subcontractor of any other Participant as a result of this Agreement, and no Participant has the right, power or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein.

### Article 14 - General Provisions

     (a)     This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.

     (b)     The failure of any Participant to give notice to another Participant of the breach or non-fulfilment of any term, clause, provision or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Agreement.

     (c)     In the event that any term, clause, provision or condition of this Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Agreement.

WO 328858.3          12

HIGHLY CONFIDENTIAL          NNC-NNL06001514 / 12

    (d)    In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

    (e)    This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto, shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

    (f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

Nortel Networks Ltd.

Per: _____

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per: _____

Nortel Networks, S.A.

NORTEL NETWORKS SA    Per: _Alain Béton,_
SIEGE SOCIAL
Parc d'Activités de Magny-Châteaufort    _General Manager_
78117 Châteaufort
389 518 741 RCS Versailles

WO X285383    13

HIGHLY CONFIDENTIAL    NNC-NNL06001514 / 13

     (d)    In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

     (e)    This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto, shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

     (f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

     IN WITNESS WHEREOF, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

Nortel Networks Ltd.

Per: _____

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per: _____

Nortel Networks, S.A.

Per: _____

WO 32583A3       13

HIGHLY CONFIDENTIAL      NNC-NNL06001514 / 14

Dec 20 07 03:48p     Janssen Pharmaceutica     201-944-9475  ··············   p.5

(d)    In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(e)    This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto, shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

(f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

Nortel Networks Ltd.

Per: _____

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per: _____

Nortel Networks, S.A.

Per: _____

WO 328838.3             13

HIGHLY CONFIDENTIAL          NNC-NNL06001514 / 15

(d)    In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(e)    This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto, shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

(f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

Nortel Networks Ltd.

Per:    _____

Nortel Networks Inc.

Per:    _____

Nortel Networks UK Limited

Per:    _____

Nortel Networks, S.A.

Per:    _____

WO 328838.3                    13

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 16

Dec 20 07 03:49p    Janssen Pharmaceutica    201-944-9475     p.7
MAR-21-2005  15:12    NORTEL TAX BRAMPTON    P.03/03

Nortel Networks Australia

Per: _____

Nortel Networks Ireland

Per: _____

WO 32/8838.3                    14

HIGHLY CONFIDENTIAL          NNC-NNL06001514 / 17

## Schedule A
### Calculation of Arm's Length R&D Allocation to each Participant

The purpose of this section is to provide a brief summary of Nortel's transfer pricing policy and to provide clarity as to how each Participant is to be compensated under this Agreement.

In 2002, Nortel made a submission to Canada Revenue Agency ("CRA"), the Internal Revenue Service ("IRS") and Inland Revenue ("IR") seeking approval to an Advance Pricing Arrangement ("APA"). The current APA submission is for the 2000 to 2004 taxation years but could be extended for a longer term if requested by either Nortel or the tax authorities.

The current transfer pricing methodology is the residual profit split method ("RPSM") which was adopted by the Participants at the request of the tax authorities as the most appropriate method for determining the arm's length compensation to each of the Participants for the R&D Activity to be provided pursuant to the Master R&D Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property ("IP").

Accordingly, the compensation provided to Participants under RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business.

On the other hand, other Nortel entities not subject to the Master R&D Agreement (i.e., Nortel Distribution Entities)[1] generally are the least complex entities in the group. They do not perform R&D, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited amount of functions. Thus, these entities are provided a routine return as compensation for the distribution function that they perform (generally a nominal amount of operating profit ranging from 0% to 4% of sales).

The formulaic steps for calculating the R&D Allocation to each Participant is as follows:
1. Identify RPSM Participants
2. Determine Accounting Operating Profit
   (a)    add back R&D Expense

---

[1] Also excluded are entities that are excluded from the Nortel transfer pricing policy. This generally applies to our joint ventures companies because Nortel does not control the joint venture entities. The results of the excluded entities are removed from consolidated results (leaving only the global results that are subject to the RPSM)

HIGHLY CONFIDENTIAL          NNC-NNL06001514 / 18

    (b)   deduct R&D Capital Stock Amortization in order to arrive at the gross economic profit:

5. From the gross economic profit,

    (a)   deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)

    (b)   deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)

to arrive at the Residual Profit pool.

6. Compute each RPSM Participants relative level of R&D Capital Stock

7. Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool with bears the same ratio as such Participant's ratio of its R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM Participants.

9. Establish entity level adjustments to the reflect arm's length R&D Allocation calculations of profit or loss for each entity.[2]

---

[2] The final R&D Allocation for any particular year could be adjusted upward or downward in order to reflect the final determination of any taxing authority that would affect the RPSM calculation for such taxable year.

HIGHLY CONFIDENTIAL

NNC-NNL06001514 / 19

Dec 20 07 03:51p   Janssen Pharmaceutica   201-944-9475   p.10

## Schedule B
### Territory for Each Licensed Participant

1) With respect to Nortel Networks Inc., "Territory" shall mean that United States of America and the Commonwealth of Puerto Rico.

2) With respect to Nortel Networks UK Limited, "Territory" shall mean the United Kingdom.

3) With respect to Nortel Networks S.A., "Territory" shall mean France.

4) With respect to Nortel Networks Australia, "Territory" shall mean Australia.

5) With respect to Nortel Networks Ireland, "Territory" shall mean the Republic of Ireland.

WO 328838.3                                18

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 20

### Addendum to Master R&D Agreement

This Addendum corrects certain minor errors contained in the terms of a Master R&D Agreement (dated December 22, 2004) entered into between NORTEL NETWORKS LTD (NNL) and certain of its direct and indirect wholly owned affiliates (referred to individually as "Participant" or collectively, as "Participants"), and adds Nortel Networks Australia Pty Limited as a Participant with effect from the Effective Date (as defined in that Agreement). The terms of the Master R&D Agreement are hereby incorporated by reference and the parties intend that the corrections are effective as if originally incorporated into the Master R&D Agreement.

Now therefore, for good and valuable consideration, the Parties wish to correct the minor errors by amending the terms of the Master R&D Agreement as set forth below.

I.    Opening Paragraph
The opening paragraph is deleted and replaced with the following -

*Agreement confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the "Effective Date").*

II.    Correction to Name of Participant
All references to Nortel Networks Australia are amended by adding to the end thereof "PTY LIMITED".

III.    Article 5 – Grant of Exclusive Licenses by NNL
The text of Article 5(a) is deleted and replaced with the following -

*(a)    To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith. ("Exclusive License")*

All other terms of the Master R&D Agreement shall remain in full force and effect.

This Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, the Parties have caused this Addendum to be executed by their duly authorized officers on the date noted below.

HIGHLY CONFIDENTIAL

Nortel Networks Ltd.

Per:   _____
Date:   _____

Nortel Networks Inc.

Per:   *Lauren G. Shely*
Date:   10/18/05

Nortel Networks UK Limited

Per:   _____
Date:   _____

Nortel Networks, S.A.

Per:   _____
Date:   _____

Nortel Networks Australia Pty Limited

Per:   _____
Date:   _____

WO 415155.1   2

HIGHLY CONFIDENTIAL   NNC-NNL06001514 / 22

Nortel Networks Ltd.

Per:
Date:

Nortel Networks Inc.

Per:
Date:

Nortel Networks UK Limited

Per:
Date:

Nortel Networks, S.A.

Per:
Date:

Nortel Networks Australia Pty Limited

Per:
Date:

WO-415155.1

2

HIGHLY CONFIDENTIAL

NNC-NNL06001514 / 23

Dec 20 07 03:57p     Janssen Pharmaceutica     201-944-9475     p.4

Nortel Networks Ireland

Per: _✗ Michael A Carp_

Date: _✗ 15 Feb 2006_

WO 415155.1        3

HIGHLY CONFIDENTIAL        NNC-NNL06001514 / 24

Dec 20 07 03:57p    Janssen Pharmaceutica     201-944-9475      p.5

**Nortel Networks Ltd.**

Per: _____
Date: _____

**Nortel Networks Inc.**

Per: _____
Date: _____

**Nortel Networks UK Limited**

Per: _D G M_    SARA GILL
        COMPANY SECRETARY
Date: _12 June 2006_

**Nortel Networks S.A.**

     Alain Biston
     GP NNSA.
Per: _____
Date: _21 June 2006_

**Nortel Networks Australia Pty Limited**

Per: _____
Date: _____

WO 415155.1                  2

**HIGHLY CONFIDENTIAL**          NNC-NNL06001514 / 25

Nortel Networks Ltd.

Per:
Date:

Nortel Networks Inc.

Per:
Date:

Nortel Networks UK Limited

Per:
Date:

Nortel Networks, S.A.

Per:
Date:

Nortel Networks Australia Pty Limited

Per:
Date:

WO 415155.1

2

HIGHLY CONFIDENTIAL       NNC-NNL06001514 / 26

Privileged and Confidential
December 14, 2007

## Addendum to Master R&D Agreement

This Addendum modifies and amends the Master R&D Agreement (dated December 22, 2004) and all amendments and addendums thereto (collectively referred to as the "Prior Agreement") by adopting certain changes to the terms of the Master R&D Agreement that have been reflected in the financial statements of the Participants as of, and effective from, January 1, 2006 (the "Effective Date"). The terms of the Prior Agreement are hereby incorporated by reference.

Whereas each Participant holds and enjoys equitable and beneficial ownership of NN Technology as defined in the Prior Agreement,

Whereas this Addendum continues each Participant's rights and obligations in the NN Technology,

Whereas given changes in the Nortel business, NNL and certain other Participants are seeking governmental approval of various modifications to the RPSM;

Whereas Participants desire to execute this Addendum in order to formally adopt these modifications to the Prior Agreement.

Now therefore, for good and valuable consideration, the Parties wish to amend the Prior Agreement as set forth below.

I.    Referenced Agreement
For purposes of interpreting the Prior Agreement, all references to this "Agreement" should include all subsequent addendums including this Addendum.

II.    Whereas Clauses
In the eighth (8th) Whereas clause delete the parenthetical "(collectively, the "Revenue Authorities")".

III.    Definitions
(a) The term "Retirement Allocation" as defined in Article 1(j) should be deleted and replaced with "Special Retirement Allocation. In addition, the phrase in the last line of Article 1(j) should be deleted and replaced with "effective on the Termination Date".

(b) The terms "Special Balancing Payment" and "Territory" found in Article 1(k) and (l) are redesignated as Article 1(m) and (n), respectively.

(c) A new term "Revenue Authority or Revenue Authorities" is inserted as Article 1(k) as follows.

(k) "Revenue Authority or Revenue Authorities" shall mean one or more governmental taxing authorities or instrumentalities thereof.

WO 830534.8

HIGHLY CONFIDENTIAL

NNC-NNL06001514 / 27

(d) A new term *"Termination Date"* is inserted as Article 1(l) as follows.

*(l) "Termination Date" shall mean with respect to an Elective Retirement the last day of the calendar year in which such election is effective and with respect to a Forced Retirement under Article 11(c)(i), the last day of the second calendar year in which there is no R&D Activity. For all other Forced Retirement events defined in Article 11(c) (ii) through (iv), the Termination Date is the date on which the Defaulting Event occurs.*

IV.    Participant's Share of R&D Allocation

Article 3(b) provides that each Participant accepts and agrees to make the payment determined under the RPSM as its shares of the R&D Allocation as defined reference to Schedule A of the Prior Agreement. The Participants have amended the computation of the R&D Allocation as set forth in new Schedule A ("Amended Schedule A"), attached hereto. Thus, all references to Schedule A in the Prior Agreement shall be deleted and replaced with references to Amended Schedule A and all references to each Participant's share of the R&D Allocation in the Prior Agreement will be made by reference to the computations set forth in Amended Schedule A.

V.    Retiring Eligible Participants

(a) For retiring Participants with a Termination Date that is after the Effective Date of this Addendum, Article 11 is hereby amended.

    (i)    The last line in Article 11(b) is deleted and replaced with the following.

    *terminated from participation in this Agreement as of the Termination Date (Forced Retirement).*

    (ii)    The last line in Article 11(c)(i) is amended to read – *"Activity for two consecutive years,"*

    (iii)    Article 11(d) is deleted and replaced with the following.

    *(d)(i)   In the event of an Elective or Forced Retirement, the retiring Participant consents, in advance, to transfer all of its rights in the NN Technology to NNL as of, and from, the Termination Date. In exchange for the Participant's transfer of its rights and obligations, such retiring Participant accepts as full payment, its R&D allocation (without any obligation to perform R&D activity) (Retiring R&D Allocation) for the shorter period of years equal to (x) each post-Termination Date year for a five-year period following the Termination Date, or, (y) each post-Termination Date year preceding the year in which the level of the five-year rolling sum of R&D Stock (as defined in Amended Schedule A) for such retiring Participant is zero. The Retiring R&D Allocation cannot be less than zero for any single year in which there is an obligation to make such allocation. The Participants agree that any negative amount (up to zero) tentatively allocated*

WG 8305344         2

HIGHLY CONFIDENTIAL        NNC-NNL06001514 / 28

to a retired Participant under the RSPM set forth in Schedule A will be reallocated to the remaining Participants disregarding any R&D spend of the retired Participant in the calculation.

(d)(ii)  For the avoidance of doubt the following example is provided. Assuming Participant A fails to perform any R&D activity in 2006 and 2007, the Termination Date will be December 31, 2007. The R&D Allocation for 2007 will be determined treating Participant A as a Participant of the Prior Agreement and this Addendum for the entirety of 2007. The sole payment for Participant A's transfer of its rights in the NN Technology and other rights and obligations under the Prior Agreement and this Addendum shall be its positive Retiring R&D Allocation for each of 2008 through 2012. However, since Participant A's level of the five-year rolling sum of R&D Stock for the 2006-2010 years is zero at the end of 2011, then pursuant to Article 11(d)(i), Participant A will only receive a Retiring R&D Allocation for three post-Termination Date years (i.e., years 2008 through 2010). Thus, for purposes of computing the Retiring R&D Allocation as set forth in Schedule A, the five-year rolling sum of R&D Stock will include Participant A's R&D activity for years 2003-2007 [first year (2008) allocation], 2004-2008 [second year (2009) allocation] and 2005-2009 [third and final year (2010) allocation].

(d)(iii)  Notwithstanding Article 11(d)(i) and (ii), no Retiring R&D Allocation will be due to a retiring Participant for any year in which such Participant is subject to a Defaulting Event described in Article 11(c)(ii) through (iv) (individually, a "Special Default Event"). In the case of any Special Default Event, the retiring Participant agrees to accept the Special Retirement Allocation as full payment for its rights in the NN Technology surrendered on the Termination Date.

(d)(iv)  The Participants agree to amend the terms of Article 11 in order to reflect any negotiated determinations with a Revenue Authority.

(iii)    The reference to "retirement date" in line 4 of Article 11(e) should be deleted and replaced with "Retirement Date".

All other terms of the Master R&D Agreement shall remain in full force and effect.

This Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, the Parties have caused this Addendum to be executed by their duly authorized officers on the date noted below.

WO 830534.4              3

HIGHLY CONFIDENTIAL

NNC-NNL06001514 / 29

## Amended Schedule A

### Calculation of Arm's Length R&D Allocation to each Participant

The purpose of this section is to provide a brief summary of Nortel's transfer pricing policy and to provide clarity as to how each Participant is to be compensated under this Agreement.

The current transfer pricing methodology is the residual profit split method ("RPSM") which was adopted by the Participants at the request of the tax authorities as the most appropriate method for determining the arm's length compensation to each of the Participants for the R&D Activity to be provided pursuant to the Master R&D Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property ("IP").

Accordingly, the compensation provided to Participants under RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business.

On the other hand, other Nortel Affiliates that are not signatories to the Master R&D Agreement and have signed distribution agreements with NNL (the "Nortel Distribution Entities") generally are the least complex entities in the group. They do not perform R&D, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited amount of functions. Thus, these entities are provided a routine return as compensation for the distribution function that they perform (generally, a nominal amount of operating profit ranging from 0% to 4% of sales).

The formulaic steps for calculating the R&D Allocation to each Participant is as follows:
1. Identify RPSM Participants
2. Determine Accounting Operating Profit (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any relevant taxing authority)
3. From the Accounting Operating Profit,
   (a)  deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority)

   (b)  deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority) to arrive at the Residual Profit pool.
4. Compute each RPSM Participants relative level of R&D Stock (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any Revenue Authority)

WO 539534.4                                6

HIGHLY CONFIDENTIAL

NNC-NNL06001514 / 30

5. Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool which bears the same ratio as such Participant's ratio of its R&D Stock as a percentage of the total R&D Stock for all RPSM Participants.
6. Establish entity level adjustments to the reflect arm's length R&D Allocation calculations of profit or loss for each entity.[1]

---

[1] The final R&D Allocation for any particular year could be adjusted upward or downward in order to reflect the final determination of any Revenue Authority that would affect the RPSM calculation for such taxable year.

WO 830534.4                                    7

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 31

Dec 20 07 06:05p    Janssen Pharmaceutica    201-944-9475     p.2

**Nortel Networks Ltd.**

Per: _____
Date: _____

**Nortel Networks Inc.**

Per: _____
Date: _____

**Nortel Networks UK Limited**

Per: _____
Date: _____

**Nortel Networks, S.A.**

Per: _J.n. LEJUR - Dir Cómerc_
Date: _19 / 12 / 2007_

**Nortel Networks Australia Pty Limited**

Per: _____
Date: _____

WO 830574.4             4

**HIGHLY CONFIDENTIAL**         NNC-NNL06001514 / 32

Nortel Networks Ltd.

Per: _____
Date: _____

Nortel Networks Inc.

Per: _____
Date: _____

Nortel Networks UK Limited

Per: _____
Date: _____

Nortel Networks, S.A.

Per: _____
Date: _____

Nortel Networks Australia Pty Limited

Per: _____
Date: _____

WO 370534.4                              4

HIGHLY CONFIDENTIAL

Dec 20 07 06:05p    Janssen Pharmaceutica    201-944-9475     p.4
18. Dec. 2007 12:38   Nortel Networks          No. 0302  P. 1/1

**Nortel Networks Ireland**

Per:
Date:

WO 8305344            5

**HIGHLY CONFIDENTIAL**        NNC-NNL06001514 / 34

Dec 20 07 06:05p     Janssen Pharmaceutica      201-944-9475          p.5

Nortel Networks Ltd.

Per: _____
Date: _____

Nortel Networks Inc.

Per: _____
Date: _____

Nortel Networks UK Limited

Per: _____
Date: _____

Nortel Networks, S.A.

Per: _____
Date: _____

Nortel Networks Australia Pty Limited

Per: _____
Date: 18/12/2007

WO 830534.4                           4

HIGHLY CONFIDENTIAL              NNC-NNL06001514 / 35

Nortel Networks Ltd.

Per: _____
Date: _____

Nortel Networks Inc.

Per: _____
Date: _____

Nortel Networks UK Limited

Per: _____
Date: _____

Nortel Networks, S.A.

Per: _____
Date: _____

Nortel Networks Australia Pty Limited

Per: _____
Date: _____

WO 930534.4                        4

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 36

Dec 20 07 06:05p   Janssen Pharmaceutica     201-944-9475      p.7

**Nortel Networks Ltd.**

Per:
Date: Dec. 18, 2007

**Nortel Networks Inc.**

Per:
Date:

**Nortel Networks UK Limited**

Per:
Date:

**Nortel Networks, S.A.**

Per:
Date:

**Nortel Networks Australia Pty Limited**

Per:
Date:

WO 830534.4

4

HIGHLY CONFIDENTIAL       NNC-NNL06001514 / 37

HIGHLY CONFIDENTIAL

## Third Addendum to Master R&D Agreement

This Third Addendum to Master R&D Agreement (**"Third Addendum"**) modifies and amends that certain Master R&D Agreement (**"Original Agreement"**) that had an original effective date of January 1, 2001, among Nortel Networks Limited (referred to in the Prior Agreement (as hereinafter defined) as Nortel Networks Ltd.), Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks SA (referred to in the Prior Agreement as Nortel Networks, S.A.), Nortel Networks Australia Pty Limited, and Nortel Networks (Ireland) Limited (referred to in the Prior Agreement as Nortel Networks Ireland), as amended by (i) that certain undated Addendum to Master R&D Agreement (**"First Addendum"**) executed by the parties between October 2005 and June 2006, (ii) the Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of Nortel's sale of its UMTS Access business to Alcatel-Lucent) (the "Alcatel-related Amendment"), and (iii) an Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006 (**"Second Addendum"**). The Original Agreement, the First Addendum, the Alcatel-related Amendment and the Second Addendum are collectively referred to as the "**Prior Agreement**"). The Prior Agreement and this Third Addendum are collectively referred to herein as the "**Agreement**"). The terms of the Prior Agreement are hereby incorporated by reference. Capitalized terms used herein and not otherwise defined herein have the meanings set forth for those terms in the Prior Agreement.

Except as otherwise provided in Article 5(a)(ii) hereof as amended herein with respect to the Non-Exclusive License Effective Date, the effective date of this Third Addendum is January 1, 2006 ("**Third Addendum Effective Date**").

Whereas Nortel expected that the RPSM attached to the Original Agreement as Schedule A would apply for an indefinite period beginning in January 1, 2001; however it was determined in discussions with certain Revenue Authorities in 2007 that certain amendments thereto retroactive from January 1, 2006 were necessary or desirable, as reflected in the revised RPSM attached as a revised Schedule A to the Second Addendum; and it has been determined at this time as a result of further discussions with Revenue Authorities that further amendments thereto, retroactive to the Third Addendum Effective Date, are necessary or desirable due to changes in the Nortel business, primarily as a result of Nortel's completion of the process of outsourcing its manufacturing activities, which changes have been reflected in the financial statements of each Participant since the Third Addendum Effective Date;

Whereas, the Participants wish to provide for additional flexibility in administration of the agreement to effect routine process and business efficiencies, as set forth in Article 3(d) as amended herein;

Whereas, NNL wishes to grant additional rights to the Licensed Participants effective January 1, 2009 as provided in amended Article 5(a)(ii) as set forth herein, also to effect routine process and business efficiencies; and

Whereas the Participants desire to execute this Third Addendum in order to formally adopt these modifications to the Prior Agreement.

Now therefore, in consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

I.      Referenced Agreement

For purposes of interpreting the Prior Agreement, all references to this "Agreement" shall include all prior and subsequent addenda including this Third Addendum.

II.      Definitions

(a)  The term "Exclusive License", defined in Article 5(a) of the Prior Agreement, is added as a new defined term in Article I of the Agreement as follows:

"*Exclusive License*" *shall mean the exclusive licence granted to a Licensed Participant as further described in Article 5(a)(i) hereof.*

(b)  The following are inserted as new defined terms in Article I of the Agreement:

"*Exclusive Territory*" *shall mean the exclusive geographic area specified for a Licensed Participant in Schedule B.*

"*Non-Exclusive License*" *shall mean the non-exclusive licence granted to a Licensed Participant as further described in Article 5(a)(ii) hereof.*

"*Non-Exclusive License Effective Date*" *has the meaning set forth in Article 5(a)(ii) hereof.*

"*Non-Exclusive Territory*" *shall mean, for each Licensed Participant, the entire world except (i) Canada where NNL retains its exclusive rights, and (ii) those geographic areas designated in Schedule B as the Exclusive Territory of another Licensed Participant.*

(c)  The definition for the term "Territory" is hereby deleted in its entirety and replaced with the following:

"*Territory*" *shall mean, with respect to each Licensed Participant, its Exclusive Territory as described on Schedule B, and its Non-Exclusive Territory.*

III.      Article 3 – R&D Activity Payments; Participant's Share of R&D Allocation

(a)     The Participants wish to again amend the computation of the R&D Allocation retroactively with effect from the Third Addendum Effective Date, as set forth in a second amendment to Schedule A ("Amended Schedule A") attached hereto and made a part hereof. As of the Third Addendum Effective Date, (i) any reference to Schedule A in the Prior

2

HIGHLY CONFIDENTIAL

Agreement shall be deemed to be a reference to the Amended Schedule A and (ii) any reference to each Participant's share of its R&D Allocation in the Prior Agreement shall be deemed to be a reference to the computations set forth in the Amended Schedule A.

(b)    The text of Article 3(d) is deleted in its entirety and replaced with the following:

*NNL agrees to administer this Agreement, or cause this Agreement to be administered by a Licensed Participant or a third party, including without limitation the making of any determinations required under the RPSM with respect to the Participants' respective interests, and the computation of amounts of the R&D Allocations due to and payments due from, as applicable, each Participant on a periodic basis. The Participants will agree to appropriate compensation for administers of this Agreement. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any true up payment to or from a Participant as described in paragraph 6 of Schedule A will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable as applicable, and may be netted pursuant to the standard Nortel practice for managing inter-company accounts.*

IV.    Article 4 – Legal Title to NN Technology

The text of Article 4(a) is deleted in its entirety and replaced with the following:

*Except as otherwise specifically agreed, legal title to any and all NN Technology, whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5.*

The text of Article 4(e) is deleted in its entirety and replaced with the following:

*Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others.*

V.    Article 5 – Grant of Exclusive Licenses by NNL

Article 5 is hereby amended to change the title of Article 5 to read as follows: *Article 5 – Grant of Licenses by NNL.*

Article 5(a) is deleted in its entirety and replaced with the following:

*To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:*

(i)    *continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter*

3

HIGHLY CONFIDENTIAL

*provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and*

(ii)   *grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").*

Schedule B, Territory for each Licensed Participant, is hereby deleted in its entirety and replaced with the First Amendment to Schedule B, attached hereto, and the title of that schedule is hereby changed to read "Exclusive Territory for Each Licensed Participant".

All other terms of the Prior Agreement shall remain in full force and effect.

This Third Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Third Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Third Addendum Effective Date and, for the Non-exclusive License, as of the Non-exclusive License Effective Date, as applicable.

Nortel Networks Limited

Per: _____   Gordon A. Davies
Date: *Dec 18/08*   Deputy General Counsel
                    and Corporate Secretary

Per: _____
Date: *Dec 18 2008*   Yoko Doolittle
                      Treasurer

Nortel Networks Inc.

Per: _____
Date: _____

4

HIGHLY CONFIDENTIAL

NNC-NNL06001514 / 42

*provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and*

(ii)    *grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").*

Schedule B. Territory for each Licensed Participant, is hereby deleted in its entirety and replaced with the First Amendment to Schedule B, attached hereto, and the title of that schedule is hereby changed to read "Exclusive Territory for Each Licensed Participant".

All other terms of the Prior Agreement shall remain in full force and effect.

This Third Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Third Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Third Addendum Effective Date and, for the Non-exclusive License, as of the Non-exclusive License Effective Date, as applicable.

Nortel Networks Limited

Per: _____
Date: _____

Per: _____
Date: _____

Nortel Networks Inc.

Per: _Eugene R. McClain_

Eugene R. McClain
Vice President

Date: ___12-19-08___

Nortel Networks UK Limited

Per:
Date: 9/1/09

Nortel Networks SA

Per:
Date:

Nortel Networks Australia Pty Limited

Per:
Date:

Nortel Networks (Ireland) Limited

Per:
Date:

*[Signature page to Third Addendum to Master R&D Agreement]*

5

HIGHLY CONFIDENTIAL        NNC-NNL06001514 / 44

Nortel Networks UK Limited

Per: _Shane Wilton_

Date: _9-1-09_

Nortel Networks SA

Per: _____

Date: _____

Nortel Networks Australia Pty Limited

Per: _____

Date: _____

Nortel Networks (Ireland) Limited

Per: _Shane Wilton_

Date: _9-1-09_

*[Signature page to Third Addendum to Master R&D Agreement]*

5

HIGHLY CONFIDENTIAL

Nortel Networks UK Limited

Per:   _____
Date:  _____

Nortel Networks S.A.

Per:   _____
Date:  _13 February 2009_

Nortel Networks Australia Pty Limited

Per:   _____
Date:  _____

Nortel Networks (Ireland) Limited

Per:   _____
Date:  _____

*[Signature page to Third Addendum to Master R&D Agreement]*

5

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 46