Nortel Networks UK Limited

Per:
Date:

Nortel Networks SA

Per:
Date:

Nortel Networks Australia Pty Limited

Per:
Date:    DEZ 22, 2008

Nortel Networks (Ireland) Limited

Per:
Date:

*[Signature page to Third Addendum to Master R&D Agreement]*

5

HIGHLY CONFIDENTIAL      NNC-NNL06001514 / 47

Schedule A
to that certain
Third Addendum to Master R&D Agreement

## Second Amendment to Schedule A

## Calculation of Arm's Length R&D Allocation ("R&D Allocation")

Nortel uses the residual profit split method ("RPSM") embodied in the calculation described below, which was originally adopted as of January 1, 2001 at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity provided pursuant to the Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property.

Accordingly, the R&D Allocation provided to Participants under the RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk. A functional rate of return ("Functional Rate of Return") is provided to each Participant as compensation for its distribution function and other activities that support revenue outside of the Participant's country of residence.

Other Nortel Affiliates that are not signatories to the Agreement and that have signed (or will sign) a distribution agreement with NNL ("Nortel Distribution Entities") generally are the least complex entities in the Nortel group of companies. They do not perform R&D Activity, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited number of functions. Thus, these entities are provided a Functional Routine Return as compensation for their distribution function and ancillary services (generally, a nominal amount of operating earnings ranging from 0% to 4% of sales, as determined based on current industry standards and third party studies).

The steps for calculating the R&D Allocation for each Participant are as follows:

1. Identify the Nortel entities that are "Participants" under the Agreement as amended from time to time.

2. Determine consolidated Nortel operating earnings/loss in accordance with U.S. GAAP.

3. From the consolidated Nortel operating earnings/loss:

   (i) Deduct the operating earnings/loss of Nortel's existing joint ventures; deduct the operating earnings/loss of Nortel's former joint venture entities that own significant intangibles, as determined by the Participants from time to time;

6

HIGHLY CONFIDENTIAL    NNC-NNL06001514 / 48

and deduct the operating earnings/loss of Nortel entities that do not perform the function of distribution of Products containing NN Technology.

(ii) The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations:

- amortization of intangibles[1]
- gain/loss on the sale of business
- restructuring charges
- stewardship costs

The resulting amount is the adjusted operating earnings/loss ("Adjusted Operating Earnings/Loss").

(iii) From the Adjusted Operating Earnings/Loss:

- deduct the Functional Routine Return of each Nortel Distribution Entity, and
- deduct the Functional Routine Returns of each Participant.

– in each case as determined by the selected transfer pricing method that establishes such return based on current industry standards and third party studies, or as may be finally determined by Nortel's negotiations with Revenue Authorities, to determine the amount representing the residual profit or loss ("Residual Pool").

4. Determine the R&D Allocation for each Participant:

(i) Calculate the relative ratios of each Participant's spending on its R&D Activity to the R&D spend of all Participants, by taking each Participant's total R&D spend over the previous five years as a ratio of the total R&D spend of the previous five years for all Participants.

(ii) Apply the ratio determined above to the Residual Pool to determine each Participant's R&D Allocation.

Take the R&D Allocation and Functional Routine Return for each Participant and compare it to such Participant's operating earnings/loss, adjusted in the manner described in paragraph 3(ii), to determine whether any "true up" payments are necessary (whereby a Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share)

---

[1]Amortization of intangibles includes goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc.

7

**HIGHLY CONFIDENTIAL**

Schedule B
to that certain
Third Addendum to Master R&D Agreement

## First Amendment to Schedule B

### Exclusive Territory for Each Licensed Participant

1) With respect to Nortel Networks Inc., "Exclusive Territory" shall mean the United States of America and the Commonwealth of Puerto Rico.

2) With respect to Nortel Networks UK Limited, "Exclusive Territory" shall mean the United Kingdom.

3) With respect to Nortel Networks SA, "Exclusive Territory" shall mean France.

4) With respect to Nortel Networks Australia Pty Limited, "Exclusive Territory" shall mean Australia.

5) With respect to Nortel Networks (Ireland) Limited, "Exclusive Territory" shall mean the Republic of Ireland.

8

HIGHLY CONFIDENTIAL

Nortel Networks Limited
195 The West Mall
Toronto, Ontario, Canada M9C 5K1

RELEASE

January 1, 2009

Nortel Networks Inc.
2221 Lakeside Boulevard
Richardson, Texas
United States of America
Attention: Corporate Secretary

Nortel Networks UK Limited
Maidenhead Office Park,
Westacott Way, Maidenhead,
Berkshire, United Kingdom, SL6 3QH
Attention: Corporate Secretary

Nortel Networks SA
Parc d'Activites de Magny
78117 Chateaufort, France
Attention: Corporate Secretary

Nortel Networks Australia Pty Limited
Nortel Networks Centre
1 Innovation Road
Macquarie University Research Park
Macquarie Park, New South Wales, Australia 2109
Attention: Corporate Secretary

Nortel Networks (Ireland) Limited
Mervue Business Park,
Mervue, Galway, Republic of Ireland
Attention: Corporate Secretary

> Re: Release ("Release") relating to Master R&D Agreement dated
> December 22, 2004 ("Agreement")

Gentlemen:

Defined terms used herein and not defined herein shall have the meaning set forth for such terms in the Agreement. The purpose of this letter is to document the complete and final resolution of matters relating to the alleged use, if any, prior to the date hereof, of the NN Technology by some or all of the Licensed Participants beyond their respective Exclusive Territories (as defined in that certain Third Addendum to Master R&D Agreement executed by the Licensed Participants and NNL effective January 1, 2006 ("Third Addendum")).

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned Nortel Networks Limited, a corporation formed under the laws of

Page 1 of 3

HIGHLY CONFIDENTIAL

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use, if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

Nortel Networks Limited

Per: _____Gordon A. Davies_____
         Chief Legal Officer
         and Corporate Secretary

Per: _J. Connelly M'Gilly_

         Tracy S.J. Connelly McGilley
              Assistant Secretary

Acknowledged and accepted as of the date first set forth above:

                                        Nortel Networks Inc.

                                        Per:    _____


                                        Nortel Networks UK Limited

                                        Per:    _____


                                        Nortel Networks SA

                                        Per:    _____

Page 2 of 3

HIGHLY CONFIDENTIAL                    NNC-NNL06001514 / 52

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use, if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

Nortel Networks Limited

Per: _____

Per: _____

Acknowledged and accepted as of the date first set forth above:

Nortel Networks Inc.

Per: _____

Eugene R. McClain, Vice President

Nortel Networks UK Limited

Per: _____

Nortel Networks SA

Per: _____

Page 2 of 3

**HIGHLY CONFIDENTIAL**                    NNC-NNL06001514 / 53

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use, if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

Nortel Networks Limited

Per:_____

Per:_____

Acknowledged and accepted as of the date first set forth above:

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per:  _Sharon Rolston_  9.1.09

Nortel Networks SA

Per: _____

Page 2 of 3

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use. if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

Nortel Networks Limited

Per: _____

Per: _____


Acknowledged and accepted as of the date first set forth above:

               Nortel Networks Inc.

               Per:      _____


               Nortel Networks UK Limited

               Per: _____ 9/1/09

               Nortel Networks SA

               Per:      _____

HIGHLY CONFIDENTIAL          NNC-NNL06001514 / 55

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use, if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

Nortel Networks Limited


Per:_____

Per:_____




Acknowledged and accepted as of the date first set forth above:

Nortel Networks Inc.

Per: _____


Nortel Networks UK Limited

Per: _____


Nortel Networks SA

Per: _____

Page 2 of 3

**HIGHLY CONFIDENTIAL**          NNC-NNL06001514 / 56

Nortel Networks Australia Pty Limited

Per:

Nortel Networks (Ireland) Limited

Per: _____

*[signature page to Release]*

Page 3 of 3

HIGHLY CONFIDENTIAL          NNC-NNL06001514 / 57

Nortel Networks Australia Pty Limited

Per: _____

Nortel Networks (Ireland) Limited

Per: *Sharon Naylor*
9-1-09

*[signature page to Release]*

Page 3 of 3

HIGHLY CONFIDENTIAL    NNC-NNL06001514 / 58

v. 4

# Fourth Addendum to Master R&D Agreement

This Fourth Addendum to Master R&D Agreement ("**Fourth Addendum**") modifies and amends that certain Master R&D Agreement ("**Original Agreement**") that had an original effective date of January 1, 2001, among Nortel Networks Limited (referred to in the Prior Agreement (as hereinafter defined) as Nortel Networks Ltd.), Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks SA (referred to in the Prior Agreement as Nortel Networks, S.A.), Nortel Networks Australia Pty Limited, and Nortel Networks (Ireland) Limited (referred to in the Prior Agreement as Nortel Networks Ireland), as amended by (i) that certain undated Addendum to Master R&D Agreement ("**First Addendum**") executed by the parties between October 2005 and June 2006, (ii) the Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of Nortel's sale of its UMTS Access business to Alcatel-Lucent) (the "Alcatel-related Amendment"), and (iii) an Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006 ("Second Addendum"), and (iv) the Third Addendum to Master R&D Agreement with an effective date of January 1, 2006 (except as otherwise provided therein) ("**Third Addendum**"). The Original Agreement, the First Addendum, the Alcatel-related Amendment, the Second Addendum and the Third Addendum are collectively referred to as the "Prior Agreement"). The Prior Agreement and this Fourth Addendum are collectively referred to herein as the "Agreement"). The terms of the Prior Agreement are hereby incorporated by reference. Capitalized terms used herein and not otherwise defined herein have the meanings set forth for those terms in the Prior Agreement.

The effective date of this Fourth Addendum is December 31, 2008 ("**Fourth Addendum Effective Date**").

In consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

I.      Referenced Agreement
For purposes of interpreting the Prior Agreement, all references to this "Agreement" shall include all prior and subsequent addenda including this Fourth Addendum.

II.     Standstill Provision

The Participants hereby agree that, notwithstanding anything to the contrary in the Agreement, in the event of the occurrence of an event described at Section 11(c)(iv):

    (i)     no Participant affected by such event shall be automatically terminated from participation in the Agreement under Article 11(b) for reasons relating to such event;

    (ii)    no Participant shall elect to withdraw from participation in the Agreement under Article 11(a); and

    (iii)   NNL shall have the right, in its sole discretion, to terminate participation in this Agreement of any Participant affected by such event, upon written notice to such Participant.

The standstill provision above shall be deemed to form a part of the Agreement from its initial effective date and shall serve to prevent any termination or withdrawal described at (i) above from occurring, so that the

Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).

All other terms of the Prior Agreement shall remain in full force and effect.

This Fourth Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Fourth Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Fourth Addendum Effective Date.

Nortel Networks Limited

Per: _____    Gordon A. Davies
                               Chief Legal Officer
Date: _____    and Corporate Secretary

Per: _____

Date: _____    Tracy S.J. Connelly McGinsey
                               — Assistant Secretary

Nortel Networks Inc.

Per: _____

Date: _____

2

HIGHLY CONFIDENTIAL

Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).

All other terms of the Prior Agreement shall remain in full force and effect.

This Fourth Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Fourth Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Fourth Addendum Effective Date.

Nortel Networks Limited

Per:
Date:

Per:
Date:

Nortel Networks Inc.

Per:
Date:   January 8, 2009
Eugene R. McClain, Vice President

Nortel Networks UK Limited

Per:
Date:

Nortel Networks (Ireland) Limited

Per:
Date:

Nortel Networks SA

Per:
Date:

2

**HIGHLY CONFIDENTIAL**

NNC-NNL06001514 / 61

Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).

All other terms of the Prior Agreement shall remain in full force and effect.

This Fourth Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Fourth Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Fourth Addendum Effective Date.

**Nortel Networks Limited**

Per: _____
Date: _____

Per: _____
Date: _____

**Nortel Networks Inc.**

Per: _____
Date: _____

**Nortel Networks UK Limited**

Per: _____
Date: _____9/1/09_____

**Nortel Networks (Ireland) Limited**

Per: _____
Date: _____

**Nortel Networks SA**

Per: _____
Date: _____

2

HIGHLY CONFIDENTIAL

Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).

All other terms of the Prior Agreement shall remain in full force and effect.

This Fourth Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Fourth Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Fourth Addendum Effective Date.

**Nortel Networks Limited**

Per: _____
Date: _____

Per: _____
Date: _____

**Nortel Networks Inc.**

Per: _____
Date: _____

**Nortel Networks UK Limited**

Per: _Shaun Naylor_
Date: _9.1.09_

**Nortel Networks (Ireland) Limited**

Per: _Shaun Naylor_
Date: _9.1.09_

**Nortel Networks SA**

Per: _____
Date: _____

2

**HIGHLY CONFIDENTIAL**

Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).

All other terms of the Prior Agreement shall remain in full force and effect.

This Fourth Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Fourth Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Fourth Addendum Effective Date.

Nortel Networks Limited

Per: _____
Date: _____

Per: _____
Date: _____

Nortel Networks Inc.

Per: _____
Date: _____

Nortel Networks UK Limited

Per: _____
Date: _____

Nortel Networks (Ireland) Limited

Per: _____
Date: _____

Nortel Networks S.A.

Per: _____
Date: ___ 19 JANUARY 2009

2

HIGHLY CONFIDENTIAL

Nortel Networks Australia Pty Limited

Per: _____

Date: _____9/1/2009_____

*[Signature page to Fourth Addendum to Master R&D Agreement]*

3

HIGHLY CONFIDENTIAL    NNC-NNL06001514 / 65

HIGHLY CONFIDENTIAL



Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**FIFTEENTH REPORT OF THE MONITOR**
**DATED JUNE 25, 2009**

**INTRODUCTION**

1.  On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all
    its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel
    Networks Technology Corporation ("NNTC"), Nortel Networks International
    Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC")
    (collectively the "Applicants") filed for and obtained protection under the
    *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this
    Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"). Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants
    (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to
    July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

2.  Nortel concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
    Code (the "Code") in the U.S. Court on January 14, 2009, for Nortel Networks Inc.
    ("NNI") and certain of its U.S. subsidiaries (the "U.S. Debtors").

A/C

3. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 15, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

4. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

5. Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court for NNSA.

**PURPOSE**

6. The purpose of this Fifteenth report of the Monitor (the "Fifteenth Report") is to provide this Honourable Court with an update in respect of the following:

    a) Nortel's consolidated cash position and liquidity as at June 6, 2009;

    b) actual receipts and disbursements from April 12, 2009 to June 6, 2009;

2

A/C

    c)  background and current status of GSPA and other intercompany transactions;

    d)  the Interim Funding and Settlement Agreement among the Applicants, U.S. Debtors and EMEA Debtors;

    e)  cash flow forecast for the period June 7, 2009 to September 30, 2009;

    f)  amendments to Export Development Canada ("EDC") Facility and EDC Charge;

    g)  update on other insolvency proceedings; and

    h)  update on Nortel's restructuring efforts.

**TERMS OF REFERENCE**

7.  In preparing this Fifteenth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Fifteenth Report.

8.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

9.  Capitalized terms not defined in this Fifteenth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

**GENERAL BACKGROUND**

10. Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the

3

globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

11. Nortel conducts its global business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

12. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

4

CONFIDENTIAL

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT JUNE 6, 2009**

13. At June 6, 2009, Nortel's estimated consolidated cash balance was approximately $2.7 billion.  Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at June 6, 2009:

| Region | Gross Cash | Restricted | Unavailable Cash - JVs and Other Items (see below) | Available Cash |
|---|---|---|---|---|
| NNL | 142 | (29) | (5) | 108 |
| Other Canada | 48 | (29) | - | 19 |
| | | | | |
| NNI | 775 | (19) | - | 756 |
| NNI - Reserve MMF (ST/LT) | 25 | - | (25) | - |
| NGS | 45 | - | (45) | - |
| Other US | 2 | - | - | 2 |
| **North America** | 1,037 | (77) | (75) | 885 |
| | | | | |
| NN UK Limited | 332 | (26) | - | 306 |
| Other EMEA Filed Entities | 398 | (2) | - | 396 |
| JV - Netas | 66 | - | (66) | - |
| EMEA non-filed entities | 24 | - | - | 24 |
| **UK/Europe** | 820 | (28) | (66) | 726 |
| | | | | |
| Greater China | 197 | (4) | - | 193 |
| Other ASIA PAC (excl JVs) | 189 | - | - | 189 |
| LG Nortel | 293 | - | (293) | - |
| Other JVs | 33 | - | (33) | - |
| **ASIA** | 712 | (4) | (326) | 382 |
| | | | | |
| **CALA** | 97 | - | - | 97 |
| | | | | |
| **Total Treasury Cash** | **2,666** | **(109)** | **(467)** | **2,090** |

14. As at June 6, 2009, North America had cash available for operations and post–filing inter-company settlements of approximately $885 million compared to a gross cash position of approximately $1 billion.  Of this amount, approximately $127 million is held by Canadian entities and approximately $758 million is held by U.S. entities.

5

CONFIDENTIAL

A/C

15. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $17 million of cash collateral posted by Nortel with respect to non-EDC performance bond and letter of credit facilities, (ii) $10 million related to cash collateral required to issue EDC performance bonds in exotic foreign currencies, (iii) $10 million held in escrow to the benefit of the insurer related to the Global Class Action, (iv) $8 million held for the benefit of the Health and Welfare Trust (the "H&WT"), and (v) $11 million held in the D&O Trust as described in the Pre-Filing Report. Unavailable Cash consists of $5 million initially deposited with financial institutions for future potential letter of credit requirements. Nortel is currently working with the financial institutions to have these funds released.

16. NNI's Restricted Cash includes the proceeds from the sale of the Layer 4-7 Business of $18 million being held in escrow by JP Morgan until an agreement is reached regarding allocation of these proceeds to various Nortel legal entities, including NNL. NNI's Unavailable Cash as at June 6, 2009 includes $25 million related to the Money Market Reserve Primary Fund (the "MMF"). Since filing, an amount of $40 million has been received from the MMF and another $6 million is expected to be received before the end of 2009.

17. NGS, a U.S. non-debtor entity, has cash of approximately $45 million for use in its own operations and for settlement of inter-company transactions.

18. The U.K. Administrators had cash available for operations and post–filing inter-company settlements for NNUK and the other EMEA Debtors, of approximately $702 million. The EMEA non-filed entities have available cash of approximately $24 million which is expected to be used primarily to fund their in-country operations and inter-company settlements. At present, this cash is considered unavailable to provide funding elsewhere in the Nortel group.

6

UCC0050391

A/C

TR49809

19. NETAS, a joint venture in which Nortel owns a 53% interest, has approximately $66 million of cash of which $35 million represents Nortel's proportionate share. Nortel believes these funds will continue to be used to fund NETAS's operations and will be difficult to repatriate as approval of the other joint venture partners would be required.

20. Nortel entities in the APAC region have approximately $382 million of cash available for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $193 million are generally only available to fund operations within China and inter-company settlements. LGN and other joint ventures Nortel participates in, hold approximately $326 million of cash of which $167 million represents Nortel's proportional share. Repatriation of these funds requires approval of the respective joint venture partners.

21. Nortel's CALA region entities have approximately $97 million of cash generally available to fund their in-country operations and inter-company settlements. At present, this cash is considered unavailable to provide funding to other Nortel entities.

**ACTUAL RECEIPTS AND DISBURSEMENTS FROM APRIL 12, 2009 TO JUNE 6, 2009**

22. The Applicants' actual consolidated net cash outflow for the period from April 12 to June 6, 2009, was $76.6 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Eighth Report of the Monitor dated April 24, 2009 is attached at Appendix A.

23. Actual net cash outflow exceeded the forecast by $46.5 million. Significant items contributing to the variance were as follows:

a) a positive permanent variance of $41.7 million with respect to the collection of accounts receivable due to a combination of the following factors:

7

UCC0050392

    i. a positive permanent variance of $37 million due to higher than expected billings and the corresponding favourable impact on collections, including receipts from Hitachi related to the LTE licensing agreement for a KDDI project in Japan; and

    ii. a positive permanent variance of approximately $5.0 million due to the strengthening of the Canadian dollar versus the U.S. dollar by approximately 14 percent over the period;

b) a negative permanent variance of $4.8 million in other receipts primarily as the result of a projected release of $5.0 million from unused bonding facilities that did not occur. Due to increased volatility in the currency markets this projected collateral release was instead utilized to provide additional collateral for performance bonds issued in exotic currencies. Accordingly, Unavailable Cash decreased and Restricted Cash increased as discussed in paragraph 24 and 25;

c) a negative net timing variance of inter-company receipts and disbursements of approximately $84.4 million primarily as a result of a negative timing variance of $79.0 million as projected transfer pricing payments from NNI were not made pending conclusion of negotiations regarding an interim funding arrangement;

d) a negative permanent variance relating to payroll of $9.6 million due to the following:

    i. a negative permanent variance as reductions in the workforce tracked behind the assumptions used in the forecast; and

    ii. a negative permanent variance relating to an appreciation in the Canadian dollar resulted in higher payroll costs in U.S. dollar terms;

8

UCC0050393

e)  a positive permanent variance of $12.9 million as inventory disbursements were lower than projected due to reductions in the purchase volumes for certain product lines; and

f)  a negative permanent variance of $4.4 million in Non-Inventory Purchases primarily as a result of the strengthening of the Canadian dollar relative to the U.S. dollar.

24. Unavailable Cash decreased by approximately $0.9 million primarily as a result of the $5.9 million that was re-classified from Unavailable Cash to Restricted Cash due to increased collateral requirements on performance bonds issued in exotic currencies. This was partially offset by the projected release of $5.0 million from unused bonding facilities to Available Cash that did not occur as discussed in paragraph 23(b) above.

25. Restricted Cash increased by $12.1 million primarily as a result of the following:

a)  $5.9 million related to the additional collateral needed on the performance bonds issued in exotic currencies as described in paragraph 24 above;

b)  $4.2 million increase in the balance of the H&WT; and

c)  the balance of the increase was due to an appreciation in the Canadian dollar relative to the U.S. dollar which had a positive impact on the Canadian dollar denominated Restricted Cash balances.

26. Post-filing, the Applicants have not advanced any loans to other non-Applicant Nortel entities.

## BACKGROUND AND CURRENT STATUS OF GSPA AND OTHER INTERCOMPANY TRANSACTIONS

27. As previously discussed in the Pre-Filing Report and the Monitor's First and Eighth Reports, Nortel conducts its business through global business units resulting in a high

9

degree of interdependence among the various legal entities in different countries around the world.

28. A significant factor relating to this interdependence is the transfer pricing methodology employed by the Nortel entities pursuant to:

    a)  the Master Research and Development Agreement entered into on December 22, 2004 and as subsequently amended (the "Master R&D Agreement"), which incorporates a transfer pricing arrangement; and

    b)  certain distribution agreements between one or more Nortel entities (the "Distribution Agreements" and together with the Master R&D Agreement, the "TPA").

29. Nortel has, for a number of years, used the TPA as a methodology for allocating profits and losses, and certain costs among the relevant entities that incur significant R&D cost and corporate sales, marketing and administrative costs on behalf of the Nortel entities globally. This group of companies is referred to as the residual profit share ("RPS") entities.

30. The RPS entities include:

    a)  in Canada: NNL;

    b)  in the U.S.: NNI; and

    c)  in EMEA: NNUK, Nortel Networks (Ireland) Limited ("NNIR") and NNSA.

31. A number of the remaining members of the Nortel group are referred to as Limited Risk Entities ("LREs") that operate under the Distribution Agreements.

10

UCC0050395

A/C

TR49809

*Transfer Pricing Arrangement*

32. The Master R&D Agreement and Distribution Agreements provide for the sharing of intellectual property rights and the related benefits thereto through the following methodology:

*Initial Mark-up on Inventory*

a) inventory is purchased centrally from third party suppliers by one of four designated transaction control centres ("TCC") and then is invoiced to the LREs with a mark-up on cost. At the end of each quarter, after the operating profit for each legal entity is calculated, routine returns are calculated for both the LREs and the RPS entities.

*LREs*

b) the LREs distribute products and provide services to customers, pursuant to Distribution Agreements, in return for a small consistent profit margin on sales. These entities have a limited amount of risk and do not participate significantly in R&D activities.

*RPS*

c) the RPS entities calculate a normal return as a profit margin on sales and "cost plus" on sales, marketing, general administration and operating costs incurred. In addition to this return, the RPS entities participate in the redistribution of profits or losses from the rest of the group, in part, to compensate them for corporate costs and research and development expenses incurred on behalf of the Nortel Group globally.

11

CONFIDENTIAL

UCC0050396

A/C

*Payments under the TPA*

33. Amounts owing pursuant to the TPA are calculated and recorded in the relevant Nortel entities' accounting records.

34. NNL's proportionate share of global revenues and customer base is significantly smaller than the proportionate share of the global corporate and R&D costs incurred in Canada. As a result, NNL has historically been a net recipient of significant funding under the TPA.

35. Since the Filing Date, the TPA calculations for the fourth quarter of 2008 and the first quarter of 2009 have been completed; however, payments have not been made by the Non-Filed Entities, EMEA Debtors or U.S. Debtors apart from a $30 million payment made by NNI to NNL in January 2009 (the "January Payment").

*Current Status of GSPA and Other Intercompany Transactions*

36. Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the Canadian Proceedings (e.g. the Initial Order) and the U.S. proceedings and/or in accordance with the Code (together the "Trading Orders"). Trade between the EMEA Debtors and the Applicants is pursuant to the Nortel Group Supplier Protocol Agreement ("GSPA"). The GSPA has been continually extended by the parties, substantially in the same form as the initial GSPA, since the Filing Date. The current GSPA expires on July 9, 2009.

37. The purpose of the Trading Orders and GSPA is to ensure that goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed by the parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amount owing for post-filing

12

A/C

purchases to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

38. The Inter-Company Charge, as described in the Initial Order, is for the purpose of securing payment of all post-filing inter-company loans and other transactions between the Applicants and the U.S. Debtors and the EMEA Debtors. The Inter-Company Charge ranks sixth behind the Administration Charge.

39. On June 17, 2009, the NNSA Administrator acceded to the sixth and seventh extensions of the GSPA.

40. The Applicants are seeking Court approval of the fifth, sixth and seventh extensions of the GSPA. The seventh extension of the GSPA expires on July 9, 2009.

*Applicants' Cash Needs*

41. The Applicants continue to incur significant R&D and corporate costs on behalf of all Nortel entities around the world. These expenses are incurred by the Applicants in order to preserve the enterprise value of Nortel's businesses and coordinate the global restructuring for the benefit of all stakeholders. With the exception of the January Payment, the Applicants have not received compensation from Nortel entities since the Filing Date to help fund these expenses.

42. The Applicants' cash flow forecast for the period June 7, 2009 to September 30, 2009 (respectively, the "June 7 Forecast" and the "Forecast Period") is attached as Appendix B to this Fifteenth Report. The June 7 Forecast indicates the Applicants will experience a negative cash flow of $23 million during the Forecast Period, including net sale proceeds of approximately $86 million from the sale of lands and buildings located in Calgary, Alberta ("Westwinds") that was previously approved by this Honourable Court and receipts on account of NNI Interim Obligations (as defined later in this Fifteenth Report) from NNI of $157 million. Excluding these items, the

13

Applicants are forecast to incur a negative cash flow for the Forecast Period of approximately $266 million.

43. It is the Monitor's continuing view that receipt by NNL of $157 million on account of NNI Interim Obligations and asset sales proceeds of $86 million from the Westwinds sale are necessary in order for the Applicants to have adequate resources to fund operations through the forecast period ended September 30, 2009. Further negotiations between NNL and the U.S. Debtors will be necessary in order to address NNL liquidity needs for periods subsequent to September 30, 2009.

44. The Applicants, U.S. Debtors, and certain of the EMEA entities, through their U.K. Administrators, have recently negotiated an agreement, (the "Interim Funding and Settlement Agreement" or "IFSA") to address the Applicants' liquidity requirements to September 30, 2009 and settle various purported economic and legal rights and obligations between them pursuant to the TPA. A summary of certain terms of the agreement is outlined in the following section entitled "Interim Funding and Settlement Agreement" and a copy of the IFSA is attached as Appendix C to this report.

45. The Applicants and U.S Debtors are seeking approval of the IFSA at a joint hearing of this Honourable Court and the U.S. Bankruptcy Court.

**INTERIM FUNDING AND SETTLEMENT AGREEMENT**

46. The IFSA represents the successful culmination of a lengthy and complicated set of negotiations between the Applicants, U.S. Debtors, EMEA Debtors, Monitor, U.K. Administrators, UCC and *Ad Hoc* Bondholders' Committee in addressing certain issues, including:

    a) forecast liquidity requirements of the Applicants;

14

b) enabling NNI, on behalf of itself and the other U.S. Debtors, to settle any claims of NNL corporate overhead and R&D costs, whether pursuant to the TPA or otherwise, incurred by NNL on behalf of the U.S. Debtors during the period from the Filing Date through and including September 30, 2009 (respectively, the "Canada/U.S. Interim Period" and the "NNI Interim Obligations");

c) enabling the EMEA Debtors to settle among themselves, and with the Canadian and U.S. Debtors, amounts payable and anticipated to become payable as TPA payments, for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period");

d) providing for the termination of intellectual property licenses and rights granted by NNL to the U.S. and EMEA Debtors pursuant to the provisions of the Master R&D Agreement for purposes of facilitating specified potential asset sales; and

e) to further facilitate potential asset sales, by agreeing that the execution of definitive documentation with a purchaser by each of the Debtors shall not be conditioned upon the Debtors reaching an agreement with respect to the allocation of the proceeds from such a sale.

47. The significant terms of the agreement include the following:

*NNI Funding and Settlement*

a) NNI shall pay to NNL $157 million (the "Total Payment") payable in five equal instalments of $31.4 million. The sum of the Total Payment and the January Payment, being $187 million, is intended to be full and final settlement of any and all NNI Interim Obligations;

b) the Total Payment is subject to the following limitations/conditions:

15

    i.  the first $131 million of the Total Payment shall be paid on an indefeasible and permanent basis;

    ii.  if it is determined that the NNI Interim Obligations are less than $187 million, then the amount by which the NNI Interim Obligations are less than $187 million, to a maximum of $26 million, shall be repaid by NNL to NNI on October 30, 2009 (the "Contingent Payment") with interest thereon as provided for in the IFSA;

    iii.  The Contingent Payment and interest, if any, arising thereon is to be secured by a charge (the "Excess Funding Charge") on the assets of the Applicants that ranks *pari passu* with the EDC Charge, or in the event the EDC Charge is extinguished the Excess Interim Funding Charge shall be a second ranking charge in the CCAA proceedings; and

    iv.  to the extent that NNL actually receives TPA payments from the Nortel entities which are not party to the IFSA in excess of the funds forecast to be received from these entities during the Canada/US Interim Period, and it is determined the amount of the NNI Interim Obligation is less than $161 million, NNL shall pay NNI a *pro rata* amount of these excess receipts, to a maximum of $30 million;

c)  The Total Payment is to be used for working capital and other purposes as reflected in the Applicants' rolling 13-week cash flow forecasts. To the extent NNL seeks to use the funds from the Total Payment for other purposes, NNL must first obtain the consent for such use from NNI, UCC, and the *Ad Hoc* Bondholders' Committee. In addition to providing these parties the 13-week cash flow forecasts on a weekly basis, NNL must provide a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment, no later than the tenth day following the last

16

day of each month commencing with the month ending June 2009 and ending with the cash flow schedule for September 2009;

d) The sum of the Total Payment and the January Payment ($187 million) constitutes a full and final settlement of the NNI Interim Obligations and represents the maximum payment the U.S. Debtors could owe with respect to the NNI Interim Obligations and the maximum administrative claim that any of the Applicants or EMEA Debtors may have or could assert against the U.S. Debtors in the Chapter 11 Proceedings or any other proceedings with respect to the NNI Interim Obligations; and

e) The Applicants agree to indemnify each U.S. Debtor from and against any and all actions resulting from a claim arising from Transfer Pricing Payments (as defined in the IFSA) in respect of the Canada/US Interim Period;

*EMEA Debtors Payments and Settlement*

f) NNUK is authorized to seek payment for its own account from other EMEA Debtors of TPA payments due or becoming due during the EMEA Interim Period, which would have otherwise been due to or administered by NNL. The EMEA Debtors appoint NNUK as their agent to administer the collection and *pro rata* distribution of the Transfer Pricing Payments received;

g) NNL shall make two payments to NNUK, in the amount of $10 million each (the "Shortfall Payments"), payable out of the proceeds from certain asset sales allocated to and received by NNL. The obligation of NNL to make the Shortfall Payments and the triggering of the Shortfall Charge (as defined below) only occur upon the execution of transaction documents in respect of a "Subject Transaction" (as defined in the IFSA);

17

CONFIDENTIAL

A/C

TR49809

h) The Shortfall Payments are to be secured by a charge (the "Shortfall Charge") on the Applicants' assets that ranks *pari passu* with the Inter-Company Charge as defined in the Initial Order;

i) The authorization provided to NNUK and the payments to be made to NNUK shall constitute a full and final settlement of any and all TPA amounts payable and that could be payable between the EMEA Debtors inter se and between an EMEA Debtor, on the one hand, and a Canadian Debtor or U.S. Debtor, on the other hand, for the EMEA Interim Period;

j) The timing of any payments which may be made to NNI under the repayment provision described in paragraph 47(b) above, and the payments to be made by NNL to NNUK as described in paragraph 47(f) above, are subject to a review of NNL's liquidity position, as reflected in NNL's then current 13-week cash flow forecast, and Monitor's determination, in its sole judgement, after consultation with either the UCC and the *Ad Hoc* Bondholders' Committee, or the Joint Administrators, respectively, that the making of such payments would not materially and adversely impact the liquidity position of NNL;

*General Settlement Provisions*

k) The U.S. Debtors and EMEA Debtors agree, that in the event of a sale of any material assets of any of the Canadian Debtors or U.S. Debtors, and in consideration of a right to an allocation of a portion of the proceeds from such a sale, they will enter into an agreement providing for the termination of the IP licenses they hold with respect to the IP used in or related to the business or assets being sold. With respect to the EMEA Debtors, the license termination provisions are limited to certain proposed asset sales previously communicated to the Joint Administrators;

18

l) Each of the Canadian Debtors, U.S. Debtors, and EMEA Debtors agree their execution of definitive documentation with a purchaser of material assets of any of the Debtors (a "Selling Debtor") shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds;

m) In the absence of an agreement regarding the allocation of any sales proceeds, the Debtors agree that the proceeds shall be deposited in an escrow account, and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers pursuant to the dispute resolution protocol referred to in paragraph 47 (n) below;

n) The Debtors shall negotiate in good faith and attempt to reach an agreement on a sample form of agreement to effectuate the termination of IP licenses as contemplated in paragraph 47 (k) above, and an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation;

o) The Interim Funding and Settlement Agreement shall not constitute an amendment, modification or waiver of rights of any party (i) under any other agreement, including, without limitation, the GSPAs and the TPA (except as expressly set forth in Sections 3 and 8 of the IFSA), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the TPA or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from transfer pricing payments pursuant to the TPA or any offset arising therefrom or otherwise; provided, however, that the Debtors waive any and all rights to object to or otherwise

19

CONFIDENTIAL

UCC0050404

seek to amend or revisit (A) any payments made pursuant to the IFSA, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights under certain provisions of the IFSA against NNL, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL under certain provisions of the IFSA, and (B) the January Payment; and

p) In addition to court approval of the IFSA in both the Canadian Court and the U.S Court, the coming into effect of the IFSA is also conditioned on the following:

    i. Canadian Court and U.S. Court approval of proposed amendments to the Cross-Border Insolvency Protocol; and

    ii. The UK Court giving a direction that the U.K. Administrators be at liberty to enter into this agreement, which direction has since been given.

48. The Applicants have indicated to the Monitor that they are engaged in ongoing discussions with respect to the proposed amendments to the Cross-Border Insolvency Protocol. The Monitor will file a report with respect to the proposed amendments upon completion of the discussions.

## CASH FLOW FORECAST FOR THE PERIOD JUNE 7, 2009 TO SEPTEMBER 30, 2009

49. Nortel, with the assistance of the Monitor, has prepared an updated 17-week cash flow forecast for the period June 7 to September 30, 2009. A copy of the June 7 Forecast is attached as Appendix B.

20

50. The cash flow forecast estimates the Applicants will have total receipts of $713 million and total disbursements of $736 million resulting in a net cash outflow of $23 million.

51. During the forecast period it is assumed NNL does not make any additional draws on the NNI Loan beyond the $75 million drawn prior to February 1, 2009.

52. At June 6, 2009, the Applicants have Available Cash balances of approximately $127 million, which excludes Restricted Cash and Unavailable Cash of approximately $63 million.

53. The Restricted Cash and Unavailable Cash balance increased by $30 million during the week ended June 20, 2009 relating to the receipt of sales proceeds from the Westwinds sale that were set aside pursuant to EDC's request (as described later in this Fifteenth Report).

54. The significant assumptions used in preparing the June 7 Forecast include the following:

    a) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and historic customer collection experience;

    b) payments from the U.S. Debtors totalling $157 million pursuant to the IFSA have been reflected in the June 7 Forecast. TPA or similar payments from non-filed entities have not been included in the forecast, however, discussions with the non-filed entities are on-going with respect to TPA payments for 2009;

    c) all disbursements are made assuming suppliers' pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

21

A/C

TR49809

d) inventory purchases includes payments to Flextronics as provided for pursuant to the amending agreement dated January 13, 2009, and the settlement agreement and the side letter dated May 22, 2009 as approved by this Honourable Court;

e) inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and the other Nortel entities. Inter-company pre-filing loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

f) severance payments are stayed during the forecast period;

g) pension funding payments are made for both current and special service payments based upon existing requirements with respect to the registered defined benefit and defined contribution plans. Funding for non-registered pension or other retirement plans is stayed;

h) funding in the ordinary course for the H&WT is included;

i) all interest payments relating to the Company's pre-filing indebtedness are stayed. Interest with respect to the post filing NNI Loan has been included;

j) Restricted Cash of $30 million relating to the sale of Westwinds is released and becomes part of Available Cash and $7 million is paid to EDC pursuant to a cash collateral arrangement addressed later in this Fifteenth Report; and

k) no material asset divestiture transactions close within the forecast period.

**ADMENDMENT TO EDC FACILTY AND EDC CHARGE**

55. As outlined in the Monitor's Eighth Report, on April 24, 2009, EDC and NNL signed the Second Amended and Restated Short Term Support Agreement which extended the availability of the EDC Facility until July 30, 2009 in an amount up to $30

22

million. EDC was granted a charge against the Applicants' assets, as provided for in the Initial Order (the "EDC Charge"), in support of this post-filing EDC Facility.

56. As at June 15, 2009, there were approximately $6 million of bonds outstanding under the $30 million post-filing EDC Facility. As well, there are approximately $100 million of pre-filing performance bonds outstanding.

57. On May 15, 2009, at a court hearing for the purpose of approving the sale of Westwinds by NNL, EDC raised concern with respect to the potential erosion of the collateral subject to its security pursuant to the EDC Charge. EDC was specifically concerned regarding the forecast use by the Applicants of the sale proceeds from the Westwinds sale.

58. Pursuant to the endorsement granted by this Honourable Court in approving the Westwinds sale, NNL was to set aside and not use $30 million of the sales proceeds until a mutually acceptable agreement was reached between the Applicants and EDC to address this issue.

59. On June 15, 2009, NNL received the Westwinds net sales proceeds of $86 million and immediately set aside in a separate bank account $30 million (CDN$33 million).

60. As a result of further discussions with EDC, the Applicants have reached an agreement, including a new cash collateral agreement (the "Amended Second Amended and Restated Short Term Support Agreement"). A copy of which is attached as Exhibit G to John Doolittle's Affidavit dated June 22, 2009.

61. The significant revisions to the EDC Facility as contained in the Amended Second Amended and Restated Short Term Support Agreement include the following:

    a) NNL to provide cash collateral to EDC in the amount of approximately $7 million (the "Cash Collateral") relating to outstanding bonds supported by

23

EDC, including any renewal or extensions thereof, issued post petition and all agreed upon fees/expenses of EDC;

b) all future support for the issuance of bonds is at the full discretion of EDC;

c) release of the EDC Charge and allow NNL to access the $30 million of proceeds from the sale of Westwinds, upon Canadian court approval and the posting of the Cash Collateral; and

d) the Cash Collateral related to a bond or any renewal or extension thereof will be released to NNL upon the extinguishment of EDC's obligation under a bond as a result of its cancelation or expiry.

62. Subject to the approval of this Honourable Court of the Amended Second Amended and Restated Short Term Support Agreement, NNL will establish, in conjunction with EDC, the Cash Collateral to support the outstanding bonds issued post-filing.

63. As contemplated by the Amended Second Amended and Restated Short Term Support Agreement, upon posting the Cash Collateral, the Applicants are seeking approval to take such steps as necessary to terminate the EDC Charge and amend the Initial Order. This will assist in facilitating the establishment of the Excess Interim Funding Charge pursuant to the IFSA.

64. Upon the termination of the EDC Charge, the NNI Loan Charge and Excess Funding Charge would be the second ranking charges after the Administration Charge as provided for in the Initial Order.

65. The Applicants have informed the Monitor that the proposed revisions to the EDC Facility, including the posting of the Cash Collateral and the termination of the EDC Charge, satisfy EDC's concerns with respect to its collateral. Furthermore, the proposed revisions continue to provide Nortel with a bonding facility, subject to EDC approval of individual bonding requests, and provide improved liquidity to the

24

Applicants by allowing them access to the $30 million currently set aside relating to the Westwinds sale.

## OTHER INSOLVENCY PROCEEDINGS UPDATE

*Secondary Proceeding for Nortel Networks S.A. in France*

66. On May 26, 2009, the Joint Administrators filed a request with the French Commercial Court in Versailles (the "French Court") for secondary proceedings (the "Secondary Proceedings"), or "liquidation with continuity of certain activities," in respect of NNSA.

67. On May 28, 2009, the French Court granted the request for Secondary Proceedings and appointed an NNSA Administrator and an NNSA Liquidator.

68. The NNSA Administrator has been authorized to carry on the business of NNSA for a renewable period of three months.

*Chapter 11 Proceedings*

69. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's Eighth Report.

    a) On April 22, 2009, the U.S. Debtors obtained an order further extending the deadline for filing their Form 26 Reports which describe the status of entities in which NNI, Nortel AltSystems Inc. and Sonoma Systems hold a substantial or controlling interest. The Form 26 Reports were filed on May 11, 2009.

    b) On May 7, 2009, the U.S. Debtors obtained orders:

        i. Further extending the period during which the U.S. Debtors may seek to remove prepetition actions from state court to United States federal court; and

25

    ii. Further extending the deadline before which the U.S. Debtors must assume or reject unexpired leases of nonresidential property to August 12, 2009.

c) On May 18, 2009, the U.S. Debtors obtained an order amending the Chapter 11 case caption to reflect the renaming of Alteon WebSystems, Inc. to Nortel Altsystems Inc. and the renaming of Alteon WebSystems International, Inc. to Nortel Altsystems International Inc.

d) On May 19, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period March 1, 2009 to March 31, 2009.

e) On May 20, 2009, the U.S. Debtors obtained orders:

    i. Further extending the period during which the U.S. Debtors may file a Chapter 11 plan and solicit acceptances thereof; and

    ii. Authorizing the U.S. Debtors to file certain portions of their Schedules of Assets and Liabilities containing customer information under seal, subject to the possible future request of the United States Trustee that such information be unsealed.

f) On May 29, 2009, the U.S. Debtors filed:

    i. The Schedules of Assets and Liabilities for NNI, Nortel Networks Capital Corp., Nortel Altsystems Inc. and Nortel Networks International Inc.;

    ii. A Form 26 Report describing the status of entities in which NNI holds a limited partnership, non-controlling interest; and

    iii. The Debtor-in-Possession Monthly Operating Report for the period April 1, 2009 through May 2, 2009.

26

CONFIDENTIAL

g) On June 11, 2009, the U.S. Debtors obtained orders:

    i. Approving the settlement agreement and the related side letter entered into between NNL, Flextronics Telecom Systems Ltd. and Flextronics Corporation on May 22, 2009 and authorizing any payments NNI may make to NNL to reimburse NNL for NNI's share of the costs relating to the agreement; and

    ii. Authorizing the U.S. Debtors to file certain portions of the settlement agreement and the related side letter under seal.

h) On June 11, 2009, the U.S. Debtors obtained an interim order authorizing NNI, subject to certain conditions, to enter into a letter of credit and bonding facility for the purpose of issuing surety and performance bonds to secure the U.S. Debtors' customer obligations.

*Chapter 15 Proceedings*

70. The following is a summary of the filings in the Chapter 15 proceedings since the last update provided in the Monitor's Eighth Report.

71. The Monitor has continued to file with the U.S. Bankruptcy Court and serve on required parties notices of each of its reports to this Honourable Court.

72. On May 5, 2009 the Monitor filed, with the U.S. Bankruptcy Court, notice of the order of this Honourable Court extending the stay until July 30, 2009. The Monitor also filed a notice of the approval and vesting order dated May 15, 2009 in relation to the sale of Westwinds. Notice of the order approving the license agreement and the non-exclusive license granted by NNL to Hitachi Communications Technologies, Ltd. was filed on June 2, 2009. The Monitor also filed a notice of the order relating to

27

pension plan commuted value payments dated May 28, 2009. Notice of the order on pension plan commuted value payments and of the order approving settlement with Flextronics was also filed on June 9, 2009 and June 15, 2009, respectively. These notices were all filed and served in the Chapter 15 proceedings and in the Chapter 11 cases for the U.S. Debtors.

73. On June 2, 2009, the Monitor also filed with the U.S. Bankruptcy Court, and served on required parties, a motion to enforce this Honourable Court's order dated June 1, 2009 authorizing NNL to sell its interest in its joint venture with LG Electronics (the "LGE Joint Venture Sale Process Order") and the retention of Goldman Sachs & Co. ("Goldman") as financial advisor to NNL in connection with that sale. A hearing in the U.S. Bankruptcy Court on the Monitor's motion to enforce the LGE Joint Venture Sale Process Order and the retention of Goldman was heard and the motion granted on June 11, 2009.

74. On June 8, 2009, the UK Administrator filed a petition with the U.S. Court seeking orders recognizing the UK administration proceedings as they relate to NNUK as foreign main proceedings.

**UPDATE ON NORTEL'S RESTRUCTURING EFFORTS**

75. On June 19, 2009, NNC issued a press release announcing that it, NNL and certain of NNL's subsidiaries, including NNI, had entered into a "stalking horse" asset sale agreement with Nokia Siemens Networks B.V. for the sale of substantially all of its CDMA business and LTE Access assets for $650 million. The terms and provisions of the agreement are more fully addressed in the Monitor's Fourteenth Report.

76. Nortel also announced that it is engaging in discussions with numerous parties for the sale of its other businesses. If necessary, Nortel will assess other restructuring alternatives for these businesses if it is unable to maximize value through a sale of these assets.

28

77. NNC also announced its intention to apply for a delisting of its common shares and the NNL preferred shares from trading on the Toronto Stock Exchange. The Monitor provided its consent to the request for the delisting of the shares.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

78. The Monitor has assisted and continues to assist the Applicants in their efforts to review their operations and assess a range of restructuring alternatives in consultation with the Applicants' legal and financial advisors.  The Monitor believes the Applicants are working diligently and in good faith towards developing a restructuring strategy to address their financial and strategic issues in the context of complex multijurisdictional insolvency proceedings.

79. It is the Monitor's view that based upon the key assumptions used in preparation of the Applicants' June 7 Cash Flow Forecast, including receipt of payments contemplated under the IFSA, that the Applicants will have sufficient cash resources available during the Forecast Period to permit the Applicants to make further progress in its efforts to pursue the sale of its other businesses or develop alternative restructuring strategies, if appropriate, and file a plan of arrangement.

80. For reasons discussed earlier in this Report, the Monitor recommends the IFSA, attached as Appendix C to this Report which is a condition to the taking effect of the IFSA, be approved by this Honourable Court and that the Initial Order be further amended for the creation of the Interim Funding Charge and Shortfall Charge to secure NNL's obligations pursuant to the IFSA.

81. The Monitor supports the Applicants' request to have the fifth, sixth and seventh extensions to the GSPA approved by this Honourable Court.

29

CONFIDENTIAL

82. The Monitor supports the Applicants' request to have the modifications to the EDC Facility and the extinguishment of the EDC Charge upon NNL posting the Cash Collateral, as contemplated by the Second Amended and Restated Short Term Support Facility Agreement, approved by this Honourable Court.

All of which is respectfully submitted this 25th day of June, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

30

CONFIDENTIAL

UCC0050415

A/C

TR49809

# APPENDIX A



**Nortel Networks**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
(USD Millions)

| Receipts & Disbursements | Forecast 12/06/07 Budget | Actuals 12/06/07 Actual | Variance 12/06/07 Budget |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 78.5 | 120.2 | 41.7 |
| Other Receipts | 10.8 | 6.0 | (4.8) |
| Intercompany Receipts | 57.7 | 27.6 | (30.1) |
| Intercompany Receipts - Interim Funding Arrangement | 79.0 | - | (79.0) |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 226.1 | 153.8 | (72.2) |
| **Disbursements** | | | |
| Payroll (Gross) | 74.3 | 83.8 | (9.6) |
| Benefits | 16.5 | 17.0 | (0.5) |
| Pension | 3.5 | 3.8 | (0.2) |
| Inventory Purchases | 47.7 | 34.8 | 12.9 |
| Non-Inventory Purchases | 63.0 | 67.4 | (4.4) |
| Intercompany Disbursements | 42.2 | 17.4 | 24.7 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 9.0 | 6.2 | 2.8 |
| NNL/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | 256.1 | 230.4 | 25.8 |
| **Net Cash Flow** | (30.1) | (76.6) | (46.5) |
| FX Impact | - | 6.4 | 6.4 |
| **Opening Available Cash Balance** | 197.5 | 197.5 | (0.0) |
| **Closing Available Cash Balance** | 167.5 | 127.3 | (40.1) |
| Unavailable Cash | 5.9 | 5.0 | (0.9) |
| **Total Cash** | 173.4 | 132.3 | (41.0) |
| Restricted Cash | 46.0 | 58.1 | 12.1 |
| **Total Cash + Restricted Cash** | 219.4 | 190.5 | (28.9) |

CONFIDENTIAL

A/C

TR49809

APPENDIX B

**Nortel Networks - Jun 7, 2009**
**GCAA Applicants**
**Forecast Cash Flow**
**Summary**
**$ Receipts & Disbursements**

| | Total |
|---|---|
| **Receipts** | |
| Net Collection/Sale of Accounts Receivable | 175.0 |
| Other Receipts | 86.2 |
| Intercompany Receipts | 316.5 |
| Intercompany Receipts - Interim Funding Arrangement | |
| NNL/NNI Restructuring Loan Advances | 197.0 |
| Total Receipts | 712.8 |
| **Disbursements** | |
| Payroll (Gross) | 198.0 |
| Benefits | 35.1 |
| Pension | 8.0 |
| Inventory Purchases | 128.2 |
| Non-Inventory Purchases | 125.3 |
| Intercompany Disbursements | 254.7 |
| Intercompany Disbursements - Interim Funding Arrangement | |
| Restructuring Costs | 19.0 |
| NNL/NNI Restructuring Loan Repayments | |
| Total Disbursements | 789.2 |
| Net Cash Flow | (33.4) |
| FX Impact | 0.0 |
| Opening Available Cash Balance | 127.3 |
| Closing Available Cash Balance | 103.8 |
| Unrestricted Cash | 6.0 |
| Total Cash | 109.9 |
| Restricted Cash | 65.1 |
| Total Cash + Restricted Cash | 174.0 |

CONFIDENTIAL

UCC0050417

APPENDIX C

**EXECUTION VERSION**

### INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

CONFIDENTIAL