iii.  the sale of the global Optical Networking and Carrier Ethernet ("MEN") businesses;

     iv.  the sale of substantially all of the global assets of the GSM/GSM-R ("GSM/GSM-R") business;

     v.  the sale of Carrier VoIP and Application Solutions ("CVAS") business;

     vi.  the sale of the interest in LG Nortel; and

     vii.  the sale of the Passport business.

The US Debtors and the Canadian Debtors will from time to time reserve reasonable amounts to cover such adjustments from proceeds of Sales Transactions or IP Transactions, allocated pursuant to the Interim Sales Protocol (as defined in the IFSA) or as agreed by the Selling Debtors in accordance with the IFSA, where the amount of such reserves will be mutually agreed by the Canadian Debtors, the US Debtors, the Monitor, the Creditors' Committee and the Bondholders' Committee. NNI's initial share of the Certain Fixed Payments is included in the amount of the Settlement Payment as disclosed in Annex C hereto.

8.     M&A Costs. The Parties hereby agree, and shall use reasonable best efforts (without a requirement to compromise any rights or to incur any liability or obligation in favor of the other Selling Debtors other than as contemplated in the foregoing) to cause the other relevant Selling Debtors to agree, to the extent permitted by applicable law, that the M&A Costs (as defined herein) incurred by the Canadian Debtors or the US Debtors shall be treated as transaction costs and will be recovered (and, to the extent funds are available, initially funded from the relevant Escrow Account (as such term is defined in the IFSA) holding sales proceeds received by the relevant Sales Transaction(s)) by such Debtors, on a transaction-by-transaction basis, from the respective proceeds of sale from the Sale Transactions prior to any allocation of sale proceeds among the relevant Selling Debtors participating in each such transaction. For the purposes of this Agreement, "M&A Costs" mean the following costs and expenses incurred by the Canadian Debtors or the US Debtors in connection with the Sales Transactions and sales of other assets of the Nortel Group: (a) fees and expenses of Lazard Ltd; (b) costs and expenses (including professional fees) to prepare carve-out financial statements of the various businesses of the Nortel Group; and (c) salaries of the employees of the Nortel Group's corporate merger and acquisitions team ("M&A Group") and the cost of other benefits provided to the M&A Group, and any expenses incurred by the M&A Group.

## PART C – ADVANCE PRICING AGREEMENTS

9.     Advance Pricing Agreements.

     a.  NNL and the Monitor hereby agree that NNL shall, in a timely manner, enter into the Advanced Pricing Agreement, the final execution version of which shall be in form and substance acceptable to NNI, the Creditors' Committee and the

HIGHLY CONFIDENTIAL                    NNC-NNL20001869 / 6

A

Bondholders' Committee (the "Canadian APA"), with the Minister of National Revenue, through its authorized representative the Director, Competent Authority Services Division International and Large Business Directorate of the Canada Revenue Agency (the "CRA"), which shall apply to the five taxable years beginning on January 1, 2001 and ending on December 31, 2005 (the "APA Years").

b.  NNI hereby agrees that NNI shall, in a timely manner, enter into the Advance Pricing Agreement, the final execution version of which shall be in form and substance acceptable to NNL, the Monitor, the Creditors' Committee and the Bondholders' Committee (the "US APA" and, together with the Canadian APA, the "APAs"), with the United States Internal Revenue Service (the "IRS"), which shall apply to the APA Years.

c.  Each of NNL, the Monitor and NNI shall cooperate with each other in finalizing the terms and conditions of the APAs with the CRA and the IRS, as applicable.

## PART D – NNI CLAIM

10.  The Parties hereby agree that a pre-filing claim against NNL (the relative priority of which is described below) in the aggregate amount of US $2.0627 billion shall be established in the Canadian Proceedings in favor of NNI (the "NNI Claim") for the full and final settlement of the following claims:

a.  any claims of the US Debtors against the Canadian Debtors for overpayments to the Canadian Debtors under the Transfer Pricing Agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005, whether or not resulting from any adjustment of taxable income of the US Debtors as determined by the IRS (such claim, a "NNI TPA Claim");

b.  other than as set forth in the last paragraph of this Section 10, any claims of NNI against NNL for amounts due and owing under that certain Revolving Loan Agreement, dated as of March 21, 2008 (the "Revolving Loan Agreement"), by and between NNI and NNL (such claim, a "Revolver Claim"); and

c.  any claims of the Canadian Debtors (A) for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations pursuant to Transfer Pricing Agreements or otherwise incurred by any Canadian Debtor for the benefit of the US Debtors which any Canadian Debtor has asserted or could assert (without admission by the US Debtors and subject to Section 23 of this Agreement) and would have been reimbursed to the Canadian Debtors through payments (including without limitation Transfer Pricing Payments) payable by the US Debtors to the Canadian Debtors during, or with respect to, the period prior to the Filing Date or (B) relating to inter-company trading of goods and services during, or with respect to, the period prior to the Filing Date (any such claim under (A) or (B) above, a "Stayed TPA Claim").

7

A                                                                    TR46910

The priority of the NNI Claim shall be as follows: (A) US $2 billion of the NNI Claim shall be a pre-filing unsecured claim against NNL ranking *pari passu* with other unsecured pre-filing claims against NNL (*provided, however,* that such claim, unlike other unsecured pre-filing claims against NNL, shall not be subject to any setoff or counterclaims) and (B) the remaining US $62.7 million of the NNI Claim shall constitute the remainder of the secured Revolver Claim (the "Remaining Revolver Claim") and shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement.

11.     Court Approval; No Setoff. The Canadian Debtors and the Monitor hereby agree to acknowledge, defend, if necessary, and obtain a Final Order (as defined herein) of the Canadian Court approving and allowing the NNI Claim. Regardless of whether the US Debtors have filed an Additional NNI Claim (as defined herein), the Canadian Debtors and the Monitor hereby irrevocably waive any and all rights that may exist at law, in equity or otherwise to setoff against, assert any counterclaims with respect to the amount or validity of, or otherwise reduce the amount of, the NNI Claim in any way.

12.     Waiver of Pre-petition Claims. Subject to Section 13 below, the Canadian Debtors and the Monitor hereby waive any and all rights that may exist at law, in equity or otherwise to assert any Claims (as defined herein) against the US Debtors relating to the period prior to the Filing Date. For the purpose of this Agreement, the term "Claim" shall have the same meaning as ascribed to it under Section 101(5) of the Bankruptcy Code.

13.     Additional NNI Claims. Notwithstanding any other provision of this Agreement, the Parties hereby agree that NNI and other US Debtors shall retain the right to assert Claims against the Canadian Debtors relating to the period prior to the Filing Date, *provided, however,* that the US Debtors shall have no right to assert any NNI TPA Claim or Revolver Claim (other than the Remaining Revolver Claim) against the Canadian Debtors (such pre-petition Claim but excluding NNI Claim (including Remaining Revolver Claim), NNI TPA Claim or Revolver Claim, an "Additional NNI Claim"). Upon the filing of an Additional NNI Claim in the Canadian Proceedings or subsequent proceedings, the waivers of the Canadian Debtors under Section 12 above shall automatically terminate and shall be of no further force and effect and the Canadian Debtors shall have the right to defend against such Additional NNI Claim, assert counterclaims against the US Debtors in the Canadian Proceedings or subsequent proceedings with regards to such Additional NNI Claim, and assert any additional Claims against the US Debtors in the US Proceedings or subsequent proceedings. For the avoidance of doubt, the filing of one or more Additional NNI Claims by the US Debtors shall in no way affect the obligations and waivers of the Canadian Debtors and the Monitor under Section 11 of this Agreement and such obligations and waivers shall continue to be in full force and effect.

14.     Inter-company Bar Date. The Parties hereby agree that (i) no Canadian Debtor shall establish a deadline for the filing of claims by the US Debtors in the Canadian Proceedings and (ii) no US Debtor shall establish a deadline for the filing of claims

8

by the Canadian Debtors in the US Proceedings, without the prior written consent of all other Parties to this Agreement, the Creditors' Committee and the Bondholders' Committee, which consent shall not be unreasonably withheld or delayed.

## PART E – OTHER SETTLEMENT MATTERS

15.    Cross Border Claims Protocol. The Canadian Debtors and the US Debtors agree to work with the Monitor, the Creditors' Committee and the Bondholders' Committee to develop and timely seek approval from each of the Courts of a cross-border claims protocol (the "Cross-Border Claims Protocol") and claims resolution procedures for the resolution of claims filed in the Canadian Proceedings and the US Proceedings (collectively, the "Claims Procedures"), each in form and substance acceptable to the Monitor, the Creditors' Committee and the Bondholders' Committee, acting reasonably. Until such time as both of the Courts have entered orders approving the Cross-Border Claims Protocol and the applicable Claims Procedures, (i) the Monitor and the Canadian Debtors agree that, except as otherwise provided herein, the Monitor and the Canadian Debtors will not seek Canadian Court approval to accept, reject or otherwise compromise (A) any Overlapping Claim, or (B) any claim that may materially impact the US Debtors' estates or recoveries to the US Debtors' creditors without seven (7) days' prior written notice to the US Debtors and the Creditors' Committee, and (ii) the US Debtors agree that, except as otherwise provided herein, the US Debtors will not seek US Court approval to accept, reject or otherwise compromise any Overlapping Claim, where "Overlapping Claim" refers to a Claim or Claims that have been filed in both the Canadian Proceedings and the US Proceedings by the same party or by the same affiliated parties, which Claims arise from the same underlying Claim, property, debt or transaction.

## PART F – PROVISIONS OF GENERAL APPLICATION

16.    Scope of this Agreement. The Parties hereto agree that:

    a.  except as expressly provided herein, this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any IP Transaction; and

    b.  except as expressly provided herein, this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Settlement Period, or allocation of any sale proceeds, or any ownership of intellectual property; and

    c.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

9

HIGHLY CONFIDENTIAL

d.  except as expressly provided herein, this Agreement is without prejudice to any provision of the Master R&D Agreement; and

e.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments pursuant to the Trading Orders, and Covered Obligations shall not include any Party's claims relating to Inter-Company Trading Payments pursuant to the Trading Orders.

17. Effectiveness.

a.  No provision of this Agreement or the obligations herein of the Parties (other than as set forth in Section 17.d. of this Agreement) shall be effective until the satisfaction of all of the following conditions (each, a "Condition" and, collectively, the "Conditions"):

    i.  the Canadian Court has entered orders, the form and substance of which are acceptable to NNI, the Creditors' Committee and Bondholders' Committee:

        (A) approving the entirety of this Agreement and all provisions hereof;

        (B) authorizing NNL to enter into the Canadian APA and to take all actions necessary to comply with its obligations thereunder, including the establishment of the Account Payable (as defined herein);

        (C) allowing the NNI Claim with the priorities as set forth in Section 10 of this Agreement and declaring that the Canadian Debtors, and the Monitor, have waived their rights at law, in equity or otherwise to setoff against or in any way reduce the NNI Claim, and that the NNI Claim and such waiver shall bind any trustee, receiver or similar individual appointed in any subsequent proceedings of the Canadian Debtors;

        (D) confirming that the Account Payable and the NNI Claim shall not have the benefit of any of the Charges (as such term is defined in the Initial Order, dated January 14, 2009, of the Canadian Court issued in the Canadian Proceedings, as the same may be amended and restated from time to time (the "Initial Order")) except to the extent set forth in the last paragraph of Section 10 and Section 22.ii. of this Agreement; and

        (E) approving an one-year extension of the Amended and Restated Revolving Loan Agreement dated March 27, 2009 among Nortel Networks Ltd., Nortel Networks Inc. and Nortel Networks Technology Corporation (the "NNI Loan") through December 31, 2010 (the "NNI Loan Extension").

10

A                                                                                                    TR46910

ii. the US Court has entered orders, the form and substance of which are acceptable to the Creditors' Committee, Bondholders' Committee, the Monitor and NNL:

(A) approving the entirety of this Agreement and all provisions hereof;

(B) authorizing NNI to enter into the US APA and to take all actions necessary to comply with its obligations thereunder;

(C) approving a stipulation resolving and allowing the claims of the IRS against the US Debtors in the US Proceedings, in an amount acceptable to the Creditors' Committee and the Bondholders' Committee; and

(D) approving the NNI Loan Extension.

iii. the orders of the Canadian Court and US Court in respect of Section 17.a.i. and Section 17.a.ii. shall have each become a Final Order, where "Final Order" means the order has been approved and entered by the Canadian Court and/or US Court, as applicable, and is no longer subject to appeal, writ of certiorari, reargument, rehearing, motion to vary or set aside or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing, or a motion to vary or set aside has been sought with regard to such order, then the order has been affirmed by the highest court to which the order was appealed and the time to take any further appeal, to petition for writ of certiorari or to move for reargument, rehearing, or to vary or set aside has expired.

iv. NNL shall have entered into the Canadian APA with the CRA;

v. NNI shall have entered into the US APA with the IRS; and

vi. the Account Payable shall have been established by NNL.

b. Upon satisfaction of the Conditions, all provisions of this Agreement shall be effective as of the date of the satisfaction of the last Condition.

c. Each Party hereto shall:

i. use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement (without prejudice to the generality of the foregoing, in the case of the Monitor, the Monitor agrees to prepare and file with the Canadian Court in advance of a hearing on this Agreement a report describing and supporting the Agreement);

ii. keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the

11

HIGHLY CONFIDENTIAL                    NNC-NNL20001869 / 11

A

Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

iii.   use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

d.   Notwithstanding any of the foregoing, the following provisions of this Agreement shall be effective as of the date hereof: Sections 9.c., 17.c., 17.d., 17.e., 18, 19, 20, 22(iii)(A), 23, 24, 25 and 30.

e.   No Condition may be waived by the Parties without the express written consent of the Creditors' Committee and the Bondholders' Committee.

18.   Amendments: Waiver.  This Agreement may be amended and a term hereunder may be waived, on no less than ten (10) Business Days' notice, only by means of a writing signed by all Parties, and approved in writing by the Creditors' Committee and the Bondholders' Committee, which amendments or waivers, if material in the judgment of the Parties, the Creditors' Committee and the Bondholders' Committee must be approved by both Courts.  For the purpose of this Section 18, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada or the United States.

19.   Governing Law and Jurisdiction.

a.   This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

b.   To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the cross-border protocol previously approved by the US Court and the Canadian Court (as the same may be in effect from time to time, the "Cross-Border Protocol")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, or a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv)

12

agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

20.    Creditors' Committee and Bondholders' Committee Support.

    a.    Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee have granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the US Debtors and the Canadian Debtors for Court approval of this Agreement.

    b.    Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the US Debtors and the Canadian Debtors for Court approval of this Agreement.

21.    Representations and Warranties. Subject to satisfaction of the Conditions, each Party hereby severally represents and warrants to each other that, as of the date hereof:

        i.    it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii.    the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii.    this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

22.    Covenants. The Parties hereby agree that:

        i.    The Canadian Debtors and the Monitor will use reasonable best efforts to obtain as promptly as practicable an order in the Canadian Proceedings that provides for the reduction in the amount of the Directors & Officers Charge (as such term is defined in the Initial Order), and the amount of such reduction shall be mutually agreed by NNL, the Monitor and the board of directors of NNL; *provided, however,* that nothing in this Agreement shall obligate the board of directors of NNL to agree to any such reduction;

        ii.    Upon satisfaction in full of each of the Conditions, (A) NNL and the Monitor shall jointly deliver to NNI a written acknowledgement of the establishment of an irrevocable non-interest bearing intercompany

13

**HIGHLY CONFIDENTIAL**

A                                                                                              TR46910

account payable due unconditionally and owing to NNI in the aggregate amount of US $2.0627 billion (the "Account Payable"), and (B) promptly, and in any event no later than ten (10) days, following the satisfaction in full of each of the Conditions, NNL shall execute and deliver to NNI (I) a non-interest bearing, pre-filing, unsecured promissory note in favor of NNI in an aggregate principal amount of US $2 billion evidencing the $2 billion unsecured portion of the Account Payable, and (II) a non-interest bearing, pre-filing promissory note in favor of NNI in an aggregate principal amount of US $62.7 million evidencing the remaining portion of the Account Payable, which shall continue to have the benefit of the court-ordered charge relating to the Revolving Loan Agreement as set forth in the last paragraph of Section 10 of this Agreement, in each case in form and substance satisfactory to NNI, the Creditors' Committee, the Bondholders' Committee and the Monitor, and which notes shall not be transferable except (x) to a liquidation trust established in connection with the US Proceedings of one or more US Debtors, (y) transferred in connection with a plan of re-organization or (z) transferred otherwise with the consent of NNL, the Monitor, the Creditors' Committee and the Bondholders' Committee to a third party; and

iii. NNL and NNI agree to amend the NNI Loan to (A) extend the term of the NNI Loan from December 31, 2009 to March 31, 2010 (which amendment shall be effective as of the date hereof) and (B) further extend the term of the NNI Loan to December 31, 2010, *provided, however,* that the extension to December 31, 2010 shall be effective only upon receipt of approval of such extension by the Courts.

23. Reservation of Rights. Except as expressly provided for in this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements (except as expressly set forth in this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise (including, without limitation, any rights NNL may have against any other Nortel Group entity that is not a Party hereto to recover payments made under or in connection with the Transfer Pricing Agreements or for any offset arising therefrom or otherwise by reason of the compensating adjustments required by the terms of the APAs) or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, (B) the APAs, (C) the allowance in full of the NNI Claim (including the Remaining Revolver Claim) in the Canadian Proceedings or (D) the waiver by the Canadian Debtors and the Monitor of their rights to setoff or in any way reduce the amount of the NNI Claim (including the Remaining Revolver Claim). The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer

14

Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements. Nothing in this Agreement shall bar, prohibit or in any way hinder the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any Sale Transaction or IP Transaction, and such presentation shall not, or otherwise be deemed to, constitute in any way a filing of an Additional NNI Claim or violation of the Canadian Debtors' obligations under Section 12 of this Agreement.

24.  Third-Party Beneficiaries. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement, nor shall any provision estop or otherwise limit the rights of the Parties to assert any claims, counterclaims or defenses against any third party; *provided, however,* that the Creditors' Committee (as a statutory fiduciary body appointed in the US Proceedings) and the Bondholders' Committee shall each be a third-party beneficiary of this Agreement entitled to enforce and take advantage of the benefits of this Agreement to their fullest extent as if it were a signatory hereto.

25.  Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

26.  Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree, with the consent of the Parties, the Creditors' Committee and the Bondholders' Committee, on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision. Notwithstanding any other provision set forth in this Section 26, in the event that all or any part of Section 17 of this Agreement shall be found pursuant to a Final Order of a court with competent jurisdiction to be illegal, invalid or unenforceable, or any part of Section 17 is in any way struck or modified without the consent of the Parties, the Creditors' Committee and the Bondholders' Committee, this Agreement in its entirety shall automatically terminate and shall cease to have any force and effect.

15

HIGHLY CONFIDENTIAL

A

27.   Several Obligations.  Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

28.   Master R&D Agreement Standstill. Neither the Canadian Debtors nor the US Debtors will exercise a right of termination under the Master R&D Agreement without the prior written consent of the other Parties to the Agreement, the Creditors' Committee and the Bondholders' Committee.

29.   IFSA and Part A of this Agreement.  The Parties agree that the sum of the Total Payment (as defined in the IFSA), the January Payment (as defined in the IFSA) and the Settlement Payment constitutes a full and final settlement of NNI Interim Obligations (as defined in the IFSA) and the Covered Obligations for the period after the Filing Date through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates.

30.   Notices. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 30.

**If to the US Debtors:**
c/o Nortel Networks Inc.
Attention: John Ray
    Principal Officer
Address: 2221 Lakeside Boulevard
    Richardson, Texas 75082
    U.S.A.
Facsimile No.: + 1 866 315 3498
Telephone No.: +1 972 684 2470

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley, Esq.
Address: One Liberty Plaza
    New York, New York 10006
    U.S.A.
Facsimile No.: +1 212 225 3999
Telephone No.: +1 212 225 2264

**If to the Canadian Debtors:**
c/o Nortel Networks Limited
Attention: Anna Ventresca, Esq.
    Chief Legal Officer
    Address: 5945 Airport Road
    Suite 360
    Mississauga, Ontario L4V 1R9
    Canada
Facsimile No.: +1 905 863 2075
Telephone No.: +1 905 863 1204

**With a copy to:**
Ogilvy Renault LLP
Attention: Derrick Tay, Esq. and Michael J. Lang, Esq.
Address: Suite 3800
    Royal Bank Plaza, South Tower
    200 Bay Street, P.O. Box 84
    Toronto, Ontario M5J 2Z4
    Canada
Facsimile No.: +1 416 216 4832 / 216 3930
Telephone No.: +1 416 216 4832 / 216 3939

**If to the Monitor:**
c/o Ernst & Young, Inc.
Attention: Murray A. McDonald
Address: Ernst & Young Tower
    222 Bay Street, P.O. Box 251
    Toronto, ON M5K 1J7
    Canada

**With a copy to:**
Goodmans LLP
Attention: Jay Carfagnini, Esq.
Address: 250 Yonge Street, Suite 2400
    Toronto, Ontario M5B 2M6
    Canada
Facsimile No.: +1 416 979 1234

16

**HIGHLY CONFIDENTIAL**

A

Facsimile No.: +1 416 943 3300
Telephone No.: +1 416 943 3016

Telephone No.: +1 416 597 4107

**If to the Creditors' Committee:**
c/o Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara, Esq.
Address: One Bryant Park
           New York, New York 10036
           U.S.A.
Facsimile No.: +1 212 872 1002
Telephone No.: +1 212 872 8040

**If to the Bondholders' Committee:**
c/o Milbank, Tweed, Hadley & McCloy LLP
Attention: Albert A. Pisa, Esq.
Address: One Chase Manhattan Plaza
           New York, New York 10005-1413
           U.S.A.
Facsimile No.: +1 212 822 5319
Telephone No.: +1 212 530 5319

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

17

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this $\underline{23^{rd}}$ day of December, 2009.

ERNST & YOUNG INC.
SOLELY IN ITS CAPACITY AS
MONITOR

By _____
    Name: Murray McDonald
    Title: President

NORTEL NETWORKS CORPORATION

By _____
    Name:
    Title:

By _____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By _____
    Name:
    Title:

By _____
    Name:
    Title:

Signature page to Final Canadian Funding and Settlement Agreement

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 23 day of December, 2009.

ERNST & YOUNG INC.
SOLELY IN ITS CAPACITY AS
MONITOR

By _____
    Name:
    Title:

NORTEL NETWORKS CORPORATION

By _____
    Name:   Clarke Glaspell
    Title:  Controller

By _____
    Name:   Grace McDonald
    Title:  Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
    Name:   Clarke Glaspell
    Title:  Controller

By _____
    Name:   Grace McDonald
    Title:  Assistant Secretary

Signature page to Final Canadian Funding and Settlement Agreement

HIGHLY CONFIDENTIAL

A

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
   Name: John Doolittle
   Title: President

By _____
   Name: Anna Ventresca
   Title: Secretary

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
   Name: John Doolittle
   Title: President

By _____
   Name: Anna Ventresca
   Title: Secretary

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
   Name: Anna Ventresca
   Title: Secretary

By _____
   Name:
   Title:

Signature page to Final Canadian Funding and Settlement Agreement

HIGHLY CONFIDENTIAL

A

NORTEL NETWORKS INC.

By _____
  Name: Anna Ventresca
  Title: Chief Legal Officer


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
  Name: John Doolittle
  Title: President


CORETEK, INC.

By _____
  Name: John Doolittle
  Title: President


NORTEL ALTSYSTEMS, INC.

By _____
  Name: John Doolittle
  Title: President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
  Name: John Doolittle
  Title: President


Signature page to Final Canadian Funding and Settlement Agreement

HIGHLY CONFIDENTIAL

A                                                                          TR46910

NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
  Name:  John Doolittle
  Title:  President

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
  Name:  John Doolittle
  Title:  Vice-President

NORTEL NETWORKS CAPITAL
CORPORATION,

By _____
  Name:  John Doolittle
  Title:  President

NORTEL NETWORKS HPOCS INC.

By _____
  Name:  John Doolittle
  Title:  President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
  Name:  John Doolittle
  Title:  President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
  Name:  John Doolittle
  Title:  President

Signature page to Final Canadian Funding and Settlement Agreement

HIGHLY CONFIDENTIAL

A

TR46910

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: President

QTERA CORPORATION

By _____
    Name: John Doolittle
    Title: President

SONOMA SYSTEMS

By _____
    Name: John Doolittle
    Title: President and Treasurer

XROS, INC.

By _____
    Name: John Doolittle
    Title: President

Signature page to Final Canadian Funding and Settlement Agreement

HIGHLY CONFIDENTIAL

A

**Schedule 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

S-1

**HIGHLY CONFIDENTIAL**

A

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

HIGHLY CONFIDENTIAL

NNC-NNL20001869 / 25

A                                                                                              TR46910

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.    Undated Addendum to Master R&D Agreement executed between October 2005 and June
      2006.

2.    Agreement with Respect to Certain NN Technology effective as of December 30, 2006
      (being the day before the closing date of the Share and Asset Sale Agreement between
      NNL and Alcatel-Lucent).

3.    Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of
      January 1, 2006.

4.    Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.    Fourth Addendum to Master R&D Agreement with an effective date of December 31,
      2008.

6.    Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK,
      NNSA and NNIR and the UK Administrator.

7.    Release in Connection with Master R&D Agreement dated 1 January 2009.

8.    Memorandum of Understanding in Connection with Master R&D Agreement, undated with
      an effective date of 1 January 2006.

A-1

**HIGHLY CONFIDENTIAL**                                        NNC-NNL20001869 / 26

A

## Annex B

### Distribution Agreements

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

B-1

HIGHLY CONFIDENTIAL

**Annex C***
**Settlement Payment Schedule**
(All amounts in millions of US dollars)

| Payment Schedule | 2010 | | | | | TOTAL | Adjustments in Aggregate Amount |
|---|---|---|---|---|---|---|---|
| Settlement Payment | X[1] | Feb 1[2] | Mar 1[2] | Mar 31[2] | Dec 31[2] | | |
| (i) Leadership Category ("LC") Cash Burn[3] | $83.7 | $11.2 | $11.2 | $11.2 | - | $117.3 | Subject to adjustment in aggregate amount to reflect changes in scheduled closing dates of the Sale Transactions |
| (ii) Allocated Corporate Costs[4] | $9.0 | - | - | $4.4 | $6.3 | $19.7 | Subject to adjustment in aggregate amount for actual insurance and changes in public company compliance costs |
| (iii) Certain Fixed Payments | $63.4 | - | - | ($2.3) | ($7.3) | $53.8 | Subject to no adjustment in aggregate amount |
| Total | $156.1 | $11.2 | $11.2 | $13.3 | ($1.0) | $190.8 | |

1  Date shall be three (3) Business Days following satisfaction of all of the Conditions and the effectiveness of this Agreement.

2  Date shall be the later of (a) the specified date and (b) the date that is three (3) Business Days following satisfaction of all of the Conditions and the effectiveness of this Agreement.

3.  "LC Cash Burn" represents the amount required for NNI to reimburse NNL for approximately 70% of NNL's total forecasted cash burn from the operation of the CDMA/LTE Access, ES, MEN, CVAS and GSM/GSM-R businesses for the period from October 1, 2009 to the actual or scheduled closing date, as the case may be, of the sale of each business. The LC Cash Burn will be adjusted to reflect any changes in the scheduled closing dates of such sales. The LC Cash Burn amounts contained in the above payment schedule have been calculated based on the following closing date or closing date assumptions, as applicable:

| | | |
|---|---|---|
| CDMA/LTE Access | - | November 13, 2009 (actual) |
| ES | - | December 18, 2009 |
| MEN | - | March 31, 2010 |
| CVAS | - | March 31, 2010 |
| GSM/GSM-R | - | March 31, 2010 |

4  As defined in Section 6 of the Agreement.

*  The amounts set forth in this annex exclude M&A Costs (as defined in Section 8) and costs incurred or relating to or in connection with IP Transactions (as defined in Section 4).

C-1

HIGHLY CONFIDENTIAL

TR46910

A

TR46910

## Annex D

## Funding Model Summary

D-1

HIGHLY CONFIDENTIAL

NNC-NNL20001869 / 29

A

**FINAL CANADIAN FUNDING AND SETTLEMENT AGREEMENT**
**FUNDING MODEL SUMMARY**
**USD Millions**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CDMA | 13-Nov-09 | Actual | $ 28.5 | $ - | $ - | $ - | $ - | $ 28.5 |
| ES | 18-Dec-09 | Forecast | 20.8 | - | - | - | - | 20.8 |
| MEN | 31-Mar-10 | Forecast | 47.3 | 30.2 | - | - | - | 77.5 |
| CVAS | 31-Mar-10 | Forecast | 14.1 | 12.1 | - | - | - | 26.2 |
| GSM | 31-Mar-10 | Forecast | 8.7 | 5.7 | - | - | - | 14.4 |
| Total LC Cash Burn | | | 119.5 | 47.9 | - | - | - | 167.4 |
| Reimbursement from NNI | 70% | | $ 83.7 | $ 33.6 | $ - | $ - | $ - | $ 117.3 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Headcount | | | $ - | $ 3.2 | $ 2.3 | $ 2.3 | $ 2.3 | $ 10.1 |
| Audit | | | - | 8.8 | 2.5 | 2.0 | - | 13.3 |
| BOD | | | - | 0.2 | 0.2 | 0.2 | 0.2 | 0.9 |
| Tax Outside Services | | | - | 0.3 | 0.2 | 0.2 | 0.2 | 1.0 |
| Insurance (other than property) | | | 28.0 | 1.1 | 3.7 | 0.3 | 3.0 | 36.1 |
| | | | 28.0 | 13.7 | 8.9 | 5.0 | 5.7 | 61.3 |
| Allocation to North American Estates | 64% | | 18.0 | 8.8 | 5.7 | 3.2 | 3.7 | 39.4 |
| Initial Allocation to NNI | 50% | | $ 9.0 | $ 4.4 | $ 2.9 | $ 1.6 | $ 1.8 | $ 19.7 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Canada Corporate Costs, Excluding Allocated Costs | | | $ 35 | $ 27 | $ 18 | $ 12 | $ 11 | $ 104 |
| U.S. Corporate Costs | | | 33.2 | 31.8 | 25.6 | 18.3 | 11.8 | 120.8 |
| Total Canada + U.S. Corporate Costs | | | 68.3 | 59.1 | 43.2 | 30.8 | 22.9 | 224.4 |
| Initial Allocation to NNI | 50% | | 34.2 | 29.5 | 21.6 | 15.4 | 11.5 | 112.2 |
| Additional Fixed Payment | | | 62.5 | - | - | - | - | 62.5 |
| Initial payment from / (to) NNI | | | $ 63.4 | $ (2.3) | $ (4.0) | $ (3.0) | $ (0.3) | $ 53.8 |

\* The amounts set forth in this annex exclude M&A Costs (as defined in Section 8) and
costs incurred or relating to or in connection with IP Transactions (as defined in Section 4).

D - 1

HIGHLY CONFIDENTIAL

NNC-NNL20001869 / 30

TR46910



EXECUTION VERSION

## Q1 2010 TRANSFER PRICING SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into as of September 8, 2011 by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto (the "Canadian Debtors"), Nortel Networks, Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto (the "US Companies", and as to those US Companies that are debtors in the United States Bankruptcy Court for the District of Delaware, the "U.S. Debtors"), the Joint Administrators (as defined below), the entities set forth in Schedule 3 attached hereto (together with Nortel Networks S.A. ("NNSA"), the "EMEA Debtors"[1]) and Nortel Networks AG ("NNAG", together with the EMEA Debtors, the "EMEA Group" and the EMEA Group, together with the Canadian Debtors, the US Companies and the non-debtor affiliates of each, the "Nortel Group"). The Canadian Debtors, the US Companies and the EMEA Group are sometimes referred to herein individually as a "Party" and collectively as the "Parties". The Joint Administrators, in their personal capacities, shall be party to this Agreement as provided in Section 11 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), the Canadian Debtors commenced creditor protection proceedings by obtaining an order (as amended and as the same may be further amended, the "Initial Order") from the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, the US Debtors (other than Nortel Networks (CALA) Inc. ("NN CALA")) filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the *United States Code* (the "Bankruptcy Code") and on July 14, 2009 NN CALA filed a petition under chapter 11 of the Bankruptcy Code in the US Court (together with the proceedings of the other US Debtors, the "US Proceedings"); and

WHEREAS, on the Filing Date, the EMEA Debtors commenced administration proceedings (the "UK Proceedings") before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of Nortel Networks (Ireland) Limited only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, while the UK Proceedings in respect of NNSA are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA

---

[1]     NNSA shall not be considered an EMEA Debtor under this Agreement until such time as NNSA accedes to this Agreement.

Liquidator") and an administrator were appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, quarterly "true up" payments ("Transfer Pricing Payments") were made by certain members of the Nortel Group to other Nortel Group entities pursuant to a transfer pricing methodology embodied in the (i) Master Research and Development Agreement dated as of December 22, 2004, with an effective date of January 1, 2001 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and, in particular, the "Second Amendment to Schedule A" thereof and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements" and, together with the "Master R&D Agreement", the "Transfer Pricing Agreements"); and

WHEREAS, since the Filing Date, the US Debtors (other than NN CALA), the Canadian Debtors and the EMEA Debtors have engaged in the inter-company trading of goods and services pursuant to those certain group supplier protocol agreements between the US Debtors (other than NN CALA) and the EMEA Debtors and between the Canadian Debtors and the EMEA Debtors (the "GSPAs") and pursuant to certain court orders entered in the Canadian Proceedings and the US Proceedings, and have made and continue to make payments in respect of such inter-company trading (the "Inter-Company Trading Payments"); and

WHEREAS, since the Filing Date, issues relating to Transfer Pricing Payments have arisen among various members of the Nortel Group such that post-filing Transfer Pricing Payments have not been included in any Inter-Company Trading Payments and certain of those issues were resolved in the Interim Funding and Settlement Agreement dated as of June 9, 2009 by and among the Canadian Debtors, the US Debtors (other than NN CALA), and the EMEA Group (the "IFSA") and in the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 by and among the Canadian Debtors and the US Debtors (other than NN CALA) (the "FCFSA"); and

WHEREAS, contemporaneous with the signing of this Agreement, the US Debtors (other than NN CALA), the Canadian Debtors and the EMEA Group have entered into the Agreement on Transfer Pricing Amendments and Certain Other Matters, dated as of the date hereof, to, among other things, cease the obligation to make Transfer Pricing Payments from and after April 1, 2010; and

WHEREAS, contemporaneous with the signing of this Agreement, certain of the US Debtors, the Canadian Debtors and the EMEA Debtors have amended the GSPAs retroactive to April 1, 2010 to remove the reference to payments under the Master R&D Agreement from the definition of "Goods and Services" (as defined in the GSPAs); and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*, the EMEA Group

shall among themselves and as between one or more EMEA Group members, on the one hand, and one or more Canadian Debtors or US Companies, on the other hand, settle amounts payable as Transfer Pricing Payments as provided for herein for the period from January 1, 2010 through March 31, 2010 (the "Q1 Settlement Period"),

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree:

## PART A – SETTLEMENT MATTERS

1.     Nortel Networks UK Limited ("NNUK") is hereby irrevocably authorized to seek and retain payment for its own account and sole benefit from other members of the EMEA Group of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the Q1 Settlement Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement in respect of the Q1 Settlement Period set out herein. Each member of the EMEA Group hereby appoints NNUK as its agent (without liability, including as to failure of any EMEA Group member to make any Transfer Pricing Payment) to administer the collection and distribution of the Transfer Pricing Payments received, solely with respect to the Q1 Settlement Period, as detailed in Annex C hereto. Each member of the EMEA Group agrees that the payments required to be made to NNUK set out in Annex C shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Group member and NNUK. NNUK agrees that it will make any payments to any member of the EMEA Group it is required to make as set out in Annex C without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof. To the extent that any member of the EMEA Group breaches any obligation to make its Transfer Pricing Payment with respect to the Q1 Settlement Period, only NNUK and none of the Canadian Debtors or the US Companies shall have any claim against such defaulting EMEA Group member for such payment and no EMEA Group member shall have any claim against the Canadian Debtors or the US Companies for such payment.

2.     NNL and NNUK hereby agree that for the Q1 Settlement Period, the EMEA Group owes NNL a net amount of US$10.6 million (the "Q1 Net Amount") which shall be satisfied in accordance with Section 3 below.

3.     Shortfall Payments.

     (a)    The Parties hereby agree that the Q1 Net Amount shall be setoff and deducted from the Shortfall Payments (as defined in the IFSA) contemplated as being payable by NNL to NNUK under the IFSA.

**HIGHLY CONFIDENTIAL**       NNC-NNL06002330 / 3

(b)    With respect to the balance of the Shortfall Payments after the setoff referred to in Sub-Section 3(a) above, being a net obligation of US$9.4 million, the Parties hereby agree that:

    (i)    NNL shall pay to NNUK the amount of US$4.7 million (the "Tranche 1 Payment") within three (3) Business Days of the Effective Date of this Agreement;

    (ii)    Upon the making of the Tranche 1 Payment, the Shortfall Charge (as defined in the Initial Order) shall be automatically reduced to US$4.7 million;

    (iii)    The remaining US $4.7 million (the "Tranche 2 Payment") being the net amount of the Shortfall Payments owing after reduction of the setoff amount in Sub-Section 3(a) above and the Tranche 1 Payment, shall be paid by NNL to NNUK in accordance with Section 6.c. of the IFSA as if that Section 6.c of the IFSA were in effect at the time the Tranche 2 Payment is made notwithstanding the provisions of Sub-Section 13.b and/or Section 14 of the IFSA; and

    (iv)    Upon the making of the Tranche 2 Payment, the Shortfall Charge shall be automatically terminated and extinguished.

For the purpose of this Agreement, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

4.    This Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could, be owing between (i) the EMEA Group *inter se*, and (ii) any member of the EMEA Group, on the one hand, and any Canadian Debtor or US Company, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof in the Q1 Settlement Period including, without limitation, any subsequent determination by any revenue authority with respect to the Q1 Settlement Period giving rise to any subsequent liability to taxation of any Party hereto (the "Settled Amounts") and provided further that in connection with such full and final settlement, (a) each member comprising the EMEA Group releases each of the Canadian Debtors and each of the US Companies and agree that they shall not allege, file or otherwise assert any claim against the Canadian Debtors or the US Companies in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against the Canadian Debtors or the US Companies in respect of the Settled Amounts; and (b) each of the Canadian Debtors and the US Companies releases each member of the EMEA Group and agrees not to allege, file or otherwise assert any claim against any one or more of the EMEA Group in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against any member of the EMEA Group in respect of the

Settled Amounts. For greater certainty, the obligation of NNL to make the Tranche 1 Payment and the Tranche 2 Payment as herein provided shall not be released pursuant to this Section 4.

Covenants

5.      NNUK shall use commercially reasonable efforts to obtain, either a deed of adherence whereby NNSA agrees to be bound by all provisions of this Agreement applicable to an EMEA Debtor or a letter from NNSA authorizing the UK Administrator to bind NNSA to all provisions of this Agreement (the "NNSA Accession") and NNL and NNI agree to provide such assistance as NNUK may reasonably require to obtain such deed of adherence or letter. The EMEA Debtors hereby agree to provide copies of such deed of adherence or letter, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Group.

6.      For the period from the Effective Date (defined below) to the date of the NNSA Accession, NNL hereby unconditionally assigns and transfers to NNUK all of its rights to any Transfer Pricing Payments paid or payable to NNL from or on behalf of NNSA under the relevant Transfer Pricing Agreements with respect to the Q1 Settlement Period (the "NNSA Inter-Company Trading Payments") and agrees that to the extent any such NNSA monies in respect of NNSA Inter-Company Trading Payments are paid by NNSA to NNL during the time between the Effective Date and the date of the NNSA Accession, NNL shall transfer such monies forthwith to such account as NNUK may direct.

PART B – PROVISIONS OF GENERAL APPLICATION

7.      Nothing in this agreement shall constitute an amendment, modification or waiver of rights of the US Debtors, the Canadian Debtors or the Monitor under the FCFSA, and this Agreement shall not supersede the FCFSA in any respect.

8.      Except as expressly set forth herein, (i) nothing in this Agreement shall constitute an amendment, modification or waiver of rights of the US Debtors, the Canadian Debtors, the Monitor, the EMEA Group or the Joint Administrators under the IFSA, and (ii) to the extent a conflict exists between the terms of this Agreement and the terms of the IFSA, the terms of the IFSA shall govern.

9.      Subject to the settlement contemplated in this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or

any offset arising therefrom or otherwise. The use of the term Transfer Pricing Payment (or any similar term) or reference to Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements. Nothing in this Agreement shall bar, prohibit, or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any transaction, including without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Parties hereto, and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. For the avoidance of doubt, nothing in this Agreement shall affect any claim a Party may have in respect of Transfer Pricing Payments relating to any period prior to the Filing Date.

10.     This agreement shall become effective between the Parties (the "Effective Date") upon the approval by each of the US Court and the Canadian Court of this Agreement and all of the provisions hereof. The US Debtors and the Canadian Debtors shall (i) use commercially reasonable efforts to obtain such approvals as soon as possible (ii) keep all other Parties reasonably apprised of the progress of such approvals and provide such other information regarding the satisfaction of such approvals as reasonably requested by other Parties; and (iii) use commercially reasonable efforts to allow any other Party which so requests in writing reasonable participation in connection with any proceedings in any Court relating to such approval.

Notwithstanding the foregoing, the following provisions of this Agreement shall be effective as of the date hereof: Sections 10, 11, 12, 13, 14, 16, 17, and 18.

11.     The Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors   (excluding NNSA, which is represented by the NNSA Liquidator) to which they are appointed and none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Agreement: (i) as agents of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

12.     The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of

which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement.

13. <u>Governing Law.</u>

    (a)     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; <u>provided</u>, however, that Section 11 shall be governed exclusively by English law.

    (b)     To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol approved by the US Court by an Order dated January 15, 2009 and by the Canadian Court in an Order dated January 14, 2009 (as amended or as amended and restated from time to time, the "<u>Cross-Border Insolvency Protocol</u>") for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Companies, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian Court and the US Court conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors, the US Companies and the EMEA Group, and the English courts if such claim, action or proceeding would solely affect the EMEA Group, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; provided, however, that any claim, action or proceeding set forth in Section 11 shall be brought exclusively in the English courts.

    (c)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction or matter contemplated hereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been

HIGHLY CONFIDENTIAL

induced to enter into this agreement by, among other things, the mutual waivers and certifications in this Section 13.

14. Each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment.

15. Except as specifically provided herein, payments required under this Agreement shall be made in accordance with the terms hereof regardless of any actual or purported right of setoff or other defense.

16. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

17. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree, with the consent of the Parties, the Creditors' Committee and the Bondholders' Group, on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

18. This Agreement may be amended, on no less than ten (10) Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Group, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement. For the purpose of this Section 18, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada or the United States.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as the date first written above.

NORTEL NETWORKS CORPORATION

By: _____

Name: Anna Ventresca
Title: General Counsel - Corporate
and Corporate Secretary


NORTEL NETWORKS LIMITED

By: _____

Name: Anna Ventresca
Title: General Counsel - Corporate
and Corporate Secretary


NORTEL NETWORKS CORPORATION

By: _____

Name: John M. Doolittle
Title: Senior VP, Corporate Services
and Chief Financial Officer


NORTEL NETWORKS LIMITED

By: _____

Name: John M. Doolittle
Title: Senior VP, Corporate Services
and Chief Financial Officer


NORTEL NETWORKS GLOBAL
CORPORATION

Per: _____

Name: John M. Doolittle
Title: President


Per: _____

Name: Anna Ventresca
Title: Secretary


NORTEL NETWORKS INTERNATIONAL
CORPORATION

Per: _____

Name: John M. Doolittle
Title: President


Per: _____

Name: Anna Ventresca
Title: Secretary


HIGHLY CONFIDENTIAL

NORTEL NETWORKS TECHNOLOGY
CORPORATION

Per: _____
      Name:  Anna Ventresca
      Title: Secretary

Per: _____
      Name:
      Title:

NORTEL NETWORKS INC.

By: _____
      Name:
      Title:

ARCHITEL SYSTEMS (U.S.) CORPORATION

By: _____
      Name:
      Title:

CORETEK, INC.

By: _____
      Name:
      Title:

NORTEL ALTSYSTEMS, INC.

By: _____
      Name:
      Title:

HIGHLY CONFIDENTIAL

NORTEL NETWORKS TECHNOLOGY
CORPORATION

Per: _____
          Name:
          Title:


Per: _____
          Name:
          Title:


NORTEL NETWORKS INC.

By: _____
          Name:                    John J. Ray, III
          Title:                   Principal Officer

ARCHITEL SYSTEMS (U.S.) CORPORATION

By: _____
          Name:                    John J. Ray, III
          Title:                   Principal Officer

CORETEK, INC.

By: _____
          Name:                    John J. Ray, III
          Title:                   Principal Officer

NORTEL ALTSYSTEMS, INC.

By: _____
          Name:                    John J. Ray, III
          Title:                   Principal Officer

HIGHLY CONFIDENTIAL

**NORTEL ALTSYSTEMS INTERNATIONAL INC.**

By: _____

| Name: | John J. Ray, III |
|---|---|
| Title: | Principal Officer |

**NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.**

By: _____

| Name: | John J. Ray, III |
|---|---|
| Title: | Principal Officer |

**NORTEL NETWORKS (CALA) INC.**

By: _____

| Name: | John J. Ray, III |
|---|---|
| Title: | Principal Officer |

**NORTEL NETWORKS CABLE SOLUTIONS INC.**

By: _____

| Name: | John J. Ray, III |
|---|---|
| Title: | Principal Officer |

**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____

| Name: | John J. Ray, III |
|---|---|
| Title: | Principal Officer |

NORTEL NETWORKS HPOCS INC.

By: _____

    Name:             John J. Ray, III
    Title:              Principal Officer

NORTEL NETWORKS INDIA
INTERNATIONAL INC.

By:

NORTEL NETWORKS INTERNATIONAL INC.

By: _____

    Name:             John J. Ray, III
    Title:              Principal Officer

NORTEL NETWORKS KABUSHIKI KAISHA

By:

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By: _____

    Name:             John J. Ray, III
    Title:              Principal Officer

NNC-NNL06002330 / 13

NORTHERN TELECOM INTERNATIONAL INC.

By: _____

     Name:        John J. Ray, III
     Title:         Principal Officer

QTERA CORPORATION

By: _____

     Name:        John J. Ray, III
     Title:         Principal Officer

SONOMA SYSTEMS

By: _____

     Name:        John J. Ray, III
     Title:         Principal Officer

XROS, INC.

By: _____

     Name:        John J. Ray, III
     Title:         Principal Officer

**HIGHLY CONFIDENTIAL**

NORTEL NETWORKS HPOCS INC.

By: _____
         Name:
         Title:


NORTEL NETWORKS INDIA
INTERNATIONAL INC.

By: _____ 8/19/11
         Name: Timothy C. Ross
         Title: Secretary


NORTEL NETWORKS INTERNATIONAL INC.

By: _____
         Name:
         Title:


NORTEL NETWORKS KABUSHIKI KAISHA

By: _____
         Name:
         Title:


NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By: _____
         Name:
         Title:

HIGHLY CONFIDENTIAL

NORTEL NETWORKS HPOCS INC.

By: _____
        Name:
        Title:

NORTEL NETWORKS INDIA
INTERNATIONAL INC.

By: _____
        Name:
        Title:

NORTEL NETWORKS INTERNATIONAL INC.

By: _____
        Name:
        Title:

NORTEL NETWORKS KABUSHIKI KAISHA

By: _____*Stephen Givens*_____
        Name: STEPHEN GIVENS
        Title: Representative Director

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By: _____
        Name:
        Title:

HIGHLY CONFIDENTIAL

SIGNED by Alan Bloom in his own capacity )
and on behalf of the Joint Administrators )
without personal liability and solely for the )
benefit of the provisions of this Agreement )
expressed to be conferred on or given to the )
Joint Administrators in the presence of: )

Witness signature

Name:   *Alex Stones* )
Address:   **Ernst & Young LLP** )
       **1 More London Place** )
       **London**
       **SE1 2AF**

SIGNED for and on behalf of **Nortel Networks** )
**UK Limited** (in administration) by Christopher )
Hill as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

Name:   *Alex Stones* )
Address:   **Ernst & Young LLP** )
       **1 More London Place** )
       **London**
       **SE1 2AF**

SIGNED for and on behalf of **Nortel Networks** )
**(Ireland) Limited** (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of: )

Witness signature

Name: )
Address: )

HIGHLY CONFIDENTIAL

SIGNED by Alan Bloom in his own capacity           )
and on behalf of the Joint Administrators          )
without personal liability and solely for the      )
benefit of the provisions of this Agreement        )
expressed to be conferred on or given to the       )
Joint Administrators in the presence of:           )

Witness signature

................................................           )
Name:                                              )
Address:                                           )

SIGNED for and on behalf of Nortel Networks        )
UK Limited (in administration) by Christopher      )
Hill as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:    )

Witness signature

.......L. Stone...................
Name:    Alex  Stones                              )
Address:    ERNST & YOUNG LLP                      )
            1 More London Place                    )
            London
            SE1 2AF

SIGNED for and on behalf of Nortel Networks        )
(Ireland) Limited (in administration) by David     )
Hughes as Joint Administrator (acting as agent     )
and without personal liability) in the presence    )
of:

Witness signature

................................................           )
Name:                                              )
Address:                                           )

HIGHLY CONFIDENTIAL

**SIGNED** by Alan Bloom in his own capacity
and on behalf of the Joint Administrators
without personal liability and solely for the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators in the presence of:

Witness signature

..............................................................
Name:
Address:


**SIGNED** for and on behalf of **Nortel Networks
UK Limited** (in administration) by Christopher
Hill as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

..............................................................
Name:
Address:


**SIGNED** for and on behalf of **Nortel Networks
(Ireland) Limited** (in administration) by David
Hughes as Joint Administrator (acting as agent
and without personal liability) in the presence
of:

Witness signature

.......~~~ de Kealy~~~..............
Name: BRENDA KEALY
Address: HARCOURT STREET, DUBLIN 2.

**SIGNED** for and on behalf of **Nortel Networks**    )
**N.V.** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

Name:    Alex Stones
Address:    ERNST & YOUNG LLP    )
         1 More London Place    )
         London
         SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**    )
**SpA** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

Name:    Alex Stones
Address:    ERNST & YOUNG LLP    )
         1 More London Place    )
         London
         SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**    )
**B.V.** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

Name:    Alex Stones
Address:    ERNST & YOUNG LLP    )
         1 More London Place    )
         London
         SE1 2AF

**HIGHLY CONFIDENTIAL**