set forth on *Exhibit A* hereto; provided, however, that in no event shall any amount paid by the Buyer or an Affiliate of the Buyer or the Alternative Transaction Buyer in respect of VAT or Transfer Taxes be required to be deposited into escrow and the applicable Seller shall be entitled to receive such funds directly from the Buyer or an Affiliate of the Buyer or the Alternative Transaction Buyer. Subject to Section 2.2 below, *Exhibit A* shall be countersigned by the escrow agent following the execution of this Agreement and the information to be added to Section 2 thereof shall be added upon receipt of such information from the escrow agent, and such subsequent execution of *Exhibit A* and completion of Section 2 of *Exhibit A* shall not affect the validity, binding nature or enforceability of this Agreement. If the escrow arrangements set forth in *Exhibit A* are not utilized because, prior to the Closing or the Alternative Transaction Closing, as applicable, the Sellers agree upon an allocation of the proceeds to be received by the Sellers from the Buyer upon the Closing or received from the Alternative Transaction Buyer upon the Alternative Transaction Closing, as applicable, or because the escrow agent requests that the terms be included in a separate agreement pursuant to Section 2.2 below, the validity, binding nature or enforceability of the remaining terms of this Agreement shall not be limited as a result of such an occurrence.

2.2     In the event that the escrow agent requests that the terms of the escrow be documented in a separate agreement, the parties agree that the terms of *Exhibit A* shall form the basis of such escrow agreement, together with such changes as may be reasonably requested by the escrow agent.

2.3     Any amounts payable to the escrow agent pursuant to the terms of *Exhibit A* (whether by way of indemnification, expense reimbursement or otherwise) shall be payable as among the Sellers in accordance with each Seller's proportion of the Purchase Price receivable by such Seller to the Purchase Price receivable by all Sellers, based on the current version of Schedule 3.2 to the Purchase Agreement (which is attached hereto as *Exhibit B*); provided, that if the parties mutually agree, either in connection with the Purchase Agreement or any Alternative Agreement, to modify the portion of the Purchase Price (or purchase price under the Alternative Agreement) receivable as among the Sellers, the portion of such amount due to the escrow agent payable as among the Sellers shall be adjusted accordingly.

2.4     In the event that any amount paid by the Buyer or an Affiliate of the Buyer or an Alternative Transaction Buyer of or in respect of VAT or in respect of a reimbursement of Transfer Taxes is, notwithstanding the provisions of Section 2.1, deposited into escrow the parties agree that the Sellers are entitled to be paid from the escrow any amounts:

    (a)     of or in respect of VAT paid by the Buyer or an Affiliate of the Buyer or the Alternative Transaction Buyer, to the extent deposited into the escrow,

2

in respect of the supply of any EMEA Acquired Assets to the Buyer or an Affiliate of the Buyer or the Alternative Transaction Buyer (such amounts to be evidenced by production of a copy of a valid VAT invoice from an EMEA Seller addressed to the Buyer or an Affiliate of the Buyer or the Alternative Transaction Buyer); or

(b)     reimbursed by the Buyer or an Affiliate of the Buyer or the Alternative Transaction Buyer, pursuant to section 9.1 of the Purchase Agreement, to the extent deposited into the escrow, in respect Transfer Taxes arising in connection with the purchase and sale of any of the Acquired Assets or EMEA Assets,

and such amounts shall in each case be payable only to the Seller supplying or selling the Acquired Assets or EMEA Assets, as applicable, in question, and the amount of any such VAT and reimbursement of Transfer Taxes, as applicable, paid by the Buyer or an Affiliate of the Buyer or the Alternative Transaction Buyer, in each case, to the extent deposited into escrow, and any amounts payable to a Seller pursuant to this Section 2.4 shall all be excluded from any calculation of the amount payable to Sellers made under Section 2.3 above. The parties further agree that in the event that a Seller is entitled to be paid out of the escrow account pursuant to this Section 2.4, it may issue a written letter of direction to the escrow agent requiring the escrow agent to disburse such sum to it in accordance with section 5(d) of *Exhibit A* but that no Seller shall issue such a letter of direction in any other circumstance.

## 3.     ALTERNATIVE TRANSACTION

3.1     If an Auction (as described in the U.S. Bidding Procedures Order) occurs and, as a result of such Auction and within 90 calendar days of the completion of such Auction, the Main Sellers enter into a binding agreement providing for an Alternative Transaction (an *Alternative Agreement*), NNUK and the Joint Administrators shall also sign the Alternative Agreement for and on behalf of NNUK and the other EMEA Sellers, provided that:

(a)     the amount payable to the EMEA Sellers under such Alternative Agreement is at least equal to or better than the amount payable to the EMEA Sellers under the Purchase Agreement (excluding, for the purposes of such calculation, any adjustments such as are set forth in clauses (ii) through (iv) of Section 3.1(a) of the Purchase Agreement); and

(b)     the other terms of the Alternative Agreement are not materially more onerous on the Joint Administrators or the EMEA Sellers, in the aggregate, than the obligations of the Joint Administrators or the EMEA Sellers under the terms of the Purchase Agreement.

## 4.     BREAK-UP FEE AND/OR EXPENSE REIMBURSEMENT

3

HIGHLY CONFIDENTIAL

4.1     If Sellers are required to pay the Break-Up Fee and/or Expense Reimbursement to the Buyer pursuant to the Purchase Agreement, each Seller hereby agrees to pay a portion thereof equal to the proportion of the Purchase Price receivable by such Seller to the Purchase Price receivable by all Sellers, based on the current version of Schedule 3.2 to the Purchase Agreement (which is attached hereto as *Exhibit B*); provided, that if the parties mutually agree, either in connection with the Purchase Agreement or any Alternative Agreement, to modify the portion of the Purchase Price (or purchase price under the Alternative Agreement) receivable as among the Sellers, the portion of the Break-up Fee and/or Expense Reimbursement payable as among the Sellers shall be adjusted accordingly.

4.2     Each Seller (other than NNI) agrees to pay its portion of the Break-Up Fee and/or Expense Reimbursement (as determined in accordance with Section 4.1) to NNI prior to the time when such amounts are due to be paid to the Buyer, and NNI shall pay its portion thereof and such received amounts from the other Sellers to the Buyer.

## 5.     OBLIGATION TO DELIVER UP CLOSING DELIVERABLES

5.1     The EMEA Sellers hereby agree to deliver executed copies of all documents deliverable under Section 4.2(a) and (b) of the Purchase Agreement by the EMEA Sellers and any analogous documents required pursuant to any Alternative Agreement, in each case reasonably prior to the scheduled closing of the Purchase Agreement or any Alternative Agreement.

## 6.     OBLIGATIONS IN RESPECT OF EMEA BUSINESS CONTRACTS

6.1     NNI and NNL hereby agree to provide:

    (a)     as soon as reasonably practicable and in any event within 14 days of the date of this Agreement, the EMEA Sellers and the Joint Administrators with details in relation to the EMEA Business Contracts as the EMEA Sellers and the Joint Administrators reasonably require, to the extent such details are reasonably available to NNI and NNL, to allow them to identify the EMEA Seller entity that is a party to each EMEA Business Contract and the revenue received by such entity pursuant to the relevant EMEA Business Contract; and

    (b)     to the EMEA Sellers all details that the EMEA Sellers reasonably require, to the extent such details are reasonably available to NNI and NNL and are not already within the possession of the EMEA Sellers, in order to permit the EMEA Sellers to comply with any obligation of the EMEA Sellers that arise pursuant to Section 7.10 of the Purchase Agreement and any analogous obligations pursuant to any Alternative Agreement.

## 7.     OTHER

4

HIGHLY CONFIDENTIAL

7.1     All questions, claims, disputes, remedies, Action or Proceeding arising from or related to this Agreement, and all relief or remedies sought by any party hereunder, shall be governed exclusively by the Laws of the State of New York, without regard to the rules of conflict of laws of the State of New York or any other jurisdiction. All disputes arising pursuant to this Agreement (including the escrow arrangements) shall be resolved in accordance with Sections 11.3 and 11.4 of the Purchase Agreement.

7.2     Sections 11.1, 11.5, 11.6, and 11.8 through 11.18 of the Purchase Agreement are hereby incorporated herein by reference and made fully applicable to this Agreement as if set forth in full herein, *mutandis mutatis*.

7.3     All notices or other communications required or permitted to be given hereunder shall be in writing and shall be deemed given to a party when (a) delivered by hand, (b) three (3) Business Days after delivery by a nationally recognized overnight courier service (costs prepaid), or (c) sent by facsimile (confirmed in writing by mail promptly thereafter dispatched), in each case to the following:

> if to NNI or NNL, to:

> Nortel Networks Inc.
> c/o Nortel Networks Limited
> 195 The West Mall
> Toronto, Ontario M9C 5K1
> Attention: Douglas M. Parker, Esq., Associate General Counsel - Corporate
> Tel: (905) 863-2564
> Fax: (905) 863-7739

> with a copy to:

> Crowell & Moring LLP
> 1001 Pennsylvania Avenue, NW
> Washington, DC 20004-2595
> Attention: James R. Stuart, III, Esq.
> Tel : (202) 624-2865
> Fax : (202) 628-5116

> if to the EMEA Sellers, to:

5

HIGHLY CONFIDENTIAL         NNC-NNL11152292 / 5

c/o the Joint Administrators
Maidenhead Office Park
Westacott Way
Maidenhead
Berkshire
SL6 3QH

if to the Joint Administrators, to:

Ernst & Young LLLP
1 More London Place
London Se1 2af
Attention: Chris Hill

Any party hereto may change its contact information for notices and other communications hereunder by notice to the other party hereto.

7.4    Notwithstanding that this Agreement shall have been signed by the Joint Administrators both in their capacities as joint administrators of the EMEA Sellers for and on behalf of the EMEA Sellers and in their personal capacities, it is hereby expressly agreed and declared that no personal liability under or in connection with this Agreement shall fall on the Joint Administrators or their firm, partners, employees, agents, advisers or representatives whether such liability would arise under paragraph 99(4) of Schedule B1 to the Insolvency Act 1986 or otherwise howsoever.

7.5    The Joint Administrators are party to this Agreement in their personal capacities only for the purpose of receiving the benefit of this Agreement and the rights, exclusions, limitations, undertakings and covenants in their favour contained in this Agreement. NNI and NNL acknowledges and agrees that in the negotiation and the completion of this Agreement the Joint Administrators are acting only as agents for and on behalf of the EMEA Sellers and without any personal liability whatsoever.

6

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Side Agreement as of the date first above written.

NORTEL NETWORKS INC.

_____

Name: Hyacinth DeAlmeida
Title: Leader, Corporate Business Development

NORTEL NETWORKS LIMITED

_____

Name:
Title:

_____

Name:
Title:

NORTEL NETWORKS UK LIMITED (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS N.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

10/18772274_1

7

HIGHLY CONFIDENTIAL      NNC-NNL11152292 / 7

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Side Agreement as of the date first above written.

NORTEL NETWORKS INC.

_____

Name: Hyacinth DeAlmeida
Title: Leader, Corporate Business Development

NORTEL NETWORKS LIMITED

_____

Name:    Gordon A. Davies
Title:     Chief Legal Officer
          and Corporate Secretary

_____

Name:
Title:     Tracy S.J. Connelly McGilley
           Assistant Secretary

NORTEL NETWORKS UK LIMITED (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

NORTEL NETWORKS N.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:
Title:

10/18772274_1                                                      7

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Side Agreement as of the date first above written.

NORTEL NETWORKS INC.

_____

Name:  Hyacinth DeAlmeida
Title:  Leader, Corporate Business Development

NORTEL NETWORKS LIMITED

_____

Name:
Title:

_____

Name:
Title:

NORTEL NETWORKS UK LIMITED (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name:  C . HILL
Title:  JOINT ADMINISTRATOR
                            WITNESSED BY    S. FREEMANTLE

NORTEL NETWORKS N.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

_____

Name: C. HILL
Title: JOINT ADMINISTRATOR
                        WITNESSED BY    S. FREEMANTLE

10/18772274_1                                                    7

HIGHLY CONFIDENTIAL                    NNC-NNL11152292 / 9

PAGE 6/9 * RCVD AT 10/02/2009 20:35:51 [GMT Standard Time] * SVR:LNX01/10 * DNIS:4672 * CSID:33 1 39 07 46 47 * DURATION (mm-ss):01-26

NORTEL NETWORKS S.A. (in administration) by Kerry Trigg
acting as authorised representative for C. Hill as Joint
Administrator (acting as agent and without personal liability) under
an authorisation dated 15 January 2009

*[signature: Kerry Trigg]*

Name: STEVE SANDERSON
Title:   SENIOR EXECUTIVE

*[initials]*

NORTEL NETWORKS FRANCE S.A.S. (in administration) by
Kerry Trigg acting as authorised representative for C. Hill as Joint
Administrator (acting as agent and without personal liability) under
an authorisation dated 15 January 2009

*[signature: Kerry Trigg]*

Name: ~~Kenny Trigg~~   STEVE SANDERSON
Title:   ~~Authorized Representative~~ SENIOR EXECUTIVE

*[initials]*

NORTEL NETWORKS (AUSTRIA) GMBH (in administration)
by C. Hill as Joint Administrator (acting as agent and without
personal liability)

Name:
Title:

NORTEL NETWORKS, S.R.O. (in administration) by C. Hill as
Joint Administrator (acting as agent and without personal liability)

Name:
Title:

Pg : 6/9   NORM  A4         14 19/02/09 22:00       Fax ends part: 33 1 39 07 46 47 PUTIMAN VERSAILLES

HIGHLY CONFIDENTIAL                                    NNC-NNL11152292 / 10

NORTEL NETWORKS AB - DENMARK BRANCH (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

NORTEL NETWORKS B.V. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

NORTEL GERMANY GMBH & CO KG (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

NORTEL NETWORKS (IRELAND) LIMITED (in administration) by D. Hughes as Joint Administrator (acting as agent and without personal liability)

Name: DAVID HUGHES
Title: JOINT ADMINISTRATOR
WITNESS: Niáll O'Coveney   Niáll O'Coveney   AUTHORISED REPRESENTATIVE OF JOINT ADMINISTRATOR

NORTEL NETWORKS S.P.A. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

LON6370184/4 153557-0001

Page 9

HIGHLY CONFIDENTIAL                    NNC-NNL11152292 / 11

NORTEL NETWORKS S.A. (in administration) by Kerry Trigg
acting as authorised representative for C. Hill as Joint
Administrator (acting as agent and without personal liability) under
an authorisation dated 15 January 2009

Name:
Title:

NORTEL NETWORKS FRANCE S.A.S. (in administration) by
Kerry Trigg acting as authorised representative for C. Hill as Joint
Administrator (acting as agent and without personal liability) under
an authorisation dated 15 January 2009

Name: Kenny Trigg
Title: Authorized Representative

NORTEL NETWORKS (AUSTRIA) GMBH (in administration)
by C. Hill as Joint Administrator (acting as agent and without
personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY    S. FREEMANTLE

NORTEL NETWORKS, S.R.O. (in administration) by C. Hill as
Joint Administrator (acting as agent and without personal liability)

Name: C. HILL
Title: JOINT ADMINISTRATOR

WITNESSED BY    S. FREEMANTLE

LON6370184/4 153557-0001                          Page 8

HIGHLY CONFIDENTIAL    NNC-NNL11152292 / 12

NORTEL NETWORKS AB - DENMARK BRANCH (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name: C·HILL
Title: JOINT ADMINISTRATOR    WITNESSED BY

NORTEL NETWORKS B.V. (in administration) by C. Hill as   S. FREEMANTLE
Joint Administrator (acting as agent and without personal liability)

Name: C·HILL
Title: JOINT ADMINISTRATOR
WITNESSED BY
S. FREEMANTLE

NORTEL GERMANY GMBH & CO KG (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name: C·HILL
Title: JOINT ADMINISTRATOR
WITNESSED BY
S. FREEMANTLE

NORTEL NETWORKS (IRELAND) LIMITED (in administration) by D. Hughes as Joint Administrator (acting as agent and without personal liability)

Name:
Title:

NORTEL NETWORKS S.P.A. (in administration) by C. Hill as Joint Administrator (acting as agent and without personal liability)

Name: C·HILL
Title: JOINT ADMINISTRATOR
WITNESSED BY
S. FREEMANTLE

HIGHLY CONFIDENTIAL            NNC-NNL11152292 / 13

NORTEL NETWORKS POLSKA SP. Z O.O. (in administration)
by C. Hill as Joint Administrator (acting as agent and without
personal liability)

Name: C-HILL
Title: JOINT ADMINISTRATOR   WITNESSED BY:

NORTEL NETWORKS PORTUGAL S.A. (in administration) by
C. Hill as Joint Administrator (acting as agent and without personal
liability)

Name: C-HILL
Title: JOINT ADMINISTRATOR   WITNESSED BY:

S. FREEMANTLE

NORTEL NETWORKS ROMANIA SRL (in administration) by C.
Hill as Joint Administrator (acting as agent and without personal
liability)

Name: C·HILL
Title: JOINT ADMINISTRATOR   WITNESSED BY:

S-FREEMANTLE

NORTEL A.G.

Name: S·ROWTON
Title: DIRECTOR    S. FREEMANTLE   WITNESSED BY:
    DIRECTOR

C. HILL, in his own capacity and on behalf of the Joint
Administrators without personal liability and solely for the benefit
of the provisions of this Agreement expressed to be conferred on or
given to the Joint Administrators:

    C. HILL

Name: C-HILL
Title: JOINT ADMINISTRATOR   WITNESSED BY:

S. FREEMANTLE

HIGHLY CONFIDENTIAL      NNC-NNL11152292 / 14

## Exhibit A

### Terms of Escrow

1.      Appointment of Escrow Agent. Nortel Networks Inc., a Delaware corporation, Nortel Networks Limited, a Canadian corporation, and the EMEA Sellers (as set out in schedule 1 to this *Exhibit A*), a United Kingdom corporation (collectively, the *Depositors* and each a *Depositor*), and A. R. Bloom, S. Harris, A. M. Hudson and C. Hill of Ernst & Young LLP, in their capacity as the joint administrators of the EMEA Sellers (other than Nortel Networks (Ireland) Limited) and A. R. Bloom and D Hughes in their capacity as the joint administrators of Nortel Networks (Ireland) Limited (the *Joint Administrators*) hereby jointly nominate, constitute and appoint [_____] as escrow agent (the *Escrow Agent*) to hold the Escrow Funds in the Escrow Account upon the terms and conditions set forth herein. By countersigning this *Exhibit A* (on the last page hereof), Escrow Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this *Exhibit A*. Escrow Agent hereby represents to each of the Depositors and the Joint Administrators that it has the corporate power and legal authority to execute this *Exhibit A* and to perform its obligations hereunder. Capitalised terms in this *Exhibit A* are to have the meaning given to them in the Purchase Agreement (as defined in the attached Side Letter), unless otherwise defined herein. As used herein, the term "*Requisite Depositors*" shall mean Depositors entitled to receive at least ninety percent (90%) of the Purchase Price (based on the current version of Schedule 3.2 to the Purchase Agreement, which is attached to this Agreement as *Exhibit B*). The Depositors and the Joint Administrators agree that any action taken by the Requisite Depositors as provided in this *Exhibit A* shall be binding upon each of the Depositors and the Joint Administrators and the Escrow Agent shall be entitled to act and rely upon any action taken by the Requisite Depositors as provided in this *Exhibit A*.

2.      Escrow Funds. At the Closing, the Purchase Price shall be paid to Escrow Agent by wire transfer of immediately available funds (the *Escrow Amount*). The Depositors shall notify the Escrow Agent of the amount of the Purchase Price at least one Business Day prior to the Closing. Said wire transfer shall be delivered directly to the following account: [_____], ABA #: [_____], Account Name: [_____], Account #: [_____], Ref: Nortel Velocity Escrow (the *Escrow Account*). The Escrow Amount, plus all interest and other income thereon received by Escrow Agent, less any funds distributed or paid in accordance with this *Exhibit A*, are collectively referred to herein as the "*Escrow Funds*." Escrow Agent shall provide the Depositors and the Joint Administrators with telephonic confirmation of receipt of the Escrow Amount in the Escrow Account.

3.      Investment of Escrow Funds. During the term of escrow, Escrow Agent shall invest or reinvest the Escrow Funds, without distinction between principal and income, solely in an interest bearing bank deposit account.

4.      Ownership of Escrow Funds; Taxes.

(a)      The Escrow Funds at all times are and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Funds shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported on Form 1099 as the income of the Depositors or their Affiliates, based upon the

Exhibit A-1

disbursement of Escrow Funds to the Depositors or their Affiliates pursuant to Section 5 hereof, whether or not such income was disbursed during such calendar year. Escrow Agent has no ownership interest in the Escrow Funds but is serving as escrow holder having only possession thereof. This Section 4 shall survive notwithstanding any termination of this *Exhibit A* or the resignation of Escrow Agent. Each Depositor will provide Escrow Agent with its certified tax identification numbers by furnishing the appropriate form W-9 or W-8 and such other forms and documents that the Escrow Agent may reasonably request. The Depositors understand that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the Regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment or monies or other property held by the Escrow Agent pursuant to this *Exhibit A*.

(b)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors, jointly and severally, shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent. The indemnification provided by this Section 4(b) is in addition to the indemnification provided in Section 15 and shall survive the resignation or removal of the Escrow Agent and the termination of this *Exhibit A*.

5.     Distribution of Escrow Funds. Depositors, Joint Administrators and Escrow Agent hereby agree that, until the termination of the escrow, Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

(a)     Escrow Agent shall disburse to any Person all or any portion of the Escrow Funds if and as so instructed pursuant to a joint written letter of direction executed by authorized representatives of all of the Sellers and the Joint Administrators.

(b)     Escrow Agent shall disburse to any Person all or any portion of the Escrow Funds if and as so instructed pursuant to a final decision of a court (or arbitrator) of competent jurisdiction (as set forth in Section 11.3 of the Purchase Agreement), which is either non-appealable or with respect to which the time for appeal has expired without the filing of a timely appeal, directing the distribution of all or such portion of the Escrow Fund.

(c)     An authorized representative of a Depositor may deliver to Escrow Agent a written notice (a *Demand Notice*), with a copy thereof to each of the other Depositors, which specifically (A) instructs Escrow Agent to deliver a specific amount of the Escrow Funds to such Depositor (the *Claim Amount*), (B) certifies that a copy of the Demand Notice has been delivered to each of the other Depositors, and (C) certifies that such Depositor is entitled in accordance with the terms of the Purchase Agreement to the receipt of funds in the amount of such Claim Amount (the *Claim*). No later than the date a Demand Notice is delivered to Escrow Agent, the Depositor issuing such Demand Notice shall deliver to each of the other Depositors and the Joint Administrators a copy of such Demand Notice. If the Requisite Depositors or the Joint Administrators disputes the Claim or the Claim Amount in, or the accuracy, genuineness or timeliness of, such Demand Notice, such Requisite Depositors or the Joint Administrators (as the

Exhibit A - Page 2

case may be) may, within 10 days after receipt of such Demand Notice by the Escrow Agent, deliver to Escrow Agent a Dispute Notice (as defined below), with a copy thereof to each of the other Depositors and the Joint Administrators (as applicable), specifying each such objection. If no Dispute Notice is received by the Escrow Agent with respect to any Demand Notice within such 10-day period (the *Dispute Period*), then Escrow Agent shall deliver the Claim Amount stated therein to the Depositor issuing the Demand Notice in accordance with the instructions set forth in such Demand Notice. In the event that Escrow Agent receives, within the Dispute Period, from the Requisite Depositors or the Joint Administrators any written instructions or notice that disputes the Claim or the Claim Amount in, or the accuracy, genuineness or timeliness of, any Demand Notice (a *Dispute Notice*), Escrow Agent must refuse to comply with the Demand Notice and to refrain from taking any action with respect to such Demand Notice other than to retain possession of the Escrow Funds requested therein until either (A) the rights of all interested parties shall have been fully and finally adjudicated by a court (or arbitrator) of competent jurisdiction, or (B) all differences shall have been adjusted and all doubt resolved by agreement among the Depositor issuing the Demand Notice, the Requisite Depositors issuing the Dispute Notice and the Joint Administrators, and Escrow Agent shall have been so notified thereof in a written instrument signed by all such parties. In any such event, Escrow Agent shall not be or become liable in any way or to any person for its failure or refusal to act.

        (d)    Escrow Agent shall, within 3 days of receipt of a written letter of direction executed by an authorized representative of a Seller, disburse to such Seller such amounts of or in respect of VAT and such reimbursement of Transfer Taxes as are payable to that Seller.

      6.    Payment Instructions. Unless otherwise directed in writing by an authorized representative of a Depositor, all wire transfers out of the Escrow Account to the Depositors shall be made in accordance with wire transfer instructions provided by the applicable Depositor at the time of the release pursuant to Section 5.

      7.    Ambiguous or Conflicting Claims or Instructions. In the event of any dispute, ambiguity or uncertainty in any notice or instruction received by the Escrow Agent hereunder or conflicting claims by or among the Depositors with respect to any amounts in the Escrow Account, Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all claims, demands or instructions with respect to such amounts in the Escrow Account so long as such dispute or conflict shall continue, and Escrow Agent shall not be or become liable in any way to the Depositors for failure or refusal to comply with such conflicting claims, demands or instructions. Escrow Agent shall be entitled to refuse to act until it either (i) receives a final non-appealable order of a court of competent jurisdiction (as set forth in Section 11.3 of the Purchase Agreement) directing delivery of the Escrow Funds, (ii) receives a written agreement executed by the Requisite Depositors and the Joint Administrators directing delivery of the Escrow Funds, in which event the Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such final court order or agreement, or (iii) files an interpleader action in any court of competent jurisdiction (as set forth in Section 11.3 of the Purchase Agreement), and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Funds, except for Losses caused by Escrow Agent's gross negligence or willful misconduct, and shall be entitled to recover attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action; provided, that Escrow Agent shall give the Depositors and the Joint Administrators prompt written notice of the commencement or taking of any such action or effort.

Exhibit A - Page 3

HIGHLY CONFIDENTIAL      NNC-NNL11152292 / 17

8.    Compensation. The Depositors shall jointly and severally be responsible for and shall reimburse Escrow Agent upon demand for all expenses, disbursements, advances and other costs incurred or made by Escrow Agent in connection with this *Exhibit A*. Other than indemnification payments pursuant to Section 15, there shall be no further amounts payable to Escrow Agent in consideration for serving as Escrow Agent.

9.    Monthly Statements. Escrow Agent shall provide to the Depositors monthly statements in the Escrow Account and each such statement shall be deemed to be correct and final upon receipt thereof by the Depositors unless Escrow Agent is notified in writing to the contrary within 30 days of the date of such statement.

10.    Judicial Orders. If at any time Escrow Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process that in any way affects the Escrow Funds or Escrow Account (including but not limited to orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any amounts in the Escrow Account), Escrow Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate. If Escrow Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, Escrow Agent shall not be liable to any of the parties hereto or to any other person or entity even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

11.    Limitation on Liability.

(a)    THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES THAT HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

(b)    Escrow Agent may consult with legal counsel of its choice at the expense of the Depositors as to any matter relating to this *Exhibit A*, and Escrow Agent shall not incur any liability in acting in good faith in accordance with any advice from such counsel. Escrow Agent may perform its duties hereunder through agents, attorneys, custodians or nominees. Escrow Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of Escrow Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, or the unavailability of the Federal Reserve Bank wire). Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement.

Exhibit A - Page 4

**HIGHLY CONFIDENTIAL**

12.    No Implied Duties. The duties, responsibilities and obligations of Escrow Agent shall be limited to those expressly set forth in this *Exhibit A*, which are ministerial in nature, and no duties, responsibilities or obligations shall be inferred or implied from any other agreement or source. Under no circumstances will the Escrow Agent be deemed to be a fiduciary to the Depositors or the Joint Administrators or any other person under this *Exhibit A*. Escrow Agent shall not be subject to, nor required to comply with, any other agreement other than *Exhibit A*, even though reference thereto may be made herein, or to comply with any direction or instruction other than those contained herein or delivered in accordance with this *Exhibit A*. Escrow Agent shall not be required to, and shall not, expend or risk any of its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder.

13.    Removal or Resignation of Escrow Agent. The Requisite Depositors and the Joint Administrators may remove Escrow Agent at any time by giving to Escrow Agent 15 Business Days' prior notice in writing signed by an authorized representative of the Requisite Depositors. Escrow Agent may resign at any time by giving to each of the Depositors and the Joint Administrators 15 Business Days' prior written notice thereof. Within 10 days after giving the foregoing notice of removal to Escrow Agent or receiving the foregoing notice of resignation from Escrow Agent, the Requisite Depositors and the Joint Administrators shall jointly agree on and appoint a successor escrow agent. If a successor escrow agent has not accepted such appointment by the end of such 10-day period, Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief. The costs and expenses (including reasonable attorneys' fees and expenses) incurred by Escrow Agent in connection with such proceeding shall be paid equally by the Depositors. Upon receipt of a joint notice from the Requisite Depositors and the Joint Administrators identifying the successor escrow agent, Escrow Agent shall either deliver the Escrow Funds then held hereunder to the successor escrow agent, less Escrow Agent's fees, costs and expenses or other obligations owed to Escrow Agent, or hold such Escrow Funds (or any portion thereof), pending distribution, until all such fees, costs and expenses or other obligations are paid. Upon delivery of the Escrow Funds to successor escrow agent, Escrow Agent shall have no further duties, responsibilities or obligations hereunder.

14.    Notices to Escrow Agent. Notices to Escrow Agent shall be deemed to be given when actually received by Escrow Agent. Escrow Agent is authorized to comply with and rely upon any notices, instructions or other communications believed by it to have been sent or given by an authorized representative of a Depositor or the Joint Administrators. Whenever under the terms hereof the time for giving a notice or performing an act falls upon any day other than a Business Day, such time shall be extended to the next Business Day.

15.    Indemnification. Depositors shall be jointly and severally liable for and shall reimburse and indemnify Escrow Agent and hold Escrow Agent harmless from and against any and all losses arising from or in connection with or related to this *Exhibit A* or being Escrow Agent hereunder (including but not limited to losses incurred by Escrow Agent in connection with its successful defense, in whole or in part, of any claim of gross negligence or willful misconduct on its part), *provided, however,* that nothing contained herein shall require Escrow Agent to be indemnified for losses caused by its gross negligence or willful misconduct and in no event shall the Depositors be liable hereunder for an amount in excess of the value of the Escrow Amount. This Section 15 shall survive notwithstanding any termination of this *Exhibit A* or the removal or resignation of Escrow Agent.

Exhibit A - Page 5

16.      <u>Termination</u>. This ***Exhibit A*** shall terminate upon the distribution of all Escrow Funds from the Escrow Account.


ACCEPTED AND AGREED:


_____, as Escrow Agent



_____
Name:
Title:

Exhibit A - Page 6

**HIGHLY CONFIDENTIAL**          **NNC-NNL11152292 / 20**

## SCHEDULE 1 – EMEA SELLERS

o   NNUK (United Kingdom) (in administration)

o   Nortel Networks N.V. (Belgium) (in administration)

o   Nortel Networks S.A. (France) (in administration)

o   Nortel Networks France S.A.S (France) (in administration)

o   Nortel Networks (Austria) GmbH (Austria) (in administration)

o   Nortel Networks, s.r.o. (Czech Republic) (in administration)

o   Nortel Networks AB – Denmark Branch (Sweden) (in administration)

o   Nortel Networks B.V. (Netherlands) (in administration)

o   Nortel Germany GmbH & Co KG (Germany) (in administration)

o   Nortel Networks (Ireland) Limited (Ireland) (in administration)

o   Nortel Networks S.p.A. (Italy) (in administration)

o   Nortel Networks Polska Sp. Z o.o. (Poland) (in administration)

o   Nortel Networks Portugal S.A. (Portugal) (in administration)

o   Nortel Networks Romania SRL (Romania) (in administration)

o   Nortel Networks A.G.

Exhibit A - Page 7

HIGHLY CONFIDENTIAL                NNC-NNL11152292 / 21

## EXHIBIT B

### Asset Allocation Schedule

See attached.

Exhibit B-1

HIGHLY CONFIDENTIAL             NNC-NNL11152292 / 22



Schedule 2.2
Nortel Networks
Asset Allocation Schedule
3/18/2009

HIGHLY CONFIDENTIAL

## EXHIBIT C

### EMEA SELLERS

o  NNUK (United Kingdom) (in administration)

o  Nortel Networks N.V. (Belgium) (in administration)

o  Nortel Networks S.A. (France) (in administration)

o  Nortel Networks France S.A.S (France) (in administration)

o  Nortel Networks (Austria) GmbH (Austria) (in administration)

o  Nortel Networks, s.r.o. (Czech Republic) (in administration)

o  Nortel Networks AB - Denmark Branch (Sweden) (in administration)

o  Nortel Networks B.V. (Netherlands) (in administration)

o  Nortel Germany GmbH & Co KG (Germany) (in administration)

o  Nortel Networks (Ireland) Limited (Ireland) (in administration)

o  Nortel Networks S.p.A. (Italy) (in administration)

o  Nortel Networks Polska Sp. Z o.o. (Poland) (in administration)

o  Nortel Networks Portugal S.A. (Portugal) (in administration)

o  Nortel Networks Romania SRL (Romania) (in administration)

o  Nortel Networks A.G.

Exhibit C-1

HIGHLY CONFIDENTIAL



EXECUTION VERSION

## ASIA RESTRUCTURING AGREEMENT

This agreement (including the Schedules and Annexes attached hereto and as amended or supplemented from time to time, this "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (each, an "EMEA Debtor" and collectively, the "EMEA Debtors") and the entities set forth in Schedule 4 attached hereto (each, an "APAC Debtor" and collectively, the "APAC Debtors"), dated as of November 5, 2009. The Canadian Debtors (as defined below), the US Debtors (as defined below), the EMEA Debtors and the APAC Debtors are sometimes referred to herein individually as a "Party" and collectively as the "Parties". The Joint Administrators, in their personal capacity, shall be party to this Agreement as provided in Section 16 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

### RECITALS

1.    WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

2.    WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Filed Debtors" and, together with the Canadian Debtors, the EMEA Debtors and the APAC Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (the "US Proceedings"); and

3.    WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), and the UK Court appointed individuals from Ernst & Young LLP (the "UK Administrator") and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "Joint Administrators"); and

1

4.      WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

5.      WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B and Annex H hereto and any other agreements similar to the agreements listed in Annex B and Annex H hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

6.      WHEREAS, subsequent to the Filing Date, NNL, NNI and the Joint Administrators have accepted that, subject to this Agreement, the APAC Debtors will pay their respective third party and intercompany debts on the following basis: (i) firstly, payment of all Third Party Liabilities (as defined below) and the Post-Filing Intercompany Debt (as defined below) on a pro rata basis, and (ii) secondly, payment of the Pre-Filing Intercompany Debt (as defined below) on a pro rata basis; and

7.      WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the intercompany trading of goods and services supplied by Nortel Group entities subsequent to the Filing Date, pursuant to the arrangements existing prior to or entered into subsequent to the Filing Date; and

8.      WHEREAS, as a consequence of the Proceedings, certain amounts or balances of intercompany payables owing by the Filed Debtors to the APAC Debtors as of the Filing Date became impaired, and certain members of the APAC Debtors, although generating cash flow from continuing operations, have liquidity and/or balance sheet constraints after conducting a proper pre-filing setoff of the corresponding intercompany debt as of the Filing Date; and

9.      WHEREAS, on July 25, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of substantially all of their CDMA business and LTE Access assets whereby Telefonaktiebolaget LM Ericsson emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on July 28, 2009, and on September 14, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of their North American, Caribbean, Latin America and Asia Enterprise Solutions business and the EMEA portion of their Enterprise Solutions business whereby Avaya Inc. ("Avaya") emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on September 16, 2009; and

2

10.     WHEREAS, NNC has also announced that it is actively engaged in discussions with external parties to sell its other businesses and that it has determined that the sale of its businesses maximizes value while preserving innovation platforms, customer relationships and jobs to the greatest extent possible; and

11.     WHEREAS, to enable the APAC Debtors to address applicable solvency issues so as to continue their respective business operations and to preserve their assets and businesses in order to facilitate and participate in any potential sale of the assets, undertakings or businesses of the Nortel Group entities, an Asia-Pacific restructuring plan has been discussed and developed with the Filed Debtors, the Monitor, the Joint Administrators together with the Creditors' Committee (as defined below) and the Bondholders' Committee (as defined below), and this Agreement represents the outcome of those discussions.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

## PART A – DEFINITIONS

| Term | Defined in Section |
|------|--------------------|
| Adjustment Payments | 8 |
| Agreement | Preamble |
| Allocation Protocol | 11.c. |
| APAC Debtors | Preamble |
| APAC Debtor Person | 17.a. |
| APAC Distribution Agreements | 8 |
| APAC Selling Debtor | 11.a. |
| Asset Sale | 10.a. |
| Avaya | Recital 9 |
| Bondholders' Committee | 3.a. |
| BOT Condition | 12.a.iv. |
| Business Day | 14 |
| Canadian Court | Recital 1 |
| Canadian Debtors | Recital 1 |
| Canadian Proceedings | Recital 1 |
| Cash and Cash Equivalents | 2.a.i.(A) |
| Category I Pre-Filing Intercompany Debt | 1.a.i. |
| Category II Pre-Filing Intercompany Debt | 1.a.ii. |
| Category III Pre-Filing Intercompany Debt | 1.a.iii. |
| Collateral | 13.c. |
| Conditions | 12.a.iv. |
| Courts | Recital 3 |
| Covenant Event of Default | 13.a. |
| Creditors' Committee | 3.a. |
| Cross-Border Protocol | 15.b. |
| Debtors | Recital 2 |
| Determination Date | 3.b. |

3

| Term | Defined in Section |
|------|--------------------|
| Distribution Agreements | Recital 5 |
| D&O Insurance | 18 |
| EMEA | Recital 3 |
| EMEA Debtors | Preamble |
| Escrow Account | 11.b. |
| Estimated Premise Reinstatement Costs | 2.a.ii.(y) |
| Estimated Restructuring Costs | 2.a.ii.(x) |
| Estimated Taxes | 2.a.ii.(z) |
| Estimated Working Capital Requirements | 2.a.ii.(w) |
| Excluded Affiliates | 2.a.ii.(v) |
| Excluded Affiliate Liabilities | 5 |
| Excluded Affiliate Pre-Filing Intercompany Debt | 2.a.ii.(v) |
| Excluded Affiliate Restructuring Agreement | 5 |
| Filed Debtors | Recital 2 |
| Filing Date | Recital 1 |
| Final Effective Date | 12.b. |
| Final Effective Date Payment Amount | 2.c. |
| Indemnified Liabilities | 17.b. |
| Identified Debtors | 4.a. |
| Indebtedness | 6.d.iii. |
| Initial Conditions | 12.a.ii. |
| Initial Determination Date | 2.a. |
| Initial Effective Date | 12.b. |
| Initial Effective Date Payment Amount | 2.b. |
| Initial Payment Amount | 2.c. |
| Intercompany Creditors | 1.a. |
| Joint Administrators | Recital 3 |
| License Termination Agreement | 10.b. |
| Master R&D Agreement | Recital 5 |
| Matured Indemnity Obligation | 2.a. |
| Monitor | Recital 1 |
| NCB Determination Procedure | 2.a. |
| NCB Items | 2.a. |
| Net Cash Balance | 2.a. |
| NN Asia Group | Schedule 4 |
| NN Australia | Schedule 4 |
| NN Australia Note Facility | 6.d.iii. |
| NN India (Private) | Schedule 4 |
| NN Indonesia | Schedule 4 |
| NN Japan | Schedule 4 |
| NN Korea | Schedule 4 |
| NN Malaysia | Schedule 4 |
| NN New Zealand | Schedule 4 |
| NN Singapore Group | Schedule 4 |

4

| Term | Defined in Section |
|------|--------------------|
| NN Thailand | Schedule 4 |
| NN Vietnam | Schedule 4 |
| NNC | Recital 1 |
| NNI | Preamble |
| NNIR | Recital 3 |
| NNIR Administrator | Recital 3 |
| NNL | Preamble |
| NNSA | Recital 3 |
| NNSA Administrator | Recital 4 |
| NNSA Liquidator | Recital 4 |
| NNUK | Recital 3 |
| Non-Filed Affiliates | 11.c.i. |
| Nortel Group | Recital 1 |
| North American Court Condition | 12.a.i. |
| Ordinary Course Cash Collateral | 6.d.iii. |
| Parties | Preamble |
| Payment Event of Default | 13.a. |
| Permitted Severance Payments | 2.a.ii.(x) |
| Post-Filing Intercompany Debt | 4.a.ii. |
| Pre-Filing Intercompany Debt | 1.a. |
| Professional Advice | 2.a. |
| Proceedings | Recital 3 |
| Purchaser | 11.a. |
| RBI Condition | 12.a.iii. |
| Relevant Parties | 3.a. |
| Restructuring Manager | 7 |
| Reversion Date | 4.d. |
| Reverted Subordinated Debt | 4.d. |
| Sale Proceeds | 11.a. |
| Sale Transaction | 11.a. |
| Secured Obligations | 13.c. |
| Selling Debtor | 11.a. |
| Senior Indebtedness | 4.a. |
| Subordinated Debt | 4.a. |
| Subsequent Determination Date | 3.b. |
| Subsequent Payment Amount | 3.c. |
| Suspended Subordinated Debt | 4.d. |
| Suspension Date | 4.d. |
| Suspension Period | 4.d. |
| Third Party Liabilities | 4.a.i. |
| Transfer Pricing | Recital 5 |
| Transfer Pricing Agreements | Recital 5 |
| Transfer Pricing Payments | Recital 5 |
| UK Administrator | Recital 3 |

5

| Term | Defined in Section |
|------|--------------------|
| UK Court | Recital 3 |
| UK Court Condition | 12.a.ii. |
| UK Court's Directions | 12.a.ii. |
| UK Proceedings | Recital 3 |
| US Court | Recital 2 |
| US Debtors | Recital 2 |
| US Proceedings | Recital 2 |

## PART B – PRE-FILING INTERCOMPANY DEBT RESTRUCTURING

1.    Pre-Filing Intercompany Debt.

   a.    Each APAC Debtor acknowledges and confirms, and each Intercompany Creditor (as defined below) of such APAC Debtor acknowledges and confirms that <u>Annex C-1</u> sets out the unpaid amount of loans, credits and obligations owing by such APAC Debtor to such Intercompany Creditor as of the Filing Date (after setting off against any receivables owing to such APAC Debtor by such Intercompany Creditor as of the Filing Date to the extent not prohibited or restricted under applicable laws and regulations) (the "<u>Pre-Filing Intercompany Debt</u>") and further sets out, as of the Initial Effective Date (as defined below):

        i.    the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Initial Payment Amount (as defined below) in accordance with Section 2 (the "<u>Category I Pre-Filing Intercompany Debt</u>"),

        ii.    the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Subsequent Payment Amount (as defined below) in accordance with Section 3 (the "<u>Category II Pre-Filing Intercompany Debt</u>"), and

        iii.    the amount of such Pre-Filing Intercompany Debt to be subordinated in accordance with Section 4 (the "<u>Category III Pre-Filing Intercompany Debt</u>").

   For the purposes of this Agreement, with respect to each APAC Debtor, the Parties to whom such APAC Debtor owes any Pre-Filing Intercompany Debt shall be referred to individually as an "<u>Intercompany Creditor</u>" and collectively, as the "<u>Intercompany Creditors</u>".

   b.    The Parties hereby agree that, effective as of the Final Effective Date (as defined below), the amounts of the Category I Pre-Filing Intercompany Debt, the Category II Pre-Filing Intercompany Debt and the Category III

6

Pre-Filing Intercompany Debt set out in <u>Annex C-1</u> shall be automatically revised to the corresponding amounts set forth in <u>Annex C-2</u>.

c.    The Parties hereby agree, that to the extent any APAC Debtor makes a Subsequent Payment Amount to its Intercompany Creditors between the Initial Effective Date and the Final Effective Date, <u>Annex C-2</u> shall be further revised on or prior to the Final Effective Date to give effect to the payment of such Subsequent Payment Amount.

d.    The Parties hereby agree, that to the extent NNSA does not become a Party to this Agreement in accordance with Section 6.a., the amounts set forth in the Annexes C-1, C-2, D, E-1 and E-2 hereto (which have been calculated based on the assumption that NNSA shall be a party to this Agreement), shall be further revised, in a manner consistent with the methodology and standards initially employed to calculate such amounts, on or prior to the Initial Effective Date to give effect to the exclusion of NNSA from the scope of this Agreement.

2.    <u>Initial Payments</u>.

a.    Each APAC Debtor having Category I Pre-Filing Intercompany Debt represents and warrants that as of July 10, 2009 (the "<u>Initial Determination Date</u>"), it has complied with the NCB Determination Procedure (as defined below) and determined its Net Cash Balance (as defined below) to be as set forth in <u>Annex D</u>. For the purposes of this Agreement, the "<u>Net Cash Balance</u>" means, as of each Determination Date (as defined below) and with respect to each APAC Debtor, without duplication:

i.    the sum of:

(A)    its (1) cash in U.S. dollars or other local currencies held by such APAC Debtor and (2) readily marketable government securities, certificates of deposit, time deposits and other readily marketable fixed income instruments, in each case, that are immediately available and freely remittable (the "<u>Cash and Cash Equivalents</u>") (for the avoidance of doubt, such Cash and Cash Equivalents shall not include any cash or cash equivalents that are considered to be restricted by reason of having been posted by such APAC Debtor as collateral to a third party), <u>plus</u>

(B)    (with respect to the calculation of the Net Cash Balance on each Subsequent Determination Date (as defined below) pursuant to Section 3 only) the net cash proceeds received by such APAC Debtor from a Sale Transaction (as defined below);

<u>minus</u>

ii.    the sum of:

7

(v)    the amount of loans, credits and obligations owing by such APAC Debtor to the entities set forth in Schedule 6 as of the Filing Date (respectively, the "Excluded Affiliate Pre-Filing Intercompany Debt" and the "Excluded Affiliates"), plus

(w)    its estimated working capital required for the four (4) weeks immediately following such Determination Date to carry on its business and to satisfy its liabilities as they fall due, together with appropriate provision for any contingent liabilities and anticipated future liabilities, including, without limitation, the Third Party Liabilities, the Post-Filing Intercompany Debt and the Matured Indemnity Obligation (as defined below) of such APAC Debtor (the "Estimated Working Capital Requirements"), plus

(x)    its estimated costs and expenses arising from or in connection with the restructuring of its indebtedness and its business or potential eventual liquidation or winding down of the business of such APAC Debtor, including, but not limited to:

　　(1)    potential statutory severance and redundancy payments,

　　(2)    potential severance and redundancy payments pursuant to binding contractual commitments existing as of the Filing Date and

　　(3)    other potential severance and redundancy payments disclosed to the Relevant Parties (as defined below) as of the date hereof or in such greater aggregate amount approved by the Relevant Parties from time to time

（collectively, the "Permitted Severance Payments") (the "Estimated Restructuring Costs"; *provided, however*, any potential severance or redundancy payments in excess of the Permitted Severance Payments based on past or existing practices and/or policies of the Debtors or otherwise shall not be included in the calculation of the Estimated Restructuring Costs), plus

(y)    its estimated costs of reinstatement of premises under the leases to which such APAC Debtor is a party (the "Estimated Premise Reinstatement Costs"), plus

8

(z)     its estimated provision for all taxes, levies, duties, deductions, charges or withholdings and all penalties, costs and interest relating thereto, whether actual, contingent, present or future, imposed or which may be imposed by any governmental or regulatory authority, central bank or court of competent jurisdiction (the "Estimated Taxes").

For the purposes of determining the Net Cash Balance of any APAC Debtor, the amounts of the Excluded Affiliate Pre-Filing Intercompany Debt (subject to Section 5), the Matured Indemnity Obligation, the Estimated Working Capital Requirements, the Permitted Severance Payments, the Estimated Restructuring Costs, the Estimated Premise Reinstatement Costs and the Estimated Taxes (each, an "NCB Item" and collectively, the "NCB Items") have been and shall be determined by the board of directors of such APAC Debtor acting reasonably and in good faith after consultation with the Restructuring Manager (as defined below) and after taking into account any written opinions obtained from its legal, financial, tax or other professional advisors (such determination procedure, the "NCB Determination Procedure" and such opinions, the "Professional Advice"). Each APAC Debtor hereby agrees and covenants that the Net Cash Balance and the NCB Items to be determined on any Subsequent Determination Date shall be calculated using the same methodology and standards employed to calculate such amounts on the Initial Determination Date. In addition, in calculating its Net Cash Balance as of any Subsequent Determination Date, each APAC Debtor shall give effect to any material amount of cash received by such APAC Debtor during the period after such Subsequent Determination Date but prior to the delivery of its Net Cash Balance calculation to the Relevant Parties in accordance with Section 3.b. Furthermore, each APAC Debtor hereby agrees and covenants that, with respect to any indemnity obligations of such APAC Debtor pursuant to Section 17.b., the Net Cash Balance and the NCB Items shall only take into account (or otherwise hold amounts in reserve to provide for) solely bona fide claims for indemnity that have been made by any APAC Debtor Person (as defined below) of such APAC Debtor against such APAC Debtor in accordance with Section 17.b. and after taking into account the availability of any liability insurance as contemplated by Section 18 or otherwise available to cover such claims for indemnity and consistent with the applicable accounting standards (such amount, the "Matured Indemnity Obligation").

b.     Effective upon the Initial Effective Date, each APAC Debtor having Category I Pre-Filing Intercompany Debt as set forth in Annex C-1 shall make the cash payment (the amount of such cash payment, an "Initial Effective Date Payment Amount") to each of its Intercompany Creditors of its Category I Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of the Initial Determination Date on a pro rata basis according to the proportion in

9

which the Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-1. Annex E-1 sets forth the payment tranches for the Initial Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

c.    Effective upon the Final Effective Date, each APAC Debtor having any remaining Category I Pre-Filing Intercompany Debt as set forth in Annex C-2 shall make the cash payment (the amount of such cash payment, a "Final Effective Date Payment Amount" and, together with an Initial Effective Date Payment Amount, an "Initial Payment Amount") to each of its Intercompany Creditors of its remaining Category I Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of the Initial Determination Date on a pro rata basis according to the proportion in which the remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-2. Annex E-2 sets forth the payment tranches for the Final Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

3.    Subsequent Payments.

a.    Following the date of this Agreement, each APAC Debtor shall provide to the Relevant Parties, once every week and substantially in the form provided by such APAC Debtor to NNL as of the date hereof, (i) rolling 13-week cash flow forecasts and (ii) reports on actual weekly cash flow results. Each APAC Debtor shall hold conference calls from time to time with the Relevant Parties to discuss such financial information at the request of any of the Relevant Parties. For the purposes of this Agreement, the "Relevant Parties" means (1) NNL (on behalf of the Canadian Debtors), (2) the Monitor, (3) NNI (on behalf of the US Debtors), (4) the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee"), (5) the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee"), (6) the Joint Administrators (on behalf of the EMEA Debtors) and (7) the Restructuring Manager (on behalf of the APAC Debtors).

10

                NNC-NNL06724463 / 10

b.    Each APAC Debtor shall, on a monthly basis, commencing on October 30, 2009 and on the last day of each month thereafter (each such date, a "Subsequent Determination Date," and each of the Initial Determination Dates and a Subsequent Determination Date, a "Determination Date"), calculate the amount of its Net Cash Balance and shall provide, no later than 14th calendar day following each Subsequent Determination Date, its calculation of its Net Cash Balance as of such Subsequent Determination Date to the Relevant Parties in reasonable detail, together with (A) a report by the Restructuring Manager which report shall provide its commentary regarding the basis for such APAC Debtor's calculation of its Net Cash Balance and such APAC Debtor's compliance with the NCB Determination Procedure and (B) any reasonably available supporting documents, including, without limitation, any material Professional Advice; *provided, however*, that if in the reasonable opinion of such APAC Debtor's counsel, the provision of any such Professional Advice would result in the loss or waiver of any lawful privilege that may be asserted with respect thereto, such APAC Debtor may provide, in lieu thereof, a summary of the conclusions set forth in such Professional Advice in a manner designed to preserve such lawful privilege. During the seven (7) calendar days following the delivery of its calculation of its Net Cash Balance as of each Subsequent Determination Date, each APAC Debtor shall consult, acting reasonably and in good faith, with the Relevant Parties in respect of its calculation of its Net Cash Balance. The determination by the board of directors of each APAC Debtor of its Net Cash Balance, if made in accordance with the NCB Determination Procedure and following such consultation process with the Relevant Parties, shall be final and binding on all Parties, absent manifest error.

c.    Each APAC Debtor shall, no later than the deadlines set forth in Annex F, make the cash payment (the amount of any such payment, a "Subsequent Payment Amount") to each of its Intercompany Creditors of a portion of its Category II Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of a Subsequent Determination Date on a pro rata basis according to the proportion in which the Category II Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category II Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors.

d.    Subject to Section 4, once all of its Senior Indebtedness (as defined below) has been paid or satisfied in full, each APAC Debtor shall, no later than the deadlines set forth in Annex F, make a Subsequent Payment Amount to each of its Intercompany Creditors of a portion of its Category III Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing, and only to the extent of, its Net Cash Balance as of a Subsequent Determination Date on a pro rata basis according to the proportion in which the Category III Pre-Filing Intercompany Debt of such APAC

11

Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category III Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors.

e.      The obligations set forth in this Section 3 shall apply only to the APAC Debtors having Category II Pre-Filing Intercompany Debt or Category III Pre-Filing Intercompany Debt and shall cease to apply to such APAC Debtors once all of their respective Category II Pre-Filing Intercompany Debt and Category III Pre-Filing Intercompany Debt have been paid or satisfied in full.

4.     Subordination.

a.      Subject to Sections 4.d. and 12, the Category III Pre-Filing Intercompany Debt owing by each of NN Asia Group, NN Australia, NN Malaysia, NN India (Private), NN Singapore Group, NN Korea, NN Thailand and NN Vietnam (each, an "Identified Debtor," and collectively, the "Identified Debtors") to its Intercompany Creditors (the "Subordinated Debt") shall be subordinated and junior in right of payment to the prior payment in full of the following debts of such Identified Debtor (the "Senior Indebtedness"), and each Intercompany Creditor agrees not to enforce the Subordinated Debt prior to such payment of the Senior Indebtedness:

     i.      subject to Section 5, all liabilities and obligations of such Identified Debtor, whether actual, contingent, present or future, to the Excluded Affiliates or non-affiliated third parties, in each case, whether incurred before or after the Filing Date (the "Third Party Liabilities");

     ii.      subject to Section 8, all intercompany loans, credits and obligations owing by such Identified Debtor to its Intercompany Creditors incurred after the Filing Date after setting off against the receivables owing to it by the relevant Intercompany Creditors after the Filing Date to the extent not prohibited or restricted under applicable laws and regulations (the "Post-Filing Intercompany Debt");

     iii.     all Category I Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 2; and

     iv.     all Category II Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 3.

b.      Each of the Identified Debtors shall only be obligated to make payment of the Subordinated Debt (i) only if no Senior Indebtedness remains outstanding and (ii) subject to Section 4.c., only to the extent of its Net

12

Cash Balance (after full payment or satisfaction of all of its Senior Indebtedness) as of the applicable Subsequent Determination Date. Any such payment of the Subordinated Debt shall be made on a pro rata basis according to the proportion in which the Subordinated Debt of such Identified Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Subordinated Debt of such Identified Debtor owing to all of its Intercompany Creditors.

c.      Upon any distribution of assets of an Identified Debtor in any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

   i.      the holders of all Senior Indebtedness of such Identified Debtor shall first be entitled to receive payment in full in cash of all Senior Indebtedness of such Identified Debtor before any Intercompany Creditor of the Subordinated Debt of such Identified Debtor is entitled to receive any payment of any kind or character on account of the principal of or interest on or any other amount owing in respect of such Subordinated Debt;

   ii.     any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, to which any Intercompany Creditor of the Subordinated Debt of such Identified Debtor would be entitled except for the provisions of this Section 4, shall be paid by the liquidating trustee or agent making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, directly to the holders of Senior Indebtedness of such Identified Debtor to the extent necessary to make payment in full in cash of all Senior Indebtedness of such Identified Debtor remaining unpaid after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness; and

   iii.    in the event that, notwithstanding the foregoing provisions of this Section 4.c., any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, shall be received by any Intercompany Creditor of the Subordinated Debt of such Identified Debtor on account of the Subordinated Debt of such Identified Debtor before all Senior Indebtedness of such Identified Debtor is paid in full in cash, such payment or distribution shall be received and held by such Intercompany Creditor for the sole benefit of, and shall forthwith be paid over to, the holders of the Senior Indebtedness of such Identified Debtor remaining unpaid for application to the payment of such Senior Indebtedness until all such Senior Indebtedness shall have been paid in full in cash, after giving effect

13

to any concurrent payment or distribution to the holders of such Senior Indebtedness.

The applicable Identified Debtor shall give prompt written notice to each Intercompany Creditor of the Subordinated Debt of such Identified Debtor and the other Relevant Parties of any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon assignment for the benefit of creditors or otherwise); *provided, however,* that failure to give such notice shall not affect the subordination effected hereby or in any way modify the provisions of this Section 4.

d.       Notwithstanding anything herein to the contrary, with respect to any Identified Debtor, during any period of time that a Payment Event of Default (as defined below) has occurred and is continuing under this Agreement (the date of the occurrence of such Payment Event of Default, the "Suspension Date"), the provisions of this Section 4 shall be suspended and not be applicable to the portion of Subordinated Debt of such Identified Debtor equal to the amount relating to such Payment Event of Default (the "Suspended Subordinated Debt") to the effect that the Suspended Subordinated Debt shall not be deemed to be Subordinated Debt during the Suspension Period (as defined below). In the event that on any subsequent date (the "Reversion Date"), such Identified Debtor cures such Payment Event of Default, the provisions of this Section 4 shall again be applicable to the Suspended Subordinated Debt equal to the amount so cured (the "Reverted Subordinated Debt") and the Reverted Subordinated Debt shall thereafter again be deemed to be Subordinated Debt. For the purposes of this Agreement, the period of time between the Suspension Date and the Reversion Date is referred to as the "Suspension Period". The applicable Identified Debtor shall deliver written notice promptly to the Relevant Parties notifying of any event set forth in this Section 4.d.

5.       Excluded Affiliate Liabilities. Notwithstanding anything herein to the contrary, if any Excluded Affiliate enters into an agreement with any APAC Debtor subsequent to the date of this Agreement (an "Excluded Affiliate Restructuring Agreement") which provides for a less favorable treatment with respect to such APAC Debtor's Third Party Liabilities owed to such Excluded Affiliate (the "Excluded Affiliate Liabilities") than the treatment thereof provided herein, then the treatment of such Excluded Affiliate Liabilities hereunder shall be in accordance with the terms of such Excluded Affiliate Restructuring Agreement from the effective date thereof and subsequent calculations of such APAC Debtor's Net Cash Balance shall give effect to such Excluded Affiliate Restructuring Agreement.

6.       Covenants.

a.       NNSA may, prior to the Initial Effective Date, by notice in writing to the Parties hereto, accede to this Agreement as an EMEA Debtor on the same

14

CONFIDENTIAL                                    NNC-NNL06724463 / 14