terms and conditions as an EMEA Debtor (such accession conditioned, if applicable, on French court approval), and the Parties shall forthwith on receipt of such notice enter into an appropriate form of accession agreement with NNSA. The Parties agree that the provisions of this Section 6.a. are for the benefit of NNSA and may be enforced by NNSA.

b.     Without limiting the generality of Section 11, each APAC Debtor hereby agrees, upon receipt of a written request from NNL, to enter into one or more asset sale agreements to transfer such APAC Debtor's assets relating to the Enterprise Solutions and Metro Ethernet Networks business units of the Nortel Group and any and all agreements and documents contemplated thereby and/or agreements between the Selling Debtors (as defined below) entered into in relation thereto.

c.     To the extent any APAC Debtor is restricted from remitting cash or making the Initial Payment or any Subsequent Payment by any applicable law or regulation, such APAC Debtor covenants to use its reasonable best efforts to undertake all necessary or desirable actions in order for such APAC Debtor to be able to freely remit cash and/or make the Initial Payment or the Subsequent Payment as soon as practicable.

d.     Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall not take any of the following actions without the prior written consent of the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators (which consent shall not be unreasonably withheld or delayed):

   i.     The distribution of profits among the shareholders of such APAC Debtor by way of dividend, return of capital or otherwise;

   ii.    The adoption or modification of any significant accounting policies of such APAC Debtor, except as required under any applicable laws, regulations or accounting standards;

   iii.   Except as contemplated by this Agreement, the entry into any material agreements, including, without limitation, any contractual agreements to make any severance or redundancy payments, to incur any obligation for the payment or repayment of money borrowed (such obligation, the "Indebtedness"), or any financing or lease agreement, or by mortgaging or creating a security interest or other encumbrance over the assets of such APAC Debtor, in each case, other than (A) in relation to the standby note facility among NN Australia, NN Japan and NN New Zealand in the aggregate amount not exceeding US$7.0 million (the "NN Australia Note Facility") and the related security interest to be provided by NN Australia to secure its obligations thereunder, (B)

15

in relation to (1) any existing or future posting of any cash or cash equivalents by such APAC Debtor to banks or other third parties as collateral or (2) any escrow arrangements entered into or to be entered into between such APAC Debtor, its customers or vendors and any financial institutions, in each case, in connection with the provision or issuance of performance, advance payment, warranty, tax, customs duty or other types of bonds, guarantees or security in the ordinary course of business and/or in the fulfillment of any contractual obligation to provide the same ("Ordinary Course Cash Collateral") and (C) in the ordinary course of such APAC Debtor's business consistent with past practice and applicable corporate policies and procedures, as such practice and corporate policies and procedures may be modified from time to time to the extent necessary to enter or consummate any Sale Transaction or the Proceedings of the shareholders of such APAC Debtor; or

iv.     The payment of any Indebtedness of such APAC Debtor other than as specifically permitted by this Agreement.

e.      Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall use its reasonable best efforts to provide written notice to and to consult with the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators prior to taking any of the following actions: liquidate, commence bankruptcy proceedings, suspend payments, assign to or make any other arrangement with such APAC Debtor's creditors or put such APAC Debtor into judicial management or administration and/or consolidation, or merge or amalgamate such APAC Debtor with any other company and/or cease to conduct or carry on such APAC Debtor's business or any part thereof other than as a result of a Sale Transaction where such APAC Debtor is a Selling Debtor.

f.      Each Party which is a shareholder of any APAC Debtor hereby agrees that to the extent required or desirable and upon receipt of a written request from such APAC Debtor, such Party shall execute shareholder(s)' resolutions (solely in its capacity as a shareholder of such APAC Debtor) approving and/or ratifying the entry of this Agreement by such APAC Debtor and the consummation of the transactions contemplated by this Agreement.

7.      Appointment of Restructuring Manager. The APAC Debtors shall appoint, with effect from the date hereof, Ernst & Young Solutions LLP as the restructuring manager (the "Restructuring Manager") to carry out the duties set out in Annex G. The fees, costs and expenses of the Restructuring Manager shall be borne jointly and severally by NN Japan, NN India (Private), NN Australia, NN Singapore Group and NN Asia Group. If the Restructuring Manager resigns or is removed or a vacancy exists in the office of the Restructuring Manager for

16

any reason, then the APAC Debtors shall promptly appoint a successor Restructuring Manager in consultation with the other Relevant Parties.

8.    Full and Final Settlement. In consideration of the obligations, covenants and rights of the Parties set forth in this Agreement, including without limitation the APAC Debtor's agreement to enter into the relevant sale agreements under Section 6.b. and to cooperate fully and participate in one or more Sale Transactions under Section 11, the Parties hereby agree that this Agreement shall constitute a full and final settlement of any and all Adjustment Payments (as defined below) owing and that may, or could be owing between (a) the APAC Debtors *inter se* and (b) an APAC Debtor, on the one hand, and a Canadian Debtor, on the other hand, under the APAC Distribution Agreements (as defined below) for all calculation periods or parts thereof during, or with respect to, the period from and including the Filing Date through and including December 31, 2009. For the purposes of this Section 8, "Adjustment Payments" means the quarterly and/or annual adjustment payments payable pursuant to the APAC Distribution Agreements; and "APAC Distribution Agreements" means certain distribution agreements, whether written or oral, in effect between two or more APAC Debtors or between one or more APAC Debtors, on the one hand, and a Canadian Debtor, on the other hand, including without limitation, the agreements listed in Annex H (as amended, supplemented or otherwise modified from time to time).

## PART C – PROVISIONS OF GENERAL APPLICATION

9.    Scope of this Agreement. The Parties hereto agree that:

a.    this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets, undertakings or businesses of Nortel Group entities;

b.    except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense;

c.    this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement or allocation of any sale proceeds, or any ownership of intellectual property;

d.    each Party approves all payments to be made in accordance with this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.    this Agreement shall not, and is not intended to, have any impact whatsoever on the rights and obligations of the various parties to the certain Interim Funding and Settlement Agreement dated June 9, 2009.

17

CONFIDENTIAL    

10.   Relinquishment of Intellectual Property Licenses.

    a.   Upon the written request of NNL, each of the APAC Debtors hereby agrees to enter into a License Termination Agreement (as defined below) with respect to the licenses and rights granted by NNL to such APAC Debtors for the purposes of facilitating, and in consideration of a right to an allocation, to be determined in accordance with Section 11, to such APAC Debtors of a portion of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, such APAC Debtor shall not be required to enter into any License Termination Agreement if a License Agreement (as defined in the License Termination Agreement) contains terms that are materially inconsistent with the terms of the License Termination Agreement.

    b.   For the purposes of this Agreement, the term "License Termination Agreement" means an agreement substantially in the form attached hereto as Annex I.

    c.   Where any APAC Debtor enters into any License Termination Agreement in accordance with the provisions of this Section 10, such APAC Debtor shall be deemed to be a Selling Debtor (as defined below), and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds (as defined below), for the purposes of Sections 11.b., 11.c. and 11.d., and Sections 11.b., 11.c. and 11.d. shall apply accordingly.

11.   Entry into Sale Transactions.

    a.   Subject to (i) compliance with applicable laws and regulations and (ii) the determination by the board of directors of each APAC Debtor, acting reasonably and in good faith and after consultation with the Relevant Parties, that the applicable Sale Transaction is in the best economic interests of such APAC Debtor's relevant stakeholders generally, each APAC Debtor hereby agrees to cooperate fully and participate in one or more Sale Transactions. Such cooperation shall include implementation of any reasonable operational or corporate structure changes required by the Filed Debtors or any purchaser (or, in the case of any auction, the successful bidder in any such auction) (a "Purchaser") and the execution of definitive documentation, including any ancillary or related documents necessary or reasonably desirable to participate in the Sale Transactions, with the Purchaser in accordance with the terms of such definitive documentation. Each APAC Debtor hereby agrees that its execution of definitive documentation with a Purchaser of, or closing of any sale of, material assets, undertakings or businesses of any of the APAC Debtors to which such APAC Debtor (an "APAC Selling Debtor") is proposed to be a party, together with each of the other Parties hereto that is proposed to be a party thereto (together with the APAC Selling Debtors, the "Selling

18

CONFIDENTIAL

Debtors") (each, a "Sale Transaction") shall not be conditioned upon such APAC Selling Debtor reaching agreement with the other Selling Debtors regarding (i) allocation of the sale proceeds (the "Sale Proceeds") from the relevant Sale Transaction or (ii) the Allocation Protocol (as defined below).

b.   Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 11.b., the entire amount of the Sale Proceeds from a Sale Transaction (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs (including any applicable break fee or expense reimbursement) and other agreed amounts) shall be deposited in an escrow account (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Allocation Protocol applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c.   Without derogating from the obligations provided in Section 11.a., each APAC Debtor shall, as soon as reasonably practicable following the execution of the Allocation Protocol by the Filed Debtors, accede to a common protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions, which shall provide in substance the following general principles, among others (the "Allocation Protocol"):

  i.   APAC Debtors, along with one or more affiliates of the Filed Debtors that have not commenced any bankruptcy or other creditor protection proceedings and so elect, (such affiliates together with the APAC Debtors, the "Non-Filed Affiliates"), shall be collectively represented in the procedures under the Allocation Protocol by an independent counsel and financial advisor, and the fees and expenses of such counsel and financial advisor shall be paid from the Sale Proceeds allocated to the Non-Filed Affiliates;

  ii.   Subject to Section 11.c.iv. of this Agreement, the representatives of the Non-Filed Affiliates shall have the right to participate and present the claims of the Non-Filed Affiliates to the relevant Sale Proceeds in the proceedings under the Allocation Protocol; the manner and terms of such participation and presentation shall be determined by the dispute resolver(s);

  iii.   In the event the Selling Debtors fail to reach agreement regarding the allocation of Sale Proceeds under the Allocation Protocol, such dispute shall be automatically referred to the dispute resolver(s) pursuant to the Allocation Protocol;

19

iv.    It is the intention of the Parties that the procedures under the Allocation Protocol shall be designed to avoid unnecessary delay or expense, so as to provide a fair and efficient means for the final resolution of the relevant dispute among the Selling Debtors. The rights of the Non-Filed Affiliates to participate and present as contemplated by Section 11.c.ii, as determined by the dispute resolver(s), shall reflect, to the extent reasonably practicable and determinable under the circumstances, the relative contribution, if any, of the assets (tangible and intangible) and the rights transferred or relinquished by and liabilities assumed from the Non-Filed Entities in comparison to other Selling Debtors in such Sale Transaction; and

v.    The written decision of the dispute resolver(s) allocating the Sale Proceeds among the Selling Debtors shall be conclusive, final and binding upon each of the parties as may be provided in the Allocation Protocol, including, without limitation, the Non-Filed Affiliates, subject to the terms of the Allocation Protocol.

d.    All Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Allocation Protocol, failing which the Allocation Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e.    For the purposes of Sections 11.a. through 11.d. (inclusive):

i.    the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

ii.    the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Monitor and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior

20

consent of the Monitor and the Bondholders' Committee acting in good faith.

12.    Effectiveness.

   a.    Subject to Sections 12.b. and 12.f., the effectiveness of the provisions of this Agreement shall be subject to the satisfaction of the following conditions:

      i.    each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition");

      ii.    the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Initial Conditions," and each, an "Initial Condition"), *provided, however,* the Joint Administrators may at their election waive the UK Court Condition;

      iii.    (A) the Reserve Bank of India approving (1) the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN India (Private) by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a., (2) the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to its Intercompany Creditors incurred after the Filing Date against any receivables owing to NN India (Private) by the relevant Intercompany Creditors as contemplated under Section 4.a.ii and (3) Section 4 and 8 of this Agreement and (B) the satisfaction of all conditions, if any, which the Reserve Bank of India may attach or impose on such approvals (collectively, the "RBI Condition"); and

      iv.    (A) the Bank of Thailand or any commercial bank that is an authorized agent of the Bank of Thailand approving the setting-off of the unpaid amount of loans, credits and obligations owing by NN Thailand to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN Thailand by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a. and (B) the satisfaction of all conditions, if any, which the Bank of Thailand or an authorized agent of the Bank of Thailand may attach or impose on such approvals (collectively, the "BOT Condition" and, together with the Initial Conditions and the RBI Condition, the "Conditions," and each, a "Condition").

21

b.      Upon the satisfaction of each of the Initial Conditions, (i) all provisions of this Agreement shall be effective with respect to all the Parties (other than NN India (Private) and NN Thailand), (ii) all provisions of this Agreement other than Sections 1-4 and 8 shall be effective with respect to NN India (Private) and (iii) all provisions of this Agreement other than Sections 1-4 shall be effective with respect to NN Thailand, in each case, as of the date of the satisfaction of the last Initial Condition (the "Initial Effective Date"). Upon the satisfaction of the RBI Condition, Sections 1-4 and 8 shall be effective with respect to NN India (Private) as of the date of the satisfaction of the RBI Condition. Upon the satisfaction of the BOT Condition, Sections 1-4 shall be effective with respect to NN Thailand. The last date of the satisfaction of the RBI Condition and the BOT Condition is referred to in this Agreement as the "Final Effective Date."

c.      Each Party hereto (including NN India (Private) and NN Thailand but excluding the other APAC Debtors) shall:

     i.      use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

     ii.      keep all other Parties, the Monitor, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

     iii.      use commercially reasonable efforts to allow any other Party, the Monitor, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

d.      Each APAC Debtor hereto shall use commercially reasonable efforts to make or obtain all applicable governmental notifications, consents, authorizations and approvals required for such APAC Debtor to enter into this Agreement and/or to consummate the transactions contemplated herein and set forth in Schedule 5 as soon as practicable.

e.      If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (i) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (ii) keep all other Parties, the Monitor, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's

22

Directions as reasonably requested by other Parties, and (iii) use commercially reasonable efforts to allow any other Party, the Monitor, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.  Notwithstanding any of the foregoing but subject to Section 12.b., the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.a., 3.b., 5, 6, 7, 8, 10, 11, 12, 13.c. and 14-27.

13.  Events of Default; Remedies.

a.  For the purposes of this Agreement, (i) a "Payment Event of Default" shall mean, with respect to an APAC Debtor, a default for ten (10) or more calendar days in the payment of any Initial Payment Amount or any Subsequent Payment Amount of such APAC Debtor when due (whatever the reason for such Payment Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and (ii) a "Covenant Event of Default" shall mean, with respect to an APAC Debtor, a failure for ten (10) or more calendar days after receipt by such APAC Debtor of written notice given by NNL or NNI to comply with its agreements set forth in Sections 10 and 11.

b.  Subject to Section 4.d. and without derogating from the obligations provided in Sections 2.b. and 3.c., upon the occurrence of a Payment Event of Default by an APAC Debtor, to the extent that such APAC Debtor has a Net Cash Balance as of the applicable Determination Date, such APAC Debtor shall make payment of a portion of the Initial Payment Amount or the Subsequent Payment Amount (as the case may be) to each of its Intercompany Creditors of its Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or its Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) owing to such Intercompany Creditor utilizing its Net Cash Balance as of the applicable Determination Date on a pro rata basis according to the proportion in which the Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or the Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or the aggregate amount of all Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) of such APAC Debtor owing to all of its Intercompany Creditors.

23

CONFIDENTIAL            

c.      Subject to compliance with all applicable laws and regulations, each APAC Debtor's obligation to comply with its agreements set forth in Sections 10 and 11, and the expenses, costs, losses, liabilities and damages that may be incurred by the other Selling Debtors by reason of such APAC Debtor's non-compliance with such agreements (the "Secured Obligations"), shall be secured by the following assets of such APAC Debtor (collectively, the "Collateral"): perfected first-priority security interests in all present and future tangible and intangible assets, properties and undertakings (including, without limitation, bank accounts, investment property, intercompany receivables and any other receivables, equipment, contractual rights, intellectual property and other general intangibles) but in each case excluding those assets over which granting of a security interest in such assets would be prohibited or limited (but if limited, only excluded to the extent of such limitation and for so long as such limitation is in force) by law and/or contract; *provided, however*, that with respect to any Collateral that also secures the obligations of NN Australia under the NN Australia Note Facility, the Secured Obligations shall be secured by second-priority security interest that shall be junior to the security interests of the secured parties under the NN Australia Note Facility, and the lien priority and the relative rights issues in respect thereof will be set forth in a customary intercreditor agreement, which shall be reasonably acceptable to the secured parties under the NN Australia Note Facility, and *provided, further*, that such security interests shall not prevent any APAC Debtor from posting Ordinary Course Cash Collateral. Subject to compliance with all applicable laws and regulations, all of the above-described security interests with respect to NN Japan, NN Asia Group and NN Singapore Group shall be created for the benefit of the other Selling Debtors on or prior to the Initial Effective Date (or with respect to the other APAC Debtors within 45 days from the date hereof) on terms, and pursuant to documentation reasonably satisfactory to the Relevant Parties, and shall provide for the ability of the secured parties thereof to enforce such security interests upon the occurrence of a Covenant Event of Default. Notwithstanding the foregoing, assets may be excluded from the Collateral in circumstances where such APAC Debtor and the Relevant Parties agree that the cost of obtaining a security interest in such assets are excessive in relation to the value afforded thereby. Each APAC Debtor shall bear all reasonable costs and expenses that may be incurred by the Parties in creating the security interests relating to such APAC Debtor in accordance with this Section 13.c.

14.     Amendments. This Agreement may be amended or any rights under the Agreement may be waived, on no less than 5 Business Days' notice, only in writing signed by all Parties, and approved by the Monitor, Creditors' Committee and the Bondholders' Committee, which amendments or waivers, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purposes of this Section 14, "Business Day"

24

shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

15.     <u>Governing Law and Jurisdiction</u>.

     a.     This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of the laws of the State of New York; *provided, however,* that Sections 1-5, 6.c., 6.d., 6.e., 7, 12.d., 13.a., 13.b., 16 and 26 shall be governed exclusively by English law and Section 8 shall be governed by Ontario law.

     b.     To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the cross-border protocol previously approved by the US Court and the Canadian Court, as it may be in effect from time to time (the "<u>Cross-Border Protocol</u>"), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in (A) the US Court if such claim, action or proceeding would solely involve the US Debtors, (B) the Canadian Court if such claim, action or proceeding would solely involve the Canadian Debtors, (C) a joint hearing of both the US and Canadian Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would involve the Canadian Debtors and the US Debtors, (D) the English courts if such claim, action or proceeding would solely involve the EMEA Debtors and (E) the English courts if such claim, action or proceeding would solely involve the APAC Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that (1) any claim, action or proceeding brought against the Joint Administrators in relation to any potential liability or their capacity be it personal or otherwise under this Agreement shall be brought exclusively in the English courts, (2) any claim, suit, action or proceeding against any APAC Debtor Person shall be brought exclusively in the courts of the place of incorporation of the relevant APAC Debtor in which such APAC Debtor Person is a director, officer or employee (as the case may be) and (3) any claim, suit, action or proceeding relating to the matters set forth in Section 8 shall be brought exclusively in the Canadian Court.

CONFIDENTIAL     

16.    No Personal Liability of the Joint Administrators.

    a.    The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

    b.    The Joint Administrators are a Party to this Agreement: (i) as agents of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

17.    No Personal Liability of the APAC Debtor Persons.

    a.    To the fullest extent permitted by applicable law, each of the Parties (other than the relevant APAC Debtor) agrees that it shall have no claim against any director, officer or employee of each APAC Debtor (each, an "APAC Debtor Person" and collectively, the "APAC Debtor Persons") and none of the APAC Debtor Persons shall have any personal liability to any Party (other than the relevant APAC Debtor) whatsoever based upon him being or having been or having done any act or omitting anything to be done as a director, officer or employee (as the case may be) of the relevant APAC Debtor, or in respect of any failure on the part of the relevant APAC Debtor to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations and each of such Parties, to the fullest extent permitted by applicable law, waives and releases and agrees and undertakes not to allege any such liability or assert, promote or support any such claim, except to the extent a liability arises out of fraud, willful misconduct or gross negligence on the part of such APAC Debtor Person.

    b.    Each APAC Debtor hereby unconditionally and irrevocably and to the fullest extent permitted by applicable law, agrees and undertakes to fully and effectively indemnify and keep indemnified and hold harmless each APAC Debtor Person of such APAC Debtor from and against all and any actions, suits, proceedings, claims, liabilities, demands, losses, charges, costs and expenses (including, without limitation, all reasonable costs and expenses incurred in disputing or defending or the settlement of any claims or actions or other proceedings as such APAC Debtor Person may

26

in his reasonable discretion decide to dispute, defend or settle, on a full indemnity basis) (collectively, the "Indemnified Liabilities") which may be made or brought, or threatened to be made or brought by any party (including by that APAC Debtor) against such APAC Debtor Person, or which such APAC Debtor Person may sustain, suffer or incur, based upon him being or having been or having done any act or omitting anything to be done as a director, officer or employee (as the case may be) of such APAC Debtor, or the failure on the part of such APAC Debtor to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; provided, however, that nothing in this Section 17.b. shall exclude liability of any APAC Debtor Person of such APAC Debtor to such APAC Debtor for fraud, wilful misconduct or gross negligence. Without prejudice to the generality of the foregoing, each APAC Debtor shall forthwith upon the written demand(s) of any APAC Debtor Person of such APAC Debtor from time to time, pay to such APAC Debtor Person any Indemnified Liabilities which may be payable by such APAC Debtor Person. Notwithstanding any of the foregoing, NN Japan shall not indemnify, keep indemnified or hold harmless any director of NN Japan from and against any Indemnified Liabilities which may be made or brought by, or threatened to be made or brought by, NN Japan or the shareholders of NN Japan on behalf of NN Japan pursuant a derivative shareholders' suit against such director.

c.     Notwithstanding anything in Section 15, any claim, suit, action or proceeding against any APAC Debtor Person shall be governed exclusively by the laws of, and shall be subject to the exclusive jurisdiction of the courts of, the place of incorporation of the relevant APAC Debtor in which such APAC Debtor Person is a director, officer or employee (as the case may be), provided that in the case of a director, officer or employee of NN Australia, any claim, suit, action or proceeding against such APAC Debtor Person shall be governed exclusively by the laws of New York and shall be subject to exclusive jurisdiction of the courts of the State of New York and of the United States sitting in the Borough of Manhattan.

d.     The Parties agree that the provisions of this Section 17 are for the benefit of each APAC Debtor Person and may be enforced by each APAC Debtor Person.

18.     D&O Insurance. In consultation with the Relevant Parties and to the fullest extent permitted by applicable law, the APAC Debtors may obtain and maintain liability insurance, or procure that liability insurance be obtained and maintained, for their directors and officers ("D&O Insurance") so long as (a) such insurance covers all directors and officers of all of the APAC Debtors and (b) the total cost of such insurance shall not exceed US$1 million per annum. The APAC Debtors hereby agree that if the cost of D&O Insurance would exceed US$1 million

27

CONFIDENTIAL

per annum, then no such insurance shall be obtained by the APAC Debtors without the prior written consent of the Relevant Parties.

19.     Representations and Warranties. Subject to the satisfaction of the Conditions and the execution of the shareholder(s)' resolutions described in Section 6.f., each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

       a.     it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

       b.     the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary corporate approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

       c.     this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

20.     Reservation of Rights. Except as set forth in Section 8 of this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (a) under any other agreement, including, without limitation, group supplier protocol agreements approved in the applicable Proceedings from time to time and the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (b) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21.     Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22.     Entire Agreement. This Agreement embodies all the terms and conditions agreed upon between the Parties as to the subject matter of this Agreement and supersedes and cancels in all respects all previous term sheets, agreements and undertakings, if any, between the Parties with respect to the subject matter hereof, whether such be written or oral.

23.     Costs and Expenses. Each Party shall bear its own costs and expenses incurred in connection with the preparation, negotiation and execution of this Agreement.

28

24.     Specific Performance. Each Party hereby agrees and acknowledges that it will be impossible to measure in money the damages that would be suffered if such Party fails to comply with any of its obligations in this Agreement and that, in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled (in addition to any other remedy to which such party may be entitled at law or in equity) to seek injunctive relief, including specific performance, to enforce such obligations.

25.     Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

26.     Contracts (Rights of Third Parties) Act 1999. Except as specifically set forth in this Agreement, no rights are conferred on any person who is not a party to this Agreement under the Contracts (Rights of Third Parties) Act 1999 of the United Kingdom to enforce any term of this Agreement, but this does not affect any right or remedy which exists or is available apart from that Act.

27.     NN Korea. NN Korea hereby represents and warrants that (except for accounts receivable owing by certain of the APAC Debtors and Filed Debtors, and a small cash balance) it has no material tangible or intangible assets, including, without limitation, any intellectual property rights that are contemplated to be included in any Asset Sale or Sale Transaction. In consideration of this representation, the Parties hereby agree that, notwithstanding anything to the contrary in this Agreement, Sections 6.b., 10, 11 and 13.c. of this Agreement shall not apply to NN Korea.

28.     Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

29

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the date hereof.

NORTEL NETWORKS CORPORATION

By:

Name: John Doolittle
Title: SVP, Finance and
Corporate Finance

NORTEL NETWORKS LIMITED

By:

Name: John Doolittle
Title: SVP, Finance and
Corporate Finance

NORTEL NETWORKS GLOBAL
CORPORATION

By:

Name: John Doolittle
Title: President

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By:

Name: John Doolittle
Title: President

NORTEL NETWORKS CORPORATION

By

Name: Anna Ventresca
Title: General Counsel-Corporate and
Corporate Secretary

NORTEL NETWORKS LIMITED

By

Name: Anna Ventresca
Title: General Counsel-Corporate and
Corporate Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By

Name: Anna Ventresca
Title: Secretary

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By

Name: Anna Ventresca
Title: Secretary

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By

Name: Anna Ventresca
Title: Secretary

CONFIDENTIAL

NORTEL NETWORKS INC.

By _____
   Name: Anna Ventresca
   Title: Chief Legal Officer


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
   Name: John Doolittle
   Title: President


CORETEK, INC.

By _____
   Name: John Doolittle
   Title: President


NORTEL ALTSYSTEMS, INC.

By _____
   Name: John Doolittle
   Title: President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
   Name: John Doolittle
   Title: President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
   Name: John Doolittle
   Title: President


CONFIDENTIAL

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
   Name:   Anna Ventresca
   Title:   Chief Legal Officer

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
   Name:   John Doolittle
   Title:   President

NORTEL NETWORKS (CALA) INC.

By: _____
   Name:   John Doolittle
   Title:   Treasurer

NORTEL NETWORKS (CALA) INC.

By _____
   Name:   Peter Look
   Title:   President

NORTEL NETWORKS HPOCS INC.

By _____
   Name:   John Doolittle
   Title:   President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
   Name:   John Doolittle
   Title:   President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
   Name:   John Doolittle
   Title:   President

2

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
   Name: John Doolittle
   Title: President


QTERA CORPORATION

By _____
   Name: John Doolittle
   Title: President


SONOMA SYSTEMS

By _____
   Name: John Doolittle
   Title: President and Treasurer


XROS, INC.

By _____
   Name: John Doolittle
   Title: President


3

CONFIDENTIAL

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
   Name:
   Title:


QTERA CORPORATION

By _____
   Name:
   Title:


SONOMA SYSTEMS

By _____
   Name:
   Title:


XROS, INC.

By _____
   Name:
   Title:


NORTEL NETWORKS (ASIA) LIMITED

By _____
   Name: ALAIN FOSTER
   Title:


NORTEL NETWORKS AUSTRALIA PTY.
LIMITED

By _____
   Name: ALAIN FOSTER
   Title:


Signature page to Asia Restructuring
Agreement

CONFIDENTIAL

NORTEL NETWORKS (INDIA) PRIVATE
LIMITED

By _____
  Name: ALAIN FOSTER
  Title:

PT NORTEL NETWORKS INDONESIA

By _____
  Name: JAMES DEMERS
  Title:

NORTEL NETWORKS KABUSHIKI
KAISHA
      See attached

By _____
  Name: RAYMOND TESKE
  Title:

NORTEL NETWORKS KOREA LIMITED

By _____
  Name: ANDREW GRANT
  Title:

NORTEL NETWORKS MALAYSIA SDN.
BHD. (COMPANY NO: 54799-M)

By _____
  Name: ALAIN FOSTER
  Title:

NORTEL NETWORKS NEW ZEALAND
LIMITED

By _____
  Name: ALAIN FOSTER
  Title:

Signature page to Asia Restructuring
Agreement

CONFIDENTIAL
NNC-NNL06724463 / 35

NORTEL NETWORKS (INDIA) PRIVATE
LIMITED

By _____
    Name: ALAIN FOSTER
    Title:

PT NORTEL NETWORKS INDONESIA

By _____
    Name: JAMES DEMERS
    Title:

NORTEL NETWORKS KABUSHIKI
KAISHA

By _____     original
    Name: RAYMOND TESKE
    Title: REPRESENTATIVE DIRECTOR

NORTEL NETWORKS KOREA LIMITED

By _____
    Name: ANDREW GRANT
    Title:

NORTEL NETWORKS MALAYSIA SDN.
BHD. (COMPANY NO: 54799-M)

By _____
    Name: ALAIN FOSTER
    Title:

NORTEL NETWORKS NEW ZEALAND
LIMITED

By _____
    Name: ALAIN FOSTER
    Title:

Signature page to Asia Restructuring
Agreement

A

TR44749

NORTEL NETWORKS SINGAPORE PTE
LTD

By _____
Name: ANDREW GRANT
Title:

NORTEL NETWORKS (THAILAND)
LIMITED

By _____
Name: JAMES DEMERS
Title:

NORTEL VIETNAM LIMITED

By _____ See attached _____
Name: NICHOLAS VREUGDENHIL
Title:

Signature page to Asia Restructuring
Agreement

NORTEL NETWORKS SINGAPORE PTE
LTD

By _____

Name: ANDREW GRANT

Title:


NORTEL NETWORKS (THAILAND)
LIMITED

By _____

Name: JAMES DEMERS

Title:


NORTEL VIETNAM LIMITED

By _____  original

Name: NICHOLAS VREUGDENHIL

Title:


Signature page to Asia Restructuring
Agreement

CONFIDENTIAL

Signed by **ALAN BLOOM** as Joint
Administrator on behalf of the Joint
Administrators of each of the EMEA Debtors
without personal liability as provided in
Section 16 of this Agreement and solely for
the purpose of obtaining the benefit of the
provisions of this Agreement expressed to be
conferred on or given to each of the Joint
Administrators

By _____

    Name:

    Title:

**SIGNED** for and on behalf of **NORTEL**     )
**NETWORKS UK LIMITED (IN**         )     **ALAN BLOOM**
**ADMINISTRATION)**                 )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature    *W. Graham*

Name:    WILMA GRAHAM
Address: N0 1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL**     )
**NETWORKS (IRELAND) LIMITED**     )    **ALAN BLOOM**
**(IN ADMINISTRATION)**              )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature    *W. Graham*

Name:    WILMA GRAHAM
Address: N0 1 MORE LONDON PLACE
          LONDON SE1 2AF

Signature page to Asia Restructuring
Agreement

CONFIDENTIAL           NNC-NNL06724463 / 39

SIGNED for and on behalf of NORTEL
NETWORKS NV (IN
ADMINISTRATION)
CHRISTOPHER HILL
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

ALAN BLOOM CHRISTOPHER HILL



Witness signature

Name:    B. DANDRIDGE
Address:  c/o NORTEL NETWORKS
          MAIDENHEAD UK

SIGNED for and on behalf of NORTEL
NETWORKS SPA (IN
ADMINISTRATION)
CHRISTOPHER HILL
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

ALAN BLOOM CHRISTOPHER HILL



Witness signature

Name:    B. DANDRIDGE
Address:  c/o NORTEL NETWORKS
          MAIDENHEAD UK

SIGNED for and on behalf of NORTEL
NETWORKS BV (IN
ADMINISTRATION)
CHRISTOPHER HILL
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

ALAN BLOOM CHRISTOPHER HILL



Witness signature

Name:    B. DANDRIDGE
Address:  c/o NORTEL NETWORKS
          MAIDENHEAD UK

SIGNED for and on behalf of NORTEL    )

Signature page to Asia Restructuring
Agreement

CONFIDENTIAL

NETWORKS POLSKA SP Z.O.O. (IN )
ADMINISTRATION) )
CHRISTOPHER HILL
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature [signature]

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

ALAN BLOOM CHRISTOPHER HILL



SIGNED for and on behalf of **NORTEL** )
**NETWORKS HISPANIA SA (IN** )
**ADMINISTRATION)** )
CHRISTOPHER HILL
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature [signature]

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

ALAN BLOOM CHRISTOPHER HILL



SIGNED for and on behalf of **NORTEL** )
**NETWORKS (AUSTRIA) GMBH (IN** )
**ADMINISTRATION)** )
CHRISTOPHER HILL
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature [signature]

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

ALAN BLOOM CHRISTOPHER HILL



Signature page to Asia Restructuring
Agreement

CONFIDENTIAL

SIGNED for and on behalf of **NORTEL** )
**NETWORKS SRO (IN** )
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

ALAN BLOOM CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

SIGNED for and on behalf of **NORTEL** )
**NETWORKS ENGINEERING** )
**SERVICES KFT (IN** )
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

ALAN BLOOM CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

SIGNED for and on behalf of **NORTEL** )
**NETWORKS PORTUGAL SA (IN** )
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

ALAN BLOOM CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

Signature page to Asia Restructuring
Agreement

**SIGNED** for and on behalf of **NORTEL NETWORKS SLOVENSKO SRO (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

ALAN BLOOM   CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS ROMANIA SRL (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

ALAN BLOOM   CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS FRANCE S.A.S. (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

ALAN BLOOM   CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

Signature page to Asia Restructuring
Agreement

CONFIDENTIAL       NNC-NNL06724463 / 43

SIGNED for and on behalf of **NORTEL**
**GMBH (IN ADMINISTRATION)** )
*CHRISTOPHER HILL*
by ~~ALAN BLOOM~~ as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK



~~ALAN BLOOM~~ CHRISTOPHER HILL

SIGNED for and on behalf of **NORTEL**
**NETWORKS OY (IN** )
**ADMINISTRATION)** )
*CHRISTOPHER HILL*
by ~~ALAN BLOOM~~ as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK



~~ALAN BLOOM~~ CHRISTOPHER HILL

SIGNED for and on behalf of **NORTEL**
**NETWORKS INTERNATIONAL** )
**FINANCE & HOLDING BV (IN** )
**ADMINISTRATION)** )
*CHRISTOPHER HILL*
by ~~ALAN BLOOM~~ as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK.



~~ALAN BLOOM~~ CHRISTOPHER HILL

Signature page to Asia Restructuring
Agreement

CONFIDENTIAL

SIGNED for and on behalf of NORTEL      )
NETWORKS AB (IN                 )     ~~ALAN BLOOM~~ CHRISTOPHER HILL
ADMINISTRATION)             )
CHRISTOPHER HILL
by ~~ALAN BLOOM~~ as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:     B. DANDRIDGE
Address:    C/O NORTEL NETWORKS
            MAIDENHEAD UK

Signature page to Asia Restructuring
Agreement

CONFIDENTIAL             NNC-NNL06724463 / 45

## Schedule 1

### Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

S-1

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks (CALA) Inc.

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

S-2

CONFIDENTIAL

## Schedule 3

### EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

CONFIDENTIAL                                    NNC-NNL06724463 / 48

## Schedule 4

### APAC Debtors

Nortel Networks (Asia) Limited  ("NN Asia Group")

Nortel Networks Australia Pty. Limited ("NN Australia")

Nortel Networks (India) Private Limited ("NN India (Private)")

PT Nortel Networks Indonesia ("NN Indonesia")

Nortel Networks Kabushiki Kaisha ("NN Japan")

Nortel Networks Korea Limited ("NN Korea")

Nortel Networks Malaysia Sdn. Bhd. ("NN Malaysia")

Nortel Networks New Zealand Limited ("NN New Zealand")

Nortel Networks Singapore Pte Ltd ("NN Singapore Group")

Nortel Networks (Thailand) Limited ("NN Thailand")

Nortel Vietnam Limited ("NN Vietnam")

CONFIDENTIAL        NNC-NNL06724463 / 49

## Schedule 5

### List of Required Governmental Notifications, Consents, Authorizations and Approvals

Capitalized terms used but not defined in this Schedule 5 have the same meanings assigned thereto in the Asia Restructuring Agreement, and all section references are to the Asia Restructuring Agreement.

**Timing**

**A.    NN India**

| | | |
|---|---|---|
| 1. | Approval from Reserve Bank of India ("**RBI**") to effect the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN India (Private) by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a. | **Before signing of the Asia Restructuring Agreement or such approval shall be a condition precedent in Section 12.a.** |
| 2. | Approval from RBI to effect the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to its Intercompany Creditors incurred after the Filing Date against any receivables owing to NN India (Private) by the relevant Intercompany Creditors after the Filing Date, as contemplated under Section 4.a.ii. | **Before signing of the Asia Restructuring Agreement or such approval shall be a condition precedent in Section 12.a.** |
| 3. | Approval from RBI to effect any intercompany payments to be made by Nortel India towards import of goods and/or services which were effected more than 1 year before the date of proposed payment, pursuant to its payment of its Pre-Filing Intercompany Debt. | Before effecting payments |
| 4. | Approval from RBI to create the security over NN India (Private)'s assets in favour of a non-resident person, as contemplated under Section 13.c. | Before signing security documents |
| 5. | Approval from RBI for (i) (where the purchaser is not an Indian entity) the Sale Transactions or (ii) (where the purchaser is an Indian entity) the payment arrangements envisaged under the Sale Transactions, which contemplate the payment of the sale proceeds due to NN India (Private), to an escrow account until finalisation of the allocation of the sale proceeds. | Before signing asset sale agreements |
| 6. | Approval from RBI to effect the setting-off / write-off of receivables (being Transfer Pricing Payments) owed to Nortel India (Private) pursuant to Section 8. | **Before signing of the Asia Restructuring Agreement or such** |

S-5-1

| | | **Timing** |
|---|---|---|
| | | **approval shall be a condition precedent in Section 12.a.** |
| 7. | Approval from RBI to effect any payments that may be required to be made by NN India (Private) to, or for the credit of any person resident outside India, in rupees or foreign currency, under or pursuant to Section 17.b. | Before effecting any payments under Section 17.b |
| 8. | Approval from RBI for the subordination to be granted by NN India (Private) pursuant to Section 4 in respect of the Category III Pre-Filing Debt owing to NN India (Private). | **Before signing of the Asia Restructuring Agreement or such approval shall be a condition precedent in Section 12.a.** |
| 9. | Filings to be made in prescribed forms for registration of the security over NN India (Private)'s assets created pursuant to Section 13.c. with the Registrar of Companies, Delhi & Haryana in India within 30 days after the date of its creation. | After execution of security documents |

**B.    NN Malaysia**

| | | |
|---|---|---|
| 1. | Lodgment of any charge created by NN Malaysia pursuant to Section 13.c. with the Companies Commission of Malaysia, within 30 days from the creation of the charge. | After execution of security documents |
| 2. | Where NN Malaysia has been recorded as the registered user of any registered trade marks, an application would need to be done to cancel the same on the register subsequent to the termination of the license. | Upon the termination of such IP licenses. |

**C.    NN Indonesia**

| | | |
|---|---|---|
| 1. | Approval from the Minister of Law and Human Rights ("**MLHR**") for amendment of NN Indonesia's Articles of Association in relation to any change of amongst other things, purposes, objectives and business activities or scope of operation of NN Indonesia due to its divestitures of its businesses pursuant to a Sale Transaction (including the assets sales referred to in Section 6.b.) (if applicable). | Before signing asset sale agreement |
| 2. | Approval from the Capital Investment Coordinating Board (*Badan Koordinasi Penanaman Modal* or "**BKPM**") for | Before signing asset sale agreement |

S-5-2

**Timing**

any change in, amongst other things, the line of business
of NN Indonesia or the BKPM approvals and licenses held
by NN Indonesia due to its divestitures of its businesses
pursuant to a Sale Transaction (including the assets sales
referred to in Section 6.b.) (if applicable).

3.  The filing of the periodic reports with respect to the status
    of NN Indonesia's main payment liabilities, its
    amendment and realization thereof with Bank Indonesia,
    the Offshore Commercial Loan Coordinating Team (the
    "**PKLN Team**") and the Ministry of Finance, as the case
    may be, status of NN Indonesia's inter-company trade
    payments / receivables before and after the setting off.

    To be done regularly by
    NN Indonesia until the
    full repayment of the
    debts.

4.  The filing with Bank Indonesia of the NN Indonesia's
    foreign exchange flow activities containing statement and
    data on the foreign exchange flow activities, as the case
    may be, status of NN Indonesia's inter-company trade
    payments / receivables before and after the setting off as
    required by Bank Indonesia Regulation No. 4/2/PBI/2002
    as lastly amended by Bank Indonesia Regulation No.
    5/1/PBI/2003 dated 31 January 2003, the implementing
    regulations thereof and any amendments thereto (such
    filing is applicable only if NN Indonesia has (i) total assets
    of at least Rp.100 Billion or (ii) gross sales in 1 (one) year
    of at least Rp.100 Billion).

    To be done regularly by
    NN Indonesia until the
    full repayment of the
    debts.

5.  The filing with Bank Indonesia of a report with respect to
    the financial ratio and financial statement of NN Indonesia
    every 10 April and 10 September of each year (or on the
    next working day if such respective dates fall on a
    holiday), as the case may be, status of NN Indonesia's
    inter-company trade payments / receivables before and
    after the setting off, as required by Bank Indonesia
    regulation No. 10/7/PBI/2008 dated 19 February 2008, the
    implementing regulations thereof and any amendments
    thereto (such filing is applicable only if NN Indonesia has
    (i) total assets of at least Rp.100 Billion or (ii) gross sales
    in 1 (one) year of at least Rp.100 Billion).

    To be done regularly by
    NN Indonesia until the
    full repayment of the
    debts.

6.  For purchase of foreign currencies against Rupiah in the
    total amount of exceeding US$100,000 per month per
    customer (including the purchase of foreign currencies for
    derivative transactions), a bank in Indonesia is required to
    obtain from its customers or foreign parties, the following

    At the time of the
    purchase of foreign
    currencies against
    Rupiah.

S-5-3

CONFIDENTIAL    NNC-NNL06724463 / 52

| | | **Timing** |
|---|---|---|
| documents: | | |

|  |  | Timing |
|---|---|---|
| | (i)    a copy of the underlying document; | |
| | (ii)    a copy of the relevant Taxpayer Code Number (only applicable for Indonesian parties); and | |
| | (iii)    a statement from the bank's customer or foreign party that the underlying document is a valid document and that the foreign currency will only be used to settle the payment obligations under the underlying document. | |
| 7. | Registration of the license termination agreement at the Directorate General of IPR office (if the license agreement has been registered (i.e., copied and 'stamped' but not fully registered, a process which is not yet possible) at the Directorate General of IPR office) | Upon the termination of the IP licenses. |
| 8. | Registration of the security over NN Indonesia's assets created pursuant to Section 13.c. with the appropriate Land Office (for mortgages) or Fiduciary Registration Office (for fiduciary security) | After execution of the security document. |
| **D.** | **NN Korea** | |
| 1. | Prior approval for the set off of receivables and payables with each Intercompany Creditor of NN Korea, from Bank of Korea (if the receivables or payables of either NN Korea or such Intercompany Creditor is in excess of USD500,000) or the designated foreign exchange bank (if the receivables or payables of either NN Korea or such Intercompany Creditor is less than USD500,000). | Before effecting payments |
| 2. | Prior approval from Bank of Korea or the designated foreign exchange bank (as the case may be) to effect any payments resulting from the set-off approved by Bank of Korea or the designated foreign exchange bank (as the case may be) (as referred to in paragraph D.1 above), after the 60-day validity period of approval. | Before expiration of the 60-day validity period |
| 3. | Prior approval from Bank of Korea or the foreign exchange bank if NN Korea is unable to collect any receivables of the applicable amount (as described below) within the applicable time period (as described below), or if NN Korea wishes to extend such period:- | Before original due date of receivables |

Applicable amount: more than USD500,000 (but if

S-5-4

**Timing**

receivables occur prior to 2 March 2006, more than USD100,000)
Applicable time period: 18 months from the original due date (but if receivables occur prior to 1 January 2006, 6 months from the original due date).

4.  Approval from the Bank of Korea for any receipt by third parties / escrow agent of any portion of the sale proceeds that are due to NN Korea in consideration of the sale of its assets pursuant to any Sale Transaction (if applicable).

Before payment of the sale proceeds to the third parties / escrow agent

5.  Approval from the Bank of Korea for any receipt by third parties / escrow agent of any portion of the sale proceeds that are due to NN Korea in consideration of its execution of the License Termination Agreement (if applicable).

Before payment of the sale proceeds to the third parties / escrow agent

6.  Approval from Bank of Korea to be obtained prior to the execution of the relevant security document for the creation of security over assets of NN Korea pursuant to Section 13.c. (if applicable)

Before execution of security documents

7.  Filing (if required) in respect of any security to be created by NN Korea pursuant to Section 13.c. (if applicable)

After execution of security documents

**E.    NN Thailand**

1.  Approval from the Bank of Thailand or any commercial bank which is an authorized agent of the Bank of Thailand to effect the setting-off of the unpaid amount of loans, credits and obligations owing by NN Thailand to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN Thailand by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a.

**Before signing of the Asia Restructuring Agreement or such approval shall be a condition precedent in Section 12.a.**

2.  Approval from the Bank of Thailand or any commercial bank which is an authorized agent of the Bank of Thailand to effect the setting-off of the unpaid amount of loans, credits and obligations owing by NN Thailand to its Intercompany Creditors incurred after the Filing Date against any receivables owing to NN Thailand by the relevant Intercompany Creditors after the Filing Date, as contemplated under Section 4.a.ii.

Before effecting the relevant set-off

3.  Approval by the Bank of Thailand or an authorized agent

Before effecting

S-5-5

CONFIDENTIAL

<u>Timing</u>

of the Bank of Thailand, which includes all commercial banks in Thailand, to be obtained immediately prior to each payment of a foreign currency out of Thailand.

payments

4.    Approval by the Board of Investment of Thailand to terminate NN Thailand's promoted business as set out in the Promotion Certificate which has been granted to NN Thailand.

Immediately after the closing of the last relevant Sale Transaction which will result in NN Thailand being unable to undertake any of its promoted business due to the disposal of its business pursuant to such Sale Transaction

5.    Filing by licensors and licensees of an application with the Department of Intellectual Property to terminate the IP licenses (which has been registered with the Department of Intellectual Property) (if applicable)

Upon the termination of such IP licenses.

**F.    NN Vietnam**

1.    Approval from the State Bank of Vietnam (or, if State Bank of Vietnam approval is not required, the remitting bank in Vietnam) for NN Vietnam to effect payments out of Vietnam as contemplated under the Asia Restructuring Agreement

Before effecting payments

2.    Registration of security interests created by NN Vietnam over its assets pursuant to Section 13.c. of the Asia Restructuring Agreement with the National Agency for Registration of Secured Transactions

After execution of security documents

3.    Approval from the State Bank of Vietnam (if required) for NN Vietnam to effect the setting-off of the unpaid amount of foreign loan or trade debts with a term of over 1 year owing by NN Vietnam to each of its Intercompany Creditors against any receivables owing to NN Vietnam by such Intercompany Creditors, as contemplated under Section 1.a. and Section 4.a.ii of the Asia Restructuring Agreement

Before setting-off

4.    Registration of termination of the intellectual property license pursuant to Section 10.b. of the Asia Restructuring Agreement with the National Office for Intellectual

If intellectual property license is registered, after execution of license

S-5-6

CONFIDENTIAL

**Timing**

Property (if required)                                          termination agreement

5.    Approvals from the relevant authorities of Vietnam in          If the Sale Transaction is
      respect of the Sale Transaction pursuant to Section 11 of       a sale of assets in the
      the Asia Restructuring Agreement (if applicable)                context of a liquidation, a
                                                                      copy of the resolution of
                                                                      the members' council
                                                                      and/or investor of NN
                                                                      Vietnam resolving to
                                                                      liquidate the company
                                                                      must be sent to the
                                                                      Department of Planning
                                                                      and Investment of Hanoi
                                                                      before the Sale
                                                                      Transaction closes.
                                                                      Following closing of the
                                                                      Sale Transaction and
                                                                      within 7 working days
                                                                      after all debts of the
                                                                      company have been paid,
                                                                      documents must be
                                                                      lodged with the same
                                                                      authority. The Hanoi
                                                                      Department of Planning
                                                                      and Investment will then
                                                                      issue a decision on
                                                                      dissolution of the
                                                                      company.

**G.    NN Hong Kong**

1.    In relation to any Sale Transaction which meets the            No specific rule on
      specified minimum concentration thresholds, mandatory          timing of notification but
      antitrust notification and pre-approval requirement in the     in practice effected after
      PRC (if applicable) is required before the underlying sale     the signing of the sale
      and purchase agreement could become operative.                 and purchase agreement.
      Concentration threshold is met if both (i) the turnover
      from within China of at least two parties each exceeds
      RMB 400 million in the previous financial year; and (ii)
      the combined global turnover of all parties together
      exceeds RMB 10 billion in the previous financial year, or
      the combined China turnover of all parties in that period
      exceeds RMB 2 billion.

2.    Registration of any charge created by NN HK over its           After execution of

S-5-7

CONFIDENTIAL