


EXECUTION COPY

# ASSET SALE AGREEMENT

## BY AND AMONG

## NORTEL NETWORKS CORPORATION

## NORTEL NETWORKS LIMITED

## NORTEL NETWORKS INC.

### AND

## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

### AND

## TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)

### DATED AS OF JULY 24, 2009

# TABLE OF CONTENTS

Page

ARTICLE I INTERPRETATION ......................................................................................... 2

    Section 1.1.      Definitions.......................................................................... 2

    Section 1.2.      Interpretation.................................................................... 26

        1.2.1.      Gender and Number........................................................ 26

        1.2.2.      Certain Phrases and Calculation of Time....................... 27

        1.2.3.      Headings, etc.................................................................. 27

        1.2.4.      Currency......................................................................... 27

        1.2.5.      Miscellaneous. ............................................................... 27

ARTICLE II PURCHASE AND SALE OF ASSETS........................................................... 28

    Section 2.1.      Purchase and Sale. .......................................................... 28

        2.1.1.      Assets.............................................................................. 28

        2.1.2.      Excluded Assets. ............................................................ 29

        2.1.3.      Assumed Liabilities. ...................................................... 30

        2.1.4.      Excluded Liabilities. ...................................................... 32

        2.1.5.      Assumption and/or Assignment or Rejection of 365
                    Contracts. ....................................................................... 33

        2.1.6.      Assignment of Non-365 Contracts................................. 34

        2.1.7.      Cure Costs; Adequate Assurance; Efforts...................... 35

        2.1.8.      Local Sale Agreements. .................................................. 37

        2.1.9.      EMEA Debtors................................................................ 37

        2.1.10.     Non-Assignable Assets................................................... 37

    Section 2.2.      Purchase Price; Adjustment. ........................................... 38

        2.2.1.      Purchase Price................................................................. 38

        2.2.2.      Estimated Purchase Price................................................ 38

        2.2.3.      Purchase Price Adjustment. ............................................ 39

        2.2.4.      Working Capital Escrow................................................. 41

    Section 2.3.      Closing. ........................................................................... 41

        2.3.1.      Closing Date.................................................................... 41

        2.3.2.      Closing Actions and Deliveries. ..................................... 41

i

Section 2.4.    Designated Purchaser(s)..................................................... 42

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..... 43**

SECTION 3.1.    Organization and Corporate Power.............................................. 43

Section 3.2.    Authorization; Binding Effect; No Breach. .................................. 44

Section 3.3.    Financing.................................................................................. 44

Section 3.4.    Adequate Assurance of Future Performance. ............................... 45

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of
Representations and Warranties................................................... 45

Section 3.6.    Brokers..................................................................................... 45

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ............ 45**

Section 4.1.    Organization and Corporate Power.............................................. 46

Section 4.2.    Authorization; Binding Effect; No Breach. .................................. 46

Section 4.3.    Title to Tangible Assets. ............................................................ 47

Section 4.4.    Material Contracts...................................................................... 47

Section 4.5.    Intellectual Property................................................................... 48

Section 4.6.    Litigation.................................................................................. 50

Section 4.7.    Financial Statements. ................................................................ 50

Section 4.8.    Compliance with Laws; Consents................................................ 51

Section 4.9.    Real Property. ........................................................................... 51

Section 4.10.    Environmental Matters............................................................... 53

Section 4.11.    Labor and Employee Benefits Matters. ....................................... 54

Section 4.12.    Brokers..................................................................................... 56

Section 4.13.    Tax Liens. ................................................................................. 56

Section 4.14.    Valid Transfers.......................................................................... 56

Section 4.15.    Investment Canada Act. ............................................................. 56

Section 4.16.    Interdependency Schedule .......................................................... 56

Section 4.17.    EMEA Debtors unrelated to Business or Assets........................... 56

Section 4.18.    Sellers' Acknowledgment; Exclusivity of Representations
and Warranties. ........................................................................... 57

**ARTICLE V COVENANTS AND OTHER AGREEMENTS.................................... 57**

Section 5.1.    U.S. Bankruptcy Actions. ........................................................... 57

Section 5.2.    Canadian Bankruptcy Actions. .................................................... 57

ii

| | | |
|---|---|---|
| 5.2.1. | Canadian Approval and Vesting Order. | 57 |
| 5.2.2. | Additional Requests. | 58 |
| Section 5.3. | Consultation; Notification. | 58 |
| Section 5.4. | Pre-Closing Cooperation. | 59 |
| Section 5.5. | Antitrust and Other Regulatory Approvals. | 60 |
| Section 5.6. | Pre-Closing Access to Information. | 63 |
| Section 5.7. | Public Announcements. | 64 |
| Section 5.8. | Post-Closing Cooperation. | 64 |
| Section 5.9. | Conduct of Business. | 64 |
| Section 5.10. | Transaction Expenses. | 66 |
| Section 5.11. | Confidentiality. | 66 |
| Section 5.12. | Disclosure Schedules and Certain Information. | 67 |
| Section 5.13. | Certain Payments or Instruments Received from Third Parties. | 67 |
| Section 5.14. | Non-Assignable Contracts. | 68 |
| Section 5.15. | Inbound License Agreements. | 69 |
| Section 5.16. | Bundled Contracts. | 69 |
| Section 5.17. | Post-Closing Assistance for Litigation. | 70 |
| Section 5.18. | Delivery of Assets. | 71 |
| Section 5.19. | Termination of Overhead and Shared Services. | 71 |
| Section 5.20. | Insurance Matters. | 72 |
| Section 5.21. | Deposits, Guarantees and Other Credit Support of the Business. | 72 |
| Section 5.22. | Use of Trademarks. | 73 |
| Section 5.23. | Sellers' Accessible Information; Cooperation. | 73 |
| Section 5.24. | Maintenance of Books and Records. | 73 |
| Section 5.25. | Ancillary Agreements. | 74 |
| Section 5.26. | Subleases. | 75 |
| Section 5.27. | Direct Leases. | 75 |
| Section 5.28. | Licenses. | 75 |
| Section 5.29. | Hazardous Materials at the Carling Property. | 75 |
| Section 5.30. | Transition Services Agreement | 76 |
| Section 5.31. | Casualty. | 78 |

iii

Section 5.32.    Set-Off........................................................................ 79

Section 5.33.    Good Faith Deposit....................................................... 79

Section 5.34.    Certain Counterparty Objections. ................................. 79

**ARTICLE VI TAX MATTERS**............................................................... **80**

Section 6.1.    Transfer Taxes. ............................................................ 80

Section 6.2.    Tax Characterization of Payments Under This Agreement. ........ 81

Section 6.3.    Apportionment of Taxes. ............................................. 81

Section 6.4.    Withholding Taxes....................................................... 81

Section 6.5.    Records. ...................................................................... 82

Section 6.6.    Tax Returns. ................................................................ 83

Section 6.7.    Allocation of Purchase Price........................................ 85

**ARTICLE VII EMPLOYMENT MATTERS** ........................................ **85**

Section 7.1.    Employment Terms...................................................... 85

Section 7.2.    Employee Benefits. ..................................................... 87

Section 7.3.    Other Employee Covenants. ........................................ 88

Section 7.4.    Excluded Employee Liabilities. ................................... 90

Section 7.5.    Sole Benefit of Sellers and Purchaser. ......................... 91

**ARTICLE VIII CONDITIONS TO THE CLOSING** ........................... **91**

Section 8.1.    Conditions to Each Party's Obligation. ....................... 91

Section 8.2.    Conditions to Sellers' Obligation................................ 92

Section 8.3.    Conditions to Purchaser's Obligation. ......................... 92

**ARTICLE IX TERMINATION** ............................................................. **93**

Section 9.1.    Termination................................................................. 93

Section 9.2.    Effects of Termination. ................................................ 94

**ARTICLE X MISCELLANEOUS** .......................................................... **95**

Section 10.1.    No Survival of Representations and Warranties or Covenants..................................................................... 95

Section 10.2.    Remedies..................................................................... 95

Section 10.3.    No Third Party Beneficiaries. ...................................... 95

Section 10.4.    Consent to Amendments; Waivers................................ 95

Section 10.5.    Successors and Assigns................................................ 96

iv

| | | |
|---|---|---|
| Section 10.6. | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. | 96 |
| Section 10.7. | Notices. | 97 |
| Section 10.8. | Exhibits; Sellers Disclosure Schedule. | 100 |
| Section 10.9. | Counterparts. | 100 |
| Section 10.10. | No Presumption; Mutual Drafting. | 100 |
| Section 10.11. | Severability. | 100 |
| Section 10.12. | Entire Agreement. | 100 |
| Section 10.13. | Availability of Equitable Relief. | 101 |
| Section 10.14. | Bulk Sales Laws. | 101 |
| Section 10.15. | Main Sellers as Representatives of Other Sellers. | 101 |
| Section 10.16. | Execution by Other Sellers. | 102 |
| Section 10.17. | Obligations of the Sellers. | 102 |
| Section 10.18. | Limitation on Losses. | 102 |

v

## EXHIBITS

Exhibit A - Other Sellers

Exhibit B - Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit C - Adjusted Net Working Capital Statement

Exhibit D - Calculation Principles

Exhibit E – CDMA Supply Agreement

Exhibit F - Flextronics Back-to-Back Agreement Term Sheet

Exhibit G - Escrow Agreement

Exhibit H - GDNT Agreements Term Sheet

Exhibit I - Intellectual Property License Agreement

Exhibit J - China Asset Sale Agreement

Exhibit K - Transferring Employee Agreement

Exhibit L - Manufacturing and Supply Regarding Dual Use Platforms Agreement

Exhibit M - Nortel Accounting Principles

Exhibit N - Specified Seller Encumbrances

Exhibit O - Real Estate Agreements Term Sheet

Exhibit P - Trademark License Agreement

Exhibit Q - Transition Services Agreement

Exhibit R – Software License and Development Agreement for Common Material Platform Software

Exhibit S - Knowledge of the Sellers

Exhibit 5.1 - Form of U.S. Sale Order

Exhibit 5.2.1 - Form of Canadian Approval and Vesting Order

HIGHLY CONFIDENTIAL     NNC-NNL06001800 / 7

## ASSET SALE AGREEMENT

         This Asset Sale Agreement is dated as of July 24, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**").

W I T N E S S E T H:

         WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

         WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit B hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009 and April 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

         WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit B hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

         WHEREAS, the Other Sellers listed in part 4 of Exhibit B hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

         WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

         WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities (as defined below) are being

1

made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates;

WHEREAS, the Purchaser (and each of the Designated Purchasers, where applicable) intends to purchase only those Assets relating to the Sellers' CDMA Business in North America and CDMA research and development in China, as well as certain LTE Assets in Canada;

WHEREAS, in accordance with the U.S. Bidding Procedures Order, Purchaser has delivered to Sellers a good faith deposit in the amount of thirty-six million five hundred thousand dollars ($36,500,000)(the "**Good Faith Deposit**"); and

WHEREAS, in addition, as of the Closing, the Purchaser (or Affiliates of the Purchaser) and certain Sellers (or Affiliates of the Sellers) will enter into the following ancillary agreements, (i) the Transition Services Agreement, (ii) the Intellectual Property License Agreement, (iii) the Trademark License Agreement, (iv) the Escrow Agreement, (v) the Transferring Employee Agreement, (vi) the Real Estate Agreements, (vii) the Manufacturing and Supply Regarding Dual Use Platforms Agreement, (viii) Flextronics Back-to-Back Agreement, (ix) the CDMA Supply Agreement, (x) the China Asset Sale Agreement, (xi) a Software License and Development Agreement for Common Material Platform Software, and (xii) the GDNT Agreements (the foregoing, collectively, the "**Ancillary Agreements**"), and any arrangements as may be required pursuant to Section 5.16.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.

Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means the amount of compensation, including the employer's portion of any associated payroll Taxes, with respect to the accrued and unused vacation days that is accrued on the account of a Transferring Employee from his or her respective employer as of the Closing Date, to be calculated in accordance with the Calculation Principles.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or investigation or other legal, administrative, regulatory or judicial proceeding.

2

"**Acquired Actions**" means any avoidance actions as used under Section 547 or 548 of the Bankruptcy Code or the equivalent provisions under other applicable Laws that the Sellers have against any counterparty to an Assumed and Assigned Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts, consistent with the Calculation Principles, a pro forma version of which (as of March 31, 2009) is provided in Exhibit C hereto.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Annual Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Antitrust Approvals**" means the HSR Approval and the Competition Act Approval.

"**Antitrust Laws**" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Accounts Receivable**" means North American trade accounts receivable that are current and not in dispute relating to the Specified CDMA Contracts, in the aggregate amount of $5,000,000, net of any allowance for doubtful accounts computed in accordance with the Nortel Accounting Principles consistent with historical practice.

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, and (ii) the Designated Non-365 Contracts.

3

"**Assigned Intellectual Property**" means (i) the Assigned Patents, (ii) the Assigned Trademarks, (iii) the Intellectual Property (other than Patents and Trademarks) in the Software (including previous versions and versions in development) predominantly used in the CDMA Products and in the Software predominantly used in the LTE Access Products, respectively, in each case, as listed in Section 1.1(a) of the Sellers Disclosure Schedule, and (iv) any other Intellectual Property (other than Patents or Trademarks) owned as of the Closing Date by any of the Sellers that is predominantly used in the Business with such predominant use to be determined, if applicable, in accordance with guidelines and principles, if any, that the Sellers and the Purchaser may from time to time agree in writing prior to Closing.

"**Assigned Patents**" means the Patents predominantly used in the CDMA Business as of Closing and owned as of the Closing Date by any of the Sellers as set forth in Section 1.1(b) of the Sellers Disclosure Schedule.

"**Assigned Trademarks**" means the Trademarks predominantly used in the Business as of the Closing and owned as of the Closing Date by any of the Sellers, as set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(d).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning set forth in the Bidding Procedures (as defined in the U.S. Bidding Procedures and Sale Motion).

"**Balance Sheet Date**" has the meaning set forth in Section 4.7(b).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers that are held from time to time.

"**Bundled Contracts**" has the meaning set forth in Section 5.16.

"**Business**" means, collectively, the following businesses consisting of:

4

(i) the business segment through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties:  (a) design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following products:  CDMA BTS, CDMA BSC/eBSC, CDMA DO-RNC, CDMA MSC/MTX, CDMA HLR, CDMA Media Gateway, CDMA Gateway controller, CDMA Billing Manager, SS7 Signaling Gateway Software and associated OAM Software Systems as listed in Section 1.1(d) of the Sellers Disclosure Schedule (collectively, the "**CDMA Products**") and (b) provide the CDMA Services (clauses (a) and (b) collectively, the "**CDMA Business**"); and

(ii)  the business through which the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, design, develop, process components, indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers the prior versions (if currently supported), current versions and versions under development of the following LTE Access products: eNodeB (including UDM and URM) and associated Element Management Systems (EMS) (collectively, the "**LTE Access Products**" and the activities described in this clause (ii) are the "**LTE Business**"),

but excluding, in each of clauses (i) and (ii) above: (A) any Excluded Asset; (B) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (C) any products and/or services provided by businesses or business segments of any Seller other than those specified in clauses (i) or (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) Stockholm, Sweden.

"**Business Information**" means all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing.  Business Information shall not include any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, applied in a manner consistent with historical practices, to the extent applicable to the determination of the Net Inventory Value, the CIP Receivables Amount, the Contractual Liabilities Amount, the Royalty Liability Amount, the Warranty Provision Amount, the Accrued Vacation Amount and

5

HIGHLY CONFIDENTIAL

the Adjusted Net Working Capital as set forth in Exhibit D and in the Adjusted Net Working Capital Statement.

"**Calgary Retention Plan**" means the retention plan developed for certain Westwinds Facility employees substantially approved by the Canadian Court on March 6, 2009, with such further approvals as may be obtained from the Canadian Court from time to time.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.1.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means the order entered on June 29, 2009 approving the items described in the Canadian Sales Process Order Motion.

"**Canadian Sales Process Order Motion**" means the motion filed by the Canadian Debtors on June 23, 2009 with the Canadian Court seeking an order for approval of, among other things, a process of the sale of the Canadian Debtors' rights, title and interests in and to the "Assets" (as defined therein).

"**Carling Property**" means the property municipally known as 3500 Carling Avenue, Nepean, Ontario.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CDMA Business**" has the meaning set forth in the definition of Business.

"**CDMA Contracts**" means those Contracts of a Seller pursuant to which a Seller or Sellers provide CDMA Products and/or CDMA Services to carriers or other customers of the CDMA Business.

"**CDMA Products**" has the meaning set forth in the definition of Business.

"**CDMA Services**" mean, collectively, the following services, solely in relation to CDMA Products, that the Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, market, distribute and sell globally to carriers: (i) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (ii) network managed services, consisting of the provision of on-site skilled resources to provide operational support, technician support, staff augmentation, on-the-job

HIGHLY CONFIDENTIAL      NNC-NNL06001800 / 13

training, product specialist consulting, core network optimization, software loading service, and transport network service; and (iii) network support services, including technical support, technical account manager service, network prime engineer service, emergency recovery services, online support , technical support for special projects, repair services, managed spares service, Third Party products spares, management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services; but expressly excludes the Sellers' network operations centre.

"**CDMA Supply Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Sellers, to be executed as of the Closing in substantially the form attached hereto as Exhibit E.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**CFIUS Approval**" means that the Parties shall have received a written notification issued by CFIUS that it has concluded a review of any notification voluntarily provided pursuant to the Exon-Florio Amendment of the Defense Production Act of 1950, as amended and Section 5.5(f) hereof and determined not to conduct an investigation or, if an investigation is deemed to be required, notification that the U.S. government will not take action to prevent the transactions contemplated by this Agreement from being consummated.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**China Asset Sale Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers and the relevant Affiliates of the Sellers to be executed as soon as practicable after the date hereof in substantially the form attached hereto as Exhibit J.

"**China Assets**" means the Assets related to the CDMA Business to be sold pursuant to the China Asset Sale Agreement.

"**CIP Receivables**" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Calculation Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business, determined in accordance with the Calculation Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a).

7

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Employee Adjustment Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Net Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Competition Act**" means the Competition Act (Canada), as amended, and includes the regulations promulgated thereunder.

"**Competition Act Approval**" means that: (i) the applicable waiting period has expired or been terminated pursuant to Section 123 of the Competition Act; (ii) the Commissioner or his/her authorized representative shall have provided the Purchaser with a waiver from complying with Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act and in either case the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice; or (iii) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement.

"**Complaining Party**" has the meaning set forth in Section 5.30(d).

HIGHLY CONFIDENTIAL     

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser, the Sellers listed therein and the Joint Administrators dated March 30, 2009, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business determined in accordance with the Calculation Principles.

"**Control**" (together with its correlative meanings, "Controlled by" and "under common Control with") means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of the Business.

"**Cross-Border Protocol**" means the certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract or an Assumed and Subleased Real Estate Lease and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract or Assumed and Subleased Real Estate Lease; and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual or accrued pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Assigned Contract to be assigned.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Purchaser**" has the meaning set forth in Section 2.4(a).

9

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.27.

"**Direct Lease**" has the meaning set forth in Section 5.27.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**EMEA Cases**" means the proceedings commenced by the applications filed with the English Court on the Petition Date, pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings.

"**EMEA Debtors**" means the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit B hereto.

"**Employee**" means any employee, as of the date hereof, of the Sellers or their Affiliates (other than the EMEA Debtors or their respective Subsidiaries) who (i) for the twelve months prior to the date hereof (or such shorter time as such employee was employed by the Sellers or such Affiliates) performed services which were all or substantially all related to the Business or (ii) was hired into, transferred into, or assigned to the Business prior to the Closing in the Ordinary Course and whose services are all or substantially all related to the Business, or (iii) whose services are necessary to the operation of the Business, provided that if the employee is at a Job Complexity Indicator 6 or above, such hire, transfer or assignment is subject to Purchaser's consent in accordance with Section 5.9(l).

"**Employee Adjustment Amount**" means, at any given time, the Accrued Vacation Amount.

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferring Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day on which the employment of a Transferring Employee commences with the Purchaser or its Designated Purchaser as provided for in this Agreement and the Transferring Employee Agreement.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the handling, generation, management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of human health, the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated

10

     NNC-NNL06001800 / 17

pursuant to these applicable Laws or any analogous supranational, foreign, state, provincial, territorial, municipal or local Laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test labs, trial equipment and other articles of personal property, including that located at the Direct Lease Real Estate or the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease; provided, however, that the term "Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate and shall not include any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease; and provided, further, that "Equipment" shall not include (i) any Inventory, (ii) items of tangible property personally assigned to Employees who are not Transferring Employees, or (iii) any Intellectual Property covering, embodied in or connected to any Equipment.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate Liability**" means any obligation, liability, or expense of any Seller which arises under or relates to any Seller Employee Plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of its ERISA Affiliates or the Purchaser being deemed a successor to any ERISA Affiliate of any Seller.

"**Escrow Agreement**" means the Escrow Agreement to be entered into on or prior to Closing substantially in the form attached hereto as Exhibit G.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Employee Adjustment Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Net Inventory Value**" has the meaning set forth in Section 2.2.2(a).

11

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Contracts**" means any Contract that is not assigned to the Purchaser under this Agreement. For the avoidance of doubt, Excluded Contracts shall include the Excluded 365 Contracts, the Excluded Non-365 Contracts, any underlying Contract between a Third Party and a Seller that is subleased or licensed to the Purchaser or a Designated Purchaser pursuant to this Agreement, the Qualcomm Cross-License, and Addendum No. 9 to the OEM iPlanet Software Products (Binary) Exhibit to the Global Account Agreement Master Terms between Sun Microsystems, Inc. and NNI, Binary License and Redistribution Agreement for Java 2 Standard Edition dated October 5, 2006.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.4.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(e).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller other than the Business, including the following products and all associated development and PLM resources: Evolved Packet Core (including MME, SGW, PGW), XACore and associated peripherals (including LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport and OAM Systems not expressly included in the Products.

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(f).

"**Executory Contract**" means an "executory contract" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Extra Services**" has the meaning set forth in Section 5.30(b).

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of

12

Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

      "**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

      "**Flextronics Back-to-Back Agreement**" means the agreement between the relevant Sellers and the Purchaser and/or any Designated Purchasers to be executed on or before Closing based substantially on the term sheet attached hereto as Exhibit F.

      "**GAAP**" means the United States generally accepted accounting principles.

      "**GDNT Agreements**" means the agreements to be entered into between the relevant Sellers, the Purchaser (and/or any Designated Purchasers), and Guangdong-Nortel Telecommunications Equipment Co. Ltd., on or prior to the Closing based substantially on the term sheet attached hereto as Exhibit H.

      "**General Scope of Included Services**" has the meaning set forth in Section 5.30(a).

      "**Good Faith Deposit**" has the meaning set forth in the recitals.

      "**Government Entity**" means any U.S., Canadian, U.K. and any other applicable supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

      "**GST**" means goods and services Tax payable under Part IX of the Excise Tax Act (Canada).

      "**Hazardous Materials**" means any chemical, material, waste, heat, sound, radiation or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

      "**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

      "**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

      "**ICA Approval**" means that the Purchaser shall have received notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the

13

provisions of the Investment Canada Act are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion.

**"Inactive Employees"** means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below. An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days (or, if such Employee is located in Canada, six (6) months) following the Closing Date.

**"Inbound License Agreements"** has the meaning set forth in Section 4.5(f).

**"Included Services"** has the meaning set forth in Section 5.30(a).

**"Indebtedness"** of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

**"Independent Auditor"** means Grant Thornton LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is jointly selected by the Primary Parties.

**"Insolvency Act"** has the meaning set forth in the definition of EMEA Cases.

**"Intellectual Property"** means any and all intellectual and industrial property rights, whether protected or arising under the Laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (i) Trademarks; (ii) Patents, invention disclosures and inventions; (iii) works of authorship (including any registrations or applications for registration of copyrights); (iv) mask works; (v) trade secrets, know-how and confidential information; (vi) *sui generis* data base rights; (vii) industrial designs; and (viii) Software.

**"Intellectual Property License Agreement"** means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit I.

14

HIGHLY CONFIDENTIAL

"**Interim Unaudited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise; provided, that inventory not located within the United States, Canada or Caribbean countries served by United States contracts ("**Caribbean Countries**") shall not be included in "Inventory", unless it (i) has been manufactured abroad; (ii) is, in the Ordinary Course, destined for shipment to the United States, Canada or Caribbean Countries; (iii) is not older than ninety (90) days; (iv) is the current product release/revision; and (v) is saleable.

"**Investment Canada Act**" means the Investment Canada Act.

"**Joint Administrators**" means Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) as appointed by the English Court under the Insolvency Act.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware pursuant to orders entered on March 5, 2009 and March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Exhibit S hereto.

"**Latest Lease Rejection Date**" means the latest of (i) August 12, 2009, or (ii) if Sellers (in their sole discretion) request and a landlord under a 365 Real Estate Lease agrees to an extension of the date by which the relevant Seller must elect to either assume or reject such 365 Real Estate Lease to a date following August 12, 2009, then with respect to such 365 Real Estate Lease, the date to which such deadline has been extended by agreement of Sellers and such landlord and (iii) with respect to the Non-365 Real Estate Leases and the Non-365 Licensed Real Estate Leases in each case related to property located in Canada, the date on which the Sellers file a "plan of record" with the Canadian Bankruptcy Court.

"**Law**" means any U.S., Canadian, U.K. and any other applicable foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

15

"**Leased Real Property**" means all real property subject to a Real Estate Lease which is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Lease(s)**" means all Seller Contracts that are leases, subleases, licenses or other agreements (written or oral), including all amendments, extensions and renewals thereof, pursuant to which real property is held.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**License**" has the meaning set forth in Section 5.28.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.5(c).

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**LTE Access Products**" has the meaning specified in the definition of Business.

"**LTE Business**" has the meaning set forth in the definition of Business.

"**LTE-Related Patents**" means any and all Patents related to 3GPP Long-Term Evolution products and services (including Patents related to the LTE Business).

"**LTE Transferring Employees**" means the Employees listed on Section 1.1(g) of the Sellers Disclosure Schedule who become Transferring Employees.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Manufacturing and Supply Regarding Dual Use Platforms Agreement**" means the agreement between the relevant Sellers (or their Affiliates), on the one hand, and the

16

Purchaser and/or a Designated Purchaser, on the other hand, to be executed on or before the Closing in the form attached hereto as Exhibit L.

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States or Canada, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v), any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole (or, solely for purposes of the representations and warranties in Section 4.11 or for purposes of Section 8.3(a)(i) as applied to the representations and warranties in Section 4.5 and Section 4.11, either of the CDMA Business or the LTE Business), as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4(a).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Net Inventory Value**" means, as of any given date, the amount of the Owned Net Inventory, net of applicable provisions, determined in accordance with the Calculation Principles.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.14(a).

17

HIGHLY CONFIDENTIAL    NNC-NNL06001800 / 24

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Solicitation Period**" means the twelve (12) month period immediately following the Closing Date.

"**Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Exhibit M hereto.

"**NSN Agreement**" means the Asset Sale Agreement, dated as of June 19, 2009, among the Sellers and Nokia Siemens Networks BV.

"**OAM Systems**" means operations, administration and maintenance systems.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software derived from such Software program or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software), (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software or (iii) is made available under any software license listed at the website http://www.opensource.org/licenses/alphabetical as of Closing.

"**Ordinary Course**" means the ordinary course of each of the Businesses through the date hereof consistent with each of their recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

"**Outbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

18

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, Tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith, including the Licensed Applications (as defined in the Transition Services Agreement).

"**Owned Equipment**" means Equipment owned by the Sellers that is (i) held or used exclusively by the LTE Transferring Employees or (ii) held or used predominantly in connection with the CDMA Business, in each case including the items listed in Section 1.1(h) of the Sellers Disclosure Schedule, and excluding in all cases any Owned Net Inventory and any Intellectual Property.

"**Owned Net Inventory**" means (i) Inventory owned by any of the Sellers that is held or used predominantly in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(i) of the Sellers Disclosure Schedule, all as reflected on Sellers' general ledger as of the Closing Date an estimate of which will be provided to the Purchaser at least three days prior to Closing.

"**Partial Allocation**" has the meaning set forth in Section 6.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross Licenses**" means all Contracts between the Sellers or their Affiliates (other than the EMEA Debtors and their respective Subsidiaries) and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property).

"**Patents**" means all national (including without limitation the United States and Canada) and multinational patents and utility models (petty patents) as well as all applications and provisional applications for any of the foregoing, and further including without limitation all

19

reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) zoning, entitlement, building and land use regulations, customary covenants, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted provided that same are complied with in all material respects; and (iv) minor title defects or irregularities which do not impair, individually or in the aggregate, in any material respect the use or value of the related Assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" means the CDMA Products and the LTE Access Products.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or

20

policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferring Employees pursuant to this Agreement.

"**Qualcomm Cross-License**" means that certain Patent Cross-License Agreement, dated December 27, 2006, by and between Qualcomm Incorporated and NNL.

"**Qualified Arbitrator**" has the meaning set forth in Section 5.30(d).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing, in accordance with and as provided by the Real Estate Agreements Term Sheet.

"**Real Estate Agreements Term Sheet**" means the Real Estate Agreements Term Sheet attached hereto as Exhibit O.

"**Real Estate Lease**" means a Seller Contract that is a lease, sublease, license or other agreement for use and occupancy of real property including all amendments, extensions and renewals thereof and is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of Purchaser and Sellers, each acting reasonably.

"**Regulatory Approvals**" means (i) the Antitrust Approvals; (ii) the CFIUS Approval; (iii) any Consent of any Government Entity required to be obtained under the Investment Canada Act (other than the ICA Approval); and (iv) if subsection 448(1) of the Budget Implementation Act, 2009 (Canada), comes into force on or before the Closing Date, the ICA Approval.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Representatives**" means as to any Person, the attorneys, accountants, financing sources, consultants, financial advisors and other representatives and agents of such Person.

"**Respective Affiliates**" has the meaning set forth in Section 10.15(c).

"**Responding Party**" has the meaning set forth in Section 5.30(d).

21

HIGHLY CONFIDENTIAL