(g) enter into, adopt, amend or modify any Collective Labor Agreement affecting Transferring Employees except as required by applicable Law;

(h) voluntarily terminate, waive any right under, or amend in any material respect any Assigned Contract, Bundled Contract, Inbound License Agreement, Outbound License Agreement or Patent Cross License, or enter into a Contract that would be a Material Contract other than a manufacturing or supply agreement with an annual cost not to exceed $1,000,000;

(i) waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind any of the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(j) solicit bids for the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction of any part of the Business;

(k) manage the Adjusted Net Working Capital other than in the Ordinary Course;

(l) take any action to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be an Employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from Purchaser or a Designated Purchaser pursuant to this Agreement provided Sellers make a reasonable effort to provide notice to Purchaser prior to such employment termination); or take any action to cause any employee of the Sellers who does not provide all or substantially all of his or her services to the Business as of the date of this Agreement, to become an Employee (other than any employees hired and transferred in the Ordinary Course below Job Complexity Indicator 6); or

(m) authorize, or commit or agree to take, any of the foregoing actions.

Section 5.10. Transaction Expenses.

Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; provided, that all filing fees in respect of Regulatory Approvals shall be shared equally between (a) the Purchaser on the one hand and (b) the Sellers on the other hand.

Section 5.11. Confidentiality.

The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had

HIGHLY CONFIDENTIAL   NNC-NNL06001800 / 73

been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided, that after the Closing Date, the Purchaser's confidentiality obligations under this Section 5.11 and the Confidentiality Agreement with respect to information and data relating to the Business and/or the Assets shall terminate. Any Business Information or copies thereof retained by the Sellers pursuant to Section 5.24(c) shall be deemed to constitute "Evaluation Material" as such term is defined under the Confidentiality Agreement and, from and after the Closing Date, the Sellers shall treat such Business Information on the same terms and conditions applicable to the Purchaser's treatment of "Evaluation Material" as such term is defined under the Confidentiality Agreement.

Section 5.12.  Disclosure Schedules and Certain Information.

(a)  The Sellers shall submit to the Purchaser, every two weeks, written updates to Section 4.11(b) of the Sellers Disclosure Schedule. The Sellers shall use reasonable efforts to submit to the Purchaser, as promptly as reasonably practicable, written updates to the Sellers Disclosure Schedule in respect of ARTICLE IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to ARTICLE IV; provided, that such updates shall be disregarded for purposes of determining whether or not the condition contained in Section 8.3(a) has been fulfilled.

(b)  The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or non-occurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in ARTICLE VIII impossible or unlikely.

(c)  The delivery of any update or notice pursuant to this Section 5.12 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice. This Section 5.12 shall not constitute a covenant or agreement for purposes of ARTICLE VIII or ARTICLE IX.

Section 5.13.  Certain Payments or Instruments Received from Third Parties.

To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Business, the relevant Main Sellers shall, and shall cause the other Sellers to, promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable.

HIGHLY CONFIDENTIAL    NNC-NNL06001800 / 74

All amounts due and payable under this Section 5.13 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

Section 5.14. Non-Assignable Contracts.

(a) To the extent that any Assigned Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing, (i) without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity), and such Consent cannot be obtained pursuant to Section 2.1.7 or (ii) whether or not Consent is required, without Sellers' and their Affiliates' compromising any right, asset or benefit (including, with respect to licenses of Intellectual Property, relinquishment of rights in the Retained Field of Use, as defined in the Intellectual Property License Agreement) or expending any amount or incurring any Liability or providing any other consideration other than as provided in Section 2.1.7 (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless and until any such Consent is obtained; provided, however, that the Sellers will use their reasonable efforts to (i) cooperate with the Purchaser in connection with any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts that are not licenses of Intellectual Property or Real Estate Leases as the applicable Seller had immediately prior to the Closing, including entering into one or more mutually agreed commercially reasonable subcontract agreements, and (ii) facilitate Purchaser's negotiation with the other party to each Non-Assignable Contract that is a license of Intellectual Property to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing (including paying Cure Costs in order to obtain such Consent). Provided, and only for so long as, the arrangements described in clause (i) of the immediately preceding sentence are made such that Purchaser has obtained the same interest, benefits and rights under any such Non-Assignable Contracts, then, as between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts shall be deemed to be assigned and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding the foregoing sentences, nothing in this Section 5.14 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired. Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.14 shall, when assigned, constitute an Assigned Contract hereunder for all purposes, except under Section 8.3(d), from and after such date.

(b) For the purposes of this Agreement (including Section 5.14(a) and Section 8.3(d)) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any Assumed and Assigned Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Purchaser or a Designated Purchaser such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

68

Section 5.15.  <u>Inbound License Agreements.</u>

Each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser and the Sellers shall cause any Affiliate (other than the EMEA Debtors) to, use reasonable efforts and work cooperatively in good faith to facilitate the Purchaser's negotiation with the licensor under any Inbound License Agreement that is not assigned to the Purchaser or a Designated Purchaser to obtain rights for the Purchaser or a Designated Purchaser to use the Intellectual Property that is licensed under that Inbound License Agreement, or, if that negotiation is unsuccessful, the Sellers shall use reasonable efforts to provide the same interests, benefits and rights under such Inbound License Agreement, in each case, as reasonably necessary to effectively operate the Business from and after Closing, including in the case of the Sellers requesting Consent to the grant of these rights from the relevant third party; <u>provided, however,</u> that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction or to compromise any right, asset or benefit (including relinquishment of rights in the Retained Field of Use, as defined in the Intellectual Property License Agreement) or to expend any amount or incur any Liability or provide any other consideration in complying with its obligations under this Section 5.15.

Section 5.16.  <u>Bundled Contracts.</u>

(a)  Each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser, as applicable, to use its reasonable efforts to, prior to the Closing Date, enter into arrangements with the counterparty to each Contract of a Seller that is listed in Section 5.16 of the Sellers Disclosure Schedule (a "**Bundled Contract**"), to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the CDMA Products and the CDMA Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable counterparty and which only relates to CDMA Products and CDMA Services, on substantially the same terms and conditions as are in effect for the sale or provision of CDMA Products and/or CDMA Services under the Bundled Contract or as otherwise acceptable to Purchaser, in which event such new Contract shall be deemed to be an Assigned Contract, and such Bundled Contract shall cease to be a Bundled Contract.  Seller shall generally be responsible for all administrative costs, fees and expenses connected with the amendment of a Bundled Contract and entry into a new Contract to replace a Bundled Contract as provided in the preceding sentence (other than Cure Costs and consent fees in respect of Bundled Contracts that are not Specified CDMA Contracts or the costs, fees and expenses of Purchaser or any counsel to Purchaser); <u>provided, however,</u> that the Sellers shall be under no obligation to compromise any right, asset or benefit in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby (except as otherwise provided in Section 8.3(d)) or reduce the Purchase Price payable hereunder (except as otherwise provided in Section 2.2.1). Except with respect to the Specified CDMA Contracts, which must be separated, in the event Sellers' efforts do not result in the separation of a Bundled Contract, then Purchaser and Sellers shall cooperate in good faith to enter into reasonable arrangements to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits, rights and obligations under such Bundled Contract, only to the extent relating to the CDMA Business. In particular, with respect to the Master Agreements ( as defined in Exhibit F), the Sellers shall comply with their obligation to

HIGHLY CONFIDENTIAL       NNC-NNL06001800 / 76

enter into a subcontract agreement relating to those Master Agreements if requested by the Purchaser, by entering into the Flextronics Back-to-Back Agreement at Closing. In connection with the efforts required of the Sellers, the Purchaser and any relevant Designated Purchaser hereunder agrees, at the request of the Main Sellers, to assume all Liabilities relating to CDMA Products and CDMA Services supplied to Verizon Services Corporation and Verizon Wireless (collectively, "**Verizon**") under the General Purchaser Agreement, effective as of January 1, 2007, between NNI and Verizon, whether such Liabilities arise before, as of or after Closing, in connection with the assignment to the Purchaser of a new contract between NNI and Verizon in respect of CDMA Products and CDMA Services.

(b)     For those Bundled Contracts for which the arrangements mentioned in Section 5.16(a) could not be entered into prior to the Closing Date, the relevant Sellers shall either: (i) continue to use their reasonable efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to CDMA Products and/or CDMA Services, on substantially the same terms and conditions as are in effect for the sale or provision of CDMA Products and/or CDMA Services under the Bundled Contract or as otherwise acceptable to Purchaser, and/or (ii) use their reasonable efforts to cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits and rights under any such Bundled Contract only to the extent relating to CDMA Products and/or CDMA Services as the applicable Seller had immediately prior to the Closing, including using its reasonable efforts to enter into one or more mutually agreed commercially reasonable subcontract agreements with respect to such Bundled Contracts; provided, that (A) nothing in this Section 5.16 shall require the Sellers to renew any Bundled Contract once it has expired, (B) the Sellers shall have the right, any time after the date that is twelve (12) months after the Closing Date, to exercise any right to terminate any Bundled Contract, and (C) the Sellers shall be under no obligation to compromise any right, asset or benefit or incur any Liability in order to comply with its obligations under this sentence. Notwithstanding the foregoing, the Sellers shall not take any action to terminate or reject any Bundled Contract, or take any action or fail to take any action that would permit the other party to any Bundled Contract to terminate such Bundled Contract, in each case, prior to the date that is twelve (12) months after the Closing Date.

Section 5.17.    Post-Closing Assistance for Litigation.

(a)     After the Closing, the Purchaser shall, upon the request of the Sellers and at the Sellers' cost (including reimbursement of out of pocket expenses of the Purchaser and the Designated Purchasers and payment of a reasonable *per diem* to the Purchaser or a Designated Purchaser which per diem shall be based on the total compensation of the affected Transferring Employees at the time), require the Transferring Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchaser hereunder shall only extend to the Transferring Employees who remain employed by the Purchaser or a Designated Purchaser as of the date of the Seller's

70

request and shall not apply to former employees no longer employed by the Purchaser or a Designated Purchaser as of such date and shall not require the Purchaser or a Designated Purchaser to continue the employment of any such employee.

        (b)       After the Closing, the Sellers shall, upon the request of the Purchaser, and at the Purchaser's cost (including reimbursement of out of pocket expenses of the Sellers and payment of a reasonable *per diem* to the Sellers which *per diem* shall be based on the total compensation of the affected employees at the time), require their employees that were not Transferring Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business; provided, that the obligations of the Sellers or their Affiliates under this Section 5.17(b) shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Seller's Affiliates as of such date and shall not require Sellers or Seller's Affiliates to continue the employment of any such employee.

Section 5.18.  Delivery of Assets.

        (a)       To the extent not provided for in the Transition Services Agreement or the Real Estate Agreements Term Sheet, the Purchaser shall, and shall cause the relevant Designated Purchasers to, within ninety (90) days after the Closing Date, relocate at the Purchaser's cost all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing other than those premises to be occupied by the Purchaser or any Designated Purchasers after the Closing Date pursuant to the provisions of the Real Estate Agreements, the Direct Leases or the Assumed and Assigned Contracts.

        (b)       As promptly as reasonably practicable, and in no event more than thirty (30) days, after the Closing Date, the Sellers shall deliver to the Purchaser copies of filings, prosecution files, dockets and certifications relating to the filing, prosecution, issuance, renewal and enforcement of the Business Registered IP; provided, that all items to be delivered hereunder shall be delivered solely by remote telecommunication to the extent the Purchaser may so request. Without limiting the generality of the foregoing, within thirty (30) days of Closing, the Sellers shall and shall cause their Affiliates (other than any EMEA Debtors or their respective Subsidiaries) to, instruct their current attorneys and agents to deliver to the Purchaser, or attorneys designated by Purchaser, any and all records in the possession of such attorneys and agents relating to the prosecution of any applications, registrations and renewals of any Business Registered IP.

Section 5.19.  Termination of Overhead and Shared Services.

The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (except the Transferred Overhead and Shared

71

Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

Section 5.20. Insurance Matters.

(a) The Purchaser acknowledges and agrees that coverage of the Covered Assets and Persons under the Seller Insurance Policies shall cease as of the Closing Date and the Covered Assets and Persons (other than assets used in, and Persons engaged in, the provision of services under the Transition Services Agreement, except as otherwise set forth therein) will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Notwithstanding anything herein to the contrary, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy.

(b) If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates (other than, in the case of the Sellers, any EMEA Debtors or their respective Subsidiaries)), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information, provided that Sellers and their Affiliates (other than any EMEA Debtors or their respective Subsidiaries) shall reasonably cooperate with Purchaser's efforts. If any Third Party requires the consent of the Sellers or any of their Affiliates (other than any EMEA Debtors or their respective Subsidiaries) to the disclosure of such information, such consent shall not be unreasonably withheld.

Section 5.21. Deposits, Guarantees and Other Credit Support of the Business.

Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchaser to, cooperate with the Sellers to procure the return and/or release by the applicable counterparty, as soon as reasonably practicable, of any lease security deposits given by the Sellers under any Leases that are Assigned Contracts or any deposits, bonds or other security posted in connection with Assigned Contracts (the "**Security Deposits**"), including where required by the applicable counterparty, offering to post such Security Deposits on terms and conditions no less favorable than offered to such Seller by such counterparty; provided, that neither the Purchaser nor any Designated Purchaser shall have any obligation under this

72

Section 5.21 if any of the Sellers shall be in breach of the representations and warranties contained in Section 4.9(b) with respect to such Security Deposits or any portion thereof. Purchaser shall in no event be required to provide any replacement financial security or any financial security or other deposits with respect to any premises leased pursuant to a Sublease or leased pursuant to a Direct Lease, all of which shall be the sole responsibility of the Sellers.

Section 5.22.  Use of Trademarks.

Except as expressly provided in the Trademark License Agreement, as of the Closing Date, neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the "**Sellers' Trademarks**").

Section 5.23.  Sellers' Accessible Information; Cooperation.

(a)    After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers and held or used in the Business (other than Tax records or Employee Records where prohibited by applicable Law), to which the Purchaser in good faith determines it needs access for bona fide business or legal purposes. The Sellers shall, or cause their Respective Affiliates (other than any EMEA Debtors or their respective Subsidiaries) to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable; provided, that the Sellers shall be allowed to redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates (other than any EMEA Debtors or their respective Subsidiaries) not included in the Business; provided, further, that nothing herein shall (i) require the Sellers to disclose any information to the Purchaser if such information disclosure would jeopardize any attorney-client or legal privilege or (ii) contravene any applicable Law, fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates is a party); it being understood, that Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement).

(b)    Purchaser and the Sellers shall reasonably cooperate, and shall cause their respective Affiliate (except, in the case of Sellers, the EMEA Debtors), officers, employees, agents, auditors and other Representatives to reasonably cooperate in preparing and auditing, as applicable, at Purchaser's expense, any financial statements that the Purchaser may request in connection with its future financing requirements, such financial statements to be compliant with any applicable regulations regarding financial statements of businesses acquired or to be acquired.

Section 5.24.  Maintenance of Books and Records.

(a)    After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the greater of the third (3rd) anniversary of the Closing Date or as otherwise provided in Purchaser's applicable document retention policies, all pre-Closing

73

Date records to the extent relating to the Business possessed or to be possessed by such Person. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to, (a) provide to the Sellers or their Representatives reasonable access to such records during normal business hours and (b) permit the Sellers or their Representatives to make copies of such records; provided, however, that (A) any such access shall be conducted at Sellers' expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), under the supervision of the Purchaser's personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Purchaser and its Affiliates, and (B) the Purchaser will not be required to provide to the Sellers access to or copies of any Employee Records where prohibited by applicable Laws.

(b)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Purchaser shall not have any obligation to make available to the Sellers or its Representatives, or provide the Sellers or its Representatives with (i) any income Tax Return or any combined or consolidated Tax Return filed by the Purchaser or any of its Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Purchaser to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Purchaser or any of its Affiliates is a party), it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(c)    In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information or any Employee Records to which the Sellers in good faith determine they are reasonably likely to need access for bona fide Tax, financial or legal purposes.

Section 5.25.  Ancillary Agreements.

The Primary Parties shall use their reasonable efforts to promptly negotiate and finalize in good faith the Ancillary Agreements to which it is contemplated they will be parties (including the Real Estate Agreements, in accordance with and as provided by the terms of the Real Estate Agreements Term Sheet). The Sellers shall use their reasonable efforts to cause the parties to the license agreements referred to in Exhibit H to terminate and replace those license agreements as contemplated in Exhibit H on or before Closing, failing which the Sellers shall file a motion with the Canadian Court to have those license agreements terminated on Closing and shall take all steps necessary both before and after the Closing to have those license agreements terminated. If requested by the Joint Administrators, the Purchaser agrees that it will negotiate in good faith with the Joint Administrators the terms and conditions upon which the Purchaser or a Designated Purchaser will supply the EMEA Debtors with services and products necessary to enable the EMEA Debtors to perform under their customer contracts existing at Closing.

HIGHLY CONFIDENTIAL    NNC-NNL06001800 / 81

Section 5.26. <u>Subleases.</u>

For each Assumed and Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.5(b) or Non-365 Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.6(b) to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) and applicable Law and the Real Estate Agreements Term Sheet, the relevant Seller, as sublandlord, and Purchaser or a Designated Purchaser, as subtenant, will enter into a sublease in accordance with, and as provided by, the Real Estate Agreements Term Sheet (each such sublease, a "**Sublease**") at or prior to Closing. Seller's obligation to assume an Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease shall be conditioned upon receipt of consent to the related Sublease from the master landlord to the extent required by the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable).

Section 5.27. <u>Direct Leases.</u>

For each of the properties owned in fee or ground leased by the Sellers identified on Section 5.27 of the Sellers Disclosure Schedule or, in the case of the Carling Property, ground leased by Seller (collectively, the "**Direct Lease Real Estate**") to the extent permitted by, and in accordance with, the terms of the related ground lease (as applicable) and applicable Law, Purchaser agrees that the relevant Seller and Purchaser or a Designated Purchaser will enter into a lease in accordance with, and as provided by the Real Estate Agreements Term Sheet (each such lease, a "**Direct Lease**"). With respect to the Carling Property, Sellers' obligation to enter into a Direct Lease shall be conditioned upon receipt of consent to such Direct Lease from the ground landlord under the related ground lease (to the extent required by the terms thereof).

Section 5.28. <u>Licenses.</u>

For each Licensed Real Estate Lease designated to be licensed pursuant to Section 2.1.5(c) or Non-365 Licensed Real Estate Lease designated to be licensed pursuant to Section 2.1.6(c) to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) and applicable Law, the relevant Seller, as licensor, and Purchaser or a Designated Purchaser, as licensee, will enter into a license in accordance with, and as provided by, the Real Estate Agreements Term Sheet (each such license, a "**License**"). Seller's obligation to assume such Licensed Real Estate Lease shall be conditioned upon receipt of consent to the related License from the master landlord to the extent required by the terms of the related Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease (as applicable).

Section 5.29. <u>Hazardous Materials at the Carling Property.</u>

(a) The Sellers acknowledge that the Purchaser and any Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the Closing Date.

(b) The Sellers that own and lease the Carling Property and the Purchaser agree that the relevant Seller and the Purchaser or a Designated Purchaser shall include in the

75

License, Direct Lease or Sublease (as the case may be): (i) an acknowledgement that the Purchaser or a Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, the currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the License, Direct Lease or Sublease (as the case may be); (ii) an indemnity by the relevant Seller in favor of the Purchaser and any Designated Purchaser for (A) any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the License, Direct Lease or Sublease (as the case may be) with respect to the Carling Property and (B) if and to the extent caused by Sellers, any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property; and (iii) an indemnity by the relevant Purchaser in favor of Sellers for, if and to the extent caused by the Purchaser, any Liabilities, if and to the extent caused by Purchaser, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property after the commencement of the License, Direct Lease or Sublease (as the case may be) with respect to the Carling Property.

Section 5.30.  Transition Services Agreement

(a)  The Parties acknowledge that Schedule 1 attached to the form of Transition Services Agreement contained in Exhibit Q (the "**General Scope of Included Services**") reflects the general scope of services anticipated by the Parties to be provided pursuant to the Transition Services Agreement, but may not be sufficiently refined to define all such services in detail. Accordingly, the Parties agree that, from and after the execution of this Agreement, they will negotiate in good faith to refine the description of the services included within the General Scope of Included Services so as to provide sufficient operational detail (as mutually agreed or as determined by arbitration in accordance with clause (d), the "**Included Services**"). The Parties agree that Included Services will be finally determined by such negotiation or by arbitration in accordance with this Section 5.30; provided that the Included Services will be consistent with, and will omit any services not reasonably within the service description categories contained in the General Scope of Included Services. The Parties further agree that such negotiation and arbitration will be subject to the following general limitations and conditions (the "**Scope Guidelines**"): (i) if and to the extent that employees of any Seller or Provider are Transferring Employees under this Agreement, then the human tasks formerly undertaken by such Transferring Employees will no longer be required to be provided under the Transition Services Agreement (but equipment, licenses and other resources not transferred shall, in accordance with the terms of the Transition Services Agreement, continue to be made available as necessary to perform such tasks under the Transition Services Agreement as contemplated by this Section 5.30), and (ii) the Included Services will be limited to those reasonably necessary to carry on the Business after the Closing in a manner consistent with the operation of the Business during the twelve month period prior to the Closing Date (and will be limited to services provided internally by the applicable Seller, or sourced from a third party by the applicable Seller, during such period).

76

(b) If, between the time of execution of this Agreement and Closing, Purchaser identifies services not reasonably within the service description categories contained in the General Scope of Included Services which are reasonably advisable in order to assist with the orderly transition of the Business to Purchaser and which are consistent with the Scope Guidelines, then the Parties agree that such additional services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to refine such additional services in operational (as mutually agreed or as determined by arbitration in accordance with clause (d), the "**Type 1 Extra Services**"). If, between the time of the execution of this Agreement and Closing, Purchaser identifies services not described within the General Scope of Included Services which are reasonably necessary to carry on the Business and which are not consistent with the Scope Guidelines, but which can reasonably be provided by the applicable Seller without hiring new employees and without materially changing or burdening the operations of such Seller, then the Parties agree that such additional services (defined in operational detail as described herein) will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to define such additional services in operational detail (as mutually agreed or as determined by arbitration in accordance with clause (h), "**Type 2 Extra Services**," together with Type 1 Extra Services, the "**Extra Services**").

(c) It is the expectation of the Parties that the Included Services and any Extra Services will be specified in accordance with the mechanisms described in Sections 5.30(a) and 5.30(b) prior to the Closing. However, notwithstanding anything to the contrary in this Agreement, finalization and mutual approval of the Included Services and the Extra Services shall not be a condition to, or delay, the Closing, or permit any Party to rescind or terminate this Agreement. In the event the Included Services and any Extra Services have not been finalized and mutually approved by the Closing Date, then the following will apply: (i) at Closing, the applicable parties will execute and deliver the Transition Services Agreement in the form of Exhibit Q, (ii) the Parties will continue to use good faith efforts after the Closing to finalize the Included Services and any Extra Services (subject to, and in accordance with, the terms of this Section), (iii) pending such finalization, the Sellers will (a) provide Included Services (subject to the Scope Guidelines), and any Extra Services as are not in dispute in accordance with the pricing and other provisions of the Transition Services Agreement and (b) use reasonable efforts, with the cooperation of Purchaser, to provide such other services, subject to the Scope Guidelines, as may be reasonably requested by Purchaser on an interim basis reasonably to support the Business in a manner materially consistent with the operation of the Business during the twelve months prior to the Closing Date (any such services provided to be in accordance with the pricing and other provisions of the Transition Services Agreement).

(d) If the Parties have not finalized the Included Services or the Extra Services forty-five (45) days after the Closing Date, then any affected Party shall have the right but not the obligation to submit the associated disagreements to binding arbitration for resolution, which arbitration proceeding will be initiated by notice delivered by such Party (the "**Complaining Party**") to the applicable counterparty, which notice shall specify the name of a person who shall serve as such Complaining Party's arbitrator. Within ten (10) business days of receipt of such notice, the applicable counterparty (the "**Responding Party**") shall notify the Complaining Party of such Responding Party's choice of a person to act as an arbitrator (if such Responding Party

does not so notify the Complaining Party, then the arbitration shall be conducted by the Complaining Party's arbitrator alone). If two arbitrators are so selected, they will attempt to resolve the matter within thirty (30) days, failing which they shall jointly appoint a third arbitrator, who shall be unaffiliated with any of the Parties (a "**Qualified Arbitrator**"), to serve as arbitrator. (If the two arbitrators are unable jointly to appoint a third arbitrator, such third arbitrator, who must be a Qualified Arbitrator, shall be appointed either by the American Arbitration Association or upon application to the Supreme Court for the State of New York sitting in New York County). Any arbitration hereunder shall be conducted in the English language by such three arbitrators (except as expressly provided above), and shall take place in New York City in accordance with the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association. In rendering a decision, the arbitrators shall abide by the provisions of this Agreement and the Transition Services Agreement (and in particular, the arbitrators shall be engaged and directed by the Parties to define the Included Services and any Extra Services in operational detail in accordance with the requirements of Sections 5.30(a) and (b)). The decision of a majority of the arbitrators shall be in writing, shall be final and conclusive on the Parties, and counterpart copies thereof shall be delivered to all of the Parties not later than sixty (60) days of initiation of the date of the submission of the associated disagreements to binding arbitration for resolution. Judgment may be had on the decision of the arbitrators so rendered in any court of competent jurisdiction. The Purchaser shall bear the fees and expenses of the arbitrator it designates, the applicable Seller shall bear the fees and expenses of the arbitrator it designates, and the Purchaser and the applicable Seller shall equally share the fees and expenses of the third arbitrator.

(e) The Sellers and Purchaser shall respectively use all commercially reasonable efforts, and take all reasonable steps, to obtain the consents and approvals listed in Section 5.30(e) of the Sellers Disclosure Schedule, which such consents and approvals are required to enable the Providers to perform the Included Services in accordance with the Transition Services Agreement. The costs for obtaining such third-party consents will be shared equally by Purchaser and the applicable Seller; provided, that to the extent the aggregate of such costs exceeds $8 million, the Sellers shall bear all of such excess. The Parties will reasonably cooperate to mitigate such costs.

Section 5.31. Casualty.

At Closing the Sellers shall assign to the Purchaser, and the Purchaser shall be entitled to receive the benefits of, any and all claims and proceeds the Sellers may have with respect to any casualty insurance policies with respect to any Assets which related to a casualty occurring after the date of this Agreement but prior to the Closing, and the Purchaser shall have the right to proceed against any insurance company to recover any such items and will have the right prior to the Closing to participate in all negotiations and discussions regarding the adjustment and settlement of any insurance claims with respect to any property or group of properties having a value in excess of $500,000. The Sellers shall promptly after learning of same notify Purchaser in writing of the occurrence of any casualty or similar event with respect to any of the Assets.

78

Section 5.32. Set-Off.

The Parties agree that in addition to any other remedy available, (i) the Purchaser and any Designated Purchaser will have the right, at any time and from time to time, with reasonable prior notice, to set-off any payment obligation (whether matured or unmatured) owed by a Seller to the Purchaser or any Designated Purchaser, as applicable, that arises under any Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) against any payment obligation owed by the Purchaser (or any Designated Purchaser) under the same or any other Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) to the same Seller, and (ii) any Seller will have the right, at any time and from time to time, with reasonable prior notice, to set-off any payment obligation (whether matured or unmatured) owed by the Purchaser or any Designated Purchaser, as applicable, to the Seller that arises under any Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) against any payment obligation owed by the same Seller under the same or any other Ancillary Agreement (other than the Transition Services Agreement and the Real Estate Agreements) to the Purchaser or any Designated Purchaser. Any such set-off will automatically satisfy and discharge the relevant obligation of the respective Persons; provided that, if an obligation exceeds the amount of the related set-off, such obligation will be novated and replaced by an obligation to pay the applicable Person only such excess. The currency of one obligation shall be converted into another currency at the then-current exchange rate prescribed by Section 1.2.4. Each Seller or Purchaser (or Designated Purchaser) that is a party to an Ancillary Agreement shall be jointly and severally liable with each other Seller or Purchaser (or Designated Purchaser), respectively, that is a party to an Ancillary Agreement.

Section 5.33. Good Faith Deposit.

Subject to the U.S. Bidding Procedures Order, Sellers shall hold the Good Faith Deposit in escrow in a non-interest-bearing account maintained by the Sellers and the Good Faith Deposit shall not become property of the Sellers' bankruptcy estates. Subject to the U.S. Bidding Procedures Order, the Sellers shall retain the Good Faith Deposit until the earlier to occur of (a) the Closing or (b) the termination of this Agreement. At the Closing, the Purchaser will be entitled to a credit for the amount of the Good Faith Deposit against the Purchase Price. Upon the termination of this Agreement, the Sellers shall return the Good Faith Deposit to Purchaser in not less than three (3) Business Days, free and clear of any claim, counterclaim, offset, recoupment lien or encumbrance; provided, that in the case of termination pursuant to Section 9.1(e), the Good Faith Deposit shall become the property of the Main Sellers.

Section 5.34. Certain Counterparty Objections.

Purchaser will use its reasonable efforts to resolve prior to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order the objections of Airvana, Inc., iStar CTL North Glenville - Richardson LLC, Sprint and Flextronics filed with the U.S. Bankruptcy Court on or prior to July 24, 2009 and will be responsible for all amounts payable to such objectors in order to accomplish the resolution of such objections; provided, that (i) any such Cure Cost paid by Purchaser must be related solely to the Business, (ii) as to the Sprint objection, Sellers shall be responsible for any attorneys fees and expenses incurred by Sprint and arising

79

before the Closing Date and Purchaser shall be responsible for all other indemnification obligations to Sprint related to the Business due after the Closing Date and (iii) Sellers shall use commercially reasonable efforts to provide Purchaser with a copy of the cross license agreement between Sellers and Lucent Technologies.

## ARTICLE VI

## TAX MATTERS

Section 6.1. <u>Transfer Taxes.</u>

(a)     The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; <u>provided</u>, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, Representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate, Representative or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. For the avoidance of doubt, the Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)     If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT or other similar registration numbers and/or any appropriate certificate of exemption and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated Purchaser, as the case may be. All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

(c)     Provided that, in the opinion of the relevant Purchaser or Designated Purchaser, acting reasonably, the sale qualifies for such an election, the Purchaser and the relevant Designated Purchasers shall jointly execute with the applicable Seller(s) an election under section 167(1) of Part IX of the Excise Tax Act (Canada) and any equivalent election provided under provincial Laws, in the forms prescribed for such purposes, such that the sale of the Assets will take place without payment of any GST. The Purchaser or the relevant Designated Purchaser, as the case may be, shall file within the prescribed filing period all forms

HIGHLY CONFIDENTIAL

supporting such election with the relevant Tax Authority, together with its Tax Returns for the applicable reporting periods during which the sale of the Assets contemplated herein occurs and shall provide the Seller with a copy of such filed election. The Purchaser shall indemnify and hold the Sellers harmless with respect to any Tax, interest or penalties assessed against the Sellers as a result of making such election or the Purchaser's or Designated Purchaser's failure to timely file such an election.

Section 6.2.  Tax Characterization of Payments Under This Agreement.

The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

Section 6.3.  Apportionment of Taxes.

(a)  Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall, and shall cause the other Sellers (to the extent such Sellers are their Subsidiaries), as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof beginning after the Closing Date.

(b)  For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

Section 6.4.  Withholding Taxes.

The Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such

81

withheld amounts shall be treated for all purposes of this Agreement and the Ancillary Agreements as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code, or any provision of state, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. In the event that a Tax withholding obligation arises with respect to payment of the Purchase Price, the Parties shall cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

Section 6.5.   Records.

(a)   Notwithstanding the provisions of Section 5.23 or Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow Representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)   On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Main Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or Nortel Networks Technology Corporation ("**NNTC**") as qualified expenditures on scientific research and experimental development for

82

purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)    The Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)    The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)    At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures.

(f)    The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.    Tax Returns.

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.6(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.6(b) shall be made available to the Purchaser at least ten (10) Business Days before such Tax Returns are due to be filed. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.6(b) at least five (5) Business Days before such Transfer Tax becomes due and payable.

83

(c) The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law.

(d) The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.6(b)) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Main Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within five (5) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the Parties immediately shall appoint an Independent Auditor to determine the correct manner for reporting the items that are in dispute and shall provide to the Independent Auditor all relevant information. The Independent Auditor shall have ten (10) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. Notwithstanding the preceding sentence, if the Independent Auditor shall not have submitted its determination on or before the date such Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions), the Purchaser shall file its original draft of such Tax Return and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.

(e) Notwithstanding any contrary provision in this ARTICLE VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions; provided, however, that (i) if such Seller and the Purchaser are unable to agree as to the amount of such liability prior to such due date, such Seller shall pay to the Purchaser such amount as it in good faith believes that it owes, and (ii) to the extent the Independent Auditor determines that the amount of such liability is greater than the amount actually paid to the Purchaser prior to such due date, such Seller shall pay to the Purchaser such excess within three (3) Business Days after receiving the Independent Auditor's determination.

(f) Notwithstanding any contrary provision in this ARTICLE VI, the Sellers shall not be entitled to any Tax-related information, including any Tax Return, that includes assets or operations of the Purchaser or any of its Affiliates in addition to the Assets; provided, however, that the Purchaser shall provide the Sellers with a copy of a pro forma Tax Return relating solely to the Assets for any Straddle Period.

HIGHLY CONFIDENTIAL                                    NNC-NNL06001800 / 91

Section 6.7. Allocation of Purchase Price.

(a) Except as otherwise required by applicable Law, the Parties shall (i) allocate to the tangible Assets a portion of the Purchase Price equal to the net book value of such Assets as of the Closing Date, and (ii) allocate to the intangible Assets the balance of the Purchase Price.

(b) To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.7(a) (such allocation, a "**Partial Allocation**"). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Independent Auditor, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including as a result of the Bankruptcy Proceedings), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation but in all cases shall be subject to the principles of Section 6.7(a). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Independent Auditor has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.6(b), then such Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return reasonably determines and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Independent Auditor (as modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer Tax Returns.

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1. Employment Terms.

(a) Immediately following the completion of the Auction, but in any event prior to Closing (or otherwise in accordance with applicable Law), the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment to the Employees as set forth on Section 7.1 of the Sellers Disclosure Schedule, such offer being contingent (x) in each case, in the discretion of the Purchaser, on such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and (y) in the case of Inactive Employees, upon

85