their return to active status (other than Employees set forth on Section 7.1 of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser. The Sellers shall have the right to review any offer of employment made pursuant to this Section 7.1 prior to it being sent to any Employee. Such offer of employment shall provide for an employee consideration period of at least one week, or such longer period as required by applicable Law. Such offers (and, with respect to Employees whose employment transfers by operation of Law, such continued employment) shall be consistent with the requirements of applicable Law and on terms and conditions no less favorable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible.  The Sellers shall provide the Purchaser or a Designated Purchaser with such additional information as the Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII.  Notwithstanding anything to the contrary contained herein, as a condition to the transfer of employment (except as prohibited by applicable Law) the Purchaser or Designated Purchaser may require Employees to provide evidence they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law. Any Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employees whose employment transfers by operation of Law, shall be deemed to be a Transferring Employee for all purposes of this Agreement, effective as of the Employee Transfer Date.

(b)      For the twelve (12) month period following the Closing Date (or for such shorter period as a Transferring Employee remains employed by Purchaser or a Designated Purchaser), such Transferring Employee, subject to applicable Law, shall be employed on terms and conditions of employment not materially less favorable, in the aggregate, than the terms and conditions of employment provided to such Employees immediately prior to the Closing, subject, following the Employee Transfer Date, to certain adjustments to conform to the Purchaser's standard employment policies where legally possible; provided, however, that, subject to the terms of the Transferring Employee Agreement, neither this Section 7.1 nor Section 7.2 restricts the right of the Sellers, the Purchaser or a Designated Purchaser to terminate the employment of any Transferring Employee after the Closing; provided, further, that, following the Employee Transfer Date, except as provided in Section 7.2(c), nothing shall prohibit the Purchaser or any Designated Purchaser from amending or terminating, in whole or in part, any Purchaser Employee Plan or from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee population; and provided, further, that for purposes of clarity the Purchaser shall not be required to offer in any offer made pursuant to this ARTICLE VII any (i) equity, (ii) retiree medical or other retiree welfare arrangement or (iii) defined benefit pension plan, in each case, unless required by applicable Law.

(c)      The Purchaser or a Designated Purchaser shall use reasonable efforts from the date hereof until the expiration of the Transferring Employee Agreement with respect to Visa Employees to obtain, at its cost, such visas or permits as are required for it to employ Visa Employees.

86

Section 7.2.    <u>Employee Benefits.</u>

(a)      The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferring Employee as set out in the Employee Information for all purposes other than benefit accrual under any defined benefit plan and except as would result in a duplication of benefits.

(b)      Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferring Employees:

(i)      The Sellers shall: (x) with respect to each Transferring Employee located in the United States and Mexico, pay to such Transferring Employee upon his or her Employee Transfer Date the amount of compensation with respect to the unused vacation days that is due and owing to such Transferring Employee, up to his or her Employee Transfer Date; and (y) with respect to each Transferring Employee located in Canada, pay to such Transferring Employee upon his or her Employee Transfer Date the amount of compensation with respect to the accrued and unused vacation days that is due and owing to such Transferring Employee up to his or her Employee Transfer Date (other than the Accrued Vacation Amount accrued and unused by such Transferring Employee in the year in which the Employee Transfer Date occurs); in each case by the date required under applicable Law in exchange for, with respect only to those Transferring Employees located in Canada, an acknowledgement and consent by each such Employee ·that he or she has received full compensation from the Sellers for such accrued and unused vacation days and has no entitlement to the vacation time associated therewith. Nothing contained in this Section 7.2(b)(i) shall be construed to amend or modify any provision in the Transferring Employee Agreement providing for any payment or transfer of paid vacation days with respect to Transferring Employees' vacation time associated with the period between the Closing Date and the Employee Transfer Date.

(ii)      Section 7.2(b)(ii) of the Sellers Disclosure Schedule sets forth the amount of the Accrued Vacation Amount that is due and owing to each Transferring Employee as of the date hereof and updated by the Sellers as of the Closing Date. The Purchaser shall, or shall cause its relevant Affiliates to, grant each Transferring Employee located in Canada or China paid time off in an amount equal to the accrued unused vacation days for such Transferring Employee that are not paid upon the Employee Transfer Date pursuant to Section 7.2(b)(i)(y). If such Transferring Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferring Employee an amount equal to any such unused paid time off upon such employment termination.

(iii)      With respect to each Transferring Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall cause the Purchaser Employee Plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations to the extent such limitations no longer apply to such Transferring Employees under the comparable Seller Employee Plan and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under

87

comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Employment Transfer Date occurs; provided, that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates.

(c)     As of the Closing Date, the Purchaser or the Designated Purchaser shall establish or otherwise provide a registered pension plan for Transferring Employees employed in Canada and maintain such plan for a period of at least five (5) years following the Closing Date and each such Transferring Employee's participation shall commence on such Transferring Employee's Employee Transfer Date.

(d)     The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date provided that Purchaser or the Designated Purchaser, as applicable, has satisfied their obligations set out in Section 7.1. Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferring Employees that occur on or after the Closing Date.

Section 7.3.    Other Employee Covenants.

(a)     After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby. If requested, the Parties shall reasonably cooperate in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)     Prior to the Employee Transfer Date (for Transferring Employees) and before and after the Closing Date for all other Employees, the Purchaser undertakes to keep the Employee Information in confidence including taking the following actions:

(i)     the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)     the Employee Information shall not be disclosed to any Person other than those set forth in Section 7.3(b)(i) above (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

(iii)     the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated

88

Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

        (iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

        (c)    Within fourteen (14) days following the Employee Transfer Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such Employee in his or her written offer of employment, or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with the Employee Records (or a copy thereof).

        (d)    During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of Purchaser, either directly or indirectly solicit for employment or hire any Transferring Employee unless the employment of such Transferring Employee is involuntarily terminated without cause by the Purchaser or Designated Purchaser prior to such action by the Sellers (other than any termination in connection with such Transferring Employee seeking employment with Sellers); provided, however, that nothing in this Section 7.3(d) shall prevent the Sellers from (i) employing the Transferring Employees pursuant to the terms of the Transferring Employee Agreement, (ii) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferring Employees or (iii) hiring such Transferring Employees identified through such employment searches.

        (e)    During the Non-Solicitation Period, the Purchaser shall not, and shall cause the Designated Purchasers not to, either directly or indirectly solicit for employment or hire any employee of the Sellers who is not an Employee unless (i) the employment of such employee is involuntarily terminated without cause by the Seller prior to such action by the Purchaser or Designated Purchasers (other than any termination in connection with such employee seeking employment with Purchaser or Designated Purchasers), or (ii) otherwise permitted by the Transition Services Agreement.

        (f)    During the Non-Solicitation Period, the Purchaser shall not, and shall cause the Designated Purchasers not to, either directly or indirectly solicit for employment or hire any Employee who has rejected an offer of employment from the Purchaser or a Designated Purchaser, or to whom the Purchaser or a Designated Purchaser did not make an offer of employment pursuant to this Agreement; provided, that this Section 7.3(f) shall not apply if the Purchaser gives the Sellers prior notice of such solicitation or hire and such employee, if applicable, returns to the Sellers any severance payments paid by the Sellers to such employee and, if applicable, releases the Sellers from any right to severance payments.

        (g)    During the Non-Solicitation Period, neither Party shall, except as specifically set out in this Agreement or without the other Parties' written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire any of the employees with whom the Party has had personal contact, or who became known to the Party in the course of its negotiation of the transactions contemplated hereby; provided that nothing in

HIGHLY CONFIDENTIAL                NNC-NNL06001800 / 96

this Section 7.3(g) shall restrict or preclude the Party, without such consent, from employing any employee Party who (x) contacts such Party directly at his or her own initiative without any direct or indirect solicitation by or encouragement from such party, (y) responds to a mass media solicitation or advertisement consistent with such Party's past practices, as applicable, that is not directed at the employees, or (z) is contacted by a third party executive search firm or employment agency, so long the Party did not provide guidance as to such employee to the third party firm or agency.

Section 7.4.    Excluded Employee Liabilities.

None of the Purchaser or the Designated Purchasers shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates relating to Employees other than the Assumed Liabilities (the "**Excluded Employee Liabilities**"). The Excluded Employee Liabilities shall include, but not be limited to, the following:

(a)    the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan (including, for the avoidance of doubt, any arrangement that provides severance-type benefits) except with respect to the Transferred Employee Plans;

(b)    any Liability with respect to the KERP, the KEIP, the Calgary Retention Plan or any other Seller retention plan, program or arrangement in effect as of the Closing Date that provides benefits to any Transferring Employee;

(c)    any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferring Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Employee Transfer Date;

(d)    Liabilities resulting from any Action (i) with respect to any Employee relating to his/her employment or termination of employment with any of the Sellers, or (ii) with respect to an applicant with respect to potential employment with any of the Sellers in the Business; and

(e)    any Liabilities relating to the Employees or any former employees employed in the Business by the Sellers (with respect only to such employee's employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employee (whether or not becoming a Transferring Employee prior to or in connection with the Closing, (including any Employee who does not accept an offer of employment with the Purchaser or a Designated Purchaser)), including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, any former Collective Labor Agreement, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any WARN Act Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor,

90

social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than any Assumed Liabilities and other than with respect to liabilities incurred after the Closing Date under Purchaser Employee Plans by Transferring Employees who are terminated by Purchaser or a Designated Purchaser after the Closing Date.

Section 7.5.    <u>Sole Benefit of Sellers and Purchaser.</u>

The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.2(c)), or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferring Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.    <u>Conditions to Each Party's Obligation.</u>

The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the fulfillment (or the express written waiver of the Primary Parties), at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals.* All Regulatory Approvals shall have been obtained; provided, <u>however</u>, that any order issued under paragraph 25.4(1)(b) of the Investment Canada Act authorizing the transactions contemplated hereby shall be an order that is on terms and conditions satisfactory to the Purchaser acting reasonably (in acting reasonably, the Purchaser shall agree to all terms and conditions, provided that they do not impair the ability of the Purchaser to operate and derive benefits from the Business in a commercially reasonable manner).

(b)    *No Injunctions or Restraints.* There shall be in effect no Law, order, injunction, decree or judgment of any court or other Government Entity in the U.S., Canada or the United Kingdom prohibiting the consummation of the transactions contemplated hereby, and there shall not be any proceedings pending by any Government Entity in the U.S. or Canada seeking such prohibition.

(c)    *U.S. Sale Order and Canadian Approval and Vesting Order.* The U.S. Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered and not

HIGHLY CONFIDENTIAL    

modified, and (ii) shall have become Final Orders, provided, that, this condition under Section 8.1(c)(ii) may be waived by the Purchaser in its sole discretion.

Section 8.2.    Conditions to Sellers' Obligation.

The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or the express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.* The covenants contained in this Agreement to be complied with by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect.

Section 8.3.    Conditions to Purchaser's Obligation.

The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or the express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)    Each of the representations and warranties set forth in Sections 4.1, 4.2 and 4.3, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

92

(b)    *No Breach of Covenants.* The covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect.

(c)    *Certificates.* The Sellers shall have delivered to the Purchaser duly executed certificates, as set forth in Section 2.3.2(a).

(d)    *Unbundling and Assignment.* With respect to Seller Contracts that accounted, in the aggregate, for at least $1,500,000,000 (or no less than 75%) of the sales revenue related to the CDMA Business in fiscal year 2008 (the "**Specified CDMA Contracts**"), the Sellers shall have (or will prior to or at the Closing) (i) in the case of Assumed and Assigned Contracts, assumed and assigned such Specified CDMA Contracts pursuant to Section 2.1.5, and (ii) in the case of Bundled Contracts other than the Contracts assumed and assigned as required by the foregoing clause (i), amended such Bundled Contracts and entered into new Contracts in accordance with Section 5.16 with the counterparties to such Specified CDMA Contracts and which will be Assigned Contracts.

(e)    *Investment Canada.* The Minister of Industry has not sent to the Purchaser a notice under subsection 25.2(1) of the Investment Canada Act and the Governor in Council has not made an order under subsection 25.3(1) of the Investment Canada Act in relation to the transaction contemplated by this Agreement or, if such a notice has been sent or such an order has been made, the Purchaser has subsequently received (i) a notice under paragraph 25.2(4)(a) of the Investment Canada Act indicating that a review of the transaction on grounds of national security will not be made, (ii) a notice under paragraph 25.3(6)(b) of the Investment Canada Act indicating that no further action will be taken in respect of the transaction or (iii) a copy of an order under paragraph 25.4(1)(b) authorizing the transaction, provided that order is on terms and conditions satisfactory to the Purchaser acting reasonably (in acting reasonably, the Purchaser shall agree to all terms and conditions, <u>provided</u> that they do not impair the ability of the Purchaser to operate and derive benefits from the Business in a commercially reasonable manner).

**ARTICLE IX**

**TERMINATION**

Section 9.1.   <u>Termination.</u>

This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Primary Parties;

(b)    by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)    if the U.S. Sale Order and the Canadian Approval and Vesting Order approving this Agreement and the transactions contemplated hereby have not been entered by the respective Courts by July 31, 2009; or

93

       (ii)      if the Closing does not take place by September 30, 2009 (the "**Termination Date**"); provided, that if the Closing does not take place by the Termination Date solely due to the condition set forth in Section 8.1(a) not being fulfilled, the Termination Date shall automatically be extended to October 31, 2009;

provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(b) shall not be available to the Party seeking to terminate if such Party or one of its Affiliates is then in breach of this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to this Section 9.1(b).

       (c)      by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business;

       (d)      by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1(a), Section 8.3(a) or Section 8.3(b), as applicable, and, in each case, which, if capable of being cured, is not cured within ten (10) days (or such lesser number of days remaining prior to the Termination Date) from receipt of a written notice from the Purchaser; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to the Purchaser where a breach of this Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

       (e)      by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 8.1(a) or Section 8.2 of this Agreement; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to the Main Sellers where a breach of this Agreement by any of the Sellers has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause; or

       (f)      by the Purchaser in the event the Sellers fail to consummate the Closing in breach of Section 2.3, within five (5) Business Days of written demand by the Purchaser to consummate the Closing.

     Section 9.2.      Effects of Termination.

       If this Agreement is terminated pursuant to Section 9.1:

       (a)      all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.7 (Public Announcements), (ii) Section 5.10 (Transaction Expenses), (iii) Section 5.11 (Confidentiality), (iv) Section 5.33 (Good Faith Deposit), with respect to the last sentence thereof, (v) Section 7.3(b) (Other Employee Covenants), (vi) Section 9.1 (Termination), (vii) Section 9.2 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous);

94

provided, that neither the termination of this Agreement nor anything in this Section 9.2 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

        (b)      except as required by applicable Law, the Purchaser shall return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

        (c)      the provisions of the Confidentiality Agreement shall continue in full force and effect.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.   No Survival of Representations and Warranties or Covenants.

No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.   Remedies.

No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

Section 10.3.   No Third Party Beneficiaries.

Except for any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Debtors or the Joint Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.   Consent to Amendments; Waivers.

No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

95

Section 10.5.  Successors and Assigns.

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by Purchaser or Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided (A) that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.4 if applicable), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

Section 10.6.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to Contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b)     To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, Action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, request that the Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, Action or proceeding, and (b) in the United States District Court for the Southern District of New York or, if that court lacks subject matter jurisdiction, the Supreme Court of the State of New York, County of New York, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, in the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, County of New York and the Canadian Court, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum;

96

(iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)      Section 10.6(b) shall not limit the jurisdiction of the Accounting Arbitrator set forth in Section 2.2.3.1(c) and 5.30, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator.

(d)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

Section 10.7.   <u>Notices.</u>

All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, by electronic mail with confirmation to any Party at the address specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

         Telefonaktiebolaget L M Ericsson (PUBL)
         Torshamnsgatan 23
         Kista
         Stockholm
         Sweden
         Attention: Per Oscarsson
         Attention: Carl Olof Blomqvist
         Facsimile: +46-8-18-4085

HIGHLY CONFIDENTIAL          NNC-NNL06001800 / 104

With copies (that shall not constitute notice) to:

      Paul, Weiss, Rifkind, Wharton & Garrison LLP
      1285 Avenue of the Americas
      New York, New York, USA 10019-6064
      Attention: Stephen J. Shimshak
      Attention: Marilyn Sobel
      Facsimile: +1-212-373-3990

      and

      Blake, Cassels & Graydon LLP
      199 Bay Street
      Suite 2800, Commerce Court West
      Toronto, Ontario, Canada M5L 1A9
      Attention: Richard Corley
      Attention: Susan Grundy
      Facsimile: +1-416-863-26-53

If to the Main Sellers or the Sellers, to:

      Nortel Networks Corporation
      195 The West Mall Mailstop: T0503006
      Toronto, Ontario, Canada M9C 5K1
      Attention: Gordon A. Davies
            Chief Legal Officer & Corporate Secretary
      Facsimile: +1-905-863-7386

      Nortel Networks Limited
      195 The West Mall
      Mailstop: T0503006
      Toronto, Ontario, Canada M9C 5K1
      Attention: Gordon A. Davies
            Chief Legal Officer & Corporate Secretary
      Facsimile: +1-905-863-7386

      Nortel Networks Inc.
      Legal Department
      220 Athens Way, Suite 300
      Nashville, Tennessee, USA 37228
      Attention: Lynn C. Egan
            Assistant Secretary
      Facsimile: +1-615-432-4067

HIGHLY CONFIDENTIAL          NNC-NNL06001800 / 105

With copies (that shall not constitute notice) to:

> Nortel Networks Limited
> 195 The West Mall
> Mailstop: T0505009
> Toronto, Ontario, Canada M9C 5K1
> Attention: Douglas Parker
>            Associate General Counsel, Corporate
> Facsimile: +1-905-863-7739

> and

> Nortel Networks Inc.
> Legal Department
> 220 Athens Way, Suite 300
> Nashville, Tennessee 37228
> USA
> Attention: Robert Fishman
>            Senior Counsel
> Facsimile: +1-347-427-3815 & +1-615-432-4067

> and

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York, USA 10006
> Attention: Paul J. Shim
> Attention: Daniel S. Sternberg
> Facsimile: +1-212-225-3999

> and

> Ogilvy Renault LLP
> 200 Bay Street
> Suite 3800, P.O. Box 84
> Royal Bank Plaza, South Tower
> Toronto, Ontario M5J 2Z4
> Canada
> Attention: Michael Lang
> Facsimile: +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

99

HIGHLY CONFIDENTIAL

Section 10.8.  Exhibits; Sellers Disclosure Schedule.

(a)  The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)  The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.  Counterparts.

The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement

Section 10.10.  No Presumption; Mutual Drafting.

The parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof.  As a consequence, the parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive the effects of such Laws.

Section 10.11.  Severability.

If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section 10.12.  Entire Agreement.

This Agreement, the other Transaction Documents and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents and

100

the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreements (if any), may be subject to different governing Laws.

Section 10.13. <u>Availability of Equitable Relief.</u>

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, calculation of which the Parties agree would be uncertain and difficult to ascertain, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.

Section 10.14. <u>Bulk Sales Laws.</u>

Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.15. <u>Main Sellers as Representatives of Other Sellers.</u>

(a)    For all purposes of this Agreement:

(i)    each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)    each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)    each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)    Pursuant to Section 10.15(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)    For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule, but in all cases other than any EMEA Debtors or their respective Subsidiaries.

101

(d)    Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate pursuant to this Section 10.15(d) for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

Section 10.16. Execution by Other Sellers.

The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.15 hereof.

Section 10.17. Obligations of the Sellers.

When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller) and Affiliates of any Sellers shall in no event include any EMEA Debtors or their respective Subsidiaries.

Section 10.18. Limitation on Losses.

Except as provided in Section 5.32 or except in the case of a Liability arising from a cash payment obligation due to a party in respect of which the party seeking set-off has received a final judgment in an Action or Proceeding in accordance with Section 10.6, no party shall be entitled to set-off any Liabilities or Losses under this Agreement against any amounts due to such party under any other agreement with the other parties or any Affiliate thereof. In no event shall any party be responsible or liable for any Losses that are consequential, in the nature of lost profits, diminution in the value of property, special or punitive or otherwise not actual damages.

**[Remainder of this page intentionally left blank.  Signature page follows.]**

102

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

Telefonaktiebolaget L M Ericsson (publ)

By: _____
Name: Per Oscarsson
Title: Head of Mergers & Acquisitions

By: _____
Name: Carl Olof Blomquist
Title: Senior Vice President & General Counsel

Nortel Networks Corporation

By: _____
Name: Gordon Davies
Title: Chief Legal Officer & Corporate Secretary

By: _____
Name: George Riedel
Title: Chief Strategy Officer

Nortel Networks Limited

By: _____
Name: Gordon Davies
Title: Chief Legal Officer & Corporate Secretary

By: _____
Name: George Riedel
Title: Chief Strategy Officer

Nortel Networks Inc.

By: _____
Name: Gordon Davies
Title: Chief Legal Officer

Signature Page – Asset Sale Agreement

## EXHIBIT A

## Other Sellers

Nortel Networks Technology Corporation

Nortel Networks (CALA) Inc.

Nortel Networks (China) Limited

A-1

HIGHLY CONFIDENTIAL    NNC-NNL06001800 / 111

## EXHIBIT B

### Part 1 – Other Canadian Debtors

Nortel Networks International Corporation

Nortel Networks Technology Corporation

### Part 2 – Other U.S. Debtors

Nortel Networks International Inc.

Northern Telecom International Inc.

Nortel Networks (CALA) Inc.

### Part 3 – EMEA Debtors

Nortel Networks UK Limited

Nortel Networks International Finance & Holdings BV

Nortel Networks (Austria) GmbH

Nortel Networks S.R.O.

Nortel Networks S.p.A.

Nortel Networks NV

Nortel Networks Polska Sp. z.o.o.

Nortel GmbH, Nortel Networks BV

Nortel Networks Slovensko s.r.o.

Nortel Networks Romania Srl

Nortel Networks Portugal, S.A.

Nortel Networks AB

Nortel Networks Hispania S.A.

Nortel Networks OY

Nortel Networks Engineering Service Kft.

Nortel Networks SA (French Entity)

Nortel Networks France SAS

Nortel Networks (Ireland) Limited

B-1

HIGHLY CONFIDENTIAL

### Part 4 – Non-Debtor Sellers

Nortel Networks de Mexico, S.A. de C.V.

Nortel Networks (Asia) Limited

Nortel Networks (China) Limited

Nortel Networks Telecommunications Equipment (Shanghai) Co Ltd.

Nortel Networks de Mexico, S. de R.L. de C.V.

HIGHLY CONFIDENTIAL    NNC-NNL06001800 / 113

## EXHIBIT C

### Adjusted Net Working Capital

Capitalized terms used but not defined herein shall have the meaning ascribed to the same in the Agreement of which this Exhibit C is a part.

The Adjusted Net Working Capital calculation only includes certain accounts and accruals, as further described in the Agreement, the Calculation Principles and this Exhibit C, and therefore differs from the Annual Audited Financial Statements, Interim Unaudited Financial Statements and Unaudited Financial Statements as presented in the Sellers Disclosure Schedule in that regard.

| Adjusted Net Working Capital Accounts | In Scope as of March 31, 2009* |
|---|---|
| CIP Receivables Amount | 45.3 |
| Net Inventory Value | 24.9 |
| **Assets** | **70.2** |
| | |
| Contractual Liabilities Amount | 13.4 |
| Royalty Liability Amount | 43.8 |
| Warranty Provision Amount | 11.8 |
| **Liabilities** | **69.0** |
| | |
| | |
| **Adjusted Net Working Capital** | **1.2** |

\*     Sets forth a pro forma calculation of the Adjusted Net Working Capital had the Closing occurred on March 31, 2009.

C-1

HIGHLY CONFIDENTIAL      NNC-NNL06001800 / 114

## EXHIBIT D

## Calculation Principles

### A. Net Inventory Value

Inventories (as defined in the Agreement) are valued at the lower of cost (calculated generally on a first-in, first-out basis) or market value. The cost of finished goods and work in process is comprised of material, labor and manufacturing overhead. Provisions for inventory are based on estimates of future customer demand for products, including general economic conditions, growth prospects within the customer's ultimate marketplaces and market acceptance of current and pending products. Full provisions are generally recorded for surplus inventory in excess of one year's forecast demand or inventory deemed obsolete. Application of these principles is further defined in the following Nortel Accounting Principles:

AG1033 – Inventory and Cost of Sales
AG1004 – Excess and Obsolete Inventory Provision

### B. CIP Receivables Amount

CIP (construction in process) receivables account is used to record unbilled receivables in the Sellers' SOP 81-1 revenue arrangements, where revenue recognized under a percent of completion calculation exceeds the amount invoiced on the respective project, and in the Sellers' SAB104/SOP 97-2 revenue arrangements, where the project has been completely delivered, but not yet billed. The revenue values creating the CIP Receivables are determined in accordance with US GAAP, and based on consistent application of the following Nortel Accounting Principles:

AG1009: Revenue Recognition – General Overview (SAB104)
AG1010: Revenue Recognition – Contract Revenue (SOP 81-1)
AG1016: Revenue Recognition – Software Revenue (SOP 97-2)
AG1025: Revenue Recognition – Multiple Element Arrangements (EITF 00-21)

### C. Contractual Liability Amount

The Contractual Liabilities Amount represents the aggregate amount of the following items: Customer-related contractual liabilities:
- Known Project Losses on SOP 81-1 contracts (percentage of completion)
- Non-cash incentives where Nortel has committed to give the customer product/service at no charge with no future purchase commitment
- Liabilities related to liquidated damages clauses payable in cash

Application of this is further defined in the following Nortel Accounting Principles:

AG1010: Revenue Recognition – Contract Revenue (SOP 81-1)
AF1015: Cash and non cash incentives, including Appendices A & B

D-1

HIGHLY CONFIDENTIAL NNC-NNL06001800 / 115

AF1014: Contractual Penalties, including Appendices A, B, & C
AG1001: Expense Accruals

### D. Royalty Liability Amount

Royalties are payments made to a supplier for the right to use and deploy licensed software (including IP and services) with, or in conjunction with, a Seller's solution or product. This software may consist of components embedded in the firmware of a shippable hardware unit. Each time the Seller deploys a product to a customer, an accurate count of all Royalty bearing products is made. The Royalty Liability Amount represents royalties that have been earned by the supplier (license or product has been deployed), but for which the Seller has not yet been invoiced. The Royalty Liability Amount is calculated in accordance with US GAAP as further described in the following Nortel Accounting Principle:

AG1001: Expense Accruals

### E. Warranty Provision Amount

This provision is for potential claims by the customer for repair or replacement of a product that they have purchased from the Seller. The Seller offers a guarantee of product performance and product capability to the customer that extends beyond the time of the sale. The sales contract normally has details on the commitment; including the length of time the product is covered by the Seller's guarantee, the type of events or occurrences that are fully or partially refundable to the customer by the warranty agreement; and any restrictions placed on the customer's use/treatment of the product that could invalidate, limit or cause a modification to the Seller's guarantee. The Closing Warranty Provision Amount shall be calculated in accordance with US GAAP utilizing consistent application of the following Nortel Accounting Principles:

AG1003: Warranty Provision
AG1002: Contingencies

### F. Adjusted Net Working Capital

The Closing Adjusted Net Working Capital shall be calculated pursuant to Section 2.2.2(c) of the Agreement.

### G. Accrued Vacation Amount

The Accrued Vacation Amount is calculated first by taking the accrued vacation hours per Transferring Employee on the Closing Date. These amounts are calculated by application of the applicable Seller policy per country as listed in the following documents, as modified to comply with applicable Law, which are subject to change with notification to the Purchaser:

United States of America: "US Benefits Paid Time Off Overview" issued October 20th, 1999 and modified May 14th 2008
Canada: "Canada Benefits Paid Time Off Overview" issued July 10th, 2001 and modified May 14th, 2008

HIGHLY CONFIDENTIAL     NNC-NNL06001800 / 116

Mexico: "México-Vacation Policy" dated January 2008
China: "Nortel Networks Corporation PRC Employee Handbook" dated December 2005

The annual base salary per Transferring Employee is then converted into a hourly rate using a
52-week year and a 37.5-hour work week in Canada and a 40-hour work week in the United
States of America, Mexico and China. This hourly rate per Transferring Employee is then
multiplied by the accrued vacation hours as of the Closing Date per Transferring Employee. The
resulting amount is multiplied by a percentage equal to 1 plus the statutory employer tax rate
effective on the Closing Date in the applicable country, state, provincial and local jurisdictions
where each Transferring Employee is employed in order to determine the Accrued Vacation
Amount per Transferring Employee.

D-3

HIGHLY CONFIDENTIAL     

## EXHIBIT E

See attached.

E-1

# <u>EXHIBIT F</u>

See attached.

HIGHLY CONFIDENTIAL   NNC-NNL06001800 / 119

## EXHIBIT G

See attached.

G-1

HIGHLY CONFIDENTIAL     

**EXHIBIT H**

See attached.

H-1

**HIGHLY CONFIDENTIAL**

## **EXHIBIT I**

See attached.

I-1

HIGHLY CONFIDENTIAL     

**EXHIBIT J**

See attached.

J-1

HIGHLY CONFIDENTIAL                    NNC-NNL06001800 / 123

## EXHIBIT K

See attached.

K-1

HIGHLY CONFIDENTIAL      NNC-NNL06001800 / 124

## EXHIBIT L

See attached.

L-1

1

HIGHLY CONFIDENTIAL

## EXHIBIT M

### Nortel Accounting Principles

The underlying data set utilized in deriving the Unaudited Financial Statements of the Business are the consolidated Nortel accounting records as recorded in SAP. These records have been prepared based on Nortel accounting principles as disclosed in the Nortel Networks Corporation Annual Report on Form 10-K for the year ended December 31, 2008 and are further described in the following policies and procedures that have been provided to the Purchaser in the General Corporate folder of the electronic data room:

| Merrill Dataroom Location | Document Name |
|---|---|
| 1.1.1.15 | FPG2007_Appendix C_Determining the Arrangement |
| 1.1.1.16 | FPG2013_Global_Revenue_Governance_Documentation_Requirements |
| 1.1.1.17 | FPG2013_Determining the Appropriate Revenue Recognition |
| 1.1.1.18 | AG1009_-_Appendix_A_-_Basic_Revenue_Recognition_Criteria.pdf |
| 1.1.1.19 | AG1009_-_Appendix_B_-_Revenue_Risk_Indicators.pdf |
| 1.1.1.20 | AG1009_-_Appendix_C_-_Examples_of_Basic_Revenue_Recognition_Criteria.pdf |
| 1.1.1.21 | AG1009_-_Appendix_D_-_Example_of_Inconsequential_or_Perfunctory_Designation.pdf |
| 1.1.1.22 | AG1009_-_Appendix_E_-_FAQ_on_Inconsequential_or_Perfunctory_Designation.pdf |
| 1.1.1.23 | AG1009_-_Appendix_F_-_Bill_and_Hold_Transactions.pdf |
| 1.1.1.24 | AG1009_-_Appendix_G_-_Service_Elements_-_Undelivered_Element_Accounting_.pdf |
| 1.1.1.25 | AG1009_-_Revenue_Recognition_-_General_Overview_(SAB_104).pdf |

M-1

HIGHLY CONFIDENTIAL

| 1.1.1.26 | AG1010_-_Appendix_A_-_Example_of_Percentage_of_Completion_Method.pdf |
| 1.1.1.27 | AG1010_-_Revenue Recognition_-_Contract_Revenue.pdf |
| 1.1.1.28 | AG1011_-_Appendix_A_-__FAQ_on_Separately_Priced_Extended_Warranty_&_Maintenance_Contracts.pdf |
| 1.1.1.29 | AG1011_-_Appendix_B_-_Example_of_Service_Revenue.pdf |
| 1.1.1.30 | AG1011_-_Revenue Recognition_-_Services_Revenue_(FTB_90-1).pdf |
| 1.1.1.31 | AG1013_-_Revenue Recognition_-_Customer_Acceptance.pdf |
| 1.1.1.32 | AG1014_-_Revenue_Recognition_-_Contractual_Penalties.pdf |
| 1.1.1.33 | AG1014_Appendix_A_-_Flowchart_of_Contractual_Penalties_in_Single_&_Multiple_Unit_of_Accounting_Arrangements.pdf |
| 1.1.1.34 | AG1014_Appendix_B_-_Flowchart_of_Product_Performance_Contractual_Penalties.pdf |
| 1.1.1.35 | AG1014_Appendix_C_-_Flowchart_of_Contractual_Penalties_in_SOP_81-1_Arrangements.pdf |
| 1.1.1.36 | AG1015_-_Appendix_A_-_Example_Cash_Incentives.pdf |
| 1.1.1.37 | AG1015_-_Appendix_B_-_Examples_of_Non_Cash_Incentives.pdf |
| 1.1.1.38 | AG1015_-_Appendix_C_-_FAQ_on_Breakage.pdf |
| 1.1.1.39 | AG1015_-_Appendix_D_-_Accounting_for_Concessions.pdf |
| 1.1.1.40 | AG1015_-_Revenue Recognition_-_Cash_and_Non-Cash_Incentives.pdf |
| 1.1.1.41 | AG1016_-_Appendix_A_-_Identification_of_Upgrades,_PCS_&_Software_Products.pdf |

M-2

| 1.1.1.42 | AG1016_-_Appendix_B_-_Examples_of_Specified_&_Unspecified_Software_Upgrades.pdf |
|---|---|
| 1.1.1.43 | AG1016_-_Appendix_C_-_FAQ_on_Catch-up_Accounting_of_Undelivered_Service_Elements.pdf |
| 1.1.1.44 | AG1016_-_Appendix_D_-_FAQ_on_Corrections_of_Errors_in_Software_(Bug_Fixes_or_Patches).pdf |
| 1.1.1.45 | AG1016_-_Appendix_E_-_FAQ_on_Overcoming_Implicit_PCS_.pdf |
| 1.1.1.46 | AG1016_-_Appendix_F_-_Example_of_Basic_Revenue_Recognition_Criteria_(SOP_97-2).pdf |
| 1.1.1.47 | AG1016_-_Appendix_G_-_Basic_Revenue_Recognition_Criteria.pdf |
| 1.1.1.48 | AG1016_-_Revenue Recognition_-_Software_Revenue_(SOP_97-2).pdf |
| 1.1.1.49 | AG1017_-_Revenue Recognition_-_Cost_Deferrals.pdf |
| 1.1.1.50 | AG1026_-_Appendix_A_-_Flowchart_of_Criteria_for_Determining_Unit(s)_of_Accounting_(EITF_00-21).pd |
| 1.1.1.51 | AG1026_-_Appendix_B_-_Example_of_No_VSOE_for_Undelivered_Services.pdf |
| 1.1.1.52 | AG1026_-_Multiple_Element_Arrangements_(EITF_00-21).pdf |
| 1.1.1.53 | CP 303.44_ Evidencing Fair Value in Revenue Arrangements.pdf |
| 1.1.2.1 | 302 Appendix A.doc |
| 1.1.2.2 | 302 Appendix B.doc |
| 1.1.2.3 | 302 Appendix C.doc |
| 1.1.2.4 | 302 Appendix D.doc |
| 1.1.2.5 | 302 Appendix E.doc |
| 1.1.2.6 | 302 Appendix F.doc |
| 1.1.2.7 | AG_1033_Inventory_Cost_of_Sales_fv1_0.pdf |

M-3

HIGHLY CONFIDENTIAL