- 29 -

pursuant to a sale process under section 363 of the Code and that the Ranger Agreement shall serve as a "stalking horse" bid pursuant to that process.

62. A copy of the proposed bidding procedures is attached as Appendix "I" hereto (the "Bidding Procedures"). The Monitor notes that the Bidding Procedures are substantially similar to the bidding procedures used in the sale of Nortel's significant business units.

63. The Ranger Agreement provides that the Sellers that are U.S. Debtors shall file the U.S. Bidding Procedures and Sale Motion with the U.S. Court no later than three Business Days from the date of the Ranger Agreement. This motion was filed with the U.S. Court on April 4, 2011. The Ranger Agreement also provides that the Applicants shall serve the Canadian Sales Process Order Motion no later than the date that is five Business Days from the date of the Ranger Agreement. This motion was served on April 7, 2011.

64. The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for May 2, 2011, conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

65. The Bidding Procedures provide that all bids must be received by the Sellers not later than 4:00 p.m. (ET) on June 13, 2011, and that the Sellers will conduct an auction of the Assets beginning on June 20, 2011, at 9:00 a.m. (ET) (the "Auction").

66. A joint sale hearing has been scheduled before both this Honourable Court and the U.S. Court for June 30, 2011.

67. The key provisions of the Bidding Procedures are outlined in the paragraphs that follow. Reference should be made directly to the Bidding Procedures for a complete understanding of the terms thereof.

*Provisions Governing Qualifications of Bidders*

68. Unless otherwise ordered by both the U.S. Court and this Honourable Court and accepted by the Joint Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to

- 30 -

participate in the Bidding Process, prior to the Bid Deadline each person other than the Purchaser who wishes to participate in the Bidding Process, and in the event that such person is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each actual or proposed holder of the equity (whether in the form of stock, partnership interests, LLC interests, debt issued in connection with such person's bid for the Assets or otherwise) or proposed beneficiary of such person through license or similar arrangement granted in connection with such person's bid (each an "Equity Holder") (each such person other than the Purchaser who wishes to participate in the Bidding Process, and each Equity Holder thereof, a "Potential Bidder") must deliver to the Notice Parties:

(a)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to such Potential Bidder) in substance substantially the same as the confidentiality agreement executed by the Purchaser in form and substance satisfactory to the Sellers and which shall inure to the benefit of any purchaser of the Assets. In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, prior to the distribution of any additional confidential information by the Sellers to such Potential Bidder, such Potential Bidder must provide a statement (i) agreeing that, if the confidentiality agreement executed by the Purchaser contains provisions that are more restrictive than the confidentiality agreement executed by such Potential Bidder, then the confidentiality agreement executed by such Potential Bidder shall be deemed to be amended to contain such more restrictive provisions; (ii) agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets; and (iii) waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transactions it may enter into, to the Notice Parties and other Qualified Bidders who submit a Qualified Bid;

(b)     current audited financial statements and latest unaudited financial statements of the Potential Bidder or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial

- 31 -

advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(c)      a statement demonstrating to the Sellers' satisfaction, a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded; (iii) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Ranger Agreement.

69.    A Potential Bidder that has delivered the documents described above, whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the Transactions, that has submitted a reasonably competitive and realistic non-binding proposal, as described above, that has delivered executed confidentiality agreement(s), as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "Qualified Bidder". The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group, the Joint Administrators and the Monitor, whether to entertain bidders for the Assets that have not

- 32 -

met one or more of the requirements specified above and deem such bidders to be Qualified Bidders. As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets as outlined in the Bidding Procedures.

*Bid Deadline*

70. A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the Notice Parties identified in the Bidding Procedures so as to be received not later than 4:00 p.m. (ET) on June 13, 2011 (as may be extended as set out below, the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so, provided that for any such extension beyond five Business Days, the Sellers shall have obtained the written consent of the Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld.

*Provisions Governing Qualified Bids*

71. A bid, other than the Ranger Agreement, submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

     (a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Ranger Agreement, including without limitation with respect to certainty and timing of closing, or pursuant to alternate structure or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Committee, the Bondholder Group and the Monitor, are no less favourable than the terms and conditions of the Ranger Agreement;

- 33 -

(b)     it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (a) with respect to the Successful Bidder only, 180 days from the Sale Hearing, subject to further extensions as may be agreed to under the applicable purchase agreements and (b) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below); provided further that, notwithstanding anything to the contrary provided in the Bidding Procedures, in no event shall the Purchaser be required to serve as an Alternate Bidder without its consent, in its sole discretion;

(c)     it includes a duly authorized and executed Purchase Agreement, including the purchase price for the Assets expressed in U.S. Dollars, together with all exhibits, schedules thereto and ancillary agreements as well as copies of such materials marked to show those amendments and modifications to the Ranger Agreement, ancillary agreements and proposed orders to approve the sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, as proposed by the Qualified Bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in or benefiting from (including through

NNC-NNL11755879 / 33

- 34 -

license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid, and the complete terms of any such sponsorship, participation, financing or benefit, such disclosure to include, without limitation, (i) in the case of a Qualified Bidder formed for the purpose of acquiring the Assets (or any portion thereof), the identity of each of the actual or proposed Equity Holders of such Qualified Bidder and the terms and participation percentage of such Equity Holder's interest in such bid and (ii) the identity of each entity that has or will receive a benefit from such bid from or through the Qualified Bidder or any of its Equity Holders and the terms of such benefit;

(g)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Ranger Agreement, plus the Break-Up Fee plus $4 million (representing the Expense Reimbursement); provided that, in determining such value, the Sellers will not be limited to evaluating the dollar amount of a competing bid, but may also consider factors including those described under the section below titled "Evaluation of Competing Bid";

(h)    it includes an acknowledgement and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)    it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the

- 35 -

Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of the any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j) it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of Marked Agreements and Marked Ancillary Agreements;

(k) it is accompanied by a good faith deposit in the form of a wire transfer, certified check or such other form acceptable to the Sellers payable to the Sellers in an amount equal to $27 million;

(l) it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with their continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m) it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the

- 36 -

Qualified Bidder in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

72.   The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified in the Bidding Procedures and deem such bids to be Qualified Bids, provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j), (k) or (o) in paragraph 71, above, without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, provided further that such consent shall not be unreasonably withheld in connection with any bid that would (i) otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimis failure to comply with those criteria; and (ii) such noncompliance is cured within 24 hours of the Bid Deadline and provided further that the Sellers shall give the Purchaser written notice no later than the later of (a) three Business Days prior to the commencement of the Auction or (b) 5:00 p.m. (ET) five calendar days prior to the commencement of the Auction of any determination by the Sellers (subject to the two preceding provisos in this sentence) to entertain a bid for the Assets that does not conform to one or more of the requirements specified herein and to deem such bid to be a Qualified Bid (it being understood that such notice shall include a description of the manner in which the applicable bid deviated from the requirements set forth herein) or to entertain a bidder for the Assets that has not met one or more of the requirements set forth under the heading "Participation Requirements" in the Bidding Procedures and deem such bidder to be a Qualified Bidder (it being understood that such notice shall include a description of the manner in which the applicable bidder deviated from the requirements set forth herein).   Notwithstanding the foregoing, the Purchaser is deemed a Qualified Bidder and the Ranger Agreement is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

- 37 -

73. The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) on the next Business Day after the day that the determination is made, provided that such notification shall be given no later than two Business Days following the expiration of the Bid Deadline. The Sellers shall provide the Purchaser and any Qualified Bidder that has previously submitted a Qualified Bid with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than the later of (x) 12:00 p.m. (noon) (ET) three Business Days prior to the commencement of the Auction or (y) 5:00 p.m. (ET) five calendar days prior to the commencement of the Auction.

74. The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from one or more "Qualified Bidders", provided that all bidders, including all Equity Holders of such bidder shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

*Evaluation of Competing Bids*

75. A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the Qualified Bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transactions, the proposed revisions to the relevant Transaction documents, the effect of the transaction on the value of the ongoing businesses of Sellers, other factors affecting the speed, certainty and value of the Transactions (including any regulatory approvals required to close the Transactions), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction), if any, to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing, if any, and any related restructuring costs, and the likelihood and timing of consummating such

NNC-NNL11755879 / 37

- 38 -

transactions, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

*Auction Process*

76.    If the Sellers receive one or more Qualified Bids in addition to the Ranger Agreement, the Sellers will conduct the Auction of the Assets at 9:00 a.m. (ET) on June 20, 2011, which Auction may be cancelled or adjourned, subject to the terms of the Ranger Agreement. The Auction shall run in accordance with the following procedures:

- only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the French Liquidator (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Applicants and any other Qualified Bidder that has timely submitted a Qualified Bid (and the advisors to such Qualified Bidder) shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with respect to the bidding or the Transactions, and if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each of the Equity Holders of such Qualified Bidder shall be required to confirm that it has not engaged, and will not engage, in any collusion with respect to the bidding or the Transactions, such confirmation, in each case, in form and substance satisfactory to the Sellers in their joint and sole discretion;

- at least one calendar day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such

- 39 -

Qualified Bidder (other than the Purchaser) is selected as an Alternate Bidder, the Alternate Bid Expiration Date. By 12:00 p.m. (noon) (ET) at least one Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids at the Auction with the understanding that (i) the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction, (ii) if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), the true identity of each of the Equity Holders of such Qualified Bidder will be fully disclosed to all Qualified Bidders at the Auction and (iii) all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person;

- the Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court, this Honourable Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

- bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid

- 40 -

is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $5,000,000 over the Starting Bid or the Leading Bid as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise best offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Ranger Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

*Selection of Successful Bid*

77. Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor and the Joint Administrators, will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth under the heading "Evaluation of Competing Bids", above, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such Qualified Bids, collectively the "Successful Bid" and the Qualified Bidder(s) making such Qualified Bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if

- 41 -

any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers after consultation with the Committee, the Bondholder Group, the Monitor and the Joint Administrators, at the conclusion of the Auction shall be final subject to approval by the U.S. Court and this Honourable Court.

78.   The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described below, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court, this Honourable Court and receipt of any required approvals of any other applicable court(s).

*Closing with Alternative Bidders*

79.   If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such Qualified Bidder, the "Alternate Bidder"). Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder. The Alternate Bid shall remain open until the earlier of (a) July 12, 2011 unless, prior to such date, the North American Sellers and NNUK have delivered written notice to the Alternate Bidder that the transaction contemplated by the Successful Bid will not occur and the North American Sellers intend to consummate the transaction contemplated by the Alternate Bid, in which case the terms of the Alternate Bid shall be enforceable and shall govern or (b) the consummation of the sale to the Successful Bidder. All the Qualified Bids other than the Successful Bid and the Alternate Bid shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and Alternate Bid by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval is required.

- 42 -

*Reservation of Rights*

80. The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction, may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Code, the Bidding Procedures, any orders of this Honourable Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Joint Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, and (c) except as otherwise expressly provided in the Bidding Procedures, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

81. Notwithstanding anything in the Bidding Procedures, the Sellers may not, without the prior written consent of the Committee, the Bondholder Group, the Joint Administrators and the Monitor, which consent may not be unreasonably withheld, (i) extend the Bid Deadline for more than five Business Days beyond June 13, 2011, (ii) adjourn the Auction for more than three Business Days, or (iii) subject to the availability of the U.S. Court and this Honourable Court, adjourn the Sale Hearing for more than three Business Days if the Auction has concluded, provided that the Sellers shall give the Purchaser written notice within one Business Day after any such action (it being understood that such notice shall include a description of the action taken). Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Bidding Procedures or the Ranger Agreement, including Purchaser's rights with respect to the timing of the Auction and the Sale Hearing, or the Purchaser's

- 43 -

right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids.


## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES

82.  NNL holds legal title to the Residual IP which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases on a non-exclusive basis.

83.  As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the Joint Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers.

84.  As of the current date, no agreement has been reached regarding the allocation of the Residual IP sale proceeds. Accordingly, the Monitor expects that such proceeds will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date.


## MONITOR'S ANALYSIS AND RECOMMENDATIONS

85.  The Monitor has reviewed Nortel's efforts to divest the Residual IP and is of the view that the Applicants are acting in good faith to maximize value. Accordingly, the Monitor

- 44 -

recommends approval of the Ranger Agreement as a "stalking horse" bid and approval of the Bidding Procedures as described above. In so doing, the Monitor considers the potential payment of the Break-Up Fee and Expense Reimbursement as reasonable in the circumstances.

86. The Monitor also supports the Applicants' request for approval of the Licence Rejection Procedures and the IP Transaction Side Agreement.

87. For the reasons described at paragraphs 19, 55 and 60, respectively, the Monitor also recommends that confidential Appendices "B", "G" and "H" to this Sixty-Third Report be sealed by this Honourable Court.

All of which is respectfully submitted this 14th day of April, 2011.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants
and not in its personal capacity

Per:

Murray A. McDonald
President

APPENDIX "A"

RANGER AGREEMENT

NNC-NNL11755879 / 45

EXECUTION COPY

## ASSET SALE AGREEMENT

BY AND AMONG

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

**NORTEL NETWORKS UK LIMITED**

**NORTEL NETWORKS (IRELAND) LIMITED**

**NORTEL NETWORKS S.A.**

AND

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

AND

**ALAN BLOOM, STEPHEN HARRIS, ALAN HUDSON, DAVID HUGHES AND
CHRISTOPHER HILL AS JOINT ADMINISTRATORS**

AND

**MAÎTRE COSME ROGEAU AS FRENCH LIQUIDATOR**

AND

**RANGER INC.**

AND

**GOOGLE INC.,**

**DATED AS OF APRIL 4, 2011**

NNC-NNL11755879 / 46

# TABLE OF CONTENTS

**Page**

ARTICLE I       INTERPRETATION ................................................................. 2

    Section 1.1.    Definitions ................................................................. 2
    Section 1.2.    Interpretation ........................................................... 23

ARTICLE II      PURCHASE AND SALE OF ASSETS ................................... 24

    Section 2.1.    Purchase and Sale ................................................... 24
    Section 2.2.    Purchase Price ......................................................... 30
    Section 2.3.    Closing .................................................................... 31

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF THE
                 PURCHASER ........................................................................ 34

    Section 3.1.    Organization and Corporate Power ......................... 34
    Section 3.2.    Authorization; Binding Effect; No Breach ............... 34
    Section 3.3.    Financing ................................................................. 35
    Section 3.4.    Adequate Assurance of Future Performance ........... 35
    Section 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations
                 and Warranties ........................................................ 35
    Section 3.6.    Brokers .................................................................... 36
    Section 3.7.    Independence ........................................................... 36

ARTICLE IV    REPRESENTATIONS AND WARRANTIES OF THE SELLERS .......... 37

    Section 4.1.    Organization and Corporate Power ......................... 37
    Section 4.2.    Authorization; Binding Effect; No Breach ............... 37
    Section 4.3.    Brokers .................................................................... 38
    Section 4.4.    Canadian Tax Matters ............................................. 39
    Section 4.5.    Export Controls ....................................................... 39

ARTICLE V      COVENANTS AND OTHER AGREEMENTS ....................... 39

    Section 5.1.    U.S. Bankruptcy Actions ........................................ 39
    Section 5.2.    Canadian Bankruptcy Actions ................................ 40
    Section 5.3.    French Bankruptcy Actions ..................................... 41
    Section 5.4.    Consultation; Notification ....................................... 41
    Section 5.5.    Pre-Closing Cooperation ......................................... 42
    Section 5.6.    Antitrust and Other Regulatory Approvals ............. 43
    Section 5.7.    Public Announcements ............................................ 47
    Section 5.8.    Further Actions ....................................................... 47
    Section 5.9.    Conduct of Business ............................................... 48
    Section 5.10.   Transaction Expenses ............................................. 50
    Section 5.11.   Confidentiality ........................................................ 50
    Section 5.12.   Certain Payments or Instruments Received from Third Parties ........... 52

NEWYORK:2330899.56

NNC-NNL11755879 / 47

# TABLE OF CONTENTS
(continued)

Page

Section 5.13.    License to Transferred Patents, Jointly Owned Patents, Specified
                UK Patents and Licensed Residual Patents; Termination of
                Intercompany Arrangements................................................................. 52
Section 5.14.    Use of Trademarks............................................................................... 54
Section 5.15.    Certain Assets ...................................................................................... 54
Section 5.16.    Access to Systems................................................................................ 54
Section 5.17.    Post-Closing Suits ............................................................................... 55
Section 5.18.    Production of Documents .................................................................... 55
Section 5.19.    Option to Purchase Undisclosed Patent Interests................................ 55
Section 5.20.    Certain Obligations ............................................................................. 57
Section 5.21.    Acknowledgement of Prior Obligations .............................................. 57
Section 5.22.    Disposition of Jointly Owned Patents.................................................. 57
Section 5.23.    Purchase of Specified UK Patents ...................................................... 58
Section 5.24.    Maintenance of Books and Records ..................................................... 58
Section 5.25.    License Power of Attorney .................................................................. 59
Section 5.26.    Exclusivity ........................................................................................... 60

ARTICLE VI      TAX MATTERS.................................................................................... 61

Section 6.1.     Transfer Taxes ..................................................................................... 61
Section 6.2.     Withholding Taxes ............................................................................... 62
Section 6.3.     Tax Characterization of Payments Under This Agreement ................... 62
Section 6.4.     Apportionment of Taxes ...................................................................... 63
Section 6.5.     Records ................................................................................................ 63
Section 6.6.     Tax Disclosure ..................................................................................... 65
Section 6.7.     Tax Returns .......................................................................................... 65
Section 6.8.     Canadian Tax Election.......................................................................... 66
Section 6.9.     VAT ..................................................................................................... 67

ARTICLE VII     CONDITIONS TO THE CLOSING....................................................... 69

Section 7.1.     Conditions to Each Party's Obligation ................................................ 69
Section 7.2.     Conditions to Sellers' Obligation ........................................................ 70
Section 7.3.     Conditions to Purchaser's Obligation .................................................. 70

ARTICLE VIII    TERMINATION..................................................................................... 71

Section 8.1.     Termination........................................................................................... 71
Section 8.2.     Expense Reimbursement and Break-Up Fee ........................................ 74
Section 8.3.     Effects of Termination ......................................................................... 75

ARTICLE IX      INDEMNIFICATION............................................................................. 75

Section 9.1.     Survival ................................................................................................ 75
Section 9.2.     Indemnification of Purchaser............................................................... 76
Section 9.3.     Notice of Claim.................................................................................... 76

-iii-

NNC-NNL11755879 / 48

# TABLE OF CONTENTS
(continued)

Page

Section 9.4.    Resolution of Notice of Claim ................................................. 77
Section 9.5.    Treatment of Indemnity Payments ........................................ 79
Section 9.6.    No Duplication of Damages ................................................... 79
Section 9.7.    Release of Remaining Funds from Indemnification Account.............. 79
Section 9.8.    Exhaustion or Distribution of Indemnity Escrow ................. 79
Section 9.9.    Indemnification Escrow ......................................................... 79

ARTICLE X    MISCELLANEOUS ................................................................... 79

Section 10.1.    Indemnity Relating to Certain License Non-Assignment and
                 Non-Renewal Protections ...................................................... 79
Section 10.2.    Remedies ............................................................................... 80
Section 10.3.    No Third Party Beneficiaries ............................................... 80
Section 10.4.    Consent to Amendments; Waivers........................................ 80
Section 10.5.    Successors and Assigns......................................................... 81
Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial...... 81
Section 10.7.    Notices .................................................................................. 84
Section 10.8.    Exhibits; Sellers Disclosure Schedule ................................. 87
Section 10.9.    Counterparts ......................................................................... 88
Section 10.10.   No Presumption .................................................................... 88
Section 10.11.   Severability .......................................................................... 88
Section 10.12.   No Set-off, Deduction or Counterclaim................................ 88
Section 10.13.   Headings ............................................................................... 89
Section 10.14.   Entire Agreement ................................................................. 89
Section 10.15.   Availability of Equitable Relief; Limitations on Damages; Sole
                 and Exclusive Remedy.......................................................... 89
Section 10.16.   Bulk Sales Laws.................................................................... 90
Section 10.17.   NA Sellers as Representatives of Other Sellers.................... 90
Section 10.18.   Obligations of Sellers and EMEA Sellers............................ 90
Section 10.19.   Exclusion of Liability of Joint Administrators and
                 Acknowledgement ................................................................ 91
Section 10.20.   Exclusion of Liability of French Liquidator and
                 Acknowledgments ................................................................ 92
Section 10.21.   Joint Administrators and French Liquidator as agents of EMEA
                 Sellers................................................................................... 92
Section 10.22.   Limitations ........................................................................... 92
Section 10.23.   Limitations on Post-Closing Obligations............................. 93
Section 10.24.   Parent Guarantee ................................................................. 93

NEWYORK:2330899.56

-iii-

# EXHIBITS

Exhibit A – EMEA Sellers (addition)

Exhibit B – Other Sellers (addition)

Exhibit C – Form of Escrow Agreement

Exhibit D – Knowledge of the Purchaser

Exhibit E – Mandatory Antitrust Approvals — Relevant Antitrust Jurisdictions / Authorities

Exhibit F – Form of U.S. Bidding Procedures Order

Exhibit G – Form of U.S. Sale Order

Exhibit H – Form of Canadian Sales Process Order

Exhibit I – Form of Canadian Approval and Vesting Order

Exhibit J – Form of French Court Order

Exhibit K – Form of Short-Form Patent Assignment

Exhibit L – Form of Assumption Agreement

Exhibit M – Form of Patent Power Of Attorney

Exhibit N – Form of Closing Date License Agreement

Exhibit O – Disclosed Intercompany Licenses

# ANNEX

Annex I – Statements

NEWYORK:2330899.56

# ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of April 4, 2011, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**," and, together with NNC and NNL, the "**NA Sellers**"); (iv) the entities listed in Exhibit A hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) ("**NN Ireland**") is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in Exhibit B hereto (the "**Other Sellers**" and, together with the NA Sellers and the EMEA Sellers, the "**Sellers**"); (vi) the French Liquidator; (vii) the Joint Administrators; (viii) Ranger Inc., a corporation organized under the laws of Delaware and a wholly owned Subsidiary of the Parent (the "**Purchaser**"), and (ix) Google Inc., a corporation organized under the laws of Delaware (the "**Parent**").

## W I T N E S S E T H:

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC and NNL (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (as in force on the Petition Date, the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 25, 2011;

WHEREAS, NNI and the Other Sellers listed in Exhibit B hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the EMEA Sellers on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") (the proceedings commenced by such

applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of the EMEA Sellers (other than NN Ireland, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) under the Insolvency Act by means of the Administration Orders (as defined below);

WHEREAS, on 28 May 2009, secondary proceedings were opened by the French Court (as defined below) in relation to NNSA pursuant to Article 27 of the EC Regulation (the "**Secondary Proceedings**") pursuant to which the French Court authorized NNSA to continue to operate the business owned and operated by NNSA and appointed *inter alia* the French Office Holders as the administrators and liquidators of NNSA under Articles L.641-1 et seq. of the FCC (the "**French Case**");

WHEREAS, the Sellers have agreed to transfer to the Purchaser, and the Purchaser has agreed to purchase and assume, including, to the extent applicable, pursuant to sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter; and

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser of the Assets (as defined below), and the assumption by the Purchaser of the Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their affiliates.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1.      <u>Definitions</u>. The following capitalized terms shall have the meanings set forth below:

"**Accounting Arbitrator**" means the auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Primary Parties agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Primary Parties to move.

"**Action**" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding, including Intellectual Property litigation (including infringement, indemnification, and declaratory judgment actions).

"**Administration Expense**" means any liability of an EMEA Seller which ranks as an administration expense in accordance with paragraph 99 of Schedule B1 to the Insolvency Act or Rule 2.67 of the Insolvency Rules 1986.

NNC-NNL11755879 / 52

"**Administration Orders**" means the orders of the English Court on the Petition Date appointing the Joint Administrators as joint administrators of the EMEA Sellers.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreed Expenses**" means those costs, fees and expenses set forth in Section 1.1(a) of the Sellers Disclosure Schedule.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, of any material portion of the Assets, in a transaction or series of transactions with one or more Third Parties; provided, however, that an "Alternative Transaction" shall not include:  (i) the mere conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code, in and of itself, without any disposition of any material portion of the Assets other than to the Chapter 7 trustee in such case by operation of Law; (ii) the mere appointment of a trustee, receiver, receiver and manager or liquidator in respect of any Canadian Debtor, in and of itself, without any disposition of any material portion of the Assets (other than to such trustee, receiver, receiver and manager or liquidator by operation of Law) or the mere dismissal of any CCAA Cases or the mere conversion of any of the CCAA Cases to a bankruptcy case under the Bankruptcy and Insolvency Act or applicable Canadian Bankruptcy Laws, in and of themselves; or (iii) the mere appointment (whether in connection with Secondary Proceedings or otherwise) of a trustee, receiver, receiver and manager or liquidator or any analogous officer in respect of any EMEA Seller, in and of itself, without any disposition of any material portion of the Assets (other than to such trustee, receiver, receiver and manager, liquidator or analogous officer by operation of Law) or the mere termination of the EMEA Cases (or any of them) or discharge of the Administrators (or any of them), in and of themselves, or the mere conversion of any of the EMEA Cases to liquidation or any analogous proceeding under the Insolvency Act, EC Regulation or applicable Law relating to the EMEA Sellers, in and of themselves, in the case of each of the foregoing clauses (i), (ii)  and (iii) that is not funded or sponsored in whole or in part by one or more Third Parties and does not otherwise involve any other contractual arrangement with one or more Third Parties having the effect of a disposition of any material portion of the Assets.

"**Antitrust Laws**" means the Competition Act (Canada), as amended, the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and European Free Trade Association member states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

NNC-NNL11755879 / 53

"**Asset Retention Transaction**" means the retention of any material portion of the Assets by the Sellers, their successor entities emerging from the Bankruptcy Proceedings or the Affiliates of the foregoing under a standalone plan of reorganization, plan of liquidation or plan of arrangement; provided, however, that an "Asset Retention Transaction" shall not include: (i) the mere conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code, in and of itself; (ii) the mere appointment of a trustee, receiver, receiver and manager or liquidator in respect of any Canadian Debtor, in and of itself, or the mere dismissal of any CCAA Cases or the mere conversion of any of the CCAA Cases to a bankruptcy case under the Bankruptcy and Insolvency Act or applicable Canadian Bankruptcy Laws, in and of themselves; or (iii) the mere appointment (whether in connection with Secondary Proceedings or otherwise) of a trustee, receiver, receiver and manager or liquidator or any analogous officer in respect of any EMEA Seller, in and of itself, or the mere termination of the EMEA Cases (or any of them) or discharge of the Administrators (or any of them), in and of themselves, or the mere conversion of any of the EMEA Cases to liquidation or any analogous proceeding under the Insolvency Act, EC Regulation or applicable Law relating to the EMEA Sellers, in and of themselves; provided further, however, that an "Asset Retention Transaction" shall include: (a) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code that occurs after the entry of the U.S. Bidding Procedures Order and prior to the entry of the U.S. Sale Order and in which the trustee in such Chapter 7 case has not agreed to be bound by this Agreement; (b) the appointment of a trustee, receiver, receiver and manager or liquidator in respect of any Canadian Debtor that occurs after the Canadian Sales Process Order is granted and prior to the granting of the Canadian Approval and Vesting Order and in which such trustee, receiver, receiver and manager or liquidator in such bankruptcy case has not agreed to be bound by this Agreement; and (c) the appointment (whether in connection with Secondary Proceedings or otherwise) of a trustee, receiver, receiver and manager or liquidator or any analogous officer in respect of any EMEA Seller that occurs after the entry of the U.S. Bidding Procedures Order and prior to the entry of the U.S. Sale Order and in which such trustee, receiver, receiver and manager or liquidator or any analogous officer has not agreed to be bound by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means (i) the Transferred Licenses and (ii) other Contracts identified on Section 1.1(b) of the Sellers Disclosure Schedule.

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Assumption Agreement**" means a duly executed assumption of intellectual property license agreement in the form attached as Exhibit L hereto.

"**Auction**" has the meaning attributed to such term in the U.S. Bidding Procedures Order.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the French Court or any other court before which Bankruptcy Proceedings are held.

NNC-NNL11755879 / 54

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the EC Regulation, the Insolvency Act, the FCC and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases, the French Case and, in each case, any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers that are held from time to time.

"**Break-Up Fee**" has the meaning set forth in Section 8.2(b).

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) San Francisco, California, United States (iii) Toronto, Ontario, Canada, and (iv) London, England, United Kingdom.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2(b).

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2(b).

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2(a).

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2(a).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CDMA Vesting Order**" means the Approval and Vesting Order of the Ontario Superior Court of Justice dated July 28, 2009.

"**Change of Control**" means (A) the direct or indirect acquisition (including by merger, consolidation or transfer or issuance of equity securities or otherwise) in a transaction or series of related transactions of 50% or more of the equity or voting interests in a Person (B) otherwise obtaining the right to elect a majority of the board of directors (or similar governing body) of such Person or (C) the acquisition of all or substantially all of the assets of such Person; provided that the actions of the type specified in clauses (i), (ii) and (iii) of the first proviso in the definition of Asset Retention Transaction (disregarding the references to the specific Sellers) shall not constitute a Change of Control.

NNC-NNL11755879 / 55

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim in the CCAA Cases**" means any right of any Person, including the right to an equitable remedy, against the Canadian Debtors and the other applicants in the CCAA Cases, or any of them or their assets, in connection with any indebtedness, liability or obligation of any kind of the Canadian Debtors and the other applicants in the CCAA Cases, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, recourse, non-recourse, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, and any indebtedness, liability or obligation of any kind, including the right to an equitable remedy, arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Petition Date.

"**Claim in the Chapter 11 Cases**" has the meaning ascribed to the term "claim" in section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Date License Agreement**" has the meaning set forth in Section 5.13(a).

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent or that applies with respect to terms and conditions of employment of the Employees of such Seller or its Affiliates.

"**Commercial Licenses**" means the Pre-Divestiture Commercial Licenses, the Post-Divestiture Commercial Licenses and the End-User Licenses.

"**Common Interest Agreement**" means an agreement, in a form to be mutually agreed reasonably and in good faith following the date hereof and prior to the Closing Date, by and among the Parties, to be dated as of the Closing Date, providing for the common interest privilege to attach, to the maximum extent permitted by applicable Law, to any privileged Patent Related Documents or other privileged documents to be acquired by the Purchaser pursuant to this Agreement or any other Transaction Document (it being understood that such Common Interest Agreement shall not diminish, terminate or otherwise affect any attorney-client privilege, protection pursuant to the work product doctrine or other privilege or protection of any Party or of the Parent with respect to any such documents).

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption, revocation or waiver by any Government Entity or other Third

NNC-NNL11755879 / 56

Party, but shall not include any consent that is rendered unnecessary by operation of Bankruptcy Laws.

"**Contested Claim**" has the meaning set forth in Section 9.4(b).

"**Continuing Unlisted License**" means, with respect to any Transferred Patent, Specified UK Patent or Jointly Owned Patent, any license under such Transferred Patent, Specified UK Patent or Jointly Owned Patent granted prior to the date hereof which license is not specifically listed (including by use of defined term) on Schedule 2.1.1(a) of the Sellers Disclosure Schedule and which license, pursuant to and after giving effect to the License Rejection Procedures (as defined and set forth in the U.S. Bidding Procedures and Sale Motion) and the Canadian License Rejection Procedures (as defined in and set forth in the Canadian Sales Process Order Motion), continues to burden such Transferred Patent, Specified UK Patent or Jointly Owned Patent following the consummation of the transactions contemplated by this Agreement.

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Control**," including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court's Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol, dated January 15, 2009, and the Canadian Court in an order, dated January 14, 2009, as the same has been and may be further amended from time to time.

"**Cross-License Agreements**" has the meaning set forth in Annex I.

"**Cure Cost**" means (i) any amounts required by the U.S. Bankruptcy Code, including section 365(b)(1) thereof, and any applicable order of the U.S. Bankruptcy Court to cure any defaults by the Sellers or any of their Affiliates under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract and (ii) with respect to any Non-365 Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts necessary to cure any defaults and to pay any actual pecuniary losses under such Contract in respect of the period prior to the Petition Date.

"**Damages**" has the meaning set forth in Section 9.2.

"**Data Room**" means the Merrill electronic data site entitled "Iceberg."

"**Deferred Jurisdiction**" has the meaning set forth in Section 5.6(f).

NNC-NNL11755879 / 57

"**Deposit Escrow Account**" means the escrow account holding the Good Faith Deposit to be set up by the Escrow Agent pursuant to the Escrow Agreement.

"**Designated Courts**" has the meaning set forth in Section 10.6(b)(i).

"**Disclosed Intercompany Licenses**" means those Contracts listed in Exhibit O hereto.

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers hereunder, the identity of which to be notified in writing by the Primary Seller Parties to the Purchaser and the Escrow Agent by not later than five (5) Business Days prior to the Closing.

"**Divested Business**" means the businesses or product lines of the Sellers set forth on Section 1.1(l) of the Sellers Disclosure Schedule sold after the Petition Date in connection with the Bankruptcy Proceedings .

"**Divestiture Date**" means with respect to each of the Divested Business set forth on Section 1.1(l) of the Sellers Disclosure Schedule, the date that such divestiture is or was completed.

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**EC Regulation**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Employee**" means an employee of the Sellers whose employment relates to the development, maintenance or management of the Assets.

"**End-User License**" means any Contract entered into by, on behalf of or under authority of Sellers or their Affiliates prior to the date hereof and, to the extent that would be permitted after the Closing pursuant to the Closing Date License Agreement, after the date hereof, including any click-through or shrink wrap license, that (i) accompanies the sale, servicing (including support, maintenance and installation) or licensing of any Nortel Product to an end user or customer in the ordinary course of business, and (ii) includes a non-exclusive grant of a license to the customer or end user under any of the Transferred Patents, the Jointly Owned Patents, or the Specified UK patents, where such license is limited to the right to use such Nortel Product.

"**English Court**" means the High Court of Justice of England and Wales.

"**Ericsson**" means Ericsson AB or any of its Affiliates.

"**Ericsson Licenses**" means (i) that certain Intellectual Property License Agreement by and between NNL, NNI, the EMEA Sellers, the Joint Administrators and Ericsson

NNC-NNL11755879 / 58

AB, classified as document number 2.5.3.175.4 in the Data Room and (ii) that certain Transition Services Agreement between NNL, NNI, NNUK, NN Ireland, the Joint Administrators and certain other Affiliates of the Sellers and Telefonaktiebolaget L M Ericsson (publ).

"**Escrow Agent**" means Wells Fargo Bank, National Association, a national banking association, in its capacity as escrow agent under the Escrow Agreement.

"**Escrow Agreement**" means the escrow agreement among the Primary Seller Parties and NNSA, the Purchaser and the Escrow Agent to be entered into in the form of Exhibit C hereto in accordance with Section 2.2.3(a).

"**Excess VAT**" has the meaning set forth in Section 6.9(e)(ii).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Licenses**" has the meaning set forth in Section 2.1.2(i).

"**Excluded Patents**" means only the specifically identified patents, patent applications and provisional patent applications listed in Section 1.1(c) of the Sellers Disclosure Schedule.

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Exercise Price**" has the meaning set forth in Section 5.19(b).

"**Expense Reimbursement**" has the meaning set forth in Section 8.2(a).

"**FCC**" means the French Commercial Code.

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (a) as to which no appeal, notice of appeal, motion for leave to appeal, motion to amend, vacate or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, amendment, vacatur, additional findings or alteration or amendment of judgment or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order, with respect to the U.S. Bidding Procedures Order, U.S. Sale Order, Canadian Sales Process Order, and Canadian Approval and Vesting Order in a manner consistent with the provisions of Sections 5.1(c), 5.1(d), 5.2(a) and 5.2(b), and, with respect to any other orders, in all material respects, without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless, in the case of a Rule 9024 motion, such motion shall be filed within fourteen (14) days of the entry of the order at issue or,

NNC-NNL11755879 / 59