to a historical line of business of the Sellers (e.g., CDMA, GSM, Enterprise)) distributed by or on behalf of the Sellers to such Affiliate during the last six months of calendar year 2010; and (y) the Sellers and any Person acting on behalf of any Seller shall immediately cease distributing any products to such Affiliate at such time, and shall not distribute any products to such Affiliate from and after such time, as such Affiliate experiences a Change of Control.

SECTION 5.14.    Use of Trademarks.  Nothing in this Agreement grants to the Purchaser the right to use the name "Nortel" or any Trademarks owned by the Sellers or any of their Affiliates or any other mark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing.

SECTION 5.15.    Certain Assets.  To the extent that any Transferred Patent, Jointly Owned Patent or Specified UK Patent that is a Listed Patent, Listed Jointly Owned Patent or Specified Listed UK Patent, as applicable,  any invention or improvement claimed or disclosed therein or any Patent Related Documentation relating to any of the foregoing is, notwithstanding the statement set forth at Annex I(n), owned by any Affiliate of the Sellers that is not, itself, a Seller, the Sellers shall cause (or, in the case of any other property that would be a Transferred Patent or Specified UK Patent if it were owned by a Seller, or any other Patent that would be a Jointly Owned Patent if any rights therein were owned by a Seller, and any invention or improvement claimed or disclosed therein or any Patent Related Documentation relating thereto, shall use their best efforts to cause) such Affiliate to transfer all of its right, title and interest in such asset to an NA Seller as soon as reasonably practicable and in any event prior to the Closing, and (a) in the case of property that would be Transferred Patents or Specified UK Patents if they were instead owned by a Seller, such assets shall be "Transferred Patents" or "Specified UK Patents" for all purposes hereof and (b) in the case of property that would be Jointly Owned Patents if any rights therein were owned by a Seller, such assets shall be "Jointly Owned Patents" subject to the Closing Date License Agreement for all purposes hereof; it being understood that (x) in the case of a Specified UK Patent or Patent Related Documentation relating thereto, the foregoing obligation shall be solely to the extent permitted by applicable Law, and (y) in the case of a Jointly Owned Patent or Patent Related Documentation relating thereto, the foregoing obligation shall be deemed satisfied by obtaining for the Purchaser the license rights granted thereunder in the Closing Date License Agreement.

SECTION 5.16.    Access to Systems.  From and after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is entered and until the Closing, the Sellers shall reasonably cooperate with the Purchaser to provide the Purchaser access to the Patent Databases, solely for the purposes of facilitating the transfer, upon and following the Closing, of such information residing in the Patent Databases from the Sellers to the Purchaser and integration of such information into the Purchaser's patent systems; provided that any such access shall only be granted to the extent the Purchaser has obtained, at its cost and expense, any license rights necessary for such access. From and after the Closing, at the Purchaser's request, the Sellers shall reasonably cooperate with the Purchaser to provide the Purchaser access to the Patent Databases, provided that such access shall be at the Purchaser's cost and expense and that the Purchaser has obtained, at its cost expense, any license rights necessary for such access.

NNC-NNL11755879 / 104

SECTION 5.17.    <u>Post-Closing Suits</u>.

(a)    Each of the Sellers hereby covenants that, from and after the Closing Date, it will not, without the written consent of the Purchaser (acting in its sole discretion), sue or otherwise participate in any Action against any party to any of the Transferred Licenses or any other licenses granted under the Transferred Patents, Jointly Owned Patents or Purchased Specified UK Patents based upon any claim under or related to any such license, including with respect to nonpayment of unpaid past, present or future income and royalties relating to any such license or past, present and future damages thereunder.

(b)    Each of the Sellers hereby covenants that, from and after the Closing Date, it will not, without the written consent of the Purchaser (acting in its sole discretion), (x) waive, release, assign, settle, maintain or compromise any Action relating to the Assets to the extent that such waiver, release, assignment, settlement, maintenance or compromise imposes any obligation, whether contingent or realized, upon the Purchaser or any of its Affiliates or the Assets or materially affects any Seller's title to or the value of any Transferred Patent or Specified UK Patent or Jointly Owned Patent or (y) voluntarily take or voluntarily cooperate in taking any position that is not consistent with the statement in Annex I(c).

SECTION 5.18.    <u>Production of Documents</u>.  In the event that at any time following the Closing Date, any Seller discovers or comes into possession or control of any document that, if such Seller had known about, controlled or possessed such document on the Closing Date would have been required to be delivered to the Purchaser pursuant to the terms hereof, then such Seller shall (or, if such Seller does not have possession or control of such document, shall use its best efforts to) promptly deliver such document to the Purchaser.

SECTION 5.19.    <u>Option to Purchase Undisclosed Patent Interests</u>.  In the event that any of the Sellers or any Affiliate of any of the Sellers discovers that it owns (i) any right, title or interest in any Patents owned by the Sellers or their Affiliates that are not Transferred Patents, Jointly Owned Patents, Specified UK Patents or Excluded Patents, (ii) any right, title or interest in any inventions, other than the Listed Inventions, disclosed in the invention disclosures owned by any of the Sellers or their Affiliates, but only to the extent such invention disclosures (x) do not relate to a patent application filed anywhere in the world and (y) are dated less than three (3) years before the Closing Date, (iii) an exclusive license to all or substantially all of the rights under any Patent that is not a Transferred Patent, Jointly Owned Patent, Specified UK Patent or Excluded Patent, or (iv) an option to receive or purchase, or any reversionary interest in, any of the foregoing (any individual asset described in clauses (i) through (iv), an "**Undisclosed Patent Interest**"), then:

(a)    In the event that one or more non-Seller Affiliates of any Seller own an Undisclosed Patent Interest, the Sellers shall use their best efforts to cause such Affiliate(s) to transfer such Undisclosed Patent Interest to a Seller promptly.

(b)    Upon identification or receipt by any Seller of an Undisclosed Patent Interest, the relevant Seller shall provide reasonably prompt written notice describing such Undisclosed Patent Interest to the Purchaser (an "**Option Trigger Notice**") (it being understood that (i) in the event that an Undisclosed Patent Interest is identified or received by a Seller

NNC-NNL11755879 / 105

between the date hereof and the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted, such Seller shall deliver an Option Trigger Notice to the Purchaser promptly after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted and (ii) each Option Trigger Notice shall relate to only one Undisclosed Patent Interest.  For a period of thirty (30) calendar days following the delivery of such notice to the Purchaser, the Purchaser shall have the option (exercisable by delivery of written notice thereof to the relevant Seller) to purchase, subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses that remain in force after Closing granted thereunder prior to the date such Undisclosed Patent Interest was discovered by or delivered to such Seller (it being understood that no Seller shall grant any licenses under or any Liens on any such Undisclosed Patent Interest after the date of discovery or delivery and during the Purchaser's consideration period described above), such Seller's right, title and interest in and to the Undisclosed Patent Interest from such Seller for a cash purchase price per Undisclosed Patent Interest of Fifty Thousand Dollars ($50,000) (the "**Exercise Price**").

(c)    From and after the date when any Seller discovers that it owns an Undisclosed Patent Interest until the expiration of the 30-day option period specified in Section 5.19(b), no Seller may directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to any Third Party, including by operation of law, in any transaction, series of related transactions or otherwise, other than as would be permitted by Section 5.9(c)(iii) if such Undisclosed Patent Interest were a Transferred Patent, and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by this Section 5.19 shall be void *ab initio* and of no force or legal effect.

(d)    The Sellers agree that, prior to the ultimate winding up or dissolution of any of them, the Primary Seller Parties will provide written notice to the Purchaser of such anticipated winding up or dissolution and provide the Purchaser with the option, exercisable by proper delivery of written notice to the Primary Seller Parties within a period of thirty (30) calendar days after delivery of the Primary Seller Parties' notice, to purchase on a "quitclaim" basis (and, for the avoidance of doubt, subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses granted thereunder prior to the date of such purchase that remain in force after Closing, it being understood that no Seller shall voluntarily take any action to grant any licenses under or place any Liens on any such Undisclosed Patent Interest), at an aggregate price of $1.00, all of each Seller's right, title and interest in and to all remaining Undisclosed Patent Interests, whether or not theretofore identified, not previously offered for sale to the Purchaser pursuant to this Section 5.19.

(e)    The settlement of each purchase and sale of Undisclosed Patent Interests pursuant to this Section 5.19 shall occur at the offices of Cleary Gottlieb Steen & Hamilton LLP, New York (or such other place as the parties may mutually agree to in writing), on a Business Day (to be specified by the Purchaser in writing at least five (5) Business Days prior thereto) occurring within thirty (30) days after the exercise by the Purchaser of its option under Section 5.19(b).  At each settlement, (i) the relevant Sellers shall deliver duly executed instruments of conveyance and assignment reasonably evidencing the assignment to the Purchaser of their right,

NNC-NNL11755879 / 106

title and interest in and to the relevant Undisclosed Patent Interest (together with all assets that would have constituted "Assets" if such Undisclosed Patent Interest had been a Listed Patent), (ii) the Purchaser shall deliver to the relevant Sellers the Exercise Price for each Undisclosed Patent Interest by wire transfer of immediately available funds to an account designated by the relevant Sellers at least five (5) Business Days prior to the settlement date.

(f)        The Parties acknowledge and agree that if the Purchaser does not elect to purchase any Undisclosed Patent Interest within the applicable 30-day option period after delivery of notice thereof pursuant to Section 5.19(b), then the Sellers shall have no further obligation whatsoever to the Purchaser with respect to such Undisclosed Patent Interest, and the Sellers shall be free to sell, license or otherwise dispose of such Undisclosed Patent Interest in their sole discretion.

(g)        Notwithstanding anything herein to the contrary, the items listed on Section A.I(r) of the Sellers Disclosure Schedules shall be treated as "Undisclosed Patent Interests" for purposes of this Section 5.19; provided, however, that (i) Seller shall deliver an Option Trigger Notice to the Purchaser promptly after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted, and (ii) the Exercise Price for such items listed on Section A.I(r) of the Sellers Disclosure Schedules shall be $0.00.

SECTION 5.20.        Certain Obligations.  As of the Closing, the Purchaser agrees to notify in writing (in the same level of detail as provided in Section 5.20 of the Sellers Disclosure Schedule) any subsequent purchaser of any of the Transferred Patents or Purchased Specified UK Patents of the promises, declarations and commitments granted, made or committed to standard-setting bodies concerning such Patents which are listed in Section 5.20 of the Sellers Disclosure Schedule, and to bind such subsequent purchasers to notice terms substantially the same as those set forth in this Section 5.20.

SECTION 5.21.        Acknowledgement of Prior Obligations.  The Purchaser acknowledges that the sale and assignment of the Transferred Patents and Purchased Specified UK Patents is subject to the obligations of certain Sellers set forth in Section 5.21 of the Sellers Disclosure Schedule with respect to the agreements referenced therein to the extent applicable.

SECTION 5.22.        Disposition of Jointly Owned Patents.

(a)        From and after the Closing, (i) the Sellers may not sell, transfer, assign, license or convey any portion of any Seller's interest in any Jointly Owned Patent except upon written consent of the Purchaser in its sole discretion or as permitted by the Closing Date License Agreement and (ii) as soon as practicable after written request by the Purchaser to the Primary Seller Parties, made at the Purchaser's sole discretion, the Sellers shall transfer all of their respective interest in one or more specified Jointly Owned Patents to a Person of the Purchaser's choosing (which, for the avoidance of doubt, may be the Purchaser or an Affiliate of the Purchaser or one or more Third Parties), to the extent permitted by and subject to applicable Law and to any Contracts governing a Seller's joint ownership of such Jointly Owned Patent, and subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any

NNC-NNL11755879 / 107

licenses granted thereunder prior to the date of such transfer (it being understood that from and after the Closing, no Seller shall voluntarily take any action to place any Liens on any Jointly Owned Patents).

(b) No Seller shall reject, repudiate or terminate any Contract governing such Seller's joint ownership of a Jointly Owned Patent, unless such Seller, prior to the date upon which such Seller consummates its plan of reorganization, liquidation or arrangement in the Bankruptcy Proceedings, provides the Purchaser at least 10 Business Days' advance written notice of such rejection, repudiation or termination (which notice shall specify the Contracts to be rejected and the Jointly Owned Patents governed by such Contracts and furnishing, to the extent the Sellers are not prohibited from doing so by such Contracts or by applicable Law, a true and complete copy of such Contracts), provided, that, in any event, no Seller shall reject, repudiate or terminate any Contract governing such Seller's joint ownership of a Jointly Owned Patent prior to the last commercially reasonable date on which it can do so in connection with such Seller's consummation of its plan of reorganization, liquidation or arrangement in the Bankruptcy Proceedings.

SECTION 5.23.    Purchase of Specified UK Patents. The Sellers hereby covenant, to the extent permitted by applicable Law, from and after the date hereof, to cooperate with the Purchaser in conducting further diligence with respect to the Specified UK Patents and facilitating the transfer of the Specified UK Patents to the Purchaser on the Closing Date. The Parties hereby agree that at any time prior to the Closing, the Purchaser may elect, in its sole discretion, to exclude any or all of the Specified UK Patents from the "Assets" and to not take an assignment of such Specified UK Patents (in which case the Patent Related Documentation relating solely thereto shall also be excluded), it being understood that any such election shall not result in a decrease in purchase price.

SECTION 5.24.    Maintenance of Books and Records. After the Closing, the Sellers shall preserve, until the third (3rd) anniversary of the Closing Date (or such longer period as may be required under applicable Law), all pre-Closing Date records to the extent relating to the Assets possessed or to be possessed by such Person. After the Closing Date and until the third (3rd) anniversary of the Closing Date (or such longer period as may be required under applicable Law), upon any reasonable request from the Purchaser, the relevant Seller shall, and/or shall cause the Person holding such records to, (a) provide to the Purchaser or its representatives reasonable access to such records during normal business hours and (b) provide or permit the Purchaser or its respective representatives to make copies of such records, in each case subject to reimbursement of the Sellers' reasonable and actual out-of-pocket expenses in connection with responding to such requests of the Purchaser, including provision of access to, and segregation and duplication of, records; provided, however, that nothing herein shall require any Seller to disclose any information to the Purchaser or its representatives if such disclosure (i) would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser or its representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement), (ii) would require the Sellers to disclose their Tax records, or (iii) involves Excluded Assets. The Purchaser acknowledges that the Sellers are in the process of ceasing active operations, and such reasonable access and costs may include the delay and expense of

NNC-NNL11755879 / 108

retrieving documents from inactive storage. Such records may be sought under this Section 5.24 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Purchaser or its representatives (other than, with respect to documents that do not describe the conception or reduction to practice of any of the Transferred Patents, Jointly Owned Patents, Specified UK Patents or Undisclosed Patent Interests, claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Transaction Document). Notwithstanding the foregoing but subject to Section 6.5, (1) any and all such records may be destroyed by the Sellers if the Sellers send to the Purchaser written notice of their intent to destroy such records, specifying in reasonable detail the nature of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Purchaser notifies the destroying party that the Purchaser desires to obtain possession of such records to the extent it is entitled thereto, in which event the Sellers shall transfer or cause to be transferred the records to the Purchaser and the Purchaser shall pay all reasonable and actual out-of-pocket expenses of the Sellers in connection therewith, including costs associated with the segregation of such records; and (2) the Sellers shall not be required to provide the Purchaser or its representatives access to, or copies of, any Tax records or audited financial statements covering any pre-Closing period. Nothing in this Section 5.24 shall limit or prejudice any of the Purchaser's rights at law or in equity relating to discovery, in the context of a dispute between the Purchaser and a Seller or otherwise.

    SECTION 5.25.   License Power of Attorney.

    (a)   With respect to the Commercial Licenses and, as such terms are defined in the Form of U.S. Sale Order set forth in Exhibit G and the form of the Canadian Approval and Vesting Order set forth in Exhibit I, the TSAs, IPLAs, Intercompany Licenses and the GDNT License, the Purchaser may exercise its rights under the License Power of Attorney only:

       (i)   with respect to any such Contract, after a Seller that is a party to such Contract dissolves or ceases to exist, or

       (ii)   with respect to any and all such Contracts, at any time after (A) a Seller has acted or omitted to act, as applicable, in contravention of its obligations described in Paragraph 28(b) through (g) of the Form of U.S. Sale Order set forth in Exhibit G and paragraph 14(b) through (g) of the Form of Canadian Approval and Vesting Order set forth in Exhibit I; (B) the Purchaser has subsequently provided such Seller with a notice entitled "NOTICE OF BREACH AND INTENDED USE OF LICENSE POWER OF ATTORNEY," alleging in reasonable detail the occurrence of such contravening action or omission described in the foregoing clause (A) and explaining why the Purchaser believes such contravening action or omission constitutes a contravention of such provisions, and (C) ten (10) Business Days have elapsed since the Purchaser provided such notice to such Seller pursuant to the foregoing clause (B), during which time (x) the Purchaser did not subsequently agree that such act or omission was not in contravention of the Sellers' obligations described in (A) OR (y) the Sellers did not obtain from a court of competent jurisdiction declaratory relief

NNC-NNL11755879 / 109

stating that such Seller has neither acted nor omitted to act in contravention of such obligations.

(b)    Following the first valid exercise of the License Power of Attorney described in Section 5.25(a), the Purchaser shall provide the Sellers with written notice at least five (5) Business Days in advance of its exercise of its rights under the License Power of Attorney, unless such provision of such notice five (5) Business Days in advance is not reasonably practicable under the circumstances, in which case the Purchaser shall give written notice of its exercise of its rights under the License Power of Attorney as early as is reasonably practicable under the circumstances.

(c)    With respect to any exercise of the License Power of Attorney with respect to the obligations described in Paragraphs 28(a) and (h)(y) of the form of U.S. Sale Order set forth in Exhibit G and Paragraphs 14(a) and (h)(y) of the form of Canadian Approval and Vesting Order set forth in Exhibit I, the Purchaser shall provide the Sellers with written notice at least five (5) Business Days in advance of its exercise of its rights under the License Power of Attorney, unless such provision of such notice five (5) Business Days in advance is not reasonably practicable under the circumstances, in which case the Purchaser shall give written notice of its exercise of its rights under the License Power of Attorney as early as is reasonably practicable under the circumstances.

SECTION 5.26.    Exclusivity.  No Seller shall (and each Seller shall cause its directors, officers, employees, consultants, representatives and other advisors not to and use its best efforts to cause its Affiliates not to), directly or indirectly, at any time prior to the later of the entry of the U.S. Bidding Procedures Order by the U.S. Bankruptcy Court and the granting of the Canadian Sales Process Order by the Canadian Court, (i) initiate, solicit or knowingly encourage (including by way of furnishing information or assistance), or knowingly induce, the submission or announcement of any proposal or offer for an Alternative Transaction, (ii) enter into any letter of intent, memorandum of understanding, asset sale agreement or other agreement, arrangement or understanding relating to any Alternative Transaction, or (iii) (A) enter into, continue or otherwise participate in any discussions or negotiations regarding, (B) furnish to any Third Party any information or data with respect to, or (C) commence or continue affording access to any Third Party to any information, data or its employees with respect to, any Alternative Transaction; provided, however, that nothing in this Agreement shall prohibit any Seller from (1) subject to Section 5.7 (Public Announcements), providing any Person with the bidding procedures for the sale of the Assets and related documents, answering questions about the bidding procedures for the sale of the Assets, or announcing the execution of this Agreement or the Auction; (2) discussing, negotiating and entering into non-disclosure agreements relating to the sale of the Assets or amendments to existing non-disclosure agreements, in each case as would be permitted by the requirements of the bidding procedures for the sale of the Assets; or (3) from and after April 18, 2011, providing access to the Data Room to Persons (and their representatives) who have entered into a non-disclosure agreement with the Primary Seller Parties.

NNC-NNL11755879 / 110

ARTICLE VI

TAX MATTERS

SECTION 6.1.      <u>Transfer Taxes</u>.

(a)      The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; <u>provided</u>, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller, the Joint Administrators, or the French Liquidator or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Joint Administrators, French Liquidator, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller, Joint Administrators or French Liquidator. Upon request from a Seller, the Joint Administrators or the French Liquidator, the Purchaser shall provide to such Seller, Joint Administrators or French Liquidator an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller, Joint Administrator or French Liquidator) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1. For the avoidance of doubt, the Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses.

(b)      If the Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, or engage in any other transaction designed to reduce, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers, Joint Administrators or French Liquidator (as applicable) prior to Closing with its permit number, GST/HST, VAT, provincial sales taxes or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser. All parties shall make commercially reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction. Notwithstanding the foregoing, any such cooperation to be provided in this Section 6.1(b) shall not include or extend to (i) a liquidation or restructuring of a Seller or any business of a Seller, including the transfer of any assets or Assets or liabilities or Assumed Liabilities between the Sellers or their Affiliates, unless the Seller or the relevant Affiliate is indemnified (prior to such liquidation or restructuring) against any cost or expense of such liquidation or restructuring to its satisfaction (acting at all times reasonably and in good faith); (ii) any action or omission that would result in the imposition on any Seller or any Affiliate of any Seller of any additional Tax liability or making any additional payment to any Tax Authority or Government Entity in respect of Tax which is an Excluded Liability, unless such Seller or Affiliate is (prior to the relevant action or omission) indemnified against such additional Tax liability or payment; (iii) any action or omission that would result in any material out of pocket cost or expense for any Seller or any

NNC-NNL11755879 / 111

Affiliate of any Seller, unless such Seller or Affiliate is (prior to the relevant action or omission), indemnified against such cost or expense to their satisfaction (acting at all times reasonably and in good faith) by the Purchaser; (iv) any action or omission which would cause the Sellers or any Affiliates of the Sellers to be in contravention of any applicable Law (including Bankruptcy Law) or published practice of a Tax Authority; (v) changing the identity or Tax residence of any Sellers, the location of any Assets or Assumed Liabilities, the nature or extent of any Assets or Assumed Liabilities, the Assets or Assumed Liabilities to be transferred by any particular Seller or the structure of the transaction as an asset sale rather than the sale of any form of entity, unless the Seller or the relevant Affiliate is indemnified (prior to such action) against any cost or expense of such action to its satisfaction (acting at all times reasonably and in good faith); or (vi) any reduction in the obligations of the Purchaser or rights of the Sellers.

It is agreed and acknowledged that for the purposes of this Section 6.1, "Transfer Taxes" do not include VAT in respect of any supply (or deemed supply) of goods and services pursuant to this Agreement, for which the provisions of Section 6.9 shall apply instead.

SECTION 6.2.      Withholding Taxes.  If the Purchaser is required for any reason to deduct or withhold from any payment made pursuant to this Agreement or any other Transaction Document, for any Tax imposed by a Tax Authority solely as a result of the identity of the Purchaser, the residence of the Purchaser or in respect of income of the Purchaser, but not for any other reason, and if the applicable Seller, Joint Administrators or French Liquidator after exercising commercially reasonable efforts is unable to recover such Tax from such Tax Authority, the payment of the Purchase Price shall be increased to an amount which, after taking into account such deduction or withholding or Tax, will result in payment to the applicable Seller, Joint Administrators or French Liquidator of the full amount such Seller, Joint Administrators or French Liquidator would have received from the Purchaser had no such deduction or withholding been made or Tax been liable.  The Purchaser shall promptly furnish the Sellers, Joint Administrators and French Liquidator with such evidence as may be required by the applicable Tax Authorities to establish that any such Tax has been paid, and shall indemnify and hold harmless the Sellers, Joint Administrators and French Liquidator on an after-Tax basis from any liability for penalties or interest due to the payor's failure to timely withhold and remit amounts in respect of Taxes to the applicable Tax Authority. The Purchaser shall promptly, and in any event not later than thirty (30) days prior to Closing, inform the Seller, Joint Administrators and French Liquidator, that either (i) deductions or withholdings as referred to in this Section 6.2 are required, or (ii) no such deductions or withholdings are required.  In the event that the Purchaser notifies that such deductions or withholdings are required, the applicable Seller, Joint Administrators or French Liquidator shall take no action inconsistent with the information contained in such notice unless such action is required to be taken in order to comply with any applicable Law or Tax Authority published practice.

SECTION 6.3.      Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

NNC-NNL11755879 / 112

SECTION 6.4.    Apportionment of Taxes.

(a)    Except as otherwise provided in this Article VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall bear all Taxes relating to the Assets for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively.  The amount of any Taxes based on or measured by income or receipts related to the Assets shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books basis.  The amount of other Taxes shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

SECTION 6.5.    Records.

(a)    Except as provided elsewhere in this Section 6.5, (i) after the Closing Date, the Purchaser, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets or the Assumed Liabilities for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets or the Assumed Liabilities for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party such access as is reasonably necessary to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be reasonably necessary or convenient.  The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof), provided, that, beginning on the date that is one year following the Closing Date, the obligations of the Sellers under this Section 6.5(a) shall be limited to commercially reasonable efforts, taking into account available personnel and resources.

NNC-NNL11755879 / 113

(b)     At any time within the ten (10) years immediately following the Closing, NNL and Nortel Networks Technology Corporation ("**NNTC**") may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser, NNL and NNTC and the Records Custodian, in form satisfactory to the Purchaser, NNL and NNTC.  The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development Tax credits of NNL and NNTC under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser, acting reasonably.  The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)     The Purchaser shall use commercially reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided that such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)     The Purchaser shall have no obligation to provide any access under Section 6.5(c) unless NNL or NNTC (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with Section 6.5(c), including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)     The obligations of the Sellers under Section 6.5(a) shall be subject to the following:

(i)     the parties agree and acknowledge that the Sellers shall be entitled, prior to any disclosure or making available, to redact the relevant information, records or documents as they hold to ensure that they show only information relevant to the Assets or Assumed Liabilities and do not show any other information except as required by applicable Law;

(ii)     the Sellers, on the one hand, and the Purchaser, on the other hand, shall not be obliged to provide any access under Section 6.5(a) unless the requesting party pays all of the reasonable costs and expenses of the party granting access, in each case incurred in connection with the granting of such access, including a reasonable hourly rate for access to employees or agents of the

NNC-NNL11755879 / 114

party granting access (based on the total compensation of the employee or agent at the time that access is provided); and

(iii)      the Sellers shall not be required, pursuant to Section 6.5(a), to provide the Purchaser with access to or copies of any working papers or other documentation (including court orders or other documents) prepared by, or relating to, the Joint Administrators or the French Liquidator which the Joint Administrators or the French Liquidator are required to maintain in confidence under applicable Law.

SECTION 6.6.      Tax Disclosure.  Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any nonpublic commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.7.      Tax Returns.

(a)      The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.7(b)). Such Tax Returns shall be true, correct and complete in all material respects.  Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Sellers as and when required by Law.

(b)      Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. The Sellers shall make available to the Purchaser that portion of such Transfer Tax Returns prepared by the Sellers that is applicable to the sale and purchase transaction contemplated by this Agreement, and, to the extent not already disclosed, such information as will enable the Purchaser to review such portion of such Transfer Tax Returns at least ten (10) Business Days before such Tax Returns are due to be filed, and such portion of such Transfer Tax Returns shall be revised before filing as reasonably requested by the Purchaser.  The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax

NNC-NNL11755879 / 115

becomes due and payable in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).

(c)    The Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets for all Post-Closing Taxable Periods and Straddle Periods, provided that for the avoidance of doubt, nothing in this Section 6.7(c) shall give the Purchaser any rights over the Tax Returns of the Sellers (a) that are required to be submitted to any relevant Tax Authority and which relate to such Sellers' taxable income and gains for the taxable period during which Closing takes place, or (b) that are in respect of VAT. Such Tax Returns shall be true, correct and complete in all material respects and shall be prepared on a basis consistent with Tax Returns prepared for prior taxable periods unless a different treatment of any item is required by Law or this Transaction. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Party responsible therefor pursuant to Section 6.4(b) hereof as and when required by Law. Nothing in this Section 6.7(c) shall prejudice the rights of the Parties under Section 2.2.4(b).

(d)    The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the NA Sellers at least sixty (60) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The NA Sellers shall have fifteen (15) days after the date of receipt thereof to submit to the Purchaser, in writing, the NA Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the NA Sellers within fifteen (15) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the NA Sellers, the Purchaser and the NA Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ten (10) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have fifteen (15) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

(e)    It is agreed and acknowledged that for the purposes of this Section 6.7, "Transfer Taxes" do not include VAT in respect of any supply (or deemed supply) of goods and services pursuant to this Agreement, for which the provisions of Section 6.9 shall instead apply, except that and for the avoidance of doubt, for the purposes of Section 2.2.4(b), "Transfer Tax Returns" shall include Tax Returns with respect to VAT.

SECTION 6.8.    Canadian Tax Election.

(a)    If the Purchaser is a resident of Canada for purposes of the Income Tax Act (Canada) (and any equivalent provincial statute) and provided that a portion of the Assets transferred pursuant to this Agreement by the NA Sellers and Other Sellers to the Purchaser is

NNC-NNL11755879 / 116

being transferred to the Purchaser in consideration for the Purchaser assuming prepaid obligations of the NA Sellers and Other Sellers to deliver goods or provide services in the future, the NA Sellers and Other Sellers and the Purchaser will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the NA Sellers and Other Sellers and the Purchaser, acting reasonably. The NA Sellers and Other Sellers and the Purchaser will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply *mutatis mutandis* in respect thereof.

(b)     To the extent the NA Sellers and Other Sellers and the Purchaser cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute), the NA Sellers and Other Sellers and the Purchaser promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.9.     <u>VAT</u>.

(a)     All sums payable by the Purchaser under this Agreement shall be exclusive of VAT and, except to the extent Section 6.9(d) applies, where a sum is paid by the Purchaser pursuant to this Agreement in consideration for any supply (or deemed supply) of goods or services by any of the EMEA Sellers the Purchaser shall, in addition to the consideration payable for such supply, pay to the relevant EMEA Seller, on receipt of an appropriate VAT invoice, an amount equal to the VAT (if any) determined in accordance with Section 2.2.4(b) as, or (as appropriate) determined by the relevant EMEA Seller(s) as arising in respect of such supply together with all interest and penalties thereon (except to the extent that such interest or penalties arise other than as a result of a failure of the Purchaser to comply with any of its obligations pursuant to this Section 6.9), with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing (whichever is the later), <u>provided</u> <u>that</u>, no payment shall be due from the Purchaser in respect of VAT pursuant to this Section 6.9(a) or Section 6.9(e) in circumstances where the EMEA Seller, Joint Administrator or French Liquidator issues a VAT invoice to the Purchaser outside of any applicable time limits within which the Purchaser (or a member of its VAT group) can claim credit for the relevant input tax.

(b)     For the avoidance of doubt, and without prejudice to the generality of this Section 6.9, if the relevant EMEA Seller or Joint Administrators or French Liquidator forms the view, acting reasonably, that the supply by the EMEA Sellers of any Assets or assumption from the EMEA Sellers of any Assumed Liabilities (if relevant) is subject to VAT, or that any other amounts payable by the Purchaser or any other supplies made to the Purchaser in each case

NNC-NNL11755879 / 117

pursuant to this Agreement are subject to VAT, then, except to the extent Section 6.9(d) applies, the relevant EMEA Seller(s) or the Joint Administrators or the French Liquidator shall be entitled to provide the Purchaser with a VAT invoice in respect of the supply in question.

(c)    Subject to any contrary provision of this Agreement, a VAT invoice served by any EMEA Seller or the Joint Administrators or the French Liquidator in good faith and in accordance with applicable VAT laws, absent manifest error, shall be accepted by the Purchaser as valid, including in relation to amounts of VAT stated in such invoice, except to the extent the Purchaser has paid the applicable VAT by virtue of Section 6.9(d) below.

(d)    Where the liability for VAT in respect of any supply is a liability of the Purchaser (whether under Section 8 of the Value Added Tax Act 1994 or similar or equivalent provisions in any member of the European Union) the Purchaser shall account for such VAT to the relevant Tax Authority within any applicable time limits.

(e)    In the event that an amount in respect of VAT is payable under the terms of this Agreement in respect of a supply and: (1) the consideration amount as indicated on the relevant VAT invoice in respect of such supply differs from the actual consideration amount for that supply for VAT purposes (including, but not limited to, situations where the Purchase Price is adjusted in accordance with any provision of this Agreement, and/or the allocation of the Purchase Price to any Assets or Assumed Liabilities is amended, whether pursuant to Section 2.2.4 or otherwise); (2) a Tax Authority determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid VAT should properly be characterized as a supply on which VAT does not arise; or (3) for any reason the rate of VAT applicable to the supply in question is changed, then the relevant EMEA Seller(s) and the Purchaser agree to co-operate in good faith to correct all relevant VAT invoices and VAT returns and (without prejudice to the generality of the foregoing):

(i)    where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is increased, or VAT otherwise becomes due, the Purchaser shall pay to the relevant EMEA Seller (or relevant Tax Authority, where applicable) an amount equal to any additional VAT that becomes due as a result of such increase with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing, whichever is the later; and

(ii)    where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is decreased, or to the extent that a relevant Tax Authority determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid an amount in respect of VAT should properly be characterised as a supply on which VAT does not arise, or where the rate of VAT applicable to the supply in question is decreased, or where the Purchaser has otherwise paid an amount in respect of VAT to an EMEA Seller under Section 6.9(a) that was not due, the relevant EMEA Seller shall, without unreasonable delay, issue an appropriate and valid VAT credit note or equivalent to the Purchaser and shall use its reasonable endeavors to recover the Excess VAT and, to the extent the Excess VAT is actually recovered and retained by it (or by any member of its VAT

NNC-NNL11755879 / 118

group) or is creditable by any EMEA Seller against any VAT liability of an EMEA Seller (or is so creditable by any member of its VAT group), the relevant EMEA Seller shall, without unreasonable delay, pay such Excess VAT to the Purchaser, and for the purposes of this Section 6.9(e)(ii), **"Excess VAT"** means the amount in respect of VAT actually paid (after deducting any previous refund under this Section 6.9(e)(ii) by the Purchaser that should not have been paid, taking into account the decrease in purchase price, the incorrect characterization of a supply, the decrease in the VAT rate or the amount in respect of VAT that was paid to an EMEA Seller that was otherwise not due.

(f)    The EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser agree to act in good faith in accordance with Section 2.2.4 for all purposes relating to VAT (including the preparation and filing of any VAT invoices or Tax Returns with respect to VAT).

(g)    If it is not possible for the EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser in accordance with Section 2.2.4 to determine before the date falling five (5) Business Days prior to Closing an amount of consideration for the purposes of VAT invoicing then (notwithstanding that the Purchaser has not by such date delivered a proposed Partial Allocation pursuant to Section 2.2.4(b)):

(i)    where any of the EMEA Sellers, the Joint Administrators or the French Liquidator are required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement, subject to Section 6.9(e), the determination of the relevant EMEA Seller or the Joint Administrators or the French Liquidator (in each case, acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services until and unless replaced pursuant to Section 6.9(e); and

(ii)    where the Purchaser is required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement, subject to Section 6.9(e), the determination of the Purchaser (acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services unless and until replaced pursuant to Section 6.9(e).

## ARTICLE VII

## CONDITIONS TO THE CLOSING

SECTION 7.1.    <u>Conditions to Each Party's Obligation</u>.  The Parties' obligation to effect the Closing is subject to the satisfaction or the express written waiver by all of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals*.  Mandatory Regulatory Approvals from the appropriate Government Entities shall have been obtained.

(b)    *No Injunctions or Restraints*.  Subject to Section 5.6(f), there shall be in effect no Law, or any order, injunction, decree or judgment of any court or other Government

NNC-NNL11755879 / 119

Entity prohibiting, preventing or making illegal the consummation of any of the transactions contemplated hereby.

(c)      *U.S. Sale Order, Canadian Approval and Vesting Order, and French Court Order*. The U.S. Sale Order shall have been entered in the form of <u>Exhibit G</u> in accordance with Section 5.1(d), shall not have been modified, revised, vacated or amended in a manner inconsistent with the provisions of Section 5.1(d) and shall have become a Final Order. The Canadian Approval and Vesting Order shall have been entered in the form of <u>Exhibit I-2</u> in accordance with Section 5.2(b), shall not have been modified, revised, vacated or amended in a manner inconsistent with the provisions of Section 5.2(b) and shall have become a Final Order. The French Court Order shall have been entered substantially in the form of <u>Exhibit J</u> in accordance with Section 5.3, shall not have been modified, revised, vacated or amended in a manner inconsistent with the provisions of Section 5.3 and shall have become a Final Order.

(d)      *CDMA Vesting Order*. The requirements of paragraph 7 of the CDMA Vesting Order shall have been satisfied.

SECTION 7.2.      <u>Conditions to Sellers' Obligation</u>. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Primary Seller Parties), at or prior to the Closing, of each of the following conditions:

(a)      *No Breach of Representations and Warranties*. Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as of the Closing Date as if made on and as of such date or (ii) as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)      *No Breach of Covenants*. The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c)      *Officer Certificate*. The Sellers shall have been furnished with a certificate signed by a senior officer of the Purchaser certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

(d)      *Recent Emergence of Unknown Licenses*. Ten (10) Business Days shall have elapsed since the provision of the most recent notice, if any, that the Sellers have provided to the Purchaser pursuant to and in compliance with Section 8.1(d)(iii)(B).

SECTION 7.3.      <u>Conditions to Purchaser's Obligation</u>. The Purchaser's obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)      *No Breach of Representations and Warranties and Annex I Statements*. Each of the representations and warranties set forth in Article IV and each statement in Annex I,

NNC-NNL11755879 / 120

in each case disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as of the Closing Date as if made on and as of such date or (ii) if made as of a date specified therein, as of such date, except for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)　*No Breach of Covenants.*　The Sellers shall have complied in all material respects with all material covenants, obligations and agreements contained in this Agreement required to be performed by the Sellers on or before the Closing.

(c)　*Officer Certificate.*　The Purchaser shall have been furnished with a certificate signed by a senior officer of each of the NA Sellers that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

For the avoidance of doubt, the parties acknowledge that the Purchaser's knowledge of the existence of any facts, events, conditions or circumstances, except by reason of the Transaction Documents and the Sellers Disclosure Schedule, shall not in any way prevent the Purchaser from exercising all of its rights hereunder and requiring that all conditions in Sections 7.1 and 7.3 be satisfied in full.

## ARTICLE VIII

## TERMINATION

SECTION 8.1.　　Termination.　This Agreement may be terminated at any time prior to the Closing:

(a)　by mutual written consent of the Primary Parties;

(b)　by either Primary Party, upon written notice to the other Primary Party:

(i)　if the Closing does not take place on or prior to the date that is one hundred and eighty (180) days from the date of this Agreement (such date, as it may be extended pursuant to the proviso below, the "**Outside Date**"); provided, that the Outside Date shall be extended by successive periods of forty-five (45) days if on the date of each such extension all of the conditions to the Closing set forth in Article VII other than the conditions in Section 7.1(a) and/or Section 7.1(b) are satisfied (or are capable of being satisfied should Closing occur on the next Business Day); provided, however, that the Outside Date shall in no event be more than three hundred and sixty (360) days from the date of this Agreement; or

(ii)　upon or following the determination by any of the Primary Seller Parties (by resolution of the board of directors or similar governing body (in the case of the NA Sellers), decision in writing of the Joint Administrators (in the case of NNUK), or by entry into a definitive written agreement) or upon or following written notice to the Purchaser, the official committee of unsecured creditors (or the equivalent) in any of the Bankruptcy Proceedings or public announcement (including any filing in a Bankruptcy Court by any of the Primary

NNC-NNL11755879 / 121

Seller Parties) thereof to proceed with an Alternative Transaction, such determination to be made (A) if the Auction occurs, not later than the date that is three (3) Business Days after the conclusion of the Auction, or (B) if the Auction does not occur, not later than the later of sixty-three (63) days from the date that the U.S. Bidding Procedures Order is first entered by the U.S. Bankruptcy Court and the date the Canadian Sales Process Order is first granted by the Canadian Court;

(c)    by the Purchaser, upon written notice to the Primary Seller Parties:

(i)    in the event of a breach by the Sellers of the Sellers' representations, warranties, Annex I statements, agreements or covenants set forth in this Agreement, which breach would result in a failure of any of the conditions to Closing set forth in Section 7.1, Section 7.3(a) or Section 7.3(b), as applicable, and which breach, if capable of being cured, has not been cured within twenty-five (25) days from receipt of written notice thereof from the Purchaser (but not later than the Outside Date);

(ii)    in the event of the Sellers' breach of their obligation to close the transactions contemplated hereby at the Closing, which breach, if capable of being cured, has not been cured within five (5) days from receipt of written notice thereof from the Purchaser (but not later than the Outside Date);

(iii)    upon or following the determination by any of the Primary Seller Parties (by resolution of the board of directors or similar governing body (in the case of the NA Sellers), decision in writing of the Joint Administrators (in the case of NNUK), or by entry into a definitive written agreement) or upon or following written notice to the Purchaser, the official committee of unsecured creditors (or the equivalent) in any of the Bankruptcy Proceedings or public announcement (including any filing in a Bankruptcy Court by any of the Primary Seller Parties) thereof to proceed with any Asset Retention Transaction;

(iv)    (A) upon or following the date that is ten (10) Business Days after the date hereof, if (x) the Canadian Debtors shall not have served the Canadian Sales Process Order Motion on the Service List or filed such motion with the Canadian Court by such date or (y) the U.S. Debtors have not filed with the U.S. Bankruptcy Court the U.S. Bidding Procedures and Sale Motion by such date; (B) upon or following the date that is thirty-five (35) days after the date hereof, if (x) the U.S. Bidding Procedures Order shall not have been entered by the U.S. Bankruptcy Court by such date or (y) the Canadian Sales Process Order shall not have been entered by the Canadian Court by such date; or (C) at any time following the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order but prior to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, upon or following the date that an order of any court of competent jurisdiction shall be entered (x) vacating or reversing the U.S. Bidding Procedures Order or the Canadian Sales Process Order or (y) amending, supplementing or otherwise modifying the U.S. Bidding Procedures Order or the

NNC-NNL11755879 / 122

Canadian Sales Process Order in a manner that is inconsistent with the standards set forth in Sections 5.1(d) or 5.2(b), as applicable;

(v)     upon or following the date sixty (60) days from the later of the date that the U.S. Bidding Procedures Order is first entered by the U.S. Bankruptcy Court and the date that the Canadian Sales Process Order is first granted by the Canadian Court, if the Auction shall not have been completed by such later date (if the Auction is required to occur at all pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order); or

(vi)     (A) upon or following the date that is seventy-five (75) days from the later of the date that the U.S. Bidding Procedures Order is first entered by the U.S. Bankruptcy Court and the date that the Canadian Sales Process Order is first granted by the Canadian Court, if the hearing(s) to consider approval of the U.S. Sale Order and the Canadian Approval and Vesting Order shall not have commenced by such date; or (B) upon or following the date on which the U.S. Bankruptcy Court shall have stated unconditionally that it will not enter the U.S. Sale Order or the Canadian Court shall have stated unconditionally that it will not enter the Canadian Approval and Vesting Order;

(d)     by the Primary Seller Parties, upon written notice to the Purchaser:

(i)     in the event of a breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of any of the conditions to Closing set forth in Section 7.1, Section 7.2(a) or Section 7.2(b), as applicable, and which breach, if capable of being cured, has not been cured within twenty-five (25) days from receipt of written notice thereof from the Primary Seller Parties (but not later than the Outside Date);

(ii)     upon the Purchaser's breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Primary Seller Parties (but not later than the Outside Date); or

(iii)     in the event that (A) one or more Persons asserts the existence of an Unknown License (as defined in the U.S. Bidding Procedures Order and the Canadian Sales Process Order) that has been or would be rejected, repudiated or terminated pursuant to the procedures described in the U.S. Bidding Procedures Order or the Canadian Sales Process Order and that the Primary Seller Parties determine, in the exercise of their reasonable good faith judgment, would, taken together with all other such Unknown Licenses asserted to exist that have likewise been or would likewise be rejected, repudiated or terminated pursuant to the procedures described in the U.S. Bidding Procedures Order or the Canadian Sales Process Order, constitute a substantial risk of resulting in an aggregate allowed damage claim at least equal to the dollar amount specified in Section 8.1(d) of the Sellers Disclosure Schedule, if rejected, repudiated or terminated; (B) the Sellers

NNC-NNL11755879 / 123

promptly notified the Purchaser in writing of such assertion of the existence of such Unknown License(s) and the basis for the Sellers' reasonable good faith estimate of such potential allowed damage claim(s) and provided to the Purchaser such copy of such Unknown License(s) as in the Sellers' possession on the basis set forth in Section 2.3.2(d)(v), and subsequently provided the Purchaser updates (which shall not constitute a further notice under this clause (B)) as to any material change in the facts that formed the basis of the Primary Seller Parties' determination specified in the preceding clause (A); (C) the Primary Seller Parties have requested in writing the consent of the Purchaser to withdraw the rejection or repudiation of, or to elect not to terminate, such Unknown License(s) and to deem each such Unknown License a "Continuing Unlisted License" for purposes of Section 2.1.1(a) (which consent shall be granted or denied in the Purchaser's sole and absolute discretion); and (D) the Purchaser shall not have provided its consent in writing to such request by the date that is ten (10) Business Days after the date the Purchaser receives the notices described in the foregoing clauses (B) and (C) and such copy of the asserted Unknown License in the Sellers' possession on the basis set forth in Section 2.3.2(d)(v) (it being understood that the Purchaser's consent to such withdrawal or election not to terminate will not affect the Purchaser's rights under Article IX or any other provision of this Agreement);

provided, however, that the right to terminate this Agreement pursuant to Section 8.1(b), Section 8.1(c)(i), Section 8.1(c)(ii), Section 8.1(d)(i) or Section 8.1(d)(ii) shall not be available to the Primary Party seeking to terminate if such Primary Party has breached this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement.

SECTION 8.2.     Expense Reimbursement and Break-Up Fee.

(a)     In the event that (A) this Agreement is terminated (x) by the Purchaser pursuant to Sections 8.1(c)(i), (ii) or (iii), (y) by either Primary Party pursuant to Section 8.1(b)(i) (because of the failure of the condition specified in Section 7.1(d)) or (ii), or (z) by the Primary Seller Parties pursuant to Section 8.1(d)(iii); and (B) when this Agreement is terminated, the Purchaser is not in breach of this Agreement, which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 7.1 or Section 7.2, the Sellers shall pay to the Purchaser cash in an amount equal to the total amount of all actual fees, costs and expenses reasonably incurred by the Purchaser in connection with the preparation, execution and performance of this Agreement, which amount shall not exceed Four Million Dollars ($4,000,000) (the "**Expense Reimbursement**"). The Expense Reimbursement shall be paid by wire transfer of immediately available funds not more than five (5) Business Days following such termination and after the receipt by the NA Sellers of written notice from the Purchaser describing the fees and expenses that constitute the Expense Reimbursement in reasonable detail.

(b)     In the event that (A) this Agreement is terminated (x) by the Purchaser pursuant to Sections 8.1(c)(i), (ii) or (iii), (y) by either Primary Party pursuant to Section 8.1(b)(ii), or (z) by the Primary Seller Parties pursuant to Section 8.1(d)(iii); (B) when this Agreement is terminated, the Purchaser is not in breach of this Agreement, which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 7.1 or Section

NNC-NNL11755879 / 124