7.2; and (C) an Alternative Transaction is consummated within twelve (12) months following such termination, the Sellers shall pay to the Purchaser, from the proceeds of such Alternative Transaction, in immediately available funds, not more than five (5) Business Days after the date of such consummation, a cash fee of Twenty-Five Million Dollars ($25,000,000) (the "**Break-Up Fee**").

      (c)    Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Expense Reimbursement and/or Break-Up Fee pursuant to this Section 8.2 is expressly subject to entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order.

      SECTION 8.3.      Effects of Termination. If this Agreement is terminated pursuant to Section 8.1:

      (a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other Parties except for the provisions of, or as provided in, this Section 8.3 and (i) Section 2.2.2 (Good Faith Deposit), (ii) Section 2.2.3 (Deposit Escrow), (iii) Section 5.7 (Public Announcements), (iv) Section 5.10 (Transaction Expenses), (v) Section 5.11 (Confidentiality), (vi) Section 8.2 (Expense Reimbursement and Break-Up Fee), (vii) Section 8.3 (Effects of Termination), (viii) Section 9.9 (Indemnification Escrow) and (ix) Article X (Miscellaneous); provided, that, subject to Section 10.15, nothing herein shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof; and

      (b)    the provisions of the Non-Disclosure Agreement and the Supplementary Non-Disclosure Agreement will continue in full force and effect.

ARTICLE IX

INDEMNIFICATION

      SECTION 9.1.      Survival. All representations, warranties, statements, covenants and agreements of any of the Sellers contained herein (including Annex I) or in any other Transaction Document shall survive the Closing until the Survival Date, except (x) for covenants that by their terms are to be satisfied after the Closing Date, which covenants shall survive in accordance with their terms, and (y) as may be expressly provided in any Transaction Document other than this Agreement. No Indemnification Claim (as defined below) may be asserted pursuant to Section 9.2 unless the applicable Notice of Claim (as defined below) is received by the Primary Seller Parties on or prior to the Survival Date (it being agreed and understood that if a claim for a breach of representation, warranty, statement, covenant or agreement is timely made, the representation, warranty, statement, covenant or agreement shall, solely for the purposes of such claim, survive until the date on which such claim is finally liquidated or otherwise resolved). No representations and warranties of the Purchaser contained herein or in any other Transaction Document (except, in the case of such other Transaction Documents, as may be expressly provided therein) shall survive beyond the Closing Date. This Section 9.1 shall not limit any Party's liability for actual fraud (which, for the avoidance of doubt, shall exclude constructive fraud and equitable fraud).

NNC-NNL11755879 / 125

SECTION 9.2.          Indemnification of Purchaser.  On and after the Closing Date, and subject to the other provisions of this Article IX (including the last sentence of this Section 9.2), each of the Purchaser Indemnitees shall be indemnified and held harmless out of the Indemnification Escrow Account and, in the aggregate, to the extent of the Indemnification Escrow Amount from and against any and all claims, demands, suits, Actions, causes of actions, losses (including, for the avoidance of doubt, loss of profits, internal costs, loss of revenue and lost sales), costs, damages, liabilities and out-of-pocket expenses incurred or paid, including reasonable attorneys' fees (including such fees which are incurred in connection with a dispute of the provisions of this Agreement), fines, penalties, costs of investigation or settlement, other professionals' and experts' fees, and court or arbitration costs (but specifically excluding any special, punitive, exemplary or speculative damages except to the extent such damages specifically excluded herein are awarded to a Third Party) (hereinafter collectively referred to as "**Damages**"), to the extent such Damages are suffered by a Purchaser Indemnitee and arise out of, result from, or are caused by:

(a)          any facts or circumstances that (i) to the Knowledge of the Sellers as of the Closing Date, constitute an inaccuracy, misrepresentation or breach of any of the representations and warranties set forth in Sections 4.2(b)(iii) or 4.2(b)(iv), or (ii) constitute an inaccuracy, misrepresentation or breach of any of the other representations or warranties in Article IV or any of the statements in Annex I;

(b)          the breach of, default in, or failure to perform any covenant, agreement or other obligation of the Sellers set forth in (i) Sections 2.1.1 (Assets), 2.1.8 (Non-Assignable Assets), 5.9 (Conduct of Business), 5.11 (Confidentiality), 5.13(b) (Termination of Intercompany Arrangements); 5.17 (Post-Closing Suits), 5.19 (Option to Purchase Undisclosed Patent Interests), and 5.22 (Disposition of Jointly Owned Patents) or (ii) the Transaction Documents other than this Agreement;

(c)          any Excluded Liabilities (it being understood that in no event shall the Purchaser assume any Excluded Liabilities); or

(d)          the existence of any Permitted Encumbrances of the type described in clause (i) of the definition of "Permitted Encumbrances" on any of the Assets;

provided, however, that the Purchaser Indemnitees shall not be entitled to any indemnification pursuant to this Section 9.2 unless and until the total amount of Damages for all Indemnification Claims for which the Purchaser Indemnitees are entitled to be indemnified hereunder exceeds One Million Dollars ($1,000,000), in which case the Purchaser Indemnitees shall be entitled only to the Damages in excess of such amount.  The Purchaser, on behalf of itself and each other Purchaser Indemnitee, acknowledges and agrees that the Indemnification Escrow Account is the sole source of funding for any Indemnification Claims and under no circumstances shall any Purchaser Indemnitees be entitled to indemnification or other monetary remedy from the Nortel Parties in respect of Damages other than from the Indemnification Escrow Account, except to the extent Damages are incurred as a result of actual fraud of the Sellers under this Agreement, with respect to which the limitations set forth in this sentence shall not apply.

SECTION 9.3.          Notice of Claim.

NNC-NNL11755879 / 126

(a)     Promptly (and in any event within thirty (30) days) after any Purchaser Indemnitee actually learns of any event or circumstance (including any Action instituted or asserted by a Third Party against any Purchaser Indemnitee (a "**Third Party Claim**")) that is reasonably likely to give rise to indemnification under Section 9.2 (an "**Indemnification Claim**"), the Purchaser Indemnitee shall deliver to the Primary Seller Parties a notice executed by the Purchaser setting forth in reasonable detail the matter giving rise to the Indemnification Claim hereunder, including, if available, a reasonable estimate of the anticipated Damages (such notice, a "**Notice of Claim**"). The Purchaser shall have the right to amend any Notice of Claim at any time, including with respect to its estimate of anticipated Damages.

(b)     No delay on the part of any Purchaser Indemnitee in giving a Notice of Claim shall limit or reduce such Person's right to indemnity hereunder, or relieve the Sellers from any of their obligations under this Article IX, unless (and then only to the extent that) the Sellers are actually prejudiced thereby.

SECTION 9.4.     Resolution of Notice of Claim.

Each Notice of Claim given by any Purchaser Indemnitee shall be resolved as follows:

(a)     *Admitted Claims.* If the Primary Seller Parties agree in writing that liability for an Indemnification Claim is indemnified under Article IX for the full amount of the Damages specified in the Notice of Claim or amendment to Notice of Claim, or fail to give the Purchaser Indemnitee written notice contesting all or any portion of a Notice of Claim within thirty (30) days after such Notice of Claim (or amendment to any such Notice of Claim) is properly delivered to each of the Primary Seller Parties pursuant to Section 10.7 of this Agreement, then the Sellers shall be conclusively deemed to have consented to the recovery (subject to the limitations set forth in Section 9.2) by the Purchaser Indemnitee of the lesser of (i) the full amount of Damages actually incurred by such Purchaser Indemnitee in respect of such Indemnification Claim and (ii) the estimate of the anticipated Damages, if any, specified in such Notice of Claim or amendment thereto, as applicable.

(b)     *Contested Claims.* With respect to any Notice of Claim not involving a Third Party Claim, if the Primary Seller Parties give the Purchaser Indemnitee written notice contesting all or any portion of a Notice of Claim or any amendment to a Notice of Claim, but solely with respect to any matters subject to such amendment (a "**Contested Claim**") within thirty (30) days after proper delivery to the Primary Seller Parties of such Notice of Claim or amendment thereto pursuant to Section 10.7, then such Contested Claim shall be resolved by either (i) a written settlement agreement executed by the Primary Parties and the Purchaser Indemnitee or (ii) in the absence of such a written settlement agreement within thirty (30) days of the Sellers' delivery of a notice contesting the Notice of Claim or amendment thereto, all Indemnification Claims that are the subject of such Notice of Claim or the amendment thereto shall be resolved by a joint hearing of the U.S. Bankruptcy Court and the Canadian Court. The foregoing dispute resolution procedures shall also apply with respect to any disputes as between the Sellers, on the one hand, and the Purchaser or the Purchaser Indemnitees, on the other, over whether the Purchaser Indemnitees are entitled to indemnification for Damages resulting from a Third Party Claim.

NNC-NNL11755879 / 127

(c)      *Participation in Defense of Third Party Claims.* In the event of a Third Party Claim, the Primary Seller Parties may, at their option, participate in the defense of the Purchaser Indemnitee against the claims giving rise to such Third Party Claim (including through the employment of its choice of counsel, who shall be reasonably satisfactory to such Purchaser Indemnitee, it being understood that the Sellers shall be responsible for the payment of the fees, charges and disbursements of such counsel) provided, that (i) such participation shall not limit the Purchaser Indemnitees' control of such Third Party Claim and (ii) the Primary Seller Parties and their counsel shall reasonably cooperate with the Purchaser Indemnitees and their counsel in connection with such Third Party Claim. For the avoidance of doubt, the applicable Purchaser Indemnitee(s) shall have the right to undertake, conduct and control, through counsel of its own choosing and at its own expense (without prejudice to its right to recover all Damages in accordance with this Article IX), the defense of any Third Party Claim.

(d)      *Settlement of Third Party Claims.* In the event that a Purchaser Indemnitee shall compromise or settle any Third Party Claim without the consent of the Primary Seller Parties (which consent shall not be unreasonably withheld, delayed or conditioned), such compromise or settlement shall not be dispositive with respect to the Damages payable to such Purchaser Indemnitee in respect of such Third Party Claim. For so long as any amounts remain in the Indemnification Escrow Account and subject to appropriate confidentiality and privilege protections, in the event a Purchaser Indemnitee intends to compromise or settle multiple claims with a Third Party and one or more of such claims is a Third Party Claim, the Purchaser shall inform the Primary Seller Parties, prior to seeking their consent to such settlement or compromise, of: (i) the amount of all claims; (ii) the aggregate amount of such settlements or compromises with the Third Party; and (iii) the amount of the settlement allocated to each claim.

(e)      *Cooperation.* From and after the delivery of any Notice of Claim subject to appropriate confidentiality and privilege protections, the Sellers and the applicable Purchaser Indemnitees shall make reasonably available to the other party, as applicable, and their respective attorneys, accountants and representatives all pertinent information under its control relating to the applicable Indemnification Claim and amount of Damages incurred in connection therewith, and the Sellers shall cooperate and, in the case of a Third Party Claim, render to the applicable Purchaser Indemnitees such assistance as such Purchaser Indemnitees may reasonably require in order to facilitate the proper and adequate defense of any such Third Party Claim (including granting the applicable Purchaser Indemnitees and their attorneys, accountants and representatives reasonable access, during normal business hours, to the personnel of the Sellers (including as witnesses or deponents at trial and during the discovery process) to the extent reasonably related to the applicable Indemnification Claim).

(f)      *Manner of Payment.* If a Purchaser Indemnitee is entitled to the recovery of Damages in respect of any Indemnification Claim pursuant to this Article IX, then as and to the extent applicable pursuant to Section 9.2, an amount equal to the amount of such Damages shall be released by the Escrow Agent from the Indemnification Escrow Account, pursuant to the Escrow Agreement, by wire transfer of immediately available funds to an account designated in writing by the Purchaser.

NNC-NNL11755879 / 128

SECTION 9.5.     Treatment of Indemnity Payments.  All indemnification payments under this Article IX shall be treated as adjustments to the Purchase Price for all applicable Tax purposes, except as is otherwise required by applicable Law.

SECTION 9.6.     No Duplication of Damages.  No Purchaser Indemnitee shall be entitled to recover any amount due hereunder more than once in respect of the same Damages, including receipt of third-party insurance proceeds in respect of Damages indemnifiable under this Article IX

SECTION 9.7.     Release of Remaining Funds from Indemnification Account.  As soon as reasonably practicable following the Survival Date, or the earliest date thereafter on which there is no Indemnification Claim outstanding, all funds remaining in the Indemnification Escrow Account shall be paid to the Distribution Agent as agent for the Sellers in accordance with the Escrow Agreement.

SECTION 9.8.     Exhaustion or Distribution of Indemnity Escrow. Notwithstanding anything to the contrary in this Article IX or otherwise, from and after the date upon which no funds remain in the Indemnification Escrow Account, no Party shall be subject to any further obligations under Sections 9.3 or 9.4 of this Agreement.

SECTION 9.9.     Indemnification Escrow.

(a)     Each of the Primary Seller Parties, NNSA and the Purchaser has entered into the Escrow Agreement with the Escrow Agent in order to secure payment in respect of Indemnification Claims as provided in this Agreement and provide for the disposition of the funds in the Indemnification Escrow Account.

(b)     Each of the Primary Seller Parties, NNSA and the Purchaser hereby undertakes to promptly execute and deliver to the Escrow Agent, in accordance with the formalities set forth in the Escrow Agreement, joint instructions to pay to the Distribution Agent (as distribution agent for the Sellers) or the Purchaser, as applicable, funds from the Indemnification Escrow Account any time that any Person becomes entitled to such payment from the Indemnification Escrow Account pursuant to this Agreement.

## ARTICLE X

## MISCELLANEOUS

SECTION 10.1.     Indemnity Relating to Certain License Non-Assignment and Non-Renewal Protections.

(a)     The Purchaser shall indemnify and hold each Seller Indemnitee harmless from and against any and all Damages suffered by such Seller Indemnitee that arise out of, result from or are caused by any Action instituted or asserted by a Third Party against such Seller Indemnitee (a "**Section 10.1 Third Party Claim**") as a result of the Purchaser's use and exercise (and not merely the grant) of the power of attorney granted pursuant to Section 28(h) of the U.S. Sale Order or Section 14(h) of the Canadian Approval and Vesting Order (the "**License Power of Attorney**").

NNC-NNL11755879 / 129

(b)       The Purchaser shall have the right to undertake, conduct and control, through counsel of its own choosing and at its own expense, the defense of any Section 10.1 Third Party Claim, and the Seller Indemnitees shall reasonably cooperate with the Purchaser in such defense at the expense of the Purchaser. Promptly (and in any event within thirty (30) days) after any Seller Indemnitee actually learns of any Section 10.1 Third Party Claim that is reasonably likely to give rise to indemnification under this Section 10.1 (a "**Section 10.1 Indemnification Claim**"), such Seller Indemnitee shall deliver to the Purchaser a notice executed by such Seller Indemnitee setting forth in reasonable detail the matter giving rise to the Section 10.1 Indemnification Claim hereunder, including, if available, a reasonable estimate of the anticipated Damages (such notice, a "**Section 10.1 Notice of Claim**"). The Primary Seller Parties may, at their option, participate in the defense of such Section 10.1 Third Party Claim (including through the employment of that choice of counsel, who shall be reasonably satisfactory to the Purchaser, it being understood that the Primary Seller Parties shall be responsible for the payment of the fees, charges and disbursements of such counsel) provided, that (i) such participation shall not limit the Purchaser's control of such Section 10.1 Third Party Claim and (ii) the Primary Seller Parties and their counsel shall reasonably cooperate with the Purchaser and its counsel in connection with such Section 10.1 Third Party Claim.

(c)       No delay on the part of any Seller Indemnitee in giving a Section 10.1 Notice of Claim shall limit or reduce such Person's right to indemnity hereunder, or relieve the Purchaser from any of its obligations under this Section 10.1, unless (and then only to the extent that) the Purchaser is actually prejudiced thereby (including with respect to the Purchaser's ability to fully undertake, conduct and control the defense of the Section 10.1 Third Party Claim or as a result of a material increase in the liability which the Purchaser would otherwise have under this Section 10.1).

(d)       The Seller Indemnitees shall not compromise or settle any Section 10.1 Third Party Claim without the consent of the Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned).

SECTION 10.2.     Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 10.3.     No Third Party Beneficiaries. Except for any acknowledgments, rights, undertakings, covenants, indemnities, representations or warranties expressed to be for the benefit of the Joint Administrators, the French Liquidator, the Purchaser Indemnitees and the Seller Indemnitees, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.4.     Consent to Amendments; Waivers. No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction

NNC-NNL11755879 / 130

Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be, at their sole discretion.

SECTION 10.5.    Successors and Assigns.  Except as otherwise expressly provided in this Agreement, all representations, warranties, Annex I statements, covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Primary Seller Parties in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such Party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that the assigning Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties), (ii) assignment by a U.S. Debtor to a succeeding entity upon consummation of a plan of reorganization with respect to such U.S. Debtor pursuant to Chapter 11 of the U.S. Bankruptcy Code and (iii) assignment by any of the Canadian Debtors to a succeeding entity pursuant to any plan of arrangement approved by the Canadian Court. The Parent may not assign any of its obligations under Section 10.24 without the prior written consent of the Primary Seller Parties and any attempted assignment by the Parent without such consent shall be void *ab initio* and of no force or legal effect.

The provisions of this Agreement shall survive for the benefit of the Joint Administrators, the French Liquidator, their firm, partners, employees, agents, advisers and representatives notwithstanding the discharge of the Joint Administrators as joint administrators of the EMEA Sellers, or the French Liquidator as liquidator of NNSA and shall be in addition to, and not in substitution for, any other right, indemnity or relief otherwise available to each of them.

SECTION 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    Subject to Section 10.6(b) and Section 10.6(f), any questions, claims, disputes, remedies or Actions arising from or related to this Agreement or the transactions contemplated hereby, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, and except for those matters specifically required to be determined by the Accounting Arbitrator pursuant to the terms hereof, each Party:

(i)    agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S.

NNC-NNL11755879 / 131

Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of New York (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country;

(ii)      agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby;

(iii)     waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum;

(iv)     agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and

(v)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)      The Purchaser hereby appoints (i) Google Canada Corporation as its authorized agent (the "**Purchaser Authorized Canadian Agent**" upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, and (ii) Google UK Limited as its authorized agent (the "**Purchaser Authorized EMEA Agent**" and together with the Purchaser Authorized Canadian Agent, the "**Purchaser Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case) and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the applicable Purchaser Authorized Agent in respect of the relevant jurisdiction and written notice of such

NNC-NNL11755879 / 132

service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)     Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, (ii) Ogilvy Renault LLP as its authorized agent (the "**Seller Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable, and (iii) NNUK as its authorized agent (the "**Seller Authorized EMEA Agent**" and together with the Seller Authorized U.S. Agent and the Seller Authorized Canadian Agent, the "**Seller Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case) and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Primary Seller Parties shall be deemed, in every respect, effective service of process upon every such Seller.

(e)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(f)     Notwithstanding Section 10.6(a) and (b), the Parties, the Joint Administrators and the French Liquidator agree that:

(i)     any questions, claims, disputes, remedies or Actions arising under Section 10.18 in respect of the EMEA Sellers or the Joint Administrators and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the Joint Administrators, (B) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (C) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (D) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other

NNC-NNL11755879 / 133

claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts; and

(ii)      any questions, claims, disputes, remedies or Actions arising under Section 10.20 and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the French Liquidator, (B) the personal liability of the French Liquidator, (C) his appointment as liquidator of NNSA or the appointment of the French Office Holders of NNSA and their status as such, shall be governed by French law and be subject to the exclusive jurisdiction of the Versailles courts (France).

SECTION 10.7.    Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Parent or the Purchaser, to:

> Ranger Inc.
> c/o Google Inc.
> 1600 Amphitheatre Parkway
> Mountain View, California 94043
> Attention: Legal – Patents
> Facsimile: (650) 618-8643

> and

> Ranger Inc.
> c/o Google Inc.
> 1600 Amphitheatre Parkway
> Mountain View, California 94043
> Attention: Legal – M&A
> Facsimile No.: (650) 887-1790

With copies (that shall not constitute notice) to:

> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
> United States
> Attention:  Philip Mindlin
>              Adam O. Emmerich
>              Benjamin M. Roth
> Facsimile:  +1-212-403-2000

NNC-NNL11755879 / 134

If to the NA Sellers or the Other Sellers, to:

    Nortel Networks Corporation
    5945 Airport Road
    Suite 360
    Mississauga, Ontario, Canada  L4V 1R9
    Attention:  Anna Ventresca
            General Counsel-Corporate, Corporate Secretary and
            Chief Compliance Officer
    Facsimile:  +1-905-863-2057

    and

    Nortel Networks Limited
    5945 Airport Road
    Suite 360
    Mississauga, Ontario, Canada  L4V 1R9
    Attention:  Anna Ventresca
            General Counsel-Corporate, Corporate Secretary and
            Chief Compliance Officer
    Facsimile:  +1-905-863-2057

    and

    Nortel Networks Inc.
    Legal Department
    4001 E. Chapel Hill – Nelson Hwy.
    Research Triangle Park, North Carolina  27709
    United States
    Attention:  Timothy Ross
            Secretary and Vice President
    Facsimile:  +1-919-905-3741

With copies (that shall not constitute notice) to:

    Cleary Gottlieb Steen & Hamilton LLP
    One Liberty Plaza
    New York, New York  10006
    United States
    Attention:  Paul J. Shim
            James L. Bromley
            Lisa M. Schweitzer
    Facsimile:  +1-212-225-3999

    and

NNC-NNL11755879 / 135

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael Lang
Facsimile: +1-416-216-3930

If to the EMEA Sellers, to:

Alan Bloom / Christopher Hill / Stephen Harris
Ernst & Young LLP
1 More London Place
London
SE1 2AF
United Kingdom
Facsimile: +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

Alex Kay
Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
United Kingdom
Facsimile: +44 (0) 20 7098 4447

If to the Joint Administrators, to:

Alan Bloom / Christopher Hill / Stephen Harris
Ernst & Young LLP
1 More London Place
London
SE1 2AF
United Kingdom
Facsimile: +44 (0) 20 7951 1345

NNC-NNL11755879 / 136

With copies (that shall not constitute notice) to:

>Alex Kay
>Herbert Smith LLP
>Exchange House
>Primrose Street
>London
>EC2A 2HS
>United Kingdom
>Facsimile:  +44 (0) 20 7098 4447

>and

>Avner Ben-Gera
>Hughes Hubbard & Reed LLP
>One Battery Park Plaza
>New York, New York  10004
>United States
>Facsimile:  +1-212-299-6366

If to NNSA or the French Liquidator, to:

>Attention: Cosme Rogeau
>26 avenue Hoche
>78000 Versailles
>France
>Facsimile: +33 1 39 49 44 63

With a copy (that shall not constitute notice) to:

>Foucaud, Tchekhoff, Pochet & Associés
>Attention: Antoine Tchekhoff & Edouard Fabre
>1bis, avenue Foch
>75116 Paris
>France
>Facsimile: +33 1 45 00 08 19

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8.     Exhibits; Sellers Disclosure Schedule.

(a)     The Sellers Disclosure Schedule, the Exhibits attached hereto and Annex I constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

NNC-NNL11755879 / 137

(b)        Disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances in any other section of the Sellers Disclosure Schedule as though fully set forth in such other section, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation, warranty or statement to be true and correct. The Sellers Disclosure Schedule is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties by any Nortel Party except to the extent expressly set forth therein. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers, the Joint Administrators or the French Liquidator pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.        Counterparts. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement.

SECTION 10.10.        No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11.        Severability. If any provision, clause or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Without limiting Section 5.6(f), upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12.        No Set-off, Deduction or Counterclaim. Subject to Section 2.2.2, every payment payable by any Party under this Agreement or under any of the other

NNC-NNL11755879 / 138

Transaction Documents shall be made in full without any set-off or counterclaim howsoever arising and shall be free and clear of, and without deduction of, or withholding for, any amount which is due and payable to such Party by any other Party whether under this Agreement or under any of the other Transaction Documents or otherwise.

SECTION 10.13.     Headings.  The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.14.     Entire Agreement.  This Agreement (including the Sellers Disclosure Schedule and all Exhibits attached hereto), the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or other contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents, and all such prior or other contemporaneous understandings, agreements, representations and warranties are hereby terminated.  In the event of any irreconcilable conflict between this Agreement and the Non-Disclosure Agreement or the Supplementary Non-Disclosure Agreement, the provisions of this Agreement shall prevail.  Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all Parties specifically acknowledge that no Party has any special relationship with another Party that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction.

SECTION 10.15.     Availability of Equitable Relief; Limitations on Damages; Sole and Exclusive Remedy.

(a)     The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, subject to the limitations set forth in this Section 10.15, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement (other than with respect to breaches of Section 5.9(c)), without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.  Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.  Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement or that equitable relief is not available pursuant to the express terms of this Section 10.15.  Without limiting the preceding provisions of this Section 10.15, it is acknowledged and agreed that (i) in the event of a material breach by the Sellers, the Purchaser shall be entitled to equitable relief to compel specific performance by the Sellers of all of the transactions contemplated by the U.S. Bidding Procedures Order, the Canadian Sales Process Order, this Agreement (other than Section 5.9(c) hereof) and any other Transaction Documents, in each case subject to the provisions of such document, including to conduct the Auction as contemplated by the U.S. Bidding Procedures Order and to effect the sale of the Assets to the Purchaser as contemplated by Article

NNC-NNL11755879 / 139

II, and (ii) under no circumstances shall any Person be liable for punitive damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or any other Transaction Document. Except for the indemnification rights of Purchaser Indemnitees expressly set forth in Article IX and Seller Indemnitees expressly set forth in Section 10.1, nothing set forth in this Agreement shall confer or give, or shall be construed to confer or give, to any Person (including any Person acting in a representative capacity) other than the Parties any rights or remedies against any Person.

(b)      Notwithstanding anything to the contrary contained in any Transaction Document but except in the case of actual fraud by any Seller and without prejudice to the Purchaser Indemnitees' right to indemnification pursuant to Article IX from and after Closing, in no event shall any of the Nortel Parties be subject to any damage, remedy or relief in respect of any Liability to the Purchaser or any other Purchaser Indemnitee in connection with, or relating to, or arising under this Agreement, any other Transaction Document or the transactions contemplated hereby or thereby, either prior to or after the Closing, and regardless of whether any such claim arises in contract (including, for the avoidance of doubt, with respect to clause (ii) below, payment of the Expense Reimbursement and/or the Break-Up Fee), tort, breach of warranty or any other legal or equitable theory, in each case other than: (i) equitable relief granted pursuant to and in accordance with Section 10.15(a); and (ii) prior to the Closing, for monetary damages in an aggregate amount not to exceed Twenty-Nine Million Dollars ($29,000,000).

(c)      The provisions of this Section 10.15 and the limitations on remedies provided hereunder were specifically bargained for between the Purchaser and the Sellers and were taken into account by the Purchaser and the Sellers in arriving at the Purchase Price. The Sellers have expressly relied on the provisions of this Section 10.15, and the limitations on remedies provided hereunder in agreeing to the Purchase Price and in agreeing to provide the specific representations, warranties, statements and covenants set forth herein.

SECTION 10.16.     <u>Bulk Sales Laws</u>. Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

SECTION 10.17.     <u>NA Sellers as Representatives of Other Sellers</u>.

(a)      For all purposes of this Agreement, each Other Seller hereby irrevocably appoints NNI as its representative.

(b)      Pursuant to Section 10.17(a), NNI shall expressly have the power to, in the name and on behalf of each Other Seller, (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.18.     <u>Obligations of Sellers and EMEA Sellers</u>. When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of

NNC-NNL11755879 / 140

certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller). Notwithstanding anything to the contrary herein, the obligations of each EMEA Seller hereunder shall be several and not joint. Effective as of the date hereof, the parties are fully bound by the terms of this Agreement; provided, however, that, except with respect to Section 5.26, none of the Sellers, the Joint Administrators or the French Liquidator shall have any obligations or incur any liabilities under this Agreement unless and until (i) the U.S. Bankruptcy Court enters the U.S. Bidding Procedures Order and (ii) the Canadian Court enters the Canadian Sales Process Order. For the avoidance of doubt, (x) no Seller shall assume any responsibility or liability for any obligations relating to any assets and/or liabilities that are not owned by it, and each Seller's liability to the Purchaser in relation to any matter contained in this Agreement shall be limited to the assets and/or liabilities of the relevant Seller and (y) the intent of the Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the French Liquidator under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.19.    Exclusion of Liability of Joint Administrators and Acknowledgement.

(a)    Notwithstanding that this Agreement shall have been signed by the Joint Administrators both in their capacities as administrators of the EMEA Sellers for and on behalf of the EMEA Sellers and in their personal capacities, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the Joint Administrators, or their firms, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act or otherwise.

(b)    The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed, that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other party to observe, perform or comply with any of its obligations under this Agreement, or under or in relation to any associated arrangements or negotiations.

(c)    The Joint Administrators are parties to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, or otherwise, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purpose of receiving the benefit of this Section 10.19.

(d)    The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each party hereto shall have the right to make claims

NNC-NNL11755879 / 141

and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns.

         SECTION 10.20.      Exclusion of Liability of French Liquidator and Acknowledgments. Notwithstanding that this Agreement shall have been signed by the French Liquidator both in his capacity as liquidator of NNSA for and on behalf of NNSA and in his personal capacity, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the French Liquidator or his firms, partners, employees, agents, advisers or representatives whether such Liability would arise under the FCC or otherwise.

         SECTION 10.21.      Joint Administrators and French Liquidator as agents of EMEA Sellers.

         (a)      For all purposes of this Agreement, the Joint Administrators and the French Liquidator act without personal liability as agents of the EMEA Sellers.

         (b)      The Joint Administrators shall expressly have the power to, in the name and on behalf of each EMEA Seller as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

         (c)      Subject to entry of the French Court Order, the French Liquidator shall expressly have the power to, in the name and on behalf of NNSA as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

         SECTION 10.22.      Limitations.

         (a)      Under this Agreement, except for any documents, the forms of which have been agreed by the Joint Administrators and the French Liquidator as at the date of this Agreement, none of the EMEA Sellers, the Joint Administrators or the French Liquidator shall be required to enter into or execute any document unless such document contains exclusions of liability in favour of the Joint Administrators or the French Liquidator (as applicable), to an extent consistent with, or more favourable than, the exclusions of liability provided in favour of the Joint Administrators or the French Liquidator (as applicable) in this Agreement. For the avoidance of doubt, neither the Joint Administrators nor the French Liquidator shall be required to enter into or execute any document in their personal capacities or as administrators of the EMEA Sellers or *mandataire liquidateur* of NNSA respectively, to the extent that such document would cause the Joint Administrators and/or the French Liquidator to incur any personal liability.

         (b)      The obligations or undertakings of the EMEA Sellers and the French Liquidator under this Agreement are subject to their duties to act at all relevant times in the best interests of the creditors of the EMEA Sellers (in respect of the Joint Administrators) and, in relation to the French Liquidator, NNSA. Accordingly, nothing in this Agreement shall operate

NNC-NNL11755879 / 142

to derogate from, restrict, or prevent the Joint Administrators and French Liquidator from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as, in the case of the Joint Administrators, administrators of the EMEA Sellers or, in the case of the French Liquidator, as *mandataire liquidateur* of NNSA, under the Insolvency Act, FCC or any other applicable legislation or statutory instrument as they see fit, (acting in good faith) and/or preclude the Joint Administrators from terminating the administration of the EMEA Sellers pursuant to the Administration Orders (and/or the French Liquidator from terminating his appointment as *mandataire liquidateur* of NNSA) should the Joint Administrators (and/or the French Liquidator, in relation to NNSA) be required to do so to discharge their statutory duties or legal obligations, provided that, notwithstanding the foregoing, any failure to comply with the terms of this Agreement by any EMEA Seller will be a breach of this Agreement by the relevant EMEA Seller, and the Purchaser shall not be restricted from claiming against the relevant EMEA Seller and receiving any remedy, or exercising any right, other than a claim against the Joint Administrators or the French Liquidator in their respective personal capacities, to which it is otherwise entitled pursuant to the terms of this Agreement, for any breach of this Agreement notwithstanding that the Joint Administrators or the French Liquidator (as applicable) are complying with such statutory duties or legal obligations in accordance with this Section 10.22.

SECTION 10.23.     Limitations on Post-Closing Obligations.  Notwithstanding any other provisions in this Agreement, all outstanding obligations of each EMEA Seller under this Agreement (except under Section 5.11 (Confidentiality), and Article 6 (Tax Matters)) shall cease on and from the date six (6) months following the Closing Date without prejudice to (i) any accrued obligations of the EMEA Sellers, (ii) any accrued rights of the Purchaser, or (iii) any accrued Liabilities in relation to any obligations to have been carried out by the EMEA Sellers, in each of (i), (ii) or (iii), prior to or on such date.

SECTION 10.24.     Parent Guarantee.

(a)     The Parent, as primary obligor and not merely as surety, hereby absolutely, unconditionally and irrevocably guarantees the full and timely payment and performance of all Liabilities (including indemnities, fees and Liabilities in respect of equitable relief) of the Purchaser incurred under, arising out of or in connection with this Agreement and the other Transaction Documents, as from time to time amended, modified or supplemented in accordance with their terms (such Liabilities, the "**Guaranteed Obligations**").  This is a guarantee of payment and performance, and not of collectibility.  The obligations of the Parent under this Section 10.24 are absolute and unconditional in respect of satisfying the Guaranteed Obligations and shall be enforceable against the Parent to the same extent as if the Parent were the primary obligor (and not merely a surety) under this Agreement and the other Transaction Documents.

(b)     The Parent hereby waives as to itself promptness, diligence, notice of the acceptance of this guarantee and of the Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Guaranteed Obligations incurred, all defenses which may be available by virtue of any valuation, stay, moratorium Law or other similar Law now or hereafter in effect, and all suretyship defenses (it being understood that nothing in this sentence shall be deemed a waiver by the Parent of the

NNC-NNL11755879 / 143

obligation of any other Party to deliver notice pursuant to the terms of this Agreement). The Parent agrees that the Guaranteed Obligations shall not be discharged except by complete performance or payment of the amounts payable under this Agreement, as applicable, and that the obligations of the Parent hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure or delay on the part of the Sellers to assert any claim or demand or to enforce any right or remedy against the Purchaser; (ii) any change in the time, place or manner of payment of any of the Guaranteed Obligations or any waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of this Agreement made in accordance with the terms thereof or any agreement evidencing, securing or otherwise executed in connection with any of the Guaranteed Obligations; (iii) any change in the corporate existence, structure or ownership of the Parent, Purchaser or any other Person interested in the transactions contemplated by this Agreement; or (iv) the adequacy of any other means the Sellers may have of obtaining payment related to any of the Guaranteed Obligations. If at any time payment under the Agreement is rescinded or must be otherwise restored or returned by the Sellers upon the insolvency, bankruptcy or reorganization of the Purchaser or the Parent or otherwise, the Parent's obligations hereunder with respect to such payment shall be reinstated upon such restoration or return being made by the Sellers, all as though such payment had not been made. The Parent acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by this Agreement.

(c)      The Parent hereby expressly acknowledges and agrees to be bound by the following provisions of this Agreement: Article III (Representations and Warranties of the Parent and the Purchaser), Section 10.2 (Remedies),Section 10.4 (Consent to Amendments; Waivers), the first paragraph of Section 10.5 (Successors and Assigns), Section 10.6(a) through (e) (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial), Section 10.7 (Notices), Section 10.9 (Counterparts), Section 10.10 (No Presumption), Section 10.11 (Severability), Section 10.12 (No Set-off, Deduction or Counterclaim), Section 10.13 (Headings) and Section 10.14 (Entire Agreement), Section 10.18 (Obligations of Sellers and EMEA Sellers), Section 10.19 (Exclusion of Liability of Joint Administrators and Acknowledgement), Section 10.20 (Exclusion of Liability of French Liquidator and Acknowledgments), Section 10.21 (Joint Administrators and French Liquidator as Agents of EMEA Sellers), Section 10.22 (Limitations), Section 10.23 (Limitations on Post-Closing Obligations), and this Section 10.24 (Parent Guarantee).

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

NNC-NNL11755879 / 144

IN WITNESS WHEREOF, the parties have duly executed this Asset Sale Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By: _____
Name: George A. Riedel
Title: Chief Strategy Officer
and President, Business Units

By: _____
Name: John M. Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

NORTEL NETWORKS LIMITED

By: _____
Name: George A. Riedel
Title: Chief Strategy Officer
and President, Business Units

By: _____
Name: John M. Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

NORTEL NETWORKS INC.

By: _____
Name: John Ray
Title: Principal Officer

NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.

By: _____
Name: John Ray
Title: Principal Officer

*Asset Sale Agreement Signature Page*

NNC-NNL11755879 / 145

NORTEL ALTSYSTEMS, INC.

By: _____
   Name: John Ray
   Title: Principal Officer

CORETEK, INC.

By: _____
   Name: John Ray
   Title: Principal Officer

QTERA CORPORATION

By: _____
   Name: John Ray
   Title: Principal Officer

XROS, INC.

By: _____
   Name: John Ray
   Title: Principal Officer

*Asset Sale Agreement Signature Page*

NNC-NNL11755879 / 146

**SIGNED** for and on behalf of **Nortel Net-**
**works UK Limited** (in administration) by
Christopher Hill as Joint Administrator (act-
ing as agent and without personal liability)
in the presence of:

)
)
)
)

.................................................................
Christopher Hill

Witness signature

...........................................................................
Name: Wilma Graham
Address: Ernst & Young LLP, 1 More Lon-
don Place, SE1 2AF

)
)
)

*Asset Sale Agreement Signature Page*

NNC-NNL11755879 / 147

**SIGNED** for and on behalf of Nortel Net-   )
works **(Ireland) Limited** (in administra-   )
tion) by David Hughes as Joint Administra-   )
tor (acting as agent and without personal   )
liability) in the presence of:   )

.............................................................
David Hughes

Witness signature

.......................................................
Name:               )
Address:         )
                   )

*Asset Sale Agreement Signature Page*

NNC-NNL11755879 / 148

**SIGNED** for and on behalf of **Nortel Net-**   )
**works S.A.** (in administration and *liquida-*   )
*tion judiciaire*) by Christopher Hill as Joint   )
Administrator (acting as agent and without   )
personal liability) in the presence of:

.........................................................
Christopher Hill

Witness signature

.............. *W. Graham* ...........................  )
Name: Wilma Graham                   )
Address: Ernst & Young LLP, 1 More Lon-   )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Networks France S.A.S.** (in administration) by Kerry Trigg acting as authorised representative of Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

Kerry Trigg

Witness signature

)
)
)

Name: LEISA HARKIN
Address: 65 SALOP ROAD
           LONDON E17·7HS
           ENGLAND

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel**
**GmbH** (in administration) by Christopher
Hill as Joint Administrator (acting as agent
and without personal liability) in the pres-
ence of:

)
)
)
)
)

.............................................................
Christopher Hill

Witness signature

.................................*W. Graham*.....................

)
)
)

Name: Wilma Graham
Address: Ernst & Young LLP, 1 More Lon-
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

**SIGNED** by Alan Bloom

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint Ad-
ministrators in the presence of:

)
)
)

......................................
Alan Bloom

Witness signature
......................................
Name: KATHRYN BAILLIE
Address:

)
)
)

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 7HS

*Asset Sale Agreement Signature Page*

NNC-NNL11755879 / 152

Signed by **MAÎTRE COSME ROGEAU**,
acting in the capacity of *Mandataire*
*Liquidateur* of **NORTEL NETWORKS S.A.**
**(IN ADMINISTRATION AND**
**LIQUIDATION JUDICIARE)**, without
personal liability and solely for the purpose of
obtaining the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the French Liquidator:

By
    Name: Maître Cosme Rogeau
    Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

Name:    Thibault LEBRAY
Address:  26 rue Hoche,
          78000 Versailles

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS S.A. (IN**
**ADMINISTRATION AND**
**LIQUIDATION JUDICIARE)**
by **MAÎTRE COSME ROGEAU** as
*Mandataire Liquidateur* (acting as agent
and without personal liability) in the
presence of:
Witness signature

)
)
)
)
)
)
)
)

........................................
**MAÎTRE COSME ROGEAU**

Name:    Thibault LEBRAY
Address:  26 rue Hoche,
          78000 Versailles

*Asset Sale Agreement Signature Page*

NNC-NNL11755879 / 153

RANGER INC.

By:

Name: Donald Harrison
Title: Chief Executive Officer,
       President and Secretary

Solely for the purpose of Section 10.24
and the other Sections referenced in
Section 10.24(c):

GOOGLE INC.

By:

Name: Kent Walker
Title: Senior Vice President,
       General Counsel and
       Assistant Secretary

*Asset Sale Agreement Signature Page*