Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, and (c) except as otherwise specifically set forth herein, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

Notwithstanding any of the foregoing, or anything else contained herein, the Sellers may not, without the prior written consent of the Creditors' Committee, the Bondholder Group, the Administrators and the Monitor, which consent may not be unreasonably withheld, (i) extend the Bid Deadline for more than five (5) Business Days beyond June 13, 2011, (ii) adjourn the Auction for more than three (3) Business Days, or (iii) subject to the availability of the Bankruptcy Court and the Canadian Court adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded; provided that the Sellers shall give the Purchaser written notice within one (1) Business Day after any such action (it being understood that such notice shall include a description of the action taken).

Each of the foregoing actions shall be made by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and their respective advisors. For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability and the French Liquidator is acting only as agent for and on behalf of NNSA without personal liability. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations hereunder or under the Purchase Agreement, including Purchaser's rights with respect to the timing of the Auction and the Sale Hearing, or the Purchaser's right to credit the Break-Up Fee and Expense Reimbursement as part of any subsequent bids.

NNC-NNL11755879 / 210

A/C

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### SIXTY-THIRD REPORT OF THE MONITOR
### DATED APRIL 14, 2011

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

TR45578





# News Release

www.nortel.com

**FOR IMMEDIATE RELEASE:**                                      **April 4, 2011**

For more information:

Media Relations
MediaRelations@nortel.com

## Nortel to Sell Patent Portfolio

- **Enters into Stalking Horse Sale Agreement with Google Inc. for US$900 million in cash**
- **Planned sale includes approximately 6,000 patents and patent applications covering a broad range of wired, wireless and digital communication technologies**
- **Subject to Canadian and U.S. court approvals, auction expected in June 2011**

TORONTO - Nortel* Networks Corporation [OTC: NRTLQ] announced today that it, its principal operating subsidiary Nortel Networks Limited (NNL) and certain of its other subsidiaries, including Nortel Networks Inc. and Nortel Networks UK Limited (in administration), have entered into a stalking horse asset sale agreement with Google Inc. for the sale of all of Nortel's remaining patents and patent applications for a cash purchase price of US$900 million.

The agreement includes the planned sale of approximately 6,000 patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. The extensive patent portfolio touches nearly every aspect of telecommunications and additional markets as well, including Internet search and social networking.

This agreement follows a confidential, multi-round bidding process involving several interested companies and consortia from around the world.

"This is an unprecedented opportunity to acquire one of the most extensive and compelling patent portfolios to ever come on the market", said George Riedel, Chief Strategy Officer and President of Business Units, Nortel.  "We look forward to what we hope will be a robust auction, following the requisite court approvals, currently expected to be held in June 2011".

**Details of Sale Process**

Nortel will file the stalking horse asset sale agreement with the United States Bankruptcy Court for the District of Delaware along with a motion seeking the establishment of bidding procedures for an auction that allows other qualified bidders to submit higher or otherwise better offers, as required under Section 363 of the U.S. Bankruptcy Code. A similar motion for the approval of the bidding procedures will be filed with the Ontario Superior Court of Justice. Following completion of the bidding process, final approval of the U.S. and Canadian courts will be required.

In addition to the processes and approvals outlined above, consummation of the transaction is subject to the satisfaction of regulatory and other customary conditions.

*****************

As previously announced, Nortel does not expect that the Company's common shareholders or the NNL preferred shareholders will receive any value from the creditor protection proceedings and expects that the proceedings will result in the cancellation of these equity interests.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## About Nortel

For more information, visit Nortel on the Web at www.nortel.com. For the latest Nortel news, visit www.nortel.com/news.

Certain statements in this press release may contain words such as "could", "expects", "may", "should", "will", "anticipates", "believes", "intends", "estimates", "targets", "plans", "envisions", "seeks" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on Nortel's current expectations, estimates, forecasts and projections about the operating environment, economies and markets in which Nortel operates. These statements are subject to important assumptions, risks and uncertainties that are difficult to predict, and the actual outcome may be materially different. Nortel's assumptions, although considered reasonable by Nortel at the date of this press release, may prove to be inaccurate and consequently Nortel's actual results could differ materially from the expectations set out herein.

Actual results or events could differ materially from those contemplated in forward-looking statements as a result of the following: (i) risks and uncertainties relating to the Creditor Protection Proceedings including: (a) risks associated with Nortel's ability to: stabilize the business and maximize the value of Nortel's businesses; obtain required approvals and successfully consummate pending and future divestitures; ability to satisfy transition services agreement obligations in connection with divestiture of operations; successfully conclude ongoing discussions for the sale of Nortel's other assets or businesses; develop, obtain required approvals for, and implement a court approved plan; allocation of the sale proceeds of our businesses among the various Nortel entities participating in these sales may take considerable time to resolve ongoing issues with creditors and other third parties whose interests may differ from Nortel's; generate cash from operations and maintain adequate cash on hand in each of its jurisdictions to fund operations within the jurisdiction during the Creditor Protection Proceedings; continue to have cash management arrangements and obtain any further required approvals from the Canadian Monitor, the U.K. Administrators, the U.S. Principal Officer, the U.S. Creditors' Committee, or other third parties; raise capital to satisfy claims, including Nortel's ability to sell assets to satisfy claims against Nortel; realize full or fair value for any assets or business that are divested; utilize net operating loss carryforwards and certain other tax attributes in the future; avoid the substantive consolidation of NNI's assets and liabilities with those of one or more other U.S. Debtors; operate Nortel's business effectively under the new organizational structure, and in consultation with the Canadian Monitor and the U.S. Creditors' Committee and work effectively with the U.K. Administrators, French Administrator and Israeli Administrators in their respective administration of the EMEA businesses subject to the Creditor Protection Proceedings; continue as a going concern; actively and adequately communicate on and respond to events, media and rumors associated with the Creditor Protection Proceedings that could adversely affect Nortel's relationships with customers, suppliers, partners and employees; retain and incentivize key employees as may be needed; retain, or if necessary, replace major suppliers on acceptable terms and avoid disruptions in Nortel's supply chain regarding our remaining businesses and stranded contracts; obtain court orders or approvals with respect to motions filed from time to time; resolve claims made against Nortel in connection with the Creditor Protection Proceedings for amounts not exceeding Nortel's recorded liabilities subject to compromise; prevent third parties from obtaining court orders or approvals that are contrary to Nortel's interests; and (b) risks and uncertainties associated with: limitations on actions against any Debtor during the Creditor Protection Proceedings; the values, if any, that will be prescribed pursuant to any court approved plan to outstanding Nortel securities and, in particular, that Nortel does not expect that any value will be prescribed to the NNC common shares or the NNL preferred shares in any such plan; the delisting of NNC common shares from the NYSE; and the delisting of NNC common shares and NNL preferred shares from the TSX; and (ii) risks and uncertainties relating to Nortel's business including fluctuations in foreign currency exchange rates; any requirement to make larger contributions to defined benefit plans in the future; a high level of debt, arduous or restrictive terms and conditions related to accessing certain sources of funding; the sufficiency of workforce and cost reduction initiatives; a failure to protect Nortel's intellectual property rights; any adverse legal judgments, fines, penalties or settlements related to any significant pending or future litigation actions; failure to maintain integrity of Nortel's information systems;; and Nortel's potential inability to maintain an effective risk management strategy.

For additional information with respect to certain of these and other factors, see Nortel's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other securities filings with the SEC. Unless otherwise required by applicable securities laws, Nortel disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

For the Companies listed below, The Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners in the UK under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner in the UK under section 390(2)(a) of the Insolvency Act 1986.

The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, AM Hudson and C Hill who act as agents of the Companies only and without personal liability.

The affairs, business and property of Nortel Networks ( Ireland ) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks ( Ireland ) Limited only and without personal liability.

The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV

In addition on 28 May 2009, secondary proceedings were opened in relation to Nortel Networks SA pursuant to which the French Court authorized Nortel Networks SA to continue to operate the business owned and operated by Nortel Networks SA and appointed inter alia the French Office Holders as the administrators and liquidators of NNSA who act as agents of Nortel Networks SA and without personal liability.

\*Nortel, the Nortel logo and the Globemark are trademarks of Nortel Networks.




# Google | Official Blog

Insights from Googlers into our products, technology, and the Google culture

## Patents and innovation

Posted: Monday, April 04, 2011    8 +1 | 83    Tweet | 759    Like | 344

The tech world has recently seen an explosion in patent litigation, often involving low-quality software patents, which threatens to stifle innovation. Some of these lawsuits have been filed by people or companies that have never actually created anything; others are motivated by a desire to block competing products or profit from the success of a rival's new technology. The patent system should reward those who create the most useful innovations for society, not those who stake bogus claims or file dubious lawsuits. It's for these reasons that Google has long argued in favor of real patent reform, which we believe will benefit users and the U.S. economy as a whole.

But as things stand today, one of a company's best defenses against this kind of litigation is (ironically) to have a formidable patent portfolio, as this helps maintain your freedom to develop new products and services. Google is a relatively young company, and although we have a growing number of patents, many of our competitors have larger portfolios given their longer histories.

So after a lot of thought, we've decided to bid for Nortel's patent portfolio in the company's bankruptcy auction. Today, Nortel selected our bid as the "stalking-horse bid," which is the starting point against which others will bid prior to the auction. If successful, we hope this portfolio will not only create a disincentive for others to sue Google, but also help us, our partners and the open source community----which is integrally involved in projects like Android and Chrome----continue to innovate. In the absence of meaningful reform, we believe it's the best long-term solution for Google, our users and our partners.

Posted by Kent Walker, Senior Vice President & General Counsel

**Google**

google.com/+google

News and updates on Google' ..

8+ Follow   +1

+ 5,706,424

Labels

Archive

Feed

8   Google

2M

Follow @google

Like | 16m

Give us feedback in our Product Forums.





# Facts about Google's acquisition of Motorola

## Overview

On August 15, Google announced an agreement to acquire <u>Motorola Mobility</u>, based in Libertyville, Illinois, for $40 per share. Both companies' boards of directors have approved the deal.

## Benefits of the deal

- Google and Motorola Mobility together will accelerate innovation and choice in mobile computing. Consumers will get better phones at lower prices.
- Motorola Mobility's patent portfolio will help protect the Android ecosystem. Android, which is open-source software, is vital to competition in the mobile device space, ensuring hardware manufacturers, mobile phone carriers, applications developers and consumers all have choice.

## Why Motorola Mobility?

- Motorola Mobility's full commitment to the Android operating system means there is a natural fit between our companies.
  - Motorola Mobility was a founding member of the <u>Open Handset Alliance</u> in 2007.
  - Motorola Mobility in 2008 made a big bet on Android as the sole operating system for all its smartphone devices.
- Google is great at software; Motorola Mobility is great at devices. The combination of the two makes sense and will enable faster innovation.
- Motorola Mobility has a long history of innovation in communications technology and the development of intellectual property.
  - Its many industry milestones include the introduction of the world's first portable cell phone nearly 30 years ago, and the StarTAC–the smallest and lightest phone in the world when it was launched.

**J.K. Shin, President, Samsung, Mobile Communications Division**
"We welcome today's news, which demonstrates Google's deep commitment to defending Android, its partners, and the ecosystem."

**Ken Hong, LG spokesman**
"We will continue [to] support the Android operating system, and we have no concerns about the changes in the Android environment." (<u>MarketWatch</u>)

**David Balto, a former FTC antitrust official and senior fellow at the Center for American Progress**
"If anything, antitrust regulators may see the deal as a boost to competition. Android is such a crucial

NNC-NNL11773292 / 1

competitor to the iPhone in particular, that allowing Google to buy Motorola Mobility will likely produce even more innovation in smartphones and other devices." (AP via <u>ABC News</u>)

© Google · <u>Privacy Policy</u>

NNC-NNL11773292 / 2




**EXECUTION**

---

## ASSET SALE AGREEMENT

BY AND AMONG

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

**NORTEL NETWORKS UK LIMITED**

**NORTEL NETWORKS (IRELAND) LIMITED**

**NORTEL NETWORKS S.A.**

AND

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

AND

**ALAN BLOOM, STEPHEN HARRIS, ALAN HUDSON, DAVID HUGHES AND
CHRISTOPHER HILL AS JOINT ADMINISTRATORS**

AND

**MAÎTRE COSME ROGEAU AS FRENCH LIQUIDATOR**

AND

**ROCKSTAR BIDCO, LP**

**DATED AS OF JUNE 30, 2011**

---

HIGHLY CONFIDENTIAL      NNC-NNL06002492 / 1

**TABLE OF CONTENTS**

**Page**

ARTICLE I INTERPRETATION ................................................................. 2

     SECTION 1.1.    Definitions ................................................. 2

     SECTION 1.2.    Interpretation .............................................. 23

ARTICLE II PURCHASE AND SALE OF ASSETS ................................. 24

     SECTION 2.1.    Purchase and Sale ...................................... 24

     SECTION 2.2.    Purchase Price ........................................... 30

     SECTION 2.3.    Closing ...................................................... 32

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............. 33

     SECTION 3.1.    Organization and Corporate Power .............. 33

     SECTION 3.2.    Authorization; Binding Effect; No Breach ......... 34

     SECTION 3.3.    Financing .................................................. 34

     SECTION 3.4.    Adequate Assurance of Future Performance ..... 35

     SECTION 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties ................. 35

     SECTION 3.6.    Brokers ..................................................... 36

     SECTION 3.7.    Independence ............................................ 36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ............. 37

     SECTION 4.1.    Organization and Corporate Power .............. 37

     SECTION 4.2.    Authorization; Binding Effect; No Breach ......... 37

     SECTION 4.3.    Brokers ..................................................... 38

     SECTION 4.4.    Canadian Tax Matters ................................ 39

     SECTION 4.5.    Export Controls ......................................... 39

ARTICLE V COVENANTS AND OTHER AGREEMENTS ....................... 39

     SECTION 5.1.    U.S. Bankruptcy Actions ............................ 39

     SECTION 5.2.    Canadian Bankruptcy Actions ..................... 40

     SECTION 5.3.    [Reserved] ................................................ 40

     SECTION 5.4.    Consultation; Notification ........................... 40

     SECTION 5.5.    Pre-Closing Cooperation ............................ 41

     SECTION 5.6.    Antitrust and Other Regulatory Approvals ......... 43

-i-

## TABLE OF CONTENTS
### (continued)

Page

SECTION 5.7.    Public Announcements ................................................................46

SECTION 5.8.    Further Actions ...........................................................................46

SECTION 5.9.    Conduct of Business ....................................................................47

SECTION 5.10.    Transaction Expenses ..................................................................49

SECTION 5.11.    Confidentiality .............................................................................49

SECTION 5.12.    Certain Payments or Instruments Received from Third Parties..........51

SECTION 5.13.    License to Transferred Patents, Jointly Owned Patents, Specified UK Patents and Licensed Residual Patents; Termination of Intercompany Arrangements......................................51

SECTION 5.14.    Use of Trademarks.......................................................................53

SECTION 5.15.    Certain Assets .............................................................................53

SECTION 5.16.    Access to Systems.......................................................................53

SECTION 5.17.    Post-Closing Suits.......................................................................54

SECTION 5.18.    Production of Documents ............................................................54

SECTION 5.19.    Option to Purchase Undisclosed Patent Interests.........................54

SECTION 5.20.    Certain Obligations .....................................................................56

SECTION 5.21.    Acknowledgement of Prior Obligations .......................................56

SECTION 5.22.    Disposition of Jointly Owned Patents...........................................56

SECTION 5.23.    Purchase of Specified UK Patents ...............................................57

SECTION 5.24.    Maintenance of Books and Records .............................................57

SECTION 5.25.    License Power of Attorney ...........................................................58

SECTION 5.26.    Exclusivity ..................................................................................59

SECTION 5.27.    Optioned Licenses.......................................................................59

SECTION 5.28.    Transferring Employees ..............................................................61

ARTICLE VI TAX MATTERS...........................................................................63

SECTION 6.1.    Transfer Taxes ...........................................................................63

SECTION 6.2.    Withholding Taxes.......................................................................64

SECTION 6.3.    Tax Characterization of Payments Under This Agreement ................64

SECTION 6.4.    Apportionment of Taxes ..............................................................65

SECTION 6.5.    Records ......................................................................................65

-ii-

**TABLE OF CONTENTS**
(continued)

Page

SECTION 6.6.    Tax Disclosure ............................................................................67

SECTION 6.7.    Tax Returns ................................................................................67

SECTION 6.8.    Canadian Tax Election ...............................................................69

SECTION 6.9.    VAT ...........................................................................................69

ARTICLE VII CONDITIONS TO THE CLOSING ...................................................72

SECTION 7.1.    Conditions to Each Party's Obligation ....................................72

SECTION 7.2.    Conditions to Sellers' Obligation ............................................72

SECTION 7.3.    Conditions to Purchaser's Obligation ......................................73

ARTICLE VIII TERMINATION ..................................................................................73

SECTION 8.1.    Termination ................................................................................73

SECTION 8.2.    Effects of Termination ...............................................................75

ARTICLE IX SURVIVAL ...........................................................................................76

SECTION 9.1.    Survival .....................................................................................76

ARTICLE X MISCELLANEOUS ................................................................................76

SECTION 10.1.    Indemnity Relating to Certain License Non-Assignment and
                  Non-Renewal Protections .........................................................76

SECTION 10.2.    Remedies....................................................................................77

SECTION 10.3.    No Third Party Beneficiaries .....................................................77

SECTION 10.4.    Consent to Amendments; Waivers.............................................77

SECTION 10.5.    Successors and Assigns..............................................................77

SECTION 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury
                  Trial ...........................................................................................78

SECTION 10.7.    Notices ......................................................................................80

SECTION 10.8.    Exhibits; Sellers Disclosure Schedule ......................................84

SECTION 10.9.    Counterparts...............................................................................84

SECTION 10.10.   No Presumption .........................................................................85

SECTION 10.11.   Severability ...............................................................................85

SECTION 10.12.   No Set-off, Deduction or Counterclaim......................................85

SECTION 10.13.   Headings ....................................................................................85

HIGHLY CONFIDENTIAL        NNC-NNL06002492 / 4

**TABLE OF CONTENTS**
(continued)

Page

SECTION 10.14.  Entire Agreement ..................................................................85

SECTION 10.15.  Availability of Equitable Relief; Limitations on Damages; Sole
and Exclusive Remedy..................................................................86

SECTION 10.16.  Bulk Sales Laws...................................................................87

SECTION 10.17.  NA Sellers as Representatives of Other Sellers...................87

SECTION 10.18.  Obligations of Sellers and EMEA Sellers...........................87

SECTION 10.19.  Exclusion of Liability of Joint Administrators and
Acknowledgement ..........................................................87

SECTION 10.20.  Exclusion of Liability of French Liquidator and
Acknowledgments............................................................88

SECTION 10.21.  Joint Administrators and French Liquidator as agents of EMEA
Sellers..............................................................................88

SECTION 10.22.  Limitations .........................................................................89

SECTION 10.23.  Limitations on Post-Closing Obligations............................89

-iv-

**HIGHLY CONFIDENTIAL**    NNC-NNL06002492 / 5

## EXHIBITS

Exhibit A – EMEA Sellers

Exhibit B – Other Sellers

Exhibit C – [Intentionally Omitted]

Exhibit D – Knowledge of the Purchaser

Exhibit E – Mandatory Antitrust Approvals — Relevant Antitrust Jurisdictions / Authorities

Exhibit F – Form of U.S. Sale Order

Exhibit G – Form of Canadian Approval and Vesting Order

Exhibit H – Employee Transfer Side Agreement

Exhibit I – Form of Short-Form Patent Assignment

Exhibit J – Form of Assumption Agreement

Exhibit K – Form of Patent Power Of Attorney

Exhibit L – Form of Closing Date License Agreement

Exhibit M – Disclosed Intercompany Licenses

## ANNEX

Annex I – Statements

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of June 30, 2011, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**," and, together with NNC and NNL, the "**NA Sellers**"); (iv) the entities listed in <u>Exhibit A</u> hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in <u>Exhibit B</u> hereto (the "**Other Sellers**" and, together with the NA Sellers and the EMEA Sellers, the "**Sellers**"); (vi) the French Liquidator; (vii) the Joint Administrators; and (viii) Rockstar Bidco, LP, a Delaware limited partnership (the "**Purchaser**").

W I T N E S S E T H:

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC and NNL (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (as in force on the Petition Date, the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 25, 2011;

WHEREAS, NNI and the Other Sellers listed in <u>Exhibit B</u> hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the EMEA Sellers on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of the EMEA

Sellers (other than NN Ireland, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) under the Insolvency Act by means of the Administration Orders (as defined below);

WHEREAS, on May 28, 2009, secondary proceedings were opened by the French Court (as defined below) in relation to NNSA pursuant to Article 27 of the EC Regulation (the "**Secondary Proceedings**") pursuant to which the French Court authorized NNSA to continue to operate the business owned and operated by NNSA and appointed *inter alia* the French Office Holders as the administrators and liquidators of NNSA under Articles L.641-1 et seq. of the FCC (the "**French Case**");

WHEREAS, on May 2, 2011, the U.S. Bankruptcy Court entered the U.S. Bidding Procedures Order and the Canadian Court entered the Canadian Sales Process Order (each as defined below);

WHEREAS, the Sellers have agreed to transfer to the Purchaser, and the Purchaser has agreed to purchase and assume, including, to the extent applicable, pursuant to sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, in accordance with the U.S. Bidding Procedures Order (as defined below), Purchaser and Apple Inc. have together delivered to the Sellers a good faith deposit in the amount of Fifty-Four Million Dollars ($54,000,000) (the "**Good Faith Deposit**"); and

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser of the Assets (as defined below), and the assumption by the Purchaser of the Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their affiliates.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

SECTION 1.1. <u>Definitions</u>. The following capitalized terms shall have the meanings set forth below:

"**Accounting Arbitrator**" means the auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Primary Parties agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Primary Parties to move.

-2-

"**Action**" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding, including Intellectual Property litigation (including infringement, indemnification, and declaratory judgment actions).

"**Administration Expense**" means any liability of an EMEA Seller which ranks as an administration expense in accordance with paragraph 99 of Schedule B1 to the Insolvency Act or Rule 2.67 of the Insolvency Rules 1986.

"**Administration Orders**" means the orders of the English Court on the Petition Date appointing the Joint Administrators as joint administrators of the EMEA Sellers.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreed Expenses**" means those costs, fees and expenses set forth in Section 1.1(a) of the Sellers Disclosure Schedule.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, of any material portion of the Assets, in a transaction or series of transactions with one or more Third Parties; provided, however, that an "Alternative Transaction" shall not include: (i) the mere conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code, in and of itself, without any disposition of any material portion of the Assets other than to the Chapter 7 trustee in such case by operation of Law; (ii) the mere appointment of a trustee, receiver, receiver and manager or liquidator in respect of any Canadian Debtor, in and of itself, without any disposition of any material portion of the Assets (other than to such trustee, receiver, receiver and manager or liquidator by operation of Law) or the mere dismissal of any CCAA Cases or the mere conversion of any of the CCAA Cases to a bankruptcy case under the Bankruptcy and Insolvency Act or applicable Canadian Bankruptcy Laws, in and of themselves; or (iii) the mere appointment (whether in connection with Secondary Proceedings or otherwise) of a trustee, receiver, receiver and manager or liquidator or any analogous officer in respect of any EMEA Seller, in and of itself, without any disposition of any material portion of the Assets (other than to such trustee, receiver, receiver and manager, liquidator or analogous officer by operation of Law) or the mere termination of the EMEA Cases (or any of them) or discharge of the Administrators (or any of them), in and of themselves, or the mere conversion of any of the EMEA Cases to liquidation or any analogous proceeding under the Insolvency Act, EC Regulation or applicable Law relating to the EMEA Sellers, in and of themselves, in the case of each of the foregoing clauses (i), (ii) and (iii) that is not funded or sponsored in whole or in part by one or more Third Parties and does not otherwise involve any other contractual arrangement with one or more Third Parties having the effect of a disposition of any material portion of the Assets.

HIGHLY CONFIDENTIAL        NNC-NNL06002492 / 9

"**Antitrust Laws**" means the Competition Act (Canada), as amended, the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and European Free Trade Association member states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Asset Retention Transaction**" means the retention of any material portion of the Assets by the Sellers, their successor entities emerging from the Bankruptcy Proceedings or the Affiliates of the foregoing under a standalone plan of reorganization, plan of liquidation or plan of arrangement; provided, however, that an "Asset Retention Transaction" shall not include: (i) the mere conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code, in and of itself; (ii) the mere appointment of a trustee, receiver, receiver and manager or liquidator in respect of any Canadian Debtor, in and of itself, or the mere dismissal of any CCAA Cases or the mere conversion of any of the CCAA Cases to a bankruptcy case under the Bankruptcy and Insolvency Act or applicable Canadian Bankruptcy Laws, in and of themselves; or (iii) the mere appointment (whether in connection with Secondary Proceedings or otherwise) of a trustee, receiver, receiver and manager or liquidator or any analogous officer in respect of any EMEA Seller, in and of itself, or the mere termination of the EMEA Cases (or any of them) or discharge of the Administrators (or any of them), in and of themselves, or the mere conversion of any of the EMEA Cases to liquidation or any analogous proceeding under the Insolvency Act, EC Regulation or applicable Law relating to the EMEA Sellers, in and of themselves; provided further, however, that an "Asset Retention Transaction" shall include: (a) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the U.S. Bankruptcy Code that occurs prior to the entry of the U.S. Sale Order and in which the trustee in such Chapter 7 case has not agreed to be bound by this Agreement; (b) the appointment of a trustee, receiver, receiver and manager or liquidator in respect of any Canadian Debtor that occurs prior to the granting of the Canadian Approval and Vesting Order and in which such trustee, receiver, receiver and manager or liquidator in such bankruptcy case has not agreed to be bound by this Agreement; and (c) the appointment (whether in connection with Secondary Proceedings or otherwise) of a trustee, receiver, receiver and manager or liquidator or any analogous officer in respect of any EMEA Seller that occurs prior to the entry of the U.S. Sale Order and in which such trustee, receiver, receiver and manager or liquidator or any analogous officer has not agreed to be bound by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means (i) the Transferred Licenses and (ii) other Contracts identified on Section 1.1(b) of the Sellers Disclosure Schedule.

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Assumption Agreement**" means a duly executed assumption of intellectual property license agreement in the form attached as Exhibit J hereto.

-4-

"**Auction**" has the meaning attributed to such term in the U.S. Bidding Procedures Order.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the French Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the EC Regulation, the Insolvency Act, the FCC and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases, the French Case and, in each case, any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers that are held from time to time.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Stockholm, Sweden (iii) Toronto, Ontario, Canada, and (iv) London, England, United Kingdom.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2(a).

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2(a).

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means the order entered on May 2, 2011 approving the items described in the Canadian Sales Process Order Motion.

"**Canadian Sales Process Order Motion**" means the motion filed by the Canadian Debtors on May 2, 2011 with the Canadian Court seeking an order for approval of, among other things, a process of the sale of the Canadian Debtors rights, title or interest in and to the "Assets" (as defined therein).

"**Canadian Sellers**" means, collectively, NNC and NNL.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

HIGHLY CONFIDENTIAL    

"**CDMA Vesting Order**" means the Approval and Vesting Order of the Ontario Superior Court of Justice dated July 28, 2009.

"**Change of Control**" means (A) the direct or indirect acquisition (including by merger, consolidation or transfer or issuance of equity securities or otherwise) in a transaction or series of related transactions of 50% or more of the equity or voting interests in a Person (B) otherwise obtaining the right to elect a majority of the board of directors (or similar governing body) of such Person or (C) the acquisition of all or substantially all of the assets of such Person; provided that the actions of the type specified in clauses (i), (ii) and (iii) of the first proviso in the definition of Asset Retention Transaction (disregarding the references to the specific Sellers) shall not constitute a Change of Control.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim in the CCAA Cases**" means any right of any Person, including the right to an equitable remedy, against the Canadian Debtors and the other applicants in the CCAA Cases, or any of them or their assets, in connection with any indebtedness, liability or obligation of any kind of the Canadian Debtors and the other applicants in the CCAA Cases, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, recourse, non-recourse, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, and any indebtedness, liability or obligation of any kind, including the right to an equitable remedy, arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Petition Date.

"**Claim in the Chapter 11 Cases**" has the meaning ascribed to the term "claim" in section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Date License Agreement**" has the meaning set forth in Section 5.13(a).

"**Closing Taxable Year**" means the taxable year in which the acquisition of the Assets is consummated and the Optioned Licenses are granted.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent or that applies with respect to terms and conditions of employment of the Employees of such Seller or its Affiliates.

"**Commitment Letters**" has the meaning set forth in Section 3.3(a).

-6-

"**Commitments**" has the meaning set forth in Section 3.3(a).

"**Commercial Licenses**" means the Pre-Divestiture Commercial Licenses, the Post-Divestiture Commercial Licenses and the End-User Licenses.

"**Common Interest Agreement**" means an agreement, in a form to be mutually agreed reasonably and in good faith following the date hereof and prior to the Closing Date, by and among the Parties, to be dated as of the Closing Date, providing for the common interest privilege to attach, to the maximum extent permitted by applicable Law, to any privileged Patent Related Documents or other privileged documents to be acquired by the Purchaser pursuant to this Agreement or any other Transaction Document (it being understood that such Common Interest Agreement shall not diminish, terminate or otherwise affect any attorney-client privilege, protection pursuant to the work product doctrine or other privilege or protection of any Party with respect to any such documents).

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption, revocation or waiver by any Government Entity or other Third Party, but shall not include any consent that is rendered unnecessary by operation of Bankruptcy Laws.

"**Continuing Unlisted License**" means, with respect to any Transferred Patent, Specified UK Patent or Jointly Owned Patent, any license under such Transferred Patent, Specified UK Patent or Jointly Owned Patent granted prior to the date hereof which license is not specifically listed (including by use of defined term) on Schedule 2.1.1(a) of the Sellers Disclosure Schedule and which license, pursuant to and after giving effect to the License Rejection Procedures (as defined and set forth in the U.S. Bidding Procedures and Sale Motion) and the Canadian License Rejection Procedures (as defined in and set forth in the Canadian Sales Process Order Motion), continues to burden such Transferred Patent, Specified UK Patent or Jointly Owned Patent following the consummation of the transactions contemplated by this Agreement.

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Control**," including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court's Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol, dated January 15, 2009, and the Canadian Court in an order, dated January 14, 2009, as the same has been and may be further amended from time to time.

"**Cross-License Agreements**" has the meaning set forth in Annex I.

HIGHLY CONFIDENTIAL    NNC-NNL06002492 / 13

"**Cure Cost**" means (i) any amounts required by the U.S. Bankruptcy Code, including section 365(b)(1) thereof, and any applicable order of the U.S. Bankruptcy Court to cure any defaults by the Sellers or any of their Affiliates under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract and (ii) with respect to any Non-365 Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts necessary to cure any defaults and to pay any actual pecuniary losses under such Contract in respect of the period prior to the Petition Date.

"**Damages**" means all claims, demands, suits, Actions, causes of actions, losses (including, for the avoidance of doubt, loss of profits, internal costs, loss of revenue and lost sales), costs, damages, liabilities and out-of-pocket expenses incurred or paid, including reasonable attorneys' fees (including such fees which are incurred in connection with a dispute of the provisions of this Agreement), fines, penalties, costs of investigation or settlement, other professionals' and experts' fees, and court or arbitration costs (but specifically excluding any special, punitive, exemplary or speculative damages except to the extent such damages specifically excluded herein are awarded to a Third Party).

"**Data Room**" means the Merrill electronic data site entitled "Iceberg."

"**Deferred Jurisdiction**" has the meaning set forth in Section 5.6(f).

"**Designated Courts**" has the meaning set forth in Section 10.6(b)(i).

"**Disclosed Intercompany Licenses**" means those Contracts listed in Exhibit M hereto.

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers hereunder, the identity of which to be notified in writing by the Primary Seller Parties to the Purchaser by not later than five (5) Business Days prior to the Closing.

"**Divested Business**" means the businesses or product lines of the Sellers set forth on Section 1.1(l) of the Sellers Disclosure Schedule sold after the Petition Date in connection with the Bankruptcy Proceedings.

"**Divestiture Date**" means with respect to each of the Divested Business set forth on Section 1.1(l) of the Sellers Disclosure Schedule, the date that such divestiture is or was completed.

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**EC Regulation**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Sellers**" has the meaning set forth in the preamble to this Agreement.

-8-

"**Employee**" means an employee of the Sellers whose employment relates to the development, maintenance or management of the Assets.

"**End-User License**" means any Contract entered into by, on behalf of or under authority of Sellers or their Affiliates prior to the date hereof and, to the extent that would be permitted after the Closing pursuant to the Closing Date License Agreement, after the date hereof, including any click-through or shrink wrap license, that (i) accompanies the sale, servicing (including support, maintenance and installation) or licensing of any Nortel Product to an end user or customer in the ordinary course of business, and (ii) includes a non-exclusive grant of a license to the customer or end user under any of the Transferred Patents, the Jointly Owned Patents, or the Specified UK patents, where such license is limited to the right to use such Nortel Product.

"**English Court**" means the High Court of Justice of England and Wales.

"**Ericsson**" means Ericsson AB or any of its Affiliates.

"**Ericsson Licenses**" means (i) that certain Intellectual Property License Agreement by and between NNL, NNI, the EMEA Sellers, the Joint Administrators and Ericsson AB, classified as document number 2.5.3.175.4 in the Data Room and (ii) that certain Transition Services Agreement between NNL, NNI, NNUK, NN Ireland, the Joint Administrators and certain other Affiliates of the Sellers and Telefonaktiebolaget L M Ericsson (publ).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate Liability**" means any obligation, liability, or expense of any Seller which arises under or relates to any employee benefit plan or arrangement of Seller or its affiliates that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of any trade or business, whether or not incorporated, that together with the Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA (an "ERISA Affiliate")or the Purchaser or any of its limited partners being deemed a successor to any ERISA Affiliate of any Seller.

"**Excess VAT**" has the meaning set forth in Section 6.9(e)(ii).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Licenses**" has the meaning set forth in Section 2.1.2(i).

"**Excluded Patents**" means only the specifically identified patents, patent applications and provisional patent applications listed in Section 1.1(c) of the Sellers Disclosure Schedule.

HIGHLY CONFIDENTIAL      NNC-NNL06002492 / 15

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Exercise Price**" has the meaning set forth in Section 5.19(b).

"**FCC**" means the French Commercial Code.

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (a) as to which no appeal, notice of appeal, motion for leave to appeal, motion to amend, vacate or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, amendment, vacatur, additional findings or alteration or amendment of judgment or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order, with respect to the U.S. Sale Order and Canadian Approval and Vesting Order in a manner consistent with the provisions of Sections 5.1(b) and 5.2(a), and, with respect to any other orders, in all material respects, without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; _provided_, _however_, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless, in the case of a Rule 9024 motion, such motion shall be filed within fourteen (14) days of the entry of the order at issue or, in the case of a Rule 60 motion, such motion shall be filed within thirty (30) days of the entering of the order at issue.

"**French Case**" has the meaning set forth in the recitals to this Agreement.

"**French Court**" means the Commercial Court of Versailles or a member of the Commercial Court of Versailles, and in particular the "_juge commissaire_" appointed by such Court in a supervisory capacity in the context of the Secondary Proceedings, or of any superior French Court.

"**French Court Order**" means that certain order of the French Court dated April 28, 2011, entered in accordance with the FCC in connection with the transactions contemplated hereby and in the other Transaction Documents and authorizing the French Liquidator to execute this Agreement and any and all other Transaction Documents in furtherance hereof.

"**French Liquidator**" has the meaning set forth in the preamble to this Agreement.

"**French Office Holders**" means the _mandataire liquidateur_ and the _administrateur judiciaire_ appointed by the French Court on the opening of the Secondary Proceedings.

"**Good Faith Deposit**" has the meaning set forth in the preamble to this Agreement.

-10-

"**Government Entity**" means any U.S., Canadian, UK, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST/HST**" means goods and services tax or harmonized sales tax payable under Part IX of the Excise Tax Act (Canada).

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**ICA Approval**" means: (a) if the transactions contemplated by this Agreement are subject to review under Part IV of the Investment Canada Act, the Purchaser shall have received notification from the responsible Minister under the Investment Canada Act that he is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion, and (b) the Purchaser shall not have received notice from the responsible Minister under either subsection 25.2(1) of the Investment Canada Act or subsection 25.3(2) of the Investment Canada Act within the period prescribed by the Investment Canada Act or, if the Purchaser has received such a notice, the Purchaser shall have subsequently received one of the following notices, as applicable: (i) under paragraph 25.2(4)(a) of the Investment Canada Act indicating that no order for the review of the transactions contemplated by this Agreement will be made under subsection 25.3(1) of the Investment Canada Act, (ii) under paragraph 25.3(6)(b) of the Investment Canada Act indicating that no further action will be taken in respect of the transactions contemplated by this Agreement, or (iii) under subsection 25.4(1) of the Investment Canada Act that the Governor in Council authorizes the completion of the transactions contemplated by this Agreement, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion.

"**Incremental Taxes**" means the excess of (i) the cash Taxes actually paid or payable by a Canadian Seller, a U.S. Seller or an EMEA Seller, as the case may be, for the Closing Taxable Year and subsequent taxable years as a result of the receipt of the Optioned Licenses Fees, over (ii) the cash Taxes that would have been payable by a Canadian Seller, a U.S. Seller, or an EMEA Seller, as the case may be, for the Closing Taxable Year and subsequent taxable years if the Optioned Licenses had not been granted and the amount of the Optioned License Fees had instead been paid as additional Purchase Price for the Assets, in each case taking into account the character of the income recognized by the Canadian Sellers, the U.S. Sellers or the EMEA Sellers, as the case may be, in the Closing Taxable Year and subsequent taxable years, the Tax rates actually applicable to the Canadian Sellers. the U.S. Sellers or the EMEA Sellers, as the case may be, in the Closing Taxable Year or such subsequent taxable years, the deductibility or creditability in one jurisdiction of Taxes imposed by another jurisdiction and any limitations thereon, and determined in each case as if all losses, undeducted expenses, tax credits or any other tax attributes that are available under Applicable Law as determined by the Canadian Sellers, the U.S. Sellers or the EMEA Sellers, as the case may be, in their reasonable discretion, could have been used to reduce the amount of cash Taxes payable by

-11-

**HIGHLY CONFIDENTIAL**

the Canadian Sellers, the U.S. Sellers or the EMEA Sellers, as the case may be, for the Closing Taxable Year or a subsequent taxable year had been so used.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means all intellectual property rights as recognized under the Laws of the United States of America, Canada and/or other countries or jurisdictions, including rights in and to: (a) Trademarks; (b) Patents, invention disclosures and inventions; (c) copyrights and works of authorship; (d) Trade Secrets; and (e) Software; in each case, including any registrations or applications therefor.

"**Intercompany Contract**" means any Contract among any Seller or Affiliate of a Seller on the one hand, and any other Seller(s) or Affiliate(s) of any Seller on the other hand, and to which no Third Party is a party.

"**Inventory**" means Nortel Products (i) owned by Sellers or their Affiliates that are part of the inventory of products of the Sellers or their Affiliates existing as of the date hereof, or (ii) that Sellers or their Affiliates have ordered or committed to buy pursuant to Contracts in existence as of the date hereof and that are actually delivered to and received by the Sellers or their Affiliates into inventory by one year from the Closing Date.

"**Investment Canada Act**" means the Investment Canada Act, as amended.

"**Irish Joint Administrators**" has the meaning set forth in the preamble to this Agreement.

"**Joint Administrators**" has the meaning set forth in the preamble to this Agreement.

"**Jointly Owned Patents**" means (a) those patents, provisional patent applications and patent applications specifically identified as such in Section 1.1(d) of the Sellers Disclosure Schedule (the "**Listed Jointly Owned Patents**"); (b) national (of any country of origin) and multinational patents or patent applications (i) to which any of the Listed Jointly Owned Patents claims priority (directly or indirectly), (ii) for which any of the Listed Jointly Owned Patents forms a basis for priority (directly or indirectly), and/or (iii) which are subject to a terminal disclaimer with any of the Listed Jointly Owned Patents; (c) reissues, reexaminations, continuations, continuations-in-part, continuing prosecution applications, requests for continuing examinations, divisions, registrations or other extensions of any item in any of the foregoing categories (a) and (b); (d) national (of any country of origin) and multinational counterparts of any item in any of the foregoing categories (a) through (c), including certificates of invention, design registrations and utility models; (e) all rights provided by multinational treaties or conventions for any item in any of the foregoing categories (a) through (d); and (f) the inventions disclosed in the invention disclosures set forth in Section 1.1(d) of the Sellers Disclosure Schedule; but in the case of each of clauses (b) through (d), (1) solely to the extent owned, at least in part, by the Sellers, and (2) excluding the Excluded Patents and the Transferred Patents.

"**Joint Ownership Agreement**" has the meaning set forth in Annex I(m).

-12-

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(e)(i) of the Sellers Disclosure Schedule, after having made reasonable inquiry of those Persons listed on Section 1.1(e)(ii) of the Sellers Disclosure Schedule and, with reference to the Purchaser, the actual knowledge of those Persons listed on <u>Exhibit D</u> hereto.

"**Law**" means any U.S., Canadian, U.K., supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Liabilities**" means debts, liabilities, commitments and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability or tort liability.

"**License Power of Attorney**" shall have the meaning set forth in Section 10.1.

"**Licensed Residual Patents**" means (i) all Patents (other than Transferred Patents, Jointly Owned Patents, Specified UK Patents and Excluded Patents) owned in whole or in part by any of the Sellers or any of their Affiliates, (ii) all inventions, other than the Listed Inventions, disclosed in the invention disclosures owned by any of the Sellers or any of their Affiliates, if any such Patents or inventions exist and (iii) all Patents, other than Transferred Patents, Jointly Owned Patents, Specified UK Patents and Excluded Patents, in respect of which any Seller or any Affiliate of any Seller holds an exclusive license to all or substantially all of the rights thereunder.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, hypothecation, encumbrance, easement, encroachment, right-of-way, right of first offer, right of first refusal, restrictive covenant on real property, real property license, lease, lien or similar charge of any kind (including any conditional sale arrangement or other title retention agreement). For the avoidance of doubt, "Lien" does not include any Intellectual Property license.

"**Listed Inventions**" has the meaning set forth in the definition of Transferred Patents.

"**Listed Patents**" has the meaning set forth in the definition of Sellers' Patents.

"**Mandatory Regulatory Approvals**" means (i) a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Antitrust Laws of any of the jurisdictions listed in <u>Exhibit E</u> or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of such jurisdictions, in each case authorizing or not objecting to the transactions contemplated by this Agreement; and (ii) the ICA Approval, which includes, in each case, as applicable, any decision or consent by any such Government Entity setting forth

-13-

conditions or obligations on the Purchaser or any of its Affiliates if such conditions or obligations have been or, pursuant to Section 5.6(e), are required to be, accepted by the Purchaser.

"**Master R&D Agreement**" shall mean that certain intercompany license agreement by and among certain Sellers and Affiliates of Sellers effective as of January 1, 2001, and as thereafter amended, all as designated in the Data Room as the "MRDA as filed" at document index 2.4.5.1.

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) has, or would reasonably be expected to have, a material adverse effect on the Assets, taken as a whole, or (b) prevents or materially impedes or delays or would reasonably be expected to prevent or materially impede or delay the ability of the Sellers to perform their obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, provided, however, that the following Effects, either alone or in combination, shall not be considered in determining whether there has been a "Material Adverse Effect": (i) changes in general economic conditions in relevant markets; (ii) the execution or delivery of this Agreement or the public announcement thereof; (iii) any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser; (iv) changes to the industries and markets to which the Transferred Patents relate; (v) changes in Law, generally accepted accounting principles or official interpretations of the foregoing; and (vi) the pendency of the Bankruptcy Proceedings.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**NA Sellers**" has the meaning set forth in the preamble to this Agreement.

"**New York Courts**" has the meaning set forth in Section 10.6(b)(i).

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NN Ireland**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**NNUK**" has the meaning set forth in the preamble to this Agreement.

"**Non-Disclosure Agreement**" means the non-disclosure agreement by and among the Purchaser, NNL, NNI and other parties thereto, dated June 9, 2011, as well as any exhibits and amendments thereto and restatements thereof.

-14-

HIGHLY CONFIDENTIAL