(ii)     agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby;

(iii)     waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum;

(iv)     agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and

(v)     agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)     The Purchaser hereby appoints (i) Ericsson Canada, Inc. as its authorized agent (the "**Purchaser Authorized Canadian Agent**" upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, and (ii) Telefonaktiebolaget L M Ericsson (publ) as its authorized agent (the "**Purchaser Authorized EMEA Agent**" and together with the Purchaser Authorized Canadian Agent, the "**Purchaser Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case) and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the applicable Purchaser Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)     Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, (ii) Norton Rose OR LLP as its authorized agent (the "**Seller Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable, and (iii) NNUK as its authorized agent (the "**Seller Authorized EMEA Agent**" and together with the Seller Authorized U.S. Agent and the Seller Authorized Canadian Agent, the "**Seller Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case)

-79-

HIGHLY CONFIDENTIAL

and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Primary Seller Parties shall be deemed, in every respect, effective service of process upon every such Seller.

(e)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(f)     Notwithstanding Section 10.6(a) and (b), the Parties, the Joint Administrators and the French Liquidator agree that:

(i)     any questions, claims, disputes, remedies or Actions arising under Section 10.18 in respect of the EMEA Sellers or the Joint Administrators and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the Joint Administrators, (B) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (C) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (D) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts; and

(ii)     any questions, claims, disputes, remedies or Actions arising under Section 10.20 and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the French Liquidator, (B) the personal liability of the French Liquidator, (C) his appointment as liquidator of NNSA or the appointment of the French Office Holders of NNSA and their status as such, shall be governed by French law and be subject to the exclusive jurisdiction of the Versailles courts (France).

SECTION 10.7.    <u>Notices</u>. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address

HIGHLY CONFIDENTIAL      NNC-NNL06002492 / 86

specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser, to:

> Rockstar Bidco, LP
> c/o Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> Attention: Marilyn Sobel
> Facsimile: +1-212-757-3900

With copies (that shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 201 Redwood Shores Parkway
> Redwood Shores, California 94065
> United States
> Attention: Kyle C. Krpata
> Facsimile: +1-650-802-3100

> and

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> United States
> Attention: Ronit J. Berkovich
> Facsimile: +1-212-310-8007

> and

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> Attention: Marilyn Sobel
> Facsimile: +1-212-757-3900

If to the NA Sellers or the Other Sellers, to:

> Nortel Networks Corporation
> 5945 Airport Road
> Suite 360
> Mississauga, Ontario, Canada L4V 1R9
> Attention: Anna Ventresca
>         General Counsel-Corporate, Corporate Secretary and
>         Chief Compliance Officer

HIGHLY CONFIDENTIAL         NNC-NNL06002492 / 87

Facsimile: +1-905-863-2057

and

Nortel Networks Limited
5945 Airport Road
Suite 360
Mississauga, Ontario, Canada L4V 1R9
Attention: Anna Ventresca
General Counsel-Corporate, Corporate Secretary and
Chief Compliance Officer
Facsimile: +1-905-863-2057

and

Nortel Networks Inc.
Legal Department
4001 E. Chapel Hill – Nelson Hwy.
Research Triangle Park, North Carolina 27709
United States
Attention: Timothy Ross
Secretary and Vice President
Facsimile: +1-919-905-3741

With copies (that shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
United States
Attention: Paul J. Shim
James L. Bromley
Lisa M. Schweitzer
Facsimile: +1-212-225-3999

and

Norton Rose OR LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael Lang
Facsimile: +1-416-216-3930

HIGHLY CONFIDENTIAL      NNC-NNL06002492 / 88

If to the EMEA Sellers, to:

        Alan Bloom / Christopher Hill / Stephen Harris
        Ernst & Young LLP
        1 More London Place
        London
        SE1 2AF
        United Kingdom
        Facsimile:  +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

        Alex Kay
        Herbert Smith LLP
        Exchange House
        Primrose Street
        London
        EC2A 2HS
        United Kingdom
        Facsimile:  +44 (0) 20 7098 4447

If to the Joint Administrators, to:

        Alan Bloom / Christopher Hill / Stephen Harris
        Ernst & Young LLP
        1 More London Place
        London
        SE1 2AF
        United Kingdom
        Facsimile:  +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

        Alex Kay
        Herbert Smith LLP
        Exchange House
        Primrose Street
        London
        EC2A 2HS
        United Kingdom
        Facsimile:  +44 (0) 20 7098 4447

        and

        Avner Ben-Gera
        Hughes Hubbard & Reed LLP
        One Battery Park Plaza

HIGHLY CONFIDENTIAL                    NNC-NNL06002492 / 89

> New York, New York 10004
> United States
> Facsimile: +1-212-299-6366

If to NNSA or the French Liquidator, to:

> Attention: Cosme Rogeau
> 26 avenue Hoche
> 78000 Versailles
> France
> Facsimile: +33 1 39 49 44 63

With a copy (that shall not constitute notice) to:

> Foucaud, Tchekhoff, Pochet & Associés
> Attention: Antoine Tchekhoff & Edouard Fabre
> 1bis, avenue Foch
> 75116 Paris
> France
> Facsimile: +33 1 45 00 08 19

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8.      Exhibits; Sellers Disclosure Schedule.

(a)      The Sellers Disclosure Schedule, the Exhibits attached hereto and Annex I constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)      Disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances in any other section of the Sellers Disclosure Schedule as though fully set forth in such other section, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation, warranty or statement to be true and correct. The Sellers Disclosure Schedule is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties by any Nortel Party except to the extent expressly set forth therein. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers, the Joint Administrators or the French Liquidator pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.      Counterparts. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of

HIGHLY CONFIDENTIAL      NNC-NNL06002492 / 90

which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement.

SECTION 10.10.     No Presumption.  The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations.  Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11.     Severability.  If any provision, clause or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Without limiting Section 5.6(f), upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12.     No Set-off, Deduction or Counterclaim.  Subject to Section 2.2.2, every payment payable by any Party under this Agreement or under any of the other Transaction Documents shall be made in full without any set-off or counterclaim howsoever arising and shall be free and clear of, and without deduction of, or withholding for, any amount which is due and payable to such Party by any other Party whether under this Agreement or under any of the other Transaction Documents or otherwise.

SECTION 10.13.     Headings.  The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.14.     Entire Agreement.  This Agreement (including the Sellers Disclosure Schedule and all Exhibits attached hereto), the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or other contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents, and all such prior or other contemporaneous understandings, agreements, representations and warranties are hereby

-85-

HIGHLY CONFIDENTIAL

terminated. In the event of any irreconcilable conflict between this Agreement and the Non-Disclosure Agreement or the Supplementary Non-Disclosure Agreement, the provisions of this Agreement shall prevail. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all Parties specifically acknowledge that no Party has any special relationship with another Party that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction.

SECTION 10.15.    Availability of Equitable Relief; Limitations on Damages; Sole and Exclusive Remedy.

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.15, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement (other than with respect to breaches of Section 5.9(c)), without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement or that equitable relief is not available pursuant to the express terms of this Section 10.15. Without limiting the preceding provisions of this Section 10.15, it is acknowledged and agreed that (i) in the event of a material breach by the Sellers, the Purchaser shall be entitled to equitable relief to compel specific performance by the Sellers of all of the transactions contemplated by this Agreement (other than Section 5.9(c) hereof) and any other Transaction Documents, in each case subject to the provisions of such document, including to effect the sale of the Assets to the Purchaser as contemplated by Article II, and (ii) under no circumstances shall any Person be liable for punitive damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or any other Transaction Document. Except for the indemnification rights of Seller Indemnitees expressly set forth in Section 10.1, nothing set forth in this Agreement shall confer or give, or shall be construed to confer or give, to any Person (including any Person acting in a representative capacity) other than the Parties any rights or remedies against any Person.

(b)    Notwithstanding anything to the contrary contained in any Transaction Document but except in the case of actual fraud by any Seller, in no event shall any of the Nortel Parties be subject to any damage, remedy or relief in respect of any Liability to the Purchaser in connection with, or relating to, or arising under this Agreement, any other Transaction Document or the transactions contemplated hereby or thereby, either prior to or after the Closing, and regardless of whether any such claim arises in contract, tort, breach of warranty or any other legal or equitable theory, in each case other than: (i) equitable relief granted pursuant to and in accordance with Section 10.15(a); and (ii) prior to the Closing, for monetary damages in an aggregate amount not to exceed Twenty-Nine Million Dollars ($29,000,000).

HIGHLY CONFIDENTIAL    NNC-NNL06002492 / 92

(c)      The provisions of this Section 10.15 and the limitations on remedies provided hereunder were specifically bargained for between the Purchaser and the Sellers and were taken into account by the Purchaser and the Sellers in arriving at the Purchase Price. The Sellers have expressly relied on the provisions of this Section 10.15, and the limitations on remedies provided hereunder in agreeing to the Purchase Price and in agreeing to provide the specific representations, warranties, statements and covenants set forth herein.

SECTION 10.16.    <u>Bulk Sales Laws</u>. Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

SECTION 10.17.    <u>NA Sellers as Representatives of Other Sellers</u>.

(a)      For all purposes of this Agreement, each Other Seller hereby irrevocably appoints NNI as its representative.

(b)      Pursuant to Section 10.17(a), NNI shall expressly have the power to, in the name and on behalf of each Other Seller, (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.18.    <u>Obligations of Sellers and EMEA Sellers</u>. When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller). Notwithstanding anything to the contrary herein, the obligations of each EMEA Seller hereunder shall be several and not joint. Effective as of the date hereof, the parties are fully bound by the terms of this Agreement. For the avoidance of doubt, (x) no Seller shall assume any responsibility or liability for any obligations relating to any assets and/or liabilities that are not owned by it, and each Seller's liability to the Purchaser in relation to any matter contained in this Agreement shall be limited to the assets and/or liabilities of the relevant Seller and (y) the intent of the Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the French Liquidator under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.19.    <u>Exclusion of Liability of Joint Administrators and Acknowledgement</u>.

(a)      Notwithstanding that this Agreement shall have been signed by the Joint Administrators both in their capacities as administrators of the EMEA Sellers for and on behalf of the EMEA Sellers and in their personal capacities, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the Joint Administrators, or their firms, partners, employees, agents,

-87-

HIGHLY CONFIDENTIAL    

advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act or otherwise.

(b)     The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed, that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other party to observe, perform or comply with any of its obligations under this Agreement, or under or in relation to any associated arrangements or negotiations.

(c)     The Joint Administrators are parties to this Agreement:  (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, or otherwise, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purpose of receiving the benefit of this Section 10.19.

(d)     The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each party hereto shall have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns.

SECTION 10.20.     Exclusion of Liability of French Liquidator and Acknowledgments.  Notwithstanding that this Agreement shall have been signed by the French Liquidator both in his capacity as liquidator of NNSA for and on behalf of NNSA and in his personal capacity, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the French Liquidator or his firms, partners, employees, agents, advisers or representatives whether such Liability would arise under the FCC or otherwise.

SECTION 10.21.     Joint Administrators and French Liquidator as agents of EMEA Sellers.

(a)     For all purposes of this Agreement, the Joint Administrators and the French Liquidator act without personal liability as agents of the EMEA Sellers.

(b)     The Joint Administrators shall expressly have the power to, in the name and on behalf of each EMEA Seller as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

(c)     The French Liquidator shall expressly have the power to, in the name and on behalf of NNSA as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other

HIGHLY CONFIDENTIAL     NNC-NNL06002492 / 94

communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.22.     Limitations.

(a)     Under this Agreement, except for any documents, the forms of which have been agreed by the Joint Administrators and the French Liquidator as at the date of this Agreement, none of the EMEA Sellers, the Joint Administrators or the French Liquidator shall be required to enter into or execute any document unless such document contains exclusions of liability in favour of the Joint Administrators or the French Liquidator (as applicable), to an extent consistent with, or more favourable than, the exclusions of liability provided in favour of the Joint Administrators or the French Liquidator (as applicable) in this Agreement. For the avoidance of doubt, neither the Joint Administrators nor the French Liquidator shall be required to enter into or execute any document in their personal capacities or as administrators of the EMEA Sellers or *mandataire liquidateur* of NNSA respectively, to the extent that such document would cause the Joint Administrators and/or the French Liquidator to incur any personal liability.

(b)     The obligations or undertakings of the Joint Administrators and the French Liquidator under this Agreement are subject to their duties to act at all relevant times in the best interests of the creditors of the EMEA Sellers (in respect of the Joint Administrators) and, in relation to the French Liquidator, NNSA. Accordingly, nothing in this Agreement shall operate to derogate from, restrict, or prevent the Joint Administrators and French Liquidator from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as, in the case of the Joint Administrators, administrators of the EMEA Sellers or, in the case of the French Liquidator, as *mandataire liquidateur* of NNSA, under the Insolvency Act, FCC or any other applicable legislation or statutory instrument as they see fit, (acting in good faith) and/or preclude the Joint Administrators from terminating the administration of the EMEA Sellers pursuant to the Administration Orders (and/or the French Liquidator from terminating his appointment as *mandataire liquidateur* of NNSA) should the Joint Administrators (and/or the French Liquidator, in relation to NNSA) be required to do so to discharge their statutory duties or legal obligations, provided that, notwithstanding the foregoing, any failure to comply with the terms of this Agreement by any EMEA Seller will be a breach of this Agreement by the relevant EMEA Seller, and the Purchaser shall not be restricted from claiming against the relevant EMEA Seller and receiving any remedy, or exercising any right, other than a claim against the Joint Administrators or the French Liquidator in their respective personal capacities, to which it is otherwise entitled pursuant to the terms of this Agreement, for any breach of this Agreement notwithstanding that the Joint Administrators or the French Liquidator (as applicable) are complying with such statutory duties or legal obligations in accordance with this Section 10.22.

SECTION 10.23.     Limitations on Post-Closing Obligations. Notwithstanding any other provisions in this Agreement, all outstanding obligations of each EMEA Seller under this Agreement (except under Section 5.11 (Confidentiality), and Article 6 (Tax Matters)) shall cease on and from the date six (6) months following the Closing Date without prejudice to (i) any accrued obligations of the EMEA Sellers, (ii) any accrued rights of the Purchaser, or

-89-

HIGHLY CONFIDENTIAL

(iii) any accrued Liabilities in relation to any obligations to have been carried out by the EMEA Sellers, in each of (i), (ii) or (iii), prior to or on such date.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

-90-

HIGHLY CONFIDENTIAL                      NNC-NNL06002492 / 96

IN WITNESS WHEREOF, the parties have duly executed this Asset Sale Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____
    Name:  John M. Doolittle
    Title:   Senior Vice-President, Corporate
           Services and Chief Financial Officer

By: _____
    Name:  George Riedel
    Title:   Chief Strategy Officer and President,
           Business Units

**NORTEL NETWORKS LIMITED**

By: _____
    Name:  John M. Doolittle
    Title:   Senior Vice-President, Corporate
           Services and Chief Financial Officer

By: _____
    Name:  George Riedel
    Title:   Chief Strategy Officer and President,
           Business Units

*Asset Sale Agreement Signature Page*

HIGHLY CONFIDENTIAL

**NORTEL NETWORKS INC.**

By: _____

    Name: John J. Ray III

    Title: Principal Officer

**NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.**

By: _____

    Name: John J. Ray III

    Title: Principal Officer

**NORTEL ALTSYSTEMS, INC.**

By: _____

    Name: John J. Ray III

    Title: Principal Officer

**CORETEK, INC.**

By: _____

    Name: John J. Ray III

    Title: Principal Officer

**QTERA CORPORATION**

By: _____

    Name: John J. Ray III

    Title: Principal Officer

**XROS, INC.**

By: _____

    Name: John J. Ray III

    Title: Principal Officer

*Asset Sale Agreement Signature Page*

HIGHLY CONFIDENTIAL     

SIGNED for and on behalf of **Nortel Net-** )
**works UK Limited** (in administration) by )
Christopher Hill as Joint Administrator (act- )       ......................................................
ing as agent and without personal liability) )       Christopher Hill
in the presence of: )

Witness signature

......................................................... )
Name:    ꗟꕷꘈꗟ    ORꝏ0ELL )
Address: Ernst & Young LLP, 1 More Lon- )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

HIGHLY CONFIDENTIAL

**SIGNED** for and on behalf of **Nortel Net-**    )
**works S.A.** (in administration and *liquida-*    )
*tion judiciaire*) by Christopher Hill as Joint    )    Christopher Hill
Administrator (acting as agent and without    )
personal liability) in the presence of:

Witness signature

Name:    IAN COROELL    )
Address: Ernst & Young LLP, 1 More Lon-    )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

HIGHLY CONFIDENTIAL    NNC-NNL06002492 / 100

SIGNED for and on behalf of **Nortel**      )
**GmbH** (in administration) by Christopher    )
Hill as Joint Administrator (acting as agent    )      ..............................................
and without personal liability) in the pres-    )      Christopher Hill
ence of:

Witness signature

..........................................................................  )
Name:       JAN CORDELL      )
Address: Ernst & Young LLP, 1 More Lon-    )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

HIGHLY CONFIDENTIAL

**SIGNED** for and on behalf of **Nortel Networks France S.A.S.** (in administration) by Kerry Trigg acting as authorised representative of Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

Kerry Trigg

Witness signature

)
)
)

Name: LEISA HARKIN
Address:

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

*Asset Sale Agreement Signature Page*

**HIGHLY CONFIDENTIAL**      NNC-NNL06002492 / 102

**SIGNED** for and on behalf of **Nortel Net-**     )
**works (Ireland) Limited** (in administra-     )
tion) by David Hughes as Joint Administra-     )
tor (acting as agent and without personal     )
liability) in the presence of:

.....................................................
David Hughes

Witness signature

.....................................................  )
Name:                )
Address:            )

    ℅   **ERNST & YOUNG**
        ERNST & YOUNG BUILDING
          HARCOURT CENTRE,
           HARCOURT ST,
            DUBLIN 2.

*Asset Sale Agreement Signature Page*

HIGHLY CONFIDENTIAL

**SIGNED** by Alan Bloom             )

in his own capacity and on behalf of the Joint   )
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

.......................................................
Alan Bloom

Witness signature

.......................................................... )
Name:      Diana Graham )
Address: Ernst & Young LLP, 1 More London )
Place, London SE1 2AF

*Asset Sale Agreement Signature Page*

**HIGHLY CONFIDENTIAL**

Signed by **MAÎTRE COSME ROGEAU**,
acting in the capacity of *Mandataire*
*Liquidateur* of **NORTEL NETWORKS S.A.**
**(IN ADMINISTRATION AND**
**LIQUIDATION JUDICIARE)**, without
personal liability and solely for the purpose of
obtaining the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the French Liquidator:

By

Name: Maître Cosme Rogeau
    Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

Name:
Address: *RAJEEV SHARMA FOWLER*
*PARTNER FTPA 1 BY AVENUE FOCH*
*75116 PARIS (FRANCE)*

**SIGNED** for and on behalf of **NORTEL**     )
**NETWORKS S.A. (IN**     )
**ADMINISTRATION AND**     )
**LIQUIDATION JUDICIARE)**     )
by **MAÎTRE COSME ROGEAU** as     )
*Mandataire Liquidateur* (acting as agent     )
and without personal liability) in the     )
presence of:     )
Witness signature

.......................................
MAÎTRE COSME ROGEAU

Name:
Address:

*RAJEEV SHARMA FOWLER*

*PARTNER, FTPA*

*1BIS AVENUE FOCH*

*75116 PARIS (FRANCE)*

*Asset Sale Agreement Signature Page*

HIGHLY CONFIDENTIAL

**ROCKSTAR BIDCO, LP**

By: Rockstar Bidco GP, LLC, *its General Partner*

By: _____
      Name:
      Title:

*Asset Sale Agreement Signature Page*

**HIGHLY CONFIDENTIAL**     

## ANNEX I – Statements

Except (i) as set forth in the applicable sections of the Sellers Disclosure Schedule or (ii) to the extent solely relating to the Excluded Assets or the Excluded Liabilities:

(a)      To the Knowledge of the Sellers, an accurate, true and complete list of all Patents owned in whole or in part by the Sellers (including Jointly Owned Patents and Specified UK Patents) is set forth in Section A.I(a) of the Sellers Disclosure Schedule. Such list includes, for each patent and patent application, the patent number or application serial number and the jurisdiction, and for each U.S. patent and patent application that is not a Specified UK Patent, the name of the Person holding such patent or patent application and the filing date and issue date, if applicable. With respect to Jointly Owned Patents, the list identifies the co-owner(s) of each U.S. patent and, to the extent the Sellers have or are able to obtain copies of the applicable agreements, the agreements under which any Seller and the co-owner(s) share ownership of the patent.

(b)      None of the Listed Patents, the Listed Jointly Owned Patents, the Specified Listed UK Patents or the Listed Inventions, and, to the Knowledge of the Sellers, none of the other Transferred Patents, Jointly Owned Patents or Specified UK Patents, is subject to any Liens other than Permitted Encumbrances, and no Seller has granted any exclusive license to any Third Party with respect to any Listed Patent, Listed Jointly Owned Patent, Specified Listed UK Patent or Listed Invention or, to the Knowledge of the Sellers, any other Transferred Patent, Jointly Owned Patent or Specified UK Patent, which exclusive license is in force as of the date hereof.

(c)      With respect to the Specified Listed UK Patents, the Listed Jointly Owned Patents and the Listed Patents, and, to the Knowledge of the Sellers, with respect to the other Specified UK Patents, Jointly Owned Patents and Transferred Patents, the Sellers own all right, title, and interest in and to each such Patent (other than the rights of co-owners of Jointly Owned Patents in and to the Jointly Owned Patents); and subject to the Cross-License Agreements, the Outbound License Agreements and the Commercial Licenses, such right, title, and interest are sufficient for the Sellers to independently bring suit against a Third Party to enforce the Listed Patents, the Specified Listed UK Patents, and, to the Knowledge of the Sellers, the other Specified UK Patents and Transferred Patents.

(d)      To the Knowledge of the Sellers, Section A.I(d) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts between the Sellers or their Affiliates, on the one hand, and any other Person, on the other hand, under which the Sellers or their Affiliates both (i) grant a license under any Transferred Patent, Jointly Owned Patent or Specified UK Patent and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property) (collectively, the **"Cross-License Agreements"**), and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof, except to the extent disclosure of the terms or existence of a Cross License Agreement is prohibited, in which case it has been omitted from Section A.I(d) of

I-1

the Sellers Disclosure Schedule, but the number of such Cross License Agreements that have been omitted is set forth in Section A.I(d) of the Sellers Disclosure Schedule.

(e)    To the Knowledge of the Sellers, Section A.I(e) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Commercial Licenses) under which the Sellers or their Affiliates grant a license (including a grant back or any other express license made by any of the Sellers (as licensors) to improvements or any other license rights) to a Transferred Patent, Jointly Owned Patent or Specified UK Patent (whether alone or with any Software or Trade Secrets) (collectively, the "**Outbound License Agreements**"), indicating for each such Outbound License Agreement the title and the parties thereto, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(f)    To the Knowledge of the Sellers, (i) Section A.I(f) of the Sellers Disclosure Schedule sets forth (A) an accurate, true and complete list of each transition services agreement, master purchase agreements and development and support agreements that the Sellers entered into with the purchasers of its various business units after the Petition Date in connection with their divestitures and (B) with respect to the transition services agreements, the original scheduled termination date thereof (which, as of the date hereof, has not been extended by more than 90 days), and (ii) the scope of the licenses granted under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to such transition services agreements, master purchase agreements and development and support agreements is not broader than the scope of such licenses contained in the form licenses provided to the Purchaser prior to the date hereof in the Data Room as document numbers 2.5.3.187 2.5.3.193, 2.5.3.194 and 2.5.3.195; it being understood that work orders under certain of such agreements have been issued pursuant to such agreements, but are not listed. To the Knowledge of the Sellers, the license rights, if any, granted by the Sellers under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to each such transition services agreement during the term of such transition services agreement shall expire upon the termination of such transition services agreement (except for (A) rights to use and make certain Software applications and tools relating to the businesses being divested, to the extent that such Software applications and tools were delivered by the Sellers or their Affiliates and (B) internal use of Intellectual Property created by Sellers or their Affiliates prior to the expiration of such transition services agreement in support of or during the course of performing the services, to the extent such Intellectual Property has been delivered, including by integration into the divested business.

(g)    To the Knowledge of the Sellers, there is no Action pending asserting invalidity, misuse or unenforceability of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents or challenging the Sellers' right to use, right to transfer, or ownership of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(h)    To the Knowledge of the Sellers, each of the registrations and applications for the Jointly Owned Patents, Transferred Patents or Specified UK Patents included in the Assets is currently in good standing and subsisting. The foregoing will not be construed as a warranty that any patent will issue based on a patent application.

I-2

HIGHLY CONFIDENTIAL

(i)      To the Knowledge of the Sellers, Section A.I(i) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Actions (including opposition, interferences and cancellation petitions and like proceedings) against any Seller, except for the Bankruptcy Proceedings, pending before any Government Entity or threatened in writing that involves the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(j)      To the Knowledge of the Sellers, there are no prior or preferential rights, rights of first refusal, rights of first offer or other similar rights of any party (other than the Purchaser) to purchase or otherwise acquire any of the Assets.

(k)      To the Knowledge of the Sellers: every Patent solely owned by the Sellers or their Affiliates, except for the Excluded Patents, is included among the Listed Patents or the Specified Listed UK Patents; every Patent jointly owned by one or more of the Sellers and their Affiliates, on the one hand, and one or more Third Parties, on the other hand, except for the Excluded Patents, is included among the Listed Jointly Owned Patents; and every invention disclosure owned by the Sellers or their Affiliates and under consideration for the filing of a patent application is included among the Listed Inventions.

(l)      No Person listed in Section A.I(l) of the Sellers Disclosure Schedule has been granted any license (other than a Commercial License) under the Jointly Owned Patents, Transferred Patents or Specified UK Patents by the Sellers, which license is in force as of the date hereof, it being understood that such Persons may have rights or licenses solely with respect to products or services sold or provided by the Sellers or Sellers' Affiliates.

(m)      To the Knowledge of the Sellers, Section A.I(m) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Outbound License Agreements listed in Sections A.I(d) or A.I(e) of the Sellers Disclosure Schedule, respectively) under which the Sellers or their Affiliates have joint ownership in the Jointly Owned Patents (collectively, the "**Joint Ownership Agreements**"), indicating each Jointly Owned Patent and the title and the parties to each such agreement, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(n)      To the Knowledge of the Sellers, no Affiliate of the Sellers that is not itself a Seller owns any Patents, invention disclosures or Patent Related Documentation.

(o)      To the Knowledge of the Sellers, (i)(x) all promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies or industry groups (other than those contained in membership agreements, by-laws or policies of standard-setting bodies or industry groups and described in clause (y) below or, without limiting clause (y) below, in Section A.I(b) of the Sellers Disclosure Schedule) and that may concern the Transferred Patents or Specified UK Patents, together with the title and number of the standard and the Patents to which such promises, declarations or commitments refer (in each case, to the extent identified in the respective promise, declaration or commitment), are listed in Section A.I(o)(i)(x) of the Sellers Disclosure Schedule, and (y) all membership agreements, by-laws or policies of standard-setting bodies or industry groups in which Sellers were participants and which contained commitments that may concern the Transferred Patents or Specified UK

I-3

Patents granted in writing by the Sellers and which bind Sellers to bind the Purchaser thereto, are listed in Section A.I(o)(i)(y) of the Sellers Disclosure Schedule; and (ii) except as set forth on Schedule A.I(o)(ii) of the Sellers Disclosure Schedule, none of the declarations, promises and commitments referred to in clause (i) above require royalty-free licensing of any of the Transferred Patents.

(p)      The patents, patent applications and provisional patent application listed in Section 1.1(c) of the Sellers Disclosure Schedule are solely those sold after the Petition Date to purchasers in connection with sales of divisions of Sellers and are not included in the Sellers' Patents.

(q)      There exist no Permitted Encumbrances of the type described in clause (i) of the definition of "Permitted Encumbrances" on any of the Assets.

(r)      To the Knowledge of the Sellers, there exist no Licensed Residual Patents (other than invention disclosures that (x) relate to a patent application filed anywhere in the world or (y) are dated thirty (30) months or more before the date hereof) or Undisclosed Patent Interests.

(s)      To the Knowledge of the Sellers, the aggregate amount of all unpaid past, present and future income and royalties payable to the Sellers under (i) the Transferred Licenses and (ii) any licenses granted under the Transferred Patents, Jointly Owned Patents or Specified UK Patents does not exceed $10 million.

(t)      The portions of the Ericsson Licenses and any other agreement between any Seller, on one hand, and Ericsson on the other hand, which were redacted in the copy of such agreements provided in the Data Room, do not provide for: (i) the assignment to any Person of any ownership or exclusive rights (including any option to acquire ownership or exclusive rights) to any Transferred Patents, Specified UK Patents or Jointly Owned Patents, (ii) the grant of any sublicense or other license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, (iii) the Sellers to have any rights to receive an ownership or exclusive interest in any Patents transferred by any Sellers to Ericsson or (iv) any rights for any Person in any improvements to any Transferred Patents, Specified UK Patents or Jointly Owned Patents made by any Seller or any purchaser of Transferred Patents, Specified UK Patents or Jointly Owned Patents.

(u)      The Sellers have disclosed to Purchaser all agreements, contracts, notices and correspondence to, from or with Ericsson that relate in any way to the Transferred Patents, Jointly Owned Patents or Specified UK Patents, other than agreements, contracts, notices and correspondence relating to a potential stalking horse transaction for the Transferred Patents, Jointly Owned Patents and Specified UK Patents, as a whole.

(v)      To the Knowledge of the Sellers, there exist no disputes between any Seller, on the one hand, and Ericsson, on the other hand, concerning the Transferred Patents, Jointly Owned Patents or Specified UK Patents or the scope of any licenses granted to the Transferred Patents, Jointly Owned Patents or Specified UK Patents.

I-4

(w)    There are no Collective Labor Agreements in effect or labor organizing efforts outstanding or threatened with respect to any Employee of any of the Sellers.

(x)    No Employee of any of the Sellers works in Quebec, Canada.

(y)    [Reserved]

(z)    To the Knowledge of the Sellers, there is no ongoing and will be no future manufacture, development, sale, supply or other distribution, or servicing of Nortel Products or other products under the Transferred Patents or Specified UK Patents by, for or on behalf of Sellers or an Affiliate of any Seller, other than to the extent such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement or Section 5.13(b) of this Agreement.

HIGHLY CONFIDENTIAL                    NNC-NNL06002492 / 111



TR44229

NNC-NNL06002505

Not filed in accordance with the Order of the Court dated May 9, 2014



*Execution Version*

## IP TRANSACTION SIDE AGREEMENT

This agreement dated as of April 4, 2011 (the "**Agreement**") by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"); (iv) the entities listed in Exhibit A hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in Exhibit B hereto; (vi) the French Liquidator; and (vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Nortel Parties**". The parties referred to in (i) through (vii) are referred to collectively as the "**Parties**".

## W I T N E S S E T H

WHEREAS the Nortel Parties have or will concurrently with the entering into of this Agreement execute a stalking horse agreement for the sale of the Nortel patent portfolio (the "**Assets**") pursuant to an asset sale agreement dated as of April 4, 2011, among the Parties and Ranger Inc. ("**Bidder 1**"), as purchaser, and Google Inc., as parent guarantor (as the same may be further amended, restated, amended and restated or modified, the "**Stalking Horse Agreement**"). The sale of the Assets, whether pursuant to the Stalking Horse Agreement or otherwise and whether to Bidder 1 or any other person (such person, including Bidder 1, a "**Purchaser**"), shall be referred to herein as the "**Transaction**";

WHEREAS as a condition of the Stalking Horse Agreement and in connection with the Transaction, the Parties have agreed to a process for the rejection, repudiation and/or deemed termination of unknown licenses (the "**Unknown Licenses**") to be approved by the U.S. Court in the U.S. Bidding Procedures Order and the Canadian Court in the Canadian Sales Process Order (the "**License Rejection Procedures**");

WHEREAS as a condition of the Stalking Horse Agreement and in connection with the Transaction, the Parties have agreed to establish an indemnification escrow account in the amount of US$45,000,000 to support certain indemnification rights of Bidder 1 under the Stalking Horse Agreement (any indemnification escrow account so established in connection

with the Transaction to support indemnification rights of a Purchaser, the "**Indemnity Escrow Account**");

WHEREAS the Nortel Parties have agreed in, and in the circumstances set out in, the Stalking Horse Agreement to pay to Bidder 1 (i) cash in an amount equal to the total amount of all actual fees, costs and expenses reasonably incurred by Bidder 1 in connection with the preparation, execution and performance of the Stalking Horse Agreement, which amount shall not exceed Four Million Dollars ($4,000,000) (the "**Expense Reimbursement**") and (ii) a cash fee of Twenty-Five Million Dollars ($25,000,000) (the "**Break-Up Fee**"); and

WHEREAS as a condition of the Stalking Horse Agreement and in connection with the Transaction, the Parties have made certain representations and warranties and have agreed to certain covenants relating to the Knowledge of certain Persons identified in Section 1.1(e)(i) of the Sellers Disclosure Schedule (the "**Designated Persons**").

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

1.    Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or, if not defined below, the meanings set forth in the Stalking Horse Agreement:

     (a)    "**Allowed Knowledge Claim**" means a Knowledge Claim finally allowed against a Nortel Debtor whether pursuant to a settlement, judicial determination or otherwise;

     (b)    "**Allowed Unknown License Claim**" means an Unknown License Claim finally allowed against a Nortel Debtor whether pursuant to a settlement, judicial determination, determination by a claims officer or otherwise;

     (c)    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

     (d)    "**Canadian Debtors**" means NNC, NNL and their Canadian affiliates that are subject to proceedings pending before the Canadian Court under the *Companies' Creditors Arrangement Act* (Canada);

     (e)    "**EMEA Debtors**" means each Nortel debtor in respect of which the Joint Administrators were appointed as administrators on 14 January 2009, including but not limited to the EMEA Sellers;

     (f)    "**Knowledge Claim**" means any claim of actual fraud (which, for the avoidance of doubt, shall exclude constructive fraud and equitable fraud) asserted by a Purchaser or any other person or entity claiming through a Purchaser in connection with the Transaction against a Nortel Debtor or a Designated Person (to the extent that the claim against such Designated Person is indemnifiable by a Nortel Debtor). For greater certainty, a Knowledge Claim shall not include an

2

indemnity claim by a Purchaser in connection with a Transaction for which there is recourse to amounts held in the Indemnity Escrow Account;

(g) **"Nortel Debtor"** means each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors;

(h) **"Unknown License Claim"** means any claim asserted by a licensee or any other person against a Nortel Debtor as a result of the rejection, repudiation or termination of an Unknown License pursuant to the License Rejection Procedures;

(i) **"U.S. Court"** means the United States Bankruptcy Court for the District of Delaware; and

(j) **"U.S. Debtors"** means NNI and its affiliated debtors subject to the jurisdiction of the U.S. Court in proceedings pending under Chapter 11 of the U.S. Bankruptcy Code.

2. The Parties agree that:

(a) any amount paid from the Indemnity Escrow Account to a Purchaser;

(b) any amount paid to Bidder 1 in respect of the Expense Reimbursement and/or Break-Up Fee;

(c) any amount that a Nortel Debtor becomes obligated to distribute or pay on account of an Allowed Unknown License Claim, whether pursuant to a settlement, court order or other judicial determination, plan of arrangement, plan of reorganization, plan of distribution, bankruptcy distribution, administration distribution, liquidation distribution, company voluntary arrangement or otherwise;

(d) any amount that a Nortel Debtor becomes obligated to pay on account of an Allowed Knowledge Claim, whether pursuant to a settlement, court order or other judicial determination, plan of arrangement, plan of reorganization, plan of distribution, bankruptcy distribution, administration distribution, liquidation distribution, company voluntary arrangement or otherwise;

(e) any amount that is expended by any Nortel Party in respect of fees, charges and disbursements of counsel appointed in relation to the defence of a Section 10.1 Third Party Claim to the extent such amount is not recovered from the Purchaser or otherwise (**"Counsel Costs"**); and

(f) any amounts paid or payable to Global IP Law Group, LLC (**"Global IP"**) in connection with the Transaction or any other work performed under that certain

3

Master Consulting Agreement dated October 15, 2009, among NNL, NNI and NNUK, on the one hand, and Global IP, on the other ("**Global IP Costs**"),

shall constitute Transaction costs and shall ultimately be borne by each Nortel Party in a proportion equal to the proportion of the aggregate IP Sale Proceeds (as defined below) allocated to such Nortel Party. Without limiting the generality of the foregoing the Expense Reimbursement shall be addressed as set forth in paragraph 3 hereof, the Break-Up Fee shall be addressed as set forth in paragraph 4 hereof, any Unknown License Claim or Knowledge Claim shall be addressed as set forth in paragraphs 5 through 8 hereof, Counsel Costs shall be addressed as set forth in paragraph 9 hereof and Global IP Costs shall be addressed as set forth in paragraph 10 hereof.

3.      The Parties agree that, subject to readjustment in accordance with paragraph 2 hereof, any amount payable to Bidder 1 in respect of the Expense Reimbursement shall be paid one third (1/3) by NNI, one third (1/3) by NNL and one third (1/3) by NNUK (the "**Initial Respective Percentages**") and any such Nortel Party paying in excess of such amount shall have rights of contribution vis-à-vis, and be entitled to payment on demand from, any Nortel Party that has paid less than its Initial Respective Percentage. The amount necessary to fully reimburse NNI, NNL and NNUK for paying the Expense Reimbursement shall be deducted from the IP Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to each of NNI, NNL and NNUK to reimburse them for the payment of the Expense Reimbursement.

4.      The Parties agree that any amount payable to Bidder 1 in respect of the Break-Up Fee shall be deducted from the IP Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid to Bidder 1 at the closing of the Transaction.

5.      Any Unknown License Claim shall be resolved and determined in the claims, proof, or other relevant process or court of the Nortel Debtor against whom such Unknown License Claim is asserted, provided that each of NNL, NNI and NNUK shall be consulted with respect to the resolution and determination of any Unknown License Claim. To the extent an Unknown License Claim is filed against more than one Nortel Debtor, the Nortel Debtors against whom such Unknown License Claim is filed shall cooperate in good faith to coordinate the resolution and determination of such Unknown License Claim. Furthermore, to the extent an Unknown License Claim is filed against both a Canadian Debtor and a U.S. Debtor the resolution of such Unknown License Claim shall, with respect to the Canadian Debtors and the U.S. Debtors, be governed by the Cross-Border Insolvency Protocol approved by the U.S. Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same has been and may further be amended from time to time (the "**Cross-Border Insolvency Protocol**") and the Cross-Border Claims Protocol approved by the U.S. Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated September 16, 2010 and by the Canadian Court pursuant to an order dated September 16, 2010, as the same has been and may further be amended from time to time (the "**Cross-Border Claims Protocol**"). Nothing in this

4