Agreement is intended to limit the U.S. Debtors or Canadian Debtors rights under the Cross-Border Insolvency Protocol, the Cross-Border Claims Protocol or the Claims Resolution Order granted by the Canadian Court on September 17, 2010.

6.     Any Knowledge Claim shall be resolved and determined as provided for in Section 10.6 of the Stalking Horse Agreement (or such similar jurisdiction clause in the asset sale agreement entered into in connection with the Transaction), provided that each of NNL, NNI and NNUK shall be consulted with respect to the resolution of any Knowledge Claim. To the extent a Knowledge Claim is filed against Nortel Debtors in different jurisdictions, the Nortel Parties shall cooperate in good faith to coordinate the resolution and determination of such Knowledge Claim. Furthermore, to the extent a Knowledge Claim is filed against both a Canadian Debtor and a U.S. Debtor, the resolution of such Knowledge Claim shall, with respect to the Canadian Debtors and the U.S. Debtors, be subject to the Cross-Border Insolvency Protocol.

7.     To give effect to paragraph 2 hereof as regards Allowed Unknown License Claims and Allowed Knowledge Claims:

    (a)    to the extent that there are funds available in the distribution escrow account (the **"Distribution Escrow Account"**) established to hold the sale proceeds from the Transaction (the **"IP Sale Proceeds"**), the obligation of any Nortel Debtor to make a distribution or payment on account of an Allowed Unknown License Claim or an Allowed Knowledge Claim shall be satisfied by causing the escrow agent appointed in connection with the Distribution Escrow Account to pay the relevant amount out of the Distribution Escrow Account; and

    (b)    to the extent there are not yet funds available in the Distribution Escrow Account, the obligation of any Nortel Debtor to make a distribution or payment on account of an Allowed Unknown License Claim or Allowed Knowledge Claim shall be satisfied by the Nortel Debtor(s) against whom the Allowed Unknown License Claim or Allowed Knowledge Claim is made making such distribution or payment. The amount necessary to fully reimburse a Nortel Debtor making any such distribution or payment shall be deducted from the IP Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to such Nortel Debtor(s) to reimburse them for the distribution or payment.

8.     If the allocation of the IP Sale Proceeds among the Nortel Parties is resolved prior to: (i) all distributions or payments on account of Allowed Unknown License Claims and Allowed Knowledge Claims being made; and/or (ii) all Unknown License Claims and Knowledge Claims being finally resolved, the Parties shall establish and maintain an appropriate reserve from the IP Sale Proceeds such that any distributions or payments on account of such claims can be satisfied as provided for in subparagraph 7(a) hereof. In establishing and maintaining such reserve, the Parties shall have regard to: (i) the aggregate quantum of Allowed Unknown License Claims for which a distribution or payment has yet to be made; (ii) the expected dividend from the Nortel Debtor(s)

HIGHLY CONFIDENTIAL      NNC-NNL11773287 / 5

required to make a distribution or payment on account of such Allowed Unknown License Claims; (iii) the aggregate quantum of any unresolved Unknown License Claims then existing and the expected dividend from the Nortel Debtor(s) that would be required to make a distribution or payment on account of such unresolved Unknown License Claims if they were to become Allowed Unknown License Claims; (iv) the aggregate quantum of Allowed Knowledge Claims for a which a payment has yet to be made; (v) the aggregate quantum of unresolved Knowledge Claims and the amount that would be necessary to make payment on such unresolved Knowledge Claims if they were to become Allowed Knowledge Claims; and (vi) an appropriate buffer amount to address any uncertainty regarding the factors specified in (ii), (iii) and (v), above; provided, however, that, unless each of NNL, NNI and NNUK agree otherwise in writing, the reserve established shall be equal to:

(a)      that percentage of the sum of (x) the aggregate amount of all Allowed Unknown License Claims for which a distribution or payment has yet to be made; and (y) the aggregate amount claimed in respect of unresolved Unknown License Claims, necessary to pay the maximum possible dividend that could apply to such claims; plus

(b)      the sum of: (x) the aggregate amount of all Allowed Knowledge Claims for which a payment has yet to be made; and (y) the aggregate amount claimed in respect of unresolved Knowledge Claims.

The Parties shall consult from time to time to determine whether to reduce the amount of the reserve, including, without limitation, in light of the development of additional information regarding Unknown License Claims and Knowledge Claims or the resolution of such claims. At such time as all distributions and payments on account of Allowed Unknown License Claims and Allowed Knowledge Claims have been made and all Unknown License Claims and Knowledge Claims have been finally resolved, any amounts remaining in such reserve shall be distributed to the Nortel Parties in accordance with the resolution of the allocation of the IP Sale Proceeds.

9.      The Parties agree that, subject to readjustment in accordance with paragraph 2 hereof, each Nortel Party shall fund any Counsel Costs incurred by it. Each Nortel Party shall be entitled to be fully reimbursed for any Counsel Costs incurred by it from the IP Sale Proceeds in the Distribution Escrow Account on a bi-monthly basis (or at such other interval as agreed to in writing by each of NNL, NNI and NNUK). To the extent any amounts in respect of Counsel Costs are recovered by a Nortel Party from the Purchaser or otherwise after the reimbursement contemplated by the preceding sentence having occurred, such amounts shall be forthwith paid by the Nortel Party into the Distribution Escrow Account and shall form part of the IP Sale Proceeds. For the avoidance of doubt, the right to reimbursement under this paragraph 9 shall cease once the funds in the Distribution Escrow Account have been extinguished.

10.      The Parties agree that the amount necessary to fully reimburse NNL for all Global IP Costs paid by NNL as of the closing of the Transaction shall be deducted from the IP

HIGHLY CONFIDENTIAL      NNC-NNL11773287 / 6

Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to NNL to reimburse it for the payment of such Global IP Costs. After the closing of the Transaction, the obligation of any Nortel Debtor to make a distribution or payment on account of Global IP Costs shall be satisfied by causing the escrow agent appointed in connection with the Distribution Escrow Account to pay the relevant amount out of the Distribution Escrow Account to Global IP. The Parties further agree that should the Transaction fail to be consummated, nothing herein shall prejudice NNL's right to seek reimbursement of the Global IP Costs from the other Nortel Debtors, including any such rights arising under existing agreements.

11. The Parties agree to negotiate in good faith to enter into a further side agreement for the purposes of facilitating the completion of the Transaction and to govern certain other matters of common interest relating to the Transaction, including certain matters relating to the allocation among the Nortel Parties of the benefits and burdens of the Transaction. To the extent the Parties enter into such a further side agreement, the terms of this Agreement shall be incorporated into such side agreement.

12. Except as expressly contemplated in Section 5.13(b) of the Stalking Horse Agreement, the Parties agree that nothing in the Stalking Horse Agreement shall constitute an amendment, modification, termination or waiver of rights of any Nortel Party under or relating to the Transfer Pricing Agreements (as defined in the Final Canadian Funding and Settlement Agreement dated December 23, 2009) (the "FCFSA")). The Parties acknowledge that the amendments and modifications to the Transfer Pricing Agreements contemplated by Section 5.13(b) of the Stalking Horse Agreement are being effected at the request of the Purchaser as a condition of the Transaction and that, for purposes of the allocation of the IP Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Nortel Debtors and any other claims or disputes among the Nortel Debtors, such amendments and modifications, and the actions taken as a result thereof, shall have no impact on the rights of the Nortel Parties (i) under or in connection with the Transfer Pricing Agreements, which rights shall continue as they exist immediately prior to the closing of the Transaction, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising therefrom or otherwise, and the right to advocate for an allocation of the IP Sale Proceeds, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments (as defined in the FCFSA) pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise. Nothing in Section 5.13(b) of the Stalking Horse Agreement or the amendments and modifications to the Transfer Pricing Agreements resulting therefrom or the actions taken as a result thereof shall bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the IP Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Nortel Parties, and such

7

presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. Furthermore, for the avoidance of doubt, all rights relating to the Transfer Pricing Agreements preserved in the FCFSA and the Interim Funding and Settlement Agreement dated June 9, 2009, continue to be preserved.

13.     The Parties agree that:

(a)     the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations;

(b)     the Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) subject to paragraph 13(d) hereof, the purposes of the other Parties hereto enforcing the obligations of the Joint Administrators hereunder;

(c)     notwithstanding anything in paragraphs 17 and 18 hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the relevant EMEA Sellers and their remaining as current joint administrators thereof under this Agreement, or (iv) the duties and obligations of the Joint Administrators as administrators of the EMEA Debtors, shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts;

(d)     any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns;

(e)     the French Liquidator is entering into this Agreement as agent for NNSA and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe,

HIGHLY CONFIDENTIAL        NNC-NNL11773287 / 8

perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and

(f)    notwithstanding anything in paragraphs 17 and 18 hereof, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French Liquidator, his firm, partners, employees, advisers, representatives or agents, (ii) his appointment as Liquidateur Judiciaire of NNSA, or (iii) the duties and obligations of the French Liquidator as Liquidateur Judiciaire of NNSA, shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French courts.

14.    No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. Except as expressly set out herein, this Agreement, or any provision hereof, may be waived or amended on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Official Committee of Unsecured Creditors of the U.S. Debtors (the "**Committee**") and Ernst & Young Inc. in its capacity as the Monitor of the Canadian Debtors (the "**Monitor**").

15.    This Agreement is for the sole benefit of the Parties and their permitted assigns (and in the case of subparagraphs 2(c) and 2(d) and paragraphs 5 through 8 hereof for the benefit of the other Nortel Debtors) and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors.

16.    Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

17.    The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction provided, however, that subparagraphs 13(a) through (d) hereof shall be governed exclusively by English law and subparagraphs 13(e) and (f) hereof shall be governed exclusively by French law.

18.    To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that

9

**HIGHLY CONFIDENTIAL**

any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNL or any of the other Canadian Debtors, or the English Court if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law provided, however, that any claim, action or proceeding set forth in or on the basis of subparagraphs 13(a) through (d) hereof shall be brought exclusively in the English courts and any claim, action or proceeding set forth in or on the basis of subparagraphs 13(e) through (f) hereof shall be brought exclusively in the French courts.

19.    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 19.

20.    All notices and communications provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified for such Party in the Stalking Horse Agreement, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this paragraph 20. Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable. A copy of any notice or communication sent pursuant to this paragraph 20 shall also be sent to the Committee: c/o Akin Gump Strauss Hauer & Feld LLP Attention: Fred S. Hodara and Stephen B. Kuhn, Esq. One Bryant Park New York, New York 10036, U.S.A (Facsimile: +1 212 872 1002) and to the Monitor: Ernst & Young Inc., Ernst & Young

HIGHLY CONFIDENTIAL     NNC-NNL11773287 / 10

Tower Attn: Murray A. McDonald, 222 Bay Street, P. O. Box 251, Toronto, Ontario, Canada, M5K 1J7 (Facsimile: +1 416 943 3300).

21. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Facsimile and pdf signatures shall be deemed original signatures.

22. The obligations of NNC and NNL under this Agreement shall be joint and several. The obligations of NNI and the other U.S. Debtors party hereto shall be joint and several. The obligations of the EMEA Sellers under this Agreement shall be joint and several.

23. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

24. The Parties hereby agree that, except as specifically set forth in paragraphs 2, 3, 4, 7, 8, 9 and 10 hereof, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of the IP Sale Proceeds among the Nortel Parties. Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentages shall not in any way determine the final allocation or distribution of proceeds from the Transaction or otherwise bind the Parties in respect of the final allocation.

25. All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.

**[Signature pages immediately follow]**

11

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By: _____
    Name: John M. Doolittle
    Title: Senior Vice-President, Corporate
    Services and Chief Financial Officer

By: _____
    Name: Clarke E. Glaspell
    Title: Controller

NORTEL NETWORKS LIMITED

By: _____
    Name: John M. Doolittle
    Title: Senior Vice-President, Corporate
    Services and Chief Financial Officer

By: _____
    Name: Clarke E. Glaspell
    Title: Controller

NORTEL NETWORKS INC.

By: _____
    Name:
    Title:

NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.

By: _____
    Name:
    Title:

HIGHLY CONFIDENTIAL    

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By _____
      Name:
      Title:

By: _____
      Name:
      Title:.

NORTEL NETWORKS LIMITED

By _____
      Name:
      Title:

By: _____
      Name:
      Title:

NORTEL NETWORKS INC.

By: _____
      Name:
      Title:

NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.

By: _____
      Name:
      Title:

NORTEL ALTSYSTEMS, INC.

By:
Name:
Title:

CORETEK, INC.

By:
Name:
Title:

QTERA CORPORATION

By:
Name:
Title:

XROS, INC.

By:
Name:
Title:

HIGHLY CONFIDENTIAL

**SIGNED** for and on behalf of **Nortel**
**Networks UK Limited** (in administration)
by Christopher Hill as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

..............................................................................
Christopher Hill

Witness signature

..............................................................................
Name:    JAN CORDELL
Address:  Ernst & Young LLP, 1 More
London Place, SE1 2AF

)
)
)

**HIGHLY CONFIDENTIAL**

**SIGNED** for and on behalf of Nortel )
Networks (Ireland) Limited (in )
administration) by David Hughes as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of: . )

*Niall Coveney*
*under power of*
*Attorney*
*(Granted) by*     David Hughes

Witness signature

Name: PETER FRIEL )
Address: c/o ERNST AND YOUNG )
HARCOURT CENTRE )
HARCOURT STREET
DUBLIN 2

SIGNED for and on behalf of Nortel     )
Networks S.A. (in administration and     )      ................................................
*liquidation judiciaire*) by Christopher Hill   )      Christopher Hill
as Joint Administrator (acting as agent and   )
without personal liability) in the presence
of:

Witness signature
................................................................
Name:       JAN CORDELL     )
Address: Ernst & Young LLP, 1 More   )
London Place, SE1 2AF

HIGHLY CONFIDENTIAL

**SIGNED** for and on behalf of Nortel
Networks France S.A.S. (in
administration) by Kerry Trigg acting as
authorised representative of Christopher
Hill as Joint Administrator (acting as agent
and without personal liability) in the
presence of:

)
)
)
)

Kerry Trigg

Witness signature

Name: TERESA ALLEN
Address: Ernst & Young, 1 More London
Place, London SE1 2AF

)
)
)

**HIGHLY CONFIDENTIAL**

SIGNED for and on behalf of Nortel      )
GmbH (in administration) by Christopher   )
Hill as Joint Administrator (acting as agent )
and without personal liability) in the     )
presence of:                             )

..............................................
Christopher Hill

Witness signature

..............................................
Name:     JAN CORDELL        )
Address: Ernst & Young LLP, 1 More    )
London Place, SE1 2AF

HIGHLY CONFIDENTIAL

SIGNED by Alan Bloom

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint
Administrators in the presence of:

)  ........................................................
)  Alan Bloom
)

Witness signature
........................................................
Name:    WILMA GRAHAM
Address: Ernst & Young, 1 More London
Place, London SE1 2AF

)
)
)

Signed by **MAÎTRE COSME ROGEAU**, acting in the capacity of *Mandataire Liquidateur* of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)**, without personal liability and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the French Liquidator:

By:

Name: Maître Cosme Rogeau
Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

Name:
Address:

RAJEEV SHARMA FOWLER
FTPA
1BIS AVENUE FOCH 75116 PARIS
(FRANCE)

**SIGNED** for and on behalf of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)** by **MAÎTRE COSME ROGEAU** as *Mandataire Liquidateur* (acting as agent and without personal liability) in the presence of:

Witness signature

Name:
Address:

RAJEEV SHARMA FOWLER
FTPA
1BIS AVENUE FOCH
75116 PARIS (FRANCE)

MAÎTRE COSME ROGEAU

**EXHIBIT A – EMEA Sellers**

Nortel Networks UK Limited (in administration)
Nortel Networks S.A. (in administration and *liquidation judiciaire*)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S. (in administration)
Nortel GmbH (in administration)

HIGHLY CONFIDENTIAL

**EXHIBIT B – Other Sellers**

NN Applications Management Solutions Inc.
Nortel Altsystems, Inc. (previously "Alteon Networks, Inc.")
CoreTek, Inc.
Qtera Corporation
Xros, Inc.

\5947002

HIGHLY CONFIDENTIAL

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**AFFIDAVIT OF SHARON HAMILTON**
(sworn April 11, 2014)

---

GOODMANS LLP
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini** (LSUC#: 22293T)
jcarfagnini@goodmans.ca
**Joseph Pasquariello** (LSUC# 38390C)
jpasquariello@goodmans.ca
**Christopher G. Armstrong** (LSUC# 55148B)
carmstrong@goodmans.ca
Tel: 416.979.2211
Fax: 416.979.1234
Lawyers for the Monitor, Ernst & Young Inc.