# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

## REPLY AFFIDAVIT OF SHARON HAMILTON SWORN APRIL 25, 2014

## Submitted by the Canadian Allocation Group (including the CCC)

---

[1]     The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### REPLY AFFIDAVIT OF SHARON HAMILTON
### (sworn April 25, 2014)

I, Sharon Hamilton, of the City of Toronto, in the Province of Ontario, MAKE OATH AND SAY:

1.      I am a Senior Vice-President of Ernst & Young Inc. ("**EYI**"), the Monitor of Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**") and the other Applicants (collectively, the "**Canadian Debtors**") in the within *Companies' Creditors Arrangement Act* (the "**CCAA**") proceedings, and as such have knowledge of the matters hereinafter deposed to. Further details of my experience and involvement in these proceedings are provided in my Affidavit sworn April 11, 2014 (the "**April 11 Affidavit**").

2.      Unless I state otherwise, the following facts are within my personal knowledge. Where I have indicated that I have obtained information from other sources, I have stated the source of that information and I believe such information to be true. I have reviewed a copy of each and every document that I refer to in my Affidavit prior to swearing it. I use the same capitalized terms as in my April 11 Affidavit, except where I note otherwise. All amounts specified herein are in USD unless otherwise stated.

- 2 -

3.     I had a significant degree of interaction with John Ray over the period January 2010 (in and around the time his engagement as NNI's principal officer began) through July 2011 (when the Residual IP sale was concluded) and direct involvement in nearly all of the matters he describes in his Declaration sworn April 11, 2014 (the **"Ray Declaration"**).

## I.     NNI COULD NOT BE A "STAND-ALONE" BUSINESS

### a.  The US Debtors Were Wound Down

4.     At paragraphs 11 to 19 of the Ray Declaration, Mr. Ray describes his understanding of NNI's business and operations. Most of what Mr. Ray describes as his understanding of NNI's business and operations is "as of the Petition Date" (i.e. January 14, 2009) or otherwise prior to the commencement of the insolvency filings. In each case, this is well before Mr. Ray was engaged as NNI's principal officer at the end of 2009.

5.     Mr. Ray goes on to opine at paragraph 15 of the Ray Declaration that "NNI had all of the administrative and operational functions it needed to operate on a standalone basis had it chosen to emerge from bankruptcy as an operating entity."

6.     I am not aware of any experience Mr. Ray had with NNI's actual business operations pre-filing, and by the time his engagement as NNI's principal officer commenced some 11 months into the insolvency proceedings, the significant restructuring decisions had been made and Nortel's business and operations (to the extent they had not already been divested) had been radically transformed. Specifically, Mr. Ray's involvement began after the Estates' decision to commence a liquidating insolvency and sell the LOBs, and I am unaware of any involvement he had in the Estates' and their respective advisors' and constituents' consideration and selection of a liquidating insolvency as opposed to any individual Nortel entity or LOB continuing as an

operating business in any fashion. For the reasons discussed at paragraphs 16 to 24 of my April 11 Affidavit, before Mr. Ray's involvement it had already been decided by the Estates that a restructuring of Nortel (or any LOB) as a going concern was not a viable option, including because: (i) one of Nortel's most important customers, Verizon, had advised Nortel management that it would not purchase Nortel's LTE technology and that it would transition its CDMA business to another supplier unless Nortel conveyed its CDMA LOB into "safe-hands"; and (ii) Nortel did not have access to the capital necessary to restructure and continue any aspect of its business as a going concern.

7.     By the time of Mr. Ray's engagement by NNI in December 2009:

    a)     the decision to sell the LOBs had been publicly announced (June 2009);

    b)     the IFSA had been agreed to and approved by the Courts (June 2009);

    c)     the CDMA/LTE transaction had closed and the business conveyed to Ericsson (November 2009). Notably (as described in detail at paragraphs 17 to 25 of my April 11 Affidavit), the CDMA LOB (together with the related and emerging LTE technology) had been the only LOB that those charged with considering Nortel's actual restructuring options had considered executing a going-concern restructuring around. By the time of Mr. Ray's involvement, the prospect of a going-concern restructuring of Nortel had been abandoned and these assets had been divested;

    d)     the Enterprise LOB had been sold in July 2009 and that transaction closed on December 18, 2009 (around the time of Mr. Ray's engagement and prior to his engagement becoming effective upon US Court approval in early January 2010);

- 4 -

e)    the Layer 4-7 and NGPC LOBs had been sold and the transactions had closed (in March 2009 and December 2009, respectively); and

f)    the sale processes and auctions (if applicable) for each of the MEN, GSM/GSM-R and CVAS LOBs had concluded and the asset sale agreements providing for their definitive sale to the ultimate purchasers of each of those LOBs had been executed.[1]

8.    In short, by the time of Mr. Ray's engagement, Nortel's largest LOBs had already been divested, its remaining significant LOBs were under contract to be sold, and the Estates were focusing their collective efforts on the actions necessary to close those transactions (in particular, the carve out process described at paragraphs 51 and 52 of my April 11 Affidavit).

9.    As part of my role on behalf of the Monitor I regularly reviewed disclosure from the other Estates regarding their operations. The divestitures noted above resulted in NNI having virtually no business operations by the time Mr. Ray commenced his engagement. This is illustrated by the fact that in June 2009 (before any of the LOB sales had closed), NNI reported total monthly revenues of $455 million, whereas by January 2010 (Mr. Ray's first full month on the job and following the closing of the CDMA/LTE and Enterprise transactions), NNI's monthly revenues had declined by approximately 82% to $81 million.[2] By April 2010 they had

---

[1] The MEN transaction closed on March 19, 2010, the GSM/GSM-R transaction closed on March 31, 2010 and the CVAS transaction closed on May 28, 2010.

[2] See: (i) NNI Monthly Operating Report No. 5 (Exhibit 11360), at p. 2; and (ii) NNI Monthly Operating Report No. 12 (Exhibit 11361), at p. 2.

- 5 -

declined to $30 million.[3] At the time of the Rockstar transaction in July 2011 NNI reported no revenue.[4]

10.    I was involved in discussions with counsel to the US Debtors and the Committee in connection with Mr. Ray's engagement. I understood the reason for Mr. Ray's engagement as NNI's principal officer was the view of counsel to the US Debtors and the Committee that, with the LOB sales signed and/or concluded, the US Debtors required an "independent" officer to represent their interests as the insolvency proceedings moved into the wind-down phase and the Estates commenced efforts to reach agreement on or otherwise provide for the determination of the allocation of the sale proceeds.

11.    I also reviewed the terms of Mr. Ray's engagement letter with NNI dated December 7, 2009. Consistent with this wind-down rationale, the engagement letter describes Mr. Ray's principal responsibility as "overseeing and directing the wind down of the estates of NNI and the other US Debtors with the goal of promptly maximizing the value to be distributed to creditors." The first two specific services listed to be performed by Mr. Ray in his engagement letter are: (i) directing and overseeing the winding up of the businesses of the US Debtors; and (ii) supporting and defending the interests of the US Debtors' estates and their creditors on issues including, without limitation, purchase price allocation among the Estates.[5] There is no reference in Mr. Ray's engagement letter to the effect that he would be charged with considering a re-start of

---

[3] NNI Monthly Operating Report No. 15, at p. 2 (Exhibit 11362).

[4] NNI Monthly Operating Report No. 30, at p. 2 (Exhibit 11365).

[5] Engagement letter between NNI and John J. Ray III dated December 7, 2009, at para. 2 (Exhibit 11358).

- 6 -

NNI, and in fact his engagement letter expressly provides that the services to be provided by him will not include day-to-day operational management of the US Debtors' businesses.[6]

12.     Similarly, I reviewed the Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors filed by the US Debtors with the US Court on September 3, 2010 (the "**Disclosure Statement**") and it also discloses an intention to wind-down the US Debtors' business rather than re-start an operating business. In the Disclosure Statement, the US Debtors note that:

> After Nortel determined in June 2009 that selling its businesses was the best path
>
> forward, Nortel commenced a process to evaluate its businesses and provide for the
>
> potential disposition of certain assets. *It quickly became clear to the [US Debtors]*
>
> *and other Nortel Affiliates subject to the Creditor Protection Proceedings that the*
>
> *best means of maximizing recovery for the creditors of all estates was through the*
>
> *expeditious monetization of Nortel's operations and assets.* In furtherance of this,
>
> the Debtors and other Nortel Affiliates have participated since the Initial Petition
>
> Date in the asset sales and other dispositions of assets that are described in greater
>
> detail below.[7] [emphasis added]

13.     The Disclosure Statement goes on to detail the US Debtors' proposed plan of "reorganization" (which is appended to the Disclosure Statement and executed by Mr. Ray). The type of plan proposed by the US Debtors is what is colloquially known in bankruptcy

---

[6] *Ibid.*

[7] Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors dated September 3, 2010 (Exhibit 11359), at p. 38.

terminology as a liquidating "pot" plan; that is, it is proposed that the assets of each US Debtor will be distributed to its creditors in accordance with applicable priorities.[8]

14.     With respect to the "post-emergence" strategy of the US Debtors, the Disclosure Statement reports that each US Debtor that is not liquidated on the plan effective date will "...operate to fulfill its obligations under the [LOB sales] and the [transition services agreements entered into with the LOB purchasers], monetize its assets, including residual intellectual property rights, and distribute Creditor Proceeds..."[9] With the exception of noting the then ongoing consideration of IP Co. as a means of maximizing the value of the Residual IP (which at that time was still being considered before being rejected by all Estates in favour of proceeding with a sale of the Residual IP as further described in my April 11 Affidavit at paragraphs 71 to 84), nowhere in the 109-page Disclosure Statement do the US Debtors' disclose an intention to consider, let alone pursue, a "re-start" of NNI.

15.     Further, at no point did Mr. Ray or any other representative of the US Debtors ever advise me of an intention to consider a "re-start" of NNI as a stand-alone entity, nor do I see how this could have been possible, especially given the divestitures described above and the interdependency of the Nortel entities as discussed below.

    b.  *Nortel's Businesses and Entities were Integrated*

16.     The LOBs operated across jurisdictional boundaries and the assets, contracts and employees relevant to the operation of a particular LOB were owned or employed by various individual Nortel legal entities. This was the reason it was necessary for each of the Estates

---

[8] *Ibid.* at p. 60.

[9] *Ibid.* at p. 81.

- 8 -

(among numerous other non-debtor Nortel affiliates) to participate in the LOB sales to effect their orderly sale and transition to the purchasers. The US Debtors consistently recognized the reality of the interdependency of the various Nortel entities during the insolvency proceedings.[10]

17.    The US Debtors described the particular importance of NNL to the overall operations of the Nortel group as follows:

> The importance of NNL to the Nortel Group is self-evident. First, NNL is both the historic and actual operational parent of the global Nortel enterprise. From the Nortel Group headquarters in Toronto, Canada, NNL provides corporate overhead support to its affiliates throughout the world. In particular, a substantial portion of Nortel's legal, finance, strategic, insurance, procurement, human resources and real estate functions are directed on a group-wide basis from NNL's Toronto offices. Second, NNL conducts a disproportionate share of Nortel's Research and Development Activities (when compared to revenue generation) and operates the Carling Facility, the largest Nortel R&D facility in the world [...]. Third, as noted

---

[10] See, for instance: (i) First Day Declaration of John Doolittle sworn January 14, 2009, at para. 26 (Exhibit 21540): "The Nortel Companies' businesses are highly complex and global in nature. As set forth in more detail below, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and their debtor and non-debtor affiliates employ a global integrated business model"; (ii) US Debtors' Motion pursuant to 11 U.S.C. § 363, § 503 and Fed. R. Bankr. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, at para. 10 (Exhibit 11366) (the "**US Debtors' IFSA Motion**"): "As described in the First Day Declaration, the Nortel entities operate on an integrated basis across multiple jurisdictions"; and (iii) US Debtors' Motion Pursuant to 11 U.S.C. § 105(a), §363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Canadian Funding and Settlement Agreement, and (B) Granting Related Relief, at para. 16 (PC0214979): "As described in the First Day Declaration, the Nortel entities have operated and continue to operate on an integrated basis across multiple jurisdictions."

- 9 -

above, NNL is the legal owner of nearly all of the group's intellectual property, which it licenses to its affiliates. [...]

The [IFSA] is further necessary to preserve the US Debtors' estate, because if NNI does not pay NNL the amounts provided in the [IFSA], NNL faces a potential funding crisis that would seriously harm the entities' interconnected global business operations and substantially decrease the value of the US Debtors' estates. [11]

18.     As part of my mandate in connection with the various sale transactions, I was involved in considering the transition service arrangements entered into with the LOB purchasers and implementing the strategy necessary to fulfill the Nortel entities' obligations thereunder, including the establishment of "Nortel Business Services" ("**NBS**"). Each of NNC, NNL and NNI (and in some cases other Nortel entities, including NNUK) were parties to the agreements governing the transition service arrangements and contributed personnel and resources to NBS so the Nortel entities could fulfil their transition service obligations. It was critical that NBS fulfil the transition services mandate as portions of the purchase price payable in connection with the LOB transactions were escrowed and their release for the benefit of the applicable Nortel vendors was conditioned upon the successful completion of the transition services.

19.     Mr. Ray makes reference to NNI's "leadership" of NBS. Although NNI played an important role in NBS, Mr. Ray's description of NBS as being led by NNI is not accurate. Rather, like the LOBs, NBS required the efforts of all Estates to successfully execute its mandate. By way of example, as at March 29, 2010, approximately 532 employees of the

---

[11] US Debtors' IFSA Motion, *supra* note 10, at paras. 16 and 30.

- 10 -

Canadian Debtors and 864 employees of the US Debtors were engaged in providing NBS related-services (together with numerous employees in other jurisdictions).[12] Also, I am informed by Allan Bifield, former NBS finance leader (and an NNL employee), that the largest portion of the billings generated by NBS resulted from the provision of IT services, a function to which the Canadian Debtors contributed more employees than the US Debtors.

20.     Further, the business of NBS was not analogous to Nortel's pre-filing business. Nortel's pre-filing business was that of a technology company driven by R&D and the IP created thereby. NBS was simply an interim provider of "back-room" HR, finance and IT support to the LOB purchasers to allow them to transition the LOBs from Nortel's support-infrastructure (for example, Nortel's IT, financial accounting and HR systems) to their own platforms.

## II. OBLIGATIONS OF THE CANADIAN DEBTORS INCURRED ON BEHALF OF THE GROUP

21.     The Ray Declaration also describes various instances of NNI providing credit support to the Canadian Debtors, particularly the guarantee of the bonds issued by NNC and NNL, as well as the guarantee of a pre-filing performance bonding facility provided by EDC.

22.     NNC or NNL are of course the principal obligors with respect to these obligations, the proceeds or other benefits of which were extended to the entire Nortel group. By way of example, none of EDC's final accepted claim against NNL of approximately $20.2 million relates to performance bonds issued in favour of a Canadian Debtor. Approximately $2.5 million relates to performance bonds issued for the benefit of the US Debtors, $4.5 million relates to performance bonds issued for the benefit of the EMEA Debtors and approximately $13.2 million

---

[12] See CCC0034853.

- 11 -

relates to performance bonds issued for the benefit of Nortel entities in the CALA and APAC regions.[13]

23.    Further, as would be expected of a parent company, NNL also provided significant and material credit support to NNI, NNUK and other Nortel entities. For instance, NNL guaranteed many of the material real estate leases of NNI, including a lease at Research Triangle Park in Raleigh, North Carolina, the lease of one of its facilities in Richardson, Texas and its lease at One Boston Place in Boston, Massachusetts. NNL also provided guarantees in respect of the lease of NNUK's headquarters (Maidenhead, Berkshire, England) and its main R&D facility (Harlow, England) as well as NNSA's main facilities in Chateaufort and Magny-Les-Hameaux, France. The pending as filed or accepted value of these lease guarantee claims against NNL is approximately CAD$440 million.

24.    NNL also facilitated the provision of letters of credit on behalf of NNI in respect of NNI's workers compensation and other liabilities, which letters of credit were fully cash collateralized by NNL. These letters of credit were called on in the post-filing period resulting in the loss of approximately $5.8 million of the cash collateral posted by NNL.

25.    In addition, NNL was generally the counter-party to various "master" supply agreements with Nortel's major suppliers, the benefit of which was extended to NNI, NNUK and other

---

[13] Mr. Ray's Declaration suggests that EDC has a $99 million claim against NNI. This would appear to be as-filed claim amount rather than NNI's ultimate liability. As noted, EDC's claim against NNL has been finally resolved in the amount of approximately $20.2 million and notice of this resolution was provided to the US Debtors. As NNI's liability to EDC arises from a guarantee of NNL's obligation to EDC, it is not apparent to me how NNI's present liability to EDC could be any greater than $20.2 million.

- 12 -

Nortel affiliates to allow them to purchase goods. Significant claims have been filed against NNL by the counter-parties to these agreements for end-of-contract liabilities arising from the cessation of Nortel's business, including last-time buy obligations and excess and obsolete inventory obligations.

## III.   THE SALES

### a.   Transaction Costs

26.   Mr. Ray also speaks to the "considerable effort and expense" of the US Debtors in organizing and running the sales. Again, like NBS, the sales were coordinated efforts in which all Estates invested significant time and effort. I do not necessarily take Mr. Ray to be suggesting that NNI bore a more substantial burden in connection with the sales than the Canadian Debtors (or the EMEA Debtors for that matter), but to the extent he is, the statement is incorrect.

27.   Each of the sale processes involved counsel and other professional advisors to the Canadian Debtors participating in crafting and implementing the sales processes and transactions. Indeed, the only difference I can think of between the efforts of the Canadian Debtors and US Debtors in this regard is that the auctions were held at the offices of counsel to the US Debtors in New York for logistical reasons (and at the insistence of the US Debtors who indicated they were legally required to hold auctions in the United States); however, in my estimation, any additional expenses of the US Debtors resulting from "hosting" were more than offset by the additional travel expenses incurred by the Canadian Debtors travelling to and from New York and paying for accommodation.

28.   Further, the Estates turned their minds to and addressed the sharing of the most significant transaction costs pursuant to agreements approved by the Courts. For instance, the

fees of Lazard and Global IP (Nortel's investment banker and IP advisor, respectively), the fees payable to PwC and KPMG LLP for preparing carve-out financial statements for the LOBs, and the break fees and expense reimbursements payable to unsuccessful stalking-horse purchasers, have all been paid (or reimbursed to the party(s) paying the cost in the first instance) from the escrowed sale proceeds such that the costs will ultimately be borne by each of the Estates in a manner consistent with the sale proceeds allocation.

29.    Mr. Ray also notes additional (and mostly unspecified) burdens assumed by NNI for the benefit of the Nortel group in connection with the sales, in particular an election by NNI to assume an unprofitable lease. I am advised by Mr. Bifield (former NBS finance leader), that what Mr. Ray neglects to mention is that the assumption of this lease occurred in the context of the transition services arrangement described above, and that NNI had a net positive recovery on TSA services (i.e. NNI billings to purchasers exceeded operation costs) through Q2 2011, at which point transition services had largely been completed.

30.    In any event, the Canadian Debtors incurred significant unreimbursed expenses in order to facilitate the transactions. Most significantly, the Canadian Debtors funded the corporate overhead and much of the R&D cost associated with the LOBs over the course of the insolvency proceedings such that the LOB transactions could be successfully consummated and the LOBs transitioned to the purchasers.[14] These costs were in part reimbursed by payments to NNL pursuant to the IFSA and the CFSA, but the amounts payable under those agreements were settlement amounts and did not represent the full amount of the expenses incurred by the

---

[14] Aspects of the significant and on-going cash burn experienced by NNL pending the closing of the LOB transactions are described at paragraphs 29 to 31 of my April 11 Affidavit.

- 14 -

Canadian Debtors. As a result, the Canadian Debtors incurred an operational cash burn of approximately $128.2 million through the closing of the final LOB transaction in March 2011.[15] This included approximately $6.4 million of salary and other compensation payable to Nortel's Canadian M&A employees who assisted and/or led the sale efforts and the cost of the electronic data rooms set up for purchaser due diligence. The Canadian Debtors incurred these expenses with a view to facilitating the successful completion of the transactions and maximizing the total value of Nortel's assets. These costs were incurred without knowing what portion of the sale proceeds would ultimately be allocated to the Canadian Debtors and understanding that, failing agreement, allocation would ultimately be determined by the Courts, and there was a risk the costs would not be fully recovered. I believe the US Debtors and EMEA Debtors incurred expenses on the same basis and with an understanding of the same risk.

31.     In addition, the Canadian Debtors paid approximately $27.8 million to maintain the Residual IP (patent analysis, drafting, filing, prosecution, registration and maintenance fees and related enforcement costs) for the period 2009 through the close of the Rockstar transaction. Although the Canadian Debtors and Monitor believe the Canadian Debtors are entitled to the entirety of the Residual IP sale proceeds, in spending these amounts we understood that allocation was subject to agreement or determination, and there was a risk that such expenses may not ultimately be recovered.

---

[15] In calculating this operational cash burn I exclude asset sale receipts, professional fees and the costs of retired and disabled employees, and the amount is net of any reimbursements received from the other Estates.

- 15 -

     *b.   The Value of IP*

32.    Mr. Ray also states in his declaration that NNI's exclusive rights to the Nortel business and IP in the United States drove the value paid by purchasers in most of the sales. No factual basis is provided by Mr. Ray for this statement and I am not aware of any basis for it other than Mr. Ray's own opinion, which I disagree with. In the numerous discussions I had with purchasers over the course of the sale transactions, I never heard any of them state that the value driver was NNI's exclusive IP rights; rather as described in detail at paragraph 62 of my April 11 Affidavit, the purchasers were uniformly focused on acquiring ownership of IP wherever possible. Mr. Ray seems to acknowledge as much at paragraph 53 of the Ray Declaration.

## IV.    THE SALE OF THE RESIDUAL IP VS. IP CO.

33.    Although Mr. Ray had no involvement in most of the LOB transactions, he did have some involvement in the Estates' and their creditors' consideration of the best means to maximize the value of the Residual IP, in particular whether to pursue a sale of the Residual IP or the so-called IP Co. These considerations are described in detail at paragraphs 65 to 84 of my April 11 Affidavit.

34.    I agree with aspects of what Mr. Ray describes at paragraphs 49 to 56 of his Affidavit.[16] Where Mr. Ray and I diverge significantly is in terms of assessing the ultimately viability of the

---

[16] I note that Mr. Ray describes George Riedel as "George Riedel of NNI" and that Mr. Riedel "led the M&A/Strategy function from the US." Mr. Riedel was an employee of NNI and a US resident but was the Chief Strategy Officer and a Senior Vice-President of NNC. His primary Nortel office was in Toronto (which he commuted to regularly from the Boston area where he lived). In addition, Mr. Ray was not selected to negotiate Mr. Riedel's compensation structure alone; rather, it was negotiated by Mr. Ray with significant input from the Canadian

IP Co. model. For the reasons described in my April 11 Affidavit, I disagree the IP Co. model was a "fully realized business model". Quite to the contrary, IP Co.'s "business model" was almost entirely speculative and was more in the nature of a straw-man that the Estates used to benchmark the sale process for the Residual IP against. In particular (as detailed at paragraphs 78 to 80 of my April 11 Affidavit):

a)      Nortel had no experience in operating a licensing business;

b)      there were no good precedents available in the market to estimate the cash flow that IP Co. could generate, or the costs that would be incurred to run its business; and

c)      no source of start-up or working capital was ever identified or proposed by any Estate or other party, and when the sole party wanting to continue to pursue IP Co. (the Ad Hoc Bondholder Group) was put to an ultimatum to provide a funding proposal, none was provided.

35.      With respect to the funding issue in particular, Mr. Ray notes at paragraph 57 of the Ray Declaration that there was consideration of listing the IP Co. business on a US securities exchange as a means of accessing necessary start-up and working capital. I recall the idea of possibly listing IP Co. on a securities exchange being discussed briefly on a very preliminary basis. The reason it was only discussed briefly is that we were advised by counsel to the Canadian Debtors and the US Debtors that listing IP Co. on a stock exchange would necessitate

Debtors, the Monitor and the EMEA Debtors. Mr. Ray also states that Nortel's IP group was based in the US; in fact, as of March 29, 2010, 17 IP employees were in Canada and 12 were located in the United States (see CCC0034853).

- 17 -

prospectus and ongoing disclosure requirements that would likely require the public disclosure of IP Co.'s business model including: (i) its licensing structure and the licensing fees it intended to charge; and (ii) IP Co.'s assets and cash resources. It was considered that public disclosure of this information would significantly undermine IP Co.'s prospective business model insofar as licensing targets would have been able to mine IP Co.'s public disclosures to determine its "bottom line" in licensing negotiations and/or litigation, as well as its ability to fund ongoing litigation. I note also that Mr. Ray specifically references listing on a "US" securities exchange. I do not recall there being any discussion of a specific exchange, and in particular whether it would be a Canadian or US exchange.

## V.   THE ASSERTION OF NNL'S OWNERSHIP OF NORTEL IP

36.   I also disagree with Mr. Ray's suggestions that the Canadian Debtors and the Monitor never disclosed that NNL owned Nortel's IP, and that he was somehow entitled to expect that the Canadian Debtors would not claim what they considered to be their full entitlement to the sale proceeds when it came time for the Courts to determine allocation.

37.   The Canadian Debtors have consistently maintained that NNL was the owner of Nortel's IP (including, without limitation, the Residual IP). The very first Report filed by EYI in the CCAA proceedings on January 14, 2009, stated that: "Nortel's intellectual property ("IP") is principally owned by NNL."[17]

38.   Similarly, the Monitor's Reports filed in connection with the Residual IP sale process clearly state that NNL holds legal title to the Residual IP. The Reports also state that the Residual

---

[17] Report of Ernst & Young Inc. dated January 14, 2009, at para. 42 (Exhibit 21278).

- 18 -

IP is subject to intercompany licenses. The Reports then provide a summary description of the provisions of the IFSA, including the Estates' agreement that entry into a sale transaction shall not be conditioned upon reaching an agreement on allocation or a binding procedure for same, and that the Residual IP sale proceeds would be deposited into escrow pending the agreement of all selling debtors or a determination by a dispute resolver. The Reports go on to indicate that no agreement has been reached regarding the allocation of the Residual IP sale proceeds.[18] The US Debtors were provided with and made no objection to these Court-filed Reports.

39.     In addition, I can recall at least two specific instances during the course of the Residual IP sale process where the issue of NNL's ownership of the Residual IP was expressly discussed with representatives of the US Debtors.

40.     By way of background, the Canadian Debtors and the Monitor initially took the position that the Residual IP sale was different from the LOB transactions as practically all of the assets being sold were patents which NNL owned and, as such, the transaction should be led by the Canadian Debtors and NNL should be the only "seller" in the transaction. After discussions between counsel and being informed that the US Debtors proposed that, consistent with the LOB transactions and the IFSA, both Estates work on the Residual IP sale process together, the Canadian Debtors and Monitor agreed to this proposal to avoid time consuming litigation over the issue that could threaten to materially disrupt the sale process. Thus, consistent with the IFSA framework, the Canadian Debtors and Monitor agreed that a cooperative approach coupled with

---

[18] Sixty-Third Report of the Monitor dated April 14, 2011 at paras. 82 – 84 (NNC-NNL11755879) and Seventy-First Report of the Monitor dated July 6, 2011 at paras. 49 - 51 (NNC-NNL11755866).

the deferral of allocation issues to a later date was in the best interests of the Canadian Debtors, even though there was or might be a divergence of views about allocation.

41.     In addition, at a meeting held at the offices of Cleary Gottlieb Steen & Hamilton LLP (counsel to the US Debtors) ("**Cleary**") (relating to another Nortel matter but held in and around the timeframe that the Estates were commencing the sale process for the Residual IP), I learned that Cleary was working on a draft form of asset sale agreement for the Residual IP. I was concerned by this as Cleary had not advised me they were preparing a draft and in prior conversations with Cleary I had indicated that I expected counsel to the Canadian Debtors (then Ogilvy Renault LLP ("**Ogilvy**")) to play a significant role in preparing the Residual IP transaction documentation as the Residual IP was an NNL asset. Upon learning of the Cleary draft, I asked Jim Bromley of Cleary to step outside the conference room we were both working in and reminded him that I had previously advised Cleary of our view that the Residual IP was an NNL asset, that I expected Ogilvy to take the lead in preparing transaction documentation, and that I was disturbed to find out that Cleary was progressing Residual IP transaction documentation internally without my knowledge. Mr. Bromley advised me it was an oversight on Cleary's part, that it was a very preliminary draft and that he would immediately provide me with a copy of the sale agreement (which Cleary subsequently did).

42.     I was also in attendance at the May 2010 meeting discussed at paragraph 72 of the Ray Declaration. In addition to Murray McDonald (of the Monitor) and the representatives of the US Debtors referenced by Mr. Ray, the meeting was attended by me, Brent Beekenkamp and William Armitage (of the Monitor), Derrick Tay and Michael Lang (counsel to the Canadian Debtors) and Jay Carfagnini and Joe Pasquariello (counsel to the Monitor).

43.    The meeting was a without prejudice settlement meeting. Without communicating the substance of the positions discussed at the meeting or waiving the confidentiality of the settlement communications, the Canadian Debtors and the Monitor indicated a willingness to negotiate a resolution of allocation that would involve accepting less than what we believe the Canadian Debtors' legal entitlement is. I can confirm Mr. Ray's statement at paragraph 73 of the Ray Declaration that the "US Debtors' proposal that day was entirely consistent with the allocation position being advanced today in the Allocation Litigation by the US Debtors, the Committee, and the Bondholders Group." It was perfectly clear that absent a settlement (which, of course, was never concluded), each of the US Debtors and Canadian Debtors (and their respective constituents) reserved all rights in the allocation dispute and I clearly recall that at the meeting Murray McDonald advised Mr. Ray and the other representatives of the US Debtors in attendance that NNL could take the position that it owns Nortel's IP and claim 100% of the sale proceeds on that basis.

44.    I do not suggest that Mr. Ray or the US Debtors agreed that NNL had a sole entitlement to the proceeds of Nortel's IP. But it is clear that they knew, or ought to have known, they had no representation or commitment that such an entitlement would not or could not be claimed by the Canadian Debtors. Nor were we ever asked for a representation, guarantee or undertaking that, regardless of the Canadian Debtors' entitlement, the US Debtors would receive some minimum amount from the Residual IP sale (or any other sale subject to allocation). Nor did we ask for or receive any such commitment from the US Debtors. Rather, we recognized that the US Debtors and EMEA Debtors would make whatever claims to allocation they wanted to, and both we and they could resist the others' positions. Absent agreement, the Courts would decide.

45.    Consistent with this, the Estates and their constituents were scrupulous in their dealings to reserve all rights and positions with respect to the allocation dispute. By way of example, every material post-filing agreement entered into among the Estates that could be taken to potentially impact on the allocation dispute (in particular those that dealt with transfer pricing issues such as the CFSA, TPAA and Q1SA, or those that dealt with the sharing of transaction costs, such as the various side agreements entered into in connection with the transactions) contained a provision which provided that nothing in the particular agreement would alter the rights of the parties to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any sale transaction or IP transaction. An example of this type of provision is the passage of the Court-approved IP Transaction Side Agreement among the Estates (and others) dated April 4, 2011 (the **"IP Transaction Side Agreement"**), cited at the conclusion of my April 11 Affidavit:

> Nothing in Section 5.13(b) of the Stalking Horse Agreement or the amendments and modifications to the Transfer Pricing Agreements resulting therefrom or the actions taken as a result thereof *shall bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the IP Sale Proceeds or the proceeds of any other transaction,* including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Nortel Parties,

- 22 -

and such presentation shall not, or otherwise be deemed to, constitute in any way

a violation of a Party's rights under any existing agreement.[19] [emphasis added]

46.     The Ray Declaration also states that no Monitor representative ever told Mr. Ray that the

license termination agreements in the Residual IP transaction were irrelevant. I am confused by

this statement as the Estates expressly agreed under the IP Transaction Side Agreement (which

Mr. Ray personally signed) that the license terminations were irrelevant for purposes of

allocation. As described at paragraph 100 of my April 11 Affidavit, the Residual IP license

terminations were a significant point of discussion among the Estates and each of them wanted to

ensure that the status quo with respect to the MRDA and their respective rights thereunder would

be preserved, and that the contemplated license terminations in connection with the Residual IP

transaction would have no impact on the allocation dispute.

47.     To that end, in addition to the portions of the IP Transaction Side Agreement I reference

above at paragraph 45, the IP Transaction Side Agreement also provides as follows:

*The Parties acknowledge that the amendments and modifications to the Transfer*

*Pricing Agreements contemplated by Section 5.13(b) of the Stalking Horse*

*Agreement[20] are being effected at the request of the Purchaser as a condition of*

*the Transaction and that, for purposes of the allocation of the IP Sale Proceeds or*

*the proceeds of any other transaction, including, without limitation, the sale of*

*assets, businesses or intellectual property, that would be subject to allocation*

---

[19] IP Transaction Side Agreement dated April 4, 2011, at Section 12 (NNC-NNL11773287).

[20] Being the provision of the stalking-horse agreement with Google pursuant to which the Nortel sellers agreed to, among other things, terminate all license rights to the Residual IP granted under the MRDA.

- 23 -

*amongst any of the Nortel Debtors and any other claims or disputes among the*
*Nortel Debtors, such amendments and modifications, and the actions taken as a*
*result thereof, shall have no impact on the rights of the Nortel Parties (i) under or*
*in connection with the Transfer Pricing Agreements, which rights shall continue*
*as they exist immediately prior to the closing of the Transaction,* including,
without limitation, the right to object to the propriety of any payments made under
or in connection with the Transfer Pricing Agreements, the right to object to the
failure to make payments under or in connection with the Transfer Pricing
Agreements, or any offset arising therefrom or otherwise, and the right to
advocate for an allocation of the IP Sale Proceeds, or (ii) with respect to any
potential tax contingencies, assessments, rulings or agreements arising from
Transfer Pricing Payments (as defined in the FCFSA) pursuant to the Transfer
Pricing Agreements or any offset arising therefrom or otherwise: [emphasis
added][21]

48.     Mr. Ray also alleges that the Monitor "said nothing" about its allocation position when
the US Court approved the Rockstar transaction as being in the best interests of the US Debtors.
As I describe above at paragraph 38, the Monitor's Report filed in connection with the Rockstar
transaction clearly indicated that allocation had not been agreed to and that proceeds would be
deposited into escrow pending agreement or resolution of the allocation dispute pursuant to the
IFSA. Both Courts approved this structure, and no representative of the US Debtors, the
Committee or any other party appearing indicated the Canadian Debtors had in any way limited
the allocation entitlement they could claim. This is because all of the Estates and their

---

[21] IP Transaction Side Agreement, *supra* note 19.

- 24 -

constituents knew allocation was a matter for another day. As counsel for the Committee accurately summarized to the Courts at the hearing to approve the Rockstar transaction:

> Your Honor, we heard a lot the last time we were together about the IFSA and what it meant. I think all parties agree that *the IFSA contemplated cooperation amongst the selling parties in the sales efforts to maximize value without reference to any allocation disputes* of which we heard so much about the last time. [emphasis added]

SWORN before me at the City of Toronto,
on April 25, 2014.

_____
A Commissioner for taking affidavits
Name: CHRIS ARMSTRONG

_____
Name:  Sharon Hamilton

6322508

# Index

## REPLY AFFIDAVIT OF SHARON HAMILTON (sworn April 25, 2014)

### INDEX

| Tab | Paragraph Referred to in Affidavit | Trial Exhibit Number | Depo Exhibit Number or Bates Number |
|-----|-----------------------------------|---------------------|-------------------------------------|
| 1 | Paragraph 9; Footnote 2 | TR11360 | Exhibit 11360 |
| 2 | Paragraph 9; Footnote 2 | TR11361 | Exhibit 11361 |
| 3 | Paragraph 9; Footnote 3 | TR11362 | Exhibit 11362 |
| 4 | Paragraph 9; Footnote 4 | TR11365 | Exhibit 11365 |
| 5 | Paragraph 11; Footnote 5 and 6 | TR11358 | Exhibit 11358 |
| 6 | Paragraph 12; Footnote 7 | TR11359 | Exhibit 11359 |
| 7 | Paragraph 16; Footnote 10 | TR21540 | Exhibit 21540 |
| 8 | Paragraph 16; Footnote 10 and Paragraph 17; Footnote 11 | TR11366 | Exhibit 11366 |
| 9 | Paragraph 16; Footnote 10 | TR49697 | PC0214979 |
| 10 | Paragraph 19; Footnote 12 and Paragraph 34; Footnote 16 | TR40175 | CCC0034853 |
| 11 | Paragraph 37; Footnote 17 | TR21278 | Exhibit 21278 |

| 12 | Paragraph 38; Footnote 18 | TR45578 | NNC-NNL11755879 |
| 13 | Paragraph 38; Footnote 18 | TR45574 | NNC-NNL11755866 |
| 14 | Paragraph 45; Footnote 19 | TR46858 | NNC-NNL11773287 |
| 15 | Paragraph 48 | TR21509 | Exhibit 21509 |

6330434