MOR-4

**NORTEL NETWORKS INC. et al**
**(DEBTORS-IN-POSSESSION)**
**NOTES TO MONTHLY OPERATING REPORT No. 30 (UNAUDITED)**
**(In millions of U.S. dollars)**

### 1. Reservation of Rights:

Nothing contained in this Monthly Operating Report shall constitute a waiver of any of the rights of the Debtors (as defined herein) or an admission with respect to their Chapter 11 Proceedings (as defined herein), including, but not limited to, matters involving objections to claims, substantive consolidation, equitable subordination, defenses, ultimate allocation of proceeds from sales among debtor estates, characterization or re-characterization of contracts, assumption or rejection of contracts under the provisions of chapter 3 of title 11 of the United States Code ("Bankruptcy Code") and/or causes of action under the provisions of chapter 5 of the Bankruptcy Code or any other relevant applicable laws to recover assets or avoid transfers.

### 2. Background and Organization:

Prior to Nortel's significant business divestitures, Nortel Networks Corporation ("NNC") and its subsidiaries (collectively "Nortel"), including the U.S. Debtors (as defined below), was a global supplier of end-to-end networking products and solutions serving both service providers and enterprise customers. Nortel's technologies spanned access and core networks and supported multimedia and business-critical applications. Nortel's networking solutions consisted of hardware, software and services. Nortel designed, developed, engineered, marketed, sold, licensed, installed, serviced and supported these networking solutions worldwide.

*Creditor Protection Proceedings* - On January 14, 2009 ("Petition Date"), Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation ("NNCC") and certain other of Nortel's U.S. subsidiaries, initiated Creditor Protection Proceedings in the U.S. Bankruptcy Court for the District of Delaware ("U.S. Court") under the Bankruptcy Code ("Chapter 11 Proceedings"), several of our Canadian affiliates ("Canadian Debtors"), including our ultimate parent company, NNC, initiated Creditor Protection Proceedings in Canada at the Ontario Superior Court of Justice ("Canadian Court") under the Companies' Creditors Arrangement Act ("CCAA"), and several of our affiliates in Europe, Middle East and Africa ("EMEA") ("EMEA Debtors") initiated Creditor Protection Proceedings in the United Kingdom under the Insolvency Act 1986. Subsequently, creditor protection proceedings were commenced for certain affiliates in other jurisdictions, including Israel and France. On July 14, 2009, Nortel Networks (CALA) Inc. ("NNCI"), an affiliate of NNI, initiated Chapter 11 Proceedings. On July 17, 2009, the U.S. Court entered an order that provided for the joint administration of NNCI's case with the pre-existing cases of the other U.S. Debtors. As a result, NNCI is included as a Debtor in the financial statements herein. Collectively, all entities under the Creditor Protection Proceedings are referred to as the "Debtors". Those entities operating in Chapter 11 Proceedings are referred to as the "Debtors in Possession" or the "U.S. Debtors." During the Creditor Protection Proceedings, the businesses of the Debtors continue to operate under the jurisdictions and orders of the applicable courts and in accordance with applicable legislation.

As of July 31, 2011, the U.S. Debtors consisted of the following entities:

| U.S. Debtors | Case no. |
|---|---|
| Nortel Networks Inc. | 09-10138 |
| Nortel Networks Capital Corporation | 09-10139 |
| Nortel Networks International, Inc. | 09-10150 |
| Nortel AltSystems, Inc. | 09-10140 |
| Nortel AltSystems International, Inc. | 09-10141 |
| Architel Systems (U.S.) Corporation | 09-10149 |
| CoreTek, Inc. | 09-10145 |
| Nortel Networks Applications Management Solutions Inc. | 09-10146 |
| Nortel Networks Cable Solutions Inc. | 09-10152 |
| Nortel Networks Optical Components Inc. | 09-10147 |
| Nortel Networks HPOCS Inc. | 09-10148 |
| Northern Telecom International Inc. | 09-10151 |
| Qtera Corporation | 09-10144 |
| Sonoma Systems | 09-10143 |
| Xros, Inc. | 09-10142 |
| Nortel Networks (CALA) Inc. | 09-12515 |

Under the Bankruptcy Code, the U.S. Debtors may assume, assume and assign, or reject certain executory contracts including unexpired leases, subject to the approval of the U.S. Court and certain other conditions.

The accompanying unaudited condensed combined financial statements do not include the effects of all current or future claims relating to the Creditor Protection Proceedings. Certain claims filed may have priority over those of the U.S. Debtors' unsecured creditors. The Debtors are reviewing all claims filed and have commenced the claims reconciliation process. Differences between claim amounts determined by the Debtors and claim amounts filed by creditors will be investigated and resolved pursuant to a claims resolution process approved by the relevant court or, if necessary, the relevant court will make a final determination as to the amount, nature and validity of claims. Certain claims that have been filed may be duplicative (particularly given the multiple jurisdictions involved in the Creditor Protection Proceedings), based on contingencies that have not occurred, or may be otherwise overstated, and would therefore be subject to revision or disallowance. The settlement of claims cannot be finalized until the relevant creditors and courts approve a plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete.

In the Monthly Operating Report No. 24, filed on March 31, 2011, covering the filing period from January 1, 2011 through January 31, 2011 (the "MOR No. 24"), the U.S. Debtors filed a copy of that certain Support Agreement, dated as of February 15, 1996, between NNI and NNCC (the "Support Agreement") following a request to do so by the Law Debenture Trust Company of New York ("Law Debenture"), as successor to The Bank of New York, trustee under the indenture dated as of February 15, 1996, among NNCC, NNL, as guarantor, and The Bank of New York, as trustee. As part of the on-going claims review and resolution process, the U.S. Debtors have determined to file the following additional documents pursuant to which NNI incurred certain indebtedness to NNCC and has made certain payments to NNCC from time to time: (i) that certain Promissory Note, dated as of July 23, 1996, between NNI and NNCC (the "1996 Note"), (ii) that certain Letter of Agreement, dated as of April 2, 2003, between NNI and NNCC (the "April 2003 Letter of Agreement"); (iii) that certain Revolving Loan Agreement, dated as of February 14, 2006, between NNI and NNCC (the "February 2006 Loan Agreement"), (iv) that certain Revolving Loan Agreement, dated as of June 15, 2006, between NNI and NNCC (the "June 2006 Loan Agreement"), and (v) that certain Revolving Loan Agreement, dated as of June 15, 2008, between NNI and NNCC (the "June 2008 Loan Agreement"), attached hereto as Exhibits A, B, C, D and E, respectively.

For further information on matters preceding the filing of this Monthly Operating Report, users should refer to prior Monthly Operating Reports. Users are also referred to the Bankruptcy Court docket for these Chapter 11 Proceedings.

### 3. Basis of Presentation:

The financial statements contained herein were not intended to reconcile to any financial statements otherwise prepared or distributed by the Debtors or any of the Debtors' affiliates. Significant efforts have been put forth to attribute the assets and liabilities to the proper legal entity. However, because the Debtors' accounting systems, policies, and practices were developed with a view to producing consolidated reporting, rather than by legal entity, it is possible that not all assets or liabilities have been recorded at the correct legal entity. Accordingly, the Debtors reserve all rights to supplement or amend any financial statements contained in this Monthly Operating Report.

The Monthly Operating Report is limited in scope, covers a limited time period, and has been prepared solely for the purpose of complying with the monthly reporting requirements of the Bankruptcy Court and the United States Trustee. The information presented herein has not been subject to all procedures that would typically be applied to financial information presented in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"). Therefore, the Debtors caution readers not to place undue reliance upon the information contained in this Monthly Operating Report. The results of operations herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the combined results of operations, financial position and cash flows of U.S. Debtors in the future.

As part of their operations and restructuring efforts, the Debtors are reviewing their assets and liabilities on an ongoing basis, including without limitation with respect to intercompany claims and obligations, and nothing contained in this Monthly Operating Report shall constitute a waiver of any of the Debtors' rights with respect to such assets, liabilities, claims and obligations that may exist.

The financial statements contained herein represent the unaudited condensed combined financial statements for the U.S Debtors only. The U.S. Debtors' non-Debtor subsidiaries are treated as non-consolidated subsidiaries in these financial statements and as such their net loss is included as "Equity in net earnings (loss) from non-Debtor subsidiaries - net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor subsidiaries" in the balance sheet. The U.S. Debtors' financial statements contained herein have been prepared in accordance with the guidance in Financial Accounting Standards Board Accounting Standards Codification 852 "Reorganizations".

The unaudited condensed combined financial statements have been derived from the books and records of the U.S. Debtors. The presentation combines the U.S. Debtors into two Reporting Groups (the Reporting Groups have now been combined into two groups

from three) consistent with the companies' ownership structure with consideration to its status as operating or non-operating and activities as follows:

● **NNI** Reporting Group: Nortel Networks Inc. and its U.S. Debtor subsidiaries Nortel Networks Capital Corporation, Nortel Networks Cable Solutions Inc., Nortel Networks International, Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Nortel Networks (CALA) Inc., Northern Telecom International Inc. and Qtera Corporation; and

● **All Other** Reporting Group: Nortel AltSystems, Inc., Nortel AltSystems International, Inc., Architel Systems (U.S.) Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions, Inc., Sonoma Systems and Xros Inc.

## 4. Liabilities Subject to Compromise:

The following tables set forth the U.S. Debtors' estimated liabilities subject to compromise as of July 31, 2011:

|  | NNI | All Other |
|---|---|---|
| Trade and other accounts payable | $          173 | $          - |
| Accounts payable intercompany | 355 | 38 |
| Restructuring liabilities | 137 | - |
| Contingent liability for NNI's debt guarantee | 3,936 | - |
| Long-term debt | 178 | - |
| Financial obligations | 40 | - |
| Pension obligations | 438 | - |
| Postretirement obligations other than pensions | 265 | - |
| Notes and interest payable intercompany | - | 125 |
| Other | 36 | - |
| Total liabilities subject to compromise | $       5,558 | $          163 |

## 5. Divestiture Proceeds Held in Escrow Pending Allocation

As of July 31, 2011, approximately $7,366 of the net proceeds (the "Escrow Funds") generated through the completed sales of businesses and certain other assets are being held in escrow accounts at JPMorgan Chase Bank, N.A. ("JPM"). The Escrow Funds are being held by JPM pending the allocation of such funds among various Nortel entities, including without limitation, one or more of the Canadian Debtors and one or more of the EMEA Debtors. The amount of the Escrow Funds that will be allocated to the U.S Debtors is not yet known. Below is a list of the escrow accounts held at JPM:

| Business/Asset Sale | Escrow Balance |
|---|---|
| CDMA | $          1,005 |
| Layer 4-7 | 18 |
| Packet Core | 10 |
| Enterprise Solutions | 920 |
| Optical Networking and Carrier Ethernet (MEN) | 637 |
| GSM | 95 |
| CVAS | 164 |
| MSS | 47 |
| Patents and Patent Applications | 4,470 |

In addition to the Escrow Funds, $115 are being held in various escrow accounts at JPM, Wells Fargo, N.A. and Citibank, N.A. in the name of certain Nortel entities and the respective purchasers of the businesses, which escrows were established in connection with the closing of the sales of the businesses, as required by the sale agreements for those transactions to secure certain obligations thereunder and ancillary to the sales.

MOR-5A

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
In re: Nortel Networks Inc. et al
**Cases No. 09-10138 – 09-10152 (KG) Jointly Administered**
**Schedule of Cash Disbursements by Petitioning Entity**
**Reporting Period: July 1, 2011 through July 31, 2011**
(Unaudited)
(In millions of U.S. dollars)

| In re: Nortel Networks Inc. et al | Case # | Payments | |
|---|---|---|---|
| Nortel Networks Inc. [1] | 09-10138 | $ | 16 |
| Nortel Networks Capital Corporation | 09-10139 | | - |
| Nortel AltSystems, Inc. | 09-10140 | | - |
| Nortel AltSystems International, Inc. | 09-10141 | | - |
| Xros Inc. | 09-10142 | | - |
| Sonoma Systems | 09-10143 | | - |
| Qtera Corporation | 09-10144 | | - |
| Coretek, Inc. | 09-10145 | | - |
| Nortel Networks Applications Management Solutions, Inc. | 09-10146 | | - |
| Nortel Networks Optical Components Inc. | 09-10147 | | - |
| Nortel Networks HPOCS Inc. | 09-10148 | | - |
| Architel Systems (U.S.) Corporation | 09-10149 | | - |
| Nortel Networks International, Inc. | 09-10150 | | - |
| Northern Telecom International Inc. | 09-10151 | | - |
| Nortel Networks Cable Solutions Inc. | 09-10152 | | - |
| Nortel Networks (CALA) Inc. | 09-12515 | | - |
| Total Payments | | $ | 16 |

(1) NNI is the centralized disbursement entity for multiple U.S. Debtors and non-Debtors and accordingly makes payments, both by wire and checks, for multiple U.S. Debtors and non-Debtors. Individual U.S. Debtor disbursements have been separated from NNI and listed under specific individual U.S. Debtors. However, disbursements made for the benefit of NNI as well as other U.S. Debtors and/or non-Debtors are still consolidated with NNI for financial reporting purposes.

MOR-5B

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
**In re: Nortel Networks Inc. et al**
**Cases No. 09-10138 – 09-10152 (KG) Jointly Administered**
**Existing Bank Account Information**
**Reporting Period: July 1, 2011 through July 31, 2011**
**(Unaudited)**
**(In millions of U.S. dollars)**

| Legal Entity | Bank | Account Type | Lockbox/Account | Bank Balance |
|---|---|---|---|---|
| Nortel Networks Inc. | Bank of America | Receipts | 3750819519 | $ - |
| Nortel Networks Inc. | Bank of America | Receipts | 3750886432 | - |
| Nortel Networks Inc. | Bank of America | Lockbox (Receipts) | Box 3985 | - |
| Nortel Networks Inc. | Bank of America | Payroll | 0101183623 | 1 |
| Nortel Networks Inc. | Bank of America | Health & Welfare Trust | 7208010001650 | - |
| Nortel Networks Inc. | Citibank NA | Main Concentration | 30463444 | 36 |
| Nortel Networks Inc. | Citibank NA | Receipts | 30508403 | 1 |
| Nortel Networks Inc. | Citibank NA | Lockbox (Receipts) | Box 2937 | - |
| Nortel Networks Inc. | Citibank NA | Disbursement (EVS) | 30509086 | - |
| Nortel Networks Inc. | Citibank NA | Disbursement (AP) | 30580851 | 6 |
| Nortel Networks Inc. | Citibank NA | Receipts (Credit Card) | 30509078 | - |
| Nortel Networks Inc. | Citibank NA | CDMA Good Faith Deposit | 40773075 | - |
| Nortel Networks Inc. | Citibank NA | Flexible Benefits | 30614505 | - |
| Nortel Networks Inc. | Citibank NA | Good Faith Deposits | 30810143 | - |
| Nortel Networks Inc. | Citibank NA | Good Faith Deposits | 30812798 | - |
| Nortel Networks Inc. | Citibank NA | Flextronics Trust | 30807059 | - |
| Nortel Networks Inc. | Citibank Delaware | Disbursement (Sales & Use Tax) | 38660426 | - |
| Nortel Networks Inc. | Citibank Delaware | Disbursement (EVS) | 38659062 | 1 |
| Nortel Networks Inc. | Citibank Delaware | Checking | 38696453 | 1 |
| Nortel Networks Inc. | Citibank Delaware | Benefits-Cigna Travel Well | 38659097 | 1 |
| Nortel Networks Inc. | Citibank Delaware | Benefits-US-Cigna Expat | 38659089 | - |
| Nortel Networks Inc. | Citibank Delaware | Utilities Order | 38794977 | 1 |
| Nortel Networks Inc. | Citibank Canada | Disbursement (AP) | 2010621007 | 1 |
| Nortel Networks Inc. | JP Morgan Chase | General | 887400521 | - |
| Nortel Networks Inc. | JP Morgan Chase | Money Market Deposit Acct [1] | 887400539 | 847 |
| Nortel Networks Inc. | JP Morgan Chase | Money Market Deposit Acct | 887400562 | 11 |
| Nortel Networks Inc. | JP Morgan Chase | General | 887400570 | - |
| Nortel Networks Inc. | Deutsche Bank | Brokerage | 400519 | - |
| Nortel Networks Inc. | Morgan Stanley | Brokerage | 293 058697 502 | - |
| Nortel Networks Inc. | Banc of America Securities | Investment [1] | 275783-22453989 | 40 |
| Nortel Networks Inc. | The Reserve | Investment | 703-29-420 | - |
| Nortel Networks Inc. | K&H Bank | General | 10201006-50041181 | - |
| Nortel Networks Inc. | K&H Bank | General | 10200971-60061049 | - |
| Nortel Networks Inc. | Citibank Egypt | General | 100827506 | 1 |
| Nortel Networks Inc. | Citibank Egypt | General | 100827018 | 1 |
| Nortel Networks Inc. | Citibank Tunis | General | 150021006 | - |
| Nortel Networks Inc. | Citibank Tunis | General | 150021014 | - |
| Nortel Networks Inc. | Citibank Tunis | General | 150021022 | - |
| Nortel Networks Inc. | Citibank Tunis | General | 100056011 | - |
| Nortel Altsystems, Inc. | JP Morgan Chase | General | 887401404 | 50 |
| Nortel Networks Capital Corp. | Citibank NA | General | 30508438 | - |
| Nortel Networks Capital Corp. | Banc of America Securities | Investment [1] | 383752-22352662 | 2 |
| Nortel Networks International, Inc. | Bank of America | General | 6059-60258-010 | - |
| Nortel Networks International, Inc. | Citibank Dubai | General | 10100262002 | 5 |
| Nortel Networks (CALA) Inc. | Citibank NA | General | 30635672 | 19 |
| Nortel Networks (CALA) Inc. | Citibank Delaware | Disbursement (AP) | 38746828 | - |
| Nortel Networks (CALA) Inc. | JP Morgan Chase | General | 887400547 | - |
| Nortel Networks (CALA) Inc. | JP Morgan Chase | Money Market Deposit Acct [2] | 887400554 | 58 |
| Nortel Networks (CALA) Inc. | Citibank Montevideo | General | 0055067007 | 1 |
| Nortel Networks (CALA) Inc. | Citibank Montevideo | General | 0055067619 | - |
| Nortel Networks (CALA) Inc. | Citibank Port of Spain | General | 0106586004 | - |
| Nortel Networks (CALA) Inc. | Citibank Trinidad & Tobago | General | 0109859015 | - |
| Nortel Networks (CALA) Inc. | Citibank Puerto Rico | General | 0301085028 | - |
| | | | $ | 1,084 |

(1) Reflects investments in money market funds via Banc of America Securities brokerage account. As of July 31, U.S. Debtors hold investments in Federated Treasury Obligations 68, Fidelity Treasury 695, BlackRock T Fund 60, JPMorgan U.S. Treasury Plus Mmkt 3918 and Treasury-Agency Cash Management 521. On July 16, 2010, the U.S. Debtors received court approval to deposit funds in money market funds that invest primarily in U.S. Treasury Bills and U.S. Treasury notes owned directly or through repurchase agreements to a maximum aggregate amount of $75.
(2) Reflects deposits in a JP Morgan account which is collateralized with U.S. Treasury securities up to 115% of the amount deposited.
Formal reconciliations between the U.S. Debtors' bank balances and the general ledger are prepared and reviewed quarterly in accordance with the U.S. Debtors' established guidelines.

A                                                                                                              TR11365

MOR-6

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
In re: Nortel Networks Inc. et al
Cases No. 09-10138 – 09-10152 (KG) Jointly Administered
Changes in Balances with Debtors and Non-Debtors
Reporting Period: July 1, 2011 through July 31, 2011
(Unaudited)
(In millions of U.S. dollars)

| In re: Nortel Networks Inc. et al | Case # | Increase / (Decrease) | |
|---|---|---|---|
| Nortel Networks Inc. | 09-10138 | $ | (2) |
| Nortel Networks Capital Corporation | 09-10139 | | - |
| Nortel AltSystems, Inc. | 09-10140 | | - |
| Nortel AltSystems International, Inc. | 09-10141 | | - |
| Xros, Inc. | 09-10142 | | - |
| Sonoma Systems | 09-10143 | | - |
| Qtera Corporation | 09-10144 | | - |
| CoreTek, Inc. | 09-10145 | | - |
| Nortel Networks Applications Management Solutions, Inc. | 09-10146 | | - |
| Nortel Networks Optical Components Inc. | 09-10147 | | - |
| Nortel Networks HPOCS Inc. | 09-10148 | | - |
| Architel Systems (U.S.) Corporation | 09-10149 | | - |
| Nortel Networks International, Inc. | 09-10150 | | - |
| Northern Telecom International Inc. | 09-10151 | | - |
| Nortel Networks Cable Solutions Inc. | 09-10152 | | - |
| Nortel Networks (CALA) Inc. | 09-12515 | | (2) |
| Net Intercompany Change [1] | | $ | (4) |

(1) The Changes in Balances with Debtors and Non-Debtors exclude discontinued operations transactions. The amounts are presented gross and exclude provision amounts.

MOR-7

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
**In re: Nortel Networks Inc. et al**
**Cases No. 09-10138 – 09-10152 (KG) Jointly Administered**
**Status of Post-Petition Taxes**
**Reporting Period: July 31, 2011**
**(Unaudited)**

I, John J. Ray III, Principal Officer of each of the U.S. Debtors, attest under penalty of perjury and to the best of my knowledge, information and belief, all post-petition federal, state and local taxes of each of the U.S. Debtors are current as of July 31, 2011 in all material respects.

September 1, 2011

_____
John J. Ray III, Principal Officer of each of the U.S. Debtors

MOR-9

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
In re: Nortel Networks Inc. et al
**Cases No. 09-10138 – 09-10152 (KG) Jointly Administered**
Debtor Questionnaire
**Reporting Period: July 1, 2011 through July 31, 2011**

| Must be completed each month | Yes | No |
|---|---|---|
| 1. Have any assets been sold or transferred outside the normal course of business this reporting period? If yes, provide an explanation below.<br>On July 29, 2011, Nortel completed the sale of all of its remaining patents and patent applications (the "Patent Sale") to a consortium consisting of Apple, EMC, Ericsson, Microsoft, Research In Motion and Sony for a cash purchase price of $4.5 billion.  The net proceeds are being held in an escrow account (the "Patent Escrow") with JPMorgan Chase Bank, N.A. ("JPM") and the ultimate determination of the final allocation of these proceeds has not yet occurred. | X | |
| 2. Have any bank accounts been opened during the reporting period?  If yes, provide documentation identifying the opened account(s).  If an investment account has been opened provide the required documentation pursuant to the Delaware Local Rule 4001-3. | | X |
| 3. Have any funds been disbursed from any account other than a Debtor-In-Possession account this reporting period? If yes, provide an explanation below.<br>On July 29, 2011, $29 million was disbursed from the Patent Escrow to pay Ranger Inc. a break-up fee and expense reimbursement for its participation as the "stalking horse" in the Patent Sale.  In addition, in connection with the closing of the Patent Sale, (i) $2,117,862.72 was disbursed to NNI as reimbursement for fees and expenses paid by NNI to Lazard Ltd. and (ii) $2,679,027.74 was disbursed to Nortel Networks Limited, $804,676.69 was disbursed to NNI and $893,742.50 was disbursed to Nortel Networks UK as reimbursement for fees and expenses paid to Global IP Law Group, LLC.  In each case the disbursements were made from the Patent Escrow and were for services rendered in connection with the Patent Sale.<br><br>In addition to the releases from the Patent Escrow described above, the following releases from escrow accounts took place during the month of July: (i) on July 7, 2011, $2,500,000 was released from an escrow account with Wells Fargo Bank, N.A. (the "CVAS Escrow"), established in connection with the closing of the sale of the CVAS business (the "CVAS Sale"), to cover certain potential tax liabilities of the purchaser, GENBAND US LLC ("GENBAND"), for which GENBAND may have become liable in connection with the CVAS Sale; and (ii) on July 22, 2011, $7,500,000 was released from an escrow account with Citibank, N.A. (the "MEN Escrow"), established in connection with the closing of the Optical Networking and Carrier Ethernet business (the "MEN Sale"), to cover certain potential obligations incurred in connection with providing transition services to the purchaser, Ciena Corporation. In each case, the disbursements were made after reaching certain milestones agreed upon when the respective escrow accounts were established. The funds disbursed from the CVAS Escrow were deposited into an escrow account with JPM that holds the net proceeds from the CVAS Sale and the funds disbursed from the MEN Escrow were deposited into an escrow account with JPM that holds the net proceeds from the MEN Sale. | X | |
| 4. Have all post-petition tax returns been timely filed? If no, provide an explanation below. | X | |
| 5. Are workers compensation, general liability and other necessary insurance coverages in effect? If no, provide an explanation below. | X | |
| 6. Are the Debtors satisfying their undisputed post-petition obligations on a timely basis? | X | |
| 7. Has there been any material change in amount or aging of the Debtors' receivables? | | X |

**EXHIBIT A**

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
In re: Nortel Networks Inc. et al
Cases No. 09-10138 – 09-10152 (KG) Jointly Administered
Exhibit A – 1996 Note
Reporting Period: July 1, 2011 through July 31, 2011

JAN-20-2003 13:12     NORTEL       P.01/01
FEB 15 '01 14:39-FK NURTEL

*[handwritten]* 5 Hay Mau

PROMISSORY NOTE — 8423

$296,671,383.90           July 23, 1996

*[handwritten]* cc: Jason Gibb

For value received, the undersigned, NORTHERN TELECOM INC., a Delaware corporation ("NTI"), hereby unconditionally promises to pay to or to the order of NORTHERN TELECOM CAPITAL CORPORATION, a Delaware corporation, ("NTCC") at 200 Athens Way, Nashville, Tennessee, or at such other location as NTCC may designate in writing to NTI, the principal sum of two hundred and ninety-six million, six hundred and seventy-one thousand, three hundred and eighty-three and ninety one-hundredths United States dollars ($296,671,383.90) plus interest thereon as hereinafter provided, on June 15, 2006.

NTI promises to pay interest on this Note from the date hereof until such principal amount is paid in full, at the interest rate of 8.25% per annum. Interest on this Note is payable semiannually on December 15 and June 15 of each year commencing July 23, 1996.

Both principal and interest are payable in same day funds in lawful money to NTCC's account at the First National Bank of Chicago, Illinois, ABA 907/1000013, account no. 55-47776 or at other such location as the holder of this Note may designate in writing. Payment will be made in full without deduction for taxes, imposts or levies of whatever nature. Demand, notice and protest are hereby expressly waived.

This Note shall be governed by and construed in accordance with the laws of the United States of America applicable therein.

IN WITNESS WHEREOF, NTI has caused this Note to be executed on its behalf with effect as of the date first written.

NORTHERN TELECOM INC.

*[handwritten]* 296,671,388 90
*[handwritten]* x 8.25% ÷ 360 X 180 =
*[handwritten]* $12,287,169 59

By: *[signature]* Mary M Cross
     Mary M. Cross
     President

*[handwritten]* Pay 4/15 + 6/15
*[handwritten]* to NT Cap and less int paid
*[handwritten]* to RONY on 300M note
*[handwritten]* $ 781 444 59
*[handwritten]* w/T 6/15/00
*[handwritten]* + 353

EXHIBIT B

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
**In re: Nortel Networks Inc. et al**
**Cases No. 09-10138 – 09-10152 (KG) Jointly Administered**
**Exhibit B – April 2003 Letter of Agreement**
**Reporting Period: July 1, 2011 through July 31, 2011**



Nortel Networks Inc.
200 Athens Way
Nashville, Tennessee 37228
Mail Stop A 611
Tel   615 432 4289
Fax   615 432 4067

www.nortelnetworks.com

April 2, 2003

Nortel Networks Capital Corporation
200 Athens Way
Nashville, Tennessee 37228
Attention: Katharine B. Stevenson,
President

RE: Promissory note executed on July 23, 1996 by Nortel Networks Inc. ("NNI") in
favor of Nortel Networks Capital Corporation ("NNCC") (the "1996 Note")

Dear Ms. Stevenson,

This letter is in reference to the 1996 Note described directly above, a photocopy
of which is attached as Exhibit A. As you will recall, the 1996 Note bearing the
original signature of NNI has been lost, and an affidavit of loss with respect
thereto was signed by you as President of NNCC on December 16, 2002. The
1996 Note has a face value of $296,671,383.90 and, as of the date hereof, a
balance due of $296,671,383.90 in principal and $6,118,847.29 in interest, for a
total of $302,790,231.19. The 1996 Note provides that all amounts of principal
and interest due thereunder are to be paid to NNCC by NNI on June 15, 2006.

At this time, NNI desires to have the option to prepay all or any portion of the 1996
Note at its discretion. Because the 1996 Note is silent on prepayment, we are
writing to request NNCC's consent to such option to prepay.

Please indicate by your signature below the agreement of NNCC that NNI may
prepay, without penalty, all or any portion of amounts of principal and/or interest
due under the 1996 Note at its option at any time, upon one (1) business day prior
notice to NNCC.

Also, please indicate by your signature below the agreement of NNCC to (i) track
payments made on, and interest calculations with respect to, the 1996 Note, on a Grid
in the form attached as Exhibit B (the "Grid"), (ii) provide (a) a copy of the Grid to NNI at
any time upon request, and (b) a quarterly Grid report on the last Banking Day of each
quarter, for the approval of NNI.

NNI agrees that any failure to make any required notation on the Grid shall not affect
the liability of NNI to NNCC under the 1996 Note. NNI further agrees that all amounts
recorded on the quarterly Grid reports prepared by NNCC will constitute *prima facie*
evidence of any and all balances owing as indicated in such quarterly Grid reports, and,

Page 2
Nortel Networks Capital Corporation
April 2, 2003
Re: July 23, 1996 Promissory Note

in the absence of evidence to the contrary, will be conclusive evidence of any unpaid balance.

Very truly yours,

**NORTEL NETWORKS INC.**

By : _____
Title:  Mary M. Cross, President

Accepted and agreed:

**NORTEL NETWORKS
CAPITAL CORPORATION**

By : _____
Title:  Katharine B. Stevenson, President

Page 3
Nortel Networks Capital Corporation
April 2, 2003
Re:  July 23, 1996 Promissory Note

Exhibit A

Photocopy of 1996 Note

Attached.

JAN-20-2003 13:12    NORTEL    P.01/01
FEB 15 '01 14:38 FR NURIEL

## PROMISSORY NOTE — 8423

$296,671,383.90                                    July 23, 1996

cc. Jason Gibb

For value received, the undersigned, NORTHERN TELECOM INC., a Delaware corporation ("NTI"), hereby unconditionally promises to pay to or to the order of NORTHERN TELECOM CAPITAL CORPORATION, a Delaware corporation, ("NTCC") at 200 Athens Way, Nashville, Tennessee, or at such other location as NTCC may designate in writing to NTI, the principal sum of two hundred and ninety-six million, six hundred and seventy-one thousand, three hundred and eighty-three and ninety one-hundredths United States dollars ($296,671,383.90) plus interest thereon as hereinafter provided, on June 15, 2006.

NTI promises to pay interest on this Note from the date hereof until such principal amount is paid in full, at the interest rate of 8.25% per annum. Interest on this Note is payable semiannually on December 15 and June 15 of each year commencing July 23, 1996.

Both principal and interest are payable in same day funds in lawful money to NTCC's account at the First National Bank of Chicago, Illinois, ABA #071000013, account no. 55-47776 or at other such location as the holder of this Note may designate in writing. Payment will be made in full without deduction for taxes, imposts or levies of whatever nature. Demand, notice and protest are hereby expressly waived.

This Note shall be governed by and construed in accordance with the laws of the United States of America applicable therein.

IN WITNESS WHEREOF, NTI has caused this Note to be executed on its behalf with effect as of the date first written.

NORTHERN TELECOM INC.

296,671,383⁹⁰

x 8.25% ÷ 360 x 180 =    Per Mary M Cross
                          Mary M. Cross
$12,237,694⁵⁹            President

Pays 4/15 + 6/15
+ NT Cap acct. less int paid
to RONY on 300M note
$781,444⁵⁹
w/t 6/15/00
+ 353

JUN 15 '02 15:28    6154495452    PAGE.84

Page 4
Nortel Networks Capital Corporation
April 2, 2003
Re: July 23, 1996 Promissory Note

**GRID FORMAT**

PAYMENTS OF PRINCIPAL AND INTEREST CALUCLATION

NOTE dated July 23, 1996 made by Nortel Networks Inc. as borrower,
in favor of Nortel Networks Capital Corporation, as lender

| Date | Amount of Advance | Currency of Advance | Type of Advance | Interest Rate Applicable | Interest Accrued | Principal Repaid or Prepaid | Unpaid Principal Balance | Approved by | Notation made by |
|------|-------------------|---------------------|-----------------|--------------------------|------------------|-----------------------------|--------------------------|-------------|------------------|
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |
|      |                   |                     |                 |                          |                  |                             |                          |             |                  |

A

TR11365

EXHIBIT C

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
In re: Nortel Networks Inc. et al
Cases No. 09-10138 – 09-10152 (KG) Jointly Administered
Exhibit C – February 2006 Loan Agreement
Reporting Period: July 1, 2011 through July 31, 2011

## REVOLVING LOAN AGREEMENT

THIS REVOLVING LOAN AGREEMENT (the "**Agreement**") is entered into as of the 14th day of February 2006 ("**Effective Date**"), by and between NORTEL NETWORKS CAPITAL CORPORATION, a Delaware corporation with its registered office at The Corporation Trust Company Corporation, Trust Center, 1209 Orange Street, Wilmington, Delaware, USA (the "**Lender**") and NORTEL NETWORKS INC., a Delaware corporation with its registered office at The Corporation Trust Company Corporation, Trust Center, 1209 Orange Street, Wilmington, Delaware, USA (the "**Borrower**").

WHEREAS, the Lender desires to make periodic loan advances to the Borrower to support on-going working capital funding for general corporate purposes in exchange for an interest bearing obligation payable to the Lender at a future date.

AND WHEREAS, the Borrower had previously delivered a Promissory Note dated 23rd July 1996 (the "1996 Promissory Note") to the Lender to evidence its borrowing of a loan from Lender with a current outstanding principal balance of USD 296,671,383.90.

AND WHEREAS, the Borrower intends to return the 1996 Promissory Note to the Lender on the Effective Date, and it is the intention of the Lender and Borrower that, as of the Effective Date, the rights and obligations relating to the loan in the principal amount of USD 296,671,383.90 previously evidenced and governed by the 1996 Promissory Note shall henceforth be evidenced by, and governed by the terms of, this Agreement.

AND WHEREAS, as of the Effective Date this Agreement supersedes the 1996 Promissory Note for all purposes with respect to actions occurring either before or after the Effective Date, including without limitation, the principal.

NOW THEREFORE, in consideration of the obligations described herein, the Lender and the Borrower agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1    Defined Terms.** As used in this Agreement, the following terms have the following meanings:

"**Advance**" means any amount advanced by the Lender to the Borrower pursuant to Section 2.2;

"**Agreement**" means this revolving loan agreement between the parties hereto, including the Funding Report referred to herein and attached hereto, as the same may be amended or supplemented in writing from time to time;

1

"Banking Day" means any day (other than a Saturday or Sunday) on which the banks are open for business in the United States and Canada;

"Effective Date" has the meaning set forth for such term in the first paragraph of this Agreement;

"Funding Report" means the schedule substantially in the form attached as Exhibit A hereto reflecting all Advances made under this Agreement, and for each such Advance, its respective Interest Rate, Interest Period and related calculations, and whether interest shall be compounded for such Advance:

"Interest Period" means a semi-annual payment due on June 15 2006:

"Interest Rate" means 8.25%.[Note: this rate needs to remain the same to match the public bonds issued by NNC- the proceeds of which were lent to NNI.]

"Maximum Facility Amount" means USD 296,671,393.90 ( Two hundred and ninety-six million. six hundred and seventy-one thousand, three hundred and ninety-three and ninety one hundredths United States Dollars); and

"Term" has the meaning set forth for such term in Section 2.4 hereof.

## ARTICLE 2 – THE FACILITY, REPORTS, TERM, COVENANT

**Section 2.1    The Maximum Facility Amount:**  The Lender agrees to make Advances to the Borrower during the Term from time to time in accordance with this Agreement. The outstanding principal amount of all Advances may not exceed the Maximum Facility Amount.

**Section 2.2    Advances:**    The Lender shall make the Advances available to the Borrower on any Banking Day upon the Lender's receipt of a written request from the Borrower specifying the amount and date of a particular Advance, together with the bank account details. On the Effective Date, the Lender shall be deemed to have made an Advance to the Borrower in an amount equal to the outstanding principal balance of the 1996 Promissory Note and the accrued but unpaid interest thereon.

**Section 2.3    Funding Report:**  The Funding Report shall be prepared on any Banking Day and updated by the Lender within five (5) days following any changes in the amount under any Advance. A copy of the Funding Report shall be provided to the Borrower upon request. Each of the Borrower and the Lender hereby acknowledge, confirm and agree that all amounts set out in each Funding Report shall be considered true and correct, and shall be accepted by the Borrower and Lender and become a part of this Agreement, absent manifest error. However, the failure to prepare such Funding Report shall not affect the liability of the Borrower to the Lender in respect of the relevant indebtedness.

**Section 2.4    Term:** This Agreement shall continue in full force and effect from the Effective Date until the earlier of (the "Term"):

(a)      15 June 2006;

(b)      The effective date of any notice delivered by either party to this Agreement to the other declaring a termination of this Agreement for any reason whatsoever, which effective date shall be no earlier than five (5) days following the other party's receipt of such notice;

(c)      Automatic termination without notice upon the occurrence of any of the following events:

     (i)      The Borrower shall fail to pay any principal due with respect to any Advance made hereunder, or any interest payable hereunder, within five (5) business days of the due date thereof (unless such failure is cured, and this provision waived by the Lender);

     (ii)      The Borrower generally does not pay its debts as they become due or shall admit in writing its inability to pay its debts generally or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower in any such case, seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganisation, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganisation or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or any substantial part of its property, and such proceeding shall remain undismissed or unvacated for a period of thirty (30) days, or any of the actions sought in any such proceeding shall be granted;

     (iii)      The Borrower shall take any corporate action to authorise any of the actions set forth in clause (ii) above in this Section 2.4(c); or

     (iv)      The Borrower shall fail to observe the covenant set forth at Section 2.5 hereof.

**Section 2.5    Covenant--Material Adverse Change:** During the period in which any Advances are outstanding, the Borrower shall notify the Lender of any material adverse change in the business, financial position or results of operations of the Borrower, within ten (10) business days after any director or officer of the Borrower obtains actual knowledge of such material adverse change. Notwithstanding the foregoing, nothing contained in this Agreement shall prevent the Borrower, from amalgamating, merging or consolidating with or into any related party, affiliate or subsidiary.

## ARTICLE 3 - INTEREST

**Section 3.1    Interest on Advances:**  The Borrower shall pay interest on the unpaid principal amount of each Advance from the date of the Advance until the principal amount of the Advance is repaid in full at the end of its respective interest period, at the Interest Rate applicable to each Advance. Interest on each Advance shall be calculated and payable at the end of each Interest Period in accordance with market practice. At the sole and absolute discretion of the Lender, interest may be compounded at the end of an Interest Period and added to the appropriate Advance. [It would be better to provide that at the Lender's election the Lender may capitalize interest which the Borrower does not pay when due and add those amounts to the principal balance of the Advances at that time.] Such compounding [We might want to change this to capitalization of interest, or adding interest not paid when due to principal – I am not sure this is technically compounding but I am not an accountant.], if any, shall be reflected in the related Funding Reports. The Lender shall provide notice to the Borrower of such compounding, through delivery of the Funding Report(s) or otherwise. All accrued interest that remains unpaid at the end of the applicable Interest Period and has not been compounded shall be paid in full when the outstanding principal amount of all Advances is repaid in full.

## ARTICLE 4 - REPAYMENT

**Section 4.1    Repayment:**  The principal and interest outstanding in respect of all Advances, as documented in the Funding Report, is due and payable by the Borrower to the Lender on the earlier of the last day of the relevant Interest Period or the last day of the Term.

**Section 4.2    Prepayment:**  The Borrower may, in its sole and absolute discretion, from time to time without notice, bonus or penalty, make prepayments in any amounts desired, on account of the principal and interest outstanding on any Advance. If more than one Advance is outstanding at the time the Borrower elects to make a prepayment, the Borrower shall be entitled to specify the Advance to which the prepayment will apply. All prepayments will be applied first on account of interest and then on account of principal due hereunder for the Advance to which the prepayment applies. In the sole discretion of the Lender, amounts prepaid hereunder may be re-borrowed during the Term, so long as the total amount of Advances borrowed and not yet pre-paid does not at any time exceed the Maximum Facility Amount.

**Section 4.3    Repayment upon Early Termination:**  Upon the early termination of this Agreement pursuant to Section 2.4(b) or Section 2.4(c) hereof, a final Funding Report shall be prepared which shall indicate the Advances outstanding and the amount of interest attributable to such Advances. The Borrower shall repay the total amount due in a manner and by a date agreed to by the parties but not later than the last day of the Term.

4

## ARTICLE 5 REPRESENTATIONS AND WARRANTIES

**Section 5.1**    Representations of the Borrower:    The Borrower represents and warrants to the Lender on the date hereof and on each date of an Advance that:

     (a)      the Borrower is a corporation duly incorporated and validly existing under the laws of the State of Delaware;

     (b)      the execution, delivery and performance by the Borrower of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body; agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Borrower, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Borrower;

     (c)      as of the date hereof and the date of each Advance, the Borrower has not ceased paying its current obligations in the ordinary course of business as they generally become due.

**Section 5.2**    Representations of the Lender:    The Lender represents and warrants to the Borrower on the date hereof and on each date of an Advance that:

     (a)      the Lender is a corporation duly incorporated and validly existing under the laws of the State of Delaware; and

     (b)      the execution, delivery and performance by the Lender of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body, agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Lender, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Lender.

## ARTICLE 6 - GENERAL PROVISIONS

**Section 6.1    Amendments to this Agreement:** This Agreement may be amended only by written agreement signed by both parties.

**Section 6.2    Waiver:** The Lender may waive in writing any breach by the Borrower of any of the provisions contained in this Agreement or any default by the Borrower in the observance or performance of any covenant or condition required to be observed or performed by the Borrower under this Agreement; provided that no act or omission by the Lender with regard to any such breach or default by the Borrower will be taken in any manner whatsoever to affect any subsequent breach or default or the rights resulting therefrom.

**Section 6.3    Notices:** Any request, notice or demand made or given in connection with this Agreement must be in writing and delivered to the relevant party at its address or facsimile number set forth below, or any other address or facsimile number that a party may direct:

| | |
|---|---|
| if to the Borrower: | Nortel Networks Inc.<br>220, Athens Way, Suite 300<br>MS 438/03/01<br>Nashville, Tennessee USA 37228<br>Attention: Legal Department |
| With copy to: | European Treasury Department<br>Nortel Networks UK Ltd<br>Maidenhead Business Park<br>Westacott Way, Maidenhead<br>Berkshire SL6 3QH England |
| if to the Lender: | Nortel Networks Capital Corporation<br>220, Athens Way, Suite 300<br>MS 438/03/01,<br>Nashville, Tennessee USA 37228<br>Attention: Finance Department |
| With copy to: | European Treasury Department<br>Facsimile number: +44 1628 432884<br>(Address as above) |

**Section 6.4    Assignment of Agreement:** All of the covenants, stipulations, promises and agreements in this Agreement shall bind the parties' respective successors and permitted assigns, whether so expressed or not; provided, however, that neither party may, without the prior written consent of the other, assign any rights, powers, duties, or obligations under this Agreement.

6

**Section 6.5**    **Headings:** The headings of this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

**Section 6.6**    **Governing Law:** This Agreement and all other documents and instruments referred to will be construed in accordance with and governed by the internal laws of the State of New York.

**Section 6.7**    **Severability:** If any term or provision of this Agreement shall be determined to be invalid or unenforceable in any situation in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining terms and provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Revolving Loan Agreement to be executed by their duly authorized persons as of the Effective Date.

**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____

Name: Lynn C. Egan

Title:   Secretary

**NORTEL NETWORKS INC.**

By: _____

Name: Allen K. Stout

Title:   Vice President, Finance

EXHIBIT D

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
In re: Nortel Networks Inc. et al
Cases No. 09-10138 – 09-10152 (KG) Jointly Administered
Exhibit D – June 2006 Loan Agreement
Reporting Period: July 1, 2011 through July 31, 2011

## REVOLVING LOAN AGREEMENT

THIS REVOLVING LOAN AGREEMENT (the "**Agreement**") is entered into as of the 15th day of June 2006 ("**Effective Date**"), by and between NORTEL NETWORKS CAPITAL CORPORATION, a Delaware corporation with its registered office at The Corporation Trust Company Corporation, Trust Center, 1209 Orange Street, Wilmington, Delaware, USA (the "**Lender**") and NORTEL NETWORKS INC., a Delaware corporation with its registered office at The Corporation Trust Company Corporation, Trust Center, 1209 Orange Street, Wilmington, Delaware, USA (the "**Borrower**").

WHEREAS, the Lender desires to make periodic loan advances to the Borrower to support on-going working capital funding for general corporate purposes in exchange for an interest bearing obligation payable to the Lender at a future date.

AND WHEREAS, the Borrower had previously delivered a Promissory Note dated 23rd July 1996 (the "**1996 Promissory Note**") to the Lender to evidence its borrowing of a loan from Lender with a current outstanding principal balance of USD 296,671,383.90.

AND WHEREAS, effective as of February 14, 2006, the Lender returned the 1996 Promissory Note to the Borrower and the Borrower and the Lender entered into a Revolving Loan Agreement evidencing the rights and obligations of the Borrower and the Lender relating to the loan in the principal amount of USD 296,671,383.90 previously evidenced and governed by the 1996 Promissory Note ( the "**February 2006 Agreement**"), which superseded and replaced the 1996 Promissory Note for all purposes with respect to actions occurring either before or after the effective date thereof, including without limitation, evidencing the principal amount thereof.

AND WHEREAS, the February 2006 Agreement matures on June 15, 2006 by its terms.

AND WHEREAS, it is the intention of the Lender and Borrower that, as of the Effective Date, this Agreement shall replace the February 2006 Agreement.

NOW THEREFORE, in consideration of the obligations described herein, the Lender and the Borrower agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1   Defined Terms.** As used in this Agreement, the following terms have the following meanings:

"**Advance**" means any amount advanced by the Lender to the Borrower pursuant to Section 2.2;

"**Agreement**" means this revolving loan agreement between the parties hereto, including the Funding Report referred to herein and attached hereto, as the same may be amended or supplemented in writing from time to time;

"**Banking Day**" means any day (other than a Saturday or Sunday) on which the banks are open for business in the United States and Canada;

"**Effective Date**" has the meaning set forth for such term in the first paragraph of this Agreement;

"**Funding Report**" means the schedule substantially in the form attached as Exhibit A hereto reflecting all Advances made under this Agreement, and for each such Advance, its respective Interest Rate, the Interest Payment Dates and related calculations, and whether interest shall be compounded for such Advance;

"**Interest Payment Dates**" means each June 15 and December 15 during the term of this Agreement;

"**Interest Rate**" means 7.875%.

"**Maximum Facility Amount**" means USD 146,671,383.90 ( One hundred and forty-six million, six hundred and seventy-one thousand, three hundred and eighty-three and ninety one hundredths United States Dollars); and

"**Term**" has the meaning set forth for such term in Section 2.4 hereof.

## ARTICLE 2 – THE FACILITY, REPORTS, TERM, COVENANT

**Section 2.1    The Maximum Facility Amount:** The Lender agrees to make Advances to the Borrower during the Term from time to time in accordance with this Agreement. The outstanding principal amount of all Advances may not exceed the Maximum Facility Amount.

**Section 2.2    Advances:** The Lender shall make the Advances available to the Borrower on any Banking Day upon the Lender's receipt of a written request from the Borrower specifying the amount and date of a particular Advance, together with the bank account details. On the Effective Date, the Lender shall be deemed to have made an Advance to the Borrower in an amount equal to the principal balance outstanding under the February 2006 Agreement and the accrued but unpaid interest thereon.

**Section 2.3    Funding Report:** The Funding Report shall be prepared on any Banking Day and updated by the Lender within five (5) days following any changes in the amount under any Advance. A copy of the Funding Report shall be provided to the Borrower upon request. Each of the Borrower and the Lender hereby acknowledge, confirm and agree that all amounts set out in each Funding Report shall be considered true and correct,

2

and shall be accepted by the Borrower and Lender and become a part of this Agreement, absent manifest error. However, the failure to prepare such Funding Report shall not affect the liability of the Borrower to the Lender in respect of the relevant indebtedness.

**Section 2.4   Term:** This Agreement shall continue in full force and effect from the Effective Date until the earlier of (the "Term"):

    (a)    June 15, 2008;

    (b)    The effective date of any notice delivered by either party to this Agreement to the other declaring a termination of this Agreement for any reason whatsoever, which effective date shall be no earlier than five (5) days following the other party's receipt of such notice;

    (c)    Automatic termination without notice upon the occurrence of any of the following events:

        (i)    The Borrower shall fail to pay any principal due with respect to any Advance made hereunder, or any interest payable hereunder, within five (5) business days of the due date thereof (unless such failure is cured, and this provision waived by the Lender);

        (ii)    The Borrower generally does not pay its debts as they become due or shall admit in writing its inability to pay its debts generally or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower in any such case, seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganisation, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganisation or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or any substantial part of its property, and such proceeding shall remain undismissed or unvacated for a period of thirty (30) days, or any of the actions sought in any such proceeding shall be granted;

        (iii)    The Borrower shall take any corporate action to authorise any of the actions set forth in clause (ii) above in this Section 2.4(c); or

        (iv)    The Borrower shall fail to observe the covenant set forth at Section 2.5 hereof.

**Section 2.5   Covenant--Material Adverse Change:** During the period in which any Advances are outstanding, the Borrower shall notify the Lender of any material adverse change in the business, financial position or results of operations of the Borrower, within ten (10) business days after any director or officer of the Borrower obtains actual

knowledge of such material adverse change. Notwithstanding the foregoing, nothing contained in this Agreement shall prevent the Borrower, from amalgamating, merging or consolidating with or into any related party, affiliate or subsidiary.

## ARTICLE 3 - INTEREST

**Section 3.1      Interest on Advances:** The Borrower shall pay interest on the unpaid principal amount of each Advance from the date of the Advance until the principal amount of the Advance is repaid in full on each Interest Payment Date, at the Interest Rate applicable to each Advance. Interest on each Advance shall be calculated and payable on each Interest Payment Date in accordance with market practice.

## ARTICLE 4 - REPAYMENT

**Section 4.1      Repayment:** The principal and interest outstanding in respect of all Advances, as documented in the Funding Report, is due and payable by the Borrower to the Lender on the earlier of the relevant Interest Payment Date or the last day of the Term.

**Section 4.2      Prepayment:** The Borrower may, in its sole and absolute discretion, from time to time without notice, bonus or penalty, make prepayments in any amounts desired, on account of the principal and interest outstanding on any Advance. If more than one Advance is outstanding at the time the Borrower elects to make a prepayment, the Borrower shall be entitled to specify the Advance to which the prepayment will apply. All prepayments will be applied first on account of interest and then on account of principal due hereunder for the Advance to which the prepayment applies. In the sole discretion of the Lender, amounts prepaid hereunder may be re-borrowed during the Term, so long as the total amount of Advances borrowed and not yet pre-paid does not at any time exceed the Maximum Facility Amount.

**Section 4.3      Repayment upon Early Termination:** Upon the early termination of this Agreement pursuant to Section 2.4(b) or Section 2.4(c) hereof, a final Funding Report shall be prepared which shall indicate the Advances outstanding and the amount of interest attributable to such Advances. The Borrower shall repay the total amount due in a manner and by a date agreed to by the parties but not later than the last day of the Term.

## ARTICLE 5 REPRESENTATIONS AND WARRANTIES

**Section 5.1      Representations of the Borrower:** The Borrower represents and warrants to the Lender on the date hereof and on each date of an Advance that:

> (a)      the Borrower is a corporation duly incorporated and validly existing under the laws of the State of Delaware;

4

(b)    the execution, delivery and performance by the Borrower of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body; agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Borrower, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Borrower;

(c)    as of the date hereof and the date of each Advance, the Borrower has not ceased paying its current obligations in the ordinary course of business as they generally become due.

**Section 5.2     Representations of the Lender:** The Lender represents and warrants to the Borrower on the date hereof and on each date of an Advance that:

(a)    the Lender is a corporation duly incorporated and validly existing under the laws of the State of Delaware; and

(b)    the execution, delivery and performance by the Lender of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body, agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Lender, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Lender.

## ARTICLE 6 - GENERAL PROVISIONS

**Section 6.1     Amendments to this Agreement:** This Agreement may be amended only by written agreement signed by both parties.

**Section 6.2     Waiver:** The Lender may waive in writing any breach by the Borrower of any of the provisions contained in this Agreement or any default by the Borrower in the observance or performance of any covenant or condition required to be observed or performed by the Borrower under this Agreement; provided that no act or omission by the

Lender with regard to any such breach or default by the Borrower will be taken in any manner whatsoever to affect any subsequent breach or default or the rights resulting therefrom.

**Section 6.3    Notices:**  Any request, notice or demand made or given in connection with this Agreement must be in writing and delivered to the relevant party at its address or facsimile number set forth below, or any other address or facsimile number that a party may direct:

if to the Borrower:                Nortel Networks Inc.
                                   220 Athens Way, Suite 300
                                   MS 438/03/01
                                   Nashville, Tennessee USA 37228
                                   Attention: Legal Department

With copy to:                      European Treasury Department
                                   Nortel Networks UK Ltd
                                   Maidenhead Business Park
                                   Westacott Way, Maidenhead
                                   Berkshire SL6 3QH England

if to the Lender:                  Nortel Networks Capital Corporation
                                   220 Athens Way, Suite 300
                                   MS 438/03/01,
                                   Nashville, Tennessee  USA 37228
                                   Attention:  Finance Department

With copy to:                      European Treasury Department
                                   Facsimile number: +44 1628 432884
                                   (Address as above)

**Section 6.4    Assignment of Agreement:**  All of the covenants, stipulations, promises and agreements in this Agreement shall bind the parties' respective successors and permitted assigns, whether so expressed or not; provided, however, that neither party may, without the prior written consent of the other, assign any rights, powers, duties, or obligations under this Agreement.

**Section 6.5    Headings:**  The headings of this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

**Section 6.6    Governing Law:**   This Agreement and all other documents and instruments referred to will be construed in accordance with and governed by the internal laws of the State of New York.

**Section 6.7    Severability:**   If any term or provision of this Agreement shall be determined to be invalid or unenforceable in any situation in any jurisdiction, such

6

invalidity or unenforceability shall not affect the validity or enforceability of the remaining terms and provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Revolving Loan Agreement to be executed by their duly authorized persons as of the Effective Date.

**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____

Name: **Lynn C. Egan**

Title: **Secretary**

**NORTEL NETWORKS INC.**

By: _____

Name: **Allen K. Stout**

Title: **Vice President, Finance**

7

EXHIBIT E

**U.S. BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
In re: Nortel Networks Inc. et al
Cases No. 09-10138 – 09-10152 (KG) Jointly Administered
Exhibit E – June 2008 Loan Agreement
Reporting Period: July 1, 2011 through July 31, 2011

## REVOLVING LOAN AGREEMENT

THIS REVOLVING LOAN AGREEMENT (the "**Agreement**") is entered as of this 15th day of June 2008 ("**Effective Date**"), by and between NORTEL NETWORKS CAPITAL CORPORATION, a Delaware corporation with its registered office at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, USA 19801 (the "**Lender**") and NORTEL NETWORKS INC., a Delaware corporation with its registered office at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, USA 19801 (the "**Borrower**").

WHEREAS, the Lender desires to make periodic loan advances to the Borrower to support on-going working capital funding for general corporate purposes in exchange for an interest bearing obligation payable to the Lender at a future date.

AND WHEREAS, the Borrower had previously delivered a Promissory Note dated 23rd July 1996 (the "**1996 Promissory Note**") to the Lender to evidence its borrowing of a loan from Lender with a current outstanding principal balance of USD 296,671,383.90

AND WHEREAS, effective as of February 14, 2006, the Lender returned the 1996 Promissory Note to the Borrower and the Borrower and the Lender entered into a Revolving Loan Agreement evidencing the rights and obligations of the Borrower and the Lender relating to the loan in the principal amount of USD 296,671,383.90 previously evidenced and governed by the 1996 Promissory Note (the "**February 2006 Agreement**"), which superseded and replaced the 1996 Promissory Note for all purposes with respect to actions occurring either before or after the effective date thereof, including without limitation, evidencing the principal amount thereof.

AND WHEREAS, the Lender and Borrower had then entered into a Revolving Loan Agreement dated 15th June 2006 (the "**June 2006 Agreement**") with respect to a credit facility of USD 146,671,383.90, of which USD 146,671,383.90 was drawn as at 15th June 2008.

AND WHEREAS, the June 2006 Agreement matures on June 15, 2008 by its terms.

AND WHEREAS, it is the intention of the Lender and Borrower that, as of the Effective Date, this Agreement shall replace the June 2006 Agreement.

NOW THEREFORE, in consideration of the obligations described herein, the Lender and the Borrower agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1     Defined Terms.** As used in this Agreement, the following terms have the following meanings:

"**Advance**" means any amount advanced by the Lender to the Borrower pursuant to Section 2.2;

"**Agreement**" means this revolving loan agreement between the parties hereto, including the Funding Report referred to herein and attached hereto, as the same may be amended or supplemented in writing from time to time;

"**Banking Day**" means any day (other than a Saturday or Sunday) on which the banks are open for business in the United States of America and Canada.

"**Effective Date**" has the meaning set forth for such term in the first paragraph of this Agreement;

"**Funding Report**" means the schedule substantially in the form attached as Exhibit A hereto reflecting all Advances made under this Agreement, and for each such Advance, its respective Interest Rate, Interest Payment Dates and related calculations, and whether interest shall be compounded for such Advance;

"**Interest Payment Dates**" means each June 15 and December 15 during the term of this Agreement;

"**Interest Rate**" means 7.875%;

"**Maximum Facility Amount**" means USD 146,671,383.90 (One hundred and forty-six million, six hundred and seventy-one thousand, three hundred and eighty-three and ninety one hundredths United States Dollars); and

"**Term**" has the meaning set forth for such term in Section 2.4 hereof.

## ARTICLE 2 – THE FACILITY, REPORTS, TERM, COVENANT

**Section 2.1     The Maximum Facility Amount:** The Lender agrees to make Advances to the Borrower during the Term from time to time in accordance with this Agreement. The outstanding principal amount of all Advances may not exceed the Maximum Facility Amount.

**Section 2.2     Advances:** The Lender shall make the Advances available to the Borrower on any Banking Day upon the Lender's receipt of a written request from the Borrower specifying the amount and date of a particular Advance, together with the bank account details. On the Effective Date, the Lender shall be deemed to have made an

Advance to the Borrower in an amount equal to the principal balance outstanding under the June 2006 Agreement and the accrued but unpaid interest thereon.

**Section 2.3    Funding Report:** The Funding Report shall be prepared on any Banking Day and updated by the Lender within five (5) days following any changes in the amount under any Advance. A copy of the Funding Report shall be provided to the Borrower upon request. Each of the Borrower and the Lender hereby acknowledge, confirm and agree that all amounts set out in each Funding Report shall be considered true and correct, and shall be accepted by the Borrower and Lender and become a part of this Agreement, absent manifest error. However, the failure to prepare such Funding Report shall not affect the liability of the Borrower to the Lender in respect of the relevant indebtedness.

**Section 2.4    Term:** This Agreement shall continue in full force and effect from the Effective Date until the earlier of (the "Term"):

(a)    June 15, 2010;

(b)    The effective date of any notice delivered by either party to this Agreement to the other declaring a termination of this Agreement for any reason whatsoever, which effective date shall be no earlier than five (5) days following the other party's receipt of such notice;

(c)    Automatic termination without notice upon the occurrence of any of the following events:

    (i)    The Borrower shall fail to pay any principal due with respect to any Advance made hereunder, or any interest payable hereunder, within five (5) business days of the due date thereof (unless such failure is cured, and this provision waived by the Lender);

    (ii)    The Borrower generally does not pay its debts as they become due or shall admit in writing its inability to pay its debts generally or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower in any such case, seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganisation, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganisation or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or any substantial part of its property, and such proceeding shall remain undismissed or unvacated for a period of thirty (30) days, or any of the actions sought in any such proceeding shall be granted;

    (iii)    The Borrower shall take any corporate action to authorise any of the actions set forth in clause (ii) above in this Section 2.4(c); or

(iv)     The Borrower shall fail to observe the covenant set forth at Section 2.5 hereof.

**Section 2.5    Covenant–Material Adverse Change:** During the period in which any Advances are outstanding, the Borrower shall notify the Lender of any material adverse change in the business, financial position or results of operations of the Borrower, within ten (10) business days after any director or officer of the Borrower obtains actual knowledge of such material adverse change. Notwithstanding the foregoing, nothing contained in this Agreement shall prevent the Borrower, from amalgamating, merging or consolidating with or into any related party, affiliate or subsidiary.

## ARTICLE 3 - INTEREST

**Section 3.1    Interest on Advances:** The Borrower shall pay interest on the unpaid principal amount of each Advance from the date of the Advance until the principal amount of the Advance is repaid in full at the end of its respective Interest Payment Date, at the Interest Rate applicable to each Advance. Interest on each Advance shall be calculated and payable at the end of each Interest Payment Date based on a 360 day year and the actual number of days elapsed. If interest on an Advance is not paid on the Interest Payment Date, then, at the request of the Borrower and at the sole and absolute discretion of the Lender, such interest may be capitalized and added to the outstanding principal amount of such Advance as of such date. Such capitalization of interest, if any, shall be reflected in the related Funding Reports. The Lender shall provide notice to the Borrower of such capitalization of interest, through delivery of the Funding Report(s) or otherwise. All accrued interest that remains unpaid at the end of the applicable Interest Payment Date and has not been capitalized shall be paid in full when the outstanding principal amount of all Advances is repaid in full.

**Section 3.2    Maximum Rate:** No interest rate specified in this Agreement shall at any time exceed the maximum rate permitted by applicable law (the "**Maximum Rate**"). Notwithstanding anything to the contrary contained in this Agreement, none of the terms and provisions of this Agreement shall ever be construed to create a contract or obligation to pay interest at a rate in excess of the Maximum Rate; and the Lender shall not ever charge, receive, take, collect, reserve or apply, as interest on the obligations evidenced by this Agreement (the "**Obligations**"), any amount in excess of the Maximum Rate. The parties hereto agree that any interest, charge, fee, expense or other obligation provided for in this Agreement which constitutes interest under applicable law shall be, ipso facto and under any and all circumstances, limited or reduced to an amount equal to the lesser of (i) the amount of such interest, charge, fee, expense or other obligation that would be payable in the absence of this Section 3.2 or (ii) an amount, which when added to all other interest payable under this Agreement, equals the maximum amount of interest that would be payable if calculated at the Maximum Rate. If, notwithstanding the foregoing, the Lender ever contracts for, charges, receives, takes, collects, reserves or applies as interest any amount in excess of the amount permitted at the Maximum Rate, such amount which would be deemed excessive interest shall be deemed a partial payment or

prepayment of principal of the Obligations and treated hereunder as such; and if the Obligations, or applicable portions thereof, are paid in full, any remaining excess shall promptly be paid to the Borrower. In determining whether the interest paid or payable, under any specific contingency, exceeds the Maximum Rate, the Borrower and the Lender shall, to the maximum extent permitted by applicable law, (i) characterize any nonprincipal payment as an expense, fee or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the entire contemplated term of the Obligations, or applicable portions thereof, so that the interest rate does not exceed the Maximum Rate at any time during the term of the Obligations; provided that, if the unpaid principal balance is paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the Maximum Rate, the Lender shall refund to the Borrower the amount of such excess and, in such event, the Lender shall not be subject to any penalties provided by any laws for contracting for, charging, receiving, taking, collecting, reserving or applying interest in excess of the Maximum Rate.

## ARTICLE 4 - REPAYMENT

**Section 4.1    Repayment:**  The principal and interest outstanding in respect of all Advances, as documented in the Funding Report, is due and payable by the Borrower to the Lender on the earlier of the last day of the relevant Interest Payment Date or the last day of the Term.

**Section 4.2    Prepayment:**  The Borrower may, in its sole and absolute discretion, from time to time without notice, bonus or penalty, make prepayments in any amounts desired, on account of the principal and interest outstanding on any Advance.  If more than one Advance is outstanding at the time the Borrower elects to make a prepayment, the Borrower shall be entitled to specify the Advance to which the prepayment will apply. All prepayments will be applied first on account of interest and then on account of principal due hereunder for the Advance to which the prepayment applies.  In the sole discretion of the Lender, amounts prepaid hereunder may be re-borrowed during the Term, so long as the total amount of Advances borrowed and not yet pre-paid does not at any time exceed the Maximum Facility Amount.

**Section 4.3    Repayment upon Early Termination:**  Upon the early termination of this Agreement pursuant to Section 2.4(b) or Section 2.4(c) hereof, a final Funding Report shall be prepared which shall indicate the Advances outstanding and the amount of interest attributable to such Advances. The Borrower shall repay the total amount due in a manner and by a date agreed to by the parties but not later than the last day of the Term.

## ARTICLE 5 REPRESENTATIONS AND WARRANTIES

**Section 5.1    Representations of the Borrower:**  The Borrower represents and warrants to the Lender on the date hereof and on each date of an Advance that:

(a)    the Borrower is a corporation duly incorporated and validly existing under the laws of the State of Delaware;

(b)    the execution, delivery and performance by the Borrower of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body, agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Borrower, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Borrower;

(c)    as of the date hereof and the date of each Advance, the Borrower has not ceased paying its current obligations in the ordinary course of business as they generally become due.

**Section 5.2    Representations of the Lender:**  The Lender represents and warrants to the Borrower on the date hereof and on each date of an Advance that:

(a)    the Lender is a corporation duly formed and validly existing under the laws of the State of Delaware; and

(b)    the execution, delivery and performance by the Lender of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body, agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Lender, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Lender.

## ARTICLE 6 - GENERAL PROVISIONS

**Section 6.1    Amendments to this Agreement:**  This Agreement may be amended only by written agreement signed by both parties.

**Section 6.2    Waiver:** The Lender may waive in writing any breach by the Borrower of any of the provisions contained in this Agreement or any default by the Borrower in the observance or performance of any covenant or condition required to be observed or performed by the Borrower under this Agreement; provided that no act or omission by the Lender with regard to any such breach or default by the Borrower will be taken in any manner whatsoever to affect any subsequent breach or default or the rights resulting therefrom.

**Section 6.3    Notices:** Any request, notice or demand made or given in connection with this Agreement must be in writing and delivered to the relevant party at its address or facsimile number set forth below, or any other address or facsimile number that a party may direct:

if to the Borrower:

Nortel Networks Inc.,
220 Athens Way, Suite 300,
MS 438/03/01,
Nashville, Tennessee USA 37228
Attention: Legal Department

With copy to:

European Treasury Department
Facsimile number: +44 1628 432884

if to the Lender:

Nortel Networks Capital Corporation,
220 Athens Way, Suite 300,
MS 438/03/01,
Nashville, Tennessee USA 37228
Attention: Legal Department

With copy to:

European Treasury Department
Facsimile number: +44 1628 432884

**Section 6.4    Assignment of Agreement:** All of the covenants, stipulations, promises and agreements in this Agreement shall bind the parties' respective successors and permitted assigns, whether so expressed or not; provided, however, that neither party may, without the prior written consent of the other, assign any rights, powers, duties, or obligations under this Agreement.

**Section 6.5    Headings:** The headings of this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.