A

**Section 6.6    Governing Law:**  This Agreement and all other documents and instruments referred to will be construed in accordance with and governed by the internal laws of the State of New York.

**Section 6.7    Severability:**  If any term or provision of this Agreement shall be determined to be invalid or unenforceable in any situation in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining terms and provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Revolving Loan Agreement to be executed by their duly authorized persons as of the Effective Date.

**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____
Name: _____Lynn C. Egan_____
Title: _____Secretary_____
Date: _____

**NORTEL NETWORKS INC.**

By: _____
Name: _____Lynn C. Egan_____
Title: _____Assistant Secretary_____
Date: _____



A                                                                            TR11358

December 7, 2009

Board of Directors
Nortel Networks Inc.
2221 Lakeside Boulevard
Richardson, Texas 75082-4399

Re: Principal Officer of Nortel Networks Inc. ("NNI")

1.    **Introduction**

Subject to the approval of the United States Bankruptcy Court for the District of
Delaware (the "Bankruptcy Court"), by this letter NNI hereby retains John Ray, Senior
Managing Director of Avidity Partners, LLC ("Ray"), to act as the Principal Officer of
NNI and its affiliates that are chapter 11 debtors (collectively, the "US Debtors" and,
together, with their non-US Debtor affiliates and subsidiaries, "Nortel") in proceedings
pending before the Bankruptcy Court, effective as of the date of execution hereof. In
his role as Principal Officer, Ray will provide certain Services (as defined herein) to
the US Debtors as set forth below.  This letter of engagement (the "Engagement") and
the related Standard Terms and Conditions together constitute the engagement contract
(the "Engagement Contract") pursuant to which the Services will be provided.

2.    **Scope of Services**

Ray shall become the Principal Officer of NNI and each of the US Debtors and in such
officer capacity shall have the principal, but not sole, responsibility for overseeing and
directing the wind down of the estates of NNI and the other US Debtors with the goal
of promptly maximizing the value to be distributed to creditors.  Ray's responsibilities
as Principal Officer shall include, but not be limited to,: (1) directing, and overseeing
the winding up of the businesses of the US Debtors, and reviewing and guiding their
interaction with other Nortel entities and businesses, (2) supporting and defending the
interests of the US Debtors' estates and their creditors on issues including, without
limitation, purchase price and cost allocation, repatriation of cash, cost reductions,
transition services and related pricing, claims resolution, inter-estate disputes between
the US Debtors or among the US Debtors and the various Nortel entities,
compensation, auditing and other administrative functions, and any other issues that
may affect recoveries to creditors of the US Debtors' estates, (3) receiving periodic
reports from operational management on the provision of transition services and the
winding down of the Nortel businesses, (4) working with all constituents to develop
and implement plans to monetize remaining assets, developing and implementing
strategies for winding down Nortel businesses or creating plans of liquidation or
reorganization, (5) in furtherance of the foregoing, interacting and consulting as
appropriate with Nortel employees, the Monitor appointed in Nortel's Canadian

1

**Highly Confidential**

EXHIBIT
11358
12/13/13 M.G

NNI_00796653

NNI_00796653

A                                                                                                          TR11358

insolvency proceedings, the Joint Administrators appointed in Nortel's UK administrative proceedings, the official committee of unsecured creditors appointed in the US Debtors' chapter 11 proceedings (the "Creditors' Committee"), the ad hoc committee of bondholders (the "Bondholders' Group") and each of their various retained advisors, (6) meeting with and providing periodic reports to the Board of Directors of NNI (the "Board"), the Creditors' Committee, the steering committee of the Bondholders' Group and, to the extent necessary, the Bankruptcy Court, which, with respect to the Creditors' Committee and the steering committee of the Bondholders' Group, shall include, if requested, one in-person meeting approximately every 60 days from and after December 7, 2009, and (7) such other services as may be mutually agreed upon by Ray and NNI (all of the foregoing collectively, the "Services") , provided, however, that it is acknowledged and agreed that the Services do not include day-to-day operational management of the US Debtors' businesses.

In his performance of the Services, Ray may seek advice and/or analyses from the advisors to the Creditors' Committee or the Bondholders' Group, and Ray shall be permitted to receive such advice and/or analyses on the condition that the parties hereto acknowledge and agree that any such advice or analyses will be provided to Ray by the advisors solely in their capacity as representatives for the Creditors' Committee and/or Bondholders' Group, as applicable, and that all appropriate steps shall be taken to protect the confidentiality and common-interest privilege, if any, of such communications.

3.      **Fees**

In consideration for the Services, Ray will charge NNI $450 per hour (the "Fees"). Such Fees shall be payable monthly, subject to Bankruptcy Court approval of fee applications filed by Ray in accordance with the interim compensation procedures order approved by the Bankruptcy Court in the US Debtors' chapter 11 cases (the "ICP Order"); provided, however, that, except as provided in Section 5.1 of the attached Standard Terms and Conditions, 50% of the Fees (the "Deferred Fees") earned by Ray (which holdback shall be inclusive of any monthly holdback for professional fees prescribed by the ICP Order) in calendar years 2009 and 2010 shall be deferred and paid to Ray in a single lump sum payment on the later of (i) January 1, 2011 and (ii) the date that the US Debtors make a distribution or distributions equal to or exceeding 35% of the amount estimated in an approved disclosure statement for distribution to general unsecured creditors under a Bankruptcy Court approved plan (the "Distribution"), provided, further, that whether or not the Distribution occurs, such payment will be made in no event later than December 31, 2011. For the avoidance of doubt, there shall be no deferral of Fees payable to Ray in calendar year 2011. Hourly rates are generally revised periodically, provided that annual increases shall not exceed 5%.

In addition to the Fees, Ray shall bill NNI for reasonable expenses incurred on behalf of the US Debtors during this Engagement, including, but not limited to airfare, meals, hotel accommodations, telephone, research, duplicating and printing.

2

**Highly Confidential**                                                        NNI_00796654

NNI_00796654

4. **Terms and Conditions**

The attached Standard Terms and Conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.

The parties intend that Ray shall render the Services hereunder as an independent contractor, and nothing in this Engagement Contract shall be construed to be inconsistent with this relationship or status. Ray shall not be entitled to any benefits paid by the US Debtors to their employees. Ray shall be solely responsible for any tax consequences applicable to Ray by reason of this Engagement Contract and the relationship established hereunder, and the US Debtors shall not be responsible for the payment of any federal, state or local taxes or contributions imposed under any employment insurance, social security, income tax or other tax law or regulation with respect to Ray's performance of services hereunder.    The parties agree that, subject to the terms and provisions of this Engagement Contract, Ray may perform any duties hereunder and set his own work schedule without day-to-day supervision by the US Debtors, but subject always to appropriate direction of the Board of Directors of the US Debtors.

3

**Highly Confidential**

**NNI_00796655**

NNI_00796655

A

5.    **Acknowledgement and Acceptance**

Please acknowledge acceptance of the terms of this Engagement Contract by signing both the confirmation below and the attached Standard Terms and Conditions and returning a copy of each to us at the above address.

If you have any questions regarding this letter or the attached Standard Terms and Conditions, please do not hesitate to contact John Ray at (630) 613-7300.

Yours faithfully,

John J. Ray III

4

NNI_00796656

NNI_00796656

A

TR11358

Confirmation of Terms of Engagement

We agree to engage John Ray upon the terms set forth herein and in the attached
Standard Terms and Conditions.

Nortel Networks Inc.

By: _____
    John Doolittle
    Vice President

Date: December 7, 2009

5

**Highly Confidential**

NNI_00796657

NNI_00796657



A                                                                                     TR11359

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------- X

*In re*                                     :        Chapter 11

                                            :

Nortel Networks Inc., *et al.*,[1]          :        Case No. 09-10138 (KG)

                                            :

    Debtors.                              :        Jointly Administered

                                            :

-------------------------------------------------- X

## PROPOSED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS

James L. Bromley (admitted *pro hac vice*)      Derek C. Abbott (No. 3376)
Lisa M. Schweitzer (admitted *pro hac vice*)    Eric D. Schwartz (No. 3134)
CLEARY GOTTLIEB STEEN & HAMILTON                MORRIS, NICHOLS, ARSHT & TUNNELL
LLP                                             LLP
One Liberty Plaza                               1201 North Market Street, 18th Floor
New York, NY 10006-1470                         P.O. Box 1347
                                                Wilmington, DE 19899-1347

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:  September 3, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.



A

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS PROPOSED DISCLOSURE STATEMENT (INCLUDING THE APPENDICES HERETO, THIS "DISCLOSURE STATEMENT") RELATES TO THE JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS (THE "PLAN"), AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO GIVE THE CREDITORS (AS DEFINED BELOW) AND INTERESTHOLDERS (AS DEFINED BELOW) AND OTHER PARTIES IN INTEREST ANY INFORMATION OTHER THAN THE INFORMATION CONTAINED HEREIN, AND THE DEBTORS TAKE NO RESPONSIBILITY FOR ANY OTHER INFORMATION THAT OTHERS MAY GIVE.

ALL SOLICITED CREDITORS (AS DEFINED BELOW) ARE ADVISED AND ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT, THE PLAN AND THE SUPPLEMENT TO THE PLAN (THE "PLAN SUPPLEMENT") TO BE FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN OR THE PLAN SUPPLEMENT AND APPENDICES TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES"). THIS DISCLOSURE STATEMENT HAS NOT BEEN PREPARED TO COMPLY WITH, AND IS NOT INTENDED TO COMPLY WITH, FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING

DISCLOSURE OUTSIDE THE CONTEXT OF THE BANKRUPTCY CODE. CREDITORS, INTERESTHOLDERS, OTHER PARTIES IN INTEREST AND ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. NEITHER ANY SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN NOR THIS DISCLOSURE STATEMENT HAS BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC APPROVED OR DISAPPROVED OF THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. IN ADDITION, THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION" AS PROVIDED IN SECTION 1125 OF THE BANKRUPTCY CODE, BUT THE BANKRUPTCY COURT HAS NOT ENDORSED AND MAY NOT ENDORSE THE PLAN. THIS DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED OR APPROVED BY ANY OTHER COURT IN ANY OTHER JURISDICTION OR BY ANY REGULATORY BODY IN ANY JURISDICTION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS, AND IS PROTECTED TO THE FULLEST EXTENT PERMITTED BY LAW BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER SIMILAR LAW, RULE OR REGULATION OF ANY APPLICABLE JURISDICTION. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE CHAPTER 11 CASES (AS DEFINED BELOW), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, ACCOUNTING OR OTHER LEGAL EFFECTS OF THE PLAN AS TO CREDITORS, INTERESTHOLDERS AND OTHER PARTIES IN INTEREST.

EACH CREDITOR, INTERESTHOLDER OR OTHER PARTY IN INTEREST SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, ACCOUNTING AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION OF THE PLAN, THE APPROVAL OF THE PLAN, THE PLAN ITSELF OR THE TRANSACTIONS CONTEMPLATED THEREBY.

ADDITIONAL INFORMATION REGARDING NORTEL IS CONTAINED IN THE PUBLIC FILINGS OF NORTEL NETWORKS CORPORATION ("NNC"), INCLUDING THE ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2009 (THE "NNC FORM 10-K"), QUARTERLY REPORTS ON FORM 10-Q (EACH, A "NNC FORM 10-Q") FOR THE QUARTERS ENDED MARCH 31, 2010 AND JUNE 30, 2010, THE

CURRENT REPORTS ON FORM 8-K FILED DURING 2010 AND FILINGS WITH THE CANADIAN SECURITIES ADMINISTRATORS (THE "CSA") (SUCH FILINGS, INCLUDING IN RESPECT OF PRIOR PERIODS, COLLECTIVELY, THE "NNC PUBLIC FILINGS"), PREPARED AND FILED BY NNC WITH THE RELEVANT AUTHORITIES, ON A CONSOLIDATED BASIS FOR NNC AND ITS AFFILIATES. SUCH INFORMATION IS NOT A PART OF AND IS NOT DEEMED TO BE INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT. CERTAIN OF SUCH INFORMATION RELATES TO NORTEL AFFILIATES OTHER THAN THE DEBTORS AND, IN PROVIDING OR REFERRING TO SUCH INFORMATION, THE DEBTORS HAVE RELIED UPON INFORMATION AND DESCRIPTIONS PROVIDED BY NORTEL AFFILIATES WITHOUT INDEPENDENT VERIFICATION. THE DESCRIPTIONS AND DISCUSSION OF NORTEL AFFILIATES OTHER THAN THE DEBTORS AND THE CREDITOR PROTECTION PROCEEDINGS OTHER THAN THE CHAPTER 11 CASES CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE RELIED ON ONLY FOR PURPOSES OF EVALUATING THE PLAN, THE DEBTORS AND THE CHAPTER 11 CASES.

ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED. THE FINANCIAL STATEMENTS AND OTHER INFORMATION INCLUDED IN THE NNC PUBLIC FILINGS WERE PREPARED BY NNC ON A CONSOLIDATED BASIS, AND THEREFORE INCLUDE FINANCIAL AND OTHER INFORMATION IN RESPECT OF THE CANADIAN PETITIONERS (AS DEFINED BELOW), THE EMEA DEBTORS (AS DEFINED BELOW) AND CERTAIN ENTITIES NOT SUBJECT TO BANKRUPTCY, INSOLVENCY OR OTHER CREDITOR PROTECTION PROCEEDINGS, AS WELL AS, ON A CONSOLIDATED BASIS, THE DEBTORS. THE CONTENTS OF SUCH NNC PUBLIC FILINGS, INCLUDING FINANCIAL STATEMENTS INCLUDED THEREIN, DO NOT NECESSARILY REPRESENT THE FINANCIAL CONDITION OF THE DEBTORS COLLECTIVELY OR THE FINANCIAL CONDITION OF ANY OF THE DEBTORS INDIVIDUALLY. THE DEBTORS CAN MAKE NO REPRESENTATION AS TO THE ACCURACY OF ANY FINANCIAL AND OTHER INFORMATION CONTAINED IN THE NNC PUBLIC FILINGS, AND BY REFERRING TO THE NNC PUBLIC FILINGS HEREIN, THE DEBTORS ARE NOT REPRESENTING OR ADMITTING TO THE COMPLETENESS OR ACCURACY OF THE CONTENT OF ANY SUCH FILINGS.

THE BUDGETS AND COST ANALYSES PROVIDED IN THIS DISCLOSURE STATEMENT AS APPENDIX H (COLLECTIVELY, THE "BUDGETS") HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT. THE BUDGETS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME THEY WERE MADE, MAY NOT BE ACHIEVED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC,

COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES (INCLUDING, WITHOUT LIMITATION, SIGNIFICANT LITIGATION CONTINGENCIES), MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD LOOKING STATEMENTS THAT ARE BASED ON THE DEBTORS' CURRENT EXPECTATIONS, ESTIMATES AND FORECASTS ABOUT THE OPERATING ENVIRONMENT, ECONOMICS AND MARKETS IN WHICH THEY OPERATE. THESE STATEMENTS ARE SUBJECT TO IMPORTANT ASSUMPTIONS, RISKS AND UNCERTAINTIES THAT ARE DIFFICULT TO PREDICT, AND THE ACTUAL OUTCOME MAY BE MATERIALLY DIFFERENT THAN IMPLIED BY SUCH FORWARD LOOKING STATEMENTS. THE DEBTORS CAUTION THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF SUCH FORWARD LOOKING STATEMENTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS DISCLOSURE STATEMENT WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THIS DISCLOSURE STATEMENT, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF ANY FUTURE EVENT DISCUSSED HEREIN.

PLEASE ALSO SEE <u>SECTION VI</u> (*CERTAIN RISK FACTORS TO BE CONSIDERED*) FOR A DISCUSSION OF CERTAIN RISK FACTORS, WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A SOLICITED CREDITOR TO ACCEPT OR REJECT THE PLAN.

INFORMATION CONTAINED ON ANY WEBSITES REFERRED TO HEREIN OR THAT CAN BE ACCESSED THROUGH ANY SUCH WEBSITE DOES NOT CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

<u>IRS CIRCULAR 230 NOTICE</u>. TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY APPENDICES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

    A.      Scope of this Disclosure Statement.............................................................. 3

    B.      Overview of the Plan and Its Treatment of Claims...................................... 4

        1.      Classification of Claims.................................................................... 4

        2.      Estimated Recoveries for Each Class of Claim ................................ 5

        3.      Bar Dates.......................................................................................... 5

    C.      Bankruptcy Plan Voting Instructions and Procedures ................................. 6

    D.      Confirmation of the Plan by the Bankruptcy Court ..................................... 8

        1.      Acceptance by Impaired Classes ...................................................... 9

        2.      Unfair Discrimination and Fair and Equitable Test ......................... 9

        3.      Best Interests Test .......................................................................... 10

        4.      Feasibility....................................................................................... 10

II.     BACKGROUND AND CERTAIN PRE-PETITION OPERATIONS OF THE
    DEBTORS ........................................................................................................ 11

    A.      Corporate Structure and Management of the Debtors ................................ 11

        1.      History of Nortel ............................................................................ 11

        2.      Overview of Nortel's Historical Business Operations..................... 11

        3.      Corporate Structure of the Debtors ................................................ 12

        4.      Business of Each Debtor ................................................................. 13

        5.      Current Management of the Debtors................................................ 16

    B.      The Debtors' Pre-petition Capital Structure ............................................. 17

        1.      NNCC 2026 Notes .......................................................................... 17

        2.      Certain NNI Guarantees.................................................................. 17

        3.      Bonding Facilities Guaranteed by the Debtors .............................. 18

        4.      Pre-petition Liquidity...................................................................... 18

        5.      Transfer Pricing .............................................................................. 19

**TABLE OF CONTENTS**
(continued)

Page

C.     Recent Financial Results..................................................................20

III.   THE CHAPTER 11 CASES AND CERTAIN POST-PETITION OPERATIONS
       OF THE DEBTORS ..........................................................................22

       A.     Events Leading up to the Chapter 11 Cases...............................22

       B.     Commencement of the Chapter 11 Cases and Other Creditor Protection
              Proceedings..........................................................................23

              1.     Chapter 11 Cases.........................................................23

              2.     CCAA Proceedings........................................................23

              3.     Other Creditor Protection Proceedings..............................24

       C.     Significant Events During the Chapter 11 Cases........................25

              1.     Certain Significant Court Orders....................................25

              2.     Appointment of Creditors' Committee and Organization of Ad Hoc
                     Group of Bondholders.................................................25

              3.     Retained Professionals................................................26

              4.     Disposition of Unexpired Leases and Executory Contracts...........27

              5.     Claims Resolution Processes.........................................28

              6.     Significant Settlements and Settlement Procedures................29

              7.     Summary of Certain Significant Claims..............................31

              8.     Avoidance Actions.....................................................32

              9.     Post-petition Liquidity, Lending and Financing....................33

              10.    Cascade Indemnity....................................................37

       D.     Post-petition Sales and Other Dispositions of Assets....................38

              1.     Mobile WiMAX Business and Alvarion Agreement......................38

              2.     Layer 4-7 Assets......................................................38

              3.     CDMA and LTE Access Assets...........................................38

              4.     Enterprise Solutions Business........................................39

              5.     Packet Core Assets...................................................40

vi

**TABLE OF CONTENTS**
(continued)

Page

6.    Optical Networking and Carrier Ethernet Businesses .................................. 41

7.    GSM/GSM-R Business ...................................................................................... 41

8.    CVAS Business ................................................................................................... 42

9.    LGN Joint Venture ............................................................................................. 43

10.   Relay Sale ........................................................................................................... 43

11.   MSS Business ..................................................................................................... 43

12.   De Minimis Asset Sales ..................................................................................... 44

13.   Purchase Price Adjustments .............................................................................. 44

14.   Transition Services Agreements ........................................................................ 44

15.   Distribution Escrow Accounts ........................................................................... 48

16.   Remaining Intellectual Property Assets ............................................................ 48

E.    Certain Other Post-petition Operations of the Debtors and Other Nortel
      Affiliates ............................................................................................................. 50

1.    Creation of Nortel Business Services Group and the Corporate
      Group ................................................................................................................... 50

2.    Employee Information ........................................................................................ 50

3.    Non-Creditor Protection Legal Proceedings ..................................................... 53

4.    Insurance ............................................................................................................. 55

5.    Environmental Matters ....................................................................................... 56

6.    Supply Chain Agreements .................................................................................. 57

F.    Description of Non-Debtor Subsidiaries of the Debtors .................................... 57

1.    Active Non-Debtor Subsidiaries Held by NNI .................................................. 57

2.    Dormant Non-Debtor Subsidiaries Held by NNI .............................................. 58

3.    Non-Debtor Subsidiaries Held by Nortel AltSystems Inc ................................ 58

4.    Non-Debtor Subsidiaries Held by Sonoma Systems ......................................... 59

5.    Non-Debtor Subsidiaries Held by NN CALA .................................................... 59

**TABLE OF CONTENTS**
(continued)

Page

IV.   CHAPTER 11 PLAN .................................................................. 60
      A.    Summary of the Plan ......................................................... 60
      B.    Treatment of Unclassified Claims ............................................ 61
            1.    Administrative Expense Claims ......................................... 61
            2.    Professional Claims ................................................... 62
            3.    Priority Tax Claims ................................................... 62
      C.    Treatment of Classified Claims and Interests ................................ 63
            1.    Class 1 — Priority Non-Tax Claims ..................................... 63
            2.    Class 2 — Secured Claims ............................................. 64
            3.    Class 3 — General Unsecured Claims .................................... 64
            4.    Class 4 — Subordinated Claims ........................................ 64
            5.    Class 5A — Interests ................................................. 64
            6.    Class 5B — Interests Securities Fraud Claims ......................... 66
      D.    Implementation of the Plan ................................................. 66
            1.    Plan Administrator ................................................... 66
            2.    Plan Advisory Committee .............................................. 67
            3.    Post-Effective Date Management ....................................... 67
            4.    Corporate Existence of Debtors ....................................... 67
      E.    Provisions Governing Voting and Distributions .............................. 68
            1.    Voting of Claims ..................................................... 68
            2.    Minimum Distribution ................................................. 68
            3.    Distributions of Creditor Proceeds ................................... 68
            4.    Distributions to Indenture Trustees .................................. 69
            5.    Distribution Record Date ............................................. 70
            6.    Limitation on Recovery ............................................... 70
            7.    Allocation of Plan Distributions Between Principal and Interest ...... 70

viii

**TABLE OF CONTENTS**
(continued)

|  |  | | Page |
|---|---|---|---|
|  | 8. | Delivery of Distributions and Undeliverable Distributions | 71 |
|  | 9. | Time Bar to Cash Payment Rights | 71 |
|  | 10. | Withholding and Reporting Requirements | 71 |
|  | 11. | Setoffs and Recoupment | 72 |
|  | 12. | Distributions for Disputed Claims | 72 |
|  | 13. | No Payment on Saturday, Sunday or Legal Holiday | 74 |
|  | 14. | Post-petition Interest | 74 |
| F. | | Treatment of Executory Contracts and Unexpired Leases | 74 |
|  | 1. | Previous Assumption, Assignment and Rejection | 74 |
|  | 2. | Assumption and Assignment of Remaining Contracts | 75 |
|  | 3. | Cure of Defaults | 75 |
|  | 4. | Objections to Assumption of Remaining Contracts | 76 |
|  | 5. | Rejection and Approval of Rejection | 76 |
|  | 6. | Post-petition Modification of Executory Contracts | 77 |
|  | 7. | Pre-existing Obligations to the Debtors under Executory Contracts | 77 |
| G. | | Conditions Precedent to Plan's Confirmation and Effective Date | 77 |
|  | 1. | Conditions to Confirmation of the Plan | 77 |
|  | 2. | Conditions to Effective Date | 77 |
|  | 3. | Waiver of Conditions | 78 |
|  | 4. | Notice of Effective Date | 78 |
| H. | | Effect of the Plan on Assets, Claims and Interests | 78 |
|  | 1. | Vesting | 78 |
|  | 2. | Limited Release of Directors, Officers and Employees | 79 |
|  | 3. | Exculpation | 79 |
|  | 4. | Injunctions | 80 |
|  | 5. | Terms of Injunctions or Stays | 80 |

**TABLE OF CONTENTS**
(continued)

|  |  | 6. | Retention of Litigation Claims and Reservation of Rights | 80 |
| I. | | | Defenses with Respect to Unimpaired Claims | 81 |
| J. | | | The Debtors' Post-Emergence Activities | 81 |
| K. | | | Summary of Other Provisions of the Plan | 82 |
| | | 1. | Retention of Jurisdiction | 82 |
| | | 2. | Plan Supplement | 83 |
| | | 3. | Modification of the Plan | 83 |
| | | 4. | Revocation or Withdrawal of the Plan | 84 |
| | | 5. | Exemption from Certain Transfer Taxes | 84 |
| | | 6. | Exemption from Registration | 84 |
| | | 7. | Governing Law | 84 |
| | | 8. | Severability | 85 |
| | | 9. | Dissolution of the Creditor's Committee | 85 |
| | | 10. | Notice | 85 |
| V. | | | CONFIRMATION OF THE PLAN | 87 |
| | A. | | Confirmation Hearing | 87 |
| | B. | | Confirmation Standards | 87 |
| | C. | | Acceptance by Impaired Classes | 87 |
| | D. | | Unfair Discrimination and Fair and Equitable Test | 88 |
| | | 1. | Unfair Discrimination Test | 88 |
| | | 2. | Fair and Equitable Test | 88 |
| | E. | | Best Interests Test | 89 |
| | F. | | Feasibility | 90 |
| VI. | | | CERTAIN RISK FACTORS TO BE CONSIDERED | 92 |
| | A. | | General Considerations | 92 |
| | B. | | Certain Bankruptcy Considerations | 92 |

**TABLE OF CONTENTS**

(continued)

Page

C.    Inherent Uncertainty of Projections and Estimations .......................................... 93

D.    Liquidation Analysis.............................................................................................. 94

E.    Claims Estimations ............................................................................................... 94

F.    Distributions under the Plan.................................................................................. 95

G.    Conditions to Effectiveness of the Plan ............................................................... 95

H.    Monetization of Remaining Intellectual Property................................................. 96

I.    Greater Than Budgeted Liquidation Costs .......................................................... 96

J.    NBS Operations .................................................................................................... 96

    1.    TSA Costs May Exceed TSA Revenues.................................................. 96

    2.    Risks of Performance and Claims Arising under TSAs............................ 97

    3.    Separation and Wind Down of Operations ............................................... 97

K.    Intercompany Claims and Causes of Action......................................................... 98

L.    Other Creditor Protection Proceedings ................................................................ 98

M.    Environmental Regulation .................................................................................... 98

N.    Certain Tax Considerations................................................................................... 99

VII.    CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ................................. 100

A.    In General............................................................................................................. 100

B.    U.S. Federal Income Tax Consequences to the Debtors...................................... 101

    1.    Cancellation of Debt and Reduction of Tax Attributes ......................... 101

    2.    Taxable Income Resulting From 363 Sales ........................................... 102

    3.    Intellectual Property Assets .................................................................... 103

    4.    Limitation of NOL Carryforwards and Other Tax Attributes................. 103

C.    Disputed Claims Reserve ..................................................................................... 104

D.    U.S. Federal Income Tax Consequences to Holders of Claims........................... 104

    1.    Generally................................................................................................. 104

    2.    Holders of Allowed General Unsecured Claims.................................... 105

A

## TABLE OF CONTENTS
(continued)

Page

       3.    Holders of Disputed Claims ................................................................ 106

       4.    Interest Income with Respect to Allowed Claims ................................. 106

   E.    Backup Withholding and Information Reporting ............................................. 106

VIII.   ALTERNATIVES TO THE PLAN ........................................................................... 108

A                                                                                    TR11359

**Index of Appendices to the Proposed Disclosure Statement**

| Appendix A | Glossary of Defined Terms |
|---|---|
| Appendix B | Joint Chapter 11 Plan of the Debtors |
| Appendix C | Estimated Recoveries |
| Appendix D-1 | Current Structure Chart of Selected Nortel Affiliates |
| Appendix D-2 | Post-Effective Date Structure Chart of the Debtors |
| Appendix E | List of Directors and Officers of the Debtors |
| Appendix F | Unaudited Condensed Combined Financial Statements and Index Thereto |
| Appendix G | Liquidation Analysis |
| Appendix H | Budgets and Cost Analyses |

**PROPOSED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS**

THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS
PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION
HEARING.

I.

INTRODUCTION

Nortel Networks Inc., a Delaware corporation ("NNI"); Nortel Networks Capital
Corporation, a Delaware corporation ("NNCC"); Nortel Altsystems Inc. (formerly known as
Alteon WebSystems, Inc.), a Delaware corporation; Nortel Altsystems International Inc.
(formerly known as Alteon WebSystems International, Inc.), a Delaware corporation; Xros, Inc.,
a Delaware corporation; Sonoma Systems, a California corporation; Qtera Corporation, a
Delaware corporation; CoreTek, Inc., a Delaware corporation; Nortel Networks Applications
Management Solutions Inc., a Delaware corporation; Nortel Networks Optical Components Inc.,
a Delaware corporation; Nortel Networks HPOCS Inc., a Delaware corporation; Architel
Systems (U.S.) Corporation, a Delaware corporation; Nortel Networks International Inc., a
Delaware corporation; Northern Telecom International Inc., a Delaware corporation; Nortel
Networks Cable Solutions Inc., a Delaware corporation; and Nortel Networks (CALA) Inc., a
Florida corporation ("NN CALA," and collectively the "Debtors"), provide this Disclosure
Statement to holders of claims against the Debtors ("Creditors") impaired by the Plan to permit
such Creditors to make an informed decision in voting to accept or reject the Plan filed on July
12, 2010 with the Bankruptcy Court. On January 14, 2009 (the "Initial Petition Date"), the
Debtors, other than NN CALA, filed their respective voluntary petitions for relief under chapter
11 of the Bankruptcy Code and, on July 14, 2009, NN CALA filed a voluntary petition for relief
under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases," and the filing
date with respect to each Debtor, the "Petition Date"), as set forth in Exhibit A to the Plan. The
Chapter 11 Cases are jointly administered with one another under Case No. 09-10138 (KG).
Please see the copy of the Plan that is included in this Disclosure Statement as Appendix B.

All Solicited Creditors (as defined below) are advised and encouraged to read and
consider carefully this Disclosure Statement, the Plan included as Appendix B and the Plan
Supplement in their entirety before voting to accept or reject the Plan.

**This Disclosure Statement and the Plan are an integral package, and they
must be considered together for the reader to be adequately informed. This introduction is
qualified in its entirety by the remaining portions of this Disclosure Statement, and this
Disclosure Statement in turn is qualified, in its entirety, by the Plan and the Plan
Supplement. In the event of any inconsistency between this Disclosure Statement and the
Plan, the Plan controls.**

**Capitalized terms used herein but not otherwise defined have the meanings
assigned to such terms in the Plan.** Whenever the words "include," "includes" or "including"
are used in this Disclosure Statement, they are deemed to be followed by the words "without

1

limitation." All dollar amounts in this Disclosure Statement are in United States Dollars unless otherwise stated.

This Disclosure Statement is presented to certain Creditors in accordance with the requirements of section 1125 of the Bankruptcy Code. Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical investor typical of the holders of claims against or interests in the debtors to make an informed judgment whether to accept or reject the plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

This Disclosure Statement solicits acceptances of the Plan from certain Creditors. To the extent that any Class entitled to vote rejects or any Class is deemed to reject the Plan, the Debtors intend to seek confirmation of the Plan, notwithstanding such rejection or deemed rejection, pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

The Debtors believe that the distributions under the Plan will provide Creditors and holders of Interests in the Debtors ("Interestholders"), at least the same recovery on account of Allowed Claims or Interests as would distributions by a chapter 7 trustee. Further, the Debtors believe that distributions under the Plan to Creditors and Interestholders likely would be made more quickly than distributions by a chapter 7 trustee, the Debtors' ability to realize value from the remaining assets could be impaired in a chapter 7 liquidation, and a chapter 7 trustee would charge a substantial fee, reducing the amount available for distribution on account of Allowed Claims or Interests.

**The Debtors believe that confirmation of the Plan is in the best interests of Creditors. Accordingly, Solicited Creditors are encouraged to vote in favor of the Plan.**

The Plan was filed on July 12, 2010, and this Disclosure Statement was filed on September 3, 2010. The Bankruptcy Court approved this Disclosure Statement and procedures for soliciting votes on the Plan by order entered on [●] and scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") beginning at [●] (prevailing Eastern time) on [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Creditors, and will review a ballot report concerning votes cast for acceptance or rejection of the Plan.

A                                                                                                                              TR11359

To obtain, at your cost, additional copies of this Disclosure Statement or of the Plan, please contact:

> Nortel Networks Inc. Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, New York 10017
> Telephone: (646) 282-2400
> Website: http://dm.epiq11.com/nortel

A.    Scope of this Disclosure Statement

Before the Initial Petition Date, the Debtors, NNC and each of their Affiliates (collectively, "Nortel") were a global group of companies with legal entities conducting business operations across many jurisdictions around the world. Nortel includes certain entities that are not Debtors in the Chapter 11 Cases but are either subject to the Creditor Protection Proceedings (as defined below) in other jurisdictions or not subject to any bankruptcy, insolvency or other creditor protection proceedings. The Debtors are each direct or indirect subsidiaries of NNC and their operations represented only parts of Nortel's global operations.

Since the Initial Petition Date, Nortel has initiated creditor protection proceedings under the respective restructuring regimes of certain jurisdictions in which it does business, including Canada, the United States, the United Kingdom, France and Israel (collectively, the "Creditor Protection Proceedings"). Resolution of each Creditor Protection Proceeding will occur in accordance with the procedures of its respective jurisdiction.

This Disclosure Statement was prepared by the Debtors in the Chapter 11 Cases only, and not for other Creditor Protection Proceedings in any other jurisdiction. The Debtors collectively do not constitute all Nortel Affiliates, and the Chapter 11 Cases do not constitute all Creditor Protection Proceedings to which Affiliates of the Debtors are subject. Creditors, Interestholders and other parties in interest are hereby advised that, although certain portions of this Disclosure Statement describe the businesses and history of Nortel as a global group, as well as various Creditor Protection Proceedings initiated by Nortel Affiliates in other jurisdictions, such descriptions should be relied upon only for purposes of evaluating the Plan, the Debtors and the Chapter 11 Cases and not for evaluating any other Creditor Protection Proceedings.

This Disclosure Statement is based on information provided by the Debtors' management and information publicly available in certain SEC filings and pleadings filed with the Bankruptcy Court. While this Disclosure Statement makes reference to the Canadian Petitioners and the CCAA Proceedings (as defined below) and certain other Nortel Affiliates, this Disclosure Statement is solely intended to provide adequate information for purposes of section 1125(a) of the Bankruptcy Code with respect to the Plan. It is not intended to provide any information regarding any Creditor Protection Proceedings other than the Chapter 11 Cases or any Nortel Affiliate other than the Debtors, and creditors and shareholders of such other Nortel Affiliates are advised not to rely on this Disclosure Statement for any purpose. Please see the Disclaimer that starts on page (i) above.

3

B.    Overview of the Plan and Its Treatment of Claims

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF
CLAIMS AND INTERESTS UNDER THE PLAN.  THE DESCRIPTION OF THE PLAN SET
FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS
ENTIRETY, BY THE PLAN, THE PLAN SUPPLEMENT AND, WHERE APPROPRIATE,
THE CONFIRMATION ORDER.  CREDITORS, INTERESTHOLDERS AND OTHER
PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED
DESCRIPTION OF THE PLAN CONTAINED IN SECTION IV (*CHAPTER 11 PLAN*) AND
THE PLAN ITSELF.  THE PLAN IS INCLUDED IN THIS DISCLOSURE STATEMENT
AS APPENDIX B.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS
DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

The Plan applies separately to each of the Debtors.  The Plan recognizes the
corporate integrity of each Debtor and, therefore, Allowed Claims against a particular Debtor
will be satisfied only from the assets of that Debtor's bankruptcy estate.  A Creditor or
Interestholder of any particular Debtor, by virtue of its Claims against or Interests in that Debtor,
has no direct claim against or interest in any other Debtor and has no direct claim against or
interest in any Affiliate of that Debtor.  As described in more detail below, the effectiveness of
the Plan with respect to each Debtor, however, is conditioned on the effectiveness of the Plan
with respect to each other Debtor.

1.    Classification of Claims

The Plan divides the Claims against and Interests in each Debtor into Classes.
Certain Claims (in particular, Administrative Expense Claims; bankruptcy fees (including filing
fees and quarterly fees) due and payable pursuant to section 1930 of title 28 of the United States
Code, as determined by the Bankruptcy Court at the Confirmation Hearing; Professional Claims;
and Priority Tax Claims) remain unclassified in accordance with section 1123(a)(1) of the
Bankruptcy Code.  Creditors whose Claims are unclassified are unimpaired and will be deemed
to accept the Plan.

Each table included in Appendix C summarizes the classification and treatment
under the Plan of the Claims and Interests and reflects the amount and form of consideration that
will be distributed in exchange for and in full satisfaction, settlement, release and discharge of
such Claims and Interests.  The classification and treatment for all Claims and Interests is
described in more detail under Articles 2, 3 and 4 of the Plan.

"Class 1" of each Debtor consists of Priority Non-Tax Claims (if any) against that
Debtor.  Class 1 is unimpaired and will be deemed to accept the Plan.

"Class 2" of each Debtor consists of Secured Claims (if any) against that Debtor.
Class 2 is unimpaired and will be deemed to accept the Plan.

"Class 3" of each Debtor consists of General Unsecured Claims against that
Debtor.  Class 3 is impaired and is entitled to vote to accept or reject the Plan.

"Class 4" of each Debtor consists of Subordinated Claims (if any) against that Debtor. Class 4 is impaired and will be deemed to reject the Plan.

"Class 5A" of each Debtor consists of Interests in that Debtor. Class 5A is impaired and will be deemed to reject the Plan.

"Class 5B" of each Debtor consists of Interests Securities Fraud Claims against that Debtor. Class 5B is impaired and will be deemed to reject the Plan.

2.       Estimated Recoveries for Each Class of Claim

The recovery percentages for each Class of Creditors and Interestholders for each Debtor are set forth in Appendix C. These recovery percentages are merely estimates. The actual amounts distributed to holders of Allowed Claims under the Plan may be higher or lower than estimated.

To estimate Allowed Claims against each Debtor, the Debtors first calculated the total asserted Claims (other than Administrative Expense Claims, which are based on filed, scheduled, accrued and budgeted amounts) based on Filed and Scheduled Claims. To the extent a Creditor filed a proof of claim that superseded a Scheduled Claim, the amount in the Filed proof of claim was used.

The Debtors and their advisors then reviewed all of the proofs of claim asserting Priority Tax Claims, Professional Claims, Secured Claims and Subordinated Claims, and a large sample size of the proofs of claim asserting General Unsecured Claims.

The Debtors (with the assistance of their advisors) then determined a range of estimated Allowed Claims by reducing asserted claim amounts for duplicate claims, amended claims, misclassified claims, settled claims, satisfied claims and claims that lack merit in whole or in part.

With respect to the Debtors' unexpired leases and executory contracts, the Debtors (with the assistance of their advisors) analyzed their financial accounts and other available information and prepared estimates of cure amounts and rejection claims for the leases or executory contracts.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates.

3.       Bar Dates

By an order dated August 4, 2009 (the "Bar Date Order"), the Bankruptcy Court established 4:00 p.m. (prevailing Eastern time) on September 30, 2009 (the "Original Bar Date") as the deadline for filing proofs of claim against the Debtors, except NN CALA. The Debtors provided notice of the Original Bar Date to all known Creditors and published notice of the same in THE GLOBE AND MAIL and THE WALL STREET JOURNAL. In addition to the Original Bar Date, on November 18, 2009, the Debtors established 5:00 p.m. (prevailing Eastern time) on December 15, 2009 as a supplemental deadline for the filing of proofs of claim by certain Creditors (the

5

A

TR11359

"Supplemental Bar Date"). The Debtors provided notice of the Supplemental Bar Date to those Creditors.

On December 3, 2009, the Bankruptcy Court entered an order (the "NN CALA Bar Date Order") fixing the general bar date as 4:00 p.m. (prevailing Eastern time) on January 25, 2010 for filing proofs of claim against NN CALA (the "NN CALA General Bar Date"). The Debtors provided notice of the NN CALA General Bar Date to all known Creditors of NN CALA and published notice of the same in THE GLOBE AND MAIL and THE WALL STREET JOURNAL.

The Original Bar Date, Supplemental Bar Date and NN CALA General Bar Date do not apply to Administrative Expense Claims, intercompany claims or certain indemnification and contribution claims by officers and directors of the Debtors, except to the extent provided by the Bar Date Order and the NN CALA Bar Date Order. Pursuant to the Plan, all unpaid Administrative Expense Claims, other than Professional Claims, that accrued on or before the Effective Date must be filed on or before the Administrative Expense Claims Bar Date. The Administrative Expense Claims Bar Date is the first Business Day that is 30 days following the Effective Date unless otherwise ordered by the Bankruptcy Court. In addition, the Debtors expect to request that the Bankruptcy Court establish a deadline for the filing of intercompany claims.

C.   Bankruptcy Plan Voting Instructions and Procedures

**THE DEBTORS URGE EACH SOLICITED CREDITOR TO VOTE TO ACCEPT THE PLAN.**

The Bankruptcy Code entitles only holders of impaired claims or interests who are to receive some distribution under a proposed plan to vote to accept or reject that plan. Pursuant to section 1126(f) of the Bankruptcy Code, holders of claims or interests that are unimpaired under a proposed plan are conclusively presumed to have accepted that plan and are not entitled to vote on it. Pursuant to section 1126(g) of the Bankruptcy Code, holders of claims or interests that will receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, are also not entitled to vote on it.

The Creditors in Classes 1 and 2 of each Debtor are not Impaired under the Plan. Thus, pursuant to section 1126(f) of the Bankruptcy Code, the Creditors in Classes 1 and 2 of each Debtor are deemed to have accepted the Plan and are not entitled to vote on the Plan.

The Class 3 Creditors of each Debtor are Impaired and thus may vote to accept or reject the Plan. The Debtors have enclosed ballots with this Disclosure Statement ("Ballots") to solicit the votes of all Class 3 Creditors of each Debtor. Each Impaired Creditor entitled to vote to accept or reject the Plan pursuant to the Plan is referred to as a "Solicited Creditor."

The Class 4 Creditors of each Debtor will receive no cash distribution under the Plan unless the Allowed Claims of Creditors in Classes 1, 2 and 3 of such Debtor have been satisfied in full, which is not expected to occur, as reflected in Appendix C. Thus, for purposes of determining the right to vote on the Plan, the Class 4 Creditors of each Debtor are deemed to

have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

The Class 5A Interestholders of each Debtor will receive no cash distribution under the Plan. Thus, pursuant to section 1126(g) of the Bankruptcy Code, the Class 5A Interestholders of each Debtor are deemed to have rejected the Plan and are not entitled to vote on the Plan.

The Class 5B Creditors of each Debtor will receive no distribution under the Plan. Thus, pursuant to section 1126(g) of the Bankruptcy Code, the Class 5B Creditors of each Debtor are deemed to have rejected the Plan and are not entitled to vote on the Plan.

**A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO SOLICITED CREDITORS. SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT, THE PLAN AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The voting deadline is [●] (prevailing Eastern time) on [●] and the Confirmation Hearing is scheduled for [●] (prevailing Eastern Time) on [●]. The Debtors presently intend to consummate the Plan and to cause the Effective Date to occur. However, the confirmation and effectiveness of the Plan are subject to material conditions precedent, some of which may not be satisfied or waived. Thus, there can be no assurance that those conditions will be satisfied or waived and there can also be no assurance as to whether or when the Effective Date actually will occur. Certain matters that are expected to affect the timing of the receipt of distributions by Creditors and Interestholders of certain Classes, and that could affect the amount of distributions ultimately received by such Creditors and Interestholders, are described in Section IV (*Chapter 11 Plan*) and in the Plan.

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan. You may not cast Ballots or votes orally or by facsimile. **In order for your Ballot to be considered by the Bankruptcy Court, it must be received by [●] (prevailing Eastern time) on [●],** at the following address:

> Nortel Networks Inc. Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, New York 10017
> Telephone: (646) 282-2400
> Website: http://dm.epiq11.com/nortel

If you are a Solicited Creditor of any Debtor, and you did not receive a Ballot with this Disclosure Statement, please contact the Nortel Networks Inc. Ballot Processing Center at the address above.

Only Solicited Creditors are entitled to vote on the Plan. Any Ballot executed by a Solicited Creditor, but which does not indicate acceptance or rejection of the Plan, will not be

considered a vote regarding the Plan. Any Ballot not executed by a Solicited Creditor will not be counted as a vote to accept or reject the Plan.

**An Impaired Class of Claims accepts the Plan if the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote cast ballots in favor of the Plan.**

**YOU MAY BE BOUND IF YOU DO NOT VOTE.** Whether or not a Creditor or Interestholder votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of the Classes of Claims and Interests and is confirmed by the Bankruptcy Court. Pursuant to the provisions of section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

The Debtors or other parties in interest, including the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee"), may dispute proofs of claim or interest that have been filed or that the Debtors listed as disputed in the Schedules. Persons whose Claims are disputed may vote on or otherwise participate in distributions under the Plan only to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for voting purposes only. Allowance of a Claim for voting purposes or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for distribution purposes. The Debtors' Schedules listing Claims and whether such Claims are disputed can be reviewed upon reasonable request at the Delaware offices of Morris Nichols (as defined below) at 1201 North Market Street, 18th Floor, Wilmington, Delaware 19899-1347 (telephone: (302) 351-9238) or at the website of the Debtors' claims agent, Epiq Bankruptcy Solutions LLC ("Epiq") (http://dm.epiq11.com/nortel).

D.     Confirmation of the Plan by the Bankruptcy Court

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan with respect to each of the Debtors only if all of the requirements of section 1129 of the Bankruptcy Code are met with respect to each such Debtor.

Among the statutory requirements for confirmation of a chapter 11 plan are that the plan is: (i) accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) in the "best interests" of creditors and interestholders that are impaired under the plan, and (iii) feasible.

As more fully discussed in Section V (*Confirmation of the Plan*), the Debtors believe that the Plan will satisfy all of the requirements for confirmation with respect to each Debtor.

1.    Acceptance by Impaired Classes

An impaired class of claims accepts a chapter 11 plan if the holders of at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote cast ballots in favor of the plan.

Class 4 Creditors of each Debtor may receive no cash distributions and Class 5A Interestholders and Class 5B Creditors of each Debtor will receive no distributions, in each case, on account of their respective Claims or Interests and are therefore deemed to have rejected the Plan. With respect to Classes 4, 5A and 5B, therefore, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan if at least one of the Impaired Classes of Claims for each Debtor (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) accepts the Plan and certain additional conditions are met.

2.    Unfair Discrimination and Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision. Pursuant to this section, the Bankruptcy Court may confirm a chapter 11 plan notwithstanding the plan's rejection (or deemed rejection) by one or more impaired classes as long as the plan is accepted by at least one impaired class (by meeting the acceptance requirement described above), "does not discriminate unfairly," is "fair and equitable" as to each impaired class that has not accepted it and meets certain other statutory requirements.

(a)    Unfair Discrimination

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

(b)    Fair and Equitable Test

(i)    *Secured Creditors*

A plan is fair and equitable as to a non-accepting class of secured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code. These requirements are fulfilled if either (i) each impaired secured creditor will retain its liens securing its secured claim and will receive on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor will realize the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim will be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(ii)    *Unsecured Creditors*

Likewise, a plan is fair and equitable as to a non-accepting class of unsecured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(B) of the

9

A

Bankruptcy Code. These requirements are fulfilled if (i) the non-accepting claimants will receive the full value of their claims or (ii) if the non-accepting claimants receive less than full value, no class of junior priority will receive anything on account of their pre-petition claims or interests. The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable as to each Impaired Class.

If the Plan does not meet the cramdown requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

3.    Best Interests Test

In order for a chapter 11 plan to be confirmed, the Bankruptcy Code requires that, with respect to each impaired class of creditors or interestholders, that each of such impaired creditors or interestholders either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount such class members would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date.

4.    Feasibility

To confirm a chapter 11 plan, the Bankruptcy Court must find that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless and to the extent liquidation is contemplated by the plan.

THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. PLEASE CONSULT WITH YOUR ATTORNEY TO OBTAIN A COMPLETE UNDERSTANDING OF THE LAW AND YOUR RIGHTS UNDER THE LAW.

II.

## BACKGROUND AND CERTAIN PRE-PETITION OPERATIONS OF THE DEBTORS

This section provides a general description of Nortel's and the Debtors' organization and businesses prior to the Initial Petition Date. As a result of the commencement of the Chapter 11 Cases, the commencement of the Creditor Protection Proceedings relating to certain Nortel Affiliates and the sale of significant business units and assets after the Initial Petition Date, the nature and scope of Nortel's current global businesses and the Debtors' individual businesses have changed substantially from the descriptions set forth in this section.

A.      Corporate Structure and Management of the Debtors

1.      History of Nortel

Nortel traces its heritage to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited ("Northern Electric") as an equipment provider for Canada's telephone system. Over the following century, Northern Electric grew into an international communications technology and services company and changed its name to Northern Telecom in 1976. In 1995, celebrating its 100th anniversary, Northern Telecom changed its name again to Nortel to reflect its corporate evolution from a telephony manufacturing company to designer, builder and integrator of diverse multiservice networks. In 1998, the name Nortel Networks was first officially adopted in recognition of the continuing transformation of the company's business. In its recent history, Nortel gained a well-deserved reputation for innovation and creativity through the development of ground-breaking technology, including many industry firsts, in such fundamental technologies as digital, optical, wireless, Internet Protocol ("IP"), voice-over IP ("VoIP"), broadband, multimedia and Ethernet.

From the mid-1980's to 2000, Nortel expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age. From its Canadian base, North American operations were expanded into the United States with the establishment of production and research and development facilities, resulting in an increase in the number of U.S.-based employees and the creation of a large customer base in the United States. At the same time, Nortel moved significantly into Europe, Asia, Africa and Latin America, becoming a truly global enterprise.

In 2000, BCE Inc. (formerly known as Bell Canada Enterprises), the parent company of Bell Canada, Inc., spun-off substantially all its shareholdings in Nortel through a statutory reorganization transaction, with the result that NNC became the ultimate parent entity of all Nortel Affiliates, and NNL became its principal Canadian operating subsidiary.

2.      Overview of Nortel's Historical Business Operations

Prior to the Initial Petition Date, Nortel supplied end-to-end networking products and solutions that helped organizations enhance and simplify communications. These organizations ranged from small businesses to multi-national corporations involved in all aspects of commercial and industrial activity, to federal, state and local government agencies and the

11

military. They included cable operators, wireline and wireless telecommunications service providers and Internet service providers. Nortel designed, developed, engineered, marketed, sold, supplied, licensed, installed, serviced and supported these networking solutions worldwide. Nortel's technology expertise ranged across carrier and enterprise, wireless and wireline, applications and infrastructure.

    3.    Corporate Structure of the Debtors

    Each Debtor is a direct or indirect subsidiary of NNC.

    NNC is a corporation organized under the laws of Canada and its principal offices are located in Mississauga, Ontario, Canada. Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), is NNC's principal Canadian operating subsidiary and also the parent of NNI. A copy of the current organizational structure of selected Nortel Affiliates, including NNC, NNL and the Debtors, is included in this Disclosure Statement as Appendix D-1.

    Nortel's U.S. assets and operations are organized under either NNC or NNI, NNL's principal U.S. subsidiary. NNI is the corporate parent of most of Nortel's wholly or partially owned U.S. subsidiaries.

    As depicted in Appendix D-1, NNL, a direct subsidiary of NNC, owns 100% of the equity of NNI, which, in turn, owns directly or indirectly 100% of the equity of the following Debtors: NNCC, Nortel Networks Cable Solutions Inc., Nortel Networks International Inc., Northern Telecom International Inc., NN CALA and Qtera Corporation. NNI also owns 99.93% (and NNL owns 0.07%) of the equity of Nortel Networks Optical Components Inc., which owns 100% of the equity of Nortel Networks HPOCS Inc.

    NNC owns 100% of the equity of the following Debtors: Sonoma Systems, CoreTek, Inc., Xros, Inc., Nortel Altsystems Inc. and Architel Systems Corporation, a non-Debtor entity that owns 100% of the equity of Architel Systems (U.S.) Corporation, a Debtor. Nortel Altsystems Inc. owns 100% of the equity of Nortel Altsystems International Inc., a Debtor. NNC also owns 88.62% (and NNI owns 11.38%) of the equity of Nortel Networks Applications Management Solutions Inc., a Debtor. NNC also directly or indirectly owns certain non-Debtor Affiliates of the Debtors.

    NNC, as a public reporting company in the United States and Canada, files annual, quarterly and current reports, and other information with the SEC and the CSA, which provide additional information about Nortel, its management and operations. NNC's SEC filings are available to the public through the SEC's Electronic Data Gathering, Analysis and Retrieval system (EDGAR) on the website maintained by the SEC at www.sec.gov and from commercial document retrieval services. NNC's CSA filings are available to the public through the CSA's System for Electronic Document Analysis and Retrieval (SEDAR) which is operated by CDS Inc. on behalf of the CSA on the website www.sedar.com and from commercial document retrieval services.

4.      Business of Each Debtor

The remainder of this section II.A.4 provides information regarding each Debtor's business operations prior to the sale of its businesses through the Creditor Protection Proceedings.

(a)      Nortel Networks Inc.

As Nortel's primary U.S. operating subsidiary, Nortel Networks Inc. has served as a supplier of data and telephony network solutions and services and a U.S. purchasing hub for various Nortel Affiliates. It is the direct or indirect parent of a majority of the Nortel Affiliates in the United States, including many of the Debtors (Nortel Networks Cable Solutions Inc., NNCC, Nortel Networks Applications Management Solutions Inc., Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., NN CALA and Qtera Corporation). It is also a guarantor of certain debt securities of NNC and NNL.

As of the Initial Petition Date, NNI had 8,843 employees. Its central headquarters and research and development complex were based in Richardson, Texas and it owned or leased multiple properties throughout the United States. NNI had a customer base of over 1,000 customers and total revenue of over $4 billion in fiscal year 2008.

(b)      Nortel Networks Capital Corporation

Nortel Networks Capital Corporation, a wholly-owned subsidiary of NNI, is a special purpose finance company that issued $150 million in aggregate principal amount of debt securities, which were guaranteed by NNL. These securities, the NNCC 2026 Notes (as defined below), are described further below. In addition, NNCC entered into a pre-petition intercompany loan with NNI pursuant to which NNI borrowed an initial principal amount equal to approximately $146.7 million. NNCC has no other independent operations.

(c)      Nortel Altsystems Inc.

Nortel Altsystems Inc. (formerly known as Alteon WebSystems, Inc.), a wholly-owned subsidiary of NNC, was a provider of content aware switching technology, a provider of Internet infrastructure equipment and a manufacturer and marketer of web switches. Nortel Altsystems Inc. has three subsidiaries: Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), Nortel Altsystems AB (formerly known as Alteon WebSystems AB), a Swedish entity that was responsible for product development of Nortel's IntelligentEdge products, and Nortel Altsystems International Limited (formerly known as Alteon WebSystems International Limited), a Bermuda-based company that provided Internet infrastructure equipment and manufactured and marketed web switches. Nortel Altsystems Inc. also holds a 14.39% minority interest in Blade Network Technologies, Inc., a Delaware corporation engaged primarily in telecommunications businesses.

13

(d)   Nortel Altsystems International Inc.

Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), a wholly-owned subsidiary of Nortel Altsystems Inc., is incorporated as a holding company for international branch and representative offices.

(e)   Xros, Inc.

Xros, Inc., a wholly-owned subsidiary of NNC, developed and marketed optical networking systems.

(f)   Sonoma Systems

Sonoma Systems, a wholly-owned subsidiary of NNC, developed carrier-class Broadband Integrated Access Devices that allow service providers to deliver integrated services (Internet, voice, data and video) over a single access network. Sonoma Systems owned 100% of a dormant U.K.-based subsidiary, Sonoma Limited, which was struck off the U.K. register of companies and dissolved pursuant to U.K. law as of August 31, 2010. Sonoma Systems Europe Limited is owned 100% by Sonoma Limited and is expected to be struck off and dissolved as of September 15, 2010.

(g)   Qtera Corporation

Qtera Corporation, a wholly-owned subsidiary of NNI, developed and marketed ultra-long-reach optical networking systems for telecommunications service providers.

(h)   CoreTek, Inc.

CoreTek, Inc., a wholly-owned subsidiary of NNC, was a leader and pioneer in the use of VCSEL (vertical cavity surface-emitting laser) and MEMs (micro-electromechanical systems) technology for optical networking.

(i)   Nortel Networks Applications Management Solutions Inc.

Nortel Networks Application Management Solutions Inc. is owned 88.62% by NNC and 11.38% by NNI. Its primary business activities were software development and marketing.

(j)   Nortel Networks Optical Components Inc.

Nortel Networks Optical Components Inc. is a holding company 99.93% owned by NNI, with the remaining 0.07% held by NNL. Nortel Networks Optical Components Inc. owns 100% of its sole subsidiary, Nortel Networks HPOCS Inc., which is described below.

(k)   Nortel Networks HPOCS Inc.

Nortel Networks HPOCS Inc. is a wholly-owned subsidiary of Nortel Networks Optical Components Inc. The entity's primary activities were research, development,

manufacture, marketing and sale of optical and microelectronic components for use in telecommunications applications.

        (l)      Architel Systems (U.S.) Corporation

Architel Systems (U.S.) Corporation, a wholly-owned subsidiary of Architel Systems Corporation (a Canadian corporation), provided sales and professional services in the United States for its parent company.

        (m)     Nortel Networks International Inc.

Nortel Networks International Inc., a wholly-owned subsidiary of NNI, holds various international sales and other branch, liaison or representative offices on behalf of its parent corporation, NNI. Nortel Networks International Inc. holds minority ownership interests in Nortel Networks Technology (Thailand) Ltd.

        (n)     Northern Telecom International Inc.

Northern Telecom International Inc., a wholly owned-subsidiary of NNI, is a service company that utilized U.S. employees to provide services to Affiliates. This entity is a name holding corporation, which preserves the use of the "Northern Telecom" name in the United States.

        (o)     Nortel Networks Cable Solutions Inc.

Nortel Networks Cable Solutions Inc., a wholly-owned subsidiary of NNI, represented Nortel interests at cable industry forums with the goal of influencing the definition of cable telephony network interface specifications and standards.

        (p)     Nortel Networks (CALA) Inc.

Nortel Networks (CALA) Inc., a wholly-owned subsidiary of NNI, conducted sales and marketing of Nortel products throughout the Caribbean and Latin America and serves as a trading partner for all Nortel local entities throughout the Caribbean and Latin American region. NN CALA wholly owns Nortel Trinidad and Tobago Limited. NN CALA also partially owns Nortel Networks de Guatemala, Ltda. (98% owned) and Nortel Networks de Colombia, S.A. (19.94% owned).

5.    Current Management of the Debtors

A list of each Debtor's directors and officers is included herein as Appendix E.

The following provides a brief description of the members of the management team of the Debtors as of August 31, 2010:

| Name | Position | Age |
|------|----------|-----|
| John J. Ray, III | Principal Officer of each Debtor | 51 |
| Christopher S. Ricaurte | Vice President of Nortel Networks Cable Solutions Inc.; President and Treasurer of NN CALA and Sonoma Systems; President of all other Debtors; Director of each Debtor | 51 |
| Clarke E. Glaspell | Vice President, Finance of each Debtor | 43 |
| Jeffrey T. Wood | Vice President, Tax of each Debtor (other than NN CALA) | 54 |
| Anna Ventresca | Chief Legal Officer of NNI | 45 |
| Lynn C. Egan | Secretary of each Debtor | 57 |

*John J. Ray, III* was retained as Principal Officer of each of the Debtors on December 7, 2009, and his appointment was approved by the Bankruptcy Court on January 6, 2010. In this capacity, Mr. Ray has the principal responsibility for overseeing and directing the reorganization and wind down of the Debtors' estates. He is the Senior Managing Director of Avidity Partners, LLC. From 2004 to 2009, he was Chairman of the Board of Enron Corporation and, from 2005 to 2009, President of Enron Corporation. Prior to that time, from 1998 to 2002, he served as Chief Administrative Officer and General Counsel of Fruit of the Loom.

*Christopher S. Ricaurte* has been the sole director of NNI since March 2, 2010, of NN CALA since March 16, 2010 and of each other Debtor since June 2, 2010. Mr. Ricaurte has also been the President and Treasurer of NN CALA and Sonoma Systems since March 16, 2010; the President of NNI since March 16, 2010; the Vice President of Nortel Networks Cable Solutions Inc. since June 2, 2010; and the President of each other Debtor since June 2, 2010. He was appointed President, Nortel Business Services ("NBS") of NNL and NNC effective February 2, 2010. Prior to this appointment, Mr. Ricaurte served as Senior Vice President, Finance, NBS from August 2009 to February 2010. He served as Vice President, Financial Planning and Analysis, Global Operations from April 2007 to August 2009. From 2004 to 2007, he acted as CFO-Commonwealth Handling Equipment Pool, Europe of Brambles Limited, a global provider of support services headquartered in Sydney, Australia.

*Clarke E. Glaspell* has been Vice President, Finance for NN CALA and Nortel Networks Cable Solutions Inc. from October 10, 2009, and for each other Debtor since October 27, 2009. Mr. Glaspell has also been serving as Controller of NNC and NNL since October 10, 2009. He is a chartered accountant with over 14 years of finance work experience. Since joining Nortel in April of 2000, Mr. Glaspell has held various positions and has gained

experience in several areas including corporate consolidations, corporate control and external reporting. Prior to joining Nortel, Mr. Glaspell earned his chartered accountancy designation while employed by Deloitte & Touche LLP.

*Jeffrey T. Wood* has been Vice President, Tax of the Debtors (except NN CALA and Nortel Networks Cable Solutions Inc.) since September 22, 2008 and of Nortel Networks Cable Solutions Inc. since September 24, 2008, and is responsible for strategic tax policy; tax compliance; U.S. federal, state and foreign controversies; financial tax reporting; and functional management. Prior to his appointment, Mr. Wood was the Vice President of Tax for Konica Minolta and previously held senior tax positions with Diageo and the Pillsbury Company.

*Anna Ventresca* was appointed Chief Legal Officer of NNI as of September 11, 2009. Ms. Ventresca has also been serving as General Counsel-Corporate and Corporate Secretary and Chief Compliance Officer of NNC and NNL since August 10, 2009. Since joining Nortel in 2000, Ms. Ventresca has held a variety of roles, including providing legal support for U.S. and Canadian securities law filings, mergers and acquisitions including antitrust, financings, investments, corporate secretarial matters, ethics and compliance matters.

*Lynn C. Egan* has been Secretary of NNI since October 27, 2009. Before that date, Ms. Egan acted as Assistant Secretary of NNI from October 23, 1996 to October 26, 2009. She was appointed Secretary of Xros, Inc., Sonoma Systems, Qtera Corporation and Northern Telecom International Inc. on May 21, 2002; Nortel Networks International Inc. on November 15, 2002; Nortel Networks Optical Components Inc. and Nortel Networks HPOCS Inc. on December 3, 2002; and NN CALA on April 5, 2010. She is also acting as Senior Counsel for the Nortel Affiliates in the United States, including the Debtors. Since joining Nortel in 1995, she has held a variety of roles, including providing legal support for U.S. and Canadian securities law filings, mergers and acquisitions, antitrust, financings, investments, Original Equipment Manufacturing (OEM) agreements, procurement and corporate secretarial matters.

B.    The Debtors' Pre-petition Capital Structure

   1.    NNCC 2026 Notes

         On June 17, 1996, NNCC issued and sold $150 million in aggregate principal amount of 7.875% notes due June 2026 (the "NNCC 2026 Notes") pursuant to an indenture dated as of February 15, 1996 among NNCC, NNL, as guarantor, and The Bank of New York, as trustee. On February 12, 2009, The Bank of New York was succeeded by Law Debenture Trust Company of New York ("Law Debenture Trust") as trustee under the indenture.

   2.    Certain NNI Guarantees

         (a)    NNI guaranteed the following debt securities of NNL, issued under an indenture dated as of July 5, 2006 among NNL, as issuer, NNC and NNI, as guarantors, and The Bank of New York Mellon ("BNYM," formerly known as The Bank of New York), as trustee:

               (i)    $2 billion in aggregate principal amount of senior notes comprised of $450 million in aggregate principal amount of 10.75% senior notes due 2016 (the "First

Tranche of NNL 2016 Notes"), $550 million in aggregate principal amount of 10.125% senior notes due 2013 (the "NNL 2013 Notes") and $1 billion in aggregate principal amount of floating rate senior notes due 2011 with a stated interest rate per annum, reset quarterly, equal to LIBOR plus 4.250% (the "NNL 2011 Notes"), each of which were issued on July 5, 2006; and

(ii)      $675 million in aggregate principal amount of 10.75% senior notes due July 2016, which were issued on May 28, 2008 (together with the First Tranche of NNL 2016 Notes, the "NNL 2016 Notes").

(b)      NNI guaranteed the following debt securities of NNC, issued under the indenture dated as of March 28, 2007 among NNC, as issuer, NNL and NNI, as guarantors, and BNYM, as trustee:

(i)      $575 million in aggregate principal amount of 1.75% convertible senior notes due 2012, which were issued on May 28, 2007 (the "NNC 2012 Notes"); and

(ii)      $575 million in aggregate principal amount of 2.125% convertible senior notes due 2014, which were issued on May 28, 2007 (the "NNC 2014 Notes").

The NNCC 2026 Notes, the NNL 2011 Notes, the NNL 2013 Notes, the NNL 2016 Notes, the NNC 2012 Notes and the NNC 2014 Notes are hereinafter referred to collectively as the "Senior Notes". The proceeds from one or more issuances of the Senior Notes were used to redeem existing debt, to refinance a credit facility and for general corporate purposes.

3.      Bonding Facilities Guaranteed by the Debtors

Nortel obtained financing support from certain institutions that issued letters of credit and performance bonds on behalf of various Nortel Affiliates (the "L/C and Bonding Facilities"). These letters of credit and performance bonds gave Nortel's customers comfort in continuing to do business with the relevant Nortel Affiliates.

Prior to the Initial Petition Date, Export Development Canada ("EDC"), Canada's federal export credit agency which provides financing support to Canadian exporters, provided a support facility that backstopped certain letters of credit and performance bonds on behalf of various Nortel Affiliates, including certain of the Debtors (the "EDC Facility"). The EDC Facility provided for the issuance of support in the form of guarantee bonds or guarantee type documents issued to financial institutions that issue letters of guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance. Prior to the Initial Petition Date, NNI issued a guaranty in support of the EDC Facility.

4.      Pre-petition Liquidity

Historically, Nortel has deployed its cash through a variety of intercompany borrowing and transfer pricing arrangements to allow it to operate on a global basis and to allocate profits, losses and certain costs among Nortel Affiliates.