From time to time, as part of the management of Nortel's cash needs on a global basis, certain Nortel Affiliates, including NNI and NNCC, funded intercompany loans and capital contributions to other Nortel Affiliates on an as-needed basis to fund working capital and other expenses for these Affiliates. As part of this practice, prior to the Initial Petition Date, NNI and NNL were parties to a $1 billion revolving loan agreement dated March 21, 2008, which permitted NNL to borrow funds on an as-needed basis. As of the day before the Initial Petition Date, the aggregate outstanding principal balance of this revolving loan was approximately $296 million. NNI's right to repayment of this loan was one of the claims comprising the FCFSA Claim (as defined below) in connection with a subsequent settlement described below.

5.      Transfer Pricing

Nortel's transfer pricing arrangements are documented in certain distribution agreements between two or more Nortel Affiliates and a Master R&D Agreement, dated as of December 22, 2004, among NNL, NNI, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited, Nortel Networks S.A. ("NNSA") and other Nortel Affiliates (as amended from time to time, the "Master R&D Agreement," and together with the distribution agreements, the "Transfer Pricing Agreements"). Until the Initial Petition Date, the Canadian Petitioners and the Debtors continued to allocate operating profits, losses and certain costs among the corporate group through Transfer Pricing Agreement payments ("TPA Payments"), although certain of such TPA Payments were suspended as of the Initial Petition Date, as further described below.

NNI, on behalf of itself and the other members of NNI's consolidated group for U.S. federal income tax purposes (the "NNI Consolidated Group"),[2] and NNL had previously entered into three concurrent Advanced Pricing Arrangements ("APAs") with the U.S. and Canadian tax authorities in connection with TPA Payments between Canada and the United States. Two of these arrangements expired in 1999 and one in 2000. In 2002, NNI (on behalf of the NNI Consolidated Group), NNL and NNUK filed APA requests for the adoption of a new transfer pricing arrangement based on the residual profit split methodology with the tax authorities in the United States, Canada and the United Kingdom. That method applied to the taxation years 2001 through 2005 (such arrangement, the "2001-2005 APA"). During 2006, NNI became aware of the fact that the U.S. Internal Revenue Service ("IRS") disagreed with certain aspects of Nortel's implementation of the residual profit split methodology. During 2009, Nortel received details from the U.S. and Canadian tax authorities concerning the settlement of the 2001-2005 APA under competent authority procedures. The settlement mandated a reallocation of taxable income from NNL to the NNI Consolidated Group in the aggregate amount of $2 billion for the tax years ending 2001 to 2005. In December 2009, NNI and NNL agreed to accept the settlement and the resulting reallocation of taxable income to the NNI Consolidated Group.

---

[2]      Only the Debtors that are direct or indirect subsidiaries of NNI are members of the NNI Consolidated Group. Therefore, Sonoma Systems, Xros, Inc., Architel Systems (U.S.) Corporation, CoreTek, Inc., Nortel Altsystems Inc., and each of their respective subsidiaries (if any) are not members of the NNI Consolidated Group. In addition, Nortel Networks Applications Management Solutions Inc. is not a member of the NNI Consolidated Group because only 11.38% of its equity is owned by NNI.

During 2007 and 2008, NNI (on behalf of the NNI Consolidated Group) and NNL requested new bilateral APAs for tax years 2007 through at least 2011 (the "2007-2011 APA"), for the United States and Canada, with a request for rollback to 2006, following methods generally similar to those requested for 2001 through 2005. NNI and NNL ultimately withdrew the relevant applications for the 2007-2011 APA following a request by the Canadian tax authority.

C.   Recent Financial Results

This Disclosure Statement includes as Appendix F certain unaudited condensed combined financial statements of each of the Debtors for the six-month period ended June 30, 2010, and the period from January 14, 2009 (or, in the case of NN CALA, July 14, 2009) to December 31, 2009, which were prepared by the Debtors for the purpose of this Disclosure Statement.

As a parent company, NNC reports publicly the financial results of NNC and its Affiliates, including the Debtors, on a consolidated basis. Supplemental condensed consolidated financial information with respect to NNI was historically included in NNC's financial statements filed as part of NNC's respective Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q. On March 11, 2010, NNC, NNL, NNI and NNCC each filed a Form 15 with the SEC related to their respective Senior Notes and all related guarantees, as applicable, which resulted in automatic suspension of reporting requirements under the U.S. Securities Exchange Act of 1934, as amended. As a result, NNC is no longer including supplemental condensed consolidated financial information regarding the guarantors and non-guarantors of the Senior Notes in the notes to the financial statements of NNC. Therefore, condensed consolidated financial information with respect to NNI was not included in the NNC Form 10-K for the fiscal year ended December 31, 2009 and has not been included in the financial statements of NNC since the Quarterly Report on Form 10-Q for the quarter ended September 30, 2009.

Proceeds received from asset sales to date that are being held in escrow (which does not include the proceeds from the sale of NNL's interests in LG-Nortel Co. Ltd. ("LGN")) are currently reported, as set forth in the NNC Form 10-K and each of the NNC Form 10-Qs, in NNL solely for financial reporting purposes. The ultimate determination of the final allocation of such proceeds among the various Nortel Affiliates has not yet occurred and may be materially different from the NNL classification and related amounts shown in the financial statements included in the NNC Form 10-K and each of the NNC Form 10-Qs, which financial statements have been prepared by NNC. The IFSA (as defined below) and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel Affiliates provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate outcome of the allocation agreement or other dispute resolution proceeding noted above will be recognized when finalized. The NNL classification and related amounts shown in the financial statements included in the NNC Form 10-K and each of the NNC Form 10-Qs are not determinative of, and have not been accepted by any Debtor, any party in interest in the Creditor Protection Proceedings or any court overseeing such Proceedings, for purposes of deciding, the final allocation of divestiture proceeds.

On January 14, 2009, NNC received notice from the New York Stock Exchange (the "NYSE") that it decided to suspend the listing of NNC's common shares on the NYSE. The NYSE stated that its decision was based on the commencement of the CCAA Proceedings and the Chapter 11 Cases. Subsequently, on February 2, 2009, NNC common shares were delisted from the NYSE. On June 19, 2009, and several times subsequently, Nortel announced that it did not expect that the holders of NNC common shares and NNL preferred shares will receive any value from the Chapter 11 Cases and the CCAA Proceedings and that such proceedings would ultimately result in the cancellation of those equity interests. As a result, NNC and NNL applied to delist the NNC common shares and the NNL preferred shares, respectively, from trading on the Toronto Stock Exchange, and such delisting occurred on June 26, 2009.

NNC common shares are currently quoted in the over-the-counter market in the Pink Sheets Electronic Quotation Service under the symbol "NRTLQ". NNL no longer files reports with the SEC, although it continues to file required reports with the CSA.

Although the reports filed with the SEC or the CSA by NNC and NNL may contain information regarding the Debtors, they are not considered to be part of this Disclosure Statement, and such reports should be taken into consideration only to the extent necessary to evaluate the Plan, the Debtors and the Chapter 11 Cases. In addition, the financial and other information provided in such reports is prepared on a consolidated basis for NNC and its Affiliates and does not currently provide information separately on the Debtors. Please see the Disclaimer that starts on page (i) above.

III.

THE CHAPTER 11 CASES AND CERTAIN POST-PETITION OPERATIONS OF THE
DEBTORS

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business
reorganization. The fundamental purpose of a chapter 11 case is to formulate a plan to
restructure a debtor's finances so as to maximize recoveries to its creditors. Below is a summary
of certain events leading up to the commencement of the Chapter 11 Cases and certain
significant events thereafter.

A.    Events Leading up to the Chapter 11 Cases

Nortel operated in a highly volatile telecommunications industry that was
characterized by vigorous competition for market share and rapid technological development. In
the years immediately preceding the Initial Petition Date, Nortel's operating costs generally
exceeded its revenues, resulting in negative cash flow. A number of factors contributed to these
results, including competitive pressures in the telecommunications industry, an inability to
sufficiently reduce operating expenses, costs related to ongoing restructuring efforts described
below, significant customer and competitor consolidation, customers cutting back on capital
expenditures and deferring new investments and the poor state of the global economy.

In the years immediately preceding the Initial Petition Date, Nortel took a wide
range of steps to attempt to address these issues, including a series of restructurings that reduced
the number of worldwide employees from more than 90,000 in 2000 to approximately 30,000
(including employees in joint ventures) as of December 31, 2008. In particular, in 2005, under
the direction of then-new management, Nortel began to develop a business transformation plan
with the goal of addressing its most significant operational challenges, simplifying the
organizational structure and maintaining a strong focus on revenue generation and improved
operating margins including quality improvements and cost reductions.

These restructuring measures, however, did not provide adequate relief from the
significant financial pressures Nortel was experiencing. As global economic conditions
dramatically worsened beginning in September 2008, Nortel experienced significant pressure on
its business and faced a deterioration of cash and liquidity, globally as well as on a regional
basis, as customers across all businesses suspended, delayed and reduced their capital
expenditures. The extreme volatility in the financial, foreign exchange, equity and credit
markets globally and the expanding economic downturn and potentially prolonged recessionary
period compounded the situation.

In addition, over the past several years, Nortel made significant cash payments
related to its restructuring programs, settlements of class action lawsuits in the United States and
Canada, debt servicing costs and pension plans. Due to the adverse conditions in the global
financial markets, the value of the assets held in its pension plans declined significantly, resulting
in material increases to pension plan liabilities, which could have in turn resulted in a significant
increase in future pension plan contributions. It became increasingly clear to Nortel that the
struggle to reduce operating costs during a time of decreased customer spending and massive

global economic uncertainty was putting substantial pressure on its liquidity position globally, particularly in North America.

Market conditions further restricted Nortel's ability to access the capital markets, which was compounded by actions taken by rating agencies with respect to the downgrading of the credit ratings of NNC and NNL. With no access to the capital markets, limited prospects of the capital markets opening up in the near term, substantial interest carrying costs on over $4 billion of unsecured public debt and significant pension plan liabilities expected to increase in a very substantial manner principally due to the adverse conditions in the global financial markets, it became imperative for Nortel to protect its cash position.

B.    Commencement of the Chapter 11 Cases and Other Creditor Protection Proceedings

On the Initial Petition Date, after extensive consideration of all other alternatives, with the unanimous authorization of Nortel's board of directors after thorough consultation with its advisors, Nortel initiated certain Chapter 11 Cases and the Canadian Proceedings. At the same time, as described below, certain Nortel Affiliates initiated other Creditor Protection Proceedings under the restructuring regimes of various jurisdictions.

1.    Chapter 11 Cases

On the Initial Petition Date, the Debtors, other than NN CALA, filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On January 15, 2009, the Bankruptcy Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only.

Subsequently, on July 14, 2009, NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, 2009, the Bankruptcy Court entered orders approving the joint administration and consolidation of NN CALA's Chapter 11 Case with the other Debtors' Chapter 11 Cases for procedural purposes, and applying to NN CALA certain previously entered orders in the other Chapter 11 Cases.

While the Debtors are authorized to operate in the ordinary course of business, transactions out of the ordinary course require approval from the Bankruptcy Court. In addition, the Bankruptcy Court has supervised the Debtors' retention of attorneys, accountants, financial advisors and other professionals as required by the Bankruptcy Code.

2.    CCAA Proceedings

Also on the Initial Petition Date, the Debtors' ultimate corporate parent NNC, NNL and certain of their Canadian Affiliates, namely Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Canadian Petitioners"), filed an application with the Ontario Superior Court of

Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (the "CCAA"), seeking relief from their creditors (collectively, the "CCAA Proceedings").

On January 14, 2009, the Canadian Court entered an order recognizing the Chapter 11 Cases filed as of that date as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed monitor in the CCAA Proceedings and as foreign representative for the Canadian Petitioners (the "Canadian Monitor"), the Bankruptcy Court entered an order recognizing the CCAA Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

     3.     Other Creditor Protection Proceedings

In addition, on the Initial Petition Date, the High Court of England and Wales (the "U.K. Court") placed 19 of Nortel's European Affiliates (collectively, the "EMEA Debtors"), NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V., into administration under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators" and such proceedings, the "EMEA Proceedings") pursuant to the English Insolvency Statute and the European Insolvency Regulation.

On June 26, 2009, the Bankruptcy Court entered an order recognizing the EMEA Proceedings of NNUK as foreign main proceedings under chapter 15 of the Bankruptcy Code.

On January 18, 2009, certain Nortel Affiliates, directly or indirectly owned by NNL, including Nortel Networks Israel (Sales and Marketing) Limited (the "Israeli Debtors"), filed an application for separate creditor protection proceedings (the "Israeli Administration Proceedings") with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Debtors under the Israeli Companies Law.

On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary liquidation proceedings (the "French Proceedings") in respect of NNSA. NNSA was authorized to continue to operate as a going concern until completion of the sale of the Global Systems for Mobile Communications ("GSM") and the Global System for Mobile Railway Communications ("GSM-R") business. While NNSA's operations are now terminated, the French Proceedings are continuing and, in accordance with the European Union's Council Regulation (EC) No. 1346/2000, the EMEA Proceedings remain the main proceedings in respect of NNSA.

A

C.    Significant Events During the Chapter 11 Cases

    1.    Certain Significant Court Orders

        (a)    Initial Orders Entered in the Chapter 11 Cases

        The Debtors have obtained numerous orders from the Bankruptcy Court that are intended to enable the Debtors to operate in the normal course of business during the Chapter 11 Cases. Among other things, these orders authorize: (i) the use and operation of the Debtors' consolidated cash management system during the Chapter 11 Cases in substantially the same manner as it was operated prior to the commencement of the Chapter 11 Cases; (ii) the continued engagement in intercompany transactions during the Chapter 11 Cases and the Debtors' exercise of setoffs in connection therewith; (iii) the payment of pre-petition employee salaries, wages and other compensation; medical, retirement and other benefits; and other employee obligations; (iv) the payment of certain taxes and fees; (v) the continuance of insurance coverage in the ordinary course of business during the Chapter 11 Cases; (vi) the performance of certain pre-petition obligations to customers; and (vii) the payment of certain pre-petition common carrier charges and warehouse fees.

        (b)    Cross-Border Court-to-Court Protocol

        Each of the Bankruptcy Court and the Canadian Court approved a cross-border court-to-court protocol (the "Cross-Border Protocol") to establish general administrative procedures to govern and to facilitate the administration of cross-border matters among the Chapter 11 Cases and the CCAA Proceedings, which protocol was last amended and approved by the Bankruptcy Court and the Canadian Court on June 29, 2009.

        (c)    Exclusivity

        From the Initial Petition Date to the date of this Disclosure Statement, the Bankruptcy Court has on three occasions granted an extension of the period during which the Debtors, other than NN CALA, have the exclusive right to file a plan of reorganization and of the period during which the Debtors have the exclusive right to solicit acceptances thereof. The last such order extended the exclusive period for filing a plan or plans for all Debtors other than NN CALA through July 13, 2010, and the period for soliciting acceptances thereof through September 13, 2010. The Debtors obtained an order extending the period during which NN CALA has the exclusive right to file a plan or plans of reorganization through January 13, 2011, and the period during which NN CALA has the exclusive right to solicit acceptances thereof through March 13, 2011. The Debtors also obtained an order extending the time to file a disclosure statement for the Plan through September 3, 2010.

    2.    Appointment of Creditors' Committee and Organization of Ad Hoc Group of Bondholders

        On January 26, 2009, the Office of the United States Trustee for the District of Delaware appointed the Creditors' Committee to represent the interests of the Debtors' unsecured creditors. Since its formation, the Debtors consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases. The Debtors have kept the Creditors'

A

Committee informed about their operations and have sought the concurrence of the Creditors' Committee for actions and transactions taken outside of the ordinary course of the Debtors' businesses.

The Creditors' Committee currently consists of the following members:

The Bank of New York Mellon, as indenture trustee
101 Barclay Street - 8 West
New York, New York 10286

Pension Benefit Guaranty Corporation
1200 K Street, Northwest
Washington, D.C. 20005

Law Debenture Trust Company of New York, as indenture trustee
400 Madison Ave., 4th Floor
New York, New York 10017

The Creditors' Committee is represented by Akin Gump Strauss Hauer & Feld LLP and Richards, Layton & Finger, P.A. Additionally, the Creditors' Committee has retained and employs Fraser Milner Casgrain LLP as Canadian counsel and Ashurst LLP as European counsel. The Creditors' Committee's financial advisor is Capstone Advisory Group, LLC, and its investment banker is Jefferies & Company, Inc.

An *ad hoc* group of bondholders (the "Ad Hoc Group of Bondholders"), including a steering committee of members of the Ad Hoc Group of Bondholders that have executed or in the future execute confidentiality or nondisclosure agreements with the Debtors and the Canadian Petitioners, has also been organized. The Ad Hoc Group of Bondholders is represented by Milbank, Tweed, Hadley & McCloy LLP and Pachulski Stang Ziehl & Jones LLP. Additionally, the Ad Hoc Group of Bondholders has retained and employs Bennett Jones LLP as Canadian counsel. The Ad Hoc Group of Bondholders' financial advisor is FTI Capital Advisors, LLC. The professionals retained and employed by the Ad Hoc Group of Bondholders have not sought approval of their retention and employment from the Bankruptcy Court, and the Debtors do not pay for their fees and expenses.

3.     Retained Professionals

The Bankruptcy Court authorized the Debtors to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases. The Debtors have retained, and the Bankruptcy Court has approved the retention of, various professionals including: (a) Cleary Gottlieb Steen & Hamilton LLP and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), as counsel for the Debtors in the Chapter 11 Cases; (b) Lazard Frères & Co. LLC ("Lazard"), as financial advisor and investment banker to the Debtors and their Affiliates; (c) Epiq, as official claims, noticing and balloting agent for the Debtors; (d) Huron Consulting Services LLC ("Huron"), as restructuring advisor to the Debtors; (e) John J. Ray, III, as the Debtors' Principal Officer; (f) Chilmark Partners, LLC, as consulting expert to the

26

Debtors; and (g) RLKS Executive Solutions LLC, as document management and data preservation consultants to the Debtors.

Pursuant to their application seeking approval for the retention of Lazard, the Debtors agreed to pay Lazard's fees and expenses for services rendered by Lazard to the Debtors as well as to certain of their Affiliates not subject to the Chapter 11 Cases, but reserved their right to seek contribution or allocation of those fees and expenses from such Affiliates. The Debtors have agreed in principle with each of NNL, NNUK and certain other Nortel Affiliates that the fees and expenses owed to Lazard, including the fees and expenses previously satisfied by the Debtors, shall be allocated among and reimbursed by such Affiliates pursuant to an agreement to be executed by NNI, NNL, NNUK and certain other Nortel Affiliates. NNI, NNL, NNUK and certain other Nortel Affiliates also agreed that the transaction fees owed to Lazard on account of the post-petition asset sales shall be released from the related sale proceeds escrows.

Finally, the Bankruptcy Court authorized the Debtors to retain, compensate and reimburse the expenses of certain attorneys, accountants, consultants and other professionals used in the ordinary course of the Debtors' businesses and retained pursuant to section 327(e) of the Bankruptcy Code.

4.    Disposition of Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code provides a debtor in possession in a chapter 11 proceeding with the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases entered into before the commencement of the case. In the event an executory contract or unexpired lease is rejected, the counterparty may file a claim for damages incurred due to the rejection. In the case of rejection of leases of real property, such claims are subject to certain limitations imposed by the Bankruptcy Code.

Since the Initial Petition Date, the Debtors, with the assistance of their professionals, have devoted substantial time to evaluating and identifying unexpired leases and executory contracts that are no longer necessary to the operation of the Debtors' estates and economically burdensome to the estates, determining the appropriate and beneficial disposition of such leases and contracts pursuant to section 365 of the Bankruptcy Code and obtaining court approval of such disposition.

On March 20, 2009, the Bankruptcy Court entered the Order Approving Procedures for the Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Certain Assets Related Thereto (the "Rejection Procedures Order"), which provides procedures for the rejection of executory contracts and unexpired leases on limited notice. These procedures alleviated additional expense to the Debtors' estates and the attendant delay that would have resulted if the Debtors had been required to proceed by separate motion and hearing for each executory contract and unexpired lease they determined to reject.

From the Initial Petition Date to the date of this Disclosure Statement, the Debtors have rejected approximately 61 unexpired real property leases and subleases pursuant to the Rejection Procedures Order and assumed five leases, one of which was assigned to a third-party in connection with such third-party's acquisition of various assets of the Debtors. In addition,

since the Initial Petition Date, the Debtors have permitted three leases to expire by their terms in the ordinary course of the Debtors' business and one lease to be deemed rejected. Following such lease being deemed rejected, the Debtors and the landlord party thereto entered into a new lease.

Under the Rejection Procedures Order, the Debtors have rejected approximately 33 executory contracts as of the date of this Disclosure Statement. A significant number of the Debtors' executory contracts have been assumed and assigned to various purchasers in connection with the 363 Sales described in Section III.D (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Post-petition Sales and Other Dispositions of Assets*). In addition, two executory contracts were assumed outside of the post-petition asset sale process.

5.    Claims Resolution Processes

Over the last several months, the Debtors have undertaken the process of reconciling the amount and classification of outstanding Claims and filing and prosecuting objections to Claims. As of June 30, 2010, approximately 7,316 proofs of claim (including only once those proofs of claim filed against more than one Debtor) had been filed against the Debtors, asserting in the aggregate approximately $27.1 billion, as well as unliquidated amounts. As of June 30, 2010, Claims included in approximately 1,298 proofs of claim have been resolved, reducing the aggregate amount claimed against the Debtors by approximately $10.8 billion. Certain of these Claims have been resolved on a consensual basis as further described below in Section III.C.6 (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Significant Events During the Chapter 11 Cases — Significant Settlements and Settlement Procedures*).

As of July 31, 2010, the Debtors had filed 15 objections, including 12 omnibus objections, to proofs of claim in which the Debtors objected to various types of Claims, such as (i) duplicative Claims; (ii) amended and superseded Claims; (iii) Claims for disputed liabilities; (iv) Claims that were previously paid or otherwise satisfied; (v) overstated Claims; (vi) Claims asserted against the wrong Nortel Affiliate; and (vii) Claims asserted against multiple Debtors with respect to the same liability. Through the omnibus objections, as of July 31, 2010, the Debtors had resolved Claims included in approximately 1,126 proofs of claim (including only once those proofs of claim filed against more than one Debtor), reducing the aggregate amount claimed against the Debtors by approximately $160 million. The Debtors expect to continue preparing, filing and resolving objections to certain other Claims throughout the course of the Chapter 11 Cases.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates. While the Debtors are working actively to resolve disputed Claims, a significant number of Claims have not yet been resolved, and additional claims could be filed. Although the Bankruptcy Court has established bar dates as described above, certain further Claims are and may be permitted. Additionally, the Debtors are in the process of reviewing their Schedules and, upon the completion of such review, may decide to amend or supplement the Schedules in accordance with the Bankruptcy Rules or orders of the Bankruptcy Court. The Debtors also continue to investigate differences between claim amounts

asserted by Creditors and claim amounts determined in accordance with the Debtors' books and records. Certain Claims may be duplicative of other claims filed against the Debtors or their Affiliates subject to the Creditor Protection Proceedings, may be based on contingencies that have not occurred or may be otherwise overstated, and would therefore be subject to reduction or disallowance. The Debtors plan to continue to review and resolve such matters throughout the Chapter 11 Cases.

As provided in the Cross-Border Protocol and the Final Canadian Funding and Settlement Agreement (the "FCFSA"), the Debtors are in discussions with the Canadian Petitioners, the Canadian Monitor, the Creditors' Committee and the Ad Hoc Group of Bondholders to develop a protocol for the resolution of Claims that raise cross-border issues with the Canadian Petitioners.

Since the Initial Petition Date, the Debtors have resolved some Claims through joint stipulations and orders, and are negotiating additional consensual resolutions. Through the course of the Chapter 11 Cases, the Debtors may continue to resolve certain Claims through joint stipulations, orders and other agreements relating to settlement of certain pre-petition claims amounts. These agreements may also include the release of other disputed amounts as well as certain post-petition claim amounts.

The amount of the Pro Rata Share that will ultimately be received by any particular holder of an Allowed Claim may be affected by the outcome of the claims resolution process.

      6.     Significant Settlements and Settlement Procedures

      (a)     Flextronics

On January 14, 2009, Nortel announced that NNL had entered into an amendment (the "Flextronics Amending Agreement") to arrangements with a major supplier, Flextronics Telecom Systems Ltd. (together with its affiliates, "Flextronics"). Under the terms of the Flextronics Amending Agreement, NNL agreed to commitments to purchase $120 million of existing inventory by July 1, 2009, and to make quarterly purchases of other inventory and to terms relating to payment and pricing. Flextronics had notified Nortel of its intention to terminate certain other arrangements upon 180 days' notice effective July 2009 pursuant to the exercise by Flextronics of its contractual termination rights, while the other arrangements between the parties would continue in accordance with their terms. Following subsequent negotiations, NNL and Flextronics executed a settlement agreement dated May 22, 2009, which was approved by the Bankruptcy Court and the Canadian Court on June 11, 2009, that, among other things, resolved various ongoing disputes and issues relating to the interpretation of the Flextronics Amending Agreement and confirmed, among other things, NNL's obligation to purchase inventory of $25 million in accordance with existing plans of record. In addition, the parties agreed that one of the supplier agreements with Flextronics would not terminate effective July 12, 2009, as originally referenced in the Flextronics Amending Agreement, but instead was extended to December 2009, with a further extension for certain products to July 2010.

The Debtors, the Canadian Petitioners, certain EMEA Debtors and Flextronics subsequently entered into a settlement and release agreement dated November 20, 2009, which was approved by the Bankruptcy Court and the Canadian Court on December 2, 2009, that, among other things, provides a mechanism for the transfer of Nortel's supply relationship to purchasers of Nortel's other businesses or assets. In addition, in exchange for payment of certain amounts by NNI to Flextronics (which payment is subject to allocation among the Debtors, the Canadian Petitioners and certain EMEA Debtors pursuant to a side agreement), Flextronics and the Debtors released any and all claims that had been or could have been filed or otherwise asserted in any proceedings of Nortel (including the Chapter 11 Cases) with certain exceptions as stated in the agreement.

(b)    APAC Debt Restructuring Agreement

As a consequence of the Chapter 11 Cases and other Creditor Protection Proceedings, a portion of intercompany payables owed by the Debtors to certain Nortel Affiliates (the "APAC Agreement Subsidiaries") in the Asia Pacific region as of the Initial Petition Date were not paid when due. To enable each APAC Agreement Subsidiary to continue its respective business operations and to facilitate any potential sales of assets, the Debtors and the APAC Agreement Subsidiaries have entered into an Asia Restructuring Agreement (the "APAC Agreement"). Under the APAC Agreement, the APAC Agreement Subsidiaries were required to pay a portion of certain of the APAC Agreement Subsidiaries' net intercompany debt outstanding as of the Initial Petition Date (the "Pre-petition Intercompany Debt") to the Canadian Petitioners, the Debtors and the EMEA Debtors. A further portion of the Pre-petition Intercompany Debt will be repayable only to the extent of such APAC Agreement Subsidiary's net cash balance, and subject to certain reserves and provisions. All required court approvals with respect to the APAC Agreement have been obtained in the United States and Canada; however, implementation of the APAC Agreement for certain parties in other jurisdictions remains subject to receipt of outstanding regulatory approvals.

(c)    IRS Settlement

In consideration of a settlement payment of $37.5 million, the IRS agreed to release all of its claims against the NNI Consolidated Group for the years 1998 through 2008. As a result of this settlement, the IRS stipulated that its Claim against NNI filed in the Chapter 11 Cases in the amount of approximately $3 billion was reduced to the $37.5 million settlement payment. This settlement was a condition to the effectiveness of the FCFSA and was approved by the Bankruptcy Court on January 21, 2010. NNI made the settlement payment to the IRS on February 22, 2010.

In addition, the IRS also agreed that the NNI Consolidated Group is entitled to a federal net operating loss carryforward of $814 million and general business credits of $306 million, as of January 1, 2009, inclusive of certain APA adjustments.

For more information on the APAs, please see Section II.B.5 (*Background and Certain Pre-petition Operations of the Debtors — The Debtors' Pre-petition Capital Structure — Transfer Pricing*).

A                                                                                                TR11359

(d)    Litigation Claims Settlement Procedures

By Order dated April 7, 2009, the Bankruptcy Court approved certain omnibus settlement procedures to resolve, mediate, compromise or otherwise settle certain claims and controversies (the "Litigation Claims Settlement Procedures Order"). Pursuant to the Litigation Claims Settlement Procedures Order, the Debtors are authorized to settle certain actions, including various judicial, administrative, arbitral or other actions or proceedings to which one or more of the Debtors are a party (the "Ordinary Course Actions"), in accordance with certain procedures. Specifically, where the claims under an Ordinary Course Action were originally greater than $200,000, or where the Debtors propose to pay a settling counterparty any amount in consideration of a pre-petition claim against the Debtors, the Debtors must provide notice of the settlement and an opportunity to object to the United States Trustee and counsel to the Creditors' Committee (the "Notice Parties"), but need not seek further approval of the settlement from the Bankruptcy Court. Where the claims under an Ordinary Course Action were originally less than $200,000, the Debtors may settle such action without providing notice to the Notice Parties and without seeking further approval of the Bankruptcy Court. The aggregate amount of Ordinary Course Actions settled pursuant to the Litigation Claims Settlement Procedures Order may not exceed $15 million without further approval of the Bankruptcy Court, and no individual Ordinary Court Action that is originally greater than $1 million may be settled without further Bankruptcy Court approval.

(e)    Reclamation Claims Settlement Procedures

By Order dated February 19, 2009, the Bankruptcy Court approved certain procedures for settling or otherwise resolving reclamation demands (the "Reclamation Procedures Order"). The Reclamation Procedures Order (i) established uniform procedures for addressing reclamation demands; (ii) authorized the Debtors to reconcile and resolve certain reclamation demands and to conduct settlement negotiations in furtherance of such resolution; and (iii) enjoined reclamation claimants from pursuing payment of reclamation demands by alternative means. To date, pursuant to the Reclamation Procedures Order, 27 reclamation demands have been settled or otherwise resolved, totaling about $6 million in Allowed Claims and payments.

7.    Summary of Certain Significant Claims

Listed below are certain significant Claims that were filed after the Initial Petition Date and have not been settled. With respect to each Claim, unless otherwise indicated, the Debtors are in the process of reviewing the Claim and intend to raise all objections and defenses available to them.

(a)    Intercompany Claims

The Joint Administrators, NNUK and the EMEA Debtors and their Affiliates have asserted protective Claims in respect of potential Claims against the Debtors arising out of transfer pricing, intercompany dealings, trading and other arrangements or agreements between them. In addition, these potential Claims could include claims against one or more of the pre-petition directors and officers of the Debtors for mismanagement, breach of duty and/or in

31

respect of the conduct of those directors and officers with respect to the operation, management and control of the Debtors. As of the date such Claims were filed by the Joint Administrators, NNUK and the EMEA Debtors and their Affiliates, the Claims have not been described in detail or quantified.

(b)    Public Debt Claims

The indenture trustees filed proofs of claim with respect to the default of the Senior Notes, which had an aggregate face value of $3.975 billion as of the Initial Petition Date. In addition to the Claims under the Senior Notes indentures and the related guarantees for the principal amount of the Senior Notes, these Claims assert liability for accrued and unpaid interest and certain other Claims.

(c)    EDC Claims

On September 28, 2009, EDC filed a proof of claim against NNI asserting General Unsecured Claims in the approximate amounts of $14.6 million, €2.3 million and £100,000, contingent Claims in the approximate amounts of $69.2 million, €11.7 million and £50,000, as well as certain unliquidated Claims. The Claims asserted by EDC are for the issuance of support in the form of guarantee bonds or guarantee type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance. The amounts asserted in the proof of claim are subject to change as projects are completed, support expires, support is recovered and support is transferred in connection with asset sales. The Debtors are reviewing these Claims and intend to raise all objections and defenses available with respect to such Claims.

(d)    Employee Claims

In the course of the Chapter 11 Cases, as of June 30, 2010, approximately 4,812 proofs of claim have been filed by the current and former employees of the Debtors, for the aggregate amount of approximately $ 530 million. The Debtors are in the process of reviewing the proofs of claim by comparing them to the Scheduled Claims and other information available to the Debtors, and considering alternatives to resolve these Claims in an efficient and orderly manner.

8.    Avoidance Actions

Pursuant to the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in bankruptcy court (each such action, an "Avoidance Action"), certain transfers of the debtor's property in respect of antecedent debts to the extent the transferees received more than they would have received on account of such pre-existing debts had the debtor been liquidated under chapter 7 of the Bankruptcy Code. Such transfers include cash payments, pledges of security interests or other transfers of interests in property. Such transfers must have been made while the debtor was insolvent, and the debtor is rebuttably presumed to have been insolvent during the 90-day period immediately prior to the commencement of its bankruptcy case. These provisions of the Bankruptcy Code can be broad in their application because they allow the debtor to recover payments regardless of whether there was any

impropriety in such payments, with certain limited exceptions. If the debtor recovers a transfer, the transferee receives a general unsecured claim against the debtor to the extent of the recovery.

During the Chapter 11 Cases, the Debtors and their professional advisors have been analyzing transfers made by the Debtors in the 90-day period immediately prior to the Petition Date to determine whether there are viable Avoidance Actions that may be brought against any of the transferees. To the extent the Debtors determine to file any such Avoidance Actions, they must do so within two years from the Petition Date, which is January 14, 2011 for all Debtors other than NN CALA, for which the two year period runs until July 14, 2011. Should any Debtor file any such Avoidance Actions and prevail, such Debtor's estate will recover funds from the transferee of the challenged transfers. However, no Debtor can predict the outcome of such Avoidance Actions or the amounts that may be realized therefrom.

     9.    Post-petition Liquidity, Lending and Financing

        (a)    Post-petition Liquidity and Capital Resources Overview

As a result of the Chapter 11 Cases and the Creditor Protection Proceedings in other jurisdictions, cash of the various Nortel Affiliates subject to such proceedings generally has been available to fund operations in particular jurisdictions, but not available to be freely transferred between jurisdictions, regions or outside joint ventures, other than for normal course intercompany trade and pursuant to specific court-approved agreements.

Since the Initial Petition Date, the Debtors have generally maintained use of their cash management system and consequently have minimized disruption to their operations pursuant to various court approvals and agreements obtained or entered into in connection with the Chapter 11 Cases. The Debtors continue to conduct ordinary course trade transactions with non-Debtor Nortel Affiliates.

On June 29, 2009, the Court granted the Debtors authority to make loans or equity infusions to their non-Debtor subsidiaries in an aggregate amount not to exceed $2 million.

On the Initial Petition Date, the Debtors entered into an agreement with the EMEA Debtors governing the settlement of certain intercompany accounts, including for the purchase of goods and services, which was periodically extended and amended. While the agreement expired on May 31, 2010, the Debtors and the EMEA Debtors have continued to trade and settle in accordance with their practices during the Creditor Protection Proceedings since that date.

As of June 30, 2010, NNI had approximately $767.6 million in cash on hand and the other Debtors collectively had approximately $96.1 million.

        (b)    Intercompany Revolving Loan Agreement

NNI, as lender, entered into a post-petition revolving loan agreement with NNL, as borrower, on January 15, 2009 (which was amended and restated on March 27, 2009), to benefit NNI's estate from NNL's continued operation by providing NNL liquidity to continue its

33

A

operations. This revolving loan agreement was approved by the Canadian Court and, subject to certain conditions, approved by the Bankruptcy Court. The outstanding amount of the loan may not exceed $200 million at any time. An initial amount of $75 million was approved and drawn, but drawing on the remaining $125 million provided for under the agreement remains subject to Bankruptcy Court approval. NNI has not sought Bankruptcy Court approval to allow the draw down of the remaining $125 million, and it is not expected that the balance will be drawn. The loan bears interest at 10% per annum, and is secured by a charge on NNC's Ottawa, Ontario, Canada Carling facility. Subject to certain conditions, the loan is also secured by an intercompany charge, each as approved by the Canadian Court on January 14, 2009. NNL's obligations under the loan are unconditionally guaranteed by Nortel Networks Technology Corporation and each of the other Canadian Petitioners. The agreement currently matures on December 31, 2010, subject to an extension to June 30, 2011, at the request of NNL and with the written consent of NNI, the Canadian Monitor, the Creditors' Committee and the Ad Hoc Group of Bondholders. The loan agreement contains certain covenants, including mandatory prepayment of loans with the net cash proceeds from certain asset dispositions.

(c)    Interim Funding and Settlement Agreement

Other than one $30 million payment made by NNI to NNL in January 2009 in respect of amounts that were alleged to have been owed in connection with the Transfer Pricing Agreements, TPA Payments among parties to the Master R&D Agreement were suspended after the Initial Petition Date. Notwithstanding such suspension, goods, services, research and development and corporate support continued to be provided by various Nortel Affiliates after the Initial Petition Date. Concluding it was in the best interests of their estates and their creditors, the Debtors (other than NN CALA), with the support of the Creditors' Committee and the Ad Hoc Group of Bondholders, entered into an Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA"), with the Canadian Petitioners and the EMEA Debtors (other than NNSA) to address certain liquidity constraints facing NNL.

Under the IFSA, NNI paid $157 million to NNL, which represented an amount that the Debtors, the Canadian Petitioners, the Creditors' Committee, the Ad Hoc Group of Bondholders, the Canadian Monitor and the Joint Administrators agreed to be an appropriate estimate (taking into account the $30 million payment in January 2009) of the value of corporate overhead and research and development activities provided by NNL to NNI and related costs (subject to the terms of the IFSA) from the Initial Petition Date through September 30, 2009, and forecasted by NNL to be due from NNI under the Master R&D Agreement. Under the terms of the IFSA, this payment was made in full and final settlement of TPA Payments owed for the period from the Initial Petition Date to September 30, 2009. The parties entered into the IFSA without any definitive and binding determination regarding the interpretation and applicability of the Transfer Pricing Agreements.

The IFSA was approved by the Bankruptcy Court and the Canadian Court on June 29, 2009, and on June 23, 2009 the U.K. Court approved entry into of the IFSA by the Joint Administrators (except for NNSA which was authorized to enter into the IFSA by the French Court on July 7, 2009). NNSA and Nortel Networks AG acceded to the IFSA on September 11, 2009.

34

(d)     Final Canadian Funding and Settlement Agreement

The arrangements under the IFSA extended through September 30, 2009, in the case of the Debtors, and through December 31, 2009, in the case of the EMEA Debtors. In connection with the expiration of the IFSA, the Debtors (other than NN CALA), together with the Creditors' Committee and the Ad Hoc Group of Bondholders, commenced additional negotiations with the Canadian Petitioners and the Canadian Monitor to address NNL's ongoing liquidity concerns, which culminated in the FCFSA, which was executed as of December 23, 2009 by the Canadian Petitioners, the Canadian Monitor and the Debtors (other than NN CALA). The FCFSA provides, among other things, for the settlement of certain intercompany claims, including in respect of any claims of the Debtors against the Canadian Petitioners for overpayments to the Canadian Petitioners under the transfer pricing agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005.

As part of the settlement, the parties have agreed to the establishment of a pre-petition intercompany claim in favor of NNI in the CCAA Proceedings in the aggregate amount of $2.0627 billion (the "FCFSA Claim"), not subject to any setoff or reduction, on account of overpayments to NNL under the Transfer Pricing Agreements, and reconciling certain pre-petition obligations of NNI and NNL. This amount represents a $2 billion unsecured pre-petition claim and a $62.7 million secured pre-petition claim, by NNI against NNL pursuant to the FCFSA, which settles (i) any claims of the Debtors (other than NN CALA) against the Canadian Petitioners for overpayments to the Canadian Petitioners under the transfer pricing agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005, whether or not resulting from any adjustment of taxable income of the Debtors as determined by the IRS, (ii) certain claims of NNI against NNL for amounts due and owing under that certain revolving loan agreement dated March 21, 2008 and (iii) any claims of the Canadian Petitioners (x) for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations pursuant to transfer pricing agreements or otherwise incurred by any Canadian Petitioners for the benefit of the Debtors which any Canadian Petitioner has asserted or could assert and would have been reimbursed to the Canadian Petitioners through payments payable by the Debtors to the Canadian Applicants during, or with respect to, the period prior to the Initial Petition Date or (y) relating to intercompany trading of goods and services during, or with respect to, the period prior to the Initial Petition Date. Also, as part of the settlement, the Canadian Petitioners and the Canadian Monitor agreed to acknowledge the FCFSA Claim; defend, if necessary, the FCFSA Claim; and obtain a final order of the Canadian Court approving and allowing the FCFSA Claim. The Canadian Petitioners and the Canadian Monitor also irrevocably waived any and all rights that may exist at law, in equity or otherwise to set off against, assert any counterclaims with respect to the amount or validity of, or otherwise reduce the amount of, the FCFSA Claim in any way.

In addition, under the FCFSA, the Canadian Petitioners and the Canadian Monitor agreed to waive any and all rights that may exist at law, in equity or otherwise to assert any claims against the Debtors (other than NN CALA) relating to the period prior to the Initial Petition Date; however, subject to certain exceptions, this waiver automatically terminates if the Debtors (other than NN CALA) assert certain pre-petition claims (other than the FCFSA Claim) against the Canadian Petitioners in the CCAA Proceedings or subsequent proceedings. In addition, under the terms of the FCFSA, NNI has paid to NNL $191.8 million, which amount

35

represents (A) the maximum payment that the Debtors may or could owe in respect of certain settled obligations, (B) the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Canadian Petitioners or EMEA Debtors may have or could assert against one or more Debtors in any proceeding with respect to certain corporate overhead, research and development costs, transition services in respect of the asset sale transactions and certain other reimbursement obligations, whether pursuant to sections 503 and 507 of the Bankruptcy Code or otherwise and (C) constitutes a full and final settlement of any and all claims for corporate overhead, research and development costs, transition services in respect of the asset sale transactions and certain other reimbursement obligations. The FCFSA also provides for the allocation of certain other anticipated costs to be incurred by the parties, including those relating to the divestiture of Nortel's various businesses, among the various estates. The parties entered into the FCFSA without any definitive and binding determination regarding the interpretation and applicability of the Transfer Pricing Agreements.

On January 21, 2010, the Debtors and Canadian Petitioners obtained approvals from the Bankruptcy Court and the Canadian Court, respectively, of the FCFSA and the creation and allowance of the FCFSA Claim. Also in connection with the FCFSA, the Debtors and NNL received the authorization of the Bankruptcy Court and the Canadian Court, respectively, to enter into advance pricing agreements with the U.S. and Canadian tax authorities to resolve certain transfer pricing issues, on a retrospective basis, for the taxable years 2001 through 2005, which was a condition to the effectiveness of the FCFSA.

(e)     Export Development Canada Support Facility

Effective January 14, 2009, NNL entered into an agreement with EDC (the "Short-Term Support Agreement") to permit NNL continued access to the EDC Facility for an interim period that was extended several times, for up to $30 million of support based on its then-estimated requirements over the period. The EDC Facility, which was guaranteed by NNI prior to the Initial Petition Date, provides for the issuance of support in the form of guarantee bonds or guarantee type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance. On June 18, 2009, NNL and EDC entered into a cash collateral agreement (the "Cash Collateral Agreement") in connection with the EDC Facility. NNL provided cash collateral of $6.5 million for all outstanding post-petition support in accordance with the terms of the Cash Collateral Agreement, of which an aggregate of $5.6 million had been released by August 31, 2010, and the charge that was previously granted by the Canadian Court over certain of Nortel's assets in favor of EDC is no longer in force or effect. The Short-Term Support Agreement expired without further extension on December 18, 2009. Further access by NNL to the EDC Facility is at the sole discretion of EDC.

(f)     Post-petition L/C and Bonding Facilities

On June 30, 2009, the Bankruptcy Court entered a final order authorizing the Debtors to negotiate and enter into L/C and Bonding Facilities and to grant the issuers under the L/C and Bonding Facilities automatically perfected first priority security interests in and liens upon deposits and cash collateral pledged by the Debtors to support the issuance of surety bonds or letters of credit, primarily in support of certain obligations to their customers.

36

On July 20, 2009, NNI entered into a collateral agreement (the "Collateral Agreement") with Westchester Fire Insurance Company and ACE INA Insurance (collectively, the "Sureties"), and Westchester Fire Insurance Company as agent for the Sureties. On the same date, NNI executed an indemnity agreement (the "Indemnity Agreement," and together with the Collateral Agreement, the "ACE Facility Agreements"), whereby NNI agreed to indemnify the Sureties in connection with the issuance of up to $30 million in bonds. The ACE Facility Agreements allow for the issuance of performance, surety or other bonds to NNI's customers in support of NNI's contract performance (the "ACE Support"). Pursuant to the ACE Facility Agreements, any ACE Support issued under the ACE Facility is secured by up to 110% cash collateral. In July 2010, NNI's rights and obligations under bonds totaling $3,110,490 were transferred to GENBAND (as defined below) in connection with the sale of the Carrier VoIP and Applications Solutions ("CVAS") business and the Sureties released NNI from all liability with respect thereto and returned $3,110,490 of cash collateral to NNI. As of August 31, 2010, ACE Support in the face amount of $367,500 remained outstanding.

On July 22, 2009, NNI entered into an agreement for standby letters of credit (the "Standby L/C Agreement") and a related pledge agreement (together with the Standby L/C Agreement, the "Citibank Facility Agreements"), each with Citibank, N.A. The Citibank Facility Agreements allow for the issuance of letters of credit to NNI's customers in support of NNI's contract performance up to an aggregate stated amount of $6.2 million (the "Citibank Support"). Pursuant to the Citibank Facility Agreements, any Citibank Support would be secured by 110% cash collateral. As of August 31, 2010, no Citibank Support was outstanding.

10.    Cascade Indemnity

Certain Nortel Affiliates have not filed for bankruptcy or other creditor protection to date. Under the laws of various jurisdictions in which these Affiliates operate, the directors, officers and agents of the Affiliates may be subject to personal liability in certain circumstances. In order to enable those individuals designated by NNL or NNI, as applicable, to serve as directors, officers or agents of such Affiliates (the "Cascade Subsidiaries") and to facilitate participation by the Cascade Subsidiaries in Nortel's sales of businesses and assets as well as the orderly wind down of such Cascade Subsidiaries, NNL and NNI have established a trust (the "Cascade Trust"), which indemnifies individuals in their capacities as directors, officers and/or agents of a Cascade Subsidiary and their successors, if any (the "Cascade Beneficiaries"), for any claims resulting from their service as a director, officer or agent of a Cascade Subsidiary, subject to limited exceptions.

Subject to certain limitations, Cascade Beneficiaries of the Cascade Trust may seek payment for any costs relating to any indemnified claim only in the following order: first, the assets of the Cascade Subsidiary to which such indemnified claim is related; second, any insurance policy currently maintained by Nortel with respect to director and officer liabilities, including any insurance policies maintained by the Cascade Subsidiaries available to such Cascade Beneficiary to cover such costs; and third, the remaining Cascade Trust property. Additionally, NNI and NNL entered into a side agreement (the "Cascade Trust Side Agreement") that requires each to share the net amounts contributed by each of them in establishing the Cascade Trust on a pro rata basis based on the weighted average of proceeds allocated to each of them from certain global sales as well as to use commercially reasonable efforts to recover from

A

other Nortel Affiliates that are benefiting from the global sales (with certain exceptions as set forth in the Cascade Trust Side Agreement) a reasonable portion of the net amounts contributed to establish the Cascade Trust. The establishment of the Cascade Trust and the Cascade Trust Side Agreement were approved by the Canadian Court and the Bankruptcy Court on March 31, 2010.

D.    Post-petition Sales and Other Dispositions of Assets

After Nortel determined in June 2009 that selling its businesses was the best path forward, Nortel commenced a process to evaluate its businesses and provide for the potential disposition of certain assets. It quickly became clear to the Debtors and other Nortel Affiliates subject to the Creditor Protection Proceedings that the best means of maximizing recovery for the creditors of all estates was through the expeditious monetization of Nortel's operations and assets. In furtherance of this, the Debtors and other Nortel Affiliates have participated since the Initial Petition Date in the asset sales and other dispositions of assets that are described in greater detail below.

1.    Mobile WiMAX Business and Alvarion Agreement

On January 29, 2009, Nortel announced its decision to discontinue its mobile WiMAX business and end its joint agreement with Alvarion Ltd. Nortel worked closely with Alvarion and Nortel's mobile WiMAX customers to transition and/or settle Nortel's contractual obligations during 2009 to help ensure that ongoing support commitments were met without interruption or alternative settlements are reached that mutually benefit Nortel and its customers. There have been no asset sales relating to the WiMAX business.

2.    Layer 4-7 Assets

On February 19, 2009, Nortel announced that certain Nortel Affiliates, including NNI and certain other Debtors, had entered into a "stalking horse" asset purchase agreement to sell certain portions of Nortel's Layer 4-7 data portfolio, including certain Nortel Application Accelerators, Nortel Application Switches and the Virtual Services Switch, to Radware Ltd. ("Radware") for approximately $18 million. The Bankruptcy Court and Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on February 27, 2009. No higher bids were submitted, and the Bankruptcy Court and Canadian Court entered orders approving the transaction with Radware as the successful bidder on March 26, 2009 and on March 30, 2009, respectively. The sale transaction closed on March 31, 2009. The proceeds of approximately $18 million were held in escrow as of August 31, 2010, by the New York branch of JPMorgan Chase Bank, N.A. ("JPMorgan"), pending allocation as provided under the orders approving the sale.

3.    CDMA and LTE Access Assets

On June 19, 2009, Nortel announced that certain Nortel Affiliates, including NNI and certain other Debtors, had entered into a "stalking horse" asset purchase agreement with Nokia Siemens Networks B.V. ("Nokia") for substantially all of Nortel's Code Division Multiple Access ("CDMA") business and Long Term Evolution ("LTE") Access assets for $650 million,

A

subject to certain purchase price adjustments under certain circumstances. The Bankruptcy Court and the Canadian Court entered orders on June 30, 2009 establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers. Competing bids were required to be submitted by July 21, 2009 and an auction with the qualified bidders was completed on July 24, 2009. Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") emerged as the successful bidder for a purchase price of $1.13 billion, subject to certain post-closing purchase price adjustments. The purchase price was finalized for a purchase price adjustment of $1 million. On July 28, 2009, the Bankruptcy Court and Canadian Court entered orders approving this sale and the sale transaction closed on November 13, 2009.

In connection with this sale, NNI, Architel Systems (U.S.) Corporation, CoreTek, Inc., Nortel Altsystems Inc., Nortel Altsystems International Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Cable Solutions Inc., NNCC, Nortel Networks HPOCS Inc., Nortel Networks International Inc., Nortel Networks Optical Components Inc., Northern Telecom International Inc., Sonoma Systems, Qtera Corporation and Xros, Inc. (the "U.S. Debtor Licensees") as well as certain other Nortel Affiliates, executed a license termination agreement.

Approximately 2,500 Nortel employees received offers of employment from Ericsson. Under the terms of the sale, and pursuant to the terms of a transition services agreement, Nortel is providing transitional services to Ericsson for a period of up to 12 to 24 months after closing of the transaction. In connection with this transaction, NNL and NNI paid an aggregate break-up fee of $19.5 million plus $3 million in expense reimbursements to Nokia.

A portion of the proceeds from this divestiture of approximately $50 million was held in escrow by the New York branch of Citibank N.A. as of August 31, 2010 to secure Nortel's obligations with respect to transition services. The remaining portion of the proceeds, after post-closing adjustments, of approximately $1.010 billion was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

4.    Enterprise Solutions Business

On July 20, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset and share sale agreement with Avaya Inc. ("Avaya") for Nortel's North American, CALA (as defined below) and Asian Enterprise Solutions ("ES") business, and an asset sale agreement with Avaya for the EMEA portion of the ES business for a purchase price of $475 million. These agreements provided for the sale of substantially all of the assets of the ES business globally as well as the shares of Nortel Government Solutions Incorporated and DiamondWare, Ltd. The Bankruptcy Court and Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on August 4, 2009. Competing bids were required to be submitted by September 4, 2009 and an auction with the qualified bidders commenced on September 11, 2009. On September 14, 2009, Avaya emerged as the successful bidder for a purchase price of $900 million in cash, subject to certain post-closing purchase price adjustments, with an additional pool of $15 million reserved for an employee retention program. The Bankruptcy Court and the Canadian Court entered orders approving the sale to Avaya on September 16, 2009 and the sale

transaction closed on December 18, 2009. The sale of certain ES assets held by Israeli subsidiaries was subsequently approved by an Israeli Court on December 21, 2009.

Under the terms of the sale, approximately 6,000 Nortel employees accepted employment with Avaya.

A portion of the proceeds from this divestiture of approximately $14 million was held in escrow by the New York branch of Wells Fargo Bank, N.A. as of August 31, 2010 to secure Nortel's obligations with respect to purchase price adjustments. The remaining portion of the proceeds of approximately $915 million was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale. Nortel and Avaya are currently working to resolve disagreements in the amount of approximately $14 million concerning each party's final calculation of certain purchase price adjustments as contained in Nortel's closing statement delivered on February 16, 2010 (including revisions delivered on April 16, 2010) and Avaya's disagreement notice delivered April 19, 2010. In the event that Nortel and Avaya are unable to resolve the disagreements, the parties would appoint an accounting arbitrator to resolve the disagreements under the terms of the sale agreement governing the transaction. A motion regarding the arbitrability of one such disagreement is currently pending before the Bankruptcy Court and the Canadian Court.

5.    Packet Core Assets

On September 21, 2009, Nortel announced its plan to sell, by "open auction," the assets of Nortel's Wireless Networks business associated with the development of its Next Generation Packet Core network components ("Packet Core Assets"). The Packet Core Assets consist of software to support the transfer of data over existing wireless networks and the next generation of wireless communications technology including relevant non-patent intellectual property, equipment and other related tangible assets. The Packet Core Assets exclude legacy packet core components for Nortel's Universal Mobile Telecommunications System Access and GSM businesses. The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures that allowed qualified bidders to submit offers to purchase the Packet Core Assets on September 30, 2009 and September 29, 2009, respectively. On October 25, 2009, in accordance with bidding procedures approved by the Bankruptcy Court and the Canadian Court, certain Nortel Affiliates, including NNI and certain other Debtors, entered into an agreement with Hitachi, Ltd. ("Hitachi") for the sale of the Packet Core Assets for a purchase price of $10 million. On October 28, 2009, the Bankruptcy Court and Canadian Court entered orders approving the sale to Hitachi and the sale transaction closed on December 8, 2009, following satisfaction of all closing conditions. The Bankruptcy Court and the Canadian Court entered orders on May 28, 2010 and May 20, 2010, respectively, approving amendments to the intellectual property license agreement and the TSA (as defined below) that had been executed in connection with the transaction, which provided for an expansion of certain sublicensing rights of Hitachi in exchange for additional consideration of $500,000.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

The total proceeds from this divestiture, after subtraction of the applicable withholding taxes, of approximately $10.36 million were held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

6.    Optical Networking and Carrier Ethernet Businesses

On October 7, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with Ciena Corporation ("Ciena") for Nortel's North American, CALA and Asian Optical Networking and Carrier Ethernet businesses, and an asset sale agreement with Ciena for the European, Middle Eastern and African ("EMEA") portion of Nortel's Optical Networking and Carrier Ethernet businesses for a purchase price of $390 million in cash, and 10 million shares of Ciena common stock. These agreements included the planned sale of substantially all the assets of Nortel's Optical Networking and Carrier Ethernet businesses globally. The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on October 15, 2009. Qualified bidders were ultimately required to submit offers by November 17, 2009. On November 22, 2009, in accordance with court approved procedures, Nortel concluded an auction for the sale of these assets to Ciena, which emerged as the successful bidder, agreeing to pay $530 million in cash, subject to certain post-closing purchase price adjustments, plus $239 million principal amount of Ciena convertible notes due June 2017. The Bankruptcy Court and Canadian Court entered orders approving the sale to Ciena on December 3, 2009 and the sale transaction closed on March 19, 2010.

Ciena elected, as permitted by the terms of the sale agreement, to replace the $239 million principal amount of convertible notes with cash consideration of $244 million, and thus pay an all cash purchase price of approximately $774 million. The purchase price was finalized, but, at and after closing, this amount was reduced pursuant to the working capital adjustment mechanism of the asset sale agreement by approximately $81 million.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

A portion of the proceeds from this divestiture of approximately $78 million was held in escrow by the New York branch of Citibank, N.A. as of August 31, 2010 to secure Nortel's obligations with respect to taxation, real estate, transition services and other matters. Another portion of the proceeds of approximately CAD$2.2 million was held in escrow by the Ottawa branch of the Royal Bank of Canada as of August 31, 2010 to secure Nortel's obligations with respect to real estate located in Canada. The remaining portion of the proceeds of approximately $614 million was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

7.    GSM/GSM-R Business

On September 30, 2009, Nortel announced that certain Nortel Affiliates, including NNI, planned to sell by "open auction" substantially all of Nortel's global GSM/GSM-R business. The Bankruptcy Court and the Canadian Court entered orders establishing bidding

procedures that allowed other qualified bidders to submit offers to purchase the GSM/GSM-R business on October 15, 2009. Competing bids were required to be submitted by November 16, 2009. An auction with the qualified bidders concluded on November 24, 2009, with Ericsson and Kapsch CarrierCom AG ("Kapsch") emerging as the successful bidders for the sale of the North American and European assets for a purchase price of $103 million in cash, subject to certain purchase price adjustments. On November 18, 2009, Kapsch filed its bid for the GSM/GSM-R assets of NNSA with the relevant French authority. The Bankruptcy Court and the Canadian Court entered orders approving the sale to Ericsson and Kapsch on December 2, 2009. The French Court entered an order approving the sale to Kapsch on March 30, 2010. The sale transaction closed on March 31, 2010. The purchase price with respect to the sale to Ericsson was finalized, subject to a further working capital downward adjustment of $6 million in the second quarter of 2010. The purchase price for the sale to Kapsch is also subject to a further working capital adjustment pending finalization between the parties.

A portion of the proceeds of this divestiture of approximately $24 million is currently held in escrow by the New York branch of Citibank, N.A. to secure Nortel's obligations with respect to transition services. The remaining portion of the proceeds, taking into account certain post-closing purchase price adjustments, of approximately $88 million is held in escrow by the New York branch of JPMorgan pending allocation as provided under the orders approving the sale.

On May 28, 2010 and May 20, 2010, the Bankruptcy Court and the Canadian Court, respectively, entered orders authorizing the sale of assets associated with the CALA region GSM/GSM-R business of Nortel to Ericsson for a purchase price of $2 million in cash. This supplemental sale transaction closed on June 4, 2010. The proceeds of this divestiture are held in escrow by the New York branch of JPMorgan pending allocation as provided under the orders approving the sale.

In connection with each of these sales, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

8.    CVAS Business

On December 23, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with GENBAND Inc. (now known as GENBAND US LLC, following a conversion completed May 27, 2010) ("GENBAND") for Nortel's North American, CALA and Asian CVAS business, and an asset sale agreement with GENBAND for the EMEA portion of Nortel's CVAS business for a purchase price of $282 million, subject to balance sheet and other adjustments then estimated at approximately $100 million, resulting in net proceeds of approximately $182 million. These agreements included the planned sale of substantially all the assets of the CVAS business globally. The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on January 8, 2010 and on January 6, 2010, respectively. Competing bids were required to be submitted by February 23, 2010. On February 24, 2010, Nortel announced that it would not proceed to auction and would work toward closing the asset sale agreements with GENBAND.

42

The Bankruptcy Court and the Canadian Court entered orders approving the sale to GENBAND on March 4, 2010, and the sale transaction closed on May 28, 2010.

A portion of the proceeds from this divestiture of approximately $15 million was held in escrow by JPMorgan as of August 31, 2010 to secure Nortel's obligations with respect to transition services and certain employment issues. An additional $13 million of the proceeds was held in escrow by Wells Fargo Bank, N.A. as of August 31, 2010 to secure Nortel's obligations with respect to certain taxation and purchase price adjustments. The remaining portion of the proceeds of approximately $153.5 million was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

9.    LGN Joint Venture

On April 20, 2010, Nortel announced that NNL had entered into a share purchase agreement with Ericsson for the sale of NNL's 50% plus 1 share interest, including preferred shares, in LGN for a purchase price of $242 million in cash, subject to certain purchase price adjustments. The Canadian Court entered an order approving this sale on May 3, 2010 and the sale transaction closed on June 29, 2010. Pursuant to the Canadian Court order approving the sale, the purchase price proceeds have been deposited in a segregated account held in the name of NNL, and such proceeds may not be distributed except upon further order of the Canadian Court, on notice to the Debtors.

10.    Relay Sale

On June 17, 2010, NNL and Nortel Networks Technology Corporation entered into an asset sale agreement with 7522312 Canada Inc. for the sale of certain assets related to the wireless backhaul and multi-hop digital repeater/relay research and development program for a purchase price of $600,000 plus applicable transfer taxes. The Canadian Court entered an order approving this sale on June 29, 2010 and the sale transaction closed on June 30, 2010.

Pursuant to the Canadian Court order approving the sale, the purchase price proceeds have been deposited in a segregated account held in the name of NNL, and such proceeds may not be allocated or distributed except upon either agreement of the U.S. Debtor Licensees as to the distribution of such proceeds (subject to the prior consent of the Creditors' Committee and the Ad Hoc Group of Bondholders acting in good faith) or upon orders of the Canadian Court and the Bankruptcy Court after notice and a joint hearing.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

11.    MSS Business

On August 27, 2010, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with PSP Holding LLC ("PSP Holding") for Nortel's North American, CALA and Asian Multi-Service Switch ("MSS") business, and an asset sale agreement with PSP Holding for the EMEA portion of Nortel's MSS business, for an aggregate

43

purchase price of $39 million, subject to working capital and other adjustments. These agreements include the planned sale of substantially all the assets of the MSS business globally. On September 1, 2010, the Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that will allow other qualified bidders to submit higher or otherwise better offers. Pursuant to such orders, competing bids must be submitted by September 21, 2010 and if qualified bids other than that of PSP Holding are received, an auction will be held on September 24, 2010.

12.    De Minimis Asset Sales

On February 18, 2009, the Bankruptcy Court entered an order establishing procedures for the sale or abandonment of de minimis assets. Pursuant to the terms of such order, the Debtors have sold and intend to continue to sell and abandon certain de minimis assets in order to maximize the value of any such assets in connection with the wind down of the Debtors' estates.

13.    Purchase Price Adjustments

Nortel's sale agreements generally provide for post-closing adjustments to the stated purchase price based on the actual value of certain assets and liabilities as of the closing date relative to an estimate of those amounts at closing. Adjustments may be made for, among other things: (i) changes in net working capital; (ii) changes in amounts to be paid in respect of transferred employees, including such items as accrued compensation and vacation days, retirement benefits and severance amounts; and (iii) changes in amounts related to assets being transferred outside the United States, including purchase price reductions for assets held by the EMEA Debtors that are unable to be transferred due to potential further insolvency proceedings. In addition, some asset sale agreements include additional purchase price adjustments that depend on changes in inventory, net debt, standard margin and deferred profits of the business sold.

14.    Transition Services Agreements

In connection with each of the sales of certain of its global businesses and assets, Nortel has entered into various transition services agreements with the purchasers of such businesses and assets (the "TSAs"). Nortel is contractually obligated under each existing TSA to provide certain information technology, business transition and related services to the relevant purchaser of its various global businesses and assets for a period following the closing of the transaction.

Of the Debtors and their subsidiaries, NNI and NN CALA are providing significant services under the TSAs and are expected to continue to do so through the TSA period; Nortel Networks Japan (also known as Nortel Networks Kabushiki Kaisha), wholly owned by NNI, is involved in a number of TSA services; and Nortel Technology Excellence Centre Private Limited (wholly owned by NNI), Nortel Networks de Guatemala (98% owned by NN CALA and 2% owned by NNL) and Nortel Trinidad and Tobago Limited (wholly owned by NN CALA) have minor roles. Numerous Nortel Affiliates other than the Debtors also are providing services under the TSAs.

The compensation the Nortel Affiliates receive under each TSA for providing services is either cost-based or, in most cases, a fixed amount agreed upon with each purchaser on the basis of a projection of the costs to be incurred by Nortel in providing such services to the business sold. Under each TSA, Nortel's compensation may be adjusted periodically based on certain changes in the product volume and headcount estimates for the relevant divested business. Unless otherwise agreed, each Nortel Affiliate providing services under a TSA bears the initial costs of providing such services. The revenue received from the relevant purchaser is distributed among the relevant Nortel Affiliates. Each TSA permits the relevant purchaser to terminate some or all services provided by Nortel under such TSA upon written notice to Nortel. To the extent any Nortel Affiliate is unable to eliminate costs associated with the provision of services that are being terminated, or otherwise cannot fully recover its costs from payments actually received from the relevant purchasers, such entity will generally be responsible for such costs and may incur a loss as a result.

With limited exceptions, the Nortel Affiliates that are parties to each TSA must indemnify the purchaser(s) for certain losses resulting from a breach of such TSA by such Nortel signatories, and in some cases, other losses caused by Nortel and relating to the provision of services under such TSA. Nortel's liability for damages under the TSAs is generally subject to certain limitations, typically including an overall cap of liability based on the revenues payable to Nortel under the relevant TSA, but there may be circumstances in which a higher limitation or no limitation applies. In addition, the TSAs generally require that all claims under a TSA be brought within enumerated time periods, ranging from 30 to 60 days, after the end of the term of the TSA. Under each TSA, each purchaser must indemnify Nortel for certain losses relating to the provision of services under such TSA or resulting from a breach of such TSA by each purchaser.

Below is a general description of the terms of the TSAs under which Nortel is currently providing services. Nortel may enter into one or more additional TSAs in connection with the sale of other remaining businesses or assets and NNI and its Affiliates may enter into one or more additional agreements to provide services to or receive services from other Nortel Affiliates after the Debtors emerge from bankruptcy. In each case, the terms of any such TSA may differ from other TSAs.

(a)    TSA for the Sale of the CDMA Business and LTE Access Assets

In connection with the sale of substantially all of Nortel's CDMA business and LTE Access assets, NNC, NNL and NNI entered into a TSA with Ericsson pursuant to which NNC, NNL and NNI have agreed to provide or cause their Affiliates to provide information technology ("IT"), order management, supply chain, service and technical support, finance and certain back office services for a period of up to 24 months beginning November 13, 2009. Any service provided under this TSA may be terminated upon 90 days' notice by Ericsson. NNC, NNL, and NNI have, subject to certain limitations, each severally agreed to indemnify Ericsson for losses in connection with (i) a breach of such Nortel Affiliate's obligations under the TSA, (ii) claims against Ericsson for benefits or compensation by the employees of service providers, (iii) failure by service providers to comply with laws or regulations or (iv) bodily injury or property damage resulting from negligent or willful acts of a services provider or its supplier or subcontractor.

45

(b)      TSA for the Sale of the ES Business

In connection with the sale of substantially all of the ES business, NNI, NN CALA and certain non-Debtor Affiliates entered into a TSA with Avaya pursuant to which these Nortel Affiliates have agreed to provide or cause their Affiliates to provide IT, order management, supply chain, service and technical support, finance, certain back office and legal services for a period of up to 18 months (up to 12 months in certain jurisdictions in the EMEA region) beginning December 18, 2009. This TSA provides for the early termination of some of the services being provided under certain conditions. The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Avaya for losses in connection with the gross negligence or willful misconduct in the performance of such Nortel Affiliate's obligations under the TSA.

(c)      TSA for the Sale of the Optical Networking and Carrier Ethernet Businesses

In connection with the sale of substantially all of the Optical Networking and Carrier Ethernet businesses, certain Nortel Affiliates[3] entered into a TSA with Ciena pursuant to which these Nortel Affiliates have agreed to provide IT, finance, certain back office, supply chain and order management services for a period of up to 24 months (up to 12 months in certain jurisdictions in the EMEA region) beginning March 19, 2010. Any service provided under this TSA may be terminated upon 90 days' notice by Ciena. The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Ciena for losses in connection with a breach of such Nortel Affiliate's obligations under the TSA and claims of intellectual property infringement by third parties where such Nortel Affiliate failed to obtain a required consent from such third party.

(d)      TSA for the Sale of the GSM/GSM-R Business

In connection with the sale of substantially all of the GSM/GSM-R business, NNI and certain non-Debtor Affiliates entered into a TSA with Ericsson pursuant to which these Nortel Affiliates have agreed to provide or cause their Affiliates to provide IT, order management, supply chain, service and technical support, finance and certain back office services for a period of up to 18 months (up to 12 months in certain jurisdictions in the EMEA region) beginning March 31, 2010. Any service provided under this TSA may be terminated upon 90 days' notice by Ericsson. The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Ericsson for losses in connection with (i) a breach of such Nortel Affiliate's obligations under the TSA, (ii) claims against Ericsson for benefits or compensation by the employees of service providers, (iii) failure by service providers to comply with laws or regulations, or (iv) bodily injury or property damage resulting from negligent or willful acts of services provider or its supplier or subcontractor.

---

[3]    These Nortel Affiliates include certain Debtors (NNI, CoreTek, Inc., Qtera Corporation, Xros, Inc. and NN CALA), as well as certain non-Debtor Affiliates.