Also in connection with the sale of substantially all of the GSM/GSM-R business, NNI and certain non-Debtor Affiliates entered into a TSA with Kapsch pursuant to which these Nortel Affiliates have agreed to provide or cause their Affiliates to provide IT, order management, supply chain, service and technical support, finance and certain back office services for a period of up to 12 months that commenced March 31, 2010. Any service provided under this TSA may be terminated upon 90 days' notice by Kapsch. The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Kapsch for losses in connection with (i) a breach of such Nortel Affiliate's obligations under the TSA, (ii) claims against Kapsch for benefits or compensation by the employees of service providers, (iii) failure by service providers to comply with laws or regulations or (iv) bodily injury or property damage resulting from negligent or willful acts of services providers or its supplier or subcontractor.

(e)     TSA for the Sale of the CVAS Business

In connection with the sale of substantially all of the CVAS business, NNI and certain non-Debtor Affiliates entered into a TSA with GENBAND pursuant to which the Nortel signatories to this TSA have agreed to provide IT, supply chain, finance, certain back office and order management services for a period of up to 18 months (up to 12 months in certain jurisdictions in the EMEA region) that commenced May 28, 2010. Any service provided under this TSA may be terminated upon 90 days' notice by GENBAND. The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify GENBAND for losses in connection with a breach of such Nortel Affiliate's obligations under the TSA by such Affiliate, its agents, shareholders, partners, representatives or subcontractors.

(f)     TSA for the Sale of the Layer 4-7 and Packet Core Assets

Nortel was providing transition services to the purchasers of the Layer 4-7 Assets and Packet Core Assets, but the terms of the TSAs under which these services were provided have expired.

(g)     TSA for the Sale of the MSS Business

In connection with the sale of the MSS business, and subject to the necessary court approval and closing of the sale, NNI and certain non-Debtor Affiliates would enter into a TSA with PSP Holding pursuant to which the Nortel signatories to the TSA would agree to provide transition services for a period beginning at the closing of the sale and continuing through June 30, 2011 or a later date based on the dates of the U.S. and Canadian sale hearings to approve the sale. Any service provided under the TSA would be terminable by PSP Holdings upon an advance notice of from 60 to 90 days, to be negotiated on a service-by-service basis. The Nortel Affiliates that are parties to the TSA (other than NNUK and Nortel Networks (Ireland) Limited) would, subject to certain limitations, each severally agree to indemnify PSP Holdings for losses in connection with (i) the breach of such Affiliate's obligations under the TSA by such Affiliate, its directors, officers and employees, agents, shareholders, partners, representatives or subcontractors; (ii) bodily injury or property damage resulting from the willful or negligent acts or omissions of such Affiliate (and any corresponding provider of services), its

47

suppliers or subcontractors or its and their personnel; and (iii) the violation by a provider of services of any law or regulation.

15.     Distribution Escrow Accounts

In connection with each of the major asset sales, each Nortel Affiliate party to the sales, as depositors, entered into escrow agreements with JPMorgan as escrow agent, to hold the proceeds from the divestitures in escrow pending allocation as contemplated by the relevant orders approving each sale. The funds held in escrow under these agreements are held in accounts in the United States.

According to these agreements, with the exception of the agreement entered into in connection with Level 4-7 sale described above, JPMorgan will distribute the sale proceeds for the relevant asset sale from the escrow funds only if so instructed by a letter of direction jointly executed by the depositors, the Creditors' Committee and the Canadian Monitor or if the depositors have entered into the protocol for resolving disputes concerning allocation proceeds as contemplated under the IFSA, upon delivery of a duly authenticated copy of the binding decision made by each relevant dispute resolver and a certificate attesting to the finality of the award. For the Level 4-7 sale, JPMorgan will distribute the sale proceeds from the escrow funds only if so instructed by the Bankruptcy Court and the Canadian Court, if the Chapter 11 Cases and the CCAA Proceedings have not yet been terminated or closed. If the Chapter 11 Cases or the CCAA Proceedings have been terminated or closed, then the proceeds will be distributed upon receipt of a joint letter from the depositors or a final decision of a court of competent jurisdiction. In all cases, the depositors agreed to reimburse the escrow agent for its reasonable costs and expenses and to indemnify and hold harmless the escrow agent and its affiliates, successors, assigns, directors, agents and employees from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigation and expenses arising out or in connection with its performance under the escrow agreement.

16.     Remaining Intellectual Property Assets

Nortel's intellectual property assets include a substantial global portfolio of patents, trademarks, copyrights in software and related documentation, domain names, trade secrets and other intellectual property rights associated with its various businesses. NNI holds a perpetual, exclusive license in the United States and Puerto Rico for intellectual property that is subject to the Master R&D Agreement (which excludes trademarks). In addition to NNI, certain other Debtors previously had or presently hold intellectual property rights, as further described below.

In connection with the 363 Sales, Nortel transferred certain intellectual property rights exclusively or predominantly used in the divested businesses to the respective business purchasers and licensed certain additional intellectual property rights related to the businesses acquired by such purchasers. While the vast majority of the transferred and licensed intellectual property that is registered or applied for with any governmental entity was (or is, in the case of the licensed intellectual property) registered or applied for in the name of NNL, certain of the patents and trademarks transferred or licensed in connection with the 363 Sales were owned by NNI, Nortel Altsystems Inc., Qtera Corporation, Sonoma Systems and Xros, Inc.

48

In addition, upon the closing of the 363 Sales, NNI agreed to terminate or relinquish its exclusive license under the transferred or licensed intellectual property solely to the extent (i) any grant of rights to the purchasers was restricted by or conflicted with any rights held by NNI or (ii) such termination was necessary to facilitate the sales. The Debtors' entitlement to an additional allocation of a portion of the sale proceeds based on the termination and relinquishment of such intellectual property rights will be addressed in connection with the allocation of the sale proceeds generally.

Nortel retains substantial intellectual property rights and IP addresses that were not transferred pursuant to any of the aforementioned asset sales. The primary retained intellectual property assets include an extensive patent portfolio, certain trademarks and domain names, and copyrights and trade secrets in software and related documentation. The majority of the value of Nortel's retained intellectual property rights lies in its residual patent portfolio, which consists of patents and patent applications registered or applied for in multiple countries and covering many aspects of telecommunications and other markets. As mentioned above, NNI holds a perpetual exclusive license for any such intellectual property that is subject to the Master R&D Agreement. In addition, certain Debtors hold certain patents directly.

Nortel has retained Lazard and Global IP Law Group ("Global IP") to assist in the development of a plan to maximize the return value for Nortel's residual patent portfolio. Lazard and Global IP, working with Nortel and its advisors, are currently exploring various options, including the following: (i) sale of the residual patent portfolio in one or more transactions; (ii) sale of or investment in Nortel's patent licensing and enforcement business; or (iii) creation of a licensing entity, which will seek to derive licensing revenue from the patent portfolio over the long term.

In the event of a sale of the residual patent portfolio, cash obtained from the sale of the residual patents will be allocated among the Nortel Affiliates with an interest in such patents either in connection with such transaction or as otherwise determined by the resolution of allocation issues generally. Other alternatives may result in the Debtors holding a continuing stake in certain intellectual property assets or in a licensing business.

The value the Debtors ultimately may realize from the residual patents through the above options discussed above is uncertain at this time and dependent on various factors, including the strategies ultimately implemented, the timing of any such transactions and the allocation of consideration among various Nortel Affiliates.

As part of the ongoing efforts to monetize remaining intellectual property, Nortel is also entertaining proposals for the acquisition of the trademark "NORTEL" and the Nortel globe logo. NNI is the registered owner of two U.S. word and design marks for "NORTEL" and the related logo; however, other similar marks (for classes of goods and services other than those to which NNI's marks apply) are owned by NNL. Accordingly, monetization efforts for these marks will be coordinated between NNL and NNI, and NNI's share of any value derived from these efforts is yet to be determined.

Nortel's current strategy with respect to its other retained intellectual property assets is to maintain only the intellectual property that has potential value greater than the cost of

maintaining it. Pursuant to this strategy, some of Nortel's remaining trademarks and software may be allowed to, respectively, expire or become obsolete.

E.    Certain Other Post-petition Operations of the Debtors and Other Nortel Affiliates

    1.    Creation of Nortel Business Services Group and the Corporate Group

        In addition to monetizing their assets, the Debtors have undertaken other restructuring efforts to maximize value for their creditors. One of such efforts was to establish two internal groups in 2009: the Corporate Group (the "Corporate Group") and NBS. Various Nortel Affiliates, including certain of the Debtors and their non-Debtor subsidiaries, provide services as part of the Corporate Group and NBS.

        The Corporate Group is focused on a number of key actions, including the completion of announced sales and the sale of remaining businesses and assets as well as exploring strategic alternatives to maximize the value of Nortel's intellectual property. The Corporate Group also is responsible for restructuring matters, including the claims resolution process and planning toward conclusion of the Chapter 11 Cases and the CCAA Proceedings. It also continues to provide administrative and management support to various Nortel Affiliates.

        NBS continues to provide global transition services in fulfillment of contractual obligations under the TSAs.

    2.    Employee Information

        (a)    Restructuring

        As of the Petition Date, the Debtors employed approximately 8,911 regular full-time employees (excluding employees on notice of termination). The Debtors also employed individuals on a regular part-time basis and on a temporary full- or part-time basis, and also engaged the services of contractors as required.

        From the Initial Petition Date to June 26, 2010, through cost reduction initiatives under the Chapter 11 Cases, the Debtors reduced their headcount by approximately 71%. Further, approximately 4,654 jobs for employees of the Debtors were preserved through creation of jobs for former employees in connection with sales of businesses during the same period. As of June 26, 2010, approximately 805 employees of the Debtors were continuing in NBS and 39 employees of the Debtors were continuing in the Corporate Group. As of June 26, 2010, there were 26 active employees of the Debtors, collectively, who were not affiliated with either NBS or the Corporate Group.

        (b)    Employee Benefit Plans

          (i)    *Nortel Plans Generally*

        The Debtors historically maintained various retirement programs covering substantially all of their employees, consisting of tax-qualified and non tax-qualified defined benefit, defined contribution and investment plans. Since the Initial Petition Date, the Debtors

have ceased payment under their non-tax qualified plans and, as discussed further below, the tax-qualified defined benefit plan has been terminated by the Pension Benefit Guaranty Corporation (the "PBGC").

The Debtors also have provided other benefits, including post-retirement benefits and post-employment benefits. Employees previously enrolled in the capital accumulation and retirement programs offering post-retirement benefits are eligible for company sponsored post-retirement health care and/or death benefits, depending on age and/or years of service. Substantially all other employees have access to post-retirement benefits by purchasing a retiree health care plan at their own cost. The Debtors bear certain administrative costs in connection with providing retiree benefits under the NNI Flex Benefits Plan. Post-retirement and post-employment benefits are funded as claims are incurred. The Debtors also maintained certain severance plans and arrangements, but they have ceased payment under such plans since the Initial Petition Date.

Generally, the employees of the Debtors participate in plans sponsored or maintained by the Debtors solely for U.S. employees, including the Nortel Networks Long-Term Investment Plan (to which the Debtors' employees and the Debtors themselves make employee and matching contributions, respectively) and its own welfare and post-retirement benefit programs.

*(ii)    Termination of the U.S. Retirement Income Plan*

On July 17, 2009, the PBGC provided a notice to NNI that the PBGC had determined under the Employee Retirement Income Securities Act of 1974, as amended ("ERISA"), that: (i) the Nortel Networks Retirement Income Plan (the "Retirement Income Plan"), a defined benefit pension plan sponsored by NNI, will be unable to pay benefits when due; (ii) under section 4042(c) of ERISA, the Retirement Income Plan must be terminated in order to protect the interests of participants and to avoid any unreasonable increase in the liability of the PBGC insurance fund; and (iii) July 17, 2009 was to be established as the date of termination of the Retirement Income Plan. On the same date, the PBGC filed a complaint in the United States District Court for the Middle District of Tennessee against NNI and the Retirement Plan Committee of the Nortel Networks Retirement Income Plan (the "Retirement Plan Committee") seeking to proceed with termination of the Retirement Income Plan though this complaint was not served against NNI. NNI worked to voluntarily assign trusteeship of the Retirement Income Plan to the PBGC and avoid further court involvement in the termination process. On September 8, 2009, pursuant to an agreement between the PBGC and the Retirement Plan Committee, the Retirement Income Plan was terminated with a termination date of July 17, 2009, and the PBGC was appointed trustee of the plan. The PBGC withdrew the complaint it had filed in the United States District Court for the Middle District of Tennessee.

The PBGC has filed a proof of claim in the amount of $593.1 million against each of the Debtors in the Chapter 11 Cases for the unfunded benefit liabilities of the Retirement Income Plan. The PBGC also has filed unliquidated Claims for contributions necessary to satisfy the minimum funding standards, for insurance premiums, interest and penalties, and for shortfall and amortization charges. Under ERISA, the PBGC may have the ability to impose certain claims and liens on the Debtors and certain of their subsidiaries and Affiliates not subject

51

to the Chapter 11 Cases. The Debtors are conducting their review of these Claims and intend to raise all objections and defenses available to them.

### (iii)    U.S. Retiree Welfare and Long-Term Disability Plans

The Debtors historically have provided a number of welfare benefits to their active employees and retirees through benefit plans, including the Nortel Networks Inc. Retiree Medical Plan and the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan (together, the "Retiree Welfare Plans") and the Nortel Networks Inc. Long-Term Disability Plan (the "LTD Plan"). Under the Retiree Welfare Plans, the Debtors provide employer-paid (i) post-employment medical benefits for current retirees, their spouses, surviving spouses, domestic partners and dependents and (ii) term life insurance coverage and long-term care expense coverage for current retirees. Under the LTD Plan, the Debtors provide employer-paid long-term disability benefits for current participants. On June 21, 2010, the Debtors filed a motion to terminate, effective August 31, 2010, the Retiree Welfare Plans and the LTD Plan. The Debtors filed a notice of withdrawal of the motion with the Bankruptcy Court on July 16, 2010. Accordingly, at this time, the Debtors continue to provide benefits under the Retiree Welfare Plans and the LTD Plan, but no final determination has been made regarding the ultimate resolution of the provision of these benefits.

On July 16, 2010, an *ad hoc* committee of retirees filed a motion requesting an order authorizing the formation of a voluntary employee benefit association (a "VEBA") to offer health, prescription drug, dental and vision care benefits to the Debtors' retirees and their spouses and dependents. The motion asserts that benefits provided through the VEBA will allow retirees aged 55 to 64 and their spouses and dependents to receive an 80% federal subsidy in the form of the Health Coverage Tax Credit codified in section 35(e)(1) of the Internal Revenue Code of 1986, as amended (the "IRC"). The motion is scheduled to be heard on September 30, 2010.

### (iv)    Annual Incentive Plans

The Nortel Networks Limited Annual Incentive Plan (the "Incentive Plan") is an ordinary course of business compensation program that has been in place for several years. It is a broad-based plan in which nearly all Nortel employees in non-sales positions are eligible to participate.

As of July 1, 2010, approximately 2,164 employees were eligible to participate in the Incentive Plan of which approximately 817 were employees of the Debtors. Eight of these employees were eligible to receive quarterly awards in connection with their employment by the MSS business. In addition, 756 and 53 employees of the Debtors associated with NBS and the Corporate Group, respectively, were eligible to receive awards under the Incentive Plan.

### (v)    Key Executive Incentive Plan and Key Employee Retention Plan

After the Initial Petition Date, the Debtors and certain Nortel Affiliates developed a key employee incentive and retention program for employees in (a) North America, (b) Central America and Latin America ("CALA") and (c) Asia. The program consists of the Nortel

52

Networks Corporation Key Executive Incentive Plan (the "KEIP") and Nortel Networks Corporation Key Employee Retention Plan (the "KERP"). The KEIP was developed in order to provide incentives to the executives to streamline Nortel's business and guide Nortel out of the Chapter 11 Cases and the CCAA Proceedings as swiftly as possible, while the KERP was aimed at retaining key employees by providing a degree of job security and preventing attrition of key employees before a confirmed plan of reorganization was obtained. The final payments to employees of the Debtors under the KEIP and KERP were made on June 18, 2010 and July 16, 2010, respectively; no further amounts will be paid to employees of the Debtors under these plans.

### (vi)    Nortel Special Incentive Plan

Nortel obtained Bankruptcy Court approval on March 4, 2010 and Canadian Court approval on March 8, 2010 of a special incentive plan developed by Nortel (excluding Nortel Affiliates in the EMEA region) as well as a number of its significant creditors (the "Special Incentive Plan"). The Special Incentive Plan is designed to provide cash incentive payments to certain employees (other than those domiciled in the EMEA region or employed by joint ventures) holding positions with NBS and the Corporate Group to encourage the achievement of certain performance targets and other business goals important to Nortel, including the successful conclusion of the Chapter 11 Cases, the compliance with Nortel's obligations under various transaction agreements and the wind down of various Nortel Affiliates. Approximately 1,475 Nortel employees were initially eligible to participate in the plan, of which approximately 866 were employees of the Debtors.

Approximately 88% of the Special Incentive Plan's costs are being funded by the purchasers of Nortel's businesses, pursuant to and during the terms of the sales agreements, which require that Nortel continue to operate, on a contract basis, substantial elements of the day-to-day business functions relating to the divested businesses until such functions can be transferred to the relevant purchaser. This means that Nortel must retain certain key employees to ensure that the transition of the acquired businesses is as effective and efficient as possible.

### (c)    Certain Employment Agreements

NNI obtained Bankruptcy Court approvals on March 4, 2010 and May 5, 2010 to enter into employment agreements providing for special incentive bonuses for certain officers and key employees of the Debtors including Christopher Ricaurte, Donald McKenna, John Veschi and George Riedel, payable upon achievement of business performance objectives relating generally to the efficient and successful wind down of certain Nortel business units. These individuals are not participants in the Special Incentive Plan described above.

### 3.    Non-Creditor Protection Legal Proceedings

### (a)    ERISA Lawsuit

Beginning in December 2001, NNI, NNC and NNL, together with certain of their then-current and former directors, officers and employees, were named as defendants in several purported class action lawsuits pursuant to ERISA. These lawsuits have been subsequently

consolidated into a single proceeding in the United States District Court for the Middle District of Tennessee. This lawsuit is on behalf of participants and beneficiaries of the Nortel Networks Long-Term Investment Plan who held shares of the Nortel Networks Stock Fund during the class period, which has yet to be determined by the court. The lawsuit alleges, among other things, material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan. The court has not yet ruled as to whether the plaintiffs' proposed class should be certified. As a result of the Chapter 11 Cases, as well as the Bankruptcy Court's order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code and the resulting enforcement of the Canadian stay of proceedings, on September 25, 2009, the district court ordered that the action be stayed and administratively closed.

(b)    The Pensions Regulator "Warning Notice"

On September 30, 2009, the Trustee of NNUK's Pension Plan (the "U.K. Pension Trustee") and the Board of Pension Protection Fund (the "PPF") jointly filed proofs of claim against the Debtors in the amount of $3.1 billion with respect to an alleged shortfall in the NNUK defined benefit pension plan. The Debtors are conducting their review of these Claims and intend to raise all objections and defenses available to them.

In January 2010, The Pensions Regulator in the United Kingdom ("The Pensions Regulator") issued a purported Warning Notice in which it alleged that the NNUK defined benefit pension plan has a shortfall of approximately £2 billion and identified certain Nortel Affiliates, including NNC, NNL, NNI and NN CALA, as targets of a procedure by The Pensions Regulator for the issuance of a financial support direction ("FSD") that could eventually require them to provide funding to eliminate the alleged shortfall.

On February 26, 2010, the Debtors obtained an order from the Bankruptcy Court that (i) affirms that, by virtue of their filing proofs of claim in the Bankruptcy Court, the U.K. Pension Trustee and the PPF have submitted to the jurisdiction of the Bankruptcy Court; (ii) enforces the automatic stay imposed by section 362 of the Bankruptcy Code against the U.K. Pension Trustee and the PPF and holds that their participation against the Debtors in U.K. pension proceedings would be deemed a violation of the automatic stay and subject them to sanctions; and (iii) deems those proceedings to be of no force or effect as to the Debtors in the Chapter 11 Cases. On March 5, 2010, the U.K. Pension Trustee and the PPF appealed the Bankruptcy Court's order to the United States District Court for the District of Delaware. On August 5, 2010, a United States Magistrate Judge of that Court issued a Report and Recommendation to the United States District Judge who will determine the appeal that the Bankruptcy Court's order should be affirmed.

A similar order was issued by the Canadian Court in the CCAA Proceedings. Such order also extended to The Pensions Regulator itself. The Pensions Regulator, the U.K. Pension Trustee and the PPF appealed such order, but their appeal was dismissed by the Court of Appeal for Ontario on June 16, 2010. In April 2010, the U.K. Pension Trustee and the PPF filed in Canada a motion to lift the stay, which motion is adjourned without date on the consent of all interested parties.

On June 25, 2010, following an oral hearing before the Determinations Panel of The Pensions Regulator in which none of the targets of the procedure, including NNI and NN CALA, participated, the panel issued a determination notice, in which it set forth its determination that a FSD will be issued against NNC, NNL, NNI, NN CALA and numerous other Nortel Affiliates, whereby such entities will be given a period of six months to put into place financial support for the NNUK defined benefit pension plan.

(c)    Securities Class Action Claim against Former CEO and CFO

On May 18, 2009, a complaint was filed in the United States District Court for the Southern District of New York alleging violations of federal securities law between the period of May 2, 2008 through September 17, 2008, against Mike Zafirovski (NNC's former President and Chief Executive Officer) and Pavi Binning (NNC's former Executive Vice President, Chief Financial Officer and Chief Restructuring Officer). Although no Nortel Affiliate (including the Debtors) is a named defendant, this lawsuit has been stayed as a result of the Bankruptcy Court's order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code, and the resulting enforcement of the Canadian stay of proceedings. Messrs. Zafirovski and Binning have filed Claims in the Bankruptcy Court for indemnification and contribution for potential liability arising out of this matter in amounts to be determined. The Debtors reserve their right to raise all objections and defenses available to them.

(d)    Others

The Debtors also are defendants in various other suits, claims, proceedings and investigations that have arisen in the normal course of business.

4.    Insurance

Prior to the Initial Petition Date, the Debtors maintained numerous insurance policies from third-party insurance carriers providing coverage for claims relating to workers' compensation and automobile liability. These policies were and are still subject to various deductibles and per-occurrence and annual aggregate limits and are supported by various letters of credit issued by NNL.

On January 15, 2009, the Bankruptcy Court entered an order authorizing the Debtors to pay pre-petition premiums necessary to maintain insurance coverage and enter into new insurance policies. Consistent with this order, the Debtors have reviewed their insurance programs and policies since the Initial Petition Date and, where necessary in their business judgment, have renewed or extended current policies or purchased additional policies. This process is ongoing.

In addition to the insurance policies funded directly by the Debtors, NNC maintains third-party insurance policies on behalf of all its subsidiaries, including the Debtors. These insurance policies include: professional liability; fiduciary liability; auto liability; comprehensive general liability; directors' and officers' liability; property, terrorism, boiler and machinery liability; transit floater liability; crime liability; employment practices liability; and special accident insurance. Such insurance policies were in NNC's name and the premiums were

A

paid by NNL. To the extent that any losses were incurred as a result of actions or omissions by the employees of any covered Nortel entity other than NNL, such entity would reimburse NNL for any associated costs through then-existing transfer pricing arrangements. In December of 2009, NNL sought partial reimbursement for a $25 million premium for a one-year extension of combined coverage under the fiduciary liability and directors' and officers' liability insurance policies from covered Nortel entities. As a result, NNL paid $8.1 million for that one-year extension, NNI paid $8.1 million to NNL for that one-year extension and the remaining amounts were paid by the EMEA Debtors and other Nortel Affiliates.

Since the Initial Petition Date, certain insurance policies held by NNC on behalf of itself and all of its subsidiaries, including the Debtors, have expired and certain policies have been renewed. The NNC-held group policies that currently cover the Debtors are scheduled to expire either in 2010 or 2011. The Debtors are currently in the process of evaluating each of the NNC-held group insurance policies to determine whether, as of the next expiration date, the Debtors should obtain separate coverage or renew their participation in the existing group coverage for a limited period of time. The Debtors intend to approach several different insurance underwriters to evaluate available insurance options and ultimately intend to choose the form of coverage that best facilitates the Debtors' performance of transition services under the sale agreements.

5.    Environmental Matters

The Debtors' businesses have been subject to a wide range of continuously evolving environmental laws in various jurisdictions, including the United States. The Debtors have sought to operate their businesses in compliance with these changing laws. Existing and new laws may cause the Debtors to incur additional costs.

The Debtors are exposed to liabilities and compliance costs arising from their past generation, management and disposal of hazardous substances and wastes. Specifically, NNI has remedial activities under way at one site that its predecessor, Northern Telecom Electronics, Inc., previously operated. At another of its former U.S. sites, an agreement has been reached to settle the Debtors' remedial obligations through the claims resolution process.

Nortel also is listed as a potentially responsible party under the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," or "Superfund") at two Superfund sites in the United States. At both of the Superfund sites, Nortel is considered a de minimis potentially responsible party. A de minimis potentially responsible party is generally considered to have contributed less than 1% (depending on the circumstances) of the total hazardous substances at a Superfund site. At one additional Superfund site, an agreement has been reached to settle the Debtors' obligations through the claims resolution process. Liability under CERCLA may be imposed on a joint and several basis, without regard to the extent of Nortel's (or any individual Debtor's) involvement. In addition, the accuracy of Nortel's estimate of environmental remediation costs is affected by several uncertainties, such as additional requirements that may be identified in connection with remedial activities, the complexity and evolution of environmental laws and regulations, the identification of presently unknown contamination, the Debtors' volumetric share of hazardous substances and the financial

viability of other potentially responsible parties. Consequently, the Debtors' liabilities under CERCLA could be greater than their current expectations.

An estimate of Nortel's anticipated remediation costs associated with all such sites, including its former site in the United States with identified remediation issues and the three identified Superfund sites, to the extent probable and reasonably estimable, is estimated at less than $300,000. The Debtors may need to contribute to these remediation costs. Additional sites for which the Debtors have remediation liability may be identified in the future.

6.      Supply Chain Agreements

As previously discussed, the Debtors, the Canadian Petitioners, certain EMEA Debtors and Flextronics entered into the Flextronics Amending Agreement that, among other things, provides a mechanism for the transfer of Nortel's supply relationship to purchasers of Nortel's other businesses or assets.

Since the Initial Petition Date, the Debtors also periodically have entered into agreements with other suppliers to address issues and concerns as they arose in order to ensure ongoing supply of goods and services and minimize any disruption in their global supply chain. In certain circumstances some of these agreements included advance deposit or escrow obligations or purchase commitments in order to mitigate the risk associated with supplying the Debtors during the pendency of the Chapter 11 Cases.

F.    Description of Non-Debtor Subsidiaries of the Debtors

1.      Active Non-Debtor Subsidiaries Held by NNI

(a)      Nortel Networks India International Inc.

Nortel Networks India International Inc., a wholly-owned subsidiary of NNI, acts as a supplier of hardware and software for contracts with certain Nortel customers in India.

(b)      Nortel Ventures LLC

Nortel Ventures LLC is a special purpose investment subsidiary with respect to NNI's investment in certain offshore funds. The sole member of Nortel Ventures LLC is NNI. Nortel Ventures LLC holds minor ownership interests in Infotech Pacific Ventures, L.P., New Enterprise Associates 12, L.P., Pacven Walden Ventures VI, L.P., VantagePoint Venture Partners 2006 (Q), L.P. and WI Harper Inc. Fund VI Ltd.

(c)      Nortel Technology Excellence Centre Private Limited

Tasman Networks Private Limited was acquired in 2006 as part of the acquisition of Tasman Networks, Inc., and subsequently renamed Nortel Technology Excellence Centre Private Limited. The company provided computer software and hardware and services including networking connectivity, systems engineering, product support, remote diagnostics, system integration, remote management and other related computer services for its only customer, NNI.

NNI currently has 99.01% ownership in the entity, while Nortel Networks Mauritius Ltd., which in turn is held by NNL, holds the remaining 0.99%.

(d)    Nortel Networks Japan

Nortel Networks Japan (also known as Nortel Networks Kabushiki Kaisha), a wholly-owned NNI subsidiary, is responsible for sales and marketing of Nortel telecommunications equipment in Japan.

2.    Dormant Non-Debtor Subsidiaries Held by NNI

NNI has a number of directly held subsidiaries that are dormant and which in most cases have little or no assets. These entities have been or will likely be liquidated and dissolved according to the applicable procedures in each entity's jurisdiction.

(a)    EMEA Region

In the EMEA region, Clarify Limited and Penril Datacomm Limited were struck off the U.K. company registry and were dissolved as of August 31, 2010. Bay Networks Redes de Dados para Sistemas Informaticos, Lda. registered for liquidation in October 2006 and is in the process of resolving tax issues. Nortel Networks Technology Ltd., a Cayman company, and its two subsidiaries in the EMEA region, Nortel Networks (Shannon) Limited and Nortel Networks Europe Sales Limited, are dormant and are expected to begin liquidation or strike off once issues in the local jurisdictions are resolved.

(b)    Asia Region

In the Asia region, Nortel Networks Southeast Asia Pte Ltd., Nortel Networks Technology K.K. and Nortel Networks Technology (Thailand) Ltd. have been dormant for several years and are proceeding towards dissolution.

Nortel Networks Eastern Mediterranean Ltd. is expected to commence liquidation in Israel at the beginning of 2011.

(c)    CALA Region

Bay Networks do Brasil Ltda. registered its dissolution before the Sao Paulo Board of Trade in September 2009 and is in the process of canceling its registration before local taxing authorities.

3.    Non-Debtor Subsidiaries Held by Nortel AltSystems Inc.

(a)    Nortel AltSystems AB

Nortel AltSystems AB, a wholly-owned subsidiary of Nortel AltSystems Inc., is a private corporation responsible for product development of Nortel's IntelligentEdge products. Nortel AltSystems AB has been dormant since the second quarter of 2006.

(b)    Nortel Altsystems International Limited

Nortel AltSystems International Limited, a wholly-owned subsidiary of Nortel AltSystems Inc. provided Internet infrastructure equipment, and manufactured and marketed web switches. The company is currently dormant.

4.    Non-Debtor Subsidiaries Held by Sonoma Systems

(a)    Sonoma Limited

Sonoma Limited was a wholly-owned subsidiary of Sonoma Systems that was struck off the U.K. company register and dissolved as of August 31, 2010.

(b)    Sonoma Systems Europe Limited

Sonoma Systems Europe Limited is a wholly-owned subsidiary of Sonoma Limited that is expected to be struck off the U.K. company register and dissolved as of September 15, 2010.

5.    Non-Debtor Subsidiaries Held by NN CALA

(a)    Nortel Networks de Guatemala, Ltda.

NN CALA holds a 98% investment and NNL holds a 2% investment in Nortel Networks de Guatemala, Ltda. Nortel Networks de Guatemala, Ltda. sold telecommunications equipment and services, and will be dissolved as soon as certain local accounting issues are resolved.

(b)    Nortel Trinidad and Tobago Limited

Nortel Trinidad and Tobago Limited is a wholly-owned subsidiary of NN CALA. The company was a supplier of data and telephony networks solutions and services in Trinidad and Tobago. Nortel Trinidad and Tobago Limited is dormant and is expected to be liquidated in the future according to local procedure.

IV.

CHAPTER 11 PLAN

As noted above, the fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors. Accordingly, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and interestholders with respect to their claims against and equity interests in the debtor's bankruptcy estate.

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN. THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS INCLUDED IN THIS DISCLOSURE STATEMENT AS <u>APPENDIX B</u>, AND THE PLAN SUPPLEMENT. THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN WITHOUT A CONCOMMITANT FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY AND, IF NECESSARY, TO CONSULT WITH COUNSEL. THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS.

A.     Summary of the Plan

The overriding purpose of the Plan is to enable the expeditious distribution of the asset sale and other proceeds of each Debtor to holders of Allowed Claims of such Debtor, to maximize the ability of each Reorganized Debtor to monetize any residual assets it may hold after the Effective Date and administer its remaining assets and obligations.

The Debtors believe that the Plan represents a fair economic solution for all of the Debtors' Creditors and Interestholders, will expedite the administration of the Chapter 11 Cases and will maximize and accelerate recoveries to holders of Allowed Claims.

The Plan recognizes the corporate integrity of each Debtor and, therefore, Allowed Claims against a particular Debtor will be satisfied only from the assets of that Debtor's bankruptcy estate. Although the effectiveness of the Plan with respect to each Debtor is conditioned on the effectiveness of the Plan with respect to each other Debtor, the distributions to Creditors and Interestholders of each Debtor, as well as other aspects of the Plan, apply separately to each of the Debtors. A Creditor or Interestholder of any particular Debtor, by virtue of its Claims against or Interests in that Debtor, has no direct claim against or interest in any other Debtor and has no direct claim against or interest in any other Affiliate of that Debtor.

As described in greater detail below, the Plan contemplates payment of all Allowed Administrative Expense Claims against each Debtor in full in Cash, inclusive of Allowed Claims against each Debtor arising under section 503(b) of the Bankruptcy Code and Allowed Priority Tax Claims against each Debtor (subject to permitted installment payments for certain Allowed Priority Tax Claims).

The Plan also provides for the treatment of Allowed Claims against and Interests in each Debtor as follows: (i) with respect to each holder of an Allowed Secured Claim against a Debtor, at the option of such Debtor, (a) payment in full in Cash, (b) the disposition proceeds of the Collateral securing such Claim to the extent of such Claim, (c) surrender of the Collateral securing such Claim to the holder of such Claim or (d) other treatment that leaves the holder of such Claim's legal, equitable and contractual rights unaltered, or such other treatment to which the parties may agree; (ii) with respect to each holder of an Allowed General Unsecured Claim against a Debtor, its pro rata share of the Creditor Proceeds of such Debtor; and (iii) with respect to any Allowed Subordinated Claim against, Interest in or Interest Securities Fraud Claim against any Debtor, no anticipated distribution, except with respect to each Interestholder of NN CALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc, Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc., which shall receive its pro rata share of limited liability interests in the relevant Reorganized Debtor.

In addition, the Plan provides for the appointment of a Plan Administrator, who shall have the authority to carry out and implement the provisions of the Plan with respect to and on behalf of the Debtors, the Reorganized Debtors and the Liquidating Debtors, in accordance with the provisions of the Plan Administration Agreement and subject to the oversight of the Plan Advisory Committee as provided therein.

Under the provisions of the Plan, the Reorganized Debtors are reorganized for the purpose of fulfilling each Reorganized Debtor's obligations under the 363 Sales and the TSAs; monetizing or otherwise disposing of each Reorganized Debtor's assets, including its residual property rights, through sale, liquidation or otherwise; distributing its Creditor Proceeds in accordance with the Plan; and fulfilling its other obligations under the Plan. Upon completion of such obligations, each Reorganized Debtor may be dissolved by the Plan Administrator without further corporate action subject to appropriate governmental filings (including transferring the assets of such Reorganized Debtor to a liquidating trust). The Plan also provides for the liquidation of each Liquidating Debtor on the Effective Date without further corporate action.

Although the Plan does not currently designate any Debtor as a Liquidating Debtor, it provides that the Debtors may subsequently make such designation by filing notice no later than 20 days prior to the Confirmation Hearing.

B.      Treatment of Unclassified Claims

1.      Administrative Expense Claims

Administrative Expense Claims are Claims constituting a cost or expense of administration (including Professional Claims) of the Chapter 11 Cases allowed under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date. Such Claims include (i) all actual and necessary costs and expenses of preserving the estates of the Debtors or operating the business of the debtors in possession arising on or after the Petition Date; (ii) any payments made under the Plan to cure a default under an executory contract or unexpired lease assumed by the Debtors; and (iii) all compensation or reimbursement of expenses of Professionals arising on or after the Petition Date unless the holder of an

Administrative Expense Claim and the relevant Debtor agree to different treatment, in each case to the extent allowed by the Bankruptcy Court under the Bankruptcy Code. Any fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code also are included in the definition of Administrative Expense Claim.

Allowed Administrative Expense Claims will be paid in full, in Cash, on the later of the Effective Date and the date the Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as is practicable by the Debtor obligated for the payment of such Administrative Expense Claim. Administrative Expenses Claims with respect to liabilities arising under a written agreement incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases will be paid in the ordinary course of business.

2.      Professional Claims

Professional Claims are Administrative Expense Claims for the compensation of Professionals and reimbursement of expenses incurred by such professionals pursuant to sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code.

Pursuant to the Plan, other than a Professional retained pursuant to the Ordinary Course Professional Order, each holder of a Professional Claim shall file its final application for the allowance of compensation for services rendered and reimbursement of expenses incurred by no later than the date that is 60 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of such Debtor in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or upon such other terms as may be mutually agreed upon by the claimant and such Debtor obligated for the payment for such Allowed Claim. The Debtors are authorized to pay compensation for professional services rendered and reimburse expenses incurred after the Confirmation Date in the ordinary course and without Bankruptcy Court approval.

Section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees and other entities making a "substantial contribution" to a reorganization case and to attorneys for and other professional advisors to such entities. The amounts, if any, which may be sought by entities for such compensation are not known by the Debtors at this time. Requests for compensation must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties in interest may participate and object to the allowance of any Claims for compensation and reimbursement of expenses.

3.      Priority Tax Claims

Priority Tax Claims are any Claims entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Pursuant to the Plan, at the option of each Debtor, the holder of an Allowed Priority Tax Claim will be entitled to receive:

      (a)     cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable;

      (b)     equal annual installment payments in cash (commencing on the Effective Date, or as soon thereafter as practicable) (i) of a total value on the Effective Date equal to the Allowed amount of such Claim; (ii) over a period not exceeding five years after the Petition Date; and (iii) in a manner not less favorable than the most favored non-priority Unsecured Claim provided for by the Plan; or

      (c)     such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the applicable Debtor.

Because certain taxes carry joint and/or several liability, taxing authorities may file duplicative Priority Tax Claims against multiple Debtors. However, because the taxing authorities do not collect more than once for a particular joint and/or several tax liability, the amount of any actual payments in respect of duplicative Allowed Priority Tax Claims would be less than the aggregate total of such duplicative claims.

The Debtors are currently engaged in dispute resolution processes with respect to their state and local disputed tax issues, as described in more detail below. Because the parties have not yet completed the dispute resolution processes, it is difficult at this stage to predict precisely the expected amount of Allowed Priority Tax Claims.

C.     Treatment of Classified Claims and Interests

The Plan places all Claims and Interests with respect to each Debtor, except Administrative Expense Claims and Priority Tax Claims, in the classes listed below for all purposes including voting and Distributions. A Claim or Interest is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in any other Class to the extent that any portion thereof falls within the description of such other Class.

Unless otherwise specified below, a holder of Claims against or Interests in a Debtor in each Class will receive its Pro Rata Share of Creditor Proceeds from the Debtor against which it holds an Allowed Claim. For further detail regarding the classification and treatment of the Claims and Interests, see the Plan included in this Disclosure Statement as Appendix B.

1.     Class 1 — Priority Non-Tax Claims

Class 1 Claims consist of all Allowed Priority Non-Tax Claims against a Debtor, including any Claim against such Debtor, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority of payment under section 507(a) of the Bankruptcy Code.

Each holder of Allowed Priority Non-Tax Claims against a Debtor will be entitled to be paid by the applicable Debtor in Cash in the full amount of the holder's Allowed Claim under the Plan.

2.    Class 2 — Secured Claims

Class 2 Claims consist of all Allowed Secured Claims, if any, against a Debtor, including any Claim (a) reflected as a Secured Claim either in the Schedules or upon a proof of claim as a Secured Claim or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

Unless the holder of a Allowed Secured Claim agrees to different treatment, each Holder of an Allowed Secured Claim against a Debtor will be entitled to receive at the option of such Debtor a Distribution of (i) payment in Cash by that Debtor in an amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) payment of the sale or disposition proceeds of the Collateral securing such Allowed Secured Claim to the extent of the value of the Collateral securing such Allowed Secured Claim; (iii) delivery of the Collateral securing such Allowed Secured Claim to the holder of such Allowed Secured Claim; or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the holder of the Allowed Secured Claim is entitled.

3.    Class 3 — General Unsecured Claims

Class 3 Claims consist of all Allowed General Unsecured Claims against a Debtor, including any Unsecured Claim against such Debtor other than Subordinated Claims and Interests Securities Fraud Claims.

Each holder of an Allowed General Unsecured Claim against a Debtor will receive its Pro Rata Share of Creditor Proceeds from such Debtor.

4.    Class 4 — Subordinated Claims

Class 4 Claims consist of all Allowed Subordinated Claims, including any General Securities Fraud Claims and any other Claims, except for Interests Securities Fraud Claims, that would be subject to subordination under section 510 of the Bankruptcy Code.

Each holder of an Allowed Subordinated Claim against a Debtor is not expected to receive any Distribution on account of such Claim; *provided, however*, that in the event that all Allowed Claims in Classes 1 through 3 of such Debtor have been satisfied in full, each holder of an Allowed Subordinated Claim in Class 4 shall receive its Pro Rata Share of any remaining Creditor Proceeds from such Debtor.

5.    Class 5A — Interests

Class 5A Claims consist of all Interests in a Debtor, including any shares of common, preferred stock, other form of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards

granted under management ownership plans, stock incentive plans or employee incentive plans that was in existence immediately prior to or on the Petition Date for such Debtor.

      (a)    NNI Class 5A

Each holder of an Interest in NNI is not expected to receive any Distributions under the Plan. On the Effective Date, all Interests in NNI will be cancelled and one new share of NNI's common stock will be issued to the Plan Administrator which will hold such share for the benefit of the holders of such former Interests consistent with their former economic entitlements. Each holder of an Interest in NNI will neither receive nor retain any property or any interest in property on account of such Interests; *provided, however,* that in the event that all Allowed Claims in NNI Classes 1 through 4 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNI consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date. Unless otherwise determined by the Plan Administrator, all such former Interests in NNI will be deemed cancelled and of no force and effect as of the closing of NNI's Chapter 11 Case, in accordance with the Plan, provided that such cancellation does not adversely affect the Debtors' Estates.

      (b)    Class 5A of Nortel Altsystems Inc., Xros, Inc., Sonoma Systems, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc. and Architel Systems (U.S) Corporation

All Interests in Nortel Altsystems Inc., Xros, Inc., Sonoma Systems, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc. and Architel Systems (U.S) Corporation will be cancelled and holders of such Interests will neither receive nor retain any property or interest in property on account of such Interests. In the event that all Allowed Claims in Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

      (c)    Class 5A of NN CALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc, Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc.

All Interests in NN CALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc, Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc. will be cancelled and each holder of any such Interest will receive its pro rata Distribution of limited liability company interests in the applicable Reorganized Debtor. No Interestholder shall receive Distributions on account of its Interests or its limited liability company interests until such time that all Allowed Claims in Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan. At such time, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

A                                                                                        TR11359

6.      Class 5B — Interests Securities Fraud Claims

Class 5B Claims consist of all Interests Securities Fraud Claims against a Debtor, including unknown claims, demands, rights, liabilities and Causes of Action of any kind whatsoever, known or unknown, that have been or could be asserted in a direct, derivative or other capacity against that Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declined, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Interests in such Debtor; (b) the purchase, ownership or sale of such Interests of that Debtor; and (c) any other claims arising out of, relating to or in connection with such Interests that would be subject to subordination under section 510(b) of the Bankruptcy Code.

Each holder of an Allowed Interests Securities Fraud Claim against a Debtor will receive no Distribution under the Plan in respect of such Claim.

D.      Implementation of the Plan

1.      Plan Administrator

(a)      Appointment and Authority of the Plan Administrator

The Plan appoints John J. Ray, III as the Plan Administrator for each of the Debtors, the Reorganized Debtors and the Liquidating Debtors.

The Plan Administrator will have the authority and right on behalf of each of the Debtors, the Reorganized Debtors and the Liquidating Debtors without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement the Plan and the Plan Administration Agreement in accordance with their terms.

(b)      Liability of Plan Administrator

The Plan Administrator will have no liability whatsoever for any acts or omissions to the Debtors, the Reorganized Debtors, the Liquidating Debtors or holders of Claims against or Interests in the Debtors, the Reorganized Debtors or the Liquidating Debtors other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order, provided that the Plan Administrator will have no liability for such acts or omissions if approved by or undertaken at the request or on behalf of the Plan Advisory Committee. The Plan Administrator will be indemnified and held harmless by each of the Debtors, the Reorganized Debtors and the Liquidating Debtors for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order.

(c)      Establishment of Reserve Accounts for Disputed Claims

On the Effective Date, the Debtors will fund the Disputed Claims Reserve in such amounts as agreed by the Debtors and the Plan Administrator in accordance with the terms of the

66

Plan Administration Agreement to be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.

    2.        Plan Advisory Committee

        On the Effective Date, an advisory committee jointly selected by the Creditors' Committee and the Ad Hoc Group of Bondholders (the "Plan Advisory Committee") will be deemed founded. The Plan Advisory Committee will consist of one member selected by the Creditors' Committee and two members selected by the Ad Hoc Group of Bondholders, in each case with the consent of the Debtors (such consent not to be unreasonably withheld). The Plan Advisory Committee will advise and approve the actions of the Plan Administrator and have certain rights and duties as more particularly set forth in the Plan Administration Agreement. The Plan Advisory Committee or its members will have no liability whatsoever for any acts or omissions to the Debtors, Reorganized Debtors, Liquidating Debtors or holders of Claims against or Interests in the Debtors, Reorganized Debtors or Liquidating Debtors other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order. The Plan Advisory Committee and its members will be indemnified and held harmless by each of the Debtors, Reorganized Debtors and Liquidating Debtors for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order.

    3.        Post-Effective Date Management

        (a)      Reorganized NNI

        On the Effective Date, the board of directors of Reorganized NNI will consist of one natural person selected by the Plan Administrator to serve through the closing of its Chapter 11 Case. The current officers of Reorganized NNI will continue to serve in such capacity in accordance with applicable non-bankruptcy law, employment agreements executed after the Petition Date and Reorganized NNI's by-laws through the closing of Reorganized NNI's Chapter 11 Case, unless such officer resigns or is removed prior to such time.

        (b)      Other Reorganized Debtors

        On the Effective Date, the manager of each Reorganized Debtor other than Reorganized NNI will consist of one natural person selected by the Plan Administrator to serve through the closing of such Reorganized Debtor's Chapter 11 Case. The current officers of such Reorganized Debtor will continue to serve in such capacity in accordance with applicable non-bankruptcy law, employment agreements executed after the Petition Date and each Reorganized Debtor's by-laws, through the closing of such Reorganized Debtor's Chapter 11 Case, unless such officer resigns or is removed prior to such time.

    4.        Corporate Existence of Debtors

        After the Effective Date, the Plan Administrator may in his sole discretion (a) maintain any Reorganized Debtor as a corporation or limited liability company in good standing until such time as all aspects of the Plan pertaining to such Reorganized Debtor have

been completed; (b) dissolve any Reorganized Debtor or complete the winding up of such Reorganized Debtor without the necessity for any further actions to be taken by or on behalf of such dissolving Reorganized Debtor, its shareholders or its members or for any payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, transferring all or part of the Residual Assets of such Reorganized Debtor to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Reorganized Debtor; or (c) dissolve any Controlled Non-Debtor Affiliate or complete the winding up of such Controlled Non-Debtor Affiliate in accordance with applicable law or abandon the interests in such Controlled Non-Debtor Affiliate.

A copy of the expected organizational structure of the Debtors and certain of their Affiliates immediately following the Effective Date is included in this Disclosure Statement as Appendix D-2.

E.    Provisions Governing Voting and Distributions

1.    Voting of Claims

Section 8.1 of the Plan provides that each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 and Article 4 of the Plan will be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. A holder of Allowed Claims in Impaired Classes of multiple Debtors will be entitled to vote on the Plan separately with respect to each such Debtor.

2.    Minimum Distribution

No payment of Creditor Proceeds of less than $100 will be made by any Debtor to any holder of an Allowed Claim against such Debtor. Such amounts will be deemed reallocated for distribution to holders of Allowed Claims against such Debtor and accordingly will be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

3.    Distributions of Creditor Proceeds

After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines in accordance with the Plan Administration Agreement that the relevant Debtor will pay such Allowed Secured Claim in Cash) against a Debtor, the Disbursing Agent will make a Distribution of its Creditor Proceeds in accordance with the provisions of the Plan (i) to each holder of an Allowed Claim as of the Effective Date against such Debtor, within 60 days of the Effective Date or as soon thereafter as practicable and (ii) to each holder of an Allowed Claim that is allowed after the Effective Date against such Debtor, in accordance with Section 9.4 of the Plan. After the initial Distribution with respect to any Allowed Claim, the Disbursing Agent will make Distributions of Creditor Proceeds in accordance with the Plan to holders of Allowed Claims against such Debtor quarterly on

March 31, June 30, September 30 and December 31 of each year (each such Distribution, an "Interim Distribution") and on the Final Distribution Date. Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (a) to make Distributions more frequently than quarterly on dates other than the Interim Distribution dates, (b) not to make an Interim Distribution on the basis that the costs of making such Interim Distribution exceed the Distribution amount or (c) not to make a Distribution to the holder of an Allowed Claim on the basis that it has not yet determined whether to object to such Claim in which case such Claim shall be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator (i) determines not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order.

4.    Distributions to Indenture Trustees

Distributions for the benefit of the holders of the Allowed Claims with respect to the NNCC 2026 Notes will be made to Law Debenture Trust upon the surrender of NNCC 2026 Notes pursuant to Section 8.14 of the Plan or as soon as practicable thereafter. Distributions for the benefit of holders of Allowed Senior Notes NNI Guarantee Claims will be made to BNYM on the close of business on the Effective Date (the "Distribution Record Date"), pursuant to Section 8.5 of the Plan, or as soon as practicable thereafter. Law Debenture Trust shall promptly administer the Distributions to the holders of Allowed Claims for the NNCC 2026 Notes and BNYM shall promptly administer the Distributions to the holders of Allowed Senior Notes NNI Guarantee Claims, in accordance with the Plan and the applicable Senior Notes Indenture.

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, (a) the NNCC 2026 Notes, the NNCC Notes Indenture, the Senior Notes NNI Guarantee Obligations and any other notes, bonds (with the exception of any surety bonds outstanding), indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under the Plan will be deemed cancelled and extinguished as to the Debtors and (b) the obligations of the Debtors (but not any other Affiliate of the Debtors, including NNC and NNL) under any agreements, documents, indentures or certificates of designation governing the Senior Notes, the Senior Notes NNI Guarantee Obligations, the Senior Notes Indentures and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under the Plan will be, discharged as to the Debtors (but not discharged as to any other Affiliate of the Debtors, including NNC and NNL), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the Security holders, officers or directors of the Debtors or by any other Person. The Depository Trust Company ("DTC") shall surrender for cancellation to Law Debenture Trust the NNCC 2026 Notes issued in the name of Cede and Co. and that are held by DTC. Notwithstanding the foregoing, the NNCC Notes Indenture will continue in effect solely for the purposes of: (i) allowing and preserving the rights of Law Debenture Trust to assert its charging Lien against such Distributions for payment of its reasonable fees and expenses (including reasonable fees and expenses of counsel and other professionals), (ii) allowing and preserving the rights of holders of Allowed Claims in respect of the NNCC 2026 Notes to receive

69

Distributions under the Plan, (iii) allowing and preserving the rights of Law Debenture Trust to make Distributions in satisfaction of Allowed Claims in respect of the NNCC 2026 Notes and (iv) allowing and preserving the rights of holders of claims in respect of the NNCC Notes Guarantee Obligations to pursue such claims in the CCAA Proceedings, but in all cases subject to the terms and conditions of the NNCC Notes Indenture.

     5.     Distribution Record Date

        As of the Distribution Record Date, the register for each Debtor will be closed and there will be no further changes to the record holder of any of the Claims or Interests, except with respect to the NNCC 2026 Notes, which will be settled for cancellation. The Debtors and the Plan Administrator will have no obligation to recognize any transfer of any such Claims or Interests occurring after the close of business on the Distribution Record Date. The Debtors will be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

        PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, OR WITH RESPECT TO THE NNCC 2026 NOTES, FOLLOWING THE SURRENDER OF SUCH NOTES FOR CANCELLATION, YOU WILL NOT RECEIVE A DISTRIBUTION FROM THE DEBTORS, THE REORGANIZED DEBTORS OR THE LIQUIDATING DEBTORS ON ACCOUNT OF SUCH CLAIM. IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE OR, WITH RESPECT TO THE NNCC 2026 NOTES, BEFORE THE SURRENDER OF SUCH NOTES FOR CANCELLATION, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.

     6.     Limitation on Recovery

        Section 8.6 of the Plan provides that, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim under the Plan or in connection with a Foreign Proceeding are in excess of 100% of a holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such holder in excess of such 100% will be deemed reallocated for distribution to other holders of Allowed Claims against such Debtor and, accordingly, will be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

        In no event shall any holder of any Allowed Claim receive Distributions under the Plan in excess of the Allowed amount of such Claim.

     7.     Allocation of Plan Distributions Between Principal and Interest

        Pursuant to Section 8.13 of the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

8.    Delivery of Distributions and Undeliverable Distributions

Distributions to holders of Allowed Claims of each Debtor will be made at the address of each such holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a holder of an Allowed Claim or (b) in another writing notifying the Plan Administrator (at the addresses set forth in Section 13.16 of the Plan) of a change of address. If any holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such holder on account of such Claim. Such Claim shall be discharged and the holder of such Claim shall be forever barred from asserting such Claim against the applicable Debtor, its Estate and its respective property. In such cases, any Cash held for Distribution on account of such Claim shall become the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

9.    Time Bar to Cash Payment Rights

Checks issued in respect of Allowed Claims will be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued. Any claim in respect of a voided check shall be made on or before 90 days after the expiration of the 90-day period following the date of issuance of such check. Thereafter, the amount represented by such voided check will irrevocably revert to the relevant Debtor's Estate, to be distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check will be discharged and forever barred from assertion against such Debtor, its Estate and its respective property.

10.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors, the Plan Administrator and the Disbursing Agent will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan will be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan has the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution. The Disbursing Agent will have the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations. The Disbursing Agent may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable, to each such holder. If the Disbursing Agent makes such a request and the holder fails to comply before the date that is 180 days after the request is made, no further Distributions will be made to the holder on account of such Claim. The amount of such Distribution will irrevocably revert to the applicable Debtor and such Claim will be discharged and the holder of such Claim will be forever barred from asserting such Claim against such Debtor, its Estate or its respective property. In such cases, any Cash held for Distribution on account of such Claim will become

the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

11.    Setoffs and Recoupment

The Debtors may setoff against any Claim the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors may have against the holder of such Claim.

Unless otherwise stipulated in writing by the Debtors, any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation or recoupment of any kind against such Estate Claim prior to the Confirmation Date, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred.

12.    Distributions for Disputed Claims

(a)    Objections

As of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, who will consult with the applicable Debtor regarding the same. Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the later of (a) the date that is 180 days after the Effective Date; *provided, however,* that the Plan Administrator may in his sole discretion extend such date for up to an additional 180 days without need for Bankruptcy Court approval and (b) such later date as may be fixed by the Bankruptcy Court for cause shown.

(b)    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no Distribution will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

(c)    Estimation of Claims

The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to

A

TR11359

be cumulative and not exclusive of one another. Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

      (d)    Resolution of Disputed Claims

On and after the Effective Date, the Plan Administrator will have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims. On the date of the first Distribution that is at least 60 days after the date on which the order allowing a Disputed Claim becomes a Final Order, such Debtor will remit, to the holder of such Allowed Claim, Creditor Proceeds equal to the amount such holder would have received as of that date under the Plan if the Allowed portion of the Disputed Claim had been an Allowed Claim as of the Effective Date. To the extent that a Disputed Claim against a Debtor is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Creditor Proceeds that would have been distributed to the holder of the Disputed Claim if the Claim had been Allowed in full, over the amount of Creditor Proceeds actually distributed on account of such Disputed Claim, will become Creditor Proceeds for Distribution to other holders of Allowed Claims in the Class corresponding to the Disputed Claim at issue in accordance with the terms of the Plan and the Bankruptcy Code.

      (e)    No Interest

Holders of Disputed Claims will not be entitled to interest if such Disputed Claim becomes an Allowed Claim unless the holder of such Allowed Claim is otherwise entitled to post-petition interest on such Claim under the Bankruptcy Code and the Plan.

      (f)    Reserve Account for Disputed Claims

On or after the Effective Date, the Plan Administrator will hold Cash in the Disputed Claims Reserve in an aggregate amount sufficient to pay to each holder of a Disputed Claim the Pro Rata Share of any Distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim. Cash withheld and reserved for payments to holders of Disputed Claims will be held and deposited by the Plan Administrator in one or more segregated reserve accounts for each Debtor, to be used to satisfy any Disputed Claim if and when any Disputed Claim becomes an Allowed Claim.

      (g)    Investment of Disputed Claims Reserve

All interest earned on Cash in the Disputed Claims Reserve will be held in the appropriate account in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of the Disputed Claims Reserve, including Taxes payable on such interest income, if any, will be transferred out of the Disputed Claims Reserve and will become Available Cash for Distribution to holders of Allowed Claims in the Class corresponding to the Disputed Claims Reserve account at issue in accordance with the terms of the Plan and the Bankruptcy Code.

A

     (h)     Release of Funds from the Disputed Claims Reserve

     If at any time or from time to time after the Effective Date there shall be Cash in a Disputed Claims Reserve account with respect to a Debtor in an amount in excess of the Plan Administrator's maximum remaining payment obligations to the then-existing holders of Disputed Claims with respect to such Debtor, such excess funds and the Pro Rata Share of net interest in respect thereof will become property of the relevant Estate and become available for distribution to the other holders of Allowed Claims in accordance with the terms of the Plan and the Bankruptcy Code.

     If at any time after the Effective Date the Bankruptcy Court expunges a Disputed Claim or estimates any contingent, unliquidated or other Disputed Claim at an amount less than the amount of Cash held in a Disputed Claims Reserve account with respect to such Claim, and the order with respect to such expungement or estimation has not been stayed pending appeal, the Cash held in the Disputed Claims Reserve account relating to such expunged Claim or in excess of the estimated amount of such Claim will become property of the relevant Estate and become available for distribution to the other holders of Allowed Claims in accordance with the terms of the Plan and the Bankruptcy Code, and the Plan Administrator shall have no further obligation to reserve funds for such expunged Claim.

     13.     No Payment on Saturday, Sunday or Legal Holiday

     If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

     14.     Post-petition Interest

     Except as specifically provided for in the Plan or under the Bankruptcy Code, no Allowed Administrative Expense Claim or Allowed Claim shall be entitled to receive any post-petition interest on such Claim under any circumstances.

F.     Treatment of Executory Contracts and Unexpired Leases

     1.     Previous Assumption, Assignment and Rejection

     Throughout the Chapter 11 Cases, the Bankruptcy Court has established deadlines and procedures for the assumption and rejection of executory contracts and unexpired leases by the Debtors, including in connection with the 363 Sale Orders and 363 Sales, and allocated responsibility for payment of cure amounts with respect to such contracts and leases. Any executory contracts and unexpired leases of the Debtors not assumed and assigned or rejected prior to the Confirmation Date or with respect to which the Debtors have not otherwise Filed a notice of assumption and assignment or obtained an order assuming or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts") will be rejected pursuant to Section 7.5 of the Plan unless assumed, or assumed and assigned, pursuant to Section 7.2 of the Plan. To the extent the Debtors have Filed a notice of assumption and assignment or motion for

the assumption or assumption and assignment prior to the Confirmation Date with respect to an executory contract or unexpired lease, but the Bankruptcy Court has not yet entered an order approving such assumption or assumption and assignment and fixing the cure amount therefor or the assumption or assumption and assignment has otherwise not yet become effective, the assumption or assumption and assignment of the contract or lease and any cure amount that may be owing in connection therewith will be governed by the terms of the applicable order or procedure.

### 2.    Assumption and Assignment of Remaining Contracts

As of the Effective Date, the Debtors will assume or assume and assign, as applicable, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, each of the Remaining Contracts of the Debtors that are identified in Exhibit E to the Plan that have not expired under their own terms prior to the Effective Date. Under the Plan, the Debtors reserve the right to amend such exhibit not later than ten days prior to the Confirmation Hearing either to: (a) delete any executory contract or unexpired lease listed therein and provide for its rejection; or (b) add any executory contract or unexpired lease to such exhibit, thus providing for its assumption or assumption and assignment, as applicable. The Debtors will provide notice of any such amendment of such exhibit to the parties to the executory contract or lease affected thereby and counsel for the Creditors' Committee not later than ten days prior to the Confirmation Hearing. The Confirmation Order will constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code approving all such assumptions or assumptions and assignments, as applicable, described in the Section 7.2 of the Plan, as of the Effective Date. If any provision of an executory contract to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

### 3.    Cure of Defaults

Any monetary defaults under each Remaining Contract to be assumed under the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either of the following ways: (a) by payment of the default amount in Cash, in full, on the Effective Date; or (b) by payment of the default amount on such other terms as may be agreed to by the Debtors and the non-Debtor parties to such Remaining Contract. In the event of a dispute regarding (i) the amount or timing of any cure payments; (ii) the ability of the Debtor or Debtors assuming such Remaining Contract, or an assignee thereof, to provide adequate assurance of future performance under the Remaining Contract to be assumed or assumed and assigned, as applicable; or (iii) any other matter pertaining to assumption or assumption and assignment of the Remaining Contract to be assumed, the Debtor or Debtors assuming such Remaining Contract will pay all required cure amounts promptly following the entry of a Final Order resolving the dispute. Under the Plan, the Debtors reserve the right (i) to withdraw their request for assumption of any Remaining Contract at any time prior to the entry of such an order and (ii) either to reject or nullify the assumption of any executory contract no later than five Business Days after the entry of a final order of the Bankruptcy Court determining the cure amount or any request for adequate assurance of future performance required to assume such executory contract.

75

A

4.    Objections to Assumption of Remaining Contracts

To the extent that any party to a Remaining Contract identified for assumption asserts a claim for arrearages or damages pursuant to section 365(b)(1) of the Bankruptcy Code, or has any other objection with respect to any proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan (including, without limitation, in Exhibit E thereto), all such Claims for arrearages and damages and objections must be filed and served: (a) as to any Remaining Contract identified in Exhibit E to the Plan that is mailed to any party to any such Remaining Contract, along with all other solicitation materials accompanying the Plan, within the same deadline and in the same manner established for the filing and service of objections to Confirmation of the Plan; and (b) as to any Remaining Contract identified in any subsequent amendments to Exhibit E to the Plan that is mailed to any party to any such Remaining Contract not later than ten days prior to the Confirmation Hearing, in such a manner as to be Filed and received by the Bankruptcy Court and the Debtors and counsel thereto, as the case may be, if applicable, no later than the earlier of (i) 20 days after such subsequent amendment is served and (ii) three days prior to the Confirmation Hearing.

Under the Plan, a party's failure to assert such claims for arrearages and damages or objections in the manner described above will constitute consent to the proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance of future performance and that the amount identified for "cure" in Exhibit E to the Plan is the amount necessary to cover any and all outstanding defaults under the Remaining Contract to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such Remaining Contract.

If any assumption of a Remaining Contract proposed in the Plan for any reason is not approved by the Bankruptcy Court, then the Debtors will be entitled, in their sole discretion, upon written notice to the applicable non-Debtor party to such Remaining Contract, to deem such Remaining Contract to have been rejected pursuant to the provisions of Section 7.5 of the Plan.

5.    Rejection and Approval of Rejection

Except for those executory contracts and unexpired leases that (a) are assumed pursuant to the Plan, (b) have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court or (c) are the subject of a pending motion before the Bankruptcy Court with respect to the assumption or assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Debtors will be rejected pursuant to section 365 of the Bankruptcy Code; *provided, however*, that neither the inclusion by the Debtors of a contract or lease on Exhibit E to the Plan nor anything contained in Article 7 of the Plan will constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.

The Confirmation Order will constitute an Order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 7.5 of the Plan