A

pursuant to section 365 of the Bankruptcy Code as of the Effective Date. Any Claim for damages arising from any such rejection must be filed within 30 days after the mailing of notice of the entry of the Confirmation Order, or such Claim shall receive no distribution under the Plan or otherwise on account of such Claim.

      6.    Post-petition Modification of Executory Contracts

Unless otherwise agreed by the parties and approved by the Bankruptcy Court, modifications, amendments, supplements and restatements to pre-petition executory contracts that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the pre-petition nature of the executory contract, or the validity, priority or amount of any Claims that may arise in connection therewith.

      7.    Pre-existing Obligations to the Debtors under Executory Contracts

Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors under such contracts.

G.    Conditions Precedent to Plan's Confirmation and Effective Date

      1.    Conditions to Confirmation of the Plan

A condition precedent to the confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order containing terms and conditions reasonably satisfactory in form and substance to each Debtor.

      2.    Conditions to Effective Date

The following are conditions precedent to the Effective Date:

      (a)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the effectiveness of which shall have not been stayed within 14 days following the entry thereof;

      (b)    All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

      (c)    All authorizations, consents and regulatory approvals, if any required by the Debtors in connection with the consummation of the Plan, are obtained and not revoked;

      (d)    The amended organizational document of Reorganized NNI and the organizational documents of the Reorganized Subsidiaries shall have been filed with the applicable authority of each of such reorganized Debtor's respective jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws;

A

(e)     Each of the relevant Debtors has received its full and final distribution of the Allocation Proceeds;

(f)     All statutory fees then due to the United States Trustee shall have been paid in full by the Debtors pursuant to the Plan;

(g)     With respect to each Debtor, each of the conditions in Section 10.2 of the Plan have been satisfied with respect to each other Debtor;

(h)     The Confirmation Order shall have become a Final Order; and

(i)     The Debtors shall have Filed the "Notice of Effective Date" in accordance with Section 10.4 of the Plan.

As noted in clause (g) above, the effectiveness of the Plan with respect to each Debtor is conditioned on the effectiveness of the Plan with respect to each other Debtor.

3.     Waiver of Conditions

Section 10.3 of the Plan provides that each Debtor may waive any or all of the conditions precedent to the Effective Date with respect to itself as set forth in Section 10.2 of the Plan other than Section 10.2(a). Any such waiver may be effected at any time without notice or leave given by the Bankruptcy Court and without any formal action other than proceeding to consummate the Plan.

4.     Notice of Effective Date

Upon satisfaction of all the other conditions to the Effective Date listed above, or if waivable, waiver pursuant to Section 10.3 of the Plan, or as soon thereafter as is reasonably practicable, the Debtors will File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided, however*, that the Debtors will have no obligation to notify any Person other than counsel to the Creditors' Committee and the Ad Hoc Group of Bondholders of such fact. The Plan shall be deemed to be effective as of 12:01 a.m. (prevailing Eastern time), on the date of such filing. A courtesy copy of the Notice of Effective Date may be sent by U.S. mail, postage prepaid (or at the Debtors' option, by courier or facsimile) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

H.     Effect of the Plan on Assets, Claims and Interests

1.     Vesting

Pursuant to Section 11.10 of the Plan, except as otherwise expressly provided in the Plan, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, the relevant Debtors will transfer, and the Reorganized Debtors will be vested with, all of the Assets of such Debtors' Estates free and clear of all Claims, Interests, Liens, encumbrances, charges and other

interests of Creditors and holders of Interests, and may operate their businesses free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by any of the Debtors after the Petition Date. The Debtors will continue as Debtors-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, the Reorganized Debtors may operate their businesses free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

2.    Limited Release of Directors, Officers and Employees

Pursuant to Section 11.4 of the Plan, claims of any of the Debtors' Estates against their present or former officers, directors or employees arising from or relating to the period prior to the Petition Date, are not released by the Plan. As of the Effective Date, each of the Debtors and the Debtors-in-Possession will be deemed to have waived and released its present and former directors, officers, and employees who were directors, officers or employees, respectively, at any time during the Chapter 11 Cases, from any and all claims of each of the Debtors' Estates arising from or relating to the period from and after the Petition Date; *provided, however,* that, except as otherwise provided by prior or subsequent Final Order of the Bankruptcy Court, this provision in Section 11.4 of the Plan shall not operate as a waiver or release of (a) any Person (i) named prior to the Effective Date as a defendant in any action commenced by or on behalf of the Debtors, including any actions prosecuted by the Creditors' Committee and the Ad Hoc Group of Bondholders or (ii) adjudicated prior to the Effective Date by a court of competent jurisdiction to have engaged in acts of dishonesty or willful misconduct detrimental to the interest of the Debtors or (b) any claim (i) with respect to any loan, advance or similar payment by the Debtors to any such person, (ii) with respect to any contractual obligation owed by such Person to the Debtors or (iii) relating to such Person's knowing fraud, gross negligence or willful misconduct, and *provided, further,* that the foregoing is not intended to release any of the Debtors' claims that may exist against the Debtors' directors and officers liability insurance; and *provided, further,* that, notwithstanding the foregoing, all such claims will be preserved by the Debtors for setoff purposes.

3.    Exculpation

Pursuant to Section 11.5 of the Plan, none of the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Creditors' Committee, the Ad Hoc Group of Bondholders, Law Debenture Trust, BNYM or any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (acting in such capacity) (individually, each an "Exculpated Party," and collectively, the "Exculpated Parties") will have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, this Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the

79

Plan; *provided, however,* the foregoing provisions of Section 11.5 of the Plan will not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

    4.    Injunctions

    Pursuant to Section 11.6 of the Plan, except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all holders of Claims or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Estates, the Reorganized Debtors, the Liquidating Debtors or any properties or interest in properties of the Debtors, the Reorganized Debtors or the Liquidating Debtors; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Estates, the Reorganized Debtors, the Liquidating Debtors or any properties or interest in properties of the Debtors or the Reorganized Debtors and the Liquidating Debtors; (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Estates, the Reorganized Debtors or any properties or interest in properties of the Debtors, the Reorganized Debtors or the Liquidating Debtors; (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Estates, the Reorganized Debtors, the Liquidating Debtors or any properties or interest in properties of the Debtors, the Reorganized Debtors or the Liquidating Debtors; (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan; and (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.

    5.    Terms of Injunctions or Stays

    Section 11.7 of the Plan provides that unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all of the Chapter 11 Cases.

    6.    Retention of Litigation Claims and Reservation of Rights

    Section 11.8 of the Plan provides that, except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order will be deemed to be a waiver or

relinquishment of any rights of Litigation Claims that the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator may have or choose to assert on behalf of the respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors, or representatives; (ii) any and all claims or rights arising under any Tax sharing agreement among the Debtors and their Affiliates; (iii) any and all Claims for reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the disposition of any Affiliate's Assets; and (iv) any and all Avoidance Actions.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim. The Debtors, the Reorganized Debtors, the Liquidating Debtors and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

Except as expressly provided in the Plan, the Plan Administrator will, after the Effective Date, retain the rights of each Debtor to prosecute any Litigation Claims that could have been brought by such Debtor at any time.

I.    Defenses with Respect to Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

J.    The Debtors' Post-Emergence Activities

After the Effective Date, each Reorganized Debtor will operate to fulfill its obligations under the 363 Sales and the TSAs, monetize its assets, including residual intellectual property rights, distribute Creditor Proceeds and otherwise effectuate the provisions of the Plan. In accordance with the Plan Administration Agreement, each Reorganized Debtor may be maintained by the Plan Administrator for the purpose of fulfilling these obligations or may be dissolved or wound down without the necessity of further corporate action by the Reorganized Debtor or the Bankruptcy Court.

Each Liquidating Debtor, on the other hand, will be liquidated as of the Effective Date in accordance with the Plan. Although the Plan identifies each Debtor as a Reorganizing Debtor, it provides that a Debtor may be subsequently designated as a Liquidating Debtor by the filing of notice no later than 20 days prior to the Confirmation Hearing.

K.     Summary of Other Provisions of the Plan

1.     Retention of Jurisdiction

Article 12 of the Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest extent legally permissible, including jurisdiction to, among other things:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)     Hear and determine any and all Causes of Action against any Person, and rights of the Debtors, the Reorganized Debtors and the Liquidating Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)     Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(d)     Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any of the Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)     Enter orders approving the Reorganized Debtors' post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)     Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

(h)     Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code;

(i)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order;

(j)    Hear and determine any matters concerning the enforcement of the provisions of Article 11 of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

(k)    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)    Permit the Debtors to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan or any agreement or document created in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

(m)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)    Enforce any injunctions entered in connection with or relating to the Plan or the Confirmation Order;

(o)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(p)    Hear and determine all claims, rights or disputes arising under or in connection with 363 Sale Agreements and the Plan Administration Agreement;

(q)    Determine any other matters that may arise in connection with or relating to the Plan or any agreement or the Confirmation Order;

(r)    Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(s)    Enter final decrees closing the Chapter 11 Cases.

2.    Plan Supplement

Section 13.1 of the Plan provides that the Plan Supplement will be filed at least ten days prior to the last day upon which holders of Claims may vote to accept or reject the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained on the Debtors' independent website at http://dm.epiq11.com/nortel or by request to the Debtors in accordance with Section 13.16 of the Plan.

3.    Modification of the Plan

Pursuant to Section 13.2 of the Plan, alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, including to substantively consolidate one or more Debtors' Assets and liabilities for

voting and Distribution purposes.  Further, the Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of the Bankruptcy Code and the Bankruptcy Court after notice and a hearing, confirms the Plan, as altered, modified or amended, in accordance with the Bankruptcy Code, and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claims of such holder.

4.      Revocation or Withdrawal of the Plan

Pursuant to Section 13.3 of the Plan, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If any Debtor revokes or withdraws the Plan with respect to such Debtor, or if Confirmation does not occur or if the Plan does not become effective, then the Plan will be null and void with respect to such Debtor, and nothing contained in the Plan or this Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person; (b) constitute an admission of any fact or legal conclusion by such Debtor or any other Entity; or (c) prejudice in any manner the rights of such Debtor in any further proceedings involving such Debtor.

5.      Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, any transfers from any of the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator pursuant to, in furtherance of, or in connection with the Plan, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.      Exemption from Registration

Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of any securities or interests on account of, and in exchange for the Claims against, the Debtors will be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and any other applicable non-bankruptcy law or regulation.

7.      Governing Law

The rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof, unless a rule of law or procedure is supplied by (a) U.S. federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express

choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan.

8.    Severability

Pursuant to Section 13.9 of the Plan, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Debtors the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.    Dissolution of the Creditor's Committee

Pursuant to Section 13.15 of the Plan, effective on the Effective Date, the Creditors' Committee will be dissolved automatically and its members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code without need for a further order of the Bankruptcy Court; *provided, however,* that (a) obligations arising under confidentiality agreements, joint interest agreements and protective orders, if any, entered during the Chapter 11 Cases will remain in full force and effect according to their terms, and (b) the Creditors' Committee may make application for Professional Claims and members of the Creditors' Committee may make requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases. The Debtors, the Reorganized Debtors, the Liquidating Debtors and the Plan Administrator will not have any obligation to pay or reimburse any fees of any official or unofficial committee of creditors or bondholders, including, without limitation, the Ad Hoc Group of Bondholders, incurred after the Effective Date.

10.    Notice

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

A                                                                        TR11359

Counsel for the Debtors

Cleary Gottlieb Steen & Hamilton LLP      Morris, Nichols, Arsht & Tunnell LLP
One Liberty Plaza                         1201 North Market Street, 18th Floor
New York, New York 10006                  P.O. Box 1347
(212) 225-3999 (facsimile)                Wilmington, Delaware 19899
Attention: James L. Bromley, Esq.         (302) 658-3989 (facsimile)
           Lisa M. Schweitzer, Esq.       Attention:   Derek C. Abbott, Esq.
                                                       Eric D. Schwartz, Esq.


The Plan Administrator

Avidity Partners, LLC
18 W140 Butterfield Road, 15th Floor
Oakbrook Terrace, Illinois 60181
(630) 613-7001 (facsimile)
Attention: John J. Ray, III

Counsel for the Plan Administrator

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-3999 (facsimile)
Attention: James L. Bromley, Esq.
           Lisa M. Schweitzer, Esq.

Counsel for the Creditors' Committee

Akin Gump Strauss Hauer & Feld LLP        Richards, Layton & Finger, P.A.
One Bryant Park                           One Rodney Square
New York, New York 10036                  920 North King Street
(212) 872-1002 (facsimile)                Wilmington, Delaware 19801
Attention: Fred S. Hodara, Esq.           (302) 651-7701 (facsimile)
           David H. Botter, Esq.          Attention:   Christopher M. Samis, Esq.

Counsel for the Ad Hoc Group of Bondholders

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5219 (facsimile)
Attention: Albert A. Pisa, Esq.

# V.
## CONFIRMATION OF THE PLAN

A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has scheduled the Confirmation Hearing for [●] at [●] (prevailing Eastern time) before the Honorable Kevin Gross, Judge for the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that it is received on or before [●] at [●] (prevailing Eastern time) by the Notice Parties.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

B.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan with respect to each of the Debtors only if all of the requirements of section 1129 of the Bankruptcy Code are met with respect to each such Debtor.

Among the statutory requirements for confirmation of a chapter 11 plan are that the plan is: (i) accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) in the "best interests" of creditors and interestholders that are impaired under the plan and (iii) feasible.

The Debtors believe that the Plan will satisfy all of the requirements for confirmation with respect to each Debtor.

C.    Acceptance by Impaired Classes

An impaired class of claims accepts a chapter 11 plan if the holders of at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote cast ballots in favor of the plan.

Class 4 Creditors of each Debtor may receive no cash distributions and Class 5A Interestholders and Class 5B Creditors of each Debtor will receive no distributions, in each case,

on account of their respective Claims or Interests and are therefore deemed to have rejected the Plan. With respect to Classes 4, 5A and 5B, therefore, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan if at least one of the Impaired Classes of Claims for each Debtor (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) accepts the Plan and certain additional conditions are met.

D.    Unfair Discrimination and Fair and Equitable Test

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES OF CLAIMS AND INTERESTS. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A CHAPTER 11 PLAN CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS FOR EACH DEBTOR HAS VOTED TO ACCEPT THE PLAN.

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision. Pursuant to this section, the Bankruptcy Court may confirm a chapter 11 plan notwithstanding the plan's rejection (or deemed rejection) by one or more impaired classes as long as the plan is accepted by at least one impaired class (by meeting the acceptance requirement described above), "does not discriminate unfairly," is "fair and equitable" as to each impaired class that has not accepted it and meets certain other statutory requirements.

1.    Unfair Discrimination Test

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

2.    Fair and Equitable Test

(a)    Secured Creditors

A plan is fair and equitable as to a non-accepting class of secured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code. These requirements are fulfilled if either (i) each impaired secured creditor will retain its liens securing its secured claim and will receive on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor will realize the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim will be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

88

(b)    Unsecured Creditors

Likewise, a plan is fair and equitable as to a non-accepting class of unsecured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(B) of the Bankruptcy Code. These requirements are fulfilled if (i) the non-accepting claimants will receive the full value of their claims or (ii) if the non-accepting claimants receive less than full value, no class of junior priority will receive anything on account of their pre-petition claims or interests. The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable as to each Impaired Class.

If the Plan does not meet the cramdown requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation, or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

E.    Best Interests Test

In order for a chapter 11 plan to be confirmed, the Bankruptcy Code requires that, with respect to each impaired class of creditors or interestholders, that each of such impaired creditors or interestholders either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount such class members would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. This test is imposed by section 1129(a)(7) of the Bankruptcy Code and is referred to as the "best interests" test. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find, before confirming the Plan, that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To estimate the recovery members of each Impaired Class of unsecured Creditors and Interestholders would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from each Debtor's assets if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value" of such assets). The Liquidation Value for a Debtor would consist of the net proceeds from the disposition of that Debtor's Assets and would be augmented by any Cash held by that Debtor.

As detailed in the liquidation analysis prepared by Huron from information provided by the Debtors and other sources (the "Liquidation Analysis"), a copy of which is included herein as Appendix G, the Liquidation Value of each Debtor's Assets available to general unsecured Creditors would be reduced by the costs and expenses of the liquidation, as well as other administrative expenses that would have been incurred in the hypothetical chapter 7 cases. Each Debtor's costs of liquidation under chapter 7 would include the compensation of a trustee or trustees, as well as counsel and other professionals retained by the trustee(s),

A

disposition expenses, all unpaid expenses incurred by that Debtor during its chapter 11 proceedings (such as compensation for attorneys and accountants) which are allowed in the chapter 7 proceedings, and litigation costs and claims against that Debtor arising from its business operations during the pendency of the chapter 11 proceedings and chapter 7 liquidation proceedings. These costs, expenses and claims would be paid in full out of that Debtor's liquidation proceeds before the balance would be made available to pay Unsecured Claims.

Once the percentage recoveries in liquidation of secured claimants, priority claimants, general unsecured Creditors and Interestholders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each Class of Claims and Interests under the Plan to determine whether the Plan is in the best interests of each such Class. The Debtors believe that the Plan satisfies the best interests test because, if the Plan is not confirmed and, instead, the Chapter 11 Cases are converted to chapter 7 liquidation proceedings, the value of each Debtor's estate would diminish because (i) each estate would need to pay fees and other costs to any chapter 7 trustee and (ii) each estate would incur increased professional fee costs associated with supporting the chapter 7 proceedings and associated litigation costs and claims. In addition, the Debtors' ability to realize value from the remaining assets could be impaired in a chapter 7 liquidation. Comparing the estimated recoveries set forth in Appendix C with the Liquidation Analysis included herein as Appendix G, the Debtors believe that distributions under the Plan will provide at least the same recovery to holders of Allowed Claims against or Interests in each of the Debtors on account of such Allowed Claims or Interests as would distributions by a chapter 7 trustee. Conversion of the Chapter 11 Cases to chapter 7 liquidation proceedings would also likely delay the ultimate distributions to Creditors and Interestholders.

F.    Feasibility

To confirm a chapter 11 plan, the Bankruptcy Court must find that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless and to the extent liquidation is contemplated by the plan. This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan, and therefore, that the Plan satisfies the feasibility requirement.

To demonstrate the feasibility of the Plan, the Debtors have prepared the Budgets, a copy of which is included herein as Appendix H. The Budgets indicate that the Debtors should have sufficient cash flow to fund and pay their various obligations existing and arising after the Effective Date of the Plan taking into account all completed and proposed asset sales. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement. The Debtors caution, however, that no representations can be made as to the accuracy of the Budgets. See Section VI (*Certain Risk Factors To Be Considered*) for a discussion of certain risk factors that may affect financial feasibility of the Plan.

THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE
PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF

THE LAW.  PLEASE CONSULT WITH YOUR ATTORNEY TO OBTAIN A COMPLETE
UNDERSTANDING OF THE LAW AND YOUR RIGHTS UNDER THE LAW.

A

VI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS BELOW, AS WELL AS OTHER RISKS AND UNCERTAINTIES IDENTIFIED IN THIS DISCLOSURE STATEMENT, IN THEIR ENTIRETY. SUCH RISKS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. THE ORDER IN WHICH RISK FACTORS ARE HEREIN PRESENTED DOES NOT NECESSARILY REFLECT THEIR ORDER OF IMPORTANCE.

A.    General Considerations

The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all. Please see Section IV (*Chapter 11 Plan*) and Article 4 of the Plan.

Creditors, Interestholders and other parties in interest are encouraged to read certain information in the NNC Public Filings under the respective risk factors headings contained in the NNC Form 10-K (*Part I.1.A. Risk Factors*) and each of the NNC Form 10-Qs (*Part II.1.A. Risk Factors*), which may be relevant to Solicited Creditors' consideration whether to accept or reject the Plan. Such information is not deemed to be a part of or incorporated by reference in this Disclosure Statement. Certain of such information relates to Nortel Affiliates other than the Debtors. The descriptions and discussion of Nortel Affiliates other than the Debtors and the Creditor Protection Proceedings other than the Chapter 11 Cases contained therein should be taken into consideration only to the extent necessary to evaluate the Plan, the Debtors and the Chapter 11 Cases. Please also see the Disclaimer that starts on page (i) above.

B.    Certain Bankruptcy Considerations

The Debtors are parties to various contractual arrangements under which the commencement of the Chapter 11 Cases and the other transactions contemplated by the Plan could, subject to the Debtors' rights and powers under the Bankruptcy Code (and in particular, sections 105, 362 and 365 of the Bankruptcy Code) (i) result in a breach, violation, default or conflict; (ii) give other parties thereto rights of termination or cancellation; and/or (iii) have other adverse consequences for the Debtors. The magnitude of any such adverse consequences may depend upon, among other factors, the diligence and vigor with which other parties to such arrangements may seek to assert any such rights and pursue any such remedies in respect of such matters, and the ability of the Debtors to resolve such matters on acceptable terms through negotiations with such other parties or otherwise.

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Even if the requisite acceptances are received and the requirements for

"cramdown" are met with respect to relevant Classes of Creditors and Interestholders, there can be no assurance that the Bankruptcy Court will confirm the Plan. A Creditor or Interestholder might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code and/or Bankruptcy Rules. Although the Bankruptcy Court has determined that this Disclosure Statement and the balloting procedures are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of a plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a liquidation except as contemplated by the Plan or a need for further financial reorganization and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received in a liquidation pursuant to chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case. See Section V.F (*Confirmation of the Plan — Feasibility of the Plan*).

The confirmation and consummation of the Plan are also subject to satisfaction or waiver of certain conditions. There can be no assurance that all of the various conditions to effectiveness of the Plan will be timely satisfied or waived. If the Plan were not to become effective for not meeting such conditions, it is unclear what distribution Creditors and Interestholders ultimately would receive with respect to their Claims and Interests.

If the Plan does not meet the cramdown requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed or consummated in the timeframe currently contemplated, could further adversely affect the Debtors' ability to maximize value. If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

C.    Inherent Uncertainty of Projections and Estimations

The Budgets included herein as Appendix H relating to operations of the Reorganized Debtors and their non-Debtor subsidiaries (collectively, the "Reorganized Debtor Group") are based on numerous assumptions including the timing, confirmation and consummation of the Plan in accordance with their terms, the anticipated future performance of the Reorganized Debtor Group (in light of the sale of substantially all of its businesses, other than certain intellectual property), an estimate of the Reorganized Debtor Group's allocation of

proceeds from any remaining intellectual property of the Nortel Affiliates and the resolution of litigation and other matters, many of which are beyond the control of the Reorganized Debtor Group and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement was approved by the Bankruptcy Court may affect the Reorganized Debtor Group's operations. These variations may be material. Because the actual results achieved throughout the periods covered by the Budgets may vary from the projected budgets, the Budgets should not be relied upon as a guaranty, representation or other assurance of the actual costs that will be realized.

Except with respect to the Budgets and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material effect on the information contained in this Disclosure Statement. The Reorganized Debtor Group does not intend to update the Budgets; thus, the Budgets will not reflect the effect of any subsequent events not already accounted for in the assumptions underlying the Budgets.

D.     Liquidation Analysis

The Debtors have prepared the Liquidation Analysis included herein as <u>Appendix G</u> based on certain assumptions that they believe are reasonable under the circumstances. Those assumptions that the Debtors consider significant are described in the liquidation analysis. The underlying projections have not been compiled or examined by independent accountants. The Debtors make no representations regarding the accuracy of the projections or a chapter 7 trustee's ability to achieve the forecasted results. Many of the assumptions underlying the projections are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the ultimate financial results. In the event the Chapter 11 Cases are converted to chapter 7 proceedings, actual results may vary materially from the estimates and projections set forth in the liquidation analysis. Therefore, the liquidation analysis is speculative in nature. In evaluating the Plan, Creditors, Interestholders and other parties in interest are urged to examine carefully all of the assumptions underlying the liquidation analysis.

E.     Claims Estimations

The Debtors' estimates of the distributions certain Classes of Creditors or Interestholders will receive under the Plan depend on numerous assumptions, including assumptions concerning the ultimate amount of Allowed Claims in relevant Classes.

There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from the estimates. Because the estimated amounts are based solely upon (i) a review of the Debtors' books and records, (ii) a review of the proofs of claim filed in the Chapter 11 Cases, (iii) the Debtors' estimates as to additional claims that may be filed in the Chapter 11 Cases and (iv) the Debtors' estimates of Claims that will be Allowed following the objections to Claims by the Debtors, such estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions

prove incorrect, the actual Allowed amounts of Claims may vary materially from those estimated.

Any allowance of Claims in any Class in an amount materially in excess of the Debtors' estimate could have a significant negative effect on the distributions received by certain Classes of Creditors.

F.    Distributions under the Plan

As discussed above, the Claims of Creditors are subject to the risk of dilution if the total amount of Allowed Claims is higher than the Debtors' estimates. Many Disputed Claims are material. Accordingly, the amount of the Distribution that will ultimately be received by any particular holder of a Claim may be adversely affected by the aggregate amount of all Allowed Claims. In order to account for such risk of dilution, Distributions to General Unsecured Creditors (and certain other Creditors, to the extent necessary and appropriate) of each Debtor will be made on an incremental basis until all Disputed Claims have been resolved.

A substantial amount of time may elapse between the Effective Date and the receipt of Distributions, including, but not limited to, the Distributions received on the Final Distribution Date under the Plan for certain holders of Claims because of the time required to achieve recovery of certain assets and final resolution of Disputed Claims.

G.    Conditions to Effectiveness of the Plan

The Plan becomes effective only when and if all of the conditions to its effectiveness are satisfied as provided in Section 10.2 of the Plan or waived pursuant to Section 10.3 of the Plan. Creditors, Interestholders and other parties in interest are therefore advised to read carefully the conditions listed above in Section IV.G (*Chapter 11 Plan — Conditions Precedent to Plan's Confirmation and Effective Date*) and Sections 10.2 and 10.3 of the Plan. Two of the conditions will be of particular importance to the Creditors, Interestholders and other parties in interest:

(a)    Pursuant to Section 10.2(e) of the Plan, the effectiveness of the Plan is conditioned on each relevant Debtor receiving its full and final distribution of the Allocation Proceeds. Therefore, the Plan will not become effective until after the final allocation of all the proceeds received from asset sales is determined. The Debtors and other relevant parties, including the Canadian Petitioners and the EMEA Debtors, are currently in negotiations with respect to allocation issues and related matters. However, there can be no assurance that the Debtors and other relevant parties will reach a consensual agreement with respect to the allocation of such proceeds and related matters.

(b)    Pursuant to Section 10.2(g) of the Plan, the effectiveness of the Plan with respect to each Debtor is conditioned on the effectiveness of the Plan with respect to each other Debtor. Accordingly, the failure of a condition to the effectiveness of the Plan with respect to any Debtor may prevent or delay the effectiveness of the Plan with respect to all other Debtors.

H.    Monetization of Remaining Intellectual Property

As discussed above, the Debtors and their Affiliates are in the process of considering how to maximize the return value on their remaining intellectual property assets, and the value the Debtors ultimately may realize from such assets is uncertain at this time and dependent on various factors, including, without limitation, the strategies ultimately implemented, the timing of any such transactions and the allocation of consideration among various Nortel Affiliates. In addition, it is possible that the actual value generated from any such transactions will be lower than expected or the cost to realizing value may be higher than anticipated.

I.    Greater Than Budgeted Liquidation Costs

Winding down the Debtors' estates may be more prolonged and result in greater costs than currently anticipated, as this process will require navigating complex cross-border legal and regulatory issues, disposing of the Debtors' remaining assets and, with respect to certain Reorganized Debtors, providing transition services under the TSAs. The Debtors have incurred significant costs to date for personnel and professional services. Due to the uncertainty of the effort, cost and time necessary to wind down the Debtors' estates, the future expenditures may be materially different than anticipated and may affect the ultimate value of the estates.

J.    NBS Operations

1.    TSA Costs May Exceed TSA Revenues

While the Debtors have attempted to structure the TSAs so that the revenue received by Nortel for providing services under the TSAs will equal or exceed Nortel's cost of providing such services, each relevant Reorganized Debtor's actual costs may exceed actual revenues and such Reorganized Debtor may incur a loss. The revenues received for providing services under each TSA will be distributed among the Nortel Affiliates, generally on the basis of each Affiliate's projected expenses for providing services under such TSA, but there is no formal mechanism for allocating among the Nortel Affiliates cost overruns or revenue shortfalls related to providing TSA services. Each Nortel Affiliate providing services under a TSA bears the costs of providing such services. To the extent that a Nortel Affiliate's costs of providing services under a TSA exceeds the revenue from such TSA distributed to such Affiliate, that Nortel Affiliate may incur a loss, regardless of whether the total revenue received by Nortel under such TSA exceeds the aggregate costs of the Nortel Affiliates providing services under such TSA. Nortel is generally not able, under the TSAs, to increase the amount it charges to provide services.

If a counterparty fails to make one or more payments to a Nortel Affiliate as required under a TSA, that Nortel Affiliate may incur a loss. The risk that a counterparty will fail to make a payment may increase at the end of the term of each TSA as the relevant counterparty becomes less dependent on Nortel for services.

As services terminate during the term of each TSA, revenues received under such TSA are likely to reduce faster than costs, increasing the risk that a Nortel Affiliate's costs

associated with providing services under a TSA will exceed the revenue from that TSA distributed to such Affiliate. Each TSA permits the relevant purchaser to terminate some or all services provided by Nortel under such TSA upon written notice to Nortel and NBS has plans for reducing or eliminating the costs associated with the provision of services that are being terminated. There is no guarantee, however, that NBS will be able to reduce these costs significantly and to the extent each relevant Reorganized Debtor is unable to eliminate costs associated with its provision of services that are being terminated, such entity will be responsible for such costs and may incur a loss as a result.

2.    Risks of Performance and Claims Arising under TSAs

With limited exceptions, the Nortel Affiliates that are parties to each TSA must indemnify the relevant purchaser for certain losses resulting from a breach of such TSA by such Nortel signatories, and in some cases, other losses caused by Nortel and relating to the provision of services under such TSA. Nortel's liability for damages under the TSAs is generally subject to certain limitations, typically including an overall cap of liability based on the revenues payable to Nortel under the relevant TSA, but there may be circumstances in which a higher limitation or no limitation applies. In addition, the TSAs generally require that all claims under a TSA be brought within enumerated time periods, generally ranging from 30 to 60 days, after the end of the term of the TSA. There is a risk under each TSA, even those with caps and claim deadlines, that Nortel will be required to indemnify a purchaser, and there can be no guarantee that the relevant Debtors and their Affiliates will be able to perform all required services under the various TSAs. If a Nortel Affiliate fails or refuses to perform its allocated function under one or more TSAs, such failures may cause certain Debtors to incur losses or be liable for damages under such TSAs. The relevant Debtors may be unable to perform such functions successfully or at a cost that is less than the revenue such defaulting Nortel Affiliate received for such function prior to defaulting.

In addition to any indemnity claim, a purchaser may bring other claims against Nortel Affiliates for a breach of another Nortel Affiliate's obligations to provide services under the relevant TSA. Claims also may arise among Nortel Affiliates who are providing services under TSAs, including with respect to their entitlement to be reimbursed for the costs of such services. Nortel Affiliates against whom claims are brought relating to a TSA also may seek contribution or indemnification from one or more of the Debtors and their subsidiaries, and to the extent the Debtors have such indemnification and/or contribution claims against their Affiliates, there can be no assurance that the Debtors will be able to collect such amounts.

3.    Separation and Wind Down of Operations

The Debtors intend over time to separate their operations from those of other Nortel Affiliates in anticipation of operating independently starting on the Effective Date. While the Debtors believe this separation will be successful, there is no guarantee that it will be and there may be unanticipated costs or losses associated with this separation and those costs or losses may be significant. Upon the termination of the TSAs, the Reorganized Debtors plan to downsize their NBS-related operations to reduce costs as each Reorganized Debtor's estate is wound down. Each Reorganized Debtor's actual costs associated with the termination of the TSAs and following such termination may exceed projected costs, perhaps significantly.

A

K.    Intercompany Claims and Causes of Action

Under the settlements embodied in the FCFSA and the IFSA, the Debtors (other than NN CALA) and the Canadian Petitioners have settled and waived certain intercompany claims. These waivers do not affect the Debtors' ability to pursue third parties, and non-Debtor Affiliates, on any claims, causes of action or challenges available to any of the Debtors that have not been settled by the FCFSA and the IFSA. However, if the Debtors (other than NN CALA) file certain pre-petition claims against any Canadian Debtor, the Canadian Debtors' waiver of certain intercompany claims under the FCFSA will automatically terminate; in that event, the Canadian Debtors may be able to file additional claims relating to the pre-petition period against the Debtors.

In addition, to the extent that any Debtor, Reorganized Debtor or Liquidating Debtor elects to pursue any claims, causes of action or challenges available against any other Debtor, Reorganized Debtor or Liquidating Debtor or any of their subsidiaries and prevails, then the applicable Debtor, Reorganized Debtor or Liquidating Debtor may be adversely affected.

L.    Other Creditor Protection Proceedings

Certain Affiliates of the Debtors are subject to Creditor Protection Proceedings in various jurisdictions, including, without limitation, the CCAA Proceedings, the EMEA Proceedings, the Israeli Administration Proceedings and the French Proceedings. In addition, other Affiliates of the Debtors may become subject to additional bankruptcy, insolvency or other creditor protection proceedings. There can be no assurance that the courts and other authorities in those Creditor Protection Proceedings will not make any factual finding or legal determination that may have a materially adverse effect on the Debtors' businesses (including their assets and liabilities) or the confirmation and consummation of the Plan. Similarly, there can be no assurance that the confirmation and consummation of the Plan will be fully recognized in those Creditor Protection Proceedings or that the courts and other authorities in such Proceedings will not make any factual finding or legal determination or otherwise take positions that may be inconsistent with the Plan or have a materially adverse effect on the Debtors or the Plan.

M.    Environmental Regulation

The Debtors' operations have been subject to various federal, state and local environmental laws and regulations, including those addressing air emission, wastewater discharges, hazardous substances and waste materials. The Debtors believe that they have been in substantial compliance with existing environmental laws and regulations. However, the Debtors' operations, including their past generation, management and disposal of hazardous substances and wastes, have been occasionally subject to proceedings, orders and notices of violation under environmental laws and regulations that may result in fines, penalties, sanctions or other liabilities and costs. Future changes in environmental laws and regulations may result in additional liabilities and costs beyond those currently projected.

Nortel has liabilities for remediation of contamination at one of its former sites and has been listed as a potentially responsible party at certain Superfund sites, and the Debtors may need to contribute to such remediation costs. Additional sites for which the Debtors have

remediation liability may be identified in the future. The Debtors' ultimate liability in connection with such remediation will depend on many factors. For more information, please see Section III.E.5 (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Certain Other Post-petition Operations of the Debtors and Other Nortel Affiliates — Environmental Matters*).

N.    Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan. Creditors and other interested parties should read carefully the discussion set forth in Section VII (*Certain U.S. Federal Income Tax Considerations*) for a discussion of certain federal income tax consequences of the transactions contemplated under the Plan.

VII.

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

A.    In General

The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan. This summary is based on the IRC, U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

The following summary is for general information only. The tax treatment of a beneficial owner of Claims (each a "Holder" and collectively, the "Holders") may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan; Holders that are non-U.S. persons or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities; Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; Holders that have a "functional currency" other than the United States dollar; and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY APPENDICES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

B.      U.S. Federal Income Tax Consequences to the Debtors

1.      Cancellation of Debt and Reduction of Tax Attributes

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in the debtor's income. Settlement of a guarantee should not give rise to COD.

The Debtors should be able to utilize a special tax provision which excludes from income COD income attributable to debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under section 108(b) of the IRC and Treasury regulations that apply to members of a consolidated group, each Debtor that does not include COD income in computing taxable income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as net operating losses (and consolidated net operating losses in the case of Debtors that are in the NNI Consolidated Group) and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Debtor; attributes that arose in separate return limitation years of such Debtor (if any); and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception. In the case of Debtors that are members of the NNI Consolidated Group, a "look-through rule" applies when asset basis

reduction reduces the basis of stock of another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Debtors believe that, to the extent the Debtors have any remaining net operating losses ("NOLs") and tax credit carryforwards after taking into account gains from the 363 Sales that closed in 2009 and 2010, and any income or gain resulting from implementation of the Plan, such remaining NOLs and tax carryforwards (and alternative minimum tax NOLs) of the Debtors should be eliminated as of the end of the taxable year which includes the Effective Date of the Plan.

2.    Taxable Income Resulting From 363 Sales

The 363 Sales are expected to trigger income or gain recognition by the Debtors. However, the Debtors will not be able to determine the amount of such income or gain with certainty, and consequently will not be able to finally determine the U.S. federal income tax, if any, attributable to the 363 Sales, until the final allocation of sale proceeds is determined. Under the Plan, the Effective Date will not occur until after the final allocation of sale proceeds is determined. Therefore, the Debtors' existing NOLs and tax credit carryforwards (prior to being reduced as a result of any attribute reduction resulting from COD Income under the Plan) should generally first be available to offset such income or gain. Based on the amount of the Debtors' NOLs and other tax attributes, and subject to the discussion in Section VII.B.3 (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to the Debtors — Intellectual Property Assets*), the Debtors do not anticipate owing significant regular U.S. federal income tax with respect to the 363 Sales for taxable years ending after the Initial Petition Date, aside from potential alternative minimum tax liability arising as a result of the Debtors' use of its NOL carryforwards from prior years to offset such income or gain, as described below. However, under certain assumptions about the allocation of proceeds from the 363 Sales, the Debtors may incur regular U.S. federal income tax. Additionally, if the IRS were to prevail in assessing U.S. federal income tax for taxable years ending after the Initial Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

A corporation or a consolidated group of corporations may incur alternative minimum tax ("AMT") liability even where an NOL is generated for regular corporate income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate income tax. In general, the AMT is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL carryforwards (as computed for AMT purposes). At this time the Debtors expect to incur some amount of AMT resulting from its utilization of NOL carryforwards to offset items of income and gain from the 363 Sales that closed during the 2009 and 2010 taxable years.

3.    Intellectual Property Assets

Nortel is still in the process of developing a plan for the maximization of value realizable from its residual patent portfolio, and is considering various options as described in Section III.D.16 (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Post-petition Sales and Other Dispositions of Assets — Remaining Intellectual Property Assets*). The Debtors may incur taxable income in connection with a disposition of intellectual property assets, or the ongoing operation of an intellectual property company, although the amount and timing of such taxable income will vary depending on the nature and timing of the plan of disposition, and the amount realized therefrom.

4.    Limitation of NOL Carryforwards and Other Tax Attributes

Under section 382 of the IRC ("Section 382"), if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (*i.e.*, economically accrued but unrecognized) as of the date of the ownership change) and tax credits that may be utilized to offset future taxable income generally is subject to an annual limitation.

Notwithstanding the general rule, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

The Debtors do not expect to have NOL carryovers and other tax attributes available on the Effective Date, as a result of giving effect to income from the 363 Sales and other items of taxable income prior to the Effective Date. Moreover, to the extent the Debtors have NOL carryovers and other tax attributes available on the Effective Date, the Debtors do not expect to have any such NOL carryovers or other tax attributes remaining after implementation of the Plan, as a result of attribute reduction resulting from the Debtors' COD income excluded under the Bankruptcy Exception. Therefore, the Debtors could incur a federal income tax liability in connection with any income earned, including through the liquidation of the Debtors' remaining assets, if any, or the operation of a licensing entity after the Effective Date.

However, the amount of such NOL carryovers and other tax attributes that could be available following the Effective Date is based on a number of factors and it is impossible to determine with certainty at this time whether any NOL carryovers and other tax attributes will be available after emergence. Some of the factors that will affect the amount of available NOL carryovers and tax attributes include: (i) the amount of taxable income incurred by the Debtors as a result of the 363 Sales and implementation of the Plan, (ii) the consummation of any additional asset sales prior to the Effective Date and (iii) the amount of COD income incurred by the Debtors, if any, in connection with the Plan.

If the Debtors have any NOL carryovers and other tax attributes available as of the Effective Date, the following results should occur. Based on a historical Section 382 analysis

103

of the changes in the Debtors' stock ownership, as well as the order entered by the Bankruptcy Court effective January 14, 2009, as amended, imposing certain restrictions on the trading of interests in the Debtors' equity, the Debtors believe that no ownership change under Section 382 has occurred to date, nor will occur prior to the Effective Date, that would limit the availability of such NOL carryovers and other tax attributes to offset taxable income. Moreover, pursuant to the Plan, the current holders of NNI Interests will maintain their economic interests in any residual assets of NNI after the satisfaction of all Allowed Claims, which economic interests will be nontransferable. Accordingly, the Debtors do not believe that an ownership change of NNI will occur on the Effective Date of the Plan. Nevertheless, due to a lack of direct authoritative guidance in the context of a liquidating chapter 11 plan, and to circumstances beyond the control of the Debtors, there is no assurance that an ownership change would not occur, or that the IRS would not take a contrary position. If, notwithstanding the Debtors' position, an ownership change were considered to occur, the Debtors' expect they would be unable to use any NOL carryovers or other tax attributes remaining as of the Effective Date (to the extent any exist). In such a case, the Debtors could incur a federal income tax liability in connection with the liquidation of the Debtors' remaining assets or the operation of a patent licensing entity after the Effective Date.

C.    Disputed Claims Reserve

The Plan Administrator may create one or more reserve accounts for Cash held on account of Disputed Claims. Under the IRC, interest and other income earned on such accounts are subject to current tax. However, the U.S. Treasury Department has not issued Treasury regulations to address the U.S. federal income tax treatment of such funds that specifically applies in a bankruptcy context. Accordingly, the proper tax treatment of such funds is uncertain. Distributions from the Disputed Claims Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed and to other Holders when Disputed Claims are subsequently disallowed. The Debtors intend to treat the Disputed Claims Reserve as a disputed ownership fund, taxable as a separate entity for U.S. federal income tax purposes. Under such treatment, the Plan Administrator shall file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and shall pay the federal, state and local income taxes attributable to the Disputed Claims Reserve using Cash available in the Disputed Claims Reserve, based on the items of income, deduction, credit or loss allocable thereto.

Holders should note the tax treatment of the Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve.

D.    U.S. Federal Income Tax Consequences to Holders of Claims

1.    Generally

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the

104

Allowed Claim exchanged (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, please see Section VII.D.4 (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims — Interest Income with Respect to Allowed Claims*). When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and is held for more than one year. Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

2.      Holders of Allowed General Unsecured Claims

A Holder of Allowed General Unsecured Claims of a Debtor as of the Effective Date should be treated as receiving from that Debtor the Holder's share of the Creditor Proceeds (net of any applicable liabilities) of the relevant Class after distributions to Holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims of that Debtor in satisfaction of those Holders' Allowed Claims. Accordingly, a Holder of such a Class 3 Claim should generally recognize gain or loss in an amount equal to the amount of Cash received in the exchange (as described above) less the adjusted tax basis of its Claim. It is possible that any loss, or a portion of the gain, realized by a Holder may be deferred until all of the distributions to such Holder are received. As discussed in Section VII.D.4 (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims — Interest Income with Respect to Allowed Claims*), the amount of Cash received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a Holder under his or her method of accounting.

Because a Holder's ultimate amount realized in exchange for its Allowed Class 3 Claim may be increased after the Effective Date due to the existence of Disputed Claims, such Holder should recognize additional or offsetting gain if, and to the extent that, the aggregate amount of cash ultimately received by such Holder is greater than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. Because, as discussed in Section VII.D.3 (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims — Holders of Disputed Claims*) the treatment of the Disputed Claims Reserve is unclear, it is unclear when a Holder of an Allowed General Unsecured Claim of any Debtor should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim, (ii) the tax status of the Holder of the Claim, (iii) whether the Claim has been held for more than one year, (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on

105

the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

3.    Holders of Disputed Claims

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the assets of the Debtors are transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. Holders of Disputed Claims should note the tax treatment of the Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve.

4.    Interest Income with Respect to Allowed Claims

Pursuant to Section 8.3 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

E.    Backup Withholding and Information Reporting

Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate. Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's

claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS. NONE OF THE DEBTORS, THE CREDITORS' COMMITTEE OR THEIR RESPECTIVE COUNSEL, ADVISORS OR OTHER PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

VIII.

ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan affords holders of Allowed Claims the potential for the greatest realization of the Debtors' assets and, therefore is in the best interests of such holders. If, however, the requisite acceptances are not received, or the requisite acceptances are received but the Plan is not confirmed and consummated, the theoretical alternatives include: (a) confirmation of another chapter 11 plan; (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (c) dismissal of the Chapter 11 Cases leaving Creditors and Interestholders to pursue available non-bankruptcy remedies.

These alternatives to the Plan are very limited and not likely to benefit creditors. Although the Debtors could theoretically file a new plan, the most likely result if the Plan is not confirmed is that the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code. The Debtors believe that conversion of the Chapter 11 Cases to chapter 7 cases would result in (i) significant delay in distributions to all Creditors and Interestholders who would have received a distribution under the Plan and (ii) diminished recoveries for certain Classes of Creditors. If the Chapter 11 Cases are dismissed, Creditors and Interestholders would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against each respective Debtor. However, in that event, Creditors and Interestholders would be faced with the costs and difficulties of attempting, each on its own, to collect claims from, depending upon the Debtor, a Debtor with very limited or no operations.