| | | |
|---|---|---|
| | | Ltd., as may be amended, supplemented or modified from time to time [Docket No. 539]. |
| | 2. | Order Authorizing and Approving (A) Bidding Procedures, (B) Break-Up Fee and Expense Reimbursement, (C) Notice Procedures, (D) Assumption and Assignment Procedures (E) Filing of Certain Schedules Under Seal and (F) Setting Time, Date and Place for Sale Hearing, entered by the Bankruptcy Court on February 27, 2009, as may be amended, supplemented or modified from time to time [Docket No. 386]. |
| **MEN Sale** | 1. | Order Authorizing and Approving (A) Sale of Certain Assets of the Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Executory Contracts, entered by the Bankruptcy Court on December 3, 2009 approving the sale of the Metro Ethernet Networks business to Ciena Corporation, as may be amended, supplemented or modified from time to time [Docket No. 2070]. |
| | 2. | Order Pursuant to Bankruptcy Code Sections 105, 363 and 365 (A) Authorizing Debtors' Entry Into The Stalking Horse Asset Sale Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving The Notice Procedures And The Assumption And Assignment Procedures, (D) Authorizing The Filing Of Certain Documents Under Seal And (E) Setting A Date For The Sale Hearing, entered by the Bankruptcy Court on October 16, 2009, as may be amended, supplemented or modified from time to time [Docket No. 1685]. |
| | 3. | Order Approving The Metro Ethernet Networks Side Agreement And Granting Related Relief, entered by the Bankruptcy Court on March 3, 2010, as may be amended, supplemented or modified from time to time [Docket No. 2627]. |
| | 4. | Order (A) Authorizing The Debtors To Accept The Metro Ethernet Networks Argentina Side Offer And (B) Granting Related Relief, entered by the Bankruptcy Court on April 13, 2010, as may be amended, supplemented or modified from time to time [Docket No. 2872]. |
| | 5. | Order Approving The Engagement Of Grant Thornton LLP Nunc Pro Tunc To February 26, 2010 As Neutral TSA Arbitrator In Connection With The Sale Of Certain Metro Ethernet Networks Business Assets, |

A                                                                                                    TR11359

<table>
<tr>
<td></td>
<td></td>
<td>entered by the Bankruptcy Court on April 13, 2010, as may be amended, supplemented or modified from time to time [Docket No. 2873].</td>
</tr>
<tr>
<td></td>
<td>6.</td>
<td>Order To Add Certain Additional Debtors As Sellers In The Sale Of The Debtors' Metro Ethernet Networks Business To Ciena Corporation, entered by the Bankruptcy Court on February 26, 2010, as may be amended, supplemented or modified from time to time [Docket No. 2562].</td>
</tr>
<tr>
<td></td>
<td>7.</td>
<td>Order (A) Approving The Assumption And Assignment Of Certain Additional Executory Contracts Pursuant To The Sale Of The Debtors' Metro Ethernet Networks Business And (B) Authorizing The Debtors To File Information Under Seal, entered by the Bankruptcy Court on January 21, 2010, as may be amended, supplemented or modified from time to time [Docket No. 2314].</td>
</tr>
<tr>
<td>Next Generation Sale</td>
<td>1.</td>
<td>Order Authorizing and Approving Sale of Debtors' Next Generation Packet Core Components Free and Clear of All Liens, Claims and Interests, entered by the Bankruptcy Court on October 28, 2009 approving the sale of assets associated with the Next Generation Packet Core network components to Hitachi, Ltd., as may be amended, supplemented or modified from time to time [Docket No. 1760].</td>
</tr>
<tr>
<td></td>
<td>2.</td>
<td>Order Authorizing and Approving (I) Sale Procedures, (II) Notice Procedures, and (III) Setting a Date for Sale Hearing, entered by the Bankruptcy Court on September 30, 2009, as may be amended, supplemented or modified from time to time [Docket No. 1584].</td>
</tr>
<tr>
<td></td>
<td>3.</td>
<td>Order (A) Approving Debtors' Entry Into The Next Generation Packet Core Network Components Escrow Agreement And (B) Granting Related Relief, entered by the Bankruptcy Court on December 3, 2009, as may be amended, supplemented or modified from time to time [Docket No. 2062].</td>
</tr>
<tr>
<td></td>
<td>4.</td>
<td>Order To Amend The Intellectual Property License Agreement And Transition Services Agreement in the Sale of the Debtors' Next Generation Packet Core Network Components to Hitachi, entered by the Bankruptcy Court on May 24, 2010, as may be amended, supplemented or modified from time to time [Docket No. 3049].</td>
</tr>
</table>

**Exhibit D**

**Foreign Proceedings**

1.     **CCAA Proceedings or Canadian Proceedings** means the proceedings relating to the Canadian Petitioners currently pending before the Ontario Superior Court of Justice.

2.     **French Proceedings** means the secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for Nortel Networks S.A.

3.     **Israeli Administration Proceedings** means the administration proceedings of the Nortel Networks Israel (Sales and Marketing) Limited and its subsidiaries commenced on January 19, 2009 pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.

4.     **U.K. Proceedings** means the administration proceedings of the EMEA Debtors commenced on January 14, 2009 in the High Court of England and Wales, pursuant to the Insolvency Act 1986.

5.     Any other insolvency or similar proceeding filed after the Petition Date in a jurisdiction other than the United States involving an Affiliate of the Debtors.

A

TR11359

**Exhibit E**

<u>**Assumed Executory Contracts**</u>

**[TO COME]**

A                                                                                          TR11359

## Appendix C

### Estimated Recoveries

[to be filed]

A                                                                    TR11359

## Appendix D-1

### Current Structure Chart of Selected Nortel Affiliates

[to be filed]

A                                                                                                    TR11359

# Appendix D-2

## Post-Effective Date Structure Chart of the Debtors

[to be filed]

A

## Appendix E

### List of Directors and Officers of the Debtors

[to be filed]

E-1

# Appendix F

### Unaudited Condensed Combined Financial Statements and Index Thereto

[to be filed]

A

TR11359

## Appendix G

### Liquidation Analysis

[to be filed]

## Appendix H

### Budgets and Cost Analyses

[to be filed]

H-1

A

TR11359

A

TR11359

TR11359



A/C                                                                                           TR21540

EXHIBIT
21540
12-5-13

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------X

*In re*                                          :        Chapter 11

Nortel Networks Inc., *et al.*,[1]               :        Case No. 09-10138 (KG)

                          Debtors.               :        Joint Administration Pending

                                                 :

---------------------------------------------------X

## DECLARATION OF JOHN DOOLITTLE, VICE PRESIDENT OF NORTEL
## NETWORKS INC. IN SUPPORT OF CHAPTER 11 PETITIONS
## AND FIRST DAY MOTIONS

I, John Doolittle, do hereby declare as follows:

1.      I am Vice President of Nortel Networks Inc. ("NNI"), a corporation

organized under the laws of Delaware. I also serve as a Vice President of the other above-

captioned debtors (collectively with NNI, the "Debtors" or the "U.S. Debtors") in these cases

filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2] I am

generally familiar with the day-to-day operations of the Debtors and their affairs, books and

records.

2.      On the date hereof (the "Petition Date"), the Debtors filed their voluntary

petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the District of Delaware. The Debtors are operating their businesses and managing

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc.
(9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera
Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel
Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and
Nortel Networks Cable Solutions Inc. (0567).

1

CCC0031058

CCC0031058

their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

        3.      The Debtors are all direct or indirect subsidiaries of Nortel Networks

Corporation ("NNC"), a corporation organized under the laws of Canada. I also serve as the

Treasurer of NNC. Concurrently with these chapter 11 cases, NNC, Nortel Networks Limited

("NNL") and other affiliated Canadian corporations (collectively, the "Canadian Debtors")[3] are

seeking insolvency protection under the Companies' Creditors Arrangement Act (the "Canadian

Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian

Court"). A proposal will be presented to the Canadian Court that Ernst & Young Inc. be

appointed to serve as the monitor (the "Monitor") and foreign representative of the Canadian

Debtors, and the Monitor is currently seeking recognition of the Canadian Proceedings in this

Court under chapter 15 of the Bankruptcy Code. Additionally, certain of Nortel's European

subsidiaries will make consequential filings for creditor protection. Together, the Debtors, the

Canadian Debtors and certain of their non-debtor affiliates operate an integrated, multinational

business, providing networking and communications technology and services to customers in the

United States, Canada and around the world. Attached as Schedule 1 is a chart summarizing the

Debtors' corporate organization.

        4.      To minimize the adverse effects of filing for bankruptcy protection on

their businesses, the Debtors have requested various types of "first day" relief (collectively, the

"First Day Motions"). The First Day Motions seek relief intended to allow the Debtors to

perform and meet those obligations necessary to fulfill their duties as debtors-in-possession. I

---

[3]    The Canadian Debtors include: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks
Global Corporation and Nortel Networks International Corporation.

CCC0031059

CCC0031058

am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estates and creditors' interests.

        5.     I submit this declaration in support of the First Day Motions and pursuant to 28 U.S.C. § 1746. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

        6.     Part I of this declaration describes the Debtors' businesses, their capital structure and the circumstances surrounding the commencement of these chapter 11 cases. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

I

**BACKGROUND**

**Nortel's History**

        7.     The name Nortel is known throughout the world for leadership in the networking and communications industries. With over 110 years of experience, the Nortel Companies (as defined below) work closely with their service provider and enterprise customers

3

CCC0031060

CCC0031058

in the United States, Canada, Central and Latin America, Europe, the Middle East and Africa, and Asia to deliver them cutting edge hardware and software solutions and related services.

8.      The Nortel Companies trace their heritage to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited ("Northern Electric") as an equipment provider for Canada's telephone system. Over the following century, Northern Electric grew into Northern Telecom and eventually Nortel, gaining a well-deserved reputation for innovation and creativity through the development of ground-breaking technology -- including many industry firsts -- in such fundamental technologies as digital, optical, wireless, internet protocol, voice-over internet protocol, broadband, multimedia, and ethernet. Through substantial research and development ("R&D") initiatives and external R&D partnerships, the Nortel Companies continue to invest in the development of next-generation technologies to deliver value to their customers around the world.

9.      From the mid-1980s to 2000, the Nortel Companies expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age. From its Canadian base, North American operations were expanded into the United States with the establishment of production and R&D facilities, resulting in an increase in the number of U.S.-based employees and the creation of a large customer base in the U.S. At the same time, the Nortel Companies moved aggressively into Europe, Asia, Africa and Latin America, becoming a truly global enterprise.

10.     In 1998, the name Nortel Networks was first officially adopted in recognition of the continuing transformation of the companies' business. In 2000, BCE Inc., the

4

CCC0031061

CCC0031058

parent company of Bell Canada, spun-off substantially all of its shareholdings in Nortel through

a statutory reorganization transaction, with the result that NNC became the ultimate parent entity

of the Nortel Companies, and NNL became its principal Canadian operating subsidiary. NNC

and its predecessors have been a public company in Canada for many decades, listed on the

Toronto Stock Exchange, and became a public company in the United States in 1975, listed on

the New York Stock Exchange. Notwithstanding the fact that NNC and NNL are non-U.S.

companies, they nevertheless report on the same basis as U.S. domestic companies because

neither NNC nor NNL meets all the requirements of a "foreign private issuer" pursuant to Rule

3b-4 under the U.S. Securities Exchange Act of 1934, as amended.

### The Dot Com Bust and Nortel's Restatements

11.    At its peak in 2000, the Nortel Companies reported approximately $30

billion of annual revenue, employed nearly 93,000 employees, and had a market capitalization

(for NNC) of over $250 billion. With the burst of the high-tech bubble in early 2001 and the

resulting significant downturn in both the telecommunications industry and the economic

environment, the Nortel Companies began to face an increasingly difficult competitive

environment. After a long period of expansion, the capital expenditure levels of many customers

began to decrease substantially in 2001. Also, R&D costs continued to expand during 2001 as

the Nortel Companies and its competitors scrambled to predict and adjust to the rapidly changing

technological landscape.

12.    Since 2001, the Nortel Companies have taken a wide range of steps to

right-size their businesses, increase efficiency, cut costs and focus on building on their

substantial franchise in potentially high-growth and high-margin areas. Among the most

significant steps taken have been a series of restructurings as principally announced in 2001,

5

CCC0031062

CCC0031058

2004, 2006, 2007 and 2008 that have reduced the number of worldwide employees from more than 90,000 to about 30,000. These restructurings have included (a) the outsourcing of nearly all manufacturing and production to a number of key suppliers, including, most importantly, Flextronics Telecom Systems Ltd. and its affiliates; (b) the substantial consolidation of key R&D expertise in Canada and China; (c) decisions to dispose of or exit certain non-core businesses, such as the sale of Nortel's United Mobile Technology System business unit; (d) the creation and/or expansion of joint venture relationships (such as with LG Electronics, Inc. of Korea and Guandong-Nortel Telecommunications Equipment Company Limited of China); (e) establishing alliances with various large organizations; (f) real estate optimizations, including the sale of the Company's former headquarters in Brampton, Ontario, Canada; and (g) the continued reorientation of the Nortel Companies from a traditional supplier of telecommunications equipment to a global leader in cutting edge networking hardware and software solutions.

13.      At the same time, the Nortel Companies worked tirelessly to meet the challenges presented in the aftermath of the tech bust and, beginning in 2003, to address the significant issues that arose when a number of accounting irregularities came to light. These irregularities, which primarily involved practices relating to the improper booking of revenue and establishment and release of accrued liabilities, led to regulatory, civil and criminal investigations, and the discovery of certain material weaknesses in internal control over financial reporting ultimately resulted in four successive restatements of the consolidated financial statements of the Nortel Companies for the fiscal years 2000 through 2005 and certain interim periods, the termination of a number of high-ranking executives for cause, the replacement of the then-incumbent CEO, CFO and Controller and the senior finance management team, and a complete revamping of control processes. The restatements also triggered substantial

6

CCC0031063

CCC0031058

shareholder litigation in Canada and the United States, all of which was settled in 2006 for cash of $575 million and NNC common shares valued at $1.6 billion. Since 2005, Nortel has established a new senior executive leadership team with key external hires and internal promotions, entered into settlements with the Ontario Securities Commission and the U.S. Securities and Exchange Commission and confirmed that it is not the subject of the ongoing criminal investigations. In addition, Nortel remediated its material weaknesses and returned to timely financial reporting.

## The Chapter 11, CCAA and European Filings

14.    The Nortel Companies operate in a highly competitive environment. The networking solutions industry is characterized both by industry rationalization as well as consolidation. By way of example, two of Nortel's largest competitors, Lucent Technologies Inc. and Alcatel, merged in 2006 and two of its largest customers, Verizon Wireless and Alltel Corporation, merged in 2008. Simply put, the competition for market share is fierce, and the cost of rapid technological development is steep.

15.    In recent years, the operating costs of the Nortel Companies have generally exceeded revenues, resulting in negative cash flow. A number of factors have contributed to these results, including competitive pressures, an inability to reduce operating expenses fast enough, the incurrence of costs related to restructuring efforts, significant competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments and the poor state of the global economy. These difficulties have increased materially in recent months as global economic conditions have dramatically worsened. The Nortel Companies are experiencing significant pressure on their businesses and facing a deterioration of their cash and liquidity, globally as well as on a regional basis, as

7

CCC0031064

CCC0031058

customers across all businesses delay and reduce their capital expenditures. In particular, the extreme volatility in the global markets has hampered the ability to accurately forecast future revenue and cash position.

16.    After Nortel announced in 2004 the need to restate prior period financial results, Standard & Poor's Corporation ("Standard & Poor's") and Moody's Investors Service, Inc. ("Moody's") reduced the Nortel credit ratings to below investment-grade. As a result, the Nortel Companies were unable to access the commercial paper market and were limited in their access to the capital markets. For several years, the Nortel Companies were only able to raise high yield/convertible debt and did not have any revolving credit or other bank lines.

17.    Current market conditions have further restricted Nortel's ability to access the capital markets, which has been compounded by recent actions taken by rating agencies with respect to its credit ratings. In September 2008, Standard & Poor's revised its outlook on Nortel from positive to stable, and Moody's revised its outlook on Nortel from stable to negative. In November 2008, Standard and Poor's changed its outlook to negative. In December 2008, Moody's issued a downgrade of Nortel's corporate family rating from B3 to Caa2. The actions of the rating agencies also jeopardize the ongoing relationship between the Nortel Companies and Export Development Canada ("EDC," Canada's federal export credit agency, which provides financing support to Canadian exporters). EDC provides a support facility that backstops certain letters of credit and performance bonds and the recent Moody's downgrade gives EDC a right to suspend additional support under the facility. A 30-day waiver was granted by EDC on December 15, 2008. On January 18, 2009, EDC and Nortel entered into a subsequent agreement for 30 days that provides Nortel access to a maximum of up to $30 million of additional support under the facility during this period, to allow EDC and Nortel to work

8

CCC0031065

CCC0031058

together to see if a longer term arrangement, acceptable to both parties, can be reached. The agreement is subject to the condition that any support granted by EDC post-filing under the EDC Support Facility, as it may be amended from time to time, is secured by a second charge over all the assets of the Canadian Debtors, subject only to the Administrative Charge (other than the Carling Facility, where the charge will be a third ranking charge). The potential termination of the EDC Support Facility would be very damaging to the Debtors' businesses.

18.    In November 2008, Nortel announced a new operating model that will consolidate executive and management personnel across the global organization and transition the company to vertically-integrated business units. In addition, Nortel announced a further restructuring plan which provides for a net reduction in global workforce of approximately 1,300 positions as well as additional cost cutting measures. The November workforce reduction was the second of the year, with total 2008 announced job reductions of 3,500.

19.    It has become increasingly clear that the struggle to reduce operating costs during a time of decreased customer spending and massive global economic uncertainty has put substantial pressure on Nortel's liquidity position globally, and in particular in North America. With no current access to the capital markets, the prospects of the capital markets opening up in the near term being very dim, substantial interest carrying costs on over $4 billion of unsecured public debt, and significant pension plan liabilities that are expected to increase in a very substantial and material manner principally due to the adverse conditions in the financial markets globally, it has become imperative for the Nortel Companies to protect their current cash positions.

20.    Against this background, Nortel has been assessing its projected liquidity position, particularly taking into account its highly leveraged debt position, downgraded credit

9

CCC0031066

CCC0031058

ratings and significant practical limitations given its existing high cost structure on accessing the

cash position of Nortel Companies in certain regions. After exploring all possible alternatives,

Nortel has concluded that, in the absence of seeking creditor protection, in later portions of this

year there is a significant risk it would have insufficient cash resources on a regional basis and

would likely be unable to remedy this deficit position through third-party financing. Nortel has

further determined that a number of factors relating to its high cost structure liabilities raise

serious impediments to its ability to continue operations absent a fundamental financial and

business restructuring that can most effectively and quickly be achieved within the framework of

bankruptcy and insolvency proceedings in multiple jurisdictions. As a consequence, Nortel has

determined that it will not make payment of its regularly scheduled interest due January 15, 2009

on its outstanding public debt and will seek creditor protection under the respective restructuring

regimes of Canada, the United States and certain EMEA subsidiaries.

        21.      Therefore, in light of the foregoing, on January 14, 2009, NNI, NNCC,

Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Architel Systems (U.S.)

Corporation, Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks

Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel

Networks HPOCS Inc., Nortel Networks International Inc., Northern Telecom International Inc.

and Nortel Networks Cable Solutions Inc. filed voluntary petitions for relief under chapter 11 of

the Bankruptcy Code with this Court. Also, on January 14, the Canadian Debtors will

commence the Canadian Proceedings and it is anticipated that certain of Nortel's European

subsidiaries will make consequential filings for creditor protection (collectively, the "EMEA

Debtors"). Pursuant to section 18.6 of the CCAA, NNI will also bring an application before the

Canadian Court for recognition of the automatic stay imposed by the filing of the U.S. Debtors'

10

CCC0031067

CCC0031058

bankruptcy petitions. Applications will be made to this Court under chapter 15 of the Bankruptcy Code for recognition of the Canadian Proceedings as foreign main proceedings by Ernst & Young Inc. as foreign representative for the Canadian Debtors.

### Corporate Structure

22.     The Nortel Companies consist of NNC, the ultimate parent company; NNL, NNC's principal Canadian operating subsidiary; NNI, a Delaware corporation and the principal U.S. operating subsidiary (and a direct subsidiary of NNL); NNCC, a Delaware corporation and a finance company with public debt; and over 140 affiliates around the world (together, the "Nortel Companies"). NNC's most significant assets consist of its investments in its direct and indirect subsidiaries. NNC and NNL are both incorporated under the Canada Business Corporations Act (the "CBCA"). As set forth in NNC's 2008 third quarter report, NNC has, as of September 30, 2008, consolidated assets of approximately $11.6 billion and consolidated liabilities of approximately $11.8 billion.

23.     The Nortel Companies' U.S. businesses are primarily conducted through NNI, which is the direct or indirect parent of a majority of the U.S. Nortel Companies, including U.S. Debtors. NNCC is a financing company with few assets and has no operations of its own. As of September 30, 2008, NNI had assets of approximately $9 billion and liabilities of approximately $3.2 billion, which liabilities do not include liabilities relating to NNI's guarantee of some or all of the Nortel Companies' approximately $4.2 billion of unsecured public debt. Each of NNC, NNL, NNI and NNCC is an issuer and/or guarantor of some or all of the Nortel Companies' approximately $4.2 billion of unsecured public debt.

24.     In addition to the Debtors, Nortel has other U.S. subsidiaries, most of which either have no material assets or business in the U.S. or are in the process of being wound-

11

CCC0031068

CCC0031058

A/C                                                                                                       TR21540

down. Several entities, particularly Nortel Government Solutions Incorporated ("NGS") and

Nortel Networks (CALA) Inc., have material operations and are not part of these proceedings.

None of these other U.S. subsidiaries has commenced chapter 11 proceedings at this time.

     25.    The Nortel Companies also include NNL's and NNC's active subsidiaries

located in Europe, the Middle East and Africa (collectively, the "EMEA Entities"). The majority

of the EMEA Entities are subsidiaries of Nortel Networks UK Limited ("NN UK), with the

exception of (a) Nortel Networks SA ("NN France"), which is jointly owned by NNL and Nortel

International Finance & Holding BV ("NNIF"), and Nortel Networks France SAS ("NN France

SAS"), which is a subsidiary of NN France; and (b) Nortel Networks (Ireland) Limited ("NN

Ireland"), which is a wholly owned subsidiary of NNL for fiscal reasons. NN UK is the largest

business of the EMEA Entities and is the headquarters for the EMEA region.

### Nortel's Business

*Global Integrated Business Model*

     26.    The Nortel Companies' businesses are highly complex and global in

nature. As set forth in more detail below, the U.S. Debtors, the Canadian Debtors, the EMEA

Debtors and their debtor and non-debtor affiliates employ a global integrated business model. In

particular:

- The main operating subsidiaries around the world operate in each of Nortel's four main business segments.

- Nortel has substantially outsourced its manufacturing, relying on contract manufacturers with affiliates across the world to supply the Nortel Companies globally.

- The Nortel Companies employ a complex internal purchasing system where sales orders are placed at the local, in-country level, and internal purchase orders are routed to one of four purchasing hubs (located in four separate countries), which entities place orders with suppliers around the world.

12

CCC0031069


CCC0031058

- The Nortel Companies use a complex transfer pricing model, periodically submitted to global taxing authorities for approval, to allocate costs and revenues throughout the global enterprise and ensure the proper allocation of tax payments among relevant jurisdictions.

- Nortel's integrated business model is financed through a complex intercompany cash management system that itself is integrated with Nortel's sales, purchasing, supply and distribution networks.

- Nortel employees around the world share responsibility for the R&D, sales and operations of the global enterprise.

### Nortel's Business Segments

27.     As of December 31, 2008, the Nortel Companies had four main business segments – (1) Carrier Networks ("Carrier"); (2) Enterprise Solutions ("Enterprise"); (3) Metro Ethernet Networks ("MEN"); and (4) Global Services.

28.     **Carrier**.  The Carrier segment provides wireless networking solutions that enable service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises using mobile telephones, personal digital assistants, and other wireless computing and communications devices.

29.     **Enterprise**.  The Enterprise segment provides communication solutions that are used to build new networks and transform existing communications networks into more cost effective, packet-based networks supporting data, voice and multimedia communications.

30.     **MEN**.  The MEN segment provides optical networking and carrier grade Ethernet data networking solutions to make the carrier and large enterprise customers' networks more scalable and reliable for the high-speed delivery of diverse multimedia communications services.

31.     **Global Services**.  The Global Services segment provides a broad range of services and solutions supporting the entire lifecycle of multi-vendor, multi-technology networks

13

CCC0031070

CCC0031058

for enterprises and carriers worldwide seeking to reduce costs, improve efficiency and performance and capitalize on new revenue opportunities.

32.     With certain exceptions, the business segments are not segregated by legal entities but are operated across various legal entities. One such exception is NGS, which has been reported historically under "Other" in Nortel's business segments.

33.     On January 1, 2009, Nortel implemented a new operating model, which decentralized several of its corporate functions and transitioned to vertically-integrated business units to give greater financial and operational control to the business units and reduce duplication. Enterprise customers are now served by the Enterprise business unit, which is responsible for product and portfolio development, R&D, marketing and sales, partner and channel management, strategic business development and associated functions. Service provider customers are served by two business units with full responsibility for all product, services, applications, portfolio, business and market development, marketing and R&D functions: Carrier and MEN. A dedicated global carrier sales organization supports both business units.The Global Services and Global Operations organizations will be decentralized and transitioned to the business units by April 1, 2009 to ensure there is no impact to customer service. Beginning January 1, 2009, Nortel includes services revenue in the respective financial results for Enterprise, Carrier and MEN.

34.     The Global Services and Global Operations organizations will be decentralized and transitioned to the business units by April 1, 2009 to ensure there is no impact to customer service. Beginning January 1, 2009, Nortel includes services revenue in the respective financial results for Enterprise, Carrier and MEN.

14

CCC0031071

CCC0031058

A/C                                                                                                    TR21540

35.    Historically, the various business segments have been reported across the following geographic regions for financial reporting purposes: United States, Europe, Middle East and Africa, Canada, Asia and Central and Latin America.

*Global Supply Chain*

36.    The Nortel Companies rely on numerous suppliers, including contract manufacturers responsible for the manufacturing of Nortel hardware and the various materials necessary for the Debtors to provide their solutions to customers and end-users. The Nortel Companies employ a complex internal purchasing system for their hardware and software products. When a sales order is placed with a regional Nortel distribution entity, an internal purchase order is generated and automatically routed through one of four purchasing hub entities, depending on the business segment and the geographical region involved. Purchasing hub entities manage key supplier relationships and act as funneling points for orders from Nortel's sale entities all around the world.

37.    The four purchasing hubs are NNL, NNI, NN UK and NN France. Approximately two-thirds of all Nortel purchasing activity flows through the North American purchasing hubs, NNL and NNI. NNI acts as the purchaser for Enterprise Data products for all of the Americas and Asia as well as certain other worldwide products.

38.    The respective purchasing hub entity contracts directly with equipment and design manufacturers to facilitate the ultimate product delivery to the customer. Following shipping of the product, the purchasing hub entity pays the manufacturer and the distribution entity books an intercompany payable to the purchasing hub entity. The payable equals the amount paid by the purchasing hub entity to the supplier plus a small margin. The manufacturer may be paid prior to the internal payment of the resulting receivable. Intercompany obligations

15

CCC0031072

CCC0031058

are settled monthly through cash payments or setoffs, to the extent available, and are carried

forward in certain circumstances as a net receivable.

*Transfer Pricing and Cash Management*

      39.     Once a customer's hardware needs have been manufactured, Nortel

provides installation, network integration and support services (collectively, "Deployment

Services"). In keeping with the integrated, co-dependent nature of the Nortel Companies,

Deployment Services are managed regionally and cover all product lines. For example, there are

two divisions responsible for Deployment Services in North America.

      40.     Given the integrated basis on which the Nortel Companies operate, certain

of the Nortel Companies have reached agreements and engaged in certain practices to properly

allocate profits and costs across the various affiliates. The key profit driver of Nortel's business

is the development and maintenance of intellectual property, and the Nortel Companies utilize a

residual profit sharing methodology (the "RPSM") that is designed to reflect that certain Nortel

affiliates, designated as profit sharing entities, are the source of the research and development

that has created Nortel's global technology footprint. The RPSM is a transfer pricing

methodology designed to allocate profit or loss based on each relevant Nortel Company's

relative share of certain R&D costs. Transfer pricing methodologies have been recognized by

the Organization for Economic Co-operation and Development (the "OECD") and U.S. and

Canadian taxing authorities as mechanisms to fairly allocate costs and profits for fully integrated

multinational corporations such as Nortel and to ensure the proper allocation of tax payments

among interested jurisdictions. Transfers and payments dictated by the RPSM are governed by

practices agreed to by the relevant Nortel Companies, including as memorialized in a master

R&D agreement, as it has been amended from time to time. Nortel's RPSM practices are meant

16

CCC0031073

CCC0031058

to comply with tax regulations, and NNI and NNL from time to time seek approval of their

bilateral Advance Pricing Agreement application permitting such practices from taxing

authorities, including the Internal Revenue Service and the Canada Revenue Agency.

41.    In addition, from time to time, as part of the management of Nortel's cash

needs on a global basis, certain Nortel affiliates, including NNI and NNCC, have funded

intercompany loans and capital contributions to other Nortel Companies on an as-needed basis to

fund working capital in the ordinary course of business. The source and terms of such

intercompany loans are typically memorialized through notes or other loan documentation.

42.    The Debtors' and their Canadian parents' interests are united in their

integrated, co-dependent business relationship. As a result, the Debtors' ability to reorganize is

dependent on (a) the reorganization of the jointly operated Nortel businesses in Canada and the

U.S. and/or (b) the sale of one or more Nortel business segments that are located in both Canada

and the U.S. The U.S. Debtors and the Canadian Debtors therefore have committed to engage in

a joint and harmonious approach to their restructuring in both jurisdictions, to the expected

benefit of their collective stakeholders. Such cooperation and coordination will be required, for

example, in any sale of a cross-border business segment by a Canadian parent, which could

involve the sale of assets and the assignment of material contracts currently employed by U.S.

Debtors and the transfer of employees relevant to U.S. operations. Such overlapping assets and

obligations of the U.S. Debtors and Canadian Debtors similarly will be relevant in the

development of a reorganization plan for any and all of the Debtors, even outside of an asset sale

context. The U.S. Debtors and Canadian Debtors will also seek to coordinate as needed any such

actions with the Nortel Companies subject to previously described proceedings in the Europe.

17

CCC0031074

CCC0031058

## II

### FIRST DAY MOTIONS

43.    To minimize the adverse effects on their businesses of seeking protection under chapter 11, the Debtors have requested various types of relief in the following First Day Motions, all of which are being filed concurrently with this declaration. For the reasons discussed below, I believe that the relief requested in each of the First Day Motions is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

### PROCEDURAL MOTIONS

A.    MOTION FOR AN ORDER PURSUANT TO RULE 1015(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE DIRECTING THE JOINT ADMINISTRATION OF THEIR CHAPTER 11 CASES ("JOINT ADMINISTRATION MOTION")

44.    As described above, all of the Debtors are direct or indirect subsidiaries of NNC. Together with the Canadian Debtors and other affiliated entities, the Debtors operate an integrated, multinational business, providing networking and communications technology and services to customers in the United States, Canada and around the world. Accordingly, the Debtors have sought entry of an order directing the joint administration of their chapter 11 cases.

45.    I believe that joint administration will eliminate the need for duplicative notices, applications and orders, thereby allowing the Debtors to avoid the time and expense that otherwise would be required to separately administer individual cases. The rights of creditors will not be adversely affected because this Joint Administration Motion requests only administrative, and not substantive, consolidation of the Debtors' cases. In fact, all creditors will benefit from the reduced costs that will result from the joint administration of these cases. Finally, I believe joint administration will simplify supervision of the administrative aspects of

18

CCC0031075

CCC0031058

these chapter 11 cases by this Court and the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee").

B.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11
       U.S.C. § 521 EXTENDING THE DEBTORS' DEADLINE TO FILE SCHEDULES OF
       ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS
       ("EXTENSION OF TIME MOTION")

        46.    By the Extension of Time Motion, the Debtors seek the entry of an Order,

extending the time within which the Debtors must file their Schedules and Statements.

        47.    I believe that "cause" exists to extend the Debtors' time to file the

Schedules and Statements. Given the size and complexity of the Debtors' business, I understand

that a significant amount of information must be accumulated, reviewed and analyzed to properly

prepare the Schedules and Statements. From the Petition Date forward, the Debtors will be

consumed with a multitude of critical administrative and business decisions arising in

conjunction with the commencement of these chapter 11 cases. While the Debtors have initiated

the major task of assembling the data necessary for the Schedules and Statements, they will not

be able to complete this undertaking prior to the Original Deadline.

        48.    At present, the Debtors estimate that an extension from the Original

Deadline of an additional thirty days, through and including March 16, 2009, should provide

sufficient time to assemble and verify information and prepare the Schedules and Statements,

without prejudice to the Debtors' right to seek further extensions if necessary.

C.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING
       CROSS-BORDER COURT-TO-COURT PROTOCOL ("CROSS-BORDER
       PROTOCOL MOTION")

        49.    By the Cross-Border Protocol Motion, the Debtors are requesting the

Court to enter an Order approving the cross-border court-to-court protocol attached to the

Motion (the "Protocol").

CCC0031076

CCC0031058

50. As described more fully above, the Debtors operate their businesses and manage their assets on a global integrated basis with the Canadian Debtors. Consequently, I believe it is essential that the companies are able to coordinate these chapter 11 cases and the Canadian Proceedings (collectively, the "Insolvency Proceedings") in a coordinated fashion so as to maximize the value of each of their estates. The Debtors and the Canadian Debtors therefore seek approval of a protocol that will provide this Court and the Canadian Court with a framework for the coordination of the administration of the Insolvency Proceedings on matters of concern to both Courts. The Protocol proposes to establish general administrative procedures to govern and facilitate the administration of cross-border matters among the Debtors and the Canadian Debtors and the Insolvency Proceedings, and to permit the effectuation of cooperative principles such as comity as appropriate, while also ensuring that this Court and the Canadian Court maintain their independent jurisdiction over other aspects of their respective Proceedings.

51. Among the issues addressed by the proposed Protocol are:

a. The purpose and goals of the Insolvency Proceedings;

b. Maintaining comity and independence between the U.S. and Canadian Courts;

c. Promoting coordination and cooperation between the U.S. and Canadian Courts; and

d. Other issues related to the Insolvency Proceedings.

52. In order to facilitate the efficient and effective administration of cross-border issues that may arise from time to time in the Insolvency Proceedings, I believe that it is necessary and appropriate to set out and have this Court and the Canadian Court adopt and approve a set of administrative and procedural guidelines for dealing with such cross-border

20

CCC0031077

CCC0031058

issues. The proposed administrative and procedural guidelines are set forth in the Protocol

attached to the Cross-Border Protocol Motion.

     53.    For these and for additional reasons set forth in the Cross-Border Protocol

Motion, I assert that the adoption of the Protocol is in the best interests of the Debtors' estate,

their creditors, and all parties-in-interest.

## PROFESSIONAL RELATED MOTIONS[4]

D.    APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND
RETENTION OF CLEARY GOTTLIEB STEEN & HAMILTON LLP NUNC PRO
TUNC TO THE PETITION DATE AS COUNSEL FOR THE DEBTORS AND
DEBTORS IN POSSESSION ("CLEARY GOTTLIEB RETENTION MOTION")

     54.    For the purposes of these chapter 11 proceedings, the Debtors have

determined that it will be necessary to engage counsel with knowledge and experience in the

areas of bankruptcy, reorganization, litigation, securities law, employee benefits, intellectual

property, mergers and acquisitions, divestitures and corporate governance. Such counsel will

enable the Debtors to carry out their duties in these chapter 11 proceedings and to assist in the

reorganization of their estates. Consequently, by filing the Cleary Gottlieb Retention Motion, the

Debtors seek to retain and employ the law firm of Cleary Gottlieb Steen & Hamilton LLP

("Cleary Gottlieb" or the "Firm") as counsel in all phases of their chapter 11 cases. Subject to

the control and further order of this Court, Cleary Gottlieb will be required to render various

services to the Debtors, including the following professional services:

     a.    providing advice to the Debtors with respect to their powers and
duties as debtors in possession in the continued operation of their businesses and
the management of their properties;

     b.    taking necessary or appropriate action to protect and preserve the
Debtors' estates, including prosecuting actions on the Debtors' behalf, defending

---

[4]    The Debtors also intend to file an application for retention of their financial advisor, Lazard Frères & Co.
LLC, in the future.

21

CCC0031078

CCC0031058

any actions commenced against the Debtors, conducting negotiations concerning litigation or other disputes in which the Debtors are involved, and filing and prosecuting objections to claims filed against the Debtors' estates;

    c.    preparing, on behalf of the Debtors, applications, motions, answers, orders, reports, memoranda of law and other papers in connection with the administration of the Debtors' estates;

    d.    representing the Debtors in negotiations with all other creditors, equity holders, and parties in interest, including governmental agencies and authorities;

    e.    representing the Debtors in negotiations regarding possible dispositions of assets;

    f.    providing advice to the Debtors with respect to the cross-border aspects of Nortel's bankruptcy proceedings;

    g.    negotiating and preparing on behalf of the Debtors one or more plans of reorganization and all related documents; and

    h.    performing other necessary or appropriate legal services in connection with these chapter 11 cases.

    55.    I understand that Cleary Gottlieb employs more than 1,000 attorneys and maintains offices for the practice of law at One Liberty Plaza, New York, New York, among other locations. I have also been informed that James L. Bromley of Cleary Gottlieb, a partner who will be engaged in these chapter 11 cases, is a member in good standing of, among others, the Bar of the State of New York and the United States District Court for the Southern District of New York; and that Lisa M. Schweitzer of Cleary Gottlieb, another partner who will be engaged in these chapter 11 cases, is also a member in good standing of, among others, the Bar of the State of New York and the United States District Court for the Southern District of New York. As I will describe in greater detail later in this declaration, the Debtors also seek to retain and employ the law firm of Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") as their Delaware co-counsel in these chapter 11 proceedings. Cleary Gottlieb and Morris Nichols intend

22

CCC0031079

CCC0031058

to work cooperatively to provide effective and cost-efficient representation of the Debtors in
their reorganization.

        56.    Cleary Gottlieb has represented Nortel, a long standing firm client for
more than twenty years, regarding a number of matters, including providing general corporate
advice and legal services relating to bankruptcy, reorganization, litigation, securities law,
employee benefits, intellectual property, mergers and acquisitions, divestitures and corporate
governance, as well as regarding the laws of certain non-U.S., non-Canadian jurisdictions.

        57.    The Debtors have selected Cleary Gottlieb to serve as their counsel in
these chapter 11 proceedings because of the Firm's extensive knowledge of Nortel, including a
variety of cross-border aspects of their operations, as well as the Firm's extensive experience and
knowledge in the field of business reorganizations under chapter 11 of the Bankruptcy Code and
other related matters. I understand that Cleary Gottlieb also has substantial experience
representing companies involved in the telecommunications industry. I believe that the Firm is
both well qualified and uniquely able to represent them as debtors in possession in these chapter
11 cases in an efficient and timely manner. If the Debtors were required to retain counsel other
than Cleary Gottlieb in connection with the prosecution of these chapter 11 cases, I believe that
the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and
expense necessarily required by such new attorneys to familiarize themselves with the intricacies
of the Debtors' businesses, operations and capital structure.

        58.    I have been informed that Cleary Gottlieb does not hold or represent any
interest adverse to the Debtors or their estates and that Cleary Gottlieb is a "disinterested person"
as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section
1107(b) of the Bankruptcy Code, and I believe Cleary Gottlieb's employment and retention is

23

CCC0031080

CCC0031058

necessary and in the best interests of the Debtors and their estates. Except as set forth in the

Cleary Gottlieb Retention Application and the Declaration of James L. Bromley attached thereto,

I understand that the partners, counsel and associates of Cleary Gottlieb have not represented,

and do not have any connection with, the Debtors, their creditors, equity security holders or any

other parties in interest in any matters relating to the Debtors or their estates. I have been

informed that Cleary Gottlieb is currently representing certain of the Debtors' creditors, equity

holders and other parties in interest in matters wholly unrelated to these proceedings. I

understand that Cleary Gottlieb has fully informed the Debtors of its ongoing representation of

these entities, and the Debtors have consented to the Firm's continued representation of these

entities in matters unrelated to these proceedings. I believe that given the size of the Debtors and

the extent of their creditor and interest holder constituencies, it is unlikely that any major law

firm with the expertise necessary for these cases could be found that is not currently representing

some of the Debtors' major creditors or interest holders in unrelated matters. I believe that

Cleary Gottlieb's current and future representation of these entities will not in any way adversely

affect the Firm's representation of the Debtors.

     59.    Therefore, I respectfully request that this Court grant the relief requested

in the Cleary Gottlieb Retention Application.

E.    APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND
    RETENTION OF MORRIS, NICHOLS, ARSHT & TUNNELL LLP NUNC PRO
    TUNC TO THE PETITION DATE AS DELAWARE COUNSEL FOR THE DEBTORS
    AND DEBTORS IN POSSESSION ("MORRIS NICHOLS RETENTION MOTION")

     60.    By this Application, the Debtors seek to retain Morris Nichols as

Delaware counsel for the Debtors, nunc pro tunc, to the Petition Date. The Debtors seek to retain

Morris Nichols because of the firm's extensive experience and knowledge in the fields of, inter

alia, Debtors' and creditors' rights, business reorganizations under chapter 11 of the Bankruptcy

24

CCC0031081

Code and general corporate law, and because of its expertise, experience and knowledge in practicing before this Court, its proximity to the Court and its ability to respond quickly to emergency hearings and other emergency matters in this Court.

61.    In addition, in connection with their engagement by the Debtors, Morris Nichols has become familiar with the Debtors' business and affairs. Accordingly, I believe Morris Nichols, in consultation with Cleary Gottlieb, is well qualified to deal effectively with the potential legal issues and problems that may arise in the context of these chapter 11 cases. I believe that the services of Morris Nichols are necessary to enable the Debtors to execute faithfully their duties as debtors in possession.

F.    APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE RETENTION OF EPIQ SYSTEMS AS NOTICE, CLAIMS AND BALLOTING AGENT TO THE DEBTORS ("EPIQ RETENTION MOTION")

62.    I have been informed that the numerous creditors and other parties in interest involved in these chapter 11 cases may impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court (the "Clerk's Office"). To relieve the Clerk's Office of these burdens, the Debtors seek an order appointing Epiq Bankruptcy Solutions, LLC ("Epiq") as the notice, claims and balloting agent to among other things: prepare and serve required notices in these chapter 11 cases; maintain copies of all proofs of claims filed in these chapter 11 cases and act as balloting agent. The Debtors selected Epiq because it is one of the nation's leading bankruptcy administrators, and has extensive experience performing these tasks in cases of this size. I believe that Epiq is well qualified to perform the services contemplated in its retention application.

25

CCC0031082

CCC0031058

**MOTIONS RELATED TO DEBTORS' OPERATIONS IN CHAPTER 11**

G.    MOTION FOR AN ORDER PURSUANT TO SECTIONS 345, 363(C)(1), 364(A) AND
503(B)(1): (A) APPROVING THE CONTINUED USE OF THE CASH
MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS;
(B) PERMITTING CONTINUED INTERCOMPANY TRANSACTIONS, GRANTING
ADMINISTRATIVE PRIORITY STATUS TO POSTPETITION INTERCOMPANY
CLAIMS AND PRESERVING AND PERMITTING THE EXERCISE OF
INTERCOMPANY SETOFF RIGHTS; (C) AUTHORIZING BANKS TO HONOR
CERTAIN TRANSFERS AND CHARGE CERTAIN FEES AND OTHER AMOUNTS;
AND (D) WAIVING THE REQUIREMENTS OF 11 U.S.C. SECTION 345(B) ON AN
INTERIM BASIS ("CASH MANAGEMENT MOTION")

63.    By this Cash Management Motion, the Debtors seek an order of this Court

(a) approving the continued use of the Cash Management System, Bank Accounts and Business

Forms (each as defined below); (b) permitting continued Intercompany Transactions (as defined

below), granting administrative priority status to postpetition Intercompany Claims (as defined

below), and preserving and permitting the exercise of intercompany setoff rights; (c) authorizing

banks to honor certain transfers and charge certain fees and other amounts; and (d) waiving the

requirements of 11 U.S.C. section 345(b) on an interim basis.

64.    In furtherance of Nortel's integrated global business operations, in the

ordinary course of business the Debtors, the Canadian Debtors and non-debtor affiliates use a

cash management system (the "Cash Management System") to transfer funds between and

among the Debtors, the Canadian Debtors and non-debtor affiliates, to properly allocate costs

and profits, as part of an arm's length transfer pricing policy to comply with tax laws, across all

Nortel entities (the "Nortel Companies") and to manage operations, their cash needs, and the

cash needs of Nortel generally.

Continued Use of the Cash Management System Is Warranted

65.    The Cash Management System is managed as part of Nortel's integrated

business operations primarily by financial personnel (the "Treasury") shared among the Debtors

26

CCC0031083

and the Canadian Debtors in Toronto and is linked to the Nortel Companies' global finance and operations personnel ("Global Treasury"). NNI maintains a series of bank, brokerage and investment accounts to facilitate the movement and investment of cash necessary for its operations. NNI is also a party to certain transfer pricing and residual profit sharing agreements, and other reconciliation practices with other Nortel affiliates that, as adjusted or amended from time to time, govern the intercompany transfers of funds. I will discuss the details of the Cash Management System, which is managed on an integrated basis, more fully below.

66.    By filing the Cash Management Motion, the Debtors seek an order authorizing, but not directing, them to continue to use the Cash Management System, subject to certain modifications as discussed below. In light of the substantial size and complexity of the Debtors' operations, and the interrelationships between the Debtors' operations and those of their affiliates, I believe the maintenance of their current cash management operations is essential for a successful reorganization of their businesses, as well as the preservation and enhancement of the Debtors' respective values as going concerns. Therefore, I request permission for them to continue, in their own discretion, to employ global cash management procedures that permit the transfer of funds between or among the Debtors and their affiliates periodically in the amounts necessary to continue the operation of their businesses in accordance with the existing Cash Management System.

67.    The Cash Management System has been continuously utilized by the Debtors and constitutes a customary and essential business practice. The Cash Management System is similar to those commonly employed by multinational corporate enterprises of comparable size and complexity as the Debtors. The system provides numerous benefits, including the ability to: (a) control and monitor corporate funds; (b) invest idle cash; (c) ensure

27

CCC0031084

CCC0031058

cash availability; and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.

68.    In addition, given the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, I believe that it would be difficult and unduly burdensome for the Debtors to establish an entirely new system of accounts and a new cash management system for each separate legal entity. Thus, under the circumstances, maintenance of the Cash Management System not only is essential, but I trust that it is also in the best interests of the Debtors' respective estates and creditors. In addition, I believe preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition business operations and (b) assist the Debtors in their reorganization efforts. The Debtors will continue to maintain accurate and current records with respect to all transactions, whether transfers of cash, setoffs or otherwise, so that all transactions can be readily ascertained, traced and recorded properly on applicable intercompany accounts.

69.    If the Debtors are not permitted to continue to utilize the Cash Management System, I believe their operations would be severely, and perhaps irreparably, disrupted. Accordingly, I respectfully request that the Court authorize (but not direct) the Debtors to continue to use the Cash Management System described herein.

70.    In addition, I hereby request authority for the Debtors to open and close bank accounts. I request that the Banks (as defined below) be authorized to honor the Debtors' requests to open or close any bank accounts, provided, however, that any new domestic account is established at a bank insured with the FDIC or the FSLIC and that it is organized under the

28

CCC0031085

CCC0031058

laws of the United States or any State therein, or in the case of accounts that may carry a balance

exceeding the insurance limitations set thereby, that the bank holding the account has entered

into a Uniform Depository Agreement with the U.S. Trustee.

Continued Use of the Bank, Brokerage and Investment Accounts Is Warranted

71.    The Debtors maintain 23 bank, brokerage and investment accounts in the

U.S. and two bank accounts abroad. The movement of funds through these accounts is described

below and is illustrated in the chart attached to the Cash Management Motion as Exhibit B, as is

described in more detail therein.

72.    Additionally, a chart containing a schedule of the Debtors' prepetition

bank, brokerage and investment accounts (the "Bank Accounts") is attached to the Cash

Management Motion as Exhibit C.

73.    As set forth in Exhibit C of the Cash Management Motion, within the

Cash Management System, the Debtors and their affiliated non-debtors utilize 25 deposit,

collection, payment, investment, and brokerage accounts on a regular basis in the ordinary course

of their businesses. To avoid substantial disruption to the normal operation of their businesses

and to preserve a "business as usual" atmosphere, as part of their request to maintain the Cash

Management System, I hereby request that the Debtors be permitted to continue to use the bank,

brokerage, and investment accounts. I believe allowing these accounts to be maintained with the

same account numbers will greatly assist the Debtors in accomplishing a smooth transition to

operating in chapter 11.

74.    To protect against the possible inadvertent payment of prepetition claims,

the Debtors will immediately advise their banks and financial institutions (collectively, the

"Banks") not to honor checks issued prior to the Petition Date, except as otherwise expressly

29

CCC0031086

CCC0031058

permitted by an order of the Court and directed by the Debtors. I believe the Debtors have the

capacity to draw the necessary distinctions between prepetition and postpetition obligations and

payments without closing the bank accounts and opening new ones.

Continued Intercompany Transactions and Related Transactions are Appropriate

     75.    The Debtors' Cash Management System is complex, but relies on

procedures that constitute ordinary, usual and essential business practices, and are similar to

those used by other major corporate enterprises. I understand that the Cash Management System

provides significant benefits to the Debtors, including the ability to control corporate funds

centrally, invest idle cash, ensure the availability of funds when necessary, and reduce

administrative expenses by facilitating the movement of funds and the development of more

timely and accurate balance and presentment information. Furthermore, the use of a centralized

cash management system reduces interest expense by enabling the Debtors to utilize all funds

within the system rather than relying upon short-term borrowing to fund the Debtors' and their

non-debtor subsidiaries' cash requirements. The Debtors also benefit from the use of a

coordinated cash management system with their other non-debtor affiliates due to the integration

of their businesses on an operational level.

     76.    The operation of the Debtors' businesses requires that the Cash

Management System continues during the pendency of these chapter 11 cases. Requiring the

Debtors to adopt new, segmented cash management systems at this early and critical stage of

these cases would be expensive, create unnecessary administrative problems, and be much more

disruptive than productive. I believe that such a disruption could have a severe and adverse

impact upon the Debtors' ability to reorganize. Moreover, as a practical matter, because of the

Debtors' complex corporate and financial structure, it would not be possible to establish a new

CCC0031087

CCC0031058

system of accounts and a new cash management and disbursement system without substantial additional costs and expenses to the Debtors' bankruptcy estates and a significant disruption of the Debtors' business operations. The Debtors propose to modify certain aspects of the Cash Management System to account for cash management practices commonly employed in chapter 11 cases (such as for the handling of setoffs and intercompany claims). Consequently, I believe that maintenance of the existing Cash Management System (as modified to the extent described herein), including the Debtors' continued ability to transfer funds among themselves and with other non-debtor affiliates as described herein, is not only essential but is in the best interests of all creditors and other parties-in-interest.

77.    The Debtors generate certain intercompany payables and receivables with their subsidiaries and other Nortel affiliates as a result of three primary types of transactions: (1) charges related to the purchase of inventory and the provision of services, (2) the Residual Profit Sharing Methodology ("RPSM") and (3) certain ordinary course intercompany loan agreements.

78.    Inventory Purchases. The Nortel Companies' complex and interconnected global supply chain requires that the companies regularly transact with each other, generating intercompany payables and receivables. From a supply chain perspective, the Nortel Companies can be separated into purchasing hub entities and distribution entities. Distribution entities are the primary Nortel sales and relationship contact points for customers in a geographic area. Distribution entities place orders with purchasing hub entities for products that are delivered to customers either by the purchasing hub entities or third party suppliers. Purchasing hub entities manage key supplier relationships and act as funneling points for orders from distribution entities all around the world.

31

CCC0031088

CCC0031058

79.     Accounts payable and receivable generated by Nortel and its affiliates in the ordinary course of business based on the purchase of products and the provision of services, and satisfaction of customer orders, are reconciled on a monthly basis. For accounts in which it is available, accounts payable and accounts receivable between the Debtors and their affiliates are calculated and reconciled through Citinetting, Citibank's automated netting software. Intercompany accounts, including the Citinetting reports and manual reconciliation and netting of other accounts, are reviewed by Global Treasury and Nortel affiliates settle such intercompany obligations through cash payments, netting (including multi-party netting in some instances) or setoffs, to the extent available. Payments under this settlement system occur monthly, typically in the third week of each month.

80.     Residual Profit Sharing Methodology. Given the integrated basis on which Nortel operates, certain of the Nortel Companies have reached agreements and engaged in certain practices to properly allocate profits and costs across the various affiliates. The key profit driver of Nortel's business is the development and maintenance of intellectual property, and the RPSM is designed to reflect that certain Nortel affiliates designated as profit sharing entities, including NNL, NNI, Nortel Networks UK Limited, Nortel Networks SA (a French company), and Nortel Networks (Ireland) Limited (collectively, the "Profit Sharing Entities") are the source of the research and development that has created Nortel's global technology footprint. The RPSM is a transfer pricing methodology designed to allocate profit or loss based on each Profit Sharing Entity's relative share of certain research and development and other overhead costs. Transfer pricing methodologies have been recognized by the Organisation for Economic Co-operation and Development (OECD) and U.S. and Canadian taxing authorities as mechanisms to fairly allocate costs and profits for fully integrated multinational corporations such as Nortel and

32

CCC0031089

CCC0031058

ensure the proper allocation of tax payments among interested jurisdictions. Transfers and

payments dictated by the RPSM are governed by practices agreed to by the Profit Sharing

Entities, including as memorialized in a master R&D agreement, as it has been amended from

time to time.[5] Payment obligations under the RPSM are reconciled quarterly, with NNL acting

as a clearinghouse for such payments. In the near future, Nortel intends to begin reconciling

such payment obligations on a monthly basis.

        81.    Intercompany Loans and Investments. From time to time, as part of the

management of Nortel's cash needs on a global basis, I am aware that certain Nortel affiliates,

including NNI and NNCC,[6] have funded intercompany loans and capital contributions to other

Nortel Companies on an as-needed basis to fund working capital in the ordinary course of

business. The source and terms of such intercompany loans are typically memorialized through

notes or other loan documentation. As part of this practice, NNI and NNL are parties to a $1

billion revolving loan agreement dated March 21, 2008, which permits NNL to borrow funds on

an as-needed basis. While a substantial loan balance has existed and fluctuated in amount over

time, the intercompany loan balance as of January 13, 2009 owed by NNL to NNI is

approximately $295,982,134.75 (the "NNL Loan Receivable"). The Debtors account for all such

intercompany loans and affiliate transactions in their internal accounting systems.

        82.    As I described above, prior to the Petition Date, the Debtors and certain

non-debtor affiliates provided services to, and engaged in intercompany financial transactions

---

[5]     Nortel's RPSM practices are meant to comply with tax regulations, and NNI and NNL from time to time seek approval of their bilateral Advance Pricing Agreement application permitting such practices from taxing authorities, including the Internal Revenue Service and the Canada Revenue Agency. Audits by the taxing authorities are ongoing for the periods 2001 to 2005 that could result in the recharacterization of a material amount of historic transfers that were made in accordance with prior transfer pricing practices.

[6]     The only loan that has been made by NNCC is an intercompany loan in the amount of $150,000,000 to NNI, made in connection with the issuance of certain bonds.

CCC0031090

CCC0031058

with, each other in the ordinary course of their respective businesses (collectively, the "Intercompany Transactions"). These transactions are recorded by each entity as an intercompany obligation. The Debtors seek authorization, but not direction, to continue to enter into Intercompany Transactions in the ordinary course of business.[7]

83.    These Intercompany Transactions reduce the administrative costs incurred by the Debtors and their affiliates and allow for the purchase and supply of essential goods for the operation of the Debtors' businesses. If the Intercompany Transactions were to be discontinued, I believe that the Debtors' Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors, their estates and their affiliates. The Intercompany Transactions are essential to the Debtors' businesses given the integrated nature of the Nortel Companies' operations. I hereby submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and creditors.

84.    If this Court authorizes the continuation of Intercompany Transactions, at any given time there may be balances due and owing from one Debtor to another, or between the Debtors and other Nortel affiliates. These balances represent extensions of intercompany credit. To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors will continue to maintain records of such transfers, including records of all current intercompany receivables and payables. Additionally, I respectfully request that, pursuant to section 364(a) of the Bankruptcy Code, all claims relating to Intercompany Transactions (collectively, the "Intercompany Claims") arising after the Petition

---

[7]    The Debtors engaged in Intercompany Transactions on a regular basis prior to the Petition Date. Such transactions are common for enterprises like the Debtors. The Debtors believe that such transactions are in the ordinary course within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions.

34

CCC0031091

CCC0031058

Date be accorded administrative priority of the kind specified in section 503(b) of the

Bankruptcy Code.

Approval of Intercompany Revolving Loan Agreement

        85.     Prior to its filing, in the ordinary course, NNI provided financing to NNL

pursuant to a revolving loan agreement entered as of March 21, 2008, for NNL to draw on an as-

needed basis. NNI seeks approval to maintain this ordinary course intercompany lending

practice through entry into a new revolving loan agreement with NNI as lender, NNL as

borrower and Nortel Networks Technology Corporation ("NNTC"), NNL's subsidiary, as

guarantor, in the amount of up to USD $200 million (the "NNL Revolver"). A form of the

agreement documenting the NNL Revolver is attached to the Cash Management Motion as

Exhibit D (the "NNL Revolver Agreement").

        86.     This facility is expected to benefit both NNI and NNL by maintaining

NNL's ordinary course access to working capital, and thereby avoiding additional fees and

expenses associated with third party financing, particularly given current market conditions.

Given the integrated nature of the Nortel Companies' operations and NNI's reliance on NNL for

certain corporate overhead and research and development functions, as well as intellectual

property licenses, NNI similarly benefits from the advance to the extent it maintains or improves

NNL's reorganization prospects.

        87.     Moreover, while NNI and NNL regard this extension of credit as a

continuation of ordinary course business practices, NNTC and NNL itself are willing to pledge

certain assets to secure the NNL Revolver. In particular, NNL and NNTC are willing to grant,

subject to approval of the Canadian Court and the co-owner of the facility, charges on (i.e. a

security interest in) all of the fee simple interest of NNTC and leasehold interest of NNL

35

CCC0031092

CCC0031058

respectively in a research and development facility located at 3100 Carling Avenue, Ottawa, Canada, which was valued at CAN $288,750,000 as of December 21, 2007 in a third party appraisal (the "Carling Charges"), which charges (a) shall rank subordinate only to the Administrative Charge sought to be approved by the Canadian Court and such other encumbrances as may currently exist on the title to the Carling Facility and (b) may not be otherwise primed without the written consent of NNI and authorization of the Court. Under the NNL Revolver, $75 million will be immediately available for borrowing and the remainder is available upon obtaining the relevant consents to the Carling Charges. To the extent the proceeds realized from the Carling Facility are insufficient to satisfy NNL's obligations under the NNL Revolver, any deficiency shall be deemed an intercompany reimbursement claim entitled to the security of an intercompany charge (as sought in the Canadian Proceedings) (the "Intercompany Charge"). The Carling Charges and the Intercompany Charge will secure any outstanding balance under the NNL Revolver. I believe that the making of this advance on a secured basis is a proper and beneficial use of the assets of NNI.

Setoffs and Payments of Intercompany Obligations

88.    The Debtors also seek authorization to preserve their ordinary course practices in recording and reconciling Intercompany Obligations, including for inventory purchases, under the RPSM, and with respect to intercompany loans, as modified below.

89.    In light of the commencement of the chapter 11 cases, the Canadian Proceedings and the expectation that the EMEA Debtors also will seek creditor protection, the Debtors and their affiliates propose to modify their ordinary course cash management practices in the following manner. First, the Debtors intend to settle postpetition transactions with the Canadian Debtors and the EMEA Debtors on a cash basis rather than through Citinetting.

36

CCC0031093

CCC0031058

Second, the Debtors propose to not set off prepetition and postpetition amounts owed between the Debtors on the one hand and the EMEA Debtors on the other hand in the ordinary course, and rather to only set off postpetition obligations.

90.    Third, with respect to the Canadian Debtors, the Debtors seek approval to continue the netting and payment of intercompany obligations in the ordinary course of business consistent with their prior practice, except that the Debtors have agreed to forbear from exercising any right of setoff they may have against the Canadian Debtors until such time as (a) the chapter 11 cases of NNI or NNCC shall been dismissed or converted to cases under chapter 7 of the Bankruptcy Code; (b) an interim or permanent trustee, a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) has been appointed to oversee or operate any of the Debtors in these chapter 11 cases; (c) any Debtor files a motion seeking any of the foregoing relief; (d) a receiver is appointed over all or substantially all of the assets of the Canadian Debtors; or (e) any of NNC, NNL or NNTC are declared bankrupt under the Bankruptcy and Insolvency Act.[8]  In consideration for such forbearance, the Canadian Debtors are seeking to grant NNI an Intercompany Charge in the Canadian Proceedings to secure the payment of the NNL Loan Receivable.

91.    In an abundance of caution, the Debtors further seek authority to enter into written agreements with the Canadian Debtors and the EMEA Debtors as may be necessary or desirable to effectuate the above arrangements.  Accordingly, the Debtors respectfully request express permission to (a) set off mutual prepetition obligations relating to Intercompany

---

[8]    Under Canadian Law, NNI would have the right to set off postpetition obligations owing to NNL against the NNL Loan Receivable.

CCC0031094

CCC0031058

Transactions, (b) in the discretion of the relevant Debtor, to set off mutual postpetition obligations relating to Intercompany Transactions and (c) to settle and reconcile certain intercompany transactions with the Canadian Debtors and EMEA Debtors as described above. Finally, the Debtors request authorization to continue their cash management practices, as modified above.

Continued Use of Business Forms Is Warranted

92.    In the ordinary course of their businesses, the Debtors use a variety of checks and other business forms (collectively, and as they may be modified, the "Business Forms"). To avoid disruption of the Cash Management System and unnecessary expense, pursuant to Local Rule 2015-2(a), the Debtors request that they be authorized to continue to use the Business Forms substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession, provided, however, that once the Debtors' existing check stock has been used, any future checks ordered by the Debtors will include the legend "Debtor-in-Possession." In the absence of such relief, I believe the estates will be required to bear a potentially significant expense, which I respectfully submit is unwarranted.

Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis Is Warranted

93.    To the extent excess funds are available in the Treasury Account at the end of each day, Treasury invests those funds through an account with BAS in certain money market funds, including the Federated Treasury Obligations Fund, the JP Morgan U.S. Money Market Fund, the Fidelity Treasury Portfolio fund and the Dreyfus Government Cash Management and Government Prime Cash Management funds (collectively, the "Money Market

38

CCC0031095

CCC0031058

Funds") on an investment/redemption basis.[9]  In addition, the Debtors currently hold

approximately $65 million in the Reserve Primary Fund, which froze withdrawals in September

2008, and is in the process of winding down.

> 94.    I understand that investment in the Money Market Funds is consistent with
the Debtors' Investment Guidelines, which were implemented by Nortel to minimize financial

risk through managed counterparty exposure limits and ensure effective diversification and

sufficient liquidity to meet business requirements and maximize returns.  The Investment

Guidelines limit investments to term deposits, certificates of deposit, commercial paper, fixed

and floating rate notes, medium term notes, government or agency securities, auction rate money

market securities, repurchase agreements and money market funds.

> 95.    As described above, the Debtors and their non-debtor affiliates invest
excess funds in certain money market funds, including the Money Market Funds. Such

investments are consistent with the Investment Guidelines.  Although I have been advised that

the current investment practices and Investment Guidelines may not strictly comply with the

approved investment guidelines identified in section 345 of the Bankruptcy Code in all cases, I

believe that the Debtors' deposits and investments nevertheless are prudent and designed to yield

the maximum reasonable net return on the funds invested, taking into account the safety of such

deposits and investments.  Accordingly, I respectfully request that the Debtors be authorized to

invest and deposit funds in the Money Market Funds and other similar instruments in accordance

with the Investment Guidelines, including as per their current investment practices,

---

[9]    Each of the Money Market Funds currently maintains both Aaa and AAAm ratings from Moody's and
Standard & Poor's, with the exception of the Dreyfus Government Prime Cash Management and Government Cash
Management funds, which maintain an AAAm rating from Standard & Poor's but are not rated by Moody's.
According to fund disclosure materials, the Money Market funds generally invest most or all of their assets in U.S.
Treasury-related securities, repurchase agreements collateralized by Treasury securities, and/or securities issued or
guaranteed by the U.S. government or its agencies or instrumentalities.

39

CCC0031096


CCC0031058