notwithstanding that they may not strictly comply in all respects with the approved investment

guidelines set forth in section 345 of the Bankruptcy Code.  I further request that the applicable

institutions be authorized and directed to accept and hold or invest such funds, at the Debtors'

direction.

    96.    I have been advised that, in other chapter 11 cases, courts in this District

have granted requests for approval of continued investment practices in accordance with

investment and deposit guidelines that did not strictly comply with section 345 of the Bankruptcy

Code, the Debtors are large, sophisticated companies with a complex Cash Management System

that provides the Debtors with the ability to transfer funds as and when needed.[10]  In light of

these factors and the safety of the investment vehicles that the Debtors propose to utilize to

invest any excess funds, the Debtors believe that sufficient cause exists under section 345(b) of

the Bankruptcy Code to allow the Debtors to deviate from the investment guidelines set forth in

section 345(b).

Authorization of (A) Banks to Charge Back Returned Items and (B) Debtors to Pay Bank Fees Is
Warranted

    97.    Concurrently with the filing of this Motion, the Debtors have filed motions

requesting authority to pay, in their sole discretion and in the ordinary course of their businesses,

certain prepetition obligations to customers, employees, lienholders, taxing authorities and other

entities.  With respect to some of these obligations, prior to the Petition Date, the Debtors issued

checks that have yet to clear the banking system.  In other cases, the Debtors would issue the

relevant checks postpetition on account of such prepetition debt once the Court enters an order

permitting the Debtors to do so.  I understand that the Debtors intend to inform their banks which

---

[10]    The Debtors also are required to maintain accounts in Toronto, Canada and in the Philippines to hold local
currency, including for use by the Debtors in the ordinary course of their business operations.

CCC0031097

CCC0031058

prepetition checks should be honored pursuant to any separate orders of the Court authorizing such payments.

      98.    As a result of the foregoing, I request that the Debtors' Banks be authorized to accept and honor all representations from the Debtors as to which checks, drafts or wires should be honored or dishonored consistent with any order(s) of this Court and governing law, whether such checks, drafts or wires are dated prior to, on or subsequent to the Petition Date. Pursuant to the relief requested in this Motion, I have been advised that the Banks shall not be liable to any party on account of (a) following the Debtors' instructions or representations as to any order of this Court, (b) the honoring of any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) an innocent mistake made despite implementation of reasonable item handling procedures. I believe that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with the Court's order or otherwise.

      99.    Finally, I request authority for the Banks to charge and the Debtors to pay or honor both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees"). I also request that the Banks be authorized to charge back returned items to the Bank Accounts in the normal course of business.

      100.    I believe this relief to minimize the disruption of the Cash Management System and their Bank Accounts and to assist them in accomplishing a smooth transition to operating in chapter 11.

41

CCC0031098

CCC0031058

Strategic Investments

101.    From time to time, NNI and its non-debtor affiliate Nortel Ventures LLC make venture capital investments in small high-tech companies. These investments are made to further expand Nortel's technology portfolio. By this Motion, the Debtors seek authority, in their sole discretion, to satisfy any existing capital calls related to existing investments to protect the value of such investments.

Payroll Administration

102.    In addition to administering its own payroll, NNI administers payroll payments for certain of its non-debtor subsidiaries, including Diamondware, Ltd. and Nortel Networks (CALA) Inc. (the "Payroll Affiliates"). On a regular periodic basis, NNI processes and issues payroll checks for the Payroll Affiliates' employees (the "Affiliate Payroll Processing System"). The payables and receivables generated by this process are currently settled as part of the regular intercompany settlement process. In light of the commencement of NNI's chapter 11 case, the Payroll Affiliates have agreed either to prefund or promptly reimburse disbursements made from the Payroll Account.

103.    I believe that the relief requested in the Cash Management Motion is required to minimize the disruption of the Cash Management System and the Debtors' bank accounts and to assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

H.    MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY CERTAIN PREPETITION (I) WAGES, SALARIES AND OTHER COMPENSATION, (II) REIMBURSABLE EXPENSES, AND (III) MEDICAL, RETIREMENT AND SIMILAR BENEFITS ("EMPLOYEE WAGE MOTION").

104.    By filing the Employee Wage Motion, the Debtors are requesting that the Court enter an Order: authorizing, but not directing, them to (i) pay prepetition claims and

42

CCC0031099

CCC0031058

obligations related to employee wages, salaries and benefits described herein; (ii) reimburse

employees for unpaid expenses incurred prepetition; and (iii) continue their wage and benefit

plans for employees, or to change their plans or policies regarding wages, salaries, benefits,

and/or reimbursable expenses, if they deem it necessary and appropriate, without obtaining

further approval of the Court.

      105.    The Debtors, collectively with the Canadian Debtors and other affiliated

entities, employ thousands of dedicated and skilled employees in the United States and around

the world.  As of the Petition Date, the Debtors employ a total of approximately of 8,911

employees in the United States.  Of those, NNI employs 8,099 full-time salaried employees, 717

full-time hourly employees, 24 part-time salaried employees, and 3 part-time hourly employees

(the "NNI Employees").  In addition, Alteon WebSystems, Inc. employs approximately 68 full-

time employees in the United States (the "Alteon Employees," and together with the NNI

Employees, the "Employees").  The Alteon Employees' compensation is funded through NNI's

payroll account, and the Alteon Employees receive the same benefits as the NNI Employees.  To

supplement their workforce, the Debtors additionally utilize the services of approximately 40

independent contractors.

      106.    In order to retain this workforce, the Debtors have incurred a variety of

obligations to its Employees, in the form of wages, salaries and benefits.  A description of these

prepetition employee related obligations and programs is as follows:

Payment of Unpaid Compensation

      107.    For 2008, the Debtors paid approximately $1.305 billion in compensation

and benefits to the Employees.  These payments consist of:

          a.    Approximately $898 million in wages and salary to the NNI full-
time salary employees, $43.6 million to the NNI full-time hourly employees, $1.7

CCC0031100

CCC0031058

million to the NNI part-time salaried employees and $180,000 to the NNI part-time hourly employees;

        b.      Approximately $8.2 million in wages and salary to the Alteon Employees;

        c.      Approximately $3 million in short-term disability benefits through salary continuance;

        d.      Approximately $8.1 million in premium payments for overtime hours, on-call hours and undesirable shift hours;

        e.      Approximately $108 million in sales commissions to the U.S. Sales Employees;

        f.      Approximately $72 million in reimbursable expenses;

        g.      Approximately $2 million in expat costs; and

        h.      Approximately $160 million in employee benefits, described more fully below.

        108.    In the ordinary course of their businesses, the Debtors pay the Employees on a bi-weekly basis on every other Friday. The Employees were paid on Friday, January 2nd for the two-week period from December 22nd to January 4th. The Debtors' next payroll will be paid on Friday, January 16th, for the period from January 5th to January 18th.[11] The Debtors' payroll is generally made by direct deposit through electronic transfer of funds to the Employees. Currently, the Debtors pay approximately $37 million per pay period in wages to the Employees.

        109.    Because the last payroll date for most Employees was on January 2nd, as of the Petition Date, certain Employees will not have been paid all of their prepetition wages.[12] Additionally, compensation may be due and owing as of the Petition Date because:

---

[11]    The January 16th payroll includes payments to certain non-active Employees, none of whom exceed the $10,950 administrative priority cap.

[12]    Certain of the Employees were last paid on January 9th, 2009 as part of an interim payroll.

CCC0031101

CCC0031058

     a.     Some discrepancies may exist between the amounts paid and amounts the Employees or others believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees;

     b.     Some payroll checks issued to the Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date;

     c.     The U.S. Sales Employees are paid in arrears by 45 days for sales commissions;

     d.     Employees who receive premium pay for overtime hours, on-call hours or undesirable shift hours are paid in arrears by two weeks; and

     e.     Variations may occur in the Debtors' various payroll schedules.

The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $26 million in wages and salaries.

     110.     In addition to the Employees' basic wages and salary, some Employees are eligible to receive additional income in the form of premium pay ("Premium Pay"). Employees may be entitled to Premium Pay for working overtime hours, for working special shifts, or for being on call outside of scheduled working hours. In 2008, the Debtors paid approximately $8.1 million in Premium Pay to the Employees. The Debtors estimate that there remains outstanding, as of the Petition Date, approximately $1 million in Premium Pay.

     111.     The U.S. Sales Employees, in addition to their base salaries, are eligible to receive variable compensation based on achieving revenue, orders or key sales objectives under the "Nortel Global Sales Incentive Compensation Plan" (the "Sales Incentive Plan"). Until January 1, 2009, payments under the Sales Incentive Plan were made on a monthly basis and were paid in arrears by 45 days. Additionally, any earned sales bonus payments under the Sales Incentive Plan were paid in the monthly or quarterly payment cycle in which the sales objectives were met. The Debtors estimate that there remains outstanding, as of the Petition Date,

45

CCC0031102

CCC0031058

approximately $14 million in payments under the Sales Incentive Plan. The Sales Incentive Plan is an ordinary course of business compensation program that has been in place and implemented for several years. The Debtors intend to renew the Sales Incentive Plan in 2009 based on the alignment of individual quota targets determined on an annual basis in the ordinary course of business.

112.    In addition to base salary, certain Employees are eligible for an annual cash bonus award under the "Nortel Networks Limited Annual Incentive Plan" (the "Annual Incentive Plan"). Bonuses under the Annual Incentive Plan are based on the achievement of pre-established corporate and individual performance objectives for a given calendar year, subject to the discretion of the joint Compensation and Human Resources Committee of the Boards of Directors of NNC and NNL (the "CHRC") and the Board of Directors of NNL. The Annual Incentive Plan is an ordinary course of business compensation program that has been in place and implemented for several years. This type of bonus structure is standard in this industry.

113.    Given that payments under the Annual Incentive Plan are made in the ordinary course of business, the Debtors note that they need not obtain special approval to continue making payments under the Annual Incentive Plan. See In re Dana Corp., 358 B.R. 567, 580-81 (Bankr. S.D.N.Y. 2006). Out of an abundance of caution, however, the Debtors by this Motion seek authority in their sole discretion to pay bonuses under the Annual Incentive Plan for 2008 in the ordinary course of business. Bonuses to be paid under the Annual Incentive Plan for a given year are typically determined in February or March of the following year upon approval of the CHRC and the Board of Directors of NNL. As of the Petition Date, the Debtors are in the process of calculating the achievement of corporate and individual performance objectives under the Annual Incentive Plan for 2008. Those calculations will not be finally

46

determined until sometime after the Petition Date. Based on preliminary estimates and under the

current circumstances, however, the Debtors anticipate that there will be no payments under the

Annual Incentive Plan for 2008.

114.    The Debtors intend to continue the Annual Incentive Plan in 2009 based

on corporate and individual performance objectives that will be adopted in or around February in

the ordinary course of business. Corporate performance objectives will be developed by

management in coordination with its compensation consultant, Mercer Human Resources

Consulting, LLC, and subject to the approval of the CHRC and the Board of Directors of NNL.

Individual performance objectives will be determined through an annual employee review

process. The Debtors expect that the performance objectives for the 2009 Annual Incentive Plan

will also be reviewed by both the Monitor in the Canadian proceedings and the official creditors

committee, once appointed, in these proceedings.

115.    The Debtors are in the process of developing a Key Employee Incentive

Plan (the "KEIP") in the course of these chapter 11 proceedings. The development of the KEIP

is essential in order to ensure that the Debtors are able to retain and motivate the employees most

critical to the Debtors' ability to successfully reorganize and maximize value for all stakeholders.

I have been informed that the Debtors anticipate that the details of the KEIP will be developed

and adopted quickly after the Petition Date by the CHRC and the Boards of Directors of NNC

and NNL. I understand that both the Monitor in the Canadian proceedings and the official

creditors committee, once appointed, will be consulted regarding the KEIP and will be offered an

opportunity to review and evaluate the KEIP before it is submitted for approval to the CHRC and

the Boards of Directors of NNC and NNL.

47

CCC0031104

CCC0031058

116.    The Debtors compensate Employees suffering from short-term disability by continuing to pay those Employees salary for the period of the time that they are disabled. Such salary continuance is available for disabilities lasting between one and 26 weeks. The Debtors estimate that the cost of providing short-term disability in 2008 was approximately $3 million.

117.    The Debtors believe that there remain unpaid, as of the Petition Date, wages, salaries, overtime pay, commissions and other compensation (excluding reimbursable expenses, vacation pay, severance pay, deferred compensation and incentive bonus pay) earned by the Employees prior to the Petition Date (the "Unpaid Compensation"). The Debtors estimate that they owe approximately $41 million in Unpaid Compensation to the Employees.

118.    I believe that authorizing the Debtors to honor and pay any outstanding unpaid compensation and to continue, during the course of these cases, to pay salary, wages, overtime pay, commissions and other compensation to the Employees in accordance with the Debtors stated policies and in the ordinary course of business is critical to maintaining the Debtors' businesses, as I will describe further below.

Deductions and Withholdings

119.    During each applicable pay period, the Debtors routinely deduct certain amounts from the Employees' paychecks, including, without limitation, garnishments and other pre-tax and after-tax deductions payable to certain of the benefit plans discussed herein, such as an employee's share of health care benefits, insurance premiums, 401(k) contributions, flexible spending account contributions, legally ordered deductions and other miscellaneous deductions (collectively, the "Employee Deductions") and forward those amounts to various third-party

CCC0031105

CCC0031058

recipients. On average, the Debtors have historically deducted approximately $14.8 million from the Employees' paychecks per pay period.

120.    Furthermore, the Debtors are required by law to withhold from the Employees' wages amounts related to federal, state and local income taxes, social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authority. In 2008, the Debtors withheld on average approximately $9.6 million from the Employees' paychecks per pay period. The Debtors must then match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Payroll Taxes, including those from the Employees and the employer, are approximately $11.2 million per pay period.

121.    Due to the commencement of the chapter 11 cases, there may be Employee Deductions from the earnings of the Employees that were not forwarded to the appropriate third party recipients prior to the Petition Date. Additionally, due to the commencement of the chapter 11 cases, the Debtors may have withheld but not yet forwarded to the appropriate authority amounts for Payroll Taxes.

Expat Costs

122.    As a global enterprise, from time to time Nortel assigns certain highly-qualified and highly-compensated employees to locations in outside of their home country either temporarily or permanently (the "Global Mobility Program"). The participants in the Global Mobility Program (the "Expats") function as the primary face of Nortel in the world community and are responsible for spearheading Nortel's global efforts. Among the critical functions

49

CCC0031106

CCC0031058

performed by the Expats are providing the expertise necessary to start up a new operation or deploy new technologies, providing on-site training for exceptional skills, and providing senior management expertise in a location where such needs cannot be met locally. Temporary assignments under the Global Mobility Program are typically for a fixed period of time lasting between 30 days and three years.

123.    Maintaining the Global Mobility Program requires Nortel to incur various costs associated with sending the Expats to their designated locations. NNI bears such costs for Expats who are sent to its operations in the United States. This bundle of costs, whether payable to the Expats or to third parties (the "Expat Costs"), represents some of the costs to Nortel of doing business in these countries and includes paying for such necessities as transportation to the assignment location, housing, utilities, schooling, medical coverage, insurance, immigration and visa costs and tax assistance. While some of the Expat Costs may be classified as imputed income to the Expats, depending on the host country and applicable tax regimes, the Expat Costs are essentially Nortel's operating costs for maintaining a global presence.

124.    For certain of the Expat Costs, Nortel contracts with a third-party supplier, which performs certain obligations on behalf of Nortel and the Expats. For instance, Nortel contracts with Mobility Service International for the purpose of providing international assignment management services, including coordinating various aspects of the temporary relocation of the Expats from their home country to their host country location. In addition, Nortel contracts with Chamness Relocation Services ("Chamness") for the purpose of assisting the Expats in finding housing and educational services. Expats also have the option of authorizing Chamness to manage the home rental in the host country and pay the Expats' rents, utilities and other bills on a recurring basis for the duration of the assignment.

50

CCC0031107

CCC0031058

125.    The Debtors estimate that they owe $100,000 in outstanding Expat Costs as of the Petition Date and that the Debtors will incur approximately $1.85 million in Expat Costs under the Global Mobility Program in 2009.

126.    While the Debtors continue to evaluate their global businesses in these chapter 11 proceedings, I believe that it is essential that they receive authority to pay any outstanding prepetition Expat Costs and continue to pay the Expat Costs. To the extent that the Debtors determine that it is in their best interests to retain the Expats, my understanding is that failure to pay the Expat Costs would not only disrupt the Expats' lives but also jeopardize Nortel's presence in the locations in which the Expats are based. Moreover, failure to pay the Expat Costs would provide little benefit to the Debtors, because the Debtors are still obligated to reimburse the Expats for their living expenses. Thus, if the Expats were forced to, for example, seek alternative housing as a result of the Debtors' failure to pay their landlords, the Debtors would be obligated to pay the Expats for any moving costs as well as to reimburse their rents. In order to continue operating the Global Mobility Program in the interim, therefore, the Debtors seek authority in the Employee Wage Motion, in their sole discretion, but not direction, to (a) pay any outstanding prepetition Expat Costs, and (b) continue during the course of these cases to pay the Expat Costs in accordance with the Debtors' stated policies and in the ordinary course of business.

127.    In addition, in order to ensure that the Expats do not suffer a financial hardship as a result of the tax consequences of an international assignment, the Debtors make certain tax equalization payments on behalf of the Expats (the "Tax Equalization Payments"). Incurring the costs of the Tax Equalization Payments ensures that the Expats pay no more or less

51

CCC0031108

CCC0031058

in taxes than they would pay if they worked in their home country. The Debtors estimate that in 2008 the cost of the Tax Equalization Payments to the Debtors was approximately $128,000.

Payment of Reimbursable Expenses

128.    Prior to the Petition Date, and in the ordinary course of business, the Debtors reimbursed the Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment in accordance with Internal Revenue Code ("IRS") regulations (the "Reimbursable Expenses").

129.    A Reimbursable Expense is an expense incurred by an Employee in the performance of his/her duties that is deemed to be necessary to the performance of his/her job, and is reasonable. The Reimbursable Expenses are paid-for expenses such as travel, meals, accommodations, parking, automobile mileage, and other business-related expenses that are paid by the Employees.

130.    A Reimbursable Expense is made to an Employee when an approved expense report is submitted by such Employee to the appropriate accounts payable department and is processed.

131.    Certain Employees are permitted to use an American Express credit card provided by the Debtors. The Employees using such credit cards are billed directly by American Express and are entitled to choose their method of payment for business expenses. Some Employees choose to pay their business expenses to American Express directly and subsequently prepare an expense report for any Reimbursable Expenses, which, if approved as valid Reimbursable Expenses, are reimbursed by the Debtors. Other Employees choose to have the Debtors pay American Express on their behalf for their valid Reimbursable Expenses. Upon the commencement of these chapter 11 proceedings, I understand that future reimbursements for

52

CCC0031109

CCC0031058

Reimbursable Expenses will be made only directly to American Express on behalf of the Employees and not to the Employees.

132.    It is likely that certain Employees have not been reimbursed for Reimbursable Expenses incurred prior to the Petition Date. In this regard, I understand that it is difficult for the Debtors to estimate the amount of Reimbursable Expenses outstanding as of the Petition Date because not all Employees may have submitted expense reports for all accrued expenses. Nevertheless, I believe that it is critical that the Debtors be authorized to reimburse all such expenses when the reports are submitted in order to assure such Employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment.

133.    In 2008, the Debtors paid approximately $6 million in Reimbursable Expenses to the Employees per month. As of the Petition Date, the Debtors estimate that there remains outstanding approximately $4 to $6 million in Reimbursable Expenses.

Employee Benefits

134.    In the ordinary course of business, the Debtors provide the Employees with a number of benefits, including: (a) health and dental insurance and other insurance benefits including life insurance; (b) worker's compensation benefits; (c) vacation pay and other paid leave; (d) retirement plan and flexible spending accounts; and (e) other non-insured programs and voluntary insured programs, (collectively, the "Employee Benefits") through employer sponsored contributory and non-contributory benefit plans and voluntary insurance coverage. In 2008, the cost to the Debtors of providing all of the Employee Benefits was approximately $160 million.

53

#### Health Care Programs & Insurance Benefits

135.   In the ordinary course of business, the Debtors offer the Employees and
their families health and dental insurance (the "Health Care Programs").  Approximately 9,890
Employees obtain health care coverage (medical and/or dental) through the Debtors' Health Care
Programs.  These figures include certain Employees on disability and paid leave or otherwise
eligible for salary continuance who are not considered active employees.  Additionally,
approximately 3,000 retired employees obtain medical coverage through the Debtors' Health
Care Programs.

136.   The Debtors maintain self-insured medical and dental plans that are
administered through CIGNA (medical and dental) and Blue Cross Blue Shield (medical only).
The Employees contribute a portion of their salaries to premium payments for the health and
dental insurance plans, and the Debtors pay the costs for all administrative claims and ancillary
costs of the health plan and dental plan.  In addition, the Debtors pay fees to CIGNA and Blue
Cross Blue Shield to administer the claims.

137.   The Debtors also provide several other types of insurance to the
Employees and their dependents, including life insurance, dependent life insurance, accidental
death and dismemberment insurance, business travel accident insurance and long-term disability
insurance (collectively, the "Insurance Benefit Programs").

138.   The costs associated with the Debtors' Health Care and Insurance Benefit
Programs are paid through the Debtors' Voluntary Employee Beneficiary Association plan (the
"VEBA Trust").  The VEBA Trust is a qualified, tax-exempt plan the purpose of which is to
provide a funding vehicle for the Debtors' Health Care and Insurance Benefit Programs.  The
Debtors manage the operation and administration of the VEBA Trust in conjunction with the

54

CCC0031111

CCC0031058

trustee, Bank of America. The VEBA Trust is open to all participants in the Debtors' Health Care Programs. Both the Debtors and the participating Employees make contributions to the VEBA Trust, the proceeds of which are used to make claim and benefit payments on behalf of the participating Employees. On a biweekly basis, the Debtors place approximately $5 million into the VEBA Trust to cover all claims and expenses associated with the Employees' Health Care and Insurance Benefits Programs. The Employees' contributions are handled through deductions from their paychecks. The annual cost to the Debtors to fund and administer the VEBA Trust is approximately $130 million.

### Workers' Compensation

139.    Under the laws of the various states in which the Debtors operate, the Debtors are required to maintain workers' compensation liability insurance and to provide employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. The Debtors provide workers' compensation benefits (the "Private Workers' Compensation Benefits") to their Employees, except for those employed in jurisdictions (the "Publicly Insured States") that require workers' compensation liability insurance to be maintained through the state, through a workers' compensation insurance policy issued by Travelers (the "Workers' Compensation Policy"). The term of the Workers' Compensation Policy is from May 15, 2008 to May 15, 2009.

140.    The Debtors provide workers' compensation benefits (the "Public Workers' Compensation Benefits," and together with the Private Workers' Compensation Benefits, the "Workers' Compensation Programs") to their Employees working in the Publicly Insured States through policies provided directly from those states (collectively, the "Public

CCC0031112

CCC0031058

Workers' Compensation Policies," and together with the Private Workers' Compensation Policy, the "Workers' Compensation Policies").

141.    For the 2008 renewals, the Debtors expect to pay approximately, but no more than, $882,000 in premiums for their Workers' Compensation Policies, of which approximately $546,000 has been paid as of Petition Date.

142.    I understand that failure to maintain workers' compensation insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors.

### Vacation, Sick and Other Paid Leave

143.    The Debtors provide vacation time to the Employees as a paid time-off benefit ("Vacation Obligations"). The Employees are entitled to take a minimum of three weeks and a maximum of five weeks vacation per year. Vacation time begins accruing on the date of employment and can be used immediately. Employees are entitled to carry forward up to one year of unused vacation time to the following year, except for those Employees located in California, who are entitled under state law to carry forward up to two years of unused vacation time.

144.    As of the Petition Date, the Debtors estimate that they have approximately 1.1 million hours and $67 million in unpaid Vacation Obligations for the Employees that accrued prior to the Petition Date (collectively, the "Unpaid Vacation"). By the Employee Wage Motion, the Debtors seek authority in their sole discretion to (a) allow the Employees to take vacation time in the ordinary course of business on a going forward basis (and thus reducing any liability

56

CCC0031113

CCC0031058

relating thereto); and (b) to the extent applicable, pay Unpaid Vacation upon termination or retirement in accordance with prior practice.

145.    I believe that the continuation of the Vacation Obligations in accordance with prior practice is essential to maintaining morale during this difficult time. Further, the Vacation Obligations are provided to all Employees and are a benefit that Employees have come to depend on. Thus, I believe that continuation of the Vacation Obligations is necessary under the circumstances and should be authorized by this Motion.

146.    Under company policy, Employees are entitled to take up to 10 sick days per year ("Sick Leave Obligations"). In addition, Employees are paid for 12 holidays per year ("Holiday Obligations"). Employees are also entitled to up to three days bereavement leave per calendar year for use in the event of a death of an immediate family member ("Bereavement Obligations"). Employees are also entitled to take a leave of absence in certain situations ("Leave of Absence Obligations" and, together with the Sick Leave Obligations, Holiday Obligations and Bereavement Obligations, the "Leave Obligations"). Employees may take up to 12 weeks of unpaid[13] leave per year for family care. Employees may take up to five years of military leave, the first two years of which the Debtors will compensate the Employee up to his/her full salary. Employees may take up to one year of unpaid personal leave. In other situations, Employees may qualify for a paid leave of absence for medical reasons.

401(k) Retirement Plan

147.    Employees are eligible to participate in the 401(k) retirement plan (the "401(k) Plan"), which is a 401(k) savings plan pursuant to the Internal Revenue Code ("IRC").

---

[13]     Except in those states that mandate by law that family leave be paid in part.

57

CCC0031114

CCC0031058

Employees may elect to contribute up to the annual IRS limits on contributions and eligible compensation.

148.    Under the 401(k) Plan, Employees become eligible to contribute immediately upon employment with the Debtors. Employees may contribute between 1% and 50% of their pay on a pre-tax basis up to the IRS limits. The Debtors automatically contribute 2% of Employees' pay and additionally provide a matching contribution on pre-tax amounts equal to 50% of the first 6% of an Employee's eligible pay. In 2008, the Debtors contributed approximately $29 million in matching contributions to the 401(k) Plan.

149.    As of the Petition Date, the Debtors estimate that there is approximately $630,000 in outstanding matching contributions to the 401(k) Plan that the Debtors have yet to pay.[14]

Flexible Spending Accounts

150.    The Debtors offer Employees the ability to contribute a portion of their compensation into flexible spending accounts on a pre-tax basis under IRC section 125 for health and dependent care expenses (the "Health Care FSA" and the "Dependent Care FSA," respectively, and collectively, the "FSAs"). The Health Care FSA allows Employees to contribute up to $5,200 per year to pay for non-reimbursed health care expenses that the IRS would consider deductible medical expenses. The Dependent Care FSA allows Employees to contribute up to $5,000 per year for day care expenses for a child or qualified adult dependent. The Debtors estimate that approximately 4,200 Employees have elected to contribute funds to either the Health Care FSA or the Dependent Care FSA.

---

[14]    The Debtors also other maintain retirement plans in addition the 401(k) Plan. However, the Debtors do not ask the Court to provide relief with respect to these retirement plans at this time.

CCC0031115

CCC0031058

151.    The FSAs are administered by a third party administrator, WageWorks, Inc. ("WageWorks"). On a bi-weekly basis, the Debtors wire the Employees' selected contribution amounts into a special employee deposit holding account. On a weekly basis, the Debtors wire money to an account maintained by WageWorks to reimburse WageWorks for claims paid to Employees for the previous week. The Debtors estimate that the cost to administer the FSAs in 2008 was approximately $300,000, which is offset by savings to the Debtors from FICA taxes that are not paid on section 125 employee contributions and amounts forfeited by Employees in the FSAs.

Additional Employee Benefits

152.    In the ordinary course of business, the Debtors provide the following additional Employee Benefits (the "Additional Employee Benefits"). Specifically:

a.    Adoption Costs: The Debtors provide up to $5,000 per Employee for adoption costs.

b.    Employee Assistance Program: The Debtors provide free counseling and referral information to Employees, up to 8 visits per year.

c.    Health & Fitness Centers: At some locations, the Debtors provide on-site access to health centers and fitness centers.

d.    Travel Well Program: The Debtors provide pre-departure health and security information for Employees traveling for business purposes and provide expert assistance with health and security emergencies during international travel whether for business or pleasure.

153.    By filing the Employee Wage Motion, the Debtors seek authority, to be exercised at their sole discretion, to pay and honor the prepetition obligations I have described above, including wages, salaries and other compensation, federal and state withholding taxes and other amounts withheld (including garnishments, employees' share of insurance premiums, taxes and 401(k) contributions), reimbursable expenses, expat costs, health and insurance benefits,

59

CCC0031116

CCC0031058

workers' compensation benefits, retirement benefits, vacation time and other paid leave, and all other benefits that the Debtors have historically provided in the ordinary course of business and to continue to pay and honor such claims postpetition and to pay all costs incident to the foregoing. In addition, the Debtors request the right to modify or discontinue any of the wages and benefits and their policy related to reimbursable expenses, and to implement new wages and benefits in the ordinary course of business during these chapter 11 cases without the need for further approval by this Court.

154.    I believe that granting the relief requested in the Employee Wage Motion is essential for the Debtors' reorganization, as it will allow the Debtors to continue to operate with minimal disruption and enable them to stabilize their businesses. A lapse in the payment of wages and benefits would distract the Debtors' Employees from the Debtors' reorganization by reducing employee morale, by raising questions as to the viability of the Debtors as a going concern, and by imposing significant financial hardships on the Debtors' Employees and their families. I am also concerned that these financial hardships would result in the loss of many crucial Employees, who could seek employment with the Debtors' competitors. Such a loss of key personnel at this crucial time would undoubtedly slow the Debtors' reorganization, and moreover, necessitate expensive recruitment and training of replacements for these employees, if replacements could be recruited at all. Given these severe potential problems, I am confident that if this Court failed to grant the relief requested in the Employee Wage Motion, the Debtors would be irreparably harmed.

155.    Furthermore, I have been advised that this Court could not confirm any plan of reorganization proposed by the Debtors if the Debtors had not first completed payment of wages and benefits to their Employees, to the extent that such payments do not exceed $10,950.

CCC0031117

CCC0031058

I also understand that if the Debtors had not paid payroll taxes and other deductions from Employees' wages to the appropriate authorities, and that if they had not made the contributions required by law to their Employees' retirement plan, that a plan of confirmation could also not be confirmed. As a result, I do not believe that payment of these obligations now will be detrimental to the Debtors' creditors and ask this Court to grant the relief requested in the Employee Wage Motion.

I.    MOTION PURSUANT TO SECTIONS 105(A), 363(B), 507(A)(8), AND 541 OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTORS TO REMIT AND PAY CERTAIN TAXES AND FEES ("TAX AND FEE MOTION")

156.    In the ordinary course of their businesses, the Debtors incur sales, use, income/franchise, real and personal property, business and occupation and other similar taxes, collect sales taxes from their customers and charge fees for licenses and other similar charges and assessments on behalf of various taxing, licensing and regulatory authorities and pay fees to such authorities for licenses required to conduct the Debtors' businesses.

157.    For example, between January and October 2008, the Debtors paid approximately $2.8 million on average each month in sales and use taxes, and estimate that as of the Petition Date, they still owe approximately $5.6 million in sales and use taxes incurred prior to seeking protection under chapter 11. Additionally, in 2008, the Debtors accrued approximately $2 million in property taxes, roughly half of which remain to be paid as of the Petition Date.

158.    In addition, in 2008 the Debtors accrued approximately $3.5 million in income/franchise taxes in certain U.S. jurisdictions, based on the income tax base, the capital employed in the Debtors' businesses, the Debtors' assets and/or a variety of other factors.

61

CCC0031118

CCC0031058

Payment of the income/franchise taxes allows the Debtors to continue operating their businesses in such states. The income/franchise taxes are typically paid on a quarterly or annual basis.

159.    In 2008, the Debtors accrued approximately $3.5 million in real property taxes. As of the Petition Date, the Debtors estimate that they owe approximately $2.36 million with respect to the 2008 real property taxes incurred prior to the Petition Date. These accrued amounts would, absent the commencement of these chapter 11 proceedings, generally be paid in the first quarter of 2009.

160.    In 2008, the Debtors accrued approximately $2 million in personal property taxes. As of the Petition Date, the Debtors estimate that they owe approximately $1 million with respect to the 2008 personal property taxes incurred prior to the Petition Date. These accrued amounts would, absent the commencement of these chapter 11 proceedings, generally be paid in the first quarter of 2009.

161.    In 2008, the Debtors incurred approximately $580,000 in business and occupation taxes and business license fees in certain jurisdictions. I believe that the Debtors are current with respect to their business and occupation taxes and business license fees.

162.    The Debtors are also required to obtain construction, telecommunication and engineering contractor licenses and pay the applicable authorities corresponding flat fees in certain jurisdictions. Typically, these contractor license fees are paid on a biannual, annual or biennial basis, depending on the jurisdiction. I believe that the Debtors are current with respect to their contractor license fees.

163.    The Debtors are subject to certain audit investigations and may be subject to further audit investigations over the course of these chapter 11 proceedings that may result in additional amounts owed in prepetition taxes and/or fees to certain authorities.

62

CCC0031119

CCC0031058

164.    By filing the Tax and Fee Motion, the Debtors request that the Court allow them to remit and pay the sales, use, income/franchise, real and personal property, business and occupation taxes, and other similar taxes as the Debtors deem necessary, as well as fees for licenses, and other similar charges and assessments as described above. I fear that if this Court does not authorize the Debtors to pay these taxes and fees, the Debtors' taxing authorities could take a range of actions that could have wide-ranging negative effects on the Debtors' operations. I understand that the Debtors' officers and directors might face personal liability for unpaid taxes or that the taxing authorities could seek to impose liens on the Debtors' assets or to suspend their operations. I am also concerned that the Debtors could face audits, which would divert their attention away from the reorganization process.

165.    Moreover, I understand that many of the Debtors' outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the authorities and are therefore not a part of the Debtors' estate. I also understand that, to the extent that debtors' taxes are not trust fund taxes, courts have regularly authorized debtors to pay such taxes so as to facilitate the reorganization process and thereby enhance the value of debtors' estates. Finally, I also understand that payment of some of the Debtors' prepetition taxes and fees is a prerequisite to any confirmation of a potential chapter 11 plan, and as such I believe there is no reason to delay these inevitable payments. Consequently, I ask the Court to grant the relief requested in the Tax and Fee Motion, including granting such relief on an interim basis pending entry of a final order.

63

CCC0031120

CCC0031058

J.    MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO
       (A) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION, AND
       (B) ENTER INTO NEW INSURANCE POLICIES ("INSURANCE MOTION")

166.    By the Insurance Motion, the Debtors are requesting that the Court enter

an Order: authorizing them to (a) continue their insurance policies uninterrupted and pay any

prepetition amounts related to such policies to the extent that the Debtors determine, in their

discretion, that such payment is necessary or appropriate; and (b) enter into new insurance

policies through renewal of their insurance policies or purchase of new policies in the ordinary

course of their businesses.

167.    Pursuant to the diverse regulations, laws and contracts that govern their

commercial activities, the Debtors hold third-party insurance policies with a number of insurance

carriers and are required to pay premiums to maintain these policies (the "Insurance Policies").

The Debtors estimate that, for the 2008 renewals, the total premiums to be paid by the Debtors

on the Insurance Policies was approximately $938,863 in the aggregate, of which approximately

$292,000 will be paid postpetition as payments come due in the ordinary course of business. I

understand that the Debtors have made all premium payments on the Insurance Policies that

came due prior to the Petition Date.

168.    The Debtors' Insurance Policies can be grouped into two categories: First,

NNI maintains insurance policies to provide coverage for workers' compensation claims brought

by employees injured on the job in the United States. For the 2008 renewals, the total cost of

premiums for the Workers' Compensation Policies is $882,004, of which $819,754 was

structured to be paid over 12 monthly installments, starting in May 2008, and the remainder

structured to be paid in accordance with the terms of individual state policies. The majority of

these policies will expire on May 15, 2009, and, as of the Petition Date, there remains to be paid

64

CCC0031121

CCC0031058

approximately and no more than $274,000 on the workers' compensation policies for the 2008 renewals. The Debtors also incur other expenses related to these policies, including a quarterly payment of $35,350 to reimburse NNL for the costs of maintaining letters of credit to cover potential workers' compensation liability. They also make monthly payments to insurance companies to cover expenses and settlements related to outstanding claims, which totaled $784,653 in 2008.

169.    Second, NNI also maintains an Insurance Policy to cover liability arising from the use of company-owned or leased automobiles in the United States. For the 2008 renewal, the total cost of premiums for the Debtors' auto liability policy is $56,859, which was structured to be paid over 12 monthly installments beginning in May 2008. The Debtors estimate that, as of the Petition Date, there remains to be paid approximately and no more than $19,000 on the auto liability policy for the 2008 renewal. In addition, the Debtors paid an additional $435,378 in claims-related expenses for this policy. These expenses include payments to the Debtors' primary automobile vendor, Automotive Rental Inc. ("ARI"), for the repair cost and any incidental costs for damaged automobiles leased to the Debtors pursuant to an agreement between the Debtors and ARI. The Debtors are contractually liable for insuring against the cost of repairs to the leased automobiles damaged in accidents. Rather than purchasing insurance, the Debtors engaged ARI to manage the repairs of the damaged automobiles. The ongoing payment of these claims-related expenses postpetition will ensure that the Debtors continue to have access to vehicles which are very important to the Debtors' business operations throughout the reorganization period.[15]

---

[15]    I have been informed that the Guidelines of the Office of the United States Trustee for the District of Delaware require the Debtors to maintain certain insurance coverage throughout their chapter 11 proceedings that is more extensive than I have described above. Although the Debtors themselves do not maintain all of the categories

65

CCC0031122

CCC0031058

170.    The Debtors have also retained an insurance broker – Willis of Tennessee, Inc. – to assist with the procurement and negotiation of the policies described above. In 2008, the Debtors paid a total of $60,000 in fees to Willis. As of the Petition Date, I understand that all broker fees for services rendered by Willis before the Petition Date have been paid in full.

171.    In addition to the Insurance Policies funded directly by the NNI, NNC maintains a number of third-party insurance policies on behalf of all of its subsidiaries, including the Debtors (the "Nortel Insurance Policies"). The Nortel Insurance Policies are in NNC's name, and the premiums for these policies are paid by NNL. The Nortel Insurance Policies cover all of NNC's subsidiaries generally, and none of the subsidiaries receive specific coverage under the Nortel Insurance Policies.

172.    The Nortel Insurance Policies are maintained for the following types of insurance: Errors and Omissions, Fiduciary Liability, Auto Liability, Comprehensive General Liability, Directors' and Officers' Liability, Property, Boiler and Machinery, Transit Floater, Crime, Employment Practices Liability and Special Accident Insurance. Most of these types of insurance are required to be maintained either by law or by contracts entered into by Nortel or its subsidiaries, including NNI.

173.    The Debtors do not fund the Nortel Insurance Policies and therefore are not seeking relief from this Court with respect to the Nortel Insurance Policies, which the Debtors understand will continue in the ordinary course during the reorganization period through the Canadian Proceedings.

---

of insurance coverage listed in the U.S. Trustee Guidelines, their corporate parent does maintain such coverage and funds it on the Debtors' behalf.

66

CCC0031123

CCC0031058

174.    I believe that the Insurance Policies are essential to the ongoing operation of the Debtors' businesses. I have been advised that the Debtors do not believe that Court approval is necessary to permit them to maintain their existing Insurance Policies. Out of an abundance of caution, however, the Debtors by the Insurance Motion seek authorization from this Court to pay prepetition amounts, if any, necessary to maintain insurance coverage currently in effect and to continue and renew these policies or purchase new policies in the ordinary course of running their businesses, to the extent that the Debtors determine that doing so would be in the best interest of the Debtors and their estates.

175.    I believe that maintaining and renewing the Debtors' insurance coverage is crucial to their reorganization, as it is required by law and is imperative to the protection and preservation of the Debtors' assets. Without the authority requested in the Insurance Motion, I am concerned that the Debtors might lose their coverage, or incur considerable cash expenditures to obtain other replacement coverage, either of which would hamper a successful reorganization. Moreover, I understand that failure to maintain the Debtors' insurance coverage could lead to dismissal or conversion of their chapter 11 cases. As a result, I request that this Court grant the relief requested in the Insurance Motion.

K.    MOTION PURSUANT TO SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE, FOR AN ORDER AUTHORIZING DEBTORS TO HONOR PREPETITION OBLIGATIONS TO THEIR CUSTOMERS ("CUSTOMER OBLIGATIONS MOTION")

176.    By the Customer Obligations Motion, the Debtors are requesting that the Court enter an Order: authorizing them, in their sole discretion, to (i) honor and perform prepetition obligations to their customers (the "Customer Obligations"); and (ii) continue their customer programs in the ordinary course of business.

67

CCC0031124

CCC0031058

177.    As I have described in greater detail above, the Debtors provide networking and communications technology and services to customers in the United States, Canada and around the world. As a whole, Nortel, including the Debtors and their affiliates, count among their customers 85% of the world's top revenue-generating wireless operators globally. In addition, Nortel has designed, installed and launched hundreds of wired and wireless networks in over 50 countries and continues to provide a wide range of network management services to hundreds of customers around the world.

178.    The Debtors' telecommunications solutions include a comprehensive spectrum of networking products and services, from initial infrastructure engineering, planning and deployment to the sale of hardware and software products and services designed to reduce complexity, improve efficiency and increase productivity for a diverse base of customers and end-users (collectively, the "Customers"). The Customers rely on the Debtors for an array of mission critical services related to their networks, including maintenance and technical support, repair and spares management,[16] network managed services, network hosting services, applications services and related engineering, marketing, sales, supply, licensing and installation.

179.    The Debtors maintain numerous customer programs (the "Customer Programs") that are critical to their past and future success and that they wish to continue postpetition. The Customer Programs are aimed at the Debtors' product and services distribution network which includes accredited resellers, distributors, value-added dealers and other strategic partners engaged in the sales and marketing of the Debtors' products and services to end-users.

---

[16]    "Spares management" is a term of art that refers to an end-to-end service offering that includes a number of functions such as spare parts inventory management (warehousing of the parts), associated logistics (collection of defective parts and delivery of replacements) and installation of replacement parts into the network.

68

CCC0031125

CCC0031058

The total cost to the Debtors and the Canadian Debtors of carrying out the Customer Programs in 2008 was approximately $249 million. Among these Customer Programs are:

  a. Volume Incentive Discount Program (the "VID Program"): The VID Program provides discounts to accredited resellers and strategic partners who act as resellers of the Debtors' products and services. The VID Program discount amount is based on an individual reseller's or partner's revenue performance in the previous year. Maintaining the VID Program is critical to ensuring that the Debtors' most successful partners remain loyal to the Debtors through this difficult time by providing them with the rewards for past performance that they have been promised. The Debtors estimate that maintaining the VID Program in 2008 cost the Debtors and the Canadian Debtors approximately $116 million;

  b. Marketing Efforts (the "Marketing Programs"): The Marketing Programs include efforts undertaken by the Debtors themselves and in conjunction with accredited resellers and strategic partners to advertise, promote and demonstrate the benefits of the Debtors' products and services to their end-user customers. The Marketing Programs involve a series of offers, incentives, discounts, rebates, communications, and training to partners acting as resellers, distributors as well as end-user customers. The Marketing Programs are primarily designed to expand the Nortel customer base and increase sales. Continuation of the Marketing Programs is essential if the Debtors are to remain competitive in the global marketplace. The Debtors estimate that maintaining the Marketing Programs in 2008 cost the Debtors and the Canadian Debtors approximately $83 million;

  c. Cooperative Partner Programs (the "Partner Programs"): The Partner Programs provide cash incentives to the Debtors' most valued accredited resellers and strategic partners for their undertaking ongoing efforts to support, market and sell the Debtors' products and services alongside their own on the Debtors' behalf. The Debtors have developed three tiers of accredited resellers and partners as determined by volume performance, portfolio breadth and service commitment: Advantage Partners, Premium Advantage Partners and Elite Advantage Partners. Participants in the Partner Programs include some of the most recognizable and powerful names in the telecommunications and networking industry including IBM, Dell, Verizon and Bell Canada, among others. Without the continued support of these partners, the Debtors' ability to restructure their businesses will be severely hindered. The Debtors estimate that maintaining the Partner Programs in 2008 cost the Debtors and the Canadian Debtors approximately $12 million and

  d. Value-Added Dealers Program (the "VAD Program"): The VAD Program provides discounts and rebates to the most valued and successful accredited distributors and dealers of Nortel products. The VAD Program includes a series of up-front discounts and back-end rebates based on the

69

CCC0031126

CCC0031058

achievement of performance metrics as well as discounts for early payment. The continuation of the VAD Program will ensure that the Debtors' products and services reach end-customers and are delivered, implemented and maintained in an orderly and efficient manner. The Debtors estimate that maintaining the VAD Program in 2008 cost the Debtors and the Canadian Debtors approximately $38 million.

180.    By the Customers Obligations Motion, the Debtors request that this Court allow them to honor obligations to their customers that arose before the Debtors sought relief under chapter 11, including through the Customer Programs. As of the Petition Date, I understand that some of the Debtors' most valued Customers, who operate complex and important networks reliant on Debtors' continued support, have outstanding claims against the Debtors for goods and services for which they have already paid. Given the critical nature of the Debtors' continued support required to ensure network operational readiness, I believe that failure to honor prepetition obligations to such Customers creates a significant risk that such customer relationships will be effectively destroyed. I am confident that honoring prepetition obligations to these Customers, including through the Customer Programs, will benefit all creditors because honoring these obligations will allow the Debtors' businesses to avoid the loss of critical Customers, the costs of which far outweigh the costs of honoring these obligations.

181.    For these and for the other reasons set forth in the Motion, I believe that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties-in-interest in these cases.

70

CCC0031127

CCC0031058

L.  MOTION PURSUANT TO SECTIONS 105(A) AND 363(B)(1) OF THE
    BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY
    PREPETITION COMMON CARRIER CHARGES AND WAREHOUSE FEES
    ("SHIPPERS AND WAREHOUSERS MOTION").

182.    In the ordinary course of providing telecommunications and networking

equipment to their customers, the Debtors employ a variety of third party common carriers to

transport their products and warehouse facilities to store them prior to sale.

183.    To facilitate their payments to common carriers, the Debtors employ

PowerTrack, a third-party freight payment manager, to audit and arrange for pass-through

payment of freight invoices. While PowerTrack charges the Debtors a fee for its services, I

believe this fee is more than offset by the savings gained from eliminating paper invoices,

avoiding late fees and other benefits. Over the last two months, the Debtors have paid

PowerTrack an average weekly amount of approximately $1.3 million per week. As of the

Petition Date, the estimated value of the Debtors' goods in transit is approximately $25 million,

and the Debtors owe PowerTrack and the Common Carriers approximately $2.5 million, which

absent the commencement of these Chapter 11 cases, would be paid over the course of the next

few weeks.

184.    The Debtors also utilize a number of third party warehouse facilities

(collectively, the "Warehouse Facilities") for the purpose of storing products prior to the point of

sale. The Warehouse Facilities are located in Oklahoma, Texas, New Jersey, New York,

Connecticut, Delaware, Maryland, North Carolina, Virginia, Illinois, Wisconsin, Georgia,

California, Tennessee and Florida.

185.    The Debtors pay storage costs (the "Warehouse Fees") directly to the

Warehouse Facilitates in exchange for their services. While the amount the Debtors pay in

Warehouse Fees fluctuates, the average weekly amount paid over the last two months was

71

CCC0031128

CCC0031058

approximately $500,000. The estimated value of the products currently being stored in the Warehouse Facilities as of the Petition Date is approximately $168 million. As of the Petition Date, the Debtors estimate that they owe Warehouse Fees of approximately $4 million, which absent the commencement of these Chapter 11 cases, would be paid over the course of the next few weeks, depending on the terms of the Debtors' contract with each individual Warehouse Facility.

186.    I understand that if the Debtors do not pay common carriers and warehouse facilities for their services, these entities may be able to refuse to deliver goods in their possession or to assert possessory liens in them, notwithstanding the automatic stay imposed by this Court. I am concerned that such actions would seriously disrupt the Debtors' operations, which are inextricably tied to the Debtors' ability to timely deliver telecommunications and networking equipment to their customers across North America. The Debtors rely heavily on their regular common carriers and warehouse facilities to deliver and store their products. To avoid this potential disruption, the Debtors have submitted the Shippers and Warehousers Motion to this Court, requesting authorization to pay its prepetition common carrier and warehouse fees. I believe granting this relief will be to the benefit of the Debtors, their estates and their creditors because the amount of the fees due to common carriers and warehouse facilities are modest in comparison to the value of the Debtors' products held by these entities and the value the Debtors' estates will receive from an uninterrupted supply of goods. I also understand that courts have regularly granted such relief under their power to authorize postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. Accordingly, I request that this Court grant

CCC0031129

CCC0031058

the relief requested in the Shippers and Warehousers Motion, including granting such relief on

an interim basis pending entry of a final order.

M.    MOTION PURSUANT TO SECTIONS 105(A) AND 366 OF THE BANKRUPTCY
      CODE FOR INTERIM AND FINAL ORDERS (I) RESTRAINING UTILITY
      COMPANIES FROM DISCONTINUING, ALTERING OR REFUSING SERVICE,
      (II) DEEMING UTILITY COMPANIES ADEQUATELY ASSURED OF FUTURE
      PERFORMANCE AND (III) ESTABLISHING PROCEDURES FOR DETERMINING
      REQUESTS FOR ADDITIONAL ASSURANCE ("UTILITY MOTION").

        187.    The Debtors obtain various products such as gas, water, electricity, sewer,

telephone, Internet and other essential services from a multitude of utility companies or utility

company divisions (collectively, the "Utility Companies"), including, but not limited to, those

listed on Exhibit A attached to the Utility Motion. Over the past twelve months, the Debtors

have paid an average of $2,113,278 per month to the Utility Companies

        188.    The Debtors directly manage their payments to Utility Companies

providing telecommunications services without the assistance of any third parties. However, to

facilitate their payments to Utility Companies providing electric, gas, water and sewage services,

the Debtors have employed Johnson Controls Inc. ("JCI"), which in turn has subcontracted with

National Information Solutions Cooperative ("NISC") to arrange for the pass-through payment

of the Debtors' utility invoices. Although the Debtors incur fees for these services, I believe

these costs are outweighed by the benefits gained from streamlined payments and simplified

tracking and analysis of the Debtors' utility usage and rates. Pursuant to their contractual

obligations, JCI and NISC will continue to manage the pass-through payment of the Debtors'

electric, gas, water and sewage utility invoices after the Petition Date and make payments to the

respective Utility Companies on behalf of the Debtors. By the Utility Motion, the Debtors are

seeking an order barring JCI and NISC from holding, using or setting off such payments for their

own benefit. In addition, the Debtors seek a finding from the Court that failure by the Debtors to

73

CCC0031130

CCC0031058

pay prepetition claims to Utility Companies, through JCI or otherwise, shall not give JCI or
NISC any postpetition claims for such unpaid amounts.

    189.    I have been advised that Section 366 of the Bankruptcy Code prevents
utility companies from discontinuing, altering or refusing service to a debtor during the first 30
days of a chapter 11 case. However, after such 30-day period, I understand that a utility
company may terminate its services if a debtor has not furnished it with adequate assurance of
payment.

    190.    By the Utility Motion, the Debtors request that this Court approve the
Debtors' proposed offer of adequate assurance and related procedures and prohibit the Utility
Companies from altering, refusing or discontinuing services to the Debtors on the basis of the
commencement of these cases, on account of any unpaid invoice for service provided prior to the
Petition Date or on account of any perceived inadequacy of the Debtors' proposed adequate
assurance. The Debtors propose, within twenty (20) business days of the Petition Date, to place
a deposit (the "Adequate Assurance Deposit") equal to the aggregate approximate cost of two (2)
weeks of utility services, calculated as a historical average over the past twelve (12) months, into
an interest-bearing, newly created segregated account ("Utility Deposit Account"), except to the
extent that (i) a Utility Company agrees to a lesser amount, (ii) a Utility Company already holds
a deposit equal to or greater than two (2) weeks of utility services, or (iii) a Utility Company is
not currently paid in advance for its services. On the basis of the Debtors' current estimates,
$1,056,639 will be paid into the Utility Deposit Account within twenty (20) days of the Petition
Date. The Adequate Assurance Deposit shall be maintained with a minimum balance equal to
the aggregate approximate cost of two (2) weeks of utility services, which may be adjusted by

CCC0031131

CCC0031058

the Debtors to account for the termination of utility services by the Debtors or other arrangements with respect to adequate assurance of payment reached with a Utility Company.

191.    Furthermore, the Debtors propose that to the extent the Debtors become delinquent with respect to a Utility Company's account, such Utility Company may file a notice of delinquency (the "Delinquency Notice") with the Court and serve such notice on (a) the Debtors, (b) counsel to the Debtors, (c) counsel to the official committee of unsecured creditors, when one is appointed, and (d) the U.S. Trustee. If the Debtors have not cured such delinquency or none of the noticed parties have objected to the Delinquency Notice within ten (10) days of the receipt of the Delinquency Notice, then the Debtors shall remit to such Utility Company from the Adequate Assurance Deposit the lesser of (i) the amount allocated to the Adequate Assurance Deposit for such Utility Company's account and (ii) the amount of postpetition charges claimed as delinquent in the Delinquency Notice. In addition to the measures I have just described, the Debtors have also proposed other procedures that allow Utility Companies to request additional adequate assurance or to opt out of the procedures proposed by the Debtors. These procedures are described in greater detail in the Debtors' Utility Motion.

192.    I fear that if the Utility Companies are permitted to terminate services, the Debtors will be forced to cease operations, resulting in a severe disruption, loss of revenue and profits, and potentially the destruction of their businesses. Such disruption and loss would at a minimum cause substantial harm to the Debtors' efforts to expeditiously restructure their business affairs and would be detrimental to the estates and the Debtors' creditors. Accordingly, I believe it is essential that the Utility Companies continue to provide their services without interruption and that this Court grant the relief requested in the Utility Motion, including granting such relief on an interim basis pending entry of a final order.

75

CCC0031132

CCC0031058

N.    DEBTORS' MOTION UNDER 11 U.S.C. §§ 105, 362 AND 541 FOR AN INTERIM
ORDER ESTABLISHING NOTIFICATION PROCEDURES AND APPROVING
RESTRICTIONS ON CERTAIN TRANSFERS OF THE DEBTORS' PARENTS'
EQUITY SECURITIES ("NOL TRADING MOTION")

193.    The Debtors estimate that, as of September 30, 2008, the Debtors and their

subsidiaries had net operating losses ("NOLs") for U.S. federal income tax purposes of at least

$1.6 billion, at least $500 million of unused excess general business and foreign tax credits, in

addition to other amounts that potentially could be subject to certain statutory limitations

described below (the "Tax Attributes"). Because the Internal Revenue Code permits

corporations to carry forward NOLs and tax credits to offset future income and reduce future tax

liabilities, these Tax Attributes are valuable assets of the Debtors' estates. Based on a combined

federal and state corporate income tax rate of 39%, Debtors' Tax Attributes could yield future

tax savings to the Debtors of at least $1.1 billion. I believe the availability of these tax savings

may prove crucial to the financial health of the Debtors and may be critical in the formulation of

any plan of reorganization.

194.    I understand that trading in equity interests in NNC and NNL could

subject the Debtors' ability to use their Tax Attributes to statutory limitations under the U.S.

Internal Revenue Code, which could result in the Debtors' inability to use a substantial portion of

these Tax Attributes.

195.    By the NOL Trading Motion, the Debtors request authorization to

establish and implement restrictions and notification requirements regarding the ownership and

certain transfers of equity interests in the Debtors' direct and indirect parent corporations, and to

notify holders of such equity interests of such restrictions and requirements. I believe that the

Debtors' ability to meet the requirements of the tax laws to protect these Tax Attributes may be

76

CCC0031133

CCC0031058

A/C                                                                              TR21540

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 14, 2009

John Doolittle
Vice President for each of the Debtors and
Debtors-in-Possession

77

CCC0031134

CCC0031058

Schedule 1: Nortel Corporate Structure Chart



[1]   Debtors that are direct subsidiaries of NNC include: Alteon Websystems, Inc., CoreTek, Inc., Sonoma Systems and Xros, Inc. Architel Systems (U.S.) Corporation is a direct subsidiary of a non-debtor subsidiary of NNC. Nortel Networks Applications Management Solutions Inc. is 88.62% owned by NNC, and 11.38% owned by NNI. Alteon Websystems International, Inc. is a direct subsidiary of Alteon Websystems Inc.
[2]   In addition to Nortel Networks Capital Corporation, the following debtors are also direct subsidiaries of NNI: Nortel Networks Cable Solutions Inc., Nortel Networks International Inc., Northern Telecom International Inc. and Qtera Corporation. Also, Nortel Networks Optical Components Inc. is 99.93% owned by NNI, and 0.07% owned by NNL. In addition, Nortel Networks HPOCS Inc. is the direct subsidiary of Nortel Networks Optical Components Inc.

CCC0031135

CCC0031058



**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------X

*In re*                            :     Chapter 11

Nortel Networks Inc., *et al.*,[1]       :     Case No. 09-10138 (KG)

               Debtors.      :     Jointly Administered

                            :     Hearing date: June 29, 2009 at a time to be determined.
                            :     Objections due: June 22, 2009 at 4 :00 P.M. (ET)

-------------------------------------------------X

**MOTION PURSUANT TO 11 U.S.C. § 105(A), § 363,
§ 503 AND FED. R. BANKR. P. 9019 FOR AN ORDER
(A) APPROVING THE INTERIM FUNDING AND
SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "US Debtors"), hereby move this Court (the "Motion"), for the

entry of an order substantially in the form attached hereto as Exhibit A, approving the Interim

Funding and Settlement Agreement dated as of June 9, 2009 (the "Agreement"),[2] attached hereto

as Exhibit B, by and among the US Debtors, the Canadian Debtors (as defined below) including

Nortel Networks Limited ("NNL"), the EMEA Debtors (as defined below) excluding Nortel

Networks S.A. (all together, the "Parties"), and for purposes of Section 17 of the Agreement

only, Ernst & Young LLP as administrator of the EMEA Debtors other than Nortel Networks

---

[1]    The US Debtors in these chapter 11 cases, along with the last four digits of each US Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the US Debtors can be found in the US Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]    The description of the Agreement set forth herein is for informational purposes only. In the event of any discrepancy between the description and the terms of the Agreement, the terms of the Agreement shall govern.



**CONFIDENTIAL**

NNC-NNL06126661 / 1

(Ireland) Limited (the "UK Administrator") and Ernst & Young Chartered Accountants on behalf of Nortel Networks (Ireland) Limited ("NNIR") only (the "NNIR Administrator," and together with the UK Administrator, the "Joint Administrators"); and granting them such other and further relief as the Court deems just and proper. In support of this Motion, the US Debtors respectfully represent as follows:

**Jurisdiction**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

**A. Introduction**

3. On January 14, 2009 (the "Petition Date"), the US Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. The US Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Also on the Petition Date, the US Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including the US Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of

---

[3] The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation ("NNTC"), Nortel Networks Global Corporation and Nortel Networks International Corporation.

2

**CONFIDENTIAL**    **NNC-NNL06126661 / 2**

Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the

"CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The

Canadian Debtors continue to manage their properties and operate their businesses under the

supervision of the Canadian Court. In addition, Ernst & Young, Inc. (the "Monitor") has been

appointed by the Canadian Court to monitor the Canadian Debtors while the Canadian

Proceedings are pending. On February 27, 2009, this Court entered an order recognizing the

Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

Also, on January 14, 2009, the Canadian Court entered an order recognizing these chapter 11

proceedings as a foreign proceeding under section 18.6 of the CCAA. In addition, at 8 p.m. on

January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European

affiliates into administration under the control of individuals from Ernst & Young LLC

(collectively, the "EMEA Debtors")[4] into administration under the control of individuals from

Ernst & Young LLC (collectively, the "EMEA Proceedings," and together with these

proceedings and the Canadian Proceedings, the "Insolvency Proceedings"). On May 28, 2009,

the Commercial Court of Versailles, France (Docket No. 2009P00492), ordered the

commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which

consist of liquidation proceedings during which NNSA will continue to operate as a going

concern for an initial period of three months. In accordance with the European Union's Council

Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain

the main proceedings in respect of NNSA. On June 8, 2009, the UK Administrator filed a

---

[4]    The EMEA Debtors include the following entities: Nortel Networks UK Limited ("NNUK"), Nortel
Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks
Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel
Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria)
GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel
Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

3

CONFIDENTIAL

NNC-NNL06126661 / 3

petition with this Court under chapter 15 of the Bankruptcy Code seeking orders recognizing the EMEA Proceedings as they relate to NNUK as foreign main proceedings.

6.   On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only.  [D.I. 36].

7.   On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc committee of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Committee").  No trustee or examiner has been appointed in the US Debtors' cases.

**B.    Corporate Structure and Business**

8.   A description of the corporate structure and business of Nortel and the US Debtors and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**Relief Requested**

9.   By this Motion, the US Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms and conditions of the Agreement, and (b) granting related relief.

---

[5]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

4

**CONFIDENTIAL**                    NNC-NNL06126661 / 4

**Facts**

A. **History**

10.    As described in the First Day Declaration, the Nortel entities operate on an integrated basis across multiple jurisdictions. Nortel's business is based on the development, licensing and maintenance of intellectual property and the marketing of products and services based on that intellectual property. Certain Nortel affiliates, including NNL, NNI, NNUK, NNIR and NNSA (collectively, the "Main Nortel Companies"), are or have been the primary source of the research and development that has created Nortel's global technology footprint, the benefits of which are shared worldwide across multiple corporate entities. These five Nortel entities also provide service and support on an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions. Certain other Nortel Group companies function primarily as sales operations, acting as intermediaries between the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel Companies, and, in certain circumstances, providing ongoing service and support in their local jurisdictions.

11.    In light of the foregoing, certain Nortel entities, including the Main Nortel Companies, have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs, across the corporate entities within the Nortel Group. These agreements include certain distribution agreements between one or more Nortel Group entities (the "Distribution Agreements"), and the Master R&D Agreement, dated as of December 22, 2004 among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement," and together with the Distribution Agreements, the "Transfer Pricing Agreements"). In addition, two group supplier protocol agreements, one

5

**CONFIDENTIAL**

**NNC-NNL06126661 / 5**

NNC-NNL06126661  00005-5

between NNL and the Joint Administrators on behalf of the EMEA Debtors, and the other between NNI and the Joint Administrators on behalf of the EMEA Debtors, have been entered in respect of the inter-company trading of goods and services after the Petition Date (together, and as amended from time to time, the "GSPAs").

12.     The Nortel Group has used "transfer pricing" to allocate profits and losses, and certain costs, among the various Nortel Group companies. Transfer pricing is an accepted method for such allocation, used widely by multinational enterprises similar in structure and geographic scope to Nortel. Transfer pricing principles similar to those used by Nortel have been accepted by most of the world's largest economies and are monitored by the Organization for Economic Co-operation and Development ("OECD"), an international non-profit organization headquartered in Paris, France, with 30 member states (including the United States, Canada, the United Kingdom and France).

13.     In the case of Nortel, the Master R&D Agreement is the governing document pursuant to which the Nortel Group implemented its transfer pricing regime using the residual profit split methodology (the "Nortel Transfer Pricing Regime"). Among other things, the Nortel Transfer Pricing Regime was designed to determine the arm's length allocation due to each of the parties for their share of the profits and losses arising from "Research and Development Activity," as that term is defined in the Master R&D Agreement. In general terms, the Nortel Transfer Pricing Regime historically sought to allocate residual profits and losses among the Main Nortel Companies based on the proportionate share of Research and Development Activity conducted by or on behalf of, such affiliates. Among other things, the Nortel Transfer Pricing Regime typically requires that profits and losses, and certain costs, be allocated among such affiliates during a calendar year under the Transfer Pricing Agreements (the "Transfer Pricing

6

CONFIDENTIAL

Payments") and that a true-up allocation is determined after the actual results for the year are known.

14.    Within the Nortel Group, NNL is the owner of the vast majority of Nortel's intellectual property assets and, in accordance with the Master R&D Agreement, NNL licenses its intellectual property to the Main Nortel Companies on a royalty-free basis. The Nortel Transfer Pricing Regime, in normal times, is the means by which NNL is compensated for the development and use of its intellectual property by affiliates. NNI has historically been a net payor under the Nortel Transfer Pricing Regime largely due to the substantial sales revenue generated in the United States when contrasted with its level of Research and Development Activity. NNL, on the other hand, has historically been a net recipient under the Nortel Transfer Pricing Regime given that NNL generates lower levels of revenue when compared to the high level of corporate overhead and Research and Development Activity incurred in Canada.

15.    As was set forth in the Cash Management Motion filed on the Petition Date, the US Debtors originally intended to reconcile amounts owed under the Master R&D Agreement on a monthly basis in the postpetition period. However, following commencement of these proceedings, discussions began with various interested parties, including Nortel, the Monitor, the Joint Administrators, the Committee and the Bondholder Committee (the Bondholder Committee, together with the Committee, the "Creditor Groups") concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings. In particular, issues were raised in light of substantial changes that have occurred and may continue to occur in respect of Nortel's business model given the uncertainties facing Nortel's business. As a result, only one payment has been made in respect of amounts that could arguably be owed in respect of the Master R&D Agreement – a January 2009 payment

7

CONFIDENTIAL

of $30 million by NNI to NNL (the "January Payment"). In addition, the EMEA Debtors have neither made, nor received, any payments under the Nortel Transfer Pricing Regime since the Petition Date. Without the receipt of these payments, NNL is currently facing significant liquidity pressure -- pressure that puts NNL, and thus the entire Nortel Group, at risk.

16.     The importance of NNL to the Nortel Group is self-evident. First, NNL is both the historic and actual operational parent of the global Nortel enterprise. From the Nortel Group headquarters in Toronto, Canada, NNL provides corporate overhead support to its affiliates throughout the world. In particular, a substantial portion of Nortel's legal, finance, strategic, insurance, procurement, human resources and real estate functions are directed on a group-wide basis from NNL's Toronto offices. Second, NNL conducts a disproportionate share of Nortel's Research and Development Activities (when compared to revenue generation) and operates the Carling Facility, the largest Nortel R&D facility in the world (NNL's Research and Development Activities and corporate overhead support, collectively, the "Postpetition Services," and the costs related thereto, the "Expenses"). Third, as noted above, NNL is the legal owner of nearly all of the group's intellectual property, which it licenses to its affiliates.

17.     The various interested parties have been discussing possible solutions to NNL's liquidity issues for over two months. Among other possible solutions, NNL requested that payments be made by both NNI and certain of the EMEA Debtors to NNL in respect of the Postpetition Services and Expenses. The Joint Administrators informed NNL and the Monitor that the EMEA Debtors are not willing to make such payments to NNL at the present time, but the Parties, the Monitor and the Joint Administrators, working with the Creditor Groups, have reached an agreement whereby NNI will make certain payments to NNL in respect of the Postpetition Services and Expenses provided to NNI (on the basis described below) that should

8

CONFIDENTIAL