provide NNL with sufficient liquidity at least through September 30, 2009 (the "Interim Funding Agreement" or the "Agreement").

18.     Prior to reaching the Interim Funding Agreement, NNI and NNL provided the Creditor Groups with access to an electronic database of relevant documents to allow the Creditor Groups' experts to conduct due diligence concerning the appropriate amount owed by NNI to NNL, whether for the provision of Postpetition Services and the reimbursement of the related Expenses, or in respect of the Nortel Transfer Pricing Regime.[6]  Furthermore, representatives of the Canadian Debtors, the Monitor, the US Debtors, the Joint Administrators and the Creditor Groups have met multiple times in person and by phone, in Toronto and in New York, to discuss this issue and reach a mutually acceptable compromise.

19.     A precise allocation of the Expenses that NNL incurs and the value of the Postpetition Services it provides on behalf of the other Nortel Group entities would be a time-consuming and difficult endeavor in light of the integrated nature of the Nortel entities.  In addition, any definitive and binding determination regarding the interpretation and applicability of the Nortel Transfer Pricing Regime similarly would be extremely time consuming and potentially contentious.  Rather than pursue such a precise allocation or definitive and binding determination at this time – and in recognition of NNL's near term liquidity needs - the Creditor Groups and the Joint Administrators have agreed with NNI and NNL that, for the purposes of and subject to the terms of the Agreement, an appropriate estimate of the value of the Postpetition Services provided and Expenses incurred by NNL postpetition on behalf of NNI for the period from the Petition Date through September 30, 2009 (the "Canada/US Interim Period"),

---

[6]     It should be noted that given the role of certain taxing authorities in reviewing the Nortel Transfer Pricing Regime, there is limited information with respect to the views of these government authorities regarding the Nortel Transfer Pricing Regime.

CONFIDENTIAL

NNC-NNL06126661 / 9

NNC-NNL06126661 00009-9

is $187 million (which includes the $30 million paid by NNI through the January Payment).

Such amount is equal to the amount forecasted by NNL to be owed by NNI under the Master

R&D Agreement, and is substantially less than an estimate generated by Nortel of the allocation

of costs to NNI on the basis of each entity's revenue generated, which indicated that NNI could

be considered responsible for a higher amount in costs incurred by NNL.

### B. Terms of the Interim Funding Agreement

20. Following lengthy, difficult, and good faith negotiations, on or about June 9, 2009,

the Parties entered into the Interim Funding Agreement. The main terms of the Interim Funding

Agreement[7] are as follows:

- PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

  - Total Payment: NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C to the Agreement.

    - Permanent Payment: The first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment").

    - Contingent Payment: If it is determined, pursuant to a process to be agreed upon by NNL, NNI and the Creditor Groups, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    - True-up Obligations: NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "Other Nortel Group Companies"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "ONGC Costs"). Solely to the extent that the Canadian

---

[7]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement, certain of which definitions appear in sections of the Agreement not set forth herein, but in the entire Agreement attached hereto as Exhibit B.

CONFIDENTIAL                         NNC-NNL06126661 / 10

NNC-NNL06126661_00010-10

Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "Excess Recoveries"), and it is also determined, pursuant to the process referred to in Section 1.a.ii of the Agreement, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "Overage Amount"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii., pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "Maximum Overage Repayment") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditor Groups, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditor Groups (the "NNL Liquidity Review Procedures"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "U.S. Pro Rata Excess Recoveries," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million minus the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

- Excess Funding Charge: NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-

11

CONFIDENTIAL

ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings (the "Canadian Initial Order"). Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

- **Use of Funds**: NNL has informed the other Parties that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI and the Creditor Groups.

- **Settlement**: The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations (as defined in the Agreement), (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, claims, costs, and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

- **PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS**

  - **Shortfall Payment**: Subject to the terms of the Agreement, NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account certain adjustments) exceeds the amount previously communicated to the

12

CONFIDENTIAL

Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor and the Creditor Groups) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); *provided, however*, that some or all of such payment shall be subject to NNL Liquidity Review Procedures (as set forth in the Agreement)  Subject to the terms of the Agreement, NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures.

- Shortfall Charge:  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order.  Without prejudice to the foregoing sentence, NNUK consents to any current or future charges that have been, or may be granted to the US Debtors in connection with any future funding provided by the US Debtors to the Canadian Debtors may, or could be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

- Settlement:  Except with respect to the obligation of NNL to make the Shortfall Payments, the Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto.  Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.  It is expressly understood that Part B of the Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of the Agreement whether arising during, or related to, the EMEA Interim Period.

- PART C – PROVISIONS OF GENERAL APPLICATION

  - Intellectual Property Licenses:  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration

13

CONFIDENTIAL

of a right to an allocation to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditor Groups (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor and the Creditor Groups) and such communication having been by the Joint Administrators.

• Sale Transactions: Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or consummation of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction. Pending the distribution of the Sale Proceeds, the entire amount of the Sale Proceeds (less certain costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors. As soon as reasonably practicable following the execution of this Agreement, the Parties shall negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation. The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Protocol, failing which the Protocol shall apply to determine the allocation of the relevant Sale Proceeds. No Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and it is expressly acknowledged by all Debtors that, in relation to any Sale

14

CONFIDENTIAL

Transaction, (A) neither any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction and sharing of transaction costs relating to such Sale Transaction between the Selling Debtors shall constitute items regarding allocation of Sale Proceeds from such Sale Transaction. For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith; and

- Effectiveness: No provision of the Agreement (other than as set forth in Section 13.f. of the Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditor Groups (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

- Creditor Group Support: Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of the Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement. Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of the Agreement.

- Reservation of Rights: Nothing in the Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of the Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety

15

CONFIDENTIAL

of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights under the Agreement against NNL, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL under certain provisions of the Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Master R&D Agreement (or similar agreement) in the Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any entity of the transfer pricing regime or the Master R&D Agreement.

### Basis for Relief

21. The relief requested herein is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

22. Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363. Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction. Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

23. The use or transfer of estate property under this provision must be supported by a sound business purpose. The Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corporation), 722 F.2d 1063, 1070-71 (2d Cir. 1983); Travelers Casualty and Surety Company v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del.

16

CONFIDENTIAL

May 20, 2002); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re

Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson

Ry. Co., 124 B.R. 169, 176 (D. Del. 1991). A court determining whether a sound business

purpose justifies the transaction "should consider all salient factors pertaining to the proceeding

and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders,

alike." In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071). In

addition, a Debtor must show that the transaction has been proposed in good faith, that adequate

and reasonable notice has been provided, and that it is receiving fair and reasonable value in

exchange. See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware &

Hudson Ry. Co., 124 B.R. at 176.

24. Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.

P. 9019. Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored

in bankruptcy." Martin, 91 F.3d at 393 (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed.

1993)). In addition, the District of Delaware has recognized that the approval of a proposed

compromise and settlement is committed to the sound discretion of the bankruptcy court. See In

re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

25. Before approving a settlement under Bankruptcy Rule 9019, a court must determine

whether "the compromise is fair, reasonable, and in the interest of the estate." In re Marvel

Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation." Protective

Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414,

17

CONFIDENTIAL

NNC-NNL06126661 / 17

424-25 (1968). The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers, 2008 WL 821088, at *5 (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000); Coram, 315 B.R. at 330; Pennsylvania Truck Lines, 150 B.R. at 598. The court need not be convinced that the settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

26. The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393.

27. The US Debtors respectfully submit that the Agreement meets each of the requirements under section 363 and Bankruptcy Rule 9019. The Agreement is proposed as a good faith means to reimburse NNL for actual costs incurred on behalf of NNI during the postpetition period while, at the same time, recognizing that assertions have been made that the Nortel Transfer Pricing Regime should no longer apply in light of the current uncertainties relating to Nortel's business. With these positions in mind, good faith negotiations took place with the intention of avoiding the potential cost and delay of litigation relating to the funding of NNL. It was determined by NNI, NNL and the Creditor Groups that a consensual resolution is in the best interest of the creditors (including those, such as the bondholders, with claims both in the United States and Canada) and the US Debtors' estates. The reimbursement of NNL for the Postpetition Services and Expenses provides NNL with the necessary funding in order for NNL to operate during the Canada/US Interim Period, which will allow the US Debtors the continued uninterrupted use of NNL's intellectual property, and maximize the likelihood of a successful

18

CONFIDENTIAL

resolution of these cases and that NNL will provide the Postpetition Services and pay the Expenses on the US Debtors' behalf in the future.

28. In addition, section 503(b) of the Bankruptcy Code provides administrative expense status for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Courts generally require that an administrative expense arise from a postpetition transaction with the debtor that provided a benefit to the debtor in the operation of its business. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl Energy. Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999); In re Women First Healthcare, Inc., 332 B.R. 115, 121 (Bankr. D. Del. 2005). These administrative expenses, in turn, are entitled to a second priority status pursuant to section 507(a)(2) of the Bankruptcy Code. 11 U.S.C. § 507(a)(2).

29. The Agreement is supported by a sound business purpose because it permits NNI to reimburse NNL for its share of the Postpetition Services and Expenses satisfying the standard set forth in Section 503(b), while including terms protecting the US Debtors in the event of an overpayment and capping the maximum liability to the US Debtors. NNL has provided postpetition benefits to the US Debtors by allowing them to continue to sell products incorporating its intellectual property, and by providing Postpetition Services and paying the Expenses on their behalf pursuant to past practices.

30. The Agreement is further necessary to preserve the US Debtors' estate, because if NNI does not pay NNL the amounts provided for in the Interim Funding Agreement, NNL faces a potential funding crisis that would seriously harm the entities' interconnected global business operations and substantially decrease the value of the US Debtors' estates. Such a crisis could also complicate the US Debtors' continued use of NNL's intellectual property. If NNL were to stop sharing costs with NNI, it is also likely estate resources would be wasted duplicating efforts

19

**CONFIDENTIAL**

NNC-NNL06126661 / 19

and trying to separate out overhead between the intertwined affiliates. Moreover, if at any point NNL is unable to demonstrate to the Canadian Court that it has sufficient funds, it would be at risk of losing the protection of the CCAA stay imposed by the Initial Order, as extended from time to time. Termination or expiration of the CCAA stay protecting the Canadian Debtors would likely result in a rapid deterioration of Nortel's Canadian assets and could have a significant negative impact on the US Debtors. Further advances from NNI to NNL under the $200 million inter-company revolving loan facility that was put in place by the US Debtors at the time of bankruptcy filings are not acceptable to the Monitor overseeing the Canadian Proceedings as they would ignore those Postpetition Services and Expenses incurred by NNL on behalf of NNI and, in any event, are insufficient to address the expected operational cash outflow of NNL during the Canada/US Interim Period.

31. Furthermore, the US Debtors have received, and will continue to receive, fair value in exchange for their performance under the Interim Funding Agreement, including use of intellectual property owned by NNL that is crucial to the US Debtors' business, the benefit of Research and Development Activity performed by NNL, and the payment of certain overhead costs, which are necessary to its operations. As such, the Interim Funding Agreement is fair and its terms are reasonable. As mentioned above, NNL undertook a cost study to ascertain the extent of costs incurred by NNL for the benefit of the Nortel Group. Using revenue as a basis for cost allocation, the study concluded that NNL would be owed a higher amount from NNI for the Postpetition Services and Expenses, though this figure would be disputed by the Creditor Groups.

32. If the Interim Funding Agreement were not approved, NNL may have no choice but to pursue legal action to recover amounts claimed to be owing, whether in respect of the

20

**CONFIDENTIAL**

Postpetition Services, the Expenses or under the Transfer Pricing Agreements, and NNL may have no choice but to also seek recovery of the value of the Postpetition Services it provided and the Expenses it paid on the US Debtors' behalf as an administrative expense. Any such lawsuit is likely to be complicated and drawn out given the factual nature of the dispute and the interconnected workings of the businesses, and will drain resources from the US Debtors' estates and detract attention from other important matters facing the US Debtors' estates.

33. Accordingly, the US Debtors submit that approval of the Interim Funding Agreement has a valid business purpose, including the payment of an administrative expense obligation owing to NNL for the provision of those actual and necessary Postpetition Services and the payment of related Expenses for the benefit of the US Debtors' estates, and the terms are fair and reasonable. The Agreement has been proposed in good faith upon reasonable and adequate notice, and is in the best interest of the US Debtors' estates, creditors and other stakeholders and should, therefore, be approved by the Court.

### Notice

34. Notice of the Motion has been given via first class mail to the (i) U.S. Trustee; (ii) the Committee; (iii) the Bondholder Committee; (iv) the Joint Administrators, and (v) the general service list established in these chapter 11 cases. The US Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

35. No prior request for the relief sought herein has been made to this or any other court.

21

CONFIDENTIAL

WHEREFORE, the US Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: June 9, 2009  
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (No. 5125)  
Lisa M. Schweitzer (No. 1033)  
One Liberty Plaza  
New York, New York 10006  
Telephone: (212) 225-2000  
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
Andrew R. Remming (No. 5120)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone: (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors  
and Debtors in Possession*

22

CONFIDENTIAL

NNC-NNL06126661 / 22



A

TR49697



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                                       :
                                                       :       Chapter 11
                                                       :
*In re*                                                :       Case No. 09-10138 (KG)
                                                       :
Nortel Networks Inc., *et al.*,[1]                     :       Jointly Administered
                                                       :
                                    Debtors.            :       **Hearing date: January 21, 2010 at 11:00 a.m.**
                                                       :       **(ET)**
                                                       :       **Objections due: January 14, 2010 at 4:00 p.m.**
                                                       :       **(ET)**
                                                       :
                                                       :
-------------------------------------------------------X

## MOTION PURSUANT TO 11 U.S.C. § 105(A), § 363, § 503 AND FED. R. BANKR. P. 9019 FOR AN ORDER (A) APPROVING THE CANADIAN FUNDING AND SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors")[2], hereby move this Court (the "Motion"), for the entry

of an order substantially in the form attached hereto as Exhibit A, approving the Final Canadian

Funding and Settlement Agreement dated as of December 23, 2009 (the "Canadian Funding

Agreement" or the "Agreement"),[3] attached hereto as Exhibit B, by and among the Debtors

(other than Nortel Networks (CALA) Inc. ("NN CALA")), the Canadian Debtors (as defined

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     The Debtors for purposes of this Motion include all of the entities listed above except Nortel Networks (CALA) Inc.

[3]     The description of the Agreement set forth herein is for informational purposes only. In the event of any discrepancy between the description and the terms of the Agreement, the terms of the Agreement shall govern.

below) including Nortel Networks Limited ("NNL") and Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), (collectively, the "Parties"), and granting them such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

#### A.      Procedural History

3.      On January 14, 2009 (the "Petition Date"), the Debtors, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (NNL, and together with

TR49697

A

NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8. On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[5] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to

---

[4]  The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]  The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

PC0214981

A

operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France. On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA. On November 30, 2009, the French Court extended the suspension of liquidation for a further period of three months. On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[6]

9.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

---

[6]      Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

A

10.    On July 14, 2009 (the "CALA Petition Date"), NN CALA (which is not a party to the Canadian Funding Agreement), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, 2009, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

### B.    Debtors' Corporate Structure and Business

11.    Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its customers around the globe. Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.    Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[7]

### C.    Case Milestones

13.    On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales. To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of the assets of its CDMA and LTE Access businesses to Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205] (the "CDMA/LTE Sale"); (iii) the sale of

---

[7]    Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

PC0214983

A

the assets of its Wireless Networks business associated with the development of Next Generation

Packet Core network components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all

of the assets of the Enterprise Solutions business globally, including the shares of Nortel

Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514] (the

"Enterprise Sale"). In addition, Nortel has completed auction processes and obtained Court

approval for the planned sale of substantially all the assets of its Optical Networking and Carrier

Ethernet businesses associated with its Metro Ethernet Networks business unit [D.I. 2070]; as

well as for the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065] (the

foregoing, collectively, the "Sale Transactions").

14.    On August 4, 2009, this Court entered an order fixing September 30, 2009

at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I.

1280]. On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM

(Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I.

2059].

### Relief Requested

15.    By this Motion, the Debtors seek an order, pursuant to sections 105(a) and

363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms of the

Canadian Funding Agreement, and (b) granting related relief.

### Facts Relevant to this Motion

**A.    History**

16.    As described in the First Day Declaration, the Nortel entities have

operated and continue to operate on an integrated basis across multiple jurisdictions. Nortel's

business has been based on the development, licensing and maintenance of intellectual property

and the marketing of products and services based on that intellectual property. Certain Nortel

6

A

affiliates, including NNL, NNI, NNUK, NNIR and NNSA (collectively, the "Main Nortel Companies"), are or have been the primary source of the research and development that has created Nortel's global technology footprint, the benefits of which are shared across multiple corporate entities. These five Nortel entities also provided and continue to provide service and support on an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions. Certain other Nortel companies function primarily as sales operations, acting as intermediaries between the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel Companies, and, in certain circumstances, providing ongoing service and support in their local jurisdictions.

17.    In light of the foregoing, certain Nortel entities, including the Main Nortel Companies, have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs, across the corporate entities within Nortel. These agreements include certain distribution agreements between one or more Nortel entities (the "Distribution Agreements"), and the Master R&D Agreement, dated as of December 22, 2004 among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement," and together with the Distribution Agreements, the "Transfer Pricing Agreements").

18.    Historically, Nortel has used "transfer pricing" to allocate operating profits and losses, and certain costs, among the various Nortel companies. Transfer pricing is an accepted method for such allocation, used widely by multinational enterprises similar in structure and geographic scope to Nortel. Transfer pricing principles similar to those used by Nortel have

7

A

TR49697

been accepted by most of the world's largest economies and are monitored by the Organization for Economic Co-operation and Development, an international non-profit organization headquartered in Paris, France, with 30 member states (including the United States, Canada, United Kingdom and France).

19.    In the case of Nortel, the Master R&D Agreement is the governing document pursuant to which Nortel implemented its transfer pricing regime using a "residual profit split" methodology (the "Nortel Transfer Pricing Regime"). Among other things, the Nortel Transfer Pricing Regime was designed to determine the arm's-length allocation of global operating profits and losses among the Main Nortel Companies based on the proportionate share of research and development activity conducted by or on behalf of such affiliates. Among other things, the Nortel Transfer Pricing Regime typically required that profits and losses, and certain costs, be allocated among such affiliates during a calendar year under the Transfer Pricing Agreements (the "Transfer Pricing Payments") and that a true-up allocation is determined after the actual results for the year are known.

B.    **Background of the Canadian Funding Agreement**

20.    The continued viability of NNL is important to Nortel generally and to the Debtors in particular. Among other things, NNL provides corporate support to its affiliates throughout the world and is contractually obligated to provide transition services to the various purchasers of Nortel's assets  (the "Services" and the costs related thereto, the "Expenses"). Additionally, NNL holds legal title to nearly all of the group's intellectual property, which it licenses to its affiliates.[8]

---

[8]    Although NNL holds legal title to nearly all of Nortel's intellectual property, nothing stated herein shall be binding on any party-in-interest as to the beneficial ownership of Nortel's intellectual property.

A

21.     As was described in the Cash Management Motion filed on the Petition Date, the Debtors originally intended to reconcile amounts owed under the Master R&D Agreement on a monthly basis in the post-filing period.  However, following commencement of these proceedings, discussions began with various interested parties, including Nortel, the Monitor, the Joint Administrators, the Committee and the Bondholder Group concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings.  In particular, issues were raised in light of substantial changes that have occurred and may continue to occur in respect of Nortel's business model given the uncertainties facing Nortel's business.

22.     Following lengthy, difficult, and good faith negotiations, on or about June 9, 2009, the Parties entered into the Interim Funding and Settlement Agreement (the "Interim Funding Agreement").  [D.I. 874].  The Court approved the Interim Funding Agreement on June 29, 2009.  [D.I. 874].  The Interim Funding Agreement authorized funding in the amount of $187 million, which assisted in partially financing the Canadian Debtors operations from the Petition Date through September 30, 2009.

23.     As described above, on June 19, 2009, shortly after entering the Interim Funding Agreement, Nortel announced its intention to commence an orderly disposition of its businesses through a series of asset sales.  To date, the six Sale Transactions approved by this Court and the Canadian Court will generate, upon closing, a total of nearly US $3 billion in proceeds.

24.     To state the obvious, consummation of the Sale Transactions are critical to the realization of value for the Debtors as well as to Nortel as a whole.  To date, two transactions, the CDMA/LTE and Enterprise Sales, have closed, but at least three additional material

9

A

transactions remain open. Until the date of the last closing of the Sale Transactions, NNL must continue to provide the corporate overhead and research and development to support the ongoing businesses.

25. Moreover, as each Sale Transaction closes, both NNL and NNI will begin to provide transition services under the transition services agreements (the "TSAs") with each purchaser. Material transition services, at total costs in the hundreds of millions of dollars, must be provided by NNI and NNL (together with other Nortel entities) and such services will be provided on a cross-jurisdictional basis. Without continued performance by NNL under the TSAs, the provision of transition services to purchasers would be jeopardized and the risk to NNI would be substantial.

26. Finally, the Interim Funding Agreement provided for funding to NNL through September 30, 2009, and NNI has not provided any additional funding to NNL since that date. During the period since October 1, 2009, NNI has continued to receive the benefit of Services provided by NNL to NNI and NNL has continued to provide Services to NNL. As such, NNL has made claims against NNI in the context of negotiations requesting reimbursement for the Expenses related to such Services.

27. Since September 30, 2009, the various interested parties have been discussing the appropriate means to alleviate NNL's liquidity issues. As a result of these good faith and lengthy discussions and negotiations, NNI, NNL, the Monitor, the Committee and the Bondholder Group reached consensus on the form of the Canadian Funding Agreement pursuant to which, among other things, NNI will make certain payments to NNL as a full and final settlement of any and all claims of the Canadian Debtors against the Debtors in respect of the Services and Expenses provided to NNI for the Settlement Period (as defined in the Canadian

10

A

Funding Agreement and on the basis described below), and such payments should provide NNL

with sufficient liquidity through the Settlement Period and whereby NNL will acknowledge

certain pre-filing intercompany claims in the Canadian Proceedings in favor of NNI, including

claims for overpayment, which claims will not be subject to setoff or reduction as described

below.

       28.     Prior to reaching the Canadian Funding Agreement, NNI and NNL

provided the Committee and the Bondholder Group with access to relevant documents and

related materials to allow the Committee and the Bondholder Groups' advisors to conduct due

diligence concerning the appropriate amount owed by NNI to NNL, whether for the provision of

Services and the reimbursement of the related Expenses, or in respect of the Nortel Transfer

Pricing Regime. Furthermore, representatives of the Canadian Debtors, the Monitor, the

Debtors, the Committee and the Bondholder Group have met multiple times in person and by

phone, in Toronto and in New York, to discuss these important issues.

       29.     In addition to the Canadian funding issues, despite the best efforts of the

Nortel companies to accurately calculate payments under the Nortel Transfer Pricing Regime,

certain overpayments may have occurred in the past. In particular, it has been determined that

NNI overpaid NNL during the period from 2001 to 2005. After considering the complexities

relating to the Nortel Transfer Pricing Regime, NNI and NNL agreed to the US $2 billion

adjustment discussed below. In order to reach agreement on Canadian funding, it was also

necessary to address the overpayment as well as certain related tax issues.

       30.     Therefore, NNI, NNL and the Monitor have reached, as part of the

Canadian Funding Agreement, an understanding for the recognition of this overpayment and

related tax treatment. As described in more detail below, an intercompany claim shall be

11

A                                                                                                    TR49697

established by NNL in favor of NNI pursuant to the Master R&D Agreement and allowed in full,

without right of setoff or reduction, in NNL's Canadian Proceedings. In addition, NNI has

agreed with the Internal Revenue Service (the "IRS") to enter into a stipulation (the "Settlement

Stipulation") providing for, among other things, the settlement of the IRS Claim (as defined

below) and NNI's entry into an Advance Pricing Agreement (an "APA") that will provide for a

positive adjustment in NNI's income (the "IRS APA"). It is anticipated that NNL will enter into

a similar APA (the "CRA APA", and together with the IRS APA, the "APAs") with the Canada

Revenue Agency (the "CRA") that will provide for a negative adjustment to NNL's income.

The Settlement Stipulation is described in greater detail in the Debtors' motion seeking

authorization to enter into the Settlement Stipulation, the IRS APA, and related relief (the "IRS

Settlement Motion"), filed contemporaneously herewith.

          31.    The APAs are part of a package of agreements that address, among other

things, funding to be provided by NNI to NNL pursuant to the Canadian Funding Agreement;

NNI's possible liability for pre-petition U.S. federal taxes, including but not limited to the taxes

described in the proofs of claim filed by the IRS against NNI, dated as of February 13, 2009,

May 22, 2009 and August 20, 2009, bearing the respective claim identification numbers 250,

1226 and 1935 (collectively, the "IRS Claim"); and any claim NNI may have against NNL with

respect to overpayment by NNI to NNL during the 2001 to 2005 tax years, including relating to

the income adjustments contemplated by the APAs. The agreements, which are described below,

are all interdependent. In particular, the Canadian Funding Agreement, which is the subject of

this Motion, shall become effective only upon satisfaction of the conditions in Section 17 of the

Canadian Funding Agreement, which conditions include entry of the Final Orders (as defined in

the Canadian Funding Agreement) approving: (i) the Debtors' entry into the Canadian Funding

12

A

Agreement; (ii) the Canadian Debtors' entry into the Canadian Funding Agreement; (iii) NNI's

entry into the Settlement Stipulation; (iv) NNI's entry into the IRS APA; (v) NNL's entry into

the CRA APA; and (vi) the establishment of the NNI Claim (as defined herein) in the Canadian

Proceedings.

**C.    Terms of the Final Canadian Funding and Settlement Agreement**

32.    Following lengthy, difficult, and good faith negotiations, on or about

December 23, 2009, the Canadian Funding Agreement was executed. In very broad terms, the

Canadian Funding Agreement provides for the following:

- Payment by NNI to NNL of $190.8 million (subject to adjustment as described in the Canadian Funding Agreement) in five installments.

- Settlement of certain claims by NNL against NNI for goods and services provided during the period covered by the Canadian Funding Agreement.

- Allocation of corporate costs for the period covered by the Canadian Funding Agreement among NNL and NNI on a 50% / 50% basis, subject to a subsequent true-up based on the allocation of purchase prices.

- Allocation of M&A Costs on a transaction by transaction basis to be satisfied out of sale proceeds.

- Establishment of a claim against NNL in favor of NNI in the amount of US $2.0627 billion to take account of any overpayments made by NNI to NNL during the period 2001 to 2005 and reconciling certain of the pre-filing obligations of NNI and NNL.

- Finalization of the APAs between NNI and the IRS and between NNL and the CRA for the taxable years 2001 to 2005.

- Certain other agreements relating to intercompany bar dates, a cross-border claims protocol and an agreement to not exercise any right of termination under the Master R&D Agreement.

- Certain reservations of rights in respect of the allocation of sale proceeds.

PC0214991

33.    The main terms of the Canadian Funding Agreement are as follows:[9]

- PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

  - Settlement Payment:  NNI shall pay to NNL an amount equal to US$190.8 million, a portion of which may be adjusted by the Parties, pursuant to the Canadian Funding Agreement, payable in five installments.

  - Use of Funds:  To the extent NNL seeks to use funds from the Settlement Payment for purposes other than for working capital and those other purposes as reflected in the 13 Week CF Forecast, NNL must obtain the consent for such uses from NNI, the Committee and the Bondholder Group.

  - Settlement:  The Settlement Payment represents (A) the maximum payment that the Debtors may or could owe in respect of the Covered Obligations[10] for the Settlement Period, (B) the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Canadian Debtors may have or could assert against one or more Debtors in any Proceeding with respect to the Covered Obligations, and (C) constitutes a full and final settlement of any and all Covered Obligations.

  - Indemnity:  Each of NNL and the other Canadian Debtors agrees to indemnify each Debtor from and against any and all claims, damages, taxes, and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with (x) Section 1 of the Canadian Funding Agreement, (y) the Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Settlement Period, or (z) the Covered Obligations.

- PART B – ALLOCATION OF CERTAIN COSTS

  - Allocated Corporate Costs.  NNL agrees to use commercially reasonable efforts to recover from Nortel entities a portion of the Allocated Corporate

---

[9]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Canadian Funding Agreement, certain of which definitions appear in sections of the Canadian Funding Agreement not set forth herein. The entire Canadian Funding Agreement is attached hereto as Exhibit B.  In the event of any inconsistencies between the Canadian Funding Agreement and the Motion, the Canadian Funding Agreement shall control.

[10]    "Covered Obligations" means claims for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations under any legal theory or contractual or extra-contractual arrangement including, without limitation, pursuant to Transfer Pricing Agreements, such other agreements between and among the Nortel entities or otherwise, incurred by any Canadian Debtor for the benefit of the Debtors which any Canadian Debtor has asserted or could assert (without admission by the Debtors and subject to Section 23 of the Agreement) and would have been reimbursed to the Canadian Debtors through payments (including without limitation Transfer Pricing Payments) payable by the Debtors to the Canadian Debtors during, or with respect to, the period from October 1, 2009 through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates (the "Settlement Period").

Costs[11] incurred by NNL on behalf of Nortel entities globally, which will be allocated to those entities (including both NNL and NNI) that are considered to benefit from such costs and to have the financial ability to pay their respective share of such costs. NNL and NNI each agree that it will initially pay fifty percent (50%) of the aggregate Allocated Corporate Costs, respectively, of the Canadian Debtors and the Debtors.

- Certain Fixed Payments. NNL and NNI each agree that it will initially make fifty percent (50%) of Certain Fixed Payments (as defined in the Canadian Funding Agreement); *provided, however,* that it is understood and agreed by the Parties that $62.5 million of the Certain Fixed Payments shall be paid solely by NNI and shall not be shared by NNL or any other Nortel entity, and such payment shall be made by NNI three (3) Business Days following satisfaction in full of all of the Conditions; *provided, further,* that the remaining Certain Fixed Payments, to the extent not recovered from other Nortel entities participating as sellers in the Sale Transactions, will ultimately be adjusted and borne by the Debtors and the Canadian Debtors on an overall weighted average basis in proportion to the amount of the aggregate proceeds of sale allocated to each of such Debtors from the Sale Transactions.

- M&A Costs. The Parties agree, and shall use reasonable best efforts to cause the other relevant Selling Debtors to agree, to the extent permitted by applicable law, that the M&A Costs[12] incurred by the Canadian Debtors or the Debtors shall be treated as transaction costs and will be recovered by such Debtors, on a transaction-by-transaction basis, from the respective proceeds of sale from the Sale Transactions prior to any allocation of sale proceeds among the relevant Selling Debtors, participating in each such transaction.

- PART C – ADVANCE PRICING AGREEMENTS[13]

  - NNL and the Monitor agree that NNL shall, in a timely manner, enter into the CRA APA with the CRA, which shall apply to the five taxable years beginning on January 1, 2001 and ending on December 31, 2005 (the "APA Years").

---

[11]    "Allocated Corporate Costs" means the insurance costs (other than property and casualty insurance) paid by NNL, public company compliance costs, including certain audit and accounting fees and related costs, incurred by NNL for the benefit of Nortel, costs for certain officers and employees of NNL that perform global corporate functions and any other costs mutually agreed by the Debtors, the Canadian Debtors, the Monitor, the Creditors' Committee and the Bondholders' Committee.

[12]    "M&A Costs" mean the following costs and expenses incurred by the Canadian Debtors or the Debtors in connection with the Sale Transactions and sales of other assets of Nortel: (a) fees and expenses of Lazard Ltd; (b) costs and expenses (including professional fees) to prepare carve-out financial statements of the various businesses of Nortel; and (c) salaries of the employees of the Nortel's corporate merger and acquisitions team ("M&A Group") and the cost of other benefits provided to the M&A Group, and any expenses incurred by the M&A Group.

[13]    The IRS Settlement Motion contains a detailed summary of the terms of the APAs.

15

- NNI agrees that NNI shall, in a timely manner, enter into the IRS APA with the IRS, which shall apply to the APA Years.

- Each of NNL, the Monitor and NNI shall cooperate with each other in finalizing the terms and conditions of the CRA APA and the IRS APA with the CRA and the IRS, as applicable.

- PART D – NNI CLAIM

  - The Parties agree that a US $2.0627 billion pre-filing claim in the Canadian Proceedings shall be established in favor of NNI for the full and final settlement of the following claims:

    o  any claims of the Debtors against the Canadian Debtors for overpayments to the Canadian Debtors under the Transfer Pricing Agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005,

    o  certain claims of NNI against NNL due and owing under that certain Revolving Loan Agreement, dated as of March 21, 2008; and

    o  any claims of the Canadian Debtors (A) for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations pursuant to Transfer Pricing Agreements or otherwise incurred by any Canadian Debtor for the benefit of the Debtors for the period prior to the Petition Date or (B) relating to pre-filing intercompany trading of goods and services.

  - The NNI Claim, unlike other unsecured pre-filing claims against NNL, shall not be subject to any offsets or counterclaims. The priority of the NNI Claim shall be as follows: (A) US $2 billion of the NNI Claim shall be a pre-petition unsecured claim against NNL ranking *pari passu* with other unsecured pre-petition claims against NNL and (B) the remaining US $62.7 million of the NNI Claim shall constitute the remainder of the secured Revolver Claim (the "Remaining Revolver Claim") and shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement.

  - The Parties agree that NNI and other Debtors shall retain the right to assert Claims against the Canadian Debtors relating to the period prior to the Filing Date, *provided, however,* that the Debtors shall have no right to assert any NNI TPA Claim or Revolver Claim (other than the Remaining Revolver Claim) against the Canadian Debtors (such pre-petition Claim but excluding NNI Claim (including Remaining Revolver Claim), NNI TPA Claim or Revolver Claim, an "Additional NNI Claim"). Upon the filing of an Additional NNI Claim in the Canadian Proceedings or subsequent proceedings, the waivers of the Canadian Debtors under Section 12 of the Canadian Funding Agreement shall automatically terminate and shall be of no

16

A

further force and effect and the Canadian Debtors shall have the right to defend against such Additional NNI Claim, assert counterclaims against the Debtors in the Canadian Proceedings or subsequent proceedings with regards to such Additional NNI Claim, and assert any additional Claims against the Debtors in the US Proceedings or subsequent proceedings. For the avoidance of doubt, the filing of one or more Additional NNI Claims by the Debtors shall in no way affect the obligations and waivers of the Canadian Debtors and the Monitor under Section 11 of the Canadian Funding Agreement and such obligations and waivers shall continue to be in full force and effect.

- The Parties agree that (i) no Canadian Debtor shall establish a deadline for the filing of claims by the Debtors in the Canadian Proceedings and (ii) no US Debtor shall establish a deadline for the filing of claims by the Canadian Debtors in the US Proceedings, without the prior written consent of all other Parties to this Agreement and the Creditor Groups, which consent shall not be unreasonably withheld or delayed.

- PART E – OTHER SETTLEMENT MATTERS

  - The Canadian Debtors and the Debtors agree to work with the Monitor, the Committee and the Bondholder Group to develop and timely seek approval from each of the Courts of a cross-border claims protocol and claims resolution procedures for the resolution of claims filed in the Canadian Proceedings and the US Proceedings, each of which shall be acceptable in form and substance to the Monitor, the Committee, and the Bondholder Group.

- PART F – PROVISIONS OF GENERAL APPLICATION

  - Written confirmation has been received from the Committee and from counsel to the Bondholder Group confirming that they will each file appropriate materials with the applicable Courts in support of the motions by the Debtors and the Canadian Debtors for Court approval of the Canadian Funding Agreement.

  - Except as expressly provided in the Canadian Funding Agreement, nothing in the Canadian Funding Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to the Canadian Funding Agreement, (B) the APAs, (C) the Canadian Proceedings, or (D) the NNI Claim and the waiver by the Canadian

17

A

Debtors and the Monitor of their rights to setoff or in any way reduce the amount of the NNI Claim (including the Remaining Revolver Claim).

- Neither the Canadian Debtors nor the Debtors will exercise a right of termination under the Master R&D Agreement without the prior written consent of the other Parties to the Canadian Funding Agreement, and the Creditor Groups.

- Among the conditions to the effectiveness of the Canadian Funding Agreement are the following:

  o Approving an extension of that certain Amended and Restated Revolving Loan Agreement dated March 27, 2009 among NNL, NNI and Nortel Networks Technology Corporation (the "NNI Loan") through December 31, 2010. Attached hereto as Exhibit C is the proposed amendment to the NNI Loan (the "NNI Loan Amendment").

  o The orders of the Canadian Court and this Court set forth in Section 17.a.i. and Section 17.a.ii. of the Canadian Funding Agreement shall have each become a Final Order.[14]

34.     The Debtors have filed a motion seeking the Court's approval to redact certain portions of Annex C to the Canadian Funding Agreement and to file Annex D to the Canadian Funding Agreement under seal, filed contemporaneously herewith.

**Basis for Relief**

35.     The relief requested herein is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

36.     Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363.

---

[14]     "Final Order" means the order has been approved and entered by the Canadian Court and/or this Court, as applicable, and is no longer subject to appeal, writ of certiorari, reargument, rehearing, motion to vary or set aside or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing, or a motion to vary or set aside has been sought with regard to such order, then the order has been affirmed by the highest court to which the order was appealed and the time to take any further appeal, to petition for writ of certiorari or to move for reargument, rehearing, or to vary or set aside has expired

PC0214996

Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction. Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

      37.    The use or transfer of estate property under this provision must be supported by a sound business purpose. The Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corporation), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Casualty and Surety Company v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008). A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071). In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange. See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Decora Industries, Inc., 2002 WL 32332749, at *2.

      38.    Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Martin, 91 F.3d at 393 (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). In addition, the District of Delaware has recognized that the

19

A

approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. See In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

39.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers, 2008 WL 821088, at *5 (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000); Coram, 315 B.R. at 330; Pennsylvania Truck Lines, 150 B.R. at 598. The court need not be convinced that the settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

40.     The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393.

41.     The Debtors respectfully submit that the Canadian Funding Agreement meets each of the requirements under section 363 and Bankruptcy Rule 9019. The Canadian Funding Agreement is proposed as a means to reimburse NNL for costs NNL asserts it incurred on behalf of NNI during the postpetition period while, at the same time, recognizing that assertions have been made that the Nortel Transfer Pricing Regime may no longer apply in light

20

A

of the current circumstances relating to Nortel's business and recognizing certain material claims

NNI has against NNL. With these positions in mind, good faith negotiations took place with the

intention of avoiding the potential cost and delay of litigation relating to the funding of NNL. It

was determined by NNI, NNL, the Committee and the Bondholder Group that a consensual

resolution is in the best interest of the creditors (including those, such as the bondholders, with

claims both in the United States and Canada) and the Debtors' estates.

42.    While the Canadian Funding Agreement provides several material benefits

to the Debtors, the most important benefit is the recognition by NNL and the Monitor of an

intercompany claim in favor of NNI in an amount in excess of US $2 billion, which claim shall

be allowed by an order of the Canadian Court approving the Canadian Funding Agreement. This

amount approximates overpayments made by NNI to NNL under the Nortel Transfer Pricing

Regime during the 2001 to 2005 time period. By this claim, without right of offset or -

counterclaim as set forth in the Canadian Funding Agreement, NNI avoids the cost of litigation

to enforce this or an even larger claim against NNL. In addition, both NNI and NNL, as well as

the other Debtors and Canadian Debtors, benefit from the consensual resolution of a potentially

contentious matter. Without such a consensual resolution, the value of the United States and

Canadian estates would have been put in danger. Moreover, the ability of the Debtors and

Canadian Debtors to fully perform their transition services obligations would have been tested

were NNI and NNL to be at odds over intercompany claims.

43.    The reimbursement of NNL for the Services and Expenses provides NNL

with the necessary funding in order for NNL to operate during the Settlement Period, which will

allow NNL to continue to provide: (i) corporate overhead and research and development support

until the date of the last close of the Sale Transactions, critically important to the realization of

21

value for the Debtors as well as to Nortel as a whole; (ii) transition services under the TSAs to the various purchasers of Nortel's assets, without which, the provision of services to the purchasers would be jeopardized and the risk to NNI would be substantial; and (iii) continued uninterrupted use by the Debtors of the intellectual property in which NNL holds legal title. Moreover, it will maximize the likelihood of a successful resolution of these cases and that NNL will provide the Services and pay the Expenses on the Debtors' behalf in the future.

44.     In addition, section 503(b) of the Bankruptcy Code provides administrative expense status for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Courts generally require that an administrative expense arise from a postpetition transaction with the debtor that provided a benefit to the debtor in the operation of its business. Calpine Corp. v. O'Brien Envtl. Energy, Inc., (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999); In re Women First Healthcare, Inc., 332 B.R. 115, 121 (Bankr. D. Del. 2005). These administrative expenses, in turn, are entitled to a second priority status pursuant to section 507(a)(2) of the Bankruptcy Code. 11 U.S.C. § 507(a)(2).

45.     The Canadian Funding Agreement is supported by a sound business purpose because it permits NNI to reimburse NNL for its share of the Services and Expenses while including terms protecting the Debtors in the event of an overpayment and capping the maximum liability of the Debtors. NNL has provided postpetition benefits to the Debtors not only by continuing to conduct the research and development required by various customers and the purchasers in the Sale Transactions, but also by continuing to support the products incorporating the intellectual property in which NNL holds legal title, and by providing Services and paying the Expenses on their behalf pursuant to past practices.

22

TR49697

A

46.    The Canadian Funding Agreement is further necessary to preserve the Debtors' estates, because if NNI does not pay NNL the amounts provided for in the Canadian Funding Agreement, NNL faces a potential funding crisis that would seriously harm the entities' interconnected global business operations and substantially decrease the value of the Debtors' estates. Such a crisis could also complicate the Debtors' continued use of NNL's intellectual property. If NNL were to stop sharing costs with NNI, it is also likely that the resources of the Debtors' estates would be wasted duplicating efforts and trying to separate out overhead between the intertwined affiliates. Moreover, if at any point NNL is unable to demonstrate to the Canadian Court that it has sufficient funds, it would be at risk of losing the protection of the CCAA stay imposed by the Initial Order, as extended from time to time. Termination or expiration of the CCAA stay protecting the Canadian Debtors would likely result in a rapid deterioration of Nortel's Canadian assets and could have a significant negative impact on the Debtors.

47.    Furthermore, the Debtors have received, and will continue to receive, fair value in exchange for their performance under the Canadian Funding Agreement, including use of intellectual property that is crucial to the Debtors' business, the benefit of research and development activity performed by NNL, and the payment of certain overhead costs, which are necessary to its operations. As such, the Canadian Funding Agreement is fair and its terms are reasonable.

48.    If the Canadian Funding Agreement were not approved, NNL may have no choice but to pursue legal action to recover amounts claimed to be owing, whether in respect of the Services, the Expenses or under the Transfer Pricing Agreements, and NNL may have no choice but to also seek recovery of the value of the Services it provided and the Expenses it paid

23

PC0215001

A

on the Debtors' behalf as an administrative expense. By the same token, NNI would have litigation claims against NNL relating to past overpayments (as described above and in the IRS Settlement Motion) and the related costs and uncertainties. Any such lawsuits are likely to be complicated and drawn out given the factual nature of the disputes and the interconnected workings of the businesses, and will drain resources from the Debtors' estates and detract attention from other important matters facing the Debtors' estates. In addition, the IRS APA and the Settlement Stipulation are essential elements of a package of agreements that, among other items, reduces the IRS Claim from $3,016,650,830.82 to $37.5 million, memorializes a large claim by NNI against NNL and are also supported by sound business purposes.[15]

49.     Accordingly, the Debtors submit that approval of the Canadian Funding Agreement and the terms and conditions thereof are fair and reasonable. The Canadian Funding Agreement has been proposed in good faith upon reasonable and adequate notice, and is in the best interest of the Debtors' estates, creditors and other stakeholders and should, therefore, be approved by the Court.

**Notice**

50.     Notice of the Motion has been given via first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Joint Administrators, and (v) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

51.     No prior request for the relief sought herein has been made to this or any other court.

---

[15]     The background facts, relief requested and description of the IRS APA and the Settlement Stipulation are detailed in the IRS Settlement Motion.

24

A                                                                                    TR49697

WHEREFORE, the Debtors respectfully request that this Court (i) grant this

Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated:  December 23, 2009          CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Wilmington, Delaware

                                   James L. Bromley (*admitted pro hac vice*)
                                   Lisa M. Schweitzer (*admitted pro hac vice*)
                                   One Liberty Plaza
                                   New York, New York 10006
                                   Telephone:  (212) 225-2000
                                   Facsimile:  (212) 225-3999

                                          - and -

                                   MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                   Derek C. Abbott (No. 3376)
                                   Eric D. Schwartz (No. 3134)
                                   Ann C. Cordo (No. 4817)
                                   Andrew R. Remming (No. 5120)
                                   1201 North Market Street
                                   P.O. Box 1347
                                   Wilmington, Delaware 19801
                                   Telephone:  (302) 658-9200
                                   Facsimile:  (302) 658-3989

                                   *Counsel for the Debtors
                                   and Debtors in Possession*

25

PC0215003



No tiff included for this record.

CCC0034853

**Q1 Headcount and Average Salary by Org**
RFT/RPT
Data as of 3/29

| OSM Level 2 | OSM Level 3 | HC Total | Avg US Salary |
|---|---|---|---|
| Board and Monitors | -- | 1 | |
| -- Total | | 1 | |
| *DirRpt IC's | -- | 1 | $ |
| *DirRpt IC's Total | | 1 | $ |
| BINNING, PAVITER; EXECUTIVE ADVISOR | -- | 1 | |
| | ELHAGE, SAMIH; PRESIDENT CARRIER VOIP & APPLICATION SOL | 1943 | $ |
| | HOUSE, PAUL; CHAIRMAN LG-NORTEL&GEN MGR LG-NORTEL BU | 25 | $ |
| | RICHARDSON, GRAHAM; VP & GM GSM | 727 | $ |
| | ROLSTON, SHARON; EMEA LEADER | 342 | $ |
| BINNING, PAVITER; EXECUTIVE ADVISOR Total | | 3038 | $ |
| DOOLITTLE, JOHN; SENIOR VP, CORPORATE SERVICES & CFO | -- | 1 | |
| | *DirRpt IC's | 3 | $ |
| | BIFIELD, ALLAN; GLOBAL LEGAL ENTITY RESTRUCTURING LEADER - ACTING | 3 | $ |
| | CHAMBERS, HINTA; CORPORATE GROUP BUSINESS OPERATIONS LEAD | 4 | $ |
| | DHOKIA, ANILA; CHIEF INTERNAL AUDITOR AND SOX LEADER | 20 | $ |
| | DOOLITTLE, JOHN; GOVERNMENT & COMMUNITY RELATIONS - ACTING | 2 | $ |
| | DOOLITTLE, JOHN; VICE PRESIDENT, TAX - ACTING | 7 | $ |
| | GLASPELL, CLARKE; CONTROLLER | 23 | $ |
| | VENTRESCA, ANNA; GEN COUNSEL, CORPORATE SECRETARY & CCO | 16 | $ |
| | VESCHI, JOHN; CHIEF IP OFFICER | 29 | $ |
| | WILLIAMS, JOHN; DIRECTOR, AMERICA'S TREASURY OPERATIONS | 7 | $ |
| | WONG, LEILA; DIRECTOR, GLOBAL PENSIONS | 3 | $ |
| DOOLITTLE, JOHN; SENIOR VP, CORPORATE SERVICES & CFO Total | | 144 | $ |
| RICAURTE, CHRISTOPHER; PRESIDENT, NORTEL BUSINESS SERVICES(NBS) | | 1 | |
| | BIFIELD, ALLAN; NBS FINANCE LEADER | 474 | $ |
| | GUERRA SANZ, LUIS; AMERICAS NBS OPERATIONS LEADER | 285 | $ |
| | KING, ELENA; SENIOR VICE-PRESIDENT HUMAN RESOURCES | 159 | $ |
| | LUKER, OLIVER; GM TRANSITION SERVICES - CDMA, LTE, ENT. | 7 | $ |
| | MCKENNA, DON; VP SUPPLY CHAIN SERVICES | 669 | $ |
| | PATCHETT, JAMES; GM TRANSITION SERVICES - MEN, CVAS, GSM | 5 | $ |
| | REICHERT, GEORGE; CHIEF INFORMATION OFFICER | 443 | $ |
| | SO, HIN MING; ASIA REGIONAL OPERATIONS | 249 | $ |
| RICAURTE, CHRISTOPHER; PRESIDENT, NORTEL BUSINESS SERVICES(NBS) Total | | 2292 | $ |
| RIEDEL, GEORGE; CHIEF STRATEGY OFFICER | | 1 | |
| | DADYBURJOR, KHUSH; VP, MERGERS & ACQUISITIONS | 6 | $ |
| | RIEDEL, GEORGE; LAW DEPT - ACTING | 1 | $ |
| RIEDEL, GEORGE; CHIEF STRATEGY OFFICER Total | | 8 | $ |
| **Grand Total** | | **5484** | **$** |

| | | | |
|---|---|---|---|
| **Current Global Fringe Average 28%** | | **$** | **112,289** |

**Q1 Headcount by Region**
RFT/RPT
Data as of 3/29

| OSM Level 2 | OSM Level 3 | AFRICA | ASIA | EUROPE | GREATER CHINA | LATIN AMERICA | MIDDLE EAST | CANADA | US | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | – | | | | | | | | 1 | 1 |
| – Total | | | | | | | | | 1 | 1 |
| *DirRpt IC's | – | | | | | | | | 1 | 1 |
| *DirRpt IC's Total | | | | | | | | | 1 | 1 |
| BINNING, PAVITER; EXECUTIVE ADVISOR | – | | | | | | | 1 | | 1 |
| | ELHAGE, SAMIH; PRESIDENT CARRIER VOIP & APPLICATION SOL | | 73 | 262 | 18 | 81 | 29 | 574 | 908 | 1943 |
| | HOUSE, PAUL; CHAIRMAN LG-NORTEL&GEN MGR LG-NORTEL BU | | 5 | 7 | | | | 9 | 4 | 25 |
| | RICHARDSON, GRAHAM; VP & GM GSM | | 21 | 253 | 40 | 13 | | 6 | 393 | 727 |
| | ROLSTON, SHARON; EMEA LEADER | 1 | | 319 | | | 21 | | 1 | 342 |
| BINNING, PAVITER; EXECUTIVE ADVISOR Total | | 1 | 99 | 841 | 58 | 94 | 50 | 590 | 1304 | 3038 |
| DOOLITTLE, JOHN; SENIOR VP, CORPORATE SERVICES & CFO | – | | | | | | | 1 | | 1 |
| | *DirRpt IC's | | | | | | | 3 | | 3 |
| | BIFIELD, ALLAN; GLOBAL LEGAL ENTITY RESTRUCTURING LEADER - ACTING | | 6 | | 8 | | | 3 | 12 | 29 |
| | CHAMBERS, HINTA; CORPORATE GROUP BUSINESS OPERATIONS LEAD | | | | | | | 4 | | 4 |
| | DHOKIA, ANILA; CHIEF INTERNAL AUDITOR AND SOX LEADER | | | | 3 | | | 2 | 14 | 20 |
| | DOOLITTLE, JOHN; GOVERNMENT & COMMUNITY RELATIONS - ACTING | | | | | | | 2 | | 2 |
| | DOOLITTLE, JOHN; VICE PRESIDENT, TAX - ACTING | | | | | | | 3 | 4 | 7 |
| | GLASPELL, CLARKE; CONTROLLER | | | | | | | 13 | 10 | 23 |
| | VENTRESCA, ANNA; GEN COUNSEL, CORPORATE SECRETARY & CCO | | | | 1 | | | 9 | 6 | 16 |
| | VESCHI, JOHN; CHIEF IP OFFICER | | | | | | | 17 | 12 | 29 |
| | WILLIAMS, JOHN; DIRECTOR, AMERICA'S TREASURY OPERATIONS | | | | | | 1 | 6 | | 7 |
| | WONG, LEILA; DIRECTOR, GLOBAL PENSIONS | | | | | | | 2 | 1 | 3 |
| DOOLITTLE, JOHN; SENIOR VP, CORPORATE SERVICES & CFO Total | | | 6 | | 12 | 1 | | 65 | 59 | 144 |
| RICAURTE, CHRISTOPHER; PRESIDENT, NORTEL BUSINESS SERVICES/NBS | – | | | | | | | | 1 | 1 |
| | BIFIELD, ALLAN; NBS FINANCE LEADER | | 24 | | 99 | 31 | | 67 | 253 | 474 |
| | GUERRA SANZ, LUIS; AMERICAS NBS OPERATIONS LEADER | | 31 | 51 | 4 | 104 | | 66 | 29 | 285 |
| | KING, ELENA; SENIOR VICE-PRESIDENT HUMAN RESOURCES | | 6 | 1 | 16 | 6 | | 50 | 80 | 159 |
| | LUKER, OLIVER; GM TRANSITION SERVICES - CDMA, LTE, ENT. | | | | | | | 3 | 4 | 7 |
| | MCKENNA, DON; VP SUPPLY CHAIN SERVICES | | 79 | 4 | 57 | 71 | | 141 | 317 | 669 |
| | PATCHETT, JAMES; GM TRANSITION SERVICES - MEN, CVAS, GSM | | | | | | | 3 | 2 | 5 |
| | REICHERT, GEORGE; CHIEF INFORMATION OFFICER | | 14 | 37 | 9 | 3 | | 202 | 178 | 443 |
| | SO, HIN MING; ASIA REGIONAL OPERATIONS | | 8 | | 241 | | | | | 249 |
| RICAURTE, CHRISTOPHER; PRESIDENT, NORTEL BUSINESS SERVICES/NBS Total | | | 162 | 93 | 426 | 215 | | 532 | 864 | 2292 |
| RIEDEL, GEORGE; CHIEF STRATEGY OFFICER | | | | | | | | | 1 | 1 |
| | DADYBURJOR, KHUSH; VP, MERGERS & ACQUISITIONS | | | | | | | 4 | 2 | 6 |
| | RIEDEL, GEORGE; LAW DEPT - ACTING | | | | | | | | 1 | 1 |
| RIEDEL, GEORGE; CHIEF STRATEGY OFFICER Total | | | | | | | | 4 | 4 | 8 |
| **Grand Total** | | **1** | **267** | **934** | **496** | **310** | **50** | **1191** | **2233** | **5484** |

**Attrition by Region**
**Q1 View**

| REGION | Total Year 2009 | | March | | Q1 2010 | |
|---|---|---|---|---|---|---|
| | # RFT EIS | Ann Attrit Rate | # RFT EIS | Curr Mth Ann Rate | # RFT EIS | Quarterly Ann Rate |
| TOTAL | 2765 | 14.8% | 48 | 10.4% | 180 | 10.2% |
| AFRICA | 6 | 27.1% | 1 | 1200.0% | 2 | 160.0% |
| ASIA | 337 | 28.8% | 5 | 21.2% | 14 | 15.8% |
| EUROPE | 429 | 13.7% | 1 | 1.3% | 24 | 8.5% |
| GREATER CHINA | 202 | 16.2% | 8 | 18.6% | 29 | 21.3% |
| LATIN AMERICA | 144 | 14.4% | 7 | 27.0% | 18 | 18.7% |
| MIDDLE EAST | 21 | 14.5% | 0 | 0.0% | 2 | 13.4% |
| CANADA | 697 | 14.6% | 15 | 15.1% | 45 | 8.6% |
| UNITED STATES | 929 | 12.9% | 11 | 5.8% | 46 | 7.3% |
| NORTH AMERICA | 1,626 | 13.6% | 26 | 9.0% | 91 | 7.9% |

**Q1 Headcount by Entity**
RFT/RPT

| COMPANY CODE | Total |
|---|---|
| 1002 | 693 |
| 1003 | 85 |
| 1101 | 411 |
| 2001 | 1780 |
| 2002 | 97 |
| 3100 | 10 |
| 3110 | 1 |
| 3130 | 2 |
| 3160 | 8 |
| 3171 | 286 |
| 3200 | 3 |
| 4100 | 4 |
| 4110 | 7 |
| 4130 | 3 |
| 4142 | 1 |
| 4160 | 208 |
| 4162 | 39 |
| 4175 | 10 |
| 4180 | 91 |
| 4200 | 4 |
| 4210 | 41 |
| 4220 | 29 |
| 4240 | 25 |
| 4260 | 16 |
| 4270 | 4 |
| 4280 | 2 |

| | |
|---|---|
| 4290 | 27 |
| 4300 | 4 |
| 4301 | 1 |
| 4310 | 56 |
| 4320 | 1 |
| 4330 | 7 |
| 4360 | 354 |
| 5102 | 45 |
| 5170 | 1 |
| 5180 | 5 |
| 6100 | 109 |
| 6111 | 85 |
| 6112 | 2 |
| 6120 | 3 |
| 6130 | 25 |
| 6160 | 8 |
| 6180 | 2 |
| 6190 | 4 |
| 6210 | 17 |
| 6220 | 4 |
| 6231 | 4 |
| 7100 | 77 |
| 7110 | 57 |
| 7120 | 306 |
| 7121 | 32 |
| 8000 | 9 |
| 8001 | 354 |
| 8003 | 24 |
| Uncoded | 1 |
| **Grand Total** | **5484** |






EXHIBIT
21278
Hamilton

Court File No.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

ERNST & YOUNG INC.
**In its capacity as proposed Monitor of the Applicants**

---

**REPORT OF ERNST & YOUNG INC.**

**JANUARY 14, 2009**

**INTRODUCTION**

1.  Ernst & Young Inc. ("EYI") understands that Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") have applied to this Honourable Court seeking commencement of proceedings under the *Companies' Creditors Arrangement Act* ("CCAA") in order to restructure the business and affairs of the Company.

2.  This is the first report of EYI, the proposed Monitor in the Applicants CCAA proceedings. EYI has consented to act as Monitor in these CCAA proceedings.