3.  The purpose of this report ("Report") is to provide this Honourable Court with information on:

- General background;

- Overview of operations and interdependencies;

- Legal entity structure;

- Nortel's operational transformation;

- Research and development ("R&D") expenditures and transfer pricing adjustments;

- Financial overview

    o  Debt structure;

    o  Export Development Canada;

    o  Pension and other post retirement plans;

- Cash position and liquidity;

- Efforts to refinance;

- Sale and divestiture efforts;

- Formal insolvency proceedings;

- Overview of the 13 week cash flow forecast;

- Flextronics Amending Agreement;

- Charges and financial thresholds in the draft Initial Order and employee and director matters;

2

- o Administrative charge;

- o Directors and Officers' trust and charge;

- o EDC Charge;

- o Inter-Company payments, Inter-Company charge and GSPA

- o Carling Facility charge;

- o Sales of assets;

- o Creditor notification;

- AIP and KEIP;

- Directors' remuneration;

- Restructuring alternatives; and

- Conclusions and recommendations.

4. In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, the financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

5. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

6. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle (the "Doolittle Affidavit") filed in connection with these CCAA proceedings.

7. EYI was retained by Nortel on September 26, 2008, to assist Nortel and its other professional advisors to analyze options available to refinance and restructure the Company's operations.

8. EYI is not the auditor of Nortel.

## GENERAL BACKGROUND

9. Nortel is fundamentally a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

10. In 2000, BCE Inc. spun-off substantially all of its shareholdings in NNC, and NNC became a widely-held public company listed on the Toronto Stock Exchange and New York Stock Exchange. NNC is a Canadian corporation and is the direct or indirect parent of 143 subsidiaries operating worldwide. NNC is also the issuer of the convertible notes, described later in this report.

11. At its peak in 2000, NNC and its subsidiaries generated approximately $30 billion of consolidated revenues and employed approximately 93,000 people around the world. Since that time, it has faced increasing challenges due to the end of the technology boom and market saturation.

12. In addition, in 2003, NNC and certain of its then-current officers and directors became the subject of numerous court actions and regulatory investigations in connection with the restatements of NNC's financial statements. During 2006, Nortel entered into agreements to settle all of these class action lawsuits, concurrently (the "Global Class Action Settlement"), with the exception of one related Canadian action. In December 2006 and January 2007, the Global Class Action Settlement was approved by the relevant courts and became effective on March 20, 2007 (the

4

"Measurement Date"). Under the terms of the Global Class Action Settlement, Nortel paid $575 million in cash plus accrued interest and NNC issued common shares with a fair value of approximately $1,600 million (at the Measurement Date).

13. During 2007 Nortel also entered into separate settlement agreements with the Ontario Securities Commission and U.S. Securities and Exchange Commission.

14. Nortel has also indicated it continues to cooperate with authorities regarding on-going criminal investigations being conducted by the U.S. Attorney's Office and the RCMP, but is not the subject of such investigations.

15. These events distracted the Company and significantly hampered the growth of Nortel during a critical time of industry consolidation.

16. Since 2000, Nortel has contracted significantly. In each of the years 2001, 2004, 2006, 2007 and 2008 the Company announced restructuring plans that involved, among other things, a reduction of real estate costs and write down of plant and equipment. However, most of the restructuring plans focused on a reduction of employee headcount. As at September 30, 2008, Nortel, including its joint ventures, employed approximately 30,000 people, including over 6,000 people in Canada. Consolidated global revenues were approximately $10.9 billion for the year ended December 31, 2007.

**OVERVIEW OF OPERATIONS AND INTERDEPENDENCIES**

17. As at December 31, 2008, Nortel conducted its business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and Global Services ("GS"). The respective business units provide the following products and services to telecommunications carriers and enterprise customers worldwide:

a) CN - provides wireless networking solutions that enable telecommunication service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises.

b) ES - provides communication solutions to large and small businesses in a variety of industries, which are used to build new networks and transform existing communications networks into more cost effective, packet-based networks supporting data, voice and multimedia communications.

c) MEN - provides optical networking and carrier grade Ethernet data networking solutions to make the CN and large ES customers' networks more scalable and reliable for the high speed delivery of diverse multimedia communications services.

d) GS – (a separate reporting segment up until December 31, 2008) provides a broad range of services and solutions supporting the entire lifecycle of multi-vendor, multi-technology networks for enterprises and carriers worldwide seeking to reduce costs, improve efficiency and performance, and capitalize on new revenue opportunities.

18. Effective January 1, 2009, Nortel implemented a new operating and customer service delivery model that involves the decentralization of several of its corporate functions and a transition to vertically integrated business units to give greater financial and operational control to the business units, and to reduce duplication inherent in a matrix organization. Specifically:

a) Enterprise customers will now be served by the ES business unit for the entire communications solutions portfolio, advanced software and the associated value-added services and solutions. Service provider customers will be served by two business units – CN and MEN - which will have full responsibility for all product, services, applications, portfolio, business and market

6

development, marketing and R&D functions. A dedicated global carrier sales organization will support both business units.

b) The GS and global operations organizations will be decentralized and transitioned to the relevant business units by April 1, 2009, although their financial results will be included in ES, CN and MEN from January 1, 2009 forward.

19. Nortel's largest business unit is CN which represents approximately 40% of Nortel's YTD Q3 2008 revenue. From a geographical perspective the largest region by revenue is the United States, primarily through Nortel Networks Inc. ("NNI"), a U.S. subsidiary of NNL, representing approximately 40% of YTD Q3 2008 revenue. A summary of 2007 and YTD Q3 2008 revenue by business unit and region is as follows:



EMEA – Europe, Middle East and Africa
APAC – Asia Pacific and China

7

20. In 2007, one customer, Verizon Communications Inc., represented approximately 11% of 2007 consolidated revenue with approximately $1,149 million of total revenue (approximately $730 million in CN).

**LEGAL ENTITY STRUCTURE**

21. Generally, Nortel has established a separate legal entity in each of the countries in which it operates.

22. The revenue and assets of each of the business units is distributed among the multiple Nortel legal entities and joint ventures around the world. Each legal entity may have revenue and operations relating to some or all of Nortel's business units. Each region generally has a main operating entity or hub. The majority of Nortel's remaining legal entities operate as sales entities within their local countries.

23. The Canadian corporate structure is as follows:

    a) NNC is the ultimate parent company of the Nortel group of companies and its executive office is located in Toronto, Ontario. NNC has no active operations and its principal assets are its investments in direct and indirect subsidiaries.

    b) NNL is a direct subsidiary of NNC. It was incorporated in Canada and is Nortel's principal Canadian operating subsidiary. NNL's executive offices are located in Toronto, Ontario with its registered office in Montreal. It also has offices in Ottawa and Montreal with sales and support offices located throughout Western and Central Canada, Québec and the Maritimes. NNL's outstanding preferred shares are publicly traded on the TSX. NNL employs approximately 2,800 employees in Canada and is the direct or indirect parent of over 100 subsidiaries including NNTC, as well as, Nortel's other principal operating subsidiaries:

        i. NNI in the U.S.; and

8

       ii.  Nortel Networks UK Limited ("NNUK") in the U.K.

c) NNTC is a Nova Scotia unlimited liability company, whose purpose is to carry on R&D. NNTC employs approximately 3,000 employees at its executive office and R&D facility in Ottawa, Ontario (the "Carling Facility"). NNTC, does not produce any third party revenue and relies on NNL for all of its funding, including for payroll and R&D. This arrangement allows NNL to receive significant tax credits.

d) NNIC is a wholly owned subsidiary of NNL. It has no business or assets other than a minority equity interest in a number of foreign Nortel companies. NNIC was incorporated in 1977 under the CBCA.

e) NNGC is a wholly owned subsidiary of NNL. It has no business or assets, but has representative offices outside of Canada on behalf of the Company and employs approximately 22 employees in China. The payroll for these employees is funded by other Nortel entities. NNGC was incorporated in 1988 under the CBCA.

24. In addition to the Applicants, there are eight other Canadian Nortel companies, all of which either have limited or no business within Canada. None of these Nortel companies are a part of the proposed CCAA proceedings.

## OPERATIONAL TRANSFORMATION

25. Prior to 2000, Nortel manufactured the majority of its own products. In 2000, Nortel undertook an initiative to transition to an outsourced manufacturer model and focus on being a sales and service provider. In 2006, Nortel completed the transition, whereby it outsourced substantially all of its hardware manufacturing and related activities including certain product integration, testing, repair operations, supply chain management, third party logistics operations and design assets.

26. As part of this transition, NNL, entered into asset purchase agreements with several contract manufacturers, including Flextronics Telecom Systems Ltd. (together with its affiliates and subsidiaries, "Flextronics") who purchased the bulk of Nortel's inventory and manufacturing facilities. In connection with the Flextronics sale, NNL and Flextronics entered into complex multi-year supply arrangements for the supply of products and services on an on-going basis. As at September 30, 2008, Flextronics, having acquired other contract manufacturers that NNL had entered into similar arrangements with, supplied approximately 75% of Nortel's finished product around the world.

27. Flextronics and the other contract manufacturers have manufacturing plants located around the world.

28. In order to accommodate its global purchase and sales structure, Nortel employs a complex internal purchasing system for its hardware and software products and services.

29. Nortel's internal purchasing system is set up as follows:

   a) When a sales order is placed with one of the regional sales offices, an internal purchase order is generated by the Nortel entity in the country originating the sale. The purchase order is then automatically routed through one of four transaction control centres ("TCCs") depending on the business segment and the geographic region involved. The TCCs act as purchasing hubs for all of the Nortel's regional sales entities. The four TCCs are NNL, NNI, NNUK and Nortel Networks SA (France) ("NNFrance").

   b) When a purchase order is received internally by one of the TCCs, it contracts directly with equipment and design manufacturers to facilitate the ultimate product delivery to the customer.

c) Upon completion of the purchase order, the TCC pays the manufacturer and invoices the regional Nortel company, adding a mark-up to the price. This internal invoice is settled after delivery of the product. As a result of these steps, the manufacturer may be paid prior to the internal settlement of the resulting inter-company transaction.

30. Approximately two-thirds of all inventory purchases flow through the North American TCCs, NNL and NNI. The TCCs typically purchase specific products for Nortel's entities within specified regions. As a result of a TCC re-design that is targeted for implementation in April 2009 or as operational changes may require, the current TCC purchasing entity may change. The current TCC structure is outlined below:

| Product Family | TCC Purchasing Entity Region Purchases For | Supplier Manufacturing Locations |
|---|---|---|
| MEN | Canada - Americas<br>UK - EMEA & APAC | Mexico<br>Poland<br>Canada |
| Enterprise | *Voice*<br>Canada - Americas & APAC<br>UK - EMEA<br><br>*Data*<br>USA - Americas & APAC<br>UK - EMEA | Malaysia<br>China<br>Mexico<br>Canada<br>USA<br>UK |
| CDMA | Canada - global | China<br>Mexico<br>Malaysia |
| CVAS | USA - global | USA<br>Mexico<br>Thailand |
| GSM | France - global | China<br>Mexico<br>Poland |

31. As a result of the purchasing system described above, there is a large volume of transactions flowing through the inter-company trade accounts on a daily basis.

11

32. Typically, the inter-company trade accounts, with the exception of disputed invoices, are settled on a monthly basis either via a cash payment (where the purchasing entity has sufficient funds to pay the account due), or a set off against previously outstanding inter-company debt owing to the same legal entity. Occasionally, the inter-company balance remains outstanding and is settled at a later date. The initial determination of how to settle inter-company accounts is typically assessed through Nortel's administrative offices in Mexico and Nortel's treasury team and then a recommendation is sent to the applicable legal entity for consideration. The payor entity is the ultimate decision maker regarding how the amount will be settled.

33. If an inter-company balance is not settled for an extended period of time or if a Nortel entity is building up a cash balance that could be used elsewhere within the group of companies, an inter-company loan agreement is set up.

34. The Applicants have significant inter-company receivables and payables both between the Applicants and from Nortel entities outside of Canada. Some of these inter-company amounts are from the U.S. and Europe, the Middle East and Africa ("EMEA") entities that are or will be under insolvency proceedings in other jurisdictions.

35. As a result of the numerous inter-company transactions related to inventory purchases, provision of services and transfer pricing (described in more detail below), it is evident that there is a significant interdependence among the Nortel entities. As such, it is imperative that the Nortel entities continue to settle their inter-company trade balances.

36. The Applicants have advised the proposed Monitor that they intend to maintain the current settlement practices for inter-company trade, including the settlement of pre-filing intercompany trade amounts, between the Applicants and the other Nortel entities, except for the EMEA filing entities and the other Nortel entities, in order to allow for the continued flow of product and funds among the various Nortel entities.

12

37. As is discussed in more detail below, NNI and certain of the other U.S. Nortel companies (the "Chapter 11 Entities") are filing for protection under Chapter 11 of the *United States Bankruptcy Code* (the "Code"). In order to preserve the *status quo* as it exists at the time of the filing of proceedings with respect to the various Nortel entities (particularly with respect to the Applicants and the Chapter 11 Entities), the Applicants will continue to keep track of all inter-company payments and advances. In addition, the Applicants will ask the Court to authorize a charge on their property and undertaking (the "Inter-company Charge") to secure advances made to the Applicants by the Chapter 11 entities. Further, to continue the settlement of pre-filing intercompany trade transactions between the Applicants and NNI, NNI is prepared to reserve its right of set-off for inter-company trade amounts as against the pre-filing loan from NNI to NNL (the "Existing NNI Revolver"), in return, the Applicants will ask the Court to secure any amounts owing by NNL to NNI pursuant to the Existing NNI Revolver (approximately $295 million as at January 13, 2009) by way of the Inter-company Charge to secure the intercompany loan from NNI to NNL.

38. NNUK and certain EMEA entities intend to seek administration orders from the U.K. Court. In order to continue to conduct business in the ordinary course with EMEA entities post-filing and post-administration, NNL has entered into a Group Supplier Protocol Agreement ("GSPA") with the proposed Administrator, which contemplates an arrangement for post-filing receivables pursuant to the Transfer Pricing Model and prevents the set-off of post filing liabilities against pre-filing obligations. The Applicants have advised the proposed Monitor that they are seeking approval of the GSPA, including that NNL's obligations pursuant to the GSPA be secured by the Inter-company Charge.

## R&D EXPENDITURES AND TRANSFER PRICING ADJUSTMENTS

39. As a Canadian technology company, R&D forms the backbone for Nortel's product development and provision of services to its customers.

40. Nortel conducts R&D through ten key R&D "Centers of Excellence" situated around the globe and also invests in technology innovation initiatives with more than twenty major universities. Its in-house R&D is complemented through strategic alliances, partnerships and joint ventures with other companies.

41. Nortel's R&D headquarters is located in Ottawa, Ontario with two R&D campuses located in China. As full-service R&D sites, the Ottawa and China locations maintain critical mass of R&D expertise spanning all of Nortel's identified business lines. Nortel also has nine other R&D laboratories, four are located in the U.S.; and there is one in each of Ireland; the U.K.; Turkey; India; and Korea. In addition, Nortel has four "specialty" R&D sites, three of which are located in Canada.

42. Nortel's intellectual property ("IP") is principally owned by NNL.

43. To provide for reimbursement of R&D costs incurred by the R&D centres on behalf of Nortel globally, including NNL funding of NNTC, and to allow for the sharing of the IP among NNL's subsidiaries, Nortel developed and implemented a Transfer Pricing Arrangement ("TPA"). The TPA provides for:

   a) the "distributor" or "limited risk" Nortel entities, to distribute product and provide services to customers in return for a small profit margin. These entities have a limited amount of risk and do not participate significantly in R&D activities; and

   b) allowing certain Nortel entities to participate in the redistribution of profits or losses to the "residual profit share" ("RPS") entities and provides these entities with exclusive rights within their geographic area and non-exclusive

14

rights elsewhere to exploit the IP. The RPS entities are the four TCCs described above and NNIreland. The RPS entities incur significant R&D cost, sales and administrative costs on behalf of Nortel globally that require reimbursement.

44. Under the TPA, inventory and services purchased by a TCC is invoiced to the purchasing entity with a mark-up on cost. At the end of each quarter, after the operating profit for each legal entity is calculated, routine returns are calculated for both the limited risk entities and the RPS entities. For a limited risk entity the normal return is generally calculated as a small percentage return on sales and for a RPS entity it is calculated as a return on sales and "cost plus" on sales and marketing, G&A and operation costs incurred. Any profits in excess of these calculations are allocated to the four RPS entities based upon a calculation determined by their historical R&D spending.

45. Historically the TPA adjustments have been calculated on a quarterly basis within 45 days of Nortel's earnings announcements or approximately two and a half months after the quarter end. Starting in the first quarter of 2009, these adjustments will be estimated, booked and settled within the quarter. A true-up will generally occur as part of the following quarter's settlement.

## FINANCIAL OVERVIEW

46. Nortel's historical consolidated financial results are summarized below:

| USD millions | 2004 | 2005 | 2006 | 2007 | YTD Q3 2008 |
|---|---|---|---|---|---|
| Revenue | 9,478 | 10,509 | 11,418 | 10,948 | 7,689 |
| Operating earnings (losses) | (298) | (2,709) | 282 | 226 | (1,125) |
| EBITDA* | 276 | 304 | 499 | 812 | 195 |
| Net earnings (losses) | (247) | (2,610) | 28 | (957) | (3,664) |
| Net cash flow | (317) | (734) | 541 | 40 | (1,228) |
| Cash - on hand | 3,685 | 2,951 | 3,492 | 3,532 | 2,304 |

| INDEBTEDNESS | | | | | |
|---|---|---|---|---|---|
| Trade, taxes, deposits and other AP | 1,504 | 1,655 | 1,750 | 1,673 | 1,439 |
| Payroll and benefit related liabilities | 515 | 803 | 640 | 690 | 541 |
| Pension and other employment liabilities | 2,350 | 2,469 | 2,759 | 2,002 | 1,763 |
| Contractual liabilities | 571 | 348 | 243 | 272 | 214 |
| Restructuring liabilities | 463 | 297 | 274 | 280 | 279 |
| Deferred revenue and advance billings | 3,349 | 3,585 | 3,388 | 3,108 | 2,317 |
| Products and warranty provisions | 330 | 257 | 310 | 340 | 287 |
| Global Class Action Settlement provision | - | 2,703 | 2,494 | - | - |
| Long term indebtedness | 3,866 | 3,885 | 4,464 | 4,514 | 4,485 |
| Other | 561 | 587 | 741 | 600 | 468 |

*EBITDA = Net income/loss before interest, taxes, depreciation, amortization, goodwill impairment and shareholder litigation expense

47. Since 2006, Nortel has experienced declining sales volumes, particularly in North America, due to challenging economic conditions including a reduction in customer capital expenditures. The significant decline in net cash flow in comparison to revenue is due to significant deferred revenue being realized.

48. Contractual liabilities of approximately $214 million (approximately $62 million related to Canada) at September 30, 2008 relate to on-going customer and supplier obligations.

49. Restructuring liabilities of approximately $279 million (approximately $34 million related to Canada) at September 30, 2008 relate to workforce reduction and contractual and lease obligations.

16

50. The decline in sales, along with Nortel's increasing restructuring and pension costs, in part has lead to an increase in operating and net losses and an increase in the cash burn of the Company.

**Debt Structure**

51. Nortel's debt structure as at January 9, 2008 consisted of the following unsecured obligations:



52. Nortel's debt structure as at January 9, 2008 consisted of the following unsecured obligations:

*NNC*

a) $575 million aggregate principal amount of 1.75% Convertible Senior Notes due 2012 (the "2012 Notes"). The 2012 Notes bear interest at an annual rate

17

of 1.75% payable semi-annually on April 15 and October 15 of each year, and mature on April 15, 2012; and

b) $575 million aggregate principal amount of 2.125% Convertible Senior Notes due 2014 (the "2014 Notes" and together with the 2012 Notes, the "Convertible Notes"). The 2014 Notes bear interest at an annual rate of 2.125% payable semi-annually on April 15 and October 15 of each year, and mature on April 15, 2014.

c) The Convertible Notes are senior unsecured obligations of NNC and rank equally and rateably with other senior unsecured obligations of NNC. Further, holders of the Convertible Notes may convert their notes into NNC common shares at any time prior to the close of business on the trading day on the NYSE prior to the stated maturity date of the notes at a conversion rate of 31.25 common shares per $1,000 principal amount of Convertible Notes so converted (equal to a conversion price of $32.00 per common share), subject to adjustment in certain circumstances.

d) The Convertible Notes are fully and unconditionally guaranteed by NNL and NNI. Each guarantee is a direct, unconditional, unsecured and unsubordinated obligation of the respective guarantor and ranks equally and rateably with other senior unsecured obligations of the respective guarantor.

*NNL*

e) $1,000 million aggregate principal amount of Floating Rate Senior Notes due 2011 (the "2011 Notes"). The 2011 Notes bear interest at an annual rate, reset quarterly, equal to three-month LIBOR plus 4.25%, payable quarterly on January 15, April 15, July 15 and October 15 of each year, and mature on July 15, 2011;

18

f) $550 million aggregate principal amount of 10.125% Senior Notes due 2013 (the "2013 Notes"). The 2013 Notes bear interest at an annual rate of 10.125% payable semi-annually on January 15 and July 15 of each year, and mature on July 15, 2013;

g) $1,125 million aggregate principal amount of 10.750% Senior Notes due 2016 (the "2016 Notes"). The 2016 Notes bear interest at an annual rate of 10.750% payable semi-annually on January 15 and July 15 of each year, and mature on July 15, 2016; and

h) $200 million principal amount of 6.875% Notes due 2023 (the "2023 Notes"). The 2023 Notes bear interest at an annual rate of 6.875% payable semi-annually on March 1 and September 1 of each year, and mature on September 1, 2023.

i) Each of the 2011 Notes, the 2013 Notes and the 2016 Notes (collectively the "High Yield Notes") is a senior unsecured obligation of NNL and ranks equally and rateably with other senior unsecured obligations of NNL. The amounts under the 2023 Notes are a direct senior, unconditional and unsecured obligation of NNL.

j) The High Yield Notes are fully and unconditionally guaranteed by NNC and NNI. Each guarantee is a direct, unconditional, unsecured and unsubordinated obligation of the respective guarantor and ranks equally and rateably with other senior unsecured obligations of the respective guarantor.

*NNCC*

k) $150 million aggregate principal amount of 7.875% Notes due 2026 of Nortel Networks Capital Corporation ("NNCC") (the "2026 Notes"). The 2026 Notes bear interest at an annual rate of 7.875% payable semi-annually on June 15th and December 15th of each year, and mature on June 15, 2026. NNL has

19

fully and unconditionally guaranteed the 2026 Notes. The guarantee is a direct, unconditional and unsecured obligation of NNL and ranks equally and rateably with other senior unsecured obligations of NNL. NNCC is a shell financing subsidiary.

**Export Development Canada ("EDC")**

53. A key element of NNL's ability to carry on its business is the ability to provide performance bonds and guarantees to its customers to support its sales contracts.

54. Through an agreement with EDC dated February 14, 2003, as amended and restated on December 14, 2007, NNL has been provided with a $750 million unsecured support facility ("EDC Support Facility"), comprised of $300 million of committed revolving support for guarantee bonds or similar instruments with individual amounts of up to $25 million and $450 million of uncommitted revolving support for accounts receivable or securitizations by EDC and for the issuance of guarantee bonds or other similar documents in support of contract performance. NNI has also guaranteed all of the existing and potential payments that NNL would or could have to make under the EDC Support Facility.

55. As at January 5, 2009, there were approximately $187 million of performance bonds outstanding of which $122 million were issued under the committed line and $65 million under the uncommitted revolving support line.

56. Pursuant to the terms of the EDC Support Facility, there are certain default clauses which if triggered permit EDC to suspend further guarantee support. On December 15, 2008, Moody's Investor Services ("Moody's") downgraded NNC's credit rating to Caa2, gave EDC the right to suspend or terminate the EDC Support Facility. Accordingly, NNL has executed a 30 day Standstill and Waiver Agreement with EDC, in relation to such termination rights, that expires on January 15, 2009.

57. On January 13, 2009, EDC provided Nortel with a waiver to provide a post filing facility that allows the Company the ability to issue new performance based bonds or other similar types of securities of up to $30 million (the "EDC Facility"), based on Nortel's estimated requirements for a period of 30 days. The facility is to be secured by a first charge on the Applicants assets.

**Pension and Other Post Retirement Plans**

58. Nortel has several funded and unfunded pension and post-employment retirement plans. In Canada, Nortel has two funded defined benefit pension plans. In 1999, Nortel closed these two plans to new members and allowed current plan members to elect to convert to defined contribution or similar retirement plans. In January 2008, all members, except for those receiving or eligible to receive a pension and certain unionized employees, were converted to the defined contribution plan.

59. The annual funding costs for the plans in Canada is summarized as follows:

| PLAN (CDN$ millions) | Service | | Total |
|---|---|---|---|
| | Current | Past | |
| Defined Benefit | 8.4 | 22.4 | 30.8 |
| SERP, TRA and Other | - | 28.8 | 28.8 |
| Defined Contribution | 70.3 | - | 70.3 |
| Total | 78.6 | 51.2 | 129.9 |

60. As at September 30, 2008, Nortel's aggregate current and long-term accounting liability for pension benefit liabilities and post employment and post-retirement benefit liabilities (as determined under U.S. GAAP) was approximately $1,800 million based on a valuation as of Nortel's most recent annual measurement date of September 30, 2007. The Company has indicated to the Monitor that due to the decline in market conditions and other factors, the estimated funding deficits, as at December 31, 2008, will have significantly increased.

21

61. NNUK is a wholly owned subsidiary of NNL. NNUK operates both a defined benefit pension plan ("UKDB") and a defined contribution pension plan. A valuation of the UKDB plan completed in 2005 disclosed a deficit of approximately £356 million.

62. In order to address the UKDB deficit issue, NNUK entered into an agreement with Nortel Networks UK Pension Trust Limited ("NPT"), the pension trustee, to amongst other things, make both current service and past service "catch up" payments and to pay the pension protection fund levy. This obligation amounts to approximately £85 million per year.

63. In support of NNUK's agreement with NPT, NNL provided a guarantee dated November 2006, of NNUK's obligation to make the required pension contributions under the agreement. In 2007, NNL further agreed to guarantee the obligations under the UKDB plan up to the lesser of £150 million and the plan's "Buy Out Deficit" (as defined in the UKDB plan) in the event of an insolvency event affecting NNUK.

64. While a further valuation of the UKDB plan has not yet been filed, based on a March 2008 actuarial valuation there is a significant increase in the deficit under the UKDB plan.

CASH POSITION AND LIQUIDITY

65. At December 31, 2008, Nortel's consolidated cash balance was, approximately $2.4 billion. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at December 31, 2008:

| Region | Gross Cash | Restricted | Unavailable (see below) | Available Cash |
|---|---|---|---|---|
| NNL | 168 | (17) | | 151 |
| Other Canada | 36 | (11) | | 25 |
| | | | | |
| NNI | 661 | | | 661 |
| NNI - Reserve MMF (ST/LT) | 65 | | (65) | - |
| NGS | 27 | | (27) | - |
| Other US | 4 | | | 4 |
| **North America** | 961 | (28) | (92) | 841 |
| | | | | |
| NN UK Limited | 396 | | (396) | - |
| NNUK subs (excl JVs) | 158 | | (158) | - |
| JV - Notes | 71 | | (71) | - |
| Other EMEA | 119 | | (79) | 40 |
| **UK/Europe** | 744 | - | (704) | 40 |
| | | | | |
| Greater China | 195 | (3) | (192) | - |
| Other ASIA PAC (excl JVs) | 119 | (1) | | 118 |
| LG Nortel | 323 | | (162) | 162 |
| Other JVs | 59 | | (30) | 30 |
| **ASIA** | 696 | (4) | (383) | 309 |
| | | | | |
| **Cala** | 41 | - | | 41 |
| | | | | |
| **Total Treasury Cash** | 2,442 | (32) | (1,179) | 1,231 |

66. As at December 31, 2008, North America had cash available for operations of approximately $841 million. Of this amount, approximately $176 million is held by Canadian entities and approximately $665 million is held by U.S. entities. It is expected that a further $65 million from the Money Market Reserve Fund will become available in the U.S. at some time during 2009.

67. The U.K. and EMEA Nortel entities had cash available for EMEA operations of approximately $711 million. As a result of the significant unfunded pension liability in the U.K. and the anticipated filings of NNUK, most of its European subsidiaries

23

and NNIreland, no cash will be available to NNL from the majority of the EMEA region. The NETAS joint venture, a joint venture in which Nortel owns approximately a 53% interest, holds approximately $71 million of cash of which $38 million represents Nortel's approximately 53% share. Nortel believes these funds will be difficult to repatriate for other funding purposes as approval of the other joint venture would be required. The proposed Monitor understands there are no current plans for a dividend distribution from the NETAS joint venture.

68. Asia Pacific, Asia Central ("APAC") Nortel entities have approximately $309 million of cash available for operations. As a result of the regulatory regime in the People's Republic of China, Nortel believes it will be difficult to repatriate funds in the near term. Furthermore, Nortel's LG Nortel Co. Ltd. joint venture and other joint ventures Nortel participates in hold approximately $383 million of cash of which $192 million represents Nortel's 50% share. Repatriation of these funds requires approval of the respective joint venture partners. A distribution of $36 million was received from LG Nortel Co. Ltd. in December 2008 and a dividend distribution of $7 million is planned from Guangdong-Nortel Telecommunications Company Limited of China, another of Nortel's joint ventures, in the first quarter of 2009.

69. The Caribbean and Latin America ("CALA") region Nortel entities have approximately $41 million of cash generally available for operations.

70. The proposed Monitor is advised by management that several of Nortel's suppliers, have reduced Nortel's credit terms, demanded deposits or periodically placed Nortel on stop shipment for late payments.

71. Further, Nortel has net interest payments totalling $107 million due on January 15, 2009, in respect of the following notes:

   a) quarterly payment on the 2011 Notes issued by NNL;

   b) semi-annual payment on the 2013 Notes issued by NNL; and

     c)  semi-annual payment on the 2016 notes issued by NNL.

72. It is anticipated that Nortel will make the decision to not make the interest payment due January 15, 2009 in the net amount of $107 million.

73. The proposed Monitor is advised by Nortel that without protection from its creditors the remaining available cash resources within Canada could be fully exhausted as early as the second quarter of 2009 and the Canadian companies will not be able to operate.

74. Nortel has undertaken steps to address its operating and financial concerns and focus on cash preservation. As previously indicated Nortel has implemented a new operating model to further consolidate and increase efficiencies in its business segments and has announced a further restructuring of its workforce and other cost reduction actions.

75. To further preserve cash, on November 10, 2008 Nortel also announced the suspension of dividends on the preferred shares of NNL.

76. Despite its efforts to restructure informally, Nortel believes a comprehensive operational and financial restructuring is required to adequately address its operating and financial challenges including significant employee expenses and high debt levels. Nortel has advised that, given its current liquidity position, the nature and extent of restructuring required is cost prohibitive and formal insolvency proceedings in multiple jurisdictions is required to allow the Company to undertake this comprehensive operational and financial restructuring.

77. It is Nortel's view and the proposed Monitor concurs, that if Nortel's requests for creditor protection are approved, Nortel has sufficient cash on hand to adequately fund its projected liquidity needs for on-going operations, while Nortel determines the basis on which it intends to restructure in consultation with its stakeholders.

25

**EFFORTS TO REFINANCE**

78. Nortel has canvassed the capital markets to review its options with respect to obtaining new or replacement financing or otherwise address its indebtedness. As a result of the challenges within the telecommunications industry including customer consolidation, cut backs or deferrals in customers' capital spending programs, the worldwide economic downturn and the general freeze of the global capital markets, Nortel has been unsuccessful in obtaining either additional or replacement financing on acceptable terms.

79. On December 15, 2008, Moody's downgraded Nortel's corporate rating from B3 to Caa2 resulting in the senior unsecured ratings for all of Nortel's outstanding $4,175 million debt securities to drop to Caa2 from B3 as well. While NNC's speculative grade liquidity rating was affirmed at SGL-2, the uncertain business environment caused the rating to remain negative. These rating actions were prompted by the potential that on-going adverse business conditions may persist for a prolonged period, implying the Company is unlikely to return to positive free cash flow generation over the near term and the risk of default has increased.

80. On November 21, 2008, Standard & Poor's Ratings Services affirmed its B- rating for NNL, including its long term corporate credit rating, and at the same time removed the ratings from its CreditWatch with negative implications status. Its overall outlook for Nortel, however, is negative. The affirmation primarily reflects its belief that Nortel should be able to sustain adequate levels of liquidity over the next 12 to 18 months; however, they remain concerned about NNL's ability to contain revenue erosion given difficult market conditions, high cash burn and execution risk as it relates to its revised strategy.

**SALE AND DIVESTITURE EFFORTS**

81. Over the past two years, Nortel has also pursued potential M&A opportunities with various parties to accomplish much needed consolidation necessary within the

industry. These pursuits have been unsuccessful thus far owing to a variety of reasons, including the condition of the capital markets, the inability to raise the funds required, and Nortel's debt and costs.

**FORMAL INSOLVENCY PROCEEDINGS**

82. As a result of Nortel's current financial and liquidity position, the Applicants have commenced an application for protection under the CCAA. NNI is filing under Chapter 11 of the Code ("Chapter 11") for itself and the majority of the U.S. operating subsidiaries. In addition, NNUK and certain of the EMEA entities intend to seek Administration orders in the U.K. Court.

83. The Applicants are also seeking this Court's direction for the Monitor to apply for recognition of the CCAA proceedings as "Foreign Main Proceedings" under Chapter 15 of the United States Bankruptcy Code. In addition, NNI is seeking an Order pursuant to Section 18.6 of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" and giving effect to the automatic stay provided for in the U.S. Bankruptcy Code.

84. Given that proceedings will be taking place in Canada and the United States, it is proposed that the Courts in these jurisdictions adopt a cross border insolvency protocol. The proposed Monitor has reviewed the protocol to be presented to the Courts and is of the view the protocol is both beneficial to effectively manage the nature of these proceedings and consistent with protocols adopted by the Courts in previous large cross border insolvency proceedings.

85. The Nortel entities in APAC and CALA (the "APAC Group" and CALA Group", respectively) are not filing for protection from their creditors. In addition, certain EMEA region Nortel entities, (the "Other EMEA Entities" and collectively with the APAC Group and the CALA Group, the "Non-Filing Entities") are not encompassed by the anticipated U.K. Administration. The Non-Filing Entities will benefit from ·

27

arrangements made for financial support from NNL and NNI as discussed later in this Report.

86. After a careful review of the operations and financial position of the Non-Filing Entities, management concluded the Non-Filing Entities should continue to operate on a business as usual basis to the fullest extent possible.

87. In the proposed Monitor's view, this approach will maintain the enterprise value of the Non-Filing Entities. However, it is anticipated that the Non-Filing Entities may require support from the Applicants and the Chapter 11 Entities.

88. In making the determination to not seek insolvency protection for the Non-Filing Entities, Nortel and its advisors considered the following:

    a) certain customers are vital to the on-going value of Nortel's business units as these customers have needs, not only in the local EMEA country or APAC and CALA regions, but in other regions serviced by Nortel's global customer network; and

    b) certain suppliers and R&D activities are critical to the continued operations of Nortel, not only in the local EMEA country or APAC and CALA regions, but globally. While these suppliers and R&D activities are, to a large extent, strategically managed out of Canada and the United States, their continued support is essential to support on-going operations and to service Nortel customers throughout the world. Any potential operational disruption with these suppliers could potentially impact all operations going forward, whether through the global purchasing agent or directly.

89. The complexity and cost of implementing formal restructuring procedures in countries such as Brazil, Columbia, Chile, Argentina, India and Australia would be prohibitive in relation to the amount owed to trade suppliers in such countries, and

28

would further complicate the efforts and length of time necessary to restructure Nortel.

90. In the view of the proposed Monitor, the Non-Filing Entities should be able to maintain operations with adequate funding from the Applicants and other North American Nortel entities without the need for creditor protection.

## OVERVIEW OF THE 13-WEEK CASH FLOW FORECAST

91. Nortel, with the assistance of the proposed Monitor, has prepared a 13-week cash flow forecast that estimates the CCAA Applicants financing requirements. A copy of the cash flow forecast is attached as Appendix A.

92. The cash flow forecast estimates that the Applicants for the period of January 11, 2009 to March 31, 2009 will have total receipts of $439 million and total disbursements of $572 million for net cash flow outflow of $133 million. NNL is not forecast to draw upon the NNI Loan (as describe later) during the forecast period.

93. At March 31, 2009, the Applicants are forecast to have available liquidity, consisting of cash on hand and availability under the NNI Loan, of approximately $278 million.

94. The main assumptions of the cash flow forecast are as follows:

   a) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and customer collection experience;

   b) all disbursements are made assuming suppliers pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms in light of the commencement of these CCAA proceedings;

   c) inter-company loans are stayed. Inter-company trade accounts including pre-filing amounts, continue to settle on a cash basis in the normal course between

the North America filing entities and the other Nortel entities except for NNUK and the other EMEA filing entities;

d) severance payments are stayed and are unsecured claims;

e) pension funding payments are made for the current service portion for defined benefit plans. Funding for past service is not included;

f) subject to both Canadian and U.S. Court approval of the NNI Loan and Carling Facility Charge, the forecast reflects funding payments to NNL from NNI in the amount of $200 million; and

g) all interest payments relating to the Company's indebtedness are not included.

### FLEXTRONICS AMENDING AGREEMENT

95. In preparation for a filing and in recognition of the importance of Flextronics' continuing compliance during the proceedings, Nortel very recently entered into negotiations with Flextronics, which would ensure ongoing supply. On January 14, 2009, NNL and Flextronics entered into an amending agreement (the "Flextronics Amending Agreement") that amends the various Flextronics agreements and provides Nortel with post petition supply of products and services.

96. Key terms of the Flextronics Amending Agreement include:

a) Purchase of certain Flextronics inventory in the total amount of $120 million payable on the following schedule: (i) $25 million on January 14, 2009; (ii) $50 million on January 20, 2009, (iii) $25 million on April 1, 2009 and (iv) $20 million on July 1, 2009; and

b) Payment of post filing products and services on a weekly basis for goods and services supplied during the immediately preceding week.

97. Due to the essential and strategic nature of Flextronics's services for Nortel, it was critical for Nortel to establish a post petition supply agreement to minimize disruption to its continuing operations. Without the agreement, Nortel risked significant interruption to its customer deliveries. Further, given the specialized IP and manufacturing equipment as well as the significant volume of business, in terms of number and quantity of products, manufactured at Flextronics, transitioning to alternative contract manufacturers would have been prolonged and costly, resulting in significant disruption to Nortel's operations.

## CHARGES AND FINANCIAL THRESHOLDS IN THE DRAFT INITIAL ORDER AND EMPLOYEE AND DIRECTOR MATTERS

98. The draft Initial Order provides for a number of charges and financial thresholds that are described below:

### Administration Charge

99. The Administration Charge as described in the draft Initial Order provides for an amount of CDN$5 million for the Monitor, the Monitor's Canadian and U.S. legal counsel, and the Applicants' Canadian counsel, as security for the professional fees and disbursements incurred both before and after the making of the Initial Order in respect of these proceedings. The Administration Charge has been established based on the respective professionals' previous history and experience with large cross border restructurings of similar magnitude and complexity. The proposed Monitor believes that the Administrative Charge is required and reasonable under the circumstances.

### D&O Trust and Charge

100. As described in the Doolittle Affidavit, Nortel has established a D&O Trust in the amount of CDN$10 million to indemnify NNC's directors and officers on terms consistent with the D&O Charge described below. The purposes of the D&O Trust is

31

to provide financial support for the defence and payment of claims against NNC's directors and officers to the extent that directors' and officers' insurance maintained by NNC is inadequate and also to pay for the maintenance of such insurance.

101.    The D&O Charge as described in the Doolittle Affidavit and the draft Initial Order provides for an amount of CDN$90 million to indemnify the Applicants' directors and officers from and against all costs, charges, expenses, claims, liabilities and obligations which may arise on or after the date of the Initial Order provided that the liability relates to his or her capacity as director and officer and all costs, charges, expenses, claims, liabilities and obligations relating to the failure of Nortel to make any payments or to pay amounts in respect of employee or former employee entitlements.

102.    The amount of the D&O Charge was estimated by Nortel with the assistance of the proposed Monitor taking into consideration the D&O trust already in place, hourly and salaried payroll, sales commissions, vacation pay and sales taxes.

103.    Given that Nortel will require the committed involvement of its directors and officers to successfully restructure, the proposed Monitor believes that the D&O Trust and the D&O Charge are required and reasonable under the circumstances.

**EDC Charge**

104.    With respect to the EDC Facility, as previously described, Nortel is seeking approval to secure the facility with a first charge on the Applicants assets. The EDC Facility will assist the Applicants in continuing to operate in the normal course.

105.    The EDC Charge shall rank after the Administration Charge and Carling Facility Charge with respect to the Carling Facility but ahead of the D&O Charge

32

**Inter-Company Payments, the Inter-Company Charge and GSPA**

106.    The Applicants are also seeking Court approval of the Inter-Company Charge as described above at paragraph 37.

107.    As discussed above, the Applicants intend to maintain the current settlement practices for inter-company trade, including the settlement of pre-filing intercompany trade amounts, with NNI and is seeking approval that the Inter-Company Charge secure NNI's payments and other advances, including goods and services, made post filing to the Applicants as well as pre-filing amounts outstanding under the Existing NNI Revolver. The Inter-company Charge will allow the Applicants to continue to ensure prompt payment post-filing for inter-company receivables between the Applicants and Chapter 11 filed entities.

**GSPA Charge**

108.    As discussed above, NNL has entered into the GSPA with the U.K. Administrator and is seeking approval that the Inter-Company Charge secure NNL's obligations thereunder.    The GSPA will allow the Applicants to continue to ensure prompt payment post-filing and post-administration for inter-company receivables relating to the sale of goods and services between the Applicants and the Administrator.

109.    The proposed Monitor is of the view that the maintenance of Nortel's system for the settling of inter-company payables is necessary to ensure the continued smooth operation of the Applicants and the Nortel business after the commencement of these CCAA proceedings. As such, the proposed Monitor believes that the continuation of the Transfer Pricing Model system, the granting of the Inter-Company Charge, and NNL entering into the GSPA is reasonable in the current circumstances. The proposed Monitor will assist the Applicants in tracking inter-company payments and will report to the Court on any developments in this regard.

33

**Carling Facility Charge**

110. To ensure that the Applicants have sufficient cash resources available to them, NNI has agreed to provide an additional inter-company loan of up to $200 million (the "NNI Loan") support to the Applicants under a proposed court sanctioned secured charge. The NNI Loan bears interest at 10% and pursuant to terms for use of proceeds, the Applicants can not advance more than $10 million to its subsidiaries that are not Applicants or debtors in the Chapter 11 proceedings.

111. NNI is seeking approval under the Chapter 11 proceedings of the NNI Loan to NNL on the basis that the NNI Loan will be secured by a court sanctioned secured charge. Therefore, NNL seeks authorization to provide NNI with a secured charge consisting of a mortgage against the Carling Facility, NNTC's R&D facility in Ottawa and a guarantee (recourse limited to only the Carling property) from NNTC (the "NNTC Guarantee"). NNTC will receive a direct benefit by the NNL's on-going ability to receive advances from NNI as it is dependent on NNL for all funding requirements, including with respect to its approximately 3,000 employees.

112. The Carling Facility Charge shall rank after the Administration Charge and ahead of the D&O Charge on the Carling Facility.

**Sales of Assets**

113. The threshold established in the draft Initial Order for each Applicant, "with the prior approval of the Monitor, to sell property worth up to $10 million or $50 million in the aggregate", was established in relation to the size of Nortel's operations and the value of its assets, in order to facilitate the orderly restructuring of the Company without adding undue administrative burden that would not add value to the process. In the proposed Monitor's view, these thresholds are appropriate given the asset base of Nortel.

**Creditor Notification**

114.    The draft Initial Order requires the proposed Monitor to send notice of the Order, within ten days, to every known creditor, including all inactive members of the Applicants' defined benefit pension plans, of each of the Applicants, having a claim of more than $5,000. Approval to use a $5,000 threshold is being sought to reduce the administrative burden and the cost of such process, considering the large number of creditors with low outstanding balances. An analysis of recent accounts payable sub-ledger indicates that almost 30% in number of the creditors have outstanding balances less than $5,000 represented less than 1% of the aggregate dollar value of the trade accounts payable. The proposed Monitor will attempt to ensure that creditors owed less than $5,000 receive notice of the Initial Order by posting the Initial Order on its website.

**AIP AND KEIP**

115.    The Applicants have indicated to the proposed Monitor that as part of the restructuring Nortel believes that it is important for its Annual Incentive Program ("AIP") for its employees to continue. In addition, Nortel has indicated that it believes a Key Employee Incentive Plan ("KEIP") should be established to retain key employees necessary to preserve Nortel's global operations. Nortel intends to establish the criteria for the 2009 AIP in consultation with its advisor, Mercer, and in accordance with past practice. Nortel also intends to develop a KEIP and seek the approval of this Honourable Court of the proposed KEIP. The proposed Monitor believes continuing the AIP and establishing the KEIP at the earliest opportunity are essential to a successful restructuring of Nortel. The proposed Monitor will, to the extent required, assist Nortel in the development of the 2009 AIP and the KEIP and will keep this Honourable Court apprised of any developments in this regard.

35

**DIRECTOR REMUNERATION**

116.    Directors may elect to receive their remuneration in the form of either cash or share units under the Directors' Deferred Share Compensation Plans of NNC and NNL. In the past the majority of the Directors' had elected to receive their remuneration by way of the allocation of share units. As a change in a Director's election constitutes an "investment decision", the non-employee Directors are currently prohibited from updating their elections. The proposed Monitor has been advised by the Applicants that in the future all Directors' will be remunerated by way of cash payments on a current basis (at current cash equivalent levels less an overall reduction of $25,000), subject to court approval. The proposed Monitor believes that the Applicants proposed change to Directors' remuneration is appropriate in the circumstances given the Directors' may not otherwise receive any remuneration.

**RESTRUCTURING ALTERNATIVES**

117.    At the outset of a complex multijurisdictional restructuring such as this, it is not possible to unveil a comprehensive restructuring strategy.

118.    The shape and direction of the Nortel restructuring will take some time to develop. It will require a thorough strategic review of the Company's assets and operations as well as input from Nortel's various stakeholder groups.

119.    Nortel has a significant employee, R&D and asset base. It is clear to the proposed Monitor that several different restructuring approaches are available to the Company including asset sales or recapitalization, or a combination thereof.

120.    The CCAA, Chapter 11, and U.K. administration proceedings will provide an environment to stabilize Nortel's business and provide for the continuation of going concern operations.

121. Once the Company's business has been stabilized, Nortel and the Monitor will be able to update this Honourable Court on Nortel's restructuring alternatives.

122. The proposed Monitor understands that it is the clear intent of Nortel to restructure and to file a plan of arrangement.

## CONCLUSION AND RECOMMENDATIONS

123. The proposed Monitor believes that the Applicants should be granted the benefit of protection under the CCAA. This will enable Nortel to commence a financial and operational restructuring and allow the Applicants to file a plan of arrangement in the best interest of all stakeholders.

124. The proposed Monitor believes that it should be authorized to apply for recognition of the CCAA proceedings as "Foreign Main Proceedings" under Chapter 15 of the Code and that the proposed Monitor be authorized to act, if necessary, as the "foreign representative" with respect to such proceedings.

125. The proposed Monitor recommends approval of the Flextronics Amending Agreement as ongoing supply from Flextronics is essential to ensure continuing operations.

126. It is the opinion of the proposed Monitor that the accommodation for the Inter-Company Charge and GSPA charge and the NNI Loan is in the best interest of stakeholders. The Inter-Company Charge and GSPA charges allow for the continuation of the Company's cash management system and the proposed NNI Loan along with the Applicants available cash should provide the necessary liquidity to Nortel's Canadian businesses in order to fund their operations. .

127. Further to EYI's review of the proposed draft Initial Order, EYI supports the charges and financial thresholds proposed in the draft Initial Order, including:

a) the Administration Charge of CDN$5 million;

37

b) the Carling Facility Charge and the NNTC Guarantee to the benefit of NNI;

c) the EDC Charge;

d) the D&O Charge of CDN$90 million;

e) the Inter-Company Charge;

f) asset sale thresholds for each of the Applicants of $10 million or $50 million in the aggregate; and

g) notices to creditors with outstanding balances of $5,000 or more.

All of which is respectfully submitted this 14th day of January 2009.

**ERNST & YOUNG INC.**
**In its capacity as the proposed Monitor of**
**Nortel Networks Corporation** *et al*

Per:

Murray A. McDonald
President

38

A/C

APPENDIX A

| Nortel Networks - (Jan 13 Edition) CCAA Applicants Forecast Cash Flow USD (Millions) 1. Receipts & Disbursements | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | (forecast) | Forecast | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan 2009 | | | | Feb 2009 | | | | Mar 2009 | | | | |
| Start of period | 11-Jan-09 | 18-Jan-09 | 25-Jan-09 | 01-Feb-09 | 08-Feb-09 | 15-Feb-09 | 22-Feb-09 | 01-Mar-09 | 08-Mar-09 | 15-Mar-09 | 22-Mar-09 | 29-Mar-09 | 11-Jan-09 |
| End of period | 17-Jan-09 | 24-Jan-09 | 31-Jan-09 | 07-Feb-09 | 14-Feb-09 | 21-Feb-09 | 28-Feb-09 | 07-Mar-09 | 14-Mar-09 | 21-Mar-09 | 28-Mar-09 | 31-Mar-09 | 31-Mar-09 |
| **Receipts** | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 5.8 | 18.9 | 65.6 | 3.3 | 4.7 | 4.0 | 19.9 | 4.1 | 4.1 | 8.1 | 18.9 | 32.1 | 180.4 |
| Other Receipts | 0.0 | - | 0.4 | - | - | 0.4 | - | - | - | - | 0.2 | | 1.1 |
| Intercompany Receipts | 15.0 | 67.2 | - | - | 131.5 | - | - | - | 55.0 | - | | | 268.8 |
| NNL/NNI Restructuring Loan Advances | - | - | - | - | - | - | - | - | - | - | | | - |
| **Total Receipts** | 20.8 | 86.1 | 66.0 | 3.3 | 4.7 | 135.6 | 20.3 | 4.1 | 4.1 | 63.1 | 10.1 | 32.1 | 439.3 |
| **Disbursements** | | | | | | | | | | | | | |
| Payroll (Gross) | 24.2 | - | 23.6 | 7.1 | 14.5 | 7.2 | 14.3 | 7.2 | 13.6 | 7.2 | 12.7 | | 131.7 |
| Benefits | 2.7 | - | 2.7 | 1.8 | 0.7 | 1.8 | 0.6 | 1.8 | 0.3 | 1.8 | 0.0 | | 14.2 |
| Pension | - | 1.9 | - | - | - | - | 1.9 | - | - | - | 1.9 | | 5.8 |
| Inventory Purchases | 34.7 | 51.3 | 4.4 | 12.5 | 17.9 | - | 14.5 | 6.1 | 18.3 | 4.2 | 5.7 | | 169.5 |
| Non-Inventory Purchases | 14.2 | 13.1 | 13.8 | 8.5 | 13.8 | 13.1 | 13.0 | 1.9 | 17.6 | 13.1 | 13.8 | | 137.0 |
| Intercompany Disbursements | - | 62.3 | - | - | - | 20.3 | - | - | - | 16.6 | - | | 99.4 |
| Professional Fees | 1.4 | 1.2 | 1.2 | 1.5 | 1.2 | 1.4 | 1.2 | 1.5 | 1.2 | 1.4 | 1.2 | | 14.4 |
| NNL/NNI Restructuring Loan Repayments | - | - | - | - | - | - | - | - | - | - | - | | - |
| **Total Disbursements** | 77.1 | 129.8 | 45.8 | 31.3 | 48.1 | 43.8 | 46.5 | 18.4 | 51.2 | 44.5 | 35.5 | | 572.0 |
| **Net Cash Flow** | (56.4) | (43.7) | 20.2 | (28.0) | (43.4) | 91.7 | (26.1) | (14.3) | (47.1) | 18.6 | (16.4) | 32.1 | (132.7) |
| **Opening Cash Balance** | 210.3 | 154.0 | 110.3 | 130.5 | 102.5 | 59.1 | 150.8 | 124.7 | 110.4 | 63.3 | 81.9 | 65.6 | 210.3 |
| **Closing Cash Balance** | 154.0 | 110.3 | 130.5 | 102.5 | 59.1 | 150.8 | 124.7 | 110.4 | 63.3 | 81.9 | 65.6 | 77.6 | 77.6 |
| Facility Size | 75.0 | 75.0 | 75.0 | 75.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| Less Utilized Facility | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Available Facility** | 75.0 | 75.0 | 75.0 | 75.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| **Closing Cash + Available Facility** | 229.0 | 185.3 | 205.5 | 177.5 | 259.1 | 350.8 | 324.7 | 310.4 | 263.3 | 281.9 | 265.6 | 277.6 | 277.6 |

1/14/2009  12:06 AM

**Nortel Networks Corporation**
**13 Week cash flow forecast assumptions:**

Nortel has prepared a 13 week cash flow forecast for the period January 1 – March 31, 2009 ("Forecast Period") that estimates the CCAA Applicants ("Applicants") financing requirements. The following outlines the main assumptions underlying the Applicants cash flow forecast ("Cash Forecast"):

**Summary of Assumptions:**

1. Collections of Accounts Receivable ("AR") include direct collections from customers and collections from contract manufacturers. Collections of AR have been estimated by the Applicant's collection group based on revenue forecasts and customer collection experience.

2. Other Receipts include real estate sublease income, income from investments, realizations on asset sales and other unusual receipts that may occur from time to time.

3. Intercompany Receipts represent collections on intercompany trade and transfer pricing adjustments from subsidiaries and joint ventures. Intercompany trade accounts and transfer pricing adjustments including pre-filing amounts continue to settle on a cash basis in the normal course with all global intercompany counterparties (filed and non-filed) with the exception of EMEA filing entities.

4. NNL / NNI Advances and Repayment represent the advances and repayment of funds drawn under the Restructuring Loan from NNI pursuant to the proposed post filing loan arrangement.

5. Payroll disbursements consist of wages, vacation pay, source deductions, and sales commissions. Payroll costs have been adjusted to reflect the anticipated workforce reduction during the forecast period.

6. Benefits include Health & Welfare Trust ("HWT") payments, defined benefit plan contribution funding, other benefit premiums and employer's share of Canada Pension Plan, Employment Insurance, Employer Health Taxes and Workers Safety and Insurance Board. Funding payments to HWT account are suspended post-filing as it is forecast that the HWT trust has sufficient surplus assets to sustain itself during the Forecast Period.

7. Pension includes payments to funded defined benefit plans for both current and past service.

8. Inventory Purchases consist of disbursements to third party suppliers for post filing product shipments on reduced credit terms.

9. Non-Inventory Purchases consist of disbursements for employee expenses, rent, taxes, capital expenditures, and all other payments to suppliers unrelated to inventory.

10. Intercompany Disbursements represent payments on intercompany trade and transfer pricing adjustments.

11. Professional fees include Monitor fees, legal, financial advisory and other professional fees related to the restructuring.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No:  09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### REPLY AFFIDAVIT OF SHARON HAMILTON
### SWORN APRIL 25, 2014

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  (LSUC#: 22293T)
jcarfagnini@goodmans.ca
**Joseph Pasquariello** (LSUC# 38390C)
jpasquariello@goodmans.ca
**Christopher G. Armstrong** (LSUC# 55148B)
carmstrong@goodmans.ca
Tel: 416.979.2211
Fax: 416.979.1234
Lawyers for the Monitor, Ernst & Young Inc.