(v)      copies of Outbound License Agreements and Cross-License Agreements;

(vi)      ribbon copies of all of the Transferred Patents and Purchased Specified UK Patents;

(vii)      infringement claim charts for the Transferred Patents and Purchased Specified UK Patents prepared by or for the Sellers;

(viii)      all books, records, files, ledgers or similar documents stored in the Sellers' document management systems used to track, organize or maintain Patents, to the extent related to the Transferred Patents or Purchased Specified UK Patents;

(ix)      all documents at any time contained in the Data Room and available to the Purchaser, other than documents that have been updated or superseded by subsequent drafts of such documents the latest drafts of which are available in the Data Room as of the date hereof;

(x)      copies of acquisition agreements relating to stand-alone acquisitions of patents by the Sellers to the extent relating to the Transferred Patents or Purchased Specified UK Patents; and

(xi)      assignment agreements to the extent relating to the Transferred Patents or Purchased Specified UK Patents;

provided, that "Patent Related Documentation" shall not include (i) the competitively sensitive portions of the foregoing that relate exclusively to Excluded Assets, Excluded Liabilities or any current or past product lines of the Sellers and (ii) any of the foregoing relating to any Specified UK Patent to the extent that (and for so long as) its disclosure to Purchaser is restricted under applicable Law.

"**Patents**" means all national (of any country of origin) and multinational patents, patent applications and provisional patent applications, and reissues, divisions, continuations, continuations-in-part, continuing patent applications, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) any Lien arising by operation of Law in respect of a liability of the EMEA Sellers where such liability does not rank as an Administration Expense; (ii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder) if such Liens exclusively secure Assumed Liabilities; (iii) Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order or the U.S. Sale Order (or, in the case of Undisclosed Patent Interests, upon transfer pursuant to Section 5.19); (iv) Liens set forth in Section 1.1(g) of the Sellers Disclosure Schedule; (v) entitlements, customary covenants, restrictions and other similar charges or encumbrances securing a liability of the EMEA Sellers only that do not, individually or in the aggregate, impair in any material respect the use or value of the Assets subject thereto and that exclusively secure Assumed Liabilities and (vi) (x) the promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies or industry groups concerning the Transferred

NNC-NNL11755879 / 66

Patents, Purchased Specified UK Patents or Undisclosed Patent Interests, solely to the extent such standard-setting bodies or industry groups, together with the title and number of the standard and the Transferred Patents to which such promises, declarations or commitments apply (in each case, to the extent identified in the respective promise, declaration or commitment) are listed in Section 1.1(g) of the Sellers Disclosure Schedule, and (y) the commitments concerning the Transferred Patents, Purchased Specified UK Patents or Undisclosed Patent Interests granted in writing by the Sellers pursuant to the membership agreements, by-laws or policies of standard-setting bodies or industry groups in which Sellers were participants, solely to the extent such standard-setting bodies or industry groups and the related membership agreements, by-laws or policies, pursuant to which such commitments were granted are listed in Section 1.1(g) of the Sellers Disclosure Schedule, and solely to the extent the Sellers are bound by such standard-setting bodies' or industry groups' membership agreements, by-laws or policies to bind the Purchaser to such commitments.

**"Person"** means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

**"Petition Date"** has the meaning set forth in the recitals to this Agreement.

**"Post-Closing Taxable Period"** means any taxable period or portion thereof beginning after the Closing Date.

**"Post-Divestiture Commercial License"** means with respect to each Divested Business, any Contract entered into with Sellers or Affiliates of the Sellers, on or after the Divestiture Date for such Divested Business, in connection with (i) performance required by Retained Contracts (including, for the avoidance of doubt, the Retained Contracts themselves) or (ii) sale, offer for sale, importation, distribution and/or lease of Inventory; in each case, where such Contract includes a non-exclusive grant of rights under any of the Transferred Patents, the Jointly Owned Patents, or the Specified UK Patents limited in time and scope to activities that would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement.

**"Pre-Closing Taxable Period"** means any taxable period or portion thereof ending on or prior to the Closing Date.

**"Pre-Divestiture Commercial License"** means any Contract entered into prior to the Petition Date in the ordinary course of business and, with respect to each Divested Business, any Contract entered into after the Petition Date but prior to the Divestiture Date in the ordinary course of business of such Divested Business, that: (1) provides for: (i) the manufacture of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller, (ii) the sale, offer for sale, importation, distribution and/or lease (or in the case of software, licensing) of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller, (iii) the servicing, including support, maintenance and installation, of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller and use of Nortel Products in connection therewith, (iv) the provision by, for or on behalf of, or under authority of any Seller or any Affiliate of any Seller of Nortel

NNC-NNL11755879 / 67

Services and use of Nortel Products in connection therewith, (v) the right to interoperate or interface (excluding air interfaces) with any Nortel Product and to use, make, sell, offer for sale, import, distribute and/or lease (or in the case of software, license), and support and maintain, the interface or the interoperability information (or software that provides the interface or interoperability), including as part of a Third Party product (but solely to the extent of the interface or the interoperability information); or (vi) research and/or development, and the right to make, use, sell, offer for sale, import, lease and support products, inventions or technologies resulting from such research and/or development, provided that (A) such Contract is with at least one of the Sellers or one of their Affiliates, (B) there is no ongoing performance of research and/or development by Sellers or their Affiliates under such Contract as of the date hereof, (C) such contract includes a defined scope for the research and development, (D) the scope of any Patent license granted under such Contract is limited to the products, inventions or technologies developed as a result of the research and development within the defined scope for such Contract, and (E) such Contract (w) is with a university or research institution, (x) is a joint research and/or development agreement, (y) provided for research and/or development by at least one of the Sellers or one of their Affiliates or (z) provided for research and/or development that was directed at Nortel Products or was otherwise for or on behalf of Sellers or their Affiliates; and (2) included a non-exclusive grant of rights under any of the Transferred Patents, the Jointly Owned Patents or the Specified UK Patents limited to any of the activities referred to in clauses (i) - (vi) above.

"**Primary Party**" means (i) the NA Sellers and NNUK, on the one hand, and (ii) the Purchaser, on the other hand.

"**Primary Seller Parties**" means the NA Sellers and NNUK.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchased Specified UK Patents**" means those Specified UK Patents assigned to the Purchaser pursuant to the terms of this Agreement.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Authorized Agents**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized EMEA Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Confidential Information**" means (i) from and after the Closing, competitively sensitive, proprietary or confidential information that pertains to the Assets, to the Specified UK Patents, or to any identified Undisclosed Patent Interests that the Purchaser has elected or is considering whether to elect to acquire pursuant to Section 5.19 (it being understood that in the event any such information pertains to such assets but not exclusively to such assets, Purchaser Confidential Information shall include only such portion of such information that pertains to such assets and all such information shall be redacted to the maximum extent possible

NNC-NNL11755879 / 68

before any such information is provided to any Person), including any information made available to the Purchaser, any Sellers or their respective Affiliates following the Closing, and (ii) any information that the Purchaser or its representatives furnish or otherwise make available to the Sellers or their representatives that relates to the Assets, to the Specified UK Patents, or to any identified Undisclosed Patent Interests or is otherwise furnished or made available by the Purchaser or its representatives to the Sellers or their representatives in connection with the evaluation of the transactions contemplated by this Agreement regardless of the form in which such information is communicated or maintained, and such portion of any notes, dockets, reports, analyses, compilations, studies, files, claim charts, or other documents or material, whether prepared by the Sellers or others, which contain or otherwise reflect such information.

"**Purchaser Indemnitee**" means the Purchaser and its Affiliates, successors and assigns, and each of the respective current and former members, officers, directors, agents, employees, partners, Affiliates and representatives of any such Person.

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Records Custodian**" means a Person of international reputation that is reasonably acceptable to the Purchaser and the NA Sellers.

"**Restricted Technical Records**" means the Livelink database or any other similar database containing necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Retained Contracts**" has the meaning set forth in Section 5.13(a).

"**Secondary Proceedings**" has the meaning set forth in the recitals to the Agreement.

"**Section 10.1 Indemnification Claim**" has the meaning set forth in Section 10.1(b).

"**Section 10.1 Notice of Claim**" has the meaning set forth in Section 10.1(b).

"**Section 10.1 Third Party Claim**" has the meaning set forth in Section 10.1(a).

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized EMEA Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Indemnitee**" means the Sellers and their Affiliates, successors and assigns, and each of the respective current and former members, officers, directors, employees, agents, partners, and Affiliates and representatives of any such Person.

NNC-NNL11755879 / 69

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Patents**" means all (a) provisional patent applications, patent applications, and patents set forth in Section 1.1(h) of the Sellers Disclosure Schedule (all such provisional patent applications, patent applications, and patents, collectively the "**Listed Patents**"); (b) national (of any country of origin) and multinational patents or patent applications (i) to which any of the Listed Patents claims priority (directly or indirectly), (ii) for which any of the Listed Patents forms a basis for priority (directly or indirectly), and/or (iii) which are subject to a terminal disclaimer with any of the Listed Patents; (c) reissues, reexaminations, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations or other extensions of any item in any of the foregoing categories (a) and (b); (d) national (of any country of origin) and multinational counterparts of any item in any of the foregoing categories (a) through (c), including certificates of invention, design registrations and utility models; and (e) all rights provided by multinational treaties or conventions for any item in any of the foregoing categories (a) through (d); but in the case of each of clauses (b) through (d), (i) solely to the extent owned by the Sellers, and (ii) excluding the Excluded Patents.

"**Service List**" has the meaning set forth in Section 5.2(a).

"**Short-Form Assignment**" means short-form Patent assignments to be executed by the Sellers and the Purchaser at or after the Closing, providing for the assignment of the Patents included in the Transferred Patents and Purchased Specified UK Patents from the Sellers to the Purchaser, in substantially the form of the assignments set forth as Exhibit K.

"**Software**" means any computer programs, applications and interfaces, whether in source code or object code, and all related documentation, user and operational guides and/or manuals.

"**Specified UK Patents**" means (a) those patents, provisional patent applications and patent applications specifically identified as such in Section 1.1(i) of the Sellers Disclosure Schedule ("**Specified Listed UK Patents**"); (b) national (of any country of origin) and multinational patents or patent applications (i) to which any of the Specified Listed UK Patents claims priority (directly or indirectly), (ii) for which any of the Specified Listed UK Patents forms a basis for priority (directly or indirectly), and/or (iii) which are subject to a terminal disclaimer with any of the Specified Listed UK Patents; (c) reissues, reexaminations, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations or other extensions of any item in any of the foregoing categories (a) and (b); and (d) national (of any country of origin) and multinational counterparts of any item in any of the foregoing categories (a) through (c), including certificates of invention, design registrations and utility models; and (e) all rights provided by multinational treaties or conventions for any item in any of the foregoing categories (a) through (d); but in the case of each of clauses (b) through (d), (i) solely to the extent owned by the Sellers, and (ii) excluding

NNC-NNL11755879 / 70

the Excluded Patents, it being understood that some of the items in categories (a)-(e) are subject to restrictions imposed under applicable Law.

**"Straddle Period"** has the meaning set forth in Section 6.4(b).

**"Subsidiary"** of any Person means any Person Controlled by such first Person.

**"Supplementary Non-Disclosure Agreement"** means the supplementary non-disclosure agreement by and among NNL, NNI and the Purchaser, dated as of December 10, 2010, including any amendments thereto or restatements thereof.

**"Survival Date"** means the date that is the one-year anniversary of the Closing Date.

**"Tax"** means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of a Tax Authority or Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, harmonized sales, gross receipts, sales, use, *ad valorem*, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest, fines and penalties, additions to tax or additional amounts imposed or assessed with respect thereto whether or not disputed, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

**"Tax Authority"** means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, UK or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

**"Tax Credit Purchaser"** has the meaning set forth in Section 6.5(b).

**"Tax Returns"** means all returns, reports (including any amendments, elections, declarations, disclosures, claims for refunds, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes.

**"Third Party"** means any Person that is not a Party or an Affiliate of a Party.

**"Third Party Claim"** has the meaning set forth in Section 9.3(a).

**"Trade Secrets"** means trade secrets, know-how and confidential technical or business information.

NNC-NNL11755879 / 71

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names, business names; in each case, whether or not registered, including all common law rights therein, and registrations, applications for registration and renewals thereof, and all rights therein provided by multinational treaties or conventions.

"**Transaction Documents**" means this Agreement and all ancillary agreements entered into, or documents or instruments executed and delivered by, any Party pursuant to this Agreement and in accordance with its terms.

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees) and for the avoidance of doubt, shall exclude any Taxes on income or gains and shall include GST/HST and VAT (unless otherwise stated), together with interest, penalties and additional amounts imposed with respect thereto whether or not disputed.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.7(a).

"**Transferred Licenses**" means the license agreements set forth in Section 1.1(j) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means (a) the Sellers' Patents and (b) the inventions disclosed in the invention disclosures set forth in Section 1.1(k) of the Sellers Disclosure Schedule (the "**Listed Inventions**").

"**UK Joint Administrators**" has the meaning set forth in the preamble to this Agreement.

"**Undisclosed Patent Interest**" has the meaning set forth in Section 5.19.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Bidding Procedures Order**" has the meaning set forth in Section 5.1(a).

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

NNC-NNL11755879 / 72

"**VAT**" means value added tax imposed in any member state of the European Union pursuant to EC Council Directive 2006/112 on the common system of value added tax (Directive 2006/112) and national legislation implementing that Directive or any predecessor to it or supplemental to that Directive or any tax of a similar nature which is imposed in any member state of the European Union and which may be substituted for or levied in addition to it.

"**365 Contracts**" means the Assigned Contracts that are Executory Contracts of a U.S. Debtor and were entered into before the Petition Date.

SECTION 1.2.     Interpretation.

1.2.1   Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2   Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation," (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from but excluding" and the words "to" and "until" each mean "to and including," and (iv) the words "date hereof" or "date of this Agreement" shall mean April 4, 2011.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.  When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3   Headings, etc.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4   Currency and Calculations.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated.  Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal, Eastern Edition for the day in question.

1.2.5   Statutory References.  Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute, each as in force from time to time.

NNC-NNL11755879 / 73

ARTICLE II

PURCHASE AND SALE OF ASSETS

SECTION 2.1.    Purchase and Sale.

2.1.1    Assets.  Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall purchase or be assigned and assume from the relevant Sellers, and each Seller shall sell, convey, transfer, assign and deliver to the Purchaser all of its right, title and interest throughout the world in the following assets as and to the extent existing on the Closing Date, other than the Excluded Assets (the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims in the Chapter 11 Cases (other than Permitted Encumbrances and Liens created by or through the Purchaser or any of its Affiliates) pursuant to sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens and Claims in the CCAA Cases (other than Permitted Encumbrances and Liens created by or through the Purchaser or any of its Affiliates) pursuant to the Canadian Approval and Vesting Order, and (z) in the case of Assets that are transferred or assigned by the EMEA Sellers, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser or any of its Affiliates):

(a)    the Transferred Patents, Specified UK Patents, and any inventions and improvements claimed or disclosed therein, subject only to any licenses granted thereunder (excluding any reservation of rights by the Sellers pursuant to such licenses) (i) prior to the date hereof that are (x) granted pursuant to Commercial Licenses entered into prior to the date hereof, (y) specifically listed (including by use of defined term) in Section 2.1.1(a) of the Sellers Disclosure Schedule or (z) Continuing Unlisted Licenses (it being understood that (a) the existence of any such Continuing Unlisted Licenses will not limit the Purchaser's rights under Sections 7.3(a), 8.1(c)(i) or Article IX hereof; and (b) the existence of any license will not provide the Purchaser with any right or remedy under Section 7.3(a), 8.1(c)(i) or Article IX hereof based on a breach of this Section 2.1.1(a)(i)); and (ii) on or after the date hereof, but solely to the extent they are granted in compliance with Section 5.9 and either (x) constitute licenses granted pursuant to Commercial Licenses entered into on or after the date hereof or (y) are identified to the Purchaser in writing prior to the Closing Date, but, in each case, only to the extent that such licenses remain in force after Closing, together with (A) the right, if any, to register or apply in all countries and regions in the Purchaser's name for patents, utility models, design registrations and like rights of exclusion and for inventors' certificates for said inventions and improvements; (B) the right to prosecute, maintain and defend the Transferred Patents before any public or private agency, office or registrar; (C) the right, if any, to claim priority based on the filing dates of any of the Transferred Patents under the International Convention for the Protection of Industrial Property, the Patent Cooperation Treaty, the European Patent Convention, the Paris Convention, and all other treaties of like purposes; and (D) the right to sue and recover damages or other compensation for past, present or future infringements thereof, the right to sue and obtain equitable relief, including injunctive relief, in respect of such infringements, and the right to fully and entirely stand in the place of the Sellers in all matters related thereto;

NNC-NNL11755879 / 74

(b)       the Assigned Contracts, any claims arising under such Assigned Contracts on or after the Closing Date, and prepaid expenses of the Sellers thereunder;

(c)       the tangible embodiments (including electronic copies) of all Patent Related Documentation owned by the Sellers or their Affiliates to the extent in the possession or under the control of the Sellers as of the date hereof or the Closing Date; provided that the Sellers shall have the right to retain copies of any Patent Related Documentation for use in accordance with Section 2.1.1(d);

(d)       all rights to Intellectual Property (other than Trademarks) of any Seller, to the extent embodied in the Patent Related Documentation and that relate (but with respect to Patent Related Documentation listed in clauses (v) and (ix) of the definition of Patent Related Documentation, only that exclusively relate) to the Transferred Patents or Purchased Specified UK Patents; provided, however, that (1) the Sellers shall have the right to use and disclose Patent Related Documentation to the extent necessary to perform their obligations, defend against the assertion of, or otherwise limit Liability with respect to the Excluded Liabilities so long as the Sellers shall have caused any Person to whom any nonpublic Patent Related Documentation is disclosed to enter into a standard confidentiality agreement with the Purchaser, substantially in the form of a model confidentiality agreement to be reasonably agreed among the Primary Parties prior to the Closing Date, such entry by the Purchaser not to be unreasonably withheld, conditioned or delayed; and (2) with respect to Patent Related Documentation listed in clauses (v) and (ix) of the definition of Patent Related Documentation that does not exclusively relate to the Transferred Patents or Purchased Specified UK Patents, the Purchaser shall have the right to use and disclose such Patent Related Documentation subject to the terms of the Non-Disclosure Agreement and (as applicable) the Supplementary Non-Disclosure Agreement;

(e)       all rights to the Sellers' patent-related data applications set forth in Section 2.1.1(e) of the Sellers Disclosure Schedule, which patent-related data applications are all of those used in connection with the Transferred Patents and the Specified UK Patents to organize, maintain or track information associated with the Patents (the "**Patent Databases**"); provided that, with respect to the data applications set forth in Section 2.1.1(e) of the Sellers Disclosure Schedule, the Sellers shall not transfer any rights with respect to such patent-related data applications unless the Purchaser holds licenses to such applications as required for such transfer on the Closing Date;

(f)       all rights of the Sellers under any non-disclosure agreement, to the extent such non-disclosure agreement relates to the Assets; and

(g)       all assets described in Section 2.1.9.

2.1.2   Excluded Assets. Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the other Transaction Documents to the contrary, the Sellers shall retain their respective right, title and interest in and to, and the Purchaser shall have no rights with respect to the right, title and interest of the Sellers in and to, the following assets (collectively, the "**Excluded Assets**"):

NNC-NNL11755879 / 75

(a)    cash and cash equivalents, accounts receivable (including intercompany receivables but other than as provided in Section 2.1.1(b)), bank account balances and all petty cash of the Sellers;

(b)    all rights to Tax refunds, credits or similar benefits relating to the Assets allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date, except to the extent expressly transferred by this Agreement to the Purchaser;

(c)    except as expressly provided herein, including pursuant to Section 2.1.1, any rights of the Sellers under any Contract (it being understood that no Seller shall retain any rights to enforce any patent rights in any of the Assets for past, present or future infringements thereof or any damages or equitable relief, regardless of whether any Contract pertains to any of the Assets);

(d)    except as expressly provided herein, including pursuant to Section 2.1.1, any Intellectual Property or domain names (i) of any Seller or any Affiliate of any Seller, and (ii) of any Third Party, except pursuant to the Assigned Contracts;

(e)    all rights of the Sellers under this Agreement and the other Transaction Documents;

(f)    all of the rights and claims of the U.S. Debtors, of whatever kind or nature, available to the U.S. Debtors under (i) the U.S. Bankruptcy Code, including all actions that have been or may be commenced in the U.S. Bankruptcy Court pursuant to Sections 541, 542, 547, 548, 549 and/or 550 of the U.S. Bankruptcy Code and (ii) any applicable Laws of the United States, any state, territory or possession thereof or the District of Columbia incorporated into the Bankruptcy Code pursuant to Section 544 thereof, and any and all proceeds of the foregoing;

(g)    all records prepared solely for purposes of the negotiations regarding the retention, sale or other disposition of the Assets, but excluding, for the avoidance of doubt, the Patent Related Documentation;

(h)    except as contemplated by Section 6.5, the Tax records of the Sellers;

(i)    all license agreements to which any of the Sellers is a party other than the Transferred Licenses (the "**Excluded Licenses**");

(j)    the Excluded Patents; and

(k)    any and all other assets and rights of the Sellers not specifically included in Section 2.1.1.

2.1.3    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume and become responsible for, and perform, discharge and pay when due, the following Liabilities of the Sellers (which, except as contemplated by clause (c) of this Section 2.1.3, shall not include any Liabilities resulting from the acquisition, ownership, use, operation or maintenance of the Assets prior to the Closing), and

NNC-NNL11755879 / 76

which, for the avoidance of doubt, shall not include any Excluded Liabilities) (the "**Assumed Liabilities**"):

(a)    all Liabilities with respect to the ownership or exploitation of the Assets by or through the Purchaser arising after the Closing Date, including all such Liabilities related to Actions or claims brought against the Assets to the extent such Actions or claims relate to post-Closing ownership or exploitation by or through the Purchaser of the Assets, and all maintenance fees and prosecution costs related to the Transferred Patents associated with the ownership or exploitation by or through the Purchaser of the Assets, or otherwise arising by or through the Purchaser, after the Closing Date;

(b)    all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof) after the Closing Date or constituting Cure Costs payable by the Purchaser pursuant to Section 2.1.7 (subject to the limits set forth in Section 2.1.7); and

(c)    all Liabilities for any Tax that the Purchaser bears under Article VI (for the avoidance of doubt, other than pursuant to Section 6.9(a)).

2.1.4    Excluded Liabilities.  Except as expressly provided in Section 2.1.3 or 2.1.8, the Purchaser shall not assume at the Closing any of the Liabilities of any Seller or any of the Sellers' Affiliates (collectively, the "**Excluded Liabilities**").  The Sellers and the Purchaser hereby acknowledge and agree that the Purchaser shall not accept, assume, agree to pay, perform or otherwise discharge or satisfy or be liable for any Excluded Liabilities.  Without limiting the foregoing (but subject to Sections 2.1.3 and 2.1.8), Excluded Liabilities include:

(a)    all Liabilities of any Seller or of any Affiliate of any Seller under Contracts that are not Assigned Contracts;

(b)    all Liabilities for any Tax other than those that the Purchaser is required to bear under Article VI;

(c)    all Liabilities of any Seller or any Affiliate of any Seller respecting employees, collective bargaining agreements, pensions, benefits, product liability, environmental contamination or remediation;

(d)    all Liabilities of any Seller or any Affiliate of any Seller constituting losses, costs or expenses (including fines, penalties, attorney fees and the costs of any investigations) associated with, relating to or arising out of any action, arbitration, audit, claim, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before any Government Entity or arbitrator against the Sellers or any of their Affiliates or any of their respective representatives, or the Assets;

(e)    all Liabilities of any Seller or any Affiliate of any Seller arising from state, provincial or bankruptcy law theories of recovery, including fraudulent transfer; and

NNC-NNL11755879 / 77

(f)        any and all Liabilities of any Seller or of any Affiliate of any Seller not specifically included in Section 2.1.3 or specifically assumed by the Purchaser pursuant to Section 2.1.8.

2.1.5    <u>Assumption and Assignment of 365 Contracts</u>. The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to the assumption and assignment of the 365 Contracts effective as of the Closing as part of the U.S. Sale Order in accordance with Section 5.1.

2.1.6    <u>Assignment of Non-365 Contracts</u>.

(a)        Subject to the receipt of any required Consent, all of the Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser at Closing pursuant to Section 2.1.1(b).

(b)        The Parties shall use their reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser of the Non-365 Contracts in force as of the Closing Date; <u>provided</u>, <u>however</u>, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents. For greater certainty, the failure to obtain any or all of such Consents described in the foregoing sentence shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.7    <u>Cure Costs; Adequate Assurance</u>.

(a)        To the extent that assumption and assignment of any 365 Contract entails the payment of any Cure Cost, the Purchaser shall pay or otherwise provide for payment of such Cure Cost, as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order or, in the case of a Non-365 Contract, as may be agreed with the counterparty with respect thereto. No payment of Cure Costs by the Purchaser under this Section 2.1.7 shall entitle the Purchaser to any adjustment to the Purchase Price.

(b)        Prior to the hearing before the U.S. Bankruptcy Court to assume the 365 Contracts, the Purchaser shall provide adequate assurance of its future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

2.1.8    <u>Non-Assignable Assets</u>. Notwithstanding anything in this Agreement to the contrary, if any requisite Consent of a Third Party (including a Government Entity) has not been obtained on or prior to the Closing and an attempted direct or indirect sale, transfer, lease, sublease or assignment of such Asset, without such Consent, would constitute a breach, default, violation or other contravention of Law or the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset, then, unless any such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder. For the avoidance of doubt, the Parties acknowledge that, subject to Article VII and Article IX, failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to

NNC-NNL11755879 / 78

complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price. In the case of Assets (i) that cannot be transferred or assigned without the consent of Third Parties, which consent has not been obtained prior to the Closing, the Sellers shall, at the Sellers' sole out-of-pocket cost, reasonably cooperate with the Purchaser in endeavoring to obtain such Consent (but, for the avoidance of doubt, Seller shall not be required pursuant to this clause (i) to pay any fee or other consideration to any Third Party whose consent is required in connection with the transfer of any Assets) and, if any such Consent is not obtained, the Sellers shall, following the Closing, cooperate with the Purchaser in all reasonable respects to enter into an arrangement reasonably acceptable to the Purchaser and the Primary Seller Parties pursuant to which the Purchaser would obtain the benefit of such Asset, Contract or other commitment and assume the obligations and economic burden thereunder (it being understood, without limiting the generality of the foregoing, that in the event that a Consent required for the transfer or assignment of a Transferred Patent or Specified UK Patent is not obtained by the Closing, the Sellers shall, concurrently with the Closing and to the maximum extent and scope permitted by applicable Law and not prohibited by any Contract (including the licenses listed in Section A.I(b) of the Sellers Disclosure Schedule), grant the Purchaser an irrevocable, worldwide, royalty free, perpetual, exclusive (subject to pre-existing license grants of the type subject to which Assets are assigned pursuant to Section 2.1.1(a)), freely assignable, sublicensable, transferable and fully paid up license under such Patent; or, if the Sellers are not permitted by applicable Law or are prohibited by a Contract from granting such an exclusive license, the Sellers shall grant the license to the Purchaser as a non-exclusive license to the maximum extent and scope permitted by applicable Law and not prohibited by any Contract (including the licenses listed in Section A.I(b) of the Sellers Disclosure Schedule); it being further understood that the terms of any such license with respect to the Specified UK Patents is set forth in the form of Closing Date License Agreement attached hereto as <u>Exhibit N</u>), or (ii) that are otherwise not transferable or assignable, the Sellers shall, following the Closing, reasonably cooperate with the Purchaser to enter into an arrangement pursuant to which the Purchaser would obtain the benefit of such Asset, Contract or other commitment and assume the obligations and economic burden thereunder. The obligation of the Sellers to provide such reasonable cooperation under this Section 2.1.8 shall continue for at least one (1) year following the Closing Date and shall thereafter continue until such time as a Seller shall determine in good faith that the discontinuance of its cooperation is reasonably necessary to effectuate its winding up and/or dissolution (in which case such cooperation obligations under this Section 2.1.8 shall terminate only as to such Seller). The Parties acknowledge and agree that the obligations under this Section 2.1.8 shall not affect the right of any Seller to wind down pursuant to applicable Law at any time after the date that is one year after the Closing Date.

    2.1.9  <u>Assignment of Title to Patent Related Documentation</u>. Except for those interests in tangible embodiments of the Patent Related Documentation retained by the Sellers pursuant to Section 2.1.1(c), all of the Sellers' right, title and interest in and to any and all tangible embodiments of the Patent Related Documentation as of the Closing Date, whether or not the tangible embodiments of such Patent Related Documentation are in Sellers' possession or control, shall be transferred and assigned to the Purchaser at Closing.

NNC-NNL11755879 / 79

SECTION 2.2.          Purchase Price.

2.2.1    Purchase Price.  Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Assets pursuant to the terms hereof, the Purchaser shall assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and shall pay to the Escrow Agent the Good Faith Deposit pursuant to Section 2.2.2 and to the Distribution Agent as agent for the Sellers an aggregate amount of cash equal to Nine Hundred Million Dollars ($900,000,000) (the "**Purchase Price**") less the amount of the Good Faith Deposit together with actual earnings thereon; provided that, for the avoidance of doubt, amounts of or in respect of Transfer Taxes shall be paid directly to the relevant Seller, Joint Administrators, the French Liquidator or Tax Authority pursuant to and in accordance with the relevant provisions of this Agreement.

2.2.2    Good Faith Deposit.

(a)      No later than 3 (three) Business Days after the later of (x) the date that the U.S. Bidding Procedures Order is entered and (y) the date that the Canadian Sales Process Order is entered, the Purchaser will deliver to the Escrow Agent cash in the amount of Twenty Seven Million Dollars ($27,000,000) (the "**Good Faith Deposit**") to serve as earnest money under this Agreement.

(b)      In accordance with the Escrow Agreement:

(i)      if the Closing occurs, the Good Faith Deposit, together with actual earnings thereon, shall be applied to the Purchase Price to be paid by the Purchaser pursuant to Section 2.2.1; or

(ii)      if the Closing does not occur and this Agreement is terminated in accordance with the terms hereof, and there are damages payable under this Agreement to any of the Sellers by the Purchaser in excess of any damages payable to the Purchaser by any of the Sellers under this Agreement, the Good Faith Deposit, together with actual earnings thereon, shall be applied to such excess damages, after which the remainder of the Good Faith Deposit, together with actual earnings thereon, shall be returned to the Purchaser; or, if no such excess damages are payable to the Sellers, the Good Faith Deposit, together with actual earnings thereon, shall be returned to the Purchaser.

2.2.3    Deposit Escrow.

(a)      Each of the Primary Seller Parties, NNSA and the Purchaser has entered into the Escrow Agreement with the Escrow Agent in order to secure payment of the Good Faith Deposit as provided in this Agreement and provide for the disposition of such Good Faith Deposit.

(b)      Each of the Primary Seller Parties, NNSA and the Purchaser hereby undertakes to promptly execute and deliver to the Escrow Agent, in accordance with the formalities set forth in the Escrow Agreement, joint instructions to pay to the Distribution Agent (as distribution agent for the Sellers) or the Purchaser, as applicable, funds from the Deposit

NNC-NNL11755879 / 80

Escrow Account any time that any Person becomes entitled to such payment from the Deposit Escrow Account pursuant to this Agreement.

2.2.4    Purchase Price Allocation.

(a)    The Parties shall (i) first allocate to the tangible Assets, if any, a proportion of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities), equal to the net book value of such Assets as of the Closing Date and (ii) then allocate the balance of the Purchase Price, as adjusted in clause (i) of this Section, to the intangible Assets.

(b)    To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities), among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 2.2.4(a) (such allocation, a **"Partial Allocation"**). The Purchaser shall deliver to the other Primary Party a proposed Partial Allocation within ten (10) Business Days after the Closing Date. If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith for a period of ten (10) Business Days from the date upon which the Purchaser delivers to the other Primary Party its proposed Partial Allocation, the Partial Allocation shall be submitted to the Accounting Arbitrator, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including for this purpose an allocation required, approved or authorized pursuant to a Bankruptcy Proceeding), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation (but in all cases shall be subject to the principles of Section 2.2.4(a)). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Accounting Arbitrator has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.7(b), then such Transfer Tax Return shall be timely filed in the manner that the Party with primary responsibility for paying the liability associated with such return reasonably determines and shall, upon receiving the Accounting Arbitrator's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Accounting Arbitrator (as modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes (including the preparation and filing of any Transfer Tax Returns).

SECTION 2.3.    Closing.

2.3.1    Closing Date. The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the **"Closing"**) shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 8:00 am New York time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under Article VII (other than conditions to be satisfied at the Closing, but

NNC-NNL11755879 / 81

subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Primary Seller Parties and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Primary Seller Parties (the day on which the Closing takes place being the "**Closing Date**"). The Closing will be deemed completed at the time the Parties release and exchange signature pages and the Sellers, Distribution Agent and the Purchaser, as applicable, receive the deliverables set forth in Section 2.3.2.

Upon occurrence of the Closing, simultaneously with the deliveries by the Purchaser described in Section 2.3.2(a) and (b), legal title, equitable title and risk of loss with respect to the Assets will thereupon transfer to the Purchaser, and the Assumed Liabilities will be assumed by the Purchaser in accordance with the terms hereof.

2.3.2   <u>Closing Actions and Deliveries</u>. At the Closing:

(a)   The Purchaser shall deliver to the Distribution Agent, as distribution agent for the Sellers, an amount equal to the Purchase Price <u>minus</u> the Good Faith Deposit (together with any actual earnings thereon) and <u>minus</u> the Indemnification Escrow Amount by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Distribution Agent in a written notice to the Purchaser;

(b)   The Purchaser shall deliver to the Escrow Agent Forty-Five Million Dollars ($45,000,000) (increased by any actual earnings thereon, the "**Indemnification Escrow Amount**") by wire transfer in immediately available funds to an account or accounts designated by the Escrow Agent at least two Business Days prior to the Closing Date pursuant to the Escrow Agreement (such account, the "**Indemnification Escrow Account**");

(c)   The Primary Seller Parties, NNSA and the Purchaser shall cause the Escrow Agent to deliver to the Distribution Agent (as agent for the Sellers) the Good Faith Deposit (together with actual earnings thereon) by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Distribution Agent in a written notice to the Primary Seller Parties, NNSA and the Purchaser;

(d)   The Sellers shall deliver, or cause to be delivered, to the Purchaser:

(i)   all duly executed instruments of conveyance and assignment as the Purchaser shall reasonably deem necessary or appropriate to vest in the Purchaser (or its designee, as the case may be) each Seller's right, title and interest in, to and under the Assets and Assigned Contracts;

(ii)   a copy of each of the U.S. Sale Order, the Canadian Approval and Vesting Order and the French Court Order;

(iii)   the officer's certificate required to be delivered pursuant to Section 7.2(c);

NNC-NNL11755879 / 82

(iv)    an executed Monitor's certificate substantially in the form attached to the Canadian Approval and Vesting Order, provided that all events to be certified therein by the Monitor have occurred;

(v)    subject to Section 5.11, a true, complete and (except to the extent executed copies thereof are not theretofore obtained pursuant to Section 5.8(d), the Contracts listed in Section 2.3.2(d) of the Sellers Disclosure Schedule) executed copy of each (A) Outbound License Agreement, Cross License Agreement, Joint Ownership Agreement and Continuing Unlisted License (if any), (B) agreement and other document at any time contained in the Data Room and available to the Purchaser, other than documents that have been updated or superseded by subsequent drafts of such documents the latest drafts of which are available in the Data Room as of the date hereof, (C) Transferred License and (D) non-disclosure agreement signed in connection with discussions concerning potential infringement, sale or licensing of any of the Transferred Patents or Specified UK Patents within the past two (2) years (it being understood that (1) the Sellers shall deliver to the Purchaser all such agreements and documents as provided in clauses (A)-(D) above in unredacted form except to the extent that the Sellers may be prohibited by applicable Law or by the terms of a Contract existing prior to the date hereof from providing unredacted versions to the Purchaser, in which case, the Sellers shall deliver to the Purchaser versions of such agreements and other documents redacted solely to the extent required by the applicable Law or Contract, (2) in accepting redacted copies of such agreements or other documents, the Purchaser is not waiving its rights to review or compel disclosure of unredacted versions of such agreements or other documents in future legal proceedings relating to the Assets, or otherwise and (3) no Party is hereby acknowledging that such delivery of unredacted versions is in fact prohibited);

(vi)    the Patent Power of Attorney; and

(vii)    the letters to the Sellers' counsel to be delivered pursuant to Section 5.8(b)(ii).

(e)    Each Primary Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Primary Party in order to effect, or evidence the consummation of, the transactions contemplated herein, including the Short-Form Assignments, the Closing Date License Agreement and the Common Interest Agreement.

(f)    The Purchaser and NNL shall deliver a duly executed copy of the Assumption Agreement.

NNC-NNL11755879 / 83

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE PARENT AND THE PURCHASER

Each of the Parent and the Purchaser hereby represents and warrants to the Sellers as follows:

SECTION 3.1.     Organization and Corporate Power.

(a)     Each of the Parent and the Purchaser is a corporation duly organized and validly existing and in good standing under the Laws of Delaware.  Each of the Parent and the Purchaser has all requisite power and authority to enter into, deliver and perform its obligations pursuant to this Agreement and any Transaction Documents to which it is or will become a party.

(b)     Each of the Parent and the Purchaser is qualified to do business as contemplated by this Agreement and the other Transaction Documents to which it is or will become a party and to own or lease and operate its properties and assets, including, following the Closing, the Assets, except to the extent that the failure to be so qualified would not, individually or in the aggregate, materially hinder, delay or impair the Parent's or the Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.

SECTION 3.2.     Authorization; Binding Effect; No Breach.

(a)     The execution, delivery and performance of each Transaction Document to which the Parent or the Purchaser is, or at the Closing Date will be, a party have been duly authorized by the Parent or the Purchaser, as applicable.  Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Parent or the Purchaser is, or at the Closing Date will be, a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Parent or the Purchaser, as applicable, enforceable against the Parent or the Purchaser, as applicable, in accordance with its respective terms.

(b)     The execution, delivery and performance by the Parent or Purchaser of the Transaction Documents to which the Parent or the Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any Consent of any Person (other than the Mandatory Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws (or similar governing document) of the Parent or Purchaser; (ii) any Contract or other document to which the Parent or Purchaser, as applicable, is a party or to which any of the Parent's or Purchaser's assets, as applicable, is subject; or (iii) any Laws to which the Parent or Purchaser, as applicable, or any of the Parent's or the Purchaser's assets as applicable, is subject; except, in the case of clauses (ii) and (iii) of this sentence, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, materially hinder, delay or impair the Parent's or the Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.

NNC-NNL11755879 / 84

SECTION 3.3.      Financing. The Parent has, as of the date hereof, and the Purchaser will have, as of the Closing, (i) sufficient funds available for purposes of paying the Purchase Price and paying any other amount due hereunder or in respect hereof, and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder, including the Assumed Liabilities. The Purchaser has not, as of the date hereof, and will not have, as of the Closing, incurred any obligation, commitment, restriction or liability of any kind that would materially impair or adversely affect such resources and capabilities. The Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person or the availability of funds to the Purchaser.

SECTION 3.4.      Adequate Assurance of Future Performance. To the extent required by any U.S. Bankruptcy Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of section 365(f)(2)(B) of the U.S. Bankruptcy Code. The Purchaser acknowledges and agrees that, if it becomes necessary to provide a 365 Contract counterparty with additional assurances to satisfy the Purchaser's obligations under Section 2.1.7, the Purchaser shall perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with its obligations under Section 2.1.7 without recourse to any Seller.

SECTION 3.5.      Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a)      Each of the Parent and the Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement and the other Transaction Documents. In consultation with experienced counsel and advisors of its choice, each of the Parent and the Purchaser has conducted its own independent review and analysis of the Assets, the Assumed Liabilities, and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents. Each of the Parent and the Purchaser acknowledges that it and its representatives have been permitted such access to the books and records, contracts and other properties related to the Assets as it required to complete its review, and that it and its representatives have been provided with an opportunity to meet with the officers and other employees of the Sellers, to discuss the conduct of business related to the Assets.

(b)      Each of the Parent and the Purchaser acknowledges and agrees that:

(i)      except for the representations and warranties expressly set forth in Article IV and the statements set forth in Annex I, neither the Parent nor the Purchaser has relied on, and each hereby specifically disclaims, any representation or warranty from the Sellers or any Affiliate of any such Person, or the Joint Administrators, the French Liquidator or any of their firms, partners, employees, agents, advisors or representatives or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or by the Joint Administrators, the French Liquidator or any of their firms, partners, employees,

NNC-NNL11755879 / 85

agents, advisors or representatives in determining whether to enter into this Agreement;

(ii)     except for the representations and warranties expressly set forth in Article IV and the statements set forth in Annex I, none of the Sellers, or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, or any Affiliate of any such Person or as to the accuracy or completeness of any information regarding any of the foregoing that the Sellers, or any other Person furnished or made available to the Parent or the Purchaser or their representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)     none of the Sellers, the Joint Administrators, the French Liquidator or any other Person shall have or be subject to any Liability to the Parent or the Purchaser or any other Person resulting from the distribution to the Parent or the Purchaser, or the Parent or the Purchaser's use, of the information referred to in Section 3.5(b)(ii); and

(iv)     the enforceability of this Agreement against the Sellers is subject to entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order.

(c)     Without limiting the generality of the foregoing, EACH OF THE PARENT AND THE PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN (INCLUDING IN ANNEX I), THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR TITLE OF ASSETS, OR NONINFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY, OR REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY TRANSFERRED PATENTS, JOINTLY OWNED PATENTS, SPECIFIED UK PATENTS, OR UNDISCLOSED PATENT INTERESTS.

SECTION 3.6.     Brokers. Except for fees and commissions that will be paid by the Parent or the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Parent or the Purchaser or any of their Affiliates.

SECTION 3.7.     Independence. In respect of NNSA, each of the Parent and the Purchaser acknowledges and agrees that: it wholly satisfies, without limitation, the statutory conditions set out under Section L.642-3 of the FCC in that (i) none of the Parent, the Purchaser, nor any director thereof has been or is a director (administrateur), a managing director (directeur

NNC-NNL11755879 / 86

général or directeur général délégué) or the President (Président) of, or has had or has, directly or indirectly, de facto Control over, NNSA and (ii) the Purchaser is not directly or indirectly Controlled by: (x) NNSA, or (y) any past or present director (administrateur), managing director (directeur général or directeur général délégué) or President (Président) of, or any person having de facto Control over, NNSA, or (z) the father, mother, son, daughter, brother or sister (in each case, by blood or in-law by marriage) of any natural person in clause (y).

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as expressly set forth in the applicable sections of the Sellers Disclosure Schedule, (i) each of the NA Sellers and Other Sellers jointly and severally represents and warrants to the Purchaser as set forth in Section 4.1 through Section 4.2(b) and Section 4.3; (ii) NNC and NNL jointly and severally represent and warrant to the Purchaser as set forth in Section 4.4 and Section 4.5; and (iii) the Joint Administrators, the EMEA Sellers and NNSA represent and warrant to the Purchaser as set forth in Sections 4.2(c), (d) and (e), respectively.

SECTION 4.1.     Organization and Corporate Power.

(a)     Each NA Seller and Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Bidding Procedures Order and the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents required from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the "**Bankruptcy Consents**"), each of the NA Sellers and Other Sellers has the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to this Agreement and each of the Transaction Documents to which it is or will become a party.

(b)     Each of the NA Sellers and the Other Sellers is qualified to do business and to own, lease or otherwise hold its properties and assets, including the Assets, and to conduct its business as presently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Assets requires it to so qualify, except for jurisdictions where the failure to be so qualified does not have, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 4.2.     Authorization; Binding Effect; No Breach.

(a)     Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by each NA Seller and Other Seller of this Agreement and each of the Transaction Documents to which such NA Seller or Other Seller is, or at the Closing will be, a party has been duly authorized by such NA Seller or Other Seller.  Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, the Transaction Documents to which any NA Seller or Other Seller is or will be a party, will constitute a legal, valid and binding obligation of such NA Seller or Other Seller, enforceable against it in accordance with its terms.

NNC-NNL11755879 / 87

(b)    Subject to receipt of the Bankruptcy Consents and the Mandatory Regulatory Approvals, the execution, delivery and performance by each NA Seller and Other Seller of this Agreement and each of the Transaction Documents to which such NA Seller or Other Seller is or will be a party do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, a breach of the terms, conditions or provisions of, constitute a default under, give rise to any right of acceleration, payment, amendment, cancellation or termination under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets pursuant to, or (subject to the receipt of Consents in connection with the Assigned Contracts, Consents required in connection with the assignment of the Sellers' interest in any of the Specified UK Patents or Patent Related Documentation relating to any Specified UK Patent and any other Consents expressly provided for herein, in each case to the extent set forth in Section 4.2(b) of the Sellers Disclosure Schedule) require any Consent (other than the Mandatory Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity or other Person pursuant to (i) the articles, charter or by-laws (or similar governing document) of the relevant NA Sellers and Other Sellers or any resolution adopted by the board of directors, shareholders, members or general partners (as applicable) of any of the Sellers and not rescinded or superseded prior to the date hereof; (ii) any order of any Government Entity applicable to any NA Seller or Other Seller or by which any of their respective properties or assets are bound; (iii) any Laws to which any of the NA Sellers or Other Sellers or any of their respective properties or assets are subject; or (iv) any Contract or other document to which any of the Sellers is a party or by which any of the Sellers or their respective properties or assets are bound. Except as may have been asserted in connection with the Bankruptcy Proceedings, there are no Actions or claims pending or, to the Knowledge of the Sellers, threatened against or affecting the Sellers in which it is sought to restrain or prohibit, or to obtain damages or other relief in connection with, the transactions contemplated hereby.

(c)    The Joint Administrators warrant to the Purchaser that: (i) they are duly authorised to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act; and (ii) they were appointed by the English Court on the Petition Date as administrators of each EMEA Seller in accordance with the Insolvency Act and such appointment has not been terminated by the English Court or the Joint Administrators.

(d)    Each EMEA Seller (acting by the Joint Administrators) warrants to the Purchaser that, with respect to itself, this Agreement has been duly executed and delivered by a representative of the Joint Administrators as agent for and on behalf of such EMEA Seller, and constitutes legal, valid and binding obligations of such EMEA Seller enforceable against such EMEA Seller in accordance with its terms.

(e)    NNSA (acting by the French Liquidator) warrants to the Purchaser that, with respect to itself, subject to entry of the French Court Order, it has the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to this Agreement and each of the Transaction Documents to which it is or will become a party.

SECTION 4.3.    Brokers. Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the

NNC-NNL11755879 / 88