Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be, at their sole discretion.

SECTION 10.5.    <u>Successors and Assigns</u>. Except as otherwise expressly provided in this Agreement, all representations, warranties, Annex I statements, covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Primary Seller Parties in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such Party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (<u>provided</u> that the assigning Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties), (ii) assignment by a U.S. Debtor to a succeeding entity upon consummation of a plan of reorganization with respect to such U.S. Debtor pursuant to Chapter 11 of the U.S. Bankruptcy Code and (iii) assignment by any of the Canadian Debtors to a succeeding entity pursuant to any plan of arrangement approved by the Canadian Court. The Parent may not assign any of its obligations under Section 10.24 without the prior written consent of the Primary Seller Parties and any attempted assignment by the Parent without such consent shall be void *ab initio* and of no force or legal effect.

The provisions of this Agreement shall survive for the benefit of the Joint Administrators, the French Liquidator, their firm, partners, employees, agents, advisers and representatives notwithstanding the discharge of the Joint Administrators as joint administrators of the EMEA Sellers, or the French Liquidator as liquidator of NNSA and shall be in addition to, and not in substitution for, any other right, indemnity or relief otherwise available to each of them.

SECTION 10.6.    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    Subject to Section 10.6(b) and Section 10.6(f), any questions, claims, disputes, remedies or Actions arising from or related to this Agreement or the transactions contemplated hereby, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, and except for those matters specifically required to be determined by the Accounting Arbitrator pursuant to the terms hereof, each Party:

(i)    agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S.

NNC-NNL11755879 / 131

Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of New York (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country;

      (ii)     agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby;

      (iii)    waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum;

      (iv)    agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and

      (v)     agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

      (c)     The Purchaser hereby appoints (i) Google Canada Corporation as its authorized agent (the "**Purchaser Authorized Canadian Agent**" upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, and (ii) Google UK Limited as its authorized agent (the "**Purchaser Authorized EMEA Agent**" and together with the Purchaser Authorized Canadian Agent, the "**Purchaser Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case) and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the applicable Purchaser Authorized Agent in respect of the relevant jurisdiction and written notice of such

NNC-NNL11755879 / 132

service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)      Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, (ii) Ogilvy Renault LLP as its authorized agent (the "**Seller Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable, and (iii) NNUK as its authorized agent (the "**Seller Authorized EMEA Agent**" and together with the Seller Authorized U.S. Agent and the Seller Authorized Canadian Agent, the "**Seller Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case) and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Primary Seller Parties shall be deemed, in every respect, effective service of process upon every such Seller.

(e)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(f)      Notwithstanding Section 10.6(a) and (b), the Parties, the Joint Administrators and the French Liquidator agree that:

(i)      any questions, claims, disputes, remedies or Actions arising under Section 10.18 in respect of the EMEA Sellers or the Joint Administrators and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the Joint Administrators, (B) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (C) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (D) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other

NNC-NNL11755879 / 133

claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts; and

(ii)     any questions, claims, disputes, remedies or Actions arising under Section 10.20 and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the French Liquidator, (B) the personal liability of the French Liquidator, (C) his appointment as liquidator of NNSA or the appointment of the French Office Holders of NNSA and their status as such, shall be governed by French law and be subject to the exclusive jurisdiction of the Versailles courts (France).

SECTION 10.7.     Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Parent or the Purchaser, to:

Ranger Inc.
c/o Google Inc.
1600 Amphitheatre Parkway
Mountain View, California  94043
Attention: Legal – Patents
Facsimile: (650) 618-8643

and

Ranger Inc.
c/o Google Inc.
1600 Amphitheatre Parkway
Mountain View, California  94043
Attention: Legal – M&A
Facsimile No.: (650) 887-1790

With copies (that shall not constitute notice) to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York  10019
United States
Attention:   Philip Mindlin
             Adam O. Emmerich
             Benjamin M. Roth
Facsimile:  +1-212-403-2000

NNC-NNL11755879 / 134

If to the NA Sellers or the Other Sellers, to:

> Nortel Networks Corporation
> 5945 Airport Road
> Suite 360
> Mississauga, Ontario, Canada  L4V 1R9
> Attention:  Anna Ventresca
>             General Counsel-Corporate, Corporate Secretary and
>             Chief Compliance Officer
> Facsimile:  +1-905-863-2057

> and

> Nortel Networks Limited
> 5945 Airport Road
> Suite 360
> Mississauga, Ontario, Canada  L4V 1R9
> Attention:  Anna Ventresca
>             General Counsel-Corporate, Corporate Secretary and
>             Chief Compliance Officer
> Facsimile:  +1-905-863-2057

> and

> Nortel Networks Inc.
> Legal Department
> 4001 E. Chapel Hill – Nelson Hwy.
> Research Triangle Park, North Carolina  27709
> United States
> Attention:  Timothy Ross
>             Secretary and Vice President
> Facsimile:  +1-919-905-3741

With copies (that shall not constitute notice) to:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York  10006
> United States
> Attention:  Paul J. Shim
>             James L. Bromley
>             Lisa M. Schweitzer
> Facsimile:  +1-212-225-3999

> and

NNC-NNL11755879 / 135

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:  Michael Lang
Facsimile:  +1-416-216-3930

If to the EMEA Sellers, to:

Alan Bloom / Christopher Hill / Stephen Harris
Ernst & Young LLP
1 More London Place
London
SE1 2AF
United Kingdom
Facsimile:  +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

Alex Kay
Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
United Kingdom
Facsimile:  +44 (0) 20 7098 4447

If to the Joint Administrators, to:

Alan Bloom / Christopher Hill / Stephen Harris
Ernst & Young LLP
1 More London Place
London
SE1 2AF
United Kingdom
Facsimile:  +44 (0) 20 7951 1345

NNC-NNL11755879 / 136

With copies (that shall not constitute notice) to:

        Alex Kay
        Herbert Smith LLP
        Exchange House
        Primrose Street
        London
        EC2A 2HS
        United Kingdom
        Facsimile:  +44 (0) 20 7098 4447

        and

        Avner Ben-Gera
        Hughes Hubbard & Reed LLP
        One Battery Park Plaza
        New York, New York  10004
        United States
        Facsimile:  +1-212-299-6366

If to NNSA or the French Liquidator, to:

        Attention: Cosme Rogeau
        26 avenue Hoche
        78000 Versailles
        France
        Facsimile: +33 1 39 49 44 63

With a copy (that shall not constitute notice) to:

        Foucaud, Tchekhoff, Pochet & Associés
        Attention: Antoine Tchekhoff & Edouard Fabre
        1bis, avenue Foch
        75116 Paris
        France
        Facsimile: +33 1 45 00 08 19

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the day after deposit with a reputable overnight courier service, as applicable.

        SECTION 10.8.        Exhibits; Sellers Disclosure Schedule.

        (a)        The Sellers Disclosure Schedule, the Exhibits attached hereto and Annex I constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

NNC-NNL11755879 / 137

(b)     Disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances in any other section of the Sellers Disclosure Schedule as though fully set forth in such other section, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation, warranty or statement to be true and correct. The Sellers Disclosure Schedule is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties by any Nortel Party except to the extent expressly set forth therein. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers, the Joint Administrators or the French Liquidator pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.     Counterparts. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement.

SECTION 10.10.     No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11.     Severability. If any provision, clause or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Without limiting Section 5.6(f), upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12.     No Set-off, Deduction or Counterclaim. Subject to Section 2.2.2, every payment payable by any Party under this Agreement or under any of the other

NNC-NNL11755879 / 138

Transaction Documents shall be made in full without any set-off or counterclaim howsoever arising and shall be free and clear of, and without deduction of, or withholding for, any amount which is due and payable to such Party by any other Party whether under this Agreement or under any of the other Transaction Documents or otherwise.

SECTION 10.13.    <u>Headings</u>. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.14.    <u>Entire Agreement</u>. This Agreement (including the Sellers Disclosure Schedule and all Exhibits attached hereto), the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or other contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents, and all such prior or other contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and the Non-Disclosure Agreement or the Supplementary Non-Disclosure Agreement, the provisions of this Agreement shall prevail. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all Parties specifically acknowledge that no Party has any special relationship with another Party that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction.

SECTION 10.15.    <u>Availability of Equitable Relief; Limitations on Damages; Sole and Exclusive Remedy</u>.

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.15, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement (other than with respect to breaches of Section 5.9(c)), without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement or that equitable relief is not available pursuant to the express terms of this Section 10.15. Without limiting the preceding provisions of this Section 10.15, it is acknowledged and agreed that (i) in the event of a material breach by the Sellers, the Purchaser shall be entitled to equitable relief to compel specific performance by the Sellers of all of the transactions contemplated by the U.S. Bidding Procedures Order, the Canadian Sales Process Order, this Agreement (other than Section 5.9(c) hereof) and any other Transaction Documents, in each case subject to the provisions of such document, including to conduct the Auction as contemplated by the U.S. Bidding Procedures Order and to effect the sale of the Assets to the Purchaser as contemplated by Article

NNC-NNL11755879 / 139

II, and (ii) under no circumstances shall any Person be liable for punitive damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or any other Transaction Document. Except for the indemnification rights of Purchaser Indemnitees expressly set forth in Article IX and Seller Indemnitees expressly set forth in Section 10.1, nothing set forth in this Agreement shall confer or give, or shall be construed to confer or give, to any Person (including any Person acting in a representative capacity) other than the Parties any rights or remedies against any Person.

(b)     Notwithstanding anything to the contrary contained in any Transaction Document but except in the case of actual fraud by any Seller and without prejudice to the Purchaser Indemnitees' right to indemnification pursuant to Article IX from and after Closing, in no event shall any of the Nortel Parties be subject to any damage, remedy or relief in respect of any Liability to the Purchaser or any other Purchaser Indemnitee in connection with, or relating to, or arising under this Agreement, any other Transaction Document or the transactions contemplated hereby or thereby, either prior to or after the Closing, and regardless of whether any such claim arises in contract (including, for the avoidance of doubt, with respect to clause (ii) below, payment of the Expense Reimbursement and/or the Break-Up Fee), tort, breach of warranty or any other legal or equitable theory, in each case other than: (i) equitable relief granted pursuant to and in accordance with Section 10.15(a); and (ii) prior to the Closing, for monetary damages in an aggregate amount not to exceed Twenty-Nine Million Dollars ($29,000,000).

(c)     The provisions of this Section 10.15 and the limitations on remedies provided hereunder were specifically bargained for between the Purchaser and the Sellers and were taken into account by the Purchaser and the Sellers in arriving at the Purchase Price. The Sellers have expressly relied on the provisions of this Section 10.15, and the limitations on remedies provided hereunder in agreeing to the Purchase Price and in agreeing to provide the specific representations, warranties, statements and covenants set forth herein.

SECTION 10.16.     Bulk Sales Laws.     Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

SECTION 10.17.     NA Sellers as Representatives of Other Sellers.

(a)     For all purposes of this Agreement, each Other Seller hereby irrevocably appoints NNI as its representative.

(b)     Pursuant to Section 10.17(a), NNI shall expressly have the power to, in the name and on behalf of each Other Seller, (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.18.     Obligations of Sellers and EMEA Sellers.     When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of

NNC-NNL11755879 / 140

certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller). Notwithstanding anything to the contrary herein, the obligations of each EMEA Seller hereunder shall be several and not joint. Effective as of the date hereof, the parties are fully bound by the terms of this Agreement; provided, however, that, except with respect to Section 5.26, none of the Sellers, the Joint Administrators or the French Liquidator shall have any obligations or incur any liabilities under this Agreement unless and until (i) the U.S. Bankruptcy Court enters the U.S. Bidding Procedures Order and (ii) the Canadian Court enters the Canadian Sales Process Order. For the avoidance of doubt, (x) no Seller shall assume any responsibility or liability for any obligations relating to any assets and/or liabilities that are not owned by it, and each Seller's liability to the Purchaser in relation to any matter contained in this Agreement shall be limited to the assets and/or liabilities of the relevant Seller and (y) the intent of the Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the French Liquidator under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

       SECTION 10.19.     Exclusion of Liability of Joint Administrators and Acknowledgement.

       (a)     Notwithstanding that this Agreement shall have been signed by the Joint Administrators both in their capacities as administrators of the EMEA Sellers for and on behalf of the EMEA Sellers and in their personal capacities, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the Joint Administrators, or their firms, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act or otherwise.

       (b)     The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed, that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other party to observe, perform or comply with any of its obligations under this Agreement, or under or in relation to any associated arrangements or negotiations.

       (c)     The Joint Administrators are parties to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, or otherwise, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purpose of receiving the benefit of this Section 10.19.

       (d)     The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each party hereto shall have the right to make claims

NNC-NNL11755879 / 141

and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns.

SECTION 10.20.     Exclusion of Liability of French Liquidator and Acknowledgments. Notwithstanding that this Agreement shall have been signed by the French Liquidator both in his capacity as liquidator of NNSA for and on behalf of NNSA and in his personal capacity, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the French Liquidator or his firms, partners, employees, agents, advisers or representatives whether such Liability would arise under the FCC or otherwise.

SECTION 10.21.     Joint Administrators and French Liquidator as agents of EMEA Sellers.

(a)     For all purposes of this Agreement, the Joint Administrators and the French Liquidator act without personal liability as agents of the EMEA Sellers.

(b)     The Joint Administrators shall expressly have the power to, in the name and on behalf of each EMEA Seller as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

(c)     Subject to entry of the French Court Order, the French Liquidator shall expressly have the power to, in the name and on behalf of NNSA as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.22.     Limitations.

(a)     Under this Agreement, except for any documents, the forms of which have been agreed by the Joint Administrators and the French Liquidator as at the date of this Agreement, none of the EMEA Sellers, the Joint Administrators or the French Liquidator shall be required to enter into or execute any document unless such document contains exclusions of liability in favour of the Joint Administrators or the French Liquidator (as applicable), to an extent consistent with, or more favourable than, the exclusions of liability provided in favour of the Joint Administrators or the French Liquidator (as applicable) in this Agreement. For the avoidance of doubt, neither the Joint Administrators nor the French Liquidator shall be required to enter into or execute any document in their personal capacities or as administrators of the EMEA Sellers or *mandataire liquidateur* of NNSA respectively, to the extent that such document would cause the Joint Administrators and/or the French Liquidator to incur any personal liability.

(b)     The obligations or undertakings of the EMEA Sellers and the French Liquidator under this Agreement are subject to their duties to act at all relevant times in the best interests of the creditors of the EMEA Sellers (in respect of the Joint Administrators) and, in relation to the French Liquidator, NNSA. Accordingly, nothing in this Agreement shall operate

NNC-NNL11755879 / 142

to derogate from, restrict, or prevent the Joint Administrators and French Liquidator from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as, in the case of the Joint Administrators, administrators of the EMEA Sellers or, in the case of the French Liquidator, as *mandataire liquidateur* of NNSA, under the Insolvency Act, FCC or any other applicable legislation or statutory instrument as they see fit, (acting in good faith) and/or preclude the Joint Administrators from terminating the administration of the EMEA Sellers pursuant to the Administration Orders (and/or the French Liquidator from terminating his appointment as *mandataire liquidateur* of NNSA) should the Joint Administrators (and/or the French Liquidator, in relation to NNSA) be required to do so to discharge their statutory duties or legal obligations, provided that, notwithstanding the foregoing, any failure to comply with the terms of this Agreement by any EMEA Seller will be a breach of this Agreement by the relevant EMEA Seller, and the Purchaser shall not be restricted from claiming against the relevant EMEA Seller and receiving any remedy, or exercising any right, other than a claim against the Joint Administrators or the French Liquidator in their respective personal capacities, to which it is otherwise entitled pursuant to the terms of this Agreement, for any breach of this Agreement notwithstanding that the Joint Administrators or the French Liquidator (as applicable) are complying with such statutory duties or legal obligations in accordance with this Section 10.22.

SECTION 10.23.    Limitations on Post-Closing Obligations. Notwithstanding any other provisions in this Agreement, all outstanding obligations of each EMEA Seller under this Agreement (except under Section 5.11 (Confidentiality), and Article 6 (Tax Matters)) shall cease on and from the date six (6) months following the Closing Date without prejudice to (i) any accrued obligations of the EMEA Sellers, (ii) any accrued rights of the Purchaser, or (iii) any accrued Liabilities in relation to any obligations to have been carried out by the EMEA Sellers, in each of (i), (ii) or (iii), prior to or on such date.

SECTION 10.24.    Parent Guarantee.

(a)    The Parent, as primary obligor and not merely as surety, hereby absolutely, unconditionally and irrevocably guarantees the full and timely payment and performance of all Liabilities (including indemnities, fees and Liabilities in respect of equitable relief) of the Purchaser incurred under, arising out of or in connection with this Agreement and the other Transaction Documents, as from time to time amended, modified or supplemented in accordance with their terms (such Liabilities, the "**Guaranteed Obligations**"). This is a guarantee of payment and performance, and not of collectibility. The obligations of the Parent under this Section 10.24 are absolute and unconditional in respect of satisfying the Guaranteed Obligations and shall be enforceable against the Parent to the same extent as if the Parent were the primary obligor (and not merely a surety) under this Agreement and the other Transaction Documents.

(b)    The Parent hereby waives as to itself promptness, diligence, notice of the acceptance of this guarantee and of the Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Guaranteed Obligations incurred, all defenses which may be available by virtue of any valuation, stay, moratorium Law or other similar Law now or hereafter in effect, and all suretyship defenses (it being understood that nothing in this sentence shall be deemed a waiver by the Parent of the

NNC-NNL11755879 / 143

obligation of any other Party to deliver notice pursuant to the terms of this Agreement).  The Parent agrees that the Guaranteed Obligations shall not be discharged except by complete performance or payment of the amounts payable under this Agreement, as applicable, and that the obligations of the Parent hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure or delay on the part of the Sellers to assert any claim or demand or to enforce any right or remedy against the Purchaser; (ii) any change in the time, place or manner of payment of any of the Guaranteed Obligations or any waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of this Agreement made in accordance with the terms thereof or any agreement evidencing, securing or otherwise executed in connection with any of the Guaranteed Obligations; (iii) any change in the corporate existence, structure or ownership of the Parent, Purchaser or any other Person interested in the transactions contemplated by this Agreement; or (iv) the adequacy of any other means the Sellers may have of obtaining payment related to any of the Guaranteed Obligations. If at any time payment under the Agreement is rescinded or must be otherwise restored or returned by the Sellers upon the insolvency, bankruptcy or reorganization of the Purchaser or the Parent or otherwise, the Parent's obligations hereunder with respect to such payment shall be reinstated upon such restoration or return being made by the Sellers, all as though such payment had not been made.  The Parent acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by this Agreement.

   (c)  The Parent hereby expressly acknowledges and agrees to be bound by the following provisions of this Agreement: Article III (Representations and Warranties of the Parent and the Purchaser), Section 10.2 (Remedies),Section 10.4 (Consent to Amendments; Waivers), the first paragraph of Section 10.5 (Successors and Assigns), Section 10.6(a) through (e) (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial), Section 10.7 (Notices), Section 10.9 (Counterparts), Section 10.10 (No Presumption), Section 10.11 (Severability), Section 10.12 (No Set-off, Deduction or Counterclaim), Section 10.13 (Headings) and Section 10.14 (Entire Agreement), Section 10.18 (Obligations of Sellers and EMEA Sellers), Section 10.19 (Exclusion of Liability of Joint Administrators and Acknowledgement), Section 10.20 (Exclusion of Liability of French Liquidator and Acknowledgments), Section 10.21 (Joint Administrators and French Liquidator as Agents of EMEA Sellers), Section 10.22 (Limitations), Section 10.23 (Limitations on Post-Closing Obligations), and this Section 10.24 (Parent Guarantee).

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

NNC-NNL11755879 / 144

IN WITNESS WHEREOF, the parties have duly executed this Asset Sale Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____
Name: George A. Riedel
Title: Chief Strategy Officer
and President, Business Units

By: _____
Name: John M. Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

**NORTEL NETWORKS LIMITED**

By: _____
Name: George A. Riedel
Title: Chief Strategy Officer
and President, Business Units

By: _____
Name: John M. Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

**NORTEL NETWORKS INC.**

By: _____
Name: John Ray
Title: Principal Officer

**NN APPLICATIONS MANAGEMENT SOLUTIONS INC.**

By: _____
Name: John Ray
Title: Principal Officer

*Asset Sale Agreement Signature Page*

NORTEL ALTSYSTEMS, INC.

By: _____
    Name: John Ray
    Title: Principal Officer

CORETEK, INC.

By: _____
    Name: John Ray
    Title: Principal Officer

QTERA CORPORATION

By: _____
    Name: John Ray
    Title: Principal Officer

XROS, INC.

By: _____
    Name: John Ray
    Title: Principal Officer

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Net-** )
**works UK Limited** (in administration) by )
Christopher Hill as Joint Administrator (act- )
ing as agent and without personal liability) )
in the presence of: )

        .......................................................

        Christopher Hill

Witness signature

.................................................. )
Name: Wilma Graham )
Address: Ernst & Young LLP, 1 More Lon- )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Net-**  )
**works (Ireland) Limited** (in administra-  )
tion) by David Hughes as Joint Administra-  )
tor (acting as agent and without personal  )
liability) in the presence of:  )

.................................................................

David Hughes

Witness signature

Name:  )

Address:  )

  )

*Asset Sale Agreement Signature Page*

SIGNED for and on behalf of **Nortel Net-**
**works S.A.** (in administration and *liquida-*
*tion judiciaire*) by Christopher Hill as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

........................................................
Christopher Hill

Witness signature

........................................................
Name: Wilma Graham
Address: Ernst & Young LLP, 1 More Lon-
don Place, SE1 2AF

)
)
)

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Networks France S.A.S.** (in administration) by Kerry Trigg acting as authorised representative of Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

Kerry Trigg

Witness signature

)
)
)

Name: LEISA HARKIN
Address: 65 SALOP ROAD
LONDON E17·7HS
ENGLAND

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel**     )
**GmbH** (in administration) by Christopher    )
Hill as Joint Administrator (acting as agent   )
and without personal liability) in the pres-   )
ence of:

........................................................
Christopher Hill

Witness signature

....................~W. Graham~....................... )
Name: Wilma Graham                 )
Address: Ernst & Young LLP, 1 More Lon- )
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*

**SIGNED** by Alan Bloom

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint Ad-
ministrators in the presence of:

)
)
)

.......................................................
Alan Bloom

Witness signature

.......................................................
Name: KATHRYN BAILLIE
Address:

)
)
)

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

*Asset Sale Agreement Signature Page*

Signed by **MAÎTRE COSME ROGEAU**,
acting in the capacity of *Mandataire*
*Liquidateur* of **NORTEL NETWORKS S.A.**
**(IN ADMINISTRATION AND**
**LIQUIDATION JUDICIARE)**, without
personal liability and solely for the purpose of
obtaining the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the French Liquidator:

By _____
   Name: Maître Cosme Rogeau
   Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

Name:    Thibault LEBRAY
Address:  26 rue Hoche
          78000 Versailles

**SIGNED** for and on behalf of **NORTEL**          )   ..............................................
**NETWORKS S.A. (IN**                                )   **MAÎTRE COSME ROGEAU**
**ADMINISTRATION AND**                               )
**LIQUIDATION JUDICIARE)**                           )
by **MAÎTRE COSME ROGEAU** as                        )
*Mandataire Liquidateur* (acting as agent            )
and without personal liability) in the               )
presence of:                                         )
Witness signature

Name:    Thibault LEBRAY
Address:  26 rue Hoche
          78000 Versailles

*Asset Sale Agreement Signature Page*

RANGER INC.

By: _____
    Name: Donald Harrison
    Title: Chief Executive Officer,
           President and Secretary

Solely for the purpose of Section 10.24
and the other Sections referenced in
Section 10.24(c):

GOOGLE INC.

By: _____
    Name: Kent Walker
    Title: Senior Vice President,
           General Counsel and
           Assistant Secretary

*Asset Sale Agreement Signature Page*

## ANNEX I – STATEMENTS

Except (i) as set forth in the applicable sections of the Sellers Disclosure Schedule or (ii) to the extent solely relating to the Excluded Assets or the Excluded Liabilities:

(a)     To the Knowledge of the Sellers, an accurate, true and complete list of all Patents owned in whole or in part by the Sellers (including Jointly Owned Patents and Specified UK Patents) is set forth in Section A.I(a) of the Sellers Disclosure Schedule. Such list includes, for each patent and patent application, the patent number or application serial number and the jurisdiction, and for each U.S. patent and patent application that is not a Specified UK Patent, the name of the Person holding such patent or patent application and the filing date and issue date, if applicable. With respect to Jointly Owned Patents, the list identifies the co-owner(s) of each U.S. patent and, to the extent the Sellers have or are able to obtain copies of the applicable agreements, the agreements under which any Seller and the co-owner(s) share ownership of the patent.

(b)     None of the Listed Patents, the Listed Jointly Owned Patents, the Specified Listed UK Patents or the Listed Inventions, and, to the Knowledge of the Sellers, none of the other Transferred Patents, Jointly Owned Patents or Specified UK Patents, is subject to any Liens other than Permitted Encumbrances, and no Seller has granted any exclusive license to any Third Party with respect to any Listed Patent, Listed Jointly Owned Patent, Specified Listed UK Patent or Listed Invention or, to the Knowledge of the Sellers, any other Transferred Patent, Jointly Owned Patent or Specified UK Patent, which exclusive license is in force as of the date hereof.

(c)     With respect to the Specified Listed UK Patents, the Listed Jointly Owned Patents and the Listed Patents, and, to the Knowledge of the Sellers, with respect to the other Specified UK Patents, Jointly Owned Patents and Transferred Patents, the Sellers own all right, title, and interest in and to each such Patent (other than the rights of co-owners of Jointly Owned Patents in and to the Jointly Owned Patents); and subject to the Cross-License Agreements, the Outbound License Agreements and the Commercial Licenses, such right, title, and interest are sufficient for the Sellers to independently bring suit against a Third Party to enforce the Listed Patents, the Specified Listed UK Patents, and, to the Knowledge of the Sellers, the other Specified UK Patents and Transferred Patents.

(d)     To the Knowledge of the Sellers, Section A.I(d) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts between the Sellers or their Affiliates, on the one hand, and any other Person, on the other hand, under which the Sellers or their Affiliates both (i) grant a license under any Transferred Patent, Jointly Owned Patent or Specified UK Patent and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property) (collectively, the **"Cross-License Agreements"**), and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof, except to the extent disclosure of the terms or existence of a Cross License Agreement is prohibited, in which case it has been omitted from Section A.I(d) of

NNC-NNL11755879 / 155

the Sellers Disclosure Schedule, but the number of such Cross License Agreements that have been omitted is set forth in Section A.I(d) of the Sellers Disclosure Schedule.

(e)      To the Knowledge of the Sellers, Section A.I(e) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Commercial Licenses) under which the Sellers or their Affiliates grant a license (including a grant back or any other express license made by any of the Sellers (as licensors) to improvements or any other license rights) to a Transferred Patent, Jointly Owned Patent or Specified UK Patent (whether alone or with any Software or Trade Secrets) (collectively, the **"Outbound License Agreements"**), indicating for each such Outbound License Agreement the title and the parties thereto, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(f)      To the Knowledge of the Sellers, (i) Section A.I(f) of the Sellers Disclosure Schedule sets forth (A) an accurate, true and complete list of each transition services agreement, master purchase agreements and development and support agreements that the Sellers entered into with the purchasers of its various business units after the Petition Date in connection with their divestitures and (B) with respect to the transition services agreements, the original scheduled termination date thereof (which, as of the date hereof, has not been extended by more than 90 days), and (ii) the scope of the licenses granted under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to such transition services agreements, master purchase agreements and development and support agreements is not broader than the scope of such licenses contained in the form licenses provided to the Purchaser prior to the date hereof in the Data Room as document numbers 2.5.3.187 2.5.3.193, 2.5.3.194 and 2.5.3.195; it being understood that work orders under certain of such agreements have been issued pursuant to such agreements, but are not listed. To the Knowledge of the Sellers, the license rights, if any, granted by the Sellers under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to each such transition services agreement during the term of such transition services agreement shall expire upon the termination of such transition services agreement (except for (A) rights to use and make certain Software applications and tools relating to the businesses being divested, to the extent that such Software applications and tools were delivered by the Sellers or their Affiliates and (B) internal use of Intellectual Property created by Sellers or their Affiliates prior to the expiration of such transition services agreement in support of or during the course of performing the services, to the extent such Intellectual Property has been delivered, including by integration into the divested business.

(g)      To the Knowledge of the Sellers, there is no Action pending asserting invalidity, misuse or unenforceability of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents or challenging the Sellers' right to use, right to transfer, or ownership of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(h)      To the Knowledge of the Sellers, each of the registrations and applications for the Jointly Owned Patents, Transferred Patents or Specified UK Patents included in the Assets is currently in good standing and subsisting. The foregoing will not be construed as a warranty that any patent will issue based on a patent application.

NNC-NNL11755879 / 156

(i)    To the Knowledge of the Sellers, Section A.I(i) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Actions (including opposition, interferences and cancellation petitions and like proceedings) against any Seller, except for the Bankruptcy Proceedings, pending before any Government Entity or threatened in writing that involves the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(j)    To the Knowledge of the Sellers, there are no prior or preferential rights, rights of first refusal, rights of first offer or other similar rights of any party (other than the Purchaser) to purchase or otherwise acquire any of the Assets.

(k)    To the Knowledge of the Sellers: every Patent solely owned by the Sellers or their Affiliates, except for the Excluded Patents, is included among the Listed Patents or the Specified Listed UK Patents; every Patent jointly owned by one or more of the Sellers and their Affiliates, on the one hand, and one or more Third Parties, on the other hand, except for the Excluded Patents, is included among the Listed Jointly Owned Patents; and every invention disclosure owned by the Sellers or their Affiliates and under consideration for the filing of a patent application is included among the Listed Inventions.

(l)    No Person listed in Section A.I(l) of the Sellers Disclosure Schedule has been granted any license (other than a Commercial License) under the Jointly Owned Patents, Transferred Patents or Specified UK Patents by the Sellers, which license is in force as of the date hereof, it being understood that such Persons may have rights or licenses solely with respect to products or services sold or provided by the Sellers or Sellers' Affiliates.

(m)    To the Knowledge of the Sellers, Section A.I(m) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Outbound License Agreements listed in Sections A.I(d) or A.I(e) of the Sellers Disclosure Schedule, respectively) under which the Sellers or their Affiliates have joint ownership in the Jointly Owned Patents (collectively, the "**Joint Ownership Agreements**"), indicating each Jointly Owned Patent and the title and the parties to each such agreement, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(n)    To the Knowledge of the Sellers, no Affiliate of the Sellers that is not itself a Seller owns any Patents, invention disclosures or Patent Related Documentation.

(o)    To the Knowledge of the Sellers, (i)(x) all promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies or industry groups (other than those contained in membership agreements, by-laws or policies of standard-setting bodies or industry groups and described in clause (y) below or, without limiting clause (y) below, in Section A.I(b) of the Sellers Disclosure Schedule) and that may concern the Transferred Patents or Specified UK Patents, together with the title and number of the standard and the Patents to which such promises, declarations or commitments refer (in each case, to the extent identified in the respective promise, declaration or commitment), are listed in Section A.I(o)(i)(x) of the Sellers Disclosure Schedule, and (y) all membership agreements, by-laws or policies of standard-setting bodies or industry groups in which Sellers were participants and which contained commitments that may concern the Transferred Patents or Specified UK Patents

NNC-NNL11755879 / 157

granted in writing by the Sellers and which bind Sellers to bind the Purchaser thereto, are listed in Section A.I(o)(i)(y) of the Sellers Disclosure Schedule; and (ii) except as set forth on Schedule A.I(o)(ii) of the Sellers Disclosure Schedule, none of the declarations, promises and commitments referred to in clause (i) above require royalty-free licensing of any of the Transferred Patents.

(p)     The patents, patent applications and provisional patent application listed in Section 1.1(c) of the Sellers Disclosure Schedule are solely those sold after the Petition Date to purchasers in connection with sales of divisions of Sellers and are not included in the Sellers' Patents.

(q)     There exist no Permitted Encumbrances of the type described in clause (i) of the definition of "Permitted Encumbrances" on any of the Assets.

(r)     To the Knowledge of the Sellers, there exist no Licensed Residual Patents (other than invention disclosures that (x) relate to a patent application filed anywhere in the world or (y) are dated thirty (30) months or more before the date hereof) or Undisclosed Patent Interests.

(s)     To the Knowledge of the Sellers, the aggregate amount of all unpaid past, present and future income and royalties payable to the Sellers under (i) the Transferred Licenses and (ii) any licenses granted under the Transferred Patents, Jointly Owned Patents or Specified UK Patents does not exceed $10 million.

(t)     The portions of the Ericsson Licenses and any other agreement between any Seller, on one hand, and Ericsson on the other hand, which were redacted in the copy of such agreements provided in the Data Room, do not provide for: (i) the assignment to any Person of any ownership or exclusive rights (including any option to acquire ownership or exclusive rights) to any Transferred Patents, Specified UK Patents or Jointly Owned Patents, (ii) the grant of any sublicense or other license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, (iii) the Sellers to have any rights to receive an ownership or exclusive interest in any Patents transferred by any Sellers to Ericsson or (iv) any rights for any Person in any improvements to any Transferred Patents, Specified UK Patents or Jointly Owned Patents made by any Seller or any purchaser of Transferred Patents, Specified UK Patents or Jointly Owned Patents.

(u)     The Sellers have disclosed to Purchaser all agreements, contracts, notices and correspondence to, from or with Ericsson that relate in any way to the Transferred Patents, Jointly Owned Patents or Specified UK Patents, other than agreements, contracts, notices and correspondence relating to a potential stalking horse transaction for the Transferred Patents, Jointly Owned Patents and Specified UK Patents, as a whole.

(v)     To the Knowledge of the Sellers, there exist no disputes between any Seller, on the one hand, and Ericsson, on the other hand, concerning the Transferred Patents, Jointly Owned Patents or Specified UK Patents or the scope of any licenses granted to the Transferred Patents, Jointly Owned Patents or Specified UK Patents.

NNC-NNL11755879 / 158

(w)    There are no Collective Labor Agreements in effect or labor organizing efforts outstanding or threatened with respect to any Employee of any of the Sellers.

(x)    No Employee of any of the Sellers works in Quebec, Canada.

(y)    [Reserved]

(z)    To the Knowledge of the Sellers, there is no ongoing and will be no future manufacture, development, sale, supply or other distribution, or servicing of Nortel Products or other products under the Transferred Patents or Specified UK Patents by, for or on behalf of Sellers or an Affiliate of any Seller, other than to the extent such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement or Section 5.13(b) of this Agreement.

NNC-NNL11755879 / 159

## APPENDIX "B"

### EXHIBITS AND SELLERS DISCLOSURE SCHEDULE

### [CONFIDENTIAL]

## APPENDIX "C"

## KNOWN LICENSE NOTICE

NNC-NNL11755879 / 161

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------- X

*In re*                                 :      Chapter 11

Nortel Networks Inc., *et al.*,[1]        :      Case No. 09-10138 (KG)

                     Debtors.        :      Jointly Administered

----------------------------------------------------- X

**Court File No. 09-CL-7950**[2]

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### JOINT NOTICE OF (I) SALE OF PATENTS SUBJECT TO CERTAIN PATENT LICENSES AND (II) REJECTION OF CERTAIN PATENT LICENSES

---

[1]      The debtors in these chapter 11 cases (the "U.S. Debtors"), along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]      The debtors in these CCAA proceedings (the "Canadian Debtors"), include Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

On April [●], 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and certain of their affiliates (collectively the "Sellers") entered into an agreement (the "Agreement") to convey substantially all of the Sellers' residual patents and certain related assets as described therein (the "Assets") to Ranger Inc., an affiliate of Google Inc., as more fully set forth in the U.S. Debtors' motion for approval of the Sale and other related relief filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April [●], 2011 (D.I. [●]) (the "U.S. Sale Motion")[3] and the Canadian Debtors' motion record containing materials supporting the request for approval of the Agreement as a stalking horse agreement and the bidding procedures filed with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") on [●], 2011 (the "Canadian Sale Motion"). The U.S. Sale Motion and Canadian Sale Motion contemplate the rejection or termination of certain outbound and cross patent license agreements in connection with the proposed Sale (as defined in the U.S. Sale Motion).

The sale of the Assets, and the transfer of the Assets to Ranger Inc. (or other Successful Bidder at the Auction), is being made subject to certain patent licenses to which the Sellers are a party, including one or more such licenses to which the Sellers believe you or your predecessor in interest are a party identified in Schedule A hereto (singularly or collectively, the "Scheduled Licenses"). The U.S. Debtors intend to reject any Unknown Licenses[4] related to patents being offered for sale to which the U.S. Debtors are a party pursuant to section 365 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in connection with the proposed Sale. The Canadian Debtors similarly intend to terminate or repudiate any Unknown Licenses related to patents being offered for sale to which the Canadian Debtors are a party in connection with the proposed Sale.

The Auction and sale of the Assets and the rejection of the Unknown Licenses by the U.S. Debtors and the Canadian Debtors will occur in accordance with procedures established by an order of the Bankruptcy Court (the "Bidding Procedures Order"), entered on [●], 2011 [D.I. [●]] and an order of the Canadian Court entered on [●], 2011 (the "Canadian Sales Process Order"), respectively.

License Rejection Procedures. Ranger Inc. has agreed that the Sellers will transfer the Assets, which include various patents in which the Sellers have an interest, subject to certain patent licenses to such Assets identified to Ranger Inc. by the Sellers, including the Scheduled

---

[3]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the U.S. Sale Motion.

[4]     "Unknown License" means any Contract entered into prior to January 14, 2009 (or prior to July 14, 2009 with respect to Nortel Networks (CALA)) pursuant to which any U.S. Debtor or Canadian Debtor is a party and pursuant to which such Debtor grants a license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, other than (i) the Outbound License Agreements and Cross-License Agreements (each as defined in the Agreement), (ii) the Commercial Licenses (as defined in footnote 5 hereof), (iii) the Disclosed Intercompany Licenses (as defined in the Agreement) and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights to the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses).

NNC-NNL11755879 / 163