requesting party pays all of the reasonable costs and expenses of the party granting access, in each case incurred in connection with the granting of such access, including a reasonable hourly rate for access to employees or agents of the party granting access (based on the total compensation of the employee or agent at the time that access is provided); and

(iii)    the Sellers shall not be required, pursuant to Section 6.5(a), to provide the Purchaser with access to or copies of any working papers or other documentation (including court orders or other documents) prepared by, or relating to, the Joint Administrators or the French Liquidator which the Joint Administrators or the French Liquidator are required to maintain in confidence under applicable Law.

SECTION 6.6.    Tax Disclosure.  Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any nonpublic commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.7.    Tax Returns.

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.7(b)). Such Tax Returns shall be true, correct and complete in all material respects.  Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Sellers as and when required by Law.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. The Sellers shall make available to the Purchaser that portion of such Transfer Tax Returns prepared by the Sellers that is applicable to the sale and purchase transaction contemplated by this Agreement, and, to the extent not already disclosed, such information as will enable the Purchaser to review such portion of such Transfer Tax Returns at least ten (10) Business Days before such Tax Returns are due to be filed, and such portion of such Transfer Tax Returns shall

-67-

NNC-NNL11755866 / 110

be revised before filing as reasonably requested by the Purchaser. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax becomes due and payable in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).

      (c)     The Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets for all Post-Closing Taxable Periods and Straddle Periods, provided that for the avoidance of doubt, nothing in this Section 6.7(c) shall give the Purchaser any rights over the Tax Returns of the Sellers (a) that are required to be submitted to any relevant Tax Authority and which relate to such Sellers' taxable income and gains for the taxable period during which Closing takes place, or (b) that are in respect of VAT. Such Tax Returns shall be true, correct and complete in all material respects and shall be prepared on a basis consistent with Tax Returns prepared for prior taxable periods unless a different treatment of any item is required by Law or this Transaction. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Party responsible therefor pursuant to Section 6.4(b) hereof as and when required by Law. Nothing in this Section 6.7(c) shall prejudice the rights of the Parties under Section 2.2.3(b).

      (d)     The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the NA Sellers at least sixty (60) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The NA Sellers shall have fifteen (15) days after the date of receipt thereof to submit to the Purchaser, in writing, the NA Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the NA Sellers within fifteen (15) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the NA Sellers, the Purchaser and the NA Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ten (10) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have fifteen (15) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

      (e)     It is agreed and acknowledged that for the purposes of this Section 6.7, "Transfer Taxes" do not include VAT in respect of any supply (or deemed supply) of goods and services pursuant to this Agreement, for which the provisions of Section 6.9 shall instead apply, except that and for the avoidance of doubt, for the purposes of Section 2.2.3(b), "Transfer Tax Returns" shall include Tax Returns with respect to VAT.

NNC-NNL11755866 / 111

SECTION 6.8.      Canadian Tax Election.

(a)      If the Purchaser is a resident of Canada for purposes of the Income Tax Act (Canada) (and any equivalent provincial statute) and provided that a portion of the Assets transferred pursuant to this Agreement by the NA Sellers and Other Sellers to the Purchaser is being transferred to the Purchaser in consideration for the Purchaser assuming prepaid obligations of the NA Sellers and Other Sellers to deliver goods or provide services in the future, the NA Sellers and Other Sellers and the Purchaser will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the NA Sellers and Other Sellers and the Purchaser, acting reasonably. The NA Sellers and Other Sellers and the Purchaser will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply *mutatis mutandis* in respect thereof.

(b)      To the extent the NA Sellers and Other Sellers and the Purchaser cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute), the NA Sellers and Other Sellers and the Purchaser promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.9.      VAT.

(a)      All sums payable by the Purchaser under this Agreement and/or in respect of the Optioned Licenses shall be exclusive of VAT and, except to the extent Section 6.9(d) applies, where a sum is paid by the Purchaser pursuant to this Agreement and/or in respect of the Optioned Licenses in consideration for any supply (or deemed supply) of goods or services by any of the EMEA Sellers the Purchaser shall, in addition to the consideration payable for such supply, pay to the relevant EMEA Seller, on receipt of an appropriate VAT invoice, an amount equal to the VAT (if any) determined in accordance with Section 2.2.3(b) as, or (as appropriate) determined by the relevant EMEA Seller(s) as arising in respect of such supply together with all interest and penalties thereon (except to the extent that such interest or penalties arise other than as a result of a failure of the Purchaser to comply with any of its obligations pursuant to this Section 6.9), with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing (whichever is the later), provided that, no payment shall be due from the Purchaser in respect of VAT pursuant to this Section 6.9(a) or Section 6.9(e) in circumstances where the EMEA Seller, the Joint Administrator or French Liquidator issues a VAT invoice to the Purchaser outside of any applicable time limits within which the Purchaser (or a member of its VAT group) can claim credit for the relevant input tax, and provided further that, for the avoidance of doubt, any amount payable pursuant to this

NNC-NNL11755866 / 112

Section 6.9(a) in respect of any Optioned Licenses shall be an amount determined by the relevant EMEA Seller(s).

(b)     For the avoidance of doubt, and without prejudice to the generality of this Section 6.9, if the relevant EMEA Seller or Joint Administrators or French Liquidator forms the view, acting reasonably, that the supply by the EMEA Sellers of any Assets or assumption from the EMEA Sellers of any Assumed Liabilities (if relevant) is subject to VAT, or that any other amounts payable by the Purchaser or any other supplies made to the Purchaser in each case pursuant to this Agreement and/or in respect of the Optioned Licenses are subject to VAT, then, except to the extent Section 6.9(d) applies, the relevant EMEA Seller(s) or the Joint Administrators or the French Liquidator shall be entitled to provide the Purchaser with a VAT invoice in respect of the supply in question.

(c)     Subject to any contrary provision of this Agreement, a VAT invoice served by any EMEA Seller or the Joint Administrators or the French Liquidator in good faith and in accordance with applicable VAT laws, absent manifest error, shall be accepted by the Purchaser as valid, including in relation to amounts of VAT stated in such invoice, except to the extent the Purchaser has paid the applicable VAT by virtue of Section 6.9(d) below.

(d)     Where the liability for VAT in respect of any supply is a liability of the Purchaser (whether under Section 8 of the Value Added Tax Act 1994 or similar or equivalent provisions in any member of the European Union) the Purchaser shall account for such VAT to the relevant Tax Authority within any applicable time limits.

(e)     In the event that an amount in respect of VAT is payable under the terms of this Agreement and/or in respect of the Optioned Licenses in respect of a supply and: (1) the consideration amount as indicated on the relevant VAT invoice in respect of such supply differs from the actual consideration amount for that supply for VAT purposes (including, but not limited to, situations where the Purchase Price is adjusted in accordance with any provision of this Agreement, and/or the allocation of the Purchase Price to any Assets or Assumed Liabilities is amended, whether pursuant to Section 2.2.3 or otherwise); (2) a Tax Authority determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid VAT should properly be characterized as a supply on which VAT does not arise; or (3) for any reason the rate of VAT applicable to the supply in question is changed, then the relevant EMEA Seller(s) and the Purchaser agree to co-operate in good faith to correct all relevant VAT invoices and VAT returns and (without prejudice to the generality of the foregoing):

(i)     where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is increased, or VAT otherwise becomes due, the Purchaser shall pay to the relevant EMEA Seller (or relevant Tax Authority, where applicable) an amount equal to any additional VAT that becomes due as a result of such increase with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing, whichever is the later; and

(ii)     where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is decreased, or to the extent that a relevant Tax Authority

NNC-NNL11755866 / 113

determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid an amount in respect of VAT should properly be characterised as a supply on which VAT does not arise, or where the rate of VAT applicable to the supply in question is decreased, or where the Purchaser has otherwise paid an amount in respect of VAT to an EMEA Seller under Section 6.9(a) that was not due, the relevant EMEA Seller shall, without unreasonable delay, issue an appropriate and valid VAT credit note or equivalent to the Purchaser and shall use its reasonable endeavors to recover the Excess VAT and, to the extent the Excess VAT is actually recovered and retained by it (or by any member of its VAT group) or is creditable by any EMEA Seller against any VAT liability of an EMEA Seller (or is so creditable by any member of its VAT group), the relevant EMEA Seller shall, without unreasonable delay, pay such Excess VAT to the Purchaser, and for the purposes of this Section 6.9(e)(ii), "**Excess VAT**" means the amount in respect of VAT actually paid (after deducting any previous refund under this Section 6.9(e)(ii)) by the Purchaser that should not have been paid, taking into account the decrease in purchase price, the incorrect characterization of a supply, the decrease in the VAT rate or the amount in respect of VAT that was paid to an EMEA Seller that was otherwise not due.

(f)    The EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser agree to act in good faith in accordance with Section 2.2.3 for all purposes relating to VAT (including the preparation and filing of any VAT invoices or Tax Returns with respect to VAT).

(g)    If it is not possible for the EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser in accordance with Section 2.2.3 to determine before the date falling five (5) Business Days prior to Closing an amount of consideration for the purposes of VAT invoicing (notwithstanding that the Purchaser has not by such date delivered a proposed Partial Allocation pursuant to Section 2.2.3(b)) and in all cases in respect of all sums payable in respect of any Optioned Licenses, then:

(i)    where any of the EMEA Sellers, the Joint Administrators or the French Liquidator are required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement and/or in respect of the Optioned Licenses, subject to Section 6.9(e), the determination of the relevant EMEA Seller or the Joint Administrators or the French Liquidator (in each case, acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services until and unless replaced pursuant to Section 6.9(e); and

(ii)    where the Purchaser is required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement and/or in respect of the Optioned Licenses, subject to Section 6.9(e), the determination of the Purchaser (acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services unless and until replaced pursuant to Section 6.9(e).

NNC-NNL11755866 / 114

ARTICLE VII

CONDITIONS TO THE CLOSING

SECTION 7.1.  Conditions to Each Party's Obligation. The Parties' obligation to effect the Closing is subject to the satisfaction or the express written waiver by all of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)  *No Injunctions or Restraints.* Subject to Section 5.6(f), there shall be in effect no Law, or any order, injunction, decree or judgment of any court or other Government Entity prohibiting, preventing or making illegal the consummation of any of the transactions contemplated hereby.

(b)  *U.S. Sale Order, Canadian Approval and Vesting Order, and French Court Order.* The U.S. Sale Order shall have been entered in the form of Exhibit F in accordance with Section 5.1(b), shall not have been modified, revised, vacated or amended in a manner inconsistent with the provisions of Section 5.1(b) and shall have become a Final Order. The Canadian Approval and Vesting Order shall have been entered in the form of Exhibit G in accordance with Section 5.2(a), shall not have been modified, revised, vacated or amended in a manner inconsistent with the provisions of Section 5.2(a) and shall have become a Final Order.

(c)  *CDMA Vesting Order.* The requirements of paragraph 7 of the CDMA Vesting Order shall have been satisfied.

SECTION 7.2.  Conditions to Sellers' Obligation. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Primary Seller Parties), at or prior to the Closing, of each of the following conditions:

(a)  *No Breach of Representations and Warranties.* Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as of the Closing Date as if made on and as of such date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)  *No Breach of Covenants.* The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c)  *Officer Certificate.* The Sellers shall have been furnished with a certificate signed by a senior officer of the Purchaser certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

(d)  *Recent Emergence of Unknown Licenses.* Ten (10) Business Days shall have elapsed since the provision of the most recent notice, if any, that the Sellers have provided to the Purchaser pursuant to and in compliance with Section 8.1(d)(iii)(B).

NNC-NNL11755866 / 115

SECTION 7.3.      <u>Conditions to Purchaser's Obligation</u>. The Purchaser's obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)     *No Breach of Representations and Warranties and Annex I Statements.* Each of the representations and warranties set forth in Article IV and each statement in Annex I, in each case disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as of the Closing Date as if made on and as of such date or (ii) if made as of a date specified therein, as of such date, except for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     *No Breach of Covenants.* The Sellers shall have complied in all material respects with all material covenants, obligations and agreements contained in this Agreement required to be performed by the Sellers on or before the Closing.

(c)     *Officer Certificate.* The Purchaser shall have been furnished with a certificate signed by a senior officer of each of the NA Sellers that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

For the avoidance of doubt, the parties acknowledge that the Purchaser's knowledge of the existence of any facts, events, conditions or circumstances, except by reason of the Transaction Documents and the Sellers Disclosure Schedule, shall not in any way prevent the Purchaser from exercising all of its rights hereunder and requiring that all conditions in Sections 7.1 and 7.3 be satisfied in full.

ARTICLE VIII

TERMINATION

SECTION 8.1.      <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written consent of the Primary Parties;

(b)     by either Primary Party, upon written notice to the other Primary Party if the Closing does not take place on or prior to the date that is one hundred and eighty (180) days from the date of this Agreement (such date, as it may be extended pursuant to the proviso below, the "**Outside Date**"); <u>provided</u>, that the Outside Date shall be extended by successive periods of forty-five (45) days if on the date of each such extension all of the conditions to the Closing set forth in Article VII other than the conditions in Section 7.1(a) and/or Section 7.1(b) are satisfied (or are capable of being satisfied should Closing occur on the next Business Day); <u>provided</u>, <u>however</u>, that the Outside Date shall in no event be more than three hundred and sixty (360) days from the date of this Agreement.

(c)     by the Purchaser, upon written notice to the Primary Seller Parties:

-73-

(i)      in the event of a breach by the Sellers of the Sellers' representations, warranties, Annex I statements, agreements or covenants set forth in this Agreement, which breach would result in a failure of any of the conditions to Closing set forth in Section 7.1, Section 7.3(a) or Section 7.3(b), as applicable, and which breach, if capable of being cured, has not been cured within twenty-five (25) days from receipt of written notice thereof from the Purchaser (but not later than the Outside Date);

(ii)      in the event of the Sellers' breach of their obligation to close the transactions contemplated hereby at the Closing, which breach, if capable of being cured, has not been cured within five (5) days from receipt of written notice thereof from the Purchaser (but not later than the Outside Date);

(iii)      upon or following the determination by any of the Primary Seller Parties (by resolution of the board of directors or similar governing body (in the case of the NA Sellers), decision in writing of the Joint Administrators (in the case of NNUK), or by entry into a definitive written agreement) or upon or following written notice to the Purchaser, the official committee of unsecured creditors (or the equivalent) in any of the Bankruptcy Proceedings or public announcement (including any filing in a Bankruptcy Court by any of the Primary Seller Parties) thereof to proceed with any Asset Retention Transaction;

(iv)      (A) upon or following the forty-fifth (45th) day after the date of this Agreement, if the hearing(s) to consider approval of the U.S. Sale Order and the Canadian Approval and Vesting Order shall not have commenced or the U.S. Sale Order and the Canadian Approval and Vesting Order shall not have been entered on such date, or (B) upon or following the date on which the U.S. Bankruptcy Court shall have stated unconditionally that it will not enter the U.S. Sale Order or the Canadian Court shall have stated unconditionally that it will not enter the Canadian Approval and Vesting Order;

(d)      by the Primary Seller Parties, upon written notice to the Purchaser:

(i)      in the event of a breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of any of the conditions to Closing set forth in Section 7.1, Section 7.2(a) or Section 7.2(b), as applicable, and which breach, if capable of being cured, has not been cured within twenty-five (25) days from receipt of written notice thereof from the Primary Seller Parties (but not later than the Outside Date);

(ii)      upon the Purchaser's breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Primary Seller Parties (but not later than the Outside Date); or

NNC-NNL11755866 / 117

        (iii)     in the event that (A) one or more Persons asserts the existence of an Unknown License (as defined in the U.S. Bidding Procedures Order and the Canadian Sales Process Order) that has been or would be rejected, repudiated or terminated pursuant to the procedures described in the U.S. Bidding Procedures Order or the Canadian Sales Process Order and that the Primary Seller Parties determine, in the exercise of their reasonable good faith judgment, would, taken together with all other such Unknown Licenses asserted to exist that have likewise been or would likewise be rejected, repudiated or terminated pursuant to the procedures described in the U.S. Bidding Procedures Order or the Canadian Sales Process Order, constitute a substantial risk of resulting in an aggregate allowed damage claim at least equal to the dollar amount specified in Section 8.1(d) of the Sellers Disclosure Schedule, if rejected, repudiated or terminated; (B) the Sellers promptly notified the Purchaser in writing of such assertion of the existence of such Unknown License(s) and the basis for the Sellers' reasonable good faith estimate of such potential allowed damage claim(s) and provided to the Purchaser such copy of such Unknown License(s) as in the Sellers' possession on the basis set forth in Section 2.3.2(b)(v), and subsequently provided the Purchaser updates (which shall not constitute a further notice under this clause (B)) as to any material change in the facts that formed the basis of the Primary Seller Parties' determination specified in the preceding clause (A); (C) the Primary Seller Parties have requested in writing the consent of the Purchaser to withdraw the rejection or repudiation of, or to elect not to terminate, such Unknown License(s) and to deem each such Unknown License a "Continuing Unlisted License" for purposes of Section 2.1.1(a) (which consent shall be granted or denied in the Purchaser's sole and absolute discretion); and (D) the Purchaser shall not have provided its consent in writing to such request by the date that is ten (10) Business Days after the date the Purchaser receives the notices described in the foregoing clauses (B) and (C) and such copy of the asserted Unknown License in the Sellers' possession on the basis set forth in Section 2.3.2(b)(v) (it being understood that the Purchaser's consent to such withdrawal or election not to terminate will not affect the Purchaser's rights under Article IX or any other provision of this Agreement);

provided, however, that the right to terminate this Agreement pursuant to Section 8.1(b), Section 8.1(c)(i), Section 8.1(c)(ii), Section 8.1(d)(i) or Section 8.1(d)(ii) shall not be available to the Primary Party seeking to terminate if such Primary Party has breached this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement.

        SECTION 8.2.       Effects of Termination.  If this Agreement is terminated pursuant to Section 8.1:

        (a)     all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other Parties except for the provisions of, or as provided in, this Section 8.2 and (i) Section 2.2.2 (Good Faith Deposit), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (vi) Section 8.2 (Effects of Termination) and (vii) Article X (Miscellaneous);

NNC-NNL11755866 / 118

provided, that, subject to Section 10.15, nothing herein shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof; and

(b)      the provisions of the Non-Disclosure Agreement and the Supplementary Non-Disclosure Agreement will continue in full force and effect.

## ARTICLE IX

## SURVIVAL

SECTION 9.1.       Survival. No representations, warranties, covenants or agreements of any of the Sellers contained herein (including Annex I) or in any other Transaction Document shall survive the Closing, except (x) for covenants that by their terms are to be satisfied after the Closing Date, which covenants shall survive in accordance with their terms, and (y) as may be expressly provided in any Transaction Document other than this Agreement. No representations and warranties of the Purchaser contained herein or in any other Transaction Document (except, in the case of such other Transaction Documents, as may be expressly provided therein) shall survive beyond the Closing Date. This Section 9.1 shall not limit any Party's liability for actual fraud (which, for the avoidance of doubt, shall exclude constructive fraud and equitable fraud).

## ARTICLE X

## MISCELLANEOUS

SECTION 10.1.       Indemnity Relating to Certain License Non-Assignment and Non-Renewal Protections.

(a)      The Purchaser shall indemnify and hold each Seller Indemnitee harmless from and against any and all Damages suffered by such Seller Indemnitee that arise out of, result from or are caused by any Action instituted or asserted by a Third Party against such Seller Indemnitee (a "**Section 10.1 Third Party Claim**") as a result of the Purchaser's use and exercise (and not merely the grant) of the power of attorney granted pursuant to Section 28(h) of the U.S. Sale Order or Section 14(h) of the Canadian Approval and Vesting Order (the "**License Power of Attorney**").

(b)      The Purchaser shall have the right to undertake, conduct and control, through counsel of its own choosing and at its own expense, the defense of any Section 10.1 Third Party Claim, and the Seller Indemnitees shall reasonably cooperate with the Purchaser in such defense at the expense of the Purchaser. Promptly (and in any event within thirty (30) days) after any Seller Indemnitee actually learns of any Section 10.1 Third Party Claim that is reasonably likely to give rise to indemnification under this Section 10.1 (a "**Section 10.1 Indemnification Claim**"), such Seller Indemnitee shall deliver to the Purchaser a notice executed by such Seller Indemnitee setting forth in reasonable detail the matter giving rise to the Section 10.1 Indemnification Claim hereunder, including, if available, a reasonable estimate of the anticipated Damages (such notice, a "**Section 10.1 Notice of Claim**"). The Primary Seller Parties may, at their option, participate in the defense of such Section 10.1 Third Party Claim

-76-

NNC-NNL11755866 / 119

(including through the employment of that choice of counsel, who shall be reasonably satisfactory to the Purchaser, it being understood that the Primary Seller Parties shall be responsible for the payment of the fees, charges and disbursements of such counsel) provided, that (i) such participation shall not limit the Purchaser's control of such Section 10.1 Third Party Claim and (ii) the Primary Seller Parties and their counsel shall reasonably cooperate with the Purchaser and its counsel in connection with such Section 10.1 Third Party Claim.

(c)      No delay on the part of any Seller Indemnitee in giving a Section 10.1 Notice of Claim shall limit or reduce such Person's right to indemnity hereunder, or relieve the Purchaser from any of its obligations under this Section 10.1, unless (and then only to the extent that) the Purchaser is actually prejudiced thereby (including with respect to the Purchaser's ability to fully undertake, conduct and control the defense of the Section 10.1 Third Party Claim or as a result of a material increase in the liability which the Purchaser would otherwise have under this Section 10.1).

(d)      The Seller Indemnitees shall not compromise or settle any Section 10.1 Third Party Claim without the consent of the Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned).

SECTION 10.2.      Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 10.3.      No Third Party Beneficiaries.  Except for any acknowledgments, rights, undertakings, covenants, indemnities, representations or warranties expressed to be for the benefit of the Joint Administrators, the French Liquidator and the Seller Indemnitees, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.4.      Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be, at their sole discretion.

SECTION 10.5.      Successors and Assigns.  Except as otherwise expressly provided in this Agreement, all representations, warranties, Annex I statements, covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Primary Seller Parties in case of an assignment by

-77-

the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such Party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that the assigning Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties), (ii) assignment by a U.S. Debtor to a succeeding entity upon consummation of a plan of reorganization with respect to such U.S. Debtor pursuant to Chapter 11 of the U.S. Bankruptcy Code and (iii) assignment by any of the Canadian Debtors to a succeeding entity pursuant to any plan of arrangement approved by the Canadian Court.

The provisions of this Agreement shall survive for the benefit of the Joint Administrators, the French Liquidator, their firm, partners, employees, agents, advisers and representatives notwithstanding the discharge of the Joint Administrators as joint administrators of the EMEA Sellers, or the French Liquidator as liquidator of NNSA and shall be in addition to, and not in substitution for, any other right, indemnity or relief otherwise available to each of them.

SECTION 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    Subject to Section 10.6(b) and Section 10.6(f), any questions, claims, disputes, remedies or Actions arising from or related to this Agreement or the transactions contemplated hereby, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, and except for those matters specifically required to be determined by the Accounting Arbitrator pursuant to the terms hereof, each Party:

(i)    agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of New York (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country;

-78-

NNC-NNL11755866 / 121

       (ii)       agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby;

       (iii)      waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum;

       (iv)      agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and

       (v)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

     (c)      The Purchaser hereby appoints (i) Ericsson Canada, Inc. as its authorized agent (the "**Purchaser Authorized Canadian Agent**" upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, and (ii) Telefonaktiebolaget L M Ericsson (publ) as its authorized agent (the "**Purchaser Authorized EMEA Agent**" and together with the Purchaser Authorized Canadian Agent, the "**Purchaser Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case) and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid. Service of process upon the applicable Purchaser Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

     (d)      Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, (ii) Norton Rose OR LLP as its authorized agent (the "**Seller Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable, and (iii) NNUK as its authorized agent (the "**Seller Authorized EMEA Agent**" and together with the Seller Authorized U.S. Agent and the Seller Authorized Canadian Agent, the "**Seller Authorized Agents**") upon whom process may be served in the EMEA Cases (including the French Case)

NNC-NNL11755866 / 122

and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the English Court or French Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Primary Seller Parties shall be deemed, in every respect, effective service of process upon every such Seller.

(e)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

(f)      Notwithstanding Section 10.6(a) and (b), the Parties, the Joint Administrators and the French Liquidator agree that:

(i)      any questions, claims, disputes, remedies or Actions arising under Section 10.18 in respect of the EMEA Sellers or the Joint Administrators and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the Joint Administrators, (B) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives and agents, (C) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (D) their appointment as joint administrators of the EMEA Sellers and their status as such, to the extent separable from other claims made hereunder, shall be governed by English law and be subject to the exclusive jurisdiction of the English courts; and

(ii)      any questions, claims, disputes, remedies or Actions arising under Section 10.20 and any questions, claims, disputes, remedies or Actions arising from or related to (A) the agency of the French Liquidator, (B) the personal liability of the French Liquidator, (C) his appointment as liquidator of NNSA or the appointment of the French Office Holders of NNSA and their status as such, shall be governed by French law and be subject to the exclusive jurisdiction of the Versailles courts (France).

SECTION 10.7.     <u>Notices</u>. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address

NNC-NNL11755866 / 123

specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser, to:

Rockstar Bidco, LP
c/o Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention: Marilyn Sobel
Facsimile: +1-212-757-3900

With copies (that shall not constitute notice) to:

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
United States
Attention: Kyle C. Krpata
Facsimile: +1-650-802-3100

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
United States
Attention: Ronit J. Berkovich
Facsimile: +1-212-310-8007

and

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention: Marilyn Sobel
Facsimile: +1-212-757-3900

If to the NA Sellers or the Other Sellers, to:

Nortel Networks Corporation
5945 Airport Road
Suite 360
Mississauga, Ontario, Canada L4V 1R9
Attention: Anna Ventresca
            General Counsel-Corporate, Corporate Secretary and
            Chief Compliance Officer

-81-

NNC-NNL11755866 / 124

Facsimile:  +1-905-863-2057

and

Nortel Networks Limited
5945 Airport Road
Suite 360
Mississauga, Ontario, Canada  L4V 1R9
Attention:   Anna Ventresca
             General Counsel-Corporate, Corporate Secretary and
             Chief Compliance Officer
Facsimile:  +1-905-863-2057

and

Nortel Networks Inc.
Legal Department
4001 E. Chapel Hill – Nelson Hwy.
Research Triangle Park, North Carolina  27709
United States
Attention:   Timothy Ross
             Secretary and Vice President
Facsimile:  +1-919-905-3741

With copies (that shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
United States
Attention:   Paul J. Shim
             James L. Bromley
             Lisa M. Schweitzer
Facsimile:  +1-212-225-3999

and

Norton Rose OR LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:   Michael Lang
Facsimile:  +1-416-216-3930

NNC-NNL11755866 / 125

If to the EMEA Sellers, to:

>
> Alan Bloom / Christopher Hill / Stephen Harris
> Ernst & Young LLP
> 1 More London Place
> London
> SE1 2AF
> United Kingdom
> Facsimile:  +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

>
> Alex Kay
> Herbert Smith LLP
> Exchange House
> Primrose Street
> London
> EC2A 2HS
> United Kingdom
> Facsimile:  +44 (0) 20 7098 4447

If to the Joint Administrators, to:

>
> Alan Bloom / Christopher Hill / Stephen Harris
> Ernst & Young LLP
> 1 More London Place
> London
> SE1 2AF
> United Kingdom
> Facsimile:  +44 (0) 20 7951 1345

With copies (that shall not constitute notice) to:

>
> Alex Kay
> Herbert Smith LLP
> Exchange House
> Primrose Street
> London
> EC2A 2HS
> United Kingdom
> Facsimile:  +44 (0) 20 7098 4447

>
> and

>
> Avner Ben-Gera
> Hughes Hubbard & Reed LLP
> One Battery Park Plaza

NNC-NNL11755866 / 126

New York, New York  10004
United States
Facsimile:  +1-212-299-6366

If to NNSA or the French Liquidator, to:

Attention: Cosme Rogeau
26 avenue Hoche
78000 Versailles
France
Facsimile: +33 1 39 49 44 63

With a copy (that shall not constitute notice) to:

Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard Fabre
1bis, avenue Foch
75116 Paris
France
Facsimile: +33 1 45 00 08 19

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8.    Exhibits; Sellers Disclosure Schedule.

(a)    The Sellers Disclosure Schedule, the Exhibits attached hereto and Annex I constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    Disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances in any other section of the Sellers Disclosure Schedule as though fully set forth in such other section, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable.  The inclusion of any information in any section of the Sellers Disclosure Schedule shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation, warranty or statement to be true and correct.  The Sellers Disclosure Schedule is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties by any Nortel Party except to the extent expressly set forth therein.  The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers, the Joint Administrators or the French Liquidator pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9.    Counterparts.  The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of

-84-

NNC-NNL11755866 / 127

which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement.

SECTION 10.10.    No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11.    Severability. If any provision, clause or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Without limiting Section 5.6(f), upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12.    No Set-off, Deduction or Counterclaim. Subject to Section 2.2.2, every payment payable by any Party under this Agreement or under any of the other Transaction Documents shall be made in full without any set-off or counterclaim howsoever arising and shall be free and clear of, and without deduction of, or withholding for, any amount which is due and payable to such Party by any other Party whether under this Agreement or under any of the other Transaction Documents or otherwise.

SECTION 10.13.    Headings. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.14.    Entire Agreement. This Agreement (including the Sellers Disclosure Schedule and all Exhibits attached hereto), the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or other contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Non-Disclosure Agreement, the Supplementary Non-Disclosure Agreement and the Transaction Documents, and all such prior or other contemporaneous understandings, agreements, representations and warranties are hereby

-85-

terminated. In the event of any irreconcilable conflict between this Agreement and the Non-Disclosure Agreement or the Supplementary Non-Disclosure Agreement, the provisions of this Agreement shall prevail. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all Parties specifically acknowledge that no Party has any special relationship with another Party that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction.

SECTION 10.15.    Availability of Equitable Relief; Limitations on Damages; Sole and Exclusive Remedy.

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.15, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement (other than with respect to breaches of Section 5.9(c)), without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement or that equitable relief is not available pursuant to the express terms of this Section 10.15. Without limiting the preceding provisions of this Section 10.15, it is acknowledged and agreed that (i) in the event of a material breach by the Sellers, the Purchaser shall be entitled to equitable relief to compel specific performance by the Sellers of all of the transactions contemplated by this Agreement (other than Section 5.9(c) hereof) and any other Transaction Documents, in each case subject to the provisions of such document, including to effect the sale of the Assets to the Purchaser as contemplated by Article II, and (ii) under no circumstances shall any Person be liable for punitive damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or any other Transaction Document. Except for the indemnification rights of Seller Indemnitees expressly set forth in Section 10.1, nothing set forth in this Agreement shall confer or give, or shall be construed to confer or give, to any Person (including any Person acting in a representative capacity) other than the Parties any rights or remedies against any Person.

(b)    Notwithstanding anything to the contrary contained in any Transaction Document but except in the case of actual fraud by any Seller, in no event shall any of the Nortel Parties be subject to any damage, remedy or relief in respect of any Liability to the Purchaser in connection with, or relating to, or arising under this Agreement, any other Transaction Document or the transactions contemplated hereby or thereby, either prior to or after the Closing, and regardless of whether any such claim arises in contract, tort, breach of warranty or any other legal or equitable theory, in each case other than: (i) equitable relief granted pursuant to and in accordance with Section 10.15(a); and (ii) prior to the Closing, for monetary damages in an aggregate amount not to exceed Twenty-Nine Million Dollars ($29,000,000).

NNC-NNL11755866 / 129

(c)      The provisions of this Section 10.15 and the limitations on remedies provided hereunder were specifically bargained for between the Purchaser and the Sellers and were taken into account by the Purchaser and the Sellers in arriving at the Purchase Price. The Sellers have expressly relied on the provisions of this Section 10.15, and the limitations on remedies provided hereunder in agreeing to the Purchase Price and in agreeing to provide the specific representations, warranties, statements and covenants set forth herein.

SECTION 10.16.     <u>Bulk Sales Laws</u>. Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

SECTION 10.17.     <u>NA Sellers as Representatives of Other Sellers</u>.

(a)      For all purposes of this Agreement, each Other Seller hereby irrevocably appoints NNI as its representative.

(b)      Pursuant to Section 10.17(a), NNI shall expressly have the power to, in the name and on behalf of each Other Seller, (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.18.     <u>Obligations of Sellers and EMEA Sellers</u>. When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller). Notwithstanding anything to the contrary herein, the obligations of each EMEA Seller hereunder shall be several and not joint. Effective as of the date hereof, the parties are fully bound by the terms of this Agreement. For the avoidance of doubt, (x) no Seller shall assume any responsibility or liability for any obligations relating to any assets and/or liabilities that are not owned by it, and each Seller's liability to the Purchaser in relation to any matter contained in this Agreement shall be limited to the assets and/or liabilities of the relevant Seller and (y) the intent of the Parties and the EMEA Sellers is that the obligations and any liabilities of the EMEA Sellers, the Joint Administrators and the French Liquidator under this Agreement will arise concurrently with the obligations and liabilities of the Sellers under this Agreement.

SECTION 10.19.     <u>Exclusion of Liability of Joint Administrators and Acknowledgement</u>.

(a)      Notwithstanding that this Agreement shall have been signed by the Joint Administrators both in their capacities as administrators of the EMEA Sellers for and on behalf of the EMEA Sellers and in their personal capacities, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the Joint Administrators, or their firms, partners, employees, agents,

NNC-NNL11755866 / 130

advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act or otherwise.

(b)     The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed, that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other party to observe, perform or comply with any of its obligations under this Agreement, or under or in relation to any associated arrangements or negotiations.

(c)     The Joint Administrators are parties to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, or otherwise, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purpose of receiving the benefit of this Section 10.19.

(d)     The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each party hereto shall have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns.

SECTION 10.20.     Exclusion of Liability of French Liquidator and Acknowledgments. Notwithstanding that this Agreement shall have been signed by the French Liquidator both in his capacity as liquidator of NNSA for and on behalf of NNSA and in his personal capacity, it is hereby expressly agreed and declared that no personal Liability, or any Liability whatsoever, under or in connection with this Agreement shall fall on the French Liquidator or his firms, partners, employees, agents, advisers or representatives whether such Liability would arise under the FCC or otherwise.

SECTION 10.21.     Joint Administrators and French Liquidator as agents of EMEA Sellers.

(a)     For all purposes of this Agreement, the Joint Administrators and the French Liquidator act without personal liability as agents of the EMEA Sellers.

(b)     The Joint Administrators shall expressly have the power to, in the name and on behalf of each EMEA Seller as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

(c)     The French Liquidator shall expressly have the power to, in the name and on behalf of NNSA as its agent: (i) take all decisions and carry out any actions required or desirable in connection with this Agreement; (ii) send and receive all notices and other

NNC-NNL11755866 / 131

communications required or permitted hereby; and (iii) consent to any amendment, waivers and modifications hereof.

SECTION 10.22.     Limitations.

(a)     Under this Agreement, except for any documents, the forms of which have been agreed by the Joint Administrators and the French Liquidator as at the date of this Agreement, none of the EMEA Sellers, the Joint Administrators or the French Liquidator shall be required to enter into or execute any document unless such document contains exclusions of liability in favour of the Joint Administrators or the French Liquidator (as applicable), to an extent consistent with, or more favourable than, the exclusions of liability provided in favour of the Joint Administrators or the French Liquidator (as applicable) in this Agreement. For the avoidance of doubt, neither the Joint Administrators nor the French Liquidator shall be required to enter into or execute any document in their personal capacities or as administrators of the EMEA Sellers or *mandataire liquidateur* of NNSA respectively, to the extent that such document would cause the Joint Administrators and/or the French Liquidator to incur any personal liability.

(b)     The obligations or undertakings of the Joint Administrators and the French Liquidator under this Agreement are subject to their duties to act at all relevant times in the best interests of the creditors of the EMEA Sellers (in respect of the Joint Administrators) and, in relation to the French Liquidator, NNSA. Accordingly, nothing in this Agreement shall operate to derogate from, restrict, or prevent the Joint Administrators and French Liquidator from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as, in the case of the Joint Administrators, administrators of the EMEA Sellers or, in the case of the French Liquidator, as *mandataire liquidateur* of NNSA, under the Insolvency Act, FCC or any other applicable legislation or statutory instrument as they see fit, (acting in good faith) and/or preclude the Joint Administrators from terminating the administration of the EMEA Sellers pursuant to the Administration Orders (and/or the French Liquidator from terminating his appointment as *mandataire liquidateur* of NNSA) should the Joint Administrators (and/or the French Liquidator, in relation to NNSA) be required to do so to discharge their statutory duties or legal obligations, provided that, notwithstanding the foregoing, any failure to comply with the terms of this Agreement by any EMEA Seller will be a breach of this Agreement by the relevant EMEA Seller, and the Purchaser shall not be restricted from claiming against the relevant EMEA Seller and receiving any remedy, or exercising any right, other than a claim against the Joint Administrators or the French Liquidator in their respective personal capacities, to which it is otherwise entitled pursuant to the terms of this Agreement, for any breach of this Agreement notwithstanding that the Joint Administrators or the French Liquidator (as applicable) are complying with such statutory duties or legal obligations in accordance with this Section 10.22.

SECTION 10.23.     Limitations on Post-Closing Obligations. Notwithstanding any other provisions in this Agreement, all outstanding obligations of each EMEA Seller under this Agreement (except under Section 5.11 (Confidentiality), and Article 6 (Tax Matters)) shall cease on and from the date six (6) months following the Closing Date without prejudice to (i) any accrued obligations of the EMEA Sellers, (ii) any accrued rights of the Purchaser, or

NNC-NNL11755866 / 132

(iii) any accrued Liabilities in relation to any obligations to have been carried out by the EMEA Sellers, in each of (i), (ii) or (iii), prior to or on such date.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

NNC-NNL11755866 / 133

IN WITNESS WHEREOF, the parties have duly executed this Asset Sale Agreement as of the date first written above.

**NORTEL NETWORKS**
**CORPORATION**

By: _____
    Name:  John M. Doolittle
    Title:   Senior Vice-President, Corporate
            Services and Chief Financial Officer

By: _____
    Name:  George Riedel
    Title:  Chief Strategy Officer and President,
          Business Units

**NORTEL NETWORKS LIMITED**

By: _____
    Name:  John M. Doolittle
    Title:   Senior Vice-President, Corporate
            Services and Chief Financial Officer

By: _____
    Name:  George Riedel
    Title:  Chief Strategy Officer and President,
          Business Units

*Asset Sale Agreement Signature Page*

**NORTEL NETWORKS INC.**

By: _____
    Name: John J. Ray III
    Title: Principal Officer

**NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.**

By: _____
    Name: John J. Ray III
    Title: Principal Officer

**NORTEL ALTSYSTEMS, INC.**

By: _____
    Name: John J. Ray III
    Title: Principal Officer

**CORETEK INC.**

By: _____
    Name: John J. Ray III
    Title: Principal Officer

**QTERA CORPORATION**

By: _____
    Name: John J. Ray III
    Title: Principal Officer

**XROS, INC.**

By: _____
    Name: John J. Ray III
    Title: Principal Officer

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Net-**
**works UK Limited** (in administration) by )
Christopher Hill as Joint Administrator (act- )
ing as agent and without personal liability) )
in the presence of: )

                                           Christopher Hill

Witness signature

Name:    JAN    OROSEL )
Address: Ernst & Young LLP, 1 More Lon- )
don Place, SE1 2AF )

*Asset Sale Agreement Signature Page*

**SIGNED** for and on behalf of **Nortel Net-**
**works S.A.** (in administration and *liquida-*
*tion judiciaire*) by Christopher Hill as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.....................................................
Christopher Hill

Witness signature

.....................................................

)
)
)

Name:            JAN  CORDELL
Address: Ernst & Young LLP, 1 More Lon-
don Place, SE1 2AF

*Asset Sale Agreement Signature Page*