Closing Date License Agreement. From and after the Closing, neither the Sellers nor any Person acting on behalf of any Seller shall distribute any products, directly or, for the purpose of circumventing this Section 5.13(b) or the Closing Date License Agreement, indirectly, to any Affiliates of any Seller that have not complied with the foregoing request and agreed to receive a sublicense under the license rights granted to the Sellers and their Affiliates under the Closing Date License Agreement, except to the extent it is a Nortel Product required pursuant to the terms of any Intercompany Contract then in effect, provided that (x) neither the Sellers nor any Person acting on behalf of any Seller shall distribute to any Affiliate in any calendar year more than two times the aggregate number of units of Nortel Products (pertaining to a historical line of business of the Sellers (e.g., CDMA, GSM, Enterprise)) distributed by or on behalf of the Sellers to such Affiliate during the last six months of calendar year 2010; and (y) the Sellers and any Person acting on behalf of any Seller shall immediately cease distributing any products to such Affiliate at such time, and shall not distribute any products to such Affiliate from and after such time, as such Affiliate experiences a Change of Control.

SECTION 5.14. ~~Section 1.31.~~ Use of Trademarks. Nothing in this Agreement grants to the Purchaser the right to use the name "Nortel" or any Trademarks owned by the Sellers or any of their Affiliates or any other mark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing.

SECTION 5.15. ~~Section 1.32.~~ Certain Assets. To the extent that any Transferred Patent, Jointly Owned Patent or Specified UK Patent that is a Listed Patent, Listed Jointly Owned Patent or Specified Listed UK Patent, as applicable, any invention or improvement claimed or disclosed therein or any Patent Related Documentation relating to any of the foregoing is, notwithstanding the statement set forth at Annex I(n), owned by any Affiliate of the Sellers that is not, itself, a Seller, the Sellers shall cause (or, in the case of any other property that would be a Transferred Patent or Specified UK Patent if it were owned by a Seller, or any other Patent that would be a Jointly Owned Patent if any rights therein were owned by a Seller, and any invention or improvement claimed or disclosed therein or any Patent Related Documentation relating thereto, shall use their best efforts to cause) such Affiliate to transfer all of its right, title and interest in such asset to an NA Seller as soon as reasonably practicable and in any event prior to the Closing, and (a) in the case of property that would be Transferred Patents or Specified UK Patents if they were instead owned by a Seller, such assets shall be "Transferred Patents" or "Specified UK Patents" for all purposes hereof and (b) in the case of property that would be Jointly Owned Patents if any rights therein were owned by a Seller, such assets shall be "Jointly Owned Patents" subject to the Closing Date License Agreement for all purposes hereof; it being understood that (x) in the case of a Specified UK Patent or Patent Related Documentation relating thereto, the foregoing obligation shall be solely to the extent permitted by applicable Law, and (y) in the case of a Jointly Owned Patent or Patent Related Documentation relating thereto, the foregoing obligation shall be deemed satisfied by obtaining for the Purchaser the license rights granted thereunder in the Closing Date License Agreement.

SECTION 5.16. ~~Section 1.33.~~ Access to Systems. From and after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is entered and until the Closing, the Sellers shall reasonably cooperate with the Purchaser to provide the Purchaser access to the Patent Databases, solely for the purposes

of facilitating the transfer, upon and following the Closing, of such information residing in the Patent Databases from the Sellers to the Purchaser and integration of such information into the Purchaser's patent systems; provided that any such access shall only be granted to the extent the Purchaser has obtained, at its cost and expense, any license rights necessary for such access. From and after the Closing, at the Purchaser's request, the Sellers shall reasonably cooperate with the Purchaser to provide the Purchaser access to the Patent Databases, provided that such access shall be at the Purchaser's cost and expense and that the Purchaser has obtained, at its cost expense, any license rights necessary for such access.

SECTION 5.17.    ~~Section 1.34.~~ Post-Closing Suits.

Each of the Sellers hereby covenants that, from and after the Closing Date, it will not, without the written consent of the Purchaser (acting in its sole discretion), sue or otherwise participate in any Action against any party to any of the Transferred Licenses or any other licenses granted under the Transferred Patents, Jointly Owned Patents or Purchased Specified UK Patents based upon any claim under or related to any such license, including with respect to nonpayment of unpaid past, present or future income and royalties relating to any such license or past, present and future damages thereunder.

Each of the Sellers hereby covenants that, from and after the Closing Date, it will not, without the written consent of the Purchaser (acting in its sole discretion), (x) waive, release, assign, settle, maintain or compromise any Action relating to the Assets to the extent that such waiver, release, assignment, settlement, maintenance or compromise imposes any obligation, whether contingent or realized, upon the Purchaser or any of its Affiliates or the Assets or materially affects any Seller's title to or the value of any Transferred Patent or Specified UK Patent or Jointly Owned Patent or (y) voluntarily take or voluntarily cooperate in taking any position that is not consistent with the statement in Annex I(c).

SECTION 5.18.    ~~Section 1.35.~~ Production of Documents. In the event that at any time following the Closing Date, any Seller discovers or comes into possession or control of any document that, if such Seller had known about, controlled or possessed such document on the Closing Date would have been required to be delivered to the Purchaser pursuant to the terms hereof, then such Seller shall (or, if such Seller does not have possession or control of such document, shall use its best efforts to) promptly deliver such document to the Purchaser.

SECTION 5.19.    ~~Section 1.36.~~ Option to Purchase Undisclosed Patent Interests. In the event that any of the Sellers or any Affiliate of any of the Sellers discovers that it owns (i) any right, title or interest in any Patents owned by the Sellers or their Affiliates that are not Transferred Patents, Jointly Owned Patents, Specified UK Patents or Excluded Patents, (ii) any right, title or interest in any inventions, other than the Listed Inventions, disclosed in the invention disclosures owned by any of the Sellers or their Affiliates, but only to the extent such invention disclosures (x) do not relate to a patent application filed anywhere in the world and (y) are dated less than three (3) years before the Closing Date, (iii) an exclusive license to all or substantially all of the rights under any Patent that is not a Transferred Patent, Jointly Owned Patent, Specified UK Patent or Excluded Patent, or (iv) an option to receive or purchase, or any reversionary interest in, any of the foregoing (any individual asset described in clauses (i) through (iv), an "**Undisclosed Patent Interest**"), then:

In the event that one or more non-Seller Affiliates of any Seller own an Undisclosed Patent Interest, the Sellers shall use their best efforts to cause such Affiliate(s) to transfer such Undisclosed Patent Interest to a Seller promptly.

Upon identification or receipt by any Seller of an Undisclosed Patent Interest, the relevant Seller shall provide reasonably prompt written notice describing such Undisclosed Patent Interest to the Purchaser (an "**Option Trigger Notice**") (it being understood that (i) in the event that an Undisclosed Patent Interest is identified or received by a Seller between the date hereof and the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted, such Seller shall deliver an Option Trigger Notice to the Purchaser promptly after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted and (ii) each Option Trigger Notice shall relate to only one Undisclosed Patent Interest). For a period of thirty (30) calendar days following the delivery of such notice to the Purchaser, the Purchaser shall have the option (exercisable by delivery of written notice thereof to the relevant Seller) to purchase, subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses that remain in force after Closing granted thereunder prior to the date such Undisclosed Patent Interest was discovered by or delivered to such Seller (it being understood that no Seller shall grant any licenses under or any Liens on any such Undisclosed Patent Interest after the date of discovery or delivery and during the Purchaser's consideration period described above), such Seller's right, title and interest in and to the Undisclosed Patent Interest from such Seller for a cash purchase price per Undisclosed Patent Interest of Fifty Thousand Dollars ($50,000) (the "**Exercise Price**").

From and after the date when any Seller discovers that it owns an Undisclosed Patent Interest until the expiration of the 30-day option period specified in Section 5.19(b), no Seller may directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to any Third Party, including by operation of law, in any transaction, series of related transactions or otherwise, other than as would be permitted by Section 5.9(c)(iii) if such Undisclosed Patent Interest were a Transferred Patent, and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by this Section 5.19 shall be void *ab initio* and of no force or legal effect.

The Sellers agree that, prior to the ultimate winding up or dissolution of any of them, the Primary Seller Parties will provide written notice to the Purchaser of such anticipated winding up or dissolution and provide the Purchaser with the option, exercisable by proper delivery of written notice to the Primary Seller Parties within a period of thirty (30) calendar days after delivery of the Primary Seller Parties' notice, to purchase on a "quitclaim" basis (and, for the avoidance of doubt, subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses granted thereunder prior to the date of such purchase that remain in force after Closing, it being understood that no Seller shall voluntarily take any action to grant any licenses under or place any Liens on any such Undisclosed Patent Interest), at an aggregate price of $1.00, all of each Seller's right, title and interest in and to all remaining Undisclosed Patent Interests, whether or not theretofore identified, not previously offered for sale to the Purchaser pursuant to this Section 5.19.

The settlement of each purchase and sale of Undisclosed Patent Interests pursuant to this Section 5.19 shall occur at the offices of Cleary Gottlieb Steen & Hamilton LLP, New York (or such other place as the parties may mutually agree to in writing), on a Business Day (to be specified by the Purchaser in writing at least five (5) Business Days prior thereto) occurring within thirty (30) days after the exercise by the Purchaser of its option under Section 5.19(b). At each settlement, (i) the relevant Sellers shall deliver duly executed instruments of conveyance and assignment reasonably evidencing the assignment to the Purchaser of their right, title and interest in and to the relevant Undisclosed Patent Interest (together with all assets that would have constituted "Assets" if such Undisclosed Patent Interest had been a Listed Patent), (ii) the Purchaser shall deliver to the relevant Sellers the Exercise Price for each Undisclosed Patent Interest by wire transfer of immediately available funds to an account designated by the relevant Sellers at least five (5) Business Days prior to the settlement date.

The Parties acknowledge and agree that if the Purchaser does not elect to purchase any Undisclosed Patent Interest within the applicable 30-day option period after delivery of notice thereof pursuant to Section 5.19(b), then the Sellers shall have no further obligation whatsoever to the Purchaser with respect to such Undisclosed Patent Interest, and the Sellers shall be free to sell, license or otherwise dispose of such Undisclosed Patent Interest in their sole discretion.

Notwithstanding anything herein to the contrary, the items listed on Section A.I(r) of the Sellers Disclosure Schedules shall be treated as "Undisclosed Patent Interests" for purposes of this Section 5.19; provided, however, that (i) Seller shall deliver an Option Trigger Notice to the Purchaser promptly after the later of (x) the date upon which the U.S. Sale Order is entered and (y) the date upon which the Canadian Approval and Vesting Order is granted, and (ii) the Exercise Price for such items listed on Section A.I(r) of the Sellers Disclosure Schedules shall be $0.00.

SECTION 5.20. ~~Section 1.37.~~ Certain Obligations. As of the Closing, the Purchaser agrees to (a) notify in writing (in the same level of detail as provided in Section 5.20 of the Sellers Disclosure Schedule) any subsequent purchaser of any of the Transferred Patents or Purchased Specified UK Patents of ~~the~~ any promises, declarations and commitments ~~granted, made or committed to standard-setting bodies concerning such Patents which are~~ listed in Section 5.20 of the Sellers Disclosure Schedule, ~~and to~~ concerning such Patents, to the extent such promises, declarations and commitments (i) have been granted, made or committed to standard-setting bodies and (ii) are enforceable against the Sellers, and to (b) bind such subsequent purchasers to notice terms substantially the same as those set forth in this Section 5.20.

SECTION 5.21. ~~Section 1.38.~~ Acknowledgement of Prior Obligations. The Purchaser acknowledges that the sale and assignment of the Transferred Patents and Purchased Specified UK Patents is subject to the obligations of certain Sellers set forth in Section 5.21 of the Sellers Disclosure Schedule with respect to the agreements referenced therein to the extent applicable to such Patents and to the extent such obligations and agreements are enforceable against the Sellers.

SECTION 5.22. ~~Section 1.39.~~ Disposition of Jointly Owned Patents.

From and after the Closing, (i) the Sellers may not sell, transfer, assign, license or convey any portion of any Seller's interest in any Jointly Owned Patent except upon written

consent of the Purchaser in its sole discretion or as permitted by the Closing Date License Agreement and (ii) as soon as practicable after written request by the Purchaser to the Primary Seller Parties, made at the Purchaser's sole discretion, the Sellers shall transfer all of their respective interest in one or more specified Jointly Owned Patents to a Person of the Purchaser's choosing (which, for the avoidance of doubt, may be the Purchaser or an Affiliate of the Purchaser or one or more Third Parties), to the extent permitted by and subject to applicable Law and to any Contracts governing a Seller's joint ownership of such Jointly Owned Patent, and subject to any Liens existing thereon not discharged by the U.S. Sale Order or Canadian Approval and Vesting Order, the undertakings specified in Sections 5.20 and 5.21, and any licenses granted thereunder prior to the date of such transfer (it being understood that from and after the Closing, no Seller shall voluntarily take any action to place any Liens on any Jointly Owned Patents).

No Seller shall reject, repudiate or terminate any Contract governing such Seller's joint ownership of a Jointly Owned Patent, unless such Seller, prior to the date upon which such Seller consummates its plan of reorganization, liquidation or arrangement in the Bankruptcy Proceedings, provides the Purchaser at least 10 Business Days' advance written notice of such rejection, repudiation or termination (which notice shall specify the Contracts to be rejected and the Jointly Owned Patents governed by such Contracts and furnishing, to the extent the Sellers are not prohibited from doing so by such Contracts or by applicable Law, a true and complete copy of such Contracts), provided, that, in any event, no Seller shall reject, repudiate or terminate any Contract governing such Seller's joint ownership of a Jointly Owned Patent prior to the last commercially reasonable date on which it can do so in connection with such Seller's consummation of its plan of reorganization, liquidation or arrangement in the Bankruptcy Proceedings.

SECTION 5.23.    ~~Section 1.40.~~ Purchase of Specified UK Patents. The Sellers hereby covenant, to the extent permitted by applicable Law, from and after the date hereof, to cooperate with the Purchaser in conducting further diligence with respect to the Specified UK Patents and facilitating the transfer of the Specified UK Patents to the Purchaser on the Closing Date. The Parties hereby agree that at any time prior to the Closing, the Purchaser may elect, in its sole discretion, to exclude any or all of the Specified UK Patents from the "Assets" and to not take an assignment of such Specified UK Patents (in which case the Patent Related Documentation relating solely thereto shall also be excluded), it being understood that any such election shall not result in a decrease in purchase price.

SECTION 5.24.    ~~Section 1.41.~~ Maintenance of Books and Records. After the Closing, the Sellers shall preserve, until the ~~third~~first (~~3rd~~1st) anniversary of the Closing Date (or such longer period as may be required under applicable Law), all pre-Closing Date records to the extent relating to the Assets possessed or to be possessed by such Person. After the Closing Date and until the ~~third~~first (~~3rd~~1st) anniversary of the Closing Date (or such longer period as may be required under applicable Law), upon any reasonable request from the Purchaser, the relevant Seller shall, and/or shall cause the Person holding such records to, (a) provide to the Purchaser or its representatives reasonable access to such records during normal business hours and (b) provide or permit the Purchaser or its respective representatives to make copies of such records, in each case subject to reimbursement of the Sellers' reasonable and actual out-of-pocket expenses in connection with responding to such requests of the Purchaser, including provision of access to, and segregation and duplication of, records; provided, however, that nothing herein shall require any

NNC-NNL11755866 / 215

Seller to disclose any information to the Purchaser or its representatives if such disclosure (i) would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser or its representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement), (ii) would require the Sellers to disclose their Tax records, or (iii) involves Excluded Assets. The Purchaser acknowledges that the Sellers are in the process of ceasing active operations, and such reasonable access and costs may include the delay and expense of retrieving documents from inactive storage. Such records may be sought under this Section 5.24 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Purchaser or its representatives (other than, with respect to documents that do not describe the conception or reduction to practice of any of the Transferred Patents, Jointly Owned Patents, Specified UK Patents or Undisclosed Patent Interests, claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Transaction Document). Notwithstanding the foregoing but subject to Section 6.5, (1) any and all such records may be destroyed by the Sellers if the Sellers send to the Purchaser written notice of their intent to destroy such records, specifying in reasonable detail the nature of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Purchaser notifies the destroying party that the Purchaser desires to obtain possession of such records to the extent it is entitled thereto, under this Section 5.24, in which event the Sellers shall transfer or cause to be transferred the records to the Purchaser and the Purchaser shall pay all reasonable and actual out-of-pocket expenses of the Sellers in connection therewith, including costs associated with the segregation of such records; and (2) the Sellers shall not be required to provide the Purchaser or its representatives access to, or copies of, any Tax records or audited financial statements covering any pre-Closing period. Nothing in this Section 5.24 shall limit or prejudice any of the Purchaser's rights at law or in equity relating to discovery, in the context of a dispute between the Purchaser and a Seller or otherwise.

        SECTION 5.25.    ~~Section 1.42~~ License Power of Attorney.

With respect to the Commercial Licenses and, as such terms are defined in the Form of U.S. Sale Order set forth in Exhibit ~~G~~F and the form of the Canadian Approval and Vesting Order set forth in Exhibit ~~I~~G, the TSAs, IPLAs, Intercompany Licenses and the GDNT License, the Purchaser may exercise its rights under the License Power of Attorney only:

    with respect to any such Contract, after a Seller that is a party to such Contract dissolves or ceases to exist, or

    with respect to any and all such Contracts, at any time after (A) a Seller has acted or omitted to act, as applicable, in contravention of its obligations described in Paragraph 28(b) through (g) of the Form of U.S. Sale Order set forth in Exhibit ~~G~~F and paragraph 14(b) through (g) of the Form of Canadian Approval and Vesting Order set forth in Exhibit ~~I~~G; (B) the Purchaser has subsequently provided such Seller with a notice entitled "NOTICE OF BREACH AND INTENDED USE OF LICENSE POWER OF ATTORNEY," alleging in reasonable detail the occurrence of such contravening action or omission described in the foregoing clause (A) and

NNC-NNL11755866 / 216

A   Case 09-10138-MFW   Doc 13583-31   Filed 05/15/14   Page 7 of 19   TR45574

explaining why the Purchaser believes such contravening action or omission constitutes a contravention of such provisions, and (C) ten (10) Business Days have elapsed since the Purchaser provided such notice to such Seller pursuant to the foregoing clause (B), during which time (x) the Purchaser did not subsequently agree that such act or omission was not in contravention of the Sellers' obligations described in (A) OR (y) the Sellers did not obtain from a court of competent jurisdiction declaratory relief stating that such Seller has neither acted nor omitted to act in contravention of such obligations.

Following the first valid exercise of the License Power of Attorney described in Section 5.25(a), the Purchaser shall provide the Sellers with written notice at least five (5) Business Days in advance of its exercise of its rights under the License Power of Attorney, unless such provision of such notice five (5) Business Days in advance is not reasonably practicable under the circumstances, in which case the Purchaser shall give written notice of its exercise of its rights under the License Power of Attorney as early as is reasonably practicable under the circumstances.

With respect to any exercise of the License Power of Attorney with respect to the obligations described in Paragraphs 28(a) and (h)(y) of the form of U.S. Sale Order set forth in Exhibit G̶F and Paragraphs 14(a) and (h)(y) of the form of Canadian Approval and Vesting Order set forth in Exhibit I̶G, the Purchaser shall provide the Sellers with written notice at least five (5) Business Days in advance of its exercise of its rights under the License Power of Attorney, unless such provision of such notice five (5) Business Days in advance is not reasonably practicable under the circumstances, in which case the Purchaser shall give written notice of its exercise of its rights under the License Power of Attorney as early as is reasonably practicable under the circumstances.

SECTION 5.26.   S̶e̶c̶t̶i̶o̶n̶ ̶1̶.̶4̶3̶.̶ Exclusivity. No Seller shall (and each Seller shall cause its directors, officers, employees, consultants, representatives and other advisors not to and use its best efforts to cause its Affiliates not to), directly or indirectly, at any time prior to the later of the entry of the U.S. B̶i̶d̶d̶i̶n̶g̶ ̶P̶r̶o̶c̶e̶d̶u̶r̶e̶s̶Sale Order by the U.S. Bankruptcy Court and the granting of the Canadian S̶a̶l̶e̶s̶ ̶P̶r̶o̶c̶e̶s̶s̶Approval and Vesting Order by the Canadian Court, (i) initiate, solicit or knowingly encourage (including by way of furnishing information or assistance), or knowingly induce, the submission or announcement of any proposal or offer for an Alternative Transaction, or (ii) enter into any letter of intent, memorandum of understanding, asset sale agreement or other agreement, arrangement or understanding relating to any Alternative Transaction,̶ ̶o̶r̶ ̶(̶i̶i̶i̶)̶ ̶(̶A̶)̶ ̶e̶n̶t̶e̶r̶ ̶i̶n̶t̶o̶,̶ ̶c̶o̶n̶t̶i̶n̶u̶e̶ ̶o̶r̶ ̶o̶t̶h̶e̶r̶w̶i̶s̶e̶ ̶p̶a̶r̶t̶i̶c̶i̶p̶a̶t̶e̶ ̶i̶n̶ ̶a̶n̶y̶ ̶d̶i̶s̶c̶u̶s̶s̶i̶o̶n̶s̶ ̶o̶r̶ ̶n̶e̶g̶o̶t̶i̶a̶t̶i̶o̶n̶s̶ ̶r̶e̶g̶a̶r̶d̶i̶n̶g̶,̶ ̶(̶B̶)̶ ̶f̶u̶r̶n̶i̶s̶h̶ ̶t̶o̶ ̶a̶n̶y̶ ̶T̶h̶i̶r̶d̶ ̶P̶a̶r̶t̶y̶ ̶a̶n̶y̶ ̶i̶n̶f̶o̶r̶m̶a̶t̶i̶o̶n̶ ̶o̶r̶ ̶d̶a̶t̶a̶ ̶w̶i̶t̶h̶ ̶r̶e̶s̶p̶e̶c̶t̶ ̶t̶o̶,̶ ̶o̶r̶ ̶(̶C̶)̶ ̶c̶o̶m̶m̶e̶n̶c̶e̶ ̶o̶r̶ ̶c̶o̶n̶t̶i̶n̶u̶e̶ ̶a̶f̶f̶o̶r̶d̶i̶n̶g̶ ̶a̶c̶c̶e̶s̶s̶ ̶t̶o̶ ̶a̶n̶y̶ ̶T̶h̶i̶r̶d̶ ̶P̶a̶r̶t̶y̶ ̶t̶o̶ ̶a̶n̶y̶ ̶i̶n̶f̶o̶r̶m̶a̶t̶i̶o̶n̶,̶ ̶d̶a̶t̶a̶ ̶o̶r̶ ̶i̶t̶s̶ ̶e̶m̶p̶l̶o̶y̶e̶e̶s̶ ̶w̶i̶t̶h̶ ̶r̶e̶s̶p̶e̶c̶t̶ ̶t̶o̶,̶ ̶a̶n̶y̶ ̶A̶l̶t̶e̶r̶n̶a̶t̶i̶v̶e̶ ̶T̶r̶a̶n̶s̶a̶c̶t̶i̶o̶n̶;̶ ̶p̶r̶o̶v̶i̶d̶e̶d̶,̶ ̶h̶o̶w̶e̶v̶e̶r̶,̶ ̶t̶h̶a̶t̶ ̶n̶o̶t̶h̶i̶n̶g̶ ̶i̶n̶ ̶t̶h̶i̶s̶ ̶A̶g̶r̶e̶e̶m̶e̶n̶t̶ ̶s̶h̶a̶l̶l̶ ̶p̶r̶o̶h̶i̶b̶i̶t̶ ̶a̶n̶y̶ ̶S̶e̶l̶l̶e̶r̶ ̶f̶r̶o̶m̶ ̶(̶1̶)̶ ̶s̶u̶b̶j̶e̶c̶t̶ ̶t̶o̶ ̶S̶e̶c̶t̶i̶o̶n̶ ̶5̶.̶7̶ ̶(̶P̶u̶b̶l̶i̶c̶ ̶A̶n̶n̶o̶u̶n̶c̶e̶m̶e̶n̶t̶s̶)̶,̶ ̶p̶r̶o̶v̶i̶d̶i̶n̶g̶ ̶a̶n̶y̶ ̶P̶e̶r̶s̶o̶n̶ ̶w̶i̶t̶h̶ ̶t̶h̶e̶ ̶b̶i̶d̶d̶i̶n̶g̶ ̶p̶r̶o̶c̶e̶d̶u̶r̶e̶s̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶s̶a̶l̶e̶ ̶o̶f̶ ̶t̶h̶e̶ ̶A̶s̶s̶e̶t̶s̶ ̶a̶n̶d̶ ̶r̶e̶l̶a̶t̶e̶d̶ ̶d̶o̶c̶u̶m̶e̶n̶t̶s̶,̶ ̶a̶n̶s̶w̶e̶r̶i̶n̶g̶ ̶q̶u̶e̶s̶t̶i̶o̶n̶s̶ ̶a̶b̶o̶u̶t̶ ̶t̶h̶e̶ ̶b̶i̶d̶d̶i̶n̶g̶ ̶p̶r̶o̶c̶e̶d̶u̶r̶e̶s̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶s̶a̶l̶e̶ ̶o̶f̶ ̶t̶h̶e̶ ̶A̶s̶s̶e̶t̶s̶,̶ ̶o̶r̶ ̶a̶n̶n̶o̶u̶n̶c̶i̶n̶g̶ ̶t̶h̶e̶ ̶e̶x̶e̶c̶u̶t̶i̶o̶n̶ ̶o̶f̶ ̶t̶h̶i̶s̶ ̶A̶g̶r̶e̶e̶m̶e̶n̶t̶ ̶o̶r̶ ̶t̶h̶e̶ ̶A̶u̶c̶t̶i̶o̶n̶;̶ ̶(̶2̶)̶ ̶d̶i̶s̶c̶u̶s̶s̶i̶n̶g̶,̶ ̶n̶e̶g̶o̶t̶i̶a̶t̶i̶n̶g̶ ̶a̶n̶d̶ ̶e̶n̶t̶e̶r̶i̶n̶g̶ ̶i̶n̶t̶o̶ ̶n̶o̶n̶-̶d̶i̶s̶c̶l̶o̶s̶u̶r̶e̶ ̶a̶g̶r̶e̶e̶m̶e̶n̶t̶s̶ ̶r̶e̶l̶a̶t̶i̶n̶g̶ ̶t̶o̶ ̶t̶h̶e̶ ̶s̶a̶l̶e̶ ̶o̶f̶ ̶t̶h̶e̶ ̶A̶s̶s̶e̶t̶s̶ ̶o̶r̶ ̶a̶m̶e̶n̶d̶m̶e̶n̶t̶s̶ ̶t̶o̶ ̶e̶x̶i̶s̶t̶i̶n̶g̶ ̶n̶o̶n̶-̶d̶i̶s̶c̶l̶o̶s̶u̶r̶e̶ ̶a̶g̶r̶e̶e̶m̶e̶n̶t̶s̶,̶ ̶i̶n̶ ̶e̶a̶c̶h̶ ̶c̶a̶s̶e̶ ̶a̶s̶ ̶w̶o̶u̶l̶d̶ ̶b̶e̶ ̶p̶e̶r̶m̶i̶t̶t̶e̶d̶ ̶b̶y̶ ̶t̶h̶e̶ ̶r̶e̶q̶u̶i̶r̶e̶m̶e̶n̶t̶s̶ ̶o̶f̶ ̶t̶h̶e̶ ̶b̶i̶d̶d̶i̶n̶g̶ ̶p̶r̶o̶c̶e̶d̶u̶r̶e̶s̶ ̶f̶o̶r̶ ̶t̶h̶e̶ ̶s̶a̶l̶e̶ ̶o̶f̶ ̶t̶h̶e̶ ̶A̶s̶s̶e̶t̶s̶;̶ ̶o̶r̶ ̶(̶3̶)̶ ̶f̶r̶o̶m̶ ̶a̶n̶d̶ ̶a̶f̶t̶e̶r̶ ̶A̶p̶r̶i̶l̶ ̶1̶8̶,̶ ̶2̶0̶1̶1̶,̶ ̶p̶r̶o̶v̶i̶d̶i̶n̶g̶ ̶a̶c̶c̶e̶s̶s̶ ̶t̶o̶ ̶t̶h̶e̶

N̶E̶W̶Y̶O̶R̶K̶:̶2̶4̶1̶2̶5̶0̶8̶.̶1̶   -6̶1̶61-

NNC-NNL11755866 / 217

~~Data Room to Persons (and their representatives) who have entered into a non-disclosure agreement with the Primary Seller Parties.~~

SECTION 5.27. Optioned Licenses.

(a) At any time after the date hereof but prior to the Closing Date, Purchaser shall have the right, by delivery of written notice to the Sellers, to require the Sellers to, and each Seller hereby agrees that it shall, concurrently with the Closing but immediately prior to the sale, conveyance, transfer, assignment and delivery to the Purchaser of the Assets, enter into one or more licenses with the Purchaser and/or one or more of the Purchaser's limited partners (collectively, the "**Optioned Licenses**") in the form or forms proposed by the Purchaser and acceptable to the Sellers (it being understood that the provisions in the Optioned Licenses relating to the field of use, scope of licensed products and services, releases by parties other than the Sellers, termination for breach, and assignment or change of control shall be determined by the Purchaser and shall not be subject to the Sellers' acceptance), in exchange for an aggregate amount of upfront license fees not to exceed $1,000,000,000 in respect of all such Optioned Licenses (such aggregate amount, the "**Optioned Licenses Fees**"). If Purchaser requires the Sellers to enter into Optioned Licenses, Purchaser shall pay or cause to be paid to the Distribution Agent, on the Closing Date in immediately available funds, the Optioned Licenses Fees, and the Purchase Price otherwise payable by Purchaser pursuant to Section 2.2 shall be reduced by the amount of the Optioned Licenses Fees.

(b) Purchaser shall defend, indemnify and hold harmless each of the Seller Licensing Indemnitees from and against any and all Damages suffered by any Seller Licensing Indemnitee that arise out of, or result from or are caused by the Sellers' execution, delivery and performance of the Optioned Licenses other than with respect to Taxes, which shall be governed by Section 5.27(b)(ii).

(i) (A) Purchaser shall pay on Closing to the Canadian Sellers Fifteen Million Dollars ($15,000,000) in respect of the utilization of tax attributes of the Canadian Sellers as a result of the receipt of the Optioned Licenses Fees;

(B) From the Closing Date until the expiration of the applicable statutes of limitation (or reassessment periods), Purchaser shall (x) indemnify and hold the Canadian Sellers harmless on an after-Tax basis from and against any Incremental Taxes paid or payable by a Canadian Seller pursuant to applicable Law; (y) indemnify and hold the U.S. Sellers harmless on an after-Tax basis from and against any Incremental Taxes paid or payable by a U.S. Seller pursuant to applicable Law; and (z) indemnify and hold the EMEA Sellers, Joint Administrators and the French Liquidator harmless on an after-Tax basis from and against any Incremental Taxes paid or payable by an EMEA Seller pursuant to applicable Law;

(C) (x) the Purchaser will pay the Optioned License Fees to the Sellers, Joint Administrators and the French Liquidator free and clear of and without deduction or withholding for withholding Taxes or any other amounts; provided that if the Purchaser shall be required under applicable Law to deduct or withhold any amount from the Optioned Licenses Fees, then (i) the amount payable shall be increased as necessary so that, after making all required deductions or withholdings (including deductions or withholdings applicable to additional amounts payable), the

NNC-NNL11755866 / 218

Sellers, Joint Administrators and the French Liquidator receive an amount equal to the sum they would have received had no such deduction or withholding been made, (ii) the Purchaser shall make such deduction or withholding, and (iii) the Purchaser shall pay to the relevant Tax Authority in accordance with applicable Law the full amount deducted or withheld; provided, further, that Purchaser shall have no obligation to pay additional amounts pursuant to clause (i) of the preceding proviso to the extent that the withholding Taxes are attributable to a Seller's failure to comply with the requirements of Section 5.27(b)(ii)(C)(y) unless such failure is due to the Purchaser's failure to cooperate fully with any Seller for the purposes of obtaining any exemption or reduction referred to in Section 5.27(b)(ii)(C)(y). The Purchaser shall promptly furnish the Sellers, Joint Administrators and the French Liquidator with such evidence as may be required by the applicable Tax Authorities to establish that any such Tax has been paid, and shall indemnify and hold harmless the Sellers, Joint Administrators and French Liquidator on an after-Tax basis from any liability for penalties or interest due to the payor's failure to timely withhold and remit amounts in respect of Taxes to the applicable Tax Authority;

(y) If the Purchaser determines that a Seller is entitled to an exemption from or reduction of withholding Tax under the law of any jurisdiction in which Purchaser or its limited partners were formed or are located, or under any treaty to which such jurisdiction is a party with respect to the Optioned Licenses Fees, such Seller shall deliver at the time or times prescribed by applicable Law or reasonably requested by Purchaser, such properly completed and executed documentation prescribed by applicable Law and as reasonably requested by the Purchaser and provided that the Purchaser cooperates with any such Seller to the extent necessary for obtaining any such exemption or reduction as will permit such payments to be made without withholding or at a reduced rate, provided that such Seller is legally entitled to complete, execute and deliver such documentation; and

(D) If any Seller becomes aware of any circumstances that could cause Purchaser to be required to indemnify any Seller, the Joint Administrators or the French Liquidator pursuant to Section 5.27(b)(ii)(B), such Seller shall promptly provide written notice to Purchaser. The Sellers shall, at the request of Purchaser and at Purchaser's expense, use commercially reasonable efforts (taking into account available resources) to object to, challenge, or appeal any assessment, audit, or administrative or judicial proceeding that could result in the denial of or limitation on the applicability, availability, or amount of any losses, undeducted expenses, Tax credits or any other Tax attributes of the Sellers (a "Tax Attribute Contest"). In furtherance of the foregoing, the Sellers shall (i) provide Purchaser with a timely account of each phase of such Tax Attribute Contest, (ii) provide Purchaser with copies of all written materials prepared or furnished in connection with such Tax Attribute Contest and (iii) permit Purchaser to participate in any Tax Attribute Contest to the extent permitted by applicable Law. Notwithstanding the foregoing, the Sellers shall not be required to pursue any Tax Attribute Contest or permit Purchaser to participate in or control any Tax Attribute Contest to the extent that they determine, in their reasonable discretion, that doing so would be administratively burdensome in the circumstances or would materially delay or impede the CCAA Cases, Chapter 11 Cases or EMEA Cases.

(ii) For the avoidance of doubt, subject to any provisions in this Agreement to the contrary, each party may report the transactions on its tax returns in its sole discretion.

SECTION 5.28.    Transferring Employees.

(a) Purchaser shall cause one of its limited partners to, and the relevant Sellers named therein shall, enter into that certain Employee Transfer Side Agreement as set forth on Exhibit H.

(b) Other than as provided for in 2.1.3(d), 5.28(c) or the Employee Transfer Side Agreement, the Sellers shall retain, and none of the Purchaser or its limited Partners shall assume or be deemed to have assumed, any Liabilities of the Sellers or their Affiliates relating to Employees (the "**Excluded Employee Liabilities**"). The Excluded Employee Liabilities shall include, but not be limited to, the following:

(i) the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any employee benefit plan or arrangement of any Seller, any obligation to provide continuation coverage pursuant to COBRA under any employee benefit plan or arrangement of any Seller that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferring Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to the Closing; and

(ii) any Liabilities relating to the Employees or any former employees employed by the Sellers (with respect only to such employees' employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employees, including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor, social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than with respect to liabilities incurred after the Closing Date by Transferring Employees who are terminated by one of Purchaser's limited partners after the Closing Date.

(c) The Purchaser shall bear severance costs incurred by the Sellers in connection with the termination of employment by Sellers of the Employees (other than the Transferring Employees (as defined in the Employee Transfer Side Agreement); provided, however, that the amount of such severance costs to be paid by the Purchaser shall not exceed $2,600,000.

(d) The terms and provisions of this Section 5.28 are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend or modify any employee benefit plans, programs, agreements or arrangements of any of the Sellers or the Purchaser, (ii) shall alter or limit the ability of the Purchaser or any of its limited partners to amend, modify or terminate any employee benefit plans, programs, agreements

NNC-NNL11755866 / 220

or arrangements after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or constitute or create an employment agreement with any Transferring Employees or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual any right as a third party beneficiary of this Agreement.

## ARTICLE VI

## TAX MATTERS

SECTION 6.1.    ~~Section 1.44.~~ Transfer Taxes.

The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller, the Joint Administrators, or the French Liquidator or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Joint Administrators, French Liquidator, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller, Joint Administrators or French Liquidator. Upon request from a Seller, the Joint Administrators or the French Liquidator, the Purchaser shall provide to such Seller, Joint Administrators or French Liquidator an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller, Joint Administrator or French Liquidator) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1. For the avoidance of doubt, the Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses.

If the Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, or engage in any other transaction designed to reduce, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers, Joint Administrators or French Liquidator (as applicable) prior to Closing with its permit number, GST/HST, VAT, provincial sales taxes or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser. All parties shall make commercially reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction. Notwithstanding the foregoing, any such cooperation to be provided in this Section 6.1(b) shall not include or extend to (i) a liquidation or restructuring of a Seller or any business of a Seller, including the transfer of any assets or Assets or liabilities or Assumed Liabilities between the Sellers or their Affiliates, unless the Seller or the relevant Affiliate is indemnified (prior to such liquidation or restructuring) against any cost or expense of such liquidation or restructuring to its satisfaction (acting at all times reasonably and in good faith);

NNC-NNL11755866 / 221

(ii) any action or omission that would result in the imposition on any Seller or any Affiliate of any Seller of any additional Tax liability or making any additional payment to any Tax Authority or Government Entity in respect of Tax which is an Excluded Liability, unless such Seller or Affiliate is (prior to the relevant action or omission) indemnified against such additional Tax liability or payment; (iii) any action or omission that would result in any material out of pocket cost or expense for any Seller or any Affiliate of any Seller, unless such Seller or Affiliate is (prior to the relevant action or omission), indemnified against such cost or expense to their satisfaction (acting at all times reasonably and in good faith) by the Purchaser; (iv) any action or omission which would cause the Sellers or any Affiliates of the Sellers to be in contravention of any applicable Law (including Bankruptcy Law) or published practice of a Tax Authority; (v) changing the identity or Tax residence of any Sellers, the location of any Assets or Assumed Liabilities, the nature or extent of any Assets or Assumed Liabilities, the Assets or Assumed Liabilities to be transferred by any particular Seller or the structure of the transaction as an asset sale rather than the sale of any form of entity, unless the Seller or the relevant Affiliate is indemnified (prior to such action) against any cost or expense of such action to its satisfaction (acting at all times reasonably and in good faith); or (vi) any reduction in the obligations of the Purchaser or rights of the Sellers.

It is agreed and acknowledged that for the purposes of this Section 6.1, "Transfer Taxes" do not include VAT in respect of any supply (or deemed supply) of goods and services pursuant to this Agreement, for which the provisions of Section 6.9 shall apply instead.

SECTION 6.2. Section 1.45. Withholding Taxes. If the Purchaser is required for any reason to deduct or withhold from any payment made pursuant to this Agreement or any other Transaction Document (other than the Optioned License Fees, which shall be governed by Section 5.27(b)(ii)(C)), for any Tax imposed by a Tax Authority solely as a result of the identity of the Purchaser, the residence of the Purchaser or in respect of income of the Purchaser, but not for any other reason, and if the applicable Seller, Joint Administrators or French Liquidator after exercising commercially reasonable efforts is unable to recover such Tax from such Tax Authority, the payment of the Purchase Price shall be increased to an amount which, after taking into account such deduction or withholding or Tax, will result in payment to the applicable Seller, Joint Administrators or French Liquidator of the full amount such Seller, Joint Administrators or French Liquidator would have received from the Purchaser had no such deduction or withholding been made or Tax been liable. The Purchaser shall promptly furnish the Sellers, Joint Administrators and French Liquidator with such evidence as may be required by the applicable Tax Authorities to establish that any such Tax has been paid, and shall indemnify and hold harmless the Sellers, Joint Administrators and French Liquidator on an after-Tax basis from any liability for penalties or interest due to the payor's failure to timely withhold and remit amounts in respect of Taxes to the applicable Tax Authority. The Purchaser shall promptly, and in any event not later than thirty (30) days prior to Closing, inform the Seller, Joint Administrators and French Liquidator, that either (i) deductions or withholdings as referred to in this Section 6.2 are required, or (ii) no such deductions or withholdings are required. In the event that the Purchaser notifies that such deductions or withholdings are required, the applicable Seller, Joint Administrators or French Liquidator shall take no action inconsistent with the information contained in such notice unless such action is required to be taken in order to comply with any applicable Law or Tax Authority published practice.

NNC-NNL11755866 / 222

SECTION 6.3.    ~~Section 1.46.~~ Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than any interest payments and Optioned Licenses Fees) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4.    ~~Section 1.47.~~ Apportionment of Taxes.

Except as otherwise provided in Section 5.27 or in this Article VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets for all Tax periods or portions thereof ending on or before the Closing Date and all Taxes resulting from the disposition of the Assets and the receipt of the Optioned Licenses Fees, and (ii) the Purchaser shall bear all Taxes relating to the Assets for all Tax periods or portions thereof beginning after the Closing Date.

For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of any Taxes based on or measured by income or receipts related to the Assets shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books (at midnight on the Closing Date) basis. The amount of other Taxes shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

SECTION 6.5.    ~~Section 1.48.~~ Records.

Except as provided elsewhere in this Section 6.5, (i) after the Closing Date, the Purchaser, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets or the Assumed Liabilities for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets or the Assumed Liabilities for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party such access as is reasonably necessary to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to

make extracts and copies thereof as may be reasonably necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof), provided, that, beginning on the date that is one year following the Closing Date, the obligations of the Sellers under this Section 6.5(a) shall be limited to commercially reasonable efforts, taking into account available personnel and resources.

At any time within the ten (10) years immediately following the Closing, NNL and Nortel Networks Technology Corporation ("**NNTC**") may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser, NNL and NNTC and the Records Custodian, in form satisfactory to the Purchaser, NNL and NNTC. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development Tax credits of NNL and NNTC under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser, acting reasonably. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

The Purchaser shall use commercially reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided that such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

The Purchaser shall have no obligation to provide any access under Section 6.5(c) unless NNL or NNTC (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with Section 6.5(c), including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

The obligations of the Sellers under Section 6.5(a) shall be subject to the following:

the parties agree and acknowledge that the Sellers shall be entitled, prior to any disclosure or making available, to redact the relevant information, records or documents as they hold to ensure that they show only information relevant to the Assets or Assumed Liabilities and do not show any other information except as required by applicable Law;

the Sellers, on the one hand, and the Purchaser, on the other hand, shall not be obliged to provide any access under Section 6.5(a) unless the requesting party

NNC-NNL11755866 / 224

pays all of the reasonable costs and expenses of the party granting access, in each case incurred in connection with the granting of such access, including a reasonable hourly rate for access to employees or agents of the party granting access (based on the total compensation of the employee or agent at the time that access is provided); and

the Sellers shall not be required, pursuant to Section 6.5(a), to provide the Purchaser with access to or copies of any working papers or other documentation (including court orders or other documents) prepared by, or relating to, the Joint Administrators or the French Liquidator which the Joint Administrators or the French Liquidator are required to maintain in confidence under applicable Law.

SECTION 6.6.    ~~Section 1.49.~~ Tax Disclosure. Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any nonpublic commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.7.    ~~Section 1.50.~~ Tax Returns.

The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.7(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Sellers as and when required by Law.

Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. The Sellers shall make available to the Purchaser that portion of such Transfer Tax Returns prepared by the Sellers that is applicable to the sale and purchase transaction contemplated by this Agreement, and, to the extent not already disclosed, such information as will enable the Purchaser to review such portion of such Transfer Tax Returns at least ten (10) Business Days before such Tax Returns are due to be filed, and such portion of such Transfer Tax Returns shall be revised before filing as reasonably requested by the Purchaser. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b)

at least one (1) Business Day before such Transfer Tax becomes due and payable in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).

The Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets for all Post-Closing Taxable Periods and Straddle Periods, provided that for the avoidance of doubt, nothing in this Section 6.7(c) shall give the Purchaser any rights over the Tax Returns of the Sellers (a) that are required to be submitted to any relevant Tax Authority and which relate to such Sellers' taxable income and gains for the taxable period during which Closing takes place, or (b) that are in respect of VAT. Such Tax Returns shall be true, correct and complete in all material respects and shall be prepared on a basis consistent with Tax Returns prepared for prior taxable periods unless a different treatment of any item is required by Law or this Transaction. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Party responsible therefor pursuant to Section 6.4(b) hereof as and when required by Law. Nothing in this Section 6.7(c) shall prejudice the rights of the Parties under Section 2.2.42.2.3(b).

The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the NA Sellers at least sixty (60) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The NA Sellers shall have fifteen (15) days after the date of receipt thereof to submit to the Purchaser, in writing, the NA Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the NA Sellers within fifteen (15) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the NA Sellers, the Purchaser and the NA Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ten (10) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have fifteen (15) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

It is agreed and acknowledged that for the purposes of this Section 6.7, "Transfer Taxes" do not include VAT in respect of any supply (or deemed supply) of goods and services pursuant to this Agreement, for which the provisions of Section 6.9 shall instead apply, except that and for the avoidance of doubt, for the purposes of Section 2.2.42.2.3(b), "Transfer Tax Returns" shall include Tax Returns with respect to VAT.

              SECTION 6.8.      Section 1.51. Canadian Tax Election.

If the Purchaser is a resident of Canada for purposes of the Income Tax Act (Canada) (and any equivalent provincial statute) and provided that a portion of the Assets transferred pursuant to this Agreement by the NA Sellers and Other Sellers to the Purchaser is

NNC-NNL11755866 / 226

being transferred to the Purchaser in consideration for the Purchaser assuming prepaid obligations of the NA Sellers and Other Sellers to deliver goods or provide services in the future, the NA Sellers and Other Sellers and the Purchaser will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the NA Sellers and Other Sellers and the Purchaser, acting reasonably. The NA Sellers and Other Sellers and the Purchaser will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply *mutatis mutandis* in respect thereof.

To the extent the NA Sellers and Other Sellers and the Purchaser cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute), the NA Sellers and Other Sellers and the Purchaser promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.9.     ~~Section 1.52.~~ VAT.

All sums payable by the Purchaser under this Agreement and/or in respect of the Optioned Licenses shall be exclusive of VAT and, except to the extent Section 6.9(d) applies, where a sum is paid by the Purchaser pursuant to this Agreement and/or in respect of the Optioned Licenses in consideration for any supply (or deemed supply) of goods or services by any of the EMEA Sellers the Purchaser shall, in addition to the consideration payable for such supply, pay to the relevant EMEA Seller, on receipt of an appropriate VAT invoice, an amount equal to the VAT (if any) determined in accordance with Section ~~2.2.4~~ 2.2.3(b) as, or (as appropriate) determined by the relevant EMEA Seller(s) as arising in respect of such supply together with all interest and penalties thereon (except to the extent that such interest or penalties arise other than as a result of a failure of the Purchaser to comply with any of its obligations pursuant to this Section 6.9), with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing (whichever is the later), provided that, no payment shall be due from the Purchaser in respect of VAT pursuant to this Section 6.9(a) or Section 6.9(e) in circumstances where the EMEA Seller, the Joint Administrator or French Liquidator issues a VAT invoice to the Purchaser outside of any applicable time limits within which the Purchaser (or a member of its VAT group) can claim credit for the relevant input tax, and provided further that, for the avoidance of doubt, any amount payable pursuant to this Section 6.9(a) in respect of any Optioned Licenses shall be an amount determined by the relevant EMEA Seller(s).

For the avoidance of doubt, and without prejudice to the generality of this Section 6.9, if the relevant EMEA Seller or Joint Administrators or French Liquidator forms the view, acting reasonably, that the supply by the EMEA Sellers of any Assets or assumption from the EMEA Sellers of any Assumed Liabilities (if relevant) is subject to VAT, or that any other

NNC-NNL11755866 / 227

amounts payable by the Purchaser or any other supplies made to the Purchaser in each case pursuant to this Agreement and/or in respect of the Optioned Licenses are subject to VAT, then, except to the extent Section 6.9(d) applies, the relevant EMEA Seller(s) or the Joint Administrators or the French Liquidator shall be entitled to provide the Purchaser with a VAT invoice in respect of the supply in question.

Subject to any contrary provision of this Agreement, a VAT invoice served by any EMEA Seller or the Joint Administrators or the French Liquidator in good faith and in accordance with applicable VAT laws, absent manifest error, shall be accepted by the Purchaser as valid, including in relation to amounts of VAT stated in such invoice, except to the extent the Purchaser has paid the applicable VAT by virtue of Section 6.9(d) below.

Where the liability for VAT in respect of any supply is a liability of the Purchaser (whether under Section 8 of the Value Added Tax Act 1994 or similar or equivalent provisions in any member of the European Union) the Purchaser shall account for such VAT to the relevant Tax Authority within any applicable time limits.

In the event that an amount in respect of VAT is payable under the terms of this Agreement and/or in respect of the Optioned Licenses in respect of a supply and: (1) the consideration amount as indicated on the relevant VAT invoice in respect of such supply differs from the actual consideration amount for that supply for VAT purposes (including, but not limited to, situations where the Purchase Price is adjusted in accordance with any provision of this Agreement, and/or the allocation of the Purchase Price to any Assets or Assumed Liabilities is amended, whether pursuant to Section 2.2.4 2.2.3 or otherwise); (2) a Tax Authority determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid VAT should properly be characterized as a supply on which VAT does not arise; or (3) for any reason the rate of VAT applicable to the supply in question is changed, then the relevant EMEA Seller(s) and the Purchaser agree to co-operate in good faith to correct all relevant VAT invoices and VAT returns and (without prejudice to the generality of the foregoing):

> where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is increased, or VAT otherwise becomes due, the Purchaser shall pay to the relevant EMEA Seller (or relevant Tax Authority, where applicable) an amount equal to any additional VAT that becomes due as a result of such increase with payment to be made by the Purchaser within five (5) Business Days of receipt of an appropriate valid VAT invoice or Closing, whichever is the later; and

> where the purchase price for any Assets and/or Assumed Liabilities (if relevant) is decreased, or to the extent that a relevant Tax Authority determines in writing that a supply by any EMEA Seller in respect of which the Purchaser has paid an amount in respect of VAT should properly be characterised as a supply on which VAT does not arise, or where the rate of VAT applicable to the supply in question is decreased, or where the Purchaser has otherwise paid an amount in respect of VAT to an EMEA Seller under Section 6.9(a) that was not due, the relevant EMEA Seller shall, without unreasonable delay, issue an appropriate and valid VAT credit note or equivalent to the Purchaser and shall use its reasonable endeavors to recover the Excess VAT and, to the extent the Excess VAT is actually

...
...
...

recovered and retained by it (or by any member of its VAT group) or is creditable by any EMEA Seller against any VAT liability of an EMEA Seller (or is so creditable by any member of its VAT group), the relevant EMEA Seller shall, without unreasonable delay, pay such Excess VAT to the Purchaser, and for the purposes of this Section 6.9(e)(ii), "**Excess VAT**" means the amount in respect of VAT actually paid (after deducting any previous refund under this Section 6.9(e)(ii)) by the Purchaser that should not have been paid, taking into account the decrease in purchase price, the incorrect characterization of a supply, the decrease in the VAT rate or the amount in respect of VAT that was paid to an EMEA Seller that was otherwise not due.

The EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser agree to act in good faith in accordance with Section ~~2.2.4~~2.2.3 for all purposes relating to VAT (including the preparation and filing of any VAT invoices or Tax Returns with respect to VAT).

If it is not possible for the EMEA Sellers, Joint Administrators, French Liquidator and the Purchaser in accordance with Section ~~2.2.4~~2.2.3 to determine before the date falling five (5) Business Days prior to Closing an amount of consideration for the purposes of VAT invoicing ~~then~~ (notwithstanding that the Purchaser has not by such date delivered a proposed Partial Allocation pursuant to Section ~~2.2.4(b)~~2.2.3(b)) <u>and in all cases in respect of all sums payable in respect of any Optioned Licenses, then</u>:

> where any of the EMEA Sellers, the Joint Administrators or the French Liquidator are required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement <u>and/or in respect of the Optioned Licenses</u>, subject to Section 6.9(e), the determination of the relevant EMEA Seller or the Joint Administrators or the French Liquidator (in each case, acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services until and unless replaced pursuant to Section 6.9(e); and

> where the Purchaser is required to account to a Tax Authority for VAT in respect of the supply of any goods or services under this Agreement <u>and/or in respect of the Optioned Licenses</u>, subject to Section 6.9(e), the determination of the Purchaser (acting reasonably) shall be accepted by the parties for VAT purposes in respect of such goods or services unless and until replaced pursuant to Section 6.9(e).

ARTICLE VII

CONDITIONS TO THE CLOSING

SECTION 7.1.    ~~Section 1.53.~~ Conditions to Each Party's Obligation. The Parties' obligation to effect the Closing is subject to the satisfaction or the express written waiver by all of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    ~~Regulatory Approvals. Mandatory Regulatory Approvals from the appropriate Government Entities shall have been obtained.~~

NNC-NNL11755866 / 229