## SCHEDULE "A"

### SUBJECT AGREEMENTS

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| International Business Machines Corporation | ICL PLC | Agreement, dated January 1, 1982 (L821428) |
| International Business Machines Corporation | Northern Telecom Limited | Agreement, dated July 1, 1979, and Amending Agreement No. 1, dated April 28, 1983 (L791262) |
| Verizon Services Corp. *et al.* | Nortel Networks Inc. | General Purchase Agreement No. 710-30912-2006, Articles I, II, III and V, effective as of January 1, 2007 |
| Alltel Communications Inc. | Nortel Networks Inc. | Master Purchase Agreement with Attachments A-L, Appendices and Exhibits Contract No. 26857, dated July 17, 2006 |
| Verizon Services Corp. | Nortel Networks Inc. | General Product Purchase Agreement for Softswitch and TDM Products and Services Contract No. C0404520, effective as of August 5, 2004 |
| Verizon Services Corp. | Nortel Networks Inc. | Succession Products and Services Deployment Agreement C0404529 |
| Verizon Services Corp. | Nortel Networks Inc. | Policy Decision Manager Products and Services Deployment Agreement MA-000797-2007 |
| WorldCom Purchasing, L.L.C. | Nortel Networks Inc. | Global Master Procurement Agreement, dated November 20, 1998 |
| Verizon Corporate Services Group Inc. | Nortel Networks Inc. | Nortel NGADM Agreement MA-003136-2008 dated November 10, 2008, as amended by Amendments 1-18 |
| Verizon Network Integration Corporation | Nortel Networks Inc. | Global Business Partner Agreement, effective January 1, 2003 |
| Verizon Corporate Services Group, Inc. | Nortel Networks Inc. | Managed Service Provider Agreement, effective July 8, 2008 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| Bell Atlantic Network Integration, Inc. | Bay Networks USA, Inc. | Verizon (Bell Atlantic) Non-Exclusive Integrator Agreement effective May 1, 1997 |
| MCI WorldCom Australia Pty Limited | Nortel Networks Australia Pty Limited | Managed Services Agreement with Nortel Networks Australia executed September 26, 2002 |
| Broadcom Corporation | Nortel Networks Inc. | Nortel Networks Agreement No. 020896, dated March 22, 2001, as amended by (i) the Amendment No. 1 with effective date of January 17, 2002, Nortel Networks Amended Agreement No. 021263, (ii) the Amendment No. 2 with effective date of March 15, 2002, Nortel Networks Amended Agreement No. 021319, and (iii) Amendment No. 3 with effective date of March 22, 2001, Nortel Networks Amended Agreement No. 021274 |
| Broadcom Corporation | Nortel Networks Inc. | Power Ranger FTAPMUX, FSWIP and FFAD ASIC Design and Development Agreement dated as of November 2, 2001 |
| SBC Operations, Inc. | Northern Telecom Inc. | AT & T – Nortel General Agreement No. 980332, dated April 30, 1999, between SBC Operations, Inc. n/k/a AT&T Services, Inc. and Northern Telecom Inc. n/k/a Nortel Networks, Inc. (as amended by Amendment No 1 dated May 5, 2008, and supplemented by a Supplemental Agreement dated March 3, 2009 and January 1, 2010). |

NNC-NNL11755866 / 291

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Services Inc. | Nortel Networks, Inc. | Nortel Switching Module No. 03031410, dated as of December 19, 2003 |
| AT&T Corp. | Nortel Networks Inc. | General Purchase Agreement No. GPA011D, dated as of March 5, 1998, as amended by Amendment No. 2 effective November 29, 1999 and Amendment 12 dated as of March 4, 2009 |
| Bellsouth Corporation | Nortel Networks Inc. | Global Supply and Services Contact No. R11796A, dated as of October 1, 1999, as supplemented by Supplemental Agreement effective as of June 25, 2001, and Supplemental Agreement effective as of April 16, 2006, as amended by Amendment No. 1 executed on April 4, 2008. |
| BellSouth Long Distance, Inc. | Nortel Networks Inc. | Purchase/License Agreement No. 100097, dated as of November 1, 1997 |
| AT&T Services, Inc. | Nortel Networks Inc. | Multi-Commitment and Purchase Agreement No. 20080912.028.C, effective November 15, 2008, as amended by amendment No. 1 executed August 21, 2009. |
| SBC Services, Inc. | Nortel Networks Inc. | Unified Networks Distributorship Agreement, Version 4.02 No. 00017864, dated as of January 1, 2001 as supplemented by Supplemental Agreement No. 20070622.898.C executed on July 11, 2007, Supplemental Agreement No. 20070705.007.C executed on July 11, 2007, Supplemental Agreement No. 20070828.022.C executed September 5, 2007; |

NNC-NNL11755866 / 292

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Services Inc. | Nortel Networks Inc. | Subordinate Agreement No. 00017864.S.006 to Agreement No. 17864 between AT&T Services, Inc. and Nortel Networks, Inc. dated December 18, 2008 |
| Cingular Wireless LLC | Nortel Networks Inc. | Master Sales Agreement, No. 20070723.013C, dated November 1, 2001<br><br>As supplemented by: Supplement A: GSM Requirements; Equipment and Services Supplement No. cing 6770.S.001; and Supplement F: UMTS Requirements<br><br>As amended by: Amendment 3 to Supplement A: GSM Requirements; Amendment 9 to Supplement A: GSM Requirements; and Amendment 12; Amendment 1 to Equipment and Services Supplement No. cing 6770.S.001 |
| Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement dated April 23, 2002, and related Memorandum of Agreement – e3 BSC |
| Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement, dated April 20, 2006. |
| Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement, dated December 18, 2006 |
| Cingular Wireless LLC | Nortel Networks, Inc. | Letter Agreement, dated September 19, 2007 |
| AT&T Mobility LLC f/k/a Cingular Wireless LLC | Nortel Networks Inc | Letter Agreement, dated December 30, 2008 |
| Cingular Wireless LLC | Nortel Networks Inc. | Information Exchange Agreement dated November 6, 2006 |

Doc#: US1 7018421v1

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Mobility LLC<br><br>Openet Telecom, Incorporated | Nortel Networks Inc. | Information Exchange Agreement, No. 20070912.049.C, dated September 7, 2007 |
| BellSouth Communications Systems, LLC d/b/a AT&T Communications Systems Southeast, LLC | Nortel Networks Inc. | Nortel Facilities Management Agreement, No. 20091008.015.C. dated June 2, 2006, as amended by Amendment No. 3 dated December 2, 2009 |
| AT&T Mobility LLC f/k/a Cingular Wireless LLC | Nortel Networks Inc. | Letter Agreement regarding ESSP Cap Solutions, No. 200900107, effective as of January 1, 2009, |
| Southwestern Bell Telephone Company | Northern Telecom Inc. | General Agreement No. C0228MO, effective January 1, 1985 |
| AT&T Services, Inc. | Nortel Networks, Inc. | AT&T – Nortel Switching Module Agreement, No. 20081204.042.C, dated as of September 11, 2009, as amended by Amendment No 20081204.042.A.0001 and supplemented by Supplemental Agreement 20081204.042.S.001, as amended by Amendment No. 1 thereto. |
| AT&T Services, Inc. | Nortel Networks Inc. | Non-Disclosure – Reciprocal, No. 20090410.042.C, dated April 28, 2009 |
| AT&T Corp | Nortel Networks, Inc. | DMS-250 Switching Level Agreement No. LLJ276D, dated as of December 21, 1998, |
| BellSouth Telecommunications Inc. | Nortel Networks Inc. | Supplemental Agreement No. 7 for DMS 10 & 100 Products and Services, dated as of April 14, 2006 |

NNC-NNL11755866 / 294

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| SBC Global Services, Inc. | Nortel Networks Inc. | Nortel Services Agreement No. 021255/SBC Contract 90055200 dated June 1, 2002, as amended by Amendments 1 through 4. |
| AT&T Services, Inc. | Nortel Networks, Inc. | Non-Disclosure - Reciprocal, No. 20071102.018.C, dated as of November 12, 2007 |
| Insight Communications Company LP<br><br>AT&T Services, Inc. | Nortel Networks Inc. | 3-Way Non-Disclosure Agreement, No. 20080922.052.C, dated as of September 23, 2008 |
| AT&T Services Inc. | Nortel Networks Inc. | Reciprocal Non-Disclosure Agreement, No. 20080514.015.C, dated as of May 19, 2008 |
| AT&T Services, Inc. | Nortel Networks Inc. | Non-Disclosure - Reciprocal No. 20070307.004.C effective as of March 7, 2007 |
| BellSouth Telecommunications, Inc. | Nortel Networks Inc. | Trial Agreement, No. SLK0041, dated as of July 7, 2006 |
| Southwestern Bell Telephone Co. | Northern Telecom, Inc. | Network ACD RT-1000 Agreement, No. CSL0348, dated as of October 7, 1992 |
| Southwestern Bell Technologies Resources, Inc. | Northern Telecom, Inc. | Technology Lab Agreement, No. 94K007, dated as of June 16, 1994 |
| AT&T Services, Inc. | Nortel Networks Inc. | Notification Letter, No. 20070919.019.C, dated as of November 8, 2007 |
| AT&T Services, Inc. | Nortel Networks Inc | OME6000 Product Family Supplemental Agreement No. 20080605.036.C dated August 31, 2009 |
| Cingular Wireless LLC | Nortel Networks Inc. | Interactive Voice Response (IVR) Professional Services Agreement effective January 1, 2005 |

NNC-NNL11755866 / 295

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Corp. | Nortel Networks Inc. | AT&T/Nortel Networks Reseller Agreement, Nortel Agreement No. 24777 |
| AT&T Services, Inc. | Nortel Networks Inc. | Trial Agreement, No. 20061215.034.C, effective as of March 27. 2007 |
| AT&T Services, Inc. | Nortel Networks Inc | Product Evaluation Agreement #20061215.034.S.004A OM 5000/OME 6500 LNS |
| SBC Services, Inc. | Nortel Networks Inc. | Work Statement, No. 04034025, dated April 1, 2004, as amended by Amendment No. 2, Amendment No. 3 and supplemented by Supplemental Statement of Work No.0434025.S.001, as amended. |
| SBC Services, Inc. | Nortel Networks Inc. | Agreement for the License of Incremental Software No. 03031697, dated October 31, 2003, as amended by Amendment No. 1. |
| Pacific Bell<br><br>Nevada Bell | Northern Telecom Inc. | Master Agreement for INA Software, No. P07137 dated June 30, 1995 |
| SBC Services, Inc.<br><br>Federal Bureau of Investigation | Nortel Networks Inc. | Cooperative Agreement to Letter Agreement No. J-FBI-99-053, No. 00014322 |
| SBC Services, Inc. | Nortel Networks Inc. | Optical Networks Management Software and Technical Support Agreement, No. 5041050, effective October 1, 2005 |

Doc#: US1 7018421v1

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| AT&T Services, Inc. | Nortel Networks Inc. | Agreement for Purchases of User Licenses and Technical Support for Optical Planner Software, No. 20071110.001.C effective June 1, 2008 as amended by Amendment No. 20071110.A.001 |
| AT&T Services, Inc | Nortel Networks Inc. | Subordinate MPS 1000 Products and Services Agreement, No. 04036069, as amended by Amendment No. 1, Amendment No. 2, and Amendment 04036069.A.003 |
| Southwestern Bell Telephone Company | Northern Telecom Inc. | DMS Family Material and Installation Contract, No. C4113FO |
| AT&T Corp. | Nortel Networks Inc. | LOA Proposal No. YEPR021105 to DMS 500 Products Sup., dated November 14, 2002 |
| | | LOA 20090828.OME between AT&T and Nortel, dated August 1, 2009 |
| AT&T Services, Inc. | Nortel Networks (Ireland) Limited | Procurement Arrangement for Supply of IP Telephony, Contract No. 20080624.025.C |
| AT&T Services Inc. | Nortel Networks Inc. | Agreement No. 06046944 dated August 28, 2006 |
| AT&T Services Inc. | Nortel Networks Inc. | Agreement No. 06046687 dated August 28, 2006 as amended by Amendment 06046687.A.001 and Amendment 06046687.A.002 |
| AT&T Services Inc. | Nortel Networks Inc. | Amendment #11 to DWDM/CWDM Agreement #01019547 |

NNC-NNL11755866 / 297

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| SBC Services, Inc. | Nortel Networks Inc. | Optical Module Agreement with Amendment #1 and Appendix #1-9, Agreement No. 03032497 effective October 1, 2005. |
| Hewlett Packard | Northern Telecom Limited | License Agreement, made and entered into on September 14, 1977 |
| Hewlett Packard Company | Northern Telecom Inc. | Operating Agreement, dated August 8, 1983. |
| Hewlett-Packard Company and Hewlett-Packard Development Company, LP | Nortel Networks Inc. | Master Agreement #MA-02-006, effective May 5, 2003 |
| US WEST Communications, Inc. | Nortel Networks Inc. | Agreement No. GAA0002 made as of October 6, 1983 |
| US West Business Resources, Inc. | Clarify Inc | Agreement No. 98051104 |
| US West Business Resources Inc. | Northern Telecom, Inc | Procurement Contract No. RPHCR42292 dated December 11, 1989 |
| Qwest Communications Corporation | Northern Telecom Inc. | Procurement Agreement No. QW9711CN |
| Qwest Communications Corporation | Northern Telecom Inc. | Procurement Agreement For Transmission Products No. QWT9801S effective May 20, 1998 |
| Qwest Communications Corporation | Nortel Networks Inc. | Procurement Agreement For Transmission Products effective January 1, 1999 |
| Embarq Management Company | Nortel Networks Inc. | Master Purchase Agreement for Products, Systems and Services |
| Qwest Corporation | Nortel Networks Inc. | Letter Agreement Re: Qwest Corporation Geomax Program – Optera Metro 5200 Products |
| US West Communications, Inc. | Nortel Networks Inc. | Quest411 Agreement effective October 21, 1999 |
| Qwest Communications Corporation | Northern Telecom Inc. | Global Services Agreement QW03-001922 |

| COUNTERPARTY | NORTEL PARTY | AGREEMENT TITLE |
|---|---|---|
| Qwest Business Resources, Inc. | Nortel Networks Inc. | Nortel Networks Business Partner Agreement effective January 1, 2003 |
| Qwest Communications Corp. | Clarify Inc. | Software License and Maintenance Agreement No. QWE121997 effective December 19, 1997 |
| LCI International Management Services, Inc. | Northern Telecom Inc. | Design, Engineering, Supply & Systems Integration Agreement – Transport |
| Thomas Swan & Co. Limited | STC PLC | Letter Memorializing Ultrasonic Analyser Licence, 1/28/1998 |
| Motorola Solutions, Inc. | Nortel Networks Inc. | Supply, Installation and Services Agreement dated July 22, 2002 |
| 3M Company | Northern Telecom Inc., among others | Project Agreement Number 98039, dated December 14, 1998. |
| Verint Systems Inc. | Nortel Networks Limited | Interface License Agreement dated January 16, 2003 |

Doc#. US1:7018421v1

APPENDIX "I"

[ATTACHED]

NNC-NNL11755866 / 300

Execution Version

## IP TRANSACTION SIDE AGREEMENT RE: CERTAIN STRUCTURAL MATTERS

This agreement dated as of June 15, 2011 (the "**Agreement**") by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"); (iv) the entities listed in Exhibit A hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in Exhibit B hereto; (vi) the French Liquidator; and (vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Nortel Parties**". The parties referred to in (i) through (vii) are referred to collectively as the "**Parties**".

### W I T N E S S E T H

WHEREAS the Nortel Parties have entered into a stalking horse agreement for the sale of the Nortel patent portfolio and certain other assets (the "**Assets**") pursuant to an asset sale agreement dated as of April 4, 2011, among the Parties and Ranger Inc. ("**Bidder 1**"), as purchaser, and Google Inc., as parent guarantor (as the same may be further amended, restated, amended and restated or modified, the "**Stalking Horse Agreement**"). The sale of the Assets, whether pursuant to the Stalking Horse Agreement or otherwise (such agreement, including the Stalking Horse Agreement, the "**Sale Agreement**") and whether to Bidder 1 or any other person (such person, including Bidder 1, a "**Purchaser**"), shall be referred to herein as the "**Transaction**";

WHEREAS the Parties entered into that certain IP Transaction Side Agreement on April 4, 2011 (the "**IP Transaction Side Agreement**"); and

WHEREAS the sale of the Assets to Bidder 1 is subject to higher or better offers and an auction process approved by the U.S. Court and Canadian Court; and

WHEREAS the Parties wish to enter into certain further agreements with respect to the sale of the Assets and the potential Transaction.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

1.    Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or, if not defined below, the meanings set forth in the Stalking Horse Agreement:

(a)    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

(b)    "**Canadian Debtors**" means NNC, NNL and their Canadian affiliates that are subject to proceedings pending before the Canadian Court under the *Companies' Creditors Arrangement Act* (Canada);

(c)    "**Direct Canadian Payment**" means the amount of US$7,500,000 paid to NNL pursuant to the Rockstar Bid;

(d)    "**EMEA Debtors**" means each Nortel debtor in respect of which the Joint Administrators were appointed as administrators on 14 January 2009, including but not limited to the EMEA Sellers;

(e)    "**Interim Sales Protocol**" has the meaning ascribed to it in the Interim Funding and Settlement Agreement entered into by certain of the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators, among others, on June 9, 2009 (the "**IFSA**");

(f)    "**Total Proceeds**" means the aggregate amounts (A) paid by the Purchaser to the Sellers under or in respect of the Sale Agreement as Purchase Price, Good Faith Deposit, damages, and any amount paid by the Purchaser to the Sellers as compensation or remuneration for a license granted in connection with the Transaction (a "**License Fee**") and (B) paid to the Sellers under any escrow arrangement pursuant to which a portion of the Purchase Price, License Fee or Good Faith Deposit has been placed in escrow, including the Indemnification Escrow Amount, but for greater certainty, subject to the provisions of Paragraph 2 below, shall exclude any amounts not constituting a portion of the Purchase Price or License Fee paid or payable by the Purchaser to one or more Sellers to compensate such Seller for costs incurred or to be incurred by such Seller, as contemplated to be paid directly to such Seller in accordance with the terms of the Sale Agreement, other Transaction Documents or related agreements, including, without limitation, the Direct Canadian Payment, if any;

(g)    "**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware; and

2

(h)     "**U.S. Debtors**" means NNI and its affiliated debtors subject to the jurisdiction of the U.S. Court in proceedings pending under Chapter 11 of the U.S. Bankruptcy Code.

2.     The Parties agree that:

(a)     In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation[1] or a Seller is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Seller responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Sellers and shall consider in good faith any comments by the other Sellers with respect to such Tax Return and any Partial Allocation related thereto, provided, and for the avoidance of doubt, that the other Sellers shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto.  It is understood that neither this Paragraph 2 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, adopt, or have any impact whatsoever on, the allocation of proceeds from the Transaction among the Sellers.

(b)     In the event that the Purchaser prepares or files a Tax Return that requires an allocation of the proceeds from the Transaction, such Tax Return and any information contained therein shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers.

(c)     If, in connection with the preparation or filing of a Tax Return as described in subparagraphs (a) and (b) of this Paragraph 2, or in connection with the transfer of the proceeds from the Transaction on the Closing Date, the Purchaser obtains any valuation calculation prepared at its request ("**Valuation**"), such Valuation and any information contained therein (other than information that may be derived therefrom that Purchaser publicly discloses, provided that the Purchaser shall not be considered to have publicly disclosed information solely by virtue of Purchaser giving notice of such information to the Sellers), shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers. The Parties agree that none of them shall request, suggest or otherwise encourage the Purchaser to make any Valuation or any information derived therefrom publicly available. Additionally, the Parties agree to oppose and to cooperate in opposing the use of the Tax Return or the Valuation by any entity before any dispute resolver(s) appointed pursuant to the Interim Sales Protocol, any court, or such other judicial or quasijudicial body or similar authority that may determine the allocation or distribution of the Total Proceeds, in a manner inconsistent with this Agreement.

---

[1]     The Parties agree that, for the purposes of this Agreement, "Partial Allocation" refers to an allocation of the Total Proceeds and not merely the Purchase Price.

NNC-NNL11755866 / 303

(d)      In the event a Party becomes aware that the Purchaser or a designated purchaser intends to deduct and withhold an amount from the Transaction proceeds as may be contemplated by the Sale Agreement (a "**Withholding**"), such Party shall forthwith consult with each of NNL, NNI and NNUK with respect to such Withholding. No Party shall consent to a Withholding by the Purchaser or a designated purchaser without the prior written consent of NNL, NNI and NNUK.

(e)      If, in connection with the Transaction, the Purchaser provides for separate consideration to be paid for the intellectual property license being granted to the Purchaser or its affiliates by one or more of the Sellers including any waivers or consents granted by the Sellers in relation to such license (the "**IP License**"), on the one hand, and the other Assets being transferred to the Purchaser by the Sellers on the other, or otherwise ascribes or allocates a portion of the Total Proceeds or a value to such IP License, on the one hand, and to the other Assets being transferred on the other (any such separate consideration or allocation, a "**License/Patent Designation**"), the Parties agree that any such License/Patent Designation or the structure of both the IP License and any waiver or consent in relation to the IP License shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers, and it is the express intent of the Parties that the allocation of the Total Proceeds shall be effected as if the Transaction had been structured so that the Total Proceeds were paid in consideration for the sale of the Assets in a manner similar to that provided in the Stalking Horse Agreement. The Parties agree that, to the extent that any such License/Patent Designations have not been made public through the auction process for the Transaction and the obtaining of the orders of the U.S. Court and the Canadian Court approving the Transaction, none of them shall request, suggest or otherwise encourage the Purchaser to make any License/Patent Designation or any information derived therefrom publicly available. Additionally, the Parties agree to oppose and to cooperate in opposing the use of the License/Patent Designation or the structure of both the IP License and any waiver or consents in relation to the IP License by any entity before any dispute resolver(s) appointed pursuant to the Interim Sales Protocol, any court, or such other judicial or quasi-judicial body or similar authority that may determine the allocation or distribution of the Total Proceeds, in a manner inconsistent with this Agreement.

(f)      The Parties agree that, subject to the IP Transaction Side Agreement, in accordance with Section 12 of the IFSA, any payment due by the Purchaser (and any designated purchaser) to the Nortel Parties under the Sale Agreement, or upon release from escrow, any escrow agreements provided for in the Sale Agreement, the Transaction Documents or any related agreements, that is included in the Total Proceeds shall be collected and held in escrow by the Distribution Agent (as agent for the Sellers).

NNC-NNL11755866 / 304

(g)    In the event that the Parties accept a bid to enter into a Sale Agreement with Rockstar Bidco, LP ("**Rockstar**") as Purchaser, which provides for a structure similar to that proposed in Rockstar's bid submitted on June 13, 2011 (such Sale Agreement, including Optioned License Fees (as defined in the Rockstar bid of June 13, 2011) not to exceed US$500,000,000, the "**Rockstar Bid**"), the Parties agree that (i) NNL shall receive with respect to any such Rockstar Bid at Closing the Direct Canadian Payment, (ii) the Canadian Debtors shall have no right to seek a further allocation of the Total Proceeds based on such tax attributes of the Canadian Debtors as are or may be used in connection with a Rockstar Bid, and that (iii) subject to receipt of the Direct Canadian Payment, the use of such tax attributes shall not, and shall not be deemed to, determine, ratify, adopt or have any further impact whatsoever on the allocation of proceeds from the Transaction among the Sellers. The Parties further agree that, at each round of bidding at the Auction (as defined in the U.S Bidding Procedures Order and the Canadian Sales Process Order), the amount of the Direct Canadian Payment should be deducted from the consideration offered by Rockstar in any bid prior to the Sellers determining whether such bid constitutes the highest or otherwise best offer in that round of bidding. For the avoidance of doubt, except as provided in the preceding sentence, each of the Sellers reserves its right at the Auction to determine whether a bid by Rockstar constitutes a higher or otherwise better offer for the Assets, and nothing herein shall constitute the acceptance of a Rockstar Bid or the Agreement by any Seller to the terms of a Rockstar Bid.

3.    The U.S. Debtors and the Canadian Debtors agree they will seek approval of this Agreement by the U.S. Court and the Canadian Court in connection with the approval of the Transaction.

4.    The Parties agree that:

(a)    the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations;

(b)    the Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) subject to paragraph 4(d) hereof, the purposes of the other Parties hereto enforcing the obligations of the Joint Administrators hereunder;

5

NNC-NNL11755866 / 305

(c)     notwithstanding anything in paragraphs 8 and 9 hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act, (iii) their appointment as joint administrators of the relevant EMEA Sellers and their remaining as current joint administrators thereof under this Agreement, or (iv) the duties and obligations of the Joint Administrators as administrators of the EMEA Debtors, shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts;

(d)     any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns;

(e)     the French Liquidator is entering into this Agreement as agent for NNSA and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and

(f)     notwithstanding anything in paragraphs 8 and 9 hereof, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French Liquidator, his firm, partners, employees, advisers, representatives or agents, (ii) his appointment as Liquidateur Judiciaire of NNSA, or (iii) the duties and obligations of the French Liquidator as Liquidateur Judiciaire of NNSA, shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French courts.

5.     No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. Except as expressly set out herein, this Agreement, or any provision hereof, may be waived or amended on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Official Committee of Unsecured Creditors of the U.S. Debtors (the "**Committee**") and Ernst & Young Inc. in its capacity as the Monitor of the Canadian Debtors (the "**Monitor**").

NNC-NNL11755866 / 306

6.   This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors.

7.   Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

8.   The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction provided, however, that subparagraphs 4(a) through (d) hereof shall be governed exclusively by English law and subparagraphs 4(e) and (f) hereof shall be governed exclusively by French law.

9.   To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNL or any of the other Canadian Debtors, or the English Court if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law provided, however, that any claim, action or proceeding set forth in or on the basis of subparagraphs 4(a) through (d) hereof shall be brought exclusively in the English courts and any claim, action or proceeding set forth in or on the basis of subparagraphs 4(e) through (f) hereof shall be brought exclusively in the French courts.

10.   EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS

NNC-NNL11755866 / 307

REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 10.

11. All notices and communications provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified for such Party in the Stalking Horse Agreement, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this paragraph 11. Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable. A copy of any notice or communication sent pursuant to this paragraph 11 shall also be sent to the Committee: c/o Akin Gump Strauss Hauer & Feld LLP Attention: Fred S. Hodara and Stephen B. Kuhn, Esq. One Bryant Park New York, New York 10036, U.S.A (Facsimile: +1 212 872 1002) and to the Monitor: Ernst & Young Inc., Ernst & Young Tower Attn: Murray A. McDonald, 222 Bay Street, P. O. Box 251, Toronto, Ontario, Canada, M5K 1J7 (Facsimile: +1 416 943 3300).

12. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Facsimile and pdf signatures shall be deemed original signatures.

13. The obligations of NNC and NNL under this Agreement shall be joint and several. The obligations of NNI and the other U.S. Debtors party hereto shall be joint and several. The obligations of the EMEA Sellers under this Agreement shall be joint and several.

14. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally

8

NNC-NNL11755866 / 308

contemplated to the greatest extent possible even in such jurisdiction.

15.    Notwithstanding anything contained herein, nothing in this Agreement shall supercede the IP Transaction Side Agreement, nor act as an amendment or waiver of any of the rights or obligations thereunder.

**[Signature pages immediately follow]**

9

NNC-NNL11755866 / 309

Execution Version

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By:_____
    Name: Anna Ventresca
    Title: General Counsel – Corporate
         and Corporate Secretary

By:_____
    Name: Clarke E Glaspell
    Title: Controller

**NORTEL NETWORKS LIMITED**

By:_____
    Name: Anna Ventresca
    Title: General Counsel – Corporate
         and Corporate Secretary

By:_____
    Name: Clarke E. Glaspell
    Title: Controller

**NORTEL NETWORKS INC.**

By:_____
    Name:
    Title:

**NN APPLICATIONS MANAGEMENT SOLUTIONS INC.**

By:_____
    Name:
    Title:

Execution Version

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

NORTEL NETWORKS INC.

By: _____
    Name: Chris Ricaurte
    Title: President

NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.

By: _____
    Name: Chris Ricaurte
    Title: President

**NORTEL ALTSYSTEMS, INC.**

By: _____
Name: Chris Ricaurte
Title: President

**CORETEK, INC.**

By: _____
Name: Chris Ricaurte
Title: President

**QTERA CORPORATION**

By: _____
Name: Chris Ricaurte
Title: President

**XROS, INC.**

By: _____
Name: Chris Ricaurte
Title: President

NNC-NNL11755866 / 312

**SIGNED** for and on behalf of **Nortel**        )
**Networks UK Limited** (in administration)    )
by Christopher Hill as Joint Administrator    )   Christopher Hill
(acting as agent and without personal        )
liability) in the presence of:                )

Witness signature

.................................................................... )
Name:     JAN CORDELL         )
Address:    1 MORE LONDON PLACE
              LONDON SE1 2AF

**SIGNED** for and on behalf of **Nortel
Networks (Ireland) Limited** (in
administration) by David Hughes as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)
)

...................................................
David Hughes

Witness signature

...................................................
Name: _Niall J Coveney_
Address: _c/o Earst + Young._
         _Harcourt/Street_
         _Dublin 2._

)
)
)

**SIGNED** for and on behalf of **Nortel Networks S.A.** (in administration and *liquidation judiciaire*) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

............................................

Christopher Hill

Witness signature

............................................

)

Name:    JAN CORDELL      )

Address:   1 MORE LONDON PLACE )

            LONDON SE1 2AF

*Kerry Trigg*

SIGNED for and on behalf of **Nortel**
**Networks France S.A.S.** (in
administration) by Kerry Trigg acting as
authorised representative of Christopher
Hill as Joint Administrator (acting as agent
and without personal liability) in the
presence of:

)
)
)
)

Kerry Trigg

Witness signature

Name: TERESA ALLEN
Address: 1 MORE LONDON PLACE
    LONDON
    SE1 2AF

)
)
)

**SIGNED** for and on behalf of **Nortel**
**GmbH** (in administration) by Christopher
Hill as Joint Administrator (acting as agent
and without personal liability) in the
presence of:

)
)
)
)

........................................................

Christopher Hill

Witness signature

........................................................

Name:    JAN CORDELL
Address:  I MORE LONDON PLACE
          LONDON SE1 2AF

)

)
)

NNC-NNL11755866 / 317

**SIGNED** by Alan Bloom                    )  ...................................................

)  Alan Bloom

)

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint
Administrators in the presence of:


Witness signature

...........................................................    )

Name:    WILMA GRAHAM              )

Address:                                       )

        E ERNST & YOUNG LLP
        1 More London Place
        London
        SE1 2AF

Signed by MAÎTRE COSME ROGEAU,
acting in the capacity of *Mandataire
Liquidateur* of NORTEL NETWORKS S.A.
(IN ADMINISTRATION AND
LIQUIDATION JUDICIARE), without
personal liability and solely for the purpose of
obtaining the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the French Liquidator:

By _____
    Name: Maitre Cosme Rogeau
    Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

Name:
Address:

AATEEN SHARMA
FOULER
PARTNER, FTPA
181) AVENUE FDC
75716 PARIS
(FRANCE)

SIGNED for and on behalf of NORTEL   )
NETWORKS S.A. (IN              )   MAÎTRE COSME ROGEAU
ADMINISTRATION AND       )
LIQUIDATION JUDICIARE)     )
by MAÎTRE COSME ROGEAU as  )
*Mandataire Liquidateur* (acting as agent )
and without personal liability) in the  )
presence of:
Witness signature

Name:
Address:

AATEEN SHARMA    FOULER

PARTNER, FTPA

181U AVENUE FDCM

75716 PARIS (FRANCE)

Execution Version

## EXHIBIT A – EMEA Sellers

Nortel Networks UK Limited (in administration)
Nortel Networks S.A. (in administration and *liquidation judiciaire*)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S. (in administration)
Nortel GmbH (in administration)

**EXHIBIT B – Other Sellers**

NN Applications Management Solutions Inc.
Nortel Altsystems, Inc. (previously "Alteon Networks, Inc.")
CoreTek, Inc.
Qtera Corporation
Xros, Inc.

A

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**SEVENTY-FIRST REPORT OF THE MONITOR**
**DATED JULY 6, 2011**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

NNC-NNL11755866 / 322

TR45574



*Execution Version*

## IP TRANSACTION SIDE AGREEMENT

This agreement dated as of April 4, 2011 (the "**Agreement**") by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"); (iv) the entities listed in Exhibit A hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in Exhibit B hereto; (vi) the French Liquidator; and (vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Nortel Parties**". The parties referred to in (i) through (vii) are referred to collectively as the "**Parties**".

## WITNESSETH

WHEREAS the Nortel Parties have or will concurrently with the entering into of this Agreement execute a stalking horse agreement for the sale of the Nortel patent portfolio (the "**Assets**") pursuant to an asset sale agreement dated as of April 4, 2011, among the Parties and Ranger Inc. ("**Bidder 1**"), as purchaser, and Google Inc., as parent guarantor (as the same may be further amended, restated, amended and restated or modified, the "**Stalking Horse Agreement**"). The sale of the Assets, whether pursuant to the Stalking Horse Agreement or otherwise and whether to Bidder 1 or any other person (such person, including Bidder 1, a "**Purchaser**"), shall be referred to herein as the "**Transaction**";

WHEREAS as a condition of the Stalking Horse Agreement and in connection with the Transaction, the Parties have agreed to a process for the rejection, repudiation and/or deemed termination of unknown licenses (the "**Unknown Licenses**") to be approved by the U.S. Court in the U.S. Bidding Procedures Order and the Canadian Court in the Canadian Sales Process Order (the "**License Rejection Procedures**");

WHEREAS as a condition of the Stalking Horse Agreement and in connection with the Transaction, the Parties have agreed to establish an indemnification escrow account in the amount of US$45,000,000 to support certain indemnification rights of Bidder 1 under the Stalking Horse Agreement (any indemnification escrow account so established in connection

with the Transaction to support indemnification rights of a Purchaser, the "**Indemnity Escrow Account**");

WHEREAS the Nortel Parties have agreed in, and in the circumstances set out in, the Stalking Horse Agreement to pay to Bidder 1 (i) cash in an amount equal to the total amount of all actual fees, costs and expenses reasonably incurred by Bidder 1 in connection with the preparation, execution and performance of the Stalking Horse Agreement, which amount shall not exceed Four Million Dollars ($4,000,000) (the "**Expense Reimbursement**") and (ii) a cash fee of Twenty-Five Million Dollars ($25,000,000) (the "**Break-Up Fee**"); and

WHEREAS as a condition of the Stalking Horse Agreement and in connection with the Transaction, the Parties have made certain representations and warranties and have agreed to certain covenants relating to the Knowledge of certain Persons identified in Section 1.1(e)(i) of the Sellers Disclosure Schedule (the "**Designated Persons**").

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties hereto agree as follows:

1.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or, if not defined below, the meanings set forth in the Stalking Horse Agreement:

    (a)  "**Allowed Knowledge Claim**" means a Knowledge Claim finally allowed against a Nortel Debtor whether pursuant to a settlement, judicial determination or otherwise;

    (b)  "**Allowed Unknown License Claim**" means an Unknown License Claim finally allowed against a Nortel Debtor whether pursuant to a settlement, judicial determination, determination by a claims officer or otherwise;

    (c)  "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

    (d)  "**Canadian Debtors**" means NNC, NNL and their Canadian affiliates that are subject to proceedings pending before the Canadian Court under the *Companies' Creditors Arrangement Act* (Canada);

    (e)  "**EMEA Debtors**" means each Nortel debtor in respect of which the Joint Administrators were appointed as administrators on 14 January 2009, including but not limited to the EMEA Sellers;

    (f)  "**Knowledge Claim**" means any claim of actual fraud (which, for the avoidance of doubt, shall exclude constructive fraud and equitable fraud) asserted by a Purchaser or any other person or entity claiming through a Purchaser in connection with the Transaction against a Nortel Debtor or a Designated Person (to the extent that the claim against such Designated Person is indemnifiable by a Nortel Debtor). For greater certainty, a Knowledge Claim shall not include an

2

HIGHLY CONFIDENTIAL

indemnity claim by a Purchaser in connection with a Transaction for which there is recourse to amounts held in the Indemnity Escrow Account;

(g) **"Nortel Debtor"** means each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors;

(h) **"Unknown License Claim"** means any claim asserted by a licensee or any other person against a Nortel Debtor as a result of the rejection, repudiation or termination of an Unknown License pursuant to the License Rejection Procedures;

(i) **"U.S. Court"** means the United States Bankruptcy Court for the District of Delaware; and

(j) **"U.S. Debtors"** means NNI and its affiliated debtors subject to the jurisdiction of the U.S. Court in proceedings pending under Chapter 11 of the U.S. Bankruptcy Code.

2. The Parties agree that:

(a) any amount paid from the Indemnity Escrow Account to a Purchaser;

(b) any amount paid to Bidder 1 in respect of the Expense Reimbursement and/or Break-Up Fee;

(c) any amount that a Nortel Debtor becomes obligated to distribute or pay on account of an Allowed Unknown License Claim, whether pursuant to a settlement, court order or other judicial determination, plan of arrangement, plan of reorganization, plan of distribution, bankruptcy distribution, administration distribution, liquidation distribution, company voluntary arrangement or otherwise;

(d) any amount that a Nortel Debtor becomes obligated to pay on account of an Allowed Knowledge Claim, whether pursuant to a settlement, court order or other judicial determination, plan of arrangement, plan of reorganization, plan of distribution, bankruptcy distribution, administration distribution, liquidation distribution, company voluntary arrangement or otherwise;

(e) any amount that is expended by any Nortel Party in respect of fees, charges and disbursements of counsel appointed in relation to the defence of a Section 10.1 Third Party Claim to the extent such amount is not recovered from the Purchaser or otherwise ("**Counsel Costs**"); and

(f) any amounts paid or payable to Global IP Law Group, LLC ("**Global IP**") in connection with the Transaction or any other work performed under that certain

HIGHLY CONFIDENTIAL  NNC-NNL11773287 / 3

Master Consulting Agreement dated October 15, 2009, among NNL, NNI and NNUK, on the one hand, and Global IP, on the other ("**Global IP Costs**"),

shall constitute Transaction costs and shall ultimately be borne by each Nortel Party in a proportion equal to the proportion of the aggregate IP Sale Proceeds (as defined below) allocated to such Nortel Party. Without limiting the generality of the foregoing the Expense Reimbursement shall be addressed as set forth in paragraph 3 hereof, the Break-Up Fee shall be addressed as set forth in paragraph 4 hereof, any Unknown License Claim or Knowledge Claim shall be addressed as set forth in paragraphs 5 through 8 hereof, Counsel Costs shall be addressed as set forth in paragraph 9 hereof and Global IP Costs shall be addressed as set forth in paragraph 10 hereof.

3.    The Parties agree that, subject to readjustment in accordance with paragraph 2 hereof, any amount payable to Bidder 1 in respect of the Expense Reimbursement shall be paid one third (1/3) by NNI, one third (1/3) by NNL and one third (1/3) by NNUK (the "**Initial Respective Percentages**") and any such Nortel Party paying in excess of such amount shall have rights of contribution vis-à-vis, and be entitled to payment on demand from, any Nortel Party that has paid less than its Initial Respective Percentage. The amount necessary to fully reimburse NNI, NNL and NNUK for paying the Expense Reimbursement shall be deducted from the IP Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to each of NNI, NNL and NNUK to reimburse them for the payment of the Expense Reimbursement.

4.    The Parties agree that any amount payable to Bidder 1 in respect of the Break-Up Fee shall be deducted from the IP Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid to Bidder 1 at the closing of the Transaction.

5.    Any Unknown License Claim shall be resolved and determined in the claims, proof, or other relevant process or court of the Nortel Debtor against whom such Unknown License Claim is asserted, provided that each of NNL, NNI and NNUK shall be consulted with respect to the resolution and determination of any Unknown License Claim. To the extent an Unknown License Claim is filed against more than one Nortel Debtor, the Nortel Debtors against whom such Unknown License Claim is filed shall cooperate in good faith to coordinate the resolution and determination of such Unknown License Claim. Furthermore, to the extent an Unknown License Claim is filed against both a Canadian Debtor and a U.S. Debtor the resolution of such Unknown License Claim shall, with respect to the Canadian Debtors and the U.S. Debtors, be governed by the Cross-Border Insolvency Protocol approved by the U.S. Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same has been and may further be amended from time to time (the "**Cross-Border Insolvency Protocol**") and the Cross-Border Claims Protocol approved by the U.S. Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated September 16, 2010 and by the Canadian Court pursuant to an order dated September 16, 2010, as the same has been and may further be amended from time to time (the "**Cross-Border Claims Protocol**"). Nothing in this

4