Agreement is intended to limit the U.S. Debtors or Canadian Debtors rights under the Cross-Border Insolvency Protocol, the Cross-Border Claims Protocol or the Claims Resolution Order granted by the Canadian Court on September 17, 2010.

6.     Any Knowledge Claim shall be resolved and determined as provided for in Section 10.6 of the Stalking Horse Agreement (or such similar jurisdiction clause in the asset sale agreement entered into in connection with the Transaction), provided that each of NNL, NNI and NNUK shall be consulted with respect to the resolution of any Knowledge Claim. To the extent a Knowledge Claim is filed against Nortel Debtors in different jurisdictions, the Nortel Parties shall cooperate in good faith to coordinate the resolution and determination of such Knowledge Claim. Furthermore, to the extent a Knowledge Claim is filed against both a Canadian Debtor and a U.S. Debtor, the resolution of such Knowledge Claim shall, with respect to the Canadian Debtors and the U.S. Debtors, be subject to the Cross-Border Insolvency Protocol.

7.     To give effect to paragraph 2 hereof as regards Allowed Unknown License Claims and Allowed Knowledge Claims:

(a)     to the extent that there are funds available in the distribution escrow account (the **"Distribution Escrow Account"**) established to hold the sale proceeds from the Transaction (the **"IP Sale Proceeds"**), the obligation of any Nortel Debtor to make a distribution or payment on account of an Allowed Unknown License Claim or an Allowed Knowledge Claim shall be satisfied by causing the escrow agent appointed in connection with the Distribution Escrow Account to pay the relevant amount out of the Distribution Escrow Account; and

(b)     to the extent there are not yet funds available in the Distribution Escrow Account, the obligation of any Nortel Debtor to make a distribution or payment on account of an Allowed Unknown License Claim or Allowed Knowledge Claim shall be satisfied by the Nortel Debtor(s) against whom the Allowed Unknown License Claim or Allowed Knowledge Claim is made making such distribution or payment. The amount necessary to fully reimburse a Nortel Debtor making any such distribution or payment shall be deducted from the IP Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to such Nortel Debtor(s) to reimburse them for the distribution or payment.

8.     If the allocation of the IP Sale Proceeds among the Nortel Parties is resolved prior to: (i) all distributions or payments on account of Allowed Unknown License Claims and Allowed Knowledge Claims being made; and/or (ii) all Unknown License Claims and Knowledge Claims being finally resolved, the Parties shall establish and maintain an appropriate reserve from the IP Sale Proceeds such that any distributions or payments on account of such claims can be satisfied as provided for in subparagraph 7(a) hereof. In establishing and maintaining such reserve, the Parties shall have regard to: (i) the aggregate quantum of Allowed Unknown License Claims for which a distribution or payment has yet to be made; (ii) the expected dividend from the Nortel Debtor(s)

5

HIGHLY CONFIDENTIAL

required to make a distribution or payment on account of such Allowed Unknown License Claims; (iii) the aggregate quantum of any unresolved Unknown License Claims then existing and the expected dividend from the Nortel Debtor(s) that would be required to make a distribution or payment on account of such unresolved Unknown License Claims if they were to become Allowed Unknown License Claims; (iv) the aggregate quantum of Allowed Knowledge Claims for a which a payment has yet to be made; (v) the aggregate quantum of unresolved Knowledge Claims and the amount that would be necessary to make payment on such unresolved Knowledge Claims if they were to become Allowed Knowledge Claims; and (vi) an appropriate buffer amount to address any uncertainty regarding the factors specified in (ii), (iii) and (v), above; provided, however, that, unless each of NNL, NNI and NNUK agree otherwise in writing, the reserve established shall be equal to:

(a)     that percentage of the sum of (x) the aggregate amount of all Allowed Unknown License Claims for which a distribution or payment has yet to be made; and (y) the aggregate amount claimed in respect of unresolved Unknown License Claims, necessary to pay the maximum possible dividend that could apply to such claims; plus

(b)     the sum of: (x) the aggregate amount of all Allowed Knowledge Claims for which a payment has yet to be made; and (y) the aggregate amount claimed in respect of unresolved Knowledge Claims.

The Parties shall consult from time to time to determine whether to reduce the amount of the reserve, including, without limitation, in light of the development of additional information regarding Unknown License Claims and Knowledge Claims or the resolution of such claims. At such time as all distributions and payments on account of Allowed Unknown License Claims and Allowed Knowledge Claims have been made and all Unknown License Claims and Knowledge Claims have been finally resolved, any amounts remaining in such reserve shall be distributed to the Nortel Parties in accordance with the resolution of the allocation of the IP Sale Proceeds.

9.     The Parties agree that, subject to readjustment in accordance with paragraph 2 hereof, each Nortel Party shall fund any Counsel Costs incurred by it. Each Nortel Party shall be entitled to be fully reimbursed for any Counsel Costs incurred by it from the IP Sale Proceeds in the Distribution Escrow Account on a bi-monthly basis (or at such other interval as agreed to in writing by each of NNL, NNI and NNUK). To the extent any amounts in respect of Counsel Costs are recovered by a Nortel Party from the Purchaser or otherwise after the reimbursement contemplated by the preceding sentence having occurred, such amounts shall be forthwith paid by the Nortel Party into the Distribution Escrow Account and shall form part of the IP Sale Proceeds. For the avoidance of doubt, the right to reimbursement under this paragraph 9 shall cease once the funds in the Distribution Escrow Account have been extinguished.

10.     The Parties agree that the amount necessary to fully reimburse NNL for all Global IP Costs paid by NNL as of the closing of the Transaction shall be deducted from the IP

HIGHLY CONFIDENTIAL      NNC-NNL11773287 / 6

Sale Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to NNL to reimburse it for the payment of such Global IP Costs. After the closing of the Transaction, the obligation of any Nortel Debtor to make a distribution or payment on account of Global IP Costs shall be satisfied by causing the escrow agent appointed in connection with the Distribution Escrow Account to pay the relevant amount out of the Distribution Escrow Account to Global IP. The Parties further agree that should the Transaction fail to be consummated, nothing herein shall prejudice NNL's right to seek reimbursement of the Global IP Costs from the other Nortel Debtors, including any such rights arising under existing agreements.

11.    The Parties agree to negotiate in good faith to enter into a further side agreement for the purposes of facilitating the completion of the Transaction and to govern certain other matters of common interest relating to the Transaction, including certain matters relating to the allocation among the Nortel Parties of the benefits and burdens of the Transaction. To the extent the Parties enter into such a further side agreement, the terms of this Agreement shall be incorporated into such side agreement.

12.    Except as expressly contemplated in Section 5.13(b) of the Stalking Horse Agreement, the Parties agree that nothing in the Stalking Horse Agreement shall constitute an amendment, modification, termination or waiver of rights of any Nortel Party under or relating to the Transfer Pricing Agreements (as defined in the Final Canadian Funding and Settlement Agreement dated December 23, 2009) (the "FCFSA")). The Parties acknowledge that the amendments and modifications to the Transfer Pricing Agreements contemplated by Section 5.13(b) of the Stalking Horse Agreement are being effected at the request of the Purchaser as a condition of the Transaction and that, for purposes of the allocation of the IP Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Nortel Debtors and any other claims or disputes among the Nortel Debtors, such amendments and modifications, and the actions taken as a result thereof, shall have no impact on the rights of the Nortel Parties (i) under or in connection with the Transfer Pricing Agreements, which rights shall continue as they exist immediately prior to the closing of the Transaction, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising therefrom or otherwise, and the right to advocate for an allocation of the IP Sale Proceeds, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments (as defined in the FCFSA) pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise. Nothing in Section 5.13(b) of the Stalking Horse Agreement or the amendments and modifications to the Transfer Pricing Agreements resulting therefrom or the actions taken as a result thereof shall bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the IP Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Nortel Parties, and such

7

presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. Furthermore, for the avoidance of doubt, all rights relating to the Transfer Pricing Agreements preserved in the FCFSA and the Interim Funding and Settlement Agreement dated June 9, 2009, continue to be preserved.

13.    The Parties agree that:

    (a)   the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations;

    (b)   the Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) subject to paragraph 13(d) hereof, the purposes of the other Parties hereto enforcing the obligations of the Joint Administrators hereunder;

    (c)   notwithstanding anything in paragraphs 17 and 18 hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the relevant EMEA Sellers and their remaining as current joint administrators thereof under this Agreement, or (iv) the duties and obligations of the Joint Administrators as administrators of the EMEA Debtors, shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts;

    (d)   any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns;

    (e)   the French Liquidator is entering into this Agreement as agent for NNSA and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe,

8

perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and

(f)     notwithstanding anything in paragraphs 17 and 18 hereof, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French Liquidator, his firm, partners, employees, advisers, representatives or agents, (ii) his appointment as Liquidateur Judiciaire of NNSA, or (iii) the duties and obligations of the French Liquidator as Liquidateur Judiciaire of NNSA, shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French courts.

14.     No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. Except as expressly set out herein, this Agreement, or any provision hereof, may be waived or amended on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Official Committee of Unsecured Creditors of the U.S. Debtors (the "**Committee**") and Ernst & Young Inc. in its capacity as the Monitor of the Canadian Debtors (the "**Monitor**").

15.     This Agreement is for the sole benefit of the Parties and their permitted assigns (and in the case of subparagraphs 2(c) and 2(d) and paragraphs 5 through 8 hereof for the benefit of the other Nortel Debtors) and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors.

16.     Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

17.     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction provided, however, that subparagraphs 13(a) through (d) hereof shall be governed exclusively by English law and subparagraphs 13(e) and (f) hereof shall be governed exclusively by French law.

18.     To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that

HIGHLY CONFIDENTIAL          NNC-NNL11773287 / 9

any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNL or any of the other Canadian Debtors, or the English Court if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law provided, however, that any claim, action or proceeding set forth in or on the basis of subparagraphs 13(a) through (d) hereof shall be brought exclusively in the English courts and any claim, action or proceeding set forth in or on the basis of subparagraphs 13(e) through (f) hereof shall be brought exclusively in the French courts.

19.    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 19.

20.    All notices and communications provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified for such Party in the Stalking Horse Agreement, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this paragraph 20. Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable. A copy of any notice or communication sent pursuant to this paragraph 20 shall also be sent to the Committee: c/o Akin Gump Strauss Hauer & Feld LLP Attention: Fred S. Hodara and Stephen B. Kuhn, Esq. One Bryant Park New York, New York 10036, U.S.A (Facsimile: +1 212 872 1002) and to the Monitor: Ernst & Young Inc., Ernst & Young

HIGHLY CONFIDENTIAL      NNC-NNL11773287 / 10

Tower Attn: Murray A. McDonald, 222 Bay Street, P. O. Box 251, Toronto, Ontario, Canada, M5K 1J7 (Facsimile: +1 416 943 3300).

21. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Facsimile and pdf signatures shall be deemed original signatures.

22. The obligations of NNC and NNL under this Agreement shall be joint and several. The obligations of NNI and the other U.S. Debtors party hereto shall be joint and several. The obligations of the EMEA Sellers under this Agreement shall be joint and several.

23. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

24. The Parties hereby agree that, except as specifically set forth in paragraphs 2, 3, 4, 7, 8, 9 and 10 hereof, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of the IP Sale Proceeds among the Nortel Parties. Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentages shall not in any way determine the final allocation or distribution of proceeds from the Transaction or otherwise bind the Parties in respect of the final allocation.

25. All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.

**[Signature pages immediately follow]**

11

HIGHLY CONFIDENTIAL    NNC-NNL11773287 / 11

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By: _____
    Name: John M. Doolittle
    Title: Senior Vice-President, Corporate
    Services and Chief Financial Officer


By: _____
    Name: Clarke E. Glaspell
    Title:   Controller

NORTEL NETWORKS LIMITED

By: _____
    Name: John M. Doolittle
    Title: Senior Vice-President, Corporate
    Services and Chief Financial Officer


By: _____
    Name: Clarke E. Glaspell
    Title:   Controller

NORTEL NETWORKS INC.


By: _____
    Name:
    Title:


NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.


By: _____
    Name:
    Title:

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:.

NORTEL NETWORKS LIMITED

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

NORTEL NETWORKS INC.

By: _____
    Name:
    Title:

NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.

By: _____
    Name:
    Title:

HIGHLY CONFIDENTIAL

NORTEL ALTSYSTEMS, INC.

By: _____
Name: John J. Roth
Title: Principal Officer

CORETEK, INC.

By: _____
Name: John J. Roth
Title: Principal Officer

QTERA CORPORATION

By: _____
Name: John J. Roth
Title: Principal Officer

XROS, INC.

By: _____
Name: John J. Roth
Title: Principal Officer

HIGHLY CONFIDENTIAL      NNC-NNL11773287 / 14

**SIGNED** for and on behalf of **Nortel**  )
**Networks UK Limited** (in administration)  )
by Christopher Hill as Joint Administrator  )
(acting as agent and without personal  )
liability) in the presence of;

Christopher Hill

Witness signature

Name:  JAN CORDELL  )
Address:  Ernst & Young LLP, 1 More  )
London Place, SEI 2AF

HIGHLY CONFIDENTIAL

*Niall Coveney*
*Under Power of*
*Attorney*
**SIGNED** for and on behalf of Nortel     *Granted*) *By*    _Niall Coveney_
Networks (Ireland) Limited (in           )    David Hughes
administration) by David Hughes as Joint   )
Administrator (acting as agent and without   )
personal liability) in the presence of: .

Witness signature
_____ )
Name:   PETER   FRIEL        )
Address:   c/o   ERNST   AND   YOUNG    )
          HARCOURT   CENTRE
          HARCOURT   STREET
          DUBLIN   2

SIGNED for and on behalf of Nortel  )
Networks S.A. (in administration and )
*liquidation judiciaire*) by Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence )
of:

..............................................
Christopher Hill

Witness signature

.............................................. )
Name:  JAN CORDELL  )
Address: Ernst & Young LLP, 1 More )
London Place, SE1 2AF

HIGHLY CONFIDENTIAL

SIGNED for and on behalf of Nortel        )
Networks France S.A.S. (in                )     .....................................
administration) by Kerry Trigg acting as  )     Kerry Trigg
authorised representative of Christopher  )
Hill as Joint Administrator (acting as agent
and without personal liability) in the
presence of:

Witness signature

.....................................        )
Name: TERESA ALLEN                           )
Address: Ernst & Young, 1 More London        )
Place, London SE1 2AF

**SIGNED** for and on behalf of **Nortel** )
**GmbH** (in administration) by Christopher )
Hill as Joint Administrator (acting as agent )
and without personal liability) in the )
presence of: )

    .......................................................
    Christopher Hill

Witness signature

.......................................................... )
Name:     JAN CORDELL )
Address: Ernst & Young LLP, 1 More )
London Place, SE1 2AF

**SIGNED** by Alan Bloom            )      ...........................................

                                            )      Alan Bloom

in his own capacity and on behalf of the Joint    )
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint
Administrators in the presence of:

Witness signature

....................................................................      )

Name:      WILMA GRAHAM          )

Address: Ernst & Young, 1 More London    )

Place, London SE1 2AF

Signed by MAÎTRE COSME ROGEAU,
acting in the capacity of *Mandataire*
*Liquidateur* of NORTEL NETWORKS S.A.
(IN ADMINISTRATION AND
LIQUIDATION JUDICIARE), without
personal liability and solely for the purpose of
obtaining the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the French Liquidator:

By:

Name: Maître Cosme Rogeau
Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

Name:
Address:

RAJEEV SHARMA FOWLER
F TPA
1BIS AVENUE FOCH 75116 PARIS
(FRANCE)

MAÎTRE COSME ROGEAU

SIGNED for and on behalf of NORTEL         )
NETWORKS S.A. (IN                          )
ADMINISTRATION AND                         )
LIQUIDATION JUDICIARE)                      )
by MAÎTRE COSME ROGEAU as                   )
*Mandataire Liquidateur* (acting as agent   )
and without personal liability) in the      )
presence of:                                )
Witness signature

Name:
Address:

RAJEEV SHARMA FOWLER
FTPA
1BIS AVENUE FOCH
75116 PARIS (FRANCE)

EXHIBIT A – EMEA Sellers

Nortel Networks UK Limited (in administration)
Nortel Networks S.A. (in administration and *liquidation judiciaire*)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S. (in administration)
Nortel GmbH (in administration)

HIGHLY CONFIDENTIAL

EXHIBIT B – Other Sellers

NN Applications Management Solutions Inc.
Nortel Altsystems, Inc. (previously "Alteon Networks, Inc.")
CoreTek, Inc.
Qtera Corporation
Xros, Inc.

\5947002

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL



EXHIBIT

21509

PENGAD 800-631-6989

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )    Case No. 09-10138(KG)
                                )
NORTEL NETWORKS, INC.,          )    Chapter 11
          et al.,               )
                                )    Jointly Administered
                                )
                                )    Courtroom 3
                                )    824 Market Street
          Debtors.             )    Wilmington, Delaware
                                )
                                )    July 11, 2011
                                )    9:30 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:            Morris, Nichols, Arsht & Tunnell
                            BY: DEREK ABBOTT, ESQ.
                            BY: ANN CORDO, ESQ.
                            1201 North Market Street
                            18th Floor
                            Wilmington, DE 19899-1347
                            (302) 351-9459

                            Cleary, Gottlieb, Steen & Hamilton
                            BY: LISA M. SCHWEITZER, ESQ.
                            BY: JAMES BROMLEY, ESQ.
                            BY: JUNE KIM, ESQ.
                            BY: EMILY BUSSIGEL, ESQ.
                            BY: JAMES CROFT, ESQ.
                            BY: MATTHEW VANEK, ESQ.
                            One Liberty Plaza
                            New York, NY 10006
                            (212) 225-2629

ECRO:                       GINGER MACE

Transcription Service:      DIAZ DATA SERVICES
                            331 Schuylkill Street
                            Harrisburg, Pennsylvania 17110
                            (717) 233-6664
                            www.diazdata.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service

2

APPEARANCES:
(Continued)

For the Committee:          Akin Gump
                            BY: DAVID BOTTER, ESQ.
                            BY: BRAD KAHN, ESQ.
                            BY: JOSHUA STURM, ESQ.
                            One Bryant Park
                            New York, NY 10036
                            (212) 872-1000

                            Richards Layton & Finger
                            BY: CHRIS SAMIS, ESQ.
                            One Rodney Square
                            920 North King Street
                            Wilmington, DE  19801
                            (302) 651-7531

For E&Y, Canadian           Allen & Overy, LLP
Monitor & Canadian          BY: KEN COLEMAN, ESQ.
Debtors:                    1221 Avenue of the Americas
                            New York, NY 10020
                            (212) 610-7300

For Bondholder Group:       Milbank Tweed Hadley McCloy
                            BY: CINDY CHEN DELANO, ESQ.
                            One Chase Manhattan Plaza
                            New York, NY  10005-1413
                            (212) 530-5885

For U.S. Trustee:           Office of the U.S. Trustee
                            BY: PATRICK TINKER, ESQ.
                            J. Caleb Boggs Federal Bldg.
                            844 King Street, Suite 2207
                            Wilmington, DE 19801
                            (302) 573-6491

For Nokia:                  Werb & Sullivan
                            BY: DUANE D. WERB, ESQ.
                            300 Delaware Ave, Ste.1300
                            Wilmington, DE  19801

                            Alston & Bird, LLP
                            BY: JOHN C. WEITNAUER, ESQ.
                            One Atlantic Center
                            1201 West Peachtree Street
                            Atlanta, GA  30309-3424
                            (404) 881-7780

3

APPEARANCES:
(Continued)

For Thomas Betts:           Morris James, LLP
                            BY: CARL N. KUNZ, III, ESQ.
                            500 Delaware Ave., Ste.1500
                            Wilmington, DE

For HP:                     Gibbons PC
                            BY: NATASHA SONGONUGA, ESQ.
                            One Gateway Center
                            Newark NJ  07102-5310
                            (973) 596-4537

For Microsoft:             Brown Stone Nimeroff, LLC
                            BY: JAMI NIMEROFF, ESQ.
                            Two Commerce Square
                            2001 Market Street, Suite 3420
                            Philadelphia, PA  19103
                            (267) 861-5335

For Apple, Inc.:           Weil Gotshal & Manges, LLP
                            BY: MARCIA GOLDSTEIN, ESQ.
                            767 Fifth Avenue
                            New York, NY  10153

                            Cole Schotz Meisel Forman & Leonard
                            BY: SANJAY BHATNAGAR, ESQ.
                            900 Third Avenue, 16th Floor
                            New York, NY

For International
Data Group:                 Potter Anderson & Carroon, LLP
                            BY: R. STEPHEN MCNEILL, ESQ.
                            1313 North Market St., 6th Fl.
                            Wilmington, DE  19801

For IEE:                    Dorsey & Whitney, LLP
                            BY: ERIC LOPEZ SCHNABEL, ESQ.
                            1105 North Market St., Ste.1600
                            Wilmington, DE  19801
                            (302) 425-7162

APPEARANCES:
(Continued)

For Ad Hoc Committee of
Deferred Comp Plan
Beneficiaries:                    Blank Rome, LLP
                                  BY: BONNIE GLANTZ FATELL, ESQ.
                                  1201 Market Street, Ste. 800
                                  Wilmington, DE  19801
                                  (302) 425-6423

                                  Bernstein Shur
                                  BY: ROBERT KEACH, ESQ.
                                  100 Middle Street
                                  Portland, ME  04104-5029
                                  (207) 228-7334

For Rockstar Consortium:  Paul Weiss Rifkind Wharton &
                          Garrison, LLP
                          BY: STEPHEN J. SHIMSHAK, ESQ.
                          BY: DIANE MEYERS, ESQ.
                          1285 Avenue of the Americas
                          New York, NY  10019-6064
                          (212) 757-3000

For Quest Corporation:    Reed Smith, LLP
                          BY: TIMOTHY REILEY, ESQ.
                          1201 Market St., Ste. 1500
                          Wilmington, DE  19801

For Special Counsel to
RRI:                              Benesch Friedlander Coplan &
                                  Aronoff, LLP
                                  BY: RAYMOND H. LEMISCH, ESQ.
                                  222 Delaware Avenue, Ste. 801
                                  Wilmington, DE  19801-1611
                                  (302) 442-7005

For Anister:              Campbell & Levine, LLC
                          BY: AYESHA S. CHACKO, ESQ.
                          800 North King St., Ste. 300
                          Wilmington, DE  19801
                          (302) 426-1900

5

APPEARANCES:
(Continued)

For SCI Brookville:  Drinker Biddle & Reath, LLP
         BY: JOSEPH N. ARGENTINA, JR.
         One Logan Square, Ste. 2000
         Philadelphia, PA  19103-6996
         (215) 988-2541

         Drinker Biddle & Reath, LLP
         BY: ROBERT K. MALONE, ESQ.
         500 Campus Drive
         Florham Park, NJ  07932-1047
         (973) 549-7080

TELEPHONIC APPEARANCES:

For Morgan Stanley:  Morgan Stanley
         BY: COLIN ADAMS, ESQ.
         (212) 761-1620

For Solus, LP:  Solus, LP
         BY: STEPHEN BLAUNER, ESQ.
         (212) 373-1562

For PSAM:  PSAM, LP
         BY: PHILIP E. BROWN,ESQ.
         (212) 649-9596

For Turner Broadcasting: Vorys Sater Seymour & Pease, LLP
         BY: TIFFANY S. COBB, ESQ.
         (614) 646-8322

For Oracle America:  Magnozzi & Kye, LLP
         BY: AMISH R. DOSHI, ESQ.
         (516) 299-5556

For Nortel Networks:  Cleary Gottlieb Steen & Hamilton
         BY: MEGAN FLEMING-DE LA CRUZ, ESQ.
         (212) 225-2108

For Paul Weiss:  Paul Weiss Rifkind Wharton &
         Garrison, LLP
         BY: ANDREW HENNIGAR, ESQ.
         (212) 373-3167

TELEPHONIC APPEARANCES:
(Continued)

For Official Committee
of Unsecured Creditors:    Akin Gump Strauss Hauer & Feld, LLP
                           BY: FRED S. HODARA, ESQ.
                           (212) 872-8040

For Verizon:               Arnall Golden & Gregory, LLP
                           BY: DARRYL LADDIN, ESQ.
                           (404) 873-8500

For Apple, Inc.:           Weil Gotshal & Manges, LLP New
                           BY: CHRISTOPHER G. LINDEN, ESQ.
                           (212) 310-8292

For Barclay's Capital:     Barclays Capital, Inc.
                           BY: OLIVIA MAURO, ESQ.
                           (212) 412-6773

For Victoria Nassi:        Victoria Nasi, In Pro Per/Pro se
                           (415) 860-2525

For Trustee of Nortel
Networks UK Pension:       Willkie Farr & Gallagher, LLP
                           BY: BRIAN O'CONNOR, ESQ.
                           (212) 728-8000

For B.J. Watrous:          B. J. Watrous, In Pro Per/ Pro Se
In Propria Persona         (408) 862-4148

1

7

1    <u>WILMINGTON, DELAWARE, MONDAY, JULY 11, 2011, 9:33 A.M.</u>

2      THE COURT: Good morning, everyone. Thank you,

3 please seated. Mr. Abbott, good morning.

4      MR. ABBOTT: Good morning, Your Honor. Derek

5 Abbott here for the U.S. debtors.

6      Your Honor, we're here in an omnibus hearing day

7 and there's quite a bit on and following on with a joint

8 hearing that we understand will start at 10:00.

9      THE COURT: That's correct.

10      MR. ABBOTT: Your Honor, obviously, that's sort

11 of the big show today and there are a lot of people here for

12 that. What we had hoped to do, Your Honor, was tackle a

13 couple of these U.S. items first. We're going to jump

14 around a little bit to facilitate getting the appropriate

15 orders couriered over and things like that --

16      THE COURT: Of course.

17      MR. ABBOTT: -- if we may, Your Honor.

18      THE COURT: Absolutely.

19      MR. ABBOTT: So what I would like to do, Your

20 Honor, if possible is cede the podium to Ms. Kim to deal

21 with Item No. 10.

22      THE COURT: All right.

23      MR. ABBOTT: If I may.

24      THE COURT: Thank you, Mr. Abbott. Good morning,

25 Ms. Kim.

8

1        MS. KIM: Good morning, Your Honor. For the

2 record, June Kim, Clearly, Gottlieb, Steen & Hamilton on

3 behalf of the debtors.

4        THE COURT: Yes.

5        MR. ABBOTT: Your Honor, as you are aware in

6 December 2010, the debtors filed a motion for turnover of

7 the assets in a rabbi trust relating to the debtors'

8 deferred compensation plan. And many of the plan

9 participants objected to the debtors having engaged in

10 discovery with the plan participants. And at this point,

11 the debtors have made a significant production of documents,

12 although the production is not yet quite complete. And as

13 attested by the motion to compel that would have been up for

14 hearing today, there are some outstanding issues in dispute.

15        Nevertheless, the debtors believe that it would

16 be worthwhile at this point to engage in settlement

17 discussions with beneficiaries concerning the turnover

18 motion. Mr. Keach and Ms. Fatell are in the courtroom and

19 able to speak on behalf of their clients, but the -- suffice

20 it to say, the beneficiaries agreed to engage in settlement

21 discussions with the debtors. And the parties also agreed

22 to that it would make sense to ask the court to appoint a

23 mediator to assist in the settlement discussions. The

24 parties agreed on the selection of a proposed mediator.

25        THE COURT: Okay.

9

1          MS. KIM:  And would propose the appointment of

2   Jacob Esher of Mediation Works, Incorporated.  I understand

3   from Mr. Esher that he has cleared conflicts and is

4   available to mediate this dispute.

5          The debtors further agree to pay the costs of

6   mediation given that Mr. Keach and Ms. Fatell's clients are

7   individual former and current employees of the debtors.  And

8   the parties have agreed on a proposed order appointing a

9   mediator which if Your Honor would allow me to approach, it

10  might be helpful to have it in front of you.

11         THE COURT:  Of course.  Yes, Ms. Kim, thank you.

12  Thank you.  The order is certainly acceptable to me, Ms.

13  Kim.

14         MS. KIM:  Thank you, Your Honor.  I just wanted

15  to point out that in addition to what I just discussed, the

16  order also deals with certain documents that the --

17         THE COURT:  Yes.

18         MS. KIM:  -- debtors have agreed to produce

19  solely for the purposes of mediation.  And also raises a

20  possibility that the beneficiaries may ask that members of

21  their steering committee may require access to certain

22  documents that the debtors have designated as attorney's

23  eyes only for the purpose of engaging in the mediation.  And

24  the parties have agreed to endeavor in good faith with

25  respect to any such requests, as well as, any further

A

TR21509

10

1  requests by the beneficiaries for additional documents or

2  information and contains a general reservation of rights.

3  And finally, the order contains adjournment dates for the --

4        THE COURT:  Yes.

5        MS. KIM:  -- motion to compel, as well as, the

6  underlying turnover motion.

7        THE COURT:  Exactly.

8        MS. KIM:  And the debtors believe that mediation

9  of the underlying dispute and the hopes of reaching a

10  consensual resolution would be a good use of the debtors'

11  resources and preferable to actively litigating the matter

12  at this time and would request that this Court enter the

13  proposed order and appoint a mediator.

14        And if Your Honor has any questions, I'd be happy

15  to answer them, otherwise I would cede the podium to Mr.

16  Keach and Ms. Fatell.

17        THE COURT:  All right, thank you.  Good morning,

18  good to see you.

19        MR. KEACH:  Good morning, Your Honor.  Robert

20  Keach for the ad hoc group of beneficiaries.

21        I'll be very brief.  We were able, the debtors

22  did reach out and suggest settlement discussions.  We were

23  obviously happy to engage in settlement discussions.  There

24  have been ongoing efforts at completing discovery.  We have

25  been very -- been able to be very cooperative in some

1    respects and have been reaching an impasse in other

2    respects, but we have agreed to do enough we think to have a

3    meaningful mediation. As you'll note in the order, we have

4    reserved the right to come back here if we need to in order

5    to get additional documents necessary for the mediation

6    effort, but we're comfortable at this point that we have

7    enough to go forward and if we need to come back, we will.

8                THE COURT: All right.

9                MR. KEACH: Barring any questions, Your Honor,

10   we're happy with a form of order. I would note that Mr.

11   Horne from the ad hob group is in the phone. The ad hoc

12   group has seen the form of order. It has also signed off on

13   it as well.

14               THE COURT: Excellent.

15               MR. KEACH: Thank you, Your Honor.

16               MR. HORNE: Good morning, Your Honor.

17               THE COURT: Good morning, Mr. Horne.

18               MR. HORNE: How are you?

19               THE COURT: Very well. How are you today?

20               MR. HORNE: Fairly well, sir, and thank you for

21   the purpose here. I will not speak anymore unless spoken to

22   by attorneys because I know that is the correct way to do

23   it.

24   (Laughter)

25               THE COURT: All right, Mr. Horne, thank you, sir.

A

TR21509

12

1    I appreciate it.  Anyone else wish to be heard with respect

2    to the proposed order?

3    (No audible response.)

4            THE COURT:  All right.  Well I won't say too much

5    either.  I think that it's certainly always helpful to have

6    mediation in a dispute.  And if I can be at all helpful in

7    the process in one way or another, please don't hesitate to

8    call upon me in the meantime, but otherwise, I'm going to

9    sign the order and wish you all good luck.

10           MS. KIM:  Thank you, Your Honor.

11           MR. ABBOTT:  Your Honor, we thought we'd next

12   address the pre-trial status conferences with respect to the

13   adversary proceedings.  I think that was Item 12 on the

14   agenda.  I'm not -- I forget which item but, Your Honor,

15   Matt Vanek from Cleary will be presenting at least that

16   scheduling order and discussing the status, if I may, Your

17   Honor.

18           THE COURT:  All right, all right.

19           MR. ABBOTT:  Thank you.

20           THE COURT:  Thank you, Mr. Abbott.

21           MR. VANEK:  Good morning, Your Honor.

22           THE COURT:  Good morning.

23           MR. VANEK:  Good morning.

24           THE COURT:  Do you by any chance know the number

25   on the agenda?

13

1          MR. VANEK:  I do, let me just --

2          MR. ABBOTT:  It is 12.

3          MR. VANEK:  12.

4          THE COURT:  There it is.  I'm sorry, of course.

5          MR. VANEK:  Right.  For the record, Your Honor,

6    Matt Vanek for Clearly Gottlieb --

7          THE COURT:  You're welcome.

8          MR. VANEK:  -- of Clearly Gottlieb for the

9    debtors.

10          So, Your Honor, the debtors are here today for an

11    initial pre-trial scheduling conference in four adversary

12    proceedings seeking to avoid and recover preferential

13    transfers --

14          THE COURT:  Yes.

15          MR. VANEK:  -- by the debtors, Nortel Networks,

16    Inc., and Nortel Networks (CALA).  At the outset, I would

17    draw your attention to one change that has taken place

18    subsequent to the filing of the agenda and that is that one

19    of the matters scheduled for today has come off the agenda

20    and I have a revised form of order and a black line that I

21    could hand up if I may approach.

22          THE COURT:  You certainly may, thank you.  Good

23    morning.  Thank you.

24          MR. VANEK:  And as Your Honor will see, the only

25    change is that the action against Thomas & Betts

A

TR21509

14

1   Manufacturing has come off and that no dates or other

2   substantive provisions have changed.  With respect to Thomas

3   & Betts, it's by the agreement of the parties, that action

4   has been adjourned to a later pre-trial date.

5           THE COURT:  All right.

6           MR. VANEK:  A few other points on the cases that

7   are going forward.  With respect to the Anixter preference -

8   -

9           THE COURT:  Yes.

10          MR. VANEK:  -- that case has been resolved in

11  principal and is -- the settlement papers are now being

12  finalized.  Pending that, at the request of Anixter, I would

13  make the following representations on the record.

14          That Anixter de Mexico which is a foreign

15  defendant will not be expected to answer pending

16  finalization of those -- of the settlement.  And second,

17  that the deadlines in the scheduling order are subject to

18  extensions by agreement between the parties obviously and

19  that the debtors will not unreasonably withhold their

20  consent to such extensions pending that finalization.

21          And as noted on the agenda in addition, Your

22  Honor, the case against Telmar Network Technology has been

23  adjourned to a September 6, pretrial.

24          And with regard to the McCann matter, the debtors

25  do not intend to seek entry of a scheduling order in that

15

1   matter as well.  And just to give, just by way of

2   background, although Cleary is not counsel in the McCann

3   matter, just for expediency sake, it's my understanding that

4   the Court has previously entered a scheduling order in that

5   case --

6            THE COURT:  Yes.

7            MR. VANEK:  -- but that McCann has asserted a

8   conduit defense.  Other parties have been added to that

9   action.  There are now dispositive motions pending on behalf

10   of some of those defendants and not all -- and in addition,

11   not all parties have yet been served.  So the parties

12   believe it is premature to seek entry of a scheduling order

13   with regard to that matter.  If you have any questions on

14   that, I would defer to my colleague at Morris Nichols.

15            And additionally, three -- this is also as noted

16   on the agenda.  Three additional matters that will not go

17   forward today.  Those are Kinnarps Project Solutions,

18   Spellbound Media, and Copula Teleservices and those are

19   foreign defendants who have not yet been served and so they

20   will go forward at a later date.

21            And finally, Your Honor, as noted on the agenda,

22   there is a separate proposed scheduling order that will be

23   submitted under a certification of counsel with -- in the

24   SCI Brockville --

25            THE COURT:  Yes.

1        MR. VANEK:  And with that, just briefly on the

2   order, Your Honor.  This is -- as we've done in the past,

3   the debtors have sent out to all defendants copies of this -

4   - copies of the proposed form of order in advance of today's

5   conference.  And this order mirrors six previous scheduling

6   orders that have been entered in respect to the avoidance

7   actions in these cases beginning in January of this year and

8   there are no substantive deviations from those previous

9   scheduling orders.  And this -- and as we've explained in

10  the past, this -- that the proposed form of order closely

11  tracks, Your Honor's form scheduling order with a few minor

12  variations.  I'm happy to walk through those if you like,

13  but unless --

14        THE COURT:  They were acceptable, those few

15  changes.

16        MR. VANEK:  Okay.

17        THE COURT:  Yes.

18        MR. VANEK:  So unless Your Honor has any other

19  questions, we would ask for entry of this order.

20        THE COURT:  All right, thank you.  Anyone else

21  with to be heard?

22  (No audible response.)

23        THE COURT:  All right.  I am going to sign --

24  I'm sorry.

25        MR. CRAPRO:  This is David Crapo for Hewlett

17

1  Packard.

2         THE COURT:  Yes, sir, good morning.

3         MR. CRAPO:  Good morning.  I had submitted or I

4  received a copy of the order which I had submitted to my

5  client pushing some of the deadlines out by about 20 to 30

6  days.  I had not heard back before -- from the client before

7  now.  I'd like to get that resolved before an order is

8  entered.

9         MR. ABBOTT:  Your Honor, may I have a short

10 moment?

11        THE COURT:  You may, Mr. Abbott, certainly.  Mr.

12 Abbott?

13        MR. ABBOTT:  Your Honor, Derek Abbott on behalf

14 of the Nortel debtors, Your Honor.  We're representing the

15 debtors with respect to HP matters.

16        THE COURT:  Right.

17        MR. ABBOTT:  Your Honor, I was unaware of Mr.

18 Crapo's request.  My suggestion would be that we simply

19 carve them out of this order today.  We'll work with them to

20 either come to a consensual order or be back in front of the

21 Court arguing competing forms of order, but we're not

22 prepared to do that today if that would be acceptable.

23 That's maybe the quickest way to resolve that.

24        THE COURT:  Mr. Crapo is that acceptable to you

25 as well?

1          MR. CRAPO:  That is acceptable to me, Judge

2    Gross.

3          THE COURT:  All right, good.  And let me just

4    say, you know, I am fairly liberal in making adjustments to

5    these scheduling orders as the need arises.  But I

6    understand it's hopeful that you'll reach a consensual form

7    of order.  So why don't I just take Hewlett Packard off the

8    caption.  Would you like me to do that?

9          MR. ABBOTT:  I think that makes perfect sense,

10   Your Honor.

11          THE COURT:  Okay.  So we're just taking that case

12   off this caption and then I will sign the order.

13          MR. ABBOTT:  Thank you, Your Honor.

14          MR. CRAPO:  Thank you, Your Honor.

15          THE COURT:  Certainly.

16          MS. COBB:  Your Honor?

17          THE COURT:  Yes.

18          MS. COBB:  This is Tiffany Cobb with the Vorys

19   Law Firm on behalf of Turner Broadcasting Sales, TNN, and

20   Time.

21          If I may briefly speak to the McCann adversary.

22   As counsel for the Nortel debtors stated among other things

23   that additional parties have been added, my clients have

24   filed a recent motion in which that very issue is in

25   dispute.  And I just wanted for clarity sake to make

19

1   reference to that on the record.  I think it's premature to

2   have that argued, but I did want to note that there is an

3   issue with that with whether or not my clients have been

4   added or other parties have been added under the federal

5   rules.

6           MR. VANEK:  Yeah, I would actually defer to my

7   colleague at Morris Nichols on that question.

8           THE COURT:  Ms. Cordo, good morning.

9           MS. CORDO:  Good morning, Your Honor.  For the

10  record, Annie Cordo of Morris, Nichols, Arsht & Tunnell on

11  behalf of the debtors.

12          We are representing Nortel with regards to the

13  McCann Erickson adversary proceedings.  On that, those

14  motions that were filed is actually one of the reasons we're

15  deferring entry of the scheduling order until those are

16  resolved.  And then once all that is resolved, we'll have a

17  scheduling order entered for those additional defendants.

18          THE COURT:  All right.  Thank you, Ms. Cordo.

19          MS. CORDO:  Thank you.

20          MS. COBB:  Thank you, Your Honor.

21          THE COURT:  Yes, thank you.  Anyone else?

22  (No audible response.)

23          THE COURT:  All right.  I better sign the order

24  before someone speaks up.

25  (Laughter)

20

1            MR. VANEK:  Thank you very much, Your Honor.

2            THE COURT:  Thank you.  Ms. Cordo, good morning,

3    again.

4            MS. CORDO:  Good morning, again, Your Honor.  Now

5    we're jumping back forward in the agenda to Items 7 and 8.

6            THE COURT:  All right.

7            MS. CORDO:  And those are the debtors' nineteenth

8    omnibus objection to claims and --

9            THE COURT:  Yes.

10           MS. CORDO:  -- the debtors' motion for entry of

11   an order deeming claims, certain claims satisfied.  With

12   regard to those, I have supplemental orders.  On the

13   nineteenth omnibus objection, it is the second supplemental

14   order.  And this time we are -- we agreed with Security

15   Services USA to reduce the amount of their claim to $7,900 -

16   - sorry, $97,640.35.  And then we are adjourning the hearing

17   with regards to the Claim 880 filed by Corning, Incorporated

18   and Claim 7406 filed by Receivable Management Services

19   Corporation on behalf of Dunn & Bradstreet.  And those are

20   the only matters that with regards to the nineteenth omnibus

21   objection.

22           THE COURT:  All right.

23           MS. CORDO:  With the first supplemental order

24   authorizing that certain claims have been deemed satisfied,

25   we have reached an agreement with Alternate Communications