1    International, Ltd.  And they have agreed that that claim

2    has been satisfied as identified in the exhibit in the

3    amount of $17,010.  And we are adjourning the motion with

4    regards to Claim 3007 filed by BT Americas, Inc.

5              THE COURT:  All right.

6              MS. CORDO:  If I may approach with the forms of

7    order?

8              THE COURT:  You certainly may.  Thank you, Ms.

9    Cordo.  Thank you.  All right.  Does anyone else wish to be

10   heard with respect to these motions?

11   (No audible response.)

12             THE COURT:  All right, hearing no one, I'm

13   signing the order.

14             MS. CORDO:  Thank you, Your Honor.

15             THE COURT:  The orders, I should say.

16             MS. CORDO:  Thank you.  And I believe that is the

17   last U.S. only matter we have before the jo8int hearing.

18             THE COURT:  All right.  And I think the timing is

19   good.  I'm going to take a brief recess and go back and just

20   coordinate the timing with Justice Morawetz and then I'll be

21   back out further, I hope.  Thank you, Counsel.

22   (Recess from 9:54 a.m. to 10:18 a.m.)

23             THE CLERK:  Please rise.

24             THE COURT:  Good morning, again, everyone.  Thank

25   you and please be seated.  Good morning Justice Morawetz.

22

1          JUSTICE MORAWETZ:  Good morning, Judge Gross.

2    And I hope that everybody can hear me in your courtroom in

3    Delaware this morning.

4          THE COURT:  We can hear you.  It's slightly

5    garbled, but we can at least hear better, I think.

6          JUSTICE MORAWETZ:  Hopefully, that will improve

7    matters.

8          THE COURT:  It certainly does, thank you.

9          JUSTICE MORAWETZ:  Good morning, Counsel in

10   Toronto and in Wilmington.  As with previous hearings, these

11   are being conducted in accordance with the cross border

12   protocol that has previously been approved by the Courts.

13   Judge Gross and I have had the opportunity to consult with

14   respect to the procedures for this morning.  And I think

15   consistent with what we have done in the past, unless there

16   are other arrangements that the parties wish to present, it

17   would start with proceedings in Delaware.  And after the

18   submissions have been completed there, there would be

19   submission in this Court, followed by a break where both

20   Judge Gross and I would then consult with one another on the

21   future direction.  Mr. Tay, does that sound fine with your

22   group?

23          MR. TAY:  That's fine.

24          THE COURT:  No parties objecting here.  Judge

25   Gross, over to you.  Thank you very much.

1          THE COURT: Thank you, Justice Morawetz. Ms.

2   Schweitzer, good morning.

3          MS. SCHWEITZER: Good morning, Your Honors, Judge

4   Gross and Mr. Justice Morawetz. Before we begin with the

5   big show I believe as Derek Abbott called it, I want to

6   thank you both for making the time on your calendars to have

7   the joint hearing today.

8          THE COURT: Absolutely.

9          MS. SCHWEITZER: I know Mr. Justice Morawetz is

10  in from a well deserved vacation otherwise and I know there

11  was a lot of reshuffling so thank you. When we asked for

12  adjournment, we believed that by adjourning the auction date

13  and the hearing date, that we'd be able to realize more

14  value for the assets. And hopefully, the proof is in the

15  pudding today that we're happy with the result.

16         THE COURT: Yes.

17         MS. SCHWEITZER: So as you're aware, we're

18  seeking the approval of the sale of the patents which is the

19  last of the major Nortel assets. We'll remind everyone that

20  two years ago this month, we were before of the Courts to

21  seek approval of the CDMA business. There we had a stalking

22  horse purchase price of about $650 million. And as you'll

23  remember, Mr. Bromley told you that we had an auction in

24  Cleary and the sun was setting, the Statue of Liberty, you

25  know, backdrop --

1   (Laughter)

2           MS. SCHWEITZER:  -- and at the close of auction

3   there, we had nearly doubled the purchase price to $1.13

4   billion.  So it's been a long two years and we've had a lot

5   more suns rising and setting and the Cleary auctions.  But

6   you'll recall we had the Enterprise auction, again we had

7   doubled the purchase price to $900 million.  And a series of

8   quite successful auctions that led us to raise about $3

9   billion in gross proceeds at the time.  And at this point,

10  we've now successfully transitioned those businesses over to

11  the buyers and are winding off the TSA's, their transition

12  services agreements.  We've saved also several hundred --

13  several tens of thousands of jobs in the process by having

14  people transfer over to buyers.

15          And we come to seek the approval of the last big

16  sale which was started with a solicitation of interest last

17  year that ultimately led to the announcement of the stalking

18  horse bid to Ranger, Inc., a subsidiary of Google, Inc., for

19  a stalking horse bid of $900 million.

20          Now, Judge Gross, I thought this was going to be

21  one of the more interesting things on your docket this

22  month, but of course, that was before major league baseball

23  came to town so.

24          THE COURT:  Yes.

25  (Laughter)

A

1          MS. SCHWEITZER:  We'll have to use the metaphor

2    there.  We think we've hit a homerun.  We're in the grand

3    slam mode here.  But in seriousness, we're very pleased with

4    the results of auction.  It's been record breaking both in

5    terms of this case and in terms of the patent industry

6    generally.  I understand and have been told that this is the

7    largest sale of patents desegregated from a business at over

8    6,000 patents both in terms of numbers of patents and in the

9    size of the sale, both at their original price and certainly

10   at the final price.  At $900 million it's also the highest

11   stalking horse bid in the case.

12          THE COURT:  Yes.

13          MS. SCHWEITZER:  It was the largest number of

14   qualified bidders.  We had five qualified bidders

15   participating at auction.  And for better or for worse, the

16   longest auction also, four days, long days and into the

17   evenings often.  Most rounds of bidding at 19 rounds of

18   bidding where bids were accepted.  And it all ended with the

19   highest final sale price of $4.5 billion with a bid from

20   Rockstar which of course instead of merely doubling the

21   stalking horse prices we've done in the past, actually more

22   than doubled the total proceeds realized from the asset

23   sales throughout the bankruptcy process.  So wow, right?

24          THE COURT:  Um-hum.

25          MS. SCHWEITZER:  So while the estates may not

26

1   agree on everything these days, I think we all agree that

2   the use of the U.S. auction style procedures and the 363

3   process certainly has been effective in this case for

4   realizing value for the Nortel debtors and for our creditors

5   and estates worldwide.

6          And so as Your Honor's indicated you prefer, what

7   we will do today in bringing the sale forward is to start in

8   the United States with our affirmative case.  To go through

9   the agreement, the law, and then turn it over to Canada for

10   their affirmative case.  We're at the point where we've

11   resolved most if not all the objections.  I'm hearing about

12   the last ones as they're mumbling in the background.  There

13   might be one or two still standing that we consider

14   secondary to the larger process.  So after we both do our

15   affirmative cases, we'll come back to the United States

16   where I can walk you through the objections that have been

17   resolved and address any that still remain.

18          THE COURT:  Okay.

19          MS. SCHWEITZER:  And then we'll turn it back to

20   Canada to do the same.

21          THE COURT:  That makes sense.

22          MS. SCHWEITZER:  So to start with, what we're

23   seeking approval today.  We're obviously seeking approval of

24   the asset sale agreement that was filed as the successful

25   bid.  It's been sold to the consortium known as Rockstar

A

1  Bidco.  It's not often you get to work with rock stars.

2  (Laughter)

3           THE COURT:  No.

4           MS. SCHWEITZER:  So it's been quite a fun

5  auction.  The members of the Rockstar's consortium, each

6  Rockstar's on their own consist of Apple, Research in Motion

7  or RIM, EMC Corporation, Erickson, Sony, and Microsoft.  And

8  they formed a consortium through the bidding process that

9  ultimately wound up being -- leading to the bid, put in with

10 Rockstar Bidco as the purchaser.

11          The assets being sold consist of Nortel's

12 residual patents and certain related assets.  There are over

13 6,000 patents and patent applications being sold that span

14 different areas of wireless telephone use and internet

15 search social networking and all sorts of things.

16          The purchase price as we said is $4.5 billion.

17 There are no purchase price adjustments similar to the

18 business sales.  It's a flat price to be delivered.  And in

19 this case because of the joining of the two bidders, the

20 good faith deposit now that the debtors have in our

21 possession is $54 million instead of $27 million so the

22 difference is what will be paid at closing.

23          In the U.S., the debtor sellers are Nortel

24 Networks, Inc., or NNI.  We have NN -- Applications

25 Management Solutions, Inc., Nortel Alt Systems, Inc.,

1   CoreTech, Cutera [ph] Corporation, and Kyros and they're all

2   listed in the sale agreement, but just so everyone knows

3   who's involved.

4          THE COURT:  Yes.

5          MS. SCHWEITZER:  Compared to the stalking horse

6   agreement, they're a few changes that are more material and

7   considered improvements in all regard.  First of all, well

8   of course the purchase price.  Beyond that, the $45 million

9   indemnity that was purchaser favorable in the original

10  stalking horse agreement has been removed.  So there's no

11  again post closing adjustment to the price or escrow of the

12  price.

13         The seller disclosure schedules have been

14  updated.  These are the lists of the known licenses that

15  we've identified for the purchaser.  They've been updated to

16  include different licenses that either we've fixed technical

17  errors or have otherwise clarified or surfaced since the

18  signing of the original stalking horse agreement.

19         And we also changed the definition of permitted

20  encumbrances to address certain objections and I'll get to

21  that when we talk about the objections what the changes have

22  been and we'll introduce that into the record.  The closing

23  is no longer subject to come by the purchaser to any of what

24  we call mandatory regulatory approvals.  In plain English,

25  there's no HSR risk.  There's no anti-trust risk to the

1    deal.

2            In this -- this agreement also differs from the

3    stalking horse agreement in that there's a different

4    mechanic.  That prior to closing, the seller at the

5    purchaser's request can deliver a license in addition just

6    to the conveyance of the assets that will be delivered

7    immediately prior to the closing of the sale.  And a certain

8    portion of the purchase price up to $1 billion can be

9    designated towards that license.  So while it's a different

10   mechanic that it might be a license and then we immediately

11   convey the licensor's rights and that license over with the

12   rest of the assets, plus the conveyance of the sale.  So the

13   sellers, we consider this the same in the end as just the

14   sale of assets for the total consideration coming back in.

15   It doesn't affect the purchase price, it's just a mechanic

16   that creates some tax advantages for the purchasers.

17           The sellers have entered into a side letter

18   related to that different structure and I'll get to that

19   again later on.  And also the -- since the time that the

20   successful bid was filed, the purchaser has approached us

21   with a possibility of requesting an increase on the

22   percentage of the purchase price that could be designated

23   over towards the license to $1.5 or $2 billion.  That's

24   under consideration by the sellers.  We don't believe we

25   need to come back to the Courts for further approval if we

1  were to move the designation over because again, it's not

2  affecting the total proceeds.  And as for tax reasons on the

3  purchaser's side rather than providing the sellers with more

4  consideration, so we'll respond to that request in time.

5          To go through more changes compared to the

6  stalking horse agreement, there's no break fee or expense

7  reimbursement payable obviously, to Rockstar.  By accepting

8  this bid, the break fee becomes due and payable to Ranger,

9  Inc., as the stalking horse purchaser at closing.  And it

10  gets paid from the closing proceeds.  And the sellers have

11  now terminated the stalking horse agreement with Ranger,

12  Inc., having accepted this alternative transaction.

13          So in more -- I think there's a more detailed

14  summary of the changes to the sale agreements.  Some of the

15  secondary changes that was in the monitor report.  It's the

16  seventy-first report of the monitor --

17          THE COURT:  Yes.

18          MS. SCHWEITZER:  -- that's on the docket under

19  5881 in the U.S. Court.  So without walking through the rest

20  of them, I just wanted to highlight some of the bigger ones.

21          As Your Honors are also aware and as we described

22  in the original hearing to approve the bidding procedures,

23  that the sale here contains certain license non-renewal

24  procedures in Paragraph 28 of the sale order where the

25  debtors as part of the sale agree that we're not going to

31

1   the extent that the patents are now conveyed and we have

2   licenses that are not being assigned over, that we're not

3   going to voluntarily extend, modify, enhance those licenses

4   beyond whatever we're actually required to do in order for

5   the purchaser to be able to enjoy the full value of their

6   assets.

7          There have been no objections to that procedures

8   other than there was one by Microsoft which has since been

9   withdrawn.  So they've gone through.  We don't think they're

10  objectionable.  They haven't been objected to, but just

11  because they're non-traditional or non-standard, we wanted

12  to highlight that for you.  And the terms of the provisions

13  is Paragraph 28 of the U.S. sale order unchanged from their

14  original order that was filed way back in April.

15         The sale agreement also -- and the related orders

16  have a right to assume and assign contracts over to the

17  purchaser.  At this time, no contracts have been designated

18  for assumption and assignment over.  Again, this isn't a

19  business conveyance so we don't have the same supplier and

20  customer contracts going over.  We've left in the mechanism

21  so that we have the right to do so if something does come up

22  and we need to convey it over, we'll follow those

23  procedures.  But as of now, no notices have been given.

24  Certain people had asked for that specifically to be

25  clarified.

32

1        The -- obviously the -- all the motions and

2   notices of the successful bid, notice of the adjournment of

3   auction all have been properly noticed in accordance with

4   the bidding procedures.

5        THE COURT:  Yes.

6        MS. SCHWEITZER:  Sent to creditors and

7   counterparties to licenses as set forth as what we were

8   required to do.  There's also publication notice given of

9   the sale as we've done in prior cases.

10       We have in the courtroom today two willing to

11  testify and support of this sale, Mr. David Descoteaux who's

12  the Managing Director at Lazard.  And also, George Riedel

13  who's the Chief Strategy Officer of Nortel Networks.  I

14  don't believe -- their testimony is certainly while

15  important, I don't believe relates to any of the pending

16  objections, it relates more generally to the sale.  So what

17  I would propose to do is proffer their testimony rather than

18  call them to the stand unless there's any objection.

19       THE COURT:  Does anyone object to a proffer of

20  the testimony of Mr. Descoteaux and Mr. Riedel?

21  (No audible response.)

22       THE COURT:  All right.  Hearing no one, you may

23  proceed then, Ms. Schweitzer.

24       MS. SCHWEITZER:  Thank you, Your Honor.

25       THE COURT:  So, first, we'll proffer the

33

1    testimony of Mr. David Descoteaux who's the Managing

2    Director at Lazard.  And Lazard is the financial advisors to

3    the directors.  And as I said, Mr. Descoteaux is in the

4    courtroom and available to testify today with respect to the

5    motion to sell the patent assets.

6          Mr. Descoteaux has been employed by Lazard since

7    1999.  He in this case has been retained by Nortel as its

8    restructuring advisor way back since the beginning of the

9    case --

10          THE COURT:  Yes.

11          MS. SCHWEITZER:  -- January 2009.  And they've

12    provided restructuring advice on general matters, but

13    particularly on the M&A sales that have occurred in the

14    case.

15          Mr. Descoteaux would testify he's generally

16    familiar with the patents being offered for sale and with

17    the sale process itself.  As you know, Mr. Descoteaux's

18    testimony has been proffered to the Court in connection with

19    prior sales as well.

20          And Mr. Descoteaux first and foremost would

21    testify that in his opinion, that it is an appropriate

22    exercise of the debtors' business judgment and appropriate

23    realization of value to proceed with the sale and that the

24    sale would bring more value to the debtors' estates and

25    Nortel generally rather than retaining the patents and

1  keeping them to reorganize around.

2         Mr. Descoteaux and Lazard generally are also

3  familiar with the solicitation of interest that has gone on

4  in furtherance of the sale.  And Mr. Descoteaux would

5  testify that Nortel first began to solicit interest in the

6  divestiture of the residual patents in May 2010.  And then

7  in connection with that effort, that Lazard and Nortel

8  engaged in discussions with approximately 105 parties who

9  would likely be interested in buying the patents which was a

10 mix of financial investors and strategic buyers.

11        Following that initial reach out, there was a

12 teaser sent to encourage interest in the assets.  And it was

13 sent to approximately 95 parties.  And from that, 40 parties

14 came forward to sign up NDA's, non-disclosure agreements to

15 look at the due diligence behind the assets.  And those

16 parties were given access to confidential data room

17 containing diligence materials regarding the assets.

18        After the expiration of the exclusivity under the

19 stalking horse agreement, you'll recall that we announced

20 the stalking horse agreement.  We had a no shop period.  And

21 then when that expired, after that expiration, Lazard re-

22 contacted 98 parties who they thought might be interested in

23 buying the assets.  Again, a mix of financial and strategic

24 buyers.

25        And Mr. Descoteaux would testify that he's not

35

1    aware and Lazard generally are not aware from either of

2    those folks contacted that there be any other people who

3    might be interested in pursuing the assets.  And obviously,

4    there was public notice and other things in order to ferret

5    out any potential interest.

6            With respect to the qualified bidders, Mr.

7    Descoteaux would testify that after the bidding procedure

8    hearing and the process I above described, that four

9    additional entities approached the debtors and their

10   advisors requesting to become qualified bidders.  And after

11   consultation among the estates and their advisors, the

12   monitors, the committees, that four other entities were, in

13   fact, qualified to become bidders, the qualified bidders,

14   again as described in the monitor report.  The qualified

15   bidders were given access to the confidential data room to

16   conduct more due diligence.  And Mr. Descoteaux would

17   testify that all four qualified bidders ultimately submitted

18   bids and did participate in the auction.

19           With respect to the auction, Mr. Descoteaux would

20   testify that he was, in fact, present for the auction.  He's

21   generally familiar with the events that transpired there.

22   During the auction, he served as advisors to the sellers

23   again, helping them to evaluate whether the bids should be

24   qualified and to value the bids that were, in fact, received

25   again in connection and conjunction working with the

36

1   estates, their advisors, and the committees, and the

2   monitor.

3            Mr. Descoteaux would testify that the final joint

4   bid from Apple and Rockstar was selected as the successful

5   bid because it represented the highest and best offer

6   received for their assets.  And he would testify that in his

7   belief, the approval of the sale of assets pursuant to the

8   sale agreement with Rockstar Bidco would be in the best

9   interest of the debtors, their creditors, and their estates.

10           With respect to the negotiations in the auction

11  process, Mr. Descoteaux would testify that both Rockstar

12  Bidco, Rockstar -- I'm sorry, and it's members including

13  Apple were represented by qualified counsel throughout the

14  negotiations and throughout the auction.  The discussions in

15  the auction were vigorous, contentious at times as always.

16  And there were no facts and circumstances that arose during

17  the course of the negotiations or the auction process that

18  led him to believe the Rockstar transaction would not be an

19  arm's length transaction.

20           He would testify that in his opinion, that Nortel

21  did not prefer Apple or Rockstar or any members of the

22  consortium over any other bidders at any point in the

23  process.

24           Mr. Descoteaux also would testify that in his

25  opinion, the value offered to the estates and to Nortel

37

1    generally from the transaction with Rockstar constitutes

2    fair and reasonable value for the assets being sold.

3            And Mr. Descoteaux finally would note, that again

4    as described in the monitor's report, that there were

5    additional safeguards put in place in the auction process to

6    assure that there was no collusion or appearance of

7    collusion among the bidders and that the bidders remained at

8    arm's length not only with the sellers, but with each other.

9            And that would be the conclusion of Mr.

10    Descoteaux's proffer that I'd offer to the Court.

11            THE COURT:  All right.  Does anyone wish to cross

12    examine Mr. Descoteaux?

13    (No audible response.)

14            THE COURT:  All right.  Hearing no one, does

15    anyone object to that proffer being admitted into evidence?

16    (No audible response.)

17            THE COURT:  Again, hearing no objection, I will

18    admit that proffer into evidence.

19            MS. SCHWEITZER:  Thank you.

20            THE COURT:  Ms. Schweitzer?

21            MS. SCHWEITZER:  Thank you, Your Honor.  Next, I

22    would like to proffer the testimony of George Riedel.  Mr.

23    Riedel is the Chief Strategy Officer of Nortel.  He's also

24    employed by NNI as an officer.  And he's in the courtroom

25    again and available to testify with respect to the debtors'

38

1    motion to sell the patents.

2         Mr. Riedel has been employed by the debtor -- by

3    Nortel since February 2006.  His job responsibilities over

4    the course of the case have been general corporate strategy,

5    as well as, the M&A efforts and business development and

6    other strategical partnering.  He previously had experience

7    at Juniper & McKenzie doing M&A work again.

8         Mr. Riedel previously testified in this Court

9    with respect to the prior sales in the Nortel assets all the

10    way starting at CDMA and the subsequent sales.

11         And if Mr. -- if called to testify, Mr. Riedel

12    would testify that he oversaw the sale process for the

13    patent assets including the negotiation of the terms of the

14    sale with interested parties, the selection of the stalking

15    horse purchasers, and the auction process itself.  He was at

16    the auction the entire time and he was involved in the

17    entity's decision to select Rockstar Bidco as the successful

18    bidder.

19         With respect to the patent assets, Mr. Riedel

20    would confirm that the assets being sold do include more

21    than 6,000 U.S. and foreign patents and patent applications

22    that span a broad spectrum of the market, including

23    wireless, optical voice, other types of patents, and the

24    touch all aspects of the telecommunications, as well as,

25    internet search, social networking, and other industries as

39

1    well.

2         Mr. Riedel would testify that after the other

3    divestitures of the business units, the patent assets do, in

4    fact, constitute one of Nortel's largest remaining assets to

5    be sold.  And that he agrees that the purchase price that

6    could be realized through the sale is better than one that

7    could be realized over a long period of time or by holding

8    onto the assets in a standalone restructuring.

9         As such, Mr. Riedel would testify that he

10   believes that selling the assets now is the best way to

11   maximize the value for the debtors' estates.

12        With respect to the pre-auction solicitation of

13   bids, Mr. Riedel would testify similar to Mr. Descoteaux

14   that the outreach began in May 2010 and that there were

15   several parties contacted to generate interest in the asset

16   sale process and that during the solicitation process,

17   Nortel's management also gave several presentations to

18   potentially entrusted buyers in order to create more

19   interest in assets.

20        With respect to the qualified bids, Mr. Riedel

21   would testify he's familiar with the bidding procedures that

22   were approved by this Court and by the Canadian Court.  And

23   that the auction process was, in fact, conducted in

24   accordance with the bidding procedures.

25        And Mr. Riedel also would testify that there was

A

40

1   this outreach of -- to 98 additional parties after the

2   stalking horse agreement was presented to the Court and that

3   five parties had signed supplemental confidential NDA's to

4   get into the data room, ultimately leading to four

5   additional qualified bidders.

6           Mr. Riedel would testify that the other qualified

7   bidders in addition to the stalking horse bidder consisted

8   of Apple, Inc., Intel, Norpax, and Rockstar Bidco.  And that

9   each one of them was qualified in accordance with the

10  bidding procedures and with consultation with the relevant

11  estates and committee members.

12          And Mr. Riedel would further testify that while

13  the auction was originally scheduled for June 20, that due

14  to the significant level of interest expressed in the

15  patents and the bids received, that the sellers believed it

16  was in their best interest to adjourn the auction to June

17  27.  And, in fact, that adjournment was announced on June

18  16.

19          And Mr. Riedel would testify that as a result of

20  reviewing those qualified bids, that Intel Corporation's bid

21  was declared to be the starting bid at the auction.

22          Mr. Riedel also would testify that he was present

23  at the auction and he's generally familiar with events that

24  transpired there.  That the auction occurred from June 27 to

25  June 30 at Cleary's offices in New York.  And that after the

41

1   auction was opened with a starting bid, that there were

2   written and oral bids submitted for an additional nineteen

3   rounds.  So there was a total of nineteen rounds where bids

4   were actually received.  And the approval of each bid in

5   each round was again done in accordance with the bidding

6   procedures in consultation with the relevant estates.

7           Mr. Riedel would testify also that over the

8   course of the auction, certain qualified bidders did not

9   submit bids, they decided that they were no longer going to

10  participate and they were no longer permitted to participate

11  independently at the auction, although some of those bidders

12  later paired with other bidders who remained qualified

13  participating bidders during the auction.

14          And Mr. Riedel would testify that in the evening

15  of June 30 after the nineteenth round of bidding that, in

16  fact, that the bid submitted by Apple in partnership with

17  the Rockstar consortium which has Rockstar Bidco as -- was

18  declared to be the successful bidder with a purchase price

19  of $4.5 billion.  And the auction was adjourned in order to

20  execute the documents which were subsequently filed with the

21  Court with the notice of successful bidder.

22          Mr. Riedel would testify to his belief and the

23  debtors' conclusion that the successful bid from Rockstar

24  does constitute the highest and best offer received for the

25  patent assets and does maximize the value for the debtors'

A

TR21509

42

1  estates.

2      And he would testify that the auction process and

3  all discussions with bidders prior to the auction were at

4  arm's length and that the negotiation of the -- negotiation

5  with bidders and that the auction process itself was

6  vigorous.

7      Mr. Riedel would testify that in order to

8  preserve the integrity of the auction and particularly with

9  the multiple bidders, that there were additional procedural

10  safeguards that were adopted by the estates to ensure the

11  bidder's bidding was at arm's length, not merely between the

12  sellers and the bidders, but among the bidding pools

13  themselves and the teams of qualified bidders such that they

14  would put in independent and separate qualified bids.

15      Mr. Riedel would testify that there was not any

16  evidence that the sale price was controlled by an agreement

17  among potential bidders at the auction.  And that he would

18  testify that Rockstar itself is not an insider of Nortel nor

19  to his knowledge are any of the members of the Rockstar's

20  consortium.  In his view, Rockstar and its members acted in

21  good faith throughout the auction process.

22      Mr. Riedel also is aware that certain documents

23  related to the sale, specifically the schedules and exhibits

24  and the ancillary agreements had been filed under seal with

25  the Court and he would testify that those exhibits do

43

1  contain sensitive information and commercial information and

2  that it would be to the disadvantage of the debtors and

3  their creditors to have such information made public as a

4  result of the sale.

5      Mr. Riedel also would testify specifically with a

6  licensed non-assignment and non-renewal procedures that are

7  contained in Paragraph 28 of the U.S. sale order, what we

8  call the withering procedures, are in the best interest of

9  the debtors in that they did provide comfort to the

10  purchaser and other potential bidders in knowing what assets

11  -- what encumbrances would be put on their assets.  And that

12  a sale without those procedures would be of less value for

13  the debtors' estates with less certainty than the sale

14  itself on these terms.

15      With that, I would conclude the proffer of Mr.

16  Riedel.

17      THE COURT:  All right, thank you, Ms. Schweitzer.

18  Does anyone wish to cross examine, Mr. Riedel?

19  (No audible response.)

20      THE COURT:  Does anyone object to the admission

21  into evidence of Mr. Riedel's proffer?

22  (No audible response.)

23      THE COURT:  All right.  Hearing no one, it is

24  admitted into evidence in support of a motion.  Ms.

25  Schweitzer?

A

44

1           MS. SCHWEITZER:  Thank you, Your Honor.  I made

2   certain references to the seventy-first report of the

3   monitor.

4           THE COURT:  Yes.

5           MS. SCHWEITZER:  That is on our docket.  And just

6   as a matter of housekeeping, I would ask that it formally be

7   accepted as part of the record in the U.S. Courts, just

8   because I know we have the two Court system.

9           THE COURT:  Yes.

10          MS. SCHWEITZER:  We want to make sure it is part

11  of the U.S. record.  So I would formally move to have it

12  admitted into evidence, unless there's an objection.

13          THE COURT:  Any objection?

14  (No audible response.)

15          THE COURT:  All right.  Well I did review it and

16  it was very helpful and I admit into evidence.

17          MS. SCHWEITZER:  Okay.  Thank you, Your Honor.

18  And just for the record, that's DI 5881 on the U.S. Docket.

19          THE COURT:  Thank you.

20          MS. SCHWEITZER:  So -- with respect to the sale

21  order, there have been some changes obviously to conform

22  over to the fact that there's a new purchaser.  And also to

23  address certain of the objections.  What I would propose to

24  do is hand up a clean and black line of the sale order now.

25          THE COURT:  Yes, please.

45

1          MS. SCHWEITZER:  I believe we have a record

2    ready.

3          THE COURT:  Yes.

4          MS. SCHWEITZER:  Hold on one second.

5          THE COURT:  Thank you.

6          MS. SCHWEITZER:  I apologize, Your Honor.

7          THE COURT:  No problem.

8          MS. SCHWEITZER:  So what I'm handing up to, Your

9    Honor, now and we have additional copies available to people

10   in the Court is first a clean version of the revised sale

11   order, a black line version of the revised sale order, that

12   final version of the asset sale agreement which is attached

13   as Exhibit A to the order, and a revised which is called an

14   amended and restated commercial licenses acknowledgement

15   which is Exhibit B to the sale order.  And what I'm going to

16   do is not walk through the sale order right now.  I'm going

17   to walk through it when we go through the objections

18   themselves if that's all right with Your Honor.

19         THE COURT:  I can understand why, yes.

20         MS. SCHWEITZER:  I'm being told also that there's

21   one or two conversations in the hall that might lead to

22   additional tweaks, but we at least wanted to give everyone

23   in the courtroom an opportunity to review it while the rest

24   of the hearing is going on.

25         THE COURT:  Excellent.

46

1          MS. SCHWEITZER:  May I approach?

2          THE COURT:  Please do, thank you.

3          MS. SCHWEITZER:  Thank you.

4          THE COURT:  Thank you, Ms. Schweitzer.

5          MS. SCHWEITZER:  Before I turn over the podium to

6    our Canadian colleagues, what I'd like to do is also just

7    address the side agreement.  There's a separate motion for

8    the side agreement, but because it's part and parcel of the

9    entire process, I figured we'll just do that at the same

10   time.

11         THE COURT:  Sure.

12         MS. SCHWEITZER:  Then we can cede the podium to

13   Canada.  As Your Honor is aware, the debtors had file in

14   connection with the sale, a separate motion to approve a

15   side agreement with other estates that addresses

16   specifically the structure of the Rockstar side agreement

17   and certain payments that will be made under it.  And again,

18   as I described before, the fact that there is this license

19   considered to be granted in connection with the sale

20   agreement as opposed to just some straight sale of the

21   assets.

22         And so I described on the record before what the

23   difference is is namely that immediately prior to the

24   closing, that there's a possibility the purchaser will ask

25   and pretty much a certainty the purchaser will ask that this

1   license be granted by the sellers which is immediately they

2   become the licensee and immediately one step later we convey

3   our license or rights over along with a sale of the

4   remaining assets.

5          In connection with that, there's a certain

6   portion of the purchase price that is designated towards the

7   license as opposed to the conveyance of the remainder of

8   assets.  And again, as I explained before, it's our

9   understanding this is being done for the purchaser to be

10  able to realize certain tax advantages, not at a seller

11  request.

12         And so the estates were comfortable accepting

13  this proposal for a couple of reasons.  As first, that it's

14  the same purchase price and that it's an instantaneous

15  transaction so it doesn't put more deal risk in terms of

16  timing.

17         Second of all, that the purchaser is giving us

18  full indemnity for any tax consequences that there might be

19  on the U.S. or on any of the seller's side as a result of

20  the difference in structure.

21         And third, as an inner estate matter, the sellers

22  agreed that two things would happen.  Is that first, with

23  respect to the transaction, there might be in addition to

24  the tax indemnity in Canada rather than paying taxes, the

25  Canadian debtors might use up some of their net operating

48

1    losses or tax attributes so that they would seek a small

2    payment of $15 million specifically directed towards them to

3    compensate them for any potential use of those tax

4    attributes which would not go into the generic black box as

5    we call it.  And so the side letter addresses that agreement

6    that there could be a separate $15 million payment directed

7    to Canada.  They get that money and they don't claim tax

8    attributes against the black box, they don't use the use of

9    the NOL's, an argument for additional allocation and other

10   sellers don't come after them for the $15 million.

11          THE COURT:  Understandable.

12          MS. SCHWEITZER:  The second point in the side

13   letter, this is a substantial point, is that the parties,

14   all the sellers agreed that notwithstanding the fact that

15   we're agreeing to this different structure for purposes of

16   allocation, this is the same as if we had done the stalking

17   horse purchase deal and a straight conveyance of the assets.

18   And the side letter sets forth the entire terms, but to

19   highlight some of them, that the parties are agreeing that

20   even though that the stalking horse agreement may designate

21   a certain portion of the purchase price to go towards the

22   license as opposed to going towards a sale of the assets,

23   that we all agree that that designation itself and the fact

24   that it's a different structure, shall have no impact

25   whatsoever on the allocation of the proceeds from the

49

1    transaction.

2            In addition, the parties state and clearly agree

3    that it's our expressed intention of all of the sellers,

4    that the allocation, the total proceeds, the money that

5    comes in, the $4.5 billion shall be affected as if the

6    transaction had been structured so that $4.5 billion was

7    paid in consideration for the straight sale of the assets in

8    a manner that's similar to that provided in the Ranger

9    stalking horse agreement.  So again, this is a deal neutral

10   proposition, even though it's a different structure.

11           Third, that the agreement provides that the

12   parties agree to impose and cooperate imposing in the use of

13   any of this evidence regarding a license designation of the

14   two prices and the structure in before any dispute resolver.

15   We don't have to talk today about what a dispute resolver

16   is, but whoever it is or wherever it is, this will not be

17   discussed in front of them.

18           So I -- that's merely a summary of the terms, but

19   it's important for everyone to understand because it was

20   important to the sellers in accepting this alternative

21   structure that we agreed that this isn't going to add layers

22   onto allocation.

23           THE COURT:  Okay.

24           MS. SCHWEITZER:  That it's the same as if we had

25   just sold the assets.  And I believe Canada as well will

A

TR21509

50

1    confirm that on the record during their presentation.

2             The motion was filed on short notice.  Apologies,

3    but it was in the necessity of the way the bid came up.  No

4    objections have been filed and so the estates seek approval

5    of the side agreement as well in connection with the sale of

6    the assets.

7             And with that, you can hold your ruling on that

8    until the end.  I wanted to get that in front of you.  But

9    with that, we turn over the podium to Canada for their

10   affirmative case, unless Your Honor has any further

11   questions at this time.

12            THE COURT:  I -- closing date would be

13   approximately when do you think, Ms. Schweitzer?

14            MS. SCHWEITZER:  Well as soon as possible, I

15   think is the goal.  There aren't conditions -- given that

16   there is no HSR condition out there, there is a closing

17   condition if the orders become final.  That's obviously

18   waivable by the purchaser.

19            THE COURT:  Oh, certainly.

20            MS. SCHWEITZER:  But I think we're talking in

21   terms of a month, not several months from now.

22            THE COURT:  Okay.  Thank you.  And before I turn

23   it over to Justice Morawetz, I want to make certain no one

24   else in this courtroom would like to be heard.  Mr. Botter,

25   good morning.

1          MR. BOTTER:  Good morning, Your Honor.  Good

2    morning, Justice Morawetz.  David Botter, Akin, Gump,

3    Strauss, Hauer & Feld on behalf of the official committee.

4          Your Honor, very, very briefly because this truly

5    is a wow transaction.  Your Honor, we heard a lot the last

6    time we were together about the IFSA and what it meant.  I

7    think all parties agree that the IFSA contemplated

8    cooperation amongst the selling parties in the sales efforts

9    to maximize value without reference to any allocation

10   disputes of which we heard so much about the last time.

11         Your Honor, I think that the efforts of all of

12   the selling parties ought to be applauded here.  We truly

13   did maximize value.  I can tell you from a diligence

14   perspective that a lot of time and effort was spent

15   analyzing what was the appropriate course with respect to

16   these assets.  Whether or not, in fact, a sale would

17   maximize value or there was an alternative structure or

18   alternative business to pursue with respect to these assets.

19   Ultimately, the debtors, the committee, the Canadian

20   debtors, the Canadian creditors determined that the sale of

21   these assets was the appropriate way to go and that decision

22   clearly was validated during this auction.

23         So, Your Honor, the official committee is fully

24   supportive of the entry of the order.  Ms. Schweitzer did

25   detail what, you know, some of the elements with respect to

A

TR21509

52

1   the side letter that are critically important.

2          THE COURT:  Yes.

3          MR. BOTTER:  That these are, in fact, that the

4   structure used by Rockstar is something that's important to

5   them and that it is, in fact, deal and allocation neutral to

6   the selling debtors and their creditors.

7          So with that, Your Honor, again, the official

8   committee is fully supportive of this transaction and would

9   ask that both Courts enter orders approving same.  Thank

10  you, Your Honor.

11         THE COURT:  Thank you, Mr. Botter.  Anyone else?

12   (No audible response.)

13         THE COURT:  All right.  Justice Morawetz, I

14  return the matter to you.

15         JUSTICE MORAWETZ:  Thank you, Judge Gross.  Mr.

16  Tay?

17         MR. TAY:  Thank you.  Good morning, Justice

18  Morawetz, Judge Gross.  Given that this is fairly one of the

19  hottest days of the year and this is one of the smallest and

20  stuffiest courtrooms we have, my goal is to get us all out

21  of here as quickly as possible.

22         THE COURT:  We're not hearing, Mr. Tay very well,

23  if perhaps --

24         MR. TAY:  Having said that --

25         THE COURT:  -- if you could speak directly into

1    that microphone.

2         MR. TAY:  -- for the first time in the history of

3    these joint hearings, I would like to proffer the evidence

4    of a witness in the Canadian proceedings.  But given that I

5    haven't got the foggiest clue how to do that, maybe we'll

6    just move right along.

7         The -- Ms. Schweitzer has set out, I think, all

8    the salient facts that you need to know.  And that what this

9    does is this brings us, I think squarely from a legal

10   perspective to the principles of [indiscernible].  There's

11   no question that what we have achieved is the best price

12   possible.  I don't believe a dollar was left on the table.

13   And I don't think there's also any question that this

14   auction was done in an efficient way, done with integrity,

15   and done with fairness.  And so I don't think you'll have

16   any difficulty it is my submission, to approve this

17   transaction and all that's related to it.

18        Now you've heard mention of the side letter

19   agreement.  I confirm our understanding that was generally

20   described by Ms. Schweitzer.  The side agreement speaks for

21   itself and it does take great pains to spell out what in

22   general was described by Ms. Schweitzer and we are -- we

23   will be okay with that and we'll be seeking approval of that

24   side letter as well.

25        As you well know that a big part of this process

54

1   was the license rejection process that we held earlier in

2   the case.  And as you also heard, most of these objections

3   if not all, we believe have been or will be resolved by the

4   end of the hearing today.  And as part of that resolution,

5   it was important and we undertook certain of the licensee

6   parties that we would state on the record our understanding

7   of certain key items as to how these licenses are to be

8   dealt with.

9           And to start with, we should understand that the

10  purchaser has agreed to acquire the patents subject to the

11  licenses that were given out by Nortel.  It is also

12  important to understand that we are not purporting to assign

13  the agreements in which the licenses were given.

14          In essence, there were two types of licenses that

15  we're trying to deal with.  One is the sort of cross license

16  situation where Nortel gave a third party licenses to its

17  patents and received cross licenses from that party.  That's

18  one kind.

19          The other kind of licenses are contained in what

20  we call commercial licenses which has a very long and

21  convoluted definition, but in essence in simple terms what

22  they are are end user licenses.

23          So dealing with the first cross license

24  situation, the purchaser is accepting the patent subject to

25  the licenses that we, Nortel gave to the third parties.  But

1    we are not in any way purporting to assign the licenses that

2    came back to us to the purchaser.  And so you will see that

3    in the stalking horse agreement, there was a schedule that

4    had a whole list of known licenses as it were that the

5    purchaser was going to take subject to.

6            Three things we should understand with respect to

7    that list.  One is that everything that was there under the

8    stalking horse agreement continues to be there.

9            The second thing is that as a result of the

10   license rejection process, we have added other licenses that

11   have come to our attention and those have also been accepted

12   by the purchaser and they will be dealt with as known

13   licenses and no declaration offered for this requirement.

14           The third thing that we should know about that is

15   that we are undertaking to the Court that none of the

16   licenses which are on that list will be removed prior to

17   closing.  So that everyone who has a license that has been

18   identified can take comfort in knowing that if either they

19   were on the list or they were added to the list, they will

20   not be removed from the list.

21           Finally, a number of other agreements that no one

22   really knew whether they were licenses and not commercial

23   licenses because of the nature of them, what we've done is

24   we've entered into a separate acknowledgement.  And that

25   acknowledgement basically says that all these things that

56

1    we've identified in that list will be -- and similar

2    agreements between the same parties and that are not broader

3    in scope will be treated as if they were commercial

4    licenses.

5         And so with all those safeguards, that's what

6    committed us to deal with the license objections.  And after

7    we've turned it back to the U.S. to deal with that, when we

8    come back, Ms. Stam will deal with whatever's left and also

9    with the specific orders that we're dealing with.

10        So I think outwardly, the bottom line of what

11   we've seen here is that this is, I think a shining example,

12   and one of many examples that you've seen in this case, of

13   the amazing things we can get done when the estates work

14   together.  Unfortunately, we've also seen the disruption in

15   value when the estates fight amongst each other, but

16   fortunately, that is not before us today.  Today we're one

17   big happy family.  I'm not sure how long it's going to last,

18   today we're one big happy family.

19        JUSTICE MORAWETZ:  Those bright lights behind,

20   I'm not sure whether they're the pens or the knives.

21   (Laughter)

22        MR. TAY:  And then finally, we're asking for some

23   of these schedules to be sealed and I think they clearly

24   fall within the *Sierra Club* test so I don't think Your Honor

25   should have much difficulty with that.

1          So unless you have any questions, I have propose

2     that we send it back to the U.S. so that Ms. Schweitzer can

3     deal with the specific treatment of the various objections.

4          JUSTICE MORAWETZ:  Okay.  Is there any other

5     party that wishes to make a submission at this time?  Mr.

6     Pasquariello?

7          MR. PASQUARIELLO:  Good morning, Your Honor,

8     Judge Gross.  As has been referenced, the monitor has filed

9     its seventy-first report in support of the motion.  The

10    monitor has been intricately involved, Your Honor, in the

11    sales process including the auction that yielded such a

12    fabulous result.  The details of the auction and process,

13    Your Honor, can be found in Paragraphs 24 through 29 of the

14    monitor's report.  And that led to the Rockstar Bidco sale

15    agreement which can also be found at Tab B.  I don't propose

16    to take you through it, but simply for your reference.

17         One of the paragraphs in the monitor's report,

18    Your Honor, Paragraph 33 in particular which is at Page 11.

19    It actually commences at Page 10.  Paragraph 33 highlights

20    some of the material differences between the stalking horse

21    agreement and the agreement before the Courts for approval

22    today.

23         Again, I won't go through them, Ms. Schweitzer

24    highlighted some of them, but I did want to point Your Honor

25    to paragraph, Subparagraph I which is on paragraph -- which

58

1  is on Page 12.  And that paragraph explains and outlines the

2  splitting of the purchase as between a licensing arrangement

3  and a purchase price.  And also links into the discussion

4  regarding the amended IP side agreement in respect of which

5  the extent that there's a transaction for licensing which is

6  not to exceed a billion, then I think Ms. Schweitzer may

7  have described it as being a small, of course, things are

8  always relative, payment of $50 million to be made directly

9  to the Canadian applicants.  So I wanted the Court to be

10  aware of that provision.

11        Also, Tab I to that monitor's report attaches the

12  original IP transaction side agreement, Your Honor.

13        JUSTICE MORAWETZ:  Yes.

14        MR. PASQUARIELLO:  Over the weekend, the Norton

15  Rose Firm provided by way of a supplement to a motion record

16  in relation to the escrow agreement the affidavit of Mr.

17  Doolittle.  And Exhibit B to that affidavit includes the

18  amended and restated IP transaction.  I believe you have it,

19  but if you --

20        JUSTICE MORAWETZ:  No.

21        MR. PASQUARIELLO:  No, Ms. Stam tells me you do

22  not.  So we will be handing that up to you, but -- I can

23  hand you my copy.  Clearly, I'm stealing some of Ms. Stam's

24  thunder unintentionally, but Tab 2, Your Honor, of that

25  record includes an affidavit of Mr. Doolittle.  Although