59

1  mainly dealing with escrow arrangements, it does attach at

2  Exhibit B an amended and restated side agreement.  And

3  that's what I wanted to direct Your Honor to.  That's Page

4  73 of that record book.

5          JUSTICE MORAWETZ:  Thank you.

6          MR. PASQUARIELLO:  Ms. Stam will be handing up an

7  order in relation to that later.

8          As Mr. Tay indicated, Your Honor, the monitor has

9  filed confidential appendices sought to be sealed in this

10 case and they are appendix -- you should have two volumes.

11         JUSTICE MORAWETZ:  I do.

12         MR. PASQUARIELLO:  Appendix D is the exhibits and

13 schedules so the sale agreement.  Appendix E and F relate to

14 service as it relates to the license objection procedures.

15 I won't get into those, but suffice it to say that it's our

16 view that the materials in those confidential appendices

17 contain commercially sensitive information and as in the

18 past, request that it be sealed in compliance with the test

19 in *Sierra Club*.

20         In conclusion, Your Honor, the monitor's

21 obviously satisfied that the sale agreement represents the

22 best transaction for the sale of the residual IP and,

23 therefore, recommends that this Honorable Court approve the

24 applicant's motion.  And the monitor is also satisfied and

25 its content with the amended and restated IP transaction

60

1  which I directed you to.  Unless you have any further

2  questions, thank you, Your Honor.

3          JUSTICE MORAWETZ:  Thank you.  Anybody else at

4  this point?

5  (No audible response.)

6          JUSTICE MORAWETZ:  Thank you.  Judge Gross, back

7  to your Court.  I guess Ms. Schweitzer's going to be doing

8  some of these other matters.

9          THE COURT:  Yes, thank you, Justice Morawetz.

10  Ms. Schweitzer, anything further?

11          MS. SCHWEITZER:  On the objections?  Ready to go

12  into that?

13          THE COURT:  Yes, yes.

14          MS. SCHWEITZER:  I apologize, Your Honor, there's

15  some real time consultation going on.

16          THE COURT:  No, if you need a few more minutes,

17  you certainly may have them.

18          MS. SCHWEITZER:  We actually don't, I'm fine.

19  What I'm going to do is go through all the objections that

20  have been resolved.

21          THE COURT:  All right.

22          MS. SCHWEITZER:  And I think there's just one or

23  two that we might have delivery by the time I get to the end

24  and if not, we ask to take a five minute break then to see

25  if we can --

1              THE COURT:  Of course.

2              MS. SCHWEITZER:  -- get there.

3              THE COURT:  While Justice Morawetz and I are

4    conferring, certainly you would have that opportunity as

5    well.

6              MS. SCHWEITZER:  Absolutely, that's a very good

7    point, Your Honor, thank you.

8              So first, I think we filed a reply last week in

9    order to help Your Honor roadmap through the different

10   objections that have been filed --

11             THE COURT:  Yes.

12             MS. SCHWEITZER:  -- so I'll try to use that

13   language to the extent possible.  The first bucket of

14   objections were the standards objections where the concern

15   was that the -- a purchaser was taken free and clear of

16   liens, claims, encumbrances, but there were certain

17   commitments that have been made by the sellers to the

18   various standards, organizations, and bodies.

19             And the original sale agreement provided that the

20   sale would be subject to certain of those obligations.  The

21   successful bid expanded the obligations.  That the sale

22   would be conducted to -- subject to -- and since the time of

23   the filing, the successful bid, the purchaser, the debtors

24   have worked with certain parties who had filed objections to

25   reach resolution of those objections by the expansion of the

62

1   -- or the modification of the definitions of permitted

2   encumbrances which is in the sale agreement itself and by

3   the modification of the term standards obligations as it's

4   used in Paragraph 8 of the U.S. sale order.

5           And then so with those changes, that there was

6   also a corrected date in the seller disclosure schedule

7   Annex A10(1)(x) in order to resolve the objection filed by I

8   EEE.  With those amendments, I believe that the standards

9   objections are resolved in their entirety.

10          THE COURT:  All right.

11          MS. SCHWEITZER:  And those were filed by I EEE,

12  Nokia, Motorola, Sprint, and Nextel.  We haven't heard from

13  Sprint and Nextel confirmation, but we also haven't heard

14  any further requests for amendments so -- and as well as

15  AT&T, Verizon, and Quest with other parties who had raised

16  the initial objection.

17          So what I think Your Honor already has the

18  modified order in Paragraph 8 specifically thereto.  There

19  are copies in the courtroom.  Other people have seen them, I

20  believe already so I'd rather not just read it into the

21  record for the sake of the record, but that contains the

22  revised definition of the standards obligation.  And since

23  the asset sale agreement contains the other modified

24  description and we don't have it revised in order to attach

25  it to the sale order, what we propose to do is to just hand

63

1   up a copy to Your Honor, mark it as Exhibit 1 and then it

2   will be in the record so that everyone knows what the final

3   definition of permitted encumbrances is.

4           So with that, I have a document, two page

5   document that's -- has the definition of permitted

6   encumbrances both clean and black line that shows the few

7   changes made to that definition in order to obviate the

8   objections that were filed.  If Your Honor -- may I approach

9   to hand up --

10          THE COURT:  You certainly may, certainly.  And we

11  have Mr. Schnabel, I think, here representing -- what do you

12  call your --

13          MS. SCHWEITZER:  I EEE.

14          THE COURT:  I EEE, okay.

15  (Laughter)

16          MR. SCHNABEL:  I EEE, Your Honor.

17          MS. SCHWEITZER:  Or as we call them EIEIO.

18  (Laughter)

19          THE COURT:  Mr. Schnabel, good morning.

20          MR. SCHNABEL:  Old McDonald.  Your Honor, Eric

21  Lopez Schnabel with Dorsey & Whitney on behalf of I EEE.

22          This is correct so we have resolved this.  I

23  think the one thing I just wanted to make sure in looking at

24  the sale order is that the correct definition of permitted

25  encumbrances is being baked into the sale order.  And I just

A

TR21509

64

1  want to note that Footnote 1, I think defaults to the motion

2  if the term is capitalized, but not defined in the sale

3  order.  And if it's not defined in the motion, then it

4  reverts to the sale agreement.  So I'm not sure whether

5  permitted encumbrances was defined in the motion originally,

6  so we'll have to just scrub that real quick.  It's not a big

7  deal.

8           MS. SCHWEITZER:  Rather than having to scrub the

9  motion, I think we're happy to represent on the record and

10  the seller -- the purchaser's counsel is in the courtroom,

11  that for purposes of the sale order, it's everyone's

12  intention that permitted encumbrances is hooked to the

13  definition of contained in the sale agreement as modified by

14  Exhibit 1 that I just handed up.  And also I don't want to

15  steal your thunder --

16           MR. SCHNABEL:  Yeah.

17           MS. SCHWEITZER:  -- but we did promise to Mr.

18  Schnabel that we would, in fact, if there were any changes

19  to the definition of permitted encumbrances or standards

20  obligations, we don't expect them to change further, but if

21  they were to change, we would give him advance notice if

22  there were any changes prior to closing.

23           THE COURT:  Mr. Schnabel?

24           MR. SCHNABEL:  That's correct and that's

25  acceptable to us.  Since those -- that definition resolves

65

1  our objection and as we all know it's, you know, approve

2  things and there can be non-material changes prior to

3  closing so if there are, we just want to see them in case

4  there's an issue, although we don't expect one.  So that's

5  correct.

6        THE COURT:  All right.  If there's a problem,

7  you'll get a hold of me, of course, but --

8        MR. SCHNABEL:  Correct.

9        THE COURT:  -- certainly, Mr. Schnabel.

10       MR. SCHNABEL:  Thank you.

11       THE COURT:  Thank you.

12       MR. SCHNABEL:  Yes.

13       THE COURT:  Does that -- so as far as you're

14  concerned, your concerns have been addressed then, Mr.

15  Schnabel with Exhibit 1 that's been submitted?

16       MR. SCHNABEL:  I haven't seen a version of that,

17  but I'm sure it's the same we were emailing each other on

18  Sunday.

19       THE COURT:  Okay.

20       MR. SCHNABEL:  So correct.

21       MS. SCHWEITZER:  There are additional copies so

22  we'll just make sure that Mr. Croft gets him one in the

23  courtroom now.

24       THE COURT:  Good, thank you, Ms. Schweitzer.

25       MS. SCHWEITZER:  And anyone else obviously who

A

1  wants to see it.

2         THE COURT:  Do you want me to attach this to the

3  order at some point?  Or is it going to be a separate

4  document?

5         MS. SCHWEITZER:  I guess when you look at the

6  purchase -- can we just attach it to the back of Exhibit 1,

7  the sale agreement?  Just put it right behind there, the

8  permitted encumbrances?  Yeah, we're just going to attach

9  it.  We'll just attach it to the back of Exhibit 1.  Yeah,

10  okay, so the final order we'll hand up for you, we'll attach

11  it behind the end of Exhibit 1, I believe which is the sale

12  agreement.

13         THE COURT:  Right.

14         MS. SCHWEITZER:  We'll put it just right behind

15  that page.

16         THE COURT:  Perfect.

17         MS. SCHWEITZER:  To note that that's the change

18  so --

19         THE COURT:  Excellent.

20         MS. SCHWEITZER:  Okay.

21         THE COURT:  Excellent, thank you.

22         MS. SCHWEITZER:  And then the final agreement

23  that's executed prior to closing, they'll amend it and

24  restate it to incorporate it into the definition.  I think

25  everyone just wanted to make sure there was a document

67

1    somewhere that had it all written out so --

2              THE COURT:  Good.

3              MS. SCHWEITZER:  Okay.

4              THE COURT:  Does anyone else wish to be heard

5    regarding the standards obligations?

6      (No audible response.)

7              THE COURT:  All right.  Hearing no one, that I

8    understand the modifications.

9              MS. SCHWEITZER:  Okay.  Okay.

10             THE COURT:  And the resolution of the objections.

11             MS. SCHWEITZER:  Yeah.  Thank you, Your Honor.

12   The second bucket are the different license issues that

13   people had raised that were what we had called that they

14   wanted comfort that their licenses are being preserved or

15   taken to the purchaser or commercial licenses.  Mr. Tay had

16   articulately expressed on the record as well that the buyer

17   is not, in fact, assuming and assigning any contracts over

18   to the purchaser including licenses, but they are taking

19   subject to such licenses.

20             THE COURT:  Right.

21             MS. SCHWEITZER:  And what that means is that with

22   respect to outbound and cross licenses that are identified

23   and as known licenses that we've actually told them about,

24   that those licenses stay with the debtors.  The purchaser

25   acknowledges the existence of the license, and that that

68

1   party to the license is able to continue using the license

2   according to its terms, although it remains with the

3   debtors.  The schedule as Mr. Tay noted will not be amended

4   to take off any known licenses prior to closing.  That was

5   important as it resolves certain objections.  And so we

6   won't delete any of the licenses listed.

7        The second thing that the stalking horse

8   purchaser is taking the assets subject to in -- is the

9   commercial licenses.  And in those, those are driven by a

10  definition of what a commercial license is rather than

11  having a list of commercial licenses.  These are licenses,

12  as we said, commercial licenses or really commercial

13  agreements with the debtors that have sometimes licenses

14  ancillary to them.

15       So for example, from a customer when I'm buying

16  product and it says and here's a license in order to use the

17  product or to sell on that product, it's contained within a

18  different type of agreement and, therefore, rather than

19  schedule those which would be an inordinate task, that they

20  are protected by the fact that they fall within the

21  definition.

22       The license rejection procedures also do not

23  apply to commercial licenses.  You don't have to shout and

24  be heard, just merely by the fact you're a commercial

25  license as the counterparty, your license continues to exist

69

1   unimpaired by the sale.  So the purchaser is taken subject

2   to those licenses is not taking assignment of those

3   licenses.

4          The other clarification that people had had

5   questions with is if it was a cross license and there was a

6   license back to the debtors of the counterparties

7   intellectual property is the debtor seeking to sign over

8   that incoming license and the answer is no.  The debtors are

9   not by this, again, the signing over the contract itself so

10  they're not trying to assign over to the purchaser the use

11  of the inbound portion of a cross license with another

12  party.

13         As I noted before and as attached to the revised

14  sale order, the purchaser has executed a commercial license

15  acknowledgement that I believe now is the amended restated

16  commercial license acknowledgement.  And the purpose of this

17  is that if -- to the extent that people did come forward

18  with concerns about their licenses, what happened -- or

19  their contracts, what happens is one of two things.  If they

20  were what we call a Capital L license, if it was actually a

21  patent license, they were added to the known license

22  schedule once we saw the contract and the purchaser agreed.

23  But if they were a commercial license, there's no need for

24  them to be scheduled.

25         So in order to give the counterparties comfort,

1  the purchaser entered into an agreement by which it

2  acknowledged that those agreements are commercial licenses

3  so that they're not being rejected as part of the sale.  And

4  they also in order to give people comfort said that if you

5  have other agreements with the -- if that same party has

6  other agreements with the debtors, that license provisions

7  are substantially similar, those too are commercial

8  licenses.  And again, it's not intended to be an I gotcha,

9  but it's intended to be if you show me your terms, I can,

10  you know, give you comfort by putting it in one bucket or

11  another.

12        And as a result of going into -- making those

13  amendments to the seller's disclosure schedule and entering

14  into the commercial license acknowledgement, I understand

15  that the objections of the following parties are now fully

16  resolved.  That includes AT&T, Verizon, Quest, Motorola

17  Solutions, Nokia, EADS, Hitachi, and Lenovo.  And so I'll

18  pause right there to -- I think that's another bucket of

19  objections we've cleaned up.

20        THE COURT:  Very well.  Thank you, Ms.

21  Schweitzer.  Anyone wish to be heard on behalf of any of

22  those entities?

23  (No audible response.)

24        THE COURT:  All right.  Hearing no one, that's

25  well done.

71

1          MS. SCHWEITZER:  Okay.  We have a couple more

2   that we've done well, hopefully.  Then we have Oracle is our

3   next objecting party.

4          THE COURT:  Yes.

5          MS. SCHWEITZER:  And they would -- what Oracle

6   was concerned about is that their agreements are not being

7   assumed and assigned over to Rockstar.  And I've said it

8   more generally, but we've agreed to say on the record that

9   the sale agreement does not provide for the assumption and

10  assignment to Rockstar of any of the Oracle contracts

11  identified in their objection.  And the sale agreement does

12  not contemplate the transfer to Rockstar of any inbound

13  license granted by Oracle to Nortel under the Oracle

14  contracts.  And that was confirmed for them by email as

15  well.  But I believe their objection, while not withdrawn,

16  is similarly resolved with that understanding.

17         THE COURT:  All right.  Anyone wish to be heard

18  here for Oracle?

19         MR. DOSHI:  Your Honor, on the phone for a brief

20  moment.

21         THE COURT:  Yes, sir.

22         MR. DOSHI:  This is Amish Doshi on behalf of

23  Oracle America East.  That is correct.  I thank Ms.

24  Schweitzer for the representation and with that

25  representation the reservation rights that we had filed is

A

72

1   resolved and thank you for allowing me to appear

2   telephonically as well, Your Honor.

3            THE COURT:  Sure, Mr. Doshi.  Thank you.

4            MR. DOSHI:  Thank you.  May I be excused, Your

5   Honor?

6            THE COURT:  Yes, you may.

7            MR. DOSHI:  Thank you.

8            MS. SCHWEITZER:  I'm going to turn the podium

9   over to Mr. Abbott with respect to the Broadcom and IBM

10  filings.

11           THE COURT:  All right.  Mr. Abbott?

12           MR. ABBOTT:  Your Honor, with respect to those

13  two filings, they were essentially 365(n) elections, if you

14  will.

15           THE COURT:  Yes.  Yes.

16           MR. ABBOTT:  And I think we're clear here on the

17  record that we're not assuming or rejecting any of those

18  contracts today, so while those haven't been withdrawn

19  they're effectively mooted by the fact that there has been

20  no rejection.  And I don't think on that basis there's any

21  pending objection to the sale going forward by either of

22  those parties and obviously I'll give those parties a chance

23  to speak if they wish, but that's my understanding, Your

24  Honor.

25           THE COURT:  All right.  Thank you.  Anyone wish

73

1    to be heard?  Anyone on the telephone for either of those

2    entities?  All right.

3            MR. ABBOTT:  Your Honor, the next thing that we

4    ought to address, and I know Mr. Crapo was on the phone --

5    is the objection and amended objection.  There have been a

6    number of filings by Hewlett-Packard, Your Honor.

7            THE COURT:  Yes.

8            MR. ABBOTT:  We have been busy out in the hall

9    during this hearing and are continuing to try to refine some

10   language.  I'm hopeful that we will get there in a side

11   letter essentially between the buyer and HP that will

12   resolve those issues.  We need a few more minutes to work

13   that, so perhaps we can get on with the balance of the

14   hearing while I continue to work that issue and we'll be

15   back to the Court as quickly as we can.

16           THE COURT:  All right.  Let's do that, Mr.

17   Abbott.

18           MR. CRAPO:  Mr. Abbott, this is David Crapo.

19           THE COURT:  Yes, Mr. Crapo.  Yes.  Certainly,

20   sir.  You may proceed.

21           MR. CRAPO:  I just -- if Mr. Abbott would have

22   Ms. Songonuga, my colleague, contact me.  I think we can

23   maybe expedite this process.  I'm here for Hewlett-Packard

24   via telephone.

25           THE COURT:  All right.  So Ms. Songonuga --

74

1          MR. ABBOTT:  I'll do that, Your Honor.  I

2   apologize.  We have an international negotiation going on in

3   the midst of an international case.  Mr. Crapo is out of the

4   country and so we're working all kinds of technical

5   communication angles to make this happen, but I think --

6          THE COURT:  I understand.

7          MR. ABBOTT:  -- we'll get there it sounds like.

8          THE COURT:  All right.

9          MR. ABBOTT:  Thank you, Your Honor.

10         THE COURT:  Thank you.  Ms. Schweitzer?

11         MS. SCHWEITZER:  We're down to short strokes

12  here.  We have as Mr. Abbott said that HP is close, but

13  optimistic.  Hopefully we can get there.  Similarly Motorola

14  Solutions is in discussions with the Purchaser out in the

15  hallway, so with respect to those two as Your Honor had

16  suggested is that we'll just keep going and it looks --

17         THE COURT:  Yes.

18         MS. SCHWEITZER:  -- like if we are there, Your

19  Honors are welcome to confer and we can come back on the

20  record if we've resolved those or if we haven't then we'll

21  address them on the record at the time.  I think that leaves

22  one other Objector left, which is Thomas & Betts.  Thomas &

23  Betts had filed an objection, as well as a Notice of

24  Election, and their objection I think plainly put is I don't

25  know what I don't know and so just reserve my rights, you

75

1  know what harm is there to that, right?

2          THE COURT:  Right.

3          MS. SCHWEITZER:  And so our understanding is that

4  Thomas & Betts is a supplier of custom made metal parts to

5  Nortel, that they're -- you know they supply metal, right?

6  They objected out of abundance of caution not because they

7  knew that there were any licenses, but they just you know

8  didn't know, so why not put in an objection?  And we already

9  have approved license rejection procedures before the Court.

10  Those were approved -- you know made by motion in April,

11  approved in May.  What those procedures provided is that

12  again commercial licenses are not being rejected.  If you

13  have these supplier, customer licenses -- contracts with the

14  Debtors that happen to have licenses in them, it's not the

15  Debtors intent to reject those.  What the Debtors do intend

16  to reject is that the Debtors have come forward and looked

17  through their books and records and made every effort to

18  find the Capital L licenses, the actual patent licenses.

19  And we've told everyone what we think we have.  If you don't

20  have one, we're rejecting it, right?  And you're welcome to

21  come and elect your remedy if you specifically identify that

22  contract, right?  If you say here's a license, I want my

23  rights preserved under 365(n).  I've elected a remedy.  Or

24  otherwise you always have the right to file damages against

25  the Debtors and those damage claims, rejection damage

1   claims, are not due until after closing.  So it's not now

2   that you'd have to file that claim.  And that's similar to

3   any license rejection procedure.  Even in a Plan the Debtors

4   would say I hereby reject everything not specifically

5   assumed and you again would have the same burden to come

6   forward and specifically elect, not just to put in

7   reservations of rights.

8           So those procedures were approved by the Court

9   without objection back in May.  Thomas & Betts filed an

10  objection that I don't know what I don't know and then also

11  filed a Notice of Election that said whatever I have I want

12  to elect, right?  And obviously from the Purchaser side

13  that's an insufficient election, but we also don't have any

14  reason to believe that there actually is a license there,

15  right, that Thomas & Betts has been active in the case since

16  the beginning of the case.  Two years ago at the bar date

17  they filed a proof of claim that is -- I'm not going to

18  count the pages, but several hundred pages long, containing

19  all these invoices and you know things that they were able

20  to find in their records in less than two months with

21  respect to their relationship with Nortel.  Clearly they

22  have a relationship.  They filed a $1 million claim, but

23  they're a supplier, right?  So they have a relationship.

24  They're also preferenced Defendant as you heard before.

25  They have an active preference case going, so they're not

77

1   strangers to the case and they now have been given three

2   months to find any licenses they have. If they're a

3   commercial license, I'm not saying they are, but if they're

4   a commercial license they still, regardless of whether

5   they've surfaced, are unaffected by the sale. But if

6   they're a known license then they are being rejected and the

7   Debtors do intend to reject them and the Debtors view is

8   that that Notice of Election isn't sufficient to preserve a

9   hypothetical license. They haven't come forward with a

10   specific agreement. If they had the Debtors would be more

11   than happy to look at it, but they haven't. The time has

12   passed.

13         And so what the Debtors and the Purchaser are

14   asking is that the Court confirm that, is that the Notice of

15   Election hasn't in fact preserved a Notice of Election, a

16   365(n) right, with respect to any particular license.

17         I don't know -- Thomas & Betts Counsel I believe

18   is in the courtroom or available by phone, so I'll allow --

19         THE COURT: Mr. Kunz is here I see.

20         MS. SCHWEITZER: -- them to talk.

21         THE COURT: Thank you. Thank you, Ms.

22   Schweitzer.

23         MS. SCHWEITZER: Sure.

24         THE COURT: Mr. Kunz, good morning, sir.

25         MR. KUNZ: Good morning, Your Honor. Thank you

1  very much.  I think we're here on kind of a fundamental

2  issue and that is notwithstanding the procedures or the

3  rejection procedures that have been put into place.  The

4  question is ultimately I think who bears the burden on that

5  with respect to moving forward to reject any unknown

6  licenses?  And that's what -- really what we're talking

7  about.  The Debtor put out a fairly comprehensive sale

8  motion that -- where they identified known licenses to those

9  people that they were able to identify, they defined

10  commercial licenses relatively broadly in order to

11  accomplish the idea that those commercial licenses are or

12  that the patents are also being taken subject to commercial

13  licenses.  But then they have this catchall, unknown

14  licenses, and they purport to through this procedure reject

15  anything that is an unknown license, which in fact is

16  basically a license that the Debtors themselves have not

17  been able to identify.

18          As Your Honor heard, Thomas & Betts does quite a

19  bit of business with Nortel and the question ultimately

20  comes down to how can Thomas Betts in essence be worse off

21  in the context of a procedure that says the Debtor is going

22  to reject everything that they can't identify?  Thomas &

23  Betts comes in and exercises its 365(n) rights.  What the

24  Debtor is saying is had they been able to identify it,

25  Thomas & Betts could elect.  365 down to the code gives

1   Thomas & Betts that right.  Now they're saying we haven't

2   identified it, so we're switching the burden over to you to

3   identify it and therefore you don't have your 365(n) rights

4   because the Debtors haven't identified it and you haven't

5   identified it and therefore you can't preserve anything.  I

6   can't understand in the context of where Thomas & Betts'

7   rights are protected under 365(n), but the Debtor can simply

8   come in and say we don't know and since you haven't come up

9   with anything you don't have those rights.

10          So this is a situation where the Debtors haven't

11  identified it.  Admittedly Thomas & Betts haven't been able

12  yet to identify anything, but why should Thomas & Betts be

13  prejudiced by the fact that the Debtors haven't identified

14  anything when 365(n), had the Debtors actually identified a

15  license, those rights would be granted to Thomas & Betts?

16  So Thomas & Betts is in effect put in a worse position

17  because the Debtors haven't identified anything, but I don't

18  think legally is an appropriate use of the rejection

19  procedure method in order to prejudice Thomas & Betts'

20  rights.

21          Now again Thomas & Betts hasn't found anything.

22  Maybe there isn't anything, but in the context where there

23  has been a good bit of business done between the two

24  entities and the Debtors have put forth a procedure that

25  basically says we don't know it and hey, if you don't come

A

TR21509

80

1   up with anything you don't have 365(n) rights, I think flies

2   in the face of what the code would provide because I can't

3   imagine how Thomas & Betts could be prejudiced or worse off

4   when the Debtor can't identify a license than it would be if

5   the Debtor had identified a license.

6           So in the context of this, although it's a --

7   it's effectively a reservation, you know we're not trying to

8   hold up a four and a half billion dollar sale.  We don't

9   think it's necessary.  What we've heard is anybody who

10  actually did come forward and was identified -- able to

11  identify a license, had that license added to a known list

12  or had that license acknowledged to be a commercial license

13  and therefore flows through, and what I just heard was that

14  they have now catchall language in all these basically

15  saying anything you haven't identified that's similar to

16  what you've already identified, that will flow through as

17  well.  So they're providing a catchall, effectively a

18  reservation to those people who have identified maybe one

19  license, but maybe have 20.  Thomas & Betts hasn't found

20  anything yet, but at the same time why should Thomas & Betts

21  be in a worse position than those other Creditors?  Seems to

22  me that if the parties come up with a license in the next

23  month, two months, three months, that Thomas & Betts should

24  have whatever rights they would have under those licenses to

25  flow through under 365(n).  They made the election, they

81

1   made the timely election, and we believe that Thomas &

2   Betts' rights should be reserved.

3            THE COURT:  All right.  I understand your

4   argument, Mr. Kunz.

5            MR. KUNZ:  Thank you, Your Honor.

6            THE COURT:  Ms. Schweitzer?

7            MS. SCHWEITZER:  Thank you, Your Honor.  I think

8   that you know this is all how you spin it.  I think that

9   certainly there is prejudice to the Debtors to allow a

10  hypothetical right to go through, but frankly this isn't

11  something novel.  This is something Debtors do all the time

12  in Plan situations.  You say I am rejecting everything that

13  I don't -- I'm not assuming it then per Plan.  I have to

14  have finality in my estate and Thomas & Betts isn't

15  suggesting if I only had one more week, if I only had two

16  more weeks I actually would have made the effort.  They're

17  actually not even suggesting they did make the effort today

18  to look -- collect -- you know exhaustively for all the

19  contracts they might have had.  Notably there's several

20  material suppliers and customers to the company, you know

21  much larger enterprises.  Not to slight them, but Verizon

22  and HP and AT&T and people who have significant commercial

23  relationships all were able to comply with these procedures

24  and all were able to show up and surface and identify their

25  licenses.

A

82

1    And you know with respect to the prejudice like
2    bankruptcy -- first of all the procedures have been
3    approved.  They were on notice.  They didn't come and object
4    to the procedures at the time that they were approved and
5    this is what the procedures do require.  They require
6    specificity, not a matter of nicety, but in a matter of a
7    Purchaser knowing what assets they're taking subject to --
8    as a matter of the Debtor giving the Purchaser
9    representations regarding what assets that are being taken
10   subject to and as a matter again of finality.  There are
11   deadlines all the time in bankruptcy.  There are deadlines
12   in proofs of claims, which they complied with.  Not to say
13   their claim is valid or invalid, but they were able within
14   months to file a proof of claim and collect documents
15   because that was what the laws and the Court order required.
16   They again have a Court order that required them to put in
17   by June the election.  We've contacted them several times
18   after that initial deadline.  Contacted them as recently as
19   last week and said hey, if you have a contract, if you want
20   me to look at a contract show it to me, tell it to me, but I
21   can't give you comfort in abstraction.
22        And specifically with respect to that catchall,
23   it's kind of apples and oranges of saying that we gave
24   comfort to other people with respect to the commercial
25   licenses because we're not seeking to reject commercial

83

1   licenses.  So it's kind of icing on the cake of yes, we're

2   not seeking to reject them, they fall within the definition,

3   and if you have three of them or one of them that have that

4   same exact provision in them, that's a commercial license.

5   We're not trying to reject it.  We're not giving them

6   comfort with respect to adding more licenses onto the

7   schedule, Capital L licenses as we call them or known

8   licenses.  And the Purchaser wants to know, right?  The

9   Purchaser doesn't -- didn't just rubberstamp -- take each of

10  these known licenses.  When people came forward with known

11  licenses, they did have to show copies of the agreements and

12  did have to have the Purchaser have an opportunity to

13  consider whether they want to put on a license and add on --

14  amend the sale agreement.

15          So while I understand that it'd be nice to have

16  more time, it'd be nice to be able to reserve your rights

17  infinitely.  That's not what the procedures require.  The

18  procedures require them to come forward.  If they haven't

19  come forward a month after the procedural deadline, it's

20  important to the Debtors and the Purchasers to have this

21  finality and to be able to enforce the procedures that were

22  approved by the Court.

23          THE COURT:  Thank you, Ms. Schweitzer.  Anything

24  further, Mr. Kunz?

25          MR. KUNZ:  Thank you, Your Honor.  I guess I

84

1   would just say that notwithstanding the definition of

2   commercial licenses or folks coming forward saying hey, I

3   have a license and we've now got the catchalls in these

4   letters that are saying to the extent you have similarly

5   situated licenses there, the fact is if the Debtor had

6   identified something or if any of the parties, Verizon or

7   some of these other parties who came forward and

8   specifically identified licenses, and the Purchaser said I

9   don't think it's a commercial license, they would have had

10  their 365(n) rights.  So they could -- so even if it fell

11  into a rejected license category, each of those parties

12  would have had their opportunity to exercise their 365(n)

13  rights with respect to that.  They would not have been

14  prejudiced in that regard.

15          Finally, with respect to -- it sounds like maybe

16  they're making a -- you know we need in this four and a half

17  billion dollar deal, we need some finality.  I'm the only

18  Objector standing up here.  I don't think it's a -- you know

19  a waterfall situation where you know a thousand more people

20  are going to come forward.  We timely exercised our rights,

21  we timely made the election, and we think we ought not to be

22  prejudiced simply because in the context where the Debtor

23  has been in this case for however many years, it hasn't

24  identified any licenses and it wants us to do so in a month

25  since the procedures were put into place.  It seems to me

85

1    that still the weight ought to be with them and that Thomas

2    & Betts ought not to be prejudiced simply because to date

3    they have not been able to identify a license.  If it's

4    rejected, it's rejected, but we have our 365(n) rights.

5    Thank you, Your Honor.

6            MS. SCHWEITZER:  Your Honor, I don't think we

7    need to belabor the argument, but obviously the Purchaser

8    wants finality and wants to know what they're taking subject

9    to, so I won't go back and forth another round on this one.

10           THE COURT:  No, I understand.

11           MS. SCHWEITZER:  With that just so you have a

12   sense of where we're at, that was the last objection that we

13   were ready to discuss.  There are two more, the HP and

14   Motorola Solutions, that still need about five minutes in

15   the hallway.

16           THE COURT:  All right.

17           MS. SCHWEITZER:  So you're welcome to address any

18   and all the things now to take a break with Justice Morawetz

19   or whatever you think is appropriate at this time.

20           THE COURT:  Well, we'll be able to take a break,

21   but I would just like to address I think the Thomas & Bett's

22   objection before the break because I do -- I am going to

23   overrule that objection.  I think that the procedures were

24   certainly clear.  They were fair and reasonable under the

25   circumstances here of this case.  There has been sufficient

1  time for Thomas & Betts to have located, if you will, or

2  found any potential Capital L licenses and so under those

3  circumstances I believe that the Court's procedures that

4  were put in place, if you will, trump those -- the

5  objection.

6          MS. SCHWEITZER:  Thank you, Your Honor.

7          THE COURT:  And we'll proceed accordingly and

8  hopefully we'll resolve the remaining two objections and

9  this -- I think, Justice Morawetz, is it an appropriate time

10 or do you have some objections in your Court to address

11 first?

12         JUSTICE MORAWETZ:  Ms. Stam, do you wish to say a

13 few words?

14         MS. STAM:  Your Honor, there are no objections to

15 address in the Court.  Just for the record you should have

16 the affidavit of Evan Cobb.

17         JUSTICE MORAWETZ:  Thank you.

18         MS. STAM:  He filed all of the objections that

19 were filed in both the US and Canada and separated them out

20 in terms of the jurisdiction in which they were filed.  To

21 the extent that objections have been -- were filed in both

22 the US and Canada, they've been resolved in Canada in a

23 similar manner as they were resolved in the US.  There were

24 three objections that were filed in Canada only, the

25 objection of ASTER Technologies, Bell Canada, and Aixtron

87

1  Limited and I can advise the Court that each of those

2  objections has been resolved and withdrawn and I don't

3  believe that Counsel is bringing those three parties in the

4  courtroom today.

5       JUSTICE MORAWETZ:  Thank you.  And with respect

6  to your escrow motion, when do you wish to address that?

7       MS. STAM:  I don't believe that needs to be

8  addressed as part of the joint hearing, so we can do it

9  after the --

10      JUSTICE MORAWETZ:  We'll do it immediately after

11 then.  Okay.  Judge Gross, we will take a -- I think Ms.

12 Schweitzer indicated that five minutes was required, but I

13 think it might be better if we give the parties perhaps 10

14 to 15 and that way they can complete because I keep hearing

15 these words cooperation and expedite and I trust that

16 Counsel will keep those in mind in their deliberations.

17      MS. STAM:  Your Honor, one more thing.  It would

18 be helpful.  There have been a few changes to the order

19 since the version that was filed in the motion record, so

20 perhaps I can hand up the --

21      JUSTICE MORAWETZ:  Hand that up now and I'll take

22 a look.  Thank you.

23      THE COURT:  All right.  Why don't we take a 15-

24 minute break at this point?  Hopefully you'll address the

25 objections and Justice Morawetz and I will confer.  Thank

88

1   you, Counsel.

2   (Recess from 11:40 a.m. to 12:34 p.m.)

3            THE CLERK:  Please rise.

4            THE COURT:  Thank you, everyone.  Please be

5   seated.  Justice Morawetz will be out momentarily.

6            THE CLERK:  All rise.

7            THE COURT:  I see we're back, Justice Morawetz.

8            JUSTICE MORAWETZ:  Yes, Judge Gross.  Hopefully

9   you've got some good news coming from Counsel.

10           THE COURT:  Ms. Schweitzer?

11           MS. SCHWEITZER:  Yes, Your Honor.  With respect

12  to the last two objections, the first one I misspoke, wasn't

13  from Motorola Solutions.  It was Motorola Mobility.

14           THE COURT:  Okay.

15           MS. SCHWEITZER:  They are two different Motorola

16  -- the other Motorola's objections were fully resolved.

17  Motorola Mobility now has conferred with the Sellers and the

18  Purchaser and they too have entered -- agreed that Motorola

19  Mobility on the one hand and Purchaser on the other hand

20  would enter into a side letter and by that agreement have

21  fully resolved that objection.  I believe she's in the

22  courtroom.  I don't know that she needs to come to the

23  podium, but --

24           UNKNOWN:  That's correct, Your Honor.

25           THE COURT:  Wonderful.  I see confirmation that

89

1   your representation is correct of course, Ms. Schweitzer.

2          MS. SCHWEITZER:  And then for the second one, HP,

3   I'll turn it over to Mr. Abbott.

4          THE COURT:  All right.  Mr. Abbott?

5          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

6   for the Nortel US Debtors.  Your Honor, we spent a lot of

7   time and effort in the hall talking to HP, trying to get

8   them comfortable, and sort through some language that we

9   could agree to in writing.  We were unable to get as far as

10  being able to reduce something to writing.  We did, Your

11  Honor, agree to make essentially two representations on the

12  record.

13         We think, Your Honor, that the hearings both here

14  and in Canada and at the procedures hearing and today, have

15  made this clear, but we're going to -- I'm going to try to

16  restate it again carefully to try to alleve [sic] whatever

17  concerns HP continues to have.  Mr. Crapo is on the phone,

18  Your Honor, and may wish to be heard in respect to these.

19         But essentially, Your Honor, HP will continue to

20  be able to use the patents that are being sold to the extent

21  that they're licensed under commercial licenses and known

22  licenses.  Those are defined in the sale agreement.

23         THE COURT:  Right.

24         MR. ABBOTT:  To the extent that those licenses

25  are valid and enforceable today and to the extent that they

1   remain so under the terms and conditions of those license

2   grants.  Obviously as those licenses expire or otherwise

3   terminate, so will HP's rights.

4           Your Honor, second we want to make clear that the

5   purchased assets in this transaction do not include any

6   license from HP and Purchaser is not assuming any such

7   licenses from HP to the extent that they may exist.  Not

8   part of the sale agreement.  We believe the sale agreement

9   is clear and explicitly states that, not specifically with

10  respect to HP, but explicitly states that they are not

11  assuming any licenses.

12          THE COURT:  That's right.

13          MR. ABBOTT:  Your Honor, so I think with those

14  representations we believe that moots whatever remaining

15  objections HP may have.  We agreed to make those

16  representations on the record.  I leave it, Your Honor, to

17  Mr. Crapo to state if he wants to -- if they're accepting

18  those representations or not.  But unfortunately we were not

19  able to get to writing where we could both stand up here,

20  Your Honor, and say this is done.  So I'll turn it back to

21  the Court and if you wish to hear from Mr. Crapo.

22          THE COURT:  Of course.  Thank you, Mr. Abbott.

23  Mr. Crapo?

24          MR. CRAPO:  The concern that we've had, Your

25  Honor, HP has had throughout this process is that the

91

1   licenses were going to be sold subject to the -- you know

2   various licenses.  What we -- the concern that we had is

3   because at this point the licenses are not going to be --

4   the license agreements are not either going to be assumed or

5   rejected.  The meaning of the phrase subject to, especially

6   when there's a bankruptcy loss on top of it, was uncertain.

7   So what we had been looking for with language in the sale

8   order to the effect of what Mr. Derek had said or something

9   more generally like non-Debtor licensees under Capital C

10  commercial licenses and known licenses, but Nortel patents

11  will continue to enjoy the rights to utilize and exploit

12  those license patents, related IP's so long as such use and

13  exploitation complies with the terms of the applicable

14  license agreement and so long as the license agreements

15  remain in force and effect.

16          THE COURT:  That sounds --

17          MR. CRAPO:  That was what we were trying to do is

18  to get -- to have language like that in the order.  We had

19  made the suggestion.  I had drafted some language, which I

20  included in our objection, which tracked the language of

21  365(n), which Nortel and Rockstar Bidco were uncomfortable.

22  But that is the position is we'd like to get language in the

23  order that actually spells out the meaning of subject to.

24          THE COURT:  Aside from the word differences, it

25  sounds to me like the concept that Mr. Abbott raised was

92

1   pretty much identical.

2           MR. ABBOTT:  Your Honor, it's similar.  Derek

3   Abbott again for Nortel.  I think there was a breadth issue

4   in Mr. Crapo's language that is not going to work with their

5   Purchaser because all we're talking about here is the sale

6   of patents and there's no related --

7           THE COURT:  Right.

8           MR. ABBOTT:  -- technology or related IP I think

9   was the word he used.

10          THE COURT:  Oh, oh, oh.

11          MR. ABBOTT:  Just the patents are all we're

12  talking about here, Your Honor.

13          THE COURT:  Okay.

14          MR. ABBOTT:  I think conceptually it sounds like

15  we're pretty close, but I've got some very strict parameters

16  I'm trying to work with with the Purchaser and their various

17  Counsel to try to make clear.  And Your Honor, as you've

18  seen this is an issue that's come up in a number of

19  objections and we've made each of the other Objectors

20  comfortable with essentially the representations that I just

21  made, Your Honor, some of them introduced it into --

22          THE COURT:  Side letters.  Yeah.

23          MR. ABBOTT:  -- side letters, but that's really

24  as far as we can go and I don't think I hear Mr. Crapo

25  asking for more than what I've represented, but I leave that

93

1  to Your Honor.  We're just not in a position today to try to

2  get this order entered and try to work out language in a

3  side letter later.  We need clarity now.  Obviously we've

4  got a lot of folks and a lot of judicial resources in play

5  right now and we'd like some finality, as the Purchasers I

6  think are entitled to, Your Honor.

7           THE COURT:  Have you read any of the language

8  from your side -- from a side letter to Mr. Crapo?

9           MR. ABBOTT:  Your Honor, we've got Mr. Crapo's

10 colleague, who's here today.  We've also been on the phone

11 with Mr. Crapo and both colleagues and clients -- his

12 clients talking about specific language that for whatever

13 reason we couldn't get down to brass tacks and I think the

14 two representations that I've made really do cover what are

15 the legitimate remaining issues by HP and so we don't think

16 that those are any basis on which the Court should

17 disapprove or delay the sale.  I'll try to respond further

18 to questions or whatever you --

19          THE COURT:  I don't have -- I understand your

20 position very well and I just didn't make the distinction

21 that you've made, which is nothing a patent lawyer -- the

22 difference between patents and IP you know and but I

23 appreciate the care with which you've used the term.  I'm

24 satisfied with the representation insofar as HP's objection

25 is concerned.  I think that by the representation I mean

94

1  Nortel's representation on the record through Mr. Abbott, I

2  think that that is what HP is entitled to and is sufficient

3  under the circumstances.

4          MR. ABBOTT:  Thank you, Your Honor.

5          THE COURT:  And I will approve that

6  representation and on the basis of it overrule the HP

7  objection or reservation of rights.  I don't recall

8  specifically which it was.

9          MR. ABBOTT:  There were a number of -- an

10  objection and amended objection.  There were a handful, as

11  long as they're all overruled, Your Honor, then we're

12  comfortable.

13          THE COURT:  Yes.  All overruled.  Yes, sir.  Yes.

14  (Laughter)

15          MR. CRAPO:  Mr. Abbott, would you -- if you could

16  just repeat for me so I can let my client know what the

17  representation, the main representation is?  HP will

18  continue?

19          MR. ABBOTT:  There were two.

20          THE COURT:  Yes.

21          MR. ABBOTT:  HP will continue to be able to use

22  the patents to the extent licensed under commercial licenses

23  and known licenses.  Those terms are defined in the sale

24  agreement.  To the extent that they are valid and

25  enforceable as of today and to the extent that they remain

A

TR21509

95

1    so under the terms and conditions of such license grants.

2    The corollary to that is that as those license grants expire

3    or terminate in accordance with the terms and conditions of

4    those licenses, those rights will go away.  The second was

5    simply that the purchased assets do not include any license

6    from HP and that Purchaser isn't assuming any such licenses.

7            THE COURT:  And that was the definition of

8    purchased assets as I recall.

9            MR. ABBOTT:  Well, it's covered in the definition

10   of purchased assets in the sale agreement, Your Honor.

11           THE COURT:  Yes.

12           MR. ABBOTT:  I didn't try to rearticulate that

13   definition, which I probably would not be able to do, but

14   that's --

15           THE COURT:  Right.

16           MR. CRAPO:  And Mr. Abbott, the definition of

17   commercial license includes the [indiscernible], the

18   definition of commercial licenses set forth in Rockstar's

19   acknowledgment that they filed after the -- they were the

20   successful bidder because that would include licenses that

21   had not yet been discovered.

22           MR. ABBOTT:  Your Honor, may I have a moment?

23           THE COURT:  You may.

24           MR. ABBOTT:  To be clear, Your Honor, the

25   definitions of commercial licenses and known licenses are

A

1   the definitions included in the sale agreement.  There was

2   an acknowledgment filed, Your Honor, and the amended and

3   restated acknowledgement, Your Honor, that I think was filed

4   with the Debtors reply specifically incorporates capitalized

5   terms not otherwise defined as those in the sale agreement

6   at paragraph 1.  So it's the definitions that are included

7   in the sale agreement.  Obviously the acknowledgment is what

8   it is, but it does not purport to change the definitions of

9   those two things as set forth in the sale agreement.

10          THE COURT:  Mr. Crapo, does that help you?

11          MR. CRAPO:  Actually it would have been better if

12  the -- it would have been of more comfort to HP if the

13  definition of commercial license was the one -- Rockstar in

14  its acknowledgment because it covers any commercial licenses

15  not as has been explained earlier, not cross licenses that

16  are discovered in the future.

17          THE COURT:  Mr. Crapo, the parties here are

18  consulting with one another.

19          MR. ABBOTT:  Your Honor, Derek Abbott for Nortel

20  again.  We may be just talking past each other I'm afraid,

21  but let me articulate I think what the position is.  In that

22  acknowledgment, Your Honor, paragraph 2 and I'll just read

23  it verbatim so Mr. Crapo can hear it if he's not looking at

24  it.  It says all agreements listed in Schedule A hereto, as

25  well as all amendments and supplements thereto, whether or