# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
|  | (Jointly Administered) |
| Debtors. |  |

## AFFIDAVIT OF PAVITER BINNING SWORN APRIL 10, 2014

## Submitted by the Canadian Allocation Group (including the CCC)

---

[1]    The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### - COMMERCIAL LIST

### IN THE MATTER OF
### THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AFFIDAVIT OF PAVITER BINNING
### (Sworn April 10, 2014)

I, Paviter Binning, of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY:**

1.      I was the Executive Vice-President and Chief Financial Officer ("CFO") of Nortel Networks Limited ("NNL") and Nortel Networks Corporation ("NNC") from November 2007 to March 2010, as well as the Chief Restructuring Officer from February 2009 until March 2010 following the filing by NNC, NNL and the other applicants (the "Canadian Debtors") for protection under the Companies' Creditors Arrangement Act. As such, I have personal knowledge of the matters to which I hereinafter depose.  Where I do not have personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true. I have reviewed a copy of each and every exhibit or document identified in this affidavit prior to swearing it.

- 2 -

## I.    QUALIFICATIONS AND WORK EXPERIENCE

2.    I am a fellow of the Chartered Institute of Management Accountants in the United Kingdom (the "UK"), one of the large professional associations for accountants in the UK.

3.    After completing my training and gaining initial experience as a finance professional in the UK, from 1986 to 2003, I worked in various finance roles at Diageo PLC, including Chief Financial Officer Europe, Chief Financial Officer Americas, Group Controller and Head of Corporate Finance. Diageo is a global consumer goods company with headquarters in the UK and operations in 180 counties across the globe.

4.    From 2003 to 2006, I was the Chief Financial Officer of Telent PLC, formerly Marconi Corporation PLC. Marconi was a global telecommunication equipment supplier and operated in the same business as Nortel[1].

5.    From January 2007 to September 2007, I was the Chief Financial Officer at Hanson PLC, a global building materials and construction company.

6.    I am currently the President of George Weston Ltd., one of Canada's largest public companies. I have held that position since July 2011. I was also the Chief Financial Officer of George Weston Ltd. from August 2010 until March 2012.

## II.    NORTEL'S ORGANIZATION STRUCTURE

7.    When I became CFO, I received a briefing regarding, among other things, Nortel's governance and business operations including its corporate structure as well as its various global functions including operations, sales, finance, audit, treasury, tax, legal, marketing, pensions, technology and human resources. Each of these global functions were also performed

---

[1] When I refer to "Nortel" or the "Nortel group" in this affidavit, I am speaking of NNC and its direct and indirect subsidiaries.

- 3 -

at a regional level and some at a company level. Certain functions, such as sales and product development, were also co-ordinated across lines of business ("LOB").

8.     Each region had its own management team and each company within the business had its own governing board of directors. The business and operations of Nortel were co-ordinated on both regional and global levels. The region that included Europe, the Middle East and Africa (known as "EMEA") had its own regional functions and also performed certain global treasury functions in the UK. While many of the global functions were overseen by corporate officers in North America such as myself, we sought and received regional and country-specific advice including operational, legal and financial advice (including tax and treasury) from employees, management and advisors of each company and region.

9.     Also, each subsidiary was organized, and its business was conducted, in accordance with local laws. The boards of directors of the subsidiaries were comprised of senior employees within Nortel, who met and considered the transactions and other matters that required board approval from the subsidiaries in accordance with local laws and governance requirements. I consider that the Nortel management team and governance processes at the board level were of the highest quality and integrity.

10.     Based on my experience with other global organizations, Nortel was organized, operated and functioned in a manner typical of other multinational groups of companies. This included the IP ownership structure which provided for ownership of the IP to reside with the parent in Canada, namely NNL, with licenses granted to other subsidiaries. This was something I specifically inquired about when I arrived at Nortel. This ownership structure, where the IP is owned by the parent company and held in a single jurisdiction, is similar to that of other global

- 4 -

companies where I worked, including Marconi. Moreover, nobody at Nortel ever suggested to me that the subsidiaries had a "beneficial ownership" in the IP.

## III.    FINANCIAL POSITION OF NORTEL

### A.    Financial Outlook from November 2007

11.    When I joined Nortel in November 2007, Nortel was taking steps to enhance business performance after having dealt with a number of challenges in the preceding years, including:

(a)    the burst of the high-tech bubble in early 2001 and the resulting significant downturn in the telecommunications industry and Nortel's business. This industry-wide decline impacted Nortel and its competitors whose revenue and profitability reduced significantly. The recovery from this had been slow and punctuated by intermittent lapses, but directionally positive overall;

(b)    a series of significant restructurings that had reduced the number of worldwide Nortel employees from approximately 90,000 to 33,000 and significant changes in business operations, including the outsourcing of all hardware manufacturing operations with corresponding cost reductions; and

(c)    the discovery of certain accounting irregularities in early 2003 that led to the commencement of criminal and regulatory investigations, shareholder class actions, the termination for cause of NNC and NNL's then CEO, CFO and Controller (among others) and the restatement of NNC and NNL's financial statements for the years 2000 through 2005.

12.    In November 2007 when I became CFO, Nortel had managed its way through these challenges and had a positive business outlook. I believed Nortel's existing operations were

- 5 -

well-grounded and Nortel was pursuing a viable plan which could see it become, once again, one of the leaders in the telecommunications industry. I had recently been involved with Marconi and its efforts to recover from the high-tech bubble burst; Nortel's recovery, although slower, was well underway when I joined.

13.     From the time that I joined Nortel through to late August/early September 2008, at no time did I consider Nortel to be in financial difficulty or in financial distress. By that, I mean it was not insolvent, technically insolvent, near insolvent, of doubtful solvency, facing a real risk of insolvency, inevitably insolvent, or experiencing a material weakening of financial position.

14.     To the contrary, Nortel's financial results had displayed progress in the first two quarters completed subsequent to my appointment as CFO. For example, with respect to NNC's financial results for Q1 2008[2]:

    (a)     revenue increased by 11% over prior year period;

    (b)     gross margin increased by 120 basis points over prior year period; and

    (c)     operating margin was up by 520 basis points over prior year period.

15.     Similarly, in Q2 2008[3]:

    (a)     revenue increased by 2% over prior year period;

    (b)     gross margin increased by 204 basis points over prior year period. This marked the 7th consecutive quarter where gross margin increased over the prior year period.;

---

[2] NNC press release dated May 2, 2008 "Nortel Reports Financial Results for the First Quarter 2008" (EMEAPROD1414417)

[3] NNC press release dated August 1, 2008 "Nortel Reports Financial Results for Second Quarter 2008" (NNI_00500348)

- 6 -

(c)     management operating margin was up by 302 basis points over prior year period. This marked the 8th consecutive quarter where gross margin increased over the prior year period.

16.     With respect to the 2007 audit of NNC and NNL's financial statements that I was involved with as CFO, I specifically considered whether there was substantial doubt about the ability of NNC or NNL to continue as going concerns. This type of consideration is conducted as part of management's assessment and presentation of the financial statements.

17.     Those of us who were responsible for the financial statements determined that no such doubt existed and that there was no need for a going concern exception in NNC or NNL's financial statements. In coming to my assessment of the ability of NNC and NNL to continue as going concerns in the audit process for the 2007 financial statements, I considered, among other things, Nortel's financial forecasts, cash flows on an operating basis, availability of financing, cost of financing and restructuring plans being pursued at the time.

18.     In light of the earlier financial restatements, Nortel's management and auditors were extremely vigilant in their quarterly and annual audit reviews and subjected the financial statements and forecasts to an even higher level of scrutiny than would ordinarily have been expected. Given the size of the goodwill and deferred tax assets on NNC's and NNL's balance sheets, enormous care and consideration was given to their carrying value and whether these values could be supported. (Goodwill and deferred tax impairment was another issue that I specifically discussed, both with management and with the auditors, when I joined Nortel in November 2007.)

19.     The auditors of Nortel, who were very familiar with Nortel's business, operations and prospects, understood Nortel's forecasting abilities and had access to people and records which

- 7 -

they considered necessary in order to carry out their audits, did not suggest that there should be a going concern exception either. At this time, Nortel's viability was not at issue; had I considered it to be otherwise, I would have insisted that a going concern exception be included in the 2007 financial statements.

20.     Just as with other companies I have had experience with, Nortel's cash flow forecasting ability was better in the short-term than the long-term. The nature of the technology industry, however, created an additional layer of uncertainty around Nortel's forecasts beyond one or two quarters where it was often difficult to predict when Nortel would be able to recognize certain revenue and when payments from customers, which may have been predicated on the occurrence of certain events or only once certain approvals had been received, would occur. The farther out the projections, the more uncertain they became. Longer term forecasts were dependent upon general market and external assumptions, as opposed to upon company-specific information. Nortel used long-term forecasts primarily for strategic planning purposes or for specific limited purposes, including with respect to the prescribed accounting assessments of goodwill and deferred taxes. The extent to which longer term forecasts were used and relied upon at Nortel was consistent with my experience with these types of forecasts at other companies.

21.     I considered the forecasts (both short-term and long-term) that Nortel had prepared to be reasonable and appropriate for their intended uses. Prior to late August/early September 2008, the short-term forecasts that were used for operational purposes were prepared and reviewed at least quarterly by senior management and were then also shared with the auditors of Nortel, who had an understanding of the nature of the Nortel business and inputs and assumptions underlying its different forecasts. Longer term forecasts were prepared and reviewed annually

- 8 -

but updated in the interim if changes to the shorter term forecasts suggested a review (an example of this occurred in Q3 2008 when goodwill and deferred taxes were written down – see NNC's November 10, 2008 press release at PC0151281). Both management and the auditors tested and analyzed our forecasts, including when actual results did not meet the forecasts.

## B.    Financial Outlook from late August/early September 2008

22.    During the period immediately leading up to the collapse of Lehman Brothers in September 2008, there was a lot of publicity questioning the stability of the financial sector and companies like Lehman Brothers. This impacted business throughout the world as almost immediately, the capital markets began to shut down.

23.    The hype leading up to the Lehman Brothers collapse prompted me, in late August/early September 2008, to review Nortel's financial projections for the year and liquidity. After the financial projections had been updated, from a risk-management perspective, I considered it prudent to review the liquidity position of each Nortel entity around the world. We used our existing cash flow forecasting procedures and supplemented them to include additional levels of information by developing forecasts by legal entity and forecasting cash collection and payments by region. We were also looking for ways to improve working capital management, in particular the collection and payment processes (for example, by reducing accounts receivable errors).

24.    The impact of the Lehman collapse and the unfolding economic crisis on Nortel was significant and immediate. With customers focusing on their own liquidity, cutting capital expenditures, scaling back orders, and deferring new investments, there was a negative impact on Nortel's sales and revenues. This was reflected in the results of the forecast and liquidity review and it led me to believe that NNC would not achieve its previously announced forecasts

- 9 -

and thus NNC issued a profit warning on September 17, 2008 . At the time, NNC also announced its intention to explore a divestiture of its Metro Ethernet Networks ("MEN") business.[4]

25.    It was at this time that I first began having concerns about Nortel from a risk perspective, which concerns are reflected in a presentation that I made to the Board of Directors on September 30, 2008 (Exhibit 22055).  Despite these concerns, however, I did not consider that Nortel was at imminent risk of insolvency or had immediate viability issues. Instead, it was my belief that Nortel would be able to work through its challenges and turn itself around.

26.    As a result of the downturn and the uncertainty surrounding how much worse the financial situation was going to get,  I was focused on assessing Nortel's liquidity and long term viability.  Although my concerns regarding liquidity were focused primarily on Canada due to its relatively low cash position and disproportionately high headquarter and research and development ("R&D") costs, as CFO it was important to me to consider liquidity in all of the entities and regions around the world.

27.    One of the external factors for evaluating the business came from the rating agencies. From a liquidity perspective, the credit rating agencies views were particularly important to me. In November 2008, Standard & Poor's ("S&P") reaffirmed NNL's credit ratings, stating that: "The affirmation primarily reflects our view that Nortel should be able to sustain adequate levels of liquidity in the next 12-18 months to support its high fixed charges and turnaround efforts despite difficult market conditions and company-specific challenges."[5] S&P's review of

---

[4] 2008 10-K (NNC-NNL06001427), pg. 6 and NNC press release dated September 17, 2008 "Nortel Announces Preliminary View of the Third Quarter and Revised Full Year 2008 Outlook" (EMEAPROD2070256)

[5] Exhibits 22058 and 22059

- 10 -

NNL's liquidity position and decision to not downgrade the credit rating was positive third party information that could be used to reassure customers and suppliers.

28.    Throughout November and December of 2008, Nortel was engaged in ongoing dialogue with customers who were trying to decide whether to award new contracts to Nortel and had concerns regarding Nortel's long-term viability and whether Nortel could commit to the investments required to see through the development of the next generation technology, particularly its LTE (4G) technology. Prior to this, I had only been asked to speak to Nortel customers in a few instances where they had raised concerns about NNL's credit ratings. None of those earlier conversations left me with the impression that the customers had concerns about the long term viability of Nortel. The discussions I had with Nortel customers in late 2008 had not only markedly increased in number, but were also of a different nature and degree.

29.    Up until the period prior to the commencement of the bankruptcy proceedings, during my tenure as CFO, I believed that Nortel had sufficient cash reserves and access to capital to meet its current and reasonably foreseeable obligations as they came due. This was based, in part, on our regular review of cash balances and likely movements of cash that were constantly being assessed and updated in Nortel's cash flash reports and global cash commentaries.

30.    By January 2009, with the continued decline in revenue, profitability and cash flows following the economic crisis and a multitude of customer and supplier concerns that could not be assuaged, I was not able to identify a sustainable future business plan, even though the immediate cash might have sustained Nortel in the short term. This is when my views of Nortel's future changed.

- 11 -

## IV.   NORTEL CASH MANAGEMENT

31.     One of my roles as CFO was to oversee the management of cash across the Nortel group
of companies. Similar to the other multinational corporations where I had worked, the purpose
of the cash management function at Nortel was to ensure that there was liquidity, both at the
group and local levels, to support the operations of the business.

32.     When I joined Nortel in November 2007, the Nortel group had a cash balance exceeding
$2 billion, which overall, I considered to be a healthy balance.  However, a substantial portion
of this cash was located in entities around the world (such as Ireland and England) that did not
require those levels of cash for their operations (I refer to this as "surplus cash").

33.     In my experience with multinational companies such as Nortel, it is consistent with
prudent liquidity management, and quite common, to transfer surplus cash from the subsidiaries
to the parent company or other affiliates that require it so that it can be utilized for the overall
benefit of the group (which includes the subsidiaries). Such needs may include, among other
things, the payment of dividends, the servicing of debt obligations, supporting growth
initiatives, the funding of R&D and headquarter expenses, as well as the overall optimization of
the group's capital structure and liquidity. I note that it may also be beneficial for funds to be
transferred *between* subsidiaries to, among other things, support investment and manage
working capital levels.

34.     Cash management on a group level meant that surplus cash be put to its highest and best
use for the overall benefit of the enterprise. If an entity did not need all the cash that it held to
fund existing or foreseeable obligations, it was in the broader group's interest to make more
effective use of it elsewhere in the group. The individual entities ultimately benefitted from the
efficient use of surplus cash across the organization to reduce external debt, fund headquarter

- 12 -

and R&D costs, support growth initiatives and enable the broader group to provide continued support, all of which were in the best interests of all of the entities within the organization.

35.    The transfer of surplus cash was achieved through loans, dividends, equity injections and return of capital that were documented and approved by the board of directors of the entities involved. Nortel also had notional cash pooling arrangements which were simply a means of enhancing investment income on the cash balances that existed from time to time in different regions.

36.    Relatively early in my tenure, I conducted a review of where Nortel's cash balance resided globally and found significant surplus amounts in various jurisdictions, including EMEA and China, among other locales. I refocused an ongoing project of identifying this surplus cash and looking for ways to transfer it to Canada in light of the disproportionately high R&D costs and headquarter costs in Canada and also so that it would be under my control. I could then deploy the cash in the most effective way for the overall benefit of the group.

37.    Based on my experience at Marconi, it was my observation that when cash was centralized and under the purview of the group CFO, it led to greater cost consciousness and working capital management in the business. In my experience, this type of arrangement had significant positive effects in the management of working capital and bringing down selling general and administration ("SG&A") expenses, thereby improving operating profit and cash flow across the group.


V.    **PROJECT COPPERHEAD**

38.    As part of this process, I had identified a significant amount of surplus cash in Nortel Networks UK Limited ("NNUK"). After the market collapse in September 2008, I contacted

- 13 -

Sharon Rolston, a director of NNUK, and discussed the possibility of moving some of the surplus cash from NNUK to Canada by way of a documented inter-company loan, as was previously the practice at Nortel. Ms. Rolston told me that from a fiduciary responsibility point of view, the Board of Directors of NNUK could not condone the movement of cash back to Canada in support of the overall group. Putting myself in her shoes from a governance perspective, I understood the concern and did not pursue the matter further.

39.    It is for this reason that in an email dated November 27, 2008 (Exhibit 22068) regarding the establishment of a working group for Project Copperhead (which project involved the creation of a contingency plan in the event Nortel could not sustain a liquidity position in certain entities), I indicated that there was no need to involve Ms. Rolston at this time in discussions concerning the project since NNUK was not willing to participate in any restructuring that involved relocating cash from NNUK. At that time, given the surplus cash position of NNUK, I did not have liquidity concerns regarding NNUK or its subsidiaries. I note, however, that NNUK and the EMEA entities were made aware of and involved in Project Copperhead through the president of EMEA, Darryl Edwards, and restructuring counsel to NNUK (Herbert Smith) who were included in this working group email.

## VI.    IP LICENSING

40.    Prior to the commencement of the bankruptcy proceedings, John Veschi was hired to lead the IP law group. One of Mr. Veschi's mandates was to consider the development of a licensing option for the IP which would effectively operate as a new line of business. Ultimately, no licensing business was commenced prior to or after the filings.

- 14 -

## VII.    NORTEL'S RESTRUCTURING AND DECISION TO SELL

41.    In light of the impact of the deteriorating market conditions and weakening customer commitments on Nortel's financial outlook, Nortel made the decision to commence formal bankruptcy and insolvency proceedings in Canada, the U.S. and England (respecting various EMEA entities) on January 14, 2009.

42.    Upon the commencement of the bankruptcy proceedings in Canada, the US and England, Nortel focused on right-sizing its business as well as considering its overall restructuring options.    These considerations were made in conjunction with Nortel's financial advisors, Lazard Frères & Co. LLC and McKinsey & Company, legal advisors to each of the estates, the Monitor, the Joint Administrators and various creditor groups (including their financial and legal advisors).

43.    Although numerous options and variations were considered, the primary options considered at that time were (a) a restructuring around Nortel's Code Division Multiple Access ("CDMA") business (a "CDMA Co. Restructuring"), which was the most significant line of business within Nortel's Carrier Networks business segment; or (b) a sale of all of the lines of business.


### A.    CDMA Co. Restructuring

44.    One of the options we considered was selling off most of Nortel's lines of business and reorganizing the business around CDMA given its strong market position. Under this strategy, the proceeds of the sales of the other lines of business would be used to pay down debt and, along with the cash generated by the CDMA legacy business, fund necessary working capital

- 15 -

for the emerging LTE business. In effect, a smaller Nortel would emerge centered on its legacy CDMA business and the successor LTE business.

45.    Although the CDMA business was a significant revenue generator for Nortel up until it was ultimately sold, it was 2nd generation (2G) wireless technology which was being replaced with 3rd and 4th generation (ie. 3G and 4G) technology (UMTS and LTE technology respectively) by major customers. The installation and maintenance of this type of technology (primarily by the large telecommunications companies) is a significant investment and contracts are awarded to companies that not only have the best technology, but are also able to perform the necessary R&D for improvements and maintain the installed base over time.

46.    Ultimately, Nortel did not pursue the CDMA Co. Restructuring option for two primary reasons.

47.    First, Verizon, Nortel's major customer for CDMA technology, did not support this plan. In early 2009, Verizon informed Richard Lowe, Nortel's President of Carrier Networks, who in turn informed me, that it questioned whether Nortel would be able to support the business going forward and was not going to award its LTE (4G) contracts to Nortel. (I subsequently spoke to the CFO of Verizon directly to confirm this information.) In late 2008, as noted above, other customers across Nortel's lines of business had started expressing similar concerns about the viability of the Nortel group as a whole and continued to do so post-filing. I personally spoke with CFOs or other members of senior management of customers, such as Comcast and AT&T, to address their ongoing concerns about awarding new contracts to Nortel.

48.    Second, over the course of early 2009, it became clear that it would not be possible for Nortel to obtain the funding that would have been required to restructure around a CDMA Co. model.

- 16 -

49.     For these reasons, the decision to sell all of its lines of business was seen by Nortel as the best way to maximize value.

## B.      The Decision to Sell

50.     In June 2009, management and the estates collectively determined that the best means to maximize value for its creditors was to sell Nortel's lines of business and other assets; in short, it was determined to commence a "liquidating insolvency".

51.     In order to sell the business units, Nortel undertook a carve-out process to align the assets with the businesses being sold. This included, among other things, the segregation of assets by lines of business and preparation of carve out financial statements.

52.     During the course of 2009 and the beginning of 2010, Nortel sold its various lines of business including the CDMA/LTE, Enterprise, MEN, GSM/GSM-R, CVAS, Next Generation Packet Core, Multi-Service Switch business (the "LOB Sales") and ultimately, the residual intellectual property. My objectives in this sale process were, in addition to maximizing value for all stakeholders, putting the technology in safe hands, protecting as many jobs as possible and making sure the customers still had a business that would support them going forward.

53.     There are many possible contributors to the value of a business in this type of a sale, but overall, in the context of Nortel's LOB Sales, it was my view at the time and remains my view today that in Nortel's market, as between customer relationships and technology, technology is the main driver of value for a number of reasons. First, in deciding what technology to purchase, a telecom operator is concerned with creating a competitive advantage in the industry by having technology that is not available to its competitors. Second, from a cost efficiency perspective, a purchaser will determine whether it can purchase comparable technology from

- 17 -

another supplier at a cheaper price, or whether the technology can be used to lower its own cost base. Third, the nature of the technology involved in the LOB Sales creates an "install base" with a captive customer, which in turn means that it is primarily the technology which feeds the long-term customer relationships. In other words, if you do not have superior technology, protecting customer relationships over the long-term will be difficult.

SWORN BEFORE ME at the City of
Toronto, in the Province of Ontario on
April 10, 2014.

_____
Niklas Holmberg
Commissioner for Taking Affidavits

_____
PAVITER BINNING

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**- COMMERCIAL LIST**

**IN THE MATTER OF**
**THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36,**
**AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**ERRATA SCHEDULE OF PAVITER BINNING**
**Re: Affidavit sworn April 10th, 2014**

| Paragraph/footnote reference in Affidavit of Paviter Binning sworn April 10th, 2014 | Changed from | Changed to | Reason |
|---|---|---|---|
| Paragraph 14 | 520 basis points | 512 basis points | Typographical error |
| Footnote 4 | (NNC-NNL06001427) pg. 6 | (NNC-NNL06001427) pg. 5-6 | Typographical error |

SWORN BEFORE ME at the City of
Toronto, in the Province of Ontario on
April 24, 2014.

_____
Niklas Holmberg
Commissioner for Taking Affidavits

_____
*PSB*
PAVITER BINNING

# Index

**AFFIDAVIT OF PAVITER BINNING (sworn April 10, 2014)**

**INDEX**

| Tab | Paragraph Referred to in Affidavit | Trial Exhibit Number | Depo Exhibit Number or Bates Number |
|-----|-----------------------------------|---------------------|-------------------------------------|
| 1 | Paragraph 14; Footnote 2 | TR43351 | EMEAPROD1414417 |
| 2 | Paragraph 15; Footnote 3 | TR47237 | NNI_00500348 |
| 3 | Paragraph 21 | TR49668 | PC0151281 |
| 4 | Paragraph 24; Footnote 4 | TR43999 | NNC-NNL06001427 |
| 5 | Paragraph 24; Footnote 4 | TR43445 | EMEAPROD2070256 |
| 6 | Paragraph 25 | TR22055 | Exhibit 22055 |
| 7 | Paragraph 27; Footnote 5 | TR22058 | Exhibit 22058 |
| 8 | Paragraph 27; Footnote 5 | TR22059 | Exhibit 22059 |
| 9 | Paragraph 39 | TR22068 | Exhibit 22068 |

6330479