Table of Contents
**ITEM 7A.    Quantitative and Qualitative Disclosures About Market Risk**

Market risk represents the risk of loss that may impact our consolidated financial statements through adverse changes in financial market prices and rates. Our market risk exposure results primarily from fluctuations in interest rates and foreign currency exchange rates. We maintain risk management control systems to monitor market risks and counterparty risks. These systems rely on analytical techniques including both sensitivity analysis and value- at- risk estimations. We do not hold or issue financial instruments or third party equity securities for trading purposes.

**Termination of Derivative Hedging Instruments**

To manage the risk from fluctuations in interest rates and foreign currency exchange rates, we had entered into various derivative hedging transactions in accordance with our policies and procedures. However, as a result of our Creditor Protection Proceedings, the financial institutions that were counterparties in respect of these transactions have terminated the related instruments. Consequently, we are now fully exposed to these risks and we are unable to mitigate them. We expect to remain so exposed at least until the conclusion of the Creditor Protection Proceedings.

Additional disclosure regarding our derivative hedging instruments is included in note 13, "Financial instruments and hedging activities" to the accompanying audited consolidated financial statements.

**Foreign Currency Exchange Risk**

Our most significant foreign currency exchange exposures for the year ended December 31, 2008 were in the Canadian Dollar, the British Pound, the Euro and the Korean Won. The net impact of foreign currency exchange fluctuations resulted in a loss of $38 in 2008, a gain of $176 in 2007, and a loss of $12 in 2006.

Given our exposure to international markets, it has been our practice to try to minimize the impact of such currency fluctuations through our ongoing commercial practices and, prior to the commencement of the Creditor Protection Proceedings, by attempting to hedge our major currency exposures. We regularly identify and monitor operations and transactions that may have material exposure based upon an excess or deficiency of foreign currency receipts over foreign currency expenditures. Prior to the initiation of our Creditor Protection Proceedings and termination of our derivative hedging instruments, we attempted to manage these exposures using forward and option contracts to hedge sale and purchase commitments. For example, we had entered into U.S. to Canadian Dollar forward and option contracts intended to hedge the U.S. to Canadian Dollar exposure on future revenues and expenditure streams. As noted above, we are no longer able to mitigate this risk through the use of derivative hedging instruments and are now fully exposed to this risk.

If an increasing proportion of our business is denominated in currencies other than U.S. Dollars, fluctuations in foreign currencies will increasingly affect us, although we cannot predict whether we will incur foreign currency exchange gains or losses. If significant losses are experienced, they could have a material adverse effect on our business, results of operations and financial condition.

In accordance with SFAS 133, we recognized gains and losses on the effective portion of the derivative hedging instruments previously held by us in earnings (loss) when the hedged transaction occurred. As of December 31, 2008, none of our cash flow hedges met the criteria for hedge accounting and therefore were considered non- designated hedging strategies in accordance with SFAS 133. As such, any gains and losses related to these contracts were recognized in results of operations at the end of each reporting period for the life of the contract.

We use sensitivity analysis to measure our foreign currency exchange risk. We compute the potential decrease in cash flows that may result from adverse changes in foreign exchange rates. The balances are segregated by source currency and a hypothetical unfavorable variance in foreign exchange rates of 10% is applied to each net source currency position, using year- end rates to determine the potential decrease in cash flows over the next year. The sensitivity analysis includes all foreign currency- denominated cash, short- term and long- term debt, and derivative hedging instruments that will impact cash flows over the next year that are held at December 31, 2008 and 2007. The underlying cash flows that relate to the hedged firm commitments are not included in the analysis. The analysis is performed at the reporting date and assumes no future changes in the balances or timing of cash flows from the year- end position. Further, the model assumes no correlation in the movement of foreign currency exchange rates. Based on a one- year time horizon, a 10% adverse change in exchange rates would have resulted in a potential decrease in fair market value of equity of $133 as of December 31, 2008, and a potential decrease in fair market value of equity of $134 as of December 31, 2007. This potential decrease would result primarily from our exposure to the Canadian Dollar, the British Pound, the Euro and the Korean Won. Because we do

HIGHLY CONFIDENTIAL                NNC-NNL06001427 / 111

**Table of Contents**

not have access to derivative hedging instruments at this time, we also performed the sensitivity analysis as of December 31, 2008 assuming no such instruments. Under that analysis, based on a one- year time horizon, a 10% adverse change in exchange rates would have resulted in a potential decrease in fair market value of equity of $96 as of December 31, 2008.

**Interest Rate Risk**

Our debt is subject to changes in fair value resulting from changes in market interest rates. Historically, and prior to the initiation of our Creditor Protection Proceedings and termination by the financial institutions of our derivative hedging instruments, we have managed interest rate exposures, as they relate to interest expense, using a diversified portfolio of fixed and floating rate derivative hedging instruments denominated in U.S. Dollars. For example, we had hedged a portion of this exposure using fixed for floating interest rate swaps on the $550 of senior fixed rate notes due 2013 issued by NNL in July 2006 (2013 Fixed Rate Notes). We are no longer able to mitigate this risk through the use of derivative hedging instruments and are now fully exposed to this risk. While operating as a debtor- in- possession, however, in accordance with SOP 90- 7, we will record interest expense only to the extent that (i) interest will be paid during our Creditor Protection Proceedings, or (ii) it is probable that interest will be an allowed priority, secured or unsecured claim.

In 2008, because the swaps for the 2013 Fixed Rate Notes passed the hedge effectiveness designation criteria in accordance with SFAS 133, the change in fair value of the swaps was recognized in earnings (loss), with offsetting amounts related to the change in the fair value of the hedged debt attributable to interest rate changes also recognized in earnings (loss). Any ineffective portion of the swaps would be recognized in results of operations at the end of each reporting period for the life of the contract, without any offset.

We use sensitivity analysis to measure our interest rate risk. The sensitivity analysis includes cash, our outstanding floating rate long- term debt and any outstanding instruments that convert fixed rate long- term debt to floating rate. A 100 basis point adverse change in interest rates would have resulted in a potential decrease in fair market value of equity of $171 as of December 31, 2008 and a potential decrease in fair market value of equity of $61 as of December 31, 2007. Because we do not have access to such instruments at this time, we also performed the sensitivity analysis as of December 31, 2008 assuming no such instruments. Under that analysis, based on a one- year time horizon, a 100 basis point adverse change in interest rates would have resulted in a potential decrease in fair market value of equity of $165 as of December 31, 2008.

**Equity Price Risk**

The values of our equity investments in several third party publicly traded companies are subject to market price volatility. These investments are generally in companies in the technology industry sector and are classified as available for sale. We typically do not attempt to reduce or eliminate our market exposure on these securities. We also hold certain derivative instruments or warrants that are subject to market price volatility because their value is based on the common share price of a publicly traded company. These derivative instruments are generally acquired in connection with original equipment manufacturer arrangements with strategic partners, or acquired through business acquisitions or divestitures. As of December 31, 2008, a hypothetical 20% adverse change in the stock prices of publicly traded equity securities issued by third parties and held by Nortel, and the related underlying stock prices of publicly traded equity securities for certain of our derivative instruments, would result in a loss in their aggregate fair value of $0.

106

**Table of Contents**

ITEM 8.          Financial Statements and Supplementary Data

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 108 |
| Report of Independent Registered Chartered Accountants | 109 |
| Consolidated Statement of Operations | 110 |
| Consolidated Balance Sheets | 111 |
| Consolidated Statements of Changes in Equity (Deficit) and Comprehensive Income (Loss) | 112 |
| Consolidated Statements of Cash Flows | 113 |
| Quarterly Financial Data (Unaudited) | 207 |
| Report of Independent Registered Chartered Accountants | 208 |
| Schedule II- Valuation and Qualifying Accounts and Reserves | 209 |

107

**Table of Contents**

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders

Nortel Networks Corporation:

We have audited the accompanying consolidated balance sheets of Nortel Networks Corporation and subsidiaries (the Company) as of December 31, 2008 and 2007, and the related consolidated statements of operations, changes in equity (deficit) and comprehensive income (loss) and cash flows for the years then ended. In connection with our audits of the consolidated financial statements, we also have audited the consolidated financial statement schedule. These consolidated financial statements and financial statement schedule are the responsibility of Nortel Networks Corporation's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Nortel Networks Corporation and subsidiaries as of December 31, 2008 and 2007, and the results of their operations and their cash flows for the years then ended in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule II, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

The accompanying consolidated financial statements have been prepared assuming that Nortel Networks Corporation and subsidiaries will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company and certain of its Canadian subsidiaries filed for creditor protection pursuant to the provisions of the Companies' Creditors Arrangement Act; certain of the Company's United States subsidiaries filed voluntary petitions seeking to reorganize under Chapter 11 of the United States Bankruptcy Code; certain of the Company's subsidiaries in Europe, the Middle East and Africa made consequential filings under the Insolvency Act 1986 in the United Kingdom; and the Company's Israeli subsidiaries made consequential filings under the Israeli Companies Law 1999. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1 to the consolidated financial statements. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 3 to the consolidated financial statements, effective January 1, 2008, the Company adopted the provisions of Statement of Financial Accounting Standards No. 157, "Fair Value Measurements", Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities- Including an amendment of FASB Statement No. 115"; and Statement of Financial Accounting Standard No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans- an Amendment of FASB Statements No. 87, 88, 106, and 132(R)". As discussed in Note 3 to the consolidated financial statements, effective January 1, 2007, the Company adopted the provisions of Financial Accounting Standards Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109".

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Nortel Networks Corporation's internal control over financial reporting as of December 31, 2008, based on the criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 2, 2009, expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

Chartered Accountants, Licensed Public Accountants

Toronto, Canada

March 2, 2009

108

HIGHLY CONFIDENTIAL

Table of Contents

## REPORT OF INDEPENDENT REGISTERED CHARTERED ACCOUNTANTS

To the Shareholders and Board of Directors of

Nortel Networks Corporation

We have audited the accompanying consolidated statements of operations, changes in equity (deficit) and comprehensive income (loss) and cash flows of Nortel Networks Corporation and subsidiaries ("Nortel") for the year ended December 31, 2006. These financial statements are the responsibility of Nortel's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with Canadian generally accepted auditing standards and the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the results of Nortel's operations and its cash flows for the year ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP

Independent Registered Chartered Accountants

Licensed Public Accountants

Toronto, Canada

March 15, 2007, except as to notes 5, 6, 7 and 24, which are as of September 7, 2007 and the effect of the retrospective adjustments for a change in the segment performance measure as described in note 6, which is as of March 2, 2009

## COMMENTS BY INDEPENDENT REGISTERED CHARTERED ACCOUNTANTS ON CANADA- UNITED STATES OF AMERICA REPORTING DIFFERENCE

The standards of the Public Company Accounting Oversight Board (United States) require the addition of an explanatory paragraph (following the opinion paragraph) when there are changes in accounting principles that have a material effect on the comparability of the company's financial statements, such as the changes described in Note 3 to the financial statements. Our report to the Shareholders and Board of Directors of Nortel dated March 15, 2007 (except as to notes 5, 6, 7 and 24, which are as of September 7, 2007 and the effect of the retrospective adjustments for a change in the segment performance measure as described in note 6, which is as of March 2, 2009) with respect to the consolidated financial statements is expressed in accordance with Canadian reporting standards which do not require a reference to such changes in accounting principles in the auditors' report when the change is properly accounted for and adequately disclosed in the financial statements.

/s/ Deloitte & Touche LLP

Independent Registered Chartered Accountants

Licensed Public Accountants

Toronto, Canada

March 15, 2007, except as to notes 5, 6, 7 and 24, which are as of September 7, 2007 and the effect of the retrospective adjustments for a change in the segment performance measure as described in note 6, which is as of March 2, 2009

109

Table of Contents

**NORTEL NETWORKS CORPORATION**
Consolidated Statements of Operations for the years ended December 31
(Under Creditor Protection Proceedings as of January 14, 2009- note 1)

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | (Millions of U.S. Dollars, except per share amounts) | |
| **Revenues:** | | | |
| Products | $ 9,189 | $ 9,654 | $ 10,158 |
| Services | 1,232 | 1,294 | 1,260 |
| Total revenues | 10,421 | 10,948 | 11,418 |
| **Cost of revenues:** | | | |
| Products | 5,483 | 5,650 | 6,267 |
| Services | 653 | 684 | 712 |
| Total cost of revenues | 6,136 | 6,334 | 6,979 |
| Gross profit | 4,285 | 4,614 | 4,439 |
| Operating expenses: | | | |
| Selling, general and administrative expense (note 4) | 2,153 | 2,490 | 2,503 |
| Research and development expense (note 4) | 1,573 | 1,723 | 1,939 |
| Amortization of intangible assets | 46 | 50 | 26 |
| In- process research and development expense | - | - | 22 |
| Special charges | 302 | 210 | 105 |
| Loss (gain) on sales of businesses and assets[(a)] | (11) | (31) | (206) |
| Shareholder litigation settlement recovery | - | (54) | (219) |
| Regulatory investigation expense | - | 35 | - |
| Goodwill impairment (note 5) | 2,379 | - | - |
| Other operating expense (income)- net (note 4) | 25 | (35) | (13) |
| Total operating expenses | 6,467 | 4,388 | 4,157 |
| Operating earnings (loss) | (2,182) | 226 | 282 |
| Other income (expense)- net (note 4) | (62) | 204 | 59 |
| Interest and dividend income | 110 | 221 | 140 |
| Interest expense | | | |
| Long- term debt | (308) | (352) | (272) |
| Other | (14) | (29) | (68) |
| Earnings (loss) from operations before income taxes, minority interests and equity in net earnings (loss) of associated companies | (2,456) | 270 | 141 |
| Income tax expense (note 8) | (3,193) | (1,114) | (60) |
| | (5,649) | (844) | 81 |
| Minority interests- net of tax | (152) | (115) | (59) |
| Equity in net earnings (loss) of associated companies- net of tax | 2 | 2 | (3) |
| Net earnings (loss) before cumulative effect of accounting change | (5,799) | (957) | 19 |
| Cumulative effect of accounting change- net of tax (note 3) | - | - | 9 |
| Net earnings (loss) | $ (5,799) | $ (957) | $ 28 |

HIGHLY CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| Basic and diluted earnings (loss) per common share | $ | (11.64) | $ | (1.98) | $ | 0.06 |

(a)  Includes related costs.

*The accompanying notes are an integral part of these consolidated financial statements*

110

HIGHLY CONFIDENTIAL

Table of Contents

## NORTEL NETWORKS CORPORATION
### Consolidated Balance Sheets as of December 31
#### (Under Creditor Protection Proceedings as of January 14, 2009- note 1)

|  | 2008 | 2007 |
|---|---|---|
|  | (Millions of U.S. Dollars) | |
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 2,397 | $ 3,532 |
| Short- term investments | 65 | - |
| Restricted cash and cash equivalents | 36 | 76 |
| Accounts receivable- net | 2,154 | 2,583 |
| Inventories- net | 1,477 | 2,002 |
| Deferred income taxes- net | 44 | 487 |
| Other current assets | 455 | 467 |
| | | |
| **Total current assets** | 6,628 | 9,147 |
| Investments | 127 | 194 |
| Plant and equipment- net | 1,272 | 1,532 |
| Goodwill | 180 | 2,559 |
| Intangible assets- net | 143 | 213 |
| Deferred income taxes- net | 12 | 2,868 |
| Other assets | 475 | 555 |
| | | |
| **Total assets** | $ 8,837 | $ 17,068 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Current liabilities** | | |
| Trade and other accounts payable | $ 1,001 | $ 1,187 |
| Payroll and benefit-related liabilities | 453 | 690 |
| Contractual liabilities | 213 | 272 |
| Restructuring liabilities | 146 | 100 |
| Other accrued liabilities (note 4) | 2,674 | 3,825 |
| Long- term debt due within one year | 19 | 698 |
| | | |
| **Total current liabilities** | 4,506 | 6,772 |
| Long- term debt | 4,501 | 3,816 |
| Deferred income taxes- net | 11 | 17 |
| Other liabilities (note 4) | 2,948 | 2,875 |
| | | |
| **Total liabilities** | 11,966 | 13,480 |
| | | |
| Minority interests in subsidiary companies | 822 | 830 |
| Guarantees, commitments, contingencies and subsequent events (notes 1, 14, 15, 22 and 23) | | |
| **SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| Common shares, without par value- Authorized shares: unlimited; Issued and outstanding shares: 497,893,086 and 437,423,006 for 2008 and 2007, respectively | 35,593 | 34,028 |
| Additional paid- in capital | 3,547 | 5,025 |
| Accumulated deficit | (42,362) | (36,532) |
| Accumulated other comprehensive income (loss) | (729) | 237 |
| | | |
| **Total shareholders' equity (deficit)** | (3,951) | 2,758 |
| | | |
| **Total liabilities and shareholders' equity (deficit)** | $ 8,837 | $ 17,068 |

*The accompanying notes are an integral part of these consolidated financial statements*

111

HIGHLY CONFIDENTIAL                                    NNC-NNL06001427 / 118

Table of Contents

## NORTEL NETWORKS CORPORATION
### Consolidated Statements of Changes in Equity (Deficit) and Comprehensive Income (Loss)
### (Under Creditor Protection Proceedings as of January 14, 2009- note 1)

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (Millions of U.S. Dollars) | | |
| **Common shares** | | | |
| Balance at the beginning of the year | $ 34,028 | $ 33,938 | $ 33,932 |
| Common shares issued- net | - | 6 | 1 |
| Common shares cancelled related to acquisitions- net | - | - | (5) |
| Common shares issued related to the Global Class Action Settlement | 1,539 | 69 | - |
| Fair value and costs associated with share- based compensation plans and stock purchase plans | 26 | 15 | 10 |
| Balance at the end of the year | 35,593 | 34,028 | 33,938 |
| | | | |
| **Additional paid- in capital** | | | |
| Balance at the beginning of the year | 5,025 | 3,378 | 3,281 |
| Fair value and costs associated with share- based compensation plans and stock purchase plans | (26) | (15) | (6) |
| Global Class Action Settlement- net | (1,539) | 1,557 | - |
| Stock option compensation | 46 | 76 | 93 |
| Restricted stock units | 31 | 23 | 8 |
| Performance stock units | 5 | 6 | 2 |
| Deferred share units | 4 | - | - |
| Other | 1 | - | - |
| Balance at the end of the year | 3,547 | 5,025 | 3,378 |
| | | | |
| **Accumulated deficit** | | | |
| Balance at the beginning of the year | (36,532) | (35,574) | (35,602) |
| Net earnings (loss) | (5,799) | (957) | 28 |
| Adoption of FIN 48 (note 3) | - | (1) | - |
| Adoption of FASB Statement No. 158 (notes 3 and 9) | (33) | - | - |
| Other | 2 | - | - |
| Balance at the end of the year | (42,362) | (36,532) | (35,574) |
| | | | |
| **Accumulated other comprehensive income (loss)** | | | |
| Balance at the beginning of the year | 237 | (621) | (848) |
| Foreign currency translation adjustment | (246) | 301 | 284 |
| Unrealized gain (loss) on investments- net | (10) | (13) | 8 |
| Unrealized derivative gain (loss) on cash flow hedges- net | - | 10 | (17) |
| Minimum pension liability adjustment- net | - | - | 94 |
| Change in unamortized pension and post- retirement actuarial losses and prior service cost | (715) | 560 | - |
| Other comprehensive income (loss) | (971) | 858 | 369 |
| Adoption of FASB Statement No. 158- net (notes 3 and 9) | 5 | - | (142) |
| Balance at the end of the year | (729) | 237 | (621) |
| | | | |
| **Total shareholders' equity (deficit)** | $ (3,951) | $ 2,758 | $ 1,121 |

HIGHLY CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| **Total comprehensive income (loss) for the year** | | | | | |
| Net earnings (loss) | $ | (5,799) | $ | (957) | $ | 28 |
| Other comprehensive income (loss) | | (971) | | 858 | | 369 |
| **Total comprehensive income (loss) for the year** | $ | (6,770) | $ | (99) | $ | 397 |

*The accompanying notes are an integral part of these consolidated financial statements*

112

Table of Contents

## NORTEL NETWORKS CORPORATION
### Consolidated Statements of Cash Flows for the years ended December 31
### (Under Creditor Protection Proceedings as of January 14, 2009- note 1)

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | (Millions of U.S. Dollars) | |
| **Cash flows from (used in) operating activities** | | | |
| Net earnings (loss) | $ (5,799) | $ (957) | $ 28 |
| Adjustments to reconcile net earnings (loss) to net cash from (used in) operating activities: | | | |
| Amortization and depreciation | 337 | 328 | 290 |
| Goodwill impairment | 2,379 | - | - |
| Non- cash portion of shareholder litigation settlement recovery | - | (54) | (219) |
| Non- cash portion of special charges | 18 | 13 | 5 |
| In- process research and development expense | - | - | 22 |
| Equity in net loss (earnings) of associated companies- net of tax | (3) | (2) | 3 |
| Share- based compensation expense | 84 | 105 | 112 |
| Deferred income taxes | 3,053 | 1,019 | 31 |
| Cumulative effect of accounting change- net of tax | - | - | (9) |
| Pension and other accruals | 129 | 277 | 346 |
| Loss (gain) on sales and write downs of investments, businesses and assets- net | (1) | (26) | (200) |
| Minority interests- net of tax | 152 | 115 | 59 |
| Other- net | (7) | (205) | 220 |
| Change in operating assets and liabilities: | | | |
| Other (note 4) | (909) | (431) | (449) |
| Global Class Action Settlement- net | - | (585) | - |
| Net cash from (used in) operating activities | (567) | (403) | 237 |
| **Cash flows from (used in) investing activities** | | | |
| Expenditures for plant and equipment | (159) | (235) | (316) |
| Proceeds on disposals of plant and equipment | - | 90 | 143 |
| Change in restricted cash and cash equivalents | 39 | 563 | (557) |
| Increase in short- term and long- term investments | (362) | - | - |
| Decrease in short- term and long- term investments | 286 | - | - |
| Acquisitions of investments and businesses- net of cash acquired | (113) | (85) | (146) |
| Proceeds from the sales of investments and businesses and assets- net | (1) | 75 | 603 |
| Net cash from (used in) investing activities | (310) | 408 | (273) |
| **Cash flows from (used in) financing activities** | | | |
| Dividends paid by subsidiaries to minority interests | (35) | (52) | (60) |
| Capital repayment to minority owners | (36) | - | - |

| | | | |
|---|---:|---:|---:|
| Increase in notes payable | 177 | 76 | 105 |
| Decrease in notes payable | (138) | (81) | (79) |
| Proceeds from issuance of long- term debt | 668 | 1,150 | 3,300 |
| Repayments of long- term debt | (675) | (1,125) | (2,725) |
| Debt issuance costs | (13) | (23) | (12) |
| Increase in capital leases obligations | – | – | 1 |
| Repayments of capital leases obligations | (22) | (24) | (17) |
| Issuance of common shares | – | 10 | 1 |
| Common share consolidation costs | – | – | (1) |
| Net cash from (used in) financing activities | (74) | (69) | 483 |
| Effect of foreign exchange rate changes on cash and cash equivalents | (184) | 104 | 94 |
| Net increase (decrease) in cash and cash equivalents | (1,135) | 40 | 541 |
| Cash and cash equivalents at beginning of year | 3,532 | 3,492 | 2,951 |
| **Cash and cash equivalents at end of year** | $ 2,397 | $ 3,532 | $ 3,492 |

*The accompanying notes are an integral part of these consolidated financial statements*

113

**Table of Contents**

**NORTEL NETWORKS CORPORATION**
Notes to Consolidated Financial Statements
(Under Creditor Protection Proceedings as of January 14, 2009- note 1)
(Millions of U.S. Dollars, except per share amounts, unless otherwise stated)

**1. Creditor Protection and Restructuring**

*Nortel Networks Corporation*

Nortel Networks Corporation ("Nortel") is a global supplier of end- to- end networking products and solutions serving both service providers and enterprise customers. Nortel's technologies span access and core networks and support multimedia and business- critical applications. Nortel's networking solutions consist of hardware, software and services. Nortel designs, develops, engineers, markets, sells, licenses, installs, services and supports these networking solutions worldwide.

Nortel Networks Limited ("NNL") is Nortel's principal direct operating subsidiary and its results are consolidated into Nortel's results. Nortel holds all of NNL's outstanding common shares but none of its outstanding preferred shares. NNL's preferred shares are reported in minority interests in subsidiary companies in the consolidated balance sheets and dividends on preferred shares are reported in minority interests - net of tax in the consolidated statements of operations.

*CCAA Proceedings*

On January 14, 2009 ("Petition Date"), Nortel Networks Corporation ("Nortel"), Nortel Networks Limited ("NNL") and certain other Canadian subsidiaries ("Canadian Debtors") obtained an initial order from the Ontario Superior Court of Justice ("Canadian Court") for creditor protection for 30 days, pursuant to the provisions of the Companies' Creditors Arrangement Act ("CCAA"), which was subsequently extended to May 1, 2009 and is subject to further extension by the Canadian Court ("CCAA Proceedings"). There is no guarantee that the Canadian Debtors will be able to obtain court orders or approvals with respect to motions the Canadian Debtors may file from time to time, to extend the applicable stays of actions and proceedings against Nortel. Pursuant to the initial order, the Canadian Debtors received approval to continue to undertake various actions in the normal course in order to maintain stable and continuing operations during the CCAA Proceedings.

Under the terms of the initial order, Ernst & Young Inc. was named as the court- appointed monitor ("Canadian Monitor") under the CCAA Proceedings. The Canadian Monitor will report to the Canadian Court from time to time on the Canadian Debtors' financial and operational position and any other matters that may be relevant to the CCAA Proceedings. In addition, the Canadian Monitor may advise the Canadian Debtors on their development of a comprehensive restructuring plan and, to the extent required, assist the Canadian Debtors with a restructuring.

As a consequence of the commencement of the CCAA Proceedings, generally, all actions to enforce or otherwise effect payment or repayment of liabilities of any Canadian Debtor preceding the Petition Date and substantially all pending claims and litigation against the Canadian Debtors and their officers and directors have been stayed until May 1, 2009, or such further date as may be ordered by the Canadian Court. In addition, the CCAA Proceedings have been recognized by the United States Bankruptcy Court for the District of Delaware ("U.S. Court") as "foreign proceedings" pursuant to the provisions of Chapter 15 of the U.S. Bankruptcy Code and, as a result, generally, all actions to enforce or otherwise effect payment or repayment of liabilities of any Canadian Debtor preceding the Petition Date and substantially all pending claims and litigation against any of the Canadian Debtors operating in the U.S. also have been stayed.

114

**HIGHLY CONFIDENTIAL**

In connection with the Creditor Protection Proceedings, the Canadian Debtors have granted a charge against some or all of Nortel's and their assets and any proceeds from and sales thereof, as follows and in the following priority:

First, the administration charge, in an amount not to exceed CAD$5 in favor of the Canadian Monitor and its counsel and counsel to the Canadian Debtors against all of the property of the Canadian Debtors, to secure payment of professional fees and disbursements before and after the Petition Date;

Second, the Carling facility charges, in favor of Nortel Networks Inc. ("NNI") as security for amounts owed by NNL and Nortel Networks Technology Corporation (NNTC) to NNI with respect to a post- Petition Date intercompany revolving loan agreement, against the fee simple interest of NNTC and the leasehold interest of NNL in the real property located at 3500 Carling Avenue, Labs 1- 10, Ottawa, Ontario, such charge not to exceed the amount of any such loan plus related interest and fees;

Third, a charge, in favor of EDC (as defined below) against all of the property of the Canadian Debtors as security for new support provided by EDC to NNL under the EDC Support Facility (as defined below) including increases in or renewals or extensions of support existing on the Petition Date;

Fourth, the directors' charge, against all property of the Canadian Debtors in an amount not exceeding CAD$90, as security for their obligation to indemnify their respective directors and officers for all claims that may be made against them relating to any failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations arising during the CCAA Proceedings, and related legal fees and expenses.

Fifth, the intercompany charge, in favor of any U.S. Debtor (as defined below) that has made or may make a post- Petition Date intercompany loan or other transfer (including of goods or services) to one or more of the Canadian Debtors (including amounts owed by NNL to NNI on the Petition Date under a certain intercompany loan agreement) against the property of the Canadian Debtor that receives such loan or transfer, to secure payments or repayments relating thereto, such charge not to exceed the amount of any such loan or transferred goods or services, plus related interest and fees.

*Chapter 11 Proceedings*

Also on the Petition Date, Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation ("NNCC") and certain other of Nortel's U.S. subsidiaries ("U.S. Debtors") filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code with the U.S. Court ("Chapter 11 Proceedings"). The U.S. Debtors received approval from the U.S. Court for a number of motions enabling them to continue to operate their businesses generally in the ordinary course and transition into the Chapter 11 process with as little disruption to their business as possible. Among other things, the U.S. Debtors received approval to continue paying employee wages and certain benefits in the ordinary course; to generally continue its cash management system, including a revolving loan agreement between NNI as lender and NNL as borrower with an initial advance to NNL of $75 to support NNL's ongoing working capital and general corporate funding requirements; and to continue honoring customer program obligations and paying suppliers for goods and services received on or after the Petition Date.

As required under the U.S. Bankruptcy Code, on January 22, 2009, the United States Trustee for the District of Delaware ("U.S. Trustee") appointed an official committee of unsecured creditors, which currently includes The Bank of New York Mellon, Flextronics Corporation, Airvana, Inc., Pension Benefit Guaranty Corporation and Law Debenture Trust Company of New York ("U.S. Creditors' Committee"). The U.S. Creditors' Committee has the right to be heard on all matters that come before the U.S. Court with respect to the U.S. Debtors. There can be no assurance that the U.S. Creditors' Committee will support the U.S. Debtors' positions on matters to be presented to the U.S. Court or on any comprehensive restructuring plan, once developed and proposed. In addition, a group purporting to hold substantial amounts of Nortel's publicly traded debt has organized ("Bondholder Group"). The role of the Bondholder Group in the Chapter 11 Proceedings and the CCAA Proceedings has not yet been formalized and may develop and change over the course of such proceedings. Disagreements between the Debtors and the U.S. Creditors' Committee and the Bondholder Group

115

Table of Contents

could protract the Creditor Protection Proceedings (as defined below), negatively impact the Debtors' ability to operate and delay the Debtors' emergence from the Creditor Protection Proceedings.

As a consequence of the commencement of the Chapter 11 Proceedings, generally, all actions to enforce or otherwise effect payment or repayment of liabilities of any U.S. Debtor preceding the Petition Date and substantially all pending claims and litigation against the U.S. Debtors have been automatically stayed for the pendency of the Chapter 11 Proceedings (absent any court order lifting the stay). In addition, NNI applied for and obtained an order in the Canadian Court recognizing the Chapter 11 Proceedings in the U.S. as "foreign proceedings" in Canada and giving effect, in Canada, to the automatic stay under the U.S. Bankruptcy Code.

*U.K. Administration Proceedings*

Also on the Petition Date, certain of Nortel's Europe, Middle East and Africa ("EMEA") subsidiaries ("EMEA Debtors") made consequential filings and each obtained an administration order from the English High Court of Justice ("English Court") under the Insolvency Act 1986 ("U.K. Administration Proceedings"). The applications were made by the EMEA Debtors under the provisions of the European Union's Council Regulation (EC) No 1346/2000 on creditor protection proceedings and on the basis that each EMEA Debtor's center of main interests is in England. Under the terms of the orders a representative of Ernst & Young LLP (in the U.K.) and a representative of Ernst & Young Chartered Accountants (in Ireland) were appointed as joint administrators with respect to our EMEA Debtor in Ireland, and representatives of Ernst & Young LLP were appointed as joint administrators for the other EMEA Debtors (collectively "U.K. Administrators") to manage the EMEA Debtors' affairs, business and property under the jurisdiction of the English Court and in accordance with the applicable provisions of the Insolvency Act 1986. The administration orders provide for a moratorium during which creditors may not, without leave of the English Court or consent of the U.K. Administrators, wind up the company, enforce security, or commence or progress legal proceedings. All of Nortel's operating EMEA subsidiaries except those in the following countries are included in the U.K. Administration Proceedings: Nigeria, Russia, Ukraine, Israel, Norway, Switzerland, South Africa and Turkey. Certain of Nortel's Israeli subsidiaries ("Israeli Debtors") have commenced a separate creditor protection process in Israel ("Israeli Proceedings").

The Canadian Debtors, U.S. Debtors, EMEA Debtors and Israeli Debtors are together referred to as the Debtors and the CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings and Israeli Proceedings are together referred to as the Creditor Protection Proceedings.

*Contributing factors*

Nortel operates in a highly volatile telecommunications industry that is characterized by vigorous competition for market share and rapid technological development. In recent years, Nortel's operating costs have generally exceeded its revenues, resulting in negative cash flow. A number of factors have contributed to these results, including competitive pressures in the telecommunications industry, an inability to sufficiently reduce operating expenses, costs related to ongoing restructuring efforts described below, significant customer and competitor consolidation, customers cutting back on capital expenditures and deferring new investments, and the poor state of the global economy. In recent years, Nortel has taken a wide range of steps to attempt to address these issues, including a series of restructurings that have reduced the number of worldwide employees from more than 90,000 in 2000 to approximately 30,000 (including employees in joint ventures) as of December 31, 2008. In particular, in 2005, under the direction of new management, Nortel began to develop a Business Transformation Plan with the goal of addressing its most significant operational challenges, simplifying the organizational structure and maintaining a strong focus on revenue generation and improving operating margins including quality improvements and cost reductions.

These restructuring measures, however, have not provided adequate relief from the significant pressures Nortel is experiencing. As global economic conditions dramatically worsened beginning in September 2008,

116

**Table of Contents**

Nortel experienced significant pressure on its business and faced a deterioration of its cash and liquidity, globally as well as on a regional basis, as customers across all businesses suspended, delayed and reduced their capital expenditures. The extreme volatility in the financial, foreign exchange, equity and credit markets globally and the expanding economic downturn and potentially prolonged recessionary period have compounded the situation.

In addition, Nortel has made significant cash payments related to its restructuring programs, Global Class Action Settlement (as defined in note 22), debt servicing costs and pension plans over the past several years. Due to the adverse conditions in the financial markets globally, the value of the assets held in its pension plans has declined significantly resulting in significant increases to pension plan liabilities that could have resulted in a significant increase in future pension plan contributions. It became increasingly clear that the struggle to reduce operating costs during a time of decreased customer spending and massive global economic uncertainty put substantial pressure on Nortel's liquidity position globally, particularly in North America.

Market conditions further restricted Nortel's ability to access capital markets, which was compounded by recent actions taken by rating agencies with respect to its credit ratings. In December 2008, Moody's Investor Service, Inc. issued a downgrade of the Nortel family rating from B3 to Caa2. With no access to the capital markets, limited prospects of the capital markets opening up in the near term, substantial interest carrying costs on over $4,000 of unsecured public debt, and significant pension plan liabilities expected to increase in a very substantial manner principally due to the adverse conditions in the financial markets globally, it became imperative for Nortel to protect its cash position.

After extensive consideration of all other alternatives, Nortel determined, with the unanimous authorization of its Board of Directors after thorough consultation with its advisors, that a comprehensive financial and business restructuring could be most effectively and quickly achieved within the framework of creditor protection proceedings in multiple jurisdictions. As a consequence, on the Petition Date, Nortel initiated creditor protection proceedings under the respective restructuring regimes of Canada, the U.S., and the U.K., and subsequently Israel. Nortel's affiliates in Asia, including LG- Nortel Co. Ltd. ("LG- Nortel"), a joint venture with LG Electronics, Inc. ("LGE"), and in CALA, as well as the Nortel Government Solutions business ("NGS"), are not included in these proceedings.

Nortel initiated the Creditor Protection Proceedings with a consolidated cash balance, as at December 31, 2008, of $2,400, in order to preserve its liquidity and fund operations during the restructuring process. The Creditor Protection Proceedings will allow Nortel to reassess its business strategy with a view to developing a comprehensive financial and business restructuring plan (comprehensive restructuring plan), also referred to as a "plan of reorganization" in the U.S. or a "plan of compromise or arrangement" in Canada.

*Business Operations*

During the Creditor Protection Proceedings, the businesses of the Debtors continue to operate under the jurisdictions and orders of the applicable courts and in accordance with applicable legislation.

Under the U.S. Bankruptcy Code, the U.S. Debtors may assume, assume and assign, or reject certain executory contracts including unexpired leases, subject to the approval of the U.S. Court and certain other conditions. Pursuant to the initial order of the Canadian Court, the Canadian Debtors are permitted to repudiate any arrangement or agreement, including real property leases. Any reference to any such agreements or instruments and to termination rights or a quantification of Nortel's obligations under any such agreements or instruments is qualified by any overriding rejection, repudiation or other rights the Debtors may have as a result of or in connection with the Creditor Protection Proceedings. The administration orders granted by the English Court do not give any similar unilateral rights to the U.K. Administrators. The U.K. Administrators decide whether an EMEA Debtor should perform under a contract on the basis of whether it is in the interests of the administration to do so. Any claims which result from an EMEA Debtor rejecting or repudiating any contract or arrangement will usually be secured. Claims may arise as a result of a Debtor rejecting or repudiating any contract or arrangement.

117

**HIGHLY CONFIDENTIAL**                    **NNC-NNL06001427 / 126**

**Table of Contents**

On February 23, 2009, the U.S. Court authorized the U.S. Debtors to reject certain unexpired leases of non- residential real property and related subleases as of February 28, 2009.

*Comprehensive Restructuring Plan*

Nortel is in the process of stabilizing its business to maximize the chances of preserving all or a portion of the enterprise and evaluating its various operations to determine how to narrow its strategic focus in an effective and timely manner, in consultation with its business and financial advisors. While Nortel undertakes this process, its previously announced intention to explore the divestiture of its Metro Ethernet Networks ("MEN") business has been put on hold. Nortel has also decided to discontinue its mobile WiMAX business and sell its Layer 4- 7 data portfolio (see note 23). Further, Nortel will be significantly reducing its investment in its Carrier Ethernet switch/router (CESR) portfolio, while continuing to ship products and support its installed base of Carrier Ethernet customers. Nortel will continue to utilize its Carrier Ethernet technology in its other MEN and other solutions. The Creditor Protection Proceedings and the development of a comprehensive restructuring plan may result in additional sales or divestitures, but Nortel can provide no assurance that it will be able to complete any sale or divestiture on acceptable terms or at all. On February 18, 2009, the U.S. Court approved procedures for the sale or abandonment by the U.S. Debtors of assets with a *de minimis* value. The Canadian Debtors and EMEA Debtors can generally take similar actions with the approval of the Canadian Monitor and the U.K. Administrators, respectively. As Nortel works on developing a comprehensive restructuring plan, it will consult with the Canadian Monitor, the U.K. Administrators and the U.S. Creditors' Committee, and any such plan would eventually be subject to the approval of affected creditors and the relevant courts. There can be no assurance that any such plan will be confirmed or approved by any of the relevant courts or affected creditors, or that any such plan will be implemented successfully.

*Export Development Canada Support Facility; Other Contracts & Debt Instruments*

Effective January 14, 2009, NNL entered into an agreement with Export Development Canada ("EDC") to permit continued access by NNL to the EDC facility ("EDC Support Facility") for an interim period to February 13, 2009, for up to $30 of support based on its then- estimated requirements over the period. The EDC Support Facility provides for the issuance of support in the form of guarantee bonds or guarantee type documents issued to financial institutions who issue letters of credit or guarantee, performance or surety bonds, or other instruments in support of Nortel's contract performance. On February 10, 2009, EDC agreed to extend this interim period to May 1, 2009. This support is secured by a charge on the Canadian Debtors' assets. Nortel and EDC continue to work together to see if a longer term arrangement, acceptable to both parties, can be reached.

Nortel's filings under Chapter 11 of the U.S. Bankruptcy Code and the CCAA constituted events of default or otherwise triggered repayment obligations under the instruments governing substantially all of the indebtedness issued or guaranteed by NNC, NNL, NNI and NNCC. In addition, Nortel may not be in compliance with certain other covenants under indentures, the EDC Support Facility and other debt or lease instruments, and the obligations under those agreements may have been accelerated. Nortel believes that any efforts to enforce such payment obligations against the U.S. Debtors are stayed as a result of the Chapter 11 Proceedings. Although the CCAA does not provide an automatic stay, the Canadian Court has granted a stay to the Canadian Debtors that currently extends to May 1, 2009. Pursuant to the U.K. Administration Proceedings, a moratorium has commenced during which creditors may not, without leave of the English Court or consent of the U.K. Administrators, enforce security, or commence or progress legal proceedings.

The Creditor Protection Proceedings may have also constituted events of default under other contracts and leases of the Debtors. In addition, the Debtors may not be in compliance with various covenants under other contracts and leases. Depending on the jurisdiction, actions taken by counterparties or lessors based on such events of default and other breaches may be unenforceable as a result of the Creditor Protection Proceedings. In addition, the Creditor Protection Proceedings may have caused, directly or indirectly, defaults or events of default under the debt instruments and/or contracts and leases of certain of Nortel's non- Debtor entities. These events of default (or defaults that become events of default) could give counterparties the right to accelerate the maturity of this debt or terminate such contracts or leases.

118

**Table of Contents**

*Flextronics*

On January 14, 2009, Nortel announced that NNL had entered into an amendment to arrangements with a major supplier, Flextronics Telecom Systems, Ltd. (Flextronics). Under the terms of the amendment, NNL agreed to commitments to purchase $120 of existing inventory by July 1, 2009 and to make quarterly purchases of other inventory, and to terms relating to payment and pricing. Flextronics has notified Nortel of its intention to terminate certain other arrangements upon 180 days' notice (in July 2009) pursuant to the exercise by Flextronics of its contractual termination rights, while the other arrangements between the parties will continue in accordance with their terms. Nortel believes that its arrangements with Flextronics are subject to the initial order granted by the Canadian Court that stays its suppliers from terminating their agreements with Nortel.

*Directors' and Officers' Compensation and Indemnification*

The Canadian Court has ordered the Canadian Debtors to indemnify their respective directors and officers for all claims that may be made against them relating to any failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations arising during the CCAA Proceedings. The Canadian Court has also granted a charge against all property of the Canadian Debtors, in the aggregate amount not exceeding CAD $90, as security for such indemnities and related legal fees and expenses.

In addition, in conjunction with the Creditor Protection Proceedings, NNC established a directors' and officers' trust ("D&O Trust") in the amount of approximately CAD $12. The purpose of the D&O Trust is to provide a trust fund for the payment of liability claims (including defense costs) that may be asserted against individuals who serve as directors and officers of NNC, or as directors and officers of other entities at NNC's request (such as subsidiaries and joint venture entities), by reason of that association with NNC or other entity, to the extent that such claims are not paid or satisfied out of insurance maintained by NNC and NNC is unable to indemnify the individual. Such liability claims would include claims for unpaid statutory payment or remittance obligations of NNC or such other entities for which such directors and officers have personal statutory liability but will not include claims for which NNC is prohibited by applicable law from providing indemnification to such directors or officers. The D&O Trust also may be drawn upon to maintain directors' and officers' insurance coverage in the event NNC fails or refuses to do so. The D&O Trust will remain in place until the later of December 31, 2015 or three years after all known actual or potential claims have been satisfied or resolved, at which time any remaining trust funds will revert to NNC.

As part of the relief sought in the CCAA Proceedings, Nortel requested entitlement to pay the directors their compensation in cash on a current basis, notwithstanding any outstanding elections, during the period in which the directors continue as directors in the CCAA Proceedings. On the Petition Date, the Canadian Court granted an order providing that Nortel's directors are entitled to receive remuneration in cash on a current basis at current compensation levels less an overall $0.025 reduction notwithstanding the terms of, or elections made under, the DSC Plans (as defined in note 20).

*Basis of presentation and going concern issues*

The commencement of the Creditor Protection Proceedings raises substantial doubt as to whether Nortel will be able to continue as a going concern. The audited consolidated financial statements have been prepared using the same U.S. GAAP and the rules and regulations of the SEC as applied by Nortel prior to the Creditor Protection Proceedings. While the Debtors have filed for and been granted creditor protection, the audited consolidated financial statements continue to be prepared using the going concern basis, which assumes that Nortel will be able to realize its assets and discharge its liabilities in the normal course of business for the foreseeable future. The Creditor Protection Proceedings provide Nortel with a period of time to stabilize its operations and financial condition and develop a comprehensive restructuring plan. However, it is not possible to predict the outcome of these proceedings and, as such, the realization of assets and discharge of liabilities are each subject to significant uncertainty. Further, it is not possible to predict whether the actions taken in any restructuring will result in improvements to Nortel's financial condition sufficient to allow it to continue as a

119

Table of Contents

going concern. If the going concern basis is not appropriate, adjustments will be necessary to the carrying amounts and/or classification of Nortel's assets and liabilities. Further, a comprehensive restructuring plan could materially change the carrying amounts and classifications reported in the audited consolidated financial statements. The audited consolidated financial statements do not reflect any adjustments related to conditions that arose subsequent to December 31, 2008.

The audited consolidated financial statements do not purport to reflect or provide for the consequences of the Creditor Protection Proceedings. In particular, such consolidated financial statements do not purport to show: (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to pre- petition liabilities, the amounts that may be allowed for claims or contingencies, or the status and priority thereof; (c) as to shareholders accounts, the effect of any changes that may be made in Nortel's capitalization; or (d) as to operations, the effect of any changes that may be made in Nortel's business.

Although Nortel is headquartered in Canada, the audited consolidated financial statements are expressed in U.S. Dollars as the greater part of the financial results and net assets of Nortel are denominated in U.S. Dollars.

Certain prior year amounts have been reclassified to conform to Nortel's current presentation, as set out in notes 4 and 6.

## 2. Significant accounting policies

### (a) Principles of consolidation

The financial statements of entities which are controlled by Nortel through voting equity interests, referred to as subsidiaries, are consolidated into Nortel's results. Entities which are controlled jointly with another entity, referred to as joint ventures, and entities which are not controlled by Nortel but over which Nortel has the ability to exercise significant influence, referred to as associated companies, are accounted for using the equity method. Variable Interest Entities ("VIEs") (which include, but are not limited to, special purpose entities, trusts, partnerships, certain joint ventures and other legal structures), as defined by the Financial Accounting Standards Board ("FASB") in FASB Interpretation No. ("FIN") 46 (revised December 2003), "Consolidation of Variable Interest Entities- an Interpretation of Accounting Research Bulletin No. 51" ("FIN 46R"), are entities in which equity investors generally do not have the characteristics of a "controlling financial interest" or there is not sufficient equity at risk for the entity to finance its activities without additional subordinated financial support. VIEs are consolidated by Nortel when it is determined that it will, as the primary beneficiary, absorb the majority of any of the VIEs' expected losses and/or expected residual returns. Intercompany accounts and transactions are eliminated upon consolidation and unrealized intercompany gains and losses are eliminated when accounting under the equity method.

### (b) Use of estimates

Nortel makes estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results may differ from those estimates. Estimates are used when accounting for items and matters such as revenue recognition and accruals for losses on contracts, allowances for uncollectible accounts receivable, inventory provisions and outsourced manufacturing related obligations, product warranties, estimated useful lives of intangible assets and plant and equipment, asset valuations, impairment and recoverability assessments, employee benefits including pensions, taxes and related valuation allowances and provisions, restructuring and other provisions, share- based compensation and contingencies.

### (c) Translation of foreign currencies

Nortel's consolidated financial statements are presented in U.S. Dollars. The financial statements of Nortel's operations whose functional currency is not the U.S. Dollar are translated into U.S. Dollars at the exchange rates

120

**Table of Contents**

in effect at the balance sheet dates for assets and liabilities, and at average rates for the period for revenues and expenses. The unrealized translation gains and losses on Nortel's net investment in these operations, including those on long-term intercompany advances that have been designated to form part of the net investment, are accumulated as a component of other comprehensive income (loss) ("OCI").

The financial statements of Nortel's operations whose functional currency is the U.S. Dollar but where the underlying transactions are in a different currency are translated into U.S. Dollars at the exchange rate in effect at the balance sheet date with respect to monetary assets and liabilities. Non-monetary assets and liabilities of these operations, and related amortization and depreciation expenses, are translated at the historical exchange rate. Revenues and expenses, other than amortization and depreciation, are translated at the average rate for the period in which the transaction occurred.

*(d) Revenue recognition*

Nortel's products and services are generally sold pursuant to a contract and the terms of the contract, taken as a whole, determine the appropriate revenue recognition models to be applied. Product revenue includes revenue from arrangements that include services such as installation, engineering and network planning where the services could not be separated from the arrangement because the services are essential or fair value could not be established. Where services are not bundled with product sales, services revenue is reported separately in the consolidated statements of operations.

Depending on the terms of the contract and types of products and services sold, Nortel recognizes revenue under American Institute of Certified Public Accountants Statement of Position ("SOP") 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" ("SOP 81-1"), SOP 97-2, "Software Revenue Recognition" ("SOP 97-2"), SEC Staff Accounting Bulletin ("SAB") 104, "Revenue Recognition" ("SAB 104"), and FASB Emerging Issues Task Force ("EITF") 00-21, "Revenue Arrangements with Multiple Deliverables" ("EITF 00-21"). Revenues are reduced for returns, allowances, rebates, discounts and other offerings in accordance with the agreement terms.

Nortel regularly enters into multiple contractual agreements with the same customer. These agreements are reviewed to determine whether they should be evaluated as one arrangement in accordance with AICPA Technical Practice Aid 5100.39, "Software Revenue Recognition for Multiple-Element Arrangements".

For arrangements with multiple deliverables entered into after June 30, 2003, where the deliverables are governed by more than one authoritative accounting standard, Nortel applies EITF 00-21 and evaluates each deliverable to determine whether it represents a separate unit of accounting based on the following criteria: (a) whether the delivered item has value to the customer on a stand-alone basis, (b) whether there is objective and reliable evidence of the fair value of the undelivered item(s), and (c) if the contract includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of Nortel.

If objective and reliable evidence of fair value exists for all units of accounting in the arrangement, revenue is allocated to each unit of accounting or element based on relative fair values. In situations where there is objective and reliable evidence of fair value for all undelivered elements, but not for delivered elements, the residual method is used to allocate the arrangement consideration. Under the residual method, the amount of revenue allocated to delivered elements equals the total arrangement consideration less the aggregate fair value of any undelivered elements. Each unit of accounting is then accounted for under the applicable revenue recognition guidance. So long as elements otherwise governed by separate authoritative accounting standards cannot be treated as separate units of accounting under the guidance in EITF 00-21, the elements are combined into a single unit of accounting for revenue recognition purposes. In this case, revenue allocated to the unit of accounting is deferred until all combined elements have been delivered or, once there is only one remaining element to be delivered, based on the revenue recognition guidance applicable to the last delivered element within the unit of accounting.

121

**HIGHLY CONFIDENTIAL**     

**Table of Contents**

For arrangements that include hardware and software where software is considered more than incidental to the hardware, provided that the software is not essential to the functionality of the hardware and the hardware and software represent separate units of accounting, revenue related to the software element is recognized under SOP 97- 2 and revenue related to the hardware element is recognized under SOP 81- 1 or SAB 104. For arrangements where the software is considered more than incidental and essential to the functionality of the hardware, or where the hardware is not considered a separate unit of accounting from the software deliverables, revenue is recognized for the software and the hardware as a single unit of accounting pursuant to SOP 97- 2 for off- the- shelf products and pursuant to SOP 81- 1 for customized products. Revenue for hardware that does not require significant customization or other essential services, and where any software is considered incidental, is recognized under SAB 104.

For elements related to customized network solutions designed and built to customer specific requirements, revenues are recognized in accordance with SOP 81- 1, generally using the percentage- of- completion method. In using the percentage- of- completion method, revenues are recorded based on the percentage of costs incurred to date on a contract relative to the estimated total expected contract costs. Profit estimates on these contracts are revised periodically based on changes in circumstances and any losses on contracts are recognized in the period that such losses become known. In circumstances where reasonably dependable cost estimates cannot be made for a customized network solution or build- out, all revenues and related costs are deferred until completion of the solution or element ("completed contract method"). Generally, the terms of SOP 81- 1 contracts provide for progress billings based on completion of certain phases of work. Unbilled SOP 81- 1 contract revenues recognized are accumulated in the contracts in progress account included in accounts receivable- net. Billings in excess of revenues recognized to date on these contracts are recorded as advance billings in excess of revenues recognized to date on contracts within other accrued liabilities until recognized as revenue. This classification also applies to billings in advance of revenue recognized on combined units of accounting under EITF 00- 21 that contain both SOP 81- 1 and non SOP 81- 1 elements.

Revenue is recognized under SAB 104 when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the fee is fixed or determinable and collectibility is reasonably assured. For hardware, delivery is considered to have occurred upon shipment provided that risk of loss, and in certain jurisdictions, legal title, has been transferred to the customer.

For arrangements where the criteria for revenue recognition have not been met because legal title or risk of loss on products does not transfer to the customer until final payment has been received or where delivery has not occurred, revenue is deferred to a later period when the outstanding criteria have been met. For arrangements where the customer agrees to purchase products but Nortel retains physical possession until the customer requests delivery ("bill and hold arrangements"), revenue is not recognized until delivery to the customer has occurred and all other revenue recognition criteria have been met.

Services revenue is generally recognized according to the proportional performance method. The proportional performance method is used when the provision of services extends beyond an accounting period with more than one performance act, and permits the recognition of revenue ratably over the services period when no other pattern of performance is discernable. The nature of the service contract is reviewed to determine which revenue recognition method best reflects the nature of services performed. Provided all other revenue recognition criteria have been met, the revenue recognition method selected reflects the pattern in which the obligations to the customers have been fulfilled.

Nortel makes certain sales through multiple distribution channels, primarily resellers and distributors. These customers are generally given certain rights of return. For products sold through these distribution channels, revenue is recognized from product sale at the time of shipment to the distribution channel when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collectibility is reasonably assured. Accruals for estimated sales returns and other allowances are recorded at the time of revenue recognition and are based on contract terms and prior claims experience.

122

**Table of Contents**

Software revenue is generally recognized under SOP 97-2. For software arrangements involving multiple elements, Nortel allocates revenue to each element based on the relative fair value or the residual method, as applicable using vendor specific objective evidence to determine fair value, which is based on prices charged when the element is sold separately. Software revenue accounted for under SOP 97-2 is recognized when persuasive evidence of an arrangement exists, the software is delivered in accordance with all terms and conditions of the customer contracts, the fee is fixed or determinable and collectibility is probable. Revenue related to post-contract customer support ("PCS"), including technical support and unspecified when-and-if available software upgrades, is recognized ratably over the PCS term.

Under SOP 97-2, if fair value does not exist for any undelivered element, revenue is not recognized until the earlier of (i) delivery of such element or (ii) when fair value of the undelivered element is established, unless the undelivered element is a service, in which case revenue is recognized as the service is performed once the service is the only undelivered element.

Deferred costs are presented as current or long-term in the consolidated balance sheet, consistent with the classification of the related deferred revenues.

*(e) Research and development*

R&D costs are charged to net earnings (loss) in the periods in which they are incurred. However, costs incurred pursuant to specific contracts with third parties, for which Nortel is obligated to deliver a product, are charged to cost of revenues in the same period as the related revenue is recognized. Related investment tax credits are deducted from the income tax provision.

*(f) Income taxes*

Nortel provides for income taxes using the asset and liability method. This approach recognizes the amount of taxes payable or refundable for the current year as well as deferred tax assets and liabilities for the future tax consequence of events recognized in the consolidated financial statements and tax returns. Deferred income taxes are adjusted to reflect the effects of changes in tax laws or enacted tax rates.

In establishing the appropriate income tax valuation allowances, Nortel assesses its net deferred tax assets quarterly and based on all available evidence, both positive and negative, determines whether it is more likely than not that the remaining net deferred tax assets or a portion thereof will be realized.

In accordance with FIN 48, "Accounting for Uncertainty in Income Taxes- an interpretation of FASB Statement No. 109" ("FIN 48"), Nortel classifies interest and penalties associated with income tax positions in income tax expense.

*(g) Earnings (loss) per common share*

Basic earnings (loss) per common share is calculated by dividing the net earnings (loss) by the weighted-average number of NNC common shares outstanding during the period. Diluted earnings (loss) per common share is calculated by dividing the applicable net earnings (loss) by the sum of the weighted-average number of NNC common shares outstanding and all additional NNC common shares that would have been outstanding if potentially dilutive NNC common shares had been issued during the period. The treasury stock method is used to compute the dilutive effect of warrants, options and similar instruments. The if-converted method is used to compute the dilutive effect of convertible debt. The dilutive effect of contingently issuable shares is computed by comparing the conditions required for issuance of shares against those existing at the end of the period.

*(h) Cash and cash equivalents*

Cash and cash equivalents consist of cash on hand, balances with banks and short-term investments with original maturities of three months or less. The amounts presented in the consolidated financial statements approximate the fair value of cash and cash equivalents.

123

**HIGHLY CONFIDENTIAL**

Table of Contents

*(i) Restricted cash and cash equivalents*

Cash and cash equivalents are considered restricted when they are subject to contingent rights of a third party customer in the normal course of business. From time to time, Nortel may be required to post cash and cash equivalents as collateral to a third party as a result of the general economic and industry environment and Nortel's and NNL's credit ratings.

*(j) Provision for doubtful accounts*

The provision for doubtful accounts for trade, notes and long- term receivables due from customers is established based on an assessment of a customer's credit quality, as well as subjective factors and trends, including the aging of receivable balances. Generally, these credit assessments occur prior to the inception of the credit exposure and at regular reviews during the life of the exposure.

Customer financing receivables are receivables from customers with deferred payment terms. Customer financing receivables are considered impaired when they are classified as non- performing, payment arrears exceed 90 days or a major credit event such as a material default has occurred, and management determines that collection of amounts due according to the contractual terms is doubtful. Provisions for impaired customer financing receivables are recorded based on the expected recovery of defaulted customer obligations, being the present value of expected cash flows, or the realizable value of the collateral if recovery of the receivables is dependent upon a liquidation of the assets. Nortel recognizes recoveries on non-performing receivables once cash payment has been received. Interest income on impaired customer finance receivables is recognized as the cash payments are collected.

*(k) Inventories*

Inventories are valued at the lower of cost (calculated generally on a first- in, first- out basis) or market value. The standard cost of finished goods and work in process is comprised of material, labor and manufacturing overhead, which approximates actual cost. Provisions for inventory are based on estimates of future customer demand for existing products, as well as general economic conditions, growth prospects within the customer's ultimate marketplaces and general market acceptance of current and pending products. Full provisions are generally recorded for surplus inventory in excess of one year's forecast demand or inventory deemed obsolete. In addition, Nortel records a liability for firm, non- cancelable and unconditional inventory purchase commitments with contract manufacturers and suppliers for product- related quantities in excess of its future demand forecasts and related claims in accordance with Nortel's excess and obsolete inventory policies.

Inventory includes certain direct and incremental deferred costs associated with arrangements where title and risk of loss were transferred to customers but revenue was deferred due to other revenue recognition criteria not being met.

*(l) Receivables sales*

Transfers of accounts receivable that meet the criteria for surrender of control under FASB Statement of Financial Accounting Standard ("SFAS") No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", are accounted for as sales. Generally, Nortel retains servicing rights and, in some cases, provides limited recourse when it sells receivables. A gain or loss is recorded as an operating expense (recovery) within selling, general and administrative ("SG&A") at the date of the receivables sale. The gain or loss is based upon, in part, the previous carrying amount of the receivables involved in the transfer allocated between the assets sold and the retained interests, based on their relative fair values at the date of the transfer. Fair value is generally estimated based on the present value of the estimated future cash flows expected under management's assumptions, including discount rates assigned commensurate with risks.

*(m) Investments*

Investments in publicly traded equity securities of companies over which Nortel does not exert significant influence are classified as available for sale and carried at fair value, based on quoted market prices. Unrealized

124

**Table of Contents**

holding gains and losses related to these securities are excluded from net earnings (loss) and are included in OCI until such gains or losses are realized or an other- than- temporary impairment is determined to have occurred. Gains and losses are realized when the securities are sold.

Investments in equity securities of private companies over which Nortel does not exert significant influence are accounted for using the cost method. Investments in associated companies and joint ventures are accounted for using the equity method. An impairment loss is recorded when there has been a loss in value of the investment that is other- than- temporary.

Nortel monitors its investments for factors indicating other- than- temporary impairment and records a charge to net earnings (loss) when appropriate. Investments are classified as long- term and short- term, based on expected time of maturity.

*(n) Plant and equipment*

Plant and equipment are stated at cost less accumulated depreciation. Depreciation is generally calculated on a straight- line basis over the expected useful lives of the plant and equipment. The expected useful life of a building is twenty to forty years, machinery and equipment including related capital leases is three to ten years, and capitalized software is three to ten years.

*(o) Software development and business re- engineering costs*

*Software development costs*

Costs to develop, acquire or modify software solely for Nortel's internal use are capitalized pursuant to SOP No. 98- 1, "Accounting for Costs of Computer Software Developed or Obtained for Internal Use" ("SOP 98- 1"). SOP 98- 1 requires qualified internal and external costs related to such software incurred during the application development stage to be capitalized, and any preliminary project costs related to such software and post- implementation costs to be expensed as incurred.

*Business re- engineering costs*

Internal and external costs of business process re- engineering activities are expensed pursuant to EITF Issue No. 97- 13, "Accounting for Costs Incurred in Connection with a Consulting Contract or an Internal Project that Combines Business Process Reengineering and Information Technology Transformation" ("EITF 97- 13"). Information technology transformation projects typically involve implementation of enterprise software packages whereby entities must re- engineer their business processes to connect into the software, rather than modify the software to connect into their existing business processes. Software development costs relating to the information technology transformation are capitalized under SOP 98- 1 as described above.

*(p) Impairment or disposal of long- lived assets*

*Long- lived assets held and used*

Nortel tests long- lived assets or asset groups held and used for recoverability when events or changes in circumstances indicate that their carrying amount may not be recoverable. Circumstances which could trigger a review include, but are not limited to: significant decreases in the market price of the asset or asset group; significant adverse changes in the business climate or legal factors; the accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of the asset; current period cash flow or operating losses combined with a history of losses or a forecast of continuing losses associated with the use of the asset; and a current expectation that the asset will more likely than not be sold or disposed of significantly before the end of its previously estimated useful life.

Recoverability is assessed based on the carrying amount of the asset or asset group and the sum of the undiscounted cash flows expected to result from the use and the eventual disposal of the asset or asset group. An

125

Table of Contents

impairment loss is recognized when the carrying amount is not recoverable and exceeds the fair value of the asset or asset group. The impairment loss is measured as the amount by which the carrying amount exceeds fair value.

*Long- lived assets held for sale*

Long- lived assets are classified as held for sale when certain criteria are met, which include: management's commitment to a plan to sell the assets; the assets are available for immediate sale in their present condition; an active program to locate buyers and other actions to sell the assets have been initiated; the sale of the assets is probable and their transfer is expected to qualify for recognition as a completed sale within one year; the assets are being actively marketed at reasonable prices in relation to their fair value; and it is unlikely that significant changes will be made to the plan to sell the assets or that the plan will be withdrawn.

Nortel measures long- lived assets held for sale at the lower of carrying amount or fair value, less cost to sell. These assets are not depreciated.

*Long- lived assets to be disposed of other than by sale*

Nortel classifies assets that will be disposed of other than by sale as held and used until the disposal transaction occurs. The assets continue to be depreciated based on revisions to their estimated useful lives until the date of disposal or abandonment.

Recoverability is assessed based on the carrying amount of the asset or asset group and the sum of the undiscounted cash flows expected to result from the remaining period of use and the eventual disposal of the asset or asset group. An impairment loss is recognized when the carrying amount is not recoverable and exceeds the fair value of the asset or asset group. The impairment loss is measured as the amount by which the carrying amount exceeds fair value.

Fair value for the purposes of measuring impairment or a planned disposal of long- lived assets is determined using quoted market prices or the anticipated cash flows discounted at a rate commensurate with the risk involved.

*(q) Goodwill*

Goodwill represents the excess of the purchase price of an acquired business over the fair value of the identifiable assets acquired and liabilities assumed. Nortel tests for impairment of goodwill on an annual basis as of October 1, and at any other time if events occur or circumstances change that would indicate that it is more likely than not that the fair value of a reporting unit has been reduced below its carrying amount.

Circumstances that could trigger an impairment test include: a significant adverse change in the business climate or legal factors; an adverse action or assessment by a regulator; unanticipated competition; the loss of key personnel; a change in reportable segments; the likelihood that a reporting unit or significant portion of a reporting unit will be sold or otherwise disposed of; the results of testing for recoverability of a significant asset group within a reporting unit; and the recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

The impairment test for goodwill is a two- step process. Step one consists of a comparison of the fair value of a reporting unit with its carrying amount, including the goodwill allocated to the reporting unit. Nortel determines the fair value of its reporting units using an income approach; specifically, based on discounted cash flows ("DCF Model"). In certain circumstances, a market approach may also be used to evaluate the reasonableness of fair value determined under the DCF Model, but results of the market approach are not given any specific weighting by Nortel in the final determination of fair value. Both approaches involve significant management judgment and as a result, estimates of fair value determined under these approaches are subject to change in relation to evolving market conditions and Nortel's business environment.

126

HIGHLY CONFIDENTIAL

Table of Contents

If the carrying amount of a reporting unit exceeds its fair value, then step two of the goodwill impairment test requires the fair value of the reporting unit be allocated to the underlying assets and liabilities of that reporting unit, whether or not previously recognized, resulting in an implied fair value of goodwill. If the carrying amount of the reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss equal to the excess is recorded in net earnings (loss).

*(r) Intangible assets*

Intangible assets consist of acquired technology and other intangible assets. Acquired technology represents the value of the proprietary know- how that was technologically feasible as of the acquisition date. Intangible assets are amortized to net earnings (loss) on a straight- line basis over their estimated useful lives, generally two to ten years, or based on the expected pattern of benefit to future periods using estimates of undiscounted cash flows.

*(s) Warranty costs*

As part of the normal sale of product, Nortel provides its customers with product warranties that extend for periods generally ranging from one to six years from the date of sale. A liability for the expected cost of warranty- related claims is established when the product is delivered and completed. In estimating warranty liability, historical material replacement costs and the associated labor costs to correct the product defect are considered. Revisions are made when actual experience differs materially from historical experience. Warranty- related costs incurred before revenue is recognized are capitalized and recognized as an expense when the related revenue is recognized. Known product defects are specifically accrued for as Nortel becomes aware of such defects.

*(t) Pension, post- retirement and post- employment benefits*

Pension expense, based on management's assumptions, consists of: actuarially computed costs of pension benefits in respect of the current year's service; imputed returns on plan assets and imputed interest on pension obligations; and straight- line amortization under the corridor approach of experience gains and losses, assumption changes and plan amendments over the expected average remaining service life of the employee group.

The expected costs of post- retirement and certain post- employment benefits, other than pensions, for active employees are accrued in the consolidated financial statements during the years employees provide service to Nortel. These costs are recorded based on actuarial methods and assumptions. Other post- employment benefits are recognized when the event triggering the obligation occurs.

The over- funded or under- funded status of defined benefit pension and post- retirement plans is recognized as an asset or liability, respectively, on the consolidated balance sheet.

*(u) Derivative financial instruments*

Nortel records derivatives as assets and liabilities measured at fair value. The accounting for changes in the fair value depends on whether a derivative has been designated as a hedge under hedge accounting, and the type of hedging relationship designated. For a derivative designated as a fair value hedge, changes in the fair value of the derivative and of the hedged item attributable to the hedged risk are recognized in net earnings (loss) in the period in which the changes occur. For a derivative designated as a cash flow hedge, the effective portions of changes in the fair value of the derivative are recorded in OCI and are recognized in net earnings (loss) when the hedged item affects net earnings (loss). The ineffective portion of changes in the fair value of the derivative in a cash flow hedge are recognized in other income (expense)- net in the period in which the changes occur. If the derivative has not been designated as a hedging instrument for accounting purposes or if a designated hedging relationship is no longer highly effective, changes in the fair value of the derivative are recognized in net earnings (loss) in the period in which the changes occur.

127

Table of Contents

When a fair value hedging relationship is terminated because the derivative is sold or the hedge relationship is de- designated, the fair value basis adjustment recorded on the hedged item is recognized in the same manner as the other components of the hedged item. For a cash flow hedge that is terminated because the derivative is sold, expired, or the relationship is de- designated, the amount in OCI is to be realized when the hedged item affects net earnings (loss). If a cash flow or fair value hedging relationship is terminated because the underlying hedged item is repaid or is sold, or it is no longer probable that the hedged forecasted transaction will occur, the accumulated balance in OCI or the fair value basis adjustment recorded on the hedged item is recorded immediately in net earnings (loss).

Nortel's policy is to formally document the terms of the relationships between derivative instruments and hedged items to which hedge accounting will be applied. This documentation includes Nortel's risk management objectives and strategy for undertaking various hedge transactions. Where hedge accounting will be applied, this process includes linking all derivatives to specific assets and liabilities on the consolidated balance sheet or to specific firm commitments or forecasted transactions. Nortel also formally assesses, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in designated hedging relationships are highly effective in offsetting changes in fair values or cash flows of hedged items. Nortel may also invest in warrants to purchase securities of other companies as a strategic investment or receive warrants in various transactions. Warrants that relate to publicly traded companies or that can be net share settled are deemed to be derivative financial instruments. Such warrants, however, are generally not eligible to be designated as hedging instruments. In addition, Nortel may enter into certain commercial contracts containing embedded derivative financial instruments. Generally for these embedded derivatives, the economic characteristics and risks are not clearly and closely related to the economic characteristics and risks of the host contract, and therefore the embedded derivatives are separated from the host contract and the changes in fair value each period are recorded in net earnings (loss).

*(v) Share- based compensation*

Nortel employees and directors have been issued share- based awards from a number of share- based compensation plans that are described in note 20.

Effective January 1, 2006, Nortel adopted SFAS No. 123R, "Share- Based Payment" ("SFAS 123R") which revises SFAS No. 123, "Accounting for Stock- Based Compensation" ("SFAS 123"). Nortel adopted SFAS 123R using the modified prospective transition approach and, accordingly, the results of prior periods have not been restated. Under the modified prospective transition approach, the provisions of SFAS 123R are generally applied only to share- based awards granted, modified, repurchased or cancelled on January 1, 2006 and thereafter. Nortel voluntarily adopted fair value accounting for share- based awards effective January 1, 2003 (under SFAS 123, as amended by SFAS No. 148, "Accounting for Stock- Based Compensation- Transition and Disclosure- an Amendment of SFAS 123"), using the prospective method. Under this method, Nortel measured the cost of share- based awards granted or modified on or after January 1, 2003 using the fair value of the award and began recognizing that cost in the consolidated statements of operations over the vesting period. Nortel will recognize the remaining previously unrecognized cost of these awards over the remaining service period following the provisions of SFAS 123R.

NNC common shares, deliverable upon the settlement or exercise of awards issued under Nortel's share- based compensation plans, may be new shares issued from treasury or shares purchased in privately negotiated transactions or in the open market.

128

**Table of Contents**

The accounting for Nortel's significant share- based compensation plans under the fair value- based method is as follows:

*Stock options*

The grant date fair value of stock options is estimated using the Black- Scholes- Merton option- pricing model. Compensation cost is recognized on a straight- line basis over the stock option vesting period of the entire award based on the estimated number of stock options that are expected to vest. When exercised, stock options are settled through the issuance of NNC common shares and are therefore treated as equity awards.

*Stock appreciation rights ("SARs")*

Stand- alone SARs or SARs in tandem with options may be granted under the Nortel 2005 Stock Incentive Plan, As Amended and Restated ("2005 SIP"). As of December 31, 2008, no tandem SARs have been granted under the 2005 SIP. SARs that are settled in cash are accounted for as liability awards and SARs that are settled in NNC common shares are accounted for as equity awards. Upon the exercise of a vested stand- alone SAR, a holder will be entitled to receive payment, in cash, NNC common shares or any combination thereof of an amount equal to the excess of the market value of an NNC common share on the date of exercise over the subscription or base price under the SAR. Stand- alone SARs awarded under the 2005 SIP generally vest in equal installments on the first four anniversary dates of the grant date of the award. All SARs currently granted will be settled in cash at the time of vesting and as such have been classified as liability awards based on this cash settlement provision. The measurement of the liability and compensation cost of outstanding SARs is based on the fair value of the awards and is remeasured each period through the date of settlement. Compensation cost is amortized over the requisite service period (generally the vesting period) of the award based on the proportionate amount of the requisite service that has been rendered to date.

*Restricted Stock Units ("RSUs")*

RSUs are settled with NNC common shares and are valued on the grant date using the grant date market price of the underlying shares. This valuation of compensation cost is not subsequently adjusted for changes in the market price of the shares. Each RSU granted under the 2005 SIP represents the right to receive one NNC common share subject to the terms and conditions of the award. Compensation cost is recognized on a straight- line basis over the vesting period of the entire award based on the estimated number of RSU awards that are expected to vest. RSUs were awarded to executive officers beginning in 2005, and employees from January 1, 2007, prospectively vest in equal installments on the first three anniversary dates of the grant of the award. With the exception of RSUs granted in China, all RSUs currently granted have been classified as equity instruments as their terms require that they be settled in NNC common shares. To address country specific rules and regulations RSUs awarded to employees working in China are cash settled awards. Nortel accounts for these cash settled grants as liability awards.

*Performance Stock Units ("PSUs")*

*Relative Total Shareholder Return Metric Awards ("PSU- rTSRs")*

PSU- rTSRs (previously defined as "PSUs" in the Annual Report on Form 10- K for the year ended December 31, 2007 ("2007 Annual Report")) are generally settled with NNC common shares and are valued using a Monte Carlo simulation model. The number of awards expected to be earned, based on achievement of the PSU- rTSR market condition, is factored into the grant date Monte Carlo valuation for the PSU- rTSR award. The grant date fair value is not subsequently adjusted regardless of the eventual number of awards that are earned based on the market condition. Compensation cost is recognized on a straight- line basis over the requisite service period. Compensation cost is reduced for estimated PSU- rTSR awards that will not vest due to not meeting continued employment vesting conditions. All PSU- rTSRs currently granted have been classified as equity instruments as their terms require settlement in shares.

129

**Table of Contents**

For PSU- rTSRs that may be settled in cash, the award is treated as a liability and compensation cost for the award is remeasured each period based on the fair value of the underlying shares at period end. Compensation cost is then recognized in the same manner as described above.

*Management Operating Margin Metric Awards ("PSU- Management OMs")*

PSU- Management OMs, as described in note 20, vest based on the satisfaction of both a performance condition and a continued service condition. PSU- Management OMs are generally settled in shares and compensation cost for these awards is measured based on the grant date fair value of the underlying NNC common shares that may be issuable based on the terms of the award. Compensation cost is recognized over the requisite service period of the award based on the probable number of shares to be issued by achievement of the performance condition, reduced by the expected awards that will not vest due to not meeting the continued service condition. Compensation cost recognized is adjusted to equal the grant date fair value of the actual shares that vest once known.

For PSU- Management- OMs that may be settled in cash, the award is treated as a liability and compensation cost for the award is remeasured each period based on the fair value of the underlying shares at period end. Compensation cost is then recognized in the same manner as described above.

*Employee stock purchase plans ("ESPP")*

Nortel has stock purchase plans for eligible employees to facilitate the acquisition of NNC common shares at a discount. The discount is such that the plans are considered compensatory under the fair value- based method. Nortel's contribution to the ESPPs, as defined in note 20, is recorded as compensation expense on a quarterly basis as the obligation to contribute is incurred.

*(w) Guarantees*

Nortel has entered into agreements which contain features that meet the definition of a guarantee under FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Other" ("FIN 45"). These arrangements create two types of obligations for Nortel:

   (i)     Nortel has a non- contingent and immediate obligation to stand ready to make payments if certain future triggering events occur. For certain guarantees, a liability is recognized for the stand ready obligation at the inception of the guarantee; and

   (ii)     Nortel has an obligation to make future payments if those certain future triggering events do occur. A liability is recognized when (a) it becomes probable that one or more future events will occur triggering the requirement to make payments under the guarantee and (b) when the payment can be reasonably estimated.

*(x) Recent accounting pronouncements*

   (i)     In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"). SFAS 157 establishes a single definition of fair value, a framework for measuring fair value under U.S. GAAP and requires expanded disclosures about fair value measurements. Nortel partially adopted the provisions of SFAS 157 effective January 1, 2008. The effective date for SFAS 157 as it relates to fair value measurements for non- financial assets and liabilities that are not measured at fair value on a recurring basis has been deferred to fiscal years beginning after December 15, 2008 in accordance with FASB Staff Position ("FSP"), SFAS 157- 2, "Effective Date of FASB Statement No. 157". Nortel plans to adopt the deferred portion of SFAS 157 on January 1, 2009. Nortel does not currently expect the adoption of the deferred portion of SFAS 157 to have a material impact on its

130

**HIGHLY CONFIDENTIAL**     NNC-NNL06001427 / 139