(4)  In accordance with the SEC rules, for each named executive officer, the table below sets forth specific amounts for payments or reimbursements by Nortel in 2008 with respect to taxes, contributions to defined contribution

243

## Table of Contents

plans, severance and perquisites exceeding the greater of $25,000 or 10% of his total perquisites and also identifies all other perquisites, including those having no incremental cost to Nortel:

M.S. Zafirovski

financial planning fees ($26,201) and the incremental cost of personal travel on the company aircraft and commercial airlines ($83,391)

tax preparation services, family travel on commercial airlines, business club membership, personal use of ground transportation and extension of work permit

family/guests traveling with Mr. Zafirovski on the company aircraft and adding a personal leg to business travel, in each case at no cost to Nortel

Nortel contributions under the Managerial and Non- Negotiated Pension Plan (Part III) defined contribution pension plan ($19,785) and the Nortel Networks Limited Investment Plan for Employees  Canada ($109,509)

taxes pursuant to the tax- equalization provisions in his employment agreement ($83,298)

P.S. Binning

relocation expenses including temporary car lease ($251,336)

tax preparation service and personal use of ground transportation

Nortel contributions under the Managerial and Non- Negotiated Pension Plan (Part III) defined contribution pension plan ($12,826)

taxes pursuant to the permanent relocation program provisions in his employment agreement and taxes paid on his behalf for a car lease benefit and for tax preparation service ($109,370)

D.J. Carey

relocation expenses ($62,252)

tax preparation service

Nortel contributions under the Nortel Networks Long- Term Investment Plan ($8,408) and the Nortel Networks Long- Term Investment Restoration Plan ($2,115)

taxes pursuant to the tax- equalization provisions in his employment agreement and taxes paid on his behalf for tax preparation service ($355,836)

S.J. Bandrowczak

relocation expenses ($859,220)

Nortel contributions under the Nortel Networks Long- Term Investment Plan ($11,004) and the Nortel Networks Long- Term Investment Restoration Plan ($11,630)

taxes pursuant to the permanent relocation program provisions in his employment agreement ($348,163)

W.K. Nelson

Nortel contributions under the Nortel Networks Long- Term Investment Plan ($4,600) and the Nortel Networks Long- Term Investment Restoration

Plan ($5,077)

payments for accrued and unused vacation ($42,308) and reimbursement of independent legal advice ($4,000) made pursuant to the letter agreement dated November 27, 2008, concerning the cessation of his employment on December 31, 2008 following the commencement of the Creditor Protection Proceedings, no severance payments have been made to Mr. Nelson

R.S. Lowe

Nortel contributions under the Nortel Networks Long- Term Investment Plan ($4,600), and the Nortel Networks Long- Term Investment Restoration Plan ($4,615), and special contribution to the Nortel Networks Long- Term Investment Plan as a result of a class action settlement ($760)

taxes paid on his behalf for tax preparation service ($1,147)

Incremental cost of travel on the company aircraft was calculated based on the total direct (or variable) operating costs (fuel, maintenance labor, parts and materials, outside services, crew expenses, catering and commissary, handling, landing and navigation fees, maintenance reserves and miscellaneous expenses) in month traveled divided by the total flight hours of the aircraft during the month. The cost per flight hour was then multiplied by personal flight hours (including so- called "deadhead flights" resulting from the plane returning empty to its home base after taking the executive to his or her destination, or for the aircraft traveling empty to a destination to pick up the executive).

(5)   Represents the U.S. Dollar equivalent of certain payments actually earned or paid in local currency. Amounts for the incremental cost of air travel in Canadian Dollars have been converted using the month- end exchange rate in effect during the applicable month of travel. Amounts representing relocation expenses and ground travel submitted in local currency have been converted using the exchange rate in effect at the time the expense is submitted for payment. All other compensation paid in Canadian Dollars has been converted using the average of the exchange rates in effect during 2008 equal to US$1.00 = CAD$1.0614, during 2007 equal to US$1.00 = CAD$1.0732 and during 2006 equal to US$1.00 = CAD$1.1343, respectively, other than Mr. Zafirovski's salary from November 13, 2006 until December 31, 2006, which was converted to U.S. Dollars using the average of the month- end exchange rates for November and December 2006 equal to US$1.00 = CAD$1.1455, and Mr. Binning's salary for 2007 which was converted to U.S. Dollars using the average of the month- end exchange rates for November and December 2007 equal to US$1.00 = CAD$0.9849. Mr. Zafirovski did not receive a salary increase in 2007 or 2008. Since November 13, 2006, Mr. Zafirovski's base salary has been paid in Canadian Dollars, prior to which it was paid in U.S. Dollars. The increases reflected in the "Salary" column are attributable to this currency conversion.

244

**Table of Contents**

(6)  Effective January 1, 2009, Mr. Bandrowczak accepted a new role to lead Enterprise Sales for the Americas.

(7)  Represents a special bonus pursuant to his employment agreement of which $200,000 was paid within 30 days following commencement of employment on July 16, 2007 and $500,000 was paid within 30 days following the one year anniversary of his commencement of employment. The $500,000 bonus was paid on July 18, 2008 in accordance with the agreement.

(8)  On November 10, 2008, Nortel announced Mr. Nelson's departure effective December 31, 2008.

(9)  Mr. Nelson's base salary was $550,000. This amount reflects the amount earned from his commencement of employment on January 18, 2008 to his employment termination as of December 31, 2008.

(10) Mr. Lowe's base salary was increased to $500,000 effective March 20, 2006. The difference in base salary showing from 2006 to 2007 reflects that Mr. Lowe did not earn a full year's base salary at this rate in 2006. He did not receive a salary increase in 2007 or 2008.

(11) For Mr. Lowe, the pension benefit accrual in Nortel's U.S. pension plans (Retirement Income Plan and Restoration Plan) is impacted by his prior service with Nortel in Canada. This prior service was previously not reflected in the fiscal 2006 and 2007 disclosure.

**Material Terms of Employment Agreements and Arrangements with Named Executive Officers**

The following is a summary of the material terms of the employment agreements for the named executive officers. Nortel's obligations under these agreements will continue to be reviewed and considered in the course of the Creditor Protection Proceedings. For more information regarding the named executive officers' pension benefits and other post- employment compensation, see "Pension Benefits for Fiscal Year 2008" and "Potential Payments upon Termination or Change in Control" below.

*Mr. Zafirovski*

Nortel entered into an employment agreement in connection with Mr. Zafirovski's appointment as President and Chief Executive Officer effective November 15, 2005. Mr. Zafirovski's employment agreement provides for tax equalization so that his after- tax compensation will be the same as if he were a resident of the State of Illinois. Compensation for this purpose includes salary, short- term incentive awards, long- term incentives and benefits under Nortel's employee benefit plans (including the Nortel relocation plan) to the extent such benefits shall be considered income for tax purposes and any other similar payments or awards. We agreed to these arrangements in order to offset any negative tax consequences as a result of relocating to Toronto. His employment agreement further provides an annual reimbursement of up to $25,000 for financial planning, as well as tax preparation services. The agreement also provides that Mr. Zafirovski is eligible to participate in the Nortel employee benefit plans, including the Capital Accumulation and Retirement Program (CARP) and the Nortel relocation program, in accordance with the generally applicable terms of such plans, as well as the CIC Plan. As of November 2006, Mr. Zafirovski's relocation to Toronto was completed.

Mr. Zafirovski was eligible for a special lifetime annual pension benefit of $500,000, including a 60% joint and survivor benefit for his spouse. At the June 28, 2006 meeting of the CHRC, Mr. Zafirovski proposed a voluntary 29% reduction of this special lifetime annual pension benefit, in conjunction with changes announced on June 27, 2006 relating to our current pension programs in the United States and Canada. The CHRC accepted Mr. Zafirovski's proposal and recommended it to the Nortel Boards for approval. At a joint meeting of the Boards held on June 28, 2006, the Boards approved the voluntary reduction. As a result, Mr. Zafirovski became eligible for a special lifetime annual pension benefit of $355,000 per year rather than $500,000 per year. Mr. Zafirovski's eligibility for this special pension accrues after five years of active employment. The terms of his special pension benefit provide that the pension is payable monthly following retirement on or after age 60.

245

**Table of Contents**

Mr. Zafirovski's employment agreement provides that the termination of his employment at or after five years will also be treated as a retirement for purposes of the terms of all equity incentive awards granted to Mr. Zafirovski under Nortel's stock option plans.

*Mr. Binning*

Nortel entered into an employment agreement with Mr. Binning in connection with his appointment as Executive Vice- President and Chief Financial Officer effective November 12, 2007. Mr. Binning's employment agreement provides that, in conjunction with Nortel's 2008 annual integrated talent planning cycle, he would receive an award of long- term incentives valued at approximately $2,300,000 using Nortel's prescribed valuation method for equity vehicles applicable to senior executives of Nortel generally, in line with the 2008 long- term incentive program design approved by the CHRC and under and subject to the terms and conditions of the 2005 SIP (or any equivalent plan existing on the date thereof) and Nortel's policies and procedures at the time of grant. The intended value of the grant was converted to 119,900 stock options, 29,950 RSUs, 44,050 PSU- rTSRs and 44,050 PSU- Management OMs, which were awarded on March 3, 2008. The agreement also provides that Mr. Binning is eligible to participate in certain employee benefit plans, the Nortel relocation program and the CIC Plan in accordance with the generally applicable terms of such plans. As of July 2008, Mr. Binning's relocation to Toronto was completed.

*Mr. Carey*

Nortel entered into an employment agreement with Mr. Carey in connection with the change in Mr. Carey's primary business location from Toronto, Ontario to Alpharetta, Georgia effective June 23, 2008. His primary business location was changed after considering both the needs of Nortel and Mr. Carey's personal situation. This agreement updates and replaces the terms and conditions of the previous letter between Nortel and Mr. Carey. Under the agreement, Mr. Carey is eligible to participate in certain employee benefit plans and the CIC Plan in accordance with the generally applicable terms of such plans. All benefits for which Mr. Carey is eligible as a result of his business office being in Toronto, Ontario, including tax equalization, ceased upon the commencement of his primary business office in Alpharetta, Georgia on June 23, 2008.

*Mr. Bandrowczak*

Nortel entered into an employment agreement with Mr. Bandrowczak in connection with his appointment as Chief Information Officer effective July 16, 2007. As described above under "Special One- Time Awards", Mr. Bandrowczak was entitled under the agreement to receive a special bonus of $700,000, with $200,000 to be paid within 30 days following commencement of employment and $500,000 to be paid within 30 days following the one year anniversary of the commencement of his employment. The agreement also provides that Mr. Bandrowczak is eligible to participate in the long- term incentive program and certain employee benefit plans, the Nortel relocation program and the CIC Plan in accordance with the generally applicable terms of such plans.

Effective January 1, 2009, Mr. Bandrowczak accepted a new role to lead Enterprise Sales for the Americas. In connection with this new role, Nortel entered into a new employment agreement which provides for continuation of all existing compensation and benefit arrangements with the exception of his participation in the Incentive Plan. Due to the scope and nature of his new role, Mr. Bandrowczak instead participates in Nortel's Sales Incentive Plan effective January 1, 2009, with a target award of $347,728.

*Mr. Nelson*

Nortel entered into an employment agreement with Mr. Nelson in connection with his appointment as Executive Vice- President, Global Sales as of January 14, 2008. On November 10, 2008, Nortel announced Mr. Nelson's departure effective December 31, 2008. Nortel entered into a letter agreement with Mr. Nelson concerning the cessation of his employment.

Under his original employment agreement, Mr. Nelson was entitled to receive a new hire, one- time grant of RSUs with an intended value of approximately $5,250,000 and a further long- term incentive award valued at no less than approximately $2,200,000 in connection with the 2008 long- term incentive award. Both grants were awarded on March 3, 2008 and were awarded using Nortel's prescribed valuation method for equity vehicles applicable to senior

246

**Table of Contents**

executives of Nortel generally and under and subject to the terms and conditions of the 2005 SIP and Nortel's policies and procedures at the time of grant. The intended value of the new hire grant was converted to a long- term incentive award of 402,250 RSUs with a five year vesting term in order to further encourage retention. In recognition of the potential forfeiture of the annual bonus to be provided by Mr. Nelson's previous employer, Nortel also agreed as a term of the employment agreement to pay an amount up to a maximum of $400,000 in recognition of the forfeiture and an amount up to a maximum of an additional $200,000 in recognition of the forfeiture of the variable component of the annual bonus. These payments were conditioned on commencement of employment, satisfactory evidence of forfeiture and continued satisfactory performance of his employment responsibilities. Mr. Nelson did not provide evidence of forfeiture and the special payments were not paid. Under the terms of the agreement Mr. Nelson was eligible to participate in certain employee benefit plans, the Nortel relocation program and the CIC Plan in accordance with the generally applicable terms of such plans. His original agreement also contained an involuntary separation provision which provided that if Mr. Nelson's separation of employment was initiated by Nortel or if he were to initiate his separation of employment because his responsibilities or authority were involuntarily changed or not substantially equivalent to his current role, he would have been provided in lieu of any other payment or benefit with the following:

the equivalent of 18 months base salary paid bi- weekly; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is enrolled for 18 months following employment termination at active employee rates.

The foregoing payments and benefits would not be provided to Mr. Nelson if his separation of employment arose out of conduct and/or inaction by Mr. Nelson that was not in the best interest of Nortel. All payments and benefits were conditional on Mr. Nelson's execution of a separation agreement. If payments had been made to Mr. Nelson under the CIC Plan as described above, he would have been ineligible for the payments and benefits under this provision of his employment agreement.

The letter agreement concerning the cessation of his employment provides for the following: (i) payment of a severance allowance pursuant to the ESAP from January 1, 2009 through June 30, 2010 paid in a bi- weekly amount of $21,154; (ii) an election to continue to participate in certain health and life insurance benefits for the duration of the severance period provided that Mr. Nelson pay the applicable employee contribution rates; (iii) no eligibility for consideration for future grants of stock options, RSUs or PSUs; (iv) continuation of his rights with respect to those stock options and RSUs previously granted in accordance with the applicable equity plans and instrument of grant/award; (v) forfeiture of all previously granted PSUs; (vi) senior executive outplacement services; (vii) income tax preparation service for the tax years 2008, 2009 and 2010; (viii) determination of his eligibility for an Incentive Plan payment for 2008; and (ix) payment of the cost of independent legal advice relating to this agreement to a maximum of $4,000. The agreement also provides that Nortel will provide indemnification in accordance with applicable Canadian law and NNC's by- laws. Mr. Nelson is subject to certain non- disclosure and non- compete obligations under the terms of the agreement. Following the commencement of the Creditor Protection Proceedings, no severance payments have been made to Mr. Nelson.

*Mr. Lowe*

Mr. Lowe is an experienced executive who has been employed by Nortel since June 1980. He is eligible to participate in certain employee benefit plans and the CIC Plan in accordance with the generally applicable terms of such plans.

247

Table of Contents

**Grants of Plan- Based Awards in Fiscal Year 2008**

The following table sets forth information concerning equity awards granted by Nortel to the named executive officers under the 2005 SIP during the 2008 fiscal year and the possible payouts to the named executive officers under the Incentive Plan for the 2008 fiscal year. On February 20, 2009, the NNL Board of Directors determined not to pay any bonuses under the Incentive Plan for 2008 to any participating employee, including any named executive officer, in accordance with the recommendation of the CHRC and management. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. For a description of the material terms of the 2005 SIP, see "Nortel 2005 Stock Incentive Plan" in the Equity- Based Compensation Plans section below. For a description of the material terms of the Incentive Plan see above under "Short- Term Incentives".

| Name | Grant Date/ Corporate Approval Date (2) | Estimated Possible Payouts under Non- Equity Incentive Plan Awards(1) | | Estimated Future Payouts under Equity Incentive Plan Awards(1) | | | All Other Stock Awards: Number of Shares of Stock or Units (#)(1) | All Other Option Awards: Number of Securities Underlying Options (#)(1) | Exercise or Base Price of Option Awards ($)(3) | Closing Price on Grant Date ($) | Grant Date Fair Value of Stock and Option ($)(4) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Target ($) | Max ($) | Threshold (#) | Target (#) | Max(#) | | | | | |
| M.S. Zafirovski | March 3 / February 22 | - | - | - | - | - | - | 119,000 | 8.31(5) | 8.05 | 2,326,444 |
| | March 3 / February 22 | - | - | 72,000 | 144,000 | 288,000 | - | - | - | - | 996,912 |
| | March 3 / February 22 | - | - | 14,400 | 144,000 | 288,000 | - | - | - | - | 1,159,200 |
| | - | 1,930,639(6) | 3,861,278(6) | - | - | - | - | - | - | - | - |
| P.S. Binning | March 3 / February 21 | - | - | - | - | - | - | 119,900 | 8.31(5) | 8.05 | 451,335 |
| | March 3 / February 21 | - | - | - | - | - | 29,950 | - | - | - | 241,098 |
| | March 3 / February 21 | - | - | 22,025 | 44,050 | 88,100 | - | - | - | - | 304,958 |
| | March 3 / February 21 | - | - | 4,405 | 44,050 | 88,100 | - | - | - | - | 354,603 |
| | - | 643,490(6) | 1,286,979(6) | - | - | - | - | - | - | - | - |
| D.J. Carey | March 3 / February 21 | - | - | - | - | - | - | 114,700 | 8.31 | 8.05 | 431,761 |
| | March 3 / February 21 | - | - | - | - | - | 28,650 | - | - | - | 230,633 |
| | March 3 / February 21 | - | - | 21,063 | 42,125 | 84,250 | - | - | - | - | 291,631 |
| | March 3 / February 21 | - | - | 4,213 | 42,125 | 84,250 | - | - | - | - | 339,106 |

HIGHLY CONFIDENTIAL

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 550,000 | 1,100,000 | - | - | - | - | - | - | - |

248

## Table of Contents

| Name | Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| S.J. Bandrowczak | March 3 / February 21 | - | - | - | - | - | - | 31,250 | 8.31 | 8.05 | 117,633 |
| | March 3 / February 21 | - | - | - | - | - | 7,800 | - | - | | 62,790 |
| | March 3 / February 21 | - | - | 5,738 | 11,475 | 22,950 | - | - | - | - | 79,441 |
| | March 3 / February 21 | - | - | 1,148 | 11,475 | 22,950 | - | - | - | - | 92,374 |
| | | 340,000 | 680,000 | - | - | - | - | - | - | - |
| W.K. Nelson [7] | March 3 / February 21 | - | - | - | - | - | - | 114,700 | 8.31 | 8.05 | 431,761 |
| | March 3 / February 21 | - | - | - | - | - | 430,900 | - | - | - | 3,468,745 |
| | March 3 / February 21 | - | - | 21,063 | 42,125 | 84,250 | - | - | - | - | 291,631 |
| | March 3 / February 21 | - | - | 4,213 | 42,125 | 84,250 | - | - | - | - | 339,106 |
| | | - | 550,000 | 1,100,000 | - | - | - | - | - | - |
| R.S. Lowe | March 3 / February 21 | - | - | - | - | - | - | 78,200 | 8.31 | 8.05 | 294,366 |
| | March 3 / February 21 | - | - | - | - | - | 19,500 | - | - | | 156,975 |
| | March 3 / February 21 | - | - | 14,363 | 28,725 | 57,450 | - | - | - | - | 198,863 |
| | March 3 / February 21 | - | - | 2,873 | 28,725 | 57,450 | - | - | - | - | 231,236 |
| | | 500,000 | 1,000,000 | - | - | - | - | - | - | - |

(1) On February 20, 2009, the NNL Board of Directors determined not to pay any bonuses under the Incentive Plan for 2008 to any participating employee, including any named executive officer, in accordance with the recommendation of the CHRC and management. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

(2) Grants were approved by the CHRC at its February 21, 2008 meeting in accordance with the equity policy. The grant to Mr. Zafirovski was approved at the February 22, 2008 Board meeting also in accordance with the equity policy. These grants were approved with a March 3, 2008 effective date provided that the window period open in accordance with applicable corporate policy as a result of the filing of financial statements for the year ended December 31, 2007. All 2008 long- term incentives were awarded in accordance with the 2005 SIP and applicable securities laws and stock exchange requirements.

(3) Stock options were awarded at an option price not less than the "market value" (as determined in accordance with the 2005 SIP) of an NNC common share on the grant date. For a description of the methodology of determining the exercise price, see the Equity- Based Compensation Plans section below.

(4) Aggregate grant date fair values computed in accordance with FAS 123R. For a detailed description of the assumptions made in the valuation of stock options, RSUs and PSUs, see note 20, "Share- based compensation plans" to the accompanying audited consolidated financial statements.

(5) Canadian grants issued with an exercise price of CAD$8.21. Table reflects equivalent U.S. Dollar exercise price converted using the March 3, 2008 Bank of Canada noon rate of exchange rate of US$1.00 = CAD$.9870.

(6) Amounts have been converted using the average of the exchange rates in effect during 2008 equal to US$1.00 = CAD$1.0614.

249

HIGHLY CONFIDENTIAL

**Table of Contents**

(7)  On November 10, 2008, Nortel announced Mr. Nelson's departure effective December 31, 2008.

**Outstanding Equity Awards at End of Fiscal Year 2008**

The following table sets forth information regarding unexercised options, RSUs that have not vested, and unearned PSUs outstanding for each named executive officer as of December 31, 2008. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($)(1) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($)(2) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(2)(3) |
| M.S. Zafirovski | 300,000 | 200,000(4) | 31.00 | November 14, 2015 | 90,600(5) | 23,556 | - | - |
| | 83,750 | 83,750(6) | 21.20 | June 13, 2016 | - | - | - | (7) |
| | 67,250 | 201,750(8) | 25.82(9) | March 20, 2017 | - | - | 67,000(10) | 17,420 |
| | - | 592,000(10) | 8.31(12) | March 2, 2018 | - | - | 86,400(13) | 22,464 |
| P. S. Binning | - | - | - | - | 64,800(14) | 16,848 | - | - |
| | - | 119,900(15) | 8.31(12) | March 2, 2018 | 29,950(16) | 7,787 | 26,430S | 6,872 |
| D.J. Carey | 12,500 | 12,500(17) | 21.20 | June 13, 2016 | 22,500(18) | 5,850 | - | (7) |
| | 12,500 | 37,500(19) | 25.82 | March 20, 2017 | 16,667(20) | 4,333 | 12,500(10) | 3,250 |
| | - | 114,700(21) | 8.31 | March 2, 2018 | 28,650(22) | 7,449 | 25,275(13) | 6,572 |
| S.J. Bandrowczak | - | - | - | - | 15,867(23) | 4,125 | 5,900(10) | 1,534 |
| | - | 31,250(24) | 8.31 | March 2, 2018 | 7,800(25) | 2,028 | 6,885S | 1,790 |
| W.K. Nelson | - | 114,700(26) | 8.31 | March 2, 2018 | 430,900(27) | 112,034 | 25,275S | 6,572 |
| R.S. Lowe | 1,600 | - | 155.33 | January 27, 2009 | - | - | - | - |
| | 2,666 | - | 71.60 | November 29, 2009 | - | - | - | - |
| | 2,666 | - | 71.60 | January 26, 2010 | - | - | - | - |
| | 1,333 | - | 71.60 | June 28, 2010 | - | - | - | - |
| | 4,000 | - | 71.60 | September 27, 2010 | - | - | - | - |
| | 4,000 | - | 71.60 | January 24, 2011 | - | - | - | - |
| | 15,000 | - | 51.50 | February 27, 2012 | - | - | - | - |
| | 56,250 | 18,750(28) | 31.80 | September 6, 2015 | - | - | - | - |
| | 12,500 | 12,500(29) | 21.20 | June 13, 2016 | 5,834(30) | 1,517 | - | (7) |
| | 9,600 | 28,800(31) | 25.82 | March 20, 2017 | 12,800(32) | 3,328 | 9,600(10) | 2,496 |
| | - | 78,200(33) | 8.31 | March 2, 2018 | 19,500(34) | 5,070 | 17,235(13) | 4,481 |

**HIGHLY CONFIDENTIAL**

(1) Historical exercise prices have been adjusted to reflect the 1- for- 10 consolidation of NNC's issued and outstanding common shares effective December 1, 2006.

(2) The market value was computed by multiplying the closing market price of NNC common shares on the NYSE on December 31, 2008 of $0.26 by the number of NNC common shares or units held.

(3) The number of unearned PSUs is based on a threshold payout. For PSU- Management OMs the threshold payout is 10% of the award. For PSU- rTSRs the threshold

250

Table of Contents

payout is 50% of the award.

(4) 100,000 options were to vest on each of November 15, 2009 and November 15, 2010.

(5) 45,300 RSUs were to vest on each of November 15, 2009 and November 15, 2010.

(6) 41,875 options were to vest on each of June 14, 2009 and June 14, 2010.

(7) Subject to the CHRC determining the percentage of target payout, if any, PSUs awarded June 14, 2006 and August 8, 2006 were to vest following the completion of the performance period which ended on December 31, 2008. Given that the threshold performance criteria under the 2006 long range incentive program was not achieved, on January 27, 2009 the CHRC approved the cancellation of all outstanding 2006 PSUs granted under such program.

(8) 67,250 options were to vest on each of March 21, 2009, March 21, 2010 and March 21, 2011.

(9) Canadian grant issued with an exercise price of CAD$29.90. Table reflects equivalent U.S. Dollar exercise price converted using the March 21, 2007 Bank of Canada noon rate of exchange of US$1.00 = CAD$1.1578.

(10) Subject to the CHRC determining the percentage of target payout, if any, based on the level of achievement of the performance criteria, PSUs were to vest following the completion of the performance period which was to end on December 31, 2009.

(11) 148,000 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.

(12) Canadian grant issued with an exercise price of CAD$8.21. Table reflects equivalent U.S. Dollar exercise price converted using the March 3, 2008 Bank of Canada noon rate of exchange of US$1.00 = CAD$9870.

(13) Subject to the CHRC determining the percentage of target payout, if any, based on the level of achievement of the performance criteria, PSU- Management OMs were to vest on December 31, 2010 and PSU- rTSRs were to vest on January 30, 2011.

(14) 16,200 RSUs were to vest on each of November 15, 2009, November 15, 2010, November 15, 2011 and November 15, 2012.

(15) 29,975 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.

(16) 9,983 RSUs were to vest on each of March 3, 2009 and March 3, 2010 and 9,984 RSUs were to vest on March 3, 2011.

(17) 6,250 options were to vest on each of June 14, 2009 and June 14, 2010.

(18) 22,500 RSUs were to vest on June 14, 2009.

(19) 12,500 options were to vest on each of March 21, 2009, March 21, 2010 and March 21, 2011.

(20) 8,333 RSUs were to vest on March 21, 2009 and 8,334 RSUs were to vest on March 21, 2010.

(21) 28,675 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.

(22) 9,550 RSUs were to vest on each of March 3, 2009, March 3, 2010 and March 3, 2011.

(23) 7,933 RSUs were to vest on August 8, 2009 and 7,934 RSUs were to vest on August 8, 2010.

(24) 7,812 options were to vest on March 3, 2009, 7,813 options were to vest on March 3, 2010, 7,812 options were to vest on March 3, 2011 and 7,813 options were to vest on March 3, 2012.

251

**Table of Contents**

(25) 2,600 RSUs were to vest on each of March 3, 2009, March 3, 2010 and March 3, 2011.

(26) 28,675 options were to vest on each of March 3, 2009 and March 3, 2010. The remaining unvested options were to expire on severance end date.

(27) 90,000 RSUs were to vest on each of March 3, 2009 and March 3, 2010. The remaining unvested RSUs were to expire on severance end date.

(28) 18,750 options were to vest on September 7, 2009.

(29) 6,250 options were to vest on each of June 14, 2009 and June 14, 2010.

(30) 5,834 RSUs were to vest on June 14, 2009.

(31) 9,600 options were to vest on each of March 21, 2009, March 21, 2010 and March 21, 2011.

(32) 6,400 RSUs were to vest on each of March 21, 2009 and March 21, 2010.

(33) 19,550 options were to vest on each of March 3, 2009, March 3, 2010, March 3, 2011 and March 3, 2012.

(34) 6,500 RSUs were to vest on each of March 3, 2009, March 3, 2010 and March 3, 2011.

**Option Exercises and Stock Vested in Fiscal Year 2008**

The following table sets forth information regarding the vesting of RSUs during the 2008 fiscal year for each of the named executive officers on an aggregated basis. None of the named executive officers exercised any options to purchase NNC common shares during the 2008 fiscal year.

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired on | Value Realized on | Number of Shares Acquired on | Value Realized on |
| Name | Exercise (#) | Exercise ($) | Vesting (#) | Vesting ($) |
| M.S. Zafirovski | - | - | 45,300 | 25,368(1) |
| P.S. Binning | - | - | 16,200 | 9,072(1) |
| D.J. Carey | - | - | 8,333 | 50,831(2) |
| | - | - | 22,500 | 226,125(3) |
| S.J. Bandrowczak | - | - | 7,933 | 47,598(4) |
| W.K. Nelson | - | - | - | - |
| R.S. Lowe | - | - | 6,400 | 39,040(2) |
| | - | - | 5,833 | 58,622(3) |
| | - | - | 10,000 | 25,400(5) |

(1) Restricted stock units vested Saturday November 15, 2008. Based on November 14, 2008 NYSE market close price of $0.56.

(2) Restricted stock units vested on March 21, 2008. Due to market holiday, settlement based on March 20, 2008 NYSE market close price of $6.10.

(3) Restricted stock units vested Saturday June 14, 2008. Based on June 13, 2008 NYSE market close price of $10.05.

(4) Restricted stock units vested on August 8, 2008. Based on August 8, 2008 NYSE market close price of $6.00.

(5) Restricted stock units vested Sunday September 28, 2008. Based on September 26, 2008 NYSE market close

252

Table of Contents
price of $2.54.

**Pension Benefits for Fiscal Year 2008**

The following table sets forth certain information regarding each plan during 2008 that provided for pension benefits to the named executive officers at, following, or in connection with retirement. Nortel continues to evaluate its pension and post retirement benefit obligations in the context of the Creditor Protection Proceedings and as a result, Nortel's current expectations regarding such obligations in 2009 and beyond are uncertain at this time and are subject to change. For further information on Nortel's obligations under the pension plans, see the MD&A section of this report and note 9, "Employee benefit plans" of the accompanying audited consolidated financial statements.

| Name | Plan Name | Number of Years Credited Service(#) | Present Value of Accumulated Benefit($)(1) | Payments During Last Fiscal Year($) |
|------|-----------|-------------------------------------|--------------------------------------------|-------------------------------------|
| M.S. Zafirovski | Special Pension Benefit Arrangement | 3.21 | 1,959,025(2) | - |
| P.S. Binning | - | - | - | - |
| D.J. Carey | Nortel Networks Retirement Income Plan | 2 | 14,646(3) | - |
|  | Nortel Networks Restoration Plan | 2 | 24,085(1) | - |
| S.J. Bandrowczak | - | - | - | - |
| W.K. Nelson | - | - | - | - |
| R.S. Lowe | Nortel Networks Retirement Income Plan | 11 | 403,892(3) | - |
|  | Nortel Networks Restoration Plan | 11 | 724,981(3) | - |
|  | Nortel Networks Managerial and Non- Negotiated Pension Plan | 16.83 | 475,892(4) | - |
|  | Nortel Networks Excess Plan | 16.83 | 814,805(4) | - |
|  | Nortel Networks Transitional Retirement Allowance Plan | 16.83 | 107,930(4) | - |

(1) The present value of accumulated benefits are estimated amounts based on assumptions, which represent contractual entitlements that may change over time. The method used to determine such estimated amounts will not be identical to the method used by other issuers and, as a result, the figures may not be directly comparable across companies. For the underlying assumptions for Nortel's defined benefit plans, see note 9, "Employee benefit plans" of the accompanying audited consolidated financial statements.

(2) Mr. Zafirovski is eligible for a special pension benefit. He is entitled to a pension of $355,000 per year after five years of service. The pension is to commence at age 60 and is payable as a joint and survivor 60% annuity. As Mr. Zafirovski was hired on October 17, 2005, he had accrued 3.21 years as at the plan measurement date of December 31, 2008. The accumulated benefit is based on the ratio of this period of service to five years. The present value represents this portion of the benefit discounted from the date of commencement back to December 31, 2008, based on a discount rate of 7.09% and post retirement mortality based on the RP2000 Table Projected to 2017.

(3) The following assumptions were used in the calculations of the present value of accumulated benefits under the Nortel Networks Retirement Income Plan (Retirement Income Plan) and the Nortel Networks Restoration Plan (Restoration Plan): Assumed retirement age: pension benefits are assumed to begin at each participant's earliest unreduced retirement age, age 65; Discount rate: the applicable discount rates are 6.26% for the Retirement Income Plan and 6.07% for the Restoration Plan as of September 30, 2007, and 6.37% for the Retirement Income Plan and 6.33% for the Restoration Plan as of December 31, 2008; Future interest crediting rate assumption: Cash Balance amounts are projected to the assumed retirement age based on the future investment crediting rate assumptions of 5.50% as of September 30, 2007 and 1.50% as of December 31, 2008; Pension Service Plan (PSP) amounts are projected to the assumed retirement age based on the future investment crediting rate plan provision of 6.00%. These rates are used in conjunction with the discount rate to estimate the present value amounts. Form of payments: 100% of Cash Balance participants are assumed to receive a single lump sum at retirement, 95% of PSP participants are assumed to receive a single lump sum at retirement and 5% of PSP participants are assumed to receive a single life annuity.

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 265

**Table of Contents**

(4)  The following assumptions were used in the calculations of the present value of accumulated benefits: Discount rate: the applicable discount rates are 7.31% for the Nortel Networks Managerial and Non- Negotiated Pension Plan Part I, 7.07% for the Nortel Networks Excess Plan, 6.67% for the Nortel Networks Transitional Retirement Allowance Plan and 7.09% for the Special Pension Benefit Arrangement; Consumer Price Index: 1.25%; Annual increases of 2.25% to the Income Tax Act (Canada) (ITA) maximum after 2009; Mortality Table: RP2000 Table Projected to 2017. The earliest age the member can retire without benefit reduction has been used as the assumed retirement age. A retirement age of 60 has been used for the Managerial and Non- Negotiated Pension Plan and the Excess Plan for Part I members and an assumed retirement age of 65 has been used for the Transitional Retirement Allowance Plan.

During 2008 Nortel maintained various employee pension plans in the United States and Canada. Commencing January 1, 2008, Nortel introduced a number of changes to its North American pension plans. With the exception of a group of Canadian "Grandfathered Members", pension accruals for employees in defined benefit pension plans have been frozen. Nortel made automatic contributions to defined contribution retirement programs for the non- grandfathered members. Employees already in defined contribution programs remained in defined contribution programs. For those employees who elected to not participate in either the defined benefit or defined contribution programs, effective January 1, 2008, Nortel commenced automatic contributions to the defined contribution program, with the option for these employees to also contribute. Except for Canadian "Grandfathered Members", benefits in the defined benefit pension plans were frozen at December 31, 2007. The matching contributions made by Nortel to the defined contribution plans were also changed as of January 1, 2008.

The following descriptions relate to defined benefit pension plans in which the named executive officers are members. Messrs. Zafirovski, Binning, Bandrowczak and Nelson do not participate in the Nortel defined benefit pension plans.

*Nortel Networks Retirement Income Plan*

A defined benefit pension plan, the Retirement Income Plan, is maintained for eligible employees, including executives, who are employed by NNI and other Nortel controlled group members that are located in the United States. Plan participants receive benefits determined under one of two formulas, depending on elections made by the plan participant: the PSP formula or the Cash Balance Plan formula. Mr. Carey participates in the Cash Balance Plan and Mr. Lowe participates in the PSP.

The PSP formula was available for participants who enrolled in the plan prior to May 1, 2000, and who elected prior to May 1, 2000 to be covered by the PSP formula. As of May 1, 2000, the PSP formula under the Retirement Income Plan was closed to new participants. Effective January 1, 2008, members will no longer be credited with additional accruals under the PSP formula. Accumulated benefits in the PSP were frozen at December 31, 2007.

The PSP formula provides a benefit calculated as percentage pension credits through December 31, 2007, multiplied by average earnings of the best three consecutive years of earnings during the ten- year period ending December 31, 2007. Participants earn pension credits during each year of participation based on age attained in the year and on years of service through December 31, 2007, as follows:

| If age + service years is | The percentage credit for the year is |
|---|---|
| 45 or less | 2% |
| 46 55 | 5% |
| 56 65 | 9% |
| 66 75 | 13% |
| 76 or more | 20% |

Eligible earnings include base salary and, where applicable, incentive awards or bonuses, if any, paid under the Incentive Plan, overtime, off- shift differentials and sales commissions. An employee becomes fully vested after completing four years of vesting service. An employee earns a year of vesting service for each calendar year in which the employee completes at least 1,000 hours of service.

HIGHLY CONFIDENTIAL    NNC-NNL06001427 / 266

Table of Contents

Upon termination of employment or retirement the PSP benefit for service to December 31, 2007, will be determined by the total percentage pension credits multiplied by the final average earnings to arrive at an account balance. The account balance will be increased by 6% per year, compounded annually from January 1, 2008, to the date of termination or retirement. The actual amount of the lump sum value will not be less than the account balance. In some instances, due to government regulations, and depending on prevailing interest rates, the lump sum value may be greater than the account balance.

Effective May 1, 2000, Nortel established the Cash Balance Plan, a defined benefit pension formula, based on pay credits and interest credits. Effective January 1, 2008, members will no longer be credited with additional accruals under the Cash Balance Plan formula.

The Cash Balance Plan formula provides a monthly credit equal to 4% of eligible earnings, with interest being credited monthly based on the month's starting balance. Nortel contributed at this level through December 31, 2007, at which time contributions ceased. The total amount in the Cash Balance Plan account as of December 31, 2007, will be increased by monthly interest credits based on the average T- bill yield for September of the previous year plus 1%, compounded annually to date of termination or retirement.

Eligible earnings include base salary and, where applicable, incentive awards or bonuses, if any, paid under the Incentive Plan, overtime, off- shift differentials and sales commissions earned prior to retirement or other termination of employment for applicable periods. An employee becomes fully vested after completing two years of vesting service.

Normal retirement age is 65. An employee is eligible for early retirement on or after his or her 55th birthday, subject to satisfaction of the vesting requirement. The PSP and Cash Balance Plan benefits can be paid in a lump sum or as an actuarially equivalent annuity.

*Nortel Networks Restoration Plan*

U.S. employees, including executives, may also be members of the Restoration Plan. Messrs. Carey and Lowe participate in the Restoration Plan. The Restoration Plan is a non- qualified deferred compensation plan. The purpose of the Restoration Plan is to provide pension benefits in cases where the compensation exceeds the limitations placed by federal laws on compensation amounts that may be included under a qualified pension plan ($230,000 in 2008) as well as limitations on the total benefit that may be paid from such plans. Pension benefits that are based on compensation amounts below the limit are provided under the Retirement Income Plan and are funded through a qualified pension trust. Pension benefits applicable to compensation that exceeds federal limitations and pension benefits in excess of the limitations on total benefits are paid from the Restoration Plan, and are funded from Nortel Network Inc.'s general assets. All of the material terms and conditions of benefits (including vesting and payment conditions and options) under the Restoration Plan are identical to the participant's tax- qualified plan benefit under the Retirement Income Plan.

Effective January 1, 2008, members will no longer accrue additional benefits under the Restoration Plan. Accumulated benefits were frozen at December 31, 2007.

*Nortel Networks Managerial and Non- Negotiated Pension Plan*

The Nortel Networks Managerial and Non- Negotiated Plan (Managerial and Non- Negotiated Plan), a defined benefit pension plan, is maintained for eligible employees, including executives, in Canada. The Managerial and Non- Negotiated Plan has two different formulas, called Part I and Part II. Mr. Lowe participates in the Nortel Canada Part I formula as a result of his prior Canadian service. An employee becomes fully vested after completing two years of pensionable service. Normal retirement age is 65. Effective January 1, 2008, members will no longer accrue additional benefits under the Managerial and Non- Negotiated Plan, with the exception of "Grandfathered Members" who will not be impacted by the changes implemented. Accumulated benefits for members who are not "Grandfathered Members" were frozen at December 31, 2007.

"Grandfathered Members" are Part I or Part II members who, on December 31, 2007:

255

Table of Contents

are at least age 60; or

have at least 30 years of pensionable service; or

are at least age 55 with years of age plus pensionable service equaling at least 70.

The Part I formula provides a monthly benefit at retirement based on years of pensionable service as of December 31, 2007, and a pension accrual of 1.3% of the average annual earnings of the best three consecutive years as of December 31, 2007. For "Grandfathered Members" the benefit is calculated based on pensionable service and average annual earnings at retirement date. A member is eligible to retire with an early unreduced pension if the member has attained age 60 at retirement date and the aggregate of the member's years of pensionable service and age equals at least 80. An early retirement reduction of 1/3 of one percent for each month by which the member's age is less than age 60 applies for retirement prior to age 60, subject to a minimum rate of 1.04%. Eligible earnings include base salary and, where applicable, overtime, off- shift differentials and an individual sales commission factor. Effective January 1, 1999, the Part I formula was closed to new participants.

The Part II formula was introduced January 1, 1999. Employees who were participants in Part I could continue to participate in Part I, or move to the new Part II formula, at their election. Part II provides a benefit calculated as pension credits accumulated to December 31, 2007, multiplied by the average annual earnings as of December 31, 2007, for the highest three consecutive years in the last 10 years at December 31, 2007. For "Grandfathered Members" the Part II benefit is calculated at retirement or other termination of employment. Pension credits are earned during each year of participation based on the participant's age attained in the year and on years of service, as follows:

| If age + service years is | The percentage credit for the year is |
|---|---|
| 45 or less | 2% |
| 46  55 | 5% |
| 66  75 | 9% |
| 56  65 | 13% |
| 76 or more | 20% |

Eligible earnings for Part II include base salary and, where applicable, incentive awards or bonuses, if any, paid under the Incentive Plan, overtime, off- shift differentials and sales commissions. Effective May 1, 2000, the Part II defined benefit formula was closed to new participants.

The Part II benefit can be paid in a lump sum or as an actuarially equivalent annuity. Under the annuity option there are reductions for retirement prior to normal retirement age of 65. Certain grandfathering rules exist for employees and executives who were participating in the pension plan as at December 31, 1998.

*Nortel Networks Excess Plan*

Employees, including executives, participating in the Managerial and Non- Negotiated Plan Part I and Part II may also be members of the Nortel Networks Excess Plan (Excess Plan). Mr. Lowe participates in the Excess Plan. The Excess Plan is a non- registered plan under Canadian tax laws. The ITA limits the amount of pension that may be paid under a registered pension plan. Pension benefits in amounts below the ITA limit are paid from a registered pension plan, the Managerial and Non- Negotiated Plan, which is funded through a pension trust. Pension benefits that exceed the ITA limits are paid from the Excess Plan, and are funded from NNL's general assets and the general assets of Nortel Networks Technology Corporation, an affiliate of Nortel. All of the material terms and conditions of benefits (including vesting and payment conditions and options) under the Excess Plan are identical to the participant's registered benefit under the Managerial and Non- Negotiated Plan Part I and Part II.

Effective January 1, 2008, the accumulated benefits of members who are not "Grandfathered Members" were frozen at December 31, 2007.

256

HIGHLY CONFIDENTIAL     NNC-NNL06001427 / 268

**Table of Contents**

*Nortel Networks Transitional Retirement Allowance Plan*

The purpose of the Nortel Networks Transitional Retirement Allowance Plan (TRA Plan) is to recognize the long service of employees, including executives, who retire under Part I of the Managerial and Non- Negotiated Plan. The TRA Plan is a non- registered plan under Canadian tax laws. The benefits under the TRA Plan are provided for out of Nortel's operating income. Mr. Lowe participates in the TRA Plan.

This benefit is payable to a member only upon retirement and who is eligible and elects to receive an immediate pension. A member' means an individual who retires under Part I after completing 4 or more years of continuous service and whose membership has not been terminated. The TRA Plan is calculated based on two components: (i) a lump sum amount based on age and service calculated according to several tables; and (ii) an earnings and service formula. A member may elect to receive payment as a lump sum, or monthly payments, or in a combination of a lump sum and monthly payments.

Effective January 1, 2008, members will no longer accrue additional benefits under the TRA Plan, with the exception of "Grandfathered Members" who will not be impacted by the changes implemented. Accumulated benefits for those members who were not identified as "Grandfathered Members" were frozen at December 31, 2007.

**Nonqualified Deferred Compensation for Fiscal Year 2008**

The following table sets forth certain information with respect to each defined contribution or other plan that provides for the deferral of compensation on a basis that is not tax- qualified. The plans will continue to be reviewed and considered in the context of the Creditor Protection Proceedings.

| Name | Executive contributions in last FY ($) | Registrant contributions in last FY ($) | Aggregate earnings in last FY ($) | Aggregate withdrawals/ distributions ($) | Aggregate balance at last FYE ($) |
|---|---|---|---|---|---|
| M.S. Zafirovski | - | - | - | - | - |
| P.S. Binning | - | - | - | - | - |
| D.J. Carey | - | 2,115(1) | 5(1) | - | 2,120(1) |
| S.J. Bandrowczak | - | 11,630(1) | (2,138)(1) | - | 9,492(1) |
| | 42,500(3) | - | (15,720)(2) | - | 36,552(2) |
| W.K. Nelson | - | 5,077(1) | (410)(1) | - | 4,667(1) |
| R.S. Lowe | - | 4,615(1) | 42(1) | - | 4,657(1) |
| | - | - | (69,530)(2) | 1,701,043(2)(3) | - (2) |

(1) Amounts represent participation in the Nortel Networks Long- Term Investment Restoration Plan, which is a non- tax qualified plan. The Nortel Networks Long- Term Investment Plan is a tax qualified plan. The Long- Term Investment Restoration Plan is intended to provide employees with the portion of the company contribution, if any, which cannot be made under the Nortel Networks Long- Term Investment Plan because of the compensation limitations of Section 401(a)(17) of the Code. Nortel contributions to the Long- Term Investment Restoration Plan disclosed in the Nonqualified Deferred Compensation Table were made by Nortel as automatic contributions or, matching contributions, as applicable, with respect to Messrs. Carey, Bandrowczak, Nelson and Lowe's contributions, to the Nortel Networks Long- Term Investment Plan and could not be made by Nortel under the Nortel Networks Long- Term Investment Plan because of the compensation limits of Section 401(a)(17) of the Code. These amounts are also reported in the Summary Compensation Table.

(2) Amounts represent participation in the Nortel Networks U.S. Deferred Compensation Plan.

(3) Amount represents a non- scheduled in- service withdrawal paid on November 24, 2008, upon Mr. Lowe's request of October 26, 2008, for deferrals made prior to January 1, 2005 in accordance with the terms of the

257

**Table of Contents**

Nortel Networks U.S. Deferred Compensation Plan. As this was a non- scheduled withdrawal there was a 10% penalty of $189,005 applied (penalty was applied to the balance at December 31, 2007 of $1,959,578 less $69,530).

### Nortel Networks U.S. Deferred Compensation Plan

Eligibility to participate in the U.S. Deferred Compensation Plan (DCP) is limited to U.S.- based employees above a certain compensation threshold. The DCP is non- tax qualified plan. Participants are unsecured creditors of NNL and the employer with respect to the payments of plan benefits. The threshold is $180,000, which is comprised of base salary plus a percentage of annual bonus. Participants may defer up to 80% of their base salary, 95% of Incentive Plan awards and up to 95% of commissions if they enroll during annual enrollment and up to 80% of base salary if they enroll during mid- year enrollment. The minimum annual deferral is $5,000.

Participants may allocate their deferrals among a variety of different investment crediting options, which are deemed investments in funds in which the participant has no ownership interest. The funds are only used to measure the gains or losses that will be attributed to the participant's deferral account over time. Investment allocation changes can be made as often as monthly, while employed, after termination, retirement or long- term disability.

Investment returns are calculated based on the returns on the funds selected. The funds are designated by a committee composed of individuals appointed by the Board to administer such employee benefit plans, including the CHRC or such other persons or committees of persons who may be designated by the CHRC to carry out responsibilities under the plan, including the administrative committee of the DCP.

To help meet its obligations under the DCP, Nortel purchased two life insurance products from Nationwide Life Insurance Company (Nationwide). The selected funds are wrapped within the life insurance products provided by Nationwide. Nationwide selects the funds that go into each product. Nortel has selected two of these products for the DCP- Nationwide Best of America Corporate Variable Universal Life and Nationwide Best of America Future Corporate Variable Universal Life. Nationwide reviews the fund offerings and manager on a regular basis and makes changes or adds funds within each product to continue to offer the most competitive investment options for its clients. Nortel decided to include all of the investment options offered within each product to participants for notional investment under the DCP. There is an annual review of the funds in the DCP.

Messrs. Bandrowczak and Lowe participated in the DCP. In 2008, Mr. Bandrowczak allocated his account to five of the 104 investment funds offered. The 2008 average rate of return applicable to the five funds was (45.44)%. Mr. Lowe allocated his account to nine of the 104 investment funds offered. The 2008 average rate of return applicable to the nine funds was (20.63)%.

Prior to the beginning of each year, participants in the DCP make an election to receive that year's deferral balance (i) in a future year while the participant is still employed as a scheduled in- service withdrawal or (ii) after the participant's employment ends as a termination payment. Distributions are made in a lump sum or, if available to the participant and elected, in installments of five, ten, or 15 years, the participant must meet certain eligibility requirements based on age, service and size of account balance. Deferrals under the DCP have been suspended for 2009. As a result of the Creditor Protection Proceedings, no distributions are being made under the DCP.

### Nortel Networks Long- Term Investment Restoration Plan

The Nortel Networks Long- Term Investment Restoration Plan (LTI Restoration Plan) is intended to provide employees with the portion of the matching contribution, if any, which cannot be made under the Nortel Networks Long- Term Investment Plan (Investment Plan) because of the compensation limitations of Section 401(a)(17) of the Code. The LTI Restoration Plan is an unfunded and non- tax qualified pension plan.

Under the terms of the LTI Restoration Plan, an "eligible employee" means an employee of NNI or its affiliates who is considered an eligible employee under the Investment Plan and has elected to participate in the Investment Plan. An eligible employee shall become an active participant of the LTI Restoration Plan if such employee's eligible compensation is not fully recognized under the Investment Plan because of the compensation limitations imposed by Section 401(a)(17) of the Code and the employee has made employee contributions to the Investment Plan during the applicable plan year.

258

**HIGHLY CONFIDENTIAL**

Table of Contents

Eligible compensation under the LTI Restoration Plan is the annual compensation of a participant that would otherwise be recognized under the Investment Plan for contribution purposes but without regard to the limit on compensation under Section 401(a)(17) of the Code, which was a $230,000 limit in 2008. The eligible compensation under the LTI Restoration Plan includes base pay, overtime pay, sales commissions, merit cash, promotion cash, career development cash, skill block awards, lead pay, shift differential and specific bonuses listed in the plan document.

For each plan year in which an eligible employee makes an employee contribution, Nortel will contribute a Matching Contribution to his or her account equal to the excess of (a) 100% of such active participant's employee contribution up to a maximum of 3% of an active participant's eligible compensation, over (b) the maximum matching company contribution made on his or her behalf under the Investment Plan for the applicable plan year. Beginning in 2008, an Automatic Company contribution of 2% of an active participant's eligible compensation is also made to an eligible employee's account. The Automatic Contribution and the Matching Contributions are added to an employee's account at or about the time such contributions are made to the Investment Plan.

All accounts under the LTI Restoration Plan are credited with notional investment earnings in amounts and at times as determined by the plan administrator based on the actual returns of the funds. The notional investment funds available under the LTI Restoration Plan mirror the 16 funds offered by the Investment Plan. Messrs. Carey, Bandrowczak, Nelson and Lowe currently participate in the LTI Restoration Plan. In 2008, Mr. Carey allocated his account to 3 of the 16 investment funds offered. The 2008 average rate of return applicable to the 3 funds was (34.53)%. Mr. Bandrowczak allocated his account to 3 of the 16 investment funds offered. The 2008 average rate of return applicable to the funds was (26.13)%. Mr. Nelson allocated his account to 1 of the 16 investment funds offered. The 2008 average rate of return applicable to the fund was (26.60)%. Mr. Lowe allocated his account to 1 of the 16 investment funds offered. The 2008 average rate of return applicable to the fund was 4.30%.

The payment option for the LTI Restoration Plan is a lump sum payment. Participants are required to take a lump sum distribution at six months after termination. A lump sum is paid out immediately to the designated beneficiary upon death of participant.

**Potential Payments upon Termination or Change in Control**

**CIC Plan**

The CIC Plan was adopted to reinforce and encourage the continued attention and commitment of specified executives to their respective duties without distraction in the face of the potentially disturbing circumstances arising from the possibility of a change in control. Nortel continues to evaluate its obligations under the CIC Plan in the context of the Creditor Protection Proceedings and as a result, Nortel's current expectations regarding such obligations in 2009 and beyond are uncertain at this time and are subject to change.

*Change in Control*

For purposes of the CIC Plan, a change in control is deemed to occur if:

any person or group acquires beneficial ownership of securities of NNC representing more than 20% of the outstanding securities entitled to vote in the election of directors of NNC, other than in connection with a "permitted business combination" (as defined in the CIC Plan);

NNC participates in a business combination, including, among other things, a merger, amalgamation, reorganization, sale of all or substantially all of its assets, or plan of arrangement, unless: (i) the business combination only involved NNC, and one and more affiliated entities; or (ii) following the completion of all steps involved in the transaction or transactions pursuant to which the business combination is effected, NNC's common shareholders beneficially owned, directly or indirectly, more than 50% of the then-outstanding voting shares of the entity resulting from the business combination (or of the person that ultimately controls such entity, whether directly or indirectly) and at least a majority of the members of the Board of Directors of the entity resulting from the business combination (or the person that ultimately controls such entity, whether directly or indirectly) were members of the Board of Directors of NNC when

259

**Table of Contents**

the business combination was approved or the initial agreement in connection with the business combination was executed;

the persons who are directors of NNC on the effective date of the CIC Plan (or the incumbent directors) cease (for reasons other than death or disability) to constitute at least a majority of NNC's Board of Directors; provided, that any person who is not a director on the effective date of the CIC Plan is deemed to be an incumbent director if such person is elected or appointed to NNC's Board of Directors by, or on the recommendation of or with the approval of, at least two- thirds of the directors who then qualify as incumbent directors, unless such election, appointment, recommendation or approval was the result of any actual or publicly threatened proxy contest for the election of directors; or

any other event occurs which NNC's Board of Directors determines in good faith could reasonably be expected to give rise to a change in control, resulting from situations such as: (i) any person acquiring a significant interest in NNC; or (ii) the election of a person to the Nortel Board in circumstances in which management has not solicited proxies in respect of such decision.

*Termination Due to Change in Control*

The CIC Plan provides that if Nortel terminates a participant's employment without cause within a period commencing 30 days prior to the date of a change in control of NNC and ending 24 months after the date of a change in control of NNC, or the participant resigns for good reason (including, among other things, a reduction in overall compensation, geographic relocation or reduction in responsibility, in each case without the consent of the participant) within 24 months following the date of a change in control of NNC, the participant will be entitled to certain payments and benefits, including:

the payment of an amount equal to three times (in the case of the chief executive officer), two times (in the case of tier 1 executives) and one and a half times (in the case of tier 2 executives) of the participant's annual base salary;

the payment of an amount equal to 300% (in the case of the chief executive officer), 200% (in the case of tier 1 executives) and 100% (in the case of tier 2 executives) of the participant's target annual incentive bonus; and

subject to the provisions of any stock incentive plan that are contrary to the CIC Plan and which cannot be waived or amended by NNC:

accelerated vesting of all unvested stock options held immediately prior to the termination date for both the chief executive officer and tier 1 and tier 2 executives in accordance with the applicable stock incentive plan, provided that no award under the 2005 SIP become vested earlier than the first anniversary date of the effective date of such award;

continued ability to exercise vested stock options during the period ending on the third year anniversary of the termination date for the chief executive officer, during the period ending on the two year anniversary of the termination date for tier 1 executives, and during the period ending on the eighteen month anniversary of the termination date for tier 2 executives; and

all unvested RSUs, PSUs or other stock based incentive awards that are outstanding immediately prior to the termination date, other than stock options, (i) granted on or after June 1, 2007 deemed to have vested on a pro rata basis as of the termination date and (ii) granted prior to June 1, 2007 deemed to have fully vested at 100% of unvested target amount as of the termination date; provided that payment in settlement of any such RSUs, PSUs or other stock based incentive awards shall be in cash, shares or a combination thereof in accordance with the applicable settlement provisions of the CIC Plan, the applicable stock incentive plan and/or the instrument of award for the particular award.

260

**HIGHLY CONFIDENTIAL**

Table of Contents

Additionally, participants under the CIC Plan also will be entitled to the following in the event of termination due to change in control:

outplacement counseling services of a firm chosen from time to time by the participant, for a period not to exceed 18 months after the payment date;

maintenance of coverage for the maximum extended reporting period available under any directors' and officers' liability insurance that is in place on the termination date, in the event that such policy is cancelled or not renewed;

during the period ending on the three year anniversary of the termination date for the chief executive officer, and the two year anniversary of the termination date for tier 1 executives, and the eighteen month anniversary of the termination date for tier 2 executives, continued coverage under each of the Nortel life insurance, medical, health and disability plans or arrangements in which the specified executive was entitled to participate immediately prior to the earlier of the termination date or the change in control date at a cost to the executive no greater than the actual amount that the executive paid or would have paid for such coverage immediately prior to the earlier of the termination date or the change in control date and otherwise in accordance with the terms of such plans and arrangements as in effect immediately prior to the earlier of the termination date or the change in control date, provided that certain conditions are satisfied; and

if a specified executive participates in any deferred compensation, pension or supplementary retirement plans offered by Nortel, then upon such specified executive's termination due to change in control, and except as otherwise specifically provided in the CIC Plan, such executive shall be entitled to payments under such plans in accordance with the terms of each such plan.

**Potential Payments under the CIC Plan**

If a change in control had occurred on December 31, 2008 and the employment of the named executive officer terminated as a result, the following payments to the named executive officers would have been required under the CIC Plan. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. Any future termination of a named executive officer during the Creditor Protection Proceedings will be dealt with in the course of those proceedings.

| Name | Tier | Salary ($)(1) | Bonus ($)(2) | Stock Options ($)(3)(4) | RSUs ($)(4)(5) | PSUs ($)(4)(6) | Health Benefits Coverage ($)(7) | Other ($)(8) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| M.S. Zafirovski(9) | CEO | 3,861,278 | 5,791,916 | — | 23,556 | 64,220 | 75,000 | 20,000 | 9,835,970 |
| P.S. Binning(5) | 1 | 1,286,979 | 1,286,979 | — | 542 | — | 50,000 | 20,000 | 2,644,500 |
| D.J. Carey | 1 | 1,100,000 | 1,100,000 | — | 10,183 | 11,050 | 50,000 | 20,000 | 2,291,233 |
| S.J. Bandrowczak | 2 | 637,500 | 340,000 | — | 825 | 2,045 | 37,500 | 20,000 | 1,037,870 |
| R.S. Lowe | 1 | 1,000,000 | 1,000,000 | — | 4,845 | 9,542 | 50,000 | 20,000 | 2,084,387 |

(1)  Salary payout is equivalent to three times annual salary for Mr. Zafirovski as President and Chief Executive Officer, two times annual salary for the named executive officers identified as tier 1 executives and one and a half times annual salary for Mr. Bandrowczak as a tier 2 executive. Mr. Zafirovski's annual salary of CAD$1,366,120 and Mr. Binning's annual salary of CAD$683,000 have been converted to U.S. Dollars using the 2008 average exchange rate of US$1.00 = CAD$1.0614.

(2)  Bonus payout is equivalent to 300% of the annual bonus that Mr. Zafirovski would have been entitled to as Chief Executive Officer and 200% of the annual bonus that each of the named executive officers identified as tier 1 executives would have been entitled to and 100% of the annual bonus Mr. Bandrowczak would have been entitled to as a tier 2 executive. Bonus entitlement for Mr. Zafirovski and Mr. Binning have been converted to U.S. Dollars using the 2008 average exchange rate of US$1.00 = CAD$1.0614.

261

HIGHLY CONFIDENTIAL

**Table of Contents**

(3)  Calculated as the intrinsic value per option, multiplied by the number of options that become immediately vested upon change in control. The intrinsic value per option is calculated as the excess of the closing market price on NYSE on December 31, 2008 of $0.26 over the exercise price of the option. If the value is less than zero, it is deemed to be zero for the purpose of this calculation.

(4)  The following number of options, RSUs and PSUs would have immediately vested upon change of control, excluding all options, RSUs and PSUs granted less than one year prior to December 31, 2008:

| Name | Number of Options (#) | Number of RSUs (#) | Number of PSUs (#) |
|---|---|---|---|
| M.S. Zafirovski | 485,500 | 90,600 | 247,000 |
| P.S. Binning | - | 2,086 | - |
| D.J. Carey | 50,000 | 39,167 | 42,500 |
| S.J. Bandrowczak | - | 3,173 | 7,867 |
| R.S. Lowe | 60,050 | 18,634 | 36,700 |

(5)  Calculated as the intrinsic value per restricted stock unit, multiplied by the number of RSUs that become immediately vested. The intrinsic value per restricted stock unit is determined based on the closing market price on NYSE on December 31, 2008 of $0.26.

(6)  Calculated as the intrinsic value per performance stock unit, multiplied by the number of PSUs that become immediately vested. The intrinsic value per performance stock unit is determined based on the closing market price on NYSE on December 31, 2008 of $0.26.

(7)  Based on an estimated annual cost of $25,000. Mr. Zafirovski's payout is based on three year coverage as provided for the chief executive officer under the CIC Plan. Payout for the named executive officers identified as tier 1 executives is based on two year coverage as defined under tier 1 executives under the CIC Plan and payout for Mr. Bandrowczak is based on 18 months coverage as defined under tier 2 executives under the CIC Plan.

(8)  Other coverage includes outplacement counseling estimated at a cost of $20,000 per named executive officer.

(9)  Payment to Mr. Zafirovski under his employment agreement would make him ineligible for these payments and benefits under the CIC Plan. Payment to Messrs. Binning and Carey of these CIC Plan benefits would make them ineligible for the payments and benefits under their respective employment agreements.

**Employment Agreements**

In addition to the CIC Plan, Nortel has agreed to termination provisions with respect to Messrs. Zafirovski, Binning and Carey. These provisions were necessary in recruiting these individuals to Nortel in their respective roles. Additional details of the employment agreements of Messrs. Zafirovski, Binning and Carey are described under "Material Terms of Employment Agreements and Arrangements with Named Executive Officers" above. Any future termination of a named executive officer during the Creditor Protection Proceedings will be dealt with in the course of those proceedings.

*Mr. Zafirovski*

Mr. Zafirovski's employment agreement provides that in the event Nortel initiates his separation of employment as President and Chief Executive Officer or if Mr. Zafirovski initiates his separation of employment because his responsibilities or authority have been involuntarily changed and are not substantially equivalent to his current role, or because his total compensation is involuntarily changed in a manner that is materially inconsistent with other key executive officers, he will be provided in lieu of any other payment or benefit with the following:

the equivalent of two years' base salary paid bi- weekly;

262

**Table of Contents**

the equivalent of two years' Incentive Plan payment at target to be paid in a lump sum; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is then enrolled for two years following employment termination at active employee rates and the continued vesting of outstanding stock options or RSUs during the salary continuance period, other than the new hire stock options and RSUs, which immediately vest on the date of separation.

In addition, in the event any Incentive Plan payment is made to key employees of Nortel in the year of such separation, Mr. Zafirovski is entitled to a pro-rata Incentive Plan payment at target. The foregoing payments and benefits will not be provided to Mr. Zafirovski if his separation of employment arises out of termination for cause, as that term is defined in the CIC Plan. All payments and benefits are conditional on Mr. Zafirovski's execution of a separation agreement. If payments are made to Mr. Zafirovski under this provision of his employment agreement, he will be ineligible for the payments and benefits under the CIC Plan as described above.

### *Mr. Binning*

Mr. Binning's employment agreement provides that in the event Nortel initiates his separation of employment or he initiates his separation of employment for Good Reason (as defined in the CIC Plan) he will be provided in lieu of any other payment or benefit with the following:

the equivalent of no less than 18 months' base salary paid bi-weekly; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is enrolled for 18 months following employment termination and active employee rates.

All of the new hire RSUs granted to Mr. Binning will continue to vest for 18 months following employment termination and, immediately prior to the end of this severance period, all of the unvested new hire RSUs will immediately vest. The foregoing payments and benefits will not be provided to Mr. Binning if his separation of employment is for Cause (as defined in the CIC Plan). All payments and benefits are conditional on Mr. Binning's execution of a separation agreement. If payments are made to Mr. Binning under the CIC Plan as described above, he will be ineligible for the payments and benefits under this provision of his employment agreement.

### *Mr. Carey*

Mr. Carey's employment agreement provides that if Nortel initiates Mr. Carey's separation of employment or if he initiates his separation of employment because his responsibilities or authority are involuntarily changed or not substantially equivalent to his current role, Mr. Carey will be provided in lieu of any other payment or benefit with the following:

the equivalent of 24 months' base salary paid bi-weekly; and

the opportunity to continue health, life insurance and AD&D benefits coverage in which he is enrolled for 24 months following employment termination at active employee rates.

The foregoing payments and benefits will not be provided to Mr. Carey if his separation of employment arises out of conduct and/or inaction by Mr. Carey that are not in the best interest of Nortel. All payments and benefits are conditional on Mr. Carey's execution of a separation agreement. If payments are made to Mr. Carey under the CIC Plan as described above, he will be ineligible for the payments and benefits under this provision of his employment agreement.

263

**Table of Contents**

**Potential Payments under Employment Agreements**

If involuntary termination of employment had occurred on December 31, 2008, the following payments would have been required under the respective employment agreements. Any future termination of a named executive officer during the Creditor Protection Proceedings will be dealt with in the course of those proceedings. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

| Name | Salary Continuance Period (# of Months) | Base Salary ($) | Bonus ($) | Stock Options ($)(1) | RSUs ($)(2) | Health Benefits Coverage ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|
| M.S. Zafirovski | 24 | 2,574,185(4) | 3,861,278(5) | - | 23,556 | 50,000 | 6,509,019 |
| P.S. Binning | 18 | 965,235(4) | - | - | 22,039 | 37,500 | 1,024,774 |
| D.J. Carey | 24 | 1,100,000 | - | - | 15,149 | 50,000 | 1,165,149 |

(1) The dollar value of stock options is calculated as the intrinsic value per stock option multiplied by the number of stock options that become vested. For stock options that would become immediately vested on termination, the intrinsic value per stock option is determined based on the closing market price on NYSE on December 31, 2008 of $0.26. For stock options that would continue to vest during the applicable salary continuance period, the intrinsic value per stock option is estimated based on the closing market price on NYSE on December 31, 2008 of $0.26. See "Potential Payments under Equity Compensation Plans" below. The following number of stock options would have vested if involuntary termination had occurred on December 31, 2008:

| Name | Immediately Vest on Termination (#) | Vest During Applicable Salary Continuance Period (#) |
|---|---|---|
| M.S. Zafirovski | 200,000 | 514,250 |
| P.S. Binning | - | 59,950 |
| D.J. Carey | - | 94,850 |

(2) The dollar value of RSUs is calculated as the intrinsic value per stock option multiplied by the number of RSUs that become vested. For RSUs that would become immediately vested on termination, the intrinsic value per restricted stock unit is determined based on the closing market price on NYSE on December 31, 2008 of $0.26. For RSUs that would continue to vest during the applicable salary continuance period, the intrinsic value per restricted stock unit is estimated based on the closing market price on NYSE on December 31, 2008 of $0.26. See "Potential Payments under Equity Compensation Plans" below. The following number of RSUs would have vested if involuntary termination had occurred on December 31, 2008:

| Name | Immediately Vest on Termination (#) | Vest During Applicable Salary Continuance Period (#) |
|---|---|---|
| M.S. Zafirovski | 90,600 | - |
| P.S. Binning | - | 84,766 |
| D.J. Carey | - | 58,267 |

(3) Based on an estimated annual cost of $25,000.

(4) Mr. Zafirovski's annual salary of CAD$1,366,120 and Mr. Binning's annual salary of CAD$685,000 have been converted to U.S. Dollars using the 2008 average exchange rate of US$1.00 = CAD$1.0614.

(5) Mr. Zafirovski's bonus entitlement has been converted to U.S. Dollars using the 2008 average exchange rate of

264

Table of Contents

US$1.00 = CAD$1.0614.

**Potential Payments under Equity Compensation Plans**

For a description of the treatment of outstanding stock options, RSUs and PSUs if a named executive officer had been terminated prior to the receipt of the equity termination order, see the Equity- Based Compensation Plans section below.

**Director Compensation for Fiscal Year 2008**

The following table sets forth information regarding the compensation of each non- employee director of NNC and NNL for the fiscal year ended December 31, 2008. Mr. Zafirovski, as our President and Chief Executive Officer, does not receive any compensation as a director of NNC or NNL. For information regarding the compensation of Mr. Zafirovski, see "Summary Compensation Table for Fiscal Year 2008" above.

| Name | Fees Earned or Paid in Cash ($)(1)(2)(3) | Stock Awards ($) | Option Awards($) | Non- Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation($)(4) | Total($) |
|---|---|---|---|---|---|---|---|
| J.H. Bennett | 200,000 | - | - | - | - | 273(5) | 200,273 |
| Dr. M. Bischoff | 212,500 | - | - | - | - | 830(6) | 213,330 |
| The Hon. J.B. Hunt, Jr. | 215,000 | - | - | - | - | 1,151(6) | 216,151 |
| Dr. K.M. Johnson | 200,000 | - | - | - | - | 1,151(6) | 201,151 |
| J.A. MacNaughton | 235,000 | - | - | - | - | 273(5) | 235,735 |
| The Hon. J.P. Manley | 215,000 | - | - | - | - | 273(5) | 215,273 |
| R.D. McCormick | 227,500 | - | - | - | - | 1,151(6) | 228,651 |
| C. Mongeau | 200,000 | - | - | - | - | 273(5) | 200,273 |
| H.J. Pearce | 562,500 | - | - | - | - | 1,151(6) | 563,651 |
| J.D. Watson(7) | 164,674(7) | - | - | - | - | 273(5) | 164,974 |

(1) Each non- employee director of NNC and NNL had the right to elect to receive all or a portion of compensation for services rendered as a member of the Nortel Boards, any Committees thereof, and as Board or Committee chair, in the form of share units, in cash or in a combination of share units and cash, under the DSC Plans. For a summary of the applicable director fees, see "Director Compensation Schedule" below. The directors made the following elections for 2008:

| Director | Election Board, Committee and Chair Fees | Election Long- Term Incentive Fees |
|---|---|---|
| J.H. Bennett | 100% share units | 100% share units |
| Dr. M. Bischoff | 100% share units | 100% share units |
| The Hon. J.B. Hunt, Jr. | 100% share units | 100% share units |
| Dr. K.M. Johnson | 50% share units, 50% cash | 100% share units |
| J.A. MacNaughton | 100% share units | 100% share units |
| The Hon. J.P. Manley | 100% cash | 100% share units |
| R.D. McCormick | 100% share units | 100% share units |
| C. Mongeau | 100% share units | 100% share units |

265

**Table of Contents**

| H.J. Pearce | 50% share units, 50% cash | 100% share units |
| | 100% cash; Board chair fees | |
| J.D. Watson | 100% share units | 100% share units |

As part of the relief sought in the CCAA Proceedings, Nortel requested entitlement to pay the directors their compensation in cash on a current basis, notwithstanding any outstanding elections, during the period in which the directors continue as directors in the CCAA Proceedings. Without this relief, the directors would essentially be providing services going forward for no compensation. On the Petition Date, the Canadian Court in the CCAA Proceedings granted an order providing that Nortel's directors are entitled to receive remuneration in cash on a current basis at current compensation levels less an overall $25,000 reduction notwithstanding the terms of, or elections made under, the DSC Plans.

(2) Share units were credited on a quarterly basis, and the number of share units received was equal to the amount of fees expressed in U.S. Dollars, converted to Canadian Dollars, divided by the market value expressed in Canadian Dollars (as determined in accordance with the DSC Plans) of NNC common shares on the last trading day of each quarter. Generally, share units are settled through open market purchases (net of taxes) on the fourth trading day following the release of Nortel's financial results after the director ceases to be a member of the applicable Board, and each share unit entitles the holder to receive one NNC common share. Nortel pays all administrative fees, including applicable brokers' commissions, under the terms of the DSC Plans. Share units for the fiscal year ended December 31, 2008 were credited based on the following exchange rates and prices:

| 2008 Fiscal Quarter | Last Trading Day of Quarter | Bank of Canada Noon Rate of Exchange | Average of High and Low Prices for a Board Lot of NNC Common Shares on NYSE (expressed in CAD$) |
|---|---|---|---|
| First quarter | March 31, 2008 | US$1.00 = $1.0279 | 6.88 |
| Second quarter | June 30, 2008 | US$1.00 = $1.0186 | 8.50 |
| Third quarter | September 30, 2008 | US$1.00 = $1.0599 | 2.50 |
| Fourth quarter | December 31, 2008 | US$1.00 = $1.2246 | 0.34 |

(3) The following table sets forth the number of share units (rounded down to the nearest whole number) received under the DSC Plans by each director during the fiscal year ended December 31, 2008, the total number of share units (rounded down to the nearest whole number) held under the DSC Plans as of the Petition Date and the total market value based on the closing market price of NNC common shares of $0.11 on the NYSE on the Petition Date.

| Director | Share Units Received in 2008 Number (#) | Market Value ($) | Total Number of Share Units Held as of January 14, 2009 Number (#) | Market Value ($) |
|---|---|---|---|---|
| J.H. Bennett | 214,748 | 23,622 | 230,763 | 25,384 |
| Dr. M. Bischoff | 228,169 | 25,099 | 214,696 | 23,617 |
| The Hon. J.B. Hunt, Jr. | 230,854 | 25,394 | 247,650 | 27,242 |
| Dr. K.M. Johnson | 174,482 | 19,193 | 180,217 | 19,824 |
| J.A. MacNaughton | 252,329 | 27,756 | 270,866 | 29,795 |
| The Hon. J.P. Manley | 134,217 | 14,764 | 151,834 | 16,702 |
| R.D. McCormick | 244,276 | 26,870 | 262,919 | 28,921 |
| C. Mongeau | 214,748 | 23,622 | 225,557 | 24,811 |
| H.J. Pearce | 175,825 | 19,341 | 188,637 | 20,750 |

266

HIGHLY CONFIDENTIAL

**Table of Contents**

(4) All other compensation paid in Canadian Dollars has been converted using the average of the exchange rates in effect during 2008 equal to US$1.00 = CAD$1.0614.

(5) Represents amounts paid by Nortel for (i) life insurance premiums and (ii) taxes with respect to the life insurance premiums. As of May 7, 2008, Nortel no longer maintains life insurance for active non- employee directors.

(6) Represents amounts paid by Nortel for (i) life insurance premiums and (ii) taxes with respect to the life insurance premiums and non- resident tax return preparation services. As of May 7, 2008, Nortel no longer maintains life insurance for active non- employee directors.

(7) Mr. Watson resigned from the Nortel Boards effective October 27, 2008. As of the October 27, 2008 date of his resignation, Mr. Watson had received 47,308 share units under the Plans rounded down to the nearest whole number during 2008. 58,118 total number of share units held by Mr. Watson under the Plans as of the October 27, 2008 date of his resignation were settled by delivery of NNC common shares on November 18, 2008 pursuant to the terms of the DSC Plans.

**Director Compensation Schedule**

The compensation of directors is considered on a combined basis in light of the overall governance structure of NNC and NNL. Director compensation is set solely on an annual fee basis (paid quarterly in arrears) and additional fees are not paid for Board or Committee meeting attendance. During 2008, directors of NNC and NNL, other than Mr. Zafirovski, were entitled to receive the following annual fees:

| | | | |
|---|---|---|---|
| Annual NNL Board retainer | | | $50,000 |
| Annual Committee membership retainer for serving on: | | | |
| Nominating and Governance Committee of NNC | | | $12,500 |
| Audit Committee of NNC | $ | 6,250 | $ 12,500 |
| Audit Committee of NNL | $ | 6,250 | 12,500 |
| Compensation and Human Resources Committee of NNC and NNL | | | $12,500 |
| Pension Fund Policy Committee of NNL | | | $12,500 |
| Litigation Committee of NNC | | | $12,500 |
| Annual fee for the non- executive Chair of the Board of NNC | $ | 180,000 | $ 360,000 |
| Annual fee for the non- executive Chair of the Board of NNL | $ | 180,000 | |
| Annual retainer for chairing the: | | | |
| Nominating and Governance Committee of NNC | | | $15,000 |
| Audit Committee of NNC | $ | 17,500 | $ 35,000 |
| Audit Committee of NNL | $ | 17,500 | |
| Compensation and Human Resources Committee of NNC and NNL | | | $15,000 |
| Pension Fund Policy Committee of NNL | | | $15,000 |
| Litigation Committee of NNC | | | $15,000 |
| Annual NNL long- term incentive fee | | | $125,000 |

On the Petition Date, upon the request of the Nortel Boards, the court in the CCAA Proceedings granted an order reducing overall director compensation by $25,000. As a result, the annual NNL Board retainer of $50,000 and the annual NNL long- term incentive fee of $125,000 has been converted to an annual cash retainer of $150,000 (paid on a quarterly basis in arrears). In recognition of the Creditor Protection Proceedings and the continued focus on cost reduction, Mr. Pearce, Chair of the Nortel Boards, and Mr. MacNaughton, Chair of the Audit Committees, voluntarily decreased the amount of the Board chair and Audit Committee chair fees, respectively. The Audit Committee chair fee is now the same as other Committee chair fees. Effective the Petition Date, the annual fee for the non- executive chair of the Boards of Directors of NNC and NNL was reduced from an aggregate of $360,000 to $150,000 and the annual retainer for chairing the Audit Committees of NNC and NNL was reduced from an aggregate of $35,000 to $15,000. In addition, Mr. Pearce voluntarily waived his retainer for chairing the Litigation Committee of NNC of $15,000 and his Litigation Committee of NNC membership fee of $12,500. All of the above reduced director compensation will result in a reduction to Mr. Pearce's fees from $562,500 to $300,000.

**HIGHLY CONFIDENTIAL**  NNC-NNL06001427 / 279

**Table of Contents**

Directors entitled to the above remuneration are also reimbursed for reasonable travel and living expenses properly incurred by them in attending any meetings of the Nortel boards or their committees or for performing services as directors. In addition, as of December 2007, Nortel provides tax preparation services for non- resident non- employee directors.

Until May 7, 2008 Nortel maintained, at its cost, life insurance for active directors, who were not salaried employees of NNC or NNL. Such insurance coverage was for CAD$100,000. Nortel no longer maintains the life insurance benefit for active directors. Directors are not eligible for retirement compensation or life insurance following retirement.

**Share Ownership Guidelines**

Effective January 1, 2004, the Boards of Directors of NNC and NNL amended share ownership guidelines to require each non- employee director (other than the chair) to own, directly or indirectly, NNC common shares having a fair market value of at least $300,000 within five years from the earlier of the date the director was first elected or appointed to the Nortel Boards. The chair of the Nortel Boards is required to own, directly or indirectly, NNC common shares having a fair market value of at least $1,600,000 within five years from the earlier of the date he or she was first appointed as chair of the Nortel Boards. Directors are expected to continue to comply with these share ownership guidelines during the balance of their tenures as directors. Each of the current non- employee directors of NNC and NNL has been a director for less than the five year threshold under the share ownership guidelines. Share units credited under the DSC Plans are included in the calculation of the number of NNC common shares owned by a director for this purpose. Given the Creditor Protection Proceedings, the decreased value of NNC common shares and the payment of director fees in cash rather than share units, on February 20, 2009, the Nominating and Governance Committee acknowledged the current inability of the directors to meet the share ownership guidelines and determined to revisit the guidelines as appropriate at a later date.

**Indemnification**

Pursuant to indemnification agreements entered into between NNC, NNL and each non- employee director, Nortel has agreed to indemnify and reimburse each director for all injury, liability, loss, damage, charge, cost, expense, fine or settlement amount reasonably incurred by such director, including reasonable legal and other professional fees:

> in connection with a claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, investigation, inquiry, hearing or other proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise, made, asserted against or affecting such director or in which such director is required by law to participate or in which such director participates at the request of Nortel or in which such director chooses to participate, if it relates to, arises from, or is based on such individual's service as a director or officer of Nortel or service as a director or officer of another entity at the request of Nortel; or

> otherwise related to, arising from or based on such individual's service as a director or officer of Nortel or service as a director or officer of another entity at the request of Nortel,

except if such indemnification or reimbursement would be prohibited by the CBCA or otherwise by law.

The initial order of the Canadian Court in the CCAA Proceedings ordered the Canadian Debtors to indemnify directors and officers for claims that may be made against them relating to failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations. The initial order also included a charge in an aggregate amount not exceeding CAD$90 million as security for such indemnification obligations.

**Compensation Committee Interlocks and Insider Participation**

The members of the Compensation and Human Resources Committee of the Nortel Boards are Mr. Richard D. McCormick (Chair), who was appointed to the Committee effective January 18, 2005, Mrs. Jalynn H. Bennett and The Hon. John. P. Manley each of whom was appointed to the Committee effective June 29, 2005, Dr. Manfred Bischoff who was appointed to the Committee effective June 29, 2006 and Dr. Kristina M. Johnson who was appointed to the Committee effective November 30, 2006. No changes to the membership of the Compensation and Human Resources Committee occurred during 2008. No member of the Compensation and Human Resources Committee was an officer (within the meaning of applicable United States securities laws) or employee of Nortel or any of its subsidiaries at any time during 2008.

268

Table of Contents

No executive officer of Nortel serves on the Board of Directors or compensation committee of any other entity that has or has had one or more of its executive officers serving as a member of the Nortel Boards.

**Compensation Committee Report**

The Compensation and Human Resources Committee of the Boards of Directors of NNC and NNL has reviewed and discussed with management the "Compensation Discussion and Analysis" required by Regulation S- K Item 402(b). Based on such review and discussion, the Compensation and Human Resources Committee recommended to the Boards of Directors that the "Compensation Discussion and Analysis" be included in this Report. This report has been submitted by Mrs. Jalynn H. Bennett, Dr. Manfred Bischoff, Dr. Kristina M. Johnson, The Hon. John P. Manley and Mr. Richard D. McCormick as members of the Compensation and Human Resources Committee of the Board of Directors of NNC and NNL.

**ITEM 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

**Equity- Based Compensation Plans**

The table below provides information as of December 31, 2008 under the 2005 SIP, the 2000 Plan and the 1986 Plan. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

| Plan category | Number of NNC common shares issuable on exercise or settlement of outstanding options, RSUs and PSUs<br>(a) | Weighted average exercise price of outstanding options<br>($)(1)<br>(b) | Number of NNC common shares remaining available for issuance under equity compensation plans (excluding common shares reflected in column (a))<br>(c) |
|---|---|---|---|
| Equity compensation plans approved by shareholders(2) | Options: 29,230,676<br>RSUs: 5,000,036<br>PSU- rTSRs: 1,553,350<br>PSU- Management OMs: 1,223,110 | Options: $53.78 | Options, RSUs and PSUs: 22,026,254(3) |
| Equity compensation plans not approved by shareholders(4) | Options : 366,931 | Options: $331.56 | - |
| Total | Options: 29,597,607<br>RSUs: 5,000,036<br>PSU- rTSRs: 1,553,350<br>PSU- Management OMs: 1,223,110 | Options: $57.23 | Options, RSUs and PSUs: 22,026,254(3) |

(1) Weighted average exercise price of options only. RSUs and PSUs did not have an exercise price.

(2) Consists of the 2005 SIP, the 2000 Plan and the 1986 Plan.

(3) Includes NNC common shares previously available for issuance under the 1986 Plan and 2000 Plan which became available for issuance under the 2005 SIP as of January 1, 2006. Of the 22,026,254 NNC common shares that were available for issuance under the 2005 SIP, only 14,115,989 remained available for issuance as RSUs and/or PSUs as of December 31, 2008.

(4) Plans that were assumed by Nortel in merger, consolidation or other acquisition transactions and under which no subsequent grants may be made. NNC common shares are issued from treasury to satisfy such awards.

269

HIGHLY CONFIDENTIAL

**Table of Contents**

**Nortel 2005 Stock Incentive Plan**

The 2005 SIP was approved by the Board of Directors of NNC on April 27, 2005, and approved by shareholders of NNC at our combined 2004 and 2005 annual meeting. On January 1, 2006, in accordance with such approvals, the number of NNC common shares available for grants under the 2000 Plan and the 1986 Plan (Prior Plan Shares), and the number of NNC common shares subject to options outstanding under the 2000 Plan and the 1986 Plan, to the extent such options thereafter expire or terminate for any reason without the issuance of shares, were transferred to the 2005 SIP. No new awards were made under either the 2000 Plan or the 1986 Plan after December 31, 2005. At the annual meeting of Nortel's shareholders held on May 7, 2008, the following amendments to the 2005 SIP were approved by NNC's shareholders in accordance with the rules of the TSX and NYSE and the terms of the 2005 SIP: (i) an increase in the number of NNC common shares issuable under the 2005 SIP by 14 million from 12.2 million to 26.2 million; (ii) the addition of certain additional types of amendments to the 2005 SIP or awards under it requiring shareholder approval; and (iii) amendments to reflect current market practices with respect to blackout periods. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

The 2005 SIP was administered by the CHRC. The CHRC or its designee was authorized to select those key employees to receive awards and, consistent with the provisions of the 2005 SIP, the terms and conditions of such awards. Non- employee directors of the Nortel Boards were not eligible to participate in the 2005 SIP.

*Material Features of the 2005 SIP*

The following summary of the 2005 SIP is qualified in its entirety by the specific language of the 2005 SIP, a copy of which is available free of charge by writing to the Corporate Secretary.

*Awards under the 2005 SIP*

The 2005 SIP permitted grants of stock options, including incentive stock options, SARs, RSUs and/or PSUs.

*Stock Options and SARs*

The normal term for options and SARs was 10 years. The exercise price for each NNC common share subject to an option could not have been less than 100% of the "market value" of the shares on the effective date of the award of such option. The exercise price was stated and payable in Canadian Dollars for Canadian awards and in U.S. Dollars for U.S. awards. The CHRC was permitted to grant stand- alone SARs or SARs in tandem with options granted under the 2005 SIP. Upon the exercise of a vested SAR (and in the case of a tandem SAR, the related option), a participant was entitled to payment equal to the excess of the "market value" of an NNC common share on the date of exercise over the subscription or base price under the SAR.

If a 2005 SIP participant was terminated prior to the expiration of the normal term of an option or SAR, options and/or SARs then held by the participant would have been treated as follows, unless the CHRC determined otherwise.

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 2005 SIP), the participant's unvested options and/or SARs became vested as of the later of (i) the participant's date of retirement or (ii) the first anniversary of the effective date of grant of such options and/or SARs. To the extent vested, the participant had three years following the date of retirement to exercise his or her options and/or SARs.

270

**HIGHLY CONFIDENTIAL**

Table of Contents

*Death.* If a participant's active employment terminated due to his or her death, all of the participant's unvested options and/or SARs became immediately vested and remained exercisable for two years following the date of the participant's death.

*Involuntary Termination other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 2005 SIP) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested options and/or SARs continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments. During such extended vesting period and for 90 days thereafter, the participant was permitted to exercise vested options and/or SARs. A participant whose active employment was terminated by Nortel other than for cause and who did not receive severance benefits had 90 days following termination to exercise vested options and/or SARs and his or her unvested options and/or SARs were cancelled.

*Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 2005 SIP), any and all outstanding options, whether or not vested, were immediately forfeited and cancelled.

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested options and/or SARs were cancelled, and the participant had 90 days following his or her date of termination to exercise vested options and/or SARs.

*Restricted Stock Units and Performance Stock Units*

Each RSU or PSU granted under the 2005 SIP generally represented the right to receive one NNC common share. Vested units were generally settled upon vesting by delivery of a share for each vested unit or payment of a cash amount equal to the "market value" of a Nortel share at the time of settlement, as the CHRC determined, subject to the CHRC determining with respect to PSUs, the percentage, which could be greater or lesser than 100%, of the PSUs that became vested depending on the extent of satisfaction of the performance criteria.

If a 2005 SIP participant was terminated prior to the vesting of a RSU, RSUs then held by the participant were treated as follows, unless the CHRC determined otherwise.

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 2005 SIP), a pro rata portion of the participant's unvested RSUs vested and the remaining portion was forfeited and cancelled, provided, however, no portion of a RSU award could become vested earlier than the first anniversary of the effective date of the award.

*Death.* If a participant's active employment was terminated due to his or her death, a pro rata portion of the participant's unvested RSUs vested and the remaining portion was forfeited and cancelled, provided, however, no portion of a RSU award could become vested earlier than the first anniversary of the effective date of the award.

*Involuntary Termination Other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 2005 SIP) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested RSUs continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments after which time any unvested RSUs were forfeited and cancelled. If after such severance period, the participant was eligible to retire under applicable laws, a pro rata portion of the then unvested RSUs vested and the remaining portion was forfeited and cancelled.

*Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 2005 SIP), any and all outstanding RSUs were forfeited and cancelled.

271

HIGHLY CONFIDENTIAL

Table of Contents

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested RSUs were forfeited and cancelled.

If a 2005 SIP participant was terminated prior to the vesting of a PSU, PSUs then held by the participant were treated as follows, unless the CHRC determined otherwise.

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 2005 SIP), a pro rata portion of the PSUs to be settled would have vested, subject to the CHRC determining the percentage, which could have been greater or lesser than 100%, of the PSUs that became vested depending on the extent of satisfaction of the performance criteria and provided the participant was a regular full- time employee of Nortel for at least twelve months from the effective date of award of the PSUs, and the remaining portion of such PSUs were forfeited and cancelled.

*Death.* If a participant's active employment was terminated due to his or her death and the participant was a regular full- time employee of Nortel for at least twelve months from the effective date of award of the PSUs, a pro rata portion of the participant's unvested PSUs immediately vested based on the target amount.

*Termination (Involuntary or for Cause).* If a participant's active employment was terminated (including for cause (as defined in the 2005 SIP)), the participant's unvested PSUs immediately forfeited and cancelled for no consideration 45 days after such date of termination.

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested PSUs were forfeited and cancelled for no consideration 45 days after such date of termination.

Notwithstanding the above, the 2005 SIP also provided that any payments made as a result of separation from service (as defined in Section 409A of the Code) to an individual who qualified as a specified employee as defined under Section 409A of the Code in the settlement of RSUs or PSUs could not be made before the date that was six months after the date of separation from service or, if earlier, the date of the individual's death.

*Vesting Conditions*

Vesting of all or any portion of awards granted under the 2005 SIP could be conditioned upon the participant's continued employment, passage of time, satisfaction of performance criteria or any combination thereof, as determined by the CHRC; provided that no portion of an award could become vested prior to the first anniversary of the date such award is granted (except in the event of a participant's death) and vesting conditions based upon achievement of performance objectives must provide for a performance measurement period or periods. In addition (except in the event of a participant's death or retirement, as determined by the CHRC) awards of time based RSUs could not become vested more rapidly than ratably over three years. The CHRC could have accelerated any condition to the vesting of all or any awards granted under the 2005 SIP or, except for performance conditions with respect to awards that were intended to qualify as performance- based compensation under Section 162(m) of the Code, could have waived any performance conditions to vesting, except that the CHRC could not accelerate vesting of any award as of any date before one year from the grant date of the award. In addition, the CHRC could not waive any performance conditions to vesting that would have resulted in the violation of Section 409A of the Code.

*Performance Vesting Conditions for Certain Awards Intended to Qualify as Performance- Based Compensation under Section 162(m) of the Code*

Awards granted under the 2005 SIP could have qualified as "performance- based compensation" under Section 162(m) of the Code in order to preserve federal income tax deductions by Nortel with respect to annual compensation required to be taken into account under Section 162(m) that is in excess of $1 million and paid to one of Nortel's five most highly compensated executive officers, provided that determinations to grant options and other awards under the 2005 SIP had to be made by a committee consisting solely of two or more "outside directors" (as defined under Section 162 regulations). The 2005 SIP's limit on the total number of shares that may be awarded to

272