**Table of Contents**

any one participant during any five year period also had to be satisfied. To the extent that an award was intended to qualify as "performance- based compensation" under Section 162(m), the performance criteria applicable to such award were based upon one or more of the following "qualifying performance criteria," as determined by the CHRC:

| | |
|---|---|
| Cash Flow | Operating profit or net operating profit |
| Earnings per share | Operating margin or profit margin |
| Earnings before interest, taxes and/or amortization | Return on operating revenue |
| Return on sales | Return on invested capital |
| Total shareholder return | Market segment share |
| Share price performance | Product release schedules |
| Return on capital | New product innovation |
| Return on assets or net assets | Product cost reduction |
| Revenue | Brand recognition/acceptance |
| Income or net income | Product ship targets |
| Operating income or net operating income | Customer satisfaction |

The CHRC would have determined whether the applicable qualifying performance criteria were achieved. The CHRC could adjust any evaluation of performance under the qualifying performance criteria described above to exclude certain events that occur during a performance period, as set forth in the 2005 SIP.

*Definition of Market Value*

Under the 2005 SIP, "Market Value" was defined as the average of the high and low prices for a board lot of NNC common shares traded in Canadian Dollars on the TSX during the relevant day or, if the volume of NNC common shares traded on the NYSE during the relevant day in the U.S. exceeded the volume of NNC common shares traded on the TSX on such relevant day, the average of the high and low prices for a board lot of NNC common shares traded in U.S. Dollars on the NYSE during the relevant day. The market value so determined could have been in Canadian Dollars or in U.S. Dollars. As a result, the market value of a common share covered by a Canadian award was either (a) such market value as determined above, if in Canadian Dollars, or (b) such market value as determined above converted into Canadian Dollars at the noon rate of exchange of the Bank of Canada on the relevant day, if in U.S. Dollars. Similarly, the market value of a common share covered by a U.S. award was either (a) such market value as determined above, if in U.S. Dollars, or (b) such market value as determined above converted into U.S. Dollars at the noon rate of exchange of the Bank of Canada on the relevant day, if in Canadian Dollars. If on the relevant day there was not a board lot trade in the NNC common shares on each of the TSX and the NYSE or there was not a noon rate of exchange of the Bank of Canada, then the market value of an NNC common share covered by a Canadian award and the market value of an NNC common share covered by a U.S. award was determined as provided above on the first day immediately preceding the relevant day for which there were such board lot trades in the NNC common shares and a noon rate of exchange. The market value of an NNC common share was rounded up to the nearest whole cent.

*Transferability*

Awards granted under the 2005 SIP were not transferable other than by testamentary disposition or the laws of intestate succession. The CHRC, however, could permit the transfer of awards without payment of consideration to members of a participant's immediate family or entities controlled by the participant or his or her immediate family members.

*Participants in Jurisdictions Outside of Canada and the United States*

To accommodate differences in local laws, customs and tax practices, awards granted to participants in countries other than Canada and the United States could have been subject to special terms and conditions, including any special supplement that may be added to the 2005 SIP, as the CHRC determined appropriate.

273

HIGHLY CONFIDENTIAL

**Table of Contents**

*Amendments*

The Board of Directors had the authority to terminate, amend or suspend the 2005 SIP at any time; provided that the prior approval of shareholders was required for any amendment that Nortel determined constituted a material amendment within the meaning of the applicable rules of the NYSE including any amendment that would have:

increased the maximum number of shares for which awards were granted under the 2005 SIP;

reduced the exercise price or base price at which options or SARs were granted;

reduced the exercise price or base price of outstanding options or SARs;

extended the term of the 2005 SIP or the maximum term of options or SARs granted under the 2005 SIP;

changed the class of persons eligible for grant of awards under the 2005 SIP;

increased any other limit with respect to the number of Nortel shares that could be granted with respect to any type of award, a single participant or any group of participants; or

reduced below one year the minimum period required as a condition to the vesting of any award (other than in the case of a participant's death).

*Adjustments*

In the event of certain events affecting the capitalization of NNC, including a stock dividend, or certain other corporate transactions, the Board of Directors could have adjusted the number and kind of shares available for grant under the 2005 SIP or subject to outstanding awards and the exercise price or base price applicable under outstanding awards.

*United States Federal Income Tax Consequences Relating to the 2005 SIP*

The United States federal income tax consequences to Nortel and its employees of awards under the 2005 SIP are complex and subject to change. The following discussion is only a summary of the general rules and tax consequences applicable to the issuance of options under the 2005 SIP.

As noted above, options granted under the 2005 SIP could have either been incentive stock options or nonqualified stock options. Incentive stock options were options which are designated as such by Nortel and which meet certain requirements under Section 422 of the Code and its regulations. Any option that did not satisfy these requirements was treated as a nonqualified stock option.

*Nonqualified Stock Options*

Nonqualified stock options granted under the 2005 SIP did not qualify as "incentive stock options" and did not qualify for any special tax benefits to the participant. A participant generally did not recognize any taxable income at the time he or she was granted a nonqualified option. However, upon its exercise, the participant recognized ordinary income for federal tax purposes measured by the excess of the then fair market value of the shares over the exercise price. The income realized by the participant was subject to income and other employee withholding taxes.

The participant's basis for determination of gain or loss upon the subsequent disposition of shares acquired upon the exercise of a nonqualified stock option was the amount paid for such shares plus any ordinary income recognized as a result of the exercise of such option. Upon disposition of any shares acquired pursuant to the exercise of a nonqualified stock option, the excess of the sale price over the participant's basis in the shares was treated as a capital gain or loss and generally was characterized as long-term capital gain or loss if the shares have been held for more than one year at their disposition.

In general, there were no federal income tax deductions allowed to Nortel upon the grant or termination of a nonqualified stock option or a sale or disposition of the shares acquired upon the exercise of a nonqualified stock option. However, upon the exercise of a nonqualified stock option, Nortel was entitled to a deduction for federal

HIGHLY CONFIDENTIAL     NNC-NNL06001427 / 286

Table of Contents

income tax purposes equal to the amount of ordinary income that a participant is required to recognize as a result of the exercise, provided that the deduction is not otherwise disallowed under the Code.

*Incentive Stock Options*

If an option granted under the 2005 SIP was treated as an incentive stock option, the participant did not recognize any income upon either the grant or the exercise of the option, and Nortel was not be allowed a deduction for U.S. federal tax purposes at such times. Upon a sale of the shares, the tax treatment to the participant and Nortel depended primarily upon whether the participant met certain holding period requirements at the time he or she sold the shares. In addition, as discussed below, the exercise of an incentive stock option could have been subject to alternative minimum tax liability. If a participant exercised an incentive stock option and did not dispose of the shares received within two years after the date such option was granted or within one year after the transfer of the shares to him or her upon exercise, any gain realized upon the disposition was characterized as long- term capital gain and, in such case, Nortel was entitled to a federal tax deduction.

If the participant disposed of the shares either within two years after the date the option was granted or within one year after the transfer of the shares to him or her upon exercise, such disposition was treated as a disqualifying disposition and an amount equal to the lesser of (1) the fair market value of the shares on the date of exercise minus the exercise price, or (2) the amount realized on the disposition minus the exercise price, was taxed as ordinary income to the participant in the taxable year in which the disposition occurred. (However, in the case of gifts, sales to related parties, and certain other transactions, the full difference between the fair market value of the stock and the purchase price was treated as compensation income). The excess, if any, of the amount realized upon disposition over the fair market value at the time of the exercise of the option was treated as long-term capital gain if the shares were held for more than one year following the exercise of the option. In the event of a disqualifying disposition, Nortel could withhold income taxes from the participant's compensation with respect to the ordinary income realized by the participant as a result of the disqualifying disposition.

The exercise of an incentive stock option could have subjected a participant to alternative minimum tax liability. The excess of the fair market value of the shares at the time an incentive stock option was exercised over the exercise price of the shares was included in income for purposes of the alternative minimum tax even though it is not included in taxable income for purposes of determining the regular tax liability of an employee. Consequently, a participant was obligated to pay alternative minimum tax in the year he or she exercised an incentive stock option.

In general, there were no federal income tax deductions allowed to Nortel upon the grant, exercise, or termination of an incentive stock option. However, in the event a participant sold or otherwise disposed of stock received on the exercise of an incentive stock option in a disqualifying disposition, Nortel was entitled to a deduction for federal income tax purposes in an amount equal to the ordinary income, if any, recognized by the participant upon disposition of the shares, provided that the deduction was not otherwise disallowed under the Code.

*Other Possible Tax Consequences*

*Section 162(m).* Section 162(m) of the Code denies a federal income tax deduction by Nortel with respect to any annual compensation in excess of $1 million paid to any of Nortel's chief executive officer and three other most highly compensated executive officers (other than any person who served as chief financial officer during the year), as applicable. Options granted under the 2005 SIP could have qualified as "performance- based compensation" and so did not count against the $1 million limit. To so qualify, options had to be granted under the 2005 SIP by a committee consisting solely of two or more "outside directors" (as defined under Section 162(m) regulations), be granted with a per share exercise price equal to fair market value of a common share on the date of grant and satisfy the 2005 SIP's limit on the total number of shares that could be awarded to any one participant during any five year period.

275

**Table of Contents**

*Section 409A.* If granted with a per share exercise price equal to fair market value of a common share on the date of grant and containing no other deferral features, options granted under the 2005 SIP were not subject to Section 409A of the Code.

*Section 280G.* If the exercisability of an option was accelerated due to a change in control of NNC under certain circumstances, the participant may have incurred a 20% excise tax and NNC may have lost a deduction as a result of such acceleration pursuant to under Section 280G of the Code (the so- called "golden parachute" regulation).

**Nortel Networks Corporation 2000 Stock Option Plan and 1986 Stock Option Plan**

Prior to the adoption of the 2005 SIP, the 2000 Plan and the 1986 Plan were the only compensation plans under which equity securities of NNC were authorized for issuance from treasury. The 2005 SIP replaced the 2000 Plan and the 1986 Plan to the extent that no new awards were granted under these stock option plans. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. The following summary of the certain terms of the 2000 Plan and the 1986 Plan is qualified in its entirety by the specific language of the 2000 Plan and the 1986 Plan, copies of which are available free of charge by writing to the Corporate Secretary.

***Terms Relating to 1986 Plan (pre- May 15, 2000)***

If a 1986 Plan participant whose options were granted on or prior to May 15, 2000 was terminated prior to the expiration of the normal term of an option, options then held by the participant were treated as follows, unless the CHRC determined otherwise.

> *Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 1986 Plan), the participant's unvested options became vested on the later of (i) the date of the participant's retirement or (ii) the first anniversary of the effective date of grant of such options. To the extent vested, the participant had 36 months following the date of retirement to exercise his or her options.

> *Death.* If a participant's active employment was terminated due to his or her death, all of the participant's unvested options became immediately vested and remained exercisable for 24 months following the date of the participant's death.

> *Involuntary Termination Other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 1986 Plan) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested options continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments. During such extended vesting period, the participant was permitted to exercise vested options. A participant whose active employment was terminated by Nortel other than for cause and who did not receive severance benefits had to exercise unvested options before his or her termination date or his or her unvested options were cancelled.

> *Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 1986 Plan), all outstanding options were immediately forfeited and cancelled.

> *Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested options were cancelled.

***Terms Relating to 1986 Plan (post May 15, 2000) and 2000 Plan***

If a 2000 Plan participant or a 1986 Plan participant whose options were granted after May 15, 2000 was terminated prior to the expiration of the normal term of an option, options then held by the participant were treated as follows, unless the CHRC determined otherwise.

276

Table of Contents

*Retirement.* If a participant's active employment was terminated due to his or her retirement (as defined in the 1986 Plan and 2000 Plan, as applicable), the participant's unvested options became vested on the later of (i) the date of the participant's retirement or (ii) the first anniversary of the effective date of grant of such options. To the extent vested, the participant had 36 months following the date of retirement to exercise his or her options.

*Death.* If a participant's active employment was terminated due to his or her death, all of the participant's unvested options became immediately vested and remained exercisable for 24 months following the date of the participant's death.

*Involuntary Termination Other than for Cause.* If a participant's active employment was terminated other than for cause (as defined in the 1986 Plan and 2000 Plan, as applicable) and the participant received severance benefits, including pay in lieu of notice, the participant's unvested options continued to vest during a period generally corresponding to the period following the participant's termination for which he or she received salary replacement payments. During such extended vesting period and for 90 days thereafter, the participant was permitted to exercise vested options. A participant whose active employment was terminated by Nortel other than for cause and who did not receive severance benefits had 90 days following termination to exercise vested options and his or her unvested options were cancelled.

*Termination for Cause.* If a participant's active employment was terminated for cause (as defined in the 1986 Plan and the 2000 Plan), all outstanding options were immediately forfeited and cancelled.

*Resignation by a Participant.* If a participant resigned from his or her employment, the participant's unvested options were cancelled. Options vested on termination could be exercised during the 90 day period following termination.

**Assumed Plans**

As part of the acquisition of certain businesses between 1998 and 2000, Nortel assumed the stock option plans of several entities that it acquired. As a result, the exercise of stock options previously granted under these assumed plans were satisfied through the issuance of NNC common shares. No additional stock options were granted under these assumed plans. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

**Security Ownership of Directors and Management**

The following table shows the number of NNC common shares beneficially owned as of March 2, 2009 by each of Nortel's directors and the individuals named as named executive officers in the Executive Compensation section above, as well as by the directors and executive officers as a group. No director or executive officer has pledged any of his or her NNC common shares as security.

A person is deemed to be a beneficial owner of a common share if that person has, or shares, the power to direct the vote or investment of that common share. Under applicable United States securities laws, a person is also deemed to be a beneficial owner of a common share if such person has the right to acquire the share within 60 days (whether or not, in the case of a stock option, the current market price of the underlying common share is below the stock option exercise price). More than one person may be deemed a beneficial owner of a common share and a person need not have an economic interest in a share to be deemed a beneficial owner. Under the equity termination order dated February 27, 2009, our equity- based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. As a result, the individuals named in the

277

Table of Contents

following table are not beneficial owners of any stock options or RSUs that would have become exercisable or would vest, respectively, within 60 days after March 2, 2009.

Share units, as referenced in the table below, represent share units issued under the DSC Plans. Each share unit represents the right to receive one NNC common share and is not considered beneficially owned under applicable United States securities laws. The DSC Plans are described under "Director Compensation for Fiscal Year 2008" under the Executive and Director Compensation section above.

| Name of Beneficial Owner | Title of Class of Security | Amount and Nature of Beneficial Ownership (#)(1) |
|---|---|---|
| J.H. Bennett | NNC common shares | - |
|  | Share units | 230,763 |
| Dr. M. Bischoff | NNC common shares | - |
|  | Share units | 241,696 |
| The Hon. J.B. Hunt, Jr. | NNC common shares | - |
|  | Share units | 247,649 |
| Dr. K.M. Johnson | NNC common shares | - |
|  | Share units | 180,217 |
| J.A. MacNaughton | NNC common shares | 10,000 |
|  | Share units | 270,866 |
| The Hon. J.P. Manley | NNC common shares | - |
|  | Share units | 151,834 |
| R.D. McCormick | NNC common shares | 10,000 |
|  | Share units | 262,918 |
| C. Mongeau | NNC common shares | - |
|  | Share units | 225,557 |
| H.J. Pearce | NNC common shares | 90,000 |
|  | Share units | 188,637 |
| M.S. Zafirovski | NNC common shares | 253,476 |
| P.S. Binning | NNC common shares | 43,794 |
| D.J. Carey | NNC common shares | 31,196 |
| S.J. Bandrowczak | NNC common shares | 5,193 |
| R.S. Lowe | NNC common shares | 47,664 |
| Directors and executive officers as a group (consisting of 24 persons, comprised of the current directors and current executive officers) | NNC common shares | 491,323(2) |
|  | Share units | 2,000,137 |

(1) Except as set forth below, each person has sole investment and voting power with respect to the NNC common shares beneficially owned by such person. As of February 20, 2009, each director and named executive officer individually, and the directors and executive officers as a group, beneficially owned less than 1.0% of the outstanding NNC common shares.

(2) Includes 270 NNC common shares as to which investment and voting power is shared with one or more other persons.

**Voting Shares**

On February 20, 2009, 497,840,534 NNC common shares were issued and outstanding. Each common share entitles its holder to one vote.

Based on public filings with the SEC, we are not aware of any person or company who, directly or indirectly, beneficially owns or has control or direction over more than 5% of NNC common shares except:

278

**Table of Contents**

| Name and Address | Amount and Nature of Beneficial Ownership | Percent of Outstanding NNC Common Shares |
|---|---|---|
| Brandes Investment Partners, L.P.(1) 11988 El Camino Real, Suite 500 San Diego, CA 92130 | 33,719,755(1) | 6.8(1) |
| Dodge & Cox (2) 555 California Street, 40th Floor San Francisco, CA 94104 | 15,105,986(2) | 3.0%(2) |

(1)  The above information is based solely on the Schedule 13F filed with the SEC on February 12, 2009.

(2)  Dodge & Cox has sole voting power and sole dispositive power in respect of 15,105,986 NNC common shares. The above information is based solely on the Schedule 13G filed with the SEC on February 11, 2009.

**ITEM 13.**  **Certain Relationships and Related Transactions, and Board Independence**

**Transactions with Related Persons**

On January 19, 2007, the CHRC adopted a written policy regarding related party transactions and related procedures. The related party policy imposes a duty on directors and senior executives of Nortel to disclose any interests they have or their related parties have in certain interested transactions. The term "senior executives" as used in the related party policy means Board appointed officers. The compliance committee, comprised of members of management, will review all material facts of all interested transactions and approve or disapprove of the entry into such transactions (except transactions where related party is a director). The compliance committee will report quarterly to the Audit Committee and to the Nominating and Governance Committee on such approvals and disapprovals. Interested transactions involving directors will be reviewed by the Audit Committee. If the interested transaction could materially affect Nortel, the Audit Committee must review and approve the interested transaction. The related party policy contains standing approval for a list of certain transactions, which can be revised by the Audit Committee at any time. Violations of the related party policy can lead to disciplinary action up to and including termination of employment.

**Board Independence**

For a discussion of the independence of the members of the Nortel Boards and Committees, see "Independence of Directors" in the Corporate Governance section above.

**ITEM 14.**  **Principal Accountant Fees and Services**

KPMG LLP (KPMG) was appointed as the independent public accountants for NNC and NNL commencing with fiscal year 2007.

In accordance with applicable laws and the requirements of stock exchanges and securities regulatory authorities, the Audit Committees of NNC and NNL must pre- approve all audit and non- audit services to be provided by the independent auditors. In addition, it is the policy of NNC and NNL to retain auditors solely to provide audit and audit- related services and advice with respect to tax matters, but not to provide consulting services, such as information technology services.

**Audit Fees**

NNC and NNL prepare financial statements in accordance with U.S. GAAP. KPMG billed NNC and its subsidiaries $21.6 million and $26.8 million for the following audit services related to fiscal year 2008 and 2007, respectively: (i) the audits of the annual consolidated financial statements of NNC and of NNL included on Form 10- K; (ii) reviews of the financial statements of NNC and of NNL on Forms 10- Q; (iii) the audits of internal controls over financial reporting as required under the United States Sarbanes Oxley Act of 2002; (iv) audits of individual subsidiary and other investments statutory financial statements; and (v) required procedures with respect to securities regulatory filing matters.

HIGHLY CONFIDENTIAL     NNC-NNL06001427 / 291

Table of Contents

**Audit- Related Fees**

KPMG billed NNC and its subsidiaries $0.7 million and $0.6 million for the following audit- related services related to fiscal year 2008 and 2007, respectively: (i) audit of pension plan financial statements; (ii) finance transformation project and other systems applications testing; (iii) due diligence assistance services; (iv) training and compliance matters; and (v) regulatory audit and assurance services.

**Tax Fees**

KPMG billed NNC and its subsidiaries $0.4 million and $0.9 million for tax compliance services related to fiscal year 2008 and 2007, respectively. Tax compliance services are services rendered based upon facts already in existence or transactions that have already occurred to document, compute and obtain government approval for amounts to be included in tax filings and consisted of: (i) assistance in filing tax returns in various jurisdictions; (ii) sales and use, property and other tax return assistance; (iii) research and development tax credit documentation and analysis for purposes of filing amended returns; (iv) transfer pricing documentation; (v) requests for technical advice from taxing authorities; (vi) assistance with tax audits and appeals; and (vii) preparation of expatriate tax returns.

**All Other Fees**

KPMG has not provided NNC and its subsidiaries any other services in 2008 or 2007.

280

HIGHLY CONFIDENTIAL

**Table of Contents**

## PART IV

**ITEM 15.**     **Exhibits and Financial Statement Schedules**
**1. Financial Statements**
The index to the Consolidated Financial Statements appears on page 107.
**2. Financial Statement Schedules**

|  | Page |
|---|---|
| Quarterly Financial Data (Unaudited) | 207 |
| Report of Independent Registered Chartered Accountants | 208 |
| Schedule II - Valuation and Qualifying Accounts and Reserves, Provisions for Uncollectibles | 209 |

All other schedules are omitted because they are inapplicable or not required.
**3. Other Documents Filed as a Part of This Report**

|  | Page |
|---|---|
| Management's Report on Internal Control over Financial Reporting | 210 |
| Report of Independent Registered Public Accounting Firm | 211 |

Individual financial statements of entities accounted for by the equity method have been omitted because no such entity constitutes a "significant subsidiary" requiring such disclosure at December 31, 2008.
**4. Exhibit Index**
Pursuant to the rules and regulations of the SEC, Nortel has filed certain agreements as exhibits to this report. These agreements may contain representations and warranties by the parties. These representations and warranties have been made solely for the benefit of the other party or parties to such agreements and (i) may have been qualified by disclosures made to such other party or parties, (ii) were made only as of the date of such agreements or such other date(s) as may be specified in such agreements and are subject to more recent developments, which may not be fully reflected in Nortel's public disclosure, (iii) may reflect the allocation of risk among the parties to such agreements and (iv) may apply materiality standards different from what may

281

**Table of Contents**

be viewed as material to investors. Accordingly, these representations and warranties may not describe Nortel's actual state of affairs at the date hereof and should not be relied upon.

The items listed as Exhibits 10.1 to 10.16, 10.19, 10.25 to 10.33, 10.35, 10.36, 10.38 to 10.43, 10.51 to 10.53, 10.56 to 10.61, 10.64 to 10.71, 10.73 to 10.77, 10.81 to 10.85 relate to management contracts or compensatory plans or arrangements.

| Exhibit No | Description |
|---|---|
| *2. | Amended and Restated Arrangement Agreement involving BCE Inc., Nortel Networks Corporation, formerly known as New Nortel Inc., and Nortel Networks Limited, formerly known as Nortel Networks Corporation, made as of January 26, 2000, as amended and restated March 13, 2000 (including Plan of Arrangement under Section 192 of the *Canada Business Corporations Act*) (filed as Exhibit 2.1 to Nortel Networks Corporation's Current Report on Form 8- K dated May 1, 2000). |
| *3.1 | Restated Certificate and Articles of Incorporation of Nortel Networks Corporation dated October 1, 2000, amended and restated on November 9, 2006 (filed as Exhibit 3.3 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2006). |
| *3.2 | By- Law No. 1 of Nortel Networks Corporation (filed as Exhibit 3.2 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2000). |
| *4.1 | Amended and Restated Shareholders Rights Plan Agreement dated as of February 28, 2006 between Nortel Networks Corporation and Computershare Trust Company of Canada, as rights agent (filed as Exhibit 3 to Nortel Networks Corporation's Form 8- A12B/A dated June 29, 2006). |
| *4.2 | Indenture dated as of November 30, 1988, between Nortel Networks Limited and The Toronto- Dominion Bank Trust Company, as trustee, related to debt securities authenticated and delivered thereunder, which comprised the 6% Notes due September 1, 2003, and the 6.875% Notes due September 1, 2023 issued by Nortel Networks Limited (filed as Exhibit 4.1 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 1999). |
| *4.3 | Indenture dated as of February 15, 1996, among Nortel Networks Limited, as issuer and guarantor, Nortel Networks Capital Corporation, formerly Northern Telecom Capital Corporation, as issuer, and The Bank of New York, as trustee, related to debt securities and guarantees authenticated and delivered thereunder, which comprised the 7.40% Notes due 2006 and the 7.875% Notes due 2026 (filed as Exhibit 4.1 to Registration Statement on Form S- 3 (No. 333- 1720) of Nortel Networks Limited and Nortel Networks Capital Corporation). |
| 4.4 | Agreement of Resignation, Appointment and Acceptance, dated as of February 12, 2009 among Nortel Networks Limited, formerly known as Northern Telecom Limited, Nortel Networks Capital Corporation, Northern Telecom Capital Corporation, The Bank of New York Mellon and Law Debenture Trust Company of New York relating to 7.875% Notes due 2026 issued under February 15, 1996 Indenture. |
| *4.5 | Third Supplemental Indenture dated as of May 28, 2008 to Indenture dated as of July 5, 2006 among Nortel Networks Limited as Issuer, Nortel Networks Corporation, Nortel Networks Inc. as Guarantors and The Bank of New York as Trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8- K dated May 28, 2008). |
| *4.6 | Second Supplemental Indenture dated as of May 1, 2007 to Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2007). |
| *4.7 | First Supplemental Indenture dated as of July 5, 2006 to Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.2 to Nortel Networks Corporation's Current Report on Form 8- K dated July 6, 2006). |
| *4.8 | Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8- K dated July 6, 2006). |
| *4.9 | Purchase Agreement dated June 29, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and the representative of the initial purchasers with regards to U.S.$1,000,000,000 Floating Rate Senior Notes due 2011, U.S.$550,000,000 10.125% Senior Notes due 2013, U.S.$450,000,000 10.750% Senior Notes due 2016 (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8- K dated July 6, 2006). |

HIGHLY CONFIDENTIAL     NNC-NNL06001427 / 294

**Table of Contents**

*4.10　　Registration Rights Agreement dated July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and the representative of the initial purchasers with regards to U.S.$1,000,000,000 Floating Rate Senior Notes due 2011, U.S.$550,000,000 10.125% Senior Notes due 2013, U.S.$450,000,000 10.750% Senior Notes due 2016 (filed as Exhibit 10.2 to Nortel Networks Corporation's Current Report on Form 8- K dated July 6, 2006).

*4.11　　Indenture dated as of March 28, 2007 among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8- K dated March 28, 2007).

*4.12　　Purchase Agreement dated March 22, 2007 among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and the representatives of initial purchasers (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8- K dated March 28, 2007).

*4.13　　Registration Rights Agreement dated March 28, 2007 among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and the representatives of the initial purchasers (filed as Exhibit 10.2 to Nortel Networks Corporation's Current Report on Form 8- K dated March 28, 2007).

*4.14　　Purchase Agreement dated May 21, 2008 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and a representative of the initial purchasers (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8- K dated May 28, 2008).

*4.15　　Registration Rights Agreement dated May 28, 2008 among Nortel Networks Limited, Nortel Networks Corporation and Nortel Networks Inc. and a representative of the initial purchasers (filed as Exhibit 10.2 to Nortel Networks Corporation's Current Report on Form 8- K dated May 28, 2008).

*10.1　　Nortel Networks Supplementary Executive Retirement Plan, as Amended effective October 18, 2001 and October 23, 2002, as amended by Resolutions by the Pension Investment Committee dated December 19, 2007 and December 20, 2007 with effect from January 1, 2008 (filed as Exhibit 10.77 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.2　　Statement describing the retirement arrangements of the former President and Chief Executive Officer (filed as Exhibit 10.5 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2001).

*10.3　　Assumption Agreement between Nortel Networks Corporation and Nortel Networks Limited dated March 5, 2001, regarding the assumption and agreement by Nortel Networks Corporation to perform certain covenants and obligations of Nortel Networks Limited under the Nortel Networks Limited Executive Retention and Termination Plan (filed as Exhibit 10.25 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2000).

*10.4　　Nortel Networks Corporation Executive Retention and Termination Plan, as Amended and Restated, effective from June 26, 2002, Amended and Restated with effect from June 1, 2007 including the name change to Nortel Networks Corporation Change in Control Plan, as Amended and Restated with effect from January 18, 2008 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008).

*10.5　　Nortel Networks Limited SUCCESS Plan approved on July 25, 2002, as Amended and Restated on July 28, 2003 with effect from January 1, 2003, as Amended on July 28, 2003 with effect from January 1, 2003, as Amended on February 26, 2004 with effect from January 1, 2004, as Amended March 9, 2006 with effect from January 1, 2006, as Amended March 15, 2007 with effect from January 1, 2007 including name change to Nortel Networks Limited Annual Incentive Plan, as Amended on February 22, 2008 with effect from January 1, 2008 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008).

*10.6　　Supplementary Pension Credits Arrangement (filed as Exhibit 10.14 to Nortel Networks Corporation's Registration Statement dated August 28, 1975 on Form S- 1 (No. 2- 71087)).

*10.7　　Statements describing the right of certain executives in Canada to defer all or part of their short- term and long- term incentive awards (filed as Exhibit 10.4 to Nortel Networks Limited's Quarterly Report on Form 10- Q for the quarter ended June 30, 2000).

*10.8　　Statement describing eligibility for the Group Life Insurance Plan for directors who are not salaried employees of Nortel Networks Corporation (filed as Exhibit 10.30 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2002).

283

HIGHLY CONFIDENTIAL　　　　NNC-NNL06001427 / 295

**Table of Contents**

*10.9    Amended general description of cash bonus for employees and executives of Nortel Networks Corporation and Nortel Networks Limited as originally filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2002 (filed as Exhibit 10.01 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2003).

*10.10   Nortel Networks Corporation Directors' Deferred Share Compensation Plan effective January 1, 2002, as Amended and Restated May 29, 2003, as Amended and Restated December 18, 2003 effective January 1, 2004, as Restated on June 29, 2005 and Amended December 7, 2005, as Amended and Restated on October 3, 2007 effective August 30, 2007 (filed as Exhibit 10.74 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.11   Nortel Networks Limited Directors' Deferred Share Compensation Plan effective June 30, 1998, as Amended and Restated May 1, 2000, as further Amended and Restated effective January 1, 2002, as Amended and Restated May 29, 2003, as Amended and Restated December 18, 2003 effective January 1, 2004, as Restated on June 29, 2005 and Amended December 7, 2005, as Amended and Restated on October 3, 2007 effective August 30, 2007 (filed as Exhibit 10.75 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.12   Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated, as amended effective April 30, 1992, April 27, 1995, December 28, 1995, April 8, 1998, February 25, 1999, April 29, 1999, September 1, 1999, December 16, 1999, May 1, 2000 and January 31, 2002 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2002).

*10.13   Nortel Networks Corporation 2000 Stock Option Plan, as Amended effective May 1, 2000 and January 31, 2002 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2002).

*10.14   Nortel Networks/BCE 1985 Stock Option Plan (Plan of Arrangement 2000) (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2000).

*10.15   Nortel Networks/BCE 1999 Stock Option Plan (Plan of Arrangement 2000) (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2000).

*10.16   Nortel Networks U.S. Deferred Compensation Plan (filed as Exhibit 4.3 to Post- Effective Amendment No. 1 to Nortel Networks Corporation's Registration Statement dated May 16, 2000 on Form S- 8 (No. 333- 11558)), as amended by Resolutions dated January 18, 2008 (filed as Exhibit 10.7 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008).

*10.17   Master Facility Agreement dated as of February 14, 2003, and amended by Amending Agreement No. 1 dated July 10, 2003, between Nortel Networks Limited and Export Development Canada, and as further amended by letter agreements dated March 29, 2004, May 28, 2004, August 20, 2004, September 29, 2004, October 29, 2004, November 19, 2004, December 10, 2004, January 14, 2005, February 15, 2005, March 15, 2005, April 29, 2005, May 31, 2005, amended and restated as of October 24, 2005 and further amended by Amendment No. 1 and Waiver dated May 9, 2006 and Amendment No. 2 dated December 12, 2006 and Waiver dated March 9, 2007 and further amended by Second Amended and Restated Master Facility Agreement dated December 14, 2007 (filed as Exhibit 99.1 to Nortel Networks Corporation's Current Report on Form 8- K dated December 18, 2007).

*10.18   Master Indemnity Agreement dated as of February 14, 2003 between Nortel Networks Limited and Export Development Canada, amended and restated as of October 24, 2005 (filed as Exhibit 10.3 to Nortel Networks Corporation's Current Report on Form 8- K dated October 28, 2005).

*10.19   Letter dated June 23, 2003 from the former President and Chief Executive Officer of Nortel Networks, to the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited regarding the voluntary return for cancellation of certain stock options to purchase common shares of Nortel Networks Corporation (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2003).

*10.20   Asset Purchase Agreement dated June 29, 2004 among Nortel Networks Limited, Flextronics International Ltd. and Flextronics Telecom Systems, Ltd., amended as of November 1, 2004, February 7, 2005, August 22, 2005 and further amended by the Fourth and Fifth Amending Agreements as of May 8, 2006 (filed as Exhibits 10.2 and 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006).

284

**Table of Contents**

| | |
|---|---|
| **10.21 | Amended and Restated Master Contract Manufacturing Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems, Ltd., amended as of November 1, 2004 and May 8, 2006 (most recently filed as Exhibit 99.1 to Nortel Networks Corporation's Current Report on Form 8- K dated June 4, 2007). |
| **10.22 | Master Repair Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems Limited, amended as of February 8, 2005 and May 8, 2006 (most recently filed as Exhibit 99.2 to Nortel Networks Corporation's Current Report on Form 8- K dated June 4, 2007). |
| **10.23 | Master Contract Logistics Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems, Ltd., amended as of February 8, 2005 (most recently filed as Exhibit 99.3 to Nortel Networks Corporation's Current Report on Form 8- K dated June 4, 2007). |
| **10.24 | Letter Agreement dated June 29, 2004 among Nortel Networks Limited, Flextronics International Ltd. and Flextronics Telecom Systems, Ltd. amended and restated as of May 8, 2006 (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006). |
| *10.25 | Letter, dated January 10, 2005, to Mr. Lynton (Red) Wilson, the Chairman of the Board of Nortel Networks Corporation, and modified March 1, 2005 and delivered on August 11, 2005 from certain officers of Nortel Networks Corporation (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8- K dated August 18, 2005). |
| *10.26 | Peter W. Currie, Executive Vice- President and Chief Financial Officer, Letter Agreement dated February 4, 2007 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2007). The Letter Agreement terminated the remuneration arrangement previously filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2005 |
| *10.27 | Summary statement of terms of the additional special pension benefits for the Vice- Chairman and Chief Executive Officer approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the Independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on March 22, 2005 (filed as Exhibit 10.8 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2005). |
| *10.28 | The Nortel 2005 Stock Incentive Plan (as filed with the 2005 Proxy Statement), as Amended and Restated on November 6, 2006 with effect on December 1, 2006, as Amended and Restated on January 18, 2008, as Amended and Restated on February 22, 2008 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008). |
| *10.29 | Summary statement of the interest payable on the special pension benefits for the Vice- Chairman and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on May 27, 2005 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2005). |
| *10.30 | Form of Indemnity Agreement effective on or as of June 29, 2005 entered into between Nortel Networks Corporation and each of the following Directors: Harry J. Pearce, Ronald W. Osborne, Richard D. McCormick, John A. MacNaughton, James B. Hunt, Jr. and Jalynn H. Bennett (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2005). |
| *10.31 | Summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Corporation effective June 29, 2005, restated with effect from February 20, 2008 (filed as Exhibit 10.73 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007). |
| *10.32 | Summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Limited effective June 29, 2005, as amended with effect from January 1, 2008 and restated February 20, 2008 (filed as Exhibit 10.72 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007). |
| *10.33 | Forms of Instruments of Grant generally provided to optionees granted options under the Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated or the Nortel Networks Corporation 2000 Stock Option Plan (filed as Exhibit 10.9 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2005). |

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 297

**Table of Contents**

*10.34    Proxy Agreement effective as of July 29, 2005 with respect to Capital Stock of Nortel Government Solutions Inc. by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., Nortel Government Solutions Inc., James Frey, Thomas McInerney, Gregory Newbold, and the United States Department of Defense (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2005).

*10.35    Escrow Agreement dated as of March 1, 2005 and as entered into on August 11, 2005 between Nortel Networks Corporation, Computershare Trust Company of Canada and certain officers of Nortel Networks Corporation (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2005).

*10.36    Termination Agreement dated September 7, 2005 between Nicholas DeRoma, Chief Legal Officer and Nortel Networks Corporation (filed as Exhibit 10.60 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2005). The Agreement terminated the remuneration arrangement previously filed as Exhibits 10.3 and 10.4 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2001.

*10.37    Agreement and Plan of Merger dated as of April 25, 2005, by and among Nortel Networks Inc., PS Merger Sub, Inc. and PEC Solutions, Inc. (filed as Exhibit 99(d)(1) to Nortel Networks Inc. Current Report on Form SC TO- T dated May 3, 2005 and filed as Exhibit 10.9 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2005).

*10.38    William A. Owens letter agreement entered into on December 1, 2005, concerning the cessation of Mr. Owens' responsibilities as Vice-Chairman and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited effective November 15, 2005 (filed as Exhibit 10.68 to Nortel Network Corporation's Annual Report on Form 10- K/A for the year ended December 31, 2005). The letter agreement terminated the employment arrangements previously filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2004 and as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2004.

*10.39    Nicholas DeRoma, former Chief Legal Officer, Letter Agreement dated December 20, 2005 amending the Termination Agreement dated September 7, 2005 (filed as Exhibit 10.69 to Nortel Networks Corporation's Annual Report on Form 10- K/A for the year ended December 31, 2005).

*10.40    Steve Pusey, Executive Vice- President and President, Eurasia, Letter Agreement dated September 29, 2005 concerning a retention bonus (filed as Exhibit 10.70 to Nortel Networks Corporation's Annual Report on Form 10- K/A for the year ended December 31, 2005).

*10.41    Mike Zafirovski, President and Chief Executive Officer, Indemnity Agreement dated January 18, 2006 with effect from October 31, 2005 (filed as Exhibit 10.72 to Nortel Networks Corporation's Annual Report on Form 10- K/A for the year ended December 31, 2005).

*10.42    Pascal Debon letter agreement dated February 21, 2006, concerning the cessation of Mr. Debon's responsibilities as Senior Advisor of Nortel Networks Corporation and Nortel Networks Limited effective December 23, 2005 (filed as Exhibit 10.75 to Nortel Networks Corporation's Annual Report on Form 10- K/A for the year ended December 31, 2005).

*10.43    Forms of Instruments of Award as amended on April 11, 2007 and subsequently on March 3, 2008 generally provided to recipients of Restricted Stock Units and Performance Stock Units, Form of Instrument of Grant as amended on April 4, 2007 generally provided to recipients of stock options subsequently amended effective March 3, 2008 generally provided to recipients of stock options and stock appreciation rights under the Nortel 2005 Stock Incentive Plan, As Amended and Restated (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2008).

*10.44    Stipulation and Agreement of Settlement, dated June 20, 2006, in the matter captioned *In re Nortel Networks Corp. Securities Litigation*, United States District Court for the Southern District of New York, Consolidated Civil Action No. 01 Civ. 1855 (RMB) (filed as Exhibit 99.1 to Nortel Networks Corporation's Current Report on Form 8- K dated December 12, 2007).

*10.45    Stipulation and Agreement of Settlement, dated June 20, 2006, in the matter captioned *In re Nortel Networks Corp. Securities Litigation*, United States District Court for the Southern District of New York, Master File No. 05- MD1659 (LAP) (filed as Exhibit 99.2 to Nortel Networks Corporation's Current Report on Form 8- K dated December 12, 2007).

286

**Table of Contents**

| | |
|---|---|
| *10.46 | Court Order, dated June 20, 2006, in the matter captioned Frohlinger et. al. v. Nortel Networks Corporation et. al., Ontario Superior Court of Justice, Court File No. 02- CL- 4605 (Ont.Sup.Ct.J.) (filed as Exhibit 10.12 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006). |
| *10.47 | Court Order, dated June 20, 2006, in the matter captioned *Association de Protection des Epargnants et. al. Investisseurs du Québec v. Corporation Nortel Networks*, Superior Court of Quebec, District of Montreal, No. 500- 06- 000126- 017 (filed as Exhibit 10.13 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006). |
| *10.48 | Court Order, dated June 20, 2006, in the matter captioned *Jeffery et. al. v. Nortel Networks Corporation et. al.*, Supreme Court of British Columbia, Vancouver Registry Court File No. S015159 (B.C.S.C.) (filed as Exhibit 10.14 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006). |
| *10.49 | Court Order, dated June 20, 2006, in the matter captioned *Gallardi v. Nortel Networks Corporation et. al.*, Ontario Superior Court of Justice, Court File No. 05- CV- 285606CP (Ont.Sup.Ct.J.) (filed as Exhibit 10.15 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006). |
| *10.50 | Court Order, dated June 20, 2006, in the matter captioned *Skarstedt v. Corporation Nortel Networks*, Superior Court of Quebec, District of Montreal, No. 500- 06- 000277- 059 (filed as Exhibit 10.16 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006). |
| *10.51 | Resolution effective June 28, 2006 for Mike Zafirovski, President and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited outlining acceptance by Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited of the voluntary reduction by Mr. Zafirovski of a special lifetime annual pension benefit by 29% resulting in a payout of U.S.$355,000 per year rather than U.S.$500,000 per year (filed as Exhibit 10.17 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2006). |
| *10.52 | Form of indemnity agreement entered into between Nortel Networks Corporation and members of the Board of Directors of Nortel Networks Corporation on or after September 6, 2006 (filed as Exhibit 10.4 to Nortel Network Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2006). |
| *10.53 | Summary statement of employment terms and conditions for Mike Zafirovski, President and Chief Executive Officer, November 15, 2005 as approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the Independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on October 16, 2005 and form of instrument of award for restricted stock units and form of instrument of award for stock options granted on November 15, 2005 under the Nortel 2005 Stock Incentive Plan to Mike Zafirovski, President and Chief Executive Officer (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2006). |
| **10.54 | Agreement between Nortel Networks Limited and Flextronics Telecom Systems, Inc. dated October 13, 2006, amending the asset purchase agreement dated June 29, 2004 among Nortel, and Flextronics International Ltd., and Flextronics Telecom, which was filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2004, as amended from time to time, the amended and restated master contract manufacturing services agreement dated as of June 29, 2004, which was filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2004, as amended from time to time, and the letter agreement dated June 29, 2004, which was filed as Exhibit 10.7 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2004, as amended and restated (filed as Exhibit 10.88 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2006). |
| *10.55 | Share and Asset Sale Agreement between Nortel Networks Limited and Alcatel Lucent dated December 4, 2006, as amended December 29, 2006 and June 28, 2007 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2007). |
| *10.56 | Dion Joannou letter agreement dated July 27, 2007 concerning the cessation of Mr. Joannou's responsibilities as President, North America of Nortel Networks Corporation and Nortel Networks Limited effective August 31, 2007 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2007). |
| *10.57 | Compensation and Human Resources Committee Policy on Company Aircraft dated July 31, 2007 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2007). |

**HIGHLY CONFIDENTIAL**      **NNC-NNL06001427 / 299**

**Table of Contents**

*10.58    Paviter Binning, Executive Vice- President and Chief Financial Officer of Nortel Networks Corporation and Nortel Networks Limited, Employment Letter dated September 28, 2007 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2007).

*10.59    Nortel Networks Corporation Share Purchase Plan for S. 16 Executive Officers dated November 8, 2007 (filed as Exhibit 10.71 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.60    Joel Hackney, President, Enterprise Solutions, Employment Letter amended effective September 19, 2007 updating and replacing the terms and conditions in the offer letter dated December 13, 2005 (filed as Exhibit 10.76 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.61    David Drinkwater, Chief Legal Officer, Employment Letter dated December 9, 2005 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2008) and Letter regarding special bonus dated October 4, 2007 (filed as Exhibit 10.79 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.62    Pay- Off Letter dated July 5, 2006 under the Credit Agreement dated February 14, 2006 among Nortel Networks Inc. and JPMorgan Chase Bank, N.A., J.P. Morgan Securities Inc. and Citigroup Global Markets Inc., Citicorp USA, Inc., Royal Bank of Canada and Export Development Canada, the Lenders party thereto (filed as Exhibit 10.80 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.63    Consent of Defendants Nortel Networks Corporation and Nortel Networks Limited, dated September 28, 2007, in the matter captioned *Securities and Exchange Commission v. Nortel Networks Corporation and Nortel Networks Limited,* United States District Court for the Southern District of New York, Civil Docket for Case No. 1:07- CV- 08851- LAP (filed as Exhibit 10.81 to Nortel Networks Corporation's Annual Report on Form 10- K for the year ended December 31, 2007).

*10.64    Nortel U.S. Stock Purchase Plan, As Amended and Restated, amended as of January 18, 2008, effective January 1, 2008 and amended and restated as of February 22, 2008 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008).

*10.65    Nortel Global Stock Purchase Plan, As Amended and Restated, amended as of January 18, 2008, effective January 1, 2008 and amended and restated as of February 22, 2008 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008).

*10.66    Nortel Stock Purchase Plan for Members of the Savings and Retirement Program, As Amended on February 22, 2008 (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended March 31, 2008).

*10.67    Dennis Carey, Executive Vice- President, Corporate Operations, Employment Letter amended effective June 23, 2008 updating and replacing the terms and conditions of the offer letter dated January 26, 2006 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2008).

*10.68    Steve Slattery letter agreement concerning the cessation of Mr. Slattery's responsibilities as President, Enterprise Solutions of Nortel Networks Corporation and Nortel Networks Limited effective September 18, 2007 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended June 30, 2008).

*10.69    Nortel Networks Enhanced Severance Allowance Plan, as Amended and Restated, effective January 1, 2008 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10- Q for the quarter ended September 30, 2008).

10.70    Form of indemnity agreement entered into between Nortel Networks Corporation and Board Appointed Officers of Nortel Networks Corporation on or after October 16, 2008.

10.71    David Drinkwater letter agreement dated November 11, 2008 concerning the cessation of Mr. Drinkwater's responsibilities as Chief Legal Officer of Nortel Networks Corporation and Nortel Networks Limited effective December 31, 2008, arrangements concerning appointment as Senior Advisor of Nortel Networks Corporation and Nortel Networks Limited effective January 1, 2009 and arrangements concerning the cessation of Mr. Drinkwater's employment effective close of business on February 28, 2009.

*10.72    Standstill and Waiver Agreement dated December 15, 2008 between Nortel Networks Limited and Export Development Canada (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8- K dated December 17, 2008).

288

**Table of Contents**

10.73    Form of indemnity agreement entered into between Nortel Networks Limited and members of the Board of Directors and Board Appointed Officers of Nortel Networks Limited on or after December 22, 2008.

10.74    William Nelson, Executive Vice- President, Global Sales, Employment Letter dated December 28, 2007.

10.75    William Nelson letter agreement dated November 27, 2008 concerning the cessation of Mr. Nelson's responsibilities as Executive Vice-President, Global Sales of Nortel Networks Corporation and Nortel Networks Limited effective December 31, 2008.

10.76    Steven Bandrowczak, Chief Information Officer, Employment Letter dated May 11, 2007.

10.77    Steven Bandrowczak letter agreement dated January 6, 2009 concerning his new role as Vice- President Enterprise Sales of Nortel Networks Inc. effective January 1, 2009.

10.78    Amending Agreement effective as of January 13, 2009 to the following agreements and any amendments from the effective date of each up to January 13, 2009: to the Amended and Restated Master Contract Manufacturing Services Agreement dated June 29, 2004 and October 13, 2006 between Nortel Networks Limited and Flextronics Telecom Systems Ltd.; to the Master Contract Manufacturing Services Agreement dated September 30, 2003 and October 13, 2006 between Nortel Networks Limited and Flextronics Corporation; to the Master Repair Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems Ltd.; to the Master Contract Logistics Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems Ltd.; and to the Master Contract Repair Services Agreement dated June 3, 2000 between Nortel Networks Limited and Flextronics Telecom Systems Ltd.

10.79    Agreement dated January 14, 2009 between Nortel Networks Limited and Export Development Canada ceasing the Standstill and Waiver Agreement dated December 15, 2008 and implementing a Temporary Facility.

10.80    Amended and Restated Short- Term Support Agreement dated as of February 10, 2009 between Nortel Networks Limited and Export Development Canada.

10.81    Amended and Restated summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Corporation effective January 14, 2009.

10.82    Amended and Restated summary of remuneration and retirement compensation of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Limited effective January 14, 2009.

10.83    Resolutions effective December 12, 2008 terminating the Nortel U.S. Stock Purchase Plan, As Amended and Restated, Nortel Global Stock Purchase Plan, As Amended and Restated and Nortel Stock Purchase Plan for Members of the Savings and Retirement Program, As Amended.

10.84    Nortel Networks U.S. Deferred Compensation Plan, as amended by Resolutions dated December 23, 2008 with effect from January 1, 2009.

10.85    Resolution of the Compensation and Human Resources Committee of the Boards of Nortel Networks Corporation and Nortel Networks Limited extending the cessation of employment date for David Drinkwater, Senior Advisor to March 31, 2009.

21.    Subsidiaries of the Registrant.

23.1    Consent of KPMG LLP.

23.2    Consent of Deloitte & Touche LLP.

24.    Power of Attorney of certain directors and officers.

31.1    Rule 13a - 14(a)/15d - 14(a) Certification of the President and Chief Executive Officer.

31.2    Rule 13a - 14(a)/15d - 14(a) Certification of the Executive Vice- President and Chief Financial Officer.

32.    Certification of the President and Chief Executive Officer and Executive Vice- President and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes- Oxley Act of 2002.

289

**Table of Contents**

\*    Incorporated by Reference.

\*\*   Incorporated by Reference. Certain portions of this Exhibit have been omitted based upon a request for confidential treatment. These portions have been filed separately with the United States Securities and Exchange Commission.

290

**HIGHLY CONFIDENTIAL**

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Toronto, Ontario, Canada on the 2nd day of March, 2009.

NORTEL NETWORKS CORPORATION

By:                                    /s/ MIKE S. ZAFIROVSKI
                                       (MIKE S. ZAFIROVSKI,
                                       President and Chief
                                       Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on the 2nd day of March, 2009.

| Signature | Title |
| --- | --- |
| Principal Executive Officer | |
| /s/ MIKE S. ZAFIROVSKI<br>(MIKE S. ZAFIROVSKI) | President and Chief Executive Officer, and a Director |
| Principal Financial Officer | |
| /s/ PAVITER S. BINNING<br>(PAVITER S. BINNING) | Executive Vice- President, Chief Financial Officer and Chief Restructuring Officer |
| Principal Accounting Officer | |
| /s/ PAUL W. KARR<br>(PAUL W. KARR) | Controller |

**Directors**

| | |
| --- | --- |
| J.H. BENNETT*<br>(J.H. Bennett) | J.P. MANLEY*<br>(J.P. Manley) |
| M. BISCHOFF*<br>(M. Bischoff) | R.D. MCCORMICK*<br>(R.D. McCormick) |
| J.B. HUNT, JR.*<br>(J.B. Hunt, Jr.) | C. MONGEAU*<br>(C. Mongeau) |
| K.M. JOHNSON*<br>(K.M. Johnson) | H.J. PEARCE*<br>(H.J. Pearce) |
| J.A. MACNAUGHTON*<br>(J.A. MacNaughton) | M.S. ZAFIROVSKI*<br>(M.S. Zafirovski) |

/s/ GORDON A. DAVIES
By:* (GORDON A. DAVIES, as attorney- in- fact
March 2, 2009.)

291

Exhibit 4.4

AGREEMENT OF RESIGNATION, APPOINTMENT AND ACCEPTANCE, dated as of February 12, 2009 among NORTEL NETWORKS LIMITED, formerly known as NORTHERN TELECOM LIMITED, a Canadian corporation (the "Guarantor"), NORTEL NETWORKS CAPITAL CORPORATION, formerly known as NORTHERN TELECOM CAPITAL CORPORATION, a Delaware corporation (the "Issuer"), THE BANK OF NEW YORK MELLON, formerly known as The Bank of New York, a national banking association duly organized and existing under the laws of the United States of America, having its corporate trust office at 101 Barclay Street New York, New York 10286 (the "Resigning Trustee"), and LAW DEBENTURE TRUST COMPANY OF NEW YORK, a New York banking corporation duly organized and existing under the laws of the State of New York and having a corporate trust office at 400 Madison Avenue, 4th Floor, New York, New York 10017, as successor Trustee (the "Successor Trustee").

### RECITALS:

WHEREAS, there was originally authorized and issued $150 million aggregate principal amount of the Issuer's 7.875% Notes due 2026, fully and unconditionally guaranteed by the Guarantor (the "Securities"), under an Indenture, dated as of February 15, 1996 (the "Indenture"), between the Issuer, the Guarantor and the Resigning Trustee;

WHEREAS, an Event of Default under the Indenture has occurred and is continuing;

WHEREAS, Section 607 of the Indenture provides that the Trustee may resign at any time by so notifying the Issuer and the Guarantor;

WHEREAS, Section 607 of the Indenture further provides that, if the Trustee shall resign, the Issuer shall promptly appoint a successor Trustee;

WHEREAS, Section 607 of the Indenture further provides that the successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer and the Guarantor;

WHEREAS, in accordance with Section 607 of the Indenture, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under the Indenture, upon the acceptance by a successor Trustee of its appointment as a successor Trustee;

WHEREAS, Section 609 of the Indenture provides that the Trustee (i) must satisfy with the requirements of Section 310(a)(1) of the Trust Indenture Act; (ii) at all times shall have a combined capital and surplus of at least $5 million, calculated as permitted by Section 310(a)(2) of the Trust Indenture Act; and (iii) is subject to Section 310(b) of the Trust Indenture Act including the optional provision permitted by the second sentence of Section 310(b)(9) of the Trust Indenture Act;

WHEREAS, the Resigning Trustee was appointed Registrar and Paying Agent under the Indenture; and

WHEREAS, the Resigning Trustee wishes to resign as Trustee, Registrar and Paying Agent under the Indenture; the Issuer wishes to appoint the Successor Trustee to succeed the Resigning Trustee as Trustee, Registrar and Paying Agent under the Indenture; and the Successor Trustee meets the qualification and eligibility requirements of Section 609 of the Indenture and wishes to accept its appointment as Trustee, Registrar and Paying Agent under the Indenture;

[Trustee Resignation, Appointment and Acceptance Agreement]

NOW, THEREFORE, the Issuer, the Guarantor, the Resigning Trustee and the Successor Trustee, for and in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby consent and agree as follows:

### ARTICLE ONE
### THE RESIGNING TRUSTEE

Section 101. Pursuant to Section 607 of the Indenture, the Resigning Trustee has notified the Issuer and the Guarantor that the Resigning Trustee is resigning as the Trustee, Registrar and Paying Agent under the Indenture.

Section 102. The Resigning Trustee hereby represents and warrants to the Successor Trustee that:

(a)    No covenant or condition contained in the Indenture has been waived by the Resigning Trustee or, to the best of the knowledge of the responsible officers of the Resigning Trustee's corporate trust department, by the Holders of the percentage in aggregate principal amount of the Securities required by the Indenture to effect any such waiver.

(b)    There is no action, suit or proceeding pending or, to the best of the knowledge of the responsible officers assigned to the Resigning Trustee's corporate trust department, threatened against the Resigning Trustee before any court or any governmental authority arising out of any action or omission by the Resigning Trustee as the Trustee under the Indenture.

(c)    The Resigning Trustee does not and as of the Effective Date (as defined in Section 402) will not hold any property under the Indenture.

(d)    This Agreement has been duly authorized, executed and delivered on behalf of the Resigning Trustee.

(e)    The current outstanding principal amount of the Securities as of the Effective Date is $150,000,000.

(f)    Interest on the Securities was paid to November 15, 2008.

(g)    The name and contact information of the registered holders and known beneficial holders of the Securities are listed on Schedule I.

**HIGHLY CONFIDENTIAL**          NNC-NNL06001427 / 304

(h)    The Event of Default is based on Section 501 (5) of the Indenture.

Section 103. The Resigning Trustee hereby assigns, transfers, delivers and confirms to the Successor Trustee all right, title and interest of the Resigning Trustee in and to the trust under the Indenture and all the rights, powers and trusts of the Trustee, Registrar and Paying Agent under the Indenture. The Resigning Trustee shall execute and deliver such further instruments and shall do such other things as the Successor Trustee may reasonably require so as to more fully and certainly vest and confirm in the Successor Trustee all the rights, trusts and powers hereby assigned, transferred, delivered and confirmed to the Successor Trustee as the Trustee, Registrar and Paying Agent.

Section 104. The Resigning Trustee shall deliver to the Successor Trustee, as of or immediately after the effective date hereof, all of the documents listed on Exhibit A hereto.

2

**HIGHLY CONFIDENTIAL**                    **NNC-NNL06001427 / 305**

## ARTICLE TWO
### THE ISSUER AND THE GUARANTOR

Section 201. Each of the Issuer and the Guarantor hereby certifies that it is, and the officers of each of the Issuer and the Guarantor who have executed this Agreement are, duly authorized to: (a) accept the Resigning Trustee's resignation as Trustee, Registrar and Paying Agent under the Indenture; (b) appoint the Successor Trustee as Trustee, Registrar and Paying Agent under the Indenture; and (c) execute and deliver such agreements and other instruments as may be necessary or desirable to effectuate the succession of the Successor Trustee as Trustee, Registrar and Paying Agent under the Indenture.

Section 202. Each of the Issuer and the Guarantor hereby accept the resignation of the Resigning Trustee as Trustee, Registrar and Paying Agent under the Indenture. Pursuant to Section 607 of the Indenture, the Issuer hereby appoints the Successor Trustee as Trustee, Registrar and Paying Agent under the Indenture and confirms to the Successor Trustee all the rights, powers and duties of the Resigning Trustee under the Indenture and with respect to all property and money held by such Resigning Trustee under the Indenture, with like effect as if the Successor Trustee was originally named as Trustee, Registrar and Paying Agent under the Indenture. Each of the Issuer and the Guarantor shall execute and deliver such further instruments and shall do such other things as the Successor Trustee may reasonably require so as to more fully and certainly vest and confirm in the Successor Trustee all the rights, powers, and duties hereby assigned, transferred, delivered and confirmed to the Successor Trustee.

Section 203.

(a) The Issuer hereby represents and warrants to the Successor Trustee that it is a corporation duly formed and validly existing under the laws of the State of Delaware.

(b) The Guarantor hereby represents and warrants to the Successor Trustee that it is a corporation duly incorporated and validly existing under the laws of Canada.

(c) Each of the Issuer and the Guarantor represents and warrants to the Successor Trustee that (i) the Indenture was validly and lawfully executed and delivered by the Issuer and the Guarantor and is in full force and effect; and (ii)the Securities are validly issued securities of the Issuer.

## ARTICLE THREE
### THE SUCCESSOR TRUSTEE

Section 301. The Successor Trustee hereby represents and warrants to the Resigning Trustee and to the Property Trustee that:

(a) The Successor Trustee is qualified and eligible under the provisions of Section 609 of the Indenture to act as the Trustee under the Indenture.

3

(b)    This Agreement has been duly authorized, executed and delivered on behalf of the Successor Trustee.

Section 302. The Successor Trustee hereby accepts its appointment as the successor Trustee, Registrar and Paying Agent under the Indenture and accepts the rights, powers, duties and obligations of the Resigning Trustee as the Trustee, Registrar and Paying Agent under the Indenture, upon the terms and conditions set forth therein, with like effect as if originally named as the Trustee, Registrar and Paying Agent under the Indenture.

Section 303. References in the Indenture to "Corporate Trust Office" or other similar terms shall be deemed to refer to the Corporate Trust Office of the Successor Trustee at 400 Madison Avenue, 4th Floor, New York, NY 10017 or any other office of the Successor Trustee at which, at any particular time, its corporate trust business shall be administered.

Section 304. Promptly after the execution and delivery of this Agreement, the Successor Trustee, on behalf of the Issuer, shall cause a notice, the form of which is annexed hereto marked Exhibit B to be sent to all Holders in the manner provided in Section 607 of the Indenture.

## ARTICLE FOUR
## MISCELLANEOUS

Section 401. Except as otherwise expressly provided herein or unless the context otherwise requires, all terms used herein which are defined in the Indenture shall have the meaning assigned to them in the Indenture.

Section 402. This Agreement and the resignation, appointment and acceptance effected hereby shall be effective as of the opening of business on the date first above written, upon the execution and delivery hereof by each of the parties hereto (the "Effective Date"); provided, however, that the resignation of the Resigning Trustee as Registrar and Paying Agent and appointment of the Successor Trustee as Registrar and Paying Agent shall be effective as of the close of business 10 days after the date first written above and until such date the Resigning Trustee shall continue to perform its duties under the Indenture.

Section 403. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Section 404. This Agreement may be executed in any number of counterparts each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

Section 405. The Issuer, the Guarantor, the Resigning Trustee and the Successor Trustee hereby acknowledge receipt of an executed counterpart of this Agreement and the effectiveness thereof.

Section 406. Notwithstanding the resignation of the Resigning Trustee effected hereby, the Issuer and the Guarantor shall remain obligated to compensate, reimburse and indemnify the Resigning Trustee in accordance with, and to the extent provided in, Section 606 of the Indenture. The Issuer also acknowledges and reaffirms its obligations to compensate, reimburse and indemnify the Successor Trustee in accordance with, and to the extent provided in, Section 606 of the Indenture, which obligations to the Successor Trustee shall survive the execution hereof.

4

IN WITNESS WHEREOF, the parties hereby have caused this Agreement of Resignation, Appointment and Acceptance to be duly executed as of the day and year first above written.

NORTEL NETWORKS LIMITED, as Guarantor

By:      /s/   J. Doolittle
Name:   J. Doolittle
Title:     Treasurer

By:      /s/   T. Connelly McGilley
Name:   Tracy S.J. Connelly McGilley
Title:     Assistant Secretary

NORTEL NETWORKS CAPITAL CORPORATION, as Issuer

By:      /s/   J. Doolittle
Name:   J. Doolittle
Title:     Vice President

THE BANK OF NEW YORK MELLON, as Resigning Trustee

By:      /s/   Martin Feig
Name:   Martin Feig
Title:     Vice President

LAW DEBENTURE TRUST COMPANY OF NEW YORK, as Successor Trustee

By:      /s/   Robert L. Bice II
Name:   Robert L. Bice II
Title:     Senior Vice President

5

**HIGHLY CONFIDENTIAL**      NNC-NNL06001427 / 308

EXHIBIT A
Documents to the extent available to be delivered to the Successor Trustee:

1.    Executed copy of Indenture dated as of February 15, 1996

2.    File of Closing Documents

3.    A copy of the most recent Compliance Certificate delivered pursuant to Section 1005 of the Indenture.

4.    Copies of any official notices sent by the Trustee to all the Holders of the Securities pursuant to the terms of the Indenture during the past twelve months and a copy of the most recent Trustee's Annual Report to Holders, if any.

5.    The original Securities.

6

**HIGHLY CONFIDENTIAL**    **NNC-NNL06001427 / 309**

EXHIBIT B
[LAW DEBENTURE TRUST COMPANY OF NEW YORK LETTERHEAD]
NOTICE

To the Holders of
Nortel Networks Limited and
Nortel Networks Capital Corporation
7.875% Notes due 2026
CUSIP No. 665810AB3

NOTICE IS HEREBY GIVEN, pursuant to Section 607 of the Indenture dated as of February 15, 1996 by and between Nortel Networks Limited, formerly known as Northern Telecom Limited, as Guarantor, Nortel Networks Capital Corporation, formerly known as Northern Telecom Capital Corporation, as Issuer, and The Bank of New York Mellon, formerly known as The Bank of New York, as Trustee, that The Bank of New York Mellon has resigned as Trustee under the Indenture.

Pursuant to Section 607 of the Indenture, Law Debenture Trust Company of New York, a New York banking corporation duly organized and existing under the laws of the State of New York, has accepted appointment as Trustee under the Indenture. The address of the Corporate Trust Office of Law Debenture Trust Company of New York is 400 Madison Avenue, 4 th Floor, New York, NY 10017.

The Bank of New York Mellon's resignation as Trustee and Law Debenture Trust Company of New York's appointment as successor Trustee were effective as of the opening of business on February 12, 2009.

Dated: New York, New York
February 12, 2009

Very truly yours,

By:
Name:
Title:

7

SCHEDULE I

NAME & ADDRESS OF REGISTERED HOLDERS:

NAME & ADDRESS OF BENEFICIAL HOLDERS:

8

**HIGHLY CONFIDENTIAL**

**NORTEL**



Exhibit 10.70

### Indemnity

In consideration of your service or continued service in any of the following capacities:

> as an officer of Nortel Networks Corporation (the "Corporation") and Nortel Networks Limited ("NNL");

> as a director of any entity of the Corporation to the extent that you are serving in such capacity at the request of the Corporation; or

> as an officer of any other entity to the extent that you are serving in such capacity at the request of the Corporation,

such capacities referred to herein as the "Indemnified Capacities", the Corporation with full power and authority to grant an indemnity valid and binding upon and enforceable against it in the terms hereinafter contained, hereby agrees to indemnify you to the full extent contemplated by this agreement.

**1.     Scope of Indemnity**

(a) The Corporation shall indemnify and hold you harmless for the full amount of any "Cost" (as hereinafter defined) reasonably incurred by you in connection with any "Proceeding" (as hereinafter defined) that may be made or asserted against or affecting you or in which you are required by law to participate or in which you participate at the request of the Corporation or in which you choose to participate (based on your reasonable belief that you may be subsequently named in that Proceeding or any Proceeding related to it) if it relates to, arises from or is based on your service in an Indemnified Capacity, in any case whether or not you have been named (an "Indemnified Claim").

(b) Subject to the terms hereof and any applicable policy of the Corporation relating to the reimbursement of expenses, the Corporation shall also indemnify and hold you harmless for the full amount of any other Cost reasonably incurred by you or to which you are subject if it relates to, arises from or is based on your service in an Indemnified Capacity (provided however that you shall not be entitled to indemnification in respect of any tax assessed on your income). Subject to the terms of any applicable policy of the Corporation, the Corporation shall also reimburse you for reasonable legal fees that you incur in connection with your retaining separate counsel in respect of a matter being considered by the board of directors of the Corporation.

(c) For the purposes of this agreement:

Nortel Networks Corporation
195 The West Mall Toronto ON Canada M9C 5K1

---

> (i)     "Indemnified Amount" means any amount which the Corporation is obliged to pay pursuant hereto;

> (ii)     "Cost" means all injury, liability, loss, damage, charge, cost, expense, fine or settlement amount whatsoever which you may reasonably incur, suffer or be required to pay (including, without limitation, all reasonable legal and other professional fees as well as all out- of- pocket expenses for attending discoveries, trials, hearings and meetings); and

> (iii)     "Proceeding" means any claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, investigation, inquiry, hearing or proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise.

**2.     Procedure for Making a Claim**

> (a)     If you wish to make any claim for payment of an Indemnified Amount to you by the Corporation hereunder, you shall deliver a written notice of such claim for payment to the Corporation, together with reasonable details and supporting documentation with respect to such claim (such written notice, together with such details and documentation, referred to herein as an "Indemnification Notice").

> (b)     Subject to obtaining any required court approval, the Corporation shall pay all Indemnified Amounts arising in connection with the matters described in the Indemnification Notice to you (or as you may direct) no later than 30 days after the date on which you deliver an Indemnification Notice on account of any such Indemnified Amount to the Corporation.

**HIGHLY CONFIDENTIAL**

(c)    The Corporation shall pay all Indemnified Amounts within the time period contemplated in this Section 2, subject to Section 6 hereof.

**3.    Notice of Claim**

(a)    <u>Notice to Corporation</u>

If you become aware of any Indemnified Claim or reasonably expect that an Indemnified Claim will be made, you will give the Corporation notice in writing promptly of such Indemnified Claim or potential Indemnified Claim.

- 2 -

(b)   Notice to Director or Officer

If the Corporation becomes aware of any Indemnified Claim or reasonably expects that an Indemnified Claim will be made, the Corporation will give you notice in writing promptly of such Indemnified Claim or potential Indemnified Claim.

**4.   Defence of Action**

(a)   By Corporation

The Corporation shall at its expense and in a timely manner contest and defend against any Indemnified Claim (other than an Indemnified Claim brought by the Corporation or any of its subsidiaries) and take all such steps as may be necessary or proper therein to prevent the resolution thereof in a manner adverse to you, including the taking of such appeals as counsel to the Corporation may advise are likely to succeed in the circumstances (which opinion shall be in writing and a copy thereof provided to you). In this regard, the Corporation will keep you fully informed on a timely basis of all steps and developments relating to the foregoing. The Corporation shall not agree to any settlement on your behalf without your written consent.

(b)   By Officer

Notwithstanding Section 4(a) hereof, you will be entitled to assume carriage of your own defence relating to any Indemnified Claim (and for greater certainty, the full amount of reasonable expense you incur in connection with such defence shall be an Indemnified Amount) if:

  (i)   the Corporation does not in a timely manner:

    (A)   undertake appropriate action; or

    (B)   take such legal steps as may be from time to time required to properly defend against any such claim; or

  (ii)   in the reasonable opinion of your counsel (which opinion shall be in writing and a copy thereof provided to the Corporation) your interests in respect of the relevant matter conflict with the interests of the Corporation in respect of such matter or with the interests of any other director or officer of the Corporation in respect of whose defence the Corporation has carriage;

provided that:

  (i)   you shall not agree to settle any Indemnified Claim without the prior written consent of the Corporation (unless you have a reasonable belief that the Corporation will not satisfy its obligations to you hereunder if the Indemnified Claim proceeds); and

- 3 -

**HIGHLY CONFIDENTIAL**                              **NNC-NNL06001427 / 314**

(ii)     if the Indemnified Claim would be covered by insurance maintained by the Corporation, you shall comply with the applicable conditions of such coverage (provided however, that failure to so comply shall not relieve the Corporation of its obligation to indemnify you hereunder).

## 5.    Former Directors and Officers

(a) You shall continue to be entitled to indemnification and advances hereunder in accordance with the terms hereof with respect to Indemnified Claims, even though you may no longer be acting in an Indemnified Capacity.

(b) You and your advisors shall at all times be entitled to review during regular business hours all documents, records and other information with respect to the Corporation or any entity in which you acted in an Indemnified Capacity which are under the Corporation's control and which may be reasonably necessary in order to defend yourself against any Proceeding that relates to, arises from or is based on your service in an Indemnified Capacity, provided that you shall maintain all such information in strictest confidence except to the extent necessary for your defence.

## 6.    No Obligation to Pay Indemnities Prohibited by Law

(a) Notwithstanding anything contained herein, the Corporation shall not pay any Indemnified Amount hereunder if the payment of such amount would be prohibited under the provisions of the *Canada Business Corporations Act* (the "CBCA") or otherwise by law.

(b) Without limitation to Section 6(a), you acknowledge that the CBCA prohibits the Corporation from indemnifying you unless you:

(i)     acted honestly and in good faith with a view to the best interests of the Corporation or, as the case may be, of NNL or any other entity to the extent that you are serving as a director or officer of that entity at the request of the Corporation; and

(ii)     in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, you had reasonable grounds for believing that your conduct was lawful (each of (i) and (ii) a "Condition").

(c) If the Corporation pays an Indemnified Amount which it is prohibited from paying by law (as determined by a court or administrative tribunal of competent jurisdiction in a final judgment that has become non- appealable), then such amount shall be deemed to have been an advance of Costs by the Corporation to you and upon written request by the Corporation, you shall repay such amounts to the Corporation. For greater certainty, it is acknowledged that the Corporation shall advance Costs to you or on your behalf in connection with an Indemnified Claim prior to the resolution of the merits of any action, provided that if a court or administrative tribunal of competent jurisdiction in a final judgment that has become non-appealable determines that you do not fulfill either of the Conditions, you shall repay such amounts to the Corporation.

- 4 -

**7.   Court Approval**

(a) If the Corporation is required under applicable law to obtain the approval of the court in order to pay any Indemnified Amount, the Corporation shall seek such approval forthwith upon demand by you for indemnification or advance.

(b) In the event of a dispute under this agreement, the Corporation shall apply to the court to approve a payment under this agreement forthwith upon receiving a written request from you to do so.

**8.   Insurance**

The Corporation will advise you promptly after it becomes aware of any material change in or withdrawal or lapse in coverage of any insurance policy of the Corporation's existing directors and officers, details of any claim made under such a policy and the triggering of any extended reporting period applicable to any such policy.

**9.   Enurement**

This indemnity and the benefit of the obligations of the undersigned hereunder shall inure to the benefit of you, your heirs, estate, executors and administrators and shall be binding upon the Corporation's successors and assigns.

**10.   Previous Indemnities**

This indemnity supersedes and replaces all prior indemnities entered into between the Corporation and you with respect to the subject matter of this indemnity, provided however, that nothing in this provision shall operate to restrict in any way any indemnity to which you are entitled under the Corporation's by- laws or otherwise at law.

**11.   Jurisdiction**

The courts of the Province of Ontario, Canada shall have exclusive jurisdiction with respect to all matters dealing with the enforcement of or otherwise arising out of or in connection with this indemnity, and by accepting and relying hereon you expressly and irrevocably submit and attorn to the exclusive jurisdiction of, and irrevocably agree to be bound by a judgment of, any such court relating to all such matters.

**12.   Notices**

Any notice permitted or required hereunder shall be made:

|  |  |
|---|---|
| (i) | to the Corporation at: Nortel Networks Corporation, 195 The West Mall, Toronto, Ontario, M9C 5K1, Attention: Chief Legal Officer (facsimile: 905.863.7386); and |
| (ii) | to you at                 **Address**<br>**City, Prov**<br>**Postal Code** |

- 5 -

HIGHLY CONFIDENTIAL

(or at such other address as you or the Corporation may from time to time specify) and shall be sufficiently given if delivered personally, if sent by mail or transmitted by fax and such notice shall be deemed to have been received on the date it is sent (or, if not sent on a day on which the Corporation is open for business at its head office (a "business day"), on the next business day), except for notices sent by mail, which will be deemed to have been received on the fifth business day following the date mailed.

**13.    Governing Law**

This indemnity shall in all respects be governed by and construed in accordance with the laws of the Province of Ontario, Canada, and all disputes, claims or matters arising out of or under it shall be governed by such laws.

DATED this      day of           , 2008.

                                                    **NORTEL NETWORKS CORPORATION**

                                                    by

                                                    Name:                                Gordon A. Davies

                                                      Title:                                Deputy General
                                                      Counsel and
                                                      Corporate Secretary

                                                      by

                                                      Name:                                Pavi Binning

                                                      Title:                                Chief Financial
                                                      Officer

The undersigned accepts the foregoing indemnity and agrees to comply with the terms and conditions set out above.


**[Name of Officer]**                                                           **[Witness]**

- 6 -



**NORTEL**

<u>**CONFIDENTIAL - SPECIAL HANDLING**</u>
           Exhibit 10.71

November 11, 2008
Mr. David Drinkwater
195 The West Mall
Toronto, Ontario
M9C 5K1
Dear David:

This letter ("Agreement") records the arrangements between you and Nortel Networks Limited ("NNL") concerning the cessation of your employment. The Agreement shall bind and inure to the benefit of each party and their respective heirs, successors and assigns. You acknowledge that this Agreement contains modifications to the arrangements provided to you in an earlier document on or about October 16, 2008 concerning the cessation of your employment.

1.     As used in this Agreement, the term "Corporation" shall mean Nortel Networks Corporation ("NNC"), its subsidiaries and affiliates, their successors and assigns, and all of their past and present officers, directors, employees and agents (in their individual and representative capacities), in every case, individually and collectively.

2.     You will cease to act as Chief Legal Officer of NNC and NNL effective December 31, 2008 and, you will be appointed Senior Advisor of NNC and NNL effective January 1, 2009. Effective as of the close of business on February 28, 2009, your active employment relationship with the Corporation will cease (the "Employment Termination Date") unless otherwise extended beyond February 28, 2009 by mutual agreement between you and the Corporation. You will cease to act as an officer and/or director of the Corporation and any of the Corporation's subsidiaries and affiliates on February 28, 2009, and the Corporation will take all necessary steps to remove you from all such positions.

3.     You understand and agree that your designation of Reporting Insider pursuant to Corporate Policy 320.28 of the Corporation (and under applicable Canadian/U.S. securities legislation for Reporting Insiders), shall cease effective 12:01 a.m. on March 1, 2009. Notwithstanding the fact that you no longer have this designation, if you are in possession of material non- public information relating to the Corporation, you are prohibited from trading in securities of the Corporation (or informing another person of the material non- public information) in accordance with applicable laws. You further understand that you are required to amend your insider profile within 10 days of February 28, 2009 on the Canadian System for Electronic Disclosure by Insiders (SEDI) to indicate that you are no longer a Reporting Insider of the Corporation. You should

    contact the Insider Reporting Department at (905) 863- 1220 and fax (905) 863- 8524 for assistance in amending the SEDI profile.

4.     Conditional upon your compliance with all terms and conditions of this Agreement, including, without restriction, paragraph 9 of this Agreement, the Corporation shall:

*(Severance Allowance)*

     (a)    pay you the sum of CAD$21,153.85 (Canadian dollars) bi- weekly, less applicable deductions, for the period commencing on March 1, 2009 and terminating August 31, 2010 ("Salary Continuation Period");

*(Vacation Benefit)*

     (b)    pay you, on or before March 31, 2009 a lump sum amount equivalent to 14 days of base salary representing all of your current accrued but unused vacation benefit, with no further vacation accrual subsequent to February 28, 2009;

*(2008 Nortel Networks Limited Annual Incentive Plan ("AIP"))*

     (c)    determine your eligibility for any AIP payment for calendar year 2008 in accordance with the terms and conditions of the 2008 AIP. Any payment under the Plan will be determined by the Corporation based on the terms and conditions of the Plan applicable to you as of this date, applying the corporate performance data applicable to all other participants. Eligibility shall not be construed as a right to any payment. In accordance with the AIP, you will not be eligible for any AIP payment for calendar year 2009 or any year thereafter;

*(Pension benefits)*

(d)   continue your participation and the related matching by the Corporation in the Capital Accumulation and Retirement Program (CARP) during the Salary Continuation Period, pursuant to the terms of the Northern Telecom Managerial and Non- Negotiated Pension Plan (the "Pension Plan") and the changes to the Pension Plan which became effective January 1, 2008. Your final Pension Plan benefits will be calculated in accordance with the Pension Plan provisions that apply to you as of the date of determination;

*(Long Term Incentives)*

(e)   consider you ineligible for consideration for any future grant(s) of stock options, restricted stock units ("RSUs") and performance stock units ("PSUs"). Stock

Page 2

options and RSUs previously granted to you will continue to vest during the Salary Continuation Period in accordance with the provisions of such plans. Your rights with respect to any outstanding stock options and RSUs will continue to be determined in accordance with the applicable Nortel equity plans and applicable Instruments of Grant and/or Instruments of Award. Subject to any applicable trading restrictions that may restrict your ability to trade Nortel securities, you will have the right to exercise any vested Nortel stock options or have any vested RSUs settled as set forth in Exhibit A in accordance with the terms of the applicable instruments of grant/award, equity plan(s) and any other relevant documents governing the options and RSUs. In addition, you acknowledge that, in certain circumstances, you agree that you will, if required by Nortel in its sole discretion, pay to Nortel an amount in cash equal to; (i) the amount by which the market value of the shares on the date of exercise of the options exceeds the exercise price (in the case of options); and (ii) the amount (subject to certain adjustments) equal to the number of RSUs that vested during the applicable period multiplied by the market value of the shares on the applicable settlement date (in the case of RSUs), all in accordance with the terms of the applicable instruments of award/grant and any other documents that govern. All outstanding unvested PSU's previously granted to you shall be forfeited and cancelled for no consideration in accordance with the applicable equity plan and instrument of award;

*(Investment Plan)*

(f)     following your completion of the necessary documentation, distribute your account balance in accordance with the provisions of the Nortel Networks Investment Plan. Your right to contribute to and participate in the Investment Plan will cease at the end of the Salary Continuation Period;

*(Income Tax Preparation)*

(g)     pay the cost of personal income tax preparation by a service provider selected by you for the tax years 2008, 2009 and 2010; and.

*(Taxation)*

(h)     with respect to any monies or monetary equivalents to be paid hereunder, in its reasonable discretion withhold appropriate amounts concerning any and all applicable federal and provincial taxes.

Page 3

**HIGHLY CONFIDENTIAL**        **NNC-NNL06001427 / 320**

*(Independent Legal Advice)*

      (i)      pay the cost of independent legal advice relating to this agreement to a maximum of $5,000.

5.    All of the Corporation's compensation, benefits and perquisites not expressly extended to or preserved for you pursuant to this Agreement shall be terminated effective 12:01 a.m., March 1, 2009.

6.    Regardless of whether you comply with this Agreement, the Corporation shall indemnify you, and advance any reasonable legal fees and expenses, to the extent permitted by, and in accordance with, section 124 of the Canada Business Corporations Act (the "CBCA") and the Corporation's By- Laws (the "By- Laws"). You shall repay such fees and expenses if and to the extent it is determined that you do not fulfill the conditions set forth in subsection 124(3) of the CBCA or the By- Laws. Subject to and without limiting the foregoing, the Corporation's legal counsel will represent you in respect of any civil, criminal, administrative, investigative (including any internal investigation or independent review being conducted by the Corporation's Board of Directors or a Committee thereof) or other proceeding in Canada, the United States or other applicable jurisdiction in which you are involved (including as a witness) because of your association with the Corporation (hereinafter, the "Matter"). However, in the event that the Corporation's counsel cannot represent you in the Matter because of a conflict, the Corporation agrees to advance monies to pay your reasonable and actual legal expenses in the Matter provided that you will not settle the Matter, retain defense counsel or expert witnesses or consultants, or incur any defense costs without obtaining the prior written consent of the Deputy General Counsel and Corporate Secretary, which consent will not be unreasonably withheld.

7.    It is agreed and understood that for the purposes of the Nortel Networks Corporation Change in Control Plan ("CIC Plan"), "Termination Date" as defined in the CIC Plan is February 28, 2009. In the event that in the 30 day period after February 28, 2009, you become eligible for the Entitlements (as defined under the CIC Plan) provided under the CIC Plan, this Agreement shall cease and be replaced by the terms and conditions of the CIC Plan.

8.    You shall reconcile and settle your employee expense account, and any advances made to you by the Corporation, as soon as possible, but in any event no later than March 31, 2009 and the Corporation shall in the normal course reimburse you for any business expenses incurred by you through the Employment Termination Date.

Page 4

HIGHLY CONFIDENTIAL