Intellectual Property and Confidentiality/Conflict of Interests. Also, the employment offer is contingent upon you providing certain legally required documentation such as those required under the Immigration Reform and Control Act of 1986, as well as the completion of background and reference checks to Nortel's satisfaction.

By your acceptance of this offer, you acknowledge that you have made Nortel aware of any fiduciary duties or restrictive agreements that may exist as a result of any former employment relationship. You are reminded of your continued obligations, if any, to any former employers with respect to confidential or proprietary information. In addition, by you signing this offer letter, you authorize Nortel to deduct from any monies it may owe you in the future, including, without limitation, salary, vacation pay, expense reimbursements, to the extent permitted by applicable law, and credit such amounts toward the repayment of any monetary amount(s) that you may owe Nortel pursuant to the provisions of this offer letter. Finally, you understand and acknowledge that you will not bring with you to Nortel, disclose to Nortel or use in the performance of your duties at Nortel, any confidential or proprietary information of a former employer which is not generally and lawfully available to the public.

I look forward to you joining Nortel and believe you will find your new position to be a challenging and rewarding experience.

If you are in accord and in agreement with the terms of this employment offer, please indicate your acceptance by signing and returning one copy of this offer letter to Ms. Leila Wong, Director, Executive and Equity Compensation, at 195 The West Mall, Toronto, Ontario, within one week of your receipt of this offer letter and retain the other for your files. If Ms. Wong does not receive your acceptance within that time period, this offer of employment will be withdrawn

Sincerely,


/s/ Dennis Carey
Dennis Carey
Executive Vice President, Corporate Operations


Accepted this 10 day of May, 2007                          Signature:     /s/ Steven Bandrowczak

Confirmed Start date: _____                          Date of Birth:   x/x/xx
Social Security #: xxx- xx- xxxx

**Dennis Carey**
**Executive Vice President, Corporate Operations**
**Nortel**
**195 The West Mall, Toronto, ON M9C 5K1 T 905- 863- 1109 dennis@nortel.com**



**CONFIDENTIAL- SPECIAL HANDLING**
January 6, 2009

Exhibit 10.77

Steve Bandrowczak
104 Charmwood Ct.
Cary, North Carolina
27518- 7102
Dear Steve:

I am writing to confirm your new role as Vice- President Enterprise Sales- Americas, of Nortel Networks Inc ("NNI") reporting to me, with an effective date of January 1, 2009. This role will be located in Raleigh, North Carolina. Nortel Networks Corporation ("NNC") and/or Nortel Networks Limited ("NNL") and/or any subsidiary, including NNI, where applicable, are collectively referred to herein as Nortel.

The initial key responsibilities and focus of this position have been discussed and communicated to you. I look forward to you playing a key role in this area and should you have any questions related to this position, I am available to further discuss them with you.

All dollar amounts contained herein are expressed in U.S. dollars. The terms of this agreement are as follows

**Base Salary**

Your base salary will remain unchanged at $425,000, calculated on a per annum basis and will be paid to you bi- weekly.

**Sales Incentive Award**

Effective January 1, 2009, you will be eligible to participate in the Nortel Sales Incentive Compensation Plan ("SIC") pursuant to its terms and conditions with a projected target award of $347,728, at 100% achievement. Further, effective January 1, 2009, you will no longer be eligible to participate in the Nortel Networks Annual Incentive Plan. Additional details regarding your 2009 SIC objectives within your new role will be discussed with you following your acceptance of this agreement.

**Recoupment of Incentive Based Compensation**

It is not anticipated in the normal course of events that you will have to re- pay Nortel for any incentive based compensation payments received during your employment tenure with Nortel. However, if the Compensation and Human Resources Committee ("CHRC") determines that you have committed intentional misconduct which contributes, directly or indirectly, to an

Joel Hackney
Nortel President, Enterprise Solutions
4001 E. CHAPEL HILL- NELSON HWY, P.O. BOX 13010, Research Triangle Park, NC 27709- 3010
T 919- 905- 4235
jhackney@nortel.com

---

error in financial information that materially affects the value of any incentive compensation realized by you, Nortel is entitled to issue proceedings to recover damages against you in respect of any losses incurred or as a result of or in connection with that intentional misconduct. Nortel may recoup any incentive compensation as an advance against such damages, whether or not proceedings are issued by Nortel. Incentive compensation payments that Nortel may recoup include all sales and incentive compensation, equity- based compensation, bonus payments and any matching pension plan payments made by Nortel. For further information please refer to the CHRC Policy Regarding Recoupment of Incentive Compensation.

**Benefits**

Your current entitlements under Nortel's employee benefit plans will not change as a result of your new position. You will continue to be entitled to four weeks of vacation per annum. Vacation is accrued monthly at the rate of 1.67 days per month of employment.

Also, as you are aware, we periodically review benefit plans and compensation programs, and make modifications, including enhancements and reductions as we deem appropriate.

**Change in Control**

You will continue to be eligible to participate in the Nortel Networks Corporation Change in Control Plan as a Tier 2 Executive.

**Reporting Insider**

You will continue to be designated a Reporting Insider under applicable Canadian securities legislation with respect to trades of securities of NNC.

**Share Ownership Guidelines**

As a senior executive you will continue to be expected under the Share Ownership Guidelines to own common shares of NNC equivalent to 300% of your base salary within five years from the effective date of this agreement. We strongly believe that it is important for senior executives to have this commitment. As a result, we review progress against these guidelines on a regular basis.

**Section 409A of the U.S. Internal Revenue Code**

The parties hereto intend that all benefits and payments to be made to you will be provided or paid to you in compliance with all applicable provisions of section 409A of the U.S. Internal Revenue Code of 1986 as amended, and the regulations issued thereunder, and the rules, notices and other guidance issued by the U.S. Internal Revenue Service.

Joel Hackney
Nortel President, Enterprise Solutions
4001 E. CHAPEL HILL- NELSON HWY, P.O. BOX 13010, Research Triangle Park, NC 27709- 3010
T 919- 905- 4235
jhackney@nortel.com

**Employment Relationship**

Your employment relationship with Nortel shall continue as that of employment at will and therefore such relationship is terminable at the will of either party and there is no employment agreement for a year or any other specified term.

I look forward to working with you and believe you will find your new position to be a challenging and rewarding experience.

If you are in accord with the terms of this role change memorandum, please sign and return one copy of this memorandum to Robert Holmes HR Leader, while retaining the other copy for your files.

Sincerely,

/s/ Joel Hackney
Joel Hackney
President, Enterprise Solutions
Accepted this ___16___ day of ___February___, 2009

/s/ Steve Bandrowczak
Steve Bandrowczak

Joel Hackney
Nortel President, Enterprise Solutions
4001 E. CHAPEL HILL- NELSON HWY, P.O. BOX 13010, Research Triangle Park, NC 27709- 3010
T 919- 905- 4235
jhackney@nortel.com

Exhibit 10.78

**Nortel- Flextronics** <span style="float:right">**Agreement dated January 13, 2009**</span>

## AMENDING AGREEMENT

This Amending Agreement ("Agreement") is entered into and made effective as of January 13, 2009 (the "Effective Date") by and between on the one hand Nortel Networks Limited ("Nortel"), and on the other hand Flextronics Telecom Systems Ltd. ("FTS") and Flextronics Corporation (f/k/a Solectron Corporation, "FC") (FTS and FC, collectively, "Flextronics"), on the terms and conditions set forth below.

WHEREAS, pursuant to the Amended and Restated Master Contract Manufacturing Services Agreement by and between Nortel and FTS, dated June 29, 2004 (as previously amended by the parties before the Effective Date, the "Flex MCMSA"), the agreement dated October 13, 2006 between Nortel and FTS (the "October Agreement") and the Master Contract Manufacturing Services Agreement by and between Nortel and FC, dated September 30, 2003 previously amended by Nortel and FC before the Effective Date) (the "SLR MCMSA") (the Flex MCMSA and SLR MCMSA and the October Agreement are each an "MCMSA" and are collectively referred to as the "MCMSAs"), the parties hereto are engaged in a complex contract manufacturing relationship whereby Flextronics purchases materials and components, assembles the materials into higher- level components and finished goods, stores and delivers such finished components and goods to Nortel based on Nortel's forecasts and demands;

AND WHEREAS, parties hereto are parties to (i) the Master Repair Services Agreement dated June 29, 2004, between Nortel and FTS, as amended by the parties thereto before the Effective Date, (ii) the Master Contract Logistics Services Agreement dated June 29, 2004, between FTS and Nortel, as amended by the parties thereto before the Effective Date, and (iii) the Master Contract Repair Services Agreement dated June 3, 2000, between Nortel and FT*[sic]*, as amended by the parties thereto before the Effective Date, (collectively the foregoing agreements are referred to as the "Related Services Agreements");

AND WHEREAS, the parties desire by this Agreement to amend the MCMSAs, to address certain outstanding obligations between them and to modify the terms on which the parties engage in their relationship;

NOW, THEREFORE, in consideration of the foregoing, the consideration recited below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, the parties agree as follows:

**1. Purchase of Inventories.** The parties have been engaged in ongoing discussions regarding the identification of various inventories that Flextronics currently holds on behalf of Nortel (individually and collectively, the "Inventory" or "Inventories"). Nortel will purchase the Inventories identified in the attached <u>Schedule A</u>, in the amount of \$120 million (U.S. dollars) (the "Inventory Purchase Amount"); Flextronics will deliver and transfer title for such Inventory to Nortel within 30 days of each payment made by Nortel as set forth below (e.g., following the first payment of \$25 million, Flextronics will deliver and transfer title to Nortel Inventory priced at \$25 million under the applicable pricing between the parties). Nortel will pay the Inventory Purchase Amount in advance of delivery by Flextronics in accordance with the following schedule:

\$25 million shall be paid by wire transfer initiated on January 14, 2009

\$50 million due and payable in full on January 20, 2009

\$25 million due and payable in full on April 1, 2009

\$20 million due and payable in full on July 1, 2009

The obligation of Flextronics to deliver and transfer title to up to \$120 million dollars in Inventory set forth in this Agreement shall not be subject to any claims of set off or counterclaim by Flextronics howsoever arising, in respect of any claim Flextronics may have as of, or prior to, the Effective Date.

Except as set out herein, all amounts owing to Flextronics by Nortel as of the date of Bankruptcy (as hereinafter defined) shall be subject to, and dealt with, in accordance with such a Bankruptcy and the court orders issued in connection therewith.

---

**Nortel- Flextronics** <span style="float:right">**Agreement dated January 13, 2009**</span>

The Inventory Purchase Amount will include a 3% cost of acquisition of Material and no additional charges or adders will be payable Flextronics agrees that Inventory to be delivered will be in compliance with the applicable Specification. Flextronics agrees to cooperate with Nortel, including by segregating Inventory and allowing access for Nortel, to provide a reasonable amount of time to validate the Inventory being transferred, such validation to be completed no later than 30 days after the date of payment.

**2. Accounts Receivable.** For the term of any Bankruptcy (as defined below), with respect to any amounts that come due for Products, Materials and services delivered or provided after the Effective Date, notwithstanding the payment terms set forth in the MCMSAs and the Related Services Agreements, Nortel will pay on a weekly basis, to be received by Flextronics the Wednesday of each week (unless the Wednesday is not a Business Day, in which case the payment will be the next Business Day) by wire transfer, all amounts due for Products, Materials, services or other items delivered or provided by Flextronics during the immediately previous week (Monday through Sunday).

**3. Pricing and Claims Processes.** After the Effective Date, the parties agree that the mechanisms for adjustments to pricing (including ROIC) and claims processes, other than the uplift percentage for underconsumption of liability pursuant to the SLR MCMSA, will remain in effect pursuant to the processes in place immediately prior to the Effective Date. Flextronics agrees that current transformation prices under the MCMSAs and Related Services Agreements, as applicable, will remain fixed during the term of any Bankruptcy (as defined below) through the end of calendar year 2009; if any Bankruptcy continues past such time, then the parties will negotiate pricing in accordance with the MCMSAs.

**4. Excess Inventory Obligations.**

(a) On the first day of each calendar quarter (i.e., January 1, April 1, July 1 and October 1), beginning April 1, 2009, and with respect to the current calendar quarter as soon as the parties can identify the applicable amounts (but with effect from January 1, 2009), Flextronics will provide to Nortel a report of the following inventories: (i) all Materials and Products in Flextronics's inventory that are in excess of Nortel's then- current forecast (i.e., the forecast loaded into Flextronics's MRP system by Nortel as of the first day of the quarter) for the next 6 months' of demand by Nortel (regardless of aging); (ii) all Materials and Products for which there is zero demand in the then- current forecast; (iii) all finished Products then in Flextronics's inventory and built in accordance with the MCMSAs (individually and collectively, such items identified in (i)- (iii), other than Materials and Products acquired before the Effective Date ("Quarterly E&O").

(b) Nortel will provide Flextronics with a purchase order covering such Quarterly E&O (the "QEO Order") no later than the first day of the second month of each calendar quarter,; payment for the Quarterly E&O will be due in full in accordance with the terms for payment set forth above. Flextronics will deliver such Quarterly E&O to Nortel or a designated storage facility or third party.

(c) Nortel shall not be liable to purchase Quarterly E & O that either (or both) (i) does not comply with applicable Specifications in accordance with the MCMSAs, or (ii) Nortel can demonstrate was not acquired using prudent purchasing practices in accordance with the MCMSAs, provided in either case (i.e., (i) or (ii)) that Nortel provides evidence of the basis for objection within 30 days of identification of such Quarterly E&O to Nortel.

**5. Changes to Supplier Terms.** Nortel will compensate Flextronics (and adjust terms with Flextronics as necessary) to address any changes to the terms for purchases of any NC Supplier or NCD Supplier.

**6. Transfers of Operations.** With respect to planned and previously- discussed transfers of operations (which include transfers from Flextronics to different Flextronics facilities, transfers from Flextronics to Nortel and transfers from Flextronics to third parties) (individually and collectively, "Transfers"):

(a) All Transfers currently subject to agreed- upon plans of record (e.g., PP15K, Calgary, M1 PCBA, Option 11) will remain subject to such plans of record, unless otherwise mutually agreed.

(b) The parties agree to consider specifically the discussed transfer of fastflow from Calgary to Flextronics operations in Columbia, South Carolina and M1 to Monkstown, and to evaluate the desirability of such potential Transfers.

**7. Available Remedies.** For the term of any Bankruptcy, if Nortel breaches any obligations set forth in this Agreement (and such breach continues for more than 2 Business Days following notice from Flextronics), including, without limitation, late payment on any amounts due to Flextronics, then Flextronics may, in addition to any other remedies available, at its option, stop shipment on any pending orders, suspend the Production Effort, cancel outstanding orders for Materials and demand pre- payments before accepting any additional Purchase Orders, after notice to Nortel of such breach.

**8. Filing to Court, Approval of Agreement.** Due to the central and strategic nature of Flextronics's services for Nortel, without which Nortel would be substantially impaired in its operations, in the event that Nortel files for any bankruptcy, reorganization or similar protections under the laws of Canada (any such proceeding individually and in combination, a "Bankruptcy"), Nortel will within 7 days following any filing petition the court, cooperate with Flextronics and otherwise use Nortel's best efforts to have this Agreement approved (or recognized, accepted or any similar designation as may be applicable) by the court with respect to such filing by Nortel. The objective of such efforts is to establish the enforceability of this Agreement in the context of the Bankruptcy and authorize Nortel to make the payments provided for herein. Nortel agrees that it will not, during the pendency of the Bankruptcy, treat any supplier or vendor of goods or services any better than the treatment afforded to Flextronics hereunder, in respect of pre- filing claims; provided, however, that this provision shall not apply to payments to be made by Nortel to other suppliers and vendors of goods or services in an amount of up to $30 million in the aggregate during the pendency of the Bankruptcy. As part of such filing, Nortel will describe in such petition(s) and approval(s) the terms and conditions in this Agreement or Nortel will attach a copy of this Agreement to such filings. Nortel agrees that Flextronics may, in its sole discretion, submit this Agreement to any court, monitor or similar authority in support of and as evidence Nortel's agreement and obligations hereunder.

**9. General.** Terms not defined herein will have the meanings provided in the applicable MCMSAs. To the extent of any conflict, inconsistency or ambiguity between and among this Agreement and the MCMSAs and October Agreement, this Agreement will control. Except as set forth herein, this Agreement is not a waiver or release of any rights or remedies available to either at law or in equity. Except as amended herein, the MCMSAs will continue to govern the relationship of the parties and will continue in effect in accordance with their respective terms; however, this Agreement will not in any way effect or negate the notice of termination of the SLR MCMSA that Flextronics provided to Nortel on January 12, 2009. If any of the provisions or terms of this Agreement are deemed unenforceable for any reason, then the parties agree that the rest of the Agreement should be given full force and effect to the greatest extent permissible under applicable law, and that the court interpreting such provision is entitled to amend or substitute a provision that gives effect to the original intent and meaning of the unenforceable provision to the greatest extent possible. This Agreement may be executed in counterparts, and each party hereto may affirm its assent by any electronic or facsimile means. This Agreement will be governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

[REST OF PAGE INTENTIONALLY LEFT BLANK  SIGNATURES FOLLOW]

**Nortel- Flextronics**                                             **Agreement dated January 13, 2009**

IN WITNESS WHEREOF, each party, by its respective duly- authorized representative identified below, acknowledges and agrees to the terms and conditions of this Amending Agreement.

**Nortel Networks Limited**                    **Flextronics Telecom Systems Ltd.**

/s/ Gordon A. Davies                              /s/ Manny Marimuthu
Signed                                            Signed

Gordon A. Davies                                  Manny Marimuthu
Print Name                                        Print Name

Chief Legal Officer and Corporate Secretary       Director
Title                                             Title

**Nortel Networks Limited**                    **Flextronics Corporation**

/s/ Anna Ventresca                                /s/ Michael Clarke
                                                  Signed

Anna Ventresca                                    Michael Clarke
                                                  Print Name

Assistant Secretary                               President, FlexInfrastructure
                                                  Title

## Schedule A
### Identification of Inventory

The parties acknowledge and agree that the specific inventory amounts, Materials and Products have been the subject of ongoing discussions, updates and negotiations and that the following breakdowns represent the agreements among the parties as to the nature of the Inventory that Nortel is purchasing. Flextronics will select the specific items to be delivered from the following identified categories, the details of which will be provided to Nortel.

Flextronics will select the specific items to be delivered based on the schedules of such items that have been delivered to and discussed with Nortel. The parties agree that the Inventory purchase by Nortel will include (without limitation) the following:

MEN (MD and other)

PP15K (RoHS and non- RoHS)

PP15K bonepile (Flextronics will continue debug efforts until June, 2009)

Flextronics will identify the applicable Inventory based on a snapshot of all Inventory currently held by Flextronics as of the Effective Date

HIGHLY CONFIDENTIAL

Exhibit 10.79

THIS AGREEMENT dated as of January 14, 2009 is made
BETWEEN
NORTEL NETWORKS LIMITED, as Principal
(hereinafter called the "**Principal**")
AND
EXPORT DEVELOPMENT CANADA
(hereinafter called "**EDC**")
WHEREAS, pursuant to a Second Amended and Restated Master Facility Agreement dated as of December 14, 2007 between the Principal and EDC (the "**Facility Agreement**"), EDC agreed to provide Support for the benefit of the Principal and its affiliates, subject to the terms and conditions of the Facility Agreement;
WHEREAS the NNL Corporate Family Rating with respect to senior unsecured long- term debt of the Principal has ceased to exist (the "**Family Rating Event**"), thereby permitting EDC to terminate or suspend the Facilities pursuant to Section 2.2 of the Facility Agreement;
WHEREAS the NNL Corporate Credit Rating with respect to senior unsecured long- term debt of the Principal is rated at less than "B3" or "B minus" (the "**Credit Rating Event**") (the Family Rating Event and the Credit Rating Event are hereby collectively referred to as the "**Rating Events**"), thereby permitting EDC to terminate or suspend the Facilities pursuant to Section 2.2 of the Facility Agreement; and
WHEREAS the Principal intends to commence a voluntary proceeding seeking relief including an initial order (the "**Initial Order**") under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") and the commencement of such proceedings (the "**Filing Event**") and the consequences of the Filing Event constitute a Default and an Event of Default under the terms and conditions of the Facility Agreement; and
WHEREAS EDC is prepared, with respect to the Rating Events, to temporarily refrain from exercising or enforcing the rights granted to it under Section 2.2 and waive the condition set forth in Section 3.1(g) of the Facility Agreement and, with respect to the Filing Event, to temporarily refrain from treating all commitments by EDC under the Facility Agreement as automatically terminated by virtue of Section 6.1 of the Facility Agreement and waive the condition set forth in Section 3.1(a) of the Facility Agreement, but only to the extent and on the terms and conditions set out in this Agreement;
THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged, the parties agree as follows:

1.    This Agreement cancels and replaces the Standstill and Waiver Agreement entered into by the Principal and EDC and dated as of December 15, 2008.

2.    Unless otherwise defined herein, words and phrases that are defined in the Facility Agreement have the meanings ascribed to them in the Facility Agreement.

3.    TEMPORARY FACILITY

     (a)    EDC agrees that, for a period of 30 days following the date of the Initial Order (the "**Interim Period**"), new Support will continue to be made available to the Principal under the Facilities, notwithstanding the existence of the Rating Events and the Filing Event, to an aggregate maximum amount of USD 30 million. Such amount includes, without limitation, any renewal or extension of Support which was made available by EDC prior to the Filing Event that matures or expires during the Interim Period.

     (b)    Except only with respect to the Rating Events and the Filing Event, nothing in this Agreement shall prevent EDC from exercising, during the Interim Period or thereafter, any other rights or recourses it may currently have or acquire under the Facility Agreement.

     (c)    Upon the termination of the Interim Period, EDC may enforce any and all rights and recourses it may have under the Facility Agreement as provided for therein, including those rights and recourses which may have arisen during the Interim Period.

4.    TERMS AND CONDITIONS

     (a)    The obligation of EDC to make any Support available under the Facilities during the Interim Period is, except as specifically stated above with respect to the Ratings Events and the Filing Event, subject to the satisfaction of all applicable conditions set forth in the Facility Agreement as well as the conditions set out in Schedule A to this Agreement.

     (b)    The Principal shall pay to EDC the fees set out, and reimburse EDC for the expenses described, in Schedule B to this Agreement.

     (c)    Nothing contained in this Agreement shall limit EDC's discretionary or other rights under the Facility Agreement with respect to the General Support Facility.

5.    MISCELLANEOUS

(a)     Save only as expressly provided in this Agreement, the provisions of the Facility Agreement continue in full force and effect, and the Facility Agreement and this Agreement shall be read and construed as one instrument.

2

(b)     This Agreement shall be governed and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

(c)     This Agreement may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(d)     This Agreement shall be binding upon and enure to the benefit of the parties and their respective successors and assigns.

(e)     Any provision of this Agreement may be amended or waived if such amendment or waiver is in writing and is signed by the Principal and EDC.

3

IN WITNESS WHEREOF the parties have signed and delivered this Agreement on the date first written above.

**NORTEL NETWORKS LIMITED, as Principal**

| | |
|---|---|
| Per: | /s/ J. Doolittle |
| Name: | J. Doolittle |
| Title: | Treasurer |
| | |
| Per: | /s/ Gordon A. Davies |
| Name: | Gordon A. Davies |
| Title: | CLO and Corporate Secretary |
| Address: | 195 The West Mall Toronto, Ontario M9C 5KI Facsimile: 905-863- 8563 |

**EXPORT DEVELOPMENT CANADA**

| | |
|---|---|
| Per: | /s/ Kirk Anderson |
| Name: | Kirk Anderson |
| Title: | Director  CIB |
| | |
| Per: | /s/ Derek Austin |
| Name: | Derek Austin |
| Title: | Manager - CIB |
| Address: | 151 O'Connor Street Ottawa, Ontario K1A 1K3 Facsimile: 613-597- 8504 |

**SCHEDULE A**
**CONDITIONS**

(a)   An order shall have been made on January 14, 2009 in the CCAA proceedings commenced by the Principal, in form and content reasonably satisfactory to EDC and its legal counsel, granting to EDC a court- ordered first charge on all of the property, assets and undertaking, wherever situate, of the Principal and of each of its affiliates that is a party to the CCAA filing (the "**EDC Charge**") as security for all Support which was made available by EDC during the Interim Period (including, without limitation, by way of any renewal or extension of Support made available by EDC prior to the Interim Period that matures or expires during the Interim Period) and for all fees and reimbursement of expenses owing by the Principal under this Agreement, except only that the EDC Charge may rank second to a court- ordered administrative charge in favour of the CCAA monitor and other professionals in a maximum amount of CDN 5 million and may rank second to a charge on the real property located at 3500 Carling Avenue, Ottawa, Ontario in favour of Nortel Networks Inc. given as security for debtor- in- possession financing provided to the Principal.

(b)   No motion or other proceeding shall have been threatened or commenced seeking to set aside the EDC Charge or to modify or vary the EDC Charge in any way, except with the express consent of EDC.

(c)   The Principal shall have paid to EDC any outstanding fees with respect to the Support owing to EDC as of the date of this Agreement.

(d)   EDC shall be satisfied on a case- by- case basis that any Support requested under the Small Bonds Facility during the Interim Period is within the parameters contemplated by the EDC Agreements in effect as of the date of this Agreement.

**SCHEDULE B**
**FEES AND EXPENSES**

(a)　For Support made available by EDC during the Interim Period (including, without limitation, by way of any renewal or extension of Support made available by EDC prior to the Interim Period that matures or expires during the Interim Period), the Principal shall pay to EDC prior to the issuance of any Support by EDC, a fee of 1.525% per annum calculated on the aggregate amount of such Support for the stated term thereof.

(b)　In anticipation of the fees to be paid by the Principal to EDC pursuant to paragraph (a) above, the Principal shall pay a deposit of USD 450,000.00 to EDC and such deposit shall be applied by EDC to any fees payable by the Principal to EDC. At the end of the Interim Period, the balance of the deposit, if any, shall be returned by EDC to the Principal.

(c)　The Principal shall reimburse EDC, on demand, for all reasonable fees and expenses of external legal counsel incurred by EDC in connection with the negotiation and preparation of this Agreement and the implementation of the arrangement between EDC and the Principal contemplated hereby, including with respect to the Filing Event.

Exhibit 10.80

THIS AMENDED AND RESTATED SHORT- TERM SUPPORT AGREEMENT (the "**Agreement**") dated as of February 10, 2009 is made
BETWEEN
NORTEL NETWORKS LIMITED
(hereinafter called the "**Principal**")
AND
EXPORT DEVELOPMENT CANADA
(hereinafter called "**EDC**")

WHEREAS, pursuant to a Second Amended and Restated Master Facility Agreement dated as of December 14, 2007 between the Principal and EDC
(the "**Facility Agreement**"), EDC agreed to provide Support for the benefit of the Principal and its affiliates, subject to the terms and conditions of
the Facility Agreement;

WHEREAS the NNL Corporate Family Rating with respect to senior unsecured long- term debt of the Principal has ceased to exist (the "**Family
Rating Event**"), thereby permitting EDC to terminate or suspend the Facilities pursuant to Section 2.2 of the Facility Agreement;

WHEREAS the NNL Corporate Credit Rating with respect to senior unsecured long- term debt of the Principal is rated at less than "B3" or "B minus"
(the "**Credit Rating Event**") (the Family Rating Event and the Credit Rating Event are hereby collectively referred to as the "**Rating Events**"),
thereby permitting EDC to terminate or suspend the Facilities pursuant to Section 2.2 of the Facility Agreement;

WHEREAS the Principal commenced a voluntary proceeding seeking relief including an initial order (as amended, the "**Initial Order**") under the
*Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") and the Principal's subsidiaries have commenced administration proceedings in the
United Kingdom and restructuring proceedings under Chapter 11 of the United States Bankruptcy Code (together, the "**Filing Event**"), and the Filing
Event and certain consequences of the Filing Event, including the inability to make certain representations pertaining to certain tax obligations and
tax compliance matters related to such United Kingdom and United States proceedings (the "**Filing Consequences**"), constitute or might constitute
Defaults and Events of Default under the terms and conditions of the Facility Agreement; and

WHEREAS the Principal and EDC entered into an Agreement dated as of January 14, 2009 (the "**Original Agreement**") pursuant to which EDC
agreed, among other things, that, for a period of 30 days following the date of the Initial Order obtained by the Principal under the CCAA, new
Support would continue to be made available to the Principal under the Facilities, notwithstanding the existence of the Rating Events and the Filing
Event, to an aggregate maximum amount of USD 30 million; and

WHEREAS the Principal and EDC wish to amend and restate the terms and conditions of the Original Agreement in accordance with the terms and
conditions herein.

THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged, the parties agree as follows:

1.    With effect as of the date hereof, the Original Agreement is hereby amended, superseded and restated in its entirety, without novation and
      without derogation from the rights and obligations of the Principal and EDC thereunder (save as amended hereunder).

2.    Unless otherwise defined herein, words and phrases herein shall have the meanings ascribed to them in the Facility Agreement, the Original
      Agreement or the Initial Order.

3.    TEMPORARY FACILITY

      (a)    EDC agrees that, for the period from January 14, 2009 to May 1, 2009 (the "**Interim Period**"), new Support will continue to be made
             available to the Principal under the Facilities, notwithstanding the existence of the Rating Events, the Filing Event and the Filing
             Consequences, to an aggregate maximum amount of USD 30 million. Such amount includes, without limitation, any increase in, or
             renewal or extension of, Support during the Interim Period under any EDC Agreement issued or executed before the Interim Period.

      (b)    Except only with respect to the Rating Events and the Filing Event, nothing in this Agreement shall prevent EDC from exercising, during
             the Interim Period or thereafter, any other rights or recourses it may currently have or acquire under the Facility Agreement.

      (c)    Upon the termination of the Interim Period, EDC may enforce any and all rights and recourses it may have under the Facility
             Agreement as provided for therein, including those rights and recourses which may have arisen during the Interim Period.

4.    TERMS AND CONDITIONS

      (a)    The obligation of EDC to make any Support available under the Facilities during the Interim Period is, except as specifically
             stated above with respect to the Ratings Events and the Filing Event, subject to the satisfaction of all applicable conditions set
             forth in the Facility Agreement as well as the conditions set out in Schedule A to this Agreement.

      (b)    The Principal shall pay to EDC the fees set out, and reimburse EDC for the expenses described, in Schedule B to this Agreement.

HIGHLY CONFIDENTIAL

(c)    Nothing contained in this Agreement shall limit EDC's discretionary or other rights under the Facility Agreement with respect to the General Support Facility.

2

5.    MISCELLANEOUS

(a)    Save only as expressly provided in this Agreement, the provisions of the Facility Agreement continue in full force and effect, and the Facility Agreement, the Original Agreement and this Agreement shall be read and construed as one instrument.

(b)    This Agreement shall be governed and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

(c)    This Agreement may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(d)    This Agreement shall be binding upon and enure to the benefit of the parties and their respective successors and assigns.

(e)    Any provision of this Agreement may be amended or waived if such amendment or waiver is in writing and is signed by the Principal and EDC.

[Remainder of page intentionally left blank]

3

HIGHLY CONFIDENTIAL      NNC-NNL06001427 / 376

IN WITNESS WHEREOF the parties have signed and delivered this Agreement as of the date first written above.

**NORTEL NETWORKS LIMITED, as Principal**

| | |
|---|---|
| Per: | /s/ John Doolittle |
| Name: | John Doolittle |
| Title: | Treasurer |
| | |
| Per: | /s/ Gordon A. Davies |
| Name: | Gordon A. Davies |
| Title: | Chief Legal Officer and |
| | Corporate Secretary |
| Address: | 195 The West Mall |
| | Toronto, Ontario M9C 5KI |
| | Facsimile: 905- 863- 8563 |

**EXPORT DEVELOPMENT CANADA**

| | |
|---|---|
| Per: | /s/ Derek Austin |
| Name: | Derek Austin |
| Title: | Manager |
| | |
| Per: | /s/ Paul Burdzy |
| Name: | Paul Burdzy |
| Title: | UNDERWRITER |
| | (SENIOR) |
| Address: | 151 O'Connor Street |
| | Ottawa, Ontario K1A 1K3 |
| | Facsimile: 613- 597- 8504 |

**SCHEDULE A**
**CONDITIONS**

(a)    An order shall have been made in the CCAA proceedings commenced by the Principal amending paragraph 33 of the Initial Order to read as follows:

"33. THIS COURT ORDERS that EDC shall be entitled to the benefit of and is hereby granted a charge on the Property (the "EDC Charge") as security for new Support (as that term is used in the short- term support agreement between NNL and EDC dated January 14, 2009 and the amended and restated short- term support agreement between NNL and EDC dated February 10, 2009), including any increases in, or renewals or extensions of, Support existing at January 14, 2009 and agreed to fees and expenses. The EDC Charge shall have the priority set out in paragraphs 42 and 44 hereof."

(b)    No motion or other proceeding shall have been threatened or commenced seeking to set aside the EDC Charge or to modify or vary the EDC Charge in any way, except with the express consent of EDC.

(c)    The Principal shall have paid to EDC any outstanding fees with respect to the Support owing to EDC as of the date of this Agreement.

(d)    EDC shall be satisfied on a case- by- case basis that any Support requested under the Small Bonds Facility during the Interim Period is within the parameters contemplated by the EDC Agreements in effect as of the date of this Agreement.

(e)    The Principal shall obtain EDC's prior written consent, which shall not be unreasonably withheld or delayed, to any amendments to letter of credit agreements entered into between the Principal and certain financial institutions.

(f)    On dates to be mutually agreed to by the Principal and EDC, the Principal shall deliver weekly reports to EDC, in form and substance satisfactory to EDC, acting reasonably, which set out EDC's outstanding exposure with respect to Instruments issued or to be issued on behalf of the Principal and its affiliates, including (i) the amounts of Instruments to be issued, increased, extended or renewed or to expire, and (ii) corresponding dates of issuance, increase, extension, renewal or expiry of such Instruments.

**HIGHLY CONFIDENTIAL**

## SCHEDULE B
## FEES AND EXPENSES

(a)    For Support made available by EDC during the Interim Period (including, without limitation, by way of any renewal or extension of Support made available by EDC prior to the Interim Period that matures or expires during the Interim Period), the Principal shall pay to EDC prior to the issuance of any Support by EDC, a fee of 1.525% per annum calculated on the aggregate amount of such Support for the stated term thereof.

(b)    EDC acknowledges receipt from the Principal of a deposit of USD 450,000.00. Such deposit shall be applied by EDC to the fees to be paid by the Principal to EDC pursuant to paragraph (a) above. At the end of the Interim Period, the balance of the deposit, if any, shall be returned by EDC to the Principal.

(c)    The Principal shall reimburse EDC, on demand, for all reasonable fees and expenses of external legal counsel and external financial advisors incurred by EDC in connection with the negotiation and preparation of this Agreement and the implementation of the arrangement between EDC and the Principal contemplated hereby, including in connection with the CCAA proceedings, the EDC Charge and the negotiation and preparation of EDC Agreements.

Exhibit 10.81

AMENDED AND RESTATED
NORTEL NETWORKS CORPORATION ("THE "CORPORATION")
DIRECTORS' REMUNERATION
(Amended to reflect changes effective January 14, 2009)

All information contained in this summary has been previously disclosed or will be disclosed in public filings of the Corporation.

| | | US Dollars | |
|---|---|---|---|
| CHAIRMAN OF THE BOARD FEE: | $ | | 75,000 per annum |
| COMMITTEE MEMBER RETAINERS: | $ | | 12,500 per annum (1) |
| Audit Committee (1) | | | |
| Nominating and Governance Committee | | | |
| Compensation and Human Resources Committee (2) | | | |
| Litigation Committee | | | |
| COMMITTEE CHAIRMAN RETAINER | $ | | 15,000 per annum (3) |
| Note: | | | |

1.   If on same Nortel Networks Limited (NNL) Committee, Committee member retainer is $6,250 per annum

2.   Joint committee of the Board of Directors of the Corporation and NNL

3.   If Chairman of same NNL Committee, Chairman retainer is $7,500 per annum

DIRECTORS' DEFERRED SHARE COMPENSATION PLAN

The payment of fees may, at the election of the director, be deferred under the Nortel Networks Corporation Directors Deferred Share Compensation Plan (the "Plan"). Directors are entitled to elect to receive all or a portion of their fees in the form of share units under the Plan (entitling the Directors to receive an equal number of common shares of the Corporation), with the remainder of such Fees to be paid in cash. The share units will be settled subject to and in accordance with the Plan upon a Director's retirement from the Board of Directors.

On January 14, 2009, the Canadian Court in the *Companies' Creditors Arrangement Act* proceedings (the "CCAA Proceedings") granted an order providing that the Corporation and NNL directors are entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall $25,000 reduction) notwithstanding the terms of or elections made under the Plan or the equivalent NNL plan. The $25,000 reduction has been reflected in the NNL director annual cash board retainer.

Note:

1.   Directors' fees are paid in quarterly installments at the end of each calendar quarter.

2.   Directors' fees generally are not payable to Directors who are salaried employees of the Corporation, NNL or of any of its or their subsidiaries.

GROUP LIFE INSURANCE

For each non- employee director in office on or after April 1, 1984, excluding those who are or who have been employees of the Corporation or of any of its subsidiaries, the Corporation shall maintain group life insurance in the amount of CDN$100,000 during tenure of office as such, and in the amount of CDN$75,000 in the event of retirement from such office at an age not less than 65 years or when having served, for not less than 10 years, as a director of the Corporation or any of its subsidiaries. At the discretion of the Nominating and Governance Committee of the Board of Directors of the Corporation, the Corporation will no longer maintain the life insurance benefit for active directors effective upon the election of directors at the 2008 annual meeting of shareholders. The Corporation's obligations with respect to group life insurance are currently being reviewed in the context of the CCAA Proceedings.

HIGHLY CONFIDENTIAL

Exhibit 10.82

## AMENDED AND RESTATED
## NORTEL NETWORKS LIMITED (THE "CORPORATION")
## DIRECTORS' REMUNERATION AND RETIREMENT COMPENSATION
(Amended to reflect changes effective January 14, 2009)

All information contained in this summary has been previously disclosed, or will be disclosed, in public filings of the Corporation.

**US Dollars**

| | | |
|---|---|---|
| CHAIRMAN OF THE BOARD FEE: | $ | 75,000 per annum |
| ANNUAL CASH BOARD RETAINER*: | $ | 150,000 per annum (1) |
| COMMITTEE MEMBER RETAINERS: <br> Audit Committee [2] <br> Pension Fund Policy Committee <br> Compensation and Human Resources Committee [3] | $ | 12,500 per annum (2) |
| COMMITTEE CHAIRMAN RETAINER <br> Note: | $ | 15,000 per annum (4) |

1.    Payable over four fiscal quarters

2.    If on same Nortel Networks Corporation Committee (NNC), Committee member retainer is $6,250 per annum

3.    Joint Committee of the Board of Directors of the Corporation and NNC

4.    If Chairman of same NNC Committee, Chairman retainer is $7,500 per annum

### DIRECTORS' DEFERRED SHARE COMPENSATION PLAN (THE "PLAN")

The payment of fees may, at the election of the director, be deferred under the Nortel Networks Limited Directors Deferred Share Compensation Plan (the "Plan"). Directors are entitled to elect to receive all or a portion of their fees in the form of share units under the Plan (entitling the Directors to receive an equal number of common shares of Nortel Networks Corporation), with the remainder of such fees to be paid in cash. The share units will be settled subject to and in accordance with the Plan upon a Director's retirement from the Board of Directors.

*On January 14, 2009, *The Canadian Court in the Companies Creditors Arrangement Act* proceedings (the "CCAA Proceedings") granted an order providing that the Corporation and NNC's directors are entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall $25,000 reduction) notwithstanding the terms of or elections made under the Plan or the equivalent NNC Plan. The $25,000 reduction is reflected above in the annual cash board retainer.

Note:

1.    Directors fees are paid in quarterly installments at the end of each calendar quarter.

2.    Directors' fees generally are not payable to Directors who are salaried employees of NNC, the Corporation or of any of its or their subsidiaries.

### RETIREMENT COMPENSATION

*DOES NOT APPLY TO DIRECTORS ELECTED AFTER JANUARY 1, 1996*

Each non- employee director who shall have retired on or after April 1, 1982 shall be paid retirement compensation comprising (1) a base element equal to a portion of the board retainer paid at the date of retirement and (2) an indexed element equal to a portion of any excess of the current board retainer from time to time over the board retainer paid at the date of retirement, as follows:

| | Base Retirement Compensation* | Indexed Retirement Compensation** |
|---|---|---|
| For directors who retired on or after April 1, 1984 | 75% | 56.25% |
| For directors who retired prior to April 1, 1984 | 50% | 37.5% |

For non- employee directors who retired on or after April 1, 1987, retirement compensation shall be paid in U.S. funds.

\*     75% of US$27,500 or 75% of the Board retainer fee payable when Director so ceased to hold office as such, whichever is greater;

**     Percentage of excess of prevailing Board retainer over Board retainer at date of retirement.

The retirement compensation shall be paid, during the lifetime of the director or their surviving spouse, for a period equal to the duration of the director's tenure as a member of the board of directors of the Corporation or ten (10) years, whichever may be the shorter. The Corporation's obligations with respect to retirement compensation are currently being reviewed in the context of the CCAA Proceedings.

Exhibit 10.83

### JOINT MEETING OF THE COMPENSATION AND HUMAN RESOURCES COMMITTEE AND THE BOARDS OF DIRECTORS OF NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED DECEMBER 12, 2008 EXTRACT

**Nortel Networks Corporation and Nortel Networks Limited**

Nortel Stock Purchase Plans

RESOLVED, That the termination of the Nortel Global Stock Purchase Plan, As Amended and Restated, the Nortel U.S. Stock Purchase Plan, As Amended and Restated and the Nortel Stock Purchase Plan for Members of the Savings and Retirement Program, As Amended is hereby approved effective December 12, 2008; and

RESOLVED, That the Senior Vice- President, Human Resources (or his/her designee) or the Chief Legal Officer (or his/her designee) are authorized to take, or cause to be taken, all such actions, to determine and pay any required fees and costs and to execute and deliver or file, or cause to be executed and delivered or filed, all such other agreements, instruments and other documents as such officer deems necessary or desirable to give effect to the foregoing resolutions, the taking of such actions and the execution and delivery or filing of any such documents to be conclusive evidence of the making of any determinations and the granting of any approvals as may be required under the foregoing resolutions with respect to such actions or documents, and Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") hereby approve, ratify and confirm any such actions taken, the determination and payment of any such fees and costs and the execution and delivery or filing of such other agreements, instruments and other documents by the proper officer of NNC and NNL in order to give effect to the foregoing.

**HIGHLY CONFIDENTIAL**

Exhibit 10.84

### Third Amendment to the Nortel Networks
### U.S. Deferred Compensation Plan

**WHEREAS,** Nortel Networks Limited (the "Company") sponsors the Nortel Networks U.S. Deferred Compensation Plan (the "Plan") and has reserved the right in Section 9.3. of the Plan to amend the Plan at any time in its sole discretion; and

**WHEREAS,** the Company has delegated to the Compensation and Human Resources Committee (the "CHRC") of the Board of Directors of the Company the right to approve amendments to the Plan at any time in its sole discretion; and

**WHEREAS,** the CHRC desires to amend the provisions of the Plan concerning participation in the Plan for the 2009 Plan Year; and

**NOW, THEREFORE,** the Plan is hereby amended in the following respects, effective as of January 1, 2009:

Section 2.3 of the Plan is hereby amended in its entirety to read as follows:

"2.3 Cessation of Participation. Active participation in the Plan shall end when a Participant's employment with all Employers that have adopted the Plan terminates for any reason or when the Board or the Committee determines, in its sole discretion, to remove such Participant from active participation in the Plan. No contributions to the Plan shall be made with respect to Salary, Bonuses or Commissions paid after either such termination or removal date.

Notwithstanding any other provision of the Plan, (i) no new Salary, Bonus, and/or Commission Deferral elections shall be permitted from April 1, 2004 to December 31, 2004, with respect to the 2004 Plan Year; (ii) no Salary, Bonus, and/or Commission Deferrals shall be permitted during and for the 2005 Plan Year, except with respect to Bonuses paid during 2005 for which the Participant elected a deferral prior to December 31, 2004; and (iii) no Salary, Bonus, and/or Commission Deferrals shall be permitted during and for the 2009 Plan Year."

IN WITNESS WHEREOF, this Amendment is hereby executed pursuant to the resolutions of the Compensation and Human Resources Committee of the Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited dated December 23, 2008 as of the 23rd day of December, 2008, to be effective as of January 1, 2009, except as otherwise indicated herein.

NORTEL NETWORKS LIMITED

BY:      /s/   Gordon A. Davies
NAME:   Gordon A. Davies
TITLE:   Chief Legal Officer and Corporate Secretary

BY:      /s/   Tracy S.J. Connelly McGilley
NAME:   Tracy S.J. Connelly McGilley
TITLE:   Assistant Secretary

Exhibit 10.85

MEETING OF THE COMPENSATION AND
HUMAN RESOURCES COMMITTEE OF
THE BOARDS OF
NORTEL NETWORKS CORPORATION AND
NORTEL NETWORKS LIMITED
FEBRUARY 19, 2009
EXTRACT

**Nortel Networks Corporation and Nortel Networks Limited**
Amendment to Severance Arrangements for David Drinkwater

RESOLVED, That the amendment to the severance arrangements for Mr. David Drinkwater, Senior Advisor of Nortel Networks Corporation and Nortel Networks Limited, to change his Employment Termination Date, as defined in the agreement between Nortel Networks Corporation and David Drinkwater dated November 11, 2008, to March 31, 2009, on the terms and conditions as recommended to the Committee, be approved.

**Exhibit 21**

**Subsidiaries of the Registrant**

| | Organized under the laws of |
|---|---|
| 1328556 Ontario Inc. | Ontario, Canada |
| AC Technologies, Inc. | State of Delaware |
| Alteon WebSystems AB | Sweden |
| Alteon WebSystems International Limited | Bermuda |
| Alteon WebSystems International, Inc. | State of Delaware |
| Alteon WebSystems, Inc. | State of Delaware |
| Architel Systems (U.S.) Corporation | State of Delaware |
| Architel Systems (UK) Limited | United Kingdom |
| Architel Systems Corporation | Canada |
| Bay Networks do Brasil Ltda. | Brazil |
| Bay Networks Redes de Dados para Sistemas Informaticos, Lda. | Portugal |
| Capital Telecommunications Funding Corporation | Canada |
| Clarify K.K. | Japan |
| Clarify Limited | United Kingdom |
| CoreTek, Inc. | State of Delaware |
| CTFC Canada Inc. | Canada |
| Diamondware, Ltd. | State of Arizona |
| Frisken Investments Pty. Ltd. | New South Wales, Australia |
| Integrated Information Technology Corporation | State of Illinois |
| Guangdong- Nortel Telecommunications Equipment Company Ltd. | People's Republic of China |
| LG- Nortel Co. Ltd. | Korea |
| Matra Communications Business Systeme GmbH | Germany |
| Matra Communication Cellular Terminals GmbH | Germany |
| Nortel Australia Communication Systems Pty. Limited | New South Wales, Australia |
| Nortel Communications Holdings (1997) Limited | Israel |
| Nortel Communications Inc. | Ontario, Canada |
| Nortel de Mexico, S. de R.L. de C.V. | Mexico |
| Nortel Government Solutions Incorporated | State of Delaware |
| Nortel GmbH | Germany |
| Nortel Limited | United Kingdom |
| Nortel Networks (Asia) Limited | Hong Kong |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks (Bulgaria) EOOD | Bulgaria |
| Nortel Networks (CALA) Inc. | State of Florida |
| Nortel Networks (China) Limited | People's Republic of China |
| Nortel Networks (India) Private Limited | New Delhi, India |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel Networks (Northern Ireland) Limited | Northern Ireland |
| Nortel Networks (Photonics) Pty Ltd | New South Wales, Australia |
| Nortel Networks (Shannon) Limited | Ireland |
| Nortel Networks (Thailand) Ltd. | Thailand |
| Nortel Networks AB | Sweden |
| Nortel Networks AG | Switzerland |
| Nortel Networks Applications Management Solutions Inc. | State of Delaware |
| Nortel Networks AS | Norway |
| Nortel Networks Australia Pty Limited | Australia |
| Nortel Networks BV | The Netherlands |
| Nortel Networks Cable Solutions Inc. | State of Delaware |
| Nortel Networks Capital Corporation | State of Delaware |
| Nortel Networks Chile S.A. | Chile |
| Nortel Networks Communications Engineering Ltd. | People's Republic of China |
| Nortel Networks Communications (Israel) Limited | Israel |
| Nortel Networks de Argentina S.A. | Argentina |
| Nortel Networks de Bolivia S.A. | Republic of Bolivia |
| Nortel Networks de Colombia S.A. | Colombia |

| | Organized under the laws of |
|---|---|
| Nortel Networks de Guatemala Ltda. | Guatemala |
| Nortel Networks de Mexico S.A. de C.V. | Mexico |
| Nortel Networks de Panama S.A. | Republic of Panama |

| | |
|---|---|
| Nortel Networks de Venezuela C.A. | Venezuela |
| Nortel Networks del Ecuador S.A. | Republic of Ecuador |
| Nortel Networks del Paraguay S.A. | Paraguay |
| Nortel Networks del Uruguay S.A. | Uruguay |
| Nortel Networks Eastern Mediterranean Ltd. | Israel |
| Nortel Networks Electronics Corporation | Canada |
| Nortel Networks Employee Benefit Trustee Company Limited | United Kingdom |
| Nortel Networks Engineering Service Kft. | Hungary |
| Nortel Networks Europe Sales Limited | Ireland |
| Nortel Networks Financial Services Limited Liability Company | Hungary |
| Nortel Networks France SAS | France |
| Nortel Networks Global Corporation | Canada |
| Nortel Networks Hispania, S.A. | Spain |
| Nortel Networks HPOCS Inc. | State of Delaware |
| Nortel Networks Inc. | State of Delaware |
| Nortel Networks India International Inc. | State of Delaware |
| Nortel Networks International Corporation | Canada |
| Nortel Networks International Finance & Holding B.V. | The Netherlands |
| Nortel Networks International Inc. | State of Delaware |
| Nortel Networks Israel (Sales and Marketing) Limited | Israel |
| Nortel Networks Japan | Japan |
| Nortel Networks Korea Limited | Korea |
| Nortel Networks Limited | Canada |
| Nortel Networks Malaysia Sdn. Bhd. | Malaysia |
| Nortel Networks Malta Limited | Malta |
| Nortel Networks Mauritius Ltd | Mauritius |
| Nortel Networks NV | Belgium |
| Nortel Networks Netas Telekomunikasyon A.S. | Turkey |
| Nortel Networks New Zealand Limited | New Zealand |
| Nortel Networks O.O.O. | Russia |
| Nortel Networks Optical Components Inc. | State of Delaware |
| Nortel Networks Optical Components Limited | United Kingdom |
| Nortel Networks Optical Components (Switzerland) GmbH | Switzerland |
| Nortel Networks OY | Finland |
| Nortel Networks Peru S.A.C. | Peru |
| Nortel Networks Polska Sp. z o.o. | Poland |
| Nortel Networks Portugal, S.A. | Portugal |
| Nortel Networks Properties Limited | United Kingdom |
| Nortel Networks Romania Srl | Romania |
| Nortel Networks S.A. | France |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks S.R.O. | Czech Republic |
| Nortel Networks Singapore Pte Ltd. | Singapore |
| Nortel Networks Slovensko, s.r.o. | Slovak Republic |
| Nortel Networks South Africa (Proprietary) Limited | South Africa |
| Nortel Networks Southeast Asia Pte Ltd | Singapore |
| Nortel Networks Technology (Thailand) Ltd. | Thailand |

 NNC-NNL06001427 / 386

| | Organized under the laws of |
|---|---|
| Nortel Networks Technology K.K. | Japan |
| Nortel Networks Technology Corporation | Nova Scotia, Canada |
| Nortel Networks Technology Ltd. | Cayman Islands |
| Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd. | People's Republic of China |
| Nortel Networks Telecomunicacoes do Brasil Ltda. | Brazil |
| Nortel Networks UK Limited | United Kingdom |
| Nortel Technology Excellence Centre Private Limited | Bangalore, India |
| Nortel Telecom International Limited | Nigeria |
| Nortel Trinidad and Tobago Limited | Trinidad and Tobago |
| Nortel Ukraine Ltd. | Ukraine |
| Nortel Ventures LLC | State of Delaware |
| Nortel Vietnam Limited | Vietnam |
| Northern Telecom Canada Limited | Canada |
| Northern Telecom France SA | France |
| Northern Telecom International Inc. | State of Delaware |
| Northern Telecom Maroc SA | Morocco |
| Northern Telecom PCN Limited | United Kingdom |
| Nor.Web DPL Limited | United Kingdom |
| Novera Optics, Inc. | State of Delaware |
| Novera Optics Korea Inc. | Korea |
| Pentil Datacomm Limited | United Kingdom |
| Periphonics Limited | United Kingdom |
| Promatory Communications (UK) Limited | United Kingdom |
| PT Nortel Networks Indonesia | Jakarta, Indonesia |
| Qtera Corporation | State of Delaware |
| R. Betts Investments Pty. Ltd. | New South Wales, Australia |
| Regional Telecommunications Funding Corporation | Canada |
| Shenyang Nortel Telecommunications Co., Ltd. | People's Republic of China |
| Sonoma Limited | United Kingdom |
| Sonoma Systems | State of California |
| Sonoma Systems Europe Limited | United Kingdom |
| Star 21 Networks GmbH | Germany |
| Star 21 Facility Management GmbH & Co. KG | Germany |
| Star 21 Facility Management Verwaltung GmbH | Germany |
| Star 21 NETWORKS Deutschland GmbH | Germany |
| Star 21 NETWORKS (Schweiz) AG | Switzerland |
| Star 21 Operations GmbH | Germany |
| Telephone Switching International Limited | United Kingdom |
| The Nortel Foundation | State of Virginia |
| TSFC Canada Inc. | Canada |
| X- CEL Communications Limited | United Kingdom |
| Xros, Inc. | State of Delaware |

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the following Registration Statements and Amendments in effect of our reports dated March 2, 2009, with respect to the consolidated balance sheets of Nortel Networks Corporation and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of operations, changes in equity (deficit) and comprehensive income (loss) and cash flows for the years then ended, and the related consolidated financial statement schedule, and the effectiveness of internal control over financial reporting as of December 31, 2008, which reports appear in the December 31, 2008 Annual Report on Form 10- K of Nortel Networks Corporation:

Registration Statement on Form S- 3
(Nortel Networks/BCE 1985 Stock Option Plan and the
Nortel Networks/BCE 1999 Stock Option Plan)
(333- 11888)

Registration Statement on Form S- 3 and all Post- Effective Amendments thereto
(Qtera Corporation)
(333- 11454)

Registration Statement on Form S- 3 and all Post- Effective Amendments thereto
(Dividend Reinvestment Plan)
(33- 62270)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Stock Purchase Plan)
(333- 11270)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks NA Inc. 1998 Employee Stock Purchase Plan)
(333- 9570)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks NA Inc. 1994 Stock Option Plan)
(333- 9066)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Qtera Corporation Amended and Restated Stock Incentive Plan)
(333- 11452)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Periphonics Corporation 1995 Stock Option Plan, as Amended and
Periphonics Corporation 1995 Non- Employee Director Stock Option Plan)
(333- 10980)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Clarify Inc. 1991 Stock Option/Stock Issuance Plan,
Clarify Inc. 1999 Non- Executive Stock Option/Stock Issuance Plan,
Clarify Inc. Amended and Restated 1995 Stock Option/Stock Issuance Plan,
Clarify Inc. Non- Employee Directors Option Plan,
OBJTX Systems Development, Inc. Stock Plan and
Certain Separate Option Agreements)
(333- 11110)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(333- 11342)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(333- 6152)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto

(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(33- 88214)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(33- 61904)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(33- 11640)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Promatory Communications, Inc. 1997 Stock Plan and Promatory Communications, Inc. 1999 Stock Plan)
(333- 11798)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Inc. Long- Term Investment Plan)
(333- 7366)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Inc. Long- Term Investment Plan)
(33- 25333)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 2000 Stock Option Plan)
(333- 11876)

Registration Statement on Form S- 8
(Xros, Inc. 1999 Stock Plan)
(333- 12176)

Registration Statement on Form S- 8
(Architel Systems Corporation 1994 Flexible Stock Incentive Plan,
1996 Stock Option Plan of Architel Systems Corporation,
Amended and Restated Accugraph Corporation 1996 Stock Option Plan,
Accugraph Corporation Key Employee Stock Option Plan and
Accugraph Corporation 1992 Directors and Officers Stock Option Plan)
(333- 12228)

Registration Statement on Form S-8
(CoreTek, Inc. 1998 Employee, Director and Consultant Stock Option Plan)
(333-12286)

Registration Statement on Form S-8
(EPiCON, Inc. 1995 Stock Plan, as Amended)
(333-12644)

Registration Statement on Form S-8
(Alteon WebSystems, Inc. 2000 Non Statutory Incentive Plan,
1999 Equity Incentive Plan,
1999 Stock Purchase Plan and
Pharsalia Technologies, Inc. 2000 Equity Incentive Plan)
(333-12760)

Registration Statement on Form S-8
(Sonoma Systems 1996 Stock Option Plan, as Amended and
Sonoma Systems 1999 Stock Option Plan, as Amended)
(333-49304)

Registration Statement on Form S-8 and all Post-Effective Amendments thereto
(Nortel Networks U.S. Deferred Compensation Plan)
(333-11558)

Registration Statement on Form S-3
(JDS Uniphase Corporation)
(333-57510)

Registration Statement on Form S-8
(Nortel Networks Stock Purchase Plan)
(333-70482)

Registration Statement on Form S-3
(Shasta Networks, Inc.)
(333-10310)

Registration Statement on Form S-8
(Nortel Networks Company Savings Plan)
(333-70504)

Registration Statement on Form S-8
(Nortel Networks Stock Purchase Plan)
(333-106633)

Registration Statement on Form S-8
(Long-Term Investment Plan)
(333-106654)

Registration Statement on Form S- 8
(Nortel Global Stock Purchase Plan, Nortel U.S. Stock Purchase Plan and
Nortel Stock Purchase Plan for Members of the Nortel Savings and Retirement Program)
(333- 126250)

Registration Statement on Form S- 8
(Nortel 2005 Stock Incentive Plan)
(333- 135768)

Registration Statement on Form S- 8
(Nortel 2005 Stock Incentive Plan, As Amended and Restated,
Nortel U.S. Stock Purchase Plan, As Amended and Restated
Nortel Global Stock Purchase Plan, As Amended and Restated
Nortel Stock Purchase Plan for Members of the Savings and Retirement Program, As Amended)
(333- 151901)

Our report dated March 2, 2009 contains an explanatory paragraph that states that the Company filed for creditors protection for itself and certain
subsidiaries, which raises substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements and
financial statement schedule do not include any adjustments that might result from the outcome of this uncertainty.

In addition, our report refers to changes in accounting for fair value measurements, pensions and uncertainty in income taxes.

/s/ KPMG LLP

Chartered Accountants, Licensed Public Accountants

Toronto, Canada

March 2, 2009

Exhibit 23.2

## CONSENT OF INDEPENDENT REGISTERED CHARTERED ACCOUNTANTS

We consent to the incorporation by reference in the following Registration Statements and Amendments of our reports dated March 15, 2007, except as to notes 5, 6, 7 and 24, which are as of September 7, 2007 and the effect of the retrospective adjustments for a change in the segment performance measure as described in note 6, which is as of March 2, 2009, relating to the consolidated statements of operations, changes in equity (deficit) and comprehensive income (loss) and cash flows and to the consolidated financial statement schedule of Nortel Networks Corporation ("Nortel") for the year ended December 31, 2006 (which audit report on the consolidated statements of operations, changes in equity (deficit) and comprehensive income (loss) and cash flows expressed an unqualified opinion, and includes a separate report titled Comments by Independent Registered Chartered Accountants on Canada- United States of America Reporting Difference referring to changes in accounting principles that have a material effect on the comparability of the financial statements) appearing in the Annual Report on Form 10- K of Nortel for the year ended December 31, 2008:

Registration Statement on Form S- 3
(Nortel Networks/BCE 1985 Stock Option Plan and the
Nortel Networks/BCE 1999 Stock Option Plan)
(333- 11888)

Registration Statement on Form S- 3 and all Post- Effective Amendments thereto
(Qtera Corporation)
(333- 11454)

Registration Statement on Form S- 3 and all Post- Effective Amendments thereto
(Dividend Reinvestment Plan)
(33- 62270)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Stock Purchase Plan)
(333- 11270)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks NA Inc. 1998 Employee Stock Purchase Plan)
(333- 9570)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks NA Inc. 1994 Stock Option Plan)
(333- 9066)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Qtera Corporation Amended and Restated Stock Incentive Plan)
(333- 11452)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Periphonics Corporation 1995 Stock Option Plan, as Amended and
Periphonics Corporation 1995 Non- Employee Director Stock Option Plan)
(333- 10980)

Page 2

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Clarify Inc. 1991 Stock Option/Stock Issuance Plan,
Clarify Inc. 1999 Non- Executive Stock Option/Stock Issuance Plan,
Clarify Inc. Amended and Restated 1995 Stock Option/Stock Issuance Plan,
Clarify Inc. Non- Employee Directors Option Plan,
OBJIX Systems Development, Inc. Stock Plan and
Certain Separate Option Agreements)
(333- 11110)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(333- 11342)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(333- 6152)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(33- 88214)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(33- 61904)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
(33- 11640)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Promatory Communications, Inc. 1997 Stock Plan and Promatory Communications, Inc. 1999 Stock Plan)
(333- 11798)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Inc. Long- Term Investment Plan)
(333- 7366)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Inc. Long- Term Investment Plan)
(33- 25333)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks Corporation 2000 Stock Option Plan)
(333- 11876)

Registration Statement on Form S- 8
(Xros, Inc. 1999 Stock Plan)
(333- 12176)

Page 3

Registration Statement on Form S- 8
(Architel Systems Corporation 1994 Flexible Stock Incentive Plan,
1996 Stock Option Plan of Architel Systems Corporation,
Amended and Restated Accugraph Corporation 1996 Stock Option Plan,
Accugraph Corporation Key Employee Stock Option Plan and
Accugraph Corporation 1992 Directors and Officers Stock Option Plan)
(333- 12228)

Registration Statement on Form S- 8
(CoreTek, Inc. 1998 Employee, Director and Consultant Stock Option Plan)
(333- 12286)

Registration Statement on Form S- 8
(EPiCON, Inc. 1995 Stock Plan, as Amended)
(333- 12644)

Registration Statement on Form S- 8
(Alteon WebSystems, Inc. 2000 Non Statutory Incentive Plan,
1999 Equity Incentive Plan,
1999 Stock Purchase Plan and
Pharsalia Technologies, Inc. 2000 Equity Incentive Plan)
(333- 12760)

Registration Statement on Form S- 8
(Sonoma Systems 1996 Stock Option Plan, as Amended and
Sonoma Systems 1999 Stock Option Plan, as Amended)
(333- 49304)

Registration Statement on Form S- 8 and all Post- Effective Amendments thereto
(Nortel Networks U.S. Deferred Compensation Plan)
(333- 11558)

Registration Statement on Form S- 3
(JDS Uniphase Corporation)
(333- 57510)

Registration Statement on Form S- 8
(Nortel Networks Stock Purchase Plan)
(333- 70482)

Registration Statement on Form S- 3
(Shasta Networks, Inc.)
(333- 10310)

Registration Statement on Form S- 8
(Nortel Networks Company Savings Plan)
(333- 70504)

Registration Statement on Form S- 8
(Nortel Networks Stock Purchase Plan)
(333- 106633)

Page 4

Registration Statement on Form S- 8
(Long- Term Investment Plan)
(333- 106654)

Registration Statement on Form S- 8
(Nortel Global Stock Purchase Plan, Nortel U.S. Stock Purchase Plan and
Nortel Stock Purchase Plan for Members of the Nortel Savings and Retirement Program)
(333- 126250)

Registration Statement on Form S- 8
(Nortel 2005 Stock Incentive Plan)
(333- 135768)

Registration Statement on Form S- 8
(Nortel 2005 Stock Incentive Plan, As Amended and Restated,
Nortel U.S. Stock Purchase Plan, As Amended and Restated
Nortel Global Stock Purchase Plan, As Amended and Restated
Nortel Stock Purchase Plan for Members of the Savings and Retirement Program, As Amended)
(333- 151901)

/s/ Deloitte & Touche LLP
Independent Registered Chartered Accountants
Licensed Public Accountants
Toronto, Canada
March 2, 2009

HIGHLY CONFIDENTIAL

Exhibit 24

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each of the undersigned directors of NORTEL NETWORKS CORPORATION (the "Corporation"), which is about to file with the Securities and Exchange Commission (the "SEC"), Washington, D.C. 20549, under the provisions of the Securities Exchange Act of 1934, as amended, an Annual Report on Form 10- K (the "Annual Report") for the fiscal year ended December 31, 2008, hereby constitutes and appoints Gordon A. Davies and Tracy S.J. Connelly McGilley his or her true and lawful attorneys- in- fact and agents, and each of them, with full power to act without the other, for him or her and in his or her name, place and stead, in any and all capacities, to sign such Annual Report and any and all amendments thereto, and other documents related thereto, with power where appropriate to affix the corporate seal of the Corporation thereto and to attest said seal and to file such Annual Report and amendments thereto, with all exhibits thereto, and any and all other information and documents in connection therewith, with the SEC, hereby granting unto said attorneys- in- fact and agents, and each of them, full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises, as fully as to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys- in- fact and agents, or any of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have signed this Power of Attorney this 2nd day of March, 2009.

| | | |
|---|---|---|
| /s/ J. H. BENNETT | /s/ M. BISCHOFF | /s/ J.B. HUNT, JR. |
| J.H. Bennett | M. Bischoff | J.B. Hunt, Jr. |
| | | |
| /s/ K.M. JOHNSON | /s/ J.A. MACNAUGHTON | /s/ J.P. MANLEY |
| K.M. Johnson | J.A. MacNaughton | J.P. Manley |
| | | |
| /s/ R.D. MCCORMICK | /s/ C. MONGEAU | /s/ H.J. PEARCE |
| R.D. McCormick | C. Mongeau | H.J. Pearce |
| | | |
| /s/ M.S. ZAFIROVSKI | | |
| M.S. Zafirovski | | |

**HIGHLY CONFIDENTIAL**

Exhibit 31.1

**Certification**

I, MIKE S. ZAFIROVSKI, certify that:

1.  I have reviewed this Annual Report on Form 10- K for the year ended December 31, 2008 of Nortel Networks Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d- 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d- 15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2009

/s/ Mike S. Zafirovski
MIKE S. ZAFIROVSKI
President and Chief Executive Officer

Exhibit 31.2

**Certification**

I, PAVITER S. BINNING, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2008 of Nortel Networks Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2009

/s/ Paviter S. Binning
PAVITER S. BINNING
Executive Vice-President, Chief Financial Officer
and Chief Restructuring Officer

Exhibit 32

**Certification**
**Pursuant to Section 906 of the Sarbanes- Oxley Act of 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes- Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of Nortel Networks Corporation, a Canadian corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Annual Report on Form 10- K for the year ended December 31, 2008 (the "Form 10- K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in the Form 10- K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 2, 2009

/s/ Mike S. Zafirovski
MIKE S. ZAFIROVSKI
President and Chief Executive Officer

Dated: March 2, 2009

/s/ Paviter S. Binning
PAVITER S. BINNING
Executive Vice- President, Chief Financial Officer
and Chief Restructuring Officer

**HIGHLY CONFIDENTIAL**    NNC-NNL06001427 / 399