# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

## REPLY AFFIDAVIT OF PAVITER BINNING SWORN APRIL 24, 2014

### Submitted by the Canadian Allocation Group (including the CCC)

---

[1]        The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**- COMMERCIAL LIST**

**IN THE MATTER OF**
**THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36,**
**AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**REPLY AFFIDAVIT OF PAVITER BINNING**
**(Sworn April 24, 2014)**

I, Paviter Binning, of the City of Toronto, in the Province of Ontario, **MAKE OATH**
**AND SAY:**

1.      I was the Executive Vice-President and Chief Financial Officer ("CFO") of Nortel

Networks Limited ("NNL") and Nortel Networks Corporation ("NNC") from November

2007 to March 2010, as well as the Chief Restructuring Officer from February 2009 until

March 2010 following the filing by NNC, NNL and the other applicants (the "Canadian

Debtors") for protection under the *Companies' Creditors Arrangement Act*. As such, I

have personal knowledge of the matters to which I hereinafter depose.  Capitalized terms

used herein and not otherwise defined have the meaning given to them in my affidavit

sworn on April 10, 2014 (my "April 10 Affidavit").

2.      I swear this affidavit in relation to whether the main Nortel operating companies (which

included principally, the U.S., Canada, England, Ireland or France) (which are referred to

for the purpose of the affidavit, the "country-specific entities") had the ability to operate on a standalone basis or to emerge from bankruptcy as an operating entity.

3.      During my tenure at NNC and NNL, both before and after the bankruptcy filings, many restructuring options were considered.  This included the CDMA Co. restructuring option which, for the reasons set out in my April 10 Affidavit, was not ultimately pursued.

4.      At the time, no one involved in considering these options believed it was a viable option to restructure along geographic lines; it was not viable for country-specific entities to independently continue without the support of elements of the wider Nortel group.  There were many reasons for this including:

(a)      The Nortel group's business structure was highly integrated.  This structure was typical of a multi-national and it allowed the Nortel group to gain efficiencies by coordinating and centralizing capabilities, areas of expertise and common cost centres.  Accordingly, restructuring on the basis of country-specific entities that would operate completely independent of each other would have introduced redundant and unsustainable costs and would have been extremely time consuming to create;

(b)      R&D capability would have been an integral part of any restructured business – whether along geographical lines or otherwise – except as discussed below, and no individual country-specific entity had independent R&D capability to sustain any of the lines of business on its own; and

(c)      A scaled down, country-specific entity was unlikely to be palatable to customers who are always concerned with the long term financial ability of their supplier to

invest in R&D resources and provide support for product over the long term and such concerns, in the context of Nortel's bankruptcy proceedings, would have applied to a country-specific restructuring. In this highly competitive industry, customers had the option to provide their business to any number of global players with significant resources to invest in R&D to support their global business.

*Nortel's Integrated Operations*

5.      Nortel's operations globally including in the U.S., Canada, EMEA and the rest of the world were integrated within the Nortel business worldwide. Despite the performance of local functions and existence of local capabilities, I can say from personal experience that both prior to the bankruptcy filings and after them, each country-specific entity relied heavily on Nortel's global functions, including in areas such as R&D, treasury, strategy and finance. They also relied on the most senior management of the Nortel group located primarily in Canada. This is typical of how global companies are run and consistent with my experience.

*R&D Capability*

6.      Importantly, any country-specific standalone business would have required the right R&D capacity to service existing needs of customers and expand into future technology. R&D can mean many things and embodies a broad range of different areas. However, R&D specialization within the "leading technology" area, takes time to develop and such development carries   risk – it is not a commodity that can be easily purchased or replaced, but to have it is a competitive advantage in the technology industry.

- 4 -

7.    Nortel's R&D activities were integrated across statutory entities and the R&D organization relied on capabilities in different countries.   R&D capabilities in any one specific country were not broad enough to support or develop the product offerings of any individual line of business other than possibly with respect to the optical business (also known as metro ethernet networks or MEN) in Canada.   That said, during my time at Nortel, I visited the Ottawa R&D facility on a number of occasions and my recollection was that there was extensive R&D presence in Ottawa supporting each of the lines of business and my recollection is that, in fact, the majority of Nortel's R&D employees overall were located in Ottawa.

8.    CDMA was the largest revenue generator for the Nortel business, but by 2008 and 2009, customers of the CDMA business (primarily large telecommunications companies, such as Verizon, one of the largest or the largest telecommunications company in the U.S.) were moving or planning to move from 2G (CDMA) into 3G (UMTS) and/or 4G (LTE) technology.   The R&D for CDMA was conducted primarily out of each of Canada, the U.S. and China and was, in many respects, maintaining a declining technology. In contrast, the vast majority of the R&D for LTE (the next generation technology), was taking place in Canada.   As I note above, this R&D specialization and capability is a competitive advantage and cannot be obtained or created overnight. Instead, acquiring or developing that capability by any country-specific entity outside of Canada would have been time consuming and expensive.

*Customer Sustainability*

9.    In my April 10 Affidavit, I referred to the potential restructuring around the CDMA business. As I also mentioned, the CDMA business (which included the LTE assets, discussed below), was eventually sold to Ericsson (although Nokia Siemens Networks was the initial stalking horse purchaser in the sale process).  The CDMA technology was a legacy business and its technology was considered to be, as indicated above, "2nd generation" or 2G technology.

10.   Given the significant investment involved for transitioning a customer from CDMA to LTE, it was essential to customers that their supplier have: (1) the R&D and technology capability to transition them into LTE as well as a plan for development and support over time of new and enhanced technology (i.e. a product road map); and (2) the financial stability to invest in, implement and sustain the road map.

11.   The situation with Verizon was an example of customer concerns.  As I note in my April 10 Affidavit, Verizon advised Nortel in early 2009 that it would not be able to support Nortel's business going forward and would not be awarding Nortel with its 4G/LTE contracts despite the high quality of the LTE technology and the road map that was in place.  Verizon communicated that it wanted to see that technology put into "safe hands" (i.e. a supplier that both had the road map but also was financially stable).  Nortel, the multi-national organization, had industry leading LTE technology and the future road map but even despite that, Verizon was prepared to go with another supplier if Nortel was not put into safe hands.  Therefore, it is unlikely that any country-specific entity on its own would have satisfied Verizon's requirements.

- 6 -

12.     In and around this time, other customers had similar concerns.  I was often asked by the sales team to speak to significant customers who wanted the assurance that they had the support of the whole Nortel global enterprise.  Nortel's business environment was highly competitive and customers had other options available to them.  Retention of these customers on any scaled down basis, particularly with the loss of Verizon, would have been extremely difficult.

*Nortel Business Services ("NBS")*

13.     NBS was not a separate statutory entity or a line of business but was a service vehicle that utilized resources from multiple Nortel entities.  NBS' did not have a permanent existence as its primary function was to provide transitional services over a relatively short time period to purchasers of the business lines who were the new owners and operators of the business. NBS was established within the Nortel matrix organization and was comprised of personnel around the world (although primarily in the US and Canada).

SWORN BEFORE ME at the City of
Toronto, in the Province of Ontario on
April 24, 2014.

_____
Niklas Holmberg
Commissioner for Taking Affidavits

_____
PAVITER BINNING

IN THE MATTER OF

THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C 36,

AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS
AMENDED

Commercial List Court File No:
09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### - COMMERCIAL LIST

Proceeding commenced at Toronto

---

### REPLY AFFIDAVIT OF
### PAVITER BINNING

---

| | |
|---|---|
| **GOODMANS LLP**<br>Barristers & Solicitors<br>333 Bay Street, Suite 3400, Toronto, Ontario M5H 2S7<br><br>**Benjamin Zarnett** LSUC#17247M – bzarnett@goodmans.ca<br>**Jay Carfagnini** LSCU#22293T – jcarfagnini@goodmans.ca<br>**Jessica Kimmel** LSUC#32312W – jkimmel@goodmans.ca<br>**Joseph Pasquariello** LSUC# 38390C – jpasquariello@goodmans.ca<br>**Peter Ruby** LSUC# 38239P – pruby@goodmans.ca<br>Tel: 416.979.2211 / Fax: 416.979.1234<br><br>Lawyers for the Monitor, Ernst & Young Inc. | **GOWLING LAFLEUR HENDERSON LLP**<br><br>Barristers & Solicitors<br>1 First Canadian Place<br>100 King Street West, Suite 1600<br>Toronto, ON  M5X 1G5<br><br>**Derrick Tay**  LSUC#: 21152A – derrick.tay@gowlings.com<br>**Jennifer Stam** LSUC#: 46735J – jennifer.stam@gowlings.com<br><br>Tel:  416.862.5697 / Fax:  416.862.7661<br><br>Lawyers for the Applicants |

6322829