**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**AFFIDAVIT OF GORDON DAVIES SWORN APRIL 11, 2014**

**Submitted by the Canadian Allocation Group (including the CCC)**

---

[1]        The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF GORDON DAVIES**

I, GORDON DAVIES, of the City of Oakville, in the Province of Ontario, make oath and
say:

1.            I am a former Nortel employee. Between 1993 and 2009, I held a number of
positions of increasing responsibility within the legal group at Nortel including, ultimately, the
position of Chief Legal Officer and Corporate Secretary. Upon my appointment as Assistant
Secretary of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") on
January 23, 2003, I became an officer of those two entities. I continued to be an officer of NNC
and NNL, in my various roles, until I left Nortel (by which I mean the global enterprise and,
collectively, all of the entities in it) in August 2009.

- 2 -

2.           Between 1998 and early 2003, I worked in Europe, supporting the businesses carried on within Nortel's Europe, Middle East and Africa ("EMEA") region. During that time, I was a director of a number of Nortel subsidiaries within EMEA ("EMEA Companies").

3.           I understand that the Joint Administrators have asserted claims, on behalf of a number of EMEA Companies, alleging that during the period that I was simultaneously an officer of NNL and NNC, and a director of certain EMEA Companies (in the parlance of this proceeding, the period when I was a "Cross-Appointee"), I breached the duties I owed to the EMEA Companies in question.

4.           I further understand that the claims against me are related to claims that the EMEA Companies have also asserted against NNC and NNL, which allege that various transactions carried out during the period 2000 to 2008 benefited NNC and/or NNL and were not in the best interests of the various EMEA Companies.

5.           I am swearing this affidavit to provide evidence regarding a number of issues which have been raised in the dispute between the various Nortel entities regarding the allocation of proceeds generated by the dispositions of Nortel's assets, and in the claims asserted by the various EMEA Companies. I have personal knowledge of the matters to which I depose in this affidavit, except where otherwise indicated. I have read each and every document referred to in this affidavit before I signed it.

6.           Nortel, the global enterprise, relied on the skills and hard work of a broad cross-section of highly capable, professional and hard-working individuals occupying senior positions in multiple disciplines around the world. Throughout my time at Nortel, we were a world-class technology business and a market leader in an extraordinarily complex and competitive

- 3 -

environment. Regardless of where we worked, and what entity we worked for, I believe we strove to ensure the success of the overall enterprise, because that is what was in the best interests of the Nortel group, every entity within it, and all of the employees, pensioners, suppliers, customers and others who depended on it. To suggest that there was some sort of adversity between the various Nortel entities, or that they were trying to take advantage of one another, or to cast aspersions on the individuals who worked so hard on behalf of Nortel, strikes me as very wrong. The Nortel described in the claims asserted in this proceeding does not reflect the organization I was proud to serve for over sixteen years.

## My Career At Nortel

7.        I am a lawyer, qualified to practice law in Canada. Following my call to the bar of Ontario in 1991, I practiced for approximately two years as a securities lawyer at McMillan Binch (as it then was). I joined Nortel in 1993 as Corporate Counsel, working out of Nortel's Brampton office. I eventually became Senior Securities Counsel and Assistant Secretary in 1996.

8.        In or about May 1998, I relocated to France and assumed the position of General Counsel, Enterprise Solutions for EMEA. In May of 2001, I moved to England and became the Assistant General Counsel for EMEA. In September 2002, I became General Counsel for EMEA, a position I held until January 2003.

9.        When I held the positions of General Counsel, Enterprise Solutions and Assistant General Counsel for EMEA, I reported to the General Counsel at EMEA. When I assumed the position of General Counsel for EMEA, I reported to the Chief Legal Officer for the business who was an NNL employee based in Brampton.

- 4 -

10.        In the various positions I held with EMEA my day to day interaction was with EMEA business leaders, and my primary role was to provide support to, and act on behalf of, Nortel's European businesses, including in relation to corporate and M&A matters in which various EMEA Companies were involved. I remained an NNL employee – my paycheque came from NNL – but my job was to provide advice and support to the leadership within EMEA.

11.        Effective as of January 23, 2003 I was appointed Assistant General Counsel – Securities and Assistant Secretary for NNL and NNC. I moved back to Canada at about that time. In November 2004 I became General Counsel – Corporate and Corporate Secretary, a position I held until December 2008. Also during that period I served as acting Chief Legal Officer for a period in 2005 and again in 2007. I assumed the role of permanent Chief Legal Officer in January 2009, a position I held until I left Nortel.

12.        In September 2009 I joined Open Text Corporation, a publicly-traded, multinational company, as its Chief Legal Officer and Corporate Secretary, a position I still hold.

13.        For a number of reasons, Nortel conducted business in Europe through corporations incorporated in various European jurisdictions. These were the EMEA Companies. With the exception of certain joint ventures, the EMEA Companies were all, directly or indirectly, wholly-owned by NNL and, ultimately, NNC.

14.        During my time in Europe, I was appointed as a member of the boards of directors of a number of EMEA Companies, many of which are now in administration in the U.K. These boards were constituted in accordance with the requirements of the countries in which they were incorporated, and were made up of a mix of senior Nortel employees. This is discussed further below.

- 5 -

15.        I resigned as a director of the EMEA Companies at about the time that I assumed

the role of Assistant General Counsel – Securities and Assistant Secretary for NNL and NNC (at

which point, as noted above, I became an officer of NNL and NNC). Accordingly, in respect of

most of the EMEA Companies that are making claims against me I was either never a Cross-

Appointee, or a Cross-Appointee for a very short period. This is summarized in the following

table:

| EMEA COMPANY | BOARD TENURE | CROSS-APPOINTMENT* |
|---|---|---|
| Nortel Networks UK Limited | November 1, 2002 to January 17, 2003 | None |
| Nortel Networks Ireland Ltd. | October 2, 2000 to December 25, 2002 | None |
| Nortel Networks s.p.a. (Italy) | December 10, 1998 to February 27, 2003 | January 23, 2003 to February 27, 2003 |
| Nortel Networks Hispania S.A. (Spain) | December 9, 1998 to February 3, 2003 | January 23, 2003 to February 3, 2003 |
| Nortel Networks BV (Holland) | December 11, 2001 to January 17, 2003 | None |
| Nortel Networks GmbH (Germany) | January 13, 2002 to February 28, 2003 | January 23, 2003 to February 28, 2003 |
| Nortel Networks (Austria) GmbH (Austria) | March 15, 2002 to February 6, 2003 | January 23, 2003 to February 6, 2003 |
| Nortel Networks Engineering Service Kft (Hungary) | March 20, 2002 to January 17, 2003 | None |
| Nortel Networks AS (Norway) | March 12, 2002 to January 13, 2003 | None |
| Nortel Networks Srl (Romania) | December 5, 2001 to January 17, 2003 | None |
| *  I became an officer of NNL and NNC on January 23, 2003 | | |

- 6 -

## The EMEA Boards

16.        To the extent that I understand the claims that have been asserted against me and the other Cross-Appointees, it appears that they share two basic premises. The first is that the Cross-Appointees viewed their role simply as to ensure that "the course of action required by NNL" was implemented, irrespective of the best interests of the EMEA Companies of which we were directors. The second is that the Cross-Appointees (and, it appears, all of the other members of the EMEA Companies' boards) were either unaware of, or ignored, the duties they owed to the EMEA Companies.

17.        From my perspective both as someone who actually was a director of EMEA Companies, and as someone who was a senior lawyer at Nortel during the years in question, those assertions are false. The first I ever heard anyone from within or outside of the organization levy such an accusation against anyone was when the Joint Administrators asserted claims against the Cross-Appointees.

### EMEA Company Directors

18.        The EMEA Companies' boards of directors were, at all times, constituted so as to comply with whatever legal requirements were imposed by the jurisdiction of incorporation: for example, requirements as to the nationality of the directors. I am not aware of any circumstance in which these requirements were not met, and I am not aware that there is any allegation in this proceeding or elsewhere that they were not.

19.        The boards of the EMEA Companies typically consisted of a mixture of senior EMEA finance, treasury, legal or operations staff. The board of Nortel Networks UK Limited ("NNUK") also usually had members who were senior Nortel employees based in Canada. In my

- 7 -

experience, both as a board member and as a senior member of Nortel's legal team throughout the relevant period, board members were chosen so as to ensure that there was an appropriate range of skills and experience to permit the board to discharge its responsibilities.

20.        There were three main internal criteria that we considered in the selection of new board members:

     (a)     "in country" requirements, meaning any necessary requirements for local board representation were met. We were also cognizant of the importance of having a senior local person;

     (b)     having someone with finance experience, who could evaluate whether financial commitments to the EMEA Company were being honoured and it was able to meet its statutory and other obligations; and

     (c)     having someone with legal experience to oversee compliance with legal obligations owed by and to it.

21.        By design, these boards included highly qualified, senior professionals with important roles within the organization. They understood their responsibilities and understood the exigencies of the business, both globally and locally.

22.        For example, the NNUK board was the most significant of the EMEA Companies' boards because to a significant degree EMEA's activities were centralized in, and carried out by, NNUK. The NNUK board was typically composed of a cross-section of very high-ranking Nortel employees. The Chief Financial Officer of NNL often sat on the NNUK board, as did the most senior lawyer within EMEA, as well as other senior EMEA employees. I

was a member of the NNUK board for a brief period, while I was the General Counsel to EMEA. During the time that I was on the NNUK board, other directors included Doug Beatty, Chief Financial Officer of NNL, Bill LaSalle, who was the General Counsel for Nortel's operations group, Michel Gasnier, who was the Vice President of Finance for EMEA, based in England, Iain Morgan, the Vice President of Vendor Finance, based in England, and Geoff Lloyd, the Vice President of Human Resources for EMEA, also based in England. In my view, these were all senior people who thoroughly understood their respective spheres of responsibility and the overall strategic direction of the business, both in EMEA and globally. This was representative of the types of people who typically sat on the NNUK board. The other EMEA Company boards were made up of similarly senior, experienced people.

23.        It is simply not the case that EMEA Companies' boards were populated by "yes men" who did not understand their responsibilities.

### *Support for EMEA Company Directors*

24.        In addition to populating EMEA Company boards with individuals who occupied senior positions within the organization, Nortel's practice was to inform those individuals as to the substance of their obligations as directors. For example, in or about 1998 I recall working on a pamphlet designed to ensure that the officers and directors of Nortel joint ventures and the EMEA Companies understood their responsibilities and fiduciary duties. Where there were differences between the responsibilities or fiduciary duties owed in different jurisdictions, those differences were highlighted. The pamphlet also contained examples of the types of decisions that board members might have to make and how they should go about making those decisions, including entering into arm's length contracts with other Nortel entities. The pamphlet also explained that if a director felt that he or she had a conflict, they were to recuse themselves.

- 9 -

Training sessions were held to ensure that directors understood their responsibilities as set out in the pamphlet.

25.         **Exhibit 32165** is a copy of a presentation entitled "Country Managers' and Directors' Training". That presentation contained an overview of the directors' responsibilities, including their duty of care and fiduciary duty and a specific admonition that directors should exercise independent judgment for the overall benefit of the company and its shareholder. Although the manner in which this information was delivered varied from time to time, to my knowledge it was consistently provided to individuals who sat as directors of EMEA Companies, either via a one-on-one briefing from a member of the EMEA legal group, or via group presentations. This was the practice when I joined the EMEA legal group, it was the practice while I was a member of the EMEA legal group, and it was continued by my successors.

26.         I do not recall anyone ever suggesting to me that they did not understand the content of the duties they owed to an EMEA Company of which they were a director. I certainly do not recall anyone suggesting to me that they viewed their role as a director to be simply to implement whatever NNL wanted.

27.         While I was a member of the EMEA legal group, we maintained a corporate governance database (held initially at the offices of Crowell & Moring, an external law firm engaged by EMEA). It was a repository of the statutory requirements of the various jurisdictions in which the EMEA Companies were incorporated, directors' registers and other resource materials.

28.         EMEA's legal and finance groups worked together to ensure that the EMEA Company boards met at least as often as required, that the matters that were required to be

- 10 -

remitted to the boards were remitted to them, and that practices were in place to ensure that directors had sufficient information on the basis of which they could make the decisions they were called upon to make.

29.        Substantially all of the support that the directors received came from within EMEA. The NNUK office in Maidenhead, England was the "head office" for EMEA. EMEA had its own finance, treasury, legal, human resources and other key functions, which were performed in Maidenhead or in other EMEA locations. As described in detail in the Witness Statement of Sharon Rolston [Exhibit 31443], which was filed with the UK court when the orders of administration in respect of certain EMEA Companies were sought in January 2009, EMEA's operations were carried out in a manner consistent with the overall strategic direction and policies and procedures of the Nortel group, which were established in Brampton. However, EMEA nevertheless operated with a considerable degree of autonomy, and had significant "in house" capability, both in terms of the number of people and their expertise, so as to enable EMEA to carry out its various functions.

30.        Part of the role of EMEA staff was to brief the directors of EMEA Companies on issues that the directors were called upon to consider. For example, EMEA Companies prepared and filed, in accordance with local requirements, financial statements and tax returns. When financial statements came before EMEA Company boards for approval, the practice was to circulate them in advance and bring to the attention of the directors any information that required their specific consideration.

31.        Directors were also briefed by EMEA staff on other significant matters that required their consideration. For example, Exhibit 33051 is a copy of the briefing note that was provided to the NNUK board when an intercompany loan was put in place from NNUK to NNL.

- 11 -

The Joint Administrators now allege that the directors of NNUK knew or ought to have known that the loan was not in the best interests of NNUK. Exhibit 33051, which encapsulates the advice received at the time from EMEA tax, treasury, and finance staff, was precisely to the contrary.

32.        As far as I am aware, board packages were circulated in advance of board meetings for all EMEA Companies. The process of preparing and circulating board packages for EMEA Company directors was controlled by EMEA, and primarily by EMEA's legal group. While I was at EMEA, we also established a practice of having directors of EMEA Companies meet in person with EMEA staff when filings or other matters needed to be reviewed. No one from outside EMEA would participate in these meetings.

33.        The EMEA Companies were also able to, and did, obtain independent external advice as and when it was required. For example, the intercompany loan from NNUK to NNL was extended and the size of the facility increased from time to time. **Exhibit 21103** is a copy of the minutes of an NNUK board meeting held in October 2005. At that meeting, the board directed the tax and legal departments to determine whether it was appropriate to extend or increase the loan, or otherwise restructure it. NNUK obtained independent external advice, a copy of which is at **Exhibit 31174**. That advice was addressed to two senior EMEA lawyers, Dara Gill and Christian Waida. Mr. Waida was also a director of NNUK.

34.        The discussions that took place in connection with Project Swift are another illustration of EMEA Company directors obtaining and considering internal and external advice. Certain of the transactions contemplated by Project Swift were conditionally approved by the NNUK board at a meeting held December 20, 2007. The minutes of that meeting are at **Exhibit 31155**. The attachments to those minutes reflect that the NNUK board received several briefings

- 12 -

from EMEA staff regarding the progress of Project Swift. They had questions for both internal staff and Ernst & Young regarding the valuations, and those questions were answered. They required a comfort letter from NNL regarding the absence of plans to discontinue the business, which was provided, and their ultimate approval was conditional on NNL approving a guarantee in favour of the NNUK pension trustee, which was also provided.

35.         I also note that Project Swift was, to my understanding, conceived of and driven by EMEA tax and treasury personnel. Kerry Stephens, who was a key architect of Project Swift, was in attendance (by telephone) at the NNUK board meeting at which Project Swift was considered. NNUK directors Sharon Rolston and Simon Freemantle were senior EMEA treasury staff, and would have been familiar with Project Swift in connection with their day to day responsibilities. The other directors at the time were Bill LaSalle and Christian Waida, two senior lawyers based in Canada and the UK, respectively.

## Cross-Appointees Discharged Their Duties

36.         As mentioned above, the EMEA Companies now allege, through the Joint Administrators, that their boards of directors acted essentially *pro forma*. For example, the claim made by the Joint Administrators on behalf of NNUK alleges that the role of the NNUK board was "limited to the fulfilment of statutory functions", and that when NNL wanted something that required the approval of the NNUK board, "this would be obtained through representatives of NNL contacting the necessary board member(s) and setting out the course of action required by NNL."

- 13 -

37.        In my view, that is not the case, either with respect to NNUK or with respect to any of the other EMEA Company boards that I sat on and/or interacted with during my time at Nortel.

## *Working as Part of a Global Organization*

38.        It is impossible to divorce the best interests of the EMEA Companies from the context in which they operated. Nortel was a matrix organization. Its significant transactions and business initiatives were usually devised and led by lines of business, which were not organized by geography. As a result, the transactions that came before the various EMEA Company boards often had implications for a number of entities within Nortel.

39.        The various entities within Nortel also operated with a high degree of integration and interdependence. NNL was the owner of the intellectual property that was used by the enterprise (in about July 2008 NNL hired John Veschi as the head of the IP law group to examine also developing a licensing option for the IP as a separate revenue stream, although this did not come to fruition). The EMEA Companies were in the business of selling Nortel products and services – products and services that used or embodied NNL's intellectual property – all of which was done under license from NNL. Those products and services were conceived, developed, paid for, manufactured, marketed and sold as part of a cohesive global effort, using the resources of Nortel entities worldwide.

40.        The effect of a particular decision on the global organization was therefore a highly relevant consideration for the directors of the EMEA Companies. In my view, we all understood that in circumstances of insolvency or near-insolvency the directors had a particular obligation to consider the interests of the EMEA Company's creditors. As discussed below,

- 14 -

when that became a concern, I believe the EMEA Company directors discharged that obligation.
Outside of those circumstances, what was good for the global organization was also, in the vast
majority of cases, good for the individual entities that made up the global organization.

41.        That was precisely the point that EMEA Treasury and Finance staff made to the
board of NNUK when they recommended that NNUK make the intercompany loan to NNL in
the briefing note referred to above. NNUK benefited from being part of the overall intra-group
arrangements. It was in the best interests of each entity within the organization, including
NNUK, that cash within the organization be used prudently and efficiently to the benefit of the
health of the overall enterprise. It was not in the best interests of any entity, including NNUK, for
cash to accumulate in NNUK, if that meant some other Nortel entity had to borrow money from
a bank in order to develop, market or make the products that NNUK sold. That was not a *pro
forma* consideration. That was a fact.

42.        For all of these reasons, in the ordinary course of business and in the vast majority
of cases, the directors of an EMEA Company would approve matters that were submitted to
them. They did not do so irrespective of the best interests of the EMEA Company. On the
contrary, they did so for the very reason that doing so was in the best interests of the EMEA
Company.

43.        The claims against me and the other Cross-Appointees appear to be premised on
the assertion that the Cross-Appointees "preferred" the interests of some entities within Nortel to
the interests of the EMEA Companies as though they were somehow adverse to one another. The
entities within Nortel were not competing with one another. The EMEA claims against the
Cross-Appointees assume that we should have had regard to an adversity that simply did not
exist.

- 15 -

### *Discharge of the Directors' Duties*

44.        None of that means that the EMEA Company directors were unaware of, or disregarded, their obligation to act specifically in the best interests of the companies of which they were directors. As stated above, I understood my obligations and acted in accordance with them. I believe that my contemporaries on EMEA Company boards understood their obligations and acted in accordance with them, and I believe that my successors on those boards understood their obligations and acted in accordance with them.

45.        There were occasions when, in the discharge of their duties, EMEA directors either declined to approve matters recommended to them, or required changes before approval was forthcoming. As noted above, the NNUK directors were consulted extensively with respect to Project Swift and required significant additional information and changes before they approved it. The NNUK directors also required that further consideration be given before approving an extension to the intercompany loan with NNL in 2005: see **Exhibit 21103**. I was not directly involved in these discussions, although I was aware of the issues at the time. In both of these cases, the NNUK board required that further consideration be given to the matters before them out of a specific concern to ensure that the proposed transaction was in the best interests of NNUK. These examples illustrate the way that, in my experience, the EMEA Company boards discharged their responsibilities.

46.        Similarly, in late 2008 when Nortel was in financial distress, the NNUK directors were approached about whether NNUK could lend money to NNL. In the circumstances, they obtained independent external legal advice having specific regard to the interests of NNUK creditors. A copy of Christian Waida's email to me including this advice is at **Exhibit 21420**. As I recall, one of Mr. Waida's concerns was that the NNUK directors receive the appropriate

- 16 -

advice in exercising their fiduciary duties having regard to the significant market events in the fall of 2008. This was entirely consistent with the specific advice EMEA Company directors received in the presentation which is **Exhibit 32165**: "If you think the Company does not have enough money to cover its debts, obtain advice straight away".

47.        Another example concerned the proposed third and fourth addenda to the MRDA in late 2008, which is discussed further below. The directors of a number of EMEA Companies refused to authorize the entry into third or fourth addenda until they received additional information on the basis of which they could conclude that doing so was in the best interests of the EMEA Companies. **Exhibit 21444** is an e-mail exchange regarding this issue in which some of the directors' concerns are discussed. It was only after extensive dialogue, and after the directors had received external advice from, among others, Ernst & Young UK and Herbert Smith, that the third and fourth addenda were eventually entered into.

## Other Issues

### *Transfer Pricing*

48.        Nortel entities had arrangements in place to govern the commercial dealings between them relating to product development, sales and support. As I understand it, these requirements were driven by the tax laws of the various jurisdictions in which Nortel did business. Accordingly, the transfer pricing arrangements within Nortel were devised of and driven by the tax group. Until approximately 2001, intercompany transactions were subject to cost sharing agreements among various Nortel entities. However, after a lengthy process which included obtaining extensive advice from outside experts, Nortel switched to a residual profit split or "RPS" model.

- 17 -

49.        The arrangements carried out pursuant to the RPS model were memorialized in agreements among the Nortel entities. NNI, NNUK, NNSA (a French company) and NN Ireland entered into the Master Research and Development Agreement, or MRDA, with NNL. Other EMEA Companies, whose functions were largely limited to the distribution of Nortel products, entered into Distribution Agreements with NNL. I was not a director of any EMEA Companies boards at the time these agreements were entered into. Although they were effective as of 2001, they were executed after I had resigned from the EMEA Company boards. I signed a number of these agreements, but only in my capacity as a signing officer of NNL. However, to my knowledge and in accordance with the consistent practice throughout my time with EMEA, I believe the EMEA Company boards gave these agreements appropriate consideration, with outside assistance as required.

50.        I was aware that the shift to the RPS method had taken place, and I was aware that the financial statements of the various EMEA Companies of which I was a board member included transfer pricing adjustments calculated in accordance with the RPS method. I do not recall ever being given any indication, either by EMEA staff or the external auditors for any of the EMEA Companies, that there was anything untoward or unfair about the transfer pricing adjustments reflected in the financial statements, or that the RPS method was not in the overall best interests of the enterprise, and of the various EMEA Companies of which I was a director.

51.        As mentioned above, the Third and Fourth addenda to the MRDA were entered into late in 2008. During this period, I was involved in discussions that ultimately led to the decision to commence restructuring proceedings in Canada, the US and England on January 14, 2009. There were many considerations given to Nortel's options during December 2008 and

- 18 -

January 2009, and Nortel received advice from outside advisors including legal counsel and financial advisors.

52.        At about this time, Nortel undertook a review of the MRDA and other agreements key to Nortel's operations. Around this time, I am aware that Peter Look, the Vice President of Tax, had suggested that amendments to the MRDA be formally reflected in a document. In particular, I believe there were discussions regarding the MRDA's termination clause which, as it was then drafted, had an automatic termination clause upon certain types of insolvency events. Left unchanged, this provision might have greatly complicated Nortel's restructuring efforts.

53.        It was these discussions that led to the drafting and negotiation of the Third and Fourth Addenda to the MRDA. Although I was not directly involved in those negotiations, I am aware that they were discussed and considered with, in particular, individuals in EMEA who initially had concerns about the proposed amendments. These negotiations took place primarily through legal counsel in the various jurisdictions and through the tax department. As noted above, the boards of directors of a number of EMEA Companies initially refused to enter into the Third Addendum, as they did not believe that doing so was in the best interests of the EMEA Companies in the circumstances. What followed were some frank discussions between NNL and the EMEA Companies, who were advised by Ernst & Young UK and Herbert Smith, among others.

54.        Ultimately, the terms of the Third and Fourth Addenda were agreed upon and I signed those documents on behalf of NNL, as a signing officer.

- 19 -

## *Vendor Financing*

55.         In order to remain competitive in the technology market, Nortel agreed to provide

certain of its customers with vendor financing for their product purchases. Because the provision

of this financing had effects on the organization as a whole, both from a risk and liquidity

perspective, vendor financing transactions above a certain threshold had to be approved by a

central committee.

56.         After I returned to Canada, I was, for a time, a member of the pre-credit and/or

credit committees. These committees established due diligence procedures to assess the risk

associated with requests for customer financing, and then facilitated the arrangements and

managed the credit process if a customer was approved. The requests for financing approval

were spearheaded by local and regional sales teams, with support from the lines of business.

There were budgetary limits within local entities, regions and lines of business on the amount of

customer financing that could be granted, so approvals from multiple levels of authority within

the line of business, product groups and regions were required before the request was brought to

the pre-credit or credit committees, typically by a senior member of the line of business or

regional sales organization.

57.         The pre-credit and credit committees' role was to monitor the overall loan

balances to customers. The committees attempted to assess the credit risks of proposed financing

arrangments to minimize the potential for bad loans.

58.         In no way did NNL force EMEA Companies to make loans to customers. On the

contrary, these transactions were driven by regional sales organizations who wished to facilitate

sales to the customers in their regions. Of necessity, NNL had a role in these decisions because

- 20 -

the loans were also carried on the consolidated balance sheet unless and until an outside lender acquired the loan.

### *Support provided to NNSA by NNL*

59.        I am aware through a review of documents to refresh my recollection that in 2001, while I was General Counsel at EMEA, NNSA at one point fell below the required level of share capital under French law. NNSA had two years to rectify this situation, but rather than wait NNL took steps in or about August or September 2002 to recapitalize NNSA in two tranches. In the first tranche, NNL made a €200 million equity investment in NNSA. In the second tranche, NNL granted a loan facility to NNSA in the amount of €200 million. In 2003, €150 million of the €200 million loan was converted into share equity. Thereafter, €50 million remained as an outstanding loan balance owing by NNSA to NNL.

60.        I was not involved in this loan afterwards. While I may have been told in February 2008 of its partial repayment, I have no recollection of any request or demand from anyone at NNL for repayment of the remaining loan balance. I understand that €25 million was repaid in February 2008.

61.        After I returned to NNL, starting in 2004 and continuing until at least 2006, I recall that NNL also provided comfort letters to NNSA, which I signed on behalf of NNL in my capacity as signing officer. These letters were unrelated to the loan and were requested by NNSA's auditors. The letters essentially provided that NNL would make available to NNSA sufficient funds so as to enable it to meet its ongoing financial commitments from time to time and to enable it to continue to operate its business in the ordinary course so that NNSA would be

- 21 -

able to meet its liabilities as they fell due: see **Exhibit 21425**, **EMEAPRIV0073709**, and **EMEAPRIV0073711**. As far as I am aware, NNSA never had to call on the comfort letters.

62.        The equity investment, loan and comfort letters were all provided by NNL to NNSA in order to ensure that it had sufficient capital and was able to meet its statutory requirements.

### *Swift Guarantee*

63.        As discussed above, in connection with Project Swift, the Trustee of the NNUK pension plan had requested a guarantee from NNL. I was not involved in the dealings directly with the Trustee regarding the terms of the guarantee (the "Swift Guarantee"). Rather, my input was sought from others at NNL and NNUK as I would be the one responsible for obtaining the approval of any such guarantee by the Board of NNL. No agreement as to the terms of the Swift Guarantee could be finalized without NNL board approval.

64.        On December 14, 2007, I received a draft copy of the proposed guarantee from Bill LaSalle, a member of my team: see **NNC-NNL08190906**. While I was not involved in the negotiation of the guarantee with the pension trustee, I do recall that I advised Mr. LaSalle that the guarantee should only apply in clearly defined circumstances. For example, it would not have made commercial sense for NNL to provide a guarantee in the event that NNUK's Plan was sold to a third party: see **Exhibit 11125**.

65.        I now recall that I continued to communicate to the parties responsible for negotiating the guarantee on behalf of NNL that the insolvency trigger for the Guarantee should

- 22 -

be narrowly defined. I have reviewed **NNC-NNL08190956**[1], and I am reminded that shortly before the guarantee was to be finalized, Mr. LaSalle confirmed to me that the insolvency trigger was in fact narrow. Mark Cooper, who was an EMEA lawyer, also confirmed to me that the trigger was "limited to liquidation or dissolution": see **EMEAPRIV0096339**. Again, I was not involved in negotiating the terms of the guarantee, but I do recall that this was an issue for me because I was acting Chief Legal Officer at the time.

66.         As noted above, the NNUK board approved Project Swift conditional upon the Swift Guarantee being given. My recollection is that the NNL Board approved the Swift Guarantee by written resolution, rather than as an agenda item at an NNL Board meeting. I have no recollection of having any separate discussions with any director of the NNL Board about the triggering events under the proposed Swift Guarantee, or any other matter with respect to the terms of that guarantee. If a director had any such questions, the practice would have been for him to contact me directly. Accordingly, I have no reason to believe that the members of the NNL Board at the time understood the terms of the Guarantee to be anything other than the terms reflected in the document itself.

SWORN BEFORE ME at the City of
Toronto, in the Province of Ontario, on
April 11, 2014

_____
Commissioner for Taking Affidavits

_____
Gordon Davies

---

[1]     I should note that I was shown part of this email chain during my deposition, but not the email from Bill LaSalle to me responding to my question. I was also not shown Mark Cooper's email directly to me, which is EMEAPRIV0096339

# Index

**AFFIDAVIT OF GORDON DAVIES (sworn April 11, 2014)**

**INDEX**

| Tab | Paragraph Referred to in Affidavit | Trial Exhibit Number | Depo Exhibit Number or Bates Number |
|-----|-----------------------------------|----------------------|-------------------------------------|
| 1 | Paragraphs 25, 46 | TR32165 | Exhibit 32165 |
| 2 | Paragraph 29 | TR31443 | Exhibit 31443 |
| 3 | Paragraph 31 | TR33051 | Exhibit 33051 |
| 4 | Paragraphs 33, 45 | TR21103 | Exhibit 21103 |
| 5 | Paragraph 33 | TR31174 | Exhibit 31174 |
| 6 | Paragraph 34 | TR31155 | Exhibit 31155 |
| 7 | Paragraph 46 | TR21420 | Exhibit 21420 |
| 8 | Paragraph 47 | TR21444 | Exhibit 21444 |
| 9 | Paragraph 61 | TR21425 | Exhibit 21425 |
| 10 | Paragraph 61 | TR41198.01 | EMEAPRIV0073709 |
| 11 | Paragraph 61 | TR41198.02 | EMEAPRIV0073711 |
| 12 | Paragraph 64 | TR45067.02 | NNC-NNL08190906 |
| 13 | Paragraph 64 | TR11125 | Exhibit 11125 |
| 14 | Paragraph 65 | TR45083 | NNC-NNL08190956 |
| 15 | Paragraph 65 | TR41229.01 | EMEAPRIV0096339 |

6330445