

NORTEL NETWORKS UK LIMITED (the *Company*)

Minutes of a meeting of the Directors of the Company held at Maidenhead Office Park, Westacott Way, Maidenhead SL6 3QH on 20 December 2007 at 3.30 p.m.

| PRESENT: | Christian Waida | (Chairman) |
|---|---|---|
| | Bill LaSalle | (by telephone) |
| | Sharon Rolston | |
| | Simon Freemantle | |
| IN ATTENDANCE: | Dara Gill | |
| | Ryan Smith | |
| | Kerry Stephens | (by telephone) |

**NOTICE**

1.    It was reported that notice of the Meeting had been given to all Directors entitled to attend and that a quorum was present.

**ACQUISITION OF NORTEL NETWORKS INTERNATIONAL FINANCE & HOLDING BV**

2.    It was explained that it was proposed that the Company acquire the entire issued share capital of Nortel Networks International Finance & Holding BV ("NNIF") from Nortel Networks Limited (the *Vendor*) for US$628,902,198 (the *Acquisition*).

**PRODUCTION OF DOCUMENTS**

3.    In connection with the Acquisition there were produced to the Meeting:

> (i)    a draft dated 20 December 2007 of a notarial deed of transfer between the Company and the Vendor relating to the sale of the entire issued share capital of NNIF (the *Sale and Purchase Deed*).
>
> (ii)    a copy of a legalised power of attorney dated 17 December 2007 in favour of the Loyens & Loeff N.V. (lawyers, tax advisors and civil notaries) ("L&L") which was executed on behalf of the Company by Christian Waida and Simon Freemantle pursuant to which L&L is authorised to execute the Sale and Purchase Deed;
>
> (iii)    a briefing paper prepared on the Acquisition and related group transactions forming part of Project Swift;
>
> (iv)    a report dated 6 December 2007 prepared by Philippe-Albert Lebrun on other value considerations in relation to Project Swift;
>
> (v)    a Comfort Letter dated 19 December 2007 from Nortel Networks Limited; and
>
> (vi)    a summary of directors enquiries in relation to Project Swift.

Confidential

CCC0017467



EXHIBIT
31155
10/17/13 HA

**CONSIDERATION OF THE ACQUISITION**

4.1 The documents submitted to the meeting were considered. It was reported to the Meeting the background to the Acquisition. It was explained that the Board of Nortel Networks Limited was currently in the process of deciding whether to provide a guarantee in the sum of $150 million to the Nortel Networks UK Pensions Trust Limited as Trustee of the Nortel Networks UK Pension Plan.

4.2 After due consideration of all the documents produced to the Meeting and the information supplied to the Meeting concerning the Acquisition, until confirmation of the approval of the Guarantee by Nortel Networks Limited has been received the Company would not enter into the Sale and Purchase Deed. **IT WAS RESOLVED THAT** conditional upon such approval being forthcoming the terms of the Acquisition were fair and reasonable and in the best interests of the Company and its shareholders.

**RESOLUTIONS**

5. Subject to receipt of confirmation that the board of Nortel Networks Limited has approved the Guarantee, **IT WAS RESOLVED THAT:**

(a) the Sale and Purchase Deed be and is hereby approved, subject to such amendments and modifications as any Director in his absolute discretion may think fit;

(b) the execution of the Power of Attorney be approved to the extent necessary ratified.

**CLOSE OF MEETING**

6. There being no further business, the Meeting then closed.

Chairman

CCC0017468

JvR/AvS/5125207

draft dated December 20, 2007

Sale and transfer of shares

On this ● day of ● two thousand and seven, appeared before me, Ronald Pfeiffer, civil-law notary in Rotterdam:
[Jannigje Jasperina van Rees, born in Gouda, the Netherlands, on the twenty-fifth day of October nineteen hundred and seventy-seven, employed at Weena 690, 3012 CN Rotterdam, the Netherlands], for the purposes hereof acting as attorney - duly authorized in writing of - each of:

1.     **Nortel Networks Limited**, a company incorporated under the laws of Canada with Corporation No. 125147-3, whose registered office is at 2351 Boulevard Alfred-Nobel, St. Laurent, Quebec, Canada, H4S (the "Seller");

2.     **Nortel Networks UK Limited**, a company ("*limited liability company*") under the laws of England & Wales, having its official seat and office address at Miadenhead Office Park, Westacott Way, Maidenhead SL6 3QH, United Kingdom (the "Purchaser");

3.     **Nortel Networks International Finance & Holding B.V.**, a private limited liability company under Dutch law, having its official seat in Amsterdam, the Netherlands, and its office address at 2132 WT Hoofddorp, the Netherlands, Siriusdreef 42-72 (the "Company").

The person appearing, acting in said capacities, declared the following:
WHEREAS:

a)    the Seller and the Purchaser have reached agreement on the sale and transfer of nine hundred forty-two thousand four hundred nineteen (942,419) ordinary shares, each with a nominal value of one hundred forty euro and ninety-seven eurocent (EUR 140.97) and one million two hundred forty-two thousand three hundred seventy-five (1,242,375) shares A, each with a nominal value of forty-six eurocent (EUR 0.46) (hereinafter: the "Shares") each, representing the entire issued share capital of the Company, on the terms set out below;

b)    on the thirteenth day of September two thousand seven the Seller and Purchaser entered into a revolving loan agreement as amended from time to time, pursuant to which the Purchaser made available to the Seller a maximum amount of six hundred million British Pounds (GBP 600,000,000.--) of which an amount of four hundred and sixty five million six hundred and thirty five thousand seven hundred and eighty five pounds and eighty eight pence (GBP 465,635,785.88) is outstanding as of today, as a result of which the Purchaser has a receivable in the aggregate amount of four hundred and sixty five million

Confidential

six hundred and thirty five thousand seven hundred and eighty five pounds and eighty eight pence (GBP 465,635,785.88) on the Seller (the "**Receivable**"), which is due and payable on tenth day of September two thousand eight.

**THE SELLER AND THE PURCHASER HAVE AGREED AS FOLLOWS:**

**Article 1. Purchase and Sale; Transfer.**

The Seller hereby sells and transfers the Shares to the Purchaser and the Purchaser hereby purchases and accepts the same from the Seller.

**Article 2. Purchase Price.**

2.1     The purchase price has been determined at six hundred and twenty eight million nine hundred and two thousand one hundred and ninety eight United States Dollars (USD 628,902,198.—) (the "**Initial Purchase Price**"), which amount shall be subject to adjustment in accordance with the procedure described hereinafter.

2.2     The Purchaser shall arrange for a liquidity schedule (the "**Liquidity Schedule**") to be prepared in accordance with the provisions of clause 2.5 to 2.12 (inclusive) of this deed. The Liquidity Schedule shall set out the net cash, being the aggregate of the:

    a)     cash at bank for the company at the close of business on the thirty-first day of December two thousand seven,

    b)     sums due from any other subsidiary company of Nortel Networks Limited on formally documented loan account or promissory note as at the close of business on the thirty-first day of December two thousand seven,

    c)     and in respect of the following companies only:

         (i) Nortel Networks AB;

         (ii) Nortel Networks A/S; and

         (iii) Nortel Networks OY;

         sums due from Nortel Networks (Ireland) Limited in respect of unpaid service fees to each such company under the Services Memoranda of Agreement dated the nineteenth day of December two thousand two;

Less the aggregate of:

    a)     bank borrowings or overdrafts for the company as at the close of business on the thirty-first day of December two thousand seven; and

    (b)     sums due to any other subsidiary company of Nortel Networks Limited on formally documented loan account or promissory note as at the close of business on thirty-first day of December two thousand seven, but excluding the sum payable of twenty four million one hundred and seventy one thousand four hundred a twelve Euros seventy cents (EUR 24,171,412.70) due from the Company to the Seller under a promissory ("**Net Cash**"), of the Company and any subsidiary company in which the Company holds a majority of issued voting share capital (the "**NNIF Group**") as at the thirty-first day of December two thousand and seven.

2.3     If the aggregate Net Cash of the NNIF Group set out in the Liquidity Schedule is greater than one hundred and sixty eight million United States Dollars (USD 168,000,000) ("**Base Cash Position**") the Purchaser shall pay an amount

CCC0017470

3

equal to the excess to the Seller as additional consideration for the purchase of the Shares.

2.4   If the aggregate Net Cash of the NNIF Group set out in the Liquidity Schedule is less than the Base Cash Position then the Seller shall pay to the Purchaser an amount equal to the shortfall as a reduction in the consideration payable for the purchase of the Shares.

2.5   The Purchaser shall ensure that a draft Liquidity Schedule is delivered to the Seller by no later than the twenty-ninth day of February two thousand eight. The Seller shall notify the Purchaser within fifteen (15) days of receipt of such draft Liquidity Schedule whether or not it accepts it for the purposes hereof.

2.6   If the Seller notifies the Purchaser that it does not accept such draft Liquidity Schedule:

    (a)   it shall set out its reasons for such non-acceptance and specify the adjustments which, in its opinion, should be made to the draft Liquidity Schedule in order to comply with the requirements of this deed; and

    (b)   the parties shall use all reasonable endeavours to meet and discuss the objections of the Seller and to reach agreement upon the adjustments (if any) required to be made to the draft Liquidity Schedule.

2.7   If the Seller is satisfied with the draft Liquidity Schedule (either as originally submitted or after adjustments agreed between the Seller and the Purchaser) or if the Seller fails to notify the Purchaser of its non-acceptance of the draft Liquidity Schedule within the fifteen (15) day period referred to in clause 2.5 of this deed, then the draft Liquidity Schedule (incorporating any agreed adjustments) shall constitute the Liquidity Schedule for the purposes of this deed.

2.8   If the Seller and the Purchaser do not reach agreement within thirty (30) days of the Seller's notice of non-acceptance under clause 2.6 of this deed, then the matters in dispute shall be referred, on the application of either party, for determination by KPMG. The following terms of reference shall apply:

    (a)   the Purchaser and the Seller shall each promptly prepare a written statement on the matters in dispute which (together with the relevant documents) shall be submitted to such independent firm for determination;

    (b)   in giving such determination, the firm shall state what adjustments (if any) are necessary to the draft Liquidity Schedule in respect of the matters in dispute in order to comply with the requirements of this deed;

    (c)   any such firm shall act as an expert (and not as an arbitrator) in making any such determination which shall be final and binding on the parties; and

    (d)   the expenses of any such determination by an independent firm of accountants shall be borne between the Seller and the Purchaser in such proportions as the firm shall in its discretion determine.

2.9   If the Seller and the Purchaser reach (or pursuant to clause 2.7 are deemed to reach) agreement on the Liquidity Schedule or the Liquidity Schedule is finally determined at any stage in the procedures set out in this clause:

Confidential

4

(a)   such as so agreed or determined shall be the Liquidity Schedule for the purposes of this deed; and shall be final and binding on the parties; and

(b)   the amount of any adjustments shall be derived from the Liquidity Schedule.

2.10   The figures to be used in order to compile the Liquidity Schedule shall be taken from those included in the Nortel Networks Group accounting form A101, being the balance sheet of each company (or division of a Company as the case may be) prepared in United States Dollars using United States Generally Accepted Accounting Principles for the purpose of the Nortel Networks group consolidated accounts as at the thirty-first day of December two thousand seven.

2.11   Where the Company does not directly or indirectly control one hundred per cent (100%) of the issued ordinary share capital of a subsidiary company in the NNIF Group the Seller and the Purchaser hereby agree that the Net Cash of such subsidiary company shall be a interest in the Net Cash of such company which is proportionate to the Company's percentage ownership interest in such entity.

2.12   The Purchaser and the Seller hereby agree to and hereby set off the Initial Purchase Price with the Receivable as a result of which the Initial Purchase Price and the Receivable are extinguished up to their common amount. As a result of the set off the Initial Purchase Price has extinguished and an amount of the Receivable remains indebted by the Seller to the Purchaser equal to the excess of the balance shown at recital (b) above less the sterling equivalent at the exchange rate of the Initial Purchase Price at the date hereof.

2.13   he Seller hereby discharges the Purchaser for the payment of the Initial Purchase Price.

2.14   The Purchaser hereby discharges the Seller for the payment of six hundred twenty-eight million nine hundred and two thousand one hundred and ninety-eight United States Dollars (USD 628,902,198.--) of the Receivable.

2.15   The Initial Purchase Price as adjusted in accordance with clause 2.2 of this deed (the "Adjusted Purchase Price") shall be further adjusted by an amount equal to any adjustment to the consideration that arises under clause 2.4 and clause 4 of the share purchase agreement dated the twentieth day of December two thousand seven between the Company and the Seller for the sale of ordinary shares in Nortel Networks (Ireland) Limited (the "SPA"), so that if the adjustment to the Consideration under the SPA is: (i) a reduction then the Seller shall refund an amount equal to such reduction to the Purchaser as a reduction in the Adjusted Purchase Price for the Shares; or (ii) an increase then the Purchaser shall pay to the Seller an amount equal to such increase as an increase in the Adjusted Purchase Price for the Shares.

2.16   The parties agree that notwithstanding the date of transfer of the Shares all income, profits and liabilities and any dividends and other distributions of profits or surplus or other assets relating to the Company and the results of the operations of the Company in each case up to and including the thirty-first day of December two thousand seven shall be for the account of the Seller. All

Confidential

5

income, profits and liabilities and any dividends and other distributions of profits or surplus or other assets relating to the Company and the results of the operations of the Company in each case after the thirty-first day December two thousand seven shall be for the account of the Purchaser.

**Article 3. Warranties and declarations of the Seller.**

3.1   The Seller warrants to the Purchaser that, on this day, the following is correct:

a.   the Company is a private limited liability company under Dutch law (*besloten vennootschap met beperkte aansprakelijkheid*), duly incorporated by notarial deed executed, on the eighteenth day of May nineteen hundred seventy-nine; the Articles of Association of the Company were last partially amended by a notarial deed of amendment executed before [me], civil law notary, on the ● day of December two thousand seven;

b.   the Company is currently registered in the Commercial Register under number 34054810; the information regarding the Company which is registered in the Commercial Register is correct and complete;

c.   the Company has not been dissolved, and no resolution has been adopted to dissolve the Company, nor has any request thereto been filed; the Company has not received any notice from the Chamber of Commerce under Section 2:19a of the Dutch Civil Code; the Company has not been declared bankrupt, nor has a suspension of payment been declared, nor have any requests thereto been filed nor is there any reason to expect the same;

d.   the issued capital of the Company consists of the Shares, all of which are fully paid in; no person holds any right, conditional or unconditional (including, but not limited to, options and debt instruments convertible into shares) against the Company to subscribe for or otherwise acquire shares in the capital of the Company;

e.   the Company's register of shareholders is up-to-date and complete;

f.   the Seller has a complete and unencumbered right to the Shares;

g.   the Shares are registered, and no share certificates (*aandeelbewijzen*) have been issued for the Shares;

h.   the Seller has not been deprived of the authority to transfer shares in the capital of the Company by virtue of Section 2:22a paragraph 1 of the Dutch Civil Code;

i.   the Shares are not subject to rights of third parties or obligations to transfer to third parties or claims based on contracts of any nature; and

j.   by the transfer of the Shares to the Purchaser, the full and unencumbered ownership of the Shares is transferred to the Purchaser.

3.2   The Seller declares to have acquired the Shares by a notarial deed, executed before me, civil law notary, on the eighteenth day of December two thousand seven.

3.3   The share transfer restrictions (also referred to as the 'blocking clause') referred to in Article 12 of the Company's Articles of Association - containing an approval of the general meeting of shareholders of the Company - have been

Confidential

CCC0017473

complied with, since NNL is the sole shareholder of the Company and hereby - in such capacity - grants its approval to the transfer to the Purchaser, such in accordance with Article 31 of the Company's Articles of Association. The management board of the Company has been given the opportunity to advise on aforementioned resolution.

**Article 4. Nachgründung.**

The Purchaser declares that Section 2:204c of the Dutch Civil Code does not apply to the transfer in question.

**Article 5. Costs.**

All costs connected with the preparation of this deed shall be for the account of the Purchaser.

**Article 6. Rescission (*ontbinding*).**

The parties hereto waive the right to rescind the agreement laid down in this deed or to demand rescission thereof.

**Finally, the person appearing, acting in said capacities, declared:**

The Company hereby acknowledges the transfer of the Shares and shall register the same in its register of shareholders.

**Powers of attorney**

The person appearing is authorised by three (3) powers of attorney, which will be attached to this deed (<u>Annexes</u>).

**End.**

The person appearing is known to me, civil-law notary.

This deed was executed in Rotterdam on the date stated in the first paragraph of this deed.

The contents of the deed have been stated and clarified to the person appearing.

The person appearing has declared not to wish the deed to be fully read out, to have noted the contents of the deed timely before its execution and to agree with the contents.

After limited reading, this deed was signed first by the person appearing and thereafter by me, civil-law notary.

Confidential

CCC0017474



*Adrian P. M. Watney*
*NOTARY PUBLIC*

## NOTARY CERTIFICATE

BE IT KNOWN THAT I ADRIAN PETER MARK WATNEY Notary Public of

33 Queen Street Maidenhead Berkshire duly authorised in the County of Berkshire

England HEREBY CERTIFY that on the date below I verified the signatures of

CHRISTIAN WAIDA and SIMON FREEMANTLE on the attached Power of

Attorney for use in the Netherlands in their capacities as Directors of NORTEL

NETWORKS UK LIMITED and whose identities are known to me

DATED this 17th day of December 2007

SIGNED AND SEALED by
ADRIAN PETER MARK WATNEY

Notary Public

*33 Queen Street, Maidenhead, Berkshire SL6 1NB*
*Telephone: 01628 621301*
*Fax: 01628 783150*
*Email: awatney@kiddrapinet.co.uk*

Confidential

CCC0017475

**APOSTILLE**

(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

1. Country: United Kingdom of Great Britain and Northern Ireland
   Pays: Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

   This public document / Le présent acte public

2. Has been signed by     Adrian Peter Mark Watney
   a été signé par

3. Acting in the capacity of   Notary Public
   agissant en qualité de

4. Bears the seal/stamp of    The Said Notary Public
   est revêtu du sceau/timbre de

5. at London/à Londres

6. Certified/Attesté
   6, the/le   18 December 2007

7. by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
   par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth

8. Number/sous No    **H623793**

9. Stamp:                          10. Signature:   P Wilkinson
   timbre:

 

For the Secretary of State / Pour le Secrétaire d'Etat

If this document is to be used in a country which is not party to the Hague Convention of 5 October 1961, it should be presented to the consular section of the mission representing that country. An apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is genuine. It does not mean that the contents of the document are correct or that the Foreign & Commonwealth Office approves of the contents.

Confidential

JvR/AvS/5124673

## POWER OF ATTORNEY TRANSFER OF SHARES

The undersigned:

**Nortel Networks UK Limited**, a company (*"limited liability company"*) under the laws of England & Wales, having its official seat and office edress at Maidenhead Office Park, Westacott Way, Maidenhead SL6 3QH United Kingdom, hereinafter: "Nortel UK";

declares to give irrevocable power of attorney to:

each employee, paralegal, *notarial office staff member* and (deputy) civil law notary, associated with Loyens & Loeff N.V., (lawyers, tax advisors and civil law notaries), (the "**Authorised Representative**"), severally, on behalf of Nortel UK;

-      to execute the notarial deed of sale and transfer 842,419 ordinary shares, each with a nominal value of EUR 140.97 and 1,242,375 shares A, each with a nominal value of EUR 0.46 in the capital of **Nortel Networks International Finance & Holding B.V.**, a private limited liability company under Dutch law, having its official seat in Amsterdam, the Netherlands, by Nortel Networks Limited, a company incorporated under the laws of Canada with Corporation No. 125147-3, whose registered office is at 2351 Boulevard Alfred-Nobel, St. Laurent, Quebec, Canada, H4S to Nortel UK, the aforementioned on the basis of a draft drawn up by Loyens & Loeff N.V., (lawyers, tax advisors and civil law notaries), aforementioned,

and furthermore to perform any other legal acts and to do anything which the Authorised Representative deems necessary in connection with the aforementioned, all this with the power of substitution.

Nortel UK hereby indemnifies the Authorised Representative against any claim made by any third party in connection with or resulting from (i) this power of attorney or (ii) any legal act that the Authorised Representative performs under this power of attorney in the name of Nortel UK, provided always that such indemnity shall not extend to any negligence or wilful misconduct by the Authorised Representative

The Authorised Representative is authorised to use this power of attorney, even when he represents one or more others, involved in the aforementioned legal act.

This power of attorney shall be governed by the laws of the Netherlands.

Signed in _Maidenhead_        on _17 December_        2007.

Nortel Networks UK Limited.
By: *Christian Wardle*
Title: *Director*

Nortel Networks UK Limited
By: *Simon Massantato*
Title *Advisor*

Confidential

CCC0017477

**Project Swift**
Summary for the Directors of Nortel Networks UK Ltd

**Background**

Nortel Networks UK Ltd ("NNUK") currently has a GBP 467m (US$950m) receivable from its direct parent, Nortel Networks Ltd ("NNL") in Canada. The receivable has built up over several years as a result of unpaid transfer pricing adjustments. The receivable is interest free. Under current UK tax legislation, NNUK is required to impute interest income on this receivable which is eroding the corporate income tax non-trading losses in NNUK and as a result, NNUK will shortly become tax paying on its non operating income, including the interest imputed on the receivable from NNL.

NNUK has to book tax expense on the interest imputed on the NNL receivable, but as there is no corresponding relief in Canada. At current interest and tax rates, the tax expense adds an additional US$ 18.8m of tax expense to Nortel's consolidated tax expense per year. The book tax expense will eventually become a cash cost as NNUK's non-trading losses are fully utilized.

The position would not change if actual interest were applied to the receivable as there would be no effective relief for NNL. An actual interest would also create an additional cash cost to the group via a 10% withholding tax on any actual interest paid by NNL to NNUK.

In addition to aligning the legal and management structure, the group wants to eliminate the imputed interest income on the NNL receivable and as a first step towards this by transferring the Dutch holding company, Nortel Networks International Financing & Holding BV ("NNIF") and the majority of its EMEA subsidiaries to NNUK in exchange for some of the receivable from NNL. Once the business uncertainties surrounding NNSA are resolved at some point in 2008, the group proposes for NNUK to acquire the 91% interest in NNSA held by NNL, which will likely eliminate the balance of the NNL receivable.

**Benefits**

The potential tax savings from Project Swift are approximately $12.3m per year after the transfer of NNIF, based on entity valuation of $1bn. This is calculated as a reduction in the receivable of some $629m (NNIF value adjusted for pre-sale capital redemptions) at UK interest rates of 7% (GBP LIBOR + 1%) at the 2008 UK tax rate of 28%.

The benefits will increase to $6.3m when NNL's 91% share of Nortel Networks SA ("NNSA") is also transferred (benefit based on the assumption that this holding will be worth at least US$ 320m, current valuation of NNSA of $403m). This should happen in 2008 as outlined below.

Also as part of Project Swift, NNIF will repatriate cash of some $120m back to Canada.

Equally importantly NNUK will be substituting a non income bearing asset in the form of the existing NNL loan for the potential of dividend income from NNIF out of the earnings of that company's subsidiaries. It is reasonable to expect that such income could be in the region of US$ 10m to US$ 20m per annum.

The transactions to be carried out prior to the NNUK purchase of the NNIF shares will not impact on the cash cover held by NNIF against its debts, including the sum of US$ 287m due to NNUK. It is anticipated that after the various transactions below NNIF will still have cash balances equal to 100% of its indebtedness.

NNUK Briefing Paper

**Timing**

The transaction as set out below must be completed before 31 December 2007 to ensure that tax losses carried forward in Germany are not lost following the introduction of new German tax rules, effective 1 January 2008.

**Transaction**

In summary the reorganisation comprises the following steps:

1. NN Luxembourg is liquidated, and this transaction has been carried out.
2. NNIF sells NN Ireland, NN Asia, NN Mauritius and NN Singapore to NNL for $252m.
3. NNIF carries out a net capital reduction of $372m, comprising $120m cash and $252m receivable (created through the sale of the entities listed in point #1). The cash has been funded by dividend receipts, German capital reduction and own cash.
4. NNL sells the shares in NNIF to NNUK in exchange for $629m of the receivable.

The valuations have been calculated by external advisers, Ernst & Young and reviewed by PwC[1].

The E&Y valuation of NNIF and its subsidiaries as at 30 September 2007 was US$ 1,001,251,000. This reconciles to the proposed purchase price for the NNIF shares as follows:

|  | US$ | |
|---|---|---|
| E&Y Valuation | | 1,001,251,000 |
| Less: Sales of shareholdings by NNIF @ E&Y Valuation to NNL | | |
| NN Ireland | (177,792,000) | |
| NN Asia | (25,201,000) | |
| NN Mauritius | (13,979,000) | |
| NN Singapore | (34,802,000) | |
| | | (251,774,000) |
| | | 749,477,000 |
| Less: Capital Redemption by NNIF (a): | | |
| Total €UR 295m @ 1.4389 (Rate used) | (424,748,802) | |
| Less: Used to settle NNL Purchase of | | |
| Shareholdings as above | 251,774,000 | |
| Cash transfer to NNL | | (172,974,802)(a) |
| | | 576,502,198 |
| Add: Capital contribution in cash by NNL to NNIF(a) | | 52,400,000(a) |
| Purchase Price | | 628,902,198 |

(a)  Net cash transfer to NNL is thus approximately US$120m

The purchase price is subject to subsequent adjustment for liquid assets (cash and group loan balances) held in the subsidiaries of NNIF against a target number of US$ 168m, being the net liquid resources taken into account in the E&Y valuation, less adjustment for the net cash distributed out of NNIF as above. In addition there will be an adjustment equal to any receipt of

---

[1] PwC were engaged by the UK Pension Trustees to confirm that the UK pension fund was not materially adversely affected by the Project Swift transaction. Ernst & Young were engaged by the NNUK directors.

NNUK Briefing Paper

Confidential

payment arising to NNIF in respect of a price adjustment clause in the NNIF sale of its shares in NN Ireland (relating to outstanding transfer pricing issues) to NNL.

### Negotiations with Trustees of the NNUK Defined Benefit Pension Plan / Guarantee by NNL

Due to the scope of UK Pensions legislation it has been necessary to consult with the Trustees of the NNUK Defined Benefit Pension Plan (the "Plan") to demonstrate to them that the NNUK covenant supporting the Plan will not be materially adversely impacted by the implementation of Project Swift.

While the Trustees accept that, on going concern basis, the implementation of Project Swift is better than or equal to neutral on the NNUK covenant, they are also obliged to consider all scenarios including the potential insolvency of NNUK as principal employer. As a result their concern was that the assets available to the Plan might be diminished by a material amount. This risk was acknowledged by the respective financial advisers of the Trustees and NNUK. Thus without further support to the Plan covering the insolvency scenario, the Trustees felt unable to support implementation of Project Swift without a means to mitigate the perceived risk.

A failure to reach agreement with the Trustees would mean that the dispute would have to be referred to the Pension Regulator. The outcome of such a referral would be uncertain.' One of the remedies available to the regulator is requiring NNUK or NNL to make an additional contribution to the Plan. Given the timing and risk issues noted above, such a delay would mean that Project Swift would not be implemented as envisaged and the resultant benefits might not be realised.

Negotiations have therefore been conducted with the Trustees to determine what measures or additional support if any would give them sufficient comfort. At all times each party has been guided by the parameters relating to the degree of detriment laid down by its respective financial advisers. Following those discussions it has been proposed that NNL will enter into a separate additional guarantee over and above the existing on demand NNL guarantee which is valid to 30 June 2012 and relates to contributions to fund the ongoing deficit of the Plan which at 5 April 2005 was £356m. The current guarantee is triggered on an ongoing basis if NNUK fails to pay in accordance with the agreed funding plan.

In contrast the proposed new guarantee would only be triggered in the event of the insolvency of NNUK in which case the liability of NNL is capped at the lesser of the Plan deficit and US$150m. We are seeking to negotiate provisions so that this additional guarantee will only remain in force until 30 June 2012 and will cease to apply if the pension deficit is extinguished prior to this date.

We are awaiting a final draft of the guarantee which should be available within 24 hours. We are also awaiting the outcome of a board approval from NNL confirming that it will provide the guarantee.

### Directors Consideration of NNIF Valuation by E&Y

The attached details the additional research and due diligence carried out by the Directors into the E&Y valuation and the conclusion reached from that exercise.

In addition the Directors have directly challenged E&Y on various aspects of the valuation and are content with the responses received.

### France

As part of the transaction described above, it is also proposed that the shares of NNSA will be transferred to NNUK when business uncertainties are resolved and the valuation of NNSA has

NNUK Briefing Paper

Confidential

been updated to reflect any business modifications. NNSA has been excluded from Project Swift at present due to operational uncertainties which may affect its value.

NNUK Briefing Paper

Confidential

CCC0017481

## Dandridge, Brenda (MOP:8310)

| | |
|---|---|
| From: | Albert-Lebrun, Phillppe (MOP:7620) |
| Sent: | 06 December 2007 18:33 |
| To: | Rolston, Sharon (MOP:7950); Freemantle, Simon (MOP:7550) |
| Cc: | Stephens, Kerry (MOP:7500); Mcardle, Tony (MOP:7620); Smith, Ryan (MOP:7500) |
| Subject: | Swift DD |

Attachments:      Other Value Considerations 6 Dec 07.doc

Sharon, Simon,

Please find herewith a summary of the supplementary DD that was performed with regard to Swift.

In summary:

- The entities not valued by E&Y would be worth $3.4m (when netting all elements). The amount is not considered material in the context of Swift.
- The review of the off B/S liabilities of the acquired entities highlighted mainly: 1- business related risks such as guarantees provided to customers (84M$ for Netas) or lease commitments (mainly RE) for 17M, 2- Tax risks due to the current position of Nortel (the late filing of tax returns following the restatements or the filing of amended returns could trigger more audits than we would normally expect), 3- Restructuring risks as previously discussed.

I am at your disposal if you have any question and I would like to take this opportunity to thank Tony for all the investigations that led to this note.

Best regards,



Other Value
Considerations 6 D...

Philippe Albert-Lebrun
Controller EMEA
ESN 560 21 76
Tel 44 1 628 43 21 76
palbert@nortel.com

1

      CCC0017482

## Project Swift – Other Value Considerations   (6 December 07)

### Background

Further to a review by Nortel of the valuation of the companies transferring under project Swift, performed by Ernst & Young, it was determined that two further issues should be considered:

(i)     as the EY valuation did not cover all companies involved in the transfer, for example certain non trading or dormant companies were not covered in the EY valuation report, separate consideration should be given to these companies to ascertain if there are any significant impact to the valuation

(ii)     for all companies being transferred under Swift, consideration should be given to any other issues that may impact valuation, for example off-balance sheet exposures, which may not have been captured in the EY valuation but may be relevant in assessing valuation.

The approach taken in addressing (i) was to extract balance sheet information for these companies from SAP at 30 September 2007 to provide a preliminary indication of value. In assessing the net value of these companies, it was noted that any inter-company balances with entities that also fall within the NNIFH BV group being transferred would not represent true value on a group basis, only on a standalone basis.

For (ii), feedback was sought from the respective finance teams responsible for the companies as to any off-balance sheet assets/liabilities or other considerations of which they were aware.

### Results

Please refer to the excel file attached in the Appendix.

(i) Companies not covered by EY valuation

There were 16 such companies identified, this includes companies that had recently being liquidated or merged. Overall, value of approximately US$3.4M was identified from these companies including:

- Northern Telecom France, US$1.6M, being cash deposits of US$1.8M less payroll accruals US$0.6M

- Nortel Bulgaria, US$0.5M, various assets excluding the inter-company payable to NNIFH, including cash US$0.5M

- Nortel Networks Eastern Mediterranean, US$0.5M, being an inter-company receivable due from Nortel Networks Inc (Nortel US registered company)

In the analysis, items 1a – 8a denote the items identified for these companies.

Other assets of a similar nature, liquid assets and inter-company balances, arose in many of the other companies. The overall total book value identified for all 16 companies was US$3.4M.

(ii)  Other Valuation Considerations / Off-Balance Sheet Issues

A variety of issues were identified, these are listed in the attached analysis and denoted by references 1 – 13. For each a summary of the item is provided, with follow up comment.

The issues identified can be split into different categories.

Firstly, it was noted that certain liabilities relating to end of lease obligations (known as Assert Retirement Obligations under FAS 143) were largely recorded in a central default entity in EMEA and not in individual company codes. (ref 1). The total liability recorded centrally was US$3.6M. The liability is long term in nature and the impact to profit stream would be over an extended period (leases duration).

A number of instances of off-balance sheet exposures were identified, including:

- lease commitments of US$17M. As lease expense is reported within the impacted companies as an ongoing expense, this will have been taken into account in the EY valuation. (ref 3 and 9)

- customer guarantees, Netas US$84M and France Eur 17M, such guarantees form part of the normal business and in the case of Netas it is assumed that any such impact would be taken into account in the (listed) market valuation. (ref 4 & 8)

- there were smaller off-balance sheet litigation risks (ref 5 & 6) noted, and also a windfall gain relating to recovery in Q4 07 of a bad debt previously written off (Carrier One)

Confidential                                                                            CCC0017484

- commitments to cover warranty claims were noted, any material adjustment to existing provisions would impact value, and specifically in France there were commitments in respect of the business sales (Osiris, Allegro) (ref 10)

- noted risk of write off for inter-company balances, this risk is perhaps most significant for France (ref 10)

There were general risks highlighted around tax issues and the Transfer Pricing Adjustment models. It was noted specifically in Ireland that the revised TPA/PRS model had not been yet accepted or approved by the tax authorities. At any one time there will be open tax returns and issues, this is normal. A tax audit was currently taking place in Italy, tax issues are noted in several of the companies including Poland and Russia. (ref 2, 11)

It was noted that Nortel's restructuring activities continues to impact many of the companies, both headcount reduction related (ref 13) and real estate rationalisation (ref 12). Provisions are in place to cover any existing obligations, however further restructuring activity is expected to take place over the foreseeable future. Such activity does give rise to one-off costs, but naturally is a cost saving measure over the longer team and therefore would be expected top enhance value.

In summary, several different issues or risks have been identified, some very specific which can be readily quantified (ARO, lease commitments), others which are more general in nature and cannot be readily measured (tax, warranty).

At any one time it would be normal to expect that in the normal course of business there would exist a range of off-balance sheet risks. This exercise has highlighted a number of issues, including some very general topics, however none have been noted that can be firmly concluded to have any real, immediate or readily ascertained impact upon the valuation of the companies.

## Conclusion

In regard to the companies not covered by the EY valuation (i), the net value was assessed as US$3.4M overall, this is not material in the context of the Swift transaction.

For the off balance sheet and other value considerations, while a number of potential risks were noted, no firm conclusions can be ascertained that a fundamental impact on company valuation arises.

Confidential

## Appendix



D:\users\My
Documents\Tony's file

Confidential

**Project Bank – Cat XX**

Comments regarding fair valuation

Off Balance Sheet Issues Identified

| | Comments | Potential Impact For discussion purposes only (USRM) | Follow-up |
|---|---|---|---|
| 1 | | (3,6) | N/A |
| 2 | | N/A | N/A |
| 3 | | N/A | |
| 4 | | N/A | N/A |
| 5 | | (3,6) | N/A |
| 6 | | (3,6) | N/A |
| 7 | | 4,6 | N/A |
| 8 | | N/A | |
| 9 | | N/A | N/A |
| 10 | | ? | |

Confidential                                      CCC0017487

A/C



Confidential

CCC0017488

A/C                                                                                                    TR31155

# N☉RTEL

December 19, 2007

The Directors
Nortel Networks UK Limited
Maidenhead Office Park
Westacott Way
Maidenhead  SL6 3QH

Dear Sirs:

This letter is provided in connection with Project Swift pursuant to which it is proposed that, inter alia, Nortel Networks UK Limited (NNUK) shall acquire the entire issued share capital of Nortel Networks International Finance & Holding BV (NNIF) from Nortel Networks Limited for a consideration of US$628,902,198.

We acknowledge that a significant proportion of the value attributed to NNIF and those of its subsidiaries being indirectly acquired by NNUK, as independently assessed by Ernst & Young LLP, derives from the distribution and other intra company agreements entered into by such entities with Nortel Networks Limited pursuant to which such entities are, inter alia, authorised to sell Nortel products and services in their respective territories.

Please take this letter as confirmation that we have no current intention of:

(a)     terminating or amending in any material respect any of the said distribution and other intra group agreements;

(b)     restructuring operations with the intention of materially eroding the valuations attributed to NNIF and those of its subsidiaries being indirectly acquired by NNUK.

This letter is provided solely for your benefit and solely for the purpose of your consideration of Project Swift. It does not create any rights in favor of any third parties. There are no third party beneficiaries of this letter.

Yours sincerely,

Nortel Networks Limited

By: _____              By: _____
Name:    Gordon A. Davies                   Name: _WILLIAM  J.  LASALLE_
Title:    General Counsel - Corporate        Title: _GENERAL  COUNSEL - OPERATIONS_
          and Corporate Secretary

Nortel Networks Limited
195 The West Mall, Toronto Ontario Canada M9C 5K1  T 905.863.7000

Confidential                                                                          CCC0017489

**PROJECT SWIFT**

**NNUK CONSIDERATION OF VALUATIONS**

On the 10, 17, 24 and 31 October 2007, and November 21, 2007, the directors of Nortel Networks UK Limited ("NNUK") convened with other key finance personnel to review and discuss the valuations of the EMEA entities as prepared by Ernst & Young and to ensure due care and attention was given to the transaction.

The valuations report was distributed to the directors and those involved in the meetings. The key issues raised were:

- France valuation methodology
- Netas valuation methodology in relation to Nortel internal business and the CoE.
- The method of valuation of the LRDs and the cost plus entities.
- The multiples and WACC factors used to arrive at terminal values
- Contingent and other "off balance sheet" liabilities, where the Directors commissioned an internal review.
- The valuation of the cash holdings of NN Ireland
- Price adjustment clause wording
- Net assets against the consideration being paid, i.e. amount of goodwill
- Which version of EY's valuation to accept

All the above issues were resolved, with appropriate adjustment of the valuations where relevant.

The directors requested a letter of comfort from the management of NNL to confirm that there are no known plans to discontinue or substantially alter any of the EMEA businesses.

The directors also requested written confirmation from the local finance teams responsible for the current and former Joint Ventures that the forecasts provided by them and used for the valuations have not materially changed, which with the exception of NN France has resulted in amended figures now taken into the valuation

The directors' formal approval will be documented in NNUK board minutes.

Confidential