

C

TR21420



| From: | Davies, Gordon (TORWM:0098) |
|---|---|
| Sent: | Monday, December 08, 2008 9:19 AM |
| To: | Doolittle, John (TORWM:0035) |
| Subject: | FW: PRIVILEGED AND CONFIDENTIAL: Intra-Group funding |

As discussed. Please do not forward.

| From: | Waida, Christian (MOP:8310) |
|---|---|
| Sent: | Friday, December 05, 2008 3:28 AM |
| To: | Davies, Gordon (TORWM:0098) |
| Subject: | PRIVILEGED AND CONFIDENTIAL: Intra-Group funding |

PRIVILEGED AND CONFIDENTIAL

Gordon,

Liquidity of the Group is currently of the utmost importance and as UK Directors Sharon, Simon any I understand the role NNUKL needs to play. There are however statutory requirements that we need to take into consideration and due process which needs to be followed. We thought it germane to seek assistance on this and we have engaged Osborne Clarke (whose advice is written for NNUKL and not NNL) to help in highlight the core issues and process considerations.

We have now received their initial advice and the three Directors have discussed it in detail. In the event that NNL might require additional funding we thought it best to share the advice so that everybody is aware of the requirements and work can start early on providing the documentation that the UK directors require for such a financing decision.

As you will read we have significant issues to consider, not least, the basic fact of whether NNL has the ability to repay such a loan. We would need the highest level of reassurance (substantiated by detailed information) that NNL has the ability to repay. Whilst nobody can remove the burden of having to make a decision from the shoulders of the UK Directors we would consider it necessary to discuss the matter with our largest creditor; the Trustees of the NNUKL Pension Plan.

Once you have read the attached, and given the obvious high degree of comfort that we would need, please let us know what you think the next steps should be.



Board Advice Paper
to NNUK dir...

Best regards

Christian

1

C

TR21420

**ID:** CLGN01:02869856
**Beg Doc:** NNC-NNL07221478
**Beg Prod:**
**Depo Topics:** Decision-making re: Pension Plan Funding and Inves;The "Insufficiently Resourced"
Test
**Attorney Comments:** Gordon Davies is advised of "significant issues to consider.." re the
"largest creditor; the Trustees of the NNUKL Pension Plan."<br/>(Attachement) is outside legal
advice on NNL considering a capital restructuring and the implications of such decision.

*[DISCUSSION DRAFT – 27 NOV 2008]*



**PRIVATE & CONFIDENTIAL**

**Nortel Networks UK Limited : Advice paper for board of directors relating to proposed intra-group funding of Nortel Canada**

**Background**

Nortel Networks UK Limited ("NNUK") is a UK incorporated trading subsidiary of Nortel Networks Limited, incorporated in Canada ("NNL"). NNUK [is anticipating receiving][has received] a request from NNL for intra-group funding support. This support is anticipated in an amount of approximately $300 million (approximately £200 million on current exchange rates) and being provided by way of intra-group loans (the **"Proposed Financing"**). We understand that the Proposed Financing will be documented by NNUK entering into a revolving credit facility agreement with NNL, which will set out the terms of each tranche of lending that NNUK may make available to NNL (each being an **"Advance"**), up to a ceiling amount.

NNL is currently considering a detailed financial capital restructuring in response to a difficult trading period. The board of NNUK has asked Osborne Clarke to assist it assessing the considerations it should have when considering the request from NNL to complete the Proposed Financing.

**Advice**

The advice contained in this paper is separated into the following sections:

1.      What considerations should the board have?

2.      What financial information does the board need from NNL to complete its considerations?

3.      What financial information does the board need to produce with respect to NNUK to complete its considerations?

4.      What documentation should the board implement to record its considerations?

**Please note that the advice contained in this paper applies at the time that NNUK proposes to enter into any credit agreement with NNL, and at the time of any subsequent Advance being made to NNL under such agreement.**

5917156_2.DOC    1

*[DISCUSSION DRAFT – 27 NOV 2008]*

**Section A: What considerations should the board have?**

The Appendix contains a detailed analysis of the relevant legal considerations that pertain to this section. We have provided our advice and certain commentary on these legal provisions below but we would also recommend that you read the detail within the Appendix.

1.    **General directors duties and specific directors duties to consider interests of creditors**

1.1    In approving the Proposed Financing the directors of NNUK need to be aware of, and carefully consider, their general duties and obligations so as to avoid personal liability, disqualification from acting as a director or the transaction being set aside. This is particularly relevant with the Proposed Financing as it is being made between connected parties (i.e. companies within the same group) and in circumstances where the businesses are not operating as successfully as expected. The Appendix contains more detail on these general considerations.

1.2    In addition, as NNUK is having to consider the financial viability of the group and carefully consider the likely ability of NNL to repay any loan made to it by NNUK, NNUK also needs to consider the interests of its creditors at this time.

1.3    In summary, at this time, each director of NNUK must be satisfied, acting in good faith, that entering into the Proposed Financing would (a) be most likely to promote the success of NNUK for the benefit of its members and (b) be in the interests of its creditors.

2.    **Clawback by administrators or liquidators as a result of (a) Transactions at Undervalue or (b) Preference.**

2.1    The Proposed Financing may, if NNUK enters into administration or insolvent liquidation within 2 years of its completion, be vulnerable to attack as "transactions at an undervalue" (section 238 of the Insolvency Act 1986) or "preference" (section 239 of the Insolvency Act 1986).

2.2    Neither of these provisions can be successfully pursued by an insolvency practitioner unless NNUK is insolvent at the time of the transaction either on the basis that it is unable to pay its debts within the meaning of section 123 of the Insolvency Act 1986 or becomes unable to pay its debts as a consequence of the transaction or preference. Section 123 of the Insolvency Act 1986 provides that a company is unable to pay its debts:

(a)    when a written demand has been made in a sum exceeding £750 and service in circumstances where the demand is not paid, secured or compounded within a 3 week period;

(b)    where execution or other process following a judgment is returned unsatisfied in whole or part;

(c)    if it is proved to the satisfaction of the court that NNUK is unable to pay its debts as they fall due (often called the "**cash flow test**");

*[DISCUSSION DRAFT – 27 NOV 2008]*

   (d)    if it is proved to the satisfaction of the court that the value of NNUK's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities (often called the **"balance sheet test"**).

On the assumption that neither of the first two limbs above are satisfied factually, we have focussed (in Section C of this paper) on what financial information NNUK needs to produce and review to satisfy itself that NNUK is not insolvent on the basis of either the cash flow test or the balance sheet test. Assuming the board of NNUK can satisfy itself of this, then the risk of challenge under these Sections can be minimised.

3.     **Potential personal liability of the directors of NNUK (including under a contribution notice issued by the Pensions Regulator)**

3.1    After any Proposed Financing, the directors of NNUK must be careful that they are not vulnerable to "wrongful trading" allegations (section 214 of the Insolvency Act 1986) or fraudulent trading (section 213 of the Insolvency Act 1986) in the event that NNUK enters into insolvent liquidation. The Appendix contains more information on these sections but we are not concerned this represents a material risk based on the information we currently have to hand.

3.2    Directors can also be penalised if a company enters into liquidation if they have misapplied or retained company assets or have been guilty of any misfeasance or breach of any fiduciary duty in connection with NNUK (section 212 of the Insolvency Act 1986). **This "misfeasance" risk is probably the risk we are most concerned about in these particular circumstances. We fear this risk is heightened by the specific concerns raised by the trustees of the Nortel Networks UK Pension Plan with the directors of NNUK around the possibility of NNUK sweeping cash out of the UK to Canada at a crucial time (referencing the similar very public way in which that occurred at the recent Lehman Brothers downfall).**

3.3    In order to mitigate risk of attack under this section the more work that is undertaken to verify the ability of NNL to comply with the terms of the Proposed Financing, the less risk. In addition, some focus needs to be given to the interdependence of the NNUK and NNL businesses albeit the directors of NNUK need to be satisfied on a stand alone basis that making the Proposed Financing can be justified as being in the best interests of NNUK.

3.4    Additionally, if directors have been "unfit" there is a risk that proceedings may be issued within 2 years of the date of insolvency by the Secretary of State for Business Enterprise and Regulatory Reform seeking the disqualification of directors for a period of between 2 and 15 years pursuant to the Company Directors Disqualification Act 1986.

3.5    The Proposed Financing could also fall within the Pensions Regulator's power to impose a contribution notice or financial support direction on NNUK and persons connected to or associated with NNUK (discussed in more detail at section 8 below). The directors should note that the Pensions Regulator can impose a contribution notice on the directors personally as they are considered to be connected to or associated with NNUK. However, the Pensions Regulator cannot impose a financial support direction on any individual.

5917156_2.DOC   3

*[DISCUSSION DRAFT – 27 NOV 2008]*

4.      **Should NNUK be requesting security for any intra-group lending?**

We suspect that if NNUK take any security over NNL that this will be difficult to implement for various reasons and in particular, that NNUK taking any security over NNL may prejudice any restructuring process. We suggest that this issue is reviewed but that it will be inappropriate to seek security over NNL. There may also be priority held by other entities over NNL and it will not be possible to vary the rights held by third parties.

5.      **Rate of interest (if any) to be sought by NNUK from NNL**

5.1     From an insolvency law perspective, if interest is not sought by NNUK from NNL in respect of any Advances, the directors of NNUK will need to justify why interest at a commercial rate is not being sought. For instance, if may be reasonable for the directors to consider that interest should not be sought due to the interdependence between the entities and any genuine commercial benefit that they can point to for NNUK in the continued success of NNL.

5.2     However, it should be noted that, from a pensions regulatory perspective, guidance states that in order to assist in ensuring an intra-group loan is not a Type A event, any inter-company loan should be on commercial rates of interest similar to those that NNL could achieve in the market and generally be documented on robust commercial terms. Section 7.5 of this note and the Appendix contain further detail on the importance of Type A events.

5.3     Our advice on this issue would be for NNUK to try to charge a commercial rate of interest on the loan.

6.      **Rights of set-off**

6.1     There are various statutory rules of set-off that apply between mutual lenders / borrowers in England and Wales. Where lender and borrower concerned straddle national borders, the situation becomes more complex.

6.2     It may be necessary to apply the local law of the insolvent party (ie UK or Canada, depending on whether NNUK or NNL is insolvent, or perhaps both) and it is possible to get into "conflict of law" territory where the two regimes conflict. We would need to do some further work on this to advise NNUK properly on any particular situation you are concerned about (perhaps in conjunction with colleagues in NNL's in house legal team in Canada) at an appropriate time.

6.3     It is worth noting however that the position could be greatly helped by including a contractual set-off provision in the credit agreement that is put in place (should the Proposed Financing proceed). The sample credit agreement we have been sent does not include such a provision and we could assist with this further should it become appropriate.

5917156_2.DOC      4

*[DISCUSSION DRAFT – 27 NOV 2008]*

7.     **Nortel Networks UK Pension Plan**

The Nortel Networks UK Pension Plan (the "**Scheme**") is NNUK's largest unsecured creditor. The Scheme's interests will, therefore, need to be considered in the context of the Proposed Financing. The directors need to consider the position of both the trustees of the Scheme and the powers of the Pensions Regulator to impose a contribution notice or financial support direction on NNUK and persons connected to or associated with it.

7.1    *Notification to the Pensions Regulator*

There is no requirement on NNUK to notify the Pensions Regulator of the Proposed Financing under section 69 Pensions Act 2004 and the Pensions Regulator (Notifiable Event) Regulations 2004.

7.2    *Notification to the trustees*

NNUK is required to communicate and share appropriate information about the Proposed Financing with the trustees prior to the event in accordance with the current funding agreement made between NNUK and the trustees. NNUK is required to tell the trustees at the same time as the Nortel Group tells its banks although it is recommended that NNUK consider telling the trustees as soon as any decision is made to provide the Proposed Financing.

NNUK is also required to tell the trustees about the Proposed Financing in accordance with the Occupational Pension Schemes (Scheme Administration) Regulations 1995 because it represents an event where there is reasonable cause to believe it will be of material significance to the exercise by the trustees of any of their functions.

7.3    *Contribution notices*

The Pensions Regulator has the power to issue a contribution notice to NNUK (and persons connected to or associated with it) requiring an amount up to and including the full buy out debt to be paid to the Scheme. The buy out debt was estimated as at 31 March 2008 to be £1.5 billion.

The circumstances in which the Pensions Regulator could impose a contribution notice on NNUK (and persons connected to or associated with it) are set out in the Appendix.

It appears to us that it would be difficult for the Pensions Regulator to impose a contribution notice on NNUK (and persons connected to or associated with it) on the basis of the law as it currently stands. The Proposed Financing does not appear to fulfil the main purpose test as there is no deliberate act designed to facilitate either NNUK (as principal employer of the Scheme) or NNL (as guarantor of some of NNUK's obligations) avoiding their liabilities to the Scheme.

However, there is a risk that the Pensions Regulator would have the power to impose a contribution notice on NNUK (and persons connected to or associated with it) on the basis of the revised law because this test looks at the effect of the inter-company loan on the ability of the Scheme to pay members' current and future benefits and not the intent of either NNUK or NNL. The Pensions Regulator would still need, however, to

5917156_2.DOC     5

consider whether it is reasonable to impose a contribution notice in all circumstances of the case.

In deciding whether the material detriment test is met, there will be a non-exhaustive list of factors that the Pensions Regulator must have regard to which are set out in the Appendix.

In addition, a statutory defence will be introduced against the imposition of a contribution notice on the basis of the material detriment test. The requirements for establishing this defence are set out in the Appendix. However, it seems unlikely that NNUK (or any persons connected to or associated with it) could defend the imposition of a contribution notice unless they were able to conclude that they have taken all reasonable steps to eliminate or minimise the potential detrimental effect of the Proposed Financing may have on the likelihood of accrued benefits in the Scheme being received.

The Pensions Regulator will also issue a code of practice that will set out the circumstances in which he expects that he would use the "material detriment test" in deciding whether to impose a contribution notice. Many of the circumstances listed in the draft code of practice are not relevant to this case but the Pensions Regulator has indicated that he would seek to use a contribution notice where there is an act which involves *"severing of employer support for the scheme so that employer support is removed, substantially reduced or become nominal"*. *"Employer support"* is defined as a product of the scheme obligations of the employer and the likelihood of recovery for the scheme under scheme obligations resulting in a reduction in employer support. Given the magnitude of the Proposed Financing relative to the size of NNUK and the deficit in the Scheme, the loan will result in a reduction in the ability of NNUK to support the Scheme.

7.4    *Financial support directions*

The Pensions Regulator has the power to issue a financial support direction to NNUK (and persons connected to or associated with it) requiring financial arrangements to be put in place to support the Scheme if NNUK is "insufficiently resourced".

The nature of the financial support that the Pensions Regulator may request and the meaning of "insufficiently resourced" is set out in the Appendix.

The process of assessing a person's resources is a complex process and heavily prescribed. We suggest that the current net asset position of NNUK needs to be verified in accordance with the Pensions Regulator (Financial Support Directions etc) Regulations 2005. It is possible, however, that NNUK would be considered sufficiently resourced at this time because its net assets as at 31 December 2007 were £1.2 billion excluding the Scheme's FRS17 deficit i.e. in excess of 50% of the buy out deficit in the Scheme of £1.5 billion. This would mean that the Pensions Regulator does not have the power to impose a financial support direction on NNUK (and persons connected to or associated with it).

Much will depend, however, on the value attributed to goodwill, investment in NNUK subsidiaries and inter-company debtors. If these adjustments (plus any adjustments to the current net asset position of NNUK arising out of previous transfer pricing, as you

*[DISCUSSION DRAFT – 27 NOV 2008]*

have previously indicated) which results in the net asset position of NNUK falling below £750 million, this could mean that the Pensions Regulator does have the power to impose a financial support direction on NNUK (or persons connected to or associated with it).

### 7.5 *Type A event*

The Pensions Regulator would expect NNUK (and persons connected to or associated with it) to apply for clearance where there is a Type A event. (We comment further on whether NNUK should do so in paragraph 7.6 below.)

A Type A event is an event which is materially detrimental to the ability of the Scheme to meet its liabilities.

Guidance issued by the Pensions Regulator indicates that the proposed inter-company loan to NNL would be considered detrimental if it weakens the employer covenant because:

(a)    it has an impact on the ability of NNUK to meet is ongoing funding commitments to the Scheme; or

(b)    it reduces the dividend that would be available to the Scheme in the event of NNUK insolvency.

The Guidance states that, to assess whether an event is detrimental, NNUK should compare and contrast the pre and post event employer covenant.

The employer covenant, for these purposes, refers to the support offered by both NNUK and NNL. NNUK is the principal employer of the Scheme against whom the trustees have direct recourse. However, the support offered by NNL must also be taken into account for a number of reasons. The financial position of NNUK may not be sufficiently strong to support the Scheme. The Proposed Financing may affect the financial position of the Group. NNL has previously indicated that the trustees should take into account the financial position of the Nortel Group when assessing the financial strength of NNUK. There is support from NNL for the Scheme in the form of two guarantees. There is also interdependency between entities in the Nortel Group.

In assessing whether there is a weakening of the employer covenant, it is necessary to analyse whether, as a result of the Proposed Financing, there is any change in the legal obligations of NNUK and NNL to the Scheme and any change in their financial position. There is no change in the legal position. It is beyond our expertise to assess the financial impact of the Proposed Financing on NNUK and NNL but the directors need to consider whether it affects the ability of NNUK to support the Scheme on an ongoing basis (taking into account that the deficit revealed by the actuarial valuation as at 5 April 2008 will be larger) and whether the Scheme would receive less in a theoretical insolvency of NNUK and / or NNL as a result of the proposed inter-company loan.

The Guidance indicates that inter-company loans may be Type A events, particularly if the inter-company loan is not on arm's length terms, is not properly documented or

PRIVILEGED - Global - All Estates        CONFIDENTIAL        NNC-NNL07221478 / 7

*[DISCUSSION DRAFT – 27 NOV 2008]*

where there is a credit risk. From a pensions perspective, therefore, the directors of NNUK should ensure that:

(a)    the inter-company loan should be on commercial rates of interest similar to those that NNL could achieve in the market;

(b)    the inter-company loan should be on robust commercial terms. Ideally, the inter-company loan should be repayable on demand but, if a term loan is preferable, the term should be identified and, preferably, should be as short as possible so that any credit risk associated by NNL can be foreseen. The events of default should be similar to those which would appear in commercial documentation;

(c)    the inter-company loan is documented.

Whilst the proposed inter-company loan may result in a weakening of the employer covenant offered by NNUK and / or NNL, the directors also need to assess whether that weakening is material. The Guidance suggests that the directors should take into account the following factors:

(a)    the amount by which the employer covenant is weakened;

(b)    the size of the employer after the event, for example, the net asset position of NNUK and / or NNL;

(c)    the amount of the Scheme's deficit.

Given that the size of the proposed inter-company loan is approximately £200 million, the assets of the Scheme as at 5 April 2008 were approximately £1.65 billion and the deficit in the Scheme on a buy out basis is approximately £1.5 billion, we would suggest that, if it is concluded that there is a weakening in the covenant offered by NNUK, NNL or the Nortel Group, the Proposed Financing is likely to be considered material.

7.6    *Clearance from the Pensions Regulator*

On the basis of the above analysis, it would appear that the Proposed Financing may represent a Type A event in relation which the Pensions Regulator would expect NNUK (and persons connected to or associated with it) to make an application for clearance.

However, whilst the Pensions Regulator may want NNUK to apply for clearance for the Proposed Financing, it is still for NNUK (and persons connected to or associated with it) to consider whether this is, in fact, appropriate or desirable. It needs to be borne in mind that clearance is a voluntary process for obtaining a statement from the Pensions Regulator that it will not use its anti-avoidance powers. It is not the role of the Pensions Regulator nor the trustees to approve the Proposed Financing and, as stated above, there is no obligation on NNUK to notify the Pensions Regulator of the Proposed Financing.

7.7    *Negotiations with the trustees and mitigation for the Scheme*

5917156_2.DOC    8

C                                                                                              TR21420

If NNUK (and persons connected to or associated with it) were to apply for clearance, the trustees need to be involved in any application and will be asked to comment on whether or not they support the application and to explain why. The Guidance suggests that, where a possible Type A event has been identified, employers and trustees should consider and agree the most appropriate mitigation. Trustees are expected to negotiate robustly.

In the circumstances of this case, the trustees may look for the following types of mitigation:

(a)    an improvement in priority, for example, granting a fixed or floating charge to the Scheme;

(b)    a standby letter of credit or guarantee from a third party bank or financial institution; or

(c)    an agreement from NNL and other members of the Group to become jointly and severally liable for the under-funding in the Scheme.

However, it seems more likely that they would seek one of the following:

(a)    the establishment of an escrow account (albeit for less than the £1.2 billion escrow account already requested by the trustees as part of discussions about ongoing funding);

(b)    an extension to the guarantee previously given by NNL in the context of Project Swift (potentially secured); or

(c)    additional cash contributions.

The quantum of the guarantee extension or the additional cash contributions is likely to be an amount which represents the difference in the recoveries they would make from an insolvency of NNUK before the Proposed Financing and the recoveries they would make from an insolvency of NNUK after the Proposed Financing.

NNUK will need to consider, therefore, whether it would be prepared (or could even afford) to offer such mitigation. An application for clearance without some form of mitigation is unlikely to succeed. If there is no mitigation or the mitigation is considered by the Pensions Regulator to be insufficient, the very consideration of a clearance application may lead the Pensions Regulator to conclude that it would be reasonable to impose a contribution notice or financial support direction on NNL or other members of the Group.

NNUK (and persons connected to or associated with it) will also need to consider whether a clearance statement does, in fact, offer any meaningful protection from the exercise of the Pensions Regulator's powers. Clearance is not forward looking and only relates to the event in question. If, therefore, clearance was sought in relation to the Proposed Financing, this would not restrict the Pensions Regulator issuing a contribution notice or financial support direction in relation to any other events or circumstances which transpire after the Proposed Financing is made. However, the proposed changes to the law may mean that there is some merit to applying for

PRIVILEGED - Global - All Estates            CONFIDENTIAL            NNC-NNL07221478 / 9

C

TR21420

[DISCUSSION DRAFT – 27 NOV 2008]

clearance from the imposition of a contribution notice if the Proposed Financing has a materially detrimental effect on the ability of the Scheme to meet its liabilities but only if some mitigation was being offered for the benefit of the Scheme.

There is a risk that, if NNUK proceeds with the Proposed Financing without going for clearance, the trustees will raise these concerns with NNUK and seek appropriate mitigation. The Guidance suggests that, where an application for clearance is not being considered and the trustees are concerned that no mitigation is being offered or any mitigation is inadequate, they should consider contacting the Pensions Regulator themselves. Based on experience of negotiations about the funding of the Scheme both in 2005 and currently and in relation to Project Swift, this should be anticipated.

However, it is also important for the trustees to bear in mind that nothing restricts in any way the duties, powers and obligations of NNUK, the trustees or the Pensions Regulator in relation to the ongoing funding of the Scheme. **As NNUK and the trustees are currently negotiating about the funding of the Scheme under the new scheme specific funding regime, any change in the employer covenant is perhaps best dealt with in the context of these negotiations. The Pensions Regulator stresses that, when agreeing the technical provisions for the Scheme (i.e. the methods and assumptions used to measure the deficit) and the recovery plan (i.e. the period over which the deficit will be amortised), the trustees must take into account the strength of the employer covenant, which is likely to change as a result of the Proposed Financing. This is the best opportunity that NNUK have to persuade the trustees about the merits of the Proposed Financing and could be combined with discussions about the proposed MEN divesture and the impact this will have on the Scheme.**

3917156_2.DOC  10

PRIVILEGED - Global - All Estates                    CONFIDENTIAL

NNC-NNL07221478 / 10

*[DISCUSSION DRAFT – 27 NOV 2008]*

**Section B: What financial information does the board need from NNL to complete its considerations?**

1.      The directors of NNUK will need to be satisfied that NNL will be able to repay the funds advanced as part of the Proposed Refinancing in accordance with the loan documentation. The directors of NNUK will need to be reasonably satisfied by information provided by NNL that it will be able to meet its commitment to make repayment and that repayment will not cause it difficulties.

2.      The standard expected of the directors of NNUK is not prescribed but the test often applied is based on the conclusions which a director ought to reach and the steps which he ought to take are those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both:

     (a)      the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that director in relation to NNUK, and

     (b)      the general knowledge, skill and experience that that director actually has.

3.      The test to be applied is both subjective and objective. The directors of NNUK are thus to be judged by the standards of the "reasonable" director. Case law has reviewed the standards and held that the court will have regard to the particular company and business, so that the general knowledge, skill and experience postulated will be much less extensive in a small company with simple accounting procedures and equipment compared to a large company with sophisticated procedures. In addition, it has been recognised that some directors have a higher standard where for instance they are qualified accountants.

4.      In the circumstances, we consider that the directors of NNUK need to have a reasonable belief that NNL will be able to comply with the repayment obligations in the loan documentation. At this stage, while it is not possible to be conclusive about the documentation and assessment work that the directors of NNUK will need to see, we expect that this will include:

     (a)      details of the restructuring plan of NNL and cash flow forecasts showing how and when repayments of the Proposed Financing will be made. As an example, the dates for repaying Advances that NNUK is relying upon should be shown as cash outflows in the restructuring financial model;

     (b)      details of the proposed divesture plan and other practical measures (such as headcount reduction and business reorganisations) being taken to back up the restructuring proposal;

     (c)      details of whether any external parties are inputting into and reviewing this restructuring plan (such as external accountants, bondholder due diligence etc) as this will provide additional comfort to NNUK that the financial planning exercise has been robust;

5917156_2.DOC    11

C

TR21420

*[DISCUSSION DRAFT – 27 NOV 2008]*

5.      The directors will need to exercise an assessment over the accuracy and reasonableness of the forecasts presented based on their experience of data previously provided by NNL and other relevant factors. For example, the directors of NNUK will need to consider whether the assumptions and assessments made in the NNL restructuring plan are reasonable and achievable. They will also need to consider whether applicable external forces (such as market forces and risks) have been properly and reasonably provided for in the NNL restructuring plan.

6.      If the directors do not feel comfortable assessing the NNL information alone and arriving at a view that the restructuring plan is reasonably achievable, they may need to consider NNUK appointing its own external accountants to independently verify the information and assumptions in the restructuring plan.

7.      Alternatively, an assessment may need to be made on the prospects of recovery of the Advances by NNUK from NNL in the event that it is unable to comply with the loan documentation.

5917156_2.DOC   12

*[DISCUSSION DRAFT – 27 NOV 2008]*

**Section C: What financial information does the board need to produce with respect to NNUK to complete its considerations?**

*We repeat here, for completeness, the requirement for NNUK to consider its balance sheet solvency test and cash flow solvency test each time an Advance is proposed to be made by NNUK to NNL as well as the outset when the Proposed Financing is being established.*

1.    **What information is required to establish balance sheet solvency?**

We suggest that NNUK ascertains the following:

(a)    a trial balance sheet as late as possible to the time of the Proposed Financing, which may require some input from either Watson Wyatt or Mercer with regard to the Scheme's current deficit on the FRS17 / IAS19 basis.

(b)    information on the Nortel Group goodwill and tax write-downs that the board is anticipating, and also a best and reasonable estimate of the impairment of value that is going to be made (if any) to the value of their investments in the European subsidiaries, so that such balance sheet can be adjusted to reflect as true an estimate as possible of the NNUK balance sheet at a point close to execution of the Proposed Financing.

2.    **What consideration needs to be given to contingent liabilities when establishing balance sheet solvency?**

2.1    The question of the Scheme deficit on a buy-out basis and the contingent liability of NNUK to make good that deficit is also relevant to the liabilities section of the balance sheet. The directors do not need to include the contingent liability to pay the full buy-out price of the Scheme deficit (which we understand to be circa £1.5bn presently) if they have a reasonable belief that NNUK is not insolvent or on the verge of insolvency. If, however, the directors cannot form such a reasonable belief, then they would need to consider the buy-out deficit as a contingent liability within the balance sheet calculations.

2.2    Liabilities are a broader term that "debts" and hence include future and contingent sums. This will therefore include any litigation and warranty claims or from landlords.

2.3    [Simon – you made reference to "TPA contingent liability". What is this referring to please?]

3.    **What information is required to establish cash-flow solvency, and how far forward does cashflow and outgoings need to be projected?**

3.1    In order to show cash flow solvency the directors of NNUK will need to be satisfied that NNUK is able to pay its debts as they fall due. We suggest it would be prudent for NNUK to consider its position as far out as 6 – 12 months forward when forming this opinion.

5917156_2.DOC  13

C

TR21420

*[DISCUSSION DRAFT – 27 NOV 2008]*

3.2    Documentation to support this view may include cashflow and expenditure forecasts, aged creditor schedules and verification that there are no outstanding judgments, executions or written demands against NNUK.

4.    **What level of deficit in the Scheme needs to be included when calculating the balance sheet position for these purposes and what level of ongoing contributions to the Scheme need to be projected when assessing cash-flow solvency?**

4.1    In our view, the correct deficit in the Scheme for the purposes of calculating the balance sheet position is the FRS17 / IAS19 measure. Please bear in mind that the current audited FRS17 / IAS19 valuation may, however, be slightly outdated as it is based as at 31 December 2007 and may need reviewing regularly for these purposes. Please also note point 2 above with respect to contingent liabilities. The directors of NNUK also need to take advice from NNUK's auditors about the potential impact of IFRIC 14 on NNUK's balance sheet which may, if applicable, require NNUK to recognise the Scheme's deficit on its technical provisions on its balance sheet where this is higher than the conventional corporate bond based measure.

4.2    For the purposes of calculating NNUK's cash-flow solvency, the directors should assume that the level of contributions necessary to amortise the deficit in the Scheme as at 31 March 2008 (measured on actuarial methods and assumptions consistent with those adopted as at 6 April 2005) by 6 April 2012 will continue to be required. This is because this is the terms of the funding agreement made between NNUK and the trustees dated 21 November 2006 and, to date, the trustees have not agreed to amend such terms. The trustees are currently insisting upon quarterly past service deficit contributions to the Scheme of £39 million as opposed to the current £21.25 million although the possibility of amending the funding agreement is currently being discussed with the trustees and it is possible that NNUK will continue contributions at the rate of £21.25 million.

5.    **What would be the position should NNUK not complete the Proposed Financing?**

5.1    The directors will also need to consider what the likely impact would be on NNUK should it *not* enter into the Proposed Financing with NNL. Any assessment of its ability to make the inter-company loans would not be complete with a downside assessment of the situation should it not make those loans.

5.2    This will involve an assessment of the interdependence of NNUK and NNL, and how long NNUK could survive trading and meeting obligations in the event that NNL went insolvent (which could be a potential outcome of not entering into the Proposed Financing).

5917156_2.DOC  14

*[DISCUSSION DRAFT – 27 NOV 2008]*

**Section D: What documentation should the board implement to record its considerations?**

In addition to the loan documentation used to implement any finally approved intra-group loan itself, the board should also produce or have produced:

1. Detailed board minutes summarising the considerations of the directors at the relevant board meeting and recording any resolutions passed at such meeting. These board minutes will record the tabling of this advice paper and the draft of any suggested intra-group loan agreement;

2. Copies of documentation detailing the financial information referred to in detail at Sections B and C above.

**Osborne Clarke**
[27] November 2008

PRIVILEGED - Global - All Estates          CONFIDENTIAL          NNC-NNL07221478 / 15

*[DISCUSSION DRAFT – 27 NOV 2008]*

**APPENDIX**
**Further detail on applicable legal provisions**

1.  **Duty to promote the success of the Company (section 172 of the Companies Act 2006)**

Each director of NNUK must be satisfied, acting in good faith, that the Proposed Financing would be most likely to promote the success of NNUK for the benefit of its members. As stated above, if NNUK is insolvent or threatened by insolvency then this duty switches to acting in the interest of the creditors of the company. In fulfilling this duty the Companies Act 2006 specifically provides that the directors must have regard (amongst other matters) to the following:

1.1  The likely consequences of any decision in the long term.

1.2  The interests of NNUK's employees.

1.3  The need to foster NNUK's business relationships with suppliers, customers and others.

1.4  The impact of NNUK's operations on the community and the environment.

1.5  The desirability of NNUK maintaining a reputation for high standards of business conduct.

1.6  The need to act fairly between the members of NNUK.

In seeking to fulfil this duty the directors:

(a)  need to consider the effect of the Proposed Financing in the round, because each element of it the transaction has been planned as part of a whole, and also consider the effect of individual steps.

(b)  should take into account all factors of which they are aware and endeavour to make themselves aware of other factors that are likely to be relevant.

(c)  need to act with due care and skill, ensure that their assumptions are reasonable and take professional advice where appropriate.

Breach of this duty may result in personal liability for directors.

2.  **Transactions at an undervalue (section 238 of the Insolvency Act 1986)**

The directors of NNUK must be careful that the Proposed Financing is not vulnerable to attack by reason of being a "transaction at an undervalue" under section 238 of the Insolvency Act 1986 the key features of which are:

2.1  If NNUK has "at a relevant time" entered into a transaction (i.e. the Proposed Financing) with any person (ie NNL) at an undervalue a liquidator or administrator who may, at a later stage, be appointed over NNUK, may apply to the court for an order restoring the position to what it would have been had the transaction not taken place.

5917156_2.DOC  16

*[DISCUSSION DRAFT – 27 NOV 2008]*

2.2    A transaction at an undervalue is one where NNUK makes a gift or otherwise enters into a transaction with a person on terms that NNUK receives no consideration or consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by NNUK. *[The terms of the Proposed Financing are unknown at this stage and whether or not the arrangements will be on an arms length basis or not].*

2.3    To satisfy the "relevant time" qualification, the Proposed Financing must have been entered into no more than two years before the onset of insolvency (i.e. the time of liquidation or administration of NNUK) and at the time of the Proposed Financing NNUK must have been insolvent under either the balance sheet or cashflow test under section 123 of the Insolvency Act 1986 (see paragraph A2 of this note) or must have become insolvent as a result of the Proposed Financing. If NNUK is therefore not balance sheet or cash flow insolvent at the time of the Proposed Financing and other Advances the transaction cannot constitute a transaction at an undervalue. As the Proposed Financing is being entered into with members of the same group of companies (and who are, therefore, "connected persons") insolvency is presumed unless the contrary is shown – hence there will be a requirement to have evidence available to rebut the presumption.

2.4    The court will not make an order under section 238 if it is satisfied that NNUK entered into the Proposed Financing in good faith and for the purpose of carrying on its business and at the time it did so there were reasonable grounds for believing that the Proposed Financing would benefit the company. Authorities show that where no consideration is given it will be harder task in fulfilling this element of the defence. In addition, whether or not reasonable grounds existed must be determined at the time of the transaction.

2.5    An officer of NNUK who authorises a transaction at an undervalue may be subject to disqualification under the Company Directors Disqualification Act 1986 and may also be subject to personal liability under misfeasance provisions (section 212 of the Insolvency Act 1986).

2.6    As stated above, these provisions cannot be triggered unless NNUK is balance sheet or cash flow insolvent at the time of the Proposed Financing and Advances. *[Depending on the nature of the terms of the Proposed Financing, it may also not be possible to view the transaction at an undervalue either at less than market value or a gift.]*

3.    **Preference (section 239 of the Insolvency Act 1986)**

The directors of NNUK must be careful that the Proposed Financing is not vulnerable to attack by reason of being a "preference" under section 239 of the Insolvency Act 1986 the key features of which are:

3.1    A preference is made where the recipient is a person who is a creditor, surety or guarantor and enables a liquidator or administrator to apply to the court for an order restoring the position to what it would have been if the preference had not been given.

3.2    A preference occurs if NNUK does anything or suffers anything to be done which has the effect of putting the creditor, surety or guarantor into a position which, if NNUK

5917156_2.DOC  17

C

TR21420

goes into insolvent liquidation, will be better than the position which that creditor would have been in if that thing had not been done.

3.3    For the purpose of satisfying the "relevant time" qualification, the transaction or arrangement must, in the case of a creditor that is also a group company (such as NNL) and is therefore deemed to be "connected", have been entered into within two years before the onset of insolvency (being the commencement of administration or liquidation) and at the time of the transaction or arrangement NNUK must have been insolvent under either the balance sheet or the cashflow test under section 123 of the Insolvency Act 1986 (see paragraph [●] of this note) or have become insolvent as a consequence of the transaction or arrangement. Unless NNUK is either balance sheet or cash flow insolvent at the time of the Proposed Financing or Advance preferences cannot be established.

3.4    The court will not make an order under section 239 unless, in giving the preference, NNUK was "influenced by a desire to improve the creditor's position". A company (i.e. NNUK) which has given a preference to a person connected with the company (i.e. NNL) is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire.

3.5    An officer of NNUK who authorises a preference may be subject to disqualification under the Company Directors Disqualification Act 1986 and may also be subject to personal liability under misfeasance provisions (section 212 of the Insolvency Act 1986).

3.6    If NNL is not a creditor, surety or guarantor of NNUK (in fact we understand NNUK is a creditor of NNL) the preference provisions cannot apply. Furthermore, as stated above the provision cannot be triggered unless either balance sheet or cash flow insolvency can be shown.

**4.    Wrongful trading (section 214 of the Insolvency Act 1986)**

The directors of NNUK must be careful to ensure that NNUK, following the Proposed Financing, has sufficient cash flow/funding to meet its debts as they fall due and are not vulnerable to the prohibition on "wrongful trading" under section 214 of the Insolvency Act 1986. In summary, a director will be liable of wrongful trading if:

4.1    during the time that person was a director and before the commencement of the winding up of NNUK, **he knew** or **ought to have known** that there was no reasonable prospect of NNUK avoiding an insolvent liquidation; and

4.2    from that time when he knew or should have known that this reasonable prospect did not exist he failed to take every step with a view to minimising the potential loss to NNUK's creditors as (assuming him to have known that there was no reasonable prospect that NNUK would avoid going into an insolvent liquidation) he ought to have taken.

The court's discretion in relation to the order which it can make under section 214 is very broad – the court may make such order as it thinks proper. The main consequence of a finding of wrongful trading is that the director may be required to

5917156_2.DOC    18

C

TR21420

*[DISCUSSION DRAFT – 27 NOV 2008]*

make a personal contribution to the assets of the insolvent company (and may be disqualified). This contribution is not penal in nature but should be equivalent to the extra losses that may have been incurred from the point that the directors knew or ought to have known that there was no prospect of insolvent liquidation.

In order to deal with the risk the directors of NNUK need to consider that if the Proposed Financing and Advances complete that there will be adequate funds in NNUK after such events to avoid insolvent liquidation.

5. **Fraudulent trading (section 993 of the Companies Act 2006 and section 213 of the Insolvency Act 1986)**

Directors can be made personally liable and subject to disqualification if they are found guilty of the offence of fraudulent trading under section 213 of the Insolvency Act 1986. This provision would apply in these circumstances if, at any time during a winding-up of NNUK, it appears that the Proposed Financing was effected with the intent to defraud creditors of NNUK or any other person. This offence is not restricted to the directors of NNUK and any third party who knowingly participates in the transaction (e.g. for example, NNL and/or its officers) could in theory be liable for fraudulent trading.

Fraudulent trading is both a criminal offence under section 993 Companies Act 2006 and a civil one under section 213 of the Insolvency Act 1986.

Despite its name, and the reference within the provision to "defrauding", fraudulent trading does not actually require fraud. Recent cases would suggest that fraudulent trading claims could become increasingly important and of wider application. Case law has tended to broaden its application to cases such that in 1995, it was held that it applied where the directors had traded either knowing or being reckless as to whether creditors would be paid and in 2006 it was interpreted as applying to a transaction which "transgresses the ordinary standards of honest behaviour". Nevertheless for fraudulent trading to apply (unlike wrongful trading) a criminal standard of proof is required which means that the court needs to be satisfied beyond reasonable doubt (compared to the balance of probabilities) that the directors were guilty of fraudulent trading.

Therefore, the parties to the Proposed Financing should carefully consider the future cash flow requirements for NNUK and how future debts will be met in order to avoid any suggestion or perception of their being reckless as to whether or not the creditors who remain with NNUK are paid.

6. **Transactions defrauding creditors (section 423 of the Insolvency Act 1986)**

If a transaction (such as the Proposed Financing) is entered into at an undervalue for the purpose of putting the assets beyond the reach of creditors, or which otherwise prejudices the interests of creditors, the court can make an order as it thinks fit to restore the position to what it would have been if the transaction has not been entered into and to protect the interests of persons who are victims of the transaction. This order may require the directors to contribute towards the shortfall if there are misfeasance proceedings. The directors may also be disqualified.

5917156_2.DOC 19

This section has broad application. There is no requirement that NNUK is insolvent, in liquidation or administration. There is no time limit for the setting aside of such transactions. A section 423 application can be made by a liquidator or any other victim prejudiced (or capable of being prejudiced) by the transaction.

The definition of a transaction at an undervalue under section 423 is the same as under section 238 (see paragraph 2 of this Appendix). It will only be a transaction defrauding creditors if the purpose of the Proposed Financing was to put NNUK's assets beyond the reach of creditors. The court has held that, to show the necessary "purpose" it is a subjective test i.e. the judge has to be satisfied that the person actually had the purpose, not that a reasonable person in that person's position would have it. In addition, the aim of entering the transaction had to be more than a mere hope of gaining an advantage.

We do not expect that this provision can be implemented because there is no evidence whatsoever to show that the purpose of the Proposed Financing or Advances is to put assets beyond the reach of NNUK's creditors or otherwise prejudice their interests.

7.    **Remedy against delinquent directors (section 212 of the Insolvency Act 1986)**

As a general point which is relevant in the event that any of the provisions and duties referred to above are breached and NNUK subsequently enters into liquidation - if, in the course of a winding-up, it appears that a director has misapplied, retained, or become accountable for any money or other property of NNUK or been guilty of any misfeasance or breach of duty in relation to NNUK, the liquidator may, pursuant to section 212 of the Insolvency Act 1986, apply for an order requiring that person to repay, restore or account for such money or property, or make a contribution to NNUK's assets by way of compensation.

In order to mitigate risk of attack under this section the more work that is undertaken to verify the ability of NNL to comply with the terms of the Proposed Financing the less risk. In addition, some focus needs to be given to the interdependence of the NNUK and NNL businesses albeit the directors of NNUK need to be satisfied on a stand alone basis that making the Proposed Financing is in the best interests of NNUK.

8.    **Company Directors Disqualification Act 1986**

The CDDA provides that if directors of a company enters into a formal insolvency regime and has been "unfit" that proceedings can be issued by the Secretary of State for Business Enterprise and Regulatory Reform seeking disqualification as a director for a period of 2 to 15 years. Examples of unfit conduct include wrongful trading, breach of fiduciary duties and continued trading at the expense of the Crown tax authorities.

3917156_2.DOC  20

[*DISCUSSION DRAFT – 27 NOV 2008*]

9.    **Contribution notices (section 38 Pensions Act 2004 and clause 124 and Schedule 9 Pensions Bill 2008)**

The Pensions Regulator may issue a contribution notice if he is of the opinion that:

(a)    the main purpose or one of the main purposes of the Proposed Financing is to prevent the recovery of the buy out debt owed to the Scheme or to prevent such a debt becoming due or to compromise, settle or reduce such an amount (this is the current law and is set out in the Pensions Act 2004; the current requirement for a party to act in bad faith is being removed);

(b)    the Proposed Financing has detrimentally affected in a material way the likelihood of accrued benefits in the Scheme being received (the so-called "material detriment test") (This test is set out in the Pensions Bill 2008 and is not yet in force. However, when enacted, this provision will be backdated to 14 April 2008 so the Proposed Financing would be caught by this new legislation).

The Pensions Regulator must then consider, with reference to a number of specified factors, whether it is reasonable to impose liability on that person to pay the sum specified in the contribution notice.

In deciding whether the material detriment test is met, there will be a non-exhaustive list of factors that the Pensions Regulator must have regard to as follows:

(c)    the value of the assets and liabilities of the Scheme;

(d)    the effect of the act on the value of the assets and liabilities of the Scheme;

(e)    the obligations (including a contingent obligation or one that might fall due) of any person to make a payment or transfer an asset to the Scheme;

(f)    the effect of the act on the obligations described at (c) above;

(g)    the extent to which any person is likely to be able to discharge the obligations described at (c) above in any circumstances (including in the event of insolvency);

(h)    the extent to which the act has affected, or might affect, the extent to which any person is likely to be able to discharge the obligations described at (c) above;

(i)    such other matters as may be prescribed.

A statutory defence will be introduced against the imposition of a contribution notice on the basis of the material detriment test. NNUK (or any persons connected to or associated with it) could defend the imposition of a contribution notice if they could demonstrate that Condition A and Condition C apply and, if applicable, Condition B applies:

(a)    Condition A is that, before becoming party to the act, NNUK (or any persons connected to or associated with it) gave due consideration to the extent to

5917156_2.DOC   21

*[DISCUSSION DRAFT – 27 NOV 2008]*

             which the act might detrimentally affect in a material way the likelihood of accrued benefits in the Scheme being received;

    (b)    Condition B is that, in any cases where as a result of that consideration NNUK (or any persons connected to or associated with it) considered that the act might have such an effect, the party took all reasonable steps to eliminate or minimise the potential detrimental effect that the act might have on the likelihood of accrued benefits in the Scheme being received;

    (c)    Condition C is that, having regard to all relevant circumstances prevailing at the relevant time, it was reasonable for NNUK (or any persons connected to or associated with it) to conclude that the act would not detrimentally affect in a material way the likelihood of accrued benefits in the Scheme being received.

The Pensions Regulator will also issue a code of practice that will set out the circumstances in which he expects that he would use the "material detriment test" in deciding whether to impose a contribution notice. The circumstances in which the Pensions Regulator expects to issue contribution notices on the material detriment test are any of the following:

    (a)    the transfer out of the jurisdictions of the United Kingdom of the scheme.

    (b)    the transfer out of the jurisdictions of the United Kingdom of the sponsoring employer if by doing so there is a material reduction in the level of employer support or legal and regulatory protection for scheme members.

    (c)    the severing of employer support for the scheme so that employer support is removed, substantially reduced or becomes nominal.

    (d)    the transfer of liabilities of the scheme to another scheme or arrangement which does not have sufficient employer support or is not sufficiently well funded.

    (e)    a business model or the operation of the scheme in such a way that is designed to create a financial benefit for the employer or some other person from the scheme, but where inadequate account has been taken of the interests of the members of the scheme, including where risks to members are increased.

10.    **Financial support directions (sections 43 – 50 Pensions Act 2004 and clause 124 and Schedule 9 Pensions Bill 2008)**

The financial support arrangements which may be put in place under a financial support direction include:

    (a)    all members of the Nortel Group becoming jointly and severally liable for the Scheme's liabilities;

    (b)    NNL becoming directly liable for the Scheme's liabilities;

    (c)    an arrangement whereby additional financial resources are provided to the Scheme.

PRIVILEGED - Global - All Estates        **CONFIDENTIAL**        NNC-NNL07221478 / 22

*[DISCUSSION DRAFT – 27 NOV 2008]*

NNUK would be considered "insufficiently resourced" if:

(a)    the value of its resources is less than 50% of the estimated buy out debt; and

(b)    the value of the resources of a persons connected to or associated with NNUK, when added to those of NNUK, would be 50% or more of the estimated buy out debt (the law is being changed so that the Pensions Regulator does not need to identify one such person but can look at the financial resources of the whole group).

The Pensions Regulator must also consider, by reference to a number of specified factors, whether it is reasonable to impose the requirements of a financial support direction on a person.

PRIVILEGED - Global - All Estates        CONFIDENTIAL        NNC-NNL07221478 / 23