



| | |
|---|---|
| From: | Parker, Douglas (TORWM:0098) |
| Sent: | Friday, January 02, 2009 10:48 AM |
| To: | Look, Peter (TORWM:0088); Egan, Lynn (NASHF:9792) |
| Subject: | FW: MOU & 3rd amendment |
| Sensitivity: | Confidential |

Talked to Gordon directly - gave full authority to ratchet this up a bit and educate them what NNL's rights are. Decide to wade in a bit stronger. We'll see how they take it. We need to get OR and/or EY engaged to provide a list of what remedies NNL may have and to provide them on a without prejudice basis to NN UK directors, HS and their counsel.

Doug


Douglas M. Parker

Associate General Counsel - Corporate and Managing Attorney

Nortel

Tel:    (905) 863-2564 or ESN 333
Fax:    (905) 863-7739
Email:  douglapa@nortel.com

This message (including any attachments) is being sent from the Law Department of Nortel and may contain information that is confidential or privileged. Any rights to privilege have not been waived. If you are not the intended recipient, please advise the sender immediately and permanently delete this message and any attachments without retaining a copy.

---

**From:** Parker, Douglas (TORWM:0098)
**Sent:** Friday, January 02, 2009 10:44 AM
**To:** Vaughan, Justin
**Cc:** Lyon, Ben; DAVIES, GAVIN; GALE, STEPHEN; Connelly McGilley, Tracy (TORWM:0098); Look, Peter (TORWM:0088); Egan, Lynn (NASHF:9792)
**Subject:** RE: MOU & 3rd amendment
**Sensitivity:** Confidential

Solicitor's Work Product - Privileged

Thank you Justin. I appreciate the diligence and responsiveness of you and your team to these challenging discussions.

FYI - I have had an opportunity to talk to our core internal team in greater detail about this matter this morning, including Gordon Davies.

We will work on more analysis of the benefits of the 3rd Amendment. We also feel compelled to explain, however, the specific rights and remedies that NNL would have if it were forced to assert those rights and entitlements (either out of a Copperhead or in it through a monitor asserting those rights on behalf of NNL) so that NN UK directors can also determine the commercial impact of those to the EU business. We have been educated as to what the NN UK entity might

1

do to preserve its rights but feel it is helpful to understand factually what NNL might consider as an appropriate response as well so their is a balanced view of rights and trade-offs (for instance, demanding economic compensation from NN UK for the historic use of non-exclusive IP from NNL). We will provide our thoughts on that as well on a without prejudice basis for the directors to consider and hopefully help them with their assessment and decision.

On the 4th Amendment, I think the commercial rationale is more than compelling for all the EU entities and we have spent a lot of time and effort to explain it already and a little bit concerned we are missing the big picture here. Without IPR rights, in a nutshell, all the EU entities could not continue their operations as going concerns. They would be I would think effectively compelled to liquidate their operations upon filing. As you know, there is a potential in any proceeding that the Nortel group of companies could divest a series of assets, sell the entire company as a going concern, and/or re-emerge out of a proceeding a stronger company not burdened by their legacy debt – NN UK and the other European entities and its employees would benefit from any such activity along with the other Nortel global operations. It would seem a shame for the Directors of NN UK entity to compromise those options, which could maximum the benefit to all many stakeholders, by taking a position now that would prevent those possibilities down the road. We believe the 4th Amendment preserves the most optionality for all parties here. As you know, this particular issue is very much linked to the timing of any possible Copperhead filing so time is absolutely of the essence. We think we have provided already some pretty persuasive arguments for why it makes sense for the NN UK directors to agree to this particular amendment and not sure what other rationale would be more persuasive. If you can give us more guidance in that regard, we can reflect upon it further.

Best Regards,

Doug


Douglas M. Parker

Associate General Counsel - Corporate and Managing Attorney

Nortel

Tel:   (905) 863-2564 or ESN 333
Fax:   (905) 863-7739
Email: douglapa@nortel.com

This message (including any attachments) is being sent from the Law Department of Nortel and may contain information that is confidential or privileged. Any rights to privilege have not been waived. If you are not the intended recipient, please advise the sender immediately and permanently delete this message and any attachments without retaining a copy.

---

**From:** Vaughan, Justin [mailto:Justin.Vaughan@herbertsmith.com]
**Sent:** Friday, January 02, 2009 10:02 AM
**To:** Parker, Douglas (TORWM:0098)
**Cc:** Lyon, Ben; DAVIES, GAVIN; GALE, STEPHEN
**Subject:** RE: MOU & 3rd amendment

Dear Doug,

Thank you for coming back to us on that. I confirm that our query about whether there are other agreements that may be put to the NNUK board was not limited to tax-related matters.

While always important, ensuring that board decisions are properly justified and the justifications documented is particularly important in light of Copperhead. Resolving any questions directors raise and having ready access to the records is similarly key

JOINT PRIVILEGED DOCUMENT    HIGHLY CONFIDENTIAL    NNC-NNL06128078 / 2

The template established in the context of the 3rd and 4th Amendments will be useful for any other agreements to which NNUK (and other Nortel entities) is a party or from which approval is sought. That is, preparing a note (as Peter Look did) and clearly spell out the benefits for NNUK (and each other Nortel party to the agreement, as relevant) so that the relevant directors have sufficient material in front of them to form their decisions. Sandy Shandro, who is advising the NNUK directors, is an invaluable resource for Simon and Sharon to discuss questions about corporate benefit in the context of any particular agreement. Although we act for NN Inc and are not advising NNUK or its directors as such, we are always happy to help facilitate any such discussions if it assists.

Returning to the 3rd and 4th Amendments for a moment. I will circulate this afternoon a status update and action items list regarding those documents. I will make sure it is cc'd to you. You may recall from the conference call that Simon Freemantle in particular seeks further information about the corporate benefit to NNUK and other RPS companies of the 3rd Amendment. To the extent you can ask your Nortel colleagues to pull together further material about this and circulate it, it would greatly assist. I appreciate there is a lot on your plate at the moment (and everyone else's) but the 3rd and 4th Amendments need to be resolved as soon as possible.

Thank you and regards,
Justin.

Justin Vaughan
Associate (Australia)
London Corporate
Herbert Smith LLP
T: +44 20 7466 2395
www.herbertsmith.com

-----Original Message-----
From: Douglas Parker [mailto:douglapa@nortel.com]
Sent: 02 January 2009 14:04
To: Lyon, Ben
Cc: Vaughan, Justin
Subject: RE: MOU & 3rd amendment


Ben and Justin

Just wanted to respond specifically to your query whether there are any other agreements of the same vein that would require NN UK directors to consider. Wasn't sure whether you were limiting your query to tax related matters. Clearly there will be other agreements related to any transactions/divestitures we would consider (such as the potential sales of our MEN and/or Enterprise businesses), either insider or outside of a Copperhead scenario, which would need EU entity support to approve and consummate (that issue was mentioned on a call held this morning with the Copperhead Work Stream heads, which Stephen participated in directly for the UK element).

Doug



Douglas M. Parker

Associate General Counsel - Corporate and Managing Attorney

Nortel

Tel:   (905) 863-2564 or ESN 333
Fax:   (905) 863-7739
Email: douglapa@nortel.com

3

This message (including any attachments) is being sent from the Law Department of Nortel and may contain information that is confidential or privileged. Any rights to privilege have not been waived. If you are not the intended recipient, please advise the sender immediately and permanently delete this message and any attachments without retaining a copy.

-----Original Message-----
From: Lyon, Ben [mailto:Ben.Lyon@herbertsmith.com]
Sent: Monday, December 29, 2008 2:31 PM
To: Parker, Douglas (TORWM:0098)
Subject: FW: MOU & 3rd amendment

Apologies - misspelt email address.

Ben


Ben Lyon
Senior Associate (New Zealand)
Corporate
Herbert Smith LLP

-----Original Message-----
From: Lyon, Ben
Sent: 29 December 2008 19:27
To: plook@nortel.com; douglaspa@nortel.com; LynnEgan@nortel.com; kerrys@nortel.com
Cc: srolston@nortel.com; 'sjfreemantle@nortel.com'; Sandy Shandro (SandyShandro@southsquare.com); Sandy Shandro (sandy.shandro@btinternet.com); 'cooperm@nortel.com'; GALE, STEPHEN; DAVIES, GAVIN; Carlile, Kate; Burnett, Emma

Subject: FW: MOU & 3rd amendment

Dear all

Further to the call today and as noted by Steve Gale, Herbert Smith (as counsel to NNUK) has been party to discussions between NNUK and its board.

As noted in Kerry's email below, there are some legal sensitivities around the 3rd and 4th Amendments, in particular (and as noted in Kerry's email) how decisions are made and justified at the NNUK level (and we presume the other companies that are a party to the Master R&D Agreement). Ensuring board decisions are properly justified becomes more pertinent in light of Copperhead.

As highlighted in the attached note, the NNUK directors must have regard to their duty to promote the success of NNUK when making decisions. A number of factors need to be considered when discharging this duty and making decisions at the NNUK board level. Essentially, the duty to promote the success of NNUK is akin to asking: "What is the commercial benefit to NNUK of entering into the 3rd and 4th Amendments (while at the same time being cognisant of the impact of Copperhead)?".

Accordingly, to help the NNUK directors with this analysis, and as you are closest to these issues, it would be very helpful if you could bring together the various arguments why there is potentially a commercial benefit to NNUK of it entering into the 3rd and 4th Amendments.

In assisting the NNUK directors, the various questions that are relevant to the NNUK directors' analysis can be synthesised into the following

queries:

4

3rd Amendment:

- The email below highlights that there are potential taxation implications of NNUK entering into the 3rd Amendment. Should NNUK enter into the 3rd Amendment, please outline (i) what the taxation implications for NNUK are (e.g. assistance with negotiations with HMRC, transfer pricing benefits etc); and (ii) to the extent that they do not relate to taxation matters, what the commercial implications / benefits to NNUK are (e.g. the grant of non-exclusive rights that were otherwise not recorded, risk mitigations etc).

- When considering the potential taxation implications / commercial benefits to NNUK, please distinguish between those that are retrospective implications / benefits (i.e. would impact the pre-31 December 2008 position) and prospective implications / benefits (i.e.

would impact the post-31 December 2008 position).

- Does the analysis of each of the retrospective and prospective implications / benefits change in any way if Copperhead proceeds?

- Do the same potential implications / benefits that apply to NNUK also apply to Nortel Networks SA, Nortel Networks Australia Pty Limited and Nortel Networks (Ireland) Limited (being the other signatories to the Master R&D Agreement?

4th Amendment:

The 4th Amendment email (attached) sets out the requested amendment to the Master R&D Agreement and is aimed at avoiding a collapse of certain parts of the Master R&D Agreement in the event of Copperhead.

- Please outline what, if any, commercial implications / benefits might accrue to NNUK by it entering into the 4th Amendment.

- As the 4th Amendment is driven by Copperhead we would expect that any commercial benefit to NNUK would be prospective. Are there any retrospective benefits (for example to cure a past event of default)?

- Do the same potential commercial implications / benefits to NNUK also apply to Nortel Networks SA, Nortel Networks Australia Pty Limited and Nortel Networks (Ireland) Limited?

We note the tight time frame in resolving the issues surrounding the 3rd and 4th Amendments and look forward to your reply.

We note that we owe you comments on the proposed 4th Amendment from an insolvency perspective. These will follow in due course.

As an aside, are there any other agreements in the same vein as the 3rd and 4th Amendments that are likely to be put to the board of NNUK for consideration?

As always, please let us know if we can be of assistance with this exercise.

Kind regard

Ben

Ben Lyon
Senior Associate (New Zealand)
Corporate
Herbert Smith LLP

T: +44 (0)20 7466 2263
M: +44 (0)780 92000 30

5

E: ben.lyon@herbertsmith.com
W: www.herbertsmith.com

-----Original Message-----
From: Look, Peter (TORWM:0088)
Sent: Tuesday, December 23, 2008 11:49 AM
To: Stephens, Kerry (MOP:7500)
Subject: RE: MOU & 3rd amendment

Thanks, Kerry, for the very focused answer.

Two keys:

- They require a better understanding of the retroactive and prospective protections related to the non-exclusive rights and try to get that approved.

- We need to remove elements that create personal risk in Third amendment if we want it signed.

As possible revisions to third amendment, potentially as a side agreement:

- Acknowledge the spectre of Copperhead and grant ability for courts to rescind in hindsight.
- That while there exists new documentary evidence of appropriate transfer pricing filed with the tax authorities and pending final resolution of the matter by the tax authorities, NNUK and NNSA will defer intercompany settlements to NNL for the increment related to the third amendment (for example, as interest-free loans).

Open to any and all other suggestions at this point.

Also, how will EMEA directors reconcile the fact that it has already been signed and approved in NN Ireland?

Thanks.

Peter

-----Original Message-----
From: Stephens, Kerry (MOP:7500)
Sent: Tuesday, December 23, 2008 11:21 AM
To: Look, Peter (TORWM:0088)
Subject: RE: MOU & 3rd amendment

Peter,

We have missed the 2008 "window" for France as a quorum of Directors cannot be assembled again this year.

The problem for Simon Freemantle and Sharon Ralston given their knowledge of "Copperhead" is the turn that events might take and here particularly an insolvency of NNUK (and in the case of Sharon NN Ireland and Simon NNSA as well). In that event every action they take now, at least in the UK, is going to be looked at with the benefit of 20/20 hindsight by the Administrator/Liquidator and the Pension Regulator.

They could end up with personal liability and if not that find themselves barred from being directors of any UK company which is not great for career prospects. The advice they have received from E&Y and Herbert Smith (a leading UK law firm) acting here for NNL is that they must not do anything that might damage the assets of any company of which they are a director. That advice has been echoed by the lawyer appointed to advise Simon and Sharon personally.

That is "scene setting", but gives you a flavour of the issue.

6

In this regard I do not think the MOA causes any issue as it merely records how the parties have acted together and how they intend to in relation to documents historically signed, although it does contain a cross reference as drafted to the Third Addendum to the MRDA.

It is the Third Addendum that probably causes a potential issue as this recites the revised economic terms, which have involved cost to NNUK (and the other EMEA RPS entities I recall). While it is accepted that the economic provisions of the Third Addendum are merely a placeholder for what the Revenue Authorities ultimately agree, the open question is what happens if the authorities never reach an agreement? That is not an impossible scenario in an insolvency as the quantum of NOLs (which are likely to grow dramatically in an insolvency) of NNUK may be irrelevant and HMRC in the UK for instance may have no appetite for APA/MAP negotiations. Clearly something would be agreed with HMRC, but this may be very different to the economic provisions of the Third Addendum, but by signing the Third Addendum NNUK would have committed itself to legally to those terms and if a "better" economic result arose for NNUK it might not be able to recover the excess, although I think it could probably only recover excess over the Second Addendum amounts as it has agreed to those already.

I realise that settlement has already been made on the basis of the Third Addendum, but in the foregoing scenario the Administrator/Liquidator of NNUK might be able to either offset or claim against NNL for the relevant excess payment.

The Third Addendum does have the important grant of non exclusive rights, which NNUK has in practice exercised for years, and which may be regarded as valuable, although I am not sure that the RPS result for NNUK is influenced very much by them, apart from perhaps the 1% distributor routine return on third party sales outside the UK, which are probably not that material.

Then there is the more subtle, but no less important, point of risk limitation, which given the scale of NOLs in the UK the directors might consider of lesser practical importance in the event of an insolvency.

What in the circumstances would help is trying to explain to the directors the issues surrounding the non exclusive licences and the risk mitigation that is derived from signature of the agreements. What they have has so far has rather majored on the changed components in the RPS model, which are at the end of the day only provisional as what the companies have done, assuming continuing business, is sign up to economic adjustments set by the revenue authorities. They have not had the issues surrounding the benefits from non exclusive licences and the precise mitigation of risk that is derived from signature of the MOA and the Third Addendum. It may be that the Third Addendum has to exclude the changes to the RPS components, and as set out above that may ultimately make no economic difference anyway, if the other elements of it and MOA are beneficial.

Regards, Kerry

Kerry Stephens
Nortel Networks
Tax Department - EMEA
Tel : +44 (0)1628 434439 ESN 560-4439 [New from 1/12/07]
Fax: +44 (0)1628 437378 ESN 560-7378
E Mail: kerrys@nortel.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

JOINT PRIVILEGED DOCUMENT    HIGHLY CONFIDENTIAL    NNC-NNL06128078 / 7

-----Original Message-----
From: Look, Peter (TORWM:0088)
Sent: 23 December 2008 15:24
To: Stephens, Kerry (MOP:7500)
Subject: MOU & 3rd amendment

Kerry,

I'd like to see if there are alterations that could be made to the documents that protect the directors, yet still achieve goals of protecting the Company against the tax authorities.

In your view, what is the most important issue creating the problem?

Thanks.

Peter

This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately by contacting our main switchboard +44 (0)20 7374 8000; you should not retain the message or disclose its contents to anyone. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP is a Limited Liability Partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales whose rules can be accessed via www.sra.org.uk/code-of-conduct.page. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS.

We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications.

Herbert Smith LLP's registration number for Value Added Tax in the United Kingdom is GB 927 1996 83.

Herbert Smith LLP, Gleiss Lutz and Stibbe are three independent firms which have a formal alliance. Further information is available from www.herbertsmith.com.