Court File No. 09-CL-7950

# ONTARIO
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al*.,<br><br>Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

## DECLARATION OF WALTER T. HENDERSON, JR.

(Submitted by US Interests)

I, Walter T. Henderson, Jr., declare under penalty of perjury as follows:

## I. Introduction

### A. Work Experience

1. I am a Senior International Tax Counsel with General Electric Company ("GE"). I have worked at GE since March 2002.

2. I received a bachelor's degree in accounting from the University of Georgia in 1989, a masters in accounting from the University of Georgia in 1990, and a juris doctorate from the University of Pennsylvania Law School in 1993. I am a Certified Public Accountant in the State of Florida. I am also a member of the State Bar of Georgia and licensed as in-house counsel in Connecticut.

3. From 1993 to 2002, I worked for the law firm of Sutherland Asbill & Brennan LLP ("Sutherland") and for Nortel Networks, Inc. ("NNI"), the US operating subsidiary of Nortel Networks Limited ("NNL"). I use the term "Nortel" or the "Company" to refer to all affiliated entities in the Nortel group of companies, including NNL, its parent, Nortel Networks Corporation, and all direct and indirect subsidiaries.

4. My work at Sutherland and NNI focused on tax and tax-related matters. This work included providing assistance in the development, documentation, and/or implementation of Nortel's transfer pricing policies.

5. In Section II of this Declaration, I describe the cost sharing agreements ("CSAs") between NNI and NNL that were a part of Nortel's transfer pricing policy between 1995 – when I first began working on these issues – and 2002. I also describe my involvement in Nortel's decision to adopt the residual profit split methodology ("RPSM"). In Section III, I explain the mechanics of the RPSM as I recall them and my understanding of Nortel's goals in adopting that methodology.

1

B.  **General Description of Transfer Pricing and Advanced Pricing Arrangements**

6. My experience with transfer pricing began when I joined Sutherland in 1993. I received mentoring and training from Jerry Cohen, a Sutherland partner who had previously served as Chief Counsel of the Internal Revenue Service ("IRS"), and had substantial transfer pricing experience.

7. Transfer pricing is the process by which a multinational enterprise ("MNE") sets prices for intercompany transactions between controlled affiliates.

8. It has been my experience at Nortel and elsewhere that one objective of an effective global transfer pricing policy is to be compliant with all applicable tax laws while also earning taxable income in jurisdictions with lower relative tax rates, thereby minimizing the MNE's global effective tax rate. Tax minimization is an objective I would expect most MNEs to seek to achieve, and was a goal I aimed to achieve while advising or employed by NNI.

9. If a tax authority disagrees with an MNE's transfer pricing methodology reflected in its tax return for a particular year, the tax authority may initiate an audit, which could potentially lead to an adjustment in taxes owed, penalties, tax court litigation, and/or double taxation.

10. Tax authorities have developed the advanced pricing arrangement ("APA") process for use in the transfer pricing field. An APA is a contract between one or more affiliates of an MNE (such as NNI) and a tax authority (such as the IRS) specifying the transfer pricing methodology that the affiliate will be permitted to use for an agreed period of time. The APA helps the affiliate avoid the uncertainty of future tax adjustments, penalties, and double taxation.

11. To start the APA process, a taxpayer must request an APA from the appropriate tax authority. The last stage of the APA process is the documentation and signing of a binding

contract (i.e., the APA).

12.     A bilateral or multilateral APA requires (i) individual agreements between the designated MNE affiliates and their respective tax authorities and (ii) a bilateral or multilateral agreement between two (or more) tax authorities.  Therefore, if MNE taxpayers seek a bilateral APA, three sets of negotiation ensue: one between the first affiliate and its tax authority, a second between the second affiliate and its tax authority, and a third between the tax authorities themselves.

       **C.**     **Nortel's Transfer Pricing Policies and APAs**

13.     Between 1993 and 1997, I worked as an associate in Sutherland's Tax Department in Atlanta, Georgia.  In or around 1995, I began spending approximately half of my time working on NNI-related matters, including IRS audits, tax court litigation, transfer pricing documentation, and the drafting of transfer pricing agreements.

14.     At that time, Nortel's transfer pricing policy relating to NNI consisted of three CSAs.  These CSAs governed intercompany transactions between NNI and NNL.  Each CSA covered one of three areas: research and development ("R&D") ("R&D CSA"), global headquarters expenses ("HQ CSA"), or the sale and purchase of tangible property ("Tangible Property CSA").  The CSAs were effectuated through bilateral agreements between NNL and NNI.  Similar CSAs existed between NNL and other Nortel affiliates, such as Nortel Networks UK Ltd. ("NNUK").

15.     As a Sutherland associate, I helped draft the last amended R&D CSA between NNI and NNL under the supervision of Mr. Cohen.  The effective date of that agreement was January 1, 1992.  However, that agreement was drafted in 1996, after the completion of APA negotiations between the IRS and the Canadian Customs and Revenue Agency ("CCRA"), now

known as the Canadian Revenue Agency, so as to reflect the terms of the APA.

16.     On January 1, 1998, I left Sutherland and joined NNI's Tax Department as a Senior Tax Manager, performing similar work for NNI as I had at Sutherland. I reported to Bob Ashby, NNI's Vice President of Tax. I held this position until my first departure from NNI in or around February 1999.

17.     On March 1, 1999, I rejoined Sutherland until approximately September 2000. During that time, I continued my work on NNI-related matters, including IRS audits, tax litigation, and transfer pricing.

18.     On September 1, 2000, I again joined NNI's Tax Department. I reported to Bob Ashby until 2001 and to Kriss Bush, NNL's Vice President of Tax, from 2001 to the date of my departure in March 2002. Mr. Bush was located in Brampton, Ontario.

19.     Beginning in late 2000 or early 2001, I became part of a team of in-house tax personnel and outside advisors that worked on a new transfer pricing methodology to replace the CSAs. This team also prepared applications for APAs with the IRS, the CCRA, and Inland Revenue Service ("Inland Revenue"), the tax authority in the United Kingdom.

## II.     Mechanics of the CSAs and Adoption of a New Methodology

### A.     Mechanics of R&D CSA, Including Ownership of Intellectual Property

20.     The Nortel affiliates who were parties to the R&D CSA ("CSA Participants")[1] shared their global R&D costs pursuant to a three-part formula that allocated costs to each CSA Participant based on its (i) royalty income, (ii) net customer sales, and (iii) modified operating income.

21.     Under the terms of the 1992 R&D CSA, I understood that the perpetual, exclusive

---

[1] These companies were NNL, NNI, NNUK, Nortel Networks Ireland, Nortel Networks, S.A. ("NNSA"), Nortel Networks Australia, Nortel Networks Japan, and Northern Telecom do Brasil Industria e Comercio Ltda.

license granted to NNI effectively amounted to economic and beneficial ownership of all interests in NT Technology within NNI's territory – the United States and Puerto Rico.[2] I understood that each CSA Participant had all the economic and beneficial rights or "benefits and burdens" of the NT Technology within its territory, which was consistent with the way Nortel operated and was taxed. US income was booked in NNI, and NNI was the only CSA Participant that paid corporate income tax in the United States.

22. In a report submitted to the IRS and the CCRA in March 2002 that I helped to draft and review, Nortel told the tax authorities at page 10: "From an economic standpoint, each R&D cost sharing participant could be considered to 'own' the NT technology as it related to its specific region." The document previously marked as Ex. 21026, NNI_00373228 is a true and correct copy of this document. I understood this statement to refer to the economic and beneficial ownership I described in paragraph 21.

23. I did not understand NNI's perpetual and exclusive license to be limited in any way and understood that the exclusive license represented all economic and beneficial ownership of NT Technology in NNI's territory. I understood that in each territory, NNL held legal title for administrative simplicity and did not have any substantive economic or beneficial rights in the NT Technology in NNI's territory.

24. In November 2001, I received an email from Timothy Collins, an in-house intellectual property ("IP") lawyer employed by NNL, with whom I discussed Nortel's IP ownership and license structure in connection with the transition from the CSAs to the adoption of a RPSM (as described below). The document previously marked as Ex. 11114, NNC-

---

[2] Under article 1(k) of the R&D CSA, "NT Technology" was defined as "any and all intangible assets (including but not limited to patents, industrial designs, copyrights and applications thereof, technical knowhow, drawings, reports, practices, specifications, software and other documentation or information) produced or conceived as a result of the R&D Expenses during a calendar year or any prior years."

5

NNL06542925 is a true and correct copy of the email sent by Mr. Collins to me and other Nortel employees. In it, Mr. Collins stated that "each of the R&D Cost Sharing participants assigns ownership of all of its intellectual property to Nortel Networks Limited in return for the exclusive right to exploit all of Nortel Networks Limited's intellectual property within the participant's designated territory." See Ex. 11114 at 1. He described "the most valuable" IP right held by any R&D CSA Participant as "the exclusive right to exploit all of Nortel's [IP rights] in the US enjoyed by NNI." Id. at 2.

25. Mr. Collins' statements are consistent with my view at the time, as I understood that NNI had the perpetual and exclusive right to exploit NT Technology in the United States, including by manufacturing and selling Nortel products, sublicensing NT Technology to third parties to make their own products, and excluding third parties – including NNL – from infringing NT Technology in the United States.

### B. Transition from the CSAs to the RPSM

#### i. APA Team

26. At the end of 1999, each of the three CSA APAs in effect (the R&D APA, HQ APA, and Tangible Property APA) had expired or was nearing expiration. Starting in late 2000, I joined a team of Nortel employees tasked with determining the appropriate transfer pricing policy to propose in the upcoming APA process ("APA Team"). The other team members included David Burn (who was then NNL's Vice President of Tax), Kriss Bush (who replaced David Burn in 2001), Marlene Gilbert, Bob Ashby, Karina O, MaryAnne Pahapill, Gilles Fortier, and Kishor Badiani. Other employees within the Nortel organization were consulted as needed. Our team kept in contact through daily emails, weekly conference calls, and occasional in-person meetings.

27. The APA Team received tax-related legal advice from Jerry Cohen of Sutherland. Sutherland engaged Horst Frisch Inc. ("Horst Frisch"), an economics consulting firm, to help us select and design the new transfer pricing methodology, run modeling, and draft the economic analysis that ultimately formed part of the APA applications. At Horst Frisch, economists Bill Morgan and Tom Horst were the primary contacts.

28. By 2001, I was the project leader for the APA Team. My responsibilities included regularly consulting with our outside advisors, educating senior management about the proposed methodology, making strategic recommendations to NNL senior management about the design of the RPSM, managing the collection of information needed for the APA submission, and finally submitting the APA applications. I communicated with representatives of Horst Frisch, Sutherland, the CCRA, and the IRS throughout this period.

    *ii. New Methodology*

29. After discussion with our external advisors and internal deliberation, the APA Team decided that Nortel should replace the CSAs with a new transfer pricing methodology.

30. In December 2001, a meeting in Brampton, Ontario was organized with senior NNL management – including Doug Beatty (Vice President and Controller), Kate Stevenson (Treasurer and Head of Business Development), John Doolittle (Assistant Treasurer), Terry Hungle (Vice President of Finance and Business Development), Nick DeRoma (Chief Legal Officer), Arthur Fisher (Vice President of Intellectual Property Law), and Kriss Bush – to brief them on the proposed new methodology. On December 2, 2001, I emailed these individuals a document the team had drafted that provided an executive summary of the CSAs and the rationale for replacing them with a new transfer pricing methodology. The document previously marked as Ex. 11058, NNC-NNL06542812 contains a true and correct copy of my email and the

7

attached executive summary.

31. The executive summary noted, among other things, that the APA covering the R&D CSA was expiring; that "neither of the major tax authorities (the CCRA, the IRS or the Inland Revenue) wants to renew the R&D CSA APA for years subsequent to 1999"; and that the R&D CSA did "not effectively allocate R&D expenses among participants during 2001 due to the large operating losses." See Ex. 11058 at attachment 1. The executive summary explained that the APA Team was investigating alternatives to the R&D CSA "[i]n an effort to minimize Nortel's long-term effective tax rate, to make the transfer pricing administrative processes more efficient, and to, over time, improve the global allocation of profits among Nortel affiliates." Id.

32. The APA Team decided to recommend the RPSM. At the meeting on December 12, 2001, NNL senior management did not see any obstacles to Nortel's adoption of this methodology. Therefore, over the next four months, the Nortel APA Team and our outside advisors continued to develop the specific mechanics of the new methodology.

### III. The March 2002 APA Applications

33. In March 2002, NNI, NNL, and NNUK, respectively, submitted APA applications to the IRS, CCRA, and Inland Revenue, seeking approval to use the RPSM as described in the application. Each application included a document entitled "Economic Analysis of Nortel Networks' Intercompany Transactions" ("Horst Frisch Report"), which was drafted by Horst Frisch. See Ex. 21026.

34. The APA Team expected that the APA process would be an ongoing negotiation in which Nortel may need to compromise to achieve its objectives, particularly with the IRS. Therefore, our proposed methodology was designed with those negotiations in mind.

### A. RPSM Overview

35. In brief, the RPSM (i) placed Nortel's affiliates into one of two categories (either integrated entities ("IEs") or limited risk entities ("LREs")), (ii) pooled Nortel's global profits or losses, and (iii) allocated those profits or losses under a two-step process.

36. The IEs – which included NNL, NNI, NNUK, NNSA, NN Ireland, and NN Australia – were former parties to the R&D CSA and had developed IP under that agreement. In addition to conducting ongoing R&D, the IEs also performed functions related to the fulfillment of customer contracts, including manufacturing support and distribution. In contrast, LREs were routine distributors whose primary function was to sell Nortel products in their respective geographic regions and had not previously participated in an R&D CSA.

37. To determine the total "pool" of profits (or losses) to be allocated among the IEs and LREs, the RPSM started with Nortel's consolidated operating profits or losses and recalculated this figure on an economic basis by adding the Company's total R&D expenses and subtracting an amortized portion of those expenses in the manner detailed in Section III.C.ii below. This calculation resulted in the gross "economic profit or loss."

38. The RPSM allocated this "pool" of gross economic global profits or losses under a two-step process. The first step provided each IE and LRE a "routine return" for its performance of certain activities, including the distribution and manufacture (in the case of the IEs) of Nortel goods. The second step provided the IEs any "residual" profits or losses that remained after routine returns were deducted from the economic profit or loss. The residual profits or losses were allocated on the basis of the IEs' proportion of capitalized R&D expenses.

### B. Aim of Adopting the RPSM

39. Nortel was experiencing significant losses in 2001. However, the design of the

RPSM was devised based on the assumption that the Company would return to and sustain its profitability. Indeed, a presentation I sent to NNL management on December 11, 2001 noted at page 21 that "[l]ong-term planning assumes that residual profits exist in the future." The document previously marked as Ex. 11053, NNC-NNL06153990 is a true and correct copy of this presentation.

40. One of the purposes of the RPSM was to minimize Nortel's long-term effective global tax rate while remaining compliant with the tax laws. At the time the RPSM was designed, NNI generated the majority of the Company's taxable income, while NNL generated a significantly smaller amount. For example, the Horst Frisch Report stated that NNI and NNL reported approximately 46 and 8.7 percent, respectively, of the Company's total third party sales in 2001. See Ex. 21026 at 49.

41. Around that time, the effective tax rate paid by NNI in the United States was higher than that paid by NNL in Canada due in part to Canada's generous R&D tax credits. For example, in the presentation I circulated to Nortel management on December 11, 2001, I noted that the effective tax rate was approximately 38 percent for NNI in the United States and 12 percent for NNL in Canada. See Ex. 11053 at 17.

42. While developing the RPSM, the APA Team sought to maximize NNL's routine returns and share of residual profits in a manner we thought the IRS could accept. Given our aim, and based on conversations with the CCRA, we expected the CCRA to negotiate in the best interests of the Canadian government, and against the IRS, to Nortel's benefit.

43. Assuming, as we did, that Nortel would return to profitability, the presentation I circulated to management on December 11, 2001 estimated that NNL's operating income would increase by $4.266 billion between 2000 and 2005 under the RPSM, while NNI's operating

10

income would decrease by $3.36 billion under the RPSM as compared to application of the R&D CSA. Id. at 15. As a result of this shift of operating income between the two jurisdictions coupled with the difference in the effective tax rate, we expected the methodology proposed in that presentation, if accepted by the tax authorities, could save the Nortel group nearly $1 billion in taxes, compared to under the R&D CSA, between 2000 and 2005, the estimated 5-year term of the APA. Id. at 17.

    **C.**    **The Development of the RPSM**

        *i.*    *First Step of the RPSM: Allocation of Routine Returns*

44.    Under the first step of the RPSM, it was contemplated that each LRE would receive at least one percent of its third party sales (the "floor") but no more than two times the percentage of third-party sales that a comparable distribution company would earn in the same geographic region (the "cap").

45.    In contrast to the LREs, the IEs – including NNL and NNI – were fully integrated companies that not only sold Nortel products in the open market, but also manufactured them and engaged in other operations in support of these customer sales, although each IE performed these functions at different levels. The IEs also performed R&D.

46.    We initially considered giving each IE a routine return consisting of a percentage of its sales and a percentage of its total manufacturing costs. However, in a memorandum to me dated November 6, 2001, Mr. Morgan of Horst Frisch calculated that basing routine returns on sales and manufacturing costs would yield a 10.9 percent return on operating assets for NNI and only a 4.1 percent return for NNL, i.e., provide NNI a higher return rate than NNL if the routine returns were modeled this way.

47.    Instead, I directed Mr. Morgan to explore the alternative of providing the IEs a

return on assets, rather than a return on sales and manufacturing costs. As the Horst Frisch Report provides, in 2001, NNL's ratio of long-term assets to net assets was 71.2 percent, while NNI's ratio was only 39.1 percent. See Ex. 21026 at 49. We calculated that use of the asset-based RPSM would generate a higher routine return rate in Canada than the United States, particularly if the calculation were weighted toward manufacturing assets like property, plant, and equipment ("PP&E").

48.  On December 13, 2001, Mr. Morgan emailed me a memorandum that provided a "defensible" methodology for generating "higher returns in Canada." The document previously marked as SUTHERLAND_00002050 is a true and correct copy of Mr. Morgan's email and attached memorandum. Mr. Morgan's memorandum recognized that it was "desirable" to produce "a relatively lower return in the US," and proposed giving each IE a "short-term rate of interest" on its net working capital (defined as operating assets less interest-bearing liabilities) and "a higher rate" on its fixed assets (i.e., PP&E). See SUTHERLAND_00002050 at attachment 1, 6. Mr. Morgan concluded that in light of NNL's "relatively higher asset-intensity," by providing a higher return on fixed assets, the methodology directed a larger rate of return to Canada than the United States. Id. at 3.

### ii.   Second Step of the RPSM:  Allocation of Residual Profits or Losses

49.  To apportion residual profits or losses, the second step (i) capitalized the historical R&D expenses of each IE and its recently-acquired companies, yielding the so-called "R&D capital stock," and (ii) amortized the R&D capital stock over the presumed "useful life" of Nortel's IP (i.e., the estimated time period the IP would continue to generate income for Nortel). The methodology then allocated the residual profits or losses on the basis of each IE's relative percentage of the total R&D capital stock.

12

50. The APA Team considered using or including the IE's selling, general, and administrative ("SG&A") expenses, such as marketing costs, as the allocation key of residual profits or losses. We ultimately excluded SG&A expenses and settled on solely using the IEs' R&D capitalized expenses as the allocation key, in part, because the inclusion of SG&A expenses in the RPSM would provide greater residual profits to NNI. We also felt that while efforts reflected by SG&A expenses may have been a factor contributing to Nortel's varying profitability in different markets, it was nonetheless reasonable to take the position that NT Technology was relatively more important to Nortel's profitability than SG&A expenses given the technological nature of Nortel's business. Again, this was a "going in" position that I knew the IRS might or might not accept.

51. Because the R&D capital stock was amortized over the "useful life" of the resulting IP, the number of years assumed for the IP's "useful life" directly impacted the allocation of residual profits or losses. If the amortization rate was high (meaning the useful life was short), historical R&D spending would be discounted from the R&D capital stock more rapidly. In contrast, if the amortization rate was low (meaning the useful life was long), the historical R&D spending would be discounted from the R&D capital stock more slowly.

52. We anticipated that during the term of the APA, R&D increasingly would be performed by NNL, and NNL's proportion of R&D spending relative to the total spending of the group would increase. See Ex. 11053 at 18. Therefore, using a higher amortization rate would result in a larger R&D capital stock balance for NNL – and thus a greater share of the residual profits – more quickly than would occur assuming a longer useful life, because the calculation of R&D capital stock would be weighted toward future, rather than historical, R&D spending.

53. We ultimately settled on a 30 percent amortization rate, though Horst Frisch was

unable to find empirical or other support for an amortization rate greater than 25 percent. We felt we would ultimately defend a higher rate given other evidence such as internal surveys we conducted of R&D personnel estimating the useful life of Nortel's R&D, interviews with Nortel engineers, or new external research that might be published during the APA negotiations. However, we recognized that this 30 percent figure might not ultimately be accepted or agreed to by the IRS and the other tax authorities.

54. On March 16, 2002, my last day at NNI, I sent an email to Kriss Bush and others providing an update on the APA submission, among other things. The document previously marked as Ex. 11068, NNI_01503491 is a true and correct copy of my email. In the email, I wrote that the application of the RPSM "resulted in a $1.6 billion decrease to NNI's income" in 2001 alone. Ex. 11068 at 2.

### D. Legal or Economic and Beneficial Ownership of IP Under the RPSM

55. Implementation of the RPSM was not expected to change the legal ownership of IP: for administrative ease, NNL was to continue to hold legal title. With respect to economic and beneficial ownership, we anticipated terminating the R&D CSA and providing each IE with a non-exclusive, worldwide license to Nortel IP, rather than the exclusive, regional license the IEs previously enjoyed as former participants to the R&D CSA.

56. I do not recall there being any discussions about whether the non-exclusive licenses under the RPSM would be restricted to Nortel "products." To the contrary, my review of the documents cited in this Declaration is consistent with my recollection that we anticipated giving the IEs non-exclusive licenses to Nortel "technology," irrespective of whether the technology had already been incorporated into a Nortel product. See Ex. 11053 at 22.

57. At the time of my departure from NNI on March 16, 2002, the CSAs had been

terminated, but I do not believe the IE's had reached an agreement on how to document the RPSM or the licenses thereunder.

[*Remainder of page intentionally left blank*]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 11, 2014

_____
Walter T. Henderson, Jr.