Court File No. 09-CL-7950

# ONTARIO
# SUPERIOR COURT OF JUSTICE
# (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re | |
|---|---|
| NORTEL NETWORKS INC., *et al.*, <br><br> Debtors. | Chapter 11 <br> Case No. 09-10138 (KG) <br> (Jointly Administered) |

## REPLY DECLARATION OF WALTER T. HENDERSON, JR.

(Submitted by US Interests)

I, Walter T. Henderson, Jr., declare under penalty of perjury as follows:

1. I have reviewed the Affidavit of Clive Allen dated April 11, 2014 ("<u>Allen Affidavit</u>"), in which Mr. Allen offers his understanding of the purpose and intent of Nortel's CSAs[1] based on his involvement with those agreements in the 1970s.

2. Mr. Allen states that the CSAs reflected Nortel's "overarching policy [to] make Technology (including patents) necessary for the manufacture and sale of Nortel products available to the subsidiaries so that they could commence and continue operations based on Technology obtained at virtually no expense, subject to ongoing research and development costs as provided in the Cost Sharing Agreements." Allen Affidavit ¶ 33. Mr. Allen further states that the CSAs "effected this arrangement through licenses and it was never intended that ownership of the Technology be transferred to the subsidiaries." <u>Id.</u>

3. As I explained in my initial Declaration, under the terms of the 1992 R&D CSA, which immediately preceded Nortel's shift to the RPSM, I understood that while NNL held legal title, the exclusive, perpetual, fully-paid, royalty-free license granted to NNI effectively amounted to economic and beneficial ownership of all interests in NT Technology within NNI's territory. Others within the Nortel Tax and Legal departments were, in my opinion, of the same general view.

4. Mr. Allen further states that he "was significantly involved in the conception, drafting and implementation of the initial Cost Sharing Agreements in the 1970s and 1980s and oversaw the work of lawyers who prepared later versions of the Cost Sharing Agreements." <u>Id.</u> ¶ 28.

---

[1] All capitalized terms not defined herein shall have the meaning set forth in my Initial Declaration dated April 11, 2014.

5.  While working on transfer pricing matters for NNI between 1995 through 2002, I do not recall working with Mr. Allen or hearing his name mentioned in connection with the R&D CSAs, and I did not have any significant involvement with him related to Nortel's CSAs or transfer pricing policies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 25, 2014

_____
Walter T. Henderson, Jr.