Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re

NORTEL NETWORKS INC., *et al.*,

Debtors.

Chapter 11
Case No. 09-10138 (KG)
(Jointly Administered)

## DECLARATION OF MICHAEL ORLANDO

(Submitted by US Interests)

I, Michael Orlando, declare under penalty of perjury as follows:

## I. Introduction

1. I held various tax positions at Nortel Networks, Inc. ("NNI") for over nine years, from May 2002 to October 2011. Throughout that time, I was based in North Carolina.

2. From 2002 until 2004, I was a Senior Tax Associate. In that position, I was responsible for federal and state tax compliance in the United States. I reported to Laurie Krebs, Vice President and Leader for US Tax. In 2004, I was promoted to Senior Tax Manager and my responsibilities grew to include international tax issues. At that time, I continued to report to Krebs, who in turn reported to John Doolittle, the Vice President of Tax at Nortel Networks Limited ("NNL"), NNI's parent company, which was based in Canada.

3. In 2005, I began reporting to Mark Weisz, the Director of International Tax, and I continued to work on international tax issues, including transfer pricing issues. At that time, Weisz reported to Doolittle. Commencing at this time, my responsibilities included overseeing day-to-day activities and risk management involved with transfer pricing, reviewing quarterly and annual transfer pricing calculations and adjustments, managing requests from sovereign tax authorities related to transfer pricing and the Advance Pricing Agreement ("APA") process, reviewing transfer pricing documentation, and other matters relating to implementing transfer pricing policies.

4. After Weisz's departure from Nortel in 2007, I worked as Transfer Pricing Leader and reported directly to Peter Look, who had replaced John Doolittle as Vice President of Tax at NNL. I held this position until I left Nortel in October 2011. As Transfer Pricing Leader, I

1

assisted in implementing Nortel's[1] global transfer pricing policies. I was also involved in negotiating Nortel's APA requests made to various tax authorities, and I worked with economists, tax advisors, and attorneys in an effort to obtain approval of these requests. Among other things, I also continued to review quarterly transfer pricing calculations and assisted in responding to requests from tax authorities related to transfer pricing.

5. Prior to joining Nortel, I began my professional career as a Tax Associate at Kreischer Miller & Company, a public accounting firm, where I worked from 1996 to 1999. From 1999 through 2000, I worked as a Tax Associate at CSS Industries, Inc. From 2000 to 2002, I worked as a Senior Tax Associate for Arthur Andersen, a public accounting firm. In these positions, my responsibilities included maintaining federal and state tax compliance for numerous clients in multiple industries. Since leaving Nortel in October 2011, I have served as Director of Transfer Pricing at Dell Inc.

6. I received a Bachelor of Arts degree in Business and Economics from Western Maryland College in 1991. I also received a Master of Science in Taxation degree from Philadelphia University in 2000. I participated in numerous training courses in taxation, including specifically transfer pricing, by outside agencies while employed at Nortel.

7. In Section II of this Declaration, I provide a background on transfer pricing and the APA process. In Section III, I describe the structure of the Nortel group, with which I became familiar through my work in transfer pricing. In Section IV, I explain Nortel's intellectual property ("IP") licensing structure and transfer pricing policy as implemented in the Master Research and Development Agreement (the "MRDA"), as well as my understanding and the common business understanding of the MRDA when I was at Nortel. Finally, in Section V, I

---

[1] I use the term "Nortel" to refer to affiliated entities in the Nortel group of companies, including NNL, its parent Nortel Networks Corporation, and all direct and indirect subsidiaries thereof.

2

use data from spreadsheets that were developed by Nortel's transfer pricing team to list the transfer pricing adjustments and annual R&D expenditures for the parties to the MRDA between 2001 and 2008.

## II. Transfer Pricing Generally and the APA Process

8. Transfer pricing refers to the process by which a multi-national enterprise (an "MNE") determines arm's length prices for related party transactions within that corporate group. Tax authorities throughout the world – including the Internal Revenue Service (the "IRS") in the US, the Canada Revenue Agency (the "CRA") in Canada, and Her Majesty's Revenue and Customs (the "HMRC") in the UK – have developed a regulatory framework that governs transfer prices and policies. Transfer pricing is also informed by transfer pricing guidelines issued by the Organization for Economic Cooperation and Development, of which the US, Canada, the UK, Ireland, France, and many other countries are member states.

9. The basic principle underlying transfer pricing rules and regulations is that affiliated entities within an MNE must price transactions for tax purposes between one another as if they were unrelated entities – in other words, as if each of the entities were transacting at "arm's length." While NNL sought at all times to comply with this arm's length standard, consistent with its obligation to maximize shareholder value, it was NNL's desire to minimize the Nortel group's tax burden and also to repatriate cash to Canada in a tax-efficient way. It is my understanding that Nortel's transfer pricing policy was designed with these goals in mind, in addition to the goal of adhering with the arm's length standard.

10. MNEs' transfer pricing policies are subject to review by tax authorities to ensure that they comply with the applicable transfer pricing regulations. In order to gain tax certainty, MNEs may choose to take advantage of the so-called Advance Pricing Agreement mechanism,

3

whereby an entity within an MNE could seek to reach an agreement with the tax authority in its country of incorporation about a mutually acceptable transfer pricing policy, which is then applied to determine the entity's taxable income over a set period of time. Sometimes, MNEs may seek to enter into APAs with multiple countries' tax authorities at the same time, and if those tax authorities agree upon an acceptable transfer pricing policy, the MNE and tax authorities will enter into a bilateral or multilateral APA.

11. Nortel submitted a request for a multilateral APA for the 2001-2005 period to the Canadian, US and UK tax authorities, and it submitted a request for a bilateral APA for the 2006-2011 period to the IRS and CRA.[2] I became involved in Nortel's APA application process after I joined the transfer pricing team in early 2005.

12. Nortel's APA application for the 2001-2005 period was not resolved until after the commencement of Nortel's insolvency proceedings, when the IRS and CRA proposed a $2 billion income adjustment from NNL to NNI for the 2001-2005 period, which NNL and NNI ultimately accepted. Although the IRS had offered various criticisms of Nortel's transfer pricing policy throughout the APA process, including in a 2006 position paper, neither the IRS nor the CRA explained the precise basis for the $2 billion adjustment. In 2010, Nortel's APA application for 2006-2011 was withdrawn at the tax authorities' request.

### III. Nortel's Structure

13. The starting point for the development of any transfer pricing policy – and for determining whether a pre-existing transfer pricing policy is still appropriate – is a "functional analysis" that examines the functions, assets, and risks of the MNE entity and its affiliated entities involved in the related party transactions. As part of my work with Nortel's transfer

---

[2] Nortel originally submitted an APA request to the CRA, the IRS and the UK tax authority for the 2000-2004 period, but this was subsequently amended to apply to the 2001-2005 period.

4

pricing team, I assisted in conducting functional analyses of various entities within the Nortel group and thus became familiar with Nortel's structure and the functions, assets, and risks performed and incurred by the various Nortel entities. Nortel's structure, including the functions, assets and risks of the corporate entities within the Nortel MNE, is described in functional analyses and other documents sent from Nortel to certain tax authorities.[3] These submissions were drafted with the consultation of Nortel's APA advisors, Ernst & Young ("E&Y"), and/or Nortel's legal advisors at Oslers, Hoskin & Harcourt LLP and Sutherland Asbill & Brennan LLP and its advisors at Horst Frisch Inc., an economics and tax consulting firm.

14. The manner in which Nortel structured its business and the functions, assets and risks of various Nortel entities is also described in the 2009 Transfer Pricing Reports for NNL and NNI, which were prepared by E&Y, with assistance from Nortel tax personnel in the US and Canada, to document Nortel's transfer pricing methodology with the understanding that the IRS or CRA may request copies of them.[4]

15. Nortel had a publicly-traded parent, Nortel Networks Corporation ("NNC"), which held 100% of the stock of Nortel's Canadian operating company, NNL. NNL, in turn, directly or indirectly held 100% of the stock in Nortel's four other operating companies, which included NNI in the US; Nortel Networks (UK) Ltd. ("NNUK") in the UK; Nortel Networks,

---

[3] I am informed that true and correct copies of certain of these documents were previously marked as Deposition Exhibit 11055, NNC-NNL004608 (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch Inc., dated Mar. 2002); Dep. Ex. 11169, NNC-NNL002707 (Nortel's Advance Pricing Arrangement Responses to Inland Revenue, Internal Revenue Service and Canada Customs and Revenue Agency, dated Sep. 2003); Dep. Ex. 31355, EMEAPROD2189880 (Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004, dated Nov. 2004); Dep. Ex. 11308, NNC-NNL06058049 (letter from Mark Weisz to the CRA, IRS and HMRC entitled "Nortel Multilateral APA," dated June 2007); and Dep. Ex. 22078, PC0184853 (Nortel Networks Limited & Nortel Networks Inc. Joint Request for US-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), dated Oct. 2008). Some of these documents were prepared with my assistance, and I am familiar with others through my work on the Nortel transfer pricing team.

[4] I am informed that documents previously produced with bates numbers NNI_00443582 and NNI_00442576 are true and correct copies of the 2009 Transfer Pricing Reports for NNL and NNI.

S.A. ("NNSA") in France; and Nortel Networks (Ireland) Ltd. ("NN Ireland") in Ireland. Nortel referred to NNL, NNI, NNUK, NNSA and NN Ireland collectively as the "Integrated Entities" ("IEs") or "Residual Profit Entities."

16. The IEs were the entrepreneurs and risk-takers of Nortel because they were the entities responsible for Nortel's R&D activities. Because of their entrepreneurial and risk-taking function, each of the IEs were entitled to enjoy the benefits from Nortel's R&D investments, and they maintained economic and beneficial ownership of Nortel's IP in their respective geographic regions.

17. In addition to their R&D activity, the IEs performed other functions related to the customer fulfillment process both inside and outside of their geographic markets. Historically, the IEs manufactured all Nortel products, and although Nortel outsourced most of its manufacturing activities by 2004, the IEs continued to be responsible for manufacturing support, quality control, procurement, and inventory and supply chain management. The IEs also performed a wide variety of distribution activities, including regional technical, sales and marketing support.[5]

18. Apart from the IEs, Nortel had dozens of other subsidiaries in other countries throughout the world that were called "Limited Risk Entities" ("LREs") or "Limited Risk Distributors." These entities were limited only to sales and distribution functions within their local markets. The LREs did not conduct R&D, assume entrepreneurial risk, or have economic and beneficial ownership of Nortel's IP.

19. The Nortel group was also organized into several lines of business. Although these lines of business evolved as Nortel undertook extensive restructuring activities throughout

---

[5] The role of the IEs is set forth in, inter alia, Dep. Ex. 31355 at pp. 6-7, 48, 92-95; Dep. Ex. 22078 at pp. 11-12, App. A pp. 1-5, 7, App. C 7; Dep. Ex. 11169 at pp. 25, 43-44; Dep. Ex. 11055 p. 49; NNI_00443582 pp. 1-2, 34-35, 37-39; and NNI_00442576 pp. 1-2, 32-33, 35-37.

the 2000s, they were generally arranged around particular types of Nortel customers and the types of networking technology provided to those customers. For example, throughout the 2000s, Nortel maintained lines of business devoted to enterprise customers (called "Enterprise Networks" or "Enterprise Solutions") and service provider and cable operator customers (e.g., "Wireless Networks," "Metro Ethernet Networks" or "Wireline Networks"). The heads of Nortel's Enterprise Networks and Enterprise Solutions line of business were based in the US throughout the 2000s. Likewise, the presidents of Nortel's wireless line of business – which was called, at different points, "Wireless Networks," "Carrier Networks" and "Mobility and Converged Core Networks" – were generally based in the US throughout the 2000s.

20. Nortel maintained a Global Accounts group, based primarily with NNI in the US, whose purpose was to support key customers through sales and engineering support. This group was based in the US with NNI because many of Nortel's largest multinational customers, including Verizon, Sprint Nextel and AT&T, were located in the US and were NNI customers.

IV. **The MRDA**

   A. **License Grants and RPSM**

21. The Master Research and Development Agreement is an agreement between all of the IEs – NNL, NNI, NNUK, NNSA, and NN Ireland – that formalized the terms of Nortel's transfer pricing policies for 2001 onward, including with respect to economic and beneficial ownership and licensing rights to Nortel's IP.[6]

22. I first became involved in the implementation of the MRDA shortly after I joined the transfer pricing group in early 2005. Although it was made effective from January 2001, the

---

[6] Nortel Networks Australia Pty. Ltd. ("NN Australia") was also a signatory of the MRDA, but ceased to be considered an IE in 2007. I am informed that a true and correct copy of the MRDA and its amendments was previously marked as Dep. Ex. 21003, NNC-NNL06001514.

MRDA had not yet been signed by all the IEs when I joined the transfer pricing group in 2005, and I was asked by Mark Weisz, the then-Director of International Tax, to contact representatives of the various IEs to obtain their signatures on the MRDA, which I did. Subsequently, the MRDA was amended several times, and I was involved in the drafting of several of those amendments. Both because of my role in the transfer pricing group and my role with respect to the MRDA in particular, I was familiar with the MRDA and had a good understanding of its business terms.

23. It was and is my understanding, as well as the understanding of other tax personnel and businesspeople at Nortel, that the MRDA was intended to provide each of the IEs with economic and beneficial ownership of Nortel's IP within their exclusive territories, e.g., the US in the case of NNI, or the UK in the case of NNUK. The MRDA states that each IE engaged in R&D, that R&D was the key profit driver of Nortel, and that the IEs thus bore the "full entrepreneurial risks and benefits for the Nortel Networks business." The MRDA also recites that NNI, NNUK, NNSA and NN Ireland (called the "Licensed Participants") "held and enjoyed equitable and beneficial ownership of certain exclusive rights" to Nortel's IP in their respective jurisdictions. From a transfer pricing perspective, these terms were intended to reflect the way the IEs functioned and the way they were in fact structured within the Nortel group.

24. Under Article 4 of the MRDA, NNL was granted legal title to Nortel's IP. It was commonly understood at Nortel that NNL held legal title for administrative convenience only. Articles 4 and 5 of the MRDA provided that in exchange for NNL getting legal title to all IP regardless of which IE created that IP, the Licensed Participants would enjoy perpetual, royalty-free and exclusive licenses to that IP in their respective territories, including the right to sublicense the IP. Article 4 further provided enforcement rights to each of the IEs in their

respective jurisdictions, including the rights to assert actions and recover damages for infringement or misappropriation of IP.

25. Article 9 of the MRDA further provided that, upon the termination of the MRDA, each of the Licensed Participants would be treated as having a fully paid up license that permitted them to continue to exercise the rights granted to them under the MRDA. Moreover, under Article 11, in the event of the insolvency of one of the Licensed Participants, the Licensed Participant would receive a "Retirement Allocation" from NNL representing the "fair market value" of the license.

26. Thus, all of the IEs enjoyed full economic and beneficial ownership rights, including enforcement rights, the rights to sublicense and the rights to make, have made, use, lease and sell products embodying Nortel technology in their specific territory. I believe that this was the common business understanding at Nortel, shared by tax and other Nortel business persons, as well as Nortel's tax and APA advisors.

27. Nortel repeatedly informed tax authorities that each of the IEs enjoyed economic and beneficial ownership of the IP in their respective territories. As part of my transfer pricing duties, I became familiar with a 2002 Economic Analysis performed by Horst Frisch which stated that "[f]rom an economic standpoint, each [IE] could be considered to 'own' [Nortel] technology as it related to its specific region."[7] This report was submitted to the US, Canadian, and UK tax authorities in connection with Nortel's APA request for the 2001-2005 period. I also became familiar with a 2003 submission by Nortel to those three tax authorities which stated that the IEs were "the owners of the intangible property."[8] Likewise, Nortel's 2008 request to the IRS and CRA for a bilateral APA, which I helped to draft, explained that although all IP was

---

[7] Dep. Ex. 11055, p. 10.
[8] Dep. Ex. 11169, p. 25.

"registered" in NNL's name, "[e]ach IE maintain[ed] an economic ownership in the IP."[9] And as late as 2010, after the commencement of Nortel's bankruptcy, the Transfer Pricing Reports for NNL and NNI – which were prepared by E&Y and others for eventual submission to the CRA and IRS, respectively – described the IEs as "the primary owners of intangibles" developed by Nortel.[10]

28.  I am not aware of any instance in which Nortel or its advisors informed the tax authorities that if Nortel sold its patents, the proceeds from that sale would be recognized exclusively by NNL. That outcome would have been inconsistent with Nortel's representations to tax authorities that the IEs enjoyed economic and beneficial ownership of the IP in their exclusive territories and that the IEs enjoyed the benefits as well as the burdens of their entrepreneurial and risk-taking functions. Based on my experience with transfer pricing and APA negotiations, had Nortel represented to the tax authorities that this was the parties' intention under the MRDA, I believe that the tax authorities would have taken the position that such an arrangement did not comply with the arm's length standard.

29.  In addition, at no time did anyone at Nortel suggest to me, either before or after the bankruptcy, that NNL would be entitled to the entirety of the proceeds from the sale of Nortel's patent portfolio.

30.  Schedule A of the MRDA memorialized Nortel's transfer pricing policy with respect to how the IEs would divide operating revenues or losses while Nortel was an operating company. Schedule A to the MRDA used a residual profit split method ("RPSM"). Nortel's RPSM operated in two steps. First, each entity was provided with a "routine return" to compensate it for manufacturing, distribution, and other routine activities. Second, the IEs

---

[9] Dep. Ex. 22078 at App. A, p. 4.
[10] NNI_00442576, p. 1; NNI_00443582, p. 1.

received a share of the residual profit or loss of the Nortel group that was proportional to that IE's share of R&D spending. Schedule A provides that the RPSM does not apply to the gain or loss from the sale of a line of business.

B.  First Addendum

31.  In the fall of 2005, the MRDA was amended by the First Addendum to the MRDA, which made three minor changes. First, the wording of the first paragraph of the MRDA was modified to say that the MRDA confirmed and formalized the parties' operating arrangements as of January 1, 2001. Second, the Addendum corrected the name of NN Australia, which was a party to the agreement. Third, the Addendum made some minor grammatical changes to article 5.

32.  The Addendum itself stated that it was intended to "correct[] certain minor errors," and I never heard anyone say that these changes were anything other than minor wording changes that did not affect the parties' rights.

C.  Second Addendum

33.  In 2007, the MRDA was amended. Among other things, the Second Addendum provided that in the event that an IE failed to perform R&D activity for two consecutive years – as NN Australia had done – it would be terminated from participation in the MRDA and would receive as a "buy out" its rolling sum of R&D Stock (as defined in Schedule A of the MRDA) over the next five years.

D.  Third Addendum

34.  In 2008, the MRDA was amended a third time. The first major change in the Third Addendum was to grant the Licensed Participants non-exclusive licenses to Nortel IP in the non-exclusive territories, i.e., territories throughout the world that did not fall under the

11

exclusive territory of one of the IEs. These non-exclusive licenses were supplementary to the exclusive licenses held by the IEs in their respective territories.

35. The second major change in the Third Addendum was an amendment to Schedule A to reflect Nortel's revised RPSM for the years from 2006 onward. Between 2001 and 2005, the IEs had received a routine return based upon their return on net assets, while the LREs' routine return was based upon returns earned by comparable independent distributors; the residual was allocated to the IEs in proportion to each IE's capitalized and amortized R&D expenses. However, from 2006 onward, the IEs' routine returns were calculated to include both (1) a return based upon comparable independent distributors (the same return earned by the LREs) and (2) a return for global operations, sales and marketing, and general and administrative costs incurred by each IE to support extraterritorial revenues. The IEs' share of the residual also changed to a distribution in proportion to each IE's R&D spending for the five years preceding the relevant calculation year.

36. The Third Addendum was drafted in late 2008, but was not executed by all of the IEs until January 2009, shortly before Nortel's bankruptcy.

E. **Fourth Addendum**

37. In December 2008, Nortel's management determined that certain affiliates within the Nortel group were likely to file for bankruptcy or to seek other similar protection. At that point, after reading the MRDA, I informed Peter Look that under the MRDA terms, any IE would be entitled to the fair market value of its license rights if it commenced proceedings for protection under insolvency laws. Look responded in an email to me that this would mean

approximately two-thirds of what he perceived to be the value of Nortel would be "sitting outside Canada for total IP."[11]

38.   Subsequently, Peter Look and Nortel's counsel drafted the Fourth Addendum to the MRDA, which provided that in the event of an insolvency, no IE would automatically be terminated as a party to the MRDA. Ultimately, the Fourth Addendum was executed by the IEs in January 2009, days before Nortel's bankruptcy.

## V.  Transfer Pricing Worksheets

39.   I and other members of Nortel's transfer pricing team used certain spreadsheets (the "Transfer Pricing Worksheets") to calculate the amount of the transfer pricing adjustments that should be made to the IEs' income pursuant to the RPSM. These Transfer Pricing Worksheets contain financial information that was essential to the transfer pricing calculations, including operating income and R&D expenditures, and they set forth the calculations underlying the transfer pricing adjustments to which each IE was entitled. There is one Transfer Pricing Worksheet that showed these figures for each of the years between 2001 and 2008.[12]

40.   The Transfer Pricing Worksheets demonstrate that each IE's annual R&D expenditure between 2001 and 2008 was as follows (in millions of US dollars):[13]

---

[11] I am informed that the document previously marked as Dep. Ex. 22139, NNC-NNL07112812 is a true and correct copy of this email.

[12] I am informed that the documents previously produced with bates stamps NOR_53648312 (2001 Transfer Pricing Worksheet), NOR_53648037 (2002 Transfer Pricing Worksheet), NOR_53648041 (2003 Transfer Pricing Worksheet), NOR_53648508 (2004 Transfer Pricing Worksheet), NOR_53648130 (2005 Transfer Pricing Worksheet), NOR_53648133 (2006 Transfer Pricing Worksheet), NOR_53648323 (2007 Transfer Pricing Worksheet), and NOR_53648048 (2008 Transfer Pricing Worksheet) are true and correct copies of the Transfer Pricing Worksheets.

[13] Sources for figures from 2001-2003 are the "Rona" tabs on the 2001-2003 Transfer Pricing Worksheets; sources for figures from 2004-2005 are the "Profit split profit" tabs on the 2004 and 2005 Transfer Pricing Worksheets; source for figures for 2006 is the "IP owner R&D" tab on the 2006 Transfer Pricing Worksheet; and sources for figures for 2007 and 2008 are the "RPS Participants" tabs on the 2007 and 2008 Transfer Pricing Worksheets. The NNI R&D expenditure figure for 2001 includes expenditures by Bay Networks U.S.

Figure 1: Annual R&D Expenditures

| IE | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|---|---|---|
| NNL | 1,463.0 | 879.6 | 821.5 | 841.7 | 804.0 | 902.4 | 841.9 | 817.4 | 7,371.5 |
| NNI | 1,343.9 | 869.9 | 793.5 | 768.3 | 719.6 | 679.2 | 677.7 | 615.0 | 6,467.1 |
| NNUK | 352.3 | 183.8 | 95.3 | 95.6 | 66.4 | 43.6 | 39.0 | 36.5 | 912.5 |
| NNSA | 223.1 | 245.6 | 266.9 | 267.3 | 256.8 | 223.2 | 67.1 | 55.4 | 1,605.4 |
| NN Ireland | 11.7 | 14.8 | 18.1 | 17.8 | 17.9 | 19.7 | 25.0 | 24.4 | 149.4 |
| NN Australia | 13.3 | 10.5 | 10.3 | 6.4 | 4.5 | 0.0 | 0.0 | 0.0 | 45.0 |

41. The Transfer Pricing Worksheets also demonstrate that between 2001 and 2008, each IE received a transfer adjustment, either upward or downward, as follows (in millions of US dollars):[14]

Figure 2: Annual Transfer Pricing Adjustments

| IE | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|---|---|---|
| NNL | 589.0 | 482.3 | 391.0 | 652.4 | 496.0 | 511.1 | 725.9 | 879.8 | 4,727.5 |
| NNI | -1,931.2 | -1,140.2 | -857.8 | -722.7 | -631.8 | -371.8 | -508.9 | -537.3 | -6,701.7 |
| NNUK | 902.7 | 198.0 | 443.8 | 307.2 | 205.5 | 36.5 | 28.1 | 20.5 | 2,142.3 |
| NNSA | -92.1 | 81.1 | -27.4 | -145.7 | -12.7 | 3.7 | -95.3 | -46.9 | -335.3 |
| NN Ireland | -44.2 | -70.5 | -67.4 | -64.9 | -50.0 | -102.6 | -119.5 | -147.6 | -666.7 |
| NN Australia | 38.2 | 24.2 | -17.8 | 1.5 | 8.2 | -95.6 | -0.4 | 0.0 | -41.7 |

42. As the figures above indicate, NNI spent a total of $6.5 billion for R&D and made $6.7 billion in transfer pricing payments to NNL from 2001 through year-end 2008.

---

[14] Sources for figures from 2001-2003 are the "Rona" tabs on the 2001-2003 Transfer Pricing Worksheets; sources for figures from 2004-2005 are the "Profit split profit" tabs on the 2004 and 2005 Transfer Pricing Worksheets; sources for figures for 2006 and 2007 are the "RPS Calculation" tabs on the 2006 and 2007 Transfer Pricing Worksheets; and source for figures for 2008 is the "FY RPS Calculation" tab on the 2008 Transfer Pricing Worksheet. The NNI transfer pricing adjustment figure for 2001 includes the adjustment for Bay Networks U.S.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 28, 2014
Austin, Texas

_____
Michael Orlando

15