**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>  NORTEL NETWORKS INC., *et al.*,<br><br>                              Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**<u>DECLARATION OF JOHN J. RAY III</u>**

(Submitted by the US Interests)

I, John J. Ray III, declare under penalty of perjury as follows:

**I.    <u>Introduction</u>**

1.    I am the Principal Officer of Nortel Networks, Inc. ( "<u>NNI</u>") and its affiliated debtors in the United States (together, the "<u>US Debtors</u>").  I have served in this role since December 7, 2009, and my appointment as Principal Officer was approved on January 6, 2010, by an order of the United States Bankruptcy Court for the District of Delaware ("<u>US Court</u>").  I am also Senior Managing Director and the sole member of Avidity Partners, LLC and the Managing Director of Greylock Partners, LLC.

2.    I have over 15 years' experience working with troubled companies.  Among other things, I served as the Chief Administrative Officer and General Counsel of Fruit of the Loom, Inc. during its proceedings under chapter 11 ("<u>Chapter 11</u>") of title 11 of the United States Code ("<u>Bankruptcy Code</u>") proceedings in the United States Bankruptcy Court for the District of Delaware and oversaw the sale of the company in those proceedings to Warren Buffett's Berkshire Hathaway.  I also served as Chairman of the Board and Chief Executive Officer of Enron Corporation following its emergence from Chapter 11.  While with Enron, I oversaw the sale of a $3 billion international energy company as well as multiple asset sales through auction or private sale, and I directed and managed multiple material litigations as plaintiff arising from Enron's failure, which generated several billion dollars in recoveries.  I was also responsible for the resolution of several hundred billion dollars of claims and the distribution of over $24 billion to Enron's creditors.  In addition to my current responsibilities to the US Debtors, I am also currently serving as the Chief Reorganization Officer of oil tanker operator Overseas Shipholding Group, Inc. and 180 of its affiliated debtors in their Chapter 11 proceedings in the United States Bankruptcy Court for the District of Delaware.  In addition, I have served as Plan

administrator or Trustee in multiple other Chapter 11 cases in both Delaware and other

jurisdictions.

3.      In my role as Principal Officer, I have become very familiar with the US Debtors'

books, records, corporate structure, employees, retirees, contracts, rights, obligations, properties,

assets, and liabilities.  I led the US Debtors in each of the three formal mediations that have taken

place in connection with the current dispute.  In addition to the formal mediations, I was

involved in several other informal negotiations dating back to mid-2010 with representatives of

the Canadian and EMEA Debtors with respect to this dispute.[1]

4.      Except as otherwise indicated, all facts set forth in this declaration are based upon

my personal knowledge or information that I learned during the course of discharging my

responsibilities in the ordinary course as Principal Officer of NNI, including my review of

relevant documents; information supplied to me by other members of the US Debtors'

employees' management and professionals based on, among other things, a review of the

Debtors' files, books and records; or my opinion, which is founded upon my experience and

knowledge of the US Debtors' operations.

5.      In Section II of this Declaration, I describe the role of the US Debtors in the

Nortel group of companies ("Nortel Group"), including their importance as a revenue generator

and liquidity source before and after the insolvency filings.  In Section III, I summarize the

events after the filings, such as the funding agreements whereby the US Debtors provided cash to

the Canadian Debtors.  Section IV discusses the  sales of the Nortel Group's businesses and

assets during the years from 2009 to 2011 ( "Sales"), the proceeds of which ("Sales Proceeds")

---

[1]     "Canadian Debtors" refers to those Nortel entities that commenced creditor protection proceedings in Toronto,
Ontario, before the Ontario Superior Court of Justice (Commercial List) on January 14, 2009 ("Canadian
Court").  "EMEA Debtors" refers to those Nortel entities in the Europe, Middle East and Africa ("EMEA") that
commenced creditor protection proceedings in London, England, before the High Court of Justice of England
and Wales on January 14, 2009.

are at issue in the current dispute ("<u>Allocation Litigation</u>").[2]  Section V focuses on how the

Nortel estates and other stakeholders evaluated ways to monetize Nortel's patents, including

creating a standalone business to license and litigate patents, before deciding to sell the patents at

auction.

## II.    <u>The US Debtors and Their Role in the Nortel Group</u>

### A.    **The Nortel Group**

6.    The following is a summary organizational chart showing the current structure of

the key Nortel entities that are involved in the current litigation.

*Figure 1.*



*\*NNUK owns 0.01% of NNSA, and NNIF owns the remainder*
*\*\*NNIF owns the remainder of NN Ireland*

---

2    The Sales include the sales of the Nortel Group's lines of business ("<u>Business Sales</u>") and the Patent Sale (as
    defined below).

7.      The parent company of the Nortel Group is Nortel Networks Corporation ("NNC"), a Canadian corporation that had been publicly listed and traded.   NNC is the sole shareholder of Nortel Networks Limited ("NNL"), the Nortel Group's principal Canadian operating subsidiary.  NNL is the sole shareholder of NNI, Nortel Networks UK, Ltd ("NNUK") and Nortel Networks (Ireland), Ltd. ("NNIRE").  NNL owns 91.17% of Nortel Networks SA ("NNSA"), and the remaining 8.83% is indirectly held by NNUK.[3]  Within the Nortel Group, NNI was the principal operating subsidiary in the United States; NNUK was the principal operating subsidiary in the United Kingdom; NNSA was the principal operating subsidiary in France; and NNIRE was the principal operating subsidiary in the Republic of Ireland.

8.      These five companies—NNI, NNL, NNUK, NNIRE, and NNSA—were the main operating entities within the Nortel Group.  These entities were also referred to collectively as the "Integrated Entities" in Nortel's transfer pricing submissions to international tax authorities. These authorities included the United States' Internal Revenue Service ("IRS"), Canada's Canadian Revenue Authority ("CRA") and the United Kingdom's Inland Revenue.

9.      The Integrated Entities and representatives of certain of their creditor constituencies are the primary parties in the Allocation Litigation.

10.      I am also the Principal Officer of NN CALA, Inc. ("NN CALA"),[4] another one of the US Debtors.   NN CALA's headquarters were located in Sunrise, Florida.  Within the Nortel Group, NN CALA was known as a limited risk entity or "LRE."  LREs distributed Nortel products in their local jurisdictions in exchange for a fixed return.  NN CALA was one of Nortel's purchasing hub entities that processed orders from distribution entities in the respective

---

[3]     NNUK is the sole shareholder of Nortel Networks International Finance & Holdings BV, which owns 8.83% of NNSA.

[4]     "CALA" stands for Caribbean and Latin America.

geographic area and managed key supplier relationships, acting as a funneling point for orders from distribution entities in the CALA region.  In addition to being an LRE, NN CALA was also the sole shareholder of two distribution entities in the Caribbean and Latin American area, Nortel Networks de Guatemala, Ltda and Nortel Trinidad and Tobago Limited.

**B.    NNI**

11.    Prior to the closing of the Sales, NNI, as one of the five Integrated Entities, was a large and self-sufficient corporate entity.  As an Integrated Entity, NNI bore the full risks and rewards of the performance of the Nortel Group.

12.    As of January 14, 2009 ("Petition Date"), NNI had nearly 10,000 employees in 80 locations in the United States.  In addition, NNI had four primary R&D facilities in the United States, at which were employed 2,294 active R&D employees.  There were more than 800 retired NNI R&D employees, out of more than 6,500 total retired NNI employees.

13.    As of the Petition Date, NNI maintained its primary research facilities in Research Triangle Park, North Carolina; Richardson, Texas (in the Texas Telecom Corridor); Billerica, Massachusetts (in the Route 128 Technology Corridor); and Santa Clara, California (in Silicon Valley).  Each of these labs carried out extensive and essential R&D for the Nortel Group, as did R&D employees working at other locations throughout the United States.  In addition to the four primary R&D sites, NNI also had previously operated research facilities in Batavia, New York and Nashville, Tennessee.

14.    In the years prior to the Petition Date, NNI generated a substantial portion of the Nortel Group's revenue.  From 2001 to 2005, NNI averaged 71.5% of the total revenue generated by all of the Integrated Entities.  In 2006, NNI accounted for 65.4% of the total revenue generated by all of the Integrated Entities.  In 2007, NNI accounted for 63.8% of the total revenue generated by all of the Integrated Entities.  In 2008, NNI accounted for 64.9% of

5

the total revenue generated by all of the Integrated Entities.  In 2009, NNI accounted for 69.3% of the total revenue generated by all of the Integrated Entities.

15.    NNI had all of the administrative and operational functions it needed to operate on a standalone basis had it chosen to emerge from bankruptcy as an operating entity.

16.    NNI maintained a separate board of directors and employed senior personnel in the accounting, human resources, legal, real estate, and information technology ("IT") areas who supported NNI's operations in the United States as well as the operations of other Nortel affiliates around the world.

17.    As of the Petition Date, NNI was the location of the headquarters of the two largest lines of business within the Nortel Group.  Carrier Networks was headquartered in NNI's Richardson, Texas facility, and Enterprise Solutions was headquartered in NNI's Research Triangle Park, North Carolina facility.  In 2008, Carrier Networks generated 41% of Nortel's global revenue.  In 2008, Enterprise Solutions generated 23% of Nortel's global revenue.  The Nortel Group's largest customers by revenue were Carrier Networks customers and were based in the United States.  Three of Nortel's top five customers were NNI customers (Verizon, Sprint Nextel and AT&T) who alone represented over 20 percent of Nortel's global revenues as of 2007.  Verizon alone accounted for more than one-tenth of Nortel's revenue in 2008.

18.    Several of the individuals who provided the most important Nortel Group functions were NNI employees.  George Riedel, an NNI employee, led the M&A/Strategy function from the US.  Chief Intellectual Property Officer John Veschi, an NNI employee, ran Nortel's Intellectual Property ("IP") group, which was based in the United States.  Joseph Flanagan and Christopher Ricaurte ran Nortel's worldwide operations and supply chain management from Research Triangle Park.  Worldwide customer service and support was led

from the United States by groups in Richardson, Texas and Research Triangle Park, North Carolina.

19.     Even though NNL provided certain headquarters functions, many of these functions had corresponding teams in the US that were capable of acting independently.  For example, NNI had personnel with expertise in accounting, tax, internal audit, compliance, revenue recognition, accounts receivable and payable, and payroll.  To my knowledge, only the Nortel Group's treasury and capital markets groups at NNL functioned without substantial personnel assistance from NNI.  These functions were well within the capabilities of NNI, as shown after my arrival when NNI separated from Canada, but NNL elected to run them from Canada.

20.     I must note, however, that NNL's treasury and capital markets groups relied heavily on NNI for liquidity and credit enhancements, as described below.

21.     NNI also led the Nortel Group in providing transition services to post-filing purchasers of Nortel's businesses and assets (together, the "Purchasers").  In connection with the Sales, NNI, NNL and the EMEA Debtors organized Nortel Business Services ("NBS") in 2009 to provide transitional business services to the Purchasers.  NNI employees Joseph Flanagan and Christopher Ricaurte led NBS, with Mr. Flanagan serving as President until his departure in early 2010, after which time Mr. Ricaurte became President of NBS.  Transition services agreements ("TSAs") were entered into with each of the Purchasers whereby NBS would provide certain human resources, finance, IT, and other transitional services to the Purchasers for a defined period of time, with the maximum period being 18 months post-closing.

22.     Under the leadership of NNI personnel, as of December 31, 2011, all obligations under the TSAs with respect to the Business Sales had been substantially completed.  Failure to

fully perform the TSAs would have led to substantial damage claims in favor of the Purchasers and materially decreased the Sale Proceeds available to allocate.

### C.    NNI's Financial Support of NNL

23.    NNI was the financial backbone of the Nortel Group for at least the ten years prior to the Petition Date.  As of September 30, 2008, NNI had assets of approximately $9 billion and liabilities of approximately $3.2 billion.[5]

24.    NNI guaranteed debt issued by NNC and NNL during the years from 2006 to 2008 and remains the sole guarantor to date.  Other Nortel entities were released from guarantees of previously issued NNC/NNL debt at the time that the 2006-2008 guarantees were given by NNI, leaving NNI as the sole guarantor of NNC/NNL debt.

25.    NNI guaranteed (i) $575 million 1.75% Convertible Senior Notes due 2012; (ii) $575 million 2.125% Convertible Senior Notes due 2014; (iii) $1 billion Floating Rate Senior Notes due 2011; (iv) $550 million 10.125% Senior Notes due 2013; and (v) $1.125 billion 10.750% Senior Notes due 2016.[6]

26.    NNI borrowed $1.3 billion under a credit agreement with JP Morgan in 2006 ("2006 Credit Facility").  The 2006 Credit Facility was drawn down in the full amount on February 14, 2006, and was primarily used to repay at maturity the outstanding $1.275 billion aggregate principal amount of the 6.125% notes due February 15, 2006, issued by NNL.  On July 5, 2006, NNL completed an offering of $2 billion aggregate principal amount of senior notes. NNL used $1.3 billion of the net proceeds to repay the 2006 Credit Facility.

---

[5]    These liabilities did not include liabilities relating to NNI's guarantee of some or all of the Nortel Group's approximately $4.2 billion of unsecured public debt.

[6]    NNI also provided certain support for the issuance of unsecured notes by US Debtor Nortel Networks Capital Corp. ("NNCC"), which notes are guaranteed by NNL, through the incurrence of intercompany debt owed by NNI to NNCC and a financial support agreement by NNI for the benefit of NNCC.

27.    NNL entered into an agreement with Export Development Canada ("EDC") to provide a $750 million support facility, which was secured together with the 2006 Credit Facility and guaranteed by NNI.  Today, EDC has a $99 million claim against NNI as a result of this guarantee.

28.    Before the Petition Date, NNI provided significant financial support to NNL.

- NNI loaned cash directly to NNL through a $1 billion revolving credit facility. As of the Petition Date, there was $295 million outstanding.

- NNI made $6.7 billion in transfer pricing payments for the 2001 to 2008 fiscal years.

29.    After the Petition Date, NNI continued to provide funding to NNL.

- NNI loaned $75 million to NNL on the Petition Date under a $200 million revolving loan agreement.

- NNI paid a further $30 million in respect of transfer pricing adjustments to NNL in January 2009.

- NNI paid NNL $157 million pursuant to the Interim Funding and Settlement Agreement, dated as of June 9, 2009 ("IFSA").

- NNI paid NNL another $190.8 million pursuant to the Final Canadian Funding and Settlement Agreement, dated as of December 23, 2009 ("FCFSA").

**D.    Corporate Formalities**

30.    NNI has respected corporate formalities.  NNI has at all times had, and continues to have, its own board of directors.  NNI has at all times been a Delaware corporation and in compliance with the laws of that State.

31.    NNI is a United States taxpayer and has filed returns on the federal level and in each of the 50 states and Puerto Rico.  NNI prepared its own tax returns, as well as statutory financial results that were audited by Big Four accounting firms.

32.     NNI and the other US Debtors have maintained their corporate formalities and separateness in the post-filing period.  This has been true in these Chapter 11 proceedings as demonstrated by the US Debtors' process for filing proofs of claim, where the US Court's order provides that if a claimant "asserts a claim against more than one [US] Debtor or has claims against different Debtors, a separate proof of claim form must be filed with respect to each Debtor."[7]

## III.     The Nortel Filings

### A.     The Chapter 11 Filings

33.     NNI and its US affiliates filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code on January 14, 2009, and NN CALA filed its petition on July 14, 2009.  [D.I. 1, 1098].  The Official Committee of Unsecured Creditors ("Committee") was appointed by the Office of the United States Trustee on January 22, 2009.  Prior to the Petition Date, an Ad Hoc Group of Bondholders holding bonds that had been issued by either NNC or NNL and guaranteed by NNI ("Bondholders Group") was formed and has participated in all material aspects of the US Debtors' and Canadian Debtors' proceedings.

### B.     Post-Petition Funding Agreements

34.     As described above, after the Petition Date, NNL had liquidity constraints, and it again turned to NNI for cash.  As a result of NNL's cash needs, the US Debtors (excluding NN CALA), Canadian Debtors and EMEA Debtors (excluding NNSA, who acceded to the agreement in September 2009) entered into the IFSA on June 9, 2009.

35.     NNL had even greater liquidity needs later in 2009.  This led to the negotiation of the FCFSA whereby, among other things, NNI agreed to provide further cash support to NNL.

---

[7]     D.I. 1280 (Aug. 4, 2009 Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof).

36.     The FCFSA addressed another important issue between NNI and NNL, which was the settlement of transfer pricing disputes from the period 2001-2005.  These years had been under audit by the IRS (for NNI) and by the CRA (for NNL), for some period of time prior to the Petition Date.  I was informed upon arriving at NNI that the IRS had serious concerns about the application of the Nortel Group's transfer pricing methodology during the years 2001 to 2005.  I also understand that NNI and NNL were contacted by the IRS and CRA, respectively, in the fall of 2009 and told that both tax authorities had concluded that NNI had overpaid NNL by the amount of $2 billion during the 2001-2005 timeframe in respect of transfer pricing payments under the Master Research & Development Agreement, dated as of December 22, 2004 (as amended, the "MRDA").  This amount represented a compromise between the IRS and the CRA given that the IRS had filed a proof of claim against the US Debtors on August 20, 2009 for taxes owing in the amount of $3 billion, which inferred that the IRS's position on that date was that NNI had overpaid NNL by the amount of approximately $7 billion.

37.     In order to address the transfer pricing issues raised by the IRS and CRA, NNI's claim against NNL for the transfer pricing adjustment proposed by the IRS and CRA, and NNL's ongoing liquidity concerns, I attended a joint meeting of the Boards of Directors of NNC, NNL, and NNI on December 17, 2009 via conference call, during which the proposed funding and settlement agreement was discussed.

38.     Thereafter, representatives of the US and Canadian Debtors, Ernst & Young LLP ("Ernst & Young Canada"), which had been appointed as the Monitor in the Canadian proceedings (in that capacity, the "Monitor"), the Committee, and the Bondholders Group continued negotiating the FCFSA, which was executed on December 23, 2009 following another joint meeting of the Boards of Directors of NNC, NNL, and NNI.

39.     Under the FCFSA, (i) NNI provided cash to NNL to address its liquidity needs, (ii) NNI and NNL agreed to enter into an advance pricing agreement with their respective tax authorities, and (iii) the parties agreed to the settlement of several inter-estate claims.  As part of the settlement, NNL agreed to an allowance of a pre-petition claim in favor of NNI in the Canadian bankruptcy proceedings in the aggregate amount of $2 billion, not subject to setoff, counterclaim, or reduction.[8] The Canadian Debtors also agreed to waive any and all rights to assert any claims against the US Debtors that may exist at law, in equity or otherwise relating to the period prior to January 14, 2009, subject to certain exceptions.  In addition, NNI paid to NNL $190.8 million, which settled certain post-filing claims of NNL against NNI (defined in the FCFSA as "Covered Obligations") including claims for corporate overhead, research and development costs, and any other alleged cost or reimbursement obligations, alleged to be due pursuant to transfer pricing agreements including the MRDA or otherwise, relating to the period from October 1, 2009 through whatever date might be the consummation or wind-down of the Canadian Debtors' estates ("Settlement Period").

40.     As part of the consideration of the funding provided by the US Debtors to the Canadian Debtors in the FCFSA, the Canadian Debtors agreed that the US Debtors had no further obligation to make transfer pricing payments under the MRDA or otherwise.

41.     The FCFSA was approved by orders of the US Court and Canadian Court following a joint hearing.  The order of the Canadian Court approving the FCFSA, dated January 21, 2010, provided that the $2 billion claim in favor of NNI against NNL was allowed and not subject to setoff or counterclaim pursuant to the terms of the FCFSA.

---

[8]     Under the FCFSA, this claim reflects a $2 billion unsecured claim and an approximately $62 million secured claim tied to inter-estate revolving loan agreements, an amount net of certain trade obligations.

## C.    Separation of the Estates

42.    When I was appointed Principal Officer, I instructed NNI personnel to continue to cooperate with the Canadian Debtors while at the same time preparing to wind down the services NNI provided to the Canadian Debtors.  Upon my arrival, NNI was providing many services for the Nortel Group generally, including accounts payable and receivable, and for the Canadian Debtors specifically, including support in the human resources, IT, finance, and tax areas.  In addition, NNI continued to support public securities filings by NNC.

43.    Based on my experience, I understood that NNI needed to separate itself from NNC and NNL to complete its reorganization or liquidation.  In the course of trying to complete this separation, it became clear that NNI was providing these services and receiving no compensation from the Canadian Debtors.  I informed John Doolittle and Alan Bifield of NNL, Murray MacDonald and Tom Ayres of Ernst & Young Canada, and others that NNI planned to terminate these services.  After contentious negotiations, we agreed to a transition and deadline after which NNI would no longer provide these services to NNL or NNC.

## IV.    Joint Asset Sales

### A.    The US Debtors Were Never Obligated to Sell their Assets

44.    Prior to the consummation of all of the Sales, NNI always retained the option to emerge from bankruptcy as an operating entity.

45.    When NNI eventually decided to participate in the joint business line Sales, each decision was made in the best interests of the US Debtors and their creditors and in close consultation with the Committee and Bondholders Group.

46.    The IFSA did not require NNI to participate in any Sale or deliver any license termination.  The IFSA specifically reserved to each signatory a typical fiduciary out providing that "no Debtor shall be required to enter into a Sale Transaction so long as such Debtor

13

reasonably determines, acting in good faith and after consultation with the other Parties to this

Agreement, that such Sale Transaction is not in the best economic interests of its creditors

generally . . . ."[9]  In my considerable experience with restructuring companies like Nortel, Enron,

and Fruit of the Loom, I am also aware that any sale requires that the debtor satisfy the court that

the decision is in the best interests of its creditors.

### B.      Conduct of the Joint Asset Sales

47.      The US Debtors made substantial contributions to the Sales.  NNI's exclusive

rights to the Nortel business and IP in the United States drove the value paid by Purchasers in

most of the Sales.  The US Debtors also put considerable effort and expense into organizing and

running the Sales pursuant to section 363 of the Bankruptcy Code.

48.      In the Sales, the US Debtors repeatedly assumed additional burdens for the

benefit of the Nortel Group.  By way of example, NNI assumed the lease for the Research

Triangle Park facility because the Purchaser of the CDMA business, Ericsson, wanted to use a

portion of the facility.  Today, NNI is receiving only a fraction of its own rent costs from the

Purchasers and is burdened with an uncompensated lease costing NNI millions of dollars.  Were

it not for the request by Ericsson to use a portion of the facility, NNI would have simply rejected

the lease and saved a considerable amount of money.

## V.    The Patent Portfolio

### A.      Evaluation of Monetization Options

49.      By the time I joined NNI in December 2009, the US, Canadian, and EMEA

Debtors, as well as the Committee and the Bondholders Group were already considering ways to

monetize Nortel's IP.  Even though the Business Sales were still in progress, the stakeholders

were looking seriously at the patents not sold in the Business Sales and evaluating paths to

---

[9]    Ex. 21638, BHG0110589 (IFSA) at § 12(e).

realizing value from them.  This process began in the summer of 2009 and led to the retention in 2010 of Global IP Law Group ("Global IP") to advise on monetization strategies.

50.     The Global IP retention was a lengthy and seriously considered decision.  After sending out the request for proposals, the estates and other stakeholders considered offers from several law firms and consulting groups before a day of in-person meetings with the top contenders.  After reaching a decision, the estates sought and received the US Court's approval to retain Global IP.

51.     In January 2010, a steering committee of representatives of the US, Canadian and EMEA Debtors ("IP Steering Committee") was formed to address intellectual property issues, including how Nortel's IP should be monetized. The IP Steering Committee included, among others, myself, Murray McDonald of Ernst & Young Canada as Monitor, and Robin Jowitt of Ernst & Young UK for those partners of Ernst & Young UK who act as Joint Administrators of the EMEA Debtors.

52.     The IP Steering Committee started by considering three options for monetizing the patent portfolio ("Patent Portfolio"):  the sale of the  Patent Portfolio in one or more transactions ("Patent Sale"); the sale of or obtaining investment in Nortel's patent licensing and enforcement business; and the creation of a licensing service to derive licensing revenue from the Patent Portfolio over the long term ("IPCo Business").  Each of these options was carefully considered and thoroughly evaluated for nearly one-and-a-half years before the Patent Portfolio was eventually sold to Rockster Bidco.  There were numerous in-bound inquiries about the Patent Portfolio, even as early as January 2009.[10]

---

[10]     US_EMEA_Canada_PRIV_00184389 (January 22, 2010 e-mail regarding "IPR Steering Committee Discussion Materials" attaching "IP Process Overview 01-22-10") at 7.

53.     During the business line Sales, John Veschi's team determined which patents would be transferred to the Purchasers and which would remain with Nortel subject to non-exclusive licenses granted to the Purchasers in the Business Sales.  In this process, Mr. Veschi retained as many patents as possible in order to bolster the value of the Patent Portfolio despite numerous attempts by the Purchasers to include patents in their asset package that were not primarily used in the business line they were purchasing.

54.     From January 2010 until early 2011, the Nortel Group pursued these approaches in parallel:  the IP Steering Committee approved approaching potential buyers while developing an actionable model business plan for monetizing the Patent Portfolio known as the IPCo Business ("IPCo Business Model").[11]  The working group that developed the IPCo Business Model included me, Murray McDonald and Sharon Hamilton of Ernst & Young Canada as Monitor, David Descoteaux of Lazard Freres & Co. ("Lazard"), George Riedel of NNI, and the advisors to the Committee (Capstone Advisory Group LLC and Akin Gump Strauss Hauer & Feld LLP) and the Bondholders Group (FTI Consulting, Inc. and Milbank, Tweed, Hadley & McCloy LLP).  This group seriously evaluated a number of options for monetization, and the deliberations show how strongly we considered the IPCo Business Model.

55.     For instance, the IP Steering Committee contemplated incentive structures for IP personnel which would trigger in the event of either a Patent Sale or the implementation of an IPCo Business Model.[12]  These options were discussed extensively.  There were frequent IP Steering Committee and working group meetings to keep the parties informed of recent

---

[11]    US_EMEA_Canada_PRIV_00184450 (January 28, 2010 e-mail regarding "Nortel IP Discussion Materials and Bridge for 5pm call" attaching "IP Process Overview 01-28-10" presentation).

[12]    NNC-NNL08127690 (Feburary 18, 2010 e-mail from G. Riedel to J. Ray).

developments.  Additionally, the working group was kept informed of the thinking of the IP

Steering Committee on a real time basis.

56.     Even after we began to publicly explore the Patent Sale, the IPCo Business Model

was actively considered in parallel with the potential Patent Sale.  In fact, one of the reasons we

gauged buyer interest in a Patent Sale was to give all the parties the information we needed to

choose between a sale or creation of the IPCo Business as a standalone licensing service.  This

commitment to both options was reflected in the compensation incentives we developed for

employees working on the Patent Portfolio, which would be triggered either by the Patent Sale or

the implementation of the IPCo Business.[13]  In particular, I was selected by the IP Steering

Committee to negotiate a compensation structure with George Riedel, an NNI employee acting

as Chief Strategy Officer, who was selected by the IP Steering Committee on behalf of all of the

US, Canadian and EMEA Debtors with assistance from Global IP and Lazard.  I negotiated a

compensation structure with Mr. Riedel that provided incentives regardless of whether the path

selected was the IPCo Business Model or a Patent Sale.

57.     The IPCo Business Model was a fully realized business model.  The Nortel Group

had taken the first steps to pursue such a business based on an IP licensing service in 2008 with

NNI's retention of John Veschi, who I worked with in monetizing the Patent Portfolio.  After the

bankruptcy filings, Mr. Veschi worked with Global IP to develop the detailed IPCo Business

Model, identify potential targets, and meet with potential licensees.  The IP Steering

Committee's painstaking evaluation of the IPCo Business Model considered all aspects of

running an ongoing business.  For example, we evaluated the real estate costs that would be

required to start the business.  In fact, we considered establishing the headquarters of the

---

[13]     NNC-NNL08127690 (Feburary 18, 2010 e-mail from G. Riedel to J. Ray).

business in the United States.  Presentations frequently included slides showing the anticipated organization structure, including current employees and future hiring needs.  To better understand the costs of running the licensing business, we obtained estimates from several United States law firms who we considered retaining to litigate infringement of the Patent Portfolio.  Notably, these litigation strategies focused on enforcement of US patents in the United States.  We also considered listing the IPCo Business on US securities exchanges as an alternative to access additional liquidity for startup costs and working capital needs.

58.     The projections and estimates contained within the IPCo Business Model were evaluated just as seriously.  The stakeholders and their advisors carefully considered potential royalty rates and addressable markets.  Global IP thoroughly reviewed thousands of patents to determine assigned end-markets and levels of interest.  This review took place after Nortel's internal IP team conducted a similarly thorough review of the patents to determine which were likely to be of high interest and most valuable.  The high interest patents were reviewed even further, as Global IP assembled claims charts and conducted infringement analyses to better understand their value.  Numerous business strategies were considered, ranging from harvesting license fees to aggressive litigation,[14] before ultimately deciding on—and basing projected revenue on—a carefully crafted strategy that contemplated taking a variety of litigation and licensing approaches toward different infringing companies.[15]

59.     All parties suggested improvements and refinements, which were incorporated over time.  As a result of this process, the IPCo Business Model was frequently revised and re-

---

[14]     Ex. 22098, US_EMEA_Canada_PRIV_00186787 (March 17, 2010 e-mail regarding "Nortel: Discussion Materials for the IP Meeting today (Mar 17th)" attaching presentation titled "IP Co. Update to Creditor Committees").

[15]     GIP_NORTEL_00233023 (May 5, 2010 presentation titled IP Co. Model 2.2 Update) at 11.

circulated to address Committee and Bondholders Group comments, update claim charts, update assumptions, and make other adjustments to the projections.

60.     In late September 2010, the IPCo Business Model served as the basis for discussions about the potential Patent Sale in light of the bids received.[16]  At that time, the expected value anticipated to be received from implementation of the IPCo Business Model exceeded the value of the bids that we had received.  At this point, neither NNI, nor the IP Steering Committee had made any decision about whether to sell or retain the Patent Portfolio, which is why we were evaluating the bids and the IPCo Business Model concurrently.

61.     As a member of the IP Steering Committee, I was one of the people involved in the decision to sell the Patent Portfolio, rather than pursue the IPCo Business Model.  I understand that certain experts in this case have asserted that the IPCo Business Model was preliminary or speculative.  I disagree completely.  We created, reviewed, and revised the IPCo Business Model for well over a year and addressed countless questions and assumptions.  The IPCo Business Model was extremely well thought-out and comprehensively prepared.  I never heard anyone raise concerns at that time that it was preliminary or speculative.  Additionally, as discussed above, while the formal reference to the IPCo Business Model was adopted during this exercise, Mr. Veschi had been developing the underpinnings of the business since joining the Nortel Group before the Petition Date.

62.     The IP Steering Committee, working closely with the Committee and the Bondholders Group and their respective advisors, developed two viable, competing alternatives for monetizing the Patent Portfolio, and our collective evaluation of each was informed by the other.  After months of careful evaluation, we had a clear sense of the costs and benefits of

---

[16]     BHG0124188 (September 21, 2010 presentation titled "Project Iceberg: Round 1 Bids Overview – Bids Received September 17, 2010").

pursuing the IPCo Business Model, but we needed to test the market to determine whether a

Patent Sale could lead to a greater recovery.  Throughout this evaluation, NNI and the other

debtors maintained complete optionality at all times to pursue either strategy or to go in another

direction, including restarting NNI as an operating business.  The ultimate decision by NNI to

pursue the Patent Sale was driven by the results of the feedback obtained when exploring the sale

process and input from its creditor constituencies, the Committee and the Bondholders Group.

63.     While the decision to pursue the Patent Sale was made jointly, NNI at all times

had the right, at its sole discretion, to withdraw from the sale process.

**B.     The Canadian Position Was Never Disclosed**

64.     Throughout the extensive discussions between my retention and the closing of the

Patent Sale, no one expressed the view that NNL had exclusive rights to the Patent Portfolio,

whether based on its holding bare legal title or otherwise.  On the contrary, the parties

consistently recognized the importance of the exclusive licenses held by NNI, NNUK, NNIRE

and NNSA.  A March 2010 presentation by Global IP to the IP Steering Committee is instructive

on this point, as it stated clearly that,  "[r]ights will be terminated coincident with any sale or

license (as happened with IP sold with business units); likely representation and warranty

regarding license grants (particularly exclusive licenses)."[17]  Indeed, the operating assumption

was that each of the estates would gain from the disposition of the Patent Portfolio.

65.     At no point during this nearly 18 month process did anyone on the IP Steering

Committee (or otherwise) express the view that NNL owned the entirety of Nortel's IP

notwithstanding the exclusive licenses to the Nortel Group's IP that were held by NNI, NNUK,

NNIRE and NNSA in their respective exclusive territories.  Similarly, at no point during this

---

[17]    US_EMEA_Canada_PRIV_00185295 (March 22, 2010 e-mail attaching presentation titled "Project Iceberg: Work Plan for Plan A & B").

process did anyone on the IP Steering Committee (or otherwise) express the view that NNL was entitled to all proceeds from the monetization of the Patent Portfolio.

66.     The decision to sell the Patent Portfolio was made jointly by the US, Canadian, and EMEA Debtors, with input from the Bondholders Group and the Committee and advice from Global IP and Lazard.  I represented the US Debtors in these discussions, and I never heard anyone express the opinion that the allocation of proceeds from any disposition of the Patent Portfolio depended on whether the disposition took place before or after the Business Sales, nor that the allocation depended on whether the Patent Portfolio was sold, used to pursue the IPCo Business Model licensing service, or retained by each of the Debtors pursuant to their exclusive licenses.  On the contrary, all stakeholders fully expected to share in the revenues generated from any disposition of the Patent Portfolio.  This is reflected in, among other things, the considerable time and money invested by the US Debtors, the Committee, the Bondholders Group, the other estates, and all of their respective advisors in evaluating the monetization options and eventually conducting the auction.

67.     Never once during this entire process did anyone ever suggest the argument being advanced by NNL during the past year that NNI, NNUK, NNIRE, and NNSA would have no rights in the Patent Portfolio following the conclusion of the last Business Sale because their exclusive licenses were limited to "products" that were being marketed by the Nortel lines of business at the time of the closing of the Business Sales.  If this position had ever been asserted, NNI never would have cooperated in the Patent Sale or in any of the Business Sales.

68.     There were numerous options available to NNI, and the decision to pursue each of the Sales was made with the expectation and understanding that all of the Sale Proceeds would be allocated fairly to each debtor according to the value of what it surrendered in each Sale.  If

the US Debtors had any reason to believe that the decision to complete the Business Sales before

carrying out the Patent Sale—or the decision to pursue the Patent Sale rather than the IPCo

Business Model—would result in the US Debtors receiving zero value for the termination of

their exclusive licenses, NNI certainly would not have agreed to participate in the Patent Sale or

to deliver the license terminations demanded by Google's affiliate, Ranger, Inc., and Rockstar.

Moreover, NNI would never have dedicated considerable resources to overseeing the Patent

Sale, including conducting the successful auction at the office of our legal advisors, Cleary

Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb").

69.    In addition to bearing the bulk of the legal fees related to the Patent Sale, NNI

also shouldered substantial additional costs while evaluating the IPCo Business Model and

conducting the Patent Sale.  For example, the salary and bonus incentives of Mr. Riedel paid

directly by NNI were not reimbursed by the other estates.

70.    Instead of jointly selling the Patent Portfolio after the Business Sales, had the

Canadian position been known, we would have taken any and all steps necessary to preserve and

maximize value to the US Debtors and their creditors.

71.    For instance, had the Monitor or the Canadian Debtors (when the Canadian

Debtors had a board and management separate from the Monitor, which has not been the case

since October 3, 2013), disclosed that it was their view that the order in which the Sales were

conducted would have an impact on the allocation of Sales Proceeds—or that selling the business

lines first and the Patent Portfolio thereafter would mean that NNI, NNUK, NNIRE, and NNSA

would be entitled to none of the Sale Proceeds attributable to a sale of the Patent Portfolio—we

would have insisted that the business lines be sold after the Patent Portfolio or, at a minimum,

sought binding judicial clarity before selling anything at all.  Similarly, had the Monitor or the

Canadian Debtors disclosed after the Business Sales that it was their view that NNI, NNUK,

NNIRE, and NNSA would be entitled to an allocation equal to their ownership interests in an

IPCo Business, but they would be entitled to none of the Sale Proceeds attributable to a Patent

Sale, we would have either insisted on the IPCo Business or decided to restart NNI as an

operating business.  Given the size of the telecommunications market in the United States and

the importance of the Nortel Group patents to which NNI had a perpetual, exclusive, and royalty

free license, there were numerous options available to us.  For example, we had the option to

pursue the IPCo Business Model in the United States alone.  This option would have been

particularly feasible as substantially all of the planning was completed and NNI had considerable

cash on hand to fund the start-up costs.

72.      I am informed that Murray McDonald, the Canadian Monitor, testified in his

deposition that the Monitor's current position was discussed as early as May 2010 with the US

Debtors at a meeting at Cleary Gottlieb's midtown office attended by, among others, Jim

Bromley, Craig Brod, Howard Zelbo, members of Chilmark Partners, and me.[18]  I am informed

that Mr. McDonald testified that the discussion at that meeting was that "NNL owns the

intellectual property and therefore we can claim an entitlement of a hundred percent of the

proceeds, and that was the extent of the discussion on the subject."[19]  I have a clear recollection

of that meeting, which took place over one year before the Patent Sale auction took place.  At no

point in the meeting did Mr. McDonald or anyone else there on behalf of the Monitor or the

Canadian Debtors ever assert that position, nor did he ever assert that there were any limitations

whatsoever on the exclusive license granted to NNI by the MRDA.

---

[18]    *See* McDonald Dep. Tr. at 99:14-100:21.

[19]    *Id.* at 147:5-158:7.

73.    On the contrary, at that meeting, two allocation proposals were discussed—one previously presented by the Monitor and one presented by me on behalf of the US Debtors.  The US Debtors' proposal that day was entirely consistent with the allocation position being advanced today in the Allocation Litigation by the US Debtors, the Committee, and the Bondholders Group.  That proposal was based on the proposition that, under the MRDA, the Integrated Entities are entitled to the fair market value of the rights surrendered in the Sales and that the US Debtors believed that a fair market valuation based on revenue multiples was the most appropriate measurement for allocation purposes.  Prior to that meeting, Mr. McDonald had delivered the Monitor's position, which was materially inconsistent with the Monitor's current position.  It was not until after the failure of the third mediation and the entry of orders by the US and Canadian Courts requiring the parties to submit pleadings outlining their allocation positions that the Monitor disclosed its position that NNL is entitled to 100% of the $4.5 billion generated by the Patent Sale.

### C.    Role of the US Debtors in the Patent Sale

74.    As with the other Sales, the US Debtors played a significant and costly role in the Patent Sale process.  Without the US Court's orders approving the numerous steps required to carry out the auction, the Patent Sale could have never been approved.  The US Debtors moved for, and the US Court granted, approval of the stalking horse sale agreement with Ranger, the bidding procedures, and the final asset sale agreement with Rockstar Bidco.

75.    The bidders involved in the Patent Sale were most interested in the United States market, and they insisted on the termination of NNI's exclusive license in the United States and Puerto Rico to the Nortel Group's IP.  In particular, Ranger demanded that the MRDA licenses be terminated when the stalking horse sale agreement for the Patent Sale ("Stalking Horse

Agreement") was drafted.[20]  The US and EMEA Debtors were always included as sellers in both

the Stalking Horse Agreement entered into with Ranger.[21] and in the ultimate sale agreement

with Rockstar ("Rockstar Agreement"),[22] and the Rockstar Agreement expressly contemplated

the transfer or termination of NNI's exclusive license rights as well as those of NNUK, NNIRE

and NNSA as a condition to closing.  The termination of the exclusive licenses was not an

afterthought or an unimportant detail.  Instead, the license termination agreement with each of

NNI, NNUK, NNIRE, and NNSA were essential elements of the Rockstar Agreement.[23]  Never

once did any representatives of the Monitor tell me (nor to my knowledge did they ever tell

Ranger or Rockstar) that the license terminations were irrelevant or not needed or that NNI's

signature on the Stalking Horse Agreement or the Rockstar Agreement was irrelevant or not

needed.

76.    In addition, the Patent Portfolio was comprised overwhelmingly of United States

patents and derived much of its value from the United States market, as indicated by Global IP's

evaluation of levels of interest.  It is inconceivable that a purchaser would have purchased the

Patent Portfolio for the amount that Rockstar Bidco paid, if anything, if NNI had retained its

exclusive license in the United States.

77.    I was present in court in Delaware when the US Court and the Canadian Court

heard evidence to approve the Patent Sale—evidence which made clear that NNI and the US

Debtors expected to share the Sale Proceeds from the Patent Sale.  In fact, the US Court

enthusiastically approved the Patent Sale and issued an order that stated that "the agreements

---

[20]    Ex. 12013, GIP_Nortel_00136187 (February 25, 2011 email chain regarding Iceberg: Asset Sale Agreement Issues attaching an issues list from Bidder 1's counsel); GIP_Nortel_00089277 (April 4, 2011 Ranger Inc. Asset Sale Agreement).

[21]    GIP_Nortel_00089277 (April 4, 2011 Ranger Inc. Asset Sale Agreement).

[22]    Ex. 22085, NNI_00825094 (June 30, 2011 Rockstar Bidco, LP Asset Sale Agreement).

[23]    *Id*.; Ex. 21508,  NNC-NNL06002543 (July 29, 2011 License Termination Agreement).

contemplated thereby in consummation of the transactions constitute a good and sufficient exercise by the Debtors of their sound business judgment and such acts are in the best interests of the Debtors, their estates and creditors and all parties' and interests."[24]

78.    The same representatives of the Monitor who now claim that the US Debtors are entitled to nothing from the Patent Sale attended this joint hearing—and heard the US Court state a conclusion completely contrary to the position they have taken in this litigation—and said nothing.

[*Remainder of page intentionally left blank.*]

---

[24]    D.I. 5939 (Tr. of July 11, 2011 Bankruptcy Hearing approving Rockstar Sale) at 13.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  April 11, 2014

_____
John J. Ray III