**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

<u>**REPLY DECLARATION OF JOHN J. RAY III**</u>

(Submitted by the US Interests)

I, John J. Ray III, declare under penalty of perjury as follows:

**I.**    **Introduction**

1.        As I stated in my Declaration dated April 11, 2011 ("Initial Declaration"), I am

the Principal Officer of NNI[1] and the US Debtors.  My role and experience have not changed

since submitting the Initial Declaration.

2.        In my role as Principal Officer, I have become very familiar with the US Debtors'

books, records, corporate structure, employees, retirees, contracts, rights, obligations, properties,

assets, and liabilities.  I led the US Debtors in each of the three formal mediations that have taken

place in connection with the current dispute.  In addition to the formal mediations, I was

involved in several other informal negotiations dating back to mid-2010 with representatives of

the Canadian and EMEA Debtors with respect to this dispute.

3.        Except as otherwise indicated, all facts set forth in this declaration are based upon

my personal knowledge or information that I learned during the course of discharging my

responsibilities in the ordinary course as Principal Officer of NNI, including my review of

relevant documents; information supplied to me by other members of the US Debtors'

employees' management and professionals based on, among other things, a review of the

Debtors' files, books and records; or my opinion, which is founded upon my experience and

knowledge of the US Debtors' operations.

4.        I have reviewed the Affidavit of Sharon Hamilton of E&Y Canada as Monitor of

the Canadian Debtors, dated as of April 11, 2014 ("Hamilton Declaration"), submitted in these

proceedings.  In Section II of this Declaration, I elaborate on my testimony in the Initial

Declaration in response to Ms. Hamilton's assertions that the IPCo Business Model was not a

---

[1]    All capitalized terms not defined herein shall have the meaning set forth in my Initial Declaration.

viable strategy.  Section III responds to Ms. Hamilton's mischaracterizations of the decision to

pursue the Patent Sale.  In Section IV, I explain how the Patent Sale was conducted, showing

how the carefully orchestrated auction process resulted in the final sale price of the Patent

Portfolio.

## II.    The IPCo Business Model Was Seriously Considered in All Respects

5.       The IPCo Business Model was a seriously considered and viable approach to IP

monetization, and Ms. Hamilton's characterization to the contrary is flatly inconsistent with

contemporaneous documents and my recollection.

6.       Ms. Hamilton's suggestion that the IPCo Model was given only cursory attention

is particularly surprising.  More than a year of presentations, calls, in-person meetings, and e-

mail correspondence involving representatives and advisors of the estates and their creditors

(including myself, Ms. Hamilton, and her superior, Mr. McDonald) cannot be ignored.  The

Nortel Group first seriously discussed monetization strategies for the Patent Portfolio—including

a licensing business—in July 2009, rather than in early 2010 as Ms. Hamilton claims.  By

January, Global IP had already been retained and completed Phase 1 of its work.

7.       Ms. Hamilton's characterization of the "guesswork" of the IPCo Business Model

is inconsistent with the facts.  She, Mr. McDonald, and I, among others, received numerous

presentations detailing the assumptions of the IPCo Business Model that:

- were prepared and reviewed by licensing professionals with extensive industry
  experience, including Global IP (who had been jointly retained by the estates to
  provide exactly this expertise),[2] Michael Lasinski (then of Capstone Advisory
  Group, financial advisors to the Committee, and now of 284 Partners, an IP
  consulting firm), Gillian McColgan (then of the Nortel Group and now with

---

[2]     Global IP was specifically retained for their expertise in and experience with selling patent portfolios because
Lazard, including Mr. Descoteaux, could not provide it.  Notwithstanding their lack of experience with IP
licensing, Lazard did consider the IPCo Business Model a realistic possibility, and we discussed the
compensation that they would receive should we pursue the IPCo Business rather than a Patent Sale.
UCC0027297 (February 20, 2010 e-mail from T. Savage regarding "Lazard").

Rockstar) and John Veschi (who ran a licensing business before he was hired by Nortel to do the same, and who is now the Chief Executive Officer of Rockstar);[3]

- were based in part on Nortel's previous licensing experience and expertise;

- included case studies of comparable companies operating in the IP licensing industry, including Qualcomm, Interdigital, Tesser, Mosaid, and Acacia;[4]

- provided projected revenues based on a ground-up approach that started with a review of available franchises and geographic markets, royalty rate ranges based on different strategies and franchises,[5] and likely targets within each franchise;

- analyzed over 6,000 issued and pending patents to categorize them in IP franchises, together with analyses of related encumbrances;

- identified all roles necessary for staffing an IPCo Business in organizational charts that showed key positions already filled by Nortel Group employees; and

- analyzed capital needs for the IPCo Business Model based on a range of potential licensing and enforcement strategies.

8.      The fact that the Patent Sale was the eventual path chosen does not mean that the IPCo Business Model was not considered viable.  On the contrary, internal presentations use the very term "viable" to describe the IPCo Business Model as early as March 2010,[6] and the projections were considered alongside potential sale alternatives when evaluating IP

---

[3]     Ex. 22098 (March 17, 2010 e-mail received by Ms. Hamilton regarding "Nortel: Discussion Materials for the IP Meeting today (Mar 17th)" attaching presentation titled "IP Co. Update to Creditor Committees") (discussing "Core team in place; experienced licensing executives" and including case studies and comparable models)

[4]     US_EMEA_Canada_PRIV_00184898 (March 9, 2010 e-mail received by Ms. Hamilton regarding "IP Review – Toronto @ Ogilvy's office" attaching presentation titled "() (showing comparisons to other market participants).

[5]     BHG0161602 (February 9, 2010 e-mail received by Ms. Hamilton regarding "Nortel IP: Discussion materials for Weekly Update Call with Creditor Advisor Working Group (Tuesday at 930a EST)" attaching presentation titled "IP Co. Business Plan: Assumptions") (discussing several different strategies); US_EMEA_Canada_PRIV_00184773 (March 1, 2010 e-mail received by Ms. Hamilton regarding "Nortel IP: Weekly Update Call with Creditor Advisor Working Group - Discussion Materials (2 Mar)" attaching presentation titled "IP Workstreams") (discussing Veschi's development of market royalty rates based on interaction with real world players, actuals from previous Nortel deals, and contributions from Global IP).

[6]     UCC0027912 (March 30, 2010 email received by Ms. Hamilton regarding "Reminder: Location and Dial in for 11am IP Process meeting – Tues Mar 30" attaching presentation titled "Project Iceberg: Work Plan for Plan A, B &C") ("The IPCo. (Plan C) business plan developed over the last several months  represents a viable and actionable alternative to a sale and serves as a reference case for comparing the proposals received in the sales process") (emphasis added) [hereinafter "March 30 Work Plan Presentation"].

monetization options.  Starting in May 2010, the Patent Sale was explored in parallel with the

IPCo Business Model by releasing a "teaser" to gauge buyer interest in the Patent Portfolio.  We

received numerous bids in the fall of 2010, including one for $660 million, but these bids were

not found to be acceptable by the estates.  At that time, the estates decided to continue to work

with the bidders to try to increase the bids, but also to continue to further explore the IPCo

Business Model in case better bids did not materialize.  In February of 2011, after further

diligence and discussions with potential bidders, as well as further considerations and refinement

of the IPCo Business Model, we received the $900 million stalking horse offer from Google.

Were it not for the realistic alternative of pursuing the IPCo Business, we would have had strong

incentives to accept one of the earlier (and substantially lower) bids as a stalking horse offer

rather than spending more time and money further developing the IPCo Business Model.

     9.     The startup costs for the IPCo Business Model were not insignificant, but they

were not so great as to preclude us from pursuing the business.  Ms. Hamilton points to a three-

year, $417 million cost to undertake the most capital-intensive strategy for three years,[7] but this

is misleading for several reasons.  First, the three year timeline to revenue was not due to a lack

of confidence, but rather due to the time it would take to litigate the infringement claims that

IPCo Business Model had already identified.  Second, the IPCo Business Model evolved beyond

the over-simplified either/or approach to strategy, as is evident from the very document that Ms.

Hamilton cites.  While Ms. Hamilton cites to the litigation heavy projections from IPCo Business

Model version 1.0, the presentation shows version 2.0 in the very same slide.  Those projections

showed revenue starting in 2011 (rather than 2013), a four year cost of $269 million (rather than

$417 million), and a profit starting in 2012.  But even had someone wanted to pursue the

---

[7]    It is also worth noting that the very fact that she can point to the anticipated three year operating cost of the
IPCo Business shows the advanced nature of the model.

strawman strategy that Ms. Hamilton cites, the US Debtors had nearly twice that amount in unrestricted cash and cash equivalents. NNL lacked the capital necessary to start an IPCo Business on its own, but NNI could have used its considerable available cash to monetize its exclusive rights, and we would have done so had the Monitor ever expressed the position recently adopted in this litigation.

10.    Ms. Hamilton claims that "[d]etailed structuring discussions regarding the potential IP Co. did not take place," but this is inconsistent with my recollection. Presentations received by both Ms. Hamilton and me frequently discussed such structural considerations as hiring needs, headquarter location, liquidity events, and exit opportunities for creditors. Ms. Hamilton suggests that the utilization of tax attributes was never "considered in significant detail" to cast doubt on the viability of the IPCo Business Model, but this is flatly untrue. She and I both received an update from Lazard in January 2011 which noted in a discussion of the IPCo Business Model that "the monetization of tax attributes has been looked at in great depth by Nortel's tax personnel, E&Y tax specialists and Ogilvy's tax counsel."[8]

11.    Mr. Veschi's notice letters to potential infringers also demonstrate the viability of IPCo. Not only had Nortel been licensing its IP for years, Mr. Veschi was vigorously pursuing the very business model he had been hired to execute. Although he did stop sending notice letters for a time, this was because the Nortel Group was approaching those same targets as potential buyers of the lines of business. By early 2010, however, Nortel had resumed sending notice letters.[9] Contrary to Ms. Hamilton's testimony that the Monitor forbade Mr. Veschi from

---

[8]    NNI_01290190 (January 5, 2011 email received by Ms. Hamilton regarding "Nortel IP | Follow-Up Information Request").

[9]    US_EMEA_Canada_PRIV_00185426 (April 20, 2010 email regarding "Materials for 8:00 a.m. EDT IP Call" attaching presentation titled "Plan C 2.0 – IP Co. Update") (listing changes since last update, including notice letters, on page 5).

coordinating with creditors, Mr. Veschi participated in meetings with the working group that prepared the IPCo Business Model,[10] of which advisors to the Committee and the Bondholders Group were members, and attended other meetings at which creditor constituencies were present.

12.     Notwithstanding how thoroughly the IPCo Business Model was vetted, one item certainly was never raised—Ms. Hamilton's current view that NNL had exclusive ownership of the Nortel Group's IP once it had been decided to liquidate the Nortel Group's businesses and assets.  On the contrary, the IPCo Business Model presentations always recognized the importance and value of the Integrated Entities' exclusive licenses,[11] and no one ever suggested that NNL's bare legal title to the Patent Portfolio granted NNL unfettered rights to dispose of the patents.  Rather, any Patent Sale or IPCo Business would need to address those licenses.  That these licenses applied to the Patent Portfolio was self-evident as shown by my involvement and the involvement of the Committee's advisors, who represented creditors of the US Debtors.

13.     Had the Monitor's current position been disclosed, the US Debtors would have informed the Bondholders Group and the Committee, and we would have considered that position when evaluating monetization strategies.  For instance, we would have considered other options for monetizing NNI's exclusive licenses, such as resuming operations, pursuing the IPCo Business Model, or both.[12]  We also would have considered seeking clarification from the Courts.  There is no question that we would have informed any party approached by NNL that NNI possessed an exclusive license to the Nortel Group's IP in the United States and Puerto

---

[10]    Initial Declaration, ¶54.

[11]    UCC0027912, March 30 Work Plan Presentation (noting that the "[o]perating Assumption re: R&D Agreement" was that "[r]ights will be terminated coincident with any sale or license (as happened with IP sold with business units)" and specifically that there would be "Likely representation and warranty regarding license grants (particularly exclusive licenses)").

[12]    While the IPCo Business may not have coexisted easily with an operating business, this does not mean that an operating business itself was impossible.  In fact, the Nortel Group was an operating business at the time the IPCo Business Model was being considered:  led by NNI, it was providing transition services through NBS.

Rico.  Moreover, the Bondholders Group and the Committee would have insisted on such measures, as their consent was required before NNI could terminate its exclusive licenses.[13]  At a minimum, NNI would have informed the Courts that the Canadian Debtors had taken the position that NNI was entitled to none of the proceeds from the Patent Sale so that the Courts could take that into account when determining whether approving the Stalking Horse Agreement or the final Patent Sale would be in the best interests of NNI's creditors.

**III.**    **The Decision to Pursue the Patent Sale Rather than the IPCo Business Model**

14.     Ms. Hamilton mischaracterizes the decision to pursue the Patent Sale.  First and foremost, the decision was made jointly by all stakeholders, not by NNL and the Monitor and simply acceded to by the other estates.  Second, the US Debtors at all times had the right—and obligation—to withdraw from any of the joint sales if participation would not be in the best interests of its creditors.  NNI simply would not have surrendered their exclusive license rights without receiving a substantial share of the proceeds.  Even if our decision not to proceed would have required us to pay a break-up fee, such an amount would be substantially less than the value of our exclusive license rights or (at a minimum) the hold-up value of refusing to terminate an exclusive right in the world's most valuable IP market.

15.     Most surprisingly, Ms. Hamilton testifies that the "Canadian Debtors and the US Debtors" provided the Bondholders Group with an ultimatum to "provide a concrete proposal" for the IPCo Business Model.  I have no recollection that any such ultimatum was given, and (if it was) the US Debtors most certainly did not provide it.

---

[13]    IFSA § 11(a).

**IV.**    <u>**The Auction Drove the Value of the Patent Sale**</u>

16.    Finally, Ms. Hamilton's description of the Patent Sale is misleading.  I have participated in numerous Section 363 sales, both on behalf of the US Debtors and on behalf of debtors in other cases, and few other auction outcomes have better reflected the fair market value of the assets sold.

17.    Even before the "teaser" was released to potential purchasers in May 2010, the Nortel Group had received numerous bids and expressions of interest from a wide variety of potential purchasers.  The IPCo Steering Committee considered and rejected offers as large as $660 million in favor of pursuing the IPCo Business Model and further exploring the Patent Sale Options.

18.    The decision to seek approval of the Stalking Horse Agreement in April 2011 was not made because IPCo was weak but because we thought the auction market was so strong. Although the IPCo Business Model was well developed and thoroughly evaluated, it carried execution risk inherent to running any business.  A Patent Sale, on the other hand, carried less risk and would realize value that could promptly and easily be distributed to our creditors.  With these considerations in mind, and with the consensus of the IP Steering Committee, we decided to proceed with an auction when Google's $900 million bid was received, as that bid indicated to us that market participants were prepared to pay the fair market value of the assets.  Additionally, at the time the estates agreed to the Stalking Horse Agreement, several other parties had expressed interest in the Patent Portfolio, received access to the electronic data room containing related materials, and provided bids.  These bidders included Apple and other members of what eventually became Rockstar.

19.    The decision to pursue the Stalking Horse Agreement with Google did not, however, permanently foreclose the possibility of the IPCO Business Model.  As part of the

Stalking Horse Agreement, Google insisted, and the estates ultimately agreed, that the estates

would not further pursue the IPCo Business Model.    Thus, once it was approved by the Court,

the agreement did limit the <u>estates'</u> prerogative to walk away from the auction process to pursue

the IPCo Business Model on its own.  But the Stalking Horse Agreement also expressly

permitted the estates to consider a proposal by the Bondholders Group or any other third party

sponsor of  a transaction that would keep the Patent Portfolio within the Nortel Group in order to

establish an IPCo Business.[14]  The  inclusion of these provisions in the Stalking Horse

Agreement reflected the possibility that, even after execution of the Stalking Horse Agreement, a

transaction built around the  the IPCo Business Model might still prove to be a competitive

proposal worthy of consideration by the estates.

        20.    The auction itself could hardly have gone better.  Nearly every major high-

technology company was represented at the auction.  Among the operating technology

companies (Google, Intel, and Apple), the consortium of operating companies (Rockstar) and the

consortium led by a defensive aggregator (Norpax), almost every potential purchaser was

represented in the conference rooms at Cleary Gottlieb that week.  Not only were they physically

present, they came with ready access to the financial resources necessary to bid on the Patent

Portfolio.

        21.    The auction lasted over four days at Cleary Gottlieb's New York office.  With

each bidder waiting in their assigned conference rooms for the next round, counsel for the US

Debtors carefully ran the bidding process to maintain tension over nineteen rounds of bidding.

After each round, the leading bid would be announced, and the bidders would return to their

conference rooms to plan their next steps.  When bidders reached their limits, the estates and

---

[14]    Section 5.5(d) of the Stalking Horse Agreement specifically allowed a so-called "Asset Retention Transaction"
        so long as it also constituted an "Alternative Transaction."

their counsel carefully considered whether to allow them to bid together.  Such requests were

denied on occasion, but others were granted when it was necessary and when it would maintain

or improve bidding tension.  This was how Apple came to join with Rockstar after the fifth round

of bidding and how Intel joined with Google after the eighth round of bidding.

22.    Ms. Hamilton tries to brush off the value received for the Patent Portfolio as

somehow idiosyncratic or tied only to the auction dynamic.  The IP Steering Committee, with the

advice of Global IP, was well aware of the market forces that were driving the value of patent

sales in the open market.  These forces did not only drive the value of the Patent Sale, the

presentations about the IPCo Business Model frequently included discussions of the patent

litigation environment.[15]  In fact, Rockstar is currently engaged in the very same business that

the IPCo Business Model proposed: they license patents and sue market participants for

infringement.  Whether Rockstar or its consortium members derive value from the offensive use

of Rockstar's patents in infringement suits and in licensing agreements or from the defensive use

of its patents as against infringement claims from other operating companies, the IPCo Business

would be profiting from the same market forces.


[*Remainder of page intentionally left blank.*]


---

[15]    BHG0033830 (April 29, 2010 email received by Ms. Hamilton regarding "Nortel | Draft IP Teaser and Selected
Business Plan Pages" attaching presentation titled "Selected Pages on IPCo. Opportunity") (slide discussing
"Recent IP Activity Outside of Nortel Frames Economic Potential" at 8).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  April 25, 2014

John J. Ray III