Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, C. C-36, AS AMENDED**
**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION APPLICATION UNDER THE COMPANIES' CREDITORS**
**ARRANGEMENT ACT, R.S.C. 1985, C. C-36, AS AMENDED ("CCAA")**

-and-

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al.*,<br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

---

**AFFIDAVIT OF PHILIPPE ALBERT-LEBRUN**
**(AFFIRMED        MAY 9 , 2014)**

---

**THIS AFFIDAVIT AND ITS EXHIBITS ARE DESIGNATED HIGHLY**
**CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDERS GRANTED IN**
**THESE PROCEEDINGS**

Vu pour la certification
matérielle de la signature
de Mr Philippe ALBERT - LEBRUN
apposée ci-contre

0

**I, PHILIPPE ALBERT-LEBRUN,** of 5Bis rue de Beauvau 78000 Versailles, France, **MAKE OATH AND SAY:**

1.          I am currently Financial Controller at Avaya, a global leader in enterprise communications systems, based in Paris, France. I have held this role since March 2012.

2.          Prior to my appointment at Avaya, I worked at Nortel for 15 years, holding various roles in the Treasury department as well as the role of Financial Controller for Nortel's French subsidiaries, from 2003 to 2007 including Nortel Networks S.A. (**"NNSA"**), and then Financial Controller for the whole region of Europe, the Middle East and Africa (**"EMEA"**) from 2007 until my departure in 2012.

3.          While English is not my first language, I have a good command of it. I was previously deposed in this case in English – on November 21 and 22, 2013 – and I am content to swear this Affidavit in English.

4.          This Affidavit is based on my personal recollection of the relevant events. My recollection has been aided by my review of documents. I make reference to these documents by referring to their exhibit references and their production bates numbers.

5.          Unless I specify otherwise, for ease of reference, I refer to the worldwide Nortel group of companies and its various affiliates as **"Nortel"**, the **"Nortel Group"** or the **"Group"**.

6.      I have knowledge of the matters referred to in this Affidavit. Save where otherwise indicated, the facts and matters contained in this Affidavit are within my own knowledge. Where the facts and matters are not within my own knowledge, I identify the source of my information and/or belief and verily believe them to be true.

## A.    SUMMARY OF FACTS

7.      Nortel was a highly integrated group and therefore transfer pricing played a critical role in the financial results of all of its subsidiaries. When Nortel adopted the residual profit split mechanism (the "**RPSM**"), it was critical in my role to understand the RPSM and to evaluate its consequences for NNSA. I was initially not convinced that the RPSM was appropriate for NNSA. I accepted the implementation of the RPSM when I understood that the company would economically hold a share in the intellectual property ("**IP**") of the Nortel Group that would be commensurate to the amounts that NNSA had invested (and would continue to invest) in its extensive research and development ("**R&D**") operations. I understood that, by entering into the RPSM, NNSA would retain a form of entrepreneurial right to share in the upsides of the creation of Nortel's IP while being subject to the full risks of making losses. This was borne out in the following:

     (a)    the explanations with the Board that I coordinated so that the Board would approve NNSA's entry into the RPSM by signing NNSA up as a participant to the Master Research and Development Agreement (the "**MRDA**");

2

(b)     the presentations made by NNSA and its tax law advisors FIDAL to the French
        Tax Authorities ("**FTA**") that the entry into the new transfer pricing mechanism
        was not an "abnormal act of management" under French law;

(c)     The decision in 2006 (with which I agreed) not to impair the value of the
        shareholding of Nortel Networks International Finance & Holdings BV
        ("**NNIFH**") in NNSA on the basis of the ownership rights in the IP of the
        Nortel Group; and

(d)     In relation to the sale of the UMTS Access business to Alcatel, in the sharing
        by the RPSM participants including NNSA of the value attributable to the IP
        based on the share of the Nortel IP that they held at the time.

## B.    PROFESSIONAL BACKGROUND

8.      I graduated from École des Hautes Etudes Commerciales ("**HEC Paris**") in
1992 with a master's business degree.  As part of HEC Paris curriculum, I also studied at the
New York University Stern School of Business and Wirtschaftsuniversität in Vienna.

9.      Prior to joining Nortel, I worked as a structured finance specialist at Bouygues,
a large French conglomerate active in complex infrastructure projects amongst other activities,
from 1991 to 1992 and from 1993 to 1996.

## C.    ROLE AT NORTEL

10.        I was employed in various capacities by NNSA from February 1997 to March

2012:

(a)    From 1997 to 1999, I was Assistant Treasurer, responsible for managing the company's financing requirements. I reported to the Treasurer, Robin Christen.

(b)    From 1999 to 2001, I was Treasurer for France and reported to the International Treasurer, Bob Williams.

(c)    Between 2001 and 2003, I took on a European role in the Treasury Department in Paris, in which I reported to Mr Williams and Simon Freemantle. My focus in this period was on financing projects, bonds and guarantees.

(d)    From December 2003 to April 2007, I was Financial Controller, responsible for the financial compliance of all of Nortel's French subsidiaries. About 60 people reported to me and I reported to the EMEA Controller, Gareth Pugh, and later to Sharon Rolston.

(e)    I was promoted to EMEA Controller in May 2007. Although I moved to the UK for this role, I remained an NNSA employee. I was responsible for the financial compliance of all EMEA entities and reported to Paul Karr, the Nortel Group Controller.

(f)    After the Group's business sales following insolvency, there were few responsibilities for someone in my position. I effectively ceased being an active full-time employee of NNSA in March 2011. In September 2011, my role

4

reduced to that of a part-time consultant to Nortel until my departure in March 2012.

11.        During my time at Nortel, therefore, I was part of Treasury from 1997 until 2003 and, thereafter, Control. In Treasury, I was generally responsible for cash management, project financing, bonds and guarantees and foreign exchange management.

12.        Treasury was always headed out of Canada as was the CFO function. Canada was where strategic decisions were made about Treasury and Finance policy. For example, all activities in the financial markets (such as bond issues and the like) were decided in Canada as well as all acquisitions and corporate restructuring.

## D.     THE MOVE TO THE RESIDUAL PROFIT SPLIT METHODOLOGY

13.        During all of my time at Nortel, NNSA invested significantly in R&D and was a major contributor to the Group's R&D projects. The system by which the sharing of the costs and rewards of the company's R&D efforts was effected (i.e. the company's transfer pricing arrangements) changed in 2001.

14.        Prior to 2001, the Nortel transfer pricing arrangements consisted of several Cost Sharing Agreements (each a "**CSA**"): for example, a CSA existed for the purposes of sharing the costs of corporate services across the Nortel Group and another existed for the purposes of sharing the costs of R&D fairly across the Nortel Group (the "**R&D CSA**"). Pursuant to the R&D CSA, the Nortel entities that performed R&D shared the global cost of

5

the Group's R&D in proportion to the profits they each realised from exploiting the Group's IP.

15.        In 2001, Nortel moved to the RPSM transfer pricing system. I was neither aware of nor involved in any of the discussions leading up to the decision to move the Nortel Group from a cost sharing mechanism to the RPSM. I understood that the decision-making in this regard was done entirely in North America.

16.        When the RPSM came into effect it caused difficulties within NNSA. This was because Nortel was making losses at the time. Whereas under the previous R&D CSA the participants to Nortel's transfer pricing mechanism had shared the costs of R&D and NNSA was reimbursed for much of the R&D it conducted, the RPSM meant that the participants (including NNSA) would now share in the profits and losses enjoyed or suffered by the Group. This was problematic for NNSA because it had a proportionally higher level of R&D spend as against revenue than the other participants to the RPSM. As a result, when it came to the booking of transfer pricing adjustments ("**TPAs**") under the RPSM, NNSA was hit particularly badly because it ended up being forced to cover its own R&D costs (which were considerable) and, in addition, it had to share in the downsides of the losses and expenses suffered by the Nortel Group as a whole. As an example, I recall that NNSA received an invoice of around €180m from NNL for, in part, NNSA's share of the Group's losses in December 2001.

17.        I therefore had to investigate the RPSM and to understand (and help the Board of NNSA to understand) the implications of the RPSM for NNSA since it appeared that it could lead to hefty transfer pricing charges. This was particularly important in light of the

strict requirements that French law sets for the obligations of directors to act in the interests of their company (some of which have criminal consequences); we had to be sure that the RPSM was in the interests of NNSA. Such interest was not obvious and I shared my concerns on several occasions with the Group's tax department.

18.        At the time, I did not immediately understand how the move to the RPSM was in NNSA's best interests nor indeed did many of my colleagues (such as Jean-Marie Lesur, Finance Director for NNSA, and Edouard Silverio, Legal Counsel for France). Given the concerns that we shared, we decided to speak to the Group's tax team in North America in order to make inquiries in respect of how the RPSM would work and what it would mean for NNSA. Although I do not remember all of these conversations and who exactly it was that we spoke to from the North American team, I recall that they explained to us that R&D would continue at NNSA (and, indeed, at the other R&D sites) but that the transfer pricing calculations would be done differently. In addition to having to share a significant portion of the Nortel Group's losses in 2001, NNSA would now, under the RPSM, have to bear its own significant R&D costs whereas previously it was reimbursed to a significant degree.

19.        As a consequence, thanks to numerous exchanges with the North American tax team, both in my position as French Treasurer and then as Controller for France, I began to piece together what the RPSM meant for NNSA. My understanding was that NNSA would continue to have an economic interest in any resulting IP arising from NNSA's R&D efforts and investment and that NNSA would retain a shared right to benefit from Nortel's IP in the future. Economic ownership signified to me that NNSA would have an entrepreneurial right to the future benefits that could be derived from Nortel's operations and, indeed, if a business

was sold then it would have a right to share in the proceeds. It also meant that NNSA would share in the downside risks by sharing in any losses that were suffered by the Group. It was never suggested to me that NNSA would be giving up any of its rights to IP nor that it was limited under the RPSM to sharing the profits and losses of the whole Group without any potential future upside in the IP. This was something that was reflected in the language that was used in the Functional Analysis which I recall referred to "entrepreneurial" risks and benefits and in a number of the submissions that we made to the FTA when NNSA was challenged by the authorities over the RPSM (which I describe in further detail below). `

20.        In my role as Controller for France, I had various discussions with Michael Orlando, who was a director in the tax department specifically in charge of transfer pricing, and Simon Schofield, a Senior Tax Manager for EMEA, to the effect that the RPSM was based on the distinction between legal ownership and economic ownership of Nortel's IP. As it was impractical to determine for each element of Nortel's IP which entity owned what "percentage" of that item of IP, I understood the RPSM was instead designed to be based on the joint ownership of substantially all of Nortel's IP. As such, I understood that NNSA would be recognised for its significant contributions to IP by being, like an entrepreneur, entitled to the full benefits and subject to the full risks of the investment that it had made (whether that would be on the sale of the IP or on the continuing use of the IP within the confines of the Nortel Group). The fact that NNSA was an economic owner of Nortel's intellectual property was a critical factor for justifying to me that NNSA could legitimately participate in the RPSM in its own interests. Even though NNSA would face costs in the short term from funding losses and R&D, it could benefit in the longer term by reaping the benefits of the IP. We were

therefore satisfied that NNSA would share in the entrepreneurial risk and reward of the Nortel Group in the future. NNSA would own a share of the IP created by the Group based on the R&D contribution which it was making. In addition, the RPSM and the rights to share in the IP across the whole Nortel Group rather than just in NNSA's IP meant that NNSA could diversify its risk profile. Instead of being only exposed to the GSM/UMTS markets NNSA would benefit and share from the much broader exposure of the group to different technologies, a clear benefit for NNSA from a risk management point of view. On this basis, we were of the view at the time that the RPSM could be justified from NNSA's perspective.

## E.    AUDIT BY THE FRENCH TAX AUTHORITIES

21.        A further example of this view was borne out in or about December 2004 (and, indeed, the following year in December 2005) when the FTA notified NNSA that:

   (a)    The FTA regarded the entry into the RPSM by NNSA to be an "abnormal act of management" under French law;

   (b)    This was potentially a criminal offence signifying that the directors of NNSA had potentially failed to act in NNSA's best interests; and

   (c)    The FTA deemed NNSA to have earned some hundreds of millions more Euros in revenue as a result of ignoring the effect of the TPAs and disallowing a portion of NNSA's R&D spending.

22.        I have been shown a copy of an internal Nortel memorandum dated April 13, 2005 (bearing bates stamp EMEAPRIV0194732) which is exhibited to this Affidavit as

Exhibit A. Exhibit A demonstrates that the FTA expressed concern that there was no legal agreement to bind NNSA to the RPSM, and that there had been no negotiations with NNSA before it was implemented. I understood that, during the course of 2004, the MRDA was being drafted to embody the RPS mechanism in part to alleviate the FTA's concerns.

23.        Although I recall that I may have commented on a draft of the MRDA, I was not close to its drafting. I was significantly involved at this point in persuading the FTA that the RPSM was in NNSA's interest. I have been shown a copy of a presentation dated March 9, 2006 titled Transfer Pricing – Meeting with French Tax Authorities (bearing bates stamp NNI_01027714) which is exhibited to this Affidavit at Exhibit B. This presentation was one of the key documents which NNSA and its tax law advisors, FIDAL, presented to the FTA in respect of the RPSM. I recall that I contributed to the drafting of this document and I would have attended this meeting as I did all key meetings with the FTA (given that liaising with the FTA was a key part of my role). The intention was to demonstrate to the FTA that, as an "entrepreneur" in the RPSM, while NNSA was at the time sharing in the Group's losses with other entrepreneurs (or Residual Profit Entities ("**RPEs**")), it would also benefit NNSA in the long run as a result of conducting and having economic ownership in the IP under the RPSM.

24.        The point we were making to the FTA was that NNSA would benefit from the RPSM in the long term since, by sharing in the entrepreneurial risk underpinning the RPSM, NNSA derived a right to share, among other things, in the benefits of Nortel's profits. To this end, crucially, the presentation stated (at page 26 of Exhibit B) that "*Sharing in profits allows NNSA to benefit from Nortel's global R&D efforts [and] RPS will benefit NNSA in the long term*". The concept of the "*shared benefit*" (at page 43 of Exhibit B) was something that had

not been fully recognised under the R&D CSA but it was enshrined in the RPSM. The key point that we sought to make to the FTA was that "*NNSA is an entrepreneur: [...] NNSA bears the risks associated with its activities and may incur losses if such risks materialize*" (page 19).

25.        Had I been told that, as part of the RPSM or the MRDA, NNSA was giving up ownership in IP it had created and continued to generate without compensation, I would not have supported the Nortel Group's new transfer pricing system as I would have questioned its legality. I would not have put it to the FTA that the RPSM was in the interests of NNSA unless I had been convinced that it was, at least, appropriate in the circumstances. I am not aware that NNSA was ever formally asked to surrender its IP. In my view, any suggestion that NNSA surrendered all of its right to ownership to IP appears to contravene the submissions that we made to the FTA in the Functional Analysis (which I describe in further detail below). I also would have raised the attention of the directors of NNSA at the time if NNSA had surrendered its rights contrary to the interests of the company. Based on my experience, I doubt that the directors would have even considered entering into any such transaction anyway.

26.        In querying NNSA's entry into the RPSM, the FTA requested that we provide them with a full Functional Analysis of NNSA's operations. In or around 2005 (although I do not recall the exact date), I began to work closely on the NNSA Functional Analysis. This was a complex document that required a thorough understanding of NNSA and that needed to ultimately be in French. I worked with the tax department to prepare the Functional Analysis for NNSA in English based on a more global functional analysis (the **"Original Functional**

**Analysis**") that had been prepared by the Nortel North American team at the request of the IRS Advanced Pricing Agreement ("**APA**") team in 2004. That functional analysis had been prepared in connection with an APA application Nortel had filed with the IRS in support of the RPSM, and had also been shared with the Canada Revenue Agency and Inland Revenue in connection with similar APA applications made with those tax authorities. We then translated the Functional Analysis into French. In the Functional Analysis, NNSA justifies the RPSM for the Nortel Group, details why NNSA in particular should be a RPE, and sets out its understanding of the effect of the RPSM.

27.         I have been shown a copy of the English-language draft Functional Analysis for NNSA for the years ended December 31, 2000 to 2004 (bearing bates stamp NNI_01492150) and exhibited to this Affidavit as Exhibit C. I have also been shown a copy of the final French-language "Analyse Fonctionnelle" for NNSA (bearing bates stamp NNI_01432695) which is exhibited to this Affidavit as Exhibit D, which I submitted to the FTA at the end of September 2005. For the purposes of this Affidavit, I have quoted the relevant excerpts from the French-language document in English translation based on the draft document at Exhibit C.

28.         The Functional Analysis formalized the understanding that I had derived from Mr Orlando and Mr Schofield (which I set out above at paragraph 20) about the economic effect of NNSA's entry into the RPSM in respect of its rights to Nortel's shared IP portfolio. It states at page 7 as follows:

  *"The R&D Entities were parties to the old R&D Cost Sharing Agreement ("CSA") and historically developed valuable intangibles by incurring R&D expenses during the*

*period the former CSA was in effect. These entities are entitled to participate in the ongoing benefits from their historical IP and bear the risks associated with the continuing value of that IP. The R&D Entities have maintained their IP activities and <u>have agreed to continue participating in the future benefits of new IP subsequent to the termination of the R&D CSA at December 31, 2000</u>. Accordingly, <u>these entities are responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts</u>. As noted in the key findings above, R&D is the primary contributor to the success of Nortel's operations. Nortel's customers choose Nortel products and services because Nortel is viewed as a technology leader in its market and because Nortel is committed to using its R&D resources in providing full pro-active services and support to its customers."* (my emphasis added)

In my eyes, this was an accurate view of how Nortel's IP was held by the participants to Nortel's RPSM: NNSA had a stake in the ongoing entrepreneurship and risk-taking that it participated in under Nortel's transfer pricing mechanism and it had economic ownership.

## F.    PROPOSED IMPAIRMENT WRITE-DOWN ON INVESTMENT IN NNSA

29.        I recall that in around September 2006 an issue arose in respect of a potential impairment in respect of the shareholding of the Netherlands incorporated holding company, NNIFH, in NNSA. I have been shown a copy of an email sent by Tony McArdle to Ryan Smith, Mr Freemantle, Robert Haitsma and me dated September 20, 2006 (bearing bates number EMEAPROD0395408) which is attached to this Affidavit as Exhibit E. The concern that the directors of NNIFH (Mr Haitsma and Mr Freemantle) had was that NNIFH's 8.83%

shareholding in NNSA needed to be impaired because of the decline in the net asset value of NNSA. For the purposes of finalising the NNIFH accounts for the financial year ending December 31, 2003, it was necessary to establish whether this needed to be reflected in the financial statements. My recollection is that the decision we took was that there was no need for the shareholding to be impaired in the accounts.

30.        A key part of the analysis that Mr McArdle undertook (with which I agreed) was predicated on our understanding that NNSA *"owns a significant IP (Intellectual Property) asset which has real economical value but which is not recorded in its balance sheet"*. Our understanding in the European finance (including tax) departments in Maidenhead and Paris was that, as Mr McArdle stated in his email, *"NN SA participates in R&D and with the other Nortel R&D participants across the world owns a share in the IP that has been generated over years of R&D. Globally this IP is valued in the region of US$6 – US$8 billion, and the NN SA share in this is approximately 8 – 10% or US$650M."* Ryan Smith, who was the Director of International Tax at the time, was also copied on the email with Mr Mrcardle's conclusions and he reported directly to North American management. This illustrates our understanding at the time that IP, which was not capitalised on NNSA's balance sheet, was economically owned by NNSA for a real value. This conclusion echoed the analysis which had been done in respect of the Functional Analysis, which I describe above at paragraphs 26 to 28, in that NNSA, having shared in the entrepreneurial risk of creating Nortel's IP, was entitled to share in the benefit of the IP.

## G.    THE SALE OF THE UMTS BUSINESS TO ALCATEL

31.          During 2006, concluding in a sale in December 2006, the Nortel Group negotiated and agreed to sell its UMTS business to Alcatel. The Nortel Group had not managed to gain a large enough market share in UMTS and the decision was made to dispose of the UMTS business to concentrate on developing 4G (or LTE) mobile technology.

32.          As part of the sale, the Nortel Group transferred to Alcatel all assets and liabilities of the UMTS business, including fixed assets, inventory, employees, customer contracts and intellectual property. The sale price that Alcatel paid to acquire the UMTS business was agreed at a global level and assets were sold by many different companies within the Nortel Group. UMTS was predominantly a European business with many large European based customers, such as Orange, Vodafone and T-Mobile.

33.          In transactions of this nature, where assets are acquired instead of shares, it is often agreed between the buyer (in this case Alcatel) and the seller to identify the assets transferred and then to apportion the purchase price over those assets. I have been shown a copy of a Share and Asset Sale Agreement between Nortel Networks Limited and Alcatel Lucent dated December 4, 2006 (bearing bates stamp NNC-NNL06026778) which is exhibited to this Affidavit as Exhibit F. As shown in Exhibit F at pages 57 to 58, subject to certain contractual mechanisms, Alcatel had the option to identify the classes of assets transferred in the sale and how much value would be attributed to each of those asset classes. There was also a provision by which Nortel had a right to object to the allocation by Alcatel and that an independent accountant would decide on the allocation if the parties could not agree. Once the asset class allocation had been established, Nortel had to determine how to allocate the sale proceeds internally among the various Nortel companies that had participated in the sale.

34.         The portions of the sale proceeds from the UMTS sale attributable to intellectual property were allocated based on the RPSM participants' shares under the RPSM. Given that the RPSM participants were the shared economic owners of the IP that was sold in the sale of the UMTS business, the sale proceeds attributable to the IP were rightly shared among the RPSM participants – including NNSA – in accordance with their rights in the IP sold. I do not recall exactly which year's RPS percentages were used for the purposes of the allocation, however, I understood at the time that the rationale for this method was that the RPSM reflected the participants' underlying ownership rights to Nortel's intellectual property, which I had understood to amount to "economic" ownership.

35.         I was in charge of coordinating the recording of the transaction as the project had been led out of Paris where most of the UMTS management was based. I led numerous calls with the support of the corporate accounting team to define how we should practically book the entries. The UMTS transaction was subsequently audited by Deloitte & Touche for all legal entities that had been involved. Whereas I do recall that numerous questions were raised at the time, I do not recall that the allocation of the IP was contested.

## H.   CUSTOMERS AND CUSTOMER RELATIONSHIPS

36.         As part of the global Nortel business, NNSA had a significant role in developing, nurturing and maintaining its customers. NNSA had two particularly prominent customers – Orange France and Bouyges Telecom. These were significant and high profile customers which generated large revenues, for example: NNSA provided nearly 100% of Bouygues Telecom's wireless stations.

37.	In order to maintain and develop customer relationships, NNSA maintained a significant sales force in France to service local customers. Senior Management of NNSA was also involved in interacting with customers and maintaining relationships. These efforts were critical to NNSA's success in retaining customer contracts and maintaining revenues.

38.	I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SWORN BEFORE ME at	)
	)
	)
this 9 day of Nary 2014	)
	)
	)

PHILIPPE ALBERT-LEBRUN

Vu pour la certification
matérielle de la signature
de Mr Philippe ALBERT-LEBRUN
apposée a-dessus

_____
A Notary Public

17

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et al.

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

Proceeding commenced at Toronto

**AFFIDAVIT OF**
**Philippe Albert-LeBrun**
**(Affirmed          , 2014)**

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, Ontario  M5V 3J7

Robin Schwill
Tel:    416.863.0900
Fax:    416.863.0871

**LAX O'SULLIVAN SCOTT LISUS LLP**
145 King Street West, Suite 2750
Toronto, Ontario  M5H 1J8

Matthew P. Gottlieb
Tel:    416.598.1744
Fax:    416.598.3730
Lawyers for the Joint Administrators of the EMEA Debtors