

Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**
**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**
**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

- and -

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS, INC., *et al.*,[1]<br>Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**AFFIDAVIT OF SIMON DANIEL BRUECKHEIMER**
**(AFFIRMED APRIL 9, 2014)**

**THIS AFFIDAVIT AND ITS EXHIBITS ARE DESIGNATED HIGHLY CONFIDENTIAL**
**PURSUANT TO THE PROTECTIVE ORDERS GRANTED IN THESE PROCEEDINGS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

I, **SIMON DANIEL BRUECKHEIMER**, of 95 Abbots Gardens, London, N2 OJJ, United Kingdom **SOLEMNLY AND SINCERELY AFFIRM AND SAY** as follows:

### INTRODUCTION

1.      I previously gave evidence by a witness statement dated December 17, 2009 in connection with steps taken by the Pensions Regulator in the United Kingdom (**"UK"**) to issue "Financial Support Directions" against entities within the Nortel group worldwide.

2.      I previously gave evidence in these proceedings, by an affidavit affirmed on September 8, 2010 and by a deposition that took place on October 1, 2013.

3.      I make this affidavit for the purposes of giving evidence to the Canadian Court and the United States (**"US"**) Court in connection with the allocation positions asserted by the Allocation Group comprising the EMEA Debtors and the UK Pension Claimants.

4.      I believe that the facts stated herein and in my earlier evidence are true. My personal knowledge of the matters deposed to herein derives from my employment from 1986 to 1991 by STC plc (**"STC"**) and from 1991 to 2009 by Nortel Networks UK Limited (**"NNUK"**), which term covers both NNUK and its predecessor operating companies in the UK. Where any facts deposed to herein are not derived from my personal knowledge, I verily believe them to be true to the best of my information and belief. I refer to the worldwide Nortel group of companies as **"Nortel"** or the **"Nortel Group"**.

SUMMARY

5.      Research & Development ("**R&D**") at Nortel was generally a collaborative process. Other NNUK employees and I not only worked together, we routinely shared our expertise, developed foundational technologies and also co-invented patents with Nortel employees based in other geographic locations, which was to the advantage of the Nortel Group. I never perceived that there was any difference between particular Nortel entities, always thinking of Nortel as a unified whole.

6.      During my 23 years working for STC and NNUK I worked with other NNUK engineers at Harlow and Maidenhead to develop technologies for Nortel that laid the foundation for technologies that are still used today, such as Voice over Internet Protocol.

7.      NNUK's R&D labs were strong contributors to Nortel and I believe were highly regarded.    We invented a significant number of patents and developed telecommunications standards-essential technology.    Patents were important to Nortel, and I was one of Nortel's most prolific inventors, contributing approximately 50 original patents (resulting in over 100 patents being issued worldwide) to Nortel's patent portfolio, some of which I have been informed were sold in 2011 to the Rockstar consortium.

8.      It could take many years to develop initial research into what ultimately became a product. This research would often result in patent filings, which could protect many generations of products and also provide licensing opportunities with competitors and discourage in-bound patent infringement claims.

9.      NNUK's R&D labs built strong relationships with Nortel customers (referred to internally as Nortel's "mind share" and "trust relationship"). These relationships took many years to

build and were good for Nortel's reputation, but were also personal to the NNUK employees involved.

10.    The work done by NNUK was important, but as far as I am aware NNUK generally had no control over the size of its R&D budgets.  Control was either through the lines of business (with the heads of business units generally based in the United States (the "**US**") or Canada) or through the global Chief Technology Officer ("**CTO**") (also based in the US or Canada).

11.    In the following sections I discuss my employment history with Nortel, including awards I received and work I did on technology standards, the collaborative nature of R&D at Nortel and the significant contribution of NNUK employees to Nortel's patent portfolio, products, and customer relationships.

### EMPLOYMENT HISTORY WITH NORTEL

12.    I hold a BSc (Eng) 1st Class Honours degree in Electronic Engineering and Systems from Queen Mary and Westfield (formerly Queen Mary) College, University of London and an MSc in Control Systems from Imperial College, University of London.  I am a Chartered Engineer and have been a Fellow of the Institute of Engineering and Technology (formerly the Institute of Electrical Engineers) since 2005.

13.    NNUK was my employer throughout my career with Nortel, the largest part of which was spent working on the research and development of technologies to enable Nortel's customers to transition from public voice networks based on "circuit switched" connections to "voice over packet" networks enabling voice integration with multimedia and data services over a single packet switching network.  At the connection level two main types of voice over packet technology exist:

Voice over Asynchronous Transfer Mode (**"VoATM"**) and Voice over Internet Protocol (**"VoIP"**). Connections are established and maintained by software entities using some form of signalling across the network, and these entities are desirably separate from the physical and functional entities that support the connection. These principles are now used worldwide in the operation of many public "landline" telephone networks, broadband access networks, as well as Third Generation (**"3G"**) and Fourth Generation (**"4G"**)/Long Term Evolution (**"LTE"**) mobile and wireless networks.

14.    In 1986 I joined STC's Harlow Labs in the UK, then known as STC Technology Laboratories, as a Research Engineer in the Digital Signal Processing department working on software for the design of a silicon device for military radio communications.

15.    In 1988 I was promoted to a Senior Research Engineer and worked on the development of Asynchronous Transfer Mode (**"ATM"**) packet technology, filing several patents relating to this field.

16.    Around 1992 I joined a team working on a Directory Enquiries product primarily for British Telecommunications plc (**"BT"**) in the UK. I developed a patented fundamental software algorithm which radically improved the performance of the product. I was promoted to a Principal Research Engineer in 1993.

17.    In 1994 I returned to advanced technology research and began working on solving the challenges of VoATM and patented and developed foundational technologies.

18.    In 1997 I was promoted to Senior Manager of Next Generation Networks architecture and systems, contributing to the development of Next Generation Networks architecture for products such as the CS2000 Call Server and Media Gateways which were the dominant products branded by Nortel as its "Succession" portfolio.

19.    In 2001 I moved to NNUK's New Southgate site (in the UK) as a Voice Architect responsible for the implementation of VoATM and VoIP Succession networks for Europe, Middle East and Africa ("**EMEA**") Carrier customers.

20.    In around 2003 I became a Consultant Architect in the newly formed CTO's Field Office in EMEA.  In February 2009 I became the Leader of the CTO's Field Office in EMEA.  This was a client facing business development role focussing primarily on all Nortel's customer types, more latterly Enterprise customers.

21.    I became an employee of Avaya when the Nortel Enterprise Division was sold to Avaya in December 2009.  I left Avaya in April 2010 and am currently employed by the CIENA Corporation as a Global Principal Consultant and Chief Technology Officer for their Network Transformation Solutions services business.

22.    I am a deferred member of the NNUK defined benefit pension plan.

AWARDS

23.    In 2005 I was awarded the prestigious Silver Medal of the Royal Academy of Engineering (the UK's national academy for engineering).  Only four medals are awarded each year. The Silver Medal is awarded to engineers under the age of 50 with an outstanding and demonstrated personal contribution to UK engineering that has resulted in successful market exploitation. Attached to this Affidavit at Exhibit "A" is the Royal Academy of Engineering's press release about my award.  It states that I am *"a pioneer of Next Generation Networks, which are changing the face of telecommunications by integrating voice, mobile, and broadband wireless and data communication into one digital system."* It goes on to quote Professor Peter Selway, a Research

Fellow in Electronic Engineering at Imperial College, London (a former NNUK employee, who led the Harlow Labs for several years), who stated that:

> *"Simon is one of the leading communications engineers of his generation...In the mid-1990s he embarked on a programme of research at Nortel's Harlow Laboratories that has led to a major new product range for the company and has revolutionised the design of communications networks. He is unique in that, as his career has progressed, he has maintained his position as a key innovator at the centre of developments in Next Generation Networks, both in terms of the sheer number of patents applied for each year and their subsequent value to the company."*

24. I have been shown an email sent to me by Brian McFadden (Chief Research Officer at Nortel at the time) entitled "Prestigious Award for Harlow Engineer" dated June 16, 2005, a copy of which is attached to this Affidavit as Exhibit "B" (bearing bates stamp NNC-NNL06900384, and which has been identified previously in these proceedings as Exhibit 21196). Mr. McFadden congratulated me on being awarded the Silver Medal of the Royal Academy of Engineering, and stated: *"Without a doubt, your work has played a significant role in establishing Nortel's leadership in a number of areas, including VoIP".* Mr. McFadden thanked me for my *"dedication, inventiveness, and leadership in keeping Nortel at the forefront of technology innovation".*

25. Nortel's last global CTO, John Roese, set up a Fellowship Programme in 2007 to recognise R&D staff who made a significant and sustained contribution to Nortel's technology resulting in commercial success and who strongly influenced the telecommunications industry. I have been shown a document entitled "The Technical Fellowship of Nortel Program General Information", a copy of which is attached to this Affidavit as Exhibit "C" (bearing bates stamp

NNC-NNL07441198).  Page 1 states that: *"The Technical Fellowship of Nortel will comprise an elite group of technologists with broadly impacting influence and responsibilities across the corporation and within the industry, and who further Nortel's global industry leadership".*  I was one of the first five people to be recognised as a Fellow in 2007 for my contributions to Next Generation Networks, voice over packet technologies and products.  Only nine active employees were ever elected as Fellows under this programme.  It is a significant endorsement of UK ingenuity and R&D contribution that two of the nine were from Harlow (myself and Nigel Bragg).

26.     Nortel also designated some inventors as "prolific inventors".  I was recognised internally and externally as one of Nortel's most prolific inventors.  I have been shown a slide deck entitled "2005 Significant Patent Awards", a copy of which is attached to this Affidavit as Exhibit "D" (bearing bates stamp NNC-NNL06606763, and which has been identified previously in these proceedings as Exhibit 21454).  Slide 3 lists me and Wen Tong as candidates to be recognised among Nortel's prolific inventors.  Slide 5 describes our contribution as follows:

*"Each inventor is distinguished by an outstanding level of invention activity, with over 30 issued US patents, ~ 100 patents issued worldwide, including a number of patents in key technologies with identified value; each inventor has also shown exemplary behaviour in their contributions as IP Mentors, and in support of UP programs and patent activities encompassing standards, licensing, litigation and defence."*

27.     Nortel gave annual and bi-annual awards for specific research and patents, including the Nortel President's Awards (Gold, Silver and Bronze), the CTO's Technology Award of Excellence, and the Chairman's and Vice-President's Innovation Awards.  I received a number of these awards during my career at Nortel.

28.     Nortel held annual patent awards ceremonies to recognise and reward its inventors. I have been shown a copy of the final draft of a World On-Line story describing the 2002 Harlow patent awards ceremony, a copy of which is attached to this Affidavit as Exhibit "E" (bearing bates stamp US_Canada_PRIV_00000064, a duplicate of which (bearing bates stamp US_Canada_PRIV_00023975) has been identified previously in these proceedings as Exhibit 21236). Page 1 of Exhibit "E" notes that I received an award for contributing 15 issued patents to Nortel's patent portfolio. I have also been shown a copy of a draft World On-Line story describing the 2004 Harlow patent awards ceremony, a copy of which is attached to this Affidavit as Exhibit "F" (bearing bates stamp US_EMEA_Canada_PRIV_00006054, and which has been identified previously in these proceedings as Exhibit 21458). Page 2 of Exhibit "F" records that I received two awards for the grant of 20 and 25 patent milestones, and states that some of my *"highly influential patents have formed the basis for the practical development and commercial deployment of today's successful Succession and VoIP solutions"*. Over the course of my employment with Nortel I contributed approximately 50 original patents (resulting in over 100 patents being issued worldwide) to Nortel's patent portfolio and got as far as receiving an award for the milestone of 40 issued patents at the ceremonies that were held.

PATENTS

29.     Patents were very important to Nortel, particularly what has been termed "foundational patents". For me a "foundational patent" is a patent that represents the inception of a new area of ideas, or has influenced greatly a field of ideas (as opposed to a "significant" patent, which is a term that was conceived by Nortel to refer to patents that had a major impact for Nortel,

for example through licensing revenue, by protecting a key product or by covering an important industry standard. A foundational patent may or may not have been recognised as "significant" by Nortel, but Nortel "significant" patents are most likely to also be foundational). Early patents are more likely to be or become foundational patents as they are likely to be cited by future patents or influence other inventors in that field. As a consequence, as well as being amongst the earliest patents filed in a particular field, foundational patents are also likely to be amongst the most valuable patents (relative to other patents in that particular field) due to (for example) the high likelihood of revenue generated through license fees from vendors of products that unavoidably apply the subject matter of that patent. All patents may be maintained in force for a significant default statutory period of time, and their value will depend upon if, and how widely, the technology to which the patent relates is adopted by customers (even unintentionally). In my experience foundational patents are more likely to have and retain their value longer (relative to other patents in that particular field) because of the intrinsic breadth of their claims, and for example their concomitant opportunities for subsequent divisional filings, worldwide filings and reissuance of claims.

30.     For example, one of the patents I invented (and consider foundational) is Patent Number US 6,519,257, reissued as Patent Number US RE40,398 E (ATM Telecommunications Systems and Method for Routing Narrow Bank Traffic). This patent discloses the invention of VoATM and VoIP network principles, and is an example of how an early patent can hold its value over a long period of time. Originally filed in 1996, based on work I did in Harlow around 1994 and 1995, I understand that it was sold in 2011 to the Rockstar consortium. As packet technology has matured, the claims in this patent, although developed for a different technology, enabled Nortel

to sell products based on VoIP (including Call Server and Passport products) 15 years after the original research was done. Future developments in VoIP might also be caught by the reissuance of this patent, allowing owners (such as the Rockstar consortium) to apply this patent to 4G/LTE networks, which also use VoIP networking principles. The longevity of this patent is not necessarily unique in the Nortel patent portfolio.

31.    NNUK employees contributed a large number of patents to Nortel's patent portfolio. I have been shown Exhibit "E" (introduced above), page 1 of which states that *"Harlow based employees contributed 1 of every 5 patents issued to Nortel Networks over the last few years"*. I have also been shown Exhibit "F" (introduced above), page 1 of which states that *"UK employees contributed about 18% of newly issued patents"*. I am not surprised by these figures given the high quality of Nortel's R&D facilities in the UK, and I recall statements during my career that *per capita* NNUK contributed the greatest number of patents to Nortel's portfolio. My belief is that NNUK punched well above its weight relative to the rest of Nortel in terms of patent output.

32.    NNUK engineers, me included, were involved in Nortel's patent portfolio management. Nortel had to decide whether or not to maintain patents by paying maintenance fees or cull patents not aligned to current and future business priorities. Engineers like me provided the benefit of our technical expertise to help determine whether particular patents were in keeping with the industry and therefore worth maintaining, or how to improve their value, for example by redrafting claims when possible to do so. When conducting those exercises no communication or statement was made to me to the effect that they were being conducted on behalf of any particular Nortel entity. My view was that we were maximising the value of patent assets and also potentially freeing up funds for future patent filings that would benefit the Nortel Group as a whole.

33.     I understand that some of the patents invented by engineers in the UK, including me, were sold to the Rockstar consortium in 2011. I have been shown a copy of the Rockstar Winter 2012 Sales Prospects, Selected Assets Catalogue, a copy of which is attached to this Affidavit as Exhibit "G" (which has been identified previously in these proceedings as Exhibit 22091). This catalogue includes patents invented by NNUK employees. For example, Patent Number US 6,266,342 (Adaption Resource Module and Operating Method Therefor) is a patent that I invented and filed in 1998 and which relates to a method and means of balancing, distributing and assigning signalling or communications traffic requiring specialised processing across a "farm" of such specialised processors, each only capable of processing a portion of the offered load.

34.     One of the terms of my employment with STC required me to assign all of my inventions to STC. It is my belief that these terms (and the patents assigned thereunder) were inherited by Nortel when Nortel acquired STC. All of the patents that I invented while an NNUK employee were assigned to Nortel; I was not given any choice as to which Nortel entity my patents were assigned to. This was not a concern for me because I assumed my patents were assigned to the Nortel Group. No one ever said to me that by assigning my patents to one Nortel entity I was advantaging that Nortel entity over another.

STANDARDS

35.     Standards establish uniform harmonious or complementary functional or technical criteria. Some standards are recognised by national governments or European Union ("**EU**") appointed standards committees, or in the case of the Telecommunications Standardisation Sector standards, the United Nations. There is considerable advantage to a technology company if their

innovations become standards within the industry. It increases reputation in market leadership and means that other technology companies will have to, and the operators that use their products will want to, comply with that standard even though they may not have achieved the technological advancement to know how to do so. Nortel was thus able to generate revenue through licensing fees or "fair patent swaps" with other vendors of products implementing a standard which Nortel had developed.

36.     Developing innovations in standards also allowed Nortel to establish a significant market share because the closer the standard is to a company's technology the quicker it can enter the market before competitors can make their products compliant with that standard (almost a universal requirement by customers). This sways more customers towards the technology and products of the "first mover" company.

37.     In the late 1980s I represented Nortel internationally as a contributing member company to one of the programmes run by the EU Research into Advanced Communications in Europe ("**RACE**") to develop the first ATM Network Demonstrator. My UK colleagues and I contributed to the formation of International Telecommunications Union ("**ITU**") ATM transmission standards which adopted methods for which I patented a means of ATM cell synchronisation and jointly patented a "scrambler" to ensure the quality of ATM communications. We also contributed to the European Telecommunications Standards Institute ("**ETSI**") standards development in Europe and the American National Standards Institute ("**ANSI**") ATM transmission standards development in the US.

38.     Patent Number US 5,367,544 (Data Stream Frame Synchronisation), was one of the first patents that I invented and subsequently helped to embed in a standard. This patent discloses a

method for synchronisation that is the method for ATM cell delineation that has been standardised as part of the Telecommunications Standardisation Sector standards by the ITU, to enable ATM data packet (cell) boundaries to be synchronised.  On several occasions the Nortel Group's Intellectual Property Law Group was extremely interested in this patent because the standard to which this patent relates is used by every ATM interface. ████████████████████

████████████████████████████████████████████

████████████████████

39.    Two significant research papers that resulted from my work in Harlow from 1994 in the field of VoATM were published by the International Switching Symposium in 1995 and 1997. These papers and presentations at the events encompassed VoATM switching technologies that were patented in the UK and were some of the earliest published material, certainly within Nortel, on what later became Next Generation Networks for voice over packet communications.

## RESEARCH & DEVELOPMENT AT NORTEL

40.    R&D was fundamental to Nortel (after all, each and every patent in Nortel's portfolio would have been preceded by research, often lasting a number of years).  In the mid to late 1990s Nortel grew exponentially, from around 35,000 employees to 100,000 employees worldwide.  The pool of knowledge on which inventors could draw grew and the potential for cross-fertilisation of ideas between different R&D locations was huge.  The kick-start to this period in Nortel was "Project Rainbow", which was a network of research projects involving labs in Harlow, Ottawa and North Carolina in the main researching the myriad challenges for VoATM and the design of concomitant systems to implement it.

41.     NNUK employees performing R&D were funded by the line of business to which they belonged or by a budget controlled by the global CTO.  These were ultimately controlled by executives in North America.  I recall that the R&D budgets and headcount declined precipitously in the period following the bursting of the dot.com bubble (from about 2000 onwards) up to Nortel's entry into insolvency in January 2009.  During this period, my colleagues and I observed North American groups within Nortel (who were less remotely located from funding resources) working to protect their interests to the disadvantage of those like NNUK who did not have sufficient political clout or direct control of budgets.  The consequence was that when Nortel reduced R&D headcount, NNUK suffered disproportionately.  For example, in 2004 R&D on Passport Voice Gateway ("**PVG**") was moved out of Harlow to North Carolina, with the NNUK employees working on PVG (who were experts on that technology) made redundant.  This was one of the last full R&D projects remaining in Harlow at that time.  Notwithstanding these constraints, not only did NNUK R&D employees have an outstanding track record in terms of numbers of patents invented, they had also built up a reputation for innovation and expertise in a number of areas.

THE SIGNIFICANCE OF NNUK RESEARCH FACILITIES

**Knowledge Transfer**

42.     Harlow developed the original ideas for many technologies and, as a consequence, was involved in significant "knowledge transfer" to individuals and groups in North America.  By way of example:

(a)     My team in Harlow was asked on numerous occasions to provide knowledge and assistance to individuals and other groups based in the US and Canada on

technologies such as our Voice on Packet silicon devices, all aspects of the CS2000 Call Server product and Media Gateways such as PVG.

(b)    My team in Harlow was regularly asked by other parts of the Nortel Group including in the US and Canada to provide consultancy on how to achieve voice quality in packet networks that used these technologies.   We also carried out product and network reliability (dependability) calculations over many years for the CS2000 and Media Gateways.

(c)    My colleagues in the UK and I provided assistance and knowledge to individuals and groups in the US and Canada in relation to the evolution of CS2000 to become compliant with the 3GPP IP Multimedia Subsystem (**"IMS"**) network architecture which was specifically designed for mobile network IP communications but not the demands of fixed public telephony and broadband networks.

(d)    As landline operators wanting to make it easier to communicate with mobile ("wireless") networks adopted many of the networking principles of mobile operators to open their networks to richer communications applications, Harlow assisted North American engineers in understanding the standards developed and how these had been applied in European customers' networks, for example Telefónica in Spain and BT in the UK.

43.    This free flowing and unfettered contribution of ideas from NNUK engineers to their colleagues in North America enabled Nortel to produce higher quality products than would have been the case without NNUK's involvement.

**"Mind Share" and "Trust Relationships" with customers**

44.    From about 2001 onwards I moved to more customer-facing roles, latterly as a Consultant Architect in the Technology Field Office for EMEA (**"Technology Field Office"**) and then as its leader.  This latter part of my career involved working with the research, technical and procurement teams at Nortel's customers to plan new or revised telecommunications networks.

45.    Nortel's customers were network operators making long-term capital investments in building communications networks, rather than individual consumers.  Large carriers, BT being a notable example, have engineers who are dedicated to considering the future needs of communications networks.  This work by customers influences the choices the procurement teams in those organisations make when deciding what to acquire for their network equipment and software, and also in evaluating a vendor's capabilities and strategy.

46.    Recognising this, in the mid-2000s Nortel decided the Technology Field Office should be established to build better relationships with customers.  This involved establishing relationships with key staff in the customers' technology community to understand their needs and to discuss Nortel's vision and strategy for the technological future.  The aim of this exercise was to gain what Nortel described as "mind share" with customers.  It was not enough to have the best products, customers had to be persuaded that the future of Nortel's products would be an evolution not a replacement and would correctly predict the direction of the industry and the customer's future needs.

47.    BT is a good example of a customer with whom we developed "mind share".  Mr. Bragg and I developed strong relationships with BT's CTO office over a number of years.  I worked with them to establish their best strategy for evolving their public telephony to IMS network

architecture and how to use that requirement to influence Nortel's product strategy. From 2003 onwards, Mr. Bragg and then I collaborated with BT's CTO office in the development of Provider Backbone Transport (**"PBT"**) technology (which is discussed in more detail below). Another specific example of building "mind share" with customers occurred in my laboratories in Harlow and Maidenhead in 2005. I demonstrated the first mobile telephone call to be conducted entirely over a packet network using a "network trial vehicle" established for the purpose in conjunction with an exemplar mobile network. This enabled Nortel to show ground-breaking research to large mobile operators such as Vodafone, O2 and T-Mobile, helping to convince them that Nortel was at the cutting edge of the future of telecommunications.

48.    These relationships with customers were not just built up over time by the account management teams and sales teams, the Technology Field Office helped to strengthen these relationships by dealing with many different internal teams (procurement, commercial, technical) within the customer. This enabled Nortel to burnish its credentials with customers and put itself in a better position to win work and sales.

**Next Generation Networks**

49.    Next Generation Networks describes the evolution in telecommunications in which all information and services (voice, data, and all sorts of media such as video) are transported over a single network as digital data. This involves "packet" technology. The Harlow Labs were recognised from the time they were acquired as having expertise in packet technology and soon after that in voice over packet technology. Much of the mid to late 1990s saw me and engineers in my Next Generation Networks team consulted by our North American colleagues on how to

commercialise packet technology. In the early and mid-1990s a significant problem with voice over packet technology was that it led to echo effects and was not suitable for telephone calls. Some of my early work helped to address this problem as well as the whole network architecture and systems for voice over packet. This work was incorporated into Nortel's Succession and Passport families of products, examples being the Call Server 2000 and the Passport Multi-Service Switch platform, which became a media (voice) gateway.

**Additional Technology Areas**

50.    PBT technology (PBB-TE in the terminology adopted by standards) was conceived in late 2003 at Harlow by Mr. Bragg in conjunction with Dave Allen at Ottawa. These ideas were prototyped at Harlow in 2004 by Simon Parry and Robert Friskney. PBT's foundational patent was filed in 2005 and these four individuals are the core inventors. I was later a contributing inventor to the PBT patent family (as was Peter Ashwood-Smith in Ottawa). Although in 2004 Nortel lost its bid to become a strategic supplier to BT's 21st Century Network to replace Public Voice Services and the associated network infrastructure, Nortel became a strategic supplier to BT in a later bid as a result of its PBT technology. When announced publicly, this lent a significant boost to Nortel's share price.

51.    Radio Access Networks ("**RAN**") Connectivity was another area that we worked on with BT. From 2005 I started to develop a solution to carry mobile RAN connectivity over packet technology and specifically Ethernet and PBT. I established a laboratory in Harlow and Maidenhead, and then I worked with BT Wholesale and their mobile customers in the UK, as well as several other mobile operators in EMEA, to verify such a solution and to investigate a key

missing capability of providing adequate network clock synchronisation over packet networks. I was jointly awarded the CTO's Technology Award of Excellence in 2007 for my contribution. I have been shown an email sent to me and the other recipients of the award by John Roese (Chief Technology Officer at Nortel at the time) dated June 5, 2007, a copy of which is attached to this Affidavit as Exhibit "H" (bearing bates stamp NNC-NNL07075635). Mr. Roese notes that we have *"created important IPR that will be available for licensing and have positioned this technology well with standards bodies that are defining industry directions in this critical area".*

## PRODUCTS

52.     As I describe below, other Harlow engineers and I were frequently involved in the process of proposing the designs of products which were based on the underlying inventions that we had created.

### Succession Portfolio

53.     The term "Succession" was adopted by the Nortel Group as part of the branding of its carrier product portfolio of Media Gateway products and the CS2000 Call Server, intended to represent the next generation of technology in carrier networks. These products were key parts of Nortel's next evolution of telecommunications which enabled Nortel to remain as a leader in the carrier networks industry.

54.     In around 1999 Dr. Philip Hargrave, Roy Mauger and I became the Harlow based members of a select team of about 10 senior network "architects" - the others coming from North

Carolina, Dallas and Ottawa - called the Succession Architecture Forum, reporting to John Bourne (CTO for the Carrier Networks business division of the Nortel Group). We were responsible for ensuring that the Succession portfolio's component products met governance criteria, which we defined, and that they would interoperate most beneficially, consistently and correctly. In my role on the Succession Architecture Forum I developed a voice quality planning methodology for voice over packet technology with the team in Ottawa in around 1999, with whom I jointly filed for a patent (which was issued as Patent Number US 7,103,003 (Network Planning Tool)). This work also won the President's Gold PRIDE award.

**Media Gateway Products**

55.    A Media Gateway enables networks operating on different principles to communicate with one another. For example, computers use IP networks to communicate using packets of information only sent as necessary, whereas telephones typically use the Public Switched Telephone Network (**"PSTN"**) based on sending a constant information flow - a circuit - which reserves resources for use during a telephone call. These two networks were designed for entirely different purposes and are fundamentally different on a technical level. A Media Gateway integrates these technologies to the extent that an old style telephone can (for example) communicate with a "phone application" running on a computer such as Skype.

56.    From around 1994 I was part of a Harlow team working on VoATM and then VoIP technologies. We formed the concept of a single fabric (packet) switch (**"SFS"**) which is capable of switching both voice and packet data communications simultaneously. Two generations of the silicon device supporting this concept (the **"Silicon Devices"**) were designed by my team and an

allied Application Specific Integrated Circuit (**"ASIC"**) team in Harlow and included the development of many algorithms which were also patented and developed by NNUK employees.

57.    The Silicon Devices formed vital components of the MG4000 and PVG Media Gateway products.  Both of these Media Gateways were very important for Nortel because they enabled Nortel to offer customers the possibility of upgrading their existing PSTN networks to ATM packet technology (and ultimately IP technology) without having to replace all their existing PSTN hardware and accordingly saved Nortel's customers very substantial sums of money.

**Call Servers: the CS2000 Product**

58.    A Call Server determines where and how to route incoming calls through a network comprising Media Gateways that connect via a packet network.    The primary Nortel Call Server product is the CS2000 and its derivatives.

59.    Harlow and Maidenhead developed fundamental R&D and patents on Call Server technology which relate directly to Nortel's CS2000 product line and its derivatives, and to the software of Media Gateways.  Harlow and Maidenhead labs researched and filed two foundational patents (among many others) in this communications discipline: (i) the concept of separating a Call Server and a connection control network layer which was developed by me and my colleagues Mr. Mauger and Dave Stacey at Harlow in 1996; and (ii) phantom trunking which was developed by Mr. Mauger and Julian Cable at Harlow and Mark Ashworth and James Shields at Maidenhead in 1997. This latter patent is an especially valuable patent that embodies an insight which enables older telephone network switching protocols (and their software implementation legacy) to control aspects of a modern packet network with the minimum of software and signalling modification.  This meant

- 21 -

that it was possible to reuse a widespread deployment of PSTN signalling to signal across the packet network as if that network were a circuit-switched PSTN.

60.    Both of these patents, and the family of patents leading up to and contemporaneously with them, embody insights, knowledge and expertise developed at Harlow and Maidenhead.  While further product development for the CS2000 was undertaken in the US and Canada, Maidenhead continued to play a key role in its development as well as in the development of its derivatives such as Centrex IP and Lawful Intercept.  Harlow continued to advise in the development of the CS2000 into an Applications Server (AS2000) to control voice applications in IMS based networks, particularly applied to fixed line and broadband access.

61.    The Nortel Group would not have developed these technologies or products as early or as quickly for the market as they did without the work done by NNUK.  Although it is hard to be precise, I believe that the work done in Harlow and Maidenhead on the Succession portfolio afforded Nortel at least a two year lead in these technology areas and thus Nortel established a larger market share than otherwise would have been possible if there had already been competition or established products.  Without essential NNUK patents on, by way of example, Call Servers, Media Gateways and ATM technology, the Nortel Group would have been required to pay license fees and/or buy-in these technologies from other companies, assuming those technologies would have become available elsewhere.

**CUSTOMER BIDS**

62.    In both Harlow and Maidenhead, the R&D teams were heavily involved in building Succession networks to meet particular customers' requirements, which involved attending a

significant number of meetings with customers in EMEA, the US and Canada, often where Nortel was bidding for contracts with that customer. By way of example:

(a)    I was asked by George Smyth who was the head of Nortel's account for AT&T in the US to lead the first AT&T bid for VoATM in 1997, for which Nortel was shortlisted as one of the top-two vendors for the first time in several years with this customer. AT&T reissued their request for proposal on the basis of the leading vendor's responses and the experience and knowledge we provided to Nortel's R&D teams in the US and Canada positioned Nortel favourably to respond to the follow-on request in 1998, for which I was a Design Authority. These successes meant that Nortel was well placed to continue its involvement with AT&T as a customer for this technology.

(b)    NNUK also worked with MCI/Worldcom in 1998 and 1999 at the request of the account team in the US and again in 2000 at the request of the Nortel Group's Carrier Networks CTO. On each of these occasions either I or colleagues of mine in Harlow liaised with the part of the MCI/Worldcom business concerned with carrier networks and in particular with the account manager in Nortel who was based in Dallas in the US.

(c)    In 2001, my expertise was specifically requested to lead a presentation in front of all the Sprint business units on voice quality planning in packet networks. I liaised directly with Rob Wood who was the Sprint account team director based in the US. I recall Mr. Wood commenting that he could not find the expertise he needed elsewhere in the Nortel Group.

(d)    Together with the CS2000 team in Maidenhead we were asked by R&D teams in Canada and the US to contribute to a pre-sales trial of Succession technology by SouthWestern Bell Corporation in 1998. The team in Harlow was asked to contribute expertise on the Connection Broker and on the Silicon Devices.

63.    I declare under penalty of perjury under the laws of the United States of America and under the laws of Canada that the foregoing is true and correct.

AFFIRMED BEFORE ME at

95 Abbots Gardens, London, N2 OJJ

SIMON DANIEL BRUECKHEIMER

in England on April 9, 2014

Notary NOTARY PUBLIC
LONDON, ENGLAND CHEESWRIGHTS
LUIS N. HYDE-VAAMONDE    NOTARIES PUBLIC
(My Commission expires with Life) Bankside House, 107 Leadenhall Street,
London EC3A 4AF
Telephone: 020 7623 9477
Facsimile: 020 7623 5428

- 24 -