Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>    NORTEL NETWORKS INC., *et al.*,<br><br>                              Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**<u>EXPERT REBUTTAL REPORT OF DANIEL R. BERESKIN, QC</u>**

(Submitted by the U.S. Debtors)

**February 28, 2014**

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY
CONFIDENTIAL UNDER THE PROTECTIVE ORDER.  THEREFORE, THIS
REPORT IS DESIGNATED HIGHLY CONFIDENTIAL.**

## I.    INTRODUCTION

### A.    Scope of Assignment

1.  I have been asked by counsel for the U.S. Debtors to provide an opinion, based on my experience and knowledge of the custom and practice in the field of intellectual property, and in particular license agreements, on the following questions:

> i.  How would a sophisticated business person, based on the custom and practice in the field of licensing of intellectual property, understand the scope of the license (the "MRDA License") granted to Nortel Networks, Inc. ("NNI") and the other Licensed Participants under Nortel's Master Research & Development Agreement ("MRDA")?[1]
>
> ii.  If I were asked by a prospective buyer of Nortel's intellectual property portfolio ("Patent Portfolio") in July of 2011 to advise it on a potential acquisition of the Patent Portfolio, what would I advise the buyer about the acquisition of the Patent Portfolio in light of the MRDA Licenses?

2.  I have been asked to submit this report in rebuttal to certain aspects of the reports of Dr. Timothy Reichert and Mr. Philip Green, submitted on January 24 on behalf of the Monitor and Canadian Debtors.[2]  Dr. Reichert interprets the MRDA and asserts that the MRDA Licenses were limited (in terms of field of

---

[1] I have received and reviewed exhibit 21003, which is the original Master Research & Development agreement dated December 22, 2004 and the amendments thereto dated October 18, 2005, December 14, 2007, January 1, 2006, and December 31, 2008. My opinions are based on the as-amended version of the MRDA.  Capitalized terms not otherwise defined herein refer to defined terms in the MRDA, certain of which are recited in paragraph 37 below.

[2] The excerpts of Dr. Reichert's and Mr. Green's reports that were shown to me and which counsel requested I review and respond to are described in Appendix C.

use) to products made by or for the MRDA Licensees.[3] Mr. Green assumes the same.[4] As set forth below, in my opinion, this reading of the MRDA is not consistent with how a sophisticated business person, based on the custom and practice in the licensing of intellectual property, would understand the MRDA Licenses.

3. In addition to the information and documents noted in my report, I have also relied on the documents identified in Appendix B.

4. I am being compensated in this matter at a rate of CAD $855 per hour. My compensation is not contingent on the outcome of this case.

5. I have not previously testified as an expert witness.

## B.    Summary of Opinion

6. A sophisticated business person, based on the custom and practice in the licensing of intellectual property, would understand the MRDA to grant all substantial rights in and to the NN Technology as defined in the MRDA to each Licensed Participant in its specified Territory in perpetuity, and on a royalty-free basis. It is my view that as a result of this grant of rights, at all material times, including at the time of the sale of the Patent Portfolio, Nortel Networks Limited ("NNL") was the owner of only the bare legal title to the NN Technology in each such specified Territory, whereas the equitable and beneficial ownership, i.e. the commercially valuable rights, was vested in each Licensed Participant in its specified Territory.

7. Additionally, were I advising a prospective buyer of the Patent Portfolio, I would have advised that as a condition to purchasing the Portfolio it require that each Licensed Participant either agree to terminate its rights under the MRDA, or to

---

[3] See, e.g., Dr. Timothy Reichert, Evaluation and Economic Analysis: The Nortel Network Group's Intercompany Transfer Pricing Arrangements, Jan. 24, 2014 [hereinafter Reichert Report] at 5-6.

[4] See, e.g., Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities, Jan. 24, 2014 [hereinafter Green Report] at 6, 64.

execute a quitclaim or release of its license and enforcement rights confirmed in the MRDA.

## II.   QUALIFICATIONS

8.  I am a graduate of the University of Saskatchewan, BSc (Engineering Physics) and LLB in 1962 and was called to the bar in Ontario in 1964.  I was named Queen's Counsel in Ontario in 1982.

9.  In 1965 I co-founded the firm now called Bereskin & Parr LLP, an intellectual property firm providing clients with advice on securing intellectual property rights world-wide and have practiced with this firm since then.  I regularly provide strategic planning and business advice to a wide variety of domestic and foreign clients relating to all aspects of intellectual property law, including licensing, due diligence in relation to securing intellectual property rights, agreements related to the assignment or sale of intellectual property, as well as related subjects.

10. For several decades after my call to bar, I practiced primarily as a patent lawyer.  One of my long time clients was Barringer Research Limited ("Barringer"), a natural resources exploration research and development company.  For several decades, I was responsible for negotiating and drafting numerous technology license agreements and joint venture agreements between Barringer and a number of leading mining and hydrocarbon companies in Canada, the United States of America, the United Kingdom, South Africa, and Australia.

11. In addition, over the years I have assisted many diverse clients in performing due diligence work, typically giving strategic and business advice in relation to proposed intellectual property and technology acquisitions.  This work has included extensive experience in drafting, negotiating, and reviewing intellectual property licensing agreements.

12. I am a Fellow of the Intellectual Property Institute of Canada, a registered Canadian and U.S. patent agent, and a registered Canadian and U.S.

trademark agent.  I have served as a Director of the International Trademark Association ("INTA") and as Legal Counsel to INTA.

13. I am ranked in the top tier of Canadian intellectual property practitioners by The World's Leading Lawyers for Business, The International Who's Who of Business Lawyers, Managing Intellectual Property, The Canadian Legal Lexpert Directory, The Best Lawyers in Canada, Chambers Global, and Expert Guide to the World's Leading Lawyers – Best of the Best.  In 2004 I received the INTA President's Award, in 2007 the Worldleaders International Lifetime Achievement Award, and a Lexpert Zenith award in 2012, awarded to lawyers from across Canada who have been "change-agents" for more than 40 years in various fields of law.  Recipients of the award included the Right Hon. Beverley McLachlin, Chief Justice of the Supreme Court of Canada; the Hon. Justice Rosalie Abella, justice of the Supreme Court of Canada; and former justices of the Supreme Court of Canada the Hon. Ian Binnie, the Hon. John C. Major, and the Hon. Frank Iacobucci.

14. I am the author of numerous published papers on various intellectual property subjects including licensing, as well as the author of *International Trademark Dilution*, a treatise published in 2013 by West Publications.  In addition, I have spoken at various seminars hosted by organizations including the Law Society of Upper Canada, Federated Press, Insight, and the Canadian Institute on a variety of topics concerning business and legal issues relating to the commercial exploitation of intellectual property rights, and have prepared papers distributed at such seminars.  Further, I was the original Editor-in-Chief of Federated Press's *Intellectual Property Quarterly* beginning in 1994.

15. In various capacities, I have been involved as a professional in advising clients with respect to the invention, development, use and commercialization, including licensing, of intellectual property for about 50 years.

16. My summary curriculum vitae and list of publications is attached as Appendix A.

### III. Custom and Practice in the Field of **Intellectual Property** Licensing

17. Before discussing the MRDA License below, I will provide some background information on the custom and practice related to licensing intellectual property, including certain common elements of license agreements and the understood meaning of common terms.

### A. Definition of Licensed Property

18. A license agreement may cover a number of distinct intellectual property rights, including patents, patent applications, know-how, trademarks, and copyright. It is customary practice that such rights or subject matter are properly described in the license agreement. The rights or subject matter of the license agreements can be described specifically (i.e., a list of patent titles, numbers and issue dates) or, on occasion, more broadly, "all present or future patents" with or without a restriction in the grant clause to a specific field of use.

19. Patents confer on the owner an exclusionary right to make, have made, sell and use the invention covered by the patent for the term of the patent in the country for which the patent is granted. This includes the right to grant licenses of such rights in whole or in part, and the right to sue for infringement of such rights.

20. Know-how generally includes any useful commercial information that is known to the licensor but not to the licensee. Know-how is usually comprised of confidential information, or information that is not easily and readily available and can be valuable in its own right. Based on custom and practice know-how frequently is included in a patent license agreement where such know-how is related to or connected with patent rights granted to the licensee, and which may be necessary or useful to the licensee's adoption and use of the licensed subject matter.

21. Regardless of the nature of the licensed property, the scope of the specific license granted may be limited, in which case this is often done by carefully specifying the licensee's permitted field of use. For example, if the licensed

patent covers an invention relating to light emitting diode ("LED") technology, it might be appropriate to restrict the field of use to LEDs "for use only in domestic lighting applications."  That would give the licensor, for example, the opportunity to license the same patent to an automobile manufacturer for LEDs used in automotive lighting applications.

22. Another common practice when there is a restriction as to the field of use is to define "Licensed Field" or "Field of Use" in the definition section of the license agreement.  Such definition typically is prominent and is expressed in clear, unambiguous terms. The grant section of the license agreement then qualifies the grant by specifying that the rights granted are restricted to the Licensed Field.  I discuss field of use restrictions in more detail in paragraph 30 below.

23. Licenses sometimes are termed either "limited" or "general", depending on whether a licensee's right to use the intellectual property is restricted in any way.

**B.      Grant of License**

24. Essentially, a license is a grant of a right to do something that a licensee could not otherwise do legally.  In the case of a license containing subject matter protected by a patent, the right granted is the right to do something that otherwise would be infringement.  A patent grants the right to exclude others from making, constructing and using the invention covered by the patent and selling it to others to be used.

**C.      Type of License**

25. The custom and practice in licensing intellectual property is to characterize licenses in one of three ways (a) exclusive, (2) non-exclusive or (3) sole.  This characterization reflects how and to what extent the licensee is entitled to commercially exploit the intellectual property.  Exclusive licensees enjoy the greatest potential for exploitation.

26. Under an exclusive license, a licensor may not itself use the licensed property, nor can the licensor grant licenses to third parties that would conflict with the

exclusive rights granted to the licensee.  To a licensee, who may be required to invest in the development and/or marketing of the licensed rights, exclusivity ensures no competition in relation to the licensed rights from the licensor or others, if, and when, commercial success is obtained.

27. A non-exclusive license allows the licensor to retain the right to use the licensed property and the right to grant additional licenses to third parties. Therefore, the licensee must expect to compete with the licensor, as well as with other licensees, in the utilization of the licensed property.  In effect, a non-exclusive license amounts to a covenant by the licensor not to sue the licensee for infringement of the licensed rights and a relinquishment of exclusivity the licensor might otherwise enjoy.

28. Under a sole license, a licensor agrees not to grant licenses to third parties; however, a licensor does retain the right to utilize the licensed right.  In the case of a sole license, a licensee can expect to compete only with the licensor in the use of the licensed property.

29. The terms referred to above are well understood in the field of technology licensing and custom and practice in this field connotes the specific meanings described above.

## D.    Field of Use

30. As indicated above, parties to a license agreement understand that it is important to specify the field of use for which the license is granted (whether that license be exclusive or otherwise).  Unless the metes and bounds of a restricted field of use are specified in the license agreement, the licensee is entitled to use the licensed subject matter for any use covered by the granted rights.  From the licensor's point of view, it is therefore important to consider whether there should be any restriction in the field of use and if so, to clearly set out the restricted field of use in the license agreement.  Again from the licensor's point of view, it would not be advisable to grant an exclusive license without a field of use limitation to an entity that is capable of exploiting the exclusive rights only within a relatively narrow field of use (because that would

leave significant aspects of the licensed subject matter unexploited).  In that case the licensor would want a limitation to be clearly articulated so that there is no ambiguity clouding the licensor's ability to license the subject matter to a third party in different or even adjacent fields of use.  Conversely, if the licensee is able to use the technology for a wide range of applications, and requires that the field of use be unrestricted, it would be reasonable to grant an exclusive license without any restrictions as to the field of use.  Accordingly, as a matter of custom and practice, where there is a limitation on the permitted use under an exclusive license, one would expect it to be explicitly and clearly stated.

## E.    Territory

31. Territorial restrictions are among the most common restrictions imposed on licensees of intellectual property, especially in the case of foreign licensees. For example, a licensor who has obtained patents in a number of different countries may wish to grant an exclusive license to a different licensee in each of the countries.  Such exclusive licenses in any particular territory involve the licensee's desire to be the only person in the territory entitled to use the patented subject matter.  Again, as a matter of custom and practice, one would expect territorial restrictions to be explicitly and clearly stated.

## F.    Royalties

32. Under most license agreements, the fundamental economic consideration from the licensor's perspective is the receipt of royalties in exchange for the use of the licensed property.  Royalties may be calculated in various ways: as a percentage of the licensee's sales, a fixed royalty per unit sold, a lump sum payment or an annual fixed payment.

## G.    Term

33. License agreements involving intellectual property may be granted for fixed terms, (renewable or otherwise) or, for example, for the duration of a patent or in perpetuity.  Certain rights and obligations may survive the end of the license agreement.  As a matter of custom and practice, one would expect the term of a

license as well as any obligations or rights that survive the termination of the agreement to be explicitly and clearly stated.

### IV.    Opinion

### A    MRDA License

34. It is my opinion that based on custom and practice a sophisticated business person would understand the MRDA License to give each Licensed Participant in its respective Territory equitable and beneficial ownership of the NN Technology.  In other words, each Licensed Participant would possess a bundle of rights consisting of all commercially valuable aspects of ownership, including the exclusive right to exploit the intellectual property covered by the MRDA in the Territory, exclusive right to license or sublicense the intellectual property, and right to exclude others (including NNL) from doing the same.  Dr. Reichert and Mr. Green ignore the Licensed Participants' sublicense and enforcement rights in their respective exclusive Territories granted by the MRDA.  Dr. Reichert and Mr. Green also place weight on the fact that NNL was the legal owner of patents developed as a result of the R&D activity by the MRDA parties,[5] but legal ownership devoid of the right to exploit the rights amounts to owning the bare legal title that has no commercial value.

35. I base my opinion not only on a customary reading of the broad license grant language and definitions used throughout the MRDA, but also on the fundamental custom and practice of licensing that the scope of a licensee's enforcement rights is coextensive with the scope of its license.  Article 4(e) gives each Licensed Participant an unrestricted right to enforce NN Technology and thus the grant of rights in Article 5 would be read as matter of custom and practice to be coextensive with this broad enforcement right.

36. In reaching this opinion, I find the following provisions instructive:

> i.   Article 5 (a) of the MRDA provides that NNL continues to grant to each Licensed Participant "an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in

---

[5] See, e.g., Reichert Report at 5-6; Green Report at 26, 55.

perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ('Exclusive License')".

ii.  "NN Technology" is defined in Article 1 (f) as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for any of the Participants, but excluding trademarks and any associated goodwill."  This definition covers all Nortel intellectual property (other than trademarks and associated goodwill) and is unrestricted by subject matter, field of use, or date.

iii.  "Products" are defined in Article 1 (g) of the MRDA as  "all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing."  Products likewise is defined in broad terms.

iv.  "Territory" is defined in Article 1 (j) and Schedule B.

v.  Although the Definition section of the MRDA defines a number of important elements of the MRDA, there is no definition of "Licensed Field" or "Field of Use."

vi.  Article 4(e) provides that "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective territories for infringement or misappropriation of NN Technology by others."

37. Based on my experience with the custom and practice in the field of intellectual property licensing, I understand the effect of Article 5(a), taken with the provisions listed above including Article 4(e), is to vest effectively all substantive rights in relation to the NN Technology in perpetuity to each Licensed Participant within their respective Territories.  The MRDA makes clear that this was the parties' intent and this is how a sophisticated business person would understand the license grant.

38. In my view, the effect of the broadly worded license grant in Article 5(a) coupled with the enforcement  provision in Article 4(e) conferred upon each Licensed Participants the following rights:

i.  the exclusive right to make, have made, use, lease, license, offer to sell and sell Products using or embodying NN Technology.  The definition of Products is extremely broad and is not restricted as to time.  Moreover, the grant is not even restricted to Products in that it includes "all rights to patents".  The grant of such rights effectively excludes NNL from directly or indirectly exploiting any of the rights at any time in relation to the Nortel patents in each Territory without the permission of the Licensed Participants.

ii.  the exclusive rights to grant sublicenses of all such rights in the Territory.

iii.  the right to exploit the technology in the Territory without any restriction.  For reasons described further below, I do not understand the "Products" definition to be a restriction on the scope of the license.  If a restriction were to exist, in my experience it would have been normal custom and practice to include such restriction in the grant clause through a "licensed field" or "field of use" definition referenced in the license grant or other clear limiting language, none of which appears in the MRDA.  Rather, the broadly worded definition of Products coupled with other provisions of the MRDA is inconsistent with any field of use restriction in the MRDA license.

iv.  the right to assert actions and recover damages or other remedies in the Territory for infringement or misappropriation of NN Technology by others (Article 4 (e)).

v.  the exclusive right is royalty-free and perpetual.

vi.  the right to exploit the NN Technology throughout the Territory without any further geographical limitation.

39. The foregoing rights granted to the Licensed Participants essentially comprise all attributes of ownership deemed by custom and practice to be commercially important and valuable.  As the MRDA itself makes clear, the Licensed Participants are the equitable and beneficial owners of the NN Technology: they exclusively have all the commercially important rights under the NN Technology, including patents, even though the bare legal title is vested in NNL.  Critically relevant from a commercial point of view, the grant of such broad exclusive rights excludes NNL from directly or indirectly exploiting any of the rights in relation to the NN Technology in the geographical areas respectively assigned to the Licensed Participants, or conferring any portion of such right on any third party.  The commercially relevant ownership, therefore, is the equitable and beneficial ownership.  Based on my experience, I would understand, for example, that in the United States of America and Puerto Rico,

the commercially valuable ownership of the NN Technology, i.e. the beneficial ownership, is vested in NNI, not NNL.

40. Further, the breadth of the Article 5 Exclusive License grant must be read in context with Article 4 (e), which provides that "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective territories for infringement or misappropriation of NN Technology". There is no restriction in the MRDA on the right of a Licensed Participant to take action against an infringer of the NN Technology, and Article 5 grants each Licensed Participant, amongst other rights, all rights to patents. As is custom and practice, the breadth of an exclusive license normally is coextensive with the breadth of the enforcement provisions of the agreement. Here, Article 4 (e) is unrestricted in scope, and therefore it is my conclusion, and belief that sophisticated business persons likewise would understand, that the exclusive license granted to each Licensed Participant under Article 5 of the MRDA is of corresponding unrestricted scope.

41. I do not understand Article 4 (a) to contradict this view, but rather I understand the opposite. As a matter of custom and practice, the grant of "legal title" to NNL in Article 4 (a) of the MDRA connotes that "beneficial title" resides elsewhere.

42. Critically, in consideration for the Licensed Participants' agreement to vest legal title to the patents with NNL, NNL has agreed to enter into the exclusive licensing provisions of Article 5 and to grant the enforcement rights in Article 4 (e). Thus, for example, in a case where a Licensed Participant creates valuable, patentable technology covered by the MRDA, and would in law be the owner of both legal and beneficial rights in relation to such technology, pursuant to the MRDA the legal (but not beneficial) title to such rights is vested in NNL with respect to that Licensed Participant's Territory. In my opinion based on custom and practice, this provision should be read as being consistent with the conclusion that effectively all of the commercially valuable property rights in the NN Technology are vested under the MRDA in each

Licensed Participant in its Territory and only the bare legal title to the NN Technology is vested in NNL in each Licensed Participant's Territory.

43. Other provisions of the MDRA are consistent with this conclusion.  For example, the second recital specifies that each Licensed Participant "held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology" and that "it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights."  Indeed, Article 5 explicitly confirms that NNL "continues to grant such rights".

44. In my experience with licensing custom and practice, it is unusual to find a license agreement confirming that the licensee is to have "equitable and beneficial ownership" of the licensed rights, even where, as in this case, effectively all substantive rights to the licensed subject matter have been granted to the licensee.  The inclusion of such language emphasizes the breadth and virtually unrestricted scope of the exclusive license grant in each Territory.

45. Dr. Reichert and Mr. Green assert that the licenses to the Licensed Participants were not assignable relying on Article 14 (a) of the MRDA, which prohibits assignment of the MRDA absent consent of all of the parties.[6]  However, Article 14 (a) addresses only one mechanism of transferability – assignment of the MRDA --- while Article 5 explicitly provides Licensed Participants with the right in effect to transfer or to assign the economic benefits of the License through a license or sublicense.

## B.    Advice to Prospective Purchaser

46. If I had acted for a prospective purchaser of Nortel's Patent Portfolio, which I assume is comprised of all or nearly all patents that fall under the definition in the MRDA of NN Technology, I would have initially performed a thorough "due diligence" audit, in order to determine, among other things, (1) that the portfolio

---

[6] Id.

to be acquired comprises all relevant intellectual property assets of interest to the prospective purchaser, (2) that the exploitation of the intellectual property and in particular rights under any patents would not be likely to violate any rights of third parties, (3) that the rights to such portfolio are not subject to pre-existing encumbrances (e.g., grants to others) that render such rights less valuable or not licensable, (4) that the vendor has full entitlement to transfer or license such portfolio, and (5) that following the transfer of vendor's rights, the purchaser will have the exclusive, unrestricted right to practice the inventions claimed in the patents, to license the patents to others and to enforce the patents against unlicensed third-parties.

47. Having previously determined that the scope of the MRDA License gives each Licensed Participant exclusivity in its respective Territory over all commercially valuable rights to the NN Technology, none of the conditions necessary to proceed with the acquisition would be met.

48. Mr. Green states that "purchasers paid for ownership of IP".[7]  Had I been acting for a prospective purchaser, I would have advised that acquiring bare legal title to the IP would not have provided them with anything of commercial value in the Territory of each Licensed Participant given the existence of the MRDA. Accordingly, I would have advised the prospective buyer that in order to proceed with the purchase it is essential to first obtain a quitclaim or release executed by the Licensed Participants or at least ensure that their rights have validly been terminated.

49. In particular, I would have advised the prospective purchaser that the exclusive rights granted to the Licensed Participants are not restricted to any particular field of use.  These rights include the right to grant licenses and sublicenses and the right to enforce such rights, and therefore it would be unwise to proceed with any acquisition of rights to NN Technology covered by the MRDA without first reaching agreement with the Licensed Participants.  So long as the Licensed Participants retained their Exclusive Licenses, a purchaser could not

---

[7] Green Report at 15.

manufacture, use or sell any products covered by any patents exclusively licensed to the Licensed Participants, without risking the real possibility of competition and/or a patent infringement action either from Licensed Participants or from licensees or sub-licensees of Licensed Participants.

50. Further, any attempt by the purchasers to enforce the patents when the MRDA Licenses remained in force could be frustrated if the Licensed Participant were to grant a sublicense to a prospective defendant.  Such risks would have an obvious impact on the value of the rights to be acquired by the purchaser.

51. I would have also advised the prospective purchaser as part of a due diligence audit to ascertain whether there were previously any sublicense or license agreements with third parties that were entered into by, or on behalf of, any of the Licensed Participants.  Accordingly, I have been provided copies of certain non-exclusive license agreements entered into while the MRDA was in effect whereby third parties were granted various rights, including, for example, the right to make their own products using certain Nortel patents.  In these agreements, Licensed Participants were included as grantors/licensors either explicitly or by virtue of the grant being made by NNL "on behalf of itself and its Subsidiaries."[8]  This is consistent with the custom and practice reading of the MRDA that Licensed Participants had the broad exclusive rights to license or sublicense Nortel patents in their respective Territories without restriction.

52. The unacceptable risks to a prospective purchaser if it purchased the patent portfolio without a release of the Licensees would exist irrespective whether a Licensed Participant was engaged at the time of the proposed acquisition in making, using or selling "Products using or embodying NN Technology".  I see nothing in the MRDA that allows NNL to authorize any acts in each Territory that conflict with the rights granted to the respective Licensed Participants irrespective whether the respective Licensed Participants are themselves able to exploit or are actually exploiting such rights.

---

[8] The agreements I reviewed are listed in Appendix B.

53. In addition, as indicated above, the definition of Products in Article 1(g) of the MRDA is extremely broad.  "Products" is defined as  "all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing".  Thus a licensed participant could have engaged in a patent licensing business which, under the custom and trade would be a service business, similar to that now engaged in by Rockstar, the purchaser of the Patent Portfolio.

54.  For these reasons, I do not believe that any rational buyer would purchase the Patent Portfolio unless the MRDA Licenses were terminated or (ideally, and) unless each Licensed Participant disavowed any interests in the Patent Portfolio.  It is thus unsurprising and entirely consistent with my view that the licenses were in fact terminated in connection with the Rockstar sale.

Date:     February 28, 2014

Daniel R. Bereskin, QC
*Signature*

Court File No.:  09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1. My name is Daniel R. Bereskin, QC.  I live in Toronto, Ontario, Canada.
2. I have been engaged by or on behalf of the U.S. Debtors to provide evidence in relation to the above-noted court proceeding.
3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:
    (a) to provide opinion evidence that is fair, objective and non-partisan;
    (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and
    (c) to provide such additional assistance as the court may reasonably require, to determine a matter in issue.
4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date:     February 28, 2014

Daniel R. Bereskin, QC
*Signature*

19

## Appendix A

## CURRICULUM VITAE

## Daniel R. Bereskin, QC

## Contact Information

57 Walker Avenue,
Toronto, Ontario, Canada M4V 1G3
Ph. (416) 944-8766
Cell (416) 302-9799
Email: dbereskin@bereskinparr.com

## Personal

born Winnipeg, Manitoba, 02 February 1938

## Employment

Ridout & Maybee, Toronto, 1962-1964 (law student, associate)
Bereskin & Parr, Toronto, 1965-present

## Education

BSc. (Engineering Physics), LLB, University of Saskatchewan, 1962

## Professional Qualifications

Fellow, Intellectual Property Institute of Canada
Registered Canadian and USA Patent Agent
Registered Canadian and USA Trade Mark Agent

## Awards

Queen's Counsel, Province of Ontario, 1982
International Trademark Association President's Award, 2004
Worldleaders International Lifetime Achievement Award, 2007

Leading Trademark Lawyer in the World, Who's Who Legal, 2006-2012
Lexpert Zenith Award, 2012


**Professional Ranking**

Consistently ranked in the top tier of Canadian intellectual property lawyers by publications including The Canadian Legal Lexpert Directory, The Best Lawyers in Canada, Chambers Global: The World's Leading Lawyers for Business, The International Who's Who of Business Lawyers, Managing Intellectual Property, and Expert Guide to the World's Leading Lawyers – Best of the Best.  Rated AV Preeminent by Martindale-Hubbell.


**Professional Memberships**

Asia-Pacific Lawyers' Association
Association of Professional Engineers of Ontario (PEO)
Canadian Bar Association (CBA)
Copyright Society of the U.S.A. (CSUSA)
European Communities Trade Mark Association (ECTA)
International Trademark Association (INTA)
Institute of Trade Mark Agents (ITMA)
Intellectual Property Institute of Canada (IPIC, Fellow)
Inter-American Association of Industrial Property (ASIPI)
International Association for the Protection of Intellectual Property (AIPPI)
Lawyers' Club
Licensing Executives Society (LES)
MARQUES
Pharmaceutical Trade Marks Group (PTMG)
Toronto Intellectual Property Group (TIPG)


**Publications**

1.    International Trademark Dilution, a treatise published annually by West Publications, ISBN: 9780314619433, and Westlaw.


2.    Canada chapter, Famous and Well-Known Marks, Frederick Mostert, published by INTA.


3.    Trade Marks chapter, IP Disputes, Resolutions and Remedies, Dimock, published by Butterworths.

4.      CTM Reform: Evolution or Revolution? Who's Who Legal, Trade Mark
        chapter, 2010


5.      Anti-Dilution/Anti-Free-Riding Laws in the United States, Canada, and the
        EU: Bridges Too Far?
        Publication:    The Trademark Reporter
        Vol. No.        101
        Issue No.       6
        Page No. 1710-1756
        Issue Date November-December, 2011


6.      Bona Fide Intent to Use in the United States and Canada
        with Miles J. Alexander and Nadine Jacobson
        Publication:    The Trademark Reporter
        Vol. No.        100
        Issue No.       3
        Page No.        709-728
        Issue Date:     May-June, 2010


7.      Trademark and Free Expression Rights: Are The Reconcilable?
        Publication:    Who's Who Legal
        Issue Date:     February 2009


8.      The Protection of Famous Marks in Canada
        Publication:    UBC Law Review
        Vol. No.        40
        Issue No.       1
        Page No.        277-292
        Issue date:     May 2007


9.      Brand Name and "Look-Alike" Drugs in Canada After Ciba-Geigy v. Apotex:
        A Proposal for Relief From Slavish Imitation
        Publication:    The Trademark Reporter
        Vol. No.        94
        Issue No.       5
        Page No.        1086-1104
        Issue Date:     September–October, 2004


10.     Crocker Revisited: The Protection of Trademarks of Foreign Nationals in
        the United States
        with Aaron Sawchuk

Publication:    The Trademark Reporter
Vol. No.        93
Issue No.       6
Page No.        1199-1218
Issue Date:     November-December, 2003


11.    History of The Trademark Reporter
       Publication:    The Trademark Reporter
       Vol. No.        93
       Issue No.       1
       Page No.        52-64
       Issue Date:     January-February, 2003


12.    Trademark Licensing in Canada
       Publication:    The Trademark Reporter
       Vol. No.        85
       Issue No.       3
       Page No.        344-355
       Issue Date:     May-June, 1995


13.    Commentary on Recent Changes to the Canadian Trade-Marks Act
       Publication:    The Trademark Reporter
       Vol. No.        84
       Issue No.       2
       Page No.        186-198
       Issue Date:     March-April, 1994


14.    A Comparison of the Trademark Provisions of NAFTA and TRIPs
       Publication:    The Trademark Reporter
       Vol. No.        83
       Issue No.       1
       Page No.        1-17
       Issue Date:     January-February, 1993


15.    Trade-mark Use
       Publication:    Trade-marks law of Canada
       Page No.        97-112
       Issue date:     1993

16.    The Lone Star Case
       Publication:   The Trademark Reporter
       Vol. No.      82
       Issue No.     2
       Page No.      270-278
       Issue Date:   March-April, 1992


17.    Trademarks as Weapons in Battles Between "Innovative" and "Generic"
       Pharmaceutical Manufacturers in Canada
       Publication:   The Trademark Reporter
       Vol. No.      81
       Issue No.     4
       Page No.      415-427
       Issue Date:   July-August, 1991


18.    The Case of the Corpulent Penguin
       Publication:   The Trademark Reporter
       Vol. No.      80
       Issue No.     5
       Page No.      571-577
       Issue Date:   September-October, 1990


19.    The Canada-United States Free Trade Agreement: Are Trademarks a
       Barrier to Free Trade?
       Publication:   The Trademark Reporter
       Vol. No.      80
       Issue No.     3
       Page No.      272-284
       Issue Date:   May-June, 1990


20.    Federal v. Provincial trade-mark and trade name rights: is the tension at the
       breaking point?
       Publication:   CIP Review
       Vol. No.      6
       Page No.      273-249
       Issue date:   April 1990


21.    Intent-to-Use in Canada after Three Decades
       Publication:   The Trademark Reporter
       Vol. No.      79
       Issue No.     3
       Page No.      379-394

Issue Date:   May-June, 1989

22.   "Making Known" a Foreign Trademark: Has Canada Fulfilled its Convention
      Obligations?
      Publication:  IP Journal
      Vol. No.      4
      Page No.      329-351
      Issue date:   May 1989

23.   Fundamentals of Trade Mark Practice
      Publication:   Law Society of Upper Canada
      Issue date:   January 1989

24.   Trademark Use in Canada
      Publication:   The Trademark Reporter
      Vol. No.      87
      Issue No.     3
      Page No.      301-318
      Issue Date:   May-June, 1987

25.   Research and Development in Canada: A Practical Guide to Financing,
      Protecting and Exploiting New Technology
      Publication:   Butterworths
      Page No.      264
      Issue date:   1987

26.   The Seiko Decision
      Publication:   The Trademark Reporter
      Vol. No.      74
      Issue No.     5
      Page No.      454-460
      Issue Date:   September-October, 1984

27.   A Trade Dress Trilogy
      Publication:   The Trademark Reporter
      Vol. No.      72
      Issue No.     2
      Page No.      216-220
      Issue Date:   March-April, 1982

28.    Trademark Licensing and Registered Users in Canada
       Publication:  The Trademark Reporter
       Vol. No.       63
       Issue No.      4
       Page No.       313-323
       Issue Date:   July-August, 1973

**Appendix B**

1.     Master R&D Agreement dated December 22, 2004 including Schedules A and B.  Exhibit 21003, NNC-NNL06001514.

2.     Addendum to Master R&D Agreement undated and executed by the parties between October 2005 and June 2006) correcting "certain minor errors" in the MRDA and adding Nortel Networks Australia Pty Limited as  Participant. Exhibit 21003, NNC-NNL06001514.

3.     Addendum to Master R&D Agreement dated December 14, 2007.  Exhibit 21003, NNC-NNL06001514.

4.     Third Addendum to Master R&D Agreement dated effective January 1, 2006.  Exhibit 21003, NNC-NNL06001514.

5.     Fourth Addendum to Master R&D Agreement effective December 31, 2008. Exhibit 21003, NNC-NNL06001514.

6.     Letter from Tracy S.J. Connelly McGilley dated January 14, 2009. US_EMEA_Canada_PRIV_00207258.

7.     Memorandum of Understanding dated 31 December 2008. US_Canada_PRIV_00111293.

8.     License Termination Agreement  (undated).  Exhibit 21508, NNC-NNL06002543.

9.     Nortel Networks/███████████ Patent License Agreement effective June 30, 2002.  NNI_ICEBERG_00137677.

10.     ████████ License Agreement effective July 28, 2004. NNI_ICEBERG_00127167.

11.     Nortel Networks/█████████ Patent License Agreement effective January 1, 2001.  NNI_ICEBERG_00135647.

12.    License Agreement effective December 21, 2005.
NNI_ICEBERG_00136716.


13.    Patent Cross-License Agreement effective April 18, 2003.
       NNI_ICEBERG_00126379.

**Appendix C**

1.      Dr. Timothy Reichert, Evaluation and Economic Analysis: The Nortel
        Network Group's Intercompany Transfer Pricing Arrangements, dated
        January 24, 2014.

        Pages reviewed:  4-6, 23, 25, 32-33, 36, 37-40.


2.      Report of Philip Green Regarding the Allocation of Recoveries Among
        Nortel Entities, dated January 24, 2014.

        Pages reviewed: 2, 4-6, 12-17, 25-26, 38-40, 42-43, 45-49, 54-55, 63-65.

        Exhibit reviewed:  Exhibit A (Major Assumptions)