# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

-------------------------------------------------------------x
In re                                             :    Chapter 11
                                                  :
NORTEL NETWORKS INC., *et al.*,                   :
                                                  :    Case No. 09-10138 (KG)
             Debtors,                             :    Jointly Administered
-------------------------------------------------------------

# EXPERT REPORT OF
# LAUREEN M. RYAN

**(Submitted by the U.S. Debtors)**

**FEBRUARY 28, 2014**

**REVISED APRIL 14, 2014**

ALVAREZ & MARSAL
GLOBAL FORENSIC AND DISPUTE SERVICES LLC

<u>**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.  THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL.**</u>

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY AND OPINION ....................................................................1

II.   CREDENTIALS AND COMPENSATION ..................................................................6

III.  ASSIGNMENT, APPROACH, AND WORK PERFORMED ......................................7

      A.    The Assignment and Scope...................................................................7
      B.    The Work Performed ............................................................................7

IV.   RELEVANT BACKGROUND ....................................................................................8

      A.    The Historical Financial Performance of Nortel.................................8
      B.    R&D and Nortel's Transfer Pricing Agreements...............................10

V.    HUFFARD REPORT CALCULATIONS – CONTRIBUTION APPROACH...........13

      A.    Tangible Assets..................................................................................13
      B.    Intellectual Property ("IP")...............................................................13
      C.    Customer-related assets and goodwill ..............................................13

VI.   REVISED HUFFARD REPORT CALCULATIONS -CONTRIBUTION APPROACH
      ..............................................................................................................................15

VII.  THE BRITVEN REPORT FLAWED RECOVERY ANALYSIS ..............................18

      A.    Allocation Should Not Be Based On Recoveries ..................................19
      B.    Debtor Groups Are Individual Estates.................................................19
      C.    Claims Are Undetermined and Uncertain.............................................20
      D.    Ultimate Recoveries Would Not Reflect Pro Rata Allocation.............23

VIII. BAZELON REPORT – PRO RATA CONCLUSION  ............................................25

IX.   CONCLUSIONS ........................................................................................26

**EXHIBIT LIST**

**A.**  **Laureen Ryan – Curriculum Vitae, Testimony History, and Publications**

**B.**  **List of Information Considered**

**C.**  **Huffard Report - Allocation of Sales Proceeds - Based on a Portion of R&D Funded**

    **C.1**  **Huffard Report – Allocation of Sales Proceeds by Transaction**

    **C.2**  **Huffard Report – R&D Amounts and Percentages by Transaction**

    **C.3**  **Huffard Report – R&D Contribution by Debtor Group - 1989 to 2011**

    **C.4**  **Huffard Report – Business Sales by Asset Class and Debtor Group**

    **C.5**  **Huffard Report – Calculation of Other Adjustments**

**D.**  **Revised Huffard Report - R&D Contribution by Debtor Group – Amount and Percentage by Transaction for IP**

    **D.1**  **Revised Huffard Report – Summary Total R&D Contribution by Debtor Group - 1989 to 2008**

    **D.2**  **Revised Huffard Report – Detail Total R&D Contribution by Debtor Group - 1989 to 2008**

**E.**  **Revised Huffard Report – Allocation of Sales Proceeds – Total R&D**

    **E.1**  **Revised Huffard Report – Allocation of Sales Proceeds by Transaction – Total R&D**

    **E.2**  **Revised Huffard Report – R&D Percentages by Transaction – Total R&D**

## I.   EXECUTIVE SUMMARY AND OPINION[1]

Nortel Networks Inc. ("NNI") and all its affiliated entities, including all of the Debtor Groups,[2] (collectively, "Nortel") sold its Patent Portfolio and its various lines of business ("Business Lines") in nine separate transactions.[3]   Total proceeds of $7.30 billion from the sales are available for distribution of which $4.5 billion related to the Patent Portfolio and $2.8 billion related to the eight Business Lines sold.[4]

At this time, a determination must be made as to how the Sales Proceeds available for distribution ($7.30 billion) are to be allocated between and among the various Debtor Groups of Nortel.  Expert reports have been proffered by numerous parties.[5]   In this regard, I was asked to address three items: (a) the R&D contribution analysis in the Huffard Report; (b) the implied recovery analysis and alternative pro-rata allocation in the Britven Report; and (c) the pro rata conclusion in the Bazelon Report.

### The Huffard Report

I was asked to review and respond to key assumptions and calculations in the expert report of Paul P. Huffard dated January 24, 2014 (the "Huffard Report")[6] which supports the allocation conclusions under the *Contribution Approach*.[7]   As an initial matter, using a historical cost-based contribution analysis of assets to allocate the fair market value ("FMV") of those assets (i.e., Sales Proceeds) is inconsistent with the methods used to perform FMV analyses in other contexts.  Assuming, nevertheless, that the Courts choose to consider the Huffard *Contribution Approach*, my report analyzes the methodology and explains certain necessary adjustments in the calculations that the Huffard Report failed to do.

More specifically, the Huffard Report splits the Sales Proceeds available for distribution (totaling $7.3 billion) into three buckets, the largest of which is intellectual property ("IP").  The Huffard Report presents the IP bucket as totaling $5.2 billion, comprising $4.5 billion from the sale of the Patent Portfolio and $765 million that is attributed to IP from the sale of the eight Business Lines.[8] Then, the $5.2 billion attributable to IP was allocated to each Debtor Group based on what is represented to be their relative contribution to direct research & development ("R&D").[9]   Notably,

---

[1] Capitalized Terms not defined in the Executive Summary are defined later in the report when the term is first used. Although this report uses and refers to factual references in the Huffard Report, it is not meant to confirm or opine that these are accurate or that the underlying document was reviewed.
[2] Counsel advised that the Canadian Debtor Group comprises five Canadian Debtor entities including NNL.  The U.S. Debtor Group comprises 16 U.S. Debtor entities including NNI.  The EMEA Debtor Group comprises 22 EMEA Debtors including NN UK, NN Ireland, and NN SA (France).
[3] Huffard Report at ¶ 51.
[4] Huffard Report at ¶ 51.
[5] The expert reports not referenced in this report have not been reviewed or analyzed.
[6] The Huffard Report was submitted by the EMEA Debtors and relies on certain analysis and information contained in the expert report of James Malackowski dated January 24, 2014 (the "Malackowski Report").
[7] This portion of my opinion is limited to reviewing the Huffard Report's R&D contribution assumptions and calculations, and showing the impact on the allocation of the Sales Proceeds as shown in the Huffard Report.  Although my report inherently uses the other approaches, amounts, values and assumptions contained in the Huffard Report to show the impact, it is not meant to confirm, opine or acknowledge the propriety of these other figures.
[8] Huffard Report at ¶ 91 and 122, respectively.
[9] Huffard Report at ¶ 8.

1

the R&D amounts used in the Huffard Report were captured from the Nortel transfer pricing ("TP") schedules and worksheets for the period 1989 to 2008,[10] but included only the amounts paid for directly within each entity's respective geography (i.e., it did not consider any amounts funded through TP adjustments). As a result, the Huffard Report determined that the $5.2 billion attributable to IP should be allocated to each Debtor Group as follows:[11]

| Huffard Report - IP Allocation of $5.2 Billion | | | | | | $ in millions | |
|---|---|---|---|---|---|---|---|
| | Business IP | | Residual IP | | Total | | |
| Canada | $ | 312 | $ | 1,757 | $ | 2,069 | 39.6% |
| US | | 329 | | 1,912 | | 2,241 | 42.9% |
| EMEA | | 123 | | 785 | | 909 | 17.4% |
| Total | $ | 765 | $ | 4,454 | $ | 5,219 | 100.0% |

Then, adding in the other buckets of value, the Huffard Report allocated the Total Sales Proceeds under the *Contribution Approach* as follows:[12]

| Huffard Report - Total Allocation of $7.3 Billion | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| | | Canada | | US | | EMEA | | Total |
| Tangible Assets | $ | 39 | $ | 106 | $ | (27) | $ | 118 |
| Customer Related Assets and Goodwill | | 202 | | 1,375 | | 409 | | 1,986 |
| Other Adjustments | | 8 | | (85) | | 34 | | (43) |
| **Non - IP Value Allocated** | | **249** | | **1,396** | | **416** | | **2,061** |
| Business Sale Related IP | | 312 | | 329 | | 123 | | 765 |
| Residual IP | | 1,757 | | 1,912 | | 785 | | 4,454 |
| **IP Value Allocated** | | **2,069** | | **2,241** | | **909** | | **5,219** |
| **Total Value Allocated** | **$** | **2,318** | **$** | **3,637** | **$** | **1,325** | **$** | **7,280** |
| **% Allocated** | | **31.8%** | | **50.0%** | | **18.2%** | | **100.0%** |

Assuming the *Contribution Approach* used by Huffard,[13] my major criticism of the allocation is that it does not consider the Total R&D contribution funded by each Debtor Group. Through a cost sharing and transfer pricing regime that was in place from at least 1989 to the Petition Date, U.S. Debtor NNI not only paid directly for R&D within its own territory, but also funded a significant portion of the R&D performed in the Canadian and EMEA Debtors' geographic territories. In order for the *Contribution Approach* to properly assess each Debtor Group's contribution, the amount of R&D spend needs to be adjusted for the R&D amounts that NNI effectively paid for on behalf of the Canadian and EMEA Debtors.

We performed an analysis of the R&D payments made from 1989 through 2008. During one portion of this time period, 1989 – 2000 ("Period One"), the amounts funded by the US Debtors for R&D on behalf of the Canadian and EMEA Debtors are set forth in available data pursuant to

---

[10] Huffard Report at ¶ 105 to 109 and Malackowski Report at 11.4 (FN 149) and Exhibit B.1.6.1 to B.1.7.2 attached thereto.
[11] See **Exhibit C** and Huffard Report at ¶105 to 109.
[12] See **Exhibit C**.
[13] As opposed to using a calculation based on fair market value.

several cost sharing agreements ("CSAs") related to R&D.  These cost sharing worksheets provide, for each year and each participant, the R&D spend in its own territory and the cost sharing R&D funding.[14]  For the remainder of the time, 2001 – 2008 ("Period Two"), transfer pricing worksheets also provide data regarding each entity's R&D spend in its own territory and also total transfer pricing payments made to the other entities pursuant to arrangements under the Master R&D Agreement ("MRDA").

The adjustments during Period Two were not entirely used to fund R&D.  An analysis was performed of the Period Two schedules to determine the portion of the transfer pricing adjustments that could be considered R&D funding.  Based on this analysis, it is reasonable to assume that the R&D funding for Period Two can be derived by assuming the TP adjustment was used proportionally to fund R&D and selling, general and administrative costs ("SG&A").[15]

Adjusting the Huffard Report figures to include the Total R&D funded from Period One and Period Two, including both cost sharing adjustments in Period One and TP adjustments in Period Two, the $5.2 billion that the Huffard Report concludes is attributable to IP would be allocated to each Debtor Group as follows: [16]

| Comparison - IP Allocation of $5.2 Billion | | | | | $ in millions |
|---|---|---|---|---|---|
| | **Huffard Report** | | | **Total R&D Approach** | |
| Canada | $   2,069 | 39.6% | $   1,220 | | 23.4% |
| US | 2,241 | 42.9% | 3,459 | | 66.3% |
| EMEA | 909 | 17.4% | 541 | | 10.4% |
| **Total** | **$   5,219** | **100.0%** | **$   5,219** | | **100.0%** |

The chart above shows that, under the *Contribution Approach*, there is a significant difference in the allocation of the proceeds ascribed to IP when the total R&D funded is considered.

Then, combining this result with the Huffard Report amounts and allocations for the Sales Proceeds ascribed to the other categories, and the Total R&D funded by each Debtor Group, the allocation of the Sales Proceeds by Debtor Group under the corrected *Contribution Approach* would result in the following allocations:[17]

---

[14] See **Exhibit D** for the information captured from the TP schedules
[15] See **Exhibit D**.
[16] See **Exhibit C** and **Exhibit E**.
[17] See **Exhibit E**.

3

| Revised Huffard Report - Total Sales Proceeds of $7.3 Billion | | | | | | | | $ in millions | |
|---|---|---|---|---|---|---|---|---|---|
| | | Canada | | US | | EMEA | | Total | |
| Tangible Assets | $ | 39 | $ | 106 | $ | (27) | $ | 118 | |
| Customer Related Assets and Goodwill | | 202 | | 1,375 | | 409 | | 1,986 | |
| Other Adjustments | | 8 | | (85) | | 34 | | (43) | |
| **Non - IP Value Allocated** | | **249** | | **1,396** | | **416** | | **2,061** | |
| Business Sale Related IP | | 176 | | 509 | | 80 | | 765 | |
| Residual IP | | 1,044 | | 2,950 | | 460 | | 4,454 | |
| **IP Value Allocated** | | **1,220** | | **3,459** | | **541** | | **5,219** | |
| **Total Value Allocated** | **$** | **1,469** | **$** | **4,855** | **$** | **956** | **$** | **7,280** | |
| **% Allocated** | | **20.2%** | | **66.7%** | | **13.1%** | | **100.0%** | |

Finally, a comparison shown below of the Huffard Report to the revised figures when the Total R&D funded is considered, shows the significant change in the allocation (See **Exhibits C and E**):

| Comparison - Total Allocation of $7.3 Billion | | | | $ in millions | |
|---|---|---|---|---|---|
| | **Huffard Report** | | **Total R&D Approach** | | |
| Canada | $ 2,318 | 31.8% | $ 1,469 | 20.2% | |
| US | 3,637 | 50.0% | 4,855 | 66.7% | |
| EMEA | 1,325 | 18.2% | 956 | 13.1% | |
| **Total** | **$ 7,280** | **100.0%** | **$ 7,280** | **100.0%** | |

## The Britven Report

I was also asked to review and respond to the implied (*or illustrative*) recovery analysis and the alternative pro rata allocation in the expert report of Thomas Britven dated January 24, 2014 ("the Britven Report").

The Britven Report includes certain analyses and opinions with respect to the amount of claims and the expected recovery by Debtor Group and by claim group.

Based on my review of the implied recovery analysis, it is my opinion that it is unreliable, flawed and based on unsupported assumptions and therefore should not be used in conjunction with the determination of the allocation of the Sales Proceeds.

Furthermore, the Britven Report prepares such pro rata calculations presumably as a basis to allocate the Sales Proceeds but does not propose any basis upon which one could conclude any actual distributions in each of the various Nortel estates that would reflect the estimates and be done on a pro rata basis.

4

**The Bazelon Report**

Lastly, I was asked to review and respond to the pro rata allocation approach described in the expert report of Coleman Bazelon dated January 24, 2014 (the "Bazelon Report").  The Bazelon Report concludes that the pro rata distribution is the most reliable method based upon the economics underlying Nortel's business model.

Not surprisingly, the report does not provide any support or precedent for this approach in the context of an insolvency proceeding.  To my knowledge, it has never been done.  In cross-border insolvencies, different sets of creditors have asserted different kinds of claims to different assets under different rules in different countries, and his report does not address how such differences, and the separate plan and distribution regimes in each country, would or could be managed to implement his idea.  The pro rata approach is not appropriate to use in the Nortel case and should be ignored for purposes of determining the allocation of the Sales Proceeds.

\*\*\*\*\*\*\*\*\*\*\*\*

The following sections of this Report provide additional details about: Alvarez & Marsal's ("A&M") credentials and compensation (Section II); the scope and approach of A&M's assignment and the documents A&M considered (Section III); the relevant background (Section IV); and A&M's analysis and resulting conclusions (Sections V through IX).

5

## II.    CREDENTIALS AND COMPENSATION

A&M is a global professional services firm specializing in turnaround and interim management, performance improvement, and business advisory services.  A&M is routinely retained to perform analyses of financial information and provide estimates of value.

I, Laureen M. Ryan, am a Managing Director at A&M with more than 25 years' experience.  I specialize in accounting and forensic investigations, and disputes with complex economic, valuation, solvency, financial and accounting related issues.

I hold a B.S. in Accounting and Economics from Oswego University.  I am a Certified Public Accountant ("CPA"), Accredited Business Valuer ("ABV"), Certified Distressed Business Valuer ("CDBV"), Certified Insolvency Restructuring Advisor ("CIRA") and a Certified Fraud Examiner ("CFE").  A copy of my *curriculum vitae*, attached as **Exhibit A,** summarizes my experience and qualifications, and lists the cases in which I provided expert testimony over the past four years and my publications over the last ten years.

A&M is being compensated at a rate of $725 per hour for the time I have spent performing the work necessary to prepare this Report.  In addition, I have been assisted by others working under my direction and supervision at hourly rates ranging from $275 to $725.

6

## III.    ASSIGNMENT, APPROACH, AND WORK PERFORMED

The following discussion describes the scope of A&M's assignment with respect to the matters described above, the approach used, and the related work performed.

### A.  The Assignment and Scope

A&M was retained by counsel to the US Debtors[18] to address certain items in the Huffard Report, the Britven Report and the Bazelon Report.  More specifically, three items are the subject of this report: (a) the R&D contribution assumption in the Huffard Report;[19] (b) the implied recovery analyses in the Britven Report, using both the "Ownership Approach" and "Alternative Pro Rata Approach"[20] and (c) the pro rata conclusion in the Bazelon Report.[21]

### B.  The Work Performed

I have prepared this Report with the assistance of other professionals at A&M working under my direct supervision.  My analyses, opinions, and conclusions are based on the work performed by me and those under my supervision through the date of this Report, as well as my training, education, and experience.

In addition, to arrive at my opinion, I and people working under my supervision:  (a) performed research; (b) prepared analyses; and (c) reviewed various materials and information produced in connection with this case, primarily those listed on **Exhibit B** and/or referenced herein.  As noted above, conclusions herein are based solely on the work performed through the date of this Report.  I reserve the right to supplement my opinion should further documentation be produced and to respond to any additional expert opinions proffered by or on behalf of the parties to this matter.  Therefore, this Report is subject to change or modification, should additional relevant information become available that bears on the analyses, opinions, or conclusions contained herein.

Selected pages from the documents and information considered may be used as exhibits at trial.  Additionally, I may prepare graphical or illustrative exhibits based on the documents and information considered and/or my analyses.

---

[18] Cleary, Gottlieb, Steen & Hamilton, LLP.
[19] Huffard Report at ¶ 105 to 108, which is in turn based upon the analysis performed in the Malackowski Report at section 11.1 and 11.4.
[20] Britven Report at ¶ 3.7 to 3.11 and sections 7.0 and 8.0.
[21] Bazelon Report at page 1.

## IV.    RELEVANT BACKGROUND

As previously noted, Nortel has $7.3 billion available to distribute from the sale of the Lines of Business and Patent Portfolio.  The proceeds from the sales of Nortel's Lines of Business and Patent Portfolio reflect the economic value relinquished by each entity in each sale.

To effectuate these sales each of the Debtor Groups agreed to the total sales prices and relinquished their rights with the understanding that the relative value each contributed would be determined and distributed subsequently.[22]  The proceeds available for distribution comprise $2.8 billion and $4.5 billion, from the eight Line of Business sales and Patent Portfolio, respectively.[23]

Once the Sales Proceeds are allocated and distributed to each of the Debtor Groups, the entities within each Debtor Group will make distributions to claimants pursuant to the local insolvency laws, claims recognized and other relevant matters within that jurisdiction.

The discussion that follows provides additional information relevant to the scope of this report, including:  (a) the Historical Financial Performance of the Debtor Groups; and (b) Nortel's Transfer Pricing Agreements.

### A.  The Historical Financial Performance of Nortel

The overall financial performance of Nortel reflects that the US accounted for a significant portion of the company's revenue and profit.  For example, from 2001 to 2008, the US accounted for 70% of the revenues as shown below:[24]

| Nortel Revenue 2001 - 2008 ($ in millions) | | | | |
|---|---|---|---|---|
| | **Canada** | **US** | **EMEA** | **Total** |
| Total Revenue | 7,781 | 42,819 | 10,995 | 61,595 |
| % of Total Revenue | 13% | 70% | 18% | 100% |

Finally, the US was the only entity that reported a cumulative operating profit for the period 2001 to 2008:[25]

---

[22] Huffard Report at ¶ 49.
[23] Huffard Report at ¶ 51.  The available proceeds refers to the original sales price less any purchase price adjustments and costs or settlement amounts already paid out of the respective escrow account.
[24] Data obtained from New Reconciliation tab of operating earnings spreadsheets for R&D CSA participants, 2001-2008 (NOR_53648312, NOR_53648037, NOR_53648041, NOR_53648508, NOR_53648130, NOR_53648133, NOR_53648323, NOR_53648048).
[25] Data obtained from spreadsheets for R&D CSA participants, 2001-2008 (NOR_53648312, NOR_53648037, NOR_53648041, NOR_53648508, NOR_53648130, NOR_53648133, NOR_53648323, NOR_53648048).  Amounts exclude TP adjustments.

| Operating Profit / (Loss) for the period 2001 to 2008 ($ in millions) | | | | |
|---|---|---|---|---|
| Period | Canada | US | EMEA | Total |
| **2001** | $ (2,337) | $ (306) | $ (1,354) | $ (3,997) |
| **2002** | (824) | 619 | (406) | (612) |
| **2003** | (255) | 967 | (335) | 377 |
| **2004** | (726) | 696 | (148) | (179) |
| **2005** | (508) | 722 | (114) | 101 |
| **2006** | (661) | 341 | 49 | (271) |
| **2007** | (692) | 582 | 226 | 116 |
| **2008** | (906) | 594 | 198 | (113) |
| **Total** | $ (6,908) | $ 4,215 | $ (1,884) | $ (4,578) |

In addition, the periodic balances of the $2 billion revolver loan the US provided to Canada reflect the dependence of the Canadian Debtors on the financial performance of its operating entities, most importantly the U.S., through the Petition Date of January 14, 2009:[26]

| Revolver Balances Between US and Canada | |
|---|---|
| Date | Loan Balance |
| June 30, 2004 | $267,854,289 |
| June 30, 2005* | 0 |
| June 30, 2006 | 560,110,000 |
| June 30, 2007 | 35,038,371 |
| June 30, 2008 | 68,988,952 |
| January 14, 2009 (Petition Date) | $297,120,075 |

* Repayment of the balance made by a "Cash Reduction Via TPA".  NNI_00832232

The Canadian Debtors' financial dependence on NNI is further illustrated by NNI's guarantee on a NNL senior note issuance of $2 billion in July 2006.  Nortel CFO Peter Currie stated in his deposition that NNI's guarantee, together with its superior credit rating, resulted in a lower interest rate, greater principal amount, and more favorable covenants for NNL.[27]  Nortel's

---

[26] Figures from U.S. to Canada Loan Schedule Under Revolving Credit Facility, 2004-2009 (NNI_00832232).  It was noted that the TPA repayment was made on June 28, 2005 and the balance was zero only June 30, 2005.  On July 1, 2005 $1 million was drawn and the balance quickly increased to $95.8 million by July 6, 2005 and stayed at that amount until the next draw in June 2006.

[27] P. Currie Dep. Tr. 262:25 – 263:21 ("Q. Why was it that NNI was a guarantor of this note issuance?  A. We found that based on advice from our capital markets consultants, we found that would be more advantageous from a structuring perspective to have NNL as the issuer and NNI as the guarantor. Q. Why?  A. Simply because we could end up frankly getting a slightly better rate by doing it that way based on the domicile of the ultimate lenders. Q. Was there also a better rate because of NNI's credit rating? A. Yes.  … Yeah, had NNI not guaranteed, it would have been a different discussion with the lenders."); P. Currie Dep. Tr. 266:3-17 ("Q. And when you said that if NNI had not been a guarantor that it would have been a different discussion with the lenders, could you clarify what you meant by that?  A. The rate would have been higher, and then the principal amount may have been lower. . . . It became clear to us early on that NNI would have needed to be involved in the transaction, so we structured the deal around that.  Q. Right, in order to get the amount of financing that you needed and also to get a more favourable -- A. At the rate and the covenant structure, yes.").

9

then-Director of Corporate Finance, John Williams, testified that NNL's investment bankers specifically requested a guarantee from NNI to close the deal.[28]  Moreover, although NNUK had guaranteed prior issuances of debt, Mr. Currie said there was no discussion of NNUK guaranteeing issuances by NNL around this time because NNUK did not have significant assets or revenues.[29]

Not surprisingly, as a result, upon entering into insolvency during 2009, the Canadian Debtors were still dependent on the US Debtors for liquidity.  More specifically, NNI provided millions of dollars to the Canadian Debtors to survive while it still continued to operate the US side of the business;[30] Canada's estate effectively would have been administratively insolvent in 2009 but for NNI's loan of $75 million[31] to NNL on the Petition Date and NNI's Interim Funding and Settlement Agreement ("IFSA") and Final Canadian Funding Settlement Agreement ("FCFSA") payments of $347.8 million in the aggregate.[32]

Based on the above, the Canadian Debtors' ability to continue as operating companies engaging in R&D and servicing customers was heavily if not wholly dependent on their receipt of loans and payments (whether as transfer pricing payments or other distributions from the US Debtors).

## B. R&D and Nortel's Transfer Pricing Agreements

As was explained by Prof. Eden in her expert report,[33] Nortel had two major transfer pricing regimes from the 1990s onward.  Prior to 2001 ("Period One"), Nortel had Cost Sharing Agreements ("CSAs") for its related party transactions, including a CSA specifically applicable to R&D.[34]  From 2001 onward ("Period Two"), Nortel used the Master Research & Development Agreement ("MRDA") that embodied the Residual Profit Split Method ("RPSM").[35]  Each of these two transfer pricing regimes had a mechanism for transfer pricing

---

[28] J. Williams Dep. Tr. 199:23-200:2 ("Q. Okay. Do you recall whether either CitiBank or JP Morgan specifically requested a guarantee from NNI?  A. Yes.").
[29] P. Currie Dep. Tr. 263:22 – 264:4 ("Q. Was there any discussion of asking for a guarantee from NNUK? A. No. Q. Why not? A. NNUK was not the repository of either significant hard assets, nor the source of significant revenues."); P. Currie Dep. Tr. 265:21-266:2 (Q. Why was it that NNUK was not asked to be a guarantee of public indebtedness after 2005? A. It wasn't required. It wasn't required to get the deal done.").
[30] Motion for an Order Approving the Interim Funding and Settlement Agreement at ¶ 30 (D.I. # 874).
[31] Declaration of John Doolittle, Vice President of Nortel Networks Inc. in Support of Chapter 11 Petitions and First Day Motions at ¶ 87 (D.I. # 3).
[32] Motion for an Order Approving the Interim Funding and Settlement Agreement at ¶ 20, June 9, 2009,  and Motion for an Order Approving the Final Canadian Funding and Settlement Agreement at ¶ 32, December 23, 2009 (D.I. #2205).
[33] Expert Report of Lorraine Eden, Ph.D. (submitted by the U.S. Debtors, January 24, 2014) (the "Eden Report").
[34] Eden Report at ¶ 97; Huffard Report, Appendix 6.
[35] Eden Report at ¶110 – 123; Huffard Report, Appendix 6.

payments related to R&D, and it is my understanding that one of the primary goals under both transfer pricing schemes was to share in the cost of R&D.[36]

As noted in the Huffard Report,[37] during Period Two there were two main types of entities in the Nortel Group:

- Residual Profit Entities ("RPEs"), which were the most significant entities in the Nortel group and performed almost all the R&D as well as significant sales and distribution functions; and

- Other entities (LREs, CPEs and AREs) which generally provided sales and distribution functions and with limited exceptions, did not contribute to the creation of IP.[38]

As of the Petition Date, there were five RPEs:  NNL (Canada), NNI (U.S.); NNUK; NNSA (France); and NN Ireland.[39]  The RPEs shared all the risks of Nortel worldwide, including the development of IP.[40]  R&D operations were a critical part of the Nortel organization and "the primary contributor to the success of Nortel's business."[41] These same five legal entities were also "participants" under the CSA transfer pricing regime, although NNUK did not become a participant until 1995[42] and NNSA not until 2000 when it became a Nortel subsidiary rather than a joint venture.[43]

During Period One under the CSA, it is my understanding that the participants' R&D spend comprised two components: (a) The amounts directly spent by each participant within its own geographic boundaries; and (b) the up or down adjustment to R&D funding allocated pursuant to the cost sharing method.  Prof. Eden states that the cost sharing method required participants to "share costs and risks in proportion to their 'reasonably anticipated benefits (RAB),'" which required "true ups" or "adjustments" when "the party that spent too much (relative to its RAB share) is compensated by the parties that spent too little."[44] As a result, the CSA transfer pricing payments funded R&D for the participating Nortel entities.

The formula for CSA adjustments required during Period One was summarized in the Eden Report[45] and the cost sharing worksheets ("CS Worksheets") reflect these adjustments to show

---

[36] It was noted that the Malackowski Report compiled the R&D spend "from various sources relative to the transfer pricing regime in effect during the relevant time periods and the transitioning roles of the relevant entities contributing to R&D within those regimes."  These sources were primarily the relevant TP worksheets. (Malackowski Report at ¶11.4, footnote 149).  The Huffard Report relies on this information and summarizes the various transfer pricing related schemes in Appendix 6.

[37] Huffard Report, Appendix 7.

[38] The Limited Risk Entities, Cost Plus Entities and At Risk Entities, respectively.  The AREs performed limited R&D and obtained patents in its own name outside of the MRDA. (Huffard Report at ¶ 25 and 26)

[39] Huffard Report at ¶ 27.

[40] Huffard Report at ¶ 26; Eden Report at ¶ 93.

[41] Eden Report at ¶ 93, quoting Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011), at 11; see Huffard Report at ¶ 41.

[42] Ex. 32117 (Transfer Pricing Report: Nortel Networks U.K. Ltd, dated July 18, 2003), at 27-28.

[43] See Nortel Networks Corp., Annual Report (Form 10K), F-16 (December 31, 2001).

[44] Eden Report at ¶ 74 – 75; Huffard Report, Appendix. 6.

[45] Eden Report at ¶ 98.

the participants real R&D funding. The net result of the CS Worksheets is to calculate the totality of R&D conducted through cost-sharing.

Similarly, during Period Two, the MRDA required certain transfer pricing payments among the RPE entities, pursuant to a formula described in Schedule A to the MRDA.[46]  A portion of the MRDA adjustments was attributable to R&D, but the transfer pricing worksheets ("TP Worksheets") for Period Two show only the Total TP adjustment, only some of which would have been attributable to R&D.

In any contribution approach analysis, the amount of R&D payments from each contributor should be adjusted to reflect the transfer pricing payments.[47]  However, the Malackowski Report, upon which the Huffard Report relies for the quantification of R&D contribution, failed to use the adjusted transfer pricing funded R&D numbers from the TP Worksheets.  In addition, the amount of the adjustment in the TP Worksheets for Period Two must be analyzed to determine what amounts are attributable to R&D and what amounts are attributable to SG&A.

---

[46] Eden Report at ¶ 102 – 109.

[47] I understand that payments made under the Transfer Pricing Agreements were reflected in the intercompany accounts of the participants.  Further, the Malackowski Report noted that "[i]t is common practice to regard each dollar spent on R&D as fungible for the purposes of measuring relative contribution to R&D as a group, as Nortel did under the RPSM." (Malackowski Report at ¶ 11.1.1)

## V.    HUFFARD REPORT CALCULATIONS – CONTRIBUTION APPROACH

Under the *Contribution Approach* the Huffard Report allocated the Sale Proceeds in three buckets using the following approach:

### A.    Tangible Assets

Total amount of $118 million[48] is only attributable to the Business Lines and is based on net book value as of 4Q 2009.[49]  This amount was allocated to the Selling Debtor.[50]

### B.    Intellectual Property ("IP")

Total amount of $5.2 billion[51] is comprised of the Residual IP Sales Proceeds of $4.5 billion[52] plus the value of the IP sold in the Business Lines of $765 million derived using the "relief from royalty approach." [53]  As previously discussed, the amounts were then allocated to each Debtor Group based on their relative contribution to the R&D direct spend during the period in which the portfolios were invented.[54]

### C.    Customer-related assets and goodwill

The balance of the Sales Proceeds not otherwise allocated to Tangible Assets or IP was allocated to each Debtor Group based on the relative global historic revenue for the year ending December 31, 2008.[55]

Further, the Huffard Report states that, under the *Contribution Approach*, the Sales Proceeds attributable to IP should be allocated among the Selling Debtors in accordance with their relative contribution to R&D.[56]

In order to determine the contribution to R&D, the Huffard Report (and the Malackowski Report) summarizes only the amount that was reported by each RPE for the period 1989 to 2008 ("direct R&D").[57]  These amounts were captured from the various schedules and sources prepared by

---

[48] Huffard Report at ¶ 95 and 101, excluding the amounts for CALA and APAC.
[49] Huffard Report at ¶ 100.
[50] Huffard Report at ¶ 84 to 86.  The total on the charts referenced is $124 million as they include the amounts related to CALA and APAC.  These amounts were excluded as they are allocated separately pursuant to the related settlement.
[51] Malackowski Report at ¶ 9.2.8, Table 9 (which adds up to $5.217 billion) and Huffard Report at ¶ 51 and ¶ 123.
[52] Huffard Report at ¶ 51, 53, and 121 to 123.
[53] Huffard Report at ¶ 88 to 91 and 109 (which adds up to $763 million due to rounding  - the detail schedule adds to $765 million as reflected in ¶ 95).
[54] Huffard Report at ¶ 8.  Although this is generally true, of the amount of Residual IP Sales Proceeds of $4.5 billion, a value of $42.85 million was first allocated to certain Debtor entities. This amount relates to the IP developed by "At Risk Entities" or AREs independent of Nortel's transfer pricing arrangements and were held in the entity's name.  The balance of the IP was developed by the Residual Profit Entities ("RPEs") who were parties to the transfer pricing arrangements based on the R&D spend. (Huffard Report at ¶ 26 and 104)
[55] Huffard Report at ¶ 9, 69 to 76, and 92 to 94.
[56] Huffard Report at ¶ 8.  Also, the Malackowski Report, on which the Huffard Report relies, states, "I am of the opinion that it is more accurate to use an approach that values all contributions made to the creation of the valuable Nortel IP assets that were ultimately sold between 2009 and 2011."  (Malackowski Report at ¶ 11.2)
[57] That is, the amount of R&D funded within the geography.

13

Nortel in conjunction with its calculation of TP adjustments each year ("the TP Schedules").[58] However, the Total R&D funded (defined as the direct R&D plus the amount funded through TP adjustments) that was clearly shown in Period One and within the TP adjustments in Period Two was ignored.

The Huffard Report then adjusted (or reduced) the R&D amounts for adjustments related to the sale of UMTS.[59]

As a result, the Huffard Report allocates the Sales Proceeds attributable to IP of $5.2 billion by Debtor Groups as shown below.[60]

| Huffard Report - IP Allocation of $5.2 Billion | | | | | $ in millions |
|---|---|---|---|---|---|
| | Business IP | | Residual IP | Total | |
| Canada | $ | 312 | $ | 1,757 | $ | 2,069 | 39.6% |
| US | | 329 | | 1,912 | 2,241 | 42.9% |
| EMEA | | 123 | | 785 | 909 | 17.4% |
| Total | $ | 765 | $ | 4,454 | $ | 5,219 | 100.0% |

Finally, the Huffard Report allocates the following amounts to each of the categories by Debtor Group:[61]

| Huffard Report - Total Allocation of $7.3 Billion | | Canada | | US | | EMEA | | Total | $ in millions |
|---|---|---|---|---|---|---|---|---|---|
| Tangible Assets | $ | 39 | $ | 106 | $ | (27) | $ | 118 |
| Customer Related Assets and Goodwill | | 202 | | 1,375 | | 409 | | 1,986 |
| Other Adjustments | | 8 | | (85) | | 34 | | (43) |
| **Non - IP Value Allocated** | | **249** | | **1,396** | | **416** | | **2,061** |
| Business Sale Related IP | | 312 | | 329 | | 123 | | 765 |
| Residual IP | | 1,757 | | 1,912 | | 785 | | 4,454 |
| **IP Value Allocated** | | **2,069** | | **2,241** | | **909** | | **5,219** |
| **Total Value Allocated** | $ | **2,318** | $ | **3,637** | $ | **1,325** | $ | **7,280** |
| **% Allocated** | | **31.8%** | | **50.0%** | | **18.2%** | | **100.0%** |

---

[58] See **Exhibit C** which summarizes the information from the Huffard Report and Malackowski Report.
[59] Huffard Report at ¶ 105 to 107 which relies on the Malakowsi Report analysis at para 11.4 (FN 149).
[60] See **Exhibit C**.
[61] See **Exhibit C** which shows the detail amounts and calculations related thereto from the Huffard Report and Malackowski Report.

## VI.    REVISED HUFFARD REPORT CALCULATIONS -CONTRIBUTION APPROACH

As shown above, of the $7.3 billion of Sales Proceeds, $5.2 billion (or 72%) was attributable to IP using the *Contribution Approach* in the Huffard Report.[62]    This amount was allocated by considering only the direct R&D incurred by geography and ignores the amount funded through TP adjustments.    However, as discussed previously, to properly reflect the "relative contribution to R&D" the Total R&D should be derived and considered in allocating the Sales Proceeds.

More specifically, the CS Worksheets for Period One show the Total R&D funded after specifically making the cost sharing adjustments related to R&D that were required under the R&D CSA. Similarly, the TP worksheets for Period Two provide the data necessary to determine what portion of the MRDA TP payments is attributable to R&D.    The direct R&D amount, which the Malackowski and Huffard Reports use for all periods, represents only a portion of the amount certain Debtor groups funded for R&D.    For his *Contribution Approach* to be consistently applied, the Huffard Report should have reflected the Total R&D funded for the entire period (1989 to 2008).

First, the Total R&D funded was captured from the CS schedules for Period One.    As shown below, properly adding the identified amount of R&D funded from the CS schedules in this period shows that the total amount for Period One increased significantly for the US Debtor Group (See **Exhibit D.1**):

| 1989 - 2000 Total R&D under CSA | Canada | EMEA | US | Total |
|---|---|---|---|---|
| Direct R&D | 7,584,432,923 | 1,999,053,630 | 9,631,744,190 | 19,215,230,743 |
| % of Total Direct R&D | 39% | 10% | 50% | 100% |
| TP - R&D | (3,571,270,233) | (864,704,463) | 4,416,704,443 | (19,270,253) |
| Total R&D Funded Period One | 4,013,162,690 | 1,134,349,167 | 14,048,448,633 | 19,195,960,490 |
| Total R&D Funded Period One as % | 21% | 6% | 73% | 100% |

Next, an analysis was performed on the TP schedules for Period Two to determine the portion of the TP adjustments that should be considered related to R&D.    More specifically, the TP schedules in Period Two reflect the net result (profit or loss) that was compared to the *Target Economic (Profit)/Loss* to determine the TP adjustment that was funded.    This TP funding should be considered, in whole or at least in part, to determine the relative contribution to R&D by each Debtor Group.

However, the Period Two analysis also reflects that the primary drivers of the operating losses incurred by the receiving entities (i.e., recipients of the TP adjustments) were R&D and SG&A.    As a result, it would be reasonable to assume that the TP adjustment was used for both R&D and SG&A, and that the amount of R&D for Period Two can be derived by assuming the TP adjustment was used proportionally to fund the R&D and SG&A losses of the receiving entities.[63]    As shown below, including the R&D funding from TP adjustments results in a significant increase in the proportion of R&D funded for Period Two for the US Debtor Group (See **Exhibit D.1**):

---

[62] See **Exhibit C**.
[63] See **Exhibit D**.

15

| 2001 - 2008 Total R&D under MRDA | Canada | EMEA | US | Total |
|---|---|---|---|---|
| Direct R&D | 7,371,647,185 | 2,667,089,237 | 6,467,188,044 | 16,505,924,466 |
| % of Total Direct R&D | 45% | 16% | 39% | 100% |
| TP - R&D | (2,986,271,470) | (204,596,839) | 3,005,706,689 | (185,161,621) |
| Total R&D Funded Period Two | 4,385,375,714 | 2,462,492,397 | 9,472,894,733 | 16,320,762,845 |
| Total R&D Funded Period Two as % | 27% | 15% | 58% | 100% |

Using the Total R&D Funded for Period One and Two, the Huffard Report amount of $5.2 billion attributable to IP would be allocated to each Debtor Group as follows: [64]

| Comparison - IP Allocation of $5.2 Billion | | | | $ in millions |
|---|---|---|---|---|
| | Huffard Report | | Total R&D Approach | |
| Canada | $ 2,069 | 39.6% | $ 1,220 | 23.4% |
| US | 2,241 | 42.9% | 3,459 | 66.3% |
| EMEA | 909 | 17.4% | 541 | 10.4% |
| Total | $ 5,219 | 100.0% | $ 5,219 | 100.0% |

As shown above, there is a significant difference in the allocation of the proceeds ascribed to IP when the Total R&D funded is considered under the *Contribution Approach*.[65]

Further, using the Huffard Report amounts and allocations ascribed to the other categories, and the Total R&D funded by each Debtor Group, the allocation of the Sales Proceeds by Debtor Group under the *Contribution Approach* would result in the following:[66]

| Revised Huffard Report - Total Sales Proceeds of $7.3 Billion | | | | $ in millions |
|---|---|---|---|---|
| | Canada | US | EMEA | Total |
| Tangible Assets | $ 39 | $ 106 | $ (27) | $ 118 |
| Customer Related Assets and Goodwill | 202 | 1,375 | 409 | 1,986 |
| Other Adjustments | 8 | (85) | 34 | (43) |
| Non - IP Value Allocated | 249 | 1,396 | 416 | 2,061 |
| Business Sale Related IP | 176 | 509 | 80 | 765 |
| Residual IP | 1,044 | 2,950 | 460 | 4,454 |
| IP Value Allocated | 1,220 | 3,459 | 541 | 5,219 |
| Total Value Allocated | $ 1,469 | $ 4,855 | $ 956 | $ 7,280 |
| % Allocated | 20.2% | 66.7% | 13.1% | 100.0% |

---

[64] See **Exhibit C and E**.
[65] This opinion is limited to reviewing the R&D contribution assumption and showing the impact on the allocation of the Sales Proceeds contained in the Huffard Report. Although this report inherently uses the other approaches, amounts, values and assumptions contained in the Huffard Report to show the impact, it is not meant to confirm, opine or acknowledge the propriety of these other figures.
[66] See **Exhibit E**.

16

Finally, as summarized below, the *Contribution Approach* results in a significant difference in the allocation of the Total Sales Proceeds when the Total R&D funded is considered, with all applicable CS and TP adjustments, as compared to the Huffard Report which considered only a portion of the R&D funding (See **Exhibits C and E**):

| Comparison - Total Allocation of $7.3 Billion | | | | | $ in millions |
|---|---|---|---|---|---|
| | **Huffard Report** | | | **Total R&D Approach** | |
| Canada | $ | 2,318 | 31.8% | $    1,469 | 20.2% |
| US | | 3,637 | 50.0% | 4,855 | 66.7% |
| EMEA | | 1,325 | 18.2% | 956 | 13.1% |
| **Total** | **$** | **7,280** | **100.0%** | **$    7,280** | **100.0%** |

## VII.    THE BRITVEN REPORT FLAWED RECOVERY ANALYSIS

The Britven Report purports to present a recovery analysis showing the expected recovery by Debtor Group and by claim group, based on (a) an *Ownership Approach* to asset allocation and (b) assumptions regarding the amount of claims that ultimately will be allowed by each Debtor Group. The Britven Report then presents an *Alternative Pro Rata Approach* in which, solely for purposes of determining how to allocate sale proceeds, all assets of each of the individual Debtor corporations are treated as if they were in one global pool, and all allowed claims worldwide were paid a pro rata portion of the global pool. Accordingly, the Britven Report provides the following simplistic approach to determine the claim amounts and an estimate of the relative recovery for each claim group.[67]

| Britven Report Recovery Analysis | | | | $ in millions |
|---|---|---|---|---|
| | Ownership Approach | | Alternative Pro Rata Approach | |
| **Sales Proceeds Amt** | | | | |
| Canadian Debtors | $ | 5,805 | $ | 5,067 |
| US Debtors | | 1,009 | | 182 |
| EMEA Debtors | | 488 | | 2,054 |
| | $ | **7,302** | $ | **7,302** |
| | | | | |
| **Assumed Claim Amt** | | | | |
| Guaranteed Bondholders | $ | 4,092 | $ | 4,092 |
| US Creditors | | 1,300 | | 1,300 |
| Canada Creditors | | 3,506 | | 3,506 |
| EMEA creditors | | 500 | | 500 |
| UK Pension Trust | | 3,000 | | 3,000 |
| | $ | **12,398** | $ | **12,398** |
| | | | | |
| **% Recovery** | | | | |
| Guaranteed Bondholders | | 100.0% | | 71.2% |
| US Creditors | | 95.0% | | 71.2% |
| Canada Creditors | | 58.7% | | 71.2% |
| EMEA creditors | | 26.5% | | 71.2% |
| UK Pension Trust | | 43.7% | | 71.2% |

As shown above, the pro rata approach inherently (and mistakenly) assumes that, the assets can be readily shifted between and among debtor Groups (and the underlying entities within), either before or after the decision is made regarding the allocation of Sales Proceeds, to achieve the hypothetical results.

---

[67] Britven Report at Schedule 1.

Overall, the Britven Report recovery analysis is not vetted, is unsupported and in no way should be used to predict an outcome or used to determine the allocation of Sales Proceeds.  The inputs to the above analysis can and will vary widely and impact the recovery.  Some key areas of criticism are as follows:

**A.      Allocation Should Not Be Based On Recoveries**

It is my understanding that the issues before the Courts at this time are (a) the allocation of sale proceeds among Debtor Groups, and (b) whether certain disputed claims by the EMEA Debtor Group and by the UK Pension Claimants should be allowed by the Canadian Debtors, and if so, in what amounts.  (The disputed claims by the EMEA Debtor Group and the UK Pension Claimants against the US Debtors have been settled.)   But it is not a principled approach to allocation to focus on the amount of recoveries to each claim group, which is necessarily based on the amount of other unrelated assets and claims that exist.

**B.      Debtor Groups Are Individual Estates**

The Britven Report improperly assumes that all of the entities within each Debtor Group can be treated as a single estate, and that furthermore, all of the Debtor Groups can be treated together as one estate.  It is my understanding that "Debtor Groups" are being used in this case for administrative convenience during the allocation trial, such that similarly-situated estates may make their presentations and arguments regarding allocation in an orderly manner.  Nevertheless, there are 5 individual Canadian Debtors in the Canadian Debtor Group, 16 individual U.S. Debtors in the U.S. Debtor Group and 22 individual Debtors in the EMEA Debtor Group.[68]  The recoveries of each of these individual Debtors' creditors will depend on the amount of assets available to, and the amount of claims allowed by, each of these individual Debtors.[69]

Furthermore, some creditors have claims against multiple Debtors.  The Britven Report brushes aside these important points and assumes that the entities within each Debtor Group can be "rolled up" or "substantively consolidated,"[70] and then that multiple creditor claims disappear.  Nor is it appropriate to assume that the Debtor Groups can be assumed to be

---

[68] *See Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets*, [D.I. #10536], Schedule 1.  Debtors' Motion to Approve Allocation Position of US Debtors and Official Committee of Unsecured Creditors (May 16, 2013) (D.I. #9947); and Declaration of John Doolittle, Vice President of Nortel Networks Inc. in Support of Chapter 11 Petitions and First Day Motions at ¶ 87 (D.I. # 3).

[69] In fact, I have been informed by counsel that the EMEA Debtor Group has requested that the Courts allocate the proceeds to the EMEA Debtor Group on an entity by entity basis.  *See Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets*, [D.I. #10536], at ¶ 10 ("Each EMEA Debtor is entitled to a separate allocation out of the Sale Proceeds.").

[70] Substantive consolidation is the pooling of assets and liabilities from related debtors to pay off their combined creditors in a bankruptcy case. In the interest of fairness, courts are reluctant to allow substantive consolidation. Pooling assets and liabilities generally will benefit one group of creditors while harming another. (http://law-dictionary.clearpointlaw.com/s/substantive-consolidation_Obl.aspx)

substantively consolidated across jurisdictions for purposes of allocation, as described further below.[71]  The Britven Report does not conclude that any of the Debtors will actually be substantively consolidated or that the courts would have jurisdiction to make such pro rata distributions on a cross-border basis.

**C.    Claims Are Undetermined and Uncertain**

There are too many uncertainties at this time regarding which claims will be allowed by which Debtor Groups in which amounts.[72]  The Britven Report is inherently unreliable because it makes over-simplistic assumptions and numerous errors regarding these claims.  I provide detail below regarding several of these assumptions and errors.

First, the Britven Report includes Debtor claim amounts which are not verifiable.  No source documents were provided – just "*Counsel Instructions.*"[73]  In addition, regardless of the source of the Britven claim estimates, the Debtor claims are not static.  Certain claims are contingent and/or dependent on adjudication of claims and payout in other estates as shown below certain creditors have claims against multiple Debtor estates:[74]

| Claims | Canada Debtors | US Debtors | EMEA Debtors |
|---|---|---|---|
| Canada Creditors | X | | |
| US Creditors | | X | |
| EMEA Creditors | | | X |
| EMEA Debtors | X | | |
| UK Pension Trust | X | | X |
| Guaranteed Bondholders and EDC Claim | X | X | |
| Intercompany due to US Debtor | X | | |

In fact, major claims against the various debtors are unresolved at this time.  The Monitor's latest report regarding claims against the Canadian Debtors show that the vast majority are shown as disputed or "under review."[75]  The Monitor notes that "All amounts (other than Accepted) are subject to potential material change (i.e. negotiation, appeal, etc.) as the process for the determination of claims proceeds."[76]

As noted above, the trial set to begin May 12, 2014 is to include an adjudication of EMEA claims against the Canadian Debtors and UKP claims against the Canadian Debtors.  The amount of these claims that the Canadian Court will allow is not known at this time.  Even the asserted amount of the EMEA claims is not yet certain; in the Sixty-Fifth Report of the

---

[71] Also see **Section VIII** of this report on the Bazelon Report.
[72] Based on my review of documents cited herein and my discussions with counsel.
[73] Britven Report at Schedule 6 and Sixty-Fifth Report of the Monitor (Apr. 28, 2011), which shows the EMEA claims against the Canadian Debtors which is not reflected in the Britven Report.
[74] Britven Report at Schedule 2.
[75] Nortel Networks – CCAA Applicants Overall Claims Status (Feb. 5, 2014), available at
http://documentcentre.eycan.com/eycm_library/Project%20Copperhead/English/Claims%20Process/CCAA%20Claims
%20schedule%20-%20February%205%202014.pdf (last accessed February 26, 2014).
[76] *Id.*

Monitor, the Monitor described quantified EMEA claims in excess of $9.8 billion, plus additional claims that were not quantified.[77]  Britven assumes zero value for these claims by the EMEA Debtors against the Canadian Debtors.[78]

Separately, in the EMEA administration pending in the UK, Britven assumes that there will be $500 million in allowed claims by EMEA creditors against the EMEA debtors. He characterizes these claims against the EMEA Debtors as GBP 204 million and EUR 151 million, converting to US $500 million, but gives no source whatsoever for this assertion.[79]

The UK Pension claim against the Canadian Debtors, based on a Financial Support Directive against related corporations, similarly was left unquantified, but was asserted to be the full amount of an alleged pension shortfall of £2.1 billion, and was asserted on a joint and several basis against Canadian Debtors NNC and NNL.[80] But Britven includes a claim against the Canadian Debtors of $880 million, representing only the portion of the UK Pension Trust claim for which the Canadian Debtors had provided a guarantee.[81] Effectively, Britven assumes zero liability beyond the guarantee.  Britven does not appear to account for the UKP claims filed against the EMEA Debtors, or how a recovery by the UKP Claimants from multiple debtors could affect the recoveries of other creditors in different jurisdictions.

In addition, a related EMEA claim against the U.S. Debtors has been settled and is being allowed as an administrative claim of $37.5 million.[82]  The UK Pension claim against the U.S. Debtors also has been settled and is being allowed as an administrative claim of $37.5 million.[83]  These amounts are not reflected in the Britven Report, either as allowed claims or as adjustments to treasury cash.

Other issues related to the assumed claim base include:

- No adjustment is made for certain claims filed against multiple estates – For purposes of his model, the Britven Report assumes that when certain claims are filed against multiple estates in different jurisdictions, such creditors can be held to one source of recovery or effectively paid off the top from a global pool of assets.  Examples include the Bondholder and UKP claims and no basis is provided for this assumption.  This is an error, and the actual recoveries of these claimants against different Debtor estates could have a material impact on the recoveries of other creditors in those jurisdictions.

---

[77] Sixty-Fifth Report of the Monitor (Apr. 28, 2011), at ¶ 9.
[78] Britven Report, Schedule 6.
[79] Britven Report, Schedule 6.
[80] Sixty-Fifth Report of the Monitor (Apr. 28, 2011), at ¶ 30.
[81] Britven Report at ¶ 4.2.h.
[82] Debtors' Mot. for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(b) and 507(a)(2) and Bankruptcy Rules 6004(h) and 9019 Approving the US Claims Litigation Settlement Agreement by and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates, at 14 (Dec. 17, 2013), with Settlement Agreement attached as Exhibit B (D.I. #12,618); Order approving same, at 2 (Jan. 7, 2014) (D.I. # 12,785).
[83] Id.

21

- Administrative Claims assumed yet no bar date - No Bar Date has yet been established for US or EMEA Administrative claims.[84]   Therefore, although the Britven Report reduces the treasury cash amount for a "*guesstimate*" for the amount of these claims in all the Debtor Groups, there is no support for these amounts[85] and thus his assertion is unverifiable.   The amount of claims ultimately filed against the US Debtors and EMEA Debtors (which can include tax claims and other administrative claims) will have an effect on the recoveries to the other creditors, and the Britven Report conclusions are unreliable and non-predictive as a result.

- Bondholder Interest not considered - The estimated Guaranteed Bondholders and EDC Claims of approximately $4.1 billion includes pre-filing interest but does not include post-filing interest that continues to accrue.[86]  Including the post-filing interest would also change the claim amount to be distributed to the US and Canadian creditors. However, Judge Gross has ruled that the issue of post-petition interest is not yet ripe for adjudication.[87]

- PBGC Claim – The PBGC has filed claims against each of the US Debtors, and the amount of those claims has not been finally determined.   One liquidated claim is in the amount of $593.1 million; the other claims are as yet unliquidated.[88]   Yet the Britven Report has estimated the PBGC claim as $400 million, and does not account for the possibility that the PBGC will receive distributions from various US Debtors or the effect that would have on other creditor recoveries.[89]

- The tax liability by the U.S. Debtors is assumed to be zero.   This assumption is not supported by any source.

Other issues related to the assumed recovery include:

- In addition, changes in foreign exchange rates would impact the recovery rates and amounts received by each debtor estate.   Although the Britven Report states that the claims calculated utilizing the foreign exchange rate as of January 14, 2009 are for

---

[84] See Notice of Bar Date (filed Aug. 4, 2009) (D.I. # 1281), section § 4(h) (bar date does not apply to administrative claims).
[85] Britven Report at Schedule 5.1. Although Schedule 5.1 references a "Global Cash Summary of Nortel as of December 31, 2013," no such document has been located on the Monitor's website.
[86] Britven Report at Footnote 115.
[87] Objection of Wilmington Trust, N.A., as Trustee, to Claims of the Bank of New York Mellon, as Trustee and Law Debenture Trust Company of New York, as Trustee at 2, 12-13 (Oct. 25, 2013) (D.I. #12,116); Joint Req. to (I) Adjourn Hearing on Objection of Wilmington Trust, N.A., as Trustee, to Claims of the Bank of New York Mellon, as Trustee and Law Debenture Trust Company of New York, as Trustee and (II) to set a Briefing Schedule to Address Certain Threshold Matters with Respect Thereto at 4 ¶ 12 (Nov. 13, 2013) (D.I. #12,351); Order (Nov. 15, 2013) (D.I. #12,399) (denying the objection as unripe).
[88] Proofs of Claim, Pension Benefit Guaranty Corporation, Filed Before the United States Bankruptcy Court for the District of Delaware, Case Number 09-10138 (KG), Claim Nos. 4735 (liquidated), 4736, 4737, 4738 (unliquidated) (Sept. 28, 2009), available at http://dm.epiq11.com/NNI/Claim.
[89] Britven Report, Schedule 6.

illustrative purposes,[90] the report does not demonstrate or explain how the recovery rates would be impacted by a change in foreign exchange rates. The Monitor has reserved the right to change the date of calculation of foreign exchange rates.

- The Britven Report also states that "we understand that a portion of the inter-estate claim by the US Debtors against the Canadian estate is subject to a "snap-back" claim by the Canadian estate against the EMEA Debtors which we have been instructed not to include in our analysis."[91]  It is my understanding, through counsel, that this "snap back" claim may arise under the MRDA because the inter-estate claims relates to the terms of a settlement with the tax authorities.  The exclusion of this data from the Britven Report analysis may result in an inflated recovery by the EMEA creditors.

In addition, the amounts assumed to represent other sources of recovery cannot be verified as no source documents were provided – the Britven Report just references *"Per instructions."*[92]  Further, certain other amounts assumed are already proven to be wrong, for example:

- The Debtor Treasury cash balances[93] purported to be available to settle the Debtor claims include restricted cash and unavailable cash that are already designated for other purposes. [94]

- The Britven Report does not account for the depletion of the treasury cash from each Debtor estate that could result from continued litigation and appeals of the current allocation dispute and the remaining claims against each estate.  While the report purports to offer a model that could predict ultimate creditor recoveries based on given sale proceeds allocation determinations, the effect of changes in treasury cash and claims amounts, for the reasons stated above, could greatly influence ultimate creditor recoveries.

Of course, changes to any of the above assumptions regarding claims and regarding assets will result in changes to projected results, illustrating the unreliability of the Briven Report model.

## D.    Ultimate Recoveries Would Not Reflect Pro Rata Allocation

Ultimate recoveries by creditors in the individual estates will depend on many factors beyond the Courts' joint trial of allocation issues, including the ultimate amount of assets in

---

[90] Britven Report at ¶ 4.2.h.
[91] Britven Report at footnote 117.
[92] Britven Report at Schedule 5.2.
[93] Britven Report at Schedule 5.1.
[94] One-Hundred and Third Report of the Monitor at ¶ 17 (Feb. 5, 2014).

and allowed claims against each estate.  If the Courts did an *Alternative Pro Rata Allocation* based on Britven's significant assumptions regarding highly disputed claims, it is highly unlikely that the results would remain *pro rata* when those claims are resolved.  In fact, any attempt to predict the claim recovery based on a pro rata approach is almost certainly guaranteed to be wrong since the ultimate recoveries will be based on a number of factors that are impossible to predict.  As a result, the Britven Report Recovery by Claimant Group is unreliable.

Finally, the above *illustrative* analysis has nothing to do with the determination of the value of what was relinquished to assist in the determination of the sales proceeds allocation. Based on my review of the so-called *implied* recovery analysis and pro rata allocation, it is my opinion that it is unreliable, flawed and based on unsupported assumptions and therefore should not be used in conjunction with the determination of the allocation of the Sales Proceeds.

## VIII.   BAZELON REPORT – PRO RATA CONCLUSION

The Bazelon Report concludes that the pro rata distribution is the most reliable method based upon the economics underlying Nortel's business model; however, it does not provide any analysis of a recovery under this approach nor does it cite any support or precedent in the context of an insolvency proceeding.

A multinational business such as Nortel operating profitably and internationally can make decisions quickly that affect its global operations; it can allocate resources internationally in a manner which best suits its objectives and it can utilize its going-concern values to augment the value of its underlying operating assets on the basis that the whole is greater than the sum of its parts.  In fact, Debtors agreement to collectively relinquish their rights to facilitate the eight transactions is a clear demonstration of the value of the whole (i.e., over $7 billion).

Having said that, even when Nortel was operating profitability, it recognized and respected the local laws, legal entities and regulations around the globe.  For example, a typical creditor/vendor in Canada could not readily seek payment from the U.S. entity.  Moreover, with the onset of an insolvency case filed in different jurisdictions, as is often the case, Nortel's business turned into a series of disconnected segments in several different countries.  As is typical in international insolvency, different sets of creditors assert different kinds of claims to different assets under different rules in different countries.  Furthermore, the administration of the EMEA estates is not before the Canadian and U.S. Courts, and thus the courts have no ability to implement the Bazelon Report idea.

As a result, in the context of cross-border insolvency, I am aware of no instance in which courts adopted a pro rata approach to distribute the assets.  In fact, numerous practitioners have researched and studied the topic of cross-border insolvency with the primary goal of suggesting protocols and guides to facilitate domestic recognition of foreign insolvency proceedings and to increase international co-operation in multinational cases.[95]  The goal is never to simply achieve a pro rata distribution around the globe to reflect the way the business operated prior to the insolvency.  Instead, large complex cross-border bankruptcies like Lehman, BCCI and Madoff are ready examples of how various approaches and protocols are employed to resolve disputes and allocate assets around the globe while still respecting the local laws and regulations.

Based on the above, the pro rata approach is not appropriate to use in the Nortel case and should be ignored for purposes of determining the allocation of the Sales Proceeds.

---

[95] For example, the UNCITRAL Model Law on Cross-Border Insolvency, July 1, 2009.
http://www.uncitral.org/pdf/english/texts/insolven/Practice_Guide_english.pdf

## IX.  CONCLUSIONS

If the allocation of the proceeds is based on the *Contribution Approach* (i.e., based on a percentage of funded R&D costs), then the total contributions that were funded for R&D should be considered when allocating the Sales Proceeds attributable to IP.

The Huffard Report failed to capture the Total R&D for the relevant period.  If the Huffard Report analysis based on the *Contribution Approach* is adjusted to reflect the Total R&D contributions, then the allocation of the Total Sales Proceeds would be as shown below (See **Exhibit E**):

| Revised Huffard Report - Total Sales Proceeds of $7.3 Billion | | | | $ in millions |
|---|---|---|---|---|
| | Canada | US | EMEA | Total |
| Tangible Assets | $    39 | $    106 | $    (27) | $    118 |
| Customer Related Assets and Goodwill | 202 | 1,375 | 409 | 1,986 |
| Other Adjustments | 8 | (85) | 34 | (43) |
| **Non - IP Value Allocated** | **249** | **1,396** | **416** | **2,061** |
| Business Sale Related IP | 176 | 509 | 80 | 765 |
| Residual IP | 1,044 | 2,950 | 460 | 4,454 |
| **IP Value Allocated** | **1,220** | **3,459** | **541** | **5,219** |
| **Total Value Allocated** | **$    1,469** | **$    4,855** | **$    956** | **$    7,280** |
| **% Allocated** | **20.2%** | **66.7%** | **13.1%** | **100.0%** |

In addition, the Britven Report implied recovery analysis and pro rata approach are unreliable, flawed, and based on unsupported assumptions and therefore should not be used in conjunction with the determination of the allocation of the Sales Proceeds.

Finally, the Bazelon Report pro rata conclusion is not appropriate to use in the context of the Nortel case and should be ignored.

I reserve the right to supplement or amend this Report as additional relevant information becomes available.

*Laureen M. Ryan*

_____

Laureen M. Ryan, CPA, ABV, CDBV, CFE, CIRA

February 28, 2014

26

Court File No.: 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, C. C-36, AS AMENDED.

- and the -

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
                                                         :
                                                         :     Chapter 11
                                                         :
*In re*                                                  :
                                                         :     Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,                          :
                                                         :     Jointly Administered
                          Debtors.                       :
                                                         :
                                                         :
                                                         :
---------------------------------------------------------X

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1.      My name is Laureen M. Ryan. I live in New York, New York, USA.

2.      I have been engaged by counsel for the U.S. Debtors to provide evidence in
        relation to the above-noted court proceedings.

3.      I acknowledge that it is my duty to provide evidence in relation to this proceeding
        as follows:

27

(a)     to provide opinion evidence that is fair, objective and non-partisan;

(b)     to provide opinion evidence that is related only to matters that are within my area of expertise; and

(c)     to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.     I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.


Date:  February 28, 2014                    _____
                                            Laureen M. Ryan



# Laureen M. Ryan, CPA, ABV, CDBV, CFE, CIRA

## Managing Director, Global Forensic and Dispute Services



600 Madison Avenue
New York, NY 10022
Direct: +1 212 763 9568
Mobile: +1 917 797 6691
lryan@alvarezandmarsal.com

**Certifications**

Certified Public Accountant

Accredited Business Valuer

Certified Distressed Business
Valuer

Certified Fraud Examiner

Certified Insolvency and
Restructuring Advisor

**Professional Affiliations**

American Institute of Certified
Public Accountants

Association of Insolvency and
Restructuring Advisors

Association of Certified Fraud
Examiners

New York State Society of
Certified Public Accountants

Founding Member,
International Women's
Insolvency & Restructuring
Confederation

Junior League

**Education**

B.S. Accounting & Economics
Oswego University

Laureen M. Ryan specializes in accounting and forensic investigations, and disputes with complex economic, valuation, solvency and financial issues.

With over 25 years of experience, Ms. Ryan has advised boards, corporations and stakeholders to help resolve high stakes financial, regulatory and legal issues. She has led complex multi-national investigations, including those involving FCPA and *Qui Tam* issues, and made presentations to the Securities and Exchange Commission, the NYS Banking Department, the U.S. Bankruptcy Court and Corporate Boards. Further, in her fiduciary roles as Responsible Officer, Chapter 11 Trustee and Liquidating Trustee, she conducted investigations, pursued litigation and resolved complex business, accounting and financial matters.

Ms. Ryan has written numerous expert reports and testified in depositions and in court in cases residing in various U.S. District Courts, Supreme Court of NY, U.S. Court of Federal Claims, State Court in Georgia, Superior Court of New Jersey, County Court in Texas, AAA and J.A.M.S. arbitrations, various U.S. Bankruptcy Courts, and the ICC International Court of Arbitration in London. Ms. Ryan has also served as a mediator for the Supreme Court of the State of NY.

Ms. Ryan's testimony and advice has been provided in civil and criminal matters involving issues related financial reporting, regulatory inquiries, financial transactions, damages, valuation, solvency, lost profits, accounting reconstruction, GAAS audits, GAAP accounting, fraud allegations, ponzi schemes, FCPA and *Qui Tam*, asset diversion, accounting irregularities, over-billing and other fictitious billing and loan schemes, post-acquisition disputes, contract provisions, cost allocations, royalties, escheatment, bankruptcy litigation, insurance, loans and securities.

Ms. Ryan has also been involved in many purchases and sales of businesses, divisions, and assets on behalf of management, secured lenders and other creditors.  In this regard, she has prepared valuation estimates of businesses in a range of industries in connection with fraudulent conveyance actions, preference actions, viability studies, contract disputes, damage quantification, and lending decisions.

Ms. Ryan has worked across a broad range of industries, including financial institutions, mutual funds, hedge funds, broker / dealers, mortgage warehousing, structured finance products, sub-prime and Alt-A loans, securities firms, healthcare, cable, media, telecommunications, hospitality, heathcare and medical claims, casino/gaming, restaurants, franchising, auto dealerships, auto parts, insurance, beverages, entertainment, retail, apparel, real estate, insurance, construction, explosives, mining, trucking, railroad, food distribution, publishing, waste management, textiles, television equipment, health and beauty aids, and sporting goods.

Prior to joining A&M, Ms. Ryan was a Senior Managing Director at FTI Consulting providing investigation and disputes services. She was also instrumental in building FTI's Forensic & Litigation Consulting practice and held various executive leadership positions, including Northeast Regional Leader and Global Expansion Leader. In addition, she worked at an affiliate in Sydney, Australia.

**Laureen M. Ryan**

Ms. Ryan began her career with Ernst & Young (E&Y) where she provided audit and advisory services to the New York and London offices. As a member of E&Y's National Financial Services Office, she targeted acquisitions, monitored the audit risk profile of banks and thrifts, provided accounting, auditing and regulatory advice for the U.S. and abroad, and worked on matters involving allegations of accounting malpractice and fraud.

Ms. Ryan has given lectures on accounting, fraud, valuation and troubled company topics to bankers, lawyers, and accountants.  She has also written articles for the *Commercial Lending Review*, *ABI Newsletter, Bank Accounting & Finance*, and *The Practical Accountant*, and a booklet entitled *White Collar Crime: Loss Prevention through Internal Control in Financial Institutions.*

**Laureen M. Ryan, CPA, ABV, CDBV, CIRA, CFE**
**Managing Director, Global Forensic and Dispute Services**

## Deposition and Trial Testimony - Last Four Years as of June 2013

| Case | Venue |
|---|---|
| | |
| House of Lloyd, Sales, et al. and Janice E. Stanton, Trustee v. SCG Partners I, LLC, et al. | U.S. Bankruptcy Court for The Western District of Missouri |
| | |
| Winstar Communications Securities Litigation; Jefferson Insurance Company of N.Y, et al., v. William J. Rouhana Jr.; Nathan Kantor; Richard J. Uhl; and Grant Thornton LLP | U.S. District Court, Southern District of New York |
| | |
| General Electric Capital Corporation vs. Deutsche Bank AG, New York Branch, 111 Debt Acquisition v. Deutsche Bank AG, New York Branch | International Institute for Conflict Prevention and Resolution |
| | |
| Tenafly Chrysler Jeep, Inc. v. Chrysler Group LLC | American Arbitration Association |
| | |
| D. B. Zwirn Special Opportunities Fund, LLC; Bernard National Loan Investors, LTD; and Hemlock (LUX) S.A.R.L. v. David R. Bergstein and Ronald N. Tutor | Superior Court of the State of California for the County of Los Angeles, Central District |
| | |
| Spring Investor Services, Inc., v. Carrington Capital Management, LLC. | U.S. District Court, District of Massachusetts |
| | |
| Getty Petroleum Marketing, Inc. et al, vs. Lukoil Americas Corporation, Lukoil North America LLC, OAO Lukoil, Vincent De Laurentis, Vadim Gluzman, Michael Hantman, Michael Lewis and Simon Logovinsky | United States Bankruptcy Court, Southern District Of new York |

**Laureen M. Ryan, CPA, ABV, CDBV, CIRA, CFE**

**Managing Director, Global Forensic and Dispute Services**

**Publications in the last ten years:**

Laureen M. Ryan, Edward McDonough, Joe Gardemal and Neil Beaton - "*Valuation in Fraudulent Transfer Action: The Balance Sheet Test;*" **(14 June 2012)**[1]

Laureen M. Ryan and Michael Salve - "*Difficult Provider - Payor Relationships Likely to Grow More Contentious;*" **Alvarez & Marsal GFD ENewsletter Archives (15 November 2012)**[2]

---

[1] Alvarez & Marsal GFD ENewsletter Archives: <http://www.alvarezandmarsal.com/en/global_services/dispute/enewsletter/archives/DisplayEnewsletter.aspx?enewsletter_id=492>.

[2] Alvarez & Marsal GFD ENewsletter Archives: <http://www.alvarezandmarsal:com/en/global_services/dispute/enewsletter/archives/DisplayEnewsletter.aspx?enewsletter_id=515>.

# Exhibit B

**EXHIBIT B**

**List of Information Considered**


*Expert Reports*

1. Expert Report of Paul P. Huffard, Jan. 24, 2014.

2. Expert Report of James E. Malackowski, Jan. 24, 2014.

3. Expert Report of Thomas Britven, Jan. 24, 2014.

4. Expert Report of Coleman Bazelon, Jan. 24, 2014.

5. Expert Report of Lorraine Eden, Jan. 24, 2014.

6. Expert Report of Jeffrey H. Kinrich, Jan. 24, 2014.

7. Expert Report of Philip Green, Jan. 24, 2014.


*Other Source Material*

1. Operating Earnings Spreadsheets for R&D CSA Participants, 2001-2008 (NOR_53648312, NOR_53648037, NOR_53648041, NOR_53648508, NOR_53648130, NOR_53648133, NOR_53648323, NOR_53648048).

2. U.S. to Canada Loan Schedule Under Revolving Credit Facility, 2004-2009 (NNI_00832232)

3. Deposition Transcript of Peter Currie, Oct. 15, 2013.

4. Deposition Transcript of John Williams, Oct. 8, 2013.

5. Declaration of John Doolittle, Vice President of Nortel Networks Inc. in Support of Chapter 11 Petitions and First Day Motions, Jan. 14, 2009 (D.I. #3).

6. Motion for an Order Approving the Interim Funding and Settlement Agreement, June 9, 2009 (D.I. #874).

7. Motion for an Order Approving the Final Canadian Funding and Settlement Agreement, Dec. 23, 2009 (D.I. #2205).

8. Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (Oct. 31, 2008) (Ex. 22078, PC0184853).

9.  Transfer Pricing Report: Nortel Networks U.K. Ltd, dated July 18, 2003 (Ex. 32117).

10. Nortel Networks Corp., Annual Report (Form 10K), F-16 (December 31, 2001).

11. Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets (D.I. #10536).

12. Law Dictionary, http://law-dictionary.clearpointlaw.com/s/substantive-consolidation_Obl.aspx.

13. Nortel Networks – CCAA Applicants Overall Claims Status (Feb. 5, 2014), *available at* http://documentcentre.eycan.com/eycm_library/Project%20Copperhead/English/Claims%20Process/CCAA%20Claims%20schedule%20-%20February%205%202014.pdf.

14. Sixty-fifth Report of the Monitor (Apr. 28, 2011).

15. Debtors' Motion for Entry of an Order Approving the US Claims Litigation Settlement Agreement by and Among the Debtors, the Creditors Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates, at 14 (Dec. 17, 2013), with Settlement Agreement attached as Exhibit B (D.I. #12,618).

16. Order approving the settlement agreement with EMEA and UKP, at 2 (Jan. 7, 2014) (D.I. # 12,785).

17. Notice of Bar Date (filed Aug. 4, 2009) (D.I. # 1281).

18. Objection of Wilmington Trust re: Postpetition Interest (Oct. 25, 2013) (D.I. #12,116).

19.  Joint Request to Adjourn Hearing on Objection of Wilmington Trust (Nov. 13, 2013) (D.I. #12,351).

20. Order re: Postpetition Interest (Nov. 15, 2013) (D.I. #12,399).

21. Proofs of Claim, Pension Benefit Guaranty Corporation, Filed Before the United States Bankruptcy Court for the District of Delaware, Case Number 09-10138 (KG), Claim Nos. 4735 (liquidated), 4736, 4737, 4738 (unliquidated) (Sept. 28, 2009), *available at* http://dm.epiq11.com/NNI/Claim.

22. One-Hundred and Third Report of the Monitor (Feb. 5, 2014).

23. UNCITRAL Model Law on Cross-Border Insolvency, http://www.uncitral.org/pdf/english/texts/insolven/Practice_Guide_english.pdf.

24. Cost Sharing Worksheets (NNI_00298735, EMEA0311234).

25. Debtors' Motion to Approve Allocation Position of US Debtors and Official Committee of Unsecured Creditors (May 16, 2013) (D.I. #9947).

# Exhibit C

**Huffard Report - Allocation of Sales Proceeds - Based on a Portion of R&D Funded**

| Contribution Approach Summary (A) | Canada | US | EMEA | Total |
|---|---|---|---|---|
| Customer Related Assets and Goodwill | $ 202 | $ 1,375 | $ 409 | $ 1,986 |
| Tangible Assets | 39 | 106 | (27) | 118 |
| Other Adjustments | 8 | (85) | 34 | (43) |
| **Non - IP Allocations** | **249** | **1,396** | **416** | **2,061** |
| Business Sale Related IP | 312 | 329 | 123 | 765 |
| Residual IP (B) | 1,757 | 1,912 | 785 | 4,454 |
| **IP Allocations** | **2,069** | **2,241** | **909** | **5,219** |
| **Total Value Allocated** | **$ 2,318** | **$ 3,637** | **$ 1,325** | **$ 7,280** |
| **% Allocated** | **31.8%** | **50.0%** | **18.2%** | **100.0%** |

**Notes:**

(A) Summary is derived from **Exhibit C.1.**

(B) As noted at note E of **Exhibit C.2**, the Malackowski Report mistakenly allocated $22 million of proceeds to the Canadian Debtors instead of the US Debtors. The correct allocation has not been reflected above. The US debtors would have received the $22 million in proceeds prior to allocation of the remaining residual IP proceeds.

The following steps were taken to derive the allocation amounts of the Huffard Report - Allocation of Sales Proceeds by Transaction table found at **Exhibit C.1:**

Step 1: Customer Related Assets and Goodwill amounts were obtained from the Huffard Report Model at tab "Business Sales + Adj.". These amounts were allocated by transaction and debtor group, and included within the allocation table at **Exhibit C.1.** See **Exhibit C.4** for further details.

Step 2: Tangible Assets amounts were obtained from the Huffard Report Model at tab "Business Sales + Adj." These amounts were allocated by transaction and debtor group, and included within the allocation table at **Exhibit C.1.** See **Exhibit C.4** for further details.

Step 3: The total Business Sales Related IP proceeds by transaction were obtained from the Huffard Report Model at tab "IP Value 140124". The allocation of the Business Sale Related IP by transaction to each debtor group was calculated by multiplying the Business Sale Related IP per transaction by the sale specific R&D spend percentages. See **Exhibit D.2** for further details.

Step 4: Allocation of total Business Sales Proceeds by Debtor group was obtained by utilizing the Allocation by Contribution Approach Percentages, obtained from the Huffard report at ¶ 11, and multiplying them by the total proceeds available by Business Sale transaction (unrounded amounts obtained from the Huffard Report Model at tab "IP, PP & Escrow," and verified at ¶ 51 of the Huffard Report). See **Exhibit C.5** for further details.

Step 5: The Huffard Report makes other additional adjustments in the report model when calculating the final escrow balances. These other adjustments are related to the re allocation of NNIC, Russia, and Israel costs, Entity Settlements and Allocations (such as the APAC and CALA Settlement), and escrow adjustments from available proceeds. As Customer Related Assets and Goodwill are presented as gross amounts, these adjustments are necessary to arrive at the correct escrow balance per Business Transaction. The escrow values of each Business Transaction was obtained from the Huffard Report Model at tab "IP, PP & Escrow". As the Customer Related Assets and Goodwill and Tangible Asset amounts were readily available (as noted in steps 1 and 2 above), and the Business Sales Related IP was allocated as outlined in step 3 above, the difference between the sum of these three categories and the total allocation by transaction and debtor group was attributed to Other Adjustments.

Step 6: Residual Patent R&D Spend percentages for the period of 1991 - 2006 were calculated by using the Huffard Report Model at tab "RIP Allocation". These R&D spend percentages were then applied to the total Residual IP escrow balance.

**Huffard Report - Allocation of Sales Proceeds by Transaction**

| Huffard Report - Allocation of Sales Proceeds by Transaction | | | | *$ in millions* | |
|---|---|---|---|---|---|
| Total Allocation by Contribution Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | | |
| | Canada | US | EMEA | Total | Source |
| CDMA - Customer Related Assets and Goodwill | $ 68 | $ 775 | $ - | $ 843 | (A) |
| CDMA - Tangible Assets | 3 | 10 | - | 13 | (B) |
| CDMA - Other Adjustments | (9) | (48) | (2) | (60) | (C) |
| Subtotal - CDMA Non - IP Allocations | 62 | 737 | (2) | 796 | (D) |
| CDMA - Business Sale Related IP | 105 | 109 | 42 | 256 | (E) |
| Total CDMA | 166 | 846 | 40 | 1,053 | (F) |
| Enterprise - Customer Related Assets and Goodwill | 45 | 338 | 172 | 555 | (A) |
| Enterprise - Tangible Assets | 8 | 25 | 7 | 40 | (B) |
| Enterprise - Other Adjustments | 20 | (43) | 27 | 4 | (C) |
| Subtotal - Enterprise Non - IP Allocations | 73 | 319 | 206 | 599 | (D), (G) |
| Enterprise - Business Sale Related IP | 97 | 110 | 38 | 244 | (E) |
| Total Enterprise | 170 | 429 | 244 | 843 | (F) |
| MEN - Customer Related Assets and Goodwill | 78 | 165 | 149 | 391 | (A) |
| MEN - Tangible Assets | 22 | 72 | 10 | 104 | (B) |
| MEN - Other Adjustments | (2) | 1 | 2 | 1 | (C) |
| Subtotal - MEN Non - IP Allocations | 99 | 238 | 160 | 497 | (D) |
| MEN - Business Sale Related IP | 46 | 49 | 18 | 113 | (E) |
| Total MEN | 144 | 287 | 178 | 610 | (F) |
| CVAS - Customer Related Assets and Goodwill | 10 | 34 | 17 | 60 | (A) |
| CVAS - Tangible Assets | (1) | (1) | 14 | 13 | (B) |
| CVAS - Other Adjustments | (4) | (5) | (4) | (13) | (C) |
| Subtotal - CVAS Non - IP Allocations | 5 | 28 | 27 | 60 | (D) |
| CVAS - Business Sale Related IP | 36 | 31 | 13 | 80 | (E) |
| Total CVAS | 41 | 59 | 40 | 140 | (F) |
| GSM - Customer Related Assets and Goodwill | 0 | 57 | 59 | 116 | (A) |
| GSM - Tangible Assets | 4 | (15) | (62) | (73) | (B) |
| GSM - Other Adjustments | 1 | 6 | 6 | 14 | (C) |
| Subtotal - GSM Non - IP Allocations | 5 | 49 | 3 | 57 | (D) |
| GSM - Business Sale Related IP | 20 | 21 | 8 | 49 | (E) |
| Total GSM | 25 | 70 | 11 | 106 | (F) |
| MSS - Customer Related Assets and Goodwill | 0 | 2 | 11 | 13 | (A) |
| MSS - Tangible Assets | 2 | 12 | 3 | 17 | (B) |
| MSS - Other Adjustments | 2 | 4 | 5 | 11 | (C) |
| Subtotal - MSS Non - IP Allocations | 4 | 18 | 20 | 42 | (D) |
| MSS - Business Sale Related IP | 2 | 2 | 1 | 4 | (E) |
| Total MSS | 6 | 20 | 20 | 46 | (F) |

**Huffard Report - Allocation of Sales Proceeds by Transaction**

| Huffard Report - Allocation of Sales Proceeds by Transaction | | | | $ in millions | |
|---|---|---|---|---|---|
| Total Allocation by Contribution Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | | |
| | Canada | US | EMEA | Total | Source |
| Layer 4-7 - Customer Related Assets and Goodwill | 1 | 5 | 2 | 7 | (A) |
| Layer 4-7 - Tangible Assets | 0 | 1 | 0 | 1 | (B) |
| Layer 4-7 - Other Adjustments | 0 | 0 | 0 | 0 | (C) |
| **Subtotal - Layer 4-7 Non - IP Allocations** | 1 | 5 | 2 | 9 | (D) |
| Layer 4-7 - Business Sale Related IP | 4 | 4 | 2 | 9 | (E) |
| **Total Layer 4-7** | **5** | **9** | **4** | **18** | (F) |
| Next Gen - Customer Related Assets and Goodwill | - | - | - | **-** | (A) |
| Next Gen - Tangible Assets | - | 2 | - | **2** | (B) |
| Next Gen - Other Adjustments | (0) | 0 | (0) | **(0)** | (C) |
| **Subtotal - Next Gen Non - IP Allocations** | (0) | 2 | (0) | **2** | (D) |
| Next Gen - Business Sale Related IP | 3 | 4 | 1 | **8** | (E) |
| **Total Next Gen** | **3** | **6** | **1** | **10** | (F) |
| **Total Residual IP** | **1,757** | **1,912** | **785** | **4,454** | (F), (H) |
| **Total Customer Related Assets and Goodwill** | **202** | **1,375** | **409** | **1,986** | |
| **Total Tangible Assets** | **39** | **106** | **(27)** | **118** | |
| **Total Other Adjustments** | **8** | **(85)** | **34** | **(43)** | |
| **Total Non-IP Allocated** | **249** | **1,396** | **416** | **2,061** | |
| **Total Business Sale Related IP** | **312** | **329** | **123** | **765** | |
| **Total Residual IP** | **1,757** | **1,912** | **785** | **4,454** | |
| **Total IP Allocated** | **2,069** | **2,241** | **909** | **5,219** | |
| **Total Value Allocated $** | **2,318** | **$ 3,637** | **$ 1,325** | **$ 7,280** | |

**Notes:**

(A) [*Business Sale*] - Customer Related Assets and Goodwill   See **Exhibit C.4.**

(B) [*Business Sale*] - Tangible Assets   See **Exhibit C.4.**

(C) The Huffard Report makes other additional adjustments in the report model when calculating his final escrow balances   These other adjustments are related to the re-allocation of NNIC, Russia, and Israel costs, Entity Settlements and Allocations (such as the APAC and CALA Settlement), and escrow adjustments from available proceeds   As Customer Related Assets and Goodwill are presented as gross amounts, these adjustments are necessary to arrive at the correct escrow balance per Business Transaction   See **Exhibit C** for steps taken to derive these amounts

(D) Non - IP Allocations are comprised of Customer Related Asset and Goodwill, Tangible Assets, and Other Adjustments   See steps at **Exhibit C** for derivation of each category   These allocation amounts are static; i e  they will not be affected by changes to allocation percentages that are derived from differing contribution approach allocations

(E) [*Business Sale*] - Total Business Sale Related IP amounts by transaction are obtained from **Exhibit C.4.**  Allocation amounts are calculated by multiplying the Sale Specific R&D Spend percentages (**Exhibit C.2**) by entity by the total Business Sale IP   See **Exhibit C.2** and **Exhibit C.4.**  See note (**G**) below for calculation of the Business Sale Related IP of the Enterprise transaction, which differs from the other Business Sales IP allocation due to a direct allocation of proceeds to the US Debtors

(F) Final escrow balances for each transaction by Debtor Group is computed in **Exhibit C.5.**  The contribution approach allocations are applied to final escrow balances by Transaction, which have been obtained and verified from the Huffard Report Model at tab "IP, PP & Escrow"

(G) As part of the Enterprise Business Sale, NNI divested shares in its wholly owned subsidiary DiamondWare, Ltd  ("DiamondWare")   As the US was the owner of the DiamondWare related patents, the proceeds of $3 million are allocated directly to the US debtors before allocating the remaining Enterprise Business Sale IP by R&D spend percentages   See Appendix 21 of the Huffard Report   See calculation at **Exhibit C.2.**

(H) Residual IP allocation amounts are calculated by multiplying the total Residual IP escrow balance by the R&D Spend percentages for the period of 1991 - 2006   Percentages were obtained from **Exhibit C.2.**

**Huffard Report - R&D Amounts and Percentages by Transaction**

| Residual Patent (A) | | Business Line Sales - Specific Period (A) | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| | 1991 - 2006 | CDMA 1992 - 2008 | Enterprise 1989 - 2008 | MEN 1990 - 2008 | GSM & MSS 1991 - 2008 | Layer 4 -7 1998 - 2008 | Next Gen 1992 - 2008 | CVAS 1996 - 2008 |
| Canada $ | 12,044 | $ 13,433 | $ 14,240 | $ 13,979 | $ 13,704 | $ 10,547 | $ 13,433 | $ 12,475 |
| US | 13,243 | 14,019 | 15,451 | 15,000 | 14,535 | 9,449 | 14,019 | 10,787 |
| EMEA | 5,300 | 5,437 | 5,577 | 5,561 | 5,548 | 3,918 | 5,437 | 4,688 |
| Total $ | 30,587 | $ 32,889 | $ 35,268 | $ 34,539 | $ 33,787 | $ 23,915 | $ 32,889 | $ 27,950 |

| Residual Patent (B) | | Business Line Sales - Specific Period (C) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1991 - 2006 | CDMA 1992 - 2008 | Enterprise 1989 - 2008 | MEN 1990 - 2008 | GSM & MSS 1991 - 2008 | Layer 4 -7 1998 - 2008 | Next Gen 1992 - 2008 | CVAS 1996 - 2008 |
| Canada | 39.4% | 40.8% | 40.4% | 40 5% | 40.6% | 44.1% | 40.8% | 44.6% |
| US | 43.3% | 42.6% | 43.8% | 43.4% | 43.0% | 39.5% | 42.6% | 38.6% |
| EMEA | 17.3% | 16.5% | 15.8% | 16 1% | 16.4% | 16.4% | 16.5% | 16.8% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

| Residual Patent Adjustment | | |
|---|---|---|
| Total proceeds from the Residual IP Sale in millions(D): | $ | 4,454 |
| At Risk Entities ("ARE Entities") value in millions (E): | | 43 |

| Enterprise Business Line Sale IP Adjustment | | |
|---|---|---|
| Proceeds Available to Enterprise BS IP (D): | $ | 244 |
| DiamondWare's IP (H) | | 3 |

**Residual Patent: 1991 - 2006**

| | Residual Patent available excluding ARE Proceeds (G) | ARE Proceeds (E) | Residual Patent (F) |
|---|---|---|---|
| CANADA $ | 1,735 | 22 | $ 1,757 |
| US | 1,912 | - | 1,912 |
| EMEA | 764 | 21 | 785 |
| Total Proceeds: $ | 4,411 | $ 43 | $ 4,454 |

| Resulting Allocation % of Residual IP Proceeds (F) | | |
|---|---|---|
| | CANADA | 39.4% |
| | US | 42.9% |
| | EMEA | 17.6% |

| | Business Line Sale IP Proceeds available excluding DiamondWare Proceeds (J) | DiamondWare Proceeds (H) | Enterprise IP (I) |
|---|---|---|---|
| CANADA $ | 97 | - | $ 97 |
| US | 107 | 3 | 110 |
| EMEA | 38 | - | 38 |
| Total Proceeds: $ | 241 | $ 3 | $ 244 |

| Resulting Allocation % of Enterprise Business Sale IP (I) | | |
|---|---|---|
| | CANADA | 39.6% |
| | US | 45.0% |
| | EMEA | 15.5% |

**Notes:**

(A) R&D Spend amounts by look back period were obtained from **Exhibit C.3.**

(B) Residual Patent R&D Spend percentages for the period of 1991 - 2006 were obtained from the Huffard Report Model at tab "RIP Allocation" and are based on the R&D Spend amounts at note A.

(C) Business Line Sales IP R&D Spend percentages were obtained from the Huffard Report Model at tab "OT BS 140124" and are based on the R&D Spend amounts above at note A.  Refer to note H below for an adjustment made to the calculation of the Enterprise Business Sale IP proceeds.

(D) Final Escrow Balances were obtained from the Huffard Report Model at tab "IP, PP & Escrow".

(E) Patents held by the ARE entities have been valued independently at approximately $43 million.  See the Malackowski Report at section 11.3.  These proceeds are allocated directly to the owning debtor entities prior to the distribution of the remaining residual patent proceeds based on R&D spend percentages.  However, the Malackowski Report has mistakenly allocated the $22 million relating to CoreTex, Xros, and NN Applications Management to the Canadian Debtors when in fact these subsidiaries are US debtors.  See Exhibit R.3.2. of the Malackowski Report.

(F) Residual IP R&D Spend allocation amounts and percentages for the period of 1991 - 2006 net of the ARE adjustment were obtained from the Huffard Report Model at tab "RIP Allocation".  These amounts represent the values and percentages net of the allocation of $43 million related to the IP developed by "At Risk Entities " or AREs (Huffard Report at ¶ 26 and ¶ 104).

(G) In order to properly allocate the residual patent proceeds amongst the Debtor Groups, proceeds related to claims previously settled must be paid directly to the Debtor Group in which the settled patent was owned before the distribution of the remaining proceeds based on R&D Spend percentages.  Given the Huffard Report's final allocation of residual proceeds after these direct payments (see note F), and given the total Residual Patent proceeds to be allocated of $4,454 (see note D), the allocated value prior to the ARE settlement proceeds can be determined, and which are based solely upon R&D spend percentages.

(H) As part of the Enterprise Business Sale, NNI divested shares in its wholly owned subsidiary DiamondWare, Ltd. ("DiamondWare").  As the US was the owner of the DiamondWare related patents, the proceeds of $3 million are allocated directly to the US debtors before allocating the remaining Enterprise Business Sale IP by R&D spend percentages.  See Appendix 21 of the Huffard Report.  Amounts have been rounded.

(I) Final Enterprise Business Sale IP values by Debtor group were obtained from the Huffard Report Model at tab "Business Sales + Adj."  These allocated values were used to calculate the resulting allocation percentage of Enterprise Business Sale IP.

(J) Similarly to the Residual Patent allocation for ARE proceeds, amounts related to the DiamondWare subsidiary must be directly allocated to the US Debtors before allocation the remaining Enterprise IP proceeds based on R&D percentages.  As the final Business Lines Sales IP allocation for the Enterprise transaction was obtained (Note I), the allocation percentages can be derived by subtracting the direct payment from the final allocated valued.

Exhibit C.3

**Huffard Report - R&D Contribution by Debtor Group - 1989 to 2011** (A)

*Millions* (B)

| | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | $ 261.40 | $ 275.00 | $ 271.00 | $ 270.30 | $ 252.00 | $ 223.10 | $ 212.70 | $ 912.75 | $ 1,014.48 | $ 1,107.60 | $ 1,168.40 | $ 1,615.70 | $ 1,339.11 | $ 764.26 | $ 703.14 | $ 719.01 | $ 689.16 | $ 781.63 | $ 841.94 | $ 817.41 | $ 564.16 | $ 84.19 | $ 3.14 | $ 14,891.58 |
| US | 451.40 | 464.10 | 516.90 | 552.40 | 657.80 | 949.90 | 1,071.70 | 583.86 | 754.09 | 770.90 | 1,248.70 | 1,610.00 | 1,229.94 | 755.85 | 679.16 | 656.36 | 616.87 | 588.33 | 677.67 | 615.04 | 412.64 | 28.82 | (0.51) | 15,891.92 |
| UK | - | - | 87.99 | 69.00 | 77.04 | 78.68 | 213.10 | 203.96 | 245.97 | 255.60 | 295.90 | 402.30 | 322.41 | 159.73 | 81.57 | 81.63 | 56.92 | 37.74 | 38.96 | 36.51 | 19.02 | 2.22 | 0.00 | 2,766.25 |
| France | - | - | - | - | 54.60 | 66.00 | 104.20 | 139.70 | 156.60 | 187.30 | 194.80 | 142.10 | 204.19 | 213.43 | 228.41 | 228.34 | 220.09 | 193.31 | 67.10 | 55.40 | 53.43 | 3.68 | 0.00 | 2,512.68 |
| Ireland | 15.80 | 13.40 | 22.10 | 14.40 | 17.80 | 22.30 | 31.90 | 10.98 | 12.74 | 20.80 | 24.80 | 33.10 | 10.68 | 12.84 | 15.48 | 15.19 | 15.35 | 17.03 | 25.02 | 24.41 | 26.99 | 0.18 | 0.00 | 403.29 |
| EMEA Subtotal | 15.80 | 13.40 | 110.09 | 83.40 | 149.44 | 166.98 | 349.20 | 354.64 | 415.31 | 463.70 | 515.50 | 577.50 | 537.28 | 386.00 | 325.46 | 325.16 | 292.36 | 248.08 | 131.08 | 116.32 | 99.44 | 6.08 | 0.00 | 5,682.22 |
| Total | $ 728.60 | $ 752.50 | $ 897.99 | $ 906.10 | $ 1,059.24 | $ 1,339.98 | $ 1,633.60 | $ 1,851.25 | $ 2,183.88 | $ 2,342.20 | $ 2,932.60 | $ 3,803.20 | $ 3,106.33 | $ 1,906.11 | $ 1,707.76 | $ 1,700.53 | $ 1,598.39 | $ 1,618.04 | $ 1,650.69 | $ 1,548.77 | $ 1,076.24 | $ 119.09 | $ 2.63 | $ 36,465.72 |

*% of RPE R&D Spend* (B)

| | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 35.9% | 36.5% | 30.2% | 29.8% | 23.8% | 16.6% | 13.0% | 49.3% | 46.5% | 47.3% | 39.8% | 42.5% | 43.1% | 40.1% | 41.2% | 42.3% | 43.1% | 48.3% | 51.0% | 52.8% | 52.4% | 70.7% | 119.2% | 40.8% |
| US | 62.0% | 61.7% | 57.6% | 61.0% | 62.1% | 70.9% | 65.6% | 31.5% | 34.5% | 32.9% | 42.6% | 42.3% | 39.6% | 39.7% | 39.8% | 38.6% | 38.6% | 36.4% | 41.1% | 39.7% | 38.3% | 24.2% | -19.4% | 43.6% |
| UK | 0.0% | 0.0% | 9.8% | 7.6% | 7.3% | 5.9% | 13.0% | 11.0% | 11.3% | 10.9% | 10.1% | 10.6% | 10.4% | 8.4% | 4.8% | 4.8% | 3.6% | 2.3% | 2.4% | 2.4% | 1.8% | 1.9% | 0.2% | 7.6% |
| France | 0.0% | 0.0% | 0.0% | 0.0% | 5.2% | 4.9% | 6.4% | 7.5% | 7.2% | 8.0% | 6.6% | 3.7% | 6.6% | 11.2% | 13.4% | 13.4% | 13.8% | 11.9% | 4.1% | 3.6% | 5.0% | 3.1% | 0.0% | 6.9% |
| Ireland | 2.2% | 1.8% | 2.5% | 1.6% | 1.7% | 1.7% | 2.0% | 0.6% | 0.6% | 0.9% | 0.8% | 0.9% | 0.3% | 0.7% | 0.9% | 0.9% | 1.0% | 1.1% | 1.5% | 1.6% | 2.5% | 0.2% | 0.0% | 1.1% |
| Total EMEA | 2.2% | 1.8% | 12.3% | 9.2% | 14.1% | 12.5% | 21.4% | 19.2% | 19.0% | 19.8% | 17.6% | 15.2% | 17.3% | 20.3% | 19.1% | 19.1% | 18.3% | 15.3% | 7.9% | 7.5% | 9.2% | 5.1% | 0.0% | 15.6% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**Notes:**
(A) Huffard Report - R&D Contribution by Debtor Group - 1989 to 2011 percentages and amounts were obtained from the Malackowski Report at Exhibit B.1.7.1.
(B) Percentages and amounts above are rounded. The Huffard Report Model in excel includes further details.

**Huffard Report - Business Sales by Asset Class and Debtor Group**

| Customer Related Assets and Goodwill Allocation (A) | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|
| Estate | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Value |
| Canada | $ 68 $ | 45 $ | 78 $ | 10 $ | 0 $ | 0 $ | 1 $ | - | $ 202 |
| US | 775 | 338 | 165 | 34 | 57 | 2 | 5 | - | 1,375 |
| EMEA | - | 172 | 149 | 17 | 59 | 11 | 2 | - | 409 |
| **Total Remaining Debtors** | **843** | **555** | **391** | **60** | **116** | **13** | **7** | **-** | **1,986** |
| CALA (B) | 6 | 19 | 21 | 1 | 9 | 0 | - | - | 57 |
| APAC (B) | 16 | 66 | 47 | 5 | 18 | 3 | - | - | 155 |
| **Settled Debtors** | **22** | **85** | **68** | **6** | **27** | **3** | **-** | **-** | **212** |
| **Total** | **$ 865 $** | **639 $** | **460 $** | **67 $** | **143 $** | **16 $** | **7 $** | **-** | **$ 2,198** |

| Net Tangible Assets (C) | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|
| Estate | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Total |
| Canada | $ 3 $ | 8 $ | 22 $ | (1) $ | 4 $ | 2 $ | 0 $ | - | $ 39 |
| US | 10 | 25 | 72 | (1) | (15) | 12 | 1 | 2 | 106 |
| EMEA | - | 7 | 10 | 14 | (62) | 3 | 0 | - | (27) |
| **Total Remaining Debtors** | **13** | **40** | **104** | **13** | **(73)** | **17** | **1** | **2** | **118** |
| CALA (B) | 0 | 0 | 3 | (0) | (1) | (0) | - | - | 2 |
| APAC (B) | (15) | 9 | (0) | (1) | (1) | 12 | - | - | 4 |
| **Settled Debtors** | **(15)** | **9** | **3** | **(1)** | **(2)** | **12** | **-** | **-** | **6** |
| **Total** | **$ (2) $** | **49 $** | **107 $** | **12 $** | **(75) $** | **29 $** | **1 $** | **2** | **$ 124** |

| Business Sales by Asset Class and Debtor Group (D) | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| Sale | Monetary Assets | Inventory | Fixed Assets | IP | Customer Related Assets & Goodwill | Business Value | Assumed Liabilities | Purchase Price |
| CDMA | $ 1 $ | 14 $ | 4 $ | 256 $ | 865 $ | 1,140 $ | 19 $ | 1,120 |
| Enterprise | - | 14 | 45 | 244 | 639 | 943 | 10 | 933 |
| MEN | 15 | 119 | 38 | 113 | 460 | 744 | 65 | 680 |
| CVAS | 22 | 21 | 17 | 80 | 67 | 207 | 49 | 159 |
| GSM | 20 | 17 | 11 | 49 | 143 | 240 | 123 | 118 |
| MSS | 13 | 27 | 3 | 4 | 16 | 63 | 14 | 49 |
| Layer 4-7 | - | 1 | 1 | 9 | 7 | 18 | - | 18 |
| Next Gen | - | - | 2 | 8 | - | 10 | - | 10 |
| **Total** | **$ 70 $** | **213 $** | **120 $** | **765 $** | **2,198 $** | **3,365 $** | **279 $** | **3,087** |

| Checks: (E) | | | | | | | Totals | Per Above (3) |
|---|---|---|---|---|---|---|---|---|
| *Customer Related Assets and Goodwill:* (1) | | | | | 2,198 | | 2,198 | 2,198 |
| *Net Tangible Assets:* (2) | 70 | 213 | 120 | | | (279) | 124 | 124 |

**Exhibit C.4**

**Notes:**

(A)   *Customer Related Assets and Goodwill Allocation*  table obtained from the expert report of Paul P  Huffard at ¶ 119   Unrounded amounts were obtained from the Huffard Report Model at tab "Business Sales + Adj "

(B)   The value allocated to CALA and APAC have been reflected within the Other Adjustments   Please see footnote D of **Exhibit C.1.**

(C)   *Net Tangible Assets*  table obtained from the expert report of Paul P  Huffard at ¶ 101   Unrounded amounts were obtained from the Huffard Report Model at tab "Business Sales + Adj "

(D)   *Business Sales by Asset Class and Debtor Group*  table obtained from the expert report of Paul P  Huffard at ¶ 95   Unrounded amounts were obtained from the Huffard Report Model at tab "IP Value 140124"

(E)   The following is a reconciliation between the three tables above   Notes (1) and (2) reflect amounts from the Business Sale by Asset Class and Debtor Group table, while note (3) reflects the corresponding amounts from the *Customer Related Assets and Goodwill Allocation*  table and the *Net Tangible Assets Table*

**Huffard Report - Calculation of Other Adjustments**

| Huffard Report Allocation by Contribution Approach Percentages (A) | | | | $ in millions |
|---|---|---|---|---|
| Total Allocation by Contribution Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | |
| | **Canada** | **US** | **EMEA** | **Total** |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.4% | 42.9% | 17.6% | 100.0% |
| **Total Value Allocated** | **31.8%** | **50.0%** | **18.2%** | **100.0%** |
| **% Allocated** | **$ 2,318** | **$ 3,637** | **$ 1,325** | **$ 7,280** |

| Total Allocation by Contribution Approach (B) | | | | $ in millions |
|---|---|---|---|---|
| Total Allocation by Contribution Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | |
| | **Canada** | **US** | **EMEA** | **Total (C)** |
| CDMA | $ 166 | $ 846 | $ 40 | $ 1,053 |
| Enterprise | 170 | 429 | 244 | 843 |
| MEN | 144 | 287 | 178 | 610 |
| CVAS | 41 | 59 | 40 | 140 |
| GSM | 25 | 70 | 11 | 106 |
| MSS | 6 | 20 | 20 | 46 |
| Layer 4-7 | 5 | 9 | 4 | 18 |
| Next Gen | 3 | 6 | 1 | 10 |
| Residual IP | 1,757 | 1,912 | 785 | 4,454 |
| **Total Value Allocated** | **31.8%** | **50.0%** | **18.2%** | **100.0%** |
| **% Allocated** | **$ 2,318** | **$ 3,637** | **$ 1,325** | **$ 7,280** |

**Notes:**

(A) *Huffard Report Allocation by Contribution Approach Percentages table* was obtained from the Huffard Report at ¶ 11. Unrounded amounts were obtained from the Huffard Report Model at tabs "BusSale IP Alloc" and "RIP Allocation".

(B) This table was used to derive the total allocation amounts by transaction and Debtor Group. This table is the product of the *Huffard Report Allocation by Contribution Approach Percentages* table above, and the total allocation by transaction for each Debtor Group, obtained from the Huffard Report Model at tab "IP, PP & Escrow". Amounts were used to calculate *Other Adjustments* at **Exhibit C.2.**

(C) Total proceeds to be allocated by transaction have been agreed to the Huffard Report Model at tab "IP, PP & Escrow".

# Exhibit D

**Exhibit - D. Revised Huffard Report - Total R&D Contribution by Debtor Group – Amount and Percentage by Transaction for IP**

Huffard Report R&D Amount and Percentage - by look back period

| Entity | Residual IP 1991 - 2006 | | CDMA 1992 - 2008 | | Enterprise 1989 - 2008 | | MEN 1990 - 2008 | | CVAS 1996 - 2008 | | GSM & MSS 1991 - 2008 | | Layer 4 - 7 1998 - 2008 | | Next Generation 1992 - 2008 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 12,044,340,000 | 39 4% | 13,432,690,000 | 40 8% | 14,240,090,000 | 40 4% | 13,978,690,000 | 40 5% | 12,474,590,000 | 44 6% | 13,703,690,000 | 40 6% | 10,547,360,000 | 44 1% | 13,432,690,000 | 40 8% |
| US | 13,242,760,000 | 43 3% | 14,018,570,000 | 42 6% | 15,450,970,000 | 43 8% | 14,999,570,000 | 43 4% | 10,786,770,000 | 38 6% | 14,535,470,000 | 43 0% | 9,448,820,000 | 39 5% | 14,018,570,000 | 42 6% |
| EMEA | 5,300,100,000 | 17 3% | 5,437,410,000 | 16 5% | 5,576,700,000 | 15 8% | 5,560,900,000 | 16 1% | 4,688,390,000 | 16 8% | 5,547,500,000 | 16 4% | 3,918,440,000 | 16 4% | 5,437,410,000 | 16 5% |
| **Total** | **$30,587,200,000** | **100.0%** | **$32,888,670,000** | **100%** | **35,267,760,000** | **100%** | **34,539,160,000** | **100%** | **27,949,750,000** | **100%** | **33,786,660,000** | **100%** | **23,914,620,000** | **100%** | **32,888,670,000** | **100%** |

Revised Huffard Report R&D Amount and Percentage - by look back period - **Total R&D**

| Entity | Residual IP 1991 - 2006 | | CDMA 1992 - 2008 | | Enterprise 1989 - 2008 | | MEN 1990 - 2008 | | CVAS 1996 - 2008 | | GSM & MSS 1991 - 2008 | | Layer 4 - 7 1998 - 2008 | | Next Generation 1992 - 2008 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | $7,170,906,561 | 23 2% | $7,569,941,066 | 22 8% | $8,398,538,404 | 23 6% | $8,141,742,961 | 23 4% | $6,266,481,026 | 21 8% | $7,871,451,466 | 23 1% | $5,507,775,714 | 22 1% | $7,569,941,066 | 22 8% |
| US | 20,695,828,248 | 66 9% | 22,099,014,940 | 66 5% | 23,521,343,367 | 66 2% | 23,068,281,338 | 66 3% | 19,050,365,637 | 66 4% | 22,598,096,352 | 66 4% | 16,419,494,733 | 65 8% | 22,099,014,940 | 66 5% |
| EMEA | 3,083,083,427 | 10 0% | 3,552,575,637 | 10 7% | 3,596,841,565 | 10 1% | 3,577,203,414 | 10 3% | 3,379,642,038 | 11 8% | 3,564,018,465 | 10 5% | 3,030,292,397 | 12 1% | 3,552,575,637 | 10 7% |
| **Total** | **$30,949,818,236** | **100%** | **$33,221,531,643** | **100%** | **$35,516,723,335** | **100%** | **$34,787,227,714** | **100%** | **$28,696,488,700** | **100%** | **$34,033,566,283** | **100%** | **$24,957,562,845** | **100%** | **$33,221,531,643** | **100%** |

Note: Data summarized from Exhibit D 1 - Revised Huffard Report – Summary Total R&D Contribution by Debtor Group - 1989 to 2008

Also, since an amount related to the ARE Entities transaction ($42 85 million) and the Cala and APAC transaction ($44 9 million) were first specifically allocated to certain Debtor Groups, and the remainder of the value ascribed to IP was allocated based on the relative contribution of R&D funded, the resulting percentages used for these transactions will be different than that shown above  See Exhibit C 2 for the related calculations

Exhibit D.1 - Revised Huffard Report – Summary Total R&D Contribution by Debtor Group - 1989 to 2008

Total R&D = Direct R&D + TP-R&D

| | Canada | EMEA | US | Total |
|---|---|---|---|---|
| **1989 - 2000 Total R&D under CSA** | | | | |
| Direct R&D | 7,584,432,923 | 1,999,053,630 | 9,631,744,190 | 19,215,230,743 |
| % of Total Direct R&D | 39% | 10% | 50% | 100% |
| TP - R&D | (3,571,270,233) | (864,704,463) | 4,416,704,443 | (19,270,253) |
| **Total R&D Funded Period One** | 4,013,162,690 | 1,134,349,167 | 14,048,448,633 | 19,195,960,490 |
| Total R&D Funded Period One as % | 21% | 6% | 73% | 100% |
| | | | | |
| **2001 - 2008 Total R&D under MRDA** | Canada | EMEA | US | Total |
| Direct R&D | 7,371,647,185 | 2,667,089,237 | 6,467,188,044 | 16,505,924,466 |
| % of Total Direct R&D | 45% | 16% | 39% | 100% |
| TP - R&D | (2,986,271,470) | (204,596,839) | 3,005,706,689 | (185,161,621) |
| **Total R&D Funded Period Two** | 4,385,375,714 | 2,462,492,397 | 9,472,894,733 | 16,320,762,845 |
| Total R&D Funded Period Two as % | 27% | 15% | 58% | 100% |
| | | | | |
| **1989 - 2008 Total R&D** | Canada | EMEA | US | Total |
| Direct R&D | 14,956,080,108 | 4,666,142,867 | 16,098,932,234 | 35,721,155,209 |
| % of Total Direct R&D | 42% | 13% | 45% | 100% |
| TP - R&D | (6,557,541,704) | (1,069,301,302) | 7,422,411,132 | (204,431,873) |
| **Total R&D Funded** | 8,398,538,404 | 3,596,841,565 | 23,521,343,367 | 35,516,723,335 |
| Total R&D Funded as % | 24% | 10% | 66% | 100% |

**Exhibit D.1 - Revised Huffard Report – Summary Total R&D Contribution by Debtor Group - 1989 to 2008**

**Total R&D =** Direct R&D + TP-R&D

| | Canada | EMEA | US | Total |
|---|---|---|---|---|
| **1989** | | | | |
| **R&D** | $261,400,000 | $15,800,000 | $451,400,000 | $728,600,000 |
| **TP - R&D** | (4,604,557) | 3,838,150 | 1,662,028 | 895,621 |
| **Total Funded R&D** | 256,795,443 | 19,638,150 | 453,062,028 | 729,495,621 |
| **1990** | | | | |
| **R&D** | 275,000,000 | 13,400,000 | 464,100,000 | 752,500,000 |
| **TP - R&D** | (4,708,505) | (215,050) | 6,084,986 | 1,161,431 |
| **Total Funded R&D** | 270,291,495 | 13,184,950 | 470,184,986 | 753,661,431 |
| **1991** | | | | |
| **R&D** | 271,000,000 | 22,100,000 | 516,900,000 | 810,000,000 |
| **TP - R&D** | 30,510,400 | (10,657,172) | (17,818,587) | 2,034,640 |
| **Total Funded R&D** | 301,510,400 | 11,442,828 | 499,081,413 | 812,034,640 |
| **1992** | | | | |
| **R&D** | 270,300,000 | 14,400,000 | 552,400,000 | 837,100,000 |
| **TP - R&D** | 42,681,509 | (9,822,430) | (29,227,490) | 3,631,589 |
| **Total Funded R&D** | 312,981,509 | 4,577,570 | 523,172,510 | 840,731,589 |
| **1993** | | | | |
| **R&D** | 252,000,000 | 17,800,000 | 657,800,000 | 927,600,000 |
| **TP - R&D** | 71,122,834 | (12,427,996) | (45,190,911) | 13,503,927 |
| **Total Funded R&D** | 323,122,834 | 5,372,004 | 612,609,089 | 941,103,927 |
| **1994** | | | | |
| **R&D** | 223,100,000 | 22,300,000 | 949,900,000 | 1,195,300,000 |
| **TP - R&D** | 70,576,993 | (5,776,941) | (40,610,847) | 24,189,204 |
| **Total Funded R&D** | 293,676,993 | 16,523,059 | 909,289,153 | 1,219,489,204 |
| **1995** | | | | |
| **R&D** | 212,700,000 | 245,000,000 | 1,071,700,000 | 1,529,400,000 |
| **TP - R&D** | 160,978,704 | (98,539,033) | (68,121,450) | (5,681,778) |
| **Total Funded R&D** | 373,678,704 | 146,460,967 | 1,003,578,550 | 1,523,718,222 |

**Exhibit D.1 - Revised Huffard Report – Summary Total R&D Contribution by Debtor Group - 1989 to 2008**

**Total R&D =** Direct R&D + TP-R&D

| | Canada | EMEA | US | Total |
|---|---|---|---|---|
| **1996** | | | | |
| **R&D** | 912,753,400 | 214,941,800 | 583,855,900 | 1,711,551,100 |
| **TP - R&D** | (580,821,804) | (33,827,155) | 605,799,357 | (8,849,603) |
| **Total Funded R&D** | 331,931,596 | 181,114,645 | 1,189,655,257 | 1,702,701,497 |
| **1997** | | | | |
| **R&D** | 1,014,479,523 | 258,711,830 | 754,088,290 | 2,027,279,643 |
| **TP - R&D** | (587,705,807) | (90,476,835) | 687,127,357 | 8,944,715 |
| **Total Funded R&D** | 426,773,716 | 168,234,995 | 1,441,215,647 | 2,036,224,358 |
| **1998** | | | | |
| **R&D** | 1,107,600,000 | 276,400,000 | 770,900,000 | 2,154,900,000 |
| **TP - R&D** | (678,200,000) | (181,600,000) | 853,200,000 | (6,600,000) |
| **Total Funded R&D** | 429,400,000 | 94,800,000 | 1,624,100,000 | 2,148,300,000 |
| **1999** | | | | |
| **R&D** | 1,168,400,000 | 320,700,000 | 1,248,700,000 | 2,737,800,000 |
| **TP - R&D** | (661,800,000) | (162,900,000) | 793,900,000 | (30,800,000) |
| **Total Funded R&D** | 506,600,000 | 157,800,000 | 2,042,600,000 | 2,707,000,000 |
| **2000** | | | | |
| **R&D** | 1,615,700,000 | 577,500,000 | 1,610,000,000 | 3,803,200,000 |
| **TP - R&D** | (1,429,300,000) | (262,300,000) | 1,669,900,000 | (21,700,000) |
| **Total Funded R&D** | 186,400,000 | 315,200,000 | 3,279,900,000 | 3,781,500,000 |
| **2001** | | | | |
| **Direct R&D** | 1,463,190,000 | 587,067,000 | 1,343,907,170 | 3,394,164,170 |
| **Total TP** | (398,157,988) | (310,409,178) | 714,025,452 | 5,458,286 |
| **Total Funded R&D** | 1,065,032,012 | 276,657,822 | 2,057,932,622 | 3,399,622,456 |
| **2002** | | | | |
| **Direct R&D** | 879,570,000 | 444,243,000 | 869,889,000 | 2,193,702,000 |
| **TP - R&D** | (335,874,606) | (133,596,933) | 474,690,368 | 5,218,829 |
| **Total Funded R&D** | 543,695,394 | 310,646,067 | 1,344,579,368 | 2,198,920,829 |
| **2003** | | | | |
| **Direct R&D** | 821,516,000 | 380,260,000 | 793,504,000 | 1,995,280,000 |
| **TP - R&D** | (239,776,483) | (57,357,038) | 314,360,182 | 17,226,661 |
| **Total Funded R&D** | 581,739,517 | 322,902,962 | 1,107,864,182 | 2,012,506,661 |

**Exhibit D.1 - Revised Huffard Report – Summary Total R&D Contribution by Debtor Group - 1989 to 2008**

**Total R&D =** **Direct R&D + TP-R&D**

| | Canada | EMEA | US | Total |
|---|---|---|---|---|
| **2004** | | | | |
| **Direct R&D** | 841,682,000 | 380,636,000 | 768,341,000 | 1,990,659,000 |
| **TP - R&D** | (432,399,443) | 27,039,743 | 381,413,390 | (23,946,310) |
| **Total Funded R&D** | 409,282,557 | 407,675,743 | 1,149,754,390 | 1,966,712,690 |
| **2005** | | | | |
| **Direct R&D** | 803,966,000 | 341,063,000 | 719,629,000 | 1,864,658,000 |
| **TP - R&D** | (272,019,038) | (19,333,761) | 278,043,203 | (13,309,596) |
| **Total Funded R&D** | 531,946,962 | 321,729,239 | 997,672,203 | 1,851,348,404 |
| **2006** | | | | |
| **Direct R&D** | 902,372,000 | 286,406,000 | 679,206,000 | 1,867,984,000 |
| **TP - R&D** | (349,237,634) | 55,539,526 | 233,617,865 | (60,080,243) |
| **Total Funded R&D** | 553,134,366 | 341,945,526 | 912,823,865 | 1,807,903,757 |
| **2007** | | | | |
| **Direct R&D** | 841,943,946 | 131,085,260 | 677,672,943 | 1,650,702,150 |
| **TP - R&D** | (447,061,352) | 124,460,566 | 302,986,915 | (19,613,871) |
| **Total Funded R&D** | 394,882,594 | 255,545,826 | 980,659,858 | 1,631,088,278 |
| **2008** | | | | |
| **Direct R&D** | 817,407,238 | 116,328,977 | 615,038,931 | 1,548,775,147 |
| **TP - R&D** | (511,744,927) | 109,060,235 | 306,569,314 | (96,115,378) |
| **Total Funded R&D** | $305,662,312 | $225,389,212 | $921,608,246 | 1,452,659,769 |
| | | | | |
| **Total R&D by Period and Sale** | | | | |
| **1991 - 2006** **Residual IP** | 7,170,906,561 | 3,083,083,427 | 20,695,828,248 | 30,949,818,236 |
| **1992 - 2008** **CDMA** | 7,569,941,066 | 3,552,575,637 | 22,099,014,940 | 33,221,531,643 |
| **1989 - 2008** **Enterprise** | 8,398,538,404 | 3,596,841,565 | 23,521,343,367 | 35,516,723,335 |
| **1990 - 2008** **MEN** | 8,141,742,961 | 3,577,203,414 | 23,068,281,338 | 34,787,227,714 |
| **1996 - 2008** **CVAS** | 6,266,481,026 | 3,379,642,038 | 19,050,365,637 | 28,696,488,700 |
| **1991 - 2008** **GSM & MSS** | 7,871,451,466 | 3,564,018,465 | 22,598,096,352 | 34,033,566,283 |
| **1998 - 2008** **Layer 4 - 7** | 5,507,775,714 | 3,030,292,397 | 16,419,494,733 | 24,957,562,845 |
| **1992 - 2008** **Next Generation** | 7,569,941,066 | 3,552,575,637 | 22,099,014,940 | 33,221,531,643 |
| Note: Data summarized from Exhibit D 2 -Revised Huffard Report – Detail Total R&D Contribution by Debtor Group - 1989 to 2008 | | | | |

Exhibit D.2 -Revised Huffard Report – Detail Total R&D Contribution by Debtor Group - 1989 to 2008

| Period / Description | Total Other (1) | NNL - Canada | EMEA (2) | Total US (3) | Total | Source |
|---|---|---|---|---|---|---|
| **1989** | | | | | | |
| Direct R&D | 1,200,000 | $261,400,000 | $15,800,000 | $451,400,000 | $729,800,000 | |
| TP - R&D | (895,621) | (4,604,557) | 3,838,150 | 1,662,028 | 0 | |
| Total Funded R&D | 304,379 | 256,795,443 | 19,638,150 | 453,062,028 | 729,800,000 | |
| **1990** | | | | | | |
| Direct R&D | 1,500,000 | 275,000,000 | 13,400,000 | 464,100,000 | 754,000,000 | |
| TP - R&D | (1,161,431) | (4,708,505) | (215,050) | 6,084,986 | 0 | |
| Total Funded R&D | 338,569 | 270,291,495 | 13,184,950 | 470,184,986 | 754,000,000 | |
| **1991** | | | | | | |
| Direct R&D | 2,700,000 | 271,000,000 | 22,100,000 | 516,900,000 | 812,700,000 | |
| TP - R&D | (2,034,640) | 30,510,400 | (10,657,172) | (17,818,587) | 0 | |
| Total Funded R&D | 665,360 | 301,510,400 | 11,442,828 | 499,081,413 | 812,700,000 | |
| **1992** | | | | | | |
| Direct R&D | 13,700,000 | 270,300,000 | 14,400,000 | 552,400,000 | 850,800,000 | |
| TP - R&D | (3,631,589) | 42,681,509 | (9,822,430) | (29,227,490) | 0 | |
| Total Funded R&D | 10,068,411 | 312,981,509 | 4,577,570 | 523,172,510 | 850,800,000 | |
| **1993** | | | | | | |
| Direct R&D | 26,300,000 | 252,000,000 | 17,800,000 | 657,800,000 | 953,900,000 | |
| TP - R&D | (13,503,927) | 71,122,834 | (12,427,996) | (45,190,911) | 0 | |
| Total Funded R&D | 12,796,073 | 323,122,834 | 5,372,004 | 612,609,089 | 953,900,000 | |
| **1994** | | | | | | |
| Direct R&D | 31,700,000 | 223,100,000 | 22,300,000 | 949,900,000 | 1,227,000,000 | |
| TP - R&D | (24,189,204) | 70,576,993 | (5,776,941) | (40,610,847) | 0 | |
| Total Funded R&D | 7,510,796 | 293,676,993 | 16,523,059 | 909,289,153 | 1,227,000,000 | NNI_00298735 / EMEA0311234. pp. 19-21. |
| **1995** | | | | | | |
| Direct R&D | 40,700,000 | 212,700,000 | 245,000,000 | 1,071,700,000 | 1,570,100,000 | |
| TP - R&D | 5,681,778 | 160,978,704 | (98,539,033) | (68,121,450) | 0 | |
| Total Funded R&D | 46,381,778 | 373,678,704 | 146,460,967 | 1,003,578,550 | 1,570,100,000 | |
| **1996** | | | | | | |
| Direct R&D | 7,942,500 | 912,753,400 | 214,941,800 | 583,855,900 | 1,719,493,600 | |
| TP - R&D | 8,849,603 | (580,821,804) | (33,827,155) | 605,799,357 | 0 | |
| Total Funded R&D | 16,792,103 | 331,931,596 | 181,114,645 | 1,189,655,257 | 1,719,493,600 | |
| **1997** | | | | | | |
| Direct R&D | 20,456,900 | 1,014,479,523 | 258,711,830 | 754,088,290 | 2,047,736,543 | |
| TP - R&D | (8,944,715) | (587,705,807) | (90,476,835) | 687,127,357 | 0 | |
| Total Funded R&D | 11,512,185 | 426,773,716 | 168,234,995 | 1,441,215,647 | 2,047,736,543 | |
| **1998 (5)** | | | | | | |
| Direct R&D | 10,300,000 | 1,107,600,000 | 276,400,000 | 770,900,000 | 2,165,200,000 | |
| TP - R&D | 6,600,000 | (678,200,000) | (181,600,000) | 853,200,000 | 0 | |
| Total Funded R&D | 16,900,000 | 429,400,000 | 94,800,000 | 1,624,100,000 | 2,165,200,000 | |
| **1999 (5)** | | | | | | |
| Direct R&D | 15,100,000 | 1,168,400,000 | 320,700,000 | 1,248,700,000 | 2,752,900,000 | |
| TP - R&D (8) | 31,000,000 | (661,800,000) | (162,900,000) | 793,900,000 | 200,000 | |
| Total Funded R&D | 46,100,000 | 506,600,000 | 157,800,000 | 2,042,600,000 | 2,753,100,000 | |
| **2000 (5)** | | | | | | |
| Direct R&D | 22,400,000 | 1,615,700,000 | 577,500,000 | 1,610,000,000 | 3,825,600,000 | |
| TP - R&D | 21,700,000 | (1,429,300,000) | (262,300,000) | 1,669,900,000 | 0 | |
| Total Funded R&D | 44,100,000 | 186,400,000 | 315,200,000 | 3,279,900,000 | 3,825,600,000 | |

Exhibit D.2 -Revised Huffard Report – Detail Total R&D Contribution by Debtor Group - 1989 to 2008

| Period / Description | Total Other (1) | NNL - Canada | EMEA (2) | Total US (3) | Total | Source |
|---|---|---|---|---|---|---|
| **2001** | | | | | | |
| Direct R&D Spend (7) | 33,461,678 | 1,463,190,000 | 587,067,000 | 1,343,907,170 | 3,427,625,847 | **EMPEAPROD2203926 / NOR_53648312 - RONA tab** |
| | | | | | | |
| Economic (Profit)/Loss | 598,382,718 | 1,748,122,744 | 1,168,258,605 | 577,247,283 | 4,092,011,350 | |
| Target Economic Profit | 22,618,452 | 1,159,136,466 | 401,818,898 | 2,508,437,534 | 4,092,011,350 | |
| Required (Increase)/Decrease TPA | (575,764,266) | (588,986,278) | (766,439,707) | 1,931,190,251 | **0** | |
| | | | | | | |
| Givers (10) | 1,226,952 | | 136,267,392 | 1,931,190,251 | 2,068,684,595 | **NOR_53648312** |
| | | | | | | |
| | | | | | | |
| SG&A | 278,304,000 | 701,274,505 | 663,212,000 | 2,451,608,277 | 4,094,398,781 | |
| Combined R&D + SGA | 311,765,678 | 2,164,464,505 | 1,250,279,000 | 3,795,515,446 | 7,522,024,629 | |
| R&D as % of Combined (6) | | | 68% | | | |
| **Total-TP - 2001** | | | | | | |
| TP used for R&D (9) | (5,458,286) | (398,157,988) | (310,409,178) | 714,025,452 | **0** | |
| TP used for non R&D (SG&A) | (570,305,980) | (190,828,290) | (456,030,529) | 1,217,164,799 | **0** | |
| Total TP | (575,764,266) | (588,986,278) | (766,439,707) | 1,931,190,251 | **0** | |
| | | | | | | |
| | | | | | | |
| **2002** | | | | | | |
| Direct R&D Spend (7) | 13,027,000 | 879,570,000 | 444,243,000 | 869,889,000 | 2,206,729,000 | **EMPEAPROD2203926 / NOR_53648037 - RONA tab** |
| | | | | | | |
| Economic (Profit)/Loss | 465,017,925 | 873,740,768 | 397,606,000 | (26,525,285) | 1,709,839,408 | |
| Target Economic Profit | 15,787,704 | 391,426,942 | 188,989,058 | 1,113,635,705 | 1,709,839,408 | |
| Required (Increase)/Decrease TPA | (449,230,221) | (482,313,826) | (208,616,943) | 1,140,160,989 | **0** | |
| | | | | | | |
| Givers (10) | | | 70,531,111 | 1,140,160,989 | 1,210,692,101 | **NOR_53648037** |
| | | | | | | |
| | | | | | | |
| SG&A | 115,288,000 | 383,487,000 | 263,566,000 | 1,396,447,000 | 2,158,788,000 | |
| Combined R&D + SGA | 128,315,000 | 1,263,057,000 | 707,809,000 | 2,266,336,000 | 4,365,517,000 | |
| R&D as % of Combined (6) | | | 70% | | | |
| **Total-TP - 2002** | | | | | | |
| TP used for R&D (9) | (5,218,829) | (335,874,606) | (133,596,933) | 474,690,368 | **0** | |
| TP used for non R&D (SG&A) | (444,011,391) | (146,439,220) | (75,020,010) | 665,470,621 | **0** | |
| Total TP | (449,230,221) | (482,313,826) | (208,616,943) | 1,140,160,989 | **0** | |

Exhibit D.2 -Revised Huffard Report – Detail Total R&D Contribution by Debtor Group - 1989 to 2008

| Period / Description | Total Other (1) | NNL - Canada | EMEA (2) | Total US (3) | Total | Source |
|---|---|---|---|---|---|---|
| **2003** | | | | | | |
| Direct R&D Spend (7) | 16,847,000 | 821,516,000 | 380,260,000 | 793,504,000 | 2,012,127,000 | **EMPEAPROD2203926 / NOR_53648041 - RONA tab** |
| | | | | | | |
| Economic (Profit)/Loss | 100,630,814 | 397,427,010 | 382,898,715 | (487,590,485) | 393,366,054 | |
| Target Economic Profit | (17,216,134) | 6,387,057 | 33,994,773 | 370,200,358 | 393,366,054 | |
| Required (Increase)/Decrease TPA | (117,846,948) | (391,039,953) | (348,903,942) | 857,790,843 | 0 | |
| | | | | | | **NOR_53648041** |
| Givers (10) | 17,847,749 | | 94,859,957 | 857,790,843 | 970,498,549 | |
| | | | | | | |
| | | | | | | |
| SG&A | 88,599,000 | 518,255,000 | 456,762,000 | 874,399,000 | 1,938,015,000 | |
| Combined R&D + SGA | 105,446,000 | 1,339,771,000 | 837,022,000 | 1,667,903,000 | 3,950,142,000 | |
| R&D as % of Combined (6) | 61% | | | | | |
| | | | | | | |
| **Total-TP - 2003** | | | | | | |
| TP used for R&D (9) | (17,226,661) | (239,776,482.69) | (57,357,038) | 314,360,182 | 0 | |
| TP used for non R&D (SG&A) | (100,620,286) | (151,263,470) | (291,546,904) | 543,430,661 | 0 | |
| Total TP | (117,846,948) | (391,039,953) | (348,903,942) | 857,790,843 | 0 | |
| | | | | | | |
| **2004** | | | | | | |
| Direct R&D Spend (7) | 6,428,000 | 841,682,000 | 380,636,000 | 768,341,000 | 1,997,087,000 | **EMPEAPROD2203926 / NOR_53648508 - Profit Split Profit** |
| | | | | | | |
| Economic (Profit)/Loss | (35,290,234) | 818,666,956 | 181,467,087 | (338,708,966) | 626,134,843 | |
| Target Economic Profit | (8,991,724) | 166,251,786 | 84,910,106 | 383,964,674 | 626,134,843 | |
| Required (Increase)/Decrease TPA | 26,298,511 | (652,415,170) | (96,556,981) | 722,673,640 | 0 | |
| | | | | | | **NOR_53648508** |
| Givers (10) | 45,718,289 | | 210,670,497 | 722,673,640 | 979,062,426 | |
| | | | | | | |
| | | | | | | |
| SG&A | 90,619,000 | 428,269,000 | 379,832,000 | 876,659,000 | 1,775,379,000 | |
| Combined R&D + SGA | 97,047,000 | 1,269,951,000 | 760,468,000 | 1,645,000,000 | 3,772,466,000 | |
| R&D as % of Combined (6) | 66% | | | | | |
| | | | | | | |
| **Total-TP - 2004** | | | | | | |
| TP used for R&D (9) | 23,946,310 | (432,399,443) | 27,039,743 | 381,413,390 | 0 | |
| TP used for non R&D (SG&A) | 2,352,201 | (220,015,727) | (123,596,724) | 341,260,250 | 0 | |
| Total TP | 26,298,511 | (652,415,170) | (96,556,981) | 722,673,640 | 0 | |

Exhibit D.2 -Revised Huffard Report – Detail Total R&D Contribution by Debtor Group - 1989 to 2008

| Period / Description | Total Other (1) | NNL - Canada | EMEA (2) | Total US (3) | Total | Source |
|---|---|---|---|---|---|---|
| **2005** | | | | | | |
| Direct R&D Spend (7) | 4,474,000 | 803,966,000 | 341,063,000 | 719,629,000 | 1,869,132,000 | EMPEAPROD2203926 / NOR_53648130 - Profit Split Profit |
| | | | | | | |
| Economic (Profit)/Loss | (26,714,636) | 551,283,744 | 170,568,716 | (430,597,996) | 264,539,829 | |
| Target Economic Profit | (19,773,795) | 55,277,668 | 27,840,300 | 201,195,657 | 264,539,829 | |
| Required (Increase)/Decrease TPA | 6,940,840 | (496,006,077) | (142,728,417) | 631,793,653 | 0 | |
| | | | | | | NOR_53648130 |
| Givers (10) | 31,939,816 | | 62,752,861 | 631,793,653 | 726,486,330 | |
| | | | | | | |
| | | | | | | |
| SG&A | 77,509,000 | 662,005,000 | 325,453,405 | 914,133,000 | 1,979,100,405 | |
| Combined R&D + SGA | 81,983,000 | 1,465,971,000 | 666,516,405 | 1,633,762,000 | 3,848,232,405 | |
| R&D as % of Combined (6) | | 55% | | | | |
| | | | | | | |
| **Total-TP - 2005** | | | | | | |
| TP used for R&D (9) | 13,309,596 | (272,019,038) | (19,333,761) | 278,043,203 | 0 | |
| TP used for non R&D (SG&A) | (6,368,756) | (223,987,038) | (123,394,656) | 353,750,450 | 0 | |
| **Total TP** | 6,940,840 | (496,006,077) | (142,728,417) | 631,793,653 | 0 | |
| | | | | | | |
| | | | | | | |
| **2006** | | | | | | |
| Direct R&D Spend (7) | 0 | 902,372,000 | 286,406,000 | 679,206,000 | 1,867,984,000 | EMPEAPROD2203926 / NOR_53648133 - RPS Calculation |
| | | | | | | |
| Operating (Profit)/Loss | (103,300,381) | 598,445,115 | (48,786,516) | (340,979,200) | 105,379,018 | |
| Target Operating Profit | (26,431,035) | 87,390,959 | 13,566,987 | 30,852,107 | 105,379,018 | |
| Required (Increase)/Decrease TPA | 76,869,346 | (511,054,156) | 62,353,504 | 371,831,307 | 0 | |
| | | | | | | NOR_53648133 |
| Givers (10) | 95,625,030 | | 102,584,016 | 371,831,307 | 570,040,353 | |
| | | | | | | |
| | | | | | | |
| SG&A | 73,887,000 | 418,107,000 | 326,097,475 | 999,317,000 | 1,817,408,475 | |
| Combined R&D + SGA | 73,887,000 | 1,320,479,000 | 612,503,475 | 1,678,523,000 | 3,685,392,475 | |
| R&D as % of Combined (6) | | 68% | | | | |
| | | | | | | |
| **Total-TP - 2006** | | | | | | |
| TP used for R&D (9) | 60,080,243 | (349,237,634) | 55,539,526 | 233,617,865 | 0 | |
| TP used for non R&D (SG&A) | 16,789,103 | (161,816,523) | 6,813,978 | 138,213,442 | 0 | |
| **Total TP** | 76,869,346 | (511,054,156) | 62,353,504 | 371,831,307 | 0 | |

Exhibit D.2 -Revised Huffard Report – Detail Total R&D Contribution by Debtor Group - 1989 to 2008

| Period / Description | Total Other (1) | NNL - Canada | EMEA (2) | Total US (3) | Total | Source |
|---|---|---|---|---|---|---|
| **2007** | | | | | | |
| Direct R&D Spend (7) | 30,792 | 841,943,946 | 131,085,260 | 677,672,943 | 1,650,732,942 | **EMPEAPROD2203926 / NOR_53648323 - RPS Calculation** |
| | | | | | | |
| Operating (Profit)/Loss | (55,258,458) | 698,916,833 | (225,585,697) | (582,414,533) | (164,341,855) | |
| Target Operating Profit | (22,314,098) | (26,974,339) | (38,874,591) | (73,503,780) | (161,666,808) | |
| Required (Increase)/Decrease TPA (4) | 32,944,360 | (725,891,172) | 186,711,107 | 508,910,752 | 2,675,047 | |
| | | | | | | NOR_53648323 |
| Givers (10) | 32,944,360 | | 214,839,991 | 508,910,752 | 756,695,103 | |
| | | | | | | |
| | | | | | | |
| SG&A | 56,099,547 | 525,116,021 | 379,614,636 | 928,344,484 | 1,889,174,688 | |
| Combined R&D + SGA | 56,130,339 | 1,367,059,967 | 510,699,896 | 1,606,017,428 | 3,539,907,629 | |
| R&D as % of Combined (6) | | 62% | | | | |
| | | | | | | |
| **Total-TP - 2007** | | | | | | |
| TP used for R&D (9) | 19,613,871 | (447,061,352) | 124,460,566 | 302,986,915 | 0 | |
| TP used for non R&D (SG&A) | 13,330,489 | (278,829,819) | 62,250,540 | 205,923,837 | 2,675,047 | |
| Total TP | 32,944,360 | (725,891,172) | 186,711,107 | 508,910,752 | 2,675,047 | |
| | | | | | | |
| | | | | | | |
| **2008** | | | | | | |
| Direct R&D Spend (7) | 0 | 817,407,238 | 116,328,977 | 615,038,931 | 1,548,775,147 | **EMPEAPROD2203926** |
| | | | | | | |
| Operating (Profit)/Loss | (186,463,723) | 905,791,729 | (198,330,154) | (594,322,846) | (73,324,995) | |
| Target Operating (Profit)/Loss | (18,003,447) | 26,021,370 | (24,340,453) | (57,002,465) | (73,324,995) | |
| Required (Increase)/Decrease TPA | 168,460,276 | (879,770,358) | 173,989,701 | 537,320,381 | 0 | |
| | | | | | | NOR_53648048 |
| Givers (10) | 168,460,276 | | 194,506,654 | 537,320,381 | 900,287,311 | |
| | | | | | | |
| | | | | | | |
| SG&A | 0 | 587,844,912 | 482,520,916 | 1,401,732,484 | 2,472,098,312 | |
| Combined R&D + SGA | 0 | 1,405,252,150 | 598,849,893 | 2,016,771,415 | 4,020,873,459 | |
| R&D as % of Combined (6) | | 58.2% | | | | |
| | | | | | | |
| **Total-TP - 2008** | | | | | | |
| TP used for R&D (9) | 96,115,378 | (511,744,927) | 109,060,235 | 306,569,314 | 0 | |
| TP used for non R&D (SG&A) | 72,344,898 | (368,025,431) | 64,929,466 | 230,751,067 | 0 | |
| Total TP | $168,460,276 | ($879,770,358) | $173,989,701 | $537,320,381 | 0 | |

(1) "Total Other" represents the sum of Distributors, NN Brazil, NNJI, NN Aus, NNC (Alteon), and Bay Ire
(2) Total "EMEA" represents the sum of NN Ireland, NNSA France, and NN plc (NN UK)  France was a Joint Venture (JV) until March 2000  Because it was a JV, it was not part
of the CSA and there is no R&D until 2000  Figures for 2000 France from client-provided document: "Gross vs Net R&D 98-00 all pdf" as adjust to comply with IRS audit and
(3) "Total US" represents the sum of NNI - US and Bay U  S
(4) The difference $2,675,047 was related to an interim TPA distribution in 2007 that was not reversed in the year end TPA adjustment
(5) Figures for 1998 - 2000 for Canada, US, UK and Ireland from client-provided document: "Gross vs Net R&D 98-00 all pdf" as adjust to comply with IRS audit and presented in
(6) Percentages not shown was calculated on an entity that is grouped
(7) It was noted in the source used to capture this amount in certain years differed from the amount used to derive the TPA
(8) The TP - R&D allocations related to the CSA agreement for 1999 do not net  as they do in all other years due to rounding
(9) Calculated on an entity basis (R&D % of combined TPA)
(10) Givers are entities that fund the TP adjustment to the recipients proportionally

# Exhibit E

# Exhibit E

**Revised Huffard Report - Allocation of Sales Proceeds - Total R&D**

| Summary (A) | Canada | US | EMEA | Total |
|---|---|---|---|---|
| Customer Related Assets and Goodwill | 202 | 1,375 | 409 | 1,986 |
| Tangible Assets | 39 | 106 | (27) | 118 |
| Other Adjustments | 8 | (85) | 34 | (43) |
| **Non - IP Allocations** | **249** | **1,396** | **416** | **2,061** |
| Business Sale Related IP | 176 | 509 | 80 | 765 |
| Residual IP | 1,044 | 2,950 | 460 | 4,454 |
| **IP Allocations** | **1,220** | **3,459** | **541** | **5,219** |
| **Total Allocation** | **1,469** | **4,855** | **956** | **7,280** |

**Notes:**

(A) The Summary table above is derived from **Exhibit E.1**. Contrary to The Huffard Report at **Exhibit C**, this **Exhibit E** captures the Total R&D contribution funded by each Debtor Group. This will result in differing R&D Spend percentages by Debtor Group (as seen at **Exhibit D**) which are used to allocate Business Sale IP proceeds and Residual Patent proceeds amongst the Debtor Groups. Non-IP allocations are static and will not have changed from the Huffard Report.

**Exhibit E.1**

`

**Revised Huffard Report - Allocation of Sales Proceeds by Transaction - Total R&D**

| Total R&D | | | | | *$ in millions* | |
|---|---|---|---|---|---|---|
| Total Allocation by TP Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | | | |
| | **Canada** | | **US** | **EMEA** | **Total** | |
| CDMA - Customer Related Assets and Goodwill | $ | 68 | $ 775 | $ - | $ 843 | (A) |
| CDMA - Tangible Assets | | 3 | 10 | - | 13 | (B) |
| CDMA - Other Adjustments | | (9) | (48) | (2) | (60) | (C) |
| **Subtotal - CDMA Non - IP Allocations** | | 62 | 737 | (2) | 796 | (D) |
| CDMA - Business Sale Related IP | | 58 | 171 | 27 | 256 | (E) |
| Total CDMA | | **120** | **907** | **25** | **1,053** | (F) |
| Enterprise - Customer Related Assets and Goodwill | | 45 | 338 | 172 | 555 | (A) |
| Enterprise - Tangible Assets | | 8 | 25 | 7 | 40 | (B) |
| Enterprise - Other Adjustments | | 20 | (43) | 27 | 4 | (C) |
| **Subtotal - Enterprise Non - IP Allocations** | | 73 | 319 | 206 | 599 | (D), (G) |
| Enterprise - Business Sale Related IP | | 57 | 163 | 24 | 244 | (E) |
| Total Enterprise | | **130** | **482** | **231** | **843** | (F) |
| MEN - Customer Related Assets and Goodwill | | 78 | 165 | 149 | 391 | (A) |
| MEN - Tangible Assets | | 22 | 72 | 10 | 104 | (B) |
| MEN - Other Adjustments | | (2) | 1 | 2 | 1 | (C) |
| **Subtotal - MEN Non - IP Allocations** | | 99 | 238 | 160 | 497 | (D) |
| MEN - Business Sale Related IP | | 26 | 75 | 12 | 113 | (E) |
| Total MEN | | **125** | **313** | **172** | **610** | (F) |
| CVAS - Customer Related Assets and Goodwill | | 10 | 34 | 17 | 60 | (A) |
| CVAS - Tangible Assets | | (1) | (1) | 14 | 13 | (B) |
| CVAS - Other Adjustments | | (4) | (5) | (4) | (13) | (C) |
| **Subtotal - CVAS Non - IP Allocations** | | 5 | 28 | 27 | 60 | (D) |
| CVAS - Business Sale Related IP | | 17 | 53 | 9 | 80 | (E) |
| Total CVAS | | **23** | **81** | **36** | **140** | (F) |
| GSM - Customer Related Assets and Goodwill | | 0 | 57 | 59 | 116 | (A) |
| GSM - Tangible Assets | | 4 | (15) | (62) | (73) | (B) |
| GSM - Other Adjustments | | 1 | 6 | 6 | 14 | (C) |
| **Subtotal - GSM Non - IP Allocations** | | 5 | 49 | 3 | 57 | (D) |
| GSM - Business Sale Related IP | | 11 | 33 | 5 | 49 | (E) |
| Total GSM | | **16** | **82** | **8** | **106** | (F) |
| MSS - Customer Related Assets and Goodwill | | 0 | 2 | 11 | 13 | (A) |
| MSS - Tangible Assets | | 2 | 12 | 3 | 17 | (B) |
| MSS - Other Adjustments | | 2 | 4 | 5 | 11 | (C) |
| **Subtotal - MSS Non - IP Allocations** | | 4 | 18 | 20 | 42 | (D) |
| MSS - Business Sale Related IP | | 1 | 3 | 0 | 4 | (E) |
| Total MSS | | **5** | **21** | **20** | **46** | (F) |

**Exhibit E.1**

**Revised Huffard Report - Allocation of Sales Proceeds by Transaction - Total R&D**

| Total R&D | | | | | *$ in millions* | |
|---|---|---|---|---|---|---|
| Total Allocation by TP Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | | | |
| | Canada | US | EMEA | | Total | |
| Layer 4-7 - Customer Related Assets and Goodwill | 1 | 5 | 2 | | 7 | (A) |
| Layer 4-7 - Tangible Assets | 0 | 1 | 0 | | 1 | (B) |
| Layer 4-7 - Other Adjustments | 0 | 0 | 0 | | 0 | (C) |
| **Subtotal - Layer 4-7 Non - IP Allocations** | 1 | 5 | 2 | | 9 | (D) |
| Layer 4-7 - Business Sale Related IP | 2 | 6 | 1 | | 9 | (E) |
| **Total Layer 4-7** | **3** | **12** | **4** | | **18** | (F) |
| Next Gen - Customer Related Assets and Goodwill | - | - | - | | - | (A) |
| Next Gen - Tangible Assets | - | 2 | - | | 2 | (B) |
| Next Gen - Other Adjustments | (0) | 0 | (0) | | (0) | (C) |
| **Subtotal - Next Gen Non - IP Allocations** | (0) | 2 | (0) | | 2 | (D) |
| Next Gen - Business Sale Related IP | 2 | 6 | 1 | | 8 | (E) |
| **Total Next Gen** | **2** | **8** | **1** | | **10** | (F) |
| **Total Residual IP** | **1,044** | **2,950** | **460** | | **4,454** | (F), (H) |
| | | | | | | |
| **Total Customer Related Assets and Goodwill** | **202** | **1,375** | **409** | | **1,986** | |
| **Total Tangible Assets** | **39** | **106** | **(27)** | | **118** | |
| **Total Other Adjustments** | **8** | **(85)** | **34** | | **(43)** | |
| **Total Non-IP Allocated** | **249** | **1,396** | **416** | | **2,061** | |
| **Total Business Sale Related IP (I)** | **176** | **509** | **80** | | **765** | |
| **Total Residual IP (I)** | **1,044** | **2,950** | **460** | | **4,454** | |
| **Total IP Allocated** | **1,220** | **3,459** | **541** | | **5,219** | |
| **Total Value Allocated  $** | **1,469** | $ **4,855** | $ **956** | $ | **7,280** | |

**Notes:**

(A) [*Business Sale* ] - Customer Related Assets and Goodwill   See **Exhibit C.4.**  These allocations are static; they are not affected by changes to R&D spend percentages

(B) [*Business Sale* ] - Tangible Assets   See **Exhibit C.4.**  These allocations are static; they are not affected by changes to R&D spend percentages

(C) [*Business Sale* ] - Other Adjustments   The Huffard Report makes other additional adjustments in the report model when calculating the final escrow balances   These adjustments have been calculated at **Exhibit C.1.**  See **Exhibit C** for further details   These allocations are static; they are not affected by changes to R&D spend percentages

(D) Non - IP Allocations are comprised of Customer Related Asset and Goodwill, Tangible Assets, and Other Adjustments   See steps at **Exhibit C** for the derivation of each category   These allocation amounts are static; i e  they will not be affected by changes to R&D Spend allocation percentages

(E) [*Business Sale* ] - Business Sale Related IP amounts by transaction are obtained from **Exhibit C.4.**  Allocation amongst the Debtors is calculated by multiplying the Sale Specific R&D Spend percentages (**Exhibit E.2)** by the total Business Sale IP   See **Exhibit C.1,** note **E** for further explanation

(F) The total escrow amounts of each Business Sale allocated to each Debtor is calculated as the sum of A, B, C, and E   The total escrow amounts were verified at the Huffard Report Model at tab "IP, PP & Escrow" and at the table "Business Sale Descriptions" at ¶ 51 of the Huffard Report See **Exhibit C.4.**

(G) As part of the Enterprise Business Sale, NNI divested shares in its wholly owned subsidiary DiamondWare   ("DiamondWare")   As the US was the owner of the DiamondWare related patents, the proceeds of $3 million are allocated directly to the US debtors before allocating the remaining Enterprise Business Sale IP by R&D spend percentages   See Appendix 21 of the Huffard Report   See calculation at **Exhibit E.2.**

(H) Residual IP allocation amounts are calculated by multiplying the total Residual IP escrow balance, obtained from the Huffard Report Model at tab "IP, PP & Escrow", by the R&D Spend percentages for the period of 1991 - 2006   Percentages were obtained from **Exhibit E.2.**

(I) Total amounts in columns rounded to agree to the Total column

**Revised Huffard Report - R&D Percentages by Transaction - Total R&D**

| Residual Patent (A) | | Business Line Sales - Specific Period (A) | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| | 1991 - 2006 | CDMA 1992 - 2008 | Enterprise 1989 - 2008 | MEN 1990 - 2008 | GSM & MSS 1991 - 2008 | Layer 4 -7 1998 - 2008 | Next Gen 1992 - 2008 | CVAS 1996 - 2008 |
| Canada | 23.2% | 22.8% | 23.6% | 23.4% | 23.1% | 22.1% | 22.8% | 21.8% |
| US | 66.9% | 66.5% | 66.2% | 66.3% | 66.4% | 65.8% | 66.5% | 66.4% |
| EMEA | 10.0% | 10.7% | 10.1% | 10.3% | 10.5% | 12.1% | 10.7% | 11.8% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

| Residual Patent Adjustment | | | Enterprise Business Line Sale IP Adjustment | |
|---|---|---|---|---|
| Total proceeds from the Residual IP Sale in millions(B): | $ | 4,454 | Proceeds Available to Enterprise BS IP (B): | $   244 |
| At Risk Entities ("ARE Entities") value in millions (C): | | 43 | DiamondWare's IP (G) | 3 |

Residual Patent: 1991 - 2006

| | Residual Patent available excluding ARE Proceeds (D) | ARE Proceeds (C) | Residual Patent (E) |
|---|---|---|---|
| CANADA | $ 1,022 | 22 | $ 1,044 |
| US | 2,950 | - | 2,950 |
| EMEA | 439 | 21 | 460 |
| Total Proceeds: | $ 4,411 | $ 43 | $ 4,454 |

| | Resulting Allocation % of Residual IP Proceeds (E) |
|---|---|
| CANADA | 23.4% |
| US | 66.2% |
| EMEA | 10.3% |

| | Business Line Sale IP Proceeds available excluding DiamondWare Proceeds (F) | DiamondWare Proceeds (G) | Enterprise IP (I) |
|---|---|---|---|
| CANADA | $ 57 | - | $ 57 |
| US | 160 | 3 | 163 |
| EMEA | 24 | - | 24 |
| Total Proceeds: | $ 241 | $ 3 | $ 244 |

| | Resulting Allocation % of Enterprise Business Sale IP (I) |
|---|---|
| CANADA | 23.4% |
| US | 66.6% |
| EMEA | 10.0% |

**Notes:**

(A) R&D Spend percentages by specific period were obtained from **Exhibit D.** These percentages were used to allocate IP proceeds.

(B) Final Escrow Balances were obtained from the Huffard Report Model at tab "IP, PP & Escrow".

(C) Patents held by the ARE entities have been valued independently at approximately $43 million. See the Malackowski Report at section 11.3. These sale proceeds are allocated directly to the owning debtor entities before distributing the remaining sales proceeds related to the residual IP sale. However, the Malackowski Report has mistakenly allocated the $22 million relating to CoreTex, Xros, and NN Applications Management to the Canadian Debtors when in fact these subsidiaries are US debtors. See Exhibit R.3.2. of the Malackowski report.

(D) In order to properly allocate the residual patent proceeds amongst the Debtor Groups, proceeds related to claims previously settled must paid directly to the Debtor Group in which the settled patent was owned, before the distribution of the remaining proceeds based on R&D Spend percentages. Proceeds of $4,411 million are allocated based on the R&D Spend percentages for the period of 1991 - 2006.

(E) After allocating the available Residual IP proceeds of $4,411 based on R&D Spend percentages (Note D), ARE proceeds are added to the allocation to arrive at a final Residual IP allocation.

(F) In order to properly allocate the Enterprise Business Sales IP proceeds amongst the Debtor Groups, proceeds related to the DiamondWare IP must paid directly to the US Debtor Group. See Note **G**. Proceeds of $241 million are allocated based on the R&D Spend percentages for the Enterprise business period of 1989 - 2008. See **Exhibit C.2.**

(G) As part of the Enterprise Business Sale, NNI divested shares in its wholly owned subsidiary DiamondWare, Ltd. ("DiamondWare"). As the US was the owner of the DiamondWare related patents, the proceeds of $3 million are allocated directly to the US debtors before allocating the remaining Enterprise Business Sale IP by R&D spend percentages.

(I) After allocating the available Enterprise Business Sale IP proceeds of $241 based on R&D Spend percentages, DiamondWare proceeds are added to the allocation to arrive at a final Enterprise Business Sale IP allocation.