Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

## REBUTTAL EXPERT REPORT OF TERRENCE P. MCGARTY

(Submitted by the U.S. Debtors)

**February 28, 2014**

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL
UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED
HIGHLY CONFIDENTIAL.**

## EXPERT REPORT OF TERRENCE P. MCGARTY

I.      QUALIFICATIONS AND EXPERIENCE ........................................................... 1

II.     ASSIGNMENT ................................................................................................ 6

III.    SUMMARY OF OPINIONS ............................................................................. 7

IV.     DOCUMENTS RELIED UPON ....................................................................... 9

V.      CANADIAN DEBTORS' THEORY OF LICENSE VALUE FOLLOWING THE BUSINESS LINE SALES ................................................ 9

VI.     NNI COULD HAVE MONETIZED THE PATENT PORTFOLIO IN A VARIETY OF WAYS .................................................................................. 10

VII.    NNI COULD HAVE CREATED PRODUCTS USING PATENTS COMPRISING A SIGNIFICANT PORTION OF THE PATENT PORTFOLIO ................................................................................................. 11

VIII.   BUSINESS PLAN ......................................................................................... 28

        A.    Operations and Management ................................................................. 30

        B.    Financials ............................................................................................. 30

IX.     CONCLUSIONS ........................................................................................... 32

I.      **QUALIFICATIONS AND EXPERIENCE**

1.      I am a Managing Partner and Founder of the Telmarc Group ("Telmarc"), a technology management and investment company. I received my Ph.D. in Electrical Engineering and Computer Science from the Massachussetts Institute of Technology ("MIT"). I also have a Master of Science degree from MIT in Electrical Engineering and Computer Science, as well as a Bachelor of Engineering degree in Electrical Engineering. I have over thirty years of academic experience at various universities, including MIT, Central University of Finance and Economics in Beijing, George Washington University, Polytechnic University, and Columbia University. I am the author or co-author of fourteen books, including *Business Plans That Win Venture Capital*, as well as over one hundred papers.

2.      Over the past thirty years, I have been extensively and personally involved in numerous efforts to monetize intellectual property, including patents and patent licenses, at Warner Communications, where I served as Group President of Warner's Electronic Media Company, at NYNEX Mobile Communications Company ("NYNEX Mobile") (now Verizon), where I served as Chief Operating Officer, and at Telmarc, among others. I have significant professional experience developing and evaluating investments based on the licensing of patents and structuring new companies around intellectual property assets in the healthcare and high tech industries. These companies include a local telephone company, an international Internet Protocol carrier, an international fiber network company, a medical software company, a computer data terminal company, a data radio network company, a satellite communications company, and large hospitals. The remainder of this section details my experience in roughly chronological order.

1

Highly Confidential

3.     From 1975 to 1980, I was Executive Director of the Equipment Integration Division at Communications Satellite Corporation ("COMSAT"), responsible for the company's first non-regulated system development and manufacturing entity. Half of the COMSAT business was in support of regulated international carriers and provided them with integrated systems to manage, control, and distribute satellite networks. I was responsible for the design and development of launch control centers for the launch of all of our satellites. The other half of the business provided complex secure data networks to government entities. For example, I led the design, development, and manufacture of the first global system to monitor Soviet nuclear testing, which was provided to a government entity as part of the Comprehensive Nuclear Test Ban Treaty negotiations.

4.     From 1982 to 1984, I was a President at Warner Communications, responsible for the development of new technology and services for its cable system. In this role, I directed the design, development, and deployment of the first two-way cable data system providing video-on-demand. This transactional system supported multiple vendors and provided applications such as home banking, home shopping, and a number of services similar to what is commonly found on the Internet today. This was the first such system developed and made operational. I also spearheaded a joint venture with Bank of America, GTE Corporation, Bell Atlantic, and Digital Equipment Corporation to create a new entity to deliver interactive home services over two-way cable and telephone networks. In this role, I oversaw the preparation of patent filings and, as part of the venture, Warner Communications and the other participants granted the new entity a perpetual irrevocable royalty-free exclusive license to all relevant patents.

5.     From 1990 to 1992, I was Senior Vice President and COO of NYNEX Mobile, the predecessor of Verizon Wireless. In that position, I was responsible for the design and

2

Highly Confidential

development of Verizon's transition to Code Division Multiple Access ("CDMA"), market development, mergers, and acquisitions. I was also responsible for the design and deployment of the transition from analog to digital in the mobile system environment. In 1990, I was President of the NYNEX Development Company and in that role, was responsible for the restructuring of eight subsidiaries, which included the restructuring of various patent assets that had been purchased and transferred to those subsidiaries. From 1986 to 1990, I was Head of the Research and Development ("R&D") Division at NYNEX and was responsible for defining and developing a broad R&D portfolio in many areas of interest to NYNEX. These areas included broadband, wireless, multimedia, network management, and Internet Protocol communications. As Head of R&D at NYNEX, I was the founder and Managing Director of the NYNEX Venture Capital fund. This fund, which had roughly $50 million in assets at the time it was established, was intended to permit NYNEX to invest in start-up exercises and provide seed money for innovation. I was extensively involved with the various start-ups in which NYNEX invested funds and to which it licensed certain patent rights for the purpose of facilitating their monetization. In this position, I focused, in particular, on multimedia communications, broadband applications, network management, and wireless.

6.      I am currently the Managing Partner of Telmarc, which I founded. I served in this role from 1984 to 1986 and rejoined Telmarc in 1992. In this role, I have been personally involved in the structure, financing, operations, and management of most of Telmarc's investments. I have created start-ups, performed turn-around operations, and restructured over thirty domestic and international companies. For example, from 1995 to 2004, I was responsible for the design, development, deployment, and operation of one of the largest Internet Protocol voice and data networks in Central and Eastern Europe, Zephyr Telecommunications, Inc.

3

Highly Confidential

("Zephyr"). At its peak, Zephyr operated in over twenty countries and interfaced its network with multiple telecommunications carriers in those countries. The company was successfully sold in 2004. Other relevant ventures of Telmarc include:

- Quazon (1984): an intelligent data terminal company providing "videotext" or Internet-like services to hotels;

- Digital Access Company (1985): a protocol conversion company that also interfaced with telephone networks;

- DRN (1985): a digital data radio network company;

- VSAT (1986): a satellite communications company that provided large scale internetworking;

- NPC (1993-1995): a network management and control company providing services to wireless carriers;

- COMAV, Inc. (1996-1999): an Internet Protocol voice-based Competitive Local Exchange Carrier ("CLEC");

- JOLT (1997): an infrared broadband data communications manufacturer; and

- Inzigo (1999): a software company that designs and develops true natural language applications and solutions.

7.      Since 2010, I have focused on the development of agreements involving patent licensing in the high tech industry. For example, in 2010, I advised an MIT faculty founded company, Code On, which specializes in network coding. This is a form of coding in wired and wireless Internet Protocol networks that significantly improves throughput and performance. The structural premise underlying Code On is that it licenses patents from MIT and institutions of

4

similar stature and uses this pool of patents to assist other companies via sublicensing and technology development. After Code On formed a patent pool comprised of patents licensed from universities, it sublicensed the patents to several companies and provided various types of technical support. As Code On states on its website:

> Code On licenses a family of coding technologies based on Random Linear Network Coding (RLNC), a proprietary algorithm that enables Network Coding. It is not an operating entity but rather prefers to work with new and established companies to develop Network Coding optimized products and services. Professional consulting services and training are a key part to Code On's product offering.[1]

8.    I am also currently working with the MIT Research Laboratory of Electronics to structure six entities using patents licensed from MIT in a variety of areas, including computers and telecommunications. We are currently considering structuring these six entities in a manner similar to Code On, where patents are licensed from universities to create patent pools and these pools, in turn, are sublicensed to third parties and then supported via professional services from the principals within the company.

9.    I have also been responsible for developing numerous agreements in the healthcare space involving patent licensing. For example, in 2010, I entered into agreements to monetize patent portfolios in medical imaging with Harvard-affiliated hospitals. As part of this exercise, I developed a business plan, negotiated and completed agreements. In 2012, I examined healthcare opportunities in a variety of institutions starting with Massachusetts General Hospital ("MGH") in Boston and Columbia University Medical Center in New York. In particular, I developed an agreement with MGH involving a license for Telmarc to develop a business providing certain imaging systems and services to support clinical trials in cancer therapy. In

---

[1] "Technology," Code On, accessed February 20, 2014, http://www.codeontechnologies.com/technology.

Highly Confidential

2013, Telmarc entered into a similar contract involving patent licensing with New York's Memorial Sloan-Kettering Cancer Center. The development of the entity is currently in progress. In addition, since 2013, I have been involved in developing patent licensing agreements for Yale-New Haven Hospital, University of Massachusetts Memorial Medical Center, Tufts Medical Center, and the National Institutes of Health (also known as NIH) in Rockville Maryland.

10.     In each of the above ventures, I sought opportunities to leverage intellectual property assets, directed and personally prepared business plans, sought financing using Telmarc resources and/or third party resources, staffed and oversaw the entities, and developed monetization strategies. I had close personal involvement in each of these efforts.

11.     I have served as an expert witness or offered support in numerous litigation matters, on subjects including, but not limited to, intellectual property, lost profits, valuation, and business practices. Additional details on my professional qualifications are described in my curriculum vitae in Exhibit 1.

12.     I am being compensated in this matter at the rate of $650 per hour for my time. My compensation is not contingent on my findings, testimony rendered, or the outcome of this litigation. I was assisted by staff members at Analysis Group working under my direction and supervision. Hourly rates for staff working on this matter range from $245 to $620 per hour.

## II.    ASSIGNMENT

13.     I have been asked by counsel to consider the validity of the assumption made in the Green Report[2] that, following the sales of Nortel's eight business lines (the "Business Lines" and "Business Line Sales"), the exclusive, royalty-free, and perpetual licenses held by Nortel

---

[2] "Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities," January 24, 2014.

6

Highly Confidential

Networks Inc. ("NNI") were worthless because NNI could no longer make and sell "Products" with such rights. In other words, I have been asked whether, following the Business Line Sales, as one possible alternative to NNI's agreement to terminate its licenses in order to effectuate the sale of Nortel's residual patent portfolio (the "Patent Portfolio") to Rockstar Bidco ("Rockstar"), NNI could have extracted value from its licenses through the manufacture and sale of products and the provision of services based on the licenses to the Patent Portfolio.

## III.    SUMMARY OF OPINIONS

14.    In my opinion, instead of terminating its licenses in order to effectuate the sale of the Patent Portfolio to Rockstar, NNI could have extracted considerable value from its licenses to the Patent Portfolio. Although NNI could have exploited its licenses in a number of different ways, including in a sublicensing business, I have been instructed only to consider the monetization potential of the licenses through the manufacture and sale of products and the provision of services based on the licenses to the Patent Portfolio. I was first approached on January 29, 2014 regarding this matter. Given the time constraints and for illustrative purposes, I considered a subset of the U.S. patents in the Patent Portfolio and identified a sample set of products and/or services that NNI could have conceived of, produced, and sold in a viable business, whether by itself or with partners. I have further identified a subset of product/service offerings which are comprised of collections of products and which are supported by the related patents. Given the quality of the U.S. patents in the Patent Portfolio and the potential products and services that could be developed with such patents, based on my experience in developing similar product offerings, it is my opinion that NNI could have developed a viable and valuable business by employing its license rights even in this limited manner.

7

Highly Confidential

15.     It is important to note that products in the telecommunications industry are not limited to physical products in the traditional sense, but rather cover a broad range of processes, services, physical products, and systems each employing some or all of these elements. For example, a standard approach to product development in the telecommunications industry involves the development of "systems" that are comprised of a collection of products delivered in an integrated offering and supported by related services, all on the basis of a collection of patents. This is the approach I primarily use to identify a subset of the products and services that could have been developed or proposed to be developed by NNI in a standalone U.S. business based on its licenses to the Patent Portfolio.

16.     After reviewing certain of the U.S. patents in the Patent Portfolio, I designed a non-exhaustive set of product offerings and related preliminary business plans that NNI could have developed and deployed following the Business Line Sales:

- Secure Local Wireless Broadband;

- Hybrid Fiber/Wireless Broadband Deployment;

- Wireless Broadband Multimedia Systems and Services;

- Multimedia Communications Systems and Services;

- Advanced Adaptive Spectrum Management and Allocation;

- Secure Internet Hubbing and Control Over Wireless and Wire Broadband Networks;

- Ultra-broadband Front End Receivers for Multiband Operations; and

- Adaptive Network Management Systems.

17.     These offerings are generally presented as systems that are integrated amalgams of product, process, and service elements and these, in turn, are predicated, in part or in whole,

8

Highly Confidential

on one or more of the patents in the Patent Portfolio. All of these offerings are based on real market demands and rely upon utilizing the technology developed in the patents. In my opinion, NNI's licenses provided a unique base on which to create multiple viable and potentially lucrative business opportunities. Based on my experience developing similar businesses in the high tech industry, it is also my opinion that the opportunities were substantial in size and scope and could have been implemented in a relatively straightforward manner.

18.     This report presents the bases for my opinions, based on the information that I have reviewed to date. I may consider additional information provided to me subsequent to the filing of this report.

## IV.     DOCUMENTS RELIED UPON

19.      In undertaking my analysis, I have considered information from a variety of sources, each of which has been identified in Exhibit 2. I have also relied upon my professional judgment and expertise, gathered from many years of professional experience in the high tech industry. In addition, some of the analysis that supports the opinions expressed in this report was performed by staff members at Analysis Group working under my direction and supervision.

## V.     CANADIAN DEBTORS' THEORY OF LICENSE VALUE FOLLOWING THE BUSINESS LINE SALES

20.     I have been instructed by counsel to focus solely on the Green Report's assumption that NNI's license rights in the Patent Portfolio had no value after the Business Line Sales because these rights "were limited to using NN Technology to sell Products and generate operating profits in [its] territor[y]" and thus, when NNI terminated its license rights in the

9

Rockstar sale, "no rights of value were surrendered relating to the Residual Patents."[3] This assumes that NNI had no ability to extract value from its license rights once the Business Line Sales were completed and thus no alternative but to terminate its licenses for no value. I have been instructed by counsel to consider whether NNI did, in fact, have the ability to monetize its license rights in the Patent Portfolio following the Business Line Sales.

## VI.    NNI COULD HAVE MONETIZED THE PATENT PORTFOLIO IN A VARIETY OF WAYS

21.    Rather than terminating its license rights in the Patent Portfolio after the Business Line Sales, NNI could have monetized the Patent Portfolio in variety of ways. Clearly, faced with the alternative of surrendering considerable value without compensation, any reasonable licensee, including NNI, would have made every effort to create additional, unrealized value from the intellectual property by any means possible. First, as I discuss in the next section, NNI could have monetized the Patent Portfolio by creating a wide variety of new product offerings with potential U.S. revenues in the billions of dollars over a period of three to five years.

22.    Although I have not been instructed to consider alternatives to the development of product offerings, it is my opinion that NNI also could have established a licensing business. The licensing business would have been a service business that would have assisted other companies in making use of the intellectual property in the Patent Portfolio within NNI's exclusive territory (the U.S. and Puerto Rico). Revenues from licensing could take a variety of forms including royalties, fees for services, or returns generated by equity interests in one or more joint ventures.

---

[3] *Id.*

Highly Confidential

## VII.    NNI COULD HAVE CREATED PRODUCTS USING PATENTS COMPRISING A SIGNIFICANT PORTION OF THE PATENT PORTFOLIO

23.    I have considered various ways in which NNI could have used the patents in the Patent Portfolio to develop a lucrative product offering. In developing and making complex products in the telecommunications industry, patents are valuable because they give the developer, manufacturer, or service provider a way of creating a product that others cannot copy without permission. Having a set of patents does not prevent a competitor from making a similar product. For example, two competing pharmaceutical companies may each make their own patented drugs that treat the same illness. The end effect may be the same – treatment of a particular illness – but they each have their own drug that the other firm cannot copy. Similarly, in the telecommunications industry, a set of patents will not prevent a competitor from making a similar product – consider the iPhone and Android phones – but the competitor must come up with its own methods and inventions to make the product.

24.    Thus, the patents in the Patent Portfolio are valuable for creating products because they give the rights holder the means that others cannot copy. In the absence of having rights to those patents, a firm would either have to license technologies from other firms to make the products, or it would have to develop its own technologies through R&D to use to make the products.

25.    As noted above, it is important to make clear that in the high tech industry, products are commonly understood to not be limited to physical products in the traditional sense, but rather cover a broad range of processes, services, physical products and systems each employing some or all of these elements. For ease of reference, I will use the term "products" to refer to goods, services, physical products, systems, or any combination throughout the report. In

11

my experience in the telecommunications industry, firms make strategic choices about whether

they offer goods, services, or a combination of the two for different technology areas. As I wrote

in my book, *Business Plans That Win Venture Capital*:

> One of the most important developments of the past ten years is the evolution of the service business (see Lovelock[4] or Drucker[5][2]). Service businesses have not received the amount of attention that they should in the business planning process. As the United States's economy changes, such service business, especially those based on electronic services, will proliferate. Because many new business opportunities already lie in this area, this book pays a great deal of attention to this segment of the business world. Throughout the book we emphasize the similarities between the service and goods businesses.
>
> This book deals with two types of products: goods and services. As we shall see, any business is characterized by the product that it offers the market. The goods product is a piece of hardware such as a modem or computer game. The service product is more intangible. It may be an enhanced communications service, such as a protocol conversion network or the selling of reservations to rock concerts. We shall discover the many similarities and dramatic differences between the two types of products as we focus on developing the business plan.
> …
>
> These two examples depict a venture's need to have at the earliest stages a clear focus on the business so that all further steps can be accomplished. In the business definition phase, the first set of questions that should be asked are:
>
> - What is our product? Is it a good or service?
> - What business are we in? Are we in manufacturing, OEMing (e.g., original equipment manufacture, using someone else's equipment and enhancing it), or reselling?
> - What is our relationship to the end user of our product? Are we planning to use a direct sales force or a different distribution channel?
> - What will we do and what will we not do?[6]

26.     Many services, processes, and systems in the telecommunications industry are

built upon the same type of, if not the very same, intellectual property as a good (a physical

---

[4] Christopher Lovelock, *Services Marketing* (Englewood Cliffs: Prentice Hall, 1984). *See also* Christopher Lovelock and Jochen Wirtz, *Services Marketing: People, Technology, Strategy*, 7th ed. (Boston: Prentice Hall, 2011), 5.
[5] Peter Drucker, *Innovation and Entrepreneurship* (New York: Harper Row, 1985). *See also* Peter F. Drucker, *Innovation and Entrepreneurship: Practice and Principles* (New York: Harper, 1993).
[6] Terrence P. McGarty, *Business Plans That Win Venture Capital* (New York: John Wiley & Sons, Inc., 1989), 4-5.

Highly Confidential

manufactured product). Just as goods may use and benefit from sublicensing, so too can services, processes, and systems benefit from an identical process. For example, among the opportunities I discuss below, the Adaptive Network Management System is a wireless network management system with fault detection and security monitoring. This can be a good or service because the customer may purchase it as some turnkey element or the purchaser may require that NNI, for example, provide its functions as a service. In either case, the patents upon which the Adaptive Network Management System is developed and relies would be identical, or at least very similar, no matter if it were a manufactured and assembled good or a process, system, or service utilizing the infrastructure so developed.

27.    In considering NNI's potential options for monetizing its license rights following the Business Line Sales, I reviewed the U.S. patents in the Patent Portfolio, as listed in the Global IP Law Group's database,[7] and considered a number of their characteristics, including:

- The technology embodied in the patent;

- Global IP Law Group's characterization of the product markets for the patents;

- The principle claim in the patent or application;

- The interest level of the patent; and

- Whether the patent is part of some standards process or not.

In addition, as described below, I examined the patents themselves in a number of key technology areas.

28.    To determine whether NNI could have produced products using a significant portion of the patents, I first examined patents in a broad range of important technology and

---

[7] GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List).

Highly Confidential

product market categories. These categories formed the basis upon which to build new product offerings encompassing inter-related products.

29.     In determining which potential product offerings were available to NNI following the Business Line Sales, in the interest of time, I focused on technologies for which I have developed similar product offerings in my own businesses. These offerings represent what could be considered a collection of new and broad product lines (not single products) incorporating a mixture of patents across multiple areas.

30.     Starting with my understanding of market demands and customer needs, through an iterative process, I took a bundle of patents and combined them to create a new system and/or service, using a collection of products to be delivered as an integrated offering. I then considered extensions to this offering by considering other functionality that would be useful and examined the Patent Portfolio to see if there is support for this additional functionality. This approach is a standard way of thinking about patented technology in the telecommunications industry. Most telecom products involve dozens, if not hundreds, of related patents.[8]

31.     Having extensive experience in building businesses and having knowledge of the ongoing demands in the telecommunications and information markets, I approached my assignment by examining those business constructs that would meet market demands and also would rely upon the subset of patents I selected in the Patent Portfolio. Based on my paper characterizing opportunities in wireless technology, including adaptive network management,

---

[8] For instance, "[a]ccording to [former Apple CEO Steve] Jobs, the patent portfolio for the iPhone is over 200 patents strong." Lindsey Gilroy and Tammy D'Amato, "How many patents does it take to build an iPhone?" *Intellectual Property Today*, accessed February 26, 2014, http://www.iptoday.com/issues/2009/11/articles/how-many-patents-take-build-iPhone.asp. Moreover, "…manufacturers can potentially infringe on **hundreds of patents** [emphasis added] with a single product." Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting," in *Innovation Policy and the Economy Volume 1*, ed. Adam B. Jaffe, Josh Lerner and Scott Stern (MIT Press, 2001), 125, http://www.nber.org/chapters/c10778.pdf.

Highly Confidential

Orthogonal Frequency-division Multiplexing ("OFDM"), and enhanced security systems, I was able to identify market opportunities for certain of Nortel's wireless technologies.[9] Similarly, I drew on another of my papers on broadband alternatives to identify opportunities for integrating fiber and wireless across a range of services, including video, Internet, telephony, portals, and Virtual Private Networks ("VPN").[10] Likewise, my paper entitled "New Spectrum Policies and Technologies: Creating a Real Time Spectrum Market," identifies opportunities for spectrum management to increase capacity and increase overall performance.[11]

32.    Using these papers as a starting point, I developed a set of broad multi-product business or service offerings, which included as key underpinnings groups of patents, as is usual for such a process. Each of these is described in some detail in Exhibits 3 to 5, including what products would be implementable and for which there is market demand. Each product offering has a realistic target market, meets a compelling need, and can be provided either as a collection of products or as an integrated service. This is the approach large technology corporations take, for example, in designing a telephone switching system, which does not rely on a single switch component, but is a collection of a multiplicity of products underpinned by a collection of patents. The product offerings I describe below are no different.

33.    Through the process described above, I identified eight potential product offerings using 408 U.S. patents in the Patent Portfolio, a small subset of the entire portfolio. I should note that these offerings and the patents underpinning them are just a sample set, and there is the

---

[9] Terrence P. McGarty, "Some Important Problems in Communications Theory: A View from the Front," 2005.
[10] Terrence P. McGarty, "Broadband Alternatives: Synergies of Fiber and Wireless," 2005.
[11] Terrence P. McGarty, "New Spectrum Policies and Technologies: Creating a Real Time Spectrum Market," 2004.

Highly Confidential

potential for a wide array of additional offerings given the breadth of the U.S. patents in the

Patent Portfolio. The eight offerings are as follows:

- Secure Local Wireless Broadband
  - o Local secure wireless network not dependent on installing fiber cable
  - o One hundred patents;

- Hybrid Fiber/Wireless Broadband Deployment
  - o Delivery of wireless broadband in rural areas using hybrid fiber/wireless system
  - o 120 patents;

- Wireless Broadband Multimedia Systems and Services
  - o Delivery of local advertising and information via wireless broadband
  - o 74 patents;

- Multimedia Communications Systems and Services
  - o Advanced video-conferencing and other techniques to make geographically separate people feel they are physically present with each other
  - o 95 patents;

- Advanced Adaptive Spectrum Management and Allocation
  - o Make better use of the spectrum through methods to share spectrum and improve cell site performance
  - o 51 patents;

- Secure Internet Hubbing and Control Over Wireless and Wire Broadband Networks
  - o Deployment and operations of Internet hubs in regional systems to enhance security and efficiency of Internet Protocol traffic
  - o 96 patents;

- Ultra-broadband Front End Receivers for Multiband Operations
  - o Improve performance and reduce costs at cell sites by replacing multiple antennas and receivers with single ultra-broadband antenna and receiver
  - o 92; and

- Adaptive Network Management Systems
  - o Wireless network management system with fault detection and security monitoring
  - o 165 patents.

Highly Confidential

34.    The age of the patents underlying these offerings vary, with some patents having only a few years of life left, while others have more than fifteen years left. The use of older patents, however, does not concern me because in my experience, the life cycle of many patents is far from short. For example, the holder of core patents, such as those in CDMA in mobile communications, very often builds on such patents by adding to them additional products and applications. In the case of CDMA, through advances in such things as "soft" cell site hand-off and integration of Internet Protocol, capabilities have been added to core CDMA patents to strengthen the initial patent and extend its useful life. Indeed, the original CDMA technology was introduced in a "secret" U.S. patent by the actress Hedy Lamarr in 1941.[12] Thus, certain core CDMA patents, by means of additions and enhancements, have attained a lifetime of decades.

35.    Exhibit 3 shows the business opportunities for each of the product areas. I link the product areas to specific systems using underlying specific products and services that NNI could have created and marketed. In addition, Exhibit 3 shows the underlying U.S. patents in the Patent Portfolio that underpin these products and services. It is essential to recognize that what is presented represents an amalgam of underlying products, each supported by one or more patents, that when integrated as a system, provides a significant saleable product offering. I have further prepared a detailed table in Exhibit 4, which addresses each patent that I reference in Exhibit 3, provides the title of the patent, and then a statement as to why each patent adds specific value to the system I have proposed. This approach is typical in the high tech industry. For example, in a wireless system, one must include an integrated whole consisting of antennas, transmitters and receivers, interconnection capabilities, switches, management and billing capabilities, and

---

[12] "Famous Women Inventors," accessed February 25, 2014, http://www.women-inventors.com/Hedy-Lammar.asp.

Highly Confidential

provisioning and repair systems.[13] The opportunities I present are of this type of integrated multi-product offering.

36.    While many of the product offerings I identify would have been new for NNI, in my opinion and experience, after the Business Line Sales, NNI would have been in a better position to pursue these opportunities. This is because it would no longer have the significant cost base it had as a member of the Nortel Group, including R&D costs, group administration expenses, and transfer pricing obligations. I understand that NNI by itself had good customer relationships and together with access to capital, which as I note below should have been available, NNI had the potential to be a profitable stand-alone business following the completion of the Business Line Sales.

37.    I will now provide an example of how patents would be used to implement a specific product offering, Multimedia Communications Systems and Services. First, I describe the Multimedia Broadband System ("MBS"), the system underlying the product offering, and demonstrate that it is a commercially viable system and service. Second, I describe, at a high level, the details around implementing the MBS, focusing on hardware, software, adaptive network management, and end-user elements. Third, I provide examples where the patents I have examined can be used to implement the MBS.[14] Finally, I discuss how the group of patents can be used in operations, specifically the benefit of the patents in implementation, rapid deployment of this type of system, and providing a sustainable competitive advantage.

---

[13] *See*, for example, "Wireless System Architecture: How Wireless Works," Cisco, accessed February 25, 2014, http://www.ciscopress.com/articles/article.asp?p=344242.
[14] *See* Exhibits 3 to 5.

Highly Confidential

38.     The MBS enables users in separate locations to communicate through high quality video, high frequency audio, data, images, and text. It attempts to recreate the in-person meeting experience. Thus, users can experience the benefits of meeting in-person without the costs and time of travel. For example, two colleagues in different offices, such as Google's New York City office and Google's headquarters in Mountain View, California, would be able to collaborate face-to-face on a long-term project using the MBS while avoiding a cross-country flight. Similarly, consultants and clients would be able to simulate the in-person experience by using the MBS, which would lead to improved productivity and cost savings.

39.     In addition to businesses and large corporations, potential users of the system include government entities, educational institutions, and hospitals. In a government setting, the MBS would facilitate collaboration and connectivity within and across large federal and state agencies. In education, the MBS can be used to connect students with teachers and professors across the U.S., fostering an environment of interactive collaboration and learning. Finally, in healthcare, the MBS can help improve quality and speed of care by enabling physicians and nurses to collaborate with colleagues across hospitals within a hospital system and with external specialists for consultations.

40.     The proposed MBS has four main technical components: software, hardware, network management, and end-user elements. The first component, software, works to minimize delays and ensure high quality video and audio for the user experience. Software consists of the following layered functions: Communications Control, Session Management, Media Interfaces, and Database Management.

1.  <u>Communications Control</u>: Software must control the flow of communications amongst the users. Communications must be secure, yet unencumbered, so that delay is minimized

19

Highly Confidential

and throughput is maximized. Delay minimization is critical for the user experience. For example, users find it frustrating when live video freezes or sound lags during a call. This set of software helps minimize such user complaints by interfacing with Internet Protocol based networks using broadband communications that provide high throughput and low delay. For example, patent ▮▮▮▮▮ and patent ▮▮▮▮▮ both lessen delays.[15]

2. <u>Session Management</u>: A session is a multimedia connection between users. Session management enables, controls, and coordinates multimedia communications for users, ensuring that users in two different locations can view multimedia elements simultaneously and in the same format. It must include: (i) Event Management: any multimedia activity leads to what is referred to as a "transaction," such as a change to a document or a purchase of a product, and the event manager manages each transaction to confirm all required steps of the transaction are completed properly. Multimedia events such as video conferences are complex, and thus, the manager must deal with these complexities across different locations; (ii) Dialogue Management: the multimedia conversation resources are shared, and the dialogue management must encourage and facilitate conversation or interaction among the various parts of the system. For example, suppose the CEO of a company holds a large meeting with several staff members to discuss progress in each office location. Dialogue management enables the CEO's voice to have priority over other meeting participants; (iii) Activity Management: activities are extended events and displaced conversational elements that must be remembered and connected. An example of an activity would be a lecture by a professor followed by an

---

[15] ▮▮▮▮▮.

Highly Confidential

experiment and student discussion. Activity management would keep track of the lecture as well as conversations between students; and (iv) Synchronization: the orchestration of the many elements in a multimedia conversation. At a high level, session management improves the user experience for sharing multimedia. For example, patent ██████ and patent ██████ support session management and are essential to the development of the MBS.[16]

3. <u>Media Interfaces</u>: Media interfaces encode and decode multimedia elements, such as audio and video, before and after transmission. Media interfaces work to ensure that video and audio conversion, or encoding, is high quality and that the final de-converted, or decoded, video and audio appear high quality to the viewer. Proper and efficient coding is critical in order to maintain high quality audio and high resolution video. Due to this process, users are able to experience high quality video resolution in real time. A low-end version of media interface would be similar to that which is used in Skype, software that allows users to make voice and video calls using the Internet.[17] For example, patent ██████ enhances speech quality through the use of directional audio.[18]

4. <u>Database Management</u>: Software can help manage underlying databases, such as data shared or downloaded by users. Transmitting and recording high resolution video and high frequency audio can require high performing data management solutions.

---

[16] ██████.
[17] "Skype Company Profile," Hoovers, accessed February 27, 2014, http://www.hoovers.com/company-information/cs/company-profile.Skype_Global_S%C3%83%C2%A0_rl.57f78cdaaf658f45 html.
[18] ██████

Highly Confidential

41.    The second component, hardware, is composed of six major categories of multimedia technology and elements: Display, Processors, Content Manager Server, Storage, Enhancement, and Communication. This set of hardware improves the user experience through enhanced video and sound performance, the ability to share and download data, and both internal and external network storage.

1. Display: Multimedia display areas offer improved resolution and display presentation. For example, high definition multimedia displays can promote a crisp, life-like image, enhancing user experience. In addition to displaying an image, the display may include sound or touchscreens. It may also be used to set up meetings.

2. Processors: In order to provide high performance overall, including a high quality image, the processor must work to locally enhance, manipulate, display, or interpret multimedia elements.

3. Content Manager Server: With a content manager server, users can share and download data and enhance communication by recording a video conference. This is a general hardware server that is part of a multimedia system.

4. Storage: Multimedia data can be stored internally or on external network storage. For example, users can store data, such as presentations, recorded tutorials, or meetings, for later use and can retrieve the data when convenient. Storage is the composite of elements used for a multimedia database storage and retrieval system.

5. Enhancement: These are special purpose processors and processes that are used for enhancing images, video, voice, and other multimedia elements. Ultimately, these hardware elements work to improve the user's multimedia experience.

22

Highly Confidential

6. <u>Communication</u>: This is the combination of all required communications hardware elements that enable capture (video, audio, etc.), transport, and interfacing with other system elements.

42.     The third component, adaptive network management, is required both in the MBS and other systems described in Exhibit 3. Adaptive network management involves monitoring faults and performance across applications, servers, and networks. An effective network management system identifies and resolves faults and minimizes the number of outages. At a high level, this complex system includes monitoring probes and performance measurement entities. Additionally, the MBS uses essential hardware and software to perform network management tasks. Although not discussed below, Exhibit 3 and Exhibit 4 detail 165 patents that support network management.

1. <u>Monitoring</u>: The system includes monitoring probes to detect whether the hardware and software are functioning properly. If an issue is detected, the probe determines which specific diagnostic data can be provided to assist in ascertaining the possible fault.

2. <u>Performance Measurement</u>: This includes entities that measure performance, specifically, how well the system is responding to requests, how fast the data is being transported, what delays may be present, and how well the complex multimedia "conversations" are being coordinated.

43.     The final component, end-user elements, includes both hardware and software. On the low-end, end-user hardware may consist of simple computers and on the high-end, hardware may include sophisticated video and other multimedia display and capture devices, such as High-definition Television ("HDTV") elements. The end-user elements are supported by the software discussed above as well as adaptive network management facilities.

23

Highly Confidential

44.     Below I present a subset of which patents would be used and for what purpose they could be employed. In Exhibit 3, I have presented a summary of the MBS and the 95 related patents. Exhibit 4 details the contribution of each of the 95 patents to the MBS. As an example, I now discuss the applicability of a limited, but descriptive, subset of the 95 patents. Table 1 below depicts a subset of patents that I have selected. The patents are identified by the patent number and the patent title. Next is a brief description of why the patent was chosen and its relationship to the MBS.

### Table 1. Selected Patents Used in Multimedia Communications Systems and Services

| Patent Number | Patent Title | Patent Contribution |
|---|---|---|
| ██████ | ██████ | This patent can provide a variety of user identification, location, and other descriptors of interest. |
| ██████ | ██████ | Speech quality is enhanced via the use of directional audio, and this patent facilitates that function. |
| ██████ | ██████ | Multi-user and multimedia systems require high quality of service over broadband environments, wire or wireless. This patent facilitates such functionality. |
| ██████ | ██████ | Speech is one element of multimedia that must be equally facilitated and integrated. This patent supports that need. |
| ██████ | ██████ | Voice management and control is an essential element of multimedia, and this patent can facilitate that requirement. |
| ██████ | ██████ | Speech recognition based upon limited data is a useful function, and this patent can prove useful. |
| ██████ | ██████ | Allocation of resources is a key element across many opportunities, not only multimedia but also spectrum sharing. This patent presents some useful applications. |
| ██████ | ██████ | Multiclass networks allow for priority queuing, and it is a form of policy management at the user level. This is an essential function of session level services as well as Layer 2 control. |
| ██████ | ██████ | In any multimedia system, it is essential to recognize the presence of individuals and to associate conversation control with some equitable and agreed to protocol. This patent assists in that function. |

24

Highly Confidential

| Patent Number | Patent Title | Patent Contribution |
|---|---|---|
| ▮▮▮ ▮▮▮ | ▮▮▮ | This patent enables the location of any user no matter what their RF access mechanism is. This is a method that can supplement GPS.<br>Each user can have a different type of capability. It is essential to detect the type of capability so as to automatically adjust the service to match capability. This patent accomplishes this task. |
| ▮▮▮ ▮▮▮ | ▮▮▮ | Security of multimedia networks can be attained at Layer 2. This is especially the case with a VPN, which would be the transport mechanism for the most secure data. This patent enables that capability. |
| ▮▮▮ | ▮▮▮ | Quality of service is essential in interconnecting the hubbed and multimedia networks, and this patent supports that requirement. |
| ▮▮▮ | ▮▮▮ | In any multimedia system, it is essential to recognize the presence of individuals and to associate conversation control with some equitable and agreed to protocol. This patent assists in that function. |
| ▮▮▮ | ▮▮▮ | This is a mechanism to insert ads in a digital video environment in anticipation of a user's interest. |
| ▮▮▮ | ▮▮▮ | Identifying and tracking users in a legal manner is an essential capability in the development of such systems. |
| ▮▮▮ | ▮▮▮ | Session management is at the heart of multimedia. This patent supports that function. |
| ▮▮▮ | ▮▮▮ | Security of multimedia networks can be attained at Layer 2. This is especially the case with a VPN, which would be the transport mechanism for the most secure data. This patent enables that capability. |
| ▮▮▮ | ▮▮▮ | Integrating services across current and older media is a need for many of these types of networks. This patent focuses on that effort.<br>Financial transactions are often involved in multimedia systems, and this patent greatly facilitates this function. |
| ▮▮▮ | ▮▮▮ | Resource allocation is a key element in balancing user demands, media complexity, and session management. |

Highly Confidential

45.     In a similar manner, for each of the other seven opportunities, I have examined the patents in the context of the specific system opportunity and then chose a set of patents that correspond to needs required in the development and deployment of such a system.[19] In many ways, the opportunities are complex yet highly interrelated systems, and the patents provided have a robust capability of being employed across a wide range of opportunities.

46.     Now, I describe how the patents are used operationally and strategically. The patents confer specific benefits in implementation, rapid deployment of this type of system, and providing a sustainable competitive advantage.

47.     The patents as I have described above allow a clear path for implementing certain features and functions. The patents demonstrate viability of a specific implementation path and provide details as to how this can be achieved. For example:

- ████████ is a patent that enables speech recognition. In some of the multimedia applications, there is often a need to convert voice to text as well as recognize certain commands. This patent supports that need.

- ████████ is a trusted multimedia patent. Having a mechanism that enables a broad security capability in a multimedia network is essential to ensure that all multimedia elements (video, voice, data, text, and image) are kept secure between authorized users. This patent assists in that function.

- ████████ is a session establishment patent. As I had indicated, the heart of any multimedia system is the construct of a session, which represents a combination of users and their related multimedia objects. This patent facilitates control over which user

---

[19] *See* Exhibits 3 and 4.

Highly Confidential

speaks and when. For example, in a large board meeting, the chair may want to control which members speaks and when.

- ███████ is a patent facilitating the process for monitoring who is present in a meeting. On the one hand, it can be useful for monitoring who is in the session, and on the other hand, it can be useful in monitoring intruders. The use of the methods in the patent can facilitate this in the implementation phase.

These few examples are just a small sample of how technology embodied in a patent can be used to implement the desired service offering.

48.     Having a patent makes it possible to skip certain development steps and reduce the risk associated with implementation. For example, below I list a few cases where the time to market can be accelerated using some of the patents.

- ███████ is a patent that facilitates the security needs of disparate networks. Multimedia sessions may be enabled between dissimilar networks and the ability to secure the disparate networks at a high level is essential. This patent assists in that function.

- ███████ is a patent for steering directional microphones. In any multimedia system, there is a need to be able to establish within sessions a protocol for who is speaking when. Quality audio is further enhanced by steering the microphone to the speaker. This patent provides an enhanced capability to attain the highest quality audio consistent with the session protocol for assigning speaker control. Thus, in the board meeting example, the chair can always gain control by having the microphone steered in a specific direction.

Highly Confidential

49.     Patents fundamentally offer a sustainable competitive advantage. Establishing the development of systems and provision of services around a strong set of patents creates a strong base to protect against competitors in the market. In addition, assets included in the patent pool may lend to strategically successful joint ventures. While at Warner Communications, I experienced this when I assembled a joint venture wherein I was able to pool the assets of a multiplicity of participants to establish a sustainable market.

50.     I now turn to a discussion of key elements of a business plan for the eight opportunities.

## VIII.  BUSINESS PLAN

51.     Each of the eight product offerings considered represent viable business opportunities similar to those I have worked on in the past. I developed a business plan for AirOptics to provide wireless short hop extremely high bandwidth systems that are readily deployable in secure environments.[20] In each of these areas, I have had the opportunity to understand the technology, deal with potential or actual customers, understand the competition, and develop a reasonable understanding of the requirements for preparing and implementing business plans. Based on this experience, I am of the opinion that the eight product offerings I have identified as being available for NNI to develop after the Business Line Sales (among many potential other offerings and monetization strategies) were viable and potentially lucrative.

52.     The previous section demonstrated that there were products that NNI could have created using a sample set of U.S. patents in the Patent Portfolio. To further show that doing so was realistic, I now outline a sample business plan to demonstrate how NNI might have

---

[20] Terrence P. McGarty, "AirOptics Business Plan," February 2, 1997.

Highly Confidential

realistically executed this monetization strategy. As I discuss in my book, *Business Plans That Win Venture Capital*, common elements to a business plan should include:[21]

1. Business Definition: This is a detailed statement of the business and the product that describes the compelling current need for the elements of the product offering.

2. Market: This describes the target customer and their demand for each product offering.

3. Competition: This describes the competition and the competitive strategy for each product offering.

4. Development Effort: This describes how the business would progress from a start-up to being fully operational and begin generating revenue. This would include details regarding how the product offering can be brought to market.

5. Operations and Management Plan: This describes how the business would be managed and what resources, labor, and capital would be required. This includes a best estimate of the costs to deliver the identified product offerings.

6. Financials: This sets forth the expected revenues, expenses, and capital requirements.

53.     For each of the product offerings, Exhibit 5 discusses elements one to four and demonstrates that each of the product offerings constitutes a viable business opportunity. I turn now to a discussion of elements five and six.

---

[21] *Supra* note **Error! Bookmark not defined.**, 21-22.

Highly Confidential

A.    **Operations and Management**

54.    From an operations and management perspective, developing the product offerings would have been easier for NNI than for a typical start-up. As discussed below, I understand that NNI had significant capital available and that capital would increase after distribution of the proceeds from the Business Line Sales. In addition, NNI had established customer relationships it could draw on. These factors would have been very powerful in retaining or attracting competent management.

55.    Most importantly, however, the product offerings would have been competitive. As detailed in Exhibit 5, each of the product offerings would have been based on a large number of inter-related patents. As discussed below, the target markets for the product offerings could have reached over $10 billion. The patents would have provided entry into markets where the cost of entry, absent a set of patents on which to base product offerings, would have been very high.

B.    **Financials**

1.    **Revenues**

56.    The businesses are likely to generate significant revenues on both a project-by-project as well as recurring basis. Assuming customer demand growth, the businesses would likely experience a gradual buildup of equity value over time. Based on my experience with similar businesses, I project the revenues for the business opportunities identified to be in the billions of dollars over a period of three to five years.

30

Highly Confidential

## 2. Operating Costs

57.     For each of the business opportunities, the operating costs would largely be related to personnel costs and outsourcing. Specifically, operating costs would include the following:

- *Project management*: This includes cost related to vendor and customer management.

- *Systems integration*: The costs related to maintaining infrastructure and software.

- *Marketing and sales:* Sales team personnel costs and related advertising costs.

- *Installation management:* The costs related to vendor selection and negotiation, network design, and installation oversight are comprised of personnel costs.

- *General & Administrative:* Personnel costs related to general management, administrative support, and customer support.

## 3. Capital Expenditures and Financing

58.     I understand from counsel that NNI would have had at least $500 million available to invest in the product offerings I have described. This amount, in my opinion, would have been more than sufficient for NNI to launch businesses based on these offerings. But even if the $500 million had not been available to NNI, in my experience NNI could have raised money for the product offerings. In early 2008, I had been considering several substantial investments but due to the financial crisis I deferred any further work. By the middle of 2010, I had begun reconsidering investment possibilities again and by early 2011 I had commenced discussions with private equity investors, whom I had dealt with in the past, and they began to show considerable interest again. In my experience, I believe that there would have been

31

Highly Confidential

substantial interest by private equity investors regarding the raising of additional capital for the product offerings that I have developed in this report.

## IX.    CONCLUSIONS

59.    Based on my experience, expertise, and analysis, I conclude that:

60.    Instead of surrendering its licenses to the Patent Portfolio after the Business Line Sales, NNI could have monetized its license rights in the Patent Portfolio in a number of ways, including through the sale of the sample set of product offerings I describe in my report.

61.    NNI's license rights in the Patent Portfolio had substantial value following the Business Line Sales and provided opportunities to develop a significant number of business opportunities, of which I only identify eight here, which in turn would generate a substantial revenue stream and cash flow. Furthermore, based on my experience building similar businesses, the development of the business opportunities I have identified is realistically achievable and potentially lucrative.

62.    Accordingly, I do not agree with the Green Report's assumption that NNI's license rights had no value after the Business Line Sales.

63.    My opinions may change if additional information from any of the parties-in-suit or their experts becomes available. I, therefore, reserve the right to supplement my report accordingly.

Signed on the 28th day of February 2014.

Terrence P. McGarty

32

Highly Confidential

Court File No.:  09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, C. C-36, AS AMENDED.

- and the -

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------------X
                                          :
                                          :      Chapter 11
                                          :
In re                                     :
                                          :      Case No. 09-10138 (KG)
                                          :
Nortel Networks Inc., et al.,             :
                                          :      Jointly Administered
               Debtors.                   :
                                          :
                                          :
                                          :
-----------------------------------------------------------X
```

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1.    My name is Terrence P. McGarty. I live in Florham Park, New Jersey, USA.

2.    I have been engaged by counsel for the U.S. Debtors to provide evidence in
      relation to the above-noted court proceedings.

3.    I acknowledge that it is my duty to provide evidence in relation to this proceeding
      as follows:

33

Highly Confidential

(a)     to provide opinion evidence that is fair, objective and non-partisan;

(b)     to provide opinion evidence that is related only to matters that are within my area of expertise; and

(c)     to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.      I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Terrence P. McGarty

Date:      February 28, 2014

34

Highly Confidential