**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

— and —

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

**In re Nortel Networks Inc.,** *et al.*

_____

**Expert Report of Paul P. Huffard**

**In Rebuttal to Canadian and U.S. Expert Reports**
_____

February 28, 2014

**THIS REPORT CONTAINS CITATIONS TO DOCUMENTS MARKED
HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

**In re Nortel Networks Inc., *et al.***

# Table of Contents

I.      INTRODUCTION ...................................................................................................4

II.     SUMMARY OF RESPONSES TO OTHER PARTIES' EXPERT
        REPORTS ...............................................................................................................5

III.    RESPONSES TO CANADIAN EXPERT REPORTS ...........................................8

        A.      The Canadian Approach to Allocation of Proceeds Attributable To
                Tangible Assets....................................................................................... 9

        B.      The Canadian Approach to Allocation of Proceeds Attributable to
                Intangible Assets.................................................................................. 10

IV.     RESPONSES TO THE CANADIAN CREDITORS COMMITTEE
        EXPERT REPORT ...............................................................................................32

V.      RESPONSES TO THE U.S. EXPERT REPORTS ...............................................42

VI.     CONCLUSION ....................................................................................................49

62875345_9

I, PAUL P. HUFFARD, declare under penalty of perjury that the following is true and correct:

## I.    INTRODUCTION

1.    I am a Senior Managing Director in the Restructuring & Reorganization Group of Blackstone Advisory Services L.P. ("Blackstone"), a financial advisory services firm retained by the Joint Administrators for the EMEA Debtors.  I submit this report to supplement my Expert Report dated January 24, 2014 (the "Opening Expert Report"), and in particular to respond to the allocation approaches proposed in the reports submitted by the experts retained by the Canadian Debtors, the Canadian Creditors Committee (the "CCC"), and the U.S. Debtors.[1]  I refer to and incorporate herein the statement of my qualifications, factual background and other pertinent sections of the Opening Expert Report.

2.    Except as otherwise indicated, the opinions set forth in this declaration are based upon my personal knowledge, experience, public information and review of relevant business records and information of Nortel.  In preparing this report, I have relied on various documents related to the issues discussed herein, including the documents set forth in Appendix 1 to this report and the documents set forth in Appendix 3 to my Opening Expert Report. I have also relied on the work of Blackstone employees, whom I have supervised in preparation of this report.  I am authorized to submit this report on behalf of Blackstone, and if called upon to testify, I would testify competently to the opinions set forth in this report.  Except where I state otherwise, the opinions expressed in this report are my own. I reserve the right to supplement or amend this report and my Opening Expert Report as appropriate.

---

1.    Unless otherwise indicated, capitalized terms used herein shall have the same meanings as in the Opening Expert Report.

## II.    SUMMARY OF RESPONSES TO OTHER PARTIES' EXPERT REPORTS

3.      For the reasons given in my Opening Expert Report and as further explained herein, the best approach to the allocation of Sale Proceeds in this matter is to (i) identify the classes of assets sold in each transaction, (ii) determine what portion of each purchase price is attributable to each class of assets, and (iii) determine how to allocate the proceeds attributable to each class of assets according to the relative rights of the Selling Debtors to that class of assets.

4.      In my Opening Expert Report I explained that, for each of the Business Sales, the assets sold were comprised of Tangible Assets and Intangible Assets.  Intangible Assets consisted of IP and a residual category of Customer-Related Assets and Goodwill.  I determined the portion of each purchase price attributable to each of these asset classes. I then allocated the portion of the Sale Proceeds attributable to Tangible Assets to the entity that owned the assets, in accordance with book value, as recorded on the books of Nortel.  I allocated the portions of the Sale Proceeds attributable to IP by applying two alternative approaches:  the Contribution Approach and the License Approach.  I believe that the Contribution Approach is most appropriate because it follows the principles applied by the parties themselves prior to insolvency, *i.e.*, that they would each enjoy the benefits from commercial exploitation of jointly created IP in proportion to their relative contributions to the creation of that IP.  These principles underpinned the residual profit sharing methodology ("<u>RPS</u>") applied by the parties from 2001 onward and were reflected in the MRDA.  It is significant that the parties applied these same principles when they divided the portion of the sale proceeds attributable to IP in the one relevant pre-insolvency business disposition, *i.e.*, the sale of the UMTS business to Alcatel.  Finally, with respect to the Customer-Related Assets and Goodwill, I allocated these according to the relative revenue that each entity produced in the year prior to the insolvency filing, *i.e.*, 2008.

5.      For the Residual Patents Sale, which was comprised entirely of IP, I have allocated the Sale Proceeds in the same manner as IP is allocated in the Business Sales, *i.e.*, by applying the Contribution Approach and the alternative License Approach.

6.      Each of the Canadian Debtors' Experts and the CCC's Experts in theory agree that an asset-based approach is the most appropriate way to allocate the proceeds.  However, I do not consider that those experts take proper account of the classes of assets and the interests that the parties had in the assets that were transferred in the various sales.

7.      The reports submitted by the Canadian Experts, while claiming to apply the MRDA and an asset-based approach, are premised on assumptions, which I do not consider are correct, about the rights that accrued to NNL as the holder of bare legal title to Nortel's IP and the nature of the Licenses held by the other RPEs.  The Canadian Experts assume that, as holder of bare legal title to most of the Nortel patents, NNL is presumptively entitled to receive 100% of the proceeds from the sale of those patents.  This assumption results in the Canadian Debtor obtaining ***all*** the value of the Residual Patents Sale, as well as the vast majority of the IP-related proceeds in each of the Business Sales.  Although the Canadian Debtors allow the other RPEs to recover the value of the license rights they surrendered in connection with the Business Sales, the methodology applied to value those Licenses is based on assumptions, which I do not consider are correct and which have the effect of underestimating the economic substance of those Licenses.  The Canadian Experts also assume that the license rights of the RPEs were far more limited than they actually were, they apply a "value in use" methodology, which in my view understates the likely future revenues to be gained from exploitation of the IP and ignoring the assumptions and projections that would have been used by the purchasers in determining the prices they were willing to pay.  The allocation to the Canadian Debtors is further increased by

grouping non-IP asset classes, such as Customer Relationships, together with IP, although they do not suggest that NNL had legal ownership of Customer Relationships, customer contracts and valuable employees that were managed by other RPEs and transferred by them in the various sales. The Canadian Experts' approach is, in my view, inconsistent with the express commercial understandings pursuant to which the entire Nortel group created the IP that the Canadian Debtors claim to be solely entitled, how the MRDA operated (particularly the fact that the MRDA treated NNL no differently than any other RPE) or to how the parties allocated proceeds associated with the 2006 sale of Nortel's UMTS business to Alcatel-Lucent. Indeed, the methodology of the Canadian Experts is also inconsistent with how the Canadian Debtor chose to allocate the proceeds of the Business Sales in their own financial accounts post-filing.

8.    The experts retained by the CCC have also attempted an asset-based approach, and also seek to apply the MRDA, but make many of the same assumptions about NNL's rights to the proceeds attributable to IP as the Canadian Experts. This again leads to the result of allocating all of the proceeds of the Residual Patents Sale to the Canadian Debtors. In relation to the Business Sales, although the CCC's Experts have attempted to distinguish between the various classes of assets being sold (albeit by using what I understand are inadmissible Buyer PPAs) they depress the non-Canadian share of value by applying a "value in use" concept through the use of business valuations drawn from the 2008 Annual Impairment Test ("AIT") that are materially lower than the actual proceeds realized in the Business Sales. This produces a result that appears to me to inequitably favor the Canadian Debtors at the expense of the U.S. and EMEA Debtors, similar to the Canadian Expert Reports.

9.    The U.S. Experts present an allocation methodology based on relative revenues for the Business Sales and essentially a high level DCF analysis with respect to the Residual

Patent Sale Proceeds.  In effect they ask the Courts to treat the U.S. company as if it had been a standalone business, unconnected to the rest of the Nortel group, that could have been sold by itself.  In my opinion, this does not reflect the pattern of ownership and rights to the assets valued, and assumes that a territorial entity was entitled to keep all of the value attributable to the revenues generated in its territory.  Although the U.S. Experts base their approach on valuing the fair market value of the Licenses granted under the MRDA, in my view the appropriate way to value the Licenses is in the manner set forth in my Opening Expert Report.

10.    I address each of the Canadian, CCC and U.S. Expert Reports in greater detail and in turn below.

## III.    RESPONSES TO CANADIAN EXPERT REPORTS

11.    The Canadian Debtors present two expert reports outlining their Valuation and Allocation Methodology ("Canadian Methodology"):  the Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities dated January 24, 2014 (the "Green Report") and the Report of Mark L. Berenblut and Alan J. Cox, NERA Economic Consulting, dated January 24, 2014 (the "NERA Report") (Green, Berenblut and Cox, collectively, the "Canadian Experts" and, with respect to their reports, the "Canadian Expert Reports").  The Canadian Experts value and ascribe proceeds from the Business Sales to a number of different asset categories: (1) Tangible Assets, (2) In-Place Workforce, and (3) License Rights Surrendered.[2] The balance of the Sale Proceeds, a residual category that represents the difference between the total proceeds and the sum of the specific asset classes Canadian Experts have discretely valued (*i.e.*, the Tangible Assets, the In-Place Workforce, and the License Rights Surrendered), are

---

2.   Green Report at 16.

nominally called "IP" by the Canadian Experts and are presumptively allocated entirely to NNL on the basis that it is the legal owner of the IP.[3]

12.     While I agree with the Canadian Experts that the classes of assets sold in each Asset Sale must be separately identified and allocated, in my view the Canadian Methodology produces an inaccurate result because it uses inappropriate metrics that limit the value of each of the asset classes it values, resulting in an inflated residual category in which several categories of Intangible Assets are grouped together with IP (*e.g.*, Customer-Related Assets, Distribution Networks, trademarks, brand names and Goodwill, collectively the residual category, the "Residual Value").  The Canadian Experts then award all of that residual pool to the Canadian Debtors, less only the minimal values they ascribe to the Licenses of the RPEs calculated and deducted solely from the proceeds of the Business Sales.[4]  The Canadian Methodology for allocating the Sale Proceeds attributable to IP results in a windfall for NNL, at the expense of each of the other RPEs, rather than treating each RPE in a manner consistent with Nortel's operating and historic practices. The size of this windfall is increased by grouping proceeds attributable to non-IP Intangible Assets together with IP.

   A.     **The Canadian Approach to Allocation of Proceeds Attributable To Tangible Assets**

13.     The Canadian Expert Reports look first to the Tangible Assets and allocate balance sheet values attributable to Tangible Assets, which include inventory, prepaid expenses and property, plant and equipment, among the various debtor entities based on the ownership of each Tangible Asset category as drawn from a combination of Nortel's Carve-out Statements

---

3.   *See id.*

4.   *See* Green Report at 5-6.

(prepared by PricewaterhouseCoopers and KPMG only for certain of the Business Sales) and Gain/Loss Statements for the balance of the Business Sales.[5]  The Canadian Experts do not include in their calculations the transfer of certain liabilities that were identified in each of the ASAs.[6]

14.  Using the financial statements as a basis to establish fair market value for the Tangible Assets is a reasonable assumption given the limited information available and the fact that an appraisal of the assets can as a practical matter no longer be conducted.  It is also reasonable to assume that the allocation of the Tangible Assets should be done in accordance with the financial statements at the entity level.  The Canadian Methodology differs from the approach in my Opening Expert Report in that it does not account for the liabilities assumed in each of the transactions, although I accept that accounting for such liabilities does not have a significant impact on ultimate allocation.

**B.    The Canadian Approach to Allocation of Proceeds Attributable to Intangible Assets**

15.  The Canadian Experts' approach to allocating Sale Proceeds attributable to what they consider to be intangible assets breaks those identified by the Canadian Experts into three main categories:

  i.    the "In-Place Workforce";

  ii.   the Residual Value (inclusive of IP, as well as Customer-Related Assets, Distribution Networks, trademarks, brand names and Goodwill) that the Canadian Experts nominally label "IP"; and

---

5.  *See* Green Report at 40-41, 50.

6.  Green Report at 42.

62875345_9

iii.    the "License Rights Surrendered."[7]

**In-Place Workforce**

16.    The Canadian Experts estimate the value of In-Place Workforce based on replacement cost of hiring and training such a workforce by type of position.[8]  The In-Place Workforce has been valued separately and allocated based on the specific employees transferred in each of the Business Sales.[9]

17.    Although the specific out-of-pocket costs (recruiting fees, training, and down-time) that the Canadian Experts calculate are legitimate portions of the In-Place Workforce value, they understate the true value of Nortel's long-standing, highly trained and expert workforce.[10]  There is no readily available method to separately quantify the value that Nortel was able to realize for its In-Place Workforce, given the qualitative and subjective nature of long employee tenure, specific training and skills, relationships with customers, scientists, suppliers, etc., all of which are difficult to quantify but nonetheless, in my opinion, are a significant

---

7.   Green Report at 5.

8.   Green Report at 44-45, 52-53.  More specifically, the estimated costs reflect the commissions to employment agencies, advertising open positions and pay for the time of in-house personnel involved in the recruitment process.  Employment agency commissions are assumed to amount to between 20% and 30% of annual salary of each replacement employee.  In-Place Workforce value also includes human resources costs of training employees.  *Id.*

9.   *See id.*

10.  The value of the inventors within Nortel's work force in particular was recognised by Gillian McColgan, the Chief Technology Officer in Nortel's IP Co. team.  During her deposition, Ms McColgan commented that the contribution of staff in all of Nortel's labs to the development of Nortel's products was "seminally important."  Transcript of Deposition of Gillian McColgan dated November 8, 2013 ("McColgan Tr.") at 81.  Ms. McColgan elaborated, "Nortel's culture was around centres of excellence, and when we drew on groups from the U.K. labs or any other lab, for that matter, it was because they were acknowledged as having a particular expertise and a contribution to make.  Harlow and Monkstown in general would have been more recognized on the optical side . . . Ian McClyont's lab, for example, was acknowledged throughout the corporation as having a significant RF analog engineering contribution.  There were other groups in Harlow that had a significant focus on ATM, data networking, switching and other things like that, and then of course there was -- those labs came out of what I would have called the STC side of the house, and then obviously the Maidenhead lab, which was the original Nortel in Europe, had a particular voice expertise, having come through the DMS side." *Id.* at 81-82.

component of the overall intangible value of a company.  Because of this difficulty, such value is typically captured in a residual Goodwill asset category rather than being separately quantified. In my Opening Expert Report, value attributed to this asset category is encompassed in a residual category of Customer-Related Assets and Goodwill, which are allocated according to the Selling Debtors' respective revenues.[11]  In the Canadian Expert Reports, there is no separate Intangible Asset category for Goodwill, rather it is subsumed within the Residual Value and allocated along the same method as other assets in that class.[12]  By ignoring Goodwill and significantly undervaluing In-Place Workforce, the Canadian Experts shift an amount that should be associated with the In-Place Workforce (and allocated to the different RPEs) into their category of Residual Value (which is allocated almost exclusively to NNL).  This approach inappropriately advantages NNL.

**Residual Value**

18.    The Canadian Methodology with respect to allocation of Sale Proceeds attributable to Residual Value (that is value the Canadian Experts say is in some way related to Nortel's IP) is based on a number of flawed assumptions that skew the results in the favor of the Canadian Debtors.  The Canadian Experts deduct the values attributed to the Tangible Assets and In-Place Workforce from the purchase price, leaving a substantial remainder of residual proceeds.[13]  The Canadian Experts then allocate that residual asset class almost entirely to the Canadian Debtors based on the incorrect assumption that NNL is entitled to those Sale Proceeds

---

11.  *See* Opening Expert Report at 3-4.

12.  *See* Green Report at 5.

13.  Green Report at 49.

because NNL held bare legal title to IP.[14]    Additionally, the Canadian Experts do not acknowledge that what they deem Residual Value necessarily encompasses value attributable not only to IP, but also to numerous other classes of Intangible Assets that transferred in the Business Sales, of which the Canadian Debtors did not hold exclusive bare legal title.

### a.    The Assignment of Legal Title to NNL Should Not Give It a Presumptive Right to All Proceeds From the Sale of IP

19.    The Canadian Expert Reports focus on the fact that bare legal title to most of the IP created by the various Nortel companies had been assigned to NNL.[15]    Based on this assignment of bare legal title, the Canadian Experts conclude that NNL is presumptively entitled to 100% of the Sale Proceeds that are attributable to IP in the Business Sales as well as in respect of the Residual Patents Sale.[16]    The only concession the Canadian Experts make to the EMEA and U.S. Debtors in respect of IP Sale Proceeds is to acknowledge that, with respect to the Business Sales only, they should at least be credited with the value of their license rights under the MRDA.[17]    The assumption that legal title carried a presumptive right to the proceeds of the Residual Patents Sale is, in my opinion, contrary to the way the Nortel companies operated.[18]

20.    The historical method in which Nortel managed its business (at least since 2001, when the original RPS was put in place) was to allocate profit or loss to those entities within the Nortel corporate family that bore the expenses and risks of R&D in proportion to their historical

---

14. Green Report at 4-5.

15. NERA Report at 21, n.56 ("We are also advised that legal title and legal ownership are synonymous.").

16. NERA Report at ¶ 26; Green Report at 5.

17. *Id.*

18. *See generally* Opening Expert Report at Appendices 4 and 6.

R&D spending.[19]   This is consistent with the fact that, as a telecommunications technology company, Nortel's success or failure depended on the quantity and quality of the IP produced by Nortel's R&D efforts.[20]

21.    Since decisions about Nortel's R&D efforts were made centrally for the global enterprise, the resulting IP could have its genesis in multiple laboratories of multiple entities, created over various periods of time.[21]   As acknowledged in the Green Report, "In 2007, Nortel noted that its IP was subject to cross-fertilization among segments, merging or recycling of ideas, developments, [and] technology.   In addition, Nortel noted that many projects were developed and based upon older R&D projects or platforms.   Since R&D activities were so collaborative, Nortel recognized that counting inventions by country of origin can be misleading."[22]   Under such circumstances, it made sense to view overall proportions of R&D spending as the relevant metric to determine contribution to the global creation of profits, losses or asset value.[23]   For the same reasons, I believe a framework based on relative contribution towards overall R&D spending is the appropriate metric for allocating that portion of the Sale Proceeds relating to IP among the various debtor entities.

---

19.  *See generally* Opening Expert Report at Appendix 6.

20.  *See* Schedule A to that certain Third Addendum to the Master R&D Agreement, Exhibit 21003 (NNC-NNL0600514/48).

21.  *See generally* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007–2011: Appendix B: Functional Analysis of R&D Activities (October 31, 2008) (NNC-NNL06120690/8-12).

22.  Green Report at 24 *citing* NNC-NNL06001555_0005, Nortel Pre-filing Conference with CRA (October 2, 2007); NNC-NNL06001553_0060, Nortel Networks Limited – Transfer Pricing Report for the Taxation year ended December 31, 2009 (internal quotations omitted).

23.  *See* Opening Expert Report at Appendix 6, ¶¶ 4.3 and 4.4.

22.      As the key driver of value of Nortel's businesses and profits, IP produced the lion's share of the Sale Proceeds.  The Canadian Experts' approach to allocation of IP proceeds gives no value to the contributions that were made by each of the RPEs to the creation of this valuable IP.  In my experience, this is not commercially reasonable and it ignores the express understandings pursuant to which the RPEs incurred the costs and assumed the risks associated with the R&D that led to the creation of Nortel's IP.

23.      Under the CSA, each of the five RPEs was entitled to retain the proceeds from exploitation of the IP in its respective geographic area, regardless of which entity held the bare legal title.[24]  Under the RPS methodology and the MRDA, the assignment to NNL of bare legal title to Nortel IP did not give NNL the right to retain the proceeds that could be realized from the exploitation of that IP.[25]  Rather, each of the RPEs had a right to a portion of the profits from the worldwide exploitation of the IP based on its respective contribution to the creation of the IP, measured by proportional R&D spending.[26]  Under either regime, it was Nortel's practice that the assignment to NNL of legal title to the Nortel patents did not give NNL rights to receive the benefits of ownership of the IP greater than the rights enjoyed by each of the other four RPEs.[27] On the contrary, each of the RPEs enjoyed equal status as an entrepreneurial entity collaborating with the others in the creation and exploitation of Nortel's IP.  There is no evidence of which I am aware that NNL paid any consideration to the other RPEs that might arguably have entitled it to a greater share of the profits to be realized from the RPEs' collective endeavor.  Thus the

---

24.  *See* Opening Expert Report at Appendix 6, ¶ 4.1.

25.  *See* Opening Expert Report at Appendix 6, ¶ 4.2.1.

26.  *Id.*

27.  *Id.*

62875345_9

Canadian Experts' approach does not reflect the historical model developed by the parties and the economic substance of the parties' relationship to one another with respect to sharing the benefits to be gained from the use, licensing or sale of IP.  In contrast, and from my commercial perspective, I believe that Nortel's historical practice should provide the framework for allocating the Sale Proceeds attributable to IP.

24.     Although the MRDA does not, by its terms, dictate how the profit or loss or proceeds from a sale of a business should be allocated among the RPEs, it is appropriate to consider what, if any, reliance the Nortel group placed on the MRDA in relation to business dispositions prior to insolvency.   As is set out in my Opening Expert Report and as is acknowledged, and then summarily dismissed, in the Canadian Expert Reports, there is a precedent about how the Nortel entities allocated the proceeds of asset sales, namely the UMTS transaction.[28]  Indeed, the MRDA was specifically amended on December 30, 2006 to reflect the sale of the UMTS business[29]  and the allocation was subsequently reviewed as part of the group's audit procedures (the "Alcatel Addendum").[30]

25.     The proceeds from the UMTS sale were not allocated through Schedule A of the MRDA (as the Canadian Expert Reports, in part, attempt to do for the Sale Proceeds at issue here).  Rather, and consistent with the approach in my Opening Expert Report, the Nortel entities allocated the proceeds from the UMTS sale along the categories of Tangible Assets, IP,

---

28.  *See generally* Opening Expert Report at Appendices  9 and 10.

29.  The Alcatel Addendum amended the calculation of their R&D Capital Stock to exclude the IP being transferred to Alcatel.  *See* Alcatel Addendum (NNC-NNL06081062/2).

30.  *See* Agreement With Respect to Certain NN Technology dated December 30, 2006 (NNC-NNL06081062); and E-mail from L. Farr, Tax Dep't, NNI to T. Pickering, Senior Manager, Int'l Tax, Deloitte & Touche LLP, *et al.*, "UMTS Alcatel Transaction" (Jan. 29, 2007, 2:25 p.m.), Exhibit 21160, at BHG0137543.

Customer Relationships and Goodwill assets that were transferred to the buyer.[31]   The Nortel

entities separately allocated Customer Relationships and Goodwill rather than as a residual asset,

but did not limit those entitlements to any RPS formula.   In relation to IP, the Nortel parties

applied the RPS percentages to represent the RPEs' ownership of IP.[32]   This was not done on the

basis that the MRDA provided a binding formula or as a consequence of any valuation of the

license rights, much less on the basis of any rights of NNL as holder of bare legal title, but

because the RPEs were the beneficial owners of the IP. The second recital to the Alcatel

Addendum states that the UMTS business was "beneficially owned by the Participants in their

respective Territories in accordance with the terms of the Master R&D Agreement."[33]   Nortel

also compiled information for its auditors in relation to their audit of the UMTS sale, in which it

was stated that the MRDA percentages were applied to divide the proceeds attributable to IP

among all of the RPEs because "[the] RPS determines how profits and losses are shared.   If

UMTS access was not sold, all of the RPS members would share profits and losses associated

with the business.   Since RPS determines the economic relationships between the parties, all

rights associated with the [IP] should be shared based on RPS percentages.   This is also

---

31.  *See* Opening Expert Report at Appendix 9, ¶ 4.

32.  *Id.* at ¶ 7.  I explain the differences between the methodology adopted by Nortel in the UMTS sale and my
      opinion on the allocation of the Sale Proceeds in this case in my Opening Expert Report at paragraph 94 and in
      Appendices 9 and 10.  Proceeds attributable to sale of IP in UMTS were allocated among the active RPEs in
      accordance with their respective residual profit shares as of December 31, 2006.  This approach generally
      conforms with the Contribution Approach to IP allocation in my Opening Expert Report.  My approach does
      vary, however, in that measurement of the share contributed by the different RPEs is based over different time
      periods than the five-year period used in the MRDA calculation.  While five years may have been appropriate
      look-back period for the divestiture of assets of an ongoing enterprise, and particularly may have been
      appropriate with respect to the UMTS transaction, I feel the periods adopted by Mr. Malackowski, as
      summarized in my Opening Expert Report, which are tailored to each individual Business Sale, better reflect the
      relative contribution of the RPEs to each Business sold, and in the context of a distressed sale of substantially
      all of the assets of a liquidating business in an insolvency proceed.

33. *See* Alcatel Addendum (NNC-NNL06081062/2).

consistent with Nortel's view that all Nortel [IP] is indistinguishable such that all value should be shared among the RPS members."[34]

26.     In my view, it is inconsistent with the commercial principles reflected in the MRDA, the RPS, and the manner in which Nortel historically operated, including with respect to allocation of proceeds from its prepetition asset sales, that in a company where R&D spending by the RPEs is viewed as the source of all IP value creation,[35] that the Canadian Experts should now claim that NNL is allocated over 66% of the Intangible Asset value from the Business Sales, including over 47% solely in its capacity as assignee of bare legal title, and over 18% in its capacity as an RPE, whereas the remaining RPEs are collectively allocated only 33%.[36]

### b.     The Canadian Experts Undervalue the License Rights of the RPEs

27.     The Canadian Methodology adopts conceptually inconsistent portions of the License Approach and the Contribution Approach in a manner apparently calculated to secure the Canadian Debtors the greatest possible percentage of Sale Proceeds.    The Canadian Methodology acknowledges that there was value in the Licenses held by the RPEs, but then limits that value by, among other things, giving an overly restrictive reading to the terms of the Licenses.[37]    The Canadian Experts do not acknowledge the right of the RPEs, as fellow entrepreneurs who had jointly assumed the risks and benefits of investing in R&D, to enjoy the

---

34.  E-mail from L. Farr, Tax Dep't, NNI to T. Pickering, Senior Manager, Int'l Tax, Deloitte & Touche LLP, *et al.*, "UMTS Alcatel Transaction" (Jan. 29, 2007, 2:25 p.m.), Exhibit 21160, at BHG0137543.

35.  *See* Schedule A to that certain Third Addendum to the Master R&D Agreement, Exhibit 21003 (NNC-NNL0600154/48). ("The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property.").

36.  *See* Green Report at 7.

37.   The Canadian Experts' approach to the valuation of the Licenses is analyzed in greater detail in the Rebuttal Report of James E. Malackowski, and I rely on that analysis.

proceeds that would flow from all forms of commercial exploitation, including alternative business models such as licensing of IP to third parties. The result is that the Canadian Experts reserve the benefit of those options exclusively for the Canadian Debtors, without taking into account the fact that the other RPEs were equally entitled to a share of the proceeds that could be realized by taking advantage of any and all options for monetizing the jointly-created IP.

28.    The Canadian Experts incorrectly assume that Licenses granted to the RPEs under the MRDA were of limited scope, were non-transferable and did not represent a meaningful economic interest in the IP of the company.[38] As a corollary, they assume that bare legal title to the IP held by NNL gave NNL a presumptive (and exclusive) right to all of the benefits of ownership of the IP, less only the value of the Licenses waived by the RPEs as part of the asset sale processes.[39]

29.    The Green Report, in my view, incorrectly describes the MRDA Licenses as being of limited scope because it has overlooked or ignored important elements of those Licenses.

> i.    The Licenses granted perpetual, royalty-free exclusivity to the RPEs within their assigned territories and, collectively among the RPEs, exclusivity with perpetual, royalty-free Licenses covering a significant portion of the global target market for Nortel's products.[40] When coupled with the non-exclusive, perpetual, royalty-free Licenses granted for other geographies not otherwise covered by exclusive Licenses, it is clear that

---

38.  *See* Green Report at  64; NERA Report at ¶ 21.

39.  *See* Green Report at 4.

40.  *See* Original Expert Report, Appendix 6 at 4.2.1.1.

the MRDA was designed such that NNL, in its role as assignee of the legal title of the company's IP, did not have an enhanced right to earn royalties or other profits in respect of revenues or proceeds from the billions of dollars of R&D expense incurred by the various Nortel RPEs, and that the RPEs (including NNL in its capacity as an RPE) were intended to share the substantive economic interest in the IP.

ii.  The RPE Licenses grant the RPEs the ability to issue sub-licenses without restriction, which effectively grants to the RPEs the same ability to benefit from the subsequent transfer of the Licenses to a third-party as they would have if the Licenses were freely assignable.[41]  This sub-license right bolsters my conclusion that the economic substance of the company's IP was held by the RPEs, otherwise the RPEs holding a perpetual right to sub-license without restriction would not make sense.

iii.  The Licenses issued to the RPEs were perpetual; the MRDA specifically states that "this Agreement will automatically renew for additional and unlimited one-year terms until terminated by the mutual written consent of all Participants."[42]  NNL did not have a unilateral right to terminate the Licenses at the time of the Asset Sales.[43]  As a result of the post-filing

---

41. *Id.*

42. Exhibit 21003 at (NNC-NNL06001514/9).

43. Under the Fourth Addendum to the MRDA, NNL had the right "in its sole discretion, to terminate participation in this Agreement of any Participant affected by [occurrence of an event described at Section 11(c)(iv) in the Agreement], upon written notice to such Participant." Exhibit 21003 (NNC-NNL06001514/59).  I am advised by counsel that this right was waived by NNL in respect of the EMEA entities in administration under the UK Insolvency Act of 1986. *See* Letter re "Acknowledgement relating to Master R&D Agreement dated December

(Footnote continued on next page.)

waiver granted by NNL, the various Asset Sales pursued by Nortel could only be achieved with the consent of each party holding a license.  NNL in its capacity as assignee of bare legal title had no ability to transfer anything other than the bare legal title it held; each RPEs exclusive license rendered that bare legal title worthless to any potential purchaser in the geographic territory in which that RPE operated, and collectively, the exclusive and non-exclusive Licenses held by the RPEs rendered the bare legal title to the IP valueless on a world-wide basis, with the only value being the exclusive right that NNL held to exploit the Licenses in Canada and a non-exclusive right to exploit the Licenses in other jurisdictions that did not otherwise have exclusive Licenses in place.[44]

30.     The summary of the RPE Licenses contained in the NERA Report does not include any of these other limiting provisions.[45]    Similarly, Mr. Green lists a seemingly comprehensive group of considerations in his report but also omits these points.[46]    As a commercial and practical matter, the Debtors that were required to terminate their Licenses in

---

(Footnote continued from previous page.)
22, 2004, as amended" dated January 14, 2009 (NNI_00907912) (stating that NNL "acknowledges and agrees that, notwithstanding the terms of the [MRDA], including the Fourth Addendum, it will not terminate participation in the [MRDA] of any Participant that has filed an application for the making of a an administration order under the UK Insolvency Act 1986 or is subject to administration pursuant to the UK Insolvency Act 1986 until the earlier to occur of (i) such Participant ceasing to be in administration and (ii) such Participant ceasing to trade."). I am further advised by counsel that NNL could not exercise any such termination right even prior to the waiver without entitling the retiring Participant to a payment from NNL for an amount mutually determined by NNL and the terminated party representing the fair market value of the RPE's Licenses, immediately payable as of the effective date of such termination.  Ex. 21003 (NNC-NNL06001514/10).

44.  *See* Original Expert Report, Appendix 6 at ¶ 4.2.1.1.

45.  NERA Report at ¶ 60-61.

46.  Green Report at 55.

62875345_9

order to permit transfer of a valuable interest in the IP to a purchaser would have had no reason to consent or participate in a sale process that did not result in a fair and equitable outcome that provided them with a value commensurate with their respective interest in the assets sold or interests terminated.  Without their consent, NNL would have had no ability to force the other RPEs to participate in the Asset Sales.

31.     The Canadian Experts also limit the value ascribed to the Licenses by purporting to value the Licenses according to a "value in use" principle, which values the Licenses based upon "the amount of cash that was or would reasonably have been earned by the licensees through their exploitation of the Licenses, assuming that the business was ongoing, without consideration of what a purchaser would or did pay for transfer of ownership of the underlying IP and without consideration of any synergies or other attributes brought by the buyers, upon which the licensees could not capitalize."[47]

32.     Based on the challenges that Nortel's business operations were encountering prior to and subsequent to the commencement of the insolvency proceedings, even the forecasts prepared to assist with the marketing processes for the Business Sales did not present the highest and best use for Nortel's assets – a fact supported by the Canadian Experts' admission that the sales of Nortel's assets realized far more in proceeds than Nortel itself could have generated had it continued to operate.[48]

---

47.  *See* Green Report at 16.

48.  *See*  NERA Report at ¶ 67.

33.     Although the Green Report suggests that Mr. Green has considered a variety of alternatives to the "value in use" concept,[49] I believe he has not considered the most appropriate alternatives and does not provide a principled basis for choosing the approaches he utilizes over the available alternatives.

34.     Mr. Green purports to consider a "safe hands" alternative, which is based on the assumption that Nortel's businesses would be sold to entities that had sufficient capital to properly operate, invest, and grow the businesses,[50] but rejects this approach as being inconsistent with the MRDA, even though I can find no provision within the MRDA that is in conflict with the concept of valuing the businesses (and the related Licenses) in a framework of what might have been a stable, value-maximizing business platform.  The fact that the businesses were sold to entities that had sufficient capital to properly operate, invest and grow the businesses at purchase prices that exceeded what Nortel could have earned from the business under its then existing operating model, is an acknowledgement that the "safe hands" alternative was the appropriate, value maximizing alternative.

35.     In applying the "value in use" principle, the Canadian Experts used different (and lower) projections from the ones the purchasers relied upon in determining how much they were willing to pay to acquire the assets.  The purchase prices reflect the market value of each business and underpinning the price paid by each buyer were "safe hands" projections.[51]  By using lower projections, the Canadian Experts have created an inconsistency in the value of the businesses and the underlying cash flows, which results in a large residual value bucket.  The

---

49.  *See* Green Report at 58.

50.  *Id.* at 59.

51.  *Id.*

62875345_9

Canadian Experts allocate 100% of this excess to NNL.[52]  Allocation of value among the Selling

Debtors should be based on the values of the businesses as perceived by the market and reflected

in the purchase prices paid, rather than "value in use."

36.     Furthermore, even though the MRDA does not explicitly apply to allocation of

the proceeds of business sales, it would have directly addressed the allocation of value among

estates if Nortel had pursued another alternative, which Mr. Green does not consider; namely,

changing Nortel's businesses from operating businesses into licensing businesses for IP.[53]  In

that sense, the Business Sales could have been recast not as Asset Sales (although the Tangible

Assets may in fact have been sold even under a licensing business model) but rather as long-term

licenses for third parties to exploit the exact same IP that was included in the Business Sales.  In

theory, if necessary and desired by the Nortel debtors, each of the Asset Sales could have been

restructured as a licensing deal and the payments resulting from a licensing format would have

come in over an extended period of time in the form of royalty payments rather than being a

single lump sum payment as actually occurred.  As reflected in Nortel's RPS calculations for at

least 2006 to 2008, Nortel's royalty income or expense was shared among the RPEs on the basis

for the RPS percentages.[54]  Based on the revenues and profits that each RPE could have

---

52.  *Id.* at 5.

53.  *See e.g.*, Transcript of Deposition of John P. Veschi dated November 7, 2013, ("Veschi Tr.") at 38 (". . . the plan was that the business I now run would have, if things went the way I thought they were going to go, would be one of the business units within Nortel going forward, similar to Texas Instruments or Qualcomm or IBM or Ericsson or a lot of other companies that have licensing businesses that are important to the success of the company.").

54.  The royalty income or expense was allocated among the RPEs for the 2006-2008 period, and I believe that may have been the case during at least portions of the preceding period as well. *See, e.g.*, Excel spreadsheet, "Nortel – Final 2008 Q4 Transfer Pricing Adjustments" (NOR_53648048); Excel spreadsheet, "RPS Participants – Q4 2007 TP Calculation" (NOR_53648323); and Excel spreadsheet, "RPS Participants – Q4 2006-Post 2005 TPM"

(Footnote continued on next page.)

continued to realize had Nortel adopted a licensing business model, the value received for the Nortel businesses should be split among the RPEs based on the metric that is consistent with their rights to share those revenues and profits, namely according to their historical R&D expenditures.[55]

37.    The Canadian Experts also adopt inconsistent reasoning to allocate a portion of the value of IP to the RPEs in the Business Sales, while concluding that the RPEs are not entitled to any portion of the Sale Proceeds attributable to IP sold in the Residual Patents Sale, despite their contribution to its creation.  The Canadian Experts describe their approach to valuation of the RPE Licenses as being "based on projections of the revenues and profits that would have resulted from continued operation of the businesses (instead of their sale) by Nortel, since continued operation was the way that the licensees could have derived any value from their license rights."[56]  While I believe that the forecasts they have used to value these Licenses are not the appropriate forecasts, I note that the Canadian Experts do use some form of future-looking business forecasts for the Business Sales.  These forecasts include assumptions about continuing sales of new technology products within each of the businesses – in many cases sales of products that would not have been in the market on day one of the projections.  In contrast, the

---

(Footnote continued from previous page.)
(NOR_53648133) (adjusting operating income to include royalty income and expense in the RPSM calculations for each year 2006-2008).

55. While I understand the Parties or the Courts might have restructured the relationship between the RPEs in order to facilitate the transition to a licensing based model, if no changes were made to the MRDA or the RPS, the RPEs would have been entitled to their portion of profits from licensing the Intellectual Property on a perpetual and royalty-free basis.  From the standpoint of a market participant, the value of such a license necessarily exceeds the "value in use" limitations imposed by the Canadian Experts.  Furthermore, I believe that none of the Parties (or any of their creditors) would have consented to a restructuring of the relationship that failed to provide adequate value for the Licenses they relinquished in light of this (and other) possibilities reflecting their value.

56. Green Report at 49.

Canadian Experts take a completely different approach to the Residual Patents Sale and do not take into account any of the significant potential for future value creation that could arise out of monetizing the Residual Patents portfolio through different business arrangements, including licensing arrangements, which Nortel itself contemplated through the Lazard and Global IP models.[57]  This assumption results from strict reliance on the purported "value in use" concept and leads to the Canadian Experts' conclusion that NNL is entitled to the entirety of the Residual Patents portfolio value.[58]  This is the wrong outcome on, at least, two levels:

    i.    First, it is inconsistent with the MRDA, which provides that the entities that had historically incurred the entrepreneurial risk of spending billions of dollars on R&D (*i.e.*, the RPEs) should be the parties to share in the benefits of such risk taking.[59]  The Residual Patents Sale is the fruit of historical expenditures on R&D by each of the RPEs[60] and the Canadian Methodology results in the RPEs (including NNL in its role as an RPE) receiving zero allocation of the Residual Patents Sale Proceeds because this IP had not yet been monetized prior to the sale date.  The Residual Patents Sale generated more in proceeds than the entirety of the Business

---

57. Exhibit 22106 PowerPoint presentation "Nortel – Strategic Alternatives for IP" dated Aug. 12, 2009, at 19(NNI_01290069); Veschi Tr. at 195-204; PowerPoint presentation "DRAFT: IP Co. Strategy: Plan C-prime" dated Oct. 2010 (NNI_01470423).

58. *See* Green Report at 5-6.

59. *See* Opening Expert Report at ¶¶ 26, 103; *see generally* Appendix 6.

60. *See* Opening Expert Report at ¶¶ 26, 46, 102.

Sales combined and, collectively IP was the single most valuable and important asset of Nortel.[61]

ii.    Second, as discussed earlier, the RPEs' perpetual Licenses applied to the IP covered by the Residual Patents Sale.[62]  If the Canadian Methodology, which allocates no proceeds from the Residual Patents Sale to the RPEs, had been proposed in advance of the sales process, it would not have been in the commercial interest of the RPEs (with the possible exception of NNL) to consent to the sales process.  Instead, it would have been in their interest to pursue a licensing strategy for these assets, which would have generated a stream of royalties largely consistent on a present value basis with the proceeds from the asset sale process ***and*** which would have been logically allocated among the RPEs, in line with what I describe in my Opening Expert Report as the Contribution Approach, based on historical R&D expenditures.

38.    I also note that the Canadian Methodology is at odds with the PPAs prepared by the Canadian Debtors following the Business Sales (the "Internal PPAs").[63]  In the Internal

---

61.  *See* Opening Expert Report at ¶ 51.

62.  Opening Expert Report at ¶ 103.

63.  *See* Excel spread sheet, "Nortel Networks CDMA/LTE Sale – High Level Estimate," dated Aug. 16, 2010 (NNI_00216279); Excel spread sheet, "Nortel Networks – CVAS Sale – High Level Estimate of Purchase Price Allocation," dated Nov. 22, 2010 (NNI_00216461); Excel spread sheet, "Nortel Networks – Enterprise Sale – High Level Estimate of Purchase Price Allocation," dated Jun. 23, 2010 (NNI_01432905); Excel spread sheet "Nortel Networks – GSM/GSM-R Sale to Ericssson and Kapsch – High Level Estimate of Purchase Price Allocation," dated Aug. 15, 2010 (NNI_00216602); Excel spread sheet "Nortel Networks – Alteon sale to Radware – High Level Estimate of Purchase Price Allocation" dated Jun. 14, 2010 (NNI_01432902); Excel spread sheet "Optical and Carrier Ethernet (MEN) sale to Ciena (Project Snow) – Net Assets Summary" (NNI_00215982); Excel spread sheet "Nortel Networks – Packet Core sale to Hitachi – High Level Estimate of

(Footnote continued on next page.)

62875345_9

PPAs, the Canadian Debtors allocate proceeds attributed to IP based on the historical contribution to R&D, and without regard to bare legal title.

>   c.   **The Canadian Experts Award the Canadian Debtors a Windfall by Subsuming Other Asset Classes Within Their Definition of IP.**

39.    Since the Canadian Experts argue that NNL presumptively gets 100% of the Residual Value as owner of the IP (despite the fact that the category necessarily includes value attributable to what I describe in my Opening Expert Report as Other Intangible Assets), they are motivated to have the In-Place Workforce and License Rights Surrendered valuations (as the only proceeds shared with other entities) as low as possible.  Furthermore, although it would be common to see a category of proceeds called Goodwill in an allocation of sale proceeds, the Canadian Experts appear to argue that there should be no goodwill in the Asset Sale Proceeds based on the fact that Nortel had historically written off significant amounts of its pre-bankruptcy Goodwill.[64]  This argument is inconsistent with commercial practice because the prior Goodwill Nortel carried on its own balance sheet has no bearing on any new Goodwill created in the Asset Sales in circumstances where the buyers paid more than the book value of the assets acquired in the Asset Sales.  Nor is it clear to me why NNL should receive the full amount of any new Goodwill created when releasing that additional value depended, in my view, on cooperation among all the Nortel sellers.[65]

---

(Footnote continued from previous page.)
Purchase Price Allocation" dated Jun. 23, 2010 (NNI_01432903); Excel spreadsheet, "Nortel Networks – Optical/Carrier Ethernet sale to Ciena – High Level Estimate of Purchase Price Allocation" dated Aug. 17, 2010 (NNC-NNL-07600301) (collectively, the "Internal PPAs").

64.   *See* Green Report at 23 ("…[t]he absence of Goodwill value from Nortel's operations is significant to the valuation of the license rights surrendered by the U.S. and EMEA Debtors and is consistent with how the residual value of the Business Sales has been allocated.").

65.   *See* Opening Expert Report at 76, p. 34.

62875345_9

40.     By counting the residual value as value that is entirely due to IP, the Canadian Experts award the Canadian Debtors the proceeds from Intangible Assets in which they have no arguable legal ownership interest.  Importantly, NN Technology is defined as "intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices specifications, designs, software and other documentation or information produced or conceived as a result of R&D by, or for, any of the Participants, but excluding trademarks and any associated Goodwill."[66]  This is a focused definition, which targets technology-related Intangible Assets but excludes a significant number of other categories of Intangible Assets.  Examples of assets the Canadian Experts consider to be included within the Residual Value, but which in my opinion do not belong in that class, are Customer-Related Assets (comprised of Customer Relationships and Nortel's Distribution Network as set forth in my Opening Report), employee-related assets, trademarks and Goodwill, which is the sum of all the other Intangible Assets that create enterprise value but are too difficult to individually value.  The title to these assets was not assigned exclusively to NNL nor were these assets licensed under the RPE Licenses.  It is neither accurate nor appropriate to lump such assets into a single residual category together with IP, because this has the effect of not recognizing those assets properly belonging to the EMEA Debtors and U.S. Debtors.  As evidenced in the ASAs, the EMEA Debtors and the U.S. Debtors sold and undertook the transfer of customer contracts and employees in a number of the Business Sales.[67]  Since the Canadian Experts do not perform valuations for the components of this residual class, it is impossible to quantify those non-technology related Intangible Assets that are

---

66.  Exhibit 21003 (NNC-NNL06001514/3); *see also* Opening Expert Report at Appendix 6, p.10.

67.  *See* Opening Expert Report at Appendices 11 and 18.

summarily (and without merit) awarded to the Canadian Debtors.  Customer Relationships, in particular, are a distinct and separate asset from IP and are owned by different entities.  Customer Relationships are difficult to value without access to each individual contract and the profitability associated with each contract.[68]  Without access to such information, the most accurate way to value Customer Relationships is as part of Goodwill value.

41.     In contrast to the Canadian Experts' approach, in my Opening Expert Report and in conjunction with Mr. Malackowski's Report, I ascribed an independent value to IP.  Notably, based on Mr. Malackowski's analysis, I concluded that IP accounted for only 24.8% of the Sale Proceeds from the Business Sales.  This contrasts with the 68.8% of value the Canadian Experts' encompass in their residual category of Intangible Assets that they nominally attribute to IP.

   **d.**  **Canadian Experts' Approach is Inconsistent With How Nortel Allocated Proceeds of Prepetition Asset Sales and The Approach Adopted by the Canadian Debtors in Post-Petition Internal Purchase Price Allocations**

42.     The Canadian Experts' approach to allocation of Intangible Assets is also inconsistent with Nortel's historical practice with respect to allocation of sale proceeds from asset sales.  The most material precedent of this type is the UMTS sale.[69]  The UMTS sale was of a comparable value and scale to the post-petition Business Sales and in common with the general structure of the post-petition sales, it was also structured as an asset sale with multiple Nortel sellers.  As detailed in Appendices 9 and 10 of my Opening Expert Report, the proceeds of the UMTS sale were allocated among the selling Nortel entities in accordance with the principles of the RPS and the MRDA.  Tangible Asset values were allocated among the entities transferring

---

68.  *Id*. at ¶ 94.

69.  *See generally* Opening Expert Report at Appendices 9 and 10.

those assets. The value attributed to IP was separately calculated and was allocated based on the

RPEs' relative residual profit share under the MRDA as calculated based on their historical R&D

expenditure. A material portion of the proceeds was also attributed to Customer Relationships,

which were allocated to the entity responsible for the relationship, and to Goodwill, which was

allocated based on historical R&D expenditures. The allocation of proceeds from the UMTS

sale demonstrates that the Nortel entities, including NNL, acknowledged that the Intangible

Assets involved in Business Sales included a variety of important categories other than IP and

that those categories could represent a significant portion of the overall proceeds (approximately

21.3% for the categories of Customer Relationships and Goodwill in the case of the UMTS sale).

Additionally, the allocation of IP value in the UMTS sale according to historical contribution to

R&D is consistent with the Contribution Approach set forth in my Opening Expert Report:

| UMTS ALLOCATION | | | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Canada | | US | | CALA | | EMEA | | APAC | | Total | |
| | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % |
| Fixed Assets | $ 13 | 16% | $ 0 | 0% | $ – | – | $ 31 | 23% | $ 4 | 85% | $ 49 | 17% |
| Inventory | 0 | 0% | 1 | 2% | 0 | 100% | 18 | 13% | 0 | 4% | 20 | 7% |
| Customer Contracts | – | – | 0 | 0% | – | – | 52 | 39% | – | – | 52 | 18% |
| In Process R&D | 65 | 80% | 68 | 95% | – | – | 28 | 21% | 1 | 11% | 162 | 55% |
| Goodwill | 3 | 4% | 2 | 2% | 0 | 0% | 6 | 4% | 0 | 0% | 11 | 4% |
| Total | $ 82 | 100% | $ 71 | 100% | $ 0 | 100% | $ 134 | 100% | $ 5 | 100% | $ 293 | 100% |
| | | | | | | | | | | | | |
| *Memo: % Customer Contracts & Goodwill* | *$ 3* | *3.7%* | *$ 2* | *2.5%* | *$ 0* | *0.1%* | *$ 58* | *42.9%* | *$ 0* | *0.4%* | *$ 62* | *21.3%* |

43. The Canadian Methodology with respect to the categorization of the Intangible

Assets is also at odds with the Internal PPAs prepared by the Canadian Debtors following the

Business Sales.[70] Contrary to the Canadian Methodology, the Internal PPAs allocate proceeds

attributed to IP based on the historical contribution to R&D, and without regard to NNL's bare

---

70. *See* the Internal PPAs, *supra,* at 27-28 n.63. The Internal PPAs recognize two categories of Intangible Assets: Distribution/Service Intangibles (which I understand to be roughly equivalent to Customer-Related Assets) and IP/Other Residual. Distribution/Service Intangibles are allocated in the Internal PPAs using a two-step methodology that attempts to capture the cash flows attributable to the distribution function provided by each entity (distinct from the IP value).

legal title. The Canadian Experts do not mention the Internal PPAs in their reports.  In my view, the Canadian Expert Reports do not set out a principled basis on which to depart from any of the Internal PPAs, or why their assumptions about "value in use" and the scope of the RPE Licenses are justified.  As a result, I do not believe the Canadian Methodology is reliable.

## IV.  RESPONSES TO THE CANADIAN CREDITORS COMMITTEE EXPERT REPORT

44.     The CCC present an expert report prepared by Duff & Phelps (the "CCC Experts" and, with respect to their report, the "CCC Expert Report") that outlines an alternative valuation and Allocation Methodology (the "CCC Methodology").  This report relies on numerous assumptions, many of which are the same as the ones applied by the Canadian Experts discussed and rebutted above.

45.     To determine the fair market value of the assets owned by the Nortel Debtors, the CCC Experts rely on the Purchase Price Allocations ("PPAs") prepared by the buyers in connection with various Business Sales (the "Buyer PPAs").[71]  These PPAs include material allocations of value to Tangible Assets net of transferred liabilities and a variety of Intangible Asset categories, including IP, Customer Relationships and Goodwill, among others.[72]  I was instructed by counsel that the PPAs were inadmissible for purposes of the allocation of the Sale Proceeds and could not be relied upon by any party for that purpose.[73]  Furthermore, even if the

---

71. *See* CCC Report at ¶¶ 6.26, 6.27.

72. *Id.*

73. As noted in my Opening Expert Report, I did not consider the Buyer PPAs in my analysis, however, because the various ASAs state that the Buyers' PPAs are not determinative of the values of the assets in question, nor the asset classes sold in the sales, and "shall not, or shall not be deemed to determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds" among the Selling Debtors. Opening Expert Report at ¶ 83; *see also see also* Asset and Share Agreement between Selling Debtors and Telefonaktiebolaget L M Ericsson (Publ), July 24, 2009 [D.I. 1205 Ex. A] at ¶ 6.7; Amended and Restated Asset and Share Sale Agreement

(Footnote continued on next page.)

Buyer PPAs were available for consideration, I do not consider reliance on those PPAs in respect of value allocation to be appropriate, because the allocation of purchase price to asset classes in purchaser PPAs is often influenced by tax, accounting and other considerations that favor the purchaser and have no relevance to the selling entities.

46.    Given that the CCC Experts have chosen to base their Expert Report in part on the Buyer PPAs, there are certain points worth noting, particularly where the CCC Methodology conflicts with the Canadian Methodology.  The CCC, in reliance on the Buyer PPAs and contrary to the Canadian Methodology, attributes significant value to Intangible Asset classes to which the Canadian Experts attributed limited or no independent value, particularly Customer Relationships and Goodwill.[74]  This difference is worth noting because the interests of these two parties, the Canadian Debtor and the CCC, are aligned and they purport to undertake the same primary allocation methodology.  These divergences raise questions about the accuracy of the Canadian Methodology and support the rebuttal points made above with respect to the Canadian Methodology.

47.    Below is a summary of the methodological differences between the CCC Experts and the Canadian Experts with respect to valuing the different asset categories.  As described above, the CCC Methodology allocates significant value (over 20% of the Sale Proceeds from

---

(Footnote continued from previous page.)

between Selling Debtors and Avaya Inc., Sept. 14, 2009 [D.I. 1514 Ex. A] at ¶ 2.2.7; ; Asset Sale Agreement between Selling Debtors and Ciena Corporation, Oct. 7, 2009 [D.I. 1627 Ex. A] at ¶ 2.2.6; Nortel Networks Corp., Annual Report (Fork 10-K) (March 15, 2010) (Electronically signed GSM Asset Sale Agreement dated as of Nov. 24, 2009 at ¶ 6.7); Asset Sale Agreement between Selling Debtors and Genband Inc., Dec. 22, 2009 [D.I. 2632 Ex. A] at ¶ 6.9; Asset Sale Agreement between Selling Debtors and Telefonaktiebolaget L M Ericsson (Publ) Sep. 24, 2010 [D.I. 4054 Ex. A] at ¶ 2.2.6; Asset Purchase Agreement between Selling Debtors and Radware Ltd., Feb. 19, 2009 [D.I. 353 Ex. A] at ¶ 3.2, and Transaction Agreement between Selling Debtors and Hitachi, Ltd., Oct. 25, 2009 [D.I. 1760 Ex. A] at ¶ 6.7; *and see e.g.,* GSM/GSM-R-Side Agreement, Mar. 31, 2010 (NNI_00812035, ¶ 2.7).

74.  *See* CCC Report at ¶¶ 6.8.

the Business Sales) to Customer Relationships and Goodwill, categories to which the Canadian

Experts do not assign any value:

| CANADA & CCC METHODOLOGY COMPARISON - VALUATION OF ASSET CLASSES | | | $ in millions |
|---|---|---|---|
| | Value | % | Approach |
| **Canada Methodology** | | | |
| Tangible Assets | $ 534 | 7.3% | Book value of assets from financial statements |
| In-Place Workforce | 256 | 3.5% | Estimated replacement cost |
| Customer Relationships | – | – | Not valued |
| IP | – | – | Not valued |
| IP Rights & Customer Relationships | 1,982 | 27.0% | For US/EMEA, valued licenses under MRDA using DCF of "value in use" projections; all residual value to Canada as "owner" |
| Purchaser Goodwill | – | – | Not valued |
| Stand-Alone Businesses | 111 | 1.5% | NGS: Based on Lazard valuation; DiamondWare: 2008 purchase price |
| Residual Patents | 4,453 | 60.7% | Residual Patent Sale Proceeds; $0.8m attributable to workforce |
| **Total** | **$ 7,337** | **100.0%** | |
| | | | |
| **CCC Methodology** | | | |
| Tangible Assets | $ 169 | 2.3% | Valued from buyer PPAs, net of liabilities transferred |
| In-Place Workforce | – | – | Not valued |
| Customer Relationships | 683 | 9.4% | Valued from buyer PPAs |
| IP | 1,143 | 15.7% | Valued from buyer PPAs |
| IP Rights & Customer Relationships | – | – | Not valued |
| Purchaser Goodwill | 853 | 11.7% | Valued from buyer PPAs |
| Stand-Alone Businesses | – | – | Not valued |
| Residual Patents | 4,455 | 61.0% | Residual Patent Sale Proceeds |
| **Total** | **$ 7,302** | **100.0%** | |

48.    The following table summarizes the differences between the CCC Methodology

and the Canadian Methodology in allocating the different asset classes across Nortel entities.

Despite the significant differences in approach, both the Canadian Experts and the CCC Experts

allocate approximately 80% of the total proceeds to the Canadian Debtors:

| CANADA & CCC METHODOLOGY COMPARISON - ALLOCATION OF ASSET CLASSES | | | | | |
|---|---|---|---|---|---|
| | Canada | US | EMEA | Total | Approach |
| **Canada Methodology** | | | | | |
| Tangible Assets | 22.8% | 59.5% | 17.8% | 100.0% | By ownership based on financial statements |
| In-Place Workforce | 30.9% | 52.8% | 16.4% | 100.0% | By location of employees |
| Customer Relationships | -- | -- | -- | -- | Not valued |
| IP | -- | -- | -- | -- | Not valued |
| IP Rights & Customer Relationships | 71.4% | 23.6% | 5.0% | 100.0% | Based on MRDA using Q1 2010 RPS percentages (5-year look back); Residual IP value to Canada |
| Purchaser Goodwill | -- | -- | -- | -- | Not valued |
| Stand-Alone Businesses | -- | 100.0% | -- | 100.0% | NGS & DiamondWare: by ownership |
| Residual Patents | 100.0% | -- | -- | 100.0% | 100% to NNL based on bare legal title |
| **Total** | **82.7%** | **14.1%** | **3.2%** | **100.0%** | |
| | | | | | |
| **CCC Methodology** | | | | | |
| Tangible Assets | 34.9% | 24.9% | 40.2% | 100.0% | By ownership, based on Nortel internal net asset balances |
| In-Place Workforce | -- | -- | -- | -- | Not valued |
| Customer Relationships | 13.6% | 57.5% | 28.8% | 100.0% | Proportion of 2008 revenue |
| IP | 75.1% | 19.9% | 5.0% | 100.0% | US/EMEA IP value based upon Q4 2008 internal asset impairment test; all other IP value allocated based upon patent ownership |
| IP Rights & Customer Relationships | -- | -- | -- | -- | Not valued |
| Purchaser Goodwill | 50.1% | 37.0% | 12.9% | 100.0% | Allocated in proportion to value of other intangible assets |
| Stand-Alone Businesses | -- | -- | -- | -- | Not valued |
| Residual Patents | 98.0% | 0.7% | 1.3% | 100.0% | Based upon patent ownership |
| **Total** | **79.5%** | **13.8%** | **6.7%** | **100.0%** | |

49.    When allocating Sale Proceeds attributable to Nortel IP, the CCC Experts apply a variation of the "value in use" logic employed by the Canadian Experts.[75]  As discussed above, this approach provides that the RPEs should be entitled only to the proceeds of Business Sale IP value based on a depressed valuation of the Nortel businesses, which the CCC Experts claim reflects what the business would have been worth on a stand-alone basis operating as they were as of December 31, 2008.  Since the businesses were actually sold for much higher values,[76] there is a significant amount of remaining value that the CCC (and the Canadian) Experts allocate to NNL in its capacity as assignee of the bare legal title of the IP.  This approach is contrary to the fact that the MRDA, the Licenses and the RPS effectively deliver all of the economic value of the IP to the RPEs, which is consistent with both the structure of the MRDA and Nortel historical practice.

---

75.  *See* CCC Report at ¶ 6.37.

76.  *See* Opening Expert Report at Appendix 2, p.9.

50.     To allocate the Residual Patent value, the CCC assigns value to the entity that holds the bare legal title to the Residual Patents, directing virtually all of the Residual Patent value to NNL.[77]   In my view, and as discussed above, this approach is based on a selective reading of the MRDA that is not consistent with the economic substance of Nortel's pre-petition structure and operations.

51.     The CCC Experts focus on the Buyer PPAs for the three largest sales: CDMA/LTE, Enterprise, and MEN.[78]   These sales comprise approximately 89% of the total Business Sale Proceeds.[79]   The remaining 11% of the proceeds from the other Business Sales were allocated based on the weighted average distribution from the three sales analyzed.[80]

52.     The table below summarizes the Buyer PPAs' asset value allocations used by the CCC Experts.   Using the Buyer PPAs, IP comprises only approximately 44% of the Intangible Asset value identified by the CCC.[81]   The remainder of the Intangible Asset value, totaling approximately 56%, is comprised of Customer Relationships and Goodwill.[82]

---

77.  *See* CCC Report at ¶ 6.19.

78.  *See id.* at ¶ 6.28, n.64 and Schedule 2.4.

79.  *Id.* at Schedule 2.3.

80.  *Id.* at Schedule 2.3, n.1.

81.  *Id.* at ¶ 6.8.

82.  *Id.*

| CCC METHODOLOGY - BUYER PPAs | | | | | | $ in millions |
|---|---|---|---|---|---|---|
| | CDMA | Enterprise | MEN | Sub-Total | Other | Total |
| *By Value* | | | | | | |
| Tangible Assets | $ (51) | $ 29 | $ 172 | $ 150 | $ 19 | **$ 169** |
| Intangible Assets | | | | | | |
| Customer Relationships | 102 | 260 | 243 | 605 | 77 | **682** |
| IP | 628 | 170 | 216 | 1,014 | 129 | **1,143** |
| Goodwill | 373 | 384 | – | 757 | 96 | **853** |
| Total Intagible Assets | 1,103 | 814 | 459 | 2,376 | 302 | **2,678** |
| | | | | | | |
| **Total** | **$ 1,053** | **$ 843** | **$ 632** | **$ 2,528** | **$ 321** | **$ 2,849** |
| | | | | | | |
| *By Percentage* | | | | | | |
| Tangible Assets | (5%) | 3% | 27% | 6% | 6% | **6%** |
| Intangible Assets | | | | | | |
| Customer Relationships | 10% | 31% | 38% | 24% | 24% | **24%** |
| IP | 60% | 20% | 34% | 40% | 40% | **40%** |
| Goodwill | 35% | 46% | – | 30% | 30% | **30%** |
| Total Intagible Assets | 105% | 97% | 73% | 94% | 94% | **94%** |
| | | | | | | |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

53.     After valuing the asset groups, the CCC Experts then allocate the value of each asset group across the Selling Debtors.  For each asset category, a different methodology was applied.

54.     The Tangible Asset values from the Buyer PPAs were allocated across the Nortel entities based on Nortel's internal financials, net of liabilities.[83]

55.     The Business Sale IP value from the Buyer PPAs was divided into two components: the "Surrendered License" value and the remaining IP.[84]  The Surrendered License valuation approach is conceptually similar to the "value in use" approach employed by the Canadian Experts, which attempts to distinguish between the value of the business as held by the Nortel entities doing business exactly as they operated as of December 31, 2008, and the value

---

83.  *See id.*  at ¶ 6.16.

84.  *Id.* at ¶ 6.27.

paid by third parties to acquire those businesses.[85]  The CCC Experts calculated the value of the Surrendered Licenses held by the Nortel entities prior to the sale as follows:

    i.      The total value of the Business Sale assets prior to the sale was assumed to equal $988 million, based on Nortel's Q4 2008 AIT.[86]

    ii.     Next, the share of each business value attributable to IP was determined by taking the IP value from the Buyer PPAs as a percentage of the total operating assets value (sale proceeds less Goodwill).[87]

| BUYER PPA % OF BUSINESS VALUE ATTRIBUTABLE TO IP | | | | | | $ in millions |
|---|---|---|---|---|---|---|
| | CDMA | Enterprise | MEN | Sub-Total | Other | Total |
| Purchase Price | $ 1,053 | $ 843 | $ 632 | $ 2,528 | $ 321 | $ 2,849 |
| Less: Goodwill | (373) | (384) | – | (757) | (96) | (853) |
| Operating Assets [(1)] | $ 680 | $ 459 | $ 632 | $ 1,771 | $ 225 | $ 1,996 |
| | | | | | | |
| IP | | $ 628 | $ 170 | $ 216 | $ 1,014 | $ 129 | $ 1,143 |
| % of Operating Assets | 92.4% | 37.0% | 34.2% | 57.3% | 57.3% | 57.3% |

(1) As defined by the CCC Report.

    iii.    To calculate the value of the Surrendered Licenses for each RPE, the CCC Experts take the AIT Business Value ($988 million, as set forth in paragraph (i) above) and multiply it by the share of value attributable to IP (57.3%, as set forth in paragraph (ii) above), and finally multiply the product by the RPS share of each entity as of December 31, 2009.  By using the AIT business values, the resulting value attributed to the

---

85. *See id.* at ¶ 6.37.

86. *Id.* at ¶ 6.38, 6.40 and Table 6.

87. *Id.*

Surrendered Licenses is less than half the total IP value identified in the Buyer PPAs.[88]

| SURRENDERED LICENSE VALUE BASED ON AIT | | | $ in millions |
|---|---|---|---|
| | Canada | US | EMEA | Total |
| RPSM Share | 49.9% | 11.6% | 38.5% | 100.0% |
| AIT Business Value | $ 493 | $ 115 | $ 380 | $ 988 |
| IP % | 57.3% | 57.3% | 57.3% | 57.3% |
| Surrendered License Value | $ 282 | $ 66 | $ 218 | $ 566 |

56.    Finally, after valuing the Surrendered Licenses, the remaining IP value was allocated across the Selling Debtors based on the relative number of patents to which each entity held bare legal title – effectively allocating the entire remaining IP value to NNL.[89]   The table below summarizes the CCC Methodology regarding allocation of Sale Proceeds attributable to IP, which is skewed toward the Canadian Debtors.

| BUSINESS SALE IP ALLOCATION BASED ON AIT | | | $ in millions |
|---|---|---|---|
| | Canada | US | EMEA | Total |
| *By Value* | | | | |
| Surrendered Licenses [1] | $ 286 | $ 224 | $ 56 | $ 566 |
| Residual IP | 572 | 4 | 1 | 577 |
| Total IP Value | $ 858 | $ 228 | $ 57 | $ 1,143 |
| | | | | |
| *By Percentage* | | | | |
| Surrendered Licenses [1] | 50.5% | 39.6% | 9.9% | 100.0% |
| Residual IP | 99.2% | 0.6% | 0.2% | 100.0% |
| Total IP Value | 75.1% | 19.9% | 5.0% | 100.0% |

(1) Canadian value calculated in accordance with the methodology used to calculate the values of the US & EMEA in the CCC Report.
(2) Canadian value is difference between Total IP Value provided in CCC Report and the calculated value of Surrendered License.

57.    The Customer Relationships were also valued based on the Buyer PPAs and allocated across the Selling Debtors based on 2008 relative revenue.[90]

---

88.  *Id.*

89.  *Id.* at ¶ 6.21.

90.  *Id.* at ¶ 6.22.  The CCC Experts do not state which year they use for revenue figures, but the revenue source reference for the Enterprise sale appears to be the 2008 value. *Id.* at Schedule 7.4, n.1.

58.     Goodwill value based on the Buyer PPAs was allocated across the Selling Debtors based on the weighted average allocation of all of the other Intangible Assets,[91] which also has the effect of favoring NNL by applying the same allocation of Sale Proceeds attributed to IP to all other Intangible Assets as well.

59.     The table below summarizes the CCC allocation of each of the asset classes across the Nortel estates:

| CCC METHODOLOGY - ALLOCATION OF SALE PROCEEDS | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|
| | Value Allocation | | | | % Allocation | | |
| | Canada | US | EMEA | Total | Canada | US | EMEA | Total |
| Tangible Assets | $ 59 | $ 42 | $ 68 | $ 169 | 34.9% | 24.9% | 40.2% | 100.0% |
| Intangible Assets | | | | | | | | |
| Customer Relationships | 93 | 393 | 197 | 683 | 13.6% | 57.5% | 28.8% | 100.0% |
| IP | 858 | 228 | 57 | 1,143 | 75.1% | 19.9% | 5.0% | 100.0% |
| Purchaser Goodwill | 427 | 316 | 110 | 853 | 50.1% | 37.0% | 12.9% | 100.0% |
| Total Business Sales | 1,438 | 979 | 432 | 2,849 | 50.5% | 34.4% | 15.2% | 100.0% |
| Rockstar Transaction | 4,368 | 30 | 57 | 4,455 | 98.0% | 0.7% | 1.3% | 100.0% |
| Total | $ 5,805 | $ 1,009 | $ 488 | $ 7,302 | 79.5% | 13.8% | 6.7% | 100.0% |

60.     The CCC Experts' use of the AIT business valuations artificially depresses the non-Canadian share of value by applying a "value in use" concept, since those valuations are materially lower than the actual proceeds realized in the Business Sales.    Adopting the AIT business value as the basis for valuing the Surrendered Licenses diverts the subsequent market values realized in the Business Sales process to the Canadian Debtors and away from the U.S. and EMEA Debtors.

61.     To value the Surrendered Licenses, the CCC applies a "value in use" framework.[92]  As noted previously, "value in use" is inappropriate, because the structure of the MRDA and the way it was applied in practice support the view that the MRDA Licenses and the

---

91. CCC Report at ¶ 6.48.

92. *See id.* at ¶ 6.37.

62875345_9

RPS entitled the RPEs to 100% of the economic value of the Nortel IP.  Arguing that a low "value in use" should be used rather than the full value realized in the sales processes represents a misunderstanding of Nortel's business practices and the MRDA.

62.    To estimate "value in use," the CCC Experts use the values from the Q4 2008 Nortel AIT, which they claim are the best reflection of the "fair value" of the business, thus what the participants in aggregate could have earned over time operating their businesses as they were as of December 31, 2008.[93]  This assumption is unreasonable in that ignores the subsequent Business Sales as a market test of the value of the assets.  An accounting estimate of fair value may be a valid basis for allocation if no other information is available, but in this case the values realized in the Business Sale processes are true arms-length market transactions and demonstrate the fair market value of the Nortel businesses.  In these market transactions, the businesses were sold to buyers at over $2.8 billion, significantly in excess of the $988 million AIT estimated value applied by the CCC.  On this basis and especially given the artificiality of the "value in use" concept, the total Sale Proceeds should be used to determine "business value," not the values from the AIT test.[94]  The below chart demonstrates the substantial disparity between the AIT Valuation of each business and the purchase price of the correlating Business Sale:

---

93.  *See id.* at ¶ 6.39.

94.  A preliminary review of the AIT process raises a number of questions about the reliability of the AIT analysis, particularly given the dramatic divergence between the AIT DCF values and the realized Business Sale values. For example, the AIT DCF valuation for the Enterprise business only includes 2009 cash flows with no subsequent cash flows.  This differs starkly from the forecasts used in the sales process, which forecast strong revenue growth through the forecast period.

| VALUATION COMPARISON - AIT vs. PURCHASE PRICE | | | $ in millions |
|---|---|---|---|
| | AIT Valuation | Headline Purchase Price[1] | Difference |
| Enterprise Solutions [2] | $ 45 | $ 900 | $ (855) |
| Carrier Networks [3] | 502 | 1,527 | (1,025) |
| Metro Ethernet Networks [4] | (184) | 840 | (1,024) |
| Global Services [5] | 625 | 18 | 607 |
| **Total** | **$ 988** | **$ 3,285** | **$ (2,297)** |

(1) Differs from CCC's reported net proceeds of $2.848 billion due to purchase price adjustments and other closing adjustments.
(2) Includes Enterprise business sale.
(3) Includes CDMA, GSM, CVAS and Next Gen business sales.
(4) Includes MEN and MSS business sales.
(5) Includes Layer 4-7 business sale.

63.     In addition to the issues listed above, the approach advocated by the CCC is internally inconsistent.  The CCC claims that the Buyer PPAs are valid for valuing all asset types (and determining the portion of value attributable to IP) other than the Surrendered Licenses. For these purposes, there is no concept of "value in use" to discredit the buyer PPAs.  However, for determining the value of the Surrendered Licenses held by EMEA and the U.S., the CCC relies on a "value in use" concept and the related AIT business valuations.  These paradigms secure a higher allocation of value to the Canada Debtors at the expense of the U.S. and EMEA Debtors.

## V.     RESPONSES TO THE U.S. EXPERT REPORTS

64.     The U.S. Debtors present three expert reports outlining their Valuation and Allocation Methodology ("U.S. Methodology") including the Report of Jeffrey Kinrich dated January 24, 2014 (the "Kinrich Report"), the Report of Raymond Zenkich dated January 24, 2014 (the "Zenkich Report") and the Report of Lorraine Eden dated January 24, 2014 (the "Eden Report," and collectively with the Kinrich Report and the Zenkich Report, the "U.S. Expert Reports").

65.     The U.S. Expert Reports raise a number of issues relating to the methodology for valuing the assets transferred and the corresponding allocation of value to the various Debtors in the Business Sales and Residual Patents Sale.  Because the analysis with respect to the valuation and allocation of the Residual Patents Sale was conducted by Ocean Tomo, I refer to their Rebuttal Report to outline the specific issues regarding the U.S. Methodology regarding the Residual Patents Sale.  For the purpose of my report herein, I have focused on critiquing the U.S. Methodology with respect to the Business Sales.

66.     The U.S. Methodology relies on a fundamental legal assumption that the allocation of Sale Proceeds to each selling Debtor entity should reflect the economic value of the geographic market in which the entity is located or where the entity shares a license to exploit the Residual Patents.[95]

67.     The U.S. Methodology rejects any approach based on historical R&D spending by the RPEs for both the Business Sales and the Residual Patents Sale.

68.     The U.S. Experts do not attempt to value the different asset classes transferred in each sale.  Instead, they use the proportion of 2009 third party revenue generated by each entity in each territory as the basis for allocating the full amount of the proceeds from each Business Sale across the Selling Debtors as described above.[96]  This value encompasses all categories of Tangible and Intangible Asset value.  As noted above, they do not consider a Contribution Approach as a potential alternative.

69.     There is a difference between the RPEs, as fully integrated operations with sales, marketing and research organizations, and the non-RPEs, which were primarily sales and

---

95.  Kinrich Report at ¶ 130.

96.  *See id.* at ¶ 30.

distribution operations.[97]   To account for this difference, the U.S. methodology considers two approaches: (1) one where the revenues of all entities are equally-weighted ("Equal-Weighted Revenue Allocation") and (2) another where non-RPEs are valued based on a multiple of their revenue ("Market-Weighted Revenue Allocation"), rather than equally weighted, which has the effect of discounting the value of the non-RPEs relative to the RPEs to reflect the more limited scope of their operations.[98]   The Market-Weighted Revenue Allocation attempts to compensate the RPEs for the additional risk they take as the creators of the IP relative to the Non-RPEs who take no risk in the creation of the IP.

> **a.      The U.S. Experts' Allocation on the Basis of Revenues is Not Consistent with Nortel's Historical Practices, Either in Terms of the Annual Allocation of Profits or Loss or the Precedent Examples in which Nortel Allocated Asset Sale Proceeds.**

70.      As discussed above, Nortel's historical practice was to treat the RPEs as beneficial co-owners of the IP and to distribute annual profits or losses to the RPEs on the basis of their historical contribution to R&D expense.   This practice was formalized through the MRDA, the RPS and the various Licenses granted to the RPEs under the MRDA.

71.      Similarly, as also discussed in detail above, the UMTS sale to Alcatel is the most relevant historical example of Nortel allocating asset sale proceeds among various legal entities within Nortel.   The allocation of proceeds from the UMTS sale was not based on the relative revenue share methodology used by the U.S. Experts.   Rather, and consistent with the approach in my Opening Expert Report, the Nortel entities allocated the proceeds from the UMTS sale along asset categories and to those entities that owned the Tangible Assets, IP, Customer

---

97.  *See* Opening Expert Report at ¶ 26.

98.  Kinrich Report at ¶ 36.

Relationships and Goodwill assets that were transferred to the buyer.[99]   Tangible Assets including Fixed Assets and Inventory were allocated to the entity owning those assets.[100] Customer Relationships were allocated based on a discounted cash flow valuation approach by entity and In Process R&D and Goodwill were allocated based on the contribution each entity spent on the creation of the IP measured by R&D expenditures.[101]

> **b.**   **The U.S. Methodology That Allocates Business Sale Proceeds by the Relative Amount of Third-Party Revenue Earned In Each Territory Does Not Accurately Value All Tangible and Intangible Assets.**

72.   Revenue-based valuation techniques are typically used in situations where there are no better alternatives, as they are subject to many distortions and poor correlations.   To allocate the Nortel Business Sale Proceeds, however, there are multiple classes of identifiable assets, which may be valued and allocated using more reliable approaches than revenue-based allocation.   Given the availability of more accurate valuation and allocation methodologies, revenue is not an appropriate basis for the allocation of the Sale Proceeds from the Business Sales.

73.   First, Net Tangible Assets can be valued using the entity level balance sheets produced internally at Nortel.   This Net Tangible Asset value can then be allocated to the entity on whose balance sheet the assets and assumed liabilities resided.   This direct ownership, as recorded on the entity balance sheets is a more accurate and appropriate method for allocation of this value than entity revenue, as Tangible Assets are not always correlated with revenue.

---

99.  *See generally* Opening Expert Report at Appendix 9.

100. *Id.*

101. *Id.*

| US ALLOCATION COMPARISON: NET TANGIBLE ASSETS | | | | | |
|---|---|---|---|---|---|
| Debtor | Approach | Canada | US | EMEA | Total |
| US Allocation | *(based upon 2009 revenue)* | 11.9% | 70.1% | 18.0% | **100.0%** |
| EMEA Allocation | *(based upon ownership)* | 18.5% | 57.7% | 23.8% | **100.0%** |
| **Difference** | | **(6.6%)** | **12.4%** | **(5.8%)** | **–** |

Note: Percentages based upon total allocations to Canada, US and EMEA within this asset class.
Note: Percentages reflect allocations for each business sale aggregated for each RPE.

74.    Second, the IP that was transferred as part of the Business Sales can be valued directly using a relief from royalty method, which is conceptually similar to the DCF analysis the U.S. Methodology applies to the Residual Patents Sale.   The relief from royalty approach captures the value a buyer may be able to realize from the IP by using it in the acquired Nortel business, as well as in the buyer's own existing businesses.   The U.S. Experts appear inconsistent in rejecting a DCF based approach to valuing IP for purposes of the Business Sales, while adopting it for purposes of valuing IP sold in the Residual Patents Sale.

75.    Third, the IP that was transferred as part of the Business Sales, after being valued as described above, can be allocated using either of two appropriate approaches: the Contribution Approach and the License Approach, depending on the legal determination of the Courts.   The Contribution Approach allocates value to the RPEs according to their beneficial interests in the IP portfolio, which is determined by the relative contributions to the development of that IP over time through historical contribution to R&D.   My opinion is that this historical measure over a longer period of time more accurately accounts for the economic interests held by each of the RPEs, as discussed above.

76.    The License Approach, on the other hand, allocates value based on a net present value calculation applied to the estimated income generated in the markets in which the Nortel RPEs have a license to exploit the IP (exclusive or non-exclusive).   This is a variation on the approach used by the U.S. in its allocation of the Residual Patents Sale.   Either approach,

Contribution or License, is a more accurate method for allocating Business Sale IP value than the

U. S. Experts' approach.

| US ALLOCATION COMPARISON: INTELLECTUAL PROPERTY | | | | | |
|---|---|---|---|---|---|
| Debtor | Approach | Canada | US | EMEA | Total |
| US Allocation | (based upon 2009 revenue) | 11.9% | 70.1% | 18.0% | 100.0% |
| EMEA Allocation | (based upon R&D contribution) | 41.1% | 42.7% | 16.2% | 100.0% |
| EMEA Allocation | (based upon license theory) | 13.2% | 43.3% | 43.4% | 100.0% |
| **Difference** | (to R&D contribution) | **(29.2%)** | **27.4%** | **1.8%** | – |
| **Difference** | (to license theory) | **(1.3%)** | **26.7%** | **(25.4%)** | – |

Note: Percentages based upon total allocations to Canada, US and EMEA within this asset class.
Note: Percentages reflect allocations for each business sale aggregated for each RPE.

77.    Customer-Related Assets and Goodwill, the residual asset value, may be reasonably allocated using revenue.  Customer-Related Assets are difficult to reliably value directly, so including them in residual value together with Goodwill is appropriate.  Goodwill is, by definition, a residual value.  Both Customer-Related Assets and Goodwill are tied to the revenue generated by an entity, so lacking a better allocation method, relative revenue is a reasonable basis for allocation.

  c.    **The U.S. Experts' Reliance on Revenue by Entity in 2009 for Allocation of Value is Inappropriate.**

78.    As described above, relative revenue alone is not an appropriate basis for allocating the Nortel Business Sale Proceeds.  Even if one were to accept that relative revenue is an appropriate basis to allocate value, however, 2009 is not an appropriate time period.  The bankruptcy filing in January 2009 had an impact on revenue for the Nortel group entities in the time following the filing.  It is not possible to know the relative influence of that impact on the different entities, how that impact would change over time, or how buyers might perceive those

62875345_9

impacts.  As a result, using the 2009 revenue presents a distorted picture of the relative value surrendered by the Nortel entities.[102]

79.    Nortel entity revenue for 2008 is a more appropriate basis for the allocation of residual value, or for all Business Sale value, in the event the Courts adopt the U.S. Experts' approach to allocation.  2008 was the last full year prior to Nortel's bankruptcy filing and thus the last year in which the results were not impacted by the filing and any distortions that the filing might have caused in the distribution of revenues across the Nortel group.[103]

80.    As seen in the table below, using 2009 revenue figures as opposed to 2008 revenue figures shifts value away from the EMEA Debtors, while benefitting the Canadian and U.S. Debtors:

| US ALLOCATION COMPARISON - 2008 VS. 2009 REVENUE AS ALLOCATION KEY | | | | |
|---|---|---|---|---|
| **Debtor** | **Approach** | **Canada** | **US** | **EMEA** | **Total** |
| *Difference in Share of Revenue* | | | | | |
| US Allocation | *(based upon 2009 revenue)* | 11.9% | 70.1% | 18.0% | **100.0%** |
| EMEA Allocation | *(based upon 2008 revenue)* | 10.2% | 69.2% | 20.6% | **100.0%** |
| **Difference** | | **1.8%** | **0.8%** | **(2.6%)** | **–** |

Note: Percentages based upon total allocations to Canada, US and EMEA within this asset class.

Note: Percentages reflect allocations for each business sale aggregated for each RPE.

---

102. *See* Opening Expert Report at ¶¶ 117-18.

103. As noted in my Opening Expert Report, I consider the use of forecasted revenues relying on market data, as opposed to historical revenues justified in relation to IP, where the IP that was sold was not limited to its value within Nortel's business and because of IP's synergistic value to the market.  However, with respect to what I refer to in my Opening Expert Report as Other Intangible Assets, which are much more driven by the actual nature of the Nortel business and the ability of the Nortel business as sold to create future revenue from the Customer Relationships and Distribution Network that were in place, I consider Nortel's 2008 historical revenue is the best metric by which to allocate value attributable to these assets.  *See* Opening Expert Report at ¶ 117.  With respect to the U.S. Debtors' Methodology, even to the extent historical revenues may otherwise be appropriate, my primary criticism is directed at the adoption of post-petition revenues as set forth herein.

## VI.    CONCLUSION

81.    As set forth above, each of the Canadian Debtors' Experts, the CCC's Experts and the U.S. Debtors' Experts apply flawed methodologies to allocate the Sale Proceeds among the Selling Debtors.

82.    The reports submitted by the Canadian Experts adopt numerous incorrect legal assumptions about the rights that accrued to NNL as the holder of legal title to Nortel's IP and the nature of the Licenses held by the other RPEs, which result in a proposed allocation that heavily favors the Canadian Debtors.  The Canadian Experts assume that, as holder of legal title to most of the Nortel patents, NNL is presumptively entitled to receive 100% of the proceeds from the Residual Patents Sale, as well as the vast majority of the IP-related proceeds in each of the Business Sales.  Although the Canadian Debtors purport to allow the other RPEs to recover the value of the license rights they surrendered in connection with the Business Sales, their methodology diminishes the value of those Licenses based on incorrect and unreasonable assumptions.  The Canadian Experts also inflate the allocation to the Canadian Debtor by grouping non-IP asset classes such as Customer Relationships together with IP, ignoring the fact that NNL had no legal right to Customer Relationships, customer contracts and valuable employees managed and transferred by the other RPEs.

83.    In contrast to the Canadian Experts, the CCC's Experts attempt to distinguish between the various classes of assets being sold (albeit using inadmissible Buyer PPAs) in relation to the Business Sales.  However, the CCC's Experts depress the non-Canadian share of value through the use of business valuations drawn from the 2008 AIT that are materially lower than the actual proceeds realized in the Business Sales.  With respect to the Residual Patents Sale, the experts retained by the CCC make many of the same incorrect legal assumptions about

NNL's rights to the proceeds attributable to IP as the Canadian Experts, reserving 100% of the Sale Proceeds from the Residual Patents Sale exclusively for the Canadian Debtors.

84.     Finally, the U.S. Experts purport to base their approach on valuing the fair market value of the Licenses granted under the MRDA.  For the reasons set forth in my Opening Expert Report and above, I do not believe a License Approach is the most appropriate methodology for allocation of the Sale Proceeds.  Particularly with respect to IP, I believe that the proceeds should be allocated according to the RPEs contribution to R&D (the Contribution Approach) because that approach is consistent with the principles applied by the parties themselves prior to insolvency, *i.e.*, that they would each enjoy the benefits from commercial exploitation of jointly created IP in proportion to their relative contributions to the creation of that IP.  However, should the Courts adopt a License Approach as advocated by the U.S. Debtors, I submit that the only proper way to value the Licenses is in the manner set forth in my Opening Expert Report.


Respectfully Submitted,

Dated: February 28, 2014
New York, New York

Paul P. Huffard
Senior Managing Director
The Blackstone Group
345 Park Avenue
New York, New York 10154

## APPENDIX 1

### Sources Considered and Relied upon in Preparation of this Report

In addition to the documents set forth in Appendix 3 to my Opening Expert Report and the reports submitted by the experts retained by the Canadian Debtors, the Canadian Creditors Committee, and the U.S. Debtors, I considered or relied upon the following sources in preparation of this report:

| Produced Documents |
|---|
| Agreement With Respect to Certain NN Technology, Dec. 30, 2006, NNC-NNL06081062 |
| Excel spread sheet "Nortel Networks – Alteon sale to Radware – High Level Estimate of Purchase Price Allocation," Jun. 14, 2010, NNI_01432902 |
| Excel spread sheet "Nortel Networks – Packet Core sale to Hitachi – High Level Estimate of Purchase Price Allocation," Jun. 23, 2010, NNI_01432903 |
| Excel spreadsheet, "Nortel – Final 2008 Q4 Transfer Pricing Adjustments, NOR_53648048 |
| Excel spreadsheet, "RPS Participants – Q4 2006-Post 2005 TPM", NOR_53648133 |
| Excel spreadsheet, "RPS Participants – Q4 2007 TP Calculation", NOR_53648323 |
| Excel spreadsheet, "Nortel Networks – Optical/Carrier Ethernet sale to Ciena – High Level Estimate of Purchase Price Allocation," Aug. 17, 2010, NNC-NNL07600301 |
| Letter re "Acknowledgement relating to Master R&D Agreement dated December 22, 2004, as amended", Jan. 14, 2009, NNI_00907912 |
| Nortel Networks Limited – Transfer Pricing Report for the Taxation year ended December 31, 2009, NNC-NNL06001553 |
| Nortel Pre-filing Conference with CRA (October 2,  2007), NNC-NNL06001555 |
| PowerPoint presentation "DRAFT: IP Co. Strategy: Plan C-prime", Oct. 2010, NNI_01470423 |
| PowerPoint presentation "Nortel – Strategic Alternatives for IP", Aug. 12, 2009, Exhibit 22106, NNI_01290069 |
| Depositions |
| McColgan Dep., Nov. 8, 2013 |
| Veschi Dep., Nov. 7, 2013 |

62875345_9