**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

— and —

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,
AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL
CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL
NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED.

---

# EXPERT REPORT OF JAMES E. MALACKOWSKI
### January 24, 2014

### Revised March 24, 2014

**THIS REPORT CONTAINS CITATIONS TO DOCUMENTS MARKED**
**HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER**
**THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

1.   BACKGROUND AND QUALIFICATIONS ..................................................................... 3
   1.1.   Background ............................................................................................................. 3
   1.2.   Qualifications ......................................................................................................... 3
2.   ASSIGNMENT ................................................................................................................. 4
3.   ASSUMPTIONS, DOCUMENTS AND OTHER EVIDENCE RELIED UPON ............ 5
4.   SUMMARY OF OPINIONS ............................................................................................ 6
   4.1.   The Contribution Approach ................................................................................... 6
   4.2.   The License Approach ........................................................................................... 7
5.   COMPENSATION AND DUTY OF INDEPENDENCE ................................................ 9
6.   INDUSTRY OVERVIEW .............................................................................................. 10
   6.1.   Smart Phones ....................................................................................................... 11
   6.2.   Wireless Infrastructure ........................................................................................ 11
   6.3.   Optical ................................................................................................................. 12
   6.4.   Data Networking ................................................................................................. 13
   6.5.   PCs ...................................................................................................................... 14
   6.6.   Internet Search and Advertising ......................................................................... 14
   6.7.   Enterprise Voice .................................................................................................. 14
   6.8.   Carrier Voice ....................................................................................................... 15
7.   NORTEL PATENT HOLDINGS .................................................................................. 16
   7.1.   IP Included in the Business Sales ....................................................................... 16
   7.2.   IP Included in the Residual Patent Sale .............................................................. 16
   7.3.   Breadth of Patent Coverage ................................................................................ 17
   7.4.   Geographic Coverage .......................................................................................... 18
8.   VALUATION METHODOLOGY ................................................................................. 20
   8.1.   Summary .............................................................................................................. 20
   8.2.   Standard of Value ................................................................................................ 20
   8.3.   Premise of Value ................................................................................................. 21
   8.4.   Methods for Determining Value .......................................................................... 21
   8.5.   Valuation Methodology Conclusion ................................................................... 23
9.   VALUATION OF IP SOLD IN BUSINESS LINES ..................................................... 24
   9.1.   Defensive Value ................................................................................................. 25
   9.2.   Synergistic Value ................................................................................................ 27
10.  VALUATION OF RESIDUAL PATENTS .................................................................. 31
   10.1.  Identification of Franchise Assets ...................................................................... 33
   10.2.  Franchise Revenue Forecasts ............................................................................. 34
   10.3.  Royalty Rate Selection ....................................................................................... 36
   10.4.  Licensing Expenses ............................................................................................ 37

10.5.    Tax Effects ................................................................................................................ 37

10.6.    Discount Rate ............................................................................................................. 37

10.7.    Results of Residual Patent Valuation by Franchise .................................................. 37

**11.    ALLOCATION** ............................................................................................................ **39**

11.1.    Contribution Approach to Allocation ....................................................................... 39

11.2.    Nortel's Reliance on R&D Spending Under the RPSM ............................................ 45

11.3.    Patents Not Assigned to NNL ................................................................................... 45

11.4.    Application of Contribution Approach ...................................................................... 47

11.5.    License Approach to Allocation ................................................................................ 49

11.6.    Allocation Summary .................................................................................................. 53

**12.    STATEMENT OF LIMITING CONDITIONS** .............................................................. **55**

**13.    CERTIFICATION** ......................................................................................................... **56**

## 1. BACKGROUND AND QUALIFICATIONS

### 1.1. Background

I am the Chairman and Chief Executive Officer of Ocean Tomo, LLC ("Ocean Tomo"), a professional services firm providing expert services, research, investments, risk management, and assistance in transactions. Ocean Tomo assists clients – corporations, law firms, governments and institutional investors – in all aspects of realizing the value of their intellectual property ("IP").

Ocean Tomo has been retained by the Joint Administrators for Nortel Networks UK and certain of its affiliates in Europe, the Middle East and Africa (the "Joint Administrators" and the "EMEA Debtors," respectively), to provide expert analysis and opinions regarding the valuation of IP and other intangibles in connection with the allocation of the proceeds of sale of certain assets of the Nortel Group.

### 1.2. Qualifications

I have more than 25 years of experience advising clients and counsel on business and IP valuation issues and all phases of the technology transfer process.

I am a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois and also have a certification in Financial Forensics. I have served as an expert in federal court or before the International Trade Commission on more than 40 occasions on questions relating to IP economics, including business valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, Hatch-Waxman Act market exclusivity, and the equities of a potential injunction. As an inventor, I have twenty issued U.S. patents.

I am Past President of The Licensing Executives Society International, Inc., a leading independent professional services organization that facilitates global IP commerce through education, networking, standards, and certification. I am a frequent Adjunct Instructor for graduate studies on IP management and markets and a frequent speaker on emerging technology markets and related financial measures. I have addressed mass media audiences on several occasions, including on Bloomberg Morning Call, Bloomberg Evening Market Pulse, Bloomberg Final Word, CNBC Closing Bell, CNBC On the Money, CNBC Street Signs, CBS News Radio and Fox Business National Television, as well as other recognized news-based Internet video channels. I have also appeared as a judge on PBS's *Everyday Edisons*.

I have substantial experience serving as a director on the boards of leading technology corporations and research organizations. I am also the Founder of the Chicago-based Center for Applied Innovation, an Illinois non-profit corporation created to manage education, public policy outreach and related economic activity around applied technology and IP rights.

A copy of my Curriculum Vitae is attached hereto as Appendix A.

## 2.  ASSIGNMENT

I have been retained by the Joint Administrators to provide expert analysis and opinions on behalf of the EMEA Debtors in the joint proceedings before the Ontario Superior Court of Justice (Commercial List) and the United States Bankruptcy Court for the District of Delaware (the "Courts") concerning the worldwide bankruptcy of the Nortel Group.

On January 14, 2009, Nortel initiated creditor protection proceedings in Canada under the *Companies' Creditors Arrangement Act*, in the United States under Chapter 11 of the U.S. Bankruptcy Code, and in the United Kingdom under the *Insolvency Act 1986*. Between April 1, 2009 and March 11, 2011, Nortel sold its operating businesses in eight separate transactions (the "Business Sales"). In June 2011, Nortel sold en bloc the remaining IP rights (the "Residual Patent" portfolio) not sold as part of the Business Sales (the "Residual Patent Sale"). The proceeds from the Business Sales and the Residual Patent Sale total approximately US$7.7 billion.

I have been asked to provide expert analysis and opinions in respect of three questions:

a) How much of the consideration paid in each of the Business Sales should properly be regarded as attributed to the IP sold in the transactions?

b) What allocation and valuation methodologies are appropriate on the facts of this case in light of valuation theory and economic principles related to IP?

c) How much of the proceeds of sales of IP (either from the Business Sales or the Residual Patent Sale) should be allocated to each of the Canadian, U.S., and EMEA Debtors under each of the two approaches advanced in this case, *i.e.*, contribution and license?

I understand and intend that the Blackstone Advisory Partners L.P. will rely on my analysis in a broader valuation and allocation exercise with respect to the proceeds of sale of the assets by the Nortel Group, and that Charles River Associates will rely on my analysis in the context of analyzing the useful life of Nortel's IP and certain other issues related to the IP sold in the Business Sales and the Residual Patent Sale.[1]

I reserve the right to alter or amend this report and any of the opinions expressed herein to take into account any changes in the factual predicates of my opinions or any rulings or interpretations by competent authorities that render any opinion expressed herein incorrect or in need of qualification.

---

[1] In respect of one Business Sale (the sale of the Next-Generation Packet Core business to Hitachi), where no patents were transferred as part of the sale and there were no customers of the business, I have relied on Blackstone Advisory Partners L.P.'s valuation of tangible assets and assumed the balance of the sale price is attributable to IP such as software.

---

3.   ASSUMPTIONS, DOCUMENTS AND OTHER EVIDENCE RELIED UPON

---

Based on the allocation position papers in this case, I assume that the proceeds of the Business Sales and Residual Patent Sale should be allocated to the various legal entities according to the value of the interests transferred or rights relinquished by each relevant party in connection with that sale.  The parties have offered two principled ways in which the value of IP included in each sale should be allocated among NNL, NNI, NNUK, NNSA and NNIR (the "Selling Debtors").  Under the "Contribution Approach," the portion of the sale proceeds attributable to IP should be allocated among the Selling Debtors in accordance with their relative contributions to the creation of the IP.  Under the "License Approach," the portion of the sale proceeds attributable to IP should be allocated among the Selling Debtors in accordance with the relative fair market value at the date of sale of the license rights to the IP held by each of those entities (the "Licenses").

With respect to the Licenses, I assume that (i) as at the date of sale each of the Licenses was in full force and effect and was not terminable and had not previously been terminated; (ii) the Licenses apply to all the IP that was transferred in each of the Business Sales and the Residual Patent Sale; (iii) the Licenses (each consisting of an Exclusive License and Non-Exclusive License) are in the terms set out in the MRDA made effective from January 1, 2001, as subsequently amended; (iv) the Exclusive Licenses confer upon the Selling Debtors the full beneficial ownership of and economic entitlement to all IP licensed in the Exclusive Territory (i.e., existing and/or registered in the Exclusive Territory); (v) the non-exclusive licenses, being sub-licensable, prevent the legal title holder or any other party from having exclusive rights to the IP in the Non-Exclusive Territory, so long as any such non-exclusive license remains outstanding in such Non-Exclusive Territory.

In relation to Trademarks, I assume that the legal rights to or ownership of trademarks are held by the entity or entities that are recorded in the books and records of Nortel as owning them.

In preparing this opinion, I have considered various facts and data related to the issues discussed herein, as cited in the text and footnotes in this report and in Appendices B through U hereto.

## 4.  SUMMARY OF OPINIONS

I have been asked to consider two approaches to the allocation of asset sale proceeds attributable to Nortel Group's IP, both of which I believe are reasonable under the circumstances. Under the Contribution Approach, sale proceeds should be allocated in proportion to the various Nortel entities' contributions towards the creation of the IP.  Under the License Approach, Nortel's entities' interests in Nortel IP are defined by their licenses to the IP, *i.e.*, they are entitled to sale proceeds attributable to IP in proportion to the value of the licenses that the Nortel entities surrendered as a condition of the sales.

### 4.1.    The Contribution Approach

The best way to determine contributions towards the creation of IP in the case of Nortel is based on research and development ("R&D") spending. Given the size of Nortel's patent portfolio and the inter-related manner in which R&D was conducted, it is not possible to interview engineers, review individual documentation, and assess patent claims on an individual basis to determine which Nortel entities contributed, in what proportions, to the creation of each patent.  In these circumstances, I conclude that spending on R&D is a reasonable proxy for the contributions that Nortel entities made towards creation of IP for the benefit of the entire Nortel Group.

I am supported in that conclusion by the fact that Nortel itself allocated profit and loss in proportion to R&D spending. Entities that did not engage in R&D received only a small, standard return on their revenues for the sales and distribution services that they provided, while the entities that performed R&D were entitled to share in the profits generated by that R&D (or suffer the losses, as was often the case).  Therefore, while I do not believe that the specifics of Nortel's past practice necessarily prescribe the proper allocation of sale proceeds, I find Nortel's general approach broadly supportive of the Contribution Approach.

In using R&D spending as a measure of contributions to the creation of IP, I have considered all spending that contributed towards the creation of the IP that generated the sale proceeds in the Business Sales and Residual Patent Sale.  I have done so on a transaction by transaction, and portfolio by portfolio basis.  I am aware of no basis on which to discount or ignore spending from any particular time period, as the timeline by which IP is adopted by the market and gains value often results in IP gaining in value as it ages, before finally losing its value once a patent expires.

I have considered a number of different starting and ending points for the reference period during which to measure R&D spending.  However, in my opinion the best approach is to consider all relevant R&D spending for each IP portfolio.  Based on evidence that it took approximately one year for Nortel R&D spending to culminate in a patented invention, I have therefore considered R&D spending starting one year before the earliest relevant patent in each portfolio.  From that starting point, I have looked at all R&D spending through the year before the last relevant patent in the portfolio was registered.  I have done this separately for each of the Business Sale portfolios and the Residual Patent portfolio, so the allocation percentages will vary for each transaction based on when the patents in each portfolio were registered, and therefore when relevant R&D spending occurred.

With respect to IP sold as part of the various Business Sales, it is first necessary under either a Contribution Approach or a License Approach to determine what portion of the sales proceeds are derived from IP so that this portion can be allocated in accordance with the principles discussed in this report.

Using these approaches and combining the results of the Residual Patent Sale and the various Business Sales produces the following results:

**Table 1:**
**Contribution Approach Summary Allocations for IP** (*millions USD*)

|  | NNL | NNI | NNUK | NNSA | NNIR |
|---|---|---|---|---|---|
| **Total Allocated Value** | $2,091.17 | $2,256.27 | $449.77 | $395.81 | $51.01 |
| **Percentage of Total IP Value** | 39.9% | 43.0% | 8.6% | 7.5% | 1.0% |

### 4.2.    The License Approach

Turning to the License Approach, it is first necessary to perform an independent valuation of the IP in question.  In addition to determining the portion of the Business Sale proceeds derived from IP, it is also necessary to perform a valuation exercise in respect to the Residual Patent portfolio.  The reason for this is that, while the price of the Residual Patent portfolio has already been determined by the sale of the portfolio in a public auction process, it is still necessary to determine how that value is derived geographically so that it can be allocated according to the different geographic licenses held by the five Selling Debtors (also commonly referred to as residual profit entities or "RPEs").[2]

To determine the value of the IP in each sale, and therefore the proportion of the sale proceeds attributable to IP, I have adopted a "Relief from Royalty" approach in order to determine the net present value of future revenues that are likely to be earned from Nortel's IP.  This approach looks at all reasonable future sources of revenue that a buyer of Nortel's IP could earn given all relevant considerations, and then discounts that future revenue to calculate a net present value.  Since future revenue can be broken down by the geographies where those revenues are generated, it is then a straightforward task to allocate the net present value by various countries.

The allocation of value based on a License Approach depends on the nature of the licenses.  The five RPEs held an exclusive license to Nortel's IP within their own country, so I allocated the entire net present value of future revenues from Nortel IP in each country to the RPE that held an exclusive license in that country.  For the rest of the world ("ROW"), the RPEs each held a non-exclusive, sub-licensable license to Nortel's IP.  In these circumstances, any one entity could undermine the value of Nortel's IP in ROW by sub-licensing Nortel's IP to any potential infringer.  I therefore conclude that each of the non-exclusive licenses has equal value worth one-fifth of the value of what an exclusive license to all ROW territories would be worth.  I have then allocated that one-fifth value to each of the five RPEs.

Using a License Approach to allocation produces the following allocation of value across all Nortel IP sale proceeds:

**Table 2:**
**License Approach Summary Values** (*millions USD*)

|  | NNL | NNI | NNUK | NNSA | NNIR |
|---|---|---|---|---|---|
| **Total Allocated Value** | $596.02 | $2,824.78 | $720.94 | $665.21 | $437.09 |
| **Percentage of Total IP Value** | 11.4% | 53.9% | 13.7% | 12.7% | 8.3% |

---

[2] The RPEs included NNL, NNI, NNUK, NNSA and NNIR.

The structure of this report is as follows. First, I provide an overview of the telecommunications industry, including how I have divided that industry into various subsectors in which Nortel participated and its IP portfolio can be divided. Second, I describe Nortel's IP portfolio, and summarize third-party assessments of its scope, breadth and geographic coverage.  Third, I perform valuations of Nortel's IP in both the Residual Patent portfolio and the various Business Sales. This valuation draws on, among other things, the conclusions I reached about the telecommunications industry and Nortel's patent portfolio.  Fourth and finally, having valued the IP, I then allocate it to the relevant Nortel entities using the Contribution Approach and License Approach described above.

## 5.   COMPENSATION AND DUTY OF INDEPENDENCE

I am being compensated for my time at an hourly rate of $795, plus reasonable out-of-pocket expenses.  My compensation is in no way contingent on or affected by the substance of this report or the outcome of these proceedings.

I understand and acknowledge that, although I have been retained by the Joint Administrators, my over-riding duty is to the Courts and includes the obligations (a) to provide opinion evidence that is fair, objective, and non-partisan; (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and (c) to provide such additional assistance as the Courts may reasonably require to determine a matter in issue.

6. INDUSTRY OVERVIEW

From the 1970s until its eventual liquidation in connection with these proceedings, the Nortel Group operated largely as a major international supplier to the telecommunications industry.

According to the North American Industry Classification System, adopted by the U.S. Department of Labor, the telecommunications industry is defined as follows:

> Industries in the Telecommunications subsector group establishments that provide telecommunications and the services related to that activity (e.g., telephony, including Voice over Internet Protocol (VoIP); cable and satellite television distribution services; Internet access; telecommunications reselling services). The Telecommunications subsector is primarily engaged in operating, and/or providing access to facilities for the transmission of voice, data, text, sound, and video. Transmission facilities may be based on a single technology or a combination of technologies.[3]

The value of Nortel's IP depends on the future stream of revenue it could generate. To calculate this value, it is necessary to understand the status and prospects for the telecommunications industry during the period the IP was sold, from 2009 to 2011. At this time, the telecommunications industry was characterized by rapidly changing technology and innovation such as the development of massive data growth, new terminals, new applications, and innovative services.[4] The industry as a whole faced constant demand for newer and faster products and services; in 2010, estimates suggested that global Internet data traffic increased by 41%, and mobile Internet data traffic increased by 159%.[5] This created an impetus for market participants to focus their resources on R&D and the raw materials needed to meet increased demand and reduce production costs.[6]

Coming out of the recession, growth in telecommunications was expected to continue in 2010 on the back of mobile services (voice, messaging, and data) and expansion of fourth-generation wireless technologies.[7]

The telecommunications industry can be divided into various subsectors, which include the following eight subsectors in which Nortel developed IP: Wireless Smart Phones, Wireless Infrastructure, Optical, Data Networking, PCs, Internet Search and Advertising, Enterprise Voice, and Carrier Voice. In this respect, I will refer to these eight industry subsectors as "franchises." In the remainder of this section, I will provide brief descriptions of each of the eight relevant franchises to which Nortel's IP is related, including the most significant market participants and projected growth. This information supports the IP valuations I perform later in this report. Throughout this report, except where indicated otherwise, I have used data and projections made as close in time as possible to the date of sale. Doing so best approximates the value projections that the purchasers would have made.

---

[3] U.S. Department of Labor, Bureau of Labor Statistics, Telecommunications: NAICS 517, available at www.bls.gov/iag/tgs/iag517.htm (last visited Jan. 23, 2014).

[4] European Securities Network, Telecommunications Investment Research, 2 (July 1, 2011) ("Telecommuinications Investment Research").

[5] Ofcom, International Communications Market Report 2011, 220 (Dec. 14, 2011), http://stakeholders.ofcom.org.uk/binaries/research/cmr/cmr11/icmr/ICMR2011.pdf ("International Communications Market Report").

[6] Telecommunications Investment Research, supra note 4, at 2.

[7] International Communications Market Report, supra note 5, at 221.

### 6.1.    Smart Phones

The smart phone industry is similar to other mobile phones in that smart phones provide digital voice service and text messaging.  However, in addition to these capabilities, smart phones provide users access to the Internet, software applications, e-mail services, still and video cameras, MP3s, and much more.[8]  For purposes of this analysis, the smart phone franchise includes all phones with these capabilities.

The smart phone has revolutionized the way society communicates. It has adapted to become an all-in-one device that caters to the convenience of the end user.  The heavily layered and constantly improving technologies embedded in these devices have created an extremely competitive market, with no one company maintaining a dominant share.

There are a few companies that have been able to gain a larger portion of the market by differentiating their product offering. In 2010, these companies included Apple, Nokia, and RIM, which carried 29.8%, 22.5%, and 15.9% of the market, respectively.[9]  Additional participants included Samsung, HTC, Motorola, Sony-Ericsson, and LG, which each held less than 10% of the market.

Demand for smart phone devices is expected to continue.[10] More than 300 million smart phone devices were sold in 2010, generating revenues in excess of $89 billion world-wide.[11]  Based on projections data provided by Infonetics Research, a leading telecommunications market research firm widely relied upon by IP valuation professionals, smart phone revenues in the emerging market regions of the Caribbean and Latin America ("CALA") and Asia-Pacific ("APAC") were projected to grow at a compound annual growth rate of 6.4% and 6.0%, respectively, through 2015.[12]  Additional revenues may still be captured as companies gravitate towards the Application Store Model (a distribution platform for application software), as they see tremendous opportunity to capitalize on revenues from advertisements.[13]

Nortel was not a prominent market participant in the smart phone industry in 2010.  However, Nortel's Residual Patent portfolio did contain a number of significant patents relevant to this industry subsector.

### 6.2.    Wireless Infrastructure

Wireless Infrastructure is the platform that enables enterprise-wide access to an organization's applications and data.[14]  In 2010, the Wireless Infrastructure environment was in a transition phase from second and third generation ("2G" and "3G") networks, to the faster, more modern 4G network.  Both 2G/3G, and 4G networks include similar components that build on the same foundation. Wireless Infrastructure is present in residential homes, public facilities, and businesses enterprises.

---

[8] Smartphone Definition, PC Magazine Encyclopedia, http://www.pcmag.com/encyclopedia/term/51537/smartphone (last visited Jan. 23, 2014).

[9] 2G/3G/4G (LTE and WiMax) Mobile Broadband Devices and Subscribers:  Quarterly Worldwide and Regional Market Share, Size and Forecasts, Infonetics Research (June 10, 2011) (EMEAPROD0231867) ("Mobile Broadband Devices and Subscribers Report").

[10] Scott Cromar, Smartphones in the U.S.:  Market Analysis, at 17 (Nov. 29, 2010).

[11] Mobile Broadband Devices and Subscribers Report, supra note 9.

[12] Id.

[13] Organisation for Economic Co-operation and Development, OECD Communications Outlook 2011, at 137-38 http://www.keepeek.com/Digital-Asset-Management/oecd/science-and-technology/oecd-communications-outlook-2011_comms_outlook-2011-en#page1 (last visited Jan. 23, 2014).

[14] What is Wireless Infrastructure? CDW, http://www.cdw.com/content/solutions/wireless-infrastructure.aspx (last visited Jan. 23, 2014).

By 2010, the market was experiencing substantial increases in data traffic. However, this increase did not translate to a commensurate increase in global telecom revenue. Total global revenue of wireless service providers increased just 2% in 2010, with much of the growth coming from China and Latin America.[15] This low increase in revenue in mature economies is primarily a result of the economic slowdown that began in 2008, but can also be attributed to inefficient investments made in the infrastructure, or lack thereof, necessary to support the increased volume of data traffic.[16] Most operators around the world had upgraded to at least 2G GSM networks, with a few countries (Japan, Sweden and US) beginning to upgrade to 4G LTE technology. Research predicted LTE technology to become up to 5.5 times more efficient than traditional 3G networks by 2020.[17] Emerging markets, such as Brazil, Russia, India and China, were expected to experience faster growth in this area compared to mature markets like the UK, primarily due to the larger availability of spectrum, and general focus on mobile infrastructure.[18]

With aims to improve data capacity over the next 10 years, in 2010 4G LTE was the latest global network and was considered the next generation broadband system.[19] A report issued by Juniper Research projected total 4G LTE subscribers to exceed 300 million by the year 2015.[20] Additional information from Infonetics research projects 4G LTE technologies to grow at a compound annual rate of 57.4% from 2011 through 2015.[21] Ericsson was the dominant player in both the 2G/3G and 4G LTE Wireless Infrastructure markets controlling 38.4% and 31.1% of these markets respectively through 2010.[22] Other leading market participants included Nokia Siemens Networks, Huawei, and Alcatel-Lucent each controlling 18.9%, 13.2%, and 12.4% of the 2G/3G market and 14.5%, 5.3%, and 24.3% of the 4G LTE market, respectively.[23]

Nortel's involvement in the Wireless Infrastructure space had been significant as recently as 2007, when it maintained 7.9% of the market – fifth among all participants.[24] However, by 2010, as described in Appendix E, Nortel had sold its UMTS access business (a 3G technology) to Alcatel in 2007 and sold its remaining GSM/CDMA/LTE assets in three separate post-petition transactions in 2009 and 2010.

### 6.3.  Optical

Optical networks operate using light, instead of electrical currents, to transmit signals through optical fibers.[25] Compared to traditional copper wires, optical networks have higher bandwidth, less loss, and a larger transmission range.[26] Additionally, optical networks operate without any electromagnetic interference.[27] The

---

[15] International Communications Market Report, supra note 5, at 220.

[16] Id.

[17] Id. at 236-37.

[18] Id. at 237.

[19] Juniper Research, 4G LTE…Beyond the Mobile, 1 (Aug. 2010) (EMEAPROD02322738).

[20] Id. at 4.

[21] Mobile Broadband Devices and Subscribers Report, supra note 9.

[22] Id.

[23] 2G/3G/4G (LTE and WiMax) Infrastructure and Subscribers:  Quarterly Worldwide and Regional Market Share, Size and Forecasts, Infonetics Research (May 31, 2011) (EMEAPROD02318768) ("Infrastructure and Subscribers Report").

[24] Id.

[25] Optical Communication Definition, Techopedia, http://www.techopedia.com/definition/24942/optical-communication (last visited Jan. 23, 2014).

[26] Id.

[27] Tellabs, Debunking the Myths About Optical LAN, at 1 (2013), http://www.tellabs.com/resources/papers/tlab_debunking-myths-about-olan.pdf.

rise of optical network communication started in response to increased consumer demand for information and application services. This higher demand for information significantly increased data traffic, and thus, has put increasing pressure on organizations to implement communication networks that have the capacity to support the level of demand.

 Through 2010, the optical network market was composed of many market participants. The most notable participants included Huawei, Alcatel-Lucent, ZTE, Fujitsu and Ciena maintaining 21.3%, 19.9%, 7.9%, 7.4% and 7.0% market share respectively.[28]

Nortel held 6.3% of the optical market in 2009, which accounted for $851 million in revenue.[29] Nortel sold its Optical Networks business line in 2010 as part of a sale to Ciena. The deal finalized on March 19, with Ciena outbidding Nokia Siemens Networks in a $769 million cash transaction. The initial reaction in the market was that Ciena faced significant integration risks from the deal, as it agreed to hire over 2,000 employees, nearly doubling its workforce.[30]

### 6.4.    Data Networking

The Data Networking subsector comprises the collaboration of electronic processes, and hardware such as routers and switches, which allows for the orderly transmission of data throughout a network.[31] This service is primarily geared towards business organizations as a means of maintaining and delivering data throughout their enterprise network.[32]

In 2010, the Data Networking market was dominated by Cisco, which maintained 66.2% of the switches market,[33] and 51.3% of the routers market.[34]

By 2009 Nortel's share of the routers and switches market had fallen well below 1%. Nortel sold its Data Networking business in 2009 as part of the sale of its Enterprise Solutions segment to Avaya for $943 million.[35] At the time of the acquisition, Avaya was a small player in both the routers and switches market, controlling less than 2% of these markets, combined.[36]

---

[28] Infrastructure and Subscribers Report, supra note 23.

[29] Id.

[30] Ben Dummet, Ciena Buys Nortel Assets for $769 Million (Nov. 24, 2009, 12:01 AM), available at http://online.wsj.com/news/articles/SB10001424052748704779704574553153736207362.

[31] What is a Data Network?, Wisegeek, http://www.wisegeek.org/what-is-a-data-network.htm (last visited Jan. 23, 2014).

[32] Data Networking Managed Services, http://www.avaya.com/usa/service/data-networking-managed-services (last visited Jan. 23, 2014).

[33] Total Enterprise and Carrier Ethernet Switches Pivot: Quarterly Worldwide and Regional Market Share, Size, and Forecasts, Infonetics Research (June 8, 2011) (EMEAPROD02318750) ("Total Enterprise and Carrier Ethernet Switches Pivot").

[34] Total Enterprise and Service Provider Routers Pivot: Quarterly Worldwide and Regional Market Size, Share, and Forecasts, Infonetics Research (June 7, 2011) (EMEAPROD02318752) ("Total Enterprise and Service Provider Routers Pivot").

[35] Avaya Inc., Annual Report (Form 10K), at 32 (September 30, 2010).

[36] Total Enterprise and Carrier Ethernet Switches Pivot, supra note 33; Total Enterprise and Service Provider Routers Pivot, supra note 34.

### 6.5.    PCs

The personal computer ("PC") subsector includes manufacturers of computers, computer peripherals, communications equipment, and similar products, as well as manufacturers of components of these products.[37]  PC products include desktops, laptops, netbooks, tablets, etc., as well as any peripherals or components associated with these products.

There are no dominant players in the PC subsector, with HP, Acer, Dell, Lenovo and Toshiba being the largest participants with market shares between 5% and 20%.  Nortel had no presence in the PC market.  However, it had a number of significant patents in this field included in the Residual Patent portfolio.

Similar to the smart phone market, the PC market is extremely competitive.  The general expectation from the market was that PC revenue would continue to grow rapidly through at least 2015, particularly when tablets are included.[38]

### 6.6.    Internet Search and Advertising

Internet search engines are online software systems that are designed to find and filter information on the World Wide Web.[39]  Revenue is generated through advertisements on the search engine websites.

Although Internet advertising took a hit during the economic recession and revenues decreased in 2009, growth returned in 2010 as total advertising revenues exceeded $26 billion.[40]  Telecom companies accounted for 13% of 2010 search engine revenues or $3.5 billion, down from the 16% ($3.6 billion) reported in 2009.[41]  Search revenue accounted for 46% of 2010 revenues, down slightly from the 47% reported in 2009.[42]

Internet search is dominated by Google, with Yahoo, Microsoft (Bing), AOL and Ask trailing well behind.[43]  Nortel did not participate in this market but held important patents in this industry subsector.

### 6.7.    Enterprise Voice

Enterprise Voice software, also known as Enterprise VoIP, provides Internet telephone capabilities specifically designed to fit the needs of large organizations.[44]  Enterprise VoIP is designed to provide the full range of publicly switched telephone network services, as well as additional services.[45]

---

[37] U.S. Department of Labor, Bureau of Labor Statistics, Computer and Electronic Manufacturing: NAICS 334, available at http://www.bls.gov/iag/tgs/iag334.htm (last visited Jan. 23, 2014).

[38] Peter Clarke, Tablet Computer Market on 81% CAGR, Says Analyst, EE Times (Nov. 29, 2011, 2:20 PM) http://www.eetimes.com/document.asp?doc_id=1260690.

[39] Search Engine Definition, The Free Dictionary, http://www.thefreedictionary.com/Internet+search+engine (last visited Jan. 23, 2014).

[40] IAB Internet Advertising Revenue Report: 2010 Full Year Results, at 4 (Apr. 2011), www.iab.net_media_file_IAB_Full_year_2010_0413.pdf.

[41] Id. at 16.

[42] Id. at 4.

[43] Google Inc., Annual Report (Form 10-K) (Feb. 11, 2011); Yahoo! Inc., Annual Report (Form 10-K) (Feb. 28, 2011); Microsoft Corp., Annual Report (Form 10-K) (July 30, 2010); AOL Inc., Annual Report (Form 10-K) (Feb. 25, 2011); IAC/Interactivecorp, Annual Report (Form 10-K) (March 1, 2011).

[44] Enterprise Voice Over Internet Protocol Definition, Techopedia, http://www.techopedia.com/definition/27852/enterprise-voice-over-Internet-protocol-enterprise-voip (last visited Jan. 23, 2014).

The leading participants in the Enterprise Voice industry in 2010 were Avaya, Cisco, NEC, and Siemens at 17.2%, 15.2%, 12.8%, and 10.2% respectively.[46]  Through 2009, Nortel had a significant role as a global provider of Enterprise Voice and Data Networking.[47]  However, in December 2009, Nortel sold its Enterprise Solutions operating segment, which competed in both the Enterprise Voice and Data Networking franchises, to Avaya, in a deal worth $943 million.[48] This acquisition effectively made Avaya the number one market participant in the Enterprise Solutions space.[49]

### 6.8.   Carrier Voice

Carrier Voice or Carrier VoIP can be described as the conversion of voice to digital signals, which are then sent over the Internet instead of traditional telephone lines.[50]

There are numerous participants in the Carrier Voice market.  According to Infonetics research, there were more than 26 companies that earned revenue in this sub-industry in 2010.[51]  Leading the market was Genband with 14.4% market share, followed by Huawei with 13.0%, with no other company controlling more than 7.1% of the market.[52]

Nortel was one of the largest participants in the Carrier Voice market in 2009, controlling over 16% of the market.[53]  However, in June 2010, Nortel sold its Carrier VoIP and Application Solutions (CVAS) segment to Genband in a deal worth roughly $282 million.[54]

---

[45] Id.

[46] Frost & Sullivan, World Enterprise Telephony Platform and Endpoint Markets (July 2011).

[47] Siemens Enterprise Communications, Global Enterprise Communications Market Compendium 2011 (Mar. 2011), at 91 (EMEAPROD02323788) ("Siemens Market Compendium").

[48] Avaya Inc., Annual Report (Form 10K), 32 (September 30, 2010).

[49] Siemens Market Compendium, supra note 47, at 91.

[50] Federal Communications Commission, Voice Over Internet Protocol, http://transition.fcc.gov/voip/ (last visited Jan. 23, 2014).

[51] Total Service Provider VoIP and IMS Equipment and Subscribers Pivot:  Quarterly Worldwide Market Share, Size, and Forecasts, Infonetics Research (June 6, 2011) (EMEAPROD02318769) ("Total Service Provider VoIP and IMS Equipment and Subscribers Pivot").

[52] Id.

[53] Id.

[54] Sean Michael Kerner, Genband Closes Purchase of Nortel CVAS (June 2, 2010), http://www.Internetnews.com/bus-news/article.php/3885606/Genband+Closes+Purchase+of+Nortel+CVAS.htm.

7.    NORTEL PATENT HOLDINGS

My valuation of IP depends on future revenues that may be earned from the IP.  To project that revenue, I must examine the industries to which the IP relates and the geographic scope of the patent filings.  In this section of my report I address these issues.

### 7.1.    IP Included in the Business Sales

The IP sold in the Business Sales included the following count of patents (in addition to copyrights, trademarks, technical know-how, etc.):[55]

**Table 3:**
**Patent Count by Business Line**

| Business Line | Patent Count |
|---|---|
| Enterprise Solutions[56] | 878 |
| CVAS[57] | 206 |
| GSM and UMTS[58] | 61 |
| Layer 4-7[59] | 6 |
| MSS[60] | 96 |
| CDMA and LTE[61] | 253 |
| Next-GEN Packet Core[62] | 0 |
| Metro Ethernet Networks[63] | 1,179 |
| **Total** | **2,679** |

### 7.2.    IP Included in the Residual Patent Sale

The Residual Patent Sale included 7,057 patents and patent applications across a broad range of technologies. I have examined various materials prepared by Nortel and its professional advisors in connection with the sale and based on that review I have counted and classified the patents and patent applications as follows:[64, 65]

---

[55] Typically, in a liquidation scenario, acquired trademarks do not contribute economic value to an operating entity.

[56] Sellers Disclosure Schedule to Amended and Restated Asset and Share Sale Agreement by and among Nortel Networks Corporation et al. and Avaya Inc. Dated as of September 14, 2009 (NNC-NNL06002086).

[57] Sellers Disclosure Schedule to Asset Sale Agreement by and among Nortel Networks Corporation et al. and Genband Inc. Dated as of December 22, 2009 (NOR_57072039).

[58] Sellers Disclosure Schedule to Asset Sale Agreement by and among Nortel Networks Corporation et al. and Telefonaktiebolaget L M Ericsson (Publ) Dated as of November 24, 2009 (NNI_01259261).

[59] Intellectual Property License Agreement by and between Nortel Networks Limited and Radware Ltd.

[60] Sellers Disclosure Schedule to the Asset Sale Agreement By and Among Nortel Networks Corporation et al. and Telefonaktiebolaget L M Ericsson (Publ) Dated as of September 24, 2010 (NNI_00822333).

[61] Sellers Disclosure Schedule to Asset Sale Agreement by and among Nortel Networks Corporation et al. and Telefonaktiebolaget L M Ericsson (Publ) Dated as of November 13, 2009 (NNC-NNL06001801).

[62] Sellers Disclosure Schedule Relating to the Transaction Agreement by and among Nortel Networks Limited et al. and Hitachi, Ltd. Dated as of October 25, 2009 as Amended on November 27, 2009 (NNC-NNL07789371).

[63] Sellers Disclosure Schedule to Amended and Restated Asset Sale Agreement by and among Nortel Networks Corporation et al. and Ciena Corporation Dated as of November 24, 2009 (NNC-NNL06002189).

[64] Nortel Final Residual Patent List (EMEAPROD02309581).

**Table 4:**
**Patent Count by Franchise**

| Franchise | Patent Count |
|---|---|
| Wireless Handsets | 1,115 |
| Wireless Infrastructure | 2,937 |
| Optical | 670 |
| Data Networking | 2,326 |
| Personal Computers | 190 |
| Internet Search and Social Networks | 38 |
| Enterprise Voice | 1,078 |
| Carrier Voice | 1,019 |
| Other | 613 |
| **Total** | **7,057**[66] |

### 7.3.    Breadth of Patent Coverage

Nortel had one of the broadest and most diverse patent portfolios within the telecommunications and networking solutions industry. Nortel had consistently conducted advanced research not only in relation to Nortel products and technologies, but also for defensive purposes in areas in which its competitors were operating.[67]  Rockstar's CEO John Veschi – the former Chief IP Officer at Nortel – has publicly taken the position that "[p]retty much anybody out there is infringing," the Residual Patent portfolio and that "it would be hard for me to envision that there are high-tech companies out there that don't use some of the patents in our portfolio."[68]

Mr. Veschi's claims in this regard arise in two principal ways. First, Nortel (along with various other companies) held various "standard essential"[69] patents that are necessary to operate within a given field, such as patents necessary for LTE 4G wireless data and voice communication, or IEEE 802.11 for WiFi networking. The following table displays the number of patents identified by Nortel as pertaining to a standard or possibly pertaining to a standard in each of the eight franchises described above[70].

---

[65] Issued Patents and Pending Patent Applications Asset List as of April 15, 2010 (NNI_ICEBERG_00000057).

[66] Note that many patents apply to more than one franchise leading the sum of the franchise counts to exceed 7,057.

[67] See McColgan Dep. 62:14-62:23 (explaining that a larger portion of Nortel's patenting spend was "strategic and defensive," thus meant to protect Nortel from competitors).

[68] Robert McMillan, How Apple and Microsoft Armed 4,000 Patent Warheads, Wired, 1 (2012), http://www.wired.com/wiredenterprise/2012/05/rockstar/; see also Veschi Dep. 79:2-16 (agreeing that the thirty-six major companies listed in Dep. Ex. 22096 were accurately listed as "potential infringers" of Nortel technology during his time at Nortel).

[69] Each standards body has a slightly different definition of what qualifies as standard essential.  According to Section 6 of the IEEE Standards Association bylaws, an essential patent claim is defined as "any Patent Claim the use of which was necessary to create a compliant implementation of either mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard when, at the time of the [Proposed] IEEE Standard's approval, there was no commercially and technically feasible non-infringing alternative. An Essential Patent Claim does not include any Patent Claim that was essential only for Enabling Technology or any claim other than that set forth above even if contained in the same patent as the Essential Patent Claim."  IEEE-SA Standards Board Bylaws, Section 6.1.

[70] Note that many standard patents apply to more than one franchise leading the sum across franchises to exceed the total number of standard patents.

**Table 5:**
**Standard-Essential Patent Count by Franchise**

| Franchise | Standard Essential Patent Count |
|---|---|
| Wireless Handsets | 185 |
| Wireless Infrastructure | 288 |
| Optical | 49 |
| Data Networking | 90 |
| Personal Computers | 7 |
| Internet Search | 0 |
| Enterprise Voice | 20 |
| Carrier Voice | 15 |
| Other | 12 |
| **Total** | **666** |

In addition, Nortel held patents that, while not incorporated in specific industry standards, are nevertheless fundamental and necessary in broad areas of the industry, such as its 1990s patents on a high-speed switching technique called ATM (asynchronous transfer mode). Similarly, the wireless handset patents being asserted by Rockstar against Google and other Android manufacturers in current patent infringement litigation are not incorporated in industry standards.

Finally, Nortel held sufficient patents over various processes and solutions in the various franchises to create a "patent thicket" in the various business lines and franchises. These patent thickets are sufficiently dense that other companies cannot carry out these processes or solutions without infringing on one or more Nortel patents.[71]

To summarize, Nortel had a large volume of patents, over numerous alternatives for performing similar functions, whether Nortel was currently practicing the alternative or not. Infringement requires only that an accused party perform one claim of one patent. Given the foregoing, there was a substantial likelihood that any major company operating in one of the franchises in which Nortel held patents was potentially infringing some part of Nortel's portfolio. For examples, Appendix O lists Nortel patents currently being asserted by Rockstar Consortium and Spherix, Inc.[72]

### 7.4.    Geographic Coverage

Nortel's policy was to be selective in pursuing international protection for its patents, as such protection is relatively costly.[73] The vast majority of patents were first filed in the United States, where patent protection is generally perceived to be strongest.[74] Nortel's IP law group had primary responsibility to select the most important patents for additional filings, and then to decide in which additional countries they would be filed.[75]

---

[71] Nortel To Sell Patent Portfolio, Market Wired (Apr. 04, 2011, 10:53), http://www.marketwired.com/press-release/Nortel-to-Sell-Patent-Portfolio-OTC-Bulletin-Board-NRTLQ-1422048.htm.

[72] Spherix is asserting certain cordless telephone patents that were acquired from Rockstar Consortium.

[73] See Cianciolo Dep. 127:7-127:22 (stating that Nortel foreign filed patents selectively because the foreign filing process was expensive).

[74] See Dep. Ex. 31304, Foreign Filing Practice Note (noting that filing in the U.S. "gives you  predictable prosecution and enforceability at the lowest cost per market %."); Dep. Ex. 21447, Further Filing Proposal – In Words and Detailed Reasoning (including "Good Patent Enforceability – Expensive, but reasonably fair and predictable, good representation available" as one justification for Nortel's policy of first filing all patents in the U.S. whenever possible).

[75] See DeWilton Dep. 62:10-74:6; Dep. Ex. 21447.

**Expert Report of James E. Malackowski**

Depending on available budgets and priorities that changed from time-to-time with changes in Nortel management, the percentage of cases selected for additional filing, and the global territories emphasized, changed over time.[76]

On average, based on issued patents as of the end of 2009, as reported in a study prepared for Nortel by Global IP Law Group ("Global IP") in preparation for the Residual Patent Sale, the Residual Patent portfolio reflected an additional filing level of approximately 12%, with emphasis on Europe (where most of the patents that comprised that 12% were additionally filed) and Canada (about 6%), with a much smaller percentage (about 2%) in Asia (reflecting that interest in Asian patents only developed in the period shortly before insolvency).  The 12% figure is consistent with internal memoranda summarizing filing objectives in the late 2000s,[77] though slightly higher percentages were sought at earlier dates.[78]

---

[76] See DeWilton Dep. 63:11-63:25; Dep. Ex. 31304 (outlining Nortel's 2000 foreign filing guidelines); Dep. Exs. 21447, 21448, and 21449 (memo and spreadsheets providing recommended foreign filing numbers for 2006).

[77] See Dep. Ex. 21190, Quarterly "Further Filing" Meeting, August 24, 2005 (explaining that Nortel foreign files "approximately the 'top 12%' of patents).

[78] See Dep. Ex. 31304, Foreign Filing Practice Note (2000 memo recommending that Nortel continue filing the best 25 percent of patents in the U.K., Germany, France, and Canada).

## 8.   VALUATION METHODOLOGY

### 8.1.   Summary

As described above, the purpose of this report is two-fold: to value the IP sold by the Nortel Group, and to allocate the proceeds of sale attributable to IP among the various Nortel Group companies. A valuation exercise is therefore necessary to answer the first two of the three questions requested as part of my expert analysis and opinions, which I repeat here:

  a) How much of the consideration paid in each of the Business Sales should properly be regarded as attributed to the IP sold in the transactions?

  b) What allocation and valuation methodologies are appropriate on the facts of this case in light of valuation theory and economic principles related to IP?

  c) How much of the proceeds of sales of IP (either from the Business Sales or the Residual Patent Sale) should be allocated to each of the Canadian, U.S., and EMEA Debtors under each of the two approaches advanced in this case, *i.e.*, contribution and license?

In my opinion, the value of Nortel's IP is best measured by the revenue it could be expected to generate at the time of sale.  This will in turn depend on the market for the IP in question.  IP that was sold as part of the Business Sales will be used in an ongoing business for which there are two components of value.  The first is the value of the transferred IP to the actual Nortel business being sold, which is the "defensive value."  The defensive value measures the amount that the Nortel business would have to pay to license the transferred IP if the IP were owned by a third party.  The second component of value is the value of the transferred IP to a hypothetical market participant's non-Nortel business, or the "synergistic value."  The synergistic value measures how much the buyer would have to pay to license the transferred IP had it not bought the IP.  My valuation captures the economic benefits of both the defensive and synergistic values.

 In regard to the Residual Patent Sale, the final price of the Residual Patent portfolio has already been determined by the sale of that portfolio.   Under the Contribution Approach, no further valuation work is required because the price can simply be allocated according to the appropriate contribution metric.  Under a License Approach, however, it is necessary to create an independent valuation of that portfolio, because the purchase price gives no insight into how and where that value was derived and therefore how it should be allocated among the RPEs.  The Residual Patent Sale is distinct from the Business Sales in that the Residual Patents were not sold with any existing Nortel business.  The Residual Patent buyer intends to demand royalties from a wide range of market participants.  I have therefore calculated the revenue that can be generated from such a licensing campaign around the world.  By independently valuing the Residual Patents, I can determine where revenues arise and where value should be allocated on the License Approach.

### 8.2.   Standard of Value

I have determined the fair value of the Business Sale IP portfolios as of the following dates of sale for each business line (the "Valuation Dates"):

**Table 6**:
**Business Sale Valuation Dates**

| Business Line | Valuation Date |
|---|---|
| Layer 4-7 | February 19, 2009 |
| CDMA/LTE | November 13, 2009 |
| Next-Gen Packet Core | December 8, 2009 |
| Enterprise Solutions | December 18, 2009 |
| MEN/Optical Networks | March 19, 2010 |
| GSM/GSM-R | March 31, 2010 |
| CVAS | May 28, 2010 |
| MSS | March 11, 2011 |

Valuation professionals typically follow a definition for "fair value" under the International Financial Reporting Standards (IFRS). Based upon the Business Sale Valuation Dates, I have applied a standard of value definition for "fair value" set out in IFRS 3, which I understand is defined as:

> "Fair Value is the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction."[79]

For the Residual Patent portfolio value, I have determined the fair value as of June 30, 2011, which is the sale transaction date. At the time of the Residual Patent transaction date, the standard of value for "fair value" under IFRS 13[80] had changed to the following:

> "The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[81]

I interpret the meaning of both definitions to be equivalent for purposes of this report, but highlight both definitions given that the transaction dates between the Business Sales and the Residual Patent Sale intersect with the change in the "fair value" definition. Under either approach, the focus must be on the amount that arm's length market participants would agree upon.

### 8.3.    Premise of Value

The premise of value utilized in this report is one of a "going concern" nature, meaning, the purchasers of the IP completed the acquisitions to facilitate their operating business models that included licensing, litigation and commercialization activities and strategies.

### 8.4.    Methods for Determining Value

The three principal methods of determining value are the income, cost and market approaches. I will briefly explain each of these approaches, and why I have adopted an income approach for valuation of Nortel's IP. As I will describe below, different considerations are relevant for the allocation of IP among the RPEs.

---

[79] International Financial Reporting Standards 3, Business Combinations, version includes amendments from IFRS up to January 17, 2009.

[80] The IFRS apply to many different topics, not just the fair value definition. While IFRS 13 updated the fair value definition under IFRS 3, IFRS 4-12 may not have pertained to this issue.

[81] International Financial Reporting Standards 13, Fair Value Measurement, Published May 2011, Effective January 1, 2013.

### 8.4.1.    Income Approach

For property dedicated to a business enterprise, including IP, the value of an asset is best measured in terms of future income.  The Income Approach attempts to measure such future income by calculating the present value of the future income streams expected from the asset being valued. To use this method I must make a series of findings about the economic attributes of the IP, including the amount and timing of the expected cash flows attributable to the IP and the risk associated with the realization of those cash flows.

The duration and timing of the cash flow stream are determined by forecasting the useful life of the property, which can be determined by the statutory or legal life of the IP.  The business risk associated with the realization of the stream of expected cash flows may be captured through the use of an appropriate discount rate, through the inputs used to forecast the cash flows, or through a combination of these factors.

The expected future cash flow stream derived from the IP may be quantified using a variety of approaches, depending on the specific circumstances of each case.  In the context of valuing IP, the Relief from Royalty methodology is most frequently used.

The Relief from Royalty approach is based on the following premise: a property's value can be measured by what the owner of the property would pay in royalties if it did not own the property and had to license it from a third party.  This approach may also quantify the amount of income the owner would generate by licensing the IP to others.

This method requires determining projected royalty payments, which are derived by applying a royalty rate to an appropriate revenue base.  The royalty rate is a percentage applied to net revenues derived from products or services using or infringing the IP.  The revenue base is determined by projecting the expected revenues to be generated throughout the useful life of the IP in question.

An appropriate royalty rate may be determined by examining actual transactions that have been negotiated between willing buyers (or licensees) and willing sellers (or licensors).  A revenue base may be derived by projecting future revenue according to market research.  Once appropriate royalty rates and revenue bases have been determined, they are multiplied to determine annual projected royalty revenue.  The lump-sum fair value of the IP is calculated as the net present value of the future royalty payments.

### 8.4.2.    Cost Approach

The Cost Approach values assets based on the cost to create and develop the assets under consideration. Values determined using this approach can also be viewed as the anticipated cost to replace the assets.  This approach does not consider future income or profit streams, market conditions, useful life of the property, or the risk associated with receiving future economic benefits.  Perhaps most importantly in the case of Nortel, it does not consider whether the cost of producing an asset was proportional to the actual value of the asset.

In the circumstances, I considered but did not use the Cost Approach to determine the value of Nortel's IP because it would produce significantly overstated values.  Nortel's R&D spending grossly exceeded both the economic benefits associated with the IP in the hands of Nortel (as demonstrated by Nortel's ultimate insolvency), and the value to any purchaser (as demonstrated by actual sale prices).  Therefore any Cost Approach would generate IP values far in excess of sale prices in the Business Sales or the Residual Patent Sale.

I note, however, that historical R&D spending is an appropriate means for determining the relative value of contributions and therefore a fair method of allocating proceeds of sales amongst Nortel entities.  I describe this approach in more detail in Section 11.  Since the allocation exercise focuses on relative levels of R&D spending, it is irrelevant that Nortel spent significantly more on R&D than the resulting IP was worth. Contribution to the creation of IP is the ideal means to allocate proceeds from the sale of jointly-owned IP.

### 8.4.3.    Market Approach

The Market Approach values assets based on comparable transactions between unrelated willing buyers (or licensees) and willing sellers (or licensors).  The relevance of comparable transactions depends on whether the transactions are sufficiently similar to provide an indication of the value of the assets in question.  Factors to consider include the nature of the assets transferred, the industry and products involved, the agreement terms, the date of the transaction (which encompasses the economic environment in which the transaction occurred), the circumstances of the parties to the agreements and other factors that may affect the agreed-upon compensation.  Specifically in regard to patents, each issued patent is unique as it must distinguish the invention from any other competing technologies or patents.  Comparisons become increasingly complex when analyzing one IP portfolio in relation to another, where every patent is unique and the legal coverage of each group of assets depends on the specific patents in the portfolio.

In the case of Nortel's IP, the only precedent transaction was the 2007 sale of the UMTS Access business to Alcatel.  I did not consider this to be a helpful precedent transaction for valuing the IP that Nortel sold post-petition because the size and scope of the portfolio was different, and the sale took place outside the context of a bankruptcy. For all of these reasons, while I considered the Market Approach, I did not directly apply it to any of Nortel's patent portfolios.

On the other hand, the implied price per patent based on the price paid and total number of patents in a deal is a common metric considered by industry experts in the field.  Accordingly, I occasionally use the implied price per patent derived from the Relief from Royalty approach to IP valuation that I have adopted, to "sense check" my indications of value to similar patent transactions.

### 8.5.    Valuation Methodology Conclusion

Based on the availability of relevant financial and market information, I have determined that the Relief from Royalty approach is the most reliable determinant of value for the Residual Patents and the Business Sale IP. This is distinct from my methodology for allocating sale proceeds, which I will discuss in Section 11.

## 9.   VALUATION OF IP SOLD IN BUSINESS LINES

As described in the previous section, the value of IP is frequently measured by what the owner of the property would pay in royalties if it did not own the property and had to license it from a third party, and the amount of income the owner would generate by licensing the IP to others. This will differ between the Business Sales and the Residual Patent Sale in at least two ways.

First, while the Rockstar Consortium bought the Residual Patent portfolio in order to license it broadly across the industry in the eight identified franchises, the IP in the Business Sales was part of an existing business, and was sold to various market participants who already participated in the same industry. I am not aware of any evidence that the buyers in the Nortel Business Sales intended to engage in an offensive licensing campaign across all industry participants equivalent to what the Rockstar Consortium is doing with the Residual Patent portfolio. As such, I have not based my valuation of the IP sold in the Business Sales on the licensing revenue obtainable from the industry as a whole. Instead, I have focused on the value of the IP to the acquired Nortel business and the existing business of a hypothetical market participant in that industry.

Second, in contrast to the Residual Patent portfolio, the IP that was sold as part of the Business Sales is not just limited to patents. It also includes other forms of IP such as copyrighted software, know-how and trademarks.[82, 83]

As discussed above, there are two components of value to the IP sold as part of the Business Sales. The first is the value of the transferred IP to the actual Nortel business being sold (the "defensive value"). The defensive value measures the amount the Nortel business would have to pay to license the transferred IP. The second component of value is the value of the transferred IP to a hypothetical market participant's pre-existing business (the "synergistic value"). The synergistic value measures how much a hypothetical market participant would have to pay to license the transferred IP.

The first step in valuing the Business Sale IP is to determine the expected future revenue, or royalty base, that would be derived from sales of products embodying the IP. In determining the defensive value of the IP, the relevant expected revenue would be that of the Nortel business. In determining the synergistic value of the IP, the relevant expected revenue would be that of the hypothetical market participant.

Once forecast revenues related to the synergistic and defensive components of value were determined I assigned a reasonable royalty rate to the forecast revenues to calculate the total value of IP for each Nortel business. For defensive rates I used rates derived by Lazard (financial advisors to Nortel in connection with the Business Sales), Global IP and Nortel in connection with the Residual Patent Sale,[84] which do not seem unreasonable in light of the totality of the record. For synergistic values I used the implied royalty rate paid by Ericsson as a member of the Rockstar Consortium which acquired the Residual Patent portfolio. The implied royalty rate calculation is explained in greater detail below.

Finally, I multiplied forecast revenues by the royalty and subtracted expected taxes to generate total net revenues. I then assigned a reasonable discount rate for future revenues in order to create a net present value. These discount rates were checked for reasonableness by comparing them to industry rates.

---

[82] See, e.g., Sellers Disclosure Schedule to Asset Sale Agreement by and among Nortel Networks Corporation et al. and Telefonaktiebolaget L M Ericsson (Publ) Dated as of November 24, 2009, § 1.1(j) (NNI_01259261) (listing Nortel trademarks and software that were included in the agreement's definition of "Transferred Intellectual Property"); Sellers Disclosure Schedule to Amended and Restated Asset and Share Sale Agreement by and among Nortel Networks Corporation et al. and Avaya Inc. Dated as of September 14, 2009 (NNC-NNL06002086) (same).

[83] Given that in a liquidation scenario, acquired trademarks do not contribute economic value to an operating entity, the IP of value primarily consisted of patents, know-how and copyrighted software.

[84] Project Copperhead, IPR Model, Royalty Rates Output Tab (GIP_Nortel_00227898).

### 9.1.    Defensive Value

#### 9.1.1.    Nortel's Forecasted Revenue

As summarized above, the royalty base represents the forecasted revenue generated from products embodying the IP.  The inputs used to calculate this royalty base, included:  1) forecasted financial information found from the Nortel "deal books" prepared as part of the sales process, including historic income statements and historic balance sheets and, 2) the expected growth rates of each Nortel business.

The available data within the Nortel deal books varied across all businesses, depending on the information that Nortel provided as of the Business Sale date. Historic and projected income statements were provided for each business, although these income statements related to different time periods depending on the business.  Historic balance sheets were provided for most of the Business Sales although as with the income statements, these related to different time periods depending on the business.

Appendix P contains a more detailed discussion of the available historic and forecast revenue data for the Nortel businesses.

#### 9.1.2.    Growth Rates

Since I am determining the total value of the IP, I must account for future revenue through to the end of the last year of the average patent life in the portfolio.  To do so I start with historical revenue as described above and apply a growth rate.  The expected growth rates for the Business Sales are pulled from one or more of the following sources: International Data Corporation (IDC) market research reports, Infonetics market research reports, and Nortel deal memo compound annual growth rates (CAGRs).[85]  These growth rates use historical performance as an indicator of future performance.  I used IDC, Infonetics or Nortel forecasts for the time period over which they are available; for the remainder of the forecast period I have applied an industry-appropriate CAGR to the remaining period.

For six of the eight businesses sold (CDMA/LTE, MSS, MEN & Optical, CVAS, GSM/GSM-R, and Layer 4-7), I used an industry growth rate provided by either IDC or Infonetics.  For the other two businesses (ES and Next-Gen), I applied a CAGR derived from the deal memos, which is applied following the last year of the actual deal memo projections, and extended through the last year of the average patent life.[86]

#### 9.1.3.    Royalty Rate Selection

The royalty rates used for the defensive IP valuations were obtained from a model developed by Lazard and Global IP in connection with the Residual Patent Sale.[87]  This model projects the future expected income derived from licensing the Residual Patents.  The expected income is divided according to the companies and franchises to which the portfolio pertains.  The model provides a range of low, medium and high royalty rates for each franchise under two assumed litigation scenarios.  The first scenario referred to as "Litigation Light"

---

[85] IDC and Infonetics are market research firms that specialize in telecommunications and information technology. Clients of these firms include the majority of the largest equipment vendors as well as numerous investment banks. Therefore, valuation professionals typically rely on these firms when seeking telecommunications market data.

[86] A deal memo growth rate is used for ES due to the fact that, although the industry was declining in size, the Business Line was continuing to grow.  A deal memo growth rate is used for Next-Gen due to the lack of available information on this industry.

[87] Project Copperhead, IPR Model, Royalty Rates Output Tab (GIP_Nortel_00227898).  I understand this model to have been produced by Lazard and Global IP for Nortel's internal use only.  This is supported by the fact that the model which was provided to potential buyers did not include royalty rates

assumes that limited litigation will be required to license the portfolio and provides for a relatively lower royalty rate.  The second scenario referred to as "Litigation Heavy" assumes greater litigation will be required to license the portfolio and provides for a relatively higher royalty rate.  I believe the royalty rates provided in the Lazard/Global IP model are reliable since they were derived by two consulting firms with complete access to Nortel's licensing team.[88]  Royalty rates derived in connection with the Residual Patent portfolio are appropriate for the Business Sale IP because they relate to the same franchises.

For each business, I identified the closest related franchise(s) from the Lazard/ Global IP model and selected the lowest, "Litigation Light" rates available for each.  The "Litigation Light" rate was selected because the IP was sold as part of the Nortel business and therefore there is no need to litigate in order to obtain a license.[89]  In certain cases where there was not a perfect match between a single franchise and a business, I used an average of several applicable franchises. For example, the ES business is closely related to the Data Networking, Enterprise Voice, and Carrier Voice franchises.  Therefore, rather than selecting the royalty rate of just Data Networking, Enterprise Voice, or Carrier Voice, I used a royalty rate that is a blend of the three franchise rates.  I consider this blended rate to be more appropriate than a single franchise rate because the ES business operates in a blend of the Data Networking, Enterprise Voice, or Carrier Voice franchises.

See Appendix Q for a detailed discussion of the royalty rates selected for the defensive IP valuations.

### 9.1.4.   Discount Rate Selection

Applying a royalty rate to a royalty base provides the projected future cash flows associated with the IP.  To determine the present value of those future cash flows one must then discount those future royalty payments to account for the time value of money and for the risk or uncertainty of receiving those payments. A common discount rate used for this kind of analysis is a firm's or industry's weighted average cost of capital ("WACC").  The WACCs used for the defensive IP valuations were based on the average discount rates of the industry in which the Nortel business operated.  I obtained the industry average WACC values for the relevant industry specific Standard Industrial Classification (SIC) codes for each of the Business Sales.[90]

### 9.1.5.   Tax Effects

Royalty income associated with the IP from each Nortel business was determined on an after-tax basis.[91]

### 9.1.6.   Summary of Defensive Value of IP

The results of the defensive IP value for all eight Business Lines are presented in Table 7.

---

[88] Royalty rates related to the Residual Patent Sale are relevant to the Business Sales because they involve patents in the same industries.  One primary difference between my valuation of the Residual Patents and the Business Line IP concerns the revenue to which these portfolios relate, not the royalty rates they can earn on given revenue.

[89] In contrast, for the Residual Patent valuation I selected higher royalty rates due in part to the increased likelihood of litigation.

[90] SIC codes were obtained for each Nortel business buyer from Capital IQ. The Ibbotson Cost of Capital Yearbooks for 2009, 2010, and 2011, were used to obtain the appropriate weighted average cost of capital for each Business Line. Cost of equity was based on a basic capital asset pricing model.  The industry average WACCs are presented in Appendix R.

[91] I have assumed different tax rates for each business line based on relevant market participants utilized within the licensing model, specifically an average of the effective tax rate of the major competitors, for the determination of cash flows.  For purposes of this analysis I have included a tax amortization benefit.  A tax-related benefit arises from the ability of an acquirer to amortize acquired intangible assets over a 15-year period according to Section 197 of the Internal Revenue Code.

Expert Report of James E. Malackowski

**Table 7:**
**Defensive IP Value – Summary Results by Business Line**

| USD in Millions | | | |
|---|---|---|---|
| Business Sales | Selected Royalty Rates (Defensive) | Selected Discount Rates (Defensive) | IP Value (Defensive) |
| CDMA | | 11.16% | CDMA: $55.16    LTE: $148.39 |
| Enterprise Solutions | | 10.89% | $236.65 |
| MEN and Optical | | 11.81% | $82.75 |
| CVAS | | 11.81% | $77.45 |
| GSM/GSM-R | | 11.03% | $22.85 |
| Multiservice Switch | | 9.68% | $4.27 |
| Layer 4-7 Assets (Alteon) | | 11.33% | $4.62 |
| The Next-Generation Packet Core | | 11.38% | $8.50 |

Complete Business Sale IP valuation calculations are available in Exhibit B.

### 9.2. Synergistic Value

The approach to determining the synergistic value of the Business Sale IP is much the same as for the defensive value described above. The principal difference is in calculating the revenue base, which for the synergistic approach focuses on the revenue of a hypothetical market participant buying the Nortel Business Sale IP, not the acquired Nortel business. I have used a hypothetical market participant rather than the actual buyer because the various businesses were auctioned off between a group of market participants, which I believe were not intending to broadly license the IP portfolios. This is in contrast to the Residual Patents that were auctioned off between a non-practicing entity and Google, both of which I believe intended to broadly and aggressively license the portfolio.

#### 9.2.1. Market Participant Selection

The first step in developing a hypothetical market participant is to identify the top four market participants in each Business Sale's industry. To accomplish this, I gathered data from Infonetics reflecting the top four competitors within the industry closest in relation to the Business Line being sold. This included the actual buyer(s) of the subject Business Sale for most of the transactions.[92] I chose to look at three additional competitors after concluding such a sample size would yield a range that adequately illustrated the likely market participants.

---

[92] The one exception to this was Kapsch Carrier Com.

### 9.2.2.    Weighting of Market Participants

As previously mentioned, I obtained the overall market share of the four largest market participants for each Business Line.  I then assumed that the revenue generated by the four market participants represented the total share of the participating market, and recalculated the respective share percentage of the four largest market participants to equal this total.  The resultant percentages, or weights, were applied to the original share percentages, and subsequently multiplied by the total amount of revenue generated by the industry in order to determine the market share of the hypothetical market participant.  The purpose of this exercise is to derive a market share of the hypothetical market participant, weighted by the market shares of the four largest such participants.  The results of this analysis are presented in Appendix S.

### 9.2.3.    Growth Rates for Hypothetical Market Participants

While deal memos were referenced as a starting point for base line revenue projections for defensive valuations, these were not available for the synergistic valuation.  Instead, I used specific reports from IDC and Infonetics to determine the base line revenue of the hypothetical market participant and then applied a long-term growth rate.

The revenue related to the IP in question was calculated by multiplying the base year[93] market share percentages of the hypothetical market participant by the total revenue generated in the relevant industry, considering four quarters of growth, ending closest to the date of sale of each Business Line. The growth rate for the hypothetical market participant is based on CAGRs obtained from IDC and Infonetics market research reports.  These growth rates were applied to the remaining portion of a forecast period after the last year industry projected information was provided.

### 9.2.4.    Royalty Rate Selection

The royalty rates used for the synergistic value was derived from the implied rate paid by Ericsson as a member of the Rockstar Consortium.  The implied rate is calculated using Ericsson's contribution to the purchase price of the Residual Patent portfolio and the present value of Ericsson's addressable projected revenue.

This implied rate is and should be lower than the running royalty rate a non-Consortium licensee would pay because each Rockstar Consortium member paid for its license in a large, one-time upfront payment.[95]

I believe these lower implied rates are more appropriate for the synergistic values than the Lazard/Global IP rates because the market participants tend to be less sophisticated at patent monetization than non-practicing entities such as Rockstar.  Using a lower implied rate than the rates used for the defensive valuation is also appropriate because as a result of the "predominant use" test, it is clear that the patents read directly on and were essential to the Nortel business product lines.  The Nortel IP is less directly connected to the business of any other market participant and so a lower royalty rate is appropriate.

---

[93] The year each Business Line was sold.

[94] Alistair Sharp and Sinead Carew, Apple/RIM Group Top Google in $4.5 Billion Nortel Sale, Reuters (July 1, 2011, 6:23 PM), http://www.reuters.com/article/2011/07/01/us-nortel-idUSTRE7600PF20110701.

[95] One of the main reasons a lump sum payment should be less than the present value of the future royalty stream is that the licensee and the licensor do not know what the future sales of licensed products will be.  Therefore, there is a significant amount of risk for a licensee to pay a large amount of money upfront based on certain assumed future sales numbers.

### 9.2.5.    Discount Rate Selection

Discount rates used for the licensing valuations are equal to the defensive discount rate plus a premium of 15% (i.e. 1.15*defensive discount rate).  The "premium" means a heavier discount on future revenue and therefore a lower net present value. This premium is based on the greater uncertainty/risk associated with the ability of the acquired IP to cover a hypothetical buyer's current products and services.  The premium also considers a certain level of both (1) negotiation risk, as various participants in a hypothetical market compete to capture the IP/technology for sale; and (2) business risk, which may impact the commercialization of the assets, IP, and goodwill.

Furthermore, the 15% premium was justified in comparison to standard risk adjusted hurdle rates ("RAHRs"), which are discount rates commonly used in IP valuation.  In the case of technology or IP, the determination of a discount rate requires substantial judgment, and these RAHRs are typically used to account for a hypothetical buyer's required rate of return, or the associated risk of commercializing a technology.

### 9.2.6.    Tax Effects

As with the defensive IP value, the royalty income associated with the synergistic IP value from each hypothetical market participant was determined on an after-tax basis.

### 9.2.7.    Synergistic Value Summary

The results of the synergistic IP value for all eight Business Sales are presented in the following table:

**Table 8:**
**Synergistic IP Value – Summary Results by Business Line**

| *USD in Millions* | | | |
|---|---|---|---|
| **Business Sales** | **Selected Royalty Rates (Synergistic)** | **Selected Discount Rates (Synergistic)** | **IP Value (Synergistic)** |
| CDMA | | 12.83% | CDMA:              LTE: $15.78          $37.05 |
| Enterprise Solutions | | 12.52% | $7.61 |
| MEN and Optical | | 13.58% | $30.38 |
| CVAS | | 13.58% | $2.43 |
| GSM/GSM-R | | 12.68% | $26.31 |
| Multiservice Switch | | 11.13% | $0.19 |
| Layer 4-7 Assets (Alteon) | | 13.03% | $4.66 |
| The Next-Generation Packet Core | | — | $0.00 |

**Expert Report of James E. Malackowski**

### 9.2.8.   Total IP Value by Business Line

The total value of IP, defensive and synergistic, for all eight Business Sales is presented in the following table:

**Table 9:**
**Total IP Value by Business Line**

| Business Sales | IP Value (Defensive) | IP Value (Synergistic) | Total IP Value (*millions USD*) |
|---|---|---|---|
| CDMA/LTE | $203.55 | $52.84 | $256.39 |
| Enterprise Solutions | $236.65 | $7.61 | $244.26 |
| MEN and Optical | $82.75 | $30.38 | $113.13 |
| CVAS | $77.45 | $2.43 | $79.87 |
| GSM/GSM-R | $22.85 | $26.31 | $49.17 |
| MSS | $4.27 | $0.19 | $4.46 |
| Layer 4-7 | $4.62 | $4.66 | $9.29 |
| Next-Gen Packet Core | $8.50 | $0.00 | $8.50 |

## 10.  VALUATION OF RESIDUAL PATENTS

The Residual Patent portfolio was purchased by Rockstar Consortium, Inc. (originally Rockstar Bidco), a consortium of global technology companies including Apple, Sony, Research in Motion, Ericsson, EMC, and Microsoft.[96]  The transaction closed on July 29, 2011 with a purchase price of $4.5 billion.[97]  However, the purchase price gives no insight into how that value was derived, and therefore how it should be allocated among the RPEs.  Under a Contribution Approach, allocation is driven by historical R&D spending. On a License Approach, I must independently value the Residual Patents to determine where revenues arise and therefore where value should be allocated.

Under a Contribution Approach, allocation is driven by historical R&D spending and no further valuation work is needed beyond knowing the purchase price.  On a License Approach, however, I need to know how that value was derived and, therefore, how it should be allocated among the RPEs.  The purchase price gives no insight into the derivation of value so, on a License Approach, I must independently value the Residual Patents to determine where revenues arise and therefore where value should be allocated.

I have divided the Residual Patent portfolio into eight franchises that correspond to those designated by Global IP and which are widely recognized subsectors of the telecommunications industry.  The franchises can be summarized as follows, while more detailed descriptions are available in Section 6 of my report above:

a)  Wireless Smart Phones – telecommunications devices

b)  Wireless Infrastructure – telecommunications infrastructure hardware

c)  Optical – telecommunications infrastructure hardware

d)  Data Networking – telecommunications infrastructure hardware

e)  PCs – computing and telecommunications devices

f)  Internet Search and Advertising – advertising services

g)  Enterprise Voice – telecommunications infrastructure hardware

h)  Carrier Voice – telecommunications infrastructure hardware

Since the Business Sale IP included only patents for which the predominant use was in the business in question,[98] the most broadly applicable patents remained in the Residual Patent portfolio.[99]  As such, I have

---

[96] Joff Wild, Star Man, Intellectual Asset Magazine, July/August 2013 at 63, available at http://www.ip-rockstar.com/Press_Releases/IAM%20Rockstar%20Article%20JulyAugust%202013.pdf.

[97] Id. at 63, 65.

[98] See Veschi Dep. 122:12-127:10 (explaining how Veschi personally developed the predominant standard and how Nortel's business units successfully applied the standard); McColgan Dep. 123:16-123:22 ("Predominant use standard had been agreed by the executives as the standard that would be used for assignment of patents to a business unit that was for sale. If it met the standard of predominant use, it would be assigned to that division; if it didn't, it would be retained.").

[99] See Veschi Dep. 128:4-128:25 (stating that the predominant use standard was the most strict standard that Nortel leadership would allow and that part of the predominant use standard's purpose was to retain as much value as possible with the residual portfolio by licensing, rather than assigning patents).

considered the entire market in my valuation of the Residual Patents because Nortel's Residual Patent portfolio was broad and diverse enough to apply to most if not all of the revenue in these franchises.[100]

In determining the relevant geographic markets for the franchises, I considered two alternative approaches to valuing the portfolio. The first approach would be to assume the licensor is able to obtain royalties from licensees on sales in all countries, including those countries where there are no granted patents. The licensor would be able to leverage its patents in the major markets (US, EU, Japan etc.) to obtain worldwide license agreements if:

a) The portfolio or residual assets is sufficiently geographically diverse that the licensor could substantially disrupt the international supply chain and other operations of an unlicensed infringer via enforcement in licensed jurisdictions; and

b) Infringers would be willing to pay royalties in smaller markets in order to obtain a license in larger markets.

Although I consider the first scenario described above to be reasonable, I have selected an approach that includes only industry revenue from countries with at least one high interest patent in a given franchise. I have done so notwithstanding the global nature of telecommunications markets, for several reasons.

The primary reason is that patents are inherently territorial. Any owner of patents (such as the Residual Patents) can only use litigation to compel royalty payments based upon a defendant's activities that have some connection to the jurisdictions where the patents have been granted. Put simply, a patent owner will look to the jurisdiction where the patent has been granted as the primary territory for claiming royalties or damages, with certain exceptions for conduct having cross-border impact. While a claimant could pursue complex claims in countries with patent protection for indirect or contributory infringement in foreign countries, the cost of doing so could outweigh the incremental benefits of royalties from sales in small markets, particularly in light of the massive operational challenge implicit in enforcing the portfolio across just the major world markets. The fact that companies such as Nortel make the effort to file and maintain a percentage of their most valuable patents not just in the United States, but also in Western Europe, large developing nations like Brazil , Russia, India and China, and other key Asian markets like Japan and South Korea, is indicative of patents' territorial nature.[101] If patent protection were unnecessary to claim royalties in a country, there would be no reason to patent in more than one jurisdiction.

I have also excluded revenues of the Business Sale purchasers from the royalty base calculations in certain Residual Patent franchises because the Business Sale purchasers obtained a nonexclusive license to the Residual Patents in the field of use of the purchased business. For example, Ericsson's revenues have been removed from the royalty base in the wireless infrastructure franchise due to Ericsson's prior acquisition of the CDMA-LTE, GSM, and MSS Business Lines.

Having forecast the global revenue attributable to each franchise, I then estimated the income achievable from licensing the Residual Patents in that franchise. I have applied the same basic method as I used for the Business Sale IP: I made a series of decisions regarding reasonable royalty rates, licensing expenses, tax rates, and discount rates and applied them to forecast revenues. These decisions were based on market research, evidence on the record, and my own experience in the IP valuation field. It is worth noting that decisions regarding licensing expenses and tax rates do not ultimately affect the allocation among regions; they only affect the estimate of value of each franchise for purposes of cross-checking against the actual $4.5 billion

---

[100] See Veschi Dep. 78:4-79:16 (stating that the thirty-six major corporations listed in Ex. 22096 were properly named as corporations that might have needed a license to a Nortel patent at that time).

[101] See Dep. Ex. 31304, Foreign Filing Practice Note (proposing a foreign filing strategy that includes filings in Western Europe, Brazil, India, and China, among others); Dep. Ex. 21447, Further Filing Proposal – In Words and Detailed Reasoning (same).

sale price paid.  The results of applying these various factors to the franchise revenues are set out below and produce a value for Nortel's Residual Patent portfolio broken down by franchise with sensitivity for several scenarios.

My valuation analysis generates a series of values for the franchises into which I have categorized Nortel's Residual Patents.  As a final step, I will reconcile these values with the actual purchase price paid by the Rockstar Consortium, and proportionally increase or decrease the values to both match the actual purchase price and determine the contribution of each franchise to the actual sale price.[102]

**Table 10:**
**Valuation Results and Pro Rata Adjustment to Purchase Price (*millions USD*)**

| Franchises | Net Present Value | Pro Rata Value | Percent of Purchase Price |
|---|---|---|---|
| Smartphones | $685.03 | $863.12 | 19.2% |
| Wireless Infrastructure | $688.19 | $866.94 | 19.3% |
| Optical | $148.51 | $187.51 | 4.2% |
| Data Networking | $1,052.10 | $1,325.62 | 29.5% |
| PCs | $315.96 | $398.10 | 8.8% |
| Internet | $468.27 | $590.01 | 13.1% |
| Enterprise Voice | $141.87 | $178.44 | 4.0% |
| Carrier Voice | $45.40 | $58.12 | 1.3% |
| Other[103] | $25.50 | $32.14 | 0.7% |
| **Total** | **$3,570.84** | **$4,500.00** | **100.0%** |

$4,500

The precise methodology for valuing the Residual Patents is set out below.

**10.1.    Identification of Franchise Assets**

First, I determined the count of Residual Patents allocable to each of the franchises listed above.  Remaining patents were put in a residual "other" category.  These franchises are consistent with the categorization of Nortel's Residual Patents implemented by Global IP and Lazard in preparation for sale.[104]  It is also consistent with the product and service taxonomies utilized by independent, third-party market research firms like IDC, Dell'Oro, and Infonetics in describing, segmenting, and quantifying these markets.[105]  The final patent count associated with each franchise can be found in Section 7, Table 2.

It is also noteworthy that Global IP performed an analysis of Nortel's Residual Patent portfolio in preparation for the sale of the portfolio in 2011. Global IP categorized the Residual Patents into "two star,"

---

[102] These implied values are calculated by adjusting my valuation conclusions for each franchise pro rata by the ratio which the actual purchase price bears to my overall value indication.

[103] Value of the Other category is estimated at $100K NPV per starred patent.

[104] Issued Patents and Pending Patent Applications Asset List as of April 15, 2010 (NNI_ICEBERG_00000057).

[105] See for example research service categorizations utilized by Infonetics (http://www.infonetics.com/research.asp) and Dell'Oro Group (http://www.delloro.com/products-and-services).

"one star" and "no star" patents, with higher-starred patents being deemed of greater interest to potential buyers.[106]

### 10.2.    Franchise Revenue Forecasts

I estimated the size of the global market for each franchise for the period beginning in 2011 and ending in the year of the average expiration date of the U.S. patents indicated as high-interest assets (one star or two star) by Global IP and Lazard for each franchise.[107]   The following narrative describes the procedure I followed in forecasting the global revenues for each franchise:

#### 10.2.1.    Smartphones

I relied upon forecasts from Infonetics in forecasting global smartphone revenues from 2011 through 2015.[108] For the period from 2016 to 2020, I have forecast growth at a rate of 6.0 percent based on the growth rate of 6.0 percent forecast by Infonetics for 2015.   Thereafter, I have assumed inflationary growth at 3.0 percent[109] as the global smartphone market becomes saturated and unit sales increasingly represent replacement devices.

#### 10.2.2.    Wireless Infrastructure

I relied upon forecasts from Infonetics in forecasting global wireless infrastructure revenues from 2011 through 2015.[110]   Infonetics provided separate forecasts for LTE and 2G/3G infrastructure, and I have forecasted them separately in my analysis.   For LTE, I have forecast growth at an annual rate of 10.0 percent from 2016 to 2020 based upon the growth rate of 11.7 percent forecast by Infonetics for 2015.   Thereafter, I have forecast growth at 5.0 percent annually.   I have selected a figure above inflationary growth for growth after 2020 as global penetration of mobile broadband was widely expected to proceed slowly at the time of the Residual IP sale.[111]

#### 10.2.3.    Optical

I relied upon forecasts from Infonetics in forecasting global optical networking hardware revenues for 2011 through 2015.[112]   For the period from 2016 to 2020, I have forecast growth at a rate of 5.0 percent based on the growth rate of 5.0 percent forecast by Infonetics for 2015.   Thereafter, I have assumed inflationary growth at 3.0 percent.

---

[106] Issued Patents and Pending Patent Applications Asset List as of April 15, 2010 (NNI_ICEBERG_00000057).

[107] Id.

[108] Mobile Broadband Devices and Subscribers Report, supra note 9.

[109] See, e.g., Data:  Inflation, Consumer Prices (Annual %), The World Bank, http://data.worldbank.org/indicator/FP.CPI.TOTL.ZG/countries?display=graph (last visited Jan. 23, 2014).

[110] Infrastructure and Subscribers Report, supra note 23.

[111] For example, the non-profit UMTS Forum predicted in January of 2011 that global mobile broadband subscribers would grow from 3.2 billion in 2015 to 4.3 billion in 2020, representing growth at a compound annual growth rate of approximately 6.1 percent.  UMTS Forum, UMTS Forum Report 44 - Mobile Traffic Forecasts 2010-2020 Report 27 (Jan. 2011), available at http://www.umts-forum.org/component/option,com_docman/task,cat_view/gid,485/Itemid,213/.

[112] Optical Network Hardware:  Quarterly Worldwide, Regional, China, Japan, and India Market Share, Size, and Forecasts, Infonetics Research (May 31, 2011) (EMEAPROD02318751) ("Optical Network Hardware Report").

### 10.2.4.    Data Networking

I relied upon forecasts from Infonetics in forecasting global data networking hardware revenues for 2011 through 2015.  Infonetics divides these revenues into revenues from routers[113] and revenues from switches,[114] and I have maintained this division in my analysis.  For routers, during the period from 2016 to 2020, I have forecast growth in revenues at a rate of 5.0 percent based on the growth rate of 10.1 percent forecast by Infonetics for 2015.  This rate is materially lower than the Infonetics 2015 growth forecast as applying the Infonetics rate would result in growth of over 60 percent in five years in a relatively mature market.  Thereafter, I have assumed inflationary growth at 3.0 percent.  For switches, I have forecast growth in revenues at 3.0 percent for all periods after 2015 based on the growth rate of 3.3 percent forecast by Infonetics for 2015 and historical inflation.[115]

### 10.2.5.    PCs

I relied upon forecasts from Boston Analytics[116] in forecasting global PC revenue for 2011 through 2015.[117] Thereafter, I have assumed growth in revenues at 3.0 percent for all periods based on the growth rate of 3.9 percent forecast by Boston Analytics for 2015 and expected levels of inflation.

### 10.2.6.    Internet Search and Advertising

I relied upon forecasts from Boston Analytics in forecasting global Internet search and advertising revenue for 2011 through 2015.[118]  For the period from 2016 to 2020, I have forecast growth at a rate of 10.0 percent based on the growth rate of 13.8 percent forecast by Boston Analytics for 2015.  Thereafter, I have assumed inflationary growth at 3.0 percent.

### 10.2.7.    Enterprise Voice

I relied upon forecasts from Siemens Enterprise Communications ("Siemens") in forecasting global enterprise voice hardware revenue for 2011 through 2015.[119]  Thereafter, I have forecast revenues at 2015 levels based on Siemens' forecast of zero growth in 2014 and 2015.

### 10.2.8.    Carrier Voice

I relied upon forecasts from Infonetics in forecasting global carrier voice hardware revenues from 2011 through 2015.[120]  For the period from 2016 to 2020, I have forecast growth at a rate of 10.0 percent based on the growth rate of 10.7 percent forecast by Infonetics for 2015.  Thereafter, I have assumed inflationary growth at 3.0 percent.

---

[113] Total Enterprise and Service Provider Routers Pivot, supra note 34.

[114] Total Enterprise and Carrier Ethernet Switches Pivot, supra note 33.

[115] See, e.g., Data:  Inflation, Consumer Prices (Annual %), The World Bank, http://data.worldbank.org/indicator/FP.CPI.TOTL.ZG/countries?display=graph (last visited Jan. 23, 2014).

[116] The Boston Analytics forecasts upon which I relied for this section and others is produced as EMEAPROD02323147 – EMEAPROD02323159.

[117] Excludes Lenovo – Boston Analytics provided forecast revenues for Lenovo through 2013.  For 2014 and 2015, I assumed Lenovo market share remained constant.  Thereafter, Lenovo revenues were grown as described above.

[118] Excludes Ask and Microsoft – Boston Analytics provided forecast revenues for these companies through 2013.  For 2014 and 2015, I assumed Ask and Microsoft market share remained constant.  Thereafter, these revenues were grown as described above.

[119] Siemens Market Compendium, supra note 46.

[120] Total Service Provider VoIP and IMS Equipment and Subscribers Pivot, supra note 51.

### 10.3.   Royalty Rate Selection

All royalty rates were obtained directly from Nortel's internal version of the model constructed by Lazard and Global IP.[121]  They correspond to the base-case, "Litigation Light" royalty rates used in that analysis.  I believe these royalty rates are commercially reasonable and given my understanding that these rates were derived by Nortel or on Nortel's behalf by Global IP and Lazard, I believe they are based on substantial experience and knowledge of licensing transactions within the relevant industries.  These royalty rates are set out below.

| Franchise | Selected Royalty Rate |
|---|---|
| Smartphones | |
| Wireless Infrastructure | |
| Optical | |
| Data Networking | |
| PC | |
| Internet | |
| Enterprise Voice | |
| Carrier Voice | |

Several factors influence royalty rates within a given industry or market, including the number of technologies incorporated into the goods comprising that market, the degree of patent assertion encountered by market participants, and industry margins.  The relatively lower royalty rates applied to smartphones and PCs in my valuation analysis reflect the vast number of technologies (and functionalities) embedded in modern computers and smartphones.  These variously include display technologies, touch screen technologies, various other sensor technologies, graphical user interfaces, database and search technologies, software, wireless communication technologies (WiFi, mobile wireless, Bluetooth, NFC), wireline communications technologies (USB, microUSB, Lightning), location-based services technologies (GPS and compatible software/database), semiconductor technologies, power management technologies, and battery technologies, to name a few.  When more patented technologies are embodied in a product, "royalty stacking" leads to a lower royalty rate for any particular patent or group of patents. The lower royalty rates applied to devices also reflect the ubiquity of patent litigation in these industries, much of it centered around the "smartphone wars," semiconductor technologies, chip architectures, and WiFi.

The materially higher royalty rates applied to the telecommunications infrastructure franchises (Wireless Infrastructure, Optical, Data Networking, Enterprise Voice, and Carrier Voice) reflect the relatively fewer number of technologies embedded in any one product line and the relative infrequency of patent litigation within these industries.  Telecommunications infrastructure product design is generally not constrained by aesthetic and ergonomic considerations.  Rather, these products tend to incorporate a "box" form factor, perform few functions individually, and are modularized internally.  Telecommunications products generally consist of a "box" or "chassis," which can then be customized for the network operator's particular deployment with modules, each of which provides a certain functionality.  For example, optical network hardware at the time periods concerned often shipped with modules which managed network traffic, while other modules would route data on to packet-based networks.  While most of these products could be termed "routers" or "switches" within the broadest definitions of those categories, product lines generally perform a very specific function.  Where there are fewer patents, there is less "royalty stacking" that tends to deflate royalty rates substantially.  The reduced incidence of royalty stacking in infrastructure franchises tends to lead to higher royalty rates than in the device industries.

---

[121] Project Copperhead, IPR Model, Royalty Rates Output Tab (GIP_Nortel_00227898).

10.4.    **Licensing Expenses**

Next, I forecasted annual pre-tax royalty income by applying forecast licensing and litigation expenses to forecast royalty revenues. This is customary when valuing portfolios of IP. I selected 20 percent of royalty revenue as the appropriate estimation of annual licensing and litigation expense based on the observed financial performance of sophisticated non-practicing entities such as Acacia Research Group. This level of expense was applied uniformly to forecast royalty revenues from each franchise. Note that, so long as the same level of expenses is applied to each franchise, the particular level chosen does not affect my allocation analysis due to the associative property of multiplication. Application of expenses to royalty revenue yielded forecast annual gross licensing income.

10.5.    **Tax Effects**

I applied taxes to forecast annual gross licensing income at a rate of 40.0 percent, consistent with a blended U.S. federal and state corporate tax burden. Again, note that the selected tax rate does not affect my allocation analysis so long as it is applied consistently across Franchises.

10.6.    **Discount Rate**

In determining the appropriate discount rate to apply in calculating the net present value ("NPV") of forecast net royalty income, I examined risk-adjusted hurdle rates ("RAHRs") associated with implementation of technology-based IP. RAHRs account for a hypothetical buyer's required rate of return, or the associated risk of commercializing a technology, and are thus comparable to the WACC used above in the Business Sale IP valuations. The RAHR table set out below lists various categories of investment/licensing opportunities and their associated RAHRs, as viewed by investors. Appendix U provides various categories of investment/licensing opportunities and their associated RAHRs, as viewed by investors.

My valuation analysis assumes that licensees will only agree to pay a royalty on sales of licensed products in countries where there is at least one issued patent covering those products. This assumption substantially reduces the license value in the ROW territories and slightly reduces the license value in EMEA. I have also excluded revenues of the business sale purchasers from the royalty base calculations in certain franchises due to the fact that the business sale purchasers obtained a nonexclusive license to the Residual IP in the field of use of the purchased business line.[122]

10.7.    **Results of Residual Patent Valuation by Franchise**

Table 13 sets out the results of my residual patent valuation by franchise. Note that the net present value will incorporate royalties through the average year of expiry of the patents in each franchise, though Table 13 only shows the total global market for 2011 for ease of presentation.

---

[122] For example, Ericsson's revenues have been removed from the royalty base in the wireless infrastructure franchise due to Ericsson's prior acquisition of the CDMA-LTE, GSM and MSS Business Lines.

**Table 13**:
**Valuation Analysis Summary (*millions USD*)**

| Franchises | 2011 Global Market | Royalty Rate | Licensing Expense | Tax Rate | Discount Rate | Net Present Value |
|---|---|---|---|---|---|---|
| Smartphones | $112,177.57 | | | 40.0% | 30.0% | $685.03 |
| Wireless Infrastructure | $46,976.59 | | | 40.0% | 30.0% | $688.19 |
| Optical | $13,276.87 | | | 40.0% | 30.0% | $148.51 |
| Data Networking | $37,939.22 | | | 40.0% | 30.0% | $1,052.10 |
| PCs | $150,676.13 | | | 40.0% | 30.0% | $315.96 |
| Internet | $26,397.97 | | | 40.0% | 30.0% | $468.27 |
| Enterprise Voice | $11,900.00 | | | 40.0% | 30.0% | $141.87 |
| Carrier Voice | 2,663.18 | | | 40.0% | 30.0% | $45.40 |
| Other[123] | - | | | - | - | $25.50 |
| **Total** | | | | | | **$3,570.84** |

Complete Residual Patent portfolio valuation calculations are available in Exhibit R**.**

---

[123] Value of the Other category is estimated at $100K NPV per starred patent.

## 11. ALLOCATION

Once the valuation exercise performed above has been completed, the task of allocation can be addressed.

My report will address both the Contribution Approach and the License Approach.

### 11.1.    Contribution Approach to Allocation

#### 11.1.1.    Appropriate Method for Measuring Contribution

The Joint Administrators take the position that the RPEs are entitled to share in the proceeds from sales of Nortel IP according to the relative contribution each of them made to the creation of that IP.  The question then arises how to measure relative contributions to the R&D activity which led to the creation of the inventions in question.  Ideally, the contributions of the RPE's labs to the development of the patented technologies could be fully and accurately determined by interviewing all of the firm's R&D staff, and by reviewing all the documentation related to the firm's research (e.g. lab notebooks, invention disclosures, meeting minutes, research presentations etc.).  This process would allow one to determine where the conception[124] of the idea for each invention occurred, what resources and data led to the conception of the inventions and what resources were used to reduce each invention to practice.  Based on my experience in corporate strategy, appraisal and litigation analysis in industries ranging from automotive to telecommunications to biotechnology, this would be the most accurate process for determining research contributions.  This approach is not possible for Nortel's IP due to the size of the portfolio, the limitations on time and the availability of information.  I do not have access to lab notebooks and R&D staff. Moreover, I understand that R&D was organized across the Nortel Group and carried out in a highly coordinated and integrated manner across the various RPEs, making it even more difficult to separate out the distinct contributions of the various RPEs. In these circumstances a proxy data set must be selected that reasonably reflects the research efforts of the various RPE's labs.

One such proxy would be to determine how many employees for each RPE are listed as an inventor on patents in each of the relevant patent portfolios.   This approach to measuring contribution would focus on the patentable output of the R&D process.  However, due to the commingled and cooperative nature of R&D conducted by Nortel, as described in more detail in Appendix B, using inventorship as the metric for measuring contribution to the development of the patented technologies would be misleading. Much of Nortel's IP was created through the collaborative efforts of the labs across all geographies, which would not necessarily be reflected by the listed inventor(s). [125]  Additionally, basic R&D can often lead to foundational discoveries which may not necessarily be patentable but which would still represent valuable contributions to the development of Nortel's IP as a whole.[126]

---

[124] Manual of Patent Examining Procedure § 2138.04 (8th ed. 2012) states:  "Conception has been defined as 'the complete performance of the mental part of the inventive act' and it is 'the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice….' *Townsend v. Smith*, 36 F.2d 292, 295, 4 USPQ 269, 271 (CCPA 1930)."

[125] See, e.g., Dep. Ex. 22123, Thomas Horst et al., Economic Analysis of Nortel Networks' Intercompany Transactions, 4 (2002) ("Horst Frisch Report") ("Nortel's R&D function is a global undertaking aligned with its business strategy of technology leadership.  Engineers in each of Nortel's geographic markets work to develop next generation products. Researchers and engineers in Nortel's 48 facilities and partner locations around the globe collaborate to develop new, best in class products for which the company is known. In addition, major R&D centers are located at various sites around the world.  As summarized in the chart below, multiple venues contribute to the development of each product line.").

[126] See, e.g., Dep Ex. 21080, Advance Pricing Arrangement Responses to Questions Posed by Inland Revenue, Internal Revenue Service, Canada Customs Revenue Agency, at 34 ("All R&D projects are ultimately intended to produce commercially exploitable products or knowledge; however, there may be R&D undertaken for which no recognizable

Another approach to measuring contributions to the development of the patented technologies would be to measure each RPE's spending on R&D. In a large organization, where R&D funding supports a large number of R&D personnel and results in a large number of patents over time, this funding can be valid and indeed the most accurate proxy measurement for determining the contribution of each research group to the development of IP. Indeed, it is common practice to regard each dollar spent on R&D as fungible for the purposes of measuring relative contribution to R&D in a group, as Nortel did under the Residual Profit Split Method ("RPSM"). This approach to measuring contribution would take account of commingled and cooperative research efforts and would therefore avoid the above-mentioned problems associated with an inventorship-based metric.

### 11.1.2. Distribution of Value Within Patent Portfolio

The Nortel portfolio had broad coverage, going deeply into at least eight franchises that I have identified. In my experience, in large IP portfolios the vast majority of the value of the portfolio is usually derived from a minority of the patents. This skew in the distribution of value of patented inventions has also been reported in a number of academic research articles. This is due in part to the fact that technology IP can be overlapping and duplicative. Value is often derived from a relatively small number of patents that are essential to industry standard technology or that cover an essential process or solution to a common problem.

In relation to the Residual Patent portfolio, the patents that were categorized as high interest by Global IP (one or two stars) likely represent the vast majority of the value of the Residual Patents. Approximately 37% of the total Residual Patent portfolio was identified as high interest.[127] The assumption that this 37% of the Residual Patents represents effectively the entire value of the portfolio is further supported by the facts that:

 a) academic literature suggests highly skewed value distributions for patent portfolios;[128, 129, 130]

 b) The claims of each issued U.S. patent were evaluated by a Global IP attorney leading to the identification of these specific high interest patents; and

 c) It is not practical to enforce over 7,000 patents, and companies like Rockstar therefore tend to focus on a minority of their patents in enforcement actions.[131]

For the Business Sales, it is less likely that a small number of patents in each portfolio represents the majority of portfolio value. This is because the Business Sale patents were handpicked based on the fact that they were in use by each business, and then were only transferred in a Business Sale if those patents met the criterion of "predominant use."

---

commercial gain is immediately evident. Long-term research projects are undertaken in a somewhat academic environment with the long-term goal of producing a commercially exploitable product. The information obtained from those projects is intellectual property; however, the ability to commercially exploit that knowledge is not yet available. For example, it may take several years before the market demands products that will incorporate the knowledge gained from long-term research projects.").

[127] The list of U.S. high interest patents and foreign counterparts was obtained from NNI_ICEBERG_00000057, titled "Revision 3 to Nortel Iceberg Asset List for EDR (February 2011)."

[128] Harhoff et al., Exploring the Tail of Patented Invention Value Distributions, in Economics, Law and Intellectual Property: Seeking Strategy for Research and Teaching in a Developing Field 279 (Ove Granstrand, ed., 2003)

[129] Scherer et al., Uncertainty and the Size Distribution of Rewards from Innovation, 10 J. Evol. Econ. 175 (2000).

[130] Mark Schankerman, How Valuable is Patent Protection? Estimates by Technology Field, 39 RAND J. Econ. 77 (1998).

[131] See Appendix O for additional details.

### 11.1.3. Appropriate Period for Measuring Contribution

Having determined the likely distribution of value within the portfolio, I can now determine the period of time over which to measure contribution to the creation of the Residual Patents and Business Sale IP, or "look back period." The look back periods will vary between portfolios if the portfolios were invented over different time periods. For example, the patent filing dates for the non-expired high interest patents in the Residual Patent portfolio range from 1992 to 2007, while the patent filing dates for the Layer 4-7 Business Sale patents range from 1999 to 2007. Therefore, the look back periods must be different between the various patent portfolios depending on the priority dates of significant patents in the particular portfolios. Figure 1 shows the distribution of high interest patent priority years and the distribution of priority years for the entire Residual Patent portfolio:

**Figure 1:**
**Priority Year Distribution for Residual Patents and High Interest Residual Patents**



The period of time for which R&D expenditures are relevant to allocating the value of IP, or "look back periods," for each IP portfolio are described in greater detail in the following sections.

Having determined that R&D spending is the most appropriate measure of contribution and that the analysis should focus on high value patents, I must then determine the appropriate time period over which to measure such spending. This is particularly true where, as here, the IP consists of a large number of items created continuously over an extended period of time, against the background of a continually changing market.

If the relative contributions by the participants were stable over time, the period over which R&D expenditure was measured would make no difference, as there would be no variation from year-to-year among the participants with regard to their relative contribution levels. But this was not the case for Nortel. Therefore, the measurement period must be carefully considered, first, to capture the relevant contributions to ultimate sales value, and second, to avoid artifice due to short-term shifts in relative contributions over time.

The outside limit on IP value as a function of time is its term of legal protection. In the United States, assuming applicable maintenance fees and annuities are paid (and give or take certain adjustments and extensions), the term of a patent from its priority date[132] is 20 years.[133] A patent derives its value from its

---

[132] The priority date, also referred to as the "effective filing date," is defined by the USPTO to be "the earlier of: (i) the actual filing date of a nonprovisional application; or (ii) the date to which the nonprovisional application claims domestic benefit or foreign priority of another application that describes the subject matter. For example, the effective filing date could be the filing date of (i) an earlier-filed nonprovisional application or international application designating the United States (benefit under 35 U.S.C. 120/121); (ii) a provisional application (benefit under 35 U.S.C. 119(e)); (iii) a

exclusivity. Once the patent expires, other parties can freely use the technology in question. After a patent expires, a party can claim damages for patent infringement that occurred before the patent expired, as long as a claim is brought within the applicable statute of limitations period. I understand that in the United States, this period is typically six years.[134] While other forms of legal protection for IP can extend beyond twenty years, I understand that patents were by far the most valuable class of IP owned by Nortel (and the only class of IP in the Residual Sale).

The commercial life of any particular patent will also depend on the invention in question. Some technologies may become obsolete relatively early in the life of a patent, while others may continue to be valuable throughout or even beyond the life of a patent.[135] Global IP's analysis of Nortel's Residual Patent portfolio found that the average priority year for "high interest" patents was 1999. This contrasts with no star patents, for which the average priority year was 2004. In other words, for the Residual Patents the most valuable patents tended to be older.

There are several reasons why older patents may be more valuable than recently filed ones. First, many technologies are adopted by the market slowly over time and do not realize their full value until later in the life of the patent.[136] For example, the Residual Patent portfolio contains a number of patents associated with GSM wireless technology.[137] The mean filing year for those patents was 1993. However, as demonstrated by Figure 2, the market for GSM services has only just peaked, 20 years later. In the case of GSM, the revenue derived from the patents increased over time as GSM technology was adopted around the world. More generally, for Nortel technology it usually took roughly seven to ten years from the filing of a patent to market adoption of a product based on that invention.[138]

---

foreign application (priority under 35 U.S.C. 119(a)-(d)); or (iv) a PCT (international) application under 35 U.S.C. 365(c)."

[133] See Dep. Ex. 31318, 2002 IPR Business Plan, Slide 3 (illustrating the lifecycle of a patent, from disclosure submission to patent expiration). If U.S. priority is based on a "provisional" patent application, up to an additional year of protection will be available. Further, patent term adjustments and the like can add relatively small periods to the 20 (or 21) years.

[134] U.S. Patent and Trademark Office, Time for Filing Prior Art Citation, available at http://www.uspto.gov/web/offices/pac/mpep/s2204.html ("The period of enforceability is the length of the term of the patent plus the 6 years under the statute of limitations for bringing an infringement action."); see also 35 U.S.C. 286 (providing the six-year statute of limitations for infringement actions).

[135] See Roese Dep. 176:15-176:24 ("Q. So on some of those products the useful life of the R&D is fairly long, correct? A. Absolutely. It was obviously trending towards shorter as the world progressed towards software. But in large, DMS-100 switches, CS 2K's, very heavy Class 5 switches, some of them were deployed for ten, 15 years, maybe longer. Modern software oriented telecommunications gear might only live two years.").

[136] See T. Collins Dep. 49:24-50:6 ("In the United States, there's…three periods in the life of the patent where you have to pay maintenance fees, and in many countries, these fees increase in value the older the patent is, the idea being is if the patent's been around longer, it tends to be more valuable.").

[137] Issued Patents and Pending Patent Applications Asset List as of April 15, 2010 (NNI_ICEBERG_00000057) (GSM patents as identified by Nortel Technology Subarea).

[138] McColgan Dep. 77:13-785 (agreeing that a lag of seven to ten years existed between the filing of an invention and the generation of any significant profit or benefit).

**Figure 2:**
**Market Adoption of Wireless Technology - GSM**



Mean filing year for Nortel GSM patents

Another reason why older patents can be more valuable is that competitors may belatedly move into the space covered by the patents, giving the patent newly realized strategic value, including potential revenue from licensing the patent and/or from infringement lawsuits. The recent and ongoing patent litigation among smart phone manufacturers, in which the Nortel patents certainly played a role, is a case in point. Industry players that had neglected patenting their R&D realized that having the correct IP could make a difference that went to their ultimate survival. The simultaneous recognition of the sudden importance of IP in this space drove the value of patents in the field to new heights. While those developments were quite dramatic, the same phenomenon repeats itself regularly throughout many different industries. Competitors converge on a new technology area and already issued patents in that area become highly strategic assets, yet this often does not begin to occur for many years after a) the R&D spending that led to the development of the patented technology, b) the patents have issued and c) the market has adopted the technology. This trend can be observed when examining the average priority date of the Nortel patents currently being asserted by Rockstar and Spherix.[139] The conclusion that older patents tend to be worth more is also supported by academic researchers.[140]

Of course, there are also factors that can enhance the commercial value of newer technologies. Most obviously, older patents have fewer years of remaining patent term. All things being equal, more years of patent protection offers more opportunity to profit from exclusive use of the technology.

---

[139] The vast majority of the Nortel patents currently being asserted have priority years in the 1990s, and the average priority year for the portfolios asserted in each identified lawsuit is 1996, 1997 or 1998. The one exception to this is Constellation Technologies LLC (a subsidiary of Rockstar) v. Time Warner Cable Inc et al., in which the average priority year of the asserted patents is 2000. See Appendix O for additional details.

[140] D.S. Abrams et al., Patent Value and Citations: Creative Destruction or Strategic Disruption?, NBER Working Paper No. 19647 (2013); J.O. Lanjouw et al, How to Count Patents and Value Intellectual Property: Uses of Patent Renewal and Application Data, NBER Working Paper 5741 (1996).

The second major factor that works in favor of newer patents is technological obsolescence. As technology ages, it can be replaced by newer technologies, which may undercut the commercial value of the older technology. On the other hand, foundational patents that are built into industry standard technology may not become obsolete at all within the life of the patent, as new generations of the technology continue to build on the earlier foundation. Various wireless patents are an example of this latter phenomenon, as 3G and 4G wireless standards continue to build on a foundation of 2G patents.

Thus, in general, most new patents have limited value due to the risks that the new technology will not be adopted by the market (though of course a set of recently filed patents may include patents the value of which will only be recognized later). In contrast, older patents covering technologies accepted by the marketplace often gain value as the market matures over a longer period, and the most valuable patents often become such only in the final years of their patent terms.

I therefore conclude that it is appropriate to determine contribution to the creation of Nortel's IP by measuring R&D spending starting the year before the filing of the earliest unexpired high interest patent in each portfolio, whether Residual Patents or the various Business Sales. For the Business Sales, the starting point will vary depending on the earliest non-expired patent priority date in the portfolio for that business. I conclude that all Business Sale patents are of high interest because only patents meeting the "predominant use" standard were included in the Business Sales. As an alternative starting point, I will also examine R&D spending since 2001, as that was the year that the RPSM was effective. While I have been given R&D spending data predating 2001, I understand that data was maintained in a different manner before and after the RPSM came into force.

Having determined how far to look back, it is then necessary to determine at which point to stop looking at R&D spending. Once again, my analysis focuses on when high value patents were created. Regarding the Residual Patents, there are three different possible end points. The first is the date of sale. However, although Nortel filed a number of patent applications following bankruptcy, I understand that little basic research was being performed during this time given that R&D spending was cut dramatically[141] and none of the patents designated as high interest by Global IP were filed during this time period. Therefore, I do not think it is appropriate to look at the post-filing period, which was outside the ordinary course of business, and during which there appears to have been negligible contributions to the value of Nortel's overall IP portfolio. The second possible end point is Nortel's filing for bankruptcy protection in January 2009. This end point would capture all meaningful contributions to R&D activity during the ordinary course of business. The third possible end point is to include spending from the years during which the relevant IP was developed, both for the Business Sale IP, and for the high interest Residual Patents identified by Global IP.

For the Residual Patents, the average gestation period from research to patent filing was one year, and the latest priority date of a starred patent was in 2007. The most logical endpoint for examining contribution towards the valuable patents in the Residual Patent portfolio is therefore 2006, since it would cover all starred patented technologies.

For the Business Sale IP, a different approach is needed. While the Residual Patents consisted of bare patents, the Business Sale IP includes "know-how" that was transferred with the sale of the businesses. It is therefore reasonable to assume that know-how was continuously being developed up to the termination of ordinary course operations with the insolvency filing on January 14, 2009. Moreover, the Business Sale patent portfolios were not evaluated by Global IP and therefore any look back period tied to Global IP's analysis is not relevant to the Business Sale IP. Based on these facts, the most appropriate end point for the Business Sale look back period is the end of 2008.

---

[141] See Exhibit B.1.7.2.

**11.2.**    <u>Nortel's Reliance on R&D Spending Under the RPSM</u>

As described in Appendix C, from 2001 forward the Nortel Group allocated residual profit and loss among the RPEs according to Residual Profit Split ("RPS") derived from R&D spending. The precise method by which RPS percentages were calculated varied from time to time.[142]

I understand that Nortel initially calculated RPS percentages based on a 30% declining balance method.  In other words, R&D spending in the current year was counted at its full value; R&D spending in the preceding year was discounted by a factor of 30%; R&D spending in the year before that was discounted by a factor of 51% (*i.e.*, 30% compounded over two years); and so on.[143]  Pursuant to the Third Addendum to the MRDA, adopted on the eve of Nortel's insolvency filings but made effective as of January 1, 2006,[144] Nortel calculated RPS percentages based on a straight-line calculation of the preceding five years of R&D spending. [145]

I do not believe either method Nortel used for transfer pricing purposes is an accurate way to measure the RPEs' relative contributions to the creation of Nortel IP.  This is so for several reasons.

First, as described above, most of Nortel's high interest patents that Global IP determined to be of the highest value were significantly more than five years old.  The five year method would attribute zero value to R&D spending that occurred more than five years before the relevant end-point, while a 30% declining balance would discount spending more than five years earlier at 84% and rising for each earlier year.  Since the vast majority of high value patents in Nortel's portfolio are derived from R&D spending that occurred more than five years before the relevant dates, I am aware of no justification for such a restricted approach.

Second, any R&D spending that supports research that leads to an invention by definition must occur before a patent application is filed on that invention. Nortel has represented that the mean lead time between R&D spending and filing of a patent is one year.[146]  Therefore, if the look-back period were only 2005-2009, this would only measure R&D spending (on average) for patents filed from 2006-2010.  Given the importance and value of older patents, this would ignore the majority of value of Nortel's IP.

As described below, I am of the opinion that it is more accurate to use an approach that values all contributions made to creation of the valuable Nortel IP assets that were ultimately sold between 2009 and 2011.

**11.3.**    <u>Patents Not Assigned to NNL</u>

Before applying allocation percentages to the Residual Patent Sale proceeds, one must first account for all Residual Patents that were not beneficially owned jointly by the RPEs. The value of high interest patents that were not so owned must be allocated directly to the entities that owned them before using a Contribution

---

[142] <u>See</u> Dep. Ex. 21003, Master R&D Agreement, Sched. A at NNC-NNL06001514/18, 30, 48 (outlining the original calculation of the RPSM and the calculation as amended by the Second and Third Addenda to the MRDA).

[143] In fact, Nortel accounted for half-years but this distinction is not material for these purposes.

[144] Provisions in the Third Addendum were generally effective as of January 1, 2006.  The exception is Article 5(a)(ii) (NNL's grant of non-exclusive licenses to the Licensed Partners), which was made effective as of January 1, 2009.  Dep. Ex. 21003 at NNC-NNL06001514, I 39.

[145] Stephens Dep. 43:3-43:10 ("[T]he previous model took R&D expenditure as far back as anybody could go in the records and amortised it at 30% reducing balance to determine the residual capital value of research and development spend whereas the second addendum model took the last—previous five years R&D spend as being the amount to calculate the factor for the share of residual profit.").

[146] Dep. Ex. 22078, Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), at PC0184902 ("[T]he useful life of the Nortel intangibles is estimated to be approximately five years with a gestation lag of one year.").

Approach or License Approach allocation table.  Below is the list of individually owned Residual Patents assigned to the Rockstar Consortium:[147]

**Table 14:**
**Non-NNL High Interest Residual Patents by Franchise**

| | Wireless Handset | Wireless Infra | Optic | Data | PC | Internet | Entprs. Voice | Carrier Voice | Other |
|---|---|---|---|---|---|---|---|---|---|
| CoreTek | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Xros | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 9 |
| Nortel GmbH | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NN Applications Management | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |
| NN France | 6 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

The percentages in the following table represent the proportion of the high interest patents in each franchise which were held by Coretek, Xros, Nortel GmbH, NN Applications Management and NN France SAS:

**Table 15:**
**Franchise Percentages Attributable to Non-NNL Residual Patents**

| | Wireless Handset | Wireless Infra | Optic | Data | PC | Internet | Entprs. Voice | Carrier Voice | Other |
|---|---|---|---|---|---|---|---|---|---|
| CoreTek | - | - | 1.1% | - | - | - | - | - | - |
| Xros | - | - | 2.2% | - | - | - | - | - | 3.5% |
| Nortel GmbH | - | 0.1% | - | - | - | - | - | - | 0.4% |
| NN Applications Management | 1.0% | - | - | 0.5% | - | - | - | - | - |
| NN France | 1.16% | 1.15% | - | - | - | - | - | - | - |

I applied the above percentages to the Residual Patent franchise values presented in Table 13.  Those values were then adjusted to reflect the proportion of the actual $4.5B Residual Patent portfolio sales price rather than the calculated Residual Patent portfolio value:

---

[147] In addition to the non-NNL Residual Patents, two patents that were sold as part of the MEN/Optical Business Sale were co-owned by NNL and NNC.  Prior to allocating the value of the MEN/Optical IP portfolio, I allocated the value of NNC's interest in these two patents directly to NNC, given that it was not a party to the MRDA.

**Table 16:**
**Values Attributable to Non-NNL Residual Patents (*millions USD*)**

| | Wireless Handset | Wireless Infra | Optic | Data | PC | Internet | Entprs. Voice | Carrier Voice | Other |
|---|---|---|---|---|---|---|---|---|---|
| CoreTek | - | - | $1.99 | - | - | - | - | - | - |
| Xros | - | - | $3.97 | - | - | - | - | - | $1.15 |
| Nortel GmbH | - | $0.99 | - | - | - | - | - | - | $0.13 |
| NN Applications Management | $8.23 | - | - | $6.52 | - | - | - | - | - |
| NN France | $9.88 | $9.90 | - | - | - | - | - | - | - |

**11.4.    Application of Contribution Approach**

**11.4.1.    Allocation Based on Relative Contribution**

All R&D spending data was obtained from internal Nortel documents.[148]  I added up the spending by each RPE over the relevant time period and determined what percentage was incurred by each RPE. For the Business Sale IP, I used a unique start point for each Business Line portfolio that corresponds to the year before the earliest unexpired patent priority date in each Business Line.  These start dates are presented in the following table:

---

[148] Due to the transition from the CSA to the MRDA during the relevant time period, and the varying participation in those regimes of the relevant entities during those time periods, I understand that there is no uniform source for R&D spend.  Figures comprising R&D spend were compiled from various sources relative to the transfer pricing regime in effect during relevant time periods and the transitioning roles of the relevant entities contributing to R&D within those regimes.  For the period 1989-1997, I primarily relied on R&D Spend from file NNI_00298735, the tab labeled "Post Transfer Pricing Dec 31st," page 6, with the following exceptions.  With respect to NMC and NNUK, for periods in which they were not CSA participants, I relied upon the Nortel file titled "2001 FY RPS 4th RSTMT_-v01.xls" (NOR_53648312), and NNUK's financial statements, respectively.  For 1998-2000, I relied upon the Nortel file"Gross vs Net R&D 98-00 all.pdf" (EMEA0311234).  In the subsequent period, 2001-2008, during which the MRDA was in effect, I relied upon the file titled "2009 TP Forecast Model - April2109" (EMEAPRIV0055531, tab labeled "IP owner R&D"), which contains R&D spend less UMTS R&D spending contributions for the years prior to UMTS's divestment.  Finally, for the post-petition fiscal year 2009, I relied upon R&D spending for each of the five RPEs as well as CALA, China and ROW (Asia) from the file titled "R&D Investment_FY2007-2011.xlsx" (EMEAPROD02314504).

**Table 17:**
**Business Line Look Back Period Start Dates**

| | Oldest Priority Date of Non-Expired Patent in Portfolio | Start Year for Look Back Period |
|---|---|---|
| CDMA/LTE | 1993 | 1992 |
| Enterprise Solutions | 1990 | 1989 |
| MEN and Optical | 1991 | 1990 |
| CVAS | 1997 | 1996 |
| GSM/GSM-R | 1992 | 1991 |
| Multiservice Switch | 1992 | 1991 |
| Layer 4-7 | 1999 | 1998 |
| Next-Gen Packet Core | No transferred patents | |

The end date of each Business Sale look back period is 2008, which corresponds to the last year before Nortel ceased normal course operations due to insolvency. I have also considered a single Business Sale look back period which begins in 2001 (reflecting the year the MRDA was adopted) and ends in 2008.[149]

---

[149] See Table 24 for the allocation results of this alternative look back period on the Nortel Business IP sale proceeds.

**Table 18:**
**R&D Spend-Based Allocations of Business Sale IP**

|  | EMEA | CA | US |
|---|---|---|---|
| CDMA/LTE | 16.5% | 40.8% | 42.6% |
| Enterprise Solutions | 15.8% | 40.4% | 43.8% |
| MEN and Optical | 16.1% | 40.5% | 43.4% |
| CVAS | 16.8% | 44.6% | 38.6% |
| GSM/GSM-R | 16.4% | 40.6% | 43.0% |
| Multiservice Switch | 16.4% | 40.6% | 43.0% |
| Layer 4-7 | 16.4% | 44.1% | 39.5% |
| Next-Gen | 16.5% | 40.8% | 42.6% |

For the Residual Patents, I have used four look back periods produced by two different start points and end points. My two start points are 1991 (reflecting the year before the earliest unexpired patent in the Residual Patent portfolio) and 2001. My two end points are 2006 (representing the year before the last high interest patent in the Residual Patent portfolio) and 2008 (representing the last year of ordinary course operations).

**Table 19:**
**R&D Spend-Based Allocations of Residual Patents**

|  | EMEA | CA | US |
|---|---|---|---|
| 1991-2006 | 17.3% | 39.4% | 43.3% |
| 1991-2008 | 16.4% | 40.6% | 43.0% |
| 2001-2006 | 18.2% | 42.9% | 38.9% |
| 2001-2008[150] | 15.9% | 44.9% | 39.2% |

Complete R&D expense data are available in Exhibit B1.7.

**11.5.    License Approach to Allocation**

The alternative allocation methodology assumes that the RPEs' rights in Nortel IP are equivalent to the value of the exclusive and non-exclusive licenses to Nortel IP held under the MRDA.  This methodology is based on the Relief from Royalty approach that was used above to value Nortel's IP.  It then goes one further step to actually allocate that value among the different RPEs.  Recall that the valuation methodologies determined the value of Nortel's IP based on projections of income related to or derived from that IP.  Those values are repeated below:

---

[150] The 2001-2008 percentages may also be used as an alternative look back period for the Business Sale allocations.

**Table 20:**
**Business Sale IP Value (***millions USD***)**

| Business Sales | NPV of IP |
|---|---|
| CDMA/LTE | $256.39 |
| Enterprise Solutions | $244.26 |
| MEN and Optical | $113.13 |
| CVAS | $79.87 |
| GSM/GSM-R | $49.17 |
| MSS | $4.46 |
| Layer 4-7 | $9.29 |
| Next-Gen Packet Core | $8.50 |
| **Total** | **$765.07** |

**Table 21:**
**Residual Patent Value (***millions USD***)**

| Franchises | NPV |
|---|---|
| Smartphones | $685.03 |
| Wireless Infrastructure | $688.19 |
| Optical | $148.51 |
| Data Networking | $1,052.10 |
| PCs | $315.96 |
| Internet | $468.27 |
| Enterprise Voice | $141.87 |
| Carrier Voice | $45.40 |
| Other | $25.50 |
| **Total** | **$3,570.84** |

Since the values above were derived based on projected revenue, they can be divided geographically according to where the projected revenue is earned. In doing so, I relied upon data from several providers of third-party market research including IDC, Infonetics, Boston Analytics, and Frost & Sullivan. The procedure for geographically allocating forecast revenues for each franchise is set out below in Appendix T.

Once value has been allocated by country, the value allocated to the country in which each RPE was located is simply allocated to that RPE. For example, value attributable to U.S. markets would be allocated to NNI. That leaves for determination the value attributable to non-RPS countries, *i.e.*, the ROW.

In my opinion, the allocation of value attributable to revenue in ROW countries depends on who is entitled to that revenue. Various Nortel LREs and CPEs operated in different ROW countries around the world, but

their returns were limited to a standard percent of revenue as compensation for their distribution function and other routine services.  More importantly, the licenses that these entities held were not sub-licensable.[151]

By contrast, each RPE held a non-exclusive license to exploit all Nortel IP in every ROW country, and each of these licenses was expressly sublicensable. Absent a waiver of such licenses pursuant to the sale process, each RPE would be entitled to sublicense the right to use Nortel technology into each ROW country, and thereby deprive any potential buyer of exclusivity in the ROW countries.[152]

The question that arises is how to value those non-exclusive licenses.  At the time of insolvency, each RPE held a non-exclusive, sublicensable license to the Nortel technology in every non-RPE jurisdiction around the world.  By virtue of the license structure under the MRDA, there were four non-exclusive licenses in every non-RPE territory: one for each of the four RPE "Licensed Participants."  In addition, NNL held legal title on behalf of all five RPEs, who are the beneficial owners of the IP.  Each RPE entity surrendered its non-exclusive rights to Nortel's IP because the sale of IP required the buyer to obtain exclusive rights to use that IP.

The key to valuing the non-exclusive rights to Nortel's IP is that the sum of the royalty revenue obtainable in a territory by the four non-exclusive license plus the non-exclusive rights retained by NNL must be equal to the value of a single exclusive license in that territory.  This is based on the fact that all of the income obtained by the holders of these non-exclusive rights, when aggregated, would be equal to the income which could be obtained through exclusive license.  In other words, the revenue generated by an entity that holds all of the license rights with no competing licensees is equivalent to what would be generated by a single exclusive licensee in that territory.

As mentioned above, the significance of the non-exclusive rights held by the RPEs stemmed from the ability of any one of the RPE entities to use its sublicensable non-exclusive license to hold-up the Residual Patent Sale or the Business Sales.  This could have been accomplished by an RPE refusing to relinquish its rights to the buyer of these portfolios. Had a buyer then proceeded to acquire the IP and tried to enforce against infringers, the RPE that held out could have granted sublicenses to targeted infringers. I am instructed that this is not just a practical impairment, but a legal disability.  As I understand it, exclusivity in a market cannot even be legally enforced if there are uncontrolled alternate licensors in the market from which any accused infringer could obtain a license.  Thus, to convey clean, enforceable exclusive rights, NNL would have had to eliminate the nonexclusive licenses under the MRDA (which is precisely what it did).

The question of how much this relinquishment was worth is an economic one.  I have also considered the fact that while each RPE held a sublicensable non-exclusive license in the non-RPS territories, only Canada or the subsequent purchaser of the IP portfolios would have the right to enforce the patents in the non-RPS territories.  However, this right or option to enforce the patents would not create extra value above that of a sublicensable non-exclusive license.  As mentioned, this is due to the fact that if there was an entity competing with the owner of the patents by granting sublicenses to the IP portfolios, that entity would be able to sell a prospective and retrospective sublicense to any company threatened with patent litigation by the owner of the patents.  Enforcement, even if it were to be permitted by a court, would be futile unless the sublicensable licenses were retired.

Based on the foregoing, each RPE's non-exclusive license can reasonably be viewed as having equivalent value in each territory. It therefore follows that each RPE should have an equal claim to the licensing value of each non-exclusive territory under a License Approach.

---

[151] At Risk Entities (Nortel GmbH and NN France SAS) held similar licenses but these entities also had certain patents in their names and were never a party to the MRDA.  The allocation for these non-NNL patents are addressed in Tables 17 and 18.

[152] In contrast, the LREs and CPEs only had a non-sublicensable license to sell Nortel products.  Therefore, the LREs and CPEs would not have been able to deprive a potential buyer of exclusivity in the ROW countries.

The license-based allocation percentages for the Business Sale IP portfolios are presented in Table 22.

**Table 22:**
**License-Based Allocation for Business Sale IP**

|  | NNSA | NNIR | NNUK | NNL | NNI |
|---|---|---|---|---|---|
| **CDMA/LTE** | 16.73% | 13.73% | 17.38% | 15.12% | 37.05% |
| **Enterprise Solutions** | 15.25% | 8.33% | 15.33% | 12.63% | 48.47% |
| **MEN and Optical** | 14.14% | 9.55% | 15.59% | 12.06% | 48.66% |
| **CVAS** | 14.06% | 9.42% | 15.54% | 11.96% | 49.02% |
| **GSM/ GSM-R** | 25.56% | 12.41% | 28.37% | 12.41% | 21.25% |
| **MSS** | 19.08% | 16.38% | 19.08% | 19.08% | 26.39% |
| **Layer 4-7** | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% |
| **Next-Gen** | 16.73% | 13.73% | 17.38% | 15.12% | 37.05% |

I concluded above in Section 4.2 that each of the non-exclusive licenses has equal value worth one-fifth of the value of what an exclusive license to all ROW territories would be worth.  By adding 20 percent of the value of ROW to each RPE's allocation in respect of its exclusive territory, I derive a total License Approach allocation.  The License Approach allocation percentages for the Residual Patent portfolio are presented in Table 23.

**Table 23:**
**Total License-Based Allocation for Residual Patents**

|  | NNSA | NNIR | NNUK | NNL | NNI |
|---|---|---|---|---|---|
| Value of Exclusive RPE License | 7.1% | 0.1% | 9.2% | 4.5% | 79.1% |
| Share of Non-Exclusive RoW License | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Portion of Total | 12.2% | 8.0% | 13.3% | 10.6% | 55.9% |

**11.6.**    **Allocation Summary**

Below are the final amounts of the Business Sale IP sale proceeds allocated to each RPE using the alternative Contribution Approaches and License Approach:

**Table 24:**

**Allocation Results for Business Line IP Sale Proceeds**

*(millions USD)*

|  | R&D Spend-Based Allocation: Earliest Relevant Patent - 2008 | | R&D Spend-Based Allocation: 2001 - 2008 | | License-Based Allocation | |
|---|---|---|---|---|---|---|
|  | Percent | Value | Percent | Value | Percent | Value |
| **NNL** | 41.6% | $314.07 | 44.9% | $343.15 | 12.3% | $101.02 |
| **NNI** | 42.1% | $326.59 | 39.2% | $300.03 | 46.0% | $331.59 |
| **NNUK** | 7.9% | $60.78 | 5.5% | $42.04 | 16.1% | $128.31 |
| **NNSA** | 7.5% | $55.85 | 9.5% | $72.71 | 15.2% | $122.17 |
| **NNIR** | 1.0% | $7.66 | 0.9% | $7.01 | 10.4% | $81.86 |

The final amounts of the Residual Patent Sale proceeds were allocated to each RPE using the alternative Contribution Approach and License Approach.[153]  Those values were then adjusted to reflect the proportion of the actual $4.5B Residual Patent portfolio sales price rather than my calculated Residual Patent portfolio value:

**Table 25:**

**Summary of Contribution Approach Allocation of Residual Patent Sale Proceeds**

*(millions USD)*

|  | R&D Allocation 1991-2006 | | R&D Allocation 1991-2008 | | R&D Allocation 2001-2006 | | R&D Allocation 2001-2008 | |
|---|---|---|---|---|---|---|---|---|
|  | Percent | Value | Percent | Value | Percent | Value | Percent | Value |
| **NNL** | 39.38% | $1,755.09 | 40.56% | $1,807.79 | 42.93% | $1,913.63 | 44.86% | $1,999.46 |
| **NNI** | 43.30% | $1,929.72 | 43.02% | $1,917.52 | 38.90% | $1,733.69 | 39.22% | $1,748.18 |
| **NNUK** | 8.73% | $389.00 | 8.12% | $362.12 | 6.36% | $283.42 | 5.50% | $244.98 |
| **NNSA** | 7.63% | $339.98 | 7.27% | $323.94 | 11.07% | $493.23 | 9.51% | $423.67 |
| **NNIR** | 0.97% | $43.365 | 1.03% | $45.77 | 0.74% | $33.16 | 0.92% | $40.86 |

---

[153] Total allocated value is equal to the Residual Patent Sale proceeds of $4.5B less the values attributable to the patents held by CoreTek, Xros, Nortel Networks Application Management, Nortel GmbH and Nortel Networks France SAS shown in Table 19.

**Table 26:**

**Summary of License Approach Allocation of Residual Patent Sale Proceeds**

*(millions USD)*

| | License-Based Allocation | |
|---|---|---|
| | Percent | Value |
| NNL | 11.0% | $494.80 |
| NNI | 55.4% | $2,493.20 |
| NNUK | 13.2% | $592.70 |
| NNSA | 12.1% | $543.10 |
| NNIR | 7.9% | $355.30 |

It is worth noting that, under the Contribution Approach, the allocation results do not vary more than a few percentage points, regardless of which R&D look back period is chosen. This is true for both the allocation of the Business Sale IP and the Residual Patent Sale proceeds. In contrast, the License Approach leads to substantially different allocation outcomes for each RPE. Having considered all of these potential allocation methodologies, it is my opinion that a Contribution Approach that considers R&D spending leading to the development of the earliest relevant IP asset through the latest relevant IP asset is the most appropriate approach. I believe this approach is the most consistent with the fact that Nortel had a long history of using R&D contribution to split residual profits and the fact that the average age of the valuable patents exceeded 10 years.

The reference period for a Contribution Approach that considers R&D spending leading to the development of the earliest relevant IP asset through the latest relevant IP asset is 1991-2006 for the Residual Patent portfolio and the various start dates listed in Table 14 through 2008 for each of the Business Sale IP portfolios. The following table, also presented in Section 4, presents the summary results of this approach:

**Table 27:**

**Contribution Approach Summary Values** *(millions USD)*

| | NNL | NNI | NNUK | NNSA | NNIR |
|---|---|---|---|---|---|
| Total Allocated Value | $2,091.17 | $2,256.27 | $449.77 | $395.81 | $51.01 |
| Percentage of Total IP Value | 39.9% | 43.0% | 8.6% | 7.5% | 1.0% |

While the license-based approach is not my preferred method of allocation, I acknowledge that this represents a reasonable alternative. The results of this approach are summarized in Section 4 and again here:

**Table 28:**

**License Approach Summary Values** *(millions USD)*

| | NNL | NNI | NNUK | NNSA | NNIR |
|---|---|---|---|---|---|
| Total Allocated Value | $596.02 | $2,824.78 | $720.94 | $665.21 | $437.09 |
| Percentage of Total IP Value | 11.4% | 53.9% | 13.7% | 12.7% | 8.3% |

## 12. STATEMENT OF LIMITING CONDITIONS

- The conclusion of value arrived at herein is valid only for the stated purpose as of the date of the valuation.

- Financial statements, technical information, and other information provided by the Joint Administrators or their representatives in the course of this engagement have been accepted without any verification as fully and correctly reflecting the enterprise's business condition, except as specifically noted herein.  Ocean Tomo expresses no form of assurance on this information.

- Public information and industry and statistical information have been obtained from sources I believe to be reliable.  However, I have performed no procedures to corroborate the information.

- I do not provide assurances on the achievability of the results forecasted because events and circumstances frequently do not occur as expected, differences between actual and expected results may be material, and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- The report and conclusion of value are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever.  The conclusion of value represents the considered opinion of Ocean Tomo, based on information furnished to them by the Joint Administrators or their representatives and other sources.

- Neither all nor any part of the contents of this report should be disseminated to the public or any third party via any medium without the prior written consent and approval of Ocean Tomo.

- No change of any item in this appraisal report shall be made by anyone other than Ocean Tomo, and I shall have no responsibility for any such unauthorized change.

- Except as noted, I have relied on the representations of the Joint Administrators or their representatives and other third parties concerning the value and useful condition of the assets that are the subject of this report, except as specifically stated to the contrary in this report.  I have not attempted to confirm whether or not all assets under consideration are free and clear of liens and encumbrances or that the entity has good title to all assets.

- None of the information contained within this report should be viewed as legal advice or tax advice.

## 13. CERTIFICATION

It is hereby certified that:

- The statements of fact contained in this report are true and correct.
- The analyses, opinions, and conclusions set forth in this report are limited only by the assumptions and limiting conditions (imposed by the terms of the assignment or by the undersigned) set forth by this report, and are our personal, unbiased, professional analyses, opinions, and conclusions.
- Where applicable, this Appraisal Report has been made in conformity with the requirements the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and the Statement on Standards for Valuation Services.
- Ocean Tomo has no present or contemplated future ownership interest in the Subject Assets nor any personal interest or bias in the subject matter or the parties involved.
- The Engagement of Ocean Tomo in this assignment was not contingent upon developing or reporting predetermined results.
- Neither the appraisal assignment nor the amount of the fee is contingent upon developing or reporting a predetermined value, requested minimum value, a direction in the value that favors the cause of the client, or a specific valuation, nor is our compensation contingent upon an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report, or the occurrence of a subsequent event directly related to the intended use of this report.
- The conclusions referenced herein are representative of my professional opinion.  Contributing members on this analysis include Roy D'Souza, Matthew Moyers, Joshua Gammon, Sean Sheridan, Daniel McEldowney, Peter Wilhem, and Tyler Remick.


James E. Malackowski                         Date:  January 24, 2014