# APPENDIX A



January 14, 2014

# JAMES E. MALACKOWSKI
# CURRICULUM VITAE

**James E. Malackowski** is the Chairman and Chief Executive Officer of Ocean Tomo, LLC, an integrated Intellectual Capital Merchant Banc™ firm providing an industry leading array of financial products and services related to intangible assets.  Ocean Tomo offerings include expert testimony, valuation, strategy, research, ratings, investments, risk management and transactions. Ocean Tomo assists clients – corporations, law firms, governments and institutional investors – in realizing Intellectual Capital Equity® value broadly defined.  Subsidiaries of Ocean Tomo include: Ocean Tomo Capital, LLC -- publisher of the Ocean Tomo 300® Patent Index (NYSE: OTPAT).  Ocean Tomo is the founder of the Intellectual Property Exchange International, Inc. where Mr. Malackowski serves as Co-Chairman.

Mr. Malackowski is a founding and continuous member of the IP Hall of Fame Academy.  He has been recognized annually since 2007 by leading industry publications as one of the fifty most influential people in intellectual property and /or one of the 'World's 300 Leading IP Strategists'.   In 2011 Mr. Malackowski was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy.  In 2013 he was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.

Prior to forming Ocean Tomo, he served as a finance and investment advisor working with one of the Nation's oldest investment banks as well as one of Chicago's largest private equity firms.  He began his career spending fifteen years as a management consultant and forensic accountant focused on intangible assets.   In this capacity Mr. Malackowski served numerous roles as a founding principal including Chief Executive Officer of his firm, growing the practice to the nation's largest before its sale.

Mr. Malackowski has advised clients and counsel on business valuation issues as well as all phases of the technology transfer process.  He has substantial experience as a Board Director for leading technology corporations and research organizations as well as companies with critical brand management issues.  He is Past President of The Licensing Executives Society International, Inc. as well as its largest chapter, LES USA & Canada, Inc.  Today, Mr. Malackowski focuses his non-for-profit efforts with organizations leveraging science and innovation for the benefit of children, including those located in lesser developed countries.  He is a Director of the Ann & Robert H. Lurie Children's Hospital of Chicago Research Center and has served since 2002 as a Trustee or Director of Invent Now, Inc., an organization providing summer enrichment programs for more than 90,000 students annually.  He is the Founder of the Chicago based Center for Applied Innovation (CAI), an Illinois non-for-profit corporation created to manage education, public policy outreach and related economic activity around applied technology and intellectual property rights.

Mr. Malackowski is a frequent speaker on emerging technology markets and related financial measures.  He has addressed mass media audiences including Bloomberg Morning Call, Bloomberg Evening Market Pulse, Bloomberg Final Word, CNBC Closing Bell, CNBC On the Money, CNBC Street Signs, CBS News Radio and Fox Business National Television as well as other recognized news-based internet video channels.  Mr. Malackowski has also appeared as a judge on PBS's *Everyday Edisons*.



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY ®

On more than forty occasions, Mr. Malackowski has served as an expert in Federal Court or the International Trade Commission on questions relating to intellectual property economics, including the subject of business valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, Hatch Waxman Act market exclusivity, and the equities of a potential injunction.  As an inventor, Mr. Malackowski has twenty issued U.S. patents.  He is a frequent Adjunct Instructor for graduate studies on IP management and markets and a Summa Cum Laude graduate of the University of Notre Dame majoring in accountancy and philosophy.  Mr. Malackowski is Certified in Financial Forensics, a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois.

| | |
|---|---|
| **PRINCIPAL EXPERIENCE** | Co-Founder, Chairman and Chief Executive Officer, *Ocean Tomo, LLC,* July 1, 2003 to present.  Mr. Malackowski is responsible for all aspects of the firm's merchant banking practice. |

Founder and Co-Chairman, *The Intellectual Property Exchange International, Inc.*  Mr. Malackowski guided initial product development of IPXI and recruitment of executive management.  In 2011, IPXI was funded by an industry consortium including the Chicago Board Options Exchange.  See www.ipxi.com.

President and Chief Executive Officer, *IP Equity Management, LLC,* doing business as Duff & Phelps Capital Partners, March 1, 2002 to June 30, 2003.  The firm's intellectual property structured finance efforts were consolidated with Ocean Tomo on July 1, 2003.

Principal and Founder, *VIGIC Services, LLC*, July 1, 2000 to February 28, 2002.  Mr. Malackowski identified and evaluated intellectual capital based private equity investment opportunities and served as an advisor to four completed transactions.

Principal and co-Founder, *IPC Group LLC*, August 1, 1988 – June 30, 2000.  Mr. Malackowski also held the offices of President and CEO and was a Board member / chairman of the firm.  Along with four co-founders, Mr. Malackowski grew IPC Group to become the largest professional services firm specializing in intellectual property valuation and strategy consulting.  IPC Group was sold in 1999 later changing its name to InteCap.

Executive Consultant, *Peterson & Co. Consulting*, Chicago, June 3, 1985 – July 30, 1988.  Mr. Malackowski began with Peterson as a Staff Consultant and was the firm's quickest promotion to both Senior Consultant and Executive Consultant.  Mr. Malackowski helped to establish the firm's intellectual property litigation and valuation practice.  Peterson & Co. was sold to Saatchi & Saatchi PLC in 1988.

Chairman and CEO, *JEMAN Technologies, Inc*. 1995 – 1999.  Mr. Malackowski led the company's efforts to develop new technologies related to wireless direct response services.  JEMAN was sold to ewireless, Inc. in 1999 as part of a



venture transaction funded by Bedrock Capital Partners and Tredegar Investments.



**OCEAN TOMO** ®
INTELLECTUAL CAPITAL EQUITY ®

| | |
|---|---|
| **NON-PROFIT AND ASSOCIATION EXPERIENCE** | Mr. Malackowski has been active in The Licensing Executives Society (LES) locally, nationally and internationally.  LES is the premiere global professional association of technology transfer and intellectual asset management professionals with more than 11,000 members in more than 32 countries. |

Mr. Malackowski is Past President of the Licensing Executives Society International, LLC, where his experience included the following positions:

- Chair, Past President's Council (2012 – 2013)
- President and Member of the Board (2011 - 2012)
- President Elect and Member of the Board (2010 - 2011)
- Secretary and Member of the Board (2007 - 2010)
- Member and Permanent Alternate, Board of Delegates (1992 - 2005)
- Past Chair, Membership, Investment, Education, Long-range Planning and Global Technology Impact Forum Committees.

Mr. Malackowski's term as President of LESI has been recognized for creation of the LESI Global Technology Impact Forum and concurrent Invent For Humanity™ Technology Transfer Exchange Fair; formalizing the National Presidents' Council; establishing the position of a permanent Executive Director; and, restructuring the leadership of LESI committees utilizing a Chair, Past Chair, Chair Elect ladder combined with functional responsibilities for committee Vice Chairs.  This later organizational stamp is based largely on Mr. Malackowski's experience as President of LES USA & Canada described below where he led a restructuring of the Board from a regional to a functional focus for each officer and Trustee.   As with his tenure at his national Society discussed below, Mr. Malackowski led a financial turn-around returning LESI to positive cash flow following its' only two years of loss.

Mr. Malackowski is also Past President of The Licensing Executives Society (USA and Canada), Inc. where he held numerous offices in the organization including:

- President and Member of the Board (2001 – 2002)
- International Vice President and Member of the Board (2000)
- Treasurer and Member of the Board (1996 -- 1999)
- Trustee and Member of the Board (1992 – 1996)
- Chair, Annual Meeting in Miami Beach (1998) and the Summer Meeting in Chicago (1997)

Mr. Malackowski presided over a restructuring of the LES USA & Canada Board and a financial turn-around returning the organization to positive cash flow following its only two years of loss.  Mr. Malackowski is the youngest President to hold office at LES USA & Canada as well as at LES International.

In 2007, Mr. Malackowski was the Founding Chair of the Board of Governors for what is now Certified Licensing Professionals, Inc., administrator of the Certified Licensing Professional (CLP) program for professionals in the fields of



licensing, business development and commercialization of intellectual property.  More than 1,000 individuals involved in patenting, marketing, valuation, IP law, negotiation, and intellectual asset management have earned the CLP certification.  CLP, Inc. is a 501(c)(6) organization whose mission is to elevate the licensing profession through knowledge and standards.

Mr. Malackowski extends significant time to non-profit activities directed towards a further understanding of the economic importance of innovation and intellectual property, in both the United States and developing economies.  These efforts include:

- Member, World Economic Forum Network of Global Agenda Councils (2011 - 2012)
- Director, International Intellectual Property Institute, Washington D.C., (2002 - 2007)
- Resident Advisor, U.S. Information Agency, (1999)
- Resident Advisor, U.S. Department of Commerce Commercial Law and Development Program (1997)
- Founder and Chairman, The Center for Applied Innovation, Inc. (2004 - )

In addition to his University instruction described herein, Mr. Malackowski focuses his non-for-profit efforts with those organizations leveraging science and innovation for the benefit of children.

- Director, Children's Research Fund (2013); Co-Chair Annual Fund Campaign (2013)
- Director, Invent Now, Inc. (2006 - ); Trustee and Director, National Inventors Hall of Fame, Inc. (2001 - 2006); and, Member, NIHF Board Finance Committee (2006 - ).  These organizations provide summer enrichment programs for more than 90,000 students annually including Camp Invention™ for kids in grades 1-6 (and their parents and teachers); Collegiate Inventors Competition™ for college students (and their mentors); and, Club Invention™ for kids in grades 1-6 (and their parents and teachers).
- President's Council, Chicago Museum of Science and Industry (2005 - 2011) including participation on the Education Advisory Committee (2007 - 2009) and the Alternative Revenue Committee (2008 - 2011)
- Director, Ann & Robert H. Lurie Children's Hospital of Chicago Research Center (2009 - ) including participation on the Technology Transfer Advisory Committee (2009- ) and the Strategic Planning Resources Committee (2011- )

Mr. Malackowski is the Founder of the Center for Applied Innovation, a Chicago based non-for-profit with both local and international programs.  CAI was created to manage education, public policy outreach and related economic activity around applied technology and intellectual property (IP) rights in the State of Illinois and around the world.



**OCEAN TOMO** ®
INTELLECTUAL CAPITAL EQUITY ®

- CAI created and patented the first commoditized contract for technology licensing, the Unit License Right™.  This innovation has been licensed to the Chicago-based Intellectual Property Exchange International.
- Under Mr. Malackowski's continued leadership as Chairman, CAI organizes the Invent for Humanity™ Technology Transfer Exchange Fair (InventforHumanity.org) launched in January, 2012, in Geneva, Switzerland. Invent for Humanity showcases field-ready, sustainable innovations, known as "appropriate technologies", leveraging the experience of licensing professionals to match and structure the actual transfer of such technology to meet recognized needs of emerging market economies.

Mr. Malackowski's association and non-profit activities are informed in part by his participation in the Harvard Business School Executive Education Program on Governing for Nonprofit Excellence, November 2000.

---

**RELATED OFFICES**

Berg Pharma, LLC, Member, Board of Advisors (2012 - ).

Curious Networks, Inc., Director, (1999 - 2000), Co-Chair of the Board's Strategic Partnership Committee.  Mr. Malackowski led the company's first and second round of venture funding.

ewireless, Inc. (f/k/a JEMAN Holdings, Inc. d/b/a Cellular Linking), Director, (1995-1999, 2000-2002)

Ford Global Technologies, Inc., Ford Motor Company, Director (1997 - 2001).  Mr. Malackowski advised Ford Motor Company on the original business strategy which led to the formation of FGTI.  FGTI was the largest known technology management company in the United States during Mr. Malackowski's term.

Infocast, Corporation (OTC BB: IFCC.OB), Director (2001-2002).  Member of the Audit and Compensation Committees.  Mr. Malackowski led the transition of the company's senior management team and continued U.S. based funding efforts.

Insignis, Inc., Director (2000 - 2002)  Mr. Malackowski led the company's first round of venture funding.  Insignis is a Chicago based provider of institutional financial data services.

Solutionary, Inc., Director (2000 - 2013).  Arranged and advised on Solutionary's asset acquisition of S3Networks effective August 31, 2001 and sale to strategic buyer in 2013.  Member of the Board's Compensation Committee.

TuShare, LLC, Advisor (2012 - )

422, Inc., Director (2002 - 2003)





**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY®

| | |
|---|---|
| **EDUCATION AND CERTIFICATION** | University of Notre Dame, B.B.A., Bachelor of Business Administration with majors in Accountancy and Philosophy.  Graduated Summa Cum Laude, 1985. |
| | Registered Certified Public Accountant, State of Illinois Certificate Number 41,187 issued January 16, 1986; License No. 239.007831; Expires September 30, 2015. |
| | Certified Licensing Professional, Certificate Number 1606 issued July 1, 2008; Expires June 30, 2014. |
| | Certified in Financial Forensics, American Institute of Certified Public Accountants, Certificate Number 391 issued July 31, 2008; Expires December 31, 2014. |

| | |
|---|---|
| **UNIVERSITY INSTRUCTION** | John Marshall Law School, Intellectual Property Damages (1992 - 1994) |
| | DePaul University, Intellectual Property Entrepreneurial Finance (2003) |
| | The George Washington University Law School, Intellectual Property Management (2004) |
| | The University of Chicago Graduate School of Business, Intellectual Property Investment (2004 - 2006) |
| | Indiana University Kelly School of Business, Intellectual Property Finance (2005) |
| | University of Notre Dame, Mendoza College of Business, Adjunct Instructor: |

- MBA Interterm Intensives, Intellectual Property Based Market Transactions, Valuation and Trading (Fall 2006, Fall 2008)
- MBA Executive Program, Course MBAE 70639, Intellectual Property, (Spring Semester 2008)
- MBA Program, Litigation Support and Valuation (Spring 2009)

University of California at Berkeley Haas School of Business, Innovation Markets (2008)

Chicago-Kent College of Law, Adjunct Professor of Law, IP Financial Markets and Legal Principals (Fall 2008).

Rutgers Professional Science Master's Program, Adjunct Instructor, Fundamentals of Intellectual Property (Summer 2011).

Northwestern University Kellogg School of Management, MGMT 441-61 and MGMT 441-76 Intellectual Property Management, Clinical Professor James G. Conley (Fall 2012 and Spring 2013)



OCEAN TOMO®
INTELLECTUAL CAPITAL EQUITY®

University of Texas McCombs School of Business, MBA Course:  Open Innovation, Professor Sirkka Jarvenpaa (Spring 2013)

---

**ACTIVE MEMBERSHIPS**

American Institute of Certified Public Accountants (1985 -)
The Economic Club of Chicago (1990 -)
The Licensing Executives Society (1988 - )
Young Presidents' Organization (2006 - )

---

**RECOGNITION AND AWARDS**

Individually, Mr. Malackowski has been recognized for his expertise as well as his work in developing markets for intellectual property transfer including:

- Inductee, Chicago Area Entrepreneurship Hall of Fame as selected by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration,  (2013; 28th Year of Program)
- Named as 1 of 50 Individuals, Companies and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011.
- "IP Personalities of 2008", *IAM blog* by Joff Wild, Editor
- "World's 300 Leading IP Strategists", *IAM Magazine* (2012-2013)
- "World's 250 Leading IP Strategists", *IAM Magazine* (2009-2011)
- "50 Under 45", *IP Law & Business*™ (2008)
- "The Most Influential People in IP", *Managing Intellectual Property*™ (2007)
- Member, IP Hall of Fame Academy (2007- )
- Mediator and Arbitrator, World Intellectual Property Organization, (1994)

Ocean Tomo as a firm has been likewise recognized for its accomplishments including:

- Ocean Tomo was honored in 2011 with the "Best of Chicago Award in Investment Advisory Services" by the U.S. Commerce Association (USCA).
- In addition to Mr. Malackowski, Ocean Tomo as a firm was named as 1 of 50 Individuals, Companies and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011 and the only firm other than Microsoft (2 of 50 mentions) to be recognized multiple times (5 of 50 mentions).
- The firm's Chicago office was presented the *2011 Alfred P. Sloan Awards for Business Excellence in Workplace Flexibility* after having been finalist for scoring in the top 20% of all firm's measured nationally.
- Ocean Tomo was recognized in 2010 by Corporate Voices for Working Families for its work-life balance as part of the National Workplace Flexibility Campaign published by *USA Today*.
- Ocean Tomo was recognized as a juried Finalist for the Illinois Technology Association 2010 CityLIGHTS Award for raising the stature of the Illinois technology industry.



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY®

- Selected as case study organization for Haas School of Business, University of California, Berkeley (2009)
- Selected as case study organization for Harvard Business School MBA Program (2008)
- Ocean Tomo was named one of 20 small and mid-sized firms recognized as the "Best Places to Work in Illinois" by Best Companies Group in a competition sponsored by the Illinois Chamber of Commerce and the Illinois State Council Society for Human Resource (2007)
- Ocean Tomo Auctions received the 2006 Chicago Innovation Award for most innovative new product or service introduced between January 1, 2005, and July 31, 2006, that uniquely satisfied unmet needs in the marketplace. The award was presented by Kuczmarski & Associates and the *Chicago Sun-Times*.
- Ocean Tomo Auctions was awarded the Department of Commerce Technology Administration & National Knowledge & Intellectual Property Management 2006 Innovator of the Year Award.
- Ocean Tomo was recognized as a "Top Ten IP Newsmakers of 2006" by *IP Law & Business*, Almanac 2006.

Numerous authors and graduate business programs have written case studies about Ocean Tomo and its affiliates including:

- Chesbrough, Henry, Open Business Models: How to Thrive in the New Innovation Landscape, Copyright 2006.
- Harvard Business School Case Study
- Houle, David, The Shift Age, Copyright 2007.
- Houle, David, Entering the Shift Age, Copyright 2013.
- Kuczmarski, Thomas D., Dan Miller and Luke Tanen, Innovating Chicago-Style:  How Local Innovators Are Building The National Economy, Copyright 2012.
- University of California Business School Case Study

---

**RELATED U.S. SPEECHES AND PUBLICATIONS**

"The Determination of a Reasonable Royalty: Hypothetical Negotiation v. A General License Agreement", The Licensing Executives Society, Chicago Chapter, December 8, 1987.

"The Business Economics of Technology Development", The Licensing Executives Society, New England Chapter, February 9, 1988.

"The Importance of Protecting Intellectual Property Through Corporate Transition", Licensing Executives Society, National Meeting, October 18, 1989, Moderator.

"Valuation of Intellectual Property Rights", The Chicago Bar Association, March 6, 1990.



"Dispute Resolution -- There Are Alternatives!", Licensing Executives Society, National Meeting, October 22, 1990.

"How to Value a License", Adding to the Bottomline Through Licensing, LES / John Marshall Law School, November 1, 1990.

"An Advanced Discussion on Licensing and Patent Damages", Licensing Executives Society, National Meeting, October 28, 1992.

"An Advanced Discussion on Patent Damages", Licensing Executives Society, National Meeting, October 18, 1993.

Royalty Provisions in Technology License Agreements, Technology Transfers, American Conference Institute, November 15 & 16, 1993.

"Commercializing Technology and the Intellectual Property Quality Management Imperative", Technology Transfer, American Conference Institute, June 20 & 21, 1994.

"How to Accurately Value Software", The Software Protection and Litigation Institute, July 28 & 29, 1994.

"IP Damages Advanced Case Studies", Licensing Executives Society, National Meeting, October 19, 1994.

"Preparation and Presentation of Damages by Outside Consultants", AIPLA Mid-Winter Meeting, February 1, 1995

"Damages Discovery - An Expert's Perspective", Intellectual Property Law Association, New York, December 15, 1995.

"Pre-Litigation Damages Techniques: Patents and More", The Intellectual Property Strategist, March, 1996.

"Corporate Exposures to Copyright, Patent, Trademark, and Trade Secret Claims", Digital Bullets - Digital Shields: A Financial Perspective, American Conference Institute, New York, March 5, 1996.

"IP Management and Taxation - How companies are proactively managing IP assets to maximize shareholder value, including measuring contribution of IP protection to corporate value", American Bar Association, Virginia, April 11, 1996.

"Effectively Select & Use Experts in Trademark & Copyright Cases", AIPLA Spring Meeting, Boston, May 1, 1996.

"The Industry-University Interface: Mechanisms For Technology Transfer", 1996 AUTM Central Region / Licensing Executives Society Chicago Chapter, Chicago, July 21, 1996.



"Valuing Health Care Technologies", Licensing Executives Society Winter Meeting, South Carolina, March 13, 1997.

"Creative Marketing & Packaging - How to Differentiate Yourself in a Competitive Market", CTIA Annual Meeting, Atlanta, February 23, 1998.

"Intellectual Property Valuation: The Latest Techniques from Boardroom and Courtroom", Patent Law Association of South Florida Annual Meeting, Fort Lauderdale, October 22, 1998.

"The Aftermath of *Rite-Hite v. Kelly*", 16th Judicial Conference of the U.S. Court of Appeals for the Federal Circuit, Washington D.C., April 6, 1999.

"Expert Admissibility After Daubert", Wisconsin Academy of Trial Lawyers, Milwaukee, December 3, 1999.

"Intellectual Property Strategic Planning: a Corporate Perspective", Research Directors Association of Chicago, Winter Meeting, January 10, 2000.

"Intellectual Property Asset Management: Linking IP and Corporate Strategy", 44th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School, Chicago, February 25, 2000.

"Boost Your Client's Intellectual Capital IQ: Get Top Management Involved", Corporate Legal Times, October 2000, p. 104.

"Strategic and Financial Opportunities for Privately Held and Public Middle Market Companies:  Building Shareholder Value", The Standard Club, Chicago, October 5, 2000.

"Commercializing Intellectual Capital Through Venture Funding", LESI Expanded Board of Directors Meeting and Seminar, Delray Beach, Florida, January 26, 2001; LES Chicago Meeting, May 10, 2001.

"New Paths to Growth:  Joint Ventures and Accessing Equity Capital", Panel Presentation and Discussion, LaSalle Street Project Economic Summit, Chicago, May 10, 2001.

*ViewPoints*, The Newsletter of the Licensing Executives Society (U.S.A. and Canada), Inc., President's Column: Vol. VIII No. 5, Nov. / Dec. 2001, "President Changes the Way LES Does Business";  Vol. VIV No. 1, Jan. / Feb. 2002, "It's Time To Count Our Intellectual Assets"; Vol. VIV No. 2; Vol. VIV No. 3, May / June 2002, "Mid-Year Review"; Vol. VIV No. 4, July / August 2002, "Ethical Issues Related To Intellectual Property".

"Venture Investment Grounded In Intellectual Capital", From Ideas To Assets: Investing Wisely in Intellectual Property, Edited by Bruce Berman, John Wiley & Sons, Inc., 2002.



OCEAN TOMO®
INTELLECTUAL CAPITAL EQUITY®

"Current Issues in Accounting for Intangibles", Congressional Economic Leadership Institute, Panel Presentation and Discussion with Steven H. Wallman, Former Commissioner, United States Securities and Exchange Commission, Washington, DC, May 1, 2002.

"Intellectual Capital Based Corporate Carve-outs: Strategy, Structure and Funding", James E. Malackowski and Suzanne Harrison, The LESI Guide to Licensing Best Practices, Edited by Robert Goldscheider, John Wiley & Sons, Inc., 2002.

"Intellectual Property Finance: Securitization to Venture Capital", American Bar Association Intellectual Property Law Conference, Philadelphia, June 28, 2002.

"The IIPI Roundtable: The New Emphasis on Patent Value – Opportunities and Challenges", Washington DC, July 22, 2002.

"Moving Technology from University to Marketplace: Business Creation and the Venture Capital Community, Licensing Executives Society Annual Conference, Chicago, September 24, 2002.

"Presidents' Forum on Intellectual Property: A Leadership Discussion with The Licensing Executives Society, the American Intellectual Property Law Association, the Association of University Technology Managers, the Intellectual Property Owners Association, The National Inventors Hall of Fame, and BIO", Licensing Executives Society Annual Conference, Chicago, September 24, 2002.

"Extracting Value From Your Intellectual Asset Portfolio: Ensuring ROI from IP and Technology Assets", World Research Group, November 22, 2002, Chicago, Illinois.

"Licensing", American Intellectual Property Law Association 2003 Mid-Winter Institute, Marco Island, Florida, January 22 – 25, 2003.

"Cashing in on Chicago: A Closer Look at Liquidity in the Heartland", The Executives' Club of Chicago, Panel Discussion, February 11, 2003.

Conference Chair and Speaker, "Optimizing Valuation & Value Realization of your IP/Intellectual Assets", World Research Group, Las Vegas, February 27-28, 2003.

Live Webcast, "Turning Your Intellectual Property into Cash", Ernst & Young Business Insights, April 28, 2003.

Intermediate PDS Workshop: Application of Private Equity and Leveraged Finance Investing to Intellectual Property, LES / AUTM Summer Meeting, Philadelphia, May 8, 2003.

World Research Group, Advanced Intellectual Property Structured Finance, Conference Co-Chair Person, New York City, June 29-30, 2003.



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY®

The Conference Board, The 2003 Conference on Intellectual Asset Management & Value Reporting, "Application of Private Equity and Leveraged Finance Investing to Intellectual Property", Chicago, June 4, 2003.

Intellectual Property and Information Technology for Investment Funds, "Intellectual Capital Equity Management", Panel Discussion Sponsored by Schulte Roth & Zabel, New York City, June 18, 2003.

Chicago Capital Access Forum III, "Private Investors: The Case for Domestic Emerging Market Investments", Panel Discussion, Chicago, June 26, 2003.

Pension Consultants' Forum, "Extracting Value from Private Equity Investing", World Research Group, Chicago, July 22, 2003.

Midwest Intellectual Property Institute, "Intellectual Capital Equity Management", Minneapolis, September 19, 2003.

"Intellectual Asset Strategies", Add-On Seminar at the 2003 Licensing Executives Society Annual Meeting, San Diego, September 25, 2003.

"Leveraging Intellectual Property", Keynote Speaker, Thomson Financial Thought Leadership Forum, New York, October 8, 2003.

"Beyond Licensing: Innovative Techniques for Extracting Value", Advanced Forum on Licensing Intellectual Property, San Francisco, December 9, 2003.

<u>Intellectual Asset Management</u>, *Column:  IP Merchant Banker*, Douglas R. Elliott & James E. Malackowski, Issue 01, "Challenges of the Fifth Epoch", July / August 2003; Issue 02, "What the Market Fortells", September / October 2003; Issue 03, "Economics, Ethos and Intellectual Ethics", December / January 2004; Issue 04, "Patent Predictions – facts or fictions?", February / March 2004; "Wealth management in the age of patents", June / July 2004; "Patent pools – the 80% solution", August / September 2004.

"Intellectual Capital Equity Management:  IP as an Asset Class", Minnesota State Bar Association Continuing Legal Education, Minneapolis, January 15-16, 2004.

"Understanding the Motivations Behind an IP Structured Finance Transaction", "Analyzing the Anatomy of A Patent-Based Structured Finance Transaction", World Research Group, New York, January 21-22, 2004.

"Managing Your Intellectual Property", Investment Banking for Women / Minority Owned Business Enterprises, Annual Forum, Conference Co-Chairperson, Chicago, March 3-5, 2004.

"Private Equity: Investor Capital for Mature Businesses", Dream*Makers* Forum 2004, Santa Barbara, California, March 7 – 10, 2004.



**OCEAN TOMO**®

INTELLECTUAL CAPITAL EQUITY®

"IP Finance:  Convergence of IP Valuation and Value Creation", World Research Group 2nd Annual Strategies and Solutions for Optimizing IP Valuation & Value Creation, Chicago, March 23 – 24, 2004.

"Leveraging the Value of Intellectual Property", Creating, Managing & Valuing an Intellectual Property Portfolio, Vedder Price Conference Series, Chicago, April 28, 2004.

"Federal Circuit Damages Decision Emphasizes the Importance of Sound Economic Models", IP Review, McDermott Will & Emery, with Robert M. Hess, Spring 2004.

"Intellectual Property Merchant Banking:  Leveraging Corporate Intangible Assets", The Licensing Executives Society (U.S.A. & Canada), Inc., Fairfield-Westchester Counties Chapter, June 23, 2004.

"Intellectual Property Financing and Securitization:  Conclusions and Future Implications for Financing the IP Market", New York, New York, July 21, 2004.

"Emerging Financial Concepts in IP Asset Management", Mining Patent Portfolios, Seattle, Washington, September 13, 2004.

"Intellectual Property Investment", National Institutes of Health, Commercialization Assistance Program, Larta Institute, Chicago, November 12, 2004.

"Using Intellectual Property to Grow", The Beacon, Chicagoland Entrepreneurial Center, Volume 3, Issue 4, December 10, 2004.

"Techniques for Assessing the Value of Your IP Portfolio", The Wall Street Transcript Intellectual Property Conference, New York, January 27, 2005.

"The Tipping Point:  Assessing Major Challenges and Growth Opportunities in IP Finance", Moderator, The 3rd Annual Advancing IP Structured Finance World Research Group Conference", New York, February 3, 2005.

"Commerce One IP Auction", Optimizing IP Valuation and Value Creation, World Research Group Conference, Miami, March 30-31, 2005.

"Intellectual Capital Equity Management: IP As An Asset Class", Minnesota Continuing Legal Education Conference, Minneapolis, May 12, 2005.

"Techniques for Evaluating IP Potential", Life for After Rembrandts, Law Seminars International, Chicago, Illinois, August 4, 2005.

Keynote Address, 2nd Annual Intellectual Property Financing and Securitization Summit, New York, September 26, 2005.



OCEAN TOMO®
INTELLECTUAL CAPITAL EQUITY®

"The Power of Intellectual Property in Private Equity Deals", Association for Corporate Growth and The Licensing Executives Society Connecticut Chapters, Greenwich, Connecticut, October 6, 2005.

"Maximizing the Value of Distressed Debt Backed by Intellectual Property", Financial Research Associates Distressed Debt Summit 2005, New York, October 7, 2005.

"To Sell or Not to Sell", Licensing in the Boardroom 2005, a supplement to Intellectual Asset Management magazine, 2005.

Patent Auctions & Marketplaces: Leveraging Value from Under-employed Technologies, IP Master Class Presentation, Washington DC, January 10, 2006.

"Risky Business: Overlooking Patents as Financial Assets", Making Innovation Pay, Edited by Bruce Berman, Published by John Wiley & Sons, Inc., 2006.

"The State of Development & Current Trends in IP Structured Finance" and "The Tipping Point: Assessing Major Challenges, Growth Opportunities and Future Trends in IP Finance", Moderator, The 4th Annual Summit on IP Structured Finance, New York, March 22-23, 2006.

"Generating Revenue From Your Inventions", IIR 2nd Annual Summit on IP Rights for Financial Services, New York, April 25-26, 2006.

"A Behind the Scenes Look at the Patent Bazaar: How Companies and Industry Are Buying and Selling Patents", Innovators in IP Litigation, IP Law & Business, San Jose, California, May 17, 2006.

"Patent Markets and Their Impact to R&D Strategy", Industrial Research Institute Annual Meeting, May 21-24, 2006, Colorado.

USC Gould School of Law 2006 Intellectual Property Institute; Featured Speaker, "A Final Word"; Panelist, "Patent Trolls: The Good, the Bad and the Ugly"; May 23, 2006, Los Angeles.

"Patent Auctions: Past, Present & Future", The 50th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School Center for Intellectual Property Law, May 25-26, 2006, Chicago.   Speech published as "The Intellectual Property Marketplace: Past, Present and Future", 5 J. Marshall Rev. of Intell. Prop. L. 605, (2006)

"Patent Auctions: Risky Endeavor or Legitimate Market Opportunity?", Strafford Legal Teleconference Presentations, June 8, 2006.

The Intellectual Property Investment Summit:  Connecting Investors with Strategic Intellectual Property Opportunities, Presented by the Center for Applied Innovation, Summit Co-Chairperson, June 15, 2006, Chicago.



Innovative Structures for Acquiring Intellectual Property:  The Benefits,
Challenges and Process, LSI Law Seminars International, Program Co-Chair,
July 17, 2006, Chicago.

"Licensing and Intellectual Property", Chicago Regional Independent Inventor's
Conference, Presented by the United States Patent and Trademark Office,
Northwestern University School of Law, and the National Inventors Hall of
Fame Foundation, July 28-29, 2006, Chicago.

"Reinventing the IP Marketplace – The Exclusive Ocean Tomo Patent Auction
Case Study", IP Licensing Summit: Practical Strategies to Maximize Revenue in
Today's Challenging Intellectual Property Marketplace, August 21-23, 2006,
New York.

"Unlocking the Value of Intellectual Property Rights", Conference of the
International Bar Association, September 20, 2006, Chicago.

"This Too Shall Pass", Americas IP Focus 2006, Managing Intellectual Property
Rights, Copyright, Euromoney Institutional Investor, PLC, 2006.

"Developing Markets for Intellectual Assets and Technology", 21st Annual
Intellectual Assets and Technology Law Institute, October 5 & 6, 2006, Irving,
Texas.

"Patent Damages" and "Patent Reform Efforts: An Update and Review", The
Sedona Conference Patent Litigation VII, October 12-13, 2006, Sedona,
Arizona.

"Patent Auctions", 44th Annual Intellectual Property Law Conference, The
Center for American and International Law, November 9-10, 2006, Plano,
Texas.

"The Future of Developing IP Markets", 3rd Annual Monetization of Intellectual
Property & Intangible Assets, Strategic Research Institute, November 16-17,
2006, Boston.

"The IP Transactional Landscape", Economics of IP Based Transactions,
National Knowledge & Intellectual Property Management Taskforce Series
Program, November 29-30, 2006, Washington, D.C.

Keynote Presentation, The Business of Intellectual Property Conference, Tech
Council of Maryland, Rockville, Maryland, January 10, 2007.

Luncheon Speaker, Corporate Intellectual Property Roundtable, Georgia State
University College of Law, Atlanta, January 24, 2007.

"Patent Markets", American Intellectual Property Law Association, 2007 Mid-
Winter Institute, New Orleans, January 24-27, 2007.



# OCEAN TOMO®

### INTELLECTUAL CAPITAL EQUITY®

"Assessing the Real Value of Your IP Portfolio" and "Growing IP Impact on Public and Semi-Public Markets", The 5th Annual Summit on Monetizing, Financing & Securitizing IP, New York, January 30-31, 2007.

"Ocean's 300", Moderator, World Intellectual Property Review 2007, pp. 16-20.

"The Intellectual Property Marketplace: Emerging Transaction and Investment Vehicles", Co-author with Cardoza, Gray and Conroy, *The Licensing Journal*, Aspen Publishers, Vol. 27, No. 2, pages 1 - 11, February 2007.

"The Importance of Emerging Intellectual Property Market Opportunities to the City of Chicago", Keynote Speaker, Notre Dame Club of Chicago Meeting, Chicago, March 8, 2007.

"The Intellectual Property Marketplace", Harvard Business School Club of New York, New York, April 12, 2007.

Keynote Address, BRICs & Mortar: Technological Drivers in Booming Economies of Brazil, Russia, India and China, Northwestern University Journal of Technology & Intellectual Property Second Annual Symposium, Chicago, April 13, 2007.

"Innovation Measurement:  The Economic Impact of Patent Value", Co-author with Barney, Cardoza, Walker and Gray, Submission to United States Department of Commerce Economics and Statistics Administration, Pursuant to Notice in the Federal Register, Vol. 72, No. 71, 18627, May 11, 2007.

"Objective Patent Valuation", Business Meeting, Association of Corporate Patent Counsel, Newport, Rhode Island, June 27, 2007.

"Intellectual Property Exchange Chicago", a two day symposium presented by The National Knowledge & Intellectual Property Management Taskforce and The Center for Applied Innovation, Moderator and Speaker, July 17 – 18, 2007, Chicago.

"Start-up Stories: Tales from the Front Line", TiE Midwest, August 1, 2007, Chicago.

Keynote Address, Notre Dame Financial Executives Alumni Conference, September 21, 2007, South Bend, Indiana.

"The Birth of an IP Marketplace", Missouri Bar Association Seminar, November 2, 2007, St. Louis, Missouri.

"Market Forces and IP", The Giles S. Rich American Inn of Court, Howard University, January 17, 2008.

"Market for Technology:  Challenges and Opportunities", Panel Discussion on Impediments to Technology Markets, Duke University's Fuqua School of Business, February 20, 2008.



# OCEAN TOMO®
### INTELLECTUAL CAPITAL EQUITY®

"IP Markets – An Intangible Walk Down Wall Street", Keynote Address, Securities Industry and Financial Markets Association, March 11, 2008, New York.

"Patent Valuation, Is there One or Many?", Mini-Plenary Session of the High Tech Sector, The Licensing Executives Society International Annual Meeting, May 7, 2008, Chicago.

"What is Patent Quality – A Merchant Banc's Perspective", with Jonathan A. Barney, *les Nouvelles*, June 2008, p. 123 – 134.

"Intangibles in the Firm and Financial Markets", *Intangible Assets: Measuring and Enhancing Their Contribution to Corporate Value and Economic Growth*, The National Academies, Washington DC, June 23, 2008.

"Developing IP Markets:  Opportunity for the Financial Services Industry", Keynote Address, The 5th Annual Patents & The Financial Services Industry Symposium, New York, July 29, 2008.

"New Trends in Monetizing IP Rights:  Trolls, Licensing and Securitization", *Managing Intellectual Property* Webinar, September 3, 2008.

"Magnificent Mile – Shopping for the Ideal IP Expert", DRI Intellectual Property Litigation Seminar, September 4-5, 2008, Chicago.

From Assets to Profits: Competing for IP Value and Return, Contributing Author, Edited by Bruce Berman, John Wiley & Sons, November 2008.

Ocean Tomo:  The New Kid on the (Auction) Block is All Grown Up, Institute for Law and Technology, 46th Annual Conference on Intellectual Property Law, November 10 – 11, 2008, Plano, Texas.

Federal Trade Commission:  The Evolving Intellectual Property Marketplace, Keynote Address, Public Hearings, April 17, 2009, Washington, DC.

"Protecting and Commercializing New Ideas", CoreNet Global Chicago Chapter Meeting, Chicago, May 13, 2009.

"The Future of the IP Marketplace", Moderator and Plenary Speaker, IP Markets 2009, Chicago, July 23, 2009.

"Staying Ahead of the Curve – Strategic Intelligence, Value Assessments and Monetization in a Highly Competitive Economy", The 6th Annual Patents & The Financial Services Industry Conference, New York City, July 28-29, 2009.

"Helping Companies in a Down Economy: Strategic Planning for Identifying and Valuing Your IP", American Bar Association Annual Meeting, Chicago, July 31, 2009.



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY ®

"Managing IP During Uncertain Times", NanoBusiness Alliance Conference, Chicago, September 8, 2010.

National Economic Framework for Intellectual Property Based Commerce, A Research Report by the National Knowledge & Intellectual Property Management Taskforce, Net Worth Press, 2009.

"The Role of IP in Tough Economic Times and How to Use it to Your Advantage:  Corporate Recovery and Restructuring", Licensing Executives Society Annual Meeting, San Francisco, October 19, 2009.

"Global IP Market Development", 11th Annual Utah IP Summit, Salt Lake City, February 13, 2010.

"Law, Economics, Business and Policy Implications for Innovation and Competition of Diverse Business Models for Using Patents", Stanford University Hoover Institution Annual Conference, Stanford, California, June 25, 2010.

"Establishing an Objective Value of IP", IPO Annual Meeting, Atlanta, September 14, 2010.

"Intellectual Property and the Marketplace:  Hot Topics Impacting the Role of Patents, Trademarks and Copyrights in Today's Business World", Vedder Price Illinois Continuing Legal Education Forum, Chicago, October 6, 2010.

"IP Essentials for the Chief Executive Officer", Illinois Technology Association, Chairman's Dinner Keynote Speaker, Chicago, October 20, 2010.

"Valuation of IP in Emerging Market Platforms", 2010 IP Damages Institute, CalCPA Education Foundation, Los Angeles, November 8, 2010.

"Shifting Sands:  What is Discoverable and Admissible for Damages, Willfulness and Other Purposes", Intellectual Property Owners Association CLE Roundtable, Washington, DC, March 21, 2011.

"Intellectual Property: From Asset to Asset Class", Intellectual Property Strategies for the 21st Century Corporation, Bryer, Lebson & Asbell Editors, John Wiley & Sons, Inc., 2011.

"The Next Big Think in Monetizing IP: A Natural Progression to Exchange-Traded Units", Ian D. McClure co-author, *LANDSLIDE*, A Publication of the ABA Section of Intellectual Property Law, Volume 3, Number 5, May/June 2011, pp. 32-37.

"Risk Management Strategies to Defend Against Patent Trolls and the New Trend in Patent Royalty Trusts", 2011 Congress on Patent Strategies for the Financial Services Industry, New York, September 19-20, 2011.



**OCEAN TOMO®**
INTELLECTUAL CAPITAL EQUITY®

"Patent Quality and its Impact on Valuation", Licensing Executives Society United States and Canada, Inc., Annual Meeting, San Diego, October 17, 2011.

Introduction, "LESI Global Technology Impact Forum (GTIF) Creates Tech Transfer Platform", *les Nouvelles*, Journal of the Licensing Executives Society International, Volume XLVII No. 2, June 2012.

Panelist, "IP Monetization", McDermott Will & Emery 2012 Intellectual Property Symposium, Chicago, June 14, 2012.

Keynote Address, Northwestern Law Fifth Annual Conference on Entrepreneurship and Innovation, Chicago, June 14, 2012.

"IP Market Development", 38th Annual Intellectual Property Law Summer Institute, Sponsored by the Intellectual Property Law Section of the State Bar of Michigan, Traverse City, Michigan, July 21, 2012.

"An Investors' Perspective on IP", CenterForce IP Strategy Summit, New York City, New York, November 13, 2012.

"Investing in IP", DealFlow Media Webinar, January 10, 2013.

"Evolving IP Marketplace", American Intellectual Property Law Association, Mid-Winter Meeting, Tampa, Florida, February 1, 2013.  Includes paper: *New Emphasis on the Analytical Approach of Apportionment In Determination of a Reasonable Royalty* by James E. Malackowski, Justin Lewis and Robert Mazur.

"An Inventor's Walk Down Wall Street", PatCon 3 at Illinois Institute of Technology Chicago-Kent School of Law, Chicago, April 12, 2013.

*Report on Judge Rader Comments at the 2013 LESI Annual Conference*, LES Global News, Vol. XLVIII No. 2, June 2013.

"Strategic Insights", Plenary Panel Discussion, IPBC 2013, IP Business Congress, Boston, June 9, 2013.

"IP and Antitrust", Panel Discussion, McDermott 2013 IP Symposium, June 13, 2013, Chicago.

*IP Investments and Markets* Presented by the Center for Applied Innovation, Panelist on IP Marketplace, Chicago, June 25-26, 2013.

*Capturing Innovation*, Irish Entrepreneurs:  An Affiliate Group of the Notre Dame Club of Chicago, Chicago, September 5, 2013.

*Preventing the Napsterization of 3D Printing:  Areas for Industry Collaboration and Transparency*, Inside 3D Printing Conference and Expo, San Jose, California, September 18, 2013.



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY®

*The Latest Thinking about Non-Practicing Entities*, 2013 AIPLA Annual Meeting, Washington, DC, October 25, 2013.

*Challenges and Opportunities in Asia*, Think Asia, Think Hong Kong: IP, Technology & China/U.S. Opportunities, The Hong Kong Business Association of the Midwest, Chicago, November 19, 2013.

*Rationalizing Remedies,* The 2013 Patent Institute presented by Cravath Swain & Moore, New York, December 5, 2013.

---

**INTERNATIONAL SPEECHES AND PUBLICATIONS**

"Taxation Issues when Licensing with the U.S.", Licensing Executives Society International, South Africa Conference, January 28, 1996.

"Intellectual Property Damages: Advanced Case Studies", Licensing Executives Society Annual Meeting, Puerto Rico, September 30, 1996.

"License Agreement Royalty Audits: Untapped Riches Or Fool's Gold?", Licensing Executives Society Annual Meeting, Puerto Rico, October 1, 1996

"Valuation of IPR", Conference on Appeals Related to Intellectual Property, Bucharest, Romania, November 20, 1997.

"Avaliacao e Contabilizacao de Propriedade Intellectual – Metodologia e Aspectos Fiscais", XIX Seminario Nacional de Propriedade Intellectual, Rio de Janeiro, Brazil, August 16, 1999.

"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Sao Paolo, Brazil, August 18, 1999.

"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Curitiba, Brazil, August 20, 1999.

"IP Valuation Trends", Licensing Add-on Seminar, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 21, 2000.

"Intellectual Property from a Board Room Window", Plenary Session II LESI Strategies, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 23, 2000.

"Due Diligence in an Intellectual Capital Focused Investment", LES Annual Conference Add-on Session, Toronto, September 14, 2000.

"What's New in Intellectual Property Asset Management", Panel Discussion, 8th Annual Intellectual Property Law Institute, State Bar of Georgia,  Puerto Vallarta Mexico,  November 15, 2002.



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY®

"Les brevets en tant qu'actifs economiques: comment les exploiter au mieux" and "Brevets et financement: couvrir les couts, trouver des investisseurs", Un System Du Brevet Competitif Pour L'Europe,  sponsored by the European Patent Office, Brussels, May 3-4, 2006.

"What is Patent Quality?", Co-author with Jonathan A. Barney, Paper Presented to the Colloquium on a Comprehensive Approach to Patent Quality, Federation Internationale Des Conseils En propriete Industrielle, Amsterdam, June 8-9, 2007.

"Fostering Innovation with Seed Money and Venture Capital", Licensing Executives Society International Annual Conference, Zurich, June 19, 2007.

"Legal Problems Arising from Auctioning of IPR", Bi-Annual International Forum, Association Internationale Pour La Protection De La Propriete Intellectuelle, October 6, 2007.

"IP Auctions", Plenary Address, The Licensing Executives Society Annual Meeting, October 16, 2007, Vancouver, Canada.

"IP Valuation for IPO's", Warsaw Stock Exchange Executive Conference, June 27, 2008, Warsaw, Poland.

"IP As A Business Tool", Licensing Executives Society International Conference, January 29-30, 2009, New Delhi, India.

"Global IP Market Development", Keynote Address, The Licensing Executives Society Australia and New Zealand, April 2-4, 2009, Camberra, Australia.

"Global IP Market Development", The Licensing Executives Society Philippines, June 8, 2009, Manila, Philippines.
Entwicklung einer Infrastruktur im Blickpunkt, Der Intellectual Property Exchange, *IP Manager:  Journal for the Knowledge Economy*, 01/2009.

"Global IP Market View", Division des Analyses Economiques et des Statistiques, Organization de Cooperation et de Developpement Economiques, January 8, 2010, Paris, France.

"Global IP Market View", BusinessEurope Patents Working Group Meeting, The Confederation of European Business a.l.a.b.l., January 28, 2010, Brussels, Belgium.

"Global IP Market View", Inaugural Annual Conference, LES Turkey, January 29, 2010, Istanbul, Turkey.

"Commercialization Strategies for Industrial Property Assets", LES Brazil Annual Congress, January 28, 2011, Rio de Janeiro, Brazil.

"Developing Commercial IP Markets", LES Arab Countries and Abu Dhabi Higher Colleges of Technology Seminar, October 12, 2011, Abu Dhabi, UAE.



OCEAN TOMO®
INTELLECTUAL CAPITAL EQUITY®

"Asian IP Market Development", LES Asia Pacific Meeting, LES Singapore, November 9-10, 2011, Singapore.

"Patent Auctions & Technology in an Emerging Global Economy", LES Philippines, November 16, 2011, Manila.

"Tech Transfer for Humanitarian Purpose", LESI Annual Conference, April 2, 2012, Auckland.

Moderator, "New Challenges in ICT:  How to Compete Using IP Assets", LES Pan European Meeting, Rome, June 12, 2012.

Workshop Panelist, "Accelerate Licensing & Avoid Litigation: Effective Use of Transparency, Investors & Risk Management Tools", LES Pan European Meeting, Rome, June 12, 2012.

Keynote Speech, "Research Trends Around the Globe on Licensing", LES Asia Pacific Regional Conference, Tokyo, Japan, September 3, 2012.

"Investing in IP and Developing IP Monetization and Risk Markets: U.S. Perspective", LES Scandinavia Annual Meeting, Helsinki, Finland, September 12, 2012.

"El Mercado Global De Tecnologia", LESI Innovation Tour, LES Mexico and Asociacion Mexicana de Directivos de la Investigation Aplicada y el Desarrollo Tecnologico, A.C., Mexico City, Mexico, September 21, 2012.

Research Handbook on Intellectual Property Licensing, Forward, Jacques de Werra, University of Geneva, Editor, Edward Elgar Publishing, 2012.

"Markets for Humanitarian Technology Transfer" and "Adoption by Resolution of LESI IP Business Principles", LESI Global Technology Impact Forum, Geneva, Switzerland, January 22, 2013.

Forward, Research Handbook on Intellectual Property Licensing, Edited by Jacques de Werra, Edward Elgar Publishing Limited, 2013.

"IP Market Development" / "Simplicity in Global IP Valuation", LESI Annual Conference, Rio de Janeiro, Brazil, April 10, 2013.



**OCEAN TOMO** ®

INTELLECTUAL CAPITAL EQUITY ®

---

**TELEVISION, RADIO AND EDITORIAL**

Bloomberg Morning Call with Brian Sullivan, "Patent Auctions", March 3, 2006.

CNBC Closing Bell, "Patents for Purchase", Interview with Maria Bartilomo, April 4, 2006.

CNBC On the Money, "Patents for Sale", Interview and Report by Scott Wapner, April 7, 2006.

Bloomberg Morning Call with Brian Sullivan, "Ocean Tomo 300 Index" and "Fall Intellectual Property Auction", September 13, 2006.

CBS WBBM-AM News Radio with Andy Giersher, Noon Business Hour, "New Stock Market Index", December 2, 2006 plus repeats.

Bloomberg Evening *Market Pulse* with Pimm Fox, "Stock Selections with Strong Patents", January 9, 2007.

Judge, *Everyday Edisons: Ordinary People, Extraordinary Ideas*, a Public Broadcasting System documentary series, 2nd Season, to be aired 2008.

Bloomberg Final Word with Brian Sullivan, "Changes in IP Laws Affect Stock Price", March 10, 2008.

FOX Business National, "Investing in Patents", June 5, 2008.

"It's the auto technology, Congress", *The Detroit News*, detnews.com, December 2, 2008.

FOX Business National, "Capturing Value from IP During a Recession", January 12, 2009.

FOX Business National, "The Value of Technology and Patents in a Chrysler Bankruptcy", May 1, 2009.

FOX Business National, "Exchange Looks to Value Patents", October 5, 2009.

TV Tokyo, "IP Markets, October 4, 2010.

FOX Business National, "Patent Litigation Trends", October 4, 2010.

CNBC Street Signs, "Patent-Palooza", July 26, 2011.

CNBC Street Signs, "Patent Battleground", August 15, 2011.

CNBC Street Signs, "IPXI: Trading Patents in 2012", December 14, 2011.



CEO IntroNet, May 16, 2012.

CNBC Street Signs, "Research In Motion's Patent Portfolio, May 30, 2012.

<u>Crain's Chicago Business</u>, Chicago Business Video, "Preview of the Eureka Index", April 25, 2013.

CNBC Street Signs, "Valuing Intangible Assets", August 5, 2013.

---

**EXPERT TESTIMONY**

01 Communique Laboratory, Inc. v. Citrix Systems, Inc. & Citrix Online, LLC
Civil Action 1:06-CV-0253 (N.D. Ohio)
United States District Court for the District of Massachusetts
Deposition Testimony

Advanced Technology Materials, Inc. v. Praxair, Inc.,
Civil Action No.03 CV 5161 (RO)
United States District Court for the Southern District of New York
Deposition Testimony

A.I.T. Industries, Inc., f/k/a Photocentron, Inc. v. Yordan Vurich and Opti-Vue, Inc.
Civil Action No.94-C-5196
Deposition Testimony

Allan Stimmel v. Eugene Weiner, Kurt Gutfreund and M & L International, Inc.
Civil Action No. 89 C 6510 (ACW)
United States District Court for the Northern District of Illinois, Eastern Division
Deposition Testimony

Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva
Pharmaceuticals Industries Ltd., et. al.
Civil Action No. 04-2355
United States District Court for the District of New Jersey
Deposition Testimony

Analog Devices, Inc. v. Christopher Michalski, Kiran Karnik and Maxim
Integrated Products, Inc.
Case 01 CVS 10614
State of North Carolina Superior Court Division, County of Guilford
Deposition Testimony

Andrx Pharmaceuticals, LLC v. GlaxoSmithKline, PLC and SmithKline
Beecham Corporation
Case No. 05-23264-CIV-Graham/O'Sullivan
United States District Court for the Southern District of Florida
Deposition Testimony

Applied Medical Resources Corporation v. Gaya Limited



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY ®

AAA Case No. 50 133T00316 06
Arbitration Testimony

Arthur Takeall v. PepsiCo, Inc.
Civil Action S92-766
United States District Court for the District of Maryland
Deposition Testimony

Ashley Furniture Industries v. Laura Ashley Holdings Plc and Laura Ashley, Inc.
AAA File No. 51 133 Y 01056 08
American Arbitration Association
Arbitration and Deposition Testimony

Atlantic Richfield Company, Chevron U.S.A., Inc., Exxon Corporation, Mobil
Oil Corporation, Shell Oil Products Company and Texaco Refining &
Marketing, Inc. v. Unocal Corporation and Union Oil Company of California
and  Union Oil Company of California v. Atlantic Richfield Company, Chevron
U.S.A., Inc., Exxon Corporation, Mobil Oil Corporation, Shell Oil Products
Company and Texaco Refining & Marketing, Inc.
Civil Action No. CV-95-2379 KMW(JRx)
Trial and Deposition Testimony

Avery Dennison Corp. et al v. FLEXcon Company, Inc.
Civil Action No. 96-C 4820
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Bath & Body Works Brand Management, Inc. v. Summit Entertainment, LLC
Case No. 11 Civ 1594 (GBD)
United States District Court for the Southern District of New York
Deposition Testimony

Bayer Pharma AG, Bayer Intellectual Property GMBH and Bayer Healthcare
Pharmaceuticals, Inc. v. Watson Laboratories, Inc.
Civil Action No 12-517-GMS
United States District Court for the District of Delaware
Deposition Testimony

Beloit Corp v. Voith, Inc. & J.M. Voith GmbH
Civil Action No. 92 C 0168 C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Board of Trustees of the Leland Stanford Junior University and Litton Systems,
Inc. v. Tyco International LTD., Tyco International, Inc., Tyco
Telecommunications, Inc, Tyco Networks, Inc., Lucent Technologies, Inc.,
Agere Systems, Inc., JDS Uniphase Corporation, Ciena Corporation, Pirelli
S.p.A., Ericsson, Inc., Telefonaktiebolaget Lm Ericsson and Ericsson
Microelectronics Ab, Optoelectronic Products.



OCEAN TOMO®

INTELLECTUAL CAPITAL EQUITY®

Case No. Cv-00-10584-TJH (RCx)
United States District Court for the Central District of California – Western
California
Deposition Testimony

Bracco Diagnostics, Inc. v. Amersham Health Inc., Amersham Health AS,
Amersham plc and Amersham Health Inc. v. Bracco Diagnostics, Inc.
Civil Action No. 03-6025
United States District Court for the District of New Jersey
Trial and Deposition Testimony

Brian D. Zdeb, et al v. Baxter International, Inc.
Civil Action No. 91-L-8726
Appellate Court of Illinois, First District, Sixth Division
Trial and Deposition Testimony

Briggs & Stratton Corporation v. Kohler Company
Case No. 05-C-0025-C
United States District Court for the Western District of Wisconsin
Deposition Testimony

Bristol-Myers Squibb Company v. Apotex Inc. and Apotex Corp.
Civil Action No. 3:10-cv-05810 (MLC)
United States District Court for District of New Jersey
Deposition Testimony

Brocade Communications Systems, Inc. and Foundry Networks, LLC v. A10
Neworks, Inc. et al.
Case No. 10-cv-03428 LHK
United States District Court for the Northern District of California San Jose
Division
Trial and Deposition Testimony

Callpod, Inc. v. GN Netcom, Inc. et al.
Case No. 06-CV-4961
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

CareFusion 303 v. Sigma International
Case No 10cv0442 DMS (WMC)
United States District Court for the Northern District of California
Trial and Deposition Testimony

Carter Bryant v. Mattel, Inc. and Consolidated Actions
United States District Court for the Central District of California Southern
Division
Case No. CV 04-9049-DOC (RNBx)
Consolidated with Nos. CV 04-9059 and CV 05-2727
Trial and Deposition Testimony



Catalina Marketing Corp. v. Advanced Promotion Technologies, Inc.
Civil Action No. CV 93-4741 WJR (Sx)
Deposition Testimony

Caterpillar Inc. v. International Truck & Engine Corp., Siemens Diesel Systems
Technology, LLC, Sturman Industries, Inc., Sturman Engine Systems, LLC,
Oded E. Sturman and Carol K. Sturman
United States District Court for the District of South Carolina, Columbia
Division
Case No. 3:03-1739-17
Deposition Testimony

CEATS, Inc. v. Continental Airlines, Inc., AeroSvit Airlines, CJSC, Air China,
Ltd., Air Europa Lineas Aereas, SAU, AirTran Airways, Inc., Alaska Airlines,
Inc., Horizon Air Industries, Inc., All Nippon Airways Co., Ltd., Aerovias Del
Contenente Americano SA, Brendan Airways, LLC, Caribbean Airlines, Ltd.,
Delta Air Lines, Inc., EgyptAir Airlines, Co., Frontier Airlines, Inc., JetBlue
Airways Corporation, Malaysia Airline System Berhad, Qatar Airways
Company QCSC, Alia Royal Jordanian, PLC, TAM, SA, Thai Airways
International Public Co., Ltd., United Air Lines, Inc., US Airways, Inc., Virgin
America, Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

CEATS, Inc. v. Granada Theater, Live Nation Worldwide, Inc., Ticketmaster,
LLC, Tickets.com, Inc., Ticket Software, LLC, Ticket Network, Inc.,
TicketsNow.com, Inc., TNow Entertainment Group, Inc., Concur Technologies,
Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

Cheetah Omni, LLC v. Alcatel-Lucent USA Inc., et al. (on behalf of Tellabs
North America, Inc.)
Case No.  6:11CV390
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Ciba Specialty Chemicals Corporation v. Hercules Inc. and Cytec Industries,
Inc.
Civil Action No. 04-293
United States District Court for the District of Delaware
Deposition Testimony

Comair Rotron, Inc. v. Matsushita Electric Corporation of America, et al. - New
Jersey Action
Civil Action No. 85-4308 (HLS)
Trial and Deposition Testimony



Commonwealth Scientific and Industrial Research Organization v. Lenovo
(United States) et al.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:09-cv-00399-LED
Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. Cisco
Systems, Inc.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:11-cv-00343-LED
Deposition Testimony

Computer Generated Solutions, Inc. v. Peter Loral, Loral Incorporated, PJK, Inc.
and Belle Loral, LLC
Civil Action No. 97 Civ. 6298 (MBM)
Deposition Testimony

Construction Technology, Inc. v. Cybermation, Inc. et al.
Civil Action No. 91 Civ. 7474 (JSM)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Cordis Corporation v. SciMed Life Systems, Inc.
Case No. CV 4-96-261
United States Court for the District of Minnesota
Deposition Testimony

C.R. Bard v. M3 Systems
Civil Action No. 93 C-4788
Trial Testimony

Curtis Amplatz and Carina Royalty, LLC v. AGA Medical Corporation
Court File No. 27-CV-10-27664
State of Minnesota District Court, County of Hennepin, Fourth Judicial District
Trial Testimony

DaiNippon Screen Mfg., Co. Ltd. *et al*. v. Scitex Corp. Ltd. *et al.*
Case No. C 96-3296 FMS
United States District Court for the Northern District of California
Arbitration and Deposition Testimony

Digital-Vending Services International, Inc. v. The University of Phoenix, Inc.
et al.
Civil Action No. 2:09-cv-00555
United States District Court for the Eastern District of Virginia
Deposition Testimony

Design Solange, Ltd., Inc. v. Lane Bryant, Inc.
Civil Action No. 94 CIV 1299 (JFK)
United States District Court for the Southern District of New York



Trial and Deposition Testimony

Durel Corporation v. Osram Sylvania, Inc.
Civil Action No. 95-1750 PHx (EHC)
United States District Court for the District of Arizona
Trial and Deposition Testimony

Dynetix Design Solutions, Inc. v. Synopsys, Inc. and Does 1-50
Case No. 5:11-cv-05973-PSG
United States District Court for the Northern District of California
Deposition Testimony

Dyson, Inc. v. Bissell Homecare, Inc.
Case No. 10-cv-08126
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Edward K. Isbey, Jr. v. Cooper Companies, Inc.
Civil Action No. 89-CVS-3776
Supreme Court of North Carolina
Deposition Testimony

Ellison v. The Chicago Heart Association
Civil Action No. 92-K-706
Deposition Testimony

Emblaze Ltd. v. Apple Inc.
Civil Action No. 45:11-cv-01079-SBA (PSG)
United States District Court for the Northern District of California San Jose
Division
Deposition Testimony

Enterasys Networks, Inc. v. Extreme Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Escada Beaute, et al. v. The Limited Inc. et al.
Civil Action No. 92-CIV-7530 (LLS)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Esquel Enterprises, Ltd., v. TAL Apparel Limited and TALTECH Limited
Civil Action No. C04-974Z
United States District Court for the Western District of Washington at Seattle
Deposition Testimony

Express, LLC v. Fetish Group, Inc.
Civil Action No. CV05-2931 SWV (JTLx)



United States District Court for the Central District of California Western
Division
Deposition Testimony

Extreme Networks, Inc. v. Enterasys Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Faye Fish Estate et al. v. Beech Aircraft et al.
Civil Action No. 631333
Deposition Testimony

FidoPharm, Inc. & Omnipharm, Ltd. v. Cheminova, Inc. A/S
AAA Case No. 50 503 T 00266 12
American Arbitration Association
Hearing Testimony

Footstar, Inc. et al v. Kmart Corporation
Chapter 11 Case No. 04-22350 (ASH)
United States Bankruptcy Court for the Southern District of New York
Deposition Testimony

Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.
Case No.: CV07-02-962
United States District Court for the Central District for the State of California
Deposition Testimony

Fractus, S.A. v. Samsung Electronics Co. Ltd.; et al (including LG Electronics,
Inc. and related parties)
Civil Action No. 6:09cv203
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Fujitsu Ltd. v. Tellabs, Inc. et al.
Case No. 1:09-cv-04530
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

General Mills, Inc. and General Mills IP Holdings II, LLC v. Fage Dairy
Industry, S.A., Fage USA Dairy Industry, Inc. and Fage USA Holdings, Inc.
United States District Court for the Northern District of New York
Deposition Testimony

Georgia-Pacific Corp. v. United States Gypsum Co. and L&W Supply Co.
Civil Action No. 94-989-RRM
United States District Court for the District of Delaware
Trial Testimony

Gibson Guitar Corp. v. Heritage Guitar, Inc. and Lasar Music Corp.



OCEAN TOMO®
INTELLECTUAL CAPITAL EQUITY®

Civil Action No. 3-90-0009
Deposition Testimony

Gilberto Arvelo v. American International Insurance
Civil Action No. 93-1287
United States District Court for the District of Puerto Rico
Deposition Testimony

Government Employees Insurance Company v. Google, Inc. and Overture
Services, Inc.
United States District Court, Eastern District of Virginia, Alexandria Division
Civil Action No: 1:04cv507
Deposition Testimony

Group One v. Hallmark
Civil Action No. 97-1224-CV-W-1
United States District Court for the Western District of Missouri, Western
Division
Deposition Testimony

Hitachi, Ltd. v. Samsung Display Devices Co., Ltd. and Samsung Display
Devices Co., Inc. and Samsung Electronics Co., Ltd. and Samsung Electronics
America Inc. and Office Depot
Civil Action No. 97-1988-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

Hoechst Celanese Corporation v. Chase Plastic Services and Kevin P. Chase
Civil Action No. 94-75361
Trial and Deposition Testimony

Hoechst Celanese Corporation v. Nylon Engineering Resins, Inc.
Civil Action No. 94-346-CIV-FTM-24D
United States District Court for the Middle District of Florida
Trial Testimony

iHance, Inc. v. Eloqua Limited and Eloqua Corporation
Case No. 2;11-CV-257-MSD-TEM
United States District Court for the Eastern District of Virginia Norfolk Division
Deposition Testimony

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson v. Fullbright &
Jaworski, LLP
Cause No. A 05 CA 334 SS
United States District Court of Texas, Austin Division
Deposition Testimony

In Re Gabapentin Patent Litigation
MDL Docket No. 1384 (FSH)
Master Civil Action No. 00-2931 (FSH)



On behalf of Defendants Teva Pharmaceutical Industries Ltd. and IVAX
Corporation and related parties
United States District Court for the District of New Jersey
Deposition Testimony

In the Matter of Certain Electronic Devices with Graphics Data Processing
Systems, Components Thereof, and Associated Software
Investigation No. 337-TA-813
On behalf of Respondent Apple Inc.
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Semiconductor Chips with Minimized Chip Package
Size and Products Containing Same (III)
Investigation No. 337-TA-630
On behalf of Respondents Acer, Nanya and Powerchip
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Short-Wavelength Light Emitting Diodes, Laser Diodes,
and Products Containing Same
Investigation No. 337-TA-640
On behalf of Respondent Panasonic
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Wiper Blades
Investigation No. 337-TA-816
On behalf of Respondents
United States International Trade Commission
Hearing (written) and Deposition Testimony

InLine Connection, Corp v. AOL Time Warner, Inc. and American Online, Inc
Civil Action 02-272
United States District Court for the District of Delaware
Deposition Testimony

InLine Connection, Corp v. Earthlink, Inc.
Civil Action 02-477
United States District Court for the District of Delaware
Deposition Testimony

Innovention Toys, LLC v. MGA Entertainment, Inc., Wal-Mart Stores, Inc. and
Toys 'R Us, Inc.
Civil Action No. 07-6510
United States District Court for the Eastern District of Louisana
Trial and Deposition Testimony

InterDigital Technology Corporation v. Motorola, Inc.
Civil Action No. 94-73



**OCEAN TOMO** ®

INTELLECTUAL CAPITAL EQUITY ®

United States District Court for the District of Delaware
Trial and Deposition Testimony

Isogon Corporation v. Amdahl Corporation
Civil Action No. 97 CIV 6219 (SAS)
United States District Court for the Southern District of New York
Deposition Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0902C
United States District Court for the Western District of Wisconsin
Trial Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0905C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Jamdat Mobile, Inc. v. JAMSTER International Sarl, Ltd; JAMBA! GMBH; and
Verisign, Inc.
Civil Action No. CV05-3945 PA (FMOx)
Deposition Testimony

Jenner & Block LLP v. Parallel Networks, LLC and EpicRealm Licensing LP
JAMS Arbitration No. 1310019934
Arbitration and Deposition Testimony

John W. Evans, et al. v. General Motors Corporation
Docket # X06-CV-94-0156090S
Superior Court of Connecticut Judicial District of Waterbury
Deposition Testimony

Joy Recovery Technology Corp. v. The Penn Central Corp. and Carol Cable
Company, Inc., aka General Cable Industries, Inc.
Civil Action No. 93 C 0992
Deposition Testimony

K-Tube Corp. v. Sterling Stainless Tube Corp. et al.
Case No. CV 90 1653 JLQ (M)
Trial and Deposition Testimony

Kay-Cee Enterprises, Inc. v. Amoco Oil Company
Civil Action No. 97-2406 (JWL)
United States District Court for the District of Kansas
Trail and Deposition Testimony

Kennecott Corporation v. Kyocera International
Civil Action No. 80-0516 R (M)
United States District Court for the Southern District of California
Deposition Testimony



Kimberly-Clark Corporation v. Cardinal Health 200, LLC
Civil Action No. 1:10 CV-0034-CAP
United States District Court Northern District of Georgia, Atlanta Division
Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest
University Health Services v. Bluesky Medical Group, Inc., Richard Weston,
Medela AG, Medela, Inc., and Patient Care Systems, Inc.
Civil Action SA-03-CA-0832-RG
United States District Court Western District of Texas San Antonio Division
Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest
University Health Services v. Bluesky Medical Group, Inc. and Smith &
Nephew, Inc.
Case No. SA:08-CV-00102-WRF
United States District Court Western District of Texas San Antonio Division
Preliminary Injunction Hearing, Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc., KCI Medical
Resources, Medical Holdings Limited, KCI Manufacturing and Wake Forest
University Health Sciences v. Convatec, Inc., Boehringer Wound Systems, LLC
and Boehringer Technologies, LP
Civil Action No. 1:08-CV-00918-WO-LPA
United States District Court for the Middle District of North Carolina
Deposition Testimony

Kruse Technology Partnership v. Caterpillar, Inc.
Case No. CV 04-10435
United States District Court for the Central District of California
Deposition Testimony

Keurig, Inc. v. Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.
C.A. No. 07-17 (GMS)
United States District Court for the District of Delaware
Deposition Testimony

Leo Pharma A/S v. Tolmar, Inc. et al.
United States District Court for District of Delaware
C.A. No. 10-269 (SLR)
Deposition Testimony

Lincoln Electric Company, et al. v. National Standard, LLC
No. 1:09-cv-01886-DCN
United States District Court of Ohio Eastern Division
Deposition Testimony

LNP Engineering Plastics, Inc. and Kawasaki Chemical Holding Co., Inc. v.
Miller Waste Mills, Inc. trading as RTP Company



**OCEAN TOMO** ®
INTELLECTUAL CAPITAL EQUITY ®

Civil Action No. 96-462 (RRM)
United States District Court for the District of Delaware
Trial Testimony

Lucent Technologies Inc. v. Extreme Networks, Inc.
Civil Action No. 03-508 (JJF)
United States District Court for the District of Delaware
Trial and Deposition Testimony

Lunar Corp. & The UAB Research Foundation v. EG&G Astrophysics Research
Corp.
Civil Action No. 96-C-199-S
Trial Testimony

Matsushita Electric Industrial Co., Ltd. v. MediaTek, Inc., Oppo Digital., and
Micro-Star International Computer Corp.
Case No. C05-03148 MMC
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

McKinley v. Zdeb
Civil Action No. 99-S-1178
United States District Court for the District of Colorado
Fact Deposition Testimony

Medgraph, Inc. v. Medtronic, Inc.
Case No. 6:09-cv-06610-DGL-MWP
United States District Court for the Western District of New York
Rochester Division
Deposition Testimony

Medtronic Xomed, Inc. v. Gryus ENT LLC
Case No.: 3:04CV400-J-32 MCR
United States District Court for the Middle District of Florida
Jacksonville Division
Deposition Testimony

MEI, Inc. v. JCM American Corp & Japan Cash Machine Co. Ltd.
United States District Court for the District of New Jersey
Civil Action No. 09-00351
Deposition Testimony

Message Phone, Inc. v. SVI Systems, Inc. and Tharaldson Properties
Civil Action No. 379CV-1813H
Trial Testimony

MGA Entertainment, Inc. and Isaac Larian v. Hartford Insurance Company of
the Midwest, Harford Fire Insurance Company, The Hartford Financial Services
Group and Does 1 through 10.



**OCEAN TOMO®**
INTELLECTUAL CAPITAL EQUITY®

Case No. CV 08-0457 DOC (RNBx)
United States District Court for the Central District of California Southern
Division
Deposition Testimony

Military Professional Services, Inc. v. BancOhio National Bank
Civil Action No. 91-5032
Deposition Testimony

Minebea Co., Ltd., Precision Motors Deutsche Minebea GmbH, and Nippon
Miniature Bearing Corp. v. George Papst, Papst Licensing GmbH, and Papst
Licensing Verwaltungsgesellschaft MIT Beschrankter Haftung
Civil Action No. 97-CV-590 (PLF)
Trial and Deposition Testimony

Mitek Surgical Products, Inc. v. Arthrex, Inc.
Case No. 1:96CV 0087S
United States District Court for the District of Utah, Central Division
Deposition Testimony

Money Suite Company v. Insurance Answer Center, LLC; Answer Financial,
Inc.; AllState Insurance Company; Esurance Insurance Services, Inc.
United States District Court Central District of California Southern Division
Deposition Testimony

Motorola, Inc. v. InterDigital Technology Corporation
Civil Action No. 93-488
United States District Court for the District of Delaware
Trial and Deposition Testimony

Nellcor Puritan Bennett, LLC v. CAS Medical Systems, Inc.
Case No. 2:11-CV-15697
United States District Court for the Eastern District of Michigan Southern
Division
Deposition Testimony

Nomadix, Inc. v. Hewlett-Packard Company, et al.
Civil Action No. CV09-08441 DDP(VBKx)
United States District Court for the Central District of California Western
Division
Deposition Testimony

Nomix Corporation v. Quikrete Companies, Inc.
Civil Action No. H88-463-AHN
Trial and Deposition Testimony

Orthofix, Inc., et al v. EBI Medical Systems, Inc., et al.
Civil Action No. 95-6035 (SMO)
United States District Court for the District of New Jersey
Trial and Deposition Testimony



Pharmacia & Upjohn Company, LLC v. Sicor Inc. and Sicor Pharmaceuticals, Inc.
Civil Action No. 04-833 (KAJ)
United States District Court for the District of Delaware
Deposition Testimony

Picker International, Inc. v. Mayo Foundation, et al.
Case No. 95-CV-2028
United States District Court for the Northern District of Ohio, Eastern Division
Trial and Deposition Testimony

Penda Corporation v. United States of America and Cadillac Products, Inc.
Case No. 473-89-C
United States Court of Federal Claims
Trial and Deposition Testimony

Power Integrations, Inc. v. Fairchild Semiconductor International, Inc., Fairchild Semiconductor Corporation and System General Corporation
Case No. 3:09-cv-05235-MMC
United States District Court for the District of Delaware
Deposition Testimony

Powertech Technology, Inc. v. Tessera, Inc.
Case No. CV10-00945EMC
United States District Court for the Northern District of California
Deposition Testimony

Praxair, Inc. and Praxair Technology, Inc. v. ATMI, Inc. and Advanced Technology Materials, Inc.
Civil Action No. 03-1158-SLR
United States District Court District of Delaware
Deposition Testimony

The Procter & Gamble Company v. Paragon Trade Brands, Inc.
Civil Action No. 94-16-LON
United States District Court for the District of Delaware
Trial and Deposition Testimony

QR Spex, Inc. and Thomas G. Swab v. Motorola, Inc. and Frog Design, Inc.
Civil Action No 03-6284 JFW (FMOx)
United States District Court for the Central District of California
Deposition Testimony

Qualcomm, Inc. v. InterDigital Communications Corporation
Case No. 93-1091G (LSP)
Deposition Testimony

Quickie, LLC v. Medtronic, Inc.
Civil Action No. 02 CV 1157 (GEL)



United States District Court for the Southern District of New York
Deposition Testimony

Remcor v. Scotsman/Booth
Civil Action No. 93 C 1822
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Remcor v. Servend
Civil Action No. 93 C 1823
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Research Corporation Technologies, Inc. v. Hewlett-Packard Company
Civil Action No. CIV 95-490-TUC-JMR
United States District Court for the District of Arizona
Deposition Testimony

Rommy Hunt Revson v. The Limited, Inc. et al.
Civil Action No. 90-3840 (MGC)
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Ameren Corporation; Union
Electric Company; Central Illinois Public Service Company; Cilcorp, Inc.;
Central Illinois Light Company
Case No. 07-4955 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. AOL, LLC, CompuServe
Interactive Services and Netscape Communications Corporation
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Cablevision Systems Corporation
et. al.
Case No. 2:07-ML-01816 / 02314 RGK-FFM
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Charter Communications, Inc.;
Charter Communications Holding Company, LLC; Charter Communications
Operating, LLC; and Charter Communications Entertainment I, LLC
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony



Ronald A. Katz Technology Licensing, LP v. CIGNA Corporation, CIGNA
Health Corporation, CIGNA HealthCare of Delaware, Inc., Tel-Drug of
Pennsylvania, LLC and Tel-Drug, Inc.
CV 07-2192 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Comcast Corporation, Sirius-XM
Radio, Inc., et al.
NO. 2:07-ML-01816-C RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. DHL Holdings (USA) Inc., DHL
Express (USA), Inc., and Sky Courier, Inc.
Case No. 07-ml-01816-B RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Fifth Third Bankcorp, Fifth Third
Bank, Fifth Third Bank (Central Ohio)
Case No. 07-4960 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Time Warner Cable Inc., Time
Warner NY Cable LLC and Time Warner Entertainment Company, L.P.
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. United States Cellular
Corporation, TDS Telecommunications Corporation and TDS Metrocom, LLC
Case No.07-ML-01816-B-RGK (FFMX)
United States District Court for the Central District of California
Deposition Testimony

Rosetta Stone Ltd. v. Google Inc.
Civil Action No. 1:09 CV 736 GBL / JFA
United States District Court for the Eastern District of Virginia
Deposition Testimony

RWM Kinetic Enterprises, Inc. and Thomas J. Ring v. Kinetic Concepts, Inc.
and KCI Therapeutic Services, Inc.
Case No. SA-96-CA-603-OG
United States District Court for the Western District of Texas San Antonio
Division
Trial Testimony



Saxon Innovations, LLC v. Nokia Corp, et al. (including Samsung Electronics, Co. and related parties)
Civil Action No. 6:07-cv-490-LED-JDL
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd., S-LCD Corporation, Samsung Electronics America, Inc. Samsung Telecommunications America, LLC
Civil Action No. 3:09-cv-00001
United States District Court for the Western District of Wisconsin
Deposition Testimony

Silicon Image, Inc. v. Analogix Semiconductor, Inc.
Case No. C 07-00635 JCS
United States District Court for the Northern District of California, San Francisco Division
Deposition Testimony

Site Microsurgical Systems v. The Cooper Companies
Civil Action S92-766
Deposition Testimony

SmartPhone Technologies, LLC v. Research In Motion Corp. et. al (on behalf LG Electronics, Inc. and LG Electronics USA, Inc.)
Civil Action No. 6:10cv74-LED
United States District Court Eastern District of Texas Tyler Division
Deposition Testimony

St. Clair Intellectual Property Consultants v. Fuji Photo Film Co., Ltd., Fuji Photo Film U.S.A., Inc., Fujifilm America, Inc., et al.
Civil Action No. 03-241 JJF
United States District Court for the District of Delaware
Trial and Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.
C.A. No. 4:05CV44
United States District Court of Texas Sherman Division
Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.
C.A. No. 4:05CV45
United States District Court of Texas Sherman Division
Deposition Testimony

Takata Corp. v. Allied Signal, Inc. and Breed Technologies, Inc.
Civil Action CV-95-1750
Deposition Testimony

Technol Medical Products, Inc., et al v. Robert Busse & Co., Inc.



Civil Action No. 3:94-CV-2284-X
Deposition Testimony

Tekmira Pharmaceuticals Corporation and Protiva Pharmaceuticals, Inc. v.
Alnylam Pharmaceuticals, Inc. and AlCana Technologies, Inc.
Civil Action No. 11-1010-BLS2
Massachusetts Superior Court for Suffolk County
Deposition Testimony

Tessera, Inc. v. Advanced Micro Devices, Inc. et al.
Case No. 4:05-cv-04063-CW
United States District Court for Northern District of California Oakland Division
Deposition Testimony

Therma-Tru Corporation v. Caradon Peachtree, Inc.
Civil Action No. 95-CV-75534-DT
Deposition Testimony

Toro Company v. MTD Products Inc., MTD Consumer Group Inc., and Cub
Cadet LLC
Civil Action No 10-cv-007-JNE-TNL
United States District Court for the District of Minnesota
Deposition Testimony

Valmet Paper Machinery, Inc. and Valmet-Charlotte, Inc. v. Beloit Corporation
Civil Action No. 93-C-587-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Volterra Semiconductor Corporation v. Primarion, Inc., Infineon Technologies
AG and Infineon Technologies North America Corporation
Case No. C 08-05129 CRB
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Wang Laboratories, Inc. v. America Online, Inc. and Netscape Communications
Corporation
Civil Action No. 97-1628-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

Wang Laboratories, Inc. v. FileNet Corporation
Civil Action No. 94-12141-RCL
Deposition Testimony

Waukesha Cherry-Burrell v. Wrightech Corporation
Civil Action No. 96-CV-00384
Deposition Testimony



# OCEAN TOMO®
### INTELLECTUAL CAPITAL EQUITY®

Zenith Electronics LLC v. Vizio, Inc.; Westinghouse Digital Electronics LLC, et al.
No. 5:06CV246-DF
United States District Court for the Eastern District of Texas
Texarkana Division
Deposition Testimony

---

**PATENTS**

Inventor, United States Patent No. 5,752,186, Access Free Wireless Telephony Fulfillment Service System, May 12, 1998.

Inventor, United States Patent No. 5,867,780, Access Free Wireless Telephony Fulfillment Service System, February 2, 1999.

Inventor, United States Patent No. 6.397,057, System and Method of Providing Advertising Information to a Subscriber Through a Wireless Device, May 28, 2002.

Inventor, United States Patent No. 6,411,803, System and Method of Providing Service Information to a Subscriber Through a Wireless Device, June 25, 2002.

Inventor, United States Patent No. 6,769,767, Eyewear with Exchangeable Temples Housing a Transceiver Forming Ad Hoc Networks with Other Devices, August 3, 2004.

Inventor, United States Patent No. 6,839,556, System and Method of Providing Information to a Subscriber through a Wireless Device, January 4, 2005.

Inventor, United States Patent No. 6,911,172, Method of Manufacturing Eyewear, June 28, 2005.

Inventor, United States Patent No. 6,929,365, Eyewear with Exchangeable Temples Housing Bluetooth Enable Apparatus, August 16, 2005.

Inventor, United States Patent No. 7,181,200, Method of Providing Information to a Telephony Subscriber, February 20, 2007.

Inventor, United States Patent No. 7,353,202, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 1, 2008.

Inventor, United States Patent No. 7,769,685, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, August 3, 2010.

Inventor, United States Patent No. 7,813,716, Method of Providing Information to a Telephony Subscriber, October 12, 2010.



Inventor, United States Patent No. 7,885,897, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, February 8, 2011.

Inventor, United States Patent No. 7,930,231, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 19, 2011.

Inventor, United States Patent No. 7,987,142, Intellectual Property Trading Exchange, July 26, 2011.

Inventor, United States Patent No. 8,041,341, System of Providing Information to a Telephony Subscriber, October 18, 2011.

Inventor, United States Patent No. 8,180,711, Intellectual Property Trading Exchange, May 15, 2012.

Inventor, United States Patent No. 8,255,932, System and Method for Managing Intellectual Property-Based Risks, January 15, 2013.

Inventor, United States Patent No. 8,515,851, Method and System for Generating an Index of Securities, August 20, 2013.

Inventor, United States Patent No. 8,554,687, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, October 8, 2013.

---

**CONTACT**

James E. Malackowski
Chairman and Chief Executive Officer
Ocean Tomo, LLC
200 West Madison
37th Floor
Chicago, Illinois  60606

312-327-4410 Direct
312-327-4401 Facsimile
312-560-8500 Personal
jmalackowski@oceantomo.com

# APPENDIX B

## Nortel Background

*Nortel's Organization*

1.    Nortel Networks Corporation ("NNC") was the ultimate parent of the Nortel Group, with an executive office in Toronto, Ontario.[1]  It was incorporated in Canada on March 7, 2000.[2]  The common shares of NNC were publicly traded on the New York Stock Exchange ("NYSE") and on the Toronto Stock Exchange ("TSX").[3]

2.    Nortel Networks Limited ("NNL"), a direct subsidiary of NNC, is a Canadian company incorporated in 1914.[4]  It was Nortel's operating subsidiary in Canada as well as a holding company for most of its 142 global subsidiary companies.[5]  NNL's executive offices were also in Toronto.[6]  NNC and NNL's respective boards of directors were comprised of the same ten directors and the same non-executive chair.[7]  NNC held all of NNL's outstanding common shares.[8]

3.    NNL was the direct or indirect parent of over 100 Nortel subsidiaries, including Nortel Networks Inc. ("NNI"), a Delaware company, Nortel Networks UK Limited ("NNUK"), a U.K. corporation, Nortel Networks S.A. ("NNSA"), a French corporation, and

---

1.    Doolittle Aff. ¶ 2, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

2.    Doolittle Aff. ¶ 21(a), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

3.    Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 1.

4.    Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 1.

5.    NNUK Administrators' statement of proposals, February 2009, at 3, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

6.    Doolittle Aff. ¶ 2, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

7.    Doolittle Aff. ¶ 44, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

8.    Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 1.

Nortel Networks (Ireland) Limited ("NNIR"), an Irish corporation.[9]  The Nortel group's

principal executive offices were located in Brampton, Ontario.[10]

4.    NNUK was responsible for and controlled the majority of the operations

in the Europe, Middle East and Africa ("EMEA") region.[11]  NNUK was incorporated in England

and Wales on February 25, 2000, under the name Nortel Networks Holdings Limited.[12]  It

changed its name to Nortel Networks plc on May 5, 2000, and on March 2, 2001, re-registered as

a private limited company and was renamed Nortel Networks UK Limited.[13]  NNUK was a

direct subsidiary of NNL, and itself owned directly or indirectly all but three[14] of the EMEA

region companies.[15]  NNUK served as the headquarters of the EMEA region.[16]

5.    Two entities in the EMEA region began life as joint ventures with third

parties outside Nortel.  These entities conducted research and development ("R&D") and held

intellectual property in their own names. These entities were the following:

a.    Nortel France SAS began in July 1992 as a joint venture called

Nortel Matra Cellular ("NMC") between Nortel and Matra Communications, a subsidiary of the

---

9.    Doolittle Aff. ¶¶ 21(b), 26, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

10.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 1–2.

11.    NNUK Administrators' statement of proposals, February 2009, at 6, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

12.    Certificate of Incorporation, PC0089161.

13.    *Id.* at PC0089163–PC0089164.

14.    Being the French entities, NNSA and Nortel Networks France S.A.S. ("Nortel France SAS"), together with NNIR.

15.    NNUK Administrators' statement of proposals, February 2009, at 6, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

16.    Doolittle Aff. ¶ 27, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

4

Lagardère Group.[17]  Nortel acquired 100% control of Nortel France SAS in September 2003,

with effect from September 18, 2003;[18] and

        b.      Nortel GmbH ("Nortel Germany") began in March 1995 as a joint

venture, called Nortel DASA, with the Daimler-Benz Aerospace Group.[19]  On September 18,

2003 Nortel acquired 100% control of Nortel Germany.[20]

*Nortel's Historical Business and Markets*

        6.      Nortel began business in 1895 as Bell Telephone Company of Canada.[21]

In the 1970s, the company changed its name to Northern Telecom and entered the realm of

digital telephony.[22]  It subsequently expanded to the United States and, by 1990, had become one

of the leading telecommunications companies in all of North America.[23]  One of its major

products from the 1970s onwards was a digital central office switch called the DMS-100.[24]

        7.      Prior to filing for bankruptcy in Canada, the United States and the United

Kingdom on January 14, 2009 (the "Petition Date"), Nortel was a global supplier of

telecommunications and computer networking solutions including hardware and software

---

17.    *See* Project Tinos [Presentation], Nov. 12, 2002, NNI_00295277 at 4.

18.    E-mail from Gordon Davies to Nicholas de Roma et al., Sept. 18, 2003, NOR-CAN00620466/1.

19.    Project Tinos [Presentation], Nov. 12, 2002, NNI_00295277 at 7.

20.    Nortel Networks Corp., Annual Report (Form 10-K) (Jan. 10, 2005) at 53.

21.    NNUK Administrators' statement of proposals, February 2009, at 3, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

22.    *See* Project Paragon - Carrier Voice & Application Solutions, Management Presentation, May 2009, NNC-NNL06085707 at 6.

23.    Rider to Proof of Claim of Nortel Networks UK Ltd ¶¶ 2–3, June 3, 2011, EMEAPROD2292750 at EMEAPROD2292752.

24.    Northern Telecom, Annual Report (1994), NNC-NNL06136896/80–82.

products and services.[25]  It provided end-to-end network solutions for its customers from

designing, engineering and marketing, through to selling, installing and supporting these network

solutions,[26] employing approximately 30,000 people globally in 2008.[27]

        8.     In the early 1990s Nortel acquired Standard Telephones and Cables

("STC") in the U.K., which had pioneered key developments in optical fiber based networking.[28]

Over the course of the 1990s, Nortel moved strongly into optical networks, and also enhanced

the DMS-100 and related switch products to handle Voice over Internet Protocol ("VoIP")

telephony.[29]  Toward the end of the decade, Nortel expanded its business substantially with the

acquisition of companies including Bay Networks and Periphonics.[30]

        9.     The acquisition of STC gave Nortel world-class R&D facilities in Harlow,

England led by the former STC laboratories, where Nobel-prize winning work on high-speed

transmission of speech signals over optical fiber had been performed.[31]  In 1998, Nortel absorbed

---

25.    NNUK Administrators' statement of proposals, February 2009, at 3, *available at*
       http://www.emeanortel.com/collateral/uk_soap.pdf.

26.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 1.

27.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 15.

28.    *See* KPMG Transfer Report for NNUK, NNC-NNL06001549/22; Nortel Global R&D News and Information
       e-mail, Jan. 30, 2006, NNC-NNL06604374/2; Nobel Lecture by Professor Charles K. Kao, *Sand From
       Centuries Past: Send Future Voices Fast*, at 71–79, Dec.8, 2009, *available at*
       http://www.nobelprize.org/nobel_prizes/physics/laureates/2009/kao_lecture.pdf.

29.    *See* Project Paragon Management Presentation (November 2009) at Slides 6-8, NNI_00216339.

30.    *See* Nortel Networks, Annual Report (1999), NNC-NNL06001433/11; Nortel Networks, Annual Report
       (1998), PWC-NRTL-00009195 at PWC-NRTL-00009199.

31.    *See* Nobel Lecture by Professor Charles K. Kao, *Sand From Centuries Past: Send Future Voices Fast*, at 71-
       79, Dec. 8, 2009, *available at*
       http://www.nobelprize.org/nobel_prizes/physics/laureates/2009/kao_lecture.pdf.

Bell Northern Research ("BNR"), which it had until then jointly owned with Bell Canada.[32]  The

BNR acquisition brought with it existing R&D facilities around the world, including that at and

Maidenhead, England.[33]  During the 1990s, Nortel also acquired R&D facilities in Monkstown,[34]

and separately developed a laboratory in Galway, Ireland.[35]

*Nortel's Pre-Petition Business Lines*

10.    Nortel has described its business in the period preceding insolvency as

"networking solutions."[36]  By the 2000s, Nortel designed, developed, manufactured, assembled,

marketed, sold, licensed, installed, serviced and supported communications technology and

infrastructure to enable Internet protocol, data, voice and multimedia communications using

wireless and wireline technologies.[37]  Nortel's business required significant ongoing investment

in R&D in order to keep pace with and anticipate evolving technologies, industry standards and

customer needs.[38]

11.    Immediately prior to the Petition Date, Nortel conducted its business

through four reportable business unit segments (the "Business Units"):  Carrier Networks,

---

32.    *See* Nortel Networks, Annual Report (1998), at 10, *available at* http://quote.morningstar.com/stock-filing/Annual-Report/1998/1/1/t.aspx?t=PINX:NRTLQ&ft=&d=c1ec9044820a58e2 ((listing the December 22, 1998 acquisition of all remaining common and preferred shares of Nortel Technology Ltd. (formerly Bell-Northern Research) as a major acquisition).

33.    *See* Telesis Magazine Article at NNC-NNL07450230.

34.    *See* 2005 R&D Site Strategy Discussion [Presentation], EMEAPROD1137447 at 3.

35.    *See* 2005 R&D Site Strategy Discussion [Presentation], EMEAPROD1137447 at 3.

36.    *See* Nortel Networks, Functional Analysis for the years ended December 31, 2000-2004, Watkins Dep. Ex. 11262, at EMEAPROD2189884.

37.    *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 50.

38.    *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 30.

Enterprise Solutions, Metro Ethernet Networks and Global Services.[39]  The respective Business

Units provided products and services to telecommunications carriers and enterprise customers

worldwide as follows:

> a.    Carrier Networks ("CN") provided technology related to wireless

mobile communication infrastructure and wireless networking solutions that enabled

telecommunication service providers and cable operators to supply mobile voice, data and

multimedia communications services to individuals and enterprises.[40]  Nortel's CN Business

Unit offered or was in the process of developing a variety of wireless technologies, including

second generation ("2G") technologies such as GSM, third generation ("3G") technologies such

as CDMA2000 and UMTS, and fourth generation ("4G") technologies such as LTE.[41]  At the

time of filing, CN was Nortel's largest Business Unit by reported revenue, representing

approximately forty percent of Nortel's revenue for the fiscal years ending December 31, 2006,

2007 and 2008.[42]

> b.    Enterprise Solutions ("ES") provided voice, data, security,

multimedia networking and conferencing solutions to large and small businesses and government

agencies in a variety of industries.  ES products and services were used to build new networks

and transform existing communications networks into more cost effective, packet-based

networks supporting data, voice and multimedia communications (also referred to as "Unified

---

39.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 6.

40.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 50.

41.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 7.

42.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 65.

Communications").[43]  ES represented approximately twenty-four percent of Nortel's revenue for

the fiscal years ending December 31, 2006, 2007 and 2008.[44]

        c.     Global Services ("GS") provided a broad range of services and

solutions to large business enterprises and carriers worldwide.  The GS Business Unit offered

implementation, support, management and applications which were designed to reduce costs,

improve efficiency and performance, and capitalize on new revenue opportunities.[45]  Global

Services represented approximately twenty percent of Nortel's revenue for each of the fiscal

years ending December 31, 2006, 2007 and 2008.[46]

        d.     Metro Ethernet Networks ("MEN") provided carrier-grade wired

networking infrastructure, including optical, Carrier Ethernet Switching and Carrier Multi-

Service Switching technology and solutions to drive scale, cost and simplicity for the high-speed

delivery of video-intensive applications.[47]  MEN represented approximately fourteen percent of

Nortel's revenue for each of the fiscal years ending December 31, 2006, 2007 and 2008.[48]

*Nortel's Matrix Structure*

        12.     Nortel employed a "matrix" organizational structure.  Its Business Units

and individual businesses comprising each Business Unit were not operated through dedicated

---

43.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 8; Doolittle Aff. ¶ 64, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

44.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 67.

45.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 50.

46.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 69.

47.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 10.

48.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 70.

legal entities or standalone divisions.[49]  Nortel instead employed a "global integrated business model" under which "[Nortel's] main operating subsidiaries around the world operate[d] in each of Nortel's four main business segments."[50]

13.    Each Business Unit operated on a global basis and was responsible for various aspects of that business, including finance, R&D, supply chain management and marketing.[51]  Business Units also supported local organizations in sales and support functions.[52]

14.    Profit and loss statements were reported and maintained by the Business Units.[53]  The revenues and assets of each Nortel Business Unit were distributed among Nortel's various legal entities and joint ventures around the world.[54]  Each legal entity could have revenue, expense and operations relating to some or all of Nortel's Business Units.[55]  Layered across the Business Units were functional groups such as finance, legal, regulatory compliance and business strategy.[56]

---

49.   *See* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184865.

50.   Doolittle Decl. ¶ 26, Jan. 14, 2009 [D.I.3].

51.   *See* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184858, PC0184863–PC0184864.

52.   Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 11.

53.   *See, e.g.*, MEN P&L Results Call (As per July 17, 2007 locked down results) version 2.0 [Presentation], NNI_00283321.

54.   Report of Ernst & Young Inc. ¶ 22, Jan. 14, 2009, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

55.   Report of Ernst & Young Inc. ¶ 22, Jan. 14, 2009, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

56.   *See* Appendix E, NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184908.

15.    The matrix system also governed intra-company transactions.  When a customer placed a sales order with one of the regional sales offices, the Nortel entity in the country originating the sale generated a purchase order.[57]  The purchase order was then routed to one of Nortel's four transaction control centers ("TCCs") depending on the Business Unit and the geographic region involved (e.g., Enterprise Voice orders from the Americas and the Asia-Pacific region were handled by NNL's TCC; Enterprise Voice orders from EMEA countries were routed to NNUK's TCC).[58]  Upon receiving the purchase order, the TCCs based in NNL, NNI, NNUK and NNSA would contract directly with Nortel's equipment and design manufacturers to facilitate the ultimate product delivery to the customer.[59]  Upon completion of the order, the TCC paid the manufacturer and invoiced the regional Nortel company at a marked-up price.[60]

*Nortel's Geographic Sales Regions*

16.    Between 2001 and 2008, Nortel also reported revenues by geographic sales region in addition to revenues by Business Unit.[61]  These sales regions were:

    a.    EMEA;

    b.    Caribbean and Latin America ("CALA");

    c.    Canada;

---

57.    Doolittle Aff. ¶ 87(a), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

58.    Doolittle Aff. ¶ 87–88, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

59.    Doolittle Aff. ¶ 87(b), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

60.    Doolittle Aff. ¶ 87(c), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

61.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54 (2006–2008); Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006)  at 78 (2003–2005); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 34 (2000–2002).

       d.     U.S.; and

       e.     Asia Pacific ("<u>APAC</u>").[62]

      17.     The EMEA region on the whole contributed between twenty-one and twenty-eight percent of Nortel's revenues between 2000 and 2008.  It was always Nortel's second largest market by reported revenues after the United States in the 2000 to 2008 time period.[63]

      18.     Nortel used the following standard form description to describe the function of these sales regions in its Annual 10-K filings between 2003 and 2007:

> *All of our reportable segments use our direct sales force to market and sell to customers around the world.  This sales force operates on a regional basis and markets and sells Nortel products and services to customers located in Canada, the U.S., CALA, EMEA and the Asia region.  Our sales offices are aligned with customers on a country and regional basis.  For instance, we have dedicated sales account teams for certain major service provider customers located near the customers' main purchasing locations.  In addition, teams within the regional sales groups work directly with top regional enterprises, and are also responsible for managing regional distribution channels.  We also have centralized marketing, product management and technical support teams dedicated to providing individual product line support to the global sales and support teams.  In some regions, we also use sales agents who assist us when we interface with our customers.  In addition, we have some non-exclusive distribution agreements with distributors in all of our regions, primarily for enterprise products.  Certain service providers, system integrators, value-added*

---

62.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54 (2006–2008); Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006)  at 78 (2003–2005); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 34 (2000–2002).

63.   *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54 (2006–2008); Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006)  at 78 (2003–2005); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 34 (2000–2002).

*resellers and stocking distributors act as our non-exclusive distribution channels under those agreements.*[64]

19.    Canada was headquartered in Brampton, Ontario; the U.S. was headquartered in Richardson, Texas; the EMEA region was headquartered in Maidenhead, U.K.; the CALA region was headquartered in Sunrise, Florida; and the APAC region reported with respect to Greater China to an executive based in Beijing and for the remainder of the APAC region to an executive based in Tokyo.[65]

*R&D at Nortel*

20.    R&D at Nortel was organized and directed, like the rest of the business, on a global matrix basis.[66]  Budgets and priorities for the R&D facilities were determined centrally, either by the Business Units ("product line management") or, in later years, by the Common Engineering Department under the Group Chief Technology Officer.[67]

---

64.    Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 11; Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 11.  For 2003–2007, the language was substantively similar. Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006) at 14; Nortel Networks Corp., Annual Report (Form 10-K) (Apr. 29, 2005) at  21; Nortel Networks Corp., Annual Report (Form 10-K) (Jan. 10, 2005) at 17.

65.    *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 17 (discussing the head offices for the regional sales forces).

66.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184925, PC0184934.

67.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184936.

21.    Globally (as at December 31, 2007),[68] Nortel employed 10,051 people in R&D roles, who worked out of laboratories primarily located in Canada, the United States and EMEA.[69]  In EMEA specifically, approximately 1,106 employees were involved in R&D activities in EMEA facilities, including laboratories in the United Kingdom, France and Ireland.[70]

22.    Notwithstanding the integrated and globally-directed nature of R&D at Nortel, individual employees were still typically employed by the local Nortel entity for the jurisdiction in question.[71]  In other words, with the exception of occasional secondments, employees performing R&D in Canada were employed by NNL, those located in the U.K. were employed by NNUK, and so on.[72]

23.    Patent applications at Nortel were centrally managed by the intellectual property ("IP") legal team.[73]  Though management of this team was a central function, there

---

68.    I have no reason to believe that the number of EMEA employees would be materially different at the Petition Date because NNC reported having 10,302 R&D employees in total as at December 31, 2008.  *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 14.

69.    *See* Appendix B to the NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184926.

70.    Based on percentages at page 4 applied to headcount number on page 3 of Appendix B to the NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006) , Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184926–PC0184927.

71.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184943.

72.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006) , Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184943.

73.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184943–PC0184943.

were patent agents and attorneys situated at individual R&D facilities and assigned to support

other groups within the Nortel legal team.[74]  Within the twelve-month grace period for priority

permitted under international conventions (e.g., the Paris Convention), those applications

deemed most important would be filed in additional countries, depending on their relevance to

the activities and expected activities of Nortel and its principal competitors in each country.[75]

*Nortel's Financial Performance and Entry into Bankruptcy Proceedings*

24.     The late 1990s were a period of tremendous growth and profit for

networking solutions companies like Nortel.  The emergence of the Internet prompted significant

growth as companies competed to build out their infrastructure for various communications

technologies.[76]

25.     However, in 2001, the networking solutions market suffered rapid

retrenchment as the economy went into recession and the communications industry found itself

with excess capacity.[77]  Nortel suffered along with its principal competitors as it experienced a

significant decline in revenue, profitability, and market capitalization.[78]  In 2001 alone, Nortel

reported losses of US$25.7 billion.[79]  Nonetheless, Nortel still held a material portfolio of

---

74.   *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
      Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at
      PC0184943–PC0184943.

75.   *See* Nortel Networks Foreign Filing Practice, Anderson Dep. Ex. 31304, at NNC·NNL06521385/1–2.

76.   *See* Doolittle Aff. ¶ 12, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

77.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 11, 2002) at 13.

78.   *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 2.

79.   Rider to Proof of Claim of Nortel Networks UK Ltd ¶ 6, June 3, 2011, EMEAPROD2292750 at
      EMEAPROD2292753.

foundational patents that had been developed in its laboratories around the world during the late 1990s.[80]

26.     In an attempt to "revive its fortunes, the Nortel Group undertook a major restructuring"[81] in the first half of the 2000s that significantly reduced the size of the Nortel group.  Various other restructurings continued throughout the decade.  By 2008, Nortel had reduced its employee numbers by two-thirds and outsourced its manufacturing.[82]  However, Nortel was still loss making, and its efforts to recover from the market downturn in 2000 were ultimately unsuccessful.  In the years leading up to it entering into an insolvency process, costs had generally exceeded revenues, which resulted in negative cash flow.[83]

27.     Following the widespread economic and financial downturn that occurred starting in the Fall of 2008, Nortel experienced significant pressure on its business and deterioration of its cash and liquidity position.[84]

28.     Between at least July 2008 and January 2009, Nortel sought a sale of its business interests.[85]  Sales negotiations were not concluded prior to the Petition Date.[86]

---

80.   *See* Executive Summary:  Project Iceberg, May 2010, NNC-NNL06096750/3.

81.   Rider to Proof of Claim of Nortel Networks UK Ltd ¶ 7, June 3, 2011, EMEAPROD2292750 at EMEAPROD2292753.

82.   Rider to Proof of Claim of Nortel Networks UK Ltd ¶ 7, June 3, 2011, EMEAPROD2292750 at EMEAPROD2292753.

83.   NNUK Administrators' statement of proposals, February 2009, at 7, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

84.   *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 1–2.

85.   *See, e.g.*, Nortel Business Update [Presentation],  July 31, 2008, NNC-NNL06240588 at 6–10.

86.   NNUK Administrators' statement of proposals, February 2009, at 7, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

29.    On January 15, 2009, Nortel was obliged to make an interest payment of US$107 million on its multibillion-dollar, long-term debt.[87]

30.    While Nortel had US$2.4 billion cash, most of this sum was held by Nortel's foreign subsidiaries and committed to joint ventures and such obligations as the pension fund for British workers.[88]  Therefore, it was not possible to repatriate the money.[89]

31.    US$841 million of Nortel's cash was available in North America, with only US$176m of it in Canada.[90]  The interest payment represented a significant portion of available resources.  In three months, another interest payment was to become payable.[91]

32.    On January 6, 2009, Nortel presented the Canadian government with a sustainability plan and requested US$1 billion to achieve a sustainable cash position with continued access to the Export Development Canada support facility up to the full amount.[92] Without this support, Nortel viewed entering the *Companies' Creditors Arrangement Act* ("CCAA") as a strong possibility to avoid the interest payment.[93]

33.    The request for government funding was dismissed, and on the Petition Date, NNL and NNC applied for bankruptcy protection pursuant to the CCAA.[94]  At the same

---

87.    James Bagnall, *Last things first: Bankruptcy protection*, Ottawa Citizen, Oct. 31, 2009.

88.    *Id.*

89.    *See id.*

90.    *Id.*

91.    *Id.*

92.    *See* Key Messages for Jan 6th Government Meeting [Presentation], NNI_00853498 at 11.

93.    *Id.* at 13.

94.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 2.

time, the U.S. entities (including NNI) filed for Chapter 11 proceedings under the U.S.

Bankruptcy Code with the U.S. Bankruptcy Court for the District of Delaware.[95]

      34.    Also on January 14, 2009, the EMEA Debtors[96] entered administration,

and five individuals[97] at EY were appointed to act as Joint Administrators.[98]  Nortel Networks

Scandinavia AS ("Nortel Norway"), Nortel Networks South Africa (Proprietary) Limited

("Nortel South Africa") and Nortel Networks A.G. ("Nortel Switzerland") remained outside

insolvency, albeit their holding companies were in administration.[99]

*Post-petition Asset Sales*

      35.    Following the Petition Date, the Nortel group conducted eight separate

sales (the "Business Sales") of functioning business lines, which were carved out from the four

Business Units described above (the "Business Lines").  Further details of the Business Sales are

provided in other Appendices.

      36.    A ninth sale (the "Residual Patents Sale"), which generated more proceeds

than the eight Business Sales combined, consisted solely of more than 6,000 granted patents,

---

95.  *See* NNUK Administrators' statement of proposals, February 2009, at 7, *available at*
     http://www.emeanortel.com/collateral/uk_soap.pdf.

96.  NNUK, NNSA, NNIR, Nortel Networks (Austria) GmbH, Nortel Networks N.V., Nortel Networks, s.r.o.,
     Nortel Networks Engineering Service Kft, Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks
     Polska Sp. z.o.o., Nortel Networks Portugal S.A., Nortel Networks Romania SRL, Nortel Networks Hispania,
     S.A., Nortel Networks Slovensko, s.r.o., Nortel Networks Oy, Nortel Networks AB, Nortel France SAS,
     Nortel Germany, and Nortel Networks International Finance & Holding B.V.

97.  For all of the EMEA Debtors with the exception of NNIR:  Alan Robert Bloom, Alan Michael Hudson,
     Stephen John Harris and Christopher John Wilkinson Hill.  For NNIR:  Alan Robert Bloom and David Martin
     Hughes.

98.  *See* NNUK Administrators' statement of proposals, February 2009, at 1, *available at*
     http://www.emeanortel.com/collateral/uk_soap.pdf.

99.  Joint Administrators' First Progress Report for NNUK at 14, Aug. 13, 2009, *available at*
     http://www.emeanortel.com/collateral/reports/adminprogrpt_uk_en.pdf.

pending patent applications and invention disclosures thought worthy of protection by patent application that were held back from the other eight sales (the "Residual Patents Portfolio").

37.    According to an information memorandum prepared by Nortel and its independent advisors – Lazard Frères & Co. ("Lazard") and Global IP Law Group – and sent to potential buyers of the portfolio between May and September 2010, the Residual Patents Portfolio consisted of approximately 4,075 granted patents, and approximately 2,075 patent applications.[100]  The information memorandum noted that the value in the Residual Patents Portfolio comes from the fact that the portfolio covered a broad range of technology areas, that it contained many foundational patents that are deemed to be essential to many different types of products, and that around one-third of the portfolio was registered outside the United States, giving global scope.[101]

38.    The sales presentations delivered by the Nortel Residual Patents team to potential bidders in late 2010 detailed the fact that the Residual Patents Portfolio was composed of patents not "predominantly used" by any one Business Line.[102]  The only material licenses granted were said to be those granted to the Business Line buyers in their respective product line or the "field of use" of the business to enable them to use Nortel IP that was required, but not predominantly used within, that Business Line.[103]

39.    Six of the nine "Asset Sales" (the Business Sales together with the

---

100.    *See* Executive Summary:  Project Iceberg, May 2010, NNC-NNL06096750/3.

101.    *See* Executive Summary:  Project Iceberg, May 2010, NNC-NNL06096750.

102.    *See* Overview [Nortel Patents Presentation given to Iceberg buyers], NNI_ICEBERG_00196153 at 8.

103.    *See* Nortel's Patent Portfolio: An Overview, July 2010, GIP_Nortel_00142929 at 3; Overview [Nortel Patents Presentation given to Iceberg buyers], NNI_ICEBERG_00196153 at 8.

Residual Patents Sale) were conducted by auction, and all of the sales were held in accordance with section 363 of the United States Bankruptcy Code.[104]  By agreement dated January 13, 2009, the Nortel Group retained Lazard, a global investment bank, to assist in marketing the businesses.[105]  The Nortel Group also retained Global IP Law Group to advise it with respect to the valuation of the assets sold in the Residual Patents Sale.[106]

---

104.  *See* Order Authorizing and Approving (A) the Sale of Certain Patent and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections, , July 11, 2011 [D.I. 5935]; Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch (Formerly Known as 'Passport') Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts, Sept. 30, 2010 [D.I. 4054]; Order Authorizing and Approving (A) the Sale of Certain Assets of  the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts, Mar. 3, 2010 [D.I. 2632]; Order Authorizing and Approving (A) Sale of Certain Assets of the Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances and (B) Assuption and Assignment of Certain Executory Contracts, Dec. 3, 2009 [D.I. 2070]; Order Authorizing and Approving Sale of GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances, Dec. 2, 2009 [D.I. 2065]; Order Authorizing and Approving Sale of Debtors' Next Generation Packet Core Network Components Free and Clear of All Liens, Claims and Interests, Oct. 28, 2009 [D.I. 1760]; Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) The Assumption and Sublease of Certain Leases, , Sept. 16, 2009 [D.I. 1514]; Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the Assumption and Sublease of Certain Leases, July 28, 2009 [D.I. 1205]; Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts, Mar. 26, 2009 [D.I. 539]; *see also* Notice of Cancellation of Auction, Feb. 25, 2010 [D.I. 2527]; Notice of Cancellation of, Mar. 20, 2009 [D.I. 506]; Notice of Successful Bid, Oct. 26, 2009 [D.I. 1723].

105.  *See* Application for an Order Authorizing Employment and Retention of Lazard Frères & Co. LLC *Nunc Pro Tunc* to the Petition Date as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Feb. 13, 2009 [D.I. 294] (attaching Letter Agreement, Jan. 13, 2009, as Exhibit C); *see also* Order Under 11 U.S.C. §§ 327 and 328 Authorizing Retention and  Employment of Lazard Frères & Co. LLC as Financial Advisor and Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date, Mar. 20, 2009 [D.I. 507].

106.  Application for an Order Authorizing Employment and Retention of Global IP Law Group LLC *Nunc Pro Tunc* to October 13, 2009 as Intellectual Property Consultant to the Debtors and Debtors in Possession, Oct. 30, 2009 [D.I. 1796] (attaching Master Consulting Agreement, Oct.15, 2009, as Exhibit D); Order Under 11 U.S.C. §§ 327 and 328 Authorizing Employment and Retention of Global IP Law Group, LLC, *Nunc Pro Tunc* to October 13, 2009 as Intellectual Property Consultant to the Debtors and Debtors in Possession, Nov. 11, 2009 [D.I. 1928].

40.     Further, the Asset Sales were made under the Interim Funding and Settlement Agreement (the "IFSA") which was agreed in June 2009.  The various parties currently before the Courts[107] participated in a coordinated program of asset disposals in order to maximize the remaining value in the business for the benefit of Nortel's creditors while postponing the allocation of the resulting proceeds from the sales (the "Sale Proceeds") until after the Asset Sales were completed.[108]

41.     Access to a share of the Sale Proceeds was made conditional on either an entity selling some or all of its business as part of the Asset Sale, or where not, executing an "Appropriate License Termination."[109]  The allocation to which each seller would be entitled was left to a future resolution.

---

107.   The U.S. Bankruptcy Court for the District of Delaware (Gross, J.) and the Ontario Superior Court of Justice (Commercial List) (Morawetz, J.), collectively.

108.   *See* IFSA § 11, June 9, 2009 [D.I. 874 Ex. B].

109.   IFSA § 11, June 9, 2009 [D.I. 874 Ex. B].

APPENDIX C

## Nortel's Transfer Pricing System

The following description of Nortel's transfer pricing system is excerpted from the Transfer Pricing Expert Report of Richard V. L. Cooper, Charles River Associates, dated January 24, 2013 (the "Cooper Expert Report").  Mr. Cooper was retained by the court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators") for Nortel Networks UK Limited ("NNUK") and certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors") located in the region known as EMEA (Europe, Middle East and Africa), through their counsel, Herbert Smith Freehills LLP, Hughes Hubbard & Reed LLP, Davies Ward Phillips & Vineberg LLP and Lax O'Sullivan Scott Lisus LLP, in connection with the bankruptcy proceedings under the *Canadian Companies' Creditors Arrangement Act* for Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (collectively, and including NNC and NNL, the "Canadian Debtors"), pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Proceeding").

Excerpt of Cooper Expert Report, pp. 35–55:

# 4    Nortel's Transfer Pricing Policies

## 4.1    CSA Period

Prior to 2001, Nortel's transfer pricing methodology was based on several cost sharing agreements ("CSAs") for pricing intercompany transactions.  These included an R&D CSA, a tangible inventory property sales CSA and a headquarter costs CSA. [1],[2],[3] Nortel entered Advanced Pricing Agreements ("APAs") with CRA and the IRS with respect to these CSAs.[4]

---

[1]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297).

### 4.1.1    Nortel's R&D Cost Sharing Agreements effective date January 1, 1995

Northern Telecom Limited, the predecessor of Nortel Networks Limited, and Nortel Limited UK were party to the R&D Cost Sharing Agreement ("R&D CSA") effective as of January 1, 1995 which aimed to allocate costs related to the R&D of technology to Nortel's entities. The R&D CSA served as an alternative to charging royalty and licensing fees to certain Nortel entities that used intangibles, such as R&D, which was owned or developed by other entities. Nortel entities could now legally share in the ownership and costs of Nortel's intangibles.[5]

By sharing the costs of the intangibles, each party to the agreement obtained rights to the R&D by funding a portion of its expense in proportion to the benefit it received. Additional benefits achieved by entering the R&D CSA, among others, included:[6]

- Reduced legal complexity;
- Reduced administrative burden;
- Enhanced knowledge-sharing between participants;
- Avoided duplication of R&D expenses, thereby potentially reducing costs; and
- Used an accepted method recognized by the OECD.

At the request of the CRA and the IRS requirements, the R&D CSA was incorporated within an APA issued by the tax authorities. In 1996, after mutual agreement, the CRA and IRS issued formal APAs to Nortel for the 1992 to 1999 tax years.[7]

### 4.1.1.1 Terms of R&D Cost Sharing

Participants of the R&D CSA shared in the costs of the intangibles in two parts which are outlined in detail below. Part one allocated a portion of total R&D expenses to royalty income

---

(Footnote continued from prior page)

[2]    Nortel established several other cost sharing agreements, mostly relating to specific product groups in its EMEA operations such as switching, transmission/optical, enterprise data, enterprise voice, and wireless. Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315308).

[3]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297).

[4]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297).

[5]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297 - 298).See also, MOU, NNI_00245811 – NNI-_00245817 at NNI_00245811).

[6]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315298 - 299).

[7]    The U.K. tax authorities were not involved in the APA. NNUK signed the R&D CSA on January 1, 1995 (Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315299 - 300)).).

earned by the participants which consequently was split amongst CSA participants. Part two allocated the remaining R&D expenses to CSA participants through different methods.[8]

Part one attributed the total R&D expenses to royalty income for each calendar year. The total royalty income of all participants in the CSA was divided by the sum of the total operating income and royalty income, net of R&D, of all participants to arrive at a percentage that was then multiplied by the total R&D expenses of all participants. The result was the amount of R&D expenses that would be attributed to total royalty income of all participants. This amount was then allocated to each participant in proportion to their share of royalty income over total royalty income. The part one allocation process can be expressed in formulas as shown below:[9]

$$(R / (OI + R)) \times R\&D = P$$

$$(A / R) \times P = S$$

R =     Total royalty income of all participants for the calendar year
OI =    Total operating income of all participants for the calendar year
R&D =  Total R&D expenses for the calendar year
P =     R&D Expenses allocated to royalty income, thus (R&D - P) is the residual R&D expense covered by part two
A =     Participant's royalty income for the calendar year
S =     R&D expenses allocated to participant based on participant's royalty income

The residual R&D expense not covered by part one, was then allocated to the participants by part two. Part two allocated 10% of the residual R&D expense to CSA participants based on the participant's share of net customer sales versus total net customer sales across all participants in the calendar year. The remaining 90% of the residual R&D expense was allocated based on the participant's share in modified operating income versus total modified operating income, defined below. The part two allocation process can be expressed in formulas provided below:[10]

---

[8]    R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794548 – 550).

[9]    R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794548).

[10]   R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794548 - 550).

$$(CS / TCS) \times 10\% \times Residual = B$$

$$(MOI / TMO) \times 90\% \times Residual = C$$

$$OI - ((COGS - IP) \times M) = MOI$$

| | |
|---|---|
| CS = | Participant's net customer sales for the calendar year |
| TCS = | Total net customer sales for the calendar year |
| Residual = | Total residual R&D expense for the calendar year *not* allocated in part one |
| B = | R&D expenses allocated to participant based on participant's net customer sales |
| MOI = | Participant's modified operating income, as calculated by formula above, for the calendar year |
| TMO = | Total modified operating income for the calendar year |
| C = | R&D expenses allocated to participant based on participant's modified operating income |
| OI = | Participant's operating income for the calendar year |
| COGS = | Participant's cost of goods sold related to net customer sales for the calendar year |
| IP = | Participant's intercompany purchases for the calendar year |
| M = | Participant's intercompany sales divided by intercompany cost of goods sold for the calendar year |

The R&D CSA also provided CSA participants with a legal title to all intangible assets produced as a result of the R&D expenses during the calendar year. CSA participants were also granted an "exclusive royalty-free license, including the right to sublicense" in return for the participant's sharing of the R&D costs.[11]

## 4.1.2   Tangible Property Pricing Agreement

Since Nortel's inception, the Company manufactured telecommunications equipment. The manufacturing operations grew over time with 38 manufacturing facilities located throughout the world by 1995. These manufacturing facilities often transferred tangible goods to Nortel's LREs, which sold the goods to third parties.[12]   To determine arms-length returns for manufacturing functions, Nortel engaged Horst Frisch, Clowery & Finan to serve as economic advisor on transfer pricing.[13]

Under the Nortel arrangement, manufacturing entities earned an 8% return on full manufacturing costs when they made an intercompany sale.[14] In addition, distribution entities earned a 3% return on third party sales, plus foreign exchange.[15] Mutual agreement was reached with respect

---

[11]   R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794551).

[12]   Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315305).

[13]   Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315305).

[14]   Exhibit 11067 at p. 9.  See also, Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315305).

[15]   Exhibit 11067 at p. 9.

to the tangible property arrangement between Nortel and the IRS and CRA in July 2003 (covering the 1995 to 1999 tax years).

### 4.1.3    Headquarter Cost Sharing Agreement effective date of January 1, 1996 [16]

Similar to the R&D CSA, the Headquarter CSA between NNL (its direct and indirect subsidiaries) and NNI was established to ensure that headquarter expenses incurred to benefit certain entities were allocated appropriately to the benefiting entity.[17]

In 1998, an APA for such transactions, for the 1996 to 2000 tax years, was executed by Nortel with the IRS and CRA tax authorities, though Nortel continued to implement it through 2001, after which it was terminated.[18] This served as a "formali[z]ation of Nortel's global transfer pricing policy with respect to head office expenses."[19]  Incorporating the OECD guidelines, the APA allocated headquarter expenses to Nortel entities throughout the world[20] based on the following methodology:[21]

1.    Determine the cost pool;

2.    Allocate from the cost pool the direct costs to the benefitting entities;

3.    Deduct 20% of the remaining headquarter expenses which are to be treated as stewardship costs; and

4.    Allocate 30% of the remainder based on headcount and 70% of the remainder based on third-party customer sales to Nortel entities worldwide.[22]

### 4.1.4    Termination of the R&D CSA and Nortel's transition to RPSM

The R&D CSA was later terminated by all parties as of January 1, 2001. However, the fully vested and paid rights of each participant remained with the participant even after the

---

[16]    NNI_00215276 to NNI_00215291.

[17]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[18]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[19]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[20]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[21]    Exhibit 11067 at p. 9. See also, Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[22]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726 to 27).  For example, US$385 million of costs were included in the headquarters cost pool in 1998, of which $30.3 million was allocated to NNUK. As a result, NNUK was charged $14 million in excess of the headquarters costs it had incurred itself.  The costs charged to NNUK included specific headquarters expenses such as global advertising costs, website management and content costs, legal support costs, treasury support costs, among others. NNUK benefitted from all these costs in a variety of ways. For example, the website management and content costs provided NNUK with worldwide sources of information and a means of communication in a global environment (Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315307)).

termination.[23] Although the original R&D CSA was effective only through 1999, Nortel applied it in practice until December 31, 2000.[24]

Due to the following issues and complexities, among others, the IRS and CRA tax authorities did not want the original R&D CSA to apply after the 1999 tax year:[25]

- Participants were not making "buy-in payments" for utilizing technology of acquired companies, which are generally required under applicable regulations but were not addressed in the CSA;
- Allocation of R&D expenses during loss years was not addressed; and
- Administrative complexity.[26]

As a result, Nortel submitted a new APA request to the taxing authorities to establish Nortel's RPSM. This RPSM was intended to be effective for an indefinite period beginning January 2001.[27]  The participants that held the rights to the R&D intangibles under the R&D CSA received compensation for those rights through Nortel's RPSM.[28]

### 4.2    Execution of the Master R&D Agreement and other transfer pricing-related agreements

In transfer pricing analyses, while a transfer pricing agreement may be one point of reference, it is not determinative of whether the mechanism employed is arm's length.  What controls are the economic principles of transfer pricing, specifically, whether two parties operating at "arm's length" would have agreed to the arrangement between the related parties.  Consistent with that, although the Original MRDA and subsequent amendments may be one point of reference in assessing Nortel's RPSM, they are not controlling of whether or not Nortel's RPSM was arm's length.  It should be noted, though, that Nortel's transfer pricing agreements outlined below do in fact acknowledge that the RPSM was intended to be arm's length.

While Nortel implemented its RPSM on January 1, 2001,[29] Nortel's RPSM was not documented until December 22, 2004, in the form of the Master R&D Agreement which generally outlined Nortel's existing RPSM.  During the Review Period, certain Nortel entities entered into the

---

[23]   MOU, NNI_00245811 – NNI_00245817.

[24]   NNC-NNL000073 – NNC-NNL000091 at NNC-NNL000077.

[25]   Exhibit 11067 at p. 10.

[26]   Exhibit 11067 at p. 10.

[27]   MOU, NNI_00245811 – NNI_00245817 at NNI_00245812. . See also, NNC-NNL000073 – NNC-NNL000091 at NNC-NNL000077.

[28]   NNC-NNL000073 – NNC-NNL000091 at NNC-NNL000077.

[29]   Nortel's RPSM during the Review Period is detailed later in this section of my report.

Original MRDA (as defined below) and its various addenda, as well as various Distribution Agreements (collectively referred to as "Nortel's Transfer Pricing Agreements"):[30]

1.    The Master R&D Agreement, dated December 22, 2004 ("Original MRDA"), effective as of January 1, 2001[31]

Parties to the MRDA were NNL, NNI, NNUK, NN France, NN Australia and NN Ireland. Schedule A of the Original MRDA detailed Nortel's RPSM and Schedule B outlined the designated territory for each licensed participant (i.e., RPSM participants). A more detailed outline of the Original MRDA is included later in this section of my report.

2.    Addendum to Master R&D Agreement effective January 1, 2001[32]

This addendum (i) made minor corrections to Original MRDA and (ii) updated Article 5 of the Original MRDA related to the grant of exclusive licenses.

3.    Agreement with respect to certain NN Technology, effective as of December 30, 2006[33]

This agreement was related to the sale of Nortel's UMTS business to Alcatel.

4.    Addendum to Master R&D Agreement, dated December 14, 2007, effective  as of January 1, 2006[34]

---

[30]   Nortel's Transfer Pricing Agreements indicate a variety of dates, including when an agreement was entered into, signed or made effective.  In some instances these agreements state all these dates however, there are instances when only one or combination of these dates are included an agreement.   The appropriate date (entered into, signed or effective or a combination of these) is included in this review.

[31]   Original MRDA, Exhibit 21003 (NNC-NNL06001514/1 – NNC-NNL06001514/20). The Original MRDA was signed by NNL and undated (at NNC-NNL06001514/14), by NNI and appears to be signed around January 14, 2005 (Exhibit 11070, NNI_01494046 – NNI_01494064 at NNI_0149406), by NNUK and undated (at NNC-NNL06001514/16) and by NNIR and undated (at NNC-NNL06001514/17).   NNSA signed sometime between June 2, 2005 and October 25, 2005 (Exhibit 31098, NNI_01532977 – NNI_01532992 at NNI_01532991). NN Australia did not sign the Original MRDA  (US_Canada_PRIV_00355402).

[32]   Exhibit 21003 (NNC-NNL06001514/21 – NNC-NNL06001514/26). This addendum (the "First Addendum") was undated.  It was signed by NNL on November 11, 2005, by NNI on October 18, 2005, by NNUK on June 12, 2006, by NNSA on June 21, 2006, by NNIR on February 1, 2006 and by NN Australia on an illegible date. All signature dates are based on Exhibit 21003.

[33]   Exhibit 21148 (NNI_00433303 – NNI_00433314). This addendum (the "Alcatel Addendum") was undated.  It was signed by NNL, NNI, NN Australia, NNIR, NNSA and NNUK and all signatures are undated.  Signature dates are based on Exhibit 21148.

This addendum (the "Second Addendum to the Original MRDA") included, among others, the following changes to the Original MRDA and all prior addenda: amendment to Article 11 (Retiring Participants) of the Original MRDA and amendment to Schedule A to the Original MRDA.

5.    Third Addendum to Master R&D Agreement, effective as of January 1, 2006, except with respect to certain provision related to non-exclusive licenses[35]

Changes implemented by the Third Addendum to the Original MRDA as amended included, among others: (i) an amendment to Article 4 - Legal title of NN technology was to be vested in NNL and NNL agreed to enter into exclusive and non-exclusive licenses with licensed participants, (ii) an amendment to Article 5 - NNL granted each licensed participant a *non*-exclusive, royalty-free license, effective January 1, 2009, (iii) a Second Amendment to Schedule A to the Original MRDA and (iv) changes to Schedule B to the Original MRDA.

6.    Fourth Addendum to Master R&D Agreement, effective as of December 31, 2008[36]

This addendum added a standstill provision to the Original MRDA as amended, to prevent the automatic termination of the MRDA Participants from that agreement upon insolvency.[37]

7.    Distribution Agreements between NNL and Nortel's LREs, which appear to be generally effective as of January 1, 2001[38]

---

(Footnote continued from prior page)

[34]    Exhibit 21003 (NNC-NNL06001514/27 – NNC-NNL06001514/38).  The Second Addendum was signed by NNL on December 18, 2007, by NNI on December 18, 2007 (NNI_00505454 – NNI_00505460 at NNI_00505457), by NNUK and undated, by NNSA on December 19, 2007, by NNIR and NN Australia on December 18, 2007. Signature dates, unless otherwise noted, are based on Exhibit 21003.

[35]    Exhibit 21003 (NNC-NNL06001514/39 – NNC-NNL06001514/50).  The Third Addendum was undated.  It was signed by NNL and NNI on December 19, 2008, by NNUK and NNIR on January 9, 2009, by NNUK on January 9, 2009, by NNSA on January 13, 2009 and by NN on December 22, 2008.  Signature dates are based on Exhibit 21003.

[36]    Exhibit 21003 (NNC-NNL06001514/59 – NNC-NNL06001514/66).  The Fourth Addendum was undated.  It was signed by NNL on January 9, 2009, by NNI on January 8, 2009, by NNUK and NNIR on January 9, 2009, by NNSA on January 13, 2009 and by NN Australia on January 9, 2009.  Signature dates are based on Exhibit 21003.

[37]    Exhibit 21003 (NNC-NNL06001514/59 – NNC-NNL06001514/66 at NNC-NNL06001514/59).

In addition to the aforementioned agreements which were between Nortel's RPEs, NNL entered into agreements with Nortel's LREs which outlined LREs' distribution functions for Nortel and the compensation for such functions.

A detailed review of the agreements and addendums that specifically outlined Nortel's RPSM calculation is included in this section of my report.  Additionally, a review of the Distribution Agreements entered into by NNL and Nortel's LREs is also included.

## 4.2.1   Master R&D Agreement and subsequent agreements amending Nortel's RPSM with RPEs[39]

### 4.2.1.1 Original MRDA

Articles of the Original MRDA included, among others:

### Article 2- Performance of R&D

Under this article, each party to the MRDA agreed to "use it (sic) best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory" and to "account for the R&D Activity by disclosing or otherwise making available to each of the other Participants the relevant results, studies etc. resulting from such R&D Activity."[40]

### Article 3- R&D Activity Payments

For the performance of R&D Activity, each participant was entitled to receive payment equal to the allocation determined by the RPSM (the "R&D Allocation") as detailed in Schedule A to the

---

(Footnote continued from prior page)

[38]   See, for example, Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240563/142), which includes several distribution agreements between NNL and Nortel's LREs.

[39]   The Original MRDA and its addenda (described at items 1 – 6 section 4.2 are collectively referred to herein as "MRDA Agreements". My review of the MRDA Agreements will only focus on the amendments to the Original MRDA that amended Nortel's RPSM (i.e., amendments to Schedule A of the Original MRDA).

[40]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/4). R&D Activity is defined as "all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products" in the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/4).. Products are defined as "all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" in the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/4).

MRDA which was "the measure of the benefit to which it [a party to the MRDA] is entitled commensurate with its performance of, and contribution to, R&D Activity."[41]

Article 3(c) stated that the R&D Allocation presented in Schedule A to the MRDA was proposed to Revenue Authorities and that parties to the MRDA were aware that Nortel's RPSM was still "the subject of review, discussions and negotiations with the Revenue Authorities."[42]

### Article 4- Legal Title to NN Technology

Legal title to any and all NN Technology "in existence or acquired or developed"[43] was vested in NNL.  NN Technology was defined within the MRDA as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."[44]

### Article 5- Grant of Exclusive Licenses by NNL

Pursuant to Article 4, NNL granted each licensed participant an exclusive, royalty-free license, including the rights to  "(i) …sublicense…(ii)…make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Territory designated for that Licensed Participant, and (iii) all rights to patents, industrial designs (or equivalents) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License")".[45]

### Article 9- Duration and Continuing Rights and Obligations

This agreement was in effect from January 1, 2001 through December 31, 2004 and could be automatically renewed for an unlimited amount of one-year terms until terminated by the mutual consent of all parties.  Upon expiration or termination of the Original MRDA "each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to

---

[41]    Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/5).

[42]    Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/5).

[43]    Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/6).

[44]    Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/3).

[45]    Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/6 – 7).

exercise the rights granted [by the Original MRDA] and in particular, the rights granted … in Article 5."[46]

## Schedule A to the Original MRDA

Schedule A to the Original MRDA titled "Schedule A - Calculation of Arm's Length R&D Allocation to each Participant" stated:

> "*The RPSM acknowledge[d] the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property (IP).*
>
> *Accordingly, the compensation provided to Participants under RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology.  Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business.*"[47]

Schedule A to the Original MRDA also set out the specific steps to calculate "entity level adjustments to the (sic) reflect arm's length R&D Allocation calculations of profit or loss for each entity"[48] as follows:

> 1.    "*Identify RPSM Participants*
> 2.    *Determine Accounting Operating Profit*
>     (a)    *add back R&D Expense*
>     (b)    *deduct R&D Capital Stock Amortization in order to arrive at the gross economic profit;*
> 3.    *From the gross economic profit*
>     (a) *deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)*
>     (b) *deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)*
>     *to arrive at the Residual Profit pool.*
> 4.    *Compute each RPSM Participants relative level of R&D Capital Stock*[49]

---

[46]    Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/9).

[47]    Schedule A to the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/18).

[48]    Schedule A to the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/19).  I have summarized the calculation steps outlined in Schedule A to the Original MRDA, and noted that the numbered steps within Schedule A to the Original MRDA do not conform to my numbered steps.

> 5. *Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool with (sic) bears the same ratio as such Participant's ratio of its R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM Participants.*
>
> 6. *Establish entity level adjustments to the (sic) reflect arm's length R&D Allocation calculations of profit or loss for each entity.*"[50]

### 4.2.1.2 First Amendment to Schedule A of the Original MRDA

Schedule A to the Original MRDA was amended twice prior to the Petition Date. The first amendment to Schedule A presented in the Second Addendum to Master R&D Agreement dated December 14, 2007 had no significant changes and stated:

> 1. "*Identify RPSM Participants*
>
> 2. *Determine Accounting Operating Profit (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any relevant taxing authority)*
>
> 3. *From the Accounting Operating Profit*
>
>     (a) *deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority)*
>
>     (b) *deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority) to arrive at the Residual Profit pool.*
>
> 4. *Compute each RPSM Participants relative level of R&D Stock (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any Revenue Authority)*
>
> 5. *Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool which bears the same ratio as such Participant's ratio of its R&D Stock as a percentage of the total R&D Stock for all RPSM Participants.*
>
> 6. *Establish entity level adjustments to the (sic) reflect arm's length R&D Allocation calculations of profit or loss for each entity.*"[51]

---

(Footnote continued from prior page)

[49]   The Original MRDA did not define how R&D Capital Stock should be calculated.

[50]   Schedule A to the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/18 – 19).

[51]   Exhibit 21038 (NNC-NNL06001514/27 – NNC-NNL06001514/38 at NNC-NNL06001514/30 – 31).

### 4.2.1.3 Second Amendment to Schedule A of the Original MRDA

The Third Addendum to the Master R&D Agreement included the Second Amendment to Schedule A which substantially revised Schedule A to the Original MRDA and came into effect January 1, 2006. Pursuant to the Second Amendment to Schedule A, the R&D Allocation was calculated for RPSM participants as follows:

1.  Identify RPSM participants;
2.  From Nortel's consolidated operating earnings/loss in US GAAP, subtract out the operating earnings/losses of existing joint ventures, former joint ventures that own significant intangibles, and Nortel entities that do not perform distribution of NN Technology products;
3.  Then adjust for:
    a.  Amortization of intangibles (including "goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc."[52])
    b.  Gain/loss on the sale of business
    c.  Restructuring charges
    d.  Stewardship costs;
4.  From this adjusted operating earnings/loss, deduct Functional Routine Return of each Nortel Distribution Entity, and Functional Routine Returns for each RPSM participant, this will yield the "Residual Pool;"
5.  Determine the R&D Allocation for RPSM participants by
    a.  Calculating the relative ratios of each RPSM participant's R&D spending to the R&D Spend of all RPSM participants, by taking each RPSM participant's total R&D spend over the previous five years as a ratio of the total R&D spend over the same period for all RPSM participants; and
    b.  Apply the ratio determined above to the Residual Pool to determine each RPSM participant's R&D Allocation; and
6.  Determine if a "true-up" payment is required by comparing an RPSM participant's R&D Allocation and Functional Routine Return (i.e., Target economic profit or loss) to its adjusted operating earnings/loss.[53]

The changes in Nortel's RPSM as stipulated by the First Amendment to Schedule A of the Original MRDA and Second Amendment to Schedule A are illustrated in **Exhibit 8**.

---

[52]  See footnote 1 of Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/49).

[53]  Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/48 – 49).

### 4.2.2    Distribution Agreements with LREs

NNL entered into Distribution Agreements with LREs "to set forth the terms and conditions pursuant to which, the Parties will ensure that [LREs] earn a reasonable arm's length rate of return for their distribution and service-related activities."[54]    A reasonable return, unless otherwise agreed upon, was established in these agreements as an operating margin between 0% and 4%.

Article 1 of Distribution Agreements stated an LRE's actual return would be calculated as its operating income divided by net customer sales.[55] In the event the LRE's actual return for a year was less than "a reasonable arm's length rate of return" then NNL had to pay a transfer pricing adjustment to the LRE.    This adjustment would be calculated as the difference between the LRE's actual return and a reasonable arm's length rate of return multiplied by the LRE's net customer sales.    In the event that an LRE's actual return was higher than an arm's length return then the LRE had to pay NNL the difference.    Any payable amount was to be adjusted for transactional foreign exchange gains/losses.    Article 1 (a)v. stated that an arm's length return would be determined by NNL with the help of the LRE and would be:

> "*based on relevant factors, including: the market and industry conditions in which [the LRE] competes; the functions performed by [the LRE]; the risks undertaken by [the LRE]; the assets employed by [the LRE]; the returns earned by comparable companies to [the LRE]; and the concepts and direction provided by the Organization for Economic Cooperation and Development in its publication entitled 'Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations' July 1995, as amended*."[56]

---

[54]    See, for example, Distribution Agreement between Nortel Networks Austria and NNL at Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240562/142 at NNC-NNL07240562/2). This document contains additional Distribution Agreements between NNL and several other LREs.

[55]    Article 1 (a)ii in Distribution Agreements found in Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240562/142).  Agreements also specified that financial statements presented in U.S. dollars in accordance with U.S. GAAP were to be used to calculate LRE returns.

[56]    Article 1 (a)v in Distribution Agreements found in Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240562/142).

### 4.3  The RPSM Model employed by Nortel for the Review Period

As of January 1, 2001, Nortel implemented a new transfer pricing methodology, the RPSM.  The RPSM was implemented by way of RPSM models, which were used to calculate quarterly and annual transfer pricing adjustments for RPEs and LREs.  Broadly speaking, there were two methods of the RPSM model implemented by Nortel for the Review Period:  models used to calculate transfer pricing adjustments for the First RPSM Period, and the model used to calculate transfer pricing adjustments for the Second RPSM Period.

### 4.3.1  The RPSM Model employed by Nortel during the First RPSM Period

My analysis of Nortel's RPSM for the First RPSM Period is based upon the Nortel RPSM Models produced by the Canadian Debtors for the fiscal years ending December 31, 2001 through 2005.[57]  The base data for each RPSM Model appears to be a data extract from Nortel's A100 accounting system of the income statement for each Nortel entity.[58]  The A100 income statement data in Nortel's RPSM Models is in U.S. dollars and appears to have been generated in accordance with U.S. GAAP.[59]  Nortel's RPSM Models indicate that certain adjustments were made to the A100 income statement data for each respective year to, among other things, consolidate legal Nortel entities together and account for the disposition of assets.  As an example, the income statement data for the fiscal year ending December 31, 2001 that was used in the 2001 RPSM Model for a select group of Nortel entities can be found at **Exhibit 9**

To review Nortel's RPSM Models employed for the First RPSM Period, I provide an overview of the calculations used in the 2001 RPSM Model.[60]  The RPSM Model used by Nortel during the First RPSM Period did not change significantly from year to year.

---

[57]  The specific excel files I have reviewed pertaining to this period are: 2001 RPSM – NOR53648312.xls ("2001 RPSM Model"), 2002 RPSM – NOR_53648037.xls ("2002 RPSM Model"), 2003 RPSM – NOR_53648041.xls ("2003 RPSM Model"), 2004 RPSM – NOR_53648508.xls ("2004 RPSM Model"), 2005 RPSM – NOR_53648130.xls ("2005 RPSM Model"), (together with the Second RPSM Period models: 2006 RPSM - NOR_53648133.xls ("2006 RPSM Model"), 2007 RPSM -NOR_53648323.xls ("2007 RPSM Model"), 2008 RPSM  - NOR_53648048.xls ("2008 RPSM Model") , referred to collectively as, "Nortel's RPSM Models").

[58]  The A100 source data used in each Nortel RPSM Model conformed to general ledger double entry booking standards; therefore, revenues are presented as credit balances, (i.e., positive revenue is shown as a negative balance while losses are shown as a positive balance) and expenses  are presented as debit balances.  To remain consistent with the original Nortel RPSM Models I present my analysis in the same format.

[59]  Nortel's 2001 RPSM Model indicates the income statements are in U.S. GAAP.  Also, the revenue reported in the 2001 RPSM Model has been reconciled to Nortel's revenues reported in its financial statements, prepared in accordance with U.S. GAAP, presented in its Form 10-K for the year ended December 31, 2001 (see **Exhibit 2**).

[60]  See **Exhibits 10 to 11**.

**Step 1: Identification of RPSM participants**

The Nortel entities treated as RPEs in the 2001 RPSM Model are: NNL, NN Ireland, NN France, NN Brazil, NN plc. (i.e., NNUK), NNJI, NN Australia, NNC, NNI, Bay U.S., and Bay Ireland.[61]

**Step 2: Determine accounting operating profit; add back R&D Expense and deduct R&D Capital Stock Amortization in order to arrive at gross economic profit/loss**

Accounting operating (profit) for each RPSM participant is calculated by (i) taking its operating (profit) or loss for the fiscal year from the A100 income statement data, (see **Exhibit 9**) and calculating adjusted operating income.  The adjustments made to determine the adjusted 2001 operating income for each RPSM participant are detailed in **Exhibit 10**.  More specifically, an RPSM participant's operating income or loss was adjusted for, among other things, the removal of restructuring costs from the RPSM and for the inclusion of transactional foreign exchange costs in the RPSM.  Nortel then made additional adjustments for prior quarter transfer pricing adjustments and local GAAP differences to derive "Accounting Operating (Profit)/Loss."

Nortel then calculated Economic Operating (Profit) or Loss for each RPSM participant by:

    i.    Deducting R&D amortization – An entity's total R&D spend to date was amortized using the double declining balance method with a 50% amortization in the first year and a 30% declining balance amortization rate; and

    ii.    Adding R&D expensed (performed) – An entity's current year R&D expense

**Step 3: From gross economic profit deduct the Functional Routine Return of Distributors and RPSM participants to arrive at the Residual Profit Pool**

Functional routine returns for LREs and RPEs were calculated as follows:

    i.    A return on distribution was calculated for each LRE by multiplying its third party sales by a certain percentage.  For 2001, this percentage or distribution return earned by each respective Nortel LRE is listed in the table below;[62] and

---

[61]    In Nortel's 2002, 2003, 2004  and 2005  RPSM Models, NNJI, Bay U.S. and Bay Ireland are eliminated as separate RPEs, but instead are consolidated into other RPEs. In addition, in Nortel's RPSM Models for 2004 and 2005 NN Brazil is included in the RPSM calculation, but has no operating income nor does it receive any return.  However, NN Brazil is consolidated into NNL's R&D stock calculation in Nortel's 2004 and 2005 RPSM Models.

[62]    In the 2001 RPSM Model each LRE earned a different return for its distribution functions on third party sales.  In 2002 all LRE's were given a 0% return on third party sales.  For the remaining years of the First RPSM Period LRE's received a 1% return for distribution on third party sales.  An assessment of LRE's returns for distribution functions is included in section 7 of my report.

| 2001 LRE Distribution Returns | | | |
|---|---|---|---|
| **Entity** | **%** | **Entity** | **%** |
| 895 (Nortel Communications Israel) | 1.3% | Swiss 390 | 2.9% |
| Italy 370 & Italy 371 | 1.8% | Norway 391 | 1.3% |
| Hungary 374 | 1.3% | Sweden 393 | 4.3% |
| Denmark 375 | 2.4% | Belgium 385 | 1.0% |
| Finland 376 | 1.3% | Holland 395 | 1.0% |
| Czech 377 | 1.3% | CALA 313 | 1.1% |
| Solvenia 378 | 1.3% | New Zealand 475 | 1.0% |
| Poland 379 | 2.2% | Singapore 388 | 1.7% |
| Austria 366 | 1.3% | Hong Kong 336 | 1.7% |
| Spain 715 | 3.1% | Japan 605 | 1.0% |
| Portugal 461 | 4.8% | Brazil 211 | 1.0% |

ii.   A return on net assets ("RONA") for RPEs was calculated for each RPE as the sum of each respective RPE's working capital return and long term assets return. Working capital return was derived by multiplying an entity's net working capital balance by a target working capital return percentage.  Long term assets return was calculated by multiplying an entity's net long term assets by a target long term asset return percentage. The table below shows the percentage returns for working capital and long-term assets RPEs received during the First RPSM Period.

| Returns for RONA: 2001 – 2005 | | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| Working Capital Return | 8.86% | 8.86% | 8.86% | 8.86% | 8.86% |
| Long Term Asset Return | 23.60% | 23.60% | 23.60% | 23.60% | 23.60% |

## Step 4: Compute each RPEs relative level of R&D Capital Stock

An RPE's R&D capital stock was calculated as it average capital stock balance for the respective year of the calculation.  The average capital stock balance for the respective year was derived by calculating the average of the opening and closing balance of an entity's capital stock for that year.[63]

## Step 5: Calculate the R&D Allocation attributable to each RPSM participant equal to that portion of the Residual Profit pool, bearing the same ratio as such Participant's ratio of it R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM participants

---

[63]   During the First RPSM Period, the closing balance of an entity's capital stock was calculated as historical R&D spend yet to be amortized.  The opening balance of an entity's capital stock was then calculated by taking the closing balance capital stock, subtracting the total R&D spend for the current year, and then adding all of the R&D amortization for the current year.

Once the R&D capital stock for each RPE was calculated as discussed in Step 4, these capital stocks were summed to give the total R&D capital stock for all RPEs. The R&D allocation percentage for each respective RPE was then calculated as its RPE's R&D capital stock divided by the total R&D capital stock for all RPEs.[64]  In 2001 NNUK's R&D Allocation percentage was 7.4%.[65]

**Step 6: Determine the entity level transfer pricing adjustments**

To calculate the transfer pricing adjustment for each respective RPE, Nortel first determined its total residual profit pool as follows: Total Economic (Profit)/loss for all RPEs minus the total routine returns for RPEs (i.e., RONA) and LREs (i.e., the distribution return).  For 2001 Nortel's residual loss was $5.56 billion.[66]

The total residual (profit)/loss pool was then allocated to each RPE by its respective R&D Allocation percentage determined in Step 5.  NNUK's share of the residual loss was determined as $5.56 billion multiplied by 7.4% and amounted to a loss of $411.4 million.[67]

The transfer pricing adjustment was determined by Nortel for each entity by:

(i)     Calculating the Target Economic Profit/Loss for each entity by combining its routine return with its Allocated Residual (profit)/loss;[68] and

(ii)    Then, deducting an entity's Economic Operating Profit/Loss, determined in Step 2, from its Target Economic Profit.

For NNUK in 2001 its Target Economic Loss equaled $120.3 million and was calculated as the total of its $291.1 million RONA return and its allocated residual loss of $411.4 million.[69] NNUK's 2001 Economic Operating Loss in Nortel's 2001 RPSM was calculated as $1.02 billion.  NNUK's 2001 transfer pricing adjustment was calculated by subtracting its Target Economic Loss of $120.3 million from its Economic Operating Loss of $1.02 billion and resulted in a transfer pricing adjustment owed to NNUK of $902.7 million.[70]

---

[64]    Within the 2001 RPSM Model the R&D Allocation percentage is referred to as the "Allocated Residual Profit %" (See **Exhibit 11**).

[65]    See **Exhibit 11.**

[66]    See **Exhibit 11**.

[67]    See **Exhibit 11.**

[68]    Within the 2001 RPSM Model target economic profit is referred to as "Profit split 'economic' profit," see **Exhibit 11.**

[69]    Within the 2001 RPSM Model target economic profit is referred to as "Profit split 'economic' profit," see **Exhibit 11.**

[70]    See **Exhibit 11.**

### 4.4    The RPSM Model employed by Nortel during the Second RPSM Period

My analysis of Nortel's RPSM for the Second RPSM Period is based upon the Nortel RPSM Models produced by the Canadian Debtors for the fiscal years ending December 31, 2006 to 2008.[71]  To review Nortel's RPSM Models employed for the Second RPSM Period, I provide an overview of the calculations used in the 2006 RPSM Model.[72]   The RPSM Models used by Nortel during the Second RPSM Period did not change significantly from year to year.[73]

### 2006 RPSM Step 1: Identification of RPSM participants

RPEs in Nortel's 2006 RPSM Model included NNL, NN Ireland, NN France, NNUK, NN Australia and NNI.[74]

### 2006 RPSM Step 2: From Nortel's consolidated operating earnings/loss in US GAAP, subtract out the operating earnings/losses of existing joint ventures, former joint ventures that own significant intangibles, and Nortel entities that do not perform distribution of NN Technology products;

### and Step 3: Then adjust for: (a) Amortization of intangibles (including "goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc."[75]), (b) gain/loss on the sale of business, (c) restructuring charges, and (d) stewardship costs.

Nortel's 2006 RPSM Model adjusted operating earnings/loss for various elements detailed in **Exhibit 13**, such as restructuring and stewardship costs.

### 2006 RPSM Step 4: From this adjusted operating earnings/loss, deduct Functional Routine Return for each Nortel Distribution Entity, and Functional Routine Returns for each RPSM participant, this will yield the "Residual Pool"

During the Second RPSM Period, LREs received a distribution return calculated as 1% of their respective third party sales.  RPEs received (i) a 15% return on excess costs (a more detailed explanation of this return is included in section 8 of my report) and (2) a 1% return for

---

[71]    The specific excel files I have reviewed pertaining to this period are: 2006 RPSM - NOR_53648133.xls ("2006 RPSM Model"), 2007 RPSM –NOR53648323.xls ("2007 RPSM Model"), 2008 RPSM – NOR_53648048.xls ("2008 RPSM Model").

[72]    See **Exhibits 12 to 13**.

[73]    2006 RPSM Model.

[74]    See **Exhibits 12 to 13**.

[75]    See footnote 1 of Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/49).

distribution functions calculated as 1% of third party sales. These aforementioned LRE and RPE returns were deducted from "the full year total operating income" to calculate Nortel's residual pool.[76]

**2006 RPSM Step 5: Determine the R&D Allocation for RPSM participants by**
**a.** **Calculating the relative ratios of each RPSM participant's R&D spending to the R&D Spend of all RPSM participants, by taking each RPSM participant's total R&D spend over the previous five years as a ratio of the total R&D spend over the same period for all RPSM participants; and**
**b.** **"Apply the ratio determined above to the Residual Pool to determine each RPSM participant's R&D Allocation"[77]**

Nortel's RPSM during the Second RPSM Period specifically defined the allocation key by which Nortel's residual profits or losses would be allocated to each RPSM participant. In practice, in Nortel's 2006 RPSM the allocation key was derived by taking a weighted average of an RPE's "Capital Asset (old method) percentage" used during the First RPSM Period to allocate Nortel's residual pool and the "R&D Asset (new method) percentage."[78] The "Capital Asset (old method) percentage" for an RPE was calculated by dividing an entity's "R&D Capital Stock Balance Pre UMTS Sale" as of December 31, 2005 by the total R&D Capital Stock Balance Pre UMTS for all RPS entities (NNL, NNI, NNUK, NN France, NN Australia, and NN Ireland). The "R&D Asset (new method) percentage" was calculated as an RPE's historical five year R&D spend (with a one year lag) over the total R&D spend for all RPEs over the same time period.

**2006 RPSM Step 6: Determine if a "true-up" payment is required by comparing an RPSM participant's R&D Allocation and Functional Routine Return (i.e., Target economic profit or loss) to its adjusted operating earnings/loss.**
As detailed in **Exhibit 12**, an RPE's transfer pricing adjustment was calculated for each RPE by comparing its target economic profit or loss to its adjusted operating income.

---

[76]  See **Exhibit 12**.

[77]  Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/49).

[78]  The weighting was 50% for the "Capital Asset (old method)" and 50% for the "R&D Asset (new method)" in Nortel's 2006 RPSM. In Nortel's 2007 RPSM the weighting was 75% for the "R&D Asset (new method)" and 25% for the "Capital Asset (old method)." By 2008 Nortel only applied the R&D Allocation method specified in the Second Amendment to Schedule A in the Third Addendum to the Original MRDA. See **Exhibit 14**.

# APPENDIX D

<u>**Entities Involved/Classifications**</u>

The following description of classification of Nortel entities is excerpted from the Transfer Pricing Expert Report of Richard V. L. Cooper, Charles River Associates, dated January 24, 2013 (the "<u>Cooper Expert Report</u>").  Mr. Cooper was retained by the court-appointed administrators and authorized foreign representatives (collectively, the "<u>Joint Administrators</u>") for Nortel Networks UK Limited ("<u>NNUK</u>") and certain of its affiliates (collectively, and including NNUK, the "<u>EMEA Debtors</u>") located in the region known as EMEA (Europe, Middle East and Africa), through their counsel, Herbert Smith Freehills LLP, Hughes Hubbard & Reed LLP, Davies Ward Phillips & Vineberg LLP and Lax O'Sullivan Scott Lisus LLP, in connection with the bankruptcy proceedings under the *Canadian Companies' Creditors Arrangement Act* for Nortel Networks Corporation ("<u>NNC</u>"), Nortel Networks Limited ("<u>NNL</u>") and certain of their Canadian affiliates (collectively, and including NNC and NNL, the "<u>Canadian Debtors</u>"), pending before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Proceeding</u>").

Excerpt of Cooper Expert Report, pp. 27–34:

# 3    Description of NNC, NNI, NNUK, Other EMEA RPEs, LREs and other entities

## 3.1    Nortel Networks Corporation: 2000 – 2009

### 3.1.1    NNC description

NNC traces its roots back to 1895 when Bell Telephone Company of Canada founded Northern Electric and Manufacturing Company Limited which was a telecommunications equipment provider to the Canadian telephone system.  By the 1980s this company became Northern

Telecom Limited ("Northern Telecom") and had expanded its global reach by developing its U.S., Chinese, and Japanese markets.[1]  In 1998 Northern Telecom changed its name to NNC.

NNC was incorporated in Canada on March 7, 2000 and its common shares were then traded publicly as "NT" on the New York and Toronto stock exchanges.  NNC was the ultimate direct or indirect parent company of 142 subsidiaries located throughout the world.[2] NNL was its principal Canadian operating subsidiary. The organizational structure of Nortel at the Petition date is depicted in **Exhibit 1** and shows that Nortel consisted of the following types of entities: RPEs, LREs, Cost Plus Entities ("CPEs"), At Risk entities ("AREs"), and holding companies.[3] Nortel supplied end-to-end networking products and solutions to customers to improve communications and gained "a well-deserved reputation for innovation and creativity through the development of ground-breaking technology – including many industry firsts – in such fundamental technologies as digital, optical, wireless, internet protocol, voice-over internet protocol, broadband, multimedia, and ethernet."[4]  Its customer base varied from small companies to multinational corporations that provided services to federal, state and local government agencies and the military and included "cable operators, wireline and wireless telecommunication service providers, and Internet service providers."[5]   Nortel's global operations (1) supplied hardware with embedded or bundled software through its four business lines: Global Services ("GS"), Carrier Networks ("CN"), Enterprise Solutions ("ES"), and Metro Ethernet Networks ("MEN") and (2) also, deployed and supported the hardware systems through the CN, ES and MEN business lines.[6]

### 3.1.1.1 Nortel RPEs

Nortel RPEs were entities with integrated operations that generated revenues from both the distribution and sale of Nortel products.  Their customer base included both third parties and other Nortel companies. Some RPEs conducted business support functions for Nortel, including

---

[1]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and in the Matter of the Insolvency Act 1986 at paragraph 17.

[2]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and in the Matter of the Insolvency Act 1986 at paragraph 12.

[3]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and in the Matter of the Insolvency Act 1986 at paragraph 40.

[4]    Declaration of John Doolittle, Vice President of Nortel Networks Inc. In Support of Chapter 11 Petitions and First Day Motions at p. 4.

[5]    Nortel Form 10-K for the years ended December 31, 2007, 2008, and 2009 at p. 1.

[6]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 57.

among other things, treasury, legal and human resource functions, but more importantly, all RPEs funded and conducted Nortel's R&D Activities which was a "key profit driver in the Nortel business."[7,8]

### 3.1.1.2 Nortel LREs

A Nortel LRE performed, among other things, routine distribution functions for Nortel but did not perform any R&D Activities for Nortel and therefore, was not party to the MRDA Agreements.[9] Each respective LRE entered into a Distribution Agreement with NNL and pursuant to this agreement, LRE's were to receive an arm's length return for their distribution and service related activities. [10] Nortel's LREs covered the following geographical regions: Europe, Asia, Central and Latin America and North America.[11]

### 3.1.1.3 Nortel CPEs

Nortel's CPEs were service companies that marketed and installed Nortel products, managed customer relations, and provided training. They provided these services directly to other Nortel entities as well as to third party customers.  The CPEs were compensated for the services they provided to other Nortel entities on a cost plus basis, which covered the cost of providing the services (inclusive of overhead) and included a mark-up of typically 10%.[12]

---

[7]    Original MRDA and subsequent amendments, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/65 at NNC-NNL06001514/18).  A more detailed analysis of the precise functions performed by RPEs can be found in **Appendix D** of this report.

[8]    At the Petition Date, Nortel's EMEA RPEs were NNUK, NN Ireland and NN France.

[9]    A more detailed analysis of the precise functions performed by LREs can be found in **Appendix D** of this report.

[10]    The financial performance of Nortel's distributors has been determined by reviewing Nortel's RPSM Models produced by the Canadian Debtors ("2001 – 2008 RPSM Models") which were reconciled to Nortel Form 10-K filings (see **Exhibit 2**). From 2001 to 2008 total revenue for Nortel's distributors declined from $3.0 billion in 2001 to $1.9 billion in 2008. Distributor revenue consisted of both third party revenue and intercompany revenue.  A segment analysis of distributor revenue illustrates that during the period 2001 to 2008 Nortel distributors saw a sharp decline of 49% in third-party revenue while intercompany revenue increased by 320% from $94.9 million to $398.7 million (see **Exhibits 3A and 3B**).

[11]    2001 RPSM Model: Distribution entities are listed by entity number and country; countries listed in model fall under all of the aforementioned regions.

[12]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 46.

#### 3.1.1.4 Nortel AREs

Nortel's AREs were joint venture operations and as such, their operations were governed by joint venture agreements.  These entities provided distribution and sales functions primarily to third party customers and to other Nortel entities.[13]

#### 3.1.1.5 Nortel Holding Companies

Nortel's holding companies were simply holding companies for subsidiaries and had no operational activities.[14]

### 3.2    NNI

NNI, a direct wholly owned subsidiary of NNL, was Nortel's principal operating subsidiary in the U.S. and was incorporated in the state of Delaware on September 16, 1971.  NNI was the direct or indirect parent of a number of Nortel's U.S. companies and acted as one of the main purchasing hubs for all Nortel regional sales entities, accounting for two thirds of all purchases in combination with NNL.[15]    Along with NNL and NNUK, NNI was one of the main manufacturing houses for the Nortel group.[16] It also was "able to perform a full scope of distribution activities, since [NNI has] technical and other regional sales and marketing personnel and general and administrative personnel who support the sales effort both locally and globally. These activities included marketing strategy, tactical marketing and advertising…"[17]

### 3.3    NNUK[18]

In 1990 Nortel acquired 100% ownership of STC Plc ("STC"), a supplier of telecommunications products with a significant presence in the U.K.[19]   Under Nortel's control, STC went through a

---

[13]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 49.

[14]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 55.

[15]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraphs 77-78.

[16]    2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189932).

[17]    2008 APA Request, Exhibit 22078 (PC0184853 – PC0185061 at PC0184874)

[18]    The financial performance of NNUK has been determined by reviewing the 2001 – 2008 RPSM Models (**see Exhibits 5A and 5B**).

series of divestitures to align its business and products to Nortel's and as a result, by 1994 NNUK conducted the following businesses: transmission systems, terminals, telephone sets, customer consoles, defence systems, and R&D among other things. Following the STC acquisition, NNUK became the largest Nortel operation in Europe.[20]   By 1995, NNUK's roots were established in the U.K. and it was a "fully integrated business with manufacturing, sales and marketing, R&D and support functions[.]"[21]    NNUK's "principal activity [was] the development and supply of telecommunications equipment, software and services."[22]   The directors of NNUK viewed its R&D activity "as necessary for the continuing success in the medium to long term future"[23] for NNUK and the Nortel Group.

Among its various support roles, NNUK supported EMEA sales groups as a Marketing Support Group and Product Line Management Group ("MSG/PLM").[24]   NNUK also developed into "the centre of operations and head office functions for the EMEA Region"[25] and performed, among other activities, human resources, finance and control, treasury, banking and lease portfolio management functions for Nortel's EMEA Region.[26,27]

---

(Footnote continued from prior page)

[19]   KPMG Nortel Networks Transfer pricing report on Nortel Networks U.K. Ltd dated July 18, 2003 ("2003 KPMG NNUK Report"), Exhibit 32117 (NNI_00315272 – NNI_00315311 at NNI_00315293).  Prior to 1990, Nortel owned a 28% equity stake in STC.

[20]   2003 KPMG NNUK Report, Exhibit 32117 (NNI_00315272 – NNI_00315311 at NNI_00315293).

[21]   2003 KPMG NNUK Report, Exhibit 32117 (NNI_00315272 – NNI_00315311 at NNI_00315293).

[22]   NNUK' Directors' Report and Financial Statements, Exhibit 31142 (NNC-NNL11667398/1 – NNC-NNL11667398/39 at NNC-NNL11667398/3).

[23]   NNUK' Directors' Report and Financial Statements, Exhibit 31142 (NNC-NNL11667398/1 – NNC-NNL11667398/39 at NNC-NNL11667398/3).

[24]   2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189950).

[25]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 6.

[26]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 15.

[27]   The "EMEA Region," at the Petition Date consisted of: NNUK, Nortel Networks S.A. (France), Nortel GmbH (Germany), Nortel Networks (Ireland) Limited (Ireland), Nortel Networks N.V. (Belgium), Nortel Networks S.p.A. (Italy), Nortel Networks B.V. (Netherlands), Nortel Networks Polska Sp. z.o.o. (Poland), Nortel Networks Hispania, S.A. (Spain), Nortel Networks International Finance & Holding B.V. (Netherlands), Nortel Networks (Austria) GmbH (Austria), Nortel Networks s.r.o. (Czech Republic), Nortel Networks Engineering Service Kft. (Hungary), Nortel Networks Portugal S.A. (Portugal), Nortel Networks Slovensko, s.r.o. (Slovakia), Nortel Networks France S.A.S

(Footnote continued on next page)

At the Petition Date NNUK was located in Maidenhead, U.K and was a wholly owned subsidiary of NNL and its parent NNC.  As detailed in **Exhibit 1,** NNUK had a number of subsidiaries in Europe and had a branch in Saudi Arabia.

## 3.4    Other EMEA Entities

### 3.4.1    EMEA RPE: NN Ireland[28]

NN Ireland was incorporated in January 1973 and was primarily involved in global distribution and sales functions, with only 10% of its revenues coming from within Ireland.[29] NN Ireland was a wholly owned subsidiary of NNIF until December 2007 when, prior to Nortel's restructuring initiative, it was sold to NNL which then became its sole owner.[30] NN Ireland was "the core legal entity for EMEA Enterprise sales"[31] and Nortel "ha[d] most of the EMEA sales for that business line passing through"[32] this legal entity. However, primary decision making and key management functions were controlled in England and flowed through the EMEA group.[33] NN Ireland also served supporting EMEA sales groups as a MSG and PLM.[34]

---

(Footnote continued from prior page)

(France), Nortel Networks Oy (Finland), Nortel Networks Romania SRL (Romania), Nortel Networks AB (Sweden), NN AS (Norway) and Nortel Networks AG (Switzerland).  The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 at paragraph 14, pp. 4-5.

[28]    The financial performance of NN Ireland has been determined by reviewing the 2001 – 2008 RPSM Models (**see Exhibits 6A and 6B**).

[29]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks Ireland and In the matter of the Insolvency Act 1986 at paragraph 30.

[30]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 39.

[31]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 38.

[32]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 38.

[33]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks Ireland and In the matter of the Insolvency Act 1986 at paragraphs 36-39.

[34]    2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189950).

### 3.4.2    EMEA RPE: NN France[35]

NN France was incorporated in 1992 as Nortel Matra Cellular and was a former joint venture until 1999, when Nortel took 100% control.  In 2000 it was renamed Nortel Networks and became Nortel Networks SA after merging with Nortel Networks Europe SA.[36] NN France was primarily focused in Nortel's wireless – GSM business segment and was "responsible for the procurement of GSM products throughout the entire Nortel Group… whenever a Nortel sales company require[d] GSM products to fulfil a customer's order, they [would] order that product from [NN France]."[37]

NN France conducted R&D activities, primarily relating to wireless operations and also supported EMEA sales groups as a MSG/PLM, in addition to performing various headquarter functions such as treasury and finance.[38]  NN France maintained two sales offices in Algeria and Malta as well as a distribution subsidiary, Nortel Networks France SAS, which shared management and support functions. In January of 2009, NNL owned 91.17% of NN France.[39]

### 3.4.3    EMEA LREs

EMEA LREs as of the Petition Date are presented in the table below. [40]

---

[35]   The financial performance of NN France has been determined by reviewing the 2001 – 2008 RPSM Models (**see Exhibits 7A and 7B**).

[36]   The Witness Statement of Michel Clement dated January 14, 2009 In the matter of Nortel Networks S.A. and In the matter of the Insolvency Act 1986 at paragraph 13.

37    The Witness Statement of Michel Clement dated January 14, 2009 In the matter of Nortel Networks S.A. and In the matter of the Insolvency Act 1986 at paragraph 10.

[38]   2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189950, EMEAPROD2189959, EMEAPROD2189903).

[39]   The Witness Statement of Michel Clement dated January 14, 2009 In the matter of Nortel Networks S.A. and In the matter of the Insolvency Act 1986 at paragraph 16.

[40]   I understand that Nortel Networks AG (Switzerland) and NN AS (Norway) have made transfer pricing claims as LREs.

| EMEA Limited Risk Entities (LREs) [a] | |
|---|---|
| Nortel Networks N.V. (Belgium) | Nortel Networks, s.r.o. (Czech Republic) |
| Nortel Networks S.p.A. (Italy) | Nortel Networks Engineering Service Kft. (Hungary) |
| Nortel Networks B.V. (Netherlands) | Nortel Networks Portugal S.A. (Portugal) |
| Nortel Networks Polska Sp. z o.o. (Poland) | Nortel Networks Slovensko, s.r.o. (Slovakia) |
| Nortel Networks Hispania, S.A. (Spain) | Nortel Networks A.G. (Switzerland) [b] |
| Nortel Networks Austria GmbH (Austria) | |

**Sources/Notes:**
[a] Witness Statement of Sharon Rolston dated January 14, 2009 at paragraph 50, page 12.
[b] Unlike the other 10, no administration application was made for this entity.

### 3.4.4    EMEA CPEs

EMEA CPEs as of the Petition Date are presented in the table below.

| EMEA Cost Plus Entities (CPEs) [a] | |
|---|---|
| Nortel Networks Oy (Finland) | Nortel Telecom International Ltd (Nigeria) [b] |
| Nortel Networks (Scandinavia) AS (Norway) [b] | Nortel Networks Romania SRL (Romania) |
| Nortel Networks O.O.O. (Russia) [b] | Nortel Networks South Africa (Proprietary) Limited (South Africa) [b] |
| Nortel Networks AB (Sweden) | Nortel Networks Ukraine Limited (Ukraine) [b] |

**Source:**
[a] Witness Statement of Sharon Rolston dated January 14, 2009 at paragraph 44, pp. 10-11.
[b] No administration application was made for these entities.

### 3.4.5    EMEA AREs

EMEA AREs as of the Petition Date included:

- Nortel GmbH (Germany);

- Nortel Networks France S.A.S (France); and

- Nortel Networks Israel (Sales and Marketing) Limited (Israel).[41]

### 3.4.6    EMEA Holding Companies

EMEA holding companies as of the Petition Date included:

---

[41]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 47.  Nortel GmbH (Germany) and Nortel Networks France S.A.S (France) have filed for administration.  Nortel Networks Israel (Sales and Marketing) Limited (Israel) is seeking the local equivalent of an administration, also at paragraph 47.

- Northern Telecom France S.A. (France);

- Nortel Networks International Finance & Holdings B.V. (Netherlands); and

- Nortel Communications Holdings (1997) Limited (Israel).[42]

---

[42]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 54.  Northern Telecom France S.A. (France) has filed for administration; Nortel Communications Holdings (1997) Limited (Israel) is seeking the local equivalent of an administration.  Nortel Networks International Finance & Holdings B.V. (Netherlands) has not filed for administration, also at paragraph 54.

# APPENDIX E

## UMTS Pre-petition Asset Sale Details

1.      On or about August 31, 2006, Nortel entered into a non-binding memorandum of understanding to sell certain assets related to its Universal Mobile Telecommunications System ("UMTS") access business to Alcatel-Lucent.[1]  The parties signed a definitive agreement on December 4, 2006 and the sale closed on December 31, 2006, for a nominal purchase price of US$320 million, less certain significant deductions, restructuring and transaction related costs.[2]   In addition, Nortel provided Alcatel-Lucent with a $23 million promissory note in lieu of transferring working capital, which was paid in the first quarter of 2007.[3]

2.      The UMTS access business included products and services within Nortel's wireless business related to third generation ("3G") wireless, a standards-based technology globally implemented to provide high data rate mobile service.[4]

3.      The majority of the UMTS business was located outside of North America, predominantly in Europe, with some presence in Latin America, Mexico, and Korea, and a number of engineers in Canada and China.[5]

---

1.      Nortel Networks Corp., Quarterly Report (Form 10-Q) (Nov. 7, 2006) at 30.

2.      Nortel Networks Corp., Current Report (Form 8-K) (Jan. 3, 2007) at Ex. 99.1.

3.      Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 43, 141.

4.      Dadyburjor Dep. 48:8–15, Oct. 3, 2013.

5.      Riedel Dep. 141:10–17, Oct. 10, 2013; *see also* Project Osiris - White Paper, May 29, 2006, EMEAPROD1243162 at EMEAPROD1243168–69 (identifying preliminary list of key customer accounts in Spain, Italy, Portugal, U.K., Germany, France, Belgium, Poland, Slovakia, Austria, Korea and Israel, and workforce details reflecting approximately 70% of the workforce in EMEA, 11% of the R&D workforce in China, and 34% of the R&D workforce in North America, including 371 employees in Canada).

4.       Twenty-two different Nortel entities were designated as sellers in the

UMTS transaction as follows:  Nortel Networks Limited ("NNL"), Nortel Networks Inc.

("NNI"), Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR")

and Nortel Networks S.A. ("NNSA"), together with entities for Austria, Australia, Belgium,

China, Germany, Hong Kong, Israel, Italy, Malta, the Netherlands, Northern Ireland, Peru,

Poland, Portugal, Slovakia and Spain, and Nortel Networks Technology Corporation.[6]

5.       With the completion of this sale, Alcatel-Lucent acquired Nortel's UMTS

access product portfolio, associated patents and tangible assets as well as customer contracts

from Nortel.[7]  Specifically, Alcatel received an assignment of all patents and other intellectual

property ("IP") mainly used in the UMTS access business, including standard essential patents.[8]

Alcatel also received a license for IP that was not assigned outright because it was needed by

other aspects of Nortel's business, but which was still needed to run the UMTS access business.[9]

As part of the asset sale, approximately 1,700 of Nortel's UMTS access employees transferred to

---

6.    *See* Final Nortel UMTS asset allocation spreadsheet, July 27, 2007, NNI_00286115.

7.    DSC Appraisal Assocs. Inc., Alcatel: Valuation of Certain Assets of Nortel Networks' UMTS Business as of
      December 31, 2006 ("DSC Alcatel Appraisal"), NNI_00174638 at NNI_00174645 ("Under the transaction,
      Alcatel acquired Nortel's UMTS radio access technology and product portfolio (made up of the Radio
      Network Controller ('RNC') and Node B products and OAM solutions), as well as all associated patents,
      tangible assets and customer contracts.  It is anticipated that a significant majority of employees of Nortel's
      UMTS access business will be transferred to Alcatel.").

8.    *See* Nortel Networks Corp., Current Report (Form 8-K) (Jan. 3, 2007) at Ex. 99.1 ("With the completion of
      this sale, Alcatel-Lucent acquired the UMTS access product portfolio, associated patents and tangible assets
      as well as customer contracts from Nortel."); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16,
      2007) at 43 ("We have committed to . . . providing Alcatel-Lucent the right to use all proprietary intellectual
      property used in our UMTS access products and services which are also common to other Nortel products and
      services.").

9.    *See* Project Osiris, Board of Directors Update, Slide 4, Aug. 29, 2006, NNC-NNL07875245 ("ALA [Alcatel
      Lucent] gets a license for the IPR that is not transferred but still needed by them to run the business.  Nortel
      gets a royalty free license back on the IPR it has assigned subject to an exclusion for UMTS Access.").

Alcatel-Lucent, primarily in France, Ottawa and Beijing.[10]

      6.     The terms of the UMTS Asset Sale Agreement granted Alcatel the right to allocate the consideration to classes of assets, subject to the condition that tangible assets (owned equipment and inventory) were valued at Nortel net book value.[11]  Alcatel retained an independent appraiser, DSC Appraisal Associates Inc. ("DSC") to conduct an analysis and estimation of the fair market value of certain intangible assets associated with the acquisition of Nortel's UMTS radio access business as of December 31, 2006, to assist Alcatel in allocating the purchase price among the acquired assets for financial reporting purposes.[12]  DSC determined the fair value of technology assets (developed technology and in-process R&D) and customer relationships (contractual and non-contractual).[13]  Based on the valuation analysis conducted by DSC and in accordance with the terms of the UMTS Asset Sale Agreement, Alcatel allocated its purchase price to tangible assets (comprised of fixed assets and inventory), customer relationships, IP and goodwill.[14]

---

10.    Nortel Networks Corp., Current Report (Form 8-K) (Jan. 3, 2007) at Ex. 99.1; Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 14.

11.    *See* UMTS Asset Sale Agreement Ex. 2.2.7 ¶ (i), Albert-Lebrun Dep. Ex. 31585, at NNC-NNL06026778/57 (stating that Alcatel "will provide to [Nortel] with [Alcatel's] proposed allocation among the Assets . . . (the 'Asset Acquisition Statement').  . . . The Asset Acquisition Statement will use net book value for the Owned Equipment and the Inventory . . . ."); e-mail from Louis Farr, Tax Dep't, NNI, to Ryan Smith, EMEA Tax Leader, et al., "'Heads Up' – Osiris Purchase Price Allocation Process," (Dec. 4, 2006, 11:36 p.m.), NNI_00432290 at NNI_00432290 (noting that the "signed agreement provides that Alcatel is to do an allocation of price among the assets"); Memorandum from the Nortel Global Initiatives Grp. to Project Osiris Files,  "Treatment of Customer Relationship Intangible in Purchase Price Allocation" (Feb. 15, 2007) ("Project Osiris File Memo"), NNC-NNL035256 at NNC-NNL035256.

12.    DSC Alcatel Appraisal, NNI_00174638 at NNI_00174638.

13.    *Id.* at NNI_00174644 (listing fair market values for the following assets: Developed Technology & Know-How, Customer relationships (contractual & non-contractual) and In-Process Research and Development).

14.    Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement, July 24, 2007, NNC-NNL06105164; Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256.

5

7.      The total purchase price for the UMTS access business was $320 million, which after various adjustments resulted in net proceeds of approximately $293 million.[15]  Of this latter amount, $68 million was allocated to tangible assets and inventory at book value.[16]  This left approximately $225 million to be assigned to intangible assets for tax and financial statement purposes.[17]  Based on an independent appraisal by DSC, Alcatel assigned approximately $162 million to IP, $52 million to customer relationships and $11 million to goodwill.[18]

8.      Nortel was then required to allocate the sale proceeds among the twenty-two Nortel sellers.[19]  The values Alcatel attributed to fixed assets and inventory were assigned to the entity transferring those assets to Alcatel in accordance with the values recorded on that entity's books as of December 31, 2006.[20]  The value attributed to IP was apportioned to the

---

15.   Amount to be allocated ("Alcatel Allocation Worksheet"), EMEAPRIV0045785 at 1 (listing Gross Consideration at $320,000,000 and Amount to be allocated at $292,745,290).

16.   *Id.*  (listing Tangible Assets at $68,407,637); Nortel Networks, Sale of UMTS Access Business to Alcatel Lucent, Allocation of Consideration ("Nortel Alcatel Allocation"), EMEAPROD1305279 at EMEAPROD1305280 ("The structure of the sale agreement was such that Alcatel had the right to allocate the agreed price over asset classes, subject to the provision that tangible assets, machinery & equipment and inventories, were to be valued at Nortel US GAAP book value at closing.").

17.   *See* Alcatel Allocation Worksheet, EMEAPRIV0045785 at 1 (remaining asset classes are Developed Tech & Know How, Customers Relationships & Contracts, In-Process R&D, and Goodwill); UMTS Asset Sale Agreement Ex. 2.2.7 ¶ (v) ("[T]he Seller shall and shall cause the other Designated Sellers, respectively . . . to file all Tax Returns and reports consistent with the allocation provided in the Asset Allocation Statement.").

18.   Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256; *see also* Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement (Dec. 29, 2006), NNI_00432293 at 1.

19.   UMTS Asset Sale Agreement Ex. 2.2.7 ¶ (v) ("[T]he Seller shall and shall cause the other Designated Sellers, respectively . . . to file all Tax Returns and reports consistent with the allocation provided in the Asset Allocation Statement.").

20.   Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305280 ("[T]angible assets, machinery & equipment and inventories, were to be valued at Nortel US GAAP book value at closing. . . . Nortel had the right under the sale agreement to allocate the consideration by asset class to each vending entity in the group.").

participants in the MRDA at the time the sale completed (NNL, NNI, NNUK, NNIR, NNSA and

Nortel Networks Australia Pty. Limited) in accordance with their respective proportionate share

in the group residual profit pursuant to the Master Research and Development Agreement

("MRDA") assessed as of December 31, 2006, as "economic owners of the intellectual property

under that Agreement."[21]  The value Alcatel attributed to customer assets was apportioned

among the various different sellers by identifying which entity held the primary customer

relationship.[22]  Alcatel deemed the remaining balance of the purchase price (after allocating the

value of the other asset classes) to be attributable to goodwill.[23]  This was allocated first to the

Limited Risk Entity ("LRE") sellers, who each received the same 1% return as paid under the

transfer pricing arrangements for 2006, with the balance shared among the Residual Profit

Entities ("RPEs") in accordance with their respective percentage stake in the R&D capital stock

under the MRDA as of December 31, 2006.[24]

---

21.  *Id.* at EMEAPROD1305281 ("Intellectual property consideration was allocated to the participants in the
Master R&D Agreement to be shared amongst them in their proportionate share in the group residual profit at
the time of Closing as they are the economic owners of the intellectual property under that Agreement.");
Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035257 ("While NNL generally is the legal owner
of the technology, the Master R&D Agreement determines the economic ownership of it and thus allocation
of the consideration by proportionate R&D Capital Stock is appropriate.").

22.  Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305281 ("Customer contract consideration
was allocated pro rata to external customer revenues for the [sic] 2006 by reference to the Nortel entity that
had the true customer relationship."); *see also* e-mail from Kerry Stephens, Tax Dep't, EMEA, to Michael
Orlando, Int'l Tax – Transfer Pricing, NNI, et al.  (Jan. 14, 2007, 9:57 a.m.), EMEAPRIV0034270 at
EMEAPRIV0034270  ("The allocation on our part was that customer contract monies were attributed to the
entity with the substantive customer relationship, so the UK for example picked up a large share because of
the revenues derived from Vodafone and O2."); *see also* Project Osiris File Memo, NNC-NNL035256 at
NNC-NNL035256 (noting the Nortel's allocation determination for customer contracts was "by reference to
the entities owning the contracts, the allocation being based on proportionate 2006 UMTS revenues").

23.  Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305280 (listing "Goodwill (the balance of
the consideration after the foregoing allocations)").

24.  *Id.* at EMEAPROD1305281 ("LRD vendors were only allocated 1% of [the balance goodwill figure],
representing their historic margin on customer revenues as found by the Distributor agreements . . . [the]

(Footnote continued on next page)

9.      In summary, Nortel decided to assign value as follows (figures rounded):

a.      $68 million attributable to tangible assets and inventory was allocated to the Nortel company that held those assets at the value recorded on that entity's books as at December 31, 2006;[25]

b.      $162 million attributable to IP was allocated to the various RPEs in proportion to their Residual Profit Share ("RPS") percentages, calculated based on the five previous years of R&D spending;[26]

c.      $52 million attributable to customer assets was allocated to the various entities that held the primary customer relationship, based on proportionate 2006 UMTS revenue;[27] and

d.      $11 million attributable to goodwill was allocated by first assigning to each entity a percentage based on a three factor formula considering assets, employees and revenue.[28] The LREs then received 1% of the initial calculated percentage,

---

(Footnote continued from prior page)
balance being allocated to the participants in the Master R&D Agreement in the same ratio as applied to the Intellectual property proceeds.").

25.    *See id.* at EMEAPROD1305281 ("The structure of the sale agreement was such that Alcatel had the right to allocate the agreed price over asset classes, subject to the provision that tangible assets, machinery & equipment and inventories, were to be valued at Nortel US GAAP book value at closing."); Alcatel Allocation Worksheet, EMEAPRIV0045785 at 1 (listing Tangible Assets at $68,407,637).

26.    *See supra* note 21; Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256 (listing Technology (IP/in process R&D) at $161.9 million).

27.    *See supra* note 22; Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256 (listing customer contracts at $51.8 million).

28.    *See* Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement (Dec. 29, 2006), NNI_00432293 at 1 (listing total Goodwill at $10,637,653.); Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256 (listing Goodwill at $10.6 million); Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305281 ("The balancing goodwill figure is allocated amongst all Nortel vendors by reference firstly to a three factor formula of revenues, assets and people for each vending entity to determine a

(Footnote continued on next page)

which was the amount paid under the relevant distribution agreements for 2006.[29]  The remaining 99% which was not allocated to the LREs was then divided among the RPEs in the same proportions as IP.[30]

10.    The net result of this allocation was the following[31]:

### UMTS Access Sale Proceeds Allocation

|  | IP | | Customers | | Goodwill | |
|---|---|---|---|---|---|---|
| NNL | $65.5MM | 40.45% | $0 | 0.00% | $3.02MM | 28.35% |
| NNI | $68.1MM | 42.05% | $0.04MM | 0.08% | $1.71MM | 16.08% |
| NNUK | $8.8MM | 5.45% | $42.8MM | 82.62% | $1.12MM | 10.50% |
| NNSA | $17.6MM | 10.86% | $7.3MM | 14.10% | $4.66MM | 43.81% |
| NNIR | $1.4MM | 0.86% | $0 | 0.00% | $0.08MM | 0.78% |
| Other EMEA | $0 | 0.00% | $1.17MM | 2.26% | $0.03MM | 0.30% |
| Other | $0.5MM | 0.33% | $0.5MM | 1% | $0.017MM | 0.18% |

11.    The final values apportioned to each Nortel selling entity were audited by Deloitte.[32]

---

(Footnote continued from prior page)
proportionate split for each vendor (its percentage of the total of its three factors against the total of those factors for all vendors.  That proportion of the Goodwill consideration was found for each vendor, but LRD vendors were only allocated 1% of that, representing their historic margin on customer revenues as found by the Distributor agreements referred to above, the balance being allocated to the participants in the Master R&D Agreement in the same ratio as applied to the Intellectual property proceeds.").

29.    *See* Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305281 ("That proportion of the Goodwill consideration was found for each vendor, but LRD vendors were only allocated 1% of that, representing their historic margin on customer revenues as found by the Distributor agreements referred to above. . . .").

30.    *Id.*

31.    Amount to be allocated, UCC0146640 at 1.

12.     Internally, Nortel decided to allocate the various asset classes among the

Nortel entities based on the following assumptions:

a.     Customer Relationship Intangibles – The value of the Customer

Relationship Intangible was allocated to those entities that had the face-to-face relationship with

the customer.  The allocation was based on the revenue that the associate customer contract

produced.  The fact that the other Nortel entities may have had revenue from a particular

customer contract was disregarded – the only reason why these entities had revenue was due to

Nortel's internal, local-to-local sales process.[33]

b.     IPR – The value for IPR was allocated using RPS percentages.

RPS determined how profits and losses are shared.  If UMTS access was not sold, all of the RPS

members would share profits and losses associated with the business.  Since RPS determined the

economic relationships between the parties, all rights associated with the IPR should be shared

based on RPS percentages.  This was also consistent with Nortel's view that all Nortel IPR is

indistinguishable such that all value should be shared among the RPS members.[34]

c.     Goodwill – Going concern value is a function of the elements of

value in a business – assets, people, and revenue.  Each of the factors was given an equal one-

---

(Footnote continued from prior page)

32.   *See* Orlando Dep. 153:17–21, Nov. 5, 2013 (agreeing that Nortel's auditors reviewed the Alcatel/UMTS sale); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 43, 141 (inclusion of the Alcatel/UMTS transaction in Nortel's audited annual financial statements); e-mail from Timothy Pickering, Senior Manager, Int'l Tax, Deloitte & Touch LLP, to Louis Farr, Tax Dep't, NNI, et al. ( Jan. 27, 2007, 11:06 a.m.), NNI_00364699 at NNI_00364700 ("Please find attached the information that we will require to assist in the audit of this transaction.").

33.   E-mail from Louis Farr, Tax Dep't, NNI, to Timothy Pickering, Senior Manager, Int'l Tax, Deloitte & Touche LLP, et al., "UMTS Alcatel Transaction" (Jan. 29, 2007, 2:25 p.m.), Culina Dep. Ex. 21160, at BHG0137543 (stating assumptions concerning customer relationship intangibles).

34.   *Id.* (stating assumptions for IPR).

third weighting in allocating the goodwill, but the economic effects of RPS were also included.

The Distributor Companies participated, but their economic upside and downside were capped

under RPS.  Therefore, the goodwill was shared among the RPS members after the Distributors

received their 1% payments in acknowledgement of their participation in the Nortel/Alcatel

transaction.[35]

---

35.    *Id.* (stating assumptions for goodwill).

APPENDIX F

## Details of the CDMA and LTE Sale to Ericsson

*Overview of the Sale*

1.      Carrier Networks ("CN"), one of Nortel's four reportable business segments, offered wireline and wireless networks that helped service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops and other wireless computing and communications devices.[1]

2.      The Code Division Multiple Access and Long Term Evolution Access ("CDMA and LTE") business fell within the CN reportable business segment.[2]

3.      The CN portfolio included 2G/3G mobility networking solutions based on the CDMA channel access method used by various radio communication technologies, and Nortel's research and development efforts included innovative technologies focused in the areas of 4G broadband wireless, including LTE, an evolving networking standard designed to increase network bandwidth for multimedia content and applications.[3]  The LTE business is the business in which the Nortel Group designed, marketed and distributed LTE access products.[4]

---

1.      Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009.

2.      Fourteenth Report of the Monitor ¶ 12, June 23, 2009 [D.I. 946].

3.      *Id.* ¶ 14.

4.      *Id.* ¶ 16.

*Details of the CDMA and LTE Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| June 19, 2009 | Nokia Siemens Networks B.V. signs Stalking Horse Agreement |
| June 30, 2009 | Court order approves sale and bid procedures |
| July 21, 2009 | Last date for submission of qualified bids |
| July 24, 2009 | Auction commenced |
| July 24, 2009 | Auction ended |
| **Details of the Sale** | |
| July 24, 2009 | Ericsson signs North American Agreement[5, 6] |
| July 28, 2009 | Court order approves sale through winning bid |
| November 13, 2009 | Completion date |

*Sale Documents*

4.     The main documents governing the sale are the Asset Sale Agreement dated July 24, 2009 (the "North American Agreement")[7] and the Sellers Disclosure Schedule.[8]

---

5.     As defined below.

6.     The purchase price is set out at Appendix 2.

7.     North American Agreement, July 24, 2009, NNI_00803798; Amendment No. 1 to the North American Agreement, Oct. 30, 2009, NNI_00804120; Amendment No. 2 to the North American Agreement, Nov. 13, 2009, NNI_00804123.

8.     North American Sellers Disclosure Schedule, Nov. 13, 2009, NNI_00803937; *see also* Amendment No. 2 to the North American Agreement, Nov. 13, 2009, NNI_00804123; CDMA & LTE Fixed Asset Summary, Dec. 11, 2009, NNI_00804119; Section 1.1(b) of the Sellers Disclosure Schedule: Assigned Patents, NNI_00804135.

The assets sold are identified at Section 2.1.1 of the North American Agreement.[9]  The assumed liabilities are identified at Section 2.1.3 of the North American Agreement.[10]

*Sellers*

5.    The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation ("<u>NNC</u>")

- Nortel Networks Limited ("<u>NNL</u>")

- Nortel Networks Technology Corporation

- Nortel Networks Inc. ("<u>NNI</u>")

- Nortel Networks (CALA) Inc.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

6.    The sellers pursuant to the China Asset Sale Agreement dated November 2, 2009 were[11]:

- Nortel Networks (China) Limited

---

9.    North American Agreement, July 24, 2009, NNI_00803832–33.  The North American Agreement when read in full sets out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

10.    North American Agreement, July 24, 2009, NNI_00803834–36.

11.    China Asset Sale Agreement, Nov. 2, 2009, NNI_00805128.

5

7.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the CDMA and LTE sale are[12]:

- NNC

- NNL

- NNI

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

---

12.    License Termination Agreement, Sept. 11, 2009, NNI_00805595.  The License Termination Agreement, under which all of the parties gave up their license rights to Nortel's IP, was required pursuant to Section 11 of the IFSA (as discussed above).

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks o.o.o.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks UK Limited

*Data room*

8.      Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[13]

Pursuant to the North American Agreement

9.      A minimum of 2500 employees were to be offered employment pursuant to the North American Agreement.[14]

EMEA

10.      No employees were transferred in EMEA.

---

13.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

14.    North American Agreement § 7.1(a), July 24, 2009, NNI_00803889–90; *see also* North American Agreement Sellers Disclosure Schedule § 7.1(1), Nov. 13, 2009, NNI_00803937 at NNI_00804114.

<u>In-scope Employees</u>

11.    A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[15]

*Intellectual Property*

12.    Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under the North American Agreement in two main ways.  First, the Sellers under the North American Agreement transferred patents, software and trademarks at the November 13, 2009 closing date.[16]  Second, at the closing date of November 13, 2009, Nortel granted[17] a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the CDMA and LTE Access business acquired from Nortel.[18]  The patents subject to this license were among those sold to Rockstar as part of the Residual Patents Sale.

---

15.    In-scope Employees Spread sheet, NNI_NARNIA_00176065.

16.    Section § 2.1.1(g) of the North American Agreement provided that the buyer would obtain 253 patents, as well as the software and trademarks listed in sections 1.1(a), 1.1(b) and 1.1(c) of the North American Agreement Sellers' Disclosure Schedule.  *See* North American Agreement § 2.1.1(g), July 24, 2009, NNC-NNL06001800/35.

17.    See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The CDMA Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ericsson at closing under Section 2.3.2 of the North American Agreement.  *See* North American ASA § 2.3.2 at NNI_00803845.

18.    Intellectual Property License Agreement § 2.01, Nov. 13 2009, NNC-NNL06001811/5–6.

# APPENDIX G

### Details of the GSM and GSM-R Sale to Ericsson and Kapsch

*Overview of the Sale*

      1.     Carrier Networks ("CN"), one of the Nortel Group's four reportable business segments, offered wireline and wireless networks that helped service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops and other wireless computing and communications devices.[1]

      2.     The Global System for Mobile communications ("GSM") and GSM for Railways ("GSM-R") business fell within the CN reportable business segment.[2]

      3.     GSM is a mobile technology providing global wireless coverage with more than 2.6 billion users worldwide.[3]  Nortel's GSM business solutions includes:  GSM network access products that offer a wide range of solutions to provide nationwide coverage and significantly increase the access to networks (and, as a result, the subscriber base); voice core solutions that focus on network optimization for cost efficiencies and better voice quality; and packet core solutions that offer network optimization for cost efficiencies for higher capacity to support data needs.[4]

---

1.    Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009.

2.    Twenty-Third Report of the Monitor ¶ 12, October 8, 2009 [D.I. 1663].

3.    *Id.* ¶ 13.

4.    *Id.*

4.      GSM-R provides a secure wireless communications system for railways operators, and is based on GSM technology.[5]

5.      Nortel's GSM products are installed and supported in more than 100 GSM public operations around the globe.[6]  Nortel was a leader in the GSM-R market segment with an approximate 60% share of global railway track kilometers awarded to date.[7]

6.      The GSM business had 2008 revenues of approximately $1.36 billion, representing approximately 13% of Nortel's 2008 revenues.[8]

*Details of the GSM and GSM-R Sale Process*

| Date | Event |
|------|-------|
| **Bidding Process** | |
| October 15, 2009 | Court order approves sale and bid procedures |
| November 16, 2009 | Last date for submission of qualified bids |
| November 24, 2009 | Auction commenced |
| November 24, 2009 | Auction ended |
| **Details of the Sale** | |
| November 24, 2009 | Ericsson signs North American Agreement[9] and Kapsch signs EMEA Agreement[10, 11] |

---

5.      *Id.*

6.      *Id.* ¶ 14.

7.      *Id.*

8.      *Id.* ¶ 15.

9.      As defined below.

4

| December 2, 2009 | Court order approves sale through winning bid |
| March 31, 2010 | Completion date |

*Sale Documents*

7.    The main documents governing the sale are the Asset Sale Agreement

dated November 24, 2009 (the "North American Agreement"),[12] the Asset Sale Agreement

relating to the Sale and Purchase of the EMEA Assets dated November 24, 2009 (the "EMEA

Agreement")[13] and the North American Sellers Disclosure Schedule.[14]  The assets sold are

identified at Section 2.1.1 in respect of the North American Agreement and 2.1 in respect of the

EMEA Agreement.[15] The assumed liabilities are identified at Section 2.1.3 in respect of the

---

(Footnote continued from prior page)

10.    As defined below.

11.    The purchase price is set out at Appendix 2.

12.    North American Agreement, Nov. 24, 2009, NNC-NNL06002582; *see also* Amendment to The North American Agreement, Mar. 31, 2010, at NNI_00810895.  The sellers of the CALA business were party to a separate ASA, but because this relates to a sub-set of the North American business it is not discussed separately and both the CALA and North American Agreements are treated as being a single agreement with Ericsson.

13.    EMEA Agreement, Nov. 24, 2009, NNC-NNL11752288; *see also* Deed of Amendment and Restatement relating to the EMEA Agreement, Mar. 8, 2010, NOR_53929099; *see also* Amendment Agreement relating to the EMEA Agreement, March 31, 2010, NOR_56782763; *see also* Consolidated EMEA Agreement, NOR_56781721.

14.    North American Sellers Disclosure Schedule, Nov. 24, 2009, NNI_01259261; *see also* Amendment to the North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00810895; Updated Section 4.10(b) of the North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00812502; Updated Section 7.1.1(c)(i) of the North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00812509.

15.    North American Agreement, Nov. 24, 2009, NNC-NNL06002582/37-38; EMEA Agreement, Mar. 24, 2009, NOR_56781721.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

5

North American Agreement and at Section 2.3 in respect of the EMEA Agreement.[16]

8.    The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation ("NNC")

- Nortel Networks Limited ("NNL")

- Nortel Networks Inc. ("NNI")

- Nortel Networks (CALA) Inc.

- Nortel Networks de Argentina S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel del Paraguay

- Nortel Networks del Uruguay S.A.

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

9.    The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

---

16.    North American Agreement, Nov. 24, 2009, NNC-NNL06002582/40-41; EMEA Agreement, NOR_56781721.

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks (Northern Ireland) Limited

10.    The sellers pursuant to the China Asset Sale Agreement dated March 31, 2010 were[17]:

- Nortel Networks (China) Limited

11.    The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the GSM/GSM-R sale are[18]:

- Nortel Networks Corporation

- Nortel Networks Limited

---

17.    China Asset Sale Agreement between Nortel Networks (China) Limited and Kapsch CarrierCom Hong Kong Limited, Mar. 31, 2010, NNI_00811123.

18.    License Termination Agreement, GIP_Nortel_00101524.

- Nortel Networks Technology Corporation

- Nortel Networks Global Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks (Northern Ireland) Limited

*Data room*

12.    Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[19]

Pursuant to the North American Agreement

13.    A minimum of 350 employees were to be offered employment pursuant to the North American Agreement.[20]

Pursuant to the EMEA Agreement

14.    Approximately 218 employees transferred by operation of law, by offer from the Purchaser or otherwise pursuant to the EMEA Agreement[21] as follows:

| Country | Approximate Transfers |
|---------|----------------------|
| Austria | 1 |
| Germany | 44 |
| Hungary | 4 |
| Ireland | 3 |
| Italy | 2 |
| Poland | 9 |
| Slovakia | 4 |
| Spain | 13 |
| UK | 18 |
| China | 15 |

---

19.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

20.    North American Agreement § 7.1.1(a), Nov. 24, 2009, NNC-NNL06002582/100; *see also* North American Agreement Sellers Disclosure Schedule § 7.1, Nov. 24, 2009, NNI_01259389.

21.    EMEA Agreement, Schedule 5, NOR_56781721 at 93.

| France (NNFSAS) | 10 |
|---|---|
| France (NNTF) | 1 |
| Romania | 2 |
| Russia | 7 |
| Taiwan | 18 |

In-scope Employees

15.    A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[22]

*Intellectual Property*

16.    Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[23]  First, the Sellers under each agreement transferred patents, software and trademarks at the March 31, 2010 closing date.[24]  Second, at the closing date of March 31, 2010, Nortel granted[25] both Ericsson and Kapsch a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the GSM and

---

22.    In-scope Employees Spreadsheet, NNI_NARNIA_00175555.

23.    The EMEA Agreement also transferred IP held by Nortel France SAS (*see* Consolidated EMEA Agreement § 2.1.7).

24.    North American Agreement § 2.1.1(f), Nov. 24, 2009 (together with EMEA Agreement  § 2.1.7) provided that the buyers would obtain 61 patents, as well as the software and trademarks listed in North American Agreement Sellers Disclosure Schedule § 1.1(j) and 1.1(l), Nov. 24, 2009.

25.    See Mr. Malackowski's Report at section  9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ericsson at closing under clause 2.3.2 of the North American Agreement.  The equivalent requirement in relation to Kapsch CarrierCom is contained in clause 4.3.1 of the EMEA Agreement.

GSM-R business acquired from Nortel.[26]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

26.    Intellectual Property License Agreement § 2.01, Mar. 31, 2010, at NNI_01265512 (in favor of Kapsch CarrierCom); Intellectual Property License Agreement § 2.01, Mar. 31, 2010, at NNI_01259143 (in favor of Ericsson).

# APPENDIX H

**Details of the Next Generation Packet Core Sale to Hitachi**

*Overview of the Sale*

1.      Carrier Networks ("CN"), one of the Nortel Group's four reportable business segments, offered wireline and wireless networks that helped service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops and other wireless computing and communications devices.[1]

2.      The Next Generation Packet Core ("NG-PC") business fell within the CN reportable business segment.[2]

3.      The NG-PC business developed network components designed to provide data network connectivity for GPRS (General Packet Radio Service), UMTS (Universal Mobile Telecommunications Systems) and LTE wireless technologies and increase network bandwidth for multimedia content and applications over wireless networks.[3]

---

1.      Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009.

2.      Twenty-First Report of the Monitor ¶ 12, Sept. 24, 2009 [D.I. 1550].

3.      *Id.*

*Details of the Next Generation Packet Core Sale Process*

| Date | Event |
|------|-------|
| **Bidding Process** | |
| September 30, 2009 | Court order approves sale and bid procedures |
| October 16, 2009 | Last date for submission of qualified bids |
| **Details of the Sale** | |
| October 25, 2009 | Hitachi signs North American Agreement[4, 5] |
| October 28, 2009 | Court order approves sale through winning bid |
| December 8, 2009 | Completion date |

*Sale Documents*

4.        The main documents governing the sale are the Transaction Agreement

dated October 25, 2009 (the "<u>North American Agreement</u>")[6] and the Sellers Disclosure

Schedule.[7]  The assets sold are identified at Section 2.1.1 in respect of the North American

---

4.        As defined below.

5.        The purchase price is set out at Appendix 2.

6.        North American Agreement, Oct. 25, 2009, NNI_01261745; *see also* Amendment to the North American Agreement, Nov. 27, 2009, NNI_01261805.

7.        North American Agreement Sellers Disclosure Schedule, Oct. 25, 2009, BHG0138007; *see also* Amended North American Agreement Sellers Disclosure Schedule, Nov. 7, 2009, NNC-NNL07789371;  *see also* Seville FA Section 1.1(b) – Appendix A, NNI_00823766; Desktop Asset Listing 20091112 Seville, Nov. 12, 2009, NNI_00823767; Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix A – Access Gateway Design Documentation, NNI_00824416;  Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix B – Access Gateway Test Documentation, NNI_00824866; Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix C – Access Gateway System Engineering Documentation, NNI_00824902; CATT Servers Spreadsheet, NNI_00824910; Desktop Asset Listing 20091112 Seville, Nov. 12, 2009, NNI_00824911; Section 4.7(b) of the Sellers Disclosure Schedule – Seville, Oct. 12, 2009, NNI_00824912; Letter from Nortel Networks Inc. to Emerson Network Power (2009), NNI_00824913; Letter from Nortel Networks Inc. to GE Fanuc Intelligent Platforms (2009), NNI_00824916.

Agreement.[8]  The assumed liabilities are identified at Section 2.1.2 in respect of the North American Agreement.[9]

*Sellers*

5.      The sellers pursuant to the North American Agreement were:

- Nortel Networks Limited ("NNL")

- Nortel Networks Inc. ("NNI")

6.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the Next Generation Packet Core sale are[10]:

- Nortel Networks Corporation

- NNL

- NNI

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

---

8.     North American Agreement, Oct. 25, 2009 NNI_01261745 at NNI_01261763–64.  The North American Agreement when read in full sets out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

9.     *Id.* at NNI_01261764–65.

10.    License Termination Agreement, GIP_Nortel_00101408.

- Architel Systems (U.S.) Corporation

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks UK Limited

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal SA

- Nortel Networks Romania Srl

*Data room*

7.      Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information and employee information.

*Employees*[11]

Pursuant to the North American Agreement

8.      A minimum of fifteen employees were to be offered employment pursuant to the North American Agreement.[12]

EMEA

9.      No employees were transferred within EMEA.

In-scope Employees

10.      All of the in-scope employees include employees focused on research, design and development.[13]

---

11.      The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

12.      North American Agreement § 7.1(a), Oct. 25, 2009, NNI_01261745 at NNI_01261788; *see also* Amended North American Agreement Sellers Disclosure Schedule § 7.1, Nov. 27, 2009, NNC-NNL07789371/18.

*Intellectual Property*

11.     Intellectual Property consisting solely of software used in the business transferred under the North American Agreement in two main ways.  First, the Sellers under the North American Agreement transferred the software at the October 25, 2009 closing date.[14] Second, at the closing date of October 25, 2009, Nortel granted[15] Hitachi a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the Next Generation Packet Core business acquired from Nortel.[16]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

(Footnote continued from prior page)

13.    In-scope Employees Spreadsheet, NNI_NARNIA_00176058.

14.    North American Agreement § 2.1.1, Oct. 25, 2009, NNI_01261745 at NNI_01261763–64 (provides that the buyers would purchase or accept assignment of the software and software documentation listed in Sections 1.1(a)(i) and 1.1(a)(ii) of the Sellers' Disclosure Schedule).

15.    See Mr. Malackowski's Report at section  9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Hitachi at closing under clause 2.3.2(a) of the North American Agreement.

16.    Intellectual Property License Agreement § 3.01, Dec. 8, 2009, NNI_00782745 at 6 (contains license grant in favor of Hitachi).

APPENDIX I

## Details of the CVAS Sale to GENBAND Inc.

*Overview of the Sale*

1.       The Carrier Voice Application Solutions ("CVAS") business was one of the Nortel Group's reportable business segments[1] and was comprised of the carrier voice and applications solutions segment of Nortel's Carrier Networks ("CN") business unit.[2]  The CVAS business delivered both products and services principally to telecommunications services providers and multi-system operators that enabled them to provide voice, data and multimedia telecommunications solutions to their end clients.[3]  Prior to its divestiture, Nortel was the leading global provider of CVAS products and services in its market segment.[4]

2.       The CVAS business operated approximately 774 deployment sites across approximately 48 countries.[5]  It had a base of over 100 million voice over internet protocol ports shipped world-wide and 21 million internet protocol telephone lines shipped.[6]  Fiscal 2008 revenues were over $870 million, representing nearly 9% of Nortel's 2008 revenues.[7]

---

1.    Since September 30, 2009. *See* Thirty-Fourth Report of the Monitor ¶ 13, Jan. 3, 2010 [D.I. 2228 Ex. A].

2.    *Id.* ¶ 16.

3.    *Id.* ¶ 17.

4.    *Id.*

5.    *Id.* ¶ 19.

6.    *Id.*

7.    *Id.*

*Details of the CVAS Sale Process*

| Date | Event |
| --- | --- |
| **Stalking Horse Bid** | |
| December 22, 2009 | GENBAND Inc. signs Stalking Horse Agreement |
| January 8, 2010 | Court order approves sale and bid procedures |
| February 23, 2010 | Last date for submission of qualified bids |
| **Details of the Sale** | |
| December 22, 2009 | GENBAND Inc. signs the North American Agreement and the EMEA Agreement[8, 9] |
| March 4, 2010 | Court order approves sale through winning bid |
| May 28, 2010 | Completion date |

*Sale Documents*

3.      The main documents governing the sale are the Asset Sale Agreement

dated December 22, 2009 (the "North American Agreement"),[10] the Asset Sale Agreement

relating to the Sale and Purchase of the EMEA Assets dated December 23, 2009 (the "EMEA

Agreement")[11] and the respective Sellers' Disclosure Schedules.[12]  The assets sold are identified

---

8.     As defined below.

9.     The purchase price is set out at Appendix 2.

10.   North American Agreement, Dec. 22, 2009, NNC-NNL06001609; Amendment No. 1 to the North American Agreement, May 28, 2010, NNC-NNL06001636.

11.   EMEA Agreement, Dec. 23, 2009, NNC-NNL06001613 (as amended on May 28, 2010).

12.   Sellers Disclosure Schedule to the North American Agreement, Dec. 22, 2009, NNC-NNL06001637; *see also* Schedule 1.1(f): Owned Equipment: Shared Laboratories, June 7, 2009, NNC-NNL06001638; Nortel Networks

(Footnote continued on next page)

at Section 2.1.1 in respect of the North American Agreement and 2.1 in respect of the EMEA

Agreement.[13]  The assumed liabilities are identified at Section 2.1.3 in respect of the North

American Agreement and Section 2.3 in respect of the EMEA Agreement.[14]

*Sellers*

4.    The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Networks International Inc.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

---

(Footnote continued from prior page)

Outstanding Bonds, May 18, 2010, NNC-NNL06001639; Section 4.6 of the Sellers Disclosure Schedule – Litigation, June11, 2009, NNC-NNL06001640; Carrier VoIP, Applications & Solutions: Combined Financial Statements for the Years Ended Dec. 31, 2008 & 2007, NNC-NNL06001641; Sellers Disclosure Schedule 4.7(b), Dec. 21, 2009, NNC-NNL06001642; CVAS P&L, Dec. 21, 2009, NNC-NNL06001643; 2009 YTD Excluding JV's – Total CVAS, NNC-NNL06001644; Section 4.11(b) of the Sellers Disclosure Schedule – Paragon, May 28, 2010, NNC-NNL06001645; Section 7.1.2 (c)(iii) of the Sellers Disclosure Schedule – Paragon, June 7, 2010, NNC-NNL06001646; Section 7.1.2(c)(v) – Specified Employee Liabilities, May 28, 2010, NNC-NNL06001647; Paragon – Schedule 7.1.2(d), Sept. 16, 2010, NNC-NNL06001648.  For the EMEA Agreement: EMEA Agreement, at NNC-NNL06001613.

13.    North American Agreement, at NNC-NNL06001609/42–43; EMEA Agreement, at NNC-NNL06001613/7–9. The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

14.    North American Agreement, at NNC-NNL06001609/45–47; EMEA Agreement, at NNC-NNL06001613/11–12.

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- Nortel Networks (India) Private Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co
  Limited

- Nortel Networks Technology Corporation

5.    The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

6.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the CVAS sale are:

- Nortel Networks S.A.[15]

*Data room*

---

15.    Letter from Antoine Tchekhoff re Sale of Carrier VoIP Application Solutions Business, Dec. 22, 2009, GIP_Nortel_00101400; Confirmation Agreement by and among NNL, NNC, Canadian and U.S. Filed Entities, EMEA Filed Entities, EMEA Non-Filed Entities, the French Liquidator, NNSA Office Holders, and the Joint Israeli Administrators, NNC-NNL06001664.  I understand that each of the Sellers under the North American and EMEA Agreement respectively is also to be treated as a Selling Debtor under the IFSA for this sale.

7.    Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[16]

Pursuant to the North American Agreement

8.    A minimum of 1,638[17] employees were to be offered employment pursuant to the North American Agreement dated December 22, 2009[18] with minimum offers as follows:

| Country or Region | Minimum Offer |
|---|---|
| EMEA Region | 301 |
| Canada | 404 |
| United States | 798 |
| Australia and Japan | 46 |
| Rest of the World | 89 |

Pursuant to the EMEA Agreement

16.   The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

17.   North American Agreement § 7.1.1(a), at NNC-NNL06001609/118–20 (such figure to include any EMEA transferring employees).

18.   *Id.*; *see also* Sellers Disclosure Schedule to the North American Agreement § 7.1.1(a), Dec. 22, 2009, NNC-NNL06001637/201.

9.    Approximately 301 employees transferred by operation of law, by offer from the Purchaser or otherwise pursuant to the EMEA Agreement dated December 23, 2009[19] as follows:

| Country | Approximate Transfers |
| --- | --- |
| Austria | 1 |
| Belgium | 4 |
| France | 31 |
| Germany | 30 |
| Ireland | 3 |
| Israel | 25 |
| Italy | 15 |
| Netherlands | 16 |
| Portugal | 2 |
| Russia | 10 |
| Spain | 24 |
| Switzerland | 5 |
| Sweden | 1 |
| UK | 122 |

---

19.    EMEA Agreement Schedule 6, at NNC-NNL06001613/112–26 (as amended at 143–89); *see also* Sellers Disclosure Schedule to North American Agreement § 7.1.1(a), at NNC-NNL06001637/201.

<u>In-scope Employees</u>

10.    A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[20]

*Intellectual Property*

11.    Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[21]  First, the Sellers under each agreement transferred patents, software and trademarks at the May 28, 2010 closing date.[22]  Second, at the closing date of May 28, 2010, Nortel granted[23] Genband a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the CVAS business acquired from Nortel.[24]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

20.    *See* Spreadsheet Regarding Paragon Employees and Functions, NNI_NARNIA_00175024.

21.    The EMEA Agreement also transferred IP.  *See* EMEA Agreement § 2.1.7, at NNC-NNL06001613/7–8.

22.    Section 2.1.1(h) of the North American Agreement (together with Section 2.1.7 to the EMEA Agreement) provided that the purchasers would purchase 206 patents, as well as the software and trademarks listed in Sections 1.1(k) and 1.1(m) of the Sellers Disclosure Schedule.  *See* North American Agreement § 2.1.1(h), NNC-NNL06001609/43; EMEA Agreement § 2.1.7, at NNC-NNL06001613/7–8.

23.    See Mr. Malackowski's Report at section 9.2.4 for the value that the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Genband at closing under clause 2.4.2(b)(iii) of the North American Agreement.  North American Agreement § 2.4.2(b)(iii), May 28, 2010, NNC-NNL06001609/59.

24.    The license grant in favor of Genband is contained at Intellectual Property License Agreement § 2.01, May 28, 2010, NNC-NNL06001658/13.

# APPENDIX J

### Details of the Enterprise and Government Solutions Sale to Avaya

*Overview of the Sale*

1.      The Enterprise Solutions ("ES") business was one of the Nortel Group's reportable business segments[1] and addressed the communication needs of large and small businesses across various industries by providing products and services that integrate voice, email, conferencing, video and instant messaging.[2]  The ES portfolio included products spanning Unified Communications, Ethernet routing and multiservice switching, Internet Protocol and digital telephony (including phones), wireless Local Area Networks, security, Internet Protocol and Session Initiation Protocol ("SIP") contact centers, self service solutions, messaging, conferencing and SIP-based multimedia solutions.[3]

2.      ES operated globally in approximately 121 countries.[4]  It had an installed base with over 75 million voice lines and 75 million data ports.[5]

3.      ES provided large businesses with the equipment and know-how necessary to design and operate data communications networks.

4.      The North American Agreement[6] records that the 100% stock of Nortel Government Solutions, Inc. ("NGS") and DiamondWare was also sold to the purchaser.

---

1.      As at June 30, 2009. *See* Eighteenth Report of Monitor ¶ 12, July 31, 2009 [D.I. 1259].

2.      *Id.* ¶ 15.

3.      *Id.*

4.      *Id.* ¶ 17.

5.      *Id.*

6.      As defined below.

*Details of the Enterprise Sale Process*

| Date | Event |
| --- | --- |
| **Stalking Horse Bid** | |
| July 20, 2009 | Avaya signs Stalking Horse Agreement |
| August 4, 2009 | Court order approves sale and bid procedures |
| September 4, 2009 | Last date for submission of qualified bids |
| September 11, 2009 | Auction commenced |
| September 14, 2009 | Auction ended |
| **Details of the Sale** | |
| September 14, 2009 | Avaya signs North American Agreement and EMEA Agreement[7, 8] |
| September 16, 2009 | Court order approves sale through winning bid |
| December 18, 2009 | Completion date |

*Sale Documents*

5.     The main documents governing the sale are the Amended and Restated

Asset and Share Sale Agreement dated September 14, 2009 (the "North American Agreement"),[9]

the Amended and Restated Asset Sale Agreement dated September 14, 2009 (the "EMEA

---

7.    As defined below.

8.    The purchase price is set out at Appendix 2.

9.    North American Agreement, Sept. 14, 2009, NNI_00806387; *see also* Amendment No. 1 to the Amended North American Agreement, Dec. 18, 2009, NNI_00807283; Amendment No. 2 to the Amended North American Agreement, Mar. 10, 2011, EMEAPROD2215918.

4

Agreement")[10] and the respective Sellers' Disclosure Schedules.[11]  The assets sold are identified

at Section 2.1.1 in respect of the North American Agreement and Section 2.1 in respect of the

EMEA Agreement.[12]  The assumed liabilities are identified at Section 2.1.3 in respect of the

North American Agreement and Section 2.3 in respect of the EMEA Agreement.[13]

*Sellers*

> 6.  The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems Inc.

- Nortel Networks International Inc.

- Nortel Networks de Argentina S.A.

---

10.  EMEA Agreement, Sept. 14, 2009, NNI_00807958; Amendment to EMEA Agreement, Sept. 14, 2009; *see also* Amendment to EMEA Agreement, Dec. 22, 2009, NNI_00808280.

11.  North American Agreement Sellers Disclosure Schedule, Sept. 14, 2009, NNI_00806963; *see also* Amended North American Agreement, Dec. 18, 2009; Amendment No. 1 to the North American Agreement, Dec. 18, 2009, NNI_00807283; Amendment No. 2 to the North American Agreement, Mar. 10, 2011, EMEAPROD2215918; Sellers Disclosure Schedule § 1.1(r)(iv), NNI_00807194; Sellers Disclosure Schedule § 1.1(e), NNI_00807356–916; Sellers Disclosure Schedule § 5.25(a), NNI_00807929; Sellers Disclosure Schedule § 7.1.2, NNI_00807931-39; EMEA Sellers' Disclosure Schedule, June 20, 2009, NNI_00808232.

12.  North American Agreement, Sept. 14, 2009, NNI_00806443–45; EMEA Agreement, Sept. 14, 2009, NNI_00807965–67.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

13.  North American Agreement, Sept. 14, 2009, NNI_00806446–49; EMEA Agreement, Sept. 14, 2009, NNI_00807969–72.

- Nortel Networks Telecomunicacoes do Brazil Ltda.

- Nortel Networks Chile S.A.

- Nortel Networks de Colombia S.A.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Australia Pty. Limited

- Nortel Networks (India) Private Limited

- Nortel Technology Excellence Centre Private Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co Limited

7.    The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Communication Holdings (1997) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks South Africa (Proprietary) Limited

8.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became

"Selling Debtors" and who therefore have a claim to some amount of the proceeds of the Enterprise sale are[14]:

- Nortel Networks S.A.

*Data room*

9.    Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence. Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[15]

Pursuant to the North American Agreement

10.    A minimum of 2,397 employees were to be offered employment pursuant to the North American Agreement[16] with minimum offers as follows:

| Country or Region | Minimum Offer |
|---|---|
| China / Hong Kong / Taiwan | 56 |
| Canada | 571 |
| United States | 1040 |
| Remaining APAC Countries[17] | 400 |

14.    Confirmation Agreement, NOR_55238302. I understand that NNSA is deemed to be a Selling Debtor for the purposes of the IFSA because it entered into this agreement and because it also transferred assets to Avaya.

15.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

16.    North American Agreement § 7.1.1, Sept. 14, 2009, NNI_00806558; *see also* North American Sellers Disclosure Schedule § 7.1.1, Sept. 14, 2009, NNI_00807187.

| Remaining CALA Countries[18] | 90 |
|---|---|

Pursuant to the EMEA Agreement

11.    Approximately 1,098 employees transferred by operation of law or by

offer from the Purchaser pursuant to the EMEA Agreement[19] as follows:

| Country | Approximate Transfers |
|---|---|
| Austria | 8 |
| Belgium | 7 |
| Czech Republic | 3 |
| Denmark | 7 |
| Finland | 4 |
| France | 57 |
| Germany | 74 |
| Ireland | 272 |
| Israel | 22 |
| Italy | 44 |
| The Netherlands | 34 |
| Norway | 9 |

(Footnote continued from prior page)

17.    Indonesia, Malaysia, New Zealand, Philippines, Thailand, Vietnam, Pakistan, United Arab Emirates, India, Singapore, Egypt, Australia and Japan.

18.    Peru, Trinidad and Tobago, Mexico, Chile, Columbia and Argentina.

19.    EMEA Agreement, Sept. 14, 2009, NNI_00808120–43.

| | |
|---|---|
| Poland | 7 |
| Portugal | 2 |
| South Africa | 11 |
| Spain | 16 |
| Sweden | 14 |
| Switzerland | 17 |
| UK | 490 |

<u>In-scope Employees</u>

12.    A significant number of the in-scope employees include employees focused on technology, sales and marketing.[20]

*Intellectual Property*

13.    Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[21]  First, the Sellers under each agreement transferred patents, software and trademarks at the December 18, 2009 closing date.[22]  Second, at the closing

---

20.    In-scope Employee Spread sheet, NNI_EQUINOX_00067756.

21.    The EMEA Agreement also transferred IP.  *See* EMEA Agreement § 2.1.7, Sept. 14, 2009, NNI_00807966.

22.    Section 2.1.1(h) of the North American Sale Agreement (together with Section 2.1.5 to the EMEA Agreement) provided that the buyers would obtain 878 patents, including those owned by Nortel France SAS, as well as the software and trademarks listed in Sections 4.6(b)(i) and 4.6(b)(ii) of the North American Sellers' Disclosure Schedule and Sections 1(d), 1(e) and 1(f) of the EMEA Sellers' Disclosure Schedule.

date of December 18, 2009, Nortel granted[23] Avaya a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the Enterprise Solutions business acquired from Nortel.[24]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

23. See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Avaya at closing under clause 5.26(c) of the North American Agreement.

24. The license grant is contained in Article 2.01 of the Intellectual Property License Agreement in favor of Avaya.  Intellectual Property License Agreement, Dec. 18, 2009, NNI_01374970.

# APPENDIX K

## Details of the Layer 4-7 Sale to Radware

*Overview of the Sale*

1.      The Layer 4-7 business fell within the Enterprise Solutions reportable business segment.[1]

2.      The Layer 4-7 business sold certain application delivery products, primarily the Nortel Application Switch and Nortel Application Accelerator products.[2]  The Nortel Application Switch was a product designed to improve application availability, performance and security through load balancing and acceleration of network traffic, giving IT managers greater control over their networks.[3]  The Nortel Application Accelerator was designed to reduce server and bandwidth needs and improve the responsiveness of web-based applications, thereby reducing overall network costs.[4]

3.      The Layer 4-7 business had an installed base of more than 1000 customers.  Product and service revenue in 2008 was approximately $50 million.[5]

---

1.      Second Report of the Monitor ¶ 17, Feb. 25, 2009 [D.I. 376 Ex. A].

2.      *Id.* ¶ 18.

3.      *Id.*

4.      *Id.*

5.      *Id.* ¶ 22.

*Details of the Layer 4-7 Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| February 19, 2009 | Radware signs Stalking Horse Agreement |
| February 27, 2009 | Court order approves sale and bid procedures |
| March 19, 2009 | Last date for submission of qualified bids |
| **Details of the Sale** | |
| February 19, 2009 | Radware signs North American Agreement[6, 7] |
| March 26, 2009 | Court order approves sale through winning bid |
| March 31, 2009 | Completion date |

*Sale Documents*

4.      The main documents governing the sale are the Asset Purchase Agreement dated February 19, 2009 (the "North American Agreement")[8] and the Sellers' Disclosure Schedules.[9]  The assets sold are identified at Section 2.1 of the North American Agreement.[10]  The assumed liabilities are identified at Section 2.3 of the North American Agreement.[11]

---

6.      As defined below.

7.      The purchase price is set out at Appendix 2.

8.      North American Agreement, Feb. 19, 2009, NNI_00814632.

9.      North American Agreement Sellers' Disclosure Schedules, Feb. 19, 2009, NNI_00814970.

10.     North American Agreement, Feb. 19, 2009, NNI_00814632 at NNI_00814652–54.  The North American Agreement when read in full sets out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and or/ liabilities acquired.

11.     *Id.* at NNI-0814656.

*Sellers*

5.      The sellers pursuant to the North American Agreement were:

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Altsystems Inc.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

*Employees*[12]

        <u>Pursuant to the North American Agreement</u>

        6.      Each of the U.S. employees, the Indian employees and the Japanese employees[13] were to be offered employment pursuant to the North American Agreement.[14]

        <u>EMEA</u>

        7.      No EMEA employees were transferred to the Purchaser.

        <u>Layer 4-7 Employees</u>

        8.      A significant number of the employees utilized by the business included employees focused on research and development.[15]

*Intellectual Property*

        9.      Intellectual Property consisting solely of the patents, trademarks and software used in the business transferred under the North American Agreement in two main ways.  First, the Sellers under the North American Agreement transferred the IP at the March 31, 2009 closing date.[16]  Second, at the closing date of March 31, 2009, Nortel granted[17] Radware a

---

12.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

13.    As defined in the North American Agreement, Feb. 19, 2009, NNI_00814632 at NNI_00814644–45, NNI_00814649.

14.    *See* North American Agreement, Exhibit O: Additional Employee Related Provisions, NNI_00814632 at NNI_00814947–57.

15.    Project Velocity, Information Memorandum, Feb. 11, 2009, NOR_55314343 at slide 42.

16.    North American Agreement § 2.1(d), Feb. 19, 2009, NNI_00814632 at NNI_00814653  (provides that the buyers would acquire six patents, together with software, software documentation and trademarks listed in Schedule 2.1(d) of the Sellers' Disclosure Schedules).

worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the Layer 4-7 business acquired from Nortel.[18]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

(Footnote continued from prior page)

17.    See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for Business Line IP.  The Intellectual Property License Agreement was identified as an agreement the Sellers were required to enter with Radware at closing by Recital G to, and under clause 4.2(b) of, the North American Agreement.

18.    Intellectual Property License Agreement § 2.01, Mar. 31, 2009, GIP_Nortel_00000917 at GIP_Nortel_00000922 (contains license grant in favor of Radware).

**APPENDIX 17**

**Details of the Metro Ethernet Networks Sale to Ciena**

*Overview of the Sale*

1.      The Metro Ethernet Networks ("MEN") business was one of the Nortel Group's reportable business segments[1] and delivered and serviced communications infrastructure and solutions for the transport of voice, video and data signals for the "Metropolitan" and "Long-Haul" communications markets using innovating optical networking capabilities.[2]  The MEN business' solutions are designed to deliver carrier-grade Ethernet transport capabilities, higher performance and lower cost communications for emerging video-intensive applications.[3]

2.      The MEN business operated globally in approximately 44 countries.[4]  It had an installed base with over 400,000 network elements.[5]

3.      Its 2008 revenues were $1.3 billion, representing approximately 13% of the Nortel Group's revenues that year.[6]

---

1.      As at June 30, 2009. *See* Twenty-Fourth Report of the Monitor ¶ 12, Oct. 13, 2009 [D.I. 1665 Ex. A].

2.      *Id.* ¶ 16.

3.      *Id.*

4.      *Id.* ¶ 18.

5.      *Id.*

6.      *Id.*

*Details of the MEN Sale Process*

| Date | Event |
|---|---|
| **Stalking Horse Bid** | |
| October 7, 2009 | Ciena signs Stalking Horse Agreement |
| October 16, 2009 | Court order approves sale and bid procedures |
| November 9, 2009 | Last date for submission of qualified bids |
| November 20, 2009 | Auction commenced |
| November 24, 2009 | Auction ended |
| **Details of the Sale** | |
| November 24, 2009 | Ciena signs North American Agreement and EMEA Agreement[7, 8] |
| December 3, 2009 | Court order approves sale through winning bid |
| March 19, 2010 | Completion date |

*Sale Documents*

4.      The main documents governing the sale are the Amended and Restated

Asset Sale Agreement dated November 24, 2009 (the "North American Agreement"),[9] the Asset

Sale Agreement relating to the Sale and Purchase of the EMEA Assets dated October 7, 2009

---

7.    As defined below.

8.    The purchase price is set out at Appendix 2.

9.    North American Agreement, Nov. 24, 2009, NNI_00216905; *see also* Amendment No. 1 to the North American Agreement, Dec. 3, 2009, NNC-NNL06002190; Amendment No. 2 to the North American Agreement, Dec. 23, 2009, NNC-NNL06002191; Amendment No. 3 to the North American Agreement, Mar. 15, 2010, NNC-NNL06002192; Amendment No. 4 to the North American Agreement, Mar. 15, 2010,  NNC-NNL06002193; Amendment No. 5 to the North American Agreement, Mar. 19, 2010, NNC-NNL06002194.

3

(the "EMEA Agreement")[10] and the respective Sellers' Disclosure Schedules.[11]  The assets sold

are identified at Section 2.1.1 in respect of the North American Agreement and Section 2.1 in

respect of the EMEA Agreement.[12]  The assumed liabilities are identified at Section 2.1.3 in

respect of the North American Agreement and Section 2.4 in respect of the EMEA Agreement.[13]

*Sellers*

5.    The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- XROS, Inc.

- QTERA Corporation

- CoreTek Inc.

---

10.    EMEA Agreement, Oct. 7, 2009, NNI_00818097; *see also* Deed of Amendment relating to the EMEA Agreement, Oct. 20, 2009, NNI_00820280; Amendment Agreement relating to the EMEA Agreement, Nov. 24, 2009, NNI_00644355; Deed of Amendment (Amendment No. 3) relating to the EMEA Agreement, Dec. 16, 2009, NNI_00819134; Deed of Amendment (Amendment No. 4) relating to the EMEA Agreement, Jan. 13, 2010, NOR_55238003; Amendment Agreement (Amendment No. 5) relating to the EMEA Agreement, Mar. 19, 2010, NOR_55238004.

11.  *See* North American Agreement Sellers' Disclosure Schedule, Nov. 24, 2009, NNC-NNL06002189; EMEA Agreement Sellers' Disclosure Schedule, Oct. 7, 2009, NNI_00818266.

12.    *See* North American Agreement, Nov. 24, 2009, NNI_00216949-51; EMEA Agreement, Oct. 7, 2009, NNI_00818103–4.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

13.    *See* North American Agreement, Nov. 24, 2009, NNI_00216952-54; EMEA Agreement, Oct. 7, 2009, NNI_00818106–7.

- Nortel Networks de Argentina S.A.

- Nortel Networks de Colombia S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks (Asia) Limited - Pakistan Branch

- Nortel Networks Singapore Pte. Limited - Philippines Branch

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

6.    The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks O.O.O.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks (Northern Ireland) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

7.    The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became

"Selling Debtors" and who therefore have a claim to some amount of the proceeds of the MEN sale are[14]:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks de Argentina S.A.

---

14.    License Termination Agreement, BHG0162049.

- Nortel Networks de Colombia S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Optical Components Limited

- Nortel Networks (Northern Ireland) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks (Asia) Limited - Pakistan Branch

- Nortel Networks Singapore Pte. Limited - Philippines Branch

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co
  Limited

*Data room*

8.      Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[15]

### Pursuant to the North American Agreement

9.      A minimum of 2,000[16] employees were to be offered employment pursuant to the North American Agreement.[17]

### Pursuant to the EMEA Agreement

10.      Approximately 323 employees transferred by operation of law, by offer from the Purchaser or otherwise pursuant to the EMEA Agreement[18] as follows:

| Country | Approximate Transfers |
|---------|----------------------|
| Austria | 1 |
| Denmark | 4 |
| France | 24 |
| Germany | 24 |

---

15.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

16.    Such figure to include all EMEA Transferring Employees.  *See* North American Agreement § 7.1.1(a), Nov. 24, 2009, NNI_00217035–36.

17.    *Id.*

18.    EMEA Agreement Schedule 6, Oct. 7, 2009, NNI_00818234–50.

| Ireland | 2 |
|---------|-----|
| Italy | 6 |
| Israel | 10 |
| The Netherlands | 16 |
| Poland | 1 |
| Russia | 10 |
| Spain | 7 |
| Switzerland | 6 |
| UK | 212 |

<u>In-scope Employees</u>

11.     A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[19]

*Intellectual Property*

12.     Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[20]  First, the Sellers under each agreement transferred patents, software and trademarks at the March 19, 2010 closing date.[21]  Second, at the closing

---

19.    In-scope Employees Spreadsheet, NNI_SNOW_00286993.

20.    The EMEA Agreement also transferred IP including patents owned by Nortel France SAS.  *See* EMEA Agreement § 2.1.7, Oct. 7, 2009, NNI_008180104.

21.    Section 2.1.1(e) of the North American Agreement (together with Section 2.1.5 to the EMEA Agreement) provided that the purchasers would purchase 878 patent (including those owned by Nortel France SAS) as well as the software and trademarks listed in Section 4.5(b) of the North American Sellers' Disclosure

(Footnote continued on next page)

date of March 19, 2010, Nortel granted[22] Ciena a worldwide, royalty-free non-exclusive license

to all patents related to, but not predominantly used in, the MEN business acquired from

Nortel.[23]   The patents subject to these licenses were among those sold to Rockstar as part of the

Residual Patents Sale.

<hr />

Schedule.  *See* North American Agreement § 2.1.1(e), Nov. 24, 2009, NNI_00216950; EMEA Agreement § 2.1.5, Oct. 7, 2009, NNI_008180103–4; North American Agreement Sellers' Disclosure Schedule § 4.5(b), Nov. 24, 2009, NNC-NNL06002189/351.

22.    See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ciena at closing under clause 2.3.2(a) of the North American Agreement.

23.    The license grant is contained in Article 2.01 of the Intellectual Property License Agreement in favor of Ciena.  *See* Intellectual Property License Agreement art. 2.01, Mar. 19, 2010, NOR_55927510.

# APPENDIX L

## Details of the Metro Ethernet Networks Sale to Ciena

*Overview of the Sale*

1.      The Metro Ethernet Networks ("MEN") business was one of the Nortel Group's reportable business segments[1] and delivered and serviced communications infrastructure and solutions for the transport of voice, video and data signals for the "Metropolitan" and "Long-Haul" communications markets using innovating optical networking capabilities.[2]  The MEN business' solutions are designed to deliver carrier-grade Ethernet transport capabilities, higher performance and lower cost communications for emerging video-intensive applications.[3]

2.      The MEN business operated globally in approximately 44 countries.[4]  It had an installed base with over 400,000 network elements.[5]

3.      Its 2008 revenues were $1.3 billion, representing approximately 13% of the Nortel Group's revenues that year.[6]

---

1.    As at June 30, 2009. *See* Twenty-Fourth Report of the Monitor ¶ 12, Oct. 13, 2009 [D.I. 1665 Ex. A].

2.    *Id.* ¶ 16.

3.    *Id.*

4.    *Id.* ¶ 18.

5.    *Id.*

6.    *Id.*

*Details of the MEN Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| October 7, 2009 | Ciena signs Stalking Horse Agreement |
| October 16, 2009 | Court order approves sale and bid procedures |
| November 9, 2009 | Last date for submission of qualified bids |
| November 20, 2009 | Auction commenced |
| November 24, 2009 | Auction ended |
| **Details of the Sale** | |
| November 24, 2009 | Ciena signs North American Agreement and EMEA Agreement[7, 8] |
| December 3, 2009 | Court order approves sale through winning bid |
| March 19, 2010 | Completion date |

*Sale Documents*

4.      The main documents governing the sale are the Amended and Restated

Asset Sale Agreement dated November 24, 2009 (the "North American Agreement"),[9] the Asset

Sale Agreement relating to the Sale and Purchase of the EMEA Assets dated October 7, 2009

---

7.      As defined below.

8.      The purchase price is set out at Appendix 2.

9.      North American Agreement, Nov. 24, 2009, NNI_00216905; *see also* Amendment No. 1 to the North American Agreement, Dec. 3, 2009, NNC-NNL06002190; Amendment No. 2 to the North American Agreement, Dec. 23, 2009, NNC-NNL06002191; Amendment No. 3 to the North American Agreement, Mar. 15, 2010, NNC-NNL06002192; Amendment No. 4 to the North American Agreement, Mar. 15, 2010,  NNC-NNL06002193; Amendment No. 5 to the North American Agreement, Mar. 19, 2010, NNC-NNL06002194.

3

(the "EMEA Agreement")[10] and the respective Sellers' Disclosure Schedules.[11]  The assets sold

are identified at Section 2.1.1 in respect of the North American Agreement and Section 2.1 in

respect of the EMEA Agreement.[12]  The assumed liabilities are identified at Section 2.1.3 in

respect of the North American Agreement and Section 2.4 in respect of the EMEA Agreement.[13]

*Sellers*

> 5.     The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- XROS, Inc.

- QTERA Corporation

- CoreTek Inc.

---

10.  EMEA Agreement, Oct. 7, 2009, NNI_00818097; *see also* Deed of Amendment relating to the EMEA Agreement, Oct. 20, 2009, NNI_00820280; Amendment Agreement relating to the EMEA Agreement, Nov. 24, 2009, NNI_00644355; Deed of Amendment (Amendment No. 3) relating to the EMEA Agreement, Dec. 16, 2009, NNI_00819134; Deed of Amendment (Amendment No. 4) relating to the EMEA Agreement, Jan. 13, 2010, NOR_55238003; Amendment Agreement (Amendment No. 5) relating to the EMEA Agreement, Mar. 19, 2010, NOR_55238004.

11.  *See* North American Agreement Sellers' Disclosure Schedule, Nov. 24, 2009, NNC-NNL06002189; EMEA Agreement Sellers' Disclosure Schedule, Oct. 7, 2009, NNI_00818266.

12.  *See* North American Agreement, Nov. 24, 2009, NNI_00216949-51; EMEA Agreement, Oct. 7, 2009, NNI_00818103–4.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

13.  *See* North American Agreement, Nov. 24, 2009, NNI_00216952-54; EMEA Agreement, Oct. 7, 2009, NNI_00818106–7.

- Nortel Networks de Argentina S.A.

- Nortel Networks de Colombia S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks (Asia) Limited - Pakistan Branch

- Nortel Networks Singapore Pte. Limited - Philippines Branch

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

6.    The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks O.O.O.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks (Northern Ireland) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

7.    The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became

6

"Selling Debtors" and who therefore have a claim to some amount of the proceeds of the MEN

sale are[14]:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks de Argentina S.A.

14.    License Termination Agreement, BHG0162049.

- Nortel Networks de Colombia S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Optical Components Limited

- Nortel Networks (Northern Ireland) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks (Asia) Limited - Pakistan Branch

- Nortel Networks Singapore Pte. Limited - Philippines Branch

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co
  Limited

*Data room*

        8.     Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[15]

       Pursuant to the North American Agreement

        9.     A minimum of 2,000[16] employees were to be offered employment pursuant to the North American Agreement.[17]

       Pursuant to the EMEA Agreement

        10.    Approximately 323 employees transferred by operation of law, by offer from the Purchaser or otherwise pursuant to the EMEA Agreement[18] as follows:

| Country | Approximate Transfers |
|---------|----------------------|
| Austria | 1 |
| Denmark | 4 |
| France | 24 |
| Germany | 24 |

---

15.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

16.    Such figure to include all EMEA Transferring Employees.  *See* North American Agreement § 7.1.1(a), Nov. 24, 2009, NNI_00217035–36.

17.    *Id.*

18.    EMEA Agreement Schedule 6, Oct. 7, 2009, NNI_00818234–50.

| | |
|---|---|
| Ireland | 2 |
| Italy | 6 |
| Israel | 10 |
| The Netherlands | 16 |
| Poland | 1 |
| Russia | 10 |
| Spain | 7 |
| Switzerland | 6 |
| UK | 212 |

In-scope Employees

11.     A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[19]

*Intellectual Property*

12.     Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[20]  First, the Sellers under each agreement transferred patents, software and trademarks at the March 19, 2010 closing date.[21]  Second, at the closing

---

19.     In-scope Employees Spreadsheet, NNI_SNOW_00286993.

20.     The EMEA Agreement also transferred IP including patents owned by Nortel France SAS.  *See* EMEA Agreement § 2.1.7, Oct. 7, 2009, NNI_008180104.

21.     Section 2.1.1(e) of the North American Agreement (together with Section 2.1.5 to the EMEA Agreement) provided that the purchasers would purchase 878 patent (including those owned by Nortel France SAS) as well as the software and trademarks listed in Section 4.5(b) of the North American Sellers' Disclosure

(Footnote continued on next page)

date of March 19, 2010, Nortel granted[22] Ciena a worldwide, royalty-free non-exclusive license

to all patents related to, but not predominantly used in, the MEN business acquired from

Nortel.[23]  The patents subject to these licenses were among those sold to Rockstar as part of the

Residual Patents Sale.

---

(Footnote continued from prior page)

Schedule.  *See* North American Agreement § 2.1.1(e), Nov. 24, 2009, NNI_00216950; EMEA Agreement § 2.1.5, Oct. 7, 2009, NNI_008180103–4; North American Agreement Sellers' Disclosure Schedule § 4.5(b), Nov. 24, 2009, NNC-NNL06002189/351.

22.   See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ciena at closing under clause 2.3.2(a) of the North American Agreement.

23.   The license grant is contained in Article 2.01 of the Intellectual Property License Agreement in favor of Ciena.  *See* Intellectual Property License Agreement art. 2.01, Mar. 19, 2010, NOR_55927510.

# APPENDIX M

## Details of the Multi-Service Switch Sale to Ericsson

*Overview of the Sale of Metro Ethernet Networks ("MEN") Business*

1.　　The Metro Ethernet Networks ("MEN") business segment was split and led to the MEN and Multi-Service Switch ("MSS") sales.

2.　　MSS operated as a division of Nortel's MEN business.[1]  The MSS business delivered a high capacity, high reliability multi-service switch that can aggregate and route different kinds of traffic such as data, video, voice and various other protocols for transmission in a combined fashion, and related services principally to telecommunications service providers and multi-system operators, and was also used by other former Nortel business units within various network products they sold.[2]

3.　　The MSS business had global revenues of approximately $350 million in fiscal 2009.[3]

*Details of the MSS Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| August 26, 2010 | PSP Holding LLC signs Stalking Horse Agreement |
| September 1, 2010 | Court order approves sale and bid procedures |
| September 21, 2010 | Last date for submission of qualified bids |

---

1.　　Fifty Second Report of the Monitor ¶ 16, Aug. 30, 2010 [D.I. 3843 Ex. A].

2.　　*Id.* ¶¶ 14-15.

3.　　*Id.* ¶ 16.

| September 24, 2010 | Auction commenced |
|---|---|
| September 24, 2010 | Auction ended |
| **Details of the Sale** | |
| September 24, 2010 | Ericsson signs North American Agreement and EMEA Agreement[4, 5] |
| September 30, 2010 | Court order approves sale through winning bid |
| March 11, 2011 | Completion date |

*Sale Documents*

4.       The main documents governing the sale are the Asset Sale Agreement dated September 24, 2010 (the "North American Agreement"),[6] the Asset Sale Agreement dated September 24, 2010 (the "EMEA Agreement")[7] and the respective Sellers' Disclosure Schedules.[8]  The assets sold are identified at Section 2.1.1 in respect of the North American

---

4.     As defined below.

5.     The purchase price is set out at Appendix 2.

6.     North American Agreement, September 24, 2010, NNI_00821708; *see also* Amended North American Agreement, March 11, 2011, NNI_00822640.

7.     EMEA Agreement, September 24, 2010, BHG0151799; *see also* Amended EMEA Agreement, January 26, 2011, NNI_00820982; *see also* Second Amended EMEA Agreement, March 11, 2011, NNI_00821147.

8.     For the North American Agreement:  Seller's Disclosure Schedule, September 24, 2010, NNI_00822333; *see also* Section 1.1(a)-10.16(a)(iii) of the Seller's Disclosure Schedule, NNI_00822569;  Schedule 1.1(n)(iii)(B) of the Seller's Disclosure Schedule, NNI_00822622; Schedule 4.5(h) of the Seller's Disclosure Schedule, NNI_00822628; Schedule 4.5(g)(ii)(B) of the Seller's Disclosure Schedule, NNI_00822630; Section 4.11(b) of the Seller's Disclosure Schedule, March 9, 2011, NNI_00822632; Section 7.1.2.(c)(ii) of the Seller's Disclosure Schedule, March 11, 2011, NNI_00822636; Section 7.1.2(c)(iv) of the Seller's Disclosure Schedule, March 11, 2011, NNI_00822639. For the EMEA Agreement:  EMEA Sellers' Disclosure Schedule to Asset Sale Agreement September 24, 2010, EMEAPROD2146445.

Agreement and Sections 2.1 and 2.2 in respect of the EMEA Agreement.[9]  The assumed

liabilities are identified at Section 2.1.3 in respect of the North American Agreement and Section

2.4 in respect of the EMEA Agreement.[10]

*Sellers*

5.    The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Global Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems Inc.

- Nortel Networks International Inc.

- Nortel Networks de Argentina S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

---

9.    North American Agreement at NNI_00821743-44; EMEA Agreement at BHG0151804–06.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

10.    North American Agreement at NNI_00821746-49; EMEA Agreement at BHG0151808–10.

4

- Nortel Networks del Uruguay S.A.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Korea Limited

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co Limited

6.      The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

7.      The sellers pursuant to the China Asset Sale Agreement dated March 9, 2011 were[11]:

- Nortel Networks (China) Limited

8.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the MSS sale are[12]:

---

11.    China Asset Sale Agreement, Mar. 9, 2011, NNI_00822139.

12.    License Termination Agreement, GIP_Nortel_00101572.

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Global Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks de Argentina S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks del Uruguay S.A.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Korea Limited

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co
  Limited

*Data room*

9.      Prior to the conclusion of the sale, a data room was set up for the purpose
of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial
information, information in respect of customers and/or customer contracts and employee
information.

*Employees*[13]

Pursuant to the North American Agreement

10.     At least ninety-five percent (95%) of employees were to be offered

employment pursuant to the North American Agreement[14] with minimum offers as follows:

Pursuant to the EMEA Agreement

11.     Approximately fifty-nine employees transferred by operation of law or by

offer from the Purchaser pursuant to the EMEA Agreement[15] as follows:

| Country | Approximate Transfers |
|---|---|
| Belgium | 3 |
| France | 6 |
| Germany | 6 |
| Italy | 5 |
| The Netherlands | 1 |
| Poland | 4 |
| Portugal | 1 |
| Spain | 13 |
| UK | 20 |

---

13.   The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

14.   North American Agreement § 7.1.1, NNI_00821821–22.

15.   EMEA Agreement, Schedule 6, BHG0151934–44.

<u>In-scope Employees</u>

12.     A significant number of the in-scope employees include employees focused on research, design and development and sales.[16]

*Intellectual Property*

13.     Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[17]  First, the Sellers under each agreement transferred patents, software and trademarks at the March 11, 2011 closing date.[18]  Second, at the closing date of March 11, 2011, Nortel granted[19] Ericsson a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the MSS business acquired from Nortel.[20]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

16.     In-scope Employees Spreadsheet, EMEAPROD1839541.

17.     The EMEA Agreement also transferred IP (*see* Section 2.1.7 to the Second Amended EMEA Agreement at NNI_00821183), including patents owned by Nortel France SAS.

18.     Section 2.1.1(f) of the North American Agreement at NNI00821743–44 (together with Section 2.1.5 to the Second Amended EMEA Agreement at NNI_00821182–83) provided that the purchasers would purchase 96 patents as well as the software and trademarks listed in Section 1.1(n) of the North American Sellers Disclosure Schedule, NNI_00822571–78.

19.     See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ericsson at closing under clause 2.3.2(a)(viii) of the North American Agreement at NNI_00821764.

20.     The license grant is contained in Article 2.01 of the Intellectual Property License Agreement in favor of Ericsson dated March 11, 2011 at GIP_Nortel_00086528, 33.

# APPENDIX N

### Details of the Residual Patents Sale to Rockstar BidCo, L.P.

*Overview of the Sale*

1.      The largest single bankruptcy sale undertaken by Nortel was that of its Residual Patents assets.  This sale consisted of more than 6,000 granted patents, patent applications and invention disclosures thought worthy of protection by patent application.  This sale raised $4.5 billion, which is more than the rest of the Business Sales combined.  The assets in this sale consisted solely of IP in the form of patents and patent applications.

2.      According to the information memorandum document prepared by Nortel and its independent advisors – Lazard and Global IP Law Group – and sent to potential buyers of the portfolio between May and September 2010, the Residual Patents Portfolio consisted of 4,040 granted patents, 2,082 patent applications and 145 invention disclosures that could form the basis of a patent application.[1]

3.      The information memorandum notes that the value in the portfolio comes from the fact that it covers a broad range of technology areas; contains many foundational patents that are deemed to be essential to many different types of products; and around one-third of the portfolio is registered outside the United States, giving global scope.[2]

4.      The information memorandum also specifically draws attention to the fact that the portfolio was a largely unencumbered by licenses and unique in the market because other similar portfolios were privately held by corporations still in business.[3]

---

1.      Executive Summary Project Iceberg, April 2010, GIP_Nortel_00143241 at 3.

2.      *Id.*

3.      *Id.* at 6.

*Details of the Residual Patents Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| April 4, 2011 | Ranger Inc. and Google Inc. sign Stalking Horse Agreement |
| May 2, 2011 | Court order approves sale and bid procedures |
| June 13, 2011 | Last date for submission of qualified bids |
| June 27, 2011 | Auction commenced |
| June 30, 2011 | Auction ended |
| **Details of the Sale** | |
| June 30, 2011 | Rockstar BidCo, L.P.  signs Asset Sale Agreement[4, 5] |
| July 11, 2011 | Court order approves sale through winning bid |
| July 29, 2011 | Completion date |

*Sale Documents*

5.     The main documents governing the sale are the Asset Sale Agreement

dated June 30, 2011 (the "Asset Sale Agreement")[6] and the Sellers' Disclosure Schedule.[7]  The

---

4.     As defined below.

5.     The purchase price is set out at Appendix 2.

6.     Asset Sale Agreement, June 30, 2011, NNI_00825094; *see also* Amendment to Asset Sale Agreement, July 29, 2011, NNI_00825205 at NNI_00825205.

7.     Seller's Disclosure Schedule, June 30, 2011, NNC-NNL06002561; *see also* Amendment to Asset Sale Agreement, July 29, 2011, NNI_00825205; Seller's Disclosure Schedule, Annex 1.1(d) Listed Jointly Owned Patents,  June 30, 2011, NNI_00825244; Seller's Disclosure Schedule, Annex 1.1(h) Listed Patents, Assets Tab, June 30, 2011, NNI_00825254; Seller's Disclosure Schedule, Annex 1.1(c), Patents That May Require Recordation of One of the Sellers as the Owner, June 30, 2011, NNI_00825621; Seller's Disclosure Schedule,

(Footnote continued on next page)

3

assets sold, which are all either granted patents, patent applications or disclosed inventions

thought worthy of protection by patent application, are identified at Section 2.1.1 in respect of

the Asset Sale Agreement.[8]  The assumed liabilities are identified at Section 2.1.3 in respect of

the Asset Sale Agreement.[9]

*Sellers*

> 6.    The sellers pursuant to the Asset Sale Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Inc.

- XROS, Inc.

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

---

(Footnote continued from prior page)
Annex A.I(h), Abandoned, Expired, Transferred Patents Tab, June 30, 2011, NNI_00825622; Seller's Disclosure Schedule,  Chart, June 30, 2011; NNI_00825647 and Seller's Disclosure Schedule, Annex A §2.1.1(a), June 30, 2011 NNI_00825680.

8.    Asset Sale Agreement § 2.1.1, June 30, 2011, NNI_00825123-25.  The Asset Sale Agreement when read in full sets out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

9.    Asset Sale Agreement § 2.1.3, June 30, 2011, NNI_00825126-27.

- Nortel Networks (Ireland) Limited

- Nortel Networks UK Limited

7.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds from the Residual Patents Sale are[10]:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Inc.

- XROS, Inc.

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks UK Limited

*Data room*

---

10.    License Termination Agreement, GIP_Nortel_00078256.

8.      Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.

*Employees*[11]

Pursuant to the Asset Sale Agreement

9.      In North America (and the rest of the world), a minimum of sixteen employees were to be offered employment pursuant to Exhibit H (Employee Transfer Side Agreement)[12] to the Asset Sale Agreement.  Each such employee was based in either Canada or the United States.

---

11.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

12.    Employee Transfer Side Agreement, June 30, 2011, BHG0245171.

# APPENDIX O

| Case | Average Priority Date |
|------|----------------------|
| Charter Communications Inc. et al. v. Rockstar Consortium US LP et al. | 20-Dec-97 |
| Constellation Technologies LLC v. Time Warner Cable Inc et al. | 11-Jun-00 |
| Rockstar Consortium US LP et al. v. HTC Corporation and HTC America, Inc. | 18-Jan-98 |
| Rockstar Consortium US LP et al. v. Huawei Investment & Holding Co. et al. | 18-Jan-98 |
| Rockstar Consortium US LP et al. v. LG Electronics, Inc. et al. | 18-Jan-98 |
| Rockstar Consortium US LP et al. v. Pantech Co., Ltd. and Pantech Wireless, | 17-Apr-98 |
| Rockstar Consortium US LP et al. v. Samsung Electronics Co., Ltd et al. | 18-Jan-98 |
| Rockstar Consortium US LP et al. v. ZTE Corporation et al. | 17-Apr-98 |
| Rockstar Consortium US LP et al. v. Google Inc. | 13-Feb-97 |
| Spherix Incorporated v. Vtech Telecommunications Ltd. and Vtech Communications, Inc. | 14-Oct-96 |
| Bockstar Technologies LLC v. Cisco Systems, Inc. | 24-Apr-98 |

Charter Communications Inc. et al. v. Rockstar Consortium US LP et al.

| Patent Asserted | Priority Date |
|---|---|
| 5471474 | 4-Jun-93 |
| 5583862 | 28-Mar-95 |
| 5761197 | 14-Nov-94 |
| 5959990 | 12-Mar-96 |
| 6128649 | 2-Jun-97 |
| 6130893 | 9-Oct-97 |
| 6192397 | 20-Jun-96 |
| 6321253 | 2-Oct-98 |
| 6845389 | 12-May-00 |
| 6901048 | 20-Aug-99 |
| 7154879 | 30-May-00 |
| 8134917 | 22-Dec-99 |
| 8464299 | 17-Nov-04 |
| RE40999 | 12-Mar-96 |
| Average Priority Year | 20-Dec-97 |

Constellation Technologies LLC v. Time Warner Cable Inc et al.

| Patent Asserted | Priority Date |
|---|---|
| 6128649 | 2-Jun-97 |
| 6845389 | 12-May-00 |
| 6901048 | 20-Aug-99 |
| 7154879 | 30-May-00 |
| 8134917 | 22-Dec-99 |
| 8464299 | 17-Nov-04 |
| Average Priority Year | 11-Jun-00 |

Rockstar Consortium US LP et al. v. HTC Corporation and HTC America, Inc.

| Patent Asserted | Priority Date |
|---|---|
| 5838551 | 1-Aug-96 |
| 6037937 | 4-Dec-97 |
| 6128298 | 24-Apr-96 |
| 6333973 | 23-Apr-97 |
| 6463131 | 22-Dec-97 |
| 6765591 | 2-Apr-99 |
| 6937572 | 29-Dec-00 |
| Average Priority Year | 18-Jan-98 |

Rockstar Consortium US LP et al. v. Huawei Investment & Holding Co. et al.

| Patent Asserted | Priority Date |
|---|---|
| 5838551 | 1-Aug-96 |
| 6037937 | 4-Dec-97 |
| 6128298 | 24-Apr-96 |
| 6333973 | 23-Apr-97 |
| 6463131 | 22-Dec-97 |
| 6764591 | 2-Apr-99 |
| 6937572 | 29-Dec-00 |
| Average Priority Year | 18-Jan-98 |

Rockstar Consortium US LP et al. v. LG Electronics, Inc. et al.

| Patent Asserted | Priority Date |
|---|---|
| 5838551 | 1-Aug-96 |
| 6037937 | 4-Dec-97 |
| 6128298 | 24-Apr-96 |
| 6333973 | 23-Apr-97 |
| 6463131 | 22-Dec-97 |
| 6765591 | 2-Apr-99 |
| 6937572 | 29-Dec-00 |
| Average Priority Year | 18-Jan-98 |

Rockstar Consortium US LP et al. v. Pantech Co., Ltd. and Pantech
Wireless, Inc.

| Patent Asserted | Priority Date |
|---|---|
| 6037937 | 4-Dec-97 |
| 6128298 | 24-Apr-96 |
| 6333973 | 23-Apr-97 |
| 6463131 | 22-Dec-97 |
| 6765591 | 2-Apr-99 |
| 6937572 | 29-Dec-00 |
| Average Priority Year | 17-Apr-98 |

Rockstar Consortium US LP et al. v. Samsung Electronics Co., Ltd et al.

| Patent Asserted | Priority Date |
|---|---|
| 5838551 | 1-Aug-96 |
| 6037937 | 4-Dec-97 |
| 6128298 | 24-Apr-96 |
| 6333973 | 23-Apr-97 |
| 6463131 | 22-Dec-97 |
| 6765591 | 2-Apr-99 |
| 6937572 | 29-Dec-00 |
| Average Priority Year | 18-Jan-98 |

Rockstar Consortium US LP et al. v. ZTE Corporation et al.

| Patent Asserted | Priority Date |
|---|---|
| 6037937 | 4-Dec-97 |
| 6128298 | 24-Apr-96 |
| 6333973 | 23-Apr-97 |
| 6463131 | 22-Dec-97 |
| 6765591 | 2-Apr-99 |
| 6937572 | 29-Dec-00 |
| Average Priority Year | 17-Apr-98 |

Rockstar Consortium US LP et al. v. Google Inc.

| Patent Asserted | Priority Date |
|---|---|
| 6098065 | 13-Feb-97 |
| 7236969 | 13-Feb-97 |
| 7469245 | 13-Feb-97 |
| 7672970 | 13-Feb-97 |
| 7895178 | 13-Feb-97 |
| 7895183 | 13-Feb-97 |
| 7933883 | 13-Feb-97 |
| Average Priority Year | 13-Feb-97 |

Spherix Incorporated v. Vtech Telecommunications Ltd. and
Vtech Communications, Inc.

| Patent Asserted | Priority Date |
|---|---|
| 5581599 | 30-Dec-93 |
| 5752195 | 30-Dec-93 |
| 5892814 | 29-Dec-95 |
| 6614899 | 31-Jan-00 |
| 6965614 | 12-Nov-99 |
| Average Priority Year | 14-Oct-96 |

Bockstar Technologies LLC v. Cisco Systems, Inc.

| Patent Asserted | Priority Date |
|---|---|
| 6233245 | 24-Dec-97 |
| 6684241 | 29-Sep-99 |
| 6069895 | 29-Aug-97 |
| 5732080 | 12-Jul-95 |
| 6636508 | 12-Feb-99 |
| 6778653 | 9-Nov-99 |
| Average Priority Year | 24-Apr-98 |

APPENDIX P

## AVAILABLE HISTORIC AND FORECAST REVENUE DATA

      A.       The Code Division Multiple Access ("CDMA" and "LTE") Business Sale

In regards to CDMA, Nortel management provided a historic and projected income statement from 2008 through 2013,[1] in addition to a historic balance sheet for the year 2008.[2]

Similarly, Nortel management provided a historic and projected income statement from 2010 through 2015 for LTE.[3]  However, a historic balance sheet for LTE was not provided, and therefore is not referenced herein.

      B.       The Enterprise Solutions ("ES") Business Sale

In the case of ES, Nortel management provided a historic and projected income statement from 2009 through 2011, as well as a historic balance sheet over the same period. [4]

      C.       The Metro Ethernet Networks ("MEN") and Optical Networks ("Optical") Business Sale

Pertaining to MEN & Optical, Nortel management provided a historic and projected income statement from 2008 through 2010. [5]  Moreover, a historic balance sheet was provided over the same period. [6]  Since the MEN & Optical transaction closed on March 19, 2010, it is important to note that all forecasts for this particular business line from 2011 through 2021 were based on industry growth rates.

      D.       The Carrier VoIP & Applications Solutions ("CVAS") Business Sale

In regards to CVAS, Nortel management provided a historic and projected income statement from 2008 through 2011,[7] in addition to a historic balance sheet for the year 2008.[8]

      E.       The Global System for Mobile Communication ("GSM")/GSM-Railway ("GSM-R") Business Sale

In regards to GSM/GSM-R, Nortel management provided a historic and projected income statement from 2007 through 2015, in addition to a historic balance sheet from 2007 through 2011.[9]

---

[1] All data values from 2008 to 2013 copied from NNC-NNL06245718, titled "090414 CDMA Co FINAL.pdf".

[2] All data values copied from source document NNI_NARNIA_1198622, titled "Balance_Sheet_Presentation."

[3] All data values copied from NNI_00147603, titled "Nortel LTE - Project MilkyWay Information Memorandum."

[4] All data values copied from source document NNI_EQUINOX_00083934, titled "Equinox_Draft PL Working Capital and Free Cash Flow Forecast_Updated 200... ."

[5] All data values from fiscal 2008 to 2010 copied from NOR_54175107, titled "Snow IM-v01.pdf".

[6] All data values copied from source document NOR_54175107, titled "Snow IM-v01.pdf."

[7] All data values from fiscal 2009 to 2011 copied from NNI_NARNIA_00287651, titled "Feb 18 - 2010 OL (Restricted), 15."

[8] All data values from fiscal 2009 to 2011 copied from NNI_NARNIA_00287651, titled "Feb 18 - 2010 OL (Restricted), 15."

F.    The Multiservice Switch ("MSS") Business Sale

In regards to MSS, Nortel management provided a historic and projected income statement from 2008 through 2014,[10] in addition to a historic balance sheet from 2008 to 2010.[11]

G.    The Layer 4-7 Assets (Alteon Business) Business Sale

In regards to Layer 4-7, Nortel management provided a historic and projected income statement from 2006 through 2010.[12]  A historic balance sheet was provided for the year 2009.[13]

H.    The Next Generation ("Next-Gen") Packet Core Business Sale

In regards to Next-Gen, Nortel management provided a historic and projected income statement from 2009 through 2011, as well as a historic balance sheet over the same period.[14]

---

(Footnote continued from prior page)

[9] All data values copied from NOR_54275576, titled "1_1_1 Project ISIS-Final IM_-01.pdf" and containing a presentation titled "ISIS Information Memorandum, October 2009."

[10] All data values from 2008 to 2014 copied from NOR_54178206, titled "Pluto DCF Model-v01.pdf" and containing a presentation titled "Passport: Discounted Cash Flow Analysis."

[11] All data values copied from source document NNI_00019769, containing a document titled "Project Pluto Working Capital By Portfolio – DRAFT."

[12] All data values from 2006 to 2010 copied from NOR_55314343, titled "Velocity IM for 363 participants Feb 11_-v01.ppt."

[13] Data Extracted from NOR_54266568, titled "Velocity-Asset Transfers by Entity_-v01.xls."

[14] All data values copied from source document NNI_EQUINOX_00083934, titled, "Equinox_Draft PL Working Capital and Free Cash Flow Forecast_Updated 200... ."

APPENDIX Q

2

## ROYALTY RATES SELECTED FOR DEFENSIVE IP VALUATIONS

I selected the royalty rates for each Business Sale IP valuation based on the following information:

A. The CDMA and LTE Business Line(s) were both wireless infrastructure businesses. Therefore, the most closely related market is the Wireless Infrastructure franchise. ██████████████████ ) ██████████ )

B. The ES Business Line products and services were related to both data and voice technologies. I therefore selected the Enterprise Voice franchise. ██████████████████ ) ██████████ )

C. The MEN & Optical Business Line products were related to optical networking technologies. Therefore the most closely related market is the Optical franchise. ██████████████ ) ██████████ )

D. The CVAS Business Line primarily consisted of carrier voice over IP technologies. Therefore, the most closely related market is the Carrier Voice franchise. ██████████████ )

E. The GSM/GSM-R Business Line(s) was a wireless infrastructure business. Therefore, the most closely related market is the Wireless Infrastructure franchise. ██████████████ ) ██████████ )

F. The MSS Business Line products were switches and routers used for data networking and to support CDMA wireless technology.[1] Therefore the most closely related markets are the Wireless Infrastructure and Data Networking franchises. ██████████████ )

G. The Layer 4-7 Business Line products primarily consisted of switches for application acceleration and load-balancing.[2] These technologies apply to the transmission of voice and data. Therefore, the most closely related market is the Data Networking franchise. ██████████████ ) ██████████ )

H. The Next-Gen Business Line was a wireless infrastructure business. Therefore, the most closely related market is the Wireless Infrastructure franchise. However, I did not use the lowest litigation light royalty rate in this instance.[3] Instead, Blackstone Advisory Partner L.P. provided me with the value of tangible assets in this business. I then calculated the difference between the Business Sale price and the tangible assets ($8.5M). The $8.5M net present value figure was used with the average industry discount rate and CDMA business revenue to calculate the royalty rate ██████████ )



---

[1] Acquisition of Nortel's Multi-Service Switch Business, Ericsson (Aug. 9, 2010), http://www.ericsson.com/news/1446864.

[2] Alteon NG Application Delivery Controller/Load Balancer, Radware, http://www.radware.com/Products/Alteon/.

[3] The approach to calculating Next-Gen IP value was distinct from the other Business Sales because no revenue was available and the business was substantially smaller than the other businesses sold in the Business Sales.

APPENDIX R

## <u>WACC BY SIC CODE FOR SELECTED MARKET PARTICIPANTS</u>

| Company | Industry SIC Code | Weighted Average Cost of Capital | | |
|---|---|---|---|---|
| | | 2009 | 2010 | 2011 |
| Avaya, Ciena Corporation, Genband, Inc. | 3661 | 10.9% | 11.8% | 11.4% |
| Ericsson | 4899 | 11.2% | 11.0% | 9.7% |
| Kapsch CarrierCom | 4813 | 14.1% | 11.0% | 8.8% |
| Radware Ltd. | 3576 | 11.3% | N/A | N/A |
| Hitachi Ltd. | 3570 | 11.4% | 13.1% | 12.3% |

APPENDIX S

## BUSINESS LINE MARKET PARTICIPANTS: MARKET SHARE ANALYSIS

| | Relevant Market Participants | Industry Market Share | Weighted Avg. Market Share | Hypothetical Market Participant Total Market Share |
|---|---|---|---|---|
| **CDMA/LTE** | Ericsson | 42.17% | 51.56% | **29.16%** |
| | Nokia Siemens Networks | 20.53% | 25.10% | |
| | Huawei | 10.75% | 13.14% | |
| | ZTE | 8.34% | 10.19% | |
| **Enterprise Solutions** | Avaya | 14.50% | 31.80% | **11.72%** |
| | Cisco | 10.90% | 23.90% | |
| | Siemens | 10.90% | 23.90% | |
| | Alcatel-Lucent | 9.30% | 20.39% | |
| **MEN & Optical** | Huawei | 21.91% | 41.35% | **18.46%** |
| | Alcatel-Lucent | 21.02% | 39.68% | |
| | Fujitsu | 6.71% | 12.66% | |
| | Ciena | 3.34% | 6.30% | |
| **CVAS** | Genband | 29.64% | 41.92% | **21.65%** |
| | Huawei | 20.66% | 29.22% | |
| | Italtel | 7.28% | 10.30% | |
| | Nokia Siemens Networks | 13.13% | 18.57% | |
| **GSM/GSM-R** | Ericsson | 36.88% | 47.85% | **25.07%** |
| | Nokia Siemens Networks | 17.59% | 22.82% | |
| | Huawei | 13.18% | 17.10% | |
| | Alcatel-Lucent | 9.43% | 12.24% | |
| **MSS** | Alcatel-Lucent | 60.40% | 60.48% | **44.41%** |
| | Cisco | 22.32% | 22.35% | |
| | Ericsson | 16.98% | 17.00% | |
| | Ciena | 0.16% | 0.16% | |
| **Layer 4-7** | Cisco | 39.40% | 44.07% | **28.59%** |
| | F5 | 27.00% | 30.20% | |
| | Citrix | 13.70% | 15.32% | |
| | Radware | 9.30% | 10.40% | |

# APPENDIX T

## DETERMINING GEOGRAPHIC SPLIT OF FORECAST REVENUE

Smartphones

I first examined historical and forecast revenues for smartphones provided by Infonetics, which provides forecast smartphone revenue for the following world regions:  North America, EMEA, APAC, and CALA.[1] I also examined forecast smartphone revenues from IDC, which utilizes a broader definition of "smartphone" in its product taxonomy relative to Infonetics and provides forecasts on a country-by-country basis.[2]  Ultimately, I elected to rely upon the Infonetics regional smartphone revenue forecasts and applied the country-specific market share implied by the IDC data as a proxy in allocating the Infonetics revenue data to specific countries through 2015.  Thereafter, I assumed that geographic market share remained constant.

Wireless Infrastructure

I again examined data from Infonetics and IDC in forecasting revenue for wireless telecommunications infrastructure by region and country.  Infonetics provided only global revenue for 2G, 3G,[3] and LTE wireless infrastructure in 2011, although WiMAX revenues are provided regionally.[4]  In allocating 2G, 3G, and LTE wireless infrastructure to world regions and countries, I relied upon IDC data as a proxy.  In particular, I examined the annual country-by-country total telecommunications equipment revenue forecasts provided by IDC and applied those territorial market shares in allocating wireless infrastructure revenues on a country-by-country basis through 2015.[5]  Thereafter, I assumed that geographic market share remained constant.  In allocating WiMAX infrastructure hardware revenues, I began with regional revenues provided by Infonetics and applied the IDC territorial market shares in allocating revenue to regional constituent nations.

Optical

I relied upon data from Infonetics and IDC in forecasting revenue for optical telecommunications hardware by region and country.  Infonetics provided these revenues on a regional basis for North America, EMEA, APAC, and CALA during 2011.[6]  In allocating these revenues to particular countries, I again relied upon IDC data as a proxy.  In particular, I examined the annual country-by-country total telecommunications equipment revenue forecasts provided by IDC and applied those territorial market shares in allocating optical hardware revenues on a country-by-country basis through 2015.[7]  Thereafter, I assumed that geographic market share remained constant.

---

[1] 2G/3G/4G (LTE and WiMax) Mobile Broadband Devices and Subscribers:  Quarterly Worldwide and Regional Market Share, Size and Forecasts, Infonetics Research (June 10, 2011) (EMEAPROD0231867).

[2] Worldwide Black Book, Q1 2011, International Data Corporation (IDC) (EMEAPROD02318770) ("Worldwide Black Book").

[3] With the exception of home location register ("HLR") equipment, which is provided on a regional basis.

[4] 2G/3G/4G (LTE and WiMax) Infrastructure and Subscribers:  Quarterly Worldwide and Regional Market Share, Size and Forecasts, Infonetics Research (May 31, 2011) (EMEAPROD02318768).

[5] Worldwide Black Book, supra note 2.

[6] Optical Network Hardware:  Quarterly Worldwide, Regional, China, Japan, and India Market Share, Size, and Forecasts, Infonetics Research (May 31, 2011) (EMEAPROD02318751).

[7] Worldwide Black Book, supra note 2.

Data Networking

I relied upon data from Infonetics and IDC in forecasting revenue for data networking hardware by region and country. Infonetics provided revenues for data networking routers (enterprise and service provider)[8] and Ethernet switches (enterprise and service provider)[9] on a regional basis during 2011. In allocating these revenues to particular countries, I again relied upon IDC data as a proxy. In particular, I examined the annual country-by-country total telecommunications equipment revenue forecasts provided by IDC and applied those territorial market shares in allocating data networking hardware revenues on a country-by-country basis through 2015.[10] Thereafter, I assumed that geographic market share remained constant.

PCs

I examined data from Boston Analytics and IDC in forecasting revenue attributable to PCs by region and country. Boston Analytics provided historical and forecast global PC revenues using the best publicly available information as of July 29, 2011.[11] IDC also provided historical and forecast revenue attributable to PCs by country.[12] I elected to first rely upon the Boston Analytics data as it was prepared based upon public company filings and equity analyst research. In allocating these revenues to particular countries, I applied the country-specific market share implied by the IDC data as a proxy in allocating the Boston Analytics revenue data to specific countries through 2015. Thereafter, I assumed that geographic market share remained constant.

Internet

I examined data from Boston Analytics and IDC in forecasting revenue attributable to Internet search and advertising by region and country. Boston Analytics provided historical and forecast global Internet revenues using the best publicly available information as of July 29, 2011.[13] IDC provided historical and forecast revenue attributable to various software and services by country.[14] I elected to first rely upon the Boston Analytics data as it was prepared based upon public company filings and equity analyst research. In allocating these revenues to particular countries, I applied the country-specific market share for packaged software[15] forecast in the IDC data as a proxy in allocating the Boston Analytics revenue data to specific countries through 2015. Thereafter, I assumed that geographic market share remained constant.

---

[8] Total Enterprise and Service Provider Routers Pivot:  Quarterly Worldwide and Regional Market Size, Share, and Forecasts, Infonetics Research (June 7, 2011) (EMEAPROD02318752).

[9] Total Enterprise and Carrier Ethernet Switches Pivot:  Quarterly Worldwide and Regional Market Share, Size, and Forecasts, Infonetics Research (June 8, 2011) (EMEAPROD02318750).

[10] Worldwide Black Book, supra note 2.

[11] Custom data provided by Boston Analytics in Excel format.  See EMEAPROD02323147 – EMEAPROD02323159.

[12] Worldwide Black Book, supra note 2.

[13] Custom data provided by Boston Analytics in Excel format.  See EMEAPROD02323147 – EMEAPROD02323159.

[14] Worldwide Black Book, supra note 2.

[15] Historical and forecast growth in the Internet search and advertising markets was compared with historical and forecast growth in a variety of software and services markets to verify that packaged software provided the most appropriate proxy for allocating Internet search and advertising revenue.

Enterprise Voice

I examined data from Infonetics, IDC, and Siemens in forecasting revenue attributable to enterprise voice telecommunications hardware by region and country. Ultimately, I elected to utilize the data from Siemens as it provided the most granularity by product segment and region.[16]  Siemens provided regional revenue forecasts for the following segments: Lifecycle Services, Platforms, Devices, Unified Communications, and Contact Center.  I included only revenues attributable to Platforms and Devices as revenues derived from the additional categories largely represent payments for software and services.  In allocating these revenues to particular countries, I again relied upon IDC data as a proxy.  In particular, I examined the annual country-by-country total telecommunications equipment revenue forecasts provided by IDC and applied those territorial market shares in allocating enterprise voice hardware revenues on a country-by-country basis through 2015.[17] Thereafter, I assumed that geographic market share remained constant.

Carrier Voice

I relied upon data from Infonetics and IDC in forecasting revenue for carrier voice telecommunications hardware by region and country.  Infonetics provided these revenues on a regional basis for North America, EMEA, APAC, and CALA during 2011.[18]  In allocating these revenues to particular countries, I again relied upon IDC data as a proxy.  In particular, I examined the annual country-by-country total telecommunications equipment revenue forecasts provided by IDC and applied those territorial market shares in allocating carrier voice hardware revenues on a country-by-country basis through 2015.[19]  Thereafter, I assumed that geographic market share remained constant.

---

[16] Siemens Enterprise Communications, Global Enterprise Communications Market Compendium 2011 (Mar. 2011) (EMEAPROD02323788).

[17] Worldwide Black Book, supra note 2.

[18] Total Service Provider VoIP and IMS Equipment and Subscribers Pivot:  Quarterly Worldwide Market Share, Size, and Forecasts, Infonetics Research (June 6, 2011) (EMEAPROD02318769).

[19] Worldwide Black Book, supra note 2.

APPENDIX U

**Risk-Adjusted Hurdle Rates for IP Assets**[1]

| Characterization of Risk | Approximate RAHR Range | |
|---|---|---|
| | Low | High |
| "**Risk-free,**" such as building a duplicate plant to make more of a currently made and sold product in response to presently high demand | 10% | 18% |
| **Very low risk**, such as incremental improvements with a well-understood technology into making a product presently made and sold in response to existing demand | 15% | 20% |
| **Low risk**, such as making a product with new features using well-understood technology into a presently served and understood customer segment with evidence of demand for such features | 20% | 30% |
| **Moderate risk**, such as making a new product using well-understood technology to a customer segment presently served by other products made by the corporation and with evidence of demand for such a new product | 25% | 35% |
| **High risk**, such as making a new product using a not well-understood technology and marketing it to an existing segment, or a well-understood technology to a new market segment | 30% | 40% |
| **Very high risk**, such as making a new product with new technology to a new market segment | 35% | 45% |
| **Extremely high risk**, such as creating a startup company to go into the business of making a product not presently sold or even known to exist using unproven technologies | 50% | 70% |

---

[1] Richard Razgaitis, <u>Valuation and Dealmaking of Technology-Based Intellectual Property:  Principles, Methods, and Tools</u> 271 (2009).