**Court File No.: 09-CL-7950**

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED**

- and -

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**Expert Report of Steven D. Felgran**

**for U.K. Pension Claimants**
January 24, 2014

**THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL PURSUANT TO THE ORDER
ENTERING A PROTECTIVE ORDER OF THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE DATED JUNE 11, 2013 [D.I. 10567], AS AMENDED
BY FIRST AMENDMENT TO PROTECTIVE ORDER DATED SEPTEMBER 20, 2013, AND
PURSUANT TO THE PROTECTIVE ORDER OF THE ONTARIO SUPERIOR COURT OF
JUSTICE (COMMERCIAL LIST) DATED JUNE 11, 2013, AS AMENDED BY ORDER OF
THE ONTARIO SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST) DATED
OCTOBER 9, 2013**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

11174629.1

**TABLE OF CONTENTS**

I. Executive Summary and Introduction ...........................................................................1

   A. Personal Background and My Assignments...........................................................1

   B. Overview of Conclusions ....................................................................................4

II. Transfer Pricing Models and My Evaluation Standards ..................................................6

   A. Transfer Pricing Methodologies..........................................................................6

   B. Goal of Transfer Pricing Methods and My Evaluation Standards ............................7

III. Nortel's RPS Models ...................................................................................................8

IV. Nortel's Treatment of Restructuring Costs Under Its Residual Profit Split Models ......12

   A. Restructuring Costs at Nortel and RPS Treatment....................................................12

   B. NNUK's Disproportionately High Restructuring Costs..........................................15

   C. Reasons for Placing Restructuring Costs Above-The-Line .....................................17

   D. Benefits Conferred by NNUK to NNL .................................................................18

V. Pension Obligations of Nortel.....................................................................................21

   A. Nortel's Pension Programs.................................................................................21

   B. Pension Costs Recognized in Transfer Pricing Models ...........................................23

   C. Impact of Total Accounting or Economic Pension Costs .........................................26

VI. Transfer Pricing Payment Terms and NNUK's Interest-Free Loans to NNL ................30

APPENDIX A: CURRICULUM VITAE

APPENDIX B: MATERIALS REVIEWED BY STEVEN D. FELGRAN

APPENDIX C: NORTEL'S TRANSFER PRICING MODELS

APPENDIX D: NORTEL'S RESTRUCTURING COSTS

APPENDIX E: TABLES SUPPORTING SECTION V

## I.   EXECUTIVE SUMMARY AND INTRODUCTION

### A.   PERSONAL BACKGROUND AND MY ASSIGNMENTS

1.   My name is Steven D. Felgran, and my home address is 219 Rockingstone Avenue, Larchmont, NY 10538.  Before my recent retirement on September 30, 2013, I was a partner with the Economic and Valuation Services practice of KPMG LLP based in New York, NY.   During my 20 years at KPMG, my primary work involved international and state transfer pricing, including planning and documentation, advance pricing agreements ("APAs"), and negotiations with tax authorities.   Before joining KPMG, I taught MBA-level managerial economics at Northeastern University's College of Business Administration.   I obtained Ph.D. and M.A. degrees from Yale University and a B.A. degree from the University of Pennsylvania, all in economics. My full curriculum vitae, attached to this report as Appendix A, provides more details about my educational and professional background and experience, as well as a list of my publications.

2.   I have been engaged by counsel for Nortel Networks U.K. Pension Trust Limited and the Board of the Pension Protection Fund (the "U.K. Pension Claimants") to review Nortel's transfer pricing policies and their implementation between 2001 and 2008. (I refer to specific companies further below but, in this Report, I use the term "Nortel" to refer to the Nortel Group as a whole).   During this time, Nortel's transfer pricing arrangement operated under a residual profit split model ("RPS model" or "RPSM"), according to which Nortel's operating profits/losses were first divided into "routine" returns, which were the normal profits unconnected to the contribution of valuable intangible assets, in particular Research and Development ("R&D"), and residual profits, which were the above-normal profits or losses resulting from the costs of development and proceeds of exploiting these intangible assets.   The residual profits/losses were then divided among five residual profit entities ("RPEs") that conducted almost all of Nortel's R&D activities.   These five RPEs include Nortel's main operating subsidiaries in Canada ("NNL"), the U.S. ("NNI"), the U.K. ("NNUK"), France ("NNSA"), and Ireland ("NN Ireland").   An Australian subsidiary was also treated as an RPE, but only between 2001 and 2007.

3.  On January 14, 2009, various Nortel entities filed for bankruptcy, insolvency, or similar protections in Canada, the U.S. and the U.K. (for Nortel's Europe, Middle East and Africa, or "EMEA" subsidiaries). Nortel's EMEA subsidiaries and the U.K. Pension Claimants have asserted separate claims against NNL before the Canadian Court.[2] The U.K. Pension Claimants' claims are based in part on the assertion of a Financial Support Direction ("FSD") and associated Contribution Notice under the U.K.'s Pensions Act 2004, which provides, after certain threshold tests are met, for NNUK's pension shortfall to be recovered in whole or in part from its parent or affiliates, and not just from NNUK, the sponsoring employer of the pension scheme.

4.  It is my understanding that one of the four tests required for a FSD is a "reasonableness test," *i.e.*, it is reasonable for the requirements of the FSD to be imposed on NNL (and Nortel Networks Corporation ("NNC"), Nortel's publicly traded parent company) having regard to various factors, including control by the target (*i.e.,* NNL and NNC) of the U.K. employer and the receipt of benefits by the target from the U.K. employer. One allegation in this regard by the U.K. Pension Claimants is that, by way of its integrated operations and NNL and NNC's central control, Nortel's transfer pricing arrangements operated to benefit Nortel overall and NNL and NNC in particular, while at the same time being detrimental to NNUK at the time, and accordingly its pension scheme.

5.  I have been engaged to address, in light of Nortel's financial conditions and actual inter-company dealings relative to arm's-length requirements, the following three questions:

    a.  Whether Nortel's restructuring costs should be considered part of normal operating costs and hence be shared among the RPEs; whether the failure to share restructuring costs was consistent with a reasonable allocation methodology under the residual profit split method, which was the transfer pricing method utilized by Nortel; and whether or not Nortel's treatment of restructuring costs had a beneficial impact on NNL but an adverse impact on NNUK?

---

[2]  Order by The Honorable Mr. Justice Morawetz in the CCAA Proceedings on February 26, 2010 as clarified by the Court of Appeals on June 16, 2010.

b. Whether the pension costs incorporated into Nortel's transfer pricing models, namely the part of overall pension costs shown "above-the-line" under U.S. GAAP (which refers to costs above the operating profit line in the income statement), reflected the real economic costs to NNUK associated with its pension scheme; whether compensation on the basis of such costs, should they have fallen short of real economic costs, was consistent with a reasonable allocation methodology under the residual profit split method; and whether Nortel's treatment of pension costs had a beneficial impact on NNL but a detrimental impact on NNUK and its pension scheme.

c. Whether NNUK's payment terms (*i.e.,* instead of paying amounts owed to NNUK for goods and services, NNL converted such trading debts into interest-free loans) in respect of transfer pricing payments owed by NNL to NNUK were consistent with arm's-length dealings between independent entities and, if not, whether such payment and loan terms operated to the benefit of NNL and to the detriment of NNUK?

6. I am being compensated at my standard hourly rate of US$750 for this report. My compensation is not tied in any way to the outcome of the litigation. Consultants from The Brattle Group provided analytical and administrative support under my direction and supervision. I also relied upon the reports of two other experts for the U.K. Pension Claimants: Mr. Roger Siefert (StoneTurn Group) for the details of U.S. GAAP pension accounting, and Mr. Ronald S. Bowie (Hymans Robertson LLP) for actuarial valuation issues associated with pension plans. However, the opinions expressed herein are mine. I reserve the right to revise and/or update my analysis as more data becomes available. Documents reviewed in connection with reaching my opinions are listed in Appendix B. I have not testified as an expert at trial or by deposition in any cases during the previous four (4) years.

7. For the avoidance of doubt, the fact that I do not address any particular aspect of Nortel's transfer pricing arrangements in this Report should not be taken as an indication that either I or the U.K. Pension Claimants accept the legitimacy or appropriateness of any such matter. In particular, I understand that certain other Core Parties have included reference to Nortel's transfer pricing arrangements (including

3

criticisms thereof) in documents filed in this litigation and have indicated an intention to rely upon the expert evidence of transfer pricing specialists.  I understand that the litigation procedural timetable provides an opportunity for rebuttal reports to be served in respect of any reports which such other experts may file.

### B.   OVERVIEW OF CONCLUSIONS

8.   Based on my review of the evidence provided to me, my long experience in the transfer pricing field, and my analyses of the relevant facts and circumstances, I have reached the following conclusions:

a.   Nortel's restructuring costs throughout the 2001 to 2008 period were ordinary, usual and recurring expenses due to its changing global business strategies in light of continuing market turmoil, which renders restructuring costs similar to ongoing operating expenses from an economic perspective.  To be consistent with arm's-length behavior and in particular with the standards of transfer pricing, which require arm's-length equivalent results, it is my opinion that these ordinary restructuring costs should have been included in the calculation of residual profits in Nortel's transfer pricing models.  Because NNUK bore a disproportionately high share of Nortel's total restructuring costs relative to NNUK's share of residual profits, not being able to share its restructuring costs under Nortel's transfer pricing arrangement resulted in a detriment to NNUK in the amount of approximately US$500 to US$660 million.

b.   Nortel's transfer pricing models reflected net periodic pension costs, which were considerably lower than true pension costs from an economic perspective.  In order for transfer pricing models to reliably reflect arm's-length equivalent dealings, true economic costs must be properly measured and compensated.  I understand from Mr. Bowie that, especially for an entity such as NNUK facing financial challenges, an economically sound measure of NNUK's pension costs would far exceed NNUK's net periodic pension costs recorded under U.S. GAAP. In addition, the GAAP pension costs considered in total should include balance sheet elements, which Mr. Siefert has calculated.  I approximate the true economic costs of NNUK's pension costs using the calculations provided to me

by Mr. Bowie and Mr. Siefert.  The failure of Nortel's transfer pricing models to capture the true pension costs, whether on an economic basis or through use of total pension costs under U.S. GAAP, resulted in a detriment to NNUK of US$517 to US$810 million from 2003 to 2008.  Nortel's approach to this issue materially benefitted NNL.

c.  The series of interest-free loans from NNUK to NNL, which arose as a result of unpaid transfer pricing adjustments from NNL to NNUK, were non-commercial transactions wholly inconsistent with the most basic principle of arm's-length equivalent pricing between related parties and the agreed payment terms – including as to the payment of arm's-length interest.  Between the end of 2003 and the end of 2007, NNUK forfeited interest income on its loans on the order of approximately £20 million per year according to Nortel's internal estimates, as well as having a loan balance of around US$170 million due from NNL as of the end of 2008.

9.  The rest of my report is organized as follows.  Section II discusses the guiding principles in the selection of a transfer pricing method according to the 1995 OECD Guidelines (as defined below), as embodied in the Canadian transfer pricing regulations, and according to the U.S. transfer pricing regulations originally issued in 1994, and describes my evaluation standards.  Section III discusses the residual profit split models that were implemented sequentially by Nortel.  Section IV explains why, from a transfer pricing perspective, Nortel's restructuring costs should have been shared, and what impact this would have had on NNUK.  Section V considers Nortel's transfer pricing models' treatment of pension costs, in particular the fact that those models accounted for only a portion of the real economic costs associated with NNUK's pension scheme.  As I am an expert in neither U.S. GAAP accounting for pensions nor actuarial issues, I rely in this section on the expert reports of Mr. Roger Siefert and Mr. Ronald S. Bowie.  Section VI addresses the last of the three questions above, the non-commercial nature of the intercompany loans from NNUK to NNL and their failure to comply with the arm's-length standard.

## II.     TRANSFER PRICING MODELS AND MY EVALUATION STANDARDS

### A.     TRANSFER PRICING METHODOLOGIES

10.  Broadly speaking, the purposes of transfer pricing for multinational corporations ("MNCs") are two-fold: "fair" tax revenues to relevant host countries, and avoidance of double taxation by the MNCs.  The fundamental principle that the OECD member countries have adopted is the concept of an arm's-length standard, which requires two related parties to set the same or a similar price for an inter-firm transaction as two unrelated parties would have set if they had been engaged in the same or similar transactions under the same or similar circumstances.  Under the arm's-length standard, the related parties, although parts of the same MNC, are treated as if they were separate and unrelated entities for tax purposes.  The OECD has published many guidelines for its member countries and developing countries, which have been influenced by and adapted to several countries' tax codes, *e.g.*, Internal Revenue Code (IRC) section 482 and accompanying Treasury regulations in the U.S. (the "U.S. Treasury Regulations").

11.  The 1995 OECD Guidelines,[3] among other methods, adopted two profit-based methods: the transactional net margin method and the profit split method.  Under the former, the net profit margins earned in comparable third-party transactions are used to set the transfer prices, whereas the latter splits the profit on inter-firm transactions between two (or more) related parties in proportion to some measure of their relative contributions (*e.g.*, sales, assets, capital, *etc.*).  The *residual* profit split model that Nortel adopted from 2001 onwards (following termination of its cost sharing agreement) is an application of the profit split approach: it first allocated an arm's-length return to routine functions performed by Nortel's RPEs, and then split any residual profit/loss based on the parties' relative contributions to achieving that profit/loss.

12.  In addition to external tax motivations, there can be internal business motivations to establish arm's-length equivalent transfer prices for cross-border transactions: many foreign subsidiaries are run as separate profit centers and hence their management

---

[3]  Organization for Economic Co-operation and Development, Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations, July 1995, ("1995 OECD Guidelines").

needs to be incentivized and compensated accordingly.  There are many multinational corporations such as Nortel, however, that manage their businesses across product lines or lines of business rather than along national borders or legal entities.  In these situations, the transfer pricing mechanism is designed only to be compliant with tax authorities' requirements.  Based on my understanding of Nortel's internal organization between 2001 and 2008, Nortel's transfer pricing arrangements were motivated, *inter alia*, by tax rules.[4]  Nortel's key personnel in the transfer pricing area agreed that the RPS models were primarily for tax compliance.[5]

**B.  GOAL OF TRANSFER PRICING METHODS AND MY EVALUATION STANDARDS**

13.  The guiding principle of the selection of a transfer pricing method is reliability of the results, *i.e.*, whether the results of the transfer pricing method reflect the economic reality given the information *currently* available.  For example, U.S. Treasury Regulations ¶1.482-1(c)(1) state that "The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result."  Further, the 1995 OECD Guidelines and U.S. Treasury Regulations suggest that the profit split method may be considered the most reliable method when intangibles are created on both sides of the affiliated transactions, given that "under the profit split method, it is less likely that either party to the controlled transaction will be left with an extreme and improbable profit result, since both parties to the transaction are evaluated."[6]

14.  In evaluating the reliability of the transfer pricing method in producing arm's-length results, the 1995 OECD Guidelines and U.S. Treasury Regulations emphasize consideration of all relevant facts and circumstances.  Consistently, the evaluation of

---

[4]  All the strategic business decisions (R&D, marketing, supply chain, *etc.*) appear to have been made either at the headquarters level or at the line-of-business level.  See, *e.g.*, Exhibit 22077 (Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007−2011, October 31, 2008, "2008 Request for Advance Pricing Agreement/Arrangement"), pp. 8−13.

[5]  See, *e.g.*, Henderson deposition, pp. 201−202; O deposition, pp. 43−45 and 49−52; Gatley deposition, p. 41; Weisz deposition, pp. 46−51; and Look deposition, p. 62.

[6]  1995 OECD Guidelines, Chapter III, p. 3.

reliability should occur both at the design and the implementation phases of a reliable transfer pricing analysis. Moreover, in some cases, *ex post* adjustments are required.

15.    In the remainder of this report, I use the guidance provided by the 1995 OECD Guidelines and the U.S. Treasury Regulations, and my many years of practical experience in transfer pricing, to evaluate three specific issues regarding Nortel's implementation of its transfer pricing mechanism. Before doing so, I provide an overview of Nortel's residual profit split models between 2001 and 2008, and summarize each RPE's financial results both before and after Nortel's transfer pricing adjustments.

## III.    NORTEL'S RPS MODELS

16.    Horst Frisch, a prominent transfer pricing boutique firm and Nortel's chief transfer pricing advisor during the early 2000s, helped Nortel develop its first residual profit split model, effective from 2001 onwards, and submitted an application for a multilateral APA between the Inland Revenue Service ("IRS") in the U.S., the Canada Customs and Revenue Agency ("CCRA," and subsequently the "CRA") in Canada, and Inland Revenue in the U.K. in March 2002.[7]   Nortel implemented the model between 2001 and 2005.[8]   Against a background of changing business circumstances and discussions with the tax authorities, Nortel engaged Ernst & Young ("E&Y") to develop a new RPS model and a bilateral APA application with the CRA and the IRS for the years 2006 through 2011.[9]   In mid- to late-2004, Nortel's RPEs entered into a Master R&D Agreement ("MRDA") to memorialize, among other things, the transfer pricing method. The RPEs signed the MRDA during or after December 2004, and it was stated to be effective retroactively as of January 1, 2001. Nortel subsequently amended the MRDA four times.[10]

---

[7]   Nortel Networks Advance Pricing Arrangement Responses to Questions Posed by Inland Revenue, Internal Revenue Service and Canada Customs and Revenue Agency, September 2003, ("APA Responses to Questions") (NNC-NNL002707), p. 2.

[8]   The initial request pertained to the taxable years between 2000 and 2004 (see NNC-NNL070785 (Draft Memo to Transfer Pricing Files re: Update on APA between CRA, IRS and IR), p. 3). See also Exhibit 21003 (Master R&D Agreement entered into on December 22, 2004, "MRDA"), p. 15.

[9]   Look deposition, pp. 36–39. Look refers to the APA as having been developed in 2006 or 2007.

[10]   Exhibit 21003 (MRDA).

17. Given that R&D was the "primary contributor to the success of Nortel's operations," R&D expenditure across entities was used as the key allocation driver for residual profits in the RPSM.[11]  Horst Frisch concluded that the allocation of residual profits based on capitalized R&D values was consistent with both the U.S. Treasury Regulations and the OECD Guidelines, given that a "prorata [*sic*] allocation of profits on intangible assets will result in the same rates of return on those assets" across entities.[12]  The E&Y transfer pricing analysis in 2008 concurred that the RPSM was still the most appropriate method for Nortel to use.[13]

18. Although Nortel's RPSMs were implemented differently between the 2001-2005 and the 2006-2008 periods,[14] they shared the same elements of a residual profit split method.  First of all, the transfer pricing arrangement participants were divided into two groups: the R&D-contributing RPEs (also referred to as the Integrated Entities),[15] and the limited-risk entities or distributors that did not develop valuable intangible property (the distributors or "LREs").  The RPEs bore "the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology."[16]  Second, for the Nortel entities included in the transfer pricing arrangement, the residual profit split models followed a three-step process:

- The first step determined a measure of adjusted operating profits for each eligible entity to be used for transfer pricing purposes, which were derived from Nortel's U.S. GAAP operating profits as presented in the company's internal financial statements (the "A-100s").[17]  Certain items not considered to be part of operating costs were excluded in order to derive adjusted operating profits, most notably restructuring costs; (see Appendix C below for further details on these

---

[11] Exhibit 21026 (Economic Analysis of Nortel Networks' Intercompany Transactions, Horst Frisch Incorporated, March 14, 2002, "Horst Frisch Report"), p. 4.

[12] Exhibit 21026 (Horst Frisch Report), p. 35.

[13] Exhibit 22077 (2008 Request for Advance Pricing Agreement/Arrangement), p. 36.

[14] For further details on the changes between the 2001-2005 and 2006-2008 RPSMs, see Appendix C.

[15] See, *e.g.*, Exhibit 22077 (2008 Request for Advance Pricing Agreement/Arrangement), p. 35.

[16] Exhibit 21003 (MRDA), p. 15.

[17] The A-100s were trial balances outlining the balance sheet and income statement by Nortel entity. The income statement element of these trial balances was a key input to the RPS models.

adjustments).  Since these costs were not included in the residual profits/losses, they were borne exclusively by, rather than shared among, the residual profit entities;

- The second step allocated profits to provide market returns for routine (*i.e.,* non-R&D-based) contributions for both the RPEs and the LREs;

- The third step allocated the pool of residual profits among the RPEs only, based on the relative value of their contributions of intangible property.  The total residual profit to the RPEs was equal to the total profit from the first step minus routine returns of the RPEs and the LREs, pooled across all entities;

- Finally, each party's share of the total profits under the residual profit split was calculated as the sum of the party's routine return and its share of the aggregate residual profit.  The difference, if any, between each entity's adjusted operating profit and its target profit per the residual profit split was the entity's transfer pricing adjustment ("TP Adjustment").

19.   Below I provide a summary of some of the key results from Nortel's transfer pricing models.  Table 1 shows the transfer pricing adjustments ("TP Adjustment") due to or from the various entities.  (Table C-8 in Appendix C is a more detailed summary by year and entity).  According to this table, NNUK was supposed to receive a cumulative US$2.1 billion in transfer pricing adjustments between 2001 and 2008, while Canada was due to receive US$4.2 billion in total, and the U.S. was supposed to pay US$6.3 billion.  However, NNUK did not receive any transfer pricing payments between 2003 and 2007 calculated as per the models from NNL, the clearing house for Nortel's transfer pricing arrangements.  The accumulation of unpaid transfer pricing adjustments led to the creation of a series of interest-free loans from NNUK to NNL.  (I will return to the non-commercial and non-arm's-length nature of these loans in Section VI).

**Table 1.  Nortel's Transfer Pricing Adjustments (US$ in Millions)**

|           | 2001-2005 | 2006-2008 | 2001 - 2008 |
|-----------|:---------:|:---------:|:-----------:|
|           | TP Adjustment | | Total TP Adjustment |
| Canada    | 2,805     | 1,422     | **4,227**   |
| U.S.      | (5,284)   | (1,023)   | **(6,307)** |
| U.K.      | 2,057     | 87        | **2,144**   |
| France    | (197)     | (71)      | **(267)**   |
| Ireland   | (297)     | (227)     | **(524)**   |
| Australia | 54        | (96)      | **(42)**    |
| LREs      | 861       | (94)      | **767**     |
| **Total** | **0**     | **(3)**   | **(3)**     |

Source: Table C-5 and Table C-8 (Appendix C).

Notes: The 2007 Nortel transfer pricing model (2007-NOR_53648323) includes an interim adjustment that increased total operating earnings across all entities by about US$3 million.  However, Nortel did not account for this in the calculation of residual profits, the result of which was that this amount was not allocated in the 2007 transfer pricing model.

20.    The results presented above are based on the transfer pricing models used by Nortel for the relevant years.  In July 2010, after its bankruptcy filing, the U.S. and Canadian tax authorities reached a settlement over Nortel's 2001 - 2005 APA Application, the result of which was a US$2 billion income adjustment to NNI (meaning that its taxable income went up by US$2 billion prior to any offsets) and an equivalent reduction in NNL's income for the years 2001-2005.[18]

21.    I should note, however, that the settlement between the taxing authorities does not mean that the reallocation of taxable income between NNI and NNL achieved arm's-length results.  Based on my 20 years of experience working with taxpayers in the APA process, it is clear that the final agreed APA is the result of negotiations that do not necessarily consider arm's-length requirements.  In fact, settlements are often the result of two taxing authorities bargaining over several multinational taxpayers during competent authority negotiations.  As a simple example, in a U.S.-Canadian bilateral negotiation, the IRS might extract additional tax revenues from Company A to the detriment of CRA, in exchange for which CRA would receive additional tax revenues from Company B at the IRS's expense.  Moreover, in the matter at hand, the absence of

---

[18]    Advance Pricing Agreement between NNI and IRS (NNI_00207501), p. 7.

active participation and agreement by the U.K. taxing authority in the 2001-2005 multilateral APA application does not indicate the U.K.'s consent that the APA was arm's length from the U.K.'s perspective.

## IV. NORTEL'S TREATMENT OF RESTRUCTURING COSTS UNDER ITS RESIDUAL PROFIT SPLIT MODELS

22.  In this section, I explain (1) why Nortel's restructuring costs should have been shared, rather than borne exclusively by the entity incurring the costs, and (2) why Nortel's transfer pricing treatment of restructuring costs prejudiced NNUK in the sum of approximately US$500 – 660 million, substantially to the benefit of NNL,  over the 2001 to 2008 period.

### A.    RESTRUCTURING COSTS AT NORTEL AND RPS TREATMENT

23.  Table 2 below summarizes the restructuring costs of the Nortel entities, as reported in the A-100 statements in the transfer pricing models from 2001 to 2008.   Two observations are immediate: (1) NNUK bore a very high proportion of Nortel's total restructuring costs at 19.2%, relative to its overall RPS allocation percentage of 7%, whereas NNL incurred 24.3% of total restructuring costs, but its overall RPS allocation percentage was about 35%, or five times that of NNUK (see Figure 1 below); and (2) 80% of Nortel's total restructuring costs (= (US$2,448+US$2,011) / US$5,555 million) occurred in 2001 and 2002, although material costs were still incurred in the years thereafter.

24.  Nortel's global restructuring activities continued annually throughout 2000–2008 to streamline its operations and segments.   The general economic downturn, over-investment in the Optical Networks and HPOCS business segments, and Nortel's constant reorganizations to meet the changing needs of the global telecommunications industry were the main causes of Nortel's significant restructuring costs throughout the early 2000s.   Appendix D provides additional details about Nortel's restructuring initiatives and their impact on Nortel's employment, R&D, and business models.   The occurrence of frequent, ongoing restructurings and the absorption of their associated costs were part and parcel of Nortel's overall business strategy.

25.   Based on the material provided to me, while regional management (*e.g.,* executives located in the EMEA region) had a certain level of autonomy, final or ultimate decision-making authority for closing research facilities or reducing headcount resided with top Nortel management in Canada.  For example, top management in Canada would determine the need to shut down an R&D lab in the EMEA region and would direct management in EMEA to select a particular lab in the EMEA region for closure.[19]   Likewise, on multiple occasions the President of the EMEA region was directed to reduce workforce in the EMEA region by the Nortel Group's CEO.[20]   Accordingly, the restructurings that occurred at NNUK and the associated costs reflected the decision-making of Nortel management in Canada in light of its overall business strategy.[21]

**Table 2.  Nortel Restructuring Costs (US$ in millions)**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total | % Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 312 | 817 | 72 | 18 | 28 | 24 | 22 | 58 | **1,351** | **24.3%** |
| U.S. | 1,482 | 661 | 176 | 54 | 54 | 48 | 71 | 134 | **2,680** | **48.2%** |
| U.K. | 465 | 404 | 18 | 44 | 54 | 9 | 34 | 37 | **1,064** | **19.2%** |
| Ireland | 24 | 1 | 1 | (1) | 1 | 1 | 1 | 1 | **28** | **0.5%** |
| France | 65 | 47 | 19 | 7 | 4 | 3 | 39 | 4 | **189** | **3.4%** |
| Australia | 43 | 2 | (2) | 3 | 4 | 2 | 4 | 0 | **57** | **1.0%** |
| LREs | 59 | 78 | (3) | 12 | 7 | 6 | 13 | 15 | **186** | **3.4%** |
| **Total** | **2,448** | **2,011** | **280** | **137** | **152** | **93** | **184** | **249** | **5,555** | **100.0%** |

Source: Nortel transfer pricing models 2001-2008.

26.   In Nortel's transfer pricing models, restructuring costs were treated "below-the-line," *i.e.*, below operating profits and thus not shared among the RPE entities, in contrast to their "above-the-line" U.S. GAAP treatment ( *i.e.*, which, if followed in the transfer pricing models, would have led to those costs being shared among the RPEs).  Except for the LREs during 2002 (see below in sub-section C), all restructuring costs for both the RPEs and LREs were considered non-operating in the application of Nortel's transfer pricing models (*i.e.,* they were not factored into the calculation of routine and residual returns).  As shown in Table 2 above, since most of the restructuring costs

---

[19]   Newcombe deposition, pp. 133-135.

[20]   Pusey deposition, p. 85.

[21]   If in effect it were established that group restructuring decisions were directed by or were the responsibility of a single entity in the group, such as NNL, an approach that involved the bearing of a greater proportion of the group's restructuring costs by that entity might also be appropriate from an arm's-length perspective.

were incurred by the RPEs, treatment of restructuring costs in the RPSM would have had no impact on the RPEs as a group as they would have had to bear them collectively.  However, the impact on individual RPEs would have depended on whether the geographic location of the restructuring activities and the R&D-based allocation ratios differed significantly.  The bigger the difference between the percentage of total restructuring costs and the allocated percentage of total residual profits, the larger would be the impact of restructuring costs' transfer pricing treatment.

27.  Figure 1 below plots each entity's percentage of total restructuring costs (as displayed in the bottom row of Table 2 above) against its allocated percentage of total residual profits from 2001 to 2008.  The U.K. falls below the 45-degree line, meaning that its restructuring cost percentage (approximately 19%) exceeds its RPS allocation percentage (approximately 7%), whereas Canada demonstrates the opposite case.  This implies that, under Nortel's transfer pricing model, NNUK conferred an uncompensated benefit to NNL, and Nortel overall, by bearing the U.K.'s restructuring costs exclusively.  The opposite held true for NNL, which, as Figure 1 shows, benefited from this approach to restructuring costs.

**Figure 1.  Restructuring Cost Percentages vs. RPS Allocation Percentages**



Source: Table C-7 and Table 2.

## B.    NNUK's Disproportionately High Restructuring Costs

28.    From the material which I have seen, restructuring costs were high in the U.K. relative to other Nortel entities for three main reasons.

29.    First, there had been a major expansion of NNUK's R&D and manufacturing activities prior to 2000 due to a global surge in demand for its optical products in the late 1990s. During that period, NNUK functioned as "a fully integrated business with manufacturing, sales and marketing, R&D and support functions conducted from multiple locations… Thus, NNUK had become almost a microcosm of the global Nortel Group's operations … albeit on a smaller scale."[22]  The U.K.'s optical business, in particular, surged between 1997 and 2000.  Throughout 1997 and 1998, NNUK's sales were driven by "significant growth in the optical components products business

---

[22]    Exhibit 32117 (Transfer Pricing Report Nortel Networks U.K. Ltd, July 18, 2003, "NNUK Transfer Pricing Report"), p. 20.

for both switching and broadband applications,"[23] and, in 1999, the U.K. experienced significantly higher sales turnover due to further growth in the demand for optical component products.[24]

30.  Second, the economic downturn in 2001 was concentrated in those sectors in which NNUK was historically strong (mostly the optical business), generating significant downsizing costs for the U.K. as employees were laid off and factories shut down.  The optical business was concentrated in the U.K. at this time.  Although the EMEA corporate headquarters were in Maidenhead, Harlow Laboratories was the primary R&D site for the U.K., specializing in wireless and optical technology.[25]  Due to the contraction of the optical and HPOCS (high-performance optical component systems) markets, for which the associated R&D was conducted primarily in Canada and the U.K., there was a sharp decline in Nortel's sales and R&D spending between 2000 and 2002.  Consequently, Canada and the U.K. faced a disproportionately large decline in R&D headcount and spending relative to other countries.[26]  The HPOCS business was subsequently sold in 2002.[27]

31.  Third, at least to some degree, a migration of key R&D growth sectors away from the U.K. took place (for example, the wireless business, which had been centered at the Harlow site).  The shift of R&D to Canada in the early 2000s was due to more attractive research tax credits in Canada and Nortel's desire to consolidate its R&D in North America.  This contributed further to the U.K.'s restructuring costs and reflected a decision made by Nortel management, rather than by the U.K. entity itself.  Jeffries estimated that, at its peak, NNUK's Harlow site employed about 1,500 people.[28]  There were new building additions and expansions at Harlow until the dot-com bubble burst, but many of the new facilities had never been used when the subsequent headcount reduction plans kicked in.[29]

---

[23]  Exhibit 32117 (NNUK Transfer Pricing Report), p. 20.

[24]  Exhibit 32117 (NNUK Transfer Pricing Report), p. 20.

[25]  Jeffries deposition, p. 162. See also McFadden deposition, p. 46.

[26]  Horn deposition, pp. 114–117.

[27]  Horn deposition, p. 112.

[28]  Jeffries deposition, pp. 162–164.

[29]  Jeffries deposition, pp. 162–164.

C.    REASONS FOR PLACING RESTRUCTURING COSTS ABOVE-THE-LINE

32.    As mentioned above, Nortel's restructurings were designed and executed in an attempt to re-align the company with its products and markets, and to benefit the entire group of companies in the future (in particular, the RPEs which would take the greater share of such profits).    Therefore, restructuring costs should have been considered part of Nortel's ordinary, usual and recurring operating costs for transfer pricing purposes. Several Nortel transfer pricing staff supported this argument, emphasizing the recurring nature of the company's restructuring costs.[30]

33.    Indeed, Nortel had internal discussions on the restructuring cost issue in 2002 and 2003. Nortel reasoned that, after two years of incurring heavy restructuring costs in 2000 and 2001, many of its local distributors had suffered such great losses that their legal solvency could be endangered.[31]   Because "it was upon the direction/instructions of the residual entities that the various [distribution] subsidiaries increased their respective capacities," "[h]ad the residual entities not instructed the distribution entities in this manner, they would not have been encumbered with their restructuring charges."[32] Therefore, to ensure the local distributors' continued survival, Nortel decided in early 2003 to reimburse approximately 75% of its local distributors' restructuring costs incurred in 2002, as it believed that a partial reimbursement for 2002 was economically correct and reflected what would have occurred between arm's-length parties.[33]

34.    A similar view was echoed in Nortel's internal emails.    For example, the former director of transfer pricing testified that two main kinds of restructurings took place at Nortel during his tenure: restructuring directed by global headquarters (*i.e.*, they told subsidiaries to increase the size of their operations), and restructuring related to downsizing driven by market forces.[34]   These restructuring decisions affected both

---

[30]   Weisz deposition, pp. 191–193 and Stephens deposition, pp. 54-56.

[31]   Exhibit 21031 (Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004), p. 14.

[32]   NNC-NNL002707 (APA Responses to Questions), p. 26.

[33]   Exhibit 11086 (Memo attached to November 2002 email from James Gatley, pp. 1-2) and Gatley deposition, pp. 88–100.

[34]   Gatley deposition, pp. 177–184 and Exhibit 21386 (Nortel internal email exchange between Phillip Wong, James Gatley, *et al.*, October, 2002).

RPEs and LREs. While Nortel's arguments were used to justify the reimbursement of restructuring costs to limited-risk distributors only in the RPSM, the same reasoning holds for the RPEs as well: Nortel operated as an integrated, matrix-based organization across its lines of business, and its restructuring activities were directed either by the global headquarters or line-of-business management.[35]

35. In addition, Nortel's U.S. GAAP financial statements reported restructuring costs above-the-line, under "Special Charges," before operating income (see Appendix D for further discussion). This classification is noteworthy as it indicates Nortel management's judgment and representations to the investing public, accepted by its auditor, that these restructuring costs should be considered part of normal operations. For this matter, I rely upon Mr. Roger Siefert, U.K. Pension Claimants' U.S. GAAP accounting expert.

### D.   BENEFITS CONFERRED BY NNUK TO NNL

36. To sum up, Nortel's restructuring costs throughout the 2000 to 2008 period were ordinary, usual and recurring expenses incurred due to its global strategy in light of a difficult economic environment. The ordinary, usual and recurring nature of Nortel's restructuring activities over this period renders them similar to ongoing operating expenses from an economic perspective. In the framework of a residual profit split method, the RPEs are considered a closely comparable set of companies , at least insofar as their contributions to potential excess profitability (or loss). Collectively they bear all the upside or downside risks of Nortel's business operations. If the transfer pricing model fails to allocate restructuring costs in proportion to the RPEs' profit allocation ratios, the resulting operating earnings for the RPEs, after the transfer pricing adjustments, will not be proportionately distributed on the basis of investment in R&D. In other words, the RPEs would not receive the same proportionate remuneration for their past R&D investment. To be consistent with transfer pricing regulations on the definition of operating income for transfer pricing purposes, it is my

---

[35]   NNC-NNL002707 (APA Responses to Questions), pp. 33–34 and Exhibit 22077 (2008 Request for Advance Pricing Agreement/Arrangement), p. 13 and pp. 36–38.

opinion that ordinary, usual and recurring restructuring costs should be included in the residual profits or losses which were shared among the RPEs.

37.    In order to estimate the effect of moving restructuring costs above-the-line for all entities in the RPS models from 2001 to 2008, I constructed two scenarios:

**(i). Above-the-line treatment of 75% of restructuring costs for RPEs only**: In Nortel's application of its transfer pricing model for 2002, 75% of the restructuring charges incurred by the LREs were reimbursed to them.  So, in this first scenario, I maintain Nortel's treatment of the LREs' restructuring costs for 2002.  But I follow Nortel's logic to assume that 75% of the RPEs' restructuring costs should also be shared and that sharing should have occurred every year from 2001 to 2008.  The remaining 25% would continue to be borne by each RPE under the assumption (were it shown to be the case) that local decisions contributed to this portion of each RPE's restructuring costs, for which each RPE would be solely responsible).

**(ii). Above-the-line treatment of 100% of restructuring costs for both RPEs and LREs:**  This is an extension of the previous scenario, where 100% of all restructuring costs for all entities (both the RPEs and the LREs) are shared every year from 2001 to 2008.  The assumption is that local decisions did not contribute materially to restructuring and associated costs, but rather all such costs were the outcome of group decisions that were the responsibility of NNL, or approached on an integrated, line-of-business basis.

38.    Table 3 below summarizes the impact of the different restructuring cost scenarios on transfer pricing adjustments across the entities for all years.  Under the assumptions of Nortel's RPS models (top panel), NNUK was due to receive a cumulative US$2.1 billion payment from 2001 to 2008 (although in fact this was never received from 2003 onwards).  When 75% of restructuring costs are reimbursed to the RPEs for all years, the cumulative payment owed to NNUK rises to US$2.6 billion, an increase of US$500 million over the RPS models.  This figure rises further to US$2.8 billion owed to NNUK when 100% of the restructuring costs are reimbursed for all entities for all years.  The opposite trend holds true for NNL; *i.e.*, under Nortel's RPS models, NNL was supposed to receive US$4.2 billion from 2001 to 2008, but this amount decreases

across the restructuring scenarios, reaching its lowest level, at US$3.7 billion, when all restructuring costs are shared across RPEs and LREs.  Comparing across the scenarios, the detriment caused to NNUK by Nortel's approach on this issue is an amount between approximately US$500 and US$660 million.  Likewise, the adoption of Nortel's approach on this issue benefitted NNL by roughly US$360 to US$530 million.

**Table 3.  Transfer Pricing Payments across Entities and Restructuring Cost Scenarios (US$ in millions)**

|  | Canada | U.S. | U.K. | Other | **Total** |
|---|---|---|---|---|---|
| **Nortel transfer pricing models** | | | | | |
| **2001-2005** | 2,805 | (5,284) | 2,057 | 422 | **0** |
| **2006-2008** | 1,422 | (1,023) | 87 | (488) | **(3)** |
| **Total** | **4,227** | **(6,307)** | **2,144** | **(66)** | **(3)** |
| **1. Nortel TP Models with Above-the-Line Treatment of 75% of RPE Restructuring Costs** | | | | | |
| **2001-2005** | 2,521 | (5,352) | 2,517 | 315 | **0** |
| **2006-2008** | 1,343 | (982) | 130 | (493) | **(3)** |
| **Total** | **3,863** | **(6,335)** | **2,647** | **(178)** | **(3)** |
| **2. Nortel TP Models with Above-the-Line Treatment of 100% of All Restructuring Costs** | | | | | |
| **2001-2005** | 2,397 | (5,420) | 2,664 | 359 | **0** |
| **2006-2008** | 1,302 | (982) | 143 | (465) | **(3)** |
| **Total** | **3,699** | **(6,403)** | **2,807** | **(106)** | **(3)** |
| **Net payments** | | | | | |
| **Using Panel 1.** | **(363)** | **(28)** | **503** | **(112)** | **0** |
| **Using Panel 2.** | **(527)** | **(96)** | **662** | **(40)** | **0** |

Source: Table D-8 (Appendix D).

39.  Given my prior discussion of the reasons for sharing NNUK's (as well as the rest of the RPEs' and LREs') restructuring costs in the RPS models, I believe the range of results from the restructuring scenarios displayed above provides a more reasonable benchmark for the appropriate transfer pricing adjustments due to NNUK.  In summary, Nortel's transfer pricing treatment of restructuring costs conferred approximately US$500–660 million of uncompensated transfers from NNUK over the 2001 to 2008 period, and very materially benefitted NNL.

40. At the request of counsel, I also performed the mathematical calculations needed to obtain the bi-lateral transfers.  This information is included in Table D-11.

## V.    PENSION OBLIGATIONS OF NORTEL

41.    In this section, I address the pension costs incorporated into Nortel's transfer pricing models. The models only considered "net periodic pension cost" under U.S. GAAP as recorded in Nortel's income statement, which cost represented only a portion of the "real" costs to NNUK associated with its pension plan.  As I am not an expert in U.S. GAAP accounting for pensions or actuarial valuations, I rely in this area on the reports of two other experts for the U.K. Pension Claimants: Mr. Roger Siefert in regard to U.S. GAAP pension accounting, and Mr. Ronald S. Bowie in regard to actuarial valuation issues associated with pension plans.   Using information and analysis provided in the reports of Mr. Siefert and Mr. Bowie, I explain and quantify why Nortel's failure to take into account a more comprehensive measure of the costs of the pension plans in its transfer pricing models, especially given the deterioration in Nortel's financial situation during the 2000s, had an adverse impact on NNUK.

42.    The rest of this section is organized as follows.  To provide a broader perspective on Nortel's pension plans, I first briefly illustrate the magnitude and funding characteristics of the Canadian, U.K., and U.S. pension plans.  Then I explain why transfer prices need to reflect the total or economic costs of pension plans, with reference to the specific facts and circumstances surrounding Nortel.  Finally, I use the comprehensive pension costs measure from Mr. Siefert's report and alternatively the economic measure of pension contributions identified in Mr. Bowie's report to calculate the transfer pricing impact.

### A.    NORTEL'S PENSION PROGRAMS

43.    Historically, Nortel sponsored defined benefit plans in Canada, the U.K., the U.S. and other jurisdictions,[36] but the numbers of participants and funding levels differed across the jurisdictions.  In 2000, Nortel closed its defined benefit plans to new employees and moved towards defined contribution plans.[37]   Effective January 1, 2008, all North

---

[36]    In defined benefit pension plans, the amount of pension benefit to an employee is defined by a formula, usually involving variables such as age, salary, and the number of years of service.  The employer bears the risks of providing benefits.

[37]    Nortel 2002 10-K/A, p. F-39.

American employees were switched over to defined contribution plans.[38]  With the movement towards defined contribution plans and repeated layoffs due to restructurings, the number of active (still working for Nortel) participants became an increasingly small proportion of Nortel's defined benefit plan recipients.  However, the absolute number of participants in Nortel's defined benefit plans remained substantial throughout the 2000s and was notably high in relation to NNUK's pension plan as compared with the pension plans in Canada and the U.S.[39]  Nortel took a global view of its pension plans and developed a "common platform" to "treat them [the pension plans] as equal as possible."[40]

44.    The relative size of the defined benefit plans' membership and composition is illustrated in Figure 2 below.[41]  As can be seen, the number of participants in the NNUK pension plan far outnumbered those in the Canadian and U.S. plans.  While all plans were dominated by non-active participants, the fraction of non-active participants was even more dominant for the U.K. plan than for the Canadian or U.S. plans.[42]  The split between active and non-active participants is important because non-active participants have stopped earning benefits but are still owed benefits, so that the annual service cost does not reflect those employees (although other cost components and funding may).

---

[38]   Nortel 2007 10-K p. 77.  Defined contribution pension plans specify the amount of money an employer puts into the plan for the benefit of employees.  No promise is made about the periodic pension benefits, hence no additional liability to the employer.  EMEAPROD0348928 and NNC-NNL20050815 confirm that the actuarial reports pertain only to the defined benefit plans in the U.K. and Canada, respectively. FAS 87, Summary also makes clear that the pension benefit obligation pertains to defined benefit plans.

[39]   See Table E-1 (Appendix E).

[40]   Donovan deposition, p. 143. See the expert report of Ronnie Bowie for additional detail as to his assessment of the appropriateness of Nortel's approach.

[41]   See Table E-1 for details.

[42]   Table E-1.

**Figure 2. Defined Benefit Plan Participants[43]**



Source: Table E-1 (Appendix E).

45.    The nature of the pension benefit plans and the financial health of these plans are discussed in detail in the report of Mr. Bowie and I do not repeat his points in this report.

## B.    PENSION COSTS RECOGNIZED IN TRANSFER PRICING MODELS

46.    Depositions of Nortel personnel confirm that the A-100 accounts relied upon in Nortel's transfer pricing models reflect the U.S. GAAP net periodic pension costs as included in the A-100 profit and loss statements.[44]  The use of financial statement data that is consistent with U.S. GAAP is standard practice in transfer pricing, unless there is an adjustment needed that might deviate from U.S. GAAP but would increase the reliability of the results for transfer pricing purposes.

47.    As explained in Mr. Bowie's actuarial report, the costs of a pension scheme to its sponsoring employer can be calculated under different methods.  One method, in which the pension scheme is viewed on an "ongoing" basis, assumes certain expected investment returns on the pension scheme's assets.   In the event that the pension

---

[43]    Effective January 1, 2008, Nortel moved North American employees enrolled in defined benefit plans to defined contribution plans, so after that date there were no participants in the U.S. defined benefit plans.  Nortel 2007 10-K p. 77.

[44]    Weisz deposition, pp. 232-233.

scheme's assets (including the expected returns) in the future fail to meet the pension liabilities, there is an implicit reliance on the willingness and ability of the sponsor to make good on the shortfall.  From an economist's standpoint, an "ongoing" basis therefore means that the pension scheme receives a "put option" from the sponsoring employer in the event that the expected investment returns do not materialize.  The cost of the put option, which can be priced in the derivatives market or estimated from option pricing models, is not included in the "ongoing" cost of the pension benefit. Another method, the "economic" measure of pension costs, does not assume the willingness and ability of the sponsoring employer to make good on any future shortfall.  As an economist, I agree with Mr. Bowie that this is a more appropriate way of assessing the true pension costs to the sponsor.

48.   Such an approach to the assessment of NNUK's true pension costs is further justified in the case of Nortel given the degree of financial difficulty faced by NNUK and Nortel generally during the 2000s.  Concerns regarding NNUK's longevity were raised at least from 2006, after the creation of the revised RPSM but well before Nortel's actual bankruptcy.  For example, an internal email exchange among Nortel officers and staff raised the issue of NNUK's going-concern status:

> "We need to…[c]onvince PwC [at the time retained by the U.K. pension plan trustee], through scenarios, that we view the Company as a going concern.…"[45]

Mr. Bowie explains that funding NNUK's pension scheme in a manner that tended towards an economic basis would have been appropriate given NNUK's weak financial position and, in hindsight, the lack of support that proved to be available from the wider Nortel group.  Mr. Bowie also expresses the view that five or ten years would have been an appropriate deficit repair period.[46]

49.   Nortel's financial challenges distinguish it from most other multinational companies that did not have going concern issues, and casts doubt on the applicability of the standard transfer pricing practice of including only the net periodic pension cost calculated under U.S. GAAP.  It is my understanding from Mr. Siefert's report that

---

[45]   Exhibit 21301 (email from Johannus Poos to Michael McCorkle and Kate Stevenson), p. 5.
[46]   Bowie Report.p. 30.

U.S. GAAP accounting standards for net periodic pension costs were written for going concern enterprises and therefore "assumed that the assets necessary to settle pension obligations, would be afforded long periods of growth."[47]  The assumption of a going concern is also the usual starting point in my experience for any transfer pricing analysis.  Deposition testimony by former Nortel employees who had worked in transfer pricing confirmed the critical assumption that the possibility of Nortel's bankruptcy was never contemplated in the development of Nortel's transfer pricing models.[48] According to Mr. Siefert, U.S. GAAP splits the total pension costs between the net periodic pension costs and a balance sheet item called "other comprehensive income" which could be amortized over time.  It is my opinion that, for reliable transfer pricing results, the net periodic pension costs as calculated under U.S. GAAP understated the true economic costs.

50.  To derive reliable transfer pricing results for the participants in the RPS model, I consider two alternative adjustments to Nortel's net periodic pension costs: (1) a full measure of U.S. GAAP pension costs from Mr. Siefert including the relevant OCI component as well as the net periodic pension costs; and (2) the economic costs of the pension plans from Mr. Bowie that aimed at rectifying the economic deficit over five or ten years.

51.  As Nortel is, to my knowledge, probably the first large multinational company to declare bankruptcy in a situation where transfer pricing is a key issue, there is no instance of which I am aware in which transfer pricing analysis accounted for the financial conditions of the members of a controlled group that went bankrupt.  However, the notion of taking account of deteriorating financial conditions is entirely consistent with the reliance on facts and circumstances upon which transfer pricing depends, and the need to perform whatever adjustments may be required and appropriate to increase the reliability of the results.  For example, the OECD's 2009 proposed transfer pricing guidelines state:

---

[47]  Siefert Report p. 12.

[48]  See O deposition, pp. 207 and 254; Henderson deposition, pp. 297-298; Weisz deposition, p. 254; and Stephens deposition, pp. 191-197.

Arm's length prices may vary across different markets even for transactions involving the same property or services; therefore, to achieve comparability requires that the markets in which the independent and associated enterprises operate do not have differences that have a material effect on price or that appropriate adjustments can be made.[49]

52.     Nortel's ongoing financial challenges and restructuring activities made it important that the transfer pricing reflect the specific circumstances at hand, and especially the substantially higher total or economic pension costs of the pension plans rather than the amount reflected in GAAP pension expense.  Given NNUK's relatively large pension obligations, had NNUK negotiated with NNL on an arm's-length basis, it doubtless would have requested more cash contributions and sharing of additional pension costs in the transfer pricing arrangement.

### C.     IMPACT OF TOTAL ACCOUNTING OR ECONOMIC PENSION COSTS

53.     I consider two better measures of pension costs than those reflected in Nortel's RPS models (*i.e.*, the U.S. GAAP net periodic pension costs for financial statement reporting purposes).  First, I incorporate in the RPS models the portion of U.S. GAAP pension costs that are reflected in other comprehensive income (OCI), which, together with the U.S. GAAP net periodic pension costs (which are already accounted for in the RPS model) comprise total pension costs captured in U.S. GAAP accounts for financial statement reporting purposes.  This data has been provided to me as contained in Mr. Siefert's expert report.[50]  Mr. Seifert has provided the OCI figures as determined under FAS 158.[51]  Second, I incorporate in the RPS models the economic costs associated with the U.K., U.S., and Canadian pension plans, as set forth in Mr. Bowie's report.[52]  Mr. Bowie also provided two figures based on: (i) amortizing the deficit over 5 years and (ii) amortizing the deficit over 10 years.

54.     **Total accounting pension costs.** As I understand from Mr. Siefert's report, a company has the discretion to recognize only a portion of the total pension costs in its income

---

[49]    OECD, Review of Comparability and of Profit Methods: Revisions of Chapters I-III of the Transfer Pricing Guidelines, paragraph 1.55, p. 15.

[50]    Siefert report Exhibit E and F.

[51]    See Siefert report for details on the calculation.

[52]    Bowie report pp. 28, 32-33.

statement on a yearly basis and record the balance in its OCI element on its balance sheet.  As explained by Mr. Siefert, the total annual cost of pension plans are split between the income statement and OCI so that the sum of the U.S. GAAP net periodic pension costs and the periodic charge to OCI is the total cost associated with pension benefit plans.[53]  If an entity's health and viability is not an issue, then the market and actuarial movements that are reflected on the balance sheet under U.S. GAAP will likely offset themselves over time.  But for an entity or a group of companies facing financial challenges, it is my opinion that it is appropriate to reflect the total costs of pension benefits in the transfer price, as a party facing such challenges and negotiating for arms'-length compensation of its pension costs would wish to ensure comprehensive compensation for those total costs.

55.   At my request, Mr. Siefert has provided me with both the U.S. GAAP net periodic pension costs and the amounts recorded in OCI for the U.K., Canadian, and U.S. pension plans.[54]  Broadly speaking, the OCI (balance sheet) component of the total pension costs serves to smooth the pension costs that could be volatile due to swings in market returns and changes in actuarial assumptions.  As a result, the total pension costs could deviate substantially from the U.S. GAAP net periodic pension costs.  The adjustment needed to reflect total accounting pension costs in the transfer pricing model is shown in Table E-4 and Table E-5.[55]

56.   The results from incorporating the total accounting pension costs in the transfer pricing models rather than the U.S. GAAP net periodic pension costs are summarized in Table 4 below.[56]

---

[53]   For details, see, Mr. Siefert's expert report.

[54]   Siefert report Exhibit E and F.

[55]   As Mr. Siefert's Report lacks data for some pensions plans for 2001-02 (and for Canada in 2004), I assume the adjustment is zero for 2001-02.

[56]   I rely only on data from 2003 onwards as Mr. Siefert's report did not have available data for several plans for 2001-02 as well as for the U.S. plan for 2004.

**Table 4.  Net Transfer Pricing Payments by Entity:**
**GAAP Net Periodic Pension Cost *vs.* Total Pension Costs**
**(US$ million)**

|  | Canada | U.S. | U.K. | Other | Total |
|---|---|---|---|---|---|
| **Nortel transfer pricing models** | | | | | |
| **2003-2005** | 1,627 | (2,212) | 956 | (371) | **0** |
| **2006-2008** | 1,422 | (1,023) | 87 | (488) | **(3)** |
| **Total** | **3,049** | **(3,236)** | **1,043** | **(859)** | **(3)** |
| **Total pension cost method (OCI using FAS 158)** | | | | | |
| **2003-2005** | 1,700 | (2,385) | 1,088 | (403) | **0** |
| **2006-2008** | 1,009 | (1,064) | 473 | (420) | **(3)** |
| **Total** | **2,709** | **(3,449)** | **1,561** | **(824)** | **(3)** |
| **Net transfers** | **(340)** | **(213)** | **517** | **36** | **0** |

Source: Siefert report Exhibits E and F.

57.    **Economic pension cost.**  Mr. Bowie explains in his report that the most prudent way in
which to measure pension obligations is on an "economic," rather than an "ongoing"
basis.   Particularly, when there is a weaker "financial covenant" from the sponsor (*i.e.,*
when the sponsor of a pension plan faces financial difficulties or insolvency risk), as
was the case with NNUK at least after 2006, it is, in Mr. Bowie's opinion, appropriate
for a pension scheme to tend toward the pursuit of low-risk investment strategy that
entails investing in government bonds with maturities that match the maturities of the
pension plan liabilities and to approach the cost and funding of the scheme in a manner
which takes account of the sponsor's position.   Using this strategy of conservative
investment, the expected return on plan assets is lower and the funding needed to
maintain the plan is higher than under the assumptions relied upon by Nortel at the
time.   Mr. Bowie calculated from 2001-08 the cash cost required by NNUK if an
economic deficit had been revealed in 2001 and any subsequent deficits had been met
to remove the NNUK pension plan's deficit over a five or ten year period (which Mr.
Bowie opined would have been reasonable in the case of the NNUK pension plan).[57]
The *difference* between the economic pension costs of the U.K., U.S., and Canadian
pension plans as calculated by Mr. Bowie and the U.S. GAAP net periodic pension
costs must be added to the costs reflected in the transfer pricing model to reflect the

---

[57]    Bowie report p. 29.

economic pension costs of the plan.[58]  As can be seen from Table E-4, the economic pension costs for the U.K. are substantially higher than the U.S. GAAP net periodic pension costs.

58.    The results from incorporating Mr. Bowie's economic pension costs in the transfer pricing models are summarized in Table 5 below.  Relative to the net transfer as per Nortel's transfer pricing models, an additional transfer of US$817 or US$577 million to NNUK would be warranted under a five- or ten-year amortization schedule, respectively.

**Table 5. Net Transfer Payment by Entity:**
**U.S. GAAP Net Periodic Pension Costs vs. Economic Pension Costs**
**(US$ in millions)**

|  | Canada | U.S. | U.K. | Other | Total |
|---|---|---|---|---|---|
| **Nortel transfer pricing models** | | | | | |
| 2003-2005 | 1,627 | (2,212) | 956 | (371) | **0** |
| 2006-2008 | 1,422 | (1,023) | 87 | (488) | **(3)** |
| Total | **3,049** | **(3,236)** | **1,043** | **(859)** | **(3)** |
| **Panel B: Nortel transfer pricing models with economic pension cost (5 year amortization)** | | | | | |
| 2003-2005 | 1,793 | (2,390) | 1,013 | (416) | **0** |
| 2006-2008 | 1,182 | (1,433) | 841 | (592) | **(3)** |
| Total | **2,974** | **(3,823)** | **1,854** | **(1,008)** | **(3)** |
| **Panel C: Nortel transfer pricing models with economic pension cost (10 year amortization)** | | | | | |
| 2003-2005 | 1,700 | (2,312) | 1,009 | (397) | **0** |
| 2006-2008 | 1,291 | (1,339) | 609 | (564) | **(3)** |
| Total | **2,992** | **(3,651)** | **1,618** | **(962)** | **(3)** |
| **Net transfers** | | | | | |
| **Using panel B** | (75) | (587) | 810 | (149) | **0** |
| **Using panel C** | (57) | (415) | 575 | (102) | **0** |

Source: Siefert report Exhibit E and Bowie report.

59.    In conclusion, for the transfer pricing payments to accurately reflect and compensate for the costs of providing pension benefits, it is important that the transfer pricing model take account of the true pension costs involved. To achieve arm's-length results, an entity would seek to ensure that the model included not only U.S. GAAP net periodic pension costs, but a more comprehensive measure of pension costs. This is

---

[58]    As above, I obtained the U.S. GAAP net periodic pension costs for the U.K., U.S. and Canada from Mr. Siefert's report.  I obtained the economic costs for the U.K., U.S., and Canadian pension plans from Mr. Bowie's report.

particularly so when the entity in question was facing severe financial challenges. These are important facts and circumstances that need to be incorporated in the transfer pricing model in order for the model to produce reliable arm's-length results.   The failure of Nortel's transfer pricing arrangements to reflect the total U.S. GAAP pension costs or economic costs resulted in a detriment to the NNUK  of US$517 to US$810, with material benefits going to NNL.

60. At the request of counsel, I also performed the mathematical calculations needed to obtain the bi-lateral transfers.  This information is included in Appendix E.

## VI.    TRANSFER PRICING PAYMENT TERMS AND NNUK'S INTEREST-FREE LOANS TO NNL

61.    This section discusses the unpaid transfer pricing adjustments and the series of interest-free intercompany loans extended by NNUK to NNL under Nortel's transfer pricing arrangement.[59]   I describe how the terms of the intercompany loans were non-commercial as applied to NNUK and demonstrated a complete lack of compliance with the arm's-length standard, in particular the requirement that arm's-length equivalent pricing (including interest on loans) exist between related  parties.[60]  As a result, the payment terms for the transfer pricing adjustments and the loans had a detrimental impact on NNUK.

62.    NNUK was a net recipient of transfer pricing adjustments between 2001 and 2008, as indicated in Table 1 above.  However, NNUK did not receive the payments it was owed between 2003 and 2007, contrary to the terms of the MRDA.   Instead, NNUK's intercompany receivables had been converted by NNL into a series of intercompany loans from NNUK to NNL.   NNL served as the central clearinghouse for transfer pricing adjustments across the Nortel entities.  The MRDA stated that NNL had the responsibility to "compute the amount of any R&D Allocation to, and payment due from, each Participant on a periodic basis" and that such payments would "be reflected in the inter-company accounts of the affected Participant as a payable or a

---

[59]    NNC-NNL06001601, Nortel Networks, Project Swift Summary for the auditors, December 2007, p. 1.
[60]    See U.S. Treas. Reg. 1.482-2(a)(1)(i) and 1.482-2(a)(2)(i).

receivable…and may be netted pursuant to the standard NNL practice for managing inter-company accounts."[61]

63.    The red line in Figure 3 below represents the cumulative transfer pricing payments owed by NNL to NNUK between 2003 and 2008.  The other two lines track the maximum loan amount and outstanding loan balance under a series of revolving loan agreements.  The three series move more or less in tandem over time, reflecting the fact that NNUK's intercompany loans accumulated as a result of unpaid transfers from NNL.

### Figure 3.  NNUK's Intercompany Loan Facility



Source: Loan balances and maximum facility are from Nortel Networks U.K. Limited Claim filed against Nortel Networks Limited.  Cumulative transfer pricing adjustments are from Table C-8.

64.    The maximum interest-free loan facility provided by NNUK to NNL was £600 million, or close to US$1.2 billion.  The actual loan balance outstanding was substantially reduced, by US$630 million[62] in December 2007, through an intercompany transaction named Project Swift, whereby certain NNL subsidiaries were transferred to NNUK in

---

[61]    Exhibit 21003 (MRDA), article 3(d), p. 5.

[62]    NNC-NNL06001601, p. 3.

exchange for a partial reduction of the loan.[63]  Approximately £113 million (US$170 million) remained outstanding from NNL to NNUK under the interest-free loan as of December 31, 2008.[64]

65.  The series of intercompany loans were first entered into between NNL and NNUK on December 10, 2003,[65] and the last one on September 10, 2008.[66]  According to Section 3.1 of the Amended and Restated Revolving Loan Agreement, the loan was *interest-free*, despite the fact that the MRDA stated clearly that late payments of amounts due under the transfer pricing model should accrue interest at the short-term federal rate if amounts owing by a Participant were still owing "90 days after notice of its R&D allocation."[67]  Mr. Kerry Stephens, in his original proposal for an intercompany loan, stated that it should be a "[s]imple advance of funds to other group members preferably at actual arm's length interest rates ... and reflecting the credit risk inherent in the counterparty and term of the loan."[68]  The loans that were eventually extended thus disregarded the proposal for an arm's-length interest rate.

66.  Internal discussions among Nortel's tax and finance professionals immediately flagged the conflict between the loans' interest-free terms and the arm's-length requirements. For example, Mr. Stephens raised the issue of whether NNUK could enter into non-arm's-length loan agreements with affiliates against local legal requirements when NNUK had a deficiency on realized profits.[69]  Mr. Mark Weisz, the former director of international tax, also questioned how NNL would "ever repay the loan."[70]  A U.K. finance executive was shocked upon hearing the proposal in August 2003, and expressed the view that "there is no way we are going to be able to settle such a large

---

[63]  NNC-NNL06001601, p. 1.

[64]  NOR_55960053, (Summary of amounts currently drawn under loan facilities as of December 31, 2008), pp. 1 and 5.

[65]  EMEAPROD2238127, p. 3 and Exhibit 21253 (Revolving Loan Agreement, dated December 10, 2003).

[66]  Exhibit 31477 (Amended and Restated Revolving Loan Agreement, dated September 10, 2008).

[67]  Exhibit 21003 (MRDA), article 3(g), p. 6.

[68]  Stephens deposition, p. 79.

[69]  EMEAPRIV0152302, p. 4.

[70]  Exhibit 11313 (email from Mark Weisz to Margaret Fraser and others dated May 14, 2003), p. 1.

balance."[71]  The concern over the non-arm's-length nature and size of the intercompany loan grew over time.  In December 2005, Alison Chan at Nortel's U.K. Financial Reporting and Consolidation department wrote "[f]rom the perspective of NNUK Company stakeholders (*e.g.* Pension Trustees, customers *etc.*), the profitability of the U.K. Company is significantly reduced by the foregone interest income on the loan of circa GBP 22M pa (calculated on an estimated loan balance of GBP 400M at LIBOR)....."[72]  She also observed that "[a]s a percentage of the estimated 2005 year end net assets of NNUK Company at GBP 780M, the NNL loan alone represents over 50% of the Company's net worth (and growing)."[73]  Further, internal Nortel communications indicated that the main purpose of the intercompany loan facility was to move cash from the U.K. to Canada. [74]

67.    Based on my knowledge of the regulatory guidance and my extensive transfer pricing experience, interest-free loans are wholly inconsistent with the arm's-length pricing principle.  The terms of NNUK's loan to NNL were non-commercial as acknowledged by several Nortel professionals. As indicated above, the U.K. forfeited interest income on its loan on the order of approximately £20 million per year, as well as having a balance of approximately US$320 million in unpaid transfer pricing adjustments due from NNL as of the end of 2008, (see Figure 3; the corresponding intercompany loan balance was approximately US$170 million).  Therefore, NNUK's loan to NNL worked to the detriment of NNUK overall and to the material benefit of NNL.

---

[71]    EMEAPROD1054723, p. 1.

[72]    EMEAPROD2238127, p. 2.

[73]    EMEAPROD2238127, p. 2.

[74]    See EMEAPROD2238127, pp. 3–4, EMEA1000002890, p. 1, and Exhibit 11313, pp. 1-2.

68. This concludes my report.


_____                            January 24, 2014

Steven D. Felgran

E.CA

FORM 53

*Courts of Justice Act*

ACKNOWLEDGMENT OF EXPERT'S DUTY

*(General heading)*

ACKNOWLEDGMENT OF EXPERT'S DUTY

1.  My name is ~~Steven D. Felgran~~ *(name)*. I live at ~~Larchment~~ *(city)*, in the
    ~~State~~ *(province/state)* of ~~New York~~ *(name of province/state)*.
    219 Rockingstone

2.  I have been engaged by or on behalf of ~~NNUK Pension Claimants~~ *(name of party/parties)* to provide
    evidence in relation to the above-noted court proceeding.

3.  I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

    (a)  to provide opinion evidence that is fair, objective and non-partisan;

    (b)  to provide opinion evidence that is related only to matters that are within my area of expertise; and

    (c)  to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.  I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose
    behalf I am engaged.

Date ...... *1 - 24 - 14* ..........................                    ~~Steven D. Felgran~~
                                                                            *Signature*

**NOTE:** This form must be attached to any report signed by the expert and provided for the purposes of subrule 53.03(1) or (2) of the *Rules
of Civil Procedure*.

RCP-E 53 (November 1, 2008)

## APPENDIX A: CURRICULUM VITAE

### STEVEN D. FELGRAN, Ph.D.

sfelgran@gmail.com

## Key Qualifications

Dr. Steven D. Felgran was a senior partner with the Economic and Valuation Services practice of KPMG LLP based in New York, NY through September 30, 2013.

An economist by training, Steve has extensive experience in economic analysis and controversy support involving tax authority policy toward intercompany pricing. His primary work involves international and state transfer pricing, including planning and documentation, advance pricing agreements ("APAs"), and negotiations with tax authorities. Steve has provided expert analysis before IRS Appeals Panels and Competent Authorities in numerous cases, which helped enable resolution of complex profit allocation disputes involving transfers of tangible products, intangibles, services, and funds. Steve also works on general matters involving applied microeconomics for such purposes as litigation support, corporate planning and supply chain analysis.

In his 20 years with KPMG, Steve founded and grew the New York City transfer pricing group into a large, well-functioning and high-quality practice, and repeated that success with the Boston transfer pricing group. Many of the current partners, directors and managers in the Northeast were hired and mentored by Steve. He also played a major role in developing the systems used to perform transfer pricing analyses at KPMG.

## Professional Experience

KPMG LLP, 1993-2013

Economic and Valuation Services, Transfer Pricing, New York and Boston

- Partner/Principal, 1997-2013
- Chair, U.S. Transfer Pricing Steering Committee, 2005-2012
- Partner-in-Charge, Economic and Valuation Services, New England and Upstate New York, 2004-2010
- U.S. Professional Practice Partner, Transfer Pricing Services, 2004-2008
- Partner-in-Charge, Economic and Valuation Services, Northeast, 1997-2002
- Senior Manager, 1993-1997

Steve's transfer pricing responsibilities at KPMG included design, direction and performance of transfer pricing analyses in connection with IRS and state audits, U.S. and global documentation requirements, and tax planning and exposure studies. As one of the practice leaders, Steve helped provide strategic direction and oversight for transfer pricing services in the United States and helped represent the U.S. firm within KPMG's Global Transfer Pricing Services network. Steve continues to specialize in conflict resolution involving U.S. and foreign governments, bilateral APAs, and transfer pricing planning and compliance.

Northeastern University, 1989-1993

College of Business Administration, Boston

Taught the Managerial Economics sequence (Micro and Macro) for the university's various MBA programs including the High-Tech MBA Program; also taught Commercial Bank Management. Research included antitrust and regulatory policy towards financial institutions, bank product and geographic expansion, Federal Reserve discount window policy, and interest rate and credit risk analysis. Consulting work doing litigation support and providing written testimony in private antitrust cases.

Federal Reserve Bank of Boston, 1983-1989

Research Department, Monetary and Financial Section, Boston

Conducted independent research projects for publication in the Bank's bimonthly review. Prepared internal reports on Federal Reserve System regulatory policies. Delivered presentations to the Bank's Board of Directors and to outside audiences. Assisted with monetary and financial policy analysis.

Arthur D. Little Inc., 1981-1983

Forensic Economics Unit, Cambridge

Casework included transfer pricing, calculation of royalty payments, information costs and tie-in sales in real estate, antitrust implications of proposed mergers and potential market dominance of transportation companies under deregulation.

## Education

- Ph.D.  Economics, Yale University

- M.A.   Economics, Yale University

- B.A.   Economics, University of Pennsylvania

  *summa cum laude*

## Other Professionally Related Activities and Honors

Steve's name appears in the 2013 edition of Euromoney's annual *Guide to the World's Leading Transfer Pricing Advisers* as well as many previous editions. He has been quoted frequently in newsletters and newspapers including BNA Tax Management's Transfer Pricing Report, CFO.com, the Christian Science Monitor, the American Banker, Banker and Tradesman and the Boston Globe, and has been interviewed on television news. Steve has made many presentations to professional organizations including the Tax Executives Institute. He has been cited in numerous academic articles and textbooks. Steve is also a member of several professional and academic organizations including the American Economic Association, the American Bar Association and the International Fiscal Association. He was previously a member of the Board of Directors of the AIM International Business Council in Boston.

# Publications[1]

"Adjusting Pricing Methods for APAs in an Economic Downturn" (with Steven Harris, Atsuko Kamen and Prita Subramanian), BNA Tax Management, *Transfer Pricing Report*, September 10, 2009, pp. 468-474.

"Treatment of Restructuring Expenses in the Application of CPM" (with Steven Harris, Julie Briks and Cherie Lehman), BNA Tax Management, *Transfer Pricing Report*, February 21, 2007, pp. 755-759.

"Are You at Risk for Transfer Pricing Audits?" CFO.com – Media Coverage, September 6, 2006.

"What triggers a tax authority challenge?" (with Patricia Fouts), International Tax Review, Tax Reference Library No. 28, *Transfer Pricing*, 8th edition, 2006, pp. 7-12.

"How to handle year-end adjustments" (with Yoko Hatta and Anthony Seve), International Tax Review, Tax Reference Library No. 23, *Transfer Pricing*, 7th edition, 2005, pp. 23-26.

"Benchmarking the Profitability of Vertically Integrated Companies" (with Steven Harris), BNA Tax Management, *Transfer Pricing Report*, September 15, 2004, pp. 97-103.

"Regional trends in transfer pricing" (with Dave Rutges, Masanori Kawanobe and Steve Fortier), International Tax Review, Tax Reference Library No. 16, *Transfer Pricing*, 6th edition, 2004, pp. 6-15.

"European Transfer Pricing Update" (with Komal Dhall and Andrew Hickman), *CEO Today*, Spring 2004, pp. 17-19.

"Mergers and Acquisitions:  Rationalizing IP Ownership and Cost-Sharing Arrangements" (with Komal Dhall), BNA Tax Management, *Transfer Pricing Report*, January 8, 2003, pp. 791-793.

"Transfer Pricing:  A Truly Global Concern" (with Mito Yamada), *Financial Executive*, November 2001, pp. 21-23.

"Banking:  an anatomy of an e-transition" (with co-authors), *International Tax Review*, September 2001, pp. 41-44.

"Global Transfer Pricing in the Age of the Euro" (with co-authors), *The European- American Business Journal*, Winter 1999, pp. 37-40.

"Is the OECD's View of Global Trading Consistent with the Arm's-Length Standard:  A U.S. Perspective" (with co-authors), BNA Tax Management, *Transfer Pricing Report*, March 26, 1997, pp. 752-763.

"Analyzing Transfers of Financial Services Using §482 Methods" (with Jeffrey I. Rosenblum), BNA Tax Management, *Transfer Pricing Report*, October 16, 1996, pp. 345-350.

"External Capital Flows and Constraints on U.S. Monetary Policy" (with Alan Alford), in H. Peter Gray and Sandra C. Richard, eds. *International Finance in the New World Order* (Oxford, UK: Pergamon Press, 1995), ch. 7, pp. 89-102.

"Advance Pricing Agreements: Starting the Process" (with co-authors), *Tax Notes*, October 10, 1994, pp. 235-240.

---

[1]   For the avoidance of doubt, this includes a list of all publications authored by the expert in the previous ten (10) years.

"Bank Participation in Real Estate: Conduct, Risk, and Regulation," in *The Commercial Bank Management Reader* (Miami: Kolb Publishing Co., 1992), pp. 145-161.

"Reform Bill is a Must," *Boston Globe*, September 17, 1991, p. 42.

"Reform Bill is Good Legislation and Merits Quick Passage," *American Banker*, September 11, 1991, p. 6.

"Living with Risk in Real Estate Investment," *Bankers Magazine* (Boston: Warren, Gorham and Lamont), November/December 1989, vol. 172, no. 6, pp. 24-32.

"Interest Rate Swaps: Use, Risk, and Prices," *Journal of Foreign Exchange and International Finance*, vol. III(I), January-March 1989.

"The Evolution of Retail EFT Networks" (with R. Edward Ferguson), in James A. Wilcox, ed., *Current Readings on Money, Banking, and Financial Markets* (Boston: Little, Brown and Co., 1987).

"Banks as Insurance Agencies: Legal Constraints and Competitive Advances," in Iowa Bankers Association, *Disclosure*, vol. 3, nos. 4, 5, and 6, 1986; also in *Securities Research* (Tokyo:  Japan Securities Research Institute, 1987).

"From ATM to POS Networks: Branching, Access, and Pricing," in Donald R. Fraser and Peter S. Rose, eds., *Financial Institutions and Markets in a Changing World*, 3rd edition (Plano, TX:  Business Publications, Inc., 1987).

"Bank Entry into Securities Brokerage: Competitive and Legal Aspects," in Edwin B. Cox, ed., *Bankers Desk Reference* (Boston: Warren, Gorham and Lamont, 1985), pp. 206-236; also in *Securities Research* (Tokyo: Japan Securities Research Institute, 1985).

"Shared ATM Networks: Market Structure and Public Policy," *New England Economic Review*, January/February 1984.

"Producer Prices versus Market Prices in the World Copper Industry," unpublished Ph.D. dissertation, committee chairman: Paul W. MacAvoy, Yale University, May 1982.

Last updated: January 2014

.

## APPENDIX B: MATERIALS REVIEWED BY STEVEN D. FELGRAN

### _Depositions_

| | |
|---|---|
| Fortier Deposition | Newcombe Deposition |
| Donovan Deposition | O Deposition |
| Gatley Deposition | Orlando Deposition |
| Henderson Deposition | Pusey Deposition |
| Horn Deposition | Raimondo Deposition |
| Jeffries Deposition | Stephens Deposition |
| Look Deposition | Weisz Deposition |
| McFadden Deposition | |

### _Case Documents_

| | |
|---|---|
| CCC0002089 | NNC-NNL10823608 |
| DT0007934 | NNC-NNL10823610 |
| EMEA1000000053 | NNC-NNL11096448 |
| EMEA1000000349 | NNC-NNL20000676 |
| EMEA1000002355 | NNC-NNL20000678 |
| EMEA1000002890 | NNC-NNL20000680 |
| EMEA1000003187 | NNC-NNL20000684 |
| EMEA1000003657 | NNC-NNL20000687 |
| EMEAPRIV0152302 | NNC-NNL20000689 |
| EMEAPROD0020613 | NNC-NNL20000691 |
| EMEAPROD0029870 | NNC-NNL20000693 |
| EMEAPROD0125067 | NNC-NNL2005815 |
| EMEAPROD0296515 | NNC-NNL2005816 |
| EMEAPROD0312331 | NNI_00020713 |
| EMEAPROD0340247 | NNI_00113940 |
| EMEAPROD0348928 | NNI_00207501 |
| EMEAPROD0410660 | NNI_00295580 |

| | |
|---|---|
| EMEAPROD0418226 | NNI_00305795 |
| **EMEAPROD0506713** | NNI_00305799 |
| **EMEAPROD0512066** | NNI_00305802 |
| EMEAPROD0889194 | NNI_00305816 |
| EMEAPROD1054723 | NNI_00305830 |
| EMEAPROD1159348 | NNI_00369255 |
| EMEAPROD1160332 | NNI_00482221 |
| EMEAPROD1160415 | NNI_00666756 |
| EMEAPROD1267841 | NNI_00697106 |
| **EMEAPROD1702241** | NNI_00711261 |
| **EMEAPROD1732111** | NNI_00793965 |
| EMEAPROD2023626 | NNI_00831146 |
| EMEAPROD2188710 | NNI_00999182 |
| EMEAPROD2238127 | NNI_01060077 |
| | NNI_ 01333115 |
| NNC_NNL06000436 | NOR_53648037 |
| NNC_NNL08005414 | NOR_53648041 |
| NNC_NNL10823590 | NOR_53648048 |
| NNC-NNL002707 | NOR_53648130 |
| NNC-NNL003255 | NOR_53648133 |
| NNC-NNL006802 | NOR_53648312 |
| NNC-NNL037052 | NOR_53648323 |
| **NNC-NNL06000436** | NOR_53648508 |
| NNC-NNL06001601 | NOR_55959506 |
| **NNC-NNL06005092** | NOR_55960053 |
| NNC-NNL06005094 | NOR_55960597 |
| NNC-NNL06005095 | NOR_57147518 |
| NNC-NNL06005104 | NOR-CAN00000090 |
| **NNC-NNL06005373** | **NOR-CAN00038480** |
| NNC-NNL06010502 | NOR-CAN00045810 |
| NNC-NNL06100066 | NOR-CAN00046869 |

| | |
|---|---|
| NNC-NNL06128088 | NOR-CAN00082054 |
| NNC-NNL06128312 | NOR-CAN00097769 |
| NNC-NNL061762 | NOR-CAN00098323 |
| NNC-NNL06221086 | NOR-CAN00098425 |
| NNC-NNL06227274 | NOR-CAN00100875 |
| NNC-NNL070785 | NOR-CAN00101020 |
| NNC-NNL07507733 | NOR-CAN00101403 |
| NNC-NNL08005414 | NOR-CAN00102567 |
| NNC-NNL099925 | NOR-CAN00160098 |
| NNC-NNL10821041 | NOR-CAN06005092 |
| NNC-NNL10821709 | PC0187245 |
| NNC-NNL10823552 | PC0239122 |
| NNC-NNL10823590 | PC0239261 |
| NNC-NNL10823605 | |

## *Financial Statements*

| | |
|---|---|
| Nortel 2000 – 2004 10-K's | Nortel 2006 – 2009 10-K's |
| Nortel 2002 10-K/A | Nortel 2012 10-K |
| Nortel 2005 10-K/A | NNUK 2000 - 2007 Financial Statements |

## *Exhibits*

Exhibit 11058: Email exchange between Lorelei Lewis and Eric Jensen et al, with attachment, December 2001.

Exhibit 11086: Memo attached to November 2002 email from James Gatley.

Exhibit 11251: Analysis of Nortel's Transfer Pricing for Years After 2005 and FIN 48 Analysis memo by Michael Orlando, February 2008.

Exhibit 11270: Nortel internal email exchange between John Payne, Michael Orlando et al, May 2009.

Exhibit 11272: Excerpt from joint response of the monitor and Canadian debtors to the claims filed on behalf of the EMEA claimants, dated May 29, 2013.

Exhibit 11277: Nortel internal email exchange between Michael Orlando, Kerry Stephens et al, November 2007.

Exhibit 11279: "Welcome to Ottawa" BoD Planning Presentation

Exhibit 11307: Nortel internal email exchanges between Mark Weisz, David Canale, et al., October 2006.

Exhibit 11308: Nortel Multilateral APA sent to the CRA, IRS, and U.K. Revenue and Customs, June 2007.

Exhibit 11313: Email from Mark Weisz to Margaret Fraser and others dated May 14, 2003.

Exhibit 21003: Master R&D Agreement entered into on December 22, 2004.

Exhibit 21004: Email from Michael Orlando to John Doolittle et al, March, 2005.

Exhibit 21026: Economic Analysis of Nortel Networks' Intercompany Transactions, Horst Frisch Incorporated, March 14, 2002.

Exhibit 21031: Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004.

Exhibit 21076: Memo written by Gilles Fortier regarding 2001 interim entries, December 2001.

Exhibit 21083: Memo written by James Gatley responding to questions of Tony Grewal, April 2004.

Exhibit 21188: Global R&D Investment Strategy and Recommendations for Nortel Networks Presentation by CTO Mike Langlois, n.d.

Exhibit 21201A: Nortel Global R&D Site Strategy Discussion

Exhibit 21209: Email from Gary Kunis to Brian McFadden et al, May 2005.

Exhibit 21253: Revolving Loan Agreement, dated December 10, 2003.

Exhibit 21301: Email from Johannus Poos to Michael McCorkle and Kate Stevenson.

Exhibit 21379: Nortel internal email exchange between James Gatley, Bill Bowrey et al, November 2003.

Exhibit 21380: Nortel internal email exchange between James Gatley, Daniel Soska et al, November 2003.

Exhibit 21385: Nortel internal email exchange between James Gatley, Peter Hutton, Mark Weisz et al, October 2002.

Exhibit 21386: Nortel internal email exchange between Phillip Wong, James Gatley, et al., October, 2002.

Exhibit 21387: Nortel internal email exchange between James Gatley, Ian Widdowson et al, November 2002.

Exhibit 21388: Nortel internal email exchange between James Gatley, Tara Hoekstra et al, July 2003.

Exhibit 21406: APA presentation attached to email sent by Giles Fortier, April, 2002.

Exhibit 22044: Nortel internal email exchange between Gareth Pugh, James Gatley et al, September 2002.

Exhibit 22077: Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011, October 31, 2008.

Exhibit 22078: Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011, October 31, 2008 and Appendix B.

Exhibit 22135: Tax Update, Audit Committee, May, 2008.

Exhibit 31477: Amended and Restated Revolving Loan Agreement, dated September 10, 2008.

Exhibit 32117: Transfer Pricing Report Nortel Networks U.K. Ltd, July 18, 2003.

Horst Frisch Report, Appendix A


*Other*

Expert Report of Roger Siefert

Expert Report of Ronnie Bowie

EY Transfer Pricing Method Analysis and Appendices

FASB, Statement of Financial Accounting Standard No. 146: Accounting for Costs Associated with Exit or Disposal Activities, June 2001.

Financial Accounting Standards Board, EITF 94-3: Liability Recognition for Certain Employee Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring), 1994 (superseded by FAS 146), as referenced in FAS 146.

Monitor's Disallowance of UK Pension Claims, March 20, 2013.

NNUK Pension Trustee - Canadian Amended Proof of Claim for NNL, November 29, 2010.

NNUK Pension Trustee - US Amended POC for NNI, September 5, 2012.

NNUK's POC (Canadian Claim) vs NNL, March 18, 2011.

NNUK's POC (US Claim) vs NNI - Joint Adm, June 3, 2011.

Nortel MRDA

Nortel Networks U.K. Limited Claim filed against Nortel Networks Limited.

Nortel Pre-filing Conference with IRS presentation, October 23, 2007.

OECD, Review of Comparability and of Profit Methods: Revisions of Chapters I-III of the Transfer Pricing Guidelines.

Order by Honorable Mr. Justice Morawetz in the CCAA Proceedings on February 26, 2010 as clarified by the Court of Appeals on June 16, 2010.

Organization for Economic Co-operation and Development, Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations, July 1995, Chapter III.

Securities and Exchange Commission, Staff Accounting Bulletin No. 100, November 24, 1999.

Stipulation re Expert Disclosures

U.S. Treas. Reg. 1.482-2(a)(1)(i)

U.S. Treas. Reg. 1.482-2(a)(2)(i)

US Joint Objection to UKPC Claim, May 14, 2013.

## APPENDIX C:  NORTEL'S TRANSFER PRICING MODELS

1. Between 1992 and 2000, Nortel operated under three separate Advance Pricing Agreements ("APAs") between the U.S. Internal Revenue Service ("IRS") and the Canada Customs and Revenue Agency ("CCRA"), a global research and development ("R&D") cost sharing agreement (the "R&D CSA"),[1] a headquarters APA, and a tangible goods APA.[2]  The transfer pricing regime at the time was undesirable to Nortel for several reasons.  First, three separate APAs were administratively cumbersome to operate.[3]  Second, since the R&D CSA allocated R&D expenses based primarily on revenues and operating income, a large share of Nortel's overall revenues and profits stayed in the U.S. during the relevant years, which was a high-tax jurisdiction.[4]  Third, operating losses at NNI in late 2000 and 2001 made it necessary to change the cost sharing calculation as global R&D expenses were allocated (to NNI) assuming positive income.[5]

2. As a result of these complexities, the U.S. and Canadian tax authorities indicated to Nortel that they would not renew the R&D CSA beyond 1999,[6] and suggested that a residual profit split ("RPS") method might best reflect that Nortel's R&D was the key driver of value.[7]  From the cash flow perspective, Nortel also favored a RPS method because more income and cash would go to Canada,[8] "a tax haven" in Nortel's

---

[1]  In its Advance Pricing Agreement application submitted in March 2002, Nortel intended to roll back the RPSM to 2000.  It subsequently withdrew the request for 2000 and used the CSA instead. See, *e.g.*, NNC-NNL070785 (Draft Memo to Transfer Pricing Files re: Update on APA between CRA, IRS and IR.), pp. 5-6.

[2]  Exhibit 21026, p. 1. These APAs were for purchases and sales of tangible property from 1995 to 1999 (effective through the year ended December 31, 2000), and global headquarters expenses from 1996 to 2000 (effective through the year ended December 31, 2001).

[3]  Exhibit 21406 (APA presentation attached to email sent by Giles Fortier, April 2002, "APA Presentation"), p. 5.

[4]  Exhibit 21406 (APA Presentation), p. 19.

[5]  Exhibit 21406 (APA Presentation), p. 5.

[6]  Exhibit 21406 (APA Presentation), p. 5.

[7]  Weisz deposition, pp. 87–88.

[8]  Henderson deposition, pp. 196–204.

organization due to Canada's generous research tax credits[9] and, hence, would lower Nortel's effective global tax rate.[10]

## I.    OVERVIEW OF THE HORST FRISCH RPS MODEL ("H-F RPSM")

### A.    ECONOMIC PROFIT CALCULATION

3.  The Horst Frisch RPS model ("RPSM") made certain adjustments to A-100 operating profits from Nortel's internal management accounts to arrive at what Nortel called "economic profits." The left-hand panel of Table C-1 below illustrates the operating earnings in the A-100s and the cumulative amounts for all eligible entities under the H-F RPSM between 2001 and 2005.[11] The line item adjustments and their magnitudes for 2001 to 2005 are summarized in the right-hand panel of Table C-1.[12] The bottom line of Table C-1 is the economic operating profit/loss.

4.   Table C-1 shows that, under U.S. GAAP, operating expenses such as cost of goods sold ("COGS"), selling and marketing expenses ("S&M"), general and administrative expenses ("G&A"), as well as purchased in-process R&D expenses, acquired technology amortization, goodwill amortization, restructuring costs, and deferred compensation expenses were deducted from revenues to obtain operating profits. For transfer pricing purposes under the RPSM, however, Nortel reversed some of the line items mentioned above to derive the so-called "adjusted operating profits/losses."[13] These items were not considered to be part of operating cost.[14] Further, the calculation of residual profits incorporated interim transfer pricing adjustments,[15] local GAAP differences (both zeroed

---

[9]   Exhibit 22135, (Tax Update, Audit Committee, May 2008), p. 3. See also O deposition, pp. 143–152.

[10]   Exhibit 11058 (Email exchange between Lorelei Lewis and Eric Jensen et al, with attachment, December 2001).

[11]   Table C-5 shows the total A-100 operating earnings across the entities in the transfer pricing ("TP") models each year from 2001 to 2008. When "excluded" entities are included, the consolidated revenues and operating earnings from the A-100s generally reconcile with those from Nortel's restated 10-Ks.

[12]   See Table C-6 for year-by-year details.

[13]   Exhibit 21026 (Horst Frisch Report), p. 38.

[14]   Horst Frisch Report, Appendix A, p. 1. See also Exhibit 21003 (MRDA), p. 49.

[15]   Transfer pricing adjustments were made quarterly with a final true up occurring after year end. After each quarter end (March, June and September), the transfer pricing team calculated the adjustment across entities; see, e.g., Exhibit 21083 (memo written by James Gatley responding to questions of Tony Grewal, April 2004) and Fortier deposition, pp. 129–131. Quarterly interim adjustments reflect

Continued on next page

out in the aggregate), and other miscellaneous one-off adjustments.[16]  Reversals were also made for prior year transfer pricing adjustments booked in the current year.[17]

**Table C-1.  Accounting vs. "Economic" Profits in the Horst Frisch RPS Model**
**(US$ in Millions, 2001–2005)**

| | 2001 - 2005 | | 2001 - 2005 |
|---|---|---|---|
| Revenues - trade & other | 54,724 | **GAAP operating earnings** | (29,431) |
| Intercompany revenue | 24,119 | | |
| Cost of revenue | (59,291) | *Add back:* | |
| ***Gross profit*** | *19,552* | Transactional F/X | 472 |
| | | Total GW & IPR&D | 18,358 |
| Selling & marketing | (8,282) | Def. compensation expense | 384 |
| Gen. & administrative | (5,447) | Restructuring costs | 4,963 |
| ***Total SG&A*** | *(13,729)* | Transfer pricing adjustments | (15) |
| | | Other adjustments | (27) |
| R&D expenses | (11,470) | R&D CSA allocation less R&D performed | 5 |
| Purchased IPR&D | (15) | ***Adjusted accounting profit*** | *(5,293)* |
| Total goodwill & IPR&D | (18,358) | | |
| Def. compensation expense | (384) | Less: R&D amortization | (13,305) |
| Restructuring costs | (5,028) | Add: R&D expensed (performed) | 11,513 |
| ***Total operating expenses*** | *(48,983)* | | |
| | | | |
| **GAAP operating earnings** | **(29,431)** | **"Economic" operating profit/(loss)** | **(7,086)** |

Source:    Table C-6.   Note that total restructuring costs in the left panel exceed total restructuring costs added back to derive adjusted accounting profit in the right panel by US$65 million, due to a one-time partial reimbursement of LRE restructuring costs in 2002.

5.   The result of these adjustments was an "adjusted accounting profit."  To reflect Nortel's view that R&D was the key driver of its business, R&D expenses were treated as capital outlays generating long-lasting impacts on Nortel's revenues and profits.  Subsequently, the capitalized R&D spending was amortized over its productive life.  Thus, economic profits in the Horst Frisch RPSM were equal to adjusted accounting profits, plus R&D expenses and less R&D amortization during the current year.

6.   As the R&D expenses were not included in the residual profits/losses, these costs were borne exclusively by, rather than shared among, the residual profit entities.  As shown in

---

Continued from previous page

that the model was not based on final full year financials; see Exhibit 21076 (memo written by Gilles Fortier regarding 2001 interim entries, December 2001) and Fortier deposition, pp. 41–54.

[16]   See Exhibit 21026, p. 38. In 2000, Nortel recorded in its A-100 statements R&D as it would have been under the prior R&D CSA. Therefore, an adjustment was made in the H-F RPSM to reverse this amount so that accounting profits reflected the R&D actually performed by each affiliate.

[17]   Nortel's financial reporting was typically closed before annual transfer pricing adjustments were completed (see footnotes above). Therefore, the GAAP financial reporting for each entity needs to reflect the re-allocation of prior-year accounting profits, but for transfer pricing purposes, these post-close GAAP adjustments were not required.

Table C-1 above, one of the other key expenses not shared among the entities in the H-F RPSM was restructuring costs.  Of all the expenses that are added back to GAAP operating earnings in the right-hand panel of Table C-1, restructuring costs are the second highest in magnitude,[18] totaling almost US$5 billion from 2001 to 2005.  Thus, the below-the-line treatment of restructuring costs in the Nortel RPS models had a significant impact on the profits of the RPEs.

### B.    ROUTINE RETURNS

7.   Routine returns were calculated in the H-F RPSM for both distributors and RPEs. Documents I have seen suggest that the routine returns were calculated using the comparable profits method to determine a range of adjusted operating margins.  The margin was then applied to sales for comparable distribution companies facing similar circumstances.[19]  RPEs received a routine return on working capital (to compensate them for distribution-related activities) and on long-term assets (for manufacturing activities).[20] The details are provided in the Horst Frisch Report.[21]

### C.    CAPITALIZED R&D

8.   Nortel capitalized each RPE's current-year R&D into its R&D stock, and then this capital stock was amortized at a 30 percent annual rate from its prior-year stock ("30% declining balance").[22]  The R&D stock was used to determine the RPS allocation percentages for each RPE in the Horst Frisch RPSM.

9.   For an illustration of this methodology, see the example below in Table C-2 where capitalized R&D is calculated for two representative entities, Canada and the rest of the world (R&D-performing RPEs only).  Each year, R&D expenses are added to the R&D stock while R&D amortization is netted out.   Annual R&D amortization in turn is

---

[18]  Excluding the one-time non-cash goodwill write-down for acquired entities in 2001.

[19]  For details, see Exhibit 21026 (Horst Frisch Report), Section VI.C.1.

[20]  Exhibit 21026 (Horst Frisch Report), Section VI.C.2.

[21]  The Nortel transfer pricing models specify these returns as 8.86% on working capital and 23.6% on long-term assets. See 2004 and 2005 Nortel TP models (2004-NOR_53648508 and 2005-NOR_53648130).

[22]  Exhibit 21026 (Horst Frisch Report), Section VI.B.1. See also NNC-NNL002707 (APA Responses to Questions), pp. 9–10.

calculated based on the previous year's capitalized R&D stock using a 30% declining rate. Using the illustrative numbers in this example, Canada ends up with a 35% share of total capitalized R&D at the end of the 6 years displayed (this approximates Canada's actual share of total R&D stock based on the RPS model from 2001–2008; see Table C-7, Panel B).

**Table C-2.  Capitalization and Amortization of R&D Stock**

| R&D years | 0 | 1 | 2 | 3 | 4 | 5 | 6 | |
|---|---|---|---|---|---|---|---|---|
| Canada | | | | | | | | |
|   R&D Expenses | | 50 | 50 | 50 | 50 | 50 | 50 | [a] |
|   R&D Amortization | | 150 | 120 | 99 | 84 | 74 | 67 | [b] |
|   Capitalized R&D | 500 | 400 | 330 | 281 | 247 | 223 | 206 | [c] |
| Rest of World (ROW) | | | | | | | | |
|   R&D Expenses | | 50 | 50 | 50 | 50 | 50 | 50 | [a] |
|   R&D Amortization | | 600 | 435 | 320 | 239 | 182 | 142 | [b] |
|   Capitalized R&D | 2000 | 1,450 | 1,065 | 796 | 607 | 475 | 382 | [c] |
| RPS Allocation Ratios | | | | | | | | |
|   Total Capitalized R&D | 2,500 | 1,850 | 1,395 | 1,077 | 854 | 697 | 588 | [d] |
|   Canada | 20% | 22% | 24% | 26% | 29% | 32% | 35% | [e] |
|   ROW | 80% | 78% | 76% | 74% | 71% | 68% | 65% | [f] |

Notes:   [b] = [c] from previous year * 30% amortization rate.

[c] = [c] from previous year + [a] – [b].

[d] = sum of [c] for Canada and ROW; [e] = [c] for Canada / [d]; [f] = [c] for ROW / [d].

## D.    THE H-F RPSM METHODOLOGY

10. To illustrate the workings of the Horst Frisch RPS model, consider the following example with "Canada" and "All Other RPEs" as two residual profit split entities, and all LREs combined as one limited risk entity.

**Table C-3.  Illustrative Example of Horst Frisch RPS Model (US$ in millions)**

|  | Canada | All Other RPEs | LREs | Total | Note |
|---|---|---|---|---|---|
| GAAP Operating Income | (17,000) | (12,600) | 100 | (29,500) | [1]: Hypothetical |
| Add: R&D Expense | 5,000 | 6,500 | - | 11,500 | [2]: Hypothetical |
| Add: Restructuring Costs and others * | 1,250 | 3,600 | 150 | 5,000 | [3]: Hypothetical |
| Less: R&D Amortization | (5,000) | (8,500) | - | (13,500) | [4]: Hypothetical |
| Economic Operating Income | (15,750) | (11,000) | 250 | (26,500) | [5]: sum ([1] - [4]) |
|  |  |  |  |  |  |
| Less: Routine Returns | 1,700 | 1,700 | 100 | 3,500 | [6]: Hypothetical |
| Residual Profit / (Loss) | (17,450) | (12,700) | 150 | (30,000) | [7 = [5] - [6] |
|  |  |  |  |  |  |
| Allocation % R&D Stock | 35% | 65% | 0% | 100% | [8]: Hypothetical |
| Allocated Residual Profit / (Loss) | (10,500) | (19,500) | - | (30,000) | [9]: [8] × Total [7] |
| Target Profit / (Loss) | (8,800) | (17,800) | 100 | (26,500) | [10] = [6] + [9] |
|  |  |  |  |  |  |
| TP Adjustments | 6,950 | (6,800) | (150) | - | [11] = [10] - [5] |
| Operating Income After TP | (8,800) | (17,800) | 100 | (26,500) | [12] = [5] +[11] |
| GAAP Operating Income after TP | (10,050) | (19,400) | (50) | (29,500) | [13]= [1] + [11] |

\*    Restructuring costs are above-the-line under GAAP and are therefore treated as an expense item that reduces GAAP operating income. Nortel's transfer pricing models moved the restructuring costs from above-the-line to below-the-line.  Operating income rises as a result, or operating loss declines.

11. The table above illustrates the key steps in calculating the transfer pricing adjustments across the entities in the H-F RPSM.   The first block (rows [1] to [5]) calculates economic profits; rows [6] to [7] deduct routine returns to determine aggregate residual profits; rows [8] to [10] allocate residual profits across the RPEs based on their capitalized R&D and add back routine returns to allocated residual profits for each entity to determine target profits; and the last three rows compare target profits with economic profits to determine the necessary transfer pricing adjustment, which is then added back to each entity's GAAP accounting income to determine its GAAP operating profit/loss after the transfer.   Note the zero-sum nature of the transfer pricing adjustment in the aggregate (row [11]).   However, the adjustments affect each transfer pricing participant's operating income and taxable income.

## II.    OVERVIEW OF THE ERNST & YOUNG RPSM ("E&Y RPSM")

12. The submission of the Horst Frisch transfer pricing analysis and Nortel's application for the APA were followed by several rounds of face-to-face meetings between Nortel and the relevant taxing authorities, information requests, and negotiations between the taxing authorities.   The multilateral APA process lasted several years, as the IRS and CRA

raised a number of issues with Nortel's RPS model implementation.[23]  These issues included the routine returns to LREs and RPEs,[24] the use of economic vs. accounting profit as the starting point,[25] the treatment of restructuring costs,[26] and customer financing losses.[27]  In addition, Nortel's business practice kept evolving, as it completed the outsourcing of its manufacturing activities in 2006, strengthened its chief technology office and made heavy use of its R&D capabilities in its marketing activities.[28]

13. There were three key differences between the H-F and E&Y RPSMs:

1. **From "Economic" Profits to Accounting Profits:** The starting point of the E&Y RPSM was the accounting profit, which expensed current-year R&D.  In contrast, the H-F RPSM capitalized R&D and used economic profit as its starting point.[29]

2. **From RONA to Sales Margin and Excess Costs for RPEs' routine returns**: These returns transitioned from a return on net assets and working capital in the H-

---

[23]  Exhibit 11308 (Nortel Multilateral APA sent to the CRA, IRS, and U.K. Revenue and Customs, June 2007, "Multilateral APA"); see also Weisz deposition, pp. 182–184.

[24]  Exhibit 11307 (Nortel internal email exchanges between Mark Weisz, David Canale, et al., October 2006), p. 3; see also Weisz deposition, pp. 174–181.

[25]  ███████████████████████████████████████████████ the IRS proposed adding back customer financing losses and current R&D expenditures to accounting profit with no deduction for amortization. See Exhibit 11308 (Multilateral APA), p. 5.

[26]  ███████████████████████████████████████████████ the IRS believed NNL should reimburse all the other Nortel entities for their restructuring costs. See NNI_00666756 (Position Paper on Bilateral Advance Pricing Arrangement(s) for the APA Term December 31, 2001–December 31, 2005, "Bilateral APA Position Paper"), pp. 10 and 12.

[27]  The IRS favored Canada taking 100% of the write-offs, ███████████████████████████████.  See Exhibit 11307 (Nortel internal email exchanges between Mark Weisz, David Canale, et al., October 2006), p. 3.

[28]  Exhibit 22077 (2008 Request for Advance Pricing Agreement/Arrangement), p. 11, Exhibit 11251 (Analysis of Nortel's Transfer Pricing for Years After 2005 and FIN 48 Analysis memo by Michael Orlando, February 2008), p. 3, and Nortel Pre-filing Conference with IRS presentation, October 23, 2007, p. 9.

[29]  Exhibit 22077 (2008 Request for Advance Pricing Agreement/Arrangement), pp. 43–44.  The E&Y Transfer Pricing Method Analysis also states that the "basis for using economic profit at the time [of the H-F RPSM] related to dealing with a buy-out effect for historic R&D from the previous cost sharing arrangement" but that, over time, this effect "has been curtailed, so that using an accounting treatment of income does not distort the results of the RPSM…U.S. GAAP accounting [also] provides consistency between the [Integrated Entities] and the comparables… Therefore, in order to obtain an arm's length result in the current proposed APA term (2006–2012)…we determined accounting profit would be a more appropriate basis for applying the RPSM…."

F RPSM (as compensation for routine manufacturing functions) to a return on sales and excess costs (as compensation for distribution-based activities) in the E&Y RPSM, due to Nortel's transitioning away from manufacturing activities.[30]

3. **From 30% R&D Stock Amortization to 5-year Rolling Sum of R&D**: The residual profit allocation metric transitioned from R&D capital stock in the H-F RPSM to a 5-year rolling sum of R&D expenses lagged by one year in the E&Y RPSM. The transition was based on an updated functional analysis that suggested a shorter product development cycle of 5 years for Nortel's R&D technologies.[31]

## III.    SUMMARY OF NORTEL'S RPSM RESULTS

14. Table C-4 below displays routine returns, allocated residual profits and the sum, total target profits, across the entities in the H-F and E&Y transfer pricing models, from 2001-2005 and 2006-2008 respectively. (Table C-7 provides year-by-year and entity-by-entity details).

---

[30]   Exhibit 22077, (2008 Request for Advance Pricing Agreement/Arrangement), pp. 44–47, and Orlando deposition, pp. 64–73.

[31]   Exhibit 22078 ("2008 Request for Advance Pricing Agreement/Arrangement"), pp. 50–51 and Appendix B, pp. 27–30.

**Table C-4.  Nortel Transfer Pricing Model Results by Entity**

**(2001–2008, US$ in Millions)**

| | 2001 - 2005 | | | 2006 - 2008 | | | 2001 - 2008 |
|---|---|---|---|---|---|---|---|
| | Routine Returns | Residual Returns | Total | Routine Returns | Residual Returns | Total | Total |
| Canada | 1,726 | (3,549) | (1,824) | 209 | (295) | (86) | **(1,910)** |
| US | 834 | (5,412) | (4,577) | 399 | (299) | 100 | **(4,478)** |
| UK | 545 | (788) | (242) | 127 | (38) | 89 | **(153)** |
| France | 224 | (674) | (450) | 17 | (81) | (64) | **(514)** |
| Ireland | 38 | (98) | (60) | 30 | (6) | 24 | **(36)** |
| Australia | 8 | (46) | (38) | 17 | (2) | 15 | **(23)** |
| LREs | 105 | 0 | 105 | 52 | 0 | 52 | **157** |
| **Total** | 3,481 | (10,567) | (7,086) | 851 | (722) | 130 | **(6,956)** |
| Canada | 49.6% | 33.6% | 25.7% | 24.5% | 40.9% | -66.7% | **27.5%** |
| US | 24.0% | 51.2% | 64.6% | 46.9% | 41.5% | 76.9% | **64.4%** |
| UK | 15.7% | 7.5% | 3.4% | 14.9% | 5.2% | 68.8% | **2.2%** |
| France | 6.4% | 6.4% | 6.4% | 2.0% | 11.2% | -49.0% | **7.4%** |
| Ireland | 1.1% | 0.9% | 0.8% | 3.6% | 0.9% | 18.6% | **0.5%** |
| Australia | 0.2% | 0.4% | 0.5% | 2.0% | 0.3% | 11.6% | **0.3%** |
| LREs | 3.0% | 0.0% | -1.5% | 6.1% | 0.0% | 39.9% | **-2.3%** |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | **100.0%** |

Source: Table C-7.

15. Although routine returns were positive between 2001 and 2008, allocated residual profits across all entities during the same period were negative.  The majority of the company's cumulative losses were incurred in the early 2000s.[32]

16. The U.K. was allocated approximately 7.5% of aggregate residual losses from 2001 to 2005 and just over 5% from 2006 to 2008 (or 7.3% of total residual losses across the 2001–2008 period, as shown in Table C-7).  In contrast, Canada was allocated 34% of residual losses during 2001–2005, and 41% during 2006–2008.

---

[32]   Residual losses totaled over US$10 billion from 2001 to 2005 versus US$700 million from 2006 to 2008.

### Table C-5.  Nortel Transfer Pricing Model A-100 Revenues and Operating Earnings (US$ in millions)

**Panel A. Revenues**

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total MRDA | Excluded | Total | Nortel 10-K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 6,276 | 11,999 | 2,378 | 740 | 690 | 233 | 3,002 | 25,317 | (5,414) | **19,904** | 18,900 |
| 2002 | 3,249 | 6,403 | 1,215 | 629 | 381 | 89 | 1,952 | 13,918 | (3,025) | **10,893** | 11,008 |
| 2003 | 3,379 | 5,720 | 879 | 830 | 360 | 180 | 1,559 | 12,907 | (2,986) | **9,921** | 9,932 |
| 2004 | 3,439 | 5,143 | 885 | 1,103 | 404 | 157 | 1,660 | 12,790 | (3,297) | **9,493** | 9,478 |
| 2005 | 3,725 | 5,480 | 936 | 1,046 | 445 | 153 | 2,127 | 13,911 | (3,401) | **10,510** | 10,509 |
| 2006 | 3,129 | 5,074 | 1,330 | 797 | 570 | 351 | 2,030 | 13,281 | (1,863) | **11,418** | 11,418 |
| 2007 | 3,163 | 5,265 | 1,386 | 564 | 596 | 179 | 1,590 | 12,743 | 2,544 | **15,286** | 10,948 |
| 2008 | 2,618 | 4,780 | 1,262 | 381 | 592 | 0 | 1,888 | 11,520 | 3,068 | **14,589** | 10,421 |
| **Total** | 28,977 | 49,863 | 10,271 | 6,089 | 4,038 | 1,342 | 15,807 | 116,388 | (14,374) | 102,014 | 92,614 |
| **% Total** | 28.4% | 48.9% | 10.1% | 6.0% | 4.0% | 1.3% | 15.5% | 114.1% | -14.1% | 100.0% | |

Source: Nortel Transfer Pricing Models (2001-NOR_53648312, 2002-NOR_53648037, 2003-NOR_53648041, 2004-NOR_53648508, 2005-NOR_53648130, 2006-NOR_53648133, 2007-NOR_53648323, 2008-NOR_53648048) except for the Nortel 10-K column which is taken from Nortel 10-Ks.

Notes:

Canada includes NNL, NNC (Alteon), NNJI, and Brazil for years in which those entities were RPEs.

Ireland includes Bay Ireland for the year 2001 when Bay Ireland was an RPE.

US includes Bay US for years in which Bay US is an RPE.

Australia is included in the LREs category in 2008.

**Panel B. Operating Earnings**

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total MRDA | Excluded | Total | Nortel 10-K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | (14,855) | (8,415) | (1,275) | (406) | (76) | (28) | (93) | (25,149) | (411) | **(25,560)** | (25,020) |
| 2002 | (1,902) | (1,147) | 35 | (363) | (8) | (5) | 105 | (3,285) | 116 | **(3,169)** | (3,072) |
| 2003 | (316) | 91 | (128) | (37) | (13) | (19) | (49) | (472) | 330 | **(142)** | (126) |
| 2004 | (240) | (242) | 16 | 102 | (4) | (65) | (0) | (432) | 50 | **(382)** | (298) |
| 2005 | 238 | (351) | 92 | (149) | 29 | 2 | 46 | (93) | (121) | **(214)** | (2,709) |
| 2006 | (278) | (173) | 162 | (31) | 55 | 68 | 46 | (152) | (8) | **(160)** | 282 |
| 2007 | (153) | 88 | 7 | (30) | 15 | (14) | 37 | (50) | 217 | **167** | 226 |
| 2008 | (211) | (2,562) | (211) | (99) | (46) | 0 | (404) | (3,532) | (472) | **(4,005)** | (2,182) |
| **Total** | (17,718) | (12,711) | (1,303) | (1,013) | (47) | (62) | (311) | (33,165) | (299) | (33,465) | (32,899) |
| **% Total** | 52.9% | 38.0% | 3.9% | 3.0% | 0.1% | 0.2% | 0.9% | 99.1% | 0.9% | 100.0% | |

Source: Nortel Transfer Pricing Models except for the Nortel 10-K column which is taken from Nortel 10-Ks.

**Table C-6.  Aggregate Adjustments from GAAP Operating Earnings to "Economic" Profits (2001–2005, US$ in millions)**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| Revenues - trade & other | 18,067 | 10,060 | 8,922 | 8,354 | 9,322 | **54,724** |
| Intercompany revenue | 7,250 | 3,859 | 3,985 | 4,436 | 4,590 | **24,119** |
| Cost of revenue | (21,445) | (10,230) | (8,815) | (9,064) | (9,737) | **(59,291)** |
| *Gross profit* | 3,872 | 3,688 | 4,091 | 3,726 | 4,174 | **19,552** |
| Selling & marketing | (3,355) | (1,693) | (1,162) | (989) | (1,083) | **(8,282)** |
| Gen. & administrative | (1,423) | (830) | (1,006) | (1,036) | (1,152) | **(5,447)** |
| *Total SG&A* | (4,778) | (2,523) | (2,168) | (2,025) | (2,235) | **(13,729)** |
| R&D expenses | (3,420) | (2,172) | (2,001) | (1,996) | (1,881) | **(11,470)** |
| Purchased IPR&D | (15) | (0) | 0 | 0 | 0 | **(15)** |
| Total goodwill & IPR&D | (18,103) | (157) | (98) | 0 | 0 | **(18,358)** |
| Def. compensation expense | (258) | (110) | (16) | (0) | 0 | **(384)** |
| Restructuring costs | (2,448) | (2,011) | (280) | (137) | (152) | **(5,028)** |
| *Total operating expenses* | (29,022) | (6,973) | (4,563) | (4,158) | (4,268) | **(48,983)** |
| **GAAP operating earnings** | **(25,149)** | **(3,285)** | **(472)** | **(432)** | **(93)** | **(29,431)** |
| *Add back:* |  |  |  |  |  |  |
| Transactional F/X | (220) | 110 | 372 | 114 | 96 | **472** |
| Total GW & IPR&D | 18,103 | 157 | 98 | (0) | 0 | **18,358** |
| Def. compensation expense | 258 | 110 | 16 | 0 | 0 | **384** |
| Restructuring costs | 2,448 | 1,945 | 280 | 137 | 152 | **4,963** |
| Transfer pricing adjustments | 0 | 4 | (30) | (1) | 12 | **(15)** |
| Other adjustments | (5) | (40) | (5) | 20 | 3 | **(27)** |
| R&D CSA allocation less R&D performed | 5 | 0 | 0 | 0 | 0 | **5** |
| *Adjusted accounting profit* | **(4,560)** | **(1,000)** | **260** | **(162)** | **169** | **(5,293)** |
| Less: R&D amortization | (2,960) | (2,917) | (2,665) | (2,461) | (2,303) | **(13,305)** |
| Add: R&D expensed (performed) | 3,427 | 2,207 | 2,012 | 1,997 | 1,869 | **11,513** |
| **"Economic" operating profit/(loss)** | **(4,092)** | **(1,710)** | **(393)** | **(626)** | **(265)** | **(7,086)** |

Source: Nortel transfer pricing models.

The goodwill and IPR&D adjustment category is large due to an adjustment of $12,772 million in 2001. This writedown was associated with prior acquisitions by NNL of the following companies: Dimension, MICOM Communications Corp., Alteon, 980 NPLC Business, Xros and Qtera. See the 2004 Functional Analysis, p. 567 (PDF p. 113/180).

Note that total restructuring costs deducted to reach GAAP operating earnings in the left panel is $65.4 million larger than total restructuring costs added back to reach adjusted accounting profit in the right panel. This is because $65.4 million of total LRE restructuring costs were reimbursed in 2002.

**Table C-7.  Routine and Non-Routine Returns from Transfer Pricing Models**

**(US$ in millions)**

**A. Routine Returns, 2001 - 2008**

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total |
|---|---|---|---|---|---|---|---|---|
| **2001** | 559 | 505 | 291 | 53 | 9 | 4 | 52 | **1,471** |
| **2002** | 439 | 102 | 125 | 42 | 6 | 1 | 0 | **715** |
| **2003** | 319 | 57 | 60 | 45 | 5 | (0) | 16 | **502** |
| **2004** | 223 | 98 | 42 | 42 | 8 | 0 | 17 | **430** |
| **2005** | 185 | 73 | 28 | 41 | 11 | 4 | 20 | **362** |
| **2006** | 66 | 139 | 40 | 7 | 9 | 8 | 20 | **289** |
| **2007** | 83 | 129 | 48 | 5 | 10 | 9 | 14 | **298** |
| **2008** | 60 | 131 | 39 | 5 | 12 | 0 | 18 | **264** |
| **Total** | **1,934** | **1,233** | **672** | **241** | **69** | **25** | **157** | **4,332** |
| **% of Total** | **44.6%** | **28.5%** | **15.5%** | **5.6%** | **1.6%** | **0.6%** | **3.6%** | **100%** |

**B. Allocated Residual Profit, 2001 - 2008**

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total |
|---|---|---|---|---|---|---|---|---|
| **2001** | (1,757) | (3,013) | (411) | (296) | (61) | (25) |  | **(5,564)** |
| **2002** | (837) | (1,215) | (194) | (150) | (18) | (11) |  | **(2,425)** |
| **2003** | (320) | (428) | (69) | (68) | (7) | (4) |  | **(895)** |
| **2004** | (393) | (482) | (74) | (95) | (8) | (5) |  | **(1,056)** |
| **2005** | (242) | (274) | (39) | (64) | (5) | (3) |  | **(627)** |
| **2006** | (153) | (170) | (24) | (43) | (3) | (1) |  | **(395)** |
| **2007** | (56) | (55) | (7) | (17) | (1) | (0) |  | **(136)** |
| **2008** | (86) | (74) | (7) | (22) | (2) | 0 |  | **(191)** |
| **Total** | **(3,844)** | **(5,711)** | **(825)** | **(755)** | **(105)** | **(48)** |  | **(11,289)** |
| **% of Total** | **34.1%** | **50.6%** | **7.3%** | **6.7%** | **0.9%** | **0.4%** |  | **100.0%** |

**C. Total Profit, 2001 - 2008**

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total |
|---|---|---|---|---|---|---|---|---|
| **2001** | (1,198) | (2,508) | (120) | (244) | (52) | (20) | 52 | **(4,092)** |
| **2002** | (398) | (1,114) | (70) | (108) | (12) | (10) | 0 | **(1,710)** |
| **2003** | (1) | (370) | (9) | (23) | (1) | (4) | 16 | **(393)** |
| **2004** | (170) | (384) | (32) | (53) | (0) | (5) | 17 | **(626)** |
| **2005** | (57) | (201) | (11) | (22) | 6 | 1 | 20 | **(265)** |
| **2006** | (87) | (31) | 16 | (35) | 5 | 7 | 20 | **(105)** |
| **2007** | 27 | 74 | 41 | (11) | 9 | 8 | 14 | **162** |
| **2008** | (26) | 57 | 32 | (17) | 10 | 0 | 18 | **73** |
| **Total** | **(1,910)** | **(4,478)** | **(153)** | **(514)** | **(36)** | **(23)** | **157** | **(6,956)** |
| **% of Total** | **27.5%** | **64.4%** | **2.2%** | **7.4%** | **0.5%** | **0.3%** | **-2.3%** | **100.0%** |

Source: Nortel Transfer Pricing Models.

**Table C-8.  Transfer Pricing Adjustments and GAAP Operating Earnings Post Transfer Pricing Adjustments (US$ in millions)**

**Panel A: Total Transfer Pricing Adjustments Across Entities**

|        | Canada | U.S.    | U.K.  | France | Ireland | Australia | LREs | Total |
|--------|--------|---------|-------|--------|---------|-----------|------|-------|
| 2001   | 686    | (1,931) | 903   | (92)   | (44)    | 38        | 440  | **0** |
| 2002   | 491    | (1,140) | 198   | 81     | (71)    | 24        | 416  | **0** |
| 2003   | 444    | (858)   | 444   | (27)   | (67)    | (18)      | 83   | **0** |
| 2004   | 670    | (723)   | 307   | (146)  | (65)    | 1         | (46) | **0** |
| 2005   | 513    | (632)   | 205   | (13)   | (50)    | 8         | (32) | **0** |
| 2006   | 511    | (372)   | 37    | 4      | (103)   | (96)      | 19   | **0** |
| 2007   | 726    | (509)   | 28    | (95)   | (119)   | (0)       | (33) | **(3)** |
| 2008   | 185    | (143)   | 22    | 21     | (5)     | 0         | (80) | **0** |
| Total  | **4,227** | **(6,307)** | **2,144** | **(267)** | **(524)** | **(42)** | **767** | **(3)** |

Source: Nortel Transfer Pricing Models.

**Panel B. GAAP Operating Earnings Post Transfer Pricing Adjustment**

|        | Canada    | U.S.      | U.K.  | France  | Ireland | Australia | LREs  | Total       |
|--------|-----------|-----------|-------|---------|---------|-----------|-------|-------------|
| 2001   | (14,169)  | (10,347)  | (373) | (498)   | (120)   | 10        | 347   | **(25,149)** |
| 2002   | (1,411)   | (2,287)   | 233   | (282)   | (78)    | 19        | 521   | **(3,285)**  |
| 2003   | 128       | (767)     | 316   | (65)    | (81)    | (37)      | 34    | **(472)**    |
| 2004   | 431       | (965)     | 323   | (44)    | (68)    | (63)      | (46)  | **(432)**    |
| 2005   | 750       | (983)     | 297   | (162)   | (21)    | 10        | 14    | **(93)**     |
| 2006   | 233       | (545)     | 198   | (27)    | (48)    | (27)      | 65    | **(152)**    |
| 2007   | 572       | (420)     | 35    | (125)   | (104)   | (15)      | 4     | **(53)**     |
| 2008   | (26)      | (2,704)   | (189) | (78)    | (51)    | 0         | (485) | **(3,533)**  |
| Total  | **(13,492)** | **(19,018)** | **841** | **(1,280)** | **(571)** | **(104)** | **456** | **(33,168)** |

Source: Nortel Transfer Pricing Models.

**APPENDIX D:  NORTEL'S RESTRUCTURING COSTS**

**I.      RESTRUCTURING COSTS AT NORTEL AND RPS TREATMENT**

1.  As explained in Section IV of my report**,** in the Nortel H-F and E&Y RPSMs, restructuring costs were treated "below-the-line".  Consider the following illustrative example of the effect of moving restructuring costs above-the-line (Table D-1).  The left portion is identical to Table C-3 in Appendix C.  The right portion differs in the treatment of restructuring costs.  Instead of being treated as "below-the-line," restructuring costs are included in GAAP Operating Income / (Loss) and shared among the RPEs (*i.e.*, in the third row below, no restructuring costs are added back, whereas they were reversed in Table C-3).

2.  All else equal, the total residual loss increases from (US$30,000 million) to (US$35,000 million), with the difference being the total restructuring costs to be shared (US$5,000 million).  Note that the LREs' restructuring costs are shared by the RPEs, in other words, reimbursed by the RPEs.  Total restructuring costs are split with approximately 25% going to Canada and most of the rest going to the other RPEs.  The magnitudes mirror the actual breakdown of total restructuring costs between 2001 and 2008 in the Nortel transfer pricing models.

Table D-1.  Illustrative Example — Effect of Restructuring (US$ in millions)

| | Restructuring Below-the-Line Treatment | | | | Restructuring Above-the-Line Treatment | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | All Other | | | | All Other | | |
| | Canada | RPEs | LREs | Total | Canada | RPEs | LREs | Total |
| GAAP Operating Income / (Loss) | (17,000) | (12,600) | 100 | (29,500) | (17,000) | (12,600) | 100 | (29,500) |
| Add: R&D Expense | 5,000 | 6,500 | - | 11,500 | 5,000 | 6,500 | - | 11,500 |
| *Add: Restructuring Costs and others* | *1,250* | *3,600* | *150* | *5,000* | - | - | - | - |
| Less: R&D Amortization | (5,000) | (8,500) | - | (13,500) | (5,000) | (8,500) | - | (13,500) |
| **Economic Operating Income / (Loss)** | **(15,750)** | **(11,000)** | **250** | **(26,500)** | **(17,000)** | **(14,600)** | **100** | **(31,500)** |
| | | | | | | | | |
| Less: Routine Returns | 1,700 | 1,700 | 100 | 3,500 | 1,700 | 1,700 | 100 | 3,500 |
| **Residual Profit / (Loss)** | **(17,450)** | **(12,700)** | **150** | **(30,000)** | **(18,700)** | **(16,300)** | - | **(35,000)** |
| | | | | | | | | |
| Allocation % R&D Stock | 35% | 65% | 0% | 100% | 35% | 65% | 0% | 100% |
| **Allocated Residual Profit / (Loss)** | **(10,500)** | **(19,500)** | - | **(30,000)** | **(12,250)** | **(22,750)** | - | **(35,000)** |
| **Target Profit / (Loss)** | **(8,800)** | **(17,800)** | **100** | **(26,500)** | **(10,550)** | **(21,050)** | **100** | **(31,500)** |
| | | | | | | | | |
| TP Adjustments | 6,950 | (6,800) | (150) | - | 6,450 | (6,450) | - | - |
| **Operating Profit / (Loss) After TP** | **(8,800)** | **(17,800)** | **100** | **(26,500)** | **(10,550)** | **(21,050)** | **100** | **(31,500)** |
| **GAAP Operating Profit / (Loss) after TP** | **(10,050)** | **(19,400)** | **(50)** | **(29,500)** | **(10,550)** | **(19,050)** | **100** | **(29,500)** |

3. In the left portion of Table D-1, Canada is due to receive a transfer of US$6,950 million and has a GAAP operating loss post transfer of (US$10,050 million). When restructuring costs are shared across the RPEs (right portion of Table D-1), it receives a smaller transfer of US$6,450 million and incurs a greater GAAP operating loss of (US$10,550 million). The opposite holds true for all other RPEs and LREs. The other RPEs were due to pay US$6,800 million, (left portion of Table D-1), but when these costs are placed above-the-line (shared), they only pay US$6,450 million (right panel of Table D-1). Their operating loss also falls from (US$19,400 million) to (US$19,050 million). The transfers are explained by Canada being allocated approximately 35% of the residual profits but only incurring approximately 25% of total restructuring costs. The transfer pricing adjustments increase the LREs' GAAP operating profit to US$100 million from a loss of (US$50 million).

## II.    NORTEL'S RESTRUCTURING INITIATIVES AND COSTS

4. Nortel was once an "industry leader and innovator focused on developing technological solutions aimed at transforming how the world communicates and exchanges information."[1] In the late 1990s, the demand for new "information age" technology was extremely high as industry and government invested in information hardware. At its height in 2000, Nortel had a market capitalization of over US$250 billion, annual revenues of approximately US$30 billion and nearly 95,000 employees worldwide.[2] The "dot.com" bubble-burst in 2000/2001 caused a collapse in the technology markets with a precipitous drop in demand for Nortel products. As a result, Nortel and the rest of the industry experienced a substantial decline in revenues and stock valuation accompanied by large write-offs of technological assets. Nortel's market capitalization collapsed to US$2 billion by 2002.[3]

5. Nortel struggled throughout the 2000s. Between 2000 and its bankruptcy filing in early 2009, Nortel rolled out seven restructuring plans: 2000, 2001 (spanning 2001 to 2003), 2004 (2004 and 2005), 2006, 2007, 2008, and November 2008. Repeated re-alignments of its business strategies, re-orientation of R&D programs, and streamlining of its

---

[1] NNI_ 01333115 ("2004 Functional Analysis"), p. 3.

[2] NNI_ 01333115 ("2004 Functional Analysis"), p. 4 and Nortel 2000 10-K, p. 15.

[3] NNI_ 01333115 ("2004 Functional Analysis"), p. 4

operations failed to revive Nortel.  Instead it faced a deterioration of cash and liquidity and filed for bankruptcy protection in January 2009.  To put the restructuring costs into perspective, I plot in Figure D-1 below both Nortel's total revenues and restructuring costs.  The top line represents revenues and the colored bars show restructuring costs by the year of the restructuring program.  In some years, the total restructuring costs reflected costs associated with two consecutive restructuring programs.

**Figure D-1.  Nortel's Revenues and Restructuring Costs from 2000–2008 (US$ in Billions)**



Source: Nortel 10-Ks.

6. The majority of the restructuring costs incurred every year were due to workforce reduction charges.  However, there were also plant closure costs, as well as some non-cash write-downs, mostly in the early years (Table D-2).

**Table D-2.  Categories of Restructuring Costs**

**(US$ in Millions)**

|  | 2001-2005 | 2006-2008 | Total |
|---|---|---|---|
| **Assumed Cash Special Charges** | | | |
| Workforce reduction | 2,424 | 552 | **2,976** |
| Contract settlement and lease costs | 1,195 | 7 | **1,203** |
| Other | 37 | 0 | 37 |
| Total | 3,656 | 560 | **4,216** |
| **Assumed Noncash Special Charges** | | | |
| Plant and equipment write downs | 1,438 | 57 | **1,495** |
| Intangible asset impairments | 434 | 0 | 434 |
| Total | 1,872 | 57 | **1,929** |
| **Total Special Charges** | **5,528** | **617** | **6,145** |

Source:  Table D-6, Panel B.

7. As Nortel's overall revenues dropped significantly from US$30 billion in 2000 to approximately US$10 billion in 2001 to 2003 (top line of Figure D-1), total restructuring charges peaked in 2001 and 2002, at US$3.4 billion and US$1.5 billion, respectively (bottom bars).  The dramatic drop in Nortel's revenues between 2000 and 2001 was mainly caused by the collapse of customer demand for optical networking solutions and high-speed access solutions.  In 2001, the burst of the dot.com bubble and ensuing economic downturn impacted the entire telecommunications industry, resulting in massive restructurings.  Approximately 52,600 employees out of 94,500 in total were terminated,[4] in addition to significant real estate closures, non-core business divestitures, and outsourcing of manufacturing activities.[5]   As the telecommunications sector experienced significant declines in industry demand for "networking equipment," the U.K. realigned its optical networks segment including the sale of its "optical components assets".[6]  Dr. Ron Horn, a former Senior Manager of Tax at Nortel, stated, "[o]ptical sales dropped drastically [between 2000 and 2002] because our customers had over-bought in the 1998–2000 time period, and there was a glut of capacity in their networks."[7]

---

[4]   Nortel 2001 10-K, p. 28.

[5]   Nortel 2001 10-K, p. 28 and Nortel 2003 10-K, pp. 40-41.

[6]   NNUK 2002 Financial Statements, p. 1.

[7]   Exhibit 21004, p. 9.

8. Restructuring costs in subsequent years, although they paled in comparison to earlier years, were US$100 to US$300 million per year until 2008, reflecting Nortel's evolving business strategies.   Table D-3 below summarizes the changes in Nortel's business segments between 2000 and 2008.  The publicly stated purposes at the time include "to streamline and focus more directly on our customers in our four core business areas"[8] in 2002, to reflect "the evolution of the network transformation to converged networks" in 2003,[9] and "to simplify our business model and create new cost efficiencies by leveraging common hardware and software platforms" in 2005.[10]

**Table D-3.  Evolution of Nortel's Business Segments, 2000 through 2008**

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|------|------|------|------|------|------|------|------|
| Service Provider & Carrier | Wireless | Wireless | Wireless | Wireless | Carrier Packet Networks | MCCN[3] | Carrier Networks | Carrier Networks |
| Enterprise | Metro & Enterprise | Enterprise | Enterprise | Enterprise | CDMA[1] | Enterprise Solutions | Enterprise Solutions | Enterprise Solutions |
| Other* | Optical Long-Haul | Wireline | Wireline | Wireline | GSM and UMTS[2] | MEN[4] | MEN[4] | MEN[4] |
| | Other* | Optical | Optical | Optical | Enterprise | Global Services | Global Services | Global Services |
| | | | Other* | Other* | Other* | Other* | Other* | |

Source: Nortel's 2008 Request for Advance Pricing Agreement/Arrangement (Exhibit 22077).  The year 2008 is appended using information from Nortel's 2008 10-K.

* "Other" represents miscellaneous business activities and corporate functions.  This category may contain discontinued operations that were previously reported as continuing operations under one of the reportable segments.

[1]: Code Division Multiple Access.

[2]: Global System for Mobile Communications and Universal Mobile Telecommunications System.

[3]: Mobility and Converged Core Networks.

[4]: Metro Ethernet Networks.

9. Two main strategic initiatives explained most of the restructuring costs beyond 2002.  As explained in its Functional Analysis submitted to the taxing authorities, "Nortel's strategy was to focus on core R&D activities increasing the relative size of its R&D force and substantially reducing its manufacturing base and proportionally downsizing its distribution and management resources."[11]  First, Nortel accelerated a strategic shift in its

---

8    Nortel 2003 10-K/A, p. 4.

9    Nortel 2003 10-K, p. 1.

10    Nortel 2005 10-K/A, p. 1.

11    NNI_ 01333115 ("2004 Functional Analysis"), p. 4.

supply chain management that was initiated in 1999 to transform the company from a vertically integrated manufacturer to a virtually integrated service provider.  Nortel explained in its 2000 10-K that this strategy was necessary to "improve our agility and flexibility in meeting customer demands for our products and network solutions"[12] and outsourced most of its manufacturing operations between 2000 and 2006.  With the sale of Flextronics in May 2006, Nortel had divested substantially all of its manufacturing assets.[13]

10. Second, Nortel gradually consolidated its R&D resources into North America, especially Canada.  A 2003 Nortel presentation entitled "Global R&D Investment Strategy and Recommendations for Nortel Networks"[14] by the then chief technology officer ("CTO") recommended a consolidation of Nortel's overall R&D facilities, a transition to NNL's Ottawa research campus as the default R&D laboratory, and a gradual reduction of the number of EMEA labs to three.  Nortel's R&D consolidation continued in 2005.  An April 2005 Nortel R&D site planning presentation recommended that Nortel "[c]onsolidate organization and location in centers of excellence to drive simplicity and innovation."[15]  The plans to consolidate were eventually presented to and reviewed by the Board of Directors.

11. Figure D-2 illustrates these trends at Nortel in R&D headcounts across regions, where especially the U.K.'s share of overall R&D headcount decreased significantly between 2000 and 2003.

---

[12]    Nortel 2000 10-K, p. 24.

[13]    Exhibit 22077, (2008 Request for Advance Pricing Agreement/Arrangement), p. 11.

[14]    Exhibit 21188, (Global R&D Investment Strategy and Recommendations for Nortel Networks Presentation by CTO Mike Langlois, undated).

[15]    Exhibit 21201A, (Nortel Global R&D Site Strategy Discussion), p. 7.

**Figure D-2.  R&D Employees by Region 2000-2003**



Source: NNI_ 01333115 ("2004 Functional Analysis"), Tables IV.1, 11 and 18.

12. Further, Figure D-3 below shows that the U.K. had a higher concentration of manufacturing workers among Nortel's entities ("Manufacturing %"), but dropped from 45% in 2000 to 24% by 2001 and to about 20% in 2003.  Hence, Nortel's outsourcing strategy impacted NNUK disproportionately relative to other entities.  Table D-4 below provides additional evidence of this trend, demonstrating that from 2000 to 2003, the cumulative decline in manufacturing headcount reached 90% in NNUK, compared with only 70% in Canada and about 80% in the U.S.  At the same time, the U.K.'s R&D headcount declined faster than in Canada and the U.S.

**Figure D-3.  Percentage of Manufacturing Employees by Region 2000-2003**



Source: Table D-4.

**Table D-4. Employees by Region and Functionality 2000-2003 ('000s)**

|  | 2000 | 2001 | 2002 | 2003 | Cumulative Percentage Change |
|---|---|---|---|---|---|
| **Canada** | | | | | |
| R&D | 12.6 | 7.5 | 5.8 | 5.3 | -58% |
| Manufacturing | 4.6 | 2.4 | 1.5 | 1.4 | -70% |
| *Manufacturing %* | *18%* | *17%* | *15%* | *15%* | |
| Other | 8.7 | 3.9 | 2.8 | 2.7 | -69% |
| **Total** | **25.9** | **13.8** | **10.1** | **9.4** | **-64%** |
| **U.S.** | | | | | |
| R&D | 10.2 | 6.5 | 5.4 | 5.0 | -51% |
| Manufacturing | 4.1 | 1.7 | .9 | .9 | -79% |
| *Manufacturing %* | *11%* | *9%* | *7%* | *7%* | |
| Other | 23.7 | 11.2 | 7.4 | 7.1 | -70% |
| **Total** | **38.0** | **19.3** | **13.8** | **13.0** | **-66%** |
| **U.K.** | | | | | |
| R&D | 2.5 | 1.7 | .8 | .7 | -72% |
| Manufacturing | 5.4 | 1.4 | .4 | .6 | -90% |
| *Manufacturing %* | *44%* | *24%* | *15%* | *20%* | |
| Other | 4.5 | 2.8 | 1.6 | 1.5 | -66% |
| **Total** | **12.4** | **6.0** | **2.9** | **2.8** | **-78%** |
| **ROW** | | | | | |
| R&D | 1.8 | 1.7 | 1.7 | 2.0 | 11% |
| Manufacturing | 1.7 | 1.0 | .7 | .7 | -58% |
| *Manufacturing %* | *10%* | *8%* | *7%* | *7%* | |
| Other | 14.7 | 10.8 | 7.7 | 7.3 | -50% |
| **Total** | **18.2** | **13.5** | **10.2** | **10.0** | **-45%** |

Source: NNI_ 01333115, ("2004 Functional Analysis"), Tables IV.1, 11 and 18.

13. I include in Table D-5 additional headcount data from Nortel's 2008 Request for an Advance Pricing Agreement/Arrangement. It shows that the trend that started in the early 2000s continued through the mid to late 2000s. The U.K.'s overall employees in Nortel's global operations dropped from 13% in 2000 to less than 8% in 2007.

**Table D-5.  Employees by Region 2000- 2007 ('000s)**

|  | 2000 | 2001 | 2002 | 2003 | 2005 | 2006 | 2007 | Cumulative % Change |
|---|---|---|---|---|---|---|---|---|
| Canada | 25.9 | 13.8 | 10.1 | 9.4 | 7.2 | 7.1 | 6.8 | -73.8% |
| U.S. | 38.0 | 19.3 | 13.8 | 13.0 | 11.8 | 11.5 | 10.5 | -72.3% |
| U.K. | 12.4 | 6.0 | 2.9 | 2.8 | 2.2 | 2.3 | 2.1 | -83.5% |
| R.O.W. | 18.2 | 13.5 | 10.2 | 10.0 | 7.9 | 6.8 | 6.9 | -62.2% |
| **Total** | **94.5** | **52.6** | **37.0** | **35.2** | **29.1** | **27.7** | **26.2** | **-72.2%** |
| **U.K. % of Total** | **13.2%** | **11.3%** | **7.8%** | **7.8%** | **7.7%** | **8.3%** | **7.8%** | |

Source: For 2000-2003, see NNI_ 01333115, ("2004 Functional Analysis"), p. 466.

For 2005-2007, see Exhibit 22077, ("2008 Request for Advance Pricing Agreement/Arrangement"), p. 16.

No data was available for 2004 or 2008.

## III.    REASONS FOR PLACING RESTRUCTURING COSTS ABOVE-THE-LINE

### A.    ABOVE-THE-LINE   TREATMENT   UNDER   NORTEL'S   GAAP ACCOUNTING

14. Nortel's U.S. GAAP financial statements report restructuring costs above-the-line, under "Special Charges," before operating income.  This treatment has been consistent despite Nortel's four restatements between 2003 and 2005.  Additionally, NNUK's financial statements in 2001 and 2002 used the label "Cost of Fundamental Restructuring of Continuing Operations" to characterize these charges (see Table D-9 below).[16]

15. This classification is noteworthy as it indicates Nortel management's judgment and representations to the investing public, accepted by its auditor, that these restructuring costs should be considered part of normal operations.  I am an economist and not an accounting expert, but as a frequent user of accounting data in my 20 years of transfer pricing field experience, I have studied U.S. GAAP and the transfer pricing treatment of restructuring costs in the context of the comparable profits method (see Section II of my main report), and for this matter, I rely upon Mr. Roger Siefert, U.K. Pension Claimants' U.S. GAAP accounting expert.

16. My inference about Nortel's judgment is based on the following relevant accounting literature.  For restructuring activities during the 2000–2002 period, the most relevant U.S. GAAP principles regarding the determination, timing, presentation and disclosure of restructuring charges were contained in Emerging Issues Task Force (EITF) Issue No.

---

[16]    NNUK 2002 Financial Statements, p. 15.

94-3, Staff Accounting Bulletin (SAB) No. 100, and FASB, Statement of Financial Accounting Standard No. 146 which superseded EITF No. 94-3.  In particular, EITF No. 94-3 makes clear that costs associated with employee termination or relocation only to a limited degree usually are part of income from continuing operations.[17]   SAB 100,[18] issued in late 1999, notes that:

> [T]hese charges [restructuring charges] typically result from consolidation and/or relocation of operations, or the disposition or abandonment of operations or productive assets.  Restructuring charges may be incurred in connection with a business combination, a change in an enterprise's strategic plan, or a managerial response to declines in demand, increasing costs, or other environmental factors.

17. Regarding the treatment of restructuring costs, SAB 100 under the heading "Income Statement Presentation of Restructuring Charges" states:

> Because restructuring charges typically do not relate to "a single separate major line of business or class of customer," they do not qualify for presentation as losses on the disposal of a discontinued operation.
>
> Additionally, since the charges are not both unusual and infrequent they are not presented in the income statement as extraordinary items.

18. FAS 146, issued in June 2002 and made mandatory after December 31, 2002 with early adoption encouraged, states at ¶18 that:

> Costs associated with an exit or disposal activity that does not involve a discontinued operation shall be included in income from continuing operations before income taxes in the income statement of a business enterprise....[19]

### B.    ADDITIONAL EVIDENCE

19. While the RPEs' restructuring costs were placed below-the-line in the transfer pricing models, there is evidence of other costs that were shared among the RPEs to benefit Canada in particular.   This represents an inconsistency in the transfer pricing methodology.  For example, in the 2006 Nortel transfer pricing model, severance costs

---

[17] Financial Accounting Standards Board, EITF 94-3*: Liability Recognition for Certain Employee Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring),* 1994 (superseded by FAS 146), as referenced in FAS 146.

[18] Securities and Exchange Commission, Staff Accounting Bulletin No. 100, November 24, 1999.

[19] FASB, Statement of Financial Accounting Standard No. 146: Accounting for Costs Associated with Exit or Disposal Activities, June 2001, p. 9.

paid by Canada to Alcatel (after the sale of the UMTS unit) were shared in the RPS pool; (*i.e.*, they were deducted from adjusted operating income and thus also from the residual profit pool).[20]

20. Vendor or customer financing losses were also shared among all RPEs in the RPSM, as explained in Nortel's responses to an IRS IDR dated April 26, 2004.[21]  Nortel stated that the write-downs were treated as bad debt expenses and were included in the Selling, General and Administrative expenses in the consolidated financial results of Nortel Networks.  Within the RPS model, Nortel stated that these write-downs "have been included in the calculation of operating earnings for the purposes of determining the residual profits allocation."[22] This is in direct contrast to restructuring costs, which are also typically treated as part of operating expenses under U.S. GAAP, but were not included in residual profits in Nortel's RPS models.

21. Finally, both the CRA and IRS agreed that restructuring costs should not simply fall where they were incurred in the RPS models, even though they did not agree on whether Canada alone or the RPEs should jointly bear those costs.[23]

---

[20]  2006-NOR_53648133.xls (Nortel's 2006 transfer pricing model), tab "Operating Income Adjustments," line 26, entry of -$26.5 million for NNL).

[21]  Exhibit 21031 (Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004), pp. 18–19.

[22]  Exhibit 21031 (Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004), p. 19.

[23]  NNI_00666756 (Bilateral APA Position Paper), pp. 10 and 12.

## Table D-6.  Nortel's Restructuring Charges (US$ in millions)

**Panel A: Nortel's Special Charges by Restructuring Plan**

| Restructuring Plan | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | 3,390 | 1,500 | 288 | 16 | (11) | 17 | 13 | 14 | **5,227** |
| 2004 | 0 | 0 | 0 | 165 | 180 | 20 | 9 | 11 | **385** |
| 2006 | 0 | 0 | 0 | 0 | 0 | 68 | 17 | (1) | **84** |
| 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 171 | 72 | **243** |
| 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 148 | **148** |
| November 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 58 | **58** |
| **Total** | **3,390** | **1,500** | **288** | **181** | **169** | **105** | **210** | **302** | **6,145** |

Source: Nortel 10-Ks as restated.

**Panel B: Nortel's Special Charges by Restructuring Category**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Assumed Cash Special Charges** | | | | | | | | | |
| Workforce reduction | 1,216 | 820 | 157 | 166 | 65 | 136 | 181 | 235 | 2,976 |
| Contract settlement and lease costs | 789 | 233 | 84 | 13 | 76 | (60) | 16 | 51 | 1,203 |
| Other | 37 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37 |
| Total | 2,042 | 1,053 | 241 | 179 | 141 | 76 | 198 | 286 | 4,216 |
| **Assumed Noncash Special Charges** | | | | | | | | | |
| Plant and equipment write downs | 941 | 420 | 47 | 2 | 28 | 29 | 12 | 16 | 1,495 |
| Intangible asset impairments | 407 | 27 | 0 | 0 | 0 | 0 | 0 | 0 | 434 |
| Total | 1,348 | 447 | 47 | 2 | 28 | 29 | 12 | 16 | 1,929 |
| **Total Special Charges** | **3,390** | **1,500** | **288** | **181** | **169** | **105** | **210** | **302** | **6,145** |

Source: Nortel 10-Ks as restated.

Notes:

The 2003 subcategories of special charges as stated in the 2004 10-K have been scaled upwards to match the total special charges amount reported on the 2005 10-K income statement.

The 2006 and 2007 subcategories of special charges as stated in the 2008 10-K have been scaled upwards to match the total special charges amount reported on the 2008 10-K income statement.

**Table D-7.  Restructuring Cost Scenarios (US$ in millions)**

Panel A: Scenario 1 - 75% Restructuring Charges for RPEs Above-the-Line

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total |
|---|---|---|---|---|---|---|---|---|
| **Allocated Residual Profit** | | | | | | | | |
| 2001 | (2,324) | (3,984) | (544) | (392) | (80) | (32) | 0 | **(7,356)** |
| 2002 | (1,337) | (1,942) | (310) | (240) | (28) | (17) | 0 | **(3,874)** |
| 2003 | (396) | (529) | (85) | (85) | (8) | (5) | 0 | **(1,108)** |
| 2004 | (428) | (524) | (80) | (104) | (9) | (5) | 0 | **(1,151)** |
| 2005 | (284) | (322) | (46) | (75) | (6) | (3) | 0 | **(735)** |
| 2006 | (179) | (198) | (28) | (50) | (4) | (2) | 0 | **(460)** |
| 2007 | (108) | (107) | (13) | (32) | (2) | (1) | 0 | **(264)** |
| 2008 | (165) | (143) | (13) | (42) | (4) | 0 | 0 | **(367)** |
| Total | **(5,221)** | **(7,749)** | **(1,121)** | **(1,018)** | **(141)** | **(65)** | **0** | **(15,315)** |
| **GAAP Operating Earnings post TP Adjustment** | | | | | | | | |
| 2001 | (14,501) | (10,206) | (157) | (545) | (122) | 34 | 347 | **(25,149)** |
| 2002 | (1,299) | (2,517) | 420 | (336) | (88) | 14 | 521 | **(3,285)** |
| 2003 | 106 | (736) | 313 | (67) | (82) | (40) | 34 | **(472)** |
| 2004 | 409 | (967) | 350 | (47) | (70) | (61) | (46) | **(432)** |
| 2005 | 730 | (990) | 331 | (170) | (21) | 13 | 14 | **(93)** |
| 2006 | 225 | (537) | 201 | (32) | (48) | (26) | 65 | **(152)** |
| 2007 | 536 | (419) | 53 | (111) | (104) | (12) | 4 | **(53)** |
| 2008 | (62) | (2,672) | (167) | (95) | (52) | 0 | (485) | **(3,532)** |
| Total | **(13,855)** | **(19,046)** | **1,344** | **(1,402)** | **(587)** | **(78)** | **456** | **(33,168)** |

Panel B: Scenario 2 - 100% Restructuring Charges for All Entities Above-the-Line

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total |
|---|---|---|---|---|---|---|---|---|
| **Allocated Residual Profit** | | | | | | | | |
| 2001 | (2,531) | (4,339) | (592) | (427) | (87) | (35) | 0 | **(8,012)** |
| 2002 | (1,509) | (2,190) | (350) | (271) | (32) | (19) | 0 | **(4,370)** |
| 2003 | (420) | (561) | (91) | (90) | (9) | (5) | 0 | **(1,176)** |
| 2004 | (444) | (544) | (83) | (108) | (9) | (5) | 0 | **(1,194)** |
| 2005 | (301) | (341) | (49) | (79) | (6) | (3) | 0 | **(779)** |
| 2006 | (189) | (210) | (30) | (53) | (4) | (2) | 0 | **(488)** |
| 2007 | (131) | (130) | (16) | (39) | (3) | (1) | 0 | **(320)** |
| 2008 | (199) | (171) | (16) | (50) | (5) | 0 | 0 | **(440)** |
| Total | **(5,723)** | **(8,486)** | **(1,227)** | **(1,115)** | **(155)** | **(71)** | **0** | **(16,778)** |
| **GAAP Operating Earnings post TP Adjustment** | | | | | | | | |
| 2001 | (14,630) | (10,191) | (89) | (564) | (123) | 42 | 406 | **(25,149)** |
| 2002 | (1,266) | (2,601) | 481 | (355) | (91) | 12 | 534 | **(3,285)** |
| 2003 | 100 | (725) | 312 | (68) | (82) | (40) | 31 | **(472)** |
| 2004 | 397 | (973) | 358 | (49) | (70) | (60) | (34) | **(432)** |
| 2005 | 720 | (996) | 341 | (173) | (21) | 13 | 22 | **(93)** |
| 2006 | 221 | (537) | 201 | (34) | (48) | (26) | 71 | **(152)** |
| 2007 | 519 | (424) | 59 | (108) | (105) | (11) | 17 | **(53)** |
| 2008 | (80) | (2,668) | (160) | (102) | (53) | 0 | (470) | **(3,532)** |
| Total | **(14,019)** | **(19,114)** | **1,503** | **(1,452)** | **(593)** | **(69)** | **576** | **(33,168)** |

**Table D-8.  Total Transfer Pricing Adjustments Across Entities
and Restructuring Cost Scenarios (US$ in millions)**

|  | Canada | U.S. | U.K. | France | Ireland | Australia | LREs | Total |
|---|---|---|---|---|---|---|---|---|
| **Nortel transfer pricing models** | | | | | | | | |
| 2001 | 686 | (1,931) | 903 | (92) | (44) | 38 | 440 | **0** |
| 2002 | 491 | (1,140) | 198 | 81 | (71) | 24 | 416 | **0** |
| 2003 | 444 | (858) | 444 | (27) | (67) | (18) | 83 | **0** |
| 2004 | 670 | (723) | 307 | (146) | (65) | 1 | (46) | **0** |
| 2005 | 513 | (632) | 205 | (13) | (50) | 8 | (32) | **0** |
| 2006 | 511 | (372) | 37 | 4 | (103) | (96) | 19 | **0** |
| 2007 | 726 | (509) | 28 | (95) | (119) | (0) | (33) | **(3)** |
| 2008 | 185 | (143) | 22 | 21 | (5) | 0 | (80) | **0** |
| **Total** | **4,227** | **(6,307)** | **2,144** | **(267)** | **(524)** | **(42)** | **767** | **(3)** |
| **Nortel transfer pricing models with above-the-line treatment of 75% of RPE restructuring costs** | | | | | | | | |
| 2001 | 354 | (1,790) | 1,119 | (139) | (46) | 62 | 440 | **0** |
| 2002 | 604 | (1,371) | 385 | 27 | (80) | 19 | 416 | **0** |
| 2003 | 422 | (827) | 441 | (30) | (69) | (20) | 83 | **0** |
| 2004 | 649 | (725) | 334 | (149) | (66) | 4 | (46) | **0** |
| 2005 | 492 | (639) | 239 | (21) | (50) | 11 | (32) | **0** |
| 2006 | 504 | (364) | 39 | (1) | (102) | (94) | 19 | **0** |
| 2007 | 690 | (508) | 47 | (82) | (120) | 2 | (33) | **(3)** |
| 2008 | 149 | (111) | 44 | 4 | (6) | 0 | (80) | **0** |
| **Total** | **3,863** | **(6,335)** | **2,647** | **(390)** | **(540)** | **(16)** | **767** | **(3)** |
| **Nortel transfer pricing models with above-the-line treatment of 100% of RPE and LRE restructuring costs** | | | | | | | | |
| 2001 | 225 | (1,775) | 1,186 | (157) | (47) | 70 | 499 | **0** |
| 2002 | 637 | (1,454) | 446 | 8 | (83) | 18 | 429 | **0** |
| 2003 | 416 | (815) | 440 | (30) | (69) | (21) | 79 | **0** |
| 2004 | 637 | (731) | 342 | (151) | (67) | 4 | (34) | **0** |
| 2005 | 483 | (645) | 250 | (24) | (51) | 12 | (24) | **0** |
| 2006 | 499 | (364) | 40 | (3) | (102) | (94) | 25 | **0** |
| 2007 | 672 | (513) | 53 | (79) | (120) | 3 | (20) | **(3)** |
| 2008 | 131 | (106) | 51 | (3) | (7) | 0 | (65) | **0** |
| **Total** | **3,699** | **(6,403)** | **2,807** | **(440)** | **(546)** | **(8)** | **888** | **(3)** |

## Table D-9. NNUK Cost of Sales and Other Operating Income and Expenses
### (GBP in millions)

| | 2000 | 2001 Continuing | 2001 Discontinued | 2002 Continuing | 2002 Discontinued | 2003 Continuing | 2003 Discontinued | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross profit / (loss):** | | | | | | | | | | | |
| Turnover | 2,930.1 | 1,618.6 | 178.4 | 823.9 | 62.0 | 613.9 | 0.0 | 518.9 | 494.9 | 713.4 | 665.0 |
| Cost of sales | (2,442.1) | (1,323.0) | (181.5) | (562.5) | (63.7) | (223.8) | 7.5 | (293.1) | (218.7) | (548.6) | (476.8) |
| | 488.0 | 295.6 | (3.1) | 261.4 | (1.7) | 390.1 | 7.5 | 225.8 | 276.2 | 164.8 | 188.2 |
| **Net Operating Income / (expenses):** | | | | | | | | | | | |
| Marketing, selling and distribution costs - pre exceptional | (287.2) | (261.7) | (5.8) | (126.1) | (1.8) | (72.2) | (0.2) | (56.8) | (55.5) | (59.1) | (65.0) |
| Marketing, selling and distribution costs - exceptional arising from fundamental restructuring of continuing | - | (258.9) | (10.4) | (45.7) | (2.3) | 5.1 | 0.3 | (7.3) | (11.5) | (3.1) | (5.2) |
| | (287.2) | (520.6) | (16.2) | (171.8) | (4.1) | (67.1) | 0.1 | (64.1) | (67.0) | (62.2) | (70.2) |
| **Administrative income / (expenses)** | | | | | | | | | | | |
| Research and development | (104.8) | (247.4) | (9.0) | (122.5) | (10.5) | (59.8) | 0.0 | (51.9) | (33.1) | (23.7) | (19.5) |
| Amortization of goodwill | (19.9) | (19.0) | (1.0) | (78.2) | (0.7) | (3.1) | 0.0 | (28.4) | (28.4) | (28.5) | (28.4) |
| Other administrative expenses | (87.9) | (145.2) | (12.7) | (105.6) | (1.0) | (53.5) | (0.6) | (49.1) | (44.4) | (55.4) | (64.2) |
| **Exceptional (charge) / gain arising from restructuring of operations\*** | (6.0) | (87.3) | (133.6) | (75.2) | (42.6) | 3.3 | 10.8 | (13.1) | (14.8) | (3.2) | (6.7) |
| Profit / (Loss) on current asset investments | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 3.6 | (1.1) | 0.0 | 0.0 | 0.0 |
| Loss on disposal of current investment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (0.9) | 0.0 |
| Gain on disposal of notes receivable | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 15.0 | 0.0 |
| | (218.6) | (498.9) | (156.3) | (381.5) | (54.8) | (113.1) | 13.8 | (143.6) | (120.7) | (96.7) | (118.8) |
| Other income | | | | | | | 21.7 | | | | |
| **Net operating income / (expenses)** | (505.8) | (1,019.5) | (172.5) | (553.3) | (58.9) | (180.2) | 35.6 | (207.7) | (187.7) | (158.9) | (189.0) |
| **Group operating profit / (loss)** | (17.8) | (723.9) | (175.6) | (291.9) | (60.6) | 209.9 | 43.1 | 18.1 | 88.5 | 5.9 | (0.8) |

Sources: Nortel Networks UK Limited: Report and Financial Statements.
* The end of these line items are worded "fundamental restructuring of continuing operations" in the 2001 and 2002 Annual Reports and "restructuring of operations" for 2003-2006. 2007 remains the same as 2006 but removes the "exceptional" disctinction.

**Table D-10.  Nortel Profit and Loss Statements from 10-Ks**
**(US$ in millions)**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Total revenues | 18,900 | 11,008 | 9,932 | 9,478 | 10,509 | 11,418 | 10,948 | 10,421 |
| Cost of revenues | 14,612 | 7,103 | 5,723 | 5,556 | 6,231 | 6,979 | 6,334 | 6,136 |
| Gross profit | 4,288 | 3,905 | 4,209 | 3,922 | 4,278 | 4,439 | 4,614 | 4,285 |
| Selling, general and administrative expense | 6,111 | 2,553 | 1,966 | 2,146 | 2,429 | 2,503 | 2,490 | 2,153 |
| Research and development expense | 3,116 | 2,083 | 1,968 | 1,975 | 1,874 | 1,939 | 1,723 | 1,573 |
| In-process research and development expense | 15 | 0 | 0 | 0 | 0 | 22 | 0 | 0 |
|     Acquired technology and other | 806 |  |  |  |  |  |  |  |
|     Goodwill | 4,058 |  |  |  |  |  |  |  |
| Amortization of intangibles: | 4,864 | 157 | 101 | 9 | 17 | 26 | 50 | 46 |
|     Goodwill impairment | 11,426 | 595 |  |  |  |  |  | 2,379 |
|     Other special charges | 3,390 | 1,500 |  |  |  |  |  | 302 |
| Special charges: | 14,816 | 2,095 | 288 | 181 | 169 | 105 | 210 | 2,681 |
| Stock option compensation | 248 | 110 | 16 | 0 | 0 | 0 | 0 | 0 |
| Loss (gain) on sale of businesses | 138 | (21) | (4) | (91) | 47 | (206) | (31) | (11) |
| Shareholder litigation settlement expense (recovery) | 0 | 0 | 0 | 0 | 2,474 | (219) | (54) | 0 |
| Regulatory investigation expense | 0 | 0 | 0 | 0 | 0 | 0 | 35 | 0 |
| Other operating income (net) | 0 | 0 | 0 | 0 | (23) | (13) | (35) | 25 |
| Total operating expenses | 29,308 | 6,977 | 4,335 | 4,220 | 6,987 | 4,157 | 4,388 | 9,148 |
| Operating income (loss) | (25,020) | (3,072) | (126) | (298) | (2,709) | 282 | 226 | (4,863) |

Source: Nortel 10-Ks as restated.

Note: Special charges are broken down into goodwill impairment and other special charges in 2001 and 2002 while from 2003 to 2007 they are not. In 2008 special charges (here included under "other special charges") are distinguished separately from goodwill impairment.

**Table D- 11. Decomposition of transfers: 75% of RPE restructuring costs above-the-line**
**(US$ in millions)**

| Years 2001-2008 | Transfer to Canada | Transfer to U.S. | Transfer to U.K. | Transfer to Other | Total transfer from |
|---|---|---|---|---|---|
| **Change in restructuring cost above-the-line** |  |  |  |  |  |
|  | **1,013** | **2,010** | **798** | **205** | **4,026** |
| Transfer from Canada | - | 175 | 197 | **(8)** | **363** |
| Transfer from U.S. | (175) | - | 258 | **(55)** | **28** |
| Transfer from U.K. | (197) | (258) | - | (49) | **(503)** |
| Transfer from Other | 8 | 55 | 49 | - | **112** |
| **Total transfer to** | **(363)** | **(28)** | **503** | **(112)** | **0** |

**Table D- 12. Decomposition of transfers: 100% of restructuring costs above-the-line (US$ in millions)**

| Years 2001-2008 | Transfer to Canada | Transfer to U.S. | Transfer to U.K. | Transfer to Other | Total transfer from |
|---|---|---|---|---|---|
| **Change in restructuring cost above-the-line** | | | | | |
| | **1,351** | **2,680** | **1,064** | **394** | **5,489** |
| Transfer from Canada | - | 233 | 262 | **32** | **527** |
| Transfer from U.S. | (233) | - | 344 | **(15)** | **96** |
| Transfer from U.K. | (262) | (344) | - | **(57)** | **(662)** |
| Transfer from Other | (32) | 15 | 57 | - | **40** |
| **Total transfer to** | **(527)** | **(96)** | **662** | **(40)** | **0** |

## APPENDIX E:  TABLES SUPPORTING SECTION V

## TABLE E-1.  ACTIVE AND NON-ACTIVE PENSION PLAN PARTICIPANTS

| | % Active [a] | % Non-Active [b] | Active Participants [c] | Total Participants [d] |
|---|---|---|---|---|
| **2002** | | | | |
| Canada | 32% | 68% | 4,955 | 15,272 |
| US | 36% | 64% | 9,749 | 26,925 |
| UK | NA | NA | - | - |
| **2003** | | | | |
| Canada | 30% | 70% | 4,425 | 14,686 |
| US | 36% | 64% | 8,911 | 24,573 |
| UK | 5% | 95% | 1,891 | 36,507 |
| **2004** | | | | |
| Canada | 27% | 73% | 3,981 | 14,862 |
| US | 37% | 63% | 8,697 | 23,766 |
| UK | 5% | 95% | 1,731 | 35,836 |
| **2005** | | | | |
| Canada | 23% | 77% | 3,311 | 14,294 |
| US | 33% | 67% | 7,882 | 23,573 |
| UK | 4% | 96% | 1,343 | 35,177 |
| **2006** | | | | |
| Canada | 22% | 78% | 3,060 | 13,751 |
| US | 33% | 67% | 7,619 | 23,066 |
| UK | 3% | 97% | 1,181 | 34,563 |
| **2007** | | | | |
| Canada | 21% | 79% | 2,866 | 13,373 |
| US | NA | NA | - | - |
| UK | 3% | 97% | 1,048 | 33,914 |
| **2008** | | | | |
| Canada | 19% | 81% | 2,541 | 13,035 |
| US | NA | NA | - | - |
| UK | 3% | 97% | 911 | 33,148 |

Sources:

Canada 2002: NNC-NNL06005104/18, 20.　　Canada 2003: NOR-CAN00000090/22, 23.
Canada 2004: NOR-CAN06005092/24-25.　　Canada 2005: NNC-NNL06005094/25-26.
Canada 2006: NNC-NNL06005095/23-24.　　Canada 2007: NNC-NNL20050815/23, 26.
Canada 2008: NNC-NNL20050816/28, 31.　　US 2002: NNC-NNL10823590/39.
US 2003/2004: NOR-CAN00097769/36.　　US 2005: NNC_NNL06000436/30.
US 2006: NNC_NNL08005414/37.　　UK 2003: EMEAPROD0348928, p. 33.
UK 2004: EMEAPROD1267841, p. 46.　　UK 2005: EMEAPROD0418226, p. 30.
UK 2006: NOR-CAN00046869/6.　　UK 2007/2008: EMEAPROD0889194, p. 99.

Notes:

[a] = [c] / [d]
[b] = ([d] - [c]) / [d]

Data for Canada is dated as of December 31st of the given year.
Data for the US is dated as of January 1st of the following year.
Data for the UK is dated as of September 30th of the given year.

**Table E- 2. U.S. GAAP Net Periodic Pension Costs from the Siefert Report**
(US$million)

|        | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|--------|------|------|------|------|------|------|------|------|
| Canada | -    | -    | 66   | 83   | 121  | 122  | 65   | 17   |
| U.S.   | 61   | 73   | 64   | 57   | 70   | 66   | 38   | 2    |
| U.K.   | 22   | 65   | 82   | 86   | 98   | 67   | 80   | 25   |
| Other  | 61   | 164  | 24   | 35   | 39   | 19   | 21   | 30   |
| Total  | 143  | 301  | 236  | 261  | 329  | 274  | 204  | 74   |

Source: Siefert report Exhibit E

**Table E- 3. Economic Pension Costs from the Bowie Report**
**(5-year amortization)**
(US$million)

|        | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|--------|------|------|------|------|------|------|------|------|
| **Panel A: Ronnie Bowie economic pension cost (5 year amortization)** | | | | | | | | |
| Canada | 98   | 112  | 151  | 196  | 250  | 242  | 36   | 35   |
| U.S.   | 166  | 119  | 75   | 80   | 59   | 40   | -    | -    |
| U.K.   | 190  | 179  | 122  | 122  | 109  | 324  | 346  | 298  |
| **Panel B: Ronnie Bowie economic pension cost (10 year amortization)** | | | | | | | | |
| Canada | 80   | 82   | 108  | 145  | 186  | 187  | 73   | 71   |
| U.S.   | 132  | 106  | 72   | 75   | 63   | 40   | -    | -    |
| U.K.   | 139  | 125  | 117  | 117  | 103  | 242  | 259  | 222  |
| **Panel C: Economic cost adjustment (5 year amortization)** | | | | | | | | |
| Canada | 98   | 112  | 85   | 113  | 129  | 120  | (30) | 17   |
| U.S.   | 105  | 46   | 11   | 23   | (11) | (26) | (38) | (2)  |
| U.K.   | 169  | 114  | 40   | 36   | 10   | 256  | 267  | 273  |
| **Panel D: Economic cost adjustment (10 year amortization)** | | | | | | | | |
| Canada | 80   | 82   | 42   | 62   | 65   | 65   | 8    | 54   |
| U.S.   | 71   | 33   | 8    | 18   | (7)  | (26) | (38) | (2)  |
| U.K.   | 117  | 61   | 35   | 31   | 5    | 175  | 180  | 197  |

Source: Bowie Report and Siefert Report
Notes:
Economic cost adjustment = economic pension cost - net periodic pension cost.
Economic pension cost is converted to US$ using foreign exchange rates from the Federal Reserve (FRED).
Exchange rates for each year are the average of beginning and end of year exchange rates

E-2

**Table E- 4. Decomposition of transfers: Using total pension costs above-the-line
(US$ in millions)**

| Years 2003-2008 | Transfer to Canada | Transfer to U.S. | Transfer to U.K. | Transfer to Other | Total transfer from |
|---|---|---|---|---|---|
| **Change from adding OCI above-the-line** | | | | | |
| | **(390)** | **(308)** | **496** | **0** | **(202)** |
| Transfer from Canada | - | 43 | 245 | 53 | **340** |
| Transfer from U.S. | (43) | - | 220 | 36 | **213** |
| Transfer from U.K. | (245) | (220) | - | (53) | **(517)** |
| Transfer from Other | (53) | (36) | 53 | - | **(36)** |
| Total transfer to | **(340)** | **(213)** | **517** | **36** | **0** |

**Table E-5: Decomposition of transfers: Economic cost (5 year amortization)
(US$ in millions)**

| Years 2003-2008 | Transfer to Canada | Transfer to U.S. | Transfer to U.K. | Transfer to Other | Total transfer from |
|---|---|---|---|---|---|
| **Change from adding economic cost (5 year)** | | | | | |
| | **436** | **(43)** | **883** | **0** | **1,275** |
| Transfer from Canada | - | (214) | 335 | (46) | **75** |
| Transfer from U.S. | 214 | - | 367 | 6 | **587** |
| Transfer from U.K. | (335) | (367) | - | (109) | **(810)** |
| Transfer from Other | 46 | (6) | 109 | - | **149** |
| Total transfer to | **(75)** | **(587)** | **810** | **(149)** | **0** |

**Table E-6: Decomposition of transfers: Economic cost (10 year amortization)**
**(US$ in millions)**

| Years 2003-2008 | Transfer to Canada | Transfer to U.S. | Transfer to U.K. | Transfer to Other | Total transfer from |
|---|---|---|---|---|---|
| **Change from adding economic cost (10 year)** | | | | | |
| | **295** | **(47)** | **622** | **0** | **870** |
| Transfer from Canada | - | (149) | 238 | (33) | **57** |
| Transfer from U.S. | 149 | - | 260 | 7 | **415** |
| Transfer from U.K. | (238) | (260) | - | (76) | **(575)** |
| Transfer from Other | 33 | (7) | 76 | - | **102** |
| Total transfer to | **(57)** | **(415)** | **575** | **(102)** | **0** |