Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al*.,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

## <u>EXPERT REPORT OF JEFFREY H. KINRICH</u>

(Submitted by the U.S. Debtors)

**January 24, 2014**

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL
UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED
HIGHLY CONFIDENTIAL.**

# EXPERT REPORT OF JEFFREY H. KINRICH

| | | |
|---|---|---|
| I. | QUALIFICATIONS AND EXPERIENCE | 1 |
| II. | ASSIGNMENT | 1 |
| III. | SUMMARY OF OPINIONS | 2 |
| IV. | DOCUMENTS RELIED UPON | 4 |
| V. | NORTEL BACKGROUND | 4 |
| VI. | NORTEL ENTITIES ELIGIBLE TO RECEIVE A DISTRIBUTION OF POST-PETITION SALES PROCEEDS | 7 |
| A. | The Debtor Groups | 8 |
| B. | Entities That Are Not Members of a Debtor Group | 9 |
| VII. | VALUATION METHODOLOGY | 11 |
| A. | Valuation Principles | 11 |
| B. | Approaches to Valuation | 12 |
| C. | Basis for Determining Value Relinquished by the Debtor Groups | 13 |
| D. | Line of Business Sales | 14 |
| E. | Patent Portfolio Sale | 15 |
| VIII. | VALUE RELINQUISHED IN THE EIGHT LINE OF BUSINESS SALES | 16 |
| A. | Overview | 16 |
| B. | Value Relinquished by the Debtor Groups | 18 |
| C. | Results Using 2007-2009 Revenues | 26 |
| D. | Sensitivity to Regional Growth Rates | 27 |
| E. | Summary of Line of Business Value Relinquished | 29 |
| IX. | NORTEL'S INTELLECTUAL PROPERTY PORTFOLIO | 30 |
| A. | How Firms Derive Value from Rights to Patented Technology | 30 |
| B. | Nortel IPCo Business Plan | 32 |
| X. | VALUE RELINQUISHED BY THE DEBTOR GROUPS IN THE PATENT PORTFOLIO SALE | 37 |
| A. | Patent Portfolio Overview | 37 |
| B. | Rights Relinquished in the Patent Portfolio Sale | 41 |
| C. | Discounted Cash Flow Valuation | 43 |
| D. | Examination of Patent Characteristics | 62 |
| E. | Summary of Valuation Results for Patent Portfolio Sale | 71 |
| XI. | CONCLUSIONS | 72 |

## I.    QUALIFICATIONS AND EXPERIENCE

1.    I am a Managing Principal at the economic, financial, and strategy consulting firm Analysis Group, Inc. Analysis Group employs approximately 500 professionals in the areas of economics, finance, and strategy. I graduated summa cum laude from Pomona College with a Bachelor of Arts degree in Mathematics. I received a Master of Science degree in Statistics from Stanford University, and a Master of Business Administration degree in Finance and Quantitative Methods from the University of Maryland, where I graduated first in my class. I am a Certified Public Accountant and hold an Accredited in Business Valuation (ABV) credential. I have more than 30 years of experience performing valuations and analyzing damages in commercial and intellectual property disputes. I have performed numerous business valuations and have analyzed the value of patents and other intellectual property both singly and in patent portfolios. Many of my analyses have involved high-technology companies, including numerous international telecommunications and equipment companies. Analysis Group is compensated at the rate of $620 per hour for my time. Hourly rates for other staff working on this matter range from $245 to $600 per hour.

2.    A copy of my curriculum vitae is attached as Appendix A. It includes a list of matters in which I have testified at deposition or trial in the last four years and a list of my publications in the past ten years.

## II.    ASSIGNMENT

3.    I have been asked by counsel to the U.S. Debtors to determine the value relinquished by each of the Nortel entities for each of the "Post-Petition Sales".[1]

---

[1] As discussed infra, the Post-Petition Sales consist of the eight business line sales ("Line of Business" sales) and the sale of the remaining patent portfolio to Rockstar Bidco ("Patent Portfolio" sale) conducted in these creditor

### III.    <u>SUMMARY OF OPINIONS</u>

4.      Nortel[2] received $7.79 billion from the sale of the Lines of Business and Patent Portfolio. These sales included each of the Debtor Groups, and each Debtor Group agreed to the total sales prices with the understanding that the relative value each contributed would be determined and distributed subsequently. The Debtor Groups differed markedly from one another with respect to the revenue they generated, the markets in which they operated, the number of patents filed in each territory and the quality of those patents. Accordingly, the value each Debtor Group relinquished in the Post-Petition Sales differs correspondingly.

5.      The proceeds from the sales of Nortel's Lines of Business and Patent Portfolio reflect the economic value relinquished by each entity in each sale. To determine the value relinquished by each entity, I apply widely accepted valuation principles.

6.      The eight Line of Business sales produced $2.85 billion of Available Proceeds for distribution.[3] To determine the fair market value of the assets relinquished by each Debtor Group in each of the Line of Business sales, I use standard valuation techniques based on measures of revenue. I also consider different financial metrics and the effects of changing macroeconomic and market conditions; my results are robust with respect to these factors.

---

protection proceedings. This report will generally refer to the value relinquished by each of the Nortel debtor groups from the Post-Petition Sales ("<u>Debtor Groups</u>," discussed infra), but I also calculate value relinquished by the individual debtors, as reflected in Exhibit 33.

[2] When I use the term "Nortel" alone, I am using it to refer to all affiliated entities in the Nortel group of companies, including all of the Debtor Groups.

[3] In this report, "<u>Available Proceeds</u>" refers to, for each sale, the original sales price less any purchase price adjustments and any costs or settlement amounts already paid out of the respective escrow account. It may be appropriate to reduce the Available Proceeds by certain costs and reimbursements. This report does not address those costs and charges. If such costs are to be charged, I may modify my report to take into account such additional charges. Available Proceeds taken from December 31, 2013 Cash Summary [hereinafter Cash Summary].

Highly Confidential

7.      There are $4.45 billion of Available Proceeds from the sale of the Patent Portfolio. To derive the value relinquished by each Debtor Group in the sale of the Patent Portfolio, I perform a discounted cash flow ("DCF") analysis based on the business plan prepared by various members of Nortel management with the help of Lazard Frères & Co., LLC ("Lazard") and Global IP Law Group ("Global IP") that was jointly vetted by the Debtor Groups and their representatives. This business plan is reflected in a model of the expected income stream that would have been obtained from a proposed reorganization of Nortel, the business of which would be the worldwide licensing and enforcement of the Patent Portfolio (the "IPCo Model").[4] The IPCo Model was based on the projected market value obtained through monetization of the Patent Portfolio through licensing and litigation efforts, broken down by technology group and geography.

8.      Based on my experience, expertise and analysis, I conclude that the value relinquished by the Debtor Groups from the Post-Petition Sales is $0.77 billion, $1.23 billion, and $5.30 billion for the Canadian, EMEA,[5] and U.S. Debtors, respectively.[6] (See Table 1.)

---

[4] BHG0124158 (IPCo Model (Model v3.1 Distributed)) [hereinafter IPCo Model 3.1].

[5] EMEA stands for Europe, the Middle East, and Africa.

[6] My opinion and the analyses contained in this report are based upon information available to date. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the parties to this dispute and to supplement my opinions based upon that review.

Highly Confidential

**Table 1 – Summary of Valuation Results[7]**

| | Lines of Business | | Patent Portfolio | | Total | |
|---|---|---|---|---|---|---|
| | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent |
| Canadian Debtors | $0.34 | 11.9% | $0.43 | 9.7% | $0.77 | 10.6% |
| EMEA Debtors | $0.51 | 18.0% | $0.71 | 16.0% | $1.23 | 16.8% |
| U.S. Debtors | $1.99 | 70.0% | $3.31 | 74.3% | $5.30 | 72.6% |
| **Total** | **$2.85** | **100%** | **$4.45** | **100%** | **$7.30** | **100%** |

## IV.     DOCUMENTS RELIED UPON

9.     A list of documents relied upon is set forth in Appendix B.

## V.     NORTEL BACKGROUND

10.     On January 14, 2009, certain Nortel affiliates commenced creditor protection proceedings before courts in three jurisdictions. A group of Nortel entities (including the ultimate, publicly-traded parent company) filed for Companies' Creditors Arrangement Act (Canada) protection in Canada (the "Canadian Debtors"), a group of entities filed administration proceedings in the United Kingdom ("U.K.") (the "EMEA Debtors"), and a group of entities filed for chapter 11 bankruptcy protection in the United States ("U.S.") (the "U.S. Debtors").[8] Subsequently, the Canadian Debtors, the EMEA Debtors, and the U.S. Debtors (collectively, the Debtor Groups or the "Nortel Debtors") sold substantially all of Nortel's assets in nine

---

[7] I calculate a small distribution for Nortel Colombia, as discussed in Paragraph 19, which I do not present in the tables throughout this report. For this reason, Line of Business value and percentages in Table 1 do not sum to total.

[8] One of the U.S. Debtors, Nortel Networks (CALA) Inc. ("NN CALA") filed a voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code on July 14, 2009. Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105, Bankruptcy Rule 1015, and Local Rule 1015-1 (I) Directing Joint Administration of the Debtors' Related Chapter 11 Cases and (II) Granting Related Relief, July 15, 2009 [D.I. 1073]. NN CALA's voluntary petition was consolidated with NNI's proceedings.

Highly Confidential

transactions: eight Line of Business sales and one Patent Portfolio sale.[9] Sales proceeds from the Post-Petition Sales were placed into escrow accounts and, as of December 31, 2013, $7.30 billion[10] remains to be divided, based upon decisions in the above-captioned court proceedings, to those Nortel entities entitled to receive a distribution.

11.    Nortel's principal businesses in the 2000s related to a range of telecommunications products and services, including those involving wireless and Internet technologies.[11] By the late 2000s, Nortel had offices around the globe.[12] Nortel Networks Corporation ("NNC") was the ultimate parent company for Nortel.[13] It owned 100% of the stock of Nortel Networks Limited ("NNL"), the Canadian Integrated Entity ("IE").[14] NNL, in turn, owned 100% of the stock of other IE subsidiaries: Nortel Networks Inc. in the U.S. ("NNI"), Nortel Networks United Kingdom Limited in the United Kingdom ("NNUK"), Nortel Networks S.A. in France ("NNSA") and Nortel Networks (Ireland) Limited in Ireland ("NN Ireland").[15]

---

[9] Additional Nortel sellers also participated in certain of the Post-Petition Sales; however, the allocation claims of some of these entities were resolved in the Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012. Ex. 21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)) [hereinafter Fourth Estate Settlement]. Other Nortel sellers included entities located in Russia, Israel and Colombia, which were resolved as set forth in Paragraph 18 herein.

[10] Cash Summary, *supra* note 3.

[11] 2000 to Present, Nortel Networks Corporation, accessed Jan. 24, 2014, http://www.nortel-canada.com/about/history/2000-to-present/.

[12] *Id.*

[13] NNI_EQUINOX_00067481 (Jan. 5, 2009, Entity Structure).

[14] "An Integrated Entity (IE) is an entity that performs […] the functions of R&D, manufacturing support, distribution, and extraterritorial services to varying degrees in a very united and reliant manner." Ex. 22077, NNC-NNL011359 (Oct. 31, 2008, Joint Request for Bilateral APA 2008) [hereinafter 2008 APA Request], at 6.

[15] Nortel Networks Australia operated as an IE until December 31, 2007. Effective January 1, 2008, Nortel Networks Australia no longer operated as an IE. *Id.* at 12, 24.

Highly Confidential

Each of NNI, NNL, NNUK, NN Ireland and NNSA was a separate legal entity that maintained its own R&D programs and had sales to non-Nortel entities.[16]

12.     Effective as of January 1, 2001, the Master Research and Development Agreement ("MRDA")[17] was the operative transfer pricing agreement among the IEs. Pursuant to the MRDA, each IE received an exclusive, royalty-free license in perpetuity to all NN Technology[18] in its own territory (each an "Exclusive Territory"), which included the exclusive right to exploit and sub-license the NN Technology in its Exclusive Territory.[19] In addition, each of the IEs had "the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others."[20] In the non-Exclusive Territories, each of the IEs had equal non-Exclusive rights to exploit and sub-license all NN Technology.[21] In the event that an IE elected to withdraw from the MRDA or in the event of bankruptcy or insolvency of one of the IEs or other parties to the MRDA, the MRDA stated that the bankrupt or insolvent party would receive the fair market value of the licenses granted to it in the MRDA.[22]

---

[16] Ex. 21003, NNC-NNL06001514 (Master R&D Agreement) [hereinafter MRDA]; NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements) [hereinafter Carve-Out Income Statements].

[17] MRDA, *supra* note 16.

[18] The MRDA defines "NN Technology" to mean "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." MRDA, *supra* note 16, at 3.

[19] *Id.* at Third Addendum.

[20] *Id.* at 6.

[21] NNL had the exclusive right to enforce in the non-Exclusive Territories. *Id.* at 6; *id.* at Third Addendum.

[22] *Id.* at 4; *id.* at 10; *see also* NNI_NARNIA_00303979 (Dec. 31, 2008, Memorandum of Understanding), at 1 ("Each Licensed Participant [also] entered into a bi-lateral Amended Research and Development Cost Sharing Agreement ("1992 Agreement") with NNL effective as of January 1, 1992, which was terminated by each party thereto as of January 1, 2001. The 1992 Agreement was a cost sharing agreement under which NNL, as

Highly Confidential

13.    On June 9, 2009, around the time the sales were first contemplated, certain Nortel Debtors and certain other Nortel entities entered into the Interim Funding and Settlement Agreement ("IFSA") to settle various intercompany obligations.[23] On December 23, 2009, the U.S. Debtors and the Canadian Debtors entered into the Final Canadian Funding and Settlement Agreement ("FCFSA").[24] Although the IFSA and FCFSA provided for certain payments to be made among various members of the Debtor Groups,[25] neither agreement impacts the valuation or has any bearing on the method in which the Post-Petition Sales proceeds would be distributed.[26]

## VI.    NORTEL ENTITIES ELIGIBLE TO RECEIVE A DISTRIBUTION OF POST-PETITION SALES PROCEEDS

14.    The members of the three Debtor Groups are eligible to receive a portion of the Post-Petition Sales proceeds.[27] In Exhibit 1, I provide a list of the individual Nortel entities in

---

consideration for the Participant's sharing of costs of research and development, granted to the Participant an exclusive, perpetual, royalty-free license to make, have made, use, lease and sell Products (as defined in the 1992 Agreement) embodying NT Technology (as defined in the 1992 Agreement), and to all rights to patents, industrial designs, copyrights and technical know-how connected thereto, within the Participant's country of residence.").

[23] NNC-NNL11756408 (June 9, 2009, Interim Funding and Settlement Agreement) [hereinafter IFSA].

[24] NNC-NNL20001869 (Dec. 23, 2009, Final Canadian Funding and Settlement Agreement) [hereinafter FCFSA].

[25] For example, the IFSA contemplated NNL making payments of up to $0.02 billion to NNUK out of the sales proceeds to be received by NNL. IFSA, *supra* note 23, at 6.

[26] The IFSA specifically states that it shall not be "determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group," *id.* at 8, and "this Agreement is without prejudice to any provision of the Master R&D Agreement," *id.* at 9, with the exception of settling the aforementioned intercompany obligations. The FCFSA contains similar language. FCFSA, *supra* note 24, at 9-10. While the IFSA states that the Debtor Groups shall develop an Interim Sales Protocol for the allocation of sales proceeds, and that the Interim Sales Protocol shall govern the allocation in the absence of a later agreement, the IFSA does not provide any guidance on what the terms of the Interim Sales Protocol should be. IFSA, *supra* note 23, at 11. I understand that the Debtor Groups never agreed to an Interim Sales Protocol.

[27] As discussed in Paragraph 18, minor amounts are also attributable to Nortel Colombia, Nortel Israel, and Nortel Russia.

Highly Confidential

each of the Debtor Groups and their 2009 revenue.[28] I briefly discuss each of the Debtor Groups in turn and then describe other Nortel entities that are not eligible to receive any portion of the remaining proceeds.

A. **The Debtor Groups**

15.    The Canadian Debtor Group comprises five Canadian Debtor entities including NNL.[29] Third-party sales of the Canadian Debtors across all Lines of Business were $0.55 billion in 2009, all of which was earned by NNL.[30]

16.    The EMEA Debtor Group comprises twenty-two entities, including nineteen EMEA Debtors as well as three entities that have not filed for protection. The three largest entities, by third-party sales, are NNUK, NN Ireland, and NNSA, with $0.36 billion, $0.28 billion, and $0.18 billion in 2009 third-party sales, respectively.[31] These three are also the only IEs in the EMEA region.[32] The EMEA Debtors' total revenue in 2009 amounted to $1.22 billion.[33]

---

[28] I understand from Counsel that branches and divisions are part of their corporate parents and not separate entities. Accordingly, the appropriate treatment of the financial results of branches and divisions is to treat such amounts as part of the financial results of the corporate parent entity to which the branch or division is related. Thus, the revenue of branches and divisions of members of a particular Debtor Group are counted along with the revenue of the related corporate parent entity in Exhibit 1 and throughout this report.

[29] NNL had a foreign exchange adjustment entity with $0.004 billion in revenue in 2009, which I attribute to NNL. NNI_EQUINOX_00084242 (Feb. 23, 2009, Nortel Corporate Structure) [hereinafter Nortel Corporate Structure].

[30] Nortel's carve-out income statements summarize the revenue earned in the six largest (by sales proceeds) Lines of Business. This is essentially all of the revenue associated with the Lines of Business. (See discussion in Paragraph 38.) All amounts are in U.S. dollars unless otherwise indicated. Carve-Out Income Statements, *supra* note 16.

[31] *Id.*

[32] MRDA, *supra* note 16.

[33] Carve-Out Income Statements, *supra* note 16.

Highly Confidential

17.    The U.S. Debtor Group comprises sixteen debtor entities including NNI.[34]
Third-party sales across all Lines of Business by the U.S. Debtors in 2009 were $3.63 billion,[35]
which include third-party sales by NNI (the only IE among the U.S. Debtors) of $3.46 billion
and NN CALA[36] of $0.16 billion.[37]

### B.    Entities That Are Not Members of a Debtor Group

18.    There are three entities that are not members of a Debtor Group – Nortel
Networks de Colombia S.A. ("Nortel Colombia"), Nortel Communication Holdings (1997)
Limited and Nortel Networks Israel (Sales and Marketing) Limited (together "Nortel Israel"),
and o.o.o. Nortel Networks ("Nortel Russia") – that are entitled to a distribution of Line of
Business sales proceeds. Any distribution to Nortel Israel is to be divided between NNI and
NNUK as stipulated in the settlement agreement concerning Nortel Israel.[38] Therefore, I value
Nortel Israel and split this value between NNUK and NNI. Similarly, any distribution to Nortel
Russia belongs to Nortel Networks International Finance & Holding B.V. ("NNIFH") (which is

---

[34] Nortel Government Solutions ("NGS") and DiamondWare, Ltd. are not members of a Debtor Group but were
owned by NNI. However, unlike other entities that relinquished assets, the equity (rather than the assets) of NGS
and DiamondWare, Ltd. was sold by NNI in one of the Line of Business transactions (Enterprise). Nortel Networks
Corporation, 2011 Annual Report (Form 10-K) (Mar. 8, 2012) [hereinafter NNC 2011 10-K], at 24. At the time of
the sale, both entities were wholly-owned subsidiaries of NNI. Nortel Corporate Structure, *supra* note 29. Together
NGS and DiamondWare, Ltd. earned $0.30 billion in revenue in 2009. Carve-Out Income Statements, *supra* note
16. Therefore, I present these revenues as part of NNI's revenues throughout this report. See further discussion in
Footnote 48.

[35] Carve-Out Income Statements, *supra* note 16.

[36] NN CALA is a Florida corporation that filed for bankruptcy as a U.S. Debtor in July 2009. Ex. 11359 (Sept. 3,
2010, Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated
Debtors), at 9, 23.

[37] Carve-Out Income Statements, *supra* note 16.

[38] Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019
Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow
Agreements, May 17, 2011 [D.I. 5424]; *see also* Order Approving Debtors' Motion for Entry of an Order Pursuant
to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel
and Approving Amendment of Certain Escrow Agreements, June 6, 2011 [D.I. 5603].

Highly Confidential

part of the EMEA Debtor Group) pursuant to the settlement agreement concerning Nortel Russia,[39] and therefore I attribute the value of Nortel Russia to NNIFH. For the purposes of my report, references to revenue and value relinquished by the Debtor Groups include appropriate amounts from Nortel Israel and Nortel Russia.

19.     In addition, Nortel Colombia is not a member of a Debtor Group, but I understand it is eligible to receive a portion of the proceeds because it relinquished value in one of the Line of Business sales, it has not already settled its claim to proceeds from the Line of Business sales, and it did not transfer its claim to a portion of the proceeds to another Debtor Group. Accordingly, I value Nortel Colombia independently. The value relinquished by Nortel Colombia is very small and, while I included it in my analysis and conclusion of value for each entity in Exhibit 33, I do not show the value for Nortel Colombia separately in the summary tables and charts in this report.

20.     Certain other Nortel entities aside from those in the Debtor Groups participated in the Nortel businesses.[40] Some of these entities participated in one or more Line of Business sales and later surrendered any claims they might have had on a portion of the sales proceeds for settlement payments. (See Exhibit 2.) Additionally, three entities were joint ventures ("JVs"),

---

[39] Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, July 28, 2011 [D.I. 6047]; Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit C:  Enterprise Russia Agreement, July 28, 2011 [D.I. 6047-4], at 2-3; Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit D:  GSM/GSM-R Russia Agreement, July 28, 2011 [D.I. 6047-5], at 2-3; *see also* Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreement Regarding Nortel Russia and Approving Certain Amendments to the Escrow Agreements, Aug. 23, 2011 [D.I. 6193].

[40] Carve-Out Income Statements, *supra* note 16.

Highly Confidential

which were sold separately from the eight Lines of Business.[41] Because the entities that settled already have received compensation for the assets they relinquished in the sale transactions, and because the JVs did not participate in the Line of Business transactions, these are not eligible to receive a distribution of Available Proceeds.

## VII.    VALUATION METHODOLOGY

### A.    Valuation Principles

21.    The Debtor Groups had rights to the economic benefits associated with the assets sold and rights relinquished in the Post-Petition Sales. The sales of the Lines of Business and the Patent Portfolio required the Debtor Groups to relinquish their economic interests when ownership of the assets was transferred to the buyers. Proceeds from the Line of Business and Patent Portfolio sales should be distributed according to the relative economic value relinquished by each Debtor Group in each of the sales.

22.    I determine the value relinquished by the Debtor Groups by applying generally accepted principles of valuation. A fundamental principle of economics is that the value of an asset is based on the ability of the asset to generate (or preserve) income.[42] Hence, a basic principle of valuation is that the current value of an income-generating asset is the present value of future cash flows that the asset is expected to generate.[43] In the case of patents, value can be

---

[41] The three JVs were LG Nortel Co. Ltd. ("LGN"), Guangdong Nortel Telecommunications Equipment Co. Ltd. ("GDNT"), and Nortel Networks Netas Telekomunikasyon A.S. Nortel Networks Corporation, 2010 Annual Report (Form 10-K) (Mar. 4, 2011) [hereinafter NNC 2010 10-K], at 14; NNC 2011 10-K, *supra* note 34, at 2, 25. The proceeds from these sales are not part of my analysis. (In the case of LGN and GDNT, the proceeds from these sales were or will be distributed to shareholders). NNC 2010 10-K, *supra* note 41, at 14; NNC 2011 10-K, *supra* note 34, at 25.

[42] Shannon P. Pratt and Alina V. Niculita, *Valuing a Business, Fifth Edition: The Analysis and Appraisal of Closely Held Companies* (McGraw-Hill Companies, Inc., 2008) [hereinafter Pratt and Niculita 2008], at 56, 175.

[43] *Id.* at 56.

Highly Confidential

derived from income directly generated by licensing or exploiting the patents, from income indirectly generated by using the patents strategically (*e.g.,* cross-licensing) or by using the patented technologies to reduce competitive entry and thereby capture additional profits.

### B.      Approaches to Valuation

23.      Valuation approaches can be divided into: (1) the income approach, (2) the market approach, and (3) the asset-based approach. The American Society of Appraisers defines these approaches as follows:[44]

- <u>Income Approach</u>: a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods through which anticipated economic benefits are converted into value.

- <u>Market Approach</u>: a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold.

- <u>Asset-Based Approach</u>: a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods based on the value of the assets net of liabilities.

24.      If applied properly and if sufficient relevant information exists, all three approaches should be economically equivalent. The market approach is economically equivalent to the income approach inasmuch as the market value of comparable assets is based on expectations regarding the future cash flows generated by those assets.[45] Similarly, the asset-based approach, when based on the current market value of an asset, is economically equivalent

---

[44] American Society of Appraisers, ASA Business Valuation Standards (2009), at 9-12, accessed Jan. 24, 2014, http://www.appraisers.org/docs/default-source/discipline_bv/bv-standards.pdf?sfvrsn=0.

[45] Pratt and Niculita 2008, *supra* note 42, at 262 ("While the income approach . . . is the core of valuation theory, actual market transaction data can provide compelling empirical evidence of value.").

Highly Confidential

to the income approach because the value of the asset is, almost by definition, the amount of economic benefit that can be obtained from the asset. In the context of the Line of Business sales and Patent Portfolio sale, the merits of using each of these approaches depends on the data available and the particular facts pertaining to the assets being evaluated.

### C.    Basis for Determining Value Relinquished by the Debtor Groups

25.    I have been asked to determine the value relinquished by each of the Debtor Groups (and individual entities) in the Post-Petition Sales. The appropriate economic basis for this exercise is the relative value of assets relinquished by each Debtor Group (and by each entity). For each Line of Business sale and for the Patent Portfolio sale, I focus on the relative proportion of value relinquished by each entity to the total value. A simplified example illustrates this principle. Suppose a firm has $100 of income each year and is sold for $1000, implying a "multiple" of ten. Further, suppose the firm has two subsidiaries, A and B. Subsidiary A generates income of $40 per year, and Subsidiary B generates income of $60 per year for the total income of $100 per year for the whole firm. All else being equal, the value relinquished by each of the subsidiaries in the sale can be derived using the same income multiple that was applied to the entire firm. The amount attributable to Subsidiary A is $40 times ten, or $400, while the amount attributable to Subsidiary B is $60 times ten, or $600.

26.    I apply the valuation approach illustrated in the above example using a combination of the income and market approaches.[46] I rely on these approaches to reach an overall conclusion as to the value relinquished by each Debtor Group.

---

[46] I considered the asset-based approach but found it to be inapplicable.

Highly Confidential

### D.    <u>Line of Business Sales</u>

27.    The Lines of Business are appropriately valued as going concerns. Using an income approach, one basic measure of relative value is the relative amount of third-party (customer) revenue obtained in each territory.[47] This measure captures the aggregate value of the business assets, both tangible and intangible. In this way, I account for the value of each Line of Business's assets as they functioned together.

28.    For the Line of Business sales, I determine the value relinquished by each of the Nortel entities using two alternative approaches. In one approach, I determine the value an entity relinquished in each Line of Business based on the revenue that entity[48] earned in the Line of Business, relative to total revenue for the Line of Business.[49] I then add the value for each entity across all Lines of Business. I then aggregate the value for each entity within a particular Debtor Group in order to present the relative value relinquished by each Debtor Group.

29.    In my alternative approach, I account for the fact that revenue earned by some entities within Nortel may reflect a different value relinquished in the asset sales as compared with revenue earned by others. Specifically, the IEs assumed risk, funded and conducted R&D, and benefitted from their exclusive licenses for all Nortel IP in their respective Exclusive Territories. Non-IEs, which were primarily distributors of Nortel products in their local

---

[47] I also considered valuation based on gross margin (revenue minus cost of goods sold) and on contribution margin (gross margin minus selling, general and administrative costs). There are reasons that these approaches are not as appropriate in this case. Regardless, these approaches yield similar results and, as such, I only discuss them briefly in Paragraph 42.

[48] As I described in Footnote 34, NGS and DiamondWare, Ltd. were sold with the Enterprise Line of Business. These entities were 100% owned by NNI. Accordingly, I include these revenues (totaling $0.30 billion) to calculate value relinquished by NNI.

[49] Certain entities already have received value from the sale proceeds and have settled. (See Exhibit 2.) Further, as I describe in Paragraph 38, only certain entities relinquished assets in the Line of Business sales. The revenues for entities that did not relinquish assets are excluded from my calculation.

Highly Confidential

countries, did not share these characteristics. In this approach, I employ a two-step process to determine the relative value conferred in the Line of Business sales, based on two different valuation techniques for the two groups.

30.    Using the market approach, I first determine the amount of value relinquished by the non-IEs by identifying a set of publicly traded firms ("comparable" firms) whose primary business is product distribution, like many of the non-IEs. I use the relationship between revenue and total enterprise value of these comparable firms to calculate a "multiple" and determine the value relinquished by Nortel's non-IEs. After deducting the total value relinquished by the non-IEs from the net sales proceeds, I determine the distribution of the remaining proceeds based on the relative value relinquished (indicated by relative revenue share) by the IEs.

### E.    Patent Portfolio Sale

31.    To determine the fair market value relinquished by each Debtor Group in the Patent Portfolio sale, I perform a DCF analysis based on the IPCo Model. This business model includes projected cash flow streams to which the standard income approach can be applied by discounting these cash flows to calculate a present value. As a confirmatory analysis, I examine several characteristics of the Patent Portfolio that are indicators of fundamental economic value. The results of this analysis are consistent with my opinion based on a DCF analysis.

Highly Confidential

## VIII.   VALUE RELINQUISHED IN THE EIGHT LINE OF BUSINESS SALES

### A.   Overview

32.    As of December 31, 2013, there was $2.85 billion in available proceeds from the Line of Business sales.[50] In this section, I determine the value relinquished by each Debtor Group in each Line of Business sale.

33.    In 2009, Nortel organized its business into five distinct "Business Segments": Wireless Networks ("WN"); Enterprise Solutions ("ES"); Metro Ethernet Networks ("MEN"); Carrier Voice over Internet Protocol and Application Solutions ("CVAS"); and the LGN JV, which was sold separately from the Lines of Business.[51] (See Exhibit 3.) In 2009-2010, there were eight Lines of Business sales to various buyers, which did not correspond exactly to Nortel's 2009 description of its Business Segments. Exhibit 4 summarizes the key characteristics of the Lines of Business and indicates that while the Lines of Business can be grouped into Business Segments, that mapping is not exact: WN was divided into three Lines of Business for sale; ES was divided into two Lines of Business for sale; CVAS was sold as one unit and MEN was divided into two Lines of Business for sale, one of which was packaged with part of the ES Business Segment.[52]

---

[50] Cash Summary, *supra* note 3.

[51] This report does not concern itself with the sale of the LGN JV.

[52] Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar. 12, 2010) [hereinafter NNC 2009 10-K], at 4-8; NNC 2011 10-K, *supra* note 34, at 78; UCC0166151 (July 8, 2010, MSS Update), at 2.

Highly Confidential

34.    As shown in Exhibit 4, purchase prices for the Line of Business sales ranged from $0.01 billion to $1.13 billion. As of December 31, 2013, there were $2.85 billion of Available Proceeds.[53]

35.    Line of Business sales included tangible assets (such as physical property, inventory, and computers) and intangible assets (such as patents, trademarks, assembled workforce, customer relationships, and goodwill). Exhibit 5 and Table 2 provide further details on the Line of Business sales.

**Table 2 – Line of Business Summary[54]**

| Line of Business | Available Proceeds ($ Billions) | 2009 Revenue (Sellers Only) ($ Billions) |
|---|---|---|
| CDMA & LTE | $1.05 | $1.40 |
| Enterprise | $0.84 | $1.67 |
| MEN | $0.63 | $0.86 |
| CVAS | $0.14 | $0.62 |
| GSM | $0.11 | $0.59 |
| MSS | $0.05 | $0.25 |
| Layer 4-7 | $0.02 | NA |
| Next Generation Packet Core | $0.01 | NA |
| **Total** | **$2.85** | **$5.39** |

36.    As I mentioned above, revenue earned by some entities within Nortel (the IEs) may reflect a different relinquished value in the Line of Business sales as compared with revenue earned by other Nortel entities (the non-IEs). Consequently, I use two approaches to determine the appropriate valuations. In the first method, I treat revenue from all of the Nortel entities

---

[53] Implicit in this analysis is that the Available Proceeds for each Line of Business are to be shared in proportion to the relative value relinquished by each Debtor Group for each Line of Business, and that all of the reductions in these sale proceeds are to be shared in proportion to that value.

[54] Carve-out income statements were not prepared and therefore are not available for the Layer 4-7 and Next Generation Packet Core Lines of Business. Table 2 excludes revenues of entities that did not relinquish assets in a particular Line of Business asset sale. See Paragraph 38 for further discussion.

Highly Confidential

equally. This has the effect of making revenue from entities that mainly engaged in distribution activities equivalent to the revenue of the IEs. In the second method, I apply a lower, market-based multiple to the revenue of the lower risk distribution entities, making the lower risk entities' value per dollar of revenue less than the IEs' value per dollar of revenue. Both methods yield very similar overall results.

37.     I use revenues from 2009, the year in which most of the Lines of Business were sold. [55] Sensitivity analyses show that the results using 2009 revenues are robust. These sensitivities include using revenue data from 2007 and 2008, using different income/apportionment metrics, and using projected revenue (rather than historical revenue) to determine value relinquished by the Debtor Groups.

###    B.    Value Relinquished by the Debtor Groups

####        1.        Revenue Treated Equally

38.     The closing documents for the Line of Business sales identify those entities that relinquished assets in those sales. The value of those relinquished assets in each Line of Business sale is reflected in the revenue the entity generated in that Line of Business. "Carve-out" income statements provide revenue figures for the Lines of Business at the entity level. These carve-out income statements present the financial performance of a Line of Business as if it had operated

---

[55] As described above in Paragraph 10, certain Nortel entities sought creditor protection in early 2009. Although the creditor protection filings may have affected the absolute levels of revenue each entity earned, they did not appear to have had a substantial effect on the relative levels of revenue across entities. Only the latter is relevant for my valuation. See Exhibit 6, where I summarize the relative revenue shares of the IEs from 2001-2009.

Highly Confidential

as a stand-alone operation and provide the revenue generated by each of the Nortel entities within a Line of Business.[56]

39.    Each Line of Business was sold separately, and thus I value each Line of Business sale separately. This is especially important because revenue earned in one Line of Business reflects a different value as compared with revenue earned in a different Line of Business. For example, Available Proceeds from the Enterprise Line of Business asset sale are $0.84 billion,[57] while revenue earned by the entities that relinquished value in that Line of Business was $1.67 billion in 2009.[58] This means that each dollar of revenue represents 50 cents in value relinquished.[59] On the other hand, Available Proceeds from the GSM Line of Business asset sale are $0.11 billion,[60] while revenue earned by the entities that relinquished value in that

---

[56]Carve-out income statements were prepared by PricewaterhouseCoopers. Carve-Out Income Statements, *supra* note 16; NNC-NNL06001456, NNC-NNL06001440, NNC-NNL06001450, NNC-NNL06001452, NNC-NNL06001454. A subset was audited by KPMG for certain buyers as part of the sale process. NNC-NNL06001443 (MEN Combined Financial Statements for the Years Ended December 31, 2009, 2008 and 2007), at 2; NNC-NNL06001445 (CVAS Combined Financial Statements for the Years Ended December 31, 2009, 2008, and 2007), at 2; NNC-NNL06001446 (CVAS Combined Financial Statements for the Three Months Ended March 31, 2010 and 2009), at 2. I have provided an illustrative example of a carve-out income statement in Exhibit 7. The revenue figures provided in the carve-out income statements, when summed across all statements, are very close in value to other independent sources of information including Nortel's 2009 Form 10-K, the detail supporting Nortel's consolidated income statement, and Nortel's transfer pricing adjustment ("TPA") worksheets. Carve-Out Income Statements, *supra* note 16, at tabs "FY 09 P&L" for each Line of Business; NNC 2009 10-K, *supra* note 16, at 60, 108, 153, 223; Carve-Out Income Statements, *supra* note 16, at tab "FY09 10-K IS"; NOR_56971224 (2009 TPA Worksheets), at tab "Q4 2009 SAP CON." A list of entities that relinquished value in each Line of Business sale is provided in Exhibit 8.

[57] Cash Summary, *supra* note 3.

[58] Carve-Out Income Statements, *supra* note 16. This does not include revenues of entities which have settled. See Exhibit 2.

[59] $\frac{\$843\ million}{\$1.67\ billion} = 0.50$

[60] Cash Summary, *supra* note 3.

Highly Confidential

Line of Business was $0.59 billion in 2009.[61] This means that each dollar of revenue represents 18 cents in value relinquished.[62]

40.    I have been provided carve-out income statements for all the Lines of Business except for Layer 4-7 and Next Generation Packet Core. For each Line of Business for which I have a carve-out income statement, I determine the value relinquished by each Debtor Group from each sale. I then sum this value across all Lines of Business in order to calculate a final value relinquished by the Debtor Groups for the Lines of Business. These results are summarized in Exhibit 9.

41.    Layer 4-7 and Next Generation Packet Core account for only $0.03 billion (1%) of the $2.85 billion in Available Proceeds from the Line of Business sales.[63] I assume that the value relinquished by each Debtor Group in these Line of Business sales was proportional to the value relinquished in the other Line of Business sales. To determine the fair market value, I use the weighted average of the determined value across the six Lines of Business for which I have carve-out income statements.[64] I summarize the results of this Line of Business sale approach – equivalent treatment of revenues for all entity types – in Table 3.[65]

---

[61] Carve-Out Income Statements, *supra* note 16.

[62] $\frac{\$106\ million}{\$595\ million} = 0.18$

[63] Cash Summary, *supra* note 3.

[64] Such an assumption has little effect on the overall apportionment. Even if 0% of the value from these other Lines of Business was distributed to the U.S. Debtors, the overall share of value owed to the U.S. Debtors would fall by less than 1%. Further, my assumption is defensible given what I know regarding the geographic distribution of the Layer 4-7 and Next Generation Packet Core Lines of Business. First, the Layer 4-7 Line of Business was part of the Enterprise Solutions Business Segment, and 58.2% of the revenue associated with the Enterprise Line of Business was earned in the U.S. NNC 2011 10-K, *supra* note 34, at 78; Carve-Out Income Statements, *supra* note 16. Likewise, the Next Generation Packet Core Line of Business was part of the WN Business Segment, and 71.7% of the revenue associated with the other WN Lines of Business (CDMA & LTE and GSM) was earned in the U.S. NNC 2009 10-K, *supra* note 16, at 5; Carve-Out Income Statements, *supra* note 16. Furthermore, the entities that are listed as sellers in the Layer 4-7 and Next Generation Packet Core Lines of Business are distributed

Highly Confidential

**Table 3 –Value Relinquished in the Line of Business Sales: Equivalent Treatment of Revenues for All Entity Types[66]**

| | Value for Six Lines of Business ($ Billions) | Value for Next Generation and Layer 4-7 ($ Billions) | Total Value Relinquished ($ Billions) | Percentage |
|---|---|---|---|---|
| Canadian Debtors | $0.31 | $0.003 | $0.32 | 11.1% |
| EMEA Debtors | $0.54 | $0.005 | $0.54 | 19.0% |
| U.S. Debtors | $1.97 | $0.020 | $1.99 | 69.8% |
| **Total** | **$2.82** | **$0.028** | **$2.85** | **100%** |

42.    As a sensitivity check, I also perform separate calculations based on two profit measures: gross margin and contribution margin.[67] There are good reasons to consider value based on relative gross margin or contribution margin; value comes from profit contribution, not just revenue. However, while each of these measures may have different advantages, there are reasons to believe that the geographically-assigned costs reported in the carve-out income statements are not as consistent with the fair market value of the assets contributed as the revenues are. For example, NNL's revenue, summed across all available carve-out income statements is $0.55 billion.[68] This is nearly the same revenue reported for NNL in the detail

---

across the U.S., Canadian, and EMEA Debtors' jurisdictions. NNI_00814632 (Feb. 19, 2009, Layer 4-7 Asset Sale Agreement) [hereinafter Layer 4-7 ASA], at Exhibit A; NNC-NNL07789371 (Nov. 27, 2009, Next Generation Packet Core Sellers Disclosure Schedule to Amended Transaction Agreement), at 1; NNI_00825055 (Next Generation Packet Core License Termination Agreement), at 24. Finally, for Next Generation Packet Core, the buyers indicated that this Line of Business would yield a global presence: "With demand in the LTE market expected to expand worldwide going forward, Hitachi has decided to conduct this acquisition in order to quickly enter the LTE field on a global basis." Hitachi Acquires Software Assets Related to Next-Generation Mobile Communication Systems from Nortel Networks, Hitachi, Dec. 9, 2009, accessed Jan. 24, 2014, http://www.hitachi.com/New/cnews/091209.pdf.

[65] The final distribution of any Available Proceeds should match the percentage shares, regardless of whether Available Proceeds differ from that reported in December 2013.

[66] Percentages in Table 3 do not sum to total because Nortel Colombia is not included. *See supra* note 7.

[67] As I described in Footnote 47, gross margin is revenue minus cost of goods sold. Contribution margin is gross margin minus selling, general and administrative expenses.

[68] Carve-Out Income Statements, *supra* note 16.

Highly Confidential

supporting Nortel's consolidated income statement.[69] Further, the revenue share of NNL amongst the IEs is 12.1% across all carve-out income statements and 12.3% in the detail supporting Nortel's consolidated income statement. However, NNL's gross margin, as a share of revenue, is 57.4% across all carve-out income statements but only 39.0% in the detail supporting Nortel's consolidated income statement. Likewise, NN Ireland's contribution margin, as a share of revenue, is 41.6% across all carve-out income statements but only 29.3% in the detail supporting Nortel's consolidated income statement.

43.    In spite of these apparent drawbacks, valuation results based on gross margin and contribution margin are, with respect to the U.S. Debtors, very similar to the valuation results based on revenue. The share of value relinquished by the U.S. Debtors is 66.6% using 2009 gross margin and 71.1% using 2009 contribution margin, compared to the 69.8% share derived from the revenue-based valuation discussed above.[70]

### 2.    Using a Market-Based Multiple for Non-IEs

44.    In the first approach, presented above, I treat revenue earned by IEs and non-IEs alike and apportion proceeds based on relative revenue share. However, in the second approach, presented here, I account for the fact that IEs incurred additional risk as compared with non-IEs, and that a dollar of revenue earned by the IEs likely reflects a greater value compared to a dollar of revenue earned by the non-IEs. To consider this, I directly calculate the value relinquished by the non-IEs. Specifically, in considering the value relinquished by the non-IEs in the Line of

---

[69] Carve-Out Income Statements, *supra* note 16, at tab "FY09 10-K IS."

[70] Because overall contribution margin among the entities that relinquished value in the Enterprise Line of Business is negative, I use the weighted average of contribution margin shares across the other Lines of Business to determine value relinquished in the Enterprise sale.

Highly Confidential

Business sales, I adopt the market approach, and I rely on a variety of sources to ascertain revenue multiples. I then subtract the value of the non-IEs from the total proceeds to determine the value relinquished by the IEs.

45.     The calculation here is the same as the calculation in the previous section: I use relative revenue share to determine the value relinquished by the IEs. The only difference is that I use a market-based multiple to value the non-IEs first. I illustrate this in Exhibit 10.[71]

### a)     Multiples for Non-Integrated Entities

46.     The non-IEs had different business models than the IEs. Many of them were simply resellers of Nortel products; they took minimal business risks compared to the IEs. As such, the value relinquished by these entities should be based on their value added as distributors.

47.     To estimate the value relinquished by Nortel's non-IEs, I first consider a set of comparable resellers selected in Nortel's transfer pricing agreements to establish the returns paid on third-party sales to resellers.[72] This is an appropriate set of comparable firms because this set was agreed upon by Nortel and presented to the tax authorities.[73] I also conducted an independent search for comparable firms, *i.e.,* resellers of technology similar to Nortel's, in order

---

[71] Among the non-IEs that relinquished value, thirteen were characterized by Nortel as Limited Risk Entities ("LREs"). (LREs are also characterized as "Limited Risk Distributors" and "Limited Risk Service Entities.") NNI_EQUINOX_00003390 (Nortel Limited Risk Distributors & Service Entities). An LRE is an entity "that earns a return for its routine distribution function." 2008 APA Request, *supra* note 14, at 6. Among the entities that relinquished value, 2009 R&D expenditures across LREs totaled $0.2 million in 2009, out of a total of $1.13 billion. Carve-Out Income Statements, *supra* note 16, at tab "FY09 10-K IS." The remaining non-IEs that relinquished value are identified as "excluded" in Nortel's TPA worksheets. I understand that several types of entities are excluded, including JVs and "immaterial entities." Ex. 31120, NNI_01503360 (Mar. 9, 2006, Transfer Pricing – Meeting with French Tax Authorities), at 28. For the purposes of my analysis, I treat all non-IEs alike.

[72] 2008 APA Request, *supra* note 14, at 47.

[73] 2008 APA Request, *supra* note 14, at 8, 19.

Highly Confidential

to confirm the reliability of the multiples established by the comparable firms selected in Nortel's transfer pricing agreements.[74] In both cases, I calculate the relationship between total enterprise value and revenue earned for these comparable firms and apply this relationship in order to estimate the value relinquished by each of Nortel's non-IEs. (See Exhibit 12).

48.      The median revenue multiple for each of the two sets of comparable firms can be seen in Exhibit 13. The multiple of 0.15 derived from the set of firms listed in Nortel's transfer pricing agreements (meaning that each dollar of revenue represents 15 cents of total enterprise value) is close to the multiple of 0.18 from my own independent search of comparable firms.[75] As such, I apply the multiple of 0.15 to the revenue of all non-IEs in order to calculate each entity's contribution to the overall value of the Line of Business sales.

### b)      Results Using the 2009 Revenues

49.      As reflected in Exhibit 10, I calculate the value relinquished by the non-IEs by multiplying their revenue by multiples established by comparable firms. I deduct the value relinquished by each non-IE from the proceeds for each Line of Business. The remaining proceeds are then distributed to each of the five IEs based upon the relative revenue in each Line of Business.

---

[74] See Exhibit 11 for a summary of my selection criteria for companies comparable to Nortel's LREs.

[75] *See* NNI_00867914 (Oct. 31, 2008, Appendix Q-2 of Joint Request Request for Bilateral APA 2008: Search for Comparable Uncontrolled North American Resellers of Information Technology Products), at 16; NNI_00867979 (Oct. 31, 2008, Appendix Q-3 of Joint Request Request for Bilateral APA 2008: Search for Comparable Uncontrolled EMEA Resellers of Information Technology Products), at 16; NNI_01015781 (Oct. 31, 2008, Appendix Q-4 of Joint Request Request for Bilateral APA 2008: Search for Comparable Uncontrolled APAC Resellers of Information Technology Products), at 15.

Highly Confidential

50.    Next, the value relinquished by each entity is added across all Lines of Business. Finally, in order to determine the value relinquished by each Debtor Group, I add the value relinquished by the non-IEs to the proceeds distributed to the IEs within each Debtor Group.

51.    In Exhibit 14, I calculate the value relinquished by each Debtor Group for the six Line of Business sales for which carve-out income statements exist. I summarize the results of this Line of Business sale approach – using a market-based revenue multiple for non-IEs – in Table 4 below. As in the previous section, I apply these relinquished value shares to the remaining two Line of Business proceeds for which I do not have carve-out income statements.[76]

### Table 4 – Line of Business Value Relinquished: Using a Market-Based Revenue Multiple for Non-IEs[77]

| | Value for Six Lines of Business ($ Billions) | Value for Next Generation and Layer 4-7 ($ Billions) | Total Value Relinquished ($ Billions) | Percentage |
|---|---|---|---|---|
| Canadian Debtors | $0.36 | $0.004 | $0.36 | 12.7% |
| EMEA Debtors | $0.48 | $0.005 | $0.49 | 17.1% |
| U.S. Debtors | $1.98 | $0.020 | $2.00 | 70.2% |
| **Total** | **$2.82** | **$0.028** | **$2.85** | **100.0%** |

52.    Comparing the results obtained from treating revenue from all entities equally (Table 3) and the results from applying a lower multiple to lower risk entities (Table 4) shows that the difference in value is at most 2% for any of the Debtor Groups.

---

[76] The calculation in this section treats all the non-IEs in a similar manner. There are three entities (Nortel GmbH, Nortel Networks Israel (Sales and Marketing) Limited, and Nortel Networks France S.A.S.) that are considered to be At-Risk Entities ("AREs"). Ex. 31443, NNC-NNL06695580 (Jan. 14, 2009, Witness Statement of Sharon L. Rolston), at 11. These entities may have accepted additional risk as compared with the LREs. To investigate the robustness of my calculation, I perform a sensitivity check of my multiple-adjusted results by treating AREs as IEs (while continuing to apply a multiple to value non-IEs other than the three AREs). Applying this method, the Canadian Debtors relinquished assets valued at $0.34 billion, the EMEA Debtors at $0.53 billion, and the U.S. Debtors at $1.94 billion. These values are only slightly different from the results shown in Table 4.

[77] Value for the Layer 4-7 and Next Generation Packet Core Lines of Business reported in Table 4 does not sum to total due to rounding.

Highly Confidential

C.    **Results Using 2007-2009 Revenues**

53.    2009 revenues are the best representation of the financial performance of the Lines of Business at the time of sale, and are thus generally a more appropriate basis for determining value. However, a buyer may reasonably consider the trends and history of the acquired asset. Accordingly, and to investigate the robustness of my analysis, I examined financial metrics for previous years.[78]

54.    The share of total revenue in 2007 was 13.9% for the Canadian IE, 22.3% for the EMEA IEs, and 63.8% for the U.S. IE. The revenue shares in 2008 were 12.3% for the Canadian IE, 22.7% for the EMEA IEs, and 64.9% for the U.S. IE. 2009 revenue shares were 12.3% for the Canadian IE, 18.4% for the EMEA IEs, and 69.3% for the U.S. IE. The differences in these revenue shares for 2007 and 2008 compared with 2009 should be put into historical context. Exhibit 6 shows the revenue share by IE from 2001-2009. Over this period, the weighted average revenue shares were 12.6% for the Canadian IE, 17.9% for the EMEA IEs, and 69.5% for the U.S. IE.[79] This shows that the 2007 and 2008 relative revenue shares were somewhat anomalous, indicating that the 2009 revenue figures are most consistent with the relative historical performance of the IEs.

55.    Moreover, my valuation results are not sensitive to using data from 2007 and 2008. In Exhibit 15, I summarize results using 2007 and 2008 revenues, as well as average

---

[78] For 2007 and 2008, I only have carve-out income statements for five Lines of Business. For the three Lines of Business for which I do not have carve-out income statements (MSS, Layer 4-7 and Next Generation Packet Core, with aggregate proceeds of $0.074 billion, Cash Summary, *supra* note 3), as with my 2009 apportionment, I assume that the distribution should be the same as the weighted average distribution across the five Lines of Business for which I have carve-out income statements.

[79] These shares are calculated by taking the total IE revenue for each Debtor Group across all years and dividing by the total IE revenue for all three Debtor Groups across all years.

Highly Confidential

revenues from 2007-2009. I perform these calculations both with equivalent treatment of IE and non-IE revenue and with different treatment of IE and non-IE revenue, as discussed above. Using the average 2007-2009 revenues indicates only small differences from the results obtained using 2009 revenues.

56.     Because 2009 revenues are the most current, because the 2007-2008 revenues are somewhat anomalous compared to the historical 2001-2009 weighted average revenue shares, and because using the average 2007-2009 revenues indicates only small differences from the results obtained using only the 2009 revenues, I rely upon the results from the 2009 analysis in reaching my valuation conclusions.

### D.     Sensitivity to Regional Growth Rates

57.     Still, a buyer looks to future revenues and profits, not merely historical revenues and profits, in assessing value. Accordingly, I also examined whether the 2009 results are proportional to, and consistent with, reasonable expectations (as of approximately 2009) of future results.

58.     It is possible that relative regional performance of the different Lines of Business might have been expected to change after 2009. In particular, it is conceivable that the global financial crisis and Great Recession fundamentally changed the business landscape and as such, a buyer of Nortel's Lines of Business expected growth at different rates across the jurisdictions of the three Debtor Groups. Such differences in growth expectations, if they existed, could lead to different values per current revenue dollar.

59.     To illustrate why this is important in calculating the value relinquished in the Line of Business asset sales, reflect again on the simple example discussed earlier in this report. (See

Highly Confidential

Paragraph 25.) Suppose that the two subsidiaries, A and B (which earn $40 and $60 per year, respectively, as part of a firm that earns $100 per year), are in regions that are expected to grow at different rates. Let us assume that subsidiary A is in a region that is expected to grow at 10% per year, whereas subsidiary B is in a region that is expected to grow at 2% per year. Because the value of the firm depends not only on current earnings but also on the future stream of earnings, subsidiary A contributes more than 40% of the value of the firm.

60.     By this logic, and using the 2009 carve-out revenue amounts for each entity as a base, as long as the expected growth rate of the U.S. Debtors' revenue is at least equal to the growth rate across the other Debtor Groups, using the U.S. Debtors' share of 2009 revenues is conservative (*i.e.*, understates value to the U.S. Debtors, or at least does not overstate it). I conclude that this is the case based on the following:

61.     First, in Exhibit 16, I present forecasts that were prepared by Nortel management in order to give prospective buyers general information about the Lines of Business.[80] These forecasts show that Nortel anticipated strong growth in North America relative to other regions.

62.     Although I believe that these forecasts are reasonable, they do not contain growth rates across all regions for each Line of Business. Accordingly, I investigate other, broad indicators of growth.

63.     As shown in Exhibit 17, Gross Domestic Product ("GDP"), a common indicator for broad economic performance, was forecasted in 2009 to grow in the U.S. at a rate close to the jurisdictions of the other Debtor Groups over the subsequent five years. I contrast this result with

---

[80] NNI_NARNIA_00197426 (July 9, 2009, Nortel CDMA Information Memorandum), at 2; NOR_54380696 (May 2009, CVAS Information Memorandum), at 2; NNC-NNL05153143 (Oct. 2009, GSM Information Memorandum), at 2; NOR_54275577 (July 7, 2009, LTE Information Memorandum), at 2.

Highly Confidential

a telecommunications market forecast shown in Exhibit 18. This forecast predicts that telecommunications growth would not be as strong in the U.S. as in the regions of the other Debtor Groups. However, because the majority of the revenue was earned in the U.S., these small differences in growth rates have only a limited effect on revenue shares across the Debtor Groups. In Exhibit 19 and Exhibit 20, I illustrate the share of total value relinquished across the three Debtor Groups that my approach would imply if 2009 revenues are projected forward using both GDP and telecommunications industry forecasts. In both cases, the U.S. share of total value relinquished is not sensitive to different revenue projections.

64.     Taking into account the results discussed above, I conclude that using 2009 data is appropriate.

### E.     Summary of Line of Business Value Relinquished

65.     As stated above, I valued the Line of Business sales treating revenue from all entities equally and, alternatively, using a lower multiple for lower risk entities. I consider both of these approaches to be reasonable. Thus, in considering the results from both approaches, and based on my review of materials in this case and my experience, my opinion is that the fair market value of the assets the Canadian, EMEA and U.S. Debtors relinquished in the Line of Business sales is $0.34 billion, $0.51 billion, and $1.99 billion, respectively. These results are presented in Table 5 below.

Highly Confidential

**Table 5 – Line of Business Sales Valuation Summary[81]**

| | Total Value Relinquished ($ Billions) | Percentage |
|---|---|---|
| Canadian Debtors | $0.34 | 11.9% |
| EMEA Debtors | $0.51 | 18.0% |
| U.S. Debtors | $1.99 | 70.0% |
| **Total** | **$2.85** | **100%** |

## IX.    NORTEL'S INTELLECTUAL PROPERTY PORTFOLIO

66.    In addition to the assets conveyed in the Line of Business sales, Nortel also held significant intellectual property assets.

### A.    How Firms Derive Value from Rights to Patented Technology

67.    The owner of a patent has the right to exploit the invention claimed in the patent and the right to exclude others from making, using, offering for sale, selling, and importing that same invention.[82] A patent owner may also license the technology to another firm either through an exclusive or non-exclusive license, and may include in the license the right to sub-license the technology to other firms, as well as the right to enforce. The patent owner may receive compensation in a number of forms including a royalty payment or a cross license, giving the patent owner the right to exploit some of the licensee's patented technology.

68.    The licensee has an economic right to the technology and may exploit it, among other ways, through an exclusive or non-exclusive license agreement. To the extent a patent

---

[81] Value and percentages in Table 5 do not sum to total because Nortel Colombia is not included. *See supra* note 7.

[82] World Intellectual Property Organization, *WIPO Patent Drafting Manual* (2010), at 7, accessed Jan. 24, 2014, http://www.wipo.int/export/sites/www/freepublications/en/patents/867/wipo_pub_867.pdf. *See also* United States Patent Code, 35 U.S.C., Sec 154 (a) (1), accessed Dec. 24, 2013, http://www.gpo.gov/fdsys/pkg/USCODE-2011-title35/html/USCODE-2011-title35-partII-chap14-sec154.htm. If the patent owner believes another party is infringing on its patent, and a license agreement cannot be negotiated, the patent owner may sue the alleged infringer for damages in the form of lost royalties, past and future, under its right to exclude.

Highly Confidential

owner grants a party an exclusive license to all the rights granted under the patent, the licensee effectively holds all the economic rights to the patent that had previously belonged to the patent owner for the term of the license.[83] For example, if a patent owner were to grant a perpetual, exclusive, royalty-free license to exploit the patent in a particular territory, the licensee, not the patent owner, would be the sole entity that could license or exploit that technology in that region. If the license also included the right to sub-license, then the licensee may allow other firms to exploit the technology.

69.     The value of patent rights is influenced by a number of factors, including the quality of the licensed technology and the size of the market or potential market for goods and services that employ the patented technology.[84] The quality of the licensed technology is determined by a number of factors, including "the breadth and depth of the technology," "the uniqueness or novel nature" of the technology and "competing or existing technologies."[85] Although compensation received for licensing a patent can take different forms, economically, the value of a license is driven by the profits a licensee could obtain by using the patented

---

[83] "Exclusivity in licensing is the legal basis for beneficial ownership of a right by the licensee since it transfers to the licensee some of the patentee's monopoly rights […] In the case of an exclusive licence, the licensee becomes the only person entitled to make use of the patent in the fields specified in the licence," CIRD210120 - Patent Box: qualifying companies: exclusive licence: meaning of exclusive licence, Her Majesty's Revenue and Customs (HMRC), accessed Jan 24, 2014, http://www.hmrc.gov.uk/manuals/cirdmanual/CIRD210120.htm.

[84] *See, e.g.*, Bas Straathof and Sander van Veldhuizen, "Market size, education, trust, and the value of IPRs: Evidence from the validation of European Patents," Aug. 31, 2011, at 3, accessed Jan. 24, 2014, http://www.epip.eu/conferences/epip06/papers/Parallel%20Session%20Papers/STRAATHOF%20Bas.pdf. ("We find that the value of a patent is positively related to the potential demand for the underlying invention, i.e., the larger the market the more valuable the patent is."). *See also* Yu-Jing Chiu and Yuh-Wen Chen, "International Symposium on the Analytic Hierarchy Process (ISAHP): Using AHP on Patent Valuation," Conference Report (2005), accessed Jan. 24, 2014, http://www.isahp.org/2005Proceedings/Papers/ChiuYJ_ChenYW_AHP_PatentValuation.pdf.

[85] Weston Anson, *Fundamentals of Intellectual Property Valuation: A Primer for Identifying and Determining Value* (Weston Anson & Donita Suchy, eds., 2005) [hereinafter Weston Anson 2005], at 76.

Highly Confidential

technology. As market size is important to determining sales and profits, it is a key factor in determining the value of a patent to its owner or a license holder.[86]

### B. Nortel IPCo Business Plan

70.    In 2008, Nortel management began exploring options to more aggressively monetize Nortel's patent portfolio. John Veschi began working for NNI on July 28, 2008, as the lead person in charge of this effort.[87] Mr. Veschi was tasked with developing a model business plan for a patent licensing business with the aid of a group of Nortel employees from the Chief Technology Group Office.[88] Nortel's impending bankruptcy filings, however, stalled this effort.

71.    In 2009, following the commencement of the various creditor protection proceedings, it was decided that the assets associated with the various Lines of Business would be sold. To further these Line of Business sales, a team of Nortel's IP employees, working under Mr. Veschi, identified which Nortel patents were exclusively or predominantly used – the standard depended on the particular Line of Business sale – in each Line of Business in order to determine which patents were to be transferred to the buyers.[89] The patents and applications not

---

[86] I discuss the application of market size in determining patent value in greater detail in Paragraph 134.

[87] Veschi Dep. Nov. 7, 2013 45:6–45:16.

[88] Veschi Dep. Nov. 7, 2013 38:11–23 ("Up until my hiring, Nortel hadn't been very programmatic or aggressive in asserting and/or licensing its patents and they were looking to – me to come in and build a licensing business much like the one I now run at Rockstar. Again, not knowing Nortel was going to go bankrupt, the plan was that the business I now run would have, if things went the way I thought they were going to go, would be one of the business units within Nortel going forward, similar to Texas Instruments or Qualcomm or IBM or Ericsson or a lot of other companies that have licensing businesses that are important to the success of the company.").

[89] NNI_00821708 (Sept. 24, 2010, MSS Asset Sale Agreement), at 31-32, 43-44; NNI_00803798 (July 24, 2009, CDMA & LTE Asset Sale Agreement), at 28; NNI_00806387 (Sept. 14, 2009, Enterprise Amended and Restated Asset Sale Agreement Relating to the Sale and Purchase of the EMEA Assets), at 49-50; NNI_00810458 (Nov. 24, 2009, GSM Asset Sale Agreement), at 31; NNI_00823699 (Oct. 25, 2009, Next Generation Packet Core Transaction Agreement), at 15; NNI_00817023 (Nov. 24, 2009, MEN Amended and Restated Asset Sale Agreement), at 37; NNC-NNL06001609 (Dec. 22, 2009, CVAS Asset Sale Agreement), at 36. The Layer 4-7 sale

Highly Confidential

exclusively or predominantly used in a single Line of Business were not sold in the Line of Business sales.[90] Instead, these remaining patents and applications remained with Nortel and comprise the Patent Portfolio. Accordingly, the Patent Portfolio includes patents and applications that were used both across multiple lines of business, and used previously within single lines of business, as well as patents and applications that could be used within or across lines of business in the future. Buyers in the Line of Business sales were given non-exclusive licenses to certain patents in the Patent Portfolio for use restricted to the particular Line of Business purchased.[91]

72.    The Patent Portfolio, consisting of 4,353 patents and 2,786 applications[92] from thirty-two countries, covers a broad range of telecommunication and information technologies including wireless/mobile communication, wireless/mobile 4G/Next Generation communication,

---

was an exception, and the ASA provided a specific list of IP transferred in the sale. *See* Layer 4-7 ASA, *supra* note 64, at 16.

[90] The applicable standard of "predominately" or "exclusively" varied depending on the sale.

[91] *See, e.g.,* ███████ (███████████ Intellectual Property License Agreement), at ██ ("Licensed Intellectual Property. Subject to the terms and conditions of this Agreement, Nortel and its Affiliates hereby grant to Licensee a perpetual, irrevocable, non-exclusive, non-assignable . . . non-sublicensable . . . worldwide, royalty-free, fully paid-up license (i) under the Licensed Patents to make, develop, use, lease, sell, offer for sale, support, service and import and otherwise dispose of any products and services and to practice and have practiced any methods therein . . ."); ███████ (defining "Licensed Patents" as "all of the Patents and patent applications (including Patents later issuing thereon) Controlled or exclusively owned by Nortel or any of its Affiliates as of the Effective Date but in each case solely to the extent such Patents and patent applications (i) are used in the Business . . . as of the Effective Date or (ii) cover █████████████ products or natural evolutions thereof.").

[92] In this report, I use the term "patent" to refer to a patent that had been granted at the time of the respective Patent Portfolio sale. "Application" refers to a patent application that was filed but not yet granted at the time of the respective Patent Portfolio sale. I rely on the Annexes to the Sellers Disclosure Schedule Pursuant to Rockstar Asset Sale Agreement dated as of June 30, 2011 to identify the patents and applications sold by Nortel to Rockstar. NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab); *See also* GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction).

Highly Confidential

wired/fixed communications, voice communication, service providers/carrier management, semiconductors, and internet search and social networking technology.[93] (See Exhibit 21).[94]

73.    While they considered Line of Business sales, the various Debtor Groups also considered and developed a plan to monetize the Patent Portfolio. As mentioned above, the Debtor Groups jointly retained Lazard[95] as their financial advisor in bankruptcy and then jointly retained Global IP[96] to assist in developing a business plan for the Patent Portfolio.[97] Both Lazard and Global IP were retained through motion by the U.S. Debtors and court order.

---

[93] GIP_Nortel_00080080 (May 2010, Iceberg Teaser) [hereinafter May 2010 Project Iceberg Executive Summary], at 5.

[94] While the patent portfolio as a whole was largely unencumbered, there were approximately two dozen active patent agreements as of July 29, 2011. NNI_00799378 (July 29, 2011, Active Patent and Technology Summary as of Q2). Prior to the Patent Portfolio sale, license agreements for patents in the Patent Portfolio had generated roughly $157 to $200 million in total license revenue. May 2010 Project Iceberg Executive Summary, *supra* note 93, at 6; US_EMEA_Canada_PRIV_00191069 (Mar. 10, 2010, IPCo Update to Nortel Leadership Team) [hereinafter Mar. 2010 IP Co. Update to Nortel Leadership Team]; GIP_Nortel_00230256 (Jan. 29, 2010, Patent Portfolio Analysis Phase One) [hereinafter Jan. 2010 Patent Portfolio Analysis Presentation], at 7. Historical licensing generated approximately $37 million per year in royalty income. GIP_Nortel_00064228 (Nortel Patents Overview) [hereinafter 2011 Nortel Patents Overview Final], at 6.

[95] Nortel, including NNI and all subsidiaries, jointly retained Lazard as "its strategic advisor and investment banker . . . in connection with any potential Restructuring, Sale Transaction, Financing or Other Transaction," on January 13, 2009. Application for an Order Authorizing Employment and Retention of Lazard Frères & Co. LLC *Nunc Pro Tunc* to the Petition Date as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Feb. 13, 2009, Exhibit C [D.I. 294-4]. The Court approved Lazard's retention on March 20, 2009 retroactive as to the Petition date. Order Under 11 U.S.C. §§ 327 and 328 Authorizing Retention and Employment of Lazard Frères & Co. LLC as Financial Advisor and Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date, Mar. 20, 2009 [D.I. 507].

[96] The Nortel estates, in consultation with their legal and financial advisors as well as representatives of the Committee and the Bondholder Group, selected Global IP, and negotiated the terms of the Master Services Agreement ("MSA") and initial Scope of Work ultimately entered into by Global IP and jointly by NNL, NNI, NNUK, and NN Ireland on October 15, 2009, and by NNSA by side letter on November 30, 2009. NNI_01393131 (Oct. 15, 2009, Master Consulting Agreement); NNSA Accession Letter, dated Nov. 30, 2009; Application for an Order Authorizing Employment and Retention of Global IP Law Group, LLC *Nunc Pro Tunc* to October 13, 2009 as Intellectual Property Consultants to the Debtors and Debtors in Possession, Oct. 30, 2009 [D.I. 1796]. The MSA provided that the Nortel parties jointly owned all "Deliverables, including Intellectual Property rights in the deliverables." It further provided for weekly update meetings between Global IP and each of the estates. The MSA also provided that Global IP's fees and expenses would be shared by all the Nortel parties but that NNL would be invoiced and then reimbursed by the other estates pursuant to a separate agreement. On October 30, 2009, shortly after the execution of the MSA, the estates sought court approval for retention of Global IP as "intellectual property consultant to the Debtors (as well as certain of their affiliates)," for work "Global IP will render [for]

Highly Confidential

74.     During 2010 and 2011, the Debtor Groups and their representatives, working with managers of certain Nortel affiliates, considered three options for monetizing Nortel's Patent Portfolio: (1) selling the Patent Portfolio as a single portfolio;[98] (2) selling the Patent Portfolio piecemeal; and (3) creating the IPCo Model, a stand-alone licensing business entity to exploit the Patent Portfolio.[99] During that time, Nortel actively considered operating the IPCo business to monetize the Patent Portfolio.[100]

75.     As part of the IPCo business plan, Mr. Veschi's internal IP team, working with Global IP and Lazard, developed a financial model for a licensing entity (the IPCo Model) based on patent classification, associated estimated royalty rates for each market, and projected income and cash flow broken down by technology area over the next ten years based on the estimated royalty rates.[101] The Nortel IP Group, Global IP and Lazard used their combined expertise as well as third-party analyst reports and other relevant sources from within and outside the corporate group to develop the IPCo business plan.[102] Each Debtor Group and its advisors,

---

consulting and advisory services to the Debtors, NNL, NNUK and NN Ireland with respect to the Residual Patent Portfolio." *Id.* at 13, 25.

[97] LAZ-NRTL-00038046 (Mar. 22, 2010, Patent Portfolio Work Plan) [hereinafter Patent Portfolio Work Plan], at 3.

[98] *Id.* at 4.

[99] *Id.*; US_EMEA_Canada_PRIV_00184539 (IPCo NYC Working Session: Scenario #2) [hereinafter IP Co. Scenario #2 Presentation].

[100] NNI_00324033 (Feb. 2011, email chain entitled, "IP Milestone & Metrics – February, 2011"); NNI_00612845 (Jan. 2011, email chain entitled, "Re: Nortel IP | Follow-Up Information Request"); GIP_Nortel_00089270 (Apr. 25, 2011, email entitled, "Fwd: IPCo. Model 4.0").

[101] LAZ-NRTL-00021779 (Oct. 25, 2010, IPCo Model 3.1 Update); IP Co. Model 3.1, *supra* note 4.

[102] Riedel Dep., Oct. 10, 2013 63:18–64:3 ("There were a number of parties involved. John Veschi was the then chief intellectual property officer. He and his team were involved in developing the plan. Nortel had hired Global IP Law Group. The principal there was Dave Berten. Nortel had retained Lazard or the creditors had retained Lazard Frères investment banking to help model and run the M&A process so those were the principal architects of the plan.").

Highly Confidential

members of Nortel management, and representatives of certain creditor constituencies[103] were involved in the consideration and development of these options and vetted multiple iterations of the business plan.[104]

76.     Ultimately, the sale of the Patent Portfolio as a single portfolio emerged as the preferred strategy. On April 4, 2011, NNC, NNL, NNI, NNUK, NNSA, and certain other Nortel affiliates entered into a stalking horse agreement with an affiliate of Google Inc. to sell the Patent Portfolio for $0.90 billion.[105] This stalking horse agreement resulted from an initial process for soliciting bids and negotiations with the stalking horse bidder.[106] The U.S. Debtors and Canadian Debtors filed the agreement with the U.S. Bankruptcy Court in Delaware and the Ontario Superior Court of Justice, respectively, and sought approval for the sale of the Patent

---

[103] *See, e.g.*, Ex. 11150, CCC0001356 (July 8, 2009, IP Aspects of Residual Co.); *see also* Veschi Dep. Nov. 7, 2013 69:18–71:12 (describing Exhibit 11150 as a presentation given on July 8, 2009 to "the creditors in general from the various estates"); Ex. 22097 (Dec. 16, 2009, Patent Portfolio Analysis Phase One – Ottawa Presentation); Veschi Dep. Nov. 7, 2013 94:2–13 (discussing Exhibit 22097 and stating, "So if you go to the summer that we were having the first meeting with the creditors, the fall when we hired Global IP, this is probably their first read-out to the various estates. And I remember something on the order of a hundred people coming here, staying in this hotel, visiting us at the Carling campus, and then we did a tour of our reverse engineering lab, walked people through the anatomy of a patent, because a lot of people had never seen a patent before, and David went through this presentation that I'm guessing is this one"); Ex. 22098 (March 17, 2010 email to creditors, attaching "the discussion material's for today's meeting" entitled, "Nortel IP Update to Creditor Committees (Mar 17)"); Riedel Dep. 124:21–125:4 ("Q. Who was involved in the creation of IPCo. other than as I believe you testified yourself Global IP and Lazard? A. John Veschi's team, the IP licensing team that reported to me was heavily involved. It was reviewed by the creditors and their advisors as we went through the journey and the board and others."); Riedel Dep. 126:14–20 (testifying that the Unsecured Creditors Committee was involved in the IPCo exercise).

[104] *See, e.g.*, Riedel Dep. 118:10–11 ("The creditors were clearly involved in anything we did with IPCo. . . ."); Ray Dep. 129:22–130:9, Dec. 13, 2013 (". . . We had a steering committee, which was comprised of the US estate, Canada and EMEA. And, jointly, the three estates commissioned Lazard to run and develop certain models in connection with a couple different alternatives, including IPCo, which was the business that -- that would allow each of the geographic regions to continue as a going concern basis to exploit the IP in their jurisdiction, but it also looked at different ways of trying to kind of value the intellectual property. . . .").

[105] GIP_Nortel_00089277 (Apr. 4, 2011, Google Stalking Horse Agreement), at 2, 30.

[106] Nortel to Sell Patent Portfolio, Nortel Networks Corporation, Apr. 4, 2011, accessed Nov. 25, 2013, http://www.nortel-canada.com/2011/04/nortel-to-sell-patent-portfolio/.

Highly Confidential

Portfolio.[107] A formal auction process was undertaken to solicit competitive bids. At the auction held in late June 2011, bidders included Google, Apple, Intel, and two consortia: Norpax and Rockstar Bidco ("Rockstar"). On June 30, 2011, after nineteen rounds of bidding, Rockstar (a consortium of Apple, EMC, Ericsson, Microsoft, Research in Motion, and Sony) purchased the Patent Portfolio for $4.5 billion.[108] After various third-party fees and transaction costs, the total Patent Portfolio sale proceeds available for distribution is $4.45 billion.[109]

## X.    VALUE RELINQUISHED BY THE DEBTOR GROUPS IN THE PATENT PORTFOLIO SALE

### A.    Patent Portfolio Overview

77.    The Patent Portfolio consists of 7,139 patents and applications filed around the world.[110] Many of these patents and applications share common end product markets. The Patent Portfolio was sold in its entirety in a single transaction and, accordingly, it should be valued as a single aggregate asset.[111]

---

[107] The approval was based on a stalking horse bid for the assets by Ranger Inc. and Google Inc. *See* Order (A) Authorizing Debtors' Entry Into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Approving the License Rejection Procedures, (E) Approving a Side Agreement, (F) Authorizing the Filing Of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, May 2, 2011 [D.I. 5359]; Approval and Vesting Order of the Ontario Superior Court of Justice (Commercial List) dated July 11, 2011, *Re Nortel Networks Corp.* (Court File No. 09-CL-7950).

[108] *See* Transcript of Record at 40:22 – 41:21, In re. Nortel Networks, et al. (July 12, 2011) [D.I. 5939], at 40:22 - 41:21. Purchase price listed as $4,500,000,000 plus an additional amendment fee of $5,000,000. NNI_00825094 (June 30, 2011, Rockstar Asset Sale Agreement) [hereinafter Rockstar ASA], at 30; NNI_00825205 (July 29, 2011, Amendment to Rockstar Asset Sale Agreement), at 4. For purposes of my report, I did not separately consider the distribution of the $5,000,000 amendment fee; however, I understand such fee should properly be divided solely between the U.S. Debtors and EMEA Debtors. *See* NNC-NNL06002580 (July 27, 2011, Second Amended and Restated IP Transaction Side Agreement).

[109] Summary of funds contained in the escrow account from the Patent Portfolio sale to Rockstar as of December 31, 2013. Cash Summary, *supra* note 3.

[110] The Patent Portfolio is made up of over 3,400 patent families.

[111] "[T]he advantages of patent portfolios far exceed the value of [the] individual patents[.] [W]ell-crafted patent portfolios have features of both scale (broad protection of subject matter) and diversity (diminished reliance on any

Highly Confidential

78.    The value of the Patent Portfolio is derived not only from the value of the individual patents, but also from the inherent synergies between the patents. Moreover, value tends to increase with portfolio size within a particular country.[112]

79.    The patents and applications in the Patent Portfolio were filed in thirty-two countries or as a part of the European Patent Office ("EPO") and Patent Cooperation Treaty ("PCT") processes. However, most of the intellectual property in the Patent Portfolio was either exclusively patented in the U.S. or patented in the U.S. first. Nortel organized the group's portfolio of patents and applications into "Technologies"[113] that generally represented an idea or piece of intellectual property that was patented and/or for which an application was filed in one or more territories. As shown in the first row of Table 6, 73% of all Technologies in the Patent Portfolio had patents or applications *only* in the U.S., and only 3% of all Technologies did not have a patent or application in the U.S.[114]

---

single patent) that enable portfolio holders to simultaneously wield significant marketplace power while hedging against the risk and uncertainty inherent in innovation-driven commercial activities." Gideon Parchomovsky and R. Polk Wagner, "Patent portfolios," *University of Pennsylvania Law Review* 154 (2005) [hereinafter Parchomovsky and Wagner 2005], at 29.

[112] Alfonso Gambardella, Dietmar Harhoff, and Bart Verspagen, "The Economic Value of Patent Portfolios," *Centre for Economic Policy Research Discussion Paper No. 9264* (2013) [hereinafter Gambardella et al. 2013], at 1. "Value may arise […] from the combination of inventions that represent different components of a more complex product or process. […] [V]alue increases by portfolio size, that is, by raising the number of inventions in the portfolio." "[C]omplementarity […] arises […] if effort exerted toward one invention increases the value of the other inventions in the portfolio—the typical situation when inventions as a whole are worth more than their sum." *Id.* at 19.

[113] I refer to these as Technologies. The Nortel IP law group identified them as assets listed in rows in both the spreadsheet prepared by Global IP, and the schedules to the Rockstar sale agreement. See GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction); NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab). *See also* Exhibit 22.

[114] Table 6 reports that 97% of Nortel Technologies had a patent or application in the U.S. The remaining 3% of Nortel Technologies did not have a U.S. patent or application.

Highly Confidential

80.     As part of the evaluation of strategic options leading up to the sale of the Patent Portfolio, Global IP, the outside professionals retained to assist the Debtor Groups in this exercise, evaluated the relative importance of the patents in the Patent Portfolio, classifying the patents as highest interest, high interest or other.[115] Table 6 shows the pattern of geographic distribution of patent interest level across Technologies in the Patent Portfolio. Of the Technologies with a highest interest patent, 66% were patented only in the U.S. with no patents or applications elsewhere. Of the high interest patented Technologies, 82% were patented only in the U.S. (See also Exhibit 22.)

**Table 6 – U.S. Share of Nortel Technologies**

| | Nortel Technologies | Technologies with Only U.S. Patents or Applications | | Technologies Including U.S. Patents or Applications | |
|---|---|---|---|---|---|
| | | Count | Percentage | Count | Percentage |
| **All Technologies** | | | | | |
| All | 3,745 | 2,747 | 73% | 3,641 | 97% |
| **Technologies with an Issued Patent** | | | | | |
| Highest interest | 411 | 270 | 66% | 405 | 99% |
| High interest | 1,045 | 852 | 82% | 1,043 | 100% |
| Neither high nor highest interest | 1,480 | 1,162 | 79% | 1,407 | 95% |

81.     The predominance of the U.S. patent filings in the Patent Portfolio can be seen not only in the Technologies that were patented exclusively in the U.S., but also in that most of the Technologies were first filed in the U.S. For all Technologies for which I have filing date information, 89% were filed first in the U.S. This statistic includes a large number of Technologies that were filed only in the U.S. Even among Technologies that were patented both

---

[115] Global IP marked highest interest patents with two asterisks and high interest patents with one asterisk. GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction).

Highly Confidential

in the U.S. and elsewhere, the application was filed first in the U.S. 62% of the time, indicating the importance to Nortel of securing patent rights in the U.S. market. (See Table 7.) Only 24% were filed outside of the U.S. before filing in the U.S. (See also Exhibit 23.)

**Table 7 – Location of Initial Filing of Patent Application in Both U.S. and Other Jurisdictions**

| Category | Number of Technologies | Percentage |
|---|---|---|
| **All Technologies with Filing Date Data** | | |
| Application is filed first in U.S. | 3,214 | 89% |
| Application is filed in U.S. and another country on the same day | 116 | 3% |
| Application is filed first outside U.S. | 286 | 8% |
| **Total** | **3,616** | |
| **Technologies with at least one U.S. and one non-U.S. Patent or Application** | | |
| Application is filed first in U.S. | 498 | 62% |
| Application is filed in U.S. and another country on the same day | 116 | 14% |
| Application is filed first outside U.S. | 191 | 24% |
| **Total** | **805** | |

82.    Another qualitative factor supporting the importance of U.S. patents to the Patent Portfolio concerns patents from the Patent Portfolio that are currently being litigated. The characteristics of litigated patents in a portfolio can shed light on the sources of value in a portfolio.[116] Since acquiring the Patent Portfolio in 2011, Rockstar and its subsidiaries have filed a number of complaints against various companies claiming infringement of certain patents acquired in the auction.[117] In addition, Spherix Incorporated, a purchaser of some of the Patent

---

[116] "[L]itigated patents are valuable to their owners and that, although not all valuable patents are litigated, litigated patents are a subset of valuable patents and analysis of their characteristics can shed light on value." John R. Allison, Mark A. Lemley, Kimberly A. Moore, and R. Derek Trunkey, "Valuable Patents," *Geo. L.J.* 92:435 (2004), at 443.

[117] Bockstar, Constellation Technologies, Mobilestar Technologies, and Netstar Technologies are the Rockstar subsidiaries who are participating in patent infringement lawsuits based on patents in the Patent Portfolio.

Highly Confidential

Portfolio patents from Rockstar, has also filed lawsuits for patent infringement. [118] The characteristics of the allegedly infringed patents suggest that the U.S. patents hold more value than those from other countries, as 36 of the 45 patents being litigated are associated with Technologies that were only patented in the U.S. (See Exhibit 24.) Although the patents cited in the complaints mentioned above represent only a small fraction of the Patent Portfolio, the fact that 36 of the 45 patents are in Technologies that do not have patents or applications in other countries suggests there is a substantial value in U.S.-only Technologies.

83.    Thus, considering where and when the patents and applications were filed, the characteristics of the litigated patents, and considering the MRDA's grant of perpetual, royalty-free, exclusive rights to the economic benefits from the patents to the participants in their respective jurisdictions (*i.e.*, the Exclusive Territories, as described below), the value relinquished by the U.S. Debtor Group was clearly greater than the value relinquished by the other Debtor Groups.

### B.    Rights Relinquished in the Patent Portfolio Sale

84.    It has been represented to me that under the MRDA each of the five IEs had exclusive rights to all NN Technology in its Exclusive Territory and had the right to exploit, sub-license, or defend a technology from infringement. The rights granted to each IE within its Exclusive Territory were exclusive, perpetual, and royalty-free. Although NNL held nominal

---

[118] "Spherix Incorporated (NASDAQ: SPEX) an intellectual property development and life sciences company, today announced that it has closed the previously announced agreement to acquire a group of seven patents in the mobile communication sector, from Rockstar Consortium, the owner of over 4,000 patents formerly owned by Nortel Networks." Spherix Closes Rockstar Patent Acquisition Transaction and Enhances its Patent Portfolio in Wireless Communications and Telecommunication Sectors – Rockstar Acquires Equity Stake in Spherix – Venture to be Headed by Seasoned Monetization Executive, Spherix, July 29, 2013, accessed Jan. 24, 2014, http://www.ip-rockstar.com/Press_Releases/Spherix%20-%20Rockstar%20Closing%20PR_%20v2%20072613.pdf.

Highly Confidential

legal title to all patents subject to the MRDA, it did not have the right to exploit or sub-license any patents in the Exclusive Territories other than Canada. In the non-Exclusive Territories, each of the IEs had the non-exclusive right to exploit and sub-license all NN Technology but NNL retained the exclusive right to enforce.[119] Thus, all the economic value of Nortel's IP in Exclusive Territories was held by the IE in that territory. In the non-Exclusive Territories, the five IEs shared equal economic rights to exploit and sub-license NN Technology.[120] It is my understanding that, with minor exceptions,[121] the IEs held all of the economic interest in the patents in the Patent Portfolio that were conveyed in the sale, and hence the IEs are the only entities within each Debtor Group that relinquished value in this sale.

85.     In the Patent Portfolio sale, each Debtor Group (specifically the IEs in each group) relinquished its exclusive rights to exploit, license, and exclude in its own Exclusive Territory and non-exclusive rights to exploit and sub-license the Patent Portfolio in the non-Exclusive Territories. In addition, NNL gave up the exclusive right to enforce in the non-Exclusive Territories.[122]

86.     To determine the value relinquished by each Debtor Group in the non-Exclusive Territories, I first consider the exclusive right to enforce in the non-Exclusive Territories relinquished by NNL. I conclude that this exclusive right to enforce had very little value because

---

[119] MRDA, *supra* note 16; *id.* at Third Addendum.

[120] *Id.*

[121] For approximately 81 patents in the portfolio, legal title was held by an entity other than one of the IEs. These patents likely represent intellectual property developed outside of Nortel and subsequently acquired through a merger or through a joint venture relationship. For purposes of my analysis, these patents are rolled up into the Debtor Groups.

[122] "Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall purchase or be assigned and assume from the relevant Sellers, and each Seller shall sell, convey, transfer, assign and deliver to the Purchaser all of its right, title and interest throughout the world in the following assets as and to the extent existing on the Closing Date, other than the Excluded Assets." Rockstar ASA, *supra* note 108, at 24.

Highly Confidential

all of the IEs held the non-exclusive right to sub-license in the non-Exclusive Territories. This removes any incremental value associated with the right to enforce. To see this, suppose the Canadian Debtor Group sold off its rights separately. Then either the EMEA Debtor Group or the U.S. Debtor Group could have made the Canadian Debtor Group's exclusive right to enforce worth little by sub-licensing to whomever was a potential target of an enforcement action by the Canadian Debtor Group. As a result, the only valuable rights relinquished by the Debtor Groups in the non-Exclusive Territories were their non-exclusive rights to exploit and sub-license. Each of the five IEs had equivalent rights in the non-Exclusive Territories and together the five IEs held all economic rights to Nortel technology in the non-Exclusive Territories. The value relinquished in the non-Exclusive Territories was equal for the five IEs and together equaled the total relinquished value. Consequently, proceeds associated with these assets should be distributed equally among the IEs, with each IE receiving one-fifth.

87.     I conclude that the fair market value of the Patent Portfolio assets each IE relinquished is the fair market value of the Nortel IP in its Exclusive Territory plus a one-fifth share of the fair market value of the Nortel IP in the non-Exclusive Territories.

### C.     Discounted Cash Flow Valuation

88.     I now turn to my analysis of the fair market value of the assets relinquished in the Patent Portfolio sale. A DCF analysis is a standard valuation technique that applies a discount rate to the expected cash flows from an asset over time to obtain the *present value* of cash flows from the asset. For example, consider an asset with cash flows of $10 now and $10 a year from now. The $10 to be received in a year is worth less than the $10 to be received now, so one must account for the time value of money, using a discount rate, and apply it to next year's $10. If the

Highly Confidential

discount rate were 10% per year, then next year's $10 cash flow would be worth $9 today. The present value of the asset is the sum of the immediate cash flow of $10 and next year's discounted cash flow of $9, for a total of $19.

89.    Financial economists agree that a DCF analysis is the preferred technique for asset valuation. According to Principles of Corporate Finance, a corporate finance textbook widely used in business schools today, "value today always equals future cash flow discounted at the opportunity cost of capital."[123] Similarly, in Valuing a Business, Pratt and Niculita write, "the theoretically correct approach is to project . . . the future benefits of ownership (usually some measure of economic income, such as cash flow, earnings, or dividends) and estimate the present value of those future benefits by discounting them based upon the time value of money and the risks associated with ownership."[124] Several other valuation techniques discussed elsewhere in this report are indirectly derived from DCF methods.

90.    A DCF analysis requires two elements: (1) projected future cash flows (revenue less costs) and (2) the discount rate to be applied to those projected cash flows to obtain the present value. As discussed in detail below, for my DCF analysis of the fair market value of the Patent Portfolio assets relinquished, I obtain the projected cash flows from Nortel's IPCo Model, and determine the market-appropriate discount rate based on the known present value of $4.5 billion applied to cash flows from the IPCo Model. I then apply this discount rate to the cash flows for the Exclusive and non-Exclusive Territories to obtain the value relinquished by each Debtor Group in the Patent Portfolio sale.

---

[123] Richard Brealey, Stewart Myers, and Franklin Allen, *11th Edition: Principles of Corporate Finance* (McGraw-Hill Companies, Inc., 2013), at 93. See generally, Richard Brealey and Stewart Myers, *6th Edition: Principles of Corporate Finance* (McGraw-Hill Companies, Inc., 2000), at 85-112.

[124] Pratt and Niculita 2008, *supra* note 42, at 40.

Highly Confidential

1.    **Methodology**

    a)    **The Factual Background of the Creation of the IPCo Model Supports its Reliability**

91.    In considering the use of the IPCo Model as a source of inputs for my DCF valuation, I first evaluated the reliability of the IPCo Model by examining the circumstances surrounding its creation and its assumptions. For the reasons stated below, I find it to be robust and reliable.

92.    To understand how the IPCo Model was prepared, I reviewed several presentations prepared by Nortel and Global IP, as well as the deposition testimony of several former Nortel executives. These documents suggest that the IPCo Model was carefully constructed with input from all three Debtor Groups.[125]

93.    Prior to the sale of the Patent Portfolio to Rockstar, the Debtor Groups explored a number of strategies to maximize the value of Nortel's IP assets not transferred as part of the Line of Business sales. As mentioned above, the Debtor Groups retained Lazard and Global IP as advisors.[126] Lazard and Global IP assisted in the development of a strategic plan for the Patent Portfolio.[127] In addition to considering selling the Patent Portfolio as a single portfolio,[128] the Debtor Groups also considered selling the Patent Portfolio piecemeal, and creating a stand-alone licensing entity, referred to as IPCo.[129]

---

[125] *See* discussion in paragraph 94 *et seq.*

[126] Veschi Dep. Nov. 7, 2013 77:18–19 ("And Global IP was hired originally by [the Nortel IP Law Group], by the estates but through us") and *supra* note 95.

[127] Patent Portfolio Work Plan, *supra* note 97, at 13.

[128] *Id.* at 4.

[129] *Id.* at 4; IP Co. Scenario #2 Presentation, *supra* note 99.

Highly Confidential

94.     Deposition transcripts indicate that the Canadian Monitor, the Joint Administrators and certain creditor constituencies were all "very much" involved in the IPCo exercise and that the Joint Administrators both participated in the review process and were given updates throughout.[130]

95.     I have reviewed the financial model (the IPCo Model) for the proposed licensing entity that Nortel developed.[131] The IPCo Model projects revenue and costs of a licensing entity created to exploit the Patent Portfolio based, in part, on potential litigation strategies to induce infringers to license Nortel's IP.

96.     In the IPCo Model, royalty rates are multiplied by vendor revenues in "addressable markets" in order to project royalty revenues. Costs, including fixed costs and variable costs (which vary depending on royalty rates), may be subtracted from royalty revenues to yield cash flows. These cash flows may be projected across the decade spanning 2010 through 2020. Further, these cash flows may be projected on a regional level to obtain cash flows from North America (U.S. and Canada), EMEA (France, Germany and U.K.), and, in one scenario, China. (See Exhibit 25.)

97.     The IPCo Model considered the structure and the market forces that a patent licensing company would have faced. To develop the IPCo Model, Nortel and Lazard conducted an "intensive, three-month study of key markets, industry players and products"[132] as part of the continuing management of the Patent Portfolio. Global IP reviewed over 10,000 individual

---

[130] Riedel Dep. 127:18–22 ("Q. Working on the IP Co. business model, were the bond holders, the creditor's committee, the Monitor and joint administrators all involved in that exercise? A. Very much so.").

[131] IP Co. Model 3.1, *supra* note 4.

[132] 2011 Nortel Patents Overview Final, *supra* note 94, at 9; *see also* Veschi Dep. Nov. 7, 2013 77:13–17.

Highly Confidential

patent claims, and considered data such as forward citation count and standard essential claims in order to assess the value of patents to potential licensees.[133] I also note that as the IPCo Model was being developed and evaluated, Nortel management reported sending patent notice letters to multiple vendors.[134]

98.    In addition to reviewing the potential benefits of licensing the Patent Portfolio, Global IP reviewed the cost structure of comparable licensing firms in order to estimate the expected litigation costs for each "franchise." [135] Other costs, such as maintenance costs, "presume Nortel [would continue] to manage the portfolio in accordance with past practices."[136] Because the IPCo Model was developed at the request of and under the direction of the three Debtor Groups, it is reasonable to conclude that the IPCo Model reflects their views of the projected cash flows by geography and by franchise of the patent portfolio at the time of the Patent Portfolio sale in 2011. Moreover, given the sophistication of Nortel and its advisors, Lazard and Global IP, and the significant effort they expended to create the IPCo Model, it is fair to conclude that it reflects the best information available to them at the time. As such, the IPCo Model provides a reliable framework from which to calculate the fair market value of the rights held by the Debtor Groups.

---

[133] Jan. 2010 Patent Portfolio Analysis Presentation, *supra* note 94, at 17; Mar. 2010 IP Co. Update to Nortel Leadership Team, *supra* note 94, at 4, 7.

[134] NNI_01323495 (Apr. 27, 2010 IPCo Update to Nortel Leadership Team) [hereinafter Apr. 2010 IP Co. Update to Nortel Leadership Team], at 4.

[135] A franchise is an end market. IP Co. Scenario #2 Presentation, *supra* note 99, at 18-23; Mar. 2010 IP Co. Update to Nortel Leadership Team, *supra* note 94, at 87-95; GIP_Nortel_00233023 (May 5, 2010 IPCo Model 2.2 Update) [hereinafter IP Co. Model 2.2 Update], at 6-7; Apr. 2010 IP Co. Update to Nortel Leadership Team, *supra* note 134, at 19.

[136] Apr. 2010 IP Co. Update to Nortel Leadership Team, *supra* note 134, at 19.

Highly Confidential

99.    In the next section, I explore the inputs and assumptions in the IPCo Model such as market size, royalty rates and geographic coverage.

### b)    IPCo Model Inputs Are Reasonable

100.    The primary drivers of the revenue streams projected by the IPCo Model are the size of the product markets (measured in product sales revenue) and the royalty rates associated with the individual patent franchises. This is because royalty revenue is a function of the assumed royalty rates for a particular patent franchise and the royalty base (product sales for the vendors to whom Nortel expected to license its patents). In constructing the IPCo Model, Nortel and Lazard based market size inputs on sources such as Infonetics, Merrill Lynch, and Oppenheimer.[137] I reviewed these inputs and concluded that the market sizes used in the IPCo Model are reasonable for the following reasons. First, the product markets, incorporated in the IPCo Model, are comparable in size to the product markets presented to the potential buyers of the Patent Portfolio.[138] Second, the sources used for market size data (such as Infonetics, Merrill Lynch, and Oppenheimer) are reputable.

101.    The royalty rates used in the IPCo Model are also reasonable.[139] During the development of the IPCo Model, the royalty rates for each franchise were developed based on

---

[137] LAZ-NRTL-00018901 (North American GDP Splits by Country) [hereinafter North American GDP Splits by Country]; NNI_01290195 (IPCo Market Data Update Summary) [hereinafter IPCo Market Data Update Summary] at 1-2; Mar. 2010 IP Co. Update to Nortel Leadership Team, *supra* note 94, at 74. Additional sources investigated included Moody's, The Economist, World Bank, The International Monetary Fund [North American GDP Splits by Country, *supra* note 137], United Nations, RoyaltySource [IP Co. Scenario #2 Presentation, *supra* note 99, at 16, 36], JPMorgan, Del' Oro, Susquehanna Research [IPCo Market Data Update Summary, *supra* note 137, at 1-2] and Wall Street Research. [Mar. 2010 IP Co. Update to Nortel Leadership Team, *supra* note 94, at 20.]

[138] May 2010 Project Iceberg Executive Summary, *supra* note 93, at 7.

[139] Even if the royalty rates were generally too high or too low, varying them has little impact on my ultimate value conclusions. This is because the royalty rates assumed by the IPCo Model are not specific to geographies, so changing the royalty rate inputs to the IPCo Model has a minimal impact on the calculation of value relinquished by each IE in the sale of the Patent Portfolio.

Highly Confidential

intensive research, including discussions with various licensing companies, feedback from licensors in the industry, and Nortel's own licensing experience.[140] Moreover, the IPCo Model's developers studied the royalty rates and licensing revenues of companies, such as Qualcomm, InterDigital, Tessera, and Mosaid, that licensed similar technologies.[141]

102.    The IPCo Model estimates royalty revenues based on product sales in Canada, the U.S., France, Germany, the U.K., and (in one scenario) China.[142] Canada, the U.S., France, Germany, and the U.K. are the top five countries in terms of the number of registered patents in the Patent Portfolio. Although the Patent Portfolio contains patents registered in other countries, the five principal countries in the IPCo Model represent 92% of the patents in the Patent Portfolio.[143] (See Exhibit 21.) Therefore, the geographic coverage of the IPCo Model is consistent with the geographic coverage of patents in the Patent Portfolio.

103.    Based on the fact that the IPCo Model was carefully constructed and vetted with the Debtor Groups and my review of the IPCo Model, I conclude that the IPCo Model is a reasonable representation of the expectation of Nortel management regarding future cash flow that the Patent Portfolio could produce if operated as a licensing entity. As such, the IPCo Model

---

[140] The royalty rates for the wireless handsets franchise were set based on discussions with various licensors to the handset industry and Royalty Source (an online database of royalty rates). Royalty rates for the PC franchise were set ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The royalty rates for wireless infrastructure, data networking, optical, carrier voice, and enterprise voice franchises were set based on feedback from the licensors in the industry, Royalty Source, Nortel licenses, experience, and the depth and breadth of the portfolio. All of the royalty rates for wireless infrastructure, data networking, optical, carrier voice, and enterprise voice franchises were set ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The royalty rates for Internet franchise were set at the middle of what Nortel deemed as a reasonable range. Mar. 2010 IP Co. Update to Nortel Leadership Team, *supra* note 94, at 13-14.

[141] Ex. 22098 (March 17, 2010 email to creditors, attaching "the discussion material's for today's meeting" entitled, "Nortel IP Update to Creditor Committees (Mar 17)"), at 27-32.

[142] IP Co. Model 2.2 Update, *supra* note 135, at 29, 32, 35, 38, 41, 44, 47, 50.

[143] China ranks sixth among countries, with 2.2% of all registered patents in the Patent Portfolio.

Highly Confidential

provides reliable data from which I can calculate the fair market value of the rights relinquished by the Debtor Groups in the sale of the Patent Portfolio.

### c)    The Model Recognized Enforcement Issues in China

104.    The IPCo Model included an option to exclude or include China as an addressable market, thereby allowing its users to exclude or include revenue derived from the Chinese market.[144] Because the telecommunications market in China is relatively large (17% of the world total telecommunications equipment market),[145] it is important to determine whether it is appropriate and reliable to include projected revenues from China. The reliability of projected Chinese royalty revenues depends in large part on the strength of IP rights in China. To this end, I conducted my own qualitative assessment of the enforceability of patents in China. The value of a patent registered in a particular country is influenced by the degree to which the patent owner or licensee can protect and enforce its IP rights associated with the patent.[146] I reviewed the published literature on the strength of IP rights across Exclusive and non-Exclusive Territories to assess the influence of intellectual property rights ("IPR") enforcement regimes on the valuation. Table 8 summarizes several independent studies addressing the relative strength of

---

[144] The IPCo Model also included a similar toggle related to one vendor, Qualcomm. However, the model results are insensitive to this toggle.

[145] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec. 2010.

[146] "The value of a patent is derived from an ability to preclude others from practicing the unique innovation described by the words of the patent's claims." Michael S. Kramer, "Valuation and Assessment of Patents and Patent Portfolios through Analytical Techniques," *The John Marshall Review of Intellectual Property Law* 6:3 (2007) [hereinafter Kramer 2007], at 466. "A patent owner needs to engage with a number of different agencies in a host country in order to defend patented technology from potential and actual infringement. These agencies include governmental and independent bodies that administer patent laws, the judicial system that enforces those laws, and public authorities such as customs and excise agencies, and police forces as well as private organisations (for example, law firms and investigators) who collaborate with patent owners to pursue infringing firms when illegal acts have been detected." Nikolaos Papageorgiadis, Adam R. Cross and Constantinos Alexiou, "The impact of the institution of patent protection and enforcement on entry mode strategy: A panel data investigation of U.S. firms," *International Business Review* 281 (2013), at 281.

Highly Confidential

IP protection across the five IEs and three major non-Exclusive Territories: India, China, and Brazil.[147] While a direct comparison across sources is not possible due to differences in methodologies, all sources paint a similar picture of the relative strength of IP rights across countries. Based on all of these sources, it is clear that the protection of IP rights is strong in all of the Exclusive Territories, and significantly weaker in non-Exclusive Territories such as China, Brazil and India.

**Table 8 – Measures of IP Rights Enforcement across Countries**

| Country | Intellectual Property Rights Index (2011) IPR Score | Global Intellectual Property Index (2011) Patent Index Rating | Park (2008) Index of Patent Rights 2005 | Global Competitiveness Report (2011-12) Intellectual Property Protection |
|---|---|---|---|---|
| Canada | 8.1 | 695 | 4.67 | 5.4 |
| France | 7.9 | 685 | 4.67 | 5.8 |
| Ireland | 7.9 | 687 | 4.67 | 5.7 |
| U.K. | 8.1 | 722 | 4.54 | 5.7 |
| U.S. | 8.4 | 706 | 4.88 | 5.0 |
| Brazil | 5.5 | 570 | 3.59 | 3.2 |
| China | 5.2 | 578 | 4.08 | 4.0 |
| India | 5.5 | 551 | 3.76 | 3.5 |

105. The U.S. Trade Representative has stated, "China's IPR enforcement regime remains largely ineffective and non-deterrent."[148] Rights holders face two obstacles: (1) foreign companies find it difficult to enforce patent rights in China, and (2) indigenous innovation

---

[147] Kyle A. Jackson, International Property Rights Index 2011, *Property Rights Alliance*, Report 29 (2011), accessed Jan. 24, 2014, http://propertyrightsalliance.org/userfiles/file/ATR_2011%20INDEX_Web2.pdf; Walter G. Park, "International patent protection: 1960–2005," *Research Policy* 37 (2008), accessed Jan. 24, 2014, nw08.american.edu/~wgp/res_policy08.pdf; TaylorWessing, Global Intellectual Property Index - The Third Report (2011), accessed Jan. 24, 2014, http://www.taylorwessing.com/ipindex/docs/global_ip_index_3.pdf [hereinafter TaylorWessing 2011]; Klaus Schwab, "The Global Competitiveness Report 2011-2012," *World Economic Forum* (2011), at 391.

[148] Office of the U.S. Trade Representative, "2010 Special 301 Report," 2010, accessed Jan. 19, 2014, http://www.ustr.gov/webfm_send/1906 [hereinafter 2010 Special 301 Report], at 19.

Highly Confidential

policies devalue Chinese patents for technology developed by foreign companies by promoting technology developed by Chinese firms.

106.    Despite passing numerous IPR laws,[149] "nepotism and corruption, politicisation of courts and judges, discrimination against foreign business, ever-changing laws and local protectionism" exacerbate lax enforcement in China.[150] Foreign firms may, for instance, lose licensing fees to small manufacturers producing imitation and pirated brands and goods.[151] In 2009, sales of imitation or pirated mobile phones, primarily 2G devices, comprised an estimated 20% - 38% of the Chinese market.[152] Imitation or pirated 3G-capable smartphones have been available since 2012.[153] Based on my review, it appears few foreign companies initiate patent litigation within China.[154]

---

[149] Marcus M. Keupp, Angela Beckenbauer, and Oliver Gassmann, "Enforcing Intellectual Property Rights in Weak Appropriability Regimes: The Case of de Facto Protection Strategies in China," *Management International Review* (2010) [hereinafter Keupp *et al.* 2010], at 3-4.

[150] Keupp *et al.* 2010, *supra* note 149, at 5. Devonshire-Ellis et al. further state that "To litigate against a public company in a province outside Beijing or Shanghai can prove a very hard challenge with very little chance of success." Chris Devonshire-Ellis et al. (eds.), *Intellectual Property Rights in China* (2011), at 29.

[151] Alexander Hammer and Katherine Linton, "China: Effects of Intellectual Property Infringement and Indigenous Innovation Policies on the U.S. Economy," USITC Publication 4226 (2011) [hereinafter Hammer and Linton 2011], at 5-20.

[152] *Id.* at 5-21.

[153] See, for instance, the Goophone I5. Dexter Roberts, "Enter Goophone I5, Looking a Lot Like Apple's iPhone 5," Businessweek.com, Sept. 6, 2012, accessed Nov. 22, 2013, http://www.businessweek.com/articles/2012-09-06/enter-goophone-i5-looking-a-lot-like-apples-iphone-5.

[154] Alexander Hammer and Katherine Linton, "China: Intellectual Property Infringement and Indigenous Innovation Policies, and Frameworks for Measuring the Effects on the U.S. Economy," USITC Publication 4199 (2010) at 4-6. According to *China Daily*, "From January to May [2013], judges nationwide announced verdicts in 24,544 intellectual property rights cases, up by 36.6 percent year-on-year, according to the Supreme People's Court. About 2 percent of those cases, or 504 lawsuits, involved overseas litigants. Last year, 1.7 percent of 83,850 such lawsuits nationwide were foreign-related, according to the top court. [...] Most of the IPR lawsuits that involve overseas companies are related to infringement of trademarks, patents or copyrights, Kong said." More Foreign Companies Involved in IPR Cases, China Daily, July 15, 2013, accessed Nov. 22, 2013, http://www.chinadaily.com.cn/china/2013-07/15/content_16775204.htm.

Highly Confidential

107.    Further, in 2006 the Chinese government introduced "indigenous innovation" policies to reduce reliance on foreign "core technologies in key fields," [155] including telecommunications.[156] These policies include the creation of domestic technological standards, such as TD-SCDMA and TD-LTE.[157] These domestic standards not only reduce China's reliance on foreign technology but also tend to reduce licensing fee payments. [158] Large foreign companies, like Nokia, have launched TD-SCDMA phones,[159] and other influential companies, including Apple, have developed TD-LTE-compatible devices.[160] While it is difficult to assess the extent to which TD-SCDMA and TD-LTE tend to reduce Chinese royalty and licensing

---

[155] The Guidelines on National Medium- and Long-Term Program for Science and Technology Development were followed by the 11th Five Year Plan (2006-2010) for Standardization Development, issued by the Standardization Administration of China (SAC) under the Administration for Quality Supervision, Inspection and Quarantine. These policies include various draft proposals not yet signed into law. Office of the U.S. Trade Representative, "2013 Special 301 Report," 2013, accessed Nov. 25, 2013, http://www.ustr.gov/sites/default/files/05012013%202013%20Special%20301%20Report.pdf [hereinafter 2013 Special 301 Report], at 5, 36-37.

[156] Adam Segal, "China's Innovation Wall," Foreign Affairs, Sept. 28, 2010, accessed Oct. 16, 2013, http://www.foreignaffairs.com/print/66714.

[157] The Chinese government compelled the development and introduction of the Time Division Synchronous Code Division Multiple Access (TD-SCDMA) standard when other 3G standards, such as WCDMA (backed primarily by the EU) and CDMA2000 (the standard based on U.S. IP) were already well-established. Hammer and Linton 2011, *supra* note 151, at 5-22.

[158] Hammer and Linton 2011, *supra* note 151, at 5-26. Sales of TD-SCDMA smartphones surpassed CDMA models in June 2013: "Based on statistics from China-based Sino Market Research, 11.71 million TD-SCDMA smartphones were sold in the China market in June 2013, compared with sales of 9.51 million WCDMA units and 5.73 million CDMA 2000 EV-DO units." Daniel Shen and Adam Hwang, "China market: TD-SCDMA smartphones outsell WCDMA, CDMA 2000 EV-DO models," Digitimes.com, Sept. 2, 2013, accessed Nov. 22, 2013, http://www.digitimes.com/news/a20130902PD212.html.

[159] Chris Ziegler, "Nokia cozies up to TD-SCDMA some more, launches China Mobile versions of the X5 and C5, joins TD Forum," Engadget.com, Apr. 23, 2010, accessed Nov. 22, 2013, http://www.engadget.com/2010/04/23/nokia-cozies-up-to-td-scdma-some-more-launches-china-mobile-ver/.

[160] Sam Oliver, "Apple Granted iPhone Network License for China Mobile, World's Largest Carrier," AppleInsider.com, Sept. 11, 2013, accessed Nov. 22, 2013, http://appleinsider.com/articles/13/09/11/apple-granted-iphone-network-license-for-china-mobile-worlds-largest-carrier.

Highly Confidential

obligations, the mandate to adopt domestic standards tends to reduce the value of Chinese patents held by foreign companies.[161]

108.    My research strongly indicates that nominally equivalent intellectual property rights in China are worth significantly less because (1) foreign patents are difficult to enforce, and (2) Chinese government policies favor domestic entities.

109.    I also consider the opinion of Mr. Raymond Zenkich, which reflects the point of view of the business community when valuing portfolios that include Chinese patents. Mr. Zenkich states that successfully enforcing patent rights in China is difficult and accordingly any projected revenues to be derived from patents in China should be discounted.[162] He concludes that in assessing a telecommunications patent portfolio in 2009-1010 he "would have generally ascribed little to no value to Chinese patents."[163]

110.    How the business community would value Chinese IP is a relevant consideration in my analysis, as both an independent input and as a check on my qualitative analysis. Based on my professional experience, expertise, and analysis as well the opinion of Mr. Zenkich, regarding China as an addressable market, I conclude that the contribution of China patents to overall value is limited relative to patents from other regions.

---

[161] "The United States is also deeply troubled by the development of policies that may unfairly disadvantage U.S. rights holders by promoting "indigenous innovation" including through, among other things, preferential government procurement and other measures that could severely restrict market access for foreign technology and products." 2010 Special 301 Report, *supra* note 148, at 19.

[162] Expert Report of Raymond Zenkich (submitted by the U.S. Debtors), dated January 24, 2014 [hereinafter 2014 Zenkich Report], at 11.

[163] 2014 Zenkich Report, *supra* note 162, at 2.

Highly Confidential

d)      **Inputs from the IPCo Model Used to Calculate the DCF**

111.     The IPCo Model is comprehensive and detailed. Eight individual technology franchises, 24 products and 47 vendors are individually modeled for the period 2011 through 2020. (See Exhibit 26.) Distinct litigation strategies are pursued for each vendor, franchise and year; the timing and intensity of litigation varies for each franchise and each region.

(1)      **IPCo Model Revenues**

112.     For each franchise, the IPCo Model calculates vendor-specific regional addressable market revenue as a function of product and service revenues, addressable shares, and vendor market shares, adjusting for pre-existing licensing rights (which the IPCo Model terms "encumbrances"), for three regions: North America, EMEA, and China.[164] The IPCo Model then calculates licensing revenue for each vendor against which litigation is projected to be pursued.

113.     Exhibit 27A and Exhibit 27B, respectively, illustrate how the IPCo Model calculates licensing revenue for one vendor ▆▆▆▆ within a particular franchise (▆▆▆▆ ▆▆▆▆), alternatively excluding and including revenue from China.[165] First, total product market size for the ▆▆▆▆▆▆▆ franchise is expressed for the listed regions across all years. Next, the addressable product and services market size is calculated by multiplying total

---

[164] The developers of the IPCo Model recognized that licensing revenues may be encumbered if Nortel had a licensing agreement in place with a given vendor in a franchise. IP Co. Jan. 2010 Patent Portfolio Analysis Presentation, *supra* note 94, at 7. Looking at the portfolio, they identified patent licenses and sought to account for them in the IPCo Model by applying an encumbrance percentage for specific vendors within a franchise to reduce or eliminate potential royalty revenues. For example, the ▆▆▆▆▆▆▆ franchise royalty revenues are reduced by 14.7%, 70.5% and 100% for ▆▆▆▆▆▆▆. IPCo Model 2.2 Update, *supra* note 135, at 29, 32, 35, 38, 41, 44, 47, 50.

[165] I use ▆▆ and the ▆▆▆▆▆ franchise as an example; the IPCo Model presents similar analyses for each franchise and vendor.

55

Highly Confidential

product market size by both a "Regional Addressable Revenue Share" (a downward,[166] region-specific adjustment that accounts for the share of total market revenues which are addressable by Nortel) and by a "Service Revenue Scalar" (an upward adjustment that accounts for the additional service revenues associated with ████████████ ). Finally, ████████ addressable market size for each region is calculated by multiplying the regional total addressable market size by ████████ regional market share and an adjustment for encumbrances.

114.    The IPCo Model then calculates the anticipated royalty payment to be earned by litigation against ████████ . To do this, the IPCo Model applies one of two franchise-specific royalty rates depending on the litigation strategy adopted: a higher royalty rate corresponding to a "Litigation Heavy" strategy or a lower royalty rate corresponding to a "Litigation Light" strategy.[167] For each year, the IPCo Model multiplies the royalty rate (which depends on the litigation strategy) by ████████ addressable market size to obtain anticipated royalty revenue.[168] Finally, the IPCo Model calculates royalty revenue to each region for a particular year by summing royalty revenue across all vendors within a particular franchise and across all franchises within each region.

---

[166] This only applies to EMEA total market revenues, because EMEA encompasses a larger geographic area than the territory where Nortel had patent rights.

[167] Both Litigation Light and Litigation Heavy royalty rates vary across franchises. In some years, no litigation is pursued.

[168] Calculated licensing revenue is capped at a specified amount per vendor per year, dependent on the litigation strategy pursued against the vendor in a given year. Past royalty payments are calculated just as described above, except that the actual royalty rate charged is scaled down to account for the fact that litigation related to previous infringement (before 2012) has a lower likelihood of success as compared with litigation related to future infringement. The IPCo Model forecasts all past royalty payments to be made as a lump-sum in 2012.

Highly Confidential

115.    For all vendors, the IPCo Model projects royalty payments on a regional level (namely, North America, EMEA, and, in one scenario, China). It does not project royalty payments by Debtor Group. I perform an additional calculation to divide the royalty payments among the three Debtor Groups.

116.    I first divide the royalty revenues for EMEA and the U.S. into royalty revenues from the contributing countries. The IPCo Model estimates EMEA licensing revenue based on sales in France, Germany, and the U.K.[169] Likewise, the IPCo Model estimates North American licensing revenue based on sales in the U.S. and Canada. To determine the share of the North American licensing revenue that should be attributed to the Canadian and U.S. Debtors, I apportion revenue using those countries' relative telecom infrastructure expenditures.[170] This is appropriate for two reasons: (1) relative telecom expenditures are reasonable bases on which to estimate relative market size and (2) it is consistent with the structure of the IPCo Model as it uses market size as the fundamental driver of royalty revenues. I apportion the EMEA licensing revenue attributable to Exclusive Territories (France and the U.K.) and the non-Exclusive Territory (Germany) in the same manner. As discussed above, I then attribute one-fifth of the revenue in non-Exclusive Territories (Germany and China, when it is included) to each of the five IEs.

### (2)    Cash Flows

117.    To calculate cash flows, I deduct costs and taxes from these royalty revenues. The IPCo Model projects four types of costs: operating costs, fixed litigation costs, additional

---

[169] IP Co. Model 2.2 Update, *supra* note 135, at 29, 32, 35, 38, 41, 44, 47, 50.

[170] I note that in the IPCo Model, all the revenue from the Internet Advertising and PC franchises in North America accrues to the U.S Debtors. The IPCo Model may have done this because, globally, almost all of the patents in these categories are in the U.S.

Highly Confidential

litigation costs, and contingent litigation costs. In the model, contingent litigation costs and additional litigation costs (increased costs associated with a Litigation Heavy strategy) vary in proportion to revenue. Fixed litigation costs apply to all franchises except the Internet franchise, for which costs are separately determined at 40% of royalty revenues (contingent litigation costs). I allocate fixed litigation costs to the relevant franchises and all costs to each region within the franchises in proportion to licensing revenues. Exhibit 28A and Exhibit 28B show the revenues and costs for each franchise and year for the IPCo Model excluding and including China, respectively. The model applies a tax rate of 30% to earnings before tax (revenue minus cost) to yield cash flow. These cash flows provide the basis for my valuation.

## 2.    The Discount Rate

118.    I infer the discount rate to apply to the expected cash flows provided by the IPCo Model by using the IPCo Model's cash flows and the value of the Patent Portfolio as revealed by its gross proceeds of $4.5 billion. With reference to the example I developed earlier (See Paragraph 88), suppose that the Patent Portfolio sold for $19, and projected cash flows over two years were $10 in the first year and $10 in the second year. In order to obtain a net present value of $19, one must apply a discount rate of 10% to the cash flows in the second year (because such a discount rate would render the NPV of the second year's cash flows equal to $9). Using a net present value (fair market value) of $4.5 billion and the IPCo Model's aggregate cash flows between 2010 and 2020, the discount rate implied by the IPCo Model is 12.2% when China is not included and 15.7% when China is included.[171]

---

[171] The discount rate applied to those cash flows to get the present value of the assets relinquished should reflect the riskiness of those assets. Typically, one would consider the cost of capital (the cost of debt and the cost equity) to derive the appropriate discount rate for an asset. As discussed below, in the case of the Patent Portfolio sale, we

Highly Confidential

119.    These discount rates are consistent with discount rates observed in the market at the time.[172]

### 3.    The Fair Market Value of Patent Portfolio Assets Relinquished

120.    In this section I calculate the fair market value of the assets relinquished by the Debtor Groups in the Patent Portfolio sale.

### a)    IPCo Model Excluding China

121.    As I mentioned previously, to determine the share of the North American revenue in the IPCo Model that represents the value relinquished by the Canadian and U.S. Debtors, I note that in the IPCo Model, all the revenue from the Internet Advertising and PC franchises in North America accrues to the U.S Debtors. (The IPCo Model may have done this because, globally, almost all of the patents in these categories are in the U.S.). For North American revenue attributable to the remainder of the franchises, I divide the revenue between the U.S. Debtors and Canadian Debtors in proportion to those countries' relative telecommunications equipment expenditures. Likewise, to determine the share of EMEA revenue that represents the

---

can reverse the process because we know the value of the portfolio as whole at the time of sale was $4.5 billion and we know the projected cash flows. Therefore we can solve for the implied discount rate. Mathematically, I solve the following equality:

$$Net\ Present\ Value = \$4.5\ billion = \sum_{t=0}^{T} \frac{Cash\ Flows\ in\ Year\ t}{(1+Discount\ Rate)^t} * (1 + Discount\ Rate)^{0.5},$$

where $t$ indexes years, $t=0$ is 2010, and $T$ is 2020 (the final year in which cash flows accrue). The final term $[(1 + Discount\ Rate)^{0.5}]$ ensures that the results are discounted to the middle of each year. The IPCo Model does not project revenues or costs beyond 2020. However, for some franchises the IPCo Model does contain revenues and costs for the period 2021-2025 that are merely repetition of the 2020 revenues and costs. Importantly, the IPCo Model that was described in presentations to the Nortel Board of Directors was based solely on the projected cash flows for the period 2010-2020. Accordingly, I did not include revenues or costs beyond 2020 in my analysis. However, I note that valuations implied by the IPCo Model are not sensitive to the inclusion of the 2021-2025 revenues and costs.

[172] Ibbotson reported the median WACC for communications equipment companies ranged from 11.3% to 16.5% in June 2011. Ibbotson, "SIC Communication Equipment," in *Ibbotson Cost of Capital Yearbook* (Morningstar, June 30, 2011). Although IPCo would not have been a communications equipment manufacturer, the Patent Portfolio consisted of patents directly related to communications equipment.

Highly Confidential

assets relinquished in the Exclusive Territories (France and the U.K.) and Germany, a non-Exclusive Territory, I use relative telecommunications equipment expenditures.

122.    I use the discount rate of 12.2%, which I inferred from the IPCo Model (see Paragraph 118), to calculate the net present value of cash flows projected by the IPCo Model for each Debtor Group.

123.    As shown in the top panel of Exhibit 29A, the IPCo Model that excludes China as an addressable market forecasts that the present value of cash flows from licensing would be $3.77 billion for North America and $0.73 billion for France, Germany, and the U.K. Allocating cash flow from Germany in the manner described previously and adjusting for the value to be distributed, the DCF analysis based on the IPCo Model, excluding China, suggests that the value distributed to the Canadian Debtors, EMEA Debtors and U.S. Debtors should be $0.41 billion, $0.62 billion and $3.42 billion, respectively.

### b)    IPCo Model Including China

124.    I also calculate the value relinquished under the alternative formulation of the IPCo Model, which includes revenue from Chinese markets for certain franchises. The value of assets in China is distributed to the Debtor Groups in the same manner as the value of German assets, as both China and Germany are non-Exclusive Territories.

125.    I use the discount rate of 15.7%, which I inferred from the IPCo Model (see Paragraph 118), to calculate the net present value of cash flows projected by the IPCo Model for each Debtor Group.

126.    As shown in Exhibit 29B, the IPCo Model forecasts that the present value of cash flows from licensing, including some revenue from China, would be $3.12 billion for North America, $0.61 billion for France, Germany, and the U.K., and $0.77 billion for China.

60

Highly Confidential

Allocating cash flow in the manner described previously and adjusting for the value to be distributed, the DCF analysis based on the IPCo Model, including China, suggests that the value distributed to the Canadian Debtors, EMEA Debtors, and U.S. Debtors should be $0.495 billion, $0.979 billion and $2.980 billion, respectively.

127.    I summarize the results of my analysis of the Patent Portfolio assets relinquished by the three Debtor Groups from the IPCo Model in Table 9.

### 4.    DCF Valuation Results

128.    I conclude that the IPCo Model is reasonable and robust, and an appropriate basis for my DCF analysis. In arriving at a valuation for the rights relinquished in the sale of the Patent Portfolio, I start with the valuation range from my DCF analysis. Within the range of values indicated by the DCF analysis, I consider a number of factors regarding the Patent Portfolio to determine the value relinquished by the Debtor Groups. These factors include, but are not limited to, the value that would be realized in China, the fact that the large majority of the patents sold were in the U.S., and my expertise and experience. I conclude that the fair market value of the assets relinquished by the Canadian, EMEA, and U.S. Debtor Groups in the Patent Portfolio sale is $0.43 billion, $0.71 billion and $3.31 billion, respectively.

**Table 9 –IPCo Model DCF Based Distribution Results ($ Billions)**

|  | Canadian Debtors | | EMEA Debtors | | U.S. Debtors | |
|---|---|---|---|---|---|---|
|  | $ Billions | Percentage | $ Billions | Percentage | $ Billions | Percentage |
| IPCo Model without China | $0.41 | 9.3% | $0.62 | 14.0% | $3.42 | 76.7% |
| IPCo Model with China | $0.50 | 11.1% | $0.98 | 22.0% | $2.98 | 66.9% |
| **IPCo Results** | **$0.43** | **9.7%** | **$0.71** | **16.0%** | **$3.31** | **74.3%** |

Highly Confidential

### D.      Examination of Patent Characteristics

129.      Having determined the fair market value relinquished by each Debtor Group in the Patent Portfolio sale based on my DCF analysis, I now consider whether an analysis of the geographic distribution of patents and other patent characteristics corroborates my opinion. I examine several standard and widely used industry factors and indications of IP value including both the quality of the patent rights relinquished and the size of the markets in which the rights were held.[173] As measures of the quality and value of the patent rights relinquished, I consider the number of patents for which each IE held licenses, the remaining term of the patents, and interest (importance) level, as determined by Nortel and Global IP. I also consider the value of pending patent applications in addition to patent rights for issued patents. I also account for the size of the market for the technologies in the geographic markets where the patents issued. I discuss each of the indicators of value in turn, and then discuss the calculation of an index (the "Patent Index") based on these factors.

### 1.      Number of Patents and Applications

130.      Because the IEs held exclusive, perpetual, royalty-free licenses to all Nortel technology patented in their Exclusive Territory, an important indicator of the value of the Patent Portfolio relinquished by the Debtor Groups is the number of patents for which each IE held economic rights. As discussed above, the value in a patent portfolio comes not just from the individual patents in the portfolio, but also from the synergies among those patents within a particular country, and value tends to increase with portfolio size within a particular country.

---

[173] Important considerations in valuing patents include "[s]ize of the market and future prospects for that market." *See* Weston Anson 2005, *supra* note 85, at 76.

Highly Confidential

This is "…because most of the advantages of patent portfolios are directly related to the quantity of constituent patents, and because high-volume patenting addresses key strategic challenges in the development of portfolios[.]"[174] Thus, for a given country, a Debtor Group that relinquished licenses to more patents (of equal individual value, on average) should get a larger distribution than a Debtor Group that held licenses to fewer patents.

131.    As shown in Exhibit 21 there are 4,353 patents and 2,786 applications in the Patent Portfolio.[175] However, I recognize that it is likely some patents in the Patent Portfolio are

---

[174] Parchomovsky and Wagner 2005, *supra* note 111, at 29. The authors further explain that "As the number of individual patents involved in a portfolio increases, the structure becomes both more sizeable (covering a broader array of subject matter) and more diverse (covering a greater difference of subject matters). […] In this sense, high-volume patenting behavior is itself a way to diminish the importance of individual patenting decisions, because simply adding total patents to the portfolio will increase both its scale and diversity. Put simply, in a portfolio-driven era of patenting, high-volume patenting is the overwhelmingly dominant decision." *Id.* at 42. Other evidence suggests that patent count influences portfolio value. For example, Kramer (2007) found that "[n]ot surprisingly, the portfolios […] possess significant total value as a result of the number of patents held in the technology space." Kramer 2007, *supra* note 146, at 485. Lerner and Tirole (2003) explicitly define their portfolio value function to be increasing in patent count. Josh Lerner and Jean Tirole, "Efficient Patent Pools," *American Economic Review* 94:3 (2003), at 691-711. In a similar finding specific to technologies within a portfolio (rather than strict patent count), Gambardella et al. (2013) find that "[a]fter exerting some effort on an invention, firms should redirect their efforts toward other inventions, which in turn suggests that value increases by portfolio size, that is, by raising the number of inventions in the portfolio." Gambardella et al. 2013, *supra* note 112, at 19.

[175] For purposes of this Patent Index, in counting the number of applications, I made an adjustment for the EPO and PCT applications. The Patent Portfolio contained 7,139 patents and applications, including 464 EPO and 70 PCT applications. (See Exhibit 21.) Unlike applications filed in specific jurisdictions (*e.g.*, U.S., Canada, U.K., China, etc.), EPO and PCT applications are initially filed with these offices and only later filed in specific jurisdictions. In order to make these EPO and PCT applications more comparable to country-specific applications, I used Nortel's historic pattern of country registration for each of these application types. For the EPO applications, I first looked at the 310 patents in the Patent Portfolio for which the initial European application was at the EPO. These patents contain the letters "EP" followed by the application number and a series of two letter country codes. The two letter country codes represent the countries in which Nortel sought (and eventually was granted) registration. By summing the number of patents granted in each country across all such patents, I was able to calculate the country distribution for EPO applications. The distribution shows that 99% of EPO applications resulted in a patent registered in the U.K. and France, 93% resulted in a patent registered in Germany and a small percentage resulted in patent registrations in eleven other countries. I applied this same distribution to each EPO application in the Patent Portfolio to determine the countries to which the application would eventually be submitted. Thus, the 464 EPO applications are accounted for as 1,411 country-specific applications.

For the PCT applications, I first identified 118 PCT applications that had entered the national phase by the time of the Patent Portfolio sale transaction. Patents or applications listed in the same row as a PCT application in the annex to the Asset Sale Agreement were assumed to be national applications or patents originating from the PCT application. I then calculate the country distribution across the applications in the national phase and apply the

Highly Confidential

more valuable than others. The available literature on patent portfolio value suggests that the distribution of value in a collection of patents tends to be skewed.[176] I account for this in my analysis by considering the patents identified as high and highest interest by Global IP.[177] It is Mr. Zenkich's opinion that the interest levels designated by Global IP are reasonable.[178]

132.    Considering the high and highest interest patents and applications separately suggests that the Patent Portfolio assets relinquished by the U.S. Debtor Group were more valuable than the assets held by the other Debtor Groups. (See Table 13.) This is because, as discussed and shown in Table 6, 66% of the highest interest Technologies were patented (or had applications for a patent) only in the U.S., and 99% of all highest interest Technologies were patented in the U.S. Moreover, 82% of the high interest Technologies were patented (or had applications for a patent) only in the U.S., and effectively all high interest Technologies were patented in the U.S.[179]

---

[176] same distribution to the seventy PCT applications in the international phase. This provides the expected additional national phase applications originating from the seventy PCT applications in the international phase. Thus, the 70 PCT applications are accounted for as 578 country-specific applications. Making these adjustments to the 7,139 patents and applications results in a total of 8,594 patents and applications. This figure includes 520 patents and applications assigned to an end product market "Other" (406) or unassigned (114) by Global IP (*see* Footnote 184). Excluding these 520 patents and applications from the Patent Index results in a total of 8,074 patents and applications. (See Table 10.)

[176] Mark Schankerman, "How Valuable is Patent Protection? Estimates by Technology Field," *The RAND Journal of Economics* 29:1 (1998), at 104. Schankerman notes "…the value of patent rights is sharply skewed, with most of the value concentrated in the tail of the distribution." *Id.* at 104.

[177] Recall that Global IP ranked the patents as highest interest, high interest, or neither highest nor high interest. I treat highest interest patents as the most valuable patents, high interest patents as the next most valuable patents, and the neither highest nor high interest patents as less valuable patents. The high interest patents and applications account for 20% of the Patent Portfolio and the highest interest patents and applications account for 13% of the Patent Portfolio. These figures reflect the attribution of EPO and PCT applications to individual countries. Please see Footnote 175 for discussion on this analysis.

[178] 2014 Zenkich Report, *supra* note 162, at 15.

[179] Of the 1,045 high interest Technologies, 1,043 are patented in the U.S. See Exhibit 22.

Highly Confidential

133.    I am also aware that Mr. Zenich has done an analysis of all patent families reviewed by Global IP that are filed solely in countries other than the United States. Mr. Zenich concludes that none of these patents is of greater interest than the highest interest patents in the Patent Portfolio.[180]

## 2.    **Market Size**

134.    As discussed above, market size is an important indicator of patent value. Royalty revenue is typically based on royalty rates times a royalty base such as revenue or profits.[181] As a result, larger markets would typically result in greater royalty revenue than smaller markets.[182] Thus, if two entities held rights to the same patented technology, the entity holding rights in the larger market would hold assets of greater value.

135.    In order to establish the relevant market size for a patent, I use the end product markets as described in documents prepared for the Patent Portfolio sale.[183] Table 10 describes these markets, the number of patents in each market, and the estimated global market sizes. The end product markets used in my analysis are Wireless, Wireless - 4G, Wired, Service Providers, Voice, Internet, and Semiconductors.[184] (See also Exhibit 30.)

---

[180] 2014 Zenich Report, *supra* note 162, at 17.

[181] Steven J. Shapiro, "Pitfalls in Determining the Reasonable Royalty in Patent Cases," *Journal of Legal Economics* 17:1 (2010), at 76.

[182] This intuitive result is supported by Bessen (2008), wherein the author observes that "[t]he estimated value of European patents is also substantially smaller than the U.S. estimates. […] However, it is not surprising that these [U.S.] values are so much larger because the U.S. market is much larger than any of the national European markets." James Bessen, "The Value of U.S. Patents by Owner and Patent Characteristics," *Research Policy* 37 (2008), at 943.

[183] May 2010 Project Iceberg Executive Summary, *supra* note 93, at 7. The end product markets listed in the Project Iceberg Executive Summary differ somewhat from the franchises in the IPCo Model.

[184] There is an end product market labeled "Other," and there are patents and applications with no end product market assigned to them. These patents and applications are not included in the Patent Index because their numbers are relatively small and it is not clear how to define a market size for these patents. There are 520 patents and

Highly Confidential

## Table 10 – End Product Markets

| End Product Market | Estimated Global Market Size (2011, $ Billions) | Number of Patents & Applications | Description |
|---|---|---|---|
| | [A] | [B] | [C] |
| Wireless | $266.2 | 3,389 | Patents covering wireless handsets, wireless telecommunications infrastructure (such as base stations or cellular towers), or both. Contains patents related to GSM, CDMA, UMTS and other standards. |
| Wireless - 4G | $6.5 | 774 | A subset of Wireless Communication Patents that describe more advanced communication technologies supporting higher bandwidths and faster communication speeds. Contains patents relating to LTE, WiMAX, and 802.11n. |
| Wired | $62.1 | 2,775 | Patents covering communication of data through networks using wire or optical fiber. Contains patents related to standards issued by IETF, IEEE and ITU. |
| Service Providers | $40.7 | 395 | Patents relating to call services, caller ID, cell tower placement and management, call center management, call routing and related technologies. |
| Voice | $32.4 | 599 | Patents relating to the communication of voice signals by Enterprises or telecommunications service providers. |
| Internet | $89.8 | 84 | Patents relating to internet search and advertising, ecommerce, and social networking. |
| Semiconductors | $299.5 | 58 | Patents relating to the design and manufacturing of semiconductors. |
| **Total** | **$797.2** | **8,074** | |

136.    The market size for each of these technology segments is estimated using data from third-party research firms. I examine the market opportunity in each Patent Portfolio technology segment and country where Nortel had patents or applications. Table 11 summarizes the market size estimates. (See Exhibit 31 for additional details.) These market size estimates are used in combination with other indicators of value, as discussed below.

---

applications with an end product market of Other or no end market. There are 22 in Canada, 88 in EMEA, and 201 in the U.S. Of the 520 patents and applications, 40 are marked high or highest interest. Thirty-three of the forty high or highest interest patents are in the U.S. These figures reflect the attribution of EPO and PCT applications to individual countries. Please see Footnote 175 for discussion on this analysis.

Highly Confidential

**Table 11 – End Product Market Size Estimates (2011 $ Billions)**

| Exclusive Territories | Wireless | Wireless 4G | Wired | Service Providers | Voice | Internet | Semi-conductors | Total |
|---|---|---|---|---|---|---|---|---|
| Canada | $3.0 | $0 2 | $2.2 | $0.7 | $1.3 | $2.3 | N/A | **$9.8** |
| France | $6.6 | $0 1 | $2.6 | $1.5 | $1.1 | $3.1 | N/A | **$14.9** |
| Ireland | $0.7 | $0.0 | $0.2 | $0.2 | $0.1 | $0.2 | N/A | **$1.5** |
| U.K. | $8.8 | $0 1 | $2.8 | $1 9 | $1.2 | $4.5 | N/A | **$19.2** |
| U.S. | $36.6 | $1 9 | $13.2 | $4.6 | $8.0 | $32.3 | $40.7 | **$137.3** |
| **Total** | **$55.8** | **$2.2** | **$21.0** | **$8.9** | **$11.7** | **$42.4** | **$40.7** | **$182.7** |

### 3.    Remaining Term

137.    A third indicator of value is the remaining term of the patent underlying the license. The remaining term of a patent is a standard measure of patent value; a shorter term means there will be fewer years in which to collect royalties on that patent.[185] Thus, a patent with a shorter remaining term is less valuable, other characteristics being equal, than a patent with a longer remaining term. I establish the remaining term of patents by taking the patent expiration date and subtracting the date of the Patent Portfolio sale. For applications, I project the expiration date as twenty years from the application filing date because twenty years is, in general, the term granted to patents from their application filing date.[186] The projected remaining term for

---

[185] A formula for calculating the present value of a portfolio includes "the term of the patent monopoly determined by the remaining life of the subsisting patents in the portfolio." Alexander Poltorak, "Valuing Individual Patents Comprising a Portfolio," *Patent Strategy & Management* 4:6 (2003), at 1.

[186] The expiration date is known only once a patent is granted; the Patent Portfolio data does not provide expiration dates for applications. In general, most jurisdictions calculate an expiration date for patents as twenty years from the application filing date in compliance with WTO rules. "The term of protection available shall not end before the expiration of a period of twenty years counted from the filing date." World Trade Organization, *The Agreement on Trade Related Aspects of Intellectual Property Rights (TRIPS)*, at Article 33. The EPO calculates the expiration date as "20 years from the date of filing of the application." European Patent Office, *Term of the European Patent*, European Patent Convention Treaty, at Article 63. The USPTO calculates the expiration date as "twenty years from the date on which the application was filed in the U.S." There are exceptions to this rule. For example, "if, the application contained a specific reference to an earlier filed application," the expiration date is twenty years from the earlier filed application. Alternately a patent term may be greater than twenty years "if the USPTO failed to meet certain statutory deadlines that guarantee prompt patent and trademark office responses and guarantee no more than a 3 year application pendency." Patent Term Calculator (Beta Version), USPTO, accessed Jan. 24, 2014, http://www.uspto.gov/patents/law/patent_term_calculator.jsp. In the Patent Portfolio, the average duration from

Highly Confidential

applications is then estimated to be the projected expiration date minus the date of the Patent Portfolio sale.[187] Table 12 shows the average remaining term of the patent portfolio across countries with five or more registered patents and applications. (See Exhibit 32.) For patents, the U.S. has an average remaining term per patent of 9.4 years, while France has 8.6 years and the U.K. has 8.5 years.[188] Among patents and applications, the U.S. has an average remaining term of 11.2 years, while France and the U.K. each have 13.2 years.[189]

---

application filing date to expiration date for patents is 20.27 years. Except for Portugal and Brazil, where there are only two registered patents, the U.S. patents have the highest average duration of 20.46 years.

[187] From here on, "remaining term" in the context of applications refers to the projected remaining term.

[188] Ireland has only two registered patents of which only one patent has an expiration date provided. The remaining term for this one patent is 11.6 years.

[189] Remaining term is, of course, possibly different from economic life. The economic life of a patent is limited by remaining term, but may be shorter. A particular technology may only have a short market life, and thus the ability to use the patent to profit from that technology may be more limited in time than for its legal remaining term. I conducted sensitivities on the remaining term and found no significant impact on my results.

Highly Confidential

**Table 12 – Average Remaining Term as of July 2011 by Country**

| Country | Average Remaining Term (years) | |
|---|---|---|
| | **Patents** | **Patents and Applications** |
| **Countries with 100 or more patents and applications** | | |
| U.S. | 9.4 | 11.2 |
| France | 8.6 | 13.2 |
| Germany | 8.6 | 13.5 |
| U.K. | 8.5 | 13.2 |
| Canada | 7.3 | 12.1 |
| **Countries with more than five and less than 100 patents and applications** | | |
| India | 11.4 | 17.5 |
| Brazil | 7.4 | 17.7 |
| Korea | 10.8 | 16.7 |
| China | 10.4 | 15.6 |
| Hong Kong | 8.2 | 16.4 |
| Taiwan | 11.4 | 12.5 |
| Spain | 7.5 | 15.4 |
| Australia | 7.3 | 7.4 |
| Italy | 7.8 | 15.4 |
| Netherlands | 7.7 | 15.4 |
| Japan | 6.6 | 15.2 |
| Mexico | 6.2 | 6.2 |
| Finland | 6.2 | 15.4 |
| Sweden | 5.8 | 15.2 |
| **Total** | **9.0** | **12.8** |

### 4.    Calculation of Patent Index

138.    I now combine these measures of patent characteristics into the Patent Index. This index accounts for the number of patents, the end product market size and the patents' remaining term or the projected remaining term of the applications. I consider this Index to be an indication of where value resided in the Patent Portfolio. I do not believe this approach permits the determination of fair market value relinquished by the Debtor Groups.

139.    The share of Patent Portfolio value held by each IE can be broken down into two parts: (a) the value of rights held by an IE in the Exclusive Territories and (b) the value of an IE's non-exclusive rights in the non-Exclusive Territories.

Highly Confidential

140.    The number of patents and applications in a geographic territory, market size and remaining term are indicators of the relative value of patent rights in that territory. For patents in the Exclusive Territories, the relative value of rights is attributed to the IE in that territory. For the non-Exclusive Territories. I attribute one-fifth of the relative value to each of the five IEs. The total relative value of patent rights held by each IE is the sum of the relative value of the rights in the IE's Exclusive Territory and one-fifth of the relative value of rights in the non-Exclusive Territories.

141.    In the above mentioned analysis I also account for the possibility that applications have less value than granted patents because whether in fact they will be granted is in doubt, and during the time until a patent is granted there is no IP protection. To address this concern, I reviewed the reported grant rate of the United States Patent Office (USPTO) as well as the literature on application grant rates in other jurisdictions. The literature shows grant rates in other jurisdictions being generally lower than those for the USPTO.[190] Based on the range of estimates, I apply a rate of 75% to the applications in the Patent Portfolio for the purpose of determining value relinquished. My application of the 75% grant rate for all jurisdictions is conservative in

---

[190] *See* IP5 Statistics Report 2011 Edition (2011), accessed Nov. 21, 2013, http://www.fiveipoffices.org/stats/statisticalreports/ip5-statistics-2011.pdf; Mark A. Lemley and Bhaven Sampat, "Is the patent office a rubber stamp?" *Emory Law Journal* 58 (2008), at 114; Cecil D. Quillen, Jr. and Ogden H. Webster, "Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office - Updated," *The Federal Circuit Bar Journal* 15:4 (2006); Clarke, Robert A., "U.S. Continuity Law and Its Impact on the Comparative Patenting Rates of the US, Japan and the European Patent Office," *Journal of the Patent and Trademark Office Society* 335 (2003), at 337; Harhoff, Dietmar and Stefan, Wagner, "Modeling the Duration of Patent Examination at the European Patent Office," *Center for Economic Policy Research Discussion Paper No. 5283* (2006), at 7; Harhoff, Dietmar, Stefan, Wagner, "Modeling the Duration of Patent Examination at the European Patent Office," Center for Economic Policy Research Discussion Paper No. 5283, (2006), at 17, 18.

Highly Confidential

that the use of a lower grant rate would tend to increase the estimate of value relinquished by the U.S Debtors.[191]

142.    I present my results in Table 13. Similar to the method in which the IPCo Model treats revenue in China, I provide the results for the Patent Index both including the Chinese patents and excluding Chinese patents. To account for the potential distribution of value within the Patent Portfolio, I present results for the Patent Index restricting my analysis to patents and applications considered to be of high and highest interest. These results imply that most of the value in the Patent Portfolio was attributable to the U.S. Debtor Group.

**Table 13 - Patent Index Results (Percentage of Value Relinquished)**

|  | All | High and Highest Interest | Highest Interest |
|---|---|---|---|
| **China Excluded** | | | |
| Canadian Debtors | 3.3% | 2.0% | 3.3% |
| EMEA Debtors | 15.5% | 9.3% | 12.9% |
| U.S. Debtors | 81.2% | 88.7% | 83.8% |
| **China Included** | | | |
| Canadian Debtors | 5.3% | 2.9% | 4.9% |
| EMEA Debtors | 20.7% | 11.8% | 17.4% |
| U.S. Debtors | 74.0% | 85.3% | 77.7% |

**E.    Summary of Valuation Results for Patent Portfolio Sale**

143.    As I previously explained, I conclude, based on a DCF model that uses cash flows projected by the IPCo Model, that the fair market value of the assets relinquished by the Canadian, EMEA and U.S. Debtor Groups in the Patent Portfolio sale is $0.43 billion, $0.71

---

[191] Moreover, even if an application is granted, the grant date will be in the future. As a result, the value of an application, even if it is certain that it will be granted, is less than the value of an already granted patent because the value of the application can only be realized in the future. This also lends credence to the idea that an application weighting lower than 75% could be appropriate.

Highly Confidential

billion and $3.31 billion, respectively. (See Table 14.) As I discussed in the previous section, my examination of patent characteristics confirms the reasonableness of my conclusion.

**Table 14 - Patent Portfolio Valuation Results**

|                  | $ Billions | Percentage |
| ---------------- | ---------- | ---------- |
| Canadian Debtors | $0.43      | 9.7%       |
| EMEA Debtors     | $0.71      | 16.0%      |
| U.S. Debtors     | $3.31      | 74.3%      |

## XI.    CONCLUSIONS

144.    Based on my experience, expertise, and analysis, I conclude that the Canadian, EMEA, and U.S. Debtor Groups relinquished assets with a fair market value of $0.34 billion, $0.51 billion and $1.99 billion, respectively, in the Line of Business sales. The shares of total Line of Business value relinquished by the Canadian, EMEA, and U.S. Debtor Groups are 11.9%, 18.0%, and 70.0%, respectively. I also conclude that the Canadian, EMEA, and U.S. Debtor Groups relinquished assets with a fair market value of $0.43 billion, $0.71 billion and $3.31 billion, respectively, in the Patent Portfolio sale. The shares of Patent Portfolio value relinquished by the Canadian, EMEA, and U.S. Debtor Groups are 9.7%, 16.0%, and 74.3%, respectively. In total, including both the Line of Business and Patent Portfolio sales, Canadian, EMEA, and U.S. Debtor Groups should receive $0.77 billion (10.6%), $1.23 billion (16.8%), and $5.30 billion (72.6%), respectively, of the Available Proceeds. See Table 15, which shows the value relinquished by each Debtor Group and each Debtor Group's relative share of proceeds for the Line of Business and Patent Portfolio sales. See also Exhibit 33, which shows the value relinquished by each entity in each sale.

Highly Confidential

**Table 15 - Summary of Results[192]**

| | Lines of Business | | Patent Portfolio | | Total | |
|---|---|---|---|---|---|---|
| | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent |
| **Canadian Debtors** | $0.34 | 11.9% | $0.43 | 9.7% | $0.77 | 10.6% |
| **EMEA Debtors** | $0.51 | 18.0% | $0.71 | 16.0% | $1.23 | 16.8% |
| **U.S. Debtors** | $1.99 | 70.0% | $3.31 | 74.3% | $5.30 | 72.6% |
| **Total** | **$2.85** | **100%** | **$4.45** | **100%** | **$7.30** | **100%** |

Signed on the 24th day of January, 2014, at Los Angeles, CA.

Jeffrey H. Kinrich

---

[192] Line of Business value and percentages in Table 15 do not sum to total because Nortel Colombia is not included. *See supra* note 7.

73

Highly Confidential

Court File No.:  09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, C. C-36, AS AMENDED.

- and the -

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
                           :

|  |  |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

---------------------------------------------------------X

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1.    My name is Jeffrey H. Kinrich. I live in Valley Village, California, USA.

2.    I have been engaged by counsel for the U.S. Debtors to provide evidence in relation to the above-noted court proceedings.

3.    I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

74

Highly Confidential

(a)     to provide opinion evidence that is fair, objective and non-partisan;

(b)     to provide opinion evidence that is related only to matters that are within my area of expertise; and

(c)     to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.     I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

_____
Jeffrey H. Kinrich

Date:     _January 24th, 2014_

75

Highly Confidential

**Appendix A**

**Curriculum Vitae of Jeffrey H. Kinrich**

**Appendix A**

## JEFFREY H. KINRICH
### Managing Principal

Phone:  (213) 896-4544
Fax:  (213) 623-4112
jkinrich@analysisgroup.com

333 South Hope Street
27th Floor
Los Angeles, CA  90071

Jeff Kinrich has over three decades of litigation consulting experience with business clients and individuals on engagements involving applications of financial and economic analysis, accounting, business valuation and statistics.  He specializes in damage quantification and valuation in the areas of commercial litigation and intellectual property.  Mr. Kinrich has testified frequently on damages, valuation, and accounting issues in numerous state and federal courts.  He is a Certified Public Accountant in the State of California, and holds an Accreditation in Business Valuation.

## EDUCATION

| 1980 | MBA, Finance and Quantitative Methods, University of Maryland, with honors, first in class, 1980. |
| 1977 | M.S., Statistics, Stanford University. |
| 1976 | B.A., Mathematics, *summa cum laude*, Pomona College, first in class, 1976. |

## PROFESSIONAL EXPERIENCE

| 2001 - present | Analysis Group, Managing Principal |
| 1981 - 2001 | PricewaterhouseCoopers LLP, Partner, Financial Advisory Services |
| 1978 - 1980 | BDM Corporation; Statistical Analyst |
| 1977 - 1978 | Lawrence Livermore Laboratory; Statistician |

## AWARDS

Elijah Watts Sells Silver Medal for second highest score in the U.S. on CPA Examination

Forbes Gold Medal for the highest CPA examination score in California.

**Appendix A**

**PROFESSIONAL AND BUSINESS AFFILIATIONS**

Certified Public Accountant

Member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants

Accredited Business Valuator

California Society of CPAs Litigation Sections, Steering Committee

American Institute of CPAs, Forensic and Litigation Services Committee

Licensing Executives Society

Phi Beta Kappa

Board of Directors, Bet Tzedek Legal Services

**SELECTED EXPERIENCE**

*Commercial Damages*

- Evaluated lost profits damages for hundreds of commercial litigation engagements, including breach of contract, employment and business tort matters.  Matters involved dozens of different industries.

- Evaluated impact of mergers on value of combined firms; computed damages resulting from failed or improperly implemented mergers.

- Measured losses due to business interruption.

- Determined damages from breach of distribution and franchising agreements.

- Analyzed revenue, cost, profit and typicality issues in connection with class actions.

- Valued assets and evaluated accounting issues in connection with merger and purchase price disputes.

- Conducted several alter ego studies.  Searched for commingling of funds, violation of corporate formalities, and other improper transactions between the company and shareholder/parent.

- Analyzed and testified about Generally Accepted Accounting Principles, cost accounting issues, accounting records, and related matters.

- Computed damages from loss of individual earnings in connection with wrongful termination, employment and personal injury claims.  Such claims included loss of wages, commissions, and bonuses.  Considered issues of mitigation and discounting.

- Provided technical consulting on many applications of statistics to litigation, including statistical sampling, regression analysis, time series, probability theory, and survey design.

- Served as an arbitrator or court-appointed special master in several commercial disputes.

### Intellectual Property

- Analyzed patent infringement damages under both lost profits and reasonable royalty approaches for a wide variety of patents. Industries include medical products, respirators, cable television, aircraft engine housings, telephone equipment, toys, semiconductors, computer printer cartridges, disposable diapers, automobile components and accessories, cigarette lighters, photographic equipment, oil tools, satellite antenna feeds, water coolers, athletic shoes, contact lenses, sprinkler systems, computer disks, magnetic insoles, robotic surgery devices, compact disk cases, superconducting amplifiers, food products, and many others.

- Measured patent damages for business method patents, including insurance processing systems, space orbital trajectories, encryption algorithms, and farming methods.

- Negotiated a reasonable royalty in settlement of a patent dispute.

- Measured damages from various trademark and copyright infringement matters, including software and entertainment properties. Apportioned profits between infringing and non-infringing elements.

- Computed damages for trade secrets and non-compete agreements. Issues involved theft of customer lists, business plans, and manufacturing methods and technologies.

### Technology/Computers

- Conducted numerous damage studies relating to high tech intellectual property, including semiconductors, space systems, computers, printers, medical products, search engine design, and others. Computed both lost profits and reasonable royalties.

- Measured damages in connection with several Internet issues, including cybersquatting and misuse of website names.

- Computed lost profits and disgorgement from sale of counterfeit software.

- Testified as to the value of a software VAR agreement.

- Conducted international transfer pricing analysis for computer manufacturer.

- Determined damages from breach of a software/firmware development agreement.

### Entertainment

- Determined royalties owed entertainers and managers.

- Computed damages for copyright and breach of contract issues relating to infomercial sales.

- Measured actual losses and disgorgement of profits from copyright infringement related to scripts and story ideas.

- Assisted numerous entertainment executives and performers in valuing personal, professional and entertainment assets.

- Computed lost profits from a breach of an agreement to lease movie projection equipment.

- Valued the overseas rights to a catalog of films.

- Estimated damages relating to failure to execute a film financing guarantee.

**Appendix A**

- Analyzed cost savings and antitrust issues resulting from selling box-lot quantities of recorded music at a discounted price.

- Evaluated the likely impact of a new video distribution technology.

- Measured value of broadcast and publicity rights.

- Computed damages related to breach of radio advertising sales contract.

- Evaluated reasonable fees to be paid for a broadcast television series.

- Computed royalties due for film rights distributed through various media.

- Measured unjust enrichment and disgorgement from misappropriation of the Academy Awards' "Oscar" ® statuette image.

- Valued movie download rights in connection with a distribution deal.

### *Employment*

- Measured statistical likelihood of differential results in employment decisions.

- Conducted and/or supervised numerous employment related damages analyses, including assessing claims for lost wages, lost commissions, and loss associated with alleged inadequate expense reimbursements.

- Analyses were conducted in connection with both class action and individual claims.

### *Telecommunications*

- Conducted a lost profits study for a major telecommunications antitrust suit.

- Measured damages in connection with various telecommunications patents and trade secrets.

- Testified as to damages from alleged below cost pricing of telecommunications services.

- Critiqued plaintiff's claim in an offshore telecom litigation.

- Worked for a cellular telephone service provider defending against breach of contract claims from a former agent.

- Testified concerning the value of stock in two privately held communications companies in conjunction with a purchase price dispute.

- Analyzed claim of predatory pricing in the cellular industry.

- Acted as arbitrator in telecommunications contract dispute.

### *Automobile Industry*

- Conducted various damage analyses involving automobile dealership disputes, including dealer terminations, dealer relocations, and failure to award a dealership. Analyzed deal financial records and other economic information to quantify the value of automobile dealerships.

- Analyzed losses from a breach of an acquisition/sale agreement for an automobile parts manufacturer.

- Computed damages for patent infringement of an automobile parts manufacturing patent.

**Appendix A**

- Conducted transfer pricing study for automobile importer.

- Investigated alternative causes for failure of auto dealerships. Searched for diverted funds.

- Acted as a neutral arbitrator in dispute between automobile manufacturer and insurer over extended warranty payments.

- Assisted automobile manufacturer in investigating fraud and diversion of funds in connection with a collection dispute.

- Analyzed accounting issues in connection with the sale of a dealer network.

### Business Valuation

- Valued numerous businesses in connection with commercial or personal disputes.

- Valued intangibles, including patents, trademarks, copyrights, trade secrets and business protocols.

### Family and Partnership Law

- Conducted valuations of numerous private businesses.

- Performed analyses of lifestyle and cash available for support.

- Valued professional practices, including law firms and accounting firms. Valuations performed for divorce purposes and to wrap up partnerships under *Jewel v Boxer*.

- Determined community portion of earnings and assets under various circumstances. Apportioned and valued stock options and profit participations.

- Traced and valued separate vs. community property. Conducted Periera-Van Camp analyses of pre-marital property.

### Construction/Environmental

- Evaluated statistical methods for invasive testing of construction defects.

- Opined about appropriate expenditures by homeowner's associations in connection with maintenance and capital expenditures.

- Testified for a construction contractor as to the amount due in a breach of contract dispute, as well as opining on alter ego issues.

- Measured the diminution in value and lost rents due to a construction delay claim resulting from environmental contamination.

### Tax Disputes

- Conducted transfer pricing studies for automobile importer, semiconductor manufacturer, computer maker, and consumer electronics manufacturer.

- Designed sampling methodology to evaluate customs duty drawback claims.

- Measured damages from improper conversion from an S-Corp. to a C-Corp.

**Appendix A**

## PUBLICATIONS

"Risk and Economic Damages: Theoretical and Practical Issues," with Brian Brinig, *Dunn on Damages,* Issue 7, Summer 2012.

"Can a Reasonable Royalty Ever Be Zero?," with Michael Hsu, *Intellectual Property Today,* May 2011.

"Risk and Economic Damages: Theoretical and Practical Considerations" (with Brian Brinig), appearing in Business Valuation Conference: The Cost of Capital, California Society of CPAs, 2009.

"Analysis and Measurement of Damages in Patent Infringement Actions," appearing in Calculating Patent Damages, Law Seminars International, 2009.

"Engagement Letters for Litigation Services: Business Valuation and Forensic & Litigation Services Practice Aid 04-1," (co-author), *American Institute of Certified Public Accountants*, 2004.

"Trademark Misuse," *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, Friedman and Weil, eds., John Wiley & Sons, 2003.

"Analysis and Measurement of Damages in Patent Infringement Actions," Patent Litigation 2001, (co-author), Practising Law Institute, 2001.

"Cost Estimation," *Litigation Services Handbook: The Role of the Accountant as Expert Witness*, 3rd ed., Weil, Wagner, and Frank, eds., John Wiley, 2001.

"Preparing for Daubert Challenges in Antitrust Cases," *Antitrust Section of the American Bar Association*, *Economic Committee Newsletter*, (co-author), Spring 2001.

"Conflicting Rulings About Conflicts," *The Witness Chair*, California Society of CPA's, (co-author), Fall, 1996.

"Damages on the Internet," *Proceedings of the AIPLA Winter Conference*, AIPLA, 1996.

"Section 482 and Technology Transfers," *Price Waterhouse, Intellectual Property Conference*, (co-author) 1993.

"Dull Witnesses," *Litigation*, American Bar Assoc., Vol. 19, No. 3, Spring, 1993.

"Forensic Accounting and Litigation Consulting Services," *The Accountant's Handbook 7th ed.*, (co-author), John Wiley, 1990.

Appendix A

## TESTIMONY LIST OF JEFFREY H. KINRICH
### (2010 – Present)

| Matter | Year | Court | Deposition | Trial |
|---|---|---|---|---|
| Linear Technology Corp v. Novellus | 2009/ 2010 | California Superior Court, San Jose | X | X |
| Edwards Lifesciences v. Corevalve | 2009, 2010 | Federal District Court, Delaware | X | X |
| Konami U.K. v. Upper Deck Panoceania | 2010 | Amsterdam, Netherlands (by written testimony) | | X |
| Jivago v. Kleinberg & Lerner | 2010 | California Superior Court, Los Angeles | X | X |
| Bangkok Broadcasting TV v. IPTV | 2010 | Federal District Court, Central District of California | X | X |
| Sand Capital I LLC v. First Private Bank & Trust | 2010 | California Superior Court, Orange County | X | |
| Tamarack Scientific v. Ultratech, Inc. | 2010 | California State Court, Riverside | X | |
| Family Nissan v. Nissan North America | 2010 | California Superior Court, Orange County | X | |
| Mattel v. MGA | 2010, 2011 | Federal District Court, Central District of California | X | X |
| Hoot Winc v. RSM McGladrey | 2011 | Federal District Court, Central District of California | X | |
| Epson v. Ninestar et al | 2011 | Federal District Court, District of Oregon | X | |

Appendix A

# TESTIMONY LIST OF JEFFREY H. KINRICH
## (2010 – Present)

| Matter | Year | Court | Deposition | Trial |
|---|---|---|---|---|
| Citri-Lite v. Cott | 2011 | Federal District Court, Eastern District of California | X | X |
| K&N Engineering v. Spectre Performance | 2011 | Federal District Court, Central District of California | X | X |
| BAM v. Albert Hill III | 2011 | Federal District Court, Northern District of Texas | X | X |
| Quality Investment Services Santa Clara v. Serrano Electric | 2011 | Federal District Court, Northern District of California | X | |
| Marriage of Taupin | 2011 | California Superior Court, Los Angeles | X | |
| Sunstone v. Heiserman | 2011 | California Superior Court, Riverside County | X | |
| Bobrick Washroom Equipment v. American Specialties, Inc. | 2011 | Federal District Court, Central District of California | X | |
| Batts v. Black Eyed Peas | 2011 | Federal District Court, Central District of California | X | |
| My Favorite Company v. Wal-Mart | 2011 | Federal District Court, Central District of California | X | |
| Ward v. American Beverage Co. | 2011 | Federal District Court, Central District of California | X | |

**Appendix A**

## TESTIMONY LIST OF JEFFREY H. KINRICH
### (2010 – Present)

| Matter | Year | Court | Deposition | Trial |
|---|---|---|---|---|
| Marriage of Armour & Ritter | 2011 | California Superior Court, Los Angeles | X | X |
| IMAX v. Sanborn Theaters | 2012 | Federal District Court, Central District of California | X | |
| Central Pacific Bank v. Fidelity National Title Insurance Co. | 2012 | California Superior Court, Riverside | X | X |
| INVISTA v. DuPont | 2012 | Federal District Court, Southern District of NY | X | Decl. |
| West & Zampella v. Activision | 2012 | California Superior Court, Los Angeles | X | |
| FormFactor v. Micro-Probe | 2012 | Federal District Court, Northern District of California | X | |
| Rincon EV Realty v CP III Rincon Towers | 2012 | California Superior Court, San Francisco | X | X |
| Marriage of Katz | 2012 | California Superior Court, Los Angeles | | X |
| Boese v. 3MJ | 2012 | California Superior Court, Riverside | X | X |
| State of Hawaii v. Westchester Fire Insurance Co. et al. | 2012 | Hawaii Circuit Court | X | |
| Jones v Sagaser | 2012 | Arbitration, Fresno | | X |

**Appendix A**

# TESTIMONY LIST OF JEFFREY H. KINRICH
## (2010 – Present)

| Matter | Year | Court | Deposition | Trial |
|---|---|---|---|---|
| No Doubt v Activision | 2012 | California Superior Court, Los Angeles | X | |
| Columbia Housing v. Almond Tree | 2012 | California Superior Court, Los Angeles | X | |
| CHD v Hill | 2012 | Arbitration, Texas | | X |
| Morpho Detection v Smiths Detection | 2012 | Federal District Court, Eastern District of Virginia | X | X |
| Evans v Trope & Trope | 2012, 2013 | Arbitration, Los Angeles | X | X |
| Legacy Villas v Centex | 2012 | California Superior Court, Riverside | X | |
| JC Trading v Wal-Mart | 2013 | Federal District Court, Delaware | X | |
| Schultz v Douglas Steel | 2013 | California Superior Court, Los Angeles | X | X |
| Aberle v Brookfield Homes | 2013 | California Superior Court, Riverside | X | |
| Exclaim Marketing v DirecTV | 2013 | Federal District Court, Eastern District of North Carolina | X | |
| Vantage v Taylor Woodrow Homes | 2013 | California Superior Court, Orange | X | |

Appendix A

# TESTIMONY LIST OF JEFFREY H. KINRICH
## (2010 – Present)

| Matter | Year | Court | Deposition | Trial |
|---|---|---|---|---|
| Color Me Mine v. Southern States Marketing, Peachtree Playthings et al. | 2013 | Federal District Court, Central District of California | X | |
| Elias (Riverside Dental) v. American Dental Partners | 2013 | JAMS Arbitration, Orange County | | X |
| Guidance Endodontics v Modrall Sperling | 2013 | New Mexico District Court, Bernalillo County | X | |
| Tessera v. Powertech Technology | 2013 | Federal District Court, Northern District of California | X | |

# **Appendix B**

## **Documents Relied Upon**

## Appendix B - Documents Relied Upon

**Case Documents**

*Asset Sale Agreements*

GIP_Nortel_00089277 (Apr. 4, 2011, Google Stalking Horse Agreement).
NNC-NNL06001609 (Dec. 22, 2009, CVAS Asset Sale Agreement).
NNC-NNL06001756 (May 28, 2010, EMEA CVAS Asset Sale Agreement).
NNC-NNL06001771 (May 28, 2010, France CVAS Asset Sale Agreement).
NNC-NNL06002361 (Mar. 11, 2011, EMEA MSS Asset Sale Agreement).
NNC-NNL06002399 (Mar. 11, 2011, MSS Amended Asset Sale Agreement).
NNC-NNL07789355 (June 4, 2010, GSM Mexico Asset Transfer Agreement).
NNC-NNL11152277 (Mar. 31, 2009, Layer 4-7 Germany Bill of Sale).
NNI_00803798 (July 24, 2009, CDMA & LTE Asset Sale Agreement).
NNI_00806387 (Sept. 14, 2009, Enterprise Amended and Restated Asset Sale Agreement Relating to the Sale and Purchase of the EMEA Assets).
NNI_00807958 (Sept. 14, 2009, EMEA Enterprise Asset Sale Agreement).
NNI_00810458 (Nov. 24, 2009, GSM Asset Sale Agreement).
NNI_00814609 (Mar. 31, 2010, GSM Asia Asset Sale Agreement).
NNI_00814632 (Feb. 19, 2009, Layer 4-7 Asset Sale Agreement).
NNI_00815758 (Mar. 31, 2009, Layer 4-7 Asia Offshore Bill of Sale).
NNI_00815839 (Mar. 31, 2009, Layer 4-7 Malaysia Bill of Sale)
NNI_00815844 (Mar. 31, 2009, Layer 4-7 Indonesia Bill of Sale).
NNI_00816040 (Mar. 19, 2010, MEN Amended and Restated Asset Sale Agreement).
NNI_00817023 (Nov. 24, 2009, MEN Amended and Restated Asset Sale Agreement).
NNI_00821708 (Sept. 24, 2010, MSS Asset Sale Agreement).
NNI_00823699 (Oct. 25, 2009, Next Generation Packet Core Transaction Agreement).
NNI_00825094 (June 30, 2011, Rockstar Asset Sale Agreement).
NNI_00825205 (July 29, 2011, Amendment to Rockstar Asset Sale Agreement).
NOR_53928208 (July 4, 2010, Layer 4-7 Spain Bill of Sale).

*Sellers Disclosure Schedules*

BHG0245595 (Annex A.I(h) Abandoned/Expired, Transferred Patents).
NNC-NNL06001637 (Dec. 22, 2009, CVAS Sellers Disclosure Schedule).
NNC-NNL07789331 (May 11, 2010, GSM CALA Sellers Disclosure Schedule).
NNC-NNL07789371 (Nov. 27, 2009, Next Generation Packet Core Sellers Disclosure Schedule to Amended Transaction Agreement).
NNC-NNL11676495 (Mar. 19, 2010, MEN Sellers Disclosure Schedule to Amended and Restated Asset Sale Agreement).
NNI_00806963 (Sept. 14, 2009, Enterprise Sellers Disclosure Schedule to Amended and Restated Asset Sale Agreement).
NNI_00808591 (Updated Enterprise Schedule A: Other Sellers).
NNI_00816247 (MEN EMEA Sellers).
NNI_00822333 (Sept. 24, 2010, MSS Sellers Disclosure Schedule).
NNI_00822569 (MSS Sellers Disclosure Schedule).
NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents).
NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab).

*License Termination Agreements*

GIP_Nortel_00101436 (GSM CALA License Termination Agreement).
GIP_Nortel_00101634 (MEN NNSA IP Confirmation Agreement).
NNC-NNL06001658 (May 28, 2010, CVAS Intellectual Property License Agreement).
NNC-NNL06001664 (CVAS License Termination Agreement).
NNC-NNL06001811 (Nov. 13, 2009, CDMA & LTE Intellectual Property License Agreement).
NNC-NNL06002178 (Feb. 26, 2010, MEN Side Letter).
NNC-NNL06002476 (Mar. 11, 2011, MSS Intellectual Property License Agreement).
NNC-NNL06002488 (MSS NNSA License Termination Agreement).
NNC-NNL11152233 (Mar. 31, 2009, Layer 4-7 Assignment of Patents).
NNI_00805595 (CDMA & LTE License Termination Agreement).
NNI_00812035 (Mar. 31, 2010, GSM Appropriate License Termination Agreement).
NNI_00812712 (Mar. 31, 2010, GSM Intellectual Property License Agreement).
NNI_00816252 (Mar. 19, 2010, MEN Intellectual Property License Agreement).
NNI_00825055 (Next Generation Packet Core License Termination Agreement).
US_EMEA_Canada_PRIV_00086159 (Dec. 18, 2009, Enterprise Intellectual Property License Agreement).

Highly Confidential

## Appendix B - Documents Relied Upon

### Case Documents

*Other Agreements*

Ex. 21003, NNC-NNL06001514 (Master R&D Agreement).

Ex. 21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)), at Appendix A.

Ex. 21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)), at Appendix H.

Ex. 21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)).

Ex. 22077, NNC-NNL011359 (Oct. 31, 2008, Joint Request for Bilateral APA 2008).

NNC-NNL11756408 (June 9, 2009, Interim Funding and Settlement Agreement).

NNC-NNL20001869 (Dec. 23, 2009, Final Canadian Funding and Settlement Agreement).

NNI_00867914 (Oct. 31, 2008, Appendix Q-2 of Joint Request for Bilateral APA 2008: Search for Comparable Uncontrolled North American Resellers of Information Technology Products).

NNI_00867979 (Oct. 31, 2008, Appendix Q-3 of Joint Request for Bilateral APA 2008: Search for Comparable Uncontrolled EMEA Resellers of Information Technology Products).

NNI_01015781 (Oct. 31, 2008, Appendix Q-4 of Joint Request for Bilateral APA 2008: Search for Comparable Uncontrolled APAC Resellers of Information Technology Products).

NNI_01393131 (Oct. 15, 2009, Master Consulting Agreement).

NNI_NARNIA_00303979 (Dec. 31, 2008, Memorandum of Understanding).

*Court Documents*

Application for an Order Authorizing Employment and Retention of Global IP Law Group, LLC Nunc Pro Tunc to October 13, 2009 as Intellectual Property Consultants to the Debtors and Debtors in Possession, Oct. 30, 2009 [D.I. 1796].

Application for an Order Authorizing Employment and Retention of Lazard Frères & Co. LLC Nunc Pro Tunc to the Petition Date as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Feb. 13, 2009, Exhibit C [D.I. 294-4].

Approval and Vesting Order of the Ontario Superior Court of Justice (Commercial List) dated July 11, 2011, Re Nortel Networks Corp. (Court File No. 09-CL-7950).

Debtors' Motion for Entry of an Order Authorizing Action under the MEN Sale Escrow Agreement Without the Consent or Participation of Nortel Colombia and Granting Related Relief, May 23, 2011 [D.I. 5472].

Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105, Bankruptcy Rule 1015, and Local Rule 1015-1 (I) Directing Joint Administration of the Debtors' Related Chapter 11 Cases and (II) Granting Related Relief, July 15, 2009 [D.I. 1073].

Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements, May 17, 2011 [D.I. 5424].

Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit C:  Enterprise Russia Agreement, July 28, 2011 [D.I. 6047-4].

Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit D:  GSM/GSM-R Russia Agreement, July 28, 2011 [D.I. 6047-5].

Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, July 28, 2011 [D.I. 6047].

Ex. 11359 (Sept. 3, 2010, Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors).

Ex. 31443, NNC-NNL06695580 (Jan. 14, 2009, Witness Statement of Sharon L. Rolston).

Expert Report of Raymond Zenkich (submitted by the U.S. Debtors), dated January 24, 2014.

NNSA Accession Letter, dated Nov. 30, 2009.

Order (A) Authorizing Debtors' Entry Into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Approving the License Rejection Procedures, Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Approving Certain Amendments to the Escrow Agreements, Aug. 23, 2011 [D.I. 6193].

Order Under 11 U.S.C. §§ 327 and 328 Authorizing Retention and Employment of Lazard Frères & Co. LLC as Financial Advisor and Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date. Mar. 20. 2009 [D.I. 507].

Ray Dep., Dec. 13, 2013.

Riedel Dep., Oct. 10, 2013.

Transcript of Record at 40:22 – 41:21, In re. Nortel Networks, et al. (July 12, 2011) [D.I. 5939].

Veschi Dep., Nov. 7, 2013.

Highly Confidential

## Appendix B - Documents Relied Upon

### Case Documents

*Data*

BHG0124158 (IPCo Model (Model v3.1 Distributed)).
Cash Summary (Dec. 31, 2013, Cash Summary).
GIP_Nortel_00063576 (Aug. 5, 2011, Iceberg-Sortable Asset List).
GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List).
NNC-NNL07586448 (Mar. 29, 2009, MEN 2006-2010 Revenue Break-Down by Region).
NNC-NNL07982049 (Feb. 21, 2009, Enterprise P&L Trend).
NNI_00070446 (Enterprise 2007-2009 Americas Revenue by Country).
NNI_00136997 (GSM 2007-2011 Revenues and Margin by Quarter, November 2009 Forecast).
NNI_00142448 (CDMA 2007-2011 Product Versus Service Revenue by Region).
NNI_00144685 (June 4, 2009, CVAS Unrestricted P&L).
NNI_00147795 (CDMA 2008-2011 Service Revenue by Customer and Type).
NNI_00216237 (Enterprise 2008-2011 Americas Revenue by Sub-Region).
NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements).
NNI_00799378 (July 29, 2011, Active Patent and Technology Summary as of Q2).
NNI_EQUINOX_00003390 (Nortel Limited Risk Distributors & Service Entities).
NNI_EQUINOX_00084242 (Feb. 23, 2009, Nortel Corporate Structure).
NNI_NARNIA_00200412 (CDMA 2007-2011 Product and Service Revenue by Customer).
NOR_53648037 (2002 TPA Worksheets).
NOR_53648041 (2003 TPA Worksheets).
NOR_53648048 (2008 TPA Worksheets).
NOR_53648130 (2005 TPA Worksheets).
NOR_53648133 (2006 TPA Worksheets).
NOR_53648312 (2001 TPA Worksheets).
NOR_53648323 (2007 TPA Worksheets).
NOR_53648508 (2004 TPA Worksheets).
NOR_54179043 (Feb. 16, 2011, Nortel, Enterprise Net Working Capital Adjustments).
NOR_54179573 (Feb. 16, 2011, Nortel, Enterprise Final Closing Statement).
NOR_56971224 (2009 TPA Worksheets).

*Financial Statements*

NNC-NNL06001440 (Carve-out income statements).
NNC-NNL06001443 (MEN Combined Financial Statements for the Years Ended December 31, 2009, 2008, and 2007).
NNC-NNL06001445 (CVAS Combined Financial Statements for the Years Ended December 31, 2009, 2008, and 2007).
NNC-NNL06001446 (CVAS Combined Financial Statements for the Three Months Ended March 31, 2010 and 2009).
NNC-NNL06001450 (Carve-out income statements).
NNC-NNL06001452 (Carve-out income statements).
NNC-NNL06001454 (Carve-out income statements).
NNC-NNL06001456 (Carve-out income statements).
NNC-NNL06113735 (Nortel Germany (Nortel GmbH), Succession Tax Liabilities).
NNI_00799378 (July 29, 2011, Active Patent and Technology Summary as of Q2).
NOR_54098895 (Enterprise and Government Solutions Combined Financial Statements for the Three and Six Months Ended June 30, 2009 and 2008).
NOR_54099216 (Nortel FY09 Consolidated P&L by Company Code).
Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar. 12, 2010).
Nortel Networks Corporation, 2010 Annual Report (Form 10-K) (Mar. 4, 2011).
Nortel Networks Corporation, 2011 Annual Report (Form 10-K) (Mar. 8, 2012).

*Other*

Ex. 11150, CCC0001356 (July 8, 2009, IP Aspects of Residual Co.).
Ex. 22097 (Dec. 16, 2009, Patent Portfolio Analysis Phase One – Ottawa Presentation).
Ex. 22098 (March 17, 2010 email to creditors, attaching "the discussion material's for today's meeting" entitled, "Nortel IP Update to Creditor Committees (Mar 17)").
Ex. 31120, NNI_01503360 (Mar. 9, 2006, Transfer Pricing – Meeting with French Tax Authorities).
GIP_Nortel_00064228 (Nortel Patents Overview).
GIP_Nortel_00080080 (May 2010, Iceberg Teaser).
GIP_Nortel_00089270 (Apr. 25, 2011, email entitled, "Fwd: IPCo. Model 4.0").
GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction).
GIP_Nortel_00230256 (Jan. 29, 2010, Patent Portfolio Analysis Phase One).

Highly Confidential

## Appendix B - Documents Relied Upon

| Case Documents |
|---|

*Other*

GIP_Nortel_00233023 (May 5, 2010, IPCo Model 2.2 Update).

LAZ_NRTL_00038046 (Mar. 22, 2010, Patent Portfolio Work Plan).

LAZ-NRTL-00018901 (North American GDP Splits by Country).

LAZ-NRTL-00021779 (Oct. 25, 2010, IPCo Model 3.1 Update).

NNC-NNL012706 (Aug. 7, 2010, Nortel Networks Summary of Proceeds).

NNC-NNL05153143 (Oct. 2009, GSM Information Memorandum).

NNC-NNL06002580 (July 27, 2011, Second Amended and Restated IP Transaction Side Agreement).

NNC-NNL07947317 (MEN Scope).

NNC-NNL08173984 (Nortel Background).

NNI_00324033 (Feb. 2011, email chain entitled, "IP Milestone & Metrics – February, 2011").

NNI_00612845 (Jan. 2011, email chain entitled, "Re: Nortel IP | Follow-Up Information Request").

NNI_01290195 (IPCo Market Data Update Summary).

NNI_01323495 (Apr. 27, 2010, IPCo Update to Nortel Leadership Team).

NNI_EQUINOX_00067481 (Jan. 5, 2009, Entity Structure).

NNI_NARNIA_00197426 (July 9, 2009, Nortel CDMA Information Memorandum).

NOR_53926476 (Oct. 27, 2009, Letter Re. Sales of Wireless Assets).

NOR_54275577 (July 7, 2009, LTE Information Memorandum).

NOR_54380696 (May 2009, CVAS Information Memorandum).

UCC0166151 (July 8, 2010, MSS Update).

US_EMEA_Canada_PRIV_00184539 (IPCo NYC Working Session: Scenario #2).

US_EMEA_Canada_PRIV_00191069 (Mar. 10, 2010, IPCo Update to Nortel Leadership Team).

Highly Confidential

## Appendix B - Documents Relied Upon

### Third Party Documents

*Articles*

Adam Segal, "China's Innovation Wall," Foreign Affairs, Sept. 28, 2010, accessed Oct. 16, 2013, http://www.foreignaffairs.com/print/66714.

Alexander Hammer and Katherine Linton, "China: Effects of Intellectual Property Infringement and Indigenous Innovation Policies on the U.S. Economy," USITC Publication 4226 (2011).

Alexander Hammer and Katherine Linton, "China: Intellectual Property Infringement and Indigenous Innovation Policies, and Frameworks for Measuring the Effects on the U.S. Economy," USITC Publication 4199 (2010).

Alexander Poltorak, "Valuing Individual Patents Comprising a Portfolio," *Patent Strategy & Management* 4:6 (2003).

Alfonso Gambardella, Dietmar Harhoff, and Bart Verspagen, "The Economic Value of Patent Portfolios," Centre for Economic Policy Research Discussion Paper No. 9264 (2013).

American Society of Appraisers, *ASA Business Valuation Standards* (2009), accessed Jan. 24, 2014, http://www.appraisers.org/docs/default-source/discipline_bv/bv-standards.pdf?sfvrsn=0.

Bas Straathof and Sander van Veldhuizen, "Market size, education, trust, and the value of IPRs: Evidence from the validation of European Patents," Aug. 31, 2011, accessed Jan. 24, 2014, http://www.epip.eu/conferences/epip06/papers/Parallel%20Session%20Papers/STRAATHOF%20Bas.pdf.

Cecil D. Quillen, Jr. and Ogden H. Webster, "Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office - Updated," The Federal Circuit Bar Journal 15:4 (2006).

Chris Devonshire-Ellis et al. (eds.), *Intellectual Property Rights in China* (2011).

Chris Ziegler, "Nokia cozies up to TD-SCDMA some more, launches China Mobile versions of the X5 and C5, joins TD Forum," Engadget.com, Apr. 23, 2010, accessed Nov. 22, 2013, http://www.engadget.com/2010/04/23/nokia-cozies-up-to-td-scdma-some-more-launches-china-mobile-ver/.

CIRD210120 - Patent Box: qualifying companies: exclusive licence: meaning of exclusive licence, Her Majesty's Revenue and Customs (HMRC), accessed Jan. 24, 2014, http://www.hmrc.gov.uk/manuals/cirdmanual/CIRD210120.htm.

Clarke, Robert A., "U.S. Continuity Law and Its Impact on the Comparative Patenting Rates of the US, Japan and the European Patent Office," Journal of the Patent and Trademark Office Society 335 (2003).

Daniel Shen and Adam Hwang, "China market: TD-SCDMA smartphones outsell WCDMA, CDMA 2000 EV-DO models," Digitimes.com, Sept. 2, 2013, accessed Nov. 22, 2013, http://www.digitimes.com/news/a20130902PD212.html.

Dexter Roberts, "Enter Goophone I5, Looking a Lot Like Apple's iPhone 5," Businessweek.com, Sept. 6, 2012, accessed Nov. 22, 2013, http://www.businessweek.com/articles/2012-09-06/enter-goophone-i5-looking-a-lot-like-apples-iphone-5.

European Patent Office, *Term of the European Patent*, European Patent Convention Treaty.

Gideon Parchomovsky and R. Polk Wagner, "Patent portfolios," *University of Pennsylvania Law Review* 154 (2005).

Hall, Bronwyn H. and Dietmar Harhoff, "Post-Grant Reviews in the U.S. Patent System Design Choices and Expected Impact," *Berkeley Technology Law Journal* 19:1 (2004).

Harhoff, Dietmar and Stefan, Wagner, "Modeling the Duration of Patent Examination at the European Patent Office," Center for Economic Policy Research Discussion Paper No. 5283 (2006).

Hitachi Acquires Software Assets Related to Next-Generation Mobile Communication Systems from Nortel Networks, Hitachi, Dec. 9, 2009, accessed Jan. 24, 2014, http://www.hitachi.com/New/cnews/091209.pdf.

Ibbotson, "SIC Communication Equipment," in *Ibbotson Cost of Capital Yearbook* (Morningstar, June 30, 2011).

IP5 Statistics Report 2011 Edition (2011), accessed Nov. 21, 2013, http://www.fiveipoffices.org/stats/statisticalreports/ip5-statistics-2011.pdf.

James Bessen, "The Value of U.S. Patents by Owner and Patent Characteristics," *Research Policy* 37 (2008).

John R. Allison, Mark A. Lemley, Kimberly A. Moore, and R. Derek Trunkey, "Valuable Patents," *Geo. L.J.* 92:435 (2004).

Josh Lerner and Jean Tirole, "Efficient Patent Pools," *American Economic Review* 94:3 (2003).

Klaus Schwab, "The Global Competitiveness Report 2011-2012," World Economic Forum (2011).

Kyle A. Jackson, International Property Rights Index 2011, *Property Rights Alliance,* Report 29 (2011), accessed Jan. 24, 2014, http://propertyrightsalliance.org/userfiles/file/ATR_2011%20INDEX_Web2.pdf.

Marcus M. Keupp, Angela Beckenbauer, and Oliver Gassmann, "Enforcing Intellectual Property Rights in Weak Appropriability Regimes: The Case of de Facto Protection Strategies in China," *Management International Review* (2010).

Mark A. Lemley and Bhaven Sampat, "Is the patent office a rubber stamp?" Emory Law Journal 58 (2008).

Mark Schankerman, "How Valuable is Patent Protection? Estimates by Technology Field," *The RAND Journal of Economics* 29:1 (1998).

Michael S. Kramer, "Valuation and Assessment of Patents and Patent Portfolios through Analytical Techniques," *The John Marshall Review of Intellectual Property Law* 6:3 (2007).

More Foreign Companies Involved in IPR Cases, China Daily, July 15, 2013, accessed Nov. 22, 2013, http://www.chinadaily.com.cn/china/2013-07/15/content_16775204.htm.

Nikolaos Papageorgiadis, Adam R. Cross and Constantinos Alexiou, "The impact of the institution of patent protection and enforcement on entry mode strategy: A panel data investigation of U.S. firms," International Business Review 281 (2013).

Nortel to Sell Patent Portfolio, Nortel Networks Corporation, Apr. 4, 2011, accessed Nov. 25, 2013, http://www.nortel-canada.com/2011/04/nortel-to-sell-patent-portfolio/.

Highly Confidential

## Appendix B - Documents Relied Upon

### Third Party Documents

### Articles

Office of the U.S. Trade Representative, "2010 Special 301 Report," 2010, accessed Jan. 19, 2014, http://www.ustr.gov/webfm_send/1906.

Office of the U.S. Trade Representative, "2013 Special 301 Report," 2013, accessed Nov. 25, 2013, http://www.ustr.gov/sites/default/files/05012013%202013%20Special%20301%20Report.pdf.

Phil Goldstein, "Rockstar, patent consortium targeting Android, drops suit against Huawei," FierceWireless, Jan. 23, 2014, accessed Jan. 23, 2014, http://www.fiercewireless.com/story/rockstar-patent-consortium-targeting-android-drops-suit-against-huawei/2014-01-23.

Richard Brealey and Stewart Myers, *6th Edition  Principles of Corporate Finance* (McGraw-Hill Companies, Inc., 2000).

Richard Brealey, Stewart Myers, and Franklin Allen, *11th Edition  Principles of Corporate Finance* (McGraw-Hill Companies, Inc., 2013).

Sam Oliver, "Apple Granted iPhone Network License for China Mobile, World's Largest Carrier," AppleInsider.com, Sept. 11, 2013, accessed Nov. 22, 2013, http://appleinsider.com/articles/13/09/11/apple-granted-iphone-network-license-for-china-mobile-worlds-largest-carrier.

Shannon P. Pratt and Alina V. Niculita, *Valuing a Business, Fifth Edition  The Analysis and Appraisal of Closely Held Companies* (McGraw-Hill Companies, Inc., 2008).

Spherix Closes Rockstar Patent Acquisition Transaction and Enhances its Patent Portfolio in Wireless Communications and Telecommunication Sectors – Rockstar Acquires Equity Stake in Spherix – Venture to be Headed by Seasoned Monetization Executive, Spherix, July 29, 2013, accessed Jan. 24, 2014, http://www.ip-rockstar.com/Press_Releases/Spherix%20-%20Rockstar%20Closing%20PR_%20v2%20072613.pdf.

Steven J. Shapiro, "Pitfalls in Determining the Reasonable Royalty in Patent Cases," *Journal of Legal Economics* 17:1 (2010).

TaylorWessing, *Global Intellectual Property Index - The Third Report (2011)*, accessed Jan. 24, 2014, http://www.taylorwessing.com/ipindex/docs/global_ip_index_3.pdf.

United States Patent Code, 35 U.S.C., Sec 154 (a) (1), accessed Dec. 24, 2013, http://www.gpo.gov/fdsys/pkg/USCODE-2011-title35/html/USCODE-2011-title35-partII-chap14-sec154.htm.

Walter G. Park, "International patent protection: 1960–2005," Research Policy 37 (2008), accessed Jan. 24, 2014, nw08.american.edu/~wgp/res_policy08.pdf.

Weston Anson, *Fundamentals of Intellectual Property Valuation  A Primer for Identifying and Determining Value* (Weston Anson & Donita Suchy, eds., 2005).

World Intellectual Property Organization, *WIPO Patent Drafting Manual* (2010), accessed Jan. 24, 2014, http://www.wipo.int/export/sites/www/freepublications/en/patents/867/wipo_pub_867.pdf.

World Trade Organization, *The Agreement on Trade Related Aspects of Intellectual Property Rights (TRIPS)*.

Yu-Jing Chiu and Yuh-Wen Chen, "International Symposium on the Analytic Hierarchy Process (ISAHP):  Using AHP on Patent Valuation," Conference Report (2005), accessed Jan. 24, 2014, http://www.isahp.org/2005Proceedings/Papers/ChiuYJ_ChenYW_AHP_PatentValuation.pdf.

### Pleadings

Complaint, Bockstar Technologies LLC v. Cisco Systems, Inc. (United States District Court for the District of Delaware, Dec. 11, 2013).

Complaint, Charter Communications, Inc., et al. v. Rockstar Consortium US LP, et al. (United States District Court for the District of Delaware, Jan. 16, 2014).

Complaint, Constellation Technologies LLC v. Time Warner Cable Inc. and Time Warner Cable Enterprises LLC (United States District Court for the Eastern District of Texas Marshall Division, Dec. 11, 2013).

Complaint, Rockstar Consortium US LP and Netstar Technologies LLC v. Google Inc. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Asustek Computer, Inc., et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. HTC Corporation, et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Huawei Investment & Holding Co., Ltd., et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. LG Electronics, Inc., et al (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Pantech Co., Ltd., et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Samsung Electronics Co., Ltd, et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. ZTE Corporation, et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

Complaint, Spherix Incorporated v. Uniden Corporation, et. al. (United States District Court for the Northern District of Texas Dallas Division, Aug. 30, 2013).

Complaint, Spherix Incorporated v. VTech Telecommunications Ltd., et al. (United States District Court for the Northern District of Texas Dallas Division, Aug. 30, 2013).

Highly Confidential

## Appendix B - Documents Relied Upon

### Third Party Documents

*Data*

Capital IQ (downloaded on Aug. 22, 2013).
Capital IQ (downloaded on Dec. 16, 2013).
Capital IQ (downloaded on Sept. 5, 2013).
Capital IQ, "GICS_Map.xls" (received Aug. 30, 2013).
IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec. 2010.
Infonetics, 2G/3G/4G (LTE and WiMAX) Broadband Devices and Subscribers, Dec. 9, 2011.
Infonetics, 2G/3G/4G (LTE and WiMAX) Infrastructure and Subscribers, Dec. 14, 2011.
International Monetary Fund, Representative Exchange Rates for Selected Currencies for Dec. 2009, accessed Jan. 24, 2014,
http://www.imf.org/external/np/fin/data/rms_mth.aspx?SelectDate=2009-12-31&reportType=REP.
International Monetary Fund, Representative rates for the period Jan. 01, 2009 - Dec. 31, 2009, accessed Jan. 24, 2014,
http://www.imf.org/external/np/fin/ert/GUI/Pages/CountryDataBase.aspx.
International Monetary Fund, World Economic Outlook Database, Oct. 2009, accessed Jan. 24, 2014,
http://www.imf.org/external/pubs/ft/weo/2009/02/weodata/index.aspx/.
International Monetary Fund, World Economic Outlook Database, Sept. 2011, accessed Jan. 24, 2014,
http://www.imf.org/external/pubs/ft/weo/2011/02/weodata/index.aspx.
PricewaterhouseCoopers, "Global entertainment and media outlook," June 2012, accessed Jan. 24, 2014,
http://www.careercatalysts.com/pdf/PwCOutlook2012-Industry%20overview%20(3).pdf.
Standard & Poor's Compustat (downloaded on Sept. 5, 2013).
Statista Inc., "Global semiconductor industry revenue from 2006-2015 (in billion U.S. dollars)," June 2013.
Statista Inc., "Projected revenue from the U.S. semiconductor industry from 2006 to 2012, in billion U.S. dollars," Sept. 2009.
Statista Inc., "Semiconductor industry revenue in Japan from 2006-2015 (in billion U.S. dollars)," June 2013.
World Bank, World Development Indicators - GDP, accessed Jan. 24, 2014,
http://data.worldbank.org/indicator/NY.GDP.MKTP.CD/countries?page=2.

*Other*

"Introduction to International Phase," in PCT Applicant's Guide - International Phase (WIPO), accessed Jan. 24, 2014,
http://www.wipo.int/pct/en/appguide/ipindex.jsp.
"Introduction to National Phase," in PCT Applicant's Guide - National Phase (WIPO), accessed Jan. 24, 2014,
http://www.wipo.int/pct/en/appguide/npindex.jsp.
"Summary of Debt Receipts and Disbursements Reporting Period: Sept. 2011," Nortel, Nov. 18, 2011, accessed Jan. 24, 2014, http://www.nortel-us.com/wp-content/uploads/2011/11/11.22.2011SeptemberMOR.pdf.
2000 to Present, Nortel Networks Corporation, accessed Jan. 24, 2014, http://www.nortel-canada.com/about/history/2000-to-present/.
Member states of the European Patent Organisation, EPO, accessed Jan. 24, 2014, http://www.epo.org/about-us/organisation/member-states.html.
Patent Term Calculator (Beta Version), USPTO, accessed Jan. 24, 2014, http://www.uspto.gov/patents/law/patent_term_calculator.jsp.
PATENTSCOPE - National Status, WIPO, accessed Jan. 24, 2014, http://patentscope.wipo.int/search/en/search.jsf.

Highly Confidential

**Exhibit 1: Debtor Groups**

| Entity | Jurisdiction | 2009 Revenue ($ Millions) | Entity | Jurisdiction | 2009 Revenue ($ Millions) |
|---|---|---|---|---|---|
| **Canadian Debtors (5 Entities)[1]** | | | **EMEA Debtors (continued) (22 Entities)[3]** | | |
| Nortel Networks Limited[2] | Canada | $550 | Nortel Networks South Africa (Proprietary) Limited | South Africa | $0 03 |
| Nortel Networks International Corporation | Canada | $0 | Nortel Networks (Scandinavia) AS | Norway | $0 01 |
| Nortel Networks Global Corporation | Canada | $0 | Nortel Networks AB | Sweden | $0 01 |
| Nortel Networks Corporation | Canada | $0 | Nortel Networks International Finance & Holding B V | Netherlands | $0 |
| Nortel Networks Technology Corporation | Canada | $0 | Nortel Networks Oy | Finland | $0 |
| **Total for Canadian Debtors** | | **$550** | **Total for EMEA Debtors** | | **$1,223** |
| **EMEA Debtors (22 Entities)[3]** | | | **U.S. Debtors (16 Entities)[5]** | | |
| Nortel Networks U K  Limited | U K | $359 | Nortel Networks Inc [6] | U S | $3,459 |
| Nortel Networks (Ireland) Limited | Ireland | $276 | Nortel Networks (CALA) Inc | U S | $163 |
| Nortel Networks S A | France | $182 | Nortel Networks International Inc | U S | $7 |
| Nortel GmbH[4] | Germany | $120 | QTERA Corporation | U S | $0 |
| Nortel Networks France S A S | France | $74 | Nortel Networks Optical Components Inc | U S | $0 |
| Nortel Networks B V | Netherlands | $54 | Nortel Networks HPOCS Inc | U S | $0 |
| Nortel Networks Hispania, S A | Spain | $38 | Northern Telecom International Inc | U S | $0 |
| Nortel Networks S p A | Italy | $29 | Alteon Websystems International Inc | U S | $0 |
| Nortel Networks N V | Belgium | $23 | XROS, Inc | U S | $0 |
| Nortel Networks Polska Sp  z o o | Poland | $22 | Sonoma Systems | U S | $0 |
| Nortel Networks A G | Switzerland | $21 | CoreTek Inc | U S | $0 |
| Nortel Networks (Austria) GmbH | Austria | $8 | Nortel Networks Applications Management Solutions Inc | U S | $0 |
| Nortel Networks Portugal S A | Portugal | $6 | Alteon WebSystems, Inc | U S | $0 |
| Nortel Networks, s r o | Czech Republic | $4 | Nortel Networks Capital Corporation | U S | $0 |
| Nortel Networks Slovensko, s r o | Slovakia | $3 | Architel Systems (U S ) Corporation | U S | $0 |
| Nortel Networks Engineering Service Kft | Hungary | $2 | Nortel Networks Cable Solutions, Inc | U S | $0 |
| Nortel Networks Romania SRL | Romania | $1 | **Total for U.S. Debtors** | | **$3,629** |

**Notes:**

[1]  Canadian Debtors are those entities listed in Schedule 1 (Canadian Debtors) of the Fourth Estate Settlement (source [A])

[2]  Revenues of US GAAP FAS 52 Foreign Exchange Adjustment Entity are counted along with revenues of Nortel Networks Limited (source [B])

[3]  EMEA Debtors: See Schedule 3 (EMEA Debtors) of the Fourth Estate Settlement (source [A])  Schedule 6 (EMEA NFEs) of the Fourth Estate Settlement includes non-filed affiliates of the EMEA Debtors  These entities are considered part of the EMEA Debtor Group for valuation purposes  Nortel Networks S A  is identified as an EMEA Debtor in the Final Canadian Funding and Settlement Agreement (source [C])

[4]  Nortel Networks Germany GmbH & Co KG merged with Nortel GmbH in 2007 (source [D])

[5]  U S  Debtors: See Schedule 2 (U S  Debtors) of the Fourth Estate Settlement (source [A])

[6]  Nortel Government Solutions ("NGS") and DiamondWare, Ltd  are not members of a Debtor Group  The equity of NGS and DiamondWare, Ltd  was sold in the Enterprise Line of Business transaction (source [E])  At the time of the sale, both entities were wholly-owned subsidiaries of NNI (source [F])  NGS and DiamondWare, Ltd  earned $295 million in revenue in 2009  These revenues are presented here as part of the revenue of Nortel Networks, Inc

[7]  Nortel Networks de Colombia S A  ("Nortel Colombia") (which earned $3 million in revenue in 2009) is not a member of a Debtor Group, but I understand that it is eligible to receive a distribution  Nortel Communication Holdings (1997) Limited and Nortel Networks Israel (Sales and Marketing) Limited (together "Nortel Israel") and o o o  Nortel Networks ("Nortel Russia") (which earned $27 million and $11 million in revenue in 2009, respectively) are not members of a Debtor Group and sold their rights to a distribution to members of the Debtor Groups

**Sources:**

[A]  Ex  21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)), at Schedules 1, 2, 3 and 6

[B]  NOR_54099216 (Nortel FY09 Consolidated P&L by Company Code, at tab "FY09 Nortel BCS by Co")

[C]  NNC-NNL20001869 (Dec  23, 2009, Final Canadian Funding and Settlement Agreement), at 1

[D]  NNC-NNL06113735 (Nortel Germany (Nortel GmbH), Succession Tax Liabilities), at 1

[E]  Nortel Networks Corporation, 2011 Annual Report (Form 10-K), at 24 (Mar  8, 2012)

[F]  NNI_EQUINOX_00084242 (Feb  23, 2009, Nortel Corporate Structure)

[G]  2009 Revenue data from: NNI_00577735 (Oct  5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business)

Highly Confidential

**Exhibit 2: Fourth Estate Settlement Entities**

| Entity | Jurisdiction | 2009 Revenue ($ Millions) |
|---|---|---|
| Nortel Networks (China) Limited | China | $124 |
| Nortel Networks Australia Pty. Limited | Australia | $101 |
| Nortel Networks Singapore Pte. Limited | Singapore | $101 |
| Nortel Networks (Asia) Limited | Hong Kong | $79 |
| Nortel Networks Kabushiki Kaisha | Japan | $79 |
| Nortel Networks (India) Private Limited | India | $43 |
| Nortel Networks Telecommunications Equipment (Shanghai) Co Limited | China | $31 |
| Nortel Networks (Asia) Limited - Taiwan Branch | Taiwan | $26 |
| Nortel Networks (Asia) Limited - Offshore Sales | Hong Kong | $24 |
| Nortel Networks de Argentina S.A. | Argentina | $24 |
| PT Nortel Networks Indonesia | Indonesia | $20 |
| Nortel Networks de Guatemala Ltda. | Guatemala | $18 |
| Nortel Networks New Zealand Limited | New Zealand | $16 |
| Nortel Networks de México, S.A. de C.V. | Mexico | $13 |
| Nortel Networks Chile S.A. | Chile | $5 |
| Nortel Networks Peru S.A.C. | Peru | $4 |
| Nortel Networks (Asia) Limited - Pakistan Branch | Pakistan | $4 |
| Nortel Networks Malaysia Sdn. Bhd. | Malaysia | $3 |
| Nortel Networks del Uruguay S.A. | Uruguay | $3 |
| Nortel Networks Singapore Pte. Limited - Philippines Branch | Philippines | $2 |
| Nortel Networks del Ecuador S.A. | Ecuador | $1 |
| Nortel Networks (Thailand) Limited | Thailand | $1 |
| Nortel Vietnam Limited | Vietnam | $0.1 |
| Nortel del Paraguay | Paraguay | $0.01 |
| Nortel de México, S. de R.L. de C.V. | Mexico | $0 |
| Nortel Networks Korea Limited | Korea | $0 |
| Nortel Networks Trinidad and Tobago Limited | Trinidad and Tobago | $0 |
| Nortel Tech Exc Centre Pvt LTD | India | $0 |
| **Total** | | **$719** |

**Note:**

[1] These entities have settled and are no longer eligible to receive a distribution.

**Sources:**

[A] This list comprises entities contained in the following: Ex. 21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)), at Schedules 4 and 5; Ex. 21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)), at Appendix A; Ex. 21468 (June 19, 2012, Allocation Settlement Agreement (APAC/CALA)), at Appendix H.

[B] Jurisdiction information from: NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements, at tab "Country Mapping").

[C] 2009 Revenue data from: NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business).

Highly Confidential

**Exhibit 3: Business Segment Overview**

| Business Segment | Description |
|---|---|
| **Wireless Networks (WN)** | The Wireless Networks ("WN") Business Segment focused on wireless and wireline networks and their related services. The WN segment helped cable operators and service providers supply mobile voice, data and multimedia communication services to individuals and enterprises using cellular phones, personal digital assistants, laptops and other computing and communication devices. Nortel's WN portfolio included 3G and 2.5G mobility networking solutions based on CDMA, GSM, GSM-R, GPRS and EDGE technologies. |
| **Enterprise Solutions (ES)** | The Enterprise Solutions ("ES") Business Segment provided enterprise communications solutions to address the office needs of large and small businesses globally across a variety of industries, including healthcare and financial service providers, retailers, manufacturers, utilities, educational institutions and government agencies. The ES portfolio included Unified Communications, Ethernet routing and multiservice switching, IP and digital telephony (including phones), wireless LANs, security, IP and SIP contact centers, self-service solutions, messaging, conferencing, and SIP-based multimedia solutions. |
| **Metro Ethernet Networks (MEN)** | The Metro Ethernet Networks ("MEN") Business Segment focused on "higher performance" Ethernet transport capabilities. The MEN portfolio included optical networking (fiber optics), carrier Ethernet switching and multiservice switching products. The products were designed to increase network capabilities and to give customers the flexibility to use and switch to various networking applications. |
| **Carrier VoIP and Application Solutions (CVAS)** | The Carrier VoIP and Application Solutions ("CVAS") Business Segment focused on enhancing the communications experience for businesses and consumers by providing multimedia applications and VoIP solutions. The CVAS portfolio included VoIP platforms (such as soft-switches and media gateways), TDM switching systems (for local, toll and long-distance deployments), and associated services (such as installation, technical support, and repairs management). |
| **LG - Nortel  Co. Ltd (LGN)[1]** | LG-Nortel Co. Ltd. ("LGN") was a joint venture between Nortel and LG Electronics, Inc. It was newly listed in Nortel's 2009 10-K and sold in 2009 as well.  Nortel's LGN segment provided telecommunications equipment and network solutions to service providers and enterprise customers. LGN's portfolio includes CDMA/LTE products, VoIP product, Enterprise solutions and Ethernet products.  LGN also provided services including installation, technical support and maintenance. |

Note:
 [1]  The LGN joint venture was sold separately from the Lines of Business. The proceeds from this sale were or will be distributed to shareholders.
Sources:
 [A]  Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar. 12, 2010), at 4-8 .
 [B]  LGN sale from Nortel Networks Corporation, 2011 Annual Report (Form 10-K) (Mar. 8, 2012), at 25 .

Highly Confidential

**Exhibit 4: Line of Business Descriptions**

| Business Segment | Line of Business Abbreviation | Buyer | Purchase Price ($ Millions) | Closing Date | Available Proceeds[1] ($ Millions) | Line of Business Name and Description |
|---|---|---|---|---|---|---|
| Wireless Networks ("WN") | CDMA & LTE | Ericsson | $1,130 | 11/13/2009 | $1,053 | Code Division Multiple Access ("CDMA") is commonly described as a third generation ("3G") wireless technology  3G technologies were some of the first to be used in broadband wireless Internet  Long Term Evolution ("LTE"), commonly described as a fourth generation ("4G") technology, is a successor to 3G and provides significantly faster data transmission  Nortel's CDMA & LTE Line of Business included CDMA and LTE "Access" products (radios and radio base station equipment), and CDMA "Core" products (switches and packet data gateway nodes used to connect the Access network to the rest of the public telecommunication world), and related services |
| | GSM[2] | Ericsson/ Kapsch | $105 | 3/31/2010 | $106 | Global System for Mobile communications ("GSM") is a digital mobile technology  Nortel's GSM Line of Business included infrastructure and solutions related to Access products, Core products, and related services |
| | Next Generation Packet Core | Hitachi | $10 | 12/8/2009 | $10 | Next Generation Packet Core refers to part of Nortel's Wireless Networks division that was associated with the development of "next generation" (LTE) "packet core" products, which move data in small units |
| Enterprise Solutions ("ES") | Enterprise | Avaya | $900 | 12/18/2009[3] | $843 | Nortel's Enterprise Solutions Segment provided business communications solutions that unified web conferencing, email, voice, video, and instant messaging  It served large and small businesses globally across a variety of industries |
| | Layer 4-7 | Radware | $18 | 3/31/2009 | $18 | Nortel's Layer 4-7 Line of Business was a part of Nortel's Enterprise Solutions Business Segment  The Layer 4-7 operation developed products such as "application accelerators" and "application switches " Application accelerators and application switches are used to optimize communication speeds and to direct internet traffic |
| Metro Ethernet Networks ("MEN") | MSS[4] | Ericsson | $65 | 3/11/2011 | $46 | Nortel's Multi Service Switch ("MSS") Line of Business was a part of both Nortel's MEN and Enterprise Solutions Business Segments  The MSS Line of Business provided switching hardware and software used to route and deliver data, voice and video signals across communication networks |
| | MEN[4] | Ciena | $775 | 3/19/2010 | $632 | Metro Ethernet Networks ("MEN") includes the deployment of Ethernet in a metropolitan area network  Nortel's MEN Line of Business developed products and services related to optical networking (fiber optics) and carrier grade Ethernet data networking solutions |
| Carrier VoIP and Application Solutions ("CVAS") | CVAS | GENBAND | $283 | 5/28/2010 | $140 | Nortel's Carrier VoIP and Application Solutions ("CVAS") Line of Business developed Voice over Internet Protocol ("VoIP") technology that enables calls over the Internet  Nortel's CVAS business included VoIP Core products, VoIP/SIP (Session Initiation Protocol) phones, and related services |

Notes:

[1] Available Proceeds are adjusted for working capital and for settlement amounts that have already been distributed  Available Proceeds are as of December 31, 2013

[2] Includes assets purchased by Ericsson and Kapsch for $72 million and $33 million, respectively

[3] The sale of Enterprise assets held by Israeli subsidiaries was subsequently approved by the Israeli Court on December 21, 2009

[4] The MEN Business Segment's portfolio comprised optical networking, carrier Ethernet switching and multiservice switching products  Both the optical networking and the carrier Ethernet switching divisions were sold to Ciena in what is referred to as the MEN Line of Business sale  The MSS sale to Ericsson comprised multiservice switching products

Sources:

[A] Business segments, Line of Business names, Line of Business abbreviations, closing dates, and buyers from: Nortel Networks Corporation, 2011 Annual Report (Form 10-K) (Mar  8, 2012), at 2, 24-25, 78; Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar  12, 2010), at 4-8, 60

[B] Purchase price from: NNC-NNL012706 (Aug  7, 2010, Nortel Networks Summary of Proceeds); NNI_00821708 (Sept  24, 2010, MSS Asset Sale Agreement), at 49

[C] Available Proceeds information from: Cash Summary (Dec  31, 2013, Cash Summary)

[D] Line of Business name and description from:

    **CDMA & LTE:** NNI_00803798 (July 24, 2009, CDMA & LTE Asset Sale Agreement); NOR_53926476 (Oct  27, 2009, Letter Re  Sales of Wireless Assets)

    **GSM:** NNI-NNL05153143 (Oct  2009, GSM Information Memorandum), at 6; Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar  12, 2010), at 12

    **Next Generation Packet Core:** NNI_00823699 (Oct  25, 2009, Next Generation Packet Core Transaction Agreement); NOR_53926476 (Oct  27, 2009, Letter Re  Sales of Wireless Assets); Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar  12, 2010), at 43

    **Enterprise:** Ex  22077, NNC-NNL011359 (Oct  31, 2008, Joint Request for Bilateral APA 2008), at 6

    **Layer 4-7:** Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar  12, 2010), at 60; Nortel Networks Corporation, 2011 Annual Report (Form 10-K) (Mar  8, 2012), at 78; NNI_00814632 (Feb  19, 2009, Layer 4-7 Asset Sale Agreement), at 171-173 ("Exhibit D")

    **MSS:** UCC0166151 (July 8, 2010, MSS Update), at 2

    **MEN:** NNC-NNL07947317 (MEN Scope), at 1; NNC-NNL08173984 (Nortel Background), at 11

    **CVAS:** NOR_54380696 (May 2009, CVAS Information Memorandum), at 2, 17; Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar  12, 2010), at 13

Highly Confidential

## Exhibit 5: Line of Business Overview

There were eight Line of Business sales originating from four Business Segments as shown in Exhibit 4. I discuss each of the Line of Business sales in the context of the Business Segments: WN, ES, MEN, and CVAS.

**Wireless Networks Lines of Business**

As described in Exhibit 4, three Lines of Business were sold from the WN Business Segment: Code Division Multiple Access & Long Term Evolution ("CDMA & LTE"), Global System for Mobile Communications ("GSM"), and "Next Generation Packet Core." The CDMA & LTE Line of Business focused on a variety of technologies commonly found in cellular phones, including software and hardware commonly described as third generation ("3G") and fourth generation ("4G") technology. On November 13, 2009, Ericsson purchased the CDMA & LTE Line of Business for $1.1 billion.[1] The largest percentage of 2009 revenues in this Line of Business (80%) was earned in the U.S.[2]

GSM is a radio communication technology that controls how voice and data are sent over wireless channels. It is an alternative standard to CDMA. Nortel's GSM Line of Business was purchased by two buyers for a total of $105 million: Ericsson paid $72 million and Kapsch CarrierCom AG paid $33 million.[3] The sale closed on March 31, 2010.[4] The largest percentage of 2009 revenues in this Line of Business (54%) was earned in the U.S.[5]

---

[1] NNC-NNL012706 (Aug. 7, 2010, Nortel Networks Summary of Proceeds) [hereinafter Summary of Proceeds]; Nortel Networks Corporation, 2011 Annual Report (Form 10-K) (Mar. 8, 2012) [hereinafter NNC 2011 10-K], at 24.

[2] NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements) [hereinafter Carve-Out Income Statements].

[3] Ericsson paid $70 million for part of Nortel's GSM/GSM-Railways assets and $2 million for Nortel's GSM-CALA (Caribbean and Latin America) assets. Kapsch paid $33 million for part of Nortel's GSM/GSM-Railways assets. Cash Summary (Dec. 31, 2013, Cash Summary) [hereinafter Cash Summary]; Summary of Proceeds, *supra* note 1; NNC 2011 10-K, *supra* note 1, at 2, 25.

[4] NNC 2011 10-K, *supra* note 1, at 25.

[5] Carve-Out Income Statements, *supra* note 2.

Highly Confidential

**Exhibit 5: Line of Business Overview (continued)**

The third and smallest Line of Business sold from the WN Business Segment was Next Generation Packet Core. It was sold to Hitachi, Ltd. on December 8, 2009 for $10 million.[6] This Line of Business was a division that focused on developing "next generation" (LTE) switches and technologies for data transmission via data packets.[7]

**Enterprise Solutions Lines of Business**

As shown in Exhibit 4, two Lines of Business were sold from Nortel's ES Business Segment: "Enterprise" and "Layer 4-7." The Enterprise Line of Business, which focused primarily on providing communications products and services to businesses,[8] was sold on December 18, 2009 to Avaya for $900 million.[9] The largest percentage of 2009 revenues in this Line of Business (58%) was earned in the U.S.[10]

The Layer 4-7 Line of Business, operating within the ES Business Segment, dealt primarily with the production of switches that are used to direct internet traffic in order to optimize communication speeds. This Line of Business was sold on March 31, 2009 for $18 million to Radware, Ltd.[11]

**Metro Ethernet Networks Lines of Business**

As shown in Exhibit 4, two Lines of Business were sold from the MEN Business Segment: Metro Ethernet Networks ("MEN") and Multiservice Switch ("MSS"). The MEN Line of Business comprised a variety of technologies related to Ethernet networks. MEN was sold to

---

[6] Summary of Proceeds, *supra* note 1; NNC 2011 10-K, *supra* note 1, at 24.
[7] Nortel Networks Corporation, 2009 Annual Report (Form 10-K) (Mar. 12, 2010) [hereinafter NNC 2009 10-K], at 43-44.
[8] NNC 2009 10-K, *supra* note 7, at 8.
[9] Summary of Proceeds, *supra* note 1; NNC 2011 10-K, *supra* note 1, at 24.
[10] Carve-Out Income Statements, *supra* note 2.
[11] Summary of Proceeds, *supra* note 1; NOR_54098895 (Enterprise and Government Solutions Combined Financial Statements for the Three and Six Months Ended June 30, 2009 and 2008), at 29.

Highly Confidential

**Exhibit 5: Line of Business Overview (continued)**

Ciena on March 19, 2010 for $775 million.[12] The largest percentage of 2009 revenues in this Line of Business (38%) was earned in the U.S.[13]

The second Line of Business sold from the MEN Business Segment, MSS, primarily developed communications switching products and services which are used to route and deliver voice and data signals across communications networks. MSS was purchased by Ericsson on March 11, 2011 for $65 million.[14] The largest percentage of 2009 revenues in this Line of Business (28%) was earned in the U.S.[15]

**CVAS Line of Business**

As shown in Exhibit 4, the Carrier Voice Over Internet Protocol ("VoIP") and Application Solutions ("CVAS") Business Segment was sold as a single Line of Business. The CVAS Line of Business comprised products and technology that enabled phone calls to be made over the internet (VoIP). CVAS was sold to GENBAND on May 28, 2010 for $283 million.[16] The largest percentage of 2009 revenues in this Line of Business (54%) was earned in the U.S.[17]

---

[12] Summary of Proceeds, *supra* note 1; NNC 2011 10-K, *supra* note 1, at 24.
[13] Carve-Out Income Statements, *supra* note 2.
[14] NNI_00821708 (Sept. 24, 2010, MSS Asset Sale Agreement), at 43-44; NNC 2011 10-K, *supra* note 1, at 25.
[15] Carve-Out Income Statements, *supra* note 2.
[16] Summary of Proceeds, *supra* note 1; NNC 2011 10-K, *supra* note 1, at 25.
[17] Carve-Out Income Statements, *supra* note 2.

Highly Confidential

## Exhibit 6: Historical Revenue Shares by Integrated Entity



**Note:**
[1] Integrated Entities ("IEs") include Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), Nortel Networks U.K. Limited ("NNUK"), Nortel Networks S.A. ("NNSA") and Nortel Networks (Ireland) Limited ("NN Ireland"). NNL is a Canadian Debtor; NNI is a U.S. Debtor; NNUK, NNSA and NN Ireland are EMEA Debtors.
**Sources:**
[A] Integrated Entities information from: Ex. 21003, NNC-NNL06001514 (Master R&D Agreement); Ex. 22077, NNC-NNL011359 (Oct. 31, 2008, Joint Request for Bilateral APA 2008), at 12.
[B] Revenue data from: NOR_56971224 (2009 TPA Worksheets, at tab "Q4 2009 SAP Con"); NOR_53648048 (2008 TPA Worksheets, at tab "Q4 2008 SAP Con"); NOR_53648323 (2007 TPA Worksheets, at tab "Q4 2007 SAP Con"); NOR_53648133 (2006 TPA Worksheets, at tab "A-100 Reconciliation"); NOR_53648130 (2005 TPA Worksheets, at tab "New reconciliation"); NOR_53648508 (2004 TPA Worksheets, at tab "New reconciliation"); NOR_53648041 (2003 TPA Worksheets, at tab "New reconciliation"); NOR_53648037 (2002 TPA Worksheets, at tab "New reconciliation"); NOR_53648312 (2001 TPA Worksheets, at tab "New reconciliation").

Highly Confidential

## Exhibit 7: Nortel Sample Carve-Out Income Statement

| | North America | CALA | EMEA | APAC | Grand Total |
|---|---|---|---|---|---|
| Revenue | $ 1,323,771,746 | $ 35,560,628 | $ 55,526,545 | $ 136,947,449 | $ 1,551,806,368 |
| Total Revenue | 1,323,771,746 | 35,560,628 | 55,526,545 | 136,947,449 | 1,551,806,368 |
| COGS | 570,789,676 | 16,841,358 | 36,950,964 | 101,681,461 | 726,263,459 |
| Total COGS | 570,789,676 | 16,841,358 | 36,950,964 | 101,681,461 | 726,263,459 |
| SG&A | 137,261,861 | 4,327,848 | 38,034,565 | 23,394,349 | 203,018,623 |
| R&D | 299,712,860 | 123,938 | 11,920,889 | 26,175,383 | 337,933,070 |
| Other Operating Expenses | 19,349,970 | - | (595,780) | - | 18,754,190 |
| Total Operating Expenses | 456,324,691 | 4,451,785 | 49,359,674 | 49,569,732 | 559,705,883 |
| Operating Earnings | 296,657,379 | 14,267,484 | (30,784,093) | (14,303,744) | 265,837,026 |
| Other Income (Expense) | 229,451 | (600,887) | (205,483) | (10,875,291) | (11,452,210) |
| Earnings (Loss) before Income Tax and Reorganization | 296,886,830 | 13,666,597 | (30,989,577) | (25,179,035) | 254,384,816 |
| Reorganization Items | (47,729,078) | 9,571 | (34,455,019) | 538,957 | (81,635,568) |
| Pre-Tax Earnings (Loss) | 249,157,752 | 13,676,169 | (65,444,596) | (24,640,078) | 172,749,248 |
| Net Earnings (Loss) | 249,157,752 | 13,676,169 | (65,444,596) | (24,640,078) | 172,749,248 |
| Earnings (Loss) before Extraordinary Items | 249,157,752 | 13,676,169 | (65,444,596) | (24,640,078) | 172,749,248 |
| Net Income (Loss) | 249,157,752 | 13,676,169 | (65,444,596) | (24,640,078) | 172,749,248 |

Total revenue for all entities by region for a particular Line of Business

By Region

Total revenue for a particular entity

Entity code

| North America | Canada | Canada | US | US |
|---|---|---|---|---|
| | 1002 | 1003 | 2001 | 2002 |
| $ 1,323,771,746 | $ 78,387,793 | $ - | $ 1,240,590,247 | $4,152,718 |
| 1,323,771,746 | 78,387,793 | - | 1,240,590,247 | $4,152,718 |
| 570,789,676 | 16,461,742 | 212,931 | 537,254,293 | $2,545,918 |
| 570,789,676 | 16,461,742 | 212,931 | 537,254,293 | $2,545,918 |
| 137,261,861 | 21,725,081 | 11,188,464 | 97,861,813 | $5,609,074 |
| 299,712,860 | 33,364,171 | 3,054,201 | 119,228,522 | $6 |
| 19,349,970 | 13,322,445 | (1,405,350) | (119,600) | - |
| 456,324,691 | 68,411,697 | 12,837,314 | 216,970,735 | 5,609,080 |
| 296,657,379 | (6,485,646) | (13,050,245) | 486,365,219 | (4,002,280) |
| 229,451 | 9,442 | - | 1,056,035 | (804,970) |
| 296,886,830 | (6,476,204) | (13,050,245) | 487,421,255 | (4,807,249) |
| (47,729,078) | 8,518,157 | (248,865,062) | 191,855,115 | (216,894) |
| 249,157,752 | 2,041,953 | (261,915,307) | 679,276,370 | (5,024,144) |
| 249,157,752 | 2,041,953 | (261,915,307) | 679,276,370 | (5,024,144) |
| 249,157,752 | 2,041,953 | (261,915,307) | 679,276,370 | (5,024,144) |
| 249,157,752 | 2,041,953 | (261,915,307) | 679,276,370 | (5,024,144) |

Sum of total revenue across entities within a particular region

Within Region

**Notes:**

[1] Carve-out income statements were prepared for the six largest (by sales price) Lines of Business in 2009. The carve-out income statement prepared for the CDMA & LTE Line of Business is presented here.

[2] "COGS" is "Cost of Goods Sold"; "SG&A" is "Selling, General and Administrative Expenses"; "R&D" is "Research and Development Expenses."

**Source:**

[A] NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements, at tab "FY09 Ericsson P&L").

Highly Confidential

**Exhibit 8: Positive Line of Business Revenues for Entities that Relinquished Value**
$ Millions

| Entity Information | | Line of Business | | | | | | 2009 Revenue |
|---|---|---|---|---|---|---|---|---|
| Entity Name | Jurisdiction | CDMA & LTE | Enterprise | MEN | CVAS | GSM | MSS | ($ Millions) |
| **Canadian Debtors** | | | | | | | | |
| Nortel Networks Limited | Canada | $80 | $133 | $215 | $96 | $20 | $5 | $550 |
| **Subtotal** | | $80 | $133 | $215 | $96 | $20 | $5 | **$550** |
| **EMEA Debtors** | | | | | | | | |
| Nortel Networks U K  Limited | U K | $46 | $104 | $93 | $77 | $20 | $20 | $359 |
| Nortel Networks (Ireland) Limited | Ireland | <$1 | $244 | $19 | $6 | <$1 | $6 | $276 |
| Nortel Networks S A | France | $1 | $6 | $1 | $2 | $126 | $45 | $182 |
| Nortel GmbH | Germany | | $10 | $34 | $11 | $39 | $26 | $120 |
| Nortel Networks France S A S | France | | $25 | $28 | $11 | <$1 | $10 | $74 |
| Nortel Networks B V | Netherlands | | $16 | $26 | $8 | $2 | $3 | $54 |
| Nortel Networks Hispania, S A | Spain | <$1 | $4 | $8 | $9 | $2 | $15 | $38 |
| Nortel Networks S p A | Italy | <$1 | $14 | $3 | $5 | $1 | $6 | $29 |
| Nortel Networks N V | Belgium | | $2 | $8 | $4 | $7 | $1 | $23 |
| Nortel Networks Polska Sp  z o o | Poland | <$1 | <$1 | $1 | | $6 | $14 | $22 |
| Nortel Networks A G | Switzerland | | $2 | $10 | $8 | <$1 | <$1 | $21 |
| Nortel Networks (Austria) GmbH | Austria | | <$1 | $2 | $3 | $3 | | $8 |
| Nortel Networks Portugal S A | Portugal | | $1 | $1 | $1 | | $3 | $6 |
| Nortel Networks, s r o | Czech Republic | $2 | <$1 | <$1 | <$1 | <$1 | <$1 | $4 |
| Nortel Networks Slovensko, s r o | Slovakia | | <$1 | | | $2 | <$1 | $3 |
| Nortel Networks Engineering Service Kft | Hungary | | <$1 | | | $2 | | $2 |
| Nortel Networks Romania SRL | Romania | | <$1 | | | | <$1 | <$1 |
| Nortel Networks South Africa (Proprietary) | South Africa | | <$1 | | | | | <$1 |
| Nortel Networks (Scandinavia) AS | Norway | | <$1 | | | | | <$1 |
| Nortel Networks AB | Sweden | | | <$1 | | | | <$1 |
| **Subtotal** | | $49 | $429 | $236 | $146 | $211 | $150 | **$1,222** |
| **U.S. Debtors** | | | | | | | | |
| Nortel Networks Inc | U S | $1,241 | $1,046 | $377 | $347 | $361 | $87 | $3,459 |
| Nortel Networks (CALA) Inc | U S | $28 | $45 | $19 | $23 | | $2 | $117 |
| Nortel Networks International Inc | U S | | $7 | | | | | $7 |
| **Subtotal** | | $1,268 | $1,098 | $395 | $370 | $361 | $90 | **$3,582** |
| **Others** | | | | | | | | |
| Nortel Israel | Israel | | $10 | $2 | $9 | | <$1 | $21 |
| Nortel Russia | Russia | | <$1 | $5 | $1 | $2 | | $10 |
| Nortel Colombia | Colombia | | | $3 | | | | $3 |
| **Subtotal** | | | $10 | $10 | $10 | $2 | <$1 | **$33** |
| **Grand Total** | | $1,397 | $1,671 | $856 | $622 | $595 | $246 | **$5,387** |

**Notes:**

[1]   Value relinquished is indicated by positive revenues in Lines of Business in which an entity was listed as a seller

[2]   The revenue presented for Nortel Networks Inc  in the Enterprise Line of Business includes $295 million in revenue from Nortel Government Solutions, Inc  and DiamondWare Ltd  See Exhibit 1

**Sources:**

[A]   Revenue data from: NNI_00577735 (Oct  5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business)

[B]   Entities that relinquished assets in the Line of Business sales are identified in:

*Asset Sale Agreements:*

**CDMA & LTE:**   NNI_00803798 (July 24, 2009, CDMA & LTE Asset Sale Agreement)

**Enterprise:**   NNI_00806963 (Sept  14, 2009, Enterprise Sellers Disclosure Schedule to Amended and Restated Asset Sale Agreement); NNI_00808591 (Updated Enterprise Schedule A: Other Sellers); NNI_00807958 (Sept  14, 2009, EMEA Enterprise Asset Sale Agreement)

**MEN:**   NNI_00816040 (Mar  19, 2010, MEN Amended and Restated Asset Sale Agreement); NNI_00816247 (MEN EMEA Sellers); NNC-NNL11676495 (Mar  19, 2010, MEN Sellers Disclosure Schedule to Amended and Restated Asset Sale Agreement)

**CVAS:**   NNC-NNL06001756 (May 28, 2010, EMEA CVAS Asset Sale Agreement); NNC-NNL06001637 (Dec  22, 2009, CVAS Sellers Disclosure Schedule); NNC-NNL06001771 (May 28, 2010, France CVAS Asset Sale Agreement)

**GSM:**   NNC-NNL07789331 (May 11, 2010, GSM CALA Sellers Disclosure Schedule); NNI_00814609 (Mar  31, 2010, GSM Asia Asset Sale Agreement); NNC-NNL07789355 (June 4, 2010, GSM Mexico Asset Transfer Agreement); NNI_00812035 (Mar  31, 2010, GSM Appropriate License Termination Agreement)

**MSS:**   NNI_00822333 (Sept  24, 2010, MSS Sellers Disclosure Schedule); NNI_00822569 (MSS Sellers Disclosure Schedule); NNC-NNL06002361 (Mar  11, 2011, EMEA MSS Asset Sale Agreement); NNC-NNL06002399 (Mar  11, 2011, MSS Amended Asset Sale Agreement)

*License Termination Agreements and Intellectual Property License Agreements:*

**CDMA & LTE:**   NNI_00805595 (CDMA & LTE License Termination Agreement)

**Enterprise:**   US_EMEA_Canada_PRIV_00086159 (Dec  18, 2009, Enterprise Intellectual Property License Agreement); NNI_00807958 (Sept  14, 2009, EMEA Enterprise Asset Sale Agreement)

**MEN:**   GIP_Nortel_00101634 (MEN NNSA IP Confirmation Agreement); NNI_00816252 (Mar  19, 2010, MEN Intellectual Property License Agreement); NNC-NNL06002178 (Feb  26, 2010, MEN Side Agreement)

**CVAS:**   NNC-NNL06001658 (May 28, 2010, CVAS Intellectual Property License Agreement); NNC-NNL06001664 (CVAS License Termination Agreement)

**GSM:**   GIP_Nortel_00101436 (GSM CALA License Termination Agreement); NNI_00812712 (Mar  31, 2010, GSM Intellectual Property License Agreement); NNI_00812035 (Mar  31, 2010, GSM Appropriate License Termination Agreement)

**MSS:**   NNC-NNL06002476 (Mar  11, 2011, MSS Intellectual Property License Agreement); NNC-NNL06002488 (MSS NNSA License Termination Agreement)

Highly Confidential

**Exhibit 9: Line of Business Valuation - Equivalent Treatment of Revenues for All Entity Types**
(Excluding Next Generation and Layer 4-7)
$ Millions

| | CDMA & LTE | | Enterprise | | MEN | | CVAS | | GSM | | MSS | | Overall | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Value Relinquished | Revenue Share | Value Relinquished | Revenue Share | Value Relinquished | Revenue Share | Value Relinquished | Revenue Share | Value Relinquished | Revenue Share | Value Relinquished | Revenue Share | Value Relinquished | Percentage |
| Canadian Debtors | $60.5 | 5.7% | $67.0 | 7.9% | $158.9 | 25.1% | $21.6 | 15.4% | $3.6 | 3.4% | $1.0 | 2.2% | $312.5 | 11.1% |
| EMEA Debtors | $36.9 | 3.5% | $219.6 | 26.1% | $178.8 | 28.3% | $34.4 | 24.6% | $38.1 | 35.9% | $28.2 | 61.3% | $535.9 | 19.0% |
| U.S. Debtors | $955.4 | 90.8% | $556.3 | 66.0% | $292.3 | 46.2% | $84.1 | 60.0% | $64.3 | 60.7% | $16.8 | 36.5% | $1,969.2 | 69.8% |
| Total | $1,052.7 | 100% | $842.8 | 100% | $631.8 | 100% | $140.1 | 100% | $106.0 | 100% | $46.0 | 100% | $2,819.5 | 100% |

**Notes:**

[1]  Analysis includes revenues of entities which relinquished value in at least one Line of Business and did not settle with the Fourth Estate Settlement  See Exhibit 8

[2]  Total Available Proceeds for each Line of Business are those proceeds available as of December 31, 2013  Value relinquished is calculated based on respective 2009 revenue shares

[3]  Nortel Colombia relinquished $2 million (0 07% of the total value relinquished in the Line of Business asset sales)

[4]  Nortel Israel's value is assigned to Nortel Networks International Finance & Holding B V  ("NNIFH") (an EMEA Debtor)  Nortel Israel's value is assigned to NNI (a U S  Debtor) and NNUK (an EMEA Debtor)  As specified in the Israel Agreement, the split is rated based on the relative amount paid by NNI and NNUK, unless NNI's ratable share is greater than $4 51 million  Any excess is assigned to NNUK

[5]  Nortel Colombia and Nortel Russia have already received some payments for the assets relinquished in the Lines of Business sales  Their values relinquished (net of payments already made) are calculated as follows: First, payments already made to these entities are added back to the available proceeds in the relevant Line of Business  Second, respective revenue shares are used to calculate values relinquished by these entities  Third, payments already paid are deducted from the values relinquished by these entities  In the case of the Enterprise Line of Business, the payment already received by Nortel Russia exceeds the value that it relinquished  As such, no additional value is assigned to Nortel Russia

[6]  An additional $295 million in revenue from NGS and DiamondWare Ltd  in the Enterprise Line of Business is used to calculate value relinquished by NNI (a U S  Debtor)

**Sources:**

[A]  Proceeds information from: Cash Summary (Dec  31, 2013, Cash Summary, at tab "Escrow Accounts")

[B]  Nortel Colombia, Nortel Israel and Nortel Russia information from: Debtors' Motion for Entry of an Order Authorizing Action under the MEN Sale Escrow Agreement Without the Consent or Participation of Nortel Colombia and Granting Related Relief, May 23, 2011 [D I  5472]; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 and Fed R  Bankr  P  9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements, May 17, 2011 [D I  5424]; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, July 28, 2011 [D I  6047]; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit C: Enterprise Russia Agreement, July 28, 2011 [D I  6047-4], at 2; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit D: GSM/GSM-R Russia Agreement, July 28, 2011 [D I  6047-5], at 2  Exchange rate as of December 18, 2009 is used to calculate equivalent amount in U S  Dollars for the Enterprise payment  International Monetary Fund, Representative Exchange Rates for Selected Currencies for Dec  2009, accessed Jan  24, 2014, http://www imf org/external/np/fin/data/rms_mth aspx?SelectDate=2009-12-31&reportType=REP

[C]  Revenue data from: NNI_00577735 (Oct  5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business)

Highly Confidential

## Exhibit 10: Using a Market-Based Revenue Multiple to Calculate Value Relinquished



1. Value relinquished by each non-Integrated Entity ("non-IE") in each Line of Business is a market-based multiple of 2009 revenue:

$$\boxed{\text{Non-IE Revenue}} \times \boxed{\substack{\text{Market-Based} \\ \text{Revenue Multiple}}} = \boxed{\substack{\text{Value} \\ \text{Relinquished} \\ \text{by Non-IE}}}$$

2. Remaining value relinquished by each Integrated Entity ("IE") is calculated as a function of each IE's relative revenue share:

$$\boxed{\substack{\text{Share of IE} \\ \text{Revenue}}} \times \boxed{\substack{\text{Remaining} \\ \text{Value}}} = \boxed{\substack{\text{Value} \\ \text{Relinquished} \\ \text{by IE}}}$$

3. To calculate the total value relinquished by each Debtor Group, add value relinquished by Non-IEs to value relinquished by IEs for each Debtor Group.

**Notes:**
[1] Available Proceeds as of December 31, 2013.
[2] IEs include Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), Nortel Networks U.K. Limited ("NNUK"), Nortel Networks S.A. ("NNSA") and Nortel Networks (Ireland) Limited ("NN Ireland"). Non-IEs refer to all entities other than the IEs.

Highly Confidential

## Exhibit 11: Selection Methodology for
## Companies Comparable to Nortel's Non-Integrated Entities



**Notes:**

[1] This flow chart describes the process for identifying companies in North America, EMEA and APAC that function as resellers of products and services comparable to those in Nortel's Lines of Business.

[2] Technology Distributors are identified using Global Industrial Classification Standard or "GICS" sub-industry code 45203030 by Standard & Poor's Compustat as of January 2009. Total number of companies is shown in parentheses.

[3] Companies with zero or negative revenues were excluded from the analysis. Companies with zero or negative Total Enterprise Value were also excluded.

[4] Companies were also screened based on two criteria. A company was included if (a) its products and services are comparable to those in Nortel's Lines of Business (products and services related to wireless, wireline, enterprise and metro ethernet communications, as well as semiconductors and other telecommunication-related technology), and (b) it is not a manufacturer or developer.

**Sources:**

[A] List of technology distributors from Standard & Poor's Compustat (downloaded on Sept. 5, 2013).

[B] Business descriptions and financial information from Capital IQ (downloaded on Sept. 5, 2013).

[C] GICS sub-industry identified from: Capital IQ, "GICS_Map.xls" (received Aug. 30, 2013).

Highly Confidential

# Exhibit 12: Calculation of Market-Based Revenue Multiple



**Notes:**

[1] The multiple used for non-Integrated Entities ("non-IEs") is established using the median Total Enterprise Value ("TEV") / Revenue ratio for a set of comparable IT products resellers. See Exhibit 13.

[2] For each comparable firm, its TEV and multiple are calculated as shown above. TEV is a measure of how much it would cost to buy a firm. The median multiple for the set of comparable firms is used to estimate value relinquished by non-IEs.

[3] Available Proceeds does not reflect transferred cash, therefore no cash needs to be added to calculate the value relinquished by the non-IEs.

Highly Confidential

**Exhibit 13: Summary of Comparable Company Analysis**

| Summary Statistics | | |
|---|---|---|
| | Nortel APA Comparables[2] | Industry Comparables[3,4] |
| Median Multiple[1] (TEV / Revenue) | 0.15 | 0.18 |
| Median Revenue ($ Millions) | $932 | $373 |

| Companies Used in Analysis | | | |
|---|---|---|---|
| Nortel APA Comparables[2] | | Industry Comparables[3,4] | |
| Acal Plc* | Mentor Computer Systems Plc | Alltek Technology Corp | Rikei Corp |
| Active Computer Systems S.A. | Micromaint S.R.L. | Also-Actebis Holding AG | Sanshin Electronics Co Ltd |
| Agilysys Inc* | Mustek Limited* | Anixter Intl Inc | Scansource Inc |
| Alterna Intertrade D.D., Druzba Za Racunalniski | No Stop Technology S P.A. | Arrow Electronics Inc | Seiryo Electric Corp |
| Captech Distribution AB | Pc Connection Inc* | Asbisc Enterprises Plc | Stjarnafyrkant AB |
| Cdw Corp | Pc Mall Inc* | Bell Microproducts Inc | Synnex (Thailand) |
| Chs Hungary Kereskedelmi És Szolgáltató | Peach Valley Co., Ltd. | Bestcom Infotech Corp | Synnex Corp |
| Daiwabo Information  System Co., Ltd | Pomeroy It Solutions Inc | Chander Electronics Corp | Synnex Tech Intl Corp |
| Databox - Informatica S.A. | Recro D.D. | Datatec Ltd | Tech Data Corp |
| Diss Distribucija Racunalniske Opreme In | Renaissance  Corporation  Limited* | Dimension Computer Tech Co | Telechoice Intl Ltd |
| Dropzone ASA | Rikei Corporation* | Disway | Telsys Ltd Electronic Engr |
| Dsp Srl* | Ryoyo Electro Corporation | Ecs Holdings Ltd | Terilogy Co Ltd |
| Dugo Tech Co., Ltd. | Scansource Inc* | Esprinet SPA | Tilgin AB |
| Elko Grupa AS | Sis International Holdings Limited* | Future Comm Co Global K | Vst Holdings Ltd |
| Elko Trading, S.R.O. | Sodexpo France* | G.M I Technology Inc | |
| En Pointe Technologies  Inc | Synnex Corp* | Huxen Corp | |
| Erc Commerce Computers D.O.O. | Tech Data Corp* | Ingram Micro Inc | |
| Europ Computer Performance | Think Tek Co., Ltd. | Insight Enterprises Inc | |
| Giciel | Tsuzuki Denki Co., Ltd.* | Interlink Comm Public Co Ltd | |
| Indienet Co., Ltd. | Uab Acme Kompiuteriu Komponentai | Intertech Intl SA | |
| Infolex S.A. | Venco Computer S.P.A. | Metatech (AP) Inc | |
| Ingram Micro Inc* | Wayside Technology Group* | Metro Systems Corp | |
| Insight Enterprises Inc* | Yoku Technology GmBH | PC Connection Inc | |
| Medical Computer Communication Caraibe | Zones Inc | Redington India Ltd | |

**Notes:**

[1] Multiples are calculated as: Total Enterprise Value ("TEV") / Revenue. The multiples represent median multiples for the list of comparable companies in North America, EMEA and APAC functioning as resellers of IT products.

[2] For the "Nortel APA Comparables" set of companies, identified in Nortel's Bilateral Advance Pricing Agreement ("APA"), companies qualified as potential comparables if they were classified as 5045 (Computers, Peripherals and Software), 5065 (Electronic Parts and Equipment, Nec) and 5961 (Catalog and Mail-order Houses) in the U.S. Standard Industrial Classification system. Additional screening using both automated search and manual review was used to arrive at the final list of companies comparable to Nortel's Limited Risk Entities. Companies with missing required data elements are excluded from this analysis. The final list of companies is indicated with an asterisk ("*").

[3] The selection criteria for the "Industry Comparables" set of companies is shown in Exhibit 11.

[4] Revenue is for the 2009 calendar year. TEV is as of 12/31/2009.

**Sources:**

[A] List of "Nortel APA Comparables" companies from: NNI_00867914 (Oct. 31, 2008, Appendix Q-2 of Joint Request for Bilateral APA 2008: Search for Comparable Uncontrolled North American Resellers of Information Technology Products), at 16; NNI_00867979 (Oct. 31, 2008, Appendix Q-3 of Joint Request for Bilateral APA 2008: Search for Comparable Uncontrolled EMEA Resellers of Information Technology Products), at 16; NNI_01015781 (Oct. 31, 2008, Appendix Q-4 of Joint Request for Bilateral APA 2008: Search for Comparable Uncontrolled APAC Resellers of Information Technology Products), at 15.

[B] Financial information for "Nortel APA Comparables" companies from Capital IQ (downloaded on Aug. 22, 2013).

[C] For "Industry Comparables" companies, GICS sub-industry identified from: Capital IQ, "GICS_Map.xls" (received Aug. 30, 2013).

[D] List of "Industry Comparables" companies from Standard & Poor's Compustat (downloaded on Sept. 5, 2013).

[E] Business descriptions and financial information for "Industry Comparables" companies from Capital IQ (downloaded on Sept. 5, 2013).

Highly Confidential

**Exhibit 14: Line of Business Valuation - Using a Market-Based Revenue Multiple for Non-IEs**
(Excluding Next Generation and Layer 4-7)
$ Millions

### Value Relinquished by Non-Integrated Entities (Non-IEs)
Value Relinquished by Non-IEs = Non-IE Revenue times Non-IE Multiple (Non-IE Multiple = 0 15)

|  | CDMA & LTE | | Enterprise | | MEN | | CVAS | | GSM | | MSS | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Value | Revenue | Value | Revenue | Value | Revenue | Value | Revenue | Value | Revenue | Value | Revenue | |
| Canadian Debtors | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 | $0 0 |
| EMEA Debtors | $0 3 | $2 2 | $12 2 | $82 1 | $19 3 | $128 6 | $10 1 | $67 6 | $10 0 | $66 5 | $11 9 | $79 4 | $63 9 |
| U S Debtors | $4 1 | $27 5 | $52 7 | $351 5 | $2 9 | $19 3 | $4 0 | $26 4 | $0 0 | $0 0 | $0 4 | $2 6 | $64 1 |
| **Total** | **$4.5** | | **$65.0** | | **$22.5** | | **$14.1** | | **$10.0** | | **$12.3** | | **$128.3** |

### Value Relinquished by Integrated Entities (IEs)
Total Remaining Value for IEs = Total Value minus Total Value Relinquished by Non-IEs

|  | CDMA & LTE | Enterprise | MEN | CVAS | GSM | MSS | Total |
|---|---|---|---|---|---|---|---|
| Total Value | $1,052 7 | $842 8 | $631 8 | $140 1 | $106 0 | $46 0 | $2,819 5 |
| Total Value Attributed to Non-IEs | $4 5 | $65 0 | $22 5 | $14 1 | $10 0 | $12 3 | $128 3 |
| Total Remaining Value for IEs | **$1,048.3** | **$777.9** | **$609.4** | **$126.0** | **$96.0** | **$33.7** | **$2,691.2** |

Value Relinquished by IEs = Total Remaining Value for IEs times IE Revenue Share

|  | CDMA & LTE | | Enterprise | | MEN | | CVAS | | GSM | | MSS | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Value | Revenue Share | Value | Revenue Share | Value | Revenue Share | Value | Revenue Share | Value | Revenue Share | Value | Revenue Share | |
| Canadian Debtors | $61 5 | 5 9% | $83 4 | 10 7% | $185 9 | 30 5% | $22 8 | 18 1% | $3 7 | 3 8% | $1 1 | 3 3% | $358 5 |
| EMEA Debtors | $35 8 | 3 4% | $222 3 | 28 6% | $98 2 | 16 1% | $20 3 | 16 1% | $26 7 | 27 8% | $14 7 | 43 5% | $418 0 |
| U S Debtors | $951 0 | 90 7% | $472 2 | 60 7% | $325 3 | 53 4% | $82 8 | 65 7% | $65 6 | 68 3% | $17 9 | 53 2% | $1,914 7 |
| **Total** | **$1,048.3** | | **$777.9** | | **$609.4** | | **$126.0** | | **$96.0** | | **$33.7** | | **$2,691.2** |

### Summary Table

|  | Non-IE Value | IE Value | Total Value Relinquished | Percentage |
|---|---|---|---|---|
| Canadian Debtors | $0 0 | $358 5 | $358 5 | 12 7% |
| EMEA Debtors | $63 9 | $418 0 | $481 8 | 17 1% |
| U S Debtors | $64 1 | $1,914 7 | $1,978 8 | 70 2% |
| **Total** | **$128.3** | **$2,691.2** | **$2,819.5** | **100%** |

**Notes:**

[1]  Analysis includes revenues of entities which relinquished value in at least one Line of Business and did not settle with the Fourth Estate Settlement  See Exhibit 8

[2]  Integrated Entities ("IEs") include Nortel Networks Limited ("NNL"), Nortel Networks Inc ("NNI"), Nortel Networks U K Limited ("NNUK"), Nortel Networks S A ("NNSA") and Nortel Networks (Ireland) Limited ("NN Ireland")  NNL is a Canadian Debtor; NNI is a U S Debtor; NNUK, NNSA and NN Ireland are EMEA Debtors  Non-Integrated Entities ("non-IEs") refer to all Nortel entities other than the IEs

[3]  The non-IE multiple is calculated by investigating the TEV / Revenue ratios of a set of comparable IT products resellers  See Exhibits 11-13

[4]  Total Available Proceeds for each Line of Business are those proceeds available as of December 31, 2013

[5]  Nortel Colombia relinquished $0 3 million (0 01% of the total value relinquished in the Line of Business asset sales)

[6]  Nortel Russia's value is assigned to Nortel Networks International Finance & Holding B V ("NNIFH") (an EMEA Debtor)  Nortel Israel's value is assigned to Nortel Networks Inc ("NNI") (a U S Debtor) and Nortel Networks U K Limited ("NNUK") (an EMEA Debtor)  As specified in the Israel Agreement, the split is based on the relative amount paid by NNI and NNUK, unless NNI's ratable share is greater than $4 51M  Any excess is assigned to NNUK

[7]  Nortel Colombia and Nortel Russia have already received some payments for the assets relinquished in the Line of Business sales  Their values relinquished (net of payments already made) are calculated as follows: First, payments already made to these entities are added back to the available proceeds in the relevant Lines of Business  Second, values relinquished by these entities are calculated as a market-based multiple of their respective revenues  Third, payments already paid are deducted from the values relinquished by these entities  In the case of the Enterprise Line of Business, the payment already received by Nortel Russia exceeds the value that it relinquished  As such, no additional value is assigned to Nortel Russia

[8]  An additional $295 million in revenue from NGS and DiamondWare Ltd in the Enterprise Line of Business is used to calculate value relinquished by NNI (a U S Debtor)

**Sources:**

[A]  Integrated Entities information from: Ex  21003, NNC-NNL06001514 (Master R&D Agreement); Ex  22077, NNC-NNL011359 (Oct  31, 2008, Joint Request for Bilateral APA 2008), at 12

[B]  Proceeds information from: Cash Summary (Dec  31, 2013, Cash Summary, at tab "Escrow Accounts")

[C]  Nortel Colombia, Nortel Israel and Nortel Russia information from: Debtors' Motion for Entry of an Order Authorizing Action under the MEN Sale Escrow Agreement Without the Consent or Participation of Nortel Colombia and Granting Related Relief, May 23, 2011 [D I  5472]; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 and Fed R  Bankr P  9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements, May 17, 2011 [D I  5424]; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, July 28, 2011 [D I  6047]; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit C: Enterprise Russia Agreement, July 28, 2011 [D I  6047-4], at 2; Debtors' Motion for Entry of an Order Pursuant to 11 U S C  §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, Exhibit D: GSM/GSM-R Russia Agreement, July 28, 2011 [D I  6047-5], at 2  Exchange rate as of December 18, 2009 is used to calculate equivalent amount in U S  Dollars for the Enterprise payment  International Monetary Fund, Representative Exchange Rates for Selected Currencies for Dec  2009, accessed Jan  24, 2014, http://www imf org/external/np/fin/data/rms_mth aspx?SelectDate=2009-12-31&reportType=REP

[D]  Revenue data from: NNI_00577735 (Oct  5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business)

Highly Confidential

## Exhibit 15: Summary of Line of Business Valuation Results
### $ Millions

| Equivalent Treatment of Revenues for All Entity Types | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 2009 | | 2008 | | 2007 | | 2007-2009 Average | |
| Value Relinquished | Percentage | Value Relinquished | Percentage | Value Relinquished | Percentage | Value Relinquished | Percentage |
| Canadian Debtors $0.3 | 11.1% | $0.3 | 11.8% | $0.4 | 13.4% | $0.4 | 12.3% |
| EMEA Debtors $0.5 | 19.0% | $0.7 | 22.9% | $0.6 | 21.2% | $0.6 | 21.1% |
| U.S. Debtors $2.0 | 69.8% | $1.9 | 65.3% | $1.9 | 65.5% | $1.9 | 66.6% |
| **Total** $2.8 | **100%** | **$2.8** | **100%** | **$2.8** | **100%** | **$2.8** | **100%** |

| Using a Market-Based Revenue Multiple for Non-IEs | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 2009 | | 2008 | | 2007 | | 2007-2009 Average | |
| Value Relinquished | Percentage | Value Relinquished | Percentage | Value Relinquished | Percentage | Value Relinquished | Percentage |
| Canadian Debtors $0.4 | 12.7% | $0.4 | 13.3% | $0.4 | 14.7% | $0.4 | 13.8% |
| EMEA Debtors $0.5 | 17.1% | $0.6 | 20.8% | $0.6 | 19.3% | $0.5 | 19.1% |
| U.S. Debtors $2.0 | 70.2% | $1.9 | 65.9% | $1.9 | 66.0% | $1.9 | 67.1% |
| **Total** $2.8 | **100%** | **$2.8** | **100%** | **$2.8** | **100%** | **$2.8** | **100%** |

**Notes:**

[1]  Total Available Proceeds for each Line of Business are those proceeds available as of December 31, 2013. Value relinquished is calculated based on 2009, 2008, and 2007 revenues, and the average of 2007-2009 revenues.

[2]  Nortel Colombia relinquished less than 0.1% of the total value relinquished in the Line of Business asset sales.

Highly Confidential

**Exhibit 16: Nortel Revenue and Growth Forecasts by Line of Business**
**2007 - 2011**

| | Revenue ($ Millions) | | | | | Year-over-Year Growth (%) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2007A | 2008A | 2009E | 2010E | 2011E | 2008A | 2009E | 2010E | 2011E | 2009-2011 Average[5] |
| **Code Division Multiple Access ("CDMA")** | | | | | | | | | | |
| North America[1] | $2,244 | $1,941 | $1,302 | $1,159 | $1,030 | -14% | -33% | -11% | -11% | -11% |
| *U.S.* | $1,961 | $1,783 | $1,272 | $1,141 | $1,024 | -9% | -29% | -10% | -10% | -10% |
| *Canada* | $283 | $158 | $31 | $18 | $6 | -44% | -80% | -42% | -67% | -54% |
| EMEA | $62 | $120 | $106 | $52 | $27 | 94% | -12% | -51% | -48% | -50% |
| **Long Term Evolution ("LTE")[2]** | | | | | | | | | | |
| Total | | $0 | $0 | $100 | $257 | | | | 157% | 157% |
| **CDMA & LTE[3]** | | | | | | | | | | |
| Total | $2,530 | $2,383 | $1,630 | $1,380 | $1,362 | -6% | -32% | -15% | -1% | -8% |
| **Enterprise** | | | | | | | | | | |
| North America | $1,294 | $1,187 | $838 | $1,112 | $1,209 | -8% | -29% | 33% | 9% | 21% |
| *U.S.[4]* | $1,111 | $995 | $716 | $936 | $1,018 | -10% | -28% | 31% | 9% | 20% |
| *Canada[4]* | $183 | $193 | $122 | $176 | $191 | 5% | -37% | 44% | 9% | 26% |
| EMEA | | $826 | $481 | $492 | $535 | | -42% | 2% | 9% | 6% |
| **Metro Ethernet Networks ("MEN")** | | | | | | | | | | |
| North America | $814 | $684 | $571 | $665 | | -16% | -17% | 16% | | 16% |
| EMEA | $675 | $648 | $430 | $442 | | -4% | -34% | 3% | | 3% |
| **Carrier VoIP and Application Solutions ("CVAS")** | | | | | | | | | | |
| North America | $660 | $504 | $435 | $451 | $475 | -24% | -14% | 4% | 5% | 4% |
| EMEA | $233 | $236 | $194 | $189 | $191 | 1% | -18% | -3% | 1% | -1% |
| **Global System for Mobile Communications ("GSM")** | | | | | | | | | | |
| North America | $403 | $396 | $345 | $202 | $167 | -2% | -13% | -41% | -17% | -29% |
| EMEA | $731 | $503 | $206 | $159 | $164 | -31% | -59% | -23% | 3% | -10% |

**Notes:**

[1] Historical and forecasted revenue is based on Nortel's internal research.

[2] With the exception of LTE, values for 2007 and 2008 represent actual figures, while 2009-2011 values are estimates. All LTE values are estimates.

[3] Nortel's LTE forecast is not presented at the regional level. Total CDMA & LTE revenue is for North America, EMEA, CALA and Asia.

[4] Enterprise 2009 values for U.S. and Canada represent the total of actual revenue for the first half of 2009, and estimated revenue for the second half of 2009.

[5] LTE 2009-2011 average only represents the growth between 2010 and 2011 (there is no revenue in 2009). MEN 2009-2011 average only represents the growth between 2009 and 2010 (2011 data is missing).

**Sources:**

[A] CDMA revenue from: NNI_00142448 (CDMA 2007-2011 Product Versus Service Revenue by Region).

[B] Breakdown of CDMA Revenue into U.S. and Canada from: NNI_NARNIA_00200412 (CDMA 2007-2011 Product and Service Revenue by Customer); NNI_00147795 (CDMA 2008-2011 Service Revenue by Customer and Type).

[C] LTE from: NOR_54275577 (July 7, 2009, LTE Information Memorandum), at 57.

[D] CVAS from: NNI_00144685 (June 4, 2009, CVAS Unrestricted P&L), at 16.

[E] MEN from: NNC-NNL07586448 (Mar. 29, 2009, MEN 2006-2010 Revenue Break-Down by Region).

[F] GSM from: NNI_00136997 (GSM 2007-2011 Revenues and Margin by Quarter, November 2009 Forecast).

[G] Enterprise from: NNC-NNL07982049 (Feb. 21, 2009, Enterprise P&L Trend); NNI_00216237 (Enterprise 2008-2011 Americas Revenue by Sub-Region); NNI_00070446 (Enterprise 2007-2009 Americas Revenue by Country), at 19-22.

Highly Confidential



**Exhibit 17: Gross Domestic Product (GDP)
Historical and Forecasted Year-Over-Year (YoY) Growth (2001 – 2014)**

**Notes:**
[1] EMEA figures represent the jurisdictions of the EMEA Debtor Group: Austria, Belgium, Czech Republic, Finland, France, Germany, Hungary, Ireland, Italy, Netherlands, Norway, Poland, Portugal, Romania, Slovakia, South Africa, Spain, Sweden, Switzerland and the U.K.
[2] First year of forecast is 2009.
**Sources:**
[A] International Monetary Fund, World Economic Outlook Database, Oct. 2009, accessed Nov. 20, 2013, http://www.imf.org/external/pubs/ft/weo/2009/02/weodata/index.aspx/.
[B] For Debtor Group jurisdictions, see Exhibit 1.

Highly Confidential

**Exhibit 18: Telecommunications Equipment Market
Historical and Forecasted Year-Over-Year (YoY) Growth (2007 - 2013)**



**Notes:**
[1] EMEA figures represent the jurisdictions of the EMEA Debtor Group: Austria, Belgium, Czech Republic, Finland, France, Germany, Hungary, Ireland, Italy, Netherlands, Norway, Poland, Portugal, Romania, Slovakia, Spain, Sweden, Switzerland and the U.K. Telecommunication equipment spending data is not available for South Africa.
[2] First year of forecast is 2010.
**Sources:**
[A] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec. 2010.
[B] For Debtor Group jurisdictions, see Exhibit 1.

Highly Confidential

## Exhibit 19: Valuation Based on Projected Future Revenue
### (2009 Revenue Projected to Grow at Forecasted GDP Growth Rates)



**Notes:**

[1] Value relinquished is calculated with equivalent treatment of IE and non-IE revenues. See Exhibit 9.

[2] Revenue projection methodology: Actual revenues from the carve-out income statements were used for 2009. Forecasted GDP growth rates in each entity's jurisdiction were applied to 2009 actual revenues to forecast 2010 - 2014 revenues.

[3] The projection for Puerto Rico was calculated separately using data from the World Bank. Puerto Rico's 2013-2014 GDP growth rate is estimated using the U.S. GDP growth rate.

**Sources:**

[A] 2009 Revenue data from: NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business).

[B] International Monetary Fund, World Economic Outlook Database, Oct. 2009, accessed Jan. 24, 2014, http://www.imf.org/external/pubs/ft/weo/2009/02/weodata/index.aspx/.

[C] World Bank, World Development Indicators - GDP, accessed Jan. 24, 2014, http://data.worldbank.org/indicator/NY.GDP.MKTP.CD/countries?page=2.

Highly Confidential

### Exhibit 20: Valuation Based on Projected Future Revenue
### (2009 Revenue Projected to Grow at Forecasted Telecommunications
### Equipment Market Growth Rates)



**Notes:**

[1] Value relinquished is calculated with equivalent treatment of IE and non-IE revenues. See Exhibit 9.

[2] Revenue projection methodology: Actual revenues from the carve-out income statements were used for 2009. Forecasted telecommunication equipment market growth rates (calculated using data from IDATE) in each entity's jurisdiction were applied to 2009 actual revenues to forecast 2010 - 2013 revenues. Where telecommunication equipment market data from IDATE was not reported for a jurisdiction, the growth rate for the relevant region was applied (Asia Pacific or rest of the world).

**Sources:**

[A] 2009 Revenue data from: NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business).

[B] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec. 2010.

Highly Confidential

**Exhibit 21: Number of Patents and Applications by Country**

| Country | Patents and Applications[2] | | |
|---|---|---|---|
| | **Patents** | **Applications** | **Total** |
| **Exclusive Territories** | | | |
| U.S. | 2,850 | 1,047 | 3,897 |
| France | 357 | 0 | 357 |
| U.K. | 345 | 5 | 350 |
| Canada | 176 | 155 | 331 |
| Ireland | 2 | 0 | 2 |
| **Non-Exclusive Territories** | | | |
| Germany | 296 | 1 | 297 |
| China | 96 | 253 | 349 |
| Japan | 65 | 199 | 264 |
| Republic Of Korea | 43 | 191 | 234 |
| India | 9 | 173 | 182 |
| Brazil | 1 | 129 | 130 |
| Russia Federation | 0 | 46 | 46 |
| Hong Kong | 16 | 45 | 61 |
| Sweden | 14 | 0 | 14 |
| Mexico | 31 | 0 | 31 |
| Australia | 15 | 1 | 16 |
| Finland | 6 | 0 | 6 |
| Spain | 5 | 1 | 6 |
| Italy | 4 | 0 | 4 |
| Netherlands | 4 | 0 | 4 |
| Taiwan | 4 | 3 | 7 |
| Belgium | 2 | 0 | 2 |
| Switzerland | 2 | 0 | 2 |
| Singapore | 4 | 0 | 4 |
| Liechtenstein | 1 | 0 | 1 |
| Denmark | 1 | 0 | 1 |
| Luxembourg | 1 | 0 | 1 |
| New Zealand | 2 | 0 | 2 |
| Chile | 0 | 1 | 1 |
| Israel | 0 | 1 | 1 |
| Portugal | 1 | 0 | 1 |
| Saudi Arabia | 0 | 1 | 1 |
| **Subtotal** | **4,353** | **2,252** | **6,605** |
| **PCT and EPO Applications** | | | |
| EPO | 0 | 464 | 464 |
| PCT | 0 | 70 | 70 |
| **Grand Total** | **4,353** | **2,786** | **7,139** |

**Notes:**

[1] Source [A] identifies the patents and applications surrendered by Nortel to Rockstar. The first two letters of the serial number identify the country in which the patent or application was filed. Serial numbers without country-identifying letters are U.S. patents or applications. All patents and applications identified as abandoned, expired, or transferred by source [B] are excluded.

[2] Serial numbers listed in the "Additional Pending Family Members" column are considered patent applications. Additionally, serial numbers identified as U.S. serial numbers via the "Serial Number (U.S. unless not filed in U.S.)" column and subsequently labeled "Pending" or "U.S. Status t.b.d." in the "U.S. Patent Number" column are also considered patent applications.

**Sources:**

[A] NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab).

[B] BHG0245595 (Annex A.I(h) Abandoned/Expired, Transferred Patents).

Highly Confidential

**Exhibit 22: U.S. Share of Nortel Technologies**

| | Nortel Technologies | Technologies with Only U.S. Patents or Applications | | Technologies Including U.S. Patents or Applications | |
|---|---|---|---|---|---|
| | | Count | Percentage | Count | Percentage |
| **All Technologies** | | | | | |
| All | 3,745 | 2,747 | 73% | 3,641 | 97% |
| **Technologies with an Issued Patent** | | | | | |
| Highest interest | 411 | 270 | 66% | 405 | 99% |
| High interest | 1,045 | 852 | 82% | 1,043 | 100% |
| Neither high nor highest interest | 1,480 | 1,162 | 79% | 1,407 | 95% |

**Notes:**

[1] Source [A] identifies the patents and applications surrendered by Nortel to Rockstar. The first two letters of the serial number identify the country in which the patent or application was filed. Serial numbers without country-identifying letters are U.S. patents or applications. Serial numbers listed in the "Additional Pending Family Members" column are considered patent applications. Additionally, serial numbers identified as U.S. serial numbers via the "Serial Number (U.S. unless not filed in U.S.)" column and subsequently labeled "Pending" or "U.S. Status t.b.d." in the "U.S. Patent Number" column are also considered patent applications. All patents and applications identified as abandoned, expired, or transferred by source [B] are excluded. The surrendered patents and applications are supplemented with End Product Market ("Assigned Market for Exp. Of Interest") and Interest Level Rating ("High Interest Patents") data from source [C].

[2] For 5 of the 6 two star Nortel Technologies that do not include a U.S. Technology, there is a patent or application assigned to the U.S. These 5 are excluded because abandoned, expired, or transferred patents and applications, identified from source [B], are excluded.

[3] Excludes 24 Nortel Technologies that are not supplemented with Interest Level Rating data from Global IP Law Group file. 22 of these 24 Nortel Technologies are U.S. Only Technologies and 2 of these 24 are non-U.S. technologies.

[4] Patents and applications in the same row (in source [A]) are assumed to have the same Technology.

**Sources:**

[A] NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab).

[B] BHG0245595 (Annex A.I(h) Abandoned/Expired, Transferred Patents).

[C] GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction).

Highly Confidential

**Exhibit 23: Location of Initial Filing of Patent Application in Both U.S. and Other Jurisdictions**

| Category | Number of Technologies | Percentage |
|---|---|---|
| **All Technologies with Filing Date Data** | | |
| Application is filed first in U.S. | 3,214 | 89% |
| Application is filed in U.S. and another country on the same day | 116 | 3% |
| Application is filed first outside U.S. | 286 | 8% |
| **Total[2]** | **3,616** | |
| **Technologies with at least one U.S. and one non-U.S. Patent or Application** | | |
| Application is filed first in U.S. | 498 | 62% |
| Application is filed in U.S. and another country on the same day | 116 | 14% |
| Application is filed first outside U.S. | 191 | 24% |
| **Total[3]** | **805** | |

**Notes:**

[1]  Source [A] identifies the patents and applications surrendered by Nortel to Rockstar. The first two letters of the serial number identify the country in which the patent or application was filed. Serial numbers without country-identifying letters are U.S. patents or applications. Serial numbers listed in the "Additional Pending Family Members" column are considered patent applications. Additionally, serial numbers identified as U.S. serial numbers via the "Serial Number (U.S. unless not filed in U.S.)" column and subsequently labeled "Pending" or "U.S. Status t.b.d." in the "U.S. Patent Number" column are also considered patent applications. All patents and applications identified as abandoned, expired, or transferred by source [B] are excluded. The surrendered patents and applications are supplemented with filing date and expiration date data from source [C].

[2]  129 Technologies are excluded due to lack of filing date data.

[3]  129 Technologies are excluded due to lack of filing date data; 2,716 Technologies associated only with U.S. patents or applications are excluded from the analysis; and 95 Technologies associated only with non-U.S. patents or applications are excluded from the analysis.

**Sources:**

[A]  NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab).

[B]  BHG0245595 (Annex A.I(h) Abandoned/Expired, Transferred Patents).

[C]  GIP_Nortel_00063576 (Aug. 5, 2011, Iceberg-Sortable Asset List).

Highly Confidential

**Exhibit 24: Litigated Patents in the Patent Portfolio**

| Parties Involved | U.S. Patent Number | End Market | Registered Territories |
|---|---|---|---|
| [A] Rockstar and Netstar Technologies LLC v. Google Inc. | 6,098,065 | | US |
| | 7,236,969 | | US |
| | 7,469,245 | | US |
| | 7,672,970 | | US |
| | 7,895,178 | | US |
| | 7,895,183 | | US |
| | 7,933,883 | | US |
| [B-H] Rockstar and Mobilestar Technologies LLC v. Huawei, Asustek, HTC, LG, Pantech, Samsung, ZTE[1] | 5,838,551 | | US |
| | 6,037,937 | | US |
| | 6,128,298 | | US, KR, GB, FR, DE, CA, AU |
| | 6,333,973 | | US |
| | 6,463,131 | | US |
| | 6,765,591 | | US |
| | 6,937,572 | | US |
| [I-J] Spherix v. Uniden and Vtech | 5,581,599 | | US, JP, CA |
| | 5,752,195 | | US |
| | 5,892,814 | | US |
| | 6,614,899 | | US |
| | 6,965,614 | | US |
| [K] Bockstar v. Cisco | 6,233,245 | | US, GB, FR, DE, CA |
| | 6,684,241 | | US |
| | 6,069,895 | | US |
| | 5,732,080 | | US |
| | 6,636,508 | | US |
| | 6,778,653 | | US, CA |
| [L] Constellation v. Time Warner | 6,128,649 | | US, GB, CA, FR, DE |
| | 6,845,389 | | US |
| | 6,901,048 | | US |
| | 7,154,879 | | US |
| | 8,134,917 | | US, GB, FR, DE |
| | 8,464,299 | | US |
| [M] Charter, WideOpenWest, Knology, Suddenlink, Cable One v. Rockstar, Bockstar, Constellation, Spherix[2] | 5,471,474 | | US |
| | 5,583,862 | | US |
| | 5,761,197 | | US, JP, GB, FR, DE, CA |
| | 5,959,990 | | US |
| | 6,128,649 | | US, FR, CA, GB, DE, CN |
| | 6,130,893 | | US |
| | 6,192,397 | | US |
| | 6,321,253 | | US |
| | 6,845,389 | | US |
| | 6,901,048 | | US |
| | 7,154,879 | | US |
| | 8,134,917 | | US, GB, FR, DE |
| | 8,464,299 | | US |
| | RE40,999 | | US |

Highly Confidential

**Notes:**

[1]  Asustek Complaint (source [B]) does not claim infringement on patent 6,333,973. Pantech Complaint (source [F]) does not claim infringment on patent 5,838,551. ZTE Complaint (source [H]) does not claim infringment on patent 5,838,551. Uniden Complaint (source [J]) does not claim infringement on patent 5,892,814.

[2]  The Plaintiffs, Charter, WideOpenWest, Knology, Suddenlink, Cable One, allege that the defendants, Rockstar, Bockstar, Constellation, and Spherix, have improperley demanded that the Plaintiffs negotiate a royalty-bearing license to the listed patents [source M at 3].

**Sources:**

[A]  Complaint, Rockstar Consortium US LP, and Netstar Technologies LLC v. Google Inc. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[B]  Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Asustek Computer, Inc., et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[C]  Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Huawei Investment & Holding Co., Ltd., et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[D]  Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. HTC Corporation, et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[E]  Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. LG Electronics, Inc., et al (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[F]  Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Pantech Co., Ltd., et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[G]  Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. Samsung Electronics Co., Ltd, et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[H]  Complaint, Rockstar Consortium US LP, and Mobilestar Technologies LLC v. ZTE Corporation, et al. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013).

[I]  Complaint, Spherix Incorporated v. VTech Telecommunications Ltd., et al. (United States District Court for the Northern District of Texas Dallas Division, Aug. 30, 2013).

[J]  Complaint, Spherix Incorporated v. Uniden Corporation, et. al. (United States District Court for the Northern District of Texas Dallas Division, Aug. 30, 2013).

[K]  Complaint, Bockstar Technologies LLC v. Cisco Systems, Inc. (United States District Court for the District of Delaware, Dec. 11, 2013).

[L]  Complaint, Constellation Technologies LLC v. Time Warner Cable Inc. and Time Warner Cable Enterprises LLC (United States District Court for the Eastern District of Texas Marshall Division, Dec. 11, 2013).

[M]  Complaint, Charter Communications, Inc., et al. v. Rockstar Consortium US LP, et al. (United States District Court for the District of Delaware, Jan. 16, 2014).

[N]  Sources for patents and applications: NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab); BHG0245595 (Annex A.I(h) Abandoned/Expired, Transferred Patents); GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction).

Highly Confidential

# Exhibit 25: IPCo Model Overview

**1. Royalty Revenues** *(in each year)* = **Royalty Rates** *(for each franchise)* × **Addressable Market Size** *(by region: North America, EMEA, and China with "toggle")*

**2. Cash Flows** *(in each year)* = **Royalty Revenues** *(in each year)* − **Fixed and Variable Costs** *(in each year)*

**3. Total Cash Flows** *(across all years)* = **Cash Flows** *(in 2010)* + **Cash Flows** *(in 2011)* ••• **Cash Flows** *(in 2020)*

***Royalty Rates and Addressable Market Sizes***
*Royalty Rates vary by franchise and litigation strategy. Addressable Market Sizes vary by year, franchise, product, vendor and region. Revenues from China can be toggled to be either included or excluded.*

***Fixed and Variable Costs***
*Variable Costs vary with royalty revenue, fixed costs are different for each year.*

***Cash Flows***
*These are negative in some years when no litigation is pursued (but fixed costs accrue).*

**Exhibit 26: List of Products and Vendors by Franchise in the IPCo Model**

| Franchise | Products | Vendors |
|---|---|---|
| Optical | WDM-LH, WDM-M, Optical Switch, Sonet SDH | |
| Data Networking | Ethernet & MPLS Switching, Routing, Security, Broadband CPE, PON, Ethernet FTTH, Broadband CMTS | |
| P.C. | Desktop, Notebook | |
| Internet Advertising | Search | |
| Enterprise Voice | IP Phones, IP PBX, Voice Application, Legacy Voice | |
| Carrier Voice | Media Processing, Call Control, IMS | |
| Wireless Infrastructure | RAN, Packet Core | |
| Wireless Handsets | Wireless Handset | |

**Source:**
 [A] BHG0124158 (IPCo Model (Model v3.1 Distributed)).

Highly Confidential

**Exhibit 27A : Illustration of IPCo Model without China - Royalty Revenue Calculation for ████████**
**(████████████ Franchise)**
**Market Size and Royalty Revenue in $ Billions**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Product Market Size** | | | | | | | |
| North America | $4.36 | $4.06 | $3.76 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | [A] |
| EMEA | $12.31 | $12.04 | $11.21 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | |
| | | | **Addressable Product and Services Market Size = Product Market Size * Regional Addressable Market Size * Service Revenue Scalar** | | | | | | | | | |
| North America | $5.66 | $5.27 | $4.88 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | [B] |
| EMEA | $5.44 | $5.32 | $4.96 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | [C] |
| | | | **Addressable Market Size = Addressable Product and Service Market Size *     Market Share * Encumbrance** | | | | | | | | | |
| North America | $0.56 | $0.52 | $0.48 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | [D] |
| EMEA | $0.54 | $0.52 | $0.49 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | |
| **Total** | **$1.10** | **$1.04** | **$0.97** | **$0.84** | **$0.84** | **$0.84** | **$0.84** | **$0.84** | **$0.84** | **$0.84** | **$0.84** | [E] |
| | | | **Royalty Revenue from ████** | | | | | | | | | |
| | | | **Post-Litigation Royalty Revenue = ████ Addressable Market Size * Royalty Rate** | | | | | | | | | |
| | | | **Pre-Litigation Compensation = Sum of the years from 2011 to the year litigation begins * Royalty Rate * Past Compensation Rate** | | | | | | | | | |
| | | | **Litigation Light Strategy** | | | | **Litigation Heavy Strategy** | | | | | |
| Post-Litigation Royalty Revenue | | | $0.02 | $0.02 | $0.02 | $0.02 | $0.03 | $0.03 | $0.03 | $0.03 | $0.03 | [F] |
| Pre-Litigation ("Past") Compensation | | $0.01 | | | | | | | | | | |
| **Total Royalty Revenue** | | **$0.03** | **$0.02** | **$0.02** | **$0.02** | **$0.03** | **$0.03** | **$0.03** | **$0.03** | **$0.03** | |
| | | | **Implied Regional Shares** | | | | | | | | | |
| North America (Canada and U.S.) | | | 50% | 48% | 48% | 48% | 48% | 48% | 48% | 48% | 48% | [G] |
| EMEA (France, Germany, and U.K.) | | | 50% | 52% | 52% | 52% | 52% | 52% | 52% | 52% | 52% | |

**Notes:**

[A]  Product market size data is taken directly from the IPCo Model.

[B]  North America addressable product and services market size is calculated by multiplying the product market size by a 100% addressable market share and 1.3 service revenue scalar.

[C]  EMEA addressable product and services market size is calculated by multiplying the product market size by a 34% addressable market share and 1.3 service revenue scalar.

[D]  North America and EMEA ████ addressable market size is calculated by multiplying the addressable product and services market size by ████ market share of 33.4% in each respective region and an encumbrance of 29.5%.

[E]  Sum of ████ North America and EMEA Addressable Market Sizes.

[F]  Post-Litigation Royalty Revenue is calculated as the product of ████ total addressable market size and royalty rate in a given year. Pre-Litigation Compensation is calculated as the sum of ████ addressable product and services market size from 2011 to the year litigation begins, the royalty rate, and pre-litigation compensation rate. The royalty rate and pre-litigation compensation rate vary by franchise and whether a litigation light or litigation heavy strategy was pursued against a vendor in a given year.  In the years 2012-2015, a litigation light strategy is pursued against ████ and post-litigation royalty revenue is calculated using a royalty rate of ████ and a pre-litigation compensation rate of 50%. In the years 2016-2020, a litigation heavy strategy is pursued against ████ and royalty revenue is calculated using a post-litigation royalty rate of ████. The total royalty revenue is the sum of the post-litigation royalty revenue and the pre-litigation compensation. Pre-litigation compensation is capped for a given vendor at the product of $250 million, the number of years from 2011 to the year litigation begins, and the pre-litigation compensation rate. Post-litigation royalty revenues are capped at $75 million dollars per year if a litigation light strategy is pursued against the vendor and $250 million dollars per year if a litigation heavy strategy is pursued against the vendor. Neither cap was incurred in the calculation of ████ total royalty revenue.

[G]  Royalty revenue distribution to regions (regional shares) directly implied by the IPCo Model are based on projections of royalty revenues in a copy of the IPCo Model without EMEA. In the IPCo Models used to calculate regional shares, royalty revenue caps are removed.

**Sources:**

[1]  BHG0124158 (IPCo Model (Model v3.1 Distributed)).

[2]  GIP_Nortel_00233023 (May 5, 2010, IPCo Model 2.2 Update), at 33.

Highly Confidential

**Exhibit 27B: Illustration of IPCo Model Royalty Revenue with China - Calculation for** ███████

(███████████████████████████)

**Market Size and Royalty Revenue in $ Billions**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Product Market Size** | | | | | | | | | | | | |
| North America | $4.36 | $4.06 | $3.76 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | $3.13 | |
| EMEA | $12.31 | $12.04 | $11.21 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | $9.99 | [A] |
| China | $7.99 | $7.82 | $7.30 | $6.54 | $6.54 | $6.54 | $6.54 | $6.54 | $6.54 | $6.54 | $6.54 | |
| **Addressable Product and Services Market Size = Product Market Size * Regional Addressable Market Size * Service Revenue Scalar** | | | | | | | | | | | | |
| North America | $5.66 | $5.27 | $4.88 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | $4.07 | [B] |
| EMEA | $5.44 | $5.32 | $4.96 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | $4.42 | [C] |
| China | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8.51 | $8.51 | $8.51 | $8.51 | $8.51 | $8.51 | [D] |
| **Addressable Market Size = Addressable Product and Service Market Size *** | | | | | | **Market Share * Encumbrance** | | | | | |
| North America | $0.56 | $0.52 | $0.48 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | $0.40 | [E] |
| EMEA | $0.54 | $0.52 | $0.49 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | $0.44 | |
| China | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.27 | $0.27 | $0.27 | $0.27 | $0.27 | $0.27 | [F] |
| **Total** | **$1.10** | **$1.04** | **$0.97** | **$0.84** | **$0.84** | **$1.11** | **$1.11** | **$1.11** | **$1.11** | **$1.11** | **$1.11** | [G] |

**Royalty Revenue from** ███████

**Post-Litigation Royalty Revenue =** ███████ **Addressable Market Size * Royalty Rate**

**Pre-Litigation Compensation = Sum of the years from 2011 to the year litigation begins * Royalty Rate * Past Compensation Rate**

| | **Litigation Light Strategy** | | | | **Litigation Heavy Strategy** | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Post-Litigation Royalty Revenue | $0.02 | $0.02 | $0.02 | $0.02 | $0.04 | $0.04 | $0.04 | $0.04 | $0.04 | [H] |
| Pre-Litigation ("Past") Compensation | $0.01 | | | | | | | | | |
| **Total Royalty Revenue** | **$0.03** | **$0.02** | **$0.02** | **$0.02** | **$0.04** | **$0.04** | **$0.04** | **$0.04** | **$0.04** | |

**Implied Regional Shares**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| North America (Canada and U.S.) | 50% | 48% | 48% | 36% | 36% | 36% | 36% | 36% | 36% | |
| EMEA (France, Germany, and U.K.) | 50% | 52% | 52% | 39% | 39% | 39% | 39% | 39% | 39% | [I] |
| China | 0% | 0% | 0% | 25% | 25% | 25% | 25% | 25% | 25% | |

Notes:

[A] Product market size data is taken directly from the IPCo Model. The IPCo Model estimates China's product market size as 40% of APAC market size.

[B] North America addressable product and services market size is calculated by multiplying the product market size by a 100% addressable market share and 1.3 service revenue scalar.

[C] EMEA addressable product and services market size is calculated by multiplying the product market size by a 34% addressable market share and 1.3 service revenue scalar.

[D] China addressable product and services market size is calculated by multiplying the product market size by a 100% addressable market share and 1.3 service revenue scalar.

[E] North America and EMEA ███████ addressable market size is calculated by multiplying the addressable product and services market size by ███████ market share of 33.4% in each respective region and an encumbrance of 29.5%.

[F] China ███████ addressable market size is calculated by multiplying the addressable product and services market size by ███████ market share of 10.9% and an encumbrance of 29.5%.

[G] = [E] + [F].

[H] Post-Litigation Royalty Revenue is calculated as the product of ███████ total addressable market size and royalty rate in a given year. Pre-Litigation Compensation is calculated as the sum of ███████ addressable product and services market size from 2011 to the year litigation begins, the royalty rate, and pre-litigation compensation rate. The royalty rate and pre-litigation compensation rate vary by franchise and whether a litigation light or litigation heavy strategy was pursued against a vendor in a given year. In the years 2012-2015, a litigation light strategy is pursued against ███████ and post-litigation royalty revenue is calculated using a royalty rate of ███████ and a pre-litigation compensation rate of 50%. In the years 2016-2020, a litigation heavy strategy is pursued against ███████ and royalty revenue is calculated using a post-litigation royalty rate of ███████ The total royalty revenue is the sum of the post-litigation royalty revenue and the pre-litigation compensation. Pre-litigation compensation is capped for a given vendor at $250 million, the number of years from 2011 to the year litigation begins, and the pre-litigation compensation rate. Post-litigation royalty revenues are capped at $75 million dollars per year if a litigation light strategy is pursued against the vendor and $250 million dollars per year if a litigation heavy strategy is pursued against the vendor. Neither cap was incurred in the calculation of ███████ total royalty revenue.

[I] Royalty revenue distribution to regions (regional shares) directly implied by the IPCo Model are based on projections of royalty revenues in copies of the IPCo Model without China and then without EMEA. In the IPCo Models used to calculate regional shares, royalty revenue caps are removed.

Sources:

[1] BHG0124158 (IPCo Model (Model v3.1 Distributed)).

[2] GIP_Nortel_00233023 (May 5, 2010, IPCo Model 2.2 Update), at 33.

Highly Confidential

**Exhibit 28A: IPCo Model without China - Revenue, Cost, Earnings Before Tax, and Cash Flow by Franchise and Year**
$ Millions

| Franchise | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative (2010-2020) | Present Value[1] (2010-2020) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue by Franchise Directly Implied by the IPCo Model[2]** | | | | | | | | | | | | | |
| [redacted] | $0 | $0 | $99 | $146 | $307 | $265 | $422 | $895 | $1,283 | $680 | $680 | $4,777 | $2,225 |
| [redacted] | 0 | 0 | 28 | 78 | 44 | 93 | 108 | 348 | 178 | 178 | 178 | 1,233 | 589 |
| [redacted] | 0 | 12 | 23 | 48 | 37 | 86 | 82 | 101 | 77 | 77 | 77 | 620 | 321 |
| [redacted] | 0 | 0 | 23 | 27 | 184 | 136 | 934 | 400 | 400 | 400 | 400 | 2,905 | 1,380 |
| [redacted] | 0 | 0 | 28 | 43 | 32 | 32 | 900 | 387 | 548 | 432 | 432 | 2,832 | 1,292 |
| [redacted] | 0 | 0 | 0 | 0 | 0 | 166 | 600 | 1,673 | 0 | 0 | 0 | 2,438 | 1,207 |
| [redacted] | 0 | 0 | 14 | 47 | 28 | 60 | 198 | 96 | 96 | 96 | 96 | 729 | 360 |
| [redacted] | 0 | 0 | 15 | 12 | 12 | 20 | 27 | 35 | 24 | 24 | 24 | 195 | 101 |
| **Total Revenue** | **$0** | **$12** | **$229** | **$400** | **$645** | **$857** | **$3,270** | **$3,933** | **$2,607** | **$1,888** | **$1,888** | **$15,729** | **$7,475** |
| **Cost by Franchise[3]** | | | | | | | | | | | | | |
| [redacted] | ($7) | $0 | ($25) | ($21) | ($33) | ($30) | ($18) | ($28) | ($35) | ($23) | ($23) | ($243) | ($138) |
| [redacted] | (2) | 0 | (7) | (11) | (9) | (12) | (7) | (12) | (4) | (6) | (6) | (76) | (45) |
| [redacted] | (1) | (45) | (11) | (14) | (12) | (15) | (5) | (4) | (2) | (3) | (3) | (114) | (88) |
| [redacted] | (6) | (11) | (21) | (30) | (41) | (25) | (29) | (8) | (9) | (13) | (13) | (206) | (131) |
| [redacted] | (4) | 0 | (7) | (11) | (8) | (12) | (28) | (13) | (18) | (14) | (14) | (130) | (70) |
| [redacted] | (4) | 0 | 0 | 0 | 0 | (73) | (246) | (684) | 0 | 0 | 0 | (1,007) | (501) |
| [redacted] | (1) | 0 | (7) | (15) | (11) | (13) | (9) | (2) | (2) | (3) | (3) | (68) | (43) |
| [redacted] | (0) | 0 | (5) | (3) | (4) | (4) | (2) | (2) | (1) | (1) | (1) | (22) | (14) |
| **Total Cost** | **($26)** | **($56)** | **($82)** | **($105)** | **($117)** | **($185)** | **($345)** | **($752)** | **($72)** | **($63)** | **($63)** | **($1,867)** | **($1,031)** |
| **Earnings Before Tax = Revenue - Cost** | | | | | | | | | | | | | |
| [redacted] | ($7) | $0 | $74 | $125 | $275 | $235 | $404 | $867 | $1,248 | $658 | $658 | $4,534 | $2,087 |
| [redacted] | (2) | 0 | 21 | 67 | 35 | 81 | 100 | 336 | 174 | 172 | 172 | 1,156 | 545 |
| [redacted] | (1) | (34) | 12 | 34 | 25 | 71 | 76 | 97 | 76 | 75 | 75 | 506 | 233 |
| [redacted] | (6) | (11) | 1 | (2) | 144 | 111 | 905 | 392 | 391 | 387 | 387 | 2,698 | 1,249 |
| [redacted] | (4) | 0 | 21 | 32 | 24 | 19 | 872 | 374 | 530 | 418 | 418 | 2,702 | 1,222 |
| [redacted] | (4) | 0 | 0 | 0 | 0 | 93 | 354 | 988 | 0 | 0 | 0 | 1,431 | 706 |
| [redacted] | (1) | 0 | 7 | 31 | 17 | 47 | 189 | 94 | 93 | 92 | 92 | 662 | 317 |
| [redacted] | (0) | 0 | 11 | 9 | 9 | 16 | 25 | 33 | 24 | 24 | 24 | 173 | 86 |
| **Total Earnings Before Tax** | **($26)** | **($44)** | **$147** | **$295** | **$528** | **$672** | **$2,925** | **$3,181** | **$2,535** | **$1,826** | **$1,826** | **$13,863** | **$6,445** |
| **Cash Flow = Revenue - Cost - Tax[4]** | | | | | | | | | | | | | |
| Taxable Income (Adjusted for Net Operating Losses) | $0 | $0 | $89 | $295 | $528 | $672 | $2,925 | $3,181 | $2,535 | $1,826 | $1,826 | $13,876 | $6,466 |
| Taxes Paid (30%) | 0 | 0 | (27) | (89) | (158) | (202) | (877) | (954) | (761) | (548) | (548) | (4,163) | (1,940) |
| **Total Cash Flow** | **($26)** | **($44)** | **$120** | **$207** | **$369** | **$470** | **$2,047** | **$2,226** | **$1,775** | **$1,278** | **$1,278** | **$9,700** | **$4,505** |

**Notes:**

[1] Represents the present value using the implied discount rate (12 2%) if the net present value of the cash flow (revenue - cost - tax) projected by the IPCo Model without China is equal to $4 5 billion

[2] Royalty rates used are those assumed by the developers of the IPCo Model (sources [A], [B])

[3] IPCo Model projects four types of cost: operation cost and fixed litigation cost, which are not franchise specific, and additional litigation cost and contingent litigation cost, which are franchise specific  2011 - 2020 operating cost is allocated to all franchises in proportion to annual revenue  2010 operating cost is allocated to franchises in proportion to cumulative revenue because the IPCo Model does not project revenue for 2010  Fixed litigation cost is allocated to all franchises, except the Internet franchise, in proportion to annual revenue  Franchise specific cost (additional litigation cost and contingent litigation cost) is allocated to their respective franchises

[4] The IPCo Model assumes a tax rate of 30%, with tax credits for net operating losses

[5] [redacted] Revenue for [redacted] China is based on number units shipped by Other Vendors  [redacted]) The IPCo Model is fixed by changing the formulas to reference the correct row  Formulas for [redacted] franchise vendors [redacted] incorrectly refer to prior year revenue  The IPCo Model is fixed by changing the formulas to reference the correct years  Due to these fixes, Cumulative Total Royalty Revenue in Business Plan (sources [B], [C]) to increase from $15,726M to $15,729M

**Sources:**

[A] BHG0124158 (IPCo Model (Model v3 1 Distributed))

[B] GIP_Nortel_00233023 (May 5, 2010, IPCo Model 2 2 Update), at 13, 14, 30, 33, 36, 39, 42, 45, 48, 51

[C] LAZ-NRTL-00021779 (Oct  25, 2010, IPCo Model 3 1 Update), at 4

Highly Confidential

**Exhibit 28B: IPCo Model with China - Revenue, Cost, Earnings Before Tax, and Cash Flow by Franchise and Year**
$ Millions

| Franchise | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative (2010-2020) | Present Value[1] (2010-2020) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue by Franchise Directly Implied by the IPCo Model[2]** | | | | | | | | | | | | | |
| ▮ | $0 | $0 | $99 | $146 | $307 | $309 | $535 | $1,003 | $1,388 | $781 | $781 | $5,348 | $2,039 |
| ▮ | 0 | 0 | 28 | 78 | 44 | 192 | 299 | 577 | 391 | 391 | 391 | 2,392 | 902 |
| ▮ | 0 | 12 | 23 | 48 | 37 | 86 | 82 | 101 | 77 | 77 | 77 | 620 | 273 |
| ▮ | 0 | 0 | 23 | 27 | 184 | 136 | 934 | 400 | 400 | 400 | 400 | 2,905 | 1,141 |
| ▮ | 0 | 0 | 28 | 43 | 32 | 68 | 1,086 | 760 | 869 | 765 | 765 | 4,415 | 1,591 |
| ▮ | 0 | 0 | 0 | 0 | 0 | 166 | 600 | 1,673 | 0 | 0 | 0 | 2,438 | 1,003 |
| ▮ | 0 | 0 | 14 | 47 | 28 | 60 | 198 | 96 | 96 | 96 | 96 | 729 | 301 |
| ▮ | 0 | 0 | 15 | 12 | 12 | 20 | 27 | 35 | 24 | 24 | 24 | 195 | 85 |
| **Total Revenue** | **$0** | **$12** | **$229** | **$400** | **$645** | **$1,036** | **$3,761** | **$4,644** | **$3,246** | **$2,535** | **$2,535** | **$19,043** | **$7,335** |
| **Cost by Franchise[3]** | | | | | | | | | | | | | |
| ▮ | ($7) | $0 | ($25) | ($21) | ($33) | ($29) | ($19) | ($26) | ($31) | ($19) | ($19) | ($229) | ($116) |
| ▮ | (3) | 0 | (7) | (11) | (9) | (17) | (10) | (14) | (7) | (10) | (10) | (98) | (49) |
| ▮ | (1) | (45) | (11) | (14) | (12) | (14) | (5) | (4) | (1) | (2) | (2) | (111) | (81) |
| ▮ | (5) | (11) | (21) | (30) | (41) | (23) | (26) | (6) | (8) | (10) | (10) | (191) | (112) |
| ▮ | (6) | 0 | (7) | (11) | (8) | (14) | (29) | (17) | (22) | (19) | (19) | (151) | (68) |
| ▮ | (3) | 0 | 0 | 0 | 0 | (72) | (246) | (682) | 0 | 0 | 0 | (1,002) | (415) |
| ▮ | (1) | 0 | (7) | (15) | (11) | (12) | (8) | (2) | (2) | (2) | (2) | (64) | (37) |
| ▮ | (0) | 0 | (5) | (3) | (4) | (4) | (2) | (1) | (0) | (1) | (1) | (21) | (12) |
| **Total Cost** | **($26)** | **($56)** | **($82)** | **($105)** | **($117)** | **($185)** | **($345)** | **($752)** | **($72)** | **($63)** | **($63)** | **($1,867)** | **($890)** |
| **Earnings Before Tax = Revenue - Cost** | | | | | | | | | | | | | |
| ▮ | ($7) | $0 | $74 | $125 | $275 | $280 | $516 | $977 | $1,356 | $761 | $761 | $5,118 | $1,923 |
| ▮ | (3) | 0 | 21 | 67 | 35 | 176 | 289 | 563 | 384 | 382 | 382 | 2,294 | 854 |
| ▮ | (1) | (34) | 12 | 34 | 25 | 72 | 77 | 97 | 76 | 75 | 75 | 509 | 192 |
| ▮ | (5) | (11) | 1 | (2) | 144 | 113 | 908 | 394 | 393 | 390 | 390 | 2,714 | 1,030 |
| ▮ | (6) | 0 | 21 | 32 | 24 | 54 | 1,057 | 742 | 847 | 746 | 746 | 4,264 | 1,522 |
| ▮ | (3) | 0 | 0 | 0 | 0 | 94 | 354 | 991 | 0 | 0 | 0 | 1,436 | 588 |
| ▮ | (1) | 0 | 7 | 31 | 17 | 48 | 189 | 94 | 94 | 93 | 93 | 666 | 264 |
| ▮ | (0) | 0 | 11 | 9 | 9 | 16 | 25 | 33 | 24 | 24 | 24 | 174 | 73 |
| **Total Earnings Before Tax** | **($26)** | **($44)** | **$147** | **$295** | **$528** | **$851** | **$3,415** | **$3,892** | **$3,174** | **$2,472** | **$2,472** | **$17,176** | **$6,446** |
| **Cash Flow = Revenue - Cost - Tax[4]** | | | | | | | | | | | | | |
| Taxable Income (Adjusted for Net Operating Losses) | $0 | $0 | $89 | $295 | $528 | $851 | $3,415 | $3,892 | $3,174 | $2,472 | $2,472 | $17,189 | $6,469 |
| Taxes Paid (30%) | 0 | 0 | (27) | (89) | (158) | (255) | (1,025) | (1,167) | (952) | (742) | (742) | (5,157) | (1,941) |
| **Total Cash Flow** | **($26)** | **($44)** | **$120** | **$207** | **$369** | **$596** | **$2,391** | **$2,724** | **$2,222** | **$1,731** | **$1,731** | **$12,019** | **$4,505** |

Notes:

[1] Represents the present value using the implied discount rate (15 7%) if the net present value of the cash flow (revenue - cost - tax) projected by the IPCo Model with China is equal to $4 5 billion

[2] Royalty rates used are those assumed by the developers of the IPCo Model (sources [A], [B])

[3] IPCo Model projects four types of cost: operation cost and fixed litigation cost, which are not franchise specific, and additional litigation cost and contingent litigation cost, which are franchise specific  2011 - 2020 operating cost is allocated to all franchises in proportion to annual revenue  2010 operating cost is allocated to franchises in proportion to cumulative revenue because the IPCo Model does not project revenue for 2010  Fixed litigation cost is allocated to all franchises, except the Internet franchise, in proportion to annual revenue  Franchise specific cost (additional litigation cost and contingent litigation cost) is allocated to their respective franchises

[4] The IPCo Model assumes a tax rate of 30% with tax credits for net operating losses

[5]      Revenue for        China is based on number units shipped by Other Vendors        The IPCo Model is fixed by changing the formulas to reference the correct row  Due to the fix, Cumulative Total Royalty Revenue in Business Plan (sources [B], [C]) to fall from $19,110M to $19,039M

[6] Formulas for        franchise vendors        incorrectly refer to prior year revenue  The IPCo Model is fixed by changing the formulas to reference the correct years  Due to the fix Cumulative Total Royalty Revenue increases from $19,039M to $19,043M

Sources:

[A] BHG0124158 (IPCo Model (Model v3 1 Distributed))

[B] GIP_Nortel_00233023 (May 5, 2010, IPCo Model 2 2 Update), at 13, 14, 30, 33, 36, 39, 42, 45, 48, 51

[C] LAZ-NRTL-00021779 (Oct  25, 2010, IPCo Model 3 1 Update), at 4

Highly Confidential

**Exhibit 29A: IPCo Model without China - Cash Flow by Region and Country**
$ Millions

| Region | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative (2010-2020) | Present Value[1] (2010-2020) | Value Distributed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Cash Flow Distribution Directly Implied by the IPCo Model (Discount Rate = 12.2%)[1,2] | | | | | | | | | |
| China | $0 | $0 | $0 | | | | | | | | | $0 | $0 | |
| EMEA (France, Germany, and U K ) | (4) | (9) | 38 | | | | | | | | | 1,555 | 731 | |
| North America | (22) | (35) | 82 | | | | | | | | | 8,145 | 3,774 | |
| **Total Cash Flow** | **($26)** | **($44)** | **$120** | | | | | | | | | **$9,700** | **$4,505** | |
| | | | | | Cash Flow Distribution Based on IPCo Model and Relative Telecom Expenditure (Discount Rate = 12.2%)[1,3,4] | | | | | | | | | |
| Canada | ($2) | ($5) | $10 | | | | | | | | | $796 | $367 | $413 |
| China | $0 | $0 | $0 | | | | | | | | | $0 | $0 | |
| France and U K | ($3) | ($6) | $25 | | | | | | | | | $1,016 | $478 | $623 |
| Germany | ($1) | ($3) | $13 | | | | | | | | | $539 | $253 | |
| U S | ($20) | ($30) | $72 | | | | | | | | | $7,349 | $3,406 | $3,418 |
| **Total Cash Flow** | **($26)** | **($44)** | **$120** | | | | | | | | | **$9,700** | **$4,505** | **$4,454** |

**Notes:**

[1] Represents the present value using the implied discount rate (12 2%) if the net present value of the cash flow (revenue - cost - tax) projected by the IPCo Model without China is equal to $4 5 billion

[2] The IPCo Model projects royalty revenues by franchise in EMEA region (U K , France, and Germany), North America (NA) region (U S and Canada), and China (sources [A], [B])  Earnings before tax by franchise (see Exhibit 28A) is distributed to EMEA region, NA region, and China based on regional royalty revenues distributions directly implied by the IPCo Model  For purposes of distribution, taxes are calculated on country level (note [4])  Royalty revenue distributions to regions (regional shares) directly implied by the IPCo Model are based on projections of royalty revenues in copies of the IPCo Model without China and then without EMEA  In the IPCo Models used to calculate regional shares, royalty revenue caps are removed  2011 additional litigation cost of $11M for the Data Networking franchise is distributed to NA and EMEA regions in proportion to future revenues from the Data Networking franchise as the IPCo Model does not project revenues for the Data Networking franchise in 2011

[3] NA region cash flow from the the Internet Advertising and PC franchises is distributed only to the U S  as the IPCo Model projects royalty revenue only for the U S  in the Internet Advertising franchise and only for the U S  and China in the PC franchise  Remaining cash flow from the NA region is distributed to Canada and U S  Debtor Groups based on annual relative telecom infrastructure expenditure data from Idate (source [C])  Cash flow from EMEA region is distributed based on annual relative telecom infrastructure expenditure among U K , France, and Germany using data from Idate (source [C])  Canada, U S , Germany, France, and U K  relative telecom expenditure is assumed to be constant from 2013

[4] The IPCo Model assumes a tax rate of 30% with tax credits for net operating losses for IPCo as a whole entity  For purposes of valuation by country, tax is calculated at a tax rate of 30% after distributing earnings before tax to countries  IPCo Model assumes that the tax credit is not applicable to half of the 2010 net operating losses

**Sources:**

[A] BHG0124158 (IPCo Model (Model v3 1 Distributed))

[B] GIP_Nortel_00233023 (May 5, 2010, IPCo Model 2 2 Update), at 29, 32, 35, 38, 41, 44, 47, 50

[C] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec  2010

[D] Available Proceeds information from: Cash Summary (Dec  31, 2013, Cash Summary)

Highly Confidential

**Exhibit 29B: IPCo Model with China - Cash Flow by Region and Country**
$ Millions

| Region | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative (2010-2020) | Present Value[1] (2010-2020) | Value Distributed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Cash Flow Distribution Directly Implied by the IPCo Model (Discount Rate = 15.7%)[1,2] | | | | | | | | | | |
| China | ($5) | $0 | $0 | | | | | | | | | $2,246 | $774 9 | |
| EMEA (France, Germany, and U K ) | (3) | (9) | 38 | | | | | | | | | 1,568 | 609 | |
| North America | (18) | (35) | 81 | | | | | | | | | 8,205 | 3,120 | |
| **Total Cash Flow** | **($26)** | **($44)** | **$119** | | | | | | | | | **$12,019** | **$4,505** | |
| | | | | Cash Flow Distribution Based on IPCo Model and Relative Telecom Expenditure (Discount Rate = 15.7%)[1,3,4] | | | | | | | | | | |
| Canada | ($2) | ($5) | $10 | | | | | | | | | $801 | $304 | $495 |
| China | ($5) | $0 | $0 | | | | | | | | | $2,246 | $775 | |
| France and U K | ($2) | ($6) | $25 | | | | | | | | | $1,025 | $398 | $979 |
| Germany | ($1) | ($3) | $13 | | | | | | | | | $543 | $211 | |
| U S | ($17) | ($30) | $72 | | | | | | | | | $7,404 | $2,817 | $2,980 |
| **Total Cash Flow** | **($26)** | **($44)** | **$119** | | | | | | | | | **$12,019** | **$4,505** | **$4,454** |

**Notes:**

[1] Represents the present value using the implied discount rate (15 7%) if the net present value of the cash flow (revenue - cost - tax) projected by the IPCo Model with China is equal to $4 5 billion

[2] The IPCo Model projects royalty revenues by franchise in EMEA region (U K , France, and Germany), North America (NA) region (U S and Canada), and China (sources [A], [B])  Earnings before tax by franchise (see Exhibit 28B) is distributed to EMEA region, NA region, and China based on regional royalty revenues distribution, directly implied by the IPCo Model  For purposes of distribution, taxes are calculated on country level (note [4])  Royalty revenue distribution, to regions (regional shares) directly implied by the IPCo Model are based on projections of royalty revenues in copies of the IPCo Model without China and then without EMEA  In the IPCo Models used to calculate regional shares, royalty revenue caps are removed  2011 additional litigation cost of $11M for the Data Networking franchise is distributed to NA and EMEA regions in proportion to future revenues from the Data Networking franchise as the IPCo Model does not project revenues for the Data Networking franchise in 2011

[3] NA region cash flow from the the Internet Advertising and PC franchises is distributed only to the U S  as the IPCo Model projects royalty revenue only for the U S  in the Internet Advertising franchise and only for the U S  and China in the PC franchise  Remaining cash flow from the NA region is distributed to Canada and U S  Debtor Groups based on annual relative telecom infrastructure expenditure data from Idate (source [C])  Cash flow from EMEA region is distributed based on annual relative telecom infrastructure expenditure among U K , France, and Germany using data from Idate (source [C])  Canada, U S , Germany, France, and U K  relative telecom expenditure is assumed to be constant from 2013

[4] The IPCo Model assumes a tax rate of 30% with tax credits for net operating losses for IPCo as a whole entity  For purposes of valuation by country, tax is calculated at a tax rate of 30% after distributing earnings before tax to countries  This results in China using its tax credit from net operating losses incurred in 2010 only in 2015  IPCo Model assumes that the tax credit is not applicable to half of the 2010 net operating losses

**Sources:**

[A] BHG0124158 (IPCo Model (Model v3 1 Distributed))
[B] GIP_Nortel_00233023 (May 5, 2010, IPCo Model 2 2 Update), at 29, 32, 35, 38, 41, 44, 47, 50
[C] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec  2010
[D] Available Proceeds information from: Cash Summary (Dec  31, 2013, Cash Summary)

Highly Confidential

**Exhibit 30: End Product Markets**

| End Product Market | Estimated Global Market Size (2011, $ Billions) | Number of Patents & Applications[1] | Description |
|---|---|---|---|
| | [A] | [B] | [C] |
| Wireless | $266 2 | 3,389 | Patents covering wireless handsets, wireless telecommunications infrastructure (such as base stations or cellular towers), or both  Contains patents related to GSM, CDMA, UMTS and other standards |
| Wireless - 4G | $6 5 | 774 | A subset of Wireless Communication Patents that describe more advanced communication technologies supporting higher bandwidths and faster communication speeds  Contains patents relating to LTE, WiMAX, and 802 11n |
| Wired | $62 1 | 2,775 | Patents covering communication of data through networks using wire or optical fiber  Contains patents related to standards issued by IETF, IEEE and ITU |
| Service Providers | $40 7 | 395 | Patents relating to call services, caller ID, cell tower placement and management, call center management, call routing and related technologies |
| Voice | $32 4 | 599 | Patents relating to the communication of voice signals by Enterprises or telecommunications service providers |
| Internet | $89 8 | 84 | Patents relating to internet search and advertising, ecommerce, and social networking |
| Semiconductors | $299 5 | 58 | Patents relating to the design and manufacturing of semiconductors |
| Total[2] | $797.2 | 8,074 | |

**Notes:**

[1]  Annex 1 1(d) and Annex 1 1(h) of source [B] identify the patents and applications surrendered by Nortel to Rockstar  The first two letters of the serial number identify the country in which the patent or application was filed  Serial numbers without country-identifying letters are U S patents or applications  Serial numbers listed in the "Additional Pending Family Members" column are considered patent applications  Additionally, serial numbers identified as U S  serial numbers via the "Serial Number (U S  unless not filed in U S " column and subsequently labeled "Pending" or "U S  Status t b d " in the "U S  Patent Number" column are also considered patent applications  All patents and applications identified as abandoned, expired, or transferred by Annex A I(h) of source [B] are excluded  The surrendered patents and applications are supplemented with End Product Market ("Assigned Market for Exp  Of Interest") data from Global IP Law Group file of source [B]

[2]  The total number of patents and applications excludes patents and applications assigned to "Other" or left blank  With the inclusion of Other (406) and patents and applications left blank (114), the total is 8,594

**Sources:**

[A]  Sources for market size estimates: Infonetics, 2G/3G/4G (LTE and WiMAX) Infrastructure and Subscribers, Dec  14, 2011; IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec  2010; Infonetics, 2G/3G/4G (LTE and WiMAX) Broadband Devices and Subscribers, Dec  9, 2011; International Monetary Fund, World Economic Outlook Database, Sept  2011, accessed Jan  24, 2014, http://www imf org/external/pubs/ft/weo/2011/02/weodata/index aspx; International Monetary Fund, Representative rates for the period  Jan 01, 2009 - Dec  31, 2009, accessed Jan  24, 2014, http://www imf org/external/np/fin/ert/GUI/Pages/CountryDataBase aspx; PricewaterhouseCoopers, "Global entertainment and media outlook," June 2012, accessed Jan  24, 2014, http://www careercatalysts com/pdf/PwСOutlook2012-Industry%20overview%20(3) pdf, at 53, 54, 67, 68, 75, 76, 83, 84, 89, 90;  Statista Inc , "Global semiconductor industry revenue from 2006-2015 (in billion U S  dollars)", June 2013; Statista Inc , "Projected revenue from the U S  semiconductor industry from 2006 to 2012, in billion U S  dollars", Sept  2009; Statista Inc , "Semiconductor industry revenue in Japan from 2006-2015 (in billion U S  dollars)", June 2013

[B]  NNI_00825244 (Annex 1 1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1 1(h) Listed Patents, Assets Tab and Design Patents Tab); BHG0245595 (Annex A I(h) Abandoned/Expired, Transferred Patents); GIP_Nortel_00071997 (Sept  1, 2010, Issued Patents and Pending Patent Applications Asset List); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction)

[C]  GIP_Nortel_00080080 (May 2010, Iceberg Teaser) at 7

Highly Confidential

**Exhibit 31: End Product Market Size Estimates (2011, $ Billions)**

| Territory | Wireless | Wireless - 4G | Wired | Service Providers | Voice | Internet | Semiconductors | Total |
|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
| **Exclusive Territories** | | | | | | | | |
| Canada | $3 0 | $0 2 | $2 2 | $0 7 | $1 3 | $2 3 | N/A | $9 8 |
| France | 6 6 | 0 1 | 2 6 | 1 5 | 1 1 | 3 1 | N/A | 14 9 |
| Ireland | 0 7 | 0 0 | 0 2 | 0 2 | 0 1 | 0 2 | N/A | 1 5 |
| U K | 8 8 | 0 1 | 2 8 | 1 9 | 1 2 | 4 5 | N/A | 19 2 |
| U S | 36 6 | 1 9 | 13 2 | 4 6 | 8 0 | 32 3 | 40 7 | 137 3 |
| **Non-Exclusive Territories[I]** | 149 6 | 1 8 | 30 6 | 21 5 | 11 3 | 35 0 | 47 9 | 297 8 |
| **Total** | **$205.4** | **$4.0** | **$51.6** | **$30.3** | **$23.0** | **$77.4** | **$88.6** | **$480.5** |

**Notes:**

[A] {Mobile Access*(1-(4G Infonetics Infrastructure Regional Total/ 2G, 3G, 4G Infonetics Infrastructure Regional Total)) + Enterprise*(Mobile Access)/(Mobile Access + Wireline Access + WAN Data Routers and Switches + Voice Switching)} + {Handsets*(1-(4G Infonetics Smartphone Regional Total/ 2G, 3G, 4G Infonetics Smartphone Regional Total))}  When Idate line items: Mobile Access, Enterprise, Wireline Access, WAN Data Routers and Switches, Voice Switching, and Mobile Handsets are not available, (IMF Country GDP/IMF World GDP)*(Corresponding Idate Line Item Global Total) is substituted  Euros are converted to U S dollars using 2009 average EUR to USD exchange rates from the IMF

[B] {Mobile Access*(4G Infonetics Infrastructure Regional Total/ 2G, 3G, 4G Infonetics Infrastructure Regional Total)} + {Handsets*(4G Infonetics Smartphone Regional Total/ 2G, 3G, 4G Infonetics Smartphone Regional Total)}  When Idate line items: Mobile Access and Mobile Handsets are not available, (IMF Country GDP/IMF World GDP)*(Corresponding Idate Line Item Global Total) is substituted  Euros are converted to U S dollars using 2009 average EUR to USD exchange rates from the IMF

[C] Wireline Access + Transmission + WAN Data Routers and Switches + Enterprise*(Wireline Access + WAN Data Routers and Switches)/ (Mobile Access + Wireline Access + WAN Data Routers and Switches + Voice Switching)  When Idate line items: Mobile Access, Enterprise, Wireline Access, WAN Data Routers and Switches, Voice Switching, and Transmission are not available, (IMF Country GDP/IMF World GDP)*(Corresponding Idate Line Item Global Total) is substituted  Euros are converted to U S dollars using 2009 average EUR to USD exchange rates from the IMF

[D] Infrastructure Services  When Idate line item: Infrastructure Services is not available, (IMF Country GDP/IMF World GDP)*(Corresponding Idate Line Item Global Total) is substituted  Euros are converted to U S dollars using 2009 average EUR to USD exchange rates from the IMF

[E] Voice Switching + Enterprise*(Voice Switching) / (Mobile Access + Wireline Access + WAN Data Routers and Switches + Voice Switching)  When Idate line items: Mobile Access, Enterprise, Wireline Access, WAN Data Routers and Switches, and Voice Switching are not available, (IMF Country GDP/IMF World GDP)*(Corresponding Idate Line Item Global Total) is substituted  Euros are converted to U S dollars using 2009 average EUR to USD exchange rates from the IMF

[F] (Advertising Revenue by Country/Total Advertising by Region)*(Internet: Wired and Mobile by Region)  When Advertising Revenue by Country is not available, (IMF Country GDP/IMF World GDP)*(World Internet: Wired and Mobile) is substituted

[G] Semiconductor Market Size by Country  When Semiconductor Market Size by Country is not available (IMF Country GDP/IMF World GDP)*(World Semiconductor Market Size) is substituted

[H] End Product Market sizes are not estimated for Liechtenstein

[I] A sum of End Product Market estimates for all non-exclusive territories with at least one patent or application

**Sources:**

[A] Infonetics, 2G/3G/4G (LTE and WiMAX) Infrastructure and Subscribers, Dec 14, 2011; IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec 2010; Infonetics, 2G/3G/4G (LTE and WiMAX) Broadband Devices and Subscribers, Dec 9, 2011; International Monetary Fund, World Economic Outlook Database, Sept 2011, accessed Jan 24, 2014, http://www imf org/external/pubs/ft/weo/2011/02/weodata/index aspx; International Monetary Fund, Representative rates for the period  Jan 01, 2009 - Dec 31, 2009, accessed Jan 24, 2014, http://www imf org/external/np/fin/ert/GUI/Pages/CountryDataBase aspx

[B] Infonetics, 2G/3G/4G (LTE and WiMAX) Infrastructure and Subscribers, Dec 14, 2011; IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec 2010; Infonetics, 2G/3G/4G (LTE and WiMAX) Broadband Devices and Subscribers, Dec 9, 2011; International Monetary Fund, World Economic Outlook Database, Sept 2011, accessed Jan 24, 2014, http://www imf org/external/pubs/ft/weo/2011/02/weodata/index aspx; International Monetary Fund, Representative rates for the period  Jan 01, 2009 - Dec 31, 2009, accessed Jan 24, 2014, http://www imf org/external/np/fin/ert/GUI/Pages/CountryDataBase aspx

[C] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec 2010; International Monetary Fund, World Economic Outlook Database, Sept 2011, accessed Jan 24, 2014, http://www imf org/external/pubs/ft/weo/2011/02/weodata/index aspx; International Monetary Fund, Representative rates for the period  Jan 01, 2009 - Dec 31, 2009, accessed Jan 24, 2014, http://www imf org/external/np/fin/ert/GUI/Pages/CountryDataBase aspx

[D] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec 2010; International Monetary Fund, World Economic Outlook Database, Sept 2011, accessed Jan 24, 2012, in Idate's years from 2006 to 2012, in IDATE's years from 2006 to 2012; International Monetary Fund, Representative rates for the period  Jan 01, 2009 - Dec 31, 2009, accessed Jan 24, 2014, http://www imf org/external/np/fin/ert/GUI/Pages/CountryDataBase aspx

[E] IDATE, World Telecom Equipment Market: Market and Capex Database (Update), Dec 2010; International Monetary Fund, World Economic Outlook Database, Sept 2011, accessed Jan 24, 2014, http://www imf org/external/pubs/ft/weo/2011/02/weodata/index aspx; International Monetary Fund, Representative rates for the period  Jan 01, 2009 - Dec 31, 2009, accessed Jan 24, 2014, http://www imf org/external/np/fin/ert/GUI/Pages/CountryDataBase aspx

[F] PricewaterhouseCoopers, "Global entertainment and media outlook," June 2012, accessed Jan 24, 2014, http://www careercatalysts com/pdf/PwCOutlook2012-Industry%20overview%20(3) pdf; International Monetary Fund, World Economic Outlook Database, Sept 2011, accessed Jan 24, 2014, http://www imf org/external/pubs/ft/weo/2011/02/weodata/index aspx

[G] Statista Inc , "Global semiconductor industry revenue from 2006-2015 (in billion U S dollars)," June 2013; Statista Inc , "Projected revenue from the U S  semiconductor industry from 2006 to 2012, in billion U S  dollars," Sept 2009; Statista Inc , "Semiconductor industry revenue in Japan from 2006-2015 (in billion U S dollars)," June 2013; International Monetary Fund, World Economic Outlook Database, Sept 2011, accessed Jan 24, 2014, http://www imf org/external/pubs/ft/weo/2011/02/weodata/index aspx

[H] NNI_00825244 (Annex 1 1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1 1h) Listed Patents, Assets Tab and Design Patents Tab); BHG0245595 (Annex A I(h) Abandoned/Expired, Transferred Patents); GIP_Nortel_00071997 (Sept 1, 2010, Issued Patents and Pending Patent Applications Asset List); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction)

Highly Confidential

**Exhibit 32: Average Remaining Term as of July 2011 by Country**

| Country | Average Remaining Term (years) | |
|---|---|---|
| | Patents | Patents and Applications |
| **Countries with 100 or more patents and applications** | | |
| U.S. | 9.4 | 11.2 |
| France | 8.6 | 13.2 |
| Germany | 8.6 | 13.5 |
| U.K. | 8.5 | 13.2 |
| Canada | 7.3 | 12.1 |
| **Countries with more than five and less than 100 patents and applications** | | |
| India | 11.4 | 17.5 |
| Brazil | 7.4 | 17.7 |
| Korea | 10.8 | 16.7 |
| China | 10.4 | 15.6 |
| Hong Kong | 8.2 | 16.4 |
| Taiwan | 11.4 | 12.5 |
| Spain | 7.5 | 15.4 |
| Australia | 7.3 | 7.4 |
| Italy | 7.8 | 15.4 |
| Netherlands | 7.7 | 15.4 |
| Japan | 6.6 | 15.2 |
| Mexico | 6.2 | 6.2 |
| Finland | 6.2 | 15.4 |
| Sweden | 5.8 | 15.2 |
| **Total** | **9.0** | **12.8** |

**Notes:**

[1] Source [A] identifies the patents and applications surrendered by Nortel to Rockstar. The first two letters of the serial number identify the country in which the patent or application was filed. Serial numbers without country-identifying letters are U.S. patents or applications. Serial numbers listed in the "Additional Pending Family Members" column are considered patent applications. Additionally, serial numbers identified as U.S. serial numbers via the "Serial Number (U.S. unless not filed in U.S.)" column and subsequently labeled "Pending" or "U.S. Status t.b.d." in the "U.S. Patent Number" column are also considered patent applications. All patents and applications identified as abandoned, expired, or transferred by source [B] are excluded. The surrendered patents and applications are supplemented with filing date and expiration date data from source [C].

[2] Remaining term in the context of applications refers to the projected remaining term. The projected remaining term for applications is estimated to be the projected expiration date minus the date of the Patent Portfolio sale. The projected expiration date is estimated to be twenty years from the application filing date. "The term of protection available shall not end before the expiration of a period of 20 years counted from the filing date." See source [D].

[3] 225 patents and applications that do not have remaining term/projected remaining term information are excluded from the analysis.

[4] Countries with less than or equal to 5 patents and applications are not shown above.

**Sources:**

[A] NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab).

[B] BHG0245595 (Annex A.I(h) Abandoned/Expired, Transferred Patents).

[C] GIP_Nortel_00063576 (Aug. 5, 2011, Iceberg-Sortable Asset List).

[D] World Trade Organization, *The Agreement on Trade Related Aspects of Intellectual Property Rights (TRIPS)*, at Article 33.

Highly Confidential

**Exhibit 33: Value Relinquished by Each Entity**

| Entity Name | Line of Business Value Relinquished | Patent Portfolio Value Relinquished | Total Value Relinquished |
|---|---|---|---|
| **Canadian Debtors** | | | |
| Nortel Networks Limited | $338,872,510 | $433,905,507 | $772,778,017 |
| Nortel Networks International Corporation | $0 | | $0 |
| Nortel Networks Global Corporation | $0 | | $0 |
| Nortel Networks Corporation | $0 | | $0 |
| Nortel Networks Technology Corporation | $0 | | $0 |
| **Subtotal** | **$338,872,510** | **$433,905,507** | **$772,778,017** |
| **EMEA Debtors** | | | |
| Nortel Networks UK Limited | $198,718,160 | $329,990,769 | $528,708,929 |
| Nortel Networks (Ireland) Limited | $157,838,733 | $86,323,838 | $244,162,571 |
| Nortel Networks S A | $37,846,569 | $295,547,440 | $333,394,009 |
| Nortel GmbH | $31,506,406 | | $31,506,406 |
| Nortel Networks France S A S | $24,701,976 | | $24,701,976 |
| Nortel Networks B V | $19,290,236 | | $19,290,236 |
| Nortel Networks Hispania, S A | $9,502,862 | | $9,502,862 |
| Nortel Networks S p A | $8,191,936 | | $8,191,936 |
| Nortel Networks N V | $6,464,081 | | $6,464,081 |
| Nortel Networks Polska Sp z o o | $4,092,635 | | $4,092,635 |
| Nortel Networks A G | $6,786,277 | | $6,786,277 |
| Nortel Networks (Austria) GmbH | $2,087,364 | | $2,087,364 |
| Nortel Networks Portugal S A | $1,734,544 | | $1,734,544 |
| Nortel Networks, s r o | $1,231,308 | | $1,231,308 |
| Nortel Networks Slovensko, s r o | $458,740 | | $458,740 |
| Nortel Networks Engineering Service Kft | $301,920 | | $301,920 |
| Nortel Networks Romania SRL | $163,046 | | $163,046 |
| Nortel Networks South Africa (Proprietary) Limited | $10,602 | | $10,602 |
| Nortel Networks (Scandinavia) AS | $4,771 | | $4,771 |
| Nortel Networks AB | $4,684 | | $4,684 |
| Nortel Networks International Finance & Holding B V | $3,069,337 | | $3,069,337 |
| Nortel Networks Oy | $0 | | $0 |
| **Subtotal** | **$514,006,189** | **$711,862,047** | **$1,225,868,236** |
| **U.S. Debtors** | | | |
| Nortel Networks Inc | $1,951,074,627 | $3,308,606,817 | $5,259,681,444 |
| Nortel Networks (CALA) Inc | $40,625,788 | | $40,625,788 |
| QTERA Corporation | $0 | | $0 |
| Nortel Networks Optical Components Inc | $0 | | $0 |
| Nortel Networks HPOCS Inc | $0 | | $0 |
| Northern Telecom International Inc | $0 | | $0 |
| Alteon Websystems International Inc | $0 | | $0 |
| XROS, Inc | $0 | | $0 |
| Sonoma Systems | $0 | | $0 |
| CoreTek Inc | $0 | | $0 |
| Nortel Networks Applications Management Solutions Inc | $0 | | $0 |
| Alteon WebSystems, Inc | $0 | | $0 |
| Nortel Networks Capital Corporation | $0 | | $0 |
| Architel Systems (U S ) Corporation | $0 | | $0 |
| Nortel Networks International Inc | $2,238,887 | | $2,238,887 |
| Nortel Networks Cable Solutions, Inc | $0 | | $0 |
| **Subtotal** | **$1,993,939,302** | **$3,308,606,817** | **$5,302,546,119** |
| **Nortel Colombia** | | | |
| Nortel Networks de Colombia S A | $1,105,730 | - | $1,105,730 |
| **Subtotal** | **$1,105,730** | **-** | **$1,105,730** |
| **Grand Total** | **$2,847,923,731** | **$4,454,374,372** | **$7,302,298,103** |

Notes:
[1] EMEA revenues projected by the IPCo Model are distributed between France, the U K , and Germany based on telecommunications equipment expenditure data
[2] Patent Portfolio value from the non-Exclusive Territories is distributed equally among the five IEs

Highly Confidential