**Court File No.: 09-CL-7950**

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL**
**NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS**
**GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND**
**NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

- and -

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**Rebuttal Expert Report of Steven D. Felgran**

**for U.K. Pension Claimants**
February 28, 2014

**THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL PURSUANT TO THE ORDER**
**ENTERING A PROTECTIVE ORDER OF THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE DATED JUNE 11, 2013 [D.I. 10567], AS AMENDED BY**
**FIRST AMENDMENT TO PROTECTIVE ORDER DATED SEPTEMBER 20, 2013, AND**
**PURSUANT TO THE PROTECTIVE ORDER OF THE ONTARIO SUPERIOR COURT OF**
**JUSTICE (COMMERCIAL LIST) DATED JUNE 11, 2013, AS AMENDED BY ORDER OF THE**
**ONTARIO SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST) DATED OCTOBER 9,**
**2013**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**TABLE OF CONTENTS**

I.  Introduction and Executive Summary .............................................................................1

II.  Appropriateness of the RPS Method for Nortel..................................................................3

    A.  Allocation of Operating Profits and Losses (2001–2008) ...................................... 3

    B.  Allocation of Bankruptcy Sales Proceeds............................................................. 4

III.  Legal Title *versus* Economic Ownership and Economic Rationality of the MRDA........6

    A.  Legal Title *versus* Economic Ownership............................................................. 6

    B.  Economic Rationality of Nortel's RPS Method.................................................... 11

IV.  NNL's Transfer Pricing Claim and the APA Settlement.................................................13

V.  Transfer Pricing Treatment of Certain aspects of the rpsm ...........................................16

    A.  General Concepts ................................................................................................ 16

    B.  Restructuring Costs ............................................................................................ 17

    C.  Routine Returns ................................................................................................. 19

    D.  Excess Costs....................................................................................................... 21

    E.  Vendor Financing Losses.................................................................................... 21

    F.  Excessive Headquarters and Stewardship Costs.................................................. 21

Appendix F: Additional Materials Reviewed

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

1.    On behalf of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund (collectively the "U.K. Pension Claimants" or "UKPC"), I submitted a report on January 24, 2014 ("Direct Report") addressing three specific transfer pricing issues in Nortel's inter-company transactions between 2001 and 2008.  In this rebuttal expert report, I have been asked by counsel for the UKPC to comment on the reports of Dr. Timothy Reichert (on behalf of the Monitor and the Canadian Debtors, the "Reichert Report"), Dr. Lorraine Eden (on behalf of the U.S. Debtors, the "Eden Report"), and Dr. Richard V.L. Cooper (on behalf of the EMEA Debtors, the "Cooper Allocation Report" and "Cooper Transfer Pricing Report").  More specifically, I address the following issues in this report:

    i.    The appropriateness of Nortel's residual profit split ("RPS") method for the purpose of allocating operating profits / losses between 2001 and 2008 (Drs. Reichert and Cooper), and its applicability to allocating post-bankruptcy sales proceeds (Drs. Cooper and Eden);

    ii.    The distinction between legal title and economic ownership (Drs. Reichert, Eden, and Cooper), and the economic rationality of the Master Research and Development Agreement ("MRDA") as interpreted by Dr. Reichert;

    iii.    The Canadian Debtors' transfer pricing claim against Nortel's residual profit entities ("RPEs") in EMEA, based on the $2 billion U.S.-Canada settlement of Nortel's 2001–2005 Advance Pricing Agreement ("APA") (Dr. Reichert); and

    iv.    The appropriate transfer pricing treatment of various costs such as Nortel's restructuring costs (Dr. Cooper), routine returns to Nortel's RPEs and limited risk entities ("LREs") (Drs. Reichert and Cooper), and, finally, excess costs, vendor financing losses, and excessive headquarters and stewardship costs (Dr. Cooper).

2.    Based on my review of the available evidence, my experience in the transfer pricing field, and my analyses of the relevant facts, I conclude as follows:

    i.    I agree with Drs. Reichert and Cooper that the RPS method was an appropriate transfer pricing method for Nortel between 2001 and 2008 (Section II);

ii.     I agree with Dr. Eden's opinion that the RPS method would not be an appropriate allocation method for Nortel's lockbox funds, given that: (1) the MRDA did not purport to cover the asset sales, (2) the bankruptcy of Nortel in its entirety was never contemplated in the preparation of the RPS model, and (3) the RPS method was primarily tax-motivated (Section II);

iii.    I do not agree with Dr. Cooper's characterization of the bankruptcy sales amount now held in the lockbox as equivalent to the present value of future operating profits, as the pension liabilities (and other deferred costs) would need to be deducted from the sales proceeds before one could arrive at a profit (or indeed loss) figure in accordance with the MRDA (Section II);

iv.     Contrary to the transfer pricing guidelines and regulations and to customary practice, Dr. Reichert adopts a hypothetical and non-commercial scenario in which the RPEs' economic ownership under the MRDA lapses and legal title alone becomes the determining factor.  As a result, Dr. Reichert's arguments that Nortel's transfer pricing arrangements (as he interprets these arrangements and the entities' rights) were economically rational are flawed and contradicted by Nortel-specific facts (Section III);

v.      Dr. Reichert's reliance on the $2 billion U.S.-Canada APA settlement for 2001–2005 to assert NNL's claims against NNUK and other EMEA RPEs is misplaced and without foundation, since the settlement itself did not imply an arm's-length agreement and the rationale for the negotiated settlement amount is unknown (Section IV);

vi.     I agree with Dr. Cooper that it is counter to arm's-length principles for each RPE to bear its own restructuring costs, given the integrated nature of Nortel's operations and the major role played by NNL in directing global restructuring activities. However, I believe that Nortel's entire restructuring costs should be shared among all RPEs in the RPS model given that they generated (or were designed to generate) mutual benefits, rather than NNL reimbursing these entities 100%, as suggested by Dr. Cooper.  A similar argument applies to the sharing of vendor financing losses across the entities (Sections V.B and V.E);

vii.    In regard to Dr. Cooper's other adjustments (distribution-related routine returns for the EMEA RPEs and LREs, compensating the EMEA RPEs for excess service costs they provided for extra-territorial benefit, and excessive NNL headquarters and stewardship costs borne over all or part of the 2001–2008 period), I generally agree with the approaches adopted by Dr. Cooper but take no position on the actual recommended adjustments as I have not performed the analyses myself (Sections V.C, V.D, and V.F).

3.    In this rebuttal report I have commented only on the most important aspects of Drs. Reichert's (Canada), Eden's (U.S.), and Cooper's (EMEA) reports.  I reserve the right to address other issues raised in their reports at the depositions and/or trial, and the fact that I may not have commented on a specific issue in this report should not be taken as an indication of my agreement or disagreement with that issue.  Additional documents that I have reviewed since filing my Direct Report are listed in Appendix F (the last appendix in my Direct Report is E).

## II.    APPROPRIATENESS OF THE RPS METHOD FOR NORTEL

### A.    ALLOCATION OF OPERATING PROFITS AND LOSSES (2001–2008)

4.    Dr. Reichert views the RPS method as "the logical and most appropriate transfer pricing method for Nortel to have chosen,"[2] out of all the transfer pricing methods available, given that it was "consistent with intercompany transfer pricing regulations and guidance"[3], and "with the facts of [Nortel's] business", because "R&D investment was … the crucial, and non-routine, contributor to [Nortel's] enterprise value."[4]  In Dr. Cooper's view, "Nortel's adoption of the RPS [method] and its selection of R&D spend as its allocation key were reasonable choices in Nortel's circumstances and consistent with transfer pricing principles and the arm's length principle."[5]  I agree with Drs. Reichert and Cooper that, given Nortel's dependence on research and development ("R&D") investment and its results

---

[2]    Reichert Report, p. 28.
[3]    Reichert Report, p. 34.
[4]    Reichert Report, p. 27.
[5]    Cooper Allocation Report, p. 22.

(including the IP assets), the RPS method was an appropriate transfer pricing method for Nortel throughout the 2001–2008 period, although we all take issue with certain aspects of the design of the residual profit split model ("RPSM") and Nortel's actual application of the RPSM (see Section V below).

### B.    ALLOCATION OF BANKRUPTCY SALES PROCEEDS

5.    Dr. Eden raises a number of issues around her opinion that the RPS method is not applicable as a method to allocate the sales proceeds currently held in the lockbox ("lockbox funds") in Nortel's bankruptcy. I share many of her observations. First, I agree with Dr. Eden that the motivations for allocating operating profits/losses under the transfer pricing arrangement may be different from allocation considerations in a bankruptcy case,[6] and more specifically that the implementation of Nortel's RPS method was motivated by a desire to minimize "Nortel's overall group tax burden"[7] and thus to maximize shareholder return. In a bankruptcy, recovery of creditor claims has a higher priority than recovery of equity investments. Second, I agree with her that Nortel's transfer pricing arrangement did not cover gains and losses from the sales of businesses.[8] This accounting entry was below the operating profit line in Nortel's A-100 schedules, and a senior Nortel transfer pricing professional confirmed that the MRDA "did not address how to allocate proceeds" from business sales.[9]

6.    In addition to tax motivations, there can be internal business motivations to establish arm's-length-equivalent transfer prices for cross-border transactions: many foreign subsidiaries are run as separate profit centers and hence their management needs to be incentivized and compensated accordingly. There are many multinational corporations ("MNCs"), however, that manage their businesses across product lines rather than along national borders or legal entities. In these situations, the transfer pricing mechanism is designed only to be compliant with tax authorities' requirements. Nortel is an example of the latter.

---

[6]    Eden Report, p. 4.

[7]    Eden Report, p. 5 and pp. 62–67.

[8]    Eden Report, p. 4.

[9]    Weisz deposition, pp. 134–135.

7.    I have not been asked and have not analyzed what is the appropriate allocation method for the lockbox funds.  However, I wish to point out one major difference between Nortel's operating profits / losses during the 2001–2008 period and the sales proceeds realized between 2009 and 2011 which now make up the lockbox funds.

8.    As Mr. Roger Siefert explained in his January 24, 2014 report, the pension expenses recorded each year in Nortel's income statement captured only a portion of Nortel's accounting pension costs.[10]   Under U.S. accounting principles, a portion of Nortel's pension costs would be recognized on its balance sheet rather than being recognized fully in its income statement, and amortized into the income statement over time.  Because Nortel sold only its assets (lines of business and residual patent portfolio) after the bankruptcy[11] and kept deferred costs such as pension expenses and other deferred costs associated with the creation of the assets, the realized sales proceeds are not equivalent to the present value of future operating profits/losses used in Nortel's transfer pricing models and the MRDA.  In this regard, I disagree with Dr. Cooper's position that "a sale of the underlying IP is nothing more than the monetization of those future profits."[12]   To the extent that the transfer pricing arrangement were to be used as a basis for the allocation of lockbox funds, pension liabilities (and other expenses not yet paid but associated with the creation and maintenance of the assets sold) would need to be netted from the lockbox funds in order to be true to the substance of the RPS method before any distribution according to the RPS percentages could take place.  However, as noted below, I do not believe that the RPSM or the MRDA was conceived as an allocation methodology or that it would be appropriate to treat them as such.

9.    In conclusion, although I do not opine on the appropriate allocation method in this report, in my view, an application of the MRDA to allocate the lockbox funds would not be an appropriate method because of the various points I have identified above: *i.e.*, (1) the MRDA did not purport to cover asset sales, (2) the bankruptcy of Nortel in its entirety was

---

[10]    Siefert Report, p. 4.

[11]    I understand that some small liabilities such as product warranties were also assumed by the buyers.

[12]    Cooper Allocation Report, p. 7.

never contemplated in the preparation of the RPSM or the MRDA, and (3) use of the RPS method was primarily tax-motivated.

## III. LEGAL TITLE *VERSUS* ECONOMIC OWNERSHIP AND ECONOMIC RATIONALITY OF THE MRDA

### A. LEGAL TITLE *VERSUS* ECONOMIC OWNERSHIP

10. Dr. Reichert distinguishes between the concepts of legal title and economic ownership[13] by dividing Nortel's RPEs into two categories: NNL (characterized as an investor in R&D and licensor of Nortel technology), and other RPEs (characterized as investors in R&D and licensees). He characterizes economic ownership, a "central" or "fundamental" concept in transfer pricing,[14] as "a party's right to benefit from an income stream attributable to a defined undertaking or activity."[15] He then defines the concept more specifically for Nortel's RPEs other than NNL (collectively, the licensed participants or "LPs") in his terms as the "rights to make and sell **products** that embodied [the LPs'] R&D investments."[16] In contrast, Dr. Reichert reasons that NNL, as the legal titleholder of Nortel technology and licensor in the MRDA, enjoys rights above and beyond its own share of the economic ownership. More specifically, given this product-based interpretation of the LPs' economic ownership, Dr. Reichert opines:

> On my understanding … the license grant from NNL [to participants in the MRDA] was thus (i) limited in scope (only a defined economic ownership interest in technology was conveyed, and this interest was limited to use by way of selling or otherwise benefitting in specified ways from the technology's inclusion in "**Products**"), and (ii) duration (the Nortel technology had a finite economic life). … Importantly, however, to my understanding there is **no provision for** a licensee to have the right to **any other exploitation interests,** including future investment opportunities or sale rights in respect of Nortel technology.[17]

---

[13]  Economists in transfer pricing practice routinely use the terms economic interest, beneficial interest, and economic ownership interchangeably.

[14]  Reichert Report, pp. 4 and 23.

[15]  Reichert Report, p. 4.

[16]  Reichert Report, p. 4 (emphasis added). For the avoidance of doubt, I am informed that the UKPC does not accept Dr. Reichert's characterization of the MRDA or the license rights conferred by it.

[17]  Reichert Report, p. 37 (emphasis added).

In other words, the LPs' economic ownership, as understood by Dr. Reichert, did not encompass any rights to sell technology assets nor entitlement to share in the proceeds of a sale of those assets, if Nortel stopped making and selling products (*e.g.,* in bankruptcy).

11.    I am not an attorney, so I will not opine on the legal interpretation of the MRDA or the two concepts of legal title vs. economic ownership.  However, as a transfer pricing practitioner and an economist, I disagree strongly with Dr. Reichert's opinion in this regard.  Contrary to the transfer pricing guidelines and regulations and to customary practice, Dr. Reichert's approach represents a hypothetical and non-commercial scenario in which economic ownership is extinguished and legal title alone becomes determinant in the unexpected event of Nortel's global bankruptcy.

12.    First, from a transfer pricing and economic perspective, it does not make sense to have economic ownership in an asset that is limited in time or form of utilization.  By definition, economic ownership covers an asset owner's claim to the residual asset value, either in its unlimited upside or downside.  Dr. Reichert's construct of a world where economic ownership in an asset comes to an abrupt end in certain circumstances short of the end of an asset, product or business life cycle is inconsistent with the concept of economic ownership.  It is also puzzling that the gain to an economic owner would be truncated.  In my 20 plus years' transfer pricing experience, I have never encountered such a hypothetical economic ownership arrangement.  As Dr. Cooper points out, "[I]f the Canadian Debtors' argument that they are entitled to 100% of the IP Sale Proceeds were taken as correct, then the other Entrepreneurs would have given the Canadian Debtors the benefit of their investment and received nothing in return."[18]  I strongly agree with Dr. Cooper.  In my opinion, such an arrangement would be economically irrational and paradoxical, cannot possibly be reconciled with arm's-length principles, and is completely contrary to any agreement business professionals would make.

13.    Second, legal title plays a minimal role in the transfer pricing regulations, guidelines, and customary practices applicable to MNCs, all of which emphasize economic ownership.

---

[18]    Cooper Allocation Report, p. 34.

Nortel itself directly represented to the tax authorities that each of its entities maintained "economic ownership in the IP."[19]    As cited by Dr. Cooper from the draft OECD guidelines, "[T]he question of legal ownership is **separate** from the question of remuneration under the arm's length principle."[20]  Further, as Dr. Reichert acknowledges in his own expert report:

> transfer pricing practice, guidance, and regulations **emphasize 'economic ownership,'** in addition to legal ownership (where it exists) … **the relevant question for transfer pricing** is whether an entity has a right to the benefit of some or all of an income stream as a result of having made investments that led to that income stream.

> This is also why the term "asset" is used somewhat loosely in transfer pricing. An asset, in a transfer pricing context, is sometimes legally owned, and sometimes **(indeed often) simply economically 'owned.'**[21]

Dr. Cooper shows in his Allocation Report that legal title to the global IP was assigned to NNL for administrative convenience only,[22] which is not unusual in similar transfer pricing arrangements in my experience.  Thus, it is inconsistent with the arm's-length principle and with Nortel's own representations to its tax authorities to elevate the concept of holding legal title to Nortel's IP to that of economic ownership.  If Nortel in the bankruptcy were to have changed its position on economic ownership of the IP assets, the non-Canadian RPEs would be entitled to compensation for giving up their economic ownership.  There may also be tax consequences from the relevant tax authorities, which might include assessing tax on the value of buy-out payments.

14.  Third and perhaps most important, Dr. Reichert points to no concrete evidence from deposition testimony that Nortel or its advisors at the time of the RPSM development in mid-2001 to the spring of 2002, or the MRDA drafting in late 2004, emphasized the importance of legal title or ownership over economic interests.  If anything, the evidence I have seen suggests that professionals involved in Nortel's transfer pricing arrangements

---

[19]   Cooper Allocation Report, p. 35.

[20]   Cooper Allocation Report, p. 34 (emphasis added).

[21]   Reichert Report, p. 24 (emphasis added).

[22]   Cooper Allocation Report, pp. 9 and 33.

focused only (and properly in my opinion) on economic ownership.  In fact, Mr. Mark Weisz, Nortel's director of international tax responsible for Latin America, Asia and Europe from 2004–2007, who was heavily involved in drafting the MRDA in 2004, stated simply that "legal IP ownership was irrelevant" for transfer pricing.[23]  Mr. James Gatley, Nortel's director of transfer pricing between 2002 and 2004, stated that it "mean[t] nothing" to him if "all the patents were registered by Canada" since what he was "concerned with from a transfer pricing perspective is who contributed to the development of the intangibles associated with that patent."[24]  Further, Mr. John Doolittle, Nortel's former global head of tax, confirmed that "the objective in the MRDA was to accurately reflect the **economic** realities of how Nortel operated."[25]  Finally, Ms. Giovanna Terese Sparagna, an outside tax counsel to Nortel who helped draft the MRDA, testified that "[T]ransfer pricing focuses on entrepreneurship, and a lot of times it's not legal title, it's entrepreneurship because profit follows the entrepreneurship.  Who takes the risk should also get the rewards, generically speaking … who was developing the intangibles … would be entitled under a transfer pricing theory—not IP law …would be entitled to get the return."[26]

15.    Fourth, Dr. Reichert's idea that legal title becomes the dominant interest upon an MNC's bankruptcy is not an accepted concept in the transfer pricing field, nor is the potential bankruptcy of an entire MNC contemplated when designing a transfer pricing structure under established practice and procedure.[27]  I have never considered bankruptcy risk in my 20 plus years of transfer pricing practice and have never seen mention of bankruptcy risk in any transfer pricing report by any Big-4 or other firm, let alone the sudden elevation of legal title or ownership over economic ownership.  Testimony from Nortel transfer pricing

---

[23]    Weisz deposition, pp. 118–119.

[24]    Gatley deposition, p. 252.  Mr. James Gatley was hired as Nortel's director of transfer pricing soon after the 2001–2005 APA was submitted to the Canadian, U.S., and U.K. taxing authorities.

[25]    Cooper Allocation Report, p. 36, citing Doolittle deposition (emphasis added).

[26]    Sparagna deposition, p. 50.

[27]    Article 11(c)(iv) in the MRDA states "[I]n the event that any **one** of the Participants becomes insolvent or is the object in bankruptcy or insolvency proceedings…" (emphasis added).  It does not address the insolvency or bankruptcy of Nortel in its entirety.  Typically, this clause is used to deal with the entry and exit of participants in the CSA or RPS transfer pricing arrangement.

personnel confirms that this is also the Nortel experience.  For example, Karina O stated that the MRDA was "supposed to be on an ongoing basis" and was "not supposed to be [constructed] in contemplation of bankruptcy."[28]

16.  The people directly involved at the time could also not have expected that NNL and the LPs would have unequal rights to Nortel's technology.  In fact, in several instances where the distinction between legal title and economic ownership, as interpreted by Dr. Reichert, could have been important for allocation purposes, Nortel's transfer pricing professionals considered only economic ownership.  Dr. Cooper in his Allocation Report provides several illustrative examples:

- Nortel used RPSM allocation percentages to allocate its UMTS sale proceeds, given that these percentages reflected the entities' economic ownership of the IP; and

- Nortel allocated its IP infringement settlement amount, i.e., revenues not related to Nortel's product sales, in accordance with the RPEs' R&D contributions.[29]

I note here, however, that the RPSM percentages were not applied blindly or automatically by Nortel to these proceeds, but rather only after a laborious process and discussions.  For example, for the UMTS sale, the decision to use the RPSM allocation percentages was vetted by Nortel transfer pricing professionals, the Nortel financial accounting group, and Nortel's outside auditor after extensive research and discussion.[30]  This suggests that this allocation procedure was not axiomatic within Nortel.  Indeed, Nortel's transfer pricing professionals recognized explicitly that the MRDA "did not address how to allocate proceeds"[31] and was thus not designed as an *ex ante* default mechanism for allocating post-bankruptcy or pre-bankruptcy business sales proceeds.

17.  I should also note that Dr. Eden takes a similar stance that, for transfer pricing purposes, "legal title ownership is less important than economic ownership," and the profit allocation

---

[28]  O deposition, p. 207. Other Nortel transfer pricing professionals confirm this in their deposition testimony. See, for *e.g.,* Henderson deposition, p. 298, and Weisz deposition, p. 254.

[29]  Cooper Allocation Report, p. 31.

[30]  Cooper Allocation Report, pp. 8 and 30–31.

[31]  Weisz deposition, p. 134.

among related entities should be "consistent with the economic substance of the transaction (*i.e.*, the functions performed, assets used, and risks borne)."[32]

18.  To sum up, both established transfer pricing practice and factual evidence suggest that Nortel, including both internal and external advisors directly involved in its transfer pricing arrangement, would not have been in agreement with the distinction between legal title and economic ownership as interpreted by Dr. Reichert.  I strongly disagree with Dr. Reichert's opinion in this regard.

### B.   ECONOMIC RATIONALITY OF NORTEL'S RPS METHOD

19.  Dr. Reichert further states that the MRDA, in providing for risk-based compensation to the licensed participants for their R&D contributions to Nortel products only, with no further entitlement or consideration beyond making and selling products (under his interpretation), was "in no way intrinsically economically irrational for the participants" (*i.e.*, it was NPV=0), was consistent with open-market behavior, and was consistent with the arm's-length principle.[33]  It appears to me that Dr. Reichert attempts to justify, from an *ex ante* contracting perspective, the Monitor and Canadian Debtors' legal position that the LPs should not be entitled to the Rockstar IP sales proceeds.  I do not agree with Dr. Reichert's arguments for a number of reasons.

20.  First, while Dr. Reichert's economic rationality argument invoking the NPV=0 concept appears to be highly theoretical, his basic logic can be boiled down to the following premise and conclusion: if Nortel's business leaders made rational investment and operating decisions, then Nortel's transfer pricing arrangement, in particular the one Dr. Reichert has in mind, must be economically rational.  This conclusion is illogical, however, and involves Dr. Reichert pre-judging what the transfer pricing arrangement means.  Recall that R&D decisions were made by line of business leaders and headquarters without Dr. Reichert's distinctions between legal title and economic ownership in mind, and these individuals were not involved in the development of Nortel's transfer pricing

---

[32]   Eden Report, p. 30.

[33]   Reichert Report, p. 6.

arrangements.[34]   Conversely, the RPSM and MRDA were designed by Nortel's transfer pricing personnel, inside counsel, and outside advisors primarily for tax compliance.  It makes no sense for an entity to voluntarily give away its IP in exchange for a transfer pricing arrangement whereby, if for some reason that global regime were terminated, its rights to share in the existing IP assets would also be eliminated.

21.   Second, it is counter-factual to suggest that Nortel's RPEs made a conscious distinction between a product-based business model and a patent-license-based business model (like the business of Rockstar).  Nortel's business model during most of its existence made use of its patented technology to sell its products and services; however, the business model underlying the Rockstar transaction represented a departure from Nortel's traditional model.  Therefore, it seems to me that Dr. Reichert's distinction between the RPEs' rights to product-based revenues *vs.* non-product-based revenues and its implication for the bankruptcy allocation assumes prescience on the part of Nortel's transfer pricing professionals.  Further, Dr. Reichert's interpretation of the distinction between product-based revenues and licensing rights for the non-Canadian RPEs is directly contradicted by his own rejection of the Rockstar transaction as a comparable for Nortel.

- Dr. Reichert first observes "[B]ecause the intent of the Rockstar transaction appears to have been mostly or at least in part related to these 'offensive' purposes [patent litigation], this suggests that the [Rockstar] purchasers did not necessarily intend to use the patents in producing and selling products as is the case with the relevant Nortel entities under analysis from 2001–2008."[35]   Thus, Dr. Reichert suggests here that licensing, or non-product-based, revenues were not considered part of Nortel's business model.  If so, how could anyone rationally expect the RPEs to develop a profit sharing agreement distinguishing between non-product-based and product-based revenues, and confining their rights to product-based revenues when the business model changed or Nortel's patents changed hands in the future?  In my opinion, this would never occur at arm's length.

---

[34]   For example, Exhibit 21031 (Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004, NNC-NNL000073–91) at p. NNC-NNL000083 states "decisions on R&D spending are made by Nortel's business unit leaders.  Input is not sought from the taxation department in determining where to perform R&D activities" (emphasis in original).

[35]   Reichert Report, Appendix D, p. D-5.

- Dr. Reichert also rejects Rockstar's comparability for Nortel during 2001–2008 because some technologies within the Rockstar patent portfolio, in particular the wireless technology, were "somewhat nascent in 2001" but "grew in acceptance and use around the world" over time.[36] Thus, Dr. Reichert acknowledges that some R&D work could be highly unpredictable in regard to future success, but could generate spectacular profits if something were to become a hit. If the RPEs conducting such advanced research and filing patents (as they were encouraged to do, especially in NNUK)[37] could not benefit from the success of such pioneering work, just as in the case of unexpected business sales or bankruptcy, why would anyone, like NNUK's Wireless Technology Lab, rationally carry out such research? Finally, an exclusive focus by the LPs simply on current product development would not be a rational R&D policy for a multinational company in which patent development and protection featured so prominently, and in which research in next-generation technologies and products was important.

22. For the above reasons, in my opinion, Dr. Reichert's support for the distinction between legal title and economic ownership, and the rationality of Nortel's transfer pricing arrangements under his interpretation of the LPs' rights, are contradicted by both logic and facts.

## IV. NNL'S TRANSFER PRICING CLAIM AND THE APA SETTLEMENT

23. Dr. Reichert takes issue with routine returns allowed under Nortel's RPSM (see Section V.C) and estimates that NNI overpaid NNL by $1.2 billion between 2001 and 2005.[38] Then, based on the $2 billion APA settlement between the IRS and CRA for the same period, he estimates NNL's claims against NNUK to be between $350 million and $370 million.[39] In my opinion, this IRS/CRA settlement cannot be used as the basis for any claims against NNUK or the other RPEs for a host of reasons.

---

[36] Reichert Report, Appendix D, p. D-6.

[37] Jeffries deposition, pp. 73–74.

[38] Reichert Report, p. 90.

[39] Reichert Report, pp. 93–96. Nortel applied for a multilateral APA for 2001–2005 between Canada, the U.S., and the U.K. taxing authorities, but the settlement was between Canada's CRA and the United States' IRS only.

24.    First, the APA settlement, which was the result of highly "contentious"[40] government-to-government negotiations between the IRS and CRA, does not imply or claim to imply an agreement across all relevant revenue authorities, all RPS entities, or even between NNI and NNL, over the specifics of arm's-length pricing.   As I stated in my Direct Report, based on my 20 plus years' experience in advising taxpayers during the APA negotiation process, the settlement for any particular taxpayer does not imply an arm's-length result has been achieved.   In my experience, revenue agents are motivated to collect more tax revenues for their tax jurisdictions and the APA process is a means to that end.   There is evidence of that motivation here: in order to reconcile the books of account to these adjustments for tax purposes, the APA between NNI and the IRS stated that "NNI shall be treated as having made a distribution to NNL in the amount of the adjustment in each such taxable year" and these "deemed distributions, totaling [US$2 billion] will be subject to a five percent…nonresident withholding tax…payable to the IRS by NNI on behalf of NNL."[41]   In layman's terms, the overpayment by NNI to NNL under the settlement would be characterized as "deemed" dividends from NNI to NNL for tax purposes.   As a result, the IRS's settlement with NNI would result in a 5% withholding tax on the $2 billion, regardless of NNI's actual tax position such as net operating losses.[42]

25.    Second, nobody knew and no one knows today what the exact rationale was behind the $2 billion settlement, as evidenced by different guesses by Mr. Michael Orlando (Nortel's former transfer pricing leader) under various ranges of potential settlements[43] and Dr. Reichert.   It thus appears contradictory and inconsistent that Dr. Reichert produced his own view of how the RPSM should have worked for 2001 to 2005,[44] but simultaneously promoted the results of the IRS/CRA settlement based on different (and unknown) adjustments.   Moreover, the aforementioned guesses regarding the settlement were all

---

[40]    NNC-NNL06275376, p. 1.

[41]    APA between NNI and IRS (NNI_00207501), pp. 7–8.

[42]    In February 2010, NNI made a $37.5 million settlement payment to the IRS in return for the IRS releasing all of its tax claims against NNI for the period 1998 through 2008 (see Nortel 10-K for 2009, at p. 94).

[43]    See Exhibit 11269.  Mr. Jeffrey Wood, Nortel's former tax leader for the U.S. and CALA, further stated that he recalled "modeling various ranges of potential settlements", which resulted in additional income recognized by NNI of approximately "1.3 to 2 billion [US dollars]." (Wood deposition, p. 67.)

[44]    See sections 6(a)(1)(b) and 6(a)(2) of Dr. Reichert's executive summary in the Reichert Report, pp. 7–8.

based in part on the IRS's and CRA's recommended negotiating positions.  Having advised many taxpayers during the APA negotiation process, I know that these position papers have little or nothing to do with the final negotiated settlement amount; they are simply the opening salvos in a protracted negotiation process.

26.  Third, the bilateral settlement between the IRS and CRA over NNI's and NNL's transfer pricing payments has no binding impact, either legally or economically, on the other Nortel entities and other taxing authorities not party to the APA.  Since the Canadian Monitor agreed to admit a claim of US$2 billion from NNI into the NNL insolvency, *i.e.*, NNI expected to receive certain recoveries on the inter-company claim, this settlement could also be motivated by non-tax, non-transfer-pricing factors.  For example, an email from Nortel's Senior Vice President Peter Look to his staff in October 2009 stated "[E]veryone is adding issues to make deals contingent on various matters, for example NNI says Canada must sign APA or else no funding from US.  And, NNL says respect R&D capital stock for proceeds allocation or we won't sign APA."[45]  Therefore, the back-to-back $2 billion APA settlement and claim allowance is also a commercial matter between the Canadian and U.S. Debtors, hence all the more reason not to use it as a basis for claims against NNUK.

27.  Fourth, the $2 billion settlement amount pertains to an income adjustment from one jurisdiction to another; more precisely in this instance, the settlement caused a shift of $2 billion in losses from NNI to NNL, which reduced NNI's loss for tax purposes and increased NNL's loss for tax purposes.[46]  In non-bankruptcy cases, the import of the income adjustment amount is solely that it forms the basis for the additional taxes to be paid in one jurisdiction at the expense of the other jurisdiction.  It is not usual for companies to make actual cash transfers within a group to mirror any APA settlement for prior years.

---

[45]  Exhibit 22133, p. 1.
[46]  NNC-NNL06275376, p. 2.

28.   For the above reasons, I conclude that Dr. Reichert's allocation of the $2 billion U.S.-Canada APA settlement should not be used as a basis for claims against NNUK or any other RPE.

## V.    TRANSFER PRICING TREATMENT OF CERTAIN ASPECTS OF THE RPSM

29.   In this section I will address portions of Drs. Reichert's and Cooper's reports regarding whether the Nortel transfer pricing model's treatment of certain cost items was consistent with arm's-length requirements.   I will start with a discussion of the general concepts, followed by restructuring costs, routine returns, and other costs.

### A.    GENERAL CONCEPTS

30.   Any entity that is a member of a controlled group is going to have expenses. There are three non-mutually-exclusive ways to cover those expenses:

   i.    The entity itself covers the expenses (allowable if the expenses are for its own benefit solely and provide no benefit to affiliates);

   ii.   The entity charges out and is reimbursed by another entity (presumably the parent company but possibly another affiliate depending on who is the beneficiary)—a variation would be to charge out less than 100% or to split the charge-out among two or more beneficiaries; and

   iii.  If an RPSM is in force, the entity charges out and is reimbursed through the mechanism of the RPSM.

31.   Under the RPSM, the members have all agreed conceptually to share in any residual profit/loss according to some metric, in this case relative R&D spend or equivalent.   Thus, all of their revenues and expenses (above-the-line) are totaled, routine returns are paid, and the remaining non-routine aggregate profit / loss is apportioned to all participants. This means in essence that the RPEs have agreed that their expenses (again, above-the-line) benefit each other, and they will consequently fully share in residual profits/losses above the routine payout.   Therefore, an asymmetry would exist if any of the RPS entities realized benefits from incurring certain costs (*e.g.*, restructuring and vendor financing) but bore none of the associated losses.

32.  On the flipside, if there is a situation in which an entity's expenses do not benefit the other members of the RPSM arrangement, those expenses should either be (1) borne directly by the entity itself, or (2) charged only to that particular entity (or entities) that is (are) the beneficiary.  The first case would apply in the case of stewardship expenses or excessive headquarters costs. The second case would apply, for example, if some particular service (*e.g.*, HR) is being performed exclusively for one other entity in the group.

33.  The approach taken in my Direct Report is to run the expense items at issue through the RPSM; namely, the restructuring expenses and the true costs of the pension scheme.  With this framework, I will address the transfer pricing treatment of several cost items that have been raised in Drs. Reichert's and Cooper's reports.

### B.   RESTRUCTURING COSTS

34.  Dr. Reichert makes no above-the-line restructuring adjustments for either RPEs or LREs; he only discusses the latter with the justification that the ratio of restructuring costs to sales (restructuring cost "intensity") for LREs in the Nortel RPSM was consistent with that of comparable companies.[47]  I take no position on his observation between Nortel's LREs and comparable companies, as I have not studied them myself.  However, I note that Dr. Reichert fails to address whether each RPE should bear its own share of the restructuring costs.  As I have shown in my Direct Report, restructuring costs amounted to $5.5 billion between 2001 and 2008, were recurring in nature, and were borne disproportionately by NNUK.

35.  Dr. Cooper argues that it is not an arm's-length result for each RPE to bear its own restructuring costs.[48]  I agree.  For RPEs, it is not relevant to compare restructuring cost intensity with comparable companies given that Nortel was a uniquely integrated company; reimbursement of restructuring costs across entities should be based on Nortel-specific factors.

---

[47]  Reichert Report, pp. 67–69.
[48]  Cooper Transfer Pricing Report, p. 65.

36. Dr. Cooper argues that NNL should reimburse NNUK, NN Ireland, NN France and EMEA LREs 100% of their restructuring costs from 2001–2008, given that NNL directed Nortel's overall restructuring programs.[49]    Alternatively (although, according to Dr. Cooper, less consistent with arm's length), Nortel's EMEA entities' restructuring costs should be shared among all RPEs in the RPSM.[50]  I fully agree with Dr. Cooper that NNUK should not bear the restructuring costs itself.   However, the position I have taken in my Direct Report, equivalent to Dr. Cooper's second approach (using the RPSM), but proposing the sharing of *all* entities' restructuring costs, is more supportable than Dr. Cooper's first approach of 100% reimbursement by NNL.   There are a couple of reasons for this.   First, I agree that NNL gave the orders to engage in restructuring at a global level, including building up capacity and reducing it again (which disproportionately affected NNUK).   However, the RPSM's purpose is to share all expenses that may produce residual profits / losses, and this would include expenses connected to both expansions and contractions (including restructuring costs).   There is no reason to believe that such a profit split method might not have been agreed to at arm's length.  It is a *bona fide* method under the regulations and is widely used to share profits and losses.   In the normal course of events, an entity does not have a chance to opt out of such an arrangement.   Therefore, the RPSM is the correct mechanism to use here.    Further, Nortel's frequent, ongoing restructurings and the absorption of their associated costs were part and parcel of its overall, globally integrated business strategy.   The benefits of these restructurings thus flowed (or were designed to flow) to the entire group of companies.   Therefore, following the reasoning laid out above, in my view, the costs of restructuring should be shared among all entities in the RPSM, not just the EMEA LREs and RPEs, given that all entities jointly bore the upside or downside risks from Nortel's business operations.

---

[49]    Cooper Transfer Pricing Report, pp. 74–75.

[50]    Cooper Transfer Pricing Report, p. 14 and pp. 78–79.

###### C.   ROUTINE RETURNS

37.   Dr. Reichert took issue with Nortel's 2001–2005 routine returns.[51]   His 2001–2005 adjustment using the median of a range of manufacturing and (sales-based) distribution routine returns and useful life assumptions works in favor of NNI ($1.2 billion)[52] to the detriment of all other entities except Nortel Ireland.  Economists working for the taxpayers and taxing authorities almost always disagree, however, with each other's choices of comparable companies, profit margins, time periods, and working capital and other adjustments.  Guidance about how to make these decisions is covered extensively in the regulations and OECD guidelines, and is transparent to all the parties involved.  I have seen no evidence that Nortel or its transfer pricing advisors acted in bad faith in their model formulation or its execution.

38.   Although I take no position on the exact magnitude of the routine returns, I note that Dr. Reichert's adjusted routine returns for 2001–2005 suffer from two potential conceptual flaws.  First, Horst Frisch (Nortel's chief transfer pricing advisor during the development of Nortel's first residual profit split model) was fully aware of Nortel's transition from an integrated manufacturer to a virtually integrated service provider.  They proposed an asset-based routine return as a result.  NNUK had disproportionately high levels of working capital in the early years in particular, due to high intercompany receivables.  This is not compensated under Dr. Reichert's approach.  Rather, Dr. Reichert's combination of manufacturing and distribution routine returns benefits NNI and harms NNUK overall, due to NNI's large contribution to Nortel's sales between 2001 and 2005 and, conversely,

---

[51]   Reichert Report, Section VIII.A.5 and Section IX, pp. 87–91. Specifically, Dr. Reichert separately quantifies routine returns into distribution (for both RPEs and LREs) and manufacturing activities (for RPEs only), with the justification that the RPEs' long-term assets included both manufacturing and distribution assets. He then examines the range of operating profit deltas to the RPEs using a combination of the median, lower quartile and upper quartile of comparable average manufacturing and distribution returns (operating margins), applied to the RPEs' net PP&E and sales respectively, year by year.

[52]   Since the total APA settlement amount in favor of NNI is $2 billion, Dr. Reichert re-allocates the "excess" adjustment to NNI ($2 billion–$1.2 billion) in two ways: first, pro-rata to his 2001–2005 adjustment based on revised routine returns (implying a total loss for NNUK of about $370 million), and, second, based on the relative R&D stocks of the non-U.S. RPEs (implying a loss for NNUK of about $350 million). His first scenario therefore double counts the effect of his revisions to routine returns. See Reichert Exhibits X-1, X-2 and X-3, p. 95 of Reichert Report.

NNUK's relatively large working capital and manufacturing assets during this time. Taking the median of Dr. Reichert's range of routine return assumptions places equal weight on all combinations of manufacturing and sales-based distribution returns, which is not justified given the skewed relative mix of manufacturing and distribution activities across the RPEs from 2001–2005. Second, combining sales margin and return on long-term capital would not appear to produce reliable results. Under a return on net assets (RONA) approach, the logical choice is to pair working capital (short-term net assets) with long-term capital to determine routine returns.

39. Dr. Cooper states that the distribution routine return ranges used in Nortel's RPS model were understated for the EMEA entities due to a lack of appropriate working capital adjustments. He argues that NNUK, NN Ireland and NN France did not receive an arm's-length return for their distribution functions and should have received returns of 3%, instead of 1%, on sales during 2006–2008. The EMEA LREs should have also received returns of 3% instead of 1% on sales during 2001–2008.[53]

40. In general, if a taxpayer has, on net, high accounts receivable or "A/R" (which increases working capital), Dr. Cooper's proposed working capital adjustments would have the effect of raising the distribution return range produced by the comparable firms. As mentioned previously, NNUK had unusually high levels of A/R. Therefore, I agree, to the extent that working capital adjustments were either not made at all or were not done properly in Nortel's routine return benchmarking analysis, that error must be fixed to produce reliable results.

---

[53]   Cooper Transfer Pricing Report, pp. 14–15.

### D.   EXCESS COSTS

41.   Dr. Cooper states that the EMEA RPEs should have received an arm's-length return of 15% for excess central services costs (*i.e.*, routine services conducted for extra-territorial benefit) incurred from 2001–2005, as they did during 2006–2008.[54]

42.   In my opinion, Dr. Cooper is correct to adopt this approach.  I have no opinion about the specific ranges he generates in his analysis.  I agree that 15% would seem to be an arm's-length return during 2001–2005 given that it was justified and used during 2006–2008.

### E.   VENDOR FINANCING LOSSES

43.   Dr. Cooper states that NNL should reimburse 100% of vendor (meaning customer) financing losses incurred by the EMEA RPEs from 2001–2008.  His justification is that the financing policy (devised in and directed by Canada) was overly generous and not what one normally sees.[55]

44.   Without regard to the specific facts at hand, I believe that, analogous to restructuring costs, these losses should normally be shared in the RPSM because vendor financing is something that would have potentially benefited all the RPEs had it been successful. However, there may be special facts and circumstances under which it may be appropriate for a parent company, such as NNL, to bear all, or almost all, of the vendor financing losses.

### F.   EXCESSIVE HEADQUARTERS AND STEWARDSHIP COSTS

45.   Dr. Cooper states that NNL alone should bear stewardship costs throughout the entire RPSM period in accordance with the regulations; however, NNL charged out stewardship costs from 2001–2005.  Thus, stewardship costs should be excluded from the RPS pool for 2001–2005.  He also states that NNL should bear its own excessive headquarters costs from 2001–2008.[56]

---

[54]   Cooper Transfer Pricing Report, p. 15.

[55]   Cooper Transfer Pricing Report, p. 15 and p. 137.

[56]   Cooper Transfer Pricing Report, p. 15.

46. I agree with Dr. Cooper's argument that NNL should solely bear its excessive headquarters and stewardship costs, given that these particular costs produced benefits for NNL only. Moreover, stewardship costs are not to be charged out to affiliates under the transfer pricing guidelines and regulations.

47. Dr. Cooper is correct to exclude stewardship costs from the residual profit sharing pool for 2001–2005; moreover, they were correctly excluded from 2006–2008.

48. If it is true that the "excessive" NNL headquarters costs provided no benefit to the other recipients, then they should not be charged out and should be borne solely by NNL, as suggested by Dr. Cooper.  However, I am not in a position to judge the nature of these particular costs and any potential benefit to the RPEs, nor whether Dr. Cooper's 50% determination for the percentage of excessive headquarters costs to total headquarters costs is correct.

49. This concludes my rebuttal report.


February 28, 2014

_____          _____

Steven D. Felgran                                                      Date

22

# APPENDIX F: ADDITIONAL MATERIALS REVIEWED

*Expert Reports*

Coleman Bazelon (UKPC)

Richard Cooper — Transfer Pricing and Allocation Reports (EMEA Debtors)

Timothy Reichert (Monitor and Canadian Debtors)

Lorraine Eden (U.S. Debtors)

*Depositions and Exhibits*

Giovanna Terese Sparagna                  John Veschi

Jeffrey Wood                                          Exhibit 21167

*Case Documents*

| | |
|---|---|
| NNC-NNL06275376 | NNC-NNL06383632 |
| EMEAPRIV0204736 | NNC-NNL085282 |
| NNC-NNL06081958 | NNC-NNL07013929 |
| NNC-NNL06136870 | NNI_01248229 |
| NNC-NNL06275375 | NOR-CAN00032308 |
| NNC-NNL06275376 | NOR-CAN00071723 |
| NNC-NNL06275377 | NOR-CAN00074616 |
| NNC-NNL06383505 | NOR-CAN00175104 |
| NNC-NNL06383606 | NOR-CAN00214360 |
| NNC-NNL06383607 | NOR-CAN00633882 |
| NNC-NNL06383630 | PC0082652 |
| NNC-NNL06383631 | PC0143687 |