THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

**Court File No.: 09-CL-7950**

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED**

- and -

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**Rebuttal Expert Report of Bruce W. Stratton**

**for U.K. Pension Claimants**

February 28, 2014

**THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL PURSUANT TO THE ORDER
ENTERING A PROTECTIVE ORDER OF THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE DATED JUNE 11, 2013 [D.I. 10567], AS AMENDED BY
FIRST AMENDMENT TO PROTECTIVE ORDER DATED SEPTEMBER 20, 2013, AND
PURSUANT TO THE PROTECTIVE ORDER OF THE ONTARIO SUPERIOR COURT OF
JUSTICE (COMMERCIAL LIST) DATED JUNE 11, 2013, AS AMENDED BY ORDER OF THE
ONTARIO SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST) DATED OCTOBER 9,
2013**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

TABLE OF CONTENTS

PART I – Qualifications, Experience, Material Reviewed .................................................................1

PART II - Scope of Report ..................................................................................................................2

PART III – Opinion - Executive Summary .......................................................................................2

                Ontario Law – MRDA Interpretation ................................................................. 2

                Scope of Patents Licensed ................................................................................. 3

                Sublicense and Enforcement Rights ................................................................. 4

PART IV – Opinion ...........................................................................................................................4

       MRDA - Stated Governing Law .........................................................................................5

       Interpretation of the MRDA under Ontario Law ...............................................................5

       Patent Rights and Licenses to Patents................................................................................7

       MRDA Terms:  Article 5(a) – Exclusive License ..............................................................9

       MRDA Terms - Article 4(e) – Enforcement Rights .........................................................12

       MRDA Terms and the Stand-Still Agreement:  Termination and Perpetual Rights..........13

       Factual Matrix..................................................................................................................14

                The Predecessor Cost Sharing Agreement (CSA) .............................................. 14

                Nortel Networks' Matrix Business Model.......................................................... 16

                Nortel Networks R&D Focused on Commercially Promising Technologies....... 17

       Canadian Reports In-Chief:  Scope of Patents Licensed ..................................................18

       Canadian Reports In-Chief:  Sublicensing and Enforcement Rights.................................19

       Extrinsic Evidence and the Interpretation of the MRDA...................................................23

THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

**PART I – Qualifications, Experience, Material Reviewed**

1. I am a barrister and solicitor, called to the Bar in the Province of Ontario. My home address is 781 Euclid Ave., Toronto, Ontario. I am retained by Thornton Grout Finnigan LLP ("TGF"), Willkie Farr & Gallagher LLP ("Willkie Farr") and Hogan Lovells International LLP ("Hogan Lovells", and collectively with Willkie Farr and TGF, "Counsel") and Counsels' clients, Nortel Networks UK Pension Trust Limited (the "Trustee") and the Board of the Pension Protection Fund (the "PPF" and together with the Trustee, the "UK Pension Claimants") to provide an opinion relating to Ontario law, as set out in more detail below.

2. In my practice, I have dealt almost exclusively with intellectual property matters. I have represented clients in litigation and provided other intellectual property advice relating to patents, copyright, trade-mark, trade secret and related rights. Due to my technical background, my practice has included legal work relating to intellectual property rights covering computer and information technology subject-matter.

3. A copy of my curriculum vitae is marked as Exhibit "A" to this Report.

4. Based on the above qualifications and experience, I believe that I am qualified to give the opinions set out below.

5. My firm is being compensated at my usual and customary rate of $700.00 CND per hour for my time, and $410.00 CND per hour for my associate, Alan Macek, plus reimbursement for expenses. No part of my compensation depends upon the outcome in this case or any issue in it.

6. Counsel has provided me with a set of material for review in preparing this Report. A list of all such material is marked as Exhibit "B" to this Report. In preparing this report, I consulted the following research sources: (i) Canadian case law and statutes; (ii) academic publications such as legal texts, journal articles and scholarly papers; and (iii) on-line annotations and digests. A list and copies of all authorities referred to in this Report are marked as Exhibit "C" to this Report.

2
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

7.      During the last four years I have testified as an expert in only the following case, by
making a declaration (on which I was not examined) concerning Canadian law:
*Therapearl v. Rapid Aid Ltd.* United States District Court District Of Maryland,
Civil Action No. 1: 13-cv-02792-CCB.

**PART II - Scope of Report**

8.      I have been provided with the Green Report[2], the Berenblut/Cox report[3] and the
Reichert[4] report on behalf of the Monitor and Canadian Debtors and the Britven
report[5] on behalf of the Canadian Creditors Committee ( collectively the "Canadian
Reports In-Chief"). I have been asked to review these reports with respect to the
statements in the reports that purport to set out or explain the rights defined or
granted under the MRDA (as referred to in those reports).

9.      Each of the Canadian Reports In-Chief sets out issues raised by the MRDA but
none of the reports sets out how the MRDA rights are to be interpreted under
Ontario law.

10.     In this report, I will therefore review Ontario law as it relates to the rights defined
or granted in the MRDA and, in particular, the patent rights dealt with in the
MRDA. I will then consider certain of the specific issues raised in the Canadian
Reports In-Chief in light of the legal principles set out in this report.

**PART III – Opinion - Executive Summary**

**Ontario Law – MRDA Interpretation**

11.     The MRDA is governed by Ontario law. Under Ontario law, the MRDA patent
licenses are interpreted based on the intention of the parties - as made apparent

---

[2] The Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities, January
24, 2014.
[3] Report of Mark L. Berenblut and Alan J. Cox, NERA Economic Consulting, January 24, 2014.
[4] Evaluation and Economic Analysis, Dr. Timothy Reichert, January 24, 2014.
[5] Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel
Debtor Groups, Tom Britven, January 24, 2014.

3
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

from the agreement itself and the factual matrix surrounding the agreement. In summary, the MRDA includes the following:

(a)    In consideration for legal title being held in the name of NNL, the Licensed Participants to the MRDA were granted a perpetual, royalty-free exclusive license to the patents held in their respective Exclusive Territories and a perpetual, royalty-free non-exclusive license in respect of the rest of the world other than Canada and the other Exclusive Territories;

(b)    The patent rights granted included rights to sub-license those rights and to independently enforce those rights; and

(c)    The MRDA licenses are for patents covering a range of technologies, including the technology in commercial offerings of Nortel, technology in development, and technology that derived from the commercial offerings and from the development work of Nortel.

**Scope of Patents Licensed**

12.    The MRDA licenses include patents for a widely-defined portfolio of Nortel technology, including technology found in commercial offerings of Nortel in the market, technology in development at Nortel (or for Nortel), and technology that derived from the products or development work of Nortel. The breadth of the definition of "Products" in the MRDA is important to understanding the full scope of the licensed patent rights.

13.    The Canadian Reports In-Chief mischaracterize the MRDA licenses as "limited" – a position arrived at, in part, because the MRDA's broad definition of "Products" is not adequately considered in those reports. In particular, the MRDA provided exclusive licenses to patents in the Nortel portfolio, including patents in the Residual IP. The Canadian Reports In-Chief are therefore incomplete as they do not include the surrender of rights to the Residual IP in their valuations and allocations.

4
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

**Sublicense and Enforcement Rights**

14.     The sublicense rights expressly granted to MRDA Licensed Participants are of key importance when considering the bundle of rights granted in the MRDA. Whether or not a license is transferrable by the licensee is a factor that depends directly on whether a sublicense right is also granted. That is, a licensed patent right is effectively transferable if it can be sublicensed.

15.     The Canadian Reports In-Chief miss this point when they focus on whether licenses granted in the MRDA are transferrable without explaining the effect of the sublicensing rights expressly granted in the MRDA. Similarly, the right to enforce NN Technology rights is important in assessing the bundle of rights granted. The Canadian Reports In-Chief do not include an appropriate analysis of the grant of the right to enforce.

**PART IV – Opinion**

16.     Each of the Canadian Reports In-Chief deals with the patent rights referred to in the MRDA. However, the Canadian Reports In-Chief do not set out a basis for how the patent-related terms of the MRDA should be interpreted. I will therefore set out the legal principles for interpreting, and then interpret, patent-related terms of the MRDA.

17.     The first version of the MRDA that was executed was dated as of December 22, 2004 ("the original MRDA"). The original MRDA was successively subject to four Addenda which amended the original agreement. Copies of the original MRDA and these Addenda are marked as Exhibit 21003 in these proceedings (and are referred to in the Canadian Reports In-Chief).

18.     I will begin my analysis below having regard to the terms of the MRDA that were in effect immediately prior to the filings made by the various Nortel entities under the relevant insolvency laws on January 14, 2009. In this Report, below, I will refer to "the MRDA" to signify the agreement as of that date.

5
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

## MRDA - Stated Governing Law

19.　　Article 14(f) of the MRDA provides that "This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada." Each of the four Addenda documents similarly defines the laws of Ontario, Canada as being the governing law for those Addenda.

## Interpretation of the MRDA under Ontario Law

20.　　The starting point for the interpretation of the MRDA is the Supreme Court of Canada *Consolidated Bathurst* case[6]:

> "… the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract." [[1980] 1 SCR 888, at p. 901]

21.　　The "true intent" of the parties is not the subjective intent of the parties. As stated by the Supreme Court of Canada in the *Eli Lilly*[7] case (that in turn commented on *Consolidated Bathurst*):

> "The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination." [para. 54]

22.　　The reference to "surrounding circumstances which were prevalent at the time" is also referred to in the case law as "context" or the "factual matrix". The Ontario Court of Appeal has recently stated[8]:

> "A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity." [para. 54]

---

[6] *Consolidated Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.*[1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49 (1979).

[7] *Eli Lilly & Co. v. Novopharm Ltd.*(1998), 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129.

[8] *Dumbrell v. Regional Group of Cos.*, (2008) 279 D.L.R. (4th) 201, 85 O.R. (3d) 616 (Ont. C.A.), at para. 55, Although concluding that context is to be considered, the Court also acknowledged that "there is some controversy as to how expansively context should be examined for the purposes of contractual interpretation."

6
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

> "Insofar as written agreements are concerned, the context, or as it is
> sometimes called the 'factual matrix', clearly extends to the genesis of the
> agreement, its purpose, and the commercial context in which the agreement
> was made: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*
> (1998), 114 O.A.C. 357 (Ont. C.A.) at 363" [para. 55]

23.    In another recent Ontario Court of Appeal decision[9], the *Dumbrell* decision was

cited with approval and the Court stated:

> "It is important to distinguish what is meant by the factual matrix from
> extrinsic evidence that is admissible to resolve an ambiguity. The factual
> matrix is gleaned from the context of the transaction." [para. 105]

> "…where there is ambiguity in the sense that a phrase is capable of bearing
> two equally reasonable interpretations, the court may consider extrinsic
> evidence…" [para. 107]

> "However, the admission of extrinsic evidence does not mean that the
> parties' subjective views of what was intended by the agreement will be
> used to resolve the ambiguity. On the contrary, the court should adopt the
> interpretation that gives effect to the reasonable expectations or intentions
> of the parties." [para. 108]

24.    In the most recent Ontario Court of Appeal decision speaking to this point

(*McLean*[10]), the Court summarized the approach in Ontario law when the issue is

"simply a question of contractual interpretation":

> "The court begins with the words of the contract and presumes that the
> parties intended what is written in the contract. In construing the intention
> behind a particular provision, the court must consider, among other things,
> the contract as a whole, the factual matrix underlying it, and the need to
> avoid commercial absurdity. The court does not consider the subjective
> intention of the parties." [para. 54]

25.    Applying the above principles to the MRDA, the Ontario law approach is:

    (a)    to seek the intention of the parties by beginning with the words of the
           MRDA,

---

[9] *Onex Corp. v. American Home Assurance Co.*, 2013 ONCA 117, 114 O.R. (3d) 161, leave to appeal
refused, S.C.C. October 3, 2013.
[10] *McLean v. McLean*, 2013 ONCA 788, 235 A.C.W.S. (3d) 415. Other cases in which the Ontario Court
of Appeal has adopted a similar approach include *Williams-Sonoma Inc. v. Oxford Properties
Group Inc.*, 2013 ONCA 441 (at para. 27 and footnote 1), citing the Ontario Court of Appeal in
*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205, at para. 24.

7
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

(b)     to consider the factual matrix for the MRDA, which includes the genesis of the MRDA, its purpose, and the commercial context in which the MRDA was made,

(c)     to give effect to the intention of the parties, with a view to avoiding commercial absurdity, and

(d)     if a term in the MRDA is identified that is capable of bearing two equally reasonable interpretations then extrinsic evidence may be considered to resolve the ambiguity.

## Patent Rights and Licenses to Patents

26.     Under Ontario law, subject to certain exceptions (primarily as provided by intellectual property rights), a person is entitled to make, use and sell any product, even if the product is a copy of the product of a competitor. One such exception to the freedom to compete is provided under patent law. Patent rights may fetter the ability of a person to use a particular technology. If a patent is held by one person, the ability of another person to make, use, and sell the invention of the patent will be removed, subject to an authorization that the patent owner may give (i.e. subject to license rights).

27.     Under Canadian law, patent rights are defined by the federally-enacted *Patent Act*. Section 42 of the *Patent Act* provides exclusive rights to the patentee and its legal representatives to make, sell, construct and use the invention defined in the patent. The exclusive right to "use" an invention has been held by the Supreme Court of Canada to mean that "if there is a commercial benefit to be derived from the invention, … it belongs to the patent holder." The rights held by the patent's owner are rights to "full enjoyment of the monopoly granted by the patent." (*Monsanto*[11]). The authorization to derive a commercial benefit from a patent may be provided to a third party by way of a patent license.

28.     The Supreme Court of Canada has cited from the text of Harold G. Fox, to set out the nature of a patent license:

---

[11] *Monsanto Canada Inc. v. Schmeiser*, 2004 SCC 34, 239 D.L.R. (4th) 271, 320 N.R. 201, [2004] 1 S.C.R. 902, 31 C.P.R. (4th) 161 at paras. 38 and 34.

8
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

> "'... But a license is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A license is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. <u>A license prevents that from being unlawful which, but for the license, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that license, would be an infringement of the right of the person who gives the license. A license gives no more than the right to do the thing actually licensed to be done.</u>'"
> (*Eli Lilly, supra,* para. 49) [emphasis in the Supreme Court quotation]

29. This analysis holding that a license provides a "transfer of a beneficial interest", coupled with the acquisition of "an equitable right in the patent", adopted by the Supreme Court of Canada above, is consistent with the words of the MRDA. The MRDA states that under predecessor agreements[12] "each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology". The MRDA expressly provides that the Licensed Participants shall "continue, as of the effective date of this Agreement, to hold and enjoy such rights." The MRDA states that despite being signed on December 22, 2004, it is an agreement "confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the "Effective Date")."

30. In a passage adopted by the Ontario court [13] Lord Denning in the English Court of Appeal (*Murray v. Imperial Chemical*) defined three different types of license rights, as follows:

> "An ordinary "licence" is a permission to the licensee to do something which would otherwise be unlawful. That leaves the licensor at liberty to do it himself and to grant the licences to other persons also. A "sole" licence is a permission to the licensee to do it, and no one else, save that it leaves the licensor himself at liberty to do it. An "exclusive" licence is a permission which is exclusive to the licensee, so that even the licensor is excluded as well as anyone else."

31. The nature of a sub-license was considered by the Supreme Court of Canada in *Eli Lilly,supra*, as follows:

---

[12] These agreements are considered in more detail below in sections relating to the "CSA".
[13] See *Close Up International Ltd. v. 1444943 Ontario Ltd. 2006 CarswellOnt 5797* at para. 15, citing *Murray v. Imperial Chemical Industries Ltd.* [1967] 2 All E.R. 980 (Eng. C.A.).

THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that 'a sublicence is simply another name for the indirect granting of a licence': see Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing* (3[rd] ed. 1977), at §3.18." [at para. 48]

32.     In the MRDA, a right for the Licensed Participants to enforce licensed rights in their respective Exclusive Territories is expressly provided for in Article 4(e).

## MRDA Terms: Article 5(a) – Exclusive License[14]

33.     The rights granted in Article 5(a) are defined in two parts. The first part is an "exclusive, royalty-free license, including the right to sublicense", in perpetuity for the Licensed Participant's Exclusive Territory, for "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology". The second part of the license includes "all rights to patents ... as necessary or appropriate in connection therewith ("Exclusive License")".

34.     The term "Products" is one of the set of defined terms in the MRDA and is expressly defined to include all "products, software and services" which are "manufactured or marketed, at any time by, or for, any of the Participants". The "Products" definition also includes all products, software and services "designed, developed", or "proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants". Also included are all "components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other

---

[14] The wording of Article 5 in the MRDA was amended in the First Addendum to remove the lower case roman numerals found in the original version and left all other words and punctuation intact. In my view of Article 5(a), there is no practical difference in interpretation between the original version with the lower case roman numerals, and the amended version, which omits the numbering scheme within the article. This is consistent with the fact that the lower case roman numerals were not removed until more than nine months after the MRDA was signed and that the addendum removing them refers to "certain minor errors" that were being corrected. Lee Transcript 166:10-167:4; Exhibit 21003 at NNC-NNL06001514/21.

THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

derivatives associated with or incorporated in any of the foregoing". The definition of "Products" was not changed during the time that the MRDA was in effect.

35.    Therefore, consistent with the Nortel Networks integrated, matrix business model, the words of the MRDA license, as read with the Products definition, included rights to:

(i)    all products, software and services (incorporating the NN Technology) made, marketed, designed, developed, by, or for, any MRDA Participant,

(ii)    all such technology *proposed* to be made or marketed and, all such technology *proposed to be designed or developed* by, or for, any MRDA Participant; and

(iii)    all improvements, upgrades, updates, enhancements *or other derivatives*.

36.    Further, the rights granted under Article 5(a)(i) are stated to be "perpetual" (see further discussion, below) and relate to development and design work for any product, software or service, developed "at any time by, or for, any of the Participants" (emphasis added) "using or embodying NN Technology". The NN Technology is defined to mean "any and all intangible assets including but not limited to patents..." as they are "produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."

37.    The broad MRDA definition of Products imports into the Exclusive License (i.e. the license of Article 5(a)(i)) perpetual rights relating to any product, software or service developed in any of the R&D facilities (i.e. by any of the Participants) of the larger Nortel Networks "matrix" of entities, whenever developed. The license rights under Article 5(a)(i) are not defined to be restricted to the actual products being commercialized by any Participant at any one time.

38.    The second part of the license granted in Article 5(a)(i) relates expressly to "all rights to patents" (and other IP rights as set out in that article). This second part of the license is defined by reference to the first part of the license: the grant is of a

11
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

license to "all rights to patents ... as necessary or appropriate in connection" with the license defined for the Products. The second part of the license is included within what Article 5(a)(i) terms the "Exclusive License" and which rights are referenced elsewhere by that name in the MRDA (see, for example, Article 4(a)). The "all rights to patents" term requires a patent license that is commensurate with the first part of the license grant defined in the Article 5(a) grant – i.e., an exclusive, paid up license, including the right to sublicense in perpetuity.

39.     In terms of the scope of the exclusive patent license, the necessary scope is broad both in terms of subject matter (see above discussion re "Products") and in terms of time: the Exclusive License of Article 5(a)(i) is expressly perpetual (except as otherwise provided for in the MRDA – see below). Further, the Products are defined in the MRDA to cover eligible subject-matter created or proposed at any time. Thus, to give effect to the rights granted to each Licensed Participant to exclusively make, use, sell or license the subject-matter (which has been at any time designed or developed or is proposed to be designed or developed), the license for a particular patent comes into effect when the patent rights are licensable or assertable in the relevant Exclusive Territory.

40.     A further point goes to the commercially unrealistic result that would follow if the patent rights granted under Article 5(a)(i) were to be tied to products actually produced and marketed by a Licensed Participant at any particular time. To determine which patents were, at any given time, subject to exclusive rights of a Licensed Participant, would require a complete understanding of the product offerings of the Licensed Participant as well as which patents were implemented in which products. To manage such a temporally fluctuating portfolio of patent rights would be, in my view, commercially unreasonable.

41.     Further, the license to the patents under Article 5(a)(i) necessarily extends beyond the time during which any sales activity is carried on by a Licensed Participant. The Licensed Participant is expressly granted the right to make, use or sell and may also license the subject-matter as defined in Article 5(a)(i) – which relates to the broad set of defined Products. Thus the grant of rights is not restricted to commercialized

THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

products of the Licensed Participant - the Licensed Participant is expressly given the ability to sublicense others to commercialize the technology. The rights accorded under Article 5 are therefore not contingent on the Licensed Participant bringing any particular product to market in the Exclusive Territory, or indeed having any product on the market at all. For the Licensed Participant to exercise and enjoy the broadly defined rights fully, including the right to be able to grant its own licenses within its Exclusive Territory, the Licensed Participant must receive exclusive rights under the relevant patents - which exclusive rights necessarily extend for the life of the patents (subject only to the specific terms of the MRDA, discussed below).

42.    Further, and as discussed further below, Nortel Networks R&D activity and patenting programs were centred on developing products, including products that were commercialized, were yet to be commercialized, or had been previously commercialized. As a result, the intention of the parties, as expressed in the agreement, is that the "necessary and appropriate" patent license is for each Participant to be granted an exclusive licence for all such Nortel patents, in its Exclusive Territory.

**MRDA Terms - Article 4(e) – Enforcement Rights**

43.    The MRDA includes a specific grant of rights to "assert actions and recover damages or other remedies" for the appropriate Exclusive Territory in Article 4(e). This reflects an intention of the parties to provide a broad set of rights to the Licensed Participants for their own Exclusive Territories. The independent right to pursue others for "infringement or misappropriation" is consistent with the view that the Licensed Participants had "equitable and beneficial ownership of certain exclusive rights".

44.    As discussed in more detail below, the ability to enforce in their own territory is a significant part of this bundle of rights granted in the MRDA[15]. Further, Article

---

[15] There are non-exclusive rights granted to the Licensed Participants in Article 5(a)(ii) but these are expressly defined to be granted for outside the Exclusive Territory and therefore the provisions of Article 4(e) do not apply to those rights.

13

THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

4(e) references the right to assert actions and recover damages as it relates to infringement or misappropriation "of NN Technology" by others. This term's reference to NN Technology – as opposed to defining the right with respect to product lines or the business of the Licensed Participant - is consistent with a broad grant of patent rights under Article 5(a)(i). It would be inconsistent if the MRDA were to provide narrower rights under Article 5(a)(i) (grant of license) than are indicated under Article 4(e) (enforcement of license rights).

45.     Both the sublicense rights and the enforcement rights relate to third party activities. Under the MRDA, the Licensed Participants can sublicense their rights to third parties to commercialize their own products, or the Licensed Participants can enforce their rights against unlicensed third parties making their own products. In both cases, the sublicense or enforcement relate to products of the third parties.

**MRDA Terms and the Stand-Still Agreement: Termination and Perpetual Rights**

46.     The grant in Article 5(a) states that the grant is perpetual, "except as hereinafter provided". The terms of the MRDA did include provisions under which the Exclusive License could be terminated (see Articles 9 and 11) . Absent the invocation of these termination terms, however, the MRDA provided for a perpetual term for the Exclusive License granted.

47.     By the terms of the Fourth Addendum, executed in December 2008 and January 2009, a "Standstill Provision" was agreed to by the parties to the MRDA. This addendum was stated to operate to "prevent any termination or withdrawal described at (i) above from occurring, so that the Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b)". The Article 11(b) terms dealt with a Forced Retirement due to a Defaulting Event which included any Participant becoming insolvent.

14
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

**Factual Matrix**

48.    To interpret the terms of the MRDA, Ontario law indicates that the context or
       factual matrix should be considered. This includes the genesis of the MRDA, its
       purpose, and the commercial context in which the MRDA was made.

**The Predecessor Cost Sharing Agreement (CSA)**

49.    The MRDA is a replacement for the Amended Research and Development Cost
       Sharing Agreement entered into on January 1, 1992 (the "CSA").[16]

50.    How the CSA's terminology was incorporated into, and modified within, the
       MRDA are both relevant in analyzing the "genesis" of the successor MRDA.

51.    The MRDA expressly references the rights granted under the CSA. The CSA
       included terms that were very similar to, but not identical to, terms set out in the
       MRDA. Therefore, the characterization of the CSA terms in the terms of the
       MRDA itself provides a strong indication as to the intention of the parties in
       entering the MRDA.

52.    As noted above, the MRDA states that despite being signed on December 22, 2004,
       it is an agreement "confirming and formalizing the operating arrangements of the
       Participants at and from January 1, 2001 (the "Effective Date")."

53.    The MRDA states that under the CSA the Licensed Participant had "equitable and
       beneficial ownership of certain exclusive rights under NT Technology". In the
       context of the CSA, this reference is to the rights granted under Article 5 of that
       agreement. In fact, for reasons set out below, the MRDA provided a bundle of
       rights to the Licensed Participants that was, in respect of patents, more extensive
       than what was held under the CSA. The MRDA's characterization that under the
       CSA the Licensed Participants held "equitable and beneficial ownership" rights
       provides a very strong indicator that the intention of the parties to the MRDA was
       to provide "equitable and beneficial ownership" rights to the Licensed Participants
       under the grant of rights of Article 5 of the MRDA. The reference to rights granted

---

[16] See Exhibit 21002. Although this report references a single "CSA", the cost sharing arrangement was
implemented with a series of agreements, as referenced in the Canadian Reports In-Chief.

15
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

to the Licensed Participants is the only time the word "ownership" is used in the MRDA.

54.    Additionally, the MRDA differed from the CSA in a number of ways:

(a)    the definition of "Products" in the MRDA was broadened from the definition found in the CSA. In contrast to the MRDA, the CSA did *not* expressly recite "design", "development" or proposed "design" or "development" in the definition of "Products". This reflects an intention of the parties to the MRDA to define a broader license – to license more than merely those "products" which were "manufactured or marketed" or "proposed to be manufactured or marketed".

(b)    The definition of NN Technology in the MRDA is also different from the definition of NT Technology in the CSA. In the CSA there is reference to "intangible" rights. The MRDA makes express that the license to the NN Technology did not include trademark rights or goodwill. This difference shows that the intention of the parties to the MRDA was not, in that agreement, to provide a right to market products under the Nortel *brand* (which requires a license under trademark rights) but rather to provide rights to technology and the related patent rights that went with *technology* being developed or proposed to be developed by the R&D entities at Nortel Networks.

(c)    The CSA had limitations on the patent license granted to the Participant by which NNL was entitled to enter into cross-licenses in the territory of the Participant and the Participant was required to permit certain activities within its territory. These terms were removed in the MRDA. This change indicates that the intention of the parties was to provide the Licensed Participants with a more complete bundle of rights in the technology and the patents to the technology consistent with Nortel's integrated, matrix business model.

16
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

55.   A further aspect of the genesis of the MRDA is made apparent in comparison with the predecessor CSA. The former agreement defined an arrangement whereby the costs of R&D for the Participants were shared between the different Participants, based on the relative income of the Participants. In contrast, the MRDA defined a "residual profit split methodology (RPSM)". This was a profit sharing approach in which, as a general matter, the profits of the Participants were (with various adjustments) shared as between the Participants based on the R&D costs incurred[17]. Further, in the original MRDA the method for calculating the RPSM was expressly subject to review by the appropriate tax authorities (see preamble). This tax-driven aspect of the MRDA is also shown by the Third Addendum which stated that "in discussions with certain Revenue Authorities in 2007 that certain amendments" were "necessary or desirable". By the Third Addendum, in December 2008/January 2009, the RPSM mechanism set out in the MRDA Schedule A was again amended. The change from a cost sharing to a profit sharing model, adopted for taxation reasons, is another factor to be considered in interpreting the terms of the MRDA. To the extent that taxation rules required that the Licensed Participants have beneficial ownership in the patents licensed, the tax-driven aspect of the agreement is consistent with an interpretation where the Licensed Participants were granted rights that fit with the beneficial ownership structure.

**Nortel Networks' Matrix Business Model**

56.   The central fact of the commercial context for the MRDA is that the Participants were all part of the global Nortel Networks business. The MRDA expressly references the full entrepreneurial risks and benefits for the Nortel Networks business that each Participant would bear under the MRDA.

57.   All the Nortel Networks business was organized around "business lines" or "business segments" on the basis of product lines (with the exception of certain joint ventures). These business segments operated globally and all of Nortel Networks' business, and each business line or segment was integrated yet capable

---

[17] The mechanism by which the profits were to be split is set out in Schedule A, which was itself subject to amendment by the Second Addendum and by the Third Addendum.

THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

of operating independently from the other business lines or segments.[18] With
certain exceptions, the business segments were not segregated by legal entities or
geography but were operated across various legal entities and therefore across the
Licensed Participants.[19]

58.    The breadth of the MRDA licenses is consistent with, and gives practical and legal
effect to, this "matrix" aspect of the Nortel Networks business. Each Licensed
Participant was granted rights to the broadly defined design, development and
manufactured technology of the other Participants. If the license was somehow
limited to current product offerings of a Licensed Participant, the question of which
rights were licensed or not at any one time would have been virtually intractable.
The practicalities of the "matrix" model for Nortel's business is consistent with an
interpretation of the MRDA under which all Participants have authorization to
utilize, to enforce and to license all patents that related to the Nortel Networks
technology as developed anywhere, any time, within the "matrix".

59.    The MRDA provides that the legal title to the licensed patents will be held in the
name of NNL. This is also consistent with the matrix business model of Nortel
Networks. For administrative convenience, where all patents are to be shared across
the matrix of Nortel Network entities, it is practical to have a single entity "vested"
with title in its name. This would permit the orderly management (maintenance and
prosecution activities) from a central repository where title is held to the various
patents which will be licensed.

**Nortel Networks R&D Focused on Commercially Promising Technologies**
60.    During the time of the MRDA, Nortel developed technology with the goal of, at
least eventually, giving rise to a commercially exploitable product.[20]The
commercial context to the MRDA, therefore, was that the business of Nortel
Networks was to design and develop technology that was intended to be

---

[18] Nortel Networks Functional Analysis for the years ended December 31, 2000-2004 ("Functional
Analysis") [Exhibit 31355].
[19] Motion by NNI in the Chapter 11 bankruptcy proceedings, January 14, 2009 at para 32.
[20] See: Exhibit 11352 at NNI_01534868, Exhibit 11074 at NNC-NNL016070 at page 10 of 14, Ex.
22078 at PC0184926.

18
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

incorporated in product offerings. Therefore, the patents which are licensed - those related to "Products" as defined in the MRDA – reflect an intention by the parties to encompass effectively all patents created by the Participants.

**Canadian Reports In-Chief:  Scope of Patents Licensed**

61.    Each of the Canadian Reports In-Chief mischaracterizes the scope of the Exclusive License of the MRDA. The mischaracterizations stem from a shared misreading of the Products definition in the MRDA: The license relates to Nortel R&D activities, not to the commercial offerings of Nortel at any one time. The misreading can be seen in the following examples:

(i)    A misplaced focus on "business operations" leads the Green report to erroneously conclude that the MRDA licenses "did not include rights to patents not used in any of their operating businesses." [p. 64]

(ii)    The Reichert report states:  "If Nortel stopped making and selling products or if those products were no longer used or no longer embodied the shared R&D ... the licensees would no longer earn profits from their R&D investments." [p. 38].

(iii)    The Berenblut/ Cox report states: "The economic benefits foregone by the U.S. Debtors and EMEA Debtors by the surrender of their property interests do not include the value of Nortel's IP assets that were not incorporated into Nortel products." [para. 78]

(iv)    The Britven report summarizes the MRDA as defining a license "to make, use and sell products of the business." [Table 11, p. 41]

62.    Each of the above mischaracterizations ignores the MRDA Products definition which expressly brings into play "design" and "development" activities that are part of R&D, in addition to the commercialization activities of manufacturing and marketing. Further, proposed design and development activities are included, as well as (for example) "derivatives" from all such activities. These broader R&D

19
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

activities of Nortel – which are understood to be at the heart of the value to the Nortel "matrix" of activities – are expressly included in the Products definition in the MRDA. The words of the MRDA define the licensed rights to be much broader than merely those Nortel products which, in fact, were manufactured and marketed. This license breadth, which includes patents in the Residual IP, is not appropriately taken into account in in the Canadian Reports In-Chief. The reports consequently do not provide a value for the licenses as they relate to Residual IP.

63.    The misplaced focus on product offerings in the Canadian Reports In-Chief is exemplified by the fact that all the Canadian Reports In-Chief refer to the MRDA license as being one limited to Products[21]. None of the Canadian Reports In-Chief restates or refers to the fact that MRDA Article 5(a) also expressly grants to the Licensed Participants "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith". In the Canadian Reports In-Chief, this second part of the license grant is passed over, while (as stated above) the references that are made to the defined term "Products" fail to recognize the breadth of the scope of activities covered by the definition.

**Canadian Reports In-Chief: Sublicensing and Enforcement Rights**

64.    MRDA Article 5(a) states that the license granted is "an exclusive, royalty-free license, including the right to sublicense". The grant term also provides rights that include "in perpetuity, rights to … license."

65.    The sublicensing right is important because the right to sublicense is related directly to the transferability of licenses. If a license cannot be sublicensed and is not transferable, the right to make use of the license is effectively restricted to use by the licensee alone. However, if the licensee has an unfettered right to sublicense then a restriction of non-transferability is of limited importance. The rights of the licensee can be effectively passed to a third party – albeit by way of a sublicense, rather than by way of transfer. When patent rights are involved, the difference

---

[21] Green report: p. 25 ; Reichert report: p. 37 ; Berenblut/Cox report:  para. 60(b); Britven report, para. 4.2(b), p. 16.

20
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

between a transfer and sublicence may have limited or no commercial importance (for example, some patents were transferred to buyers of Nortel business units and some were licensed). The important factor for the purchaser being the authorization to be able to use the technology – a right made available under either mechanism.

66.  Despite the express reference to sublicensing rights in Article 5(a), the Canadian Reports In-Chief do not acknowledge its importance. For example:

(a)  The Reichert report states: "In short, the licence was to make and sell Products and to use the Nortel technology as required for these purposes." The report also ignores the sub-license rights in referencing the MRDA license rights as "product make-sell rights". The right to license "Products" is referenced but the rights are summarized as rights to "make and sell Products", without reference to licensing or sub-licensing rights.

(b)  The expressly granted sublicensing right is not mentioned in the Berenblut/Cox para. 60(b) summary – nor in any other part of the report.

(c)  The summary of the provisions of the MRDA that are of "particular importance" in the Green report does not reference the sub-clause setting out the sublicensing right in Article 5(a). Green states that the license rights were "restricted to specific fields of use as required to operate the Nortel operating business as managed by the licensee." [pp. 25 and 55]

(d)  The Britven report summarizes the "licenses granted by NNL" as being "limited in scope" and lists some but not all of the rights that were included in Article 5(a) (at section 4.2(b), p. 16). Missing is the right to sublicense or license. A further reference to the rights of each Licensed Participant does define the right to sublicence but states that it is a "limited right" only "within the scope and field of use of its other license rights." The terms of the MRDA do not include any such express "scope and field of use" restriction. Further, the summary provided by the Britven report lists "other license rights" as being only "making, using and selling and marketing". Missing from this list are the expressly defined rights granted to the

Licensed Participants to "have made", "lease", and "license". A later summary in the report (section 6.33) reduces the listed rights to be merely rights to "make, use and sell" – again omitting the right to license which is expressly granted in the MRDA.

67. An example of how this oversight impacts on the analysis in the Canadian Reports In-Chief is found in the Berenblut/Cox report. At paragraph 62, the report states that NNL, as "owner of Nortel's IP", was entitled to "the benefit of that IP in its highest and best use – including from the transfer of those assets to third parties who were prepared to pay more for those assets than the present value of the operating profits Nortel could have been expected to realize from their use in its own operations."[22] However, the type of value identified in this sentence can also be realized through a licence to third parties. In the MRDA, the Licensed Participants were provided with the right to sub-license and, accordingly, were expressly granted the ability to license the rights so as to obtain the "benefit of that IP" in their respective Exclusive Territories. This is a salient omission because the report states that, "importantly", the license rights are not transferable to third parties.

68. Similarly, the Green report identifies an income approach valuation and states that the methodology is "especially appropriate because the license rights could not be transferred." [p. 54]

69. In Reichert, the same stress is put on the inability to transfer the license: "there is no provision for a licensee to have the right to any other exploitation interests, including future investment opportunities or sale rights in respect of Nortel technology." [p. 37] The report also identifies the licensed rights as being "product make-sell rights", a characterization that omits the important right to sublicense.

---

[22] The MRDA does not refer to NNL as the "owner" of Nortel's IP. As set out above, the only time "ownership" is used is in relation to the Licensed Participants.

22
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

70.     The Britven report lists the "lack of transferability without the consent of the other
        parties to the MRDA" as being one of the factors used to arrive at the value of the
        surrendered licenses. (Section 6.33)

71.     The Canadian Reports In-Chief also mischaracterize the intention of the parties to
        the MRDA in stating that the MRDA included a term that "licenses were non-
        transferable without the consent of all parties to the MRDA" (see Berenblut/Cox at
        para. 61(b), Green at p. 26, Britven at section 4.2(b), p. 16). In fact, the words of
        the MRDA (Article 14(a)) refer to the MRDA agreement itself not being assignable
        without consent of all Participants. The parties to the MRDA did not choose to
        include an express term in the MRDA to restrict the transfer of licenses granted
        under the MRDA. This makes sense as, by allowing the licensees to freely
        sublicence, the MRDA operated to transfer a right to the Licensed Participants that
        was of similar if not identical value as the right to transfer the license itself. There
        was little benefit in the parties stating that the license was not transferrable when
        the rights under the license could be freely transferred by sublicensing.

72.     The broader misunderstanding of the MRDA licensed rights in the Canadian
        Reports In-Chief goes to the heart of the reports. The Canadian Reports In-Chief
        conclude that the valuation and allocation methods proposed were appropriate
        because there was no transferability of the MRDA license rights (see
        Berenblut/Cox at para. 62, Reichert at p. 37, Britven at section 4.2(b), p. 16). In
        fact, the sublicensing right provides an economically equivalent right in the hands
        of the MRDA licensees. This right is not accounted for in the Canadian Reports In-
        Chief.

73.     A related point concerns MRDA Article 4(e) which grants Licensed Participants
        the right "to assert actions and recover damages or other remedies" for
        infringement of "NN Technology." As was the case with the right to sublicense, the
        Canadian Reports In-Chief do not acknowledge that this grant of rights goes
        beyond "make-sell" rights that are purported to be the extent of MRDA license
        rights. The ability to enforce rights is not required to be granted if a license is truly
        a "make-sell" authorization only, nor is the right to enforce referenced to

23
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Products". The right to enforce the licensed rights is, in itself, potentially a source of revenue and is an indicator that the MRDA's grant of rights to the Licensed Participants was intended to be broad. The unsupported characterization of this as a "limited right to assert actions and recover damages" (Green, p. 25) misses the significance of this grant.

74. As the above indicates, the MRDA grants rights that are perpetual, paid up, and exclusive, and which include sublicensing rights and include independent rights to enforce. This significant bundle of rights is entirely consistent with the "equitable and beneficial ownership" rights, referred to in the MRDA as being granted to Licensed Participants. In fact, the bundle of rights provides the licensees with an authorization to use the patented rights, a right to allow others to use the patents, and a right to enforce the patents. These are not "limited" license rights, as the Canadian Reports In-Chief have stated, but rather provide a full range of the benefits available under patent rights.

**Extrinsic Evidence and the Interpretation of the MRDA**

75. As is set out above, it is my opinion that the intention of the parties to the MRDA is able to be found in the words of the MRDA, as interpreted in the context of the factual matrix of the agreement. However, as set out above, the law of Ontario also provides that if a term of the agreement is held to be ambiguous, then recourse may be had to extrinsic evidence to interpret the agreement.

76. It is my opinion that the MRDA is not ambiguous. Assuming, however, the Courts were to conclude that any ambiguity exists in Article 5 in view of the position taken in the Canadian Reports In-Chief that the licensed patent rights are narrowly tied to current commercial offerings of the Licensed Participant, the Courts could look to extrinsic evidence.

77. The conduct of NNL under the terms of the MRDA is extrinsic evidence which may bear on the interpretation of the agreement. In particular, after the effective date of the MRDA, NNL commenced patent infringement actions in courts in the United States of America. In these actions, NNL was named as a plaintiff as having

24
THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

title to the U.S. patents in suit. Further, in the court documents, the Nortel Networks U.S. subsidiary (and Licensed Participant) Nortel Networks Inc. ("NNI") was named as an "exclusive licensee" under the patents in suit[23]. In each of these actions, the Complaint recited NNI as an exclusive licensee. However, I am not aware of any evidence to suggest that there had been any investigation into whether the specific patents in suit related to commercialized Nortel products. This extrinsic evidence supports the interpretation of the MRDA under which the exclusive patent licenses granted to the Licensed Participants were perpetual and were not restricted to the commercial offerings of the Licensed Participants.

78.     Further, there are documents generated by NNL which purported to summarize the effect of the terms of the MRDA. One such document is the "memo to file" prepared by Giovanna Sparagna in 2006.[24] This document includes the following summary of the rights granted under the MRDA:

> "As under the cost sharing agreement, each Participant has the beneficial ownership of the Nortel intangible property in its own Territory. Although NNL (Canada) owns legal title to the intangibles, the Participants are granted by NNL exclusive perpetual licenses in their respective jurisdictions to exploit and otherwise develop the Nortel intangibles."

79.     The above extrinsic evidence supports the interpretation of the MRDA provided above, should there be a conclusion that terms of the MRDA are ambiguous. For the reasons set out above, however, in my view the terms of the MRDA do not require extrinsic evidence for their proper interpretation.

---

[23] See Complaints in Exhibits 22084, 21456, and 21457.
[24] Exhibit 11345.

25

THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
THEREFORE THIS REPORT  IS DESIGNATED HIGHLY CONFIDENTIAL

Bruce W. Stratton
February 28, 2014

EXHIBIT "A" TO THE REPORT OF BRUCE W. STRATTON

# BRUCE W. STRATTON

**HOME ADDRESS:**

781 Euclid Ave.
Toronto, Ontario, Canada
M6G 2V3

**BUSINESS ADDRESS:**

DIMOCK STRATTON LLP
32nd Floor,
20 Queen St. West
Toronto, Ontario, Canada
M5H 3R3

Phone: (416) 971-7202
Fax:    (416) 971-6638
Email:  bstratton@dimock.com

**EDUCATION AND PROFESSIONAL QUALIFICATIONS:**

Law Society of Upper Canada - Barrister and Solicitor; 1987 Call.

Registered Patent Agent and Registered Trade-mark Agent.

University of Toronto, Ll. B. – 1985.

Queen's University, Kingston, Ontario:  B.Sc. (Computing and Information Science, First Class Honours) – 1981.

**PROFESSIONAL EXPERIENCE:**

Dimock Stratton LLP, Toronto, Canada – Partner, 1994 to present.

Sim, Hughes, Dimock, Toronto, Canada – Associate Lawyer, 1987-1994.

Strathy, Archibald and Seagram and Sim, Hughes, Dimock, Toronto, Canada – Articling Student (split articling program), 1985-1986.

Barrigar & Oyen, Ottawa, Canada – Summer Student, May-August, 1984.

System Teknik, Hjorring, Denmark – Programmer, exchange student, May-August, 1983.

University of Sydney, Australia – Research Assistant, Computer Science Department, March-May, 1982.

Queen's University, Kingston, Canada – Research Assistant, Computing Science Department, May-Aug 1980, May-December, 1981.

**PROFESSIONAL ASSOCIATIONS:**

Canadian Bar Association (previously Chair, Patents Committee).

Intellectual Property Institute of Canada, Fellow (previously Computer-related Technology Committee; Forums and Seminars Committee).

American Intellectual Property Law Association.

International Technology Law Association.

Canadian IT Law Association.

The Advocates' Society

**BOOKS:**

*Annotated Patent Act*, (Toronto:  Carswell, current - loose leaf service).

"Computer-Related Disputes" chapter in *Intellectual Property Disputes: Resolutions & Remedies*, (Toronto:  Carswell, current - loose leaf service), co-author with Martin Kratz.

"Computer Contracts" chapter in *Canadian Forms and Precedents*, (Toronto: LexisNexis, 1992 – 2010), co-author with Donald M. Cameron.

*"I Thought of That", A Handbook of Intellectual Property Law*, (Toronto:  CCH Canada, 1999), co-author with Ronald E. Dimock and Dino P. Clarizio

**PROFESSIONAL DIRECTORIES:**

Martindale-Hubbell International Law Directory

Chambers & Partners Chambers Global Guide

IAM Patent 1000

The Best Lawyers in Canada

International Who's Who of Patent Lawyers

Canadian Legal Lexpert Directory

Benchmark Litigation – Canada

The Legal 500

**PAPERS AND SEMINARS:**
**(Ten Year Listing)**

"18[th] Annual Intellectual Property Year in Review: Patents", Law Society of Upper Canada; January 16, 2014.

"Recent Developments: Patents", The Federal Circuit Bar Association conference re Trade, Intellectual Property and Recovering Economies: A search for best practices; September, 2013.

"Effective Opening Statements", Ontario Bar Association Oral Advocacy Boot Camp, October 8, 2013.

"Annual Update on IP Issues for Information Technology", moderator, Canadian IT Law Association Annual General Meeting, October 24, 2013.

"Intellectual Property Law", course instructor, University of Toronto, Masters in Engineering Program, Stronach Center for Innovation, February-March, 2013.

"Non-Practising Entities", moderator, University of Toronto, Technology and Intellectual Property Conference, February 14, 2012.

"Techniques of Crossing the Software Expert", Canadian Bar Association meeting re "Advocacy before the courts in IP Matters: The Art of Cross Examination"; May 5, 2011.

"U.S.-Canadian Patent Law", The Giles Sutherland Rich American Inn of Court; May 20, 2011.

"Using Patents to Gain Competitive Advantage While Mitigating Infringement", Federated Press; June 6, 2011.

"Top 10 Patent Cases", moderator, IPIC webinar; April, 2011.

"The Weatherford Decision", IPIC Webinar; September 9, 2011.

"Amazon.com v. Commissioner of Patents", Toronto Informals Group; December 5, 2011.

"Top 10 Patent Cases", moderator, IPIC webinar; April, 2010.

"Developments in International Patent Law", Federated Press Internet Law Conference; May, 2010.

"Discovery Motions in Federal Court", Canadian Bar Association ; May, 2010.

"Monetary Remedy Quantification in Patent Cases", IPIC Annual General Meeting; October, 2010.

"Patent Law Update", Canadian IT Law Association Annual General Meeting; October, 2010.

"Software/Business Method Patents", in *Lawyers' Weekly*; December, 2009.

"Patent Law Update", IPIC webinar; 2009.

"Open Source Software", Federated Press Internet Law Conference; December 2009.

"Damage Quantification in Patent Litigation", NERA Seminar; December, 2009.

"Injunctive and Equitable Relief", Intellectual Property Institute of Canada, Spring Meeting; April 14, 2008.

"Open Source Software", Federated Press Internet Law Conference; December 4, 2008.

"Supreme Court of Canada's Approach to IP Rights", Thomson Carswell Webinar, November 6, 2007.

"The Extraterritorial Effect of U.S. Patents", International Technology Law Association European Conference; November 6, 2006.

"*Lego v Mega Bloks* in the Supreme Court of Canada: Ephemeral Rights in Toy Bricks", in *INTA Trademark Reporter*, May-June 2006, co-author Henry Lue.

"Experimental Use and Patent Infringement", IPIC Annual Meeting; September, 2006.

"Leading IP Cases", Canadian Bar Association Annual Meeting; August, 2006.

"Functionality in Trade-marks", New York State Bar Association, IP Section Meeting, July, 2006;

"Expert Evidence In Intellectual Property Cases", CBA Conference; April, 2005.

"IP Rights in Software - Mock Arbitration", New York State Bar Association, IP Section Meeting; December, 2005.

## EXHIBIT "B" TO THE REPORT OF BRUCE W. STRATTON

## DOCUMENTS PROVIDED TO DIMOCK STRATTON

| No. | Document | Date | Source |
|---|---|---|---|
| 1. | Amended Research and Development Cost Sharing Agreement between Northern Telecom Ltd. and Northern Telecom Inc. | January 1, 1992 | NNC-NNL006440 Exhibit 21002 |
| 2. | Complaint filed by NNI and NNL against Foundry Networks, Inc. in the United States District Court (District of Massachusetts) | March 14, 2001 | Exhibit 22084 |
| 3. | Complaint filed by NNI and NNL against Extreme Networks, Inc. in the United States District Court (District of Massachusetts) | March 14, 2001 | n/a |
| 4. | Complaint filed by NNI and NNL against Kyocera Wireless Corp. in the United States District Court (Northern District of Texas, Dallas Division) | January 4, 2002 | n/a |
| 5. | • Master R&D Agreement with amendments<br>• Memorandum of Understanding | December 22, 2004<br><br>December 31, 2008 | NNC-NNL06001514 Exhibit 21003<br>NNC-NNL016265 (not an Exhibit) |
| 6. | 2004 Functional Analysis | December 31, 2000 – 2004 | EMEAPROD218980 Exhibit 31355 |
| 7. | Presentation: Residual Profit Split – Summary of Principles and Advance Pricing Agreement Status | October 31, 2005 | EMEA1000000349 Exhibit 31094 |
| 8. | Original Complaint for Patent Infringement filed by NNI and NNL against Ciena Corporation | April 17, 2006 | Exhibit 11141 |
| 9. | 2008 APA Application with Appendices | October 31, 2008 | PC0184853 Exhibit 22078 |
| 10. | Affidavit of John Doolittle | January 14, 2009 | PC0184338 Exhibit 21539 |
| 11. | Report of Ernst & Young Inc. | January 14, 2009 | PC0184486 Exhibit 21278 |
| 12. | Interim Funding and Settlement Agreement | June 9, 2009 | International Insolvency Institute Paper |
| 13. | Asset Sale Agreement | June 30, 2011 | NNI_00825094 |

1

2

| No. | Document | Date | Source |
|---|---|---|---|
| 14. | Apple-Rockstar Sellers Disclosure Schedule | June 30, 2011 | BHG0057360 |
| | Annex 1.1(c) – Excluded Patents | | BHG0056760 |
| | Annex 1.1(d) – Listed Jointly Owned Patents | | BHG0056985 |
| | Annex 1.1(h) – Listed Patents, Assets Tab | | BHG0056996 |
| | Annex A.1(h) – Abandoned, Expired, Transferred Patents | | BHG0056945 |
| | Annex A.1(o)(i)(x) – Standards-Related Patents | | BHG0056759 |
| 15. | Allocation Position of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund (CCAA) | May 16, 2013 | n/a |
| 16. | Appendix A to the Allocation Position of the UK Pension Claimants (CCAA) | May 16, 2013 | n/a |
| 17. | Allocation Position of the Monitor and Canadian Debtors (CCAA) | May 16, 2013 | Exhibit 21283 |
| 18. | Allocation Position of the Canadian Creditors' Committee (CCAA) | May 16, 2013 | Exhibit 21511 |
| 19. | Allocation Position of The Joint Administrators Regarding the Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets (CCAA) | May 16, 2013 | n/a |
| 20. | Opening Allocation Position of *Ad Hoc* Group of Bondholders (Chapter 11 and CCAA) | May 16, 2013 | n/a |
| 21. | Opening Submission of Allocation Position of Wilmington Trust, National Association, as Successor Indenture Trustee (Chapter 11) | May 16, 2013 | n/a |
| 22. | Allocation Response of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund (CCAA) | May 29, 2013 | n/a |
| 23. | Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings of the Other Core Parties (CCAA) | May 29, 2013 | n/a |

3

| No. | Document | Date | Source |
|---|---|---|---|
| 24. | Joint Response of the Monitor and the Canadian Debtors to the Claims by the UK Pension Trustee and PPF re: UK Pension Scheme (CCAA) | May 29, 2013 | n/a |
| 25. | Canadian Creditors' Committee Response to Core Parties' Opening Allocation Positions (CCAA) | May 29, 2013 | n/a |
| 26. | Responding Allocation Position of The Joint Administrators Regarding the Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets (CCAA) | May 29, 2013 | n/a |
| 27. | Response of *Ad Hoc* Group of Bondholders to Allocation Positions of other Core Parties (Chapter 11 and CCAA) | May 29, 2013 | |
| 28. | Joinder of Law Debenture Trust Company of New York, as Indenture Trustee, in Response of US Debtors and Official Committee of Unsecured Creditors to the Core Parties' Allocation Positions (CCAA) | May 29, 2013 | n/a |
| 29. | Facts Taken from Nortel Group Sources | Undated | Prepared by TGF |
| 30. | HS Internal Draft - Master R&D Agreement Conformed Copy | | NNC-NNL06735267 |
| 31. | Representative Witness Subjects Served by the Monitor and Canadian Debtors | January 24, 2014 | n/a |
| 32. | E-mail to Mr. Ralph from Mr. Canale re: Reponses to Questions | May 6, 2005 | Exhibit 11074 |

4

**TRANSCRIPTS/EXHIBITS PROVIDED TO DIMOCK STRATTON**

| No. | Deponent | Exhibits | Deposition Date |
|-----|----------|----------|-----------------|
| 1. | Chris Cianciolo | 11149 – 11174 | October 15 |
| 2. | Michelle Lee | 22076 – 22091 | October 28 |
| 3. | Angela Anderson | 31304 – 31328 | October 31 |
| 4. | John Veschi | 22092 – 22109 | November 7 |
| 5. | Gillian McColgan | 22110 – 22119 | November 8 |
| 6. | John Roese | 11278 – 11289 | November 11-12 |
| 7. | Timothy Collins | 22142 – 22154 | November 15 |
| 8. | Angela DeWilton | 21446 – 21464 | November 20 |
| 9. | Mark Weisz | 11304 – 11314 | November 25 |
| 10. | John Doolittle | 21525 – 21549 | December 5 |
| 11. | Scott Wilkie | No Exhibits Marked | December 6 |
| 12. | Giovanna Sparagna | 11338 – 11356 | December 10 |

**EXPERT REPORTS PROVIDED TO DIMOCK STRATTON**

| No. | Document | Date |
|-----|----------|------|
| 1. | Expert Report Legend (created by TGF) | January 30, 2014 |
| 2. | Berenblut and Cox Report | January 24, 2014 |
| 3. | Cole Report – CCC | January 24, 2014 |
| 4. | Cooper Report (allocation) – EMEA | January 24, 2014 |
| 5. | Cooper Report (transfer pricing) EMEA | January 24, 2014 |
| 6. | Eden Report – US Debtors | January 24, 2014 |
| 7. | Green Report – Monitor | January 24, 2014 |
| 8. | Green Report (appendices) – Monitor | January 24, 2014 |
| 9. | Reichert Report – Monitor | January 24, 2014 |
| 10. | Representative Witness Subjects Served by the Monitor and Canadian Debtors | January 24, 2014 |

E.CA

FORM 53

*Courts of Justice Act*

ACKNOWLEDGMENT OF EXPERT'S DUTY

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

ACKNOWLEDGMENT OF EXPERT'S DUTY

1.  My name is Bruce W. Stratton. I live at 781 Euclid Ave. in the City of Toronto, Ontario, Canada.

2.  I have been engaged on behalf of the Trustee of Nortel Networks U.K. Pension Plan and the Board of the Pension Protection Fund to provide evidence in relation to the above-noted court proceeding.

3.  I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

    (a)  to provide opinion evidence that is fair, objective and non-partisan;

    (b)  to provide opinion evidence that is related only to matters that are within my area of expertise; and

    (c)  to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.  I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date: February 28, 2014

**EXHIBIT "C" TO THE REPORT OF BRUCE W. STRATTON**

## <u>Table of Authorities</u>

| Tab | Case |
|-----|------|
| 1 | *Consolidated Bathurst Export Ltd. c Mutual Boiler & Machinery Insurance Co.*, [1980] SCR 888. |
| 2 | *Dumbrell v Regional Group of Cos.*, 85 OR.(3d) 616 [2007] (Ont CA). |
| 3 | *Eli Lilly & Co. v Novopharm Ltd.*, [1998] 2 SCR 129. |
| 4 | *Onex Corp. v American Home Assurance Co.*, 2013 ONCA 117. |
| 5 | *Williams-Sonoma Inc. v Oxford Properties Group Inc.*, 2013 ONCA 441. |
| 6 | *McLean v McLean*, 2013 ONCA 788. |
| 7 | *Monsanto Canada Inc. v Schmeiser*, 2004 SCC 34. |
| 8 | *Close Up International Ltd. v 1444943 Ontario Ltd.*, 2006 CarswellOnt 5797 (SCJ). |

# TAB 1

CONSOLIDATED-BATHURST *v.* MUTUAL BOILER

**Consolidated-Bathurst Export Limited**
(*Plaintiff*) *Appellant*;

and

**Mutual Boiler and Machinery Insurance Company** (*Defendant*) *Respondent*.

1979: March 13; 1979: December 21.

Present: Martland, Ritchie, Pigeon, Dickson, Beetz, Estey, and McIntyre JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC

*Insurance — Interpretation of insurance contracts — Definition of accident — Direct and consequential damages.*

The appellant, a manufacturer of paper products, was required to shut down part of its facilities because of the failure of three heat exchangers and thereby suffered a loss of $158,289.24 of which $15,604.44 was direct damage to the tubes in the heaters. The respondent is the insurer under a policy issued in respect of certain property of the appellant including these heat exchangers. The respondent resists the appellant's claim for the above mentioned loss on the basis that the damage was caused by corrosion of the tubes inside the heat exchangers and this risk was specifically excluded from the coverage provided by the policy of insurance. This position was adopted in both the Superior Court and the Court of Appeal. Hence the appeal of the plaintiff to this Court.

*Held* (Martland, Ritchie and McIntyre JJ. dissenting): The appeal should be allowed.

*Per* Pigeon, Dickson, Beetz and Estey JJ.: The issue is whether the loss occasioned by the corrosion of the heat exchangers is recoverable under the terms of the policy. The heart of the argument is that while the definition of accident in the policy does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material" the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion.

In interpreting an insurance contract, effect must first be given to the intention of the parties, to be gathered from the words they have used, just as in any other contract. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine by which any doubt as to the meaning and scope of the excluding or limiting term is to be resolved against the party who has inserted it and who is now relying on it. Even apart from

**Exportations Consolidated Bathurst Limitée**
(*Demanderesse*) *Appelante*;

et

**Mutual Boiler and Machinery Insurance Company** (*Défenderesse*) *Intimée*.

1979: 13 mars; 1979: 21 décembre.

Présents: Les juges Martland, Ritchie, Pigeon, Dickson, Beetz, Estey et McIntyre.

EN APPEL DE LA COUR D'APPEL DU QUÉBEC

*Assurance — Interprétation des contrats d'assurance — Définition d'accident — Dommages directs et indirects.*

L'appelante, un fabricant de produits du papier, a dû fermer une partie de son usine en raison de la panne de trois échangeurs de chaleur, ce qui lui a occasionné une perte de $158,289.24, dont $15,604.44 de dommages directs aux tubes des échangeurs. L'intimée est l'assureur aux termes d'une police relative à certains biens de l'appelante, y compris ces échangeurs de chaleur. L'intimée conteste la réclamation de l'appelante pour la perte susmentionnée au motif que les dommages résultent de la corrosion des tubes à l'intérieur des échangeurs de chaleur et que ce risque est spécifiquement exclu de la protection offerte par la police d'assurance. La Cour supérieure et la Cour d'appel ont toutes deux adopté cette position. La demanderesse se pourvoit donc devant cette Cour.

*Arrêt* (les juges Martland, Ritchie et McIntyre sont dissidents): Le pourvoi est accueilli.

*Les juges* Pigeon, Dickson, Beetz et Estey: La question est de savoir si la perte causée par la corrosion des échangeurs de chaleur est garantie par les clauses de la police. Le cœur de l'argument est que bien que la définition du mot accident dans la police ne comprenne pas le cas de la corrosion ou des cas semblables tels que «l'usure normale, la détérioration, l'épuisement ou l'érosion du matériel», la définition inclut, aux dires de l'appelante, ce qui suit la corrosion et qui peut en résulter.

Dans l'interprétation d'un contrat d'assurance, tout comme dans n'importe quel autre contrat, il faut d'abord donner effet à l'intention des parties qui se dégage des mots qu'elles ont employés. La deuxième étape est l'application, lorsqu'il y a ambiguïté, de la doctrine *contra proferentem*; elle prévoit que le doute quant au sens et à la portée de la clause d'exclusion ou limitative sera résolu contre la partie qui l'a introduite et

this doctrine the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. There is no dispute that the heat exchangers were covered by the insurance contract. There is also no serious dispute that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. To interpret "corrosion" as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract.

*Per* Martland, Ritchie and McIntyre JJ., *dissenting*: While the policy here covers damage to property other than the object itself, the coverage is limited to indemnity in respect of loss or damage to property of the insured <u>directly</u> caused to an object by an accident as that word is defined in the policy. Therefore an interpretation which would result in affording coverage to the insured for <u>consequential</u> damages whether it was due to corrosion or otherwise cannot be adopted. The only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of . . . material".

[*Indemnity Insurance Company of North America v. Excel Cleaning Service*, [1954] S.C.R. 169, followed; *Pense v. Northern Life Assurance Co.* (1907), 15 O.L.R. 131, aff'd (1908), 42 S.C.R. 246; *Stevenson v. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. v. Canadian General Insurance Co.*, [1956] S.C.R. 936; *Cornish v. Accident Insurance Co.* (1889), 23 Q.B. 453 (C.A.) referred to.]

APPEAL from a judgment of the Court of Appeal of Quebec affirming a judgment of the Superior Court. Appeal allowed, Martland, Ritchie and McIntyre JJ. dissenting.

qui cherche maintenant à l'invoquer. Même indépendamment de cette doctrine, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Il n'est pas contesté que les échangeurs de chaleur sont protégés par le contrat d'assurance. Il n'est pas non plus sérieusement contesté que la corrosion des tubes à l'intérieur des échangeurs de chaleur, probablement causée par la présence d'eau de mer, a été la cause réelle de leur panne. Comme il en a le droit, l'assureur a cherché dans les termes du contrat à limiter sa protection à la perte accidentelle, ce qu'il a fait en essayant de restreindre la définition d'accident. Interpréter la «corrosion» au sens où ce mot est employé dans la définition d'accident, comme le désire l'intimée, équivaudrait à éliminer de la protection de l'assurance toutes les pertes subies par l'assurée en raison de la présence de corrosion. Pareille interprétation entraînerait nécessairement la suppression d'une partie importante de la protection prévue au contrat.

*Les juges* Martland, Ritchie et McIntyre, *dissidents*: Bien que la police en l'espèce garantisse les dommages à des biens autres que l'objet lui-même, la garantie est limitée à une indemnité relativement à la perte des biens de l'assurée ou aux dommages subis par eux résultant <u>directement</u> d'un accident au sens donné à ce mot par la définition de la police. En conséquence, on ne peut adopter une interprétation qui protégerait l'assurée des dommages <u>indirects</u> qu'ils aient été causés par la corrosion ou par autre chose. Les seuls dommages «directs» à un objet quelconque dans l'usine de l'appelante sont ceux subis par les tubes eux-mêmes et les termes clairs employés dans le contrat d'assurance pour définir le mot «accident» prévoient l'événement même qui s'est produit ici, savoir, les dommages causés à un objet appartenant à l'assurée suite à la «corrosion du . . . matériel», et l'excluent de la garantie.

[Jurisprudence: *Indemnity Insurance Company of North America c. Excel Cleaning Service*, [1954] R.C.S. 169, arrêt suivi; *Pense v. Northern Life Assurance Co.* (1907), 15 O.L.R. 131, conf. par (1908), 42 R.C.S. 246; *Stevenson c. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. c. Canadian General Insurance Co.*, [1956] R.C.S. 936; *Cornish v. Accident Insurance Co.* (1889), 23 Q.B. 453 (C.A.).]

POURVOI à l'encontre d'un arrêt de la Cour d'appel du Québec qui a confirmé un jugement de la Cour supérieure. Pourvoi accueilli, les juges Martland, Ritchie et McIntyre étant dissidents.

*Guy Desjardins, Q.C.*, for the appellant.

*Marcel Cinq-Mars, Q.C.*, for the respondent.

The reasons of Martland, Ritchie and McIntyre JJ. were delivered by

RITCHIE J. (*dissenting*)—This is an appeal from a judgment of the Court of Appeal of the Province of Quebec affirming the judgment rendered at trial by Mr. Justice Bisson and dismissing the claim of the appellant against its insurer for damage sustained to its property located at a plant which it operated at New Richmond in the Province of Quebec, where it was engaged in the manufacture of paper and paper and wood products.

By reason of their malfunction, direct damage was caused to several tubes in the heaters employed for the heating of bunker "C" fuel with the consequence that temporary closing of the plant became necessary. The appellant's claim in this action encompasses not only the direct damage done to the tubes, but the consequential loss allegedly sustained because of the breakdown of the tubes.

I have had the privilege of reading the reasons for judgment prepared for delivery by my brother Estey in this case, but as I reach a different conclusion concerning the risk insured against by the policy in question, I have found it necessary to express my views separately.

The appellant's claim is made pursuant to the terms of an insurance agreement with the respondent which was in force at the time of the events above referred to whereby the respondent agreed

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

   .  .  .

1.  ... To pay the Insured for loss or damage to property of the Insured directly caused by such Accident *to an Object*, or if the Company so elects, to repair or replace such damaged property; ...

(The italics are my own.)

The objects covered by the policy are defined in the 1st Schedule thereof as follows:

*Guy Desjardins, c.r.*, pour l'appelante.

*Marcel Cinq-Mars, c.r.*, pour l'intimée.

Version française des motifs des juges Martland, Ritchie et McIntyre rendus par

LE JUGE RITCHIE (*dissident*)—Il s'agit d'un pourvoi à l'encontre d'un arrêt de la Cour d'appel de la province de Québec qui confirme le jugement rendu en première instance par le juge Bisson et rejette la réclamation de l'appelante contre son assureur pour dommages à ses biens situés dans une usine qu'elle exploite à New Richmond dans la province de Québec, où elle fabrique du papier et des sous-produits du papier et du bois.

Suite à leur mauvais fonctionnement, des dommages directs ont été causés à plusieurs tubes dans les échangeurs de chaleur utilisés pour chauffer du mazout lourd de catégorie «C», ce qui a nécessité la fermeture temporaire de l'usine. La réclamation de l'appelante dans cette action comprend non seulement les dommages directs aux tubes, mais la perte indirecte présumément subie suite à l'avarie des tubes.

J'ai eu l'avantage de lire les motifs de jugement préparés par mon collègue le juge Estey dans cette affaire mais, puisque je parviens à une conclusion différente quant au risque assuré par la police en question, j'ai jugé nécessaire d'exposer mon point de vue séparément.

La réclamation de l'appelante est fondée sur un contrat d'assurance qu'elle a conclu avec l'intimée et qui était en vigueur au moment des événements susmentionnés et aux termes duquel l'intimée

[TRADUCTION] Eu égard au paiement de la prime la Compagnie convient par la présente avec l'Assurée désignée, relativement à la perte résultant d'un accident, tel que défini dans la présente:

   .  .  .

1. ... D'indemniser l'Assurée pour la perte de ses biens ou les dommages subis par eux, résultant directement d'un accident *à un objet* ou, si la Compagnie le préfère, de réparer ou de remplacer lesdits biens endommagés;

. . .

(Les italiques sont de moi.)

Les objets protégés par la police sont définis comme suit dans la première annexe:

The Objects covered under this Schedule are of the type designated as follows:

1. Any metal fired or metal unfired pressure valve; and

2. Any piping, on or between premises of the Insured, connected with such vessel and which contains steam or other heat transfer medium or condensate thereof, air, refrigerant, or boiler feedwater between the feed pump or injector and a boiler, together with the valves, fittings, separators and traps on all such piping.

What is insured against by this agreement in my opinion is damage to the property of the insured "directly caused to an "object" by an "accident" as that word is defined in the policy. While the policy covers damage to property other than the object itself, it only covers that damage when it has been directly caused by "accident" to an "object". I am satisfied that the tubes were "objects" within the meaning of the above definition and that damage directly caused to the tubes would have been covered by the insurance agreement had it not been for the terms of the definition of "accident" contained therein which reads as follows:

C. Definition of Accident—As respects any Object covered under this Schedule, 'Accident' shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof: but Accident shall not mean (a) *depletion, deterioration, corrosion, or erosion of material*, (b) wear and tear (c) leakage at any valve, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protection device.

(The italics are my own.)

Both the trial judge and the Court of Appeal were satisfied that the damage to the tubes was occasioned by corrosion and this conclusion is supported by the fact that quantities of salt water did flow through the pipes. Expert evidence was called on behalf of the appellant directed to supporting the submission that the damage was caused by an hydraulic hammer effect of sudden

[TRADUCTION] Les objets protégés par cette annexe sont de la catégorie désignée comme suit:

1. Toute soupape de métal soumise ou non soumise à la flamme; et

2. Toute tuyauterie dans l'usine de l'assurée ou entre ces bâtiments, reliée à un tel récipient et qui contient de la vapeur ou un autre moyen d'échange de chaleur ou condensat de celle-ci, air, réfrigérant ou eau d'alimentation de chaudière entre la pompe d'alimentation ou l'injecteur et une chaudière, ainsi que les soupapes, accessoires, séparateurs et purgeurs de toute ladite tuyauterie.

A mon avis, sont assurés par cette convention les dommages aux biens de l'assurée «causés directement» à un «objet» par un «accident» au sens donné à ce mot par la définition de la police. Bien que la police garantisse les dommages à des biens autres que l'objet lui-même, elle ne les garantit que lorsqu'il ont été causés directement par un «accident» à un «objet». Je suis convaincu que les tubes sont des «objets» au sens de la définition susmentionnée et que les dommages directement causés aux tubes auraient été garantis par le contrat d'assurance n'eût été les termes de la définition d'«accident» y contenue dont voici le texte:

[TRADUCTION] C. Définition d'accident—En ce qui concerne un objet garanti par cette Annexe, «accident» signifie un événement soudain et accidentel touchant l'objet, ou une partie de celui-ci, qui l'endommage et en nécessite la réparation ou le remplacement total ou partiel; mais accident ne signifie pas a) *l'épuisement, la détérioration, la corrosion ou l'érosion du matériel*, b) l'usure normale, c) la fuite d'un raccord, d'un calage, d'un joint d'étanchéité, d'un presse-étoupe, d'un joint ou d'un contact, d) l'avarie d'un tube à vide, d'un tube à gaz ou d'une brosse, e) l'avarie d'une structure ou d'une fondation soutenant l'objet ou une partie de celui-ci, ni f) le fonctionnement d'un dispositif de sécurité ou de sûreté.

(Les italiques sont de moi.)

Le juge de première instance et la Cour d'appel étaient convaincus que les dommages aux tubes ont été causés par la corrosion et cette conclusion est confirmée par le fait qu'une grande quantité d'eau salée a circulé dans les tuyaux. Un témoin expert a été cité par l'appelante pour appuyer la prétention que les dommages ont été causés par un effet de coup de bélier d'origine soudaine qui a

origin which placed an inordinate strain on the pipes and tubes causing them to break. This evidence was, however, not accepted either at trial or in the Court of Appeal and I do not find it necessary to discuss it. In the result it has been concurrently found at trial and on appeal that corrosion was the cause of the damage to the tubes and pipes and it follows from the terms of the "definition of accident" that this damage is not insured against by the policy in question.

It was contended also that even if the coverage afforded by the policy did not include damage by "depletion, deterioration, corrosion" or "wear and tear" within the meaning of the definition of "accident", it was nevertheless effective to make the insurer responsible for consequential loss suffered by the insured as a result of a sudden rupture of the heat exchanger, whether due to corrosion or not. In view of the fact that the coverage is limited to indemnity in respect of loss or "damage to property of the insured <u>directly</u> caused by such accident to an Object", I cannot adopt an interpretation which would result in affording coverage to the insured for <u>consequential</u> damage whether it was due to "corrosion" or otherwise. In my opinion, the only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to me to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of . . . material".

It has been suggested that the language employed in the policy should be construed against the insurance company which was the author of it in accordance with the *contra proferentem* rule which is frequently invoked in the construction of insurance contracts when it is found that all other rules of construction fail to assist the Court in determining the true meaning of the policy.

In this regard my brother Estey has made reference to the reasons for judgment of Cartwright J., as he then was, in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited*

imposé une pression excessive dans les tuyaux et les tubes, causant leur rupture. Cependant, cette preuve n'a pas été acceptée en première instance ni en Cour d'appel et je n'estime pas nécessaire de l'examiner. Finalement, il a été jugé en première instance et en appel que la corrosion était la cause des dommages aux tubes et aux tuyaux et il découle des termes de la «définition d'accident» que ces dommages ne sont pas assurés par la police en question.

On a également prétendu que même si la protection accordée par la police ne comprenait pas les dommages causés par «l'épuisement, la détérioration, la corrosion» ou «l'usure normale» au sens de la définition d'«accident», elle rendait néanmoins l'assureur responsable de la perte indirecte subie par l'assurée suite à la rupture soudaine de l'échangeur de chaleur, qu'elle ait ou non été causée par la corrosion. Étant donné que la garantie est limitée à une indemnité relativement à la perte des biens de l'assurée ou aux «dommages subis par eux résultant <u>directement</u> d'un accident à un objet», je ne peux adopter une interprétation qui protégerait l'assurée des dommages <u>indirects</u> qu'ils aient été causés par la «corrosion» ou par autre chose. A mon avis, les seuls dommages «directs» à un objet quelconque dans l'usine de l'appelante sont ceux subis par les tubes eux-mêmes et les termes clairs employés dans le contrat d'assurance pour définir le mot «accident» prévoient, selon moi, l'événement même qui s'est produit ici, savoir, les dommages causés à un objet appartenant à l'assurée suite à la «corrosion du . . . matériel», et l'excluent de la garantie.

On a avancé que les termes employés dans la police devraient être interprétés contre la compagnie d'assurances qui en est l'auteur, conformément à la règle *contra proferentem* qui est fréquemment invoquée dans l'interprétation des contrats d'assurance lorsque la cour arrive à la conclusion qu'aucune autre règle d'interprétation ne lui permet d'établir le sens réel de la police.

A cet égard, mon collègue le juge Estey a fait référence aux motifs du juge Cartwright, alors juge puîné, dans *Stevenson c. Reliance Petroleum Limited; Reliance Petroleum Limited c. Canadian*

*v. Canadian General Insurance Company*[1] where he said at p. 953:

> The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

It will however be seen from what I have said that I do not find it necessary to resort to this rule in the interpretation of the policy here at issue.

My brother Estey has, however, adopted the view that in construing the policy and particularly the definition of accident contained therein in the manner adopted in these reasons and in those of the majority of the Court of Appeal, the result is to "largely, if not completely, nullify the purpose for which the insurance was sold" which is "a circumstances to be avoided so far as the language used will permit". In this regard reliance is placed on the judgment of this Court in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[2], at pp. 177-178, but with the greatest respect I am unable to relate the circumstances of that case to those with which we are here concerned.

The *Excel Cleaning Service* case was one in which an "on location cleaning service" business was covered by a property damage liability policy insuring it for damage to property caused by accident arising out of its work. This policy however contained an exclusion relating "to damage to or destruction of property owned, rented, occupied or used by or in the care, custody and control of the insured", and the insurer contended that a wall to wall carpet fixed to the floor of a house where the insured was employed which was damaged was "in the care, custody and control of the insured" and therefore excluded from the coverage. Consistent with this reasoning all of the customer's belongings on which the insured was working were similarly exclusions which would have meant that the policy afforded no coverage whatever for the business of the insured. It was in this connection that this Court said, at pp. 177-178:

*General Insurance Company*[1] où il est dit à la p. 953:

> [TRADUCTION] Les plaidoiries ont insisté sur la règle exprimée dans la maxime *verba fortius accipiuntur contra proferentem*, mais il faut recourir à cette règle seulement lorsque aucune autre règle d'interprétation ne permet à la Cour de s'assurer du sens d'un document.

Ce que j'ai dit indique toutefois que je n'estime pas nécessaire de recourir à cette règle pour interpréter la police examinée ici.

Toutefois, mon collègue le juge Estey est d'avis qu'en interprétant la police et en particulier la définition du mot accident y contenue de la manière adoptée dans les présents motifs et dans ceux de la majorité de la Cour d'appel, on [TRADUCTION] «annulerait en grande partie, sinon totalement, l'objet de l'assurance» ce qui constitue «une situation qui doit être évitée, dans la mesure où les termes employés le permettent». A cet égard, on s'appuie sur l'arrêt de cette Cour, *Indemnity Insurance Company of North America c. Excel Cleaning Service*[2], aux pp. 177 et 178, mais, avec égards, je ne puis établir un rapport entre les circonstances de cette affaire et celles de la présente.

Dans l'affaire *Excel Cleaning Service* une entreprise de «service de nettoyage à domicile» était protégée par une police d'assurance responsabilité civile pour les dommages matériels causés par un accident survenant dans l'exécution de ses travaux. Cette police contenait cependant une exclusion relative [TRADUCTION] «aux dommages ou à la destruction des biens appartenant à l'assurée, loués, occupés, utilisés par celle-ci ou sous sa responsabilité, sa garde et son contrôle». L'assureur a prétendu qu'une moquette couvrant le plancher d'une maison où l'assurée avait travaillé et qui avait été endommagée était sous «sa responsabilité, sa garde ou son contrôle» et donc exclue de la garantie. Selon ce raisonnement, tous les biens du client sur lesquels l'assurée travaillait étaient aussi exclus, ce qui aurait signifié que la police n'offrait absolument aucune protection à l'entreprise de l'assurée. C'est à ce sujet que la Cour a dit aux pp. 177 et 178:

---

Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

I am respectfully of the opinion that this case involves a very different situation from the one with which we are here concerned. The construction sought to be placed on the Excel Cleaning Service Policy would have meant that although it purported to be a property damage liability policy covering the insured's business, it in fact insured nothing whereas the present policy affords insurance "for loss or damage to property of the insured" directly caused by an accident as defined therein. The meaning assigned to the word "accident" in the policy does not constitute an exclusion from the coverage but is rather a part of the definition of the risk insured against.

For all these reasons, as well as for those stated by Mr. Justice Turgeon, I would dismiss this appeal with costs.

The judgment of Pigeon, Dickson, Beetz and Estey JJ. was delivered by

ESTEY J.—The appellant operates a manufacturing facility for the production of paper products, including paper boxes, at New Richmond, Quebec, and the respondent is the insurer under a policy of insurance issued in respect of certain property of the appellant including the property with which this action is concerned, being three heat exchangers. The heat exchangers in question are described by the trial judge as follows:

[TRANSLATION] The parts of this system with which we are particularly concerned are three heat exchangers, a type of pipe measuring fifteen feet long with an interior diameter of ten inches.

Within each of these three exchangers there are 102 tubes thirteen feet long, with an exterior diameter of 5/8 inch and a metal casing measuring 1/16 inch, or .065 inch.

Inside each exchanger at the ends the 102 pipes pass through a tubular metal plate one inch thick.

Further, the 102 tubes of each exchanger are themselves divided into three groups of 34 tubes each, so that oil flowing in the tubes passes around the exchanger

[TRADUCTION] Une telle interprétation [celle de l'assureur] annulerait en grande partie, sinon totalement, l'objet de l'assurance—une situation qui doit être évitée, dans la mesure où les termes employés le permettent.

Je suis respectueusement d'avis que cette affaire-là porte sur une situation très différente de celle qui nous occupe ici. L'interprétation qu'on a voulu donner à la police d'Excel Cleaning Service aurait signifié que, bien qu'elle se veuille une police d'assurance responsabilité civile pour les dommages matériels protégeant l'entreprise de l'assurée, cette police n'assurait en fait rien, alors que la présente police offre une assurance à [TRADUCTION] «l'assurée pour la perte de ses biens ou les dommages à eux causés» résultant directement d'un accident suivant la définition de ce mot dans la police. Le sens donné au mot «accident» dans la police ne constitue pas une exclusion de la garantie mais est plutôt une partie de la définition du risque assuré.

Pour tous ces motifs, de même que pour ceux énoncés par le juge Turgeon, je suis d'avis de rejeter ce pourvoi avec dépens.

Version française du jugement des juges Pigeon, Dickson, Beetz et Estey rendu par

LE JUGE ESTEY—L'appelante exploite une usine de fabrication de produits du papier, y compris des boîtes de carton, à New Richmond (Québec) et l'intimée est l'assureur aux termes d'une police d'assurance relative à certains biens de l'appelante, y compris les biens qui font l'objet de cette action, savoir, trois échangeurs de chaleur. Le juge de première instance décrit les échangeurs de chaleur en ces termes:

Les pièces qui nous intéressent plus particulièrement dans ce système sont trois échangeurs de chaleur, sorte de tuyaux mesurant quinze pieds de long avec un diamètre inférieur de dix pouces.

A l'intérieur de chacun des ces trois échangeurs, on retrouve 102 tubes de treize pieds de longueur, d'un diamètre extérieur de 5/8 de pouce et dont la paroi métallique mesure 1/16 de pouce ou .065 pouce.

A chacune de leurs extrémités, à l'intérieur de l'échangeur, les 102 tuyaux pénètrent dans une plaque tubulaire métallique d'un pouce d'épaisseur.

D'autre part, les 102 tubes de chaque échangeur sont eux-mêmes divisés en trois groupes de 34 tubes chacun, de façon à ce que l'huile s'écoulant dans les tubes fasse

three times and is heated to the right level before emerging and being directed towards the boilers as a fuel.

Steam circulates in the exchangers, passing in through the left end immediately to the right of the tubular plate and emerging at the right end, just as it strikes the other tubular plate.

Each exchanger is sealed at each end by a lid.

As the exchanger measures fifteen feet and the tubes thirteen feet, it follows that a space of one foot remains at each end between the tubular plate and the lid closing the exchanger.

The whole apparatus forms a sealed unit, which it was established cannot be opened without causing a break-down and considerable damage.

Due to the failure of these heat exchangers, the appellant was required to shut down part of their facilities and thereby suffered a loss which the parties have agreed amounted to $158,289.24. This sum is set out in the Plaintiff's Declaration and includes "Direct Damage Loss" of $15,604.44. The insurer resists the appellant's claim on the basis that the damage was caused by corrosion of the tubes inside the heat exchanger and this risk was specifically excluded from the coverage provided by the policy of insurance. The material provisions of the policy of insurance issued by the respondent are as follows:

## INSURING AGREEMENT

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

COVERAGE A—PROPERTY OF THE INSURED

1. ACTUAL CASH VALUE—To pay the Insured for loss of or damage to property of the Insured directly caused by such Accident to an Object, or if the Company so elects, to repair or replace such damaged property; and

The definition of accident as employed in the above excerpt is as follows:

As respects any Object covered under this Schedule, "Accident" shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or

trois fois le circuit de l'échangeur pour être chauffée à point avant d'en sortir pour se diriger comme combustible vers les bouilloires.

Quant à la vapeur, elle circule dans les échangeurs, pénétrant par l'extrémité de gauche immédiatement à droite de la plaque tubulaire, pour en ressortir à l'extrémité de droite, tout juste au moment où elle frappe l'autre plaque tubulaire.

Chaque échangeur est scellé à chacune des deux extrémités par un couvercle.

L'échangeur mesurant quinze pieds, et les tubes, treize pieds, il faut en conclure qu'il reste un espace d'un pied à chaque extrémité entre la plaque tubulaire et le couvercle qui ferme l'échangeur.

Le tout forme une unité scellée dont on a établi qu'il ne saurait être question de l'ouvrir sans la démanteler et y causer des dommages considérables.

En raison de la panne de ces échangeurs de chaleur, l'appelante a dû fermer une partie de son usine, ce qui lui a occasionné une perte évaluée par les parties à $158,289.24. Ce montant est détaillé dans la déclaration de l'appelante et comprend la «perte directe» de $15,604.44. L'assureur conteste la réclamation de l'appelante au motif que les dommages résultent de la corrosion des tubes à l'intérieur des échangeurs de chaleur et que ce risque est spécifiquement exclu de la protection offerte par la police d'assurance. Les clauses essentielles de la police d'assurance délivrée par l'intimée sont les suivantes:

[TRADUCTION]

## CONVENTION D'ASSURANCE

Eu égard au paiement de la prime la Compagnie convient par la présente avec l'Assurée désignée, relativement à la perte résultant d'un accident, tel que défini dans la présente:

GARANTIE A—BIENS DE L'ASSURÉE

1. VALEUR RÉELLE—D'indemniser l'Assurée pour la perte de ses biens ou les dommages subis par eux, résultant directement d'un accident à un objet ou, si la Compagnie le préfère, de réparer ou de remplacer lesdits biens endommagés; et

Voici la définition du mot accident employé dans l'extrait ci-dessus:

[TRADUCTION] En ce qui concerne un objet garanti par cette Annexe, «accident» signifie un événement soudain et accidentel touchant l'objet, ou une partie de celui-ci, qui l'endommage et en nécessite la réparation ou le

replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material, (b) wear and tear, (c) leakage at any value, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protective device.

The employees of the appellant became aware of the failure of the heat exchangers when small fuel oil spots were noticed on linerboard being produced in the mill. The source of the oil was traced to the boiler and hence to the heat exchangers where a number of ruptured tubes were discovered.

The appellant advanced two main submissions:

(a) that the damage was caused by hydraulic hammer effect; and,

(b) alternatively, that the damage was caused by corrosion and that the terms of the policy do not exclude damage thus occasioned.

The learned trial judge found that the damage was caused by corrosion and discusses the contribution of pressure changes as follows:

[TRANSLATION] There is no doubt that the damage occurred suddenly, but the phenomenon which led up to it, namely the chemical process of corrosion, was not of a sudden and accidental nature, so that it could not be regarded as an "accident".

On December 4, 1968 some occurrence, probably a fall in the steam pressure in the heat exchanger, caused a failure in certain oil tubes, which moreover apparently broke in a relatively short space of time.

The fact remains, however, that corrosion was the cause of the damage.

The majority of the Court of Appeal found the damage was the result of corrosion and thereby excluded from policy coverage. Turgeon J.A. dealt with the hydraulic hammer theory as follows:

[TRANSLATION] This was a possibility, not a probability, mentioned by appellant's expert witness Mahoney in his examination in chief. However, when he was

remplacement total ou partiel; mais accident ne signifie pas a) l'épuisement, la détérioration, la corrosion ou l'érosion du matériel, b) l'usure normale, c) la fuite d'un raccord, d'un calage, d'un joint d'étanchéité, d'un presse-étoupe, d'un joint ou d'un contact, d) l'avarie d'un tube à vide, d'un tube à gaz ou d'une brosse, e) l'avarie d'une structure ou d'une fondation soutenant l'objet ou une partie de celui-ci, ni f) le fonctionnement d'un dispositif de sécurité ou de sûreté.

Les employés de l'appelante se sont aperçus de la panne des échangeurs de chaleur lorsqu'ils ont remarqué des taches d'huile sur des feuilles de carton en voie de fabrication à l'usine. La source de l'huile a été retracée dans la chaudière et de là dans les échangeurs de chaleur où l'on a découvert un certain nombre de tuyaux fissurés.

Voici les deux prétentions principales de l'appelante:

a) que les dommages ont été causés par l'effet d'un coup de bélier; et,

b) subsidiairement, que les dommages ont été causés par la corrosion et que les termes de la police n'excluent pas les dommages ainsi causés.

Le savant juge de première instance a jugé que les dommages avaient été causés par la corrosion et discute ainsi de l'effet de la chute de pression:

Que le dommage se soit manifesté de façon soudaine, cela ne fait aucun doute, mais le phénomène qui l'a entraîné c'est-à-dire le processus chimique de la corrosion ne s'est pas réalisé de façon soudaine et accidentelle, de sorte qu'on ne peut dire qu'il y a eu «accident».

Le 4 décembre 1968, un événement, vraisemblablement la chute de pression de vapeur d'eau dans l'échangeur de chaleur, a provoqué la rupture de certains tubes d'huile, qui se seraient d'ailleurs rupturés à plus ou moins brève échéance.

Mais il n'en reste pas moins que la cause du dommage a été la corrosion.

La majorité de la Cour d'appel a jugé que les dommages avaient été causés par la corrosion et qu'ils étaient donc exclus de la protection de la police. Le juge Turgeon a traité ainsi de la théorie du coup de bélier:

Il s'agit là d'une possibilité invoquée par l'expert Mahoney de l'appelante à son interrogatoire en chef, non d'une probabilité. Cependant, lorsqu'il fut contre-

cross-examined, he admitted that he could not provide any direct evidence that a "hydraulic hammer" effect was produced, or that there was excessive pressure, or that the safety valves did not operate effectively.

Dissenting from the majority, Kaufman J.A. appears to have adopted in part the hydraulic hammer theory as being a "trigger" which precipitated the leaks in the tubes. The learned justice went on to state:

But where, as here, the pressure suddenly increased, it will not do for the insurer to point to the corrosion and say that, sooner or later, the tubes would have burst anyway.

Thus it will be seen that in both courts below the cause of the damage was found to be corrosion of the tubes which both courts went on to conclude was a risk or peril not covered by the insurance contract.

The issue is simply, therefore, whether the admitted loss suffered by the appellant and which was occasioned by the corrosion of the heat exchangers is a loss recoverable under the above-quoted terms of the policy of insurance issued by the respondent to the appellant. This leaves the alternative submission advanced by the appellant, namely that the term of the contract of insurance covers the damages suffered by the appellant. The heart of this argument is that while the definition of accident does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material", the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion. Thus the insurer would not be liable under the contract for the cost of repairing or replacing any insured property damaged by "depletion, deterioration, corrosion, wear and tear, etc.", but would be responsible for any consequential loss to the insured following the sudden rupture of the heat exchanger whether or not it be due to "corrosion" or "wear and tear", etc.

In the preliminary provisions setting up the coverage under the policy of insurance, the definition of accident is, of course, fundamental, and strip-

interrogé, il a admis qu'il ne pouvait fournir aucune preuve directe qu'il se serait produit un «hydraulic hammer» ni qu'il y avait eu une pression excessive, ni enfin que les valves de sécurité n'avaient pas fonctionné adéquatement.

Le juge Kaufman, dissident, a retenu en partie la théorie que le coup de bélier a joué comme «déclic» qui a accéléré les fuites dans les tubes. Le savant juge a poursuivi:

[TRADUCTION] Mais lorsque, comme en l'espèce, la pression augmente soudainement, l'assureur ne peut accuser la corrosion et dire que, dans un avenir plus ou moins rapproché, les tubes auraient éclaté de toute façon.

Il est donc clair que les deux cours d'instance inférieure ont conclu que la cause des dommages était la corrosion des tubes qui, selon elles, n'est pas un risque ou un péril garanti par le contrat d'assurance.

Donc, la question est simplement de savoir si la perte que l'on admet avoir été subie par l'appelante et qui a été causée par la corrosion des échangeurs de chaleur est une perte garantie par les clauses précitées de la police d'assurance délivrée par l'intimée à l'appelante. Ceci laisse la prétention subsidiaire de l'appelante, savoir, que les clauses du contrat d'assurance garantissent les dommages qu'elle a subis. Le cœur de cet argument est que bien que la définition du mot accident ne comprenne pas le cas de la corrosion ou des cas semblables tels que «l'usure normale, la détérioration, l'épuisement ou l'érosion du matériel», la définition inclut, aux dires de l'appelante, ce qui suit la corrosion et qui peut en résulter. Ainsi, l'assureur ne serait pas responsable en vertu du contrat du coût des réparations ou du remplacement d'un bien assuré endommagé par «épuisement, détérioration, corrosion, usure normale etc.», mais le serait de toute perte indirecte subie par l'assurée après la rupture soudaine de l'échangeur de chaleur, qu'elle soit ou non causée par la «corrosion» ou «l'usure normale» etc.

Dans les dispositions préliminaires sur la garantie accordée par la police d'assurance, la définition d'accident est, bien sûr, fondamentale et, si l'on ne

ping out the words not here relevant, the definition reads as follows:

Accident shall mean a sudden and accidental occurrence to the object ... but accident shall not mean ... corrosion ...

Some light may be thrown on this interpretation difficulty by reference to a latter portion of the policy of insurance headed "Exclusions". The following excerpts illustrate the drafting technique employed in the policy where risks are to be excluded from its coverage:

### EXCLUSIONS

This policy does not apply to

1. WAR DAMAGE—Loss from an Accident <u>caused directly or indirectly</u> by

    (a) Hostile or warlike action, including action in hindering, combating or defending against an actual, impending or expected attack, by

. . .

2. NUCLEAR HAZARDS—Loss, <u>whether it be direct or indirect, proximate or remote,</u>

    (a) From an Accident <u>caused directly or indirectly</u> by nuclear reaction ...

    (b) From nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, <u>caused directly or indirectly by, contributed to or aggravated by an Accident;</u>

. . .

3. MISCELLANEOUS PERILS—Loss under Coverages A and B from

. . .

    (b) An Accident <u>caused directly or indirectly by fire</u> or from the use of water or other means to extinguish fire;

. . .

    (d) Flood <u>unless an Accident ensues and the Company shall then be liable only for loss from such ensuing Accident;</u>

. . .

(Emphasis added.)

Thus it may be argued that when the draftsman wished to exclude consequences from an event, the words "directly or indirectly" were employed. Had

retient que les mots pertinents à l'espèce, la définition devient:

Accident signifie un événement soudain et accidentel touchant l'objet ... mais accident ne signifie pas ... la corrosion ...

L'examen d'un chapitre de la police que l'on trouve plus loin et qui est intitulé «Exclusions» peut jeter un peu de lumière sur cette difficulté d'interprétation. Les extraits suivants illustrent la technique de rédaction utilisée dans la police lorsque des risques en sont exclus:

[TRADUCTION]
### EXCLUSIONS

Cette police ne s'applique pas aux

1. AVARIES CAUSÉES PAR LA GUERRE—La perte résultant d'un accident <u>causé directement ou indirectement</u> par

    a) une action hostile ou belliqueuse, comprenant une manœuvre de diversion, de combat ou de défense contre une attaque réelle, imminente ou prévue, par

. . .

2. DANGERS NUCLÉAIRES—La perte, <u>qu'elle soit directe ou indirecte, immédiate ou éloignée,</u>

    a) résultant d'un accident <u>causé directement ou indirectement</u> par une réaction nucléaire ...

    b) résultant d'une réaction nucléaire, d'une radiation nucléaire ou d'une contamination radioactive, qu'elles soient ou non contrôlées, <u>causées directement ou indirectement, entraînées ou aggravées par un accident;</u>

. . .

3. RISQUES DIVERS—La perte en vertu des garanties A et B résultant

. . .

    b) d'un accident <u>causé directement ou indirectement par le feu</u> ou l'usage de l'eau ou d'un autre moyen d'extinction du feu;

. . .

    d) l'inondation, <u>à moins qu'un accident s'ensuive, et la Compagnie sera alors seulement responsable de la perte résultant d'un tel accident subséquent;</u>

(C'est moi qui souligne.)

On peut donc prétendre que lorsque le rédacteur a voulu exclure les conséquences d'un événement, il a employé les mots «directement ou indirecte-

this technique been adopted in the primary coverage provisions excerpted above, it would have read;

Accident does not mean that which directly or indirectly results from corrosion.

Alternatively, if the consequences of corrosion were intended by the parties to be beyond the protection of the contract, such circumstances would have been included under the heading "Exclusions" as a subparagraph comparable to one of those set out above.

At best, one must conclude that the definition of accident, including as it does the reference to corrosion, leaves two clear alternative interpretations open. Firstly, the definition may not include an event relating to corrosion. Secondly, the definition may exclude only the cost of making good the corrosion itself.

Insurance contracts and the interpretative difficulties arising therein have been before courts for at least two centuries, and it is trite to say that where an ambiguity is found to exist in the terminology employed in the contract, such terminology shall be construed against the insurance carrier as being the author, or at least the party in control of the contents of the contract. This is, of course, not entirely true because of statutory modifications to the contract, but we are not here concerned with any such mandated provisions. Meredith J.A. put the proposition in *Pense v. Northern Life Assurance Co.*[3] at p. 137:

There is no just reason for applying any different rule of construction to a contract of insurance from that of a contract of any other kind; and there can be no sort of excuse for casting a doubt upon the meaning of such a contract with a view to solving it against the insurer, however much the claim against him may play upon the chords of sympathy, or touch a natural bias. In such a contract, just as in all other contracts, effect must be given to the intention of the parties, to be gathered from the words they have used. A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement. The onus of proof, if I may use such a term in reference to the interpretation of a writing, is, upon each party respectively, precisely the same. We are all, doubtless, insured, and none insurers,

ment». Si cette technique avait été adoptée dans les dispositions de garantie de base citées précédemment, le texte aurait été:

Accident ne signifie pas ce qui résulte directement ou indirectement de la corrosion.

Subsidiairement, si les parties ne désiraient pas que les conséquences de la corrosion soient visées par le contrat, ces circonstances auraient été incluses sous le tire «Exclusions» dans un alinéa comparable à l'un de ceux que j'ai cités.

Au mieux, il faut conclure que la définition d'accident, qui mentionne effectivement la corrosion, laisse deux interprétations possibles évidentes. Premièrement, la définition peut n'inclure aucun événement relié à la corrosion. Deuxièmement, la définition peut exclure seulement ce qu'il en coûte pour réparer la corrosion elle-même.

Les contrats d'assurance et les difficultés d'interprétation qu'ils posent ont été examinés par les cours depuis au moins deux siècles, et c'est un truisme de dire que lorsque l'on conclut que le texte du contrat est ambigu, il doit être interprété contre l'assureur qui est l'auteur, ou du moins la partie qui a la haute main sur le contenu du contrat. Ceci n'est pas entièrement vrai, bien sûr, à cause des modifications au contrat imposées par la loi, mais aucune de ces dispositions imposées n'est en litige ici. Dans l'arrêt *Pense v. Northern Life Assurance Co.*[3] à la p. 137, le juge Meredith de la Cour d'appel a formulé la proposition que:

[TRADUCTION] Il n'y a aucune raison valable pour appliquer à un contrat d'assurance une règle d'interprétation différente de celle applicable à un contrat d'une autre nature; et il ne peut y avoir aucune sorte d'excuse pour jeter le doute sur le sens de pareil contrat en vue de l'interpréter contre l'assureur, quel grand que soit le parti pris naturel ou la sympathie que peut éveiller la demande d'indemnité qu'on lui adresse. Dans ce contrat, tout comme dans tous les autres, il faut donner effet à l'intention des parties qui se dégage des mots qu'elles ont employés. Un demandeur doit pouvoir établir son droit de recouvrer une indemnité d'après les termes du contrat; un défendeur doit de même établir une défense fondée sur la convention. Le fardeau de la preuve, si je peux utiliser cette expression à l'égard de l'interprétation d'un écrit, est exactement le même pour chaque

and so, doubtless, all more or less affected by the natural bias arising from such a position; and so ought to beware lest that bias be not counteracted by a full apprehension of its existence.

(Adopted in this Court in 1908[4].)

Such a proposition may be referred to as step one in the interpretative process. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine. This doctrine finds much expression in our law, and one example which may be referred to is found in *Cheshire and Fifoot's Law of Contract* (9th ed.), at pp. 152-3:

If there is any doubt as to the meaning and scope of the excluding or limiting term, the ambiguity will be resolved against the party who has inserted it and who is now relying on it. As he seeks to protect himself against liability to which he would otherwise be subject, it is for him to prove that his words clearly and aptly describe the contingency that has in fact arisen.

This Court applied the doctrine in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[5] where at pp. 179-180 it was stated:

It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already described and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain ... Furthermore, the language of Lord Greene in *Woolfall & Rimmer, Ltd. v. Moyle*, [1942] 1 K.B. 66 at 73, is appropriate. He there states:

I cannot help thinking that, if underwriters wish to limit by some qualification a risk which, prima facie, they are undertaking in plain terms, they should make it perfectly clear what that qualification is.

As has already been stated, this is, of course, the second phase of interpretation of such a contract. Cartwright J., as he then was, stated in *Stevenson*

4 (1908), 42 S.C.R. 246.
5 [1954] S.C.R. 169.

partie respectivement. Nous sommes tous, très probablement, assurés et non assureurs et donc, très probablement, plus ou moins influencés par le parti pris naturel qui se dégage d'une telle position; aussi, faut-il prendre garde aux effets de ce parti pris en prenant entièrement conscience de son existence.

(Adoptée par cette Cour en 1908.[4])

On peut qualifier pareille proposition de première étape du processus d'interprétation. La deuxième étape est l'application, lorsqu'il y a ambiguïté, de la doctrine *contra proferentem*. Cette doctrine est souvent exposée dans notre droit et on peut citer à titre d'exemple ce qu'en dit *Cheshire and Fifoot's Law of Contract* (9e éd.), aux pp. 152 et 153:

[TRADUCTION] S'il y a le moindre doute quant au sens et à la portée de la clause d'exclusion ou limitative, l'ambiguïté sera résolue contre la partie qui l'a introduite et qui cherche maintenant à l'invoquer. Puisqu'elle cherche à se protéger contre une responsabilité à laquelle elle serait autrement assujettie, il lui incombe de prouver que les mots qu'elle a employés décrivent clairement et convenablement l'éventualité qui s'est en fait produite.

Cette Cour a appliqué la doctrine dans *Indemnity Insurance Company of North America c. Excel Cleaning Service*[5] où elle a dit, aux pp. 179 et 180:

[TRADUCTION] C'est, dans un tel cas, une règle générale que de donner aux termes employés une interprétation qui soit favorable à l'assuré. Le fondement de cette règle est que l'assureur cherche par de semblables clauses à imposer des exceptions et des restrictions à la protection qu'il a déjà décrite et, par conséquent, doit employer des termes qui expriment clairement l'étendue et l'importance de ces exceptions et restrictions, et, dans la mesure où il omet de le faire, ce sont les termes décrivant la protection qui doivent prévaloir ... De plus, les paroles de lord Greene dans *Woolfall & Rimmer, Ltd. v. Moyle*, [1942] 1 K.B. 66 à la p. 73, sont appropriées. Il a dit:

Je ne peux m'empêcher de penser que si les assureurs désirent limiter par quelque condition un risque qu'à première vue, ils acceptent en des termes clairs, ils devraient très nettement l'énoncer.

Comme je l'ai déjà dit, il s'agit bien sûr de la deuxième étape de l'interprétation d'un tel contrat. Le juge Cartwright, alors juge puîné, a dit dans

4 (1908), 42 R.C.S. 246.
5 [1954] R.C.S. 169.

v. *Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company*[6] at p. 953:

The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

Lindley L.J. put it this way:

In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty.
*Cornish v. Accident Insurance Company*[7], at p. 456.

Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or

*Stevenson c. Reliance Petroleum Limited; Reliance Petroleum Limited c. Canadian General Insurance Company*[6] à la p. 953:

[TRADUCTION] Les plaidoiries ont insisté sur la règle exprimée dans la maxime *verba fortius accipiuntur contra preferentem*, mais il faut recourir à cette règle seulement lorsque aucune autre règle d'interprétation ne permet à la Cour de s'assurer du sens d'un document.

Le lord juge Lindley l'a dit en ces termes:

[TRADUCTION] Dans un cas limite, lorsqu'il y a un doute réel, il faut interpréter la police de façon plus stricte contre les assureurs; ils conçoivent la police et introduisent les exceptions. Mais ce principe ne doit être appliqué que dans un doute et non pour en créer un ou grossir une ambiguïté, lorsque les circonstances de l'affaire ne soulèvent aucune difficulté réelle.
*Cornish v. Accident Insurance Company*[7], à la p. 456.

Même indépendamment de la doctrine *contra proferentem* dans la mesure où elle est applicable à l'interprétation des contrats, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Dès lors, on ne doit pas utiliser le sens littéral lorsque cela entraînerait un résultat irréaliste ou qui ne serait pas envisagé dans le climat commercial dans lequel l'assurance a été contractée. Lorsque les mots sont susceptibles de deux interprétations, la plus raisonnable, celle qui assure un résultat équitable, doit certainement être choisie comme l'interprétation qui traduit l'intention des parties. De même, une interprétation qui va à l'encontre des intentions des parties et du but pour lequel elles ont à l'origine conclu une opération commerciale doit être écartée en faveur d'une interprétation de la police qui favorise un résultat commercial raisonnable. C'est un truisme de faire remarquer que l'on doit éviter une interprétation d'une clause contractuelle ambiguë qui rendrait futile l'effort déployé par l'assuré pour obtenir la protection d'une assurance. En d'autres mots, les cours devraient être réticentes à appuyer une interprétation qui permettrait soit à l'assureur de toucher une prime sans risque soit à l'assuré d'obtenir une

---

[6] [1956] S.C.R. 936.
[7] (1889), 23 Q.B. 453 (C.A.).

[6] [1956] R.C.S. 936.
[7] (1889), 23 Q.B. 453 (C.A.).

the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract.

The *Cornish* case, *supra*, illustrates a course generally taken when such contracts reach the courts. There the court was interpreting an insurance contract in the light of the death of the insured while crossing a railway track. The policy included an exception from insured risks resulting from "exposure of the insured to obvious risk of injury". Lindley L.J., in the course of judgment, stated:

The words are "exposure of the insured to obvious risk of injury." These words suggest the following questions: Exposure by whom? Obvious when? Obvious to whom? It is to be observed that the words are very general. There is no such word as "wilful," or "reckless," or "careless"; and to ascertain the true meaning of the exception the whole document must be studied and the object of the parties to it must be steadily borne in mind. The object of the contract is to insure against accidental death and injuries, and the contract must not be construed so as to defeat that object, nor so as to render it practically illusory. A man who crosses an ordinary crowded street is exposed to obvious risk of injury; and, if the words in question are construed literally, the defendants would not be liable in the event of an insured being killed or injured in so crossing, even if he was taking reasonable care of himself. Such a result is so manifestly contrary to the real intention of the parties that a construction which leads to it ought to be rejected. But, if this be true, a literal construction is inadmissible, and some qualification must be put on the words used. (at p. 456)

An example of the application of the same principles is found in the *Indemnity Insurance Company of North America v. Excel Cleaning Service, supra,* where, at pp. 177-8, it was concluded:

Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

The appellant, as the owner and operator of a large forest products facility, sought insurance protection of the machinery employed in the plant in its industrial processes. There is no dispute that the heat exchangers in question were covered by the insurance contract. There is also no serious dispute, at least by the time the litigation had

indemnité que l'on n'a pas pu raisonnablement rechercher ni escompter au moment du contrat.

L'arrêt *Cornish*, précité, illustre la ligne de conduite généralement suivie lorsque pareils contrats sont soumis aux tribunaux. La cour y interprète un contrat d'assurance dans le contexte du décès de l'assuré survenu alors qu'il traversait une voie ferrée. La police comportait une exception aux risques assurés en cas de [TRADUCTION] «risques évidents de blessures pris par l'assuré». Dans le cours de son jugement, le lord juge Lindley a dit:

[TRADUCTION] Les mots sont «risques évidents de blessures pris par l'assuré». Ces mots suggèrent les questions suivantes: Risques pris par qui? Évidents: quand et pour qui? Il faut remarquer que ces mots sont très généraux. Il n'y a aucun mot tel que «intentionnel» ou «téméraire» ou «négligent»; et pour s'assurer du sens réel de l'exception, il faut examiner le document dans son ensemble et garder toujours à l'esprit l'objet qu'avaient les parties à ce contrat. L'objet du contrat est d'assurer contre la mort ou les blessures accidentelles, et le contrat ne doit pas être interprété d'une manière telle qu'il détruise cet objet, ou le rende pratiquement illusoire. Un homme qui traverse une rue ordinairement encombrée s'expose à des risques évidents de blessures; et, si l'on interprète littéralement les mots en question, les défendeurs ne seront pas responsables si l'assuré est tué ou blessé en traversant, même s'il a été raisonnablement prudent. Pareil résultat est si manifestement contraire à l'intention réelle des parties que l'on doit rejeter une interprétation qui y mène. Mais, si cela est vrai, une interprétation littérale est irrecevable et il faut assortir les mots employés de certaines réserves. (à la p. 456)

On trouve un exemple de l'application des mêmes principes dans *Indemnity Insurance Company of North America c. Excel Cleaning Service,* précité, où l'on a conclu aux pp. 177 et 178:

[TRADUCTION] Une telle interprétation [celle de l'assureur] annulerait en grande partie, sinon totalement, l'objet de l'assurance—une situation qui doit être évitée, dans la mesure où les termes employés le permettent.

L'appelante, en qualité de propriétaire et d'exploitant d'une grande usine de produits forestiers, a voulu assurer la machinerie utilisée dans l'usine à des fins industrielles. Il n'est pas contesté que les échangeurs de chaleur en question sont protégés par le contrat d'assurance. Il n'est pas non plus sérieusement contesté, du moins lorsque le litige

reached this Court, that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger, and the consequential release of oil into the processed steam. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. If a court were to accept the submissions of the respondent, that loss suffered by the insured by reason of the failure of a machine due to wear and tear and the consequential downtime of the plant was excluded by the definition of accident, then the insured would have purchased, by its premiums, no coverage for what may well be the most likely source of loss, or certainly a risk pervasive through much of the plant. Similarly, to interpret corrosion as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract. It may well be argued by insurers that the premium will reflect such a narrowed coverage. There is no evidence that such is the case here.

It may also be argued by the insurance industry that applying the more favourable construction to this ambiguous provision will be to unnecessarily and unfairly burden the carrier. The carrier under this policy has at least two defensive mechanisms which it can readily call to its aid: firstly, the right of inspection which was exercised here both before and during the contract; and secondly, the right to terminate in the event the insurance carrier determines that the condition of the insured machinery is such as to make it impractical to extend coverage in the manner required by the contract.

I therefore would allow the appeal, set aside the judgment at trial and of the Court of Appeal and direct the entry of judgment in favour of the appellant in the amount of $158,289.24 with interest from the 1st of April, 1969, as claimed (it

est venu devant cette Cour, que la corrosion des tubes à l'intérieur des échangeurs de chaleur, probablement causée par la présence d'eau de mer, a été la cause réelle de leur panne et de la fuite consécutive d'huile dans l'eau de condensation. Comme il en a le droit, l'assureur a cherché dans les termes du contrat à limiter sa protection à la perte accidentelle, ce qu'il a fait en essayant de restreindre la définition d'accident. Si une cour devait accepter la prétention de l'intimée, que la perte subie par l'assurée en raison de la panne de la machinerie causée par l'usure normale et que l'immobilisation consécutive de l'usine étaient exclues par la définition d'accident, alors l'assurée n'aurait obtenu, par ses primes, aucune garantie pour ce qui peut bien être la source de perte la plus vraisemblable, ou certainement un risque constant dans presque toute l'usine. De même, *interpréter la corrosion* au sens où ce mot est employé dans la définition d'accident, comme le désire l'intimée, équivaudrait à éliminer de la protection de l'assurance toutes les pertes subies par l'assurée en raison de la présence de corrosion. Pareille interprétation entraînerait nécessairement la suppression d'une partie importante de la protection prévue au contrat. Il est possible que des assureurs prétendent que la prime sera fixée en fonction d'une garantie aussi limitée. Il n'y a aucune preuve à cet effet en l'espèce.

Il est également bien possible que l'industrie des assurances prétende qu'appliquer l'interprétation la plus favorable à cette disposition ambiguë va imposer un fardeau inutile et injuste à l'assureur. L'assureur en vertu de cette police peut invoquer au moins deux mécanismes de défense pour lui venir facilement en aide: premièrement, le droit d'inspection qui a été exercé en l'espèce, avant et pendant le contrat; et, deuxièmement le droit de mettre fin au contrat si l'assureur est d'avis que l'état de la machinerie est tel qu'il est impossible d'accorder la garantie de la manière stipulée au contrat.

Je suis donc d'avis d'accueillir le pourvoi, d'infirmer le jugement de la cour de première instance et l'arrêt de la Cour d'appel et d'ordonner que l'appelante a le droit de recouvrer $158,289.24 avec intérêt à compter du 1er avril 1969, tel que

being the date of submission of claim and which date has not been contested in any court in these proceedings), together with costs throughout. In the event the parties are in disagreement as to whether the "Direct Damage" in the amount of $15,604.44 mentioned above is, in fact, repairs of the actual corrosion damage and should not there-fore, on the basis of these reasons be included in judgment granted, the matter shall be determined on application to a Judge of the Superior Court.

*Appeal allowed with costs,* MARTLAND, RIT-CHIE *and* MCINTYRE JJ. *dissenting.*

*Solicitors for the appellant: Desjardins, Ducharme, Desjardins & Bourque, Montreal.*

*Solicitors for the respondent: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montreal.*

demandé (soit la date du dépôt de la réclamation, date qui n'a été contestée devant aucune cour dans les présentes procédures), et les dépens dans toutes les cours. Si les parties ne s'entendent pas sur la question de savoir si les dommages-intérêts pour la «perte directe» au montant de $15,604.44 susmen-tionné s'appliquent en fait à la réparation des dommages causés par la corrosion et ne devraient donc pas être inclus dans les dommages-intérêts accordés, compte tenu des présents motifs, elles devront s'adresser à un juge de la Cour supérieure pour faire trancher cette question.

*Pourvoi accueilli avec dépens, les juges* MART-LAND, RITCHIE *et* MCINTYRE *étant dissidents.*

*Procureurs de l'appelante: Desjardins, Ducharme, Desjardins & Bourque, Montréal.*

*Procureurs de l'intimée: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Mont-réal.*

# TAB 2

DATE: 20070131
DOCKET: C43885

## COURT OF APPEAL FOR ONTARIO

### DOHERTY, MOLDAVER and SHARPE JJ.A.

| | |
|---|---|
| **B E T W E E N :** | ) |
| | ) |
| **J. MICHAEL B. DUMBRELL** | ) **Benjamin Zarnett and** |
| | ) **Alexa Abiscott** |
| *Plaintiff/Respondent* | ) **for the appellants** |
| | ) |
| - and - | ) **R.G. Slaght, Q.C.** |
| | ) **for the respondent** |
| **THE REGIONAL GROUP OF COMPANIES INC. and STEVEN H. GORDON** | ) |
| | ) |
| | ) |
| *Defendants/Appellants* | ) **Heard:  October 23, 2006** |
| | ) |
| | ) |
| | ) |

On appeal from the order of Justice Monique Métivier of the Superior Court of Justice dated June 23, 2005 and amended on October 28, 2005.

DOHERTY J.A.:

I

Overview

[1]    The respondent, J. Michael B. Dumbrell ("Dumbrell"), was employed by the appellant, the Regional Group of Companies Inc. ("Regional"), for about one year beginning in November 1998.  The appellant, Steven H. Gordon ("Gordon"), was the president, CEO, and directing mind of Regional.

Page: 2

[2]     Dumbrell left Regional's employment in November 1999. He subsequently sued Regional and Gordon claiming he was owed fifty percent of the profit earned on a commercial real estate transaction referred to as the "Queen Street project". The trial judge found that Dumbrell was entitled, under the terms of his employment contract, to fifty percent of the $1,000,000 profit earned on the Queen Street project.

[3]     Regional and Gordon appeal. Counsel raises three issues:

- Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit earned on the Queen Street project even though that profit was earned long after the termination of his employment contract?
- Even if Dumbrell was entitled to the profits under the terms of the employment contract, did the trial judge err in awarding him fifty percent of the profit earned by entities other than Regional or Gordon?[1]
- Did the trial judge err in holding Gordon personally liable?

[4]     I would allow Regional's appeal in part. I would hold Regional liable under the contract but only for commission on profits earned by Gordon's company and his wife and children. I would not hold Regional liable for commission on profits earned by other investors brought into the project by Gordon.

[5]     I would allow Gordon's appeal. Dumbrell alleged various causes of action against Regional and Gordon at trial. The trial judge found a breach of contract, but rejected the other claims made by Dumbrell. Dumbrell's contract was with Regional and only Regional. He could have no reasonable expectation of recovery upon breach of the contract from any entity other than Regional. I see no legal basis upon which Gordon could be found personally liable for a breach of the contract made between Dumbrell and Regional. Nor can Gordon be liable for inducing Regional's breach of contract. Dumbrell did not plead that cause of action and did not adduce evidence capable of establishing that Gordon induced a breach of contract.

II

## The Facts

[6]     The trial lasted two weeks. The trial judge heard different versions of many events, some of which are not relevant to this appeal. I will summarize only those facts germane to the issues raised on appeal. My summary also reflects the trial judge's findings of fact and her credibility assessments. Neither are challenged on appeal. The

---

[1] In their factum, the appellants argued that under the terms of the employment contract, Dumbrell was entitled only to fifty percent of Regional's profits and that none of the profit from the Queen Street project was earned by Regional. In oral argument, counsel accepted that the terms of the employment contract would reach profits earned by Regional or other entities controlled by Gordon.

Page: 3

trial judge preferred Dumbrell's version of events over Gordon's whose evidence she found to be unworthy of belief in many respects.

### (a) Dumbrell's Employment with Regional

[7]    In the summer of 1998, Dumbrell was living in British Colombia. He had spent most of his working life in the real estate development business and was looking for an opportunity to get back into that business in Ottawa where he had previously worked for many years.

[8]    Regional operated a large, well established real estate business in the Ottawa area. Gordon had been Regional's CEO since 1984. He held all the voting shares. Regional provided a variety of services, including property management, property appraisals, land acquisitions, land development, and consulting.

[9]    Regional would sometimes put together groups of investors or syndicates to purchase and develop properties. The properties would be located by Regional and purchased in trust by a shell company for the investors. Regional would earn various fees for arranging the purchase, syndication, management, and development of the property. Investors in the syndicate often were officers or employees of Regional or relatives of Gordon. Gordon sometimes took an equity position in these developments through Regional or various other corporate entities he controlled.

[10]    Gordon had the final say in respect of all facets of Regional's operation. He decided which projects in which Regional would become involved, the fees Regional would charge, which corporate entities would be used, the roles those entities would play in a transaction, and which investors would be invited to join which syndicates.

[11]    Dumbrell met with an employee of Regional in the summer of 1998 to discuss the possibility of Dumbrell working with Regional. Dumbrell met with Gordon either at the same meeting or in a subsequent meeting shortly afterward. Dumbrell had considerable expertise in the commercial real estate field, an area in which Gordon wanted Regional to become more involved.

[12]    Gordon and Dumbrell agreed that Dumbrell would work for Regional and would have the title Vice-President, Commercial Development. Dumbrell understood that he would find commercial real estate projects, bring them to Regional and that Regional would then become involved in the purchase and development of those properties. Dumbrell would be paid a commission on the profits earned from the projects that he brought to Regional.

[13]    On Gordon's instructions, Regional's lawyer drafted an employment contract between Dumbrell and Regional. Three drafts were prepared and reviewed by Dumbrell,

Page: 4

Gordon, and their respective lawyers. There were several changes made in the various drafts of the contract. Almost all of these changes reflected Gordon's and not Dumbrell's preferences. Eventually, in November 1998, they agreed on the terms and both signed the agreement. Gordon signed as president of Regional.

[14]    Some of the contract terms are set out in full below. Generally speaking, the contract provided that Dumbrell would be compensated exclusively on a commission basis. His commission would be calculated as a percentage of the profit generated from projects that he brought to Regional.

### (b) The Queen Street Property

[15]    Like most people familiar with the Ottawa real estate market, Dumbrell knew of the Queen Street property in November 1998. The property was owned by Canadian Real Estate Investment Trust ("CREIT"). It occupied a full downtown city block in Ottawa and in late 1998 was being used as a parking lot. It was zoned for use as office space. Dumbrell believed that the price of the property would increase dramatically in the immediate future as the need for office space increased in Ottawa. He also believed that the property was ripe for development in late 1998. The property was not on the market, but Dumbrell mentioned it to Gordon as a potential project for development by Regional. Gordon encouraged him to look into the possibility of acquiring the Queen Street property.

[16]    In early 1999, Dumbrell began to assemble a file on the Queen Street property. He received information from an employee of CREIT pertaining to possible development plans for the property and certain rent schedules. CREIT gave the information to Dumbrell on the undertaking that it would be kept confidential.

[17]    Shortly after Dumbrell acquired information from CREIT, he contacted an architect who had worked on development plans for that property some years earlier. Dumbrell and the architect spoke at length and the architect gave Dumbrell a great deal of background information pertaining to the property. Based on the information he had accumulated, Dumbrell concluded that the Queen Street property was under priced and presented an excellent opportunity for a profitable development as an office tower. Regional decided to proceed with efforts to acquire the Queen Street property.

[18]    In February 1999, on Gordon's instructions, Dumbrell prepared and submitted an offer to purchase the Queen Street property for $7,745,000. That offer was in the name of Canadian Gateway, a consortium of five companies, including Regional, that had been assembled by Gordon. CREIT was not interested in selling the property on the terms of the offer.

Page: 5

[19]    Gordon instructed Dumbrell to submit a second offer in February 1999. This offer, also in the name of Canadian Gateway in the amount of $9,000,000, was rejected by CREIT. In March 1999, a third offer, also at $9,000,000, but providing for a shorter due diligence period, was submitted by Dumbrell on Gordon's instructions. This offer was also rejected.

[20]    The trial judge described, at para. 35, Dumbrell's role in these three offers as follows:

> Mr. Dumbrell was the point man in these negotiations,
> drafting these offers at Mr. Gordon's direction and reporting
> back the reactions of Mr. Dansereau [the vendors'
> representative] who communicated only with Mr. Dumbrell.

[21]    Some time after the third offer was rejected, some of the partners in Canadian Gateway decided they were no longer interested in purchasing the Queen Street property. In July 1999, Dumbrell, on Gordon's direction, prepared a fourth offer. This offer showed Regional as the purchaser at a purchase price of $9.3 million. It also provided for a $300,000 commission payable to Regional on closing by CREIT. The corporate identity of the purchaser was irrelevant to Dumbrell. As far as he was concerned, he was working on a "Regional" project and it was up to Gordon to decide what corporate entities would be used to effect the transactions and subsequent development of the property.

[22]    CREIT knew that Regional would not be the ultimate purchaser and developer of its property. It, therefore, wanted to know the identity of Regional's investors. Negotiations broke down when Regional could not or would not identify its investors. The July offer was rejected in August 1999.

[23]    In August, Gordon told Dumbrell that he was no longer interested in the Queen Street property. Dumbrell had spent most of his time since he commenced employment with Regional in November 1998 working on the Queen Street property. His interest in the property continued even after Gordon told him that he was no longer interested in the property.

[24]    In October 1999, Gordon spoke with a government official who told him that there would be a significant increase in the demand for downtown office space in Ottawa in the immediate future. This information made the Queen Street property more attractive.

[25]    In late October 1999, Mr. Samuel Grosz, a friend of Gordon's and a real estate developer whose Ottawa properties were managed by Regional, visited Ottawa primarily to look at his properties. Gordon showed Mr. Grosz the Queen Street property and gave him all of the information that Dumbrell had assembled, including the confidential

Page: 6

information that had been provided to him by CREIT in January 1999. Mr. Grosz soon became interested in the Queen Street property.

[26]   Shortly after Gordon alerted Mr. Grosz to the possibility of purchasing the Queen Street property, Mr. Grosz learned that Philip Reichman and his company, O. & Y. Properties Inc. ("O. & Y."), were about to make an offer to purchase the Queen Street property. Mr. Grosz and Mr. Reichman knew each other well and decided to proceed by way of a joint venture with each holding a fifty percent interest in the Queen Street property if they were able to purchase it from CREIT.

[27]   By early November 1999, it was clear that the working relationship between Gordon and Dumbrell was not going to last. None of the projects that Dumbrell had worked on had produced any profit for Regional. Dumbrell had not received any remuneration in the year he had been at Regional. Gordon had refused Dumbrell's request for an advance on his commissions. Gordon was also systematically excluding Dumbrell from meetings and the decision-making process at Regional. On November 4, 1999, Dumbrell resigned effective November 22, 1999. He had decided to go into business for himself.

[28]   On November 19, 1999, after Dumbrell had tendered his resignation from Regional, but while he was still employed there, Mr. Grosz told Gordon that Mr. Grosz and O. & Y. were considering making an offer on the Queen Street property. Mr. Grosz asked Gordon to determine the status of the property. He also told Gordon that because Gordon had brought the property to his attention, he was prepared to allow Gordon to participate with he and O. & Y. in the joint venture. Mr. Grosz indicated that Gordon could purchase one-half of Mr. Grosz's fifty percent interest in the joint venture. This would mean that Gordon would have a twenty-five percent interest in the Queen Street property if the joint venture could acquire it.

[29]   Mr. Grosz and O. & Y. were respected and high profile participants in the Ottawa commercial real estate market. They did not need Regional's participation to complete the purchase. Gordon wanted to be involved in a joint venture with them. At Mr. Grosz's suggestion, Gordon prepared an offer to purchase the Queen Street property in the name of Regional. When he did so, he anticipated that Regional would purchase the property in trust for Mr. Grosz (twenty-five percent), Gordon or his corporate nominee (twenty-five percent), and O. & Y. (fifty percent).

[30]   The offer to purchase the Queen Street property prepared by Gordon in November 1999 was very similar to the offer prepared by Dumbrell in July 1999. Both offers provided for a purchase price of $9.3 million with a commission of $300,000 payable to Regional. The only significant difference between the two offers was that the July offer identified Dumbrell as the contact person at Regional and the November offer identified Gordon as the contact person.

Page: 7

[31]    The asking price for the Queen Street property had dropped by about $1 million since July when Regional had submitted its offer at $9.3 million. Unlike Dumbrell, Gordon was not familiar with the commercial real estate market in Ottawa and was unaware that the asking price for the property had gone down. Gordon did not speak to Dumbrell before preparing this offer. The offer prepared by Gordon was reviewed by his putative partners. Mr. Reichman of O. & Y. learned that the offer prepared by Gordon was about one million dollars more than the current asking price for the Queen Street property. He decided that he would take over any negotiations to purchase the Queen Street property. He submitted an offer in the name of O. & Y. at $8,000,000. That offer did not provide for any commissions payable to Regional.

[32]    The offer submitted by O. & Y. was accepted by CREIT on or about November 25, 1999. The transaction was completed on December 2, 1999 and closed on January 24, 2000. The Queen Street property was purchased in trust by a numbered company. The numbered company was owned fifty percent by O. & Y., and fifty percent by a numbered company owned equally by Mr. Grosz and a company controlled by Gordon. Gordon's company held its twenty-five percent interest in the property in trust for a syndicate assembled by Gordon. The syndicate consisted of Gordon, his wife and children, several cousins, and his lawyer. Gordon, his wife and his children owned 73.33 percent of the syndicate. In total, the syndicate advanced about $1,200,000 toward the project. Some of the payments went through Regional.

[33]    Gordon acknowledged in cross-examination that this was not a typical syndication for which Regional would charge a fee for bringing the investors together. Regional did all of the work that had to be done for the syndicate on the project, but did not charge any fees until it submitted an invoice in late May 2002 after the interest in the property was sold. The trial judge was dubious as to the *bona fides* of that invoice.

[34]    Early in 2000, Dumbrell learned through a contact at O. & Y., that O. & Y. had agreed to purchase the Queen Street property. Dumbrell spoke with Gordon and asked him about his or Regional's involvement in that purchase. Gordon lied to Dumbrell. He told him that he was unaware of the proposed purchase of the Queen Street property by O. & Y. and that neither Regional nor Gordon had anything to do with the purchase. Dumbrell subsequently learned of Gordon's involvement and commenced this lawsuit in October 2000. At that time, the syndicate put together by Gordon still held a twenty-five percent interest in the Queen Street property.

[35]    Under the terms of the agreement between O. & Y., Mr. Grosz and Gordon's syndicate, O. & Y. had an option to purchase the interests held by the other partners. In May 2002, O. & Y. exercised its option and bought out Gordon's syndicate. The syndicate's twenty-five percent interest was sold at a profit of slightly more than

Page: 8

$1,000,000. Dumbrell amended his statement of claim and alleged that he was entitled to fifty percent of that profit.

### III

### Issue #1 – Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit under the terms of the employment contract?

#### (a) The trial judge's analysis

[36]  The trial judge found that the potential value of the Queen Street property as a development was made known to Gordon and Regional through Dumbrell's efforts. She further held that it was through those efforts that Regional established contacts with CREIT, assembled a file containing a great deal of information on the property, and was in a position to provide that information to Mr. Grosz when he expressed an interest in the property in October 1999. Mr. Grosz in turn offered Regional/Gordon a twenty-five percent interest in the property because of the information he had received from Gordon.

[37]  On the trial judge's findings, Dumbrell was directly responsible for the syndicate, under Gordon's direction and control, obtaining a twenty-five percent interest in the Queen Street property. The syndicate ultimately made a one million dollar profit from its involvement in the transaction.

[38]  The trial judge rejected Gordon's evidence that he and Dumbrell had agreed that the Queen Street project would not be covered by the terms of Dumbrell's employment contract. She noted that it made no sense that Dumbrell would spend the vast majority of his time over several months trying to secure a property that was excluded from the terms of his employment contract. She then turned to the terms of that agreement.

[39]  The contract was between Regional and Dumbrell. It described Dumbrell as "an employee". The services to be provided to Regional by Dumbrell were described in Schedule "A" to the agreement:

> The Corporation and the Employee agree that the Employee
> will be charged with the responsibility <u>to provide the
> Corporation with Development, Acquisitions, Financing and
> Syndications and Consulting Services. Employee to research,
> investigate, report and recommend real property capital asset
> purchases suitable for development or syndication.</u> Employee
> shall not bind the Corporation to any contract or legal
> commitment without the prior written authority of the
> Corporation. [Emphasis added.]

[40]    The contract was for a term of six months with an expiry date of May 1, 1999 and provided for renewal for an additional term of six months on mutual agreement of the parties.  Although the contract was not formally renewed, the parties agreed that it was renewed and was in effect when Dumbrell resigned in November 1999.

[41]    The agreement provided for termination "at the end of the Term hereof", and further provided that neither party could commence an action under the contract more than one year after the expiration of the term of the contract.  Dumbrell commenced this action in October 2000, less than one year after he quit.  This initial claim eventually developed into one for commission on a profit realized more than two years after the contract was terminated.

[42]    The provision of the contract governing Dumbrell's compensation is found under the heading "Employee Earnings":

> 1.EMPLOYEE EARNINGS
>
> The Corporation shall pay to the Employee the sum of [as per the commissions payable as set out in Schedule "B" attached].  The Corporation is responsible for making source deductions, including payments on account of Canada Pension Plan and Employment Insurance.  Employee shall be entitled to participate in Corporation's Health Benefit Package as exists as of the date hereof and as amended from time to time.  [Emphasis in original.]

[43]    Schedule "B" referred to in the above clause reads as follows:

> SCHEDULE "B"
>
> DESCRIPTION OF REMUNERATION PACKAGE TO EMPLOYEE
>
> 1(1)* The remuneration package for the Employee will be based on performance of the Employee payable as follows:
>
> (a)For each project, *profits* to be split 50% to the Employee and 50% to the Corporation.

---

* In the contract, all of the paragraphs in Schedule "B" are numbered "1".  For ease of reference, I have added the numbers in parentheses.

Page: 10

1(2)  For purposes of this Agreement, "_profit_" shall include
monies earned and actually received by the Corporation as
completed Acquisition Fees, Development Fees and
Syndication Fees earned as a result of the Employee's direct
involvement for completed and closed projects in accordance
with standard operating policy of the Corporation on the
following business activities:

    (a)  Development projects;

    (a)  Syndication projects:

    (a)  Special consulting and brokerage fees payable to
        the Division.

1(3)   "_Profit_" shall be defined as the Gross Revenues
received for a particular Project less expenses directly related
to the negotiation, acquisition, development and sale of the
project.  All such expenses shall be deducted from Gross
Revenues as would a prudent accountant applying generally
accepted accounting principles.  Expenses shall include, but
not limited to:

(a)  Acquisition cost of the property;

(a)  Governmental and development fees;

(a) Professional advice (accountants, engineers, lawyers, third
party consultants);

(a) Financing fees, brokers fees, interest and carrying charges;

(a) Fees paid to investors for the project;

(a) Costs and disbursements paid pursuant to any syndication
agreement;

(a) Realtor's fees; and

Page: 11

(a) Construction costs and related site improvements.
[Emphasis added.]

[44]    The trial judge did not find that the contract of employment provided for payment
of commission to Dumbrell on profits earned after the termination of the employment
agreement. Rather, she equated the relationship between Regional and Dumbrell with a
principal-agent relationship. Relying on *Charles P. Rowen & Associates Inc. v. Ciba-
Geigy Canada Inc.* (1994), 19 O.R. (3d) 205 (C.A.), the trial judge held that since
Regional accepted the benefit of the work done by Dumbrell regarding the Queen Street
property, Regional was obligated to pay for that work in the absence of an agreement to
the contrary. Next, she examined the language of the employment contract and
concluded at para. 131:

> The fact that crystallization of the deal [the sale of the
> syndicate's interest in the Queen Street property], and the
> culminating events occurred after the employee left his
> employment, is not, in my view, relevant. ... The contract
> did not deal with this situation and therefore the entitlement is
> as set out in *Charles P. Rowen & Associates Inc. et al. v.
> Ciba-Geigy Canada Inc., supra.* [Emphasis added.]

[45]    I agree with the trial judge's conclusion that Dumbrell was entitled to
compensation for profits earned after the termination of the agreement, but my analysis is
somewhat different than hers. I do not regard *Charles P. Rowen, supra*, as controlling.
In *Charles P. Rowen*, the court was faced with a true principal-agent relationship, the
terms of which had not been reduced to writing by the parties. The reasoning of the
majority blends notions of *quantum meruit* and implied terms of a contract to resolve a
problem that the parties had not addressed when establishing their relationship.

[46]    In the present case, the parties did consider the nature of their working
relationship. After considerable negotiation and legal assistance, they entered into an
employment contract which described Dumbrell as an "employee" and addressed the
nature of his compensation. In my view, the question of whether Dumbrell was entitled
to commission on the profits earned on the Queen Street project depends on an
interpretation of the language used in the contract. If he is entitled to commission on the
profits from the Queen Street property, that entitlement must be found in the language of
the agreement he entered into with Regional.

### (b) Contractual interpretation

[47]    Judges spend most of their working time deciphering the meaning of various kinds
of legal documents, including written contracts: see e.g. Lord Justice Johan Steyn, "The

Page: 12

Intractable Problem of the Interpretation of Legal Texts" (2003) 25 Sydney L. Rev. 5; Sir Christopher Staughton, "How Do the Courts Interpret Commercial Contracts?" (1998) 58 Cambridge L.J. 303. Most Canadian judges faced with interpreting a written commercial contract, cite either or both of *Consolidated-Bathurst Export Limited v. Mutual Boiler and Machinery Insurance Company*, [1980] 1 S.C.R. 888 at 901, and *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 52-56. Professor Ruth Sullivan has observed that these two authorities can be read as advancing different notions of contractual intent. She observes that *Consolidated-Bathurst, supra*, arguably looks to the subjective intention of the contracting parties at the time the contract was made, while *Eli Lilly, supra*, looks to the intent as discerned from the words used in the written contract. Professor Sullivan refers to the former approach as the intentionalist approach, and the latter as the textualist approach: see Ruth Sullivan, "Contract Interpretation in Practice and Theory" (2000) 13 Sup. Ct. L. Rev. (2d) 369 at 375-86, 392.

[48]   In *Eli Lilly, supra*, at paras. 52-54, Iacobucci J. refers to *Consolidated-Bathurst, supra*, with approval. He clarifies, at para. 54, what is meant in *Consolidated-Bathurst* by "the true intent of the parties" for contractual purposes:

> The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.

[49]   On the approach taken in *Eli Lilly, supra*, the focus is on the meaning of the words used in the contract. Evidence of the subjective intention of the parties has "no independent place" in the interpretative process: *Eli Lilly*, at para. 54; see also Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 304-306; *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All. E.R. 98 at 114-15 (H.L.).

[50]   In my view, when interpreting written contracts, at least in the context of commercial relationships, it is not helpful to frame the analysis in terms of the subjective intention of the parties at the time the contract was drawn. This is so for at least two reasons. First, emphasis on subjective intention denudes the contractual arrangement of the certainty that reducing an arrangement to writing was intended to achieve. This is

Page: 13

particularly important where, as is often the case, strangers to the contract must rely on its terms. They have no way of discerning the actual intention of the parties, but must rely on the intent expressed in the written words. Second, many contractual disputes involve issues on which there is no common subjective intention between the parties. Quite simply, the answer to what the parties intended at the time they entered into the contract will often be that they never gave it a moment's thought until it became a problem: see Kim Lewison, *The Interpretation of Contracts*, 3d ed. (London: Sweet & Maxwell, 2004) at 18-31.

[51]    *Eli Lilly, supra*, instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not the subjective intentions of the parties. In this sense, my approach is textualist. However, the meaning of the written agreement must be distinguished from the dictionary and syntactical meaning of the words used in the agreement. Lord Hoffmann observed in *Investors Compensation Scheme Ltd., supra*, at 115:

> The meaning which a document (or any other utterance)
> would convey to a reasonable man is not the same thing as
> the meaning of its words. The meaning of words is a matter
> of dictionaries and grammars; the meaning of the document
> is what the parties using those words against the relevant
> background would reasonably have been understood to mean.

[52]    No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

> There are a number of inherent features of language that need
> to be noted. Few, if any words, can be understood apart from
> their context and no contractual language can be understood
> without some knowledge of its context and the purpose of the
> contract. Words, taken individually, have an inherent
> vagueness that will often require courts to determine their
> meaning by looking at their context and the expectations that
> the parties may have had.

[53]    The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances

Page: 14

include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement: see *BG Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 at 23-24; *H.W. Liebig & Co. v. Leading Investments Ltd.*, [1986] 1 S.C.R. 70 at 80-81, La Forest J.; *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381 at 1383-84 (H.L.); Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 307-308.

[54]    A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 710-11.

[55]    There is some controversy as to how expansively context should be examined for the purposes of contractual interpretation: see Geoff R. Hall, "A Curious Incident in the Law of Contract: The Impact of 22 Words from the House of Lords" (2004) 40 Can. Bus. L.J. 20. Insofar as written agreements are concerned, the context, or as it is sometimes called the "factual matrix", clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at 363 (C.A.).

[56]    I would adopt the description of the interpretative process provided by Lord Justice Steyn, "The Intracticable Problem of the Interpretation of Legal Texts", *supra*, at 8:

> In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. <u>The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text, which they adopted. The aim is to determine the meaning of the contract against its objective contextual scene. By and large the objective approach to the question of construction serves the needs of commerce.</u>[2] [Emphasis added.]

---

[2] Lord Steyn has taken the same approach in his judgments: see *Pagnan SpA v. Tradax Ocean Transportation SA*, [1987] 1 All E.R. 81 (Q.B.), Steyn J., aff'd [1987] 3 All E.R. 565 (C.A.). See also *Toronto-Dominion Bank v. Leigh Instruments Ltd.* (1999), 178 D.L.R. (4th) 634 at 639 (Ont. C.A.); Lewison, *The Interpretation of Contracts, supra*, at 5, 22-24; *Mount Joy Farms Limited v Kiwi South Island Co-operative Dairies Ltd*, [2001] NZCA 372 at para. 38.

Page: 15

### (c) The interpretation of this contract

[57]   The context in which the written words used in this agreement must be understood begins with the parties who negotiated the agreement.  Both were sophisticated, experienced, successful businessmen who could reasonably be expected to negotiate a commercially sensible and workable agreement.  When they agreed to work together, it was anticipated that Dumbrell, whose expertise lay in finding commercial real estate projects, would investigate and, where appropriate, bring potentially profitable large-scale commercial developments to Regional.  Regional had the ability to finance and develop these projects.  It did so in various ways using whatever corporate vehicle Gordon deemed appropriate.

[58]   The agreement reached by the parties contemplated a relatively short working relationship of between six months and one year.  It also contemplated that Dumbrell would receive nothing unless he brought projects to Regional which earned profits for Regional.  If he did that, his compensation would be significant (fifty percent of the profits).  In tying Dumbrell's compensation to profits as opposed to, for example, fees earned by Regional, the parties anticipated that Dumbrell's entitlement to commissions would not be known until a project was complete and Regional's net profit on the project could be determined.

[59]   Given Regional's business history, it could reasonably be anticipated when the employment agreement was made that when projects were brought to it by Dumbrell, Regional would be involved in various ways and that its involvement could yield profits through a variety of methods at different stages of Regional's involvement in any given project.  On the findings made by the trial judge, Dumbrell was not taking employment with a company whose sole source of profits came through various forms of fees, but was taking employment with a company whose profits could come through various kinds of involvement in different projects.

[60]   I turn from the context in which the employment agreement was made to the words used in the agreement and in particular the words used in Schedule "B".  Schedule "B" begins by stating that Dumbrell's remuneration will be based on his performance.  He must produce to be paid.  Schedule "B" then describes his remuneration as fifty percent of "profits" for each project.  "Profits" are described in paras. 1(2) and 1(3).

[61]   Paragraph 1(2) makes it clear that profits must be earned as a result of Dumbrell's direct involvement in the project.  In addition, the project must be "completed and closed … in accordance with standard operating policy of the Corporation".  The reference to

Page: 16

"standard operating policy" is of no assistance as it is common ground that there was no such thing.

[62]   Paragraph 1(2) sets out certain kinds of fees that are included in the meaning of profits, such as acquisition fees, development fees, and syndication fees. The fees described in para. 1(2) are not an exhaustive list of the kinds of payments to Regional that can constitute profits. Lastly, para. 1(2) refers to business activities which constitute projects for the purpose of the calculation of profits, including "Syndication projects".

[63]   Paragraph 1(3) sets out a formula by which profits are to be determined by deducting certain expenses from "Gross Revenues". The reference in para. 1(3) to "Gross Revenues" and the types of expenses identified in that paragraph indicates two things. First, the question of whether Regional earned any profit and, if so, the amount of that profit may well not be determined until the end of Regional's involvement in a particular project. Second, Regional's involvement in projects could take forms other than a fee for service basis. The reference to "Gross Revenues" and many of the expenses described in para. 1(3) are consistent with Regional taking equity positions in a project and realizing a profit upon a sale of that equity position.

[64]   On my reading of Schedule "B", Dumbrell was entitled to a fifty percent commission on profits if:

- he was directly responsible for the project in that it was secured for Regional through his efforts;
- Regional had earned and actually received monies on the project;
- the project was "completed and closed", that is Regional's involvement was completed; and
- using the method described in para. 1(3), Regional had earned a profit.

[65]   Nothing in the language of Schedule "B" limits Dumbrell's potential remuneration to projects that are completed and closed as of the date of termination of his employment contract. The context in which the contract was made contraindicates imposing any such limitation on profits. Reasonable people in the position of Dumbrell and Gordon would have appreciated that Regional's involvement in the kind of complex large scale commercial projects that it was anticipated Dumbrell would bring to it may well not be completed within the relatively short time span contemplated by the employment contract. Similarly, the method used for calculating Dumbrell's compensation by reference to profit as calculated in para. 1(3) contemplates that the projects could well extend over a considerable period of time with the ultimate determination of whether any profit was made and, therefore, any remuneration owed to Dumbrell being based on events that occurred well after the relatively brief period of employment contemplated by the agreement. On my reading of Schedule "B", Dumbrell was entitled to fifty percent of

Page: 17

Regional's profits even if the profits were made after the employment contract was terminated.

[66]   The appellants rely on the termination provision:

> 1.1 This contract shall terminate:
>
> 1.1.1          at the end of the Term hereof.
>
> 1.1 Upon termination or other expiration of this contract the Employee shall forthwith return to the Corporation all papers, materials, equipment and other properties of the Corporation held for the purpose of execution of the contract. In addition, each party will assist the other party in the orderly termination of the contract and the transfer of all aspects hereof, tangible and intangible, as may be necessary for the orderly, non-disrupted business continuation of the Corporation.
>
> 1.1 <u>Neither party may commence an action under this contract more than one (1) year after the expiration of its term, or, in the event of default, more than one (1) year after the occurrence of said default.</u>  [Emphasis added.]

[67]   The termination provision does not assist in defining profits for the purpose of calculating Dumbrell's compensation. The first part of the termination clause speaks to the point at which the contractual relationship ends. It does not purport to terminate obligations that existed under the contract when the contract came to an end. If, as I would hold, profits as defined in Schedule "B" include profits earned and calculated after the termination of the contract, the obligation to pay those profits, when and if they arise, is an obligation that exists under the contract as of the date of termination albeit in an inchoate form.

[68]   The last paragraph in the termination clause is also a relevant consideration. That paragraph answers one of the arguments relied on by the appellants. They submitted that a definition of profits that included profits made after the termination date of the contract would create indefinite and potentially open-ended liability by Regional to Dumbrell for profits earned on projects many years down the road. The limitation provision in the termination clause excludes any claim by Dumbrell that is not advanced within one year of the termination of the contract. This provision effectively places limits on Regional's

Page: 18

potential liability to Dumbrell. As it happens, the limitation clause does not assist
Regional here because Dumbrell had commenced his action within the one year period.

[69]   In summary, like the trial judge, I conclude that Dumbrell was entitled to fifty
percent of the profits earned by Regional on the Queen Street project. I reach that
conclusion through a reading of Schedule "B" of the agreement in the context of the
circumstances in which the agreement was made. I do not read the termination clause as
modifying the meaning of profits in the agreement.

**IV**

**Issue #2 – Was Dumbrell entitled to fifty percent of the profits earned by entities
other than Regional/Gordon?**

[70]   As outlined above, through Dumbrell's efforts, and at Mr. Grosz's invitation,
Regional/Gordon acquired a twenty-five percent interest in the Queen Street property
early in 2000.

[71]   At Gordon's direction, the twenty-five percent interest in the Queen Street
property was held by one of his companies in trust for a syndicate of investors. Another
Gordon company (LPH), his wife and his children held 73.33 percent of the syndicate.
Several of Gordon's cousins and his lawyer, who practised with one of the cousins, held
the other 26.67 percent of the syndicate.

[72]   The accounting breakdown on the syndicate's investment in the Queen Street
property, prepared at Gordon's request, but accepted by Dumbrell at trial, showed that the
syndicate advanced about $1,200,000 on the Queen Street project and received about
$2,200,000 on that project resulting in a profit of just over $1,000,000. The accounting
records indicate that the funds were distributed in accordance with the percentage of
ownership in the syndicate. Gordon and his immediate family received about $732,000
of the $1,000,000 profit earned by the syndicate.

[73]   In oral argument, Mr. Zarnett acknowledged that if Dumbrell was entitled to
compensation on the Queen Street project under the terms of the employment contract, no
distinction could be drawn between profits earned directly by Regional and profits earned
by other corporate entities used by Gordon to generate the profit. I would extend the
same reasoning to cover profits earned by Gordon's wife and children. On this approach,
Dumbrell was entitled to fifty percent of the profits earned by LPH, Gordon's wife and
Gordon's children.

[74]   Counsel submits, however, that profits earned by other investors in the syndicate
cannot be treated as the same as Regional's profits. The accounting records demonstrate

Page: 19

that profits were paid out to the other investors when the syndicate sold its twenty-five percent interest in the Queen Street property to O. & Y.

[75]    In her reasons, the trial judge accepted, at para. 158, that there were "third parties investing and risking money". I take this to mean that the trial judge accepted that Gordon's cousins and his lawyer were *bona fides* investors who helped finance the twenty-five percent interest in the Queen Street property. She went on to hold, however, that Gordon's resort to other investors could not affect the compensation owed to Dumbrell. She said, at paras. 159-60:

> In calculating damages, there is no evidentiary foundation of any kind on which to assess legitimate costs which might have been set off against this profit.

> Without a scintilla of such evidence, the court is unable to do other than order damages of $500,000, pursuant to the first part of the paragraph in the employment contract dealing with employee remuneration.

[76]    I cannot agree with this analysis. To the extent that the syndicate was owned by third parties who genuinely invested funds in the project, I do not see how profits payable to those investors can become the profits of Regional for the purposes of calculating Dumbrell's compensation. The accounting records do provide evidence that 26.67 percent of the profit realized on the sale of the twenty-five percent interest in the Queen Street project was paid to third party investors and not to Regional, Gordon, his companies, or his immediate family. The calculation of Dumbrell's compensation on the Queen Street project should not have extended to a percentage of the profits earned by third party investors. If my arithmetic is correct, Dumbrell should have received fifty percent of the profits realized by a 73.33 percent interest in the syndicate.

V

## Issue #3 – Did the trial judge err in holding Gordon personally liable for breach of contract?

[77]    In his statement of claim, Dumbrell alleged several causes of action against Regional and Gordon. At trial, he succeeded only on the breach of contract claim. In the statement of claim, Dumbrell alleged a breach of contract against only Regional. In her initial reasons for judgment, the trial judge found both Regional and Gordon liable for breaching the contract. She did not separately address Gordon's personal liability for breaching a contract to which he did not appear to be a party. Gordon's liability for

breach of contract as distinct from Regional's liability was not addressed by counsel in closing argument.

[78]   After the trial judge released her initial reasons, and at the request of counsel for Regional and Gordon, she heard further argument on Gordon's personal liability for breach of contract. The trial judge gave additional reasons in which she confirmed her initial finding that Regional and Gordon were both liable for the breach of contract.

[79]   I have difficulty understanding the basis upon which the trial judge found Gordon liable for breach of contract. She spoke of "piercing the corporate veil" and described Regional as Gordon's agent for the purposes of the contract. However, she found both Regional and Gordon liable for breaching the contract. I agree with Mr. Zarnett's submission that if Regional acted as Gordon's agent for the purposes of the contract, only Gordon could be liable for breaching that contract. The trial judge's finding that Regional was liable along with Gordon for breaching the contract was also inconsistent with the trial judge's conclusion, at para. 187, that she should "pierce the corporate veil" and hold Gordon liable. Either Regional had a separate legal persona for the purposes of the contract or it did not.

[80]   The concepts of piercing the corporate veil and holding that a corporation acts as an agent for the individual who controls that corporation achieve the same result in that they both impose personal liability for what appear to be corporate actions. They achieve that result, however, in different ways. The agency relationship assumes that the corporation and the controlling mind are distinct, but that on the relevant facts the former acted as agent for the latter. Piercing the corporate veil ignores the legal persona of the corporation: Bruce L. Welling, *Corporate Law in Canada: The Governing Principles*, 2d ed. (Markham, Ont.: Butterworths, 1991) at 122-36.

[81]   There is no basis in this record for describing Regional as Gordon's agent for the purpose of entering into the employment contract with Dumbrell. Dumbrell did not plead that Regional acted as Gordon's agent. The terms of the contract offer no suggestion that Regional was acting in an agency capacity. Finally, Dumbrell's evidence does not suggest that he regarded Regional as Gordon's agent for the purposes of the contract.

[82]   Nor is any case made out for ignoring Regional's separate legal persona. There can be no doubt that Dumbrell contracted with Regional and only Regional in November 1998. The employment contract clearly describes Dumbrell as Regional's employee. Dumbrell's pleadings and his evidence do not suggest otherwise. Gordon's total ownership and control of Regional and the fact that he made all decisions on behalf of Regional in respect of its dealings with Dumbrell does not detract from Regional's standing as a separate and distinct legal entity. Corporations must necessarily act at the instance and under the direction of those fixed with the responsibility and authority to

direct the affairs of the corporation: see *ScotiaMcLeod Inc. v. Peoples Jewellers Ltd.* (1995), 26 O.R. (3d) 481 at 492 (C.A.).

[83]   The separate identity of a corporation can be ignored where the corporation is inserted into a transaction for a fraudulent or dishonest purpose. Corporations used in that way often have no assets, no corporate history, and no reason for existence other than facilitating a particular transaction. None of those indicia apply to Regional. Regional cannot be described as a shell or corporation of convenience put in place by Gordon for the purpose of entering into the contract with Dumbrell. As of November 1998, Regional had been a thriving well established corporate entity for many years. It participated in many different real estate transactions and employed many people. Dumbrell chose to become one of those employees. There is no suggestion in the evidence that the creation of the employer/employee relationship between Regional and Dumbrell was tainted by fraud or dishonesty on the part of Gordon. There is simply nothing to suggest that Gordon set out to deceive or trick Dumbrell when he and Dumbrell negotiated the employment contract which created the contractual relationship between Dumbrell and Regional, and not between Dumbrell and Gordon. Dumbrell knew full well he was contracting with Regional. He could only reasonably expect to look to Regional for compensation in the event of a breach of the terms of the contract.

[84]   The trial judge's reasons also suggest a second basis for holding Gordon liable. She referred to authorities that hold a directing mind of a company liable for inducing a breach of contract by that company: see e.g. *Said v. Butt*, [1920] 3 K.B. 497 at 504-506 (H.L.); *Truckers Garage Inc. v. Krell* (1993), 68 O.A.C. 106 at 114-15 (C.A.); *Kepic v. Tecumseh Road Builders* (1987), 23 O.A.C. 72 at 74 (C.A.).

[85]   Cases where an individual has been held liable for inducing a corporation's breach of contract have nothing to do with piercing the corporate veil or the concept of agency. These cases acknowledge the separate legal identity of the corporation and its directing mind. They hold the directing mind liable for the discrete tort of inducing the breach of contract and not for breach of contract itself. The measure of damages for inducing the breach of contract may or may not be the same as would apply to the breach of contract.

[86]   Gordon cannot be liable for inducing a breach of the contract between Regional and Dumbrell. That cause of action was not pleaded. Nor do I understand counsel at trial or on appeal to have argued that Gordon's liability could be based on the separate tort of inducing a breach of contract. An allegation of inducing a breach of contract is very different from a claim that a person is liable for breaching the contract. In the absence of any pleading which expressly or impliedly alleges the tort of inducing a breach of contract, I do not think the principles underlying that tort can be relied on to render Gordon liable for the breached contract.

Page: 22

[87]   The difficulties inherent in transforming an allegation of a breach of contract into a finding of inducing a breach of that contract are apparent in the trial judge's reasons. To establish the tort of inducing a breach of contract by the directing mind of the contracting party, it must be shown, among other things, that the conduct of the directing mind was not *bona fides* in the best interest of the corporation. In the addendum to her reasons, the trial judge indicates that Gordon's conduct caused Regional to lose certain fees on the Queen Street property. She states, at para. 173:

> His [Gordon's] secretive and misleading conduct eventually
> caused a serious loss to his company when the company
> became unable to make the offer which would have resulted
> in another $300,000. - $400,000. fee.

[88]   I cannot agree that anything Gordon did caused Regional to act to its detriment in respect of the Queen Street property. The trial judge found that as a result of Dumbrell's efforts, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property. That is the only interest that was available to Gordon in the joint venture that ultimately purchased the property. As the trial judge found, the calculation of Regional's profits and, therefore, Dumbrell's commission, did not depend on what part of the profits Regional described as fees. Had Gordon chosen to describe some of the profits generated for the syndicate from the sale of its interests as fees payable to Regional, it would not have increased the overall profit earned by the syndicate and would have had no effect on the quantification of Dumbrell's compensation. There is no evidentiary basis to hold that Gordon's conduct in respect of the Queen Street property cost Regional anything. On my reading of Gordon's cross-examination, it was not suggested to him that his conduct had somehow deprived Regional of profits that it would otherwise have earned. A finding that Gordon acted against Regional's best interests in connection with the profit earned on the Queen Street property has no foundation in either the pleadings or the evidence.

## VI

### Conclusion

[89]   I would allow Gordon's appeal, set aside the trial judge's finding regarding Gordon's personal liability, and dismiss the action against Gordon. I would allow Regional's appeal in part and vary the trial order to provide that Dumbrell is entitled to fifty percent of the profit from the Queen Street project earned by LPH, Gordon's wife and Gordon's two daughters.

[90]   Counsel should make written submissions (no more than ten pages each) as to costs both at the trial and on appeal.

Page:  23

**RELEASED: "DD" "JAN 31 2007"**

"Doherty J.A."
"I agree M.J. Moldaver J.A."
"I agree Robert J. Sharpe J.A."

23p

# TAB 3

ELI LILLY & CO. *c.* NOVOPHARM LTD.

**Novopharm Limited**  *Appellant*

*v.*

**Eli Lilly and Company and Eli Lilly Canada Inc.**  *Respondents*

and

**The Minister of National Health and Welfare**  *Respondent*

and between

**Apotex Inc.**  *Appellant*

*v.*

**Eli Lilly and Company and Eli Lilly Canada Inc.**  *Respondents*

and

**The Minister of National Health and Welfare**  *Respondent*

INDEXED AS: ELI LILLY & CO. *v.* NOVOPHARM LTD.

File Nos.: 25402, 25348.

1998: January 21; 1998: July 9.

Present: L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major and Bastarache JJ.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Patents — Infringement — Sublicensing — Licensee agreeing to supply patented medicine to unlicensed third party — Licence expressly prohibiting sublicensing — Breach of licence terms grounds for termination of licence — Whether supply agreement between licence holder and third party a sublicence or having legal effect of creating a sublicence.*

*Agency — Supply agreement — Licensed party to obtain patented bulk medicine for unlicensed party —*

**Novopharm Limited**  *Appelante*

*c.*

**Eli Lilly and Company et Eli Lilly Canada Inc.**  *Intimées*

et

**Le ministre de la Santé nationale et du Bien-être social**  *Intimé*

et entre

**Apotex Inc.**  *Appelante*

*c.*

**Eli Lilly and Company et Eli Lilly Canada Inc.**  *Intimées*

et

**Le ministre de la Santé nationale et du Bien-être social**  *Intimé*

RÉPERTORIÉ: ELI LILLY & CO. *c.* NOVOPHARM LTD.

Nos du greffe: 25402, 25348.

1998: 21 janvier; 1998: 9 juillet.

Présents: Les juges L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major et Bastarache.

EN APPEL DE LA COUR D'APPEL FÉDÉRALE

*Brevets — Contrefaçon — Sous-licence — Titulaire d'une licence acceptant de fournir un médicament breveté à un tiers non titulaire d'une licence — Licence interdisant expressément d'accorder une sous-licence — Violation des conditions de la licence justifiant son annulation — L'accord d'approvisionnement intervenu entre le titulaire d'une licence et un tiers constitue-t-il une sous-licence ou a-t-il pour effet juridique de créer une sous-licence?*

*Mandat — Accord d'approvisionnement — Partie titulaire d'une licence devant obtenir un médicament breveté en vrac auprès d'une partie non titulaire d'une*

*Whether licensed party acting as agent of unlicensed party in carrying out contractual obligations.*

*Patents — Notice of allegation (NOA) — Proper date for assessing NOA.*

*Jurisdiction — Declaratory relief — Whether declaration should issue as to patent holder's failure to show notice of allegation unjustified or that it was entitled to terminate compulsory licence — Whether appropriate to declare that supply agreement not constituting sublicence or transfer of compulsory licence.*

*Patents — Medicine — Reformulation of patented product — Bulk medicine reformulated into final-dosage form — Whether reformulation of patented product amounting to infringement of patent.*

Eli Lilly and Co. ("Eli Lilly") owned the Canadian patents for nizatidine and for its manufacturing process. It alone held a notice of compliance (NOC) to produce and market certain final-dosage forms of the medicine. Novopharm held a compulsory licence, obtained under the *Patent Act* (the "Act") as it existed prior to February, 1993, which permitted it to use the patented process to make nizatidine for the preparation or production of medicine and to import and/or sell medicine made by the process. The licence stipulated that it was non-transferable, prohibited Novopharm from granting any sublicence, and provided Eli Lilly with the option to terminate the licence upon any breach of its terms.

In anticipation of the 1993 amendments to the Act, which radically altered the procedures for the issuance of NOCs and eliminated the compulsory licensing regime entirely, Novopharm and Apotex entered a "supply agreement" in November, 1992. The agreement provided that, where one party held a licence for a patented medicine for which the other did not, the licensed party would obtain, at the request and direction of the unlicensed party, specified quantities of that medicine, and supply it to the unlicensed party at cost plus a four per cent royalty. In April, 1993, Apotex commenced efforts to obtain a NOC for certain final-dosage forms of nizatidine, and issued a notice of allegation ("NOA") alleging that no claim for nizatidine or for its use would be infringed. In support of this allegation, Apotex relied upon the licence issued to Novopharm and the "mutual understanding" with Novopharm. On the same date, Apotex notified Novopharm of its intention to request

*licence — La partie titulaire d'une licence agit-elle à titre de mandataire de la partie non titulaire en remplissant des obligations contractuelles?*

*Brevets — Avis d'allégation (ADA) — Date pertinente pour évaluer l'ADA.*

*Compétence — Jugement déclaratoire — Un jugement déclaratoire devrait-il être rendu au sujet de l'omission du titulaire du brevet de démontrer que l'ADA n'était pas fondé ou qu'il avait le droit d'annuler la licence obligatoire? — Convient-il de déclarer que l'accord d'approvisionnement ne constitue ni une sous-licence ni une cession de licence obligatoire?*

*Brevets — Médicament — Préparation sous une autre forme d'un produit breveté — Médicament en vrac préparé sous forme posologique définitive — La préparation sous une autre forme du produit breveté constitue-t-elle une violation de brevet?*

Eli Lilly and Co. ("Eli Lilly") possédait les brevets canadiens relatifs à la nizatidine et à son procédé de fabrication. Elle seule détenait un avis de conformité (ADC) qui l'autorisait à produire et à mettre en marché le médicament sous certaines formes posologiques définitives. Novopharm détenait une licence obligatoire, délivrée en vertu de la *Loi sur les brevets* (la «Loi») en vigueur avant février 1993, qui l'autorisait à recourir au procédé breveté pour fabriquer de la nizatidine aux fins de la préparation ou de la production de médicaments, et d'importer et de vendre les médicaments obtenus grâce à ce procédé. La licence prévoyait qu'elle était incessible, interdisait à Novopharm d'accorder une sous-licence et conférait à Eli Lilly la faculté de l'annuler en cas de violation de ses conditions.

En prévision des modifications devant être apportées à la Loi en 1993, qui ont modifié radicalement la procédure de délivrance des ADC et aboli complètement le régime de licences obligatoires, Novopharm et Apotex ont conclu un «accord d'approvisionnement» en novembre 1992. Cet accord prévoyait que, lorsqu'une partie détenait, à l'égard d'un médicament breveté, une licence non détenue par l'autre partie, la partie titulaire de la licence se procurerait, à la demande et sur l'ordre de la partie non titulaire, certaines quantités de ce médicament et le fournirait à la partie non titulaire au prix coûtant auquel s'ajouterait une redevance de quatre pour cent. En avril 1993, Apotex s'est efforcée d'obtenir un ADC pour certaines formes posologiques définitives de nizatidine et a déposé un avis d'allégation («ADA») dans lequel elle prétendait qu'aucune revendication pour la nizatidine elle-même ou pour son utilisation ne serait contrefaite. À l'appui de cette allégation, Apotex invo-

Novopharm to supply it with nizatidine. However, Apotex also indicated that, because it did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

Eli Lilly and Eli Lilly Canada Inc. ("Eli Lilly Canada") brought an application (*Eli Lilly and Co. v. Apotex Inc.*, S.C.C., No. 25348 (*Apotex #1*)), under s. 6(1) of the *Patented Medicines (Notice of Compliance) Regulations* (the "Regulations"), for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under the amended *Patent Act*, would be the first date on which Apotex, without a NOC, would be entitled to import nizatidine for consumption in Canada. On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence, alleging that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. The Federal Court — Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence but nonetheless granted the prohibition order on the grounds that, because the reformulation of nizatidine for consumption in Canada would infringe Eli Lilly's patent, the NOA was not justified. The Federal Court of Appeal dismissed Apotex's appeal, but on the grounds that the agreement did constitute a sublicence.

In July 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to nizatidine and relied on its own compulsory licence as the basis for the non-infringement of the patents. Eli Lilly and Eli Lilly Canada brought an application before the Federal Court — Trial Division (*Eli Lilly and Co. v. Novopharm Ltd.*, S.C.C., No. 25402 (the *Novopharm* proceeding)), requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way. The application

quait la licence délivrée à Novopharm et l'«entente mutuelle» intervenue avec cette dernière. Le même jour, Apotex a signifié à Novopharm son intention de demander à cette dernière de lui fournir de la nizatidine. Cependant, Apotex a aussi indiqué que, parce qu'elle ne disposait toujours pas d'un ADC lui permettant de mettre en marché la nizatidine au Canada, elle ne pouvait pas donner à Novopharm les détails de ses exigences, mais qu'elle lui communiquerait en temps utile la quantité requise et l'identité du fabricant auquel la substance devrait être achetée.

Eli Lilly et Eli Lilly Canada Inc. ("Eli Lilly Canada") ont présenté, en application du par. 6(1) du *Règlement sur les médicaments brevetés (avis de conformité)* (le «Règlement»), une demande d'ordonnance (*Eli Lilly and Co. c. Apotex Inc.*, C.S.C., nº 25348 (*Apotex nº 1*)) interdisant au Ministre de délivrer un ADC à Apotex ou, subsidiairement, de le lui délivrer avant le 31 décembre 1997, soit dix ans après la délivrance de l'ADC à Eli Lilly Canada, qui, aux termes de la nouvelle *Loi sur les brevets*, représenterait la première date à laquelle Apotex aurait le droit, sans ADC, d'importer la nizatidine pour fins de consommation au Canada. Le 15 juillet 1993, Eli Lilly a voulu exercer sa faculté d'annuler la licence obligatoire de Novopharm pour le motif que Novopharm avait violé les conditions de la licence en accordant une sous-licence à Apotex. Novopharm a nié cette allégation, affirmant que l'accord commercial intervenu entre elle et Apotex ne constituait ni une sous-licence ni une cession de droits aux termes de la licence. La Cour fédérale, Section de première instance, a statué que l'accord d'approvisionnement entre Novopharm et Apotex n'était pas une sous-licence, mais a néanmoins accordé l'ordonnance d'interdiction en faisant valoir que, parce que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets d'Eli Lilly, l'ADA n'était pas fondé. La Cour d'appel fédérale a rejeté l'appel d'Apotex, mais pour le motif que l'accord en question constituait une sous-licence.

En juillet 1993, Novopharm a déposé un ADA à l'appui de sa propre demande d'ADC relativement à la nizatidine, et a invoqué sa propre licence obligatoire pour dire qu'il n'y avait pas eu de violation des brevets en cause. Eli Lilly et Eli Lilly Canada ont présenté à la Cour fédérale, Section de première instance, une demande d'ordonnance d'interdiction (*Eli Lilly and Co. c. Novopharm Ltd.*, C.S.C., nº 25402 (*Novopharm*)) visant à empêcher le Ministre de délivrer l'ADC demandé à Novopharm, pour le motif que la licence de cette dernière avait été annulée et que Novopharm ne pouvait donc pas obtenir le médicament en vrac d'une

was dismissed at trial but this decision was reversed by the Federal Court of Appeal.

The issue common to both appeals is whether the agreement between Apotex and Novopharm constituted a sublicence, such as to justify Eli Lilly's purported termination of Novopharm's compulsory licence. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. Each appeal also raises other discrete issues. Specifically, in the *Novopharm* proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in *Apotex #1* to the *Novopharm* appeal, whether as *res judicata* or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which the NOA proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In *Apotex #1*, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

*Held*: The appeals should be allowed.

A sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. By the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. Thus, for Novopharm to have granted a sublicence to Apotex, it must have granted, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence. This may have been accomplished either by virtue of some express provision or provisions of the agreement, or by virtue of its actual legal effect (even if this runs contrary to the subjective intentions of the parties).

The ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract. The contractual intent of the parties is to be determined by reference to the words they

manière n'emportant pas contrefaçon. La demande a été rejetée en première instance, mais cette décision a été infirmée par la Cour d'appel fédérale.

La question commune aux deux pourvois est de savoir si l'accord d'approvisionnement entre Apotex et Novopharm est une sous-licence, de manière à justifier l'annulation voulue par Eli Lilly de la licence obligatoire de Novopharm. Dans l'affirmative, les ADA déposés par Novopharm et Apotex n'étaient pas fondés et il y a lieu de rendre l'ordonnance d'interdiction demandée. Chaque pourvoi soulève également d'autres questions distinctes. Plus précisément, dans l'affaire *Novopharm*, notre Cour est appelée à décider (1) si la Cour d'appel fédérale a commis une erreur en appliquant à l'affaire *Novopharm* son arrêt *Apotex n° 1*, que ce soit à titre de chose jugée ou pour un autre motif, (2) si l'ADA de Novopharm était non fondé, peu importe que sa licence obligatoire ait ou non été annulée pour cause de violation, parce que la licence n'autorisait pas les activités proposées dans l'ADA, et (3) si la Cour fédérale avait compétence pour rendre un jugement déclaratoire dans le cadre d'une telle procédure de contrôle judiciaire limité. Dans *Apotex n° 1*, il est aussi allégué que, outre la question principale de la contrefaçon, la préparation sous forme posologique définitive proposée par Apotex constituerait elle-même une violation des brevets d'Eli Lilly et qu'il y a donc lieu de rendre une ordonnance d'interdiction peu importe que l'accord d'approvisionnement constitue ou non une sous-licence.

*Arrêt*: Les pourvois sont accueillis.

Une sous-licence représente l'attribution par le titulaire d'une licence de certains droits conférés par celle-ci à un tiers, le titulaire de la sous-licence. Par l'attribution d'une licence, le breveté accorde au titulaire de cette licence le droit d'agir d'une certaine façon relativement à l'article breveté, droit dont le titulaire de la licence ne jouirait pas sans celle-ci. Ainsi, pour que Novopharm ait accordé une sous-licence à Apotex, elle doit avoir, expressément ou implicitement, accordé à Apotex le droit de faire quelque chose qu'il lui aurait par ailleurs été interdit de faire et que Novopharm n'aurait été autorisée à faire qu'en vertu de sa licence obligatoire. Cela peut avoir été accompli soit en vertu d'une seule ou de plusieurs dispositions explicites de l'accord, soit en vertu de son effet juridique réel (même s'il est contraire aux intentions subjectives des parties).

L'interprétation du contrat devrait viser en définitive à vérifier l'intention véritable des parties au moment de conclure le contrat. L'intention des parties contractantes doit être déterminée en fonction des mots qu'elles ont

used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination. It is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. Here, there was no ambiguity to the contract entered into between Apotex and Novopharm and further interpretive aids were therefore unnecessary. The evidence as to the subjective intentions of the principals at the time of drafting was thus inadmissible by virtue of the parol evidence rule especially since it did not go to the circumstances surrounding the making of the contract.

Nothing in the wording of the document suggested that the parties intended to grant sublicences to each other. Rather, every indication was that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. While no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But there was no indication that Apotex acquired any other independent rights under the compulsory licence. In fact, such an interpretation would be inconsistent with the combined effect of certain express provisions of the agreement.

To prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed. The sale of a licensed article, while it does transfer to the purchaser the rights of use and alienation, does not have the automatic effect of constituting the purchaser a sublicensee; thus, the fact that a third party enjoys these rights cannot alone be indicative of the existence of a sublicence. Any number of ways exist in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. The rights of use and alienation can only be determinative of the existence of a sublicence where there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type. Where the rights of the unli-

employés en rédigeant le document, éventuellement interprétés à la lumière des circonstances du moment. La preuve de l'intention subjective d'une partie n'occupe aucune place indépendante dans cette décision. Il n'est pas nécessaire de prendre en considération quelque preuve extrinsèque que ce soit lorsque le document est, à première vue, clair et sans ambiguïté. En l'espèce, le contrat intervenu entre Apotex et Novopharm ne comportait aucune ambiguïté et aucun autre outil d'interprétation n'était donc nécessaire. La preuve relative aux intentions subjectives des mandants au moment de la rédaction était donc irrecevable en vertu de la règle d'exclusion de la preuve extrinsèque, étant donné, particulièrement, qu'elle ne touchait pas les circonstances de la signature du contrat.

Rien dans le texte du document ne laissait supposer que les parties voulaient s'accorder mutuellement des sous-licences. Tout indiquait au contraire qu'elles voulaient créer une entente commerciale en vertu de laquelle la partie non titulaire d'une licence aurait le droit de demander à la partie titulaire d'utiliser ses diverses licences à son profit pour acquérir, peut-être sur son ordre, divers médicaments brevetés, pour ensuite les lui revendre. Bien qu'il ne soit pas nécessaire de prévoir expressément la création d'une sous-licence, il est évident que, pour constituer une sous-licence, l'accord d'approvisionnement doit avoir cédé à Apotex davantage que le simple droit d'obliger Novopharm à utiliser sa licence d'une certaine manière. Cependant, rien n'indiquait qu'Apotex acquérait d'autres droits indépendants conférés par la licence obligatoire. En réalité, pareille interprétation serait incompatible avec l'effet conjugué de certaines dispositions explicites de l'accord.

Pour prouver l'existence d'une sous-licence, il faut établir que l'accord était, sur le plan du fond sinon de la forme, plus qu'une entente détaillée aux termes de laquelle de futurs contrats de vente pourraient être signés. Bien qu'elle transfère à l'acquéreur les droits d'utilisation et d'aliénation, la vente d'un article autorisé n'a pas automatiquement pour effet de faire de l'acheteur un titulaire de sous-licence; par conséquent, le fait qu'un tiers jouisse de ces droits ne saurait indiquer en soi l'existence d'une sous-licence. Il existe un certain nombre de manières dont le titulaire d'une licence peut vendre un article autorisé à un tiers avec l'éventail complet des attributs ordinaires de la propriété, sans pour autant faire de ce dernier un titulaire de sous-licence. Les droits d'utilisation et d'aliénation ne peuvent être déterminants quant à l'existence d'une sous-licence que lorsqu'il n'y a eu aucune vente au tiers de l'article autorisé. En pareil cas, un droit d'utilisation ne pourrait

ELI LILLY & CO. *v.* NOVOPHARM LTD.

censed party are derived from a sale of licensed material, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted. This situation was plainly contemplated by the supply agreement here, under which the only way Apotex could acquire bulk nizatidine was by purchasing it from Novopharm, not directly from Novopharm's supplier.

Further, because legitimate transfers were to take place between separate entities, dealing at arm's length, the contemplated transactions could not be characterized, *ex ante*, as shams. While it was theoretically possible that the agreement could be implemented in an infringing way, it had not yet been implemented at all and thus any suggestion of infringement was speculative. The agreement did not, on its face or in its actual legal effect, amount to a sublicence.

The degree of control likely to be exercised by Apotex over the acquisition of nizatidine would not result in a situation where Novopharm in reality would be acting as Apotex's agent. Nor would Novopharm, because of its allegedly standing in the shoes of Apotex, become an unlicensed entity. Under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations.

Given that the agreement was properly characterized as a supply agreement and given that the agreement had not been implemented at the material time, it was not necessary to decide if the Federal Court of Appeal erred in applying its decision in *Apotex #1* to its decision in *Novopharm*.

Since the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued (see *Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare*, S.C.C., No. 25419 (*Apotex #2*)), Novopharm's NOA was not premature and therefore unjustified. Pursuant to s. 39.14 of the *Patent Act*, it was entitled to manufacture the medicine

découler que d'une sous-licence quelconque. Quand les droits de la partie non titulaire d'une licence découlent de la vente d'une substance autorisée, il serait trompeur de se fonder sur les droits d'utilisation et d'aliénation pour conclure qu'une sous-licence a été ou va être accordée. En l'espèce, cette situation était nettement envisagée par l'accord d'approvisionnement aux termes duquel la seule façon dont Apotex pouvait acquérir de la nizatidine en vrac était auprès de Novopharm et non pas directement auprès du fournisseur de Novopharm.

En outre, parce que des cessions légitimes devaient avoir lieu entre des entités distinctes qui n'avaient entre elles aucun lien de dépendance, les opérations envisagées ne pouvaient pas être qualifiées *ex ante* de subterfuges. S'il était théoriquement possible que l'accord soit exécuté d'une manière emportant contrefaçon, il n'avait toujours pas été exécuté et toute proposition selon laquelle il y avait contrefaçon était conjecturale. Cet accord ne constituait une sous-licence ni à première vue ni en vertu de son effet juridique réel.

Le contrôle qu'Apotex exercerait vraisemblablement sur l'acquisition de nizatidine ne ferait pas en sorte que Novopharm se trouverait, en réalité, à agir en qualité de mandataire d'Apotex. Novopharm ne deviendrait pas non plus une entité non titulaire d'une licence parce qu'elle semblerait avoir pris la place d'Apotex. Aux termes de l'accord d'approvisionnement tout rapport contractuel qui pourrait être établi pour l'achat de nizatidine serait entre Novopharm et le tiers fournisseur. Apotex ne serait pas partie au contrat; Novopharm ne conclurait pas le contrat «pour le compte» d'Apotex de quelque manière que ce soit. L'idée qu'un mandataire établisse un rapport contractuel avec le tiers va à l'encontre du concept même de mandat, qui suppose que le mandataire lie le mandant et ne se lie pas lui-même par des rapports et des obligations contractuels.

Étant donné que l'accord a été qualifié à juste titre d'accord d'approvisionnement et qu'il n'avait pas été exécuté à l'époque pertinente, il n'était pas nécessaire de décider si la Cour d'appel fédérale a commis une erreur en appliquant son arrêt *Apotex n° 1* à l'affaire *Novopharm*.

Puisque la date appropriée pour évaluer un ADA, lorsqu'une ordonnance d'interdiction est demandée par le breveté, est celle de l'audition et non celle du dépôt de l'ADA (voir *Merck Frosst Canada Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)*, C.S.C., n° 25419 (*Apotex n° 2*)), l'ADA de Novopharm n'était pas prématuré et n'était donc pas non fondé. Selon l'art. 39.14 de la *Loi sur les brevets*, Novopharm

itself or through Canadian agents seven years after the date of the issue of the first NOC to Eli Lilly Canada. As this seven-year period had expired before the date the application was heard, Novopharm was entitled, as of the date of hearing, to manufacture or have made the drug for its own use, for sale for consumption in Canada. The NOA did not specify that the nizatidine was to be imported and not produced in Canada, and so, at the date of hearing, there existed at least one non-infringing way for Apotex to obtain the necessary medicine.

In light of its other findings, it was not necessary for the Court to grant declaratory relief to the effect that Eli Lilly failed to show either that the NOA was not justified, or that it was entitled to terminate the compulsory licence. Moreover, in light of the limited nature of these judicial review proceedings, it would be inappropriate for this Court to declare conclusively, and for purposes other than those of these appeals, that the supply agreement did not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex. Accordingly, the requested declaratory relief was denied.

Absent express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he or she sees fit, so long as such dealings do not infringe the rights conferred by the patent. The reformulation of nizatidine into final-dosage form would not have the effect of creating a new article, such as to infringe Eli Lilly's patent. Rather, reformulation is more akin to repackaging the substance into a commercially usable form, which is not a violation of any rights under the patents. The right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, encompasses the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. This is, in reality, the only practical use of bulk medicine in the hands of a purchaser, which may explain why reformulation was implicitly contemplated by the compulsory licence held by Novopharm. Apotex therefore would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right. Thus, in the absence of some express prohibition in the compulsory licence, the right to reformulate should be seen as inherent to the

aurait le droit de fabriquer le médicament elle-même ou par l'intermédiaire de mandataires canadiens sept ans après la date de délivrance du premier ADC à Eli Lilly Canada. Vu que ce délai de sept ans avait expiré avant la date d'audition de la demande, Novopharm avait, à la date de l'audition, le droit de fabriquer ou de faire fabriquer le médicament pour son propre usage, dans le but de le vendre à des fins de consommation au Canada. L'ADA ne précisait pas que la nizatidine devait être importée et non produite au Canada et ainsi, à la date de l'audition, Apotex disposait d'au moins un moyen n'emportant pas contrefaçon d'obtenir le médicament requis.

Compte tenu de ses autres conclusions, il n'était pas nécessaire à la Cour d'accorder un jugement déclarant qu'Eli Lilly n'avait pas démontré que l'ADA n'était pas fondé ou qu'elle avait le droit d'annuler la licence obligatoire. En outre, en raison de la nature limitée des présentes procédures de contrôle judiciaire, il ne conviendrait pas que notre Cour déclare péremptoirement, et à des fins autres que celles des présents pourvois, que l'accord d'approvisionnement ne constituait ni une sous-licence ni une cession de la licence obligatoire de Novopharm à Apotex. En conséquence, le jugement déclaratoire demandé a été refusé.

En l'absence de conditions contraires expresses, l'acheteur d'un article autorisé a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet. La préparation de la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer un nouvel article de manière à violer le brevet d'Eli Lilly. La préparation sous une autre forme s'apparente plutôt davantage à un nouveau conditionnement de la substance sous une forme commercialement utilisable, ce qui ne viole aucun droit conféré par les brevets. Le droit d'utilisation et de vente qui est inhérent à l'acquisition par Apotex de la nizatidine de Novopharm englobe le droit d'utiliser et de vendre les choses produites au moyen de cette nizatidine, y compris les gélules sous forme posologique définitive. Cela représente, en réalité, le seul usage pratique qu'un acheteur peut faire du médicament en vrac, ce qui peut expliquer pourquoi la préparation sous une autre forme était implicitement envisagée par la licence obligatoire de Novopharm. Apotex ne violerait donc pas les brevets d'Eli Lilly simplement en vendant le médicament sous la forme envisagée par l'ADA. Cela est particulièrement vrai lorsque les droits exclusifs conférés au breveté par le brevet sont limités essentiellement à la préparation du médicament en vrac suivant le procédé breveté. Le procédé de préparation sous une autre forme ne peut aucunement être considéré comme violant ce droit. Ainsi, en

purchaser's right to deal with licensed material as he or she sees fit. Eli Lilly accordingly failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

l'absence de quelque interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance autorisée. En conséquence, malgré ses divers efforts en ce sens, Eli Lilly n'a pas réussi à établir que l'ADA d'Apotex n'était pas fondé et qu'il y avait donc lieu de rendre une ordonnance d'interdiction.

## Cases Cited

**Distinguished:** *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 227 USPQ 233 (1985); **referred to:** *Apotex Inc. v. Merck Frosst Canada Inc.*, [1998] 2 S.C.R. 193; *Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare)* (1997), 75 C.P.R. (3d) 129; *David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.*, [1995] 1 F.C. 588; *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888; *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, rev'd in part [1995] 2 F.C. 723; *Carey v. United States*, 326 F.2d 975 (1964); *Howard and Bullough, Ld. v. Tweedales and Smalley* (1895), 12 R.P.C. 519; *Lampson v. City of Quebec* (1920), 54 D.L.R. 344; *Joy Oil Co. v. The King*, [1951] S.C.R. 624; *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497; *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605; *Gillette v. Rea* (1909), 1 O.W.N. 448; *Betts v. Willmott* (1871), L.R. 6 Ch. App. 245; *Intel Corp. v. ULSI System Technology Inc.*, 995 F.2d 1566 (1993); *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (1996); *Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare)* (1994), 55 C.P.R. (3d) 302; *National Phonograph Co. of Australia, Ltd. v. Menck*, [1911] A.C. 336; *Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd.*, [1970] S.C.R. 833, aff'g [1969] 1 Ex. C.R. 529; *Rucker Co. v. Gavel's Vulcanizing Co.* (1985), 7 C.P.R. (3d) 294.

## Jurisprudence

**Distinction d'avec l'arrêt:** *E.I. du Pont de Nemours & Co. c. Shell Oil Co.*, 227 USPQ 233 (1985); **arrêts mentionnés:** *Apotex Inc. c. Merck Frosst Canada Inc.*, [1998] 2 R.C.S. 193; *Glaxo Wellcome Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1997), 75 C.P.R. (3d) 129; *David Bull Laboratories (Canada) Inc. c. Pharmacia Inc.*, [1995] 1 C.F. 588; *Exportations Consolidated Bathurst Ltée c. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 R.C.S. 888; *Merck & Co. c. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, inf. en partie par [1995] 2 C.F. 723; *Carey c. United States*, 326 F.2d 975 (1964); *Howard and Bullough, Ld. c. Tweedales and Smalley* (1895), 12 R.P.C. 519; *Joy Oil Co. c. The King*, [1951] R.C.S. 624; *Indian Molybdenum Ltd. c. The King*, [1951] 3 D.L.R. 497; *Badische Anilin und Soda Fabrik c. Isler*, [1906] 1 Ch. 605; *Gillette c. Rea* (1909), 1 O.W.N. 448; *Betts c. Willmott* (1871), L.R. 6 Ch. App. 245; *Intel Corp. c. ULSI System Technology Inc.*, 995 F.2d 1566 (1993); *Cyrix Corp. c. Intel Corp.*, 77 F.3d 1381 (1996); *Merck Frosst Canada Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1994), 55 C.P.R. (3d) 302; *National Phonograph Co. of Australia, Ltd. c. Menck*, [1911] A.C. 336; *Libbey-Owens-Ford Glass Co. c. Ford Motor Co. of Canada, Ltd.*, [1970] R.C.S. 833, conf. [1969] 1 R.C. de l'É. 529; *Rucker Co. c. Gavel's Vulcanizing Co.* (1985), 7 C.P.R. (3d) 294.

## Statutes and Regulations Cited

*Food and Drug Regulations*, C.R.C., c. 870, s. C.08.004.
*Patent Act*, R.S.C., 1985, c. P-4, s. 39(4), 39.11 [ad. c. 33 (3rd Supp.), s. 15], 39.14 [*idem*].
*Patent Act Amendment Act, 1992*, S.C. 1993, c. 2, s. 11(1).
*Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133, ss. 4(1), 5, 6, 7.

## Lois et règlements cités

*Loi de 1992 modifiant la Loi sur les brevets*, L.C. 1993, ch. 2, art. 11(1).
*Loi sur les brevets*, L.R.C. (1985), ch. P-4, art. 39(4), 39.11 [aj. ch. 33 (3e suppl.), art. 15], 39.14 [*idem*].
*Règlement sur les aliments et drogues*, C.R.C., ch. 870, art. C.08.004.
*Règlement sur les médicaments brevetés (avis de conformité)*, DORS/93-133, art. 4(1), 5, 6, 7.

**Authors Cited**

Fox, Harold G. *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. Toronto: Carswell, 1969.

Fridman, G. H. L. *The Law of Contract in Canada*, 3rd ed. Scarborough, Ont.: Carswell, 1994.

Melville, Leslie W. *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1, 3rd ed. rev. New York: West Group, 1997 (loose-leaf updated August 1997, release 29).

APPEAL (*Eli Lilly and Co. v. Novopharm Ltd.*, S.C.C., No. 25402) from a judgment of the Federal Court of Appeal (1996), 67 C.P.R. (3d) 377, 197 N.R. 291, [1996] F.C.J. No. 576 (QL), allowing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 181, 91 F.T.R. 161, [1995] F.C.J. No. 238 (QL), granting an application for judicial review and prohibiting the Minister from issuing a notice of compliance. Appeal allowed.

APPEAL (*Eli Lilly and Co. v. Apotex Inc.*, S.C.C., No. 25348) from a judgment of the Federal Court of Appeal (1996), 66 C.P.R. (3d) 329, 195 N.R. 378, [1996] F.C.J. No. 425 (QL), dismissing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 206, 91 F.T.R. 181, [1995] F.C.J. No. 237 (QL), dismissing an application for judicial review. Appeal allowed.

*Harry B. Radomski*, *Richard Naiberg* and *David Scrimger*, for the appellant Apotex Inc.

*Donald N. Plumley*, *Q.C.*, *Mark Mitchell* and *Stephanie Chong*, for the appellant Novopharm Limited.

*Anthony G. Creber* and *David Watson*, *Q.C.*, for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

The judgment of the Court was delivered by

IACOBUCCI J. — A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation

**Doctrine citée**

Fox, Harold G. *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. Toronto: Carswell, 1969.

Fridman, G. H. L. *The Law of Contract in Canada*, 3rd ed. Scarborough, Ont.: Carswell, 1994.

Melville, Leslie W. *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1, 3rd ed. rev. New York: West Group, 1997 (loose-leaf updated August 1997, release 29).

POURVOI (*Eli Lilly and Co. c. Novopharm Ltd.*, C.S.C., nº 25402) contre un arrêt de la Cour d'appel fédérale (1996), 67 C.P.R. (3d) 377, 197 N.R. 291, [1996] A.C.F. nº 576 (QL), qui a accueilli l'appel d'un jugement du juge McGillis (1995), 60 C.P.R. (3d) 181, 91 F.T.R. 161, [1995] A.C.F. nº 238 (QL), qui avait fait droit à une demande de contrôle judiciaire et interdit au Ministre de délivrer un avis de conformité. Pourvoi accueilli.

POURVOI (*Eli Lilly and Co. c. Apotex Inc.*, C.S.C., nº 25348) contre un arrêt de la Cour d'appel fédérale (1996), 66 C.P.R. (3d) 329, 195 N.R. 378, [1996] A.C.F. nº 425 (QL), qui a rejeté l'appel d'un jugement du juge McGillis (1995), 60 C.P.R. (3d) 206, 91 F.T.R. 181, [1995] A.C.F. nº 237 (QL), qui avait rejeté une demande de contrôle judiciaire. Pourvoi accueilli.

*Harry B. Radomski*, *Richard Naiberg* et *David Scrimger*, pour l'appelante Apotex Inc.

*Donald N. Plumley*, *c.r.*, *Mark Mitchell* et *Stephanie Chong*, pour l'appelante Novopharm Limited.

*Anthony G. Creber* et *David Watson*, *c.r.*, pour les intimées Eli Lilly and Company et Eli Lilly Canada Inc.

Version française du jugement de la Cour rendu par

LE JUGE IACOBUCCI — Un seul et même accord intervenu entre Novopharm Limited («Novopharm») et Apotex Inc. («Apotex»), des concurrents dans l'industrie pharmaceutique, est à l'ori-

resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "*Novopharm*" and "*Apotex #1*", reasons in *Apotex Inc. v. Merck Frosst Canada Inc.*, [1998] 2 S.C.R. 193 ("*Apotex #2*"), are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

2     Owing to the intertwining nature of the lower court decisions in *Novopharm* and *Apotex #1*, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

I. Background

A. *The Patents and the Compulsory Licence*

3     Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the *Patent Act*, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

gine d'une litige ayant entraîné pas moins de trois pourvois devant notre Cour. Outre les deux présents pourvois, que je vais appeler «*Novopharm*» et «*Apotex n° 1*», des motifs sont également déposés aujourd'hui dans l'affaire *Apotex Inc. c. Merck Frosst Canada Inc.*, [1998] 2 R.C.S. 193 («*Apotex n° 2*»). La question litigieuse commune aux trois pourvois est de savoir si l'accord en cause est un simple accord d'approvisionnement, comme le prétendent les deux parties qui l'ont signé, ou s'il s'agit, comme l'allèguent les divers intimés, d'une sous-licence permettant d'exercer les droits que Novopharm a acquis en vertu de licences obligatoires obtenues avant les récentes modifications apportées au régime législatif applicable aux médicaments brevetés. La décision à ce sujet est la clef de la solution des questions en litige dans ces pourvois parce que, comme nous le verrons, l'attribution d'une sous-licence par Novopharm pourrait justifier l'annulation, par le breveté, de la licence obligatoire en cause et rendre inutile l'accord d'approvisionnement.

     Comme les décisions des tribunaux d'instance inférieure dans les affaires *Novopharm* et *Apotex n° 1* se recoupent, je vais statuer sur ces deux pourvois dans les mêmes motifs. Outre la question commune d'interprétation, chacun de ces pourvois soulève un certain nombre d'autres questions que je vais m'efforcer de régler de manière appropriée au fur et à mesure qu'elles se présenteront.

I. Contexte

A. *Les brevets et la licence obligatoire*

     Avant février 1993, il y avait, au Canada, un régime de licences obligatoires applicable aux brevets portant sur des médicaments. Aux termes du par. 39(4) de la *Loi sur les brevets*, L.R.C. (1985), ch. P-4, en vigueur à l'époque, une personne pouvait présenter une demande de licence à l'égard d'un brevet portant sur une invention destinée à des médicaments ou à la préparation ou à la production de médicaments, ou susceptible d'être utilisée à de telles fins:

**39.** . . .

(4) . . .

(*a*) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or

(*b*) where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of medicine. . . .

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the *Food and Drug Regulations*, C.R.C., c. 870, thereby permitting Eli Lilly Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

On January 17, 1990, Novopharm applied under s. 39(4) of the *Patent Act* for a compulsory licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of

**39.** . . .

(4) . . .

*a*) lorsque l'invention consiste en un procédé, utiliser l'invention pour la préparation ou la production de médicaments, importer tout médicament dans la préparation ou la production duquel l'invention a été utilisée ou vendre tout médicament dans la préparation ou la production duquel l'invention a été utilisée;

*b*) lorsque l'invention consiste en autre chose qu'un procédé, importer, fabriquer, utiliser ou vendre l'invention pour des médicaments ou pour la préparation ou la production de médicaments . . .

Selon le par. 39(4), le commissaire aux brevets était tenu d'accorder au requérant ou demandeur une licence pour faire les choses spécifiées dans la demande, sauf s'il avait de bonnes raisons de ne pas accorder une telle licence.

Les présents pourvois concernent les deux brevets canadiens relatifs au médicament nizatidine, que possède Eli Lilly and Company («Eli Lilly»): l'un pour le médicament lui-même, l'autre pour le procédé de fabrication du médicament. Le 31 décembre 1987, le ministère de la Santé nationale et du Bien-être social a délivré un avis de conformité («ADC») à Eli Lilly Canada Inc. («Eli Lilly Canada»), conformément à l'art. C.08.004 du *Règlement sur les aliments et drogues*, C.R.C., ch. 870, autorisant ainsi Eli Lilly Canada à mettre en marché pour fins de consommation au Canada des gélules de nizatidine sous forme posologique définitive de 150 mg et de 300 mg. Jusqu'à maintenant, aucune autre société n'a obtenu un ADC à l'égard de la nizatidine.

Le 17 janvier 1990, Novopharm a présenté, conformément au par. 39(4) de la *Loi sur les brevets*, une demande de licence obligatoire en vertu des brevets d'Eli Lilly. La demande a été vigoureusement contestée par Eli Lilly, mais il a été jugé qu'aucune des objections soulevées ne représentait une raison valable de rejeter la demande et le commissaire aux brevets a donc accordé la licence, comme la Loi l'obligeait à le faire à l'époque. La licence, qui est toujours en vigueur, à moins d'être annulée validement par Eli Lilly (point fort controversé dans les présents pourvois), permet à Novopharm de recourir au procédé breveté pour fabri-

4

5

medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final-dosage form is fixed at six percent of the selling price. The Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence".

6     Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final-dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final-dosage form, and any subsequent non-arm's length purchasers from the latter.

7     Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and

quer de la nizatidine aux fins de la préparation ou de la production de médicaments, et d'importer et de vendre les médicaments obtenus grâce à ce procédé. Elle autorise également Novopharm à fabriquer, utiliser, vendre et importer l'invention pour des médicaments de même que l'invention pour la préparation ou la production de médicaments. La redevance due par Novopharm à Eli Lilly Canada pour la vente du médicament sous forme posologique définitive est fixée à six pour cent du prix de vente. Dans une décision en date du 21 octobre 1991, le commissaire aux brevets a conclu que la licence ne se limite pas aux formes de médicament énumérées par Novopharm dans sa demande, étant donné que [**TRADUCTION**] «cela restreindrait indûment les activités [de Novopharm] en vertu de la licence».

Certaines autres modalités particulières de la licence sont aussi pertinentes. L'article 1 énonce les modalités de calcul de la redevance pour les ventes de nizatidine à des acquéreurs sans lien de dépendance et prévoit la vente par Novopharm du médicament sous forme posologique définitive et en vrac, fixant le taux de la redevance pour l'une et l'autre forme. Aux termes des articles 3 et 4, Novopharm est aussi obligée de se procurer des états trimestriels qui donnent la description, la quantité, le prix de vente net et les montants de redevance découlant des activités des acquéreurs, sans lien de dépendance, du médicament, des acquéreurs, avec lien de dépendance, du médicament sous forme posologique définitive et de tout acquéreur subséquent ayant un lien de dépendance avec ces derniers.

L'article 9 de la licence, qui revêt une importance primordiale en l'espèce, confère à Eli Lilly la faculté d'annuler la licence par préavis écrit, dans le cas où Novopharm en violerait les conditions. Si jamais Novopharm ne remédie pas à la violation dans un délai de 30 jours, la licence est annulée automatiquement. Toutefois, suivant l'article 10, si Novopharm conteste l'existence de la violation au moyen d'un avis écrit à Eli Lilly, la licence demeure en vigueur en attendant qu'une décision soit prise par une cour de justice ou à la suite d'une procédure d'arbitrage convenue par les parties.

that Novopharm is prohibited from granting "any sublicence".

### B. *The Supply Agreement Between Novopharm and Apotex*

On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the *Patent Act*, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,

AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:

Finalement, l'article 12 prévoit que la licence est incessible et qu'il est interdit à Novopharm d'accorder [TRADUCTION] «une sous-licence».

### B. *L'accord d'approvisionnement entre Novopharm et Apotex*

Le 27 novembre 1992, Novopharm et Apotex ont conclu ce qu'elles ont appelé un «accord d'approvisionnement» en prévision des modifications proposées à la *Loi sur les brevets* dans le projet de loi C-91. On s'attendait à ce que, s'il était adopté, ce projet de loi éliminerait le régime de licences obligatoires alors existant et compromettrait les licences existantes et les demandes de licence des deux sociétés. Le président d'Apotex, Bernard Sherman, et le président de Novopharm, Leslie Dan, ont rédigé l'accord sans recourir, semble-t-il, aux services d'un conseiller juridique. Voici le texte de cet accord:

[TRADUCTION] ATTENDU QUE le gouvernement fédéral a déposé le projet de loi C-91 qui, s'il est adopté, aura pour effet de supprimer l'octroi de licences obligatoires aux termes de la Loi sur les brevets;

ATTENDU QU'Apotex et Novopharm sont titulaires de différentes licences et qu'elles ont présenté différentes demandes de licence qui sont compromises par le projet de loi C-91;

ATTENDU QUE, selon les dates limites qui s'appliqueront une fois la version finale du projet de loi C-91 adoptée, il est prévu que chacune des parties aux présentes pourra détenir des licences valides à l'égard de certains produits, à l'exclusion de l'autre, plus de précisions ne pouvant actuellement être données à ce sujet;

ATTENDU QUE, dans leur intérêt commun face aux autres concurrents, les parties souhaitent prendre des mesures afin de pouvoir utiliser des licences visant le plus de produits possible;

ATTENDU QUE les parties ont convenu de partager leurs droits aux termes de licences à l'égard de tout produit pour lequel une seule d'entre elles détient une licence utilisable.

En contrepartie de ce qui précède, des engagements pris de part et d'autre et par ailleurs à titre onéreux, LES PARTIES AUX PRÉSENTES CONVIENNENT DE CE QUI SUIT:

8

1. At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2. In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3. In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4. In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5. In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

   Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

1. À tout moment après l'adoption et la proclamation du projet de loi C-91 ou de tout projet de loi qui en découle, pour tout produit à l'égard duquel une partie (ci-après la «partie titulaire d'une licence») détient une licence utilisable et l'autre partie (ci-après la «partie non titulaire») n'en détient pas, la partie titulaire d'une licence, à la demande de la partie non titulaire, utilise sa licence au bénéfice de cette dernière suivant les modalités énoncées aux présentes.

2. Dans le cas d'une licence d'importation, la partie titulaire d'une licence se conforme aux instructions de la partie non titulaire quant à la source, à la quantité et aux conditions de l'importation et revend la marchandise importée à la partie non titulaire au prix coûtant majoré de la redevance payable aux termes de la licence.

3. Dans le cas d'une licence de fabrication au Canada, la partie titulaire d'une licence conclut des contrats avec des fabricants canadiens de produits chimiques selon les instructions de la partie non titulaire pour la fabrication de la substance en cause et vend les substances fabriquées à la partie non titulaire au prix coûtant majoré de la redevance payable aux termes de la licence.

4. Lorsque la partie titulaire d'une licence dispose d'une source d'importation de la substance ou si elle fabrique cette substance en application d'une licence de fabrication et que la partie non titulaire ne peut trouver une autre source d'importation de la substance ou un endroit où prendre des arrangements pour la fabrication de celle-ci, la partie titulaire d'une licence fournit la substance à la partie non titulaire à partir de la source dont elle dispose, à un prix égal au juste prix de la substance sur le marché, majoré de la redevance due aux termes de la licence. Tout désaccord concernant le juste prix du marché est réglé par voie d'arbitrage obligatoire.

5. En sus des paiements exigés aux articles 2, 3 et 4, la partie non titulaire verse à la partie titulaire d'une licence des droits équivalant à 4 % de ses ventes nettes d'un produit acheté à cette dernière et couvert par un brevet non expiré visé par la licence de la partie titulaire d'une licence.

   Au plus tard 60 jours après l'expiration d'un trimestre, la partie non titulaire remet à la partie titulaire d'une licence les droits payables sur les ventes réalisées au cours du trimestre précédent ainsi que des états vérifiés par un vérificateur indépendant qui précisent les quantités vendues, les ventes nettes en dollars et les droits exigibles à leur égard.

6. The licensed party shall comply with the terms of the licence.

7. The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence has remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8. For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9. The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10. Neither party will engage in preventing or blocking the accessability [*sic*] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11. This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

12. Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licence [*sic*] prior to December 20, 1991, then this agreement shall be terminated.

13. Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994, advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

    On February 15, 1993, most of the provisions of the *Patent Act Amendment Act, 1992*, S.C. 1993,

6. La partie titulaire d'une licence se conforme aux conditions de la licence.

7. La partie titulaire d'une licence n'est pas dispensée d'accomplir un acte conformément aux instructions données par la partie non titulaire en application des articles 2, 3 ou 4 pour le motif qu'un doute subsiste quant à savoir si la licence est toujours valide ou permet l'acte en question, non plus que sur le fondement d'une contestation, actuelle ou éventuelle, de la part du breveté, dans la mesure où la partie non titulaire s'engage à assurer la défense de la partie titulaire d'une licence dans le cadre de toute poursuite judiciaire intentée contre celle-ci en raison de l'acte accompli et à la dédommager des frais de justice qu'elle engage et des dommages-intérêts auxquels elle est condamnée.

8. Il est entendu que les articles qui précèdent ne sont pas limitatifs et que la partie titulaire d'une licence collabore pleinement avec la partie non titulaire et se conforme aux instructions de cette dernière afin de lui permettre d'utiliser la licence tout comme si elle en était elle-même titulaire, dans la mesure où la partie titulaire d'une licence est protégée quant aux actes ainsi accomplis.

9. La partie non titulaire revend tout produit acheté à la partie titulaire d'une licence uniquement sous sa propre étiquette et elle s'interdit de vendre le produit en vue de sa revente sous une autre étiquette que la sienne.

10. Les parties s'abstiennent de faire obstacle à l'obtention d'une autorisation de la DGPS visant toute substance à l'état brut relative à des produits pharmaceutiques existants ou ultérieurs.

11. Le présent accord expire le 31 décembre 1994, sauf prorogation avec le consentement des parties.

12. Malgré l'article 11, si le projet de loi C-91 est adopté à l'issue d'un amendement qui permet aux sociétés de continuer de demander et d'obtenir des licences obligatoires à l'égard de tout produit pour lequel une licence a été délivrée à un ou plusieurs titulaires avant le 20 décembre 1991, le présent accord est résilié.

13. Malgré l'article 11, en ce qui concerne toute licence particulière à l'égard de laquelle la partie non titulaire informe la partie titulaire d'une licence, au plus tard le 31 décembre 1994, de son intention d'utiliser cette licence, le présent accord demeure en vigueur jusqu'à l'expiration du dernier brevet visé par cette licence.

    Le 15 février 1993, la plupart des dispositions de la *Loi de 1992 modifiant la Loi sur les brevets*, 9

c. 2, were proclaimed into force. On March 12, 1993, the *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133 (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in *Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare)* (1997), 75 C.P.R. (3d) 129 (F.C.T.D.), at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the *Food and Drug Regulations*, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the *Patent Act Amendment Act, 1992*, . . . (the "*Patent Act*") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the *Regulations*.

.    .    .

In effect, under Subsection 5(3) of the *Regulations*, in a "Notice of Allegation", the generic drug manufacturer, "the second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the

L.C. (1993), ch. 2, sont entrées en vigueur par proclamation. Le 12 mars 1993, le *Règlement sur les médicaments brevetés (avis de conformité)*, DORS/93-133 (le «Règlement»), est entré en vigueur et a modifié radicalement la procédure régissant la délivrance des ADC en renforçant le monopole exercé par le breveté, en abolissant le régime de licences obligatoires et en réduisant la capacité des fabricants de médicaments génériques d'obtenir l'autorisation de mettre en marché un médicament breveté avant l'expiration de tous les brevets pertinents visant un produit et une utilisation. Le nouveau régime d'ADC est résumé avec clarté dans l'extrait suivant des motifs rédigés par le juge Teitelbaum dans l'affaire *Glaxo Wellcome Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1997), 75 C.P.R. (3d) 129 (C.F. 1re inst.), aux pp. 131 et 132:

Le ministre délivre un avis de conformité, lequel autorise officiellement la vente d'un médicament, après que le fabricant de ce médicament a rempli deux conditions. La première condition concerne la sécurité et l'efficacité générales du médicament (voir l'article C.08.004 du *Règlement sur les aliments et drogues*, C.R.C. 1978, ch. 870). La seconde condition concerne la non-infraction par le fabricant du médicament de certains brevets incorporés dans le médicament. Cette seconde condition plutôt inattendue qui se rapporte au brevet a été créée après que des changements eurent été apportés au régime d'octroi de licences obligatoires. Auparavant, le fabricant de médicaments génériques qui détenait une licence obligatoire pouvait obtenir du breveté la fourniture sous licence d'une certaine quantité d'un médicament breveté. La procédure de délivrance de l'avis de conformité ne se préoccupait alors pas de questions de contrefaçon de brevet. Toutefois, par suite de l'abolition du régime d'octroi de licences obligatoires décrétée par la *Loi de 1992 modifiant la loi sur les brevets* [. . .] (la «*Loi sur les brevets*»), le régime d'obtention d'un avis de conformité a également été modifié. Les fabricants de médicaments génériques qui cherchent à obtenir un avis de conformité doivent maintenant déposer ce qu'on appelle un avis d'allégation, conformément à l'article 5 du *Règlement*.

.    .    .

De fait, aux termes du paragraphe 5(3) du *Règlement*, dans un «avis d'allégation», le fabricant du médicament générique, «la seconde personne», indique qu'il respecte les brevets incorporés dans le médicament qu'il

*Regulations*, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or the use of the medicine. Under Section 3 of the *Regulations*, the Minister compiles the patent lists into a public document called the "Patent Register".

As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(*b*) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased. Although Apotex did apparently locate a source for the nizatidine, it

fabrique. Aux termes de l'article 4 du *Règlement*, le propriétaire du brevet ou le titulaire d'une licence, habituellement le fabricant d'un médicament d'origine comme les requérantes, soumet une liste des brevets qui comportent des revendications pour le médicament en soi ou des revendications pour l'utilisation du médicament. Aux termes de l'article 3 du *Règlement*, le ministre inscrit les listes de brevets dans un registre public appelé «registre des brevets».

Conformément au par. 4(1) du nouveau règlement, Eli Lilly Canada a soumis au ministre de la Santé nationale et du Bien-être social une liste de brevets, en date du 6 avril 1993, qui incluait les brevets relatifs à la nizatidine pour laquelle un ADC lui avait été délivré. [10]

Apotex s'est efforcée d'obtenir un ADC fondé sur le nouveau régime pour les gélules de 150 mg et de 300 mg de nizatidine, et a donc fait parvenir à Eli Lilly Canada une lettre datée du 28 avril 1993, qui constituait un avis d'allégation («ADA») au sens de l'al. 5(3)*b*) du Règlement. Dans cet ADA, Apotex prétendait qu'aucune revendication pour le médicament breveté lui-même ou pour l'utilisation du médicament ne serait contrefaite advenant l'utilisation, la fabrication, la construction ou la vente par elle des gélules de nizatidine en cause. À l'appui de cette allégation, Apotex invoquait la licence délivrée à Novopharm pour la nizatidine et l'«entente mutuelle» aux termes de laquelle Novopharm, la titulaire de la licence, fournirait à Apotex les substances à l'état brut obtenues en vertu de sa licence. Apotex a précisé qu'elle avait avisé Novopharm de son intention d'obtenir la nizatidine et s'est engagée à s'abstenir d'obtenir, d'utiliser ou de vendre de la nizatidine ne provenant pas de Novopharm, jusqu'à l'expiration des brevets. [11]

Dans la lettre d'intention mentionnée, elle aussi datée du 28 avril 1993, il était indiqué que, comme Apotex ne disposait toujours pas d'un ADC lui permettant de mettre en marché la nizatidine au Canada, elle ne pouvait pas donner à Novopharm les détails de ses exigences, mais qu'elle lui communiquerait en temps utile la quantité requise et l'identité du fabricant auquel la substance devrait être achetée. Bien qu'Apotex ait apparemment [12]

had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

13    Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the *Patent Act*, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in *Apotex #1*, upon which I shall elaborate shortly.

14    On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

C. *The Novopharm Proceeding*

15    On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court — Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and

trouvé une source pour la nizatidine, elle n'en avait pas communiqué l'identité à Novopharm à la date de l'audition du présent pourvoi, et la preuve est demeurée sous scellés en tant que renseignement confidentiel.

Eli Lilly et Eli Lilly Canada ont présenté, en application du par. 6(1) du Règlement, une demande d'ordonnance interdisant au Ministre de délivrer un ADC à Apotex ou, subsidiairement, de le lui délivrer avant le 31 décembre 1997, soit dix ans après la délivrance de l'ADC à Eli Lilly Canada, qui, aux termes de l'art. 39.11 de la *Loi sur les brevets*, représenterait la première date à laquelle Apotex aurait le droit, sans ADC, d'importer le médicament breveté pour fins de consommation au Canada. Cette demande est à l'origine du litige dans *Apotex n° 1*, sur lequel je vais revenir un peu plus loin.

Le 15 juillet 1993, Eli Lilly a voulu exercer sa faculté d'annuler la licence obligatoire de Novopharm en lui donnant un préavis écrit de 30 jours. À l'appui de son avis d'annulation, Eli Lilly a allégué que Novopharm avait violé les conditions de la licence en accordant une sous-licence à Apotex. Novopharm a nié cette allégation, affirmant que l'accord commercial intervenu entre elle et Apotex ne constituait ni une sous-licence ni une cession de droits aux termes de la licence. Elle a prévenu le commissaire aux brevets de l'annulation projetée et de sa contestation des allégations de violation.

C. *L'affaire Novopharm*

Le 30 juillet 1993, Novopharm a déposé un ADA à l'appui de sa propre demande d'ADC relativement aux gélules de 150 mg et de 300 mg de nizatidine. Elle a invoqué sa propre licence obligatoire pour dire qu'il n'y avait pas eu de violation des brevets d'Eli Lilly. Le 15 septembre 1993, Eli Lilly et Eli Lilly Canada ont présenté à la Cour fédérale, Section de première instance, une demande d'ordonnance d'interdiction visant à empêcher le Ministre de délivrer l'ADC demandé à Novopharm, pour le motif que la licence de cette

that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court — Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licences". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

dernière avait été annulée et que Novopharm ne pouvait donc pas obtenir le médicament en vrac d'une manière n'emportant pas contrefaçon.

Entre-temps, Eli Lilly a, de son côté, saisi la Cour de justice de l'Ontario (Division générale) d'une demande de jugement déclarant que la licence de Novopharm était annulée parce qu'elle avait accordé une sous-licence à Apotex, contrairement aux conditions de la licence. Le juge Forget a conclu que la cour où il siégeait et la Cour fédérale du Canada, Section de première instance, avaient compétence concurrente pour accorder le redressement demandé, mais appliquant le critère du *forum conveniens*, il a décidé que l'affaire devait être tranchée par la Cour fédérale dans le cadre des procédures relatives à la demande d'ordonnance d'interdiction. Eli Lilly et Eli Lilly Canada ont alors déposé devant la Cour fédérale une requête interlocutoire en vue de modifier l'avis de requête par l'ajout d'une demande de jugement déclaratoire. Le juge Pinard a rejeté la requête en affirmant que, en examinant l'avis de requête (c'est-à-dire la demande d'interdiction), la cour avait compétence pour conclure, de manière accessoire, que la licence obligatoire en question avait été annulée, ce qui suffirait à justifier une ordonnance interdisant au Ministre de délivrer un ADC.

Le 20 juillet 1993, M. Dan, de Novopharm, a écrit à M. Sherman, d'Apotex, pour l'informer que les deux sociétés n'avaient conclu aucun accord de cession de licences ou d'attribution de sous-licences, et pour demander à Apotex de s'abstenir de préciser dans ses demandes d'ADC que des licences seraient cédées. Il a confirmé que l'accord d'approvisionnement prévoyait que Novopharm fournirait certains produits autorisés à Apotex, en tant que tiers client, mais il a précisé que Novopharm n'avait jamais eu l'intention de créer une sous-licence, vu que cela serait [TRADUCTION] «contraire aux conditions types de toutes les licences obligatoires». Le lendemain, M. Sherman a répondu, par lettre, qu'Apotex n'avait jamais laissé entendre que des droits seraient cédés ou que des sous-licences seraient accordées, mais seulement que Novopharm fournirait des substances à Apotex, en tant que tiers acquéreur.

16

17

18     Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the *Patent Act* which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

Monsieur Dan a également déposé un affidavit au sujet de ses intentions quant à la nature de l'accord avec Apotex. Au cours de son contre-interrogatoire, il a témoigné que Novopharm et Apotex avaient voulu créer un accord d'approvisionnement et que l'énoncé du préambule quant au partage des droits était mal formulé. Il a ajouté qu'Apotex n'avait pas encore demandé à Novopharm de lui fournir de la nizatidine, mais que, si jamais une demande était faite en vue d'obtenir de la nizatidine auprès d'une source étrangère, ce serait Novopharm qui s'adresserait à différentes sources, obtiendrait des propositions de prix, importerait la substance en vrac pour enfin la vendre à Apotex aux conditions convenues avec le fournisseur. Il a précisé que, dans le cas où il n'y aurait qu'un seul fournisseur d'une substance donnée, la pratique commerciale reconnue serait la suivante: [TRADUCTION] «si nous avons accès, ils devraient avoir accès». De même, interrogé au sujet des dispositions de la *Loi sur les brevets* qui interdiraient l'importation et la fabrication de nizatidine jusqu'au 31 décembre 1997 et au 31 décembre 1994 respectivement, M. Dan a répondu: [TRADUCTION] «[n]ous devons nous conformer au règlement».

19     McGillis J. of the Federal Court — Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in *Apotex #1*, *infra*, held that a sublicence had in fact been conferred by virtue of the supply agreement.

Le juge McGillis de la Cour fédérale, Section de première instance, a rejeté la demande de contrôle judiciaire présentée par Eli Lilly, concluant que l'accord entre Novopharm et Apotex n'était pas une sous-licence, qu'Eli Lilly ne pouvait donc pas annuler la licence pour ce motif et, en conséquence, qu'Eli Lilly n'avait pas prouvé que l'avis d'allégation de Novopharm n'était pas fondé. Cette décision a été infirmée par une formation unanime de la Cour d'appel fédérale, qui, s'appuyant sur son arrêt antérieur *Apotex nᵒ 1*, *infra*, a décidé que l'accord d'approvisionnement avait en réalité conféré une sous-licence.

### D. *The Apotex #1 Proceeding*

### D. *L'affaire Apotex nᵒ 1*

20     In cross-examination on the hearing of the application for a prohibition order in *Apotex #1*, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require

Lors de son contre-interrogatoire pendant l'audition de la demande d'ordonnance d'interdiction dans l'affaire *Apotex nᵒ 1*, dont le contexte est exposé en détail plus haut, M. Sherman, d'Apotex, a témoigné que l'accord d'approvisionnement conclu avec Novopharm permettait non pas à Apotex

Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

Relying on her analysis in *Novopharm*, McGillis J. of the Federal Court — Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final-dosage form would not have infringed the patents.

## II. Relevant Statutory Provisions

*Patent Act*, R.S.C., 1985, c. P-4

**39.11** (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention

d'importer ou de fabriquer de la nizatidine, mais seulement de demander à Novopharm d'importer ou de fabriquer le médicament conformément à sa licence et de vendre la substance à Apotex. Il a déclaré qu'Apotex acquerrait en fait de la nizatidine auprès de Novopharm et que, si l'ADC était délivré, elle en ferait des gélules de 150 mg et de 300 mg destinées à la vente au Canada. Il était d'avis que cela ne violerait pas les brevets d'Eli Lilly étant donné qu'aucune autre licence ne serait nécessaire une fois que la substance autorisée serait achetée à Novopharm. Toutefois, il a paru mentionner, à un moment donné, qu'Apotex «avait des droits» en vertu de la licence.

Se fondant sur son analyse dans l'affaire *Novopharm*, le juge McGillis de la Cour fédérale, Section de première instance, a statué que l'accord d'approvisionnement entre Novopharm et Apotex n'était pas une sous-licence. Néanmoins, elle a accordé l'ordonnance d'interdiction pour le motif que les allégations de non-contrefaçon d'Apotex n'étaient pas fondées, puisque sa préparation de gélules de nizatidine pour fins de consommation au Canada violerait les brevets d'Eli Lilly.

La Cour d'appel fédérale (le juge Pratte étant dissident) a rejeté l'appel d'Apotex, mais pour des raisons différentes. Elle a conclu que, malgré l'intention apparente des parties d'éviter de s'accorder mutuellement des sous-licences, tel était en réalité l'effet juridique du contrat écrit qu'elles avaient passé. En conséquence, la licence de Novopharm avait été annulée à bon droit et Apotex ne disposait donc d'aucun moyen n'emportant pas contrefaçon d'obtenir de la nizatidine. Même s'il n'était pas nécessaire de trancher cette question, il a été néanmoins décidé à l'unanimité que, contrairement au point de vue du juge McGillis, la préparation par Apotex de la nizatidine sous forme posologique définitive n'aurait pas violé les brevets.

## II. Les dispositions législatives pertinentes

*Loi sur les brevets*, L.R.C. (1985), ch. P-4

**39.11** (1) Sous réserve des autres dispositions du présent article et par dérogation à l'article 39 ou à toute licence délivrée sous son régime, il est interdit de se prévaloir d'une licence, peu importe la date de délivrance,

21

22

23

pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

(*a*) where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

(*b*) where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

(2) The prohibition under subsection (1) expires in respect of a medicine

.   .   .

(*c*) ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

**39.14** (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

(*a*) where the invention is a process, to use the invention for the preparation or production of medicine, or

(*b*) where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

*Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133

5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

accordée sous son régime relativement à un brevet portant sur une invention liée à un médicament pour revendiquer ou exercer le droit, si l'invention est un procédé, d'importer pour vente au Canada le médicament dans la préparation ou la production duquel l'invention a été utilisée, ou, si elle n'est pas un procédé, d'importer l'invention pour des médicaments ou pour la préparation ou la production de médicaments pour vente à la consommation au Canada.

(2) L'interdiction est levée à l'expiration des délais suivants:

.   .   .

*c*) dix ans après la délivrance du premier avis de conformité, si elle survient après le 27 juin 1986.

**39.14** (1) Par dérogation à l'article 39 ou à toute licence délivrée sous son régime, lorsque le premier avis de conformité pour le médicament est délivré après le 27 juin 1986, il est interdit de se prévaloir d'une licence accordée sous le régime de cet article relativement à un brevet portant sur une invention liée à un médicament pour revendiquer ou exercer le droit d'utiliser l'invention si elle est un procédé, pour la préparation ou la production de médicaments pour vente à la consommation au Canada ou, si elle n'est pas un procédé, de réaliser ou d'utiliser celle-ci pour des médicaments ou pour la préparation ou la production de médicaments pour telle vente. L'interdiction est levée à l'expiration des sept ans qui suivent la délivrance du premier avis de conformité en cause.

*Règlement sur les médicaments brevetés (avis de conformité)*, DORS/93-133

5. (1) Lorsqu'une personne dépose ou, avant la date d'entrée en vigueur du présent règlement, a déposé une demande d'avis de conformité à l'égard d'une drogue et souhaite comparer cette drogue à une drogue qui a été commercialisée au Canada aux termes d'un avis de conformité délivré à la première personne et à l'égard duquel une liste de brevets a été soumise ou qu'elle souhaite faire un renvoi à la drogue citée en second lieu, elle doit indiquer sur sa demande, à l'égard de chaque brevet énuméré dans la liste:

(*a*) state that the person accepts that the notice of compliance will not issue until the patent expires; or

(*b*) allege that

(i) the statement made by the first person pursuant to paragraph 4(2)(*b*) is false,

(ii) the patent has expired,

(iii) the patent is not valid, or

(iv) no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(*b*) or subsection (2) the person shall

(*a*) provide a detailed statement of the legal and factual basis for the allegation; and

(*b*) serve a notice of the allegation on the first person and proof of such service on the Minister.

6. (1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(*b*), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2) The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

*a*) soit une déclaration portant qu'elle accepte que l'avis de conformité ne sera pas délivré avant l'expiration du brevet;

*b*) soit une allégation portant que, selon le cas:

(i) la déclaration faite par la première personne aux termes de l'alinéa 4(2)*b*) est fausse,

(ii) le brevet est expiré,

(iii) le brevet n'est pas valide,

(iv) aucune revendication pour le médicament en soi ni aucune revendication pour l'utilisation du médicament ne seraient contrefaites advenant l'utilisation, la fabrication, la construction ou la vente par elle de la drogue faisant l'objet de la demande d'avis de conformité.

(2) Lorsque, après le dépôt par la seconde personne d'une demande d'avis de conformité mais avant la délivrance de cet avis, une liste de brevets est soumise ou modifiée aux termes du paragraphe 4(5) à l'égard d'un brevet, la seconde personne doit modifier la demande pour y inclure, à l'égard de ce brevet, la déclaration ou l'allégation exigée par le paragraphe (1).

(3) Lorsqu'une personne fait une allégation visée à l'alinéa (1)*b*) ou au paragraphe (2), elle doit:

*a*) fournir un énoncé détaillé du droit et des faits sur lesquels elle se fonde;

*b*) signifier un avis d'allégation à la première personne et une preuve de cette signification au ministre.

6. (1) La première personne peut, dans les 45 jours suivant la signification d'un avis d'allégation aux termes de l'alinéa 5(3)*b*), demander au tribunal de rendre une ordonnance interdisant au ministre de délivrer un avis de conformité avant l'expiration de un ou plusieurs des brevets visés par une allégation.

(2) Le tribunal rend une ordonnance en vertu du paragraphe (1) à l'égard du brevet visé par une ou plusieurs allégations si elle (*sic*) conclut qu'aucune des allégations n'est fondée.

(3) La première personne signifie au ministre, dans la période de 45 jours visée au paragraphe (1), la preuve que la demande visée à ce paragraphe a été faite.

(4) Lorsque la première personne n'est pas le propriétaire de chaque brevet visé dans la demande mentionnée au paragraphe (1), le propriétaire de chaque brevet est une partie à la demande.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(*a*) the expiration of 30 days after the coming into force of these Regulations,

(*b*) the day on which the second person complies with section 5,

(*c*) subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(*d*) subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(*b*) in respect of any patent on the patent list,

(*e*) subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(*f*) the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(*e*) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(*a*) the patent has expired; or

(*b*) the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

(3) Paragraphs (1)(*c*), (*d*) and (*e*) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(*e*) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(*e*) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

7. (1) Le ministre ne peut délivrer un avis de conformité à la seconde personne avant la plus tardive des dates suivantes:

*a*) la date qui suit de 30 jours la date d'entrée en vigueur du présent règlement;

*b*) la date à laquelle la seconde personne se conforme à l'article 5;

*c*) sous réserve du paragraphe (3), la date d'expiration de tout brevet énuméré dans la liste de brevets qui n'est pas visé par une allégation;

*d*) sous réserve du paragraphe (3), la date qui suit de 45 jours la réception de la preuve de signification de l'avis d'allégation visé à l'alinéa 5(3)*b*) à l'égard de tout brevet énuméré dans la liste de brevets;

*e*) sous réserve des paragraphes (2), (3) et (4), la date qui suit de 30 mois la date à laquelle est faite une demande au tribunal visée au paragraphe 6(1);

*f*) la date d'expiration de tout brevet faisant l'objet d'une ordonnance rendue aux termes du paragraphe 6(1).

(2) L'alinéa (1)*e*) ne s'applique pas si, à l'égard de chaque brevet visé par une demande au tribunal aux termes du paragraphe 6(1):

*a*) soit le brevet est expiré;

*b*) soit le tribunal a déclaré que le brevet n'est pas valide ou qu'aucune revendication pour le médicament en soi ni aucune revendication pour l'utilisation du médicament ne seraient contrefaites.

(3) Les alinéas (1)*c*), *d*) et *e*) ne s'appliquent pas à l'égard d'un brevet si le propriétaire de celui-ci a consenti à ce que la seconde personne utilise, fabrique, construise ou vende la drogue au Canada.

(4) L'alinéa (1)*e*) cesse de s'appliquer à l'égard de la demande visée au paragraphe 6(1) si celle-ci est retirée ou est rejetée par le tribunal de façon définitive.

(5) Le tribunal peut abréger ou proroger le délai visé à l'alinéa (1)*e*) à l'égard d'une demande lorsqu'elle (*sic*) n'a pas encore rendu d'ordonnance aux termes du paragraphe 6(1) à l'égard de cette demande et qu'elle (*sic*) constate qu'une partie à la demande n'a pas collaboré de façon raisonnable au traitement expéditif de celle-ci.

III. Judicial History

A. *Novopharm Ltd. v. Eli Lilly and Co.*

(1) Federal Court — Trial Division (1995), 60 C.P.R. (3d) 181

As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the *Regulations* is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to *David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.*, [1995] 1 F.C. 588 (C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novopharm's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

Relying on the decision of this Court in *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888, McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract". She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted, was inadmissible on the basis of the parol evidence rule. In her view,

III. Historique des procédures judiciaires

A. *Novopharm Ltd. c. Eli Lilly and Co.*

(1) Cour fédérale, Section de première instance (1995), 60 C.P.R. (3d) 181

À titre préliminaire, le juge McGillis a étudié la nature des procédures dont la cour était saisie. Elle a fait observer qu'une demande d'interdiction fondée sur le par. 6(1) du *Règlement* est une procédure de contrôle judiciaire visant à déterminer promptement s'il y a lieu de délivrer un ADC. À cet égard, elle a cité l'affaire *David Bull Laboratories (Canada) Inc. c. Pharmacia Inc.*, [1995] 1 C.F. 588 (C.A.), dans laquelle le juge Strayer a statué que les questions qui doivent être examinées dans le cadre de ces procédures sont de nature limitée ou préliminaire, et ne doivent l'être qu'à la seule fin limitée mentionnée précédemment et que, si un examen complet des questions de validité ou de contrefaçon est nécessaire, il faut procéder de la façon habituelle en intentant une action. [24]

Quant à la question de savoir si les allégations de non-contrefaçon que Novopharm a faites en demandant l'ADC étaient fondées, le juge McGillis a souligné que, puisque le point de vue de Novopharm était fondé sur sa licence, la question clé qui se posait était celle de l'interprétation à donner à l'accord de novembre 1992 intervenu entre Apotex et Novopharm. Si l'accord était essentiellement une sous-licence, la licence aurait alors été annulée à bon droit par Eli Lilly, et Novopharm n'aurait disposé d'aucun moyen n'emportant pas contrefaçon d'obtenir le médicament pour lequel l'ADC était demandé. [25]

Invoquant l'arrêt de notre Cour *Exportations Consolidated Bathurst Ltée c. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 R.C.S. 888, le juge McGillis a affirmé (à la p. 197) qu'il incombait alors de décider quelle était «l'intention véritable des parties au moment où elles ont contracté». Elle a repoussé les arguments d'Eli Lilly voulant que le témoignage de M. Dan, à la fois dans son affidavit et en contre-interrogatoire, concernant l'intention qu'il avait au moment de la rédaction de l'accord d'approvisionnement soit inadmissible [26]

Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

27    With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex". In her view, at p. 199, the true nature of the agreement was that of "a supply agreement dressed up to look like a sublicence". In other words, despite the presence in the supply agreement of wording which might tend to suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

28    In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition

compte tenu de la règle d'exclusion de la preuve extrinsèque. Selon elle, M. Dan pouvait présenter une preuve directe concernant l'intention qu'il avait à l'époque de la rédaction. Quant aux lettres échangées entre M. Dan et M. Sherman, le juge McGillis a refusé de se prononcer sur leur admissibilité vu que, même si ces lettres avaient été admissibles, elle ne leur aurait accordé aucune importance pour le motif qu'elles ont été rédigées dans le but de clarifier l'intention des parties longtemps après la signature de l'accord et, apparemment, seulement pour répondre à la menace d'annulation de la licence détenue par Novopharm.

Quant aux intentions de M. Dan à l'époque de la rédaction, le juge McGillis a statué, sur la foi de sa preuve directe, qu'il avait voulu conclure un accord d'approvisionnement avec Apotex. Toutefois, elle a reconnu (à la p. 199) la nécessité d'examiner l'accord dans son ensemble afin de déterminer si les termes employés par les parties traduisaient raisonnablement leur intention, en gardant à l'esprit qu'«une sous-licence n'aurait pu voir le jour que si Novopharm avait accordé tous ses droits aux termes de la licence, ou certains d'entre eux, à Apotex». Quant à la nature véritable de l'accord, elle a estimé, à la p. 199, qu'il s'agissait d'un «accord d'approvisionnement déguisé en sous-licence». Autrement dit, malgré la présence, dans l'accord d'approvisionnement, de termes qui pouvaient laisser croire à l'attribution d'une sous-licence, le dispositif de cet accord n'équivalait pas à l'attribution à Apotex de droits que Novopharm possédait en vertu de sa licence.

De l'avis du juge McGillis, le simple fait que l'accord d'approvisionnement prévoyait que Novopharm conclurait des contrats avec des tiers sur l'ordre d'Apotex n'était pas en soi une attribution de sous-licence. En réalité, si les droits conférés par la licence avaient été cédés sous forme de sous-licence à Apotex, la participation de Novopharm aux opérations n'aurait plus été nécessaire. Tout bien pesé, le juge McGillis était d'avis qu'aucune des dispositions de l'accord ne conférait à Apotex les droits que Novopharm possédait en vertu de sa licence, et que l'article 6, en stipulant que le titulaire d'une licence doit se conformer aux

against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on *Consolidated-Bathurst*, *supra*. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in *David Bull Laboratories*, *supra*, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

conditions de sa licence, notamment à l'interdiction d'attribuer une sous-licence, laisse fortement entendre que les parties n'avaient pas l'intention de créer une sous-licence.

En conséquence, le juge McGillis a décidé que Novopharm n'avait accordé aucune sous-licence à Apotex. À son avis, cette interprétation contribuait à promouvoir l'intention véritable des parties au moment de la conclusion de l'accord d'approvisionnement et à engendrer un résultat commercial raisonnable à leur point de vue, qu'elle percevait comme un objectif d'interprétation important, compte tenu de l'arrêt *Consolidated Bathurst*, précité. En fait, elle a dit que la conclusion qu'une sous-licence avait été créée aurait contrecarré en entier l'objectif que les parties poursuivaient en concluant l'accord d'approvisionnement, étant donné que les brevetés auraient alors pu annuler les licences obligatoires. Elle a également précisé que, même si elle n'avait pas pris en considération la preuve extrinsèque de M. Dan quant à l'intention qu'il avait, elle serait arrivée à la même conclusion, compte tenu du texte clair de l'accord dans son ensemble. Le juge McGillis a conclu, pour ce motif, qu'Eli Lilly et Eli Lilly Canada n'avaient pas établi, selon la prépondérance des probabilités, que l'allégation de Novopharm, dans son ADA, n'était pas fondée au sens du par. 6(2) du Règlement. Elle a donc rejeté la demande d'ordonnance d'interdiction.

Quant à savoir si la licence avait été annulée, le juge McGillis s'est déclarée non compétente pour trancher cette question, en dépit des ordonnances antérieures des juges Forget et Pinard. Elle se sentait liée par l'arrêt subséquent *David Bull Laboratories*, précité, selon lequel la cour n'a pas compétence, dans le contexte d'une procédure de contrôle judiciaire relative à une demande d'ordonnance d'interdiction de cette nature, pour trancher des questions accessoires ou incidentes qui portent uniquement sur les droits de deux parties privées. Cependant, au cas où elle aurait tort de tirer cette conclusion, elle a exprimé l'avis que sa décision que Novopharm n'avait pas accordé une sous-licence à Apotex menait nécessairement à la conclusion que la licence n'avait pas été violée.

29

30

(2) <u>Federal Court of Appeal</u> (1996), 67 C.P.R. (3d) 377

(2) <u>Cour d'appel fédérale</u> (1996), 67 C.P.R. (3d) 377

31    In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in *Apotex #1*, *infra*, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

Dans des motifs oraux prononcés à l'audience, le juge Stone (avec l'appui des juges MacGuigan et McDonald) a rejeté l'appel. Cet appel a été entendu trois semaines après l'audition de l'appel *Apotex n⁰ 1*, *infra*, et à l'audience, la cour a invité les parties à présenter des arguments sur l'application possible de cet arrêt à l'issue de l'appel dont elle était saisie. Eli Lilly a fait valoir que l'arrêt était décisif en ce sens que la cour y avait décidé que l'accord d'approvisionnement transgressait l'interdiction, stipulée dans la licence obligatoire, d'accorder une sous-licence et qu'Eli Lilly avait réussi à annuler la licence au moyen d'un préavis. Novopharm a soutenu, pour sa part, qu'il n'y avait pas lieu d'appliquer l'arrêt parce que les faits de l'appel différaient sensiblement de ceux de l'affaire antérieure et aussi parce que, bien qu'une décision sur une demande d'ordonnance d'interdiction lie les parties au litige en cause, elle a peu de valeur comme précédent.

32    The court held that, while the previous decision was not *res judicata*, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in *Apotex #1* was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply agreement in *Apotex #1* could therefore be applied to *Novopharm*. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had

La cour a décidé que, bien que la décision antérieure n'ait pas eu valeur de chose jugée, elle la liait néanmoins, sauf si elle pouvait faire l'objet d'une distinction fondée sur ses faits ou si elle était manifestement erronée en raison de l'omission de tenir compte d'une règle de droit pertinente. Ce dernier argument n'a pas été avancé. Quant au premier, bien que la cour ait reconnu que les faits étaient différents à certains égards et que certains éléments de preuve soumis à la cour dans *Apotex n⁰ 1* ne faisaient pas partie du dossier dans l'affaire qui l'occupait, la même licence obligatoire et le même accord d'approvisionnement étaient en cause et avaient été soumis en preuve dans les deux cas. Dans la mesure où elle n'était pas influencée par des éléments de preuve propres à l'affaire, l'analyse de l'accord d'approvisionnement dans *Apotex n⁰ 1* pouvait donc être appliquée à *Novopharm*. Même s'il était vrai que l'article 6 de l'accord d'approvisionnement obligeait Novopharm à se conformer aux conditions de sa licence, la cour a décidé que cette clause devait être interprétée de concert avec les autres clauses de l'accord, ce qui l'a amenée à conclure qu'une sous-

indeed been granted. Accordingly, the appeal was allowed.

B. *Apotex Inc. v. Eli Lilly and Co.*

(1) Federal Court — Trial Division (1995), 60 C.P.R. (3d) 206

In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

In concluding in *Novopharm*, *supra*, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in *Novopharm* that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in *Novopharm* applied equally to the case at bar.

Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (F.C.T.D.), and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier" (p. 218).

licence avait de fait été accordée. En conséquence, l'appel a été accueilli.

B. *Apotex Inc. c. Eli Lilly and Co*.

(1) Cour fédérale, Section de première instance (1995), 60 C.P.R. (3d) 206

Dans cette instance, Eli Lilly a prétendu que l'allégation n'était pas fondée parce que la licence que Novopharm détenait à l'égard de la nizatidine avait été annulée en raison de son attribution d'une sous-licence à Apotex et parce qu'Apotex ne disposait donc d'aucun moyen n'emportant pas contrefaçon d'obtenir de la nizatidine en vrac pour préparer les gélules visées par la demande d'ADC. Subsidiairement, elle a soutenu que la préparation des gélules violerait elle-même les droits que possédait Eli Lilly en vertu de ses brevets. 33

En concluant, dans *Novopharm*, précité, que l'entente entre Apotex et Novopharm était non pas une sous-licence mais un simple accord d'approvisionnement, le juge McGillis avait tenu compte du témoignage de M. Dan, de Novopharm, quant à l'intention qu'il avait au moment de rédiger l'accord avec M. Sherman. Même si ce témoignage ne faisait pas partie du dossier dont elle était alors saisie, le juge McGillis avait indiqué, dans *Novopharm*, qu'elle aurait tiré la même conclusion même indépendamment de celui-ci. En conséquence, elle estimait que sa conclusion sur la nature de l'accord, à laquelle elle en était arrivée dans *Novopharm*, s'appliquait également à l'affaire dont elle était saisie. 34

Quant à la question de savoir si la préparation de gélules à partir de la substance en vrac violerait les droits qu'Eli Lilly possédait en vertu de ses brevets, le juge McGillis a examiné la décision du juge MacKay dans l'affaire *Merck & Co. c. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (C.F. 1re inst.), et a souscrit à sa conclusion que cette activité de transformation constituerait en fait de la contrefaçon car «un tiers acquéreur non titulaire d'une licence n'acquiert aucun des droits exclusifs accordés à un breveté du simple fait qu'il a acheté la matière en vrac à un fournisseur qui est lui-même titulaire d'une licence» (p. 218). 35

36    Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

(2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329

(a) *MacGuigan J.A. (Robertson J.A. concurring)*

37    In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

38    MacGuigan J.A. noted that the conclusion of McGillis J. in *Novopharm* as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could

En conséquence, le juge McGillis a conclu qu'Eli Lilly avait établi, selon la prépondérance des probabilités, que l'allégation de non-contrefaçon d'Apotex contenue dans l'avis d'allégation n'était pas fondée au sens du par. 6(2) du Règlement. Par conséquent, elle a fait droit à la demande de contrôle judiciaire et a interdit au Ministre de délivrer un ADC à Apotex avant l'expiration des brevets d'Eli Lilly.

(2) Cour d'appel fédérale (1996), 66 C.P.R. (3d) 329

a) *Le juge MacGuigan (avec l'appui du juge Robertson)*

Au cours de son examen des faits et de la preuve, le juge MacGuigan a fait observer que M. Sherman avait souligné, à maintes reprises, que toutes les décisions fondées sur l'accord d'approvisionnement seraient prises par Apotex et communiquées à Novopharm. L'intention explicite d'Apotex était de faire affaire avec un fabricant canadien, indépendant de Novopharm, et, en fait, Apotex a refusé de communiquer à Novopharm l'identité de ce fabricant jusqu'à ce qu'il lui convienne de le faire. Mais M. Sherman a insisté pour que ce soit Novopharm, et non Apotex, qui achète la substance et la vende à Apotex, conformément aux conditions de sa licence.

Le juge MacGuigan a souligné que la conclusion que le juge McGillis a tirée, dans *Novopharm*, sur la bonne façon de qualifier l'accord entre Apotex et Novopharm reposait, jusqu'à un certain point, sur le témoignage de M. Dan quant à l'intention au moment de la rédaction de l'accord. Il a fait observer non seulement que ce témoignage ne faisait pas partie du dossier dont il était saisi, mais encore que, en vertu de la règle d'exclusion de la preuve extrinsèque, toute preuve directe relative à l'intention des parties ne pouvait pas être prise en considération. À son avis, la question du sens de l'accord était une question de droit qui devait être résolue en fonction du texte de cet accord. Quoique le juge McGillis ait précisé qu'elle en serait venue à la même conclusion même en l'absence de la preuve extrinsèque, le juge MacGuigan a fait remarquer que sa décision semblait avoir été

only have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: see *Consolidated-Bathurst*, *supra*.

MacGuigan J.A. relied on the decision of the Delaware Supreme Court in *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 227 USPQ 233 (1985) ("*du Pont*"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on *Carey v. United States*, 326 F.2d 975 (Ct. Cl. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement" (p. 338). While he

influencée par deux thèses juridiques en particulier: celle voulant qu'une sous-licence ne puisse avoir été créée que si Novopharm avait cédé à Apotex une partie ou l'ensemble de ses droits aux termes de la licence, et l'autre thèse selon laquelle, les tribunaux devraient, en interprétant un contrat, privilégier une interprétation qui favorise un résultat commercial raisonnable: voir *Consolidated Bathurst*, précité.

Le juge MacGuigan s'est appuyé sur l'arrêt de la Cour suprême du Delaware *E.I. du Pont de Nemours & Co. c. Shell Oil Co.*, 227 USPQ 233 (1985) («*du Pont*»), qui, malgré un contexte factuel quelque peu différent, portait essentiellement, selon lui, sur le même genre d'opération en ce sens que le produit breveté était fabriqué non pour le titulaire de la licence mais pour une partie non titulaire de la licence. Dans cette affaire, invoquant la décision *Carey c. United States*, 326 F.2d 975 (Ct. Cl. 1964), décidé que le critère applicable à une sous-licence consiste à déterminer si la production de l'article autorisé est faite par le titulaire de la licence originale ou destinée à son propre usage, ou encore si elle est destinée à celui du prétendu titulaire d'une sous-licence. Elle a jugé que l'application de ce critère révélait l'existence d'une sous-licence dans un cas où une partie non titulaire d'une licence était censée fabriquer un article breveté à titre de mandataire du titulaire de la licence, pour ensuite acheter cet article au titulaire de la licence immédiatement après sa fabrication, chaque cession du droit de propriété n'étant rien de plus qu'une opération fictive.

Selon le juge MacGuigan, un tel «tour de passe-passe» a eu lieu dans le cas qui nous occupe. Il a conclu que, d'après l'accord d'approvisionnement, les contrats distincts entre Novopharm et ses fournisseurs et entre Novopharm et Apotex ne devaient être maintenus que pour faire en sorte qu'il n'y ait aucun lien contractuel direct entre Apotex et les fournisseurs. Il percevait cela comme une question de forme seulement. Étant donné qu'Apotex était, en réalité, l'âme dirigeante et que Novopharm se servait de sa licence au profit d'Apotex, il a statué que, contrairement au point de vue du juge McGillis, l'accord intervenu entre les deux était

39

40

recognized that the <u>subjective</u> intention of the parties was to avoid creating a sublicence, he found that this was at odds with the <u>objective</u> intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

41    MacGuigan J.A. also found that, in accordance with his reading of *Consolidated-Bathurst*, *supra*, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation — the objective analysis of the actual words used by the parties — and the application of the *contra proferentum* doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

42    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

(b) *Pratte J.A., dissenting*

43    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature of the arrangement — that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug —

«une sous-licence déguisée en accord d'approvisionnement» (p. 338). Tout en reconnaissant que l'intention <u>subjective</u> des parties était d'éviter la création d'une sous-licence, il a conclu que cela contrastait avec l'intention <u>objective</u> du document qu'elles avaient signé. En d'autres termes, le contrat a eu pour effet juridique de créer une sous-licence.

Le juge MacGuigan a aussi statué que, selon son interprétation de l'arrêt *Consolidated Bathurst*, précité, tout examen de la question de savoir si cette interprétation favoriserait un «résultat commercial raisonnable» ne doit occuper qu'une «troisième place», derrière la «première» règle d'interprétation — l'analyse objective des termes utilisés par les parties — et l'application de la règle *contra proferentem*, qui consiste à interpréter toute ambiguïté d'un texte au détriment de la partie qui l'a rédigé. Selon lui (à la p. 338), la première règle s'appliquait en l'espèce étant donné qu'il n'y avait aucune ambiguïté dans «les mots qu'[elles] ont utilisés, selon l'interprétation que je donne à la réalité qu'ils dissimulent».

Le juge MacGuigan a donc rejeté l'appel d'Apotex, concluant qu'Eli Lilly avait annulé à bon droit la licence de Novopharm. Même s'il jugeait inutile de trancher la question de la contrefaçon découlant de la préparation, il a affirmé qu'il aurait souscrit aux motifs du juge Pratte sur ce point.

b) *Le juge Pratte, dissident*

Le juge Pratte a exprimé son désaccord avec les juges majoritaires sur la question de l'interprétation du contrat. Il a estimé qu'il n'y avait rien d'obscur dans le texte de l'accord d'approvisionnement, qui n'avait donc pas besoin d'être interprété davantage. Même si le contrat avait à la fois pour but et pour effet d'accorder aux parties, dans la mesure du possible, les mêmes avantages qu'elles auraient obtenus en s'accordant mutuellement des sous-licences, l'accord d'approvisionnement ne prévoyait pas l'attribution de sous-licences. Quant à l'argument d'Eli Lilly selon lequel les parties n'avaient pas dévoilé la nature véritable de l'accord — que chaque partie accorderait des sous-

there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement". In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it". He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore, Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

## IV. Issues

As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both

licences à l'autre et alors, pour sauver les apparences, agirait à titre de mandataire du titulaire de la sous-licence en obtenant le médicament —, il n'y avait, selon le juge Pratte (à la p. 342), «absolument aucune preuve que les parties aient jamais eu l'intention de conclure un arrangement aussi surréaliste». À son avis, Eli Lilly n'avait pas réussi à prouver que l'entente était un subterfuge en montrant simplement que les parties auraient pu obtenir les mêmes avantages en signant une entente différente. Par conséquent, il a conclu que Novopharm n'avait pas violé les conditions de sa licence.

Quant à savoir si les activités réelles d'Apotex n'emportaient pas contrefaçon, le juge Pratte était d'avis, aux pp. 342 et 343, qu'«Apotex, en achetant de Novopharm de la nizatidine en vrac fabriquée ou importée par cette société en vertu de sa licence obligatoire, acquerrait le droit d'utiliser ce médicament et, accessoirement, le droit de fabriquer des gélules à partir de celui-ci». Il a conclu que, si le titulaire d'un brevet vend l'objet breveté, il cède à l'acheteur le droit de propriété relatif à cet article. Le titulaire du brevet ne jouit plus d'aucun droit à l'égard de cet objet, et l'acheteur, à titre de nouveau propriétaire, «jouit du droit exclusif de posséder cet objet, de l'utiliser, d'en jouir, de le détruire ou de l'aliéner» (p. 343), sans crainte de violer le brevet du vendeur. Autrement dit, le titulaire du brevet a renoncé implicitement à son droit exclusif d'usage et de vente. Selon le juge Pratte, à l'avis duquel ont souscrit les juges majoritaires sur ce point, les mêmes principes s'appliquent à la vente d'un article breveté par le titulaire d'une licence qui, en vertu de cette dernière, est autorisé à vendre sans restriction et, en conséquence, Apotex avait le droit de fabriquer des gélules à partir de la nizatidine obtenue de Novopharm sans violer le brevet de Lilly. Pour ces motifs, le juge Pratte aurait accueilli l'appel.

44

## IV. Les questions en litige

Comme nous l'avons vu, la question commune aux deux pourvois est de savoir si l'accord d'approvisionnement entre Apotex et Novopharm est une sous-licence, de manière à justifier l'annulation par Eli Lilly de la licence obligatoire accordée à Novopharm relativement à la nizatidine. Dans

45

Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

46    Specifically, in the *Novopharm* proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in *Apotex #1* to the *Novopharm* appeal, whether as *res judicata* or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In *Apotex #1*, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

## V. Analysis

### A. *The Agreement Between Apotex and Novopharm*

47    The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

l'affirmative, les ADA déposés par Novopharm et Apotex n'étaient pas fondés et il y a lieu de rendre l'ordonnance d'interdiction demandée. Toutefois, chaque pourvoi soulève d'autres questions distinctes que je vais examiner à tour de rôle.

Plus précisément, dans le pourvoi *Novopharm*, notre Cour est appelée à décider (1) si la Cour d'appel fédérale a commis une erreur en appliquant à l'affaire *Novopharm* son arrêt *Apotex nᵒ 1*, que ce soit à titre de chose jugée ou pour un autre motif, (2) si l'ADA de Novopharm était non fondé, peu importe que sa licence obligatoire ait ou non été annulée pour cause de violation, parce que la licence n'autorisait pas les activités qui y étaient proposées, et (3) si la Cour fédérale avait compétence pour rendre un jugement déclaratoire dans le cadre d'une telle procédure de contrôle judiciaire limité. Dans *Apotex nᵒ 1*, il est aussi allégué que, outre la question principale de la contrefaçon, la préparation de la nizatidine sous forme posologique définitive proposée par Apotex constituerait elle-même une violation des brevets d'Eli Lilly et qu'il y a donc lieu de rendre une ordonnance d'interdiction peu importe que l'accord d'approvisionnement constitue ou non une sous-licence.

## V. Analyse

### A. *L'accord entre Apotex et Novopharm*

Le principal argument avancé par Eli Lilly veut que l'accord d'approvisionnement représente l'attribution d'une sous-licence par Novopharm à Apotex, ce qui est directement contraire à l'article 12 de la licence obligatoire de Novopharm à l'égard de la nizatidine. Tous s'accordent pour dire qu'une telle violation donnerait à Eli Lilly, en vertu de l'article 8 de la licence, le droit d'annuler la licence, ce qui aurait pour effet d'empêcher Novopharm de fabriquer, d'utiliser, d'importer ou de vendre de la nizatidine sans violer le brevet d'Eli Lilly. Dans un tel cas, ni l'ADA de Novopharm ni celui d'Apotex ne seraient fondés.

## (1) The Nature of a Sublicence

Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1 (3rd ed. rev. 1997 (loose-leaf)), at § 3.18.

To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed. 1969), the concept is expressed as follows (at p. 285):

A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not nec-

## (1) La nature d'une sous-licence

On a soumis relativement peu d'arguments au sujet de la définition d'une sous-licence. En général, une sous-licence représente l'attribution par le titulaire d'une licence de certains droits conférés par celle-ci à un tiers, le titulaire de la sous-licence. Autrement dit, le titulaire de la licence cède effectivement la totalité ou une partie de ses droits au titulaire de la sous-licence, ce qui signifie que la sous-licence comporte des attributs semblables à ceux de la licence principale, dont le droit d'exercer de façon indépendante certains droits que la licence confère à son titulaire. En réalité, on a dit qu'[TRADUCTION] «une sous-licence est simplement un autre nom donné à l'attribution indirecte d'une licence»: voir Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1 (3e éd. rév. 1997 (feuilles mobiles)), au § 3.18.

Pour comprendre la nature d'une sous-licence, il est donc nécessaire de commencer par saisir la nature d'une licence. Dans Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4e éd. 1969), le concept est exprimé ainsi (à la p. 285):

[TRADUCTION] Une licence, quoiqu'exclusive, ne confère pas à son titulaire tous les droits du breveté. Elle n'investit pas son titulaire de droits opposables au grand public, mais lui permet seulement de faire ce qui lui serait par ailleurs interdit de faire. Il n'obtient qu'un droit d'usage. Mais une licence est une attribution d'un droit et ne fait pas que conférer à son titulaire un simple intérêt en *equity*. Une licence représente une cession de droit à titre bénéficiaire dans une certaine mesure, par laquelle le cessionnaire acquiert un droit en *equity* sur le brevet. Une licence empêche d'être illégal ce qui, sans elle, serait illégal; elle est un consentement du titulaire d'un droit à ce qu'une autre personne accomplisse un acte qui, sans la licence, violerait le droit de la personne qui accorde la licence. Une licence confère tout au plus le droit de faire la chose qu'elle permet vraiment de faire. [Je souligne.]

En d'autres termes, par l'attribution d'une licence, le breveté accorde au titulaire de cette licence le droit d'agir d'une certaine façon relativement à l'article breveté, droit dont le titulaire de la licence ne jouirait pas sans celle-ci. Toutefois, les droits du

48

49

essarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

50          Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, *Howard and Bullough, Ld. v. Tweedales and Smalley* (1895), 12 R.P.C. 519, at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

51          For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

titulaire d'une licence n'équivalent pas nécessairement à ceux du breveté; ils sont plutôt limités aux conditions explicites de la licence et nuancés par celles-ci.

De plus, je devrais souligner, en passant, que, sauf si cette intention est explicite ou implicite dans la licence, le titulaire de cette dernière n'est pas libre d'accorder une sous-licence sans la permission du donneur de licence: voir, par exemple, *Howard and Bullough, Ld. c. Tweedales and Smalley* (1895), 12 R.P.C. 519, à la p. 528. Cela peut-être perçu comme une tentative de la loi de protéger les droits de propriété du titulaire du bien, même si l'attribution d'une licence a compromis la nature exclusive de ces droits. Ainsi, même si la licence obligatoire n'interdisait pas expressément d'accorder une sous-licence, Novopharm n'aurait pas été autorisée à accorder une sous-licence à Apotex. Toutefois, il découle de l'interdiction expresse, compte tenu de la licence dans son ensemble, que l'attribution d'une sous-licence par Novopharm engendrerait une violation susceptible d'entraîner l'annulation de la licence obligatoire à la demande d'Eli Lilly.

Pour que Novopharm ait accordé une sous-licence à Apotex au moyen de l'accord d'approvisionnement, elle doit lui avoir cédé une partie ou la totalité des droits qu'elle possédait en vertu de sa licence obligatoire. Il s'agit simplement de savoir si Novopharm a, expressément ou implicitement, accordé à Apotex le droit de faire quelque chose qu'il lui aurait par ailleurs été interdit de faire et que Novopharm n'aurait été autorisée à faire qu'en vertu de sa licence obligatoire relative à la nizatidine. Cela a pu se produire de deux manières: soit qu'une seule ou plusieurs dispositions explicites, qui se dégagent à la lecture de l'accord, puissent révéler que les parties avaient l'intention de créer une entente de sous-licence, soit que l'effet juridique du document peut être tel qu'une sous-licence a été créée malgré les intentions contraires des parties. Je vais examiner chacune de ces possibilités à tour de rôle.

### (2) Contractual Interpretation and the Intentions of the Parties

In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In *Consolidated-Bathurst*, *supra*, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation . . . which promotes a sensible commercial result.

From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of *contra proferentem*. *Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against <u>both</u> contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471. Therefore, I would, as a prelimi-

### (2) Interprétation des contrats et intentions des parties

Pour vérifier si l'accord d'approvisionnement a conféré ou a pour effet de conférer une sous-licence à Apotex, il faut tout d'abord décider quelle est la méthode d'interprétation qui convient pour ce type de contrat et, en particulier, quelle preuve peut être prise en considération à cet égard. Dans *Consolidated Bathurst*, précité, à la p. 901, le juge Estey fait l'analyse suivante, en son propre nom et en celui des juges Pigeon, Dickson et Beetz:

> Même indépendamment de la doctrine *contra proferentem* dans la mesure où elle est applicable à l'interprétation des contrats, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Dès lors, on ne doit pas utiliser le sens littéral lorsque cela entraînerait un résultat irréaliste ou qui ne serait pas envisagé dans le climat commercial dans lequel l'assurance a été contractée. Lorsque des mots sont susceptibles de deux interprétations, la plus raisonnable, celle qui assure un résultat équitable, doit certainement être choisie comme l'interprétation qui traduit l'intention des parties. De même, une interprétation qui va à l'encontre des intentions des parties et du but pour lequel elles ont à l'origine conclu une opération commerciale doit être écartée en faveur d'une interprétation [. . .] qui favorise un résultat commercial raisonnable.

Un certain nombre de principes importants en matière d'interprétation des contrats se dégagent de ce passage. Toutefois, ils ne s'appliquent pas tous au présent pourvoi. Un principe qui ne s'applique sûrement pas est la règle *contra proferentem*. Cette règle a pour effet de protéger une partie à un contrat contre les conditions ambiguës ou déroutantes introduites d'une façon détournée par l'autre partie, en privilégiant une interprétation de l'ambiguïté au détriment de la partie qui les a rédigées. Toutefois quand les deux parties s'entendent sur la façon d'interpréter le contrat, il n'est pas loisible à un tiers d'affirmer que la règle *contra proferentem* devrait être appliquée pour interpréter le contrat au détriment des <u>deux</u> parties contractantes. En fait, un tiers n'a aucune raison d'invoquer la règle *contra proferentem*: voir G. H. L. Fridman,

nary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

54    The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

55    Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in *Lampson v. City of Quebec* (1920), 54 D.L.R. 344 (P.C.), at p. 350:

. . . the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself. . . . [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses. . . ."

56    When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true

*The Law of Contract in Canada* (3e éd. 1994), à la p. 471. En conséquence, je suis d'avis, à titre préliminaire, de repousser la proposition selon laquelle cette règle devrait s'appliquer de manière à interpréter toute ambiguïté du contrat au détriment des parties qui l'on rédigé, en l'occurrence tant Novopharm qu'Apotex.

Le juge de première instance semble avoir considéré que, d'après l'arrêt *Consolidated Bathurst*, l'interprétation du contrat devrait viser en définitive à vérifier l'intention véritable des parties au moment de conclure le contrat et que, ce faisant, le juge des faits peut admettre des éléments de preuve extrinsèques concernant les intentions subjectives des parties à ce moment-là. À mon avis, cela n'est pas tout à fait exact. L'intention des parties contractantes doit être déterminée en fonction des mots qu'elles ont employés en rédigeant le document, éventuellement interprétés à la lumière des circonstances du moment. La preuve de l'intention subjective d'une partie n'occupe aucune place indépendante dans cette décision.

En fait, il n'est pas nécessaire de prendre en considération quelque preuve extrinsèque que ce soit lorsque le document est, à première vue, clair et sans ambiguïté. Pour reprendre les propos de lord Atkinson dans *Lampson c. City of Quebec* (1920), 54 D.L.R. 344 (C.P.), à la p. 350:

[TRADUCTION] . . . l'intention qu'il faut rechercher en interprétant l'acte est celle des parties telle qu'elle se dégage des termes qu'elles ont utilisés dans l'acte lui-même. [. . .] [S]i la signification de l'acte, selon le sens ordinaire des mots qui y sont employés, est claire et sans ambiguïté, il n'est pas permis aux parties à cet acte, aussi longtemps qu'il n'est pas modifié, de venir affirmer devant une cour de justice: «Notre intention était tout à fait différente de celle qui est exprimée par les termes de l'acte . . .»

Quand le texte du document est sans ambiguïté, l'idée exprimée dans *Consolidated Bathurst*, selon laquelle il y a lieu de retenir l'interprétation qui assure un «résultat équitable» ou un «résultat commercial raisonnable», n'est pas déterminante. Certes, il serait absurde d'adopter une interprétation nettement incompatible avec les intérêts commerciaux des parties, si l'objectif est de vérifier leur

contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in *Joy Oil Co. v. The King*, [1951] S.C.R. 624, at p. 641:

. . . in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the *Patent Act*, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see *Indian Molybdenum*

véritable intention au moment de contracter. Toutefois, il n'est pas difficile d'interpréter un document clair conformément à l'intention véritable des parties contractantes, si l'on présume que les parties voulaient les conséquences juridiques des mots qu'elles ont employés. Cela est conforme à l'opinion incidente de notre Cour dans *Joy Oil Co. c. The King*, [1951] R.C.S. 624, à la p. 641:

[TRADUCTION] . . . en interprétant un document, il s'agit non pas de chercher à comprendre ce que les mots seulement veulent dire, ni ce que le rédacteur seulement a voulu dire, mais plutôt de chercher ce que les mots employés par le rédacteur veulent dire.

À mon sens, le contrat intervenu entre Apotex et Novopharm ne comporte aucune ambiguïté. Aucune tentative n'a été faite pour camoufler l'objet véritable de l'entente ou les circonstances ayant entouré sa rédaction. De toute évidence, l'accord visait à réduire au minimum les effets préjudiciables des modifications apportées à la *Loi sur les brevets*, qui étaient censées imposer, et ont imposé en définitive, des restrictions considérables au régime antérieur de licences obligatoires, en portant au maximum l'accès de chaque partie à la plus grande variété possible de médicaments brevetés. Cela a été fait en obligeant chaque partie à obtenir de telles substances pour l'autre partie dans le cas où cette partie possédait une licence que l'autre n'avait pas et ne pourrait plus facilement acquérir. Tout cela ressort du texte clair des considérants de l'accord d'approvisionnement. Mis à part la question de contourner la loi, qui n'a rien à voir avec l'interprétation du contrat, les intentions des parties ressortent clairement à la lecture de l'accord. En conséquence, j'estime qu'on ne saurait affirmer à juste titre que l'accord d'approvisionnement comporte des ambiguïtés que son texte même ne permet pas de résoudre. Aucun autre outil d'interprétation n'est nécessaire.

57

Plus précisément, il n'est pas nécessaire de recourir à l'un ou l'autre élément de preuve soumis par Apotex ou Novopharm relativement aux intentions subjectives de leurs mandants au moment de rédiger l'accord. Par conséquent, j'estime que cette preuve est irrecevable en vertu de la règle d'exclu-

58

*Ltd. v. The King*, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-3.

59      Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

60      Therefore, I am of the opinion that the trial judge erred, in the *Novopharm* proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in *Apotex #1*, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

61      Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence. Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to

sion de la preuve extrinsèque: voir *Indian Molyb-denum Ltd. c. The King*, [1951] 3 D.L.R. 497 (C.S.C.), aux pp. 502 et 503.

De plus, même si cette preuve était nécessaire, telle n'est pas la nature de la preuve soumise en l'espèce, qui n'élucide aucunement les circonstances de la rédaction. Elle ne concernait que les intentions subjectives des parties: l'intention subjective de M. Dan au moment de la rédaction et l'intention subjective de M. Sherman d'exécuter l'accord d'une certaine manière.

En conséquence, je suis d'avis que le juge de première instance a commis une erreur, dans l'affaire *Novopharm*, en tenant compte du témoignage de M. Dan quant à l'intention qu'il avait au moment de conclure le contrat. Toutefois, je reconnais aussi qu'elle a affirmé clairement qu'elle aurait tiré la même conclusion même indépendamment de ce témoignage, et je ne rejetterais donc pas son interprétation de l'accord d'approvisionnement pour ce seul motif. À juste titre, le juge McGillis n'a pas paru tenir compte du témoignage de M. Sherman dans *Apotex n° 1*, bien qu'on ne puisse pas en dire autant du juge MacGuigan dans la façon dont il a statué sur cette affaire. En fait, il a semblé avoir été fortement influencé par ce témoignage, ce qui met nécessairement en doute la validité de ses conclusions.

Une fois qu'il est établi qu'aucune preuve extrinsèque n'est recevable, que dit le texte de l'accord au sujet de l'intention des parties? Malgré les arguments contraires quelque peu percutants avancés par Eli Lilly, une chose que l'accord ne dit sûrement pas c'est qu'Apotex a le droit d'utiliser de manière indépendante, à son propre profit, toute licence obligatoire que possède Novopharm. Il ne dit pas non plus qu'Apotex a le droit d'exercer tout droit conféré à Novopharm par une telle licence. Il ne fait plutôt que prévoir, à l'article 1, que Novopharm va, sur l'ordre d'Apotex, «utilise[r] sa licence au bénéfice» d'Apotex. À mon sens, cela ne correspond pas à la définition de la souslicence, donnée précédemment. Le seul droit acquis par Apotex, en vertu de cette disposition, est celui de demander à Novopharm d'exercer d'une certaine manière les droits que lui confère sa

enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to <u>act</u> pursuant to the licence.

Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: four percent of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention <u>not</u> to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be

licence, c'est-à-dire de manière à l'habiliter à déclencher l'exercice par Novopharm de ses propres droits d'obtenir et de vendre certains médicaments brevetés, et à profiter de cet exercice. Apotex n'acquiert aucun droit d'obtenir ces médicaments indépendamment de Novopharm. En fait, il reste tout à fait clair que Novopharm est toujours la seule partie ayant réellement le droit d'<u>agir</u> conformément à la licence.

Ainsi, il est vraiment sans importance que l'accord donne à Apotex le droit de dire à Novopharm qui devrait fabriquer le médicament, à qui il devrait être acheté et à quel prix, ou que Novopharm soit tenue, en vertu du contrat, de suivre ces directives. Il n'importe pas non plus que Novopharm doive toucher une redevance pour la fourniture à Apotex des substances autorisées ainsi obtenues. À certains égards, ces dispositions créent tout au plus un engagement détaillé à conclure un accord. Autrement dit, l'accord établit une procédure par laquelle la partie non titulaire de la licence peut contraindre la partie titulaire de la licence à conclure un autre contrat, à savoir un contrat de vente, dont les conditions précises peuvent être fixées en grande partie par la partie non titulaire, sauf que la partie titulaire de la licence a toujours droit au même taux de rendement: quatre pour cent du prix de la substance vendue. De cette façon, la redevance ne fait que garantir à la partie titulaire de la licence une certaine marge bénéficiaire en contrepartie de son rôle dans ces futures opérations prévues. Malgré les arguments de l'intimée, je ne vois pas comment cela peut indiquer soit l'intention d'attribuer une sous-licence, soit l'attribution réelle d'une sous-licence.

62

Il est vrai que, dans les considérants, les parties parlent d'une volonté commune de «partager leurs droits», ce qui pourrait bien être interprété en soi comme une intention de créer une sous-licence. Cependant, cette disposition doit être interprétée en fonction du reste de l'accord, qui révèle clairement l'intention de <u>ne pas</u> créer une sous-licence. En particulier, la condition, à l'article 6, que la partie titulaire d'une licence se conforme aux conditions de sa licence milite contre la conclusion que les parties voulaient, par cet accord, s'accorder

63

possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

64    Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party . . . on the grounds that there is doubt as to whether or not the licence . . . permits the requested acts" (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

65    Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply

mutuellement des sous-licences. Il serait simplement impossible à Novopharm d'accorder une sous-licence tout en respectant les conditions de sa licence obligatoire relative à la nizatidine, étant donné l'interdiction expresse qui y est faite d'attribuer des sous-licences. D'après la preuve, il n'y a aucune raison de conclure que Novopharm a voulu violer à la fois l'accord d'approvisionnement et sa licence obligatoire en accordant une sous-licence à Apotex.

En outre, selon moi, à l'article 7 de l'accord, qui prévoit que «[l]a partie titulaire d'une licence n'est pas dispensée d'accomplir un acte conformément aux instructions données par la partie non titulaire [. . .] pour le motif qu'un doute subsiste quant à savoir si la licence [. . .] permet l'acte en question» (je souligne), pourvu également que la partie non titulaire soit tenue d'assurer la défense de la partie titulaire de la licence dans le cadre de toute poursuite judiciaire qui peut s'ensuivre, ne permet pas ou n'exige pas l'attribution d'une sous-licence en l'espèce. Pour que l'article 6 ait un sens, il doit à tout le moins être interprété comme interdisant les actes qui contreviendraient clairement à la licence de la partie qui en est titulaire. Je ne puis imaginer de violation plus claire que l'attribution d'une sous-licence. Il n'y a aucun «doute» quant à savoir si la licence permet un tel acte; il est interdit expressément par l'article 12 de la licence. En conséquence, je ne crois pas que l'article 7 soit applicable dans les circonstances; il n'écarte certes pas l'effet de l'article 6.

L'article 8 qui oblige la partie titulaire d'une licence à «collabore[r] pleinement avec la partie non titulaire et [à] se conforme[r] aux instructions de cette dernière afin de lui permettre d'utiliser la licence tout comme si elle en était elle-même titulaire» (je souligne) est certes une clause inhabituelle et, pourrait-on soutenir, rédigée de façon malencontreuse. En effet, si quelqu'un devait douter que l'accord d'approvisionnement a vraiment été rédigé sans l'aide d'un conseiller juridique, comme l'ont fait valoir Novopharm et Apotex, cet article tendrait fortement à corroborer cette assertion. Toutefois, il doit lui aussi être interprété en fonction du reste de l'accord, qui ne permet sim-

does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only indirect enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

### (3) The Legal Effect of the Supply Agreement

Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by

plement pas à la partie non titulaire d'une licence d'«utiliser la licence» au sens actif, c'est-à-dire de l'utiliser réellement. Il ne permet plutôt qu'une utilisation indirecte: tirer profit de l'utilisation de la licence par la partie qui en est titulaire. Il est sûrement vrai que la partie titulaire d'une licence est tenue de suivre les directives de la partie non titulaire et de faire toutes les démarches juridiques possibles pour permettre à cette dernière de profiter de l'existence de la licence, à sa demande. Toutefois, cela ne va pas jusqu'à permettre à la partie non titulaire d'une licence d'exercer les droits conférés par la licence indépendamment de la partie qui en est titulaire, ce qui représente l'essence d'une sous-licence.

Bref, je ne trouve rien dans le texte du document qui laisse supposer que les parties voulaient s'accorder mutuellement des sous-licences. Tout indique au contraire qu'elles voulaient créer une entente commerciale en vertu de laquelle la partie non titulaire d'une licence aurait le droit de demander à la partie titulaire d'utiliser ses diverses licences à son profit pour acquérir, peut-être sur son ordre, divers médicaments brevetés, pour ensuite les lui revendre. En fait, il vaut la peine de souligner que la création de sous-licences n'aurait pas vraiment été commercialement avantageuse pour les parties, car cela aurait justifié l'annulation des diverses licences obligatoires détenues par chaque société, et aurait ainsi non seulement rendu inutile l'accord d'approvisionnement lui-même, mais encore compromis les opérations commerciales des deux sociétés. S'il est vrai, comme le soutient Eli Lilly, qu'il n'est pas nécessaire de prévoir expressément la création d'une sous-licence, il est évident que, pour constituer une sous-licence, l'accord d'approvisionnement doit avoir cédé à Apotex davantage que le simple droit d'obliger Novopharm à utiliser sa licence d'une certaine manière. Mais il appert que, dans le contexte de l'ensemble de l'accord, l'expression «partager leurs droits» ne signifiait rien de plus.

### (3) L'effet juridique de l'accord d'approvisionnement

Eli Lilly prétend que l'accord a eu pour effet juridique d'entraîner l'attribution mutuelle de

each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

### (i) *Sublicence Versus Purchase and Sale*

68     By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the *Patent Act*, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

69     As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605, at p. 610; see

sous-licences par les parties, malgré l'intention qu'elles ont pu avoir. Compte tenu de l'analyse qui précède, je ne vois cependant pas comment cet argument peut être retenu. Apotex et Novopharm voulaient créer un certain type d'accord d'approvisionnement et non pas une sous-licence, et je crois qu'elles sont parvenues à le faire. Toutefois, dans la mesure où l'argument d'Eli Lilly peut reposer sur une certaine confusion quant à la distinction entre une sous-licence et un contrat de vente ordinaire, il convient, à ce stade, d'examiner brièvement cette distinction.

### (i) *Sous-licence versus contrat de vente*

En vertu de sa licence obligatoire, Novopharm a le droit de fabriquer ou d'importer de la nizatidine en vrac, ou de faire les deux, à la condition de respecter les délais prescrits par la *Loi sur les brevets*, et de vendre la nizatidine ainsi obtenue à Apotex ou à tout autre tiers. Après avoir acquis la nizatidine de Novopharm, Apotex était ensuite libre de l'utiliser d'une manière qui ne violait pas les brevets d'Eli Lilly. Par conséquent, aucune sous-licence n'aurait pu être créée par un accord qui confirmait ces droits et accordait simplement à Apotex le droit supplémentaire de demander à Novopharm d'acquérir et de lui vendre de la nizatidine en vrac à un certain tarif. En d'autres mots, pour prouver l'existence d'une sous-licence, il faut établir que l'accord était, sur le plan du fond sinon de la forme, plus qu'une entente détaillée aux termes de laquelle de futurs contrats de vente pourraient être signés.

Je le répète, pour qu'il y ait sous-licence, il doit y avoir attribution par le titulaire d'une licence à un tiers, titulaire de la sous-licence, des droits conférés par la licence. Cela peut cependant générer une certaine confusion entre une sous-licence et un contrat de vente ordinaire, vu qu'un tiers peut acquérir des droits semblables en vertu de chacune de ces ententes. Autrement dit, tout comme le titulaire d'une sous-licence peut obtenir le droit d'utiliser et de vendre un article breveté si le titulaire de la licence possède ce droit et le lui cède en conséquence, de même la vente par le titulaire d'une licence d'un article breveté est présumée conférer à l'acheteur le droit [TRADUCTION] «d'utiliser, de

also *Gillette v. Rea* (1909), 1 O.W.N. 448 (H.C.); *Betts v. Willmott* (1871), L.R. 6 Ch. App. 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see *Intel Corp. v. ULSI System Technology Inc.*, 995 F.2d 1566 (Fed. Cir. 1993).

Thus, practically speaking, the rights of use and alienation can only be <u>determinative</u> of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

In the present case, it is plainly the latter situation which is contemplated by the supply agree-

vendre ou d'aliéner les marchandises à son gré»: voir *Badische Anilin und Soda Fabrik c. Isler*, [1906] 1 Ch. 605, à la p. 610; voir aussi *Gillette c. Rea* (1909), 1 O.W.N. 448 (H.C.); *Betts c. Willmott* (1871), L.R. 6 Ch. App. 245. En d'autres termes, sauf stipulation contraire de la licence, le titulaire de celle-ci a généralement le droit de céder à un acheteur le droit d'utiliser ou de revendre l'article breveté sans crainte de violer le brevet.

Mais, de toute évidence, la vente d'un article autorisé n'a pas automatiquement pour effet de faire de l'acheteur un titulaire de sous-licence et, par conséquent, le fait qu'un tiers jouisse de droits d'utilisation et d'aliénation ne saurait indiquer en soi l'existence d'une sous-licence. En réalité, comme Apotex le souligne, il existe, selon la jurisprudence et le bon sens, un certain nombre de manières dont le titulaire d'une licence peut vendre un article autorisé à un tiers avec l'éventail complet des attributs ordinaires de la propriété, sans pour autant faire de ce dernier un titulaire de sous-licence. Cela va de l'achat imprévu ordinaire à la fabrication par le titulaire d'une licence, à la demande et sur l'ordre de l'acheteur, et suivant ses propres spécifications, de produits qui incorporent l'objet de la licence: voir *Intel Corp. c. ULSI System Technology Inc.*, 995 F.2d 1566 (Fed. Cir. 1993). 70

Ainsi, en pratique, les droits d'utilisation et d'aliénation ne peuvent être <u>déterminants</u> quant à l'existence d'une sous-licence que lorsqu'il est évident qu'il n'y a eu aucune cession de droits de propriété, c'est-à-dire qu'il n'y a eu aucune vente au tiers de l'article autorisé. En pareil cas, un droit d'utilisation ne pourrait découler que d'une sous-licence quelconque et il ne pourrait pas y avoir de droit d'aliénation illimité, car il serait impossible à un tiers de céder un titre valable sans d'abord posséder un droit de propriété sur l'article. Toutefois, quand les droits de la partie non titulaire d'une licence découlent de la vente d'une substance autorisée, il serait trompeur de se fonder sur les droits d'utilisation et d'aliénation pour conclure qu'une sous-licence a été ou va être accordée. 71

Dans la présente affaire, c'est clairement la dernière situation qu'envisage l'accord d'approvision- 72

ment between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

73    A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in *Intel*, *supra*, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

74    In the instant appeals, the Federal Court of Appeal relied on *du Pont*, *supra*, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view *du Pont* as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal prin-

nement entre Novopharm et Apotex. Aux termes de l'accord, tout droit que pourrait posséder Apotex de vendre de la nizatidine émanerait, de toute évidence, de son achat préalable de cette substance à Novopharm. Comme nous l'avons vu, la possibilité que la substance puisse être acquise par Novopharm, sur l'ordre ou sous réserve des directives d'Apotex, est sans importance. Ce qui importe, c'est plutôt que l'accord d'approvisionnement ne permet nullement à Apotex d'exercer les droits conférés par la licence à Novopharm pour fabriquer ou autrement acquérir indépendamment la substance brevetée pour laquelle elle ne détient elle-même aucune licence. Si l'accord était essentiellement une sous-licence, la participation de Novopharm serait totalement inutile; Apotex pourrait négocier directement avec le fabricant ou l'exportateur de la substance, ou fabriquer elle-même les médicaments. Mais l'accord d'approvisionnement ne confère en fait aucun droit de cette nature.

Un certain nombre de précédents américains récents étayent le point de vue selon lequel, pour établir l'existence d'une sous-licence dans des situations analogues à celle qui nous occupe, il faut habituellement démontrer que la partie non titulaire d'une licence exerce le droit de la partie titulaire de la licence de fabriquer ou d'importer la substance autorisée. Par exemple, dans l'affaire *Intel*, précitée, il a été décidé que la vente de micropuces par le titulaire d'une licence, Hewlett-Packard («HP»), à un tiers, ULSI, ne constituait pas une sous-licence, même si les puces étaient fabriquées par HP conformément aux devis et aux spécifications de USLI, puis revendues par USLI. La cour a cependant reconnu dans cette affaire qu'en permettant à ULSI de fabriquer les puces elle-même, HP lui aurait alors accordé une sous-licence.

Dans les présents pourvois, la Cour d'appel fédérale s'est appuyée sur la décision *du Pont*, précitée, pour affirmer qu'en fait une sous-licence est créée chaque fois qu'un produit breveté est fabriqué au profit de la partie non titulaire d'une licence plutôt que de la partie titulaire de la licence. Toutefois, en toute déférence, j'estime qu'il est facile d'établir une distinction entre l'af-

ciple propounded. In *du Pont*, it was more significant that the unlicensed party actually manufactured the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal *personnae*, and legitimate transfers of property do, in fact, take place. In *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished *du Pont*, *supra*, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

In my view, *Cyrix* is much more closely analogous than *du Pont* to the instant appeal, a case in

faire *du Pont* et celles dont nous sommes saisis, et je ne crois pas, de toute façon, qu'elle permet de faire valoir le principe de droit préconisé. Dans *du Pont*, ce qui a été plus significatif c'est que la partie non titulaire d'une licence fabriquait réellement l'article autorisé, censément à titre de mandataire du titulaire de la licence, pour ensuite «acheter» cet article au titulaire de la licence immédiatement après sa fabrication. Cette entente a été qualifiée, à juste titre, de subterfuge par la Cour suprême du Delaware. Le seul facteur qui différenciait cette situation du cas patent de la partie non titulaire d'une licence qui fabrique un article breveté strictement à son propre profit était une série d'opérations fictives réalisées entre une filiale et sa société mère dans le but de masquer la nature véritable de l'entente.

Mais la situation est manifestement différente lorsque le fabricant et l'utilisateur final sont deux personnes morales distinctes et que des cessions légitimes de droit de propriété ont effectivement lieu. Dans *Cyrix Corp. c. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996), la partie titulaire d'une licence s'était engagée à fournir à un tiers des microprocesseurs qu'elle avait le droit de fabriquer en vertu d'une licence que lui avait accordé le breveté. La partie titulaire de la licence avait, à son tour, fait fabriquer les processeurs par une autre société (associée mais non une filiale) qui les lui a vendues pour qu'elle les revende au tiers. On a soutenu que cette entente était essentiellement une sous-licence accordée au tiers fabricant par la partie titulaire de la licence, et que les droits de cette dernière de «faire fabriquer» en vertu de la licence ne visaient que la fabrication de marchandises à son propre profit. La cour a rejeté cet argument, concluant que la partie titulaire d'une licence avait le droit de confier à un mandataire la fabrication des produits autorisés et de les revendre à son gré. Elle a établi une distinction d'avec l'affaire *du Pont*, précitée, en faisant valoir que le fabricant et l'utilisateur final étaient deux entités complètement distinctes, de sorte que l'entente ne pouvait pas être qualifiée de subterfuge.

À mon avis, *Cyrix* ressemble beaucoup plus que *du Pont* à la présente affaire, où il est question de

75

76

which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in *Cyrix* the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed four percent royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

77    Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in *du Pont*. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, *inter alia*, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

78    Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would

deux sociétés sans lien de dépendance, l'une titulaire d'une licence et l'autre non titulaire d'une licence, qui ont conclu un accord en vue de l'achat et de la vente éventuels de marchandises brevetées. Elles ont convenu que la partie titulaire d'une licence, en l'occurrence Novopharm, allait, sur l'ordre et suivant les directions d'Apotex, la partie non titulaire d'une licence, fabriquer ou importer les marchandises, acquérir les droits de propriété relatifs à celles-ci et les vendre à Apotex. La seule différence véritable réside dans le fait que, tandis que dans *Cyrix*, le titulaire d'une licence a vraisemblablement fait fabriquer les puces à des conditions qui garantiraient la réalisation d'un bénéfice sur le contrat de vente signé antérieurement avec le tiers, dans le cas qui nous occupe, le bénéfice que Novopharm est assurée de réaliser n'est pas fondé sur l'entente qu'elle a conclue avec son fournisseur, mais découle de la redevance garantie de quatre pour cent que doit verser Apotex. Cette distinction ne saurait à elle seule transformer l'accord d'approvisionnement en une sous-licence.

Comme l'accord d'approvisionnement n'a pas encore été exécuté, la preuve n'établit certainement pas qu'il s'agit d'un cas où la partie non titulaire d'une licence fabrique elle-même les marchandises, comme dans *du Pont*. En conséquence, je n'ai pas à décider si une sous-licence serait accordée dans cette situation hypothétique. En réalité, on n'a pas fait valoir, et je ne saurais simplement présumer, que l'accord d'approvisionnement a été ou est destiné à être exécuté de cette manière. De plus, je souligne encore une fois que cet accord prévoit expressément, à l'article 6, que la partie titulaire d'une licence doit se conformer aux conditions de la licence, qui lui interdisent notamment d'accorder des sous-licences. Par conséquent, s'il est théoriquement possible que cette entente soit un jour exécutée d'une manière qui entraînerait l'attribution d'une sous-licence, il faut présumer, pour les présentes fins, que, si l'accord est jamais exécuté, les parties agiront conformément à la loi.

Aux termes du contrat tel que rédigé, Apotex est simplement autorisée à guider Novopharm vers le tiers fabricant qu'elle préfère et avec qui elle a négocié des conditions, obligeant ainsi Novopharm

then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and *de facto* transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would necessarily render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

#### (4) The Agency Argument

In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make

à traiter avec ce fabricant et à acquérir le médicament breveté aux conditions négociées. Malgré l'importance du contrôle exercé par Apotex, il n'en reste pas moins que des entités distinctes sont en cause, qu'Apotex n'est aucunement responsable, en fin de compte, de la fourniture des marchandises que Novopharm lui vendra éventuellement et qu'une cession de biens légitime et de fait doit survenir entre Novopharm et le tiers pour qu'Apotex puisse acquérir des droits de propriété. Par conséquent, c'est seulement si la désignation par Apotex d'une source ou d'un fabricant qu'elle préfère en faisait nécessairement la titulaire d'une sous-licence accordée par Novopharm, que l'accord entre les deux sociétés violerait les conditions de la licence obligatoire. Étant donné qu'Apotex peut exercer ce droit contractuel sans jouir des droits conférés par une licence qui lui seraient cédés par Novopharm, il serait inexact de dire que l'accord d'approvisionnement viole nécessairement la licence.

79

Comme je l'ai déjà précisé, l'accord d'approvisionnement conclu avec Novopharm ne confère à Apotex aucun droit qui lui soit propre en vertu de la licence, peu importe l'intention apparente des parties de «partager leurs droits». Au fond, l'accord n'est rien de plus qu'un engagement à conclure un accord, une obligation mutuelle des parties à conclure, à l'avenir, des contrats entre elles. Ni le texte de l'accord ni la manière dont les parties étaient censées l'exécuter ne justifient de conclure qu'il constitue essentiellement une sous-licence.

#### (4) L'argument du mandat

80

Subsidiairement, Eli Lilly a soutenu que l'accord d'approvisionnement devait être considéré comme une sous-licence parce que le contrôle qu'Apotex exercerait vraisemblablement sur l'acquisition de nizatidine ferait en sorte que Novopharm se trouverait, en réalité, à agir en qualité de mandataire d'Apotex. En procédant à cette acquisition, Novopharm agirait non pas pour son propre compte mais pour celui d'Apotex, ce qui impliquerait que cette dernière aurait obtenu de Novopharm des droits conférés par une licence. Dans le même ordre d'idées, on affirme que, en réalité, Novo-

these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

81    To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

### (5)  Conclusion as to the Nature of the Supply Agreement

82    The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the

pharm ne serait pas autorisée à faire ces acquisitions parce qu'elle se trouverait à prendre la place d'Apotex qui n'est pas titulaire d'une licence. Le dernier argument est donc un argument subsidiaire par rapport à l'argument de la sous-licence et il subsiste même si l'accord d'approvisionnement n'est pas considéré comme une sous-licence.

À mon sens, cet argument doit être rejeté sous ses deux formes, pour une raison très simple. Il est tout à fait clair qu'aux termes de l'accord d'approvisionnement tout rapport contractuel qui pourrait être établi pour l'achat de nizatidine serait entre Novopharm et le tiers fournisseur. Apotex ne serait pas partie au contrat; Novopharm ne conclurait pas le contrat «pour le compte» d'Apotex de quelque manière que ce soit. L'idée qu'un mandataire établisse un rapport contractuel avec le tiers va à l'encontre du concept même de mandat, qui suppose que le mandataire lie le mandant et ne se lie pas lui-même par des rapports et des obligations contractuels. La signature d'un contrat entre Novopharm et un tiers fournisseur empêcherait la formation d'un rapport mandant-mandataire parce que, même si un tel rapport était envisagé, il ne pourrait pas être réalisé par une opération aboutissant à un contrat entre le tiers et le mandataire plutôt que le mandant.

### (5)  Conclusion sur la nature de l'accord d'approvisionnement

L'entente conclue entre Apotex et Novopharm n'est pas une sous-licence. Peu importe l'importance du contrôle qu'Apotex pourrait exercer sur les mesures prises pour organiser et faciliter l'acquisition à son propre profit des substances autorisées, aucune acquisition réelle n'est possible sans la participation de Novopharm. L'accord ne confère pas à Apotex le droit de faire indépendamment de Novopharm quelque chose que seule Novopharm est autorisée à faire, et il n'implique pas ou ne traduit pas l'intention des parties contractantes de conférer un tel droit. Autrement dit, Novopharm ne cède à Apotex aucun droit conféré par sa licence. Ainsi, bien qu'il en résulte peut-être une situation peu conventionnelle sur le plan commercial, l'entente est, en fin de compte, essentielle-

Federal Court of Appeal held otherwise, it was, with respect, in error.

That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in *du Pont*, *supra*. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the *Patent Act* or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is

ment incompatible avec l'attribution d'une sous-licence. Dans la mesure où la Cour d'appel fédérale a conclu le contraire, elle a, en toute déférence, commis une erreur.

Cependant, cela ne signifie pas qu'il serait impossible d'exécuter l'accord de manière à créer une sous-licence. Par exemple, quoique je n'aie pas à trancher cette question hypothétique, je ferais observer une fois de plus que, si le fournisseur canadien auprès duquel Apotex a demandé à Novopharm de se procurer la nizatidine se trouvait à être Apotex elle-même, l'accord serait vraisemblablement considéré comme un subterfuge, tout comme dans l'affaire *du Pont*, précitée. De même, si Novopharm devait manquer de vigilance en exécutant l'accord et permettre à Apotex de contracter directement avec le tiers fournisseur pour acheter la nizatidine, il pourrait bien se révéler que cet assouplissement des conditions entraînerait en fait l'attribution d'une sous-licence. Mais ce sont là des hypothèses et non pas les faits dont nous sommes saisis. À vrai dire, la manière dont l'accord a été exécuté par les parties est absolument impossible à prouver en l'espèce, parce qu'à la date de l'audience il n'avait toujours pas été exécuté. En revanche, si l'accord a été exécuté par la suite de manière à créer une sous-licence, ou s'il l'est à l'avenir, il sera certainement loisible au breveté de demander l'annulation de la licence obligatoire ou tout autre redressement qui pourrait convenir en vertu de la *Loi sur les brevets* notamment. Toutefois, cela n'a rien à voir avec le caractère fondé des ADA en cause dans la présente affaire.

En conséquence, je soulignerais qu'il ne faudrait pas interpréter les conclusions tirées en l'espèce comme prévoyant que tout accord d'approvisionnement semblable à celui qui nous occupe protège les parties à cet accord contre toute allégation d'attribution d'une sous-licence. La présente décision doit plutôt être limitée pour l'essentiel à ses faits: une affaire dans laquelle un accord a été conclu entre deux sociétés sans lien de dépendance, qui, à première vue, n'est pas une sous-licence et qui n'avait pas été exécuté à quelque époque pertinente relativement au litige. Tout dépendant de l'exécution de l'accord, de l'identité des parties ou

83

84

entirely possible that a different result might be reached on the specific facts of another case.

B. *Other Issues in the Novopharm Appeal*

(1) Did the Federal Court of Appeal Err in Applying its Decision in *Apotex #1* to its Decision in *Novopharm*?

85    Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the *Novopharm* appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence and, whereas the conclusion of the court in *Apotex #1* may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in *Apotex #1* if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before the court in *Novopharm* and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

86    It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as *res judicata* or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement,

d'un certain nombre d'autres facteurs distinctifs, il se pourrait fort bien que les faits particuliers d'une autre affaire donnent lieu à un résultat différent.

B. *Autres questions en litige dans le pourvoi Novopharm*

(1) La Cour d'appel fédérale a-t-elle commis une erreur en appliquant son arrêt *Apotex n° 1* à l'affaire *Novopharm*?

Novopharm soutient que, même si la Cour d'appel fédérale avait eu raison d'interpréter l'accord d'approvisionnement comme attribuant une sous-licence à Apotex, cet accord ne devrait pas cependant être considéré comme une sous-licence aux fins du pourvoi *Novopharm*. On fait valoir, à l'appui de cette distinction, que l'accord ne peut pas être considéré, à première vue, comme une sous-licence et que, tandis que la conclusion de la cour dans *Apotex n° 1* peut avoir reposé en partie sur le témoignage de M. Sherman au sujet de la manière dont Apotex s'attendait à ce que l'accord soit exécuté, aucune mesure n'avait encore été prise pour l'exécuter. On soutient donc que, alors qu'il aurait pu être loisible à la cour d'accorder l'ordonnance d'interdiction demandée dans *Apotex n° 1* si l'exécution proposée par M. Sherman avait entraîné l'attribution d'une sous-licence, la cour ne disposait pas de ce témoignage dans *Novopharm* et, en fait, celui-ci était incompatible avec le témoignage de M. Dan quant à sa compréhension de l'accord. Dans la mesure où la Cour d'appel fédérale n'a pas tenu compte de cette différence majeure sur le plan de la preuve, cela, affirme-t-on, constitue une erreur de droit.

Il est sûrement vrai que chaque cas doit être examiné en fonction de ses propres faits, et j'ai déjà exprimé l'avis que l'exécution de l'accord d'une certaine manière pourrait bien entraîner hypothétiquement la création d'une sous-licence. Pour ce motif, je suis d'accord pour dire qu'il n'aurait pas convenu que la Cour d'appel fédérale applique au second pourvoi son arrêt dans le premier pourvoi, que ce soit à titre de chose jugée ou autrement, sans prendre en considération toute différence factuelle importante qui pouvait exister entre les deux affaires. Toutefois, vu ma conclusion antérieure sur

together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

### (2)  Was Novopharm's Notice of Allegation Premature and Therefore not Justified?

Even the unequivocal conclusion as to the character of the supply agreement does not put the *Novopharm* matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

Pursuant to s. 39.11(2)(*c*) of the *Patent Act*, Novopharm was prohibited from importing, under its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the *Patent Act Amendment Act, 1992*, s. 11(1) of that Act provides that licences granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

la nature de l'accord d'approvisionnement et compte tenu du fait que cet accord n'avait pas été exécuté à l'époque pertinente, il n'est pas nécessaire de statuer sur ce point. Aucun des éléments de preuve extrinsèque examinés par la Cour d'appel fédérale n'a eu quelque influence que ce soit sur les conclusions que j'ai tirées.

### (2)  L'avis d'allégation de Novopharm était-il prématuré et donc non fondé?

Même la conclusion sans équivoque sur la nature de l'accord d'approvisionnement ne met pas fin à l'affaire *Novopharm*. Il reste à décider si, comme l'allègue Eli Lilly, l'ADA de Novopharm n'était pas fondé indépendamment de la question de savoir si on avait réussi à annuler sa licence obligatoire pour la nizatidine. 87

Selon l'al. 39.11(2)*c*) de la *Loi sur les brevets*, il était interdit à Novopharm d'importer, en vertu de sa licence obligatoire, un médicament à l'égard duquel un ADC avait été délivré après le 27 juin 1986, jusqu'à l'expiration d'un délai de 10 ans après la date de délivrance de cet ADC. Bien que cette disposition ait été abrogée par la *Loi de 1992 modifiant la Loi sur les brevets*, le par. 11(1) de cette loi prévoit que les licences accordées en vertu de l'ancien art. 39, avant le 20 décembre 1991, restent valides dans les limites de leurs conditions, et que les art. 39 à 39.14 de la loi antérieure s'appliquent à elles comme s'ils n'avaient pas été abrogés. 88

Un ADC relatif à la nizatidine a été délivré à Eli Lilly Canada le 31 décembre 1987. En conséquence, Eli Lilly soutient que l'ADA de Novopharm qui a été déposé le 30 juillet 1993 n'aurait pas pu être fondé avant le 31 décembre 1997, la première date à laquelle elle aurait eu le droit, en vertu de sa licence obligatoire, d'importer de la nizatidine. Eli Lilly fait donc valoir que, même si aucune sous-licence n'a été accordée et que l'annulation de la licence de Novopharm n'était donc pas fondée, Novopharm aurait néanmoins violé les brevets d'Eli Lilly si elle avait reçu un ADC à l'égard de la nizatidine, car elle ne disposait d'aucun moyen n'emportant pas contrefaçon d'obtenir le médicament en vrac. 89

90    However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the *Patent Act*. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

Toutefois, cet argument ne tient apparemment pas compte du fait que l'ADA de Novopharm ne semble pas révéler l'intention précise d'importer de la nizatidine. Il s'agit plutôt d'une demande d'ADC pour la fabrication, l'exécution, l'utilisation ou la vente de gélules de 150 mg et de 300 mg de nizatidine. Il n'y est pas fait état de la manière dont Novopharm se propose d'obtenir le médicament en vrac et on n'a produit aucun élément de preuve laissant entendre qu'il devrait être importé. En fait, quoique M. Dan ait reconnu, dans ses réponses écrites à des engagements en contre-interrogatoire, qu'au moment de l'audition les fournisseurs de Novopharm étaient à l'étranger, il a aussi indiqué que Novopharm savait qu'il lui était interdit d'importer de la nizatidine avant le 31 décembre 1997 et qu'elle avait l'intention de respecter les dispositions pertinentes de la *Loi sur les brevets*. En outre, il a indiqué que Novopharm pourrait trouver un fournisseur canadien entre le 31 décembre 1994 et le 31 décembre 1997, et il a expressément nié toute intention d'importer de la nizatidine avant cette dernière date.

91    Pursuant to s. 39.14 of the *Patent Act*, Novopharm was entitled to use the patented invention for the preparation or production of medicine — that is, to manufacture the medicine itself or through Canadian agents — after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

Selon l'art. 39.14 de la *Loi sur les brevets*, Novopharm avait le droit d'utiliser l'invention brevetée pour préparer ou produire un médicament — c'est-à-dire pour fabriquer le médicament elle-même ou par l'intermédiaire de mandataires canadiens — à l'expiration des sept années suivant la date de délivrance du premier ADC à Eli Lilly Canada. Ce délai de sept ans a expiré le 31 décembre 1994 et, bien que Novopharm ait signifié son ADA à Eli Lilly Canada le 30 juillet 1993, la demande n'a été entendue que le 30 janvier 1995. Par conséquent, Novopharm avait, à la date de l'audition, le droit de fabriquer ou de faire fabriquer le médicament pour son propre usage, dans le but de le vendre à des fins de consommation au Canada.

92    In *Apotex #2*, *supra*, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As

Dans *Apotex n⁰ 2*, précité, l'affaire connexe aux présents pourvois, j'ai décidé que la date appropriée pour évaluer un ADA, lorsqu'une ordonnance d'interdiction est demandée par le breveté, est celle de l'audition et non celle du dépôt de l'ADA. En conséquence, je ne puis conclure que l'ADA de Novopharm était prématuré et donc non

of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the *Patent Act* by obtaining the medicine either from a Canadian supplier or not at all.

### (3) Jurisdiction to Grant Declaratory Relief

The final issue to be determined with respect to the *Novopharm* appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the

fondé. À la date de l'audition, elle disposait en réalité d'un moyen n'emportant pas contrefaçon d'obtenir de la nizatidine en vrac et, en l'absence de preuve contraire, je présume qu'elle avait l'intention, comme l'a affirmé M. Dan, de respecter les restrictions de la *Loi sur les brevets* en se procurant exclusivement le médicament chez un fournisseur canadien.

### (3) Compétence pour accorder un jugement déclaratoire

La dernière question qui doit être tranchée en ce qui concerne le pourvoi *Novopharm* est de savoir si, dans le cadre d'une procédure sommaire de contrôle judiciaire relative à une demande d'ordonnance interdisant la délivrance d'un ADC, notre Cour a compétence pour accorder un jugement déclaratoire. Plus précisément, Novopharm demande à notre Cour de déclarer (1) qu'Eli Lilly n'a pas démontré que l'avis d'allégation n'était pas fondé, (2) qu'Eli Lilly n'a pas démontré qu'elle avait le droit d'annuler la licence obligatoire, et (3) que l'accord d'approvisionnement ne constitue ni une sous-licence ni une cession de la licence obligatoire de Novopharm à Apotex. [93]

À mon avis, les deux premières demandes sont inutiles. La conclusion que l'accord d'approvisionnement n'était pas une sous-licence nous amène nécessairement à conclure, du moins pour les fins du présent pourvoi, qu'Eli Lilly n'avait pas le droit d'annuler la licence obligatoire de Novopharm. En fait, on n'a allégué l'existence d'aucune autre violation susceptible de déclencher l'application de l'article 9 de la licence. De même, cette conclusion, conjuguée à celle que l'ADA de Novopharm n'était pas prématuré, amène à conclure qu'Eli Lilly n'a pas démontré que l'ADA n'était pas fondé. Je ne vois aucune raison d'accorder ce qui serait un jugement déclaratoire superflu à l'égard de ces questions, quand il suffit de décider si la Cour d'appel fédérale a commis une erreur en rendant les ordonnances d'interdiction demandées. [94]

Quant à la troisième demande, j'estime qu'il ne conviendrait pas que notre Cour accorde le redressement demandé étant donné la nature des présentes procédures. Comme le juge McGillis l'a fait [95]

summary judicial review that is to be conducted on an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In *Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare)* (1994), 55 C.P.R. (3d) 302 (F.C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

> In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

> In this connection, it may be noted that, while s. 7(2)(*b*) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. <u>Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding.</u> [Emphasis added.]

96     This point was reinforced more recently by Strayer J.A. in *David Bull Laboratories*, *supra*, at p. 600:

> If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. <u>This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application.</u> As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary

observer à juste titre, le contrôle judiciaire sommaire auquel donne lieu une demande d'ordonnance d'interdiction fondée sur le Règlement dépend énormément des faits de l'espèce et est généralement considéré comme ne liant que les parties au litige. Cela est seulement indiqué vu la nature limitée des procédures, la question à trancher et le dossier constitué à cette fin limitée. Dans *Merck Frosst Canada Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1994), 55 C.P.R. (3d) 302 (C.A.F.), aux pp. 319 et 320, le juge Hugessen a fait la remarque suivante, à laquelle je souscris:

> Pour décider si les allégations sont «fondées» (paragraphe 6(2)), la Cour doit examiner si, à la lumière de ces faits tels qu'ils sont présumés ou prouvés, ces allégations engageraient en droit à conclure que le brevet ne serait pas contrefait par la partie intimée.

> À ce sujet, il y a lieu de noter que si l'alinéa 7(2)*b*) semble prévoir que la Cour rend un jugement déclarant que le brevet n'est pas valide ou qu'il n'est pas contrefait, il ne fait aucun doute que ce jugement déclaratoire ne peut être rendu dans le cadre de la procédure fondée sur l'article 6 elle-même. <u>Cette procédure est après tout engagée par le breveté pour demander une interdiction contre le ministre; puisqu'elle revêt la forme d'un recours sommaire en contrôle judiciaire, il est impossible de concevoir qu'elle puisse donner lieu à une demande reconventionnelle de la part de l'intimé en vue de pareil jugement déclaratoire. L'invalidité de brevet, tout comme la contrefaçon de brevet, n'est pas une question relevant d'une procédure de ce genre.</u> [Je souligne.]

    Cette remarque a été renforcée plus récemment par le juge Strayer dans l'arrêt *David Bull Laboratories*, précité, à la p. 600:

> Si, en prenant ce Règlement, le gouverneur en conseil avait eu l'intention de prévoir le prononcé d'une décision définitive sur la validité et la contrefaçon d'un brevet, qui lierait toutes les parties privées et empêcherait tout litige ultérieur visant les mêmes questions, il l'aurait sûrement exprimée. <u>Le tribunal n'est pas disposé à accepter l'hypothèse voulant que les brevetés et les sociétés génériques soient forcés de faire valoir leurs droits privés uniquement au moyen de la procédure sommaire de demande de contrôle judiciaire.</u> Étant donné que le Règlement dispose que les questions qui peuvent être tranchées à cette étape seront examinées dans le cadre d'une telle procédure, il est donc assez

nature. <u>If a full trial of validity or infringement issues is
required this can be obtained in the usual way by com-
mencing an action.</u> [Emphasis added.]

While the relief requested of the Federal Court
of Appeal in these cases touched on issues pertain-
ing to the infringement and/or invalidity of the
actual patents, not the effect of an external agree-
ment, I believe that the reasoning involved is also
applicable to the *Novopharm* appeal. The nature of
the inquiry on this judicial review proceeding
requires only a determination as to whether or not
the NOA was justified in the circumstances of this
case. While this necessarily entails a decision as to
whether, in these particular circumstances, the sup-
ply agreement constituted a sublicence and thus
justified the termination of the licence, this is not
to be taken as a final decision on the nature of the
agreement for all purposes. For this Court to make
a binding declaration concerning the private rights
and obligations of the parties to the agreement
would go well beyond the limited scope of the pro-
ceeding. Accordingly, I would deny the declara-
tory relief requested by Novopharm.

### C. *Other Issues in the Apotex #1 Appeal*

#### (1) Would the Reformulation of Nizatidine by Apotex into Final-dosage Form Infringe the Patent Held by Eli Lilly?

Even assuming that the supply agreement did
not constitute a sublicence, that Novopharm's
licence remains in force, and that Apotex is there-
fore able to purchase bulk nizatidine under the
supply agreement as a third-party purchaser, the
possibility remains that the use to which Apotex
proposes, in its NOA, to put the drug would
infringe Eli Lilly's patent. In this vein, Eli Lilly
submits that the Federal Court of Appeal erred in
holding that the formulation of final-dosage cap-
sules by Apotex would not infringe the patent.
Specifically, it is submitted that the rights of use
and sale that are inherent in the unrestricted

clair que ces questions sont obligatoirement de nature
limitée ou préliminaire. <u>Si l'instruction complète des
questions de validité et de contrefaçon est nécessaire, on
peut procéder de la façon habituelle en intentant une
action.</u> [Je souligne.]

Même si le redressement demandé à la Cour    97
d'appel fédérale dans ces affaires concernait des
questions touchant la violation ou l'invalidité des
brevets eux-mêmes, et non pas l'effet d'un accord
externe, je crois que le raisonnement adopté est
aussi applicable au pourvoi *Novopharm*. La nature
de l'examen relatif à la présente procédure de con-
trôle judiciaire exige seulement de décider si
l'ADA était fondé dans les circonstances de la pré-
sente affaire. Bien que pour répondre à cette ques-
tion il faille nécessairement décider si, dans ces
circonstances particulières, l'accord d'approvision-
nement constituait une sous-licence et justifiait
donc l'annulation de la licence, ce ne doit pas être
interprété comme une décision définitive sur la
nature de l'accord à toutes fins. En rendant un
jugement déclaratoire sur les droits et les obliga-
tions privés des parties à l'accord, notre Cour irait
bien au-delà de la portée limitée de la procédure.
En conséquence, je suis d'avis de refuser le juge-
ment déclaratoire demandé par Novopharm.

### C. *Autres questions en litige dans le pourvoi Apotex nº 1*

#### (1) La préparation par Apotex de la nizatidine sous forme posologique définitive violerait-elle le brevet d'Eli Lilly?

Même en supposant que l'accord d'approvision-    98
nement ne constituait pas une sous-licence, que la
licence de Novopharm est toujours valide et
qu'Apotex peut donc acheter de la nizatidine en
vrac, en vertu de l'accord d'approvisionnement, à
titre de tiers acquéreur, il demeure possible que
l'utilisation qu'Apotex propose, dans son ADA, de
faire du médicament viole le brevet d'Eli Lilly.
Dans la même veine, Eli Lilly soutient que la Cour
d'appel fédérale a commis une erreur en décidant
que la préparation par Apotex des gélules sous
forme posologique définitive ne violerait pas le
brevet. Plus précisément, on fait valoir que les

purchase of a licensed article do not permit the making of a new article.

99    In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

> If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession, and the right to destroy, encumber or alienate it". . . . If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [*sic*] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.

> The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions. It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

100    Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see *Badische Anilin und Soda Fabrik v. Isler*, *supra*, at p. 610. Unless otherwise stipulated in the licence to sell a patented

droits d'utilisation et de vente inhérents à l'achat sans restriction d'un article autorisé ne permettent pas de fabriquer un nouvel article.

Le juge Pratte de la Cour d'appel fédérale, avec l'appui de la majorité sur ce point, a répondu, à la p. 343, à cet argument dans le passage concis et utile ci-après, auquel je souscris:

> Si le titulaire d'un brevet fabrique un objet breveté, il a, outre ce monopole, la propriété de cet article. Et la propriété d'une chose implique, comme chacun sait, [**TRADUCTION**] «le droit de posséder la chose et de l'utiliser, le droit de jouir des produits et des accessoires de la chose, ainsi que le droit de la détruire, de la grever ou de l'aliéner» [. . .] Si le titulaire du brevet vend l'objet breveté qu'il a fabriqué, il cède à l'acheteur le droit de propriété relatif à cet article. Cela signifie qu'à partir de ce moment, le titulaire du brevet ne jouit plus d'un droit quelconque à l'égard de l'objet qui appartient maintenant à l'acheteur, lequel, à titre de nouveau propriétaire, jouit du droit exclusif de posséder cet objet, de l'utiliser, d'en jouir, de le détruire ou de l'aliéner. Il s'ensuit qu'en vendant l'objet breveté qu'il a fabriqué, le titulaire du brevet renonce implicitement, pour ce qui est de cet objet, au droit exclusif qu'il possède d'utiliser et de vendre l'invention en vertu du brevet. Par conséquent, après la vente, l'acheteur peut faire ce qu'il veut de l'objet breveté sans craindre de contrefaire le brevet de son vendeur.

> Les mêmes principes s'appliquent manifestement lorsqu'un article breveté est vendu à un titulaire de licence qui, en vertu de cette dernière, est autorisé à vendre sans restriction. Il s'ensuit que si Apotex devait acheter de la nizatidine en vrac fabriquée ou importée par Novopharm en vertu de sa licence, Apotex pourrait, sans contrefaire les brevets de Lilly, fabriquer des gélules à partir de cette substance ou l'utiliser de toute autre manière possible. [Je souligne.]

Peut-être convient-il d'expliquer brièvement les principes qui sous-tendent cet énoncé légitime du droit. Comme je l'ai déjà fait remarquer au sujet de la distinction entre une sous-licence et un contrat de vente ordinaire d'un article breveté ou autorisé, la vente d'un article breveté est présumée conférer à l'acheteur le droit [**TRADUCTION**] «d'utiliser, de vendre ou d'aliéner les marchandises à son gré»: voir *Badische Anilin und Soda Fabrik c. Isler*, précité, à la p. 610. Sauf stipulation contraire de la licence autorisant la vente d'un article breveté, le

article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see *National Phonograph Co. of Australia, Ltd. v. Menck*, [1911] A.C. 336 (P.C.).

Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in *Merck & Co. v. Apotex Inc.*, *supra*, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged through-

titulaire de cette licence est ainsi en mesure de céder aux acheteurs le droit d'utiliser ou de revendre l'article en cause sans crainte de violer le brevet. En outre, toute restriction imposée au titulaire d'une licence, qui est destinée à toucher les droits des acheteurs subséquents, doit être exprimée clairement et sans équivoque; les conditions restrictives imposées par un breveté à un acheteur ou au titulaire d'une licence ne sont pas rattachées aux marchandises sauf si elles sont portées à l'attention de l'acheteur au moment de l'acquisition de ces dernières: voir *National Phonograph Co. of Australia, Ltd. c. Menck*, [1911] A.C. 336 (C.P.).

Par conséquent, il est clair que, en l'absence de conditions contraires expresses, l'acheteur d'un article autorisé a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet. À cet égard, Eli Lilly allègue qu'en l'espèce la préparation de la nizatidine sous une autre forme irait au-delà de la portée des droits obtenus par l'acheteur parce qu'elle reviendrait non pas simplement à revendre la substance achetée, mais plutôt à créer un nouvel article contrairement au brevet qu'elle détient. Toutefois, j'estime que cet argument n'est justifié ni par la preuve, ni par la jurisprudence citée par Eli Lilly. À mon avis, la préparation de la nizatidine sous forme posologique définitive n'a pas pour effet de créer un nouvel article. Elle s'apparente plutôt davantage à un nouveau conditionnement de la substance sous une forme commercialement utilisable, ce qui, à mon sens, ne viole aucun droit conféré par les brevets.

101

Aucun élément de preuve particulier n'a été produit en l'espèce au sujet de la nature du procédé par lequel le médicament en vrac est préparé sous forme posologique définitive. Toutefois, dans l'affaire *Merck & Co. c. Apotex Inc.*, précitée, à la p. 155, le juge MacKay a fait un résumé utile du procédé. Bien qu'il soit possible que le procédé employé pour préparer la nizatidine sous une autre forme diffère légèrement de celui utilisé pour la préparation sous une autre forme du médicament en cause dans cette affaire, à savoir le maléate d'énalapril, l'essentiel de la description qu'en a fait le juge MacKay est néanmoins pertinent: le com-

102

out the reformulation process. It exists in the same
chemical form in the final-dosage product as in the
bulk product. However, the two products are sub-
stantially different, in that the bulk form is essen-
tially a powder without other form or shape, while
the final-dosage form is a coloured tablet, consist-
ing of the bulk medicine and other ingredients and
shaped in a form associated with a particular dos-
age. Indeed, in the view of MacKay J., the process
so described was such a significant transformation
that the final-dosage form of enalapril maleate sold
by Apotex was not protected by s. 56 of the *Patent
Act*, which authorizes the use and sale of a "spe-
cific" patented article by a party who purchased,
constructed, or acquired the article before the pat-
ent application became open to the inspection of
the public. In other words, MacKay J. was unwill-
ing to accept that the final-dosage form was the
same "specific article" as the bulk enalapril
maleate purchased by Apotex prior to the date on
which Merck's patent application became open for
inspection.

103    However, this conclusion was rejected by the
Federal Court of Appeal, in a judgment reported at
[1995] 2 F.C. 723. At p. 738, MacGuigan J.A.,
writing for a unanimous court, expressed the view
that "the right to use or sell the 'specific article,
etc.' is independent of the form in which the
invention is purchased: any form of the invention
may be used or sold within the immunity conferred
by s. 56" (emphasis in original). In so holding,
MacGuigan J.A. relied on the following statement
of Hall J. in *Libbey-Owens-Ford Glass Co. v. Ford
Motor Co. of Canada, Ltd.*, [1970] S.C.R. 833, at
p. 839, affirming the judgment of Thurlow J. (as he
then was) in the court below (reported at [1969] 1
Ex. C.R. 529):

   The question in this case is with respect to the extent
of the meaning of "using" and it arises because with
respect to "vending" the right of the owner of the spe-

posé de base breveté en cause, c'est-à-dire le médi-
cament en vrac produit par le breveté ou le titulaire
d'une licence, reste inchangé pendant tout le pro-
cessus de préparation sous une autre forme. Il
existe, dans le produit sous forme posologique
définitive, sous la même forme chimique que dans
le produit en vrac. Toutefois, les deux produits sont
fondamentalement différents du fait que le produit
en vrac est essentiellement une poudre informe
alors que, sous forme posologique définitive, il
s'agit d'un comprimé coloré qui est composé du
médicament en vrac et d'autres ingrédients et dont
la forme correspond à un dosage donné. En fait, le
juge MacKay a estimé que le procédé ainsi décrit
représentait une transformation tellement impor-
tante que le maléate d'énalapril sous forme posolo-
gique définitive vendu par Apotex n'était pas pro-
tégé par l'art. 56 de la *Loi sur les brevets*, lequel
permet l'utilisation et la vente de l'article «spéci-
fique» breveté par la personne qui l'a acheté, exé-
cuté ou acquis avant que la demande de brevet
devienne accessible à l'inspection du public.
Autrement dit, le juge MacKay n'était pas disposé
à admettre que la forme posologique définitive
était le même «article spécifique» que le maléate
d'énalapril en vrac acheté par Apotex avant la date
à laquelle la demande de brevet de Merck est deve-
nue accessible à l'inspection.

   Toutefois, cette conclusion a été rejetée par la
Cour d'appel fédérale dans un arrêt publié à [1995]
2 C.F. 723. À la page 738, le juge MacGuigan a
exprimé l'avis, au nom de la cour à l'unanimité,
que «le droit d'utiliser ou de vendre l'«article»
etc., ne dépend pas de la forme sous laquelle l'in-
vention est achetée: l'invention sous toutes ses
formes peut être utilisée ou vendue avec l'immu-
nité conférée par l'article 56» (souligné dans l'ori-
ginal). En tirant cette conclusion, le juge MacGui-
gan s'est appuyé sur l'énoncé suivant du juge Hall
dans *Libbey-Owens-Ford Glass Co. c. Ford Motor
Co. of Canada, Ltd.*, [1970] R.C.S. 833, à la
p. 839, confirmant le jugement du juge Thurlow
(plus tard Juge en chef) (publié à [1969] 1 R.C. de
l'É. 529):

   Dans cette affaire, la question a trait à l'étendue du
sens à donner au terme «utiliser», et elle se pose parce
que, en ce qui a trait au terme «vendre», le droit du pro-

cific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] if the owner could not put it to the only use for which it is usable without being liable for infringement. [Emphasis added.]

Accordingly, MacGuigan J.A. concluded, at p. 741, that:

The use and sale of the product of a machine, particularly if production is the only possible use of the machine, is accorded protection under section 56 as a use of the machine itself. . . . In my view, use must be given the same sense in the case of a chemical invention. [Emphasis added.]

The *Merck & Co. v. Apotex Inc.* decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Noth-

priétaire de la machine spécifique, ou autre chose, est exprimé comme étant celui de la vendre, et non celui de vendre sa production. Cependant, dans le cas d'une machine conçue pour la production de biens, il est évident que l'art. 58 [56] n'accorderait vraiment aucune protection valable si le propriétaire ne pouvait en faire le seul usage auquel elle peut servir, sans se rendre coupable de contrefaçon. [Je souligne.]

En conséquence, le juge MacGuigan a conclu, à la p. 741:                                                    104

L'utilisation et la vente du produit d'une machine, en particulier si la production est le seul usage possible auquel la machine peut servir, sont protégées par l'article 56 à titre d'utilisation de la machine elle-même. [. . .] À mon avis, il faut attribuer le même sens à l'utilisation dans le cas d'une invention chimique. [Je souligne.]

La décision *Merck & Co. c. Apotex Inc.* met en   105
évidence le fait qu'il n'y a vraiment, pour le médicament en vrac, aucun autre usage commercial que sa préparation sous forme posologique définitive destinée au consommateur. Pour que son acquisition ait quelque utilité, l'acheteur doit donc prendre des mesures pour la transformer sous cette forme commercialement utilisable. À mon avis, la conclusion du juge MacGuigan selon laquelle le droit d'utiliser et de vendre un article inclut celui d'utiliser et de vendre les choses produites au moyen de cet article, quoiqu'elle ait été tirée dans le contexte particulier d'un moyen de défense fondé sur l'art. 56, s'applique avec la même vigueur dans le cas qui nous occupe. En d'autres termes, le droit d'utilisation et de vente qui est inhérent à l'acquisition par Apotex de la nizatidine de Novopharm doit être interprété comme englobant le droit d'utiliser et de vendre les choses produites au moyen de cette nizatidine, y compris les gélules sous forme posologique définitive. Il s'ensuit donc qu'Apotex ne violerait pas les brevets d'Eli Lilly simplement en vendant le médicament sous la forme envisagée par l'ADA. Cela est particulièrement vrai lorsque, comme en l'espèce, les droits exclusifs conférés au breveté par le brevet sont limités essentiellement à la préparation du médicament en vrac suivant le procédé breveté. Le procédé de préparation sous une autre forme ne

ing in the reformulation process can be seen as infringing upon this right.

106      Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final-dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final-dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

107      Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

108      I would emphasize, however, that this conclusion is in no way premised upon, and should not be

peut aucunement être considéré comme violant ce droit.

Tout doute concernant cette conclusion de non-contrefaçon doit, selon moi, être dissipé par l'examen de la licence obligatoire de Novopharm, qui prévoit explicitement la vente en vrac de la substance autorisée, en établissant une formule de calcul des redevances sur le produit ainsi vendu. Si je comprends bien, étant donné l'absence de tout autre usage pratique pour le médicament en vrac, la licence doit aussi être interprétée comme envisageant et permettant implicitement la préparation par l'acheteur du produit sous forme posologique définitive. Cette conclusion est seulement renforcée, à mon sens, par le fait que les taux de redevance prévus sont fixés en fonction des montants perçus par les acquéreurs subséquents pour la vente aux détaillants des produits sous forme posologique définitive. Si le commissaire aux brevets avait voulu restreindre cette utilisation du médicament, il l'aurait dit expressément ou, du moins, il n'aurait pas énoncé explicitement la méthode de rémunération du breveté pour cette utilisation.

En conséquence, Eli Lilly a tort d'affirmer que la préparation sous une autre forme proposée par Apotex devrait être réalisée conformément à une sous-licence accordée par Novopharm, ce qui justifierait l'annulation de la licence obligatoire de Novopharm et, par conséquent, de la sous-licence, ou encore serait absolument interdite et violerait les brevets qu'elle détient. Il vaut mieux considérer, je le répète, que le droit de préparation sous une autre forme est basé sur le droit inhérent du propriétaire d'un bien d'en disposer à son gré. En l'absence, dans la licence obligatoire, de quelque condition expresse interdisant aux acheteurs de nizatidine en vrac de Novopharm de préparer le médicament sous forme posologique définitive, la jurisprudence penche en faveur du point de vue selon lequel Apotex, après avoir validement acquis le médicament en vrac, serait libre de le préparer sous une autre forme pour le revendre sans crainte de violer quelque droit conféré par les brevets d'Eli Lilly.

Je soulignerais, toutefois, que cette conclusion n'est aucunement fondée sur les règles établies

taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, *Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 7 C.P.R. (3d) 294 (F.C.T.D.). Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

## VI. Disposition

A. *Novopharm Ltd. v. Eli Lilly and Co.*

For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court — Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

B. *Apotex Inc. v. Eli Lilly and Co.*

Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

concernant les limites acceptables de la réparation d'un article breveté et qu'elle ne doit pas être interprétée comme ayant un rapport avec ces règles: voir, par exemple, *Rucker Co. c. Gavel's Vulcanizing Ltd.* (1985), 7 C.P.R. (3d) 294 (C.F. 1$^{re}$ inst.). En l'espèce, il est question non pas de la réparation d'un article breveté, mais de sa revente sous une forme quelque peu différente. J'ajouterais également que je ne suis pas convaincu par la jurisprudence citée par Eli Lilly à l'appui de son assertion que les droits de l'acheteur ne comprennent pas le droit de préparation sous une autre forme.

Compte tenu de ce qui précède, je suis d'accord avec le juge Pratte et avec la Cour d'appel fédérale à la majorité, et je conclus que la préparation de la nizatidine en vrac sous forme posologique définitive ne violerait pas le brevet d'Eli Lilly. En conséquence, je statue donc que, malgré ses divers efforts en ce sens, Eli Lilly n'a pas réussi à établir que l'ADA d'Apotex n'était pas fondé et qu'il y avait donc lieu de rendre une ordonnance d'interdiction.   109

## VI. Dispositif

A. *Novopharm Ltd. c. Eli Lilly and Co.*

Pour les motifs qui précèdent, je suis d'avis d'accueillir le pourvoi, d'infirmer l'arrêt de la Cour d'appel fédérale et de rétablir le jugement de la Cour fédérale, Section de première instance, avec dépens en faveur de l'appelante dans toutes les cours. Toutefois, je suis d'avis de refuser la demande de jugement déclaratoire de l'appelante.   110

B. *Apotex Inc. c. Eli Lilly and Co.*

Également pour les motifs qui précèdent, et après examen complet des différences factuelles entre les deux pourvois dont nous sommes saisis en l'espèce, je suis d'avis d'accueillir le pourvoi, d'infirmer l'arrêt de la Cour d'appel fédérale et de rejeter la demande d'ordonnance d'interdiction. L'appelante a droit à ses dépens dans toutes les cours.   111

192        **ELI LILLY & CO.** *v.* **NOVOPHARM LTD.**        [1998] 2 S.C.R.

*Appeals allowed with costs.*

*Solicitors for the appellant Apotex Inc.: Goodman, Phillips & Vineberg, Toronto.*

*Solicitors for the appellant Novopharm Limited: Ridout & Maybee, Toronto.*

*Solicitors for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.*

*Pourvois accueillis avec dépens.*

*Procureurs de l'appelante Apotex Inc.: Goodman, Phillips & Vineberg, Toronto.*

*Procureurs de l'appelante Novopharm Limited: Ridout & Maybee, Toronto.*

*Procureurs des intimées Eli Lilly and Company et Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.*

# TAB 4

# COURT OF APPEAL FOR ONTARIO

CITATION: Onex Corporation v. American Home Assurance Company,
2013 ONCA 117
DATE: 20130225
DOCKET: C54076, C54123, C55034

O‟Connor A.C.J.O., Rosenberg and Simmons JJ.A.

BETWEEN

Onex Corporation, Gerald W. Schwartz, Christopher A. Govan, Mark Hilson and
Nigel Wright

Plaintiffs/Defendants by Counterclaim

(Respondents/Cross-Appellants)

and

American Home Assurance Company, Brit Syndicates Ltd. (Lloyd‟s Syndicate
2987), Heritage Managing Agency Limited (Lloyd‟s Syndicate 3245), XL
Insurance Company Limited, Liberty Mutual Insurance Company, Lloyd‟s
Underwriters Syndicates No. 2623, 0623, 0033 and AIG Europe (UK) Limited,
and Houston Casualty Company

Defendants/Plaintiff by Counterclaim American Home

(Respondents/Appellant/Respondent on Cross-Appeal)

Geoffrey D. E. Adair, Q.C. and Alexa Sulzenko, for the respondents/cross-
appellants

Glenn A. Smith, Rory Gillis and Marcus B. Snowden, for the appellant and
respondent on cross-appeal, American Home Assurance Company

Alan L. W. D‟Silva, Mark E. Walli and Ellen M. Snow, for the respondents Brit
Syndicates Ltd. (Lloyd‟s Syndicate 2987), Heritage Managing Agency Limited
(Lloyd‟s Syndicate 3245) and XL Insurance Company Limited

Heard:  June 20, 2012

Page:  2

On appeal and cross-appeal from the judgment of Justice Laurence A. Pattillo of the Superior Court of Justice, dated June 30, 2011, with reasons reported at 2011 ONSC 1142, 98 C.C.L.I. (4th) 228, with supplementary reasons dated August 4, 2011, and on appeal from the judgment of Justice Laurence A. Pattillo of the Superior Court of Justice, dated January 20, 2012.

**O'Connor A.C.J.O. and Simmons J.A.:**

## A. OVERVIEW

[1]    The main issues before this court concern whether Onex Corporation is entitled to reimbursement for defence and settlement costs ("defence costs") under various directors" and officers" ("D&O") liability insurance policies.

[2]    In 2005, Onex, four of its directors and officers – Gerald W. Schwartz, Christopher A. Govan, Mark Hilson and Nigel Wright (the "personal defendants") - and others were sued in the state of Georgia by the Trustee of the Magnatrax Litigation Trust (the "Georgia Action").

[3]    The Georgia Action arose out of bankruptcy proceedings involving Magnatrax Corporation under Chapter 11 of the United States Bankruptcy Code. Magnatrax was a former subsidiary of Onex. The Magnatrax Litigation Trust was established during the Chapter 11 proceedings to pursue claims on behalf of the unsecured creditors of Magnatrax and its subsidiaries.

[4]    In the Georgia Action, the Trustee of the Magnatrax Litigation Trust alleged that Onex and the personal defendants used their control of Magnatrax to enrich

themselves at the expense of Magnatrax and ultimately caused Magnatrax and its subsidiaries to become insolvent.

[5]    The Georgia Action eventually settled for US$9.25 million. In the course of defending the Georgia Action on behalf of itself and the personal defendants, Onex incurred close to US$35 million.

[6]    Like many corporations, Onex regularly purchased D&O liability insurance and excess D&O liability insurance to protect both its own directors and officers, and also the directors and officers of its subsidiaries, from claims arising from their actions while acting in their capacity as directors and officers.

[7]    In 2008, Onex and the personal defendants commenced this action (the "Onex Action") against American Home Assurance Company[1] and various excess insurers ("Excess Insurers"). Onex and the personal defendants claimed they were entitled to reimbursement for defence costs incurred in the Georgia Action under a US$15 million 2004-2005 American Home D&O policy (the "Onex 2004-2005 Policy") and under various excess D&O policies purchased for the

_____

[1] Now known as Chartis Insurance Company of Canada.

Page:  4

2004-2005 policy year (the "2004-2005 Excess Policies").[2]

[8]     In the alternative, Onex and the personal defendants claimed they were entitled to reimbursement under a US$15 million 2002-2003 American Home D&O policy (the "Onex 2002-2003 Policy").

[9]     While serving as directors and officers of Onex, the personal defendants, Wright and Hilson, were also directors and officers of Magnatrax. In the Georgia Action, it was alleged that the personal defendants, Schwartz and Govan, acted as *de facto* directors and officers of Magnatrax.

[10]    Before Onex and the personal defendants commenced the Onex Action, American Home paid out US$15 million – the full limit of liability – under a D&O policy issued to Magnatrax (the "Magnatrax Run-Off Policy") to defray the Georgia Action defence costs of the personal defendants and two other directors and officers of Magnatrax.

[11]    The Magnatrax Run-Off Policy was issued on May 12, 2003 – on the eve of Magnatrax"s insolvency. It was issued in anticipation of Magnatrax ceasing to

---

[2] As will be further discussed below, the personal defendants" claim for defence costs was based on the Executive Liability section of the applicable D&O policies. Onex"s coverage under the applicable D&O policies was limited to reimbursement for defence costs that it incurred on behalf of the personal defendants.

Page:  5

be an Onex subsidiary and therefore ceasing to be covered under the Onex 2002-2003 Policy.[3]

[12]   In defending the Onex Action, American Home and the Excess Insurers claimed that Onex learned about the possibility of the Georgia Action in August 2003 and gave notice to American Home of that possibility (the "notice of circumstances") in compliance with clause 7(c) of the Onex 2002-2003 Policy, as well as clause 7(c) of the Magnatrax Run-Off Policy. Accordingly, under clause 4(d) of the Onex 2004-2005 Policy, if Onex was entitled to any coverage for defence costs in connection with the Georgia Action under its American Home D&O policies, it could only be under the Onex 2002-2003 Policy and not under the Onex 2004-2005 Policy or the 2004-2005 Excess Policies.

[13]   Further, American Home relied on Endorsement #14 of the Onex 2002-2003 Policy, which was added effective on the date the Magnatrax Run-Off Policy was issued. American Home denied coverage under the Onex 2002-2003

_____

[3] It is not clear from the record when Magnatrax in fact ceased to be an Onex subsidiary. The motion judge stated that Magnatrax ceased to be an Onex subsidiary on November 17, 2003, which was the date the U.S. Bankruptcy Court approved the Magnatrax Plan of Reorganization.  In their appeal facta, the parties suggest different dates for when Magnatrax ceased to be an Onex subsidiary. Onex and the Excess Insurers indicate that Magnatrax ceased to be an Onex subsidiary when it emerged from Chapter 11 protection on January 20, 2004, whereas American Home indicates that Magnatrax ceased to be an Onex subsidiary when it declared bankruptcy, which was May 12, 2003. We need not resolve this issue because Endorsement #14 of the Onex 2002-2003 Policy provides that the definition of subsidiary shall not include Magnatrax Corporation as of May 12, 2003, which is the date that Endorsement #14 became effective and is the inception date of the Magnatrax Run-Off Policy.

Page:  6

Policy based on its position that Endorsement #14 of that policy excludes any Magnatrax-related claims from coverage.

[14]   On competing motions for summary judgment, Pattillo J. accepted American Home"s argument that Onex gave notice of circumstances under clause 7(c) of the Onex 2002-2003 Policy. Therefore, under clause 4(d) of the Onex 2004-2005 Policy, Onex and the personal defendants were not entitled to reimbursement for defence costs in connection with the Georgia Action. It followed that the Excess Insurers, who had agreed to follow the form of the Onex 2004-2005 Policy, were also excluded from liability under the 2004-2005 Excess Policies for any loss in respect of the Georgia Action. The motion judge accordingly dismissed Onex"s action against the Excess Insurers in reasons dated June 30, 2011 and reported at 2011 ONSC 1142, 98 C.C.L.I. (4th) 228 (the "reported reasons").

[15]   However, in his reported reasons, the motion judge rejected American Home"s argument that Endorsement #14 of the Onex 2002-2003 Policy excluded Onex"s claim for reimbursement of defence costs in connection with the Georgia Action. He concluded that Endorsement #14 does not exclude "any claim by a third party against Onex"s directors and officers in their capacity as such for their wrongful acts in relation to Magnatrax."

Page:  7

[16]    The motion judge therefore ordered American Home to pay Onex US$15 million on behalf of the personal defendants for defence costs in connection with the Georgia Action under the Onex 2002-2003 Policy.

[17]    Following the original summary judgment motions, American Home moved to amend its pleadings to further particularize its claim for legal or equitable set-off of amounts that it paid under the Magnatrax Run-Off Policy against amounts owing under the Onex 2002-2003 Policy. American Home also moved for summary judgment on its amended counterclaim. In unreported reasons dated January 20, 2012 (the "unreported reasons"), the motion judge permitted American Home to amend its pleadings, but went on to dismiss the motion for summary judgment on the claim as amended.

[18]    American Home appeals from the motion judge"s judgments requiring that it pay US$15 million to Onex and the personal defendants under the Onex 2002-2003 Policy and dismissing its claim for set-off.

[19]    Onex and the personal defendants cross-appeal from that part of the motion judge"s judgment dismissing their action for indemnification under the Onex 2004-2005 Policy and the 2004-2005 Excess Policies. They also cross-appeal from the motion judge"s judgment granting American Home leave to amend its pleadings to plead set-off (collectively, the "Onex cross-appeal").

Page: 8

[20]    For the reasons that follow, we would allow American Home"s appeal, set aside the decision of the motion judge and return the matter to the Superior Court. In addition, we would dismiss the Onex cross-appeal.

## B. FACTS

### (i) Onex and Magnatrax

[21]    Onex is an Ontario corporation that regularly acquires operating businesses with a view to creating value and subsequently either retaining them or disposing of them.

[22]    To the knowledge of its D&O insurers, Onex"s directors and officers often serve in a dual capacity as directors and officers of its subsidiaries while they remain directors and officers of Onex.

[23]    Onex incorporated Magnatrax in Delaware in 1999. Between May 1999 and March 2000, Magnatrax and/or its subsidiaries purchased several U.S. and Canadian manufacturing companies. Three of these transactions were the subject matter of the allegations against Onex and the personal defendants in the Georgia Action.

Page:  9

### (ii) Aon Reed Stenhouse

[24]    Aon Reed Stenhouse is an insurance broker who acted as agent and broker for both Onex and Magnatrax in obtaining and negotiating the various policies of insurance at issue.

### (iii)  Onex's D&O Coverage

[25]    As we have said, Onex regularly purchased D&O liability insurance to protect both its own directors and officers and also the directors and officers of its subsidiaries from claims arising from their actions while acting in their capacity as directors and officers. These policies were generally "claims made and reported policies", meaning they provide coverage for claims first made against an insured party during the policy period and reported to the insurer within a time frame defined in the policy.

[26]    The specific language of all relevant policy provisions referred to in these reasons is set out in the Appendix.

### (iv)  Onex 2002-2003 Policy

[27]    In 2002, American Home, which is a member of the American International Group ("AIG"), issued the Onex 2002-2003 Policy. The policy covered the period from November 29, 2002 to November 29, 2003 and had a US$15 million limit of liability.

[28]    Among other things, the Onex 2002-2003 Policy provided "Executive Liability Insurance" and "Organization Insurance". Put briefly, "Executive Liability Insurance" coverage requires an insurer to pay defence costs incurred by directors and officers of a corporation arising from a proceeding against them based on their wrongful conduct as directors and officers of the corporation. "Organization Insurance" entitles a corporation to be reimbursed by the insurer for defence costs it pays on behalf of its directors and officers for such proceedings.

[29]    More specifically, the Onex 2002-2003 Policy"s Executive Liability Insurance coverage provision provides that American Home would pay the "Loss" of any "Insured Person" arising from a "Claim" made against the "Insured Person" for any "Wrongful Act" of the "Insured Person". The Organization Insurance coverage provision provides that American Home would pay the "Organization" for such loss only to the extent that the Organization has indemnified such "Insured Person".

[30]    In the definition section of the Onex 2002-2003 Policy, "Loss" is defined to include "Defence Costs". "Insured Person" is defined to include any Executive of Onex or its subsidiaries. "Executive" is defined to include directors and officers, and *de facto* directors and officers, of a corporation, which would include Onex and its subsidiaries.

Page:  11

[31]    The definitions of "Claim" and "Wrongful Act" are important for the purposes of this appeal. The relevant portions of these definitions read as follows:

> "Claim" means:
>
> (1)  a written demand for monetary, non-monetary or injunctive relief;
>
> (2)  a civil … proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a Writ of Summons, Statement of Claim or similar originating legal document; …
>
> …
>
> "Wrongful Act" means:
>
> (1)  any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act …:
>
> > (i) with respect to any Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such;
>
> ...

[32]    Clause 7(c) of the Onex 2002-2003 Policy permits an Insured to give written notice to the Insurer "of any circumstance which may reasonably be expected to give rise to a Claim" to enable the insured to obtain coverage for a Claim during the policy period even though the Claim is not advanced until after the expiry of the policy period.

[33]   Endorsement #10 of the Onex 2002-2003 Policy excludes coverage under the policy for "Loss in connection with any Claim made against any Insured in any bankruptcy proceeding by or against an Organization, when such Claim is brought by the examiner, trustee, receiver, creditors" committee, trust, liquidator or rehabilitator (or any assignee thereof) of such Organization."

[34]   In addition to the Onex 2002-2003 Policy, Onex also obtained US$45 million in excess "follow form" D&O insurance for the 2002-2003 coverage period from various excess insurers other than those involved in these proceedings. Onex renewed its D&O policies in each policy year between 2002 and 2005. The level of excess coverage increased over this time frame.

### (v)   The Magnatrax Run-Off Policy and Changes to the Onex 2002-2003   Policy

[35]   In January 2003, Onex contemplated selling Magnatrax to a third party. The proposed sale would have ended Magnatrax"s status as an Onex subsidiary. This, in turn, would have removed Magnatrax and its executives from coverage under the Onex 2002-2003 Policy.

[36]   In the face of this possibility, Aon on Onex"s behalf, requested a quote from American Home for a "run-off" D&O policy. The proposed run-off policy would protect Magnatrax and its executives for a period of six years against claims commenced after Magnatrax ceased to be an Onex subsidiary (and

therefore ceased to be protected under Onex"s D&O policies), but which claims related to the executives" conduct or status before Magnatrax ceased to be an Onex subsidiary.

[37]    As noted by the motion judge, American Home"s quote proposed a number of endorsements to the run-off policy, including #13 – Non-Pyramiding of Limits; and #14 – Absolute Onex Corporation Exclusion – Carve-out for co-defendant with Onex Corporation. Underneath the listed exclusions, the following appeared:

> NOTE: Endorsements to be added to Onex Corporation Policy
>
> 1. Absolute Exclusion from Magnatrax Corporation;
>
> 2. Non-Pyramiding of Limits.

[38]    The motion judge found that Aon had concerns about American Home"s quote. However, the contemplated sale of Magnatrax was abandoned before the concerns were fully resolved.

[39]    On May 11, 2003, Aon was advised by the Magnatrax board of directors that Magnatrax was intending to file for bankruptcy protection. Aon asked American Home to bind coverage for a run-off D&O policy for Magnatrax on an urgent basis. On May 12, 2003, American Home issued a Temporary and Conditional Binder of Insurance ("Binder") that described the coverages and endorsements to be included in the US$15 million Magnatrax Run-Off Policy.

[40]   As noted by the motion judge, 13 endorsements were listed in the Binder. In particular, Endorsements #12 and #13 were: "12. Non-pyramiding of Limits (To Be Manuscripted) and 13. Absolute Onex Corporation Exclusion – Carve-put (sic) for co-defendant with Onex Corporation (To Be Manuscripted)". "To Be Manuscripted" means that the wording of these endorsements had not yet been finalized.

[41]   The Binder also indicated that two endorsements were to be added to the Onex 2002-2003 Policy. The following language appeared under the listed exclusions:

> NOTE: Endorsements to be added to Onex Corporation Policy
>
> 1. Non-pyramiding of Limits (To Be Manuscripted)
>
> 2. Absolute Exclusion from Magnatrax Corporation (To Be Manuscripted)

[42]   Although the Binder indicated that two endorsements were to be manuscripted for the Magnatrax Run-Off Policy and two endorsements were to be manuscripted and added to the Onex 2002-2003 Policy, ultimately Endorsements #16 and #4 were added to the Magnatrax Run-Off Policy and only one endorsement was added to the Onex 2002-2003 Policy, namely, Endorsement #14. All of these endorsements are significant for the purposes of this appeal.

Page:  15

[43]   Endorsement #16 of the Magnatrax Run-Off Policy deals with coordinating the limits of liability between the Magnatrax Run-Off Policy and other American Home or AIG policies. The relevant portions of Endorsement #16 read as follows:

> ENDORSEMENT #16
>
> …
>
> COORDINATION OF AIG LIMITS
>
> In consideration of the premium charged, it is hereby understood and agreed that, with respect to any Claim under this policy for which coverage is provided by one or more other policies issued by the Insurer or any other member of the American International Group (AIG), … the Limit of Liability provided by virtue of this policy shall be reduced by the limit of liability provided by said other AIG policy.

[44]   Endorsement #4 of the Magnatrax Run-Off Policy is important because it provides coverage for Onex Executives in certain circumstances:

> ENDORSEMENT #4
>
> …
>
> DEFINITION OF ORGANIZATION AMENDED TO INCLUDE ENTITY
> (CO-DEFENDANT ONLY)
>
> In consideration of the premium charged, it is hereby understood and agreed that the term "Organization" is amended to include the following entity, subject to the terms, conditions and limitations of this endorsement and this policy.

Page:  16

ENTITY

Onex Corporation

Coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Persons thereof shall only apply if: (1) such Claim relates to a Wrongful Act committed by an Insured (other than Onex Corporation or an Insured Person thereof); and (2) an Insured (other than Onex Corporation or an Insured Person thereof) is and remains a defendant in the Claim along with Onex Corporation or any Insured Person thereof.

In all events coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Person thereof shall only apply to Wrongful Acts committed or allegedly committed prior to May 12, 2003.

[45]   Neither Onex nor Magnatrax obtained excess insurance for the Magnatrax Run-Off Policy.

### (vi)  Endorsement #14 to the Onex 2002-2003 Policy

[46]   Endorsement #14 is central to the issues on appeal. It was added to the Onex 2002-2003 Policy as part of finalizing the terms of the Magnatrax Run-Off Policy. It is a "Specific Entity/Subsidiary Exclusion", which excludes continuing coverage under the policy for certain Magnatrax-related losses:

ENDORSEMENT #14

SPECIFIC ENTITY/SUBSIDIARY EXCLUSION

(Claims brought by or made against)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss alleging, arising out of, based upon or attributable to or in connection with any Claim brought by or made against the Entity listed below and/or any Insureds thereof.

1. MAGNATRAX Corporation (including any subsidiary or affiliate thereof)

It is further understood and agreed that the Definition of Subsidiary shall not include MAGNATRAX Corporation. Further, the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of MAGNATRAX Corporation, or any director, officer, member of the board of managers or employee thereof.

**(vii)  Magnatrax's Chapter 11 Bankruptcy Proceedings**

[47]    Magnatrax sought Chapter 11 bankruptcy protection on May 12, 2003. A Creditors" Committee was formed on May 22, 2003. The Creditors" Committee selected the law firm of Foley & Lardner to act as its counsel.

[48]    On August 19, 2003, the Creditors" Committee reached an agreement with Magnatrax and its subsidiaries on a plan of reorganization. The Magnatrax Plan of Reorganization was subsequently confirmed by the U.S. Bankruptcy Court on November 17, 2003. Magnatrax emerged from Chapter 11 protection on January

20, 2004. After that date, Onex no longer had any ownership interest in Magnatrax.

### (viii)   Notice of Circumstances – The Foley Letter

[49]    On August 1, 2003, Foley and Lardner, counsel for the Magnatrax Creditors" Committee, wrote a letter to counsel for Magnatrax asserting that the Creditors" Committee believed that Magnatrax had various claims against Onex and its affiliates, and the officers and directors of Onex and Magnatrax.

[50]    As described in the Foley Letter, the purported claims were against "those parties involved in the May 1999, September 1999, and March 2000 transactions, as well as the credit facilities and related agreements supporting those transactions". The letter refers to numerous claims, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, preference claims "and possibly other claims yet to be identified".

[51]    The Foley Letter requested confirmation that Magnatrax would prosecute all of these claims or, in the alternative, sought confirmation that the Committee could pursue the claims on Magnatrax"s behalf.

[52]    After receiving the Foley Letter, counsel for Magnatrax forwarded it to Aon on August 7, 2003 and inquired about what notice should be sent to Magnatrax"s insurers.

[53]   On November 28, 2003, the day before the Onex 2002-2003 Policy was to expire, Aon faxed the Foley Letter to American Home. In doing so, Aon referenced both the Onex 2002-2003 Policy and the Magnatrax Run-Off Policy and stated that the Foley Letter "contains information on a situation which could in future give rise to a claim under [those] polic[ies]".

### (ix)   Onex's 2004-2005 D&O Coverage

[54]   Onex renewed its US$15 million D&O coverage with American Home in 2003-2004 and in 2004-2005. As it had done in other years, Onex also obtained excess "follow form" D&O coverage for 2004-2005.

[55]   The coverage provisions under the Onex 2004-2005 Policy are the same as the coverage provisions under the Onex 2002-2003 Policy.

[56]   Clause 4(d) of the Onex 2004-2005 Policy is significant to this appeal. It creates an exclusion from coverage where a Claim is covered under a prior policy:

> 4.    EXCLUSIONS
>
> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:
>
> ...
>
> (d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or

Page:  20

> contained in any Claim which has been
> reported, or in any circumstances of which
> notice has been given, under any policy of
> which this policy is a renewal or
> replacement or which it may succeed in
> time;
>
> ...

### (x) Removal of the Specific Entity/Subsidiary Exclusion Endorsement

[57]   The policy wording for the Onex 2004-2005 Policy was not sent to Aon for review until May 10, 2005. After receiving the policy language, Aon requested that American Home delete the endorsement containing the Specific Entity/Subsidiary Exclusion, which was Endorsement #14 in the Onex 2002-2003 Policy and Endorsement #13 in the Onex 2003-2004 Policy, and replace it with a Prior Acts Exclusion to provide coverage under the Onex 2004-2005 Policy for wrongful acts committed by Magnatrax directors and officers during the period May 12, 2003 to January 20, 2004 when Magnatrax and its subsidiaries were in Chapter 11 protection.

[58]   The Onex 2004-2005 Policy was later re-issued with the Prior Acts Exclusion replacing the Specific Entity Exclusion. The Prior Acts Exclusion appears in the 2004-2005 Policy as Endorsement #13, which states in part:

> PRIOR ACTS EXCLUSION FOR LISTED ENTITIES
>
> …
>
> In consideration of the premium charged, it is hereby understood and agreed that the term Subsidiary is

amended to include the entity(ies) listed below, but only for Wrongful Acts committed by such entity(ies) and/or any Insureds thereof which occurred subsequent to such entity"s respective acquisition/creation date listed below and prior to the time the Named Entity no longer maintains Management Control of such entity(ies), respectively, either directly, or indirectly through one or more other Subsidiaries.  Loss arising from the same or related Wrongful Act shall be deemed to arise from the first such same or related Wrongful Act.

| ENTITIES | ACQUISITION/CREATION DATE |
|---|---|
| Magnatrax Corporation […] | May 12, 2003 |

[59]    Significantly, the Excess Insurers never agreed to this change in the policy provisions.

### (xi)  The Georgia Action

[60]    On May 10, 2005, the Trustee of the Magnatrax Litigation Trust commenced the Georgia Action.

[61]    The Magnatrax Litigation Trust was established under s. 4.21 of the Magnatrax Plan of Reorganization, which was approved by the U.S. Bankruptcy Court, to pursue causes of action on behalf of the Litigation Trust beneficiaries, who are defined as unsecured creditors of Magnatrax.

[62]    Of the 19 counts asserted in the Georgia Action, four are asserted against the personal defendants, as well as against two directors of Magnatrax: i) breach of fiduciary duty; ii) aiding and abetting breach of fiduciary duty; iii) civil

conspiracy; and iv) unjust enrichment. These four counts were also asserted against Onex and various Onex-related companies. The remaining 15 counts in the Georgia Action are pleaded only against Onex and Onex affiliates.

[63]   The breach of fiduciary duty count alleges that Onex was the *de facto* board and *alter ego* of Magnatrax and its subsidiaries. The count further alleges that the defendants exploited their positions as directors and officers of Magnatrax, as *de facto* directors and officers of Magnatrax, or as the *alter ego* to the board of Magnatrax, to further their own benefit and in breach of their duties owed to the "Debtors" ("Debtors" refers to Magnatrax and Magnatrax-related companies).

[64]   The aiding and abetting breach of fiduciary duty count alleges that each of the defendants knowingly induced, participated in and substantially assisted the other defendants" breaches of fiduciary duty owed to the Debtors.

[65]   The civil conspiracy count alleges that the defendants wilfully conspired to embark on a scheme to divert value from the Debtors to themselves; to fraudulently transfer assets and value from the Debtors to the benefit of themselves; and to breach fiduciary duties.

[66]   The unjust enrichment count alleges that the defendants used their "complete domination and control of the Debtors" to receive a "benefit from their

management of the Debtors, and this benefit inured to the detriment of both the Debtors and the Debtors" creditors."

### (xii) Notice of the Georgia Action to American Home and the Coverage Provided by American Home

[67]    On July 4, 2005, Aon sent on Onex"s behalf a copy of the complaint in the Georgia Action to American Home as notice of a Claim under the Onex 2004-2005 Policy.

[68]    On September 15, 2005, American Home denied coverage under that policy because the allegations in the Georgia Action pre-dated May 12, 2003. According to American Home, the Prior Acts Exclusion in Endorsement #13 of the Onex 2004-2005 Policy limited coverage to Wrongful Acts committed after May 12, 2003.

[69]    American Home also contended that the Claim is excluded because the allegations relate to the personal defendants" actions in a capacity other than as an Executive of Onex and subsidiaries of Onex. Finally, American Home raised the possibility that coverage was not available because the allegations in the Georgia Action involved intentional acts that are excluded from coverage by clauses 4(a) and (c) of the Onex 2004-2005 Policy.

[70]    Initially, American Home also denied coverage under the Magnatrax Run-Off Policy. However, on August 28, 2006, American Home"s counsel indicated

that coverage would be available for the personal defendants under that policy based on Endorsement #4. In counsel"s view, this co-defendant endorsement afforded coverage with respect to a Claim against Onex Executives provided an Insured under the policy remained as a co-defendant in the Claim along with Onex or an Insured Person of Onex.

[71]   As we have said, Onex and the personal defendants were jointly represented by counsel throughout the Georgia Action and incurred defence costs totalling approximately US$35 million and settlement costs of over US$9 million. American Home paid out US$15 million – the limit of liability under the Magnatrax Run-Off Policy – to reimburse the personal defendants and two other Magnatrax directors and officers for their defence costs. Of this US$15 million, US$13,881,991.90 was paid to reimburse the personal defendants and the remaining US$1,118,008.10 was paid to reimburse the two other Magnatrax directors and officers. As noted, Onex and Magnatrax did not obtain excess insurance for the Magnatrax Run-Off Policy.

### (xiii) The Onex Action Against American Home and the Excess Insurers

[72]   Onex and the personal defendants commenced this action in 2008 against American Home and the various Excess Insurers seeking coverage under the Onex 2004-2005 Policy and under the 2004-2005 Excess Policies.   In the alternative, the plaintiffs sought coverage under the Onex 2002-2003 Policy.

American Home and the Excess Insurers defended and also counterclaimed for declarations that they had no obligation to provide coverage.

[73]   Onex and the personal defendants, American Home and the Excess Insurers brought competing motions for summary judgment.[4]

## C. MOTION JUDGE'S REASONS

[74]   In his reported reasons dated June 30, 2011, the motion judge held as follows:

- The Foley Letter constituted notice of circumstances under clause 7(c) of the Onex 2002-2003 Policy with respect to the Georgia Action.

- Clause 4(d) of the Onex 2004-2005 Policy operates to exclude American Home from having to pay any defence costs in connection with the Georgia Action under the Onex 2004-2005 Policy. The follow-form 2004-2005 Excess Policies also excluded the Excess Insurers from any liability in respect of the Georgia Action.

_____

[4] The motion judge was advised by the parties that as a result of the settlement of the Georgia Action, the total amount of Onex and the personal defendants" claim in the action would not impact the third and fifth excess layers of D&O coverage insured by excess D&O policies issued by the defendants Liberty Mutual Insurance Company and Houston Casualty Company for the 2004-2005 period. The parties agreed that the action should be dismissed against these defendants on consent.

Page:  26

- Endorsement #14 of the Onex 2002-2003 Policy does not exclude coverage for any claim by a third party against Onex"s directors and officers in their capacity as such for their wrongful acts in relation to Magnatrax, and thus, under the Onex 2002-2003 Policy, American Home is required to indemnify Onex and the personal defendants for defence costs incurred in in relation to the Georgia Action.

[75]    In reaching these conclusions, the motion judge found, at para. 97, that the terms of the D&O policies in issue are clear and unambiguous and that evidence of intention adduced by the various parties was inadmissible.

[76]    After receiving the motion judge"s decision, American Home brought a motion to amend its counterclaim to have the monies owing under the Onex 2002-2003 Policy set-off against the US$13,881,991.90 already paid to the personal defendants under the Magnatrax Run-Off Policy. American Home also moved for summary judgment on the set-off issue.

[77]    The motion judge granted American Home leave to amend. However, on the motion for summary judgment, he dismissed American Home"s counterclaim. In his unreported reasons dated January 20, 2012, he found that Endorsement #16 of the Magnatrax Run-Off Policy does not reduce the limit of liability of the Magnatrax Run-Off Policy, and thus American Home was not entitled to repayment of amounts previously paid to the personal defendants under the

Page:  27

Magnatrax Run-Off Policy. Given his conclusion that American Home was not entitled to repayment, he did not consider American Home"s claim for set-off.

## D. ISSUES

### The Appeal by American Home

[78]   American Home raises two issues on the appeal:

> (1)   Did the motion judge err in concluding that Endorsement #14 of the Onex 2002-2003 Policy does not exclude coverage for defence costs of the personal defendants in connection with the Georgia Action?

> (2)   Did the motion judge err in concluding that Endorsement #16 of the Magnatrax Run-Off Policy does not entitle American Home to set-off amounts owing under the Onex 2002-2003 Policy against payments made under the Magnatrax Run-Off Policy?

[79]   It is worth noting that American Home accepts that, but for Endorsement #14, it would be liable to pay the personal defendants the amounts claimed under the Onex 2002-2003 Policy. Thus, American Home accepts that the coverage provisions in that policy include the payment of defence costs of the personal defendants arising from the Georgia Action.

### The Onex Cross-Appeal

[80]   On the cross-appeal, two issues need to be considered:

> (1)   Did the motion judge err in concluding that the Foley Letter complied with the requirements of clause 7(c) of the Onex 2002-2003 Policy?

Page:  28

> (2)   Did the motion judge err in granting American Home leave to amend its Amended Amended Statement of Defence and Counterclaim?

[81]   We will deal with the Onex cross-appeal first.

## E.  THE ONEX CROSS-APPEAL

### (1) The Foley Letter and clause 7(c) of the Onex 2002-2003 Policy

[82]   On its cross-appeal, Onex argues that the motion judge erred in concluding that the Onex 2004-2005 Policy and the 2004-2005 Excess Policies did not provide coverage because Onex had previously given notice of the circumstances that gave rise to the Georgia Action pursuant to the Onex 2002-2003 Policy.[5]

[83]   The Onex 2002-2003 Policy and the Onex 2004-2005 Policy are claims made and reported policies. Losses resulting from a Claim are eligible for coverage under a policy if the Claim is made and reported during the policy period.

[84]   Clause 7(c) of the Onex 2002-2003 Policy provides that the period of coverage can be extended beyond the Policy Period if an insured party provides

─────────────────────

[5] The Onex 2004-2005 Policy does not contain the exclusion found in Endorsement #14 in the Onex 2002-2003 Policy.

notice during the Policy Period of circumstances that may lead to a future Claim.

Clause 7(c) states in relevant part:

> If during the Policy Period ... an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

[85]    Clause 7(c) dovetails with clause 4(d) of the standard exclusions in American Home"s D&O policies, including the Onex 2004-2005 Policy. Clause 4(d) excludes from coverage under the present policy Loss from any Claim arising out of Wrongful Acts of which notice has been given under a previous policy.

[86]    The cross-appeal turns on whether Onex provided American Home with notice of circumstances during the policy period for the Onex 2002-2003 Policy that complied with clause 7(c) of that policy. If it did, then coverage under the Onex 2004-2005 Policy is excluded pursuant to clause 4(d) and, consequently,

coverage under the excess insurance follow-form policies would also be excluded.

[87]    As we have said at paras. 49-53, on August 1, 2003, Foley and Lardner, counsel for the Magnatrax Creditors" Committee, wrote a letter to counsel for Magnatrax asserting that Magnatrax had claims against Onex, the directors and officers of Onex, and the directors and officers of Magnatrax. These claims were said to arise from "the May 1999, September 1999, and March 2000 transactions, as well as the credit facilities and related agreements supporting those transactions." The letter refers to numerous claims, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, "and possibly other claims yet to be identified".

[88]    On November 28, 2003, the day before the Onex 2002-2003 Policy was to expire, Aon faxed the Foley Letter to American Home. In doing so, Aon referred to both the Onex 2002-2003 Policy and the Magnatrax Run-Off Policy and stated that the Foley Letter "contains information on a situation which could in future give rise to a claim under [those] polic[ies]".

[89]    Onex argues that the Foley Letter does not satisfy the specificity requirements of clause 7(c) of the Onex 2002-2003 Policy in that it does not set out full particulars as to dates, persons and entities involved.  Onex contends that the letter did not describe the nature of the commercial transactions or Onex"s

role in them, did not specify any wrongful act that might be alleged, nor did it set out the names of the directors and officers who were involved in the transactions.

[90]    The motion judge rejected these same arguments. In his reported reasons, he indicated that he was in agreement with U.S. cases holding that, in determining whether a notice by an insured to an insurer is sufficient, an objective test should be applied having regard to the wording of the policy. He held, at para. 136:  "The test is whether the insured objectively complied with the notice provision in the Policy", citing *Continental Insurance Co. v. Superior Court Los Angeles County*, 37 Cal. App. 4th 69, 80 (1995) and *McCullough v. Fidelity & Deposit Co.*, 2 F.3d 110, 113 (5th Cir. 1993).

[91]    We see no reason to interfere with the motion judge"s finding that the Foley Letter contains sufficient particulars to meet the requirements of clause 7(c).  We agree with the motion judge"s conclusion, at para. 150, that "it sets out the specific transactions and agreement involved, the dates of the transactions, the claims which are alleged to exist and the entities and individuals involved." What is important here is that Onex, through Aon, provided American Home with the specifics of the threatened litigation as those specifics were provided to it. It was not necessary for the insured to speculate about the names of the individual directors or officers who might be named in the threatened litigation. As found by the motion judge, when viewed objectively as a whole, the Foley Letter contains

sufficient particulars of the dates, persons and entities involved to comply with clause 7(c) of the Onex 2002-2003 Policy.

[92]   We share the motion judge''s view that the claims being advanced in the Georgia Action are "the same as or related to" the claims asserted in the Foley Letter. The Foley Letter referred to claims arising out of transactions in May 1999, September 1999 and March 2000. The Georgia Action is based on corporate acquisitions by Magnatrax of American Buildings Company in May 1999, Republic Builders Products in August 1999, and Jannock Limited in March 2000.

[93]   Further, the claims asserted in the Georgia Action against the personal defendants are breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy and unjust enrichment. The Foley Letter sets out a number of claims, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty and unjust enrichment. Thus, the Foley Letter alleges the same or related claims against Onex and the personal defendants as were alleged in the Georgia Action.

[94]   We therefore agree with the motion judge that the Foley Letter meets the requirement of clause 7(c) of the Onex 2002-2003 Policy such that the Georgia Action constitutes a Claim made during the Policy Period of the Onex 2002-2003 Policy.

[95]   As a result of clause 4(d) of the Onex 2004-2005 Policy, coverage is excluded under that policy. Coverage is also excluded under the 2004-2005 Excess Policies.

### (2) Leave to Amend American Home's Pleadings

[96]   Onex cross-appeals the motion judge"s order granting American Home leave to amend its Amended Amended Statement of Defence and Counterclaim and to further particularize its claim for legal or equitable set-off. Onex submits that the motion judge erred in failing to find that the set-off issue raised by American Home was *res judicata*. On appeal, Onex advances the same arguments that were made to the motion judge on the issue of *res judicata*. Onex also submits, as it did on the motion, that permitting the amendment would result in non-compensable prejudice because American Home was effectively allowed to bolster arguments that had already been considered and rejected by the motion judge.

[97]   The motion judge dealt with these arguments at para. 30 of his unreported January 20, 2012 reasons:

> In my view, *res judicata* does not apply to American Home"s proposed amendments. Cause of action estoppel is not applicable. Nor, in my view, is issue estoppel. The issues of whether the limits of the Magnatrax Policy were reduced by the limits of the 2002-2003 D&O Policy and whether American Home was entitled to a refund of amounts paid under the

Page: 34

> Magnatrax Policy were not decided by me. The former
> issue was pleaded but not argued. The latter issue is a
> corollary which arises only on a determination of the first
> issue. The Action, and specifically the counterclaim has
> not been concluded.

[98]   We see no reason to interfere with the motion judge"s exercise of discretion permitting American Home to amend its pleadings. The motion judge had not yet decided whether the limits of the Magnatrax Run-Off Policy were reduced by the Onex 2002-2003 Policy, nor the corollary issue of whether American Home was entitled to a refund of amounts paid under the Magnatrax Run-Off Policy. We fail to see how Onex was prejudiced by the permitted amendments.

[99]   For the foregoing reasons, we would dismiss the Onex cross-appeal.

## F.  AMERICAN HOME'S APPEAL

### (1) Legal Principles

[100]  The issues raised by American Home relate to the proper interpretation of certain endorsements in the Onex 2002-2003 Policy and the Magnatrax Run-Off Policy. American Home does not argue that the motion judge erred in setting out the legal principles for interpreting the terms of an insurance policy. However, we include a summary of these principles because they inform our analysis of the issues raised by American Home"s appeal.

[101]  The Supreme Court of Canada has canvassed the principles of insurance policy interpretation on several occasions: see *Progressive Homes Ltd. v. Lombard General Insurance Co. of Canada*, 2010 SCC 33, [2010] 2 S.C.R. 245, at paras. 21-24; *Co-operators Life Insurance Co. v. Gibbens*, 2009 SCC 59, [2009] 3 S.C.R. 605, at paras. 20-28; *Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744, at paras. 27-30; *Non-Marine Underwriters, Lloyd's of London v. Scalera*, 2000 SCC 24, [2000] 1 S.C.R. 551, at paras. 67-71; and *Brissette Estate v. Westbury Life Insurance Co.*, [1992] 3 S.C.R. 87, at pp. 92-93.

[102]  The primary interpretative principle is that when language of the policy is unambiguous, the court should give effect to the clear language, reading the contract as a whole: *Scalera*, at para. 71. The terms of the policy must be examined "in light of the surrounding circumstances, in order to determine the intent of the parties and the scope of their understanding": *Jesuit Fathers*, at para. 27.

[103] In *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, 114 O.A.C. 357, at para. 25, this court referred to the need to examine the language of a contract in light of the surrounding circumstances:   "While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its „factual

Page:  36

matrix" will also provide the court with useful assistance."  In cases of insurance contracts, the evidence of the factual matrix may be of more assistance when the contract is an individually negotiated contract rather than a standard form contract resulting from a routine purchase of an insurance policy.

[104]  Be that as it may, before reaching a finding that a contractual provision is ambiguous, the court must assess the words of a contract in light of the factual matrix in which the agreement was written. As Doherty J.A. stated in *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59, 85 O.R. (3d) 616, at para. 54:

> A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity.  To find ambiguity, one must come to certain conclusions as to the meaning of the words used.  A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made:  see McCamus, *The Law of Contracts* (Toronto:  Irwin Law, 2005) at 710-11.

[105]  It is important to distinguish what is meant by the factual matrix from extrinsic evidence that is admissible to resolve an ambiguity. The factual matrix is gleaned from the context of the transaction. Doherty J.A. explained in *Dumbrell*, at para. 55, that the factual matrix "clearly extends to the genesis of the

agreement, its purpose, and the commercial context in which the agreement was made".

[106]  Where the language of an insurance policy is found to be ambiguous, the court will rely on general rules of contract construction. As explained in *Progressive Homes*, at para. 23:

> For example, courts should prefer interpretations that are consistent with the reasonable expectations of the parties (*Gibbens*, at para. 26; *Scalera*, at para. 71; *Consolidated-Bathurst*, at p. 901 [*Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888]), so long as such an interpretation can be supported by the text of the policy. Courts should avoid interpretations that would give rise to an unrealistic result or that would not have been in the contemplation of the parties at the time the policy was concluded (*Scalera*, at para. 71; *Consolidated-Bathurst*, at p. 901). Courts should also strive to ensure that similar insurance policies are construed consistently (*Gibbens*, at para. 27). These rules of construction are applied to resolve ambiguity.  They do not operate to create ambiguity where there is none in the first place.

[107]  In *Lombard Canada Ltd. v. Zurich Insurance Co*., 2010 ONCA 292, 101 O.R. (3d) 371, at para. 33, this court held that, where there is ambiguity in the sense that a phrase is capable of bearing two equally reasonable interpretations, the court may consider extrinsic evidence and the applicability of the *contra proferentem* rule.

Page:  38

[108] However, the admission of extrinsic evidence does not mean that the parties" subjective views of what was intended by the agreement will be used to resolve the ambiguity. On the contrary, the court should adopt the interpretation that gives effect to the reasonable expectations or intentions of the parties: *Scalera*, at para. 71; *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.*, [1993] 1 S.C.R. 252, at p. 269; *Dunn v. Chubb Insurance Co. of Canada*, 2009 ONCA 538, 266 O.A.C. 1, at para. 35.

[109] We turn now to the arguments with respect to the interpretation of Endorsement #14 of the Onex 2002-2003 Policy.

### (2) Endorsement #14 of the Onex 2002-2003 Policy

[110] American Home argues that the motion judge erred in finding that Endorsement #14 of the Onex 2002-2003 Policy does not exclude coverage for the personal defendants" claims for defence costs arising from the Georgia Action. According to American Home, under the plain meaning of Endorsement #14, the personal defendants" losses in the form of defence costs fall into each of the following three exclusions in Endorsement #14:

> (i)  the Georgia Action is a Claim made against Magnatrax or its Executives;
>
> (ii)  the Georgia Action is a Claim brought by Magnatrax; and

>           (iii) the Georgia Action is a Claim based on an act or
>           omission of Magnatrax Executives.

[111] Before turning to the specific arguments, it is important to note that Endorsement #14 to the Onex 2002-2003 Policy is one part of an individually negotiated set of insurance arrangements between Onex, American Home and Magnatrax. Those arrangements resulted from a number of discussions and email exchanges. Those arrangements also included the issuance of the Magnatrax Run-Off Policy. The origin of those arrangements goes back to the discussions between the parties in January 2003 when Onex was contemplating a sale of Magnatrax. The parties added Endorsement #14 to the Onex 2002-2003 Policy as a result of a negotiated set of contractual arrangements.

[112] Next, it is worth noting that the positions of both parties in approaching the interpretation dispute are commercially reasonable. Onex says that it is reasonable that Onex Executives would have wanted to maintain coverage under the more extensive Onex tower of insurance policies in the face of Magnatrax"s Chapter 11 filing and the heightened litigation risk associated with that filing. American Home, on the other hand, says it would be reasonable for it to provide no more than one of its policy limits to respond to any "Claim" related to Magnatrax. Both of these positions are commercially reasonable when viewed from the parties" own perspective.  Hence, the difficulty.

[113] We first explain why we would not give effect to American Home"s argument based on the second exclusion identified by American Home in Endorsement #14 of the Onex 2002-2003 Policy.

### (a) The Georgia Action is a Claim Brought By Magnatrax

[114] American Home argues that the Loss arising from the Georgia Action is excluded by Endorsement #14 of the Onex 2002-2003 Policy because the Loss arises out of or in connection with a Claim brought by Magnatrax. We repeat for convenience the language of the first paragraph of Endorsement #14 that relates to this argument:

> [T]he Insurer shall not be liable for any Loss... arising out of … or in connection with any Claim brought *by* … [Magnatrax]" … [Emphasis added.].

[115] The question then becomes whether the Georgia Action, which was brought by the Magnatrax Litigation Trust as plaintiff, and which asserts only causes of action assigned to it under the Magnatrax Plan of Reorganization, is a Claim brought by Magnatrax. If so, the Loss arising therefrom is excluded by Endorsement #14.

[116] The motion judge set out the facts relevant to this argument at paras. 175-77 of his reported reasons. American Home does not dispute the motion judge"s summary of the facts.

[117]  As we said above, the Georgia Action was brought by the Trustee of the Magnatrax Litigation Trust. The Magnatrax Litigation Trust was established pursuant to s. 4.21 of the Magnatrax Plan of Reorganization, which was approved by the U.S. Bankruptcy Court in the Chapter 11 proceedings. It is clear, however, from both the Foley Letter and the complaint in the Georgia Action that the claims being advanced are claims which, up until their assignment to the Litigation Trust, belonged entirely to Magnatrax and its subsidiaries.

[118]  The Foley Letter requested immediate confirmation from Magnatrax and its subsidiaries in bankruptcy that it would pursue the claims identified against the entities and the individuals named, failing which it requested confirmation that the Creditors" Committee could pursue the claims of Magnatrax on their behalf.

[119]  American Home argues that the motion judge erred in concluding that the Georgia Action was not brought by Magnatrax so as to come within the second exclusion in Endorsement #14 of the Onex 2002-2003 Policy. The Georgia Action is a derivative action instituted by the Litigation Trust and alleges causes of action originally belonging to Magnatrax. American Home correctly points out that if the Georgia Action had been brought by Magnatrax, it would be clear that Endorsement #14 would have excluded coverage.

[120]  American Home also points out that prior to the issuance of Endorsement #14, the exclusion in Endorsement #10 of the Onex 2002-2003 Policy, which

Page:  42

amends clause 4(i) in that Policy, would have excluded coverage for proceedings – including derivative actions – commenced by a trustee established in bankruptcy proceedings of Magnatrax for the benefit of its creditors.

[121] The exclusion in clause 4(i) of the Onex 2002-2003 Policy is a standard "Insured versus Insured" exclusion (see the Appendix for the text of clause 4(i)). This exclusion is designed to protect the insurer from having to provide coverage in relation to a legal proceeding by one insured party against another insured party. The "Insured versus Insured" exclusion is designed to prevent collusive proceedings whereby "an insured company might seek to force its insurer to pay for the poor business decisions of its officers or managers": *Twp. Of Center, Butler County, Pa. v. First Mercury Syndicate, Inc.*, 117 F.3d 115, 119 (3d Cir. 1997).

[122] Paragraph 3 of clause 4(i) provides that the Insured versus Insured exclusion "shall not apply to":

> (3) in any bankruptcy proceeding by or against an Organization, any Claim brought by the examiner, trustee, receiver, receiver manager, liquidator or rehabilitator (or any assignee thereof) of such Organization, if any;

[123] Endorsement #10 deleted subparagraph 3 of clause 4(i). Thus, the "Insured versus Insured" exclusion would apply to exclude coverage for a Claim

brought in bankruptcy proceedings by a trustee of an Organization as defined in the Onex 2002-2003 Policy.

[124] However, the effect of Endorsement #10 was removed insofar as Magnatrax was concerned after the parties agreed upon Endorsement #14. Endorsement #14 provides that Magnatrax is no longer a Subsidiary of Onex. "Organization" is defined to mean each "Subsidiary".

[125]  American Home argues that there is no evidence that the parties intended that the amendments to the Onex 2002-2003 Policy resulting from the inclusion of Endorsement #14 should operate to expose it to a form of coverage previously excluded – liability for derivative legal proceedings brought against Onex by a creditors" litigation trust.

[126]  The motion judge rejected these arguments. We agree with his conclusion and his reasons, at paras. 178-80 of his reported reasons:

> Notwithstanding that the claims which are asserted against [the personal defendants] in the [Georgia Action] are derivative claims which initially belonged to Magnatrax and its subsidiaries, in my view, they are not brought by Magnatrax. The exclusion in the first paragraph of Endorsement #14 of the [Onex 2002-2003 Policy] is clear. It applies to "any Claim brought by…" Magnatrax or any subsidiary or affiliate thereof.  While [the Georgia Action] asserts claims which originally belonged to Magnatrax and its subsidiaries, it is brought by the Trustee on behalf of the Magnatrax Litigation Trust and not Magnatrax.

Page:  44

> As noted earlier, exclusions are to be interpreted narrowly.  In the absence of more expansive wording in Endorsement #14 to exclude derivative claims, the words: "any Claim brought by or made against [Magnatrax, its subsidiaries and affiliates]" restrict the application of the exclusion to claims brought by Magnatrax, its subsidiaries and affiliates. As [the Georgia Action] is not such a Claim, Endorsement #14 does not exclude it from coverage.

> Nor, in my view, can American Home rely on Endorsement #10 of the [Onex 2002-2003 Policy] which excludes claims against any Insured where the claim is brought in any bankruptcy proceeding by or against an Organization when the claim is brought by, among others, the creditors" committee or trust. Endorsement #14 removed Magnatrax as a subsidiary thereby excluding it from the definition of Organization under the [Onex 2002-2003 Policy].

[127] To those reasons, we would add that the circumstances surrounding the adoption of Endorsement #14 support the motion judge"s interpretation of the words in that clause. The reason for the negotiations that resulted in Endorsement #14, as well as Endorsements #4 and #16 to the Magnatrax Run-Off Policy, was the impending bankruptcy of Magnatrax. Although these three endorsements were not, in fact, issued until sometime after the Chapter 11 proceedings involving Magnatrax had commenced, the endorsements were dated May 12, 2003 so as to coincide with the beginning of the Chapter 11 proceedings.

[128] Endorsement #14 had the effect of removing the bankruptcy exclusion in Endorsement #10 as it applied to Magnatrax. It is significant, we suggest, that the

language in Endorsement #14 excludes coverage for Loss arising from a Claim brought by Magnatrax (the insolvent entity) but does not, as Endorsement #10 had, exclude Loss arising from a Claim brought by a trustee, a creditors" committee, or a trust. We do not think that this omission, viewed objectively and reasonably, should be treated as an oversight, particularly when it is considered that Endorsement #14 was drafted in the circumstances of Magnatrax declaring bankruptcy. Rather, given the experience and sophistication of the parties, we conclude, as the motion judge did, that the parties intended the exclusion in Endorsement #14 to apply only to Loss arising from a Claim brought by Magnatrax. Had the parties intended that the exclusion was to apply to Loss arising from a Claim brought by assignees, trustees, or other representatives asserting Magnatrax"s claims, they would have specifically said so.

[129] We now consider together the remaining two exclusions identified by American Home.

**(b)    The Georgia Action is a Claim Made Against Magnatrax or its Executives / The Georgia Action is Claim Based on an Act or Omission of Magnatrax Executives**

[130] American Home argues that the defence costs claimed by the personal defendants are excluded from coverage by two additional exclusions in Endorsement #14 of the Onex 2002-2003 Policy: the remaining language in the first paragraph of Endorsement #14 and the second sentence of the second

paragraph of Endorsement #14. We repeat the relevant language for convenience:

> In consideration of the premium charged, it is hereby understood and agreed that *the Insurer shall not be liable for any Loss alleging, arising out of, based upon or attributable to or in connection with any Claim brought by or made against* [Magnatrax Corporation] *and/or any* [Executive] *thereof.*
>
> …
>
> Further, the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of MAGNATRAX Corporation, or any director, officer, member of the board of managers or employee thereof. [Emphasis added.]

[131] The motion judge did not accept American Home"s arguments based on either the first or second paragraphs of Endorsement #14. He concluded, at para. 169 of his reported reasons, that although Endorsement #14 of the Onex 2002-2003 Policy is an exclusion provision, it does not operate as an "absolute" exclusion in respect of all claims against Onex"s directors and officers relating to Magnatrax. He concluded that the language of Endorsement #14 was unambiguous and thus only open to the interpretation he adopted.

[132] We have considered the language of Endorsement #14 of the Onex 2002-2003 Policy in the context of the surrounding circumstances or the factual matrix. In our view, the language viewed in that context is ambiguous.  It is open to two

Page:  47

reasonable interpretations: the one urged by American Home and the one adopted by the motion judge.

[133] Because there is ambiguity, it becomes necessary to turn to extrinsic evidence to assist with the interpretative exercise.  Before turning to the use of extrinsic evidence, we will set out why we consider both of the competing interpretations to be reasonable.

[134]  We start with the motion judge"s interpretation.

[135]  In the motion judge"s view, Endorsement #14 excludes coverage for claims against the personal defendants acting in their capacity as Magnatrax Executives, but it does not exclude from coverage claims against the personal defendants acting in their capacity as Onex Executives. The motion judge drew the distinction between the capacity in which the personal defendants were acting at para. 105 of his reported reasons:

> Further, based on a review of the entire Complaint in the [Georgia] Action and in particular the allegations against [the personal defendants], it is my view that the claims against the [personal defendants] are asserted against them in their capacity both as directors and officers of Onex and as directors (or de facto directors…) and officers of Magnatrax. *The overarching theme of the Complaint* [i.e., the Georgia Action] *is that Onex, as directed by the [personal defendants] in their capacity as Onex directors and officers, engineered the demise of Magnatrax and its subsidiaries for their collective benefit.* [Emphasis added.]

Page:  48

[136]  The motion judge went on, at paras. 173-74, to interpret the exclusionary

effect of Endorsement #14 as follows:

> Accordingly, when read in its entirety, Endorsement #14 operates to remove Magnatrax (and any subsidiary or affiliate) from coverage under the [Onex 2002-2003 Policy] and exclude any claim against Onex directors and officers by or against Magnatrax or arising out of, based upon or attributable to any act on the part of Magnatrax or its directors and officers. What Endorsement #14 does not exclude, in my view, is any claim by a third party against Onex"s directors and officers in their capacity as such for their wrongful acts in relation to Magnatrax.
>
> Based on the above interpretation of Endorsement #14, it is my view that the [Georgia] Action is not excluded from coverage under the [Onex 2002-2003 Policy]. As has been previously discussed, the [Georgia] Action asserts claims against the [personal defendants] in their capacity as directors and/or officers of Onex relating to Magnatrax. The claims are not based upon or attributable to any act on the part of Magnatrax or its directors and officers.

[137]  The motion judge elaborated on his understanding of the term "Claim" in

the Magnatrax Run-Off Policy and the Onex 2002-2003 Policy at paras. 54-55 of

his unreported January 20, 2012 reasons:

> The term "Claim" is broadly defined in both the Magnatrax [Run-Off] Policy and the [Onex 2002-2003 Policy] to include, among other things, a written demand for monetary, non-monetary or injunctive relief as well as [a] civil proceeding for monetary, non-monetary or injunctive relief commenced by statement of claim. It is intended to define a triggering event in respect of coverage under the Policies. In my view, however,

> based on the wording of the Policies as a whole, the definition of Claim is broad enough to also encompass multiple individual claims within an action or proceeding as well. It is not restricted to mean solely an action or proceeding.
>
> To define Claim as being limited to a legal action or proceeding makes no sense having regard to the wording of the Policies. The Policies refer to and deal with actions or proceedings which assert multiple claims where some of the claims are covered and some are not. They also provide for claims against insured in actions where there are co-defendants who are not covered. It is the covered claims within an action or proceeding that are covered rather than the entire action.

[138] These reasons indicate that the motion judge was satisfied that the Georgia Action advanced claims against the personal defendants both in their capacities as Executives of Magnatrax and in their capacities as Executives of Onex. American Home does not challenge this finding on appeal.

[139] It is also apparent that the motion judge was satisfied that while the term "Claim" as it is defined in the Onex 2002-2003 Policy refers to a civil proceeding, the term need not necessarily encompass the entirety of the civil proceeding. According to the motion judge, when the wording of the policies is looked at as a whole: "the definition of Claim is broad enough to also encompass multiple individual claims within an action or proceeding as well. It is not restricted to mean solely an action or proceeding": unreported reasons, at para. 54.

[140]  We think that the motion judge"s view is tenable to the following extent. We agree that when the wording of the policies is looked at as a whole, it is reasonable to interpret the term "Claim" in Endorsement #14 as not necessarily referring to the entirety of a proceeding. The phrase in the first paragraph of Endorsement #14 – "any Claim … made against [Magnatrax or its Executives]" – can be taken as referring to the Georgia Action as advanced against Magnatrax or its Executives, and not as referring to the Georgia Action as advanced against Onex or its Executives acting in their capacity as such.

[141]  The following wording of the policies supports this view. Under the terms of the Executive Liability coverage in the Onex 2002-2003 Policy, American Home was responsible to pay the Loss of an Onex Executive arising from a Claim made against the Executive for any "Wrongful Act" of the Executive.

[142]  "Wrongful Act" is defined as meaning:

> (1)    any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act…
>
> (i) with respect to any Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such;

[143]  It is apparent from this definition that the capacity in which an Executive is acting when committing a Wrongful Act is a crucial feature of coverage. It is only

when acting in his or her capacity as an Executive of the covered Organization that the Executive is covered.

[144] When the Magnatrax Run-Off Policy was issued and Magnatrax and Magnatrax Executives were removed from coverage under the Onex 2002-2003 Policy, it would be reasonable to interpret these policies as providing that Magnatrax Executives would no longer be covered under the Onex 2002-2003 Policy for a Claim brought against them in their capacity as Magnatrax Executives, but that Onex Executives would continue to be covered under the Onex 2002-2003 Policy for Wrongful Acts committed by them in their capacity as Onex Executives. In other words, it is reasonable to interpret the term "Claim" in Endorsement #14 as referring to a proceeding against a particular Insured acting in the capacity that attracts coverage. Considered in this light, the wording of the first paragraph of Endorsement #14 – "the Insurer shall not be liable for any Loss… arising out of… any Claim… made against [Magnatrax or its Executives]" – could reasonably mean a Claim to the extent that it is advanced against Magnatrax or its Executives in their capacity as such.

[145] On this interpretation of the phrase "any Claim", the exclusion in the second paragraph of Endorsement #14 could reasonably be interpreted as not excluding all of the defence costs of the Georgia Action from coverage. If a proceeding (in this case a civil action) includes causes of action against an

Page: 52

Insured acting in more than one capacity, it would be necessary to separate the claims based upon the capacities in which the Insured is being sued and to then determine whether or not the Insured is covered or excluded under the provisions of the policy.

[146]  In this case, the motion judge found, at para. 105 of his reported reasons, that "[t]he overarching theme of the Complaint [*i.e.*, the Georgia Action] is that Onex, as directed by the [personal defendants] in their capacity as Onex directors and officers, engineered the demise of Magnatrax and its subsidiaries for their collective benefit." At para. 174 of his reported reasons, he held that at least some of the claims were advanced against the personal defendants "in their capacity as directors and/or officers of Onex" and are not "based upon or attributable to any act on the part of Magnatrax or its directors and officers."

[147] At least with respect to the unjust enrichment claim, we agree with the motion judge"s characterization. This claim is not "alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of Magnatrax [or any Magnatrax Executive]". On this view, it would be reasonable to interpret the second paragraph of Endorsement #14 of the Onex 2002-2003 Policy as not excluding the cost of defending the unjust enrichment aspect of the Georgia Action.

Page:  53

[148] Having said that, we are not prepared to find that the motion judge"s interpretation of Endorsement #14 of the Onex 2002-2003 Policy is the only reasonably available interpretation. We find that American Home"s suggested interpretations of the first paragraph of Endorsement #14 and of the second paragraph of Endorsement #14 are also reasonable ones.

[149]  In advancing the argument based on the exclusion in the first paragraph of Endorsement #14, American Home"s fundamental position is that the word "Claim" in this clause should be read as it is defined in the Onex 2002-2003 Policy. The definition of "Claim" states:

> "Claim" means:
>
> …
>
> 2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:  (i) service of a Writ of Summons, Statement of Claim or similar originating legal document; (ii) return of a summons, information, indictment or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges;

[150]  Based on the definition of the term "Claim" as a civil proceeding, American Home contends that the first paragraph of Endorsement #14 clearly excludes the personal defendants" defence costs from coverage for two main reasons.

[151]  First, the personal defendants" defence costs constitute Loss arising out of, attributable to or in connection with "a civil proceeding", namely, the Georgia

Page:  54

Action. Second, the Georgia Action is a civil proceeding against Magnatrax Executives, who were named as individual defendants in the Georgia Action. Thus, on a plain reading of the first paragraph of Endorsement #14, the personal defendants" Loss in the form of defence costs arising from the Georgia Action is excluded from coverage.

[152]  Similarly, American Home"s argument based on the second paragraph of Endorsement #14 is that this language operates to exclude coverage for Loss in connection with any civil proceeding against Onex Executives alleging, arising out of, based upon or attributable to the conduct of Magnatrax Executives. The Georgia Action includes allegations of wrongful acts committed by directors and officers of both Magnatrax and Onex. Thus, the argument goes, the Georgia Action is a "Claim" – that is, a civil proceeding – arising out of acts by Magnatrax Executives. That being the case, the defence costs associated with the Georgia Action are excluded from coverage by the above-quoted language from the second paragraph of Endorsement #14.

[153] On American Home"s interpretation, there is no basis in the language of Endorsement #14 or elsewhere in the policy language for assigning a different meaning to the term "Claim" than is provided by the definition in the policy. American Home argues that giving a different meaning to the term "Claim" as it

appears in Endorsement #14 would deviate from the meaning of the term most commonly used in the D&O insurance industry.

[154] We agree with American Home to the extent that we conclude that it is reasonable to interpret the term "Claim" in Endorsement #14 in the way the term is defined in the Onex 2002-2003 Policy, namely, as a civil proceeding. On one reading of the first paragraph of Endorsement #14, the Georgia Action constitutes a civil proceeding brought against Magnatrax Executives, and the Insurer is not liable for "any Loss" in connection with this Claim.

[155] We agree that it is also reasonable to interpret the second paragraph of Endorsement #14 as excluding coverage for the claimed defence costs because these costs arise from a Claim that is based on acts or omissions of Magnatrax Executives. Each of the four counts in the Georgia Action against the individual defendants name both the personal defendants who served as Onex Executives (*i.e.*, Schwartz, Govan, Wright and Hilson), as well as two individual defendants who only served as Magnatrax Executives (*i.e.*, Richard T. Ammerman and Raymond C. Blackmon Jr.). The language of the second paragraph of Endorsement #14 can be read to exclude from coverage the costs of defending the Georgia Action because these costs constitute Loss in connection with a Claim alleging, arising out of, based upon or attributable to the conduct of Magnatrax Executives (*i.e.*, Wright, Hilson, Ammerman and Blackmon).

Page:  56

[156]  In assessing the reasonableness of the competing interpretations of the term "Claim" in Endorsement #14, it is necessary to consider if each interpretation is consistent with the use of that term elsewhere in the Onex 2002-2003 Policy. We have reviewed the language of the policy, and in particular have examined Endorsements #5 and #9. American Home contended that the language of these endorsements supports its interpretation of Endorsement #14. We conclude that the way the term "Claim" is used elsewhere in the policy does not assist in determining which interpretation of the use of that term in Endorsement #14 is the correct one.  There are reasonable arguments pointing in both directions.

[157]  We have also considered the factual matrix in this case, which is set out above in paras. 25-48 above.  As we see it, plausible arguments can be made on both sides as to the reasonableness of either interpretation in view of the surrounding circumstances, the provisions of the Magnatrax Run-Off Policy and when viewed objectively, what the parties to the negotiations would have been trying to accomplish.

[158]  In reaching the conclusion that Endorsement #14 is ambiguous, we have specifically considered Endorsements #16 and #4 to the Magnatrax Run-Off Policy (see paras. 43 and 44 above).  In our view, these endorsements can be

interpreted to sit comfortably with American Home"s interpretation of Endorsement #14 in the Onex 2002-2003 Policy.

[159] Using the plain meaning of the definitions provided in the policies, under American Home's interpretation of Endorsement #14 in the Onex 2002-2003 Policy and Endorsement #16 in the Magnatrax Run-Off Policy, coverage is not simultaneously available under the two policies.

[160] According to American Home, Endorsement #4 of the Magnatrax Run-Off Policy would afford coverage with respect to any civil proceeding against Onex or Onex Executives provided that the civil proceeding relates to a Wrongful Act committed by Magnatrax or a Magnatrax Executive if either Magnatrax or a Magnatrax Executive remains as a defendant in the civil proceeding.

[161] That said, we do not think that the compatibility of Endorsements #16 and #4 of the Magnatrax Run-Off Policy with American Home"s interpretation of Endorsement #14 in the Onex 2002-2003 Policy is determinative of the interpretation exercise.

[162] As a starting point, American Home"s interpretation of these paragraphs in Endorsement #14 of the Onex 2002-2003 Policy leaves a potential gap in coverage for Onex Executives. On American Home"s interpretation, Onex Executives would be covered by the Magnatrax Run-Off Policy for their Wrongful Acts in relation to Magnatrax provided they were sued along with Magnatrax or a

Magnatrax Executive. However, they would not be afforded coverage under either policy if they were sued on their own in their capacity as Onex Executives for the same Wrongful Acts.

[163]  Further, Endorsement #16 also can be read in a manner that is consistent with the motion judge"s interpretation of Endorsement #14 to the Onex 2002-2003 Policy.  If "Claim" as it appears in Endorsement #14 to the Onex 2002-2003 Policy is interpreted as meaning the Georgia Action as advanced against Magnatrax or its Executives, and not as referring to the Georgia Action as advanced against Onex or its Executives acting in their capacity as such, the coverage afforded to Magnatrax Executives under the Magnatrax Run-Off Policy would not trigger Endorsement #16 to the Magnatrax Run-off Policy. Similarly, aspects of the Georgia Action advanced against Onex Executives that do not attract coverage under Endorsement #4 of the Magnatrax Run-Off Policy would not trigger Endorsement #16 of the Magnatrax Run-Off Policy. Viewed in this way, Endorsement #16 of the Magnatrax Run-Off Policy does not make the motion judge"s interpretation of Endorsement #14 of the Onex 2002-2003 Policy unreasonable.

[164]  Endorsement #4 of the Magnatrax Run-Off Policy may sit less comfortably with the motion judge"s interpretation of Endorsement #14 of the Onex 2002-2003 Policy. Arguably, the motion judge"s interpretation avoids the potential for a

gap in coverage if a civil proceeding involving Magnatrax named only Onex and Onex Executives as defendants and did not name as defendants Magnatrax or any individuals who served as Magnatrax Executives.  That said, it is not entirely clear what effect such an interpretation would have on the coordination of liability limits under Endorsement #16 of the Magnatrax Run-Off Policy.

[165] In our view, however, the difficulty in reconciling the two endorsements from the Magnatrax Run-Off Policy with the motion judge"s interpretation of Endorsement #14 of the Onex 2002-2003 Policy does not determine the interpretative exercise. We have concluded that the ambiguity, as discussed above in these reasons, remains. The factual matrix in this case does not resolve which interpretation of Endorsement #14 of the Onex 2002-2003 Policy reflects the parties" reasonable expectations or intentions in putting in place the Magnatrax Run-Off Policy and amending the Onex 2002-2003 Policy by adding Endorsement #14.

[166] Each party advanced an interpretation of Endorsement #14 reflecting their reasonable expectation of coverage. Viewed objectively, either interpretation of Endorsement #14 would produce a commercially sensible result.

[167] In summary, we are of the view that the wording of Endorsement #14 in the Onex 2002-2003 Policy is susceptible of more than one meaning and is therefore ambiguous. Accordingly, we do not agree with the motion judge"s

conclusion at para. 169 of his reported reasons that the wording of Endorsement #14 is clear and unambiguous.

[168]  Where an ambiguity is first identified on appeal, it must be asked if the appellate court is in a position to resolve the ambiguity *de novo*. Section 134(1) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, empowers this court to make any order that the motion judge could have made. The parties brought competing motions to decide the personal defendants" action by way of summary judgment. The evidentiary record from the motions was filed electronically in this court with leave.

[169]  The governing test for assessing if it is appropriate to exercise the powers conferred by rule 20.01(2.1) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, on a motion for summary judgment is the full appreciation test from *Combined Air Mechanical v. Flesch*, 2011 ONCA 764, 108 O.R. (3d) 1. This court described the test as follows, at para. 50: "can the full appreciation of the evidence and issues that is required to make dispositive findings be achieved by way of summary judgment, or can this full appreciation only be achieved by way of a trial?"

[170]  We have examined the record carefully.  Regrettably, we find that we are not in a position to decide the factual issues that need to be determined in order to resolve the interpretative dispute. Having found that Endorsement #14 was

unambiguous, the motion judge did not make findings of fact with respect to the issues we consider relevant to the resolution of the interpretation exercise.

[171] In arguing the appeal, the parties each took the position that the interpretation they urged on the court was unambiguous. That being the case, they paid little attention to the issues that we now find must be determined – what were the reasonable expectations or intentions of the parties in adopting Endorsement #14 of the Onex 2002-2003 Policy?

[172]  Given the disposition we would make of this appeal, we will not express an opinion on the body of evidence that may be relevant to determining that issue. Suffice it to say that there is evidence of discussions and correspondence that took place in January 2003 and again at the time of the issuance of the Magnatrax Run-Off Policy and the issuance of Endorsement #14.

[173] We note that it will be open to the Superior Court to decide, if need be, whether Endorsement #16 of the Magnatrax Run-Off Policy entitles American Home to set-off amounts that may be found owing under the Onex 2002-2003 Policy against payments made under the Magnatrax Run-Off Policy.

## G. DISPOSITION

[174] In the result, we would dismiss the Onex cross-appeal. We would allow American Home"s appeal, set aside the order of the motion judge, and return the matter to the Superior Court.  We leave it open to the parties to decide whether

Page:  62

to renew motions for summary judgment or to proceed by way of a trial of the issues that we have identified in these reasons.

[175]  The parties may make brief written submissions on costs within a period of 30 days from the release of these reasons.


Released: "DOC" February 25, 2013

"D. O"Connor A.C.J.O."

"Janet Simmons J.A."

"I agree M. Rosenberg J.A."

Page:  63


**Appendix**

**1. Onex 2002-2003 Policy**

Coverage A: EXECUTIVE LIABILITY INSURANCE

This policy shall pay the Loss of any Insured Person arising from a Claim (including, but not limited to, an Employment Practices Claim, an Oppressive Conduct Claim, a Canadian pollution Claim and a Statutory Claim) made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person.  Coverage A shall not apply to Loss arising from a Claim made against an Outside Entity Executive.

…

2. DEFINITIONS

…

(c) "Claim" means:

    (1) a written demand for monetary, non-monetary or injunctive relief,

    (2) a civil, criminal, administrative, regulatory or arbitration proceeding for   monetary, non-monetary or injunctive relief which is commenced by:  (i) service of a Writ of Summons, Statement of Claim or similar originating legal document; (ii) return of a summons, information, indictment or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or

    (3) a civil, criminal, administrative or regulatory investigation of an Insured Person:

        (i)    once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (c)(2) may be commenced; or

        (ii)   in the case of an investigation by any PSC or similar foreign securities authority, after the service of a subpoena upon such Insured Person.

The term "Claim" shall include any Securities Claim, Employment Practices Claim, Oppressive Conduct Claim, Canadian Pollution Claim and Statutory Claim.

…

Page:  64

(h) "Defence Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defence and/or appeal of a Claim against an Insured, but excluding any compensation of any Insured Person or any Employee of an Organization.

…

(l) "Executive" means any:

(1) past, present and future duty elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position), including a de facto director, officer, trustee, governor, management committee member or member of the management board of such entities;

(2) past, present and future person in a duty elected or appointed position in an entity organized and operated in a Foreign Jurisdiction that is equivalent to an executive position listed in Definition (l)(1); or

(3) past, present and future General Counsel and Risk Manager (or equivalent position) of the Named Entity.

…

(p) "Insured" means any:

(1) Insured Person; or
(2) Organization, but only with respect to a Securities Claim, an Oppressive Conduct Claim or a Canadian Pollution Claim.

(q) "Insured Person" means any:

(1) Executive of an Organization;
(2) Employee of an Organization; or
(3) Outside Entity Executive.

(r) "Loss" means damages (including aggravated damages), settlements, judgments (including pre/post-judgment Interest on a covered judgment), Defence Costs and Crisis Loss; however, "Loss" (other than Defence Costs) shall not include:  (1) civil or criminal fines or penalties; (2) taxes; (3) punitive or exemplary damages; (4) multiplied portion of

Page:  65

multiplied damages; (5) any amounts for which an Insured is not financially liable or which are without legal recourse to an Insured; and (6) matters which may be deemed uninsurable under the provincial or state law pursuant to which this policy shall be construed.

…

(w) "Organization" means:

(1)  the Named Entity;

…

(dd) "Subsidiary" means: (1) any for-profit entity that is not formed as a partnership of which the Named Entity has Management Control ("Controlled Entity") on or before the inception of the Policy Period either directly or indirectly through one or more other Controlled Entities and (2) a not-for-profit organization as defined in Section 149.1(b) of the Income Tax Act, R.S.C., 1985 (5th Supp.) sponsored exclusively by the Named Entity.

(ee) "Wrongful Act" means:

(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged Employment Practices Violation:

  (i)   with respect to any Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such;

  (ii)  with respect to any Employee of an Organization, by such Employee in his or her capacity as such, but solely in regard to any: (a) Securities Claim; or (b) other Claim so long as such other Claim is also made and continuously maintained against an Executive of an Organization; or

  (iii) with respect to any Outside Entity Executive, by such Outside Entity Executive in his or her capacity as such or any matter claimed against such Outside Entity Executive solely by reason of his or her status as such; or

(2) with respect to an Organization, any actual or alleged breach of duty, neglect, error, misstatement, mis-leading statement, omission or act by such Organization, but solely in regard to:  (a) any Securities Claim or Oppressive Conduct Claim;  or  (b) a Canadian Pollution

Page:  66

Claim so long as such Canadian Pollution Claim is also made and continuously maintained against an Executive of an Organization.

…

## 4. EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

(i) which is brought by or on behalf of an Organization or any Insured Person, other than an Employee of an Organization; or which is brought by any security holder or member of an Organization, whether directly or derivatively, unless such security holder"s or member"s Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Executive of an Organization or any Organization, provided, however, this exclusion shall not apply to:

(1) any Claim brought by an Insured Person in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a Claim that is covered by this policy;

(2) any Employment Practices Claim brought by an Insured Person, other than an Insured Person who is or was a member of the Board of Directors (or equivalent governing body) of an Organization;

(3) in any bankruptcy proceeding by or against an Organization, any Claim brought by the examiner, trustee, receiver, receiver manager, liquidator or rehabilitator (or any assignee thereof) of such Organization, if any;

(4) any Claim brought by any past Executive of an Organization who has not served as a duty elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an Organization for at least four (4) years prior to such Claim being first made against any person; or

(5) any Claim brought by an Executive of an Organization formed and operating in a Foreign Jurisdiction against such Organization or any Executive thereof, provided that such Claim is brought and maintained outside Canada, the United States, or any other common law country (including any territories thereof);

…

Page:  67

7. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to American Home Assurance Company, 145 Wellington Street West, Toronto, Ontario M5J 1H8: Attention Claims Department.  If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

…

(c) If during the Policy Period or during the Discovery Period (if applicable) an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

**ENDORSEMENT #5**

…

"NO LIABILITY" PROVISION DELETED AND
SECURITIES CLAIM RETENTION APPLIES TO ALL LOSS

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

(1) The Definition of and all provisions referring to "No Liability" are hereby deleted in their entirety.

(2) Clause 6 RETENTION CLAUSE is deleted in its entirety and replaced by the following:

Page:  68

6.    RETENTION CLAUSE

For each Claim, the Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the applicable Retention amounts stated in Items 4(a) through 4(e) of the Declarations, such Retention amounts to be borne by an Organization and/or the Insured Person and remain uninsured, with regard to all Loss other than Non-Indemnifiable Loss. The Retention amount specified in:

(i)      Item 4(a) applies to Loss that arises out of a Securities Claim;

(ii)     Item 4(b) applies to Loss that arises out of an Employment Practices Claim; and

(iii)    Item 4(c) applies to Loss that arises out of Oppressive Conduct Claim;

(iv)     Item 4(d) applies to Loss that arises out of a Canadian Pollution Claim; and

(v)      Item 4(e) applies to Loss that arises out of any Claim other than a Claim listed in Clause 6(i) through 6(iv) above.

A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

In the event a Claim triggers more than one of the Retention amounts stated in Items 4(a) through 4(e) of the Declarations, then, as to that Claim, the highest of such Retention amounts shall be deemed the Retention amount applicable to Loss (to which a Retention is applicable pursuant to the terms of this policy) arising from such Claim.

No Retention amount is applicable to Crisis Loss or Non-Indemnifiable Loss.

…

**ENDORSEMENT #9**

…

PREDETERMINED ALLOCATION FOR DEFENCE COSTS
OTHER THAN SECURITIES CLAIM OR EMPLOYMENT PRACTICES
CLAIM

Page:  69

In consideration of the premium charged, it is hereby understood and agreed that Clause 8 is hereby amended by adding the following at the end thereof:

If a covered Claim other than a Securities Claim(s) or Employment Practices Claim(s) results in Loss which is both covered under the terms and conditions of this policy and uncovered by the terms and conditions of this policy (other than as a result of an exception of the Definition of Loss, the Definition of Defence Costs or the terms, conditions and limitations of this Clause 8), because such Claim includes both covered and uncovered matters or covered or uncovered parties, then the Insurer, the Insureds and the Company agree to allocate Defence Costs incurred in connection with such Claim, as follows:

Eighty percent (80%) shall be deemed to be Loss incurred by the Insureds; however, the Insurer shall only be liable to pay such Loss of the Insureds subject to the policy"s application retention amount, limits of liability, and expressed exceptions to the definition of Loss and the other provisions of this Clause 8 and the definition of Defence Costs; and the remainder shall be deemed to be the obligation of the Organization and the Insureds and not insured under this policy. ("Preset Allocation of Defence Costs")

Provided that in all events the Preset Allocation of Defence Costs described above shall not apply to or create any presumption with respect to the allocation of any damages, judgments or settlement in regard to any Claim.

…

**ENDORSEMENT #10**

BANKRUPTCY TRUSTEE, RECEIVER, LIQUIDATOR
OR REHABILITATOR EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured in any bankruptcy proceeding by or against an Organization, when such Claim is brought by the examiner, trustee, receiver, creditors" committee, trust, liquidator or rehabilitator (or any assignee thereof) of such Organization.

It is further understood and agreed that the policy is modified as follows:

Page:  70

1.  Clause 4. EXCLUSIONS, Exclusion (i) is hereby amended by deleting subparagraph (3) in its entirety.

…

**ENDORSEMENT #14**

SPECIFIC ENTITY/SUBSIDIARY EXCLUSION
(Claims brought by or made against)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss alleging, arising out of, based upon or attributable to or in connection with any Claim brought by or made against the Entity listed below and/or any Insureds thereof.

1.  MAGNATRAX Corporation (Including any subsidiary or affiliate thereof)

It is further understood and agreed that the Definition of Subsidiary shall not include MAGNATRAX Corporation.  Further, the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of MAGNATRAX Corporation, or any director, officer, member of the board of managers or employee thereof.

**2. Magnatrax Run-Off Policy**

>**ENDORSEMENT #4**
>
>...
>
>DEFINITION OF ORGANIZATION AMENDED TO INCLUDE ENTITY
>(CO-DEFENDANT ONLY)
>
>In consideration of the premium charged, it is hereby understood and agreed that the term "Organization" is amended to include the following entity, subject to the terms, conditions and limitations of this endorsement and this policy.
>
>ENTITY
>
>Onex Corporation
>
>Coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Persons thereof shall only apply if: (1) such Claim relates to a Wrongful Act committed by an Insured (other than Onex Corporation or an Insured Person thereof); and (2) an Insured (other than Onex Corporation or an Insured Person thereof) is and remains a defendant in the Claim along with Onex Corporation or any Insured Person thereof.
>
>In all events coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Person thereof shall only apply to Wrongful Acts committed or allegedly committed prior to May 12, 2003.
>
>...
>
>**ENDORSEMENT #11**
>
>...
>
>COVERAGES B(i) DELETED
>ALLOCATION ENDORSEMENT
>
>...
>
>DEFENCE COSTS) is deleted in its entirety and replaced with the following:

Page:  72

8.  DEFENCE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENCE COSTS)

(a)  Under Coverage A, B and C of this policy, except as hereinafter stated, the Insurer shall advance, excess of any applicable retention amount, covered Defense Costs no later than ninety (90) days after the receipt by the Insurer of such defense bills.  Such advance payments by the Insurer shall be repaid to the Insurer by each and every Insured Person or Organization, severally according to their respective interests, in the event and to the extent that any such Insured Person or Organization shall not be entitled under this policy to payment of such Loss.

…

(f)  In connection with any Claim, other than a Claim that is or includes a Securities Claim, with respect to:  (i) Defense Costs jointly incurred by, (ii) any joint settlement entered into by, or (iii) any judgment of joint and several liability against any Organization and any Insured Person, there shall be a fair and equitable allocation as between any such Organization and any such Insured Person, taking into account the relative legal and financial exposures and the relative benefits obtained by any such Insured Person and any such Organization, without any presumption that the coverage afforded to the Insured Person shall in any way reduce the allocation to the Organization which shall not be insured for such allocation.  In the event that a determination as to the amount of Defense Costs to be advanced under the policy cannot be agreed to, then the Insurer shall advance Defense Costs excess of any applicable retention amount which the Insurer states to be fair and equitable until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

…

**ENDORSEMENT #16**

…

COORDINATION OF AIG LIMITS

In consideration of the premium charged, it is hereby understood and agreed that, with respect to any Claim under this policy for which coverage is provided by one or more other policies issued by the Insurer or any other

Page:  73

member of the American International Group (AIG), (or would be provided but for the exhaustion of the limit of liability, the applicability of the retention/deductible amount or coinsurance amount, or the failure of the Insured to submit a notice of a Claim), the Limit of Liability provided by virtue of this policy shall be reduced by the limit of liability provided by said other AIG policy.

Notwithstanding the above, in the event such other AIG policy contains a provision which is similar in intent to the foregoing paragraph, then the foregoing paragraph will not apply, but instead:

(1) the Insurer shall not be liable under this policy for a greater proportion of the Loss than the applicable Limit of Liability under this policy bears to the total limit of liability of all such policies, and

(2) the maximum amount payable under all such policies shall not exceed the limit of liability of the policy that has the highest available limit of liability.

Nothing contained in this endorsement shall be construed to increase the limit of liability of this policy.

Page:  74

**3. Onex 2004-2005 Policy**

4.  EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

…

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

…

**ENDORSEMENT #13**

…

PRIOR ACTS EXCLUSION FOR LISTED ENTITIES

In consideration of the premium charged, it is hereby understood and agreed that the term Subsidiary is amended to include the entity(ies) listed below, but only for Wrongful Acts committed by such entity(ies) and/or any Insureds thereof which occurred subsequent to such entity"s respective acquisition/creation date listed below and prior to the time the Named Entity no longer maintains Management Control of such entity(ies), respectively, either directly or indirectly through one or more other Subsidiaries.  Loss arising from the same or related Wrongful Act shall be deemed to arise from the first such same or related Wrongful Act.

ENTITY(IES)                                    ACQUISITION/CREATION DATE

1. MAGNATRAX Corporation [...]                         May 12, 2003

For the purpose of the applicability of the coverage provided by this endorsement, the entities listed above and the Organization will be conclusively deemed to have indemnified the Insureds of [...] each respective entity to the extent that such entity or the Organization is permitted or required to indemnify such Insureds pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an Organization.  The entity and the Organization hereby agree to indemnify

Page:  75

the Insureds to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

# TAB 5

# COURT OF APPEAL FOR ONTARIO

CITATION: Williams-Sonoma Inc. v. Oxford Properties Group Inc.,
2013 ONCA 441
DATE: 20130626
DOCKET: C56194

Weiler, Gillese and Hoy JJ.A.

BETWEEN

Williams-Sonoma Inc., Williams-Sonoma Canada Inc.,
Pottery Barn and Pottery Barn Kids

Plaintiffs (Appellants)

and

Oxford Properties Group Inc., Paragon Protection Ltd.
and EllisDon Corporation

Defendants (Respondent)

and

Yorkdale Shopping Centre Holdings Inc. and
Omers Realty Management Corporation

Third Parties (Respondents)

Raj K. Datt and Gerry Grossi, for the appellants

Marcia J. Oliver, for the respondent, EllisDon Corporation

Heard: May 9, 2013

On appeal from the judgment of Justice Darla A. Wilson of the Superior Court of
Justice, dated October 1, 2012, with reasons reported at 2012 ONSC 5448.

**Hoy J.A:**

Page:  2

## I.    OVERVIEW

[1]    Williams-Sonoma Inc., Williams-Sonoma Canada Inc., Pottery Barn and Pottery Barn Kids (the "Tenants") appeal the October 1, 2012 judgment of the motion judge, dismissing their action against the respondent, Ellis Don Corporation.

[2]    The Tenants are tenants at Yorkdale Shopping Centre in Toronto. The landlord, Yorkdale Shopping Centre Holdings Inc., (the "Landlord") contracted for the respondent – an independent contractor – to perform certain construction work at the mall. Early one morning, a vandal opened a fire hose located in the vacant, third floor area of the mall that the Landlord had permitted the respondent to use for its office and storage.  As a result, the Tenants' premises suffered what they allege is some $7,000,000 of water damage.

[3]    The leases between the Tenants and the Landlord (each a "Lease") required the Tenants to take out and maintain insurance covering water damage to the leased premises and to the Tenants' property within those premises. Under subsection 8.3.1 of each Lease, the Tenant waives all claims against the Landlord and "those for whom the [Landlord] is in law responsible" with respect to occurrences required to be insured against by the Tenant.

[4]    The Tenants sued the respondent contractor, alleging that it breached common-law and statutory duties owed to the Tenants by failing to properly

Page: 3

secure the area where the fire hose was located.  The respondent brought a motion for summary judgment, arguing that the Tenants had waived all claims against it pursuant to s. 8.3.1 of the Leases. The respondent argued that: the Landlord is in law responsible for the respondent within the meaning of that phrase in s. 8.3.1 of the Lease; s. 8.3.1 accordingly applies; the benefit of s. 8.3.1 extends to the non-party respondent; and the Tenants are therefore barred from suing the respondent.

[5]    The motion judge concluded that the respondent was an entity for which the Landlord was responsible in law, and that, although the respondent was not a party to the Lease, the benefit of s. 8.3.1 should be extended to it pursuant to *Fraser River Pile & Dredge Ltd. v. Can-Dive Services Ltd.*, [1999] 3 S.C.R. 108. She accordingly granted summary judgment, dismissing the Tenants' claims against the respondent.

[6]    On this appeal, the Tenants argue that the motion judge erred in concluding that the Landlord could be responsible in law for the respondent if not vicariously responsible for it, and that the respondent did not fall within any exception to the general immunity from vicarious liability for the negligence of an independent contractor.

[7]    The Tenants do not argue that this was a matter that should not have been dealt with by way of a motion for summary judgment.

Page:  4

[8]     For the reasons that follow, I conclude that the Landlord is responsible in law for the respondent, within the meaning of those words in the Leases, and that the benefit of s. 8.3.1 should be extended to the respondent. I would accordingly dismiss this appeal.

## II.    THE RELEVANT PROVISIONS OF THE LEASES

[9]     The Leases are the same in all material respects. The relevant provisions are contained in Part 8, entitled "Insurance". That Part requires the Landlord and the Tenant to take out certain insurance coverage and to release the other to the extent of such coverage.

[10]    Section 8.1 provides that the "Landlord shall not be required to take out or maintain any insurance with respect to any loss, injury or damage required to be insured against by Tenant or with respect to Tenant Property."

[11]    Section 8.2 then requires the Tenant to take out and maintain, among other insurance coverage, coverage with respect to "water damage howsoever caused…fully covering the Store (including all Leasehold Improvements), all Tenant Property and any other property owned by [the] Tenant or for which it is legally liable and which is located within the Project."

[12]    Pursuant to s. 8.3, the Tenant releases the Landlord and those for whom it is "in law responsible" from claims arising out of the water damage with respect to which s. 8.2 requires the Tenant to obtain coverage:

Page: 5

8.3.1. Subject to sections 8.3.2 and 8.3.3, each of the Landlord and Tenant hereby releases the other and waives all claims against the other and *those for whom the other is in law responsible* with respect to occurrences insured against or required to be insured against by the releasing party, whether any such claims arise as a result of the negligence or otherwise of the other or those for whom it is in law responsible. [Emphasis added.]

8.3.2. Such release and waiver shall be effective only to the extent of proceeds of insurance received by the releasing party and proceeds which would have been received if the releasing party obtained all insurance required to be obtained by it under this lease and for this purpose deductible amounts shall be deemed to be proceeds of insurance received.

8.3.3. Notwithstanding anything to the contrary in this section 8.3, Landlord and Tenant shall each be liable to any third person (being any person other than Landlord or Tenant) to the extent of their respective fault or negligence and each shall be entitled to full indemnity and contribution from the other to the extent of the other's fault or negligence.

[13]    Finally, pursuant to s. 8.4, "to the extent not released under s. 8.3", the

Landlord is required to indemnify the Tenant in respect of any losses occasioned

by the act, default or negligence of the respondent, which was its contractor:

8.4 To the extent not released under section 8.3, each party shall indemnify and save harmless the other from all liabilities, damages, losses or expenses growing out of:

…

2. … any loss, cost or expense arising from occasioned by the act, default or negligence of the indemnifying party, its

> officers, agents, servants, employees,
> *contractors,* customers or licensees…
> [Emphasis added.]

## III.    EXCEPTIONS TO THE DOCTRINE OF PRIVITY OF CONTRACT

[14]   In addition to the provisions of the Leases, the law regarding privity of contract is relevant to the analysis that follows.

[15]   In two decisions – *London Drugs Ltd. V. Kuhne & Nagel Ltd*., [1992] 3 S.C.R. 299 and *Fraser River* – the Supreme Court decided that, in certain circumstances, the doctrine of privity of contract should be relaxed to recognize the rights of a third party beneficiary to enforce contractual provisions made for its benefit to defend against an action commenced by one of the contracting parties.

[16]   In *London Drugs*, a storage company was party to a contract limiting its liability to $40 for any one package.  A package – a 7,500-pound transformer – was damaged while being moved by its employees.   The owner of the transformer sued the company and its employees for negligence.  All were found liable. At first instance, the liability of the company was limited to $40 while the employees were found liable for the full amount of the damages. The traditional exceptions to the doctrine of privity did not apply. At para. 107, the Supreme Court held that an employee should be entitled to benefit from a limitation of liability clause found in a contract between his employer and a plaintiff if:

Page:  7

1.     The limitation of liability clause, either expressly or impliedly, extends its benefit to the employee seeking to rely on it; and

2.     The employee seeking the benefit of the limitation of liability clause was acting in the course of his employment and performing the very services provided for in the contract between the employer and the plaintiff when the loss occurred.

[17]    *Fraser River* followed some seven years later. That case dealt with a subrogation clause in an insurance contract in which the insurer waived its right of subrogation against persons to whom the insured owner chartered its vessels. The owner chartered a barge to a third party. The barge sunk through the negligence of the charterer. The insurer paid the loss; the owner waived the subrogation clause, and sued the charterer for the benefit of the insurer.

[18]    The Supreme Court clarified that the principled approach in *London Drugs* was not limited to employee-employer relationships and applies where the traditional exceptions to the doctrine of privity do not. At para. 32, it rephrased the test in *London Drugs*, in general terms:

1.     Did the parties to the contract intend to extend the benefit in question to the third party seeking to rely on the contractual provision; and

2.     Are the activities performed by the third party seeking to rely on the contractual provision the very activities contemplated as coming within the scope of the contract in general, or the provision in particular, again as determined by reference to the intentions of the parties.

Page:  8

[19]   The Supreme Court found that the first prong of the test was clearly met: the clause expressly referenced "charters". The second prong was also met: "the relevant activities arose in the context of the relationship of Can-Dive to Fraser River as a charterer, the very activity anticipated in the policy pursuant to the waiver of subrogation clause" (at para. 39).

## IV.    MOTION JUDGE'S REASONS

[20]   The motion judge considered the two factors in *Fraser River*.

[21]   As to the first, she concluded that the parties must have intended the protection arising from s. 8.3 of the Lease to extend to others involved in the renovation work ongoing in the mall.   At para. 28, she reasoned that one of the intentions of the release was "the allocation of risk and certainty that cost will not be affected by one party asserting subrogation rights. In order to give effect to this intention, in my opinion, the benefit must be extended to a contractor such as [the respondent]." The first part of the test was therefore satisfied.

[22]   With respect to the second part of the test, she concluded that "the consideration of vicarious liability is irrelevant." The motion judge found that the Landlord was responsible for the presence of the respondent at the mall:  the Landlord hired the respondent to perform work to satisfy the Landlord's obligations to its tenants.  Moreover, the respondent "utilized the third floor space

to house its site office and to store equipment and other items necessary for the work it was conducting."

[23]   The motion judge concluded, "In my view, the waiver of subrogation extends to the benefit of [the respondent], being an entity for whom the landlord is responsible in law. To permit [the Tenants] to advance a subrogated claim against [the respondent] when it cannot advance a claim against the landlord would lead to a result that the subrogation clause is intended to prevent."

## V.    ANALYSIS

### (1)    Summary

[24]   I come to the same conclusion as the motion judge, although for slightly different reasons.

[25]   The Respondent was not a party to the Leases; consequently, it can only claim the benefit of s. 8.3.1 if it falls within the test set out in *Fraser River*. In this case, as in *Fraser*, the parties specifically indicated the persons to whom they intended the benefit of the waiver of subrogation extend. Here, the Lease extends the benefit of the waiver of subrogation to those for whom the Landlord is in law responsible. The first task for the court, therefore, is to determine whether the respondent was a person for whom the Landlord was "in law responsible," within the meaning of those words as used in the Lease. Applying the ordinary principles of contract interpretation, I conclude that the Landlord was

Page: 10

in law responsible for the respondent, within the meaning of those words as used in the Lease.

[26]    I also conclude that the two-part test in *Fraser* is met in this case, and that the respondent was accordingly entitled to invoke s. 8.3.1 of the Lease as a defence to the Tenants' claims against it.

## (2)    Interpretation of "in law responsible"

[27]    The Tenants argue that s. 8.3 is in essence a waiver, or exclusion of liability, and, as such, should be strictly construed against the  party seeking to invoke it: *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, para. 132.   In *Hunter Engineering*, sellers sought to rely on provisions in their contracts to preclude the application of the warranty implied by the *Sale of Goods Act* that the goods supplied were reasonably fit for the purpose.   In this case, unlike *Hunter Engineering*, the exclusion clause is a mutual one. In my view, the principle of strict construction relied on by the Tenants is therefore not applicable. The ordinary principles of contract interpretation apply.[1]

---

[1] A commercial contract is to be interpreted,
    (a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;
    (b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;
    (c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and
    (d) to the extent that there is ambiguity in the contract, in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.
*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205, 85 O.R. (3d) 254, at para. 24.

Page:  11

[28]  I start by considering the ordinary meaning of the words "in law responsible."

[29]   The *Dictionary of Canadian Law* defines "responsible" as meaning liable, accountable legally, answerable.[2] The *Canadian Oxford Dictionary* defines "responsible" as "liable to be called to account (to a person or for a thing)," and defines "liable" as legally bound.[3]

[30]  Vicarious liability is a theory that holds one person responsible for the misconduct of another because of the relationship between them: *671122 Ontario Ltd. v. Sagaz Industries Canada Inc*., 2001 SCC 59, [2001] 2 S.C.R. 983, at para. 25.

[31]   In my view, the ordinary meaning of the phrase "in law responsible" is liable, accountable in law, or legally responsible; its ordinary meaning is not necessarily limited to legal responsibility arising through vicarious liability, and the manner in which the phrase is used in the Lease does not restrict its ordinary meaning.

[32]   The respondent argues that a person may become legally responsible for another through the operation of a contract of indemnity. I agree.  Indeed, in this

---

[2] D.A. Dukelow ed, *The Dictionary of Canadian Law*, 4th ed. (Toronto: Carswell, 2011), at p. 1124.
[3] K. Barber ed, *Canadian Oxford Dictionary*, 2nd ed. (Don Mills, ON: Oxford University Press, 2004), at pp. 1317 and 883.

case, under s. 8.4, "to the extent not released under s. 8.3,"  the Landlord specifically agrees to indemnify the Tenant in respect of losses occasioned by the act, default or negligence of the Landlord's "officers, agents, servants, employees, contractors, customers or licensees" – a class of persons including the respondent. Under this clause, the Landlord agrees to indemnify the Tenant for damages caused by its contractors, such as the respondent. In other words, the Landlord has specifically made itself legally responsible for the respondent. In my view, the effect of s. 8.4 is that the Landlord is generally "in law responsible" to the Tenant for the respondent within the meaning of s. 8.3.1.

[33]   My conclusion is not altered by the phrase "to the extent not released under s. 8.3" that prefaces s. 8.4.  Part 8 of the Lease is entitled "Insurance"; it allocates risk between the parties based on which party is required to obtain insurance coverage. The indemnity in s. 8.4 is situated in the part of the Lease dealing with insurance.  The effect of the phrase "to the extent not released under s. 8.3" is that the Landlord is not required to indemnify the Tenant in respect of the act, default or negligence of a person listed in s. 8.4.1, if the claim is with respect to an occurrence insured against or required to be insured against by the Tenant.  It does not mean that the Landlord is not in law responsible to the Tenant for such persons within the meaning of s. 8.3.1

[34]   In my view, any other interpretation of the interplay of ss. 8.3.1 and 8.4 is inconsistent with the overall scheme of risk allocation envisaged by Part 8 of the

Page:  13

Lease and would not make commercial sense. For that reason, I reject the Tenants' argument that if it were the intent of the parties that the release in s. 8.3.1 were to extend to the parties' "officers, agents, servants, employees, contractors, customers or licensees" then they would have used that wording, and not the words "those for whom the other is in law responsible".

[35]   Having concluded that the Landlord is, under the Lease, in law responsible for the respondent, it is unnecessary to address the arguments of the Tenants regarding vicarious liability.

**(3)     The application of the test in *Fraser River***

[36]   I turn next to the issue of whether the two-part test in *Fraser* has been met.

[37]   It follows from my conclusion that the respondent is a person for whom the Landlord is "in law responsible" that the parties intended the benefit of s. 8.3.1. to extend to the respondent, and that the first prong of the test is met.

[38]   I also conclude that the activities performed by the respondent were activities contemplated as coming within the scope of s. 8.3.1. The respondent was providing services to the Landlord as a contractor – an activity specifically contemplated by the indemnity provision contained in s. 8.4 of the Lease. The second prong of the test is also met.

[39]   The respondent is accordingly entitled to enforce s. 8.3.1.of the Leases to defend against the Tenants' claim against it.

Page:  14

## VI.   DISPOSITION AND COSTS

[40]   I would accordingly dismiss this appeal, and award costs in the agreed upon amount of $ 30,000, inclusive of disbursements and applicable taxes, to the respondent.


Released: June 26, 2013                          "Alexandra Hoy J.A."
  "EEG"                                          "I agree K.M. Weiler J.A."
                                                 "I agree E.E. Gillese J.A."

# TAB 6

# COURT OF APPEAL FOR ONTARIO

CITATION: McLean v. McLean, 2013 ONCA 788
DATE: 20131227
DOCKET: C56293

Weiler, Rouleau and Pepall JJ.A.

BETWEEN

Helen Gertrude McLean, in her personal capacity and as executrix of the Estate
of Wilmur Russell McLean, deceased

Plaintiff (Appellant)

and

Melville Kenneth McLean and Maureen Holly McLean

Defendants (Respondent)

AND BETWEEN

Maureen Holly McLean

Plaintiff by Counterclaim

and

Helen Gertrude McLean, in her personal capacity and as executrix of the Estate
of Wilmur Russell McLean, deceased and Trudy McLean

Defendants by Counterclaim

Avril A. Farlam, for the appellant

Stephen F. Ault, for the respondent

Heard: September 12, 2013

Page:  2

On appeal from the judgment of Justice Christopher Bondy of the Superior Court of Justice, dated October 26, 2012, as amended January 24, 2013.

**Weiler J.A.:**

**A.    OVERVIEW**

[1]    In 1989, Helen and Wilmur McLean sold their farming business as a going concern, including all real and personal property, to their son, Melville McLean, and daughter-in-law, Maureen McLean. Wilmur has since died.

[2]    The parties signed a memorandum of agreement outlining the terms of the transfer. It listed the various ways that the purchase price for the real and personal property was to be satisfied, including a vendor take-back mortgage in respect of the real property.

[3]    Helen, the appellant, claimed rectification of the memorandum of agreement on the basis that the total purchase price was incorrectly recorded. Specifically, she alleged that the portion of the purchase price related to the real property, which was to be paid by way of the vendor take-back mortgage, was incorrectly recorded in the agreement as $222,444 or $115,000 less than the fair market value of the real property, which was $337,444. Helen testified at trial that the sale of the farming business was intended to be at fair market value, which had been appraised as $733,255.

[4]    Maureen, the respondent, submits that Helen has not met the requirements for rectification. She argues that the parties did not have the

requisite common intention as to the purchase price of the farm business at the time that the memorandum of agreement was signed. Although she accepted in cross-examination that the consideration for the real property was to be $337,444, she testified that she believed the total purchase price for the farming business, including both the real and personal property, was to be $625,000, not $733,255. She argues that without consensus on this amount, rectification cannot be granted.

[5]    In *Snell's Equity*, 32nd ed. (London: Sweet & Maxwell, 2010), rectification is defined at para. 16-001:

> Where the terms of a written instrument do not accord with the true agreement between the parties, equity has the power to reform, or rectify, that instrument so as to make it accord with the true agreement. What is rectified is not a mistake in the transaction itself, but a mistake in the way in which that transaction has been expressed in writing.

As Laskin J.A. stated in *Royal Bank of Canada v. El-Bris Ltd.*, 2008 ONCA 601, 92 O.R. (3d) 779, at para. 13, "[r]ectification is an equitable remedy designed to ensure that one party is not unjustly enriched at the expense of another."

[6]    If Helen's claim for rectification of the memorandum of agreement were to succeed, then the necessary implication is that the purchase price of the real property and the principal amount of the vendor take-back mortgage as indicated

Page: 4

in the parcel register for the real property in the Land Titles system would also need to be rectified.[1]

[7]   Section 160 of the *Land Titles Act*, R.S.O. 1990, c. L.5 allows for rectification of entries in the Land Titles register. It provides:

> 160. Subject to any estates or rights acquired by registration under this Act, if a person is aggrieved by an entry made, or by the omission of an entry from the register, or if default is made or unnecessary delay takes place in making an entry in the register, the person aggrieved by the entry, omission, default or delay may apply to the court for an order that the register be rectified, and the court may either refuse the application with or without costs to be paid by the applicant or may, if satisfied of the justice of the case, make an order for the rectification of the register.

[8]   Equity continues to have application to claims governed by the *Land Titles Act*: see *MacIsaac v. Salo,* 2013 ONCA 98, 114 O.R. (3d) 226, at para. 39; *Durrani v. Augier* (2000), 50 O.R. (3d) 353, at para. 52.

[9]   The trial judge refused to grant rectification for two reasons. First, he determined that Helen failed to meet the standard of proof for rectification, which he held was "convincing proof". Second, although the trial judge acknowledged that the documentation in issue was poorly drafted and contained errors, he held that the requirements for granting the remedy of rectification were not met

---

[1] Presently, the parcel register indicates that the real property was sold by Helen and Wilmur to Maureen and Melville for $222,444, and a vendor-take back mortgage is shown for the same amount. The implication of Helen's claim is that the consideration for the transfer and the principal amount of the mortgage should be in the amount of $337,444.

Page:  5

because the parties did not have a common intention as to the amount of consideration for the farm business at the time that they executed the agreement.

[10]    I am of the opinion that the trial judge erred in both reasons he gave for refusing rectification. The ordinary civil burden of proof on a balance of probabilities is the standard that now applies to all civil actions, including a claim for rectification. The trial judge also erred in his approach to determining whether, at the time of the sale, a common intention as to the purchase price existed but had been incorrectly expressed in the written agreement. In finding that the parties did not have a common intention, the trial judge relied almost exclusively on Maureen's testimony that she believed the purchase price to be $625,000. Instead, he should have adopted an objective approach; that is, what a reasonable observer would have believed the parties intended, taking into consideration the evidence of all the parties as well as the surrounding documentary evidence.

[11]  Applying the ordinary civil standard of proof, and considering the surrounding documentary and oral evidence as a whole, in my view, the requirements for rectification based on common mistake are met. The parties had a common intention to enter into a transaction for a total selling price at fair market value, the fair market value is clear, and the fair market value was incorrectly expressed in the documentation. Unless rectification is granted, Maureen will be unjustly enriched.

Page:  6

**B.    FACTS**

[12]    Helen and Wilmur McLean lived on and operated their dairy farm until they moved into a nearby bungalow in May 1988. The farm house was soon occupied by their son, Melville, and his then-fiancée, Maureen, whom he married soon after. Like Melville, Maureen had grown up on a dairy farm, and the couple intended to make farming their life's work. They understood that they would be given the opportunity to purchase the farm from Helen and Wilmur at fair market value. That opportunity arose later in 1988.

[13]    On January 1, 1989, Melville and Maureen began to operate the farm as if it were their own. They became partners in the farm business and entered into a written partnership agreement between themselves. Maureen began doing the books for the farm, including the farm ledger, with help from Helen. She began doing the accounting on her own in January 1990.

[14]    Maureen also worked as a legal secretary for a lawyer named Jennifer Sims in 1989. At this time Maureen had approximately three years of administrative experience: one year working for a financial firm and two years working as a legal secretary.

[15]    Ms. Sims acted for both parties respecting the sale and purchase of the farm. The trial judge found that she "took the vast majority of her instruction from

Page:  7

her employee and client Maureen" and did not require Helen and Wilmur to obtain independent legal advice.

[16]   Ms. Sims dictated to Maureen, while Maureen typed up the documentation relating to the sale. Maureen testified that she simply typed in the figures as instructed by Ms. Sims and did not really understand what she was typing. The trial judge found that Ms. Sims was an inexperienced lawyer who made "countless errors" in drafting the documents, including the memorandum of agreement. Ms. Sims has since lost the file.

[17]   The parties signed the memorandum of agreement in May 1989.[2] The transfer and the vendor take-back mortgage were not signed until October 1989. The consideration recorded on the transfer and the principal amount recorded on the mortgage is $222,444 on both instruments.

[18]   Melville and Maureen ran a successful farming operation together, but they separated in 2005. In 2008, Helen became concerned about her interests. The vendor take-back mortgage remained largely unpaid. Helen read the closing documents for the sale transaction for the first time and became concerned that "the figures did not add up." Specifically, the purchase price for the farm was

---

[2] It appears that the memorandum of agreement was intended to be effective as of January 1, 1989, though it was not actually signed until May 1989. Although the signed copy of the memorandum of agreement is dated January 1, 1989, Ms. Sims sent a letter to Helen and Wilmur containing the draft sale documents for their review on May 3, 1989. This package included a draft copy of the memorandum of agreement. The remainder of the documents, including a general security agreement and a promissory note, were signed on May 16, 1989. The trial judge found that the memorandum of agreement was also signed in May 1989 and the parties also take this position.

Page:  8

$115,000 less than the total of the fair market value of all the assets. The figure listed for the principal amount of the mortgage was also missing $115,000. Notably, $115,000 was the fair market value of the stone farm house on the property.

[19]    Helen brought a claim for rectification against both Melville and Maureen. She sought to add $115,000 to the principal amount of the mortgage, and consequently to the total purchase price of the property.

[20]    Melville did not oppose Helen's claim and summary judgment issued against him. Maureen did oppose the claim for rectification and was successful at trial.

## C.    THE TRIAL JUDGE'S DECISION

[21]    In considering whether Helen's claim for rectification was made out, the trial judge reviewed the documentary evidence and oral testimony of the witnesses to determine the intentions of the parties at the time they signed the memorandum of agreement.

## (1)    The Memorandum of Agreement, Schedule E, and the Mortgage

[22]    The memorandum of agreement provides that the purchase price is to be based on:

> values as shown on the statement as prepared by BDO
> Ward Mallette for the business at the close of business

> on the 31st day of December 1988 as attached and
> marked as Schedule "E" hereto.

[23]   There was no Schedule E attached to the memorandum of agreement when it was signed. There was no reporting letter from Ms. Sims. The documentation that she sent to Helen and Wilmur following the sale did not include a Schedule E.

[24]   A draft Schedule E appears to have been prepared before the memorandum of agreement was signed. Although Maureen typed all of the other documents relating to the sale, she maintained that she did not type Schedule E. However, in cross-examination, she acknowledged that her initials were at the bottom of a letter dated May 3, 1989, enclosing the draft documents sent by Ms. Sims to Helen and Wilmur for their review. Draft Schedule E appears to have been with the attachments sent for their review. For ease of reference, this document is shown below.

SCHEDULE "E"

WILMUR & HELEN McLEAN

TRANSFER OF FARM OPERATIONS TO MELVILLE McLEAN

(55) 225

|  | Fair Market Value | U.C.C. | Transfer Value |
|---|---|---|---|
| Land | $ 100,000 | $        - | $ 100,000 |
| Principal residence | 115,000 | - | - |
| Barn | 110,000 | 5,510 | 110,000 |
| Other buildings | - | 12,444 | 12,444 |
| Equipment | - | 101,811 | 101,811 |
| Quota | 180,000 | 1,197 | 180,000 |
|  |  |  | 504,255 |
| Inventories - livestock | 105,000 |  | 105,000 |
| - feed, supplies | 9,000 |  | 9,000 |
|  |  |  | $ 618,255 |

Consideration:

| | |
|---|---|
| Bank loan | $   53,129 |
| Open account | 54,000 |
| Demand note | 228,682 |
| Demand mortgage | 222,444 |
| Cash | 60,000 |
| | $ 618,255 |

[25]   The values shown in the draft Schedule E for the land ($100,000), principal residence ($115,000), barn ($110,000), and other buildings ($12,444), total $337,444, which is the amount that Helen contends was the agreed upon purchase price of the real property that should have been included in the memorandum of agreement, the transfer and the mortgage.

[26]   It is not clear why Schedule E was not included in the signed copy of the memorandum of agreement. At paras. 59-60 of his reasons, the trial judge discussed the draft Schedule E document:

> I make the following further observations regarding the draft Schedule E. That document recognizes that the principal residence was to be included in the purchase price and assigns it a "fair market value" of $115,000, but does not assign it a "transfer value". No one was able to explain to me why. It follows that if the document is considered in isolation it is as likely as not the lack of a transfer value for the house was deliberate.
>
> Complicating matters further, Maureen testified the document was not likely prepared by her. Ms. Joanne King, who was qualified as an expert in income tax matters, testified that the draft Schedule E was likely prepared for tax purposes. It follows that Schedule E may not have been intended for the purpose to which Ms. Sims put it. As a result I have no way of knowing if the Schedule E in those draft documents was intended to be incorporated in the signing copies, or if a different schedule altogether was intended to be included.

The trial judge found that "[w]ithout Schedule E it is difficult or impossible to ascertain the total purchase price and/or the apportionment of it."

Page:  12

[27]    Paragraph 3 of the memorandum of agreement lists the ways in which the purchase price was to be paid and satisfied. Paragraph 3(iv) states:

> as to $337,444.00 by delivery of a registerable Deed for the property described in Schedule "A" attached hereto free and clear of any encumbrances of any nature whatsoever;

[28]    The trial judge commented, "Presumably, that is a reference to real estate included in the deed to be delivered by the vendors on closing."

[29]    Helen testified that the entire purchase price of the real property was to be financed by way of a vendor take-back mortgage. The trial judge observed that if the amount in paragraph 3(iv) was correct, it should coincide with the corresponding mortgage amount in paragraph 3(v). Paragraph 3(v) states:

> as to $222,444.00 by issuance to the Vendors of a Mortgage on the land as set out in Schedule "A" attached hereto;

[30]    The principal amount of the mortgage stated in paragraph 3(v) and on the mortgage itself is $222,444. As such, there is a discrepancy of $115,000 between the amount of the mortgage, $222,444, and the amount indicated in paragraph 3(iv), $337,444.

[31]    The trial judge found that the memorandum of agreement was an inaccurately written document and therefore a candidate for rectification, but that it was not possible to ascertain the intentions of the parties from that contract alone.

Page:  13

## (2)    Other Documentation

[32]    Paragraph 2 of the memorandum of agreement references a statement prepared by BDO Ward Mallette for the farm business as at December 31, 1988 as the basis for the amounts listed in Schedule E. Although BDO did not prepare a statement as at December 31, 1988, it did prepare an opening balance sheet for the farm business one day later, January 1, 1989. That balance sheet values the personal property of the business at $396,311. The bill of sale for the personal property shows consideration of $395,811 (the trial judge presumed the $500 difference in the two figures was the amount of $500 shown in the starting bank account). Maureen approved the opening balance sheet on behalf of Melville.

[33]    Melville and Maureen each applied to the Ministry of Agriculture for a farm grant. In her application, which she filled out sometime after December 1, 1989, Maureen reported to the Ministry in her own handwriting that the farm real estate was acquired for a total price of $337,444. She wrote that the principal residence was acquired for $115,000.

[34]    After reviewing these documents, the trial judge found, at para. 44 of his reasons, that "no assistance can be had from a review of collateral documents". Accordingly, he based his decision as to the prior intentions of the parties with respect to the purchase price on the testimony of the witnesses.

Page:  14

**(3)    Testimony of the Witnesses**

[35]    The trial judge found that there was consensus between the parties as to the fundamentals of the transaction. At para. 61 of his reasons, under the heading "The Facts Agreed To", the trial judge found that the parties agreed that:

> i.    Melville and Maureen were buying all of the farm assets and that the farm assets included the stone farmhouse located on the lands.
>
> ii.    There were no gifts expressed or intended.
>
> iii.    The transaction was to take place at fair market value.
>
> iv.    The fair market value of the land and buildings, including the farm house, was $337,444.
>
> v.    The fair market value of the personal property was $395,811.
>
> vi.    The fair market value of all assets was $733,755.

[36]    The trial judge commented, at para. 62 of his reasons, that:

> [G]enerally speaking, it would not be necessary for each of them to have completed the necessary arithmetic to conclude the purchase price was $733,755 [*sic* $733,255] in order to establish a common intention. It follows that had the evidence gone no further, it is possible that rectification may have been an appropriate remedy in the circumstances. However, the evidence did not end there.

[37]    Maureen testified that she formed an opinion that the price agreed upon for the sale was $625,000. She could not remember exactly where this number

came from, but thought that she had either seen it on a document or that Melville had told her that was the price.

[38]    The trial judge held that Maureen's evidence as to her understanding of the purchase price was consistent and he accepted it. He concluded that if Maureen had been advised that the actual purchase price of the farming business was $733,255 and not $625,000 as she thought, she may not have signed the agreement. As a result, he held that it was not possible to ascertain the intention of the parties from the memorandum of agreement. The onus on Helen to provide "convincing proof" that the parties agreed on the purchase price had not been discharged. He therefore dismissed Helen's claim.

## D.    ANALYSIS

### (1)    Did the trial judge err in requiring Helen to present "convincing proof" as the standard for a claim for rectification?

[39]    The trial judge held that Helen was required to provide "convincing proof" of a prior common intention to support her claim for rectification. He relied on the decision in *Performance Industries Ltd. v. Sylvan Lake Golf & Tennis Club*, 2002 SCC 19, [2002] 1 S.C.R. 678, at para. 41, in which Binnie J. held that in cases of rectification, "convincing proof", that is, "proof that may fall well short of the criminal standard, but which goes beyond the sort of proof that only reluctantly

and with hesitation scrapes over the low end of the civil 'more probable than not' standard", is required.

[40]   Helen submits that the decision in *Sylvan Lake* has been superseded by the later decision of the Supreme Court of Canada, *F.H. v. McDougall*, 2008 SCC 53, [2008] 3 S.C.R. 41, which held that the only civil standard of proof in Canadian common law is proof on a balance of probabilities. Writing for a unanimous court, Rothstein J. stated at para. 40, under the heading "The Approach Canadian Courts Should Now Adopt":

> Like the House of Lords, I think it is time to say, once and for all in Canada, that there is only one civil standard of proof at common law and that is proof on a balance of probabilities. Of course, context is all important and a judge should not be unmindful, where appropriate, of inherent probabilities or improbabilities or the seriousness of the allegations or consequences. However, these considerations do not change the standard of proof. I am of the respectful opinion that the alternatives I have listed above [including the requirement that evidence must be clear, convincing and cogent] should be rejected for the reasons that follow.

[41]   Maureen submits that if the Supreme Court of Canada had intended to overrule the comments of Binnie J. in *Sylvan Lake,* it would have expressly said so. She alleges that *McDougall* is distinguishable as a case where civil damages were claimed for an alleged sexual assault at an Indian residential school many years before.

[42]    I cannot accept Maureen's submission. Rothstein J. specifically states at para. 49 that his conclusion respecting the standard of proof applies to all civil cases:

> In the result, I would reaffirm that in civil cases there is only one standard of proof and that is proof on a balance of probabilities. In *all* civil cases, the trial judge must scrutinize the relevant evidence with care to determine whether it is more likely than not that an alleged event occurred. [Emphasis added.]

[43]    The trial judge erred in requiring Helen to present a higher standard of proof than the ordinary civil standard.

**(2)    Did the trial judge err in finding that the parties had no common intention with respect to the total purchase price for the farm?**

**(a)    Rectification Principles**

[44]    Rectification is an equitable remedy dependent on the trial judge's exercise of discretion. Judicial review of the exercise of that discretion is constrained to situations where the trial judge misdirected himself, came to a decision that is so clearly wrong that it amounts to an injustice, or gave no weight, or insufficient weight, to relevant considerations: see *Wasauksing First Nation v. Wasausink Lands Inc* (2004), 43 B.L.R. (3d) 244, [2004] 2 C.N.L.R. 355 (Ont. C.A.), at para. 82; *Penner v. Niagara (Regional Police Services Board)*, 2013 SCC 19, 356 D.L.R. (4th) 595, at para. 27 (dealing generally with the standard of review of a trial judge's exercise of discretion). In addition, an appellate court may intervene

where the trial judge exercised his or her discretion based on a wrong principle: see *Soulos v. Korkontzilas* (1995)*,* 25 O.R. (3d) 257 (Ont. C.A.), aff'd [1997] 2 S.C.R. 217, at p. 259. For the reasons that follow, I am of the opinion that the trial judge gave insufficient weight to relevant considerations and also erred in principle.

[45]   In this case, rectification is claimed on the basis of common mistake; although the figure for the real property was correctly shown as $337,444 in para 3(iv) of the memorandum of agreement, the amount of the vendor take back mortgage, which was to be for the full amount of the real property, was incorrectly recorded in para. 3(v) as $222,444 as well as in the mortgage.  Helen must show: 1) that the parties had a common continuing intention prior to the making of the document alleged to be deficient; 2) that that intention remained unchanged or existed at the time when the document sought to be rectified was signed; and 3) by mistake, the parties signed a document that did not accurately reflect their common intention: see *Wasauksing First Nation*, at para. 81; *Swainland Builders v. Freehold Properties Ltd.,* [2002] EWCA Civ 560, [2002] 2 E.G.L.R. 71, at para. 33, approved in *Chartbrook Ltd. v. Persimmon Homes Ltd.* [2009] UKHL 38, [2009] 1 A.C. 1101, at para. 48. The claimant may introduce oral or written evidence that there was a common intention between the parties that is not reflected in the written contract due to error, and the court is to decide whether to rectify the document to give effect to this true agreement.

[46]    I would also add the following guidance from *Swainland*, at para. 34:

> While a common intention must be shown, the exact form of words in which the common intention is to be expressed is immaterial if in substance and in detail the common intention can be ascertained. [Citations omitted.]

Furthermore, "[t]he fact that a party intends a particular form of words in the mistaken belief it is achieving his intention does not prevent the court giving effect to the true common intention."

**(b)    Discussion**

[47]    The trial judge found that there was consensus as to the fundamentals of the sale including that it was to take place at fair market value, and that the fair market value of the land and buildings was $337,444, including $115,000 for the farm house. He also found that the parties agreed that the fair market value of the personal property was $395,811. The total of these two figures reflects the purchase price for the farm business of $733,255.

[48]    Despite finding there was consensus on these matters, the trial judge held that the parties did not have a common intention as to the total purchase price that was to be paid for the farm business. He based his finding almost exclusively on Maureen's oral evidence at trial that, at the time she entered into the memorandum of agreement, she had formed the impression that the total purchase price was $625,000. This figure is similar to the purchase price of

$618,255 listed at the bottom of the draft Schedule E, which excludes the value of the farm house.

[49]   Although Maureen agreed that fair market value for the assets was likely $733,255, she testified that she thought $625,000 was probably the fair market value. The trial judge excused the discrepancy in her evidence as "a lack of understanding on her part as to precisely what the term 'fair market value' means". He found that Maureen "lacked sophistication in business matters notwithstanding her secretarial training." The trial judge ultimately held that Maureen believed that the purchase price for the farming business was $625,000 and that she intended to close the transaction at that price.

[50]   Helen testified that she did not notice the errors in the memorandum of agreement or the mortgage. With a grade eight education, she has the least formal training of any of the parties. As noted earlier, Maureen had three years of secretarial experience, including some real estate and corporate commercial work.

[51]   The trial judge found that although Helen intended to sell the farm business for fair market value and Maureen intended to buy the farm business for fair market value, the fact that the parties cannot agree on the 1989 fair market value means they did not have a common intention in relation to the total purchase price of the farming business.

Page:  21

[52]    The trial judge's finding of fact that Maureen intended to buy the farming business for $625,000 raises two sub-issues:

> 1) how is the common intention of the parties to be established? and
>
> 2) was the trial judge's finding of a lack of common intention reasonable?[3]

**(i)    How is the common intention of the parties to be established?**

[53]    The trial judge's reliance on Maureen's subjective belief that the purchase price of the farming business was $625,000 raises the question of how the common intention of the parties is to be established. Is the search for common intention based on the subjective understanding of each party, or on what an objective reasonable observer would have understood the parties' intentions to be up to the time of execution of the contract for which rectification is sought?

[54]    When the issue before the court is simply a question of contractual interpretation, and rectification is not involved, the question is what an objective reasonable bystander would think the agreement meant based on the parties' intentions: see *UBS Securities Canada, Inc. v. Sands Brothers Canada, Ltd.,* 2009 ONCA 328, 95 O.R. (3d) 93, at para. 47; *Ron Ghitter Property Consultants*

---

[3] In *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 SCR 235, at para. 10, a majority of the Supreme Court of Canada held that findings of fact should be reversed where it can be established that the finding is a "palpable and overriding" error. In *H.L. v. Canada (A.G.)*, 2005 SCC 25, [2005] 1 S.C.R. 401, at paras. 55-56, Fish J. clarified that the "palpable and overriding" error test is met if the findings are "clearly wrong" or can "properly be characterized as 'unreasonable' and 'unsupported by the evidence.'" In para. 20 of *El-Bris Ltd.*, a case involving rectification, Laskin J.A. framed the issue before the court as whether the trial judge's finding of common intention was reasonable.

Page:  22

*Ltd. v. Beaver Lumber Co.*, 2003 ABCA 221, 330 AR 353, at para. 9; see also

S.M. Waddams, *The Law of Contracts*, 5th ed. (Aurora, Ont: Canada Law Book

Inc., 2005), at 105. The court begins with the words of the contract and presumes

that the parties intended what is written in the contract. In construing the intention

behind a particular provision, the court must consider, among other things, the

contract as a whole, the factual matrix underlying it, and the need to avoid

commercial absurdity. But the court does not consider the subjective intention of

the parties: see *Downey v. Ecore International Inc.*, 2012 ONCA 480, 294 O.A.C.

200, at paras. 37-38; *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA

673, 268 O.A.C. 279, at para. 16.

[55]   Helen submits that the same objective approach applies when determining

the common intention of the parties in cases where rectification for common

mistake is sought. Neither party presented the court with any authority directly on

point and further submissions on the issue were sought.

[56]   In his text *Misrepresentation, Mistake and Non-Disclosure*, 3d ed. (London:

Sweet & Maxwell, 2012), Professor John Cartwright observes, at pp. 641-42:

> Judges and writers have commonly stated, or have
> used language which appears to suggest, that the test
> should be subjective. This has, however, been
> challenged, and in *Chartbrook Ltd. v. Persimmon
> Homes Ltd.,* [2009] 1 A.C. 1101, Lord Hoffmann
> considered that the test was objective.

Page:  23

[57]    Lord Hoffmann, at paras. 60-61 of *Chartbrook*,[4] stated that:

> Now that it has been established that rectification is also
> available when … the parties had a common continuing
> intention in respect of a particular matter in the
> instrument to be rectified, it would be anomalous if the
> 'common continuing intention' were to be an objective
> fact if it amounted to an enforceable contract but a
> subjective belief if it did not. On the contrary, the
> authorities suggest that in both cases the question is
> what an objective observer would have thought the
> intentions of the parties to be. Perhaps the clearest
> statement is by Denning L.J. in *Frederick E. Rose
> (London) Ltd. v. William H. Pim Jnr & Co Ltd* [1953] 2
> QB 450, 461:
>
> > Rectification is concerned with contracts
> > and documents, not with intentions. In
> > order to get rectification it is necessary to
> > show that the parties were in complete
> > agreement on the terms of their contract,
> > but by an error wrote them down wrongly;
> > and in this regard, in order to ascertain the
> > terms of their contract, you do not look into
> > the inner minds of the parties - into their
> > intentions - any more than you do in the
> > formation of any other contract. You look at
> > their outward acts, that is, at what they said
> > or wrote to one another in coming to their
> > agreement, and then compare it with the
> > document which they have signed. If you
> > can predicate with certainty what their
> > contract was, and that it is, by a common
> > mistake,    wrongly    expressed    in    the

---

[4] Although Lord Hoffmann decided the issue in *Chartbrook* as a matter of construction of the contract in issue, he held that both parties were mistaken in thinking that the written contract reflected their prior consensus and would have otherwise granted rectification. Lord Hope of Craghead did not comment on this aspect of Lord Hoffmann's decision, but the other Law Lords on the case, Rodger of Earlsferry, Walker of Gestingthorpe, and Baroness Hale of Richmond, associated themselves with his views on rectification. In his text, Professor Cartwright comments at p. 644, "Lord Hoffmann's approach in *Chartbrook* has now been followed, although it has not been met with unanimous approval."

Page:  24

> document, then you rectify the document;
> but nothing less will suffice.

Likewise in *Etablissements Georges et Paul Levy v. Adderley Navigation Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's Rep 67, 72, Mustill J. said:

> > The prior transaction may consist either of a concluded agreement or of a continuing common intention. In the latter event, the intention must have been objectively manifested. It is the words and acts of the parties demonstrating their intention, not the inward thoughts of the parties, which matter.

[58]   The comments of Denning L.J. in *Frederick E. Rose (London)* were also adopted by the Supreme Court of Canada in *Shafron v. KRG Insurance Brokers (Western) Inc.*, 2009 SCC 6, [2009] 1 S.C.R. 157, at para. 52.

[59]   Lord Hoffmann indicated in *Chartbrook* that the court should consider the relevant documents, the oral evidence of the parties, and the parties' post-agreement conduct in determining common intention. This is precisely the evidence that this court considered in *El-Bris* in holding that the trial judge's decision to grant rectification was reasonable, at para. 20.

[60]   In my view, the question that the court must answer is whether the totality of the evidence supports the conclusion on a balance of probabilities that an agreement was in place but that an error was made in recording it. This is an objective inquiry. The totality of the evidence can include the testimony of a party as to what he or she understood the terms to be. The weight of this testimonial

evidence will vary depending on the documentary and other evidence available: see *Chartbrook,* at para. 65; *Ron Ghitter,* at para. 16.

[61]   As I will next discuss, in my view, the trial judge erred in determining that the parties did not have a common intention prior to signing the memorandum of agreement due to Maureen's subjective belief concerning the total purchase price of the farming business. Instead, he ought to have adopted an objective approach that considered Maureen's understanding of the total purchase price together with the remainder of her evidence, as well as the documentary evidence and the evidence of the other witnesses.

**(ii)   Was the trial judge's finding of a lack of common intention reasonable?**

[62]   In relying almost exclusively on Maureen's evidence of her subjective belief regarding the total purchase price of the farming business, the trial judge not only erred in principle, he failed to give sufficient weight to all the documentary evidence and did not consider the evidence as a whole, together with Maureen's oral testimony and after the fact conduct. Where several documents are executed to effect a commercial transaction, the interpretation of a document in issue is informed by the related documents. Only when the related documents are considered as a whole does the intention of the parties emerge: see *Salah,* at para. 16; *Downey,* at para. 63. In this case, the related documents

are the transfer and the mortgage. However, because other documentation forms part of the factual matrix respecting the transaction it must also be considered in determining the intent of the parties. That documentation includes the draft Schedule E, the appraisal given by Barry Gordon, and Maureen's Farm Start application.

[63]   When the documentary and oral evidence is considered as a whole, the only reasonable conclusions are that: 1) the parties intended to enter into a transaction at fair market value; 2) the fair market value of the farm business was $733,255; and 3) the transfer value of the real property was correctly stated in para. 3(iv) of the memorandum of agreement as $337,444 but the amount of the vendor take-back mortgage was incorrectly stated in para. 3(v) as $222,444. Draft Schedule E incorrectly stated the transfer value of the real property as did the transfer. These documents therefore do not accurately reflect the intention of the parties.

a)      The totality of the evidence

[64]   The following aspects of the documentary and oral evidence support Helen's position that the purchase price agreed to for the real property was $337,444 and so the purchase price for the real property expressed in the transfer and the principal amount expressed in the vendor take-back mortgage

should have been $115,000 greater than the amount indicated in these documents.

1) <u>The memorandum of agreement.</u> The memorandum of agreement refers to the inclusion of the farm house in the sale and indicates a total price of $337,444 for the real property:

- Paragraph 1(a) lists the real property assets to be transferred as "land, dwelling and other buildings (Schedule A)". Schedule A details the metes and bounds description of the property and states, "Including the principal residence, barn and other buildings located thereon."

- Paragraph 3(iv) indicates that the purchase price is to be paid in part "as to $337,444.00 by delivery of a registerable Deed for the property described in Schedule "A" attached hereto free and clear of any encumbrances of any nature whatsoever". As noted above, the trial judge presumed this to be a reference to the real property included in the sale.

2) <u>Maureen's cross-examination on the memorandum of agreement.</u> In cross-examination, the following suggestion was put to Maureen:

> Q:   [I]t [paragraph 3(iv) of the memorandum of
> agreement] means that you're going to get a deed
> to property for which you will pay $337,444. Can
> you agree with me on that?

A:    Yes.

She agreed that they were purchasing the farm house, the farm acreage, and the barns. She also agreed that the purchase of the real property was to be 100 percent financed by the vendor take-back mortgage. Logically, therefore, the consideration shown on the registered transfer and the principal amount on the vendor take-back mortgage should have been $337,444, not $222,444.

3)  The error in the draft Schedule E. The top portion of the draft Schedule E contains three columns: Fair Market Value, "U.C.C." (Undepreciated Capital Cost), and Transfer Value. In the Fair Market Value column, the farm house is listed for $115,000. There is no amount shown for it in the U.C.C. column or the Transfer Value column. As a result, the total of the Transfer Value column is only $618,255. Joanne King, a chartered accountant with experience preparing financial statements for transfers of family businesses, prepared a report and testified at trial that the document appeared to have been created for tax purposes. She stated that the value of the principal residence, $115,000, was likely left out of the "Transfer Value" column – and therefore the total amount of the transfer value shown at the bottom of the column -- because there is no tax on the sale of a principal residence. This explains why the $115,000 for the farm house was left out of the total amount on the draft Schedule E.

Page: 29

The trial judge found that Schedule E was likely prepared for tax purposes, but that Ms. Sims may have used the document for a purpose for which it was not intended. I agree with this finding. However, the trial judge concluded that he had no way of knowing whether the draft Schedule E was intended to be included with the final signed copy of the agreement, or whether a different schedule altogether was intended to be included. The trial judge's comment ignores the fact that draft Schedule E was sent by Maureen on behalf of Ms. Sims as an attachment to the May 3, 1989 letter to Helen and Wilmur enclosing documents for their review. Further, if the draft Schedule E was not the document referred to in the memorandum of agreement, there would be no purpose to the consideration calculation below the Transfer Value column using the $618,255 total and showing a demand mortgage in the amount of $222,444, the exact amount of the mortgage in issue. No other version of Schedule E was presented in evidence. The trial judge's conclusion is not supported by the evidence.

4) <u>No inference can be drawn that the land transfer tax affidavit correctly records the purchase price.</u> The land transfer tax affidavit attached to the transfer, dated May 16, 1989, indicates that total consideration for the transaction was $222,444. Section two of the affidavit states that it must be completed where the value of the consideration for a conveyance *exceeds* $250,000. Section two of the affidavit was filled out in the transfer, even

Page:  30

though the total consideration for the transaction was indicated as less than $250,000.[5]

5) <u>The appraisal by Barry Gordon.</u> Barry Gordon, an appraiser, prepared an appraisal of the lands and buildings on the property on February 10, 1989. He valued the farm house at $115,000, the barn at $110,000, and the acreage at $100,000. He testified that he was asked to give his opinion by Melville because he and his wife were planning to buy the farm from his parents and he wanted to establish the fair market value of the property. Mr. Gordon affirmed his appraisal at trial. In cross-examination, Maureen testified that she knew that Mr. Gordon was supposed to give an appraisal of the farm real estate.

6) <u>Maureen's Farm Start grant application and her evidence respecting it.</u> After purchasing the farm, Maureen filled out a farm inventory for her application to the Farm Start grant program by hand. On the page titled "Land, Buildings and Quota", dated January 1, 1989, she identified three parcels of "farmland owned", including the year acquired and the cost. She wrote: (1) the acreage, acquired 1989 for $100,000; (2) the principal

---

[5] In 1989, land with a value greater than $250,000 that did not contain a single family residence was taxed at a lower rate than land of the same value that did. In 1989, the definition of a single family residence in the *Land Transfer Tax Act*, R.S.O. 1980, c. 231 as am. by S.O. 1985, c. 21 excluded such residences located on farm land. Filling out section two would therefore have entitled the parties to a lower tax rate.

residence, acquired 1989 for $115,000; and (3) the barn and other buildings, acquired in 1989 for $122,444, for a total of $337,444.

The figures she inserted were identical to those of Mr. Gordon for the acreage and the principal residence. The amount for the barn and other buildings shown by Mr. Gordon was $110,000. The amount Maureen wrote on the form was $122,444, a difference of $12,444. She acknowledged that this was the amount in the draft Schedule E under "Other Buildings". When asked in cross-examination where these values came from, she admitted that they probably came from Mr. Gordon's appraisal and from the draft Schedule E. Maureen then amended her answer to say that her husband had given her the numbers and that he probably obtained them from Schedule E and the appraisal.

Whether Maureen obtained the figures she used in the farm grant application from Mr. Gordon's appraisal and the draft Schedule E or whether her husband gave her the figures, this document is an implicit acknowledgment by her that she did not intend to acquire the real property for $222,444 but for $337,444. She did not dispute that she intended to pay $395,811 for the personal property. She even agreed in cross-examination that the amounts that she and Melville had agreed to pay totalled $733,255. Despite this, she testified that she did not intend to pay

the mathematical total of these two amounts. Instead, she maintained that she intended to pay $625,000 and that the mortgage figure should stand.

[65]   In summary, there is no dispute that the parties intended the purchase of the farm business to be at fair market value. Fair market value at the time of the sale was $733,255 and was comprised of personal property and real property. There is no dispute respecting the amount for personal property. There is no dispute that no gifts were expressed or intended. There is also no dispute that the purchase included the farm house. Maureen does not dispute the figure of $337,444 for real property mentioned in the memorandum of agreement in paragraph 3(iv) or that this amount was being paid in exchange for the deed to the real property. At no point did Maureen testify that the amount of $337,444 in paragraph 3(iv) of the memorandum of agreement for the real property was incorrect or that, at the time, she did not intend to pay this amount, even when the question was specifically put to her. Had the parties intended a lesser figure, there would have been no reason to mention the $337,444 amount. She nonetheless maintains that she intended to pay $625,000 for the farm because she had formed the impression that was what fair market value was, and, consequently, the amount of the mortgage should not be changed.

[66]   The evidence I have outlined above indicates that there was an agreement to sell the property for fair market value and that the parties agreed the fair market value of the real property being conveyed was $337,444, including the

farm house valued at $115,000. However, through multiple errors in drafting, the fair market value of the farm house was not included in the consideration for the real property and the principal amount of the vendor take-back mortgage was incorrectly expressed as $222,444.

[67]   In refusing to order rectification, the trial judge placed too much weight on Maureen's oral evidence that she intended to pay $625,000 for the farming business and failed to place any weight on her oral evidence agreeing that the purchase price of the real property was $337,444 and her subsequent conduct in filling out the Farm Start application indicating that the cost of acquiring the real property was $337,444.

[68]   A reasonable third party bystander would conclude that the amount for the farm house had been mistakenly left out of the documents registered on title. Due to error, the common intention of the parties to purchase the real property for $337,444 was not reflected in either para. 3(v) of the memorandum of agreement, or the transfer, or the mortgage.

**b)    Other considerations**

[69]   Maureen submits that this was not a case of common mistake but rather of mutual mistake. In *Lee v. 1435375 Ontario Ltd.*, 2013 ONCA 516, 363 D.L.R. (4th) 222, Strathy J.A. commented on the distinction between common and mutual mistake, at para. 28:

Page:  34

> While the Purchaser put his amended claim in both
> mutual mistake and common mistake, the motion judge
> held that it was a case of common mistake, rather than
> mutual mistake. She noted that mutual mistake exists
> when the "'parties misunderstand each other and are at
> cross purposes' – where both parties are mistaken, but
> about different things and are therefore not 'on the
> same page'": referring to M.P. Furnston, *Cheshire and
> Fifoot's Law of Contract*, 9th ed. (London: Butterworths,
> 1976) at pp. 206-20 and *Ron Ghitter Property
> Consultants Inc. v. Beaver Lumber Co. Ltd.*, 2003 ABCA
> 221, 330 A.R. 353, at para. 10. Common mistake, she
> observed, is "one in which both parties make the same
> mistake. Each party knows what the other party wants,
> but the parties are 'mistaken about some underlying and
> fundamental fact'": referring to *Cheshire and Fifoot's*, at
> p. 206.

Professor G.H.L. Fridman states in his text *The Law of Contract in Canada*, 6th

ed. (Toronto: Thomson Reuters, 2011) at 252:

> Whether the kind of mistake that is involved is described
> as "mutual" or as "common", it is suggested that, in the
> final analysis, the rationale for invalidating the alleged
> contract at common law is the same: was there any
> error as to the intention to contract, or, putting this
> slightly differently, did the contracting party seeking to
> avoid the contract for mistake obtain the consideration
> for which he had bargained?

[70]   This is not a case of mutual mistake. Rather, the parties agreed to a sale of

the farming business at fair market value, and this is not reflected in the

documentation. Helen bargained for a purchase price of real property that

reflected the property's fair market value. She did not obtain the consideration for

which she had bargained.

Page:  35

[71]    Maureen also submits that this was a case of unilateral mistake.[6] For the reasons given above I have implicitly rejected that submission.

[72]     With respect to unilateral mistake, the question as set out in *Sylvan Lake*, at para. 31, is whether one party knew or ought to have known of the other party's mistake, sought to take advantage of it, and whether permitting that party to take advantage of the mistake would amount to unfair dealing.

[73]    This is not a case where one party knew or ought to have known of the other party's mistake and sought to take advantage of it. It is, however, a case where the effect of the trial judge's refusal to exercise his discretion to rectify the memorandum of agreement and the mortgage is to allow Maureen to be unjustly enriched at Helen's expense. There is no juristic reason for this deprivation. This is yet another case where the pitfalls of having the same lawyer act for both parties involved in a real estate transaction are all too apparent. The purpose of rectification, to prevent unjust enrichment, is fulfilled in granting this remedy.

## E.    CONCLUSION

[74]    The trial judge erred in both reasons he gave for refusing rectification. The ordinary civil burden of proof on a balance of probabilities is the standard that now applies to all civil actions, including rectification.

_____

[6] I note that even when the situation is one of unilateral mistake, the issue of whether a party "ought to have known" of the other's mistake and is seeking to take advantage of it in circumstances that would amount to unfair dealing or unconscionable conduct, the inquiry is an objective one: see *Downtown King West Development v. Massey Ferguson Industries Ltd.* (1996), 28 O.R. (3d) 327 (C.A.), at paras. 34-35.

Page:  36

[75]   The trial judge also erred in his approach to rectification. Instead of adopting the objective reasonable bystander approach, he relied almost exclusively on Maureen's testimony as to her subjective intention that the total purchase price for the farming business was $625,000. Instead of considering the documentary and oral evidence as a whole, he looked at individual aspects of the evidence and did not give sufficient weight to the cumulative effect of the evidence including: Maureen's acknowledgment that she and her former husband were to pay $337,444 for the real property; the exclusion of the farm house for tax reasons in draft Schedule E leading to the error on that document in calculating the consideration for the property and the amount of the mortgage; and the manner in which Maureen filled out the Farm Start application.

[76]   The cumulative effect of the evidence is that the parties had a common intention with respect to the amount of the purchase price for the real property and the amount of the vendor take-back mortgage.

[77]   I would accordingly allow the appeal, set aside paragraphs 1, 2(a), and 7(a) of the order of the trial judge, and grant Helen's claim for rectification of the memorandum of agreement by changing the amount in paragraph 3(v) from $222,444 to $337,444. I would also order that the draft Schedule E be attached to the memorandum of agreement and be amended to show the value of the farm house at $115,000 in the Transfer Value column, with the total as $733,255.

I would also set aside paragraph 3 of the trial judge's order awarding costs to Maureen.

[78]   I would further order the Land Registrar for the Office of Land Titles Leeds (No. 28) at Brockville to rectify the Parcel Register for Parcel 44238-0060(LT) by indicating that the amount of the transfer and the charge is $377,444 instead of $222,444.

[79]   If necessary to give effect to these reasons, I would order the Land Registrar to permit the registration of a corrected transfer and a corrected mortgage in the amount of $377,444 instead of $222,444, upon payment of any prescribed fee. I note that additional land transfer tax liability may arise with the addition of $115,000 to the consideration paid for the real property.

[80]   Having regard to the decision of Blair J.A. in *Re Regal Constellation Hotel Ltd.* (2004), 71 O.R. (3d) 355 (C.A.), at para. 35-36, this decision is stayed until the time to file a Notice of Appeal has passed or the outcome of any appeal has been determined.

[81]   In addition, having regard to the opening words of s. 160 of the *Land Titles Act,* and the jurisprudence respecting it, this decision is subject to the rights of any third parties for value without notice who may have registered an interest in the property. Thus, any existing charge to a third party for value without notice

Page:  38

registered before this judgment would take priority over the $115,000 increase in the mortgage to Helen.

## F.    COSTS

[82]    Helen is entitled to her costs of both the appeal and the trial. The costs at trial were fixed in the amount of $27,343.46 payable by Helen to Maureen. I would set aside that order. In its place, and subject to Helen wishing to have her trial costs assessed in the Superior Court, or other agreement of counsel, I would order that Maureen pay the same amount to Helen. Insofar as the costs of the appeal are concerned, having regard to the costs outlines submitted, I would order costs in the amount of $30,000.00 inclusive of all taxes and disbursements payable by Maureen to Helen.

Released: December 27, 2013

(K.M.W.)

"Karen M. Weiler J.A."
"I agree Paul Rouleau J.A,"
"I agree S.E. Pepall J.A."

# TAB 7

**Percy Schmeiser and Schmeiser Enterprises Ltd.**  *Appellants*

*v.*

**Monsanto Canada Inc. and Monsanto Company**  *Respondents*

and

**Attorney General of Ontario, Canadian Canola Growers Association (CCGA), Ag-West Biotech Inc., BIOTECanada, Canadian Seed Trade Association, Council of Canadians, Action Group on Erosion, Technology and Concentration, Sierra Club of Canada, National Farmers Union, Research Foundation for Science, Technology and Ecology, and International Centre for Technology Assessment**  *Interveners*

INDEXED AS: MONSANTO CANADA INC. *v.* SCHMEISER

Neutral citation: 2004 SCC 34.

File No.: 29437.

2004: January 20; 2004: May 21.

Present: McLachlin C.J. and Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel, Deschamps and Fish JJ.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Patents — Scope and validity of patent — Patentable subject matter — Biotechnology — Genes and cells — Whether patents extent to plants — Patent claims disclosing genetically modified genes and cells which, when inserted into plants, increased tolerance to glyphosate herbicides — Whether patent valid.*

*Patents — Infringement — Patent disclosing genetically modified genes and cells which, when inserted into plants, increased tolerance to glyphosate herbicides — Agricultural production of canola containing patented*

**Percy Schmeiser et Schmeiser Enterprises Ltd.**  *Appelants*

*c.*

**Monsanto Canada Inc. et Monsanto Company**  *Intimées*

et

**Procureur général de l'Ontario, Canadian Canola Growers Association (CCGA), Ag-West Biotech Inc., BIOTECanada, Association canadienne du commerce des semences, Conseil des Canadiens, Groupe d'action sur l'érosion, la technologie et la concentration, Sierra Club du Canada, Syndicat national des cultivateurs, Research Foundation for Science, Technology and Ecology et International Centre for Technology Assessment**  *Intervenants*

RÉPERTORIÉ : MONSANTO CANADA INC. *c.* SCHMEISER

Référence neutre : 2004 CSC 34.

N° du greffe : 29437.

2004 : 20 janvier; 2004 : 21 mai.

Présents : La juge en chef McLachlin et les juges Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel, Deschamps et Fish.

EN APPEL DE LA COUR D'APPEL FÉDÉRALE

*Brevets — Portée et validité du brevet — Objet brevetable — Biotechnologie — Gènes et cellules — Les brevets s'appliquent-ils aux plantes? — Revendications de brevet divulguant des gènes et cellules génétiquement modifiés qui, une fois insérés dans des plantes, en augmentent la tolérance aux herbicides à base de glyphosate — Le brevet est-il valide?*

*Brevets — Contrefaçon — Brevet divulguant des gènes et cellules génétiquement modifiés qui, une fois insérés dans des plantes, en augmentent la tolérance aux herbicides à base de glyphosate — Production agricole*

*cell and gene without obtaining licence or permission — Whether patent infringed — Meaning of word "use" in s. 42 of Patent Act, R.S.C. 1985, c. P-4.*

*Patents — Remedy — Accounting of profits — Whether accounting of profits may be claimed in absence of evidence of profit attributable to invention.*

The respondents are the licensee and owner, respectively, of a patent that discloses the invention of chimeric genes that confer tolerance to glyphosate herbicides such as Roundup and cells containing those genes. Canola containing the patented genes and cells is marketed under the trade name "Roundup Ready Canola". The appellants grow canola commercially in Saskatchewan. The appellants never purchased Roundup Ready canola nor obtained a licence to plant it. Tests of their 1998 canola crop revealed that 95-98 percent was Roundup Ready Canola. The respondents brought an action against the appellants for patent infringement. The trial judge found the patent to be valid and allowed the action, concluding that the appellants knew or ought to have known that they saved and planted seed containing the patented gene and cell and that they sold the resulting crop also containing the patented gene and cell. The Federal Court of Appeal affirmed the decision but made no finding on patent validity.

*Held* (Iacobucci, Bastarache, Arbour and LeBel JJ. dissenting in part): The appeal should be allowed in part.

*Per* McLachlin C.J. and Major, Binnie, Deschamps and Fish JJ.: The patent is valid. The respondents did not claim protection for the genetically modified plant itself, but rather for the genes and the modified cells that make up the plant. A purposive construction of the patent claims recognizes that the invention will be practised in plants regenerated from the patented cells, whether the plants are located inside or outside a laboratory. Whether or not patent protection for the gene and the cell extends to activities involving the plant is not relevant to the patent's validity. The appellants have failed to discharge the onus to show that the Commissioner of Patents erred in allowing the patent.

To determine whether the appellants infringed s. 42 of the *Patent Act* by "using" the patented cell and

*de canola contenant une cellule et un gène brevetés, sans licence ni autorisation en ce sens — Le brevet est-il contrefait? — Sens du verbe « exploiter » figurant à l'art. 42 de la Loi sur les brevets, L.R.C. 1985, ch. P-4.*

*Brevets — Réparation — Remise des profits — Peut-on solliciter une remise de profits en l'absence de preuve que l'invention a permis de réaliser un profit?*

Les intimées sont respectivement titulaire et propriétaire d'un brevet qui divulgue l'invention de gènes chimériques conférant une résistance aux herbicides à base de glyphosate, tel le Roundup, et de cellules contenant ces gènes. Le canola contenant les gènes et cellules brevetés est commercialisé sous le nom de « Roundup Ready Canola ». Les appelants pratiquent la culture commerciale du canola en Saskatchewan. Ils n'ont jamais acheté de canola Roundup Ready ni obtenu une licence les autorisant à le cultiver. Des tests effectués sur leur récolte de canola de 1998 ont révélé que cette récolte était composée, dans une proportion de 95 à 98 pour 100, de canola Roundup Ready. Les intimées ont intenté contre les appelants une action pour contrefaçon de brevet. Le juge de première instance a décidé que le brevet était valide et a accueilli l'action, en concluant que les appelants savaient ou auraient dû savoir qu'ils conservaient et mettaient en terre des semences contenant le gène et la cellule brevetés, et que la récolte résultante qu'ils vendaient contenait également le gène et la cellule brevetés. La Cour d'appel fédérale a confirmé la validité de cette décision, sans toutefois se prononcer sur celle du brevet.

*Arrêt* (les juges Iacobucci, Bastarache, Arbour et LeBel sont dissidents en partie) : Le pourvoi est accueilli en partie.

*La* juge en chef McLachlin et les juges Major, Binnie, Deschamps et Fish : Le brevet est valide. La protection revendiquée par les intimées vise non pas la plante génétiquement modifiée elle-même, mais plutôt les gènes et les cellules modifiées qui la constituent. L'interprétation téléologique des revendications du brevet reconnaît que l'invention s'appliquera aux plantes régénérées à partir des cellules brevetées, indépendamment de la question de savoir si ces plantes se trouvent à l'intérieur ou à l'extérieur d'un laboratoire. La question de savoir si la protection par brevet du gène et de la cellule s'étend aux activités mettant en cause la plante n'est pas pertinente pour décider de la validité du brevet. Les appelants ne se sont pas acquittés du fardeau de prouver que le Commissaire aux brevets a commis une erreur en accueillant la demande de brevet.

Pour déterminer si les appelants ont enfreint l'art. 42 de la *Loi sur les brevets* en « exploitant » la cellule

gene, the word "use" in that section must be interpreted taking into account its plain meaning, the purpose of s. 42, its context, and the case law. The plain meaning of the word "use" or "*exploiter*" denotes utilization with a view to production or advantage. The purpose of s. 42 is to define the exclusive rights granted to the patent holder. The question in determining whether a defendant has "used" a patented invention is whether the defendant's activity deprived the inventor in whole or in part, directly or indirectly, of full enjoyment of the monopoly conferred by law. A contextual examination shows that if there is a commercial benefit to be derived from the invention, it belongs to the patent holder. According to the case law, it is no bar to a finding of infringement that the patented object or process is a part of or composes a broader unpatented structure or process, provided the patented invention is significant or important to the defendant's activities that involve the unpatented structure. Possession of a patented object or an object incorporating a patented feature may constitute "use" of the object's stand-by or insurance utility and thus constitute infringement. Possession, at least in commercial circumstances, raises a rebuttable presumption of "use". While intention is generally irrelevant to determining whether there has been "use" and hence infringement, the absence of intention to employ or gain any advantage from the invention may be relevant to rebutting the presumption of use raised by possession.

In this case, the appellants' saving and planting seed, then harvesting and selling plants that contained the patented cells and genes appears, on a common sense view, to constitute "utilization" of the patented material for production and advantage, within the meaning of s. 42. The other questions of principle relevant to "use" under s. 42 also support that preliminary conclusion. By cultivating a plant containing the patented gene and composed of the patented cells without license, the appellants deprived the respondents of the full enjoyment of the monopoly. The appellants' involvement with the disputed canola was also clearly commercial in nature.

Case law shows that infringement is established where a defendant's commercial or business activity involving a thing of which a patented part is a component necessarily involves use of the patented part. Infringement in this case therefore does not require use of the gene or cell in isolation. Infringement also does not require

et le gène brevetés, il faut interpréter le verbe « exploiter », qui figure à cet article, en fonction de son sens ordinaire, de l'objet de l'art. 42, de son contexte et de la jurisprudence. Le sens ordinaire du verbe « exploiter » ou « *use* » connote une utilisation en vue d'une production ou dans le but de tirer un avantage. L'article 42 a pour objet de définir les droits exclusifs du titulaire d'un brevet. La question qu'il faut se poser pour déterminer si un défendeur a « exploité » une invention brevetée consiste à se demander si les activités du défendeur ont privé l'inventeur, en tout ou en partie, directement ou indirectement, de la pleine jouissance du monopole conféré par la loi. L'examen contextuel démontre que tout avantage commercial qui peut découler de l'invention appartient au titulaire du brevet. Selon la jurisprudence, il est possible de conclure à l'existence de contrefaçon même si l'objet ou le procédé breveté fait partie ou est une composante d'une structure ou d'un procédé non brevetés plus vastes, pourvu que l'invention brevetée soit importante pour les activités du défendeur qui mettent en cause la structure non brevetée. La possession d'un objet breveté ou d'un objet ayant une particularité brevetée peut constituer une « exploitation » de l'utilité latente de cet objet et constitue donc de la contrefaçon. La possession, du moins dans le cadre d'un commerce, donne naissance à une présomption d'« exploitation » réfutable. Bien qu'en général l'intention ne soit pas pertinente pour déterminer s'il y a eu « exploitation » et donc contrefaçon, l'absence d'intention d'utiliser l'invention ou d'en tirer un avantage peut être pertinente pour réfuter la présomption d'exploitation découlant de la possession.

En l'espèce, le fait que les appelants aient conservé et mis en terre des semences contenant les cellules et gènes brevetés et qu'ils aient récolté et vendu les plantes résultantes paraît logiquement constituer une « utilisation » de la matière brevetée en vue d'une production ou dans le but de tirer un avantage, au sens de l'art. 42. Les autres questions de principe pertinentes pour déterminer s'il y a eu « exploitation » au sens de l'art. 42 étayent également cette conclusion préliminaire. En cultivant sans licence une plante contenant le gène breveté et formée des cellules brevetées, les appelants ont privé les intimées de la pleine jouissance de leur monopole. L'utilisation, par les appelants, du canola dont il est question en l'espèce était aussi de nature commerciale.

Selon la jurisprudence, il y contrefaçon lorsque les activités commerciales d'un défendeur, qui mettent en cause une chose comportant un élément breveté, requièrent nécessairement l'exploitation de l'élément breveté. Pour qu'il y ait contrefaçon en l'espèce, il n'est pas nécessaire que le gène ou la cellule soient exploités

that the appellants have used Roundup herbicide as an aid to cultivation. First, this argument fails to account for the stand-by or insurance utility of the properties of the patented genes and cells. Second, the appellants did not provide sufficient evidence to rebut the presumption of use. While a defendant's conduct on becoming aware of the presence of the patented invention may assist in rebutting the presumption of use arising from possession, in the circumstances of this case, this presumption stands unrebutted. The appellants actively cultivated Roundup Ready Canola as part of their business operations. In light of all of the relevant considerations, the appellants used the patented genes and cells, and infringement is established.

The *Patent Act* permits two alternative types of remedies: damages and an accounting of profits. Here damages are not available, in view of the respondents' election to seek an account of profits. The inventor is only entitled to that portion of the infringer's profit which is causally attributable to the invention. A comparison is to be made between the appellants' profit attributable to the invention and their profit had they used the best non-infringing option. The appellants' profits were precisely what they would have been had they planted and harvested ordinary canola. Nor did they gain any agricultural advantage from the herbicide resistant nature of the canola since no finding was made that they sprayed with Roundup herbicide to reduce weeds. On this evidence, the appellants earned no profit from the invention and the respondents are entitled to nothing on their claim of account.

*Per* Iacobucci, Bastarache, Arbour and LeBel JJ. (dissenting in part): The heart of the issue is whether the Federal Court of Appeal's decision can stand in light of this Court's ruling that plants as higher life forms are unpatentable. A purposive construction that limits the scope of the respondents' claims to their "essential elements" leads to the conclusion that the gene claims and the plant cell claims should not be construed to grant exclusive rights over the plant and all of its offspring. This interpretation is fair and predictable because it ties the respondents to their claims; the respondents specifically disclaim plants. Patents must be interpreted from the point of view of the person skilled in the art who must also be taken to know the law. A person skilled in the art could not reasonably have expected that patent protection extended to unpatentable plants and their

isolément et il n'est pas nécessaire non plus que les appelants aient pulvérisé de l'herbicide Roundup sur leurs cultures. Premièrement, cet argument ne tient pas compte de l'utilité latente des propriétés des gènes et cellules brevetés. Deuxièmement, la preuve produite par les appelants n'est pas suffisante pour réfuter la présomption d'exploitation. Bien que la conduite qu'un défendeur a adoptée après avoir pris connaissance de la présence de l'invention brevetée puisse aider à réfuter la présomption d'exploitation découlant de la possession, cette présomption subsiste dans les circonstances de la présente affaire. Les appelants ont réellement cultivé du canola Roundup Ready dans le cadre de leurs activités commerciales. Compte tenu de tous les facteurs pertinents, les appelants ont exploité les gènes et cellules brevetés, et il y a donc contrefaçon.

La *Loi sur les brevets* prévoit deux différents types de réparation : les dommages-intérêts et la remise des profits. En l'espèce, il n'y a pas lieu d'accorder des dommages-intérêts, étant donné que les intimées ont choisi de demander la remise des profits. L'inventeur a seulement droit à la remise de la portion des profits réalisés par le contrefacteur, qui a un lien de causalité avec l'invention. Il faut comparer le profit que l'invention a permis aux appelants de réaliser à celui que leur aurait permis de réaliser la meilleure solution non contrefaisante. Les appelants ont réalisé exactement les mêmes profits que s'ils avaient planté et récolté du canola ordinaire. Sur le plan agricole, les appelants n'ont également tiré aucun avantage de la résistance du canola à l'herbicide, vu l'absence de conclusion qu'ils ont pulvérisé de l'herbicide Roundup pour diminuer la présence des mauvaises herbes. Selon la preuve produite en l'espèce, les appelants n'ont tiré aucun profit de l'invention et les intimées n'ont droit à rien en ce qui concerne leur demande de remise.

*Les* juges Iacobucci, Bastarache, Arbour et LeBel (dissidents en partie) : Il s'agit essentiellement de savoir si l'arrêt de la Cour d'appel fédérale peut être maintenu eu égard à la décision de notre Cour selon laquelle les plantes, en tant que formes de vie supérieures, ne sont pas brevetables. Une interprétation téléologique qui limite les revendications des intimées à leurs « éléments essentiels » amène à conclure qu'il n'y a pas lieu de considérer que les revendications relatives au gène et à la cellule végétale confèrent des droits exclusifs sur la plante et toute sa descendance. Cette interprétation est équitable et prévisible étant donné qu'elle lie les intimées à leurs revendications; ces dernières ont expressément renoncé aux plantes. Les brevets doivent être interprétés du point de vue de la personne versée dans l'art, qui doit également être considérée comme connaissant le droit

offspring. Properly construed, the respondents' product and process claims are both valid because neither extends patent protection to the plant itself.

The issue at the infringement stage is whether the appellants used the invention so as to interfere with the exclusive rights of the patentee, keeping in mind that the scope of the claims does not extend patent protection to plants. The meaning of "use" in s. 42 of the *Patent Act* requires a purposive interpretation of the word "use", a contextual analysis given the surrounding words in the provision, and the case law. A purposive construction of "use" suggests that "use" is limited by the subject-matter of the invention, and that any acts for a purpose whether foreseen or not by the inventor may constitute an infringing use. The contextual analysis also links the verb "use" with the noun "invention". Accordingly, the test for determining "use" is not whether the alleged user has deprived the patentee of the commercial benefits flowing from his invention, but whether the alleged user has deprived the patentee of his monopoly over the use of the invention as construed in the claims. In the context of this case, the question is whether the appellants used the respondents' genetically modified cells and genes as they existed in the laboratory prior to differentiation and propagation — or the process of genetic alteration. Much of the case law on "use" and various analogies are unhelpful, in this context, to define the meaning of "use" because of the unique properties of biological materials, especially higher life forms that can self-replicate and spread. A knowledge element should not be incorporated in the definition of "use" since it is a settled issue in Canadian patent law that intention is irrelevant to infringement. If the person's acts interfere with the exclusive rights granted by the patent, then there is infringement, although the presumption of use may be rebutted in very rare circumstances.

In the result, the lower courts erred not only in construing the claims to extend to plants and seed, but also in construing "use" to include the use of subject-matter disclaimed by the patentee, namely the plant. The appellants as users were entitled to rely on the reasonable expectation that plants, as unpatentable subject-matter,

applicable. Une personne versée dans l'art ne pouvait pas raisonnablement s'attendre à ce que la protection conférée par le brevet s'étende aux plantes non brevetables et à leur descendance. Correctement interprétées, les revendications des intimées relatives aux produits et aux procédés sont valides dans les deux cas, étant donné qu'aucune d'elles n'étend la protection par brevet à la plante elle-même.

Au moment de déterminer s'il y a contrefaçon, il faut se demander si les appelants ont exploité l'invention de façon à porter atteinte aux droits exclusifs du titulaire du brevet, sans oublier que les revendications du brevet ne s'appliquent pas aux plantes. Pour établir le sens du verbe « exploiter » figurant à l'art. 42 de la *Loi sur les brevets*, il faut procéder à une interprétation téléologique du verbe « exploiter » et à une analyse contextuelle qui tient compte des autres termes de la disposition, et consulter la jurisprudence en la matière. Selon une interprétation téléologique, le sens du verbe « exploiter » est limité par l'objet de l'invention, et tout acte accompli dans un but prévu ou non prévu par l'inventeur peut constituer une exploitation contrefaisante. L'analyse contextuelle permet également de lier le verbe « exploiter » au substantif « invention ». Par conséquent, le critère applicable pour déterminer s'il y a eu « exploitation » consiste à se demander si le présumé exploiteur a privé le titulaire du brevet non pas des avantages commerciaux de son invention, mais plutôt de son monopole de l'exploitation de l'invention expliquée dans les revendications. En l'espèce, la question est de savoir si les appelants ont exploité les gènes et les cellules génétiquement modifiés des intimées, tels qu'ils existaient en laboratoire avant leur différenciation et leur multiplication — ou le procédé de modification génétique. Une bonne partie de la jurisprudence relative au verbe « exploiter » ainsi que diverses analogies sont inutiles pour déterminer le sens du verbe « exploiter » dans le présent contexte, en raison des propriétés uniques des matières biologiques et, plus particulièrement, des formes de vie supérieures qui peuvent se reproduire et se propager. Il n'y a pas lieu d'incorporer un élément de connaissance dans la définition du verbe « exploiter », étant donné qu'il est bien établi, en droit canadien des brevets, que l'intention n'est pas pertinente en matière de contrefaçon. Si les actes d'une personne portent atteinte aux droits exclusifs conférés par le brevet, il y a contrefaçon bien que la présomption d'exploitation soit réfutable dans des circonstances très rares.

En définitive, les tribunaux inférieurs ont commis une erreur en considérant non seulement que les revendications s'appliquent aux plantes et aux semences, mais encore que le verbe « exploiter » signifie également exploiter l'objet auquel le titulaire du brevet a renoncé, à savoir la plante. En tant qu'exploiteurs, les appelants

fall outside the scope of patent protection. Accordingly, the cultivation of plants containing the patented gene and cell does not constitute an infringement. The plants containing the patented gene can have no stand-by value. To conclude otherwise would, in effect, confer patent protection on the plant. Since there is no claim for a "glyphosate-resistant" plant and all its offspring, saving, planting, or selling seed from glyphosate-resistant plants does not constitute an infringing use. As was done here, the respondents can still license the sale of seeds that they produce from their patented invention and can impose contractual obligations, such as prohibition on saving seeds, on the licensee.

The conclusion on the scope of the respondents' patent claims, that is determinative of both validity and infringing use, is consistent with the *Agreement on Trade-Related Aspects of Intellectual Property Rights.*

## Cases Cited

By McLachlin C.J. and Fish J.

**Applied:** *Betts v. Neilson* (1868), L.R. 3 Ch. App. 429, aff'd (1871), L.R. 5 H.L. 1; *Dunlop Pneumatic Tyre Co. v. British and Colonial Motor Car Co.* (1901), 18 R.P.C. 313; *British United Shoe Machinery Co. v. Simon Collier Ld.* (1910), 27 R.P.C. 567; *Adair v. Young* (1879), 12 Ch. D. 13; **distinguished:** *Kirin Amgen Inc. v. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096; **referred to:** *Whirlpool Corp. v. Camco Inc.*, [2000] 2 S.C.R. 1067, 2000 SCC 67; *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504; *Harvard College v. Canada (Commissioner of Patents)*, [2002] 4 S.C.R. 45, 2002 SCC 76; *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] 4 S.C.R. 153, 2002 SCC 77; *Free World Trust v. Électro Santé Inc.*, [2000] 2 S.C.R. 1024, 2000 SCC 66; *Lishman v. Erom Roche Inc.* (1996), 68 C.P.R. (3d) 72; *Saccharin Corp. v. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307; *Stead v. Anderson* (1847), 4 C.B. 806, 136 E.R. 724; *Hoechst Celanese Corp. v. BP Chemicals Ltd.* (1998), 25 F.S.R. 586; *Illinois Tool Works Inc. v. Cobra Anchors Co.* (2000), 221 F.T.R. 161, 2002 FCT 829; *Computalog Ltd. v. Comtech Logging Ltd.* (1992), 44 C.P.R. (3d) 77; *Pfizer Corp. v. Ministry of Health*, [1965] A.C. 512; *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81; *Lubrizol Corp. v. Imperial Oil Ltd.*, [1997] 2 F.C. 3; *Celanese International Corp. v. BP Chemicals Ltd.*,

pouvaient raisonnablement s'attendre à ce que les objets non brevetables que sont les plantes ne bénéficient pas de la protection conférée par le brevet. Par conséquent, la culture des plantes contenant le gène et la cellule brevetés ne constitue pas de la contrefaçon. Les plantes contenant le gène breveté ne peuvent avoir aucune valeur latente. Toute conclusion contraire aurait pour effet de rendre applicable à la plante la protection conférée par le brevet. Puisqu'il n'y a aucune revendication relative à une plante « résistant au glyphosate » et à toute sa descendance, le fait de conserver, de mettre en terre ou de vendre des semences provenant de plantes résistant au glyphosate ne constitue pas une exploitation contrefaisante. Comme cela a été fait en l'espèce, les intimées peuvent toujours accorder des licences autorisant la vente des semences qu'elles produisent à partir de leur invention brevetée et imposer au titulaire de la licence des obligations contractuelles, telle l'interdiction de conserver des semences.

La conclusion sur la portée des revendications du brevet des intimées, qui est déterminante en ce qui concerne, à la fois, la question de la validité et celle de l'exploitation contrefaisante, est conforme à l'*Accord sur les aspects des droits de propriété intellectuelle qui touchent au commerce.*

## Jurisprudence

Citée par la juge en chef McLachlin et le juge Fish

**Arrêts appliqués :** *Betts c. Neilson* (1868), L.R. 3 Ch. App. 429, conf. par (1871), L.R. 5 H.L. 1; *Dunlop Pneumatic Tyre Co. c. British and Colonial Motor Car Co.* (1901), 18 R.P.C. 313; *British United Shoe Machinery Co. c. Simon Collier Ld.* (1910), 27 R.P.C. 567; *Adair c. Young* (1879), 12 Ch. D. 13; **distinction d'avec l'arrêt :** *Kirin Amgen Inc. c. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096; **arrêts mentionnés :** *Whirlpool Corp. c. Camco Inc.*, [2000] 2 R.C.S. 1067, 2000 CSC 67; *Consolboard Inc. c. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 R.C.S. 504; *Harvard College c. Canada (Commissaire aux brevets)*, [2002] 4 R.C.S. 45, 2002 CSC 76; *Apotex Inc. c. Wellcome Foundation Ltd.*, [2002] 4 R.C.S. 153, 2002 CSC 77; *Free World Trust c. Électro Santé Inc.*, [2000] 2 R.C.S. 1024, 2000 CSC 66; *Lishman c. Erom Roche Inc.*, [1996] A.C.F. nᵒ 560 (QL); *Saccharin Corp. c. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307; *Stead c. Anderson* (1847), 4 C.B. 806, 136 E.R. 724; *Hoechst Celanese Corp. c. BP Chemicals Ltd.* (1998), 25 F.S.R. 586; *Illinois Tool Works Inc. c. Cobra Fixations Cie*, [2002] A.C.F. nᵒ 1104 (QL), 2002 CFPI 829; *Computalog Ltd. c. Comtech Logging Ltd.* (1992), 44 C.P.R. (3d) 77; *Pfizer Corp. c. Ministry of Health*, [1965] A.C. 512; *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81; *Lubrizol Corp. c. Compagnie*

[1999] R.P.C. 203; *Canson Enterprises Ltd. v. Boughton & Co.*, [1991] 3 S.C.R. 534; *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142; *Collette v. Lasnier* (1886), 13 S.C.R. 563; *Colonial Fastener Co. v. Lightning Fastener Co.*, [1937] S.C.R. 36.

By Arbour J. (dissenting in part)

*Harvard College v. Canada (Commissioner of Patents)*, [2002] 4 S.C.R. 45, 2002 SCC 76; *Gillette Safety Razor Co. v. Anglo-American Trading Co.* (1913), 30 R.P.C. 465; *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81; *Whirlpool Corp. v. Camco Inc.*, [2000] 2 S.C.R. 1067, 2000 SCC 67; *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504; *Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, [1989] 1 S.C.R. 1623; *Free World Trust v. Électro Santé Inc.*, [2000] 2 S.C.R. 1024, 2000 SCC 66; *Western Electric Co. v. Baldwin International Radio of Canada*, [1934] S.C.R. 570; *Needham v. Johnson and Co.* (1884), 1 R.P.C. 49; *Amfac Foods Inc. v. Irving Pulp & Paper Ltd.* (1984), 80 C.P.R. (2d) 59; *B.V.D. Co. v. Canadian Celanese Ltd.*, [1936] S.C.R. 221; *Lubrizol Corp. v. Imperial Oil Ltd.* (1992), 98 D.L.R. (4th) 1; *Kirin Amgen Inc. v. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096; *Commissioner of Patents v. Farbwerke Hoechst Aktiengesellschaft Vormals Meister Lucius & Bruning*, [1964] S.C.R. 49; *Shell Oil Co. v. Commissioner of Patents*, [1982] 2 S.C.R. 536; *Schlumberger Canada Ltd. v. Commissioner of Patents*, [1982] 1 F.C. 845; *Tennessee Eastman Co. v. Commissioner of Patents*, [1974] S.C.R. 111; *State Street Bank & Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368 (1998); *Re Application of Boussac*, CIPO, Commissioner's Decision No. 143, March 10, 1973; *Re Application of Ijzerman*, CIPO, Commissioner's Decision No. 254, July 4, 1975; *Gale's Application*, [1991] R.P.C. 305; *Application No. 995 for a Townhouse Building Design (Re)* (1979), 53 C.P.R. (2d) 211; *F. Hoffmann-Laroche & Co. v. Commissioner of Patents*, [1955] S.C.R. 414; *Adair v. Young* (1879), 12 Ch. D. 13; *The King v. American Optical Co.* (1950), 11 Fox Pat. C. 62; *Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada* (1969), 1 Ex. C.R. 529, aff'd [1970] S.C.R. 833; *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, rev'd [1995] 2 F.C. 723; *Saccharin Corp. v. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307; *Wellcome Foundation Ltd. v. Apotex Inc.* (1991), 39 C.P.R. (3d) 289; *American Cyanamid Co. v. Charles E. Frosst & Co.* (1965), 29 Fox Pat. C. 153; *British United Shoe Machinery Co. v. Gimson Shoe Machinery Co.* (1928), 45 R.P.C. 290; *Computalog Ltd. v. Comtech Logging Ltd.* (1992), 44 C.P.R. (3d) 77; *Illinois*

*Pétrolière Impériale Ltée*, [1997] 2 C.F. 3; *Celanese International Corp. c. BP Chemicals Ltd.*, [1999] R.P.C. 203; *Canson Enterprises Ltd. c. Boughton & Co.*, [1991] 3 R.C.S. 534; *Cadbury Schweppes Inc. c. Aliments FBI Ltée*, [1999] 1 R.C.S. 142; *Collette c. Lasnier* (1886), 13 R.C.S. 563; *Colonial Fastener Co. c. Lightning Fastener Co.*, [1937] R.C.S. 36.

Citée par la juge Arbour (dissidente en partie)

*Harvard College c. Canada (Commissaire aux brevets)*, [2002] 4 R.C.S. 45, 2002 CSC 76; *Gillette Safety Razor Co. c. Anglo-American Trading Co.* (1913), 30 R.P.C. 465; *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81; *Whirlpool Corp. c. Camco Inc.*, [2000] 2 R.C.S. 1067, 2000 CSC 67; *Consolboard Inc. c. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 R.C.S. 504; *Pioneer Hi-Bred Ltd. c. Canada (Commissaire des brevets)*, [1989] 1 R.C.S. 1623; *Free World Trust c. Électro Santé Inc.*, [2000] 2 R.C.S. 1024, 2000 CSC 66; *Western Electric Co. c. Baldwin International Radio of Canada*, [1934] R.C.S. 570; *Needham c. Johnson and Co.* (1884), 1 R.P.C. 49; *Amfac Foods Inc. c. Irving Pulp & Paper Ltd.*, [1984] A.C.F. nº 105 (QL); *B.V.D. Co. c. Canadian Celanese Ltd.*, [1936] R.C.S. 221; *Lubrizol Corp. c. Imperial Oil Ltd.*, [1992] A.C.F. nº 1110 (QL); *Kirin Amgen Inc. c. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096; *Commissioner of Patents c. Farbwerke Hoechst Aktiengesellschaft Vormals Meister Lucius & Bruning*, [1964] R.C.S. 49; *Shell Oil Co. c. Commissaire des brevets*, [1982] 2 R.C.S. 536; *Schlumberger Canada Ltd. c. Commissaire des brevets*, [1982] 1 C.F. 845; *Tennessee Eastman Co. c. Commissaire des brevets*, [1974] R.C.S. 111; *State Street Bank & Trust Co. c. Signature Financial Group, Inc.*, 149 F.3d 1368 (1998); *Re Application of Boussac*, OPIC, décision du Commissaire nº 143, 10 mars 1973; *Re Application of Ijzerman*, OPIC, décision du Commissaire nº 254, 4 juillet 1975; *Gale's Application*, [1991] R.P.C. 305; *Application No. 995 for a Townhouse Building Design (Re)* (1979), 53 C.P.R. (2d) 211; *F. Hoffmann-Laroche & Co. c. Commissioner of Patents*, [1955] R.C.S. 414; *Adair c. Young* (1879), 12 Ch. D. 13; *The King c. American Optical Co.* (1950), 11 Fox Pat. C. 62; *Libbey-Owens-Ford Glass Co. c. Ford Motor Co. of Canada* (1969), 1 R.C. de l'É. 529, conf. par [1970] R.C.S. 833; *Merck & Co. c. Apotex Inc.*, [1994] A.C.F. nº 1898 (QL), inf. par [1995] 2 C.F. 723; *Saccharin Corp. c. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307; *Wellcome Foundation Ltd. c. Apotex Inc.* (1991), 39 C.P.R. (3d) 289; *American Cyanamid Co. c. Charles E. Frosst & Co.* (1965), 29 Fox Pat. C. 153; *British United Shoe Machinery Co. c. Gimson Shoe Machinery Co.* (1928), 45 R.P.C. 290; *Computalog Ltd. c. Comtech Logging Ltd.* (1992), 44

Tool Works Inc. v. Cobra Anchors Co. (2002), 221 F.T.R. 161, 2002 FCT 829; *Merrell Dow Pharmaceuticals Inc. v. H.N. Norton & Co.*, [1996] R.P.C. 76; *Pfizer Corp. v. Ministry of Health*, [1965] A.C. 512; *British United Shoe Machinery Co. v. Simon Collier Ld.* (1910), 27 R.P.C. 567.

**Statutes and Regulations Cited**

*Agreement on Trade-Related Aspects of Intellectual Property Rights*, 1869 U.N.T.S. 299 (being Annex 1C of the *Marrakesh Agreement establishing the World Trade Organization*, 1867 U.N.T.S. 3), art. 27(1), (3).

*Directive 98/44/EC of the European Parliament and of the Council of July 6, 1998 on the legal protection of biotechnological inventions*, [1998] *O.J. L.* 213/13.

*Patent Act*, R.S.C. 1985, c. P-4, ss. 2, 27(8) [rep. & sub. 1993, c. 15, s. 31], 42 [rep. & sub. c. 33 (3rd Supp.), s. 16], 56(1) [formerly s. 58; rep. & sub. c. 33 (3rd Supp.), s. 22; rep. & sub. 1993, c. 44, ss. 194, 199].

*Plant Breeders' Rights Act*, S.C. 1990, c. 20.

**Authors Cited**

Canada. Patent Office. *Manual of Patent Office Practice*. Ottawa-Hull: Industry Canada, Canadian Intellectual Property Office, 1998.

Canadian Biotechnology Advisory Committee. *Patenting of Higher Life Forms and Related Issues: Report to the Government of Canada Biotechnology Ministerial Coordinating Committee*. Ottawa: The Committee, June 2002.

*Concise Oxford Dictionary of Current English*, 9th ed. Oxford: Clarendon Press, 1995, "use".

Fox, Harold G. *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. Toronto: Carswell, 1969.

Gold, E. Richard, and Wendy A. Adams. "The *Monsanto* decision: The edge or the wedge" (2001), 19 *Nat. Biotechnol.* 587.

Hughes, Roger T., et al. *Hughes and Woodley on Patents*. Markham, Ont.: LexisNexis Canada, 1984.

*Nouveau Petit Robert, dictionnaire alphabétique et analogique de la langue française*. Paris: Dictionnaires Le Robert, 2003, "*exploiter*".

Siebrasse, Norman. "A Remedial Benefit-Based Approach to the Innocent-User Problem in the Patenting of Higher Life Forms" (2004), 20 *C.I.P.R.* 79.

Thorley, Simon, et al. *Terrell on the Law of Patents*, 15th ed. London: Sweet & Maxwell, 2000.

Vaver, David. *Intellectual Property Law: Copyright, Patents, Trade-marks*. Concord, Ont.: Irwin Law, 1997.

C.P.R. (3d) 77; *Illinois Tool Works Inc. c. Cobra Fixations Cie*, [2002] A.C.F. nº 1104 (QL), 2002 CFPI 829; *Merrell Dow Pharmaceuticals Inc. c. H.N. Norton & Co.*, [1996] R.P.C. 76; *Pfizer Corp. c. Ministry of Health*, [1965] A.C. 512; *British United Shoe Machinery Co. c. Simon Collier Ld.* (1910), 27 R.P.C. 567.

**Lois et règlements cités**

*Accord sur les aspects des droits de propriété intellectuelle qui touchent au commerce*, 1869 R.T.N.U. 332 (annexe 1C de l'*Accord de Marrakech instituant l'Organisation mondiale du commerce*, 1867 R.T.N.U. 3), art. 27(1), (3).

*Directive 98/44/CE du Parlement européen et du Conseil du 6 juillet 1998 relative à la protection juridique des inventions biotechnologiques*, [1998] *J.O. L.* 213/13.

*Loi sur la protection des obtentions végétales*, L.C. 1990, ch. 20.

*Loi sur les brevets*, L.R.C. 1985, ch. P-4, art. 2, 27(8) [abr. & rempl. 1993, ch. 15, art. 31], 42 [abr. & rempl. ch. 33 (3ᵉ suppl.), art. 16], 56(1) [auparavant art. 58; abr. & rempl. ch. 33 (3ᵉ suppl.), art. 22; abr. & rempl. 1993, ch. 44, art. 194, 199].

**Doctrine citée**

Canada. Bureau des brevets. *Recueil des pratiques du Bureau des brevets*. Ottawa-Hull : Industrie Canada, Office de la propriété intellectuelle du Canada, 1998.

Comité consultatif canadien de la biotechnologie. *Brevetabilité des formes de vie supérieures et enjeux connexes : Rapport adressé au Comité de coordination ministériel de la biotechnologie du Gouvernement du Canada*. Ottawa : Le Comité, juin 2002.

*Concise Oxford Dictionary of Current English*, 9th ed. Oxford : Clarendon Press, 1995, « *use* ».

Fox, Harold G. *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. Toronto : Carswell, 1969.

Gold, E. Richard, and Wendy A. Adams. « The *Monsanto* decision : The edge or the wedge » (2001), 19 *Nat. Biotechnol.* 587.

Hughes, Roger T., et al. *Hughes and Woodley on Patents*. Markham, Ont. : LexisNexis Canada, 1984.

*Nouveau Petit Robert, dictionnaire alphabétique et analogique de la langue française*. Paris : Dictionnaires Le Robert, 2003, « exploiter ».

Siebrasse, Norman. « A Remedial Benefit-Based Approach to the Innocent-User Problem in the Patenting of Higher Life Forms » (2004), 20 *C.I.P.R.* 79.

Thorley, Simon, et al. *Terrell on the Law of Patents*, 15th ed. London : Sweet & Maxwell, 2000.

Vaver, David. *Intellectual Property Law : Copyright, Patents, Trade-marks*. Concord, Ont. : Irwin Law, 1997.

APPEAL from a judgment of the Federal Court of Appeal, [2003] 2 F.C. 165, 218 D.L.R. (4th) 31, 293 N.R. 340, 21 C.P.R. (4th) 1, [2002] F.C.J. No. 1209 (QL), 2002 FCA 309, affirming a decision of the Trial Division (2001), 202 F.T.R. 78, 12 C.P.R. (4th) 204, [2001] F.C.J. No. 436 (QL), 2001 FCT 256. Appeal allowed in part, Iacobucci, Bastarache, Arbour and LeBel JJ. dissenting in part.

*Terry J. Zakreski*, for the appellants.

*Roger T. Hughes*, *Q.C.*, *Arthur B. Renaud* and *L. E. Trent Horne*, for the respondents.

*Sara Blake* and *Ryan Collier*, for the intervener the Attorney General of Ontario.

*Mona G. Brown* and *Carena Roller*, for the intervener the Canadian Canola Growers Association.

Written submissions only by *Richard W. Danyliuk*, for the intervener Ag-West Biotech Inc.

*Anthony G. Creber* and *Henry S. Brown*, *Q.C.*, for the intervener BIOTECanada.

*A. David Morrow* and *Colin B. Ingram*, for the intervener the Canadian Seed Trade Association.

*Steven Shrybman* and *Steven Barrett*, for the interveners the Council of Canadians, the Action Group on Erosion, Technology and Concentration, the Sierra Club of Canada, the National Farmers Union, the Research Foundation for Science, Technology and Ecology, and the International Centre for Technology Assessment.

The judgment of McLachlin C.J. and Major, Binnie, Deschamps and Fish JJ. was delivered by

THE CHIEF JUSTICE AND FISH J. —

I.   Introduction

1    This case concerns a large scale, commercial farming operation that grew canola containing a

---

POURVOI contre un arrêt de la Cour d'appel fédérale, [2003] 2 C.F. 165, 218 D.L.R. (4th) 31, 293 N.R. 340, 21 C.P.R. (4th) 1, [2002] A.C.F. nº 1209 (QL), 2002 CAF 309, confirmant une décision de la Section de première instance (2001), 202 F.T.R. 78, 12 C.P.R. (4th) 204, [2001] A.C.F. nº 436 (QL), 2001 CFPI 256. Pourvoi accueilli en partie, les juges Iacobucci, Bastarache, Arbour et LeBel sont dissidents en partie.

*Terry J. Zakreski*, pour les appelants.

*Roger T. Hughes*, *c.r.*, *Arthur B. Renaud* et *L. E. Trent Horne*, pour les intimées.

*Sara Blake* et *Ryan Collier*, pour l'intervenant le procureur général de l'Ontario.

*Mona G. Brown* et *Carena Roller*, pour l'intervenante Canadian Canola Growers Association.

Argumentation écrite seulement par *Richard W. Danyliuk*, pour l'intervenante Ag-West Biotech Inc.

*Anthony G. Creber* et *Henry S. Brown*, *c.r.*, pour l'intervenante BIOTECanada.

*A. David Morrow* et *Colin B. Ingram*, pour l'intervenante l'Association canadienne du commerce des semences.

*Steven Shrybman* et *Steven Barrett*, pour les intervenants le Conseil des Canadiens, le Groupe d'action sur l'érosion, la technologie et la concentration, le Sierra Club du Canada, le Syndicat national des cultivateurs, Research Foundation for Science, Technology and Ecology et International Centre for Technology Assessment.

Version française du jugement de la juge en chef McLachlin et des juges Major, Binnie, Deschamps et Fish rendu par

LA JUGE EN CHEF ET LE JUGE FISH —

I.   Introduction

Dans la présente affaire, une entreprise de grande culture commerciale a cultivé du canola contenant

patented cell and gene without obtaining licence or permission. The main issue is whether it thereby breached the *Patent Act*, R.S.C. 1985, c. P-4. We believe that it did.

In reaching this conclusion, we emphasize from the outset that we are not concerned here with the innocent discovery by farmers of "blow-by" patented plants on their land or in their cultivated fields. Nor are we concerned with the scope of the respondents' patent or the wisdom and social utility of the genetic modification of genes and cells — a practice authorized by Parliament under the *Patent Act* and its regulations.

Our sole concern is with the application of established principles of patent law to the essentially undisputed facts of this case.

II.   The Salient Facts

Percy Schmeiser has farmed in Saskatchewan for more than 50 years. In 1996 he assigned his farming business to a corporation in which he and his wife are the sole shareholders and directors. He and his corporation grow wheat, peas, and a large amount of canola.

In the 1990s, many farmers, including five farmers in Mr. Schmeiser's area, switched to Roundup Ready Canola, a canola variety containing genetically modified genes and cells that have been patented by Monsanto. Canola containing the patented genes and cells is resistant to a herbicide, Roundup, which kills all other plants, making it easier to control weeds. This eliminates the need for tillage and other herbicides. It also avoids seeding delays to accommodate early weed spraying. Monsanto licenses farmers to use Roundup Ready Canola, at a cost of $15 per acre.

une cellule et un gène brevetés, sans avoir préalablement obtenu une licence ou une autorisation en ce sens. Il s'agit principalement de savoir si elle a, de ce fait, contrevenu à la *Loi sur les brevets*, L.R.C. 1985, ch. P-4. Nous croyons que oui.

En tirant cette conclusion, nous tenons à souligner, dès le départ, qu'il n'est pas question, en l'espèce, de la découverte innocente, par des agriculteurs, de plantes brevetées « disséminées par le vent » sur leurs terres ou dans leurs champs cultivés. Nous ne nous intéressons pas non plus à la portée du brevet des intimées ou à l'intérêt et à l'utilité pour la société de la modification génétique de gènes et de cellules — pratique que le législateur a autorisée dans la *Loi sur les brevets* et son règlement d'application.

Il s'agit simplement d'appliquer les principes établis du droit des brevets aux faits de la présente affaire qui, pour l'essentiel, ne sont pas contestés.

II.   Les faits saillants

Percy Schmeiser exploite une ferme en Saskatchewan depuis plus de 50 ans. En 1996, il a cédé son entreprise agricole à une société dont son épouse et lui sont les seuls actionnaires et administrateurs. L'entreprise cultive du blé, des pois et une grande quantité de canola.

Au cours des années 90, de nombreux agriculteurs, dont cinq agriculteurs de la région de M. Schmeiser, se sont convertis au canola Roundup Ready, une variété de canola contenant des gènes et des cellules génétiquement modifiés que Monsanto a fait breveter. Le canola qui contient les gènes et les cellules brevetés permet de lutter plus efficacement contre les mauvaises herbes grâce à sa résistance à l'herbicide Roundup qui tue toutes les autres plantes. Il permet d'éliminer le travail du sol et la pulvérisation d'autres herbicides, ainsi que d'éviter de retarder l'ensemencement pour effectuer de la pulvérisation précoce destinée à éliminer les mauvaises herbes. Les agriculteurs qui utilisent le canola Roundup Ready doivent payer à Monsanto des droits de licence de 15 $ l'acre.

6    Schmeiser never purchased Roundup Ready Canola nor did he obtain a licence to plant it. Yet, in 1998, tests revealed that 95 to 98 percent of his 1,000 acres of canola crop was made up of Roundup Ready plants. The origin of the plants is unclear. They may have been derived from Roundup Ready seed that blew onto or near Schmeiser's land, and was then collected from plants that survived after Schmeiser sprayed Roundup herbicide around the power poles and in the ditches along the roadway bordering four of his fields. The fact that these plants survived the spraying indicated that they contained the patented gene and cell. The trial judge found that "none of the suggested sources [proposed by Schmeiser] could reasonably explain the concentration or extent of Roundup Ready canola of a commercial quality" ultimately present in Schmeiser's crop ((2001), 202 F.T.R. 78, at para. 118).

7    The issues on this appeal are whether Schmeiser infringed Monsanto's patent, and if so, what remedies Monsanto may claim.

### III.  Analysis

#### A.  *The Patent: Its Scope and Validity*

8    Canola is a valuable crop grown in Canada and used to make edible oil and animal feed. The respondents are the licensee and owner, respectively, of Canadian Patent No. 1,313,830. This patent, titled "Glyphosate-Resistant Plants", was issued on February 23, 1993, and expires on February 23, 2010. It discloses the invention of genetically engineered genes and cells containing those genes which, when inserted into plants (in this case canola), dramatically increase their tolerance to herbicides containing glyphosate. Ordinarily, glyphosate inhibits an enzyme essential for plant survival. Most plants sprayed with a glyphosate herbicide do not survive, but a canola

Monsieur Schmeiser n'a jamais acheté de canola Roundup Ready ni obtenu une licence l'autorisant à le cultiver. Pourtant, en 1998, des tests ont révélé que la récolte de canola provenant des 1 000 acres qu'il avait cultivés était composée, dans une proportion de 95 à 98 pour 100, de plantes Roundup Ready. La provenance de ces plantes n'est pas claire. Elles peuvent provenir des semences de plantes qui ont poussé sur les terres de M. Schmeiser ou près de celles-ci à la suite de la dissémination par le vent de graines Roundup Ready, et qui ont survécu à la pulvérisation d'herbicide Roundup que M. Schmeiser avait effectuée autour des pylônes et dans les fossés qui longent la route en bordure de quatre de ses champs. Le fait que ces plantes aient survécu à la pulvérisation indiquait qu'elles contenaient le gène et la cellule brevetés. Le juge de première instance a conclu qu'« aucune des sources évoquées [par M. Schmeiser] ne pouvait logiquement expliquer la concentration ou l'ampleur de canola Roundup Ready de qualité commerciale » qui s'est retrouvée dans la récolte de M. Schmeiser ([2001] A.C.F. nº 436 (QL), par. 118).

Les questions en litige dans le présent pourvoi sont de savoir si M. Schmeiser a contrefait le brevet de Monsanto et, dans l'affirmative, à quelles réparations peut prétendre Monsanto.

### III.  Analyse

#### A.  *Le brevet : sa portée et sa validité*

Le canola est une culture de grande valeur au Canada et sert à fabriquer de l'huile comestible et des aliments pour animaux. Les intimées sont respectivement titulaire et propriétaire du brevet canadien nº 1,313,830. Ce brevet intitulé « Plantes résistant au glyphosate » a été délivré le 23 février 1993 et expirera le 23 février 2010. Il divulgue l'invention de gènes génétiquement modifiés et de cellules contenant ces gènes qui, une fois insérés dans des plantes (le canola en l'espèce), en augmentent remarquablement la tolérance aux herbicides à base de glyphosate. Le glyphosate inhibe habituellement l'enzyme essentielle à la survie des plantes. La plupart des plantes traitées par pulvérisation

plant grown from seed containing the modified gene will survive.

Since 1996, canola seed containing the patented gene and cell has been produced in Canada under licence from the respondents; this seed has been marketed to farmers under the trade name "Roundup Ready Canola", reflecting its resistance to the glyphosate herbicide "Roundup" manufactured by the respondents. Roundup can be sprayed after the canola plants have emerged, killing all plants except the canola. This eliminates the need for tillage and other herbicides. It also avoids delaying seeding to accommodate early weed spraying.

In 1996, approximately 600 Canadian farmers planted this Roundup Ready Canola on 50,000 acres. By 2000, approximately 20,000 farmers planted 4.5 to 5 million acres — nearly 40 percent of all canola grown in Canada.

Monsanto requires a farmer who wishes to grow Roundup Ready Canola to enter into a licensing arrangement called a Technology Use Agreement ("TUA"). The licensed farmers must attend a Grower Enrollment Meeting at which Monsanto describes the technology and its licensing terms. By signing the TUA, the farmer becomes entitled to purchase Roundup Ready Canola from an authorized seed agent. They must, however, undertake to use the seed for planting a single crop and to sell that crop for consumption to a commercial purchaser authorized by Monsanto. The licensed farmers may not sell or give the seed to any third party, or save seed for replanting or inventory.

The TUA gives Monsanto the right to inspect the fields of the contracting farmer and to take samples to verify compliance with the TUA. The farmer must also pay a licensing fee for each acre planted

d'herbicide à base de glyphosate meurent, mais une plante produite à partir d'une semence contenant le gène modifié survit au traitement.

Depuis 1996, des semences de canola contenant le gène et la cellule brevetés sont produites au Canada en vertu d'une licence accordée par les intimées. Ces semences sont commercialisées auprès des agriculteurs sous le nom de « Roundup Ready Canola », qui reflète leur résistance au « Roundup », un herbicide à base de glyphosate fabriqué par les intimées. Le Roundup, qui peut être pulvérisé après l'émergence des plants de canola, tue toutes les plantes à l'exception du canola. Il permet d'éliminer le travail du sol et la pulvérisation d'autres herbicides, ainsi que d'éviter de retarder l'ensemencement pour effectuer de la pulvérisation précoce destinée à éliminer les mauvaises herbes.

En 1996, environ 600 agriculteurs canadiens ont planté du canola Roundup Ready sur 50 000 acres. En 2000, environ 20 000 agriculteurs ont planté ce type de canola sur 4,5 à 5 millions d'acres, ce qui représente près de 40 pour 100 de tout le canola cultivé au Canada.

L'agriculteur qui souhaite cultiver le canola Roundup Ready doit conclure avec Monsanto un accord de licence appelé l'Entente sur les utilisations technologiques (« EUT »), et assister à une réunion d'inscription des producteurs au cours de laquelle Monsanto lui décrit la technologie et lui explique les conditions de la licence. L'agriculteur qui signe l'EUT peut se procurer le canola Roundup Ready auprès d'un représentant autorisé. Cependant, il doit promettre d'utiliser les semences pour une seule récolte et de vendre celle-ci aux fins de consommation à un acheteur commercial autorisé par Monsanto. L'agriculteur qui a obtenu une licence ne peut pas vendre ou donner les semences à un tiers, ni les conserver pour les mettre de nouveau en terre ou les stocker.

L'EUT confère à Monsanto le droit d'inspecter les champs des agriculteurs contractants et de prélever des échantillons afin de vérifier si l'EUT est respectée. L'agriculteur doit également payer

9

10

11

12

with Roundup Ready Canola. In 1998, the licensing fee was $15 per acre.

13    A Roundup Ready Canola plant cannot be distinguished from other canola plants except by a chemical test that detects the presence of the Monsanto gene, or by spraying the plant with Roundup. A canola plant that survives being sprayed with Roundup is Roundup Ready Canola.

14    The trial judge found the patent to be valid. He found that it did not offend the *Plant Breeders' Rights Act*, S.C. 1990, c. 20, and held that the difficulty of distinguishing canola plants containing the patented gene and cell from those without it did not preclude patenting the gene. The trial judge also rejected the argument that the gene and cell are unpatentable because they can be replicated without human intervention or control.

15    The scope of the patent is largely uncontroversial.

16    The trial judge found that "it is the <u>gene</u> and <u>the process for its insertion</u> . . . and <u>the cell derived from that process</u>" that comprise the invention (para. 88 (emphasis added); see also para. 26). The Federal Court of Appeal likewise endorsed the claims as being for "genes and cells which are glyphosate-resistant" ([2003] 2 F.C. 165, at para. 40).

17    Everyone agrees that Monsanto did not claim protection for the genetically modified plant itself, but rather for the genes and the modified cells that make up the plant. Unlike our colleague, Arbour J., we do not believe this fact requires reading a proviso into the claims that would provide patent protection to the genes and cells only when in an isolated laboratory form.

18    Purposive construction of patent claims requires that they be interpreted in light of the whole of the

des droits de licence pour chaque acre de culture de canola Roundup Ready. En 1998, les droits de licence étaient de 15 $ l'acre.

Seul un test chimique permettant de déceler la présence du gène Monsanto ou encore la pulvérisation de Roundup sur les plantes permet de distinguer les plantes de canola Roundup Ready des autres plantes de canola. Une plante de canola qui survit à la pulvérisation de Roundup est une plante de canola Roundup Ready.

Le juge de première instance a conclu que le brevet était valide et qu'il ne contrevenait pas à la *Loi sur la protection des obtentions végétales*, L.C. 1990, ch. 20. Selon lui, la difficulté de distinguer les plantes de canola contenant le gène et la cellule brevetés de celles ne les contenant pas n'empêchait pas de breveter le gène. Le juge de première instance a aussi rejeté l'argument voulant que le gène et la cellule ne soient pas brevetables en raison de leur capacité de se multiplier sans intervention ni contrôle humains.

La portée du brevet suscite peu de controverse.

Le juge de première instance a conclu que « ce sont le <u>gène</u> et son <u>procédé d'insertion</u> [. . .] et [. . .] <u>la cellule résultant de ce procédé</u> » qui constituent l'invention (par. 88 (nous soulignons); voir aussi par. 26). De même, la Cour d'appel fédérale a considéré que les revendications concernent « les gènes et les cellules qui sont résistants au glyphosate » ([2003] 2 C.F. 165, par. 40).

Tous s'accordent pour dire que la protection revendiquée par Monsanto vise non pas la plante génétiquement modifiée elle-même, mais plutôt les gènes et les cellules modifiées qui la constituent. Contrairement à notre collègue la juge Arbour, nous ne croyons pas que ce fait oblige à considérer que les revendications comportent une réserve voulant que seuls les gènes et les cellules isolés en laboratoire bénéficient de la protection du brevet.

L'interprétation téléologique des revendications d'un brevet exige qu'elles soient interprétées en

disclosure, including the specifications: *Whirlpool Corp. v. Camco Inc.*, [2000] 2 S.C.R. 1067, 2000 SCC 67; *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504. In this case, the disclosure includes the following:

*Abstract of the Disclosure*

Plant cells transformed using such genes and plants regenerated therefrom have been shown to exhibit a substantial degree of glyphosate resistance.

*Background of the Invention*

The object of this invention is to provide a method of genetically transforming plant cells which causes the cells and plants regenerated therefrom to become resistant to glyphosate and the herbicidal salts thereof.

*Detailed Description of the Invention*

Suitable plants for the practice of the present invention include, but are not limited to, soybean, cotton, alfalfa, canola, flax, tomato, sugar beet, sunflower, potato, tobacco, corn, wheat, rice and lettuce.

A purposive construction therefore recognizes that the invention will be practised in plants regenerated from the patented cells, whether the plants are located inside or outside a laboratory. It is difficult to imagine a more likely or more evident purpose for patenting "a method of genetically transforming plant cells which causes the cells and plants regenerated therefrom to become resistant to glyphosate" (trial judgment, para. 20 (emphasis added)).

More particularly, the patented claims are for:

1.  A chimeric gene: this is a gene that does not exist in nature and is constructed from different species.

2.  An expression vector: this is a DNA molecule into which another DNA segment has been

fonction de l'ensemble de la divulgation, y compris le mémoire descriptif : *Whirlpool Corp. c. Camco Inc.*, [2000] 2 R.C.S. 1067, 2000 CSC 67; *Consolboard Inc. c. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 R.C.S. 504. En l'espèce, la divulgation est divisée ainsi :

[TRADUCTION]

*Abrégé*

Les cellules végétales transformées au moyen de ces gènes et les plantes régénérées à partir de celles-ci démontrent un niveau important de résistance au glyphosate.

*Objectif de l'invention*

La présente invention a pour but de fournir une méthode pour l'obtention de cellules végétales génétiquement modifiées, qui rend ces cellules et les plants produits à partir de celles-ci résistants au glyphosate et à ses sels herbicides.

*Description détaillée de l'invention*

Parmi les plantes auxquelles peut être appliquée la présente invention, il y a notamment le soja, le coton, la luzerne, le canola, le lin, la tomate, la betterave à sucre, le tournesol, la pomme de terre, le tabac, le maïs, le blé, le riz et la laitue.

L'interprétation téléologique reconnaît donc que l'invention s'appliquera aux plantes régénérées à partir des cellules brevetées, indépendamment de la question de savoir si ces plantes se trouvent à l'intérieur ou à l'extérieur d'un laboratoire. Il est difficile de concevoir une raison plus vraisemblable ou évidente de breveter « une méthode pour l'obtention de cellules végétales génétiquement modifiées, qui rend ces cellules et les plants produits à partir de celles-ci résistants au glyphosate » (jugement de première instance, par. 20 (nous soulignons)).    19

Plus précisément, les revendications du brevet visent :    20

1.  Un gène chimère : ce gène n'existe pas dans la nature et est construit à partir de différentes espèces.

2.  Un vecteur d'expression : ce vecteur est une molécule d'ADN dans laquelle on a introduit

integrated so as to be useful as a research tool.

3. A <u>plant transformation vector</u>: used to permanently insert a chimeric gene into a plant's own DNA.

4. Various species of <u>plant cells</u> into which the chimeric gene has been inserted.

5. A <u>method of regenerating a glyphosate-resistant plant</u>. Once the cell is stimulated to grow into a plant, all of the differentiated cells in the plant will contain the chimeric gene, which will be passed on to offspring of the plant.

21    The appellant Schmeiser argues that the subject matter claimed in the patent is unpatentable. While acknowledging that Monsanto claims protection only over a gene and a cell, Schmeiser contends that the result of extending such protection is to restrict use of a plant and a seed. This result, the argument goes, ought to render the subject matter unpatentable, following the reasoning of the majority of this Court in *Harvard College v. Canada (Commissioner of Patents)*, [2002] 4 S.C.R. 45, 2002 SCC 76 ("*Harvard Mouse*"). In that case, plants and seeds were found to be unpatentable "higher life forms".

22    This case is different from *Harvard Mouse*, where the patent refused was for a mammal. The Patent Commissioner, moreover, had allowed other claims, which were not at issue before the Court in that case, notably a plasmid and a somatic cell culture. The claims at issue in this case, for a gene and a cell, are somewhat analogous, suggesting that to find a gene and a cell to be patentable is in fact consistent with both the majority and the minority holdings in *Harvard Mouse*.

23    Further, all members of the Court in *Harvard Mouse* noted in *obiter* that a fertilized, genetically

un autre segment d'ADN afin de pouvoir l'utiliser comme outil de recherche.

3. Un <u>vecteur de transformation des plantes</u> : ce vecteur sert à insérer de façon permanente un gène chimère dans l'ADN d'une plante.

4. Diverses espèces de <u>cellules végétales</u> dans lesquelles le gène chimère a été inséré.

5. Une <u>méthode de régénération d'une plante résistant au glyphosate</u>. Dès que la cellule est stimulée pour devenir une plante, toutes les cellules différenciées de la plante contiennent le gène chimère, qui sera transmis à la descendance de la plante.

L'appelant Schmeiser fait valoir que l'objet revendiqué dans le brevet n'est pas brevetable. Tout en reconnaissant que Monsanto revendique une protection uniquement à l'égard d'un gène et d'une cellule, M. Schmeiser prétend que l'application de cette protection a pour effet de restreindre l'utilisation d'une plante ou d'une semence. Ce résultat, ajoute-t-il, rend l'objet non brevetable, selon le raisonnement majoritaire de l'arrêt *Harvard College c. Canada (Commissaire aux brevets)*, [2002] 4 R.C.S. 45, 2002 CSC 76 (« *souris de Harvard* »). Dans cet arrêt, la Cour a statué que les plantes et les semences sont des « formes de vie supérieures » non brevetables.

La présente affaire est différente de celle de la *souris de Harvard*, où le brevet refusé concernait un mammifère. Le commissaire aux brevets avait, en outre, accueilli d'autres revendications — dont la Cour n'a pas été saisie dans cette affaire — ayant trait notamment à un plasmide et à une culture de cellules somatiques. Les revendications concernant un gène et une cellule qui sont en litige dans la présente affaire sont quelque peu analogues, ce qui laisse croire que la conclusion qu'un gène et une cellule sont brevetables est, en fait, conforme tant aux motifs majoritaires qu'aux motifs dissidents de l'arrêt relatif à la *souris de Harvard*.

De plus, dans l'arrêt relatif à la *souris de Harvard*, tous les juges ont souligné, dans une remarque

altered oncomouse egg would be patentable subject matter, regardless of its ultimate anticipated development into a mouse (at para. 3, *per* Binnie J. for the minority; at para. 162, *per* Bastarache J. for the majority).

Whether or not patent protection for the gene and the cell extends to activities involving the plant is not relevant to the patent's validity. It relates only to the factual circumstances in which infringement will be found to have taken place, as we shall explain below. Monsanto's patent has already been issued, and the onus is thus on Schmeiser to show that the Commissioner erred in allowing the patent: *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] 4 S.C.R. 153, 2002 SCC 77, at paras. 42-44. He has failed to discharge that onus. We therefore conclude that the patent is valid.

B.  *Did Schmeiser "Make" or "Construct" the Patented Gene and Cell, Thus Infringing the Patent?*

The *Patent Act* confers on the patent owner "the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used" (s. 42). Monsanto argues that when Schmeiser planted and cultivated Roundup Ready Canola seed, he necessarily infringed their patent by making the gene or cell.

We are not inclined to the view that Schmeiser "made" the cell within the meaning of s. 42 of the *Patent Act*. Neither Schmeiser nor his corporation created or constructed the gene, the expression vector, a plant transformation vector, or plant cells into which the chimeric gene has been inserted.

It is unnecessary, however, to express a decided opinion on this point, since we have in any event concluded that Schmeiser infringed s. 42 by "using" the patented cell and gene.

incidente, qu'un œuf d'oncosouris fécondé et génétiquement modifié serait brevetable, indépendamment de toute prévision qu'il deviendra, en fin de compte, une souris (par. 3, le juge Binnie au nom des juges dissidents; par. 162, le juge Bastarache au nom des juges majoritaires).

24

La question de savoir si la protection par brevet du gène et de la cellule s'étend aux activités mettant en cause la plante n'est pas pertinente pour décider de la validité du brevet. Comme nous l'expliquerons plus loin, elle ne concerne que les circonstances factuelles dans lesquelles on constatera qu'il y a eu contrefaçon. Le brevet de Monsanto a déjà été délivré, et il incombe à M. Schmeiser de démontrer que le commissaire a commis une erreur en accueillant la demande de brevet : *Apotex Inc. c. Wellcome Foundation Ltd.*, [2002] 4 R.C.S. 153, 2002 CSC 77, par. 42-44. Il ne s'est pas acquitté de ce fardeau de preuve. Nous concluons donc que le brevet est valide.

B.  *Monsieur Schmeiser a-t-il contrefait le brevet par la « fabrication » ou la « construction » du gène et de la cellule brevetés?*

25

La *Loi sur les brevets* confère au propriétaire du brevet « le droit, la faculté et le privilège exclusif de fabriquer, construire, exploiter et vendre à d'autres, pour qu'ils l'exploitent, l'objet de l'invention » (art. 42). Monsanto fait valoir qu'au moment où il a semé et cultivé du canola Roundup Ready, M. Schmeiser a alors fabriqué le gène ou la cellule et a ainsi forcément contrefait son brevet.

26

Nous ne sommes pas portés à croire que M. Schmeiser a « fabriqué » la cellule au sens de l'art. 42 de la *Loi sur les brevets*. Ni M. Schmeiser ni sa société n'ont créé ou construit le gène, le vecteur d'expression, un vecteur de transformation de plantes ou des cellules végétales dans lesquelles le gène chimérique a été inséré.

27

Il n'est cependant pas nécessaire d'exprimer une opinion définitive à cet égard puisque, de toute façon, nous avons conclu que M. Schmeiser avait enfreint l'art. 42 en « exploitant » la cellule et le gène brevetés.

C.  *Did Schmeiser "Use" the Patented Gene or Cell, Thus Infringing the Patent?*

(1)  The Law on "Use"

28    The central question on this appeal is whether Schmeiser, by collecting, saving and planting seeds containing Monsanto's patented gene and cell, "used" that gene and cell.

29    The onus of proving infringement lies on the plaintiff, Monsanto.

30    Infringement is generally a question of fact (see *Whirlpool, supra*). In most patent infringement cases, once the claim has been construed it is clear on the facts whether infringement has taken place: one need only compare the thing made or sold by the defendant with the claims as construed. Patent infringement cases that turn on "use" are more unusual. In those rare cases where a dispute arises on this issue, as in this case, judicial interpretation of the meaning of "use" in s. 42 of the Act may be required.

31    Determining the meaning of "use" under s. 42 is essentially a matter of statutory construction. The starting point is the plain meaning of the word, in this case "use" or "*exploiter*". *The Concise Oxford Dictionary* defines "use" as "cause to act or serve for a purpose; bring into service; avail oneself of": *The Concise Oxford Dictionary of Current English* (9th ed. 1995), at p. 1545. This denotes utilization for a purpose. The French word "*exploiter*" is even clearer. It denotes utilization with a view to production or advantage: "*tirer parti de (une chose), en vue d'une production ou dans un but lucratif. [. . .] Utiliser d'une manière avantageuse*": *Le Nouveau Petit Robert* (2003), at p. 1004.

32    Three well-established rules or practices of statutory interpretation assist us further. First, the inquiry

C.  *Monsieur Schmeiser a-t-il contrefait le brevet par l'« exploitation » du gène ou de la cellule brevetés?*

(1)  Le droit en matière d'« exploitation »

La question centrale dans le présent pourvoi est de savoir si, en récoltant, en conservant et en semant des graines contenant le gène et la cellule brevetés de Monsanto, M. Schmeiser a « exploité » ce gène et cette cellule.

Il incombe à la demanderesse Monsanto de prouver qu'il y a eu contrefaçon.

La contrefaçon est généralement une question de fait (voir l'arrêt *Whirlpool*, précité). Dans la plupart des affaires de contrefaçon de brevet, les faits indiquent clairement s'il y a eu contrefaçon, une fois que la revendication a été interprétée : il suffit de comparer la chose fabriquée ou vendue par le défendeur avec les revendications interprétées. Les affaires de contrefaçon de brevet dans lesquelles il est question d'« exploitation » sont plus inhabituelles. Dans les rares cas, comme en l'espèce, où cette question se pose, il peut se révéler nécessaire d'interpréter judiciairement le verbe « exploiter » qui figure à l'art. 42 de la Loi.

La détermination du sens du verbe « exploiter » figurant à l'art. 42 est essentiellement affaire d'interprétation législative. Il faut d'abord établir le sens ordinaire du verbe « exploiter » ou « *use* » dont il est question en l'espèce. Le sens du verbe « exploiter » est très clair. Il connote une utilisation en vue d'une production ou dans le but de tirer un avantage : « tirer parti de (une chose), en vue d'une production ou dans un but lucratif. [. . .] Utiliser d'une manière avantageuse » (*Le Nouveau Petit Robert* (2003), p. 1004). De même, le *Concise Oxford Dictionary* donne une définition claire du verbe « *use* » : « *cause to act or serve for a purpose; bring into service; avail oneself of* » (*The Concise Oxford Dictionary of Current English* (9ᵉ éd. 1995), p. 1545). Le verbe « *use* » connote une utilisation dans un but particulier.

Le recours à trois règles ou pratiques bien établies en matière d'interprétation législative peut

into the meaning of "use" under the *Patent Act* must be underlined purposive, grounded in an understanding of the reasons for which patent protection is accorded. Second, the inquiry must be underlined contextual, giving consideration to the other words of the provision. Finally, the inquiry must be attentive to the wisdom of the underlined case law. We will discuss each of these aids to interpretation briefly, and then apply them to the facts of this case.

We return first to the rule of purposive construction. Identifying whether there has been infringement by use, like construing the claim, must be approached by the route of purposive construction: *Free World Trust v. Électro Santé Inc.*, [2000] 2 S.C.R. 1024, 2000 SCC 66. "[P]urposive construction is capable of expanding or limiting a literal [textual claim]": *Whirlpool*, *supra*, at para. 49. Similarly, it is capable of influencing what amounts to "use" in a given case.

The purpose of s. 42 is to define the exclusive rights granted to the patent holder. These rights are the rights to full enjoyment of the monopoly granted by the patent. Therefore, what is prohibited is "any act that interferes with the full enjoyment of the monopoly granted to the patentee": H. G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed. 1969), at p. 349; see also *Lishman v. Erom Roche Inc.* (1996), 68 C.P.R. (3d) 72 (F.C.T.D.), at p. 77.

The guiding principle is that patent law ought to provide the inventor with "protection for that which he has actually in good faith invented": *Free World Trust*, *supra*, at para. 43. Applied to "use", the question becomes: underlined did the defendant's activity deprive the inventor in whole or in part, directly or indirectly, of full enjoyment of the monopoly conferred by law?

A purposive approach is complemented by a contextual examination of s. 42 of the *Patent Act*,

également se révéler utile. Premièrement, l'interprétation du verbe « exploiter » figurant dans la *Loi sur les brevets* doit être underlined téléologique et fondée sur la compréhension des raisons pour lesquelles la protection par brevet est accordée. Deuxièmement, l'interprétation doit être underlined contextuelle, en ce sens qu'elle doit tenir compte des autres termes de la disposition. Enfin, elle doit tenir compte de l'apport de la underlined jurisprudence. Nous analyserons brièvement chacun de ces outils d'interprétation pour ensuite les appliquer aux faits de la présente affaire.

33    Revenons d'abord à la règle de l'interprétation téléologique. L'interprétation téléologique (ou fondée sur l'objet visé) applicable à la revendication du brevet s'impose également pour déterminer s'il y a eu contrefaçon par exploitation (*Free World Trust c. Électro Santé Inc.*, [2000] 2 R.C.S. 1024, 2000 CSC 66). « L'interprétation téléologique est susceptible d'élargir ou de limiter la portée [du] texte [d'une revendication] » (*Whirlpool*, précité, par. 49). De même, elle est susceptible d'influer sur ce qui constitue une « exploitation » dans une affaire donnée.

34    L'article 42 a pour objet de définir les droits exclusifs du titulaire d'un brevet, à savoir le droit à la pleine jouissance du monopole conféré par le brevet. Par conséquent, l'interdiction s'applique à [TRADUCTION] « tout acte qui nuit à la pleine jouissance du monopole conféré au titulaire du brevet », s'il est accompli sans le consentement de ce dernier (H. G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4ᵉ éd. 1969), p. 349; voir également *Lishman c. Erom Roche Inc.*, [1996] A.C.F. nᵒ 560 (QL) (1ʳᵉ inst.), par. 16.

35    Le principe directeur est que le droit des brevets doit accorder à l'inventeur « l'exclusivité de ce qu'il a inventé de bonne foi » : *Free World Trust*, précité, par. 43. En ce qui concerne le verbe « exploiter », la question devient la suivante : underlined les activités du défendeur ont-elles privé l'inventeur, en tout ou en partie, directement ou indirectement, de la pleine jouissance du monopole conféré par la loi?

36    L'interprétation téléologique est complétée par l'examen contextuel de l'art. 42 de la *Loi sur les*

which shows that the patentee's monopoly generally protects its business interests. Professor D. Vaver, in *Intellectual Property Law: Copyright*, *Patents*, *Trade-marks* (1997), suggests that the common thread among "'making, constructing and using the invention and selling it to others to be used'. . . is that the activity is usually for commercial purposes — to make a profit or to further the actor's business interests" (p. 151). This is particularly consistent with the French version of s. 42, which uses the word "*exploiter*".

37    As a practical matter, inventors are normally deprived of the fruits of their invention and the full enjoyment of their monopoly when another person, without licence or permission, uses the invention to further a business interest. Where the defendant's impugned activities furthered its own commercial interests, we should therefore be particularly alert to the possibility that the defendant has committed an infringing use.

38    With respect for the contrary view of Arbour J., this does not require inventors to describe in their specifications a commercial advantage or utility for their inventions. Even in the absence of commercial exploitation, the patent holder is entitled to protection. However, a defendant's commercial activities involving the patented object will be particularly likely to constitute an infringing use. This is so because if there is a commercial benefit to be derived from the invention, a contextual analysis of s. 42 indicates that it belongs to the patent holder. The contextual analysis of the section thus complements — and confirms — the conclusion drawn from its purposive analysis. It is the reverse side of the same coin.

39    We turn now to the case law, the third aid to interpretation. Here we derive guidance from what courts in the past have considered to be use. As we shall see, precedent confirms the approach proposed

*brevets*, qui démontre que le monopole conféré protège généralement les intérêts commerciaux du titulaire du brevet. Dans l'ouvrage intitulé *Intellectual Property Law : Copyright, Patents, Trade-marks* (1997), le professeur D. Vaver indique que le dénominateur commun qui existe entre [TRADUCTION] « "fabriquer, construire, exploiter et vendre à d'autres, pour qu'ils l'exploitent, l'objet de l'invention" [. . .] est que chacun de ces actes est généralement accompli dans un but commercial, c'est-à-dire pour réaliser un profit ou pour servir les intérêts commerciaux de son auteur » (p. 151). Cette interprétation est particulièrement compatible avec le terme « exploiter » utilisé à l'art. 42.

En pratique, l'inventeur est normalement privé des fruits de son invention et de la pleine jouissance de son monopole lorsqu'une autre personne exploite l'invention en question à des fins commerciales, sans avoir préalablement obtenu une licence ou une autorisation en ce sens. Par conséquent, lorsque les activités contestées du défendeur ont servi ses propres intérêts commerciaux, nous devons être particulièrement conscients de la possibilité qu'il se soit livré à une exploitation contrefaisante.

En toute déférence pour le point de vue contraire exprimé par la juge Arbour, cela n'oblige pas l'inventeur à décrire, dans son mémoire, l'avantage ou l'utilité de son invention sur le plan commercial. Même en l'absence d'exploitation commerciale, le titulaire du brevet a le droit d'être protégé. Cependant, les activités commerciales d'un défendeur qui mettent en cause l'objet breveté sont particulièrement susceptibles de constituer une exploitation contrefaisante. Cela s'explique par le fait que, selon une analyse contextuelle de l'art. 42, tout avantage commercial qui peut découler de l'invention appartient au titulaire du brevet. Par conséquent, l'analyse contextuelle de cet article complète — et confirme — la conclusion à laquelle a donné lieu l'analyse téléologique dont il a été l'objet. Elle représente l'autre côté de la médaille.

Nous examinerons maintenant la jurisprudence, qui est le troisième outil d'interprétation. À cet égard, nous nous inspirons de ce que les tribunaux ont considéré, dans le passé, comme étant une

above and it is of assistance as well in resolving some of the more specific questions raised by this case.

First, case law provides guidance as to whether patent protection extends to situations where the patented invention is contained within something else used by the defendant. This is relevant to the appellants' submission that growing <u>plants</u> did not amount to "using" their patented <u>genes</u> and <u>cells</u>.

Patent infringement actions often proceed in a manufacturing context. Case law has for that reason focussed on situations where a patented part or process plays a role in production. As Professor Vaver states, *supra*, at p. 152:

"Use" applies both to patented products and processes, and also to their output. A patent that covers a zipper-making machine or method extends to zippers made by the machine or method. Each zipper sold without authority infringes the patent, even if the zippers themselves are unpatented. This expansive doctrine applies, however, only if the patent plays an important part in production.

By analogy, then, the law holds that a defendant infringes a patent when the defendant manufactures, seeks to use, or uses a patented part that is contained within something that is not patented, provided the patented part is significant or important. In the case at bar, the patented genes and cells are not merely a "part" of the plant; rather, the patented genes are present throughout the genetically modified plant and the patented cells compose its entire physical structure. In that sense, the cells are somewhat analogous to Lego blocks: if an infringing use were alleged in building a structure with patented Lego blocks, it would be no bar to a finding of infringement that only the blocks were patented and not the entire structure. If anything, the fact that the Lego structure could not exist independently of the patented blocks would strengthen the claim, underlining the significance of the

exploitation. Nous constaterons que la jurisprudence confirme l'interprétation proposée plus haut dans les présents motifs et aide aussi à répondre à certaines questions plus précises soulevées en l'espèce.

40    Premièrement, la jurisprudence est utile pour décider si la protection par brevet s'applique dans les cas où l'invention brevetée fait partie d'une autre chose exploitée par le défendeur. Elle est utile pour trancher l'argument des appelants selon lequel cultiver des <u>plantes</u> n'équivalait pas à en « exploiter » les <u>gènes</u> et <u>cellules</u> brevetés.

41    Les actions pour contrefaçon de brevet émanent souvent du secteur des produits manufacturés. C'est pourquoi la jurisprudence porte principalement sur des situations où un élément ou un procédé breveté joue un rôle dans la production. Comme l'affirme le professeur Vaver, *op. cit.*, p. 152 :

[TRADUCTION] « Exploiter » s'applique à la fois aux produits et aux procédés brevetés, ainsi qu'à leurs dérivés. Un brevet qui protège une machine ou méthode servant à fabriquer des fermetures éclair s'applique également aux fermetures éclair que permet de fabriquer la machine ou la méthode en question. Chaque fermeture éclair vendue sans autorisation contrefait le brevet, même si les fermetures éclair elles-mêmes ne sont pas brevetées. Cette règle ayant une portée large n'est toutefois applicable que si le brevet joue un rôle important dans la production.

42    Par analogie, la loi considère donc qu'un défendeur contrefait un brevet s'il fabrique, cherche à exploiter ou exploite un élément breveté contenu dans une chose non brevetée, à condition que l'élément breveté soit important. En l'espèce, les gènes et cellules brevetés ne sont pas simplement un « élément » de la plante; au contraire, les gènes brevetés sont présents dans toute la plante génétiquement modifiée, dont toute la structure physique est formée des cellules brevetées. C'est en ce sens que les cellules ressemblent quelque peu à des blocs Lego : si on alléguait que la construction d'une structure à l'aide de blocs Lego brevetés constitue une exploitation contrefaisante, le fait que seuls les blocs ont été brevetés et non toute la structure n'empêcherait pas de conclure à l'existence de contrefaçon. Au contraire, le fait que la structure Lego ne peut pas exister indépendamment des blocs brevetés renforcerait

patented invention to the whole product, object, or process.

43    Infringement through use is thus possible even where the patented invention is part of, or composes, a broader unpatented structure or process. This is, as Professor Vaver states, an expansive rule. It is, however, firmly rooted in the principle that the main purpose of patent protection is to prevent others from depriving the inventor, even in part and even indirectly, of the monopoly that the law intends to be theirs: only the inventor is entitled, by virtue of the patent and as a matter of law, to the <u>full</u> enjoyment of the monopoly conferred.

44    Thus, in *Saccharin Corp. v. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307 (H.C.J.), the court stated, at p. 319:

> By the sale of saccharin, in the course of the production of which the patented process is used, the Patentee is deprived of some part of the whole profit and advantage of the invention, and the importer is indirectly making use of the invention.

This confirms the centrality of the question that flows from a purposive interpretation of the *Patent Act*: did the defendant, by his acts or conduct, deprive the inventor, in whole or in part, directly or indirectly, of the advantage of the patented invention?

45    In determining whether the defendant "used" the patented invention, one compares the object of the patent with what the defendant did and asks whether the defendant's actions involved that object. In *Betts v. Neilson* (1868), L.R. 3 Ch. App. 429 (aff'd (1871), L.R. 5 H.L. 1), the object of the patent was to preserve the contents of bottles in transit. Though the bottles were merely shipped unopened through England, the defendant was held to have used the invention in England because, during its passage through that country, the beer was protected by the invention. Lord Chelmsford said, at p. 439:

l'action, en faisant ressortir l'importance de l'invention brevetée pour l'ensemble du produit, de l'objet ou du procédé en cause.

Il peut donc y avoir contrefaçon par exploitation même dans le cas où l'invention brevetée fait partie ou est une composante d'une structure ou d'un procédé non brevetés plus vastes. Comme l'affirme le professeur Vaver, cette règle a une portée large. Elle est toutefois profondément enracinée dans le principe voulant que la protection par brevet ait principalement pour objet d'empêcher des tiers de priver l'inventeur, ne serait-ce qu'en partie ou indirectement, du monopole que la loi entend lui conférer : seul l'inventeur a droit, en vertu du brevet ou de la loi, à la <u>pleine</u> jouissance du monopole conféré.

Ainsi, dans l'arrêt *Saccharin Corp. c. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307 (H.C.J.), p. 319, la cour affirme :

> [TRADUCTION] En vendant la saccharine produite au moyen du procédé breveté, l'importateur prive le titulaire du brevet d'une partie des profits et avantages globaux de l'invention, et se trouve à exploiter indirectement l'invention.

Cet extrait confirme le caractère crucial de la question découlant de l'interprétation téléologique de la *Loi sur les brevets* : par ses actes ou sa conduite, le défendeur a-t-il privé l'inventeur, en tout ou en partie, directement ou indirectement, des avantages de l'invention brevetée?

Pour déterminer si le défendeur a « exploité » l'invention brevetée, il faut examiner les agissements du défendeur au regard de l'objet du brevet et se demander si ces agissements mettaient effectivement en cause cet objet. Dans l'arrêt *Betts c. Neilson* (1868), L.R. 3 Ch. App. 429 (conf. par (1871), L.R. 5 H.L. 1), l'objet du brevet était la préservation du contenu de bouteilles pendant leur transport. La cour a statué que, même si les bouteilles ne faisaient que transiter par l'Angleterre sans être ouvertes, le défendeur avait exploité l'invention dans ce pays étant donné que, pendant qu'elle y était transportée, la bière était protégée par l'invention. Lord Chelmsford a affirmé, à la p. 439 :

It is the employment of the machine or the article for the purpose for which it was designed which constitutes its active use; and whether the capsules were intended for ornament, or for protection of the contents of the bottles upon which they were placed, the whole time they were in *England* they may be correctly said to be in active use for the very objects for which they were placed upon the bottles by the vendors.

In fact, the patented invention need not be deployed precisely for its intended purpose in order for its object to be involved in the defendant's activity. It was not relevant in *Neilson* whether the invention had actually caused bottles to be preserved during shipping, in a situation in which they would otherwise have broken. As a further example, in *Dunlop Pneumatic Tyre Co. v. British and Colonial Motor Car Co.* (1901), 18 R.P.C. 313 (H.C.J.), the defendants placed on display at a car show a car with patented tires which they had intended to remove prior to sale, substituting other tires. The exhibition of the car with the patented tires was nonetheless held to be an infringing use. The common thread is that the defendants employed the invention to their advantage, depriving the inventor of the full enjoyment of the monopoly.

Moreover, as Lord Dunedin emphasized in *British United Shoe Machinery Co. v. Simon Collier Ld.* (1910), 27 R.P.C. 567 (H.L.), <u>possession as a stand-by has "insurance value"</u>, as for example in the case of a fire extinguisher. The extinguisher is "used" to provide the means for extinguishment should the need arise. This is true, too, of a spare steam engine which is "intended in certain circumstances to be used for exactly the purpose for which the whole machine is being actually used" (p. 572). Exploitation of the stand-by utility of an invention uses it to advantage.

In *Terrell on the Law of Patents* (15th ed. 2000), at para. 8.24, the authors observe that "[t]he word 'use'. . . would . . . seem to indicate making practical use of the invention itself." In some circumstances, "practical use" may arise from the stand-by utility resulting from mere possession of the

[TRADUCTION] C'est l'utilisation de la machine ou de l'article aux fins pour lesquelles ils ont été conçus qui constitue l'utilisation concrète de ceux-ci, et, peu importe que les capsules aient été destinées à orner ou encore à protéger le contenu des bouteilles sur lesquelles elles étaient placées, on peut dire à juste titre que, pendant tout le temps qu'elles se sont trouvées en *Angleterre*, elles étaient exploitées concrètement dans le but même pour lequel les vendeurs les avaient placées sur les bouteilles.

En fait, il n'est pas nécessaire que l'invention brevetée soit utilisée exactement dans le but pour lequel elle a été conçue pour que l'activité du défendeur en mette en cause l'objet. Dans l'arrêt *Neilson*, il n'importait pas de savoir si l'invention avait effectivement permis de protéger les bouteilles pendant leur transport, étant donné que, sans cette invention, elles auraient cassé. Un autre exemple est l'affaire *Dunlop Pneumatic Tyre Co. c. British and Colonial Motor Car Co.* (1901), 18 R.P.C. 313 (H.C.J.), où les défendeurs avaient présenté, lors d'une exposition de véhicules automobiles, une voiture munie de pneus brevetés qu'elle avait l'intention de remplacer par d'autres pneus avant de vendre la voiture en question. La cour a néanmoins décidé que l'exposition de la voiture munie des pneus brevetés était une exploitation contrefaisante. Le dénominateur commun est le fait que les défendeurs ont tiré avantage de l'invention et privé l'inventeur de la pleine jouissance de son monopole.

De plus, comme lord Dunedin l'a souligné dans l'arrêt *British United Shoe Machinery Co. c. Simon Collier Ld.* (1910), 27 R.P.C. 567 (H.L.), <u>la possession à titre préventif</u> d'un extincteur, par exemple, <u>a une « valeur latente »</u>. L'extincteur est « exploité » pour éteindre les flammes en cas de besoin. Il en est de même d'une machine à vapeur de secours [TRADUCTION] « destinée à être exploitée, dans certaines circonstances, exactement dans le même but que la machine principale » (p. 572). L'exploitation de l'utilité latente d'une invention est un avantage que l'on tire de l'invention.

Dans l'ouvrage intitulé *Terrell on the Law of Patents* (15e éd. 2000), par. 8.24, les auteurs font remarquer que [TRADUCTION] « [l]e terme "*use*" ["exploiter"] semble [. . .] indiquer une exploitation concrète de l'invention même. » Dans certaines circonstances, l'« exploitation concrète » peut émaner

46

47

48

invention, or from some other practical employment with a view to advantage. Use, and thereby infringement, are then established.

49    The general rule is that the defendant's intention is irrelevant to a finding of infringement. The issue is "what the defendant does, not . . . what he intends": *Stead v. Anderson* (1847), 4 C.B. 806, 136 E.R. 724 (C.P.), at p. 736; see also *Hoechst Celanese Corp. v. BP Chemicals Ltd.* (1998), 25 F.S.R. 586 (Pat. Ct.), at p. 598; *Illinois Tool Works Inc. v. Cobra Anchors Co.* (2002), 221 F.T.R. 161, 2002 FCT 829, at paras. 14-17; *Computalog Ltd. v. Comtech Logging Ltd.* (1992), 44 C.P.R. (3d) 77 (F.C.A.), at p. 88. And the governing principle is whether the defendant, by his actions, activities or conduct, appropriated the patented invention, thus depriving the inventor, in whole or part, directly or indirectly, of the full enjoyment of the monopoly the patent grants.

50    However, intention becomes relevant where the defence invoked is possession without use. Where the alleged use consists of exploitation of the invention's "stand-by" utility, as discussed above, it is relevant whether the defendant intended to exploit the invention should the need arise.

51    Thus, possession was found to constitute "use" in *Adair v. Young* (1879), 12 Ch. D. 13 (C.A.), where a ship's master was sued for infringement in relation to the presence of patented pumps on his ship. The ship's owners had fitted the ship with the pumps but were not named in the suit. The master had no power to remove the pumps and had never used them to pump water in British waters. However, the court held that the master intended to use the pumps if the need arose. The court thus granted an injunction against use of the pumps to pump water.

52    Similarly, Fox states, *supra*, that "[m]ere possession of a patented article may amount to

de l'utilité latente qui résulte de la simple possession de l'invention, ou de quelque autre utilisation concrète destinée à procurer un avantage. L'exploitation et donc la contrefaçon sont alors établies.

En général, l'intention du défendeur n'est pas pertinente pour conclure à la contrefaçon; la question est de savoir [TRADUCTION] « ce que le défendeur fait, et non ce qu'il entend faire » : *Stead c. Anderson* (1847), 4 C.B. 806, 136 E.R. 724 (C.P.), p. 736; voir aussi *Hoechst Celanese Corp. c. BP Chemicals Ltd.* (1998), 25 F.S.R. 586 (Pat. Ct.), p. 598; *Illinois Tool Works Inc. c. Cobra Fixations Cie*, [2002] A.C.F. no 1104 (QL), 2002 CFPI 829, par. 14-17; *Computalog Ltd. c. Comtech Logging Ltd.* (1992), 44 C.P.R. (3d) 77 (C.A.F.), p. 88. Il faut donc se demander si, par ses actes, ses activités ou sa conduite, le défendeur s'est effectivement arrogé l'invention brevetée et a ainsi privé l'inventeur, en tout ou en partie, directement ou indirectement, de la pleine jouissance du monopole conféré par le brevet.

L'intention devient toutefois pertinente lorsque la possession sans exploitation est invoquée comme moyen de défense. Si, comme nous l'avons vu, l'exploitation alléguée est l'exploitation de l'utilité « latente » de l'invention, il importe de savoir si le défendeur entendait exploiter l'invention si jamais le besoin se faisait sentir.

Ainsi, dans l'arrêt *Adair c. Young* (1879), 12 Ch. D. 13 (C.A.), la cour a décidé que, dans les circonstances, la possession constituait une « exploitation ». Dans cette affaire, le capitaine d'un navire était poursuivi pour contrefaçon en raison de la présence à son bord de pompes brevetées. Les propriétaires du navire avaient pourvu le bateau des pompes, mais n'étaient pas visés par la poursuite. Le capitaine n'avait pas le pouvoir de retirer les pompes et ne les avait jamais exploitées, dans l'espace maritime britannique, pour pomper de l'eau. La cour a cependant conclu que le capitaine entendait utiliser les pompes si jamais le besoin se faisait sentir. La cour a donc accordé une injonction interdisant l'exploitation des pompes pour pomper de l'eau.

De même, Fox, *op. cit.*, p. 383-384, affirme que [TRADUCTION] « [l]a simple possession d'un objet

infringement where such possession is unlicensed and where there is present the intention of user to the detriment of the patentee, but not if there is no intention to use" (pp. 383-84 (emphasis added; footnotes omitted)).

The onus of proving infringement would become impractical and unduly burdensome in cases of possession were the patent holder required to demonstrate the defendant's intention to infringe. As Professor Vaver explains, "[m]ere possession may not be use, but a business that possesses a patented product for trade may be presumed either to have used it or to intend to use it, unless it shows the contrary" (*supra*, at p. 151 (emphasis added)).

The classic case of *British United Shoe*, *supra*, suggests that mere possession of an object containing a patented ingredient or made by a patented process may not amount to "use" if the defendant can show that the object is held without a view to advancing the patentee's interest. The defendant boot maker owned a machine containing a patented mechanism but was held not to have infringed the patent. The defendants did not use the patented part itself, as it was possible not to bring it into operation unless one wanted to do so. The court noted there was no question of the defendants' honesty (they had returned the patented part willingly when legal action commenced). In the court's view, "[t]he patented part . . . was . . . of no use to the Defendants and was put aside by them, and they never thought of using the patented part, nor was it appropriate to their trade" (p. 571). The court stated that there is a rebuttable presumption or "ordinary inference" that a defendant in possession of an invention had either used it or had it for the future purpose of using it in an infringing manner (p. 571).

Commenting on *British United Shoe* in *Pfizer Corp. v. Ministry of Health*, [1965] A.C. 512 (H.L.),

breveté peut constituer de la contrefaçon lorsqu'une telle possession n'est pas autorisée en vertu d'une licence et lorsqu'il y a intention d'exploiter cet objet au détriment des droits du titulaire du brevet, mais non en l'absence d'une telle intention » (nous soulignons; renvois omis).

53  Le fardeau de prouver la contrefaçon deviendrait irréaliste et trop lourd en matière de possession, si le titulaire du brevet devait démontrer que le défendeur avait l'intention de contrefaire le brevet. Comme l'explique le professeur Vaver, *op. cit.*, p. 151, [TRADUCTION] « [i]l se peut que la simple possession ne constitue pas une exploitation, mais on peut présumer qu'une entreprise qui possède un produit breveté à des fins commerciales a exploité ce produit ou entend le faire, à moins qu'elle ne démontre le contraire » (nous soulignons).

54  Ainsi, l'arrêt classique *British United Shoe*, précité, indique qu'il se peut que la simple possession d'un objet comportant un élément breveté ou fabriqué au moyen d'un procédé breveté ne constitue pas une « exploitation », si le défendeur est en mesure de démontrer qu'il ne détient pas cet objet dans le but de promouvoir ses intérêts. La défenderesse, un fabricant de bottes, était propriétaire d'une machine comportant un mécanisme breveté, mais la cour a jugé qu'elle n'avait pas contrefait le brevet. La défenderesse n'avait pas exploité la pièce brevetée, puisqu'il était possible de ne pas l'actionner si on ne le voulait pas le faire. La cour a souligné que l'honnêteté de la défenderesse n'était pas en cause (elle avait retourné de son plein gré la pièce brevetée dès l'introduction de l'action en justice). Selon la cour, [TRADUCTION] « [l]a pièce brevetée [. . .] n'était pas utile à la défenderesse, qui l'a retirée, et celle-ci n'a jamais songé à exploiter cette pièce, qui n'était d'ailleurs pas adaptée à son commerce » (p. 571). La cour a ajouté qu'il existe une présomption réfutable ou « inférence normale » que le défendeur en possession d'une invention l'a exploitée ou encore l'avait en sa possession dans le but de l'exploiter éventuellement d'une manière contrefaisante (p. 571).

55  Commentant l'affaire *British United Shoe* dans l'arrêt *Pfizer Corp. c. Ministry of Health*, [1965]

Lord Wilberforce observed that "if it can positively be proved that the possession was innocent of any actual use or intention to use, the defendant will not be held to have infringed" (p. 572). Possession requires an "additional ingredient" to make up an infringement (p. 572). In *Pfizer*, according to Lord Wilberforce, use arose from the transportation of patented articles (possession) with a view to trade (the additional ingredient). Where the patent holder shows that the defendant possessed the patented invention, it is up to the defendant to show the absence of the "additional ingredient".

56    Thus, a defendant in possession of a patented invention in commercial circumstances may rebut the presumption of use by bringing credible evidence that the invention was neither used, nor intended to be used, even by exploiting its stand-by utility.

57    The court does not inquire into whether the patented invention in fact assisted the defendant or increased its profits. This is the natural corollary of the finding in *Neilson*, *supra*, that it was not relevant to infringement whether the beer actually was preserved by the invention, and the finding in *Adair*, *supra*, that it was irrelevant whether the ship's master had profited from the presence of the pumps on the ship. The defendant's benefit or profit from the activity may be relevant at the stage of remedy, but not in determining infringement.

58    These propositions may be seen to emerge from the foregoing discussion of "use" under the *Patent Act*:

1.    "Use" or "*exploiter*", in their ordinary dictionary meaning, denote utilization with a view to production or advantage.

2.    The basic principle in determining whether the defendant has "used" a patented invention

A.C. 512 (H.L.), lord Wilberforce a fait observer que, [TRADUCTION] « si on peut prouver de manière irréfutable que la possession n'était pas assortie d'une exploitation véritable ou de l'intention d'exploiter, le défendeur ne sera pas jugé coupable de contrefaçon » (p. 572). La possession doit être assortie d'un « élément additionnel » pour qu'il y ait contrefaçon (p. 572). Dans l'arrêt *Pfizer*, lord Wilberforce a considéré que l'exploitation résultait du transport des articles brevetés (possession) dans le but d'en faire le commerce (l'élément additionnel). Lorsque le titulaire du brevet démontre que le défendeur avait en sa possession l'invention brevetée, il appartient au défendeur de démontrer l'absence d'« élément additionnel ».

Ainsi, le défendeur qui, dans le cadre d'un commerce, a en sa possession une invention brevetée peut réfuter la présomption d'exploitation en présentant une preuve crédible qu'il n'a ni exploité ni eu l'intention d'exploiter cette invention, même par l'exploitation de son utilité latente.

La cour ne se demande pas si l'invention brevetée a, dans les faits, aidé le défendeur ou lui a permis d'augmenter ses profits. Il s'agit là du corollaire naturel de la conclusion tirée dans l'arrêt *Neilson*, précité, selon laquelle, pour déterminer s'il y avait eu contrefaçon, il n'était pas utile de savoir si la bière avait effectivement été protégée par l'invention, et de la conclusion tirée dans l'arrêt *Adair*, précité, selon laquelle il n'était pas utile de savoir si le capitaine du navire avait tiré profit de la présence des pompes à son bord. L'avantage ou le profit que le défendeur a tiré de l'activité peut être pertinent lorsqu'il est question de réparation, mais non lorsqu'il s'agit de déterminer s'il y a eu contrefaçon.

On peut considérer que ces propositions émanent de l'analyse précédente du verbe « exploiter » figurant dans la *Loi sur les brevets* :

1.    Selon leur sens lexicographique ordinaire, les verbes « exploiter » et « *use* » connotent une utilisation en vue d'une production ou dans le but de tirer un avantage.

2.    Le principe fondamental qui s'applique pour déterminer si le défendeur a « exploité » une

is whether the inventor has been deprived, in whole or in part, directly or indirectly, of the full enjoyment of the monopoly conferred by the patent.

3.  If there is a commercial benefit to be derived from the invention, it belongs to the patent holder.

4.  It is no bar to a finding of infringement that the patented object or process is a part of or composes a broader unpatented structure or process, provided the patented invention is significant or important to the defendant's activities that involve the unpatented structure.

5.  Possession of a patented object or an object incorporating a patented feature may constitute "use" of the object's stand-by or insurance utility and thus constitute infringement.

6.  Possession, at least in commercial circumstances, raises a rebuttable presumption of "use".

7.  While intention is generally irrelevant to determining whether there has been "use" and hence infringement, the absence of intention to employ or gain any advantage from the invention may be relevant to rebutting the presumption of use raised by possession.

### (2) Application of the Law

The trial judge's findings of fact are based, essentially, on the following uncontested history.

Mr. Schmeiser is a conventional, non-organic farmer. For years, he had a practice of saving and developing his own seed. The seed which is the subject of Monsanto's complaint can be traced to a 370-acre field, called field number 1, on which Mr. Schmeiser grew canola in 1996. In 1996 five other canola growers in Mr. Schmeiser's area planted Roundup Ready Canola.

invention brevetée consiste à se demander si l'inventeur a été privé, en tout ou en partie, directement ou indirectement, de la pleine jouissance du monopole conféré par le brevet.

3.  Tout avantage commercial qui peut découler de l'invention appartient au titulaire du brevet.

4.  Il est possible de conclure à l'existence de contrefaçon même si l'objet ou le procédé breveté fait partie ou est une composante d'une structure ou d'un procédé non brevetés plus vastes, pourvu que l'invention brevetée soit importante pour les activités du défendeur qui mettent en cause la structure non brevetée.

5.  La possession d'un objet breveté ou d'un objet ayant une particularité brevetée peut constituer une « exploitation » de l'utilité latente de cet objet et ainsi constituer de la contrefaçon.

6.  La possession, du moins dans le cadre d'un commerce, donne naissance à une présomption d'« exploitation » réfutable.

7.  Bien qu'en général l'intention ne soit pas pertinente pour déterminer s'il y a eu « exploitation » et donc contrefaçon, l'absence d'intention d'utiliser l'invention ou d'en tirer un avantage peut être pertinente pour réfuter la présomption d'exploitation découlant de la possession.

### (2) Application du droit

Les conclusions de fait du juge de première instance reposent essentiellement sur l'historique non contesté suivant.

59

Monsieur Schmeiser pratique l'agriculture traditionnelle non biologique. Pendant de nombreuses années, il a pris l'habitude de conserver et de cultiver ses propres semences. On peut constater la présence des semences visées par la plainte de Monsanto dans un champ de 370 acres, appelé le champ nº 1, où M. Schmeiser a cultivé du canola en 1996. En 1996, cinq autres producteurs de canola de la même région que M. Schmeiser ont planté du canola Roundup Ready.

60

61    In the spring of 1997, Mr. Schmeiser planted the seeds saved on field number 1. The crop grew. He sprayed a three-acre patch near the road with Roundup and found that approximately 60 percent of the plants survived. This indicates that the plants contained Monsanto's patented gene and cell.

62    In the fall of 1997, Mr. Schmeiser harvested the Roundup Ready Canola from the three-acre patch he had sprayed with Roundup. He did not sell it. He instead kept it separate, and stored it over the winter in the back of a pick-up truck covered with a tarp.

63    A Monsanto investigator took samples of canola from the public road allowances bordering on two of Mr. Schmeiser's fields in 1997, all of which were confirmed to contain Roundup Ready Canola. In March 1998, Monsanto visited Mr. Schmeiser and put him on notice of its belief that he had grown Roundup Ready Canola without a licence. Mr. Schmeiser nevertheless took the harvest he had saved in the pick-up truck to a seed treatment plant and had it treated for use as seed. Once treated, it could be put to no other use. Mr. Schmeiser planted the treated seed in nine fields, covering approximately 1,000 acres in all.

64    Numerous samples were taken, some under court order and some not, from the canola plants grown from this seed. Moreover, the seed treatment plant, unbeknownst to Mr. Schmeiser, kept some of the seed he had brought there for treatment in the spring of 1998, and turned it over to Monsanto. A series of independent tests by different experts confirmed that the canola Mr. Schmeiser planted and grew in 1998 was 95 to 98 percent Roundup resistant. Only a grow-out test by Mr. Schmeiser in his yard in 1999 and by Mr. Freisen on samples supplied by Mr. Schmeiser did not support this result.

Au printemps 1997, M. Schmeiser a semé les graines du champ n⁰ 1, qu'il avait conservées. Des plantes ont poussé. Il a pulvérisé du Roundup sur une parcelle de trois acres située en bordure de la route et a constaté qu'environ 60 pour 100 des plantes avaient survécu, ce qui indique que ces plantes contenaient le gène et la cellule brevetés de Monsanto.

À l'automne 1997, M. Schmeiser a récolté le canola Roundup Ready se trouvant sur la parcelle de trois acres qu'il avait pulvérisée de Roundup. Il ne l'a pas vendu. Il a préféré le conserver séparément et l'a entreposé pour l'hiver à l'arrière d'une camionnette recouverte d'une bâche.

En 1997, un enquêteur de Monsanto a prélevé des échantillons de canola dans les réserves routières contiguës à deux champs de M. Schmeiser. Des tests ont révélé qu'ils contenaient tous du canola Roundup Ready. En mars 1998, Monsanto a rendu visite à M. Schmeiser et l'a avisé qu'elle croyait qu'il avait cultivé sans licence du canola Roundup Ready. Monsieur Schmeiser a néanmoins apporté les graines entreposées dans sa camionnette à une usine de traitement des semences, où elles ont été traitées afin de servir à l'ensemencement, ce qui les rendait inaptes à tout autre usage. Monsieur Schmeiser a ensuite semé les graines traitées dans neuf champs d'une superficie totale d'environ 1 000 acres.

De nombreux échantillons ont été prélevés, dont certains en vertu d'une ordonnance judiciaire, sur les plantes de canola provenant de ces graines de semence. De plus, l'usine de traitement des semences a, à l'insu de M. Schmeiser, conservé des échantillons des graines qu'il y avait apportées aux fins de traitement au printemps 1998, et les a remises à Monsanto. Une série de tests indépendants effectués par divers experts a démontré que 95 à 98 pour 100 du canola planté et cultivé par M. Schmeiser en 1998 était résistant au Roundup. Seuls les tests de croissance que M. Schmeiser a effectués dans son champ en 1999 et les tests de croissance effectués sur les échantillons que M. Schmeiser a fournis à M. Freisen n'étayaient pas ce résultat.

Dr. Downey testified that the high rate of post-Roundup spraying survival in the 1997 samples was "consistent only with the presence in field number 2 of canola grown from commercial Roundup tolerant seed" (trial judgment, at para. 112). According to Dr. Dixon, responsible for the testing by Monsanto US at St. Louis, the "defendants' samples contain[ed] the DNA sequences claimed in claims 1, 2, 5, and 6 of the patent and the plant cell claimed in claims 22, 23, 27, 28 and 45 of the patent" (trial judgment, at para. 113). As the trial judge noted, this opinion was uncontested.

The remaining question was how such a pure concentration of Roundup Ready Canola came to grow on the appellants' land in 1998. The trial judge rejected the suggestion that it was the product of seed blown or inadvertently carried onto the appellants' land (at para. 118):

> It may be that some Roundup Ready seed was carried to Mr. Schmeiser's field without his knowledge. Some such seed might have survived the winter to germinate in the spring of 1998. However, I am persuaded by evidence of Dr. Keith Downey . . . that none of the suggested sources could reasonably explain the concentration or extent of Roundup Ready canola of a commercial quality evident from the results of tests on Schmeiser's crop.

He concluded, at para. 120:

> I find that in 1998 Mr. Schmeiser planted canola seed saved from his 1997 crop in his field number 2 which he knew or ought to have known was Roundup tolerant, and that seed was the primary source for seeding and for the defendants' crops in all nine fields of canola in 1998.

In summary, it is clear on the findings of the trial judge that the appellants saved, planted, harvested and sold the crop from plants containing the gene and plant cell patented by Monsanto. The

65   Monsieur Downey a témoigné que le taux de survie élevé des plantes ayant germé après avoir été traitées au Roundup, qui avait été constaté lors des tests effectués sur les échantillons de 1997, « ne s'expliquait que par la présence, dans le champ nº 2, de canola cultivé à partir de semences commerciales résistantes au Roundup » (jugement de première instance, par. 112). Madame Dixon, responsable des tests effectués à St. Louis par Monsanto US, s'est dite d'avis que « les échantillons des défendeurs contenaient les séquences d'ADN revendiquées dans les revendications 1, 2, 5 et 6 du brevet, ainsi que la cellule végétale visée par les revendications 22, 23, 27, 28 et 45 du brevet » (jugement de première instance, par. 113). Comme l'a fait remarquer le juge de première instance, cet avis n'était pas contesté.

66   Restait à savoir ce qui expliquait la présence d'une concentration aussi élevée de canola Roundup Ready sur les terres des appelants en 1998. Le juge de première instance a écarté l'idée que cette concentration résultait de la dissémination, soit par le vent soit par inadvertance, de graines sur les terres en question (par. 118) :

> Il est possible que des graines Roundup Ready se soient retrouvées dans le champ de M. Schmeiser à son insu. Il est également possible qu'une partie de ces graines aient survécu à l'hiver et aient germé au printemps 1998. Le témoignage de M. Keith Downey [. . .] m'a toutefois persuadé qu'aucune des sources évoquées ne pouvait logiquement expliquer la concentration ou l'ampleur de canola Roundup Ready de qualité commerciale qui a été constatée à la suite des tests réalisés sur les récoltes de M. Schmeiser.

67   Il a tiré la conclusion suivante (par. 120) :

> Je conclus que, en 1998, M. Schmeiser a planté des graines de canola qu'il avait gardées de sa récolte de 1997 dans son champ nº 2 alors qu'il savait ou aurait dû savoir que ces graines étaient résistantes au Roundup. Je conclus également qu'il s'est principalement servi de ces graines pour ensemencer la totalité de ses neuf champs de canola en 1998.

68   En résumé, il ressort des conclusions du juge de première instance que les appelants ont conservé, semé, récolté et vendu des graines provenant de plantes contenant le gène et la cellule brevetés de

issue is whether this conduct amounted to "use" of Monsanto's invention — the glyphosate-resistant gene and cell.

69    The preliminary question is whether this conduct falls within the meaning of "use" or "*exploiter*". We earlier concluded that these words, taken together, connote utilization with a view to production or advantage. Saving and planting seed, then harvesting and selling the resultant plants containing the patented cells and genes appears, on a common sense view, to constitute "utilization" of the patented material for production and advantage, within the meaning of s. 42.

70    We turn next to whether the other considerations relevant to "use" support this preliminary conclusion.

71    In this regard, the first and fundamental question is whether Monsanto was deprived in whole or in part, directly or indirectly, of the full enjoyment of the monopoly that the patent confers. And the answer is "yes".

72    Monsanto's patent gives it a monopoly over the patented gene and cell. The patent's object is production of a plant which is resistant to Roundup herbicide. Monsanto's monopoly enabled it to charge a licensing fee of $15 per acre to farmers wishing to grow canola plants with the patented genes and cells. The appellants cultivated 1030 acres of plants with these patented properties without paying Monsanto for the right to do so. By cultivating a plant containing the patented gene and composed of the patented cells without licence, the appellants thus deprived Monsanto of the full enjoyment of its monopoly.

73    The complementary question is whether the appellants employed or possessed the patented invention in the context of their commercial or business interests. The initial answer must again be "yes".

Monsanto. La question est de savoir si, en agissant ainsi, ils ont « exploité » l'invention de Monsanto, c'est-à-dire le gène et la cellule résistant au glyphosate.

La question préliminaire est de savoir si cette conduite correspond à la définition du verbe « exploiter » ou « *use* ». Nous avons déjà conclu que ces verbes, pris ensemble, connotent une utilisation en vue d'une production ou dans le but de tirer un avantage. Le fait de conserver et de mettre en terre des semences contenant les cellules et gènes brevetés et de récolter et de vendre les plantes résultantes paraît logiquement constituer une « utilisation » de la matière brevetée en vue d'une production ou dans le but de tirer un avantage, au sens de l'art. 42.

Voyons maintenant si les autres considérations pertinentes pour déterminer s'il y a eu « exploitation » étayent cette conclusion préliminaire.

À cet égard, la première question fondamentale est de savoir si Monsanto a été privée, en tout ou en partie, directement ou indirectement, de la pleine jouissance du monopole conféré par le brevet. La réponse est oui.

Le brevet confère à Monsanto le monopole du gène et de la cellule brevetés. L'objet du brevet est la production d'une plante résistant à l'herbicide Roundup. Le monopole de Monsanto lui permettait d'exiger le paiement de droits de licence de 15 $ l'acre par les agriculteurs qui souhaitaient cultiver des plantes de canola contenant les gènes et cellules brevetés. Les appelants ont cultivé 1 030 acres de plantes ayant ces propriétés brevetées, sans avoir payé à Monsanto des droits les autorisant à le faire. En cultivant sans licence une plante contenant le gène breveté et formée des cellules brevetées, les appelants ont privé Monsanto de la pleine jouissance de son monopole.

La question complémentaire est de savoir si les appelants ont utilisé ou eu en leur possession l'invention brevetée dans le cadre de leur entreprise ou commerce. Là encore, la réponse initiale doit être oui.

One of the appellants' businesses was growing canola. It used seeds containing the patented qualities in that business. Subject to the appellants' argument discussed below that they did not use the patented invention itself (whether because they used only the plant or because they did not spray with Roundup), the appellants' involvement with the disputed canola is clearly commercial in nature.

The answers to the two questions of principle that lie at the heart of "use" under the *Patent Act* both thus suggest that the trial judge and the Court of Appeal were correct in finding that the appellants "used" the protected invention and hence infringed Monsanto's patent. It is helpful as well, however, to consider the insights gained from the case law discussed above and their impact on arguments raised against this conclusion.

First, it is suggested that because Monsanto's claims are for genes and cells rather than for plants, it follows that infringement by use will only occur where a defendant uses the genes or cells in their isolated, laboratory form. This argument appears not to have been advanced in any detail at trial or on appeal, but is the position taken by our colleague, Arbour J.

It is uncontested that Monsanto's patented claim is only for the gene and cell that it developed. This, however, is the beginning and not the end of the inquiry. The more difficult question — and the nub of this case — is whether, by cultivating plants containing the cell and gene, the appellants used the patented components of those plants. The position taken by Arbour J. assumes that this inquiry is redundant and that the only way a patent may be infringed is to use the patented invention in isolation.

This position flies in the face of century-old patent law, which holds that where a defendant's commercial or business activity involves a thing

L'une des activités des appelants était la culture de canola. Dans le cadre de cette activité, ils ont utilisé des semences possédant les caractéristiques brevetées. Sous réserve de leur argument — que nous analyserons plus loin — selon lequel ils n'ont pas exploité l'invention brevetée (que ce soit parce qu'ils ont exploité seulement la plante ou parce qu'ils n'ont pas pulvérisé du Roundup), il est clair que l'utilisation, par les appelants, du canola dont il est question en l'espèce est de nature commerciale.

Les réponses aux deux questions de principe qui sont au cœur de l'« exploitation » au sens de la *Loi sur les brevets* indiquent donc, dans les deux cas, que le juge de première instance et la Cour d'appel ont eu raison de conclure que les appelants ont « exploité » l'invention protégée et, partant, contrefait le brevet de Monsanto. Cependant, il est également utile de tenir compte des indications fournies par la jurisprudence analysée plus tôt, et de leur incidence sur les arguments avancés à l'encontre de cette conclusion.

Premièrement, on laisse entendre qu'étant donné que les revendications de Monsanto visent des gènes et des cellules et non pas des plantes, seul le défendeur qui exploite les gènes et les cellules isolés en laboratoire se rendra coupable de contrefaçon par exploitation. Cet argument ne paraît avoir été avancé en détail ni en première instance ni en appel, mais il représente le point de vue adopté par notre collègue la juge Arbour.

Personne ne conteste que la revendication brevetée de Monsanto ne vise que le gène et la cellule que celle-ci a mis au point. Cela représente, toutefois, le début et non la fin de l'examen. La question plus difficile, qui est au cœur de la présente affaire, est de savoir si, en cultivant des plantes contenant la cellule et le gène en question, les appelants ont exploité les composantes brevetées de ces plantes. Dans le point de vue qu'elle adopte, la juge Arbour tient pour acquis que cet examen est redondant et que la seule façon de contrefaire un brevet est d'exploiter isolément l'invention brevetée.

Ce point de vue va à l'encontre d'un droit des brevets séculaire, selon lequel il y contrefaçon lorsque les activités commerciales d'un défendeur mettent

74

75

76

77

78

of which a patented part is a significant or important component, infringement is established. It is no defence to say that the thing actually used was not patented, but only one of its components.

79    Professor Vaver, *supra*, observes that this is an "expansive doctrine". This is so because otherwise the inventor would be deprived of the full enjoyment of the monopoly that the law of patent confers on him or her. It is rare that patented components or processes are used in isolation; without this principle, an infringer could use the invention to his advantage, and take shelter in the excuse that he or she was not using the invention in isolation.

80    Provided the patented invention is a significant aspect of the defendant's activity, the defendant will be held to have "used" the invention and violated the patent. If Mr. Schmeiser's activities with Roundup Ready Canola plants amounted to use interfering with Monsanto's full enjoyment of their monopoly on the gene and cell, those activities infringed the patent. Infringement does not require use of the gene or cell in isolation.

81    Second, Mr. Schmeiser argued at trial that he should not be held to have "used" Monsanto's invention because he never took commercial advantage of the special utility that invention offered — resistance to Roundup herbicide. He testified that he never used Roundup herbicide as an aid to cultivation. (That he used it in 1996 in his initial gathering of the Roundup Ready seed is clear.)

82    The trial judge dismissed this argument. He pointed out, at para. 122, that it "is the taking of the essence of the invention . . . that constitutes infringement", and that by growing and selling the Roundup Ready crop Mr. Schmeiser took that invention. Consequently, in the judge's view, "whether or not that crop was sprayed with Roundup . . . [was] not important" (para. 123).

en cause une chose dont une composante importante est un élément breveté. On ne saurait faire valoir, comme moyen de défense, que seule une composante de la chose que l'on a exploitée était brevetée, et non la chose au complet.

Le professeur Vaver, *op. cit.*, fait remarquer qu'il s'agit d'une [TRADUCTION] « règle ayant une portée large ». S'il en était autrement, l'inventeur serait privé de la pleine jouissance du monopole que le droit des brevets lui confère. Il arrive rarement que des composantes ou procédés brevetés soient exploités isolément; en l'absence de cette règle, un contrefacteur pourrait tirer avantage de l'invention et se protéger en prétextant qu'il ne l'exploitait pas isolément.

Si l'invention brevetée est un aspect important des activités du défendeur, on considérera alors qu'il a « exploité » l'invention et contrefait le brevet. Si ses activités relatives aux plantes de canola Roundup Ready constituent une exploitation ayant privé Monsanto de la pleine jouissance de son monopole du gène et de la cellule, M. Schmeiser a alors contrefait le brevet. Il n'est pas nécessaire d'exploiter isolément le gène et la cellule pour qu'il y ait contrefaçon.

Deuxièmement, M. Schmeiser a soutenu au procès qu'il n'y avait pas lieu de conclure qu'il avait « exploité » l'invention de Monsanto parce qu'il n'a jamais tiré un avantage commercial de son utilité particulière — la résistance à l'herbicide Roundup. Il a témoigné qu'il n'avait jamais pulvérisé de l'herbicide Roundup sur ses cultures. (Il est clair qu'il s'est servi de cet herbicide, en 1996, lors de sa première récolte de semences Roundup Ready.)

Le juge de première instance a rejeté cet argument. Il a souligné, au par. 122, que «[c']est le fait de s'arroger l'essence même d'une invention [. . .] qui constitue une contrefaçon » et qu'en cultivant, en récoltant et en vendant le canola Roundup Ready en question, M. Schmeiser s'était arrogé cette invention. En conséquence, selon le juge, « le fait que cette récolte ait ou non été traitée au Roundup [. . .] [était] sans importance » (par. 123).

Perhaps the appellants' failure to spray with Roundup herbicide is a way of attempting to rebut the presumption of use that flows from possession. However, the appellants have failed to rebut the presumption.

Their argument fails to account for the stand-by or insurance utility of the properties of the patented genes and cells. Whether or not a farmer sprays with Roundup herbicide, cultivating canola containing the patented genes and cells provides stand-by utility. The farmer benefits from that advantage from the outset: if there is reason to spray in the future, the farmer may proceed to do so.

Although not directly at issue in this case, cultivating Roundup Ready Canola also presents future revenue opportunities to "brown-bag" the product to other farmers unwilling to pay the licence fee, thus depriving Monsanto of the full enjoyment of their monopoly.

Further, the appellants did not provide sufficient evidence to rebut the presumption of use. It may well be that defendant farmers could rebut the presumption by showing that they never intended to cultivate plants containing the patented genes and cells. They might perhaps prove that the continued presence of the patented gene on their land was accidental and unwelcome, for example, by showing that they acted quickly to arrange for its removal, and that its concentration was consistent with that to be expected from unsolicited "blow-by" canola. Knowledge of infringement is never a necessary component of infringement. However, a defendant's conduct on becoming aware of the presence of the patented invention may assist in rebutting the presumption of use arising from possession.

However, the appellants in this case actively cultivated canola containing the patented invention as part of their business operations. Mr. Schmeiser

Il se peut que l'allégation des appelants selon laquelle ils n'ont pas pulvérisé de l'herbicide Roundup représente une tentative de réfuter la présomption d'exploitation découlant de la possession. Ils n'ont cependant pas réussi à réfuter cette présomption. 83

Leur argument ne tient pas compte de l'utilité latente des propriétés des gènes et cellules brevetés. Qu'un agriculteur pulvérise ou non de l'herbicide Roundup, la culture de canola possédant les gènes et cellules brevetés engendre une utilité latente. L'agriculteur profite de cet avantage dès le départ : il lui sera possible de recourir à la pulvérisation si jamais elle se révèle nécessaire. 84

Bien qu'elle ne soit pas directement en cause dans la présente affaire, la culture du canola Roundup Ready offre également à l'agriculteur la possibilité de toucher, à l'avenir, des revenus en fournissant subrepticement le produit à d'autres agriculteurs non disposés à payer les droits de licence, privant ainsi Monsanto de la pleine jouissance de son monopole. 85

En outre, la preuve produite par les appelants n'est pas suffisante pour réfuter la présomption d'exploitation. Il se pourrait qu'en qualité de défendeurs des agriculteurs puissent réfuter cette présomption en démontrant qu'ils n'ont jamais eu l'intention de cultiver des plantes contenant les gènes et cellules brevetés. Ils pourraient prouver que la présence continue du gène breveté sur leur terre était accidentelle et non souhaitée, en démontrant, par exemple, qu'ils ont pris rapidement des mesures pour l'enlever, et que la concentration de ce gène correspondait ainsi à ce qu'on peut s'attendre dans le cas où du canola non sollicité a été transporté par le vent. Pour contrefaire, il n'est pas nécessaire de savoir qu'on contrefait. Cependant, la conduite qu'un défendeur a adoptée après avoir pris connaissance de la présence de l'invention brevetée peut aider à réfuter la présomption d'exploitation découlant de la possession. 86

En l'espèce, les appelants ont toutefois, dans le cadre de leurs activités commerciales, réellement cultivé du canola contenant l'invention. 87

complained that the original plants came onto his land without his intervention. However, he did not at all explain why he sprayed Roundup to isolate the Roundup Ready plants he found on his land; why he then harvested the plants and segregated the seeds, saved them, and kept them for seed; why he next planted them; and why, through this husbandry, he ended up with 1030 acres of Roundup Ready Canola which would otherwise have cost him $15,000. In these circumstances, the presumption of use flowing from possession stands unrebutted.

88    Third, as in their submissions on validity, the appellants seek to rely on the decision of the majority of this Court in *Harvard Mouse*. They contend that the patent should be given a narrow scope for infringement purposes, since the plants reproduce through the laws of nature rather than through human intervention. Thus, they argue, propagation of Roundup Ready Canola without a licence cannot be a "use" by them because plants are living things that grow by themselves.

89    This is also the perspective adopted by Arbour J. In support of the proposition that infringement of gene claims occurs only in a laboratory setting, she cites *Kirin Amgen Inc. v. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096 (C.A.). That case dealt with a protein useful in the diagnosis and treatment of blood disorders. The English court construed the claims to exclude the naturally occurring form of the DNA sequence in a human cell. However, this was done to accord with the provisions of a regulatory scheme that has no parallel in Canada: Article 5 of the European Parliament's Directive 98/44/EC, which regulates patentability of biotechnological inventions. It states that the discovery of elements of the human body, including genes, is not patentable, although such elements are patentable when isolated or otherwise produced through technical means. The legislature has not enacted a comparable statutory scheme in Canada to narrow the

Monsieur Schmeiser s'est plaint que les premières plantes s'étaient retrouvées sur ses terres sans aucune intervention de sa part. Cependant, il n'a absolument pas expliqué pourquoi il avait pulvérisé du Roundup pour isoler les plantes Roundup Ready trouvées sur sa terre, pourquoi il avait alors récolté ces plantes et en avait sélectionné les graines pour les conserver et les convertir en semences, pourquoi il les avait ensuite semées et pourquoi il a ainsi fini par cultiver 1 030 acres de canola Roundup Ready qui lui auraient par ailleurs coûté 15 000 $. Dans ces circonstances, la présomption d'exploitation découlant de la possession subsiste.

Troisièmement, les appelants tentent — comme ils le font dans leur argumentation relative à la validité — de s'appuyer sur l'arrêt majoritaire de notre Cour dans l'affaire de la *souris de Harvard*. Ils soutiennent que le brevet doit recevoir une interprétation restrictive lorsqu'il s'agit de déterminer s'il y a eu contrefaçon, étant donné que les plantes se reproduisent naturellement, sans intervention humaine. Ainsi, font-ils valoir, ils ne se sont pas livrés à une « exploitation » en reproduisant sans licence le canola Roundup Ready, étant donné que les plantes sont des êtres vivants qui croissent spontanément.

C'est également le point de vue qu'adopte la juge Arbour. À l'appui de la proposition que la contrefaçon de revendications relatives à des gènes ne peut avoir lieu qu'en laboratoire, elle cite l'arrêt *Kirin Amgen Inc. c. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096 (C.A.). Dans cette affaire, il était question d'une protéine utile pour diagnostiquer et traiter des affections sanguines. La Cour d'appel d'Angleterre a considéré que les revendications excluaient la séquence d'ADN naturelle contenue dans une cellule humaine. Cependant, elle l'a fait dans le but de se conformer aux dispositions d'un régime de réglementation qui n'a aucun équivalent au Canada : l'art. 5 de la Directive 98/44/CE du Parlement européen, qui régit la brevetabilité des inventions biotechnologiques. Cet article prévoit que la découverte d'un élément du corps humain, y compris un gène, n'est pas brevetable, même si cet élément est brevetable lorsqu'il est isolé ou autrement produit par

scope of patent construction. Thus, *Kirin Amgen* is not applicable to the case before this Court.

The appellants' argument also ignores the role human beings play in agricultural propagation. Farming is a commercial enterprise in which farmers sow and cultivate the plants which prove most efficient and profitable. Plant science has been with us since long before Mendel. Human beings since time immemorial have striven to produce more efficient plants. Huge investments of energy and money have been poured into the quest for better seeds and better plants. One way in which that investment is protected is through the *Patent Act* giving investors a monopoly when they create a novel and useful invention in the realm of plant science, such as genetically modified genes and cells.

Finally, many inventions make use of natural processes in order to work. For example, many valid patents have referred to various yeasts, which would have no practical utility at all without "natural forces". See *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81 (Pat. App. Bd.), in which the inventive step consisted of acclimatizing a known species of yeast from domestic sewage to a new environment, where it would then through its natural operation act to purify waste from pulp plants.

The issue is not the perhaps adventitious arrival of Roundup Ready on Mr. Schmeiser's land in 1998. What is at stake in this case is <u>sowing</u> and <u>cultivation</u>, which necessarily involves deliberate and careful activity on the part of the farmer. The appellants suggest that when a farmer such as Mr. Schmeiser actively cultivates a crop with particular properties through activities such as testing, isolating, treating, and planting the desired seed and tending the crops until harvest, the result is a crop which has merely "grown itself". Such a suggestion denies the realities of modern agriculture.

un procédé technique. Au Canada, le législateur n'a adopté aucun régime de réglementation comparable qui commande une interprétation restrictive des brevets. Par conséquent, l'arrêt *Kirin Amgen* est inapplicable en l'espèce.

90

L'argument des appelants ne tient pas compte non plus du rôle que l'être humain joue en matière de multiplication agricole. L'agriculture est une activité commerciale où les agriculteurs sèment et cultivent les plantes qui s'avèrent les plus rentables et lucratives. La phytologie existait bien avant Mendel. Depuis des temps immémoriaux, l'être humain cherche à améliorer le rendement des plantes. Beaucoup d'énergie et d'argent ont été consacrés à la recherche de meilleures semences et de meilleures plantes. La *Loi sur les brevets* compense cette énergie et cet argent en conférant un monopole à ceux et celles qui les consacrent, lorsqu'il en résulte une invention nouvelle et utile en phytologie, tels les gènes et cellules génétiquement modifiés.

91

Enfin, de nombreuses inventions font appel à des procédés naturels pour fonctionner. Par exemple, diverses levures sont mentionnées dans maints brevets valides qui n'auraient aucune utilité concrète sans les [TRADUCTION] « forces naturelles ». Voir la décision *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81 (C.A.B.), où l'étape inventive consistait à acclimater à un nouvel environnement, où elle contribuerait naturellement à purifier des résidus d'usine de pâte à papier, une espèce de levure connue extraite des eaux usées.

92

La question litigieuse n'est peut-être pas l'arrivée fortuite, en 1998, du Roundup Ready sur les terres de M. Schmeiser. Ce qui est en jeu en l'espèce est l'<u>ensemencement</u> et la <u>culture</u>, qui impliquent nécessairement des actes délibérés et réfléchis de la part de l'agriculteur. Les appelants prétendent qu'un agriculteur comme M. Schmeiser, qui cultive des plantes ayant des propriétés particulières en testant, en isolant, traitant et semant les graines souhaitées, et en s'occupant de ces plantes jusqu'à leur récolte, obtient une récolte qui a simplement « poussé spontanément ». Une telle prétention ne reflète pas la réalité de l'agriculture moderne.

93    Inventions in the field of agriculture may give rise to concerns not raised in other fields — moral concerns about whether it is right to manipulate genes in order to obtain better weed control or higher yields. It is open to Parliament to consider these concerns and amend the *Patent Act* should it find them persuasive.

94    Our task, however, is to interpret and apply the *Patent Act* as it stands, in accordance with settled principles. Under the present Act, an invention in the domain of agriculture is as deserving of protection as an invention in the domain of mechanical science. Where Parliament has not seen fit to distinguish between inventions concerning plants and other inventions, neither should the courts.

95    Invoking the concepts of implied licence and waiver, the appellants argue that this Court should grant an exemption from infringement to "innocent bystanders". The simple answer to this contention is that on the facts found by the trial judge, Mr. Schmeiser was not an innocent bystander; rather, he actively cultivated Roundup Ready Canola. Had he been a mere "innocent bystander", he could have refuted the presumption of use arising from his possession of the patented gene and cell. More broadly, to the extent this submission rests on policy arguments about the particular dangers of biotechnology inventions, these, as discussed, find no support in the *Patent Act* as it stands today. Again, if Parliament wishes to respond legislatively to biotechnology inventions concerning plants, it is free to do so. Thus far it has not chosen to do so.

96    The appellants argue, finally, that Monsanto's activities tread on the ancient common law property rights of farmers to keep that which comes onto their land. Just as a farmer owns the progeny

Dans le domaine de l'agriculture, les inventions peuvent susciter des préoccupations inconnues dans d'autres domaines — des préoccupations d'ordre moral quant à savoir s'il est bon de manipuler des gènes pour lutter plus efficacement contre les mauvaises herbes ou pour améliorer les rendements. Il est loisible au législateur d'examiner ces préoccupations et de modifier la *Loi sur les brevets* s'il les juge incontournables.

Cependant, notre rôle se limite à interpréter et à appliquer, conformément aux principes établis, le libellé actuel de la *Loi sur les brevets*. Aux termes de la loi actuelle, une invention dans le domaine de l'agriculture a droit à la même protection qu'une invention dans le domaine de la mécanique. Si le législateur n'a pas jugé bon d'établir une distinction entre les inventions relatives aux plantes et les autres types d'invention, les tribunaux ne doivent pas le faire non plus.

Invoquant les concepts d'autorisation et de renonciation tacites, les appelants soutiennent que notre Cour devrait établir une exception prévoyant que les « contrefacteurs innocents » ne peuvent pas être accusés de contrefaçon. À cette prétention, nous répondons simplement que, d'après les faits constatés par le juge de première instance, M. Schmeiser n'était pas un contrefacteur innocent; au contraire, il a cultivé du canola Roundup Ready. S'il avait simplement été un « contrefacteur innocent », il aurait pu réfuter la présomption d'exploitation découlant de sa possession du gène et de la cellule brevetés. De manière plus générale, dans la mesure où cette prétention repose sur des arguments de politique générale concernant les dangers particuliers que comportent les inventions biotechnologiques, ces arguments, comme nous l'avons vu, ne sont aucunement étayées par le libellé actuel de la *Loi sur les brevets*. Là encore, le législateur peut, s'il le souhaite, légiférer pour réagir aux inventions biotechnologiques relatives aux plantes. Il ne l'a pas fait jusqu'à maintenant.

Les appelants soutiennent enfin que les activités de Monsanto portent atteinte au droit de propriété que la common law reconnaît depuis très longtemps aux agriculteurs, soit le droit de conserver ce qui

of a "stray bull" which wanders onto his land, so Mr. Schmeiser argues he owns the progeny of the Roundup Ready Canola that came onto his field. However, the issue is not property rights, but patent protection. Ownership is no defence to a breach of the *Patent Act*.

We conclude that the trial judge and Court of Appeal were correct in concluding that the appellants "used" Monsanto's patented gene and cell and hence infringed the *Patent Act*.

### D. *Remedy*

The trial judge granted injunctive relief and awarded Monsanto an accounting of the profits made by the respondents through growing Roundup Ready Canola, which he ultimately quantified at $19,832. The record is not clear on precisely how this sum was arrived at; that it was awarded by the trial judge on account of profits is, however, undisputed.

The Court of Appeal upheld that order on the same basis and the issue is whether it erred in this regard.

The *Patent Act* permits two alternative types of remedy: damages and an accounting of profits. Damages represent the inventor's loss, which may include the patent holder's lost profits from sales or lost royalty payments. An accounting of profits, by contrast, is measured by the profits made by the infringer, rather than the amount lost by the inventor. Here, damages are not available, in view of Monsanto's election to seek an accounting of profits.

parvient sur leurs terres. Monsieur Schmeiser prétend qu'il est propriétaire de la descendance du canola Roundup Ready qui s'est retrouvé dans son champ, de la même façon qu'un agriculteur devient propriétaire de la progéniture du « taureau égaré » qui erre sur ses terres. Toutefois, ce qui est en cause en l'espèce est non pas un droit de propriété, mais plutôt la protection conférée par brevet. La propriété ne peut pas être invoquée comme moyen de défense dans le cas d'une contravention à la *Loi sur les brevets*.

97    Nous concluons que le juge de première instance et la Cour d'appel ont eu raison de conclure que les appelants ont « exploité » le gène et la cellule brevetés de Monsanto et, partant, contrevenu à la *Loi sur les brevets*.

### D. *Réparation*

98    Le juge de première instance a accordé une injonction et ordonné aux appelants de remettre à Monsanto les profits que la culture de canola Roundup Ready leur a permis de réaliser et qu'il a, en fin de compte, chiffrés à 19 832 $. Le dossier n'indique pas clairement comment il est parvenu à ce montant. Cependant, personne ne conteste qu'il s'agit là du montant des profits dont le juge de première instance a ordonné la remise.

99    La Cour d'appel a, pour la même raison, confirmé la validité de cette ordonnance, et il s'agit maintenant de savoir si elle a commis une erreur à cet égard.

100    La *Loi sur les brevets* prévoit deux différents types de réparation : les dommages-intérêts et la remise des profits. Les dommages-intérêts représentent la perte de l'inventeur, qui peut comprendre soit la perte de profits que le titulaire du brevet a subie au chapitre des ventes, soit la perte de redevances. Par contre, la remise des profits est calculée en fonction des profits réalisés par le contrefacteur plutôt qu'en fonction du montant perdu par l'inventeur. En l'espèce, il n'y a pas lieu d'accorder des dommages-intérêts, étant donné que Monsanto a choisi de demander la remise des profits.

101    It is settled law that the inventor is only entitled to that portion of the infringer's profit which is causally attributable to the invention: *Lubrizol Corp. v. Imperial Oil Ltd.*, [1997] 2 F.C. 3 (C.A.); *Celanese International Corp. v. BP Chemicals Ltd.*, [1999] R.P.C. 203 (Pat. Ct.), at para. 37. This is consistent with the general law on awarding non-punitive remedies: "[I]t is essential that the losses made good are only those which, on a common sense view of causation, were caused by the breach" (*Canson Enterprises Ltd. v. Boughton & Co.*, [1991] 3 S.C.R. 534, at p. 556, *per* McLachlin J. (as she then was), quoted with approval by Binnie J. for the Court in *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142, at para. 93).

102    The preferred means of calculating an accounting of profits is what has been termed the value-based or "differential profit" approach, where profits are allocated according to the value contributed to the defendant's wares by the patent: N. Siebrasse, "A Remedial Benefit-Based Approach to the Innocent-User Problem in the Patenting of Higher Life Forms" (2004), 20 *C.I.P.R.* 79. A comparison is to be made between the defendant's profit attributable to the invention and his profit had he used the best non-infringing option: *Collette v. Lasnier* (1886), 13 S.C.R. 563, at p. 576, also referred to with approval in *Colonial Fastener Co. v. Lightning Fastener Co.*, [1937] S.C.R. 36.

103    The difficulty with the trial judge's award is that it does not identify any causal connection between the profits the appellants were found to have earned through growing Roundup Ready Canola and the invention. On the facts found, the appellants made no profits <u>as a result of the invention</u>.

104    Their profits were precisely what they would have been had they planted and harvested ordinary canola. They sold the Roundup Ready Canola they grew in 1998 for feed, and thus obtained no premium for the fact that it was Roundup Ready Canola. Nor did they gain any agricultural advantage from the

Il est bien établi que l'inventeur a seulement droit à la remise de la portion des profits réalisés par le contrefacteur, qui a un lien de causalité avec l'invention : *Lubrizol Corp. c. Compagnie Pétrolière Impériale Ltée*, [1997] 2 C.F. 3 (C.A.); *Celanese International Corp. c. BP Chemicals Ltd.*, [1999] R.P.C. 203 (Pat. Ct.), par. 37. Cela est conforme à la règle générale qui s'applique en matière de réparation non punitive : « il est essentiel que les pertes compensées soient seulement celles qui, selon une conception normale du lien de causalité, ont été causées par le manquement » (*Canson Enterprises Ltd. c. Boughton & Co.*, [1991] 3 R.C.S. 534, p. 556, la juge McLachlin (plus tard Juge en chef), cité et approuvé, au nom de la Cour, par le juge Binnie dans l'arrêt *Cadbury Schweppes Inc. c. Aliments FBI Ltée*, [1999] 1 R.C.S. 142, par. 93).

La méthode privilégiée de calcul des profits devant être remis est appelée méthode fondée sur la valeur ou méthode du « profit différentiel », qui consiste à calculer les profits en fonction de la valeur que le brevet a permis aux marchandises du défendeur d'acquérir : N. Siebrasse, « A Remedial Benefit-Based Approach to the Innocent-User Problem in the Patenting of Higher Life Forms » (2004), 20 *C.I.P.R.* 79. Il faut comparer le profit que l'invention a permis au défendeur de réaliser à celui que lui aurait permis de réaliser la meilleure solution non contrefaisante (*Collette c. Lasnier* (1886), 13 R.C.S. 563, p. 576, aussi mentionné avec approbation dans l'arrêt *Colonial Fastener Co. c. Lightning Fastener Co.*, [1937] R.C.S. 36).

Le problème est que, en ordonnant la remise des profits, le juge de première instance n'a fait état d'aucun lien de causalité entre l'invention et les profits que, selon lui, les appelants ont tirés de la culture de canola Roundup Ready. D'après les faits constatés, les appelants n'ont réalisé aucun profit <u>dû à l'invention</u>.

Ils ont réalisé exactement les mêmes profits que s'ils avaient planté et récolté du canola ordinaire. Ils ont vendu, comme aliment pour animaux, le canola Roundup Ready cultivé en 1998 et n'ont donc pas obtenu un meilleur prix du fait qu'il s'agissait de canola Roundup Ready. Sur le plan agricole, les

herbicide resistant nature of the canola, since no finding was made that they sprayed with Roundup herbicide to reduce weeds. The appellants' profits arose solely from qualities of their crop that cannot be attributed to the invention.

On this evidence, the appellants earned no profit from the invention and Monsanto is entitled to nothing on their claim of account.

## IV. Conclusion

We would allow the appeal in part, setting aside the award for account of profit. In all other respects we would confirm the order of the trial judge. In view of this mixed result, we would order that each party bear its own costs throughout.

The reasons of Iacobucci, Bastarache, Arbour and LeBel JJ. were delivered by

Arbour J. (dissenting in part) —

## I. Introduction

This case was decided in the courts below without the benefit of this Court's decision in *Harvard College v. Canada (Commissioner of Patents)*, [2002] 4 S.C.R. 45, 2002 SCC 76. The heart of the issue is whether the Federal Court of Appeal's decision can stand in light of our decision in that case.

More specifically, the trial judge interpreted the scope of the Monsanto patent without the benefit of the holding in *Harvard College* that higher life forms, including plants, are not patentable. Both lower court decisions "allo[w] Monsanto to do indirectly what Canadian patent law has not allowed them to do directly: namely, to acquire patent protection over whole plants" (E. R. Gold and W. A. Adams, "The *Monsanto* decision: The edge or the wedge" (2001), 19 *Nat. Biotechnol.* 587).

appelants n'ont également tiré aucun avantage de la résistance du canola à l'herbicide, vu l'absence de conclusion qu'ils ont pulvérisé de l'herbicide Roundup pour diminuer la présence des mauvaises herbes. Les profits des appelants découlaient uniquement des caractéristiques de leur récolte qui ne sont pas attribuables à l'invention.

Selon la preuve produite en l'espèce, les appelants n'ont tiré aucun profit de l'invention et Monsanto n'a droit à rien en ce qui concerne sa demande de remise.

## IV. Conclusion

Nous sommes d'avis d'accueillir en partie l'appel, d'annuler la remise des profits ordonnée et de confirmer, à tous autres égards, la validité de l'ordonnance du juge de première instance. Étant donné ce résultat mitigé, chaque partie assumera ses propres dépens dans toutes les cours.

Version française des motifs des juges Iacobucci, Bastarache, Arbour et LeBel rendus par

La juge Arbour (dissidente en partie) —

## I. Introduction

Les tribunaux inférieurs ont tranché la présente affaire alors qu'ils ne disposaient pas de l'arrêt de notre Cour *Harvard College c. Canada (Commissaire aux brevets)*, [2002] 4 R.C.S. 45, 2002 CSC 76. Il s'agit essentiellement de savoir si l'arrêt de la Cour d'appel fédérale peut être maintenu eu égard à notre décision dans cette affaire.

Plus particulièrement, le juge de première instance a interprété la portée du brevet de Monsanto sans disposer de la conclusion tirée dans l'arrêt *Harvard College*, selon laquelle les formes de vie supérieures, y compris les plantes, ne sont pas brevetables. Les deux décisions des tribunaux inférieurs [TRADUCTION] « permet[tent] à Monsanto de faire indirectement ce que le droit canadien des brevets lui interdit de faire directement, soit obtenir à l'égard de plantes entières la protection par brevet » (E. R. Gold et W. A. Adams, « The *Monsanto* decision : The edge or the wedge » (2001), 19 *Nat. Biotechnol.* 587).

105

106

107

108

109 Such a result is hard to reconcile with the majority decision in *Harvard College*. It would also invalidate the Patent Office's long-standing policy of not granting exclusive rights, expressed in a patent grant, over higher life forms, that was upheld in *Harvard College*: Patent Office, *Manual of Patent Office Practice* (1998 "*Patent Office Manual*"), at para. 16.05.

Un tel résultat est difficilement conciliable avec l'arrêt majoritaire *Harvard College*. Il aurait également pour effet d'invalider la politique de longue date du Bureau des brevets, qui consiste à ne pas accorder de droits exclusifs, sous forme de brevet, à l'égard des formes de vie supérieures et dont la validité est confirmée dans l'arrêt *Harvard College* : Bureau des brevets, *Recueil des pratiques du Bureau des brevets* (1998), par. 16.05.

110 The two central issues here, the scope of Monsanto's patent and whether agricultural production of Roundup Ready Canola constitutes an infringing use, are determined by a purposive construction of the patent claims and the proper application of the majority decision in *Harvard College*. Monsanto is on the horns of a dilemma; a narrow construction of its claims renders the claims valid but not infringed, the broader construction renders the claims invalid: *Gillette Safety Razor Co. v. Anglo-American Trading Co.* (1913), 30 R.P.C. 465 (H.L.), at p. 481.

Les deux principaux points en l'espèce, soit la portée du brevet de Monsanto et la question savoir si la production agricole de canola Roundup Ready constitue une exploitation contrefaisante, sont tranchés au moyen d'une interprétation téléologique des revendications du brevet et de l'application correcte de l'arrêt majoritaire *Harvard College*. Monsanto est devant un dilemme : interprétées d'une manière stricte, ses revendications sont valides mais n'ont pas été contrefaites, alors qu'elles sont invalides si elles sont interprétées de manière large : *Gillette Safety Razor Co. c. Anglo-American Trading Co.* (1913), 30 R.P.C. 465 (H.L.), p. 481.

111 In light of *Harvard College*, I conclude that the patent claims here cannot be interpreted to extend patent protection over whole plants and that there was no infringing use. I need not review, and take no issue with the factual overview of the case provided in my colleagues' reasons.

Compte tenu de l'arrêt *Harvard College*, je conclus que les revendications dont il est question en l'espèce ne peuvent pas être interprétées de manière à étendre à des plantes entières la protection assurée par le brevet, et qu'il n'y a pas eu non plus d'exploitation contrefaisante. Je ne juge pas nécessaire d'examiner l'aperçu des faits que mes collègues donnent dans leurs motifs et que je ne conteste pas.

## II. Analysis

### A. *The Decision in Harvard College*

112 The issue in *Harvard College*, *supra*, was whether a mouse that was genetically modified to make it susceptible to cancer was the valid subject matter for a patent claim. The majority found that higher life forms were not "compositions of matter". Plants were clearly included in the category of higher life forms: e.g., *Harvard College*, at para. 199. Accordingly, plants do not fit within the definition of an "invention": *Patent Act*, R.S.C. 1985, c. P-4, s. 2.

## II. Analyse

### A. *L'arrêt Harvard College*

Dans l'affaire *Harvard College*, précitée, la question était de savoir si une souris génétiquement modifiée pour la rendre prédisposée au cancer pouvait validement faire l'objet d'une revendication de brevet. Les juges majoritaires ont conclu que les formes de vie supérieures n'étaient pas des « composition[s] de matières ». Les plantes faisaient clairement partie de la catégorie des formes de vie supérieures : par exemple, l'arrêt *Harvard College*, par. 199. Par conséquent, les plantes ne sont pas visées par la définition du mot « invention » figurant à l'art. 2 de la *Loi sur les brevets*, L.R.C. 1985, ch. P-4.

The majority approved the line drawn by the Patent Office between unpatentable higher life forms, patentable lower life forms, and patentable processes for engineering transgenic higher life forms in the laboratory: *Harvard College*, at para. 199. That line is described in the *Patent Office Manual*, *supra*, at para. 16.05:

Higher life forms are not patentable subject matter. However, a process for producing a higher life form may be patentable provided the process requires significant technical intervention by man and is not essentially a natural biological process which occurs according to the laws of nature . . . .

The line was clearly enunciated in *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81 (Pat. App. Bd.), at p. 89; patents apply to:

. . . all micro-organisms, yeasts, moulds, fungi, bacteria, actinomycetes, unicellular algae, cell lines, viruses or protozoa; in fact to all new life forms which are produced *en masse* as chemical compounds are prepared, and are formed in such large numbers that any measurable quantity will possess uniform properties and characteristics.

Thus, in *Harvard College*, claims for a genetically modified plasmid and the process claims to genetically modify a mouse so that it became susceptible to cancer were found to be valid. Claims for the mouse itself were found to be invalid by the Patent Commissioner and that finding was upheld by this Court. No other claims were at issue in *Harvard College*; transgenic mammalian eggs (single cells) were not claimed, although the majority suggested in *obiter* that such a claim may be the valid subject matter of a patent claim: *Harvard College*, at para. 162.

B.  *The Patent Claims*

Monsanto's Canadian Patent No. 1,313,830 is entitled "Glyphosate-Resistant Plants" (see Appendix). The use is evident on the face of the

Les juges majoritaires ont approuvé la ligne de démarcation tracée par le Bureau des brevets entre les formes de vie supérieures non brevetables, les formes de vie inférieures brevetables et les procédés brevetables de production en laboratoire de formes de vie supérieures transgéniques : *Harvard College*, par. 199. Cette ligne de démarcation est décrite dans le *Recueil des pratiques du Bureau des brevets*, *op. cit.*, par. 16.05 :

Les formes de vie supérieures ne sont pas brevetables. Un procédé ayant pour objet la production d'une forme de vie supérieure par contre peut être brevetable pourvu que le procédé exige une intervention significative d'ordre technique de l'homme, et que le procédé [ne soit] pas seulement un procédé biologique naturel qui se conforme aux lois de la nature . . .

Cette ligne de démarcation a été clairement tracée dans la décision *Re Application of Abitibi Co.* (1982), 62 C.P.R. (2d) 81 (C.A.B.), p. 89, où on a jugé que les brevets s'appliquent à

[TRADUCTION] tous les micro-organismes, champignons, virus ou protozoaires, à toutes les levures, moisissures, bactéries, actinomycètes, algues unicellulaires, lignées cellulaires et, en fait, à toutes les nouvelles formes de vie qui seront produites en grande quantité, comme dans le cas de la production de composés chimiques, et en si grand nombre que toute quantité mesurable possédera des propriétés et des caractéristiques uniformes.

Ainsi, dans l'arrêt *Harvard College*, les revendications concernant un plasmide génétiquement modifié et le procédé de manipulation génétique destinée à produire une souris prédisposée au cancer ont été jugées valides. La Cour a confirmé la conclusion du Commissaire aux brevets selon laquelle les revendications concernant la souris elle-même étaient invalides. Aucune autre revendication n'était en cause dans cette affaire; les œufs de mammifères transgéniques (cellules isolées) n'étaient pas revendiqués, quoique, dans une remarque incidente, les juges majoritaires aient laissé entendre que ces œufs pourraient validement faire l'objet d'une revendication de brevet : *Harvard College*, par. 162.

B.  *Les revendications du brevet*

Le brevet canadien nᵒ 1,313,830 de Monsanto est intitulé « Plantes résistant au glyphosate » (voir annexe). À première vue, les revendications

113

114

115

116

claims, namely glyphosate resistance that a person skilled in the art would understand to mean the conferring of resistance to a glyphosate herbicide, such as "Roundup".

117   The patent contained a series of hierarchical claims. The method claims are separate. The claims in the patent may be split into five general categories:

(1) the chimeric gene, claims 1-7, that does not exist in nature and is constructed, through human intervention, of three components;

(2) the cloning or expression vector, claims 8-14 (a vector is a DNA molecule into which another DNA segment has been integrated);

(3) the plant transformation vector, claims 15-21, 52;

(4) the glyphosate-resistant plant cell containing the chimeric gene, claims 22-28 and claims 43-51; and

(5) the method for constructing (1)-(4) and, in the laboratory, regenerating a plant from the plant cell containing the chimeric gene, claims 29-42.

118   All of the differentiated cells in the regenerated plant contain the chimeric gene, which will be passed to offspring of the plants through natural reproduction. However, as recognized by my colleagues, there is no claim for the regenerated plant or its progeny.

### C. *Purposive Construction of the Claims*

119   The first and pivotal step in an infringement action is the purposive construction of the patent claims: *Whirlpool Corp. v. Camco Inc.*, [2000] 2 S.C.R. 1067, 2000 SCC 67, at para. 43. The claims construction will set the scope of the patent claims, which, in turn, resolves the two issues in this case: validity and infringing use. However, Monsanto's

montrent clairement que l'invention brevetée sert à assurer la résistance au glyphosate, qu'une personne versée dans l'art interpréterait comme la résistance à un herbicide à base de glyphosate, tel le « Roundup ».

Le brevet comporte une série de revendications hiérarchiques. Les revendications relatives à la méthode sont présentées séparément. Les revendications du brevet peuvent être réparties en cinq catégories générales :

(1) le gène chimère, revendications 1 à 7, qui n'existe pas dans la nature et qui, à la suite d'une intervention humaine, comporte trois éléments;

(2) le vecteur de clonage ou d'expression, revendications 8 à 14 (un vecteur est une molécule d'ADN dans laquelle on a introduit un autre segment d'ADN);

(3) le vecteur de transformation des plantes, revendications 15 à 21 et 52;

(4) la cellule végétale résistant au glyphosate, qui contient le gène chimère, revendications 22 à 28 et 43 à 51; et

(5) la méthode d'interprétation des catégories (1) à (4) et de régénération, en laboratoire, d'une plante à partir de la cellule végétale qui contient le gène chimère, revendications 29 à 42.

Toutes les cellules différenciées de la plante régénérée contiennent le gène chimère, qui est transmis, par reproduction naturelle, à la descendance de la plante. Cependant, comme l'ont reconnu mes collègues, aucune revendication ne vise la plante régénérée ou sa descendance.

### C. *Interprétation téléologique des revendications*

Dans une action pour contrefaçon, la première étape cruciale consiste à interpréter de façon téléologique les revendications du brevet : *Whirlpool Corp. c. Camco Inc.*, [2000] 2 R.C.S. 1067, 2000 CSC 67, par. 43. L'interprétation des revendications du brevet permettra d'établir leur portée, laquelle permettra à son tour de résoudre les deux questions

patent claims cannot be construed with an eye to either infringement or the appellants' defence to infringement, invalidity: *Whirlpool*.

Purposive construction delineates the scope of the invention. It identifies what the inventor considered to be the essential elements of the invention: *Whirlpool*, *supra*, at para. 45.

My colleagues emphasize the commercial value of the exclusive rights to the patentee as the primary consideration in distilling the "essential elements" of the patent claims. However, commercial interests are not the only considerations. There are three further themes to purposive construction of patent claims. I will address each of these in turn.

(1) Fairness and Predictability

Fairness to the public is a recurring theme in jurisprudence on claims construction because of the severe economic consequences of patent infringement: *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504; *Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, [1989] 1 S.C.R. 1623; *Free World Trust v. Électro Santé Inc.*, [2000] 2 S.C.R. 1024, 2000 SCC 66, at para. 41. The scope of the patent protection should be both "fair" and "reasonably predictable": *Whirlpool*, *supra*, at para. 49; *Consolboard*, *supra*, at pp. 520-21. "Predictability is achieved by tying the patentee to its claims; fairness is achieved by interpreting those claims in an informed and purposive way": *Free World Trust*, *supra*, at para. 43.

(2) What Is Not Claimed Is Disclaimed

The classic rule is "what is not claimed is considered disclaimed": *Whirlpool*, *supra*, at para. 42. The

en litige en l'espèce : la validité et l'exploitation contrefaisante. Cependant les revendications du brevet de Monsanto ne peuvent pas être interprétées en fonction de la contrefaçon ou de l'invalidité que les appelants opposent comme moyen de défense à l'accusation de contrefaçon dont ils font l'objet : *Whirlpool*.

L'interprétation téléologique détermine la portée de l'invention. Elle permet d'identifier ce qui, selon l'inventeur, constituait les éléments essentiels de l'invention : *Whirlpool*, précité, par. 45. **120**

Mes collègues soulignent que la valeur commerciale des droits exclusifs pour le titulaire du brevet est l'élément principal qui doit être pris en considération pour dégager les « éléments essentiels » des revendications du brevet. Toutefois, les intérêts commerciaux ne sont pas les seuls éléments qui doivent être pris en considération. L'interprétation téléologique des revendications du brevet porte sur trois autres thèmes que j'aborderai successivement. **121**

(1) L'équité et la prévisibilité

En raison des graves répercussions financières de la contrefaçon, l'équité envers le public est un thème qui revient souvent dans la jurisprudence portant sur l'interprétation des revendications d'un brevet : *Consolboard Inc. c. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 R.C.S. 504; *Pioneer Hi-Bred Ltd. c. Canada (Commissaire des brevets)*, [1989] 1 R.C.S. 1623; *Free World Trust c. Électro Santé Inc.*, [2000] 2 R.C.S. 1024, 2000 CSC 66, par. 41. L'étendue de la protection par brevet doit être à la fois « équitable » et « raisonnablement prévisible » (*Whirlpool*, précité, par. 49; *Consolboard*, précité, p. 520-521). « La prévisibilité est assurée du fait que les revendications lient le breveté; l'équité résulte de l'interprétation des revendications de façon éclairée et en fonction de l'objet » (*Free World Trust*, précité, par. 43). **122**

(2) Ce qui n'est pas revendiqué a fait l'objet d'une renonciation

La règle classique veut que « ce qui n'est pas revendiqué soit considéré comme ayant fait l'objet **123**

inventor may not get exclusive rights to an invention that was not part of the public disclosure of the invention. The public must be able to predict the activities that will infringe on the exclusive rights granted to the patentee: *Free World Trust*, *supra*, at para. 41.

124    So long as the claims are interpreted fairly and knowledgeably, if the patentee has limited the claims, then the public is entitled to rely on that limitation: *Free World Trust*, *supra*, at para. 51. An inventor cannot enlarge the scope of the grant of exclusive rights beyond that which has been specified: *Western Electric v. Baldwin International Radio of Canada*, [1934] S.C.R. 570. However, the full specification may be looked at to discern the scope of the claims: *Whirlpool*, *supra*, at para. 49; *Free World Trust*, *supra*; *Western Electric*, *supra*, at p. 573; Lindley L.J. in *Needham v. Johnson and Co.* (1884), 1 R.P.C. 49 (H.C.A.), at p. 58. The claims are invalid if they are broader than the disclosures: *Amfac Foods Inc. v. Irving Pulp & Paper Ltd.* (1984), 80 C.P.R. (2d) 59 (F.C.T.D.), at p. 80, citing a long list of authority; *B.V.D. Co. v. Canadian Celanese Ltd.*, [1936] S.C.R. 221.

### (3)  The Person Skilled in the Art

125    Patent claims must be interpreted from the point of view of the hypothetical worker skilled in the art, who has been described by Binnie J. as a

hypothetical person possessing the ordinary skill and knowledge of the particular art to which the invention relates, and a mind willing to understand a specification that is addressed to him. This hypothetical person has sometimes been equated with the "reasonable man" used as a standard in negligence cases. He is assumed to be a man who is going to try to achieve success and not one who is looking for difficulties or seeking failure.

(*Free World Trust*, *supra*, at para. 44, quoting from H. G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed. 1969), at p. 184.)

d'une renonciation » (*Whirlpool*, précité, par. 42). L'inventeur ne peut pas obtenir des droits exclusifs à l'égard d'une partie de l'invention qu'il n'a pas divulguée au public. Ce dernier doit être en mesure de prévoir quelles activités violeront les droits exclusifs du titulaire du brevet (*Free World Trust*, précité, par. 41).

Si le titulaire du brevet a limité les revendications, le public doit pouvoir s'en remettre à ces limites à condition que les revendications soient interprétées de manière équitable et éclairée (*Free World Trust*, précité, par. 51). L'inventeur ne peut pas élargir, au-delà de ce qui a été précisé, la portée des droits exclusifs qui lui sont attribués : *Western Electric Co. c. Baldwin International Radio of Canada*, [1934] R.C.S. 570. Cependant, il est possible d'examiner au complet le mémoire descriptif pour déterminer la portée des revendications : *Whirlpool*, précité, par. 49; *Free World Trust*, précité; *Western Electric*, précité, p. 573; le lord juge Lindley dans l'arrêt *Needham c. Johnson and Co.* (1884), 1 R.P.C. 49 (H.C.A.), à la p. 58. Les revendications sont invalides si elles ont une portée plus large que la description qui en est faite : *Amfac Foods Inc. c. Irving Pulp & Paper Ltd.*, [1984] A.C.F. nº 105 (QL) (1re inst.), p. 15, où l'on cite une longue liste de décisions; *B.V.D. Co. c. Canadian Celanese Ltd.*, [1936] R.C.S. 221.

### (3)  La personne versée dans l'art

Les revendications d'un brevet doivent être interprétées du point de vue du travailleur fictif versé dans l'art, que le juge Binnie décrit ainsi :

[TRADUCTION] . . . un être fictif ayant des compétences et des connaissances usuelles dans l'art dont relève l'invention et un esprit désireux de comprendre la description qui lui est destinée. Cette notion de la personne fictive a parfois été assimilée à celle de l'« homme raisonnable » retenue en matière de négligence. On suppose que cette personne va tenter de réussir, et non de rechercher les difficultés ou viser l'échec.

(*Free World Trust*, précité, par. 44, citant l'extrait de la p. 184 de l'ouvrage de H. G. Fox, intitulé *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4e éd. 1969).)

A reasonable person skilled in the art, however, must also be taken to know the state of the law as it relates to the subject matter of his or her invention. For example, in *Lubrizol Corp. v. Imperial Oil Ltd.* (1992), 98 D.L.R. (4th) 1 (F.C.A.), at p. 18, Mahoney J.A. accepted that drafters of patents were able to express their claims with "extreme precision" in order for their claims to stand up to any challenge on validity, that is, they were taken to understand patent law so as to draft claims that accorded with statutory requirements.

This interpretation is fair and predictable because the public must equally be entitled to rely on this Court's jurisprudence in determining the scope of patent claims: *Kirin Amgen Inc. v. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096, at para. 60. In *Kirin Amgen*, the English Court of Appeal considered the testimony of opposing experts (persons skilled in the art) and narrowed a patent claim over a naturally occurring DNA sequence (EPO gene) so that it excluded that DNA sequence in its natural and therefore unpatentable form. In doing so, the court stated at para. 60:

The patentee could not monopolise the gene per se as that existed in nature. The patentee therefore monopolised the DNA sequence encoding for DNA when isolated and in that respect was suitable for use to express EPO in a host cell. As of 1984 such a monopoly would have seemed to give fair protection. To seek to monopolise use of the sequence when not isolated by inserting a construct into a human cell would provide a monopoly not properly supported by the description in the specification. We also believe that third parties could reasonably expect that if they did not use a DNA sequence for insertion into a host cell, there would be no infringement. [Emphasis added.]

In conclusion, a person skilled in the art, upon filing of Monsanto's patent, could not reasonably have expected that the exclusive rights for gene, cell,

Toutefois, il faut également tenir pour acquis que la personne raisonnable versée dans l'art connaît l'état du droit applicable à l'objet de son invention. Par exemple, dans l'arrêt *Lubrizol Corp. c. Imperial Oil Ltd.*, [1992] A.C.F. nº 1110 (QL) (C.A.), par. 42, le juge Mahoney a reconnu que les rédacteurs du brevet en cause avaient été en mesure de formuler avec une « extrême précision » leurs revendications afin qu'elles puissent résister à toute contestation de leur validité. Autrement dit, il a tenu pour acquis que ceux-ci comprenaient suffisamment le droit des brevets pour être en mesure de rédiger des revendications conformes aux exigences de la loi.

Cette interprétation est équitable et prévisible étant donné que le public doit également pouvoir s'en remettre à la jurisprudence de notre Cour pour déterminer la portée des revendications d'un brevet : *Kirin Amgen Inc. c. Hoechst Marion Roussel Ltd.*, [2002] E.W.J. No. 3792 (QL), [2002] EWCA Civ. 1096, par. 60. Dans cet arrêt, la Cour d'appel d'Angleterre a pris en considération les témoignages opposés d'experts (personnes versées dans l'art) et a donné à une revendication de brevet relative à une séquence d'ADN d'origine naturelle (le gène de l'EPO) une interprétation restrictive selon laquelle elle excluait la séquence d'ADN sous sa forme naturelle et donc non brevetable. Ce faisant, la cour a dit (par. 60) :

[TRADUCTION] Le titulaire du brevet ne pouvait pas monopoliser le gène lui-même étant donné qu'il existait dans la nature. Le titulaire du brevet a donc monopolisé la séquence d'ADN codant pour l'ADN lorsqu'elle est isolée et, à cet égard, utilisable pour exprimer l'EPO dans une cellule hôte. Dès 1984, un tel monopole aurait semblé accorder une protection équitable. Vouloir monopoliser l'utilisation de la séquence lorsqu'elle n'est pas isolée par l'insertion d'une construction génique dans une cellule humaine reviendrait à créer un monopole qui n'est pas bien étayé par le mémoire descriptif. Nous croyons également que les tiers pourraient raisonnablement s'attendre à ce que, en s'abstenant d'utiliser une séquence d'ADN pour l'insérer dans une cellule hôte, il n'y ait pas contrefaçon. [Je souligne.]

En conclusion, une personne versée dans l'art ne pouvait pas raisonnablement s'attendre, à la suite du dépôt du brevet de Monsanto, à ce que les droits

126

127

128

vector, and method claims extended exclusive rights over unpatentable plants and their offspring.

#### (4) Conclusion on the Scope of Monsanto's Claims

129    Accordingly, a purposive construction that limits this claim to its "essential elements", considering both the plain language of the claim and the specifications, leads me to the conclusion that the gene patent claims and the plant cell claims should not be construed to grant exclusive rights over the plant and all of its offspring.

130    It is clear from the specification that Monsanto's patent claims do not extend to plants, seeds, and crops. It is also clear that the gene claim does not extend patent protection to the plant. The plant cell claim ends at the point where the isolated plant cell containing the chimeric gene is placed into the growth medium for regeneration. Once the cell begins to multiply and differentiate into plant tissues, resulting in the growth of a plant, a claim should be made for the whole plant. However, the whole plant cannot be patented. Similarly, the method claim ends at the point of the regeneration of the transgenic founder plant but does not extend to methods for propagating that plant. It certainly does not extend to the offspring of the regenerated plant.

131    In effect, the patent claims grant Monsanto a monopoly over the chimeric gene and the cell into which it is inserted and the method for doing so. Therefore, no other biotechnology company can use the chimeric gene to create a glyphosate-resistant plant cell that can then be regenerated into a glyphosate-resistant plant.

exclusifs des revendications relatives au gène, à la cellule, au vecteur et à la méthode s'étendent aux plantes non brevetables et à leur descendance.

#### (4) Conclusion sur la portée des revendications de Monsanto

Par conséquent, une interprétation téléologique qui limite la présente revendication à ses « éléments essentiels », compte tenu à la fois de la formulation claire de la revendication et du mémoire descriptif, m'amène à conclure qu'il n'y a pas lieu de considérer que les revendications du brevet relatives au gène et à la cellule végétale confèrent des droits exclusifs sur la plante et toute sa descendance.

Il ressort clairement du mémoire descriptif que les revendications du brevet de Monsanto ne visent pas les plantes, les semences et les récoltes. Il est également clair que la revendication relative au gène n'étend pas à la plante la protection conférée par le brevet. La revendication concernant la cellule végétale cesse de s'appliquer au moment où la cellule végétale isolée qui contient le gène chimère est placée dans le milieu nutritif pour qu'elle se régénère. Dès que la cellule commence à se multiplier et à se différencier en tissu végétal, pour ensuite aboutir à la croissance d'une plante, la plante entière devrait faire l'objet d'une revendication. Toutefois, une plante entière n'est pas brevetable. De même, la revendication relative à la méthode cesse de s'appliquer au moment de la régénération de la plante transgénique fondatrice, mais elle ne vise pas les méthodes de reproduction de la plante et sûrement pas non plus la descendance de la plante régénérée.

En réalité, les revendications du brevet attribuent à Monsanto le monopole du gène chimère et de la cellule dans laquelle il est inséré, ainsi que de la méthode d'insertion du gène chimère dans la cellule. Par conséquent, aucune autre société de biotechnologie ne peut utiliser le gène chimère pour créer une cellule végétale résistant au glyphosate qui pourra ensuite être régénérée en plante résistant au glyphosate.

D. *Validity*

(1) The Law on Validity

Claims that would otherwise be valid may be limited by statutory provisions or by jurisprudence: *Commissioner of Patents v. Farbwerke Hoechst Aktiengesellschaft Vormals Meister Lucius & Bruning*, [1964] S.C.R. 49; *Shell Oil Co. v. Commissioner of Patents*, [1982] 2 S.C.R. 536. As stated in *Farbwerke*, at p. 57, "[t]here is no inherent common law right to a patent. An inventor gets his patent according to the terms of the *Patent Act*, no more and no less. If the patent for which he is applying comes within the provisions of s. 41(1) [an exemption] of the Act, then he must comply with that section."

Subject matters that are specifically precluded by statute from patent protection are natural phenomena, laws of nature, and scientific principles: s. 27(8). Other subject matter has been excluded by judicial interpretation of s. 2 definitions of "invention" and "process" and s. 27(8). For example, the following have been excluded: computer programs if the discovery involved is a method of calculation (*Schlumberger Canada Ltd. v. Commissioner of Patents*, [1982] 1 F.C. 845 (C.A.)); methods of medical treatment (*Tennessee Eastman Co. v. Commissioner of Patents*, [1974] S.C.R. 111); higher life forms (*Harvard College*, *supra*); business systems and methods and professional skills and methods (*State Street Bank & Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998)); printed matter producing only an artistic intellectual or literary result (*Re Application of Boussac*, CIPO, Commissioner's Decision No. 143, March 10, 1973); mere human conduct or mental steps, or instructions (*Re Application of Ijzerman*, CIPO, Commissioner's Decision No. 254, July 4, 1975; *Gale's Application*, [1991] R.P.C. 305 (Pat. Ct.), at p. 323); and architectural plans (*Application No. 995 for a Townhouse Building Design (Re)* (1979), 53 C.P.R. (2d) 211 (Pat. App. Bd.)). These examples demonstrate that it is not unusual for courts and the Patent Office

D. *Validité*

(1) Le droit en matière de validité

Il se peut que des revendications qui seraient par ailleurs valides soient limitées par des dispositions législatives ou par la jurisprudence : *Commissioner of Patents c. Farbwerke Hoechst Aktiengesellschaft Vormals Meister Lucius & Bruning*, [1964] R.C.S. 49; *Shell Oil Co. c. Commissaire des brevets*, [1982] 2 R.C.S. 536. Comme le précise l'arrêt *Farbwerke*, p. 57, [TRADUCTION] « [i]l n'existe pas, en common law, de droit inhérent à un brevet. L'inventeur obtient son brevet conformément à *Loi sur les brevets*. Un point, c'est tout. Si le brevet qu'il sollicite est visé par les dispositions du par. 41(1) [une exception] de la Loi, il doit alors se conformer à ce paragraphe. »

La Loi soustrait expressément à la protection par brevet les phénomènes naturels, les lois de la nature et les principes scientifiques : par. 27(8). D'autres objets ont été exclus à la suite de l'interprétation que les tribunaux ont donnée de la définition des mots « invention » et « procédé » figurant à l'art. 2, et du par. 27(8). Par exemple, les objets suivants ont été exclus : les programmes informatiques, si la découverte est une méthode de calcul (*Schlumberger Canada Ltd. c. Commissaire des brevets*, [1982] 1 C.F. 845 (C.A.)); les méthodes de traitement médical (*Tennessee Eastman Co. c. Commissaire des brevets*, [1974] R.C.S. 111); les formes de vie supérieures (*Harvard College*, précité); les systèmes et méthodes de gestion d'entreprise, ainsi que les compétences et les méthodes professionnelles (*State Street Bank & Trust Co. c. Signature Financial Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998)); les imprimés ne produisant que des résultats artistiques, intellectuels ou littéraires (*Re Application of Boussac*, OPIC, décision du Commissaire n° 143, 10 mars 1973); le simple comportement humain ou processus mental, ou les modes d'emploi (*Re Application of Ijzerman*, OPIC, décision du Commissaire n° 254, 4 juillet 1975; *Gale's Application*, [1991] R.P.C. 305 (Pat. Ct.), p. 323); les plans d'architecte (*Application No. 995 for a Townhouse Building Design (Re)* (1979),

132

133

to interpret provisions of the *Patent Act* so as to exclude subject matter from patentability.

134    If a claim encompasses subject matter that is precluded from patentability, it is invalid. However, a claim may be interpreted taking into account the exemption. In *Shell Oil*, *supra*, Wilson J. stated, at p. 553, that "a claim for the compositions in these cases would, it seems to me, extend beyond the scope of the invention and violate s. 36". Section 36 provides that the specification needs to describe new subject matter in which exclusive property rights are claimed. Following Wilson J.'s reasoning, if any of Monsanto's patent claims had been construed to encompass plants, they would have been invalid.

(2)  Validity of Monsanto's Claims

135    Applying the purposive construction of Monsanto's product claims, that they do not extend patent protection to plants, all of Monsanto's product claims are valid.

136    Monsanto's process claims are likewise valid. The method claims for making transgenic glyphosate-resistant plant cells should be valid because an invention may be a "process": *Tennessee Eastman*, *supra*. A process claim may be valid even where the subject matter it manufactures is not patentable, for example, because it is obvious: *F. Hoffmann-Laroche & Co. v. Commissioner of Patents*, [1955] S.C.R. 414; or it constitutes unpatentable subject matter: *Harvard College*, *supra*.

137    The second part of the method — the regeneration of the plant cell into a plant — may, however, seem more problematic. However, since this process involves substantial human intervention and does not follow the "laws of nature" as would natural asexual or sexual reproduction, I conclude that this part of the process would likewise be patentable. The

53 C.P.R. (2d) 211 (C.A.B.)). Ces exemples démontrent qu'il n'est pas inhabituel que les tribunaux et le Bureau des brevets interprètent les dispositions de la *Loi sur les brevets* de manière à soustraire un objet à la brevetabilité.

La revendication qui englobe un objet non brevetable est invalide. Cependant, une revendication peut être interprétée en fonction de l'exception prévue. Dans l'arrêt *Shell Oil*, précité, p. 553, la juge Wilson a affirmé qu'« une revendication pour les compositions dans ces affaires-là aurait, à mon sens, une portée qui dépasse celle de l'invention et contreviendrait à l'art. 36 ». L'article 36 prévoit que le demandeur doit décrire, dans son mémoire, le nouvel objet dont il revendique la propriété exclusive. Selon le raisonnement de la juge Wilson, si l'une des revendications du brevet de Monsanto avait été interprétée comme englobant des plantes, elle aurait été invalide.

(2)  La validité des revendications de Monsanto

Selon l'interprétation téléologique voulant qu'elles n'étendent pas aux plantes la protection par brevet, les revendications relatives au produit de Monsanto sont toutes valides.

Les revendications relatives au procédé de Monsanto sont également valides. Les revendications concernant la méthode de fabrication de cellules végétales transgéniques résistant au glyphosate devraient être valides parce qu'une invention peut être un « procédé » (*Tennessee Eastman*, précité). La revendication relative à un procédé peut être valide même si l'objet qu'il permet de fabriquer n'est pas brevetable, notamment parce qu'il est évident (*F. Hoffmann-Laroche & Co. c. Commissioner of Patents*, [1955] R.C.S. 414) ou parce qu'il s'agit d'un objet non brevetable (*Harvard College*, précité).

Le deuxième étape de la méthode — la régénération d'une plante à partir de la cellule végétale — peut toutefois sembler plus problématique. Cependant, puisque ce procédé comporte une intervention humaine importante et n'est pas conforme aux « lois de la nature », comme la reproduction naturelle sexuée ou asexuée, je conclus que cette

Patent Commissioner in *Harvard College* found that the process of creating a transgenic cell culture that had the intermediate step of "allowing said embryo to develop into an adult animal" was patentable as a process claim. This conclusion is consistent with the policy of the Patent Office: *Patent Office Manual*, *supra*, at para. 16.05, and with art. 27(3)(b) of the *Agreement on Trade-Related Aspects of Intellectual Property Rights* ("*TRIPS*"), 1869 U.N.T.S. 299 (being Annex 1C of the *Marrakesh Agreement establishing the World Trade Organization*, 1867 U.N.T.S. 3).

### E.   *Summary and Conclusion on Construction and Validity of the Claims*

In short, properly construed, Monsanto's claims both for products and processes are valid. Neither extends patent protection to the plant itself, a higher life form incapable of patent protection. In order to avoid the claim extending to the whole plant, the plant cell claim cannot extend past the point where the genetically modified cell begins to multiply and differentiate into plant tissues, at which point the claim would be for every cell in the plant, i.e., for the plant itself.

Therefore, Monsanto's valid claims are solely for genetically modified chimeric genes and cells in the laboratory prior to regeneration — and for the attendant process for making the genetically modified plant.

### F.   *Infringement*

"Infringement" is not defined in the *Patent Act*. To determine what constitutes infringement, recourse must be had to the common law, the statutory provisions that define the grant of rights to the inventor and the recourse to remedies, and, most importantly, the scope of the exclusive rights claimed in the patent: Fox, *supra*, at p. 349. Infringement, in short, is "any act that interferes with the full enjoyment

étape serait également brevetable. Dans l'affaire *Harvard College*, le Commissaire aux brevets a estimé que le procédé de création d'une culture cellulaire transgénique, dont l'étape intermédiaire consiste à [TRADUCTION] « laisser ledit embryon se développer jusqu'au stade d'animal adulte », était brevetable en tant que revendication relative à un procédé. Cette conclusion est conforme à la politique du Bureau des brevets (*Recueil des pratiques du Bureau des brevets*, *op. cit.*, par. 16.05) et à l'al. 27(3)b) de l'*Accord sur les aspects des droits de propriété intellectuelle qui touchent au commerce* (« *ADPIC* »), 1869 R.T.N.U. 332 (annexe 1C de l'*Accord de Marrakech instituant l'Organisation mondiale du commerce*, 1867 R.T.N.U. 3).

### E.   *Résumé et conclusion concernant l'interprétation et la validité des revendications*

138

Bref, correctement interprétées, les revendications de Monsanto relatives aux produits et aux procédés sont valides dans les deux cas. Aucune d'elles n'étend la protection par brevet à la plante elle-même, qui est une forme de vie supérieure qui ne peut pas bénéficier de cette forme de protection. Pour éviter que la revendication vise la plante entière, la revendication relative à la cellule végétale doit cesser de s'appliquer au moment où la cellule génétiquement modifiée commence à se multiplier et à se différencier en tissus végétal, sinon la revendication viserait chaque cellule de la plante, c'est-à-dire la plante elle-même.

139

Par conséquent, les revendications valides de Monsanto visent uniquement les gènes chimères et les cellules génétiquement modifiés en laboratoire avant la régénération — et le procédé connexe de fabrication de la plante génétiquement modifiée.

### F.   *Contrefaçon*

140

La *Loi sur les brevets* ne définit pas le mot « contrefaçon ». Pour déterminer ce qui constitue une contrefaçon, il faut consulter la common law, les dispositions législatives qui définissent les droits conférés à l'inventeur et les recours dont il dispose, et surtout vérifier la portée des droits exclusifs revendiqués dans le brevet (Fox, *op. cit.*, p. 349). Bref, la contrefaçon s'entend de [TRADUCTION] « tout acte

of the monopoly granted to the patentee", if done without the consent of the patentee: Fox, *supra*, at p. 349.

141    The issue at this stage is whether the appellants used the invention so as to interfere with the exclusive rights of the patentee, keeping in mind that the scope of Monsanto's patent does not extend to plants. The public is entitled to rely on the reasonable expectation that unpatentable subject matter falls outside the scope of patent protection and its use does not constitute an infringement: *Kirin Amgen*, *supra*, at para. 60.

142    I will assume, as found by the courts below, that the appellants planted seeds containing Monsanto's patented gene and cell. I agree with my colleagues that the appellants did not make or construct the gene or cell contained in the canola crop and did not use Monsanto's patented process.

### (1)  Statutory Interpretation of "Use" in Section 42 of the *Patent Act*

143    The relevant statutory provision is s. 42 of the *Patent Act* where:

> **42.** Every patent granted under this Act shall contain the title or name of the invention, with a reference to the specification, and shall, subject to this Act, grant to the patentee and the patentee's legal representatives for the term of the patent, from the granting of the patent, the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used, subject to adjudication in respect thereof before any court of competent jurisdiction.

144    I will use the same three principles of statutory interpretation as did my colleagues to construe the meaning of "use" in s. 42 of the *Patent Act*. These are a purposive interpretation of the word "use", a contextual analysis given the surrounding words in the provision, and the case law.

145    A purposive construction of "use" suggests that "use" is limited by the subject matter of the invention, and that any acts for a purpose whether fore-

qui nuit à la pleine jouissance du monopole accordé au titulaire du brevet », s'il est accompli sans le consentement de ce dernier (Fox, *op. cit.*, p. 349).

La question est maintenant de savoir si les appelants ont exploité l'invention de façon à porter atteinte aux droits exclusifs du titulaire du brevet, sans oublier que le brevet de Monsanto ne s'applique pas aux plantes. Le public a le droit de s'attendre raisonnablement à ce qu'un objet non brevetable ne bénéficie pas de la protection par brevet et que son exploitation ne constitue pas de la contrefaçon : *Kirin Amgen*, précité, par. 60.

À l'instar des tribunaux inférieurs, je vais présumer que les appelants ont semé des graines contenant le gène et la cellule brevetés de Monsanto. Je conviens avec mes collègues que les appelants n'ont ni fabriqué ni construit le gène ou la cellule contenus dans la récolte de canola et qu'ils n'ont pas exploité le procédé breveté de Monsanto.

### (1)  Interprétation législative du verbe « exploiter » figurant à l'art. 42 de la *Loi sur les brevets*

La disposition législative pertinente est l'art. 42 de la *Loi sur les brevets*, qui est ainsi rédigé :

> **42.** Tout brevet accordé en vertu de la présente loi contient le titre ou le nom de l'invention avec renvoi au mémoire descriptif et accorde, sous réserve des autres dispositions de la présente loi, au breveté et à ses représentants légaux, pour la durée du brevet à compter de la date où il a été accordé, le droit, la faculté et le privilège exclusif de fabriquer, construire, exploiter et vendre à d'autres, pour qu'ils l'exploitent, l'objet de l'invention, sauf jugement en l'espèce par un tribunal compétent.

J'appliquerai les trois mêmes principes d'interprétation législative que mes collègues pour interpréter le sens du verbe « exploiter » (« *use* ») figurant à l'art. 42 de la *Loi sur les brevets*. Ces principes sont l'interprétation téléologique du verbe « exploiter », l'analyse contextuelle qui tient compte des autres termes de la disposition, et la jurisprudence.

Selon une interprétation téléologique, le sens du verbe « exploiter » est limité par l'objet de l'invention, et tout acte accompli dans un but prévu ou non

seen or not by the inventor may constitute an infringing use. The problem with defining "use" in the manner of my colleagues as commercial use is that the inventor is not obliged to describe the utility of the invention, the inventor must merely describe the invention so as to produce it: *Consolboard, supra*. Utility need not include commercial utility, contrary to my colleagues' opinion. That is determined by the market place: D. Vaver, *Intellectual Property Law: Copyright, Patents, Trade-marks* (1997), at p. 120. An inventor should be entitled to a remedy such as an injunction regardless of whether the infringing use has commercial applications: *Adair v. Young* (1879), 12 Ch. D. 13 (C.A.).

Dickson J. (as he then was) in *Consolboard, supra*, cited with approval, at p. 526, the following passage, *per* Thorson P. in *The King v. American Optical Co.* (1950), 11 Fox Pat. C. 62 (Ex. Ct.), at p. 85:

If an inventor has adequately defined his invention he is entitled to its benefit even if he does not fully appreciate or realize the advantages that flow from it or cannot give the scientific reasons for them. It is sufficient if the specification correctly and fully describes the invention and its operation or use as contemplated by the inventor, so that the public, meaning thereby persons skilled in the art, may be able, with only the specification, to use the invention as successfully as the inventor could himself.

Although *Consolboard, supra*, rejected a need to either claim a utility, or set out the "useful" characteristics of the invention in the disclosure, it did not necessarily eliminate any relationship between infringement and the specification. In *Pioneer Hi-Bred, supra*, at p. 1637, Lamer J. (as he then was) held that "[s]ection 36(1) was enacted so competitors could know the limits within which they should avoid infringing the subject of the invention and be aware of their freedom of maneuver when they work in an area related to that of the patentee."

prévu par l'inventeur peut constituer une exploitation contrefaisante. Le problème que pose le sens d'exploitation commerciale que mes collègues donnent au verbe « exploiter » est que l'inventeur est tenu de décrire non pas l'utilité de l'invention, mais simplement l'invention et la façon de la produire : *Consolboard*, précité. Contrairement à ce que considèrent mes collègues, l'utilité n'englobe pas nécessairement l'utilité commerciale, qui est déterminée par le marché : D. Vaver, *Intellectual Property Law : Copyright, Patents, Trade-marks* (1997), p. 120. Un inventeur devrait avoir droit à une réparation telle une injonction, peu importe que l'exploitation contrefaisante ait ou non des applications commerciales : *Adair c. Young* (1879), 12 Ch. D. 13 (C.A.).

146    Dans l'arrêt *Consolboard*, précité, p. 526, le juge Dickson (plus tard Juge en chef) a cité, en les approuvant, les propos suivants du président Thorson dans la décision *The King c. American Optical Co.* (1950), 11 Fox Pat. C. 62 (C. de l'É.), p. 85 :

[TRADUCTION] Si un inventeur a adéquatement décrit son invention, il a droit d'en jouir même s'il n'apprécie ni ne réalise pleinement les avantages qui en découlent ou s'il ne peut fournir l'explication scientifique de ces derniers. Il suffit que le mémoire descriptif décrive de façon complète et correcte l'invention et son emploi ou fonctionnement prévus par l'inventeur de telle sorte que le public, c.-à-d. les personnes versées dans l'art, puisse, en n'ayant que le mémoire descriptif, utiliser l'invention avec le même succès que l'inventeur.

147    Bien que, dans l'arrêt *Consolboard*, précité, la Cour ait rejeté l'idée qu'il soit nécessaire de revendiquer une utilité ou d'exposer les propriétés « utiles » de l'invention dans la divulgation, elle n'a pas nécessairement écarté tout lien entre la contrefaçon et le mémoire descriptif. Dans l'arrêt *Pioneer Hi-Bred*, précité, p. 1637, le juge Lamer (plus tard Juge en chef) a conclu que « [l]e paragraphe 36(1) a été édicté pour permettre aux compétiteurs de savoir quelles sont les limites à l'intérieur desquelles ils doivent s'abstenir de contrefaire [l'objet] de l'invention et de connaître quelle est leur marge de manœuvre lorsqu'ils travaillent dans un domaine analogue à celui du breveté. »

148     This reasoning is essential to a more balanced interpretation of s. 42. A contextual analysis of that section links the verbs "use", "sell", and "make" to the noun "invention". The definition of "use" in any given circumstances must therefore be limited by the subject matter of the invention. This approach has been followed to interpret "use" in the context of s. 58, now s. 56, of the *Patent Act*. Section 56 grants an exemption from infringement for persons who have acquired patentable subject matter prior to the grant of a patent:

Ce raisonnement est essentiel à une interprétation plus harmonieuse de l'art. 42. Une analyse contextuelle de cet article permet de lier les verbes « exploiter », « vendre » et « fabriquer » au substantif « invention ». La définition du terme « exploiter » doit donc, dans tous les cas, être limitée par l'objet de l'invention. Cette approche a été adoptée pour interpréter le terme « utiliser » dans le contexte de l'art. 58, devenu l'art. 56, de la *Loi sur les brevets*. L'article 56 établit une exception à la contrefaçon à l'égard des personnes qui ont acquis l'objet brevetable avant la délivrance du brevet :

**56.** (1) Every person who, before the claim date of a claim in a patent has purchased, constructed or acquired the subject matter defined by the claim, has the <u>right to use</u> and sell to others the <u>specific article, machine, manufacture or composition of matter patented</u> [i.e., the invention] and so purchased, constructed or acquired without being liable to the patentee or the legal representatives of the patentee for so doing. [Emphasis added.]

**56.** (1) Quiconque, avant la date de revendication d'une demande de brevet, achète, exécute ou acquiert l'objet que définit la revendication <u>peut utiliser</u> et vendre <u>l'article, la machine, l'objet manufacturé ou la composition de matières brevetés</u> [c'est-à-dire l'invention] ainsi achetés, exécutés ou acquis avant cette date sans encourir de responsabilité envers le breveté ou ses représentants légaux. [Je souligne.]

149     In *Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada* (1969), 1 Ex. C.R. 529, at p. 553, in reasoning approved by this Court: *Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada*, [1970] S.C.R. 833, and followed in *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (F.C.T.D.), the trial judge stated that "the proper approach to the interpretation of s. 58 [now s. 56] is to first read its wording, coupled with that of s. 2(*d*) [the definition of invention], in an effort to ascertain its meaning therefrom".

Dans l'arrêt *Libbey-Owens-Ford Glass Co. c. Ford Motor Co. of Canada* (1969), 1 R.C. de l'É. 529, p. 553, adoptant un raisonnement approuvé par notre Cour dans l'arrêt *Libbey-Owens-Ford Glass Co. c. Ford Motor Co. of Canada*, [1970] R.C.S. 833, et suivi dans la décision *Merck & Co. c. Apotex Inc.*, [1994] A.C.F. nº 1898 (QL) (1ʳᵉ inst.), le juge de première instance a dit que [TRADUCTION] « pour interpréter correctement l'art. 58 [maintenant l'art. 56], il faut d'abord le lire conjointement avec l'al. 2*d*) [la définition de l'invention], afin d'en déterminer le sens ».

150     Further, the Federal Court of Appeal in *Merck & Co. v. Apotex Inc.*, [1995] 2 F.C. 723, at p. 745, stated:

En outre, dans l'arrêt *Merck & Co. c. Apotex Inc.*, [1995] 2 C.F. 723, p. 745, la Cour d'appel fédérale a dit :

It is the intention of the inventor, as inscribed in the patent, which protects the appellant under section 56, given that the law is not one based on form but on the scope of the whole invention. . . .

C'est l'intention de l'inventeur, indiquée dans le brevet, qui protège l'appelante en vertu de l'article 56 étant donné que les règles de droit applicables ne reposent pas sur la forme mais sur la portée de l'invention dans son ensemble. . .

.   .   .

.   .   .

This conclusion will, I believe, be strengthened in the subsequent consideration of the composition and use claims of the patent, which will reveal even more clearly the interrelatedness of the whole patent.

Je crois que l'examen des revendications du brevet relatives à la composition et à l'utilisation, qui fera ressortir davantage l'interrelation qui existe entre toutes les parties du brevet, renforcera cette conclusion.

Therefore "use" and "invention" must be read conjunctively and the scope of "use" must be bounded by the scope of the claims.

The test for determining "use" is not whether the alleged user has deprived the patentee of the commercial benefits flowing from his invention, but whether the alleged user has deprived the patentee of his monopoly over the use of the invention as construed in the claims.

Applied here, the question is whether the appellants used Monsanto's genetically modified cells and genes as they existed in the laboratory prior to differentiation and propagation — or the process of genetic alteration. The question is not whether the appellants deprived Monsanto of some or all the commercial benefits of their invention.

### (2) The Law on Use

With respect, in my view, the case law does not support my colleagues' interpretation of use. Much of the jurisprudence on "use" and various analogies are unhelpful because of the unique properties of biological materials, especially higher life forms that can self-replicate and spread. The fact that self-replicating materials are difficult to place within the confines of the *Patent Act* was acknowledged by the Federal Court of Appeal, at para. 57: ". . . it seems to me arguable that the patented Monsanto gene falls into a novel category. It is a patented invention found within a living plant that may, without human intervention, produce progeny containing the same invention."

It is well established that the use or sale of unpatented subject matter may still infringe a patent where the unpatented subject matter is made employing a patented process: *Saccharin Corp. v. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307 (H.C.J.); *F. Hoffmann-Laroche*, *supra*, at p. 415; *Wellcome Foundation Ltd. v. Apotex Inc.* (1991), 39 C.P.R. (3d) 289 (F.C.T.D.); *American Cyanamid Co. v. Charles E. Frosst & Co.* (1965), 29

Par conséquent, les mots « exploiter » et « invention » doivent être interprétés ensemble et la portée du mot « exploiter » doit être limitée par celle des revendications. 151

Le critère applicable pour déterminer s'il y a eu « exploitation » consiste à se demander si le présumé exploiteur a privé le titulaire du brevet non pas des avantages commerciaux de son invention, mais plutôt de son monopole de l'exploitation de l'invention expliquée dans les revendications. 152

En l'espèce, ce critère consiste à se demander si les appelants ont exploité les gènes et les cellules génétiquement modifiés de Monsanto, tels qu'ils existaient en laboratoire avant leur différenciation et leur multiplication — ou le procédé de modification génétique. Il ne s'agit pas de savoir si les appelants ont privé Monsanto de tous les avantages commerciaux de son invention, ou d'une partie de ceux-ci. 153

### (2) Le droit en matière d'exploitation

En toute déférence, j'estime que la jurisprudence n'étaye pas l'interprétation que mes collègues donnent du verbe « exploiter ». Une bonne partie de la jurisprudence relative au verbe « exploiter » ainsi que diverses analogies sont inutiles en raison des propriétés uniques des matières biologiques et, plus particulièrement, des formes de vie supérieures qui peuvent se reproduire et se propager. La Cour d'appel fédérale a reconnu, au par. 57, la difficulté d'appliquer la *Loi sur les brevets* aux matières capables de se reproduire : « . . . il [. . .] semble contestable que le gène Monsanto breveté appartienne à une nouvelle catégorie. Il s'agit d'une invention brevetée existant dans une plante vivante qui peut, sans intervention humaine, produire une descendance contenant la même invention. » 154

Il est bien établi que l'exploitation ou la vente d'un objet non breveté peut tout de même contrefaire un brevet lorsque cet objet non breveté est fabriqué au moyen d'un procédé breveté : *Saccharin Corp. c. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307 (H.C.J.); *F. Hoffmann-Laroche*, précité, p. 415; *Wellcome Foundation Ltd. c. Apotex Inc.* (1991), 39 C.P.R. (3d) 289 (C.F. 1^re inst.); *American Cyanamid Co. c. Charles E. Frosst & Co.* (1965), 29 155

Fox Pat. C. 153 (Ex. Ct.). This proposition does not assist the respondent, however. The appellants have not infringed the process claim because they have not used the claimed method to produce their canola crop.

156    The real question is whether a patented product (the gene or cell) extends patent protection to the unpatentable object into which it is incorporated. The respondents and the intervener, BIOTECanada, further contend that "[i]t is trite law that an unpatentable composition of matter can be an infringement by virtue of it incorporating patented material" (joint factum of BIOTECanada and the Canadian Seed Trade Association, at para. 39 (emphasis added)), but, like my colleagues, provided no authority on this point. In any event, there is no genuinely useful analogy between growing a plant in which every cell and every cell of all its progeny are remotely traceable to the genetically modified cell and contain the chimeric gene and putting a zipper in a garment, or tires on a car or constructing with Lego blocks. The analogies are particularly weak when it is considered that the plant can subsequently grow, reproduce, and spread with no further human intervention.

157    One option that was urged on us by the appellants was to incorporate a knowledge element into the definition of "use". Such a solution would be broadly applicable to other types of patents and lend uncertainty to a settled issue in Canadian patent law that intention is irrelevant to infringement: *Terrell on the Law of Patents* (15th ed. 2000), at para. 8.10; *Hughes and Woodley on Patents* (1984), at § 26; *British United Shoe Machinery Co. v. Gimson Shoe Machinery Co.* (1928), 45 R.P.C. 290 (C.A.), at p. 308; *Computalog Ltd. v. Comtech Logging Ltd.* (1992), 44 C.P.R. (3d) 77 (F.C.A.), at p. 88; *Illinois Tool Works Inc. v. Cobra Anchors Co.* (2002), 221 F.T.R. 161, 2002 FCT 829. Lord Hoffmann in *Merrell Dow Pharmaceuticals Inc. v. H.N. Norton & Co.*, [1996] R.P.C. 76 (H.L.), at p. 92, pointed out that since liability is absolute, the alleged infringer's

Fox Pat. C. 153 (C. de l'É.). Cette proposition n'est cependant d'aucune utilité aux intimées. Les appelants n'ont pas contrefait la revendication relative au procédé parce qu'ils n'ont pas exploité la méthode revendiquée pour produire leur culture de canola.

La véritable question est de savoir si un produit breveté (le gène ou la cellule) incorporé dans un objet non brevetable a pour effet d'étendre à l'objet non brevetable la protection conférée par le brevet. Les intimées et l'intervenante BIOTECanada prétendent, en outre, qu'[TRADUCTION] « [i]l est bien établi qu'une composition de matières non brevetable dans laquelle est incorporée une matière brevetée peut constituer de la contrefaçon » (mémoire conjoint de BIOTECanada et de l'Association canadienne du commerce des semences, par. 39 (je souligne)), mais, à l'instar de mes collègues, ils ne citent aucune jurisprudence ni aucune doctrine à cet égard. Quoi qu'il en soit, il n'existe aucune analogie vraiment utile entre cultiver une plante dont chaque cellule, ainsi que chaque cellule de toute sa descendance, peut être vaguement reliée à la cellule génétiquement modifiée et contient le gène chimère et munir un vêtement d'une fermeture éclair ou une voiture de pneus, ou encore construire à l'aide de blocs Lego. Ces analogies sont particulièrement faibles lorsqu'on tient compte du fait que la plante peut subséquemment croître, se reproduire et se propager sans autre intervention humaine.

Une solution que les appelants nous ont proposé d'adopter consistait à incorporer un élément de connaissance dans la définition du verbe « exploiter ». Cette solution, qui serait généralement applicable aux autres types de brevet, créerait de l'incertitude au sujet d'une question déjà réglée en droit canadien des brevets, à savoir que l'intention n'est pas pertinente en matière de contrefaçon : *Terrell on the Law of Patents* (15e éd. 2000), par. 8.10; *Hughes and Woodley on Patents* (1984), § 26; *British United Shoe Machinery Co. c. Gimson Shoe Machinery Co.* (1928), 45 R.P.C. 290 (C.A.), p. 308; *Computalog Ltd. c. Comtech Logging Ltd.* (1992), 44 C.P.R. (3d) 77 (C.A.F.), p. 88; *Illinois Tool Works Inc. c. Cobra Fixations Cie*, [2002] A.C.F. no 1104 (QL), 2002 CFPI 829. Dans l'arrêt *Merrell Dow Pharmaceuticals Inc. c. H.N. Norton & Co.*, [1996]

state of mind is irrelevant. "[I]t is and always has been the law in relation to direct infringement that the knowledge or intention of the infringer is irrelevant" (*Terrell on the Law of Patents*, *supra*, at para. 8.08).

Most people are not aware of the contents of patents but are effectively deemed to have knowledge. What matters is what the person does. If the person's acts interfere with the exclusive rights granted by the patent, then there is infringement: *Pfizer Corp. v. Ministry of Health*, [1965] A.C. 512 (H.L.). A case such as *British United Shoe Machinery Co. v. Simon Collier Ld.* (1910), 27 R.P.C. 567 (H.L.), that may suggest the contrary is unusual and restricted to its facts: *Pfizer*, *supra*, or goes to remedy and not infringement: *Terrell on the Law of Patents*, *supra*, at para. 8.09. As pointed out by my colleagues, the presumption of use may only be rebutted in the very rare circumstances, such as in *British United Shoe Machinery Co. v. Simon Collier Ld.*, *supra*, where neither the product nor its stand-by value was used.

A truly innocent infringer may be able to rebut the presumption of use. However, that would likely prove difficult once the innocent infringer became aware that the genetically modified crop was present — or was likely to be present — on his or her land and continued to practice traditional farming methods, such as saving seed. The complexities and nuances of innocent bystander protection in the context of agricultural biotechnology should be expressly considered by Parliament because it can only be inadequately accommodated by the law on use.

### (3) Conclusion on Infringement

In the result, the lower courts erred not only in construing the claims to extend to plants and seed, but in construing "use" to include the use of subject matter disclaimed by the patentee, namely the plant. The appellants as users were entitled to rely on the reasonable expectation that plants, as unpatentable

R.P.C. 76 (H.L.), p. 92, lord Hoffmann a souligné que, puisque la responsabilité est absolue, l'état d'esprit du présumé contrefacteur n'est pas pertinent. [TRADUCTION] « [I]l est acquis qu'en matière de contrefaçon directe la connaissance ou l'intention du contrefacteur n'est pas pertinente » (*Terrell on the Law of Patents*, *op. cit.*, par. 8.08).

158

La plupart des gens ne connaissent pas le contenu des brevets, mais sont effectivement réputés le connaître. L'important est ce que la personne fait. Si les actes d'une personne portent atteinte aux droits exclusifs conférés par le brevet, il y a contrefaçon : *Pfizer Corp. c. Ministry of Health*, [1965] A.C. 512 (H.L.). Un arrêt tel *British United Shoe Machinery Co. c. Simon Collier Ld.* (1910), 27 R.P.C. 567 (H.L.), qui peut indiquer le contraire, est inhabituel et constitue un cas d'espèce (*Pfizer*, précité) ou porte sur la réparation et non sur la contrefaçon (*Terrell on the Law of Patents*, *op. cit.*, par. 8.09). Comme le soulignent mes collègues, la présomption d'exploitation n'est réfutable que dans des circonstances très rares, comme celles de l'arrêt *British United Shoe Machinery Co. c. Simon Collier Ld.*, précité, où ni le produit ni sa valeur latente n'ont été exploités.

159

Un contrefacteur vraiment innocent peut être en mesure de réfuter la présomption d'exploitation. Cependant, il lui serait probablement difficile de le faire une fois qu'il a pris connaissance de la présence, réelle ou probable, de la plante génétiquement modifiée sur sa terre et qu'il a continué d'utiliser ses méthodes de culture traditionnelles, comme celle consistant à conserver des semences. Le législateur devrait examiner expressément les complexités et nuances de la protection du contrefacteur innocent dans le contexte de la biotechnologie agricole, étant donné que le droit en matière d'exploitation ne peut en tenir compte que d'une manière insuffisante.

### (3) Conclusion sur la contrefaçon

160

En définitive, les tribunaux inférieurs ont commis une erreur en considérant non seulement que les revendications s'appliquent aux plantes et aux semences, mais encore que le verbe « exploiter » signifie également exploiter l'objet auquel le titulaire du brevet a renoncé, à savoir la plante. En tant

subject matter, fall outside the scope of patent protection. Accordingly, the cultivation of plants containing the patented gene and cell does not constitute an infringement. The plants containing the patented gene can have no stand-by value or utility as my colleagues allege. To conclude otherwise would, in effect, confer patent protection on the plant.

161    Uses that would constitute an infringement include using the chimeric gene in its isolated form to create an expression or cloning vector or a transformation vector and using the transformation vector to create a transgenic plant cell. The use claimed for the plant cell extends to the isolated plant cell in a laboratory culture used to regenerate a "founder plant" but not to its offspring.

162    There is no claim for a "glyphosate-resistant" plant and all its offspring. Therefore saving, planting, or selling seed from glyphosate-resistant plants does not constitute an infringing use.

163    Obviously, as was done here, Monsanto can still license the sale of seeds that it produces from its patented invention and can impose contractual obligations on the licencee. Licensing allows the patent owner to impose conditions on the use of the plant, such as a prohibition on saving seeds, with the concomitant ability to sue the farmer for breach of contract if the farmer violates any of the terms of the licence.

G.  *The Conclusion Is Consistent With Canada's International Obligations Under the Agreement on Trade-Related Aspects of Intellectual Property Rights*

164    In *Harvard College*, *supra*, both the majority and the minority called for Parliament's intervention on

qu'exploiteurs, les appelants pouvaient raisonnablement s'attendre à ce que les objets non brevetables que sont les plantes ne bénéficient pas de la protection conférée par le brevet. Par conséquent, la culture des plantes contenant le gène et la cellule brevetés ne constitue pas de la contrefaçon. Les plantes contenant le gène breveté ne peuvent avoir aucune valeur ou utilité latente, contrairement à ce qu'affirment mes collègues. Toute conclusion contraire aurait pour effet de rendre applicable à la plante la protection conférée par le brevet.

Parmi les exploitations qui constitueraient de la contrefaçon, il y a l'exploitation du gène chimère sous sa forme isolée pour créer un vecteur d'expression ou de clonage ou encore un vecteur de transformation, et l'exploitation du vecteur de transformation pour créer une cellule végétale transgénique. L'exploitation revendiquée de la cellule végétale a trait à la cellule végétale isolée qui se trouve dans une culture en laboratoire servant à régénérer une « plante fondatrice », mais non à sa descendance.

Il n'y a aucune revendication relative à une plante « résistant au glyphosate » et à toute sa descendance. Par conséquent, le fait de conserver, de mettre en terre ou de vendre des semences provenant de plantes résistant au glyphosate ne constitue pas une exploitation contrefaisante.

De toute évidence, comme cela a été fait en l'espèce, Monsanto peut toujours accorder des licences autorisant la vente des semences qu'elle produit à partir de son invention brevetée et imposer des obligations contractuelles au titulaire de la licence. En accordant des licences, le titulaire du brevet peut assujettir l'exploitation de la plante à certaines conditions, telle l'interdiction de conserver des semences, et se réserver ainsi la capacité de poursuivre l'agriculteur pour rupture de contrat si ce dernier viole l'une ou l'autre des conditions de la licence.

G.  *La conclusion est conforme aux obligations internationales incombant au Canada en vertu de l'Accord sur les aspects des droits de propriété intellectuelle qui touchent au commerce*

Dans l'arrêt *Harvard College*, précité, tant les juges majoritaires que les juges dissidents ont

the issue of patenting higher life forms. As things stand, my conclusion on the scope of Monsanto's patent claims that is determinative of both validity and infringing use is not contrary to art. 27(1) of *TRIPS* whereby Canada has agreed to make patents available for any invention without discrimination as to the field of technology.

The Canadian Biotechnology Advisory Committee, in *Patenting of Higher Life Forms and Related Issues* (June 2002), suggests that the contrary may, in fact, be the case. The use of biologically replicating organisms as a "vehicle" for genetic patents may overcompensate the patentee both in relation to what was invented, and to other areas of invention. The Canadian Biotechnology Advisory Committee explains the point as follows (at p. 12):

Because higher life forms can reproduce by themselves, the grant of a patent over a plant, seed or non-human animal covers not only the particular plant, seed or animal sold, but also all its progeny containing the patented invention for all generations until the expiry of the patent term (20 years from the priority date). In addition, much of the value of the higher life form, particularly with respect to animals, derives from the natural characteristics of the original organism and has nothing to do with the invention. In light of these unique characteristics of biological inventions, granting the patent holder exclusive rights that extend not only to the particular organism embodying the invention but also to all subsequent progeny of that organism represents a significant increase in the scope of rights offered to patent holders. It also represents a greater transfer of economic interests from the agricultural community to the biotechnology industry than exists in other fields of science.

My conclusion does not violate, and indeed is supported by art. 27(3)(b) of *TRIPS*, that states:

recommandé l'intervention du législateur sur la question de la brevetabilité des formes de vie supérieures. Dans l'état actuel des choses, ma conclusion sur la portée des revendications du brevet de Monsanto, qui est déterminante en ce qui concerne, à la fois, la question de la validité et celle de l'exploitation contrefaisante, ne contrevient pas au par. 27(1) de l'*ADPIC*, aux termes duquel le Canada a consenti à rendre brevetable, sans discrimination, toute invention relevant du domaine technologique.

Dans le rapport intitulé *Brevetabilité des formes de vie supérieures et enjeux connexes* (juin 2002), le Comité consultatif canadien de la biotechnologie indique qu'il se peut, en fait, que le contraire soit vrai. L'utilisation d'organismes biologiques autoreproducteurs en tant que « moyen » d'obtenir des brevets génétiques peut être trop favorable au titulaire du brevet, tant en ce qui concerne ce qu'il a inventé qu'en ce qui concerne d'autres domaines d'invention. Le Comité consultatif canadien de la biotechnologie explique ce point de vue de la façon suivante (p. 12) :

Étant donné que les formes de vie supérieures peuvent se reproduire sans aide, la délivrance d'un brevet sur une plante, une graine ou un animal couvre non seulement la plante, la graine ou l'animal vendu, mais également toute sa descendance renfermant l'invention brevetée, et ce pour toutes les générations jusqu'à l'expiration du brevet (20 ans à compter de la date d'antériorité). De plus, une grande partie de la valeur de toute forme de vie supérieure, particulièrement dans le cas d'animaux, provient des caractéristiques naturelles de l'organisme d'origine et n'a rien à voir avec l'invention. Vu les attributs uniques des inventions biologiques, l'octroi exclusivement au détenteur du brevet de droits qui s'appliquent non seulement à l'organisme renfermant l'invention, mais également à toute sa descendance représente une augmentation substantielle de la portée des droits offerts aux détenteurs de brevets. Il représente également un plus grand transfert d'intérêts économiques de la communauté agricole en faveur de l'industrie de la biotechnologie que dans d'autres champs scientifiques.

Ma conclusion ne contrevient pas à l'al. 27(3)b) de l'*ADPIC*, mais est plutôt étayée par cet alinéa, qui prévoit :

165

166

*Article 27*

. . .

3.  Members may also exclude from patentability:

. . .

(b)  plants and animals other than micro-organisms, and essentially biological processes for the production of plants or animals other than non-biological and microbiological processes. However, Members shall provide for the protection of plant varieties either by patents or by an effective *sui generis* system or by any combination thereof. . . .

167   Allowing gene and cell claims to extend patent protection to plants would render this provision of *TRIPS* meaningless. To find that possession of plants, as the embodiment of a gene or cell claim, constitute a "use" of that claim would have the same effect as patenting the plant. Therefore, my conclusion on both the scope of the claims and the scope of use is consistent with Canada's international obligations under *TRIPS*.

168   Canada has a *sui generis* system of protection for plants. The *Plant Breeders' Rights Act*, S.C. 1990, c. 20, represents a nuanced statutory regime that takes into consideration the rights of both the developers of new plant varieties and users. There is nothing in the *Plant Breeders' Rights Act* that would exclude genetically modified new plant varieties, such as Roundup Ready Canola, from its purview.

169   While the "rights available under the *Plant Breeders' Rights Act* fall well short of those conferred by patent, both in comprehensiveness and in duration" (*Harvard College*, *supra*, at para. 61), they may be all that Monsanto is entitled to. Indeed, Professor Vaver, *supra*, at p. 128, recognizes that patents should not necessarily be available when other, more tailored intellectual property protection exits. Monsanto has since had the opportunity to come within its protection even though the Act was not in force when Monsanto was granted its patent.

*Article 27*

. . .

3.  Les Membres pourront aussi exclure de la brevetabilité :

. . .

b)  les végétaux et les animaux autres que les micro-organismes, et les procédés essentiellement biologiques d'obtention de végétaux ou d'animaux, autres que les procédés non biologiques et microbiologiques. Toutefois, les Membres prévoiront la protection des variétés végétales par des brevets, par un système *sui generis* efficace, ou par une combinaison de ces deux moyens. . .

Permettre que les revendications relatives au gène et à la cellule étendent aux plantes la protection par brevet dépouillerait l'*ADPIC* de tout son sens. Conclure que la possession de plantes, en tant que réalisation de la revendication relative à un gène ou à une cellule, constitue une « exploitation » de cette revendication aurait la même incidence que breveter la plante. Par conséquent, ma conclusion sur la portée des revendications et celle de l'exploitation est conforme aux obligations internationales qui incombent au Canada en vertu de l'*ADPIC*.

Le Canada possède un système *sui generis* de protection des plantes. La *Loi sur la protection des obtentions végétales*, L.C. 1990, ch. 20, est un régime législatif nuancé qui tient compte des droits des obtenteurs de nouvelles variétés de plantes et de ceux des utilisateurs. Rien dans cette loi ne permet d'exclure de son champ d'application les nouvelles variétés de plantes génétiquement modifiées, comme le canola Roundup Ready.

Même si, « [s]ur le plan de la portée générale et de la durée, les droits offerts par la *Loi sur la protection des obtentions végétales* sont bien loin de correspondre à ceux conférés par un brevet » (*Harvard College*, précité, par. 61), ce sont peut-être les seuls auxquels Monsanto puisse prétendre. En effet, le professeur Vaver, *op. cit.*, p. 128, reconnaît qu'il ne devrait pas nécessairement être possible d'obtenir un brevet lorsqu'il existe une autre forme de protection intellectuelle mieux adaptée. Depuis, Monsanto a eu la possibilité de bénéficier de la protection de cette loi même si elle n'était pas en vigueur au moment de la délivrance de son brevet.

In light of my conclusion on the issue of infringement, it is unnecessary for me to consider the other issues on appeal.

Vu ma conclusion sur la question de la contrefaçon, il n'est pas nécessaire que j'examine les autres questions soulevées dans le pourvoi.

170

### III.  Disposition

I would allow the appeal with costs to the appellants throughout.

### III.  Dispositif

J'accueillerais le pourvoi avec dépens en faveur des appelants dans toutes les cours.

171

## APPENDIX

## ANNEXE

*Patent Document Number 1,313,830: Glyphosate-Resistant Plants*

*Brevet numéro 1,313,830 : Plantes résistant au glyphosate*

[TRADUCTION]

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

Les réalisations de l'invention qui font l'objet d'une revendication de propriété ou de privilège exclusifs sont définies de la façon suivante :

**1.** A chimeric plant gene which comprises:

(a)  a promoter sequence which functions in plant cells;

(b)  a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and

(c)  a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA;

the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.

**1.** Un gène chimère pour plante qui comprend :

a)  un promoteur fonctionnant dans des cellules végétales;

b)  une séquence de codage qui produit l'ARN codant le peptide de transfert vers les chloroplastes et le polypeptide de fusion 5-énolpyruvylshikimate-3-phosphate synthase (EPSPS), lequel peptide de transfert vers les chloroplastes permet de transporter le polypeptide de fusion jusque dans un chloroplaste de cellule végétale;

c)  une région non traduite en 3' qui code un signal de polyadénylation qui, dans les cellules végétales, permet l'addition de nucléotides de polyadénylates à l'extrémité 3' de l'ARN;

le promoteur est hétérologue eu égard à la séquence de codage et adapté pour permettre une expression suffisante du polypeptide de fusion afin d'améliorer la résistance au glyphosate de la cellule végétale transformée à l'aide du gène.

**2.** A chimeric gene of Claim 1 in which the promoter sequence is a plant virus promoter sequence.

**2.** Un gène chimère de la revendication 1, dans lequel le promoteur est un promoteur de phytovirus.

**3.** A chimeric gene of Claim 2 in which the promoter sequence is a promoter sequence from cauliflower mosaic virus (CaMV).

**3.** Un gène chimère de la revendication 2, dans lequel le promoteur est un promoteur du virus de la mosaïque du chou-fleur (CaMV).

**4.** A chimeric gene of Claim 3 in which the promoter sequence is the CaMV35S promoter sequence.

**4.** Un gène chimère de la revendication 3, dans lequel le promoteur est le promoteur CaMV35S.

**5.** A chimeric gene of Claim 1 in which the coding sequence encodes a mutant 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS).

**5.** Un gène chimère de la revendication 1, dans lequel la séquence de codage code une 5-énolpyruvylshikimate-3-phosphate synthase (EPSPS) mutante.

**6.** A chimeric gene of Claim 1 in which the EPSPS coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants.

**7.** A chimeric gene of Claim 1 in which the chloroplast transit peptide is from a plant EPSPS gene.

**8.** A cloning or expression vector comprising a chimeric plant gene of Claim 1.

**9.** A cloning or expression vector of Claim 8 in which the chimeric plant gene encodes a chloroplast transit peptide of a plant EPSPS gene.

**10.** A cloning or expression vector of Claim 9 in which the chimeric plant gene comprises a promoter sequence from a plant virus.

**11.** A cloning or expression vector of Claim 10 in which the promoter sequence is a promoter sequence from cauliflower mosaic virus (CaMV).

**12.** A cloning or expression vector of Claim 11 in which the promoter sequence is the CaMV35S promoter sequence.

**13.** A cloning or expression vector of Claim 8 in which the chimeric plant gene comprises a coding sequence encoding a mutant 5-enolpyruvylshikimate-3-phosphate synthase.

**14.** A cloning or expression vector of Claim 8 in which the coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants.

**15.** A plant transformation vector which comprises a chimeric gene of Claim 1.

**16.** A plant transformation vector of Claim 15 in which the chimeric plant gene encodes a chloroplast transit peptide of a plant EPSPS gene.

**17.** A plant transformation vector of Claim 15 in which the chimeric plant gene comprises a promoter sequence from a plant virus.

**18.** A plant transformation vector of Claim 17 in which the promoter sequence is a promoter sequence from cauliflower mosaic virus (CaMV).

**19.** A plant transformation vector of Claim 18 in which the promoter sequence is the CaMV35S promoter sequence.

**6.** Un gène chimère de la revendication 1, dans lequel la séquence de codage de l'EPSPS code une EPSPS d'un organisme choisi dans le groupe des bactéries, des champignons et des plantes.

**7.** Un gène chimère de la revendication 1, dans lequel le peptide de transfert vers un chloroplaste provient d'un gène d'EPSPS de plante.

**8.** Un vecteur de clonage ou d'expression comportant un gène chimère pour plante de la revendication 1.

**9.** Un vecteur de clonage ou d'expression de la revendication 8, dans lequel le gène chimère pour plante code un peptide de transfert vers le chloroplaste d'un gène d'EPSPS de plante.

**10.** Un vecteur de clonage ou d'expression de la revendication 9, dans lequel le gène chimère pour plante comporte un promoteur de phytovirus.

**11.** Un vecteur de clonage ou d'expression de la revendication 10, dans lequel le promoteur est un promoteur du virus de la mosaïque du chou-fleur (CaMV).

**12.** Un vecteur de clonage ou d'expression de la revendication 11, dans lequel le promoteur est le promoteur CaMV35S.

**13.** Un vecteur de clonage ou d'expression de la revendication 8, dans lequel le gène chimère pour plante comporte une séquence de codage codant une 5-énolpyruvylshikimate-3-phosphate synthase mutante.

**14.** Un vecteur de clonage ou d'expression de la revendication 8, dans lequel la séquence de codage code une EPSPS d'un organisme choisi dans le groupe des bactéries, des champignons et des plantes.

**15.** Un vecteur de transformation de plantes comportant un gène chimère de la revendication 1.

**16.** Un vecteur de transformation de plantes de la revendication 15, dans lequel le gène chimère pour plante code un peptide de transfert vers le chloroplaste d'un gène d'EPSPS de plante.

**17.** Un vecteur de transformation de plantes de la revendication 15, dans lequel le gène chimère pour plante comporte un promoteur de phytovirus.

**18.** Un vecteur de transformation de plantes de la revendication 17, dans lequel le promoteur est un promoteur du virus de la mosaïque du chou-fleur (CaMV).

**19.** Un vecteur de transformation de plantes de la revendication 18, dans lequel le promoteur est le promoteur CaMV35S.

**20.** A plant transformation vector of Claim 15 in which the chimeric plant gene comprises a coding sequence encoding a mutant 5-enolpyruvylshikimate-3-phosphate synthase.

**21.** A plant transformation vector of Claim 15 in which the coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants.

**22.** A glyphosate-resistant plant cell comprising a chimeric plant gene of Claim 1.

**23.** A glyphosate-resistant plant cell of Claim 22 in which the promoter sequence is a plant virus promoter sequence.

**24.** A glyphosate-resistant plant cell of Claim 23 in which the promoter sequence is a promoter sequence from cauliflower mosaic virus (CaMV).

**25.** A glyphosate-resistant plant cell of Claim 24 in which the promoter sequence is the CaMV35S promoter sequence.

**26.** A glyphosate-resistant plant cell of Claim 22 in which the coding sequence encodes a mutant 5-enolpyruvylshikimate-3-phosphate synthase.

**27.** A glyphosate-resistant plant cell of Claim 22 in which the coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants.

**28.** A glyphosate-resistant plant cell of Claim 22 in which the chloroplast transit peptide is from a plant EPSPS gene.

**29.** A method for producing a glyphosate-resistant dicotyledonous plant which comprises:

(a) transforming plant cells using an *Agrobacterium* transformation vector comprising a chimeric plant gene of Claim 1; and

(b) regenerating glyphosate-resistant plants from said transformed plant cells.

**30.** A method of Claim 29 in which the chimeric plant gene comprises a plant virus promoter sequence.

**31.** A method of Claim 30 in which the promoter sequence is a promoter sequence from cauliflower mosaic virus (CaMV).

**20.** Un vecteur de transformation de plantes de la revendication 15, dans lequel le gène chimère pour plante comporte une séquence de codage codant une 5-énolpyruvylshikimate-3-phosphate synthase mutante.

**21.** Un vecteur de transformation de plantes de la revendication 15, dans lequel la séquence de codage code une EPSPS d'un organisme choisi dans le groupe des bactéries, des champignons et des plantes.

**22.** Une cellule végétale résistant au glyphosate, comportant un gène chimère pour plante de la revendication 1.

**23.** Une cellule végétale résistant au glyphosate de la revendication 22, dans laquelle le promoteur est un promoteur de phytovirus.

**24.** Une cellule végétale résistant au glyphosate de la revendication 23, dans laquelle le promoteur est un promoteur du virus de la mosaïque du chou-fleur (CaMV).

**25.** Une cellule végétale résistant au glyphosate de la revendication 24, dans laquelle le promoteur est le promoteur CaMV35S.

**26.** Une cellule végétale résistant au glyphosate de la revendication 22, dans laquelle la séquence de codage code une 5-enolpyruvylshikimate-3-phosphate synthase mutante.

**27.** Une cellule végétale résistant au glyphosate de la revendication 22, dans laquelle la séquence de codage code une EPSPS d'un organisme choisi dans le groupe des bactéries, des champignons et des plantes.

**28.** Une cellule végétale résistant au glyphosate de la revendication 22, dans laquelle le peptide de transfert vers un chloroplaste provient d'un gène d'EPSPS de plante.

**29.** Une méthode de production d'une dicotylédone résistant au glyphosate, qui consiste :

a) à transformer des cellules végétales en utilisant comme vecteur un *Agrobacterium* comportant un gène chimère pour plante de la revendication 1;

b) à régénérer des plantes résistant au glyphosate à partir des cellules végétales transformées.

**30.** Une méthode de la revendication 29, dans laquelle le gène chimère pour plante comporte un promoteur de phytovirus.

**31.** Une méthode de la revendication 30, dans laquelle le promoteur est un promoteur du virus de la mosaïque du chou-fleur (CaMV).

MONSANTO CANADA INC. *v.* SCHMEISER

**32.** A method of Claim 31 in which the promoter sequence is the CaMV35S promoter sequence.

**33.** A method of Claim 29 in which the chimeric gene comprises a coding sequence encoding a mutant 5-enolpyruvylshikimate-3-phosphate synthase.

**34.** A method of Claim 29 in which the coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants.

**35.** A method of Claim 29 in which the coding sequence encodes the chloroplast transit peptide from a plant EPSPS gene.

**36.** A method for producing a glyphosate-resistant plant cell which comprises transforming the plant cell with a plant transformation vector of Claim 15.

**37.** A method of Claim 36 in which the chimeric gene comprises a promoter sequence from a plant virus.

**38.** A method of Claim 37 in which the promoter sequence is a promoter sequence from cauliflower mosaic virus (CaMV).

**39.** A method of Claim 38 in which the promoter sequence is the CaMV35S promoter sequence.

**40.** A method of Claim 36 in which the chimeric gene comprises a coding sequence encoding a mutant 5-enolpyruvylshikimate-3-phosphate synthase.

**41.** A method of Claim 36 in which the coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants.

**42.** A method of Claim 36 in which the coding sequence encodes the chloroplast transit peptide from a plant EPSPS gene.

**43.** A glyphosate-resistant tomato cell of Claim 22.

**44.** A glyphosate-resistant tobacco cell of Claim 22.

**45.** A glyphosate-resistant oil seed rape cell of Claim 22.

**46.** A glyphosate-resistant flax cell of Claim 22.

**47.** A glyphosate-resistant soybean cell of Claim 22.

**32.** Une méthode de la revendication 31, dans laquelle le promoteur est le promoteur CaMV35S.

**33.** Une méthode de la revendication 29, dans laquelle le gène chimère comporte une séquence de codage codant une 5-énolpyruvylshikimate-3-phosphate synthase mutante.

**34.** Une méthode de la revendication 29, dans laquelle la séquence codage code une EPSPS d'un organisme choisi dans le groupe des bactéries, des champignons et des plantes.

**35.** Une méthode de la revendication 29, dans laquelle la séquence de codage code le peptide de transfert vers le chloroplaste d'un gène d'EPSPS de plante.

**36.** Une méthode de production d'une cellule végétale résistant au glyphosate, qui consiste à transformer la cellule végétale à l'aide d'un vecteur de transformation de plantes de la revendication 15.

**37.** Une méthode de la revendication 36, dans laquelle le gène chimère comporte un promoteur de phytovirus.

**38.** Une méthode de la revendication 37, dans laquelle le promoteur est un promoteur du virus de la mosaïque du chou-fleur (CaMV).

**39.** Une méthode de la revendication 38, dans laquelle le promoteur est le promoteur CaMV35S.

**40.** Une méthode de la revendication 36, dans laquelle le gène chimère comporte une séquence de codage codant une 5-énolpyruvylshikimate-3-phosphate synthase mutante.

**41.** Une méthode de la revendication 36, dans laquelle la séquence de codage code une EPSPS d'un organisme choisi dans le groupe des bactéries, des champignons et des plantes.

**42.** Une méthode de la revendication 36, dans laquelle la séquence de codage code le peptide de transfert vers le chloroplaste d'un gène d'EPSPS de plante.

**43.** Une cellule de tomate résistant au glyphosate de la revendication 22.

**44.** Une cellule de tabac résistant au glyphosate de la revendication 22.

**45.** Une cellule de colza oléagineux résistant au glyphosate de la revendication 22.

**46.** Une cellule de lin résistant au glyphosate de la revendication 22.

**47.** Une cellule de soja résistant au glyphosate de la revendication 22.

**48.** A glyphosate-resistant sunflower cell of Claim 22.

**49.** A glyphosate-resistant sugar beet cell of Claim 22.

**50.** A glyphosate-resistant alfalfa cell of Claim 22.

**51.** A glyphosate-resistant cotton cell of Claim 22.

**52.** Plasmid pMON546, ATCC accession number 53213.

*Appeal allowed in part,* IACOBUCCI, BASTARACHE, ARBOUR *and* LEBEL JJ. *dissenting in part.*

*Solicitors for the appellants: Priel, Stevenson, Hood & Thornton, Saskatoon.*

*Solicitors for the respondents: Sim, Hughes, Ashton & McKay, Toronto.*

*Solicitor for the intervener the Attorney General for Ontario: Ministry of the Attorney General of Ontario, Toronto.*

*Solicitors for the intervener the Canadian Canola Growers Association: McCarthy & Brown, Carman, Manitoba.*

*Solicitors for the intervener Ag-West Biotech Inc.: McDougall Gauley, Saskatoon.*

*Solicitors for the intervener BIOTECanada: Gowling Lafleur Henderson, Ottawa.*

*Solicitors for the intervener the Canadian Seed Trade Association: Smart & Biggar, Ottawa.*

*Solicitors for the interveners the Council of Canadians, the Action Group on Erosion, Technology and Concentration, the Sierra Club of Canada, the National Farmers Union, the Research Foundation for Science, Technology and Ecology, and the International Centre for Technology Assessment: Sack Goldblatt Mitchell, Toronto.*

**48.** Une cellule de tournesol résistant au glyphosate de la revendication 22.

**49.** Une cellule de betterave à sucre résistant au glyphosate de la revendication 22.

**50.** Une cellule de luzerne résistant au glyphosate de la revendication 22.

**51.** Une cellule de coton résistant au glyphosate de la revendication 22.

**52.** Plasmide pMON546, numéro d'accession ATCC 53213.

*Pourvoi accueilli en partie, les juges* IACOBUCCI, BASTARACHE, ARBOUR *et* LEBEL *sont dissidents en partie.*

*Procureurs des appelants : Priel, Stevenson, Hood & Thornton, Saskatoon.*

*Procureurs des intimées : Sim, Hughes, Ashton & McKay, Toronto.*

*Procureur de l'intervenant le procureur général de l'Ontario : Ministère du procureur général de l'Ontario, Toronto.*

*Procureurs de l'intervenante Canadian Canola Growers Association : McCarthy & Brown, Carman, Manitoba.*

*Procureurs de l'intervenante Ag-West Biotech Inc. : McDougall Gauley, Saskatoon.*

*Procureurs de l'intervenante BIOTECanada : Gowling Lafleur Henderson, Ottawa.*

*Procureurs de l'intervenante l'Association canadienne du commerce des semences : Smart & Biggar, Ottawa.*

*Procureurs des intervenants le Conseil des Canadiens, le Groupe d'action sur l'érosion, la technologie et la concentration, le Sierra Club du Canada, le Syndicat national des cultivateurs, Research Foundation for Science, Technology and Ecology et International Centre for Technology Assessment : Sack Goldblatt Mitchell, Toronto.*

# TAB 8

2006 CarswellOnt 5797,

2006 CarswellOnt 5797

Close Up International Ltd. v. 1444943 Ontario Ltd.

Close Up Internantaional Ltd. v. 1444943 Ontario Ltd. (also known as Video Arena Inc.) 1179468 Ontario Ltd. (also known as Raduga Inc.), Alexandre Avroutine and Lidia Yakubovsky

Ontario Master

Master R. Dash

Heard: September 18, 2006
Judgment: September 27, 2006
Docket: 05-CV-297955PD3

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Nicholas Cartel for Plaintiff

Vadim Kats for Defendants, 1444943 Ont. Ltd., 1179468 Ont. Ltd., Avroutine

Robert Levine for Defendant, Yakubovsky

Roderic Hinton for Defendants, Kurgozor, Chyzhyk, Larin, Russian Kino, Sytnyk

Natalie Medovoy for Defendants, Russian House, Konev, Mankaouskas

Vernon Balaban for Defendants, 1562944 Ont., Blizniuk

Shana Dale for Defendants, Belisa, Pinsky, 1614622 Ont, International Discount, Zaretsky

Subject: Intellectual Property; Civil Practice and Procedure

Intellectual property --- Copyright — Practice and procedure — Parties — General principles

Intellectual property --- Copyright — Practice and procedure — Pleadings — Amendment

### Cases considered by *Master R. Dash*:

*ADGA Systems International Ltd. v. Valcom Ltd.* (1999), 41 B.L.R. (2d) 157, 117 O.A.C. 39, 168 D.L.R. (4th) 351, 1999 CarswellOnt 29, 44 C.C.L.T. (2d) 174, 43 O.R. (3d) 101, 39 C.C.E.L. (2d) 163 (Ont. C.A.) — referred to

*Bishop v. Stevens* (1987), 16 C.I.P.R. 243, 18 C.P.R. (3d) 257, 1987 CarswellNat 744, *(*sub nom. *Bishop v.*

2006 CarswellOnt 5797,

*Télé-Métropole Inc.)* 80 N.R. 302 (Fed. C.A.) — followed

*Close Up International Ltd. v. Yakubovsky* (2006), 2006 CarswellOnt 3522 (Ont. Master) — referred to

*Entral Group International Inc. v. 1438762 Ontario Inc.* (2005), 40 C.P.R. (4th) 410, 2005 CarswellOnt 2141 (Ont. Master) — considered

*Henry v. 1213962 Ontario Ltd.* (2005), 2005 CarswellOnt 2121 (Ont. Master) — referred to

*Kane Yee Pharmacy Ltd. v. TDM Drugs Inc.* (1997), *(sub nom. Yee (Kane) Pharmacy Ltd. v. TDM Drugs Inc.)* 108 O.A.C. 74, 17 C.P.C. (4th) 126, 1997 CarswellOnt 4283 (Ont. Div. Ct.) — referred to

*Masterfile Corp. v. World Internett Corp.* (2001), 2001 FCT 1416, 2001 CarswellNat 2966, 215 F.T.R. 266, 16 C.P.R. (4th) 139 (Fed. T.D.) — considered

*Mentmore Manufacturing Co. v. National Merchandise Manufacturing Co.* (1978), 40 C.P.R. (2d) 164, 1978 CarswellNat 164, 89 D.L.R. (3d) 195, 22 N.R. 161 (Fed. C.A.) — considered

*Mobilevision Technology Inc. v. Rushing Water Products Ltd.* (1984), 1 C.P.R. (3d) 385, 1984 CarswellNat 861 (Fed. T.D.) — considered

*Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 129 D.L.R. (4th) 711, 9 C.C.L.S. 97, 23 B.L.R. (2d) 165, 87 O.A.C. 129, 1995 CarswellOnt 1203, *(sub nom. ScotiaMcLeod Inc. v. Peoples Jewellers Ltd.)* 26 O.R. (3d) 481 (Ont. C.A.) — referred to

*Murray v. Imperial Chemical Industries Ltd.* (1967), [1967] 2 All E.R. 980, [1967] 44 T.C. 174, [1967] Ch. 1038 (Eng. C.A.) — considered

*Plante v. Industrial Alliance Life Insurance Co.* (2003), 3 C.C.L.I. (4th) 274, 39 C.P.C. (5th) 323, 2003 CarswellOnt 2961, 66 O.R. (3d) 74 (Ont. Master) — considered

*Radulescu v. Toronto District School Board* (December 6, 2004), Doc. 03-CV-259977CM 1 (Ont. Master) — considered

*Sydlo Inc. v. Mixing Equipment Co.* (1986), 1986 CarswellOnt 564, 8 C.P.C. (2d) 179 (Ont. Master) — considered

*876761 Ontario Inc. v. Maplewood Ravines Ltd.* (2002), 2002 CarswellOnt 1877, 22 C.P.C. (5th) 290 (Ont. Master) — considered

*955105 Ontario Inc. v. Video 99* (1993), 1993 CarswellOnt 770, 48 C.P.R. (3d) 204 (Ont. Gen. Div.) — considered

*1174538 Ontario Ltd. v. Barzel* (2001), 2001 CarswellOnt 557 (Ont. Master) — referred to

**Statutes considered:**

*Copyright Act*, R.S.C. 1985, c. C-42

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

Generally — referred to

s. 2.7 [en. 1997, c. 24, s. 2] — considered

s. 3(1) "copyright" — considered

s. 13(4) — considered

s. 13(5) — considered

s. 13(6) — considered

s. 13(7) — considered

s. 34(1) — considered

s. 35(1) — considered

s. 36(1) — considered

s. 36(2) — considered

s. 36(2)(c) — considered

s. 36(3) — considered

s. 38 — referred to

s. 38.1 [en. 1997, c. 24, s. 20(1)] — considered

s. 53(2.2) [en. 1997, c. 24, s. 30] — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

R. 5.03(5) — considered

R. 5.04(3) — considered

R. 25.11(c) — considered

R. 56.01(1)(a) — referred to

**Forms considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

Form 57B [en. O. Reg. 42/05] — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

**Master R. Dash:**

1        This action is one of a number of actions commenced by Close Up International Ltd. ("CUI"), a U.S. company, for infringement of its copyright in films. The plaintiff alleges that the defendants unlawfully reproduced, sold, rented and distributed its films without licence from the plaintiff. This is a motion by the plaintiff to amend the statement of claim by adding as parties two Canadian companies, Close Up Holdings Canada Incorporated, a federally incorporated company resident in Ontario ("CUC") and Close Up Canada Inc., an Ontario incorporated and resident company ("CUO"), that had received by way of assignment from CUI certain distribution and other rights in Canada, (referred to jointly as the "Ontario Companies") as well as three Russian companies, two that produced the films and one that had worldwide rights to reproduce and distribute the copyrighted films.

2        Although one action is referenced in the above style of cause the motion herein was one of 10 similar motions in 10 separate actions heard together and this endorsement applies to all actions.[FN1]

3        The motions to amend followed two decisions by Master Egan to award security for costs against CUI, a non-resident plaintiff, in two of the actions. The defendants in each action oppose the amendments on three grounds. Firstly they argue the claims by the two Ontario Companies are untenable at law as they have no interest in and no standing to enforce the copyright which is owned by CUI. Secondly they argue that the consent of the proposed plaintiffs was not attached as required by rule 5.04(3). Finally they argue that the motions to add resident corporations as plaintiffs should be denied as an abuse of process as they were brought for the sole purpose of avoiding security for costs. The defendants do not object to the addition of the proposed Russian plaintiffs, but I am invited by the plaintiff to consider whether the interests of justice require it. The defendants also attack portions of the proposed amended statement of claim based on an improper plea of similar facts, lack of particularity and untenable pleas personally against the individual defendants.

**The Proposed Amended Pleading**

4        In the draft fresh as amended statement of claim, all plaintiffs claim various declarations respecting the films defined as the Close-Up Works ("CUW") including a declaration that the defendants have infringed the copyright in the CUW and a declaration that the defendants breached the plaintiffs' exclusive licence and thereby infringed its copyright. The plaintiffs also seek a declaration that CUI is the owner of all rights to the trademark in the words Close-Up and the associated packaging and that CUI is owner of all rights to copyright in the packaging. They seek declarations relating to the defendants' passing off of their infringing works as CUW. They claim for an injunction under section 34(1) of the Copyright Act R.S.C. 1985, c. C-42 (the "Act") to restrain the defendants from infringing the plaintiffs' copyright by selling infringing works and reproducing labels and seek an order that the infringing works and labels be destroyed. The plaintiffs seek damages for passing off and statutory damages under section 34(1) and 38.1 of the Act, an accounting and non-pecuniary damages to the reputation of CUI.

5        The plaintiffs plead in paragraphs 4 and 22 that CUI is the owner of the copyright in the CUW and that CUI holds the exclusive right to reproduce the CUW. In paragraph 23 the plaintiffs plead that CUI has "granted a right of action for enforcement of intellectual property rights pursuant to sub-licence agreements" to CUC and CUO and in paragraph 24 that CUC and CUO are the "exclusive sub-licensees of copyright in the CUW in Canada". In paragraph 25 the plaintiffs plead that CUC through the grant of an exclusive sub-licence "acquired an interest in the copyright" of the CUW. Finally it is pleaded in paragraph 27 that CUC and CUO are the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

plaintiffs carrying on this action "on behalf of all plaintiffs" through the right of action in the licence agreements.

6      The proposed pleading read in isolation indicates that the Ontario Companies have an interest in copyright acquired through an exclusive licence and a right to enforce the copyright through action. The plaintiff however has proffered in evidence the actual agreements referenced in the pleading that purport to grant the rights to the Ontario Companies and they tell a very different story. "Documents referred to, and relied upon in a proposed pleading are incorporated in the pleading and should form part of the motion materials": *Plante v. Industrial Alliance Life Insurance Co.* (2003), 66 O.R. (3d) 74 (Ont. Master) at p. 83.

**The Agreements**

7      Two Russian film studios, referred to as Mosfilm and Lenfilm, granted exclusive worldwide copyright and licence to a third Russian company referred to as Krupniy Plan (referred to cumulatively as the Russian Companies). Krupniy Plan granted exclusive licence and copyright in the films for the United States and Canada to the plaintiff, CUI. Therefore, by way of partial assignment of copyright from the Russian Companies, CUI has the exclusive right to reproduce and distribute the films throughout the United States and Canada.

8      By Agreement dated June 30, 2005 (the "June 2005 Agreement") CUI granted CUO the exclusive right to wholesale distribution of the films in Ontario. All copies of the films were to be supplied by CUI. CUO had no right to make reproductions. CUO was to "encourage" wholesale customers in Ontario to buy directly from CUO. CUI was not prohibited from selling to such customers in Ontario, but if it did, it was required to credit CUO with the sale price received less certain costs, such that CUO retains all "profits" therefrom. CUI agreed to "perform any necessary actions to suppress video piracy" in Toronto against stores "violating the copyright in the Films." CUO was given the "legal rights to independent and joint (with the Dealer) actions to suppress illegal copying and distribution of the Films of the Dealer by third parties." CUI is referred to as the "Dealer". The contract by its terms expired in June 2006.

9      By Distributorship Agreement dated March 27, 2006 (the "March 2006 Agreement") CUI granted CUC the exclusive right to wholesale distribution of the films in Canada except Ontario until August 31, 2006 and thereafter throughout Canada including Ontario. The preamble references a "license to sell, distribute and rent" the licensed products in the territory. All copies of the films were to be supplied by CUI. CUC had no right to make reproductions. CUC was to "recommend" to retailers in the territory to buy directly from CUC. CUI was not prohibited from selling to such customers in Canada, but if it did, it was required to credit CUC with the sale price received less certain costs, such that CUC receives all "profits" of such direct sales. The agreement refers to CUI as the "dealer" and provides that CUC "has full legal rights for joint actions with the Dealer to enforce and protect all *rights of the dealer* in any court" in Canada (emphasis added). The agreement is silent on CUC enforcing its own distribution rights.

10      The plaintiff refers to both of the above agreements as exclusive licensing agreements. I agree they are licensing agreements, but it is less clear that they are exclusive, as opposed to sole, licensing agreements. This becomes an important distinction when determining if the Ontario Companies have any copyright interest in the films.

11      Finally, pursuant to a Share Purchase Agreement dated June 5, 2006 (the "June 2006 Agreement") CUC purchased all the "shares and debt" of CUO. There is a reference to a monetary sum representing the value of CUO's interest in the licence from CUI as a component of the purchase price of the shares. The plaintiff submits

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

that as a result of this agreement CUC obtained all of the rights of CUO under the June 2005 Agreement and is thus able to assert claims in Ontario for unlawful distribution of the films. I disagree. CUC became the sole shareholder of CUO, and with it the right to control the actions of CUO, but in my view it did not specifically purchase its assets, including the license to distribute in Ontario. There is no specific assignment from CUO to CUC of any rights under licence. This is of little consequence however since for purposes of this motion the rights of CUC as a separate entity to distribute in Ontario arise out of the March 2006 Agreement which granted rights in Ontario as of September 1, 2006.

**Are the Amendments Adding the Ontario Companies Tenable?**

12     Amendments to a pleading and additions of a party should not be allowed unless the amended pleading is legally tenable, i.e. whether it discloses a cause of action: *Plante v. Industrial Alliance Life Insurance Co.*, supra, at p. 85. Masters have jurisdiction to determine whether the proposed amendments are tenable at law: *Kane Yee Pharmacy Ltd. v. TDM Drugs Inc.* (1997), 17 C.P.C. (4th) 126 (Ont. Div. Ct.). The court should not conduct a detailed examination of the evidentiary merits of a proposed amendment but should concern itself only with whether there is a prima facie meritorious case in the sense that there is a tenable plea set out in the pleading itself and the documents referred to and relied upon therein, as such documents are incorporated in the pleading and should form part of the motion material: *Plante* at p. 83-84.

13     Under section 35(1) of the Act an infringing party is liable to pay damages and disgorgement of profits to the "owner of the copyright" and under section 38.1 a "copyright owner" may elect instead to recover statutory damages. Under section 38 of the Act "the owner of the copyright" may recover possession of infringing copies. Section 34(1) states that "the owner of the copyright" is entitled to all remedies by way of injunction, damages, accounts and delivery up. It is therefore clear that only a copyright owner is entitled to the relief claimed in the statement of claim for infringement, damages, injunction and recovery of infringing property. It is common ground that CUI is the owner of the copyright in question, but there is an issue whether CUC and CUO can be considered an owner of an interest in the copyright by assignment in accordance with the various agreements referred to herein. Since it is pleaded that only CUI is the owner of the trademarks, the relief respecting trademarks and passing off belong to CUI.

14     Do CUC and CUO have standing to bring the action as copyright owner or otherwise by virtue of the licensing agreements? Under section 3(1) of the Act "copyright" means "the sole right to produce or reproduce the work." Since CUC and CUO have no right to reproduce the films, they cannot be said to be an owner of copyright under that section. Section 13(4) of the Act provides however that the owner of the copyright may assign the right, wholly or partially and "may grant any interest in the right by licence" and under section 13(5) where an assignee becomes entitled "to any right comprised in copyright" the assignee, with respect to the partial rights assigned, shall be treated as owner of the copyright. Section 13(6) provides that a right of action for infringement of copyright may be assigned "in association with the assignment of the copyright" or with "the grant of an interest in the copyright by licence". Therefore all of these rights obtained by assignment require an assignment of an interest in the copyright. The question is whether the June 2005 and March 2006 Agreements granted an interest in the copyright by licence.

15     Section 13(7) of the Act provides that a "grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence." The jurisprudence distinguishes three types of licences. In *Murray v. Imperial Chemical Industries Ltd.*, [1967] 44 T.C. 174 (Eng. C.A.) at p. 211 Lord Denning explains the difference between an ordinary licence, a sole licence and an exclusive licence:

2006 CarswellOnt 5797,

An ordinary license is a permission to the licensee to do something which would otherwise be unlawful. That leaves the licensor at liberty to do it himself and to grant the licenses to other persons also. A sole license is a permission to the licensee to do it, and no one else, save that it leaves the licensor himself at liberty to do it. An exclusive license is a permission which is exclusive to the licensee, so that even the licensor himself is excluded as well as anyone else.

16     Consistent with that common law definition, exclusive licence is defined in section 2.7 of the Act as "an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner." Both the June 2005 Agreement and the March 2006 Agreement purport to give CUO and CUC respectively an exclusive right to distribute the films in Ontario or Canada, but neither exclude CUI from distributing the films in Ontario itself. While both agreements require that the Ontario Companies "recommend" or "encourage" retailers to purchase directly from them and provide that the Ontario Companies still get the profit if CUI sells direct to the retailer, they do not go that additional step of excluding CUI from selling in Ontario and in fact CUI specifically retains that right. As a result, CUC and CUO do not have an exclusive licence within the meaning of the Act. They have but a sole license. Therefore, the grant of the licence does not constitute a grant of an interest in the copyright.

17     The plaintiff also refers to a Certificate of Registration of Copyright in one film dated July 15, 2006 from CUI to "Close-Up Canada" and to section 53 (2.2) of the Act which states that "a certificate of registration of a licence granting an interest in a copyright is evidence that the interest recorded in the certificate has been granted and that the licensee is the holder of that interest." As stated in *955105 Ontario Inc. v. Video 99* (1993), 48 C.P.R. (3d) 204 (Ont. Gen. Div.): "No proof of title is required on an application for registration. The Copyright Office assumes no responsibility for the truth of the facts asserted in the application and conducts no independent examination." A plaintiff who produces such a certificate "has adduced some evidence in support of his case" but a court would only uphold the certificate as proof of such interest "in the absence of any evidence to contradict it." Here, the plaintiff has produced the actual agreements that form the basis of the claim to a copyright interest and this is of course the best evidence. Upon examination of those documents I have concluded, as indicated above, that neither of the Ontario Companies was granted an interest in the copyright in the films.

18     Since the Ontario Companies have no interest in the copyright in the films, they cannot obtain for their own benefit any of the relief set out in the statement of claim. The question remains whether they can bring action in Ontario to enforce rights belonging to CUI as owner of the copyright by way of damages or statutory damages, injunction and surrendering of copies. Although the June 2005 Agreement gave CUO the independent and joint right with CUI to suppress illegal copying and distribution, the March 2006 Agreement was significantly different — it gave CUC the legal right only for "joint" (and not independent) action together with CUI and the right granted was to enforce only the rights of CUI. Since the current licence in Ontario belongs to CUC by virtue of the March 2006 Agreement, it is the terms of that Agreement that govern. Therefore if CUC has a right to enforce in Ontario, such action must be taken jointly with CUI and may be taken only to enforce the rights of CUI. In my view however, given the wording of the Act and the case law referenced below, a right to bring an action to enforce copyright cannot be granted by contract to a person without an accompanying grant of an interest in the copyright. Copyright is created by statute and any rights to enforce copyright must be in accordance with the Act.

19     At first blush sections 36(1) and (2) of the Act appear to create rights to enforce in favour of a party with no interest in the copyright since it refers to a copyright owner *or* a person deriving an interest by assignment

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

being able to enforce such rights that he holds in his own name. The section provides:

> 36.(1) Subject to this section, the owner of any copyright, or any person or persons deriving any right, title or interest by assignment or grant in writing from the owner, may individually for himself or herself, as a party to the proceedings in his or her own name, protect and enforce any right that he or she holds, and, to the extent of that right, title and interest, is entitled to the remedies provided by this Act.

> (2) Where proceedings referred to in subsection (1) are taken by a person other than the copyright owner, the copyright owner must be made a party to those proceedings, except

> . . . . .

> (c) in any other case, if the court is of the opinion that the interests of justice do not require the copyright owner to be a party.

20      In my view, the reference to "any person...deriving any right, title or interest by assignment...from the owner, may individually for himself or herself, as a party...in his or her own name, protect and enforce any right that he or she holds" does not help CUC for two reasons. Firstly, the reference to "deriving any right, title or interest by assignment...from the owner" must mean a right, title or interest *in the copyright* pursuant to sections 13(4) and (5) of the Act which permits an assignment of interest in the copyright. Secondly, section 36(1) refers to a person who is not the copyright owner bringing an action to enforce his *own* rights and not the rights of the copyright holder, yet the March 2006 Agreement purports to grant a right to CUC to enforce the rights *only of CUI*. Section 36(2) which provides that if proceedings are taken by a person other than the copyright owner, the copyright owner must be made a party, in my view refers to proceedings taken by persons who have an interest by assignment *in the copyright*, but are not the owner of the entire copyright. As noted, since CUC does not have a right to reproduce copies and since it does not have a right to distribute in Ontario to the exclusion of CUI, CUC has no interest in the copyright. It has no standing to bring this action as plaintiff.

21      I am reinforced in my view by the case law proffered by the defendants. In *Bishop v. Stevens* (1987), 18 C.P.R. (3d) 257 (Fed. C.A.) an agreement was entered into between the composer of a work (one "Bishop") and CMRRA who was made responsible for administering the right to reproduce his work, but who did not have its own right to reproduce the work, which read: "CMRRA shall have the right to take...all action...and to protect and enforce [Bishop's] rights" in the work in Canada. The Federal Court of Appeal considered the effect of the predecessor to section 36(1) of the Act and asked itself whether CMRRA had capacity to sue the defendant who infringed Bishop's copyright by making an unauthorized copy of the recording. The court held at p. 4, "For it to be able to sue, therefore CMRRA must have acquired from Bishop a right or interest in the work." At p. 6 it concluded: " The contract does not give it any portion of Bishop's copyright. In my view, therefore, CMRRA did not have the capacity to bring an action under the Copyright Act...This is not an action in tort at common law...but an action governed by the Copyright Act."

22      In *Masterfile Corp. v. World Internett Corp.* (2001), 16 C.P.R. (4th) 139 (Fed. T.D.) the plaintiff was a stock image company that acquired rights to images from photographers and licensed such images to end users such as web designers. The plaintiff had different contracts with different photographers but all granted to the plaintiff a right to litigate over unauthorized use, for example: "Photographer grants Masterfile full and complete authority to...take such action as may be necessary...if there occurs...unauthorized use of Agency images by any

2006 CarswellOnt 5797,

third party." There were no provisions for copyright assignment for litigation in some contracts and in others there was an agreement to assign copyright in the images in the pursuit of infringement claims, although no such executed assignment was made. The court concluded at p. 9 that notwithstanding such litigation clauses "Masterfile has neither an exclusive licence nor an assignment of copyright for the images at issue in this case" and as a result "Masterfile has no standing to prosecute this action."

23      Although these cases involve agency rather than a sole distributorship, they stand for the proposition that a person without an assignment of an interest in the copyright has no standing to sue for copyright infringement.

24      With respect to the plaintiff herein bringing action for breach of its own distribution rights, it is my view that these are not rights actionable under the Copyright Act. In fact in *Mobilevision Technology Inc. v. Rushing Water Products Ltd.* (1984), 1 C.P.R. (3d) 385 (Fed. T.D.) the terms of agreement were not set out in the decision but the court concluded at p. 2 that "an ancillary right or a collateral interest to distribution...is not actionable under the Copyright Act." In any event the March 2006 Agreement purports to grant CUC the right to bring action to enforce the rights of CUI, not any independent right of CUC.

25      I therefore conclude that neither CUC nor CUO have in interest in the copyright in the films by assignment or otherwise and neither have standing to bring this action in their own name either to enforce the copyright interest of CUI or to enforce any contractual distribution rights they have may obtained from CUI. Therefore there is no tenable plea by them as set out in the proposed amended statement of claim and the motion to add the Ontario Companies must be dismissed.

**Should the Amendments Be Denied as an Abuse of Process?**

26      If I am wrong, and if CUC and CUO have standing to sue as plaintiffs either because they are exclusive licensees or because they obtained an interest in the copyright by assignment such that they are entitled to bring this action under section 36(1) of the Act as "persons deriving any right, title or interest by assignment or grant in writing from the owner" I must consider whether the motion should be denied because adding them as plaintiffs would constitute an abuse of process.

27      Proposed amendments must comply with the rules of pleading and this includes compliance with rule 25.11(c), which provides that pleadings may be struck as "an abuse of the process of the court": *Plante*, supra, at p.85. "No amendment should allowed if it could successfully be attacked under rule 25.11 or rule 21": *1174538 Ontario Ltd. v. Barzel*, [2001] O.J. No. 580 (Ont. Master) at p. 6.

28      In particular the court should refuse to add a party if it is shown to be an abuse of process. As stated in *Plante*, supra, at p. 87:

> Addition of a party will not be permitted if it is shown to be an abuse of process. Abuse of process will exist where the addition of a party is for an improper purpose such as solely to obtain discovery from them, to put unfair pressure on the other side to settle, to harass the other party or for purely tactical reasons. *National Trust Co. v. Furbacher*, [1994] O.J. No. 2385 (Gen. Div.);*MacRae v. Lecompte* (1983), 143 D.L.R. (3d) 219, 32 C.P.C. 78 (Ont. H.C.J.).

29      Most cases dealing with abuse of process are concerned with a plaintiff adding a defendant for the sole purpose of obtaining that person's discovery or harassing the defendants into settlement. In my view, it should be no different if the plaintiff is adding another plaintiff for the purpose of avoiding security for costs, for

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

instance by adding an unnecessary Ontario resident in order that a non-resident plaintiff might avoid security for costs on the basis that any liability for costs will be a joint obligation.

30    In *Sydlo Inc. v. Mixing Equipment Co.*, [1986] O.J. No. 2542 (Ont. Master), at p. 2, where an assignment of debt from a corporate plaintiff without assets was made to an individual while a security for costs motion was pending, the court set aside an order to continue in favour of the individual assignee as an abuse of process "as it will have the effect of defeating the motion for security for costs" because "the plaintiff is no longer a corporation." In this case of course there can be no suggestion that the March 2005 Agreement was signed to defeat a motion for security since it pre-dated the issuance of the original statement of claim, however the defendants' submission is that the addition of the Ontario Corporations as plaintiffs at this time was done to defeat security for costs.

31    A short chronology is instructive. CUI is an American incorporated company with its principal place of business in New York. CUI had by assignment from the Russian Companies exclusive copyright in and exclusive right to reproduce and distribute the films in issue throughout the United States and Canada. The ten actions which are the subject of the motions before me, as well as other actions, were all commenced in Ontario in October 2005, all named CUI as the sole plaintiff and all sought similar relief against persons who copied, sold or rented films in which CUI had a copyright interest. There is no question that CUI, as copyright owner, had standing to bring the actions in Ontario to enforce its copyright.

32    In the original actions CUI, as sole plaintiff, is referred to in the statements of claim as the "exclusive licensee and copyright holder" in Canada. The original statements of claim seek an injunction and damages suffered by CUI who "lost and will continue to lose substantial revenue from the sale of the copyrighted Subject works" and because of the defendants' "misappropriation of protected trademarks" in the packaging. The proposed new plaintiffs CUC and CUO are not even mentioned in the original statements of claim.

33    On February 21, 2006 and March 17, 2006 Master Egan ordered CUI to pay security for costs pursuant to motions brought by defendants in two of the actions currently before me.[FN2] In two other actions[FN3] motions for security for costs were scheduled to be heard by me on June 23, 2006. In response to and just prior to the hearing of those motions the plaintiff brought cross-motions dated June 21, 2006 to amend the statements of claim to add CUC and CUO as plaintiffs returnable on the same date. Other security for costs motions were either pending or threatened and the plaintiff had indicated that it would be bringing motions to add the Ontario Companies in all actions. All motions were adjourned so that I could hear all pleading amendment motions at one time. This has resulted in the ten motions currently before me.

34    The defendants in actions where no security for costs order has been made all intend to bring or proceed with their existing motions for security for costs once the pleadings are finalized.[FN4]

35    Master Egan's orders that CUI post security was based on rule 56.01(1)(a) that the plaintiff is ordinarily resident outside Ontario. Master Egan refused to accept the plaintiff's impecuniosity because "there was no evidence about the ability of shareholders of the plaintiff to post security for costs."[FN5]

36    The defendants advance the proposition that given the timing of the motions to amend the statements of claim by adding the Ontario Companies as plaintiffs shortly after security for costs were ordered in two actions on the basis that a non-resident was the sole plaintiff and on the eve of the hearing of other motions for security, it is clear that the motivation for adding the resident plaintiffs is to avoid further orders for security. The solicitor for the plaintiff has indicated that if the amendments are allowed he will be moving to vary the orders

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

for security for costs made by Master Egan. The defendants suggest this is further evidence of the plaintiff's purpose in a moving to add resident plaintiffs.

37        In the face of such allegations of improper purpose it is incumbent upon the plaintiff to explain why it wishes to add new plaintiffs and why they were not included in the original statement of claim. As stated by Master Clark in *876761 Ontario Inc. v. Maplewood Ravines Ltd.*, [2002] O.J. No. 2261, 22 C.P.C. (5th) 290 (Ont. Master) at p. 293:

> In my view, the material supporting this type of motion must state clearly and specifically why the plaintiff seeks to add the defendants, and why they were not added until after the claim was issued. The value of such evidence is the bona fides it brings to the motion by dispelling suspicions of ulterior motives, such as adding parties mainly for the purpose of obtaining discovery, or adding individuals in order to simply put pressure on defendant corporations or vice versa, and thereby gain an unjust advantage.

> In *National Trust v. Furbacher*, [1994] O.J. No. 2385, Farley, J. dismissed the defendant's motion to amend their statement of defence and counterclaim, in part due to the absence of such an explanation in the supporting affidavit. He concluded that the court process was being abused in the circumstances.

38        The defendants have not put in any responding affidavit. That is understandable. The plaintiff's real purpose in moving to add party plaintiffs at this time is entirely within the knowledge of the plaintiff. The defendants cannot know the plaintiff's motives. They can do no more than raise a reasonable inference, as they have done here, based on suspicious circumstances.

39        The onus is on the plaintiff to explain. In its supporting affidavit, the plaintiff gives absolutely no reason why it seeks to add additional plaintiffs at this time or why the Ontario Companies (or at least CUO, the only company then in existence with any rights) were not named as plaintiffs in the original statements of claim. The plaintiff's affidavit, sworn by a junior law clerk in the office of plaintiff's solicitor, does little more than recite the various agreements among the plaintiff and the proposed plaintiffs and attach them as exhibits. The affidavit merely recites legal conclusions, namely that the Copyright Act requires copyright owners to be named as plaintiffs and that a party with an assignment of right of action may enforce any right held by that assignment.

40        I note that section 36(1) of the Act creates two categories of plaintiffs who have rights to enforce their interests under the Act, the first being the owner of any copyright and the second being a person deriving rights from the owner. Section 36(2)(c) of the Act requires the first category of persons, the copyright owner, to be made a party to any action unless the court is of the opinion that the interests of the justice do not require it (the "Mandatory Parties"). The second category of persons "may" bring an action but are not required to be added as a party (the "Optional Parties").

41        To put this into context, CUI has the exclusive licence and copyright throughout Canada and the United States. It was an appropriate party to enforce its copyright interests in Ontario both in October 2005 when the action was commenced and now. CUI was properly named as plaintiff. The plaintiff argues that the Russian Companies also are copyright owners and must be named as plaintiffs pursuant to section 36(2) of the Act unless the court orders otherwise.[FN6] The same cannot be said of CUC and CUO who are at best Optional Parties. It was not necessary to name them as plaintiffs in October 2005 and it is not necessary now.

42        Although COC did not gain its rights in Ontario until September 1, 2006 pursuant to the March 2006 Agreement (or possibly in June 2006 pursuant to the Share Purchase Agreement) and thus could not have been a

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

plaintiff in October 2005 when the actions were commenced, CUO had purportedly been granted enforcement rights in Ontario as of the date of the June 2005 Agreement and it could have been named as a party in the original statements of claim. The execution of the March 2006 and June 2006 Agreements, which gave rights to CUC during the course of this litigation and after the first security for costs orders, is in itself an additional suspicious circumstance.

43      Even if the reference to the various agreements among the plaintiff and the proposed plaintiffs constitutes some evidence as to *how* the proposed plaintiffs may be proper parties, the affidavit is lacking in explanation as to *why* the plaintiff chooses to add them as additional plaintiffs when it is not mandatory that they be named, and *why* it chooses to add them now. There is no evidence why the proposed plaintiffs, or at least CUO, were not named in the original statements of claim. I would have expected, at a minimum, an affidavit from Ms. Kogan, the solicitor of record who drafted the original statements of claim, that provided an answer to these questions, even if it were no more than an admission of inadvertence or lack of knowledge. Ms. Kogan's silence in that regard is deafening.

44      The one paragraph in the affidavit of the junior law clerk that gives a hint as to the motive for the amendments is set out in paragraph 13 which states: "The Fresh as Amended Statement of Claim for the Plaintiff include multiple Plaintiffs all of whom assert a joint claim where two of the Plaintiffs are resident within Ontario and carry out their business." There is no other meaning one could give to this sworn statement other than that the plaintiff wanted to add a resident plaintiff in order to resist security for costs.

45      In the absence of any other explanation as to the purpose in adding the Ontario Companies as plaintiffs at this time and the absence of any explanation as to the plaintiff's failure to name CUO as a plaintiff in the original statement of claim, and in the face of the suspicious circumstances set out herein, I inescapably come to the conclusion that the plaintiff's purpose in seeking to add the Ontario Companies as plaintiffs is to avoid further orders for security for costs by having resident plaintiffs make a joint claim with that of the original non-resident plaintiff.[FN7] In my view that is an improper purpose for adding parties and the motion to add the Ontario Companies will be denied on the further ground of abuse of process.

46      There will be no prejudice to CUI, other than loss of a ground to resist security for costs, if the Ontario Companies are not added as parties, since CUI can fully protect its rights and recover damages by action in its own name pursuant to section 36(1) of the Act.

**The Russian Companies**

47      I accept for purposes of this motion that the Russian Companies own copyright in the films and that pursuant to section 36(2)(c) of the Act, in proceedings taken by a person other than the copyright owner, the "copyright owner" must be made a party[FN8] unless "the court is of the opinion that the interests of justice do not require the copyright owner to be a party." The plaintiff invites me to consider this exception and opines that as a Master hearing a motion to add the Russian Companies as parties I have jurisdiction to refuse the motion if I am of the view that their addition as plaintiffs is not required in the interests as justice. The defendants do not resist this proposition as to my jurisdiction.

48      In my view the interests of justice do not require that the Russian Companies be added as plaintiffs. There are a number of reasons for coming to that conclusion.

49      Firstly, CUI is the exclusive owner of the copyright in Canada and the U.S. and is already a party. Only

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

CUI will benefit from the action by way of damages or other enforcement measures. The Russian Companies have no real interest in the action or the relief claimed.

50      Secondly, the proposed amended statements of claim plead that the Russian Companies are named as parties pursuant to section 36(2) of the Act but are not participating pursuant to section 36(3) which reads:

> (3) A copyright owner who is made a party to proceedings pursuant to subsection (2) is not liable for any costs unless the copyright owner takes part in the proceedings.

51      Thirdly, none of the defences to the action relate to the copyright interest of the Russian Companies.

52      Fourthly, to keep them as plaintiffs will add an unnecessary layer of complexity, uncertainty and cost to the action. It will also result in added procedural motions. Although the Russian companies have pleaded that they are not participating, the defendants have made it clear they wish to compel them to submit to examination for discovery. I am advised that the Russian Companies will resist examination in Ontario and may resist examination in Russia as they are not participating.

53      Fifthly, neither the plaintiff nor the defendants have expressed a strong interest in keeping the Russian Companies as plaintiffs, nor have they urged me not to keep them. Although the defendants suggest the Russian Companies should have been added, it appears that this is solely for the purpose of discovery, which may not be granted. This differs from *Entral Group International Inc. v. 1438762 Ontario Inc.*, [2005] O.J. No. 2140 (Ont. Master) where the exclusive distributor (in that case with reproduction rights) was the sole plaintiff and opposed adding the Hong Kong copyright holders. Master Hawkins stayed the action until the copyright owners were added because it was uncertain whether the copyright owner would be bound by any adverse finding that there had been no copyright infringement. In this case however, CUI, the copyright owner is already a party. Although as the plaintiff suggests, the Russians have an ownership interest in the trademark that CUI is enforcing, that interest can be adequately protected by CUI.

54      Finally, there is no evidence that the Russian Companies desire or even consent to be added as plaintiffs.

55      No compelling reason has been suggested to keep the Russian Companies in the action. I have determined that their addition as plaintiffs is not required in the interests as justice and as a result the motion to add them as plaintiffs is refused.

**Failure to Comply with Rule 5.04(3)**

56      The plaintiff has not included the signed consent of any of the proposed added plaintiffs. Rule 5.04(3) provides:

> (3) No person shall be added as a plaintiff or applicant unless the person's consent is filed.

57      This is not in conflict with section 36(2) of the Act which requires that the copyright owner must be made a party. If the Russian Companies are not prepared to sign a written consent to be added as a party plaintiff, then rule 5.03(5) provides that a person required to be joined as a party "who does not consent to be joined as a plaintiff...shall be made a defendant." Section 36(2) refers to adding the copyright owner as a "party" and not necessarily a party plaintiff. Section 36(2) of course does not apply to the Ontario Companies. They must consent to be added as party plaintiffs.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

58      The failure to file consent would in itself be fatal to the plaintiff's motion, which could be dismissed on that ground alone. However, if the amendments were otherwise proper, I would not have dismissed the motion on this ground alone, but I would have adjourned final disposition of the motion until it could be ascertained whether any or all of the proposed plaintiffs are willing to provide their written consent.

**Other Objections to the Amended Pleading**

59      The defendants raise other issues about particular pleas in the fresh as amended statement of claim. These pleas had also been advanced in the original statement of claim although the wording has been changed, in some case significantly. This of course is a motion to amend the statement of claim. There is no motion by the defendants to strike portions of the original pleadings. Therefore the context of the attack is that new parties are being added and as the added plaintiffs are making the impugned claims, the defendants have a right to determine if the pleas by the added parties are tenable. Since I have determined to dismiss the motion to add plaintiffs and to amend the statement of claim, the attack on a portion of the amended pleadings is moot. However, the issues have been argued and must be addressed in the event I am wrong with respect to adding the additional plaintiffs. Furthermore, these reasons may be of benefit if the plaintiff seeks to amend the original statements of claim without the added plaintiffs in order to "clean up" the pleadings or if the defendants move against the original pleadings. I state no opinion however whether the paragraphs in the original statements of claim that are similar to the impugned paragraphs in the proposed amended statement of claim comply with the rules of pleading as those issues are not before me.

*(a) Plea of Similar Facts*

60      Both the plaintiff and the defendants proceeded on the basis that paragraph 37 of the proposed fresh as amended statement of claim was a plea of similar facts and the argument was focussed on whether the plea met the test of allowing similar facts to be pleaded. That test is concerned with weighing the added complexity of the plea against its probative value, commonality of facts and unfairness. In my view however paragraph 37 is not a plea of similar facts and the test need not be applied. Proposed paragraph 37 reads:

> The Defendants engaged in a continuing pattern of copyright infringement in which they wilfully reproduced multiple copies of the Close-Up Works for sale or distribution employing similar technical copying of DVD and/or VHS formatted copyrighted works.

61      To constitute similar facts there must be a plea that past or other conduct of the defendants is sufficiently similar to the conduct that is the subject matter of the action, such that it has probative value to an issue in the action. For example, if the plaintiffs had pled that the defendants engaged in this conduct with films of other copyright owners or that it was a general pattern of the defendants, then that would constitute a plea of similar facts to which the test must be applied. In this case the "continuing pattern" only involves the "Close-Up Works" and it is the sale and distribution of those very works which are the subject matter of the action.

62      In the motions for security for costs before Master Egan, the defendants also moved to strike allegations of similar facts from the original statement of claim. The pleading in the proposed amended statement of claim is very different from that that faced by Master Egan. In the original plea in those actions the plaintiff had alleged in paragraph 31: "The Defendants are professional pirates, whose entire business consists solely of wilful misappropriation and infringement for profit of copyrighted works, of which a significant portion involves the copyrighted Subject works of this case." In paragraph 32 the plaintiff pleaded proof could be found in the fact that "pirated editions of works copyrighted to major American studios" were contained in defendants'

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

stores. Master Egan properly concluded: "The thrust of paragraphs 31 and 32 is to plead similar facts, that is, that the defendants' entire business, not just that involving the subject works described in the statement of claim, consists of infringing copyrighted works."[FN9] As indicated, in the proposed amendments the plaintiffs have restricted their plea to defendants' activities involving only the subject works.

63      In my view therefore paragraph 37 of the proposed fresh as amended statement of claim is not a plea of similar facts and would not be struck on that basis.

*(b) Lack of Particularity*

64      On the other hand, the defendants also argue that the pleadings lack sufficient particulars to which they are entitled especially in a copyright action. In particular the proposed pleading does not state which films were allegedly reproduced and sold for profit. This is the real problem with paragraph 37 as well as paragraphs 38 and 40 which allege sale of the films in improper packaging. Although in paragraph 37 the plaintiff adds that "the extent of the Defendants' infringing activities is known to the Defendants and not the Plaintiffs" the plaintiff must still provide sufficient particulars that are within its knowledge as to the films unlawfully sold and the specific trademark infringed so as to sufficiently define the issues and so as to allow the defendants to marshal their defences.

65      As stated in *Radulescu v. Toronto District School Board*, [2004] O.J. No. 5613 (Ont. Master) at p. 6: "The defendant is entitled to specific allegations in order to craft specific defences and in a technical area such as intellectual property, defences may hinge on the very specific information and nuances."

66      If I had otherwise allowed the plaintiff to amend the statement of claim, I would have struck paragraph 37, but with leave to amend in order to provide the necessary particulars.

*(c) No Tenable Plea Against Directors Personally*

67      Finally, the defendants claim that there are no specific actionable allegations pleaded against the individual defendants, who are directors of the infringing corporate defendants, and as such no tenable plea against them. For example, paragraph 35 in this action pleads that the defendant *corporations* sell, rent and distribute the Close-Up Works without licence from CUI. Paragraph 36 then pleads that the individual defendants are directors, officers or owners of the defendant corporation "and as such were in control...of the corporations' activities at the material time."

68      An officer or director of a corporation cannot be found personally liable for acts of the corporation in the absence of findings of fraud, deceit, dishonesty or want of authority or unless their actions are themselves tortious or the directors exhibit a separate identity from that of the corporation so as to make the conduct complained of their own: *Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 26 O.R. (3d) 481 (Ont. C.A.) at p. 490-491. Such tortious act may be committed by the director personally, even if acting in the course of duty, provided it is properly pleaded: *ADGA Systems International Ltd. v. Valcom Ltd.*, [1999] O.J. No. 27 (Ont. C.A.) at p. 9. It does not constitute a civil wrong to simply manage or be the controlling mind of a corporation that commits a tort. If the plaintiff wishes to plea that the director personally committed a tort, sufficient particulars of what the director personally did or failed to do must be pleaded so as to lead to that conclusion, failing which the plea against the director may be struck as not raising a tenable cause of action: *Henry v. 1213962 Ontario Ltd.*, [2005] O.J. No. 2132 (Ont. Master).

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

69      The plaintiff refers to *Mentmore Manufacturing Co. v. National Merchandise Manufacturing Co.* (1978), 89 D.L.R. (3d) 195 (Fed. C.A.) at paragraphs 27 and 28, which holds that a director can be personally liable if he "acts wilfully and knowingly, or uses the corporation as an instrument to carry out his deliberate infringement." The director must be wilfully pursuing a "course of conduct that was likely to constitute infringement or reflected an indifference to the risk of it." The plaintiff however must plead the facts as against the individual defendants that could lead to such a conclusion.

70      In the proposed amended statement of claim, following the plea in paragraph 35 that the corporations sold and distributed the films and in paragraph 36 that the individuals were the directors or officers in control of the corporation's activities, paragraphs 37, 38 and 40 allege that the defendants (plural) committed acts of copyright and trade-mark infringement including reproducing, selling, renting and displaying copies of films or packaging. Paragraph 41 pleads that the defendants (plural) had knowledge of the infringement and each defendant made a profit thereby and paragraph 43 pleads that the activities of the defendants (plural) have caused harm to the plaintiffs. Strangely other paragraphs, such as 39 and 44 refer only to a singular unidentified defendant, although this may be a typographical error. There are no allegations specific to the individual directors.

71      Although the plaintiff's solicitor suggests that the reference to actions of the defendants in the plural is a "global" allegation of infringing activities and that this implies a plea that the corporations and the individuals each committed separate acts of infringement, in my view such global plea, without more, is insufficient. Without some plea as to the specific acts of the individual directors that could constitute separate tortious conduct or that could amount to wilful conduct using the instrumentality of the corporation, the plea against those individuals is untenable.

72      If it were necessary to determine whether the claim against the individual directors at the suit of the added plaintiffs should be struck, I would have struck the pleading with leave to amend to specify the specific facts to support the claims against them personally. As I have not allowed the motion to add the plaintiffs or to amend the statement of claim, it is not necessary to so order.

**Amending the Name of the Plaintiff CUI and One Defendant**

73      The plaintiff states in argument that CUI was incorrectly named as Close Up International Ltd. in each action whereas its correct name is "Close Up International Inc." There is however no evidence of such reason for seeking the change of name and no evidence as to the correct name, such as an incorporating document. The agreements produced in evidence refer to two different names, Close-Up International, Inc. and Close-Up International Inc., neither of which exactly match the proposed name. Furthermore, the proposed amended statement of claim continues to list Close Up International Ltd. in the style of cause. The amendment is denied based on lack of an evidentiary foundation, without prejudice to renew such motion on proper evidence and with a corrected draft amended pleading.

74      In one action, 05-CV-297957PD2, the motion to add or correct the name of a defendant must also be dismissed based on lack of any explanation or evidentiary foundation, without prejudice to renew such motion on proper evidence.

**Order**

75      The motions in each of the ten actions before me for leave to amend the statement of claim, add party

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 5797,

plaintiffs and correct the name of the plaintiff and in 05-CV-297957PD2 to add a defendant are dismissed.

76      Unless the parties are able to agree on costs, I would be prepared to receive brief written submissions from the defendants, separately or jointly, within seven days and from the plaintiff within seven days after receipt thereof. Any party seeking costs shall include a Costs Outline (Form 57B) and supporting dockets.

FN1 This endorsement applies to motions to amend the statement of claim in each of the following actions: 05-CV-297953PD2,    05-CV-298322PD3,    05-CV-297955PD3,    05-CV-298319PD1,    05-CV-297957PD2, 05-CV-298321PD2, 05-CV-297961PD3, 05-CV-297964PD3, 05-CV-297962PD1 and 05-CV-297958PD1. An eleventh action, 05-CV-297948PD3 had been dismissed by the registrar as case expired and a motion to set aside the dismissal was refused. Rather than appeal, the plaintiff commenced a fresh action, 06-CV-317963PD1, in which all plaintiffs are named. As a result the motions today do not concern these last two referenced actions.

FN2 Actions 05-CV-297957PD2 and 05-CV-297955PD3.

FN3 Actions 05-CV-297953PD2 and 05-CV-298322PD3.

FN4 In two of those actions (05-CV-297964PD3 and 05-CV-297961PD3) Master Egan refused to order security for costs because a counterclaim was asserted arising out of the same circumstances as the claim. Those counterclaims have since been withdrawn and those defendants intend to bring fresh motions for security.

FN5 Master Egan's decision in 05-CV-297955PD3 is reported at [2006] O.J. No. 2301 (Ont. Master) quoted at p. 4.

FN6 I accept this proposition for purposes of this motion, with some reservations as set out in footnote 8.

FN7 Whether the plaintiff would have been successful in avoiding security even if the Ontario Companies were added is not before me. It may be that the rights to be enforced by CUI and by the Ontario Companies are not joint, but rather distinct, claims. The plaintiff however clearly intended to make the argument that a non-resident plaintiff was making joint claims with resident plaintiffs.

FN8 The proceedings in fact have been taken by the copyright owner, CUI, within the meaning of section 36(2) and it may therefore not be necessary to add the Russian Companies as copyright owners under that section. I also query whether in fact the Russian Companies do own copyright in Ontario as a result of their assignment to CUI. The plaintiff however proposes they are copyright owners and that section 36(2) applies and the defendants do not argue to the contrary. As a result for purposes of this motion I assume section 36(2) applies to the Russian Companies.

FN9 *Close Up International Ltd. v. Yakubovsky*, [2006] O.J. No. 2301 (Ont. Master) at paragraph 53.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works