Court File No.: 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)
IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED
- and -
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>NORTEL NETWORKS, INC., *et al.*,[1]<br>Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

REPLY AFFIDAVIT OF ANGELA ANDERSON
(AFFIRMED APRIL 25, 2014)

THIS AFFIDAVIT AND ITS EXHIBITS ARE DESIGNATED HIGHLY CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDERS GRANTED IN THESE PROCEEDINGS

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

I, **ANGELA ANDERSON**, of 1253 Chemin des Peyroues, Mougins 06250, France **SOLEMNLY AND SINCERELY AFFIRM AND SAY** as follows:

INTRODUCTION

1.        I previously gave evidence in these proceedings by a deposition that took place on October 31, 2013 at the offices of Herbert Smith Freehills LLP in Exchange Square, London, United Kingdom ("**UK**").

2.        I make this reply affidavit for the purposes of giving evidence to the Canadian Court and the United States ("**US**") Court in connection with the allocation position asserted by Nortel Networks UK Pension Trust Limited (the Trustee of the Nortel Networks UK Pension Plan, the "**Trustee**") and the Board of the Pension Protection Fund (the "**PPF**").

3.        I believe that the facts stated herein and in my earlier evidence are true.  My personal knowledge of the matters deposed to herein derives from my employment from 2000 to 2004 by Nortel Networks UK Limited ("**NNUK**"), which term covers both NNUK and its predecessor operating companies in the UK.  Where any facts deposed to herein are not derived from my personal knowledge, I verily believe them to be true to the best of my information and belief.  I refer to the worldwide Nortel group of companies as "**Nortel**" or the "**Nortel Group**".

SUMMARY

4.        I was located in the UK and served as the head of Intellectual Property ("**IP**") for Europe, the Middle East, and Africa ("**EMEA**").  I have reviewed the Affidavits of Clive Allen,

- 1 -

Angela De Wilton, and Brian McFadden submitted by the Canadian Debtors, and submit this affidavit in response.

5.      Nortel had policies governing the filing of patents, and that policy applied regardless of where the inventors were located.  The patent filing budget was set by the Finance Group in North America.  Most patents were filed first in the US because the cost of filing was relatively low compared to the size of the market in that jurisdiction.  The patents which were regarded as most important or valuable were "further filed" in additional jurisdictions.  Patents were also continuously "culled" from the portfolio to reduce portfolio maintenance costs.

6.      Despite Nortel's patent filing restrictions and culling, NNUK employees contributed a significant portion of patents to Nortel's global patent portfolio.  NNUK employees invented significant patents, and received awards and recognition for their contribution to the Nortel portfolio.  I have reviewed the spreadsheet referred to by Ms. DeWilton in her affidavit, and note that at least 14% of the patents had a primary inventor (to use her language) from the UK.  I believe that there may be more patents that involved UK inventors (but where UK inventors were not the first named inventors).

7.      Under Nortel's Research and Development Cost-Sharing Agreement ("**CSA**"), NNUK held an exclusive license to Nortel's portfolio of patents and other IP.  NNUK had the right to sublicense Nortel IP ████████ ███  ████████████████████████████████████████ ████████████████████████.

8.      In the sections below I discuss my background and employment history with Nortel; Nortel's policies regarding patent filing, budgets, and culling; the UK contribution to Nortel's patent portfolio; and NNUK's rights to Nortel's IP under the CSA.

EMPLOYMENT HISTORY

9.        I have a degree in Physics and Chemistry from London University. I practice as a patent attorney in the UK, France, and Europe. Prior to working at Nortel, I worked as a trainee patent attorney at British Aerospace, a patent attorney at Texas Instruments, and I started a patent group at News Digital Systems.

10.       I joined Nortel's IP group, part of its legal division, as a Director of Patents in 2000 and worked there until December 2004. I was based at the NNUK Harlow site. My responsibilities evolved over time, and I eventually became the head of Nortel's European IP Law Group. The Nortel IP Law Group was a global group that worked as an integrated team.

11.       During my time at Nortel I was involved in determining whether patents should be obtained for inventions disclosed by engineers working in Nortel's Enterprise laboratories around the world and later in other business units and divisions.

12.       I was also involved in the Nortel Patent Practice Group, which laid out guidelines describing how and when Nortel would seek protection for its patented intellectual property by filing further applications in countries outside the US. There was one Patent Practice Group for the entire IP department at Nortel across geographies. I was chair of the Patent Practice Group starting in June 2000 and continuing for most of my time at Nortel. In this affidavit I will refer to legal personnel in the IP Law Group and the Patent Practice Group generally as the "**Patent Group.**"

13.       I also helped the legal group with licensing, mergers, and any other activities that required IP input. My role also involved providing corporate support to other lawyers and people in the business as and when Nortel disposed of certain parts of its business.

NORTEL'S PATENT POLICIES

14.    I have reviewed the statements by Mr. Allen, Mr. McFadden, and Ms. DeWilton concerning IP at Nortel, and I believe they fail to recognize the significant UK contribution to Nortel's IP portfolio.  I would like to provide further information and clarification on Nortel's IP policies to put the UK's contribution into context.

15.    The first step in filing a patent at Nortel was for the inventor to fill in a form describing the invention, which form was then sent to the Patent Group.  A "Patent Committee" meeting would be convened at which the inventor would make a presentation about the invention to personnel from the Patent Group, the lines of business, and the commercial group.

16.    The Patent Committee assessed inventions using three criteria—Technical contribution, Inventive contribution, and Commercial contribution—which was referred to as the "TIC Score."  Each of those criteria received a score of 1 to 3, with the best inventions receiving a total score of 9 out of 9.

17.    The Technical contribution reflected the value of the technical aspects of the invention, such as whether it was a broad invention, an important improvement, or something less significant.  The Inventive contribution related to how patentable the invention was likely to be, for example whether it was close to the prior art or not.  The Commercial contribution related to whether the invention was used or might in the future be used in one or more Nortel products, and how important such products were or were likely to be to Nortel's product portfolio.  Depending on the invention, one patent could relate to one specific product or to multiple products, and could be used in multiple business lines.  Likewise, at the time of invention or the meeting of the Patent Committee, it was not always known in which products a patent would or could be used in the

.

future, particularly because inventions often relate to the newest technology and the invention itself may lead to a new product. It was not the case that an invention was only considered as having a Commercial contribution if was already identified as being used in an existing product.

18.     Even though I was head of IP for EMEA, I was not the decision-maker on what patents to file. Indeed, there was no one decision-maker who made that decision. Rather, the Patent Committee rated the inventions and if an invention reached a threshold TIC Score, it would be drafted as a patent application. All patent applications were generally filed in the name of Nortel Networks Limited ("**NNL**"), regardless of where the invention underlying that patent occurred. My understanding is that this was done for historical reasons, administrative convenience and potentially for tax reasons (although I am not familiar with any details in that area).

19.     Normally patent applications were filed in the US first. However, there were some exceptions depending on the location of the inventors. For example, if the inventors were French, a patent may have to be filed in France first due to national security laws. While I was at Nortel, I personally supervised and prepared patent applications for any jurisdiction in which we were filing, and the first draft was usually done in the US format.

20.     Nortel's policy of filing patents in the US first was in effect during the entire period that I worked for Nortel, and was followed regardless of the location of the inventors and even though not all inventions were necessarily relevant to the US market. Patents were filed in the US first for several reasons: the US has a relatively quick system (it typically took 3-5 years to obtain a patent); Nortel had good attorney coverage there; it is relatively inexpensive to file and maintain patents in the US; and the marketplace is quite big compared to the cost of obtaining a patent. When I was at Nortel, it was five or six times more expensive to obtain patent coverage in Europe,

particularly because you had to file patents in multiple European jurisdictions, the fees were higher, and if you wanted to enforce patents you might have to bring litigation in multiple jurisdictions in which any infringement was taking place.

21.    Nortel also had policies for the "further filing" of patents in additional jurisdictions. Within 12 months of filing the first application, Nortel was entitled to file patents in other jurisdictions whilst still claiming the original first filing date. The benefits of further filing were to expand the Nortel patent portfolio into additional jurisdictions where Nortel could use the patents for licensing, litigation, defensive protection against its competitors, and protection for Nortel and its customers to continue carrying on their business. However, because the costs were higher, the value of the invention had to justify the additional cost expenditure.

22.    Because of budget constraints, not all patents were further filed. The patent filing budget was set by the Finance Group in North America. There was one budget worldwide for patent filings, with no specific budget for NNUK. Even though I was head of IP for EMEA, I was not given control of my own budget. The budget was a global budget and I was just told the number of patent applications which the budget allowed me to file. When I was at Nortel, the IP budget was managed by Art Fisher (the head of the Patent Group), who was located in Boston and later Texas. The budget governed how many patent applications we could make in the first instance, and also how many further filings we could make. Nortel 'further filed' around 25% of its patent applications when I was there. The decision was based on the TIC Score determined by the Patent Committee.

23.    Attached to this affidavit as Exhibit "A" is an email from Ms. DeWilton dated December 12, 2000, forwarding an email and attachment from me to other lawyers at Nortel regarding "Issuance of Foreign Filing Practice Note" (bearing bates stamp NNC-NNL06521384,

and which has previously been marked in these proceedings as Exhibit 31304). The attachment at Exhibit "A" was put together by the Patent Group and accurately reflects Nortel's further filing practice throughout my time at Nortel. As item 2 on the first page of the attachment explains, Nortel's policy was to *"Keep filing the best 25% of cases in EP (GB, DE, FR) and CA."* Those refer to Europe (Great Britain, Germany, France) and Canada, respectively. Nortel filed only the top 25% of patents in those jurisdictions because there was less predictability in terms of obtaining patents at a reasonable cost and enforcing them. No distinction was made in terms of further filings as to where the original invention had occurred. Item 5 on the next page refers to Patent Cooperation Treaty ("**PCT**") filings, which were rarely used at Nortel because that is a much more expensive route.

24.     Nortel also engaged in a continuous process of "culling" patents. The process was time-consuming and required us to review the portfolio in detail and to identify any redundant pieces of IP that we could stop paying to maintain. The entire Patent Group was involved in the culling process along with technology and business unit personnel. Patents may have been culled because they were filed in less important countries, they related to redundant technology, or they related to old products that were no longer being used in the marketplace. Once patents were identified for culling, we confirmed with the technology area and business unit to make sure that valuable assets were not being culled.

25.     Attached to this affidavit as Exhibit "B" is an email from Jack Vynalek (the co-chair of the Patent Group, who was located at Research Triangle Park, North Carolina) to me (among others) dated November 10, 2004 regarding "2005 IP Program Structure and Process" (bearing bates stamp US_EMEA_Canda_PRIV_00048628, and which has previously been marked in these

proceedings as Exhibit 31323). This document discusses the budget constraints and culling process I described above. For example, slide 3 indicates that there was going to be a *"50% reduction in 2005 new filing budget from 2004."* In fact, I recall that we were anticipating a budget reduction that may have been even greater than that. I also recall a general reduction in foreign filings in the 2003/2004 time frame because of budget reductions. Slide 5 discusses culling and notes that we should *"Preferentially Cull Anything We Can't Sell or License or that does not have clear Defensive Value against Identified Competitors."* This statement is consistent with the factors considered in culling patents during my time at Nortel.

### NNUK CONTRIBUTION TO NORTEL'S PATENT PORTFOLIO

26.    NNUK made a significant contribution to Nortel's patent portfolio in terms of number of patents contributed and the significance of those patents.

27.    I have reviewed the affidavit of Mr. McFadden in which he discussed patent awards in Ottawa. In paragraph 27 he notes that *"The awards ceremonies incentivized innovation within Nortel by rewarding the inventors whose contributions were most consequential for Nortel's long-term success, regardless of their location."* This statement applies equally to the patent awards that were given in Harlow.

28.    For example, I was involved in correspondence with Bill Junkin in 2002 regarding top inventors from Harlow and patents invented in Harlow that had received awards in 2000 and 2001. Mr. Junkin was in charge of portfolio management for the Patent Group, and he was located in Canada.

- 8 -

29.    I recall Mr. Junkin putting together a list of top inventors for a "Tech Expo" at Nortel that included Harlow inventors. Attached to this affidavit as Exhibit "C" is an email from Mr. Junkin to me (among others) dated April 25, 2002 regarding "Tech Expo Patent Showcase – Proposal Based on Your Inputs" (bearing bates stamp NNC-NNL06570644, and which has previously been marked in these proceedings as Exhibit 31305). The chart attached to the email shows prolific inventors and inventors who received significant patent awards, whom I understand would likely be the best generators of income for Nortel in the 2002 timeframe. I believe that these are key inventors who made a considerable contribution to the IP of Nortel. I am personally familiar with some of the inventors listed and I know that some of their patents were involved in licensing deals. For example, Richard Epworth from Harlow had his name on approximately 50 patents.

30.    Attached to this affidavit as Exhibit "D" is an email from me to Mr. Junkin dated December 4, 2002 regarding "Value Info from Dbase on Patents Honoured in Harlow and Ottawa Events" (bearing bates stamp US_EMEA_Canda_PRIV_00009119, and which has previously been marked in these proceedings as Exhibit 31306). In the second paragraph regarding "Smart Antennas" I say that *"we have some fairly basic patents here."* By "we" I meant Nortel – ie the general Nortel Group, and by "basic" I meant fundamental to the relevant technology.    The Research Group at Harlow had come up with some fundamental IP related to smart antennas that would most likely need to be used if anybody else adopted that technology. These basic patents were building blocks of the technology. The next page mentions that 6 patents concerned Smart Antennas and involved Martin Smith, an inventor based in Harlow.

31.    Attached to this affidavit as Exhibit "E" is an email from Mr. Junkin to me, again regarding "Value Info from Dbase on Patents Honoured in Harlow and Ottawa Events" (bearing

bates stamp US_Canda_PRIV_00027933, and which has previously been marked in these proceedings as Exhibit 31307). It attaches lists of patents that came out of Harlow and which received plaques in 2000 and 2001, some of which relate to the Smart Antenna patents referred to above.

32.     My perception when I was at Nortel was that in EMEA generally, and Harlow in the UK specifically, the level of innovation was particularly high and well thought of throughout all of the different groups at Nortel. The Patent Group was always very eager for Harlow inventors to be recognized and included in decision-making because of the volume of high quality inventions coming out of Harlow and other NNUK and EMEA sites. I disagree with Mr. McFadden's characterization of Nortel's R&D in paragraphs 51-52 of his affidavit. He suggests that NNUK was not involved in Optical or Wireless research, but NNUK did a significant amount of work on those technologies, including the Smart Antennas referenced above.

33.     I have reviewed the affidavit of Ms. DeWilton and the spreadsheet in which she counts up the number of Canadian-invented patents in paragraphs 13-14. I likewise recall that inventions were referred to by unique Invention Disclosure Number called the "Disc. No." As noted in one of the documents referenced by Ms. DeWilton (NNC-NNL11772035), if the first-named inventor was in Ireland or Great Britain, the Disc. No. included the code "ID." I note that this code refers to the first named inventor and that there may have been additional patents that included UK inventors. Many patents at Nortel were invented by teams that worked together across geographies.

34.     I have been given a copy of the spreadsheet referenced by Ms. DeWilton. The copy I have been given includes an extra second column called "UK Count" which has the letters "UK" for every entry in which the Disc. No. contains the code "ID." A printout of this spreadsheet is

attached as Exhibit "F" to this affidavit and I understand that a native Excel file ("CCC0067164_With_UK_Count.xls") will also be provided.

35.    When I filter the UK Count column to show the entries in which the first named inventor is from the UK, there are **998** of **7,057** records, which is **14.14%** of the list.

36.    This spreadsheet demonstrates the significant contribution to Nortel's patent portfolio that was made by UK inventors.  Because of the policies described above, any patent invented in the UK that was filed by Nortel at all must have passed the threshold TIC score.  In addition, any UK-invented patent that was further filed in a jurisdiction outside the US was among the top 25% of patents.

## NNUK's Rights Under the CSA

37.    I have reviewed the affidavit of Mr. Allen and I disagree with his characterization of the CSA in paragraphs 25, 28, 30 and 33.  When I joined Nortel, I became aware that there was a CSA in place between Northern Telecom Limited (a predecessor of NNL) and NNUK.  Attached to this affidavit as Exhibit "G" is a copy of the CSA dated January 1, 1995 (bearing bates stamp NNI_00794545, and which has previously been marked in these proceedings as Exhibit 31309).

38.    My understanding was that Article 5 of the CSA contained an exclusive license to NNUK to use Nortel's intellectual property as it wished. It was my understanding that this license was not restricted to the sale or manufacture of Nortel's products.  During the time I was at Nortel, no one ever referred to the license in the CSA as an exclusive *product* license rather than an exclusive *IP* license.

39.      Article 5 of the CSA also gave NNUK the right to sublicense Nortel's IP.  Attached as Exhibit "H" is a Technology License Agreement between NNUK and ██ (bearing bates stamp NNI_00837748, and which has previously been marked in these proceedings as Exhibit 31308).

40.      Licensing was part of my responsibilities at Nortel and I was involved in supervising one of our junior attorneys to put together this license.  The first WHEREAS clause refers to the exclusive license from the CSA that I referred to above:  *"WHEREAS Nortel Networks has exclusive rights to certain intellectual property relating to network management software for a local fibre network in the UK."*  I personally commented on that WHEREAS clause when the IP department was asked whether NNUK was entitled to give the license.  Further down the page, the agreement refers to the licensed intellectual property as licensed copyrights and trade secrets.

41.      ████████████████████████████████████████████████████████ ████████ The licensor in this agreement was NNUK. ██ made payments for this license and it is my opinion that NNUK would not grant a license to ██ or collect money from ██ for a license it had no right to convey.

42.      I declare under penalty of perjury under the laws of the United States of America and under the laws of Canada that the foregoing is true and correct.

AFFIRMED BEFORE ME

ANGELA ANDERSON

in Mougins, France on April 25, 2014

Vu pour la seule légalisation matérielle
de la signature de Madame Angela ANDERSON,
sans lecture ni traduction du présent document.
Fait à Mougins, le 25/04/2014.

_____

Notary Public

- 13 -