Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>    NORTEL NETWORKS INC., *et al.*,<br><br>                                   Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**EXPERT REPORT OF LORRAINE EDEN, PH.D.**

(Submitted by the U.S. Debtors)

**January 24, 2014**

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL
UNDER THE PROTECTIVE ORDER.  THEREFORE, THIS REPORT IS
DESIGNATED HIGHLY CONFIDENTIAL.**

# TABLE OF CONTENTS

I.   QUALIFICATIONS AND ASSIGNMENT.......................................................... 1

   A. Qualifications............................................................................................... 1

   B. Assignment ................................................................................................. 2

II.  SUMMARY OF OPINIONS ......................................................................... 3

III. BACKGROUND ON TRANSFER PRICING ............................................... 7

   A. What Is Transfer Pricing?........................................................................... 7

   B. Regulatory Framework: The "Arm's Length" Standard.............................. 11

   C. Transfer Pricing Methods and Their Reliability ......................................... 16

      1. Transaction-based Methods ................................................................. 19

      2. Profit-based Methods ........................................................................... 21

      3. The Residual Profit Split Method ......................................................... 23

   D. Additional Considerations Regarding Intangibles ...................................... 28

      1. The Commensurate with Income Standard............................................ 28

      2. Legal Title versus Economic Ownership ............................................... 29

      3. Cost Sharing Arrangements ................................................................. 31

      4. Advance Pricing Agreements ............................................................... 35

IV.  NORTEL'S TRANSFER PRICING POLICIES ......................................... 39

   A. Nortel as a Multinational Enterprise ......................................................... 39

   B. Nortel's Management and Development of R&D ........................................ 40

   C. Nortel's RPSM........................................................................................... 44

   D. The MRDA ............................................................................................... 50

      1. IEs' Rights to Residual Profits or Losses in Accordance with
         RPSM .................................................................................................. 50

      2. Licensing and Ownership Rights Under the MRDA ............................. 52

      3. Disavowal of Joint Venture or Partnership.......................................... 56

   E. The APA Process for Nortel's RPSM......................................................... 57

V.   NORTEL'S TRANSFER PRICING SHOULD NOT BE USED FOR
    ENTITY VALUATION IN A BANKRUPTCY ............................................ 58

   A. Transfer Pricing Is Inappropriate for Entity Valuation in a Bankruptcy .................. 58

   B. Nortel's Transfer Pricing Policy Is Inappropriate for Entity Valuation
     in a Bankruptcy ......................................................................................... 60

      1. Nortel's Transfer Pricing Policy Was Tax Driven................................. 62

i

    2.   The RPSM Is Based on R&D Expenditures, Which Is Not a Proxy
for Fair Market Value of Assets Transferred or Rights Sold ................................ 67

    3.   Nortel's Transfer Pricing Policy Was Flawed ...................................................... 68

**VI.    CONCLUSION** ...................................................................................................... **72**

**ACKNOWLEDGMENT OF EXPERT'S DUTY** ................................................................... **74**

**Appendix A:  Documents Relied Upon in this Report** ............................................................ **76**

**Appendix B:  Calculation of Nortel Transfer Pricing, 2001 to 2005** ..................................... **83**

**Appendix C:  Calculation of Nortel Transfer Pricing, 2006 Onward** ................................... **85**

**Appendix D:  Curriculum Vitae of Lorraine Eden, PhD** ........................................................ **87**

I.      **QUALIFICATIONS AND ASSIGNMENT**

A.      **Qualifications**

1.      I am a Professor of Management and Mays Research Fellow at Texas A&M University in College Station, Texas, and a Visiting Professor at The Ohio State University in Columbus, Ohio.  I have previously taught at Carleton University, Brock University and Mount St. Vincent University in Canada, and I have been a visiting professor at Harvard University, the University of Texas, and the University of Reading in the United Kingdom.  At Texas A&M, I teach graduate courses on transfer pricing and multinational enterprises ("MNEs"), undergraduate courses on international business, and executive training courses on transfer pricing and global strategic management.

2.      I have a Ph.D. with Distinction in Economics from Dalhousie University, an M.A. in Economics from McGill University, and a B.A. with First Class Honors in Economics from Mount Allison University.  I am a dual citizen of the United States and Canada.

3.      I am a globally recognized authority on transfer pricing and MNEs, with over 25 years of consulting experience with the U.S. and Canadian governments, United Nations agencies, and MNE executives on these issues.  I have taught more than a dozen in-house training courses on transfer pricing to Canada Revenue Agency economists, auditors and tax professionals; I have also provided in-house transfer pricing training to field economists in the U.S. Bureau of Labor Statistics.  Since its introduction in 2007, my transfer pricing training program at Texas A&M has launched more than 60 graduate students into transfer pricing careers.

4.      I am the author of several leading works on transfer pricing and MNEs, including *Multinationals and Transfer Pricing* (1985), *Multinationals in North America* (1994), *Governance, Multinationals, and Growth* (2005), and *Taxing Multinationals: Transfer*

1

*Pricing and Corporate Income Taxation in North America* (1998).  I am the author of hundreds of journal articles, book chapters, working papers, presentations, and other scholarly works on these issues.

5.      I have received multiple teaching, research and professional awards, including a Canada-U.S. Fulbright, a Pew Fellowship and several Canadian Social Sciences and Humanities Research Council (SSHRC) research grants.  I was elected a Fellow of the Academy of International Business ("AIB") in 2004 and received the AIB President's Award for my contributions to the field of international business in 2012.  I have been Editor-in-Chief of the top scholarly journal in the field of international business, the *Journal of International Business Studies.*  I am also the founder of WAIB (Women in the Academy of International Business), an organization with more than 1,700 members worldwide.

6.      My curriculum vitae containing my publications, employment history, honors and awards and other professional experiences is attached as **Appendix D** to this report.

**B.      Assignment**

7.      I have been requested by counsel to the U.S. Debtors[1] to provide my expert opinion as to whether Nortel's[2] transfer pricing arrangement, as set forth in Schedule A to Nortel's Master Research and Development Agreement, would be an appropriate basis for valuing the assets and rights sold or relinquished by the U.S. Debtors and other Nortel entities in the various sales that have occurred in these bankruptcy proceedings (the "Sales").

---

[1] The U.S. Debtors include Nortel Networks Inc. ("NNI") and various of its affiliates, including Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[2] For convenience, I have used the term "Nortel" to refer to all affiliated entities in the Nortel group of companies, including Nortel Networks Corp. and its subsidiaries.

8.      In working on this assignment, I have relied on the documents and data listed in

**Appendix A**.

9.      I am being compensated in this matter at a rate of $650 per hour.  My compensation is

not contingent on the outcome of this case.  In connection with this assignment,

employees of Analysis Group, Inc. have worked under my supervision and direction to

assist me.

10.     Although I have advised clients in litigations in the past, I have never testified as an

expert witness, either in a deposition or at trial.


## II.    SUMMARY OF OPINIONS

11.     I understand that the Monitor, on behalf of the Canadian Debtors, and the Canadian

Debtors (collectively, the "Monitor") assert that allocation should be determined with

reference to Nortel's transfer pricing methodology.  In particular, in the Monitor's

allocation briefs dated May 16, 2013 and May 29, 2013, the Monitor proposes different

methods for allocating different asset classes from the line of business sales among the

various selling debtors.[3]  The Monitor asserts that the relative value allocable to the U.S.

Debtors (and to NNUK, NN Ireland and NNSA[4]) with respect to intellectual property

rights, including licenses, sold or relinquished in the line of business sales must be

capped by the residual profit split method percentages set forth in Schedule A to the

parties' transfer pricing agreement, the Master Research and Development Agreement

("MRDA").

---

[3] *See* Allocation Position of the Monitor and Canadian Debtors, May 16, 2013; Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings of the Other Core Parties, May 29, 2013.

[4] "NNUK" refers to Nortel Networks U.K. Limited, Nortel's U.K. operating company; "NN Ireland" refers to Nortel Networks (Ireland) Ltd., Nortel's Irish operating company; and "NNSA" refers to Nortel Networks S.A., Nortel's French operating company.

12.     In my opinion, there is no basis to use Nortel's transfer pricing policy, and particularly the Schedule A RPSM percentages derived through the MRDA, to determine allocation of Sales proceeds, as a cap or otherwise.  In fact, Schedule A to the MRDA explicitly excludes the gain or loss on the sale of a business from the RPSM calculations.

13.     Transfer pricing refers to the mechanism in which MNEs price intra-group transactions for income tax purposes.  Transfer pricing is a highly regulated activity, with detailed rules and procedures that have been developed over the years by national tax authorities, including the Internal Revenue Service ("IRS") and the Canada Revenue Agency ("CRA"), and at the international level by the Organization for Economic Co-operation and Development ("OECD").  These regulations and procedures are designed to ensure the appropriate realization of tax receipts among the jurisdictions where affiliated entities within an MNE are located.

14.     Counsel to the U.S. Debtors have asked me to assume that a bankrupt entity's assets must be liquidated and paid first to creditors, with equity holders having the lowest priority.  If the goal of allocation is to determine the value of the assets sold or relinquished by each selling debtor so that value can be distributed to each debtor's own creditors, then resorting to the firm's transfer pricing arrangements would neither be instructive nor appropriate.  These arrangements address entirely different policy considerations.

15.     This is particularly so with respect to Nortel's transfer pricing policy:

    A.  As a general matter, a multi-national corporate group will typically adopt a transfer pricing policy that minimizes the overall tax burden on the group, within the confines that the MNE in good faith believes the transfer pricing results will pass muster with tax authorities under the "arm's length" standard.  This tax

4

motivation is unrelated and irrelevant to the valuation of the Sales proceeds.

B.  Effective January 1, 2001, Nortel adopted the residual profit split method ("RPSM") as its overall transfer pricing policy, replacing a cost-sharing methodology.  The RPSM is a transfer pricing method of last resort that is least favored by tax authorities and, of all recognized transfer pricing methods, the one that is typically furthest away from market-based pricing.  Application of Nortel's RPSM, which was in part based on historical R&D spending, would not be an appropriate method for conducting a valuation of the assets sold or relinquished in the Sales.

C.  Nortel applied its RPSM in a manner consistent with group tax avoidance even if intended to meet the constraints imposed by national tax regulations.

- Nortel representatives have readily acknowledged that its transfer pricing arrangements were adopted with a view towards minimizing Nortel's overall group tax burden in at least two distinct but related ways.

- Because Canada was an effective "tax haven" for Nortel, Nortel sought to shift reported income into Nortel's Canadian operating company, Nortel Networks Ltd. ("NNL"), from NNL's subsidiaries, including NNI, Nortel's U.S. operating company.  NNI was the principal revenue generator for the Nortel group.  Through its transfer pricing arrangements, Nortel shifted billions of dollars of reported revenue from NNI in the United States to NNL in Canada.

- Because it was the principal revenue generator, NNI was also cash rich

relative to the other Nortel entities.  By setting up a transfer methodology that resulted in billions of dollars of transfer pricing payments from NNI to its Canadian parent NNL, NNL was able to obtain NNI's cash in a tax-efficient manner (a cash dividend from NNL to NNI, for example, could have been a taxable event).

- This intentional skewing of the transfer pricing policy in NNL's favor for tax avoidance reasons is a strong reason why Nortel's transfer pricing policy is inappropriate for valuing the assets sold or relinquished by the Nortel selling parties in the Sales.

D. Even if the RPSM in the abstract could be used for valuation of the Nortel entities, which I do not believe is the case, the manner in which Nortel applied the RPSM was flawed and inconsistent with the arm's length standard, █████████ ██████████████████████████████████████████████████.  For many years prior to its insolvency filings, several Nortel entities sought approval for the RPSM transfer pricing policy through an Advance Pricing Agreement ("APA") process with tax authorities in Canada, the United States and the United Kingdom.  The 2001-2005 APA was approved only after a settlement between the IRS and CRA ████████████████████████████ ████████████████████████████████████ by $2 billion for the years 2001 to 2005.  The IRS and CRA never approved Nortel's RPSM transfer pricing policy for the years after 2005, and there is no reason to believe that they would have done so.  The fact that Nortel's application of the RPSM was flawed, as evidenced by the settlement █████████████, is

yet another reason why the RPSM percentages are not an appropriate benchmark for the allocation of sale proceeds in bankruptcy among the Nortel entities.

16.     In the following sections, I expand upon the opinions summarized above and provide the bases for them.  My work is ongoing and, as noted above, I reserve the right to supplement my analysis and opinions during the course of my further work.

17.     In Section III below, I explain what transfer pricing is and discuss the applicable transfer pricing regulatory framework.  In Section IV, I analyze Nortel's transfer pricing policy set forth in the MRDA.  In Section V, I demonstrate why application of Nortel's transfer pricing policy is not an appropriate methodology for allocating the Sales proceeds.

## III.     BACKGROUND ON TRANSFER PRICING

### A.     What Is Transfer Pricing?

18.     In today's global economy, hundreds of thousands of firms are structured as multinational enterprises, wherein a parent entity owns or controls one or more foreign-affiliated entities that perform value-adding activities in one or more foreign countries.[5]

19.     Entities within an MNE that are based in different countries frequently engage in transactions between one another, and these transactions are referred to as *related party transactions*.  The price of a related party transaction is called a *transfer price,* and the process by which an MNE group determines prices for their related party transactions is generally called *transfer pricing*.  Transfer pricing can involve setting prices for a wide variety of related party transactions, such as transactions involving semi-finished goods,

---

[5] *See* John Dunning, *Location and the Multinational Enterprise:  A Neglected Factor?*, 29.1 J. Int'l Bus. Stud. 45, 53, 59-60 (1998); U.N. Conference on Trade and Development (UNCTAD), *World Investment Report 2011: Non-Equity Modes of International Production and Development*, Annex Table 34, U.N. Doc. UNCTAD/WIR/2011, U.N. Sales No. E.11.D.2 (2012), *available at* http://unctad.org/Sections/dite_dir/docs/ WIR11_web%20tab%2034.pdf.

shared services, intellectual property, and intracorporate loans and guarantees.

20.     In this report, *transfer pricing* refers specifically to the pricing of related party transactions among entities in an MNE, such as Nortel, for corporate income tax ("CIT") purposes.[6]  I distinguish among three concepts, and will use the generic term "transfer pricing" to encompass all three concepts:  regulations, methods and policies.

A.  *Transfer pricing regulations* include government laws, administrative regulations and guidelines that regulate how MNEs must set their transfer prices for tax purposes. Examples are laws such as U.S. Internal Revenue Code ("IRC") Section 482, regulations such as Canada's Information Circular 87-2R, and guidelines such as the OECD Transfer Pricing Guidelines, as described below in Section III.B.

B.  *Transfer pricing methods* are the specific techniques MNE groups must use to meet these governmental regulatory requirements.  These methods, normally spelled out in regulations or guidelines, include, for example, the comparable uncontrolled price method and the residual profit split method.  Different types of related party transactions normally require different transfer pricing methods because governments require an MNE group to select the best method for valuing each transaction type, based on the facts and circumstances, as described below in Section III.C.

C.  A *transfer pricing policy* is the set of transfer pricing methods used by the entities comprising a particular MNE for valuing all related party transactions.

---

[6] While transfer pricing policies for customs valuation purposes have existed since the GATT Valuation Code in 1994, almost all subnational, national and international policies on transfer pricing have been developed for corporate income tax purposes.  On transfer pricing from a customs valuation perspective, see Lorraine Eden, *Transfer Pricing, Intrafirm Trade and the BLS International Price Program*, 28, 30 (U.S. Dep't. of Labor, Bureau of Labor Statistics, Working Paper No. 334, 2001), *available at* http://www.bls.gov/osmr/pdf/ec010020.pdf.  Given the overwhelming importance of CIT regulations as external determinants of MNEs' transfer pricing policies, including at Nortel, I focus in this report on transfer pricing from a tax perspective.

21.　　An MNE group uses transfer pricing for both internal purposes and external purposes.[7]

Internal transfer prices – which are normally set by either the MNE parent, negotiations

between the buying and selling divisions/entities, or some combination of the two – are

typically based on cost (e.g., the selling division/entity's costs plus a markup) and price

(e.g., the retail price minus a margin for the selling division/entity).[8]

22.　　An MNE group also sets transfer prices for external purposes – in particular, for tax

avoidance purposes. *Tax avoidance* is defined as tax planning, within the constraints of

tax laws, that is designed to minimize the tax burden of the MNE group as a whole.[9]

There is nothing nefarious about tax avoidance – as long as it remains within the law.  An

individual corporate entity may take advantage of legal opportunities to minimize its tax

liabilities.  Judge Learned Hand made this point very clearly as early as 1934: "Any one

may so arrange his affairs that his taxes shall be as low as possible; he is not bound to

choose that pattern which will best pay the Treasury; there is not even a patriotic duty to

increase one's taxes."[10]  Later, Learned Hand reaffirmed this position:

> Over and over again courts have said there is nothing sinister in so arranging
> one's affairs as to keep taxes as low as possible.  Everybody does so rich or poor;

---

[7] *See, e.g.*, Karen S. Cravens, *Examining the Role of Transfer Pricing as a Strategy for Multinational Firms*, 6.2 Int'l Bus. Rev. 127, 129, 133-134 (1997); Jamie Elliott & Clive Emmanuel, *International Transfer Pricing: Searching for Patterns*, 18.2 Eur. Mgmt. J. 216, 216-217 (2000); Lorraine Eden, *Taxes, Transfer Pricing and the Multinational Enterprise*, in Oxford Handbook of Int'l Bus. 591, 593 (Alan Rugman ed., 2d ed. 2009).

[8] *See* Karen S. Cravens, *Examining the Role of Transfer Pricing as a Strategy for Multinational Firms*, 6.2 Int'l Bus. Rev. 127, 137 (1997).  Internal disputes among divisional or entity managers over transfer prices are a common problem because the higher the transfer price, the greater the share of profits that goes to the selling division/entity and the smaller the share to the buying division/entity.  Thus, transfer pricing has an important managerial role.  *See* Martine Cools, *Increased Transfer Pricing Regulations: What about the Managerial Role of Transfer Pricing?*, 10.4 Int'l Transfer Pricing J. 134, 136 (2003); Laurel Adams & Ralph Drtina, *Transfer Pricing for Aligning Divisional and Corporate Decisions*, 51.5 Bus. Horizons 411, 411-412 (2008).

[9] *See generally* Lorraine Eden & L. Murphy Smith, Prof. of Mgmt. & Prof. of Acct., The Ethics of Transfer Pricing at AOS Workshop on Fraud in Accounting, Organizations and Society, Imperial College, London, U.K., 14-17 (Apr. 1-2, 2011).  While tax avoidance is legal, tax evasion (tax avoidance coupled with the creation of artificial, abusive or sham transactions) and tax fraud (tax evasion coupled with lying) are illegal in most tax jurisdictions.

[10] *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J.).

and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant.[11]

23.     Similar statements on the legality of tax avoidance have been made in other countries. For example, the U.K. House of Lords in *Inland Revenue Commissioners v. Westminster* (1936) affirmed that a taxpayer can legally arrange one's affairs to minimize the tax payable regardless of motive.[12]

24.     As an MNE group raises or lowers its transfer prices in order to avoid taxes, not only are divisional/entity profits affected, but also the taxable income the MNE group declares to tax authorities in different countries. Since transfer prices are set within the MNE group, this creates the risk that an MNE group may manipulate transfer prices so as to shift their profits from higher to lower tax jurisdictions.[13] Not surprisingly, governments have developed a dense regulatory framework for transfer pricing due to worries about the potentially negative impacts that transfer pricing can have on government tax and customs duty revenues, as well as other issues such as home and host country balance of payments and the location of international production and employment.[14] As noted

---

[11] *Comm'r of Internal Revenue v. Newman*, 159 F.2d 848, 850-51 (2d Cir. 1947) (Hand, J., dissenting).

[12] [1936] A.C. 1 (H.L.) 490, 520 (Lord Tomlin) (U.K.) ("Every man is entitled if he can to order his affairs so that the tax attaching under the appropriate Acts is less than it otherwise would be. If he succeeds in ordering them so as to secure this result, then, however unappreciative the Commissioners of Inland Revenue or his fellow tax-payers may be of his ingenuity, he cannot be compelled to pay an increased tax.").

[13] *See* Sol Picciotto, *International Taxation and Intrafirm Pricing in Transnational Corporate Groups*, 17.8 Acct., Orgs. & Soc'y 759, 787 (1992); Lorraine Eden, *Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America*, 9 (1998); Lorraine Eden & L. Murphy Smith, Prof. of Mgmt. & Prof. of Acct., The Ethics of Transfer Pricing at AOS Workshop on Fraud in Accounting, Organizations and Society, Imperial College, London, UK, 8 (Apr. 1-2, 2011).

[14] *See* Lorraine Eden & L. Murphy Smith, Prof. of Mgmt. & Prof. of Acct., The Ethics of Transfer Pricing at AOS Workshop on Fraud in Accounting, Organizations and Society, Imperial College, London, UK, 6 (Apr. 1-2, 2011); OECD, *Transfer Pricing Guidelines for Multinational Enterprises & Tax Administrations*, Preface (2010) [hereinafter *OECD Transfer Pricing Guidelines* (2010)]; 26 C.F.R. § 1.482–1(a) (2013); Canada Customs & Revenue Agency, *International Transfer Pricing: Advance Pricing Arrangements (APAs)*, Information Circular 94-4R ¶ 3 (Mar. 16, 2001), *available at* http://www.cra-arc.gc.ca/E/pub/tp/ic94-4r/ic94-4r-e.pdf.

above, examples of this regulatory framework include the U.S. IRC Section 482,

Canada's Information Circular 87-2R, and the OECD Transfer Pricing Guidelines.

25.     As a result, the setting of MNE transfer pricing policies for external purposes, especially

for corporate income tax purposes, is a highly regulated, data-driven and fact-intensive

activity dominated by professionals.  The establishment of an MNE's transfer pricing

policy typically involves not only MNE group in-house staff, but also accountants,

economists, lawyers, tax experts and other consultants.[15]  Moreover, an MNE's transfer

pricing policy, as was the case with Nortel, may involve the input of revenue authorities

through an "advance pricing agreement" procedure, as described below in Section

III.D.4.

###     B.      Regulatory Framework: The "Arm's Length" Standard

26.     The touchstone for transfer pricing regulations is the "arm's length" standard.  Under the

arm's length standard, the affiliated entities that are part of an MNE are treated as if they

were unrelated entities.  Each affiliated entity must price its related party transactions as

if the entity were at arm's length from its parent and affiliated entities within the MNE.

Under the arm's length standard, a transfer price is appropriate if it falls within the range

of prices that two unrelated parties may reasonably negotiate for the same or similar

product traded under the same or similar facts and circumstances to the related party

transaction.

27.     This arm's length standard has been incorporated into transfer pricing regulations

adopted by the U.S. and Canadian governments, as well as the OECD, of which the U.S.,

Canada, the U.K., Ireland and France are member states.

---

[15] *See, e.g.*, Jamie Elliott & Clive Emmanuel, *International Transfer Pricing: Searching for Patterns*, 18.2 Eur. Mgmt. J. 216, 216 (2000).

28.     In the United States, the arm's length standard was initially adopted into law in 1928, when Section 45 of the IRC was added to authorize the IRS Commissioner to allocate income and deductions among related corporate entities so as to prevent tax avoidance and determine the true taxable liability of the related parties.[16]  The purpose of this section – which in 1935 was formalized as IRC Section 45-1(b) – was "to place a controlled taxpayer [that is, a taxpayer related to its counterparty] on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer."[17]  IRC Section 45, renamed in 1954 as Section 482, has remained largely unchanged since then.[18]  On the other hand, the regulations accompanying this statute (the "Section 482 Regulations") have gone through multiple iterations, with the two major revisions finalized in 1968 and 1994.  Each of these revisions promulgated certain transfer pricing methods – techniques that an MNE group might use to calculate the range of transfer prices that are the "most reliable measure of an arm's length result" for tax purposes.[19]

29.     In Canada, transfer pricing legislation was first adopted in 1972, when Section 69 was added to the Income Tax Act.[20]  Section 69(2, 3) stated that transactions with nonresident related parties were deemed to be reasonable in the circumstances, except where the amount paid by the taxpayer in Canada was higher (or the amount received lower) when

---

[16] The IRS Commissioner originally acquired the authority to allocate income and deductions among affiliated corporations in 1917, when Section 41 of the IRC was enacted.

[17] Treas. Reg. 86, § 45, Art. 45-1(b) (1935).

[18] One exception is the 1986 addition of a one-line sentence requiring that the income from a transfer or license of an intangible be "commensurate with the income" attributable to the intangible.  This "commensurate with the income" standard was also implemented in the regulations for IRC Section 482, and is described in Section III.D.1 below.

[19] 26 C.F.R. § 1.482–1(c)(1) (2013).

[20] *See generally* Lorraine Eden, *Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America* 484-86 (1998).

compared to the amount that would have been reasonable in the circumstances.[21]  In

1987, Canada issued Information Circular 87-2 ("IC 87-2"), which provided the first

Canadian transfer pricing regulations and listed several transfer pricing methods that

could be used to meet the arm's length standard.  In 1998, Canada replaced Section

69(2,3) with Section 247, and in 1999, it issued Information Circular 87-2R ("IC 87-

2R"), which replaced IC 87-2 and offered additional transfer pricing methods.  The new

statute and circular reaffirmed Canada's legislative "require[ment] that, for tax purposes,

the terms and conditions agreed to between non-arm's length parties . . . be those that one

would have expected had the parties been dealing with each other at arm's length.[22]  Like

the U.S. regulations, IC 87-2R provided methods by which an MNE group could

determine a "range" of prices that would be a "reliable estimate" of an arm's length

transaction.[23]  As a result, Canada's transfer pricing framework is very similar to the U.S.

framework.[24]

30.    The arm's length standard has also been adopted by the OECD, whose guidelines are

followed by Canada, the U.S., the U.K, Ireland, and France as OECD members.  The

arm's length standard was originally included in Article 9 of the draft OECD Model

---

[21] Section 69(1), which applied to domestic transactions, stated that transactions between related parties were deemed to be at fair market value except where a taxpayer had paid too much for the product or sold it for too little.

The motivation behind Section 69 is that in over-invoicing purchases or under-invoicing sales, the MNE entity that is a taxpayer in Canada would have reduced its taxable income and thus its Canadian income taxes.

[22] Revenue Canada, *International Transfer Pricing*, Information Circular 87-2R, Sep. 27, 1999 [hereinafter IC 87-2R] ¶ 7.  IC 87-2R further notes that "[t]his ensures that taxpayers, who are non-arm's length members of a group and engage in transactions with other members of the group, report substantially the same amount of income as they would if they had been dealing with each other at arm's length." *Id.*

[23] *Id.* ¶ 34.

[24] Lorraine Eden et al., *Standards across Borders: Crossborder Diffusion of the Arm's Length Standard in North America*, 26.1 Acct., Orgs. & Soc'y  1, 15-17, 19 (2001).

Double Taxation Convention on Income and Capital in 1963,[25] as well as the final

version of that convention (the "Model Tax Convention"), adopted in 1977, which states

as follows:

> Where . . . conditions are made or imposed between the two [associated]
> enterprises in their commercial or financial relations which differ from
> those which would be made between independent enterprises, then any
> profits which would, but for these conditions, have accrued to one of the
> enterprises, but, by reason of these conditions, have not so accrued, may
> be included in the profits of that enterprise and taxed accordingly.[26]

31.     In 1979, the OECD began to issue guidelines (the "OECD Transfer Pricing Guidelines")

to national tax authorities and MNEs on how to set transfer prices for national CIT

calculations under the Model Tax Convention.  The first OECD Transfer Pricing

Guidelines were issued in 1995 and have been updated since then; revisions to some

chapters remain under discussion.  More than 60 countries now use some version of the

OECD Transfer Pricing Guidelines as the basis for their transfer pricing regulations,

although there are often significant differences in the applications of these regulations.[27]

32.     The U.K. government implemented transfer pricing rules in July 1999 that are largely

based on the OECD Transfer Pricing Guidelines.[28]  Part 4 of the Taxation (International

and Other Provisions) Act 2010 ("TIOPA 2010") covers cross-border and domestic

---

[25] Likewise, the earlier draft Model Income Tax Treaty, published by the League of Nations in 1933, was based on the "independent persons" test in IRC Section 45.

[26] OECD, *Model Tax Convention on Income and Capital* art. 9, ¶ 1 (July 22, 2010).

[27] *See, e.g.*, Ernst & Young, *The 2012 Worldwide Corporate Tax Guide* at 73, 90, 156, 193, 241, 481-82, 506, 542-43, 658, 685, 735-36, 829, 924, 933, 944, 963-64, 980, 992, 1046, 1062-63, 1072-73, 1105, 1134, 1149, 1198, 1334 (2012), *available at* http://www.ey.com/Publication/vwLUAssets/Worldwide_corporate_tax_guide_2012/$file/WCTG_2012_Worldwide_Corporate_Tax_Guide.pdf (discussing application of the OECD Transfer Pricing Guidelines in various countries).

[28] *See* KPMG Global Transfer Pricing Services, *Global Transfer Pricing Review United Kingdom* 2, 3 (2013), *available at* http://www.kpmg.com/ Global/en/IssuesAndInsights/ArticlesPublications/global-transfer-pricing-review/Documents/uk.pdf [hereinafter KPMG, *Global Transfer Pricing Review United Kingdom*].

transactions within the U.K.[29]  An APA program[30] was established in the U.K. in 1999,

and legislation relating to APAs appears in Sections 218-230 of TIOPA 2010.[31]  In 2008,

Her Majesty's Revenue and Customs ("HMRC"), the U.K. tax authority, established a

dedicated Transfer Pricing Group in order to identify and address transfer pricing risks.[32]

33.     Ireland introduced its transfer pricing legislation as part of the 2010 Finance Act,

effective as of January 2011.[33]  Although Ireland's local transfer pricing legislation

wasn't formalized until this date, transfer pricing had long been a significant issue for

MNE groups operating in Ireland because of the existence of transfer pricing regulations

in many jurisdictions worldwide.[34]  Ireland's transfer pricing legislation follows the

OECD Transfer Pricing Guidelines and arm's length standard, and the legislation adopts

OECD guidance on transfer pricing methods, intangible property considerations, and cost

contribution arrangements.[35]  Ireland does not have a formal APA procedure, but Irish tax

authorities have been willing to negotiate and enter into bilateral APAs with treaty

---

[29] Ernst & Young, *Transfer Pricing Global Reference Guide*, 215 (2013), *available at* http://www.ey.com/ Publication/vwLUAssets/Transfer_pricing_global_reference_guide_2013/$FILE/Transfer_pricing_global_reference _guide_2013.pdf [hereinafter E&Y, *Transfer Pricing Global Reference Guide*]; KPMG, *Global Transfer Pricing Review United Kingdom* at 2.

[30] An explanation of the APA (advance pricing agreement) process is provided below.  *See infra* Section III.D.4.

[31] Ernst & Young, *Guide to Advance Pricing Agreements (APA) United Kingdom*, http://www.ey.com/GL/en/ Services/Tax/International-Tax/Guide-to-advance-pricing-agreements--APA----United-Kingdom (last visited Jan. 17, 2014).

[32] HM Revenue & Customs, *Taxing Multinationals: Transfer Pricing Rules* 2 (2013), *available at* https://www.gov.uk/ government/uploads/system/uploads/attachment_data/file/193458/HMRC_Issue_briefing_- _transfer_pricing_rules.pdf.

[33]  KPMG Global Transfer Pricing Services, *Global Transfer Pricing Review Ireland* 2 (2013), *available at* https://www.kpmg.com/Global/en/IssuesAndInsights/ArticlesPublications/global-transfer-pricing-review/ Documents/ireland.pdf [hereinafter KPMG, *Global Transfer Pricing Review Ireland*].

[34] PwC, *Ireland* in International Transfer Pricing 2013/14 503, 503 (2013), *available at* http://www.pwc.com/gx/en/ international-transfer-pricing/assets/ireland.pdf [hereinafter PwC, *Ireland*].

[35] KPMG, *Global Transfer Pricing Review Ireland* at 2, 3.

partners.[36]

34.     French transfer pricing regulations, codified in Article 57 of the French Tax Code, were

introduced in 1933.[37]  The French Tax Authority ("FTA") considers the French transfer

pricing regulations to be consistent with the OECD Transfer Pricing Guidelines.[38]  In

September 1999, the FTA issued a regulation defining the conditions under which it

would grant a bilateral APA; only bilateral APAs were accepted prior to 2004, after

which the FTA also considered unilateral APAs.[39]  Since the creation of France's APA

program, at least fifty APAs have been granted.[40]

## C.     Transfer Pricing Methods and Their Reliability

35.     U.S. and Canadian tax law and the OECD Transfer Pricing Guidelines all recommend

various "methods" that an MNE group may choose from and adopt to adhere to the arm's

length standard.[41]  It is important to recognize that "transfer pricing is not an exact

science."[42]  Accordingly, it may be impossible to determine a single arm's length price.

For each method there may be a range of "equally reliable" prices – the "arm's length

---

[36] PwC, *Ireland* at 514.

[37] E&Y, *Transfer Pricing Global Reference Guide* at 74; KPMG Global Transfer Pricing Services, *Global Transfer Pricing Review France* 2 (2013), *available at* http://www.kpmg.com/Global/en/IssuesAndInsights/ ArticlesPublications/global-transfer-pricing-review/Documents/france.pdf [hereinafter KPMG, *Global Transfer Pricing Review France*].

[38] E&Y, *Transfer Pricing Global Reference Guide* at 74.

[39] PwC, *France* in International Transfer Pricing 2013/14 405, 423 (2013), *available at* http://www.pwc.com/gx/en/ international-transfer-pricing/assets/france.pdf.

[40] KPMG, *Global Transfer Pricing Review France* at 5.

[41] The transfer pricing methods outlined in Chapter II of the OECD Transfer Pricing Guidelines are acceptable as part of the transfer pricing regulations for the U.K., Ireland and France.  KPMG, *Global Transfer Pricing Review Ireland* at 3; KPMG, *Global Transfer Pricing Review France* at 3; KPMG, *Global Transfer Pricing Review United Kingdom* at 3.

[42] *OECD Transfer Pricing Guidelines* (2010) ¶¶ 1.13, 3.55, 4.8, 8.3; IC 87-2R ¶ 34.

range" – that result from the application of that method.[43]  Moreover, more than one

transfer pricing method may fit the facts and circumstances of the case.  Nevertheless,

U.S. transfer pricing regulations require that MNE entities in the United States, both U.S.

owned and foreign owned, select the "best method" for their transfer pricing policies,

which is defined as the one that generates the "most reliable measure of an arm's length

result."[44]  Similarly, Canada's IC 87-2R and the OECD Transfer Pricing Guidelines,

applicable to the U.K., Ireland, and France, require that MNE entities in their

jurisdictions also choose the "most appropriate" method for the particular case.[45]

36.    The basic starting point to determine the "best" or "most appropriate" method for

calculating transfer prices is a "functional analysis" of the MNE entity and its affiliated

entities involved in the related party transactions.  This involves constructing profiles of

the related parties' functions, businesses and transactions to understand the value chain of

the MNE and its industry.  A functional analysis typically identifies and examines the

following items:

- Products of the related parties and the markets where they are traded
- Functions performed by each related party
- Assets (tangible/intangible, routine/nonroutine) owned or controlled by each related party
- Risks assumed by each related party
- The various types of related party transactions
- Contractual arrangements and terms between the related parties
- Any internal comparables (any arm's length transactions similar to the related party transactions)

---

[43] *OECD Transfer Pricing Guidelines* (2010) ¶ 3.55.

[44] 26 C.F.R. § 1.482-1(c)(i) (2013).

[45] IC 87-2R ¶¶ 33-34; *OECD Transfer Pricing Guidelines* (2010) ¶ 2.2; KPMG, *Global Transfer Pricing Review Ireland* at 3; KPMG, *Global Transfer Pricing Review France* at 3; KPMG, *Global Transfer Pricing Review United Kingdom* at 3.

- The MNE's strategy, structure, management philosophy, success drivers and goals
- The MNE's current transfer pricing policies and the reasons for their selection, including internal and external motivations.[46]

37.     When choosing a transfer pricing method, the MNE must also analyze the availability of "comparables" – data on transactions that were negotiated between unrelated parties under comparable circumstances to the related-party transactions in question, such that the prices of those comparables may serve as proxies for the arm's length prices of the related-party transactions.  A comparable may be either an "internal comparable," in which the MNE entity at issue itself bought from or sold to one or more arm's-length entities under comparable circumstances,[47] or an "external comparable," in which one party unrelated to an MNE entity bought from or sold to one or more other parties unrelated to an MNE entity under comparable circumstances.[48]

38.     All transfer pricing methods rely upon comparables to some degree, though the quality and availability of comparables varies depending upon the factors relevant in a functional analysis, that is, the characteristics of the property or services; the contractual terms for the transaction; the functions of, assets held by, and risks incurred by the parties; the economic conditions of the market; and any special circumstances, such as business strategies (e.g., the sale of a product at a low price to achieve greater access to a market). If comparable transactions differ from the related party transactions in ways that decrease

---

[46] *See generally* Valerie Amerkhail, *Functional Analysis & Choosing the Best Method*, in Practical Guide to U.S. Transfer Pricing 12-1, 12-2, 12-3 and 12-9 (3d ed. 2006); Lorraine Eden, *Taxes, Transfer Pricing and the Multinational Enterprise*, in Oxford Handbook of Int'l Bus. 591, 608 (Alan Rugman ed., 2d ed. 2009).

[47] Any transactions between the MNE and unrelated parties that are the same or similar to the related party transactions are highlighted as possible internal comparable transactions.

[48] To search for external comparable transactions, it is typical to search databases of firms (e.g., Compustat, Amadeus, ktMINE) and/or commodity exchanges (e.g., the London Metal Exchange) to determine whether there are comparable transactions between unrelated parties.

their comparability – e.g., the firms have different asset intensities, or the markets are different – adjustments must ultimately be made to account for such differences in order to improve the reliability of the comparable transactions.[49]

39.     Guided by functional and comparables analyses, the MNE should choose the "best" or "most appropriate" transfer pricing method given the economic justification that underlies each method and the conditions where each method applies, as well as the comparability, data quality, and reliability of assumptions required by each method. Typically, MNEs choose one of several recommended transfer pricing methods, each of which I briefly describe in turn.

### 1.     Transaction-based Methods

40.     The most reliable transfer pricing method is the comparable uncontrolled price (or "CUP") method.  The CUP method looks to two "comparable uncontrolled transactions" – specific comparable transactions negotiated between unrelated parties in comparable circumstances – to measure an arm's length price.

41.     Because the CUP provides a direct measurement of the prices that two arm's length parties would agree upon when negotiating a specific transaction, the tax authorities uniformly prefer the CUP method when the necessary data are available.  IRS regulations state that "[t]he results derived from applying the comparable uncontrolled price method generally will be the most direct and reliable measure of an arm's length price" if sufficient comparable uncontrolled transactions can be used.[50]  Likewise, Canada's IC 87-2R states that "[t]he CUP method provides the best evidence of an arm's length

---

[49] *OECD Transfer Pricing Guidelines* (2010) ¶ 3.47; 26 C.F.R. § 1.482-1(d)(2) (2013).

[50] 26 C.F.R. § 1.482-3(b)(2)(ii) (2013).

price,"[51] and the OECD confirms that "[w]here it is possible to locate comparable uncontrolled transactions, the CUP method is the most direct and reliable way to apply the arm's length principle."[52]

42.     However, the option to use the CUP method depends on the quality of comparable data available, and, in many cases, the taxpayer will be unable to find sufficiently comparable transactions. When "there is not enough quality information available with respect to uncontrolled transactions" or "it is not possible to reliably quantify the differences between controlled and uncontrolled transactions,"[53] tax authorities have long authorized the use of two other methods that indirectly determine or "back into" the transfer price by focusing on compensating one of the two parties to the transaction (the "tested party") for its functions, assets and risks.[54] These methods are:

> A.    The *resale price method*, which measures the arm's-length gross profit margin of the buyer (distributor or reseller) in one or more comparable transactions to determine the transfer price in a related-party transaction; and
>
> B.    The *cost plus method*, which measures the arm's-length gross markup (over cost of production) of the seller (manufacturer or supplier) in a comparable transaction to determine the transfer in a related-party transaction.[55]

43.     Although each of these methods tests comparable uncontrolled transactions, each is considered to be less reliable than the CUP method. Whereas the CUP method measures a transaction from both the buyer's and seller's sides, the resale price and cost plus

---

[51] IC 87-2R ¶ 64.

[52] *OECD Transfer Pricing Guidelines* (2010) ¶ 2.14.

[53] IC 87-2R ¶ 54; *see also* 26 C.F.R. § 1.482-1(c) (2013).

[54] The IRS has authorized these three transaction-based methods since it promulgated its first regulations in 1968, and Canada has likewise authorized these methods since it issued its original Information Circular 87-2 in 1987.

[55] For example, an MNE may have two affiliated entities that serve as a manufacturer and distributor of a given product, respectively. Under the resale price method, the arm's length price is the price at which the distributor sold the product, less the gross profit margin that a comparable, independent distributor would have made. Under the cost plus method, the arm's length price is the cost of manufacture, plus the gross profit markup that a comparable, independent manufacturer would have made.

methods focus on only one party to the transaction.  In addition, whereas the CUP

directly measures the transfer price, the resale price and cost plus methods use the

estimated gross profit margin/markup to back into the transfer price and allocate the

profits on the transaction between the related parties.  Accordingly, each of these

methods is less likely than the CUP method to reflect the arm's length price.

### 2.    *Profit-based Methods*

44.    In many instances, there are "no quality data" available to use the CUP, resale price, or

cost plus methods.[56]  In such situations, affiliated taxpayers may use a "profit-based

method" to determine the transfer price.  Rather than measure individual transactions,

these methods attempt to gauge an appropriate transfer price by measuring the profit that

a related party in a transaction would have realized and then "backing into" the transfer

price.  There are two main profit-based methods:

A.    The *comparable profit method*, which was developed by the IRS and is widely
applied in U.S. transfer pricing practice, uses the operating profit margins for
comparable firms to determine whether the MNE entity's operating profit
represents an arm's length result.  The CRA and the OECD Transfer Pricing
Guidelines prefer the *transactional net margin method*, which is a slightly
different version of the comparable profit method that is more focused on
transactions than firm-level comparisons.

B.    The *profit split method*, which uses various techniques to determine an arm's
length splitting of profits between entities within an MNE.  The two
recommended methods are either measuring a comparable enterprise's net profit
split for a comparable product line (the *comparable profit split method*), or using
the MNE entities' historical cost data to split the residual profits between the
entities after the payment of routine returns (the *residual profit split method*).

45.    These profit-based methods focus on and attempt to adjust the related parties' net profits

rather than use comparisons to individual transactions.  In the United States, profit-based

methods were not listed as approved transfer pricing methods until the 1994 revision to

---

[56] IC 87-2R ¶ 59; *see also* 26 C.F.R. § 1.482-8 (2013).

the Section 482 Regulations.  Although the OECD and Canada have also acknowledged the legitimacy of profit-based methods, they regard transaction-based methods as the "most direct" and "preferable" to profit-based methods.[57]

46.     The profit split method is considered to be particularly unreliable.  Whereas transaction-based methods look directly at comparable transactions to determine how related-party transactions should be priced and the comparable profit method looks directly at comparable firms to determine how related-party profits should be allocated, the profit split method does not rely upon such direct comparisons because there are so little observable and reliable data on how independent parties – under the same facts and circumstances – would split their joint profits.[58]  As a result, historically, the U.S. Canada, and OECD have considered the profit split method to be a method of "last resort," applied only in cases where other methods cannot be applied reliability or cannot be applied at all.[59]

47.     Nevertheless, the U.S., Canada and the OECD endorse profit-based methods, including the profit split method, when it is difficult to analyze transfer prices on a transaction-by-transaction, gross margin or markup level.[60]  Where an MNE group operates in complex

---

[57] *OECD Transfer Pricing Guidelines* (2010) ¶ 2.3; IC 87-2R ¶ 52.

[58] The comparable profit split method generally splits operating income in a manner that is consistent with the way comparable unrelated parties divide their operating income in similar transactions.  The use of the comparable profit split method tends to be limited because it is typically difficult to find comparable companies engaged in transactions that are similar to the affiliated entities that are buyer and seller in the MNE.  *See* Marc M. Levey et al., *Transfer Pricing Rules and Compliance Handbook* 33 (2006).

[59] Lorraine Eden, *Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America*, 45 (1998).  In 1987, Canada's Information Circular 87-2 included the profit split method as one of the possible "fourth methods", to be used only as a last resort when none of the other methods could be applied.  In the U.S., the profit split method was first included as a listed method in the 1994 Section 482 Regulations; the regulations also recommended it be used only as a "method of last resort."  The 1996 OECD Transfer Pricing Guidelines also treated the PSM as a method to be used by taxpayers only where the traditional transaction-based methods could not be applied.  OECD, *Transfer Pricing Guidelines for Multinational Enterprises & Tax Administrations* ¶ 3.1 (1996).

[60] *See* 26 C.F.R. § 1.482-1(c) (2013); IC 87-2R ¶¶ 90-92; *OECD Transfer Pricing Guidelines* (2010) ¶ 1.9.  The OECD Transfer Pricing Guidelines argue that the profit split method is most appropriate when the MNE's

businesses, there simply may not be many examples of comparable uncontrolled

transactions to apply the CUP method – or even the resale price or cost plus methods,

which also depend upon limited comparable uncontrolled transactions – because the

property or services in question, the contractual terms, the functions of the parties, the

market conditions, or other circumstances are too specific.  When that is the case, profit-

based methods may provide the best estimate of arm's length prices – though, as the

OECD notes, "[t]he recognition that the use of [profit-based] methods may be necessary

is not intended to suggest that independent enterprises would use these methods to set

prices."[61]

### 3.    *The Residual Profit Split Method*

48.    The most commonly applied profit split method is the residual profit split method.  The

RPSM was the transfer pricing method used by Nortel for almost a decade before the

creditor protection filings in Canada, the U.S. and the U.K. by the main Nortel affiliated

entities; for that reason, I will describe the RPSM in more detail than I have described the

other transfer pricing methods.

49.    As previously noted, the profit split method – unlike the other transfer pricing methods

discussed above – does not measure comparable prices or profits for a given transaction

or business line and apply those comparables to the MNE group in question.  Rather, the

method draws partially upon comparable data and partially upon internal MNE data to

---

operations are so highly integrated that a one-sided method – one which prices an appropriate return for one party, without regard to the other party – would be inappropriate.  *OECD Transfer Pricing Guidelines* (2010) ¶ 2.109. Alternatively, a profit split method may be appropriate where both related parties make "unique and valuable contributions" and (a) independent entities would also have chosen to split their joint profits based on their respective contributions, or (b) there is insufficient comparables information to use any other method, leaving PSM as the only option.  *Id.*

[61] *OECD Transfer Pricing Guidelines* (2010) ¶ 2.148.

"back into" a theoretical arm's length division of operating profits for tax purposes.

50.    The RPSM works in two steps.  First, each affiliated entity is distributed sufficient profit to provide it with a basic return appropriate to its routine, non-unique functions, assets and risks, such as non-complex manufacturing or distribution activities.  Normally, the routine return is determined by measuring the market returns for similar transactions between independent enterprises that occurred under the same facts and circumstances as the related party transactions.

51.    Second, the remaining (or "residual") profit (or loss) – theoretically representing the return for non-routine functions, assets and risks performed by entities within the MNE – is distributed among the affiliated entities depending on an appropriate formula.  Typically, the residual profit distributed in this second step is derived largely from intangible assets, particularly intellectual property (or "IP") such as patents, inventions, formulae, processes, designs, patterns, or know-how.[62]

52.    U.S. and Canadian tax law and the OECD Transfer Pricing Guidelines suggest two possible ways to determine the value of each MNE entity's contribution of intangible property.  The first is to use an external market benchmark that reflects the fair market value of the intangible property.[63]  Alternatively, the MNE group can use an "allocation

---

[62] U.S. transfer pricing regulations state that an intangible asset is one that derives its value not from its physical attributes, but from its intellectual content or other intangible properties.  26 C.F.R. § 1.482-4(b) (2013).  Other examples mentioned in the U.S. regulations are copyrights and literary, musical, or artistic compositions; trademarks, trade names, or brand names; franchises, licenses, or contracts; methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, estimates, customer lists, or technical data.  *Id.*  Note that this list does not include workforce-in-place, synergies or goodwill.

[63] The Section 482 Regulations require that, in order for a transfer of intangibles between unrelated parties to be considered comparable for transfer pricing purposes, the uncontrolled transfer must involve (1) comparable intangible property, such that the property (a) is used in connection with similar products or processes within the same general industry or market, and (b) has similar profit potential to the controlled intangible; and (2) comparable circumstances.  26 C.F.R. § 1.482-4(c)(2)(iii) (2013).

A key difference between transfer pricing tangibles or services and intangibles is that the 482 regulations require that the controlled and uncontrolled transactions for intangibles must have similar profit potential.  Thus,

key"[64] to split the residual profits between the related parties.  The allocation key can reflect a measurement of each MNE entity's costs in developing the intangibles, either in the form of  (1) the capitalized cost of developing the intangibles and all related improvements and updates, less an appropriate amount of amortization based on the useful life of each intangible, or (2) the actual cost of developing the intangibles, if these expenditures have been constant over time and the useful life of the intangible property of all entities involved is roughly similar.[65]  Most MNE groups that use the RPSM use an allocation key based upon internal data – not one based on external market benchmarks – primarily because such external data are not readily available.[66]

53.    Because the RPSM relies principally on internally generated data (e.g., cost data) to split profits among the entities, the method is relatively easy for complex MNE businesses with valuable intellectual property to use.  That ease of use for MNEs, however, creates a problem for tax authorities.  Because internally generated data can be manipulated and cannot be easily compared to open market data, tax authorities view the RPSM as typically the *least reliable transfer pricing method* for determining an arm's length price.[67]  It is a method of last resort to be used when other methods fail.[68]

---

determining a transfer pricing for an intangible asset requires the economist to evaluate the profit potential for all potential comparable transactions and discard those that are not at least roughly similar.

[64] The term "allocation key" in transfer pricing regulations has no linkage to bankruptcy terminology.

[65] *See* 26 C.F.R. § 1.482-6(c)(3)(i)(B)(2) (2013).

[66] Marco Fiaccadori et al., *Licensor-Licensee Profit Split and the Income Approach*, Int'l. Tax Rev. 1 (Dec. 17, 2012), *available at* http://www.internationaltaxreview.com/Article/3132196/Licensor-licensee-profit-split-and-the-income-approach.html.

[67] 26 C.F.R. § 1.482-1(c)(2)(ii)(B) (2013) ("[T]he residual profit split method may be based on the assumption that capitalized intangible development expenses reflect the relative value of the intangible property contributed by each party.  Because the costs of developing an intangible may not be related to its market value, the soundness of this assumption will affect the reliability of the results derived from this method."); 26 C.F.R. § 1.482-6(c)(3)(ii)(B) (2013) ("[T]he reliability of  the results under [the RPSM] is reduced to the extent that the allocation of profits in the second step does not rely on market benchmarks."); E&Y, *Transfer Pricing Global Reference Guide* at 35 ("Traditionally, the CRA considered that . . . there is a natural hierarchy in the application of the above-noted

54.    A second weakness of the RPSM relates to the allocation key for the residual returns. The RPSM separates returns into two categories:  routine and non-routine.  The routine return is designed to compensate the related parties for their functions, assets and risks based on what comparable unrelated entities would earn under comparable facts and circumstances.  The non-routine return part of the RPSM is designed to compensate related parties for their intangible assets, those that are so unique or valuable that they cannot be valued through comparables searches in the open market place.  These high-value intangibles would include intellectual property created through R&D spending. Thus, the arm's-length allocation key for allocating residual returns among related parties in an R&D alliance, for example, should compensate them for the intangible assets created through their R&D spending.

55.    However, the RPSM allocation key under the current transfer pricing regulations in the U.S., Canada and the OECD is not based on valuing the intangible assets created by MNE entities through the R&D alliance – a process that would value the future income stream generated by those assets – but rather the allocation key is a much simpler one based on internal data on the related parties' actual R&D spending, either capitalized or a historical average.  This creates an obvious issue, in that not all R&D expenditures are equally successful, and not all R&D leads to property for which someone would be willing to pay.  R&D spending does not necessarily bear any relation to the value of each entity's intangible assets and rights.

56.    Where external metrics are not available, the OECD Transfer Pricing Guidelines permit

---

transfer pricing methods, with the CUP method providing the most reliable indication of an arm's length transfer price or allocation and the Profit Split method providing the least reliable indication of an arm's length result.").

[68]    On the use of internal data for the RPSM, see *OECD Transfer Pricing Guidelines* (2010) ¶¶ 2.141-2.145.

the use of an allocation key based on each affiliated entity's expenses, such as its R&D spending, but only where the taxpayer can show a "strong correlation between relative expenses incurred and relative value added" by each related party; moreover, "it is not appropriate to use a cost-based allocation key unless cost is a reliable measure of the relative value of those intangibles."[69]

57.    It is also important to recognize that the RPSM is a transfer pricing method set up by national tax authorities for the purpose of allocating an MNE's taxable income among the various national tax jurisdictions where the MNE has affiliated entities conducting operations.  The RPSM – in its current formulation and as applied by Nortel  – is not intended to, and does not, measure the value of the assets created in the co-development activities by the related parties.  The RPSM is also not intended to, and does not, measure the value sold or relinquished by individual affiliated entities in the MNE as part of a bankruptcy liquidation.  This is particularly the case because the second step of the RPSM formula – which is the step upon which the Monitor appears to be primarily relying as a cap on the allocation of virtually all of the proceeds from the line of business sales here – is based not on the value of assets sold or relinquished, but rather on each affiliated entity's costs incurred to create that value.  Fundamentally, the costs incurred to create value do not equate to value.

58.    Because the RPSM – and particularly the RPSM as applied by Nortel – is not designed to value assets sold or relinquished by each affiliated MNE entity in a bankruptcy liquidation, it should not be used for that purpose.  This is discussed further in Section V.B.2 below.

---

[69] OECD, *Review of Comparability and of Profit Methods:  Revision of Chapters I-III of the Transfer Pricing Guidelines* ¶ 2.138 (2010).

**D.    Additional Considerations Regarding Intangibles**

59.    Apart from the specific method that they choose to determine transfer prices, an MNE

group with substantial IP assets must also be conscious of several general principles

regarding the treatment of IP in the transfer pricing context.

### *1.    The Commensurate with Income Standard*

60.    IRS regulations specify that "[t]he arm's length consideration for the transfer of an

intangible . . . must be commensurate with the income attributable to the intangible."[70]

The "commensurate with income" standard was enacted by the U.S. Congress in 1986 in

response to concerns that U.S. MNEs were under-invoicing intrafirm transfers of non-

routine intangibles assets to foreign affiliates in low-tax jurisdictions.[71]  The

commensurate with income standard is arm's length, according to the 1988 U.S.

Treasury White Paper, because its goal is "to ensure that each party earns the income or

return from the intangible that an unrelated party would earn in an arm's length transfer

of the intangible."[72]  Because the commensurate with income standard requires the

transfer price be based on the "actual profit experience realized as a consequence of the

transfer," the IRS retains the power to retroactively make periodic adjustments to the

transfer price should the intangible's income stream change over time.[73]

---

[70] 26 C.F.R. § 1.482-4(a) (2013).

[71] Lorraine Eden, *Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America,* 411-12 (1998).

[72] U.S. Treasury Dep't & Internal Revenue Service, *A Study of Intercompany Pricing (Section 482 White Paper)* 47 (Oct. 18, 1988), *available at* https://ia600305.us.archive.org/17/items/studyofintercomp00unit/studyofintercomp00unit_bw.pdf.

[73] *Id.* at 63.

### 2.    *Legal Title versus Economic Ownership*

61.    Transfer pricing in relation to intangibles is accompanied by unique challenges.

Intangibles are often not sold in external markets and thus a comparable price is not

observable.[74]  In addition, intangibles are typically unique in nature (e.g., a patent for a

new technology), which makes it difficult to find a suitable comparable transaction for

determining an arm's length price.

62.    Transfer pricing issues involving intangible assets can arise if:

- One entity within the MNE group (typically, the parent) creates an intangible asset
  and either sells or licenses the IP to one or more affiliated entities.

- Two entities within the MNE group jointly develop IP (typically, the parent and an
  offshore R&D center).  One entity (typically, the parent) is considered the developer
  of the IP, and the other entity is either an "assister" or a "contract R&D provider."

- Two or more MNE entities that perform R&D pool the R&D costs and risks of
  development through a cost sharing arrangement (CSA).

63.    An MNE group must be conscious that legal arrangements regarding the ownership of

and rights to IP when two or more entities within that MNE contributed to the

development of the IP are appropriately arm's length.  In each of the above cases, the

relevant transfer pricing questions are (i) which MNE entity holds legal title to the IP,

(ii) how the IP transfer (license or sale) should be structured, (iii) what the appropriate

price is for the transfer, (iv) whether a profit element should be part of the transfer price,

and (v) what rights are granted to practice, exploit and license the IP in different

geographic regions.[75]

---

[74] *See, e.g.*, Lorraine Eden, *Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America* 256 (1998).

[75] I understand that in contrast to its position with respect to the line of business sales, the Monitor does not contend that the $4.5 billion in proceeds from the sale of Nortel's residual patent portfolio (the "Rockstar Sale") should be allocated according to Schedule A to the MRDA.  Instead, the Monitor takes the position that the Canadian Debtors should receive the entirety of the Rockstar Sale proceeds because, in the Monitor's interpretation of the MRDA,

64.    Where there is no contemporaneous written legal contract, the tax authority can impute one based on the economic substance of the transactions between the related parties.

65.    From a transfer pricing perspective, the division of legal title and economic ownership is acceptable as long as profits are allocated among entities consistent with the economic substance of the transaction (i.e., the functions performed, assets used, and risks borne).

66.    For example, the IRC Section 482 Regulations state that the "greatest weight will be given to the actual conduct of the parties, and the respective legal rights of the parties . . . [but, if] the contractual terms are inconsistent with the economic substance of the underlying transaction, the district director may disregard such terms and impute terms that are consistent with the economic substance of the transaction."[76]

67.    The OECD Transfer Pricing Guidelines and proposed revisions thereto emphasize the importance of economic ownership.  The July 2013 proposed revisions[77] to the OECD Transfer Pricing Guidelines on intangibles are very clear that legal title ownership is less important than economic ownership.  These proposed revisions state:

---

NNL was the sole "owner of the IP" sold in the Rockstar Sale and the licenses owned by the U.S. and EMEA Debtors at the time of the Rockstar Sale were "inapplicable, irrelevant and without value."  Allocation Position of the Monitor & Canadian Debtors, May 16, 2013, ¶¶ 54-56.  As I understand this position, it is inconsistent with representations that Nortel made to tax authorities stating that NNI, NNUK, NNSA and NN Ireland "owned" the Nortel IP in their respective exclusive jurisdictions by virtue of their exclusive licenses confirmed in the MRDA.  In addition, in interpreting those licenses as set forth in the MRDA, it is important to note that the arrangement suggested by the Monitor – whereby NNL's legal title to the IP entitles NNL to the entirety of the proceeds from the sale of $4.5 billion worth of patents jointly developed by all five IEs, including NNI – would not have met the arm's length standard.  I understand that the Monitor has not explained whether or how this reading of the MRDA complies with the arm's length standard and I reserve the right to submit a rebuttal report to address that question.

[76] 26 C.F.R. § 1.482–1(d)(3)(ii)(B)(1) (2013).  Of course, this ability on the part of tax authorities relates only to taxes and the application of tax standards.  It does not have the effect of undoing otherwise valid legal provisions for non-tax purposes.

[77] The OECD regularly posts revisions and iterations to the OECD Transfer Pricing Guidelines.  The OECD's July 2013 Revised Discussion Draft contained proposed revisions to the OECD Transfer Pricing Guidelines on Transfer Pricing Aspects of Intangibles.  *See* OECD, *Revised Discussion Draft on Transfer Pricing Aspects of Intangibles* (July 2013), *available at* http://www.oecd.org/ctp/transfer-pricing/revised-discussion-draft-intangibles.pdf.

The question of legal ownership is separate from the question of remuneration under the arm's length principle. It is important to note that, for transfer pricing purposes, legal ownership of intangibles, by itself, does not confer any right ultimately to retain any return from exploiting the intangible that may initially accrue to the legal owner as a result of its legal or contractual right to exploit the intangible. The return ultimately retained by the legal owner depends upon the contributions it makes to the anticipated value of the intangibles through its functions performed, assets used, and risks assumed, and upon the contributions to the anticipated value of intangibles made by other MNE group members through their functions performed, assets used, and risks assumed.[78]

68.     Likewise, the 2010 OECD Transfer Pricing Guidelines state: "each participant is accorded separate rights to exploit the intangible property, for example in specific geographic areas or applications . . . The separate rights obtained may constitute actual legal ownership; alternatively, it may be that only one of the participants is the legal owner of the property, but economically all the participants are co-owners."[79] This latter situation, where one participant is the legal owner of the IP, but economically, all of the participants are co-owners (here, with each exclusive license-holding integrated entity[80] owning the IP in its own exclusive territory) describes Nortel's situation.

### 3.     Cost Sharing Arrangements

69.     When an MNE group has multiple affiliated entities conducting R&D around the world, the group can choose to use a Cost Sharing Arrangement ("CSA"), also known as a Cost Contribution Arrangement ("CCA"), as its transfer pricing policy for the co-development of intellectual property.[81] CSAs can also be used for many co-development activities, but

---

[78] OECD, *Revised Discussion Draft on Transfer Pricing Aspects of Intangibles* ¶ 73 (July 2013), *available at* http://www.oecd.org/ctp/transfer-pricing/revised-discussion-draft-intangibles.pdf.

[79] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.6.

[80] Nortel's "integrated entities" and their rights under the MRDA are described *infra* at Sections IV.B and IV.D.

[81] The U.S transfer pricing rules use the term "CSA"; Canada and the OECD use "CCA." The terms are used interchangeably here.

are most commonly used for co-development of IP.[82]  CSAs are typically structured as

contractual joint ventures where the parties share development costs and risks.  The

parties agree "to share the costs and risks of developing, producing, or obtaining assets,

and to determine the nature and extent of the interests of each participant in those assets,

services, or rights."[83]

70.     CSAs have been part of the U.S. Section 482 Regulations since 1968,[84] and Canadian

rules for CCAs first appeared in Income Tax Act Section 247 in 1998.[85] Both the U.S.

and Canadian regulations are similar to the OECD Transfer Pricing Guidelines on CCAs.

71.     When a CSA is used for co-development of intangibles by multiple entities within an

MNE that conduct R&D (as was the case with Nortel's five integrated entities), in order

to meet the arm's length standard for U.S. income tax purposes, each CSA member "must

receive a non-overlapping interest in the cost shared intangibles without further

obligation to compensate another controlled participant for such interest" and "must be

entitled to the perpetual and exclusive rights to the profits from transactions of any

member of the controlled group . . . to the extent that such profits are attributable to such

interest in the cost shared intangibles."[86]  In other words, each CSA member must have

---

[82] Canada's IC 87-2R states that CSAs are typically used for joint development of intellectual property, but may also be used to "pool their resources to acquire any kind of centralized services…"  IC 87-2R ¶ 122.

[83] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.3.

[84] Lorraine Eden, *Taxing Multinationals: Transfer Pricing and Corporate Income Taxation in North America*, 389 (1998); U.S. Treasury Dep't & Internal Revenue Service, *A Study of Intercompany Pricing (Section 482 White Paper)* 114-29 (Oct. 18, 1988), *available at* https://ia600305.us.archive.org/17/items/studyofintercomp00unit/ studyofintercomp00unit_bw.pdf.

[85] Income Tax Act Section 247(1) defines a CCA as "an arrangement under which reasonable efforts are made by the participants in the arrangement to establish a basis for contributing to, and to contribute on that basis to, the cost of producing, developing or acquiring any property, or acquiring or performing any services, in proportion to the benefits which each participant is reasonably expected to derive from the property or services, as the case may be, as a result of the arrangement."  R.S.C. 1985, c. 1 (5th Supp.).  *See also* IC 87-R ¶¶ 120-38 (describing Qualifying Cost Contribution Arrangements).

[86]  26 C.F.R. § 1.482-7(b)(4)(i) (2013).

non-overlapping interests in the cost sharing activity, which give each member perpetual and exclusive rights to all profits related to its interest.  The OECD Transfer Pricing Guidelines similarly state that each participant is "entitled to exploit its interest in the CCA separately as an effective owner thereof and not as a licensee, and so without paying a royalty or other consideration to any party for that interest."[87]

72.    To ensure non-overlapping rights, the CSA must clearly define each member's interest. Typically, the defining boundary is geographic territory.[88]  In its assigned territories, each CSA member has "perpetual and exclusive right to exploit the cost shared intangibles through the use, consumption, or disposition of property or services."[89]

73.    "The separate rights obtained may constitute actual legal ownership; alternatively, it may be that only one of the participants is the legal owner of the property, but economically all the participants are co-owners."[90]  In order for a CSA to satisfy the arm's length standard, each participant's contribution must also be "consistent with what an independent enterprise would have agreed to contribute under comparable circumstances given the benefits it reasonably expects to derive from the arrangement."[91]

74.    The CSA participants must share costs and risks in proportion to their "reasonably anticipated benefits (RAB)," either measured directly by their additional revenues generated or costs saved over the lifetime of the intangible assets (the preferred but more difficult method) or indirectly by an "allocation key" (the less preferred but more feasible

---

[87] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.3.

[88] In a geographic split, "[e]ach controlled participant must receive at least one such territory, and in the aggregate all the participants must receive all such territories." 26 C.F.R. § 1.482-7(b)(4)(ii) (2013).

[89] 26 C.F.R. § 1.482-7(b)(4)(ii) (2013).

[90] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.6.

[91] *Id.* ¶ 8.8.

method).  The allocation key can be based on revenues, costs, quantities or profits, but must be an appropriate metric.[92]

75.     If there is a mismatch between a CSA participant's share of total RAB and its share of the total expenditures, a "true-up" or adjustment is made where the party that spent too much (relative to its RAB share) is compensated by the parties that spent too little.  Thus, a participant's RAB share drives its cost share, at least in theory.  In addition, there is a buy-in payment when a new party joins an existing agreement and a buy-out if one leaves.[93]

76.     There are clear benefits to using a CSA as a method for organizing R&D development within an MNE.  First, cost shares are deductible costs (i.e., reductions to taxable income) to each participant.  Second, because CSAs simply allocate the group's total R&D costs among the group's members, there is no income or mark-up element involved and no royalty receipts or payments (which would be taxable as income) move among the CSA members.  CSAs are therefore an alternative way for the MNE to organize development and funding of R&D, one that avoids the payment or receipt of income through royalties or fees.  Third, since intragroup income payments (e.g., royalties, licensing fees) typically trigger withholding taxes of 15 to 30 percent, depending on the existence of a double tax

---

[92] 26 C.F.R. § 1.482-7(e)(2)(i) (2013).

[93] The valuation of buy-ins has been one of the most controversial areas of the U.S. CSA regulations, as evidenced by the recent *Veritas* case, which the IRS lost, and subsequent revisions to the CSA regulations finalized in 2011 and 2013.  In *Veritas*, the IRS argued that the U.S. parent should have received a buy-in payment from its Irish subsidiary based on the foregone income the U.S. parent could have earned on its next best alternative use of the intangible assets.  The court disagreed and used a version of the CUP (comparable uncontrolled price) method to value the buy-in payment.  The new U.S. regulations re-assert using the income method over CUP; that is, the buy-in payment should be based on each participant's expected risk-adjusted  return from its total investment in the CSA. *See Veritas Software Corp. v Commissioner,* 133 T.C. 297 (T.C. 2009); T.D. 9568, 2012-12 I.R.B. 499 (Mar. 19, 2012) ("Section 482: Methods to Determine Taxable Income in Connection with a Cost Sharing Arrangement"); T.D. 9630, 2013-38 I.R.B. 199 (Sep. 16, 2013) ("Use of Differential Income Stream as an Application of the Income Method and as a Consideration in Assessing the Best Method"); *see also* Andrew P. Solomon, et al., *Final Section 482 Cost Sharing Regulations: A Renewed Commitment to the Income Method,* 20.17 Tax Mgmt. Transfer Pricing Report, 780-85 (2012).

treaty, a CSA is also tax efficient because it avoids the payment of withholding taxes.

### 4.    *Advance Pricing Agreements*

77.    In addition to specific guidelines on transfer pricing methods, an important procedural

innovation has been the development of the advance pricing agreement ("APA") as a

risk-mitigation strategy for MNEs.[94]   An APA is a form of alternative dispute resolution

mechanism, distinct from the traditional transfer-pricing dispute processes of audit,

appeals and (occasionally) tax court.[95]   An MNE entity typically documents its transfer

pricing policy as part of its tax return.  If the tax authority disagrees with the transfer

pricing policy (for example, if the entity's taxable income appears low), the authority can

conduct an audit, which might lead to a penalty, an appeal, and possibly tax court

proceedings.  As an alternative to this process, the IRS, CRA, and other tax authorities

have developed the APA mechanism, which allows an MNE entity and its national tax

authority (for example, NNI and the IRS, or NNL and the CRA) to reach an agreement on

a mutually acceptable transfer pricing method, which is then applied to determine the

entity's taxable income in that jurisdiction.[96]   By participating in the APA process, an

MNE entity can avoid uncertainties about future audit risks.

78.    APAs are a recent addition to the transfer pricing regulatory framework, but the

---

[94] *See* Ernst & Young, *The 2012 Worldwide Corporate Tax Guide* at 73, 193, 293, 324, 443, 482, 518, 736, 821, 845, 925, 1105, 1298 (2012), *available at* http://www.ey.com/Publication/vwLUAssets/ Worldwide_corporate_tax_guide_2012/$FILE/WCTG_2012_Worldwide_Corporate_Tax_Guide.pdf (noting availability of APAs in Canada, the U.S., and other countries).

[95] Paul A. DiSangro et al., *Alternative Dispute Resolution Processes in the Current U.S. Transfer Pricing Landscape*, 21.5 Tax Mgmt. Transfer Pricing Report 1, 3 (June 28, 2012).

[96] *Id.*; *OECD Transfer Pricing Guidelines* (2010), Ch. IV, Section F; Internal Revenue Service, *Advance Pricing Agreement Program*, *available at* http://www.irs.gov/Businesses/ Corporations/Advance-Pricing-Agreement-Program (last visited Jan. 19, 2014); IC 87-2R ¶ 223.

procedure has now been adopted by more than 30 countries.[97]  The IRS developed the

APA process in 1990, and IRS Revenue Procedure 91-22, which provided guidance on

APAs, was published in 1991.[98]  Canada opened its APA program in 1993, with

regulations outlined in Information Circular 94-4R in 1994, subsequently updated in

2001.[99]  Nortel's 1991-1999 three bilateral APAs (which covered CSAs) with Canada and

the United States would therefore have been among the earliest APAs.

79.     The number of APAs has continued to grow, albeit slowly.  By the end of 2012, the IRS

had completed 1,155 APAs[100] and the CRA 192 APAs.[101]  A total of 390 APAs were in

force within the European Union member states.[102]

80.     The numbers of APAs represent only a very small percentage of taxpayers.  Estimates

suggest there are only 400 or so APAs in the United States, compared to more than

11,000 MNEs with U.S. parents and foreign affiliated entities, which is less than 4

percent of the total.[103]  In addition, some MNEs will have multiple APAs on different

product lines or entities, further reducing the percentage.  Thus, APAs are rare, even in

the U.S., the country with the longest history and experience with this process.

---

[97] Ernst & Young, *Guide to Advance Pricing Agreements (APAs)*, *available at* http://www.ey.com/GL/en/Services/Tax/International-Tax/Guide-to-advance-pricing-agreements--APA----Managing-Global-Transfer-Pricing-Issues-with-APA (last visited Jan. 19, 2014).

[98] *See* Rev. Proc. 91-22, 1991-1 C.B. 526.

[99] *See generally* Canada Customs & Revenue Agency, *International Transfer Pricing: Advance Pricing Arrangements (APAs)*, Information Circular 94-4R, Mar. 16, 2001, *available at* http://www.cra-arc.gc.ca/E/pub/tp/ic94-4r/ic94-4r-e.pdf.

[100] Internal Revenue Service, *Announcement & Report Concerning Advance Pricing Agreements* 6 (Mar. 25, 2013), *available at* http://www.irs.gov/pub/irs-drop/a-13-17.pdf.

[101] Canada Revenue Agency, *Advance Pricing Arrangement: Program report 2012-2013 available at* http://www.cra-arc.gc.ca/tx/nnrsdnts/cmp/p_rprt13-eng.html (last visited Jan. 19, 2014).

[102] PwC, *EU Joint Transfer Pricing Forum Releases 2012 Statistics on APAs and Pending Cases under the EU Arbitration Convention* (Oct. 9, 2013), *available at* http://www.pwc.com/en_GX/gx/tax/newsletters/tax-controversy-dispute-resolution/assets/pwc-eu-jtpf-2012-statistics.pdf.

[103] Richard C. Stark et al., *Consistency, Sunshine, Privacy, Secret Law and the APA Program*, 130 Tax Notes 655, 670 (Feb. 7, 2011).

81.     An MNE entity (the taxpayer) starts the APA process by requesting an APA from its national tax authority (the "pre-filing" stage).  There may be several pre-filing meetings before the two parties decide whether to pursue an APA, and either party can withdraw from the process.  If the tax authority decides to approve the application, the process moves into the "due diligence" stage.  The taxpayer completes a detailed APA application.  The requirements are similar across tax authorities.  For the CRA, for example, the APA application must include "the specifics of the covered transaction(s) including a detailed transfer pricing analysis and all pertinent information necessary for the CRA to review and complete its own transfer pricing analysis."[104]

82.     If the application is approved, the MNE entity and APA team within the national tax authority work together to develop a transfer pricing policy that is mutually agreeable to both sides.  The tax authority reviews the materials submitted by the taxpayer, undertakes site visits, and can request additional materials and/or meetings.  The APA team also completes its own functional analysis and comparables searches, ending with a formal position paper that accepts or recommends modifications to the MNE entity's proposed transfer pricing policy.

83.     The last stage is the documentation and signing of a binding contract between the MNE entity and its national tax authority where the tax authority agrees not to seek a transfer pricing adjustment for a covered transaction as long as the taxpayer files its tax return for a covered year showing results (taxable income) consistent with the agreed upon transfer pricing results.[105]  Where a foreign tax authority is involved, there is also the

---

[104] Canada Revenue Agency, *Advance Pricing Arrangement: Program report 2012-2013*, *available at* http://www.cra-arc.gc.ca/tx/nnrsdnts/cmp/p_rprt13-eng.html (last visited Jan. 19, 2014).

[105]  Internal Revenue Service, *Advance Pricing Agreement Program*, *available at* http://www.irs.gov/Businesses/ Corporations/Advance-Pricing-Agreement-Program (last visited Jan. 19, 2014).

documentation and signing of a bilateral or multilateral understanding between the two (or more) tax authorities.

84.     The APA agreement typically consists of three elements:  (1) an agreement between the taxpayer and the tax authority about the relevant facts and circumstances under negotiation, (2) the development of an acceptable transfer pricing method, and (3) the application of the methodology to determine an arm's length range of results.  The APA covers identified transactions for a specified number of years, both prior and future years, and the MNE entity's transfer prices over the life of the APA are expected to fall within the agreed upon range of results.

85.     Where the APA is bilateral or multilateral, an additional stage is needed for government-to-government negotiations.  As an example, assume a U.S. subsidiary and its Canadian parent have extensive cross-border transactions and decide a bilateral APA would reduce their tax risk.  The U.S. subsidiary approaches the IRS for a U.S. APA, and the Canadian parent approaches the CRA for a Canadian APA.  These two sets of taxpayer-government negotiations must be accompanied by a third set of negotiations between the two governments if the APA is to be bilateral.  The three sets of negotiations can become quite complex because the two tax authorities must reach agreement with the two MNE entities and between themselves (that is, four parties) on the transfer pricing methodology and results that apply for each entity in each jurisdiction over the life of the bilateral APA.  Moreover, a transfer pricing policy that results in a larger tax base in one jurisdiction may result in a lower tax base in the other jurisdiction, making a mutually agreeable decision between the two governments even more difficult.  If the negotiation processes are successful, the result consists of two domestic APAs and a separate

agreement between the two tax authorities.

86.     Bilateral APAs typically take more time than a unilateral APA because of the

complexities and number of parties involved.  For the CRA, the average time to complete

a bilateral APA from acceptance into the program to completion is 48 months, compared

to an average of 33 months for a unilateral APA.[106]  For the IRS, the average time to

complete a bilateral APA in 2012 is 48 months, compared to 28 months for a unilateral

APA.[107]  More than 80% of Canada's APA cases have been (perhaps not surprisingly)

bilateral or multilateral,[108] compared with 61% of U.S. APAs.[109]


## IV.     NORTEL'S TRANSFER PRICING POLICIES

### A.     Nortel as a Multinational Enterprise

87.     Nortel was a multinational enterprise in the telecommunications industry; the MNE

group's affiliates and activities were spread across the globe in more than 100

countries.[110]  Nortel had a publicly traded corporate holding company parent, Nortel

Networks Corporation ("NNC"), listed and reporting in both the U.S. and Canada, trading

on the New York Stock Exchange and the Toronto Stock Exchange.  NNC held 100

percent of the stock of Nortel Networks Limited ("NNL"), the Canadian operating

---

[106] Canada Revenue Agency, *Advance Pricing Arrangement: Program report 2012-2013 available at* http://www.cra-arc.gc.ca/tx/nnrsdnts/cmp/p_rprt13-eng.html (last visited Jan. 19, 2014).  These figures address the 2008 to 2013 period.

[107] Internal Revenue Service, *Announcement & Report Concerning Advance Pricing Agreements,* 16 (Mar. 25, 2013), *available at* http://www.irs.gov/pub/irs-drop/a-13-17.pdf.

[108] Canada Revenue Agency, *Advance Pricing Arrangement: Program report 2012-2013 available at* http://www.cra-arc.gc.ca/tx/nnrsdnts/cmp/p_rprt13-eng.html (last visited Jan. 19, 2014).

[109] Internal Revenue Service, *Announcement & Report Concerning Advance Pricing Agreements,* 6 (Mar. 25, 2013), *available at* http://www.irs.gov/pub/irs-drop/a-13-17.pdf.

[110] NNI_00265297 (Feb. 28, 2010 Report entitled "Nortel Networks Limited Transfer Pricing Report for the Year Ended December 31, 2009") at 4.

company and an intermediate holding company.[111]

88.     NNL, in turn, owned, among other things, 100% of the stock of NNI, the U.S. operating

company; NNUK, the U.K. operating company; NN Ireland, the Irish operating

company; and NNSA, the French operating company.  The five main operating

companies – NNL, NNI, NNUK, NN Ireland and NNSA – performed the vast majority of

Nortel's R&D, provided Nortel's corporate direction, overhead, management and

structure, generated the vast majority of Nortel's global revenue, and created, owned and

licensed Nortel's IP.[112]  NNL also served as a parent company for numerous other Nortel

subsidiary companies throughout the world, as did NNI and NNUK.

89.     As a for-profit enterprise, Nortel's corporate organization was intended to maximize

shareholder value, and, as part of this effort, minimize the group's worldwide tax

obligations.  Given the group's reliance on R&D, booking R&D costs across the group

entities in a tax efficient manner was a priority.  These priorities are reflected in Nortel's

transfer pricing system and the agreement that embodies it – the MRDA – discussed

further below.

        **B.     Nortel's Management and Development of R&D**

90.     As a leader in the global telecommunications industry, Nortel provided

telecommunications infrastructure and technology – end-to-end "networking solutions"[113]

– to small businesses, governments and multinational corporations worldwide.  Nortel

---

[111] *Id.*

[112] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 6, 11-12; *see also* Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and Amendments) at Sched. A.

[113] Networking solutions are defined as "network equipment, software and other technologies that enable communications through the use of data, voice and multimedia networking." Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004) at 140, 149.

was a "B2B" firm; its sales were to other businesses, not to households.[114]

91.     Nortel asserted that R&D was a major driver of Nortel's revenue and a necessary

component of Nortel's competitive position in the industry.[115]  According to Nortel,

"R&D is the primary contributor to the success of Nortel's business.  Nortel's customers

choose Nortel products and services because Nortel is viewed as a technology leader and

innovator in its market."[116]  Nortel's R&D investments were aimed at network

transformations and next generation products and solutions such as wireless voice and

broadband networking.[117]  Nortel estimated that the group had 10,000-12,000 ongoing

R&D projects.[118]

92.     From a management perspective, Nortel was structured as a "matrix organization,"

meaning that there was a vertical and horizontal flow of skills and information across

geographic regions within the organization, and Nortel shared information and performed

common tasks across countries.  Nortel's matrix structure was based on three

characteristics:

- Lines of business.  Nortel had several core lines of business that evolved over time; throughout the 2000s, there were between three and five Nortel lines of business.  In 2004, for example, Nortel had four lines of business:  Wireless Networks, Enterprise Networks, Wireline Networks, and Optical Networks.[119]

- Geographic region.  These geographic regions included the U.S.; the Europe, Middle East, and Africa region (or "EMEA"); Canada; the Asia Pacific region;

---

[114] NNI_00265297 (Feb. 28, 2010 Report entitled "Nortel Networks Limited Transfer Pricing Report for the Year Ended December 31, 2009") at 5.

[115] *See, e.g.*, Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 49.

[116] *Id.* at 11.

[117] Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004) at 18.

[118] *Id.* at 24.

[119] NNC-NNL06016944 (May 2, 2005 Nortel Networks Corp. Form 10-K for the Year Ending 2004) at 1.

and the Caribbean and Latin American region (or "CALA). [120]

- Functions.  Nortel's business activities included the "the design, development, manufacture, assembly, marketing, sale, licensing, installation, servicing and support of . . . networking solutions,"[121] as well as administrative support for those operations.

93.     A specific subset of five legal entities within the Nortel group – NNL, NNI, NNUK, NNSA, and NN Ireland – served as the core operating entities within the Nortel group. The five core entities performed R&D activities that generated Nortel's IP, which was "the primary contributor to the success of Nortel's business."[122]  These R&D activities were performed at specific locations in each of the five countries.  For example, in the United States, R&D was conducted at NNI facilities in Richardson, Texas; Billerica, Massachusetts; Santa Clara, California; Raleigh, North Carolina; Nashville, Tennessee; and Batavia, New York.[123]

94.     The five core entities, often referred to as Integrated Entities (or "IEs"),[124] also performed critical activities related to the customer fulfillment process, both inside and outside their respective geographic markets.  Originally, the IEs manufactured most Nortel products,[125] but by 2004, almost all manufacturing activities had been outsourced except

---

[120] *See* Ex. 11003, NNC-NNL007750 (Apr. 28, 2006 Nortel Networks Corp. Form 10-K for the Year Ending 2005) at 78.

[121] *Id.* at 1.

[122] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 11.

[123] *See* Ex. 33056, NNC-NNL07376624 (Jan. 2, 2003 PowerPoint entitled "Global R&D Investment Strategy and recommendations for Nortel Networks") at 4-6.

[124] Nortel Networks Australia, Ltd., was also considered to be an IE until December 31, 2007.  *See* NNI_01503523 (Dec. 23, 2008 Letter from A. Seve to M. Orlando) at 1. ("We understand that as of 1 January 2008, NN Australia has transitioned to being characterized as a distribution and service providing entity.")

[125] Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004) at 17 ("[C]ertain Nortel entities are fully integrated companies which perform the functions of R&D, manufacturing and distribution."), 51 ("Nortel's manufacturing is principally located in Canada, the U.S. and the U.K. Under the ROW category, France and Ireland also perform manufacturing functions.").

for the most complex stages that remained with Nortel's System Houses.[126]  The IEs

moved into specializing in manufacturing *support* activities, such as "procurement,

logistics, demand planning and other supply chain activities" at the local, regional and

global levels.[127]  Because IEs undertook selling and marketing activities and general and

administrative activities within their own country and on an extraterritorial basis, they

effectively acted as regional headquarters or hubs, supporting the affiliates in their region

by providing them with support services.[128]

95.     A second type of entity, the Limited Risk Entities (or "LREs"), consisted of Nortel

affiliates that primarily performed only sales and distribution and technical support

services within their assigned (typically national) markets.[129]  In cases where a LRE did

not have the needed technical support staff for a particular contract, the services were

provided by one or more of the IEs.[130]

96.     LREs maintained various "distribution agreements" with the IEs guaranteeing that the

LREs would at least have break-even operating income.[131]  Moreover, as a general

---

[126] *Id.* at 5, 114-23 (describing Nortel outsourcing of manufacturing and other activities); Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 18  ("[M]any of the entities drastically reduced or eliminated their manufacturing in favor of outsourcing during the APA Term."); *see also* NNI_01534432 (Oct. 23, 2006 letter with subject "Nortel Multilateral APA: Taxpayer's Suggested Approach to Resolve the APA") at 3 ("NNI outsourced routine manufacturing in 2000, well before the rest of the Nortel RPS entities, thereby changing an emphasis in its functions to more distribution and less manufacturing than the other RPS entities.").

[127] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 12.

[128] *Id.* at 12-13 ("The S&M and G&A activities of the IEs support the sales within the country of the IE as well as support extraterritorial sales.  By funding S&M and G&A activities in jurisdictions other than their own, Nortel's IEs are performing a value added service that supports the fulfillment process outside their own jurisdiction.").

[129] *Id.* at 12, 22.

[130] *Id.* at 12-13, 44.

[131] *See, e.g.*, Ex. 32166, EMEAPROD0888515 (Sept. 19, 2005 Distribution Agreement entered into by and between Nortel Networks S.P.A. ("NN Italy") and Nortel Networks Limited [effective date Jan. 1, 2002]) at 2 ("Unless otherwise agreed by the parties, a "reasonable arm's length rate of return", for purposes hereof, shall be equal to an operating margin between 0% and 4% . . . .").

matter, the LREs typically received at least a 1% operating margin.[132]

## C.    Nortel's RPSM

97.    Prior to 2001, Nortel had three cost sharing arrangements (CSAs) set up to manage its related party transfers.  Each CSA was covered by a bilateral APA with the IRS and another with the CRA, then called the Canadian Customs and Revenue Agency.  The three sets of agreements covered R&D, tangible property and headquarters costs.[133]  I focus on the R&D CSA because it is most relevant to this report.

98.    The R&D CSA granted each participant, later called IEs, the right to use the IP developed as part of the arrangement in its respective market.  "From an economic standpoint, each [IE] could be considered to 'own' the [Nortel] technology as it related to its specific region."[134]  The R&D CSA allocated R&D costs among the IEs using a three-factor formula based on royalty income, third party sales and modified operating income (see

---

[132] *See, e.g.*, NNI_01042966 (Apr. 6, 2006 Letter with subject "RE: Nortel Networks, Inc (APA-148919-02) Proposed U.S.-Canada Bilateral APA") at 6 ("It has been Nortel's practice since 2002, to reevaluate the appropriate arm's length operating margin for its routine distributors using comparable companies enduring similar risks and performing similar functions to Nortel's routine distributors.  Since 2002, the arm's length operating margin has been determined to be 1%."); NNI_00684753 (Oct. 3, 2007 Memo with subject "Analysis of Nortel's Transfer Pricing for Years After 2005") at 4-5 ("Based on 2006 updated comparables from E&Y, the Nortel limited risk distributors will continue to be compensated based on a 1% return on sales. . . . Operating margin based on 1% of sales falls within the interquartile range . . . ."); US_EMEA_Canada_PRIV_00147144 (Aug. 8, 2005 email with subject "Poland Addendum – Distribution Agreement") at 1 (explaining that although the Distribution Agreement does not guarantee a 1% routine return, "[t]he 1% return is a Nortel target"); *see also* Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 21 (stating LREs "perform limited routine distribution and/or service functions only. Such entities are responsible for the sales and distribution activities within their local markets," while IEs "perform the functions of research and development ('R&D'), design, liaison with third-party manufacturers, logistics, fulfillment, services, and distribution" and "are able to perform a full scope of distribution activities . . . both locally and globally.").

[133] Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 1; Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 4.

[134] Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 10.

Figure 1).[135]  The formula was designed to bring IE R&D spending in line with their

reasonably anticipated benefits.[136]

**Figure 1: Allocation Keys in Nortel's R&D Cost Sharing Arrangement**[137]

> - Step 1:  Royalty income (the ratio of an IE's royalty income divided by the sum of group royalty income plus group operating income from third party sales)
>
> - Step 2:  Third party sales (10% of the residual R&D expenses after the "Step 1" allocation key had been applied were allocated based on the ratio of the IE's third party sales divided by group third party sales)
>
> - Step 3:  Operating income from third party sales (90% of the residual R&D expenses after the "Step 1" allocation key had been applied were allocated based on the ratio of each IE's operating income from third party sales as a share of group operating profit from third party sales)

99.     According to the three part formula in Figure 1, NNI booked an annual average of 70%

of firm-wide R&D expenses under the R&D CSA from 1992 through 2000.[138]  When all

three of the Cost-Sharing APAs expired in 1999 or 2000,[139] Nortel collaborated with

outside advisors, including Horst Frisch Associates ("Horst Frisch"), a transfer pricing

and tax advisory firm; Ernst & Young U.S.; Ernst & Young Canada; and external counsel

in the U.S. and Canada to help it develop a new transfer pricing policy that would replace

all three of the APA agreements.[140]  Nortel's stated goals with respect to the new transfer

pricing policy were "to minimize Nortel's long-term effective tax rate, to make the

transfer pricing administrative process more efficient, and to, over time, improve the

---

[135] *Id.*

[136] *See* 26 C.F.R. § 1.482-7(b) (2013) (defining Cost Sharing Arrangement as one "by which controlled participants share the costs and risks of developing cost shared intangibles in proportion to their RAB shares").

[137] *See* Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 10.

[138] *See, e.g.,* NOR_53648130 (2005 Transfer Pricing Worksheet); NNI_00578051 (2000 R&D CSA Worksheet).

[139] Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004) at 100.

[140] Weisz Dep. 35:15-36:12, Nov. 25, 2013; Bush Dep. 44:12-25, Nov. 11, 2013.

global allocation of profits among Nortel affiliates."[141]  In 2001, Horst Frisch

recommended Nortel adopt the residual profit split method to allocate global profits

among the LREs and IEs.[142]

100.    The RPSM recommended by Horst Frisch, and later implemented by Nortel, involved a

two-step process:  first, provide each Nortel entity (both the IEs and LREs) a return for its

routine contributions to the business (called the "routine return"), and second, distribute

the remaining profits or losses among the IEs based upon their historical R&D

expenditures (called the "residual return" or "residual").

101.    Neither of these steps involved valuing the assets owned by each entity within the Nortel

group, by line of business or otherwise.

102.    It is important to recognize that the IEs and LREs were treated differently under Nortel's

RPSM.  First, their routine returns were calculated differently because the two groups

performed different types of routine functions:  the LREs were primarily engaged in

sales, distribution and technical support functions, whereas the IEs also performed other

administrative, manufacturing and technical support activities.  Second, because only the

---

[141] Ex. 11058, NNC-NNL06542812 (Dec. 31, 2001 email with subject "FW: Overview of Objectives of December 12) at 4 ("For several reasons, the R&D Cost Sharing Agreement ('R&D CSA') Nortel has utilized since 1992 needs to be replaced with a new transfer pricing methodology.  The reasons include: (a) the expiration of the APA covering the R&D CSA (which was effective until 12/31/1999); (b) the fact that neither of the major tax authorities (the CCRA, the IRS or the Inland Revenue) wants to renew the R&D CSA APA for years  subsequent to 1999; and (c) the fact that the R&D CSA does not effectively allocate R&D expenses among participants during 2001 due to the large operating losses.  Furthermore, changes in Nortel's business operations (e.g., gradual outsourcing of contract manufacturing) have necessitated a reexamination of our methods for determining intercompany transfer pricing. In an effort to minimize Nortel's long-term effective tax rate, to make the transfer pricing administrative processes more efficient, and to, over time, improve the global allocation of profits among Nortel affiliates, the Global Tax Practice ('Tax') has been investigating alternatives to the R&D CSA."); *see also* Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004) at 101 (stating the IRS also suggested that use of the RPSM and a single APA covering all of Nortel's intercompany transactions "would assist in simplifying Nortel's transfer pricing approach").

[142] Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 3 ("We have determined that a residual profit split method is the best method to be used to allocate income or loss among the various Nortel entities . . . .").

IEs performed R&D, only the IEs shared in the residual profit or loss after the payout for the routine returns.  As a result, the LREs received only a routine return; the IEs received both a routine return and a share of the residual profit or loss.

103.    <u>For 2001 to 2005</u>, the LREs' routine return was based upon measurements of returns achieved by comparable independent distributors in the same regions as those LREs (e.g., U.S., Europe, or Asia),[143] while the IEs' routine return was based on their return on net operating assets ("RONA"), estimated from returns achieved by independent contract manufacturers.[144]  The IEs' share of the residual profits or losses (their "residual return") was distributed according to the capitalized costs of each IE's R&D expenditures, amortized at a rate of 30% per annum.[145]

**Figure 2: Routine Returns and Residual Profit/Loss
under Nortel's RPSM, 2001-2005**

|  | **IEs** | **LREs** |
|---|---|---|
| Routine Return | Return on net operating assets (RONA) achieved by comparable contract manufacturers | Based upon return achieved by comparable distribution company in the same geographic region |
| Residual Profits/Losses | Distributed in proportion to IEs' capitalized and amortized R&D expenses | None (LREs did not have R&D expenditures, so not entitled to payment of residual profits or losses) |

---

[143] Nortel also implemented a working capital adjustment to improve comparability.  *See* Ex. 21408 (June 19, 2002 PowerPoint presentation entitled "Nortel's Proposed APA:  Presentation to the Competent Authorities of Canada, the United Kingdom and the United States") at 39-48; EMEAPROD0884602 (Undated Canada Revenue Agency Advance Pricing Arrangement Position Paper – Supplementary Analysis) at 7.

[144] Ex. 21408 (June 19, 2002 PowerPoint presentation entitled "Nortel's Proposed APA:  Presentation to the Competent Authorities of Canada, the United Kingdom and the United States") at 50-54.  The return on short term assets was calculated by applying LIBOR plus 300 points to the working capital of each IE; the return on long term assets was based on the median of long term assets earned by a set of manufacturing comparables.  *See* EMEAPROD0884602 (Undated Canada Revenue Agency Advance Pricing Arrangement Position Paper – Supplementary Analysis) at 7.

[145] Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 40; Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 9-10.

A detailed outline of the steps in Nortel's RPSM between 2001 and 2005 appears in **Appendix B.**

104.  <u>For 2006 onward</u>, the formula for calculating the LREs' routine return under the RPSM remained the same, but the calculation of both the routine return and residual return for the IEs changed.

105.  In terms of the routine return, effective in 2006, Nortel no longer based its calculation on the RONA achieved by comparable manufacturers.  As the IRS observed in 2006, Nortel had transformed from a company that "created, manufactured/assembled and distributed almost everything in-house" to one that outsourced all of its manufacturing, and it "sold most of its production and manufacturing assets" in the process.[146]  Since the IEs were no longer manufacturing entities, except for selective high-tech manufacturing activities that remained with the System Houses, a routine return based on net assets made little economic sense.

106.  Another reason, cited by the IRS, for changing from a RONA-based routine return was that the 2001-2005 RPSM "characterized each [Nortel] entity simply as a distributor or manufacturer" by providing LREs a return based on comparable distribution companies and only providing IEs with a return based on comparable manufacturers.  This was a problem because "most, if not all" IEs *also* performed distribution functions;[147] moreover, as noted above, Nortel had outsourced most of its manufacturing activities

---

[146] Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 7.

[147] *Id.* at 18; *see also* Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 11 ("In addition to performing ongoing R&D functions, the IEs are fully integrated, meaning they perform all functions related to the customer fulfillment process including manufacturing support and distribution functions both inside and outside of their respective geographic markets.").

during the 2000 to 2004 period.[148]

107.    Therefore, from 2006 onward, the IEs' routine return under Nortel's RPSM was

separated into two categories of calculations:  (1) a routine return based upon returns

achieved by comparable independent distributors (i.e., the same routine return the LREs

received) and (2) a routine return based on the IEs' costs incurred to support

extraterritorial revenues for three types of activities:  (i) Global Operations, (ii) Sales &

Marketing, and (iii) General & Administrative Expenses.

108.    Also effective in 2006, Nortel revised the calculation of residual profits and losses used

in the RPSM.  Whereas residual profits and losses had previously been distributed among

the IEs based upon their capitalized and amortized R&D expenses, the new calculation

distributed the residual among the IEs based on their historical R&D spending over the

previous five years.

**Figure 3: Routine and Residual Returns under Nortel's RPSM, 2006 onward**

|  | **IEs** | **LREs** |
|---|---|---|
| Step 1: Routine Return | • Return achieved by comparable distribution company in the same geographic region, and<br><br>• Return for costs incurred to support extraterritorial revenues achieved from (1) Global Operations, (2) Sales & Marketing, and (3) General & Administrative Expenses | Based upon return achieved by comparable distribution company in the same geographic region |
| Step 2: Residual Profits/Losses | Distributed in proportion to five-year rolling sum of R&D spending by each IE | None (LREs did not have R&D expenditures, so not entitled to payment of residual profits or losses) |

---

[148] *See supra* n. 126.

109.    A detailed outline of the steps in Nortel's RPSM from 2006 onward appears in **Appendix C.**

### D.    The MRDA

110.    Between December 2004 and October 2005, the IEs signed a Master Research and Development Agreement (the "MRDA"), dated retroactive to January 1, 2001.  The MRDA both formalized the elements of Nortel's transfer pricing policy and set forth the contractual agreement among the IEs concerning the creation, ownership and licensing of IP that had been developed by these entities.[149]

### 1.    IEs' Rights to Residual Profits or Losses in Accordance with RPSM

111.    The "Whereas" clauses at the beginning of the MRDA state Nortel's view that "the residual profit split methodology (RPSM) is the best arm's length measure" of the contributions made by each of the IEs with respect to the benefits of R&D activity to the Nortel group.[150]  Accordingly, Article 3(a) of the MRDA establishes that each participant would receive (or, in the event of losses and depending on the formula, one or more participants might provide) a payment as compensation for "its performance of, and contribution to, R&D Activity."[151]  That payment, in turn, would be computed using the RPSM as outlined in Schedule A of the MRDA.[152]

112.    Under Schedule A, Nortel's RPSM separates returns into two categories:  routine and non-routine.  First, Nortel entities (both the LREs and IEs) are compensated for their

---

[149] The MRDA went through four series of amendments and addenda.  Except as otherwise noted, references here are to the final version of the MRDA, which was last amended in January 2009.  *See* Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and Amendments).

[150] *Id.* at 2.

[151] *Id.* at Art 3(a).

[152] *Id.*

routine functions, assets and risks.  Second, any remaining residual profit (or loss) is used
to compensate the IEs for the "full entrepreneurial risk" involved in their R&D activities.
Nortel's key for allocating residual profit (or loss) among the IEs was their historical
R&D spending.[153]

113.    Schedule A also describes the rationale for the different treatment of IEs and LREs in
Nortel's transfer pricing system, noting that the IEs each bore the "full entrepreneurial
risk of the Nortel business," both the upside and the downside risk:

> [T]he compensation provided to [IEs] under [Nortel's] RPSM reflects the
> fact that the [IEs] bear the full entrepreneurial risk of the Nortel business
> such as the risks attendant with the substantial and continuous
> development and ownership of NN Technology.  Mathematically the
> RPSM accords the [IEs] all the upside risk in the Nortel business as well
> as the downside risk in such business.
>
> [The LREs] generally are the least complex entities in the group.  They do
> not perform R&D, and generally perform routine activities.  In addition,
> these entities have limited business risks in that they engage in a limited
> amount of functions.  Thus, these entities are provided a routine return as
> compensation for the distribution function that they perform . . ."[154]

114.    As I have argued above,[155] an allocation key that is based solely on costs, such as
historical R&D spending, and that ignores income is unlikely to meet the arm's length
standard.  The IRS' preface to the 1994 Section 482 IRC Regulations describes the
RPSM as a "method of last resort"[156] and goes on to critique the reliability of the method
as follows:

> The reliability of this method [the residual profit split] could be
> particularly adversely affected if capitalized costs of development are used
> to estimate the value of intangible property because such costs may bear
> no relation to market value, calculation of such costs may require

---

[153] *See id.* at Sched. A.

[154] *Id.*

[155] *See supra* ¶ 55.

[156] Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 130  (July 8, 1994).

allocation of indirect expenses between the relevant business activity and the controlled taxpayer's other lines of business, and capitalizing costs requires assumptions regarding the useful life of intangible property.[157]

115.    The current Section 482 regulations allow the use of R&D costs as an allocation key for the RPSM, but only under restrictive circumstances.  First, the allocation key is to be used only in situations where an allocation key cannot be estimated based on how comparable independent parties would split their profits under comparable circumstances.  Second, if R&D costs are to be used as an allocation key, they should be amortized and capitalized; the use of actual R&D costs is discouraged except in situations where costs do not vary much over time or across parties.  However, even capitalized costs can be an unreliable metric, as the preface to the 1994 U.S. transfer pricing regulations notes.[158]  Moreover, while Nortel's 2001-2005 RPSM was based on amortized and capitalized R&D costs, Nortel requested its RPSM allocation key for 2006 onward be based on a five-year rolling sum of actual historical R&D spending by the IEs  – and, not surprisingly, the IRS and CRA refused to grant the APA request.

### 2.    *Licensing and Ownership Rights Under the MRDA*

116.    The "Whereas" clauses of the MRDA also explain that NNL held legal title to Nortel's technology, referred to as "NN Technology."[159]  Each IE other than NNL had "held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT

---

[157] *Id.*

[158] *Id.*

[159] "NN Technology" is defined as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software, and other documentation or information produced or conceived as a result of research and development by, or for, any of the [IEs], but excluding trademarks and any associated goodwill."  Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and Amendments) at Art. 1(f).

Technology . . . pursuant to the [R&D CSA] entered into on January 1, 1992."[160]  The

"Whereas" clauses state that the MRDA's "Licensed Participants" (all the IEs except

NNL) would continue to enjoy "equitable and beneficial ownership of certain exclusive

rights" with respect to that technology after their bilateral R&D CSAs with the parent

firm were terminated and replaced by the MRDA.[161]  The R&D CSAs were terminated in

December 2000.  The MRDA was executed between December 2004 and October 2005.

117.    Therefore, in addition to the MRDA outlining the IEs' right to Nortel's profits (or losses),

each of the IEs (other than NNL) had a fully paid up "exclusive, royalty-free license" in

perpetuity to NN Technology in its exclusive territory, e.g., the U.S. for NNI, or the U.K.

for NNUK.[162]  The IEs also had "the right to assert actions and recover damages or other

remedies in their respective Exclusive Territories for infringement or misappropriation of

NN Technology by others."[163]  The MRDA was later amended also to grant each of the

Licensed Participants (the IEs other than NNL) as of January 2009 a "non-exclusive,

royalty-free license" to NN Technology in any territory throughout the world that was not

the exclusive territory of another IE.[164] Thus, NNI for example had an exclusive,

perpetual royalty-free license for the U.S. (including Puerto Rico) and a non-exclusive,

perpetual royalty-free license for all other countries except Canada, the U.K., France and

Ireland.

---

[160] *Id.* at 2.

[161] *Id.*

[162] *Id.* at Art. 5(a).

[163] *Id.* at Art. 4(e).  In addition, Article 4(d) of the MRDA provided that "[w]ith respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any [IE] pursuant to [the MRDA], NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world."  *Id.* at Art. 4(d).

[164] *Id.* at 3d Add., Art. 5(a)(ii).

118.    Furthermore, the MRDA provides that IEs that were not party to an APA governing

Nortel's transfer pricing policy could withdraw from the MRDA, at which point they

would be awarded the "fair market value" of their exclusive license to NN Technology.[165]

Any IE that withdrew or was terminated as a party to the MRDA was entitled to the fair

market value of its exclusive license upon the occurrence of a "Defaulting Event" –

defined to include an IE's loss of status as an NNL affiliate, its unremedied breach of the

MRDA, or, importantly, any IE's insolvency.[166]  Consistent with the fact that the RPSM

does not measure the value of the assets that each entity owns, the MRDA uses the term

"fair market value" to determine the appropriate payment to an IE upon withdrawal from

the MRDA and relinquishment of the exclusive licenses in a bankruptcy scenario.  The

buy-out payment to an IE that exits the MRDA as the result of a special defaulting event

does not reference Schedule A, which was instead set up to provide an "arm's length

compensation" to each IE for its R&D activity.[167]

119.    This licensing structure ties directly into Nortel's strategy of minimizing taxes on a

worldwide basis for the Nortel group.  Taxation follows substance over form and,

therefore, tax authorities would understand that the IEs had economic ownership of the

intellectual property in their respective exclusive jurisdictions, regardless of where legal

title was held.  Nortel itself told tax authorities that, "[f]rom an economic standpoint,"

each of the IEs other than NNL "could be considered to 'own' the NT technology as it

related to its specific region."[168]

---

[165] *Id.* at Arts. 1, 11.

[166] *Id.*

[167] *Id.* at Sched. A ¶ 3.

[168] Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 10.

120.    Nortel, of course, could have structured this differently.  The Canadian parent, for example, *could have* acquired the IP created by the other IEs and then, in turn, licensed back and charged royalties to the IEs for use of that IP in each jurisdiction.  However, this approach would have generated taxable income for the other IEs on their sales to NNL, and the royalties would have also generated taxable gain at the NNL level.  Withholding taxes would also have been levied on the royalty payments based on the applicable double tax treaty.

121.    Today, a common practice among MNEs is "IP migration," whereby legal title to all IP created within the MNE group is held in a low-tax jurisdiction such as Switzerland or Ireland; that entity then licenses the IP back to the MNE's affiliates in return for licensing fees or royalty payments.  If tax treaties are structured appropriately, withholding taxes can be minimized, and the income from the IP licenses sheltered offshore from tax authorities.  The tax authorities, however, now scrutinize these transactions to determine whether they have economic substance and comply with the arm's length standard; IP migration can often trigger taxation under, for example, U.S. Internal Revenue Code Section 367(d).[169]

122.    However, this is not what Nortel did.  Instead, Nortel structured its transfer pricing arrangements such that all the IEs would allow NNL to have legal title to all NN Technology, notwithstanding the other IEs' significant contribution to the development of that technology, but in exchange received, among other things, exclusive, perpetual royalty-free licenses for the NN Technology in their respective territories.  This structure

---

[169] Sang Ji & Steven Gee, White & Case, *US—Benefits of Intangible Property Migrations*, in Global Tax Report: Intellectual Property Tax Planning 2, 3 (Sep. 2013), *available at* http://www.whitecase.com/files/Publication/ 09053fd0-edb6-497b-855c-77aa622b9b75/Presentation/PublicationAttachment/ebf87b12-512d-46f0-8930- 8cec5c6c89c9/newsletter-global-tax-report-september-2013-11.pdf.

avoided the negative potential tax consequences described above.

123.    Importantly, although Nortel's RPSM was set up for tax purposes, the licensing features

of the MRDA also embedded the value of the exclusive licenses in each IE for its

respective jurisdiction.  Instead of structuring its affairs such that NNL would own all of

the economic value in Nortel's IP, which could have had adverse consequences as

described above, the IEs had economic ownership of the IP in their respective

jurisdictions and NNL, in turn, indirectly owned that value through its equity ownership

in those IEs.  There is nothing wrong with this structure from a tax perspective.

### 3.    *Disavowal of Joint Venture or Partnership*

124.    Nortel's concerns about taxation are also reflected in Article 13 of the MRDA, which

states that "[t]he relationship of the [IEs] under th[e] [MRDA] shall not constitute a

partnership or joint venture for any purpose."

125.    Under U.S. tax law, if a partnership is engaged in a U.S. trade or business, non-U.S.

resident partners that own an interest in that partnership are also deemed to have a U.S.

trade or business, and would be subject to net income and withholding tax in the United

States in respect of income attributable to that business, provided that, if a treaty applies,

that trade or business is treated as creating a "permanent establishment" for the non-U.S.

partner in the United States.[170]  Informal joint ventures may be treated the same as

partnerships under the relevant tax rules.[171]

126.    Nortel sought to avoid these tax consequences by explicitly stating in Article 13 of the

MRDA that the Nortel group was not a partnership or joint venture.  There was nothing

---

[170] 26 U.S.C. §§ 875(1), 1446 (2013).

[171] 26 U.S.C. § 761(a) (2013).

improper about this, and indeed many MNEs use similar language in intra-group

agreements for precisely the same purpose:  they want to avoid subjecting corporate

entities to tax filing and payment responsibilities in jurisdictions in which those entities

were not intended to operate.

### E.    The APA Process for Nortel's RPSM

127.    In 2002, requests were filed with each of the IRS (by NNI), CRA (by NNL), and the U.K.

tax authority (Inland Revenue[172]) (by NNUK) for a trilateral APA that would cover the

years from 2000 to 2004.[173]  The request was later amended to cover 2001 to 2005, the

period covering Nortel's first RPSM.  Thus, in collaboration with the U.S., Canadian and

U.K. tax authorities, Nortel entities worked from the time of the initial APA filing in

2002 onwards in an effort to arrive at a suitable transfer pricing policy.  In February

2010, after years of deliberation, APAs (between NNI and IRS and between NNL and

CRA) were signed covering Nortel's 2001-2005 transfer pricing policy.[174]  The final

APAs were contingent upon a settlement between the CRA and the IRS in which it was

determined that NNI had overpaid NNL for the taxable years 2001 to 2005, and that the

---

[172] Inland Revenue was the U.K. tax authority until 2005, when it was combined with Her Majesty's Customs and Excise to form Her Majesty's Revenue and Customs, the current U.K. tax authority.

[173] See NNC-NNL089697 (Mar. 14, 2002 letter to IRS with subject "Nortel Networks' Request for Advance Pricing Agreement Pursuant to Revenue Procedure 96-53"); NNI_00226852 (Mar. 14, 2002 letter to CRA with subject "Nortel Networks' Request for Advance Pricing Arrangement"); NNI_00226879 (Mar. 27, 2002 letter to Inland Revenue with subject "Nortel Networks' Request for Advance Pricing Arrangement).

[174] See NNI_01532818 (Feb. 2010 Advance Pricing Arrangement between Nortel Networks Limited and the Minister of National Revenue); Ex. 11239, EMEAPROD2287383 (Feb. 18, 2010 Advance Pricing Agreement Between Nortel Networks Inc. and the Internal Revenue Service).  NNUK and Inland Revenue did not reach an APA settlement.

taxable income of NNI and NNL would be adjusted by a total of $2 billion ($400 million in each of the five years was shifted from NNL to NNI).[175]

128.    In 2008, Nortel filed requests with the IRS and the CRA for a bilateral APA that would cover 2007 through 2011, with a rollback to 2006.[176]  Although this second APA request incorporated Nortel's revised methodologies for providing routine returns and residual profits or losses to the IEs – revisions that were made partly in response to the tax authorities' criticisms of those returns, described above[177] – the new APA request was never approved by the tax authorities.  The CRA explicitly rejected an APA for this time period, and Nortel later withdrew its application to the IRS.[178]


## V.    NORTEL'S TRANSFER PRICING SHOULD NOT BE USED FOR ENTITY VALUATION IN A BANKRUPTCY

### A.    Transfer Pricing Is Inappropriate for Entity Valuation in a Bankruptcy

129.    MNEs are profit-seeking private-sector organizations; as such, they are motivated and expected to engage in activities that generate greater returns to their shareholders.

---

[175] See Ex. 11239, EMEAPROD2287382 (Feb. 18, 2010 Advance Pricing Agreement Between Nortel Networks Inc. and the Internal Revenue Service) at App. A; NNI_01532818 (Feb. 17, 2010 Advance Pricing Arrangement between Nortel Networks Limited and the Minister of National Revenue) at 9.  Although the tax authorities' criticisms of the RPSM are not described in the settlement, the IRS provided various criticisms of the RPSM to Nortel, as described below in Section V.B.3.

[176] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 6.

[177] See Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 15-22; see also supra section IV.C.

[178] NNC-NNL033613 (June 30, 2009 letter with subject "Bilateral Advance Pricing Arrangement, Nortel Networks Limited (Canada), Nortel Networks Inc. (United States), 2006 through 2010 Taxation Years") at 1-2 (stating that a bilateral APA will not be concluded for the 2006 through 2010 taxation years because Nortel's business will likely experience significant change following the announcement of its decision to pursue creditor protection measures, the series of financial restatements the company has made, and "the divestiture of Nortel's remaining manufacturing operation to Flextronics Inc. in previous taxation years, combined with the potential divestiture of key assets over the proposed term of the BAPA, represent significant change to Nortel's lines of business."); US_Canada_PRIV_00275175 (Mar. 9, 2010 letter with subject "Nortel Networks Incorporated Withdrawal of Bilateral APA Request with Canada") at 1 ("Nortel Networks Incorporated . . . formally withdraws its bilateral Advance Pricing Agreement . . . request, that was filed with the IRS APA Program in October 2008 for the APA term of 2007 – 2011.").

Because transfer pricing can be used to take advantage of differences in tax rates across countries, transfer pricing can also be used for these profit-seeking activities.[179]

130.    As discussed above, transfer pricing is a highly regulated field in part because tax authorities seek to prevent MNEs from unduly taking advantage of differences in corporate income tax rates between countries. Nevertheless, "transfer pricing is not an exact science," and transfer pricing regulations recognize that there is no single arm's length price for a given related-party transaction.[180] Rather, there may be a range of "equally reliable" prices that results from the application of the "best method."[181] Accordingly, when setting its transfer pricing policies, it is rational, legal, and normal for an MNE group to choose the method that will minimize the MNE's global tax burden. In order to take advantage of differences in national tax rates across countries (e.g., corporate income tax, withholding taxes, and trade taxes), MNEs spend considerable time and resources to legally structure transfer pricing systems to maximize global net-of-taxes profits and minimize their overall tax burden.

131.    In addition to tax motivations, MNEs may consider other external factors – such as fiscal and financial incentives and differences in levels of political, economic, and financial risk across countries – when designing their transfer pricing policies. An MNE group may also design transfer pricing systems for internal purposes, e.g., to motivate affiliates to behave in ways that achieve firm-wide objectives, or to aid management control by

---

[179] This can be illustrated using a simple example. Suppose that Entity A and Entity B are related parties within an MNE, and that Entity A is located in a high-tax country, while Entity B is in a low-tax country. If Entity A purchases products from Entity B, a transfer price for that product that is relatively high will result in Entity A reporting high costs and thus low profits. Conversely, Entity B would report high revenue and thus high profits. Considering the relative tax rates on Entity A and Entity B, a high transfer price for that product would reduce the overall tax burden of the MNE.

[180] *OECD Transfer Pricing Guidelines* (2010) ¶ 4.8.

[181] *Id.* ¶ 3.55.

measuring and evaluating of performance.[182]

132.    Further, as I have explained above, tax avoidance considerations encourage an MNE

group to drift toward the low-tax edge of the arm's length range of prices – or, if

unchecked, beyond the arm's length range as applicable to transfer pricing – in order to

further their profit-making goal.  A rational MNE group chooses the transfer pricing

method and rules that minimize its tax burden (or accomplish other corporate goals),

subject to not triggering negative repercussions from tax authorities.  The use of a

transfer pricing method or policy that is biased by tax considerations would therefore

more likely than not result in a biased valuation if used for valuation of a bankrupt entity

within an MNE group.

133.    These various motivations bear no relation to how to value assets sold or relinquished by

an entity in a bankruptcy.  I understand that the fundamental policies underlying the

relevant bankruptcy regimes, which are relevant to the Nortel case, are to liquidate each

debtor's assets for the benefit of each debtor's creditors.  I also understand that the

shareholders of the debtor are only entitled to a distribution from such assets after all of

the creditors of the debtor entity are paid in full.  The tax avoidance motivations

underlying transfer pricing systems are far away from these bankruptcy policies.  Since

transfer pricing policies are influenced by tax and other corporate motives, it would

therefore be inappropriate to use transfer pricing policies for entity valuation.

**B.    Nortel's Transfer Pricing Policy Is Inappropriate for Entity Valuation in a Bankruptcy**

134.    I have already discussed why, as a general matter, transfer pricing is inappropriate for

---

[182] Lorraine Eden, *Taxes, Transfer Pricing and the Multinational Enterprise*, in Oxford Handbook of Int'l Bus. 591, 593 (2d ed. 2009).

valuing assets sold or relinquished by an entity in a bankruptcy proceeding.

135.    The MRDA specifically provides that the proceeds from a sale of a Nortel business will not be allocated according to the RPSM percentages in Schedule A.[183]  Therefore, the MRDA does not appear to contemplate using the RPSM for allocation, which is consistent with the basic premise that transfer pricing should not, as a general matter, be used for that purpose.

136.    Moreover, beyond the text of the MRDA, based on my analysis of Nortel's transfer pricing policy, I believe that it is particularly inappropriate for valuing assets in this proceeding for the following reasons:

    A.    There is clear evidence that Nortel's transfer pricing policy was designed to attribute income to Canada.[184]

    B.    Nortel's RPSM would be highly unlikely to value the assets sold or relinquished in the sales correctly, and there is thus no basis to use the RPSM percentages to create a "cap" on the allocation to the IEs with respect to the business sales.

    C.    Tax authorities viewed Nortel's RPSM as unfair and flawed, as evidenced by IRS criticisms and the $2 billion settlement.[185]

---

[183] Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and Amendments) at 3d Add., Sched. A (excluding "gain/loss on the sale of business" from operating earnings/loss when calculating RPSM percentages).

[184] Culina Dep. 164:12-25, 186:2-6, Oct. 17, 2013; *see also* Ex. 21169, NNI_00430668 (Dec. 18, 2006 email with subject "RE: Transfer Pricing methodology beyond 2006") at 1 ("For example, the global strategy is to drive profit & cash to Canada"); Ex. 21170, NNC-NNL061547 (Dec. 5, 2007 PowerPoint presentation entitled "Global Tax Town Hall") at 17 ("RPS method allocates more profit to Canada in the long term and takes advantage of Canada as a tax haven"); Ex. 21175, NNI_00018618 (May 10, 2007 email with subject "RE: New TP strategy") at 2.  ("I just wanted to confirm that our global strategy has not changed, that is we want to maximize our profit to Canada and minimize profits in the region. We do not see any valuable IP owned outside the RPS entities.  Maximize cash to Canada.")

[185] *See* Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 15-22; NNI_01532818 (Feb. 2010 Advance Pricing Arrangement between Nortel Networks Limited and the Minister of National Revenue) at 9; Ex. 11239, EMEAPROD2287383 (Feb. 18, 2010 Advance Pricing Agreement Between Nortel Networks Inc. and the Internal Revenue Service) at App. A.

I expand on these reasons below.

### 1.    Nortel's Transfer Pricing Policy Was Tax Driven

137.    First, various documents and deposition testimony show that, like other for-profit entities

with a goals of maximizing shareholder returns, Nortel set up and applied its transfer

pricing policy so as to reduce Nortel's global tax burden, while at the same time

remaining compliant with the constraints imposed by national tax regulations.[186]

138.    Although Canada had a tax rate of roughly 40%, Nortel was able to use R&D tax credits

generated in Canada to offset those taxes, resulting in a much lower effective tax cost on

Canadian income than on NNI or NNUK income (see Figure 4).

### Figure 4: Nortel's 2002 Tax Rate by Country[187]

|         | Statutory Rate | Effective Tax Rate | R&D Credit |
|---------|----------------|--------------------|------------|
| Canada  | 34%            | 11%                | -23%       |
| US      | 39%            | 37%                | -2%        |
| UK      | 30%            | 30%                | 0%         |
| France  | 35%            | 34%                | -1%        |
| Ireland | 13%            | 13%                | 0%         |

139.    According to Nortel's former Vice President for Tax, Peter Look, one goal of Nortel's

transfer pricing policy was "to attribute more income to Canada,"[188] as Canada was

considered a "tax haven."[189]    John Doolittle, former Treasurer and another former Vice

---

[186] NNC-NNL099354 (May 6, 2008 PowerPoint presentation entitled "Tax Matters Update, Audit Committee Meeting") at 3; *see also* Look Dep. 62:21-22, 307:6-9, Nov. 12-13, 2013 ("The RPS model was a tax model" and confirming that "[t]he Nortel tax group always sought, within the confines of applicable laws and regulations, to minimize its tax exposure").

[187] Source data is from Ex. 22121, NNC-NNL07490130 (July 11, 2002 PowerPoint presentation entitled "Global Tax Practice") at 16.

[188] NNC-NNL099354 (May 6, 2008 PowerPoint presentation entitled "Tax Matters Update, Audit Committee Meeting") at 3.

[189] NNC-NNL06128358 (June 22, 2006 PowerPoint presentation entitled "Nortel Transfer Pricing Overview: Nortel Tax Department") at 4 (notes to slide state "Canada tax haven with majority of NOLs").

President for Tax at Nortel, has also testified in this litigation that "[t]he thesis behind the [RPSM] when [Nortel] was profitable was that to the extent laws permitted it, we would move as much profit and hence cash into Canada and as a consequence we would . . . minimize the tax on the entire corporation."[190]  Roseanne Culina, Vice President of Tax for Canada and later Vice President for Global Tax Strategy and Initiatives, has also testified that "[t]ransfer pricing was a key part of [Nortel's] tax strategy," and that "one of the objectives in redeveloping the transfer pricing mechanism was getting cash to Canada," where there was a "low effective tax rate."[191]

140.    Moreover, as Karina O – Nortel's former Director of Corporate Taxation and Leader of Tax Planning – has testified, it was tax-efficient to move any excess cash to Canada because excess cash held outside of Canada might be treated by CRA as foreign accrued

---

[190] Doolittle Dep. 52:7-12, Dec. 5, 2013; *see also* Ex. 21525, NOR-CAN00655995 (Nov. 23, 2005 email with subject "Transfer pricing – 23 illustration") at 1 ("UK and Canada were net beneficiaries in Q3 with the US receiving the negative adjustment.  This is exactly the way we designed our transfer pricing i.e. take as much out of the US as we could"); Doolittle Dep. 104:14-25 (Doolittle: "…[T]here were a few different objectives of the overall transfer pricing methodology, and, you know, one of them was tax minimization, and I think by [November 2005] we may have been profitable, and so, you know, our highest tax costs would have been in the U.S. So I'm saying that's what we intended it to do."; Questioner: "Take as much of that profit out of the U.S. as you could to the extent permissible by applicable regulations and laws?"; Doolittle: "Correct. Correct.").

[191] Culina Dep. 164:17-18, 186:2-6, Oct. 17, 2013; *see also* Ex. 21169, NNI_00430668 (Dec. 18, 2006 email with subject "RE: Transfer Pricing methodology beyond 2006") at 1 ("For example, the global strategy is to drive profit & cash to Canada"); Ex. 21170, NNC-NNL061547 (Dec. 5, 2007 PowerPoint presentation entitled "Global Tax Town Hall") at 17  ("RPS method allocates more profit to Canada in the long term and takes advantage of Canada as a tax haven"); Ex. 21175, NNI_00018618 (May 10, 2007 email with subject "RE: New TP strategy") at 2 ("I just wanted to confirm that our global strategy has not changed. That is, we want to maximize our profit to Canada and minimize profits in the region. We do not see any valuable IP owned outside the RPS entities maximize cash to Canada."); Ex. 22121, NNC-NNL07490130 (July 11, 2002 PowerPoint presentation entitled "Global Tax Practice") at  13 ("GTP's role is to ensure that our business can continue to operate seamlessly globally while effectively reducing the global tax burden and minimizing exposure[.]  [Transfer pricing] is key to Nortel's global tax planning and management of our tax rate[.]"); Ex. 11053, NNC-NNL06153990 (Dec. 2001 PowerPoint Presentation entitled "Overview of Transfer Pricing APA and Recommendation) at 15-18 (detailing expected changes to operating income and net tax impact as a result of switch from CSAs to RPSM); Henderson Dep. 202:20-203:9, Oct. 4, 2013 (Questioner: ". . . How is it that the RPSM would minimize Nortel's long-term effective tax rate?"  Henderson: "It would have the effect . . . of moving taxable income out of the U.S. and into other jurisdictions, primarily into Canada and the U.K.  Questioner: "And those jurisdictions have lower tax rates – "  Henderson: "Yes." Questioner: "and that would minimize Nortel's long-term effective tax rate?"  Henderson: "The global tax rate would go down."); Ex. 11068, NNI_01503491 (Mar. 17, 2002 Email with subject "Mission Accomplished!") at 1 (noting that "going-in" position for APA process "resulted in approximately $1.6 billion of deductions flowing into the US for 2001 alone").

property income (FAPI) and be taxed in two separate jurisdictions.[192]  By repatriating

cash to Canada through transfer pricing, potential withholding taxes on dividends could

be avoided.[193]

141.   Not surprisingly, given the Nortel tax group's focus on using transfer pricing to reduce

taxes by shifting income to Canada, Nortel's switch to the RPSM was designed to and did

result in a substantial increase in NNL's income.  In 2008, Peter Look, Nortel's Vice

President for Tax, noted that prior to 2000, when Nortel was operating under its former

transfer pricing model, NNL's operating income for tax purposes was about 16% of

Nortel's global total.  However, following implementation of the RPSM, NNL's share of

operating income was expected to be potentially more than 30%.[194]

142.   NNL's anticipated increase in operating income was due to the change in the transfer

pricing method – not to changes in the functions, assets and/or risks performed by the

Nortel entities.

143.   On the one hand, after the RPSM was implemented, NNL continued to account for

approximately the same percentage of group-wide third-party revenue (9-15% under the

CSA and 9-12% under the RPSM) and account for approximately the same percentage of

group-wide R&D expense (43-53% during the time that the CSA was in effect and 32-

---

[192] O Dep. 223:23-224:13, Nov. 9, 2013 ("Typically cash would be left in the local entity to fund expansion or whatever their normal cash requirement would be, and then any excess on top of what . . . they budgeted for and so on, then we would consider whether it would make sense to repatriate back to Canada.  From a tax perspective, if we have excess cash that is sitting, for example, in a bank account and it triggered interest, in Canada we would have potentially deemed that foreign accrued property income, so you would have to recognize the income in Canada immediately, as opposed to – so you would be sort of taxed in the local jurisdiction as well as in Canada.").

[193] Ex. 31086, NNI_00693643 (May 20, 2004 PowerPoint presentation entitled "International Tax Issues") at 10 ("Goal is to repatriate excess cash to Canada . . . Dividends may be subject to withholding taxes").

[194] NNC-NNL099354 (May 6, 2008 PowerPoint presentation entitled "Tax Matters Update, Audit Committee Meeting") at 3-4.

53% under the RPSM).[195]  This indicates that NNL's operations did not undergo

appreciable change after the advent of the RPSM.[196]  On the other hand, comparison of

the R&D expense allocated under the CSA and the RPSM residuals (reflecting

capitalized/amortized R&D expenditures) shows that the financial performance of NNL

and NNI would be strongly influenced by the change from the CSA to the RPSM.

144.    Figure 5 illustrates this point.  The portion of R&D expense booked by NNL for transfer

pricing purposes changed from an average of 22% under the CSA to 39% on average

under the RPSM.[197]  This is consistent with NNL's motives to take advantage of the

R&D tax credit and attribute more cash to Canada.  Meanwhile, the portion of R&D

expense booked by NNI for transfer pricing purposes averaged 70% during the CSA

years, but dropped to an average of 44% under the RPSM.[198]  This change in results,

---

[195] Third party revenue percentages under the CSA are from 1995-2000 and are for NTL Statutory.  R&D percentages under the CSA refer to the years 1996-2000 and are for Total NTL (NTL Statutory is not reported). NTL Total includes NTL Statutory, NT CALA, NT NZ, NT Asia and additional entities.  For CSA data, see NNI_00578051 (2000 R&D CSA Worksheet).

[196] It is worth noting that aspects of Nortel's operations did change; by 2004, Nortel outsourced the majority of its manufacturing activities that had previously been done in-house. These outsourcing and downsizing activities, however, were not related to third party revenue and R&D contributed by NNI and NNL.  See, e.g., Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004) at 17 ("Certain Nortel entities are fully integrated companies which perform the functions of R&D, manufacturing and distribution."), 51 ("Nortel's manufacturing is principally located in Canada, the U.S. and the U.K. Under the ROW category, France and Ireland also perform manufacturing functions.") 5, 114-23 (describing Nortel outsourcing of manufacturing and other activities); Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 18 ("[M]any of the entities drastically reduced or eliminated their manufacturing in favor of outsourcing during the APA Term.").

[197] 39% reflects NNL's average residual profit split percentage for 2001-2009.  NNL's percentage of total IE annual R&D expense averaged 45% for 2001-2009.  From 2001-2005, NNL's R&D expense also includes Brazil, NNJ and Distributors. See NOR_53648312 (2001 Transfer Pricing Worksheet); NOR_53648037 (2002 Transfer Pricing Worksheet); NOR_53648041 (2003 Transfer Pricing Worksheet); NOR_53648508 (2004 Transfer Pricing Worksheet); NOR_53648130 (2005 Transfer Pricing Worksheet); NOR_53648133 (2006 Transfer Pricing Worksheet); NOR_53648323 (2007 Transfer Pricing Worksheet); NOR_53648048 (2008 Transfer Pricing Worksheet); NOR_56971224 (2009 Transfer Pricing Worksheet).

[198] 44% reflects NNI's average residual profit split percentage for 2001-2009.  NNI's percentage of total IE annual R&D expense averaged 40% for 2001-2009.  From 2001-2006, NNI's R&D expense also includes Bay U.S. See NOR_53648312 (2001 Transfer Pricing Worksheet); NOR_53648037 (2002 Transfer Pricing Worksheet); NOR_53648041 (2003 Transfer Pricing Worksheet); NOR_53648508 (2004 Transfer Pricing Worksheet); NOR_53648130 (2005 Transfer Pricing Worksheet); NOR_53648133 (2006 Transfer Pricing Worksheet);

purely due to a different transfer pricing policy, highlights the inappropriateness of using transfer pricing results in asset valuation.  There is no reason to believe that the valuation of Nortel assets should mirror the results from implementation of any specific transfer pricing policy.

**Figure 5: NNL and NNI Percent of Transfer Pricing R&D 1992-2009**[199]



---

NOR_53648323 (2007 Transfer Pricing Worksheet); NOR_53648048 (2008 Transfer Pricing Worksheet); NOR_56971224 (2009 Transfer Pricing Worksheet).

[199] Note that bars for 1992 to 2000 represent R&D allocation under Nortel's CSA and bars for 2001 to 2009 represent residual percentage received under the RPSM.  Data for 1992-1999 are from Nortel's 2005 transfer pricing worksheet, 2000 data are from Nortel's 2000 CSA worksheet, and 2001-2008 data are from transfer pricing worksheets from their corresponding years.  *See* NNI_00578051 (2000 CSA Worksheet); NOR_53648312 (2001 Transfer Pricing Worksheet); NOR_53648037 (2002 Transfer Pricing Worksheet); NOR_53648041 (2003 Transfer Pricing Worksheet); NOR_53648508 (2004 Transfer Pricing Worksheet); NOR_53648130 (2005 Transfer Pricing Worksheet); NOR_53648133 (2006 Transfer Pricing Worksheet); NOR_53648323 (2007 Transfer Pricing Worksheet); NOR_53648048 (2008 Transfer Pricing Worksheet); NOR_56971224 (2009 Transfer Pricing Worksheet).

145.    In and of itself, the fact that Nortel was motivated primarily by tax avoidance in choosing

its transfer pricing policy is not necessarily a problem.  As I have argued above, the use

of transfer pricing to minimize worldwide tax payments is a legal, rational and normal

activity for MNEs, as long as the transfer pricing policy produces transfer prices that fall

within the arm's length range under transfer pricing regulations.  However, Nortel's focus

on designing a transfer pricing policy that would minimize its tax burden as much as

possible, even if it sought to do so without violating transfer pricing regulations, suggests

that Nortel's RPSM is an especially poor proxy for fair market value of assets transferred

or rights sold or disposed of in a bankruptcy sale.

### 2.    The RPSM Is Based on R&D Expenditures, Which Is Not a Proxy for Fair Market Value of Assets Transferred or Rights Sold

146.    As explained above, the RPSM is a "method of last resort" transfer pricing policy,

designed to be used by complex businesses with valuable intellectual property where

there are not comparable, external data to set transfer prices among the related parties.

Instead, under the second step of the RPSM calculation, transfer pricing regulations allow

MNEs to pay non-routine returns (typically returns on intangibles) according to either the

capitalized or actual historical costs of developing the intangibles.[200]

147.    The RPSM's focus on cost shares does not answer the question of what is the value (or

relative value) of the assets sold or relinquished by each selling party in the Nortel post-

bankruptcy Sales.  There is no reason why the value of an entity's intangible assets

should be equal to or directly proportional to the costs incurred by that entity in

developing those intangibles.

---

[200] *See, e.g.*, 26 C.F.R. § 1.482-6(c)(3)(i)(B)(2) (2013).

148.    A simple example will suffice to demonstrate this.  Suppose a rational buyer in the open

market wanted to purchase an intangible asset or group of intangible assets.  The buyer of

course would not pay more or less depending on how much cost the seller incurred when

making the asset(s).  Rather, the buyer would look first to the expected benefits that the

buyer would receive from the asset(s) and then to the cost to the buyer of obtaining an

equivalent asset from an alternative source.  Although the amount of time, money, and

other costs expended in creating an asset sometimes correlate with the value of that asset,

that is not typically the case – and, in any event, such valuations are indifferent to such

costs.

### 3.    Nortel's Transfer Pricing Policy Was Flawed

149.    As explained above, the RPSM was not designed to and would not be expected to result

in a proper valuation of the assets sold or relinquished in the Sales.  However, even

assuming for the sake of argument that the allocation of the proceeds from the Sales

should be based on the RPSM, the application of that RPSM by Nortel, as set forth in the

MRDA and Schedule A, is flawed and should not be used.

150.    Evidence of the flaws can be seen in the numerous criticisms that tax authorities voiced

over Nortel's RPSM.  As described above, in 2002, NNI filed a bilateral APA application

with the IRS and NNL filed a bilateral APA application with the CRA, each seeking

approval for its proposed RPSM.  A lengthy back-and-forth between the two tax

authorities ensued, culminating in 2009, when the IRS and CRA notified Nortel of their

settlement of the 2001-2005 APA.  The settlement consisted of a $2 billion adjustment

from NNL to NNI, ███████████████████████████████ ██ .[201]

In other words, the IRS and CRA agreed to reverse what had been an under-reporting of

income by NNI for 2001-2005 and an over-reporting of income by its parent firm, NNL.

151.    The magnitude of this $2 billion ████████████████ adjustment is especially

apparent when compared against the sums that were transferred from NNI under Nortel's

RPSM between 2001 and 2005:  $1,584 million in 2001, $1,140 million in 2002, $858

million in 2003, $723 million in 2004, and $632 million in 2005.[202]  Adding those figures

together, Nortel's RPSM transferred $4.9 billion from NNI between 2001 and 2005 –

implying that the $2 billion adjustment reversed more than 40% of the transfers initially

made from NNI during that period.

152.    The settlement is clear evidence that the IRS and CRA believed that Nortel's proposed

transfer pricing was inappropriate and flawed.  No specific transfer pricing calculation

could be agreed upon by the IRS, CRA, and Nortel, so the $2 billion adjustment was

negotiated between the CRA and IRS, and Nortel, in turn, accepted that adjustment.   The

settlement itself ████████████████████████████████████████

████████████████████████ did not signify the tax authorities' actual approval of

Nortel's use of the RSPM – much less the specific formula that Nortel used for its RPSM

– for either the 2001-2005 or 2006-2011 periods.  Indeed, the tax authorities' approval of

an ongoing transfer policy at Nortel was a moot point by the time of the settlement,

which was reached well after Nortel had announced that it would be liquidating all of its

---

[201] Ex. 11239, EMEAPROD2287382 (Feb. 18, 2010 Advance Pricing Agreement Between Nortel Networks Inc. and
the Internal Revenue Service) at App. A; NNI_01532818 (Feb. 17, 2010 Advance Pricing Arrangement between
Nortel Networks Limited and the Minister of National Revenue) at 9.

[202] NOR_53648312 (2001 Transfer Pricing Worksheet); NOR_53648037 (2002 Transfer Pricing Worksheet);
NOR_53648041 (2003 Transfer Pricing Worksheet); NOR_53648508 (2004 Transfer Pricing Worksheet);
NOR_53648130 (2005 Transfer Pricing Worksheet).

assets.  I interpret ███████████████████████████ based

on convenience; it is highly unlikely to reflect the actual transfer prices that would have

been appropriate in any specific year.

153.   The transfer pricing adjustment negotiated between the IRS and CRA did not result in

any adjustment for Nortel entities besides the transfer from NNL to NNI.  However, the

IRS position at least raises the question as to whether the transfer prices among other

Nortel entities besides NNL and NNI were appropriate, and there is evidence to suggest

that Nortel and the other tax authorities were aware of problems in the RPSM beyond

under-compensation of NNI.

154.   For instance, in its March 2006 position paper assessing Nortel's 2002 APA application,

the IRS criticized the RPSM because it did not provide any differentiation among

Nortel's lines of business.  The IRS observed that Nortel itself had stated in its APA

submission that the lines of business were separately managed, "with each line of

business operating quite independently of each other."[203]  Moreover, the IRS' analysis

demonstrated that, in the previous few years, "the profitability of [Nortel's] different lines

of business varied radically."[204]  For example, "while [the Optical Networks line of

business] revenues and profits plummeted, Wireless sales increased and profits rose," and

"[t]he differences among Enterprise and Wireline [were] material, if not as dramatic."[205]

The IRS found that these differences were "incongruous" with Nortel's RPSM, yet

[203] Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 15 (quoting Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the years ended Dec. 31, 2000-2004) at 9).

[204] Ex. 11237, NNC-NNL11137449 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 15.

[205] *Id.*

"Nortel refused to modify its [transfer pricing method]."[206]

155.    In addition to its criticisms that the RPSM did not differentiate as to lines of business, the IRS' March 2006 memorandum offered several other criticisms that affected both NNI and the other IEs:

A.    The IRS argued that the routine returns awarded under the RPSM should have been lower.[207]  Lower routine returns would have caused an increase to the residual pool of income, thus affecting the transfer pricing adjustments made to the other IEs.

B.    The IRS noted that the RPSM's routine return calculations were affected by the screening in or out of firms making losses, firms with volatile swings in profitability, and firms with sales declines.[208]  If loss-making firms are eliminated from the comparables list, the arm's length range would be higher, resulting in higher profits for the tested party.  Thus, it is clear that the financial picture for Nortel entities can be highly sensitive to decisions for how to deal with loss-making entities.

C.    The IRS also believed that NNL should have borne all vendor financing losses, but under the RPSM, the IEs shared those losses.[209]  Reversing vendor finances would also have increased the residual profit pool and affected the transfer pricing adjustments made to all IEs.

156.    Other tax authorities also recognized that the RPSM was flawed and that the resultant

---

[206] *Id.* at 16.

[207] *Id.* at 18-22.

[208] *Id.*

[209] *Id.* at 30-31.

distribution of income between the IEs was flawed.  For example, Nortel staff expressed the opinion that the U.K. tax authority had identified problems with the RPSM but the tax authority did not pursue an adjustment because it would have "attract[ed] further losses to the UK."[210]

157. The flaws in Nortel's RPSM, as evidenced by the prolonged APA negotiations between Nortel and the IRS and CRA which resulted in a $2 billion adjustment and the tax authorities' request that Nortel withdraw its APA application, indicate that Nortel's RPSM was inappropriate for transfer pricing, let alone for using as a proxy for entity valuation in a bankruptcy.

## VI.    CONCLUSION

158. Transfer pricing is a highly regulated activity designed to ensure the appropriate realization of tax receipts.  MNEs are incentivized to use transfer pricing to minimize the overall tax burden of the group while complying with the arm's length standard established by tax authorities.  Nortel's transfer pricing policy was similarly implemented in an effort to minimize its worldwide taxation while remaining compliant with national tax regulations, particularly in those countries where Nortel had Advance Pricing Agreements.

159. It is my opinion that transfer pricing policies and, specifically, Nortel's transfer pricing policy are inappropriate for valuing entities or allocating the proceeds of the Nortel bankruptcy Sales among the Nortel entities for numerous reasons, including that:

(1) structures to minimize taxes are unrelated and irrelevant to entity valuation; (2) the

---

[210] *See* Ex. 11241, NNI 01509155 (Undated Memo entitled "Transfer Pricing 2Q08 FIN48 Memo") at 2; Ex. 11242, NNI_00879669 (Jan. 6, 2010 Memo entitled "Transfer Pricing 4Q09 FIN48 Memo") at 2.

RPSM is a method of last resort and recognized as typically furthest away from market-based pricing; and (3) Nortel's RPSM was flawed and inconsistent with the arm's length standard, as evidenced by the $2 billion settlement between the IRS and CRA for 2001-2005 and the fact that its proposed APA for 2006-2011 was not approved by the U.S. or Canadian tax authorities.

Date: 1-24-2014

_____
Signature

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>        NORTEL NETWORKS INC., *et al.*,<br><br>                            Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1.      My name is Lorraine Eden.  I live in College Station, Texas.

2.      I have been engaged by counsel for the U.S. Debtors to provide evidence in relation to the above-captioned court proceedings.

3.      I acknowledge that it is my duty to provide evidence in relation to these proceedings as follows:

        (a)      to provide opinion evidence that is fair, objective and non-partisan;

        (b)      to provide opinion evidence that is related only to matters that are within my area of expertise; and

74

(c)     to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.      I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date: _1-24-2014_                    _Lorraine Eden_
                                         Signature