Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>    NORTEL NETWORKS INC., *et al.*,<br><br>                              Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

## REBUTTAL EXPERT REPORT OF LORRAINE EDEN, PH.D.

(Submitted by the U.S. Debtors)

**February 28, 2014**

**THIS REPORT CONTAINS CITES TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER THEREFORE THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

## TABLE OF CONTENTS

I.     EXECUTIVE SUMMARY ................................................................ 1

II.    DR. REICHERT'S OPINION WITH RESPECT TO THE
       INTERPRETATION OF THE SCOPE OF THE MRDA LICENSES
       IS FLAWED ................................................................................... 4

       A. Dr. Reichert Mischaracterizes the Arm's Length Principle ......................... 5

           1.   Definition of the Arm's Length Principle ................................. 6

           2.   The Differences Between the Arm's Length Principle and
                Economic Rationality ......................................................... 7

           3.   Dr. Reichert's Oversimplification of Economic Rationality ................ 10

       B. Dr. Reichert Mischaracterizes Nortel's Structure ................................. 11

           1.   Dr. Reichert Mischaracterizes Nortel's R&D Activity as a Simple
                Licensor-Licensee Relationship ............................................. 13

           2.   Nortel Did Not Employ a "Centralized Hub" Structure for R&D as
                Dr. Reichert's Characterization Suggests .................................. 14

           3.   Nortel's Division of IP Rights Needed to be Consistent with
                Nortel's Integrated R&D Network ........................................... 18

       C. Dr. Reichert's Interpretation of the MRDA and Licenses Is Neither
          Arm's Length nor Economically Rational ......................................... 20

       D. Dr. Reichert's Interpretation of the MRDA and Licenses Is Refuted by
          Nortel's Representations to Tax Authorities ..................................... 26

III.   USE OF NORTEL'S TRANSFER PRICING POLICY TO
       ALLOCATE SALES PROCEEDS IS INAPPROPRIATE ............................ 29

       A. Nortel's Transfer Pricing Policy Was Designed to Minimize Taxes and
          Move Cash to Canada, Which Invalidates its Use for Determining the
          Appropriate Allocation ......................................................... 31

       B. Nortel's Transfer Pricing Regime Was Criticized by Tax Authorities ............. 36

       C. Additional Reasons Why Mr. Green's Application of Nortel's Transfer
          Pricing Policy for Allocation Purposes Is Flawed ............................... 41

IV.    DR. REICHERT'S ASSUMPTION THAT NORTEL'S CSA AND
       RPSM TRANSFER PRICING POLICIES WERE THE SAME IS
       INCORRECT ................................................................................. 47

V.     DR. COOPER INCORRECTLY RELIES ON ELEMENTS OF
       TRANSFER PRICING FOR ALLOCATION ...................................... 51

VI.    CONCLUSION ............................................................................. 53

ACKNOWLEDGMENT OF EXPERT'S DUTY ............................................. 55

i

**APPENDIX A:  DOCUMENTS RELIED UPON IN THIS REPORT** ................................... **57**

**APPENDIX B:  CANADIAN TAXATION OF FOREIGN SOURCE INCOME** ...................................................................................................................... **61**

**APPENDIX C:  CSAS AND RELATED REGULATIONS** ..................................................... **68**

## I.    EXECUTIVE SUMMARY

1.      I have reviewed the expert reports of Timothy Reichert, Philip Green and Richard Cooper and they do not lead me to change the conclusion of my January 24, 2014 report ("Report") that there is no basis to use Nortel's transfer pricing policy, and particularly the Schedule A RPSM percentages derived through the MRDA, to determine allocation of proceeds from the lines of business or Rockstar sales.[1]  I have evaluated the opinions of Dr. Reichert, Mr. Green, and Dr. Cooper as they relate to Nortel's transfer pricing policy and find numerous flaws in their analyses.

2.      Dr. Reichert opines, and Mr. Green is asked to assume, that NNI, NNUK, NN Ireland and NNSA had limited rights to and interests in Nortel's intellectual property under the MRDA.  In particular, they assert that these entities are not entitled to the benefits of any sale of Nortel's patents or from any use of those patents other than with respect to the sale of Nortel's products embodying Nortel technology as they existed at the time of the line of business sales.

3.      Dr. Reichert claims that his reading of the MRDA license is consistent with the transfer pricing arm's length principle.  I disagree with Dr. Reichert's view that his reading of the license reflects an arm's length arrangement for the following reasons, among others.

- Dr. Reichert wrongly defines the arm's length principle.  For Dr. Reichert, the question is "whether there is anything that is inherently inconsistent with economic rationality" with his reading of the license.  This is not the arm's length test.  The arm's length principle looks to whether the transfer pricing policy is

---

[1] The statements and opinions expressed in my Report and this rebuttal report are my own professional statements and opinions as a private individual, and do not represent in any way an official statement or opinion of the Texas A&M University System.

1

consistent with prices that unaffiliated buyers and sellers would agree upon in the marketplace.

- In my opinion, Dr. Reichert's reading of the MRDA licenses is not an arm's length arrangement because it is not what unrelated parties would do under the same or similar facts and circumstances.  Mr. Reichert's reading fails to meet even his own erroneous "inherently inconsistent with economic rationality" test.

- The parties to the MRDA – NNL, NNI, NNSA, NNUK, and NN Ireland – agreed to jointly engage in research and development with the aim of developing intellectual property, an inherently risky and expensive endeavor that could yield enormous benefits or losses.  It would not have been arm's length, and would have been economically *irrational*, for NNI, NNSA, NNUK and NN Ireland to have agreed to allow NNL to reap all of the benefits from the sale of residual patents.  An uncontrolled party in an arm's length negotiation would not agree to assume the risks of investing in speculative research and development, only to surrender any benefit from the sale of resultant patents.  Similarly, an uncontrolled party would not agree that if its existing business were changed or sold, it would have limited ability to benefit from any of the developed patents, including by providing new products or services using those patents.

4.    I disagree with Mr. Green's opinion that it is appropriate to look to Nortel's transfer pricing policy in connection with allocating proceeds from the lines of business sales for the reasons set forth in my initial Report, including that tax-motivated transfer pricing policies are not designed for determining the fair market value of what parties sold or relinquished in bankruptcy sales.

2

- Mr. Green fails to acknowledge that Nortel's transfer pricing policy was designed to minimize its overall tax burden, including by moving cash to Canada in a tax efficient manner, and thus is inappropriate to use for fair market valuation.  Dr. Reichert sees no indication that Nortel's transfer pricing was designed to minimize taxes because, he asserts, the jurisdictions in which Nortel's IEs operated, including Canada and the United States, had similar statutory tax rates. What Dr. Reichert misses is that as a result of generous research and development credits in Canada, Nortel's effective tax rate in Canada was substantially lower than its effective rate in the United States.  Dr. Reichert also fails to take note of the abundant evidence that Nortel expressly designed its transfer pricing policies to take advantage of those tax credits and other tax benefits.

- Mr. Green fails to address the fact that ████████████████████████ ██████████████████████ Nortel agreed with the CRA and IRS to make a $2 billion upward adjustment to NNI's income for the five-year period from 2001 to 2005 alone, resulting from massive transfer pricing overpayments by NNI to NNL.

- He also presents a flawed application of Nortel's transfer pricing policies (even assuming it was appropriate to look to those policies for allocation purposes, which I do not believe is the case) by, among other things, wrongly assuming that Nortel's transfer pricing policies and calculations would remain unchanged from 2010 to 2018, an assumption that is completely contrary to transfer pricing theory and Nortel's own historical experience.

5.      Dr. Cooper's opinion with respect to allocation is also flawed for several reasons, most

significantly because he wrongly assumes that spending on research and development

corresponds to the fair market value of the resultant intellectual property.

6.      In Section II below, I explain why Dr. Reichert's conclusion that his reading of the

licenses in the MRDA reflects an arm's length arrangement is incorrect.  In Section III, I

explain why Mr. Green errs by looking to Nortel's transfer pricing policy in connection

with allocating proceeds from the line of business sales.  In Section IV, I explain that Dr.

Reichert's opinion that Nortel's CSA and RPSM were the same is incorrect.  In Section

V, I identify certain flaws in Dr. Cooper's analysis as they relate to allocation issues.[2]


## II.    DR. REICHERT'S OPINION WITH RESPECT TO THE INTERPRETATION OF THE SCOPE OF THE MRDA LICENSES IS FLAWED

7.      According to Dr. Reichert, "as [he] read[s] the MRDA," the exclusive licenses granted in

the MRDA to NNI, NNUK, NN Ireland and NNSA (the "Licensed Participants") were

"limited in scope."[3]  Dr. Reichert asserts that the Licensed Participants only had a license

to use Nortel technology "by way of selling or otherwise benefitting in specified ways

from the technology's inclusion in 'Products.'"[4]  According to Dr. Reichert, the Licensed

Participants do not "have the right to any other exploitation interests, including future

investment opportunities or sale rights in respect of Nortel technology."[5]  Dr. Reichert

further opines that his reading of the MRDA is consistent with the arm's length principle

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in my Report.

[3] Timothy Reichert, Evaluation and Economic Analysis: The Nortel Network Group's Intercompany Transfer Pricing Arrangements, Jan. 24, 2014 [hereinafter "Reichert Report"] at 5, 37.

[4] *Id.* at 6, 37.

[5] *Id.*

as that term is used and understood in transfer pricing regulations and guidelines.[6]  In his report, Mr. Green assumes the licenses were limited in scope in a similar manner as described by Dr. Reichert.[7]

8.      I disagree with Dr. Reichert's opinion and Mr. Green's assumption.  In my opinion, their reading of the MRDA leads to a result that is contrary to the arm's length principle under U.S. and Canadian transfer pricing regulations and the OECD Transfer Pricing Guidelines.  In addition to the tax authorities' other concerns about the RPSM, if Nortel had told tax authorities that the licenses were limited in the manner Dr. Reichert suggests, the tax authorities would not have accepted that limitation.

### A.      Dr. Reichert Mischaracterizes the Arm's Length Principle

9.      In his analysis, Dr. Reichert applies an incorrect formulation of the arm's length principle.[8]  Dr. Reichert frames the question as follows:  "whether there is anything [with his reading of the licenses] that is inherently inconsistent with economic rationality."[9]  "Inherently inconsistent with economic rationality" is not a recognized or accepted standard in transfer pricing regulations or guidelines.  Dr. Reichert's use of this incorrect standard invalidates his opinion on the scope of the license granted to NNI and the EMEA IEs.

---

[6] *Id.* at 6, 40-41.

[7] Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities, Jan. 24, 2014 [hereinafter "Green Report"] at 5-6, 15.

[8] While U.S. transfer pricing regulations refer to the "arm's length standard," Canadian regulations and the OECD Transfer Pricing Guidelines refer to the "arm's length principle."  Although I used the U.S. regulations' term "arm's length standard" in my report, in this rebuttal report, I follow the Canadian and OECD terminology and use the term "arm's length principle" to be consistent with Dr. Reichert's Report.

[9] Reichert Report at 6, 38.

### 1.    Definition of the Arm's Length Principle

10.    Transfer pricing regulations are based on the arm's length principle, which requires that

related parties price their related party transactions as if they were operating at arm's

length.  As I state in my Report, the arm's length principle is that "each affiliated entity

must price its related party transactions as if the entity were at arm's length from its

parent and affiliated entities within the MNE."[10]  This definition is consistent with U.S.

and Canadian transfer pricing regulations and the OECD Transfer Pricing Guidelines.

For example, under the U.S. Section 482 Regulations, a transfer price is the "most

reliable measure of an arm's length result" if the transfer price is equivalent to the price

that two unrelated parties would voluntarily negotiate for the same or similar product

traded under the same or similar facts and circumstances as the related party

transaction.[11]

11.    Dr. Reichert defines the arm's length principle and what it means in several places

throughout his report.  In some instances, his definition is largely correct, and in other

instances – notably, when he applies the principle to his reading of the MRDA – it is

clearly erroneous.  For example, on the third page of his report, Dr. Reichert accurately

states that "[t]he arm's length principle necessitates that intercompany transactions be

priced in a manner consistent with the way in which similarly situated uncontrolled

parties bargaining at arm's length would price the transactions."[12]  Nevertheless, he

immediately proceeds to mischaracterize the arm's length principle, stating as follows:

In its most general and broadly applicable conception, the arm's length

---

[10] Expert Report of Lorraine Eden, Ph.D., Jan. 24, 2014 [hereinafter "Eden Report"] ¶ 11.

[11] 26 C.F.R. § 1.482-1(b), (c)(i) (2013).

[12] Reichert Report at 3.

> principle says that transfer prices should produce an allocation of operating profit that is consistent with the relative value creation of the controlled entities within the enterprise. . . .[13]

12.     This statement, that transfer prices should produce an allocation of operating profit consistent with the relative value creation of the controlled entities, is not a definition or requirement of the arm's length principle.  Transfer pricing regulations are designed to place a controlled taxpayer on tax parity with an uncontrolled taxpayer by determining, according to the standard of an uncontrolled taxpayer, the true taxable income of the controlled taxpayer.  The regulations are not designed to ensure that the allocation of operating profit is consistent with the relative value creation of the controlled entities.[14]

13.     More problematic is that Dr. Reichert elsewhere in his report states that an arrangement would satisfy the arm's length's test if it were not "inherently inconsistent with economic rationality."[15]  It is simply not the case that an arrangement between affiliated entities will satisfy the arm's length test so long as it was not done on economically irrational terms.  The arm's length test requires more than just avoiding economic irrationality.

### 2.    The Differences Between the Arm's Length Principle and Economic Rationality

14.     Dr. Reichert conflates economic rationality with the arm's length principle.  Thus, Dr. Reichert's analysis is premised upon his proposition that:

---

[13] *Id.*

[14] One transfer pricing method, the comparable profit method, is based on comparing the operating margin of the tested party (the related party with the simplest functions, assets and risks) with operating margins earned on similar activities by similar firms under similar facts and circumstances.  However, other transfer pricing methods do not have operating profit as their base; some have prices, others have gross margins.  In its most general formulation, the application of the arm's length principle sets transfer prices based on the prices (for transactions), margins or markups (for functions) or profit margins (for profits) that would be set by unrelated parties trading under the same or similar facts and circumstances.

[15] Reichert Report at 6, 38.

> Central to an inquiry of whether the transfer pricing among the parties to
> the Nortel RPS was arm's length is an examination of whether the
> allocation of economic benefits and burdens resulting from the Nortel RPS
> was consistent with economically rational behavior.[16]

15.    Dr. Reichert then defines economically rational behavior as follows:  an investor would

undertake a project if "the net present value (present value of returns less the investment)

[is] greater than or equal to zero."[17]

16.    Tax authorities do not evaluate an MNE's transfer pricing policy in an effort to assess

whether it meets Dr. Reichert's definition of economic rationality.  Rather, tax authorities

are concerned with whether a controlled entity reports transfer prices that are reflective of

those observed between uncontrolled parties – that is, the arm's length price.  Appendix

C to Dr. Reichert's report, which contains a 22-page description of the "transfer pricing

regulatory framework" established by the OECD, the U.S., Canada and the U.K., does

not include any mention of an economic rationality standard or, in particular, the standard

of economic rationality that Dr. Reichert uses in his report.[18]

17.    Typically, transfer pricing studies will find evidence of several possible open-market

prices which could be used as comparable prices to determine the transfer price.[19]  Tax

authorities in such cases require the MNE to select a transfer price within the interquartile

range of these prices (that is, the top 25% and bottom 25% of the observations are

discarded).  This interquartile range is considered to be the "arm's length range" (see

---

[16] *Id.* at 5.

[17] *Id.* at 38.  There are many varying definitions of economic rationality.  For purposes of this report, I will refer to
Dr. Reichert's characterization of economic rationality as an investment with net present value greater than or equal
to zero.

[18] *Id.* App. C.

[19] I explain the arm's length range here in terms of the comparable uncontrolled price method.  The same
explanation applies to the arm's length margin under the resale price method, the arm's length markup under the
cost plus method, and the arm's length profit margin under the comparable profits method.

Figure 1).  Under the U.S. Section 482 Regulations, the MNE can pick any point within

the interquartile range as an acceptable arm's length price.[20]  As long as the transfer price

lies within the interquartile range of prices that could reasonably be negotiated between

arm's length parties, the arm's length principle has been met from the perspectives of the

tax authorities.

**Figure 1: The Arm's Length Range and Comparable Market Transactions**



18.     The conventional approach to calculating an arm's length range shows that the arm's

length principle and economic rationality, as defined by Dr. Reichert, are different.  As

Dr. Reichert notes:

> The lower quartile and upper quartile comprise the interquartile range
> ('IQR') of results for each year, which is a commonly used statistical
> measure in intercompany pricing and is acknowledged in the Sec 482
> Regulations and the OECD Guidelines.[21]

19.     The open market prices that fall into the lowest quarter (0-25%) or highest quarter (75-

100%) are not considered to be part of the arm's length range and are therefore discarded.

On the other hand, the discarded transactions are voluntary trades between unrelated

---

[20] *See* 26 C.F.R. § 1.482–1(e)(2)(iii) (2013).

[21] Reichert Report at 70.

parties in an open market; as such, there is no reason to believe they were economically

irrational.[22]  Thus, prices that satisfy the arm's length principle are a subset of

economically rational prices.

### 3.    Dr. Reichert's Oversimplification of Economic Rationality

20.    In addition to conflating the arm's length principle with economic rationality, Dr.

Reichert's interpretation of economic rationality makes no sense in the context of Nortel.

21.    As noted, Dr. Reichert states that an investment with a net present value ("NPV") equal

to or greater than zero – i.e., an investment that returns its nominal dollar cost and a

required rate of return – is economically rational.[23]  But this is true only if the investor

has no other potential alternative investments that offer higher rates of return.  One might

expect that an economically rational firm or individual would choose the investment

opportunity with the *highest* NPV.[24]  Therefore, Dr. Reichert's statement that a rational

actor would accept the bare minimum required return, an NPV of zero, is oversimplified

and wrong because it ignores that alternative investments with higher NPVs are likely to

exist.  Presuming NNI, NNUK, NN Ireland and NNSA would be willing to invest in

projects with an NPV of zero assumes they had no alternative investments with higher

NPVs, an assumption which Dr. Reichert does not establish or support.

22.    It is likely that in an arm's length arrangement with NNL, NNI – if viewed as an

---

[22] While I am not an expert in the definition of economic rationality, I am aware of multiple definitions of economic rationality in the economics and other social sciences literatures.  In a standard economics model, open market transactions negotiated between willing buyers and sellers with full information are typically assumed to be economically rational transactions.

[23] Reichert Report at 38.

[24] On the complexities involved in applying economic rationality to risk-taking decisions, see Paul J. H. Schoemaker, *Determinants of Risk-Taking: Behavioral and Economic Views*, 6 J. Risk & Uncertainty 49 (1993).

uncontrolled entity, as the arm's length principle requires – could have exercised superior

bargaining power due to the fact that NNI had its business operations in the United

States, the most valuable of all Nortel markets.[25]  As a result, it is reasonable to conclude

that in a negotiation between NNI and NNL with respect to rights to Nortel IP developed

through their joint R&D efforts, NNI would be able to use its bargaining strength

(ignoring, as the arm's length principle requires, the leverage that NNL holds as the

parent corporation) to obtain very favorable rights to Nortel IP, not the limited scope

licenses posited by Dr. Reichert.  In this arm's length negotiation, NNI would be unlikely

to settle for the bare minimum return of its investment in R&D.

23.     As explained further below, in my opinion, it would not have been arm's length (nor even

economically rational) for the Licensed Participants to have entered into a contractual

agreement whereby they all engaged in R&D activity that jointly developed Nortel

technology, but where only one of them, the parent firm NNL, received all of the "future

investment opportunities or sale rights in respect of Nortel technology"[26] that resulted

from their joint R&D activity.

**B.      Dr. Reichert Mischaracterizes Nortel's Structure**

24.     In addition to applying an erroneous arm's length test, Dr. Reichert's analysis is also

flawed because he misunderstands the economic relationship between Nortel's Integrated

Entities.  As explained in my Report, a proper understanding of the value chain of the

MNE – including each entity's functions, assets, and risks – is a first step to evaluating

---

[25]  Bargaining power is an important factor in considering the arm's length principle, as noted in the OECD Transfer Pricing Guidelines.  OECD, *Transfer Pricing Guidelines for Multinational Enterprises & Tax Administrations* ¶ 2.122 (2010) [hereinafter *OECD Transfer Pricing Guidelines* (2010)].  This suggests that relative bargaining power could be an important factor affecting allocation of residual profit.

[26]  Reichert Report at 6, 37.

the propriety of that MNE's transfer pricing policy.[27]

25.    NNL and the Licensed Participants were the five main operating companies for Nortel.  I refer to them collectively as the Integrated Entities, or IEs.[28]  The IEs performed the vast majority of Nortel's R&D; provided Nortel's corporate direction, overhead, management and structure; generated the bulk of Nortel's global revenue; and jointly created and owned rights in Nortel's IP.[29]

26.    From a transfer pricing perspective, the division of legal title and economic ownership of intellectual property is proper only if "profits are allocated among entities consistent with the economic substance of the transaction (i.e., the functions performed, assets used, and risks borne)."[30]  Tax authorities will determine which entity is the true economic owner based on the functions performed, assets used and risks assumed by the related parties.  Where legal ownership is not consistent with the facts and circumstances (for example, if the legal owner does not have control or bear the risks of ownership), the tax authorities base their assessment of ownership on what independent enterprises would have done under the same facts and circumstances.

27.    Dr. Reichert mischaracterizes the functions, assets, and risks of Nortel's IEs and the relationship between those entities.  Dr. Reichert then advances an interpretation of the

---

[27] Eden Report ¶ 36.

[28] In the Reichert Report, Dr. Reichert generally refers to Nortel's Integrated Entities (NNL, NNI, NNUK, NN Ireland and NN S.A.) as Residual Profit Entities (RPEs).  *See* Reichert Report at 4.  While it is true that these firms shared in the residual returns under Nortel's 2001-2009 transfer pricing policy, I view the term "Integrated Entity" as a much better characterization of the roles these entities played within the Nortel group from the 1980s forward.  I therefore use "IE" instead of "RPE" in my initial Report and this rebuttal report.

[29] *See, e.g.*, Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 6, 11-12; *see also* Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and Amendments) at 2, 15.

[30] Eden Report ¶ 65.

MRDA and the IEs' IP license rights that is inconsistent with the IEs' actual functions, assets, and risks; inconsistent with the arm's length principle; and inconsistent with economic rationality.

### 1. Dr. Reichert Mischaracterizes Nortel's R&D Activity as a Simple Licensor-Licensee Relationship

28.    Dr. Reichert characterizes Nortel's R&D activities as a set of binary licensor-licensee relationships between the parent firm NNL and each of Nortel's other IEs.  As Dr. Reichert sees it, NNL owned the IP and licensed it to the other IEs.  He summarizes Nortel's R&D activity as one where:

> NNL operated as both an R&D investor in its own right, and as a licensor that licensed the rights to other [IEs] to make, use and sell products that embedded this R&D (and therefore to earn residual profit from these activities).  The other [IEs] were licensees of NNL, invested in R&D, and licensed what was, in essence, a share in the value of Nortel's "Product make-sell" rights.[31]

29.    Thus, Dr. Reichert states that NNL "held all the sticks" and licensed a few of these "sticks" (what he calls the "product make-sell rights"[32]) to the other IEs (NNI, NNUK, NN Ireland and NNSA).  This is an oversimplification that presents an inaccurate picture of Nortel.  The principal problem with this picture – a parent firm licensing its IP to one or more of its subsidiaries – is that it obscures the reality of how Nortel actually conducted its R&D activity.

30.    The facts and circumstances were not those of a single entity performing or paying for all the R&D, which might give rise to a right to control "all the sticks" while licensing a few "sticks" to a group of licensees.  Rather, the Nortel IEs were five legally separate entities,

---

[31] Reichert Report at 4.

[32] *See id.* at 4, 5-6, 37.

located in different countries, which were part of an MNE group and came together to

engage in R&D co-development activities whereby they agreed to share the costs, risks

and rewards of their joint development activity in accordance with each IE's respective

geographic territory.

31.     As the MRDA stated:

> Accordingly, the R&D Allocation provided to Participants under the
> RPSM reflects the fact that the Participants bear the full entrepreneurial
> risk of the Nortel business, such as the risks attendant with the substantial
> and continuous development and ownership of the NN Technology.
> Mathematically the RPSM accords the Participants all the upside risk in
> the Nortel business as well as the downside risk.[33]

32.     Dr. Reichert's analysis and view of Nortel's structure is inconsistent with the MRDA

because it reserves only for NNL all of the upside from the sale of Nortel's IP.  At the

same time, Dr. Reichert's analysis has the IEs sharing in all of the downside risk from the

R&D activity.  This is not an arm's length relationship.

> ### 2.     Nortel Did Not Employ a "Centralized Hub" Structure for R&D as Dr.
> ### Reichert's Characterization Suggests

33.     In this subsection, I take a closer look at why Dr. Reichert's view of the relationship

between the IEs is incorrect.  Viewing NNL as the licensor in a series of bilateral

licensor-licensee relationships with its foreign subsidiaries – as Dr. Reichert characterizes

this relationship – implies that Nortel's R&D activities were organized as a centralized

hub where the parent firm (NNL) created all of the IP and then licensed that IP to its

foreign subsidiaries, each of which was given limited rights to exploit Nortel's IP in its

geographic territory.  In this characterization, NNI and the EMEA IEs serve largely as

distribution companies rather than co-developers of IP.  As such, Dr. Reichert's view of

---

[33] See Ex. 21003, NNCNNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and
Amendments) at 2d Amend. to Schedule A.

the Nortel structure blurs the important distinction between the IEs – all of whom

engaged in R&D activity and undertook other entrepreneurial risks – and the Limited

Risk Entities.

34.     The "centralized hub" structure historically was used by MNEs headquartered in large

countries such as the United States.[34]  This structure is less common today with the

globalization of R&D activities, and it does not resemble Nortel's modern structure.

Under the centralized hub structure, most R&D activities are performed at home by the

parent firm and the resulting IP is licensed by the parent firm to its foreign subsidiaries in

return for royalties or license fees.[35]  In a centralized hub structure, very little R&D is

carried on outside the home country.  The few R&D activities performed by the foreign

subsidiaries are normally limited in scope, focused primarily either on adaptation for

local markets or operating as "listening posts" in larger foreign markets.[36]

35.     A very different structure has characterized the international R&D activities of high-tech

companies from small countries since the 1980s.  These MNEs, particularly in global

markets where firm size is important for competitiveness, typically do not use a

centralized hub structure to organize their R&D activities.[37]  Instead, high-tech MNEs

from small countries have structured their R&D activities as an "integrated R&D

network," where each of the R&D units has "equal rights and duties" with "flexible

---

[34] Large and small countries are defined here in terms of the size of their markets, not geography or population.

[35] Oliver Gassman and Maximilian von Zedtwitz, *New Concepts and Trends in International R&D Organization,* 28 Research Policy 231, 236 (1999).

[36] For example, Daimler-Benz has listening posts in Moscow and Tokyo and local adaptation R&D centers in Palo Alto, Portland, Shanghai and Bangalore.  *Id.* at 242 (1999).

[37] *Id.* at 231.  Examples of such firms include Novartis (home country Switzerland), Philips (the Netherlands), and Ericsson (Sweden).

connections and relations between the network partners."[38]  The units also engage in

cross-border and cross-disciplinary projects.[39]

36.     Nortel's R&D activity is much better described as an integrated R&D network.  There

were two very large R&D integrated entities (NNL and NNI) and three or more smaller

ones depending on the time period in Nortel's history (during the MRDA, there were

three smaller IEs: NNUK, NN Ireland and NNSA).  And, in fact, that is how Nortel

characterized itself from the late 1980s onwards – as an integrated network.  In numerous

statements to the tax authorities in connection with its APAs, Nortel depicted its R&D as

highly interrelated, stating for example:

- "Nortel's R&D function is a global undertaking aligned with its business strategy of technology leadership.  Engineers in each of Nortel's geographic markets work to develop next generation products.  Researchers and engineers in Nortel's 48 facilities and partner locations around the globe collaborate to develop new, best in class products for which the company is known.  In addition, major R&D centers are located at various sites around the world."[40]

- "The R&D groups operate on the basis of technology, domain and program. Though there are several excellence centers across the globe, program plan execution is coordinated among a virtual team that is made up of various groups, in various locations, under various VPs.  There is no one central geographic region that supports all activities."[41]

- "Much of Nortel's R&D is interrelated, and one specific project may be developed based upon older R&D projects or platforms. . . .  In addition, in some cases, some of the knowledge and intellectual property obtained from developing projects for one specific line of business can be used to develop projects within

---

[38] *Id.* at 244.

[39] Paola Criscuolo and Rajneesh Narula, *Using Multi-hub Structures for International R&D: Organisational Inertia and the Challenges of Implementation,* 47 Mgmt. Int'l Rev. 639, 655 (2007).

[40] Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 4.

[41] Ex. 31355, EMEAPROD2189880 (Nov. 30, 2004 Nortel Networks Functional Analysis for the Years Ended December 31, 2000 – 2004) at 19.

another line of business."[42]

37.    Figure 2 below illustrates the centralized hub structure posited by Dr. Reichert versus the

integrated R&D network that in reality characterizes the relationship between the Nortel

IEs.

### Figure 2: International R&D Activities in a Centralized Hub versus Integrated Network



38.    Furthermore, Nortel drew a clear distinction between the IEs, which jointly developed IP,

and the LREs, which did not engage in R&D activities.  Nortel described this distinction

to the IRS and CRA as follows:

> **Integrated Entities** – these entities are party to an IP development
> agreement and have historically, and continue to develop, valuable
> intangible property ("IP") by conducting R&D.  These entities are entitled
> to participate in the ongoing benefits from their historical IP and bear the
> risks associated with the continuing value of that IP.  The IEs maintain
> their historical IP and continue to develop new IP from which they
> anticipate sharing in the future benefits.

---

[42] *Id.* at 24.

**Limited Risk Entities** – Certain Nortel entities perform routine distribution and service activities only. These entities do not perform any R&D or own any nonroutine intangible property. LRE's perform distribution and service functions in many countries around the world and are not involved in the manufacturing of Nortel products. Moreover, their distribution activities are supported by the efforts of the Nortel integrated entities.[43]

### 3. Nortel's Division of IP Rights Needed to be Consistent with Nortel's Integrated R&D Network

39.    As established above, Dr. Reichert's incorrect characterization of Nortel's R&D activity as a centralized hub structure where a single licensor licenses product make-sell rights to its subsidiaries (which amount to little more than distributors) obscures the facts and circumstances of the economic relationships within the Nortel group, which are more properly described as an integrated R&D network. Nortel's division of IP rights, as reflected in the MRDA licenses, reflected this integrated structure and avoided the need for royalty-based cross-licensing.

40.    Nortel's R&D activities were integrated such that the MNE needed an intellectual property strategy and transfer pricing policy that both reflected this integration and were acceptable to national tax authorities, especially the IRS and CRA, since the bulk of Nortel's R&D activity occurred in the U.S. and Canada.[44] For income tax purposes, Nortel – like almost all MNEs – structured its foreign affiliates such as NNI as separate legal entities by country. Profits were determined on a country-by-country basis, with

---

[43] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 11-12.

[44]  Before restructuring and downsizing, Nortel employed more than 27,000 R&D employees, representing 28.7% of all Nortel employees. The R&D employees were allocated on a geographic basis as follows: Canada (46.5%), the U.S. (37.7%), the U.K. (9.3%) and rest of the world (6.5%). *See* Ex. 21407, NNI_01333113 (Nov. 30, 2004 Letter to IRS with subject "Nortel Networks Multilateral APA, Response to IRS Information and Document Request for Functional Analysis") at 20. Thus, approximately 85% of these R&D employees were located in two countries: Canada and the United States .

transfer pricing being used to price intrafirm transactions between the related parties.[45]

41.    Where a multinational's R&D activities are organized at multiple locations and the entity

at each location holds title to IP created at that location, there would need to be extensive

cross-licensing in order for all the related parties to have access to all the technologies.

Such cross-licensing would even further complicate the problems of determining arm's

length royalties or licensing fees in order to comply with the arm's length principle, and it

would trigger additional withholding taxes depending on the applicable double tax treaty.

Nortel was able to avoid these complex and tax inefficient cross-licensing structures (and

the associated burden of potential withholding taxes) by administratively consolidating

legal title with NNL, but maintaining the economic ownership rights of the other IEs

within their respective geographic territories.[46]    According to internal Nortel emails,

conferring legal title on a single Nortel entity was done for administrative purposes and

resulted in a "cleaner" structure.[47]

42.    In summary, Nortel's R&D activity had been organized as an integrated network since

the 1980s.  Nortel had multiple "centers of excellence" run by the IEs that were organized

as primary R&D labs for one or more core Nortel global product lines and support labs

---

[45] In a centralized hub R&D structure, a common transfer pricing policy would be to use the comparable uncontrolled transaction (CUT) method to determine the royalties or licensee fees that the foreign affiliates would pay their parent firm for the product make-sell rights to the parent's technology.  However, this transfer pricing policy typically attracts withholding taxes.  Moreover, for valuable IP, it is often difficult if not impossible to find comparable arm's length transactions.

[46] See Appendix B for a discussion of Canada's methods of taxing foreign source income.

[47] *See, e.g.*, Ex. 22080, US_EMEA_Canada_PRIV_00071352 (Mar. 29, 2002 Email with subject "RE: patent license question") ("Why wouldn't we continue to assign all IPR to NNL in the PRS?  Otherwise, don't we end up with IPR . . . being owned in various subsidiaries?  It seems 'cleaner' for me to continue to have it owned by one entity."); Ex. 11065, NNC-NNL06542851 (Dec. 12, 2001 presentation entitled "Residual Profit Split Arrangement (RPSA) Proposal – Legal Issues") ("Suggest maintaining NNL as IPR owner for administrative simplicity"); Ex. 22079, NNC-NNL06542925 (Nov. 7, 2001 email with subject "Modification of Nortel Networks' R&D Cost Sharing Arrangement") ("Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity.").

for others. [48]  For tax purposes, Nortel organized its foreign affiliates as independent legal

entities and set up the MRDA in a manner that allowed each of the IEs to participate in

the benefits and risks (the upside and the downside) of their R&D co-development

activities.  Nortel's transfer pricing policies were chosen because they were applicable to

legally separate entities that were part of an MNE group and were organized as an

integrated R&D network structure.  Nortel told the tax authorities that it was an

integrated network and that its R&D activities were integrated.

43.     Disavowing these realities of Nortel's structure and strategy in order to argue that the

relationship between NNL and the other Integrated Entities was a simple licensor-

licensee relationship is misleading.  I would not expect an MNE to tell tax authorities that

the MNE operated as an integrated network where risks and profits were shared when the

MNE actually operated as a centralized hub in which one firm in the group (the parent)

had all the "sticks" and doled out a few "sticks" in the form of product make-sell rights to

the rest of the group.

### C.     Dr. Reichert's Interpretation of the MRDA and Licenses Is Neither Arm's Length nor Economically Rational

44.     Consistent with his mischaracterization of the relationship between the Nortel IEs, Dr.

Reichert argues that under the MRDA, NNL (which held legal title to Nortel IP) granted

the IEs license rights for Nortel's IP, but the scope of the license did not cover sales

rights or future investment opportunities with respect to Nortel IP.  He argues, in other

words, that the MRDA only granted what he calls product make-sell rights to Nortel's IP.

The implication is that the IEs have no claim to any of the value from the Rockstar Sale

---

[48] Ex. 21033, NNC-NNL068851 (May 6, 2005 Letter from Mark Weisz to Thomas Ralph at IRS about Nortel's proposed APA) at 3-4.

or any other benefit from the patents (e.g., starting new lines of business) after the sale of

Nortel's lines of business. Dr. Reichert interprets the scope of the license rights based on

his reading of the MRDA as follows:

> As I read the MRDA, it codified the arrangement of the parties with respect to the rights ("sticks") in respect of Nortel technology, and as well codified the parties' transfer pricing terms and the compensation for R&D activity conducted by the [IEs]. The MRDA states the intention that the licensees continue to hold and enjoy the rights they had under the transfer pricing arrangement that existed prior to the implementation of the Nortel RPS (the 'Nortel CSA'), NNL retaining legal title to all of Nortel's technology. On my understanding, the license grant from NNL was thus (i) limited in scope (only a defined economic ownership interest in technology was conveyed, and this interest was limited to use by way of selling or otherwise benefitting in specified ways from the technology's inclusion in 'Products'), and (ii) duration (the Nortel technology had a finite economic life). Importantly, there is no provision for a licensee to have the right to any other exploitation interests, including future investment opportunities or sale rights in respect of Nortel technology.[49]

45.    Like Dr. Reichert, I am not an attorney and therefore it is beyond the scope of my

expertise to offer legal interpretations of the provisions of the MRDA regarding the scope

of the license rights granted in the MRDA. However, I can evaluate whether Dr.

Reichert's narrow interpretation of the MRDA – that the licenses only granted rights to

Nortel technology that was contained in "Products" and thus do not include the right to

future investment opportunities and sales of Nortel technology – is consistent with the

principles of transfer pricing.[50]  I can conclude that Dr. Reichert's analysis is inconsistent

with the arm's length principle.  It is also inconsistent with economic rationality.

---

[49] Reichert Report at 5-6.

[50] I note also that Mr. Green takes position that is very similar to Dr. Reichert's. Mr. Green assumes that the IEs' "license rights were limited to using NN Technology to sell Products and generate operating profits in their respective territories. It is my understanding that the U.S. and EMEA Debtors' licenses did not include right to patents not used in any of their operating businesses under the MRDA," and thus the IEs have no claim to any of the proceeds from the sale of residual patents. My opinions on Dr. Reichert's views on this topic also apply to Mr. Green.

46.     Firms operating in a competitive market face a risk-reward tradeoff.  The tradeoff is that

risk tends to increase along with potential returns.  Firms are willing to bear substantial

risks if those risks are accompanied by the potential for large returns.  R&D activities are

particularly risky because of the uncertainty of outcomes; the results may yield a

blockbuster product or may be fruitless.  Given the high costs of developing and

commercializing IP, firms' R&D decisions are therefore typically very sensitive to the

risk-reward tradeoff.[51]

47.     As seen in Figure 3, the Nortel IEs spent billions of dollars on R&D during the 2001-

2008 period.  There was a chance that Nortel's R&D would yield extremely valuable

results and a chance that Nortel's R&D would result in no or little value.

---

[51] *See generally* Carey C. Curtis, *Investing in R&D: How to Manage Your Risk*, 12.3 Journal of Corporate
Accounting & Finance 51 (2001).

**Figure 3: Total Direct R&D Expense by IE, $ Millions, 2001-2008**[52]



48.    From 2001 to 2008, NNL spent $7.4 billion on R&D and NNI directly spent $6.5 billion

on R&D.[53]  NNI also made approximately $6.7 billion in transfer pricing payments while

NNL received $4.7 billion in transfer pricing payments between 2001 and 2008.[54]  I

understand that Laureen Ryan has opined that a portion of these transfer pricing

payments were a source of funding for NNL's R&D expenditures.[55]

49.    Nortel's RPSM was used to allocate residual profit among the IEs based on R&D

spending.[56]  This meant that the more an IE spent directly on R&D, the greater its share

---

[52] *See* NOR_53648312 (2001 Transfer Pricing Worksheet); NOR_53648037 (2002 Transfer Pricing Worksheet); NOR_53648041 (2003 Transfer Pricing Worksheet); NOR_53648508 (2004 Transfer Pricing Worksheet); NOR_53648130 (2005 Transfer Pricing Worksheet); NOR_53648133 (2006 Transfer Pricing Worksheet); NOR_53648323 (2007 Transfer Pricing Worksheet); NOR_53648048 (2008 Transfer Pricing Worksheet).  These collective sources will be referred to hereinafter as the "2001 to 2008 Transfer Pricing Worksheets."

[53] *See* 2001 to 2008 Transfer Pricing Worksheets.

[54] *See id.*

[55] *See* Expert Report of Laureen Ryan, Feb. 28, 2014.

[56] From 2001 to 2005, Nortel's residual profit allocation was calculated based on capitalized R&D expenses; as of 2006, the residual profit allocation was calculated based on the sum of the prior 5-years' historical R&D expense.

of the residual profit/loss.  From 2001 to 2008, the IEs' R&D expenses were used to distribute residual losses instead of residual profits and therefore the IEs that accounted for a greater portion of firm-wide R&D were allocated the bulk of the losses.  In other words, the IEs' financial results reflected the downside of risk-taking during the 2001-2008 period.  The losses allocated to the IEs under Nortel's RPSM for 2001-2008 are shown in Figure 4.

**Figure 4: Total Residual Profit by IE, $ Millions, 2001-2008**[57]



50.     The $4.5 billion in proceeds from the sale of the patent pool (the Rockstar Sale) is evidence of the previously unrealized value of Nortel's R&D efforts.  Under Dr. Reichert's interpretation of the MRDA, the entirety of the proceeds from the Rockstar Sale would be allocated to NNL.  His view is that all of the IEs should (and did) bear

---

[57] *See* 2001 to 2008 Transfer Pricing Worksheets.

firm-wide losses, but that only NNL should receive the realized value of the R&D efforts from the Rockstar Sale. No firm in an arm's length negotiation would have agreed to this arrangement.

51.     Dr. Reichert's product make-sell argument implies that NNI, NNSA, NNUK, and NN Ireland were willing to invest in R&D knowing that if the IP was not used by them to make or sell products, but rather the IP was sold by Nortel to a third party, they would not receive any return on their investment in R&D because all sale rights (and thus all profits from the sales of IP) belonged to NNL. This would not be an arm's length relationship.

52.     In addition, it is worth noting that Dr. Reichert never discloses what he believes was the "required" rate of return for any of the parties to the MRDA, including NNI and NNL. Without this information, it is impossible to understand how Dr. Reichert is able to conclude that the MRDA, as he reads the licenses, would qualify as an arm's length agreement even under Dr. Reichert's economic rationality test.

53.     Ironically, if Dr. Reichert's interpretation of the MRDA licenses were correct, it also would have made little sense for *NNL* itself to have agreed to this. The Canadian Debtors set up Nortel's corporate structure such that NNI was the Nortel entity transacting business in the United States (with the other IEs transacting business in their respective territories), presumably for good and sound liability-management, tax avoidance and other business reasons. If Dr. Reichert's reading of the MRDA were correct (i.e., that the license granted to the IEs solely covered product make-sell rights), then Nortel would have been precluded from selling Nortel's IP in the U.S. except through NNL, which ran the risk of undercutting the sound business reasons Nortel had for incorporating a separate U.S. subsidiary.

### D.    Dr. Reichert's Interpretation of the MRDA and Licenses Is Refuted by Nortel's Representations to Tax Authorities

54.    Dr. Reichert's reading of the MRDA licenses is also inconsistent with representations that Nortel made to tax authorities, which further undermines Dr. Reichert's opinion.

55.    Nortel engaged in the APA process with the IRS and CRA for many years regarding the development and use of the RPSM. The frequent communication between Nortel and the tax authorities resulted in substantial documentation of Nortel's positions regarding its transfer pricing policy.

56.    In communications with the tax authorities related to the adoption of the RPSM, Nortel repeatedly described the ownership rights in Nortel's IP of NNI, NNSA, NNUK, and NN Ireland and did not state that these entities were only granted a limited scope of rights.

57.    For example, in its first APA application using the RPSM, Nortel represented to the tax authorities that from an economic standpoint dating back to the R&D CSA, "each R&D cost sharing participant could be considered to 'own' the NT technology as it related to its specific region."[58] While it is common practice for an MNE to devise a transfer pricing system that minimizes its tax burden, it would be extremely uncommon for the MNE to make an outright false statement to tax authorities in connection with the APA process or otherwise.

58.    Likewise, in response to questions posed by Inland Revenue, the IRS and the CRA in 2003, Nortel explained that the IEs would be willing to reimburse the LREs for a portion of their restructuring costs because "the residual entities, as the owners of the intangible property, as well as the manufacturers of the tangible goods, would recognize that

---

[58] Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions) at 10.

[Nortel's] distribution network is critically necessary for their long-term survival."[59]

59.     NNL's Transfer Pricing Report for 2009, which I understand was prepared with the

assistance of Ernst & Young for presentation to tax authorities upon their request,

explicitly describes the ownership rights of the IEs other than NNL:

> The Nortel Group, of which Nortel Networks Corporation ('NNC') is the
> ultimate parent, operates under the residual profit split method ('RPSM')
> whereby certain affiliates, including NNL and other integrated entities
> ('IEs') are the primary owners of intangibles developed by the Nortel
> Group and bear the risk of development.[60]

That same report explains that under the RPSM, non-routine profits/losses are

"shared between the IEs based on their ratios of intangible ownership" and

includes a functional analysis that describes each of NNL, NNI, NNUK, NNSA,

and NN Ireland as intellectual property owners, unlike the LREs.[61]  A similar

Transfer Pricing Report for NNI – which was also prepared with the assistance of

E&Y for presentation to tax authorities upon their request – contained virtually

identical representations.[62]

---

[59] Ex. 21080, NNC-NNL002707 (Sep. 2003 Advance Pricing Arrangement Responses to Questions Posted by Inland Revenue, Internal Revenue Service, Canada Customs and Revenue Agency) at 25.

[60] NNI_01005985 (Oct. 29, 2010 Report entitled "Nortel Networks Limited Transfer Pricing Report for the Year Ended December 31, 2009") at 1.  The report was prepared "under the framework set out in subparagraphs 247(4)(a)(i) through (vi) of the Income Tax Act (Canada)," *see id.*, which provides for the avoidance of certain penalties if a taxpayer "makes or obtains . . . records or documents" detailing the transfer pricing policies and provides them "to the Minister [of National Revenue] within 3 months after service . . . of a written request therefor," Income Tax Act, R.S.C. 1985, c. 1, § 247(4).

[61] NNI_01005985 (Oct. 29, 2010 Report entitled "Nortel Networks Limited Transfer Pricing Report for the Year Ended December 31, 2009") at 2, 42.

[62] NNI_00442576 (Sep. 14, 2010 Nortel Networks Inc. Transfer Pricing Report for Year Ended December 31, 2009) at 1 ("NNI, NNL, and other integrated entities . . . are the primary owners of intangibles developed by the group and bear the risk of development"; "non-routine profits/losses are . . . shared between the IEs based on their ratios of intangible ownership"), 38 (functional analysis chart shows NNL, NNI, NNUK, NNSA, and NN Ireland as performing intellectual property ownership in support of local revenues)).  The report was prepared "for purposes of determining compliance with the reasonableness requirements of [IRC] § 1.6662-6(d)," *id.* at 1, which allows for the avoidance of certain penalties if a "taxpayer maintains sufficient documentation" of a transfer pricing method and

60.     Moreover, consistent with its representations about the ownership of its IP, Nortel
repeatedly emphasized to tax authorities that NNL, NNI and the EMEA IEs had all
assumed entrepreneurial, risk-taking roles in developing IP, and were all entitled to the
accordant benefits of those activities.  For instance, in its 2004 response to an IRS request
for information in connection with its APA application, Nortel explained that the IEs
"have agreed to continue participating in the future benefits of new IP" following the
termination of the CSA, and the IEs were "responsible for ongoing entrepreneurship and
risk-taking functions with respect to the IP arising from their collective R&D efforts."[63]
Later, in its 2008 U.S.-Canada APA request for 2007 to 2011, Nortel stated:

> [The IEs] are entitled to participate in the ongoing benefits from their
> historical IP and bear the risks associated with the continuing value of that
> IP.  The IEs maintain their historical IP and continue to develop new IP
> from which they anticipate sharing in the future benefits.  These entities
> are responsible for ongoing entrepreneurship and risk-taking functions
> with respect to their ongoing IP activities.[64]

These representations made no mention of the limitation that Dr. Reichert has described
with respect to NNI and the EMEA IEs' rights under the licenses.

61.     The significant limitation to the scope of the IEs' IP rights proposed by Dr. Reichert
would have been an important issue for tax authorities in terms of their evaluation of
Nortel's transfer pricing policy.  Had such a limitation in the scope of the rights of the IEs
existed, Nortel would have been obligated to communicate this fact clearly and explicitly
to the tax authorities as part of the APA process.

---

"provides that documentation to the Internal Revenue Service within 30 days of a request for it in connection with the examination of the taxable year," 26 C.F.R. 1.6662-6 (d)(2)(iii)(A).

[63] Ex. 21407, NNI_01333113 (Nov. 30, 2004 Letter to IRS with subject "Nortel Networks Multilateral APA, Response to IRS Information and Document Request for Functional Analysis") at 2.

[64] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 11.

62.     If Nortel representatives *had* told the revenue authorities that the licenses held by NNI,

NNSA, NNUK, and NN Ireland were limited to make-sell rights and not rights to further

IP investments and sales, as Dr. Reichert asserts, in my opinion, the revenue authorities

would have concluded that this limitation would not satisfy the arm's length principle.

Therefore, Dr. Reichert's interpretation of the IEs' limited IP rights is at odds with what

Nortel represented to the tax authorities and what the tax authorities would have

reasonably accepted.

## III.    USE OF NORTEL'S TRANSFER PRICING POLICY TO ALLOCATE SALES PROCEEDS IS INAPPROPRIATE

63.     In my Report, I demonstrated that Nortel's RPSM should not be used to allocate proceeds

from the post-petition Sales.[65]  Nothing in the reports of Dr. Reichert or Dr. Cooper

changes my opinion.  Transfer pricing in general, and Nortel's transfer pricing regime in

particular, are not an appropriate basis for valuing the assets sold or relinquished in the

Sales.[66]  This is true for several reasons as set forth in my Report:

- **Transfer pricing has an entirely different objective than valuing assets sold or relinquished in a bankruptcy sale.**  Transfer pricing refers to the mechanism in which MNEs price intra-group transactions for income tax purposes.  The rules and procedures developed by tax authorities (including the IRS and the CRA at the national level and the OECD at the international level) are designed to ensure an appropriate allocation of MNE taxable income across jurisdictions.[67]  They are not designed to ensure the correct valuation of sale proceeds among legal entities in bankruptcy.

---

[65] *See generally* Eden Report § V.

[66] Dr. Reichert and Dr. Cooper provide several examples in which they explain how Nortel's transfer pricing policy was calculated improperly and was therefore not arm's length.  *See, e.g.*, Reichert Report at 7-8, 91; Transfer Pricing Expert Report of Richard V.L. Cooper, Jan. 24, 2014 [hereinafter Cooper Transfer Pricing Report] at 65, 84, 128; Expert Report of Richard V.L. Cooper, Jan. 24, 2014 [hereinafter Cooper Allocation Report] at 22 n. 67, 31-32.  The findings of these experts support to my contention that Nortel's transfer pricing policy was not arm's length and should not be used for allocating the proceeds of the Sales.

[67] *See* Eden Report ¶¶ 26-34.

- **MNEs use transfer pricing in part to minimize the overall tax burden of the MNE group while adhering to the arm's length principle to avoid tax authority investigation.** This approach is legal and widely accepted and acknowledged within the transfer pricing field.[68] However, the goal of tax minimization has nothing to do with valuation. Transfer pricing policies designed with the objective of tax minimization, including Nortel's, should therefore not be used for the valuation of bankruptcy sales proceeds.[69]

- **The RPSM is a transfer pricing method of last resort that is least favored by tax authorities.** Nortel's transfer pricing policy from 2001 onwards was the residual profit split method, which is the least favored transfer pricing methodology of tax authorities for a variety of reasons, most importantly because it is the furthest away from the arm's length principle. Moreover, R&D expenditures (the RPSM allocation key), whether capitalized or a rolling average, are not a reliable measure of the value of the property developed with those expenditures. Thus, the RPSM has the potential to result in transfer prices which are very different than a market-based valuation.[70]

- **Nortel's application of the RPSM was aggressive and tax authorities, particularly the IRS, concluded that it did not reflect an arm's length arrangement.** This is evidenced by the fact that the IRS, CRA and Nortel agreed that NNI make $2 billion in transfer pricing overpayments in the aggregate from 2001 to 2005 alone.[71]

64.     Given these considerations, it is inappropriate to allocate the proceeds of the Sales based on Nortel's transfer pricing policy. In my opinion, for the reasons set forth above and additional reasons, Mr. Green's analysis that seeks to allocate proceeds from the sales of Nortel's lines of business based on Nortel's transfer pricing scheme is incorrect. I elaborate further on these reasons below.[72]

---

[68] *See id.* ¶¶ 22-25, 130-32.

[69] *See id.* ¶ 133.

[70] *See id.* ¶¶ 46, 48-58, 114-15, 146-48.

[71] *See id.* ¶¶ 150-56.

[72] I understand that other experts for the U.S. Debtors, including Jeffrey Kinrich, also address Mr. Green's report. It is not my intent to list here all of the flaws in Mr. Green's report, but only to address those issues that relate to transfer pricing.

**A.** **Nortel's Transfer Pricing Policy Was Designed to Minimize Taxes and Move Cash to Canada, Which Invalidates its Use for Determining the Appropriate Allocation**

65.     As discussed in my Report,[73] there is no single arm's length price for a given related-party transaction; rather, there is a range of prices that may qualify as arm's length under transfer pricing regulations.  Therefore, when setting its transfer pricing policy, an MNE group will typically choose a transfer pricing method that minimizes the MNE's global tax burden while at the same time attempting to stay within the range of arm's length prices deemed acceptable by tax authorities.  It is rational and normal for an MNE group to consider tax minimization when designing a transfer pricing policy – just as it is rational and normal for an MNE group to organize its corporate structure to reduce its taxes – because this allows the MNE group to maximize shareholder value within the boundaries of the law.  Indeed, it would be surprising if Nortel did *not* consider tax minimization when developing its transfer pricing policy.  Mr. Green does not acknowledge the strong incentives that MNEs have to adopt transfer pricing policies that minimize their taxes on a global basis.

66.     Dr. Reichert, on the other hand, does implicitly acknowledge that transfer pricing policies may be motivated by a desire to minimize taxes.  However, he appears to opine that this was not the case with Nortel.  He states that:

> Nortel's transfer pricing framework involved the assignment of residual profit to entities in jurisdictions which are considered to have *high statutory tax rates* (it being recognized that effective tax rates may be reduced from time to time through various tax incentives) . . . *Thus, on its face, Nortel's transfer pricing framework does not appear to be motivated by a desire to divert residual profit to low tax jurisdictions.*  While not dispositive,  these  characteristics  are  indicia  of  a  transfer  pricing

---

[73] *See* Eden Report ¶ 130.

framework that is consistent with the arm's length principle.[74]

67.     Dr. Reichert ignores the differences between the Canadian and U.S. statutory *and effective* tax rates from 2000 to 2009.  Starting with the former, Figure 5 below shows that the statutory corporate income tax (CIT) rate in Canada was less than that in the U.S. starting in 2002 and the gap between the two continued to widen through 2009.[75]  The greater the gap, the larger the tax advantage of shifting taxable income from the United States to Canada.

**Figure 5: Statutory Corporate Income Tax Rates,**
**Canada and the United States 2000-2009**[76]

|        | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|--------|------|------|------|------|------|------|------|------|------|------|
| Canada | 42.2 | 40.5 | 38.0 | 35.9 | 34.4 | 34.2 | 33.9 | 34.0 | 31.4 | 31.0 |
| US     | 39.3 | 39.3 | 39.3 | 39.3 | 39.3 | 39.3 | 39.3 | 39.3 | 39.3 | 39.1 |

68.     In addition, the rates in Figure 5 are *average* rates, at the country level and will vary slightly for each MNE depending on its location – the provinces and states in which its entities are resident for tax purposes – and any tax credits or deductions for which the MNE qualifies.

69.     Further, as a high-tech MNE spending billions on R&D in Canada, Nortel received a tax credit through the Canadian Scientific Research and Experimental Development Tax Incentive Program.[77]  Under that program, Nortel received R&D tax credits for its R&D spending, which could be used to offset its Canadian taxes, resulting in a much lower

---

[74] Reichert Report at 27-28 (emphasis added).

[75] More information on the Canadian and U.S. corporate income taxes and Canada's foreign source income regime are provided in Appendix A.

[76] Org. for Econ. Coop. & Dev. (OECD), Table II.1, Corporate & Capital Income Taxes, *OECD Tax Database* (May 2013), http://www.oecd.org/ctp/tax-policy/tax-database.htm (last accessed Feb. 28, 2014).

[77] *See generally* Canada Revenue Agency, *Overview of the Scientific Research and Experimental Development (SR&ED) Tax Incentive Program*, RC 4472(E) Rev. 08 (2008), *available at* http://www.cra-arc.gc.ca/E/pub/tg/rc4472/rc4472-08e.pdf.

*effective* tax rate on Canadian income.[78]

70.     Nortel's R&D tax credits were large. In its public filings covering the period from 2001-

2008, Nortel reported annual firm-wide investment tax credits between $810 million and

$1.601 billion.[79]   For 2006 to 2008, where data were available, Nortel's annual

investment tax credits in Canada were between $869 million and $1.038 billion.[80]

71.     Dr. Reichert's report acknowledges – at an abstract level – that effective tax rates may be

reduced through various tax incentives,[81] but he fails to acknowledge that this was

specifically the situation for Nortel in Canada.  Dr. Reichert's downplaying of the tax

minimization motive is also surprising because Nortel employees recognized and stated

that Canada was a low tax location with generous R&D credits.  For example, a 2008

presentation by Peter Look, a former NNL Vice President for Tax, to Nortel's Audit

Committee noted that "Nortel's Canadian tax profile can provide a strategic financial

competitive advantage" . . . because of the "[o]ngoing generation of new R&D tax credits

---

[78] The generosity of the Canadian government's Scientific Research and Experimental Development Tax Incentive Program ("SR&ED") is well known.  For example, PwC Canada notes "Canada offers some of the most lucrative tax credits in the world," ranging from "20-35 percent of eligible R&D costs."  PwC Canada, *Research & Development*, http://www.pwc.com/ca/en/sred/index.jhtml (last accessed Feb. 27, 2014.  BDO also notes these incentives "are among the most generous SR&ED incentives in the world."  BDO Canada, *Tax Bulletin: Tax Benefits of SR&ED* 1 (June 2011), *available at* http://www.bdo.ca/en/Library/Services/Tax/Documents/Tax-Bulletins/Tax-Benefits-of-SRED.PDF.

[79] Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 11 2002) at F-29; Nortel Networks Corp., Annual Report Amendment No. 1 (Form 10-K/A) (Dec. 23, 2003) at F-38; Nortel Networks Corp., Annual Report (Form 10-K) (Jan. 11, 2005) at F-47; Nortel Networks Corp., Annual Report Amendment No. 1 (Form 10-K/A) (May 1, 2006) at 163; Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 76; Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 71; Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 90.

[80] Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 76; Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 71; Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 90.

[81] Reichert Report at 27.

each year" and the fact that there was "[z]ero tax cost for income attributed to Canada."[82]

72.    The impact of R&D tax credits on Nortel's effective tax rates, by country, was recognized by senior Nortel tax staff.  For example, a 2002 presentation by Nortel's Global Tax Practice (which was made during the period when Nortel was developing the RPSM) compared the statutory and effective CIT rates in Canada, the United States, the United Kingdom, France and Ireland (the countries where Nortel's IEs were resident). Nortel's effective CIT rate was calculated as its statutory CIT rate minus the R&D credit. Figure 6 shows the percentage calculations in the Nortel presentation.  Nortel's statutory CIT rate of 34% minus its 23% R&D tax credit resulted in an effective tax rate of 11% in Canada.  This rate was substantially lower than the effective tax rates of 37% in the U.S., 34% in France and 30% in the UK, and even lower than the 13% effective tax rate in Ireland. [83]

**Figure 6: Nortel's 2002 Statutory and Effective Tax Rates by Country**[84]

|         | Statutory Rate | R&D Credit | Effective Tax Rate |
|---------|----------------|------------|--------------------|
| Canada  | 34%            | -23%       | **11%**            |
| U.S.    | 39%            | -2%        | **37%**            |
| U.K.    | 30%            | 0%         | 30%                |
| France  | 35%            | -1%        | 34%                |
| Ireland | 13%            | 0%         | 13%                |

73.    Moreover, Nortel personnel, including senior NNL employees, openly acknowledged that Nortel's transfer pricing system was motivated by the desire to take advantage of Canada's low effective tax rate.  As I noted in my Report, documents and testimony

---

[82] Ex. 22135, NNC-NNL06038888 (May 6, 2008 PowerPoint presentation entitled "Tax Matters Update, Audit Committee Meeting") at 2.

[83] *See* Ex. 22121, NNC-NNL07490130 (July 11, 2002 PowerPoint presentation entitled "Global Tax Practice") at 16.

[84] *Id.* at 16 (figures rounded to nearest whole percent).

produced in this case demonstrate that Nortel executives and other personnel understood

that shifting from a transfer pricing regime based on geographic net sales (the CSA) to

one based on geographic R&D spending (the RPSM) would shift more income to NNL

from NNI,[85] including:

- Testimony by John Doolittle, NNL's former Treasurer, CFO, and Vice President for Tax, that "[t]he thesis behind the [RPSM] when [Nortel] was profitable was that to the extent laws permitted it, we would move as much profit and hence cash into Canada and as a consequence we would . . . minimize the tax on the entire corporation."[86]

- Testimony by Roseanne Culina, NNL's Vice President of Tax for Canada and later Vice President for Global Tax Strategy and Initiatives, that "[t]ransfer pricing was a key part of [Nortel's] tax strategy," and that "one of the objectives in redeveloping the transfer pricing mechanism was getting cash to Canada," where there was a "low effective tax rate."[87]

- Presentations by Peter Look – a former NNL Vice President for Tax – and other tax personnel stating that "one goal of Nortel's transfer pricing policy was "to attribute more income to Canada";[88] that the "RPS method allocates more profit to Canada in the long term and takes advantage of Canada as a tax haven";[89] that transfer pricing "is key to Nortel's global tax planning and management of [Nortel's] tax rate";[90] and that the RPSM was expected to shift billions of dollars of income out of NNI and into NNL, resulting in substantial tax savings to Nortel.[91]

74.    Many more such examples exist of testimony and documents demonstrating that Nortel's

transfer pricing policy was motivated by tax avoidance considerations, as well as the

---

[85] *See* Eden Report ¶¶ 137-41, nn. 190-92.

[86] Doolittle Dep. 52:7-12, Dec. 5, 2013.

[87] Culina Dep. 164:17-18, 186:2-6, Oct. 17, 2013

[88] NNC-NNL099354 (May 6, 2008 PowerPoint presentation entitled "Tax Matters Update, Audit Committee Meeting") at 3.

[89] Ex. 21170, NNC-NNL061531 (Dec. 5, 2007 PowerPoint presentation entitled "Global Tax Town Hall") at 17.

[90] Ex. 22121, NNC-NNL07490130 (July 11, 2002 PowerPoint presentation entitled "Global Tax Practice") at 13.

[91] Ex. 11053, NNC-NNL06153990 (Dec. 2001 PowerPoint Presentation entitled "Overview of Transfer Pricing APA and Recommendation") at 15-18 (detailing expected changes to operating income and net tax impact as a result of switch from CSAs to RPSM).

desire to repatriate cash (on a tax-efficient basis) to Canada.[92]  This makes application of that transfer pricing regime to allocation particularly inappropriate.

### B.    Nortel's Transfer Pricing Regime Was Criticized by Tax Authorities

75.    As I discussed in my Report, application of Nortel's transfer pricing policy to allocation is also inappropriate in light of the IRS' serious criticisms.

76.    Neither the IRS nor the CRA approved Nortel's APA with respect to its MRDA transfer pricing methodology.  To the contrary, they reached an agreement that the RPSM should be adjusted to shift $2 billion in income back to NNI from NNL for the years 2001 through 2005 alone.  This agreement ███████████████████████████████ ████████████  likely understates the amount by which the IRS believed Nortel's transfer pricing policies improperly shifted billions in income from NNI to NNL.

77.    Dr. Reichert discounts the significance of the $2 billion settlement.  He states that the $2 billion adjustment represents less than 5% of the revenues of NNL and NNI during 2001-2005[93] and therefore does not "reflect a fundamentally flawed approach to selecting and designing an arm's length transfer pricing method."[94]  He also states that this adjustment is "not very large" relative to Nortel's global revenues.[95]  Based on my experience, I can

---

[92] *See, e.g.*, Ex. 22143, NNC-NNL06491238 (Dec. 3, 2001 Document entitled "Modification of R&D Cost Sharing Agreement") at 1 (explaining that Nortel's tax group had been "investigating alternatives to the R&D CSA" in part because it wanted "to minimize Nortel's long-term effective tax rate," and had decided upon the RPSM); Ex. 21385, NNI_00020713 (Oct. 9, 2002 email with subject "RE: Restructuring costs") (email from Mark Weisz to James Gatley stating Nortel's strategy "for a long time" has been to "create as much profit in Canada as possible" because "Canada is a tax haven for the company.  When [Nortel] is profitable in the future, the RPS will help create more profits in Canada."); Ex. 11081, NNI_00694120 (Aug. 2, 2002 memorandum entitled "APA Strategy") at 2 ("The profit split method is intended to transition ownership of Nortel's valuable intangibles into countries with lower effective tax rates such that, over time, the method will produce favorable tax results for Nortel.").

[93] Reichert Report at 93.

[94] *Id.* at 8.

[95] *Id.* at 91.

say with confidence that regardless of the size of Nortel's global revenues, a $2 billion income adjustment arising out of a transfer pricing agreement between two country's tax authorities indeed reflects the tax authorities' clear disapproval of the Nortel's transfer pricing regime.  Such large adjustments of income between related parties, as part of an APA process, have historically been relatively rare.

78.     Dr. Reichert's reference to Nortel's global *revenue* is also misleading.  The $2 billion adjustment had a dramatic impact on NNL and NNI's *operating profit*.  This adjustment amounted to a 52% decrease in NNL's operating profit and a 60% increase to NNI's operating profit for the years 2001-2005.  Moreover, as I noted in my Report, the adjustment amounted to a reversal of more than 40% of the sums transferred from NNI to NNL during the 2001-2005 period.[96]

79.     Neither the CRA nor the IRS explained to Nortel the basis underpinning the $2 billion agreed-upon adjustment for the years 2001-2005.  What is known, however, is that in its 2006 position paper on the proposed bilateral APA for that period, the IRS raised several objections to how Nortel calculated both components of the RPSM: the routine returns and the residual profit split percentages.[97]  This, coupled with the size of the ultimate settlement, in my view reflects the IRS' dissatisfaction with Nortel's transfer pricing policy.

80.     Dr. Reichert implicitly acknowledges that Nortel's transfer pricing policy was not arm's length for the years 2001-2005.  In those years, Dr. Reichert states he would adopt a "somewhat different approach" for calculating the arm's length routine returns for the

---

[96] Eden Report ¶ 151.

[97] *See, e.g.*, Ex. 11237, NNC-NNL061995 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 4, 7, 14-22, 30-31.

IEs, separately quantifying the distribution and manufacturing functions for the IEs and conducting a new analysis of comparables.[98]  After conducting his alternative calculation, Dr. Reichert opines that a $1.2 billion adjustment to increase NNI's income should have been made for the 2001 to 2005 period,[99] rather than the $2 billion adjustment agreed to between the IRS and CRA.  This amount – $1.2 billion – is still large and demonstrates that Nortel's transfer pricing regime was flawed and not arm's length.  If Dr. Reichert's calculation is correct, he also implies that CRA made an $800 million error by agreeing to a transfer pricing adjustment that shifted $2 billion in taxable income from Canada to the United States, which seems unlikely.

81.    Dr. Reichert also implies that the flaws identified by tax authorities with respect to Nortel's transfer pricing policy from 2001 to 2005 disappeared in the years that followed.[100]  I do not believe that is a reasonable assumption.  While there were modest changes to Nortel's transfer pricing policy after 2005,[101] in my opinion, tax authorities

---

[98] Reichert Report at 7, 61.

[99] *Id.* at 91.

[100] Mr. Green notes that the IRS' $3 billion claim against NNI was settled for $37.5 million for the 1998 to 2008 period, and then concludes that "Nortel's transfer pricing system has been accepted . . . by the IRS through 2008." Green Report at 28.  However, I have not seen any evidence indicating that the IRS was satisfied with Nortel's transfer pricing policy for 2006 and onward, or that the $37.5 million settlement addressed the IRS' concerns about the RPSM during that period.  To the contrary, given the magnitude of the settlement, the fact that Nortel's transfer pricing policy continued to shift significant income from NNI to NNL and because several of the IRS' concerns expressed in its position papers were never addressed by Nortel, I expect that the IRS would have continued to object to Nortel's transfer pricing policy. Had Nortel not gone into insolvency proceedings, further transfer pricing adjustments for the period after 2005 would have required extensive negotiations between the IRS and CRA.  Under these circumstances, it is unsurprising that the IRS agreed to settle with Nortel through 2008 even if it continued to disapprove of Nortel's RPSM.

[101] For example, from 2006 onward, the calculation of routine returns for Nortel's IEs was no longer based on RONA.  As I note in my initial Report, the calculation of the IEs' routine return was separated into two categories: (1) a routine return based upon returns achieved by comparable independent distributors (i.e., the same routine return the LREs received) and (2) a routine return based on the IEs' costs incurred to support extraterritorial revenues for three types of activities – Global Operations, Sales & Marketing, and General & Administrative Expenses.  Eden Report ¶ 107.  As of 2006, the residual profit allocation was calculated based on the sum of the prior 5-years' historical R&D expense, rather than based on capitalized and R&D expenses.  *Id.* ¶ 108.

would not have viewed these changes as sufficient to satisfy the arm's length principle.

In the modified RPSM, the IEs shared large residual losses based on their contribution to

R&D.[102]  This was a central concern of the IRS because negative residual returns were

inconsistent with Nortel's representation to tax authorities that R&D was a key part of its

business model.   According to Nortel, "R&D [was] the primary contributor to the

success of Nortel's business," and "Nortel's customers [chose] Nortel products and

services because Nortel [was] viewed as a technology leader and innovator in its

market."[103]  Put simply, it made no sense to the IRS that increased R&D spend resulted in

an increased share of a negative residual pool.

82.      It is clear that the IRS was concerned that the RPSM was shifting too much income out of

the United States and not sufficiently rewarding NNI for its revenue-generating activities.

This fundamental problem with Nortel's RPSM continued from 2006 and onward,

consistent with Nortel's desire to shift taxable revenue from the U.S. to Canada.

83.      Dr. Reichert also points to the fact that Nortel hired professionals to assist in developing

Nortel's transfer pricing policy as providing support for his view that Nortel's transfer

pricing policy was arm's length.   Thus, he states:

> In my opinion, Nortel engaged in a responsible and robust process to
> develop Nortel's RPS.  It engaged in a thorough and transparent process, it

---

[102] Ex. 11237, NNC-NNL061995 (Mar. 22, 2006 IRS Position Paper to Proposed U.S.-Canada Bilateral APA) at 20 ("The absurdity of the taxpayer's position for routine functions is apparent when on examines the implication for the R&D function.  In contrast to the positive profits proposed by the taxpayer for manufacturing and distribution, [Nortel assigned] extreme losses (even a negative royalty) for the R&D function . . . Thus, the APA Team views the Nortel proposed routine returns for the manufacturing and distribution functions as too generous . . . .").

[103] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Ltd. & Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011) at 11.  Furthermore, the results of Nortel's post-petition Sales are consistent with those representations.  The sale of Nortel's Residual Patent Portfolio accounted for $4.5 billion of the $7 billion in proceeds from the Sales.  Also, the purchasers of Nortel's business lines attributed significant value to the IP they acquired.  The inconsistency of Nortel's transfer pricing policy allocating losses to R&D and the value realized from the sale of IP provides additional support for my opinion that Nortel's RPSM should not be used for conducting a valuation of the assets sold or relinquished in the Sales.

engaged highly qualified independent transfer pricing advisors, in addition to employing its in-house resources, and it selected the best method (the residual profit split method) out of the recognized and potentially available transfer pricing methods. . . .

To ensure that its transfer prices system complied with the arm's length principle in these challenging circumstances, Nortel sought the help of multiple highly experienced professional advisors including, among others, Horst Frisch and Ernst & Young LLP, and selected a transfer pricing method that by its nature considered the implications for all countries within which Nortel operated.[104]

84.    Tax authorities were aware that Nortel had hired Horst Frisch and Ernst & Young LLP (among other professionals) to assist Nortel's tax group in developing a new transfer pricing policy.  These professionals communicated directly with the IRS, CRA and the HMRC in England to advocate Nortel's position with the tax authorities.  The engagement of these professionals and their advocacy over many years, however, did not result in tax authorities approving Nortel's APA with respect to the MRDA, nor did it prevent the IRS and CRA from agreeing on the $2 billion adjustment to NNI's income.

85.    Further, the fact that Nortel engaged "highly experienced professional advisors" does not provide any reason to believe that Nortel's RPSM in fact satisfied the arm's length principle or that tax authorities' criticisms of Nortel's RPSM were unjustified.  In my experience, it is the norm that in large, high profile transfer pricing disputes, firms will engage highly experienced professional advisors.  Obtaining such advice should not be interpreted as evidence that a transfer pricing system satisfies the arm's length principle.  On the contrary, firms often engage such professionals when the stakes are high and/or the transfer prices are likely to be disputed.  Moreover, since tax minimization is an important transfer pricing policy objective for MNEs, their tax advisors are (not

---

[104] Reichert Report at 5, 35.

surprisingly) focused on ways that MNEs can reduce their taxes while staying within the boundaries established by national tax authorities.

### C.    Additional Reasons Why Mr. Green's Application of Nortel's Transfer Pricing Policy for Allocation Purposes Is Flawed

86.    As I have explained, transfer pricing is not appropriate for allocation of the proceeds of the Sales. There are additional issues with the way in which Mr. Green used Nortel's transfer pricing policy that further support this conclusion.

87.    As I understand it, Mr. Green presents two approaches to allocate the proceeds from the sales of Nortel's lines of business (the "Business Sales"). In Mr. Green's first approach, which he calls "Allocation Based on Projected Earnings,"[105] he calculates the value of the licenses that NNI and EMEA relinquished as part of the Business Sales by projecting Nortel's financial performance through 2018, including the transfer pricing payments that he projects would take place. In doing so, Mr. Green projected the revenue and expenses of Nortel's lines of business, aggregated the cumulative operating profit by debtor (e.g., NNI), and made transfer pricing adjustments assuming that Nortel's transfer pricing policy, including the RPSM percentages, would remain the same as it was in 2010. Mr. Green then estimates the resulting profit that NNI would have earned through 2018.[106] In his second approach, which he calls the "Maximum Allocation Assuming the Business Sale Proceeds Were Capitalized Earnings that Nortel Would Have Achieved," he allocates the sales proceeds (less the value he ascribes to tangible assets) solely according

---

[105] Green Report at 61-62.

[106] *Id.* at App. J p. 2.

to the RPSM percentages as they stood in the first quarter of 2010.[107]  Both approaches are flawed for a number of reasons.

88.     Both of Mr. Green's approaches wrongly assume that allocation should be determined based upon the value NNI would have realized from operating the business lines after transfer pricing adjustments.  Prior to the Business Sales, NNI's income as reported to tax authorities did depend heavily on how the RPSM apportions profit among the various IEs.  But a third-party purchaser would not be bound to the MRDA and the same transfer pricing policy as NNI.  Indeed, given that the buyers of the lines of business were all headquartered in countries other than Canada, it is hard to believe that they would preserve the Canada-centric cost structure in Nortel.  As noted above and in my Report, companies are free to structure their transfer pricing in a manner that is tax efficient from their perspective.  Once the lines of business were sold, there is no reason to conclude that Canada would continue to be a tax haven or that the transfer pricing system that was structured, in part, to send cash to Canada would still make sense.  As such, Mr. Green's assumption that the value generated by the different IEs would be a function of Nortel's RPSM is inappropriate.

89.     In both approaches, Mr. Green also assumes that Nortel's transfer pricing policy would remain static for nine years through 2018.  This is not a reasonable assumption.

- Nortel's transfer pricing policy changed several times during the ten years prior to its bankruptcy, including a switch from the CSA to the RPSM and subsequent modifications to the RPSM.  There is no reason to believe this evolution in Nortel's transfer pricing policies would have suddenly stopped in 2010 had Nortel continued operating its businesses.

---

[107] *Id.* at 62-63.  Mr. Green states that this second approach is inappropriate, but he includes "the calculation as a data point." *Id.* at 62.

- Several elements of Nortel's transfer pricing policy were based on the results of searches for comparables (e.g., routine returns). Because the set of relevant comparable transactions and the financial characteristics of those comparables both change over time, tax authorities require the use of reasonably contemporaneous comparables. Given the rapidly changing nature of the telecom sector, it is clearly unreasonable to think that Nortel would not change certain elements of its transfer pricing policy over a 9-year time span.

- Nortel anticipated that changes would be made over time, as evidenced by the fact that the MRDA explicitly states that the RPSM may be amended as a result of reviews by tax authorities and that it would be amended to conform to any negotiated determination with revenue authorities.[108]

- It is also not a reasonable assumption that Nortel's transfer pricing policy would remain unchanged through 2018 given the criticisms the tax authorities, particularly the IRS, had with the 2001-2005 RPSM and that the IRS and CRA never approved an APA for later years.

90.    Mr. Green's calculated valuation is simply an artifact of the transfer pricing policy that Nortel had in place and the way it was organized at a specific point in time. In addition to the unlikelihood that Nortel's transfer pricing policy would have remained unchanged from 2010 to 2018, even had the policy remained the same, the RPSM percentages calculations would not. It is unclear to me why using a snapshot of one year (i.e., 2010) would be appropriate to forecast financial performance for the following eight years. Nortel's RPSM percentages changed dramatically from the time this transfer pricing policy was implemented in 2001 through until 2010.[109] Given this historical variability, it makes little sense to assume – in the hypothetical world where the Nortel entities

---

[108]  The MRDA specifically contemplated that the RPSM would change in the event that the tax authorities disapproved of the MRDA. The Whereas Clauses of the MRDA provide that the IEs "acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue regarding the application of the RPSM, the calculation of the RPSM as set forth in Schedule A may be amended which amendments would require the consent of the Participants." Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and Amendments) at 2. Article 3(c) further provides that the IEs "understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. The [IEs] agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation." *Id.*

[109]  *See* 2001-2008 Transfer Pricing Worksheets; NOR_56971224 (2009 Transfer Pricing Worksheet); NNI_00309072 (spreadsheet entitled "1Q 2010 Transfer Pricing Adjustments").

continued to operate through 2018 – that Nortel's transfer pricing policy and the RPSM

percentages would remain static even if its policy did.[110]

91.    In addition, Mr. Green's analysis implies that Nortel's RPSM percentages were arm's

length.  Presumably, this is based on Dr. Reichert's opinion that Nortel's IP had an

economic life of 3 to 5 years, which is roughly consistent with an amortization rate of

30%,[111] but, in my opinion, Dr. Reichert's analysis of the economic life of Nortel's IP is

flawed.  Dr. Reichert relies on several unconvincing arguments to support his conclusion.

For example, he states that that the *average* product life cycle of Nortel products is

approximately 4.4 years (weighted by business segment revenue).[112]  He also states that

academic research in the software and information technology hardware sectors supports

his contention.[113]

92.    There is compelling evidence that the particular IP that drives the value of the R&D at

issue in this matter has a longer economic life than assumed by Dr. Reichert.  I

understand that Dr. Catherine Tucker has been asked to opine on Nortel's organizational

structure and incentives surrounding innovation.  Dr. Tucker describes a clear difference

between product lifecycle and the lifespan of IP (where the lifespan of IP is substantially

---

[110] Further, Mr. Green's analysis includes the 2010 RPSM percentages to make forecasts through 2018. Green Report, App. J, p. 8, Ex. 1.5.  Given that Nortel went bankrupt in January 2009, it is unclear why data including year 2010 would be appropriate, even if the RSPM percentages were appropriate for allocation, which they are not.  I do not expect the RPSM percentages from a year after Nortel filed for bankruptcy – which were likely based on R&D performed only with the purpose of keeping a business line operational so that it could be bought by a third party – to be representative of an accurate split of the contribution by the IEs to the development of Nortel's IP.  Moreover, the sales of Nortel's two largest lines of business, CDMA and Enterprise, closed in the fourth quarter of 2009, *see* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 15, 2010) at 43-44, which meant that Nortel's R&D in the first quarter of 2010 was fundamentally different than its R&D just a year earlier.

[111] Reichert Report at 82.

[112] *Id.* at 76-77.

[113] *Id.* at 75-76.

longer than product lifecycles).[114]  Dr. Tucker also cites multiple Nortel internal

documents which show that Nortel understood that the lifespan of its IP exceeded the five

years claimed in the Green Report; one presentation showed a 20.5-year patent life

cycle.[115]  In addition, she references a Nortel marketing document from May 2010 stating

that "[m]any of the issued patents will not expire for a decade, and the more than 2,000

pending patent applications indicate that the portfolio will continue to be relevant in the

late 2020s."[116]

93.    Mr. Green's approaches also misapply Nortel's transfer pricing policy.  In Mr. Green's

first projection-based approach,[117] he calculates the value of the licenses that NNI and

EMEA relinquished as part of the Business Sales by projecting Nortel's financial

performance through 2018, including his projected transfer pricing payments.  He

contends that the projected RPSM-adjusted income for NNI and EMEA (in net present

value terms) is equal to the value that they should receive from the Business Sales.

However, this exercise by Mr. Green does not allocate all of the proceeds of the Business

Sales, leaving an additional, unallocated amount.  This "excess" amount of the proceeds

of the Business Sales, over and above the amount allocated in connection with tangible

assets, workforce transferred, and the value of NNI's and EMEA's licenses is allocated

by Mr. Green entirely to NNL.  Mr. Green asserts that this excess value is "attributable to

the value of intellectual property (unencumbered by any license rights) and customer

rights that was owned by NNL and transferred to the purchasers.  This value has been

---

[114] Expert Report of Catherine Tucker, Feb. 28, 2014 ¶¶ 13, 65.

[115] *Id.* ¶ 92.

[116] *Id.* ¶ 90.

[117] Green Report at 61-62.

allocated to NNL."[118]

94.    This approach is nonsensical from a transfer pricing perspective.  Mr. Green allocates the excess of the Business Sales – which he asserts is associated with IP and customer relationships – entirely to NNL, even though NNI (and the EMEA IEs) also invested in the R&D that created the IP sold in the Business Sales.

95.    In Mr. Green's alternative approach, in which he calculates what the allocation would be if the proceeds – less the value of tangible assets – were allocated based on the RPS percentage from the first quarter of 2010.  This approach is not even consistent with Nortel's transfer pricing policy (which should not be applied to allocation) because it relies exclusively on R&D expenditures and ignores value of the routine functions performed by the IEs, which is a significant part of the RPSM.  The use of the RPS percentages alone ignores the fact that in every year from 2001 to 2008, as shown in Figure 7, Nortel's RPSM awarded substantial routine returns but then allocated massive losses to the IEs in compensation for their R&D contributions.[119]

---

[118] *Id.* at 5.

[119] Mr. Green's second approach also suffers from the same flaws I discuss above regarding the assumption that Nortel's 2010 numbers are appropriate.

**Figure 7:  Total Integrated Entity Routine Returns Compared to Residual Profit, $ Millions, 2001-2008**[120]



96.     For these reasons, I conclude that even if Mr. Green's application of transfer pricing was appropriate – which in my opinion it is not – it is nonetheless flawed.

## IV.     DR. REICHERT'S ASSUMPTION THAT NORTEL'S CSA AND RPSM TRANSFER PRICING POLICIES WERE THE SAME IS INCORRECT

97.     In my Report, I demonstrated that the RPSM was the least favored transfer pricing method by tax authorities and the one least likely to generate an arm's length result. Moreover, using historical R&D spending as an allocation key further reduces the reliability of the RPSM.  If the RPSM is a "method of last resort" for income tax

---

[120] From 2001 to 2005, NNC received a residual profit.  NNC's routine return and residual profit data are also included in this figure.  *See* 2001 to 2008 Transfer Pricing Worksheets.

purposes, to be used only when other methods fail, surely the RPSM is even less well

suited for the allocation of the proceeds of the Sales in these bankruptcy proceedings.

This is set forth in Section V.B.2 of my Report.

98.     In his report, however, Mr. Reichert states that Nortel's CSAs prior to 2001 (which were

approved by the CRA and IRS) and the RPSM from 2001 and beyond (which were not so

approved) "were manifestations of the same underlying logic, and essentially the same

methodology."[121]   Dr. Reichert is correct that the CSAs and the RPSM are both suitable

transfer pricing methods for co-development activities within a multinational group.

However, Dr. Reichert is mistaken in his assertion that they are the essentially the same

methodology.   In fact, they are not the same methodology; they are the inverse of each

other – the CSA allocates R&D expenditures based on profits from IP and the RPSM

allocates profits from IP based on R&D expenditures.   The two methods can generate

very different results, as in fact occurred with respect to Nortel.

99.     Further, Nortel's tax professionals recognized that the two transfer pricing policies were

quite different and would have different effects on the IEs.   When the RPSM was

introduced, Nortel's tax personnel recognized that residual profits would be shifted from

---

[121] Reichert Report at 26 ("Under the Nortel CSA, Nortel first assigned territories, in which residual profit would be earned on any sales in that territory, to a group of legal entities that had historically invested in R&D.   It then aligned R&D investments with the residual profit expected to be earned in each entity's territory by apportioning the collective R&D costs pro-rata based upon anticipated residual profit levels.   Conversely, under the Nortel RPS, Nortel first observed previous investments made in R&D, and then allocated residual profit pro-rata to the entities that made these R&D investments.   The entities that were parties to the Nortel RPS were the same entities as those that had been parties to the Nortel CSA, with the exception of entities that stopped investing in R&D.   Thus, the Nortel CSA and Nortel RPS were manifestations of the same underlying logic, and essentially the same methodology.   The Nortel CSA began with a measure of expected (future) residual profit and allocated current R&D investments in proportion to expected future residual profit shares.   The Nortel RPS follows a very similar logic – it begins with a measure of past R&D investments (capitalized sunk R&D investments) and allocates current residual profit in proportion to investment shares.   Whether under the Nortel CSA or the Nortel RPS, the participating entities had economic ownership of the R&D in the sense of defined rights to an income stream derived from the R&D, but with legal ownership resting with NNL.") (citations omitted).

revenue-generating entities to entities in which R&D was performed, resulting in major changes to the income received by NNL, NNI, and NNUK.[122]  As I have previously noted, Nortel's tax professionals recognized that these changes would bring substantial tax benefits to the Nortel group.[123]

100.    The differences between the CSA and RPSM approaches can be illustrated using a simple, stylized example, illustrated in Figure 8 below.

**Figure 8: Comparison of CSA and RPSM Results**



101.    As illustrated in Figure 8, consider two related parties (Firm A and Firm B) that each

---

[122] *See, e.g.*, Ex. 11053, NNC-NNL06153990 (Dec. 2001 PowerPoint Presentation entitled "Overview of Transfer Pricing APA and Recommendation) at 11 ("Residual profits will be shifted from country where customers are located/customer sales are booked to regions where R&D is performed/funded.").

[123] *See, e.g.*, *id.* at 12, 15-18 (contrasting historical profit split with historical share of R&D expenditures between NNL, NNI, NNUK, and other Nortel entities, and estimating decrease in Nortel group tax liability through use of RPSM due to RPSM's effect on various entities' income).

invest in R&D and earn revenue in their respective territories.  Specifically, Firm A and Firm B each earn 50% of the aggregate revenue, but Firm A is responsible for 25% of the aggregate R&D expenditures, while Firm B accounts for the remaining 75%.  Prior to any transfer pricing adjustments, the profit can be calculated as each firm's revenue less its R&D cost.  Thus, the Firm A earns 75% of the aggregate profit.  Under the CSA regulations, Firm A is allocated a share of R&D expenditures based on its reasonably anticipated benefits, that is, its share of third party net sales.  Under the RPSM, the allocation key is each party's share of R&D contribution, that is, its share of R&D spending.[124]  These two allocation keys give very different results.  Under the CSA regulations, Firm A receives a share of the profits based on its reasonably anticipated benefits; under the RPSM, its share is based on its R&D spending.  Only where the two shares are one and the same does the firm receive the same profit allocation from the co-development R&D activity.  It is clear that the CSA and RPSM lead to different profit results for each firm.  My illustrative example obviously simplifies what is likely to be a more complicated calculation (e.g., there are costs besides R&D, and I've assumed that routine returns are small enough to ignore).  I discuss CSAs and expand on this example further in **Appendix C**.[125]

102.  I conclude that even if the MRDA's compensation for contribution to R&D were commensurate with the IEs' *contribution* to R&D, it is not commensurate with the *expected income* generated by that R&D.  Indeed, compensation for contribution under the MRDA does not bear any relation to the *value* of the assets that each entity owns as a

---

[124] From 2001 to 2005, Nortel's residual profit allocation was calculated based on capitalized R&D expenses; as of 2006, the residual profit allocation was calculated based on the sum of the prior 5-years' historical R&D expense.

[125] Figure C-1 in Appendix C details the calculations underpinning this example.

result of its R&D contribution, that is, the value of the IP rights owned by each entity.  I

therefore conclude that Dr. Reichert incorrectly argues that the CSA and RPSM are the

same transfer pricing methodology.

103.    Using a transfer pricing method with an allocation key that is commensurate with

*contribution* rather than *expected income* for the purpose of allocating of sales proceeds is

especially inappropriate.  Such a key bears no relation to the value of the assets owned by

each entity and means that using it to allocate sales proceeds would lead to an inaccurate

outcome.


**V.      DR. COOPER INCORRECTLY RELIES ON ELEMENTS OF TRANSFER PRICING FOR ALLOCATION**

104.    According to Dr. Cooper, the EMEA Debtors' position is that proceeds from the sale of

Nortel's IP should be allocated based on the IEs' contributions to the creation of IP, as

measured by R&D spend.[126]  He also asserts that "[w]hen the assets responsible for

driving the residual profits are sold, according to transfer pricing and arm's length

principles, the sales proceeds should presumptively be allocated on the same basis that

annual trading profits and losses from those assets were to have been allocated."[127]

105.    I disagree with these opinions for many of the same reasons that I have already described

above and in my earlier Report.  Dr. Cooper is correct that *all* of the IEs – not just NNL –

are entitled to share in the proceeds of the Rockstar sale (and the Business Sales).

However, Dr. Cooper's approach for allocating those proceeds ignores the fair market

value of the assets that were held by each of the IEs and sold or relinquished in those

---

[126] Cooper Allocation Report at 6.

[127] *Id.* at 7.

Sales.  As I have explained in my Report and in section III of this rebuttal report, transfer

pricing should not be used for the valuation of assets sold in a bankruptcy.  This is

because there is no reason why the value of an entity's intangible assets would be equal

or directly proportional to the costs incurred by that entity in developing those

intangibles, such that each IE's historical R&D spending is unlikely to approximate the

value that should accrue to that entity when its assets and rights are sold.  Contrary to Dr.

Cooper's opinion, there is in fact no basis in "transfer pricing and arm's length

principles" for his allocation method.

106.    However, I do agree with Dr. Cooper that if R&D expenditures are used to allocate the

proceeds of the Sales, Nortel's RPSM must at a minimum be adjusted to account for

Nortel's underestimation of the useful life of IP, as I have noted above.[128]

107.    Most of Dr. Cooper's report appears to be directed towards supporting the EMEA

Debtors' claims against the Canadian Debtors, as to which I have not been requested to

render an opinion.  There is one further aspect of Dr. Cooper's opinion, however, that I

do wish to briefly comment on.  Dr. Cooper asserts that the $2 billion CRA and IRS

settlement I have discussed above "is based, if not entirely, then substantially, on the IRS

position with respect to the treatment of restructuring costs and vendor financing

losses."[129]  This conclusion is based on his interpretation of the August 2009 IRS Claim,

in which the IRS sought an income adjustment for NNI of $7.3 billion for the 2001-2005

period.[130]  Dr. Cooper notes that the spreadsheet accompanying the IRS Claim lists three

line items justifying its proposed $7.3 billion adjustment: "APA TP Adj.," "Restructure,"

---

[128] *See supra* ¶ 92.

[129] Cooper Transfer Pricing Report at 64.

[130] *See id.* at 57-58.

and "Vendor Finance."[131]  He then asserts that because the IRS Claim was made after the

$2 billion settlement was agreed, any issues that the IRS took into account when agreeing

to the settlement would be "apparent on the face of the IRS Claim."[132]  Therefore, Dr.

Cooper concludes, the IRS Claim "strongly suggests" that the settlement was based at

least "substantially" on the IRS' position with respect to restructuring and vendor

financing costs.[133]

108.    Dr. Cooper's conclusion is not supported.  As I understand it, the precise basis for the $2

billion figure agreed upon first between the CRA and IRS is unknown.  As I have noted

above, the IRS did issue a position paper in which it outlined some of its criticisms of

Nortel's transfer pricing policy, and those criticisms were not limited to restructuring and

vendor financing costs.  In addition, the spreadsheet to which Dr. Cooper refers includes

the amount of $3.3 billion (out of the $7.4 billion claim) for a line item for "APA TP

Adj."[134]  This is the largest of the adjustments listed on the IRS spreadsheet, and

therefore almost certainly reflects the IRS' dissatisfaction with other elements of Nortel's

RPSM beyond just restructuring and vendor financing costs.


## VI.    CONCLUSION

109.    I evaluated the opinions of Dr. Reichert, Mr. Green and Dr. Cooper as they relate to

Nortel's transfer pricing policy and find numerous errors in their analyses.

---

[131] *Id.* at 59.

[132] *Id.* at 64.

[133] *Id.*

[134] *See id.* at 59.

110.   I disagree with Dr. Reichert's opinion that his reading of the licenses granted under the MRDA is consistent with the arm's length principle.  The IEs jointly agreed to engage in R&D to develop intellectual property – an expensive and inherently risky activity – and it would not have been arm's length for NNL alone to enjoy the benefits from the sale of that IP.  Dr. Reichert reaches a different conclusion by examining whether it would be "inherently inconsistent with economic rationality" for the IEs to agree to the limited license structure he describes, but this is not the correct test to determine whether an agreement is arm's length, and in any event, it would not even have been economically rational for the IEs to agree to that structure.

111.   Mr. Green's opinion that Nortel's transfer pricing policy can be and is appropriate to allocate the proceeds of the Business Sales is wrong, as transfer pricing is not designed to value assets sold by entities to third parties.  Moreover, Mr. Green and Dr. Reichert fail to acknowledge that Nortel's transfer pricing policy was designed for tax minimization purposes.  Their analyses also fail to properly consider the IRS and CRA's agreement for a $2 billion upward adjustment to NNI's income for the 2001-2005 time period alone.

112.   Dr. Cooper's assertion that the IEs' contributions to R&D are an appropriate metric to allocate the proceeds of the Sales fails to acknowledge that contributing to the creation of an asset does not equate to the fair market value of that asset.

113.   None of the arguments advanced by Dr. Reichert, Mr. Green or Dr. Cooper change my opinion that there is no basis to use either transfer pricing in general or Nortel's transfer pricing policy in particular to determine allocation of Sales proceeds.

Date: _2-28-2014_                  _Lorraine Eden_
                                        Signature

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al*.,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1.      My name is Lorraine Eden.  I live in College Station, Texas.

2.      I have been engaged by counsel for the U.S. Debtors to provide evidence in relation to the above-captioned court proceedings.

3.      I acknowledge that it is my duty to provide evidence in relation to these proceedings as follows:

    (a)      to provide opinion evidence that is fair, objective and non-partisan;

    (b)      to provide opinion evidence that is related only to matters that are within my area of expertise; and

(c)     to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.      I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date: 2-28-2014                    Lorraine Eden
                                        Signature