**APPENDIX C:**
**CSAs and Related Regulations**

1. Nortel set up (what I believe to be) its first cost sharing arrangement (CSA) between NNL and NNI on January 1, 1978. While I was unable to find the original 1978 CSA, the Preamble to the 1985 CSA references IRC Section 482, stating that the CSA was set up "within the meaning" of the U.S. Section 482 regulations:

   > Whereas the Parties have, pursuant to a cost sharing arrangement within the meaning of Regulation 1.482 of the Internal Revenue Code of the United States of America embodied in an Agreement, dated as of January 1, 1978 . . . [9]

2. There are various requirements that CSAs involving co-development of intangibles by multiple entities within an MNE must meet in order to satisfy the arm's length principle under U.S. and Canadian transfer pricing regulations and the OECD Transfer Pricing Guidelines:

   - Each CSA member "must receive a non-overlapping interest in the cost shared intangibles without further obligation to compensate another controlled participant for such interest" and "must be entitled to the perpetual and exclusive right to the profits from transactions of any member of the controlled group . . . to the extent that such profits are attributable to such interest in the cost shared intangibles."[10] To ensure non-overlapping rights, the CSA must clearly define each member's interest. The most common defining boundary is geographic territory.[11]

   - In its assigned territory or territories, each CSA member must have "perpetual and exclusive right to exploit the cost shared intangibles through the use, consumption, or disposition of property or services."[12] "The separate rights may constitute actual legal ownership; alternatively, it may be that only one of the participants is the legal owner of the property, but economically all the

---

[9] NNC-NNL08002476 (Jan. 1998 Amended Research and Development Cost Sharing Agreement) at 1.

[10] 26 C.F.R. § 1.482-7(b) (2013); *see also* OECD Transfer Pricing Guidelines (2010) ¶ 8.3.

[11] In a geographic split, "[e]ach controlled participant must receive at least one such territory, and in the aggregate all the participants must receive all such territories." 26 C.F.R. § 1.482-7(b)(4)(ii) (2013). *See also* OECD Transfer Pricing Guidelines (2010) ¶ 8.3.

[12] 26 C.F.R. § 1.482-7(b)(4)(ii) (2013).

participants are co-owners."[13]

- Each participant's contribution must also be "consistent with what an independent enterprise would have agreed to contribute under comparable circumstances given the benefits it reasonably expects to derive from the arrangement."[14] The CSA participants must share costs and risks in proportion to their "reasonably anticipated benefits" (RAB), either measured directly by their additional revenues generated or costs saved over the lifetime of the intangible assets (the preferred but more difficult method) or indirectly by an "allocation key" (the less preferred but more feasible method). The allocation key can be based on revenues, costs, quantities or profits, but must be an appropriate metric.[15]

- If there is a mismatch between a CSA participant's share of total RAB and its share of the total expenditures, a "true-up" or "balancing payment" must be made where the party that spent too much (relative to its RAB share) is compensated by the parties that spent too little, and vice versa. The purpose of the balancing payments is to ensure that "each participant's proportionate share of the overall contributions be consistent with its proportionate share of the overall expected benefits to be received under the arrangement."[16] Thus, each participant's RAB share drives its cost share.

3. Under CSA regulations, the allocation key is based on each participant's reasonably anticipated benefits (RAB) from exploiting the resulting IP in the participant's exclusive territory, that is, the participant's expected net sales to third parties. Each participant's share of actual historical R&D costs is compared with its share of net third party sales. Where a participant's cost share is higher than the RAB share, the participant receives a positive transfer pricing true-up from the group. Where the cost is lower, the participant pays a transfer pricing true-up to the group. Costs are adjusted among the group based on RAB share. Final profits equal each participant's net third party sales minus its adjusted R&D spend.

---

[13] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.6. *See also* Revenue Canada, International Transfer Pricing, Information Circular 87-2R, Sep. 27, 1999 [hereinafter IC 87- 2R] ¶ 121.

[14] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.8. *See also* IC 87-2R ¶ 124.

[15] *See* 26 C.F.R. § 1.482-7(e)(2)(i) (2013). *See also* IC 87-2R ¶ 127.

[16] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.18 (2010). *See also* IC 87-2R ¶ 132.

4. Under the RPSM, each Participant has two kinds of costs: costs for routine activities and R&D spend. Actual profit is net third party sales minus costs for routine activities and R&D spend. Routine activities are compensated with routine returns. Each participant's residual profit (or loss) is calculated as its net third party sales minus its routine returns and R&D spend. The residual profit (or loss) is then summed for the group. The allocation key is the ratio of each participant's R&D spend divided by group R&D spend, as a percentage. Each participant's share of R&D spend (the allocation key) is compared with its share of residual profits. Where a participant's R&D spend share is higher than its share of residual profits, the participant receives a positive transfer pricing true-up from the group. Where its share of group R&D spend is lower, the participant pays a transfer pricing true-up to the group. Residual profit is allocated among the group based on each participant's share of R&D spend. Final profits equal each participant's routine returns plus its share of residual profit (or loss).

**Figure C-1: Comparison of CSA and RPSM Calculations**

| Participant | $ Actual R&D Spend | $ Third Party Sales (RAB) | $ Original Profit (j=d-b) | CSA % Allocation Key (based on RAB) (e=c/∑c) | CSA $ Transfer Pricing TrueUp (f= (h - b/∑b)*∑b) | CSA $ Final R&D Spend (g= b + i) | CSA $ Final Profit (h=d-j) | CSA % Share of Final Profit (i=k/∑k) | RPSM % Allocation Key (based on R&D Spend) (j=b/∑b) | RPSM $ Transfer Pricing TrueUp (k= (m-f/∑f)*∑f ) | RPSM $ Final Profit (l=f+n) | RPSM % Share of Final Profit (m=o/∑o) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a | b | c | d | e | f | g | h | i | j | k | l | m |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| Firm B | 75 | 100 | 25 | 50% | -25 | 50 | 50 | 50% | 75% | 50 | 75 | 75% |
| Firm A | 25 | 100 | 75 | 50% | 25 | 50 | 50 | 50% | 25% | -50 | 25 | 25% |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| TOTAL | 100 | 200 | 100 | 100% | 0 | 100 | 100 | 100% | 100% | 0 | 100 | 100% |

5. The core issue is: how would independent entities split the profits arising from their co-development activities? Would arm's length parties willingly share their profits based simply on their cost shares, ignoring their revenue streams from exploiting the jointly created assets? The 2012 OECD Transfer Pricing Guidelines recognize this problem and

70

recommend that cost-based allocation keys for R&D co-development activities be restricted to situations where each party's share of R&D expenses is similar to its share of value from exploiting the co-developed intangibles. Where revenue shares and cost share differ, an allocation key that reflects expected benefits should be used.[17]

6. The U.S. Treasury also recognized this problem as far back as 1988, when its White Paper on the implications of the commensurate with income standard for U.S. transfer pricing rules admitted that an allocation key based on costs would be a poor metric for allocating non-routine returns to intangibles in a residual profit split.[18] The 1994 Section 482 IRC Regulations, however, did allow costs as an allocation key. The reason given for this in the Preamble to the regulations discussing Section 1.482-6 was that "Since fair market value of the intangible property usually will not be readily ascertainable, the regulations permit use of other measures of the relative values of intangible property, including capitalized intangible development expenses."[19] The 1994 regulations view the RPSM as a "method of last resort," going on to critique the reliability of the method as follows:

> The reliability of this method [the residual profit split] could be particularly adversely affected if capitalized costs of development are used to estimate the value of intangible property because such costs may bear no relation to market value, calculation of such costs may require allocation of indirect expenses between the relevant business activity and

---

[17] *OECD Transfer Pricing Guidelines* (2010) ¶ 8.19.

[18] U.S. Treasury Dep't & Internal Revenue Service, A Study of Intercompany Pricing (Section 482 White Paper) 101 (Oct. 18, 1988), *available at* https://ia600305.us.archive.org/17/items/studyofintercomp00unit/studyofintercomp00unit_bw.pdf ("Furthermore, the costs of developing intangibles, even if known, may bear no relationship to value, especially in the case of legally protected intangibles, and generally should not be used to assign relative values to the parties' intangible assets.").

[19] Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 130 (July 8, 1994).

the controlled taxpayer's other lines of business, and capitalizing costs requires assumptions regarding the useful life of intangible property.[20]

7. The current Section 482 regulations allow the use of R&D costs as an allocation key for the RPSM, but only under restrictive circumstances. First, an allocation formula such as R&D costs may be used in situations where an allocation key cannot be estimated based on how comparable independent parties would split their profits under comparable circumstances.[21] Second, if R&D costs are to be used as an allocation key, they should be amortized and capitalized; the use of R&D costs may be appropriate in situations where costs do not vary much over time or across parties.[22] As I have noted above, however, even capitalized costs can be an unreliable metric, as the Preamble to the 1994 U.S. transfer pricing regulations note.[23] Moreover, while Nortel's 2001-2005 RPSM was based on amortized and capitalized R&D costs, Nortel requested its RPSM allocation key for 2006 onward be based on a five-year rolling average of actual historical R&D spending by the IEs. The IRS and CRA still refused to grant Nortel's APA request for a second APA from 2006 forward.[24]

---

[20] Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 130 (July 8, 1994).

[21] 26 C.F.R. § 1.482-6(c)(3)(i)(B)(2).

[22] *Id.*

[23] *See* Intercompany Transfer Pricing Regulations Under Section 482, 59 Fed. Reg. 130 (July 8, 1994).

[24] *See* NNC-NNL033613 (June 30, 2009 letter with subject "Bilateral Advance Pricing Arrangement, Nortel Networks Limited (Canada), Nortel Networks Inc. (United States), 2006 through 2010 Taxation Years"); US_Canada_PRIV_00275175 (Mar. 9, 2010 letter with subject "Nortel Networks Incorporated Withdrawal of Bilateral APA Request with Canada") at 1 ("Nortel Networks Incorporated . . . formally withdraws its bilateral Advance Pricing Agreement . . . request, that was filed with the IRS APA Program in October 2008 for the APA term of 2007 – 2011.").