Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

- and -

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>    NORTEL NETWORKS, INC., *et al.*,<br>                           Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

EXHIBIT "G" TO THE AFFIDAVIT OF ANGELA ANDERSON
AFFIRMED APRIL 25, 2014

Signed: _____

        ANGELA ANDERSON

Date:     April 25, 2014

Before me: _____

        NOTARY PUBLIC

*[Handwritten note:]* Vu pour la seule légalisation matérielle de la signature de madame Angela ANDERSON, sans lecture ni traduction du présent document. Fait à Houpin, le 25/04/2014

*[Stamp:]* Olivier LESC... Administrateur, Off Notaire...



## RESEARCH AND DEVELOPMENT COST SHARING AGREEMENT

Agreement made and entered into with effect as of and from the 1st day of January, 1995.

BY AND BETWEEN:    NORTHERN TELECOM LIMITED, a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 (hereinafter referred to as "Northern Telecom")

AND;    NORTEL LIMITED, a corporation duly incorporated under the laws of England, having its executive offices at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, England    SL6 3QH (hereinafter referred to as "Nortel U.K.")

WHEREAS Northern Telecom and certain Subsidiaries, including Participant, have in the past expended, and intend in the future to expend, substantial sums of money on research and development services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to utilize in their businesses the NT Technology (as hereinafter defined) derived from such services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to share the costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or activities;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH THAT, IN CONSIDERATION OF THE MUTUAL PROMISES HEREINAFTER SET FORTH, THE PARTIES AGREE AS FOLLOWS:

### ARTICLE 1
### DEFINITIONS

As used herein, unless otherwise defined:

(a)    "Board of Directors" shall mean the Board of Directors of Northern Telecom;

(b)    "Compensating Adjustment" shall mean adjustments made in accordance with Article 3 of this Cost Sharing Agreement;

(c)    "Cost of Goods Sold" shall mean the cost of goods sold determined according to GAAP;

(d)    "Cost Sharing Participant" shall mean any member of the NTL Group sharing in the R&D Expenses pursuant to a R&D Cost Sharing Agreement;

(e)    "GAAP" shall mean Canadian Generally Accepted Accounting Principles as applied by Northern Telecom or Participant, as the case may be, in making determinations under this Cost Sharing Agreement;

Highly Confidential

NNI_00794545

- 2 -

(f)  "Intercompany Purchases" shall mean purchases from one member of the NTL Group by another such member;

(g)  "Intercompany Sales" shall mean sales to a member of the NTL Group by another such member;

(h)  "Net Customer Sales" shall mean customer sales, less discounts and returns;

(i)  "Nortel U.K. Subsidiaries" shall mean those entities the financial results of which are included in the Nortel U.K. consolidated financial statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the Nortel U.K. consolidated financial statements under GAAP;

(j)  "Northern Telecom Subsidiaries" shall mean those entities the financial results of which are included in the NTL Consolidated Financial Statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the NTL Consolidated Financial Statements under GAAP;

(k)  "NT Technology" shall mean any and all intangible assets (including but not limited to patents, industrial designs, copyrights and applications thereof, technical know-how, drawings, reports, practices, specifications, software and other documentation or information) produced or conceived as a result of the R&D Expenses during a calendar year or any prior years;

(l)  "NTL Consolidated Financial Statements" shall mean the audited consolidated financial statements of Northern Telecom;

(m)  "NTL Group" shall mean Northern Telecom and all Northern Telecom Subsidiaries, and their successors, transferees and assigns;

(n)  "Operating Income" shall mean Net Customer Sales, less Cost of Goods Sold, selling expenses, and general and administrative expenses allocable to such Net Customer Sales, but before the deduction of any R&D Expenses, goodwill amortization, interest expense, income taxes, or any other expenses not relating to continuing operations; provided, Operating Income shall exclude any other income and expense and extraordinary items;

(o)  "Participant" shall mean Nortel U.K. and all Nortel U.K. Subsidiaries, and their successors, transferees and assigns;

(p)  "Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(q)  "Participant's Share" in respect of R&D Expenses shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(r)  "Planned Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(s)  "Products" shall mean all products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by the NTL Group, and all components, parts, sub-assemblies and software associated with or incorporated in any of the foregoing;

Highly Confidential

- 3 -

(t) "R&D Cost Sharing Agreement" shall mean a research and development cost sharing agreement that is in effect between Northern Telecom and another member of the NTL Group pursuant to which Northern Telecom and the other such member share in some or all of the R&D Expenses during a calendar year;

(u) "R&D Expenses" shall mean the sum of the expenses of Research and Development incurred for the development of NT Technology directly or indirectly by all Cost-Sharing Participants in the NTL Group and approved by, or under authority from, the Board of Directors;

(v) "Research and Development" shall mean all research and development services or activities performed by or for all Cost Sharing Participants including, without limitation, development of methods, processes, procedures and tools related to manufacturing, installation, operation, maintenance and use of Products, but excluding services designated by Northern Telecom as custom research and development;

(w) "Residual" shall mean the total R&D Expenses less the amount of R&D Expenses allocated to Royalty Income;

(x) "Royalty Income" shall mean income (net of any income paid to other Cost Sharing Participants and which is included in such other Cost Sharing Participant's Royalty Income) generated during a calendar year through the licensing of NT Technology;

(y) "Subsidiary" shall mean a Northern Telecom Subsidiary or a Nortel U.K. Subsidiary as the case may be; and

(z) "United Kingdom" shall mean the United Kingdom of Great Britain and Northern Ireland.

## ARTICLE 2
### RESEARCH AND DEVELOPMENT PROGRAM AND BUDGET

Budgets for the performance of Research and Development, and appropriations for expenditures on all Research and Development projects, shall, from time to time, be reviewed and approved by, or under authority from, the Board of Directors.

All costs incurred directly or indirectly within the Research and Development appropriations approved as contemplated above shall be paid for by the Party or its Subsidiary incurring such expense, and shall be shared by Northern Telecom and Participant as hereinafter set forth.

## ARTICLE 3
### COST SHARING OF RESEARCH AND DEVELOPMENT

Participant and Northern Telecom shall each bear its share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement as hereinafter provided, regardless of whether or not any NT Technology is successfully produced by any or all of the Research and Development conducted pursuant to this Cost Sharing Agreement.

Participant's share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement ("Participant's Share") shall be calculated in two parts as follows:

Highly Confidential

NNI_00794547

- 4 -

(a) under Part 1, as described below, a determination shall be made of the amount of the R&D Expenses to be allocated to Royalty Income and a portion of this amount of the R&D Expenses shall then be allocated to Participant; and

(b) under Part 2, as described below, a portion of the Residual shall then be allocated to Participant.

Any foreign currency translations shall be made in accordance with GAAP as adopted in the NTL Consolidated Financial Statements. Calculations under this Article shall incorporate all amounts within a Cost Sharing Participant's geographic market.

Part 1

(a) The amount of the R&D Expenses to be attributed to Royalty Income for the calendar year shall be determined in accordance with the following formula:

$(R/(T + R)) \times R\&D = P$, where

R = the total Royalty Income of all Cost Sharing Participants for the calendar year;

T = total Operating Income for all Cost Sharing Participants for the calendar year (T will be deemed to be zero if T is negative);

R&D = R&D Expenses for the calendar year; and

P = the R&D Expenses to be allocated to Royalty Income for the calendar year.

(b) The R&D Expenses allocated to Royalty Income for the calendar year in accordance with this Article shall be allocated between Northern Telecom and Participant by applying the following formula:

$(A/R) \times P = S$, where

A = Participant's Royalty Income for the calendar year;

R = the total Royalty Income for all Cost Sharing Participants for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined in this Article; and

S = the R&D Expenses attributable to Royalty Income and allocated to Participant for the calendar year.

Part 2

(a) The allocation of the Residual for each calendar year will be made as follows:

(1) Ten percent (10%) of the Residual for the calendar year shall be allocated between Participant and Northern Telecom on the basis of Net Customer Sales by applying the following formula:

Highly Confidential

NNI_00794548

- 5 -

(CS/TCS) x .10 x (R&D-P) = B, where

CS = Participant's Net Customer Sales for the calendar year;

TCS = total Net Customer Sales for all Cost Sharing Participants for the calendar year;

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

B = Participant's allocation of ten percent (10%) of the Residual for the calendar year.

(2)   Ninety percent (90%) of the Residual shall be allocated between Northern Telecom and Participant on the basis of Modified Operating Income (as defined in this Article) by applying the following formula:

(MOI/TMO) x .90 x (R&D-P) = C, where

MOI = Participant's Modified Operating Income for the calendar year (as defined in this Article); provided, if MOI is less than or equal to zero, no allocation will be made to Participant under this subsection (a)(2) of Part 2 of this Article for the calendar year;

TMO = the sum of all Cost Sharing Participants' Modified Operating Income for the calendar year; provided, if the total Modified Operating Income of all Cost Sharing Participants other than Participant is equal to or less than zero, and MOI is greater than $0, (MOI/TMO) shall be deemed to equal 1, and the R&D Expenses allocated under this subsection (a)(2) of Part 2 of this Article for the calendar year shall be allocated entirely to Participant;

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

C = Participant's allocation of ninety percent (90%) of the Residual for the calendar year.

(3)   For purposes of subsection (a)(2) of Part 2 of this Article, a Cost Sharing Participant's Modified Operating Income for the calendar year shall be determined in accordance with the following formula:

OI - ((CGS - IP) x M) = MOI, where

OI = the Cost Sharing Participant's Operating Income for the calendar year, it being acknowledged that Operating Income may change as the result of issues raised on audit other than those presented by this Cost Sharing Agreement;

Highly Confidential

NNI_00794549

- 6 -

CGS = the Cost Sharing Participant's Cost of Goods Sold attributable to Net Customer Sales for the calendar year;

IP = the Cost Sharing Participant's Intercompany Purchases for the calendar year; and

M = for the calendar year ending December 31, 1995, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales divided by the total Cost of Goods Sold attributable to Intercompany Sales and for calendar years ending December 31, 1996, and following, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales, as determined by Northern Telecom, divided by the Cost of Goods Sold on Intercompany Sales.

Participant's Cost Sharing Payment for each calendar year, to be paid as hereinafter provided, shall equal Participant's Share less Participant's R&D. In the event Participant's Cost Sharing Payment is negative, Northern Telecom shall make a payment to Participant as hereinafter provided.

Nortel U.K. shall make payments to Northern Telecom on account of Participant's Cost Sharing Payment in the manner hereinafter set forth, with an appropriate adjusting payment to be made as provided below.

Nortel U.K. shall pay to Northern Telecom, based on budgeted or forecasted amounts but otherwise determined as hereinabove provided, a planned Participant's Cost Sharing Payment ("Planned Participant's Cost Sharing Payment") in twelve (12) equal monthly instalments within thirty (30) days of the date of the invoice therefor commencing in January of each year. In the event the Planned Participant's Cost Sharing Payment is negative, such amount shall be payable by Northern Telecom to Nortel U.K. in like manner as hereinabove provided.

For the calendar year ending December 31, 1995, any resulting Compensating Adjustment, reflecting the application of the formula as hereinabove provided, shall be paid within a reasonable period of time.

For subsequent calendar years, to the extent a Compensating Adjustment is necessary, Northern Telecom or Participant shall pay the Compensating Adjustment to the other entity within three hundred and twenty (320) days of the year end of the paying entity to which the Compensating Adjustment relates.

Compensating Adjustments may also arise when Northern Telecom, Participant, Revenue Canada or the Inland Revenue of the United Kingdom makes normal and routine adjustments (e.g. correction of computational errors) to the determination and computation of Northern Telecom's or Participant's Share of R&D Expenses or related calculations. Any such subsequent Compensating Adjustment agreed to by Northern Telecom and Participant shall be paid within ninety (90) days from the date of final determination and agreement thereof.

Northern Telecom or Participant may employ any payment method which it deems appropriate for settling Compensating Adjustments, including, but not limited to, the use of cheques, wire transfers, or offsets through intercompany accounts maintained by the entities with each other. Payment of Compensating Adjustments shall be made in the currency in which payment between the related entities is made for the transactions covered by this Cost Sharing Agreement.

Highly Confidential

NNI_00794550

- 7 -

The Parties may agree, from time to time, prior to the end of each calendar year, to an estimate or revised estimate of such adjusting payment and adjust the monthly payments hereinbefore determined, or otherwise make payment, according to such estimate or revised estimate, in which event the final adjusting payment to be made shall reflect such payment(s).

The receipt or payment of a Compensating Adjustment shall not be subject to any withholding taxes in Canada or the United Kingdom.

### ARTICLE 4
### LEGAL TITLE TO
### NT TECHNOLOGY

The Parties hereto acknowledge that, except as otherwise specifically agreed, legal title to all NT Technology whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement shall be vested in Northern Telecom. With respect to patentable inventions and copyrightable property encompassed by NT Technology, Northern Telecom shall have the exclusive right but not the obligation to file and prosecute applications in its name for patent or copyright protection in every country of the world. Participant shall execute or cause to be executed such documents reasonably requested by Northern Telecom as may be necessary or desirable to give effect to the foregoing.

Participant shall, from time to time, promptly upon receipt of Northern Telecom's request, and at Northern Telecom's expense, furnish to Northern Telecom all available and requested documentation relating to the NT Technology developed by or for Participant pursuant to the terms of this Cost Sharing Agreement.

### ARTICLE 5
### PARTICIPANT'S EXCLUSIVE ROYALTY-FREE LICENSE TO
### NT TECHNOLOGY

To the extent of its legal right so to do, and subject to the rights of third parties under agreements to which Northern Telecom is a party, Northern Telecom, in consideration of Participant's sharing of the costs of Research and Development pursuant to this Cost Sharing Agreement, as from time to time amended, hereby grants to Participant an exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NT Technology in and for the United Kingdom, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith.

Northern Telecom shall, from time to time, promptly upon receipt of Participant's request, and at Participant's expense, furnish to Participant all available and requested documentation and other information relating to the NT Technology developed by or for Northern Telecom pursuant to the terms of this Cost Sharing Agreement.

Participant shall not exercise its exclusive rights hereunder to prohibit (to the extent, if any, it were otherwise entitled to do so):

(a)     the import into the United Kingdom of products manufactured by licensees of a member of the NTL Group outside the United Kingdom and Canada;

(b)     the exercise of the right to make or have made in the United Kingdom items required by a third party in connection with manufacturing by such party pursuant to a license agreement with a member of the NTL Group; or

Highly Confidential

NNI_00794551

- 8 -

(c)    the procurement by a member of the NTL Group of components, assemblies, sub-assemblies, supplies, facilities, services and products as may be required by the NTL Group in its business outside the United Kingdom or in support of the Participant's business in the United Kingdom.

Participant shall from time to time upon request by Northern Telecom, grant such non-exclusive license to Northern Telecom in and for the United Kingdom under the patents and patent applications encompassed by the NT Technology as may be necessary to enable Northern Telecom to enter into cross-licensing arrangements with one or more third parties.

The rights granted under this Article shall not relieve either Party from its obligations in respect of royalty payments to third parties.

### ARTICLE 6
### CONFIDENTIAL INFORMATION

Participant acknowledges that Northern Telecom is the legal owner of the NT Technology developed pursuant to this Cost Sharing Agreement and that the NT Technology is proprietary and constitutes a trade secret. Participant shall hold the NT Technology in confidence and only make use of or disclose it as permitted by this Cost Sharing Agreement.

Participant shall have primary right and obligation to protect through appropriate contractual arrangements, legal proceedings or otherwise the confidentiality of the NT Technology in and for the United Kingdom, subject to Northern Telecom's right to file and prosecute applications for patent and copyright protection as hereinbefore provided.

Participant shall, during the full term of this Cost Sharing Agreement and for fifteen (15) years thereafter hold secret and not disclose, make known, divulge or communicate to any person (except Participant's employees and licensees as permitted under Article 5 and then only under an obligation of secrecy binding upon such employees and licensees) any of the NT Technology.

Participant shall not make or have made or permit to be made any copies or translations of the NT Technology except those copies or translations which are reasonably necessary for the exercise by Participant of the rights herein granted to it and all such copies or translations shall, upon reproduction by Participant, contain the same proprietary and confidentiality notices or legends which appear on the NT Technology made available to Participant under this Cost Sharing Agreement.

Notwithstanding the foregoing, Participant shall have the right:

(a)    to communicate relevant portions of the NT Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(b)    to communicate to customers purchasing the Products, such portions of the NT Technology as are reasonably needed by such customers for operating and maintaining the Products;

provided, however, that the recipients of the NT Technology be advised by Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept

Highly Confidential

- 9 -

confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

The provisions of this Cost Sharing Agreement concerning confidentiality shall survive the expiration or termination of this Cost Sharing Agreement, but in no event shall such provisions apply to the extent that:

(a)    NT Technology was supplied to Participant by an independent third party prior to the effective date of this Cost Sharing Agreement; or

(b)    NT Technology becomes available to the general public through no fault of Participant.

## ARTICLE 7
## LIABILITY

Neither Party makes any representation in respect to, and does not warrant, any NT Technology provided to the other Party hereunder, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, neither Party makes any representation or warranty as to whether or not use of the NT Technology supplied hereunder will infringe any patent or other rights of any other person.

Participant shall have the primary right and obligation to bring and defend in and for the United Kingdom, at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the NT Technology by a third party or the alleged infringement by Participant's use of the NT Technology of the rights of third parties. If Participant fails to act within sixty (60) days from the notice of any such alleged infringement, Northern Telecom shall have the right to bring or defend, in and for the United Kingdom, the proceedings in its own name, at its own expense and for its own benefit.

Nortel U.K. shall indemnify and save Northern Telecom harmless from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in and for the United Kingdom out of any such infringement or alleged infringement by Participant.

## ARTICLE 8
## RECORDS

Participant shall keep clear and accurate records to support the calculations under Article 3 pertaining to the Participant and Northern Telecom shall keep clear and accurate records to support the calculations of all other amounts to be determined pursuant to Article 3. Both Parties shall provide to each other upon request, in such form as may reasonably be requested, documentation with respect to the foregoing.

Each Party shall have the right to examine and audit, during normal hours, semi-annually (or at less frequent intervals) all such records and such other records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable to it or the other Party under this Cost Sharing Agreement. Prompt adjustment shall be made by the proper Party to compensate for any errors or omissions disclosed by such examination or audit.

Highly Confidential

- 10 -

## ARTICLE 9
### FORCE MAJEURE

Neither Party shall be in default or liable for any loss or damage resulting from delays in performance or from failure to perform or comply with terms of this Cost Sharing Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Party is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

## ARTICLE 10
### DURATION AND CONTINUING RIGHTS

This Agreement shall continue until the 31st day of December 1999, unless terminated by either Party in accordance with Article 11, and thereafter shall be renewed for further one (1) year terms unless notice is given by one Party to the other of its intention not to renew this Cost Sharing Agreement at least sixty (60) days before any anniversary date hereof.

Subject to the provisions of the second paragraph of Article 11, upon the expiry or termination of this Cost Sharing Agreement, Participant shall be deemed to have acquired a fully paid up license permitting Participant to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5, as though this Cost Sharing Agreement had continued without, however, Participant being subject to payment of any further amounts to Northern Telecom by way of cost sharing payment or otherwise.

The provisions of Article 6 related to confidentiality and of Article 7 related to liability shall survive notwithstanding the expiry of this Cost Sharing Agreement or any termination of this Cost Sharing Agreement for any cause whatever.

## ARTICLE 11
### TERMINATION

In the event either Party shall be in breach of this Cost Sharing Agreement or fail to perform one or more of its material obligations under this Cost Sharing Agreement, the other Party may, by written notice to the Party in default, require the remedy of the breach or the performance of the obligation and, if the Party so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, the other Party may, by written notice, terminate this Cost Sharing Agreement. In the event of such termination by Participant, Participant shall have such continuing rights as are provided in Article 10.

In the event Participant becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or if a substantial part of the assets of Nortel U.K., or a controlling interest in the stock of Nortel U.K., is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision, or if Northern Telecom terminates this Cost Sharing Agreement pursuant to the preceding paragraph, all rights granted to Participant hereunder shall be cancelled forthwith and shall automatically revert, without further action by either Party, to Northern Telecom. Immediately upon such cancellation and reversion, Participant shall discontinue the exercise of the rights granted hereunder and shall promptly deliver to Northern Telecom all documentation with respect to NT Technology.

Highly Confidential

- 11 -

In the event of an enforceable judicial decision declaring invalid an essential part of this Cost Sharing Agreement, without which this Cost Sharing Agreement would not have been entered into, this Cost Sharing Agreement may, at the option of either Party, be terminated upon the giving of notice to the other Party.  Save as before set forth, in the event that any term, clause, provision or condition of this Cost Sharing Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Cost Sharing Agreement.

## ARTICLE 12
### NOTICES

Any and all notices or other information to be given by one of the Parties to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to Participant:

> Nortel Limited
> Maidenhead Office Park
> Westacott Way
> Maidenhead, Berkshire
> England SL6 3QH
>
> Attention: Secretary

If to Northern Telecom:

> Northern Telecom Limited
> 8200 Dixie Road, Suite 100
> Brampton, Ontario
> Canada L6T 5P6
>
> Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

The aforementioned address of either Party may be changed at any time by giving fifteen (15) business days prior notice to the other Party in accordance with the foregoing.

In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

**Highly Confidential**

NNI_00794555

- 12 -

## ARTICLE 13
## GENERAL PROVISIONS

This Agreement shall not be assigned by either Party except with the written consent of the other.

The failure of either Party to give notice to the other Party of the breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Cost Sharing Agreement.

In respect to the subject matter hereof, this Cost Sharing Agreement sets forth the entire agreement and understanding between the Parties.

The currency to be used for computing all amounts hereunder shall be the U.S. dollar, unless the Parties agree otherwise.

This Cost Sharing Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by all Parties hereto, shall constitute one agreement which shall enure to the benefit of and be binding upon the Parties hereto.

This Cost Sharing Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Parties have caused this Cost Sharing Agreement to be executed by their duly authorized officers as of the date first written above.

NORTHERN TELECOM LIMITED

Per: _____
A.J. Lafleur
Vice-President and
Associate General Counsel

Per: _____
D.J. Noble
Assistant Secretary

NORTEL LIMITED

Per: _____

Per: _____

Highly Confidential

NNI_00794556