Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

- and -

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>    NORTEL NETWORKS, INC., *et al.*,<br>                                Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**EXHIBIT "H" TO THE AFFIDAVIT OF ANGELA ANDERSON**
**AFFIRMED APRIL 25, 2014**

Signed:

ANGELA ANDERSON

Date:          April 25, 2014

Before me:

NOTARY PUBLIC

*Vu pour la seule légalisation matérielle de la signature de madame Angela ANDERSON, sans lecture ni traduction du présent document. Fait à Morgins, le 25/04/2014.*



Network Management Platform

TECHNOLOGY LICENSE AGREEMENT

between

Nortel Networks UK Ltd.

and

British Telecommunications Plc

Highly Confidential

NNI_00837748

TECHNOLOGY LICENSE AGREEMENT

THIS TECHNOLOGY LICENSE AGREEMENT ("Agreement") is made and entered into as of the (the "Effective Date")

BY AND BETWEEN

Nortel Networks UK Limited, a corporation organised and existing under the laws of the United Kingdom, whose registered office is at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, SL6 3QH, and registered in England as Company No. 3937799 (hereinafter referred to as "Nortel Networks");

AND

British Telecommunications Plc, a corporation organised and existing under the laws of the United Kingdom, whose registered office is at 81, Newgate Street, London, EC1A 7AJ, England (hereinafter referred to as "BT"). Registered number: 1800000

WHEREAS Nortel Networks has exclusive rights to certain intellectual property relating to network management software for a local fibre network within the UK; and

WHEREAS BT requires a license to certain rights to such intellectual property, hardware and data corruption processes; and Nortel Networks is willing to grant BT such license upon the terms and conditions herein;

NOW THEREFORE, in consideration of the mutual promises set forth herein, the Parties agree as follows:

1.0    DEFINITIONS

The following capitalized terms, and other capitalized terms defined elsewhere in this Agreement, will have the meanings ascribed thereto wherever used in this Agreement:

(a) "Business Day" means any of Monday, Tuesday, Wednesday, Thursday or Friday, excluding any statutory holiday in the UK;

(b) "Confidential Information" means any business, marketing, technical, scientific or other information disclosed by any Party which, at the time of disclosure, is designated as confidential or proprietary (or like designation), is disclosed in circumstances of confidence, or would be understood by the Parties, exercising reasonable business judgment, to be confidential. Confidential Information includes, without limitation, all Technology, all Source Code, all Object Code, all Technical Information, and the terms and conditions of this Agreement.

(c) "Development Site(s)" means the Development Site(s) of BT as specified in Schedule E or such other sites as shall be agreed in writing.

(d) "Field of Use" means the support of the NMP within BT's LLFN in London, UK.

(e) "Hardware" means the hardware specified in Schedule A;

(f) "Licensed Copyrights" means any and all copyrights (including database rights), whether or not registered, to the extent licensed to Nortel Networks in, to and under Software and related documentation for Software, including Technical Information, or any portion thereof;

(g) "Licensed Intellectual Property or Licensed IP" means the Licensed Copyrights and Licensed Trade Secrets;

(h) "Licensed Service" means the support that BT undertakes within the Field of Use and as described in Schedule C.

(i) "Licensed Trade Secrets" means any and all trade secrets, confidential information, or proprietary know-how to the extent licensed to Nortel Networks existing or embodied in Software, Hardware, Technical Information or Technology Transfer or any portion of Software, Hardware, Technical Information or Technology Transfer;

(j) "London Local Fibre Network" or "LLFN" means the network to support analogue private circuits on CAS and AC-15 based signalling protocols for connection to both the existing service platforms (the DACS and the SAS).

Highly Confidential

(k) "Modified Object Code" means machine-executable code obtained from Source Code or works derived by BT from Object Code only as permitted by license hereunder.

(l) "Network Management Platform" or "NMP" means the platform used to support configuration management functionality and as described in Schedule B.

(m) "Object Code" means the code substantially or entirely in binary form, including header files if any, and includes the machine-executable version from the translation or processing of Source Code;

(n) "Party" means either BT or Nortel Networks;

(o) "Software" means computer software, programs, applications, interfaces, and tools, listed in Schedule A. Except as otherwise specified or granted hereunder, Software shall include both Source Code and Object Code;

(p) "Source Code" means the code in human-readable form to the extent licensed by Nortel Networks as of the Effective Date and that pertains exclusively to the Software;

(q) "Tax or Taxes" means any and all federal, state, local, foreign, gross income, gross receipts, sales, use, value added, stamp, customs, duties, levy, franchise, withholding, excise, personal property, registration charges and all other similar taxes, including any interest or penalties on any such costs or taxes, that are imposed as a result of the existence or operation of, or originating from or in connection with the Agreement save for taxes computed on the income of Nortel Networks;

(r) "Technical Information" means all drawings, schematics, formulae, specifications, designs, concepts, diagrams, processes, procedures, protocols, parameters, engineering details, functional descriptions, layouts, architectural models, invention disclosures, data and database content, or other technical or scientific documentation, including bills of materials, component supplier lists, manuals, and other information (in any form communicated or mediated) to the extent it exclusively relates to the Software, Hardware, Technology Transfer or the use, support or maintenance of the NMP and/or Licensed Services and that is specified in Schedule A and provided by Nortel Networks to BT under this Agreement, but other than the Source Code and Object Code.

(s) "Technology" means the Software, Hardware, the Technical Information and the Technology Transfer as provided by Nortel Networks to BT under this Agreement.

(t) "Technology Transfer" means the technical or other services described in Schedule D to be provided by Nortel Networks to BT in order to transfer the Technology to BT;

(u) "Trademarks" means all registered and unregistered trademarks, service marks, trade names, business names, brand names, product names, distinguishing guises, trade dress, network identifiers, domain names and any other indicators of origin, whether registered or unregistered, in every part of the world, and any and all applications or registrations, and any and all rights whatsoever, for any of the foregoing, belonging to Nortel Networks;

**Highly Confidential**

NNI_00837750

2.0    LICENSES

2.1    Grant of Licenses. Subject to the terms and conditions of this Agreement, to the extent of its legal right to do so, which term includes intellectual property rights where appropriate, Nortel Networks grants to BT a personal, non-transferable, non-exclusive, non-sublicensable license in, to and under the Licensed IP, within the Field of Use solely:

(a)    to make a reasonable number of backup copies of the Source Code and the Object Code and retain such copies at the Development Site(s) and, one (1) additional backup copy of the Source Code and the Object Code and retain such additional copy in a secure location other than at the Development Site, provided however, such right to make such additional backup copy is granted only if and to the extent such secure location is subject to the confidentiality obligations of Section 4.0;

(b)    to use, copy, modify, and create derivative works from the Source Code only at the Development Site solely to create, compile, assemble and integrate Object Code and Modified Object Code for use with and to support the NMP;

(c)    to use the Software and Technical Information to support the NMP;

(d)    to use the Hardware with and to support the NMP

(e)    to make Improvements solely to support the NMP; and

(f)    to deliver Licensed Services to support the NMP;

Such licence shall be irrevocable save as set out in clause 9,"Term and Termination" hereof.

2.2    Suppliers. BT may engage suppliers to have the acts set out in 2.1 above performed on BT's behalf and may communicate to suppliers Technical Information reasonably necessary to allow BT to procure such services and to procure commercially available materials, parts, components, and assemblies for use in supporting the NMP provided such suppliers are advised before communication that proprietary and confidential information is being communicated and prior to disclosure such suppliers give a written undertaking to respect such confidentiality. Prior to, or at the time of providing any portion of the Technology to a supplier, BT shall enter into a written agreement with the supplier requiring that:

(a)    the supplier use the applicable portion of the Technology provided exclusively for the benefit of BT and in accordance with Clause 2.1;

(b)    the supplier shall incur and agree to be bound by all of the same obligations and restrictions with respect to the Technology as those incurred by and applicable to BT under this Agreement, including, without limitation, the restrictions set forth herein associated with use of the Technology and the confidentiality provisions contained herein; and

(c)    all copies of any Technology provided to or made by the supplier shall be returned to BT upon supplier's completion of work or termination of the supplier's manufacturing agreement with BT.

2.3    Limited License. Notwithstanding any other provision of this Agreement, neither BT nor any supplier, end-user customer or any other end user shall use any Technology, in whole or part, except exclusively within the Field of Use and in accordance with Clause 2.1. BT shall have no right to sublicense, transfer, distribute or otherwise disclose Software to any third party, with the exception of engaging suppliers as set out in clause 2.2.

Highly Confidential

NNI_00837751

2.4    Copying.  BT shall not reproduce or copy, except as permitted hereunder, any part of the Technology.

2.5    Prohibited Uses.  Save as permitted under the then current statute BT shall not reverse engineer, disassemble, reverse translate, decompile, or in any other manner decode any Object Code provided or licensed under this Agreement in order to derive the source code form unless the Source Code for such Object Code is also licensed under this Agreement.  BT shall not decode any passwords, encrypted keys or other security features associated with any Object Code that has been provided or licensed under this Agreement. BT shall have no right to use or duplicate the Technology for any other purpose than as granted, including no right to use Source Code, in whole or part, to develop any product or provide any service with functionality substantially different than the NMP or to develop a new product with functionality similar to the NMP.

2.6    Specific Acknowledgments.

(a)    BT acknowledges that the transfer of Technology and grant of rights associated with this Agreement are subject to the termination of all terms in Contract No. 617729 and all co-dependent support agreements, with the exception of those clauses which relate to the protection of Confidential Information by a receiving party.

(b)    BT acknowledges that BT shall be solely responsible for the maintenance of any component of the LLFN and NMP subsequent to earlier of the termination of Contract No. 617729 and all co-dependent support agreements, or the commencement of the Technology Transfer and Nortel Networks shall have no liability therefrom.

(c)    BT acknowledges that Nortel Networks shall not be responsible for the LLFN and NMP after March 31, 2002 and this shall include any support or maintenance.

(d)    BT acknowledges that the Technology provided by Nortel Networks may be incomplete or inaccurate, however Nortel Networks shall use all reasonable efforts to inform BT should any Technology be incomplete and/or inaccurate, to the best of its knowledge.

(e)    In the event of a conflict between the terms of Contract No. 617729, including all co-dependent support agreements, and this Agreement, the terms of this Agreement shall take precedence.

2.7    Third Party Components. This Agreement does not grant BT any rights to copy, modify, distribute or use (in any manner) any third party hardware or software, including the Third Party Components.  BT acknowledges and agrees that BT must acquire from suppliers of any third party hardware or software, including the Third Party Components, all rights necessary to use and support the NMP in relation to software and hardware supplied by such third parties or covered by intellectual property rights or confidential information rights owned by such third parties as soon as reasonably possible. BT shall be responsible, at its sole cost, for payment of any and all applicable third party royalties and license fees directly to the applicable third party licensors and/or suppliers. Nortel Networks may support BT in obtaining necessary licenses from third parties for software or software tools which Nortel Networks has incorporated in, or used to develop, said relevant Nortel Networks proprietary software by providing BT with an initial point of contact.  In the event that BT has not obtained all required permissions and/or licence terms for any of said third party hardware and/or software as soon as reasonably possible, Nortel Networks reserves the right not to provide BT with said third party hardware and/or software and BT shall indemnify Nortel Networks from any infringement of third party intellectual property rights in accordance with Clause 7.1

Highly Confidential

NNI_00837752

2.8    Nortel Networks has endeavoured to deliver to BT in the agreed form and to the agreed location, the Source Code, the Hardware and the Technical Information by 30th June, 2002, and the Technology Transfer shall be deemed by both parties to have taken place by that date.

3.0    RESERVATION OF RIGHTS, AND PROTECTION

3.1    Reservation of Rights. Except for the rights expressly granted under this Agreement, Nortel Networks shall retain all right and interest in and to the Technology, Licensed IP, and Trademarks. Nortel Networks reserves all rights not expressly granted herein, and any express reservations of rights set forth herein shall not be construed as limiting such reservation or conferring by implication, estoppel or otherwise any grant or license or other right under any patent or other right of intellectual property or confidential information other than those rights expressly set forth in this Agreement.

3.2    Copies. Nortel Networks retains title to all copies of Technology, and BT hereby grants and assigns title to Nortel Networks of all copies of Technology made, or to be made, by or on behalf of BT, including copies of Source Code and Object Code.

3.3    Non-exclusivity. Nortel Networks also reserves the right to license the Technology, or rights thereunder, to parties other than BT.

3.5    Trademark License. No trademark license is granted hereunder, and BT shall not use or display any Trademark on or in association with the NMP or LLFN, or in any other manner, including but not limited to in branding, labelling, advertising or promotions. BT shall not in respect of the NMP or the LLFN employ trade dress similar to that used by Nortel Networks in its products, documentation, advertising or publicity.

3.6    Copyright Notices.

        (a)    BT shall not remove or destroy any copyright or restricted rights notices affixed to any original media containing any Technology. All copies of Technology made by or on behalf of BT shall either be labelled in the same manner as on the original media or in a manner substantially similar to the following:

               Copyright Nortel Networks. All Rights Reserved.

        (b)    All copies of Source Code, Modified Object Code and Modified Documentation made by or on behalf of BT shall either be labelled in the same manner as on the original media or in a manner substantially similar to the following:

               Copyright [year(s)] BT and its licensors. All Rights Reserved.

4.0    FEES AND PAYMENTS

4.1    License Fees, Technology Transfer Fees and Consulting fees. In partial consideration of the Grant of Licenses and Technology Transfer provided herein, BT shall pay to Nortel Networks:

        (a)    a non-refundable lump sum amount of £80,000 due and payable upon the date BT executes this Agreement (which shall be invoiced to BT upon signature of the proposed contract and to fall due for payment upon completion );and

        (b)    the amounts as set forth in Schedule D.

4.2    Third Party License Fees. BT acknowledges that, as agreed under Section 2.7, any license fees that BT may be required to pay to suppliers of Third Party Components are in addition to the fees listed above.

Highly Confidential

4.3     Taxes.

The License Fees, Technology Transfer Fees and Consulting Fees are exclusive of all Taxes, which, if applicable, shall be identified separately on the Invoice and shall be paid by BT as an addition to the License Fees, Technology Transfer Fees and Consulting Fees.

4.4     Other Payments; Currency; Interest. All payments due under this Agreement, other than the Fees payments described in Section 4.1, shall be due and payable within thirty (30) days of the date of Nortel Networks invoice therefor. All payments due under this Agreement shall be made in Pounds Sterling, and payable to Nortel Networks care of the address set forth under the "Notices" provision under Section 10.2 of this Agreement, or at such other address as Nortel Networks shall have specified by written notice.   Payments to Nortel Networks shall be made by wire transfer or in other immediately available funds as Nortel Networks may direct in writing, and the costs or fees for payment shall be borne by BT. Overdue payments shall be subject to interest charges, calculated daily commencing on the day after the date of such payment, at one percent (1.0%) per month or such lesser rate as may be the maximum permissible rate under applicable law.

5.0     TECHNOLOGY TRANSFER

5.1     Nortel Networks shall provide the Technology Transfer to BT as set forth in Schedule D. Risk of loss or damage to Licensed IP or Technical Information shall pass to BT upon delivery.

5.2     The Technology Transfer is subject to Nortel Networks having resources available with the necessary skills and knowledge which shall be in accordance with clause 2.8.

6.0     LIMITATION OF LIABILITY

6.1     Except as expressly set out herein the Technology and Licensed IP is licensed to BT by Nortel Networks (and its suppliers/licensors, if any) "as is" without warranty or condition of any kind.   Nortel Networks (and its suppliers/licensors, if any) expressly disclaim and exclude all warranties and conditions, statutory, express or implied, including, without limitation, any warranty or condition of title, non-infringement, merchantability, fitness or suitability for any particular purpose (even if on notice of such purpose), custom or usage in the trade.

6.2     In no event shall Nortel Networks (or its suppliers/licensors, if any) be liable for any direct, indirect, reliance, incidental, special, or consequential damages, economic loss, lost business, lost savings, lost data, and lost profits of any kind whatsoever arising out of this agreement, regardless of the cause and whether arising in contract (including fundamental breach), tort (including negligence), infringement or misappropriation or otherwise, even if advised of the possibility of such damages.

6.3     The above limitations apply equally to all components comprising the NMP and the LLFN managed by the NMP. No warranty express or implied is made herein that any component of the NMP and/or the LLFN will not become obsolete during the term of this technology licence agreement, or that the NMP technology will be able to manage to any replacement components installed in said LLFN following the date of execution of this agreement.

6.4     The Parties acknowledge and agree that the exclusions of liability contained herein reflect the allocations of risk amongst the Parties and the price of the Technology under license, and accordingly are reasonable and appropriate in the circumstances and were a material factor in determining the Fees.

6.5     To the best of its knowledge and belief, Nortel Networks warrants that as of 31st March 2002, it is not aware of any court action brought or threatened in writing to be brought by a third party in the UK in respect of infringement of any patents, copyright, or registered design in connection with the use, operation, support or maintenance of the Technology.

Highly Confidential

NNI_00837754

6.6     BT shall warrant that it shall use its best efforts to:

    (a)    acquire all appropriate third party licences in accordance with Clause 2.7; and

    (b)    maintain and manage the LLFN and/or the NMP to the extent that the goodwill of Nortel Networks is not adversely affected by the failure of BT to manage and maintain the the LLFN and/or the NMP in a reasonable manner.

## 7.0     INDEMNIFICATION

7.1     Save for breach of the warranty set out in Clause 6.5, BT shall defend and indemnify Nortel Networks from any and all claims and actions brought against Nortel Networks by any third party, and shall hold Nortel Networks harmless from all corresponding damages, penalties, liabilities, costs and reasonable expenses, (including reasonable attorneys' fees) incurred by Nortel Networks arising out of or in connection with this Agreement, including but not limited to BT's exercise of its rights granted in this Agreement, or arising out of or in connection with BT's use or in any other manner under this agreement related to the NMP, LLFN and/or performance of the Licensed Services. BT shall promptly notify Nortel Networks of any such claims or actions. BT shall promptly notify Nortel Networks of any claims or actions where BT is aware that such claims or actions have the potential to impact the reputation and/or goodwill of Nortel Networks in connection with this Agreement. Nortel Networks shall not indemnify BT from any claims or actions brought against BT by any third party arising out of or in connection with this Agreement.

## 8.0     CONFIDENTIALITY

8.1     Confidential Information. Any Confidential Information received by BT pursuant to this Agreement shall be used, disclosed, or copied, only for the purposes of, and only in accordance with, this Agreement. All Confidential Information provided by Nortel Networks to BT pursuant to any prior confidentiality or non-disclosure agreements concerning the NMP or the LLFN shall be deemed to be included hereunder as if provided pursuant to this Agreement and shall be subject to the terms and conditions herein. BT shall retain such Confidential Information in confidence and use, as a minimum, the same degree of care as it uses to protect its own Confidential Information of a similar nature, but no less than reasonable care, to prevent the unauthorized use, disclosure or publication of Confidential Information. Without limiting the generality of the foregoing:

    (a)    BT shall only disclose Confidential Information to its bona fide employees who need to obtain access thereto consistent with BT's license rights under this Agreement;

    (b)    BT shall not make or have made any copies of Confidential Information except those copies which are necessary for the purposes of this Agreement; and

    (c)    BT shall affix to any copies it makes of the Confidential Information, all proprietary notices or legends affixed to the Confidential Information as they appear on the copies of the Confidential Information originally received from Nortel Networks.

8.2     Persons with Access. BT acknowledges that Nortel Networks' Confidential Information, and all Nortel Networks' rights, title and interest in Confidential Information, associated with Technology and/or Licensed IP is the sole and exclusive property of Nortel Networks. Therefore, in addition to the confidentiality obligations BT assumes in Section 8.1 above, BT also agrees to devote its reasonable endeavours to ensure that all persons afforded access to Confidential Information associated with Technology and/or Licensed IP protect such Confidential Information against unauthorized dissemination or disclosure.

8.3     Exclusions. BT shall not be bound by obligations restricting disclosure and use set forth in this Agreement with respect to Confidential Information or any part thereof to the extent that it:

    (a) was known by BT prior to disclosure, as evidenced by its business records;

    (b) as lawfully in the public domain prior to its disclosure, or lawfully becomes publicly available other than through breach of this Agreement or any other confidentiality obligation on behalf of any third party;

**Highly Confidential**

NNI_00837755

(c) was disclosed to BT by a third party provided such third party, or any other party from whom such third party receives such information, is not in breach of any confidentiality obligation in respect of such information;

(d) is independently developed by BT, as evidenced by its business records; or

(e) is disclosed when such disclosure is compelled pursuant to legal, judicial, or administrative proceedings, or otherwise required by law, provided that BT advises Nortel Networks of any such disclosure in a timely manner prior to making any such disclosure (so to allow Nortel Networks to seek such legal protection or court order as may be available with respect to the confidentiality of the information which is to be disclosed), and provided that BT shall apply for such legal protection as may be available with respect to the confidentiality of the Confidential Information which is required to be disclosed.

8.4 Return of Confidential Information. Immediately upon termination of this Agreement, BT shall return to Nortel Networks all Confidential Information and all copies thereof, or, if so directed by Nortel Networks, shall immediately destroy such Confidential Information and all copies thereof and shall certify such destruction to Nortel Networks.

8.5 Notice of Disclosures. Except for disclosures authorized under the terms of this Agreement, BT shall notify Nortel Networks immediately upon learning of any disclosure of Nortel Networks' Confidential Information.

9.0 TERM AND TERMINATION

9.1 Term. The term of this Agreement shall commence on the Effective Date and shall continue for a period of 10 years thereafter, unless terminated as otherwise provided under this Agreement.

9.2 Breach. In the event BT is in breach of, or fails to perform, a material obligation under this Agreement, and fails to cure such breach or perform such obligation to Nortel Networks' satisfaction within thirty (30)) days after the date of notice thereof, Nortel Networks may upon notice immediately terminate the rights of BT under this Agreement and upon the expiry of the 30-day cure period all rights granted to BT under this Agreement shall automatically terminate. However, the Agreement and BT's rights hereunder shall endure if the BT has cured such breach within the time period allowed herein.

9.3 For the purposes of Clause 9.2, a breach of material obligation shall include but not be limited to:

(a) breach of fee payment obligations;

(b) any use, practice, exercise, or exploitation of the Technology or Licensed IP that breaches the licenses granted hereunder;

(c) In the event of a Change of Control, which means transfer or issue by sale, subscription, or any other disposition of any part or all of the corporate shares of BT so as to result in any change, from that existing as of the Effective Date, in effective voting control, directly or indirectly, of BT ("Change of Control"), in which a third party acquiring control of BT is a competitor of Nortel Networks, AND should the Change of Control cause or be likely to cause material damage to the commercial interests of Nortel Networks or cause any transfer of source code to a third party as set out in 9.3(d) below.

(d) In the event any intangible assets, including source code, transferred by this agreement to BT are acquired by a third party which is a competitor of Nortel Networks, should the consent of Nortel Networks to the transfer of such intangible assets, including this Agreement, to the third party not be sought prior to said transfer and/or if such consent is reasonably withheld and should the transfer cause material damage to the commercial interests of Nortel Networks

(e) breach by BT of the warranties set out in Clause 6.6 which causes material damage to the commercial interests of Nortel Networks;

9.4 Bankruptcy. If a Party, during the Term:

Highly Confidential

(a)  admits in writing its inability to pay its debts generally as they become due; or

(b)  commits an act of bankruptcy; or

(c)  files a voluntary position or is the subject of a petition or assignment in bankruptcy under applicable bankruptcy laws or other similar laws; or

(d)  files a notice of intention to make a proposal or otherwise seeks a reorganization under applicable bankruptcy laws or any other similar law or statute of any relevant jurisdiction; or

(e)  makes any assignment for the benefit of its creditors; or

(f)  seeks any court or governmental protection from creditors; or should an order be entered pursuant to any law relating to bankruptcy or insolvency; or

(g)  consents to the appointment of a trustee or a receiver for such Party, or to the appointment of a receiver-manager of itself or of the whole or any substantial part of its property or for any tangible or intangible assets, rights or interests of such Party related to this Agreement;

and such order, assignment, proceeding, appointment or receivership, or inability to debts is not terminated within thirty (30) days, then the other Party may terminate this Agreement immediately upon notice.

9.5   Survival.  In addition to this Section 9.0, the following provisions shall survive termination or expiry of this Agreement: Section 1.0 - Definitions, Section, Section 3.0 - Reservation of Rights and Protection, Section 6.0 - Limitation of Liability, Section 7.0 - Indemnification, and Section 8.0 – Confidentiality and include Clauses 2.6. 2.7, 10, 10.4, 10.11

10.0  GENERAL

10.1  Specific Disclaimers.  Save as set out in clause 6.5 nothing contained in this Agreement shall be construed as:

(a)  a warranty or representation by Nortel Networks as to the validity or scope of any of the Licensed IP; or

(b)  a warranty or representation by Nortel Networks that any use or practice of the Technology, or that the NMP and LLFN when used or supported with the Technology, will not infringe any patent, copyright, trade secret or other industrial or intellectual property rights of any third party; or

(c)  conferring on Nortel Networks an obligation to file any application, secure, prosecute, or maintain in force any Licensed IP; or

(d)  conferring on Nortel Networks an obligation to make any determination as to the applicability of any Licensed IP to any product or service of BT; or

(e)  imposing on any Party any obligation to institute any suit or action for infringement or misappropriation of any of the Licensed IP licensed under this Agreement or to defend any suit or action brought by a third party which challenges or concerns the validity or enforceability of any Licensed IP, it being expressly understood that BT shall have no right to institute any such suit or action for infringement or misappropriation of any Licensed IP, nor the right to defend any such suit or action which challenges or concerns the validity or enforceability of any Licensed IP.

10.2  Notices.  All notices provided by one Party to another shall be in writing and shall be deemed sufficiently given when sent by certified or registered mail, return receipt requested, or by hand delivery to the other Party at the following address or fax number:

(a) if to BT:

Highly Confidential

British Telecommunications Plc
pp B117 North Star House
North Star Avenue
Swindon
SN2 1BS

Attention:    Cate Gullick

Fax:    01793 547406

(b) if to Nortel Networks:

i) Nortel Networks UK Limited

Westacott Way
Maidenhead
Berkshire SL6 3QH
United Kingdom

Attention:    Mr. David Pipe

Fax : 01628 43 2538

with a copy to:

ii) Nortel Networks Ltd.

8200 Dixie Road
Suite 100
Brampton
Ontario, Canada L6T 5P6
Mail Stop : 036/NO/148

Attention: Licence Contract Administrator

Such notices shall be deemed to have been received five (5) Business Days after mailing if forwarded by mail, the following Business Day if sent by facsimile transmission or overnight courier, or on the day of receipt if delivered by hand. The address of either Party may be changed by giving prior written notice to the other Party in accordance with the foregoing.

10.3    Independent Contractors. No agency, partnership, joint venture or employment relationship is or shall be created by virtue of this Agreement.

10.4    Solicitation of Employees. Neither Party shall during the Term or for one (1) year thereafter solicit for employment or hire, directly or indirectly, the other Party's personnel who are directly involved in the conception, reduction to practice, or development of any Technology, Improvements or related technology, or the transfer or receipt of any Technology, Improvements or related technology, hereunder, without the express prior written consent of the other Party.

10.5    Publicity. Neither Party shall have the right to use in any advertising, publicity or media release, or otherwise, any name, trade name or trade mark of the other Party, or any contraction, abbreviation or simulation thereof.

10.6    Assignment. A Party shall have the right to delegate any duty or obligation, or assign any right hereunder, upon the prior written consent of the other Party, such consent not to be unreasonably withheld or delayed.

**Highly Confidential**

NNI_00837758

10.7    Non-Assertion of Rights. If at any time a Party shall elect not to assert its rights under any provision of this Agreement, such action or lack of action in that respect shall not be construed as a waiver of its rights under such provision or of any other provision of this Agreement. For certainty, no Party will be deemed to have waived the exercise of any right held under this Agreement unless such waiver is made in writing.

10.8    Section Headings. Section headings are for convenience only and shall not be considered in the construction or interpretation of this Agreement.

10.9    Entire Agreement. The attached Schedules A through F form part of this Agreement and are incorporated by reference herein. This Agreement constitutes the entire agreement between the Parties as to the subject matter contained herein and supersedes and cancels all other representations, agreements, or statements between the Parties, whether oral or in writing, express or implied, concerning such subject matter. This Agreement may only be modified by an instrument in writing executed by each Party's duly authorized representative.

10.10   Severability. In the event that any provision of this Agreement is found to be invalid, void, voidable or unenforceable, the Parties agree that, unless such provision materially affects the entire intent and purpose of this Agreement, such invalidity, voidness, voidability or unenforceability shall affect neither the validity of this Agreement nor the remaining portions herein, and that the provision in question shall be deemed to be replaced with a valid and enforceable provision most closely reflecting the intent and purpose of the original provision. In the event that any provision of this Agreement is found to be invalid, void, voidable or unenforceable by a court of competent jurisdiction, and such provision materially affects the entire intent and purpose of this Agreement, the Parties shall negotiate in good faith to enter into a new agreement replacing this Agreement. In the event that the Parties are unable to enter into a new agreement replacing this Agreement after negotiating for ninety (90) days, this Agreement shall be deemed terminated.

10.11   Governing Law. This Agreement, and all rights and obligations hereunder, shall be governed by and construed in accordance with the laws of the United Kingdom applicable therein. The exclusive venue for any disputes arising under or in respect to this Agreement shall be the Courts of England, and the Parties irrevocably submit to the exercise of personal jurisdiction by the courts therefor.

10.12   This Agreement and all rights hereunder shall inure to the benefit of, and be binding upon, Parties and their respective successors, heirs and permitted assigns.

10.13   The rights of each Party under this Agreement are cumulative and no exercise or enforcement by a Party of any right or remedy hereunder shall preclude the exercise or enforcement by the other Party of any right or remedy under this Agreement or which such Party is otherwise entitled by law to enforce.

Highly Confidential

NNI_00837759

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

Nortel Networks UK Ltd                    British Telecommunications PLC

Authorized Signature                      C.L. Gullick
                                          Authorized Signature

Printed Name and Title                    CATE GULLICK - SENIOR BUYER
                                          Printed Name and Title


Authorized Signature                      Authorized Signature


Printed Name and Title                    PAUL TINSLEY    Manager, Transmission
                                          Printed Name and Title    Procurement.

Highly Confidential                    NNI_00837760

SCHEDULE A: TECHNOLOGY

Software:
Database Utilities in Lucid Lisp, to be used to assist in the correction of corruptions
 • Object Utilities
These functions allow specific objects and/or index records to be retrieved and examined. This allows the support engineer to establish the nature of any corruption and identify what corrective action is required.
 • Previous Fixes
There are a number of previous repair programs which can be used as templates for future corruption repairs.
 • Sanity Suite
There are 27 tests which can be applied to an Object Store to report inconsistencies.

Hardware:

LLFN Model
SunSparc 10

6 SPARCstation-2 base units P/N 600-2841-02
6 SPARCstation-2 monitors P/N 3651140-02
2 SPARC-5 base units P/N 600-3903-03
1 SPARC-5 monitor P/N 3651335-01
4 external hard drives
4 external DDS-1 tape drives
5 external CD-ROM's
1 NCS-150
1 bridge (suitable as a test unit only, due to missing mounting bolts)
2 CXS cards
1 bridge cabinet

35 X PDMX racks with various spare/test cards
38 X ETE racks with various spare/test cards
4 X 480 NSM cabinets, keys lost, contents unknown.
1 X 120 NSM cabinet, key lost, contents unknown.
1 X 30 NSM cabinet, key lost, contents unknown.

Technical Information:

Database organisation.
Database corruption correction techniques for Lucid
Database corruption correction techniques within Medley.
Understanding Isis within LLFN

Highly Confidential                                                    NNI_00837761

SCHEDULE B: NETWORK MANAGEMENT PLATFORM

- Data servers--Sun Sparc 2 (6 total, 2 per network)
  - SunOs 4.1.3
  - Isis v 3.0.8 (copyright held by Stratos Inc). Licensed to IP address
  - Lucid v 4.1 (copyright held by Harlequin Inc)
  - Programs written in Lucid Lisp
  - Various programs written in 'C'
  - Cshell and Bourne shell scripts
- Application Workstations--Sun Sparc 2 (21 total, 7 per network)
  - SunOs 4.1.3
  - Isis v3.0.8
  - Medley v 2.0 (Copyright held by Venue http://top2bottom.net/index.shtml) License keyed on Host Id (MAC address)
  - Programs written in Medley Lisp
  - Various programs written in 'C'
  - Cshell and Bourne shell scripts
- KAS (Kilostream Alarm Server)--Sun Sparc5 (3 total, 1 per network)
  It collects all alarms and sends them to a server within BT, over a nailed up modem link.
  - SunOs 4.1.4
  - Isis v 3.0.8
  - Various programs written in 'C'
  - Cshell and Bourne shell scripts
- NCS-150--3rd party box, originally from Bridge Inc, lately 3Com (3 total, 1 per network)
- Bridge--3rd party box, originally from Bridge Inc, lately 3Com (42 total, 17 + 16 + 9)
  - Image software only--source and development system (DEC PDP-8) were scrapped sometime in the early 90's. Image software is onproprietary format 5.25" floppies.
- CXS (Cluster Controller)--
  - Source, written in PL/M, is available, though the development system is unavailable.

Highly Confidential                                                                    NNI_00837762

SCHEDULE C: LICENSED SERVICES

Licensed Services

Database Corruption Correction
When a corruption is uncovered, typically a message is displayed on the Application Workstation indicating that the application is to be reset, together with some information about the object which caused the problem. This information (generally the UID--Unique Identity) should be recorded for use during the investigation. The process of investigation, and generation of a fix is as follows:

·       Object Store Investigation
This phase is performed on the Sparc 10. The faulty Object Store is loaded onto the Sparc 10 from the latest archive available. The Object Store software is started in Debug mode, and the object with offending UID can be retrieved and examined to establish the character of the corruption.

·       If the corruption affects an index, a Lisp program must be generated to repair the corruption--a number of examples of each kind of repair are available, and may be edited, replacing the UID and key information as appropriate. This program should then be tested on the LLFN model, and the original operation repeated to confirm that the fix is effective. The repair can then be carried out on the live system.

·       If the corruption affects a part of the object other than the index record, the object can be repaired in situ using the debug facilities of the Medley environment. The support engineer selects debug mode on the application workstation, and retrieves the offending object. The object may then be inspected and manipulated using Medley's debug features, and written back to the object store. This work should be tested on the model first, then carried out on the live system immediately after an archive. Thus, in the event of some problem, the original object store can be restored without losing work.

Highly Confidential

NNI_00837763

SCHEDULE D: TECHNOLOGY TRANSFER

Each of the items has comprised a face-to-face presentation and supporting technical documentation: Database organisation.
Database corruption correction techniques for Lucid—(BT personnel require Lisp competence to proceed with technology transfer).
Database corruption correction techniques within Medley.
Understanding Isis within LLFN——(BT personnel require UNIX competence to proceed with technology transfer)

The above technology transfer is acknowledged to have taken place during the 1st to 5th of July 2002.

Travel and living expenses for this course are to be paid for by BT.  Related travel and living expenses will be invoiced by Nortel Networks and paid by BT with a maximum payment of £20,000.

Highly Confidential                                                        NNI_00837764

SCHEDULE E:

BT LOCATIONS FOR SOURCE CODE USE

Use of Source Code as licensed hereunder is restricted solely to the following BT location(s):

| | |
|---|---|
| BT Name: | Baynard House |
| Street: | 135 Queen Victoria Street |
| City, [County]: | London |
| Postal Code, Country: | EC4V 4AA UK |

| | |
|---|---|
| BT Name: | Barking ATE |
| Street: | 42 North Street |
| City, [County]: | Barking |
| Postal Code, Country: | IG11 8JE UK |

or such other sites as shall be agreed in writing.

**Highly Confidential**

NNI_00837765

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

Court File No.:  09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceedings commenced at Toronto

AFFIDAVIT OF ANGELA ANDERSON

**Thornton Grout Finnigan LLP**
100 Wellington St. West, Suite 3200
TD West Tower
Toronto-Dominion Centre
Toronto, ON  M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D.J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 52781P)
**Rebecca Lewis** (LSUC# 61146S)

Tel:    416-304-1616 / Fax:    416-304-1313

Counsel to Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund