**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------
```
In re:

Nortel Networks Inc., *et al.*,

                Debtors.

```
-------------------------------------------------
```

Chapter 11

Case No. 09-10138 (KG)

(Jointly Administered)

— and —

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

## EXPERT REPORT OF JOHN J. MCCONNELL

(Submitted by the Official Committee of Unsecured Creditors of the US Debtors)

**February 28, 2014**

## Expert Report of John J. McConnell

I.      Assignment ...........................................................................................................................1

II.     Summary of Opinions ..........................................................................................................1

III.    Professional Qualifications of John J. McConnell and Compensation ..........................3

IV.     Background on the Clark and Westbrook Report ............................................................3

V.      Basic Principles Governing Credit Markets .....................................................................4

VI.     "Modified Universalism" v. Absolute Priority in Credit Markets .................................6

VII.    Expectations of Nortel's Debt Holders .............................................................................9

VIII.   Conclusion ...........................................................................................................................19

## I.    Assignment

1.     I have been retained by Counsel for the Official Committee of Unsecured Creditors of Nortel Networks Inc. ("UCC") in the matter of *In re Nortel Networks Inc., et al*.

2.     I have been asked to review, evaluate, and comment on, from an economic perspective, the report submitted in this matter by Messrs. Leif M. Clark and Jay L. Westbrook (the "Clark and Westbrook Report").

## II.    Summary of Opinions

3.     In my opinion, Messrs. Clark and Westbrook incorrectly contend that the expectations of Nortel's[1] creditors were based on the global, integrated operations of Nortel and not on any individual entity or territory within Nortel.  The Clark and Westbrook Report concludes that Nortel was liquidated on a consolidated basis and, thus, the value received upon the liquidation of Nortel's assets should be distributed on a consolidated basis through a global, single pool distribution.

4.     The Clark and Westbrook Report does not base its conclusions on the application of any economic or valuation analysis.  Rather, it bases its conclusions on the theory of "modified universalism."  The Report reasons that allocation on the basis of territory or entity is undesirable in the liquidation of a multinational company because: (a) entity and territorial lines were irrelevant to Nortel's operations; (b) creditors' expectations were based on capacities of Nortel, not individual entities within Nortel; and (c) creating pools of value that were never intended to exist would be a waste of the time and resources of Nortel's debt holders.

5.     Critical to Messrs. Clark and Westbrook's conclusions is their assertion that "it appears more likely that the expectations of Nortel creditors were based upon the credit of the corporate group rather than any component of that group."[2]

---

[1]    Unless otherwise indicated, Nortel is a reference to the global enterprise.

[2]    Clark and Westbrook Report, ¶49.

6.    The Clark and Westbrook Report errs because, among other things, contrary to the Report's assertion, the economic evidence establishes that Nortel's debt holders did not expect recoveries based on a single pool approach. For example:

    a.    As a general proposition, in evaluating debt issuances, credit rating agencies take into account the priority of repayment in the event of default;

    b.    As a general matter, in practice and as it should in theory, senior debt (including debt that is senior on account of guarantee claims or claims against particular entities in the corporate structure) trades at a premium to junior debt;

    c.    As of the Petition Date (defined below), consistent with creditors expecting higher recoveries for bonds issued by NNC or NNL that were guaranteed by NNI than for those that were not guaranteed, prices for such bonds were substantially above those of bonds with no NNI guarantee;

    d.    In evaluating likely recovery rates in the event of corporate bankruptcy for U.S. and Canadian corporations, rating agencies do not assume a simple consolidation of all companies under the corporate family umbrella, but rather analyze a firm's obligations by legal entity;

    e.    In the prospectus for its bond issuance, NNC advised investors that creditors of a Nortel subsidiary will be paid from the assets of that subsidiary before any assets of the subsidiary are made available to NNC creditors; and

    f.    Credit rating agencies recognized NNI's contributions to Nortel's revenues, cash flow, and assets by assigning higher expected recovery rates for debt guaranteed by NNI and classifying Nortel's non-guaranteed debt as junior to the guaranteed debt.

7.    In my opinion, and as demonstrated by the data, contrary to the assertions of Messrs. Clark and Westbrook, an allocation based on a single pool approach is not consistent with the "legitimate expectations" of Nortel debt holders.

### III.    Professional Qualifications of John J. McConnell and Compensation

8.      Appendix 1 sets forth my professional qualifications and curriculum vitae that includes, among other information, a list of publications that I have authored or co-authored.  Appendix 2 is a list of testimony that I have given at trial, in arbitrations, or in depositions during the past four years.

9.      Documents that contain facts or data that I considered in forming my opinions in connection with this matter are listed in Appendix 3 or cited herein.

10.     In my work on this assignment, I have been assisted by personnel at Navigant Economics working under my direction, who charge hourly rates ranging from $290 to $900 per hour.  I supervised all work performed in connection with this Report. The opinions that I express in this Report are my own.

11.     For my work on this matter, Navigant is being compensated at my customary rate of $1,000.00 per hour.  Payment for my work on this matter is in no way contingent on the opinions that I express or the outcome of this litigation.

12.     I am prepared to testify at trial on the topics referenced in this Report.  I understand that additional discovery may be allowed in this matter or additional documents may be produced.  As additional information becomes available, I reserve the right to refine this Report as necessary and to the extent permitted under applicable law and by the Courts.  Moreover, I anticipate that I may be called upon to respond to issues raised by other experts at deposition or at trial.

### IV.    Background on the Clark and Westbrook Report

13.     The Clark and Westbrook Report sets forth certain background information with respect to Nortel's history, bankruptcy, and asset sales.  I will not repeat that here except to note that Nortel sold its assets in two "bundles."

14.     Messrs. Clark and Westbrook refer to one of these as the sale of the "residual patent portfolio or the "Rockstar IP Transaction."   I refer to this as the Residual Patent

Portfolio ("RPP") Sale.  In this transaction, Nortel sold its portfolio of patents and patent applications by means of an open market ascending English auction to an entity named Rockstar Bidco, an alliance of Research in Motion Limited, Microsoft Corporation, LM Ericsson Telephone Company, Sony Corporation, EMC Corporation, and Apple Inc.

15.     Messrs. Clark and Westbrook refer to the other set of transactions as the "business sales."  I also refer to these sales as the "Business Sales."

## V.     Basic Principles Governing Credit Markets

16.     Messrs. Clark and Westbrook base their analysis not on the application of economic or valuation principles, but instead on the theory of "modified universalism."  It is beyond the scope of this report to address the pros and cons of the legal policies that Messrs. Clark and Westbrook would apparently like to see adopted; instead, I will confine my review and comments to identifying how "modified universalism" is at odds with the ways in which credit markets function.

17.     Before addressing the Clark and Westbrook Report specifically, I review certain principles about the way in which credit markets function.

18.     Potential corporate borrowers enter the loan and bond markets (i.e., the credit markets) to seek capital.  Lenders and bond buyers (i.e., creditors) evaluate potential borrowers and decide whether to make a loan or buy a bond and, if so, what interest rate is required of the borrower.

19.     These decisions depend upon the risk, as perceived by the creditors, that the borrower will be able to service the debt.  That is, the providers of funds (i.e., the creditors) make assessments about whether a potential borrower will be able to make interest payments as promised and be able to repay the principal balance of the debt at its maturity date.  In general, the greater risk that the borrower will be unable to service the debt, the greater the promised interest rate required by creditors.

20.     In assessing risk, that is, in assessing the likelihood that the borrower can service the debt, creditors consider the assets of the borrower, the borrower's potential future earnings, and the covenants embedded in the debt agreement.  It is the borrower's assets that generate future earnings, and it is from these earnings that interest and principal payments are made.  It is also the borrower's assets that serve as a source of payment in the event of default, bankruptcy, and liquidation of the borrower.

21.     A borrower can reduce the risk to a specific debt by incorporating protective covenants in a loan agreement (or, equivalently, a bond indenture).  Protective covenants include such features as the pledge of specific assets as collateral for a specific loan or restrictions on the borrower's ability to make dividend payments to shareholders.  All else being equal, restrictions on dividends reduce the lender's risk because lower dividends reduce payouts of earnings and, thereby, increase funds available to make future interest and principal payments.  Other protective covenants include restrictions on asset sales, restrictions on leases, limits on the total debt that a borrower may incur, and minimum ratios of current assets to current liabilities.  I have been advised by counsel that Nortel's long-term debt does not feature any collateral pledge and is entirely unsecured.

22.     In certain instances, unsecured debts can also be ranked according to their priority of payment in the event of bankruptcy and liquidation.  Such "seniority" may arise from provisions in the relevant debt documents which provide that one or more issuances of unsecured debt is "subordinated" to other issuances of unsecured debt.  In this instance, the "subordination" provision in favor of the "senior" unsecured debt embeds a promise that any proceeds received from liquidation of the borrower's assets (and after secured creditors are paid) will be paid to the senior unsecured creditor until the senior unsecured creditor is paid in full.  I have been advised by counsel that none of Nortel's long-term debt contains contractual subordination provisions.

23.     In instances in which a subsidiary of a parent issues debt and the parent company holds only equity in the subsidiary, in the event of bankruptcy and liquidation of the

5

subsidiary, and when absolute priority is the governing doctrine, the equity interest of the parent and, accordingly, any debt claims against the parent are subordinate to the claims of the creditors of the subsidiary.

24.    When assessing risk, lenders take all of these factors into account before deciding whether to make a loan (or to buy a bond) and, if so, what promised interest rate to require.

25.    The borrower that I describe can be thought of as a free-standing enterprise, but the factors that I describe also apply to entities that are part of more complex organizational structures.   One such entity could be an operating subsidiary of a parent company.   The parent company could be the parent of several operating subsidiaries.   Nevertheless, the subsidiaries can borrow on the basis of their own creditworthiness, and lenders will assess the creditworthiness of the subsidiary as if the subsidiary was an otherwise free-standing entity, and the same factors would apply.

## VI.    "Modified Universalism" v. Absolute Priority in Credit Markets

26.    The Clark and Westbrook Report considers several questions.  I consider one of these here:

> [H]ow would international insolvency principles and policy inform the allocation of the lockbox funds (representing the proceeds of sale of coordinated global realizations) among the various estates?[3]

27.    Messrs. Clark and Westbrook address this question from the perspective of a hypothetical international legal tribunal.

28.    In doing so, Messrs. Clark and Westbrook review a theory (referred to as "modified universalism") to serve as a basis for the allocation of the proceeds from the Business Sales and the RPP Sale among creditors on a "single pool" basis.

---

[3]    Clark and Westbrook Report, ¶1(vi).

29.     As set forth by Messrs. Clark and Westbrook, "modified universalism" stands in contrast to the application of "absolute priority" across creditors in the event of corporate bankruptcy and reorganization or liquidation.  Under absolute priority, in the event of corporate reorganization or liquidation, creditors are paid on the basis of the seniority of their claims, with more senior creditors being paid in full before any more junior creditor receives any payment and with unsecured creditors being paid in full before equity holders (and any creditors of such equity holders) receive any payment.

30.     Corporate credit agreements are customarily written with an apparent presumption that absolute priority will be the governing doctrine in the event of corporate bankruptcy.  For example, bond indentures customarily classify the relevant debt as being secured or unsecured, or senior or subordinated as the case may be.  Bond indentures also customarily note whether the obligations of the borrower are guaranteed by an entity, including any of the borrower's affiliates.  Such rules are only required when priority of payment has implications for payouts in the event of default.

31.     Under "modified universalism," such provisions of a credit agreement are superfluous because every creditor has an equal claim to all assets of a borrower regardless of the provisions spelled out in the credit agreement.

32.     Two types of economic data demonstrate that "modified universalism" is at odds with how credit markets function.  The first of these is bond prices (or, equivalently, bond yields).  The second is the actual payouts realized by creditors in the event of corporate reorganizations and liquidations.

33.     Economic studies report that prices are lower (or, equivalently, yields are higher) for more junior debt securities in comparison with otherwise equivalent senior debt securities.[4]  This evidence contradicts any presumption that creditors, in general, form

---

[4]    Research on the pricing of covenants in corporate bonds has examined the impact of seniority covenants. "Black and Cox and Ho and Singer use the option pricing model to show that senior debt should have a higher

expectations on the basis of "modified universalism" being the governing doctrine in the event of corporate bankruptcy.

34.     Likewise, various studies report that, in the event of corporate bankruptcy and reorganization or liquidation, senior creditors receive higher proportional payouts than do more junior creditors.[5]  Given such data, rational creditors would expect that payouts would be proportionally higher for more senior creditors.

35.     Consider Exhibit 1 below.  This Exhibit from Moody's shows that senior creditors systematically experience higher recovery rates in bankruptcy than more junior creditors.[6]

---

price than subordinated debt . . . . Our results support the view that seniority/security covenants are rationally priced." [Roberts, Gordon S. and Jerry A. Viscione, "The Impact of Seniority and Security Covenants on Bond Yields: A Note," *The Journal of Finance*, Volume 39, Issue 5, pp. 1597−1602, December 1984.]

Additionally, Black and Cox (1976) "investigated the effects of three specific provisions often found in bond indentures. These were safety covenants, subordination arrangements, and restrictions on the financing of interest and dividend payments. We found that these provisions do indeed increase the value of bonds, and that they may have a quite significant effect on the behavior of the firm's securities." [Black, Fischer  and John C. Cox, "Valuing Corporate Securities: Some Effects of Bond Indenture Provisions," *Journal of Finance*, Volume 31, Issue 2; Papers and Proceedings of the Thirty-Fourth Annual Meeting of the American Finance Association Dallas, Texas, December 28−30, 1975 (May, 1976), pp. 351−67.]

[5]     For example, Altman and Kishore (1996) find that "seniority does play the expected role" and recovery rates are higher for senior debt as compared to junior debt. [Altman, Edward I. and Vellore M. Kishore, "Almost Everything You Wanted to Know about Recoveries on Defaulted Bonds," *Financial Analysts' Journal*, November/December 1996, pp. 57−64.]

[6]     Moody's Ultimate Recovery Database, *Moody's*, April 2007.  According to the report, the data underlying the research in this study are from Moody's Ultimate Recovery Database (URD).  The database includes over 3,500 loans and bonds, over 720 different non-financial corporations, and over $400 billion in debt issued between 1987 and 2006.  Moody's provides "credit ratings, research, tools and analysis that contribute to transparent and integrated financial markets. Moody's Corporation (NYSE: MCO) is the parent company of Moody's Investors Service, which provides credit ratings and research covering debt instruments and securities, and Moody's Analytics, which offers leading-edge software, advisory services and research for credit and economic analysis and financial risk management.  The Corporation, which reported revenue of $3.0 billion in 2013, employs approximately 8,400 people worldwide and maintains a presence in 31 countries.  Further information is available at www.moodys.com." [https://www.moodys.com/Pages/atc.aspx.]

**Exhibit 1 – Discounted Ultimate Recovery Rates on Defaulting Debt by Seniority and Security, 1987 – 2006**



36.    Thus, as a general matter, both the ex-ante data (i.e., bond yields and prices) and the ex-post data (i.e., actual payouts in the event of bankruptcy) contradict a presumption that creditors expect payment on a pro-rata basis in the event of corporate bankruptcy.

## VII.    Expectations of Nortel's Debt Holders

37.    With respect to Nortel, Messrs. Clark and Westbrook argue for global consolidation of all creditor claims and against allocation across creditors on a corporate basis or on the basis of specific credit agreements.  Messrs. Clark and Westbrook opine that:

> *The job of allocation should not be undertaken until there is a demonstrated need to allocate and, if so, how to allocate.  On the face of the proceedings so far, and consistent with the results obtained by consent in so many other cases, the presumptive answer in a ["]modified*

> *universalism["] jurisdiction is that distribution from a global realization should be on a global (single pool) basis.  One who would allocate on a corporate basis or, even more repugnant to universalism, on a territorial basis, must come forward with good reasons and solid evidence to support a need to allocate.*[7]

38.     Further, Messrs. Clark and Westbrook    assert that, according to "modified universalism":

> *the only policy supporting a commitment to the mantra of corporate form is **a vested expectation of creditors***[8]

And that

> *[f]rom the fact of integration flows the reality that in most, although not all cases, **creditor expectations (the only relevant policy supporting the corporate form in a liquidation) are most likely based on capacities of the global group**.*[9]

> *[all emphases added]*

39.     Thus, on the basis of four criteria—"proceedings so far," "the results obtained by consent in so many other cases," the assumption that "modified universalism" is the accepted theory of distribution, and the fact the Business Sales and the RPP Sale occurred on a global basis—Messrs. Clark and Westbrook argue that the claims of creditors of the multi-entity, multinational Nortel enterprise should be consolidated across all entities and be paid on a "single pool" (i.e., consolidated) basis.

40.     Messrs. Clark and Westbrook do allow that even in these circumstances the corporate form should be respected in liquidation if the "commitment to the mantra of corporate form is a vested expectation of creditors."[10]   They then immediately reject this possibility by asserting, without proof, that Nortel's creditors' expectations "are most

---

[7]   Clark and Westbrook Report, ¶3.

[8]   *Id.*, ¶3.

[9]   *Id.*, ¶18B.

[10]   *Id.*, ¶3.

likely based on capacities of the global group"[11] as opposed to those of the individual debtor entity.  And that

> *It appears more likely that the expectations of Nortel creditors were based upon the credit of the corporate group rather than any component of that group.*[12]

41.     Messrs. Clark and Westbrook's position that Nortel's creditors' expectations "are most likely based on capacities of the global group"[13] as opposed to those of the individual debtor entity is contradicted by the data.

42.     First, as noted above, as a general proposition, in the event of bankruptcy, more senior creditors' recovery rates are systematically higher than those of more junior creditors.

43.     These data contradict Messrs. Clark and Westbrook's position that all creditors of a corporate entity, either as part of a larger operating group or on a stand-alone basis, would form the same expectations of payout in the event of corporate bankruptcy.

44.     Second, investors are sensitive to credit ratings when evaluating corporate debt. Some factors that rating agencies take into account when awarding ratings include the terms of the debt contract, the seniority of the debt relative to other claims, and credit enhancements that improve the credit risk profile of the debt.

45.     In analyzing debt issues, for example, Standard & Poor's Corporation (S&P)[14] analysts evaluate, among other things:

---

[11]    *Id.*, ¶18B.

[12]    *Id.*, ¶49.

[13]    *Id.*, ¶18B.

[14]    S&P Corporation has "offices in 23 countries and a history that dates back more than 150 years."  Its "Ratings Services provides high-quality market intelligence in the form of credit ratings, research, and thought leadership." [http://www.standardandpoors.com/en_US/web/guest/home.]  "A credit rating is Standard & Poor's opinion on the general creditworthiness of an obligor, or the creditworthiness of an obligor with respect to a particular debt security or other financial obligation.  Over the years credit ratings have achieved wide investor acceptance        as        convenient        tools        for        differentiating        credit        quality." [http://www.standardandpoors.com/ratings/en/us/.]

> The terms and conditions of the debt security and, if relevant, its **legal structure**.

> The relative seniority of the issue with regard to the issuer's other debt issues and **priority of repayment in the event of default**.

> The existence of external support or **credit enhancements**, such as letters of credit, **guarantees**, insurance, and collateral.  These protections can provide a cushion that limits the potential credit risks associated with a particular issue.[15]

*[all emphases added]*

46.     These statements by S&P contradict Messrs. Clark and Westbrook's position that creditors would expect every liability of an integrated group of corporate entities such as Nortel to provide the same recovery rate in the event of bankruptcy.

47.     Third, in evaluating likely recovery rates in the event of corporate bankruptcy for U.S. and Canadian corporations, Moody's notes that in its analysis of the loss on a corporate credit given default by the debtor, it "do[es] not typically assume a simple consolidation of all companies under the corporate family umbrella, but rather analyze a firm's obligations by legal entity, subject to having sufficient information."[16]  Moody's also considers "the flow of inter-company guarantees into the liability structure and distinguishes whether such guarantees have been issued on a senior versus subordinated, and secured versus unsecured basis."[17]

48.     This statement by Moody's contradicts Messrs. Clark and Westbrook's assertion that creditors would expect every Nortel liability to provide the same recovery rate in the event of bankruptcy.

---

[15]   "Guide to Credit Rating Essentials," *Standard & Poor's*, 2010, p. 12.

[16]   "Probability of Default Ratings and Loss Given Default Assessments for Non-Financial Speculative-Grade Corporate Obligors in the United States and Canada," *Moody's*, August 2006, p. 9.

[17]   *Id.*

49. Fourth, consider the $575 million convertible notes issued by NNC due in 2012 ("2012 Notes") and 2014 ("2014 Notes") issued in a private placement and for which the Bank of New York Mellon has filed a proof of claim before these Courts.[18]

50. On December 21, 2007, NNC issued a prospectus to assist the holders of the 2012 Notes and 2014 Notes to "resell in the United States their notes and related guarantees . . . and the common shares issuable upon conversion of the notes."[19]  In the prospectus for the notes, NNC described certain guarantees related to the notes and told creditors that:

> The [2012 and 2014] notes are senior unsecured obligations of the company and rank pari passu with all other senior obligations of the company. The notes are effectively **subordinated to all liabilities of the subsidiaries of NNC that are not guarantors** to the extent of the **value** of such subsidiaries.[20]

And

> The issuers' subsidiaries are **separate and distinct legal entities and any subsidiary that is not a guarantor has no obligation**, contingent or otherwise, to pay amounts due under the notes or the guarantees or to make any funds available to pay those amounts, whether by dividend, distribution, loan or other payment.[21]

And

> In the event of a bankruptcy, liquidation or reorganization of any direct or indirect non-guarantor subsidiary of the company, all of the **creditors of that subsidiary** (including trade creditors and creditors holding secured or unsecured indebtedness or guarantees issued by that subsidiary) and third parties having the benefit of liens (including statutory liens) against

---

[18] "Nortel Networks Corporation, or the company, issued in a private placement on March 28, 2007 $575,000,000 aggregate principal amount of 1.75% Convertible Senior Notes due 2012, or the 2012 notes, and $575,000,000 aggregate principal amount of 2.125% Convertible Senior Notes due 2014, or the 2014 notes." [Nortel Networks Corporation, December 21, 2007 prospectus for US$575 million of 1.75% Convertible Senior Notes Due 2012 and US$575 million of 2.125% Convertible Senior Notes 2014, henceforth " 2007 Convertible Notes Prospectus".]  *See also* "Proof of Claim, Bank of New York Mellon, as Indenture Trustee Filed Before the United States Bankruptcy Court for the District of Delaware," Case Number 09-10138, September 25, 2009.

[19] 2007 Convertible Notes Prospectus.

[20] *Id.*

[21] *Id.*

13

*that subsidiary's assets will generally be **entitled to payment of their claims from the assets of such non-guarantor subsidiary before any of those assets are made available for distribution to any issuer that is a shareholder** of such subsidiary. As a result, the notes and the guarantees are effectively junior to the obligations of non-guarantor subsidiaries.*[22]

[all emphases added]

51.    In sum, bondholders of NNC were told that:[23]

    a.  Their claims were subordinated to the claims of creditors of subsidiaries not guaranteeing those bonds with respect to the assets of such non-guarantor subsidiaries;

    b.  NNC's subsidiaries are distinct legal entities with no commitment to pay NNC's creditors (absent an explicit guarantee), in the event of bankruptcy of a subsidiary;

    c.  The creditors of that subsidiary will be paid from the assets of that subsidiary before any assets of the subsidiary are made available to NNC; and

    d.  The claims of NNC's bondholders on a subsidiary's assets are junior to obligations of that subsidiary.

52.    These provisions of the prospectuses establish a reasonable economic basis by which Nortel debt holders would base their expectations on the payment capacities of the individual Nortel corporate entities.   These provisions contradict the assertions of Messrs. Clark and Westbrook.

53.    Fifth, if Messrs. Clark and Westbrook's assertion is correct that investors expected distribution on a single pool basis, creditors would expect the recovery rate to be a constant fraction of the outstanding face amount of every Nortel debt and, as such, all

---

[22]    *Id.*

[23]    Nortel made analogous statements (similar to ones quoted from the 2007 Convertible Prospectus) for the other three bonds issued by NNC or NNL and guaranteed by NNI.  [Nortel Networks Limited, December 21, 2007 prospectus for the Offers to Exchange for US$450 million of 10.75% Senior Notes due 2016, US$550 million of 10.125% Senior Notes due 2013 and US$1,000 million of Floating Rate Senior Notes due 2011.]

of Nortel's bonds would have traded at similar prices as of Nortel's bankruptcy date. Nortel filed bankruptcy on January 14, 2009 ("Petition Date"). Exhibit 2 below displays prices (as of the Petition Date) for six bonds issued by NNC or NNL.[24] Five of the bonds are guaranteed by NNI. The sixth (i.e., the 6 and 7/8s bond maturing 9/01/23) is not.

54.    As Exhibit 2 demonstrates, as of the Petition Date, the prices of the bonds guaranteed by NNI were all substantially above, and in some cases almost double, the price of the non-guaranteed bond.

**Exhibit 2 – NNC or NNI Issued Bond Prices as of Petition Date**

| Name | NT Floating Rate 07/15/11 | NT 1 3/4 04/15/12 | NT 10 1/8 07/15/13 | NT 2 1/8 04/15/14 | NT 10 3/4 07/15/16 | NT 6 7/8 09/01/23 |
|---|---|---|---|---|---|---|
| **Issuer** | Nortel Networks Ltd | Nortel Networks Corp | Nortel Networks Ltd | Nortel Networks Corp | Nortel Networks Ltd | Nortel Networks Ltd |
| **Guarantor 1** | Nortel Networks Corp | Nortel Networks Inc | Nortel Networks Corp | Nortel Networks Inc | Nortel Networks Corp | Nortel Networks Corp* |
| **Guarantor 2** | Nortel Networks Inc | Nortel Networks Ltd | Nortel Networks Inc | Nortel Networks Ltd | Nortel Networks Inc | |
| **Price ($):** | | | | | | |
| 1/14/2009 | 19.5 | 16.75 | 21 | 16.75 | 19.75 | 10 |
| 1/15/2009 | 17.438 | 16.5 | 18.5 | 16 | 18 | 10 |

55.    Exhibit 3 below plots the prices of the six bonds for the period January 14, 2009 through January 14, 2014. This Exhibit shows that the price differences as of January 14, 2009 were not an aberration. The bond not guaranteed by NNI continued to trade at prices substantially below those of the guaranteed bonds.

---

[24]   All data are from Bloomberg except for certain items (denoted by "*") which are from "Nortel Networks Ltd.'s Recovery Rating Profile," *Standard & Poor's* Global Credit Portal RatingsDirect, November 21, 2008, p. 3; henceforth "S&P's Nortel Recovery Report."

**Exhibit 3 – Time Series of NNC or NNI Issued Bond Prices**



56. These data contradict the implication of Messrs. Clark's and Westbrook's assertion that all Nortel's creditors expected recovery on a single pool basis in the event of default and liquidation.

57. Sixth, prior to the Petition Date, S&P concluded that recoveries for Nortel debt holders would depend on the value of the assets of specific Nortel entities because, according to S&P, Nortel bondholders that have the benefit of an NNI guarantee can expect a higher recovery rate compared to other bondholders.  Specifically, in 2008, S&P noted that NNI "represents a material portion of the company's revenues, cash flow, and assets" and concluded that "those obligations that benefit from the NNI guarantee would be likely to enjoy superior recoveries" compared to the NNL-issued

bond having no NNI guarantee (i.e., the 6.875% note due 09/01/23).[25]  S&P also considered this note "to be structurally junior to those obligations that carry the NNI guarantee."[26]

58.    Accordingly, S&P assigned lower ratings to the 6.875% note that does not have the benefit of an NNI guarantee.[27]

59.    These data contradict Messrs. Clark and Westbrook's assertion that "the expectations of Nortel creditors were based upon the credit of the corporate group rather than any component of that group."[28]

60.    The clear implication is that, contrary to Messrs. Clark and Westbrook's opinion, "the single pool approach" does not "most accurately reflect the expectations of [Nortel's] creditors."[29]

61.    As one further observation, the official Canadian export credit agency received explicit guarantees from NNI and other subsidiaries when providing an export credit facility to NNL.  "On February 14, 2003, NNL entered into a $750 million support facility with Export Development Canada, or the EDC Support Facility."[30]

　　　　a.    At the inception of the EDC Support Facility, a number of Nortel subsidiaries guaranteed the EDC Support Facility, including NNUK and NNI and others until these guarantees were terminated in October 2005.[31]

---

[25]    S&P's Nortel Recovery Report.

[26]    *Id.*, p. 3.

[27]    *Id.*, pp. 2−3.

[28]    Clark and Westbrook Report, ¶49.

[29]    *Id.*, ¶32.

[30]    Nortel Networks Corporation, 2007 Annual Report, p. 55.  Export Development Canada or EDC is a Canadian Crown corporation that is Canada's export credit agency.  *See* http://www.edc.ca/EN/About-Us/Pages/default.aspx.

[31]    *See* Nortel 10K FY 2003, p. 50.

b.  Effective February 2006, NNL's obligations under the EDC Support Facility were provided guarantees by only NNI and NNC.[32]

c.  Under a new guarantee agreement with EDC as of July 2006, NNI alone provided guarantees for NNL's obligations under the EDC Support Facility[33] and continued to do so until the facility itself was renegotiated following Moody's downgrade of Nortel's corporate rating in December 2008.[34]

62.  In other words, Export Development Canada, a government agency, received a guarantee from NNI, the U.S. subsidiary of Nortel.  If creditors, in general, expected all liabilities of Nortel entities to receive payments from a single pool with no distinction among creditors, these guarantees would not have been necessary.

63.  Messrs. Clark and Westbrook further assert that:

*Insolvency outcomes ought to match pre-insolvency expectations.* [35]

64.  In Nortel's case, the economic evidence indicates that Nortel's debt holders did not expect consolidation of all of Nortel's claims in a single pool. Therefore, an allocation based on a single pool approach is not consistent with "legitimate expectations" of Nortel debt holders.[36]

65.  Nothing about the fact that Nortel is a multinational enterprise or how Nortel is organized changes this conclusion. Nortel organized its business into a matrix structure.[37]  That is, Nortel was organized into product groups responsible for product

---

[32]  *See* Nortel 10-K FY 2005, p. 104.

[33]  *See* Nortel 10-K FY 2006, p. 67.

[34]  Nortel Networks Corporation, 2008 Annual Report, p. 31.

[35]  Clark and Westbrook Report, ¶51.

[36]  Clark and Westbrook Report, ¶52.

[37]  *See* M. Zafirovski Deposition: ("Q. And if we look at the chart to the left, we can see the breakdown of revenues by North America, Asia, EMEA and CALA. That accords with your general recollection? A. Correct, which was one of the risks at that point.  Well, never mind. Q. So you had these separate legal entities carrying on business in separate jurisdictions, correct? A. Correct. Q. And then you had those four business segments that we looked at, carrier enterprise, etcetera? A. In various functions as well, a matrixed organization, but, yes, sales, R&D. There were direct reports, but through a matrix environment, you provide those services to the

18

development (e.g., wireless products) and sales groups responsible for geographic regions (e.g., a country or a region).  A matrix organization is not an uncommon organizational structure.  Corporate texts and the testimony of Nortel's executives support this conclusion.[38]  As I describe above, in assessing the borrower's ability to service its debt, potential lenders are concerned with the borrower's assets, future earnings potential, and loan covenants.  Lenders are concerned with organizational structure only to the extent that organizational structure affects a borrower's assets and earnings potential.

## VIII.    Conclusion

66.    To summarize, in my opinion, Messrs. Clark and Westbrook err in asserting that Nortel creditors would base their expectations of recovery in the event of default on the payment capacities of the global group as opposed to those of individual entities within the group.

---

businesses as well, correct.") [November 6, 2013 Deposition of Mike Zafirovski (Nortel Networks' President and CEO), 26:13-27:6]; K. Dadyburjor Deposition:  ("Q. You referred earlier in your evidence to Nortel's matrix structure.  Can you just describe in your own words for me what that means to you? A. So we were a global multinational company.  The way we managed our businesses was we fundamentally organized ourselves into product groups, and those product groups were responsible for the product development, the technology, the R&D, and the manufacturing specs for a particular line of products, like, say, wireless products. We were then organized as a sales force by country and region globally, and we would also have other support groups like customer service, which were like the product groups, global groups.  We also had corporate groups like finance and HR and certainly like my group that provided services globally to both product and market groups.  And the reason it is called matrix is because you can see that these organizations overlapped. In a typical region you would have local sales force and they would be supported by people from the various lines of business or product groups.  They would also be supported by various other groups such as customer service and groups like myself.") [October 3, 2013 Deposition of Khush Dadyburjor (Nortel Networks' Vice President & Global Head, M&A), 37:17-38:19]; D. Edwards Deposition: ("Q. So what does it mean that you are in under "Account" and he is under "Finance".  What are those functions? A.  It was a matrix organization.  So "account" means sales, and "finance" rolled up to whoever the CFO was in the corporation.  Finance never had a solid reporting line to the accounts.  It was to keep good governance and independence.") [October 31, 2013 Deposition of Darryl Edwards (President of EMEA Region at Nortel), 37:3-16.].

[38]    *See* Jay R. Galbraith, "Designing Matrix Organizations that Actually Work: How IBM, Proctor & Gamble and Others Design for Success," *John Wiley & Sons*, 2008; *see also* Bus. Counselor's Guide to Org. Mgmt. § 1.15 (May 2013) (listing a matrix structure as one of many organizational structures employed by corporations); *see also* M. Zafirovski Depo. Tr. 31:20-32:2 ("Q. You mentioned the matrix structure, sir. Do other multinationals use a matrix structure? [A:] It is quite common to be centralized or matrix organization. Quite often companies go from one to the other for change, but yes, it is not uncommon."); M. Zafirovski Deposition ("Q. Is matrix a form of corporate organization unique to Nortel, or I should say was it a form unique to Nortel? A. No.") [November 6, 2013 Deposition of Mike Zafirovski (Nortel Networks' President and CEO), 71:14-17.]

67.     If the principles of "modified universalism" were to be accepted globally as a general legal doctrine, the immediate impact would be far-reaching.  Generally, senior credits (i.e., senior loans and bonds) would fall in price and more junior credits (i.e., junior loans and bonds) would increase in price.  Such price changes would represent wealth transfers from senior creditors to more junior creditors.  These wealth transfers would occur among the creditors of a single corporation or among the creditors of an integrated group of corporations.  Further, in general, secured credits would fall in price and unsecured credits would increase in price.  Again, the wealth transfers would occur among creditors to a single corporation or among the creditors of an integrated group of corporations.

68.     On a longer-term basis, new corporate credit agreements would not contain loan covenants that specify a priority of claims across credit contracts within a single entity nor would contracts specify a priority of claims within a nexus of related corporations.

69.     Other changes would occur as well.  For example, credit agreements would likely specify that no additional borrowing of any kind can occur once a borrower undertakes an initial debt because any additional debt would receive the same priority as the already existing debt.  If any new unexpected debt was issued, the already outstanding debt would fall in price.  The alternative, of course, is that the lenders of the first loan would protect themselves by requiring a higher interest rate with the expectation that additional debt would soon be incurred bearing the same claim to the same assets as the initial credit.

70.     In short, adopting the principles of "modified universalism" would fundamentally alter the prices of many already outstanding debts and affect the way in which new credit agreements are structured.

John J. McConnell, Ph.D

February 28, 2014

FORM 53

*Courts of Justice Act*

ACKNOWLEDGMENT OF EXPERT'S DUTY

1.   My name is John J. McConnell, Ph.D. I live in West Lafayette in the State of Indiana.

2.   I have been engaged by or on behalf of the Unsecured Creditors Committee of the U.S. Debtors to provide evidence in relation to the court proceeding referenced in the text of my report.

3.   I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a)   to provide opinion evidence that is fair, objective and non-partisan;

   (b)   to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c)   to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.   I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date:   2-2-14

Signature:   *John J. McConnell*

**NOTE:** This Appendix is provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure*.

Appendix 1

# JOHN J. MCCONNELL
January 2014

I.  **ADDRESS**

BUSINESS:                                             HOME:
Purdue University                                     725 Northridge Drive
Krannert Building                                     West Lafayette, IN 47906
403 West State Street                                 Telephone:  (765) 463-9678
West Lafayette, IN  47907-2056
Telephone:  (765) 494-5910
E-mail:  mcconnj@purdue.edu
FAX:  (765) 494-7863

II.  **PERSONAL**

Born November 13, 1945, Warren, Ohio
Married with two children

III.  **EDUCATION**

Ph.D., Purdue University, August 1974
M.B.A., University of Pittsburgh, August 1969
B.A., Denison University, June 1968

IV.  **ACADEMIC EMPLOYMENT**

Emanuel T. Weiler Distinguished Professor of Management (Finance), Purdue
    University, 2000-present
Academic Director of Professional Masters Programs, May 2001-June 2006
Emanuel T. Weiler Professor of Management, Purdue University, 1989-2000
Director of Doctoral Programs and Research, Krannert School of Management, Purdue
    University, July 1989-1998
Professor of Management, Purdue University, July 1983-present
Visiting Scholar, University of North Carolina, January 1999-March 1999
Visiting Professor of Finance, Stanford University, September 1986-August 1987
Professor of Finance, University of Minnesota, July 1981-July 1982
Associate Professor of Management, Purdue University, July 1979-June 1983
Assistant Professor of Management, Purdue University, July 1976-June 1979
Assistant Professor of Finance, Ohio State University, January 1975-June 1976
Visiting Assistant Professor, Purdue University, August 1974-December 1974

V.  **RECOGNITION OF OUTSTANDING TEACHING**

Salgo-Noren Outstanding Teacher Award, 1993, 1995, 2011, 2012
Salgo-Noren Outstanding Teacher Award, Runner Up, 1986, 1994, 1996, 2001, 2008,
    2010
Most Effective Teacher, Krannert Graduate Student Association, 1992
Purdue University Teaching Academy, 2001-present
Dean's MBA Core Course Outstanding Teacher Award, 2005, 2007, 2009, 2010

VI.    **MAJOR ACADEMIC HONORS**

Fellow, Financial Management Association, 2007
Distinguished Scholar, Eastern Finance Association, 2002
Phi Kappa Alpha Academic Honorary
Omicron Delta Epsilon Economics Honorary
Keynote Speaker, Midwest Finance Association Annual Meeting, 2009
Keynote Speaker, Financial Management Association Annual Meeting - Europe, 2008
Keynote Speaker, Eastern Finance Association Annual Meeting, 2002
Best Paper, *Review of Financial Studies*, 1989, "Requiem for a Market:  An Analysis of the Rise and Fall of a Financial Futures Contract" (with E. T. Johnston)
Fama-DFA Prize for Capital Markets and Asset Pricing, *Journal of Financial Economics*, Second Place, 2006, "The Other January Effect" (with M. J. Cooper and A. V. Ovtchinnikov)
Graham and Dodd Scroll Award, *Financial Analysts Journal*, 2008, "Equity Returns at the Turn-of-the-Month" (with W. Xu)
All Star Paper, *Journal of Financial Economics*, 1983, "An Empirical Investigation of the Impact of 'Antitakeover' Amendments on Common Stock Prices" (with S. Linn)
All Star Paper, *Journal of Financial Economics*, 1985, "Corporate Capital Expenditure Decisions and the Market Value of the Firm" (with C. J. Muscarella)
All Star Paper, *Journal of Financial Economics*, 1989, "Further Evidence on the Bank Lending Process and the Capital-Market Response to Bank Loan Agreements" (with S. L. Lummer)
All Star Paper, *Journal of Financial Economics*, 1990, "Additional Evidence on Equity Ownership and Corporate Value" (with H. Servaes)

VII.   **BOARDS OF DIRECTORS**

Federal Home Loan Bank of Indianapolis, 1983-1986
American Finance Association, 1986-1988
Harrington Bank, FSB, 1993-2001
Harrington Financial Group, Inc., 1996-2001
Los Padres Bank, 1996-2009
Harrington West Financial Group, Inc., 1996-2009
Western Finance Association, 2002-2004
Advisory Board, Global Finance Academy, University College Dublin, 2007-present

VIII.  **EDITORIAL EXPERIENCE**

Co-Editor, FMA Survey and Synthesis Series, 2011-present
Associate Editor, Journal of Financial and Quantitative Analysis, 1987-present
Associate Editor, Journal of Finance, 1992-2000
Associate Editor, Journal of Real Estate Finance and Economics, 1987-1998
Editorial Review Board, Journal of Business Research, 1977-1993
Associate Editor, Financial Management, 1979-1993
Associate Editor, Journal of American Real Estate and Urban Economics Association, 1980-1991
Associate Editor, Journal of Financial Intermediation, 1989-1995
Associate Editor, Asia Pacific Journal of Management, 1990-2000
Associate Editor, Journal of Fixed Income, 1990-present
Associate Editor, Journal of Empirical Finance, 1991-1995
Associate Editor, Pacific Basin Finance Journal, 1997-2006
Associate Editor, Financial Review, 1998-2003
Associate Editor, Asia Pacific Journal of Finance, 1998-2000

Associate Editor, <u>Real Estate Review</u>, 1999-present
Associate Editor, <u>Journal of Corporate Finance</u>, 2001-present
Associate Editor, <u>Annals of Finance</u>, 2005-present
Associate Editor, <u>Investment Management and Financial Innovations</u>, 2009-present
Editorial Board, <u>International Journal of Governance</u>, 2011-present

## IX.    RESEARCH GRANTS AND CONTRACTS

National Science Foundation Research Grant, 1976-1977, 1977-1978
Department of Housing and Urban Development Research Contract,
    1978-1979, 1979-1980, 1980-1981
Small Business Administration Research Contract, 1979-1980
Federal Home Loan Bank Board Research Grant, 1982-1983
Eli Lilly and Co. Summer Research Grant, 1985
Center for the Study of Futures Markets Research Grant, 1987
Small Business Administration Finance Research Program Grant, 1988
Mid-America Institute Research Grant, 1993
Center for International Business Education and Research Grant, 1999
BSI Gamma Foundation Research Grant, 2008

## X.    RESEARCH ACTIVITIES AND PUBLICATIONS

### Books

<u>Corporate Restructuring</u>, co-editor with D. J. Denis (Edward Elgar Publishing, 2005).

<u>Governance:  An International Perspective</u>, co-editor with D. K. Denis (Edward Elgar
    Publishing, 2005).

### Monographs and Book Chapters

<u>Research Topics in Mortgage Markets</u>, Monograph No. 3, Credit Research Center,
    Purdue University, 1976, co-editor with R. M. Fisher.

<u>Survey of the Impact of Regulation on the Residential Mortgage Market</u>, Chapter 5,
    Monograph No. 10, Credit Research Center, Purdue University, 1978.

"Application of the Modern Theory of Finance to Small Business Firms" (with R. Pettit)
    in <u>Small Business Finance</u>, Ed. P. M. Horvitz and R. R. Pettit (JAI Press, Inc.:
    Greenwich, CT, 1984).

"The Impact of Usury Laws on the Effectiveness and Efficiency of the Operation of Small
    Business" (with R. Pettit) in <u>Small Business Finance</u>, Ed. P. M. Horvitz and R. R.
    Pettit (JAI Press, Inc.:  Greenwich, CT, 1984).

"Common Stock Valuation Effects of International Joint Ventures" (with S. Lummer) in
    <u>Pacific Basin Capital Markets Research</u>, Vol. I, Ed. R. Chang and S. Rhee (Elsevier
    Science Publishers:  North-Holland, 1989).

"Dividend Policy" (with J. A. Brickley) in <u>The New Palgrave:  A Dictionary of
    Economics</u>, Vol. I, Ed. J. Eatwell, M. Milgate and P. Newman (MacMillan Press,
    Ltd., 1987).    Also in <u>The New Palgrave Dictionary on Money and Finance</u>
    (MacMillan Press, Ltd., 1990).

"What Do We Know About Corporate Performance and Ownership Structure?" (with H. Servaes) in <u>Pacific Basin Capital Markets Research</u>, Vol. II, Ed. R. Chang and S. Rhee (Elsevier Science Publishers:  North-Holland, 1991).

"Bank Credit and Information in Capital Markets" (with S. L. Lummer) in <u>The Palgrave Dictionary on Money and Finance</u>, Ed. J. Eatwell and P. Newman (MacMillan Press, Ltd., 1992).

"Securities Transaction Taxes:  What Would Be Their Effects on Investors and Portfolios" in <u>Securities Transaction Taxes:  False Hopes and Unintended Consequences</u> (Irwin Books, 1995).

"Introduction to Corporate Restructuring" (with D. J. Denis) in <u>Corporate Restructuring</u>, Vol. I & II, co-editor with D. J. Denis (Edward Elgar Publishing, 2005).

"Introduction" (with D. K. Denis) in <u>Governance:  An International Perspective</u>, co-editor with D. K. Denis (Edward Elgar Publishing, 2005).

"Dividend Policy" (with D. J. Denis) in <u>The New Palgrave Dictionary of Economics</u>, 2nd edition, Ed. S. N. Durlauf and L. E. Blume (Palgrave Macmillan Ltd., 2008).

"Corporate Governance and Ownership Structure" (with S. B. McKeon and W. Xu) in <u>Corporate Governance</u>, Ed. H. K. Baker and R. Anderson (John Wiley & Sons, Inc., 2010).

"Development of the Market for Mortgage Backed Securities" (with S. A. Buser) in <u>Real Estate – Markets and Investment Opportunities</u>, Ed. H. K. Baker and P. Chinloy (Oxford University Press, 2014).

## **Papers, Notes and Comments**

"Payback Substitutes for Discounted Cash Flow," <u>Financial Management</u>, Summer 1973, Vol. 2, pp. 17-23 (with W. G. Lewellen and H. P. Lanser).

"The Weighted Average Cost of Capital:  Some Questions on Its Definition, Interpretation and Use:  Comment," <u>Journal of Finance</u>, June 1975, Vol. XXX, No. 3, pp. 883-886 (with C. M. Sandberg).

"Mortgage Companies:  A Financial Model and Evaluation of Their Residential Real Estate Lending Activities:  A Dissertation Abstract," <u>Journal of Finance</u>, September 1975, Vol. XXX, No. 4, pp. 1157-1158.

"Asset Leasing In Competitive Capital Markets," <u>Journal of Finance</u>, June 1976, Vol. XXXI, pp. 787-798 (with W. G. Lewellen and M. S. Long).

"Valuation of A Mortgage Company's Servicing Portfolio," <u>Journal of Financial and Quantitative Analysis</u>, September 1976, Vol. XI, pp. 433-453.

"Mortgage Company Bids on The GNMA Auction," <u>Journal of Bank Research</u>, Winter 1977, Vol. 7, pp. 294-302.

"Corporate Merger and The Co-Insurance of Corporate Debt," <u>Journal of Finance</u>, May 1977, Vol. XXXII, No. 2, pp. 349-365 (with E. H. Kim).

"Capital Structure Rearrangements and Me-First Rules in an Efficient Capital Market," Journal of Finance, June 1977, Vol. XXXII, No. 3, pp. 789-810 (with E. H. Kim and P. R. Greenwood).

"Price Distortions Induced by The Revenue Structure of Federally-Sponsored Mortgage Loan Programs," Journal of Finance, September 1977, Vol. XXXII, pp. 1201-1206.

"Tax Reform, Firm Valuation, and Capital Costs," Financial Management, Winter 1977, Vol. 6, pp. 59-66 (with W. G. Lewellen).

"Financial Leverage Clienteles:  Theory and Evidence," Journal of Financial Economics, March 1978, Vol. 7, pp. 83-110 (with E. H. Kim and W. G. Lewellen).

"Sale-And-Leaseback Agreements and Enterprise Valuation," Journal of Financial and Quantitative Analysis, December 1978, Vol. XIII, pp. 871-883 (with E. H. Kim and W. G. Lewellen).

"Discussion," Journal of Finance, May 1980, Vol. 35, pp. 465-467.

"Another Foray into the Backwaters of the Market," Journal of Portfolio Management, Fall 1980, Vol. 7, pp. 61-65 (with G. G. Schlarbaum).

"Rates of Return on GNMA Securities:  The Cost of Mortgage Funds," Journal of American Real Estate and Urban Economics Association, Fall 1980, Vol. 8, pp. 320-336 (with K. B. Dunn).

"Evidence on the Impact of Exchange Offers on Security Prices:  The Case of Income Bonds," Journal of Business, January 1981, Vol. 54, No. 1, pp. 65-85 (with G. G. Schlarbaum).

"Returns, Risks and Pricing of Income Bonds, 1956-1976 (Does Money Have An Odor?)," Journal of Business, January 1981, Vol. 54, No. 1, pp. 33-63 (with G. G. Schlarbaum).

"A Comparison of Alternative Models for Pricing GNMA Mortgage-Backed Securities," Journal of Finance, May 1981, Vol. 36, No. 2, pp. 471-484 (with K. B. Dunn).

"Valuation of GNMA Mortgage-Backed Securities," Journal of Finance, June 1981, Vol. 36, No. 3, pp. 599-616 (with K. B. Dunn).

"Further Evidence on the Terms of Financial Leases," Financial Management, Autumn 1981, Vol. 10, No. 4, pp. 7-14 (with P. J. Crawford and C. P. Harper).

"Rate of Return Indexes for GNMA Securities," Journal of Portfolio Management, Winter 1981, Vol. 7, No. 2, pp. 65-74 (with K. B. Dunn).

"The Administrative Costs of Corporate Bankruptcy," Journal of Finance, March 1982, Vol. 37, No. 1, pp. 219-226 (with J. S. Ang and J. H. Chua).

"The Income Bond Puzzle," Chase Financial Quarterly, Summer 1982, Vol. 1, No. 9, pp. 9-28 (with G. G. Schlarbaum).

"An Empirical Investigation of the Impact of 'Antitakeover' Amendments on Common Stock Prices," <u>Journal of Financial Economics</u>, April 1983, Vol. 11, Nos. 1-4, pp. 361-399 (with S. Linn).

"The Market Value of Control in Publicly-Traded Corporations," <u>Journal of Financial Economics</u>, April 1983, Vol. 11, Nos. 1-4, pp. 439-471 (with R. C. Lease and W. H. Mikkelson).

"Valuation of Asset Leasing Contracts," <u>Journal of Financial Economics</u>, August 1983, Vol. 12, No. 2, pp. 237-261 (with J. S. Schallheim).

"A Trading Strategy for New Listings on the NYSE," <u>Financial Analysts Journal</u>, January/February 1984, Vol. 40, No. 1, pp. 34-38 (with G. Sanger).

"The Turn-of-the-Year in Canada," <u>Journal of Finance</u>, March 1984, Vol. 39, No. 1, pp. 185-192 (with A. Berges and G. G. Schlarbaum).

"The Market Value of Differential Voting Rights in Closely Held Corporations," <u>Journal of Business</u>, October 1984, Vol. 57, No. 4, pp. 443-467 (with R. C. Lease and W. H. Mikkelson).

"Corporate Combinations and Common Stock Returns:  The Case of Joint Ventures," <u>Journal of Finance</u>, June 1985, Vol. 40, No. 2, pp. 519-536 (with T. J. Nantell).

"Corporate Capital Expenditure Decisions and the Market Value of the Firm," <u>Journal of Financial Economics</u>, September 1985, Vol. 14, No. 3, pp. 399-422 (with C. J. Muscarella).

"A Model for the Determination of 'Fair' Premiums on Lease Cancellation Insurance Policies," <u>Journal of Finance</u>, December 1985, Vol. 40, No. 5, pp. 1439-1457 (with J. S. Schallheim).

"Stock Exchange Listings, Firm Value, and Security Market Efficiency:  The Impact of NASDAQ," <u>Journal of Financial and Quantitative Analysis</u>, March 1986, Vol. 21, No. 1, pp. 1-25 (with G. C. Sanger).

"Corporate Mergers and Security Returns," <u>Journal of Financial Economics</u>, June 1986, Vol. 16, No. 2, pp. 143-187 (with D. K. Dennis).

"LYON Taming," <u>Journal of Finance</u>, July 1986, Vol. 41, No. 3, pp. 561-577 (with E. S. Schwartz).

"The Evidence on Limited Voting Stock:  Motives and Consequences," <u>Midland Corporate Finance Journal</u>, Summer 1986, Vol. 4, No. 2, pp. 66-71 (with R. C. Lease and W. H. Mikkelson).

"The Puzzle in Post-Listing Common Stock Returns," <u>Journal of Finance</u>, March 1987, Vol. 42, No. 1, pp. 119-140 (with G. C. Sanger).

"The Determinants of Yields on Financial Leasing Contracts," <u>Journal of Financial Economics</u>, September 1987, Vol. 19, No. 1, pp. 45-67 (with J. S. Schallheim, R. Johnson and R. C. Lease).

"Valuing Mortgage Loan Servicing," <u>Journal of Real Estate Finance and Economics</u>, March 1988, Vol. 1, No. 1, pp. 5-22 (with L. D. Van Drunen).

"Requiem for a Market:  An Analysis of the Rise and Fall of a Financial Futures Contract," <u>Review of Financial Studies</u>, 1989, Vol. 2, No. 1, pp. 1-23 (with E. T. Johnston).

"Further Evidence on the Bank Lending Process and the Capital-Market Response to Bank Loan Agreements," <u>Journal of Financial Economics</u>, November 1989, Vol. 25, No. 1, pp. 99-122 (with S. L. Lummer).

"Realized Returns and the Default and Prepayment Experience of Financial Leasing Contracts," <u>Financial Management</u>, Summer 1990, Vol. 19, No. 2, pp. 11-20 (with R. C. Lease and J. S. Schallheim).

"Additional Evidence on Equity Ownership and Corporate Value," <u>Journal of Financial Economics</u>, September 1990, Vol. 27, No. 1, pp. 595-612 (with H. Servaes).

"Day-of-the-Week Effects in Financial Futures:  An Analysis of GNMA, T-Bond, T-Note, and T-Bill Contracts," <u>Journal of Financial and Quantitative Analysis</u>, March 1991, Vol. 26, No. 1, pp. 23-44 (with E. T. Johnston and W. A. Kracaw).

"Corporate Performance, Corporate Takeovers, and Management Turnover," <u>Journal of Finance</u>, June 1991, Vol. 46, No. 2, pp. 671-687 (with K. J. Martin).

"Prepayments and the Valuation of Adjustable Rate Mortgage-Backed Securities," <u>Journal of Fixed Income</u>, June 1991, Vol. 1, pp. 21-35 (with M. K. Singh).

"The Economics of Pre-packaged Bankruptcy," <u>Journal of Applied Corporate Finance</u>, Summer 1991, Vol. 4, No. 2, pp. 93-97 (with H. Servaes).

"The Origin of LYONs:  A Case Study in Financial Innovation," <u>Journal of Applied Corporate Finance</u>, Winter 1992, Vol. 4, No. 4, pp. 82-89 (with E. S. Schwartz).

"Seasonalities in NYSE Bid-Ask Spreads and Stock Returns in January," <u>Journal of Finance</u>, December 1992, Vol. 47, No. 5, pp. 1999-2014 (with R. A. Clark and M. K. Singh).

"Valuation and Analysis of Collateralized Mortgage Obligations," <u>Management Science</u>, June 1993, Vol. 39, No. 6, pp. 692-709 (with M. Singh).

"The Effect of Market Segmentation and Illiquidity on Asset Prices:  Evidence From Exchange Listings," <u>Journal of Finance</u>, June 1994, Vol. 49, No. 2, pp. 611-636 (with G. B. Kadlec).

"Rational Prepayments and the Valuation of Collateralized Mortgage Obligations," <u>Journal of Finance</u>, July 1994, Vol. 49, No. 3, pp. 891-921 (with M. Singh).

"Investor Base, Cost of Capital, and New Listings on the NYSE," <u>Journal of Applied Corporate Finance</u>, Spring 1995, Vol. 8, No. 1, pp. 59-63 (with G. B. Kadlec).

"Equity Ownership and the Two Faces of Debt," <u>Journal of Financial Economics</u>, September 1995, Vol. 39, No. 1, pp. 131-157 (with H. Servaes).

"Open-Market Share Repurchase Programs and Bid-Ask Spreads on the NYSE: Implications for Corporate Payout Policy," <u>Journal of Financial and Quantitative Analysis</u>, September 1995, Vol. 30, No. 3, pp. 365-382 (with J. M. Miller).

"Can Takeover Losses Explain Spin-off Gains?," <u>Journal of Financial and Quantitative Analysis</u>, December 1995, Vol. 30, No. 4, pp. 465-485 (with J. W. Allen, S. L. Lummer and D. K. Reed).

"Prepacks: An Empirical Analysis of Prepackaged Bankruptcies," <u>Journal of Financial Economics</u>, January 1996, Vol. 40, No. 1, pp. 135-162 (with E. Tashjian and R. C. Lease).

"Implementing an Option-Theoretic CMO Valuation Model with Recent Prepayment Data," <u>Journal of Fixed Income</u>, March 1996, Vol. 5, No. 4, pp. 45-55 (with M. K. Singh).

"Prepacks as a Mechanism for Resolving Financial Distress: The Evidence," <u>Journal of Applied Corporate Finance</u>, Winter 1996, Vol. 8, No. 4, pp. 99-106 (with R. C. Lease and E. Tashjian).

"A Survey of Evidence on Domestic and International Stock Exchange Listings with Implications for Markets and Managers," <u>Pacific-Basin Finance Journal</u>, 1996, Vol. 4, pp. 347-376 (with H. J. Dybevik, D. Haushalter and E. Lie).

"An Analysis of Prices, Bid/Ask Spreads and Bid and Ask Depths Surrounding Ivan Boesky's Illegal Insider Trading in Carnation's Stock," <u>Financial Management</u>, Summer 1997, Vol. 26, No. 2, pp. 18-34 (with S. Chakravarty).

"To Live or Let Die? An Empirical Analysis of Piecemeal Voluntary Corporate Liquidations," <u>Journal of Corporate Finance</u>, December 1997, Vol. 3, No. 4, pp. 325-354 (with G. R. Erwin).

"Equity Carve-outs and Managerial Discretion," <u>Journal of Finance</u>, February 1998, Vol. LIII, No. 1, pp. 163-186 (with J. W. Allen).

"Mortgage Prepayment Float: Pricing and Risk Analysis," <u>Journal of Fixed Income</u>, March 1998, Vol. 7, No. 4, pp. 83-93 (with L. A. Angbazo, I. F. Megbolugbe and T. T. Yang).

"MIPS, QUIPS and TOPrS: Old Wine in New Bottles," <u>Journal of Applied Corporate Finance</u>, Spring 1998, Vol. 11, No. 1, pp. 39-44 (with A. Khanna).

"Earnings Signals in Fixed-Price and Dutch Auction Self-Tender Offers," <u>Journal of Financial Economics</u>, August 1998, Vol. 49, No. 2, pp. 161-186 (with E. Lie).

"Does Insider Trading Really Move Stock Prices?," <u>Journal of Financial and Quantitative Analysis</u>, June 1999, Vol. 34, No. 2, pp. 191-209 (with S. Chakravarty).

"A Survey of U.S. Corporate Financing Innovations: 1970-1997," <u>Journal of Applied Corporate Finance</u>, 1999, Vol. 12, No. 1, pp. 55-69 (with K. Carow and G. Erwin).

"Do Institutional Investors Exacerbate Managerial Myopia?," <u>Journal of Corporate Finance</u>, September 2000, Vol. 6, No. 3, pp. 307-329 (with S. Wahal).

"Spin-offs, Ex Ante," Journal of Business, April 2001, Vol. 74, No. 2, pp. 245-280 (with M. Ozbilgin and S. Wahal).

"Debt-Reducing Exchange Offers," Journal of Corporate Finance, June 2001, Vol. 7, No. 2, pp. 179-207 (with E. Lie and H. J. Lie).

"The Cadbury Committee, Corporate Performance, and Top Management Turnover," Journal of Finance, February 2002, Vol. 57, No. 1, pp. 461-483 (with J. Dahya and N. G. Travlos).

"Learning from a Keynote Speaker:  Lessons from Merton Miller's PACAP Addresses," Pacific-Basin Finance Journal, 2002, Vol. 10, pp. 359-369.

"International Corporate Governance," Journal of Financial and Quantitative Analysis, March 2003, Vol. 38, No. 1, pp. 1-36 (with D. K. Denis).

"S&P 500 Index Additions and Earnings Expectations," Journal of Finance, October 2003, Vol. 58, No. 5, pp. 1821-1840 (with D. K. Denis, A. V. Ovtchinnikov and Y. Yu).

"Predictability of Long-Term Spinoff Returns," Journal of Investment Management, 2004, Vol. 2, No. 3, pp. 35-44 (with A. Ovtchinnikov).

"Outside Directors and Corporate Board Decisions," Journal of Corporate Finance, 2005, Vol. 11, pp. 37-60 (with J. Dahya).

"Returns to Acquirers of Listed and Unlisted Targets," Journal of Financial and Quantitative Analysis, March 2006, Vol. 41, No. 1, pp. 197-220 (with M. Faccio and D. Stolin).

"The Other January Effect," Journal of Financial Economics, November 2006, Vol. 82, No. 2, pp. 315-342 (with M. J. Cooper and A. V. Ovtchinnikov).

"Political Connections and Corporate Bailouts," Journal of Finance, December 2006, Vol. 61, No. 6, pp. 2597-2635 (with M. Faccio and R. Masulis).

"Board Composition, Corporate Performance, and the Cadbury Committee Recommendation," Journal of Financial and Quantitative Analysis, September 2007, Vol. 42, No. 3, pp. 535-564 (with J. Dahya).

"Dominant Shareholders, Corporate Boards and Corporate Value:  A Cross-Country Analysis," Journal of Financial Economics, January 2008, Vol. 87, No. 1, pp. 73-100 (with J. Dahya and O. Dimitrov).

"Changes in Insider Ownership and Changes in the Market Value of the Firm," Journal of Corporate Finance, April 2008, Vol. 14, No. 2, pp. 92-106 (with H. Servaes and K. V. Lins).

"Equity Returns at the Turn-of-the-Month," Financial Analysts Journal, March/April 2008, Vol. 64, No. 2, pp. 49-64 (with W. Xu).

"Capital Market Imperfections and the Sensitivity of Investment to Stock Prices," Journal of Financial and Quantitative Analysis, 2009, Vol. 44, No. 3, pp. 551-578 (with A. V. Ovtchinnikov).

"Does Board Independence Matter in Companies with a Controlling Shareholder?," <u>Journal of Applied Corporate Finance</u>, Winter 2009, Vol. 21, No. 1, pp. 67-78 (with O. Dimitrov and J. Dahya).

"Auction Failures and the Market for Auction Rate Securities," <u>Journal of Financial Economics</u>, September 2010, Vol. 97, No. 3, pp. 451-469 (with A. Saretto).

"Why Did Auction Rate Bond Auctions Fail During 2007-2008?," <u>Journal of Fixed Income</u>, Fall 2010, Vol. 20, No. 2, pp. 5-18 (with B. Liu and A. Saretto).

"What's the Best Way to Trade Using the January Barometer?," <u>Journal of Investment Management</u>, Fourth Quarter 2010, Vol. 8, No. 4, pp. 1-15 (with M. J. Cooper and A. V. Ovtchinnikov).

"The Origins and Evolution of the Market for Mortgage Backed Securities," <u>Annual Review of Financial Economics</u>, December 2011, Vol. 3, pp. 173-192 (with S. A. Buser).

"The Role of the Media in Corporate Governance:  Do the Media Influence Managers' Capital Allocation Decisions?," <u>Journal of Financial Economics</u>, 2013, Vol. 110, No. 1, pp. 1-17 (with B. Liu).

"Sheltering Corporate Assets from Political Extraction," <u>Journal of Law, Economics, and Organization</u>, 2013, Vol. 29, No. 2, pp. 332-354 (with L. Caprio and M. Faccio).

## Book Reviews

<u>Security Prices in a Competitive Capital Market</u>, Richard A. Brealey, <u>The Financial Review</u>, Spring 1973, pp. 74-75.

<u>Risk and Opportunity:  A New Approach to Stock Market Profits</u>, Conrad W. Thomas, <u>The Bankers Magazine</u>, Summer 1975, Vol. 158, p. 108.

<u>The Inflation of House Prices</u>, Leo Grebler and Frank Mittelbach, <u>Journal of Money, Credit and Banking</u>, November 1980, Vol. XII, No. 4, p. 677.

## Sponsored Reports

"Feasibility of an Organized Market for Options on GNMA Securities," Parts 1-4, Department of Housing and Urban Development, Office of Housing Finance, Washington, D.C., 1978.

"The Fungibility of GNMA Securities and the Implications for Market Liquidity," Department of Housing and Urban Development, Office of Housing Finance, Washington, D.C., 1979.

"Application of the Theory of Finance to Small Businesses," Small Business Administration, Washington, D.C., 1980 (with R. R. Pettit).

"The Impact of State Usury Laws on Small Businesses," Small Business Administration, Washington, D.C., 1980 (with R. R. Pettit).

"The Efficiency of the GNMA Securities Market: Model Development and Documentation," Department of Housing and Urban Development, Washington, D.C., 1981 (with K. B. Dunn).

"Evaluation of an S&L's Mortgage Servicing Portfolio," Federal Home Loan Bank Board, Washington, D.C., 1984 (with L. D. Van Drunen).

"Realized Returns and the Default and Prepayment Experience of Financial Leasing Contracts," Small Business Administration, Washington, D.C., 1988 (with R. C. Lease and J. S. Schallheim).

XI. **PROFESSIONAL EDUCATION PROGRAMS**

National Real Estate Lending School sponsored by American Bankers Association, Columbus, OH, 1975

Advanced Seminar on Consumer Credit sponsored by National Association of Mutual Savings Banks, Bridgeport, CT, 1977, 1978

Portuguese Housing Conference sponsored by Portuguese National Bank and U.S. Agency for International Development, Salt Lake City, UT, 1979

Executive Seminar on "Cash Management and Short-term Financial Planning," San Diego, Houston, Toledo and Cincinnati, 1978-1979

Seminar on Mergers and Acquisitions sponsored by Berkeley Program in Finance, Monterey, CA, 1983

Seminar on the Analysis of Security Prices sponsored by University of Chicago Center for Research in Security Prices, Chicago, IL, May 1984, November 1984, November 1985

Executive Seminar on "Introduction to Corporate Finance" for BATUS, Inc., 1986

Executive Seminar on "Financial Planning and Corporate Valuation" for Sears, Roebuck & Co., 1996 and 1997

Pacific Coast Bank School sponsored by Pacific Coast Bankers Association, Seattle, WA, 1978

Directors Forum, "The Role of Capital Markets in Corporate Governance," Universidade Católica Portuguesa, 2009

XII. **PROFESSIONAL ACTIVITIES**

**Presented Testimony before**

U.S. House of Representatives Subcommittee on Housing and Urban Development during hearings on H.R. 6442, "The Federal Home Loan Mortgage Corporation Act," June 1982

U.S. Senate Subcommittee on Housing and Urban Affairs during roundtable discussion on the "Safety and Soundness of Fannie Mae and Freddie Mac," February 1990

**Presented Papers at**

American Finance Association Meeting, 1976, 1978, 1980, 1981, 1982, 1983, 1985, 1986, 1988, 1990, 1991, 1993, 1998, 2003, 2006, 2009, 2014

Financial Management Association Meeting, 1975, 1976, 1977, 1978, 1980, 1981, 1982, 1983, 1984, 1986, 1988, 1992, 1999, 2000, 2001

Western Economics Association Meeting, 1975

Midwest Finance Association Meeting, 1975, 1985

American Real Estate and Urban Economics Association Meeting, 1979, 1981

Western Finance Association Meeting, 1980, 1981, 1982, 1984, 1985, 1986, 1988, 1989, 1990, 1995, 2000
American Economics Association Meeting, 1987, 2006, 2009
Pacific Basin Finance Conference, 1989, 1990
Garn Institute Symposium, 1989
Western Finance Conference, 1991
Hyundai Research Institute Conference, 1996
Association of Financial Economists Meeting, 1999
European Finance Association, 1999
European Financial Management Association, 2000
Global Finance Academy Conference, 2008, 2011

**Discussed Papers at**

American Finance Association Meeting, 1976, 1977, 1979, 1985, 2000
Financial Management Association Meeting, 1975, 1977
American Real Estate and Urban Economics Association Meeting, 1978, 1979
American Economics Association Meeting, 1985
Pacific Basin Finance Conference, 1989
National Bureau of Economic Research Conference, 1994

**Session Chairman at**

Financial Management Association Meeting, 1979, 1985, 2006
American Finance Association Meeting, 1981, 1988, 1994, 1995, 1996, 1999, 2000, 2001
Winter Finance Conference, 1992, 1995

**Program Committee for**

Financial Management Association Meeting, 1979, 1984, 1985, 1986, 1988, 1993, 2009 (Chairman, Doctoral Student Consortium, 1993)
Western Finance Association Meeting, 1980, 1986, 1991, 1993, 1995
American Finance Association Meeting, 1987, 1988, 1994, 1996, 1998, 1999
Pacific Basin Finance Conference, 1989, 1990, 1998, 2000
Eastern Finance Association, 2007

XIII. **COMMITTEE ASSIGNMENTS -- PURDUE UNIVERSITY**

Finance Area Recruiting Committee, 1977-present
Krannert School Library Committee, 1977-1978
Krannert School Doctoral Student Placement Officer, 1978-1979
Krannert School Colloquium Committee, 1978-1981
Purdue University Grievance Committee, 1978-1980, 2001-2003 (Subcommittee Chairman, 1980; Chairman, 2002-2003)
Krannert School Masters Student Advisory Committee, 1979-1980
Krannert School Masters Student Examining Committee, 1980-1981
Krannert School Undergraduate Program Committee, 1979-1980 (Subcommittee Chairman)
Finance Area Ph.D. Admissions Committee, 1979-1981, 1983-1985, 1991-present
Krannert School Search Committee for Morgan Professor of Private Enterprise, 1980-1981
Krannert School Computer Policy Committee, 1982-1984
Krannert School Dean Search Committee, 1982-1984, 1989-1990

Krannert School Committee on Organizational Structure
    (Chairman, 1984)
Krannert School Committee on Funded Research, 1984-1985
Krannert School Ph.D. Preliminary Examination Committee, 1982-1984
    (Chairman, 1982)
Krannert School Faculty Grievance Committee, 1985-1986
Area Coordinator, Finance Faculty, 1985-1986, 1994-1998, 2006-2008, 2012-2013
Krannert School Management Policy Committee, 1985-1986, 1992-1993, 1994-2008,
    2010-2013
Krannert School Faculty Relations Committee, 1985-1986
Purdue University Senate, 1987-1990
Krannert School Management Lecture Series Committee, 1987-1989
    (Chairman, 1987-1989)
Krannert School Grade Appeals Committee, 1988-1991, 2011-2013
    (Chairman, 1989-1990)
Krannert School Accounting Faculty Search Committee, 1988-1989
    (Chairman, 1988-1989)
Krannert School M.I.S. Faculty Search Committee, 1989-1990, 1999-2000
    (Chairman, 1989-1990)
Krannert School Search Committee for Henderson Professorship, 1991-1993
    (Chairman, 1991-1992)
Krannert School Committee to Reconsider Ph.D. Program in Management, 1990-1991
    (Chairman, 1990-1991)
Krannert School Faculty Advisory Committee, 1992-1998
Krannert School Teaching and Research Supplement Committee, 1993-2003
    (Chairman, 1994-1996)
Krannert School MSM Curriculum Committee, 1996-1998
Krannert School Search Committee for Accenture Professor of IT, 2000-2002
    (Chairman, 2001-2002)
Purdue University Committee for Ethics in Graduate Education, 2002-2004
Krannert School MBA Rankings Committee, 2002-2004
    (Chairman, 2002-2004)
Purdue University Graduate School Council, 2002-2006
Purdue University Search Committee for Dean of the Graduate School, 2002-2003
Krannert School Masters Programs Review Committee, 2003-2004
    (Chairman, 2003-2004)
Krannert School Undergraduate Program Task Force, 2006-2007
Purdue University Retirement Plan Review Task Force, 2008-2010
Krannert School Department Chair Search Advisory Committee, 2013
    (Chairman, 2013)
Krannert School Management/HTM Working Group, 2013
Chicago Weekend MBA Program Committee, 2013

XIV.    **CONSULTING**

**Government Agencies**

Department of Housing and Urban Development
Small Business Administration
Government National Mortgage Association
U.S. Internal Revenue Service
Office of Thrift Supervision (Topeka, KS)
Department of Justice
Office of Federal Housing Enterprise Oversight

**Corporations**

Knutsen Companies, Inc.
Wilder Foundation
Merrill Lynch White Weld Capital Markets, Inc.
Goldman, Sachs and Company
Federal Home Loan Bank of Dallas
Federal Home Loan Mortgage Corporation
Merrill Lynch Mortgage Capital, Inc.
Ernst and Young
Santa Fe Pacific Corporation
Federal Home Loan Bank of Indianapolis
Consolidated Edison, Incorporated

**Trade Associations**

National Association of Mutual Savings Banks
Massachusetts Consumer Finance Association

**Law Firms**

Cravath, Swaine & Moore (New York, NY)
Davis, Polk & Wardwell (New York, NY)
Simpson, Thacher & Bartlett (New York, NY)
Mayer, Brown & Platt (Chicago, IL)
Davis, Miner & Barnhill (Chicago, IL)
Stroock & Stroock & Lavan (New York, NY)
Shartsis, Friese & Ginsburg (San Francisco, CA)
Franta & White (Minneapolis, MN)
Kightlinger, Young, Gray & DeTrude (Indianapolis, IN)
Wetzel & DeFrang (Portland, OR)
Cochrane & Bresnahan (St. Paul, MN)
Kirkpatrick & Lockhart (Washington, DC)
Brown & Bain (Palo Alto, CA)
Hennigan & Mercer (Los Angeles, CA)
Cadwalader, Wickersham & Taft (Washington, DC)
Drinker, Biddle & Reath (Philadelphia, PA)
Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson (Miami, FL)
Timothy D. Kelly (Minneapolis, MN)
Mackall, Crounse & Moore (Minneapolis, MN)
Streich, Lang, Weeks & Cardon (Phoenix, AZ)
Finkelstein, Thompson & Loughran (Washington, DC)
Maslon, Edelman, Borman & Brand (Minneapolis, MN)
Morrison & Hecker (Phoenix, AZ)
Bell, Boyd & Lloyd (Chicago, IL)
Ireland, Stapleton, Pryor & Pascoe (Denver, CO)
Carr & Mussman (San Francisco, CA)
Oppenheimer, Wolff & Donnelly (Minneapolis, MN)
Gibson, Dunn & Crutcher (Dallas, TX; San Diego, CA)
Sachnoff & Weaver (Chicago, IL)
Richards & O'Neil (New York, NY)
Choate, Hall & Stewart (Boston, MA)

Barnes & Thornburg (Indianapolis, IN)
Schiff, Hardin & Waite (Chicago, IL)
Leonard, Street & Deinard (Minneapolis, MN)
Wilson, Sonsini, Goodrich & Rosati (San Francisco, CA)
Theodore Goddard (London, England)
Akerman, Senterfitt & Eidson (Miami, FL)
Jones, Day, Reavis & Pogue (Cleveland, OH)
Brobeck, Phleger & Harrison (San Francisco, CA)
Davis, Scott, Weber & Edwards (New York, NY)
Kramer, Levin, Naftalis & Nessen (New York, NY)
Rogers & Wells (New York, NY)
Willkie, Farr & Gallagher (New York, NY)
Shearman & Sterling (San Francisco, CA)
Gibson, Dunn & Crutcher (San Francisco, CA)
Sidley & Austin (Chicago, IL)
Arnold & Porter (Washington, DC)
Stuart, Branigin, Ricks & Schilling (Lafayette, IN)
Hertlein & Brown (Columbus, OH)
Brault, Graham, Scott & Brault (Baltimore, MD)
Spriggs & Hollingsworth (Washington, DC)
Jenner & Block (Chicago, IL)
Brown & Wood (New York, NY)
Alschuler, Grossman, Stein & Kahan (Los Angeles, CA)
Wynne & Maney (Houston, TX)
Wachtell, Lipton, Rosen & Katz (New York, NY)
Quarles & Brady Streich Lang (Phoenix, AZ)
Herrick, Feinstein (New York, NY)
McCutchen, Doyle, Brown & Enersen (San Francisco, CA)
Shaffer, Lombardo & Shurin (Kansas City, MO)
James E. Dahl & Associates (Chicago, IL)
Lankler, Siffert & Wohl (New York, NY)
Hogan & Hartson (New York, NY)
Bendinger, Crockett, Peterson, Greenwood & Casey (Salt Lake City, UT)
Schulte, Roth & Zabel (New York, NY)
Lewis, Brisbois, Bisgaard & Smith (New York, NY)
Skadden, Arps, Slate, Meagher & Flom (New York, NY)
Menz, Bonner & Komar (New York, NY)
Sutherland, Asbill & Brennan (Washington, DC)
Jeffer, Mangels, Butler & Marmaro (Los Angeles, CA)
Roeca, Luria & Hiraoka (Honolulu, HI)
Blank Rome (Philadelphia, PA)
Zelle, Hofmann, Voelbel & Mason (Minneapolis, MN)
Bingham McCutchen (Los Angeles, CA)
Winston & Strawn (Chicago, IL)
Fried, Frank, Harris, Shriver & Jacobson (New York, NY)
Reed Smith (San Francisco, CA)
Schlam, Stone & Dolan (New York, NY)
Winthrop & Weinstine (Minneapolis, MN)
Wilmer Cutler Pickering Hale and Dorr (New York, NY)

# Appendix 2

### Trial and Deposition Testimony

### of

### John J. McConnell

### January 2009 – December 2013

Blue Cross and Blue Shield of Minnesota, as Administrator of the Blue Cross and Blue Shield of
  Minnesota Pension Equity Plan, et al., Plaintiffs, v. Wells Fargo Bank, N.A., Defendant
  (United States District Court of Minnesota, Case No. 11-cv-2529 DWF/JJG)
  Deposition: January 2013
  Trial: August 2013

The City of Farmington Hills Employees Retirement System, Individually and on Behalf of
  Others Similarly Situated. Plaintiff, vs. Wells Fargo Bank, N.A., Defendant (United
  Stated District Court, District of Minnesota, Case No. 0:10-cv-04372-DWF/JJG)
  Deposition: April 2013

Duff & Phelps, LLC, in its capacity as Trustee of the Protostar I Litigation Trust, Claimant, vs.
  Jefferies & Company, Inc., Richard E. Morrison, Jr., and Paul F. Deninger, Respondents
  (Financial Industry Regulatory Authority Arbitration No. 11-02937)
  FINRA Hearing: February 2013

MBIA Insurance Corporation v. Countrywide Home Loans, Inc., Countrywide Securities Corp.,
  Countrywide Financial Corp., Countrywide Home Loans Servicing, LP (n/k/a Bank of
  America, N.A., successor by de jure merger to BAC Home Loans Servicing, LP), and
  Bank of America Corp. (Supreme Court of the State of New York, County of New York,
  Index No. 602825/2008, IAS Part 3 (Bransten, J.)
  Deposition: September 2012

The Bank of New York Mellon Trust Company, National Association, soley as Trustee under
  that certain Indenture dated September 1, 1999 and amendments thereto v. Santander
  Holdings USA, Inc. (United States District Court, Southern District of New York, 10
  Civ. 9420 (RMB) (JCF) ECF CASE)
  Trial: June 2012

Kin Nolte, et al. v. Cigna Corporation, et al. (United State District Court, Central District of
  Illinois, Urbana Division, Case No: 2:07-CV-02046-HAB-DGB)
  Deposition: 2011

T. H. Lee Fund V, L.P., et al. v. Grant Thornton LLP (Supreme Court of the State of New York,
  County of New York, Index No. 60277-4107)
  Deposition: 2010

<u>In the Matter of GSI Commerce Solutions, Inc., Plaintiff v. Lehman Brothers Inc., Stanford A. Haber, Neil Greenspan, Jeffrey Chernick, Joseph L. Arena and Kurt Locher, Respondents,</u> (Financial Industry Regulatory Authority Case No. 08-02857)
FINRA Hearing:          2009

# Appendix 3: Documents Relied Upon

**Legal Documents**

1. "Proof of Claim, Bank of New York Mellon, as Indenture Trustee Filed Before United States Bankruptcy Court for the District of Delaware," Case Number 09-10138, September 25, 2009

**Declarations, Expert Reports and Testimony**

1. Expert report and exhibits of Leif M.Clark and Jay L. Westbrook, dated January 24, 2014
2. Deposition transcript of Khush Dadyburjor, dated October 3, 2013
3. Deposition transcript of Darryl Edwards, dated October 31, 2013
4. Deposition transcript of Mike Zafirovski, dated November 6, 2013

**Publicly Available Documents**

1. "Guide to Credit Rating Essentials," *Standard & Poor's*, 2010
2. "Nortel Networks Ltd.'s Recovery Rating Profile," *Standard & Poor's* Global Credit Portal RatingsDirect, November 21, 2008
3. "Probability of Default Ratings and Loss Given Default Assessments for Non-Financial Speculative-Grade Corporate Obligors in the United States and Canada," *Moody's*, August 2006
4. "Moody's Ultimate Recovery Database," *Moody's*, April 2007
5. Nortel Networks Corporation, December 21, 2007 prospectus for US$575 million of 1.75% Convertible Senior Notes Due 2012 and US$575 million of 2.125% Convertible Senior Notes 2014
6. Nortel Networks Limited, December 21, 2007 prospectus for the Offers to Exchange for US$450 million of 10.75% Senior Notes due 2016, US$550 million of 10.125% Senior Notes due 2013 and US$1,000 million of Floating Rate Senior Notes due 2011
7. Nortel Networks Corporation, SEC 10-K filing for the fiscal year ended December 31, 2003
8. Nortel Networks Corporation, SEC 10-Q filing for the quarterly period ended September 30, 2005
9. Nortel Networks Corporation, SEC 10-K filing for the fiscal year ended December 31, 2005
10. Nortel Networks Corporation, SEC 10-K filing for the fiscal year ended December 31, 2006
11. Nortel Networks Corporation 2007 Annual Report
12. Nortel Networks Corporation 2008 Annual Report

**Academic Literature**

1. Roberts, Gordon S., and Jerry A. Viscione, "The Impact of Seniority and Security Covenants on Bond Yields: A Note," *The Journal of Finance*, Volume 39, Issue 5, pages 1597-1602, December 1984
2. Black, Fischer, and John C. Cox, "Valuing Corporate Securities: Some Effects of Bond Indenture Provisions," *Journal of Finance*, Volume 31, Issue 2, Papers and Proceedings of the Thirty-Fourth Annual Meeting of the American Finance Association Dallas, Texas December 28-30, 1975
3. Altman, Edward I., and Vellore M. Kishore, "Almost Everything You Wanted to Know about Recoveries on Defaulted Bonds," *Financial Analysts' Journal*, November/December 1996
4. Jay R. Galbraith, "Designing Matrix Organizations that Actually Work: How IBM, Proctor & Gamble and Others Design for Success," *John Wiley & Sons*, 2008
5. Bus. Counselor's Guide to Org. Mgmt. § 1.15 (May 2013)

**Data Sources**

1. Bloomberg L.P for Nortel bond prices and other characteristics