Court File No. 08-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| Nortel Networks Inc., *et al.*, | : | Case No. 09-10138 (KG) |
| Debtors. | : | (Jointly Administered) |

**EXPERT REPORT OF ROBERT KILIMNIK**

(Submitted by the U.S. Debtors and the Ad Hoc Group of Bondholders)

**February 28, 2014**

## ASSIGNMENT

I have been retained jointly by the US Debtors and the Ad Hoc Group of Bondholders to provide a responding report in connection with a dispute pertaining to the allocation of sales proceeds in the Nortel proceedings pending before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware. This report responds to the expert reports of Leif Clark and Jay Westbrook, Coleman Bazelon, and Thomas Britven (the "Reports").

The Reports, among other things, advance the following opinions:

- Clark and Westbrook opine that the Courts should adopt a theory of allocation they call "modified universalism", pursuant to which every creditor of the various Nortel entities is entitled to a single claim against a global pool of assets of all Nortel entities;

- Bazelon opines that a *pro rata* distribution model is the most appropriate allocation method for the Nortel assets because, he suggests, it best reflects the manner in which the Nortel entities operated; and

- Britven opines that the application of a *pro rata* distribution model would result in each creditor of the various Nortel entities receiving payment amounting to approximately 71.2% of its claim.

Based on my experience in the capital markets, I have been asked to respond to the above opinions based on the functioning of the bond market and expectations of creditors. In responding to these opinions, I focus in particular on:

1. how indenture terms and pricing for corporate bonds are arrived at;

2. the purpose and rationale for having related but legally separate corporate entities guarantee an issuance of corporate bonds and the impact of such a guarantee on pricing and available purchasers of an issuance of corporate bonds; and

3. the potential ramifications within capital markets if courts in Canada and the United States were to adopt a theory of allocation like the one sought by the Canadian Creditors' Committee and the UK Pension Claimants in this litigation (and advocated in the Reports) that collapses the assets and claims of related but legally separate corporate entities, across international borders, and effectively eliminates the cross-border guarantees that were sold as part of the bonds.

For my work on this assignment, I am being compensated by the US Debtors at my customary rate of $500 per hour. Payment for my work on this matter is not contingent on the opinions I express or the outcome of this litigation. As additional information becomes available, I reserve the right to supplement my report.

In providing the below opinion, I have not made any factual assumptions. I have reviewed the pleadings in this matter, the Reports, and the note indentures for NNL's and NNC's November 1988, February 1996, July 2006 and March 2007 note offerings. I also researched what various rating agencies have published on the issue of bond guarantees.

Attached as Appendix A is an acknowledgment of my duty as an expert as required by Rule 53 of the Ontario Rules of Civil Procedure.

## SUMMARY OF OPINION

1. Corporate bonds are carefully-crafted instruments with terms that reflect the demands of a highly competitive marketplace. The market is dominated by large insurance companies and major pension funds which employ sophisticated analysts to look at both the credit risk and structural risk of a bond issuance.

    Purchasers of corporate bonds generally do not directly negotiate the terms or pricing of a bond issuance. It is the investment banker or underwriter that normally has the direct contact with the issuer and develops bond terms and pricing. Pricing or spreads are determined using pricing for similar credits, structure and priorities in the capital markets as a reference. The spread will reflect the risk associated with a particular issuance.

2. Guarantees, where provided, are a critical element of the structuring of a corporate bond. Bond purchasers rely on guarantees as an essential element of the structural "security" package being offered to help reduce the risk exposure of lenders over the term of the loan. A guarantee gives the corporate bond buyer assurance that other entities have agreed to support the primary debtor and provides further protection against adverse events in or affecting the issuer, including insolvency. Therefore, a guarantee also helps the issuer obtain more favourable pricing and other terms. Bondholders that purchase a bond with a guarantee expect the guarantee to be honoured.

3. A court order adopting the "*pro rata*" approach proposed by the CCC and the UKPC in this litigation, which effectively results in the cross-border "substantive consolidation" of assets and claims among related but legally separate corporate entities, and eliminates or limits intercompany guarantees, would create significant uncertainty and therefore reduced liquidity in the corporate bond market. Such an order would undermine bondholder expectations and cause disruption to the capital markets by reducing the availability of corporate bond issuances, and increasing the cost of funding for borrowers still able to issue bonds.

## PERSONAL EXPERIENCE AND QUALIFICATIONS

My curriculum vitae is appended at Appendix B.

I am a senior investment executive with extensive experience in credit and the North American public debt markets. I have had direct responsibility for both credit departments and trading desks at two of the largest life insurance companies in Canada. My extensive experience qualifies me to opine on the impact that adopting the theories advanced in the Reports would have on the public debt markets.

My early career experience included doing credit analysis, reading the fine print of indentures, negotiating transactions with investment dealers, and eventually overseeing trading operations. As my resume demonstrates, as Vice President, Investments at Clarica Life I was directly responsible for public bond trading operations and all Canadian credit. Every new bond issue and significant transaction required my personal approval. I also played a key leadership role in the development of the private placement debt market, infrastructure financing and public-private partnerships in Canada.

In 2002, I was hired by Manulife to run their North American Fixed Income operations, reporting directly to the Chief Investment Officer. The $40 billion portfolio under my direction included money market investments but focused primarily on public corporate bonds, both Canadian and US. There were some 20 portfolio managers and traders. The Credit Department, with 9 analysts, which covered both Canadian and US issuers, reported to me. I had personal authority to approve issuer exposure up to some $700 million for AA credits, with reduced authorities for lower credits. I also served as a member of the Investment Committee. My role was extremely hands-on. I had daily interaction with the trading desks, discussing trading opportunities, approving larger trades, reading and approving quarterly and annual credit reviews from my credit staff, approving new corporate bond issues for purchase, dealing with any emerging credit issues in the portfolio, and monitoring compliance.

Following Manulife's merger with John Hancock, my responsibilities changed. Manulife had no presence in the private placement debt market, and I assumed responsibility for developing a leading role for Manulife in the Canadian private debt market. I also retained responsibility for all Canadian credit as well as certain US credit responsibilities when our US bond trading operations moved to John Hancock in Boston.

I have retired from Manulife, and now act as a Senior Advisor (part-time) for The Collins Group, a boutique international investment bank, focusing on debt transactions. I also serve as an independent member of the Credit Committee for two infrastructure funds managed by Stonebridge Financial. From time to time, on a personal basis, I advise on raising funds and other corporate finance issues.

I received my Hon. B.A in Economics from the University of Waterloo (earning a Woodrow Wilson Graduate Fellowship) and an M.B.A. from McMaster University. I am also a C.F.A.

As an Adjunct Assistant Professor at the University of Waterloo in the Department of Economics and School of Accounting, I taught a variety of courses in accounting, management, corporate finance, investments and macro-economics.

I have also been a keynote speaker at numerous conferences and seminars on the bond market, corporate finance, credit and the public bond market, real estate, leasing, economics and the financial markets.

ANALYSIS

1. UNDERSTANDING CORPORATE BONDS

Overview

1. Bonds are loans to corporate entities and bondholders are lenders to corporate entities. Bondholders make considered and complex credit decisions before purchasing bonds, in the same way bank lenders do. The bond markets are premised on the fundamental proposition that all rights included with the loan, including protective covenants and guarantees, are transferred on sale, and the markets operate in reliance on this proposition.

2. Bond issuances are priced based on the perceived credit risk (including the probability of default) and expectations about recovery of principal and interest should the credit deteriorate and/or default. Credit spreads, the difference between the interest rate offered by an issuer and a "risk free" government bond, generally are wider as the maturity or term of the issue lengthens, given that longer term issues are inherently more risky than shorter term issues. The pricing will also reflect the elements of structural "security", including guarantees from related entities. The spread for the same bond issue by a given issuer can be expected to be higher if that issue provides fewer elements of security. Ultimately, pricing or spreads are determined in a competitive marketplace with pricing for similar credits and priorities in the capital market as a reference. If not properly structured or priced, the market will not buy an issue and the issuer will not receive the financing it was seeking.

Risk Factors

3. Investment grade corporate bonds are considered to be relatively safe long-term investments, i.e., longer than five years and extending to 30 years and beyond. In the US and Canada, corporate bonds are purchased most frequently by insurance companies and large pension funds, as well as mutual funds. Insurance companies and large pension funds have a need for long-term, predictable cash flows to match their long-term liabilities. The spreads earned for the same duration or term on corporate bonds are critical to meeting funding and profitability objectives. These institutions are active in both the new issue market and secondary markets because the continuing objective is to find high quality, properly priced bonds or investments in a very competitive market for corporate bonds. The need for an adequate spread is balanced against the need to minimize credit losses.

4. All large and many smaller bond buyers have experienced credit staffs who actively analyze and monitor credit and assist portfolio managers and trading desks in purchasing new and secondary issues and trading holdings when appropriate. These analysts often have industry expertise or bank credit experience. Often they will have worked for one of the credit rating agencies.

5. Any issue to be purchased must meet the quality standards set by the purchasing institution's internal investment policy statement or guidelines. To evaluate the quality of a bond issuance, purchasers evaluate both the credit risk and structural risk.

6. In looking at credit risk they will consider such things as industry outlook, product issues, competitive challenges, impact of technology, management performance and governance practices, environmental issues, financial performance including leverage and free cash flow analysis, and financial management policies, among many other credit issues.

7. In looking at structural risk, prospective bond buyers consider what would happen if the credit of the issuer deteriorates and/or there is a "credit event". Significant effort is spent by the credit analysts understanding the structural risk of the transaction including priorities (junior/senior positions) and guarantees. For as a long-term lender, the driving question is how the bondholder will recover its original principal and accrued interest.

8. Several sources of information are available to help bond buyers evaluate the credit risk factors. Consolidated financial statements, which are used to analyze credit risk for issuers that are part of a group of related companies, are not ideal, but they may be the only financial statements available to the bond buyer. Bond buyers look, where possible, to other supplemental information to better understand the creditworthiness of the relevant entities. Ratings and information provided by the credit rating agencies are also considered, and may be relied upon by smaller bond purchasers.

Bondholder Expectations

9. In making purchasing decisions, bondholders expect that corporate separateness will be respected and guarantees will be enforced. The creditworthiness of the issuer and the pricing and features of the issue are evaluated based on these basic assumptions. Bondholders have an expectation that, in any realization scenario, legal priorities and the right to claim repayment will be respected and can be relied upon. Adopting the "*pro rata*" allocation theories advanced in the Reports would upend these basic creditor expectations and could cause substantial damage to the long-term lending / corporate bond market.

10. Bond buyers usually have very few opportunities to negotiate directly with borrowers. On initial issuance, this role is assumed primarily by the investment bank or underwriter which has the direct relationship with the issuer/borrower. The job of the investment bank is to get the best pricing with the fewest conditions for its client, i.e., the issuer. The bond purchasers will then evaluate whether the particular terms of an indenture provide sufficient protection to warrant taking on the credit risk of lending money to that issuer.

11. Public bonds are largely unsecured, with limited covenant protection. The investment banker or underwriter will advise the issuer on the terms of the indenture or supplemental indenture that will be necessary to place the issue based on their knowledge of the market. The investment bank's or underwriter's placement desk will then offer the bonds for purchase to market participants, often with little advance notice. Accordingly, bond managers looking to make purchases must regularly monitor the credit of the issuer and relevant risk factors. For

new issuers (which do not have existing bonds issued and outstanding), more time is given to get to know the issuer (do the necessary credit work), possibly meet and question management of the issuer, and occasionally have some input on structuring and pricing.

2.     THE NATURE OF CORPORATE GUARANTEES

12.     Guarantees are a critical element of the structuring of many corporate bonds, providing an alternative to traditional security. Most corporate bonds today are not secured by specific collateral, such that bondholders have equal priority recourse to the assets of the company with other unsecured creditors at the time of insolvency and/or realization. Some entities may not be financially strong enough to borrow or issue bonds on their own, or to issue bonds on terms acceptable to the issuer. Guarantees are a way for lenders or bondholders to contractually protect themselves through separate claims to multiple pools of either cash flows or assets in the event of a default by the issuer. These guarantees are often a valuable and indeed critical part of the protections afforded to purchasers under the indenture, failing which the bonds would not be purchased by buyers, at least not for any reasonable borrowing cost from the issuer's perspective. They are part of the structural "security" for the loan, without which many guaranteed bonds would not be purchased.

13.     Guarantees are necessitated by the long term nature of corporate bonds and the uncertainties to which these long time horizons give rise. In the absence of broad covenants (such as are common in many bank loans), there is limited protection with respect to such things as merger activity, sale of assets, increased leverage, and so forth. Guarantees provide additional protection from adverse events. In turn, they allow the issuer to obtain better lending terms and costs. Guarantees, whether in bank debt or bonds, are not afterthoughts; they are critical parts of the loan packages that are relied upon by lenders.

14.     The market assumes that guarantees are fully effective and enforceable. DBRS, the largest bond-rating service in Canada, stated in its "DBRS Criteria: Guarantees and Other Forms of Explicit Support" from July 2013:

> A financial guarantee is a contract under which a guarantor agrees to become responsible for the financial obligations of a principal debtor to a third-party creditor. Of the three forms of explicit support DBRS considers (guarantees, keepwell agreements and comfort letters), guarantees provide the strongest support as they create a legally enforceable obligation on the part of the guarantor to service the subsidiary's debt. This legally enforceable obligation of the guarantor may allow DBRS to rate the subsidiary at the same level as the guarantor. When rating specific securities, DBRS will consider if the guarantee relates to all obligations of the issuer or if it only applies to specific securities.

> DBRS recognizes that each financial guarantee is unique and drafted to address specific circumstances. Therefore, while DBRS generally expects guarantees to display the following characteristics, each guarantee is reviewed on a case-by-case basis.

- The guarantee is an absolute, direct, irrevocable, unconditional and continuing obligation of the guarantor.
- The guarantee will not terminate until full payment of the sum due. DBRS will consider language that allows the guarantor to terminate the guarantee only if the rating of the supported entity would not be negatively affected by such termination.
- The guarantee ranks senior to or pari passu with the guarantor's senior unsecured obligations. [On occasion, a guarantor will provide a guarantee that will rank equally with its subordinated debt. In these circumstances, any reliance of the guarantor's rating will be at the subordinate debt level.]
- The guarantor waives all defences that would otherwise be available to guarantors, and waives the enforceability or pursuit of the underlying obligation against the principal debtor.
- The guarantor waives all rights of subrogation, reimbursement, contribution, indemnified offset or participation against the principal debtor until the guaranteed obligations are paid in full.
- The trustee, on behalf of the bondholders, is a party to the guarantee and the guarantee states that the guarantee is enforceable on behalf of bondholders.
- The guarantee is binding on successors and assigns of the guarantor.
- The guarantee may not be amended or modified without the written consent of the third-party creditor relying on the guarantee.

In order to be satisfied that a guarantee incorporates these features, DBRS generally requires all customary corporate opinions appropriate in these transactions from counsel for the guarantor, addressed to DBRS, stating that the guarantee is an irrevocable and unconditional obligation of the guarantor, ranking equally with the senior unsecured debt of the guarantor, duly supported by board resolutions, etc., which is enforceable by the trustee on behalf of bondholders against the guarantor. If the guarantor is located in a jurisdiction other than the jurisdiction of the guarantee, DBRS will generally require an opinion that a judgement obtained under the guarantee is enforceable against the guarantor in the guarantor's jurisdiction.

15. In my experience, issuers, underwriters, bondholders and rating agencies rely on the enforceability of guarantees provided in bond indentures.

16. Clark & Westbrook assert that enforcing corporate guarantees creates a problem of "double proof", in that they provide certain creditors with recourse to multiple sources of recovery while other creditors have only one source of recovery.[1] But contrary to this assertion by Clark & Westbrook, recourse to additional asset pools through such guarantees does not result in a windfall for the bondholders any more than does the entitlement to claim repayment directly from the issuer. There is in fact no "double proof" problem with respect to guarantees because that is precisely what guarantees are all about – separate claims to access separate and additional pools of financial wherewithal and assets directly in order to enhance the

---

[1] See paragraphs 27 and 28 of the Clark & Westbrook Report.

prospect of repayment in full. Bondholders, as holders of guarantees, receive, as an essential element of their bonds, a contractual entitlement to assert the full amount of their claims as separate claims against other, separate asset pools directly and not through the issuer's equity in subsidiaries. Accordingly, bondholders are not similarly situated to other unsecured creditors. They are merely exercising a right that was expressly provided to them as an inducement to lend money to the issuer, and upon which they relied in making their lending decision.

### 3. RAMIFICATIONS OF AN ORDER ADOPTING EITHER OF THE "*PRO RATA*" APPROACHES ADVANCED BY THE CCC AND THE UKPC

17. Based on my experience, if the courts were to adopt a "*pro rata*" allocation approach as advanced by the CCC and the UKPC, institutional bondholders, including insurance companies and pension plans, would likely respond in the short term by instituting a freeze on all corporate bond purchasing. This alone would be highly disruptive to the capital markets, which have an aversion to uncertainty. Bondholders would then need to review their portfolio and analyze, on an issuer-by-issuer basis, which bond issuers had affiliate companies and thus represent a heightened risk, particularly without the protection traditionally afforded by guarantees.

18. On new issues, I would expect potential bond purchasers to take a hard line with issuers and demand significant protections, in addition to guarantees, in an effort to address the increased risk of a form of the "*pro rata*" allocation advanced in the Reports. Such protections would likely include several new and significant covenants (such as restrictions on an issuer's ability to issue further debt, to create or acquire new affiliates, or to undertake certain activities in affiliated entities). As well, prospective bond purchasers would likely require enhanced financial disclosure, including unconsolidated financial statements for each related entity. Potential bond purchasers would become more discriminating in their purchases.

19. Given that guarantees would afford less protection, and accordingly be of lesser or no value to bondholders, many issuers with affiliated corporate entities would have to offer more protective terms and/or higher spreads to attract buyers, impacting their ability to raise funds. Some such issuers would potentially not be able to access the corporate bond market at all, and in other cases, might have to issue high yield debt, rather than investment grade debt. In all cases, I would expect that the market would price in materially higher spreads to reflect this increased risk.

### CONCLUSION

20. Corporate loans (bonds and otherwise) are by their nature complex arrangements that require considerable analysis and risk assessment. Contrary to the assertions of Clark and Westbrook, corporate bondholders understand clearly the nature of guarantees and expect that they will be enforceable as claims to separate pools of assets in any insolvency and realization scenario by the courts. In a situation in which there are clearly separate legal entities and the parties have gone so far as to provide for guarantees from some, but not all, of

those entities, Clark and Westbrook's and Bazelon's arguments are calculated to benefit one group of creditors at the expense of others, and suffer from the following three major flaws, among others: (i) they ignore legal rights and remedies that were bargained and paid for; (ii) they allege that expectations were completely different from those actually held by bondholders; and (iii) they undermine longstanding and accepted principles upon which bond purchasers lend money.

Signed on the 28th day of February, 2014, at Toronto, Ontario

_____
Robert Kilimnik

# APPENDIX A

Court File No. 08-CL-7950

# ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

---------------------------------------------------------------- x

## ACKNOWLEDGMENT OF EXPERT'S DUTY

1. My name is Robert Kilimnik. I live at 408 Clairbrook Cr., Waterloo, in the Province of Ontario.

2. I have been engaged by or on behalf of US Debtors and the Ad Hoc Group of Bondholders to provide evidence in relation to the above-noted court proceeding.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

    (a) to provide opinion evidence that is fair, objective and non-partisan;

    (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and

(c) to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date ....February 28, 2014............................. _____
ROBERT KILIMNIK

**NOTE:** This form must be attached to any report signed by the expert and provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure*.

# APPENDIX B

# ROBERT F. KILIMNIK, MBA, CFA

408 Clairbrook Cr.,
Waterloo, Ontario
Phone: 519 884-3746
Fax: 519 884-3746
Cell: 519 884-1899

## PROFILE

A senior investment executive who played a key leadership role in the development of the private placement debt market, infrastructure financing and public-private partnerships in Canada. Extensive experience in credit and North American public debt markets.

## PROFESSIONAL EXPERIENCE

### STONEBRIDGE INFRASTRUCTURE DEBT FUNDS                              2012-

Serves as an independent member of the Credit Committee for 2 infrastructure funds managed by Stonebridge Financial with committed funds of approximately $500 million.

### THE COLLINS GROUP                                                              2009 –

Spring of 2009 joined The Collins Group, an internationally focused boutique investment bank, on a part time basis as Senior Advisor, to focus on debt transactions.

### MANULIFE FINANCIAL CORPORATION                                       2002-2008

Hired by MFC as Vice President and Managing Director, North American Fixed Income to direct their Canadian and U.S. bond and money market operations (assets of $40 billion). With the 2004 acquisition of John Hancock/Maritime Life assumed responsibility for Canadian Credit and Canadian Private Debt operations. Retired September 2008.

- ✓ Key member of MFC Investments acquisition acquisition/integration team for successful John Hancock/Maritime Life merger.

- ✓ Grew Canadian Private Debt portfolio from $1.5 billion to $3.4 billion (MFC now #2 private placement lender in Canada).
- ✓ Key member of the MFC Credit Committee which approves and monitors worldwide Investment Guidelines and larger transactions for both public and private markets.

## BOREALIS CAPITAL CORPORATION                                         2000-2001

A co-founder (with Steve Hudson) and Chief Investment Officer of Dorset Partners (subsequently Borealis Capital).
- ✓ As CIO and Chairman of the Investment Committee of the Board, developed investment policies and infrastructure, setting the stage for sound underwriting and investment practice.
- ✓ In a difficult market helped raise $450 million for the Private Equity Fund and $75 million for the Financial Technology Fund from such investors as OMERS, CPPIB, Royal Bank, Bank of Montreal, CIBC, Trizec, CS First Boston, Clarica Life, Sun Life and Maritime Life. Raised $33 million for the Private Equity Fund from the life companies based on personal reputation.

## CLARICA LIFE INSURANCE COMPANY                                       1971-2000

Joined Clarica Life (formerly the Mutual Life of Canada) in 1971 conducting business conditions analysis and economic forecasting. At the time of leaving Clarica in early 2000 as Vice-President, Investments responsible for Clarica's Canadian investment portfolio operations (assets of $24 billion and staff of 150) which included corporate lending, private equity, commercial mortgages, real estate, public bonds and stocks, treasury operations and ALM/portfolio management.
- ✓ Developed strong credit culture at Clarica with below average arrears and credit losses while encouraging innovation.
- ✓ Led Clarica's growth in the private placement debt market to where it became the largest non-bank corporate lender in Canada. Innovative and dominant presence in secured term lending, lease receivables financing and independent power and other infrastructure financing.
- ✓ Strategic equity interest in Newcourt Credit Group in 1993 and $150 million net profit when interest sold. Other strategic leasing equity investments in Tuckahoe Financial and National Leasing Group.
- ✓ Active involvement in the successful acquisition and integration of the Canadian operations of the Prudential of England and Metropolitan Life.

## BOARD EXPERIENCE

Served on a number of outside boards where Clarica held a strategic equity interest including Newcourt Credit Group Inc., Princeton Developments Ltd. (Edmonton), National Leasing Group (Winnipeg), Canadian Environmental Energy Corporation, Teletech Financial Limited (Montreal), and Tuckahoe Financial. Served on Princeton board as independent director and Chairman Audit Committee after leaving Clarica.

## EDUCATION

M.B.A., McMaster University
Hon. B.A. (Economics), University of Waterloo (earned Woodrow Wilson Graduate Fellowship)
C.F.A., CFA Institute

## PROFESSIONAL ACTIVITIES

- ✓ Keynote speaker at numerous conferences on corporate finance, credit and the public bond market, real estate, leasing, economics and the financial markets including various TSFA events on credit and the bond market.
- ✓ 1972 to 1986 Adjunct Assistant Professor at the University of Waterloo in the Department of Economics and School of Accounting teaching a variety of courses in accounting, management, corporate finance, investments and macro-economics.
- ✓ Chairman, Executive Committee, Investment Section, Canadian Life and Health Insurance Association (1997-1998).
- ✓ University of Waterloo Advisory Council (2001-2005).

February 2014