Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, C. C-36, AS AMENDED

— and —

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------

In re

NORTEL NETWORKS INC., *et al.*,

Debtors.

-----------------------------------------------------------

Chapter 11

Case No. 09-10138 (KG)

(Jointly Administered)

**<u>EXPERT REPORT OF CATHERINE TUCKER</u>**

(Submitted by the U.S. Debtors)

**February 28, 2014**

**REDACTED VERSION**

# EXPERT REPORT OF CATHERINE TUCKER

I.      Assignment ......................................................................................................... 1

II.     Summary of Conclusions ................................................................................... 3

    A.   Economic Incentives for Innovation in High-Technology Organizations ...................... 4

    B.   Economics of High-Technology Patents ........................................................................ 5

    C.   Drivers of the Economic Value of a Patent Portfolio ..................................................... 6

III.    Qualifications ...................................................................................................... 7

IV.     Economic Incentives to Innovate ...................................................................... 9

    A.   Summary of Conclusions .............................................................................................. 9

    B.   Why Must High-Technology Organizations Give Incentives for Forward-Looking
Innovation? ........................................................................................................................... 10

    C.   Is it Consistent Given This Framework to Assume that the Exclusive Licenses Given to
Participants in the MRDA Were Limited to the Sale and Licensing of Contemporaneous
Products? ............................................................................................................................... 12

    i.    Does Such a Limitation Make Sense from an Organizational Economics Perspective? 13

    ii.   Were the Outcomes Observed in Terms of Innovation at Nortel Consistent with Such a
Limitation? ............................................................................................................................. 20

V.      The Economics of High-Technology Patents ................................................. 25

    A.   Summary of Conclusions ............................................................................................ 25

    B.   How Do the Economics of High-Technology Patents Differ from Low-Technology
Patents and How Do These Differences Affect How an Organization Derives Value from the
Rights to a Patent? ................................................................................................................ 26

    i.    Protecting current innovation ...................................................................................... 27

    ii.   Protecting future innovation ........................................................................................ 27

    iii.  Protecting against patent litigation .............................................................................. 31

    iv.   Case Study 1: Patent number 5,583,862 ..................................................................... 32

    v.    Case Study 2: Patent 6,765,591 .................................................................................. 34

    C.   Over What Timespan Does a Rights Holder Draw Value From a Patent Portfolio? ..... 35

VI.     Derivation of Economic Value from a Patent Portfolio ............................... 42

    A.   Summary of Conclusions ............................................................................................ 42

B.    Are There Meaningful Economic Differences between Being Able to Transfer or Sell a Patent Relative to Being Able to Sublicense the Same Patent? ........................................... 43

C.    Is the Value of a Patent Portfolio Exclusively Licensed to a Subsidiary Bounded by Existing Lines of Business?............................................................................................... 44

D.    How Does an Exclusive and Perpetual License Affect the Residual Value of a Patent to the Title-Holder?............................................................................................................... 48

**ACKNOWLEDGMENT OF EXPERT'S DUTY** .................................................................. **54**

Appendix A....................................................................................................................... A-1

Appendix B ....................................................................................................................... B-1

Appendix C ....................................................................................................................... C-1

# I.    ASSIGNMENT

1. First, I have been asked by counsel for Nortel Networks, Inc. ("NNI" and together with its affiliated U.S. debtors, the "U.S. Debtors") to analyze incentives, corporate structures, and research frameworks that high-technology organizations use to foster forward-looking innovations. Counsel has also asked me to examine and apply my knowledge of these organizational frameworks in high-technology markets, in order to evaluate how Nortel's organizational structure and incentives aligned with a culture of innovation and long-run objectives to stay ahead of competitors. Second, I have also been asked to describe the nature of high-technology patents and to discuss how they generate value for the overall strategy of a high-technology organization. Finally, I have been asked to explain the economics of value capture as it relates to the ownership and licensing rights of patents.

2. I have been asked to describe these economic frameworks in order to discuss the validity of the Green Report's assumption that NNI's parent, Nortel Networks Limited ("NNL" and together with its affiliated Canadian debtors, the "Canadian Debtors"), intended to limit the benefits that NNI would obtain from its research and development solely to benefits generated from patents in use by the products produced by Nortel's Lines of Business at the time those businesses were sold ("Contemporaneous Products").[1]

3. I have also been asked to use these economic frameworks to analyze the Green Report's conclusion that the "entirety of the proceeds from the Rockstar Transaction should be allocated to the owners of the Residual Patents, the Canadian Debtors" and that the U.S. Debtors' and EMEA Debtors' license rights under the Master R&D Agreement (as amended, "MRDA") to the patents sold in the Rockstar transaction "have no value."[2]

4. The frameworks describing (1) the economic incentives to innovate in a high-technology organization, (2) differences in the economics of high-technology patents, and (3) derivation of economic value from a high-technology patent portfolio specifically allow me to give my opinion about several interlinked assumptions in the Green Report.

---

[1] In this report, the term "Contemporaneous Products" is defined as the set of Products that were made and sold by Nortel's lines of business at the time those lines of business were sold in 2009-2010.

[2] Expert Report of Philip Green Regarding the Allocation of Recoveries among Nortel Entities (submitted by the Canadian Debtors) at 64-65, Jan. 24, 2014 [hereinafter the "Green Report"]. Note that the EMEA Debtor group is comprised of Nortel Networks UK and affiliates in Europe, the Middle East and Africa.

a.  The Green Report interprets the rights to the patent portfolio to which NNI and certain other Nortel entities referred to as Integrated Entities (each an "IE" and collectively, the "IEs") were entitled, as only covering the rights to sell and generate operating profits in their respective territories from the sale of, Contemporaneous Products.[3] I have been asked to consider whether, through the lens of economic theories of organizational incentives for innovation, a rational economic organization would limit patent rights to physical products existing as of a certain date.

b.  The Green Report assumes the value of the licenses surrendered by NNI "is equal to the present value of the income that could have been generated for the licensees [from selling and repairing Contemporaneous Products] had they not surrendered their licenses and had they instead continued to operate with the MRDA (and its sharing of operating profit) remaining in effect."[4] I have been asked to consider, through the lens of the economics of high-technology patents, whether it is economically rational to assume that NNI's only benefit from its rights to the patent portfolio would be the present value of income that could have been generated by the Contemporaneous Products.

c.  The Green Report concludes that NNI is only entitled to share the value of the patent portfolio directly embodied in "Contemporaneous Products" – and explicitly concludes that the "licenses did not grant the licensees the right to sell the underlying intellectual property or to share in the proceeds of such a sale."[5] I have been asked to consider, through the lens of the economic factors that drive patent portfolio valuation, whether there are sources of value derived from a patent portfolio by a license holder or ways that a license holder affects the value of such a patent portfolio that the Green Report's assumption ignores.

5.  As background to my analysis, I am informed by Counsel to the U.S. Debtors that the MRDA granted NNI and certain other Nortel geographic subsidiaries (together with NNL,

---

[3] Green Report at 4.

[4] Green Report at 4.

[5] Green Report at 4.

collectively the "IEs")[6] exclusive rights to use and sublicense all Nortel Technology[7] within the IE's respective geographies. I understand that this agreement specifically granted each IE an exclusive, royalty-free license in perpetuity to all Nortel Technology in its territory, including the right to sub-license that technology in the specified territory -- there were no specific exclusions beyond geographic scope subsumed in that license.[8] The agreement further granted each IE "the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."[9] In the event of a bankruptcy or insolvency (or in the event that one of these IEs elected to withdraw from the agreement), the MRDA requires that each IE would receive the "fair market value" of the licenses that it would be relinquishing.[10] In return for these rights, I understand that NNI and the other IEs vested in NNL title to any and all technology and know-how developed by the IEs in their respective geographies.[11]

## II.    SUMMARY OF CONCLUSIONS

6.    The conclusion in the Green Report that NNI is merely entitled to "the present value of the income that could have been generated for the licensees [from making the Contemporaneous Products] had they not surrendered their licenses and had they instead continued to

---

[6] NNL owned 100% of the stock of other IE affiliates: Nortel Networks Inc. in the U.S. ("NNI"), Nortel Networks United Kingdom Limited in the United Kingdom ("NNUK"), Nortel Networks S.A. in France ("NNSA") and Nortel Networks (Ireland) Limited in Ireland ("NN Ireland"). *See* Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004 Master Research & Development Agreement and Amendments) [hereinafter the "MRDA"].

[7] "'NN Technology' shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." *Id.* at 3.

[8] *Id.*

[9] MRDA, Third Add., at 6.

[10] MRDA at 4, 10. *See also* NNI_NARNIA_00303979 (Dec. 31, 2008 Memorandum of Understanding) at 1 ("Each Licensed Participant [also] entered into a bi-lateral Amended Research and Development Cost Sharing Agreement ('1992 Agreement') with NNL effective as of January 1, 1992, which was terminated by each party thereto as of January 1, 2001. The 1992 Agreement was a cost-sharing agreement under which NNL, as consideration for the Participant's sharing of costs of research and development, granted to the Participant an exclusive, perpetual, royalty-free license to make, have made, use, lease and sell Products (as defined in the 1992 Agreement) embodying NN Technology (as defined in the 1992 Agreement), and to all rights to patents, industrial designs, copyrights and technical know-how connected thereto, within the Participant's country of residence.").

[11] MRDA at 6.

operate"[12] is contradicted by the economics of incentives in high-technology organizations, the economics of high-technology patents and the economics of drivers of patent portfolio value.

### A.  Economic Incentives for Innovation in High-Technology Organizations

7.  Economic theory describing incentives needed for innovation in high-technology organizations, Nortel's own organizational structure, and the outputs of Nortel's worldwide research and development efforts, contradict the Green Report's assumption that Nortel intended to limit its subsidiaries' benefits from their research and development efforts to profits from products being produced at that time.

8.  The economics of innovation and technology emphasize that for a high-technology organization to survive, it has to jump from one short technology-cycle to another. This means that it is crucial for any high-technology organization to provide incentives to its employees and subsidiaries to make sure that the kind of innovations they pursue are forward-looking and not just focused on incremental improvements to Contemporaneous Products.

9.  Indeed, a view that the MRDA was only intended to encourage the IEs to focus on incremental innovations surrounding Contemporaneous Products is at odds with four facts about how the Nortel organization was set up. First, it is at odds with Nortel's explicitly reiterated intentions to embrace the next wave of technologies through its research and innovation process and with what economics tells us about appropriate incentives an organization needs to offer to make this occur. Second, it is at odds with the emphasis on giving incentives for entrepreneurial-risk taking expressed both in the MRDA and elsewhere. Third, it is at odds with the broad licensing rights provided in the MRDA, as well as the cross-organization economic incentives associated with the vesting of intellectual property developed by each subsidiary in NNL, the Canadian parent company, as custodian. In particular, it cannot explain the substantial differences in the nature of broad licenses given to the subsidiaries engaged in research and development and the narrow licenses given to the subsidiaries which were distribution entities. Fourth, it is at odds with the economic

---

[12] Green Report at 4.

4

incentives that would be demanded by independent third parties to enter into such an arrangement, which I understand is the criterion required by the laws and rules governing transfer pricing.

10. This interpretation of the MRDA is also at odds with observed outputs from the Nortel group research and development process. I offer two case studies where NNL IE subsidiaries were focused precisely on the kind of research and development with associated contributions to the patent portfolio that were ahead or sidewards of Contemporaneous Products. Such examples are evidence that Nortel's research and development subsidiaries were incentivized to be forward-looking beyond Contemporaneous Products.

**B. Economics of High-Technology Patents**

11. The assumption in the Green Report that NNI is entitled to an amount which "is equal to the present value of the income that could have been generated for the licensees [from making Contemporaneous Products] had they not surrendered their licenses and had they instead continued to operate with the MRDA (and its sharing of operating profit) remaining in effect" is not only inconsistent with the economics of organizational incentives but it is also inconsistent with the economics of high-technology patents. This branch of economics highlights high-technology patents' multi-faceted role in a firm's strategy and shows that high technology patents generate substantially broader value for an organization far beyond Contemporaneous Products. This contrasts starkly with how value is generated by a low-technology patent.

12. High-technology patents differ from low-technology patents because they are best viewed as "building blocks" that, when used in multiple combinations, describe a set of ideas and methods which go into making a piece of technology. This is distinct from low-technology patents, where a patent serves as a "recipe" for how to make a single product. The complexity and building-block nature of high-technology products is reflected in the fact that typically a cell phone will draw on well over 200 patents. High-technology patents also serve a multi-faceted role since they allow organizations to innovate towards the next S-curve and successfully defend the next iteration of its technology. Specifically, having access to a broad spectrum of patents allows an organization to innovate safely, knowing that if there is patent

litigation or other incursions by competitors it will be protected by having patents that can serve defensive purposes.

13. The Green Report incorrectly assumes, because certain Nortel documents state that product life-cycles are short in high technology, that the research and development and associated patent portfolio in high-technology organizations have a similarly short lifespan. The lifespan of the usefulness of research and development and the associated patent portfolio for the purposes of making and proposing new products is far removed from a single short physical product lifecycle. This is because high-technology patents serve as building blocks upon which new products and innovations can be developed. Demonstrating the fact that the most valuable high-technology patents are building blocks, I describe how the highest value and most useful (in terms of forward citation counts) and also the most litigated patents in the Nortel patent portfolio are older than the less useful patents. I also share evidence from Nortel's own internal documents that acknowledges how much longer was the lifespan of the patents embedded in the development of high-technology innovations, compared to the lifespan of their physical products.

## C. Drivers of the Economic Value of a Patent Portfolio

14. The Green Report's interpretation of the MRDA as meaning that NNI is only entitled to share the value of the patent portfolio that was directly embodied by Contemporaneous Products is not only inconsistent with the theory of organizational incentives for innovation and the economics of high-technology patents, but is also inconsistent with how economics explains the drivers of value of a patent portfolio. Beyond integration into existing product lines, there are additional sources of value that a rights holder can draw upon or take from a patent portfolio that the Green Report ignores. Rights holders can offer sub-licensing services to other firms to provide direct revenues, and, when needed, enforce their patent rights via litigation. Furthermore, the encumbrance that rights holders place on the value of a patent portfolio is sizable, simply because these rights cloud the major defensive values of such patent portfolios which are valued by potential buyers.

15. Reflecting the economics of property rights, the economic value of a patent portfolio stems from the ability to enforce the patents and consequently having the "right to exclude." It does not stem from having bare legal title to patents, and it does not stem from the amount of

money or effort spent creating the patents. Accordingly, an exclusive license holder who has enforcement rights and consequently the economic value embedded in the right to exclude can monetize their rights through sub-licensing their patent portfolio and other valuable by-products of research and development to potentially infringing firms, using litigation as called for to back up these rights.

16. The economic value of a patent portfolio is substantially reduced by any license or sub-license clouding the ability of the rights owner to enforce these rights. This is especially true if a potential buyer's motivation for purchasing the portfolio is partially defensive. The Nortel patent portfolio was relatively unencumbered other than by the exclusive licenses held by NNI and the other IEs. Had the Nortel portfolio been encumbered by other perpetual and exclusive licenses (which also had rights of enforcement), especially ones governing the United States where the right to enforce is key for driving the defensive value of patents in a particularly commercially large and attractive market, the patent portfolio value would have been far lower. This economic reality is recognized in the sale of the Nortel patent portfolio by the emphasis that was given both in Nortel's internal documents, the Google Asset Sale Agreement and the ultimate Rockstar sales agreement (and related license termination agreements) for the need to terminate all exclusive licenses encumbering the Nortel patent portfolio if it were to be sold.

## III.   QUALIFICATIONS

17. I am the Mark Hyman Jr. Career Development Professor and Associate Professor of Marketing at MIT Sloan at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts.

18. My academic specialty is applied microeconomics, and an area of particular focus for me has been how new technologies have changed and shaped intellectual property regimes and outcomes. I have written multiple studies that examine, among other subjects, how new strategies aiming at monetizing patent portfolios affect innovation outcomes, and I have also published various papers which examine the diffusion and growth of new networked telecommunications technologies.

19. I received an undergraduate degree in Politics, Philosophy and Economics from Oxford University in the United Kingdom. I received a Ph.D. in Economics from Stanford University in 2005. I have been at MIT since completing my Ph.D.

20. I am an Associate Editor at *Management Science* for "Entrepreneurship and Innovation" and Co-Editor of the *Journal of Quantitative Marketing and Economics*. I was a co-editor of the recent National Bureau of Economics Research volume on the *Economics of Digitization*. I am also Associate Editor for the *Information Systems Research* Special Issue on Social Media and Business Transformation and Co-Editor of the *Information Economics and Policy* Special Edition on the Economics of Digital Media Markets. I received a National Science Foundation CAREER Award, which is the National Science Foundation's most prestigious award in support of junior faculty who "exemplify the role of teacher-scholars through outstanding research, excellent education and the integration of education and research within the context of the mission of their organizations."[13] I have testified about the effect of privacy regulation before Congress and presented my research to the Federal Trade Commission, the Federal Communications Commission and the OECD. I have published multiple academic papers in leading economic, management and information systems journals, including the *Journal of Political Economy*, *RAND Journal of Economics*, *Management Science* and *Information Systems Research*. My *curriculum vitae* is attached as Appendix A. A list of matters in which I have testified in the last five years is attached as Appendix B.

21. I am being compensated for my services in this matter at my customary hourly rate of $1,050. In working on this report, I have been assisted by certain employees of Analysis Group, who provided support and assistance to me while preparing this report. Analysis Group is being compensated for their time in this matter at a rate ranging between $245 and $650 an hour.

22. Since my work on this matter is ongoing, I may review additional materials produced subsequent to the issuance of this report and/or conduct further analysis. I reserve the right to update, refine or revise my opinions, or form additional opinions.

---

[13] For more information, *see Faculty Early Career Development (CAREER) Program*, Nat'l Sci. Found. (Feb. 20, 2014), http://www.nsf.gov/funding/pgm_summ.jsp?pims_id=503214

IV.    **ECONOMIC INCENTIVES TO INNOVATE**

 A.  **Summary of Conclusions**

23. The economic theory characterizing the evolution of innovation, and how this theory explains organizational incentives found in high-technology organizations is useful for analyzing the Green Report's assumption that the exclusive licenses granted to the Licensed Participants in the MRDA were limited to the sale and licensing of the then current physical set of "Products," which it assumes are simply the Contemporaneous Products. The implication of this assumption is that if Licensed Participants could expect to receive only the stream of profits that were associated with Contemporaneous Products, they would have had no expectations to participate in the profits from future cycles of innovation associated with their own research and development efforts. This is inconsistent with the economics of incentives. The Green Report's assumption and its implications are contradicted by Nortel's own statements regarding its innovative nature and intentions, the nature of Nortel group's organizational structure that gave incentives for research and development, and the outputs observed from this organizational structure.

24. The economics of innovation emphasizes that for high-technology organizations, the crucial business imperative is to be constantly innovating and giving incentives so that those engaged in research and development focus on influencing and developing the next technology, rather than on making marginal improvements to or extending the life of Contemporaneous Products. This process is commonly referred to as being able to "leap from one S-curve to the next." A limitation of a subsidiary's exclusive licenses to Contemporaneous Products would be inconsistent with the economic and strategic incentives necessary for an organization such as Nortel, which operates in a dynamic competitive environment characterized by rapid technological change. Such a limitation would also have contradicted numerous statements made by the Nortel group (and by NNL and NNI, in particular, among other Nortel entities) that acknowledged the importance of staying on the technological frontier and focusing on long-run innovations rather than on marginal improvements.

25. In additional to contemporaneous documents reflecting Nortel's motivations, I also find that these economic imperatives for innovation are reflected in the Nortel group's corporate

structure, internal strategy incentive system, and ultimately in its patent portfolio development. For example, in countries where no Nortel affiliate conducted research and development, Nortel set up entirely different license structures, which considerably restricted the potential for that affiliate to ever benefit from the upside of future innovations. This is in line with the economics literature which emphasizes the huge incentives conferred for technology development on an exclusive licensee. It also ignores the repeated emphasis given to the need to encourage entrepreneurial risk-taking and the affirmative statements made to government authorities that NNI and the other IEs each bore the full upside and downside entrepreneurial risk of the Nortel business,[14] and the forward-looking research and development outcomes actually observed. Further, the Green Report's interpretation of the arrangement is inconsistent with economic incentives that would have been needed to ensure, for transfer pricing purposes, that the MRDA was consistent with the incentives that independent third parties would demand.

26. Multiple examples of outcomes from research and development by NNL subsidiaries demonstrate these subsidiaries were not focused only on Contemporaneous Products in their research and development efforts, but instead on developing future waves of innovation. The breadth of the patents associated with this research and development and their forward-looking nature were also emphasized in Nortel's own marketing materials when it came to publicizing the sale of their patent portfolio. That these outputs from the research and development process were not focused on Contemporaneous Products but instead towards forward-looking innovations speaks against the Green Report's contention that benefits were limited only to Contemporaneous Products.

## B.  Why Must High-Technology Organizations Give Incentives for Forward-Looking Innovation?

27. Economics contrasts two types of efficiency that firms might strive for. The first is *static efficiency*, which in the context of innovation is capitalizing on the existing stock of innovation and making it efficient at ensuring profits in the short term. Concerns over this static type of efficiency would lead a firm to make sure it maximized prices only for

---

[14] *See* MRDA at Sched.  A; Ex. 21407, NNI_01333113 (Nov. 30, 2004 Nortel Networks Multilateral APA Response to IRS Information and Document Request for a Functional Analysis); Ex. 21026, NNI_00373228 (Mar. 14, 2002 Horst-Frisch Report).

Contemporaneous Products. The second type of efficiency is *dynamic efficiency*. This describes the need to ensure that everyone involved with research and development throughout the organization has incentives to make innovation decisions today which maximize the profitability of future products.

28. The reason why dynamic efficiency is particularly important in high-technology markets relates back to a recurring empirical pattern observed for high-technology products, called the "S-curve" of innovation. This tracks out the typical diffusion path of a technology, where a slow start in sales is gradually followed by a ramp-up which is then followed by a gradual decline in sales. The shape of an S-curve reflects the fact that typically, as one technology starts to stagnate, another technology comes along to replace it. Figure 1 describes the typical timing of this process by which one S-curve replaces the next.



Figure 1: S-Curve of Innovation

29. This means that the crucial managerial challenge for innovation-driven firms is to make the technological investments which allow them to leap from one S-curve to another: that is, to be able to embrace and lead the adoption of the next wave of disruptive technology rather than clinging on to an existing technology which, though profitable today, will not be profitable in the future. The need for existing tech firms to manage this process of shifting from one technology to the next and being willing to ruthlessly jettison old technology

markets is highlighted not only in the academic literature but also in popular business books.[15]

### C. Is it Consistent Given This Framework to Assume that the Exclusive Licenses Given to Participants in the MRDA Were Limited to the Sale and Licensing of Contemporaneous Products?

30. I understand that the MRDA gave NNI and the other IEs, exclusive, perpetual, royalty-free licenses to Nortel technology in each IE's exclusive territory.[16]

31. I have been asked to examine the assumption that this arrangement meant that the only benefits associated with these exclusive licenses were those limited to the sale and licensing of Contemporaneous Products. This is the assumption that underpins the conclusions drawn in the Green Report:

> As for those Residual Patents that were not used in any of Nortel's operating businesses, they have no value allocable to the U.S. or EMEA Debtors since, based on the assumptions that I have been asked to make, their license rights were limited to using NN Technology to sell Products and generate operating profits in their respective territories. It is my understanding that the U.S. and EMEA Debtors' licenses did not include rights to patents not used in any of their operating businesses under the MRDA. Put another way, the rights would have no value.[17]

32. This assumption is in turn based on a limited and narrow interpretation of what both "NN Technology" and "Products" meant in the context of the Nortel group generally and in particular how one should interpret the use of these terms in the MRDA, which states:

> "NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill. ... "Products" shall mean all products, software and services designed, developed, manufactured or marketed, or

---

[15] *See* PAUL NUNES & TIM BREENE, JUMPING THE S-CURVE: HOW TO BEAT THE GROWTH CYCLE, GET ON TOP, AND STAY THERE (2011); SCOTT ANTHONY et al., THE INNOVATOR'S GUIDE TO GROWTH: PUTTING DISRUPTIVE INNOVATION TO WORK (2013).

[16] MRDA at 1st Add.

[17] Green Report at 64.

> proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.[18]

33. There are two approaches that I will take to answer the question of whether assuming there was an implied limitation to Contemporaneous Products would make sense in the context of the Nortel group. First, does such a limitation make sense from an economics of the organization incentives perspective? Second, were the outcomes observed in terms of innovation at Nortel consistent with such a limitation? I discuss these two approaches in turn.

### i.    Does Such a Limitation Make Sense from an Organizational Economics Perspective?

34. In high-technology markets, unlike in low-technology consumer goods markets, the primary concern of organizations is to maximize incentives for dynamic efficiency. This is because product cycles are short and fluid and transitions from one S-curve to another are swift. A cellphone manufacturer might only have a few months when their phone is on the technological frontier. As a result, to remain profitable they need to make sure that everyone in their organization is focused on developing new technologies and innovations that will allow them to replace that phone in the upcoming years and keep them at the technological frontier.

35. By contrast, a manufacturer of pet products might have a decade to reap the reward of a well-priced and well-branded dog bowl. Therefore, they have to worry less about giving the right incentives to their research and development organization to come up with the next iteration in dog bowl technology. Indeed, the model assumed by the Green Report, where a research and development affiliate has the rights to reap the profits of innovations, but only when applied to Contemporaneous Products, makes sense only in the context of products analogous to dog bowls, where there is little risk of a new technology displacing the current set of products. There, because an affiliate could not be guaranteed the upside of any future developments, the focus of the entire organization would be on ensuring that any affiliates made and designed these dog bowls as efficiently as possible and perhaps tweaked color or

---

[18] MRDA at 3-4.

curvatures slightly as fashion dictated. This would be in line with an exclusive focus on achieving static efficiency.

36. However, in a high-technology industry, this backwards-looking focus, which simply gives incentives to tweak Contemporaneous Products, would not make sense. It would seem a surefire recipe for ensuring that a research and development arm of that organization only ever focused on the existing S-curve for a technology, rather than giving it the incentives that a third party would demand to make the research and development investments which would be needed to help the entire organization move to the next S-curve. This distinction is important for understanding how an organization such as Nortel might want to set up incentives around its research and development process and its associated patent portfolio if it wants to maintain a leadership position.

37. There is plenty of evidence in Nortel's public statements that they were well aware of this imperative. Indeed, Nortel externally emphasized its focus on research and development. Nortel's annual financial filings reflect a shift in research and development investments as technology evolved.[19] In the 2003 10-K, while explaining varying cost reductions, Nortel stated "[o]ur R&D expense did not decline to the same extent as our SG&A expense on a percentage basis due to our technology focus and commitment to invest in next generation solutions."[20] A later Nortel 10-K reiterated this, noting, "We are seeking to generate profitable growth by using this focus to identify markets and technologies where we can

---

[19] In 2002, Nortel noted investments in packetized networks, secure multimedia services, broadband and the dynamic optical foundation. In 2003, noted investments included wireless voice and data, voice over packet, multimedia services and applications, broadband networking and network security. By 2008, the "[k]ey areas of investment ... included Unified Communications, 4G broadband wireless technologies, carrier Ethernet, next-generation optical, advanced applications and services, secure networking, professional services for Unified Communications and multimedia services. *See* Nortel Networks Corporation, 2002 Annual Report (Form 10-K) (Mar. 3, 2003) at 19, Nortel Networks Corporation, 2003 Annual Report (Form 10-K) (Jan. 11, 2005) at 20, and Nortel Networks Corporation, 2008 Annual Report (Form 10-K) (Mar. 2, 2009) at 6.

[20] Nortel Networks Corporation, 2003 Annual Report (Form 10-K) (Jan. 11, 2005) at 37. Similarly, throughout the years Nortel repeatedly emphasized externally that "[a] substantial portion of our business has a technology focus and is dedicated to research and development. This focus forms a core strength and is a factor that we believe differentiates us from many of our competitors. We envision a network society where people will be able to connect and interact with information and with each other instantly, simply and reliably, accessing data, voice and multimedia communications services and sharing experiences anywhere, anytime." *Id.* at 1.

attain a market leadership position... Some areas in which we are increasing investment include 4G broadband wireless technologies..."[21]

38. This emphasis continued in later years. Indeed, in NNL and NNI's Bilateral Advance Pricing Agreement (Appendix B) in 2007, which I understand was submitted to several national tax authorities, including the Canadian Revenue Authority ("CRA") in Canada and the Internal Revenue Service ("IRS") in the U.S., there was an emphasis on how Nortel "[a]ccelerated the shift of R&D dollars towards new and emerging markets and technologies."[22]

39. Internal statements at Nortel also reflected a keen awareness of this imperative. For example, take the punchline, "True innovation is anticipating what will be important years ahead of time."[23] This punchline encapsulates the spirit and rationale behind forward-looking innovation. The punchline was used at the bottom of a slide which discussed the filing of "presence related patents" back in the 1990s in a 2009 presentation related to Project Equinox and Enterprise Solutions, suggesting that the patenting strategy at Nortel was thought of as being crucial to facilitating this jump from S-curve to S-curve. An earlier presentation showed Nortel prided itself on these jumps, noting "Nortel - at the forefront of every major technology shift in the telecom industry - and each of those shifts has in some way changed the world and the user experience."[24]

40. Reflecting this internal awareness, after being appointed CTO in 2006, John Roese discussed the individual planned research and development sites emphasized in his "State of R&D at Nortel" presentation, stating "[w]e are replicating on a broader scale a model that has proven to be highly successful (historically and today) of driving disruptive technology/innovation into market."[25] "[A] technology company that only builds for the present eventually fails in the future. And your ability to deliver future products requires investment in R&D in those

---

[21] Nortel Networks Corporation, 2006 Annual Report (Form 10-K) (Mar. 16, 2007) at 3.

[22] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011)).

[23] CCC0006612 (Mar. 2009 Presentation, "Enterprise Solutions Project Equinox") at p. 49.

[24] Ex. 11282, NNC-NNL06651522 (Sept. 26, 2007 Email attaching John Roese Remarks At Ottawa Patent Awards Ceremony) at 1.

[25] Ex. 22119, NNI_00319480 (April 9, 2008 Email (NNI_00319465) attaching Presentation, "The State of R&D at Nortel") at 16.

products before they actually are necessary."[26] Backing up such statements with actions, John Roese also directed an "advanced development" program to encourage "speculative innovation," focused on capitalizing advances from research and development activities in the product market.[27]

41. To achieve these stated aims, and to reflect this awareness of the challenges posed by having to constantly leap from S-curve to S-curve, a high-technology organization such as Nortel would have needed to make sure that each research and development affiliate had the right incentives to innovate, and consequently, to maximize innovation across their organization. The key objective is to ensure that each research and development affiliate has the right incentives not to merely maximize its own short-term profits, but instead to maximize the organization's long-run profits. The way dynamic incentives for innovation are typically achieved is by ensuring that affiliates within a global organization that engage in research and development are given guarantees that they would participate in the gains from any investments in future technologies, rather than receiving gains only from investments aimed at tweaking contemporaneous products and only achieving static efficiency. The key insight is that the more expansive the rights given to a potential innovator to receive profits from an existing innovation and the future innovations that spin off from it, the more incentive they have to develop these future innovations.

42. To see this, imagine the following analogy: Let us suppose two different kinds of property rights that I might give regarding an outmoded street-front commercial property that I was thinking of renting out. In the first scenario, I allow a potential renter to pay me each month with no guarantee or agreement that our arrangement will continue or that they alone would occupy the property. I thereby ensure that the renters have no incentive to perform future maintenance on the property, and instead only deal with issues that immediately affect them, like a flood in a storage room. In the second scenario, I give someone a perpetual (and exclusive) lease. With such a perpetual and exclusive lease, by contrast, I would ensure that

---

[26] Roese Dep. 32, Nov. 11, 2013.

[27] These advanced development programs were international in scope. In his deposition, Roese stated, "I would be in Ottawa. Much of these [R&D] functions were decentralized. They would be strategically aligned and they would be operationally centralized, but the actual activity would be where it made sense. For example, in data networking, for Enterprise, there really was no presence in Ottawa. The leader that reported to me that ran that piece of R&D, Liam Kiely, was based in Billerica[, Massachusetts,] and primarily Bangalore[, India,] and a bit in China." *Id.* at 94-95.

the renter was both interested and active in ensuring the commercial property was constantly updated and improved. The lease would give incentives for my renters to behave as though the property was theirs – as in some sense it would be – so that every improvement they make could be viewed as something from which they would reap benefits. In particular, the tenants would have incentives to ensure that the property is maintained in a manner that keeps ahead of commercial trends.

43. In general, the organizational structure at Nortel, which emphasized the perpetual and exclusive nature of the IE licenses, very much echoes the latter example. By assigning expansive property rights, Nortel was able to ensure that non-Canadian affiliates and their engineers and researchers did not just focus on the immediate and the incremental, but instead thought about how to reach the next frontiers in innovation and improvements.

44. Indeed, the economics literature emphasizes the uniquely strong incentives for future innovations given by exclusive licenses. Dr. Gallini, in her discussion of the Bayh-Dole Act of 1980, states that "without exclusive licenses, private firms would be unwilling to commit investments necessary to develop university inventions beyond their 'embryonic' stage." In other words, giving exclusive licensing rights to patents "facilitates the use and development of pioneer inventions" by the exclusive license holders.[28]

45. This organizational imperative to give incentives for dynamic efficiency in innovation was not only reflected in the nature of the exclusive patents given, but it was also reflected in the MRDA, and in particular by the phrase:

> Accordingly, the compensation provided to Participants under RPSM [(residual profit split methodology)] reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN [(Nortel Networks)] Technology. Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business.[29]

46. The emphasis on giving incentives for both the upside and the downside of the entrepreneurial risk taken towards innovation emphasizes the extent to which the MRDA was

---

[28] Nancy T. Gallini, *The Economics of Patents: Lessons from Recent U.S. Patent Reform*, J. ECON. PERSP., Spring 2002, at 131.

[29] MRDA at Sched. A.

intended to be consistent with creating incentives for each affiliate to be aware of the need to move from one S-curve to another. There are echoes of this sentiment in other phrases in the MRDA when it states:

> WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits...[30]

47. Of key interest to an economist is what economic incentives supported the "arm's length" nature of the transfer pricing agreement.[31] In particular, for an affiliate to agree to an arrangement where it would vest in a related firm legal title to the patent portfolio it created and agree to fund substantial losses incurred by the other firms to create the patent portfolio, and for this to be something that they would be willing to do at "arm's length" as if the agreement were between two independent firms, there must have been a considerable upside from the perspective of the contributing firm. In particular, in Nortel's case, for the structure to be accurately described as arm's length, it was essential to ensure that there was enough upside present for all affiliates to incentivize the affiliates to contribute the inventions that arose from their research and development to the common patent portfolio for which NNL was the administrative custodian.[32] It is difficult to imagine an arm's length arrangement where the only upside that an IE could expect from its research and development efforts was simply the ability to benefit from sale and licensing of Contemporaneous Products to the exclusion of the forward-looking potential of the research and development for future iterations of the technology or from revenues from licensing activities.

---

[30] *Id.* at 2.

[31] The Eden Report ¶26 provides a working definition of the "arm's length" standard: "The touchstone for transfer pricing regulations is the "arm's length" standard. Under the arm's length standard, the affiliated entities that are part of an MNE are treated as if they were unrelated entities. Each affiliated entity must price its related party transactions as if the entity were at arm's length from its parent and affiliated entities within the MNE. Under the arm's length standard, a transfer price is appropriate if it falls within the range of prices that two unrelated parties may reasonably negotiate for the same or similar product traded under the same or similar facts and circumstances to the related party transaction." Expert Report of Lorraine Eden ¶26, Jan. 24, 2014 [hereinafter "Eden Report"].

[32] *See* Eden Report ¶¶26-34.

48. This same economic theory of organizational incentives in high-technology markets helps to illuminate the distinctions made in the licensing arrangements between the Nortel subsidiaries where there were facilities and infrastructures for doing research and development and those subsidiaries where no such research and development occurred.[33] This distinction is made in the "Advance Pricing Agreement/Arrangement 2007-2011"[34] that states that Nortel entities which perform the functions of research and development, manufacturing support, distribution and have economic rights to the patent portfolio are considered Integrated Entities ("IEs"). Entities which strictly perform distribution and related services are Limited Risk Entities ("LREs"). As I understand it, several of Nortel's European markets where the Nortel entities were LREs were larger than the Irish market where the Nortel affiliate was an IE.[35]

49. If the focus of the cross-licensing arrangements had been to simply allow the production and efficient delivery of the current set of products, then we would have expected to see similar incentives offered in those larger markets for innovation to those offered in Ireland. However, I understand that the patent licenses given to the European subsidiaries where there were no research and development facilities were entirely different in their scope and purpose than the ones given in Ireland. Very noticeably, the licenses were not exclusive.[36]

---

[33] For example, some of the language used in Nortel's agreements with subsidiaries where no research and development occur recognizes the entrepreneurial activity of IEs. For example, "NNL and certain NNL affiliates ("the NNL Entrepreneurial Entities") assume all the expenses and risks of ownership associated with the development and exploitation of such intangibles assets, including without limitation, research and development activities, manufacturing oversight, and development costs for the intangible assets  (such as patents, industrial designs, copyrights and applications thereof, technical know-how, drawings, reports, practices specifications, software and other documentation or information) ("NN Technology") relating to manufacturing, installation, operation, maintenance and use of products, software and services ("NN Products) manufactured or marketed, or proposed to be manufactured or marketed, by NNL and its affiliates, including NN Poland;" Ex. 32012, NNC-NNL06001488 (Jan. 1, 2001 Distribution Agreement and Addendum to Distribution Agreement) at 37.

[34] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011)).

[35] *See, e.g.*, *International Communications Market Report 2012*, Ofcom (2012), http://stakeholders.ofcom.org.uk/binaries/research/cmr/cmr12/icmr/ICMR-2012.pdf (in which Figure 6.18 lists "Telecoms service retail revenues by sector: 2006 and 2011," emphasizing that Italy has revenues of £25 billion in 2006 and Spain has revenues of £20 billion in 2006, as compared to revenues of £2 billion in Ireland.).

[36] *See, e.g.,* Ex. 32166, EMEAPROD0888515 (Jan. 1, 2002 Distribution Agreement between Nortel Networks Limited (NNL) and Nortel Networks S.P.A. (NN Italy) with Addendum), distinguishing IEs from NN Italy as an LRE. *See also* NNI_00245703 (Jan. 1, 2001, Distribution Agreement between Nortel Network Hispania S.A. ("NN Spain") and Nortel Networks Limited ("NNL")) for corresponding language.

50. The lack of research and invention facilities in many European countries rendered the business objectives for the Nortel subsidiaries located there analogous to those of the dog-bowl manufacturer, with a short-term profit focus aimed at maximizing static efficiency for Contemporaneous Products. This provides a useful contrast to the different business objectives that existed in any country where Nortel hoped to inspire research and development.

### ii.    Were the Outcomes Observed in Terms of Innovation at Nortel Consistent with Such a Limitation?

51. Another way of evaluating the intentions underlying Nortel's organizational structure is to look at the outputs of that organizational structure. If indeed the benefits that each subsidiary could receive were limited to the license to manufacture and sell Contemporaneous Products, then we would expect research and development that took place in those subsidiaries to be focused solely on improving the sales potential of that current product. However, the history of Nortel itself testifies to the fact that this was not the case.

52. Nortel has had a long history of such forward-looking innovation. In the book *Adventures in Innovation*, John F. Tyson, a longtime Nortel employee and executive, describes how an earlier incarnation of the firm had used patents generated during World War II, presumably for military radio purposes, to develop "Baby Champ" desktop radios with miniature vacuum tubes. He also describes the process by which the company decided to take a leap of faith to make the transition to digital switches rather than analog switches – as he says, "Northern had shown time and time again that it was adaptive in anticipating market discontinuity" and "My greatest concern was falling one step behind. I had seen Digital Equipment consumed by Hewlett-Packard, Rolm by IBM and STC by Northern... In my experience, corporations that fail to continuously innovate are vulnerable to product atrophy or being made obsolete by competition."[37]

53. As I highlighted earlier, it appears that Nortel's corporate culture persisted in recognizing the importance of investing not in innovations which were incremental and focused on the current set of technologies and products, but instead investments in the kind of innovations

---

[37] JOHN F. TYSON, ADVENTURES IN INNOVATION: INSIDE THE RISE AND FALL OF NORTEL, 98, 132-133(2014).

which would allow Nortel to jump successfully to future S-curves and navigate disruptive shifts in technologies. An example of this continuing awareness is Nortel's decision to prioritize investments in developing 4G technology at a time when 2G and 3G cellular technologies were dominant.[38] CTO John Roese highlighted how aggressive the investment in LTE at Nortel was compared to its peers: "[I]n 2008, I was, gave a keynote at the CTO panel of Mobile World Congress, the largest event of the year. It was myself, Harkum Erickson who was the CTO of Erickson, our largest competitor; Paul Macovitz, who was the CTO of Alcatel Lucent, and a few others. At that point one of the questions was when will LTE happen and what will be the killer application. The consensus of my peer group was 2015, and the killer app was some random thing that nobody cared about that they invented on the spot. My answer was it will happen in 2011, because we are going to make it happen, and the killer application will be that you will be able to mobilize all of the applications that you find useful at home but can't run on a mobile phone because of band width and performance. I would argue I was right."[39] "The early WiMax market that's emerging and the 4G market associated with it, is actually... for the first time ever, an ability to truly mobilize their workforce. To have the same application running on a broadband wireless network that runs on their LAN... will benefit tremendously from the 4G ecosystem that's emerging over the next couple of years."[40]

54. Another example is voice over Internet protocol (VoIP), for which "Nortel would take a 'right angle turn' away from its … roots" and file a "click to call" patent more than 10 years prior to its becoming a reality.[41] This is a classic example of a company that realized that its survival rested on giving the correct incentives throughout the organization to be forward-

---

[38] "Now demand for video, high-definition television, peer-to-peer connectivity, video-on-demand and other bandwidth-hungry applications is increasing substantially. Our analysis indicates that, to address this demand, wireless networks will need to move to fourth generation, or 4G, technology." Nortel Networks Corporation, 2006 Annual Report (Form 10-K) (Mar. 16, 2007) at 2. "Over the last eight years [emphasis added], we have also made progressive investments in 4G technologies." *Id.* at 6.

[39] Roese Dep. 183. Nortel's vision of investment to jump to the next S-curve showed "[e]ven though LTE was still a few years away, its predecessor, the first technology to use OFDM and MIMO wireless technology was known as WiMAX, and we [Nortel] were one of the first developers of that technology." *Id.* at 103.

[40] *Catching Up With Nortel CTO John Roese*, NETWORK WORLD (June 27, 2007), http://www.networkworld.com/podcasts/panorama/2007/062607pan-nortel.html, 36:00-36:43, at 36:00-36:43 [hereinafter NETWORK WORLD]

[41] Ex 11282, NNC-NNL06651522 (Sept. 26, 2007 Email attaching John Roese Remarks At Ottawa Patent Awards Ceremony) at 4.

looking when it came to technology.  Indeed, as Nortel's CTO John Roese describes in an online interview, "If you take your eye off the ball, you suddenly find out a few years later that most of your people are working on legacy products which is probably not a very good way to run a business."[42]

55. A useful historical contrast to the awareness exhibited by Nortel is Kodak. Kodak made sizable investments in digital photographic technology but was unable to manage to shift from the S-curve for its established film market business to the new digital photography S-curve, leading to its eventual collapse. Academic work studying why this occurred suggests that it was because Kodak did not provide adequate incentives for managers to be forward-looking and be willing to ruthlessly look beyond contemporaneous profitable products.[43]

56. This backwards-looking behavior at Kodak should be contrasted with Nortel's own record and the way it was perceived externally. In a 2001 article, the New York Times describes how Nortel, the "chief rival" to Bell Laboratories, won this battle of establishing technological prowess in optical networking technologies. In the same article, it described Bell Laboratories as a "pillar of scientific and technical ingenuity," and this seems to describe well the kind of company that Nortel had to be to win in the markets in which it competed.[44] This parallel with Bell Labs seemed merited. John Veschi has stated that he was attracted to Nortel because it had "Bell Lab quality patents […] based on fundamental R&D."[45]

57. Further evidence in the recent history of Nortel which does not support such a limited interpretation of its patent rights is the nature of the patent portfolio developed by Nortel. A specific example was Nortel's development of many patented technologies that eventually

---

[42] NETWORK WORLD, *supra* note 40, at 7:04.

[43] See Henry C. Lucas Jr.& Jie Mein Goh, Disruptive Technology: How Kodak Missed the Digital Photography Revolution, 18 J. STRATEGIC INFO. SYS. 46 (2009); Rebecca M. Henderson, & Kim B. Clark, Architectural Innovation: The reconfiguration of existing product technologies and the failure of established firms, 35 ADMIN. SCI. Q. (SPECIAL ISSUE: TECH., ORG., & INNOVATION) (1990).

[44] William J. Broad, *Bell Labs: A Bit Abstract and Always Curious*, N.Y. TIMES, May 30, 2001, http://www.nytimes.com/2001/05/30/technology/30BELL.html.

[45] John P. Veschi et al., *Panelists, Key Transaction Diligence and Deal Issues from Perspective of Leading Seller and Buyer*, Conference on IP Investments & Markets 2013: Asset Acquisition and Divestiture, held by the Center for Applied Innovation, YOUTUBE (Aug. 8, 2013), https://www.youtube.com/watch?v=16McIOuCdLU, from 10:25 [hereinafter Veschi Panel].

found themselves in a cell phone handset. Despite the fact that a mobile handset was never a commercially marketed Nortel product, its subsidiaries still had incentives to create many mobile handset-related patents, given that Nortel's business was focused on the design of wireless networks through which handsets must operate.

58. Indeed, in Nortel's marketing materials for the sale of the patent portfolio, it emphasized the extent to which the patents were not limited to contemporaneous products that Nortel produced:

> Nortel's patents are not limited to behind-the-scenes technology that only engineers can appreciate; the patents also cover elements of the user experience and key aspects of Internet technology that can be observed without any sort of reverse engineering. Nortel's patents include inventions on Internet search and advertising, social networking, e-commerce, GUIs, Caller ID, GPS and other technologies that consumers use everyday.[46]

59. The fact that the Nortel group's innovation was itself so broad-ranging and applied to so many products that had not yet evolved or had not yet been manufactured or marketed by Nortel emphasizes that its research and development affiliates and their engineers and researchers felt that there were incentives to be forward-looking beyond contemporaneous products in terms of which innovations they pioneered. The 2002 Economic Analysis by Horst Frisch explained "Nortel's R&D function is a global undertaking aligned with its business strategy of technology leadership. Engineers in each of Nortel's geographic markets work to develop next generation products. Researchers and engineers in Nortel's 48 facilities and partner locations around the globe collaborate to develop new, best in class products for which the company is known."[47]

60. Another outcome that calls into question this very narrow view of the incentives at play is the number of important pieces of research and development which involved cross-country teams who developed products outside the territorial boundaries implied by a focus on products that could be sold within a specific region.[48] If research and development subsidiaries were focused only on the profits that they could realize selling Contemporaneous

---

[46] GIP_Nortel_00080080 (May 2010 Project Iceberg Executive Summary) at 3.

[47] Ex 21026, NNI_00373228 (Mar. 14, 2002 Horst-Frisch Report) at 4.

[48] Roese described Nortel's R&D as having "[c]omplex geographical distribution" and "[m]ulti-site product development." Ex. 21016, NNC-NNL07453772 (Oct. 10, 2006 Email attaching Presentation, "R&D Update")

Products, they would have little incentive to coordinate with teams outside those territories focused on producing the next wave of innovation.

61. However, instead it seems that there were substantial incentives for cross-geography collaborations focused on future innovations. As Gillian McColgan has explained,

> Nortel was what we would have called a multi-site R&D operation, split site. We had a number of divisions that were R&D divisions around the world, many of which were deemed centres of excellence for particular technologies.[49]

That "matrix organization is intended to foster a collaborative environment where the right resources are brought to an issue, product, proposal, or other organizational need without typical constraints such as where the resources are located or reporting lines. With the interactive communications technologies available, Nortel is able to offer its teams the ability to interact and collaborate across functional boundaries, and to work effectively together depending on the product, process, project, or other business need."[50] She continued,

> They – in the lines of business and even within the CTO office, there were labs that worked together on an on-going basis on joint projects, either for product development or for advanced research and development, and the groups were made up of individuals from all over the world in terms of participation from different groups... There would have been significant collaboration when you're working with a group of – members of a team on a single objective for a project. Yes, it's very likely that you would have communication and collaboration with the rest of the team.[51]

62. We can also see how successful such cross-geography collaborations were at producing forward-looking innovation. For example, U.S. Patent No. 5263084 entitled "Spontaneous caller identification with call-waiting" involved a cross-country team that encompassed Canada and the U.S.[52] This patent has been cited nearly 100 times and is an important innovation which would not have occurred if researchers were given incentives to simply think about existing products in their own exclusive territories. Internal Nortel documents,

---

[49] McColgan Dep. 52:9-53:5, Nov. 8, 2013.

[50] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011)) at 38.

[51] McColgan Dep. 52:9-53:5.

[52] U.S. Patent No. 5,263,084 (filed July 22, 1991), available at http://www.google.com/patents/US5263084.

also cited by the Green Report,[53] echo this notion of cross-collaboration: "R&D at Nortel is often characterized by a collaboration between inventors in different countries and joint inventorship. This focus on the usefulness of cross-geography collaboration for future innovation, also means that counting inventions by 'country of origin' can be misleading. Instead it appears that much of Nortel's research and development was interrelated, and that one specific project was often developed based upon older research and development projects or platforms."[54]

## V.    THE ECONOMICS OF HIGH-TECHNOLOGY PATENTS

### A.  Summary of Conclusions

63. The economics of high-technology patents emphasizes that unlike a low-technology patent which can be simply a recipe about how to manufacture a physical product, a high-technology patent is best thought of as a building block which describes a concept or method of approaching and developing new technologies. This means that future waves of innovation can build on this patent, safe in the knowledge that such innovations will be protected from competitive forces through defensive patent value. Given the complexity of the patents surrounding high-technology products and the high risk of litigation, high-technology patents often also serve a defensive role, which helps protect a firm sued for patent infringement. High-technology patent portfolios are therefore not only focused on protecting current products, technologies, and innovations, but also on future innovations.

64. I use this economic framework to consider an assumption in the Green Report that the benefit a high-technology organization derives from rights to a patent portfolio is limited to the stream of profits it can make from Contemporaneous Products that are manufactured on the strength of the patent portfolio. Given the multi-faceted sources of value that a typical high-

---

[53] Green Report at 24.

[54] Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011)). A memo from 2003 also shows Nortel aware of this interrelatedness even earlier: "It is difficult to simply adjust the accumulated net capitalized R&D upon a disposition for the following reasons: Nortel R&D typically migrates from one product and/or business to other products and/or businesses. That is, a product may be developed by one entity, and that same product is subsequently improved upon or utilized in another product developed by another entity." Ex. 21381, NNI_00208244 (Mar. 31, 2003, Memo from James Gately)

technology organization derives from a patent, this assumption does not accurately reflect the value that a high-technology firm or its subsidiaries derives from its patent portfolio.

65. This multi-faceted function of research and development and its associated patent portfolio also has implications for its useful lifespan for an organization. In contrast to the conclusions drawn by NNL's expert reports, including the Green Report,[55] given the various purposes of high-technology patents,  research and development spending and the patents generated through this spending often has a lifespan that outlives a specific product. It is therefore mistaken to make inferences about the lifespan of the underlying research and development and its associated patent portfolio from an average product life. In fact, the effect that research and development has on industry standards, future innovations (as can be seen in patterns of forward-patent citations), and unexpected patent litigation means that the value of patents generally can far outlive specific products and product lines.[56]

**B. How Do the Economics of High-Technology Patents Differ from Low-Technology Patents and How Do These Differences Affect How an Organization Derives Value from the Rights to a Patent?**

66. To understand what is distinct about a high-technology patent, it is useful to set up the baseline contrast of a "low-technology patent." Let us return to the dog bowl example and imagine I had a patent on a particular kind of spill-proof dog water bowl. The function and role of such a product-focused patent is quite simple. It allows me to manufacture that particular dog bowl safe in the knowledge that competitors will not be able to freely copy the way I made it spill-proof. By contrast, a typical high-technology patent typically serves three complementary functions, which is to protect current innovation, to protect future innovation, and to defensively protect against competitor patent litigation. I discuss these points of distinctiveness in turn.

---

[55] The Green Report states that since there was a high pace of development in the industry, Nortel's IP had a technological life of five years or fewer. Green Report at 23-24.

[56] This conclusion that emphasizes that a high-technology patent lifespan far exceeds a particular product lifespan echoes the useful life analysis found in the Expert Report of James Malackowski, especially when he says "older patents covering technologies accepted by the marketplace often gain value as the market matures over a longer period, and the most valuable patents often become such only in the final years of their patents terms." Given my discussion on the economic usefulness of a high-technology patent, I agree that an appropriate constraint to consider for a very valuable high-technology patent's useful life is its legal life. Expert Report of James Malackowski at 44, Jan. 24, 2014 [hereinafter the "Malackowski Report"].

### i.    Protecting current innovation

67. A dog bowl patent can protect a dog bowl manufacturer from other firms capitalizing on its design. However, an additional nuance when it comes to high-technology patents is that a high-technology patent can often describe something far more abstract that the curvature of a particular bowl. It can describe a process or an idea about a certain way of achieving something. For example, as I discuss in greater detail in a case study below (paragraphs 85 and 86), it can describe something as abstract as a virtual private network. This very much describes a process rather than a particular set of wires that allows the firm to achieve this goal.

68. This is important, as it allows more conceptual patents to be somewhat divorced from Contemporaneous Products, and instead to apply to a variety of settings and product categories. This was emphasized by John Roese when he said "the technology is very applicable across boundaries," giving the specific example of enterprise technology and 3G cellular standards as technologies.[57] It also adds the complication that tying a particular patent to a particular product through a one-to-one match is rarely straightforward or even possible.

### ii.    Protecting future innovation

69. Another distinction between a high-technology patent and a dog bowl patent is that for the dog bowl patent it is difficult to see how major new innovations will build on the specific solutions or technology embodied in that patent. By contrast, a high-technology patent typically builds on multiple existing patents, and in turn innovations that build on it will refer to that patent. This means that a patent does not merely protect an existing innovation, but also protects an organization's ability to innovate in the future.

70. A useful analogy is that high-technology patents should be thought of as the various and intertwined building blocks which make an innovation possible, rather than being the single foundation on which a single innovation is built. This reflects the multi-purpose and complex nature of a single typical piece of new technology. For example, a recent analysis shows that

---

[57] NETWORK WORLD, *supra* note 40, at 5:13.

the patent portfolio for Apple's iPhone "is over 200 patents strong" not including "the patents that Apple licenses from other companies in order to bolster the iPhone's capabilities."[58]

71. The fact that so many of Nortel's patents were viewed as building blocks across and beyond directly commercialized products is illustrated in Nortel's own marketing materials when it came to the sale of its patent portfolio. It was also echoed in multiple PowerPoint slides that were constructed by John Veschi and his team to persuade Nortel executives of the potential value of their patent portfolio. Figure 2 shows a screenshot of the way that Nortel portrayed how many of its patents actually were building blocks within a typical cell phone.[59]



Figure 2: Screenshot from Project Iceberg - Nortel

---

[58] Lindsey Gilroy and Tammy D'Amato, *How Many Patents Does It Take to Build an iPhone?* INTELLECTUAL PROPERTY TODAY (November 2009), http://www.iptoday.com/issues/2009/11/articles/how-many-patents-take-build-iPhone.asp.

[59] GIP_Nortel_00080080 (May 2010 Project Iceberg Executive Summary) at 3.

72. The "building block" nature of the typical high-technology patent led to the development of "patent thickets." A patent thicket is "a dense web of overlapping intellectual property rights that a company must hack its way through in order to actually commercialize new technology."[60] As described in recent economics research, patent thickets can act as a barrier to entry to potential rivals.[61] This property of competitive deterrence would have been important to an organization such as Nortel trying to establish its pre-eminence in high technology. Their patents that served as part of a patent thicket were an important way for Nortel to protect its innovations from competitive threats and guarantee future revenues. "Whether you choose to develop a product or no product emerges from it, the concept of patents and ownership of patents gives you protection in the future..."[62]

73. The complementary role of patents in patent thickets also further emphasizes the multiple roles that a high-technology patent can serve, both in terms of allowing a firm to create new innovations, and in defending the firm from competitive threats within the future technology space as it evolves. As Google's general counsel Kent Walker has explained, "one of a company's best defenses against [patent] litigation is (ironically) to have a formidable patent portfolio, as this helps maintain your freedom to develop new products and services."[63] Nortel appears to have understood the importance of these thickets:

> Patents that only read on a specific widget in your Product have the least value to you as a company, because they don't read on other competitors products and the scope of the invention granted will be very limited because there is so much prior art in that field, so Nortel's focus was where possible to always file in emerging technology areas as early as possible. ... Nortel [would] think about what competitors or other target companies might do in the future so Nortel could lay down some inventions to give us defensive protection against others...[64]

---

[60] Carl Shapiro, *Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting* 1 NBER INNOVATION POL'Y & ECON. 119(2001), http://www.nber.org/chapters/c10778.pdf, accessed February 18, 2014.

[61] Bronwyn Hall et al., *A Study of Patent Thickets, A Final Report Prepared for the UK Intellectual Property Office*, NAT'L INST. ECON. & SOC. RES. (2010), available at http://elsa.berkeley.edu/~bhhall/papers/HHvGR_Patent_Thickets_FIN_29Oct12.pdf, accessed February 18, 2014.

[62] McColgan Dep. 69-70.

[63] Kent Walker, *Patents and Innovation*, GOOGLE OFFICIAL BLOG (April 4, 2011), http://googleblog.blogspot.ca/2011/04/patents-and-innovation.html [hereinafter Walker Blog].

[64] Ex. 22107, NNC-NNL06740124 (Jan. 12, 2010 Email from Gillian McColgan responding to an email titled "Patent questions" sent by Carol McGran at E&Y) at 2-3.

74. Finally, the other consideration when it comes to the role that high-technology patents play in protecting future innovations is the role of high-technology patents in standards. Some of the most important building blocks that an innovation company can lay claim to are their patents that are adopted as part of a standard which is later embraced by the industry either through an explicit standards setting organization or through leading a market towards a certain standard or way of doing things.[65] The ability to drive what kind of technologies an industry coordinates around, divorces a patent's value further from a particular product that the firm manufactures, allowing the beneficiaries of the patent to both reap future profits and shape the future of that particular high-technology innovation and that particular S-curve. Hall emphasizes that control of this coordination process is crucially important at the beginning of a technology's lifecycle.[66] In this summary article, Hall says that it is clear that the "importance of [standards battles] has increased recently, with increase in information and communication technologies." She ascribes this to the importance of compatibility in such industries, a fact that Nortel itself recognized in its emphasis on the future convergence of technologies and hyper-connectivity.[67]

75. This sentiment was also reflected in how those responsible for marketing the patent portfolio viewed standards that were embedded in patents. For example, Gillian McColgan said on the importance of standards, "We had between – we had about 20 percent that was focused towards standards, because one of the things you have to do before you take anything into a standards body is you must lay down the patent protection before you put it into the public domain, so as we were focusing a lot on early standard bodies, we had a pool of money set aside for that."[68]

76. The importance of standards to Nortel's strategy is further illustrated in the Project Iceberg Marketing Materials, which emphasize that:

---

[65] Timothy Simcoe, *Standard Setting Committees: Consensus Governance for Shared Technology Platforms*, 102 AM. ECON. REV. 1 (2012), *available at* http://ssrn.com/abstract=899595. *See also* Marc Rysman & Timothy Simcoe, *Patents and the Performance of Voluntary Standard-Setting Organizations*, 51, no. 11 MGMT SCI. 1920 (2008).

[66] Bronwyn H. Hall, *Innovation and Diffusion* OXFORD HANDBOOKS ONLINE (Sept. 2008), http://www.oxfordhandbooks.com/view/10.1093/oxfordhb/9780199286805.001.0001/oxfordhb-9780199286805-e-17.

[67] *Id.* at 472; Ex. 22078, PC0184853 (Oct. 31, 2008 Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011)) at 9-13..

[68] McColgan Dep. 67:25-68:8.

> Nortel contributed inventions to standards-setting bodies that make modern telecommunications systems work. Nortel's inventions are part of the CDMA standard, the GSM standard, and dozens of other standards. Nortel's patents also underpin the next generation of wireless standards that the world will be implementing and using for the next decade: LTE & WiMAX.[69]

### iii.    Protecting against patent litigation

77. A final consideration is that the patent will likely also serve as a defensive mechanism should there be litigation by a market competitor.

78. The likelihood that a high-technology patent will need to be employed as a defensive mechanism rises as the likelihood of litigation increases. High-technology patents are frequently litigated, because of their building-block nature and their tendency to refer to an abstract idea rather serve as a recipe to build a single and unique product.[70]

79. It is also important to remember that patents are not just used in litigation to assert rights to a particular technology or domain. There is also the important role of a patent being used in a counter-suit should the company itself be sued for patent infringement.[71] This defensive purpose was emphasized by Kent Walker, Google's General Counsel, who wrote at the time of the Rockstar bid that it was supposed to "create a disincentive for others to sue Google."[72] A central source of value to Google for the Asset Sales Agreement was considered to be the strategic value of Nortel's patent portfolio which "really dealt with the notion of big companies who were in big disputes who were cash rich, but patent poor..."[73]

80. Other documents suggest that Nortel had used its patent portfolio defensively. In 2007, Vonage sued Nortel and Nortel customers for patent infringement on three recently acquired

---

[69] GIP_Nortel_00080080 (May 2010 Project Iceberg Executive Summary) at 3.

[70] John R. Allison et al., *Patent Litigation and the Internet* 3 STAN. TECH. L. REV. 1, 8 (2012) provides some evidence of this showing that Internet-related patents have a 10% litigation rate as opposed to a 1.36% litigation rate for non-Internet patents. It is clear that Internet patents (taken here as representative of the broader high-technology field) are litigated at far higher rates.

[71] "Then there was a larger set of patenting spend put aside for what we called strategic and defensive. The defensive was we have chosen to take another -- another path in the industry but we do see that some of our competitors are taking a different path to us and we want to be sure that they don't come after us so we need to lay down some materials in that space even though it's not the direction we are taking with our own products." McColgan Dep. 62:14–23.

[72] Walker Blog, *supra* note 63.

[73] Riedel Dep. 134:16-135:18, Oct. 10, 2013.

patents.[74] Nortel used a countersuit strategy against Vonage - accusing Vonage of infringing on 12 Nortel patents related to telephone data management solutions.[75] The defensive value of patents is also supported by statements made by Nortel employees such as Tim Collins, former Assistant General Counsel for IP Law, who said "having a sizable patent portfolio of patents that were essential throughout the telecommunications industry created a deterrent effect from other players in that industry from asserting their intellectual property rights s against Nortel in order to gain some kind of competitive advantage. It was a deterrent effect."[76] When describing the "Significant Patent Awards," Mr. Collins also reiterated this sentiment and said that "[They] were a way of recognizing the contribution particular inventors had for specific patents which were identified as being - bringing value to the company, either in terms of supporting a litigation, either offensive or defensive, or being the basis of a licensing program."[77]

81. This multi-faceted role of a patent in high-technology markets means that a firm and its subsidiaries can derive three complementary sources of value from a high-technology patent. To make this concrete, I illustrate this in two case studies of Nortel patents that highlight the value drawn from specific patents by Nortel subsidiaries.

### iv.    Case Study 1: Patent number 5,583,862

82. In the 1990s, Nortel recognized it needed to invest in next-generation networks in order to capitalize on new market opportunities related to data and wireless networks.[78] Despite internal efforts to foster such innovation, Nortel realized that it needed to quickly bring enterprise-level networking capabilities to market.[79] Bay Networks, an important competitor in the enterprise networking market, was the result of a merger (July 6, 1994) between Santa

---

[74] US_EMEA_Canada_PRIV_00163879 (Dec. 2007 Vonage Counterclaim Communications Plan).

[75] Russell Shaw, *Nortel sues Vonage for patent infringement*, IP TELEPHONY (Dec. 14, 2007, 11:41 PM), http://www.zdnet.com/blog/ip-telephony/nortel-sues-vonage-for-patent-infringement/2878.

[76] Collins Dep. 63:5-11, Nov. 15, 2013.

[77] *Id*. 150:20-151:2.

[78] Ex 21026, NNI_00373228 (Mar. 14, 2002 Horst-Frisch Report) at 8.

[79] "John's [Roth, CEO Nortel] memo to employees in June 1998 identified local area networks (LAN) and wide area networks (WAN) as the new frontier of communications. Being the first to deliver these new generation networks to customers is a big growth opportunity. 'I see [the Bay acquisition] as an investment in the future of the company and the major step in making the "right-angle turn" Nortel needed to achieve our webtone vision.'" TYSON, *supra* note 36, at 179.

Clara, California based SynOptics Communications and Billerica, Massachusetts-based Wellfleet Communications.[80] Nortel, emphasizing the need to "[think] about data and IP networking first and about voice second rather than the other way around," bought Bay Networks for $9.1 billion dollars and appointed David House, Bay's CEO, as president of Nortel.[81] This acquisition added 7,000 new employees to Nortel, all with specialized knowledge about sending voice, video, and data over the internet.[82]

83. As part of the Bay Networks acquisition,[83] Nortel was assigned several patents relevant to data and wireless networks, some of which are often cited as prior art. One such example of a patent transferred from Bay Networks is U.S. patent number 5,583,862 ('862), which relates to "a method and apparatus for internetwork routing in systems that include virtual networks."[84] According to the Google patent search database, the patent transferred title from Bay Networks to Nortel Networks NA, California in April 1999, and then to Nortel Networks Canada (which I understand to have become NNL) at the end of December 1999.

84. Apart from enhancing the leadership position of Nortel in wireless and routing market segments and supporting existing Nortel lines of business, this patent had a strategic value for Nortel and its subsidiaries, providing a competitive edge and allowing them to develop further innovations. The original '862 patent has been cited 10 times by Nortel inventors, and more than 100 times by Nortel competitors such as Cisco, Lucent, Motorola, and IBM. Sold

---

[80] John Markoff, *Wellfleet and Synoptics Plan $2.7 Billion Computer Union*, N.Y. TIMES, July 6, 1994, http://www.nytimes.com/1994/07/06/business/company-news-wellfleet-and-synoptics-plan-2.7-billion-computer-union.html.

[81] TYSON, *supra* note 37, at 172, 178.

[82] *Id.* at 178.

[83] It seemed there was some confusion within Nortel's legal department as to whether or not NNL had legal title to Bay Networks' patents. The issue in question was whether Bay's patents would be subject to the terms of the old CSA. Specifically, the question was whether the Bay patents constituted "NT Technology" (referenced as "NN Technology" in the MRDA) because they were not actually developed "by or for" any Nortel entity. US_Canada_PRIV_00493788 (Sept. 2, 2003 Email re: "Bay patents and Cost Sharing Agreement") at 2. If the Bay patents could be considered "NT Technology," then legal title would vest in NNL and NNI would have an exclusive license to exploit the patents in the U.S. If not, then NNI would be the legal owner and the patents were not subject to the CSA and, later, the MRDA. *Id.* at 1.

[84] U.S. Patent No. 5,583,862 (filed Mar. 28, 1995), available at https://www.google.com/patents/US5583862.

as a part of the Rockstar portfolio, the patent's "two-star" rating is further evidence of its potential value as a defensive shield.[85]

### v.    Case Study 2: Patent 6,765,591

85. Nortel's commitment to making the Internet as reliable, available, and as secure as telephone systems[86] continued after the multi-billion dollar Bay Networks acquisition. As part of Nortel's ongoing research and development efforts in Internet communications, Nortel filed and was assigned several patents related to "Managing a virtual private network" and other data and internet related communications. U.S. patent number 6,765,591 ('591) filed on April 2, 1999, was among these virtual private network patents, and was assigned to Nortel on June 21, 1999.[87] This patent was assigned a one-star rating by Global IP Law Group, and is cited by more than 20 other patents, including those assigned to Microsoft, Panasonic, Hitachi, AT&T, and Alcatel Canada.[88] This patent related to Nortel's ████████████ ████████████████████████████████████.[89] Following Nortel's bankruptcy, this patent was not sold with any business asset and instead was offered as a part of the portfolio auctioned to the Rockstar Consortium in the summer of 2011. In addition to supporting Nortel's leadership in Internet communications and ongoing innovations along a key product line, the patent had a strategic potential that was recently explored by the patent's new owner (Rockstar) and exclusive licensee (MobileStar). On October 31, 2013, Rockstar sold the patent to MobileStar Technologies. On the same day, Rockstar Consortium and MobileStar Technologies filed a patent infringement complaint against Huawei, a

---

[85] The Global IP rating system, which assigned stars to more patents thought to be of higher interest (and likely therefore more valuable) uses an approach to identify high interest patents that as my later analysis shows is in accord with practice in economics of using forward-citation to identify highly innovative patents. The highest interest patents were assigned two stars and high interest patents were assigned one star.

[86] Larry McDonald, NORTEL NETWORKS: HOW INNOVATION AND VISION CREATED A NETWORK GIANT 177 (2000), citting Mem. of John Roth, *The Right Angle Turn.*

[87] The various patents related to managing a virtual private network list inventors from different Nortel facilities. For the '591 patent, the listed inventors were based in the U.S. *See* U.S. Patent No. 6,765,591 (filed Apr. 2, 1999), available at https://www.google.com/patents/US6765591.

[88] *Id.*

[89] MCDONALD, *supra* note 86, at 176.

leading global ICT solutions provider.[90] Patent 6,765,591 was among the asserted patents in the complaint.[91]

86. Huawei was not the only company targeted. As noted by Google in their recent counter-claim, "In the Android OEM Actions, Rockstar accuses Android OEM Defendants ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE of infringing the '591 patent in that each 'makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States' devices incorporating a version of Google's Android platform that supports 'VPN management functionality.'"[92] The large scope of this action and industry coverage indicates the potential defensive value of such future-looking innovation and also signals the potential usefulness of such patents as a bargaining chip with other large firms who operated in Nortel's area.

### C. Over What Timespan Does a Rights Holder Draw Value From a Patent Portfolio?

87. I have been asked by counsel to provide my opinion on how this distinctiveness of high-technology patents relates back to the lifespan of patents generated from research and development. It might be tempting to conclude erroneously that because of the short lifespan of high-technology products, this implies that high-technology research and development investments and the associated patent portfolio are more short-lived than in other industries. However, the nature of patent protection given to technology and the way that patents are used actually mean the reverse is the case. The ability to protect future innovation and use patents as building blocks means that the standard lifetime of research and development and its associated patent portfolio can be far greater than for low-technology patents.[93]

---

[90] Huawei: Company Information, http://www.huawei.com/en/about-huawei/corporate-info/annual-report/annual-report-2012/company-information/index.htm (last visited Feb. 19, 2014).

[91] Compl., Rockstar Consortium U.S. LP v. Huawei Investment & Holding Co., *et al.,* No. 2:13-cv-896 (E.D. Tex. Filed Oct. 31, 2013), ¶ 18; *Failed $4.4 Billion Bid for Nortel Patents Comes Back to Haunt Google and Friends on Halloween*, Foss Patents Blog (November 1, 2013) http://www.fosspatents.com/2013/11/failed-44-billion-bid-for-nortel.html.

[92] Compl., Google Inc. v. Rockstar Consortium U.S. LP, No. 3:13-cv-5933 (N.D. Cal. Filed Dec. 23, 2013), ¶ 58.

[93] Notes for remarks by John Roese at a 2008 Ottawa Patent Awards Ceremony talk about the value gleaned from a patent over a decade: "Patents play a critical role - both strategically and monetarily

  • Generate income (upfront fees and royalties) through licensing
    – In last 10 years - almost $300 million

88. One thing I noticed was that the first slide in the Nortel Pre-filing Conference with CRA was its initial statement that the commercial life of technology is much shorter than its patented life. As that document states, the reason for this distinction is that "IP is subject to cross-fertilization among segments, merging or recycling of ideas, developments, technology (Convergence)."[94] I believe that this is the same document that was used in the Green Report[95] to justify the decision to limit product life to five years, but in reading the document I found it instead reflected the reality that because of future technology convergence and cross-fertilization, a patent portfolio has a far longer shelf life than simply the commercial life of the initial technology or of a physical product embodying the initial product technology.

89. Also, as I read the source material that is cited in the Berenblut and Cox Report, it appears to conclude that the relevant lifespan of "technology" for value calculations is less than 4.5 years.[96] It is incorrect to use this conclusion to support a further conclusion that the lifespan of the underlying patents is also less than 4.5 years. Again, I want to emphasize that this Request for an Advance Pricing Agreement is characterizing a specific piece of technology's life-cycle - that is, how long, for example, a specific version of a router would expect to be current and sellable in the market. This is, again, quite distinct from the timespan over which associated patents might be useful to an exclusive-license holder, simply because of the fact that for technology, as described before, a patent should be viewed as a building block rather than a set and static description of how to make a specific product. Indeed, in this document, I noted that in another section of the Request for an Advance Pricing Agreement, the long-term nature of a patent's value is highlighted when it says "[Integrated Entities (IEs)] are

---

- Save the company $$ (important defense mechanism to protect against potentially costly infringement claims from competitors
  - In last 10 years - at least $50 million in quantifiable value"

Ex 11282, NNC-NNL06651522 (Sept. 26, 2007 Email attaching John Roese Remarks at Ottawa Patent Awards Ceremony) at 1.

[94] NNC-NNL06001555 (Oct. 2, 2007 Nortel Pre-Filing Conference with CRA) at 3, 5.

[95] Green Report at 23-24.

[96] "In 2008, as result of the pace of technological change, Nortel calculated its 'overall technology lifecycle' to be less than four and a half years." Expert Report of Mark L. Berenblut and Alan J. Cox Report ¶32, Jan. 24, 2014 [hereinafter the "Berenblut & Cox Report"] (citing NNC-NNL06001560 (Oct. 31, 2008 Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011)) at 11). The specific wording in the document is that the company's overall technology lifecycle is 4.4 years.

entitled to participate in the ongoing benefits of their historical IP and bear the risks associated with the continuing value of that IP. The IEs maintain their historical IP and continue to develop new IP from which they anticipate sharing the future benefits… These entities are responsible for entrepreneurship and risk-taking functions with respect to their ongoing IP activities."[97]    It seems that Nortel itself in these documents was drawing a distinction between the ongoing and long-term nature of research and development and its associated patent portfolio and contrasting it with the shortness of a specific product-life cycle.

90. This lengthy cycle of patent value is emphasized in Nortel's own marketing materials for its patent portfolio, which emphasize that:

> Many of the issued patents will not expire for a decade, and the more than 2,000 pending patent applications indicate that the portfolio will continue to be relevant into the late 2020s.[98]

91. To give some idea of the age distribution of the typical patents which were rated as two-star (2*) patents by an external patent evaluation group to indicate the highest interest patents[99] (and consequently likely the most valuable), I compared the age distribution across these highest interest patents compared to those that were not marked either high (one star) or highest (two star) interest patents in Figure 3.  In line with this economic framework, which explains that we generally would expect a truly useful high-technology patent to have a long lifespan, the highest interest and more useful patents are on average older, as shown below.

---

[97] NNC-NNL06001560 (Oct. 31, 2008 Nortel Networks Limited and Nortel Networks Inc. Joint Request for  U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011)) at 11; *see also* NNC-NNL06001553 (Nortel Networks Limited Transfer Pricing Report for the Year Ended December 31, 2009) at NNC-NNL06001553/37.

[98] GIP_Nortel_00080080 (May 2010 Project Iceberg Executive Summary) at 3.

[99] The Global IP Law Group (GIPLG) issued the star ratings. GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List).



Figure 3: Distribution of Patent Ages among Rockstar Patents Issued in the U.S.[100]

---

[100] "Years After Patent Filing Date" is the year of the patent's life in which the Rockstar transaction occurred.

92. Other documents from Nortel confirm this interpretation. For example, a 2004 response to the IRS regarding the APA draws the distinction, noting, "Generally, the patent life tends to be long, while the commercial life of the products incorporating the patented intellectual property tends to be relatively short without continuing investment in research and development. Continuing investment in research and development is essential in extending the commercial life of products throughout the term of the related patents."[101] A presentation given by Gillian McColgan, who was NNI Portfolio Management Board Leader at the time, included a slide showing a 20.5-year "patent cradle-to-grave process" as can be seen in Figure 4.[102]



Figure 4: IPR-Technology Creation

BHG0245595 (Annex to Sellers Disclosure Schedule, Annex A.I(h) Abandoned/Expired, Transferred Patents); NNI_00825244 (Annex to Sellers Disclosure Schedule, Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex to Sellers Disclosure Schedule, Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction); GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List); and GIP_Nortel_00063576 (Aug. 5, 2011, Iceberg-Sortable Asset List).

[101] Ex. 21407, NNI_01333113 (Nov. 30, 2004 Nortel Networks Multilateral APA Response to IRS Information and Document Request for a Functional Analysis) at 29.

[102] NNI_01391420 (Presentation, "Nortel's Patent Portfolio") at 33.

39

93. The fact that the useful life of a valuable high-technology patent tends to be constrained mainly by its legal lifespan is echoed in my own empirical analysis of the U.S. patents sold to Rockstar, shown in Figure 5. This analysis is limited to U.S. patents only for which we have available data.[103] In order to obtain a measure of patent strength, I take the patent numbers from the Rockstar transaction and "scrape" the Google Patent Search Database to obtain more detailed forward citation history for each patent number.[104] The number of forward citations, a typical measure used by economists to proxy for the importance of the invention,[105] is far higher on average for two-star patents. Figure 5 displays the distribution of cumulative forward citations across no-star and two-star patents. The two-star patents are cited far more frequently and increasingly so as the patents age.  This is illustrated by Figure 5.

---

[103] I combine: (1) data from the GIPLG file, which provides measures of patent "quality" including the star rating, (2) the list of patents sold from the Asset Sale Agreement, (3) GIP_Nortel_00063576 (Aug. 5, 2011, Iceberg-Sortable Asset List), which was provided by Nortel, and (4) a file containing Post-signing changes. They span 2,819 patents, 399 of which are two-star U.S. patents and 1,349 no-star U.S. patents.

[104] Data scraping is a technique that uses a computer program (in this case, Python ) to extract data from readable output from another program, such as HTML. In this instance, I use Python to "fetch" the HTML text files from the Google Patents Database, and then use Python to transform and aggregate the information from the HTML text files into usable aggregate data on patent citations from U.S.-issued patents sold as part of the Rockstar portfolio. Google Patent Search, www.google.com/patents.

[105] Bronwyn H. Hall et al., *Market value and patent citations*, RAND J. ECON. 16 (2005).



Figure 5: Cumulative Forward Patent Cites among Rockstar Patents Issued in the U.S.[106]

---

[106] Citation data were obtained from a scrape of the Google Patents Search database. Forward citations include both U.S. and international patents and are computed from filing date to the sale of the patent portfolio to Rockstar Bidco (June 30, 2011). Statistics are calculated using full years and are reported for those years with at least five patents. By nature of the patent filing system's date assignment method, a limited number of patent citations (147 citations to 96 "No-Star" patents and 140 citations to 78 "Two-Star" patents) are made prior to the filing date used in this analysis. Google Patent Search; BHG0245595 (Annex A.I(h) Abandoned/Expired, Transferred Patents); NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab); GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction);

94. My analysis and Nortel's internal emphasis on the fact that the useful life of a patent tends to be constrained mainly by its legal lifespan echoes the methodology in the Malackowski analysis which states, "The duration and timing of the cash flow stream are determined by forecasting the useful life of the property, which can be determined by the statutory or legal life of the IP."[107] I found Malackowski's useful life analysis regarding the appropriate lifespan of a patent to be in agreement with my own, in particular where he highlighted that the most binding constraint on a high-technology patent's usefulness is its legal lifespan.[108] In particular, I found his example of the useful lifespan associated with GSM patents internationally (as exemplified in Figure 2 in his report) a useful demonstration of how certain patents actually become more valuable over time as the technologies they tend to refer to are more fundamental, and act themselves as building blocks as the S-curve of diffusion spreads worldwide.

## VI.    DERIVATION OF ECONOMIC VALUE FROM A PATENT PORTFOLIO

### A.  Summary of Conclusions

95. There are multiple other drivers of the economic value of a patent portfolio, beyond the obvious use of the patent portfolio in the core business of the firm of making and selling products. These sources of economic value are drawn from the ability to exclude others from the innovation described in the patent and enforce this exclusion. Beyond profiting from selling products, a rights owner with the ability to sublicense is also able to monetize this right through litigation and a variety of sublicensing strategies. However, the ability of rights owners to monetize in this manner also means that a patent portfolio's value is substantially affected by whether it is sold with or without such external rights attached or removed.

96. In economics, the key driver of economic value from a right to property comes from the ability to charge for access to that property and to be able to enforce that right and exclude others from that right. This means that the value of a patent portfolio does not stem from

---

GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List); and GIP_Nortel_00063576 (Aug. 5, 2011, Iceberg-Sortable Asset List).

[107] Malackowski Report at 22.

[108] I adopt the Malackowski Report's useful life analyses for the purposes of my report as it applies to understanding the useful life of patents. However, I do not adopt the perspective in the Malackowski Report's contribution analysis that a patent portfolio's value is driven by how much time or effort was spent creating it. Instead, I take a market-based approach that is more consistent with economics.

having legal title to the underlying patents, or from the amount of money or effort spent creating it. What matters is the ability to sub-license patents and enforce those property rights through litigation. This is important because the Green Report only focuses on NNL's custodial "ownership" of the patent portfolio and not on NNI's ownership of "rights" to that portfolio, and my understanding is that NNI had sublicensing rights and the right to enforce their exclusive license in the U.S. This framework for understanding what fundamentally drives the value of a patent portfolio is also different from the assumption by Berenblut and Cox[109] that what matters is legal title. As I describe, there are various monetization and licensing strategies that an exclusive licensee can pursue to earn incremental revenues from their rights, and there is also evidence that such strategies were being considered and, to a lesser extent, pursued by Nortel before bankruptcy.

97. The economic value of the Nortel portfolio would have been damagingly encumbered by a series of perpetual and exclusive licenses and attendant rights of enforcement had NNI and the other subsidiaries not relinquished their rights in connection with the sale of the patent portfolio. This is not reflected in the analysis of economic value in the Green Report. The reduced value would be especially true in connection with NNI's exclusive license governing the United States, where the right to enforce and launch litigation clear of encumbrances is key for driving the offensive and defensive value of patents. As the evidence presented about both the patent portfolio sales process and the Asset Sale Agreement illustrates, both buyers and sellers of the Nortel patent portfolio were well aware of the need to eliminate the MRDA encumbrances on the Nortel patent portfolio as part of any sale.[110]

**B.  Are There Meaningful Economic Differences between Being Able to Transfer or Sell a Patent Relative to Being Able to Sublicense the Same Patent?**

98. Counsel has asked me to sketch out whether there are meaningful economic differences between being able to transfer or sell a patent relative to being able to sub-license the same patent. As the Green Report acknowledges, the MRDA granted NNI exclusive rights to exploit Nortel's patents in the U.S. However, he focuses on how these rights relate solely to the right to make and sell products that embody the underlying Nortel technology.

---

[109] Berenblut & Cox Report ¶73.

[110] Ex. 22085, NNI_00825094 (June 30, 2011, "Asset Sale Agreement" for Rockstar Bidco, LP).

99. By contrast, economics takes the perspective that when it comes to property rights, the crucial economic properties come from the ability to enforce such rights to protect all of the value derived from those rights[111] and exclude others from those rights.[112] A useful analogy is that of a gold mine: there is no distinction in the economic value that would be derived from being the owner of a gold mine or the perpetual and exclusive licensee of a gold mine. What is ultimately important is whether the gold mine operator is the one able to enforce those rights and prevent other people from also digging in that particular gold mine for gold.

100. As I understand it, the MRDA granted NNI unrestricted enforcement rights and that the way the MRDA was drawn up, it separated out these enforcement rights in a separate clause from the clause where it described the license. Specifically, the MRDA granted each subsidiary "the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."[113]

## C.  Is the Value of a Patent Portfolio Exclusively Licensed to a Subsidiary Bounded by Existing Lines of Business?

101. Counsel has asked me to consider the validity of an assumption that the licenses did not have any value in relation to the patent portfolio if the patents in question were not used in any operating business. This is in the context of the Green Report, which concludes:

> I also have considered the value of the licenses in the context of the Residual IP Sale. However, because the IP in question either was not used in any operating businesses or its value had already been realized in the Business Sales, and given the meaning of the terms of the licenses which I have been asked to assume, I conclude that the licenses did not have any value in relation to the Residual IP.[114]

---

[111] For a fuller discussion from an economics perspective, *see* ILYA SEGAL & MICHAEL WHINSTON, *Property Rights*, *in* HANDBOOK OF ORGANIZATIONAL ECONOMICS 2 (R. Gibbons & J. Roberts, eds., 2012) (forthcoming), *available at* http://www.stanford.edu/~isegal/prights.pdf. As they say, "A property right gives the owner of an asset the right to the use and benefits of the asset, and the right to exclude others from them. It also, typically, gives the owner the freedom to transfer these rights to others." This passage emphasizes that "the right of exclusion" is the necessary and sufficient condition for a property right and that the freedom to transfer legal title is something that is often observed but that is not necessary or sufficient.

[112] This is similar to a legal literature that emphasizes the "right to exclude" as being a fundamental driver of property rights. *See, e.g.*, Thomas W. Merrill, *Property and the Right to Exclude*, 77 NEB. L. REV. 730 (1998).

[113] MRDA at 3d Add., at 3.

[114] Green Report at 16-17.

102. In Section IV, I explained why I did not agree with the assumption that rights were limited to existing products, given the organizational imperatives and outputs at Nortel. In Section V, I discussed how patents serve a multi-faceted role which means that high-technology organizations derive value from their rights to a patent portfolio in multiple different ways beyond Contemporaneous Products. In this section, I consider whether there are further considerations that this statement ignores when it comes to understanding how an exclusive rights holder derives value and affects the value of a patent portfolio.

103. An exclusive rights holder with rights to sub-license can derive further value from their rights to a patent portfolio, if that rights holder decides to deploy a strategy that explicitly allows them to monetize their patent portfolio by offering the service of patent licensing. This multi-layered way of viewing value from a patent portfolio was reflected as Deputy IP Counsel in Nortel Networks IP Law Group emphasized that patent rights:

- Can exclude others from using Nortel Networks innovations
- Can be licensed for income
- Can be utilized for other business value
- Can be used strictly defensively, to avoid or minimize litigation
- Demonstrates technology leadership
- Can be used for cross-licensing, if appropriate
- Can enable "freedom to operate"[115]

104. The MRDA gave participants the right to assert actions and recover damages in their exclusive territories for infringement or misappropriation of Nortel's technologies.[116] Given the increasing importance of patent monetization strategies in the U.S., it is therefore important to think about what was the value to NNI of the ability to offer the service of sublicensing the Nortel patent portfolio in the U.S.

---

[115] US_Canada_PRIV_00014888 (May 18, 2004 R&D Academy Presentation) at 12.

[116] *See, e.g.*, John C. Paul & Brian Kacedon, Exclusive Patent Licenses May Have Standing to Sue for Infringement Even if Others Have the Right to License the Patent, FINNEGAN (Jan. 24, 2011), http://www.finnegan.com/resources/articles/articlesdetail.aspx?news=7853c148-f3b8-46a3-927b-8b45ec995719, (stating that "A U.S. patent provides a statutory right to exclude others from practicing the invention claimed in that patent. Generally, only the owner of a patent has the ability (or 'standing') to sue to enforce that exclusionary right. U.S. courts have recognized, however, that when a patent owner grants a licensee those exclusionary rights, that licensee may also have the ability to sue to enforce that right. Thus, an exclusive licensee by virtue of being granted exclusivity under the patent will typically have the right to sue to protect that exclusivity.") This article also emphasizes that the recent "In WiAV Solutions LLC v. Motorola, Inc., No. 2010-1266 (Fed. Cir. Dec. 22, 2010), the Federal Circuit clarified the boundary between exclusive and bare licensees in holding that a licensee can be an exclusive licensee under a patent even if other entities [such as licensees in other geographies] also have limited rights to license those patents." *Id.*

105. There are two ways that deploying a monetization strategy broadens the potential of service revenues from a patent portfolio away from a focus on the manufacturing of existing products. First, it helps firms monetize older patents that perhaps they are no longer using, by ensuring that other companies that are using the patented technology are offered a service whereby they pay an appropriate license fee. Second, it can help broaden the scope of potential revenues for a firm outside their base industry. For example, a patent that was originally filed to cover a technique for facilitating telephone networking may become important for internet-enabled digital televisions, and therefore the entity enforcing that patent can license the patented technology to more industries.

106. There are obviously firms that are politely referred to as "patent assertion entities" ("PAEs") that offer these services. However, not all such firms that offer patent licensing services that are separate from their product-lines must be classified as PAEs. Indeed, a firm may choose to monetize a patent that is already serving a triple role in protecting current innovation, promoting future innovation and defending against external litigation. In their appointment notice for John Veschi,[117] Nortel echoed this, stating that his role would be to "protect, commercialize and exploit Nortel's IP."

107. Figure 6 shows that back in 2004, Nortel was aware that one of the four major revenue potentials of its patent portfolio could be achieved through such a licensing strategy.[118]

---

[117] NNC-NNL07720475 (July 21, 2008 Appointment Notice for John Veschi).

[118] US_Canada_PRIV_00014888 (May 18, 2004 R&D Academy Presentation).



Figure 6: 2004 Strategy Towards Monetizing Intellectual Property

At that time, Nortel's IP Law Group was tasked with protecting and leveraging Nortel's IP to obtain business value by:

> [E]nsuring that third-parties that are utilizing the Company's IP pay appropriate royalties or fees to Nortel; ensuring that companies that want to interface with Nortel's proprietary interfaces are properly licensed to do so; and marketing selected Nortel technology, including certain IP rights, to third parties in return for monetary consideration.[119]

Other documents confirm the implementation of this strategy – in the form of licensing deals or litigation. For example, one document points to cross-licensing agreements with ▇▇▇▇▇▇ and ▇▇▇▇▇▇ "covering volumes of patents."[120] The value of these patents was not measured "strictly in cash payments (although it can be measured from Benefit in Kind contributions) ... ie ▇▇▇▇▇▇ we get incrementally discounted parts from them, ▇▇▇▇▇▇ some of the value is cash, some of it is value benefit within the Alliance program etc."

---

[119] Ex. 21407, NNI_01333113, p. (Nov. 30, 2004 Nortel Networks Multilateral APA Response to IRS Information and Document Request for a Functional Analysis) at 32.

[120] Ex. 22112 – NNI_00320890 (July 26, 2007 Email from Gillian McColgan to David Hudson).

108. Although overly-aggressive patent litigation did not appear to be a major strategy at Nortel, documents nonetheless provide an example of litigation surrounding the ATM ("Asynchronous Transfer Mode") patent.[121] This patent served as the foundation to the MPLS ("Multiprotocol Label Switching") standard.[122] This "patent was basically a fundamental architectural invention of MPLS in 1985 ... which was about 12 years before anyone reinvented it as MPLS in the IETF as a standard .... by the time we got it noticed to companies and then sued them it was into its last 5 years of commercial value .... So in 2005 we would recognise Raymond for something he invented 20 years previously and that standards & product caught up with 15 years later and we generated $30M+ in licensing fees and litigation awards from in the last 5 years of its commercial life."[123]

109. Nortel's awareness of the monetization potential of its patent portfolio is further seen in its hiring of John Veschi, former Chief Intellectual Property Officer of Nortel.[124] In February 2008, Nortel sought an Assistant General Counsel for Intellectual Property to "have global responsibility for Nortel's worldwide IP legal strategy including but not limited to: patent acquisition, licensing and litigation issues."[125] After a recruitment process that lasted several months, Nortel hired John Veschi into the role as Chief IP Officer[126] specifically "to come in and build a licensing business much like the one [Veschi] now run[s] at Rockstar."[127]

   **D.  How Does an Exclusive and Perpetual License Affect the Residual Value of a Patent to the Title-Holder?**

110. I have been asked by Counsel to consider whether a patent that already has exclusive, royalty-free licenses with rights of enforcement encumbering it could sell for the same

---

[121] U.S. Patent No. 4,736,363 (filed Oct. 11, 1985), available at http://www.google.com/patents/US4736363.

[122] Ex. 22107, NNC-NNL06740124 (Jan. 12, 2010 Email from Gillian McColgan responding to an email titled "Patent questions" sent by Carol McGran at E&Y).

[123] Ex. 22112 (NNI_00320890 July 26, 2007 Email from Gillian McColgan to David Hudson).

[124] Veschi Dep. 47:15-20, Nov. 7, 2013.

[125] The same document regarding the search process noted, "Ideally, the individual will have strong US and also some international experience and be able to scale up and grow in a dynamic business." NNC-NNL08182908 (Feb. 1, 2008 Role Specification for Assistant General Counsel, Intellectual Property) at 4.

[126] "The position will be located at one of the company's primary R&D facilities which include Dallas, Texas and Ottawa, Canada [note Veschi was assigned to Dallas, Texas]." *Id.* at 5.; Veschi Dep. 47:15-20.

[127] Veschi Dep. 38:11-23.

amount as a patent that does not have such licenses. This question is important because the Berenblut and Cox Report assumes that the "value of the non-transferable license rights surrendered by the U.S. and EMEA Debtors depends only on, and is limited to, the present value of their share of the expected future operating profits of Nortel but for the decision to sell its assets."[128] Additionally, the Green Report's conclusion that NNI would only be entitled to value directly derived from NNI's manufacture and sale of existing products that embodied NNL technology also neglects to reflect the value that NNI added to the patent portfolio sale by surrendering its license.[129] To evaluate these assumptions and conclusions, I consider what the likely value of the portfolio might have been if NNI had not surrendered its exclusive and perpetual licenses.[130]

111. To start, it is helpful to return to what is particularly distinctive about a high-technology patent relative to other patents. First, such patents are useful for enabling and protecting future innovation. Second, such patents are useful for defensive purposes, particularly in a litigious environment where countersuits -- or the possibility of countersuits -- are a common defensive strategy. For both of these two distinct purposes, it is important that the patent holder is not encumbered by competing perpetual license holders who also have enforcement rights. It is self-evident that the ability to protect and nurture new innovation away from competition would be far less valuable if another company were able to do the same. Furthermore, using patents in various defensive strategies, such as counter-suing, would be complicated if there were another party with enforcement rights.

112. As John Veschi has noted, in addition to the quality of the patents he was drawn to Nortel because "what really set the hook in me was the opposite side of the equation [which was the lack of encumbrance]."[131] This was because his experience in patent portfolio valuation led to many occasions where he felt that, "If I had a chance to wipe that agreement out we would be in a much stronger position." He said that a lack of encumbrances was the "hidden story behind the success of the Nortel [patent portfolio] sale." He also made the useful analogy that

---

[128] Berenblut & Cox Report ¶21.

[129] Green Report at 64-65.

[130] Ex. 22085, NNI_00825094 (June 30, 2011 Rockstar Bidco, LP Asset Sale Agreement) and GIP_Nortel_00089277 (April 4, 2011, Google Asset Sale Agreement).

[131] Veschi Panel, *supra* note 45, at 10:25-49:06.

if you view the value of rights to the patents as a bundle of sticks -- as you are taught in first year law classes -- the existence of encumbrances in the form of licensing agreements meant that you had to take sticks out of your bundle of rights, leaving you with just a skinnier bundle.

113.   He echoes this sentiment in his deposition[132] where he says that "what was most attractive to me about Nortel, and it was originally the patent portfolio which I described many places and believe is Bell Labs quality, is the way I characterized it, but more than that was the lack of encumbrances on the portfolio. Because Nortel didn't have a programmatic approach over the years to license, there weren't a lot of licenses." Veschi goes on to specify that "if I was going to sell a patent to somebody and say I'm going to sell you the patent but I'm also going to keep an exclusive license to that same patent, then I'm not really selling you much because the exclusive license is a substantial percentage of it."[133] In his deposition, Veschi further reiterated a statement he made in a presentation with Gillian McColgan that exclusive licenses would have been a "significant consideration for a buyer."[134] The presentation from July 8, 2009, gives:

> Next Steps...
> - Do what we can to preserve value in business transactions…
>   - Eliminate or minimize exclusive license grants to Buyers with respect Residual patents
>     * ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ deal does not grant any exclusive licenses
>     * Other Buyers are asking for them, but such licenses will complicate downstream activities regarding the Residual patents[135]

114.   Other Nortel internal documents reflect its awareness of the devastating effect that existing licenses can have on the value of the portfolio. In an executive summary, when considering the value of the patent portfolio, a particular point of emphasis was the extent to which the lack of licensing activities had meant that there was only a "limited" encumbrance on the

---

[132] Veschi Dep. 40:12-21.

[133] *Id.* 52:13-19.

[134] *Id.* 66:2.

[135] Ex 11150, CCC0001356 (July 8, 2009 Presentation, "IP Aspects of Residual Co.") at 11.

portfolio.[136] Similarly, in a spreadsheet which contained Revenue Projections, the title used was "Global Revenue Projections and Portfolio encumbrances," emphasizing the extent to which the value of the portfolio reflected its likely degree of encumbrances.[137] The lack of encumbrances within these documents refer to the lack of encumbrances by any external firm, as shown by the fact that the encumbrances discussed related to other high-technology firms such as Bell Canada, Huawei, Microsoft, and Qualcomm, among others.

115. Another consideration which affects the value of the removal of an exclusive license from a patent portfolio is the strength of perceived intellectual property rights in that country. "When [intellectual property rights] surrounding the technology being contracted upon are weak, exclusive contracts are unlikely to effectively restrict access to the technology to only licensed parties... [W]hen [intellectual property rights] are strong, exclusive contracts can meaningfully guarantee exclusivity to the licensee."[138] In general, the U.S. is perceived as having strong intellectual property rights,[139] rendering the need to remove such a large encumbrance as an exclusive and perpetual license integral to the ability to sell such a patent portfolio.

116. Indeed, this argument is underscored by the actual sales process to various U.S.-based companies. When summarizing Project Iceberg, the plan noted the exclusive licenses held by the IEs and emphasized that such "[r]ights will be terminated coincident with any sale or license... Likely representation and warranty regarding license grants (<u>particularly</u> [emphasis added] exclusive licenses)."[140] In negotiations, I understand that both Rockstar and Google required the exclusive and perpetual license to be dropped.[141]

117. This insistence is reflected in the emphatic nature of Section 5.13 (b) of the Asset Sale Agreement, which stipulated that "Effective as of the Closing, the Sellers shall terminate all

---

[136] GIP_Nortel_ 00230509 (Jan. 29 2010 Patent Portfolio Analysis: Phase One - Board of Directors Presentation ) at 7.

[137] LAZ-NRTL-00040022 (Global Revenues Projections and Portfolio Encumbrances).

[138] Bharat Anand & Tarun Khanna, *The Structure of Licensing Contracts* 48 J. INDUS. ECON. 129 (2000).

[139] Gallini, *supra* note 28.

[140] LAZ-NRTL-00038046 (Mar. 22, 2010 Nortel, Project Iceberg, Work Plan for Plan A & B).

[141] Ex. 22085, NNI_00825094 (June 30, 2011 Rockstar Bidco, LP Asset Sale Agreement) and GIP_Nortel_00089277 (April 4, 2011 Google Asset Sale Agreement).

license rights granted under the Master R&D Agreement." This reflects the fact that much of the value of the patent portfolio in their eyes came from the ability to have exclusive rights to the rights embodied in the patent. That is key for both the protection and development of future innovation and defensive properties of high-technology patents discussed in Section V.

118. One comparison that is useful to make to underscore the extent to which the removal of these exclusive licenses likely made to the realization of value from the patent portfolio is the contrast between the Nortel sale of its patent portfolio and the sale of the Kodak patent portfolio in 2014. As stated by RPX's Heath when commenting on one of the reasons why the monetization of the patent portfolio fell far short of industry projections that were as high as $2.4 billion or even $4.5 billion.[142] "The earlier licensing deals with LG and Samsung, he adds, 'had reduced the strategic value of the portfolio and... dampened people's enthusiasm.'"[143] This was echoed by Alexander Poltorak, CEO of General Patent Corporation, who said, "[i]t's very difficult to sell patents which have so many encumbrances... Heavily licensed patents are difficult to value because buyers would need to see how far partnerships travel and if infringement claims are already protected by pervious settlements."[144]

119. This is a striking example of why the removal of the IE's exclusive licenses were key to achieving the high price for the Nortel portfolio in its sale to Rockstar. A comparison can also be drawn with the sale of Motorola who were "very careful about licensing their patent portfolio"; the lack of encumbrances was acknowledged as a key driver in the final $12.5 billion price paid by Google.[145]

---

[142] These high projections came from a firm hired by Kodak and Ken Luskin of Intrinsic Value Asset Management. *See* Matthew Daneman, *Monday Is Deadline for Bids on Eastman Kodak Digital Patents*, USA TODAY (July 30, 2012, 3:31 PM), http://usatoday30.usatoday.com/money/industries/technology/story/2012-07-30/kodak-patent-deadline/56593812/1.

[143] Mark Harris, *The Lowballing of Kodak's Patent Portfolio, The Bankrupt Giant Found that its Huge Trove of IP Could Fetch Only Pennies on the Dollar*, IEEE SPECTRUM (Jan. 31, 2014, 7:37 PM), http://spectrum.ieee.org/at-work/innovation/the-lowballing-of-kodaks-patent-portfolio.

[144] Antoine Gara, *Kodak's Patent Pivot May Not Avert Bankruptcy (Update 1)*, THE STREET (Jan. 4, 2012, 5:36 PM), http://www.thestreet.com/story/11365202/1/kodak-bankruptcy-weeks-away-report.html.

[145] Antoine Gara, *Kodak's Bankruptcy Plan Slugged by InterDigital Sale Failure,* THE STREET (Jan. 23, 2012, 6:23 PM), http://www.thestreet.com/story/11382462/1/kodaks-bankruptcy-plan-slugged-by-interdigital-sale-failure.html.

**Catherine Tucker**
**February 28, 2014**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al*., | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1.      My name is Catherine Tucker.  I live in Belmont, Massachusetts.

2.      I have been engaged by counsel for the U.S. Debtors to provide evidence in relation to the above-captioned court proceedings.

3.      I acknowledge that it is my duty to provide evidence in relation to these proceedings as follows:

54

(a)    to provide opinion evidence that is fair, objective and non-partisan;

(b)    to provide opinion evidence that is related only to matters that are within my area of expertise; and

(c)    to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.    I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date: ___2/28/2014___ .    _____
                                            Signature

# Catherine Tucker

MIT Sloan School of Management                    Tel: (617) 252-1499
100 Main St, E62-536                                  cetucker@mit.edu
Cambridge MA 02142                        http://cetucker.scripts.mit.edu

## Education

Stanford University, Ph.D. in Economics (Advisor: Tim Bresnahan), 2005

Oxford University, BA in Politics, Philosophy and Economics, 1999

## Appointments

National Bureau of Economic Research (NBER), Research Associate, September 2012 –

MIT Sloan, Mark Hyman Jr. Career Development Professor (with tenure), July 2012 –

MIT Sloan, Associate Professor of Marketing, July 2011 –

National Bureau of Economic Research (NBER), Faculty Research Fellow, May 2011 –
September 2012

MIT Sloan, Douglas Drane Career Development Chair in IT and Management, July 2006 –

MIT Sloan, Assistant Professor of Marketing, July 2005 – June 2011

## Honors and Awards

| | |
|---|---|
| 2013 | Teacher of the Year Award, MIT Sloan |
| 2013 | Jamieson Prize for Excellence in Teaching |
| 2012 | Garfield Economic Impact Award for Best Paper in Health Economics |
| 2012 | Nominated for outstanding teacher of the year award (Also in 2010 and 2009) |
| 2011 | WHITE Award for best paper in the Economics of Healthcare IT |
| 2011 | Public Utility Research Prize for the best paper in regulatory economics |
| 2011 | NSF CAREER Award |
| 2011 | MSI Young Scholar |
| 2010 | Management Science Distinguished Service Award |
| 2004 | Koret Foundation Scholar, Stanford Institute for Economic Policy Research Fellowship |
| 2004 | Fourth Annual Claire and Ralph Landau Student Working Paper prize |

Published/Accepted Papers

1. 'Identifying Formal and Informal Influence in Technology Adoption with Network Externalities', *Management Science*, Vol. 55 No. 12, December 2008, pp. 2024-2039

2. 'Privacy Protection and Technology Diffusion: The Case of Electronic Medical Records' with Amalia Miller, *Management Science (Lead Article)*, Vol. 55 No. 7, July 2009, pp. 1077-1093

3. 'How Sales Taxes Affect Customer and Firm Behavior: The Role of Search on the Internet' with Eric Anderson, Nathan Fong and Duncan Simester, *Journal of Marketing Research*, Vol. 47 No. 2, April 2010, pp. 229-239

4. 'Growing Two-sided Networks by Advertising the User Base: A Field Experiment', with Juanjuan Zhang,  *Marketing Science*, Vol. 29 No. 5, September-October 2010, pp. 805-814

5. 'Privacy Regulation and Online Advertising' with Avi Goldfarb, *Management Science*, Vol. 57 No. 1, January 2011, pp. 57-71

6. 'Search Engine Advertising: Channel Substitution when Pricing Ads to Context', with Avi Goldfarb, *Management Science*, Vol. 57 No 3, March 2011, pp. 458-470

7. 'Stuck in the Adoption Funnel: The Effect of Interruptions in the Adoption Process on Usage' with Anja Lambrecht and Katja Seim, *Marketing Science*, Vol. 30 No. 2, March-April 2011, pp. 355-36

8. 'Advertising Bans and the Substitutability of Online and Offline Advertising', with Avi Goldfarb, *Journal of Marketing Research (Lead Article)*, Vol. 48 No. 2, April 2011, pp. 207-227

9. 'Can Healthcare Information Technology Save Babies?' with Amalia Miller, *Journal of Political Economy*, Vol. 119 No. 2, April 2011, pp. 289-324

10. 'How Does Popularity Information Affect Choices? A Field Experiment' with Juanjuan Zhang, *Management Science*, Vol. 57 No. 5, May 2011, pp. 828-842

11. 'Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science (Lead Article and Discussion Paper)*, Vol. 30 No. 3, May-June 2011, pp. 389-404

- 'Rejoinder - Implications of "Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science*, Vol. 30 No. 3, May-June 2011, pp. 413-415

12. 'Encryption and Data Security' with Amalia Miller, *Journal of Policy Analysis and Management*, Vol. 30 No. 3, Summer 2011, pp. 534-556

13. 'Paying With Money or With Effort: Pricing When Customers Anticipate Hassle' with Anja Lambrecht, *Journal of Marketing Research*, Vol. 49 No. 1, February 2012, pp. 66-82.

14. 'Heterogeneity and the Dynamics of Technology Adoption' with Stephen Ryan, *Quantitative Marketing and Economics*, Vol 10, No. 1 2012, pp 63-109

15. 'Shifts in Privacy Concerns', *American Economic Review: Papers and Proceedings*, Vol. 102, May 2012, with Avi Goldfarb

16. 'How does the Use of Trademarks by Intermediaries Affect Online Search?' with Lesley Chiou. *Marketing Science*, Vol 31 No. 5 2012, pp 819-837

17. 'Active Social Media Management: The Case of Health Care' with Amalia Miller. *Information Systems Research* Vol. 24, No. 1, March 2013, pp. 52-70

18. 'Paywalls and the Demand for News' with Lesley Chiou. *Information Economics and Policy* Volume 25, Issue 2, June 2013, pp. 61-69

19. 'Days on Market and Home Sales' with Juanjuan Zhang and Ting Zhu. *RAND Journal of Economics* Volume 44, Issue 2, pages 337-360, Summer 2013

20. 'When Does Retargeting Work? Timing Information Specificity' with Anja Lambrecht. *Journal of Marketing Research (Lead Article)* Vol. 50, No. 5, October 2013: pp. 561-576

21. 'Electronic Discovery and the Adoption of Information Technology' with Amalia Miller. *Journal of Law, Economics, & Organization*, 2013

22. 'Privacy Regulation and Market Structure' with James Campbell and Avi Goldfarb. Forthcoming at *Journal of Economics & Management Strategy*

23. 'Social Networks, Personalized Advertising, and Privacy Controls.' Conditionally Accepted at *Journal of Marketing Research*

24. 'Health Information Exchange, System Size and Information Silos' with Amalia Miller. Forthcoming at *Journal of Health Economics*

CHAPTERS IN EDITED VOLUMES AND SUMMARY PIECES

25. 'Modeling Social Interactions: Identification, Empirical Methods and Policy Implications' with Wes Hartmann, Puneet Manchanda, Harikesh Nair, Matt Bothner, Peter Dodds, David Godes and Karthik Hosanagar, *Marketing Letters*, Vol. 19 No. 3, December 2008, pp. 287-304

26. 'Search Engine Advertising - Examining a profitable side of the long tail of advertising that is not possible under the traditional broadcast advertising model' with Avi Goldfarb, *Communications of the ACM*, Vol. 51 No. 11, November 2008, pp. 22-24

27. 'Online Advertising', with Avi Goldfarb, *Advances in Computers*, Vol. 81, March 2011, Marvin Zelkowitz (Ed), Elsevier

28. 'Substitution between Online and Offline Advertising Markets', with Avi Goldfarb, *Journal of Competition Law and Economics*, Vol. 7 No. 1, March 2011, pp. 37-44

29. 'Online Advertising, Behavioral Targeting, and Privacy', with Avi Goldfarb, *Communications of the ACM*, Vol. 54 No. 5, May 2011, 25-27

30. 'Privacy and Innovation', *Innovation Policy and the Economy*, Vol. 11, 2012, Josh Lerner and Scott Stern (Eds), NBER

31. 'The Economics of Advertising and Privacy', *International Journal of Industrial Organization*, Vol. 30, No. 3, May 2012, pp. 326-329

32. 'Social Networks, Advertising and Antitrust', *George Mason Law Review*, 2012, Vol 19 No 5., pp. 1211-1227.

33. 'Managing Privacy' with Avi Goldfarb, *Spring 2013, Sloan Management Review*

34. 'Empirical Research on the Economic Effects of Privacy Regulation'. Forthcoming at *Journal on Telecommunications and High Technology Law*

35. The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets, *George Mason Law Review* Vol. 2, No. 2, pp. 1025-1054 (2013).

## POLICY WRITING

36. OECD Roundtable on Privacy, Report on the 'Economic Value of Online Information', December 2010

37. Written Congressional Testimony on 'Internet Privacy: The Impact and Burden of European Regulation,' U.S. House Energy and Commerce Committee, September 2011

## PAPERS UNDER REVIEW

38. 'Consumer Search and Pharmaceutical Advertising' with Lesley Chiou. Revise and resubmit at *Management Science*

39. 'Standards and Online Advertising' with Avi Goldfarb. Revise and resubmit at *Management Science*

40. 'Ad Virality and Ad Persuasiveness.' Revise and resubmit at *Marketing Science*

41. 'Copyright, Digitization, and Aggregation' with Lesley Chiou Revise and resubmit at *RAND Journal of Economics*

42. 'Social Advertising'. Revise and resubmit at *Management Science*

43. 'Patent Trolls and Technology Diffusion'

44. 'Guns, Privacy and Crime' with Alessandro Acquisti

## WORK IN PROGRESS

'Identity Based Targeting and the Marketing Funnel'

'Trademark Confusion' with Stefan Bechtold

'Data Security and Network Effects in Online Search' with Lesley Chiou

'Genetic Privacy' with Amalia Miller

'Spillovers from Product Failure' with Amalia Miller

'Third-Party Marketing Approvals' with Cristina Nistor

INVITED SEMINARS

*Universities*
1. March 2014, Technology Group, University of California at Berkeley, CA
2. January 2014, Marketing Department at Texas A&M
3. November 2013, Marketing Group, University of California at Berkeley, CA
4. October 2013, Marketing Group, Tulane University, LA
5. October 2013, Marketing Group, University of Houston, TX
6. May 2013, Tuck School of Management, Dartmouth University, NH
7. March 2013, Economics Department, University of Toulouse
8. March 2013, Marketing Group, Rotterdam University
9. March 2013, Economics Department, University of Zurich
10. March 2013, Marketing group, Georgia Tech
11. January 2013, Anderson School, UCLA
12. January 2013, Marketing Group, CMU
13. October 2012, Marketing Group, Stanford University
14. October 2012, Marketing Group, Columbia University
15. October 2012, Marketing Group, University of Texas at Austin
16. September 2012, Marketing Group, Harvard Business School
17. June 2012, Strategy Group, London Business School
18. March 2012, Marketing Group, Cornell
19. February 2012, IS Group, Indian School of Business
20. February 2012, Marketing Group, Wharton
21. January 2012, Marketing Group, UCLA
22. November 2011, Marketing Group, University of Rochester
23. October 2011, Marketing Group, University of Zurich
24. October 2011, Department of Law and Economics, Swiss Federal Institute of Technology, Zurich
25. May 2011, Marketing Group, National University of Singapore
26. May 2011, IS Group, National University of Singapore
27. May 2011, Strategy Group, LMU Munich
28. May 2011, Marketing Group, New York University
29. March 2011, Marketing Group, Florida University
30. February 2011, IS Group, New York University
31. November 2010, European School of Management and Technology
32. October 2010, Marketing Group, Yale University
33. October 2010, Networked Business Group, Harvard Business School
34. September 2010, TIES Group, MIT Sloan
35. July 2010, Department of Economics, University of Mannheim
36. March 2010, Marketing Group, Wharton School, University of Pennsylvania
37. January 2010, Marketing Group, University of Michigan
38. November 2009, Marketing Group, University of California at Berkeley
39. October 2009, Digital Business Seminar, MIT Sloan

40. December 2008, Marketing Group, MIT Sloan
41. November 2008, Marketing Group, Rady School of Business, UCSD
42. September 2008, Strategy Group, MIT Sloan
43. May 2008, Digital Strategy Group, Tuck School of Business, Dartmouth University
44. April 2008, Kellogg Management and Strategy Group, Northwestern University
45. March 2008, Marketing Group, Duke University
46. March 2008, Strategy Group, Chicago GSB
47. July 2007, Marketing Group, London Business School, London, UK
48. April 2007, Marketing Group, Chicago GSB
49. March 2007, Marketing Group, Rotman School, University of Toronto
50. November 2005, Economics Department, Harvard University
51. October 2004-February 2005 (Job Market): NYU Stern, University of Michigan, University of Arizona, University of British Columbia, Federal Reserve Board, Federal Reserve Bank of New York, Harvard Business School, Kellogg, MIT Sloan, Federal Reserve Bank of Chicago, Stanford Economics Department

*Other*
52. August 2012, DG Competition, European Commission, Brussels
53. August 2012, Technology Policy Institute Conference, Aspen
54. December 2011, Havas Digital, New York
55. June 2011, Eneca
56. September 2010, Federal Trade Commission
57. September 2010, Google European Public Policy Unit, Paris
58. July 2009, Information Technology and Innovation Foundation, Washington DC

---

PRESENTATIONS OF RESEARCH AT CONFERENCES

1. January 2014, American Economic Association Meetings
2. July 2013, Marketing Science, Istanbul, Turkey
3. June 2013, Searle Center Conference on Internet Search and Innovation, Chicago, IL
4. April 2013, Brown University Mini-Networks Conference
5. February 2013, WSDM 2013 Conference (Keynote Speaker), Rome, Italy
6. January 2013, American Economic Association Meetings, San Diego, CA (Co-author presented)
7. December 2012, New York Computer Science and Economics Day
8. November 2012, Search and Competition Conference, Melbourne Australia
9. October 2012, Economics of Personal Data, (Keynote Speaker), Amsterdam
10. August 2012, Amsterdam Symposium on Behavioral and Experimental Economics
11. July 2012, Fudan University Marketing Research Symposium, China
12. June 2012, Searle Center Conference on Internet Search and Innovation, Chicago, IL
13. June 2012, Innovation, Intellectual Property and Competition Policy Conference, Tilburg, Netherlands
14. June 2012, Marketing Science, Boston, MA

15. June 2012, Social Media and Business Transformation, Baltimore, MD
16. May 2012, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
17. February 2012, NBER Economics of Digitization (co-author presented), Cambridge, MA
18. January 2012, Symposium on Antitrust and High-Tech Industries, George Mason University, VA
19. January 2012, Patents, Standards and Innovation, Tucson, AZ
20. January 2012, Econometric Society Meetings, Chicago, IL
21. January 2012, AEA Meetings (2 papers), Chicago, IL
22. December 2011, Economics of Privacy Workshop, Boulder, CO
23. November 2011, Economics and Computation Day, Cambridge, MA
24. November 2011, HBS Strategy Research Conference, Boston, MA
25. November 2011, The Law and Economics of Internet Search and Online Advertising Roundtable, George Mason University, Arlington, VA
26. November 2011, Patents Statistics for Decision Makers, Alexandria, VA
27. October 2011, Workshop on Health IT and Economics, Washington, DC
28. October 2011, Innovation, Organizations and Society, University of Chicago, IL
29. October 2011, Direct Marketing Research Summit, Boston, MA
30. September 2011, Invited Session 'Economics and Marketing', EARIE, Stockholm, Sweden.
31. July 2011, NBER Economics of Digitization, Cambridge, MA
32. July 2011, SICS, Berkeley, CA
33. June 2011, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
34. June 2011, Workshop on the Economics on Information Security, Washington, DC
35. June 2011, Marketing Science (3 papers), Houston, TX
36. June 2011, Searle Center Conference on Internet Search and Innovation, Chicago, IL
37. May 2011, Boston College Social Media Workshop, Boston, MA
38. May 2011, Technology Pricing Forum, Boston, MA
39. April 2011, NBER Innovation Policy and the Economy, Washington, DC
40. April 2011, International Industrial Organization Conference (3 papers), Boston, MA
41. March 2011, Technology Policy Institute, Washington, DC
42. February 2011, NBER Economics of Digitization (co-author presented), Palo Alto, CA
43. January 2011, Sixth bi-annual Conference on The Economics of Intellectual Property, Software and the Internet (2 papers, plenary speaker), Toulouse, France
44. January 2011, MSI Young Scholars Conference, Park City, UT
45. December 2010, Workshop on Information Systems and Economics, Washington University of St. Louis (co-author presented), St. Louis, MO
46. December 2010, OECD Economics of Privacy Roundtable, Paris, France
47. November 2010, Net Institute Conference, New York, NY
48. October 2010, Workshop on Media Economics and Public Policy (co-author presented), New York, NY
49. October 2010, Workshop on Health IT and Economics, Washington, DC
50. September 2010, ITIF and CAGW Privacy Working Group Meetings, Washington, DC
51. September 2010, Medical Malpractice Conference, Mohegan, CT
52. September 2010, Search and Web Advertising Strategies and Their Impacts on Consumer

Workshop, Paris, France
53. July 2010, NBER Meetings (IT), Cambridge, MA
54. July 2010, NBER Meetings (Healthcare and IT), Cambridge, MA
55. July 2010, SICS, Berkeley, CA
56. July 2010, Keynote Speaker, 8th ZEW Conference on the Economics of Information and Communication Technologies, Mannheim, Germany
57. June 2010, American Society of Health Economists Conference, Cornell, NY
58. June 2010, Marketing Science (2 papers), Koeln, Germany
59. June 2010, Workshop on the Economics of Information Security (2 papers), Harvard, MA
60. January 2010, AEA Meetings, Atlanta, GA
61. December 2009, Workshop on Information Systems and Economics, Scottsdale, AZ
62. November 2009, WPP/Google Marketing Awards, Cambridge, MA
63. July 2009, NBER meetings (IT), Cambridge, MA
64. June 2009, IHIF Debate on Privacy, Washington, DC
65. June 2009, Marketing Science, Ann Arbor, MI
66. April 2009, International Industrial Organization Conference, Boston, MA
67. January 2009, Information Security Best Practices Conference, Philadelphia, PA
68. January 2009, Modeling Social Network Data Conference, Philadelphia, PA
69. July 2008, NBER Meetings (Productivity), Cambridge, MA
70. July 2008, SICS, Berkeley, CA
71. July 2008, Fourth Workshop on Ad Auctions, Chicago, MA
72. June 2008, Marketing Science, Vancouver, BC
73. May 2008, International Industrial Organization Conference, Richmond, VA
74. April 2008, Net Institute Conference, New York, NY
75. November 2007, NBER Health Meetings (Co-author presented), Boston, MA
76. July 2007, SICS, Berkeley, CA
77. June 2007, Workshop on the Economics of Information Security, Pittsburgh
78. June 2007, Choice Symposium, Philadelphia, PA
79. May 2007, eCommerce Research Symposium, Stamford, CT
80. April 2007, Net Institute Conference, New York, NY
81. April 2007, International Industrial Organization Conference, Savannah, GA
82. March 2007, Health Economics Conference, Tucson, AZ
83. February 2007, NBER Winter Meetings, Palo Alto, CA
84. January 2007, Economics of the Software and Internet Industries (2 Papers), Toulouse, France
85. October 2006, QME Conference, Stanford University, CA
86. June 2006, Marketing Science, Pittsburgh, PA
87. April 2006, International Industrial Organization Conference, Boston, MA
88. October 2005, NEMC Conference, Boston, MA
89. October 2005, TPRC Conference, Washington, DC
90. June 2005, CRES Industrial Organization Conference, Washington University in St. Louis, MO
91. July 2002, Payment Systems Conference, IDEI, Toulouse, France

## GRANTS

| | | |
|---|---|---|
| 2012 | Google Australia | $50,000 |
| 2011 | Tilburg Law and Economics Center (TILEC) IIPC grant | $21,000 |
| 2011 | Google Grant | $50,000 |
| 2011 | Junior Faculty Research Assistance Program | $30,000 |
| 2011 | Net Institute Grant | $6,000 |
| 2011 | NBER Digitization Grant | $20,000 |
| 2011 | NSF CAREER Award | $502,000 |
| 2010 | Time-Warner Research Program on Digital Communications | $20,000 |
| 2010 | Net Institute Grant | $6,000 |
| 2009 | Net Institute Grant | $6,000 |
| 2009 | The James H. Ferry, Jr. Fund for Innovation in Research Education | $50,000 |
| 2009 | Google/WPP Grant | $55,000 |
| 2008 | Net Institute Grant | $15,000 |
| 2007 | Net Institute Grant | $8,000 |
| 2006 | Net Institute Grant | $8,000 |

## PROFESSIONAL SERVICE

- **Associate Editor:** Management Science, International Journal of Research in Marketing
- **Associate Editor:** Information Systems Research, Special Issue on Social Media and Business Transformation
- **Editor:** The Economics of the Internet, Palgrave Dictionary of Economics
- **Co-Editor:** NBER: The Economics of Digitization - An Agenda
- **Co-Editor:** Information Economics and Policy, Special Issue on Economics of Digital Media Markets
- **Editorial Review Board:** Journal of Marketing, Journal of Marketing Research, Marketing Science
- **Advisory Board:** Future of Privacy Forum

- **Conference Program Committees**
  - 2013 Quantitative Marketing and Economics
  - 2013 Program Committee: Workshop on the Economics of Information Security
  - 2013 Associate Editor of Personal Data Markets Track: ECIS 2013
  - 2012 Program Committee (Conference Organizer) NBER: The Economics of Digitization Pre-Conference, June 2012
  - 2012 Program Committee: Economics of Information and Communications Technology
  - 2012 Senior Program Committee: 13th ACM Conference on Electronic Commerce
  - 2012 Program Committee: Workshop on the Economics of Information Security
  - 2011 Program Committee: European Association for Research in Industrial Economics Conference

- 2011 Program Committee: Economics of Information and Communication Technologies
- 2011 Program Committee: Ad Auctions Workshop
- 2011 Program Committee: Workshop on the Economics of Information Security
- 2010 Program Committee: Workshop on IT and Economic Growth
- 2010 Program Committee: Conference on Health IT and Economics
- 2010 Program Committee: Workshop on the Economics of Information Security
- 2009 Program Committee: Workshop on the Economics of Information Security
- 2008 Program Committee: Workshop on the Economics of Information Security
- 2008 Program Committee: Ad Auctions Workshop

## MIT Service

- 2013-2014 Group Head, Marketing Group
- 2011 North East Marketing Conference Coordinator
- 2011 MIT Sloan Marketing Conference, Panel Moderator
- 2011 Sloan Women in Management Conference, Panel Moderator
- 2005, 2008, 2012 Marketing Faculty Search Committee

## Expert Advice

- Osler, Hoskin & Harcourt LLP: Expert Witness in Civil Litigation Proceedings
- Gibson Dunn: Expert Witness in Civil Litigation Proceedings
- Boston Fusion: DARPA Project on Pricing of Tank Components (Spring 2011)
- NERA Economic Consulting: Market Definition in Online Advertising Markets (Fall 2011)

## Teaching

- 15.818, Pricing (MBA Elective), Spring 2006, 2007, 2009, 2010, 2011, 2012, 2013
  - 4.84/5 and 4.83/5 ratings for: 'I would recommend this Professor to other students' in 2011
- 15.732, Marketing Management for Senior Executives 2012
- 15.838, Doctoral Seminar, Spring 2006, Fall 2007

**Appendix B**

**Prior Testimony**

Declaration of Catherine Tucker in Support of Facebook, Inc.'s Opposition to Plaintiffs' Motion for Class Certification, *Angel Fraley et al.* v. *Facebook, Inc.,* United States District Court Northern District of California, Case No. 5:11-cv-01726-LHK, April 19, 2012.

**Appendix C**

**Documents Relied Upon**

<u>**Sources from These Proceedings**</u>

*Deposition Transcripts*

Deposition of George Riedel, Oct. 10, 2013

Deposition of Gillian McColgan, Nov. 8, 2013

Deposition of John J. Roese, Nov. 11, 2013

Deposition of John P. Veschi, Nov. 7, 2013

Deposition of Timothy Collins, Nov. 15, 2013

*Exhibits*

Ex. 11150, CCC0001356 (Jul. 8, 2009, Presentation, "IP Aspects of Residual Co.")

Ex. 11282, NNC-NNL06651521 (Sept. 26, 2007, Email attaching John Roese Remarks at Ottawa Patent Awards Ceremony)

Ex. 21003, NNC-NNL06001514 (Dec. 22, 2004, Master Research & Development Agreement and Amendments)

Ex. 21016, NNC-NNL07453772 (Oct. 10, 2006, Email attaching Presentation, "R&D Update")

Ex. 21026, NNI_00373228 (Mar. 14, 2002, Horst Frisch Report)

Ex. 21381, NNI_00208244 (Mar. 31, 2003, Memo from James Gately)

Ex. 21407, NNI_01333113 (Nov. 30, 2004, Email attaching Nortel Networks Multilateral APA Response to IRS Information and Document Request for a Functional Analysis)

Ex. 22078, PC0184853 (Oct. 31, 2008, Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011), with Appendices)

Ex. 22085, NNI_00825094 (Jun. 30, 2011, Rockstar Bidco, LP Asset Sale Agreement)

Ex. 22107, NNC-NNL06740124 (Jan. 12, 2010, Email from Gillian McColgan responding to an email with subject "Patent questions" sent by Carol McGran at E&Y)

Ex. 22112, NNI_00320890 (Jul. 26, 2007, Email from Gillian McColgan to David Hudson)

Ex. 22119, NNI_00319465 (Apr. 9, 2008, Email attaching Presentation, "The State of R&D at Nortel")

Ex. 32012, NNC-NNL06001488 (Jan. 1, 2002, Distribution Agreement between Nortel Networks Polska SP. Z.O.O. ("NN Poland") and Nortel Networks Limited ("NNL"))

Ex. 32166, EMEAPROD0888515 (Jan. 1, 2002, Distribution Agreement between Nortel Networks S.P.A. ("NN Italy") and Nortel Networks Limited ("NNL"))

*Other Produced Documents*

BHG0245595 (Annex to Sellers Disclosure Schedule, Annex A.I(h) Abandoned/Expired, Transferred Patents)

CCC0006612 (Mar. 2009, Presentation, "Enterprise Solutions Project Equinox")

GIP_Nortel_00230509 (Jan. 29, 2010, Presentation, "Patent Portfolio Analysis: Phase One - Board of Directors")

GIP_Nortel_00063576 (Aug. 5, 2011, Iceberg-Sortable Asset List)

GIP_Nortel_00071997 (Sept. 1, 2010, Issued Patents and Pending Patent Applications Asset List)

GIP_Nortel_00080080 (May 2010, Project Iceberg Executive Summary)

GIP_Nortel_00089277 (Apr. 4, 2011, Google Asset Sale Agreement)

GIP_Nortel_00132745 (Changes Made to Annexes Post Signing to Auction)

LAZ-NRTL-00038046 (Mar. 22, 2010, Presentation, "Nortel, Project Iceberg, Work Plan for A&B")

LAZ-NRTL-00040022 ("Global Revenues Projections and Portfolio Encumbrances")

NNI_00245703 (Jan. 1, 2001, Distribution Agreement between Nortel Network Hispania S.A. ("NN Spain") and Nortel Networks Limited ("NNL"))

NNI_00825244 (Annex to Sellers Disclosure Schedule, Annex 1.1(d) Listed Jointly Owned Patents)

NNI_00825254 (Annex to Sellers Disclosure Schedule, Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab)

NNI_01391420 (Presentation, "Nortel's Patent Portfolio")

NNI_NARNIA_00303979 (Dec. 31, 2008, Memorandum of Understanding)

NNC-NNL06001553 (Report titled "Nortel Networks Limited Transfer Pricing Report for the Year Ended December 31, 2009")

NNC-NNL06001555 (Oct. 2, 2007, Nortel Pre-Filing Conference with CRA)

NNC-NNL06001560 (Oct. 31, 2008, Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement (2007-2011))

NNC-NNL07720475 (Jul. 21, 2008, Appointment Notice for John Veschi)

NNC-NNL08182908 (Feb. 1, 2008, Role Specification for Assistant General Counsel, Intellectual Property)

US_Canada_PRIV_00493788 (Sept. 2, 2003, Email with subject "RE: Bay patents and Cost Sharing Agreement")

US_Canada_PRIV_00014888 (May 18, 2004, R&D Academy Presentation)

US_EMEA_Canada_PRIV_00163879 (Dec. 2007, Vonage Counterclaim Communications Plan)

### *Other Case Documents*

Expert Report of James Malackowski, Jan. 24, 2014

Expert Report of Lorraine Eden, Jan. 24, 2014

Expert Report of Mark L. Berenblut and Alan J. Cox, Jan. 24, 2014

Expert Report of Philip Green Regarding the Allocation of Recoveries among Nortel Entities (submitted by the Canadian Debtors), Jan. 24, 2014

## Other References

### *Complaints*

Compl., *Google Inc. v. Rockstar Consortium U.S. LP*, No. 3:13-cv-5933 (N.D. Cal. Filed Dec. 23, 2013)

Compl., *Huawei Investment & Holding Co. et al. v. Rockstar Consortium U.S. LP*, No. 2:13-cv-896 (E.D. Tex. Filed Oct. 31, 2013)

### *Patents*

U.S. Patent No. 4,736,363 (filed Oct. 11, 1985), available at http://www.google.com/patents/US4736363

U.S. Patent No. 5,263,084 (filed Jul. 22, 1991), available at http://www.google.com/patents/US5263084

U.S. Patent No. 5,583,862 (filed Mar. 28, 1995), available at https://www.google.com/patents/US5583862

U.S. Patent No. 6,765,591 (filed Apr. 2, 1999), available at https://www.google.com/patents/US6765591

### *SEC Filings*

Nortel Networks Corporation, Form 10-K for the fiscal years 2002, 2003, 2006, and 2008

### *Data*

Google Patents Search

### *Books, Academic Papers, and Other Publicly Available Documents*

Antoine Gara, *Kodak's Patent Pivot May Not Avert Bankruptcy (Update 1)*, THE STREET (Jan. 4, 2012, 5:36 PM), http://www.thestreet.com/story/11365202/1/kodak-bankruptcy-weeks-away-report.html

Antoine Gara, *Kodak's Bankruptcy Plan Slugged by InterDigital Sale Failure*, THE STREET (Jan. 23, 2012, 6:23 PM), http://www.thestreet.com/story/11382462/1/kodaks-bankruptcy-plan-slugged-by-interdigital-sale-failure.html

Bharat Anand & Tarun Khanna, *The Structure of Licensing Contracts*, 48 J. INDUS. ECON. 129 (2000)

Bronwyn Hall et al., *A Study of Patent Thickets, A Final Report Prepared for the UK Intellectual Property Office*, NAT'L INST. ECON. & SOC. RES. (2010), available at http://elsa.berkeley.edu/~bhhall/papers/HHvGR_Patent_Thickets_FIN_29Oct12.pdf

Bronwyn H. Hall, *Innovation and Diffusion*, OXFORD HANDBOOKS ONLINE (Sept. 2008), http://www.oxfordhandbooks.com/view/10.1093/oxfordhb/9780199286805.001.0001/oxfordhb-9780199286805-e-17

Bronwyn H. Hall et al., *Market Value and Patent Citations*, RAND J. ECON. 16 (2005)

Carl Shapiro, *Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting*, 1 NBER INNOVATION POL'Y & ECON. 119 (2001), http://www.nber.org/chapters/c10778.pdf

*Catching Up With Nortel CTO John Roese*, NETWORK WORLD (Jun. 27, 2007), http://www.networkworld.com/podcasts/panorama/2007/062607pan-nortel.html

"Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) And 364(E) And (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364, And (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) And (C)," *In re: Eastman Kodak Compan*y, *et. al.*, Chapter 11 Case No. 12-10202, United States Bankruptcy Court Southern District of New York, Jan. 19, 2012

"Debtor's Supplemental Motion for an Order Authorizing (A) the Sale of Patent Assets Free and Clear of Claims and Interests, (B) the License of Patents, (C) the Assumption of Patent Cross License Agreement with Fujifilm and (D) the Settlement of Claims Related to Certain Patents," *In re: Eastman Kodak Company*, *et. al.*, Chapter 11 Case No. 12-10202, United States Bankruptcy Court Southern District of New York, Dec. 19, 2012

*Faculty Early Career Development (CAREER) Program*, NAT'L SCI. FOUND. (Feb. 20, 2014), http://www.nsf.gov/funding/pgm_summ.jsp?pims_id=503214

*Failed $4.4 Billion Bid for Nortel Patents Comes Back to Haunt Google and Friends on Halloween*, FOSS PATENTS BLOG (November 1, 2013) http://www.fosspatents.com/2013/11/failed-44-billion-bid-for-nortel.html

Henry C. Lucas Jr.& Jie Mein Goh, *Disruptive Technology: How Kodak Missed the Digital Photography Revolution*, 18 J. STRATEGIC INFO. SYS. 46 (2009)

Huawei: Company Information, http://www.huawei.com/en/about-huawei/corporate-info/annual-report/annual-report-2012/company-information/index.htm

ILYA SEGAL & MICHAEL WHINSTON, *Property Rights*, *in* HANDBOOK OF ORGANIZATIONAL ECONOMICS 2 (R. Gibbons & J. Roberts, eds., 2012) (forthcoming), http://www.stanford.edu/~isegal/prights.pdf

*International Communications Market Report 2012*, Ofcom (2012), available at http://stakeholders.ofcom.org.uk/binaries/research/cmr/cmr12/icmr/ICMR-2012.pdf

John R. Allison et al., *Patent Litigation and the Internet*, 3 STAN. TECH. L. REV. 1, 8 (2012)

John C. Paul & Brian Kacedon, *Exclusive Patent Licenses May Have Standing to Sue for Infringement Even if Others Have the Right to License the Patent*, FINNEGAN (Jan. 24, 2011), http://www.finnegan.com/resources/articles/articlesdetail.aspx?news=7853c148-f3b8-46a3-927b-8b45ec995719

JOHN F. TYSON, ADVENTURES IN INNOVATION: INSIDE THE RISE AND FALL OF NORTEL, 98, 132-133(2014)

John P. Veschi et al., *Panelists*, *Key Transaction Diligence and Deal Issues from Perspective of Leading Seller and Buyer*, Conference on IP Investments & Markets 2013: Asset Acquisition and Divestiture, held by the Center for Applied Innovation, YOUTUBE (Aug. 8, 2013), https://www.youtube.com/watch?v=16McIOuCdLU

John Markoff, *Wellfleet and Synoptics Plan $2.7 Billion Computer Union*, N.Y. TIMES, Jul. 6, 1994, http://www.nytimes.com/1994/07/06/business/company-news-wellfleet-and-synoptics-plan-2.7-billion-computer-union.html

Kent Walker, *Patents and Innovation*, GOOGLE OFFICIAL BLOG (Apr. 4, 2011), http://googleblog.blogspot.ca/2011/04/patents-and-innovation.html

Larry McDonald, NORTEL NETWORKS: HOW INNOVATION AND VISION CREATED A NETWORK GIANT 177 (2000), citing Mem. of John Roth, *The Right Angle Turn*

Lindsey Gilroy & Tammy D'Amato, *How Many Patents Does It Take to Build an iPhone?*, INTELLECTUAL PROPERTY TODAY, 2014

Marc Rysman & Timothy Simcoe, *Patents and the Performance of Voluntary Standard-Setting Organizations*, 51, No. 11 MGMT SCI. 1920 (2008)

Mark Harris, *The Lowballing of Kodak's Patent Portfolio, The Bankrupt Giant Found that its Huge Trove of IP Could Fetch Only Pennies on the Dollar*, IEEE SPECTRUM (Jan. 31, 2014, 7:37 PM), http://spectrum.ieee.org/at-work/innovation/the-lowballing-of-kodaks-patent-portfolio

Matthew Daneman, *Monday is deadline for bias on Eastman Kodak digital patents*, USA TODAY (Jul. 30, 2012, 3:31 PM), http://usatoday30.usatoday.com/money/industries/technology/story/2012-07-30/kodak-patent-deadline/56593812/1

Nancy T. Gallini, *The Economics of Patents: Lessons from Recent U.S. Patent Reform*, J. ECON. PERSP., Spring 2002

PAUL NUNES & TIM BREENE, JUMPING THE S-CURVE: HOW TO BEAT THE GROWTH CYCLE, GET ON TOP, AND STAY THERE (2011)

Rebecca M. Henderson & Kim B. Clark, *Architectural Innovation: The reconfiguration of Existing Product Technologies and the Failure of Established Firms*, 35 ADMIN. SCI. Q. (SPECIAL ISSUE: TECH., ORG., & INNOVATION) 9 (1990)

Russell Shaw, *Nortel Sues Vonage for Patent Infringement*, IP TELEPHONY (Dec. 14, 2007, 11:41 PM), http://www.zdnet.com/blog/ip-telephony/nortel-sues-vonage-for-patent-infringement/2878

SCOTT ANTHONY et al., THE INNOVATOR'S GUIDE TO GROWTH: PUTTING DISRUPTIVE INNOVATION TO WORK (2013)

Thomas W. Merrill, *Property and the Right to Exclude*, 77 NEB. L. REV. 730 (1998)

Timothy Simcoe, *Standard Setting Committees: Consensus Governance for Shared Technology Platforms*, 102 AM. ECON. REV. 1 (2012), http://ssrn.com/abstract=899595

William J. Broad, *Bell Labs: A Bit Abstract and Always Curious*, N.Y. TIMES, May 30, 2001, http://www.nytimes.com/2001/05/30/technology/30BELL.html