Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, C. C-36, AS AMENDED

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------

In re

    NORTEL NETWORKS INC., *et al.*,

             Debtors.

-------------------------------------------------------

Chapter 11

Case No. 09-10138 (KG)

(Jointly Administered)

**<u>REBUTTAL EXPERT REPORT OF JEFFREY H. KINRICH</u>**

(Submitted by the U.S. Debtors)

**Feburary 28, 2014**

**REDACTED VERSION**

## EXPERT REPORT OF JEFFREY H. KINRICH

## Table of Contents

I.     QUALIFICATIONS AND EXPERIENCE .......................................................1

II.    ASSIGNMENT.............................................................................................1

III.   SUMMARY OF MY OPINIONS .................................................................2

IV.   REBUTTAL TO THE EXPERT REPORTS SUBMITTED BY THE MONITOR AND CANADIAN DEBTORS.....................................................5

A.     The Canadian Debtors' Experts' Licensing Assumptions Are Unreasonable.........6

    1.   The Canadian Experts' Assumptions Regarding the Scope of the Licenses Are Not Economically Reasonable..............................................................................9

    2.   The Canadian Experts' Reliance on the Purported Non-Transferability of the Licenses is Misplaced ...........................................................................11

B.     Analysis of Mr. Green's Line of Business Allocation ..........................................14

    1.   Overview of Mr. Green's Calculation..................................................................15

    2.   Mr. Green Does Not Follow Basic Valuation Principles and His Value in Use Approach is Internally Inconsistent and Biased ..................................................16

    3.   Using Projections Incorporating Nortel's Transfer Pricing Formula Introduces Additional Bias in Mr. Green's Value in Use Calculation...................................24

    4.   Mr. Green's "Maximum Allocation" is Biased in Favor of the Canadian Debtors ................................................................................................................27

    5.   Mr. Green's Results Are Unreasonable ...............................................................30

C.     Analysis of Mr. Green's Patent Portfolio Allocation...........................................31

    1.   General Discussion ...............................................................................................31

    2.   The Canadian Debtors' Experts Do not Follow Basic Valuation Principles, Their Approach is Biased, and Their Conclusion Is Not Based on FMV.............34

V.    REBUTTAL TO THE EXPERT REPORTS SUBMITTED BY THE CCC EXPERT.........................................................................................43

A.     The CCC Makes the Same Inappropriate Assumptions About the Licenses as the Canadian Debtors......................................................................................43

B.     Line of Business Critique .....................................................................................44

C.     Patent Portfolio Critique.......................................................................................50

VI.   REBUTTAL TO THE MALACKOWSKI AND HUFFARD EXPERT REPORTS SUBMITTED BY THE EMEA DEBTORS.................................52

A.     The EMEA Experts' Contribution Approach Does Not Appropriately Value the IP Assets the Debtor Groups Relinquished ....................................................54

B.     The EMEA Experts' License Approach to Value the IP Assets the Debtor Groups Relinquished has Implementation Defects...............................................55

1.  Mr. Malackowski's Use of the License Approach in his Proposed Line of Business Allocation has Implementation Defects ...............................................55

2.  Mr. Malackowski's Use of the License Approach in his Proposed Patent Portfolio Allocation Has Implementation Defects................................................60

3.  Corrections to Patent Portfolio and Line of Business Valuation.........................65

**VII.    CONCLUSION** ................................................................................................**67**

## I.    QUALIFICATIONS AND EXPERIENCE

1.    I am a Managing Principal at the economic, financial, and strategy consulting firm Analysis Group, Inc. I have been retained as a valuation expert in this matter. I provided a detailed description of my qualifications and experience in my previous Expert Report submitted on behalf of the U.S. Debtors on January 24, 2014.[1]

## II.    ASSIGNMENT

2.    I was asked by counsel to the U.S. Debtors to opine on and respond to the asset valuations and allocations of Available Proceeds proposed by the following experts:

- Mr. Philip Green on behalf of the Monitor and Canadian Debtors (valuation of all assets and allocation of proceeds);[2]

- Mr. Mark Berenblut & Dr. Alan Cox on behalf of the Monitor and Canadian Debtors (guidance on valuation of all assets and allocation of proceeds);[3]

- Mr. Thomas Britven on behalf of the Canadian Creditors Committee ("CCC") (valuation of all assets and allocation of proceeds);[4]

- Mr. Paul Huffard on behalf of the Joint Administrator and EMEA Debtors (valuation of all non-IP assets and allocation of proceeds);[5]

- Mr. James Malackowski on behalf of the Joint Administrator and EMEA Debtors (valuation of IP assets and allocation of proceeds).[6]

---

[1] "Expert Report of Jeffrey H. Kinrich," January 24, 2014 [hereinafter Kinrich Report].

[2] "Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities," January 24, 2014 [hereinafter Green Report].

[3] "Report of Mark L. Berenblut and Alan J. Cox, NERA Economic Consulting," January 24, 2014 [hereinafter Berenblut & Cox Report].

[4] "Nortel Networks Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups," January 24, 2014 [hereinafter Britven Report].

[5] "Expert Report of Paul P. Huffard," January 24, 2014 [hereinafter Huffard Report].

[6] "Expert Report of James E. Malackowski," January 24, 2014 [hereinafter Malackowski Report].

### III.    SUMMARY OF MY OPINIONS

3.      I have reviewed the expert opinions listed above (collectively, "the Canadian and EMEA Valuation Experts").[7]  The arguments they present do not alter the opinions I set forth in my opening report regarding the fair market value ("FMV") of the assets relinquished by the Debtor Groups. It continues to be my opinion that the methodology that I used to value the assets relinquished by each Debtor Group is the most economically correct and reliable approach under the circumstances presented here.

4.      Although there are fundamental valuation concepts that we agree upon, each of the approaches proposed by the Canadian and EMEA Valuation Experts is flawed in its own way.  These flaws result in a failure to determine the FMV of the assets relinquished by the Debtor Groups as a part of the Line of Business and Patent Portfolio sales.

5.      The Canadian Experts'[8] approaches are primarily flawed by virtue of two economically unreasonable assumptions that they were asked to make and which they did not test.  First, the Canadian Experts improperly assume that the licenses granted to each of the IEs under the MRDA contains a restriction that limited the licenses to exploitation of patents that were being used in the operating businesses at the time those businesses were sold.  Said differently, under their interpretation, the licensees did not have any rights to patents that were "not used" in a Nortel operating business (under their narrow view of what was "not used").  Second, the Canadian Experts assume that because licenses are "non-transferable," the licensees' ability to realize the economic value of their licenses was limited. These assumptions do not

---

[7] Where I refer to one expert report specifically herein, to the extent that other expert reports espouse the same opinion or use the same methodology, my reference to the one report in particular is not an indication that I do not also disagree with the other expert reports.

[8] The Canadian Experts refers to the expert reports submitted by the Canadian Creditors Committee ("CCC") Expert (Mr. Britven) and the Canadian Debtors' Experts (Mr. Berenblut & Dr. Cox and Mr. Green).

make sense from an economic perspective. These assumptions are central to the Canadian Experts' valuations methods such that their results are economically unreasonable.

6.      In his analysis of the Lines of Business sales, Mr. Green values the tangible assets, the in-place workforce, and customer relationships and IP rights (which he incorrectly lumps together). Then, relying on the assumptions made about the scope and non-transferability of the licenses, he limits the U.S. and EMEA Debtors to the value that he projects that they could have generated through their respective exploitation of the license rights if Nortel had continued to operate the businesses with the MRDA in effect, which he terms "value in use."

7.      The flaws in Mr. Green's "value in use" analysis become clear once one examines his methodology. Although he presents a "value in use" for the U.S. Debtors and the EMEA Debtors based upon the projections he used, he does not present the "value in use" calculation for the Canadian Debtors. Instead, he includes it in the "excess" value left over in his method and allocates that to the Canadian Debtors. When one calculates the Canadian Debtors' "value in use" under Mr. Green's methodology, it becomes apparent that the "value in use" for all of the entities combined accounts for less than half of the total value he describes as the "IP Rights and customer relationships" value in the Line of Business sales. It then becomes clear that this method results in a shift of over a billion dollars to the Canadian Debtors.

8.      In performing this "value in use" calculation, Mr. Green generally relied on the business projections showing the lowest projected profits, among the Nortel projections he considered. In some cases, he made his own downward adjustments to the available projections. If one uses the most recent available projections in Mr. Green's value in use framework, there is no residual IP & Customer Relations value for Mr. Green to attribute to the Canadian Debtors.

3

Furthermore, Mr. Green improperly applies Nortel's transfer pricing system to his valuation, thereby confusing the value of an asset with the use to which profits from that asset can be put.

9.      Mr. Green's Patent Portfolio valuation is a tautological extension of his assumptions. He explains that the Patent Portfolio consists of patents that were "used" in Lines of Business and patents that were not used. He asserts that the U.S. Debtors and the EMEA Debtors were already compensated for their licenses to the patents in the Patent Portfolio that were "used" in the Lines of Business and based on his assumption regarding the scope of the licenses and their purported non-transferability, he concludes that the U.S. Debtors' and EMEA Debtors' licenses "had no material value" and that the "entirety of the proceeds from the Residual IP Sale should be allocated to the owner of the intellectual property."[9]

10.      Even applying his inappropriate "value in use" framework, demonstrates that there is significant value in the U.S. and EMEA Debtors' licenses. The CCC Expert, Mr. Britven, relies upon the same economically unreasonable assumptions regarding the scope and transferability of the licenses.

11.      Mr. Britven also relies on the 2008 asset impairment test (2008 AIT), which was prepared before the Line of Business sales and which reflects a value that was one-third of the price that was ultimately received for these assets in an open market auction between willing sellers and willing buyers. The 2008 AIT does not reflect fair market value of the assets when they were sold and should not be used for determining the value that each Debtor Group relinquished.

12.      Finally, the EMEA Debtors' Valuation Expert Reports also contain a number of errors. Mr. Malackowski inappropriately relies upon a "contribution method" to determine the

---

[9] Green Report, at 6.

4

allocation.   This is not an appropriate valuation approach.   How much you spend to create something is not its fair market value, especially when considering costs for intangibles such as R&D.  There are numerous examples of this, including the new pharmaceutical that cost millions of dollars to develop but which does not receive FDA approval and is now worthless, and an exploratory oil well that does not strike oil.

13.     Mr. Malackowski's licensing approach is conceptually appropriate. But it also includes implementation issues which have the effect of skewing value to the EMEA Debtors. When these issues are corrected, an increased allocation to the U.S. Debtors results.

14.     Accordingly, I find that none of the other valuation experts properly determined fair market value. The remainder of this report details my critiques further and provides specific numerical corrections to correct the largest flaws in the other experts' calculations.

## IV.     REBUTTAL TO THE EXPERT REPORTS SUBMITTED BY THE MONITOR AND CANADIAN DEBTORS

15.     This section addresses the analyses in the reports provided by Mr. Green and by Mr. Berenblut and Dr. Cox (the "Canadian Debtors' Experts"). Although they acknowledge that the purchase prices of the Line of Business sales and the Patent Portfolio sale represent their FMVs,[10] the Canadian Debtors' Experts do not determine the FMV of the assets relinquished by each of the Debtors. Instead, the Canadian Debtors' Experts develop an alternative (lower) valuation of the assets relinquished by the U.S. and the EMEA Debtors and then allocate the difference between that lower value and the total sales proceeds to the Canadian Debtors.

---

[10] Berenblut & Cox Report, at 6; Green Report, at 14.

A.    **The Canadian Debtors' Experts' Licensing Assumptions Are Unreasonable**

16.    A premise of the Canadian Debtors' Experts analyses is that the U.S. and EMEA IEs' licenses were very narrow in scope. In sum:

- they appear to have been instructed to assume that the U.S. and EMEA IEs' licenses did not include rights to patents not currently used in products or in any of their operating businesses,[11] and

- that the licenses were non-transferable.[12]

17.    Specifically, with respect to the scope of the licenses, Mr. Green asserts that "The exclusive license rights held by the Participants were restricted to specific fields of use as required to operate the Nortel operating business as managed by the licensee."[13] Mr. Berenblut & Dr. Cox similarly characterize the licenses as "limited" and assert that "the U.S. Debtors and EMEA Debtors had license rights to use the technology protected by that IP for the purposes of carrying out Nortel's business in their respective geographies."[14] Mr. Green also states, "It is my understanding that the U.S. and EMEA Debtors' licenses did not include rights to patents not used in any of their operating businesses under the MRDA" and he assumes that the licenses held by the U.S. and the EMEA Debtors were limited to Nortel "Products." [15] Mr. Berenblut & Dr. Cox similarly opine that "[g]iven that the Residual IP was in respect of technology that was not used in the business of the Nortel Group or was subject to licenses granted to the purchaser in the

---

[11] Green Report, at 6, 64; Berenblut & Cox Report, at 22.

[12] Green Report, at 4; Berenblut & Cox Report, at 5.

[13] Green Report, at 55

[14] Berenblut & Cox Report, at 19, 20, 24.

[15] Green Report, at 64, 4.  While the Canadian Debtors' Experts are not entirely clear, it appears that they are limiting their assumption to patents used in products at the time of each sale.

Business Sales, it seems like[ly] that, at the Valuation date, there was no expected future operating profits from the use of the Residual IP in Nortel's business from which the U.S. Debtors and/or the EMEA Debtors would have benefitted"[16] and that the "economic benefits forgone by the U.S. Debtors and EMEA Debtors by the surrender of their property interests do not include the value of Nortel's IP assets that were not incorporated into Nortel products."[17]

18.    Given these assumptions, Mr. Green concludes that "[b]ecause the licenses, by their terms, were not transferable, the appropriate method to value the licenses is to consider what income the relevant US and EMEA Debtors could have generated through their respective exploitation of the license rights if Nortel continued to operate the business with the MRDA continuing in effect."[18] Similarly, Mr. Berenblut & Dr. Cox conclude that "the value of the non-transferable license rights surrendered by the U.S. and EMEA Debtors depends only on, and is limited to, the present value of their share of the expected future operating profits of Nortel but for the decision to sell its assets."[19]

19.    Similarly, the CCC's Expert, Mr. Britven,[20] was instructed to assume that the U.S. and EMEA IEs' licenses were narrow in scope. Specifically, he was instructed to assume that the licenses were limited to "Products"[21] and that "NNL retained all rights relating to uses of the NN Technology unrelated to Products"[22] and that the licenses were exclusive "only within defined territories and field of use." He also assumes that the licenses were not transferable without the

---

[16] Berenblut & Cox Report, at 25.

[17] *Id.*, at 27-28.

[18] Green Report, at 4.

[19] Berenblut & Cox Report, at 5.

[20] Collectively, I refer to the Canadian Debtors' Experts and the CCC's Expert as the "Canadian Experts."

[21] Britven Report, at 16.

[22] *Id.*, at 16.

consent of the other parties to the MRDA but notes that the licensees had the right to sub-license (although he assumes this right is circumscribed by the limited scope that he was asked to assume).[23]

20.     The Canadian Experts offer no analysis as to whether the above assumptions would have been economically reasonable for Nortel as a going concern.

21.     In contrast, the U.S. and EMEA Debtors' position is that the exclusive, perpetual, royalty-free licenses NNI and the EMEA IEs held, which included the right to sub-license, gave each of them all economic rights to exploit all Nortel IP within their Exclusive Territories, regardless of the fact that NNL held nominal legal title.[24]  The U.S. and EMEA Debtors' position is that these economic rights in each IE's Exclusive Territory were not limited by any scope or field of use restriction.[25,26]

22.     Consistent with the U.S. and EMEA Debtors' position, I have been asked to assume there is no scope of use restriction on the licenses. However, I also examined the

---

[23] *Id.*, at 16.

[24] The Debtor Groups had approximately the same economic rights in their non-Exclusive Territories as well. I discussed these rights in more detail in my affirmative report. See Malackowski Report, at 51 and Huffard Report, at 49 for the position of the EMEA Debtors.

[25] I am aware that Mr. Bereskin in his rebuttal report explains that as a matter of custom and practice not only is the U.S. and EMEA Debtors' interpretation correct, but that even if the scope of the licenses were limited to Products, as a matter of custom and practice, that term is so broad as to encompass any economic benefit I understand NNI and the EMEA IEs to have relinquished.  Accordingly, the scope of use restriction would have no economic impact.  However, as this rebuttal report is centered on my critique of the opposing expert reports, unless stated otherwise, my reference to the Products scope of use restriction is intended to refer to the definition of that restriction that is assumed by the Canadian Experts.

[26] The EMEA Debtors' Experts also recognize that the licenses were not limited to current Products. In describing his license approach, Mr. Malackowski writes: "The five [IEs] held an exclusive license to Nortel's IP within their own country so, I allocated the entire net present value of future revenues from Nortel IP in each country to the RPE that held an exclusive license in that country." Malackowski Report, at 7.  While Mr. Huffard does not speak explicitly to the IP covered by the U.S. and EMEA IEs' licenses, it is implicit that he understood the license rights to extend to all Nortel IP because he adopts and relies on Mr. Malackowski's license approach to allocate Available Proceeds.  Huffard Report, at 56.

economic reasonableness of these assumptions and the alternatives given to the Canadian Experts. I find that the U.S. and EMEA Debtors' interpretation of the scope of the licenses is consistent with how an economically-motivated going concern company would structure its license arrangements and that the Canadian Debtors' interpretation is not.

**1.    The Canadian Experts' Assumptions Regarding the Scope of the Licenses Are Not Economically Reasonable**

**a)    Under the Canadian Experts' Theories the Economic Incentives Are Inconsistent with the Incentives a Profit Maximizing Corporation Would Seek to Instill**

23.    A technology company should structure itself to incentivize the R&D that is valuable to it. In a company like Nortel, in which separate entities shared R&D responsibility and were granted exclusive licenses to the IP for their respective territories, the licenses should provide appropriate incentives to encourage each entity to perform R&D leading to the continued success of the company. Licenses that give the R&D-developing entities access to the full upside from the development of that more valuable technology provide powerful incentives for that R&D. On the other hand, licenses that provide access to less than the full upside to the more valuable R&D provide weaker incentives to invest in that R&D. In this context, the U.S. and EMEA Debtors' interpretation of the licenses would provide considerably stronger R&D incentives than would the Canadian Debtors' interpretation.

**b)    It is Not Economically Reasonable to Assume, as is Inherent in the Assumptions Adopted by the Canadian Experts, that NNL Would Have Either Foregone Valuable Licensing and Enforcement Rights in the U.S. or Paid Substantially Higher Taxes to Avoid Granting These Rights to NNI Under the Licenses**

24.    In addition to exploiting a patent by developing products and services that employ it, a holder of the economic rights to a patent also may derive value from it by licensing it to third parties, or enforcing its rights to the patent through litigation.  Pursuant to the scope of the

license assumption the Canadian Experts have adopted, the right to license or to enforce against any third parties to make their own products would belong to NNL.  As such, if NNL wished to exploit those rights in the U.S. while Nortel was a going concern, NNL would have had to enter into its own transactions in the U.S. and incur the resulting tax consequences.

25.     As Dr. Eden opined, NNL wanted to minimize taxes, which included recognizing income in Canada, not the US.[27]  An example of this is in a 2008 presentation by Peter Look, a former NNL Vice President for Tax, to Nortel's Audit Committee; it stated that "Nortel's Canadian tax profile can provide a strategic financial competitive advantage" because there was "[z]ero tax cost for income attributed to Canada" and that the "goal [is] to attribute more income to Canada."[28]  Similarly, John Doolittle, NNL's former Treasurer, CFO, and Vice President for Tax, stated that the goal of Nortel's transfer pricing system "was that to the extent laws permitted it, we would move as much profit and hence cash into Canada."[29]  Furthermore, Nortel specifically represented to the tax authorities that "From an economic standpoint, each R&D cost sharing participant could be considered to 'own' the NT technology as it related to its specific region."[30]

26.     The Canadian Debtors' Experts interpret the U.S. and EMEA licenses narrowly. The economic implication of the Canadian Experts' license assumptions is that NNL would either have had to forego the potentially substantial revenue that would be generated from

---

[27] Eden Report at 5-6.

[28] NNC-NNL099354 (May 6, 2008, PowerPoint presentation entitled "Tax Matters Update, Audit Committee Meeting"), at 3.

[29] Doolittle Dep., Dec. 5, 2013 52:7-12.

[30] Ex. 21026, NNI_00373228 (Mar. 14, 2002, Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions), at 10.

licensing to and enforcing against third parties in the U.S. or bear the tax consequences of transacting business in the U.S.

27.     Alternatively, if one understands the license to grant the right to license and enforce against third parties for their own products and services to NNI as do the U.S. Debtors, revenue earned from that activity while Nortel was a going concern would have been run through the MRDA and just as with the income generated from NNI's other business activities in the U.S., the income received by Canada through the transfer pricing payments would not be subject to U.S. taxes.  Thus, the assumption the Canadian Experts have adopted which results in NNL receiving less profit than it would have if it structured the license consistent with the U.S. Debtors' understanding is economically unreasonable.

## 2.     The Canadian Experts' Reliance on the Purported Non-Transferability of the Licenses is Misplaced

### a)     Even Under Their Assumptions Regarding the Licenses of Limited Scope and Non-Transferability, the Canadian Experts Allocate Too Much Value to the Canadian Debtors

28.     The Canadian Debtors' Experts premise their analysis of the value of U.S. and the EMEA Debtors' rights to the IP on the fact that the licenses were non-transferable and limited to patents used in Products.[31]  Based on those premises, they calculate the difference between the FMV (as implied by the sales proceeds) of the Nortel IP assets relinquished and the U.S. and EMEA Debtors' value in use; they give this difference to Canada. This is unreasonable, even accepting the Canadian Debtors' interpretation of the license rights.

---

[31] Green Report, at 4; Berenblut & Cox Report, at 5; Britven Report, at 15-17.

29.     As the Canadian Debtors' Experts recognize, NNI and the EMEA IEs had perpetual licenses (including the right to enforce) in their Exclusive Territories.[32] These licenses gave NNI and the EMEA IEs the right to prevent any buyers of patents from NNL from extracting value from the patents in their Exclusive Territories. Thus, as long as NNI and the EMEA IEs held Exclusive Licenses,[33] NNL would not have been able to realize any value from its patents pertaining to the Exclusive Territories by attempting to sell its patents. Indeed, in the sale of the Patent Portfolio, both Google and Rockstar wanted to secure global rights to the patents and to terminate all intercompany license rights.[34]

30.     At the same time, under the Canadian Debtors' interpretation of license rights, the U.S. and EMEA IEs would not have been able to transfer their licenses (without the other IEs' consent).[35] Suppose a prospective buyer of Nortel's IP would like to obtain the rights to some of Nortel's IP in, say, the U.S. market at a premium above what NNI was able to realize by using

---

[32] Green Report, at 4; Berenblut & Cox Report, at 22.

[33] "Exclusive Licenses" refer to the licenses granted under Article V of the MRDA.

[34] See Ex. 22085, NNI_00825094 (June 30, 2011 Rockstar Bidco, LP Asset Sale Agreement) (Section 5.13(b) requires that "as of the Closing, the Sellers shall terminate all license rights granted under the Master R&D Agreement to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests") and GIP_Nortel_00089277 (April 4, 2011 Google Asset Sale Agreement). See also Exhibit 11173, GIP_Nortel_00136187 (February 25, 2011 email chain regarding Iceberg: Asset Sale Agreement Issues attaching an issues list from Bidder 1's counsel in which purchaser proposed that "the Asset Sale Agreement (and Sale Order) provide that (a) the MRDA will terminate at Closing, and (b) all other intercompany licenses will terminate at Closing, except to the extent required for continuity of supply of Seller's products and Sellers' services pursuant to retained contracts, and will terminate completely as soon thereafter as the related runoff business ceases); Riedel Dep. Oct. 10, 2013, 137:5 – 139:5 - "Q. If you could turn over to the second page of that attachment there is the second bullet point has a heading that says intra-company license termination, do you see that? A. Correct. Q. If I could ask you briefly to read that bullet to yourself and tell me when you are finished? A. Okay. Q. Do you recall that Google as bidder one required that the MRDA would terminate at closing? A. I do. Q. Do you recall that it wanted all other intra-company licenses to also terminate at closing? A. Correct. Q. Do you recall why Google wanted those provisions? Two part answer. They were very concerned about what's euphemistically referred to as a back door license entry meaning someone could buy NN India and end up with a license to this portfolio that they were hoping to assert it against them therefore terminating those agreements with the exception of the run off of contracts and wind down of entities was deemed as important to them because it would diminish the value that they were prepared to pay." Riedel Dep., Oct. 10, 2013 137:23 - 139:5.

[35] Green Report, at 4; Berenblut & Cox Report, at 22.

the same IP. Under the Canadian Debtor's interpretation, absent cooperation, neither NNI nor NNL would have been able to assign the rights to the IP to the prospective buyer because both parties had the ability to block any transaction. Neither party could act alone; they would have to cooperate. Despite this, Mr. Green concludes that NNL would have obtained the entire premium the prospective buyer placed on Nortel's IP. This cannot be correct. Clearly, NNI would not have consented to the transaction without obtaining a portion of the premium, so Mr. Green's conclusion is biased in favor of the Canadian Debtors.

> **b)**   **With Sublicense Rights, the Entire Value of IP Belongs to the Exclusive Licensee**

31.    I understand the U.S. and EMEA Debtors had sublicense rights to all Nortel technology in their Exclusive Territories.[36] This right to sublicense Nortel Technology is absent from the Canadian Debtors' Experts' analysis of the implications of the alleged non-transferability of the license rights. The ability to sublicense Nortel Technology within their Exclusive Territories means that NNI and the EMEA IEs could have granted third parties some or all of their economic rights to the Nortel IP, including on an exclusive and perpetual basis. As such, the third party could receive the identical economic rights through a sublicense that it could through a transfer.   For this reason, the right to sublicense is economically equivalent to a transfer right, and the Canadian Experts' argument regarding transferability lacks any economic significance.

---

[36] Ex. 21003, NNC-NNL06001514 (Master R&D Agreement) [hereinafter MRDA], at Article 5. The EMEA Debtors' Expert explicitly recognizes this as well. Mr. Malackowski writes: "each RPE held a non-exclusive license to exploit all Nortel IP in every ROW country, and each of these licenses was expressly sublicensable." Malackowski Report, at 51. Similarly, Mr. Huffard writes:  "I consider it of particular significance that the exclusive and non-exclusive licenses held by the [IEs] afforded each [IE] the right to grant sublicenses."  Huffard Report, at 49.

B.     **Analysis of Mr. Green's Line of Business Allocation**

32.     While the Canadian Debtor Experts and I agree on the total FMV of the Lines of Businesses and the Patent Portfolio, and on the principle that each Debtor Group should receive the FMV of the assets it relinquished, we disagree on the application of this principle. I apply this principle to all assets. The Canadian Debtor Experts do not.

33.     To value the rights relinquished in the Line of Business sales, Mr. Green values each entity's license rights along with its tangible assets, in-place workforce, and wholly-owned businesses. To value the surrendered license rights, Mr. Green applies what he terms the "value in use" which looks to the "determination of the value that could have been realized by the U.S. Debtors and the EMEA Entities if the businesses in question had continued to operate."[37]

34.     Mr. Green's bases for applying "value in use" are his assumptions regarding the scope of use restriction on the licenses and their non-transferability.  Specifically, Mr. Green relies on the assumption of non-transferability to claim that the only value the U.S. and EMEA Debtors could have realized for their Line of Business assets was the value they could derive if they continued to operate as the ongoing businesses.  This is not so.

35.     As explained above, an important distinction between Mr. Green's analysis and mine is our understanding of the scope of the licenses.  If my understanding is correct, Mr. Green does not present any relevant analyses.  But even if his understanding is correct, his analysis was improperly implemented and fails to measure the proper value attributable to the U.S. and EMEA Debtors.

---

[37] Green Report, at 5.

### 1.    Overview of Mr. Green's Calculation

36.    Mr. Green estimates the value of the U.S. and EMEA IEs' interests based on their values in use. According to International Financial Reporting Standards ("IFRS"), to which Mr. Green cites for his value in use calculation, value in use is "the present value of estimated future cash flows expected to arise from the continuing use of an asset and from its disposal at the end of its useful life."[38] In principle, value in use represents the value today, to the owner of an asset, of continuing to use an asset for its remaining useful life. In practice, Mr. Green calculates value in use in the following manner:

- he identifies forecasts prepared by Nortel, assuming the Lines of Business would be retained by Nortel, and (in some Lines of Business) reduces the forecasted earnings on his own initiative;

- he uses the resulting forecasts to project earnings for the U.S. and EMEA IEs (but not the Canadian IE); and

- he discounts his projected earnings to obtain their present values, which he treats as the Lines of Business's *values in use* for the U.S. and EMEA IEs.

37.    Mr. Green does not perform a value in use calculation for the Canadian IE. Instead, he estimates the value of the Canadian IE's interests as the available proceeds from the Line of Business sales less his estimate of the values in use of the U.S. and EMEA IEs' interests.

38.    For the reasons discussed in this section, Mr. Green's conclusions with respect to the value relinquished in the Line of Business sales should not be used to determine the allocation of Available Proceeds. Mr. Green does not follow standard valuation principles in his

---

[38] "Value in use - IFRS," in The International Financial Reporting Standards Database and Textbook, accessed Feb. 21, 2014, http://annualreporting.info/definiciones/value-in-use.

valuation of Line of Business IP rights and customer relationships. His approach is internally inconsistent, does not determine FMV, and is biased in favor of the Canadian Debtors. Mr. Green's use of transfer pricing adjusted financials is not appropriate for determining FMV and his application of the RPSM in a valuation context is inappropriate. These flaws cause his results to be biased and result in an overstatement of value relinquished by the Canadian Debtors.

**2.      Mr. Green Does Not Follow Basic Valuation Principles and His Value in Use Approach is Internally Inconsistent and Biased**

**a)      Mr. Green's Choice of Projections Results in the Lowest Possible License Value**

39.      In his value in use calculations, Mr. Green relies on projections that result in NNI and the EMEA IEs' licenses being undervalued.  As his basis for his value in use calculations, Mr. Green projects operating income by applying revenue and operating cost growth forecasts to historical revenue and operating costs reported in the 2009 carve-out income statements for five Lines of Business.[39] Mr. Green then discounts the (transfer pricing-adjusted) operating income from the forecasts[40] to estimate the values in use of the Lines of Business.[41]

40.      The IFRS describes how to make forecasts in value in use calculations:

"In measuring *value in use* an entity shall base cash flow projections on reasonable and supportable assumptions that represent *management's best*

---

[39] He makes an adjustment for the MSS, Layer 4-7 and Next Generation Packet Core Lines of Business.

[40] Mr. Green discounts operating income earned from existing technology and yet to be invented technology at 12% and 30%, respectively,

[41] Green Report, at 60.

*estimate* of the range of economic conditions that will exist over the remaining useful life of the asset."[42] (Emphasis added.)

41.     Mr. Green does not follow the guidance of the IFRS in his selection of Line of Business forecasts. Instead, Mr. Green claims that his selection of forecasts (including his own ex-post downward adjustments) best represents expected financial results from the Lines of Business had they continued to be operated by Nortel.[43] Mr. Green selected and adjusted various company forecasts so that his resulting value in use calculation is lower than the value he would have found had he simply selected the *least optimistic* among the Nortel projections he reviewed. Using the least optimistic Nortel projections, rather than Mr. Green's own projections, the value in use would be $1.30 billion, as compared to the $0.95 billion value he calculated. Alternatively, Mr. Green could have (and should have) selected the *most recent* among the Nortel projections he reviewed. Under this alternative, the value in use would be $2.82 billion. (*See* Exhibit 1.)

42.     As a general matter of valuation, it is preferable to rely on financial projections prepared by management, subject to validation, rather than projections prepared ex-post for the purposes of litigation. Moreover, it is reasonable to conclude that the most recent management projections represent management's most current expectations about future business performance near the valuation date. Mr. Green did not rely on Nortel's most recent projections and the projections he created distort his valuation results. His projections also imply values considerably at odds with the actual FMVs "revealed" by the Line of Business sales amounts. By

---

[42]"IAS 36 Basis for estimates of future cash flows," in The International Financial Reporting Standards Database and Textbook, accessed Feb. 21, 2014, http://annualreporting.info/impairment-asset/measuring-recoverable-amount/value-in-use/basis-for-estimates-for-future-cash-flows/basis-for-estimates-of-future-cash-flows.

[43] Green Report, at 59. Mr. Green rejects some of the most recent forecasts, arguing that these reflect value in the hands of a well-capitalized buyer. Green Report Appendix A, at 7; Green Report Appendix B, at 6; Green Report Appendix C, at 7-8; *Id.* Appendix D, at 5-6; *Id.* Appendix E, at 7-8. However, upon review of these forecasts, I see no evidence to this effect.

not relying on actual Nortel forecasts and management's best estimates, Mr. Green's analysis is in error.

43.    One consequence of this error that is of particular concern is that under Mr. Green's valuation approach, his use of a self-created projection that is lower than any prepared by Nortel results in a residual value of $1.03 billion that he allocates to NNL (*See* Table 1). If Mr. Green had used the most recent Nortel projections, his approach would not have resulted in an unexplained residual amount.[44] Mr. Green's error is compounded by his decision to allocate this residual entirely to NNL. Because Mr. Green allocates all value in excess of his forecasts (as selectively applied to the U.S. and EMEA Debtors) to the Canadian Debtors, his projections bias his results in favor of the Canadian Debtors.

### b)    Mr. Green Does Not Follow Standard Valuation Principles

44.    In addition, and independently, Mr. Green's calculation is inconsistent with the above IFRS definition of value in use because he does not include a terminal value for the business (in spite of the fact that he does not consider this a wind-down business). As a result, his analysis understates the value of the U.S. and EMEA Debtors' licenses.

45.    Mr. Green projects operating profits for each of the Lines of Business over a nine-year period. His projections include nearly $8 billion in continued investment in R&D,

---

[44] In fact, the aggregate value from this correction is in excess of the aggregate sales price. This is entirely attributable to another flaw in Mr. Green's assemblage of assets approach. When measuring the value of a business based on its projected income (using, for example, a DCF analysis), it is improper to combine that value with the value of the other assets (here, in Mr. Green's analysis, tangible assets and assembled work force), because those assets must be utilized to generate the income. (The exception would be for excess assets that are not needed to generate the income. This is sometimes referred to as the "Picasso in the boardroom" issue. That exception does not apply to Nortel.) Mr. Green's approach improperly combines income based and asset based valuation methodologies.

distributed more or less evenly across his forecast period.[45] Mr. Green assumes that this R&D

will generate new technology and new products; his financial projections include future profit

streams derived from this "yet to be invented technology."[46] Mr. Green also clearly states that in

his framework, Nortel would have run through two complete product or technology cycles

during the projection period, also driven by this ongoing R&D.[47] As a consequence, his

projections imply that Nortel would have operated the Lines of Business as going concerns for

the indefinite future.

46.    The standard approach to financial modeling and valuation would require some

consideration of the value of the ongoing business at the end of the projection period. As an

illustration of the importance of the fact that he assumes that the Lines of Business would

continue to operate after the projection period, Mr. Green acknowledges that Nortel would be

starting its third product cycle in 2019, based in part on R&D conducted during the projection

period.[48] However, Mr. Green does not incorporate the value of the Lines of Business after 2018

because he "considered any potential profits after year nine [2018] to be too speculative to include

in the analysis."[49] All cash flow projections are uncertain. However, under standard valuation

principles it is not appropriate to dismiss the future value of an asset because of this uncertainty.

Mr. Green's approach is inconsistent with standard valuation practice. Because Mr. Green's

valuation model implies Nortel would have continued operating the Lines of Business after 2018,

---

[45] The projection that Mr. Green uses to calculate license value is of his own creation. It is not a projection prepared by Nortel management.

[46] Green Report, at 60.

[47] *Id.* Appendix K, at 9.

[48] *Id.*, at 9.

[49] *Id.*, at 9.

he should have accounted for this additional value. The standard valuation approach to account for value after the modeling period is to calculate a terminal value.[50]

47.     Instead, Mr. Green's treatment of the value of the Nortel Lines of Business after 2018 is consistent with a run-off or wind-down business in which there is no significant value after the projection period. But if that were the case, Mr. Green should not have projected continued R&D spending during the 2010 to 2018 time period. Such spending is inconsistent with a run-off or wind-down business. The inconsistency between Mr. Green's modeling of Nortel as an ongoing business in the 2010 to 2018 period and the implicit assumption that there would be no value after 2018 cannot be reconciled. By including R&D expenditures in the projection period and ignoring the value of the businesses after the projection period, Mr. Green underestimates the value in use of the U.S. and EMEA Debtors' Licenses. This improper methodology is compounded by Mr. Green's failure to apply the same methodology to value the Canadian Debtors' interests.  Rather, he simply allocates all of the remainder of the Line of Business sale proceeds to the Canadian Debtors, and therefore this understatement of the value in use benefits the Canadian Debtors.

**c)     Mr. Green's Methodology for Value in Use Favors the Canadian Debtors**

48.     Mr. Green calculates the value of the Lines of Business on an asset-by-asset basis. He calculates a value for tangible assets and workforce for all three Debtor Groups. He also calculates a limited combined value for the IP rights and customer relationships relinquished by the U.S. and EMEA Debtor Groups. Under Mr. Green's calculations, Available Proceeds

---

[50] Shannon P. Pratt and Alina V. Niculita, *Valuing a Business, Fifth Edition: The Analysis and Appraisal of Closely Held Companies* (McGraw-Hill Companies, Inc., 2008), at 219.

considerably exceeds the sum of these values.[51] Mr. Green does not separately value the Canadian Debtors' rights but rather attributes all remaining sale proceeds to the Canadian Debtors.

49.     Mr. Green relies on global forecasts and therefore he could have calculated a value in use for the Canadian Debtors' IP rights and customer relationships. In fact, his "Alternative Maximum Allocation" implicitly acknowledges a value in use for the Canadian Debtors. However, he does not present this value in use for the Canadian Debtors. Rather, he lumps it in with all other remaining value above and beyond the value that would be derived from a consistent application of his value in use methodology and then attributes all of this remaining value entirely to the Canadian Debtors. As shown in Table 1 below, Mr. Green ascribes a combined IP rights and customer relationship value for the Canadian Debtors of $1.41 billion. Under Mr. Green's approach, the value in use for the Canadian Debtors would be $0.39 billion. This results in a residual value of $1.03 billion. (*See* Table 1.) Thus, of the $1.41 billion in IP rights and customer relationship value that Mr. Green ascribes to the Canadian Debtors, 73% (36.1% of the total Line of Business sale proceeds) consists of residual value that results from Mr. Green's value in use approach and the projections he created. The only basis Mr. Green offers for allocating this residual to Canada are the assumptions he was asked to make by the Canadian Debtors about the limited scope of the license and non-transferability.

---

[51] As stated above, using a more reasonable forecast as the basis for the value in use calculation eliminates this residual.

**Table 1– Mr. Green Disguises his Residual Value by Not Presenting Value In Use for Each Debtor Group ($ millions)**

|  | In-Use IP Rights & Customer Relationship Value | Residual Value | Total IP Rights & Customer Relationship Value Presented by Mr. Green |
|---|---|---|---|
| Canadian Debtors | $387 | $1,028 | $1,415 |
| EMEA Debtors | $100 | $0 | $100 |
| U.S. Debtors | $468 | $0 | $468 |
| **Total** | **$954** | **$1,028** | **$1,982** |

50.     Even under Mr. Green's value in use methodology (which I do not accept), a more appropriate method of attributing the residual value is to allocate it across all Debtor Groups, rather than allocate it entirely to the Canadian Debtors.

51.     Mr. Berenblut & Dr. Cox, like Mr. Green, opine that there is a difference between FMV and the value in use. They assert that this difference is likely attributable to a) synergies; b) preventing competitors from gaining access to Nortel assets; or c) using scale, financial resources, and market position to capitalize on new and emerging technologies.[52] None of these factors is a function of IP rights and customer relationships alone, and there is no reason to believe these factors would be uniquely associated with the Canadian assets purchased.  In fact, they are more likely to be linked to the size of Nortel's business in different geographies. For example, Ericsson, which paid $1.27 billion for the CDMA, GSM, and MSS Lines of Business, noted increased sales in the U.S. and *decreased* sales in Canada from 2009 to 2010, the time period surrounding the Line of Business purchases.[53] Generally, the buyers' perceived benefits

---

[52] Including Ericsson, Avaya, Genband, and Kapsch. Berenblut & Cox Report, at 28.

[53] Telefonaktiebolaget LM Ericsson, 2011 Annual Report (Form 20-F) (Apr. 4, 2012).

from the Line of Business transactions, as compiled by Mr. Berenblut & Dr. Cox, do not appear to be specific to Canada.[54]

52.     Moreover, all the IEs had to give up IP rights to realize the total value received in the sales. That total value was unlocked by the parties' cooperation. Had the parties not relinquished their IP rights, they could have continued to exploit their rights (and the other Line of Business assets) within their Exclusive Territories—they could have restructured their businesses, sublicensed their rights, or created new products and lines of business. As I detailed in my opening report, the majority of revenues from these Lines of Business were generated in the U.S. Therefore, it is reasonable to conclude that, to the extent residual value exists (and is not merely an artifact of Mr. Green's improper methodology), this residual value should be attributed in largest part to the U.S. Debtors, not to the Canadian Debtors.

53.     Notwithstanding my concern about Mr. Green's selection of forecasts, I have prepared a correction to Mr. Green's Line of Business allocation by applying his value in use approach consistently across all Debtor Groups and allocating the residual value based on relative revenue shares. (*See* Table 2 and Exhibit 2.) This correction illustrates the magnitude of his errors in methodology; making this correction alone, the Canadian Debtors' allocation of the Line of Business Available Proceeds decreases from 56.0% to 24.1%.

---

[54] Berenblut & Cox Report, at Appendix D, 66-68.

**Table 2 – Using Revenue Shares to Allocate Residual IP & Customer Relationship Value**

| Debtor Group | Mr. Green's Allocation | | Mr. Green's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,616 | 56.0% | $696 | 24.1% |
| EMEA Debtors | $236 | 8.2% | $469 | 16.3% |
| U.S. Debtors | $1,032 | 35.8% | $1,718 | 59.6% |
| **Total** | **$2,884** | **100%** | **$2,884** | **100%** |

54.     Alternatively, I present Line of Business allocation results if Mr. Green's analysis was corrected to use the most recent company projections identified by Mr. Green. (*See* Table 3 and Exhibit 2.)

**Table 3 – Using Most Recent Nortel Projections in Mr. Green's Value in Use Calculation**

| Debtor Group | Mr. Green's Allocation | | Mr. Green's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,616 | 56.0% | $1,110 | 38.5% |
| EMEA Debtors | $236 | 8.2% | $387 | 13.4% |
| U.S. Debtors | $1,032 | 35.8% | $1,387 | 48.1% |
| **Total** | **$2,884** | **100%** | **$2,884** | **100%** |

### 3.     Using Projections Incorporating Nortel's Transfer Pricing Formula Introduces Additional Bias in Mr. Green's Value in Use Calculation

55.     Even if I accept Mr. Green's calculation of value in use (which I do not), his reliance on forecasts that contemplate continued payments under Nortel's transfer pricing arrangements to estimate the FMV relinquished by each individual Debtor Group is inappropriate.  As described in greater detail in Professor Eden's report, transfer pricing refers to

the mechanism by which multinational organizations ("MNEs") price intra-group transactions for income tax purposes, not FMV purposes.[55]

56.    Mr. Green calculates the value of the U.S. Debtors' assets by assuming the U.S. Debtors would be required to continue making payments under Nortel's transfer pricing system, including making payments to the Canadian Debtors for R&D costs and sharing of profits based on those arrangements in place in 2008 to 2010, which causes a significant transfer of U.S. revenues to Canada and decreases the U.S. Debtors' value in his value in use calculation. This is notably problematic, for as Professor Eden noted, Nortel's transfer pricing system was structured to ensure greater transfers of revenue earned by the IEs to Canada, for tax and Nortel-specific motivations.[56] It was not designed to be used in valuation.

57.    Mr. Green confuses the FMV of what NNI owns with the amount that he assumes NNI would keep after paying for ongoing expenditures. In other words, expenditures for R&D or for tax management are *uses* of profits; such expenditures do not cause the paying entity's assets to be worth less.

58.    Under the specific transfer pricing regime adopted by Nortel, entities are first paid a routine return, which is a function of both revenues earned and costs incurred, and then any residual profits are split based on historical cost shares (R&D costs in Nortel's case). It is important to note that in the routine returns stage of the transfer pricing method, the entities are reimbursed for the costs they incur *plus* a profit margin on those costs.  In this case, the practical effect is that, for example, the U.S. pays Canada for activities such as general and administrative functions, and it provides Canada with a profit in the process. In this sense, Mr. Green's use of

---

[55] "Expert Report of Lorraine Eden, Ph.D.," January 24, 2014 [hereinafter Eden Report], at 11-16.

[56] *Id.*, at ¶¶ 139-45.

Nortel's transfer pricing agreement to calculate the value of the U.S. and EMEA Debtors' interests biases his analysis in favor of the Canadian Debtors.

59.     If the IEs were operating as stand-alone businesses, there is no reason to believe they would continue operating under the MRDA. They could hire the employees necessary to undertake the various functions for which they are paying the other IEs and they would not need to provide a profit margin on top of those costs to do so. Table 4 show that the Nortel transfer pricing-adjusted operating earning shares across the Debtor Groups are dissimilar to unadjusted operating earning shares, revenue shares, and gross profit shares.  A review of Table 4 shows that Nortel's transfer pricing system (as implemented by Mr. Green) moves considerable income from the U.S. to Canadian Debtors.

**Table 4 – Transfer Pricing Adjustments Do Not Reflect Value "In Use"**

|  | Sum over Mr. Green's Projection Period ($ Millions) | | | Relative Proportion | | |
|---|---|---|---|---|---|---|
|  | Canada | EMEA | U.S. | Canada | EMEA | U.S. |
| Revenue | $4,450 | $9,096 | $27,515 | 10.8% | 22.2% | 67.0% |
| **Gross Profit** | $2,304 | $2,866 | $14,335 | 11.8% | 14.7% | 73.5% |
| SG&A | $1,899 | $2,933 | $5,627 |  |  |  |
| R&D | $3,230 | $964 | $3,325 |  |  |  |
| **Pre-TPA Operating Earnings** | ($2,825) | ($1,030) | $5,382 | 0.0% | 0.0% | 100.0% |
| TPA Adjustments | $3,601 | $1,237 | ($4,392) |  |  |  |
| **Post-TPA Operating Earnings** | $775 | $207 | $990 | 39.3% | 10.5% | 50.2% |

60.     Table 4 shows the significant shift of cash to Canada which results from the RPSM used by Nortel.  A buyer would not be subject to the same arrangements, and if the Canadian Debtors had sold all of their assets separately from the U.S. Debtors, there is no reason they would have been entitled to continue receiving such payments.  Accordingly, by relying on forecasts that include these payments to calculate the U.S. and EMEA's value, Mr. Green undervalues these assets.

61.     Moreover, as reflected in the MRDA itself, and as discussed in Dr. Eden's report, there is no reason to believe that the routine return calculation and RPS percentages would have remained unchanged until 2018.[57] I understand that Nortel's historical R&D spending varied on a relative basis across IEs in the 1990s and 2000s. Variations in relative R&D spending over time could, in turn, cause variations in residual profit split shares.

62.     I note that under Mr. Green's value in use framework, if revenue rather than transfer pricing adjusted financials are used to allocate his IP & Customer Relationship value, the U.S. Debtors are entitled to a substantially higher allocation. (*See* Table 5 and Exhibit 2.)

**Table 5 – Using Mr. Green's Projections in Value in Use Calculation and Allocating IP & Customer Relationship Value on the Basis of Revenue**

| Debtor Group | Mr. Green's Allocation | | Mr. Green's Allocation with Limited Corrections | |
| --- | --- | --- | --- | --- |
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,616 | 56.0% | $416 | 14.4% |
| EMEA Debtors | $236 | 8.2% | $576 | 20.0% |
| U.S. Debtors | $1,032 | 35.8% | $1,892 | 65.6% |
| **Total** | **$2,884** | **100%** | **$2,884** | **100%** |

## 4.     Mr. Green's "Maximum Allocation" is Biased in Favor of the Canadian Debtors

63.     In addition to the allocation discussed above, Mr. Green also performs an alternative calculation that he titles the "Maximum Allocation Assuming the Business Sale Proceeds Were Capitalized Earnings that Nortel Would have Achieved" ("Alternative Maximum Approach"). According to Mr. Green, this analysis presents an allocation of the Line of Business sale proceeds assuming the "entire excess of the sale price over the value of the tangible assets

---

[57] "Whereas Participants acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue regarding the application of the RPSM, the calculation of the RPSM as set forth in Amended Schedule A may be amended which amendments would require the consent of the Participants." *See* MRDA, at 2.

was treated as the present value of the amount that could have been earned by the continued operation of the Nortel businesses."[58]

64.     To undertake this analysis, Mr. Green recognizes two types of assets: (1) tangible assets (as he did in his prior analysis); and (2) all remaining value from the sale price, which he characterizes as capitalized future earnings.  Mechanically, Mr. Green performs the calculation as follows.  First he identifies the value of tangible assets (the same as in his earlier Line of Business allocation).  He then subtracts the value of these tangible assets from the purchase price of the Lines of Business and calls this remaining value *capitalized earnings*.  After identifying the amount of capitalized earnings to be allocated among the IEs, Mr. Green allocates them based solely on first-quarter 2010 R&D shares (the RPS shares).  There are several additional problems with his capitalized earnings approach.

65.     First, as with his value in use analysis, which I discuss above, Mr. Green assumes that the Lines of Business would continue to be operated jointly as Nortel entities and be bound by the MRDA.  As discussed above in the value in use section, this is a flawed assumption.

66.     Second, even under Mr. Green's counterfactual that the Lines of Business would be operated as Nortel entities, his application of the RPS shares differs from his application of it in his Line of Business allocation.  In his value in use analysis, he follows the RPSM transfer pricing approach of first calculating the routine returns for each entity and then splitting the residual profits using the RPS shares.  In his Alternative Maximum Approach, however, he only uses RPS shares and ignores routine returns in allocating value.  He asserts that this modified approach is appropriate because "Normal/routine returns are in approximately the same relative

---

[58] Green Report at 62. Mr. Green states: "I do not agree with this hypothesis, but have included the calculation as a data point."

proportion as the RPS percentages." This is not true. In fact, there is a substantial difference in the two types of percentages that are applied. (See Table 6.)

**Table 6 – Nortel Q1 2010 Routine Return Shares and Residual Profit Split Shares**

|                  | Routine Return Share | Residual Profit Split Share |
|------------------|----------------------|-----------------------------|
| Canadian Debtors | 25.2%                | 49.9%                       |
| EMEA Debtors     | 18.6%                | 11.6%                       |
| U.S. Debtors     | 56.1%                | 38.5%                       |

67.    In making this assumption, Mr. Green chooses to selectively apply portions of the RPSM. While it is inappropriate to use transfer pricing income for valuation,[59] at least in his initial analysis Mr. Green applied the totality of the transfer pricing approach (routine returns and RPS). By using only the RPS percentages, Mr. Green is neither calculating the FMV of the assets nor applying the Nortel transfer pricing system to the sale proceeds. As shown in Table 6, by failing to account for routine returns, Mr. Green's Alternative Maximum Approach is biased in favor of the Canadian Debtors.

68.    If one applies Mr. Green's Nortel transfer pricing-based Line of Business allocation consistently, first allowing for routine returns before applying the RPS percentages, the total allocated to the Canadian Debtors is less than the allocation in his Alternative Maximum Approach. (*See* Table 7 and Exhibit 3.)

---

[59] Generally, relying on cost-based transfer pricing payments in the context of valuation may be problematic because the value of an asset is not necessarily proportional to what the company paid to develop the asset (whether through direct costs or costs covered by transfer pricing arrangements).

**Table 7 – Corrected Application of Nortel's RPSM to Mr. Green's Calculation**

| Debtor Group | Mr. Green's Alternative Maximum Allocation | | Mr. Green's Alternative Maximum Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,238 | 43.0% | $1,022 | 35.5% |
| EMEA Debtors | $354 | 12.3% | $340 | 11.8% |
| U.S. Debtors | $1,290 | 44.8% | $1,521 | 52.7% |
| **Total** | **$2,883** | **100%** | **$2,883** | **100%** |

69.     Finally, Mr. Green offers no principled explanation why the RPSM should be used as a maximum allocation for the U.S. and EMEA Debtors (i.e., a cap on recoveries) rather than a basis for apportionment, to the extent it is used at all.

### 5.     Mr. Green's Results Are Unreasonable

70.     In summary, I have identified several reasons why Mr. Green's valuation is biased and flawed. I note that Line of Business revenues for the U.S. and EMEA Debtors represented 89.2% of Nortel's revenues in 2009.  (See Table 4 above.) However, under his approach the value of NNI's and the EMEA Debtors' IP & Customer Relationships would be only 28.6% ($0.57 billion) of his estimate of total IP & Customer Relationship value ($1.98 billion). This disparity further illustrates the extent to which Mr. Green's approach is unreasonable.[60]  Even using Mr. Green's methodology, once certain errors are accounted for, a significant portion of this disparity disappears.

71.     The results I present in my affirmative report use revenues to estimate the value of the assets relinquished in the Line of Business sales, and are thus free from the biases inherent in Mr. Green's analysis.

---

[60] Mr. Green's treatment of the intangible assets associated with the Line of Business sales, notably his valuation of the customer relationships and goodwill, appear to be flawed and biased in favor of the Canadian Debtors. I understand an analysis of these flaws has been performed in a report that Mr. Philip Antoon is submitting. Accordingly, I have not offered a separate opinion on those aspects of Mr. Green's report.

### C.    Analysis of Mr. Green's Patent Portfolio Allocation

#### 1.    General Discussion

72.    The Canadian Debtors' Experts conclude that no share of the Patent Portfolio sale proceeds should be allocated to the U.S. and EMEA Debtor Groups.[61]  They base this opinion on certain assumptions or conclusions regarding the scope and transferability of the licenses.

73.    Mr. Green concludes that the "licenses had no material value."[62]  He reaches this conclusion based on (i) certain assumptions he was asked to make about the scope of the licenses,[63] (ii) the assumption that a significant portion of the IP in the Patent Portfolio had not been used in an operating business, and (iii) his conclusion that the U.S. and EMEA Debtors were already compensated in the Line of Business Sales allocation for any intellectual property used in the businesses.[64]  Mr. Green concludes that any rights the licensees had were non-transferable.[65]  His analysis does not take the licensees' right to sublicense into consideration. Mr. Green asserts, *"Because the licenses, by their terms, were not transferable, the appropriate method to value the licenses is to consider what income the relevant US and EMEA Debtors could have generated through their respective exploitation of the license rights if Nortel continued to operate the business with the MRDA continuing in effect."*[66]  As noted elsewhere, I

---

[61] The Canadian Debtors' Experts allocate only a de minimus value to the U.S. for the in-place workforce transferred in connection with the Rockstar sale.  *See* Green Report, at 64.  In addition, as Mr. Green notes, there was a "small number of patents registered in the names of other companies." Green Report, at 12, n.35.  Mr. Green compensates the U.S. and EMEA Debtors for these patents at their net book value.  *Id.*

[62] *Id.*, at 6.

[63] Mr. Green states that the U.S. and EMEA IEs' license rights were "limited to using NN Technology to sell Products and generate operating profits in their respective territories" and that the licenses "did not include rights to patents not used in any of their operating businesses."  *Id.*, at 64.

[64] *Id.*, at 6, 64.

[65] *Id.*, at 4.

[66] *Id.*

disagree with Mr. Green's interpretation of license rights and transferability. But even under his assumptions, his conclusions are biased and unreasonable.

74.     In particular, by simply using patents—by licensing or creating new products—in the Patent Portfolio, even in Mr. Green's framework, the U.S. and EMEA IEs could have established a claim on those patents. As such, at a minimum, they had two income-generating alternatives to relinquishing their license rights in the Patent Portfolio sale.

75.     *Establishing an IP licensing business.* The IPCo Model, which is the basis for my valuation in my affirmative report, represents such an IP licensing business. As discussed in my affirmative report, the IPCo model was developed by Nortel prior to the patent portfolio sale and shows that U.S. and EMEA Debtor Groups' interest in the IP had significant value.

76.     *Creating new products.* Separate from the value that could be created by IPCo, Dr. McGarty opines that NNI could have monetized the Patent Portfolio by creating new products consisting of various goods and services across a variety of technologies.[67] In this scenario, NNI could have extracted value from its licensed IP while continuing to operate independently of the other Nortel entities.

77.     Either of these options would have generated substantially more value for the U.S. and EMEA Debtors than the value Mr. Green's analysis provides (which is nearly zero). The sale of the Patent Portfolio could not realistically have taken place without the consent of the U.S. and EMEA Debtors. Mr. Green does not acknowledge any value that could have been realized by these other alternatives and does not consider whether a buyer would have paid less for the Patent Portfolio if NNI and the EMEA IEs had not conveyed their license rights.

---

[67] "Rebuttal Expert Report of Terrence P. McGarty," February 28, 2014.

78.     Mr. Berenblut & Dr. Cox rely on similar assumptions to Mr. Green's regarding the scope of the U.S. and EMEA IEs' IP rights.[68] Mr. Berenblut & Dr. Cox acknowledge: "After exploring various alternatives, *Nortel* ultimately determined that the best way for it to realize value from the Residual IP was through a sale of the portfolio."[69] The "Nortel" Mr. Berenblut & Dr. Cox refer to includes the U.S. and EMEA Debtor Groups, in addition to the Canadian Debtor Group, and the "alternatives" that were considered that he references included IPCo as well as other alternative sale scenarios. Mr. Berenblut & Dr. Cox state that because the Patent Portfolio "was in respect of technology that either was not used in the business of the Nortel Group or was subject to licenses granted to purchasers in the Business Sales, it *seems likely* that, at the Valuation Date, there were not expected future operating profits from the use of the Residual IP in Nortel's business from which the U.S. Debtors and/or the EMEA Debtors would have benefited."[70] Mr. Berenblut & Dr. Cox do not explain the basis for their statement that such a conclusion "seems likely," and do not acknowledge the alternatives discussed above. Similarly, the CCC Expert, Mr. Britven, states that the patents that were not used in the Lines of Business were "not within the scope" of the license rights surrendered by the U.S. and EMEA Debtor Groups.[71] He further states that "it is reasonable to conclude that the Rockstar Transaction proceeds reflected only the value of the patents owned by NNL, and did not reflect any value attributable" to the license rights surrendered by the U.S. and EMEA Debtor Groups.[72] As with the Canadian Debtors' Experts, Mr. Britven does not provide a basis for his conclusion. The

---

[68] Berenblut & Cox Report, at 24-25.

[69] *Id.*, at 19.

[70] *Id.*, at 25 (emphasis added).

[71] Britven Report, at 41, 42.

[72] *Id.*, at 42.

notion that the U.S. and EMEA Debtors would have terminated their licenses with the expectation of no compensation, or that they are entitled to no compensation for terminating their licenses as part of the sale, is entirely implausible, given that they had various alternatives and that they clearly could have generated income if they had retained their Patent Portfolio licenses. Moreover, as noted above, it is very unlikely that the Patent Portfolio sale would have taken place without the U.S. and EMEA Debtors agreeing to surrender their licenses, and it certainly would not have raised $4.5 billion in sales proceeds.

79.     As stated in my affirmative report, financial economists agree that a DCF analysis is the preferred technique for asset valuation. The Canadian Debtors' Experts fail to perform a DCF in their Patent Portfolio valuation and therefore fail to consider an important technique for determining FMV. The Canadian Debtors' Experts arguments regarding the Patent Portfolio do not alter my opinions regarding the FMV of the assets relinquished by the Debtor Groups.

80.     In the next section, I discuss first the fact that, even under Mr. Green's assumptions regarding the licenses, his conclusions are unreasonable and biased in favor of the Canadian Debtors. I then discuss the implications for Mr. Green's conclusions.

## 2.    The Canadian Debtors' Experts Do not Follow Basic Valuation Principles, Their Approach is Biased, and Their Conclusion Is Not Based on FMV

81.     Mr. Green states: "two categories of patents were included in the Rockstar transaction: Residual Patents applicable to multiple operating business lines" ("In-Use Patents") and "Residual Patents not used in Products in any of Nortel's sold operating businesses" ("Other Patents").[73] Both Mr. Green and Mr. Berenblut & Dr. Cox admit that for the former, the U.S. and

---

[73] Green Report, at 64.

EMEA Debtors have rights to those patents, but claim there was no value remaining in those rights. Specifically, Mr. Green concludes that the value of licenses the U.S. and EMEA Debtors held for the In-Use Patents was captured in his Line of Business valuation. Mr. Green asserts that the U.S. and EMEA Debtors did not have any license rights to the Other Patents. Mr. Berenblut & Dr. Cox come to the same conclusion.[74] I disagree with their claims. However, even under these assumptions and Mr. Green's assumptions regarding transferability, their conclusions are incorrect and result in fundamental bias in their valuation of the U.S. and EMEA Debtor Groups' interests in the Patent Portfolio.

> a)    **The Canadian Debtors' Experts Fail to Credit the U.S. and EMEA for Value Relinquished in the Patent Portfolio Sale**

82.    Mr. Green first concludes that the U.S. and EMEA Debtors "have already been compensated for the value of the MRDA license rights that they surrendered" relating to patents used in the Lines of Business that remained in the Patent Portfolio.[75] Specifically, he claims that the cash flows he used in his Line of Business value in use calculation compensate the U.S. and EMEA Debtors for their license rights to the patents that were used in the Lines of Business, but not transferred in the Line of Business sales. Because Mr. Green does not allocate any further value to the U.S. and EMEA Debtors for the transfer of these rights, Mr. Green appears to conclude the value in use calculation fully compensates the U.S. and EMEA Debtors for these rights. As I discuss above regarding Mr. Green's Line of Business valuation, his value is not a reasonable reflection of the value of the U.S. and EMEA Licenses associated with the Lines of Business. Additionally, the value attributed to the U.S. and EMEA Debtors in the Line of Business Sales does not reflect the value of the Patent Portfolio to which the U.S. and EMEA

---

[74] Berenblut & Cox Report, at 18, 25.

[75] Green Report, at 64.

Debtors are entitled. This is because the rights the U.S. and EMEA Debtors relinquished for the In-Use patents sold in the Patent Portfolio sale were far greater than the rights they conveyed via the limited Non-Exclusive Licenses[76] they granted in the Line of Business Sales. Mr. Green fails to recognize this value in connection with the Patent Portfolio Sale.

83.     Mr. Berenblut & Dr. Cox have a slightly different interpretation of the license rights relinquished in the Patent Portfolio Sale. They claim that, with respect to the In-Use patents, the licenses held by the U.S. and EMEA Debtors "had similar scope"[77] to the licenses received by the Line of Business buyers, and therefore the U.S. and EMEA Debtors did not relinquish any value related to the In-Use patents in the Patent Portfolio sale because "it seems likely" that the U.S. and EMEA Debtors would not have realized profits from their rights.[78] This statement is incorrect. A comparison of the rights held by the U.S. and EMEA Debtor Groups as part of their licenses and the rights that the Line of Business buyers obtained makes the error in this statement clear.

84.     The U.S. and EMEA Debtor Groups' licenses in the exclusive territories were exclusive, perpetual, and royalty-free, and included the rights to sublicense and enforce.[79] These were not rights that the Line of Business purchasers were granted in connection with the limited Non-Exclusive Licenses they received for the Nortel IP that remained in the Patent Portfolio. The Line of Business buyers generally obtained only non-exclusive rights to make and sell products within a defined field of use (corresponding to the technological field of the respective

---

[76] Non-Exclusive Licenses refer to the licenses granted under Article V of the MRDA.

[77] "We are also advised that with respect to the patents transferred in the Rockstar Transaction which had been used in Nortel's businesses, licenses were granted in the Business Sales to the purchasers of the operating businesses that had similar scope to the licenses granted under the MRDA." Berenblut & Cox Report, at 25.

[78] *Id.*, at 25.

[79] MRDA, at 6-7.

sold business) and natural evolutions thereof, with limited sublicense rights to only affiliates,

customers, and contractors.[80] Rights held by the Debtor Groups included exclusivity, the right to

sublicense, the right to use for future products and product development, and the right to enforce.

Even under the Canadian Experts' interpretation of the U.S. and EMEA license rights, it is clear

that these rights, associated with the development and production of current Nortel products, had

value and were not transferred to the Line of Business buyers. Instead, those were the rights the

U.S. and EMEA Debtors relinquished in the sale of the Patent Portfolio to Rockstar and to which

the Canadian Debtors' Experts wrongly attribute no value.

85.    Mr. Berenblut & Dr. Cox acknowledge as much in describing the licenses as

"similar" but not identical in scope.[81]  Mr. Britven similarly qualifies his conclusion by noting

"the value of the licenses provided to the Licensed Participants under the MRDA for these uses

is *substantially captured* in the Business Sales proceeds."[82]

86.    Mr. Berenblut &  Dr. Cox, base their opinion that the US Debtors' IP rights have

no value in part on their conclusion that, "Approximately two-thirds of the patent families in the

---

[80] *See, e.g.*, ██████████████ (██████████, ███ Intellectual Property License Agreement)███ ( "Subject to
the terms and conditions of this Agreement, Nortel, NNI and the EMEA Sellers hereby grant to Licensee a
perpetual, irrevocable, non-assignable (except as specifically provided in Section 4.05), non-sublicensable (except
as specifically provided in Sections 2.04 and 4.05), non-exclusive, worldwide, royalty-free, fully paidup license (i)
under the Licensed Patents to make, develop, use, lease, sell, offer for sale, import, support, service and otherwise
dispose of the Licensed Products and Licensed Services, and to practice and have practiced any methods therein,"
██████████ (██████████, ███ Intellectual Property License Agreement), ███ *See  also*
████ (██████████, ███ Intellectual Property License Agreement), ███ ████████ (
████████ Intellectual Property License Agreement), ███ ███████ (
████ Intellectual Property License Agreement), ███ I note that in both the ██████████
sales, the purchasers were entitled to certain exclusive rights but that these rights were limited to particular
exhaustively-listed products and (██████████████) short time periods, and none of these (or other) buyers
received the right to enforce any licensed IP. *See* ████ (██████████, ███ Intellectual Property
License Agreement), ███ ████████████ (████████████ Intellectual Property
License Agreement), ███ .

[81] Cox and Berenblut Report, at 25.

[82] Brtiven Report, at 44 (emphasis added).

Residual IP were not the subject of licenses to the purchasers in the Business Segments."[83]  The

CCC valuation expert, Mr. Britven, similarly asserts that "Of patents and patent applications sold

as part of the Rockstar Transaction, approximately 59 percent to 66 percent were patents and

applications that were not used to make, use or sell Products."[84]  Mr. Green concludes that the IP

sold in the Patent Portfolio sale "either was not used in any operating business or its value had

already been realized in the Business Sales",[85] but he does not provide any information about

how many patents he believes fall into either of those two buckets.

87.     There are several issues of concern with these conclusions. First, I understand that

the patents Mr. Berenblut & Dr. Cox and Mr. Britven identify as not "In-Use" likely included

patents that were generating revenue at or around the time of sale, so the percentages of patents

in the Patent Portfolio categorized as In-Use is likely an underestimate.[86] Second, I note that

documents on which the Canadian Experts rely for their conclusions consist of drafts and other

incomplete documents.[87,88] Third, these numbers seem to ignore patents that had previously been

---

[83] Berenblut & Cox Report, ¶ 50 (emphasis added).

[84] Britven Report ¶ 6.63 (emphasis added).

[85] Green Report, at 16.

[86] McColgan Dep., Nov. 8, 2013 133:3-133:10.

[87] "[Patent segmentation was] … a multi-stage process. We dealt with the shared assets first, then we went back to all of the groups on the individually claimed assets and worked through them on a one-by-one basis in the, okay, you know, I think you really use this but truly what is your evidence because our view is it's not used, and then they had the right to respond which be come back to us with either the product it's in, the plan of record it's on, the plan of intent that it's attached to, and if it isn't there, then it's not used and you don't get it." McColgan Dep., Nov. 8, 2013 128:7-128:9, 131:20-25, 132:1-7.

[88] While Mr. Berenblut & Dr. Cox categorize Other Patents as those that were supposedly not licensed to Line of Business buyers, Mr. Britven categorizes these patents as those that were supposedly not used to make "Products" and Mr. Green categorizes these patents as those not used in any operating business. This variability in opinions regarding an important distinction to the experts' conclusions suggests a lack of precision.

I note that Mr. Berenblut & Dr. Cox and Mr. Britven appear to rely on documents that are not definitive. Mr. Berenblut & Dr. Cox cite only to the deposition testimony of Gillian McColgan and to Exhibit 22107, a draft spreadsheet that is missing 505 patents that were transferred in the Patent Portfolio sale. [*See* McColgan Dep., Nov. 8, 2013 136:19 – 137:3 (Ms. McColgan testifies that the spreadsheet in Exhibit 22107 was a working draft and not the final copy).] I rely on the Annexes to the Sellers Disclosure Schedule Pursuant to Rockstar Asset Sale

used for Products or could be in the future. Fourth, the Canadian Experts do not account for the proposed use of the Patent Portfolio for a licensing business. The IPCo model, which projects revenues and costs if Nortel had used the Patent Portfolio to operate a licensing business, is evidence that Nortel seriously contemplated developing a service business on the basis of its Patent Portfolio. Because the Patent Portfolio had potential future use, even under Mr. Green's framework, the U.S. and EMEA Debtors are entitled to a share of the entire value of the Patent Portfolio. Table 9 shows the allocation shares to each Debtor Group based on assuming that the entire Patent Portfolio consists of In-Use Patents.

88.     But notwithstanding the effect of the data problems expressed in the prior paragraph, the most important conclusion is that even using the Canadian Experts estimates, fully 33 to 41% of the Patent Portfolio were used in the Lines of Business.[89] Even under the Canadian Experts' assumptions, the U.S. and EMEA IEs had Exclusive Licenses and

---

Agreement dated as of June 30, 2011 to identify the patents and applications sold by Nortel to Rockstar. NNI_00825244 (Annex 1.1(d) Listed Jointly Owned Patents); NNI_00825254 (Annex 1.1(h) Listed Patents, Assets Tab and Design Patents Tab).

Although Mr. Britven cites to several documents in his discussion of patents supposedly not used in the Lines of Business, he does not identify the specific bases for his range of unused patents. Several of the documents he cites to are drafts or other intermediate work product. [NNI_00627822 (Mar. 2010, email chain entitled "Not Used and Shared list for Nortel remaining patents.") (In Feb. 23, 2010 email, Ms. McColgan writes, "We have given you some information that should help you filter items on the Not Used worksheet where Pluto feel they may have a predominant use claim based on current product usage or POR/POI fully documented please indicate this to us and we will move forward to review these items with your team and any other relevant groups"). *See also, e.g.,* NNI_01462625 (June 2009, email chain entitled "Query") (In June 14, 2009 email, Gillian McColgan writes that the "Predominant Use and Not Used in Business" list is "still a little fluid"); NNI_01388250 (May 2009, email chain entitled "Aviator Patent List – Schedule C") (In May 11, 2009 email Bill Junkin writes, "Here is the analysis *so far,*" and the attached spreadsheet lists only 2,037 patents) (emphasis added); NNI_00321988 (Apr. 2009, email chain entitled "Another question for you both wrt EN") (In Apr. 20, 2009 email, David Smith indicates that the "Not Used" list for the Enterprise Line of Business remained up for debate: "These are ones that I don't believe are in use or in any sort of POR or 'near' official POI. If they want to claim these, I think they should have to show us proof of use or intention to use in the next 12-24 months.").

[89] I note that In-Use Patents represents both patents and applications in the Patent Portfolio. I understand that applications were in use because applications were transferred in the Lines of Business sales. The inclusion of applications in the portfolio is conservative in that the U.S. has a higher share of patents compared to applications in the Patent Portfolio.

enforcement rights to these patents subject only to the more limited Line of Business licenses. Accordingly, and contrary to the views of the Canadian Experts, the U.S. and EMEA Debtors have not been compensated for this value.

89.     The Canadian Experts' assertions do not support their opinion that the U.S. Debtors are not entitled to any value for those patents; the Canadian Debtors' Experts and Mr. Britven did not calculate the value of these rights. In order to estimate the value of the In-Use patents, a naïve approach would be to assume that all patents in the Patent Portfolio were of equal value. Under this framework, given that the FMV of the Patent Portfolio was $4.5 billion and using the range of In-Use patent shares presented by the various experts, the aggregate value of the In-Use patents would be between $1.50 billion (one-third) and $1.85 billion (41%). The share of this value attributable to the U.S. and EMEA Debtors can be estimated based on the IPCo cash flow projections. (*See* Table 8.) This analysis demonstrates that even under the Canadian Debtors' Experts' and Mr. Britven's speculative opinions regarding the share of patents in use, it would not be appropriate to allocate *no* value to NNI; their own assumptions suggest a value in excess of $1 billion for the NNI's relinquishment of its licenses.

**Table 8 – Value of In-Use Patents in the Patent Portfolio under the Canadian Debtors' and Canadian Creditor's Committee's Experts' Claims**

| Debtor Group | Based on IPCo Model DCF | | | |
| | In-Use Patents Comprise 33.3% of Patent Portfolio | | In-Use Patents Comprise 41% of Patent Portfolio | |
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $3,114 | 69.9% | $2,805 | 63.0% |
| EMEA Debtors | $237 | 5.3% | $292 | 6.6% |
| U.S. Debtors | $1,103 | 24.8% | $1,356 | 30.5% |
| **Total** | **$4,453** | **100%** | **$4,453** | **100%** |

90.     The IPCo model suggests that all patents in the Patent Portfolio should be considered in use, which leads to the valuation conclusion I presented in my initial report. To

illustrate the unreasonableness of the Canadian Debtors' and Canadian Creditor's Committee's experts' claims regarding in use patents, I consider allocations implied by percentages of In-Use Patents within the range discussed in their reports and the conclusion based on the IPCo model. For the purpose of illustration, Table 9 shows the allocation to each Debtor Group if the share of In-Use Patents in the Patent Portfolio is between 50% and 60%. I also provide the allocation results if all patents are In-Use (the IPCo Model).

**Table 9 – Value of In-Use Patents in the Patent Portfolio at points between IPCo and the Canadian Debtors' and Canadian Creditor's Committee's Experts' Claims**

| Debtor Group | Based on IPCo Model DCF | | | | | |
| | In-Use Patents Comprise 50% of Patent Portfolio | | In-Use Patents Comprise 60% of Patent Portfolio | | In-Use Patents Comprise 100% of Patent Portfolio | |
| | $ Millions | Percentage | $ Millions | Percentage | $ Millions | Percentage |
|---|---|---|---|---|---|---|
| Canadian Debtors | $2,444 | 54.9% | $2,042 | 45.8% | $434 | 9.7% |
| EMEA Debtors | $356 | 8.0% | $427 | 9.6% | $712 | 16.0% |
| U.S. Debtors | $1,654 | 37.1% | $1,985 | 44.6% | $3,308 | 74.3% |
| **Total** | **$4,453** | **100%** | **$4,453** | **100%** | **$4,453** | **100%** |

91.     Under any scenario between the Canadian Experts' own argument regarding In-Use patents and the result implied by the IPCo model, the U.S. Debtors should be allocated a substantial share of the Patent Portfolio proceeds. This illustrative discussion demonstrates that the Canadian Debtors' claim that the U.S. and EMEA Debtors should not receive any proceeds from the Patent Portfolio Available Proceeds is unreasonable.[90]

---

[90] Conceptually, there are additional considerations in the context of this analysis. The rights transferred to Rockstar were somewhat encumbered, in that Rockstar received the in-use patents subject to the limited license granted to the Line of Business buyers. This would have a downward impact on the valuation calculations above. However the value associated with the in-use licenses is also likely to be understated. As noted in my affirmative report, the distribution of value in a collection of patents tends to be skewed. Mark Schankerman, "How Valuable is Patent Protection? Estimates by Technology Field," The RAND Journal of Economics 29:1 (1998), at 104. Because the In-Use Patents were already being used for products across multiple Lines of Business, the portion of the Patent Portfolio value attributable to the in-use patents likely would be greater than the fraction of the portfolio they represent. These issues are offsetting. In any case, my illustrative conclusions are reasonable indicators of the fact

> **b)**    **Mr. Green's Opinion Regarding Value Relinquished by the U.S. and EMEA Debtors in the Patent Portfolio Is Implausible**

92.    Mr. Green estimates the total value of U.S. and EMEA Debtors' IP and customer relationships in use to be $0.57 billion. (See Table 1 above.[91]) According to Mr. Green's calculation, the total value of patents transferred in the Line of Business sales is $1.98 billion. As I described above, the In-Use Patents in the Patent Portfolio are worth at least $1.5 billion. Thus, in Mr. Green's framework, the U.S. and EMEA Debtors are allocated only 16.4%[92] of the IP and customer relationship value in use. (Their share is even lower if we consider Mr. Green's allocation relative to all IP value.) In contrast, the U.S. and EMEA Debtors represent 89% of the revenues[93] and 94% of the patents and applications registered in the Exclusive Territories. The disparity between revenue shares, patent shares, and value attributed in Mr. Green's calculation illustrates the unreasonableness of his approach.

> **c)**    **Applying Nortel's Transfer Pricing Methodology Consistently**

93.    Although I disagree with his use of transfer pricing, I note that Mr. Green did not apply Nortel's Transfer Pricing Methodology consistently across his Line of Business and Patent Portfolio analyses. In his Line of Business analysis, Mr. Green adjusts his results for Nortel's Transfer Pricing Methodology. In contrast, Mr. Green does not apply Nortel's Transfer Pricing Methodology in his analysis of Patent Portfolio allocation. To the extent Nortel's Transfer Pricing Methodology is used in an allocation calculation, which I believe is not appropriate, it

---

that the U.S. and EMEA Debtors should receive allocations of the Patent Portfolio Available Proceeds, and that the Canadian Debtors' position that Canada should receive all Available Proceeds is not reasonable.

[91] He calculates a value in use of $0.47 billion and $0.1 billion for the U.S. and EMEA Debtors, respectively.

[92] $\$0.57 / (\$1.98 + \$1.5) = 16.4\%$

[93] Carve-Out Income Statements.

should be applied consistently. Mr. Green's failure to apply Nortel's Transfer Pricing Methodology is further evidence of the bias in his approach and conclusions.

## V.   REBUTTAL TO THE EXPERT REPORTS SUBMITTED BY THE CCC EXPERT

94.     This section addresses the report provided by Mr. Britven on behalf of the CCC.[94]

### A.   The CCC Makes the Same Inappropriate Assumptions About the Licenses as the Canadian Debtors

95.     The allocation analyses presented by Mr. Britven are conceptually similar to those in the Green and Berenblut & Cox Reports. For this reason, my discussion of Mr. Britven's report focuses on the ways in which his analysis differs from the Canadian Debtors' Experts' reports. On issues where the Canadian Debtors' Experts and Mr. Britven take a similar position, and where I disagree with the Canadian Debtors' Experts for reasons discussed above, I disagree with Mr. Britven for the same reasons. Nothing in Mr. Britven's report causes me to alter my conclusions regarding the value of assets relinquished by the Debtor Groups.

96.     Mr. Britven assumes the same instructions as Mr. Green and Mr. Berenblut & Dr. Cox – that the U.S. and EMEA Debtors' licenses to the Nortel IP were:

> "not transferrable to third parties without the consent of the other parties to the MRDA;"[95]

> "limited in scope to make, use, and sell products;"[96]

> and that

---

[94] I have not been asked to review or comment on the recoveries or pro-rata theory addressed in the Britven Report. I understand that a separate rebuttal report prepared by Laureen Ryan will address these portions of the Britven Report.

[95] Britven Report, at 16.

[96] *Id.*, at 16.

> "Patents and patent applications within the NN Technology that were not
> used to make, use, or sell Products were not subject to the licenses
> provided to the Licensed Participants under the MRDA."[97]

97.     Mr. Britven also assumes that the NNL "retained all rights relating to uses of the

NN Technology unrelated to Products."[98]  As stated above, this instruction is not reasonable in

light of the U.S. and EMEA Debtors' rights to sublicense (which Mr. Britven acknowledges),[99]

the manner in which Nortel conducted business, and fundamental economic principles.  As such,

I disagree with the allocation analysis presented by Mr. Britven, which I discuss in more detail

below.


## B.     Line of Business Critique

98.     Like Mr. Green, Mr. Britven uses an asset-based approach to valuation as the

basis of his allocation of the proceeds from the Line of Business Sales.  Mr. Britven bases his

valuation on his opinion that the buyers' purchase price allocations to the individual assets within

each Line of Business (the "PPAs") provide reasonable estimates of those assets' FMVs.  In

particular, Mr. Britven states:

> "The amounts determined under the PPAs are the purchasers' assessments
> of the fair value ("Fair Value") of the assets acquired by the purchaser.
> While prepared by the purchasers, they are an objective assessment of
> value based on a standard definition.
>
> […]
>
> While the term Fair Value as used for the PPAs differs from Fair Market
> Value, the definition is substantively identical[.]"[100]

---

[97] *Id.*, at 17.

[98] *Id.*, at 16.

[99] Mr. Britven describes the sublicensing right as:  "Each Licensed Participant had a right to sublicense its license
rights within the scope and field of use of its other license rights in making, using and selling and marketing
Products…" *Id.*, at 16.

[100] *Id.*, at 27.

99.     Relying on these PPAs, Mr. Britven allocates the asset values reported in the PPAs for Tangible Assets and three categories of Intangible Assets – Customer Relationships, IP and Purchaser Goodwill[101] – to each Debtor "based on ownership."[102] It is noteworthy that Mr. Britven adopts the method used in the PPAs that value should be separately calculated for customer relationships and goodwill, in addition to IP.  This approach is noticeably different than Mr. Green's approach.  Because the PPAs only provide an aggregate value for customer relationships, Mr. Britven allocates the value of customer relationships across the Debtor Groups based on relative revenue.[103]

100.    Mr. Britven next values the IP sold by each Debtor Group. He was instructed to assume that the U.S. and EMEA Debtors agreed to surrender their IP licenses when they signed the IFSA in June 2009 and that they "were not to improve or diminish their position from that which they had" under the terms of their licenses.[104] Based on this instruction and other instructions provided to him regarding the "limited scope" of the U.S. and EMEA Debtors' licenses, Mr. Britven concludes that "the value of the [U.S. and EMEA Debtors' IP licenses] should reflect only what was held by the [U.S. and EMEA Debtors] on or about the date they were surrendered."[105]  Mr. Britven purports to determine the FMVs of the U.S. and EMEA Debtors' licenses through two analyses: "from (i) the perspective of a purchaser stepping into the

---

[101] Each PPA includes an allocation for goodwill.  Mr. Britven allocates the goodwill in the Line of Business Sales across Debtor Groups on the basis of his allocation for identifiable intangible assets (Customer Relationships and IP); *see Id.*, at 35. Thus, Mr. Britven's allocation of IP in the Line of Business Sales, which reflects his unreasonable instruction to treat the U.S. and EMEA Debtors' licenses as "limited," directly and mechanically impacts the corresponding allocation of goodwill.

[102] *Id.*, at 22.

[103] *Id.*, at Schedule 7.4. Allocation based on revenue makes some sense because, as discussed in Paragraph 27 of the Kinrich Report, revenue provides a basic measure of relative value among the Debtor Groups within each Line of Business.

[104] *Id.*, at 15.

[105] *Id.*, at 21.

shoes of the [U.S. and EMEA Debtors]; and (ii) from the perspective of the [U.S. and EMEA Debtors] continuing in the context of Nortel."[106] He rejects the first option in favor of the second. His approach is flawed for numerous reasons discussed below.

101.    With respect to his analysis "from the perspective of a purchaser stepping into the shoes of the [U.S. and EMEA Debtors]," Mr. Britven states that a purchaser "would be subject to the terms of the MRDA[.]"[107] He does not appear to undertake any independent analysis, and rather concludes, based on this assumption, that, "given [their] numerous restrictions" the U.S. and EMEA Debtors' licenses "were of *de minimis* value to a buyer."[108]

102.    Mr. Britven then undertakes an analysis of the value of the U.S. and EMEA Debtors' IP conveyed in the Line of Business Sales "from the perspective of the [U.S. and EMEA Debtors] continuing in the context of Nortel" as of June 2009; in other words, assuming value in use. Mr. Britven uses a Nortel 2008 year end annual impairment test (the "2008 AIT")[109] to determine that the total "Business Value" of the Lines of Business was $988 million as of December 31, 2008. He states that "the Business Value determined in the AIT process [$988 million] was the aggregate of the values of the business reporting units and is a fair value defined in a very similar way to fair value used in the PPA context"[110] – i.e. that the definition is "substantively identical"[111] to FMV. Mr. Britven assumes that 57% of the $988 million 2008

---

[106] *Id.*, at 29.

[107] *Id.*, at 29.

[108] *Id.*, at 29.

[109] *Id.*, at 30.

[110] *Id.*, at 30.

[111] *Id.*, at 27.

AIT Business Value (or $566 million) was related to IP.[112] He then concludes that 50% of that IP value ($285 million) was owned by the U.S. and EMEA Debtors, based on their aggregate transfer pricing RPSM percentages as of 2008.[113]

103.    Mr. Britven concludes that $285 million reflects the combined IP value that the U.S. and EMEA Debtors surrendered when they agreed to give up their licenses in the Line of Business Sales.[114] Mr. Britven allocates this $285 million across the Line of Business Sales between the U.S. Debtors and the EMEA Debtors based on their "relative operating profit levels" within each Line of Business Sale on the basis of 2008 revenue.[115]  Mr. Britven assigns nearly the entire remainder of each Line of Business Sale's IP to the Canadian Debtors.[116]

104.    Mr. Britven makes at least two errors in his analysis.  First, the 2008 AIT analysis that Mr. Britven relies upon assumes the IP owned by the U.S. Debtors and the EMEA Debtors was limited in value to what he assumes they could realize through operating in a manner consistent with past practices. This is similar to the "value in use" methodology employed by Mr. Green and, consequently, for the reasons I discuss with respect to Mr. Green's report, I conclude that it is not reasonable for Mr. Britven to rely on the 2008 AIT as a basis for determining the FMV of the assets relinquished by the U.S. and EMEA Debtors in the Line of Business Sales.

---

[112] 57% is based on the share of IP value as a percentage of total Operating Asset value in the PPAs.  *See Id.*, at Table 6.

[113] *Id.*, at Table 6.

[114] *Id.*, at 15 and 31-32.

[115] *Id.*, at Schedule 2.5.

[116] *Id.*, at Schedule 2.5. He does not assign 100% of this value to the Canadian Debtors because entities other than Canada owned a very small portion of Nortel's patents.

105.    However, in contrast to Mr. Green, Mr. Britven claims that the Business Value from the 2008 AIT, which assumes value in use of the Nortel IP, was equivalent to FMV of the Lines of Business as a whole as of December 31, 2008.[117] Importantly, we now know, with hindsight, that the FMV was not the $988 million reported in the 2008 AIT, but rather $2.848 billion, as revealed through the Line of Business Sales.[118]  Mr. Britven does not explain why the FMV of the Lines of Business would have increased by billions of dollars between the date of the AIT and the date of the sales.[119] Of course, it did not. Rather, the AIT merely reflects an estimate of value without the benefit of actually selling the assets and learning their true worth.

106.    Revising Mr. Britven's analysis to reflect only the fact that the true FMV of the Lines of Business was $2.848 billion, while maintaining his remaining assumptions regarding the manner in which this value should be apportioned (assumptions which I do not agree with but use solely for this analysis), results in an ascribed value of $1.143 billion for the value of the IP,[120] and increases Mr. Britven's estimate of the value of the U.S. and EMEA licenses from $285 million to $573 million. The result of this correction on Mr. Britven's allocation of the total proceeds from the Line of Business Sales is shown in Table 10 below and in Exhibit 4.

---

[117] Id., at 27, 30.

[118] Purchase Prices from: NNC-NNL012706 (Aug. 7, 2010, Nortel Networks Summary of Proceeds); NNI_00821708 (Sept. 24, 2010, MSS Asset Sale Agreement), at 43-44.The total purchase price was $3.286 billion. After adjustments, costs, etc., Available Proceeds from December 31, 2013 Cash Summary. Available Proceeds are $2.848 billion. Because I am apportioning the Available Proceeds, I use that figure in the calculation. Mr. Britven does the same. Id., at 2.

[119] Even if the value had increased during the intervening time, the value actually received, and not the value in the 2008 AIT, is the amount to be apportioned among the Debtors.

[120] Id., at Schedule 2.5. This is Mr. Britven's calculation of the portion of the sales price apportioned to the IP in the PPAs, adjusted for the difference between the sales price and Available Proceeds.

**Table 10 – Correcting Mr. Britven's Allocation for His Failure to Incorporate the FMV of Lines of Business**

| Debtor Group | Mr. Britven's Allocation | | Mr. Britven's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,438 | 50.5% | $1,011 | 35.5% |
| EMEA Debtors | $432 | 15.2% | $512 | 18.0% |
| U.S. Debtors | $979 | 34.4% | $1,325 | 46.5% |
| **Total** | **$2,848** | **100.0%** | **$2,848** | **100.0%** |

107.    Second, Mr. Britven inappropriately uses the RPS percentages to cap the amount of IP value attributable to the U.S. Debtors and the EMEA Debtors. As discussed above in connection with the Green Report, it is not appropriate to use Nortel's transfer pricing adjusted financials in the determination of FMV. Mr. Britven appears to acknowledge as much as he does not use the RPS percentages to calculate the final IP value he ascribes to the US Debtors and EMEA Debtors. Rather, Mr. Britven concludes that, with respect to the U.S. and EMEA Debtors' license values, "the value of the IP in each Business Sale…is appropriately allocated between the U.S. and EMEA Debtors based on relative operating profit levels," which are reasonably "similar" to "relative revenue levels."[121] If the "share of the combined EMEA Debtor Groups" from Mr. Britven's Table 6 is calculated on the basis of revenue, rather than the RPS percentages he uses, and no other changes are made to Mr. Britven's analysis, Mr. Britven's "Value of Surrendered Licenses to US and EMEA Debtor Groups" would increase from $285 million to $504 million. The results of this correction on Mr. Britven's allocation of the total proceeds from the Line of Business Sales are shown in Table 11 below and in Exhibit 4. The revenue basis I use for this correction is the revenue shares that Mr. Britven identifies in his own Customer Relationships analysis.

---

[121] *Id.*, at Schedule 2.5, Note 2.

**Table 11 – Correcting Mr. Britven's Allocation for His Use of Transfer Pricing Adjusted Financials**

| Debtor Group | Mr. Britven's Allocation | | Mr. Britven's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,438 | 50.5% | $1,112 | 39.1% |
| EMEA Debtors | $432 | 15.2% | $493 | 17.3% |
| U.S. Debtors | $979 | 34.4% | $1,243 | 43.6% |
| **Total** | **$2,848** | **100.0%** | **$2,848** | **100.0%** |

108.    These two errors – failing to use FMV and applying an RPS cap – are not mutually exclusive and, even under his theory, both should be corrected.  Table 12 and Exhibit 4 show the effect on Mr. Britven's allocation of the total proceeds from the Line of Business Sales if these two corrections are made together such that Mr. Britven's "Business Value" reflects the true FMV as revealed through the sale of the Lines of Business *and* the portion of that value that Mr. Britven identifies as the FMV of IP is apportioned on the basis of revenue rather than based on the RPS percentages. See Exhibit 4 for a summary of my corrections to Mr. Britven's Line of Business allocation.

**Table 12 – Correcting Mr. Britven's Allocation for His Failure to Incorporate the FMV of Lines of Business and for His Use of Transfer Pricing Adjusted Financials**

| Debtor Group | Mr. Britven's Allocation | | Mr. Britven's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,438 | 50.5% | $353 | 12.4% |
| EMEA Debtors | $432 | 15.2% | $628 | 22.1% |
| U.S. Debtors | $979 | 34.4% | $1,866 | 65.5% |
| **Total** | **$2,848** | **100.0%** | **$2,848** | **100.0%** |

## C.    Patent Portfolio Critique

109.    Although Mr. Britven allocates the proceeds associated with the Patent Portfolio based on the ownership of legal title to the patents and patent applications, his approach is substantively the same as Mr. Green's. Mr. Britven determines that legal title to the patents in the Patent Portfolio were "98 percent owned by NNL with the balance owned by the US Debtors and

EMEA Debtors."[122] Similar to Mr. Green, Mr. Britven asserts that the value of the In-Use licenses included in the Patent Portfolio was "substantially captured" in the Line of Business Sales proceeds.[123] On these bases, he concludes that 98% of the Patent Portfolio proceeds should be allocated to the Canadian Debtors.[124]

110.    For the reasons discussed above, I disagree that the U.S. and EMEA Debtors' licenses to the patents and applications in the Patent Portfolio had no value.  The U.S. and EMEA Debtors' licenses were not "limited" to only those uses previously exploited by Nortel, as Mr. Britven, Mr. Green, and Mr. Berenblut & Dr. Cox assume, but rather encompassed economic rights within each Exclusive Territory to the value from future uses (including sublicensing and enforcement) sufficient to make them indistinguishable from "ownership" in an economic sense.  Thus, an allocation approach based merely on legal title, which Mr. Britven equates with legal ownership, is incorrect because the economic value associated with the patents and applications in the Patent Portfolio was not reflected in which entity held bare legal title. Furthermore, I disagree with Mr. Britven's conclusion regarding compensation for the In-Use patents in the Patent Portfolio for the same reason I disagree with Mr. Green.

111.    Mr. Britven argues that the rights to patents in the Patent Portfolio held by the U.S. and EMEA Entities were "practically and economically similar"[125] to the rights conveyed to the Line of Business buyers. However his own Table 11 demonstrates that this is not true.  For example, in row 5 of Table 11, Mr. Britven admits the parties held an "exclusive license in certain territories" but relinquished "limited exclusive rights in some cases" in the Line of

---

[122] *Id.*, at 38.

[123] *Id.*, at 41.

[124] *Id.*, at 42.

[125] *Id.*, at 40.

Business sales. [126] Furthermore, "the license granted to purchasers in the Business Sales effectively confined the field of use" whereas the licenses held by the U.S. and EMEA Entities had no such restriction.[127]

112.    Even so, the descriptions in Mr. Britven's Table 11 understate the magnitude of the difference in rights, and thus in value. As discussed above in connection with Mr. Green, the U.S. and EMEA Entities held all economic rights to all Nortel technology in their Exclusive Territories, including the in-use patents, whereas the Line of Business purchasers generally received only Non-Exclusive Licenses to those patents, and those rights were limited to the pre-existing field of use. The purchasers generally did not receive exclusive rights or the right to enforce the patents, and they received only limited sublicense rights. Moreover, as discussed in connection with Mr. Green's analysis, a significant percentage of the patents in the Patent Portfolio were used in multiple Lines of Business. Mr. Britven's failure to take this value into account biases his results in favor of the Canadian Debtors.

## VI.    REBUTTAL TO THE MALACKOWSKI AND HUFFARD EXPERT REPORTS SUBMITTED BY THE EMEA DEBTORS

113.    The EMEA Debtor Group's reports by Mr. Huffard and Mr. Malackowski are also flawed. Mr. Malackowski values the IP assets relinquished by each Debtor Group using two different methodologies that he refers to as a *contribution approach* and a *license approach*, resulting in different valuations. Mr. Malackowski's contribution approach focuses on how much each entity paid to develop the IP, without reference to what the IP is worth, and thus is not a valuation. Mr. Malackowski's license approach to IP valuation is similar to mine in that it

---

[126] *Id.*, at 41.

[127] *Id.*, at 41.

recognizes that entitlement to the economic rights to, rather than ownership of IP, drives value. Moreover, contrary to the assumption the Canadian experts rely upon, Mr. Malackowski operates from the same economically reasonable understanding as I do that the MRDA license had no scope of use restriction in it.   However, for the reasons set out below, there are errors in his analysis that must be corrected to appropriately value the assets each Debtor Group relinquished. Mr. Huffard's report, which relies on Mr. Malackowski's valuation of IP, inherits its errors from Mr. Malackowski's report.

114.    The errors in Mr. Malackowski's analysis include:

- his proposal to allocate IP based on a *contribution approach*;

- in his *license approach*, he uses telecom industry expenditures instead of Nortel's actual revenues to allocate estimated Lines of Business IP defensive value;

- he does not account for the number of patents in estimating the value of geographic markets; and

- he does not account for patent enforceability in estimating the value of geographic markets.

115.    In the remainder of this section, I discuss the errors listed above and describe the effect of correcting them.[128]

---

[128] I also note that in his report, Mr. Huffard calculates the value of customer-related assets and goodwill using 2008 financial statements. *See* Huffard Report, at 4. As I described in my affirmative report, 2007 and 2008 relative revenue shares were somewhat anomalous and the 2009 revenue figures are most consistent with the relative historical performance of IEs. *See* Kinrich Report, at 26. However, this has only a modest impact on the final allocation.

### A.    The EMEA Experts' Contribution Approach Does Not Appropriately Value the IP Assets the Debtor Groups Relinquished

116.    Mr. Huffard describes the EMEA Experts' contribution approach as follows: "Under the 'Contribution Approach,' the portion of the Sale Proceeds attributable to IP should be allocated among the Selling Debtors in accordance with their relative contribution to R&D."[129] Mr. Malackowski uses this as one way to apportion the IP sold in both the Lines of Business and the Patent Portfolio sales.

117.    The fundamental problem with the contribution approach is that it ignores the value of IP and, instead, focuses on the cost to develop IP. In assessing value, a buyer of IP cares about the benefits of IP, not what it cost to develop. Accordingly, the value of IP is not driven by its development cost.

118.    As stated in *Valuing Intangible Assets*, a source cited by Mr. Green,

"[The relevant cost] is not necessarily the actual historical cost of creating the subject intangible and it is not necessarily the sum of the costs for which the willing seller would like to be compensated. In other words, value is not necessarily equal to cost, at least not to cost as measured in the historical accounting sense."[130]

119.    Accordingly, to the extent the EMEA experts' allocation is intended to reflect the FMV of the IP assets each Debtor Group relinquished, their contribution-based analysis is flawed as contribution does not necessarily relate to FMV.

---

[129] Huffard Report, at 3.

[130] Robert Reilly and Robert Schweihs, *Valuing Intangible Assets* (McGraw-Hill Companies, Inc., 1999), at 97.

**B.**     **The EMEA Experts' License Approach to Value the IP Assets the Debtor Groups Relinquished has Implementation Defects**

120.    Mr. Malackowski and Mr. Huffard also apply what they term a "license approach" to value the IP assets each Debtor Group relinquished.  Mr. Huffard describes the *license approach* as follows: "Under the 'License Approach,' the portion of the Sale Proceeds attributable to IP should be allocated among the Selling Debtors in accordance with the relative fair market value of the license rights to the IP held by each of those entities at the date of the Asset Sales."[131] Much of Mr. Malackowski's approach is similar to mine; he recognizes that the value of the IP should be based on what the IEs relinquished and he calculates a NPV using cash flows attributable to those rights. However, Mr. Malackowski's analysis has implementation defects that affect his valuations of the IP assets in both the Lines of Business and Patent Portfolio sales. Because Mr. Huffard relies on Mr. Malackowski's analysis, his analysis shares those defects, which I discuss below.

**1.**     **Mr. Malackowski's Use of the License Approach in his Proposed Line of Business Allocation has Implementation Defects**

121.    Mr. Malackowski categorizes the value of IP sold in the Lines of Business into two components: *defensive* value and *synergistic* value.  He defines defensive value as "the value of the transferred IP to the actual Nortel business being sold [or] the amount that the Nortel business would have to pay to license the transferred IP if the IP were owned by a third party."[132] He defines synergistic value as "how much the buyer would have to pay to license the transferred IP had it not bought the IP."[133]

---

[131] Huffard Report, at 3.

[132] Malackowski Report, at 20.

[133] *Id.*, at 20.

122.    For his calculation of synergistic value, Mr. Malackowski estimates the market size of a hypothetical market participant for each Line of Business to determine the relevant royalty base. The royalty rate is based on the "implied rates paid by Rockstar Consortium members."[134] Growth rates are based on third party market research reports.[135]

123.    I note that Mr. Malackowski's calculation of synergistic value, while not necessarily wrong in principle, is both speculative and prone to error due to unnecessary complexity and reliance on uncertain forecasts for nascent businesses (e.g., LTE). The approach also assumes that the hypothetical buyer needs the acquired Nortel IP in its non-Nortel business activities.[136] While I did not provide a separate breakout of synergistic value in my analysis, I note that it would only have an impact on the allocation results if the geographic distribution of value across the Debtor Groups for the synergistic value is substantially different from the geographic distribution of value from the existing Lines of Business. To the extent that the geographic distribution of value from synergistic IP is similar to the relative geographic distribution of value from the existing Lines of Business, there would be no impact on the relative share of value to each Debtor Group and the analysis in my affirmative report accurately captures this value. To the extent that relative value from synergistic IP is different, it is speculative because Mr. Malackowski would not know the extent that the buyer would need to use the IP in its pre-existing business or, for nascent businesses, how that business is likely to grow. Moreover, because Mr. Malackowski's estimate of synergistic value represents only 4% of

---

[134] "The implied rates are calculated using each consortium member's contribution to the purchase price of the Residual Patent portfolio and the present value of the consortium member's addressable projected revenue." *See Id.*, at 28.  Of course, these rates were not known to the buyer at the time each of the Lines of Business was acquired.

[135] *Id.*, at 20.

[136] "The second component of value is the value of the transferred IP to a hypothetical market participant's non-Nortel business, or the "synergistic value." *Id.*, at 20.

the purchase price paid and, in actuality, is proportional to his defensive value in terms of geographic distribution, the use of synergistic value does not change his results materially (nor would it change mine).[137]  Essentially, his approach and mine are two slightly different ways to arrive at the same answer.  Thus, I do not address the synergistic value issue further.

124.    For his calculation of the defensive value, Mr. Malackowski uses global revenue figures for each Line of Business and grows these based on third party market research reports and internal "Nortel deal memo[s]".[138]  He then applies royalty rates taken from the royalty rates used in Nortel's IPCo Model for each franchise and calculates the present value of royalty revenues based on industry weighted average cost of capital.[139]

125.    That approach to compute the total value of the IP associated with the Lines of Business is valid.  To allocate that total value to the various Debtor Groups, Mr. Malackowski uses market-wide telecom expenditure data from IDC, a third party data source. While, this is an appropriate basis for the allocation of synergistic value (because Mr. Malackowski bases his synergistic valuation on a hypothetical market participant), it is not appropriate for the allocation of defensive value. Mr. Malackowski's calculation of defensive value is based on the revenue generated by each Line of Business. Therefore, the allocation should be based on the revenue generated by the Lines of Business in each country. Actual historic Line of Business revenue by country would predict future Line of Business revenue by country more accurately than would a third party estimate of total market size. As I show in my affirmative report, the share of value relinquished by the Debtor Groups in the Lines of Business from 2007 through 2009 is relatively

---

[137] Huffard Report at 24; Malackowski Report at 30.

[138] *Id.*, at 25.

[139] The discount rates used by Malackowski for the Lines of Business vary from 9.68% (MSS) to 11.81% (MEN & Optical and CVAS). *Id.*, at 27.

constant (see Exhibit 15 of my affirmative report). I also show that, using industry level Lines of Business projections, the shares for each Debtor Group remain relatively constant whether using GDP growth rates or telecom expenditure growth rates at the country level (see Exhibits 19 and 20 of my affirmative report). This further demonstrates that the 2009 Line of Business revenue by country is a more accurate basis for allocation. Mr. Malackowski's use of market-wide revenues rather than Nortel Line of Business revenues is, thus, inappropriate.

126.    To see this, consider a hypothetical line of business which operated in only two countries. Assume the total market size and Nortel's revenues are as follows:

**Table 13 - Example of Using Total Market versus Nortel Line of Business Revenue by Country**

|  | Total Market | Share of Global Market | Nortel Revenues | Share of Nortel Revenue |
|---|---|---|---|---|
| Country A | $200 | 20% | $10 | 5% |
| Country B | $800 | 80% | $190 | 95% |
| Total | $1,000 | 100% | $200 | 100% |

127.    From Table 13, it is easy to see that 80% of the market is in Country B.  Mr. Malackowski would thus allocate 80% of the Line of Business IP value to Country B.  However, in this example, Nortel has a larger market share in Country B than in Country A, so 95% of Nortel's sales are in Country B.  When measuring the value attributable to Nortel's activities in Country B, one should use Nortel's sales, not the sales of the market as a whole.  In this example, 95% of Nortel's value should be attributed to Country B, rather than the 80% Mr. Malackowski's approach would suggest.

128.    In Table 14 and Exhibit 5, I show the results of adjusting Mr. Malackowski's Line of Business IP analysis using Nortel's actual Line of Business geographic revenue data from

2009 instead of the IDC telecom market data for the defensive value allocation.[140]  By using the actual sales data for defensive value, the share of value from the Lines of Business IP (including both defensive and synergistic value) relinquished by the Canadian, EMEA, and U.S. Debtors are 12.2%, 26.5%, and 61.3%, respectively.

**Table 14 - Mr. Malackowski's Lines of Business IP Valuation Using Nortel's Actual Revenue Distribution Instead of IDC Market-wide Data[141] ($ Millions)**

| Debtor Group | Mr. Malackowski's Allocation | | Allocation Using Nortel Revenue from 2009 Carve-Out Financials | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $101 | 13.2% | $93 | 12.2% |
| EMEA Debtors | $332 | 43.4% | $203 | 26.5% |
| U.S. Debtors | $332 | 43.3% | $469 | 61.3% |
| **Total** | **$765** | **100%** | **$765** | **100%** |

129.    In Table 15 and Exhibit 6A, I show the results of incorporating Mr. Malackowski's adjusted results into Mr. Huffard's Lines of Business valuations. By using this adjustment, the shares of value from Lines of Business relinquished by the Canadian, EMEA, and U.S. Debtors are 12.0%, 22.1%, and 65.9%, respectively. These results are similar to the results I presented in my affirmative report.

---

[140] I note that NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements), the 2009 Carve-Out Income Statements, are not cited in the Malackowski Report. These statements provide geographic level Nortel revenue figures and are used as the basis for the valuation of the Lines of Business in my affirmative report.

[141] Historical revenue distribution data used to allocate defensive value only. No changes made to the synergistic value.

**Table 15 - Incorporating Corrections to Mr. Malackowski's Allocation of Lines of Business IP Value into Mr. Huffard's Lines of Business Allocation**

| Debtor Group | Mr. Huffard's and Mr. Malackowski's Allocation | | Allocation of Line of Business IP Using 2009 Revenue | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $344 | 12.2% | $338 | 12.0% |
| EMEA Debtors | $750 | 26.5% | $624 | 22.1% |
| U.S. Debtors | $1,732 | 61.3% | $1,864 | 65.9% |
| **Total** | **$2,827** | **100%** | **$2,827** | **100%** |

## 2.   Mr. Malackowski's Use of the License Approach in his Proposed Patent Portfolio Allocation Has Implementation Defects

130.    Mr. Malackowski uses a similar approach for his proposed Patent Portfolio License Approach allocation. In it, because the royalty is to be applied to the market as a whole, it is appropriate to look at overall market sizes.  Mr. Malackowski estimates the value of each franchise among countries in which there was at least one registered high or highest interest patent based on market size data from third party market research reports.[142] He then calculates the value relinquished by each IE as the sum of the value in its Exclusive Territory and one-fifth of the value in non-Exclusive Territories.[143]

131.    To estimate the royalty base for the Patent Portfolio, Mr. Malackowski uses research conducted by Lazard and Global IP to group the patents into franchises.[144] He also uses third party market research reports and forecasts to estimate "the size of the global market for

---

[142] *Id.*, at 32.

[143] *Id.*,at 51.

[144] *Id.*,at 36.

each franchise for the period beginning in 2011 and ending in the year of the average expiration date of the U.S. patents indicated as high-interest assets."[145]

132.    Mr. Malackowski estimates the royalty revenue that could be earned in each franchise by applying the *litigation light* royalty rates used by Nortel in its IPCo Model.[146] He then subtracts licensing expenses and taxes to obtain the cash flows that could be earned using the Patent Portfolio.[147] Finally, Mr. Malackowski applies a discount rate of 30% to cash flows to calculate the net present value of the Patent Portfolio.[148] This results in a value of approximately $3.5 billion which Mr. Malackowski proportionally increases to match the nominal sale price of $4.5 billion.[149]

133.    Under Mr. Malackowski's License Approach, the entire market serves as the royalty base for the royalty revenue calculations in any territory in which there was at least one high or highest patent. This is problematic for several reasons.

134.    First, Mr. Malackowski fails to acknowledge that, all else being equal, there is more value in a territory which has a portfolio with a large number of patents than if that territory has a portfolio with only a few patents. In markets with fewer patents, the royalty rate that Nortel could obtain would reasonably be lower. The result would be relatively low royalty income. The expense of generating that income would be expected to be high as a percentage of the income generated. As a result, commonly, smaller markets with limited patent protection and a small number of patents are not the objects of licensing or value-extraction activities. Nortel's

---

[145] *Id.*, at 34.

[146] "All royalty rates were obtained directly from Nortel's internal version of the model constructed by Lazard and Global IP." *Id.*, at 36.

[147] *Id.*, at 37.

[148] *Id.*, at 37.

[149] *Id.*, at 33.

contemporaneously-developed IPCo Model, which serves as the basis for the analysis in my affirmative report, is not prone to the same error as it considers only the top five markets (six if China is included) in terms of the number of registered patents in the Patent Portfolio, which account for 92% to 95% of the patents in the Patent Portfolio.[150] The remaining 5% of the patents are spread across multiple countries with an average of 11 patents per country. As I discuss below, it would be difficult to extract value from a market with so few patents, especially given then many of these countries have weak enforcement regimes.

135.    It is inappropriate to assign an effective royalty rate of, say, 2% to the U.S. patent portfolio and its 1,449 high and highest interest patents and then assert that the same 2% could be obtained in India (where Nortel only held five high and highest interest patents patents) or Netherlands (where Nortel only held two high and highest interest patents).[151] The effect of not accounting for the number of patents can be quite significant. For example, in Mr. Malackowski's analysis, 28% of the value in the Internet franchise is attributed to territories outside the U.S even though nearly all of the high and highest interest technologies in this franchise are patented only in the U.S.[152] This is why the IPCo Model attributed 100% of Internet franchise revenue to the NNI.   Recent litigation involving patents in the Internet franchise supports the approach taken in the IPCo Model. Of the seven Internet franchise patents in the

---

[150] If China is included as is the case when the toggle for China is switched on, the top six markets account for 95% of the patents in the Patent Portfolio. For the reasons discussed above, the remaining 5% of the patents are unlikely to produce profitable royalties.

[151] In fact, the same is true when comparing the U.S. to Canada, China and the European countries.  Even though Canada, China and the European countries had significantly more high interest patents than the small countries used by the Malackowski Report, the value attributable to those countries is necessarily less than that attributed to the US.  I discuss this more completely in my affirmative report.

[152] US_EMEA_Canada_PRIV_00191069 (Mar. 10, 2010, IPCo Update to Nortel Leadership Team), at 6.

recent lawsuit launched by Rockstar against Google, all are registered only in the U.S.[153] Mr. Malackowski's failure to account for this leads him to significantly overstate the value associated with EMEA (to which three-fifths of all non-Exclusive Territory value is attributed) and understate the value associated with the NNI.

136.    Second, Mr. Malackowski's analysis fails to acknowledge the variation in patent enforcement regimes across countries in which Nortel had patents. As I described in my affirmative report, it is clear that the protection of IP rights is strong in all of the Exclusive Territories, and significantly weaker in non-Exclusive Territories.[154] The IPCo Model, which serves as the basis for my analysis, recognized this issue by providing an option to exclude or include China as an addressable market, thereby allowing its users to exclude or include revenue derived from the Chinese market.[155] The IPCo Model did not include any non-Exclusive Territories other than China or Germany. The enforcement regimes in many of the other non-Exclusive countries to which Mr. Malackowski attributes value are similarly weak when compared to those in the Exclusive Territories.[156] Ignoring enforcement regimes leads Mr. Malackowski to attribute too much value to the non-Exclusive Territories, thereby attributing too much value to EMEA.

137.    Finally, although Mr. Malackowski uses royalty rates from the IPCo Model produced in collaboration with the Nortel IP Group, Global IP Law Group, and Lazard, he does

---

[153] Complaint, Rockstar Consortium US LP, and Netstar Technologies LLC v. Google Inc. (United States District Court for the Eastern District of Texas Marshall Division, Oct. 31, 2013). *See also* Kinrich Report, Exhibit 24.

[154] *Id.*, at 51.

[155] *Id.*, at 50.

[156] In Table 8 of my affirmative report I show that enforcement regimes are considered to be especially weak in India and Brazil (relative to the Exclusive Territories). The analysis in the Malackowski Report does not discount the revenue generated in these and similar markets.

not seem to use other inputs from the IPCo Model.[157] Because the IPCo Model and the corresponding inputs to it were developed in 2010 and 2011, close to the sale of the Patent Portfolio, they reflect the best assessment of the relevant markets as of that time.[158] In addition, as a part of the development of the IPCo Model, Global IP reviewed over 10,000 patent claims and considered attributes such as forward citation count and standard essential claims in order to assess the value of patents to potential licensees.[159] Further, the IPCo Model incorporated specific vendor strategies with regard to timing and intensity of litigation.[160] These strategies sometimes varied regionally, under the implicit assumption that some franchises would not be able to obtain revenue in specific regions. For example, licensing revenue from the Internet franchise was limited to just the United States because the developers of the model believed the relevant Internet patents would only be able to extract revenues in the U.S.  Mr. Malackowski did not take advantage of this richness. Mr. Malackowski's approach is inferior to the allocation derived from IPCo Model (used as the basis for my affirmative report) and generally overestimates the relative importance of royalties from countries not included in the IPCo Model.[161]

138.    Correcting Mr. Malackowski's approach to reflect the countries in which the IPCo Model estimated royalty revenue, adjusting revenues in China,[162] and restricting the revenue

---

[157] *Id.*, at 34.

[158] *Id.*, at 35-36.

[159] GIP_Nortel_00230256 (Jan. 29, 2010, Patent Portfolio Analysis Phase One), at 17; Mar. 2010 IP Co. Update to Nortel Leadership Team, at 4, 7.

[160] Kinrich Report at 55.

[161] Any overestimate of value from the non-Exclusive Territories accrues to EMEA's benefit, as both the Malackowski Report and I agree that EMEA gets 60% of the value from those territories.

[162] Per the IPCo Model, revenues in China are restricted to only three franchises: Wireless Handsets, Wireless Infrastructure, and PC. Revenues only begin in 2015.

stream in the Internet franchise only to the U.S. leads to a share for the U.S. Debtor Group very close to the figure in my affirmative report. Table 16 below and Exhibit 6B show the results of making these corrections. I note that Mr. Malackowski's analysis results in a greater allocation of IP value to the U.S. Debtor Group than the allocation including China presented in my affirmative report.

**Table 16 - Corrections to Mr. Malackowski's Patent Portfolio Allocation to Be More Consistent with IPCo Model**

| Debtor Group | Mr. Malackowski's Allocation | | Mr. Malackowski's Allocation with IPCo Related Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $490 | 11.0% | $265 | 5.9% |
| EMEA Debtors | $1,497 | 33.6% | $857 | 19.2% |
| U.S. Debtors | $2,468 | 55.4% | $3,333 | 74.8% |
| **Total** | **$4,454** | **100%** | **$4,454** | **100%** |

### 3. Corrections to Patent Portfolio and Line of Business Valuation

139.    As described above, the corrections made to the IP valuation analysis for both the lines of business IP and the Patent Portfolio result in allocation shares very similar to the allocations shares I presented in my affirmative report. Since Mr. Huffard relies on Mr. Malackowski's report, the corrections above flow directly into corrections of Mr. Huffard's analysis. Table 17 and Exhibit 6C compares the allocation shares derived from Mr. Huffard's and Mr. Malackowski's approach with the results from the corrections described above. I note that, the corrected results are similar to the figures in my affirmative report.

**Table 17 - Summary of Corrections to Mr. Huffard's and Mr. Malackowski's Allocation**

| Debtor Group | Mr. Huffard's and Mr. Malackowski's Allocation | | Mr. Huffard's and Mr. Malackowski's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $834 | 11.5% | $603 | 8.3% |
| EMEA Debtors | $2,247 | 30.9% | $1,481 | 20.3% |
| U.S. Debtors | $4,200 | 57.7% | $5,197 | 71.4% |
| **Total** | **$7,280** | **100%** | **$7,280** | **100%** |

## VII.    <u>CONCLUSION</u>

140.    The analyses of the Canadian and EMEA Debtors' Valuation Experts are flawed. My analysis as reflected in my initial report is the best measure of the FMV of the assets relinquished by the various Debtor Groups.

Signed on the 28th day of February, 2014, at Los Angeles, CA.

Jeffrey H. Kinrich

Court File No.:  09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, C. C-36, AS AMENDED.

- and the -

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
---------------------------------------------------------X
                                          :
                                          :        Chapter 11
                                          :
 In re                                    :
                                          :        Case No. 09-10138 (KG)
                                          :
 Nortel Networks Inc., et al.,            :
                                          :        Jointly Administered
                 Debtors.                 :
                                          :
                                          :
                                          :
---------------------------------------------------------X
```

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1.      My name is Jeffrey H. Kinrich. I live in Valley Village, California, USA.

2.      I have been engaged by counsel for the U.S. Debtors to provide evidence in
relation to the above-noted court proceedings.

3.      I acknowledge that it is my duty to provide evidence in relation to this proceeding
as follows:

        (a)      to provide opinion evidence that is fair, objective and non-partisan;

68

(b)    to provide opinion evidence that is related only to matters that are within my area of expertise; and

(c)    to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.    I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.


Jeffrey H. Kinrich

Date:    February 28th, 2014


69

**Exhibit 1**

**Exhibit 2**

**Exhibit 3**

**Exhibit 4**

**Exhibit 5**

**Exhibit 6**

## Exhibit 1: Mr. Green's "Value In Use" Calculation with Nortel's Own Projections
### $ Millions

|  | Mr. Green's Forecasts | Most Recent Nortel Forecasts that Mr. Green Considered | Lowest Nortel Forecasts that Mr. Green Considered |
|---|---|---|---|
| Canadian Debtors | $387 | $1,290 | $554 |
| EMEA Debtors | $100 | $355 | $154 |
| U.S. Debtors | $468 | $1,170 | $596 |
| **Total "Value In Use"** | **$954** | **$2,815** | **$1,304** |

**Notes:**

[1] "Value in Use" (IP Rights and Customer Relationship value) is calculated by applying Mr. Green's DCF framework to the TPA-adjusted operating profits of all three Debtor Groups.

[2] "Most Recent" and "Lowest" forecasts are among Nortel forecasts discussed in the appendices of Mr. Green's report that have sufficient financial data.

[3] Differences due to rounding.

**Sources:**

[A] List of forecasts reviewed by Mr. Green:

**CDMA**: NNC-NNL06272681 (Mar. 5, 2009, Carrier Networks - Wireless Business Plan), at 12; NNC-NNL06072974 (Mar. 16, 2009, Carrier Networks - CDMA Co.), at 6; NNC-NNL06001110 (Apr. 15, 2009, Carrier Networks - Wireless Business Plan), at 30; NNC-NNL06244515 (June 4, 2009, CDMA-Co), at 59 and 64; NNC-NNL06001106 (July 9, 2009, Nortel CDMA - Project Zenith Information Memorandum), at 8; NNC-NNL06273841 (Mar. 27, 2009, McKinsey Forecast), at 15; LAZ-NRTL-00037453 (June 2009, Nortel Networks Discussion Materials by Lazard), at 6, 7.

**Enterprise**: NNC-NNL07982049 (Feb. 21, 2009, Enterprise P&L Trend), at tab "P&L Trends ES."

**MEN**: NNC-NNL06236054 (Dec. 22, 2008, Plan for Short-Term and Long-Term Viability), at 17; NNC-NNL06001113 (March 2009, MEN Project SNOW Management Presentation), at 62. I note that the source for Mr. Green's MEN projection is a document that has been marked "removed as privileged" and is therefore unavailable to me. See NNC-NNL06232471 (May 2009, 2009-2012 Optical Business Plan v1). I have retrieved Mr. Green's projection from Appendix C Exhibit 2 of his report. I have also located what I believe to be the information for both the "Retained by Nortel" and "Safe Hands" projections that Mr. Green relied upon in LAZ-NRTL-00037522 (May 12, 2009, Snow Valuation Discussion Materials by Lazard), at 20 and US_Canada_PRIV_00213891 (May 22, 2009, 2009-2012 Optical – Business Plan), at 8, 13.

**CVAS**: NNC-NNL06001111 (May 2009, Project Paragon Management Presentation), at 77; NNC-NNL06245719 (April 2009, Nortel Carrier VoIP and Application Solutions), at 22.

**GSM**: NNC-NNL06272681 (Mar. 5, 2009, Carrier Networks - Wireless Business Plan), at 17; NNC-NNL06001110 (Apr. 15, 2009, Carrier Networks - Wireless Business Plan), at 38; NNC-NNL06001112 (April 2009, Project Isis Information Memorandum), at 57; NNC-NNL05153143 (October 2009, ISIS Information Memorandum), at 88.

## Exhibit 2: Limited Corrections to Mr. Green's Line of Business Allocation

### Correction 1:  All IP Rights and Customer Relationship Value
Allocated Based on TPA-Adjusted Operating Profit Shares (Using the Most Recent Projections)

| Debtor Group | Mr. Green's Allocation | | Mr. Green's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,616 | 56.0% | $1,110 | 38.5% |
| EMEA Debtors | $236 | 8.2% | $387 | 13.4% |
| U.S. Debtors | $1,032 | 35.8% | $1,387 | 48.1% |
| **Total** | **$2,884** | **100%** | **$2,884** | **100%** |

### Correction 2: Use Mr. Green's In-Use IP Rights and Customer Relationship Valuation for All Debtor Groups;
Residual Value Allocated Based on Revenue Shares (Using Mr. Green's Projections)

| Debtor Group | Mr. Green's Allocation | | Mr. Green's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,616 | 56.0% | $696 | 24.1% |
| EMEA Debtors | $236 | 8.2% | $469 | 16.3% |
| U.S. Debtors | $1,032 | 35.8% | $1,718 | 59.6% |
| **Total** | **$2,884** | **100%** | **$2,884** | **100%** |

### Correction 3:  All IP Rights and Customer Relationship Value
Allocated Based on Revenue Shares (Using Mr. Green's Projections)

| Debtor Group | Mr. Green's Allocation | | Mr. Green's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,616 | 56.0% | $416 | 14.4% |
| EMEA Debtors | $236 | 8.2% | $576 | 20.0% |
| U.S. Debtors | $1,032 | 35.8% | $1,892 | 65.6% |
| **Total** | **$2,884** | **100%** | **$2,884** | **100%** |

**Notes:**

[1]  For all corrections, valuation of tangible assets and workforce is Mr. Green's valuation.

[2]  Differences due to rounding.

**Sources:**

[A] "Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities," January 24, 2014, at 7.

[B] List of  most recent forecasts for each Line of Business:

   **CDMA**: NNC-NNL06001106 (July 9, 2009, Nortel CDMA - Project Zenith Information Memorandum), at 8.
   **Enterprise**: NNC-NNL07982049 (Feb. 21, 2009, Enterprise P&L Trend), at tab "P&L Trends ES."
   **MEN**: LAZ-NRTL-00037522 (May 12, 2009, Snow Valuation Discussion Materials by Lazard), at 20.
   **CVAS**: NNC-NNL06001111 (May 2009, Project Paragon Management Presentation), at 77.
   **GSM**: NNC-NNL05153143 (October 2009, ISIS Information Memorandum), at 88.

**Exhibit 3: Correction to Mr. Green's "Alternative Maximum" Line of Business Allocation**

Correction: Difference between Sale Price and Tangible Asset Value Allocated Using TPA-Adjusted Operating Profit Shares (Based on Mr. Green's Projections)

| Debtor Group | Mr. Green's Alternative Maximum Allocation | | Mr. Green's Alternative Maximum Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,238 | 43.0% | $1,022 | 35.5% |
| EMEA Debtors | $354 | 12.3% | $340 | 11.8% |
| U.S. Debtors | $1,290 | 44.8% | $1,521 | 52.7% |
| **Total** | **$2,883** | **100%** | **$2,883** | **100%** |

**Notes:**

[1] Valuation of tangible assets is Mr. Green's valuation.

[2] Differences due to rounding.

**Sources:**

[A] "Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities," January 24, 2014, at 62.

## Exhibit 4: Limited Corrections to Mr. Britven's Line of Business Allocation

**Correction 1: Basis for Business Value in Mr. Britven's Framework Is FMV as Determined by the Line of Business Sales**

| Debtor Group | Mr. Britven's Allocation | | Mr. Britven's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,438 | 50.5% | $1,011 | 35.5% |
| EMEA Debtors | $432 | 15.2% | $512 | 18.0% |
| U.S. Debtors | $979 | 34.4% | $1,325 | 46.5% |
| **Total** | **$2,848** | **100.0%** | **$2,848** | **100.0%** |

**Correction 2: Calculate U.S. and EMEA Share of Business Value Using 2008 Revenue**

| Debtor Group | Mr. Britven's Allocation | | Mr. Britven's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,438 | 50.5% | $1,112 | 39.1% |
| EMEA Debtors | $432 | 15.2% | $493 | 17.3% |
| U.S. Debtors | $979 | 34.4% | $1,243 | 43.6% |
| **Total** | **$2,848** | **100.0%** | **$2,848** | **100.0%** |

**Correction 3: Correction 1 + Correction 2**

| Debtor Group | Mr. Britven's Allocation | | Mr. Britven's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $1,438 | 50.5% | $353 | 12.4% |
| EMEA Debtors | $432 | 15.2% | $628 | 22.1% |
| U.S. Debtors | $979 | 34.4% | $1,866 | 65.5% |
| **Total** | **$2,848** | **100.0%** | **$2,848** | **100.0%** |

**Notes:**

[1]   Tangible asset value, customer relationships value, and goodwill value are allocated according to Mr. Britven's methodology.

[2]   Correction 1: The "Business Value" of $988 million from the 2008 AIT is replaced with the proceeds from the Line of Business Sales of $2.848 billion, and the IP value is otherwise allocated according to Mr. Britven's methodology.

[3]   Correction 2: The U.S. and EMEA share of the IP component of the "Business Value" is calculated on the basis of 2008 revenue shares, rather than RPS percentages, using the 2008 AIT.

[4]   Correction 3: The "Business Value" of $988 million from the 2008 AIT is replaced with the proceeds from the Line of Business Sales of $2.848 billion, and the IP component is allocated on the basis of 2008 revenue shares.

**Sources:**

[A]   "Nortel Networks Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups," January 24, 2014, Schedule 2.1.

**Exhibit 5: Correcting Mr. Malackowski's Allocation of Line of Business IP Using 2009 Nortel Revenue**

| Debtor Group | Mr. Malackowski's Allocation | | Allocation Using Nortel Revenue from 2009 Carve-Out Financials | |
|---|---|---|---|---|
| | **$ Millions** | **Percentage** | **$ Millions** | **Percentage** |
| Canadian Debtors | $101 | 13.2% | $93 | 12.2% |
| EMEA Debtors | $332 | 43.4% | $203 | 26.5% |
| U.S. Debtors | $332 | 43.3% | $469 | 61.3% |
| **Total** | **$765** | **100%** | **$765** | **100%** |

**Note:**

[1]  Mr. Malackowski allocated Line of Business Defensive IP value using IDC market size data. In this correction I allocate Mr. Malackowski's estimate of Line of Business Defensive IP value using Nortel 2009 revenue from the Carve-Out Income Statements. This correction does not affect Mr. Malackowski's allocation of Synergistic IP value, which is also a component of his total Line of Business IP value estimate.

**Sources:**

[A]  "Expert Report of James E. Malackowski," January 24, 2014.

[B]  NNI_00577735 (Oct. 5, 2010, 2009 Carve-Out Income Statements, at tabs "FY09 P&L" for each Line of Business).

**Exhibit 6A: Incorporating Corrections to Mr. Malackowski's Allocation of Line of Business IP Value into Mr. Huffard's Line of Business Allocation**

| Debtor Group | Mr. Huffard's and Mr. Malackowski's Allocation | | Allocation of Line of Business IP Using 2009 Revenue | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $344 | 12.2% | $338 | 12.0% |
| EMEA Debtors | $750 | 26.5% | $624 | 22.1% |
| U.S. Debtors | $1,732 | 61.3% | $1,864 | 65.9% |
| **Total** | **$2,827** | **100%** | **$2,827** | **100%** |

**Sources:**

[A] "Expert Report of Paul P. Huffard," January 24, 2014.

[B] Exhibit 5.

**Exhibit 6B: Corrections to Mr. Malackowski's Patent Portfolio Allocation
Consistent with Nortel IPCo Model**

| Debtor Group | Mr. Malackowski's Allocation | | Mr. Malackowski's Allocation with IPCo Related Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $490 | 11.0% | $265 | 5.9% |
| EMEA Debtors | $1,497 | 33.6% | $857 | 19.2% |
| U.S. Debtors | $2,468 | 55.4% | $3,333 | 74.8% |
| **Total** | **$4,454** | **100%** | **$4,454** | **100%** |

**Notes:**

[1]  List of corrections to Mr. Malackowski's Patent Portfolio Analysis:
  - Limit valuation to countries in IPCo Model (Canada, China, France, Germany, the U.K., and the U.S.)
  - Exclude revenue from franchise labeled "Other" (not part of the IPCo Model)
  - Restrict revenue from Internet franchise to U.S. only with revenue ending in 2017
  - Revenues from China starting in 2015 and are limited to three franchises: Wireless Handsets,
    Wireless Infrastructure, and PC.

**Sources:**

[A]  "Expert Report of James E. Malackowski," January 24, 2014.

**Exhibit 6C: Summary of Corrections to Mr. Huffard's and Mr. Malackowski's Allocation**

| Debtor Group | Mr. Huffard's and Mr. Malackowski's Allocation | | Mr. Huffard's and Mr. Malackowski's Allocation with Limited Corrections | |
|---|---|---|---|---|
| | $ Millions | Percentage | $ Millions | Percentage |
| Canadian Debtors | $834 | 11.5% | $603 | 8.3% |
| EMEA Debtors | $2,247 | 30.9% | $1,481 | 20.3% |
| U.S. Debtors | $4,200 | 57.7% | $5,197 | 71.4% |
| **Total** | **$7,280** | **100%** | **$7,280** | **100%** |

**Source:**

[A] Exhibit 6A and Exhibit 6B.

# Appendix A - Additional Documents Relied Upon

## Case Documents

### *Asset Sale Agreements*

Ex. 22085, NNI_00825094 (June 30, 2011 Rockstar Bidco, LP Asset Sale Agreement).

### *License Termination Agreements*

NNI_01570315 (Mar. 12, 2010, Side Agreement).

### *Court Documents*

"Expert Rebuttal Report of Daniel R. Bereskin, QC," February 28, 2014.

"Expert Report of Catherine Tucker," February 28, 2014.

"Expert Report of James E. Malackowski," January 24, 2014.

"Expert Report of Lorraine Eden, Ph.D.," January 24, 2014.

"Expert Report of Paul P. Huffard," January 24, 2014.

"Nortel Networks Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups," January 24, 2014.

"Rebuttal Expert Report of Lorraine Eden, Ph.D.," February 28, 2014.

"Rebuttal Expert Report of Terrence P. McGarty," February 28, 2014.

"Report of Mark L. Berenblut and Alan J. Cox, NERA Economic Consulting," January 24, 2014.

"Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities," January 24, 2014.

Doolittle Dep., Dec. 5, 2013.

Ex. 21026, NNI_00373228 (Mar. 14, 2002, Horst Frisch Inc. Economic Analysis of Nortel Networks' Intercompany Transactions).

McColgan Dep., Nov. 8, 2013.

### *Data*

LAZ-NRTL-00037453 (June 2009, Nortel Networks Discussion Materials by Lazard).

LAZ-NRTL-00037522 (May 12, 2009, Snow Valuation Discussion Materials by Lazard).

NNC-NNL05153143 (Oct. 2009, ISIS Information Memorandum).

NNC-NNL06001106 (July 9, 2009, Nortel CDMA - Project Zenith Information Memorandum).

NNC-NNL06001110 (Apr. 15, 2009, Carrier Networks - Wireless Business Plan).

NNC-NNL06001111 (May 2009, Project Paragon Management Presentation).

NNC-NNL06001112 (Apr. 2009, Project Isis Information Memorandum).

NNC-NNL06001113 (March 2009, MEN Project SNOW Management Presentation).

NNC-NNL06072974 (Mar. 16, 2009, Carrier Networks - CDMA Co.).

NNC-NNL06232471 (May 2009, 2009-2012 Optical Business Plan v1).

NNC-NNL06236054 (Dec. 22, 2008, Plan for Short-Term and Long-Term Viability).

NNC-NNL06244515 (June 4, 2009, CDMA-Co).

NNC-NNL06245719 (Apr. 2009, Nortel Carrier VoIP and Application Solutions).

NNC-NNL06272681 (Mar. 5, 2009, Carrier Networks - Wireless Business Plan).

NNC-NNL06273841 (Mar. 27, 2009, McKinsey Forecast).

US_Canada_PRIV_00213891 (May 22, 2009, 2009-2012 Optical – Business Plan).

### *Other Documents*

Ex. 11173, GIP_Nortel_00136187 (February 25, 2011 email chain regarding Iceberg: Asset Sale Agreement Issues).

NNC-NNL099354 (May 6, 2008, PowerPoint presentation entitled "Tax Matters Update, Audit Committee Meeting").

NNI_00321988 (April 2009, email chain entitled "Another question for you both wrt EN").

NNI_00627822 (March 2010, email chain entitled "Not Used and Shared list for Nortel remaining patents.").

NNI_01388250 (May 2009, email chain entitled "Aviator Patent List – Schedule C").

NNI_01462625 (June 2009, email chain entitled "Query").

## Appendix A - Additional Documents Relied Upon

| Third Party Documents |
|---|
| ***Third Party Research*** |
| "IAS 36 Basis for estimates of future cash flows," in The International Financial Reporting Standards Database and Textbook, accessed Feb. 21, 2014, http://annualreporting.info/impairment-asset/measuring-recoverable-amount/value-in-use/basis-for-estimates-for-future-cash-flows/basis-for-estimates-of-future-cash-flows. |
| "Value in use - IFRS," in The International Financial Reporting Standards Database and Textbook, accessed Feb. 21, 2014, http://annualreporting.info/definiciones/value-in-use. |
| Robert Reilly and Robert Schweihs, *Valuing Intangible Assets* (McGraw-Hill Companies, Inc., 1999). |
| ***Financial Statements*** |
| Telefonaktiebolaget LM Ericsson, 2011 Annual Report (Form 20-F) (Apr. 4, 2012). |