Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>    NORTEL NETWORKS INC., *et al.*,<br><br>                    Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

<u>**DECLARATION OF MARK WEISZ**</u>

**(Submitted by the US Interests)**

I, Mark Weisz, declare under penalty of perjury as follows:

**A. Background**

1.      I worked in the Nortel tax department from 1997 through 2007.

2.      In 1997, I began my career at Nortel with CALA, Inc. ("CALA"), in Sunrise, Florida, where I was Senior Manager for Latin American Tax.  I was later promoted to Director of Tax for CALA and remained in that position until approximately 2000 when I was promoted to Director of Tax Planning for the Americas at Nortel Networks, Inc. ("NNI"), located in Richardson, Texas.

3.      In 2003, I became Leader of International Tax, remaining with NNI and in Richardson, Texas.  I held this position until I left Nortel in September 2007 although my responsibilities within this title shifted throughout the years.  As Leader of International Tax, I reported directly to the VP of Tax, John Doolittle and, later, Peter Look, both of whom worked for Nortel Networks Limited ("NNL") in Canada.

4.      In 2004, John Doolittle, the VP of Tax at that time, asked me to become involved in Nortel's global transfer pricing policy.  Specifically, Nortel had previously filed a request for an Advance Pricing Agreement ("APA") which is a means by which a multinational enterprise can seek to reach agreement with tax authorities on a mutually acceptable transfer pricing policy that is then applied to determine the entity's taxable income over a set period of time.  Obtaining an APA often involves a negotiation process with tax authorities ("APA Process").  As Nortel's APA Process had stalled, Mr. Doolittle requested that I become involved to try to bring it to a conclusion.  During the APA Process, I worked and consulted with numerous economists, tax advisors, and attorneys in an effort to obtain an APA and importantly, to codify the operating arrangements that varying Nortel subsidiaries had operated under since 2001, which agreement was memorialized in the Master R&D Agreement ("MRDA").

1

5.      My role with respect to Nortel's transfer pricing policy diminished in late 2006 or early 2007 when Peter Look succeeded John Doolittle as the VP of Tax.  However, I remained involved in advising and assisting in the still ongoing APA Process.

6.      Prior to joining Nortel, I began my professional career in 1987 at Coopers & Lybrand, a multinational professional services firm.  I started as an associate and was eventually promoted to tax manager at the firm.

7.      I have a Bachelors of Science degree in Accounting from Rutgers University in 1987.

8.      Throughout my years of professional experience, I have participated in numerous training courses in taxation, including courses specifically focused transfer pricing.

**B.  The MRDA**

9.      The MRDA set forth the agreement among Nortel entities governing intercompany transactions for tax purposes and created ownership and licensing rights to Nortel technology created by the MRDA parties.  The parties to the MRDA were NNL, NNI and certain Nortel entities in Europe (referred to as the "EMEA Entities").[1]

10.      I was involved in drafting the MRDA and, in doing so, I worked with outside advisors, outside counsel, and numerous internal groups at Nortel.  I reviewed the MRDA to ensure that it reflected the transaction that we intended to enter into and had described to the advisors.

11.      The MRDA granted the parties full economic and beneficial ownership of the Nortel technology for each parties' exclusive territory.

12.      In the MRDA, NNI and the EMEA Entities agreed to vest legal title to Nortel

---

[1]      In addition, Nortel Networks Australia Pty. Ltd. ("NN Australia") was also an original signatory of the MRDA, but ceased to be considered a participant in 2007 and accordingly I do not mention NN Australia again.

technology with NNL, but only in exchange for receiving exclusive, perpetual, royalty-free licenses to exploit fully Nortel technology in their exclusive territories, which for NNI was the United States.  The licensed entities in the MRDA were referred to as the Licensed Participants. The MRDA vested legal title in NNL for administrative simplicity only.

13.      The exclusive, perpetual, royalty-free licenses the Licensed Participants received under the MRDA provided them with full economic and beneficial ownership of Nortel's IP in their respective exclusive territories.  Thus, it was always my understanding that, from an economic perspective, the MRDA parties intended that each of the MRDA parties would exclusively own the rights to exploit fully Nortel technology in their exclusive territories (for example, for NNL, this was Canada and for NNI, this was the United States).   It was also always my understanding that the Licensed Participants had a broad enforcement right with respect to Nortel technology in their respective territories.  Each of the participants was granted the right to assert actions and recover damages or other remedies in their respective exclusive territories for infringement or misappropriation of NN Technology by others.  This structure was created to reflect the business reality of the economic ownership of IP rights.  Each of the MRDA parties were entrepreneurs engaging in substantial R&D efforts; as a result it was important that the economic ownership of the resulting Nortel IP be shared among the parties.

14.      I did not understand the scope of the exclusive licenses provided to the Licensed Participants to be limited in any way other than with respect to the geographic territory.

15.      It was my practice to be involved with all of the important communications with tax authorities when I was leading the APA Process.  The submissions I provided to the tax authorities were always written to be as accurate as possible.  In preparing our APA submissions we worked closely with Bob Ackerman and Dave Canale at Ernst & Young U.S. ("E&Y") – two

former IRS officers who had previously worked in the APA office – and Bob Turner at Ernst & Young Canada.  When necessary, we also consulted with our economic advisors, Horst Frisch, as well as our legal advisors at Oslers and Sutherland & Asbill prior to responding to any inquiries from the tax authorities.

16.     In all of the APA submissions that were provided to the tax authorities while I was involved in the APA Process, as well as meetings and informal communications with the tax authorities, it was made clear that full economic ownership (often referred to as beneficial or economic ownership) of Nortel technology in each of the exclusive territories was held by the MRDA participant for that exclusive territory.  The IRS specifically was interested in who had economic ownership of Nortel's technology and I recall conversations with them on this issue. NNL's legal title of the Nortel technology was virtually irrelevant; instead the MRDA participants' full economic ownership of Nortel's IP in their respective territory reflected the economic realities and business deal among the MRDA parties.

17.     During my involvement with the MRDA and the APA Process, no one at Nortel, including at NNL or any advisor, ever expressed the view to me that the MRDA Licensed Participants owned less than the full economic rights to exploit Nortel technology in their respective  exclusive territories.  Nor to my knowledge was this ever said to tax authorities. Instead, as noted, we informed the IRS that the MRDA Licensed Participants were the economic and beneficial owners of Nortel's IP in their respective territories.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  April 11, 2014

_____
Mark Weisz