Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

- and -

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

**AFFIDAVIT OF AYLWIN KERSEY STEPHENS**
**(AFFIRMED APRIL 11, 2014)**

I, AYLWIN KERSEY STEPHENS, of Warwick House, 21 South Park, Gerrards Cross, SL9 8HQ, United Kingdom, MAKE OATH AND SAY:

1.      I am a chartered accountant and currently employed as a Senior Tax Manager for Nortel Networks UK Limited ("**NNUK**").

2.      Some of the events to which this Affidavit relates occurred many years ago.  Although I can still recall the key issues and events, my memory has been aided by the review of the documents exhibited to this Affidavit.  I make specific reference to these documents in this Affidavit by reference to their exhibit reference.

3.      I have knowledge of the matters referred to in this Affidavit.  Save where otherwise indicated, the facts and matters contained in this Affidavit are within my own knowledge. Where the facts and matters are not within my own knowledge, I identify the source of my information and/or belief. I refer to the worldwide Nortel group of companies as "**Nortel**", the "**Nortel Group**" or the "**Group**".

**PROFESSIONAL BACKGROUND**

4.      I qualified as a chartered accountant in 1969 after a four year training contract with a small firm of London accountants, J Hulbert Grove & Co. On qualifying, I joined the London office tax department of the accountancy firm which is now known as PricewaterhouseCoopers UK ("**PwC**"). I remained there for most of my professional career until I retired as a corporate tax partner in 2003, having been in that role for 25 years.

5.      During my time with PwC and its predecessor firms, my client base largely consisted of multinational corporations, both UK and foreign listed, and through that client base I did a lot of mergers and acquisitions ("**M&A**") and reorganisation work, leading to my working on a number of M&A transactions where I was not otherwise involved with the client. The listed clients with whom I had a longer term relationship during my time with PwC included Rockwell International, Honeywell, 3M, Aventis/Rhodia, Bayer, Equant (now part of France Telecom), MIM Holdings (now part of Glencore Xtrata), Laura Ashley, Wellcome plc (now part of GlaxoSmithKlein), Segro (a major UK property group with international interests), RMC Group (now part of Cemex) and Wilkinson Sword/Allegheny International /Swedish Match (a 33-year relationship).

6.      As a corporate tax partner at PwC, I was also responsible for providing tax services to NNUK from around 1998 through the then EMEA Director of Tax, Ian Barton, who had worked with me at PwC and had been employed by another client before joining Nortel.  I specialised in the areas of tax strategy in respect of M&A and restructuring.

7.      I also gave substantial advice to NNUK on corporate tax return and compliance issues and business and asset divestments. Insofar as I was aware, PwC was at no time instructed by NNUK on transfer pricing matters, including planning or assisting with the then on-going UK revenue authorities (Her Majesty's Revenue and Customs ("**HMRC**")) transfer pricing audit.

8.      On retiring from PwC in June 2003, I took on a number of part time roles with former clients including NNUK. On 1 July 2003, I joined NNUK's Europe, Middle East and Africa ("**EMEA**") Tax Group on an employed consultancy basis. I remain with NNUK as an employed consultant.

9.      I was not assigned any particular role or responsibility; in Nortel terms my role was "special projects", in other words I became involved with issues referred to me by other team members. I initially reported to Mark Weisz, the then Director of International Tax, based in North America, and de facto EMEA Tax Director (there was no one designated in that role at the time). I then subsequently reported to Ryan Smith and Lorraine Harper during their respective tenure as EMEA Tax Director.

10.     In my earlier years at NNUK, I was most heavily engaged in issues for the entities based in the UK, Ireland and Germany. As time progressed, I became more generally involved with most of the EMEA entities with the general exception of the French entities.

## MASTER RESEARCH AND DEVELOPMENT AGREEMENT

11.     As a result of my role in tax upon joining NNUK as a consultant, I was also involved with Nortel's transfer pricing system. The principal transfer pricing document was the Master Research and Development Agreement (the **"MRDA"**). Although I was not involved in the negotiation or drafting of the MRDA, I came to understand its workings during my time at Nortel because it had an impact on NNUK's tax affairs.

12.     The MRDA was signed in December 2004 and I had first become aware of the MRDA shortly before that on or around November 2004. The MRDA was largely drafted and created in North America. It was sent to me for comments which I provided but do not recollect the entirety of my comments. I was also involved in commenting on the various addenda to the MRDA and, in respect of the second addendum, I assisted in the preparation of a presentation, which I then delivered to the Board of NN Ireland (**"NNIR"**), explaining the second addendum. I also assisted in the preparation of a presentation which was then delivered by others to the Boards of NNUK and NNSA (the French entity).

13.     The MRDA is designed to be a transfer pricing document. This means that it purported to represent an arm's length agreement between certain Nortel entities (NNL, NNI, NNUK, NNSA, NNIR and, at least originally, Nortel Australia) as to how those entities would allocate the Nortel Group's operating results among them for purposes of taxation in the countries where they operated.

14.     The fact that the MRDA purported to be "arm's length" is important because Nortel would have to satisfy various tax authorities (including those in the US, Canada and the UK) that the MRDA would both:

  a.  allocate the Nortel Group's profit or loss among the entities that participated in the MRDA so that the economic result for each was comparable to independent entities operating in similar fields and geographies; and

  b.  reflect the functions, assets and risks of those entities.

15.     From a tax perspective, the relevant assets included the legal or ownership rights in the intellectual property arising as a result of the contribution to research and development ("**R&D**") by those entities which were party to the MRDA.

16.     In order to determine whether the allocation of profit or loss complied with the arm's length principle, tax authorities would look at the rights of the Nortel entities so that, for example, those with a limited role in the Nortel Group – such as distributors – bore less entrepreneurial risks and therefore their rewards would be lower than those with an extensive role such as the MRDA participants which jointly created and owned the intellectual property.

17.     The MRDA allocated Nortel's global profit or loss by re-assigning profits and losses among the parties to the MRDA. This re-assigning of profits and losses was the ultimate

4

determinant of whether any party to the MRDA, including NNL, would make a profit or a loss. All MRDA participants were treated equally in the sense that they all bore a share of residual profits and losses depending on how much they spent on R&D.

18.    This process of re-assigning was referred to as "allocating the residual profits and losses". That is to say, the profit or loss remaining, after the costs or profits of certain so called routine functions (global logistics and distribution in particular) had been deducted and allocated to the companies responsible for performing those functions, belonged to the parties to the MRDA (known as the **"Residual Profit Entities"** or **"RPEs"**). These entities shared in the profits and losses because, as the MRDA provides, these were the entities that participated in the R&D activities which were responsible for the success or failure of the Nortel Group.

19.    Schedule A of the MRDA contained the method for allocating profits and losses, known as the residual profit share methodology (or **"RPSM"**). Schedule A was amended over time but essentially it always provided for the sharing of profits or losses in accordance with the relative share of R&D spending by the parties to the MRDA. By 2008, the sharing of profits was fully based on revenue accounts of R&D spending over the previous five years, with the counting delayed by a "gestation period" of one year (the **"five year look-back"**).

20.    I had always understood that each of the RPSM participants had an "economic interest" in Nortel's intellectual property. This was implicit in the various representations (such representations made by, or with the approval of, those in North America) made to the UK revenue authorities as the profit sharing mechanism had no provision for a royalty or similar type of reward to any individual MRDA participant. In other words, I had understood that the RPSM participants owned Nortel's intellectual property and were entitled to receive the economic benefits from exploiting it in proportion to their relative contributions to the creation of that

intellectual property. Those contributions were measured by the participants' relative share of R&D spending over time and this in turn dictated how much profit or loss each participant made. This economic ownership was the basis on which we could represent to the tax authorities that each RPE was entitled to share in the profits and losses of the Nortel Group.

21.     The practice I observed during my time at Nortel confirmed my understanding that parties to the MRDA owned a share of Nortel's intellectual property, particularly the following two examples:

    a.  I can see from Exhibit 32121 (bearing bates stamp NNI_00668603), shown to me at my deposition and which is attached to this Affidavit as Exhibit A, that in 2008 I advised Michael Orlando – Nortel's manager for international tax affairs – that it would not be right for any companies other than the ones party to the MRDA to share in the costs of settling a patent infringement lawsuit[1]. I had formed this view because no other companies owned Nortel's intellectual property apart from those which were a party to the MRDA. Only those which were a party to the MRDA should benefit from the intellectual property and it followed that they too must contribute to the cost of remedying any infringement for the Nortel Group. Michael Orlando appeared to share my view noting that "*it could send a IP ownership message to the tax authorities that would be counterproductive to our TP methodology*" (page 1).

    b.  The portion of the proceeds from the sale of UMTS attributable to intellectual property was allocated in accordance with the RPS percentages.

---

[1] Nortel had settled for US$5 million an intellectual property infringement claim. The settlement sum had to be booked to the appropriate Nortel entities. I suggested that the cost be borne by NNL and shared amongst the RPSM participants.

22.    My understanding of the MRDA, and the requirements of the tax authorities, shaped my views as to the appropriate principles to be adopted when the Nortel Group made a disposal of an asset. I explain in further detail below that I, and the other Nortel personnel involved, considered those principles to be relevant when allocating the value of the intellectual property sold as part of the UMTS business.

**USEFUL LIFE OF INTELLECTUAL PROPERTY**

23.    As I explain above, Schedule A of the MRDA incorporated a five year look-back intended to reflect an estimate of the useful or economic life of the intellectual property being developed by the MRDA participants.

24.    Whether or not the five year look-back represented an accurate estimate of the economic life of Nortel's intellectual property is not within my expertise.  I do not consider myself to have knowledge of technology or intellectual property and I am unable to say whether the five years provided for in the MRDA is or is not appropriate. From a tax perspective, the look-back should be based on the economic reality of the intellectual property and there is no tax or transfer pricing rule which dictates the use of a five year period in particular.

25.    However appropriate the use of an estimate of economic life may have been for determining annual transfer pricing adjustments from operating income or losses under the MRDA, from the perspective of a tax authority, different criteria are likely to apply in a sale of technology in isolation from a business where it is obvious that what is being sold for value had a longer life than that provided for in the MRDA calculations. For instance, this may be relevant where, as in the UK, the time at which the technology was created may determine the tax treatment of any proceeds.

**THE SALE OF THE UMTS BUSINESS TO ALCATEL**

26.     One of the larger transactions that occurred during my time at NNUK was the sale of the Nortel Group's UMTS business (the "**UMTS sale**"). This was a global disposal of the UMTS business and the purchaser was Alcatel.

27.     As I understand, the terms of the sale agreement gave the purchaser the right to allocate the purchase price across the various asset classes, save that tangible assets were to be valued at book value. In addition to tangible assets, Alcatel had identified a further three asset classes, each being an intangible asset: customer contracts, technology and goodwill.

28.     While the purchaser had the right to allocate the purchase price across the various asset classes, Nortel had the right to allocate the consideration by asset class to each selling entity within the Nortel Group as it deemed appropriate.

29.     Although I had known that the UMTS sale was happening, all of the tax and legal work relating to the UMTS sale was initially dealt with in North America.

30.     I had been involved generally in the discussions surrounding the UMTS sale. I have been shown an email (bearing bates stamp EMEAPRIV0204736 and attached to this Affidavit as Exhibit B) where I wrote to Michael Orlando that in the UMTS sale we "*will be confronted...I think for the first time with a global disposal of IP arising under the master agreement*" (page 1) and that "*our view was that the IP proceeds would be allocated to each participant in accord with the current proportionate share in the Residual*" (page 1). When I refer to "Residual", I was referring to the residual profits and losses allocated to the RPEs under the RPSM.

31.    Whilst I had been involved, and indeed expressed views on the allocation of the intellectual property, the first that I knew that I would be asked to comment on the allocation of the UMTS sale proceeds was when I had received an email from Louis Farr (who was based in North America) on December 4, 2006 advising that a draft by-country split of the allocation would be circulated. This email, bearing bates stamp NNI_00432289, is attached to this Affidavit as Exhibit C. This was followed by a further email, bearing bates stamp NNI_00432290 and attached to this Affidavit at Exhibit D, from Louis Farr on December 8, 2006 setting out that *"Rosanne and I are in the process of drafting the by-country allocation. We anticipate being in touch with you..."* (page 1).

32.    I then recollect on December 12, 2006 receiving the proposed allocation of the UMTS sale proceeds from Louis Farr which was sent under cover of a calendar invitation (bearing bates stamp NNI_00174525 and attached to this Affidavit at Exhibit E) for a phone call between Louis Farr, Rosanne Culina, Mark Weisz and me which was to take place on December 13, 2006. I recollect that Ryan Smith also joined this call.

33.    After receipt of this proposed allocation, Ryan Smith and I discussed our concerns that this proposal was not the proper way in which to allocate the UMTS sale proceeds. There were two main issues: (1) the intellectual property or technology was allocated other than in accordance with the contribution to the creation of the intellectual property or technology as represented at that time by the RPS percentages and (2) the method being proposed in respect of customer contracts did not properly identify the owner of the relevant customer relationship (although we did agree that revenue was the proper metric). We then expressed our views to those in North America on the phone call which took place on December 13, 2006.

34.     I was not aware of Alcatel's reasoning in determining the asset classes but under the terms of the sale agreement I understand that the choice of asset classes was solely Alcatel's.

35.     I recollect noting that customer contracts and relationships was not an asset class that Nortel would normally have identified as a distinct class of assets. Schedule A of the MRDA, and the distribution agreements that governed the non-RPEs, had historically focussed on the distribution function as an asset class rather than the broader customer related intangibles. Nevertheless, I did not find it problematic to use this asset class as I was aware that it is an asset class used by buyers and sellers in purchase price allocations and also used in financial statements.

36.     Over the next few days there were a variety of calls between me, Ryan Smith, Louis Farr and Rosanne Culina to discuss the allocation of the UMTS sale proceeds.

37.     On December 18, 2006, Louis Farr emailed the Asset Allocation Statement to Alcatel in respect of the allocation of the sale proceeds to the various Nortel entities and then forwarded the email to me. This statement had been prepared with consideration of the concerns that I had raised in the calls and, as such, this draft had allocated the sale proceeds to the Nortel entities based on what Ryan Smith and I had thought was proper and appropriate. The email and statement are attached to this Affidavit as Exhibits F and G (bearing bates stamps NNI_00745167 and NNI_00745169 respectively).

38.    The Asset Allocation Statement had allocated the various assets as follows:

**Tangible Assets**

39.    In respect of the tangible assets, these were to be allocated at book value (based on the US dollar).

**Customer Contracts**

40.    In respect of customer contracts and the revenues associated with the customer contracts, these were to be allocated to the entities which owned the customer relationship. As the UMTS business was European-centric, the bulk of the purchase price in respect of this asset class went to the UK and France. In terms of identifying which Nortel Group entity owned a customer contract or customer relationship, this was determined by considering a specific customer relationship in the round, for example who was managing the customer relationship or marketing to the customer. In order to establish which entity got what from the purchase price, we took the revenue of the UMTS business for part of 2006 and allocated it using that metric. By way of example, if NNUK "owned" customers had generated 50% of the UMTS business revenue in that time period, it would receive 50% of the purchase price for the asset class of customer contracts.

41.    The buyer of a business – in this case Alcatel – will naturally be very interested in customer contracts as they will wish for the business to continue operating post-sale in as seamless a manner as possible. As such, customer contracts and customer relationships will be essential from day one and will be valuable to the buyer of any business. Therefore, it was appropriate that the Nortel Group entities which held and managed the relationships received the purchase price allocation in respect of this category of assets.

11

**Technology / Intellectual Property**

42.     In respect of the technology, this reflected the largest portion of the purchase price. The technology and intellectual property were generally considered to be key components of the business and the reason the Nortel Group was able to generate revenue.

43.     The correct way, in our view, was to allocate the purchase price for technology to those Nortel Group entities which, as owners of the technology, were entitled to receive the proceeds from exploiting it. As such, the correct way was the use of the RPEs' shares of residual profits or losses under the RPSM (the "**RPS percentages**").

44.     The reason that the RPS percentages was the correct method is that it was my understanding that the RPSM participants owned the economic rights to the technology being sold and should therefore share in the sale proceeds received by the Nortel Group for selling those technology rights. The technology had been developed jointly by the RPSM participants investing in R&D over a number of years and conducting that R&D together in a highly integrated matter.  It was proper that the RPSM participants' economic interest in that technology was recognised and that appropriate compensation was then received in respect of that economic interest.

45.     As noted above, it was not within my expertise to consider the life span of technology and I do not recall considering this issue.

**Goodwill**

46.     Finally, in respect of goodwill, this accounted for a very small portion of the purchase price. There was a complex formula for allocating the purchase price in respect of goodwill and all of the entities participating in the UMTS sale got something. I cannot recollect the exact

formula but I have been shown a document (bearing bates stamp EMEAPROD1305279 and attached to this Affidavit as Exhibit H) which sets out that the goodwill was allocated amongst the sellers by reference to a three factor formula of assets, people and revenue - with any remaining goodwill being allocated on a basis that incorporated the RPS percentages (and so the same as the technology allocation) but recognised the limited profit participation rights of the non-MRDA sellers. The formula was not controversial.

47.    In my mind, the purchase price allocation adopted in the UMTS sale was without doubt the correct approach. As I set out in Exhibit 32113 (bearing bates stamp EMEA1000000947), which was shown to me at my deposition and which is attached to this Affidavit as Exhibit I, *"the MRDA principles have been used to allocate some of the consideration derived from the UMTS Access sale"* (page 2).

48.    I consider that the allocation of sale proceeds in the UMTS sale is consistent with principles underlying the MRDA and do not believe that the adoption of the third addendum to the MRDA would have required or supported a different approach. The third addendum made it clear that the total profits or losses from the sale of a Nortel business should not automatically be treated as operating profits or losses for purposes of the formula for determining the residual profits to be allocated among the Nortel entities under the MRDA. Although this was only clarified in the third addendum, it has been in practice since 2001 and was accepted by all parties in the transfer pricing calculations. Consistent with this, the proceeds of the UMTS sale had been excluded from the 2006 RPSM calculations. The proceeds had first been divided among the various asset classes specified by the purchaser. Such a division would have been an appropriate first step in determining how to allocate the sale proceeds among the Nortel entities in any event, inasmuch as the rights of each entity in each asset class were different. Once the

proceeds had been divided by asset class, it was only the value attributable to intellectual property that was allocated in accordance with the then-prevailing RPS percentages.

**REVIEW BY AUDITORS AND HMRC**

49.    Shortly after the UMTS sale, in February 2007, the allocation method adopted was challenged by the auditors who questioned, amongst other things, why the UMTS sale proceeds for customer contracts had not been allocated on the same basis as the technology (i.e. by using the RPS percentages). Although the relationship with the auditors was managed by North America, I had prepared a first draft of a memorandum which sought to explain the allocation generally and in respect of the treatment of customer contracts in the UMTS sale and to justify such to the auditors. I have been shown Exhibits 11260 and 11261, bearing bates stamps NNC-NNL06031297 and NNC-NNL06121236, attached to this Affidavit as Exhibits J and K respectively.   These Exhibits confirm my recollection that I had drafted this memorandum alongside Michael Orlando before it was approved by Peter Look and then sent to the auditors. The memorandum explained that the technology was allocated according to the RPS percentages and that the customer contract allocation was by reference to the entity which owned the contracts.

50.    I was not involved in the discussions with the auditors but I understand that the auditors accepted that the method which Nortel had adopted in respect of the allocation of customer contracts (and the other asset classes) was acceptable.  My understanding is reinforced by the fact that the audited financial statements of the various EMEA sellers in the UMTS sale reflected the UMTS sale proceeds allocation that Nortel had adopted.

51.    Further, I have been shown documents in respect of correspondence with HMRC.  Those documents indicate that the allocation had been accepted by the HMRC and this is my

recollection. Specifically, on April 23, 2007, I sent an email to Nick Randall of HMRC attaching a memorandum setting out the allocation in respect of the UMTS sale. This email and memorandum are attached to this Affidavit as Exhibits L and M (with bates stamp EMEAPROD2285660 and EMEAPROD2285662 respectively). By email dated August 3, 2007, HMRC advised that they were "*prepared to accept the tax analysis set out in your email of 23 April 2007*" (page 1). This email is attached to this Affidavit as Exhibit N bearing bates stamp EMEA1000000720.

52.     The tax returns of NNUK, and I understand the tax returns of the North American sellers, reflected the allocation of the UMTS sale proceeds that Nortel had adopted.

SWORN BEFORE ME at          )
Buckinghamshire,            )
United Kingdom              )
this eleventh day of April, 2014   )

AYLWIN KERSEY STEPHENS



A Notary Public



Court File No. 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, et al.

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(Commercial List)

Proceeding commenced at Toronto

---

**AFFIDAVIT OF**
**Aylwin Kersey Stephens**
**(Affirmed 11 April, 2014)**

---

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, Ontario  M5V 3J7

Robin Schwill
Tel:   416.863.0900
Fax:   416.863.0871

**LAX O'SULLIVAN SCOTT LISUS LLP**
145 King Street West, Suite 2750
Toronto, Ontario  M5H 1J8

Matthew P. Gottlieb
Tel:   416.598.1744
Fax:   416.598.3730

Lawyers for the Joint Administrators of the EMEA Debtors

16

This is Exhibit "A" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS  sworn April 11, 2014



_Commissioner for Taking Affidavits (or as may be)_

**To:**    Gaglione, Michael (GWRTP:8413)[michaeg2@nortel.com]; Naqvi, Sadiq
(TORWM:0300)[SADIQNA@nortel.com]
**Cc:**    Payne, John (GWRTP:8413)[JPAYNE@nortel.com]
**From:**    Orlando, Michael (GWRTP:8413)
**Sent:**    Fri 8/8/2008 8:06:08 PM
**Importance:**    **Normal**
**Subject**    FW: IP infringement settlement booking - Advice required before LEC tomorrow
RE: IP infringement settlement booking - Advice required before LEC tomorrow

Sadiq/Mike,

We need to follow this through for 2008 TP calculations. I do not know on who's books it will end up, but
it could have a material impact upon audit by the tax authorities if not handled properly (even though it is
only $5M). It may even be booked below the line locally.


Let me know if you have any questions.

*Michael Orlando*
*Leader - Global Transfer Pricing*
*Nortel*
*ESN: 355-6679*
*Phone: 919-905-6679*
*Fax: 919-905-3096*
*email: Morlando@nortel.com*

-----Original Message-----
**From:**    Orlando, Michael (GWRTP:8413)
**Sent:**    Friday, August 08, 2008 4:02 PM
**To:**    Stephens, Kerry (MOP:7500); Burke, Lisa (MOP:7500)
**Cc:**    Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413); Harper,
Lorraine (MOP:0000)
**Subject:**    RE: IP infringement settlement booking - Advice required before LEC
tomorrow

From a TP perspective, I agree with Kerry's advice. If we let the LRDs bare the burden of this cost, it
could send a IP ownership message to the tax authorities that would be counterproductive to our TP
methodology. Wherever the cost gets booked, I think it would be reimbursed by NNL via TP.

Thanks,

*Michael Orlando*
*Leader - Global Transfer Pricing*
*Nortel*
*ESN: 355-6679*
*Phone: 919-905-6679*
*Fax: 919-905-3096*
*email: Morlando@nortel.com*

-----Original Message-----
**From:**    Stephens, Kerry (MOP:7500)
**Sent:**    Friday, July 11, 2008 4:03 AM
**To:**    Burke, Lisa (MOP:7500); Orlando, Michael (GWRTP:8413)

**Confidential**



NNI_00668603
1

**Cc:**   Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413);
          Harper, Lorraine (MOP:0000)
**Subject:** RE: IP infringement settlement booking – Advice required before
          LEC tomorrow

Lisa,

So we are at this point merely providing for the cost and could later correct any booking today
by reference to the terms of the written agreement with KPN. Nonetheless I do not think NN
BV is the right place to book the initial settlement cost, even if it ultimately involved in making
the payment by way of product discount.

The Distribution Agreements clearly state that NNL is the owner of IP (legally the position as
the other RPS entities only have an economic interest by virtue of the Master R&D
Agreement and their performance of R&D), so it seems to me that NNL must be the one in
breach of the KPN patents as it has purported to own IP which it in fact did not. Thus in my
view the cost should be borne in NNL (albeit shared amongst the RPS participants through
the mechanisms in the Master R&D Agreement).

Generally so far as I am aware it is NNL that benefits from damages secured for breach of
Nortel IP by others (benefit shared with other RPS participants) so there is logic in it bearing
costs of Nortel breach at first instance.

Regards, Kerry

---

**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 434439 ESN 560-4439 *[New from 1/12/07]*
Fax: +44 (0)1628 437378 ESN 560-7378
*E Mail: kerrys@nortel.com*

---

The information contained in this message may be privileged and confidential and protected
from disclosure. If the reader of this message is not the intended recipient, or an employee or
agent responsible for delivering this message to the intended recipient you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please notify us immediately by
replying to the message and deleting it from your computer.

---

**From:**    Burke, Lisa (MOP:7500)
**Sent:**    10 July 2008 16:51
**To:**      Stephens, Kerry (MOP:7500); Orlando, Michael (GWRTP:8413)
**Cc:**      Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413);
             Harper, Lorraine (MOP:0000)
**Subject:** RE: IP infringement settlement booking – Advice required before
             LEC tomorrow

**Confidential**

Kerry, Mike,

Randip has confirmed that the contract for settlement is not currently in place. No specific Nortel entity has yet been determined as the one who will settle the amount.

Which Nortel entity should be liable for patent infringement settlements? Which entity causes the least tax issues?

Thanks

Lisa

EMEA Tax Senior Manager

Tel: +44 (0) 1628 43 2728 (ESN 560)
Fax: +44 (0) 1628 43 7378 (ESN 560)
email: lisabu@nortel.com

*The information contained in this message may be privileged and confidential and protected from disclosure. If the reader is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.*

| | |
|---|---|
| **From:** | Stephens, Kerry (MOP:7500) |
| **Sent:** | 10 July 2008 14:27 |
| **To:** | Burke, Lisa (MOP:7500); Orlando, Michael (GWRTP:8413) |
| **Cc:** | Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413); Harper, Lorraine (MOP:0000) |
| **Subject:** | RE: IP infringement settlement booking - Advice required before LEC tomorrow |

Lisa,

That may be fine if NN BV is legally the Nortel party settling with KPN, but otherwise I fear it runs the risk of being disallowed as a deduction if the legal Nortel party settling is a different entity. OK the result for NN BV might be overall the same, although I might ask why it should bear any cost, even the 1%, I could see a Revenue Authority not taking an overall result approach.

For this size of cost and the fact that we may be cash tax paying in the Netherlands I think we would need some local advice if the cost does get booked in NN BV at first instance, but we do need to know which Nortel entity(s) will be party to the settlement agreement.

Regards, Kerry

NNI_00668605

**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 434439 ESN 560-4439 *[New from 1/12/07]*
Fax: +44 (0)1628 437378 ESN 560-7378
*E Mail: kerrys@nortel.com*

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

| | |
|---|---|
| **From:** | Burke, Lisa (MOP:7500) |
| **Sent:** | 10 July 2008 14:03 |
| **To:** | Orlando, Michael (GWRTP:8413) |
| **Cc:** | Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413); Harper, Lorraine (MOP:0000); Stephens, Kerry (MOP:7500) |
| **Subject:** | RE: IP infringement settlement booking - Advice required before LEC tomorrow |

Hi Mike

Further to my e-mail below, the CAT team is proposing to book the USD 5m in NN BV on the basis that the Q2 TPAs will redistribute the impact to the RPS entities, leaving a USD 50k impact in NN BV.

Any objections?

Thanks

Lisa

EMEA Tax Senior Manager

Tel: +44 (0) 1628 43 2728 (ESN 560)
Fax: +44 (0) 1628 43 7378 (ESN 560)
email: lisabu@nortel.com

*The information contained in this message may be privileged and confidential and protected from disclosure. If the reader is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.*

Confidential

| From: | Burke, Lisa (MOP:7500) |
|---|---|
| Sent: | 10 July 2008 13:05 |
| To: | Orlando, Michael (GWRTP:8413) |
| Cc: | Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413); Harper, Lorraine (MOP:0000); Stephens, Kerry (MOP:7500) |
| Subject: | IP infringement settlement booking - Advice required before LEC tomorrow |

Hi Mike,

Randip from the CAT team (copied above) has a query on where to book a specific infringement settlement. The background, per my understanding, is as follows:

We have a Netherlands-based customer (KPN) who has looked at a series of Nortel products across EMEA and has claimed IP infringement on the basis that Nortel has breached one of their patents. Nortel has settled for USD 5m.

Randip's issue, given TP relationships and the fact that the issue is EMEA-wide, is understanding in which Nortel entity(ies) this should be booked (Spread across NNUK/NN Ireland and NNSA as RPS participants?). Is there also an issue from a TP perspective as to <u>where</u> in the GL it should be booked?

To possibly complicate matters, the amount will be settled via product credits, which will mean probable offsets against revenue which would be generated in NN BV.

Please let us know your thoughts, and whether you need further information.

Thanks

Lisa

EMEA Tax Senior Manager

Tel: +44 (0) 1628 43 2728 (ESN 560)
Fax: +44 (0) 1628 43 7378 (ESN 560)
email: lisabu@nortel.com

*The information contained in this message may be privileged and confidential and protected from disclosure. If the reader is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.*

NNI_00568607
5

**To:**      Burke, Lisa (MOP:7500)[LISABU@nortel.com]
**Cc:**      Chhokar, Randip (MOP:7620)[RANDIPCH@nortel.com]; Payne, John
(GWRTP:8413)[JPAYNE@nortel.com]; Harper, Lorraine (MOP:0000)[lharper@nortel.com]; Stephens,
Kerry (MOP:7500)[KERRYS@nortel.com]
**From:**   Orlando, Michael (GWRTP:8413)
**Sent:**    Fri 8/8/2008 7:58:03 PM
**Importance:**      **Normal**
**Subject:**  RE: IP infringement settlement booking - Advice required before LEC tomorrow

Lisa,

This sounds more like a technical accounting issue. I can not provide accounting advice on this issue.
However, I would like to know how it is ultimately treated for book purposes so we can decide on an
appropriate tp strategy.

Thanks,

*Michael Orlando*
*Leader - Global Transfer Pricing*
*Nortel*
*ESN: 355-6679*
*Phone: 919-905-6679*
*Fax: 919-905-3096*
*email: Morlando@nortel.com*

     -----Original Message-----
    **From:**    Burke, Lisa (MOP:7500)
    **Sent:**    Thursday, July 10, 2008 9:03 AM
    **To:**      Orlando, Michael (GWRTP:8413)
    **Cc:**      Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413); Harper,
                Lorraine (MOP:0000); Stephens, Kerry (MOP:7500)
    **Subject:**  RE: IP infringement settlement booking - Advice required before LEC
               tomorrow

    Hi Mike

    Further to my e-mail below, the CAT team is proposing to book the USD 5m in NN BV on the basis
    that the Q2 TPAs will redistribute the impact to the RPS entities, leaving a USD 50k impact in NN BV.

    Any objections?

    Thanks

    Lisa

    EMEA Tax Senior Manager

    Tel: +44 (0) 1628 43 2728 (ESN 560)
    Fax: +44 (0) 1628 43 7378 (ESN 560)
    email: lisabu@nortel.com

*The information contained in this message may be privileged and confidential and protected*
*from disclosure. If the reader is not the intended recipient, or an employee or agent*
*responsible for delivering this message to the intended recipient, you are hereby notified that*

*any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.*

| | |
|---|---|
| **From:** | Burke, Lisa (MOP:7500) |
| **Sent:** | 10 July 2008 13:05 |
| **To:** | Orlando, Michael (GWRTP:8413) |
| **Cc:** | Chhokar, Randip (MOP:7620); Payne, John (GWRTP:8413); Harper, Lorraine (MOP:0000); Stephens, Kerry (MOP:7500) |
| **Subject:** | IP infringement settlement booking - Advice required before LEC tomorrow |

Hi Mike,

Randip from the CAT team (copied above) has a query on where to book a specific infringement settlement. The background, per my understanding, is as follows:

We have a Netherlands-based customer (KPN) who has looked at a series of Nortel products across EMEA and has claimed IP infringement on the basis that Nortel has breached one of their patents. Nortel has settled for USD 5m.

Randip's issue, given TP relationships and the fact that the issue is EMEA-wide, is understanding in which Nortel entity(ies) this should be booked (Spread across NNUK/NN Ireland and NNSA as RPS participants?). Is there also an issue from a TP perspective as to <u>where</u> in the GL it should be booked?

To possibly complicate matters, the amount will be settled via product credits, which will mean probable offsets against revenue which would be generated in NN BV.

Please let us know your thoughts, and whether you need further information.

Thanks

Lisa

EMEA Tax Senior Manager

Tel: +44 (0) 1628 43 2728 (ESN 560)
Fax: +44 (0) 1628 43 7378 (ESN 560)
email: lisabu@nortel.com

*The information contained in this message may be privileged and confidential and protected from disclosure. If the reader is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.*

Confidential

Confidential

NNI_00668610

This is Exhibit "B" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS  sworn April 11, 2014



*Commissioner for Taking Affidavits (or as may be)*



Subject to EMEA-US-Canada Joint Privilege

To:     Orlando, Michael
(GWRTP:8413)[/o=Nortel/ou=AmericasM01/cn=Recipients/cn=Exchange/cn=5058648]; Weisz, Mark
(RICH1:6911)[/o=Nortel/ou=AmericasM01/cn=Recipients/cn=Exchange/cn=0248830]; Smith, Ryan
(MOP:7500)[/o=Nortel/ou=AmericasM01/cn=Recipients/cn=Exchange/cn=5065694]
Cc:     Farr, Louis
(NASHF:8413)[/O=NORTEL/OU=AMERICASM01/CN=RECIPIENTS/CN=EXCHANGE/CN=5001199]
From:              Stephens, Kerry (MOP:7500)
Sent:              Mon 11/6/2006 8:44:14 AM
Importance:        Normal
Sensitivity:       None
Subject:           RE: Nortel Internal IP Agreement

Mike,

Agreed that legal should be involved, if nothing else we will need their help in EMEA to get the
participants to sign off. To that end it might be helpful if Sullivans could write something in relatively plan
language which explains the purpose of the document as on its own it does not make a lot of sense.

I suspect it is a stand alone document because it is a special carve out from the master agreement to
allow the divestment of IP in the Osiris transaction and is not the general grant of rights to divest, there
being I think the intent that once Osiris is closed there is no change to the rights and obligations of
participants in respect of the remaining IP.

We will be confronted, in practice I think for the first time with a global disposal of IP arising under the
master agreement. This happened in theory in the Optical Component sale, but in that case there was no
IP value ascribed (we sold at a discount to book value of the tangible assets) and other divestments
involving intangible value since 2001 have I think been manufacturing outsourcing where IP value was not
in point.

Thus certainly in EMEA we expect that the vending participants in the Residual will receive a share of the
IP value in Osiris. What that value will be is still uncertain as under the contract Alcatel have the right to
allocate consideration over assets classes, with the stipulation that tangible assets (M&E and inventory)
are to be valued at Nortel book so in practice they will allocate the surplus over Nortel book to intangible
classes (receivables are being retained by Nortel). Nortel then has the right to allocate the proceeds to
vending entities and jurisdictions. Our allocation here will depend in how Alcatel allocate over asset
classes and we should know this at about the middle of this month. However, our view was that the IP
proceeds would be allocated to each participant in accord with the current proportionate share in the
Residual. It may be that because of the allocation to intangible classes selected by Alcatel some of the
intangible value will have to be allocated to specific vending entities, for instance contract values.

In EMEA we expect that any intangible consideration allocated to NNSA will be taxable as ordinary
income, the issue there will be whether the existing NOLs survive the UMTS sale under French continuity
of business rules and we await advice from our local advisors there following supply of the facts as we
currently understand them. In Ireland the consideration will likely be capital gain taxable at 20% and we
will struggle to establish any basis to offset. In the UK the position is not very clear following a law change
in 2002, which had the effect of making post 31 March 2002 IP an income asset, with not very easily
applied transitional rules from a previous capital gain regime to a situation like ours where IP evolves
rather than the creation of identifiably new product. The default in the UK might be to divide value
received on the basis of the RPS R&D amortisation formula (30% rdb), so that something like 20% of the
value would be capital gain, where we have shelter,  and the balance income, eroding our NOLs with a
book charge. There are arguments to produce a larger allocation to capital gain, but the success of those
cannot be forecast.

Mark will correct me if I am wrong, but I recall that in a presentation to the APA Authorities some time ago
we explained how we deal with IP divestment and in particular confirmed that any divestment did not

Subject to EMEA-US-Canada Joint Privilege

erode the unamortised R&D pool of each participant. The relevant IP proceeds in any divestment attributable to each residual participant would thus fall to be taxed in its hands as a separate source of income or gains and the R&D pool continues to be amortised as if nothing had happened.

Regards, Kerry

---

**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 437439 ESN 560-7439
Fax: +44 (0)1628 437378 ESN 560-7378
*E Mail: kerrys@nortel.com*

---

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

---

| | |
|---|---|
| **From:** | Orlando, Michael (GWRTP:8413) |
| **Sent:** | 03 November 2006 20:48 |
| **To:** | Weisz, Mark (RICH1:6911); Stephens, Kerry (MOP:7500); Smith, Ryan (MOP:7500) |
| **Cc:** | Farr, Louis (NASHF:8413) |
| **Subject:** | RE: Nortel Internal IP Agreement |

Comments:

- The signatory should be an officer of the company.  For the Master R&D agreement it was Alain Biston, Alan Kenny, Dara Gill, Laurie Krebs, John Doolittle
- Why are we not just calling this an addendum to the Master R&D agreement (similar to the first amendment to the agreement)?
- In Para. 2 we state that the disposed business is beneficially owned by the participants in their respective territories.  Wouldn't that imply that there may be realized and recognizable gain in each country?
- Further to the 3rd point above, if each participant beneficially owns the disposed business then each participant's R&D capital stock should be reduced by a portion of the disposed business.  I suspect this could cause cash tax for the UK, depending on the character of the gain.
- I think we should send to each legal department in each country to be sure they are comfortable with the language and will sign.

- I feel like we should discuss this agreement and the transaction with our E&Y APA team and Bill Morgan to understand how to properly treat the disposed business for TP purposes.

*Michael Orlando*
*International Tax - Transfer Pricing*
*Nortel*
*ESN: 357-0076 new*

Subject to EMEA-US-Canada Joint Privilege

*Phone: 919-997-0076 new*
*Fax: 919-905-3096 new*
*email: Morlando@nortel.com*

-----Original Message----
**From:**      Weisz, Mark (RICH1:6911)
**Sent:**      Friday, November 03, 2006 2:06 PM
**To:**        Stephens, Kerry (MOP:7500); Smith, Ryan (MOP:7500); Orlando, Michael
               (GWRTP:8413)
**Cc:**        Farr, Louis (NASHF:8413)
**Subject:**   FW: Nortel Internal IP Agreement

Can you provide comments for Monday. Sorry I did not send out earlier. Also who is the NT person
that would sign the document for each RPS participant

**Mark Weisz**
**Director - International Tax**
**Work (972) 684 - 2322**
**Fax (972)685 - 3458**
**mweisz@nortel.com**

The information contained in this message may be privileged and confidential and protected
from disclosure. If the reader of this message is not the intended recipient, or an employee or
agent responsible for delivering this message to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please notify us immediately by
replying to the message and deleting it from your computer.

-----Original Message-----
**From:**      Farr, Louis (NASHF:8413)
**Sent:**      Friday, October 27, 2006 1:58 PM
**To:**        Weisz, Mark (RICH1:6911)
**Cc:**        Culina, Rosanne (BRAM:0088)
**Subject:**   Nortel Internal IP Agreement

Recall that as part of the Osiris transaction, NNSA will be transferring various assets to Alcatel's
French newco. Recall also that we concluded that the Master R&D Agreement does not permit
NNSA (or any other participant) to transfer its IP. Therefore, in order to implement the French newco
structure and to respect Nortel's internal agreements, there would have to be another agreement
among the participants to permit the IP transfer to happen. Giovanna Sparagna (Sutherland Asbill)
agreed with our conclusions.

At our request, Giovanna has prepared the Internal IP Agreement which is below. The document
includes my comments and those of Nortel IP Law. Please let me know if you have any comments.
Of course, feel free to forward the draft to anyone on your staff who you would like to assist you in
your group's review of the agreement. Would appreciate your comments by C.O.B. Friday,
November 3.

After your comments are incorporated, we can discuss the process that should be followed re the

Subject to EMEA-US-Canada Joint Privilege

signing of the agreement.

Thanks in advance.

<< File: Nortel Internal IP clean.DOC >>

Louis Farr
Nortel Networks Tax Department
Phone:  (615) 432-4422  ESN:  222-4422
Fax:     (615) 432-4490  ESN:  222-4490
E-Mail:  lgfarr@nortel.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Highly Confidential                    EMEAPRIV0204739

This is Exhibit "C" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS sworn April 11, 2014



*Commissioner for Taking Affidavits (or as may be)*

MARTIN D. SILVERMAN
NOTARY PUBLIC
GERRARDS CROSS, ENGLAND

| | |
|---|---|
| **From:** | Farr, Louis (NASHF:8413) |
| **Sent:** | Monday, December 04, 2006 11:36 AM |
| **To:** | Smith, Ryan (MOP:7500); Stephens, Kerry (MOP:7500); Weisz, Mark (RICH1:6911) |
| **Cc:** | Culina, Rosanne (TORWM:0088); Look, Peter (TORWM:0088) |
| **Subject:** | "Heads Up" -- Osiris Purchase Price Allocation Process |

Wanted to give you a heads up re the Osiris purchase price allocation process and what is to occur during the next few weeks.

The signed agreement provides that Alcatel is to do an allocation of price among the assets (based on its outside appraisal). Under the terms of the Agreement, we can expect this from Alcatel by this weekend (at the latest). As a business matter, Nortel agreed to do the by-country split within 10 days after receipt of Alcatel's by asset-class allocation. It is noted that 10 days is shorter than the 15 days that Tax had originally asked for.

In view of the above, please review our draft by-country split as soon as possible after you receive it. We envision having calls that are intended to finalize the by-country allocation very soon after it is in draft form.

Louis Farr
Nortel Networks Tax Department
Phone:  (615) 432-4422  ESN:  222-4422
Fax:     (615) 432-4490  ESN:  222-4490
E-Mail: lgfarr@nortel.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

1

1

This is Exhibit "D" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS  sworn April 11, 2014

_____
Commissioner for Taking Affidavits (or as may be)

MARTIN D. SILVERMAN
NOTARY PUBLIC
GERRARDS CROSS, ENGLAND

| From: | Farr, Louis (NASHF:8413) |
|---|---|
| Sent: | Friday, December 08, 2006 5:56 PM |
| To: | Smith, Ryan (MOP:7500); Stephens, Kerry (MOP:7500); Weisz, Mark (RICH1:6911) |
| Cc: | Culina, Rosanne (TORWM:0088); Look, Peter (TORWM:0088) |
| Subject: | RE: "Heads Up" -- Osiris Purchase Price Allocation Process |

FYI. As a follow-up to the e-mail below, Alcatel's appraisal and allocation among asset classes has arrived. Under the terms of the agreement, we have until December 18 to complete the by-country allocation.

Rosanne and I are in the process of drafting the by-country allocation. We anticipate being in touch with you by mid-week (at the latest) re the draft. At this point, we are planning to hold a call about it in the afternoon (Europe time) of Thursday, December 14.

More later.


Louis Farr
Nortel Networks Tax Department
Phone:  (615) 432-4422  ESN:  222-4422
Fax:     (615) 432-4490  ESN:  222-4490
E-Mail: lgfarr@nortel.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.


-----Original Message-----
| From: | Farr, Louis (NASHF:8413) |
|---|---|
| Sent: | Monday, December 04, 2006 11:36 AM |
| To: | Smith, Ryan (MOP:7500); Stephens, Kerry (MOP:7500); Weisz, Mark (RICH1:6911) |
| Cc: | Culina, Rosanne (TORWM:0088); Look, Peter (TORWM:0088) |
| Subject: | "Heads Up" -- Osiris Purchase Price Allocation Process |

Wanted to give you a heads up re the Osiris purchase price allocation process and what is to occur during the next few weeks.

The signed agreement provides that Alcatel is to do an allocation of price among the assets (based on its outside appraisal). Under the terms of the Agreement, we can expect this from Alcatel by this weekend (at the latest). As a business matter, Nortel agreed to do the by-country split within 10 days after receipt of Alcatel's by asset-class allocation. It is noted that 10 days is shorter than the 15 days that Tax had originally asked for.

In view of the above, please review our draft by-country split as soon as possible after you receive it. We envision having calls that are intended to finalize the by-country allocation very soon after it is in draft form.


Louis Farr
Nortel Networks Tax Department
Phone:  (615) 432-4422  ESN:  222-4422
Fax:     (615) 432-4490  ESN:  222-4490
E-Mail: lgfarr@nortel.com

1

Confidential

NNI_00432290

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

2

Confidential

NNI_00432291

This is Exhibit "E" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS sworn April 11, 2014

_____
Commissioner for Taking Affidavits (or as may be)

**Subject:**         Updated: DRAFT Osiris Purchase Price Allocation
**Location:**       ESN 350-8152 (Outside Dial -- (919) 997-8152); PC 2224422#

**Start:**            12/13/2006 10:30 AM
**End:**              12/13/2006 11:30 AM
**Show Time As:**   Tentative

**Recurrence:**      (none)

**Meeting Status:**   Not yet responded

**Required Attendees:**   Farr, Louis (NASHF:8413); Culina, Rosanne (TORWM:0088); Smith, Ryan
                      (MOP:7500); Stephens, Kerry (MOP:7500); Weisz, Mark (RICH1:6911)
**Resources:**        ESN 350-8152 (Outside Dial -- (919) 997-8152); PC 2224422#

When: Wednesday, December 13, 2006 9:30 AM-10:30 AM (GMT-06:00) Central Time (US & Canada).
Where: ESN 350-8152 (Outside Dial -- (919) 997-8152); PC 2224422#

*~*~*~*~*~*~*~*~*~*

Per prior e-mails, Rosanne and I would like to have a call with you re the draft purchase price allocation
for Project Osiris.  A draft of the allocation is below.  We will discuss it on our call.

Please do not forward to draft, as Finance is in the process of updating the numbers in the draft (even
the fixed asset numbers).

Originally, we were planning to have the call on Thursday (12/14).  Because we had finished our work
early, we decided to move the call up by one day.

MARK -- Your calendar indicates that you are only available for the first 1/2 hour.  Please join us to the
extent that your schedule permits.


Redemption_objattph__

NNI_00174525

This is Exhibit "F" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS sworn April 11, 2014



*Commissioner for Taking Affidavits (or as may be)*

**To:**     Smith, Ryan (MOP:7500)[rsmith@nortel.com]; Stephens, Kerry
(MOP:7500)[KERRYS@nortel.com]; Weisz, Mark (RICH1:6911)[MWEISZ@nortel.com]; Kong, Harold
(HKGHK:6911)[cheeweko@nortel.com]; Fu, Loretta (HKGHK:0088)[LLFU@nortel.com]
**Cc:**     Look, Peter (TORWM:0088)[PLOOK@nortel.com]; Culina, Rosanne
(TORWM:0088)[RCULINA@nortel.com]; Krebs, Laurie (GWRTP:8413)[LKREBS@nortel.com]
**From:**   Farr, Louis (NASHF:8413)
**Sent:**   Mon 12/18/2006 6:49:47 PM
**Importance:**     Normal
**Subject:** Nortel/Alcatel Asset Allocation Statement
Nortel-Alcatel Asset Allocation Statement.xls

FYI -- In the e-mail below is the Asset Allocation Statement that Nortel sent to Alcatel earlier today. The
completion of the Asset Allocation Statement is the second step of what could be a lengthy process
through which the parties come to an agreement re the statement. Therefore, it is emphasized that
because Alcatel has not yet agreed to it, the schedule is subject to change and is not final.

If you have any questions about this matter, do not hesitate to contact me.

Louis Farr
Nortel Networks Tax Department
Phone: (615) 432-4422  ESN: 222-4422
Fax:   (615) 432-4490  ESN: 222-4490
E-Mail: lgfarr@nortel.com

The information contained in this message may be privileged and confidential and protected
from disclosure. If the reader of this message is not the intended recipient, or an employee or
agent responsible for delivering this message to the intended recipient, you are hereby notified
that any dissemination, distribution or copying of this communication is strictly prohibited. If
you have received this communication in error, please notify us immediately by replying to the
message and deleting it from your computer.

-----Original Message-----
**From:**     Farr, Louis (NASHF:8413)
**Sent:**     Monday, December 18, 2006 11:21 AM
**To:**       'Thomas.Geary@alcatel-lucent.com'
**Cc:**       Culina, Rosanne (TORWM:0088); Fishman, Robert (NASHF:9791);
              Navaratnam, Atulan (TORWM:0066); Morra, Carm (TORWM:0066); Lesur,
              Jean-Marie (CTF:7972)
**Subject:**  Asset Allocation Statement

In accordance with paragraph (ii) of Exhibit 2.2.7 of the Share and Asset Sale Agreement (dated
December 4, 2006) between Nortel Networks Limited and Alcatel Lucent ("SASA"), enclosed please find
the Asset Allocation Statement.

The allocation will have to updated to the extent the required under various sections of the SASA. See,
for example, section 8.3 and Exhibit 2.2.7.

Recall that in one of our telephone conversations, you noted that ADC did not allocate any value to the
non-compete. In reviewing the report from ADC, I did not see either their statement to this effect or the

**Confidential**

NNI_00745167

1

associated rationale. Please send me ADC's narrative that accompanied its valuation report.

If you agree with the Asset Allocation Statement, please send my an e-mail indicating your agreement. If you would like to discuss the document, do not hesitate to contact us.

In a prior conversation, we talked about the possible impact of the upcoming holiday period on the Exhibit 2.2.7 process. Please contact me before C.O.B. Friday, December 22, so that we may coordinate our schedules.

Louis Farr
Nortel Networks Tax Department
Phone: (615) 432-4422  ESN:  222-4422
Fax:     (615) 432-4490  ESN:  222-4490
E-Mail:  lgfarr@nortel.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

**Confidential**

**NNI_00745168**

This is Exhibit "G" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS  sworn April 11, 2014

_Commissioner for Taking Affidavits (or as may be)_

MARTIN D. SILVERMAN
NOTARY PUBLIC
GERRARDS CROSS, ENGLAND

December 18, 2006
Nortel/Alcatel Purchase Price Allocation
Asset Allocation Statement
Paragraph (ii) of Exhibit 2.2.7 of the Share and Asset Sale Agreement (dated December 4, 2006)

Amount to be allocated --------

| | | |
|---|---|---|
| Gross Consideration | $320,000,000 | |
| Working Capital Credit | ($23,000,000) | |
| Rent Credit | ($3,000,000) | |
| Fixed Asset Adjustment | $0 | Pre-Closing Statement showed fixed assets in excess of $50 |
| Canadian Retirement Obligation | $0 | Canadian Retirement Obligation not included because of the liability.  See also, other adjustments under section 2.2.3. |

Amount to be allocated          $294,000,000

| | Austria | Australia | Belgium | NNL | Nortel Tech | China |
|---|---|---|---|---|---|---|
| F/A & Inventory | $0 | $0 | $1,511,910 | $705,647 | $12,440,000 | $6,575,100 |
| Customer Contracts | $1,100,942 | $0 | $0 | $0 | $0 | $0 |
| IPR | $0 | $534,270 | $0 | $65,488,550 | $0 | $0 |
| Goodwill | $647 | $10,971 | $756 | $2,532,703 | $0 | $5,534 |
| Totals | $1,101,589 | $545,241 | $1,512,666 | $68,726,900 | $12,440,000 | $6,580,634 |

**Confidential**

**NNI_00745169**

million.
offsetting

| | France | Germany | Hong Kong | Ireland | Israel | Italy | Malta |
|---|---|---|---|---|---|---|---|
| | $34,150,952 | $65,508 | $179,572 | $949,306 | $152,613 | $3,381,578 | $553,578 |
| | $7,302,448 | $0 | $0 | $0 | $487,759 | $0 | $0 |
| | $17,582,340 | $0 | $0 | $1,392,340 | $0 | $0 | $0 |
| | $3,841,111 | $7,032 | $92 | $67,969 | $536 | $6,386 | $230 |
| | $62,876,851 | $72,540 | $179,664 | $2,409,615 | $640,908 | $3,387,964 | $553,808 |

**Confidential**

NNI_00745170

2

| Netherlands | Peru | Poland | Portugal | Slovakia | Spain | UK | US |
|---|---|---|---|---|---|---|---|
| $243,058 | $413,462 | $104,409 | $12,564 | $363,072 | $6,612,487 | $1,441,413 | $1,556,934 |
| $0 | $0 | $0 | $0 | $0 | $69,680 | $42,797,363 | $41,808 |
| $0 | $0 | $0 | $0 | $0 | $0 | $8,823,550 | $68,078,950 |
| $133 | $172 | $239 | $1,143 | $598 | $10,043 | $935,599 | $1,464,943 |
| $243,191 | $413,634 | $104,648 | $13,707 | $363,670 | $6,692,210 | $53,997,925 | $71,142,635 |

**Confidential**

**NNI_00745171**

Totals

$71,413,163

$51,800,000

$161,900,000

$8,886,837

$294,000,000

**Confidential**

**NNI_00745172**

This is Exhibit "H" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS  sworn April 11, 2014



_Commissioner for Taking Affidavits (or as may be)_

**Nortel Networks**

**Sale of UMTS Access Business to Alcatel Lucent**

**Allocation of Consideration**

## 1. Background

1.1 The business relationships between members of the Nortel Networks group are governed by a series of legal agreements which set out the functions and risks of the group companies from which the remuneration of those entities is then derived. There are four different types of agreements, as follows:

a.  Master R&D Agreement

The parties to this are the major Nortel entities in Canada, the USA, the UK, France, Ireland and Australia. These entities have historically funded the Nortel group R&D costs. Nortel regards its intellectual property derived from the group R&D efforts as the main driver of profit. The participants in this Agreement own the economic interest in the Nortel group intellectual property, their proportionate interest being by reference to their historic contribution towards group R&D costs.

The Residual profits (or as the case may be losses) of the Nortel group are shared amongst the participants to this Agreement. The Residual profits for this purpose are the group profits after providing remuneration to routine functions performed both by the participants and other group entities. The remuneration to the other group entities for their routine functions is provided for in the following categories of agreements.

b.  Limited Risk Distributor ("LRD") Agreements

These are entered into by Nortel Networks Limited (the Canadian participant in the Master R&D Agreement) and a number of its affiliates. These appoint the relevant entity as territorial distributor of Nortel product, but grant no intellectual property rights in that product, other than necessary rights to sub license customers as part of the distribution function.

EMEAPROD1305279

A LRD is remunerated at a benchmarked rate of between 0% and 4% of external customer revenues for its distribution function. Thus the LRD is protected from making losses and therefore the impact of market movements.

c.  Current and Former Joint Venture Distributors

These entities also perform distribution functions in their designated territories. However, unlike the LRDs they are not protected from market movements, but rather the agreements here, generally with Nortel Networks Limited, specify the pricing of product by Nortel and in some cases impose royalties on sales of some product.

d.  Cost Plus Businesses

These entities generally do not make end customer sales, but rather provide support to other Nortel entities (for instance marketing, customer relationship management, R&D) and are remunerated at a margin on locally incurred costs.

## 2. The UMTS Sale

This was a global disposal to Alcatel Lucent ("Alcatel") of the Nortel UMTS Access business, with a number of Nortel entities transferring assets associated with that business to Alcatel. This transaction closed on 29 December 2006

The structure of the sale agreement was such that Alcatel had the right to allocate the agreed price over asset classes, subject to the provision that tangible assets, machinery & equipment and inventories, were to be valued at Nortel US GAAP book value at closing. Alcatel identified in this exercise the following asset classes:

> Machinery & equipment,
> Inventories,
> Intellectual property,
> Customer contracts, and
> Goodwill (the balance of the consideration after the foregoing allocations).

Nortel had the right under the sale agreement to allocate the consideration by asset class to each vending entity in the group.

Highly Confidential                    EMEAPROD1305280

The consideration for the tangible assets was allocated to the individual vending entity owning those assets.

Intellectual property consideration was allocated to the participants in the Master R&D Agreement to be shared amongst them in their proportionate share in the group residual profit at the time of Closing as they are the economic owners of the intellectual property under that Agreement.

It was considered that the proceeds attributable to customer contracts should not be allocated to the entities making the actual sales unless there was a pure local relationship with revenues generated from the efforts of the local entity, be it a LRD or otherwise.

Customer contract consideration was allocated pro rata to external customer revenues for the 2006 by reference to the Nortel entity that had the true customer relationship. In this regard it was generally the entity which had the main interface with the customer and through which multi territory revenues had been earned as many major international customer contracts are central framework agreements with "local to local" invoicing for regulatory or VAT/Customs Duty reasons, often because the customer does not wish to be involved in the processes for importing product. Thus generally the consideration for customer contracts has been allocated to the Nortel entity based in the same territory as the parent company of the customer group, for instance Vodafone to the UK and Orange to France.

The balancing goodwill figure is allocated amongst all Nortel vendors by reference firstly to a three factor formula of revenues, assets and people for each vending entity to determine a proportionate split for each vendor (its percentage of the total of its three factors against the total of those factors for all vendors). That proportion of the Goodwill consideration was found for each vendor, but LRD vendors were only allocated 1% of that, representing their historic margin on customer revenues as found by the Distributor agreements referred to above, that balance being allocated to the participants in the Master R&D Agreement in the same ratio as applied to the Intellectual property proceeds.

## 3. The Alcatel Internal Adjustments

Nortel is aware through its negotiations with Alcatel that Alcatel operate a very different economic model for allocation of income amongst group companies representing different risks and functions carried out by their territorial entities as against those of the Nortel entities. Nortel is not however aware of the details of the Alcatel model.

EMEAPROD1305281

While Alcatel accepted the Nortel allocation to individual vending entities they needed to internally reallocate to reflect their economic model, in particular reallocating goodwill to a number of their entities, but Nortel can only assume this is based on the fact that as compared to the Nortel LRDs some of the Alcatel entities have greater business risk and thus profit potential in future and the purchase of goodwill by those entities represents the cost of business acquisition to them.

Highly Confidential

EMEAPROD1305282

This is Exhibit "I" referred to in the Affidavit of AYLWIN KERSEY STEPHENS sworn April 11, 2014



_Commissioner for Taking Affidavits (or as may be)_

| | |
|---|---|
| **From:** | Stephens, Kerry (MOP:7500) |
| **Sent:** | Tuesday, August 28, 2007 3:43 AM |
| **To:** | Smeaton, Lorraine (MOP:0000) |
| **Cc:** | BURKE, LISA (MOP:7500); Smith, Ryan (MOP:7500) |
| **Subject:** | UMTS Sale |

Lorraine,

The attached documents all look very innocent, but they may establish a precedent for tax treatment of the UK intangibles, hence they need to be retained somewhere.

Firstly a mail to HMRC enclosing a paper on the proposed tax treatment of the proceeds of the UMTS sale received by NNUK in 2006:



UK Capital Gains
Position

HMRC verbally accepted the position at a meeting in May. I updated the figures later and the following exchange of correspondence confirms HMRC acceptance:



UMTS Sale          UMTS Sale

The significant point is the calculation behind the split between the "new scheme" and "old scheme" intangible rights in para 8.2 of the attached paper and splitting the pure IP rights between the right to exploit IP in the UK, which will transition ultimately to being a wholly "new scheme" asset, and the right to participate in profits arising from exploitation of IP by other RPS participants, which is treated as "grandfathered" goodwill and thus a CGT asset.

Whether in the event of a much more material transaction in future this would be viewed as precedent is open for debate, but it provides a methodology for calculating the tax impact and its use would at least have the benefit of consistency.

Regards, Kerry


**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 437439 ESN 560-7439
Fax: +44 (0)1628 437378 ESN 560-7378
*E Mail: kerrys@nortel.com*

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

1



EXHIBIT
32113
MB 11.7.13
PENGAD 800-631-6989

1

| From: | Stephens, Kerry (MOP:7500) |
|---|---|
| Sent: | April-23-07 6:58 AM |
| To: | nick.randall@hmrc.gsi.gov.uk |
| Cc: | Widdowson, Ian (MOP:MS077); Smith, Ryan (MOP:7500) |
| Subject: | UK Capital Gains Position |

Nick,

In advance of our meeting, and the concern expressed about the UMTS Access business sale in 2006 and the issue of precedent in respect of the Optical Component capital loss claim, I attach a summary setting out the structure of the UMTS divestment and our thoughts on how it should be dealt with for UK tax in NNUK.



UMTS and NNUK
CGT V2.doc

We are as you can see considering very different transactions, but also in respect of rights to Intellectual Property ("IP") different rights that were in place in 2000 and those applicable currently.

In 2000 the Nortel group IP rights were governed by a Cost Sharing Agreement ("CSA") to which NNUK and NNOCL were parties along with other material group entities. This provided that R&D costs would largely be shared by reference to proportionate operating income derived by participating entities, with minor elements based on proportionate third party revenues (both product and royalties). This agreement provided that on exit any participant would retain the then existing IP rights on a non exclusive basis, but have no right to further enhancements/products from continuing IP developments funded by the continuing participants.

The CSA was replaced with effect from 1 January 2001 by the Master R&D Agreement ("MRDA") between the same parties. This gives the parties an economic interest in the profits (or losses) derived from exploitation of the Nortel group IP by reference to their proportionate historical contribution to the group R&D spend. The profit derived from IP exploitation is broadly the group profit after allocation of remuneration for so called routine functions performed, manufacturing and product distribution. This agreement provides that on exit a participant will be paid out for the market value of the participant's economic right to participate in future profits derived from IP exploitation. There is no right to utilise the Nortel IP post exit from the MRDA.

I do in fairness have to point out that the MRDA is the core of the group transfer pricing arrangements which are subject to the APA covering years 2001 onwards, which is not settled and the terms of that Agreement may fall to be modified upon ultimate agreement. Also it is not certain that the APA will cover all years up to and including 2006. However, the participants have no current choice but to follow the only legal agreement in place and thus as you will note from the enclosure the MRDA principles have been used to allocate some of the consideration derived from the UMTS Access sale.

Regards, Kerry

**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 437439 ESN 560-7439
Fax: +44 (0)1628 437378 ESN 560-7378
_E Mail: kerrys@nortel.com_

1

2

EMEA1000000947

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

2

3

EMEA1000000947

**Nortel Networks UK Limited**
**Year Ended 31 December 2006**

**Sale of UMTS Access Business**

1. This was a global disposal of the UMTS Access business to Alcatel in which NNUK participated. The transaction closed on 29 December 2006.

2. The transaction was structured globally as an asset disposal to Alcatel entities with the exception of France, where the UMTS assets were contributed to a French company which was then sold for cash to Alcatel. This was done to help with specific French issues associated with a sale of a going concern, and produced the same French tax result as a direct asset sale, as the shares had the same tax basis as the contributed assets and the cash proceeds are compared to that basis to find taxable gain.

3. The numbers have not finally settled pending agreement with Alcatel on the value to be ascribed to the tangible assets transferred, but the impact on the UK divestment will not be material.

4. The global sale contract, which governs local sale agreements, was structured to give:

    4.1 Alcatel the right to allocate the overall price to asset classes, subject to the proviso that tangible assets (machinery and equipment and inventory) were to be valued at Nortel US GAAP net book value, and

    4.2 Nortel the right to allocate the proceeds per asset class to individual vending entities.

5. The global asset price was US$ 320m, but this is subject to ascertaining the value, in accordance with the above proviso, of the tangible assets transferred where unless minimum numbers are met the total price will reduce. Apart from that the actual value of tangible assets will impact the total element of consideration attributable to intangible assets.

6. Apart from allocations to net tangible assets Alcatel identified three classes of intangible as follows:

V2: Revised 17/04/07

4

Customer contracts
Intellectual property
Goodwill - a balancing figure after all other allocations.

7. In its allocation amongst vending entities Nortel allocated consideration for tangible assets to the entities that owned those assets, with the result that NNUK received US$ 22k for fixed assets (machinery & equipment) and some US$ 1.8m for inventory. These figures are subject to change as noted above by reference to the assets actually transferred.

8. For the intangible assets Nortel allocated to the vending entities on the following bases:

### 8.1 Customer Contracts

The consideration has been allocated in accordance with the location of customer revenues in 2006 for UMTS Access business. However, in determining the location of such revenues regard has been had to where the major customer relationship is held. There are two reasons for this. Firstly revenues derived from the major customers are generally under framework agreements between the Nortel entity with the main customer relationship and the parent entity of the customer group, providing for "local to local" sales usually both for VAT reasons and to ensure standard contract terms. Secondly sales are frequently made by Nortel "Limited Risk Distributors", which have no long term of valuable rights to Nortel IP or to make sales of Nortel product (annually renewable agreements).

Alcatel have provisionally allocated US$ 52m to customer contracts.

NNUK had major customers for UMTS access business, Vodafone and O2, and for the reasons above the revenues earned from those customers were attributed to NNUK. In 2006 the total UMTS revenues were US$ 455m, of which US$ 367m were derived from Vodafone and O2 group companies. As a result NNUK has been allocated some US$ 42m of the provisional total customer contract consideration.

It is considered that this consideration is "grandfathered" goodwill, intangible consideration derived from a business conducted on 31 March 2002, and as such represents capital gain proceeds.

V2: Revised 17/04/07

5

**8.2 Intellectual Property**

This has been allocated amongst the participants in the Nortel Master R&D Agreement, which governs their individual interest in the IP and their participation in the profits derived from its exploitation. The actual allocation is proportionate their individual share in Residual Profits as at 31 December 2006, which is found by the proportionate individual historic contribution to group R&D spend. This formula is the subject of the Advanced Pricing Agreement application so the allocation adopted here may change on ultimate agreement of that application.

Alcatel provisionally allocated some US$ 162m to IP and on the basis of the above Nortel allocation of that sum NNUK received some US$ 8.8m.

It is considered that the NNUK rights under the master R&D Agreement consist of two assets. The first is the right to exploit Nortel IP in its designated territory, the UK. The second is a participation in the profits from earned by other participants in the Master R&D Agreement from exploitation of the Nortel IP in their designated territories. The first right is clearly IP and the latter is considered to be goodwill and thus again a "grandfathered" intangible assets derived from a trade conducted at 31 March 2002 and thus accorded capital gain treatment.

To split the IP value between the two elements a turnover basis has been used. As noted above the total UMTS revenues in 2006 were US$ 455m of which US$ 95m were in the UK. Thus using the above formula 79.1% ([455 – 95]/455), some US$ 6.9m, is attributable to goodwill, leaving some US$ 1.9m as IP.

It is recognised that of the element of the consideration to be treated as IP there has to be some part that it is attributable to post 31 March 2002 assets as technology has been developed. In practice it is impossible to allocate value to such developments. It is proposed that to further split the IP consideration between "new scheme" and "grandfathered" value the amortisation of R&D spend used in the Advanced Pricing Agreement application be used. This amortises R&D at 30% reducing balance to reflect the declining value of technology. Using this amortisation formula any IP in existence at 31 March 2002 would have been depreciated by 81.6% by 31 December 2006.

EMEA1000000947

Using this method of the IP consideration 18.4% is treated as capital gain consideration, US$ 350k, and the balance US$ 1.55m will fall to be treated as ordinary Case I income.

**8.3 Goodwill**

This has been allocated amongst all Nortel vendors on a three factor formula taking assets, people and revenues.

The provisional Alcatel allocation is US$ 10.6m, and US$ 1.1m has been allocated as a receipt to NNUK and is considered "grandfathered" goodwill and thus capital gain consideration.

Although there may be base cost (31 March 1982 value and perhaps subsequent cost) and indexation relief in the capital gains assets sold here no effort will be made to establish these potential deductions from consideration.

V2: Revised 17/04/07

7

| | |
|---|---|
| From: | Welch, Colin (LBS CT Bristol) [colin.welch@hmrc.gsi.gov.uk] |
| Sent: | August-03-07 5:51 AM |
| To: | Stephens, Kerry (MOP:7500) |
| Cc: | Randall, Nick (LBS CT Bristol) |
| Subject: | UMTS Sale |

Kerry

Thank you for your email to Nick on 1 August 2007 in which you provided final settlement figures.

I can confirm that the settlement figures do not alter our view and we are still prepared to accept the tax analysis set out in your email of
23 April 2007.

Kind regards

Colin Welch
(Tax Specialist)

Large Business Service CT Bristol
1st Floor
101 Victoria Street
Bristol
BS1 6DQ

0117 983 8320

The information in this e-mail and any attachments is confidential and may be subject to legal professional privilege. Unless you are the intended recipient or his/her representative you are not authorised to, and must not, read, copy, distribute, use or retain this message or any part of it. If you are not the intended recipient, please notify the sender immediately.

HM Revenue & Customs computer systems will be monitored and communications carried on them recorded, to secure the effective operation of the system and for lawful purposes.

The Commissioners for HM Revenue and Customs are not liable for any personal views of the sender.

This e-mail may have been intercepted and its information altered.

The original of this email was scanned for viruses by the Government Secure Intranet Anti-Virus service supplied by Cable&Wireless in partnership with MessageLabs. (CCTM Certificate Number 2006/04/0007.) On leaving the GSi this email was certified virus free. Communications via the GSi may be automatically logged, monitored and/or recorded for legal purposes.

1

8

| | |
|---|---|
| **From:** | Stephens, Kerry (MOP:7500) |
| **Sent:** | August-01-07 8:50 AM |
| **To:** | nick.randall@hmrc.gsi.gov.uk |
| **Cc:** | Smith, Ryan (MOP:7500); BURKE, LISA (MOP:7500) |
| **Subject:** | UMTS Sale |

Nick,

I refer to my e-mail of 23 April, which we subsequently discussed and the conclusions reached in the paper attached to it you provisionally agreed with subject to settlement of the numbers:



UK Capital Gains
  Position

We have now settled the figures with Alcatel and by asset class they are for NNUK as follows:

Fixed assets - US$ 22,400
Inventory - US$ 1,194,618
Customer Contracts - US$ 47,424,105
Intellectual property - US$ 8,829,000
Goodwill - US$ 436,410

A total receipt of US$ 57,905,533.

I trust that this does not cause a change in your view.

Regards, Kerry

---

**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 437439 ESN 560-7439
Fax: +44 (0)1628 437378 ESN 560-7378
*E Mail: kerrys@nortel.com*

---

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

1

9

FMFA1000000947

| | |
|---|---|
| **From:** | Stephens, Kerry (MOP:7500) |
| **Sent:** | April-23-07 6:58 AM |
| **To:** | nick.randall@hmrc.gsi.gov.uk |
| **Cc:** | Widdowson, Ian (MOP:MS077); Smith, Ryan (MOP:7500) |
| **Subject:** | UK Capital Gains Position |

Nick,

In advance of our meeting, and the concern expressed about the UMTS Access business sale in 2006 and the issue of precedent in respect of the Optical Component capital loss claim, I attach a summary setting out the structure of the UMTS divestment and our thoughts on how it should be dealt with for UK tax in NNUK.



UMTS and NNUK
CGT V2.doc

We are as you can see considering very different transactions, but also in respect of rights to Intellectual Property ("IP") different rights that were in place in 2000 and those applicable currently.

In 2000 the Nortel group IP rights were governed by a Cost Sharing Agreement ("CSA") to which NNUK and NNOCL were parties along with other material group entities. This provided that R&D costs would largely be shared by reference to proportionate operating income derived by participating entities, with minor elements based on proportionate third party revenues (both product and royalties). This agreement provided that on exit any participant would retain the then existing IP rights on a non exclusive basis, but have no right to further enhancements/products from continuing IP developments funded by the continuing participants.

The CSA was replaced with effect from 1 January 2001 by the Master R&D Agreement ("MRDA") between the same parties. This gives the parties an economic interest in the profits (or losses) derived from exploitation of the Nortel group IP by reference to their proportionate historical contribution to the group R&D spend. The profit derived from IP exploitation is broadly the group profit after allocation of remuneration for so called routine functions performed, manufacturing and product distribution. This agreement provides that on exit a participant will be paid out for the market value of the participant's economic right to participate in future profits derived from IP exploitation. There is no right to utilise the Nortel IP post exit from the MRDA.

I do in fairness have to point out that the MRDA is the core of the group transfer pricing arrangements which are subject to the APA covering years 2001 onwards, which is not settled and the terms of that Agreement may fall to be modified upon ultimate agreement. Also it is not certain that the APA will cover all years up to and including 2006. However, the participants have no current choice but to follow the only legal agreement in place and thus as you will note from the enclosure the MRDA principles have been used to allocate some of the consideration derived from the UMTS Access sale.

Regards, Kerry

---

**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 437439 ESN 560-7439
Fax: +44 (0)1628 437378 ESN 560-7378
*E Mail: kerrys@nortel.com*

---

1

10

EMEA1000000947

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

2

EMEA1000000947

**Nortel Networks UK Limited**
**Year Ended 31 December 2006**

**Sale of UMTS Access Business**

1. This was a global disposal of the UMTS Access business to Alcatel in which NNUK participated. The transaction closed on 29 December 2006.

2. The transaction was structured globally as an asset disposal to Alcatel entities with the exception of France, where the UMTS assets were contributed to a French company which was then sold for cash to Alcatel. This was done to help with specific French issues associated with a sale of a going concern, and produced the same French tax result as a direct asset sale, as the shares had the same tax basis as the contributed assets and the cash proceeds are compared to that basis to find taxable gain.

3. The numbers have not finally settled pending agreement with Alcatel on the value to be ascribed to the tangible assets transferred, but the impact on the UK divestment will not be material.

4. The global sale contract, which governs local sale agreements, was structured to give:

> 4.1 Alcatel the right to allocate the overall price to asset classes, subject to the proviso that tangible assets (machinery and equipment and inventory) were to be valued at Nortel US GAAP net book value, and

> 4.2 Nortel the right to allocate the proceeds per asset class to individual vending entities.

5. The global asset price was US$ 320m, but this is subject to ascertaining the value, in accordance with the above proviso, of the tangible assets transferred where unless minimum numbers are met the total price will reduce. Apart from that the actual value of tangible assets will impact the total element of consideration attributable to intangible assets.

6. Apart from allocations to net tangible assets Alcatel identified three classes of intangible as follows:

V2: Revised 17/04/07

EMEA1000000947

Customer contracts
Intellectual property
Goodwill - a balancing figure after all other allocations.

7. In its allocation amongst vending entities Nortel allocated consideration for tangible assets to the entities that owned those assets, with the result that NNUK received US$ 22k for fixed assets (machinery & equipment) and some US$ 1.8m for inventory. These figures are subject to change as noted above by reference to the assets actually transferred.

8. For the intangible assets Nortel allocated to the vending entities on the following bases:

**8.1 Customer Contracts**

The consideration has been allocated in accordance with the location of customer revenues in 2006 for UMTS Access business. However, in determining the location of such revenues regard has been had to where the major customer relationship is held. There are two reasons for this. Firstly revenues derived from the major customers are generally under framework agreements between the Nortel entity with the main customer relationship and the parent entity of the customer group, providing for "local to local" sales usually both for VAT reasons and to ensure standard contract terms. Secondly sales are frequently made by Nortel "Limited Risk Distributors", which have no long term of valuable rights to Nortel IP or to make sales of Nortel product (annually renewable agreements).

Alcatel have provisionally allocated US$ 52m to customer contracts.

NNUK had major customers for UMTS access business, Vodafone and O2, and for the reasons above the revenues earned from those customers were attributed to NNUK. In 2006 the total UMTS revenues were US$ 455m, of which US$ 367m were derived from Vodafone and O2 group companies. As a result NNUK has been allocated some US$ 42m of the provisional total customer contract consideration.

It is considered that this consideration is "grandfathered" goodwill, intangible consideration derived from a business conducted on 31 March 2002, and as such represents capital gain proceeds.

V2: Revised 17/04/07

## 8.2 Intellectual Property

This has been allocated amongst the participants in the Nortel Master R&D Agreement, which governs their individual interest in the IP and their participation in the profits derived from its exploitation. The actual allocation is proportionate their individual share in Residual Profits as at 31 December 2006, which is found by the proportionate individual historic contribution to group R&D spend. This formula is the subject of the Advanced Pricing Agreement application so the allocation adopted here may change on ultimate agreement of that application.

Alcatel provisionally allocated some US$ 162m to IP and on the basis of the above Nortel allocation of that sum NNUK received some US$ 8.8m.

It is considered that the NNUK rights under the master R&D Agreement consist of two assets. The first is the right to exploit Nortel IP in its designated territory, the UK. The second is a participation in the profits from earned by other participants in the Master R&D Agreement from exploitation of the Nortel IP in their designated territories. The first right is clearly IP and the latter is considered to be goodwill and thus again a "grandfathered" intangible assets derived from a trade conducted at 31 March 2002 and thus accorded capital gain treatment.

To split the IP value between the two elements a turnover basis has been used. As noted above the total UMTS revenues in 2006 were US$ 455m of which US$ 95m were in the UK. Thus using the above formula 79.1% ([455 – 95]/455), some US$ 6.9m, is attributable to goodwill, leaving some US$ 1.9m as IP.

It is recognised that of the element of the consideration to be treated as IP there has to be some part that it is attributable to post 31 March 2002 assets as technology has been developed. In practice it is impossible to allocate value to such developments. It is proposed that to further split the IP consideration between "new scheme" and "grandfathered" value the amortisation of R&D spend used in the Advanced Pricing Agreement application be used. This amortises R&D at 30% reducing balance to reflect the declining value of technology. Using this amortisation formula any IP in existence at 31 March 2002 would have been depreciated by 81.6% by 31 December 2006.

V2: Revised 17/04/07

EMEA1000000947

Using this method of the IP consideration 18.4% is treated as capital gain consideration, US$ 350k, and the balance US$ 1.55m will fall to be treated as ordinary Case I income.

### 8.3 Goodwill

This has been allocated amongst all Nortel vendors on a three factor formula taking assets, people and revenues.

The provisional Alcatel allocation is US$ 10.6m, and US$ 1.1m has been allocated as a receipt to NNUK and is considered "grandfathered" goodwill and thus capital gain consideration.

Although there may be base cost (31 March 1982 value and perhaps subsequent cost) and indexation relief in the capital gains assets sold here no effort will be made to establish these potential deductions from consideration.

V2: Revised 17/04/07

This is Exhibit "J" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS  sworn April 11, 2014



_Commissioner for Taking Affidavits (or as may be)_



| From: | Orlando, Michael (GWRTP:8413) |
|---|---|
| Sent: | Thursday, February 15, 2007 9:52 PM |
| To: | Culina, Rosanne (TORWM:0088); Stephens, Kerry (MOP:7500); Farr, Louis (NASHF:8413) |
| Cc: | Weisz, Mark (RICH1:6911) |
| Subject: | Customer relationship intangible |
| | |
| Importance: | High |

Enclosed is a memo that Kerry and I drafted discussing the facts around Nortel's position related to the UMTS sale.  Mark has reviewed it.  This is the memo that Deloitte has been requesting.  Please review and provide your approval.

Kerry, could you please address the comments on page 3?



Summary of
ustomer Relationsh.

Thanks,

*Michael Orlando*
*International Tax - Transfer Pricing*
*Nortel*
*ESN: 357-0076*
*Phone: 919-997-0076*
*Fax: 919-905-3096*
*email: Morlando@nortel.com*

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer



EXHIBIT
11260
11/5/13  MG

1

CONFIDENTIAL

1
NNC-NNL06031297 / 1

2



# NORTEL

# MEMO

**Date:**      February 15, 2007
**To:**        Project Osiris Files
**From:**    Nortel Global Initiatives Group
**Subject:**    Treatment of Customer Relationship Intangible in Purchase Price Allocation

1. **The Transaction**
   - Global asset sale of the UMTS Access business to Alcatel.
   - Master (and governing) sale agreement between NNL and Alcatel parent, with local sale agreements for asset transfers.
   - Except for NN Israel, all Nortel vendors are RPS entities, either LRDs or Residual participants.
   - Tangible assets sold as Nortel US GAAP book value.
   - Alcatel had right to allocate intangible consideration over asset categories, and its determination was as follows:
     - o    Technology (IP/in process R&D)        US$161.9m
     - o    Goodwill                                        US$ 10.6m
     - o    Customer contracts                        US$ 51.8m
   - Nortel had the right to allocate the sale price amongst vending entities, its determination being on the following basis:
     - o    Tangible assets to the owner at US GAAP book
     - o    Technology to Residual participants proportionate to their individual share of the R&D Capital Stock under the master R&D Agreement.
     - o    Goodwill on a three factor formula of assets, people and revenues.
     - o    Customer contracts by reference to the entities owning the contracts, the allocation being based on proportionate 2006 UMTS revenues.

2. **The RPS Model**

- Designed to allocate operating income from the global Nortel operations amongst participating members.
- Technology is the value driver of operating income from those operations.
- Allocates Residual profit from operations, after remuneration to LRDs and Residual participants for routine functions, proportionately using a basis of R&D Capital Stock.
- US GAAP accounting is adjusted to determine operating income in the RPS.
- Historically operating profit ("operating income" in the LRD agreements, "accounting profit" in the Master R&D Agreement) has been found from Nortel A100s, where operating profit is determined after FX, and before, restructuring, interest income/expense and gain/loss on sale of assets. The presentation of Nortel A100s was changed in 2006 to move gain/loss on sale of assets above the operating income line, but it is considered that this change in presentation would not impact settled economic arrangements between the parties.

### 3.  US GAAP Accounting for UMTS Sale
- The profit on the sale to Alcatel, the consideration allocated to intangibles less costs, is included in gain/loss on sale of assets.
- Because of the cut off agreed with Alcatel in respect of billing for continuing contracts certain internal adjustments are also included in gain/loss on sale of assets. Mainly these are acceleration of recognition of deferred revenues and write offs of accrued income, resulting in significant net additional profit.

### 4.  RPS Impacts
- Consistent with the prior operation of the RPS model the profit from the UMTS sale included in gain/loss on sale of assets is excluded from operating income to determine profit for allocation amongst the Residual participants.
- Thus the allocation of the elements of the gain on sale of UMTS assets has to be considered in the context of the RPS arrangements.
- While NNL generally is the legal owner of the technology, the Master R&D Agreement determines the economic ownership of it and thus allocation of the consideration by proportionate R&D Capital Stock is appropriate.
- The allocation of goodwill is consistent with the approach adopted in previous global divestments.

4

- US$ 10.5m out of the total of US$ 10.9m is being allocated to residual participants, with no individually material amount being allocated to LRDs.
- Customer contracts (the basis for the Customer Relationship intangible), which are owned by the Nortel contracting party, are not considered technology and are thus outside the Master R&D Agreement.
- The profit is included in gain/loss on asset sales, which is not part of operating income for RPS.
- The asset owners receiving and retaining the consideration from their sale is consistent with the principles of the RPS model for any asset sold when the gain or loss on that sale is recorded in the gain/loss line of the financials.

## 5.  Other Observations

- Deferred and accrued revenue are included in the gain/loss on asset sale line, which are items that would be included in RPS absent the sale of the UMTS business. The 2006 tax accrual assumes these items are retained by the entity in which the accounting entries arise. By excluding that deferred revenue from operating earnings, the entity that maintained the asset will keep the deferred revenue instead of sharing it in the RPS. This is a conservative position in the tax accrual. Consideration will be given as to whether these items should be included in operating income for the RPS model in 2006. This would not make any material difference to the tax accrual.
- If the customer relationship intangible consideration were allocated to the Residual participants in current proportionate share the impact on the 2006 tax accrual would be marginal, an additional provision of about US$ 100,000.

CONFIDENTIAL

This is Exhibit "K" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS  sworn April 11, 2014



_Commissioner for Taking Affidavits (or as may be)_

| | |
|---|---|
| **From:** | Look, Peter (TORWM:0088) |
| **Sent:** | Friday, February 16, 2007 3:12 PM |
| **To:** | Orlando, Michael (GWRTP:8413) |
| **Cc:** | Weisz, Mark (RICH1:6911); Stephens, Kerry (MOP:7500); Farr, Louis (NASHF:8413); Culina, Rosanne (APORT:0088); Smith, Ryan (MOP:7500) |
| **Subject:** | Re: Customer relationship intangible |

Reviewd and approved.  Thanks for thw write-up.

Peter

-----Original Message-----
From: Orlando, Michael (GWRTP:8413)
To: Look, Peter (TORWM:0088)
CC: Weisz, Mark (RICH1:6911); Stephens, Kerry (MOP:7500); Farr, Louis (NASHF:8413); Culina, Rosanne (TORWM:0088); Smith, Ryan (MOP:7500)
Sent: Fri Feb 16 14:39:42 2007
Subject: RE: Customer relationship intangible

Peter,

Enclosed is a memo, requested by Deloitte, that factually describes Nortel's position related to the allocation of the Customer Relationship Intangible from the sale of UMTS.  If you recall, Deloitte contacted me over concern that the method used to allocate this intangible is not consistent with Nortel's TPM.  They have asked Nortel to state its position in writing and that is what this memo does.  We do not know what action Deloitte will take as a result of Nortel's position.

Could you please take a look at the memo and provide your approval.  All parties copied on this e-mail have approved of its contents.  Deloitte has been pressing hard for this, so I would like to send it to them by COB today.

  <<Summary of Customer Relationship Intangible.doc>>

Thanks,

Michael Orlando
International Tax - Transfer Pricing
Nortel
ESN: 357-0076
Phone: 919-997-0076
Fax: 919-905-3096
email: Morlando@nortel.com

        -----Original Message-----
        From: Culina, Rosanne (TORWM:0088)
        Sent: Friday, February 16, 2007 9:41 AM
        To:   Orlando, Michael (GWRTP:8413); Stephens, Kerry (MOP:7500); Farr, Louis
(NASHF:8413)
        Cc:   Weisz, Mark (RICH1:6911)
        Subject:   RE: Customer relationship intangible

        I am fine with the memo.

1

EXHIBIT
11261
1/5/13  m6

1
NNC-NNL06121236 / 1

FYI - In your other observations regarding the "internal adjustments" - there has since (yesterday) been some additional PCAs that have produced amounts such as this. We have treated them consistently - ie. Attributed them to the entity it relates to as opposed to RPS. These impact NNL mostly.

Rosanne

From: Orlando, Michael (GWRTP:8413)
Sent: Thursday, February 15, 2007 9:52 PM
To:    Culina, Rosanne (TORWM:0088); Stephens, Kerry (MOP:7500); Farr, Louis (NASHF:8413)
Cc:    Weisz, Mark (RICH1:6911)
Subject:    Customer relationship intangible
Importance: High

Enclosed is a memo that Kerry and I drafted discussing the facts around Nortel's position related to the UMTS sale. Mark has reviewed it. This is the memo that Deloitte has been requesting. Please review and provide your approval.

Kerry, could you please address the comments on page 3?

    << File: Summary of Customer Relationship Intangible.doc >>

Thanks,

· Michael Orlando
International Tax - Transfer Pricing
Nortel
ESN: 357-0076
Phone: 919-997-0076
Fax: 919-905-3096
email: Morlando@nortel.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer

2

2
NNC-NNL06121236 / 2

This is Exhibit "L" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS sworn April 11, 2014



_Commissioner for Taking Affidavits (or as may be)_

**To:**      'nick.randall@hmrc.gsi.gov.uk'[nick.randall@hmrc.gsi.gov.uk]
**Cc:**      Widdowson, Ian
(MOP:MS077)[/o=Nortel/ou=AmericasM01/cn=Recipients/cn=Exchange/cn=5052919]; Smith, Ryan
(MOP:7500)[/o=Nortel/ou=AmericasM01/cn=Recipients/cn=Exchange/cn=5065694]
**From:**    Stephens, Kerry (MOP:7500)
**Sent:**    Mon 23/04/2007 10:58:25 AM
**Subject:**  UK Capital Gains Position
UMTS and NNUK CGT V2.doc

Nick,

In advance of our meeting, and the concern expressed about the UMTS Access business sale in 2006 and the issue of precedent in respect of the Optical Component capital loss claim, I attach a summary setting out the structure of the UMTS divestment and our thoughts on how it should be dealt with for UK tax in NNUK.


We are as you can see considering very different transactions, but also in respect of rights to Intellectual Property ("IP") different rights that were in place in 2000 and those applicable currently.

In 2000 the Nortel group IP rights were governed by a Cost Sharing Agreement ("CSA") to which NNUK and NNOCL were parties along with other material group entities. This provided that R&D costs would largely be shared by reference to proportionate operating income derived by participating entities, with minor elements based on proportionate third party revenues (both product and royalties). This agreement provided that on exit any participant would retain the then existing IP rights on a non exclusive basis, but have no right to further enhancements/products from continuing IP developments funded by the continuing participants.

The CSA was replaced with effect from 1 January 2001 by the Master R&D Agreement ("MRDA") between the same parties. This gives the parties an economic interest in the profits (or losses) derived from exploitation of the Nortel group IP by reference to their proportionate historical contribution to the group R&D spend. The profit derived from IP exploitation is broadly the group profit after allocation of remuneration for so called routine functions performed, manufacturing and product distribution. This agreement provides that on exit a participant will be paid out for the market value of the participant's economic right to participate in future profits derived from IP exploitation. There is no right to utilise the Nortel IP post exit from the MRDA.

I do in fairness have to point out that the MRDA is the core of the group transfer pricing arrangements which are subject to the APA covering years 2001 onwards, which is not settled and the terms of that Agreement may fall to be modified upon ultimate agreement. Also it is not certain that the APA will cover all years up to and including 2006. However, the participants have no current choice but to follow the only legal agreement in place and thus as you will note from the enclosure the MRDA principles have been used to allocate some of the consideration derived from the UMTS Access sale.

Regards, Kerry

---

**Kerry Stephens**
**Nortel Networks**
Tax Department - EMEA
Tel : +44 (0)1628 437439 ESN 560-7439
Fax: +44 (0)1628 437378 ESN 560-7378

Confidential                                    EMEAPROD2285660

1

*E Mail: kerrys@nortel.com*

---

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Confidential                                                    EMEAPROD2285661

2

This is Exhibit "M" referred to in the Affidavit of AYLWIN
KERSEY STEPHENS sworn April 11, 2014



_____
*Commissioner for Taking Affidavits (or as may be)*

**Nortel Networks UK Limited**
**Year Ended 31 December 2006**

**Sale of UMTS Access Business**

1. This was a global disposal of the UMTS Access business to Alcatel in which NNUK participated. The transaction closed on 29 December 2006.

2. The transaction was structured globally as an asset disposal to Alcatel entities with the exception of France, where the UMTS assets were contributed to a French company which was then sold for cash to Alcatel. This was done to help with specific French issues associated with a sale of a going concern, and produced the same French tax result as a direct asset sale, as the shares had the same tax basis as the contributed assets and the cash proceeds are compared to that basis to find taxable gain.

3. The numbers have not finally settled pending agreement with Alcatel on the value to be ascribed to the tangible assets transferred, but the impact on the UK divestment will not be material.

4. The global sale contract, which governs local sale agreements, was structured to give:

> 4.1 Alcatel the right to allocate the overall price to asset classes, subject to the proviso that tangible assets (machinery and equipment and inventory) were to be valued at Nortel US GAAP net book value, and

> 4.2 Nortel the right to allocate the proceeds per asset class to individual vending entities.

5. The global asset price was US$ 320m, but this is subject to ascertaining the value, in accordance with the above proviso, of the tangible assets transferred where unless minimum numbers are met the total price will reduce. Apart from that the actual value of tangible assets will impact the total element of consideration attributable to intangible assets.

6. Apart from allocations to net tangible assets Alcatel identified three classes of intangible as follows:

V2: Revised 17/04/07

Customer contracts
Intellectual property
Goodwill - a balancing figure after all other allocations.

7. In its allocation amongst vending entities Nortel allocated consideration for tangible assets to the entities that owned those assets, with the result that NNUK received US$ 22k for fixed assets (machinery & equipment) and some US$ 1.8m for inventory. These figures are subject to change as noted above by reference to the assets actually transferred.

8. For the intangible assets Nortel allocated to the vending entities on the following bases:

### 8.1 Customer Contracts

The consideration has been allocated in accordance with the location of customer revenues in 2006 for UMTS Access business. However, in determining the location of such revenues regard has been had to where the major customer relationship is held. There are two reasons for this. Firstly revenues derived from the major customers are generally under framework agreements between the Nortel entity with the main customer relationship and the parent entity of the customer group, providing for "local to local" sales usually both for VAT reasons and to ensure standard contract terms. Secondly sales are frequently made by Nortel "Limited Risk Distributors", which have no long term of valuable rights to Nortel IP or to make sales of Nortel product (annually renewable agreements).

Alcatel have provisionally allocated US$ 52m to customer contracts.

NNUK had major customers for UMTS access business, Vodafone and O2, and for the reasons above the revenues earned from those customers were attributed to NNUK. In 2006 the total UMTS revenues were US$ 455m, of which US$ 367m were derived from Vodafone and O2 group companies. As a result NNUK has been allocated some US$ 42m of the provisional total customer contract consideration.

It is considered that this consideration is "grandfathered" goodwill, intangible consideration derived from a business conducted on 31 March 2002, and as such

V2: Revised 17/04/07

Confidential

EMEAPROD2285663

represents capital gain proceeds.

## 8.2 Intellectual Property

This has been allocated amongst the participants in the Nortel Master R&D Agreement, which governs their individual interest in the IP and their participation in the profits derived from its exploitation. The actual allocation is proportionate their individual share in Residual Profits as at 31 December 2006, which is found by the proportionate individual historic contribution to group R&D spend. This formula is the subject of the Advanced Pricing Agreement application so the allocation adopted here may change on ultimate agreement of that application.

Alcatel provisionally allocated some US$ 162m to IP and on the basis of the above Nortel allocation of that sum NNUK received some US$ 8.8m.

It is considered that the NNUK rights under the master R&D Agreement consist of two assets. The first is the right to exploit Nortel IP in its designated territory, the UK. The second is a participation in the profits from earned by other participants in the Master R&D Agreement from exploitation of the Nortel IP in their designated territories. The first right is clearly IP and the latter is considered to be goodwill and thus again a "grandfathered" intangible assets derived from a trade conducted at 31 March 2002 and thus accorded capital gain treatment.

To split the IP value between the two elements a turnover basis has been used. As noted above the total UMTS revenues in 2006 were US$ 455m of which US$ 95m were in the UK. Thus using the above formula 79.1% ([455 − 95]/455), some US$ 6.9m, is attributable to goodwill, leaving some US$ 1.9m as IP.

It is recognised that of the element of the consideration to be treated as IP there has to be some part that it is attributable to post 31 March 2002 assets as technology has been developed. In practice it is impossible to allocate value to such developments. It is proposed that to further split the IP consideration between "new scheme" and "grandfathered" value the amortisation of R&D spend used in the Advanced Pricing Agreement application be used. This amortises R&D at 30% reducing balance to reflect the declining value of technology. Using

V2: Revised 17/04/07

Confidential                    EMEAPROD2285664

this amortisation formula any IP in existence at 31 March 2002 would have been depreciated by 81.6% by 31 December 2006.

Using this method of the IP consideration 18.4% is treated as capital gain consideration, US$ 350k, and the balance US$ 1.55m will fall to be treated as ordinary Case I income.

**8.3 Goodwill**

This has been allocated amongst all Nortel vendors on a three factor formula taking assets, people and revenues.

The provisional Alcatel allocation is US$ 10.6m, and US$ 1.1m has been allocated as a receipt to NNUK and is considered "grandfathered" goodwill and thus capital gain consideration.

Although there may be base cost (31 March 1982 value and perhaps subsequent cost) and indexation relief in the capital gains assets sold here no effort will be made to establish these potential deductions from consideration.

V2: Revised 17/04/07

Confidential

EMEAPROD2285665

4

This is Exhibit "N" referred to in the Affidavit of AYLWIN KERSEY STEPHENS sworn April 11, 2014

_Commissioner for Taking Affidavits (or as may be)_

**To:**        'Welch, Colin (LBS CT Bristol)'[colin.welch@hmrc.gsi.gov.uk]
**Cc:**        'Randall, Nick (LBS CT Bristol)'[nick.randall@hmrc.gsi.gov.uk]; Burke, Lisa
(MOP:7500)[LISABU@nortel.com]
**From:**      Stephens, Kerry (MOP:7500)
**Sent:**      Fri 03/08/2007 10:08:02 AM
**Subject:**   RE: UMTS Sale

Colin,

I am most grateful for the rapid turn around.

Regards, Kerry

_____

Kerry Stephens
Nortel Networks
Tax Department - EMEA
Tel : +44 (0)1628 437439 ESN 560-7439
Fax: +44 (0)1628 437378 ESN 560-7378
E Mail: kerrys@nortel.com
_____

The information contained in this message may be privileged and confidential and protected from
disclosure. If the reader of this message is not the intended recipient, or an employee or agent
responsible for delivering this message to the intended recipient you are hereby notified that any
dissemination, distribution or copying of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by replying to the message and deleting it from your
computer.

-----Original Message-----
From: Welch, Colin (LBS CT Bristol) [mailto:colin.welch@hmrc.gsi.gov.uk]
Sent: 03 August 2007 10:51
To: Stephens, Kerry (MOP:7500)
Cc: Randall, Nick (LBS CT Bristol)
Subject: UMTS Sale

Kerry

Thank you for your email to Nick on 1 August 2007 in which you provided final settlement figures.

I can confirm that the settlement figures do not alter our view and we are still prepared to accept the tax
analysis set out in your email of
23 April 2007.

Kind regards

Colin Welch
(Tax Specialist)

Large Business Service CT Bristol
1st Floor
101 Victoria Street
Bristol

EMEA1000000720

BS1 6DQ

0117 983 8320

The information in this e-mail and any attachments is confidential and may be subject to legal professional privilege. Unless you are the intended recipient or his/her representative you are not authorised to, and must not, read, copy, distribute, use or retain this message or any part of it. If you are not the intended recipient, please notify the sender immediately.

HM Revenue & Customs computer systems will be monitored and communications carried on them recorded, to secure the effective operation of the system and for lawful purposes.

The Commissioners for HM Revenue and Customs are not liable for any personal views of the sender.

This e-mail may have been intercepted and its information altered.

The original of this email was scanned for viruses by the Government Secure Intranet Anti-Virus service supplied by Cable&Wireless in partnership with MessageLabs. (CCTM Certificate Number 2006/04/0007.) On leaving the GSi this email was certified virus free.
Communications via the GSi may be automatically logged, monitored and/or recorded for legal purposes.

EMEA1000000720