

Court File No. 09-CL-7950

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

## EXPERT REPORT OF RICHARD V.L. COOPER

(Submitted by the EMEA Debtors)

January 24, 2014

Case 09-10138-MFW    Doc 13653    Filed 05/28/14    Page 2 of 56

January 24, 2014                                                                      Charles River Associates

Table of Contents

**Table of Contents** ................................................................................................................ i

**1    Glossary of Defined Terms** ..................................................................................... iii

**2    Introduction and Scope of Review** .........................................................................1

    2.1    Background .............................................................................................................1

    2.2    Assignment ............................................................................................................3

    2.3    Credentials .............................................................................................................4

    2.4    Documents and Other Information Considered or Relied Upon ...........................6

    2.5    Summary of Opinions ...........................................................................................6

        2.5.1    The EMEA Debtors' Allocation Position ...................................................6

        2.5.2    The Canadian Debtors' Allocation Position ...............................................9

**3    Transfer Pricing Principles and their Application by Nortel** ...................................10

    3.1    Overview of Transfer Pricing Principles ...........................................................10

        3.1.1    Transfer Pricing Methodologies ...............................................................10

        3.1.2    The Residual Profit Split Method (RPSM) ...............................................12

    3.2    Nortel's Implementation of Transfer Pricing .....................................................13

        3.2.1    1992-2000:  Cost Sharing ........................................................................13

        3.2.2    2001-2008:  Residual Profit Split Methodology (RPSM) ........................15

    3.3    Appropriateness of Nortel's Adoption of RPSM ...............................................22

**4    EMEA Debtors' Allocation Position** .........................................................................24

    4.1    Consistency with Transfer Pricing and Arm's Length Principles ......................24

    4.2    Consistency with Tax Representations ...............................................................26

    4.3    Consistency with Business Arrangements ..........................................................28

        4.3.1    Consistency with the Principles Embodied in the RPSM and the MRDA28

        4.3.2    Consistency with Nortel's Prior Practice ..................................................30

    4.4    Nortel's Underestimate of Useful Life ...............................................................31

**5    Canadian Debtors' Allocation Position** ....................................................................32

January 24, 2014                                                   Charles River Associates

5.1     Inconsistency with Transfer Pricing and Arm's Length Principles ....................33

5.2     Inconsistency with Tax Representations................................................................34

5.3     Inconsistency with Business Arrangements .........................................................35

**Appendices ...................................................................................................................38**

A.      Richard V.L. Cooper's CV ...................................................................................38

B.      Summary of Richard V.L. Cooper's Deposition and Trial Testimony................38

C.      Documents Considered or Relied Upon ...............................................................38

D.      Acknowledgment of Expert's Duty .....................................................................38

**Exhibit 1:  R&D Spend, 2001-2008 .......................................................................38**

# 1    Glossary of Defined Terms

Alcatel or Alcatel Lucent:  Alcatel-Lucent S.A.

APA:  Advanced Pricing Arrangement or Advanced Pricing Agreement.

Apple:  Apple, Inc.

Business Sales:  The sales of the eight operating global lines of business of the Nortel group:  Layer 4-7, CDMA and Long Term Evolution Access, Next Generation Packet Core, Enterprise, Metro Ethernet Networks, GSM/GSM-R, Carrier Voice over Internet Protocol and Applications Solutions, and Multi-Service Switch Assets.

CALA:  The region including the Caribbean and Latin America.

Canadian Debtors:  NNC, NNL, and certain of their Canadian affiliates that filed for protection under the Canadian Companies' Creditors Arrangement Act, pending before the Ontario Superior Court of Justice (Commercial List), including Nortel Networks Technology Corporation, Nortel Networks International Corporation, and Nortel Networks Global Corporation.

CDMA:  Code Division Multiple Access.

CRA:  Canada Revenue Agency.

CSA:  Cost Sharing Agreement.

EMC:  EMC Corporation.

EMEA:  The region including Europe, the Middle East, and Africa.

EMEA Debtors:  NNUK and certain of the Nortel entities whose registered offices were in EMEA, including Nortel GmbH; Nortel Networks N.V.; Nortel Networks S.p.A.; Nortel Networks B.V.; Nortel Networks Polska Sp. Z.o.o.; Nortel Networks Hispania S.A.; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service K.f.t.; Nortel Networks Portugal S.A.; Nortel Networks Slovensko s.r.o.; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; and Nortel Networks International Finance & Holding B.V.; Nortel Networks (Ireland) Limited; Nortel Networks S.A.; and Nortel Networks France S.A.S.

Entrepreneurs:  The Nortel entities that jointly created Nortel's IP, including NNUK, NNSA, NNIR, NNL, and NNI.

Ericsson:  Telefonaktiebolaget LM Ericsson.

GSM:  Global Systems for Mobile.

GSM-R:  Global System for Mobile communications for Railways.

<u>HMRC</u>:  Her Majesty's Revenue & Customs.

<u>IP</u>:  Intellectual Property.

<u>IRS</u>:  Internal Revenue Service.

<u>IP Sale Proceeds</u>:  The amount attributable to IP within the proceeds of the Business Sales and the Residual IP sale.

<u>Joint Administrators</u>:    The court-appointed administrators and authorized foreign representatives for the EMEA Debtors in insolvency proceedings before the High Court of Justice of England and Wales.  The Joint Administrators for all of the EMEA Debtors, with the exception of NNIR, are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.   The Joint Administrators for NNIR are:  Alan Robert Bloom and David Martin Hughes.  The Joint Administrators also represent the directors of Nortel Networks Scandinavia AS, Nortel Networks South Africa (Proprietary) Limited, and Nortel Networks A.G.

<u>Layer 4-7</u>:  The software applications used in the data transport and application data layers (*i.e.*, Layers 4 to 7) of the Open Systems Interconnection Standard.

<u>MRDA</u>:  Master Research and Development Agreement.

<u>Microsoft</u>:  Microsoft Corporation.

<u>NNC</u>:  Nortel Networks Corporation.

<u>NNI</u>:  Nortel Networks Inc.

<u>NNIR</u>:  Nortel Networks (Ireland) Limited.

<u>NNL</u>:  Nortel Networks Limited.

<u>NNSA</u>:  Nortel Networks S.A., also referred to as NN France.

<u>NNUK</u>:  Nortel Networks UK Limited.

<u>R&D</u>:  Research and development.

<u>R&D Capital Stock</u>:    Under the MRDA, a measure of an Entrepreneur's R&D contribution.

<u>Residual IP</u>:  Nortel IP that remained after the Business Sales and that was sold to Rockstar Bidco, a consortium made up of Apple, EMC, Microsoft, RIM, Sony, and Ericsson.

<u>RIM</u>:  Research In Motion Ltd.

<u>RPSM</u>:  Residual profit split method.

<u>RPS</u>:  Residual profit split.

<u>Sony</u>:  Sony Corporation.

<u>UMTS</u>:  Universal Mobile Telecommunications System.

<u>U.S. Debtors</u>:  NNI and certain of its affiliates, as debtors and debtors in possession in proceedings before the United States Bankruptcy Court for the District of Delaware, including Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros, Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.

## 2    Introduction and Scope of Review

### 2.1    Background

I, Richard V.L. Cooper, am a Vice President of Charles River Associates.  Charles River Associates has been retained by the Joint Administrators for Nortel Networks UK Limited ("NNUK") and certain of its affiliates in Europe, Middle East and Africa ("EMEA") through their counsel, Herbert Smith Freehills LLP, Hughes Hubbard & Reed LLP, Davies Ward Phillips & Vineberg LLP, and Lax O'Sullivan Scott Lisus LLP, in connection with the matter captioned *In re Nortel Networks Inc., et al*., pending in the United States Bankruptcy Court for the District of Delaware, Chapter 11 Case No. 09-10138 (KG),[1] and in connection with proceedings under the *Companies' Creditors Arrangement Act*, pending in the Ontario Superior Court of Justice (Commercial List), Court File No. 09-CL-7950.

On January 14, 2009, the Nortel group began insolvency proceedings in various jurisdictions.[2]  Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and certain of their Canadian affiliates[3] (collectively with the court-appointed monitor, Ernst & Young Inc., the "Canadian Debtors") filed for protection under the Canadian Companies' Creditors Arrangement Act.  Nortel Networks Inc. ("NNI") and some of its affiliates (collectively, as provided in footnote one, the "U.S. Debtors") filed for Chapter 11 relief under the United States Bankruptcy Code.  Nortel companies in EMEA were placed into administration in England by order of

---

[1]    The debtors in these Chapter 11 cases are:  Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros, Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.

[2]    Nortel Networks (CALA) Inc. filed for bankruptcy relief on July 14, 2009, but is being jointly administered with the U.S. Debtors' Chapter 11 cases.

[3]    Those affiliates include:  Nortel Networks Technology Corporation, Nortel Networks International Corporation, and Nortel Networks Global Corporation.

the High Court of Justice of England and Wales pursuant to the Insolvency Act 1986 (collectively, the "EMEA Debtors"[4]).

Between 2009 and mid-2011 Nortel sold off its major business lines and related assets in eight transactions (the "Business Sales") for approximately US$3.3 billion in cash proceeds.[5]   These sales each included substantial intellectual property ("IP"), including over 2,500 patents in the aggregate.[6]   The patents included in the Business Sales were limited to patents that passed the test of being used "predominantly" in the sold businesses.[7]   The Business Sales did not for the most part include patents the use of which was shared by more than one business, patents that were once used but were no longer being used, or patents that might have applied to proposed designs but for which products were not in the business's written Plan of Record or Plan of Intent.[8]

This left Nortel with more than 7,000 residual patents (the "Residual IP") that had been held back from the Business Sales.[9]   The Residual IP included many foundational and standard essential patents,[10] and had been retained with a view

---

[4]   NNUK and certain of the Nortel entities whose registered offices were in EMEA, including Nortel GmbH; Nortel Networks N.V.; Nortel Networks S.p.A.; Nortel Networks B.V.; Nortel Networks Polska Sp. Z.o.o.; Nortel Networks Hispania S.A.; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service K.f.t.; Nortel Networks Portugal S.A.; Nortel Networks Slovensko s.r.o.; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; and Nortel Networks International Finance & Holding B.V.; Nortel Networks (Ireland) Limited ("NNIR"); Nortel Networks S.A. ("NNSA"); and Nortel Networks France S.A.S.

[5]   Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 16, 2013, Schedule 3.

[6]   Expert Report of James E. Malackowski, submitted in connection with these proceedings (the "Malackowski Report"), Section 7.1.

[7]   John P. Veschi's deposition dated November 7, 2013, at pp. 122-127 (explaining how Veschi personally developed the predominant standard and how Nortel's business units successfully applied the standard); Gillian McColgan's deposition dated November 8, 2013, at p. 123 ("Predominant use standard had been agreed by the executives as the standard that would be used for assignment of patents to a business unit that was for sale.  If it met the standard of predominant use, it would be assigned to that division; if it didn't, it would be retained.").

[8]   Gillian McColgan's deposition dated November 8, 2013, at pp.124-133, 183-186.  Non-transferred patents that were needed for the acquired businesses were licensed under nonexclusive licenses, which were limited to the purchasers' respective fields of use.  *See* Christopher James Cianciolo's deposition dated October 15, 2013, at pp. 19-21; John P. Veschi's deposition dated November 7, 2013, at p. 128.

[9]   Malackowski Report, Section 7.2.

[10]   Deposition Exhibit ("Dep. Ex.") 11150 (CCC0001356), IP Aspects of Residual Co, 5 ("Many of these patents/apps likely have high value if packaged or licensed appropriately, there are still many standards related patents, also fairly broad range of technologies in Telecom and many other areas.").

toward a final IP-only sale of the remaining Nortel portfolio.[11]   On June 30, 2011, NNC announced that together with its subsidiary NNL and certain of its other subsidiaries, including NNI and NNUK, it had "concluded a successful auction of all of Nortel's remaining patents and patent applications," *i.e.*, the Residual IP.[12] Pursuant to the asset sale agreement, also dated June 30, 2011, between Nortel and a consortium of buyers including Apple, EMC, Ericsson, Microsoft, RIM, and Sony, Nortel was to be paid US\$4.5 billion in cash for the Residual IP.[13]   On July 11, 2011, the United States Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice approved the sale.[14]   The sale of the Nortel's group's Residual IP closed on July 29, 2011.[15]

## 2.2   Assignment

I have been asked to opine on certain issues in relation to the allocation of the amounts attributable to IP within the proceeds of the Business Sales and the Residual IP sale (collectively, the "IP Sale Proceeds").   In particular, with respect to that allocation, I have been asked to provide my opinion on the consistency of the allocation positions of the EMEA Debtors[16] and the Canadian Debtors[17] with (a) established transfer pricing and arm's length principles, (b) prior representations by Nortel to various tax authorities, including without limitation the Internal Revenue Service ("IRS"), the Canada Revenue Agency ("CRA") and Her Majesty's Revenue

---

[11]   John P. Veschi's deposition dated November 7, 2013, at pp. 122-128.

[12]   NNC Form 8-K dated June 30, 2011.

[13]   Dep. Ex. 22085 (NNI_00825094), Asset Sale Agreement dated June 30, 2011.

[14]   NNC Form 8-K dated July 11, 2011.

[15]   NNC Form 8-K dated July 29, 2011.

[16]   For the purposes of this report, I have considered the EMEA Debtors' allocation position to be reflected in (i) Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 16, 2013, and (ii) Joint Administrators' Response Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 29, 2013.   In paragraph 72 of the Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 16, 2013, the EMEA Debtors refer to "non-Arm's Length transactions which enabled some [parties] to invest more in R&D or which resulted in other [parties] being less able to so invest."   I have been instructed not to consider this argument in my evaluation of the EMEA Debtors' allocation position.

[17]   For the purposes of this report, I have considered the Canadian Debtors' allocation position to be reflected in (i) Allocation Position of the Monitor and Canadian Debtors dated May 16, 2013, and (ii) Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings of the Other Core Parties dated May 29, 2013.

and Customs ("HMRC"), and (c) the business arrangements among the Nortel entities from 2001 forward, as confirmed in (1) the principles embodied in the Nortel group's transfer pricing methodology, the Residual Profit Split Method ("RPSM"), and the Nortel group's Master Research and Development Agreement effective January 1, 2001 (the "MRDA," as amended[18]), and (2) prior Nortel practice in allocating proceeds of IP exploitation that technically fell outside the strict terms of the MRDA.[19]

I understand and acknowledge that, although I have been retained by the Joint Administrators for the EMEA Debtors, my over-riding duty is to the courts and includes the obligations (a) to provide opinion evidence that is fair, objective, and non-partisan; (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and (c) to provide such additional assistance as the courts may reasonably require to determine a matter in issue.

## 2.3    Credentials

As noted above, I am currently a Vice President of Charles River Associates, based in the firm's Chicago, Illinois office where I focus primarily on transfer pricing and valuation engagements.  Prior to joining Charles River Associates in 2009, I was a Managing Director at Houlihan Lokey Howard & Zukin, where I built and managed the transfer pricing and analytics-based consulting practice.  Prior to joining Houlihan Lokey Howard & Zukin in 2007, I was a Senior Managing Director of FTI Consulting.  Before joining FTI Consulting, I was a partner at Ernst & Young, where I co-chaired the firm's Transfer Pricing practice and then later headed the firm's Economics & Business Analytics practice.  Earlier in my career, I was a partner at Coopers & Lybrand and was responsible for the firm's Economics & International Trade Services practice.  I also spent the first eight years of my professional career at the Rand Corporation.

I have more than 30 years of professional consulting experience and, for the past 25 years, have focused principally on transfer pricing and valuation.  Over this period, I have conducted more than 500 transfer pricing and/or valuation projects and have been named in the Expert Guides published by the International Tax Review/Legal

---

[18]   Dep. Ex. 21003 (NNC-NNL06001514).

[19]   By "…that technically fell outside the strict terms of the MRDA," I am referring to events that I describe later in this report.  Specifically, Nortel received proceeds on the sale of a business and through a settlement of a litigation concerning infringement of Nortel's IP rights.  Although both of these situations technically fell outside the MRDA, I believe they fell within the intent of Nortel's RPSM and Nortel itself chose to treat these events within the framework of the RPSM.

January 24, 2014                                                    Charles River Associates

Media Group as one of the world's leading transfer pricing advisors from the time that the Expert Guides series was first published in 1999.[20]  My transfer pricing and valuation projects have covered a broad range of issues and situations, including the valuation of entities, the sale of tangible property, the valuation and/or transfer of intangible property, royalties, cost sharing, residual profit sharing, performance of services, contract manufacturing, contract research and development ("R&D"), leasing, and intercompany loans and advances. In my transfer pricing and valuation work, I have advised both companies and tax authorities (the IRS, CRA, HMRC, and state revenue authorities, among others).

I have an undergraduate degree and M.A. in Economics from UCLA.  I earned my Ph. D. degree, also in Economics, from the University of Chicago in 1971.  I have previously served as an expert witness and those appearances have included testimony before the U.S. Tax Court, Congressional Committees, the U.S. International Trade Commission, and arbitration proceedings. I am or have been a member of many international business organizations and was appointed to the Industry Sector Advisory Committee on Trade in Services by the U.S. Secretary of Commerce.  I have taught economics, econometrics, and international business and tax courses at both the undergraduate and graduate levels at UCLA, UCSB, Georgetown University, the University of Hawaii, and the Rand Graduate Institute.  I have been a frequent speaker on valuation, transfer pricing, and business strategy, having given more than 250 speeches and presentations around the world on these and related topics.

A more comprehensive description of my relevant experience is contained in my curriculum vitae, which can be found as Appendix A to this report.  Also included as Appendix B is a list of cases in which I have provided deposition and/or trial testimony during my career.

My time is being billed at a rate of $815 per hour in connection with my work on this case.  Other Charles River Associates personnel assisting me in connection with my work on this matter are also being billed at their customary hourly rates.  No portion of the compensation related to my work in this case is dependent upon the outcome of this matter.

---

[20]   The Transfer Pricing Expert Guides were published in '99, '01, '03, '05, '07, '09, and '11.

**2.4     Documents and Other Information Considered or Relied Upon**

In connection with my work on this matter, I and/or members of my staff have
reviewed and analyzed, among other things, certain documents and information
produced in this case, contemporaneous business records, depositions taken in the
case to date, and certain information derived from publicly available sources and
other subscription services.   A listing of information that has been considered in
rendering the opinions set forth herein is included as Appendix C to this report.

The opinions expressed in this report are based on information available to me as of
the date of this report.   To the extent documents or other information that might affect
the opinions and conclusions expressed herein should become available subsequent to
the submission of this report, I reserve the right to supplement and/or amend this
report on that basis, or for other reasons.

**2.5     Summary of Opinions**

Based upon my knowledge of transfer pricing principles generally and in particular of
those applicable to the RPSM used by Nortel during the period of January 1, 2001
through December 31, 2008, and the work I have performed to date in reviewing the
business arrangements among the relevant Nortel entities, and the representations
made to the relevant tax authorities, I have concluded the following:

**2.5.1     The EMEA Debtors' Allocation Position**

According to the EMEA Debtors' allocation position, each of the parties is entitled to
a share of the IP Sale Proceeds based on its relative contribution to the creation of the
IP.   That relative contribution, according the EMEA Debtors, should be measured
based on the parties' investments in R&D, or "R&D spend."   Further, I understand
that the EMEA Debtors take the position that R&D spend should be calculated based
on the same principles on which the parties calculated it prior to Nortel's insolvency
proceedings.[21]

At the time of insolvency, five entities performed R&D under the MRDA:   three
entities in EMEA – NNUK, NNSA, and NNIR; one entity in the U.S. – NNI; and one
entity in Canada – NNL (each of these, an "Entrepreneur").   The position of the
EMEA Debtors is that the Entrepreneurs – sometimes described as the Residual Profit
Entities – were the economic and beneficial owners of Nortel's IP and are entitled to
share in the economic benefits flowing from that IP (including from both its

---

[21]   As discussed below, the EMEA Debtors take the position that Nortel underestimated the useful life of its
IP, which had the effect of discounting or ignoring older R&D contributions.

exploitation and sale) in proportion to their respective contributions to the creation of the IP, which in the context of the operation of the Nortel group is best measured by each Entrepreneur's respective investment in R&D.[22]

In my opinion, the EMEA Debtors' allocation position is consistent with (a) established transfer pricing and arm's length principles, (b) prior representations by Nortel to various tax authorities, including without limitation the IRS, the CRA, and HMRC, and (c) the business arrangements among the Nortel entities from 2001 forward, as confirmed in (1) the principles embodied in the RPSM and the MRDA, and (2) prior Nortel practice in allocating proceeds of IP exploitation that technically fell outside the strict terms of the MRDA.  I have reached this conclusion based on the following considerations (each of which is developed in greater detail in the body of this Report):

a. *Consistency with Transfer Pricing and Arm's Length Principles*.  Where various legal entities of an integrated enterprise share the costs and bear the risks of jointly creating the assets that drive the profitability of the enterprise, the RPSM is an appropriate method for allocating non-routine (*i.e.*, "residual") profits (or losses) derived from those assets to those entities on a year-to-year basis and into the future.  Given the integrated nature of Nortel's enterprise and technology, the fact that IP was a key profit driver in its business, and the fact that a number of legal entities within the Nortel group (*i.e.*, the Entrepreneurs) shared the costs and bore the risks of jointly developing the IP, the use of the RPSM to allocate residual profits (or losses) among the Entrepreneurs was a reasonable choice for Nortel.  Further, it is my view that, because Nortel's IP was the result of expenditures on R&D, it was reasonable for Nortel to use the relative monetary contributions by the Entrepreneurs to R&D as the criterion ("allocation key") for dividing the residual profits among them.

When the assets responsible for driving the residual profits are sold, according to transfer pricing and arm's length principles, the sales proceeds should presumptively be allocated on the same basis that annual trading profits and losses from those assets were to have been allocated.  The RPSM applies to both current and future profits generated on the IP, and a sale of the underlying IP is nothing more than the monetization of those future profits.  Since the RPSM anticipates that the future profits from the specified assets

---

[22]  In this context, I understand the terms "beneficial," "economic" and "equitable" to be essentially synonymous.

would be allocated the same way as the current profits, then the same reasoning (and resultant allocation) should presumptively apply to the sales proceeds as well.

However, notwithstanding the foregoing opinions concerning the appropriateness of Nortel's use of the RPSM and of the type of allocation key that it chose, I understand from the Malackowski Report that Nortel used a method that resulted in an understatement of the useful life of its IP for determining what amounts spent on R&D would be considered in calculating each Entrepreneur's contribution to R&D. As implemented, therefore, the RPSM either disregarded altogether or undervalued earlier investments in IP that were highly valuable at the time of sale. As described later, it is reasonable to use a more accurate measure of the Entrepreneurs' respective contributions.

b. *Consistency with Tax Representations*. The EMEA Debtors' allocation position is consistent with Nortel's numerous submissions to tax authorities over the course of more than five years during which Nortel sought to obtain Advance Pricing Agreements ("APAs") from the tax authorities for approval of its RPSM. In those submissions, Nortel confirmed that R&D was critical to the Nortel business and that the Entrepreneurs bore the full risk – including the upside – of the Nortel business. Those submissions also demonstrated how IP was jointly created through the efforts of each of the Entrepreneurs and they confirm that each of the Entrepreneurs held an economic interest in the IP.

c. *Consistency with Business Arrangements*. The EMEA Debtors' allocation position is also consistent with the Entrepreneurs' business arrangements. In their business arrangements, each of the Entrepreneurs held an economic interest in the proceeds from the worldwide exploitation of the entire pool of Nortel IP, calculated in accordance with the RPSM, and, as such, they were beneficial owners of the IP. Those business arrangements were confirmed in the MRDA, which required that the Entrepreneurs divide residual profits in proportion to their respective R&D contributions. Those arrangements were also confirmed in the Entrepreneurs' division of proceeds from IP that did not fall within the terms of the MRDA. Thus, when Nortel sold a business along with certain of its IP just a few years prior to the insolvency, the proceeds from that IP were divided in accordance with the Entrepreneurs' relative R&D contributions. Similarly, in a significant settlement arising from claims of IP infringement, Nortel divided the settlement amounts in accordance with the Entrepreneurs' R&D contributions.

### 2.5.2    The Canadian Debtors' Allocation Position

The Canadian Debtors take the position that, because NNL held legal title to Nortel's IP, NNL alone is presumptively entitled to receive all of the proceeds from the sale of that IP. This allocation position is fundamentally flawed, and not consistent with (a) established transfer pricing and arm's length principles, (b) prior representations by Nortel to various tax authorities, including without limitation the IRS, the CRA, and HMRC, and (c) the business arrangements among the Nortel entities from 2001 forward, as confirmed in (1) the principles embodied in the RPSM and the MRDA, and (2) prior Nortel practice in allocating proceeds of IP exploitation that technically fell outside the strict terms of the MRDA.

a.  *Inconsistency with Transfer Pricing and Arm's Length Principles.* The Canadian Debtors equate the mere holding of legal title with entitlement to all of the economic benefits flowing from the Nortel IP. This is inconsistent with transfer pricing principles, which examine the economic substance of the relationships among entities in a corporate group in order determine their respective rights and confirm that relations are conducted on an arm's length basis. The facts of the present case show that title to Nortel IP was assigned to NNL for reasons of administrative convenience only, while the actual economic benefits derived from the IP were shared among NNL and the other Entrepreneurs in accordance with the RPSM. The assignment of legal title to NNL did not give NNL a greater right to receive those economic benefits than the other Entrepreneurs. The fact that NNL held legal title to the IP should therefore, in my opinion, be given no weight or significance in determining the proportion of the IP Sale Proceeds to which NNL is entitled.

If accepted, the Canadian Debtors' allocation position would result in a huge windfall, because such an allocation would benefit the Canadian Debtors far beyond what they contributed to the creation of the IP or could reasonably expect to receive based on the pre-insolvency economic arrangements between the group companies. This would result in a transfer of wealth from the other Entrepreneurs to NNL without payment by NNL.

b.  *Inconsistency with Tax Representations.* What the Canadian Debtors are proposing is also inconsistent with the Nortel group's representations to the tax authorities from at least 2001. Nortel represented that the group's IP was created and exploited in a decentralized manner, with distributed assumption of economic risk, and therefore that each Entrepreneur had a right to share equitably in the proceeds of the jointly-created IP. NNL and the other Entrepreneurs all benefited from these representations by obtaining the favorable tax treatment they had sought.

  c. *Inconsistency with Business Arrangements*.  The Canadian Debtors' allocation position is also inconsistent with the business arrangements that governed the Entrepreneurs' split of residual profits in the period 2001-2008.  The Canadian Debtors now seek to cherry-pick rights from the MRDA (*i.e.*, NNL's right to legal title of Nortel's IP), while eliminating the concomitant rights of the other Entrepreneurs (*i.e.*, to receive a proportional share of the economic benefits derived from exploiting Nortel's IP).

Finally, the Canadian Debtors cannot reconcile their allocation position with the Entrepreneurs' treatment of IP proceeds from a major pre-petition disposition and a significant settlement of IP infringement claims, where the amounts were divided in accordance with R&D contribution (and not legal title).

# 3  Transfer Pricing Principles and their Application by Nortel

## 3.1  Overview of Transfer Pricing Principles

Revenue authorities such as the IRS, the CRA, and HMRC assess tax liabilities based on economic realities (*i.e.*, the true costs and benefits of the company's operations), whether or not such realities are reflected in the company's books and records.  "Transfer pricing" is a tool used to evaluate and, if necessary, assign prices reflecting economic realities in transactions and activities among divisions or constituents of commonly controlled enterprises.  It is motivated by the fact that such enterprises are subject to tax in multiple jurisdictions, and that relevant tax authorities will not want to see taxable revenue shifted out of their jurisdictions as a result of non-arm's length intercompany pricing.  Transfer pricing evaluates whether pricing meets the arm's length standard, and, if not, adjusts the pricing associated with related party transactions to approximate the corresponding pricing that would have applied in arm's length transactions.  The result of properly functioning transfer pricing arrangements is that income is recorded in the appropriate legal entity based on what that legal entity would have earned had it participated in the activities in question purely on an arm's length basis.  One place transfer pricing comes into play is where, as here, related companies share in R&D activities and expenses and transfer substantial value internally.

### 3.1.1  Transfer Pricing Methodologies

It is common in transfer pricing to distinguish between intangibles on the one hand and everything else on the other.  The reason is simple:  it is much easier to benchmark the prices or returns for the "everything else" (tangible property, services, loans and advances, *etc*.) than it is for intangibles.  When there are residual profits, it is al-

most always due to intangibles, be they technology, marketing, process, or something else that is special and/or unique.

In a multi-national enterprise with two or more entities, for business purposes, tax purposes, or both, it often makes sense for the entities that comprise the enterprise to jointly create the intangibles and to share the resulting profits and losses. There are two principal transfer pricing methodologies for accomplishing this: cost sharing and profit split.

Under a cost sharing arrangement, participating entities share in the cost of developing the intangibles according to the value each receives from the use of the intangibles. In my experience, it is most common to assign cost sharing rights and responsibilities according to geographic territories.[23] In this instance, a cost sharing participant's cost share is proportionate to the economic benefit the participant receives from the intangibles in its geographic territory as compared with the economic benefit derived from the intangibles worldwide. One way to measure that benefit is to consider the amount of revenue earned in a territory as compared with revenue worldwide.

Under a profit split, participating entities share the profits (or losses) in part according to their contributions to the creation of the intangibles responsible for the profits. For example, if profits are seen to arise primarily from marketing intangibles, the profit shares might be determined according to the amount that each entity spent on developing those marketing intangibles.

Thus, at a high level, cost sharing and profit split can be seen as mirror images of one another:

- Cost sharing arrangement – the economic benefit received by each entity determines what it owes for its cost share; and
- Profit split – the amount contributed to developing the intangibles (its "share of costs," if you will) determines the economic benefit that each entity receives.

In both cases – cost sharing and profit split – each participating entity receives its appropriate share of proceeds from the intangibles in which it had invested.

---

[23] Although it is much less common in my experience, one could conceivably use another basis for cost sharing. For example, cost shares might be allocated according to specific categories of intangibles. No matter what basis is used, however, the actual cost shares are determined according to the benefit received.

The most common version of profit split in my experience is the residual profit split method, or RPSM.[24]

### 3.1.2  The Residual Profit Split Method (RPSM)

RPSM was developed as a method for recognizing explicitly that an enterprise's profit often derives from two broad sources: (1) the routine functions that it performs, and (2) the intangibles that it owns. RPSM consists of two steps.

1. *Identifying "Routine" Profits.* The first step is to reward those functions that can be viewed as "routine" with the "routine" profits that such functions would normally receive in the marketplace. For example, controlled entities that perform distribution would, under this approach, be compensated for their distribution function in an amount similar to what unrelated distributors performing similar functions and operating in similar industries and geographies earn. Once all of the so-called routine functions have been compensated, the amounts are summed and then subtracted from the enterprise's total profit. The resulting amount is what is termed the "residual profit," which may in reality turn out to be a profit or a loss. This completes the first step in the RPSM.

2. *Allocation Key(s): Allocating the portion of Profits or Losses that was Over and Above those which were Routine.* The second step in the RPSM concerns how to apportion the remaining profit or loss among the entities that are participating in the split of this residual profit. This apportionment of residual profit is determined by one or more allocation keys. In order to properly implement an RPSM, one must find an allocation key that reflects the principal "driver" or source of the residual profit. Such allocation key should be based on the underlying economics of the business. Three examples illustrate the point:

- As a first and simple example, consider the case of a professional services firm. It is not uncommon for a professional service firm, for instance, to allocate at least some of its "residual" profit to its residual profit participants (typically partners or officers in the firm) according to the amount of fees generated by each participant. In this case, a relatively simple current measure (fees generated) is the allocation key used to allocate current residual profits.
- Alternatively, consider the case of a pharmaceutical company, whose profits might be determined significantly by drugs based on patents issued years ago,

---

[24] The other form of profit split is the comparable profit split (CPS). In my experience, this is far less common because it is so rare to find comparable profit splits among unrelated parties. In fact, in my 25 years conducting transfer pricing analyses, I personally have only seen one CPS.

which in turn resulted from R&D performed years before that.  In this in-
stance, even though the company knows that drug sales can ultimately be
traced back to R&D, it does not know the exact relationship, but it can posit a
relationship.  If what it posits is "reasonable," it can base its allocation of re-
sidual profits – *i.e.*, transfer pricing – on this.

- A third and similarly complicated example might be a consumer products
technology company, whose profits the company believes are determined sig-
nificantly by both the new products that it develops and the brand image that it
has carefully cultivated.  Because the company spends heavily on both R&D
to generate new products and marketing to create brand image, the company
believes that R&D spending and spending on marketing should both be used
as allocation keys.

Although considerable thought and effort goes into choosing the appropriate alloca-
tion key(s), as illustrated in the above examples, a very important point to note is that
no one expects the allocation key(s) to be 100% accurate in an *ex post* sense.  For ex-
ample, every dollar spent on R&D will not be equally effective after the fact.  There
could be two R&D projects that cost the same.  One might result in a blockbuster
product, while the other yields only duds.  Similarly, one advertising campaign might
be very successful while another is not.  Instead, the allocation keys provide a reason-
able *ex ante* basis for sharing the residual profits and losses.

## 3.2    Nortel's Implementation of Transfer Pricing

### 3.2.1    1992-2000:  Cost Sharing

Prior to 2001, Nortel relied on cost sharing as its transfer pricing method for sharing
intangibles among certain of its operating entities.[25]

In essence, under Nortel's cost sharing arrangements ("CSAs"), a participant shared
in the costs of R&D performed globally in proportion to the economic benefit
received by the participant in its geographic territory.[26]  That benefit was measured by

---

[25]   *See* Dep. Ex. 22123 (EY-NRTL-000023), Thomas Horst et al., Economic Analysis of Nortel Networks'
Intercompany Transactions, 10 (EY-NRTL-000038) ("Horst Frisch Report") (2002); *see*, *e.g.*, Dep. Ex.
21002 (NNC-NNL 006440), Amended Research and Development Cost Sharing Agreement Between
Northern Telecom Limited and Northern Telecom Inc., dated Jan. 1, 1992; Dep. Ex. 33067
(NNI_00794545), Research and Development Cost Sharing Agreement between Northern Telecom Limited
and Nortel Limited, effective Jan. 1, 1995 ("NNUK CSA").

[26]   Thus, Nortel's cost sharing arrangement was of the more common type (as mentioned above) in which cost
sharing rights are assigned by geographic territory.

a formula in which a modified version of operating income (as defined in the CSAs) was the predominant factor.[27]

In Nortel's case, matching a participant's R&D cost obligation with the participant's territorial income was reasonable. Nortel's R&D function was a "global undertaking."[28] The R&D performed by a participant, however, was not necessarily proportionate to the economic benefits of that R&D in the participant's geographic territory. If the benefit received by a cost share participant exceeded its R&D expense, the participant was charged a cost share adjustment; conversely, if the cost share participant's R&D expense was greater than its benefit, the cost share participant received a credit.

Nortel's cost sharing arrangements had specific provisions concerning legal title of Nortel IP and the participants' economic or beneficial interests in that IP, as well as some necessary implications:

- Legal title to Nortel IP was "vested in" NNL.[29]

- Each R&D cost sharing participant had an exclusive license of Nortel's IP in its operating territory.[30]

- The exclusive licenses provided a form of "beneficial ownership" of the Nortel IP within the participant's operating territory;[31] the participant could use the IP in that territory without paying royalties to the other participants and could enforce the IP against infringers in the territory.[32]

- As noted by Horst Frisch, which assisted Nortel in connection with transfer pricing in the early 2000s, "[f]rom an economic standpoint, each R&D cost sharing participant could be considered to 'own' the NT technology [*i.e.*, Nortel IP] as it related to its specific region."[33]

---

[27] *See*, *e.g.*, NNUK CSA, Art. 3, at NNI_00794547-51.

[28] Dep. Ex. 21407 (NNI_01333113), Nortel Networks Functional Analysis for the years ended December 31, 2000-2004 ("Functional Analysis"), 18.

[29] *See*, *e.g.*, NNUK CSA, Art. 4, at NNI_00794551.

[30] *See*, *e.g.*, NNUK CSA, Art. 5, at NNI_00794551-52.

[31] Dep. Ex. 21003, MRDA at NNC-NNL06001514/2 (referring to pre-existing arrangements).

[32] *See* NNUK CSA, Art. 5, Art. 7, at NNI_00794551-53.

[33] *See* Dep. Ex. 22123, Horst Frisch Report at 10 (EY-NRTL-000038).

In sum, under the cost sharing arrangements, each Nortel participant paid for Nortel IP (through its calculated share of the group's R&D costs) on an arm's length basis and owned that IP as it related to its territory.

The CSA arrangements were eventually terminated effective as of the end of 2000.[34] When the CSA arrangements were terminated, the Entrepreneurs determined that they would "mutually agree upon a basis to equitably apportion the benefits resulting from their collective contributions to research and development expenses during 2001 and prior years and [would] formalize their agreement upon such basis in an agreement as soon as practicable."[35]

### 3.2.2   2001-2008:  Residual Profit Split Methodology (RPSM)

### 3.2.2.1 Reasons for Adoption of the RPSM

For a variety of reasons, Nortel changed from its historic cost sharing arrangement to an RPSM, effective January 1, 2001.[36]  Chief among those reasons were: (1) that Nortel recognized that IP had increasingly become a principal "value driver,"[37] (2) that the R&D that led to this IP was interrelated, shared, and performed jointly by the Entrepreneurs,[38] and (3) that the numerous acquisitions by Nortel during the 1990s and 2000 had created difficult tax problems, such as buy-in payments required under cost-sharing.[39]

Nortel repeatedly memorialized the importance of IP to its profitability, as reflected in the MRDA,[40] representations to tax authorities,[41] and the testimony of senior tax

---

[34]   *See*, *e.g.*, Dep. Ex. 31016 (NNC-NNL08000141), Termination of Research and Development Cost Sharing Agreement.

[35]   *See*, *e.g.*, Dep. Ex. 31016 (NNC-NNL08000141), Termination of Research and Development Cost Sharing Agreement, at 1.

[36]   *See* Dep. Ex. 21003, MRDA at NNC-NNL06001514/1.

[37]   Dep. Ex. 22020 (NNI_00327110), APA Kick Off Meeting: Potential Questions and Sample Answers ("APA Kick Off Meeting"), 1 (NNI_00327110).

[38]   Dep. Ex. 21407, Functional Analysis at 18-30.

[39]   *See* Dep. Ex. 22123, Horst Frisch Report at Table 1 (EY-NRTL-000086) (listing Nortel's eighteen major acquisitions between 1998 and 2000); Dep. Ex. 21384 (NNL00697106), Overview of Transfer Pricing APA and Recommendation, 6 (in the period 1998-2000, Nortel acquired companies with an aggregate value of over $29 billion); Dep. Ex. 21407, Functional Analysis at 104-09 (summarizing Nortel's twelve major acquisitions in 2000-2001); Dep. Ex. 21384 (NNL00697106), Overview of Transfer Pricing APA and Recommendation, 5 (summarizing problems with the CSAs).

[40]   Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18 (identifying the "development and maintenance" of IP as the "key profit driver in the Nortel business").

personnel at Nortel.[42]  For example, in Nortel's "Multilateral APA Response to IRS Information and Document Request for a Functional Analysis," also provided to the Canadian and U.K. tax authorities, Nortel's tax advisor explained that Nortel's success was tied to its "critical R&D activities," and therefore the entities performing that R&D should "share equitably" in residual profits (and losses):

> The key functional activity performed by the APA Participants is R&D. Together, the APA Participants perform most of Nortel's critical R&D activities.  Ultimately, Nortel's success or failure is driven by the outcome of its continuing R&D investments.  R&D is the primary contributor to the success of Nortel's operations.  Nortel's customers choose Nortel products and services because Nortel is viewed as a technology leader in its market and because Nortel is committed to using its R&D resources in providing full pro-active services and support to its customers.  *Consistent with this and the functions performed and risks assumed, each APA Participant should share equitably in the residual profits and losses of Nortel.*[43]

Nortel also repeatedly represented to the tax authorities the shared and interrelated nature of its R&D.  Nortel's IP was jointly created by the Entrepreneurs.[44]  The R&D

---

[41]  Dep. Ex. 21407, Functional Analysis at 17 ("Research, design and development are the primary contributor to the success of Nortel's operations."); Dep. Ex. 22078 (PC0184853), Joint Request for US-Canada Bilateral APA dated Oct. 31, 2008 ("2008 US-Canada Bilateral APA Application") at PC0184863 ("As described in the functional analysis, R&D is the primary contributor to the success of Nortel's business."); NNC-NNL10957720, Aug. 26, 2004 letter to CRA, at NNC-NNL10957720/3 ("As noted in our APA submission, Nortel's R&D is the primary contributor to the success of Nortel's operations.  The success and failure of Nortel is directly dependent on its technology, and therefore its R&D. . . . The R&D performers receive the bulk of the global profit based on their relative R&D capital stock.  On the other hand, the R&D performers also have the risk of loss."); Dep. Ex. 21007 (NNI_00430039), FW: Functional Analysis: R&D ("We have pressed upon the tax authorities that the value in NT is with our R&D.  R&D is the backbone of the company.  R&D is the focal point of how NT will allocate our profits and losses between 2000 to 2004 and the future.  This is coming down as the single most important factor for income allocation."); *see also* Dep. Ex. 22020, APA Kick Off Meeting at 12 (NNI_00327121) ("[I]t was evident to Nortel that technology, proxied by R&D capital stock, is the primary value driver for the company and the basis upon which the residual profit sharers should be rewarded.").

[42]  Mark Weisz's deposition dated November 25, 2013, at p. 89 ("Q. You say [R&D] was a value driver, but was it the most important value driver? A. Yes, it was. Q. And was that something that was stressed with the tax authorities? A. Yes."); John Doolittle's deposition dated December 5, 2013, at p. 159 (agreeing that R&D was the primary contributor to the success (or failure) of Nortel's operations).

[43]  Dep. Ex. 21407 (NNI_01333113), Nov. 30, 2004 letter to IRS, 2 (emphasis added).

[44]  Dep. Ex. 21407, Functional Analysis at 5, 18-31.

at Nortel was organized and directed primarily by Nortel's business lines and those business lines cut across legal entity lines.[45]

Nortel had a multi-site strategy for R&D to take advantage of the best talent for a task wherever that talent was located.[46]  This meant that more than one facility typically worked on any given project.[47]  R&D at any given facility also spanned multiple lines of business.[48]

In seeking approval of the RPSM as its transfer pricing methodology, Nortel emphasized to tax authorities that its R&D was "highly inter-related, and R&D efforts

---

[45]  Dep. Ex. 21407, Functional Analysis at 9, 18-19; Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184940; John J. Roese's deposition dated November 12, 2013, at pp. 291-293.

[46]  Dep. Ex. 21407, Functional Analysis at 18 ("Researchers and engineers in Nortel's facilities and partner locations around the globe collaborate to develop new, best in class products for which the Company is known."); Walter Henderson's deposition dated October 4, 2013, at p. 210 (confirming his understanding that "there would be multiple R&D centers in different locations, some in different countries that could perform R&D on the same product."); Dep. Ex. 21451 (NNC-NNL06607282), FW:  URGENT – Intro to Patent Booklet – going to print Wednesday Morning, 1 (NNC-NNL06607282) (cautioning against recognizing only the Canadian inventors on a patent, as "quite a few inventions have inventors from more than one location" and "[Nortel] . . . encourage[s] collaboration across the company.").

[47]  See Gillian McColgan's deposition dated November 8, 2013, at pp. 52-54.

[48]  See Dep. Ex. 21407, Functional Analysis at 18-19; Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184940; Dep. Ex. 11074 (NNC-NNL016069), Nortel Multilateral APA Responses to IRS Information and Document Request, 3 (NNC-NNL016072) (showing the multiple R&D centers of excellence that contributed to the various Nortel business lines, e.g., "Optical: Main centers of excellence in Ottawa, Harlow and Paignton, supported by Montreal").

[could] migrate between entities, divisions, product lines, and regions."[49]  As Nortel's tax advisor explained to the IRS on September 22, 2006:

> For example, one business segment may spend $50 million USD to develop a technology that will never make it to market but will be accounted for in the business segment's R&D spend.  Another business segment may pick up the failed technology and develop it into a marketable solution and generate substantial revenue.  By bifurcating the development costs and product sales by business segment a result may be derived in different business segments that is less than equitable.  Nortel developed its transfer pricing methodology by considering its business as a whole, which ultimately captures all migration of the business segment's investment in R&D and communal platforms, leading to the most equitable result.[50]

---

[49]  US_EMEA_Canada_PRIV_00214146, Transfer Pricing – Meeting with French Tax Authorities, 9th March 2006, at 13 ("As a result of the integrated and inter-related nature of R&D efforts, Nortel entities are highly dependent on each other and could not survive in the market place on a stand alone basis."); *accord* Dep. Ex. 11169 (NNC-NNL002707), Advanced Pricing Arrangement Responses to Questions Posed by Inland Revenue, Internal Revenue Service, and Canada Customs and Revenue Agency dated September 2003 ("APA Responses dated September 2003"), 8 (NNC-NNL002715) ("Much of Nortel's R&D is interrelated, and one specific project may be developed based upon older R&D projects or platforms.  For example, assume that NNUK undertakes certain R&D that is not patented (*e.g.* possibly because it is not yet in a patentable form, or it would not meet the legal requirements to be patented).  A year later, a *portion* of the information and intellectual property from NNUK's R&D is utilized by R&D personnel at NNL.  NNL patents the results of its efforts.  In this example, it is difficult to state that the patentable invention was purely the result of NNL's efforts – clearly, NNUK had some involvement in the process. . . .") (emphasis in original); *id.* at 34 (same); Dep. Ex. 21407, Functional Analysis at 24 (same); NNC-NNL11656151, April 6, 2006 letter to IRS RE: Nortel Networks, Inc (APA-148919-02) Proposed U.S.-Canada Bilateral APA at NNC-NNL11656151/3 ("That is, even where an R&D project is not successful, the knowledge and experience gained may be used within other or future R&D projects."); Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184940 (describing interrelatedness of R&D); *see also* APA Responses dated September 2003 at 34 (NNC-NNL002742) ("[S]ome of the knowledge and intellectual property obtained from developing projects for one specific line of business can be used to develop projects within another line of business."); Dep. Ex. 21407, Functional Analysis at 6 ("The APA Participants bore the responsibility for, and risks associated with, the ongoing R&D activities.  Each of the R&D participants performs unique R&D, however, each Participant relies on each other for the R&D they produce and contribute.").

[50]  NNI_01534132, Email to IRS Providing Draft Responses; NNI_01534134, Draft Responses, 12 (NNI_01534145).

R&D work was also routinely shared among various facilities, and work performed in one facility might build on earlier work performed by another facility.[51]  Thus, as Nortel represented to the French tax authority:

> [The] Nortel Group's R&D efforts are highly interrelated:  R&D efforts performed by one entity relating to a specific product technology can benefit R&D efforts undertaken by another Nortel entity relating to a different product technology.  As such, it is impossible to separately track the financial results obtained from a successful R&D effort as such effort would most likely have benefited from previous R&D costs incurred by another Group entity.[52]

Similarly, different facilities might work on different components of a particular project, or might even collaborate on a particular element of a project.[53]  Thus, it is not feasible to say with certainty which Entrepreneur's R&D was associated with particular items of IP.  Indeed, as Nortel represented to both the CRA and IRS:

> Nortel R&D activities are on a global scale cross Canada, U.S., Europe and Asia regions.  On a highly coordinated and interdependent basis, R&D projects are structured and executed across the regions with products delivered to various lines of businesses.  Not one single R&D location or region is solely responsible for all project components that make up a product.  R&D activities are highly distributed but executed in a coordinated fashion.  For example, in the case of Wireless development (CDMA and GSM products), Nortel's Canadian, U.S., European, and Asian R&D labs are all involved in

---

[51]  *See* notes 49 & 50; *see also* US_EMEA_Canada_PRIV_00214833, Nortel letter to French tax authority, 2 (US_EMEA_Canada_PRIV_00214834) ("As you rightly pointed out in your correspondence of 22 December 2004, the R&D activities performed by Nortel Networks SA benefit, and the results of such activities are used by, the entire Nortel group.").

[52]  NNI_00432842, letter to French tax authority dated Nov. 13, 2007 at NNI_00432895.

[53]  *See* Dep. Ex. 21407, Functional Analysis at 18 ("Researchers and engineers in Nortel's facilities and partner locations around the globe collaborate to develop new, best in class products for which the Company is known."); NNC-NNL11656151, April 6, 2006 letter to IRS RE: Nortel Networks, Inc (APA-148919-02) Proposed U.S.-Canada Bilateral APA at NNC-NNL11656151/2 (same); Dep. Ex. 21451 (NNC-NNL06607282), RE: URGENT - Intro to Patent Booklet - going to print Wednesday Morning, 1 (Nortel email stating that "quite a few inventions have inventors from more than one location" and "[Nortel] . . . encourage[s] collaboration across the company."); Dep. Ex. 22020, APA Kick Off Meeting at 35 (NNI_00327144) ("Numerous entities and R&D centers are involved in any particular R&D project. Developments in one avenue of R&D may have benefits in others. Whether an avenue of R&D research is ultimately incorporate [*sic*] into a future product or not, the knowledge stemming from such research is useful to the company.").

these development projects.  A second example is CDMA (technology), which was developed in various regional centers in the U.S. and Canada, but has generated sales in the U.S., Canada, and many other countries worldwide. This type of highly integrated R&D coordination has been in existence for a long time.[54]

Summarizing its "functional analysis" of the group's R&D in a presentation to the IRS, Nortel explained:

- "Each of the APA participants play [*sic*] a major role in this activity and [the APA participants] work together to succeed in a very risky and competitive environment."[55]
- "Together, the APA participants perform most of Nortel's critical R&D activities as evidenced by the level of R&D spend – accounted for 85%-95% during 2000-2003."[56]
- "Each of the participants performs unique R&D but relies on the other participants for the R&D they produce and contribute."[57]

Based on its functional analysis, Nortel stated its conclusion that the Entrepreneurs "should share equitably in the residual profits and losses of Nortel."[58]

### 3.2.2.2  Transition to the RPSM and to the MRDA

Nortel decided that, beginning as of 2001, it would move its transfer pricing arrangements from an R&D cost sharing to an RPSM basis.[59]   However, this

---

[54]  Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184940; *accord* NNC-NNL015507, Email Sending Nortel's Responses to the IRS and CRA; NNC-NNL015508, Feb. 18, 2008 letter to IRS and CRA, 4-5 (NNC-NNL015511-12).

[55]  NNI_01041734, Joint IRS/Nortel Tax Meeting, April 11, 2005, 24.

[56]  NNI_01041734, Joint IRS/Nortel Tax Meeting, April 11, 2005, 24.

[57]  NNI_01041734, Joint IRS/Nortel Tax Meeting, April 11, 2005, 24.

[58]  NNI_01041734, Joint IRS/Nortel Tax Meeting, April 11, 2005, 29; *see also* Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184863 (the entities that perform R&D have "economic rights" and they are "entitled to participate in the ongoing benefits from their historical IP").

[59]  *See* Dep. Ex. 21384 (NNL00697106), Overview of Transfer Pricing APA and Recommendation, 5 (summarizing problems with the CSAs); Dep. Ex. 11114 (NNC-NNL06542925), FW:  Modification of Nortel Networks' R&D Cost Sharing Arrangement at NNC-NNL06542925/1 ("[T]he Tax Group is proposing the change [from the CSA to the RPSM] because (i) the approvals given by the various regional revenue authorities to the current R&D Cost Sharing Arrangement are set to expire, and (ii) the current arrangement never anticipated losses of the magnitude we are now seeing within Nortel.").

transition was not documented until the Entrepreneurs entered into the MRDA as of December 22, 2004 (retroactive to January 1, 2001).[60]

Per my earlier discussion, the conversion to an RPSM consisted of two steps for Nortel: (1) identifying the routine functions performed and how to compensate them, and (2) determining the allocation key(s) for sharing the residual profits (or losses) among the Entrepreneurs. First, Nortel chose to give routine returns for certain functions of its constituent companies. Second, Nortel concluded that the key profit driver in its business was the development and maintenance of IP.[61] It therefore chose to allocate residual profit (the profit remaining after distribution of routine returns) among the Entrepreneurs according to the R&D spend of each.

Three types of routine returns were provided for: (1) distribution returns to certain "Limited Risk Entities" in both the 2001-2005 and 2006-2008 periods; (2) a return on net assets to the Entrepreneurs in the 2001-2005 period; and (3) returns to the Entrepreneurs for distribution and excess costs only in the 2006-2008 period.[62]

Provision was then made for allocating profits (or losses) over and above the routine returns – *i.e.*, the profit/loss that was deemed to have been attributed to Nortel's IP.[63] In the 2001-2005 period, Nortel used R&D Capital Stock as the basis for allocation.[64] In essence, the R&D spend for each Entrepreneur was amortized over time by 30%

---

[60]  Dep. Ex. 21003, MRDA at NNC-NNL06001514/1.

[61]  *See* Section 3.2.2.1.

[62]  My understanding of Nortel's RPSM is based on my review of Nortel RPSM models produced by the Canadian Debtors. *See also* Kerry Stephens' deposition dated November 7, 2013, at p. 42 (summarizing routine returns for the Entrepreneurs under the 2001 model and after the second addendum to the MRDA in 2006); Dep. Ex. 32145 (US_Canada_PRIV_00199548), Distribution Agreement effective as of January 1, 2001; Dep. Ex. 21410 (EMEAPRIV0236224), "Inter company Agreements" PowerPoint Presentation, 5.

[63]  Schedule A of MRDA, as originally executed (the "Original MRDA"), stipulated that residual profits should be allocated by "R&D Capital Stock" but did not define how this allocation measure should be calculated. The Original MRDA was subsequently amended over time and the Third Addendum of the MRDA revised Schedule A of the Original MRDA and specifically stated that residual profit should be allocated based upon an entity's total of R&D spend over the previous five years as a percentage of total Nortel R&D spend over the same period. I have reviewed Nortel's RPSM models that reflect Nortel's calculations for residual profits made pursuant to Schedule A of the Original MRDA and the Third Addendum of the MRDA.

[64]  Dep. Ex. 21003, MRDA at NNC-NNL06001514/18-19.

per year.[65]  In the 2006-2008 period, Nortel used a simple trailing five-year rolling sum ("look back") of the R&D spend for each Entrepreneur.[66]

## 3.3    Appropriateness of Nortel's Adoption of RPSM

Having been actively involved with transfer pricing matters for 25 years, I have had the opportunity to be involved in a number of situations similar to Nortel's and in most instances have found the RPSM to be the most appropriate transfer pricing method.  Based on my review of Nortel's business, as discussed in Section 3.2, Nortel's adoption of the RPSM and its selection of R&D spend as its allocation key were reasonable choices in Nortel's circumstances and consistent with transfer pricing principles and the arm's length principle.[67]

In my experience, cost sharing, as previously practiced by Nortel, works best when R&D is relatively centralized and when there are relatively few acquisitions that will be part of the cost sharing arrangement.  Neither of these conditions prevailed for Nortel:  (1) Nortel had significant R&D spread among at least five countries;[68] and (2) during the 1990s and through 2000 it made significant acquisitions.[69]  In these circumstances, in my experience, RPSM is appropriate, particularly where, as with Nortel in the period following 2000, various entities of an integrated enterprise work jointly to create intangibles, those intangibles are the key driver of profits, and the

---

[65]  However, the current year's R&D spend was only amortized at half the 30% rate.  The lower amortization rate for current-year R&D spend made sense because R&D expenditures made during the current year are on average only about half a year old at the end of the year.

[66]  Dep. Ex. 21003, MRDA at NNC-NNL06001514/48-49; Kerry Stephens' deposition dated November 7, 2013, at p. 43 ("[T]he previous model took R&D expenditure as far back as anybody could go in the records and amortised it at 30% reducing balance to determine the residual capital value of research and development spend whereas the second addendum model took the last – previous five years R&D spend as being the amount to calculate the factor for the share of the residual profit.").

[67]  In its implementation of the RPSM, Nortel made several errors, one of which I discuss in Section 4.4, below.

[68]  Dep. Ex. 21407, Functional Analysis at 21-22; Dep. Ex. 11074 (NNC-NNL016070), Nortel Multilateral APA Responses to IRS Information and Document Request, 3-4 (NNC-NNL016072-73); Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184864.

[69]  *See* Dep. Ex. 22123, Horst Frisch Report at Table 1 (EY-NRTL-000086) (listing Nortel's eighteen major acquisitions between 1998 and 2000); Dep. Ex. 21384 (NNL00697106), Overview of Transfer Pricing APA and Recommendation, 6 ("over the period 1998-2000, NNC acquired companies with an aggregate value of over $29 billion"); Dep. Ex. 21407, Functional Analysis at 104-09 (summarizing Nortel's twelve major acquisitions in 2000-2001).

participating entities share in the entrepreneurial risks and benefits.[70]  A switch from a cost sharing arrangement to an RPSM during that time frame thus made sense on a conceptual level from a transfer pricing and tax perspective.[71]

One way of looking at this situation is to consider five unrelated parties who enter into a venture where they pool their R&D efforts such that the group agrees that each partner will focus on a particular subset of the overall R&D plan.  No one knows beforehand which R&D efforts will be successful and which ones will not.  (If they did, no one obviously would invest in those R&D activities that would not be successful.)  Anyone entering into such a joint enterprise at arm's length would want an undivided interest in all assets that resulted based on how much they invested.  What they have done is to share the risk and to share the rewards.  In Nortel's case, they shared the risks and rewards (or lack thereof) according to each Entrepreneur's relative R&D spend.[72]

---

[70]   *See* Dep. Ex. 21407, Functional Analysis at 6 ("The APA Participants bore the responsibility for, and risks associated with, the ongoing R&D activities.  Each of the R&D participants performs unique R&D, however, each Participant relies on each other for the R&D they produce and contribute."); Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18 ("Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk."); Dep. Ex. 22020, APA Kick Off Meeting at 1 (NNC-NNL327110) ("Why does Nortel believe that the change in methodologies is appropriate?  [Answer:] The new methodology is an integrated approach that aligns with Nortel's business model.   R&D benefits and risk are attributed to R&D performers . . . .   The residual profit methodology . . . allows super profits to accumulate to the entrepreneurs of the group.  R&D, which is the value driver for Nortel, is now the basis on which entities are remunerated."); US_EMEA_Canada_PRIV_00214146, Transfer Pricing – Meeting with French Tax Authorities, 9th March 2006, 23 ("The [residual profit split ("RPS")] is the most appropriate [transfer pricing] method given NNSA's entrepreneurial role in the NN organization").

[71]   *See* NNC-NNL05529325, May 6, 2005 Response to IRS Information and Document Request, 4 ("As described in the Functional Analysis and elaborated in this response, Nortel has a highly integrated business structure, particularly with respect to R&D.  We believe that the significant level of Nortel's integration of its business arrangements further supports the need to employ a single RPSM to provide the most reliable measure of arm's length results for its intercompany transactions."); NNC-NNL05529325, May 6, 2005 Response to IRS Information and Document Request, 10 (citing the "highly integrated nature of Nortel's R&D function").

[72]   *See* Dep. Ex. 21003, MRDA at NNC-NNL06001514/12 ("[E]ach Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits[.]"); Dep. Ex. 21407, Functional Analysis at 48 ("The [Entrepreneurs] each perform R&D that contributes to Nortel's innovation and new products.  Each RPS [participant] continues to share entrepreneurial risks.  The allocation of the Company's profit or loss should be commensurate with its risks associated with the company's R&D.").

# 4       EMEA Debtors' Allocation Position

The EMEA Debtors have taken the position that (with the exception of patents held not by the Entrepreneurs but by two "At Risk Entities"[73]) proceeds from the sale of Nortel's IP should be allocated among the EMEA Debtors, the Canadian Debtors, and the U.S. Debtors in proportion to each party's respective contribution to the creation of the IP, which in the context of the operation of the Nortel group is best measured by R&D spend.

In my opinion, the EMEA Debtors' approach to allocation is consistent with (a) established transfer pricing and arm's length principles, (b) prior representations by Nortel to various tax authorities, including without limitation the IRS, the CRA, and HMRC, and (c) the business arrangements among the Nortel entities from 2001 forward, as confirmed in (1) the principles embodied in the RPSM and the MRDA, and (2) prior Nortel practice in allocating proceeds of IP exploitation that, as I noted earlier, technically fell outside the strict terms of the MRDA.  In sum, for the reasons discussed herein, each of the Entrepreneurs is a beneficial owner of an undivided interest in the Nortel IP in its entirety, and each is entitled to the economic benefits arising from the sale of that property in proportion to its R&D contribution.

Additionally, although the EMEA Debtors' approach is consistent with the principles embodied in the RPSM and the MRDA, the EMEA Debtors take the position that the determination of the Entrepreneurs' R&D contributions should be measured not necessarily by the IP useful life period provided for under the MRDA, but by the period that most closely corresponds to the actual useful life of the IP.  For the reasons discussed below, that position is reasonable.

## 4.1     Consistency with Transfer Pricing and Arm's Length Principles

In Section 3.2.2.1 above, I explained that Nortel determined and represented to tax authorities that IP was the principal driver of its residual profits, and that the Entrepreneurs jointly created the Nortel IP.  In Section 3.3, I determined that Nortel's method for allocating residual profits and losses according to each Entrepreneur's respective contribution to R&D was consistent with established transfer pricing principles and the arm's length principle.

I further conclude that, consistent with transfer pricing principles and all of the above, where an asset is identified as the principal driver of residual profits, the proceeds of

---

[73]   Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 16, 2013, ¶ 84.

any sale of that asset should be allocated **on the same basis** that other residual profits were to have been allocated.  The transfer pricing allocation key should apply equally to both current and all future profit from an asset.  The sale of the asset should not change its character, much less a party's economic interests in it; it simply capitalizes future profit.  Moreover, because the same economic contributions lead to both forms of profit, there should be no difference in how the two forms of profit are allocated.

Indeed, in seeking approval of its APAs, Nortel reached the same conclusion and was prepared to represent as much to the tax authorities.  In its "APA Kick Off Meeting," Nortel prepared the following potential question and proposed answer:

> 31.  How does Nortel propose to account for any future sale of intellectual property developed prior to or during the term of the APA?  Which entities are considered the legal owner of IP and which are considered the economic owners?
>
> - *Proceeds from the sale of IP will be allocated to residual profit split participants on the basis of their economic ownership of the IP* – that is, on the basis of their share of total R&D capital stock in the year of sale.[74]

Similarly, NNL's Leader of Transfer Pricing from 2002-2004 James Gatley explained:

> What I'm concerned with from a transfer pricing perspective is who contributed to the development of the intangibles associated with that patent?  And that might be R&D undertaken in the U.K. or R&D undertaken in Australia and Canada.  So if those three entities contributed to developing R&D and allowed Canada to register a patent. . . . I'm not concerned with the registration of the patent.  I'm concerned with making sure that everybody who helped develop that intellectual property is compensated properly for their efforts through the transfer pricing model.[75]

Accordingly, the Entrepreneurs signed a Memorandum of Understanding which confirmed that the Entrepreneurs held "ownership interests" in the IP.  Paragraph 6 provides in part:  "The Participants believe that, through the date hereof under the prior formula, and going forward under the new formula as amended in the Third Addendum to the 2004 Agreement executed on the date hereof with effect from

---

[74]   Dep. Ex. 22020, APA Kick Off Meeting at 39 (NNI_00327148) (emphasis added).

[75]   James Gatley's deposition dated November 7, 2013, at pp. 252-253.

January 1, 2006 ('Third Addendum'), ***their respective ownership interests in the NN Technology*** and their respective R&D Activity have been and will be adequately and fairly compensated, as envisioned in the APA discussions referenced in Paragraph 5 above."[76]

Although NNL held legal title to the patents registered in its name, under the Entrepreneurs' business arrangements as confirmed in the RPSM and the MRDA, that legal title was divorced from the economic rights to the proceeds that flowed from the exploitation of those patents. The Entrepreneurs, who jointly created the IP and bore and shared in the full risks and benefits of the business, held the economic rights to the proceeds derived from that IP.[77] As discussed below, this beneficial ownership is confirmed in the Entrepreneurs' agreement, the MRDA, and is fully consistent with the principles of transfer pricing. In fact, anything else would be contrary to transfer pricing principles. In consideration of these economic rights and transfer pricing principles, it is my opinion that each of the Entrepreneurs has a right to share in the proceeds flowing from the jointly created IP in accordance with the Entrepreneurs' chosen allocation key – contribution to R&D.

## 4.2    Consistency with Tax Representations

As discussed in Section 3.2.2.1, to gain approval of its RPSM, Nortel repeatedly and consistently represented the nature and operations of its business to tax authorities in the U.S., Canada, and the U.K. Through those submissions, the following points are clear and undeniable:

- R&D was the key profit driver in Nortel's business;
- Each of the Entrepreneurs played a significant and critical role in the performance of the group's R&D;
- By undertaking R&D, each of the Entrepreneurs bore the risk of the business and was entitled to enjoy the upside as well;

---

[76]  NNC-NNL06128094, Memorandum of Understanding at NNC-NNL06128094/2 (emphasis added).

[77]  *See* Dep. Ex. 21003, MRDA at NNC-NNL06001514/2; Dep. Ex. 21003, MRDA, Art. 3 at NNC-NNL06001514/5; Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18; Dep. Ex. 22020, APA Kick Off Meeting at 31 (NNI_00327140) ("Nortel is a global integrated R&D company. Major R&D performers should be entitled to share in the benefits and risks related to their efforts. . . . The reason these companies need to share in residual profits is that they have developed valuable Nortel technology by virtue of the R&D expenses they have incurred. Therefore, they should share in the residual profits of the company as compensation for their R&D investments."); Dep. Ex. 22020, APA Kick Off Meeting at 39 (NNI_00327148).

- R&D was "interrelated," meaning that R&D was not performed in isolation but relied and built upon earlier work;
- R&D was performed jointly across business and entity lines; and
- Due to all of the above, IP created through the group's R&D efforts could not be directly attributed to a single entity.

In those submissions, Nortel also made clear that each of the Entrepreneurs held an economic interest in proceeds generated from the group's IP. For example:

- In Nortel's Functional Analysis for the years ended December 31, 2000-2004, Nortel explained: "Ultimately, Nortel's success or failure is driven by the outcome of its continuing R&D investments. Consistent with this and the functions performed and risks assumed, each APA participant should share equitably in the residual profits and losses of Nortel."[78]

- In the 2008 US-Canada Bilateral APA Application, Nortel stated that: "each [Entrepreneur] maintains an economic ownership in the IP."[79]

Additionally, "for purposes of determining compliance with the reasonableness requirements of Treas. Reg. § 1.6662-6(d)," NNI prepared a "Transfer Pricing Report for the year ended December 31, 2009."[80] In that report, NNI explained that "Nortel entities which perform the functions of R&D, manufacturing support, distribution and have economic rights to intellectual property are considered 'integrated entities' ('IEs');"[81] and reported that "NNC operates under a residual profit split method ('RPSM') whereby certain affiliates, including NNI, NNL, and other integrated entities ('IEs') are the primary owners of intangibles developed by the group and bear the risk of development. . . . The remaining non-routine profits/losses are then shared between the IEs based on their ratios of intangible ownership (as determined by capital stock ownership percentages)."[82]

---

[78]   Dep. Ex. 21407, Functional Analysis at 6.

[79]   Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184911.

[80]   NNI_00442576, Nortel Networks Inc. Transfer Pricing Report For the year ended Dec. 31, 2009, dated Sept. 14, 2010, 1 (NNI_00442579).

[81]   NNI_00442576, Nortel Networks Inc. Transfer Pricing Report For the year ended Dec. 31, 2009, dated Sept. 14, 2010, 32 (NNI_00442610).

[82]   NNI_00442576, Nortel Networks Inc. Transfer Pricing Report For the year ended Dec. 31, 2009, dated Sept. 14, 2010, 1 (NNI_00442579).

In my opinion, the EMEA Debtors' allocation position, contrary to the Canadian Debtors' allocation position, is consistent with all of these representations. The EMEA Debtors recognize, as Nortel represented to the tax authorities, that the IP was jointly created and held by the Entrepreneurs and that each of the Entrepreneurs holds an economic stake in that IP to the extent of its contribution to R&D. Further, as Nortel concluded, the EMEA Debtors assert that the Entrepreneurs should share equitably in amounts generated from the group's IP based on their respective contributions to R&D. Accordingly, because the EMEA Debtors present the same position that Nortel presented to the tax authorities, the hundreds of pages of facts and analysis submitted by Nortel to the tax authorities also support the EMEA Debtors' allocation position.

### 4.3    Consistency with Business Arrangements

### 4.3.1    Consistency with the Principles Embodied in the RPSM and the MRDA

The EMEA Debtors' position is consistent with the principles embodied in the RPSM and the MRDA. The following provisions of the MRDA are most pertinent in the present context:

- *Recitals* – Recitals to the MRDA recognize that "each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business" and that "each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity."[83]

- *Profit-Splitting* – Under Article 3(a), "[f]or and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the 'R&D Allocation') as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity."[84]

  Under Article 3(b), the Entrepreneurs are directed to measure contribution to R&D pursuant to Schedule A to the MRDA.[85]

- *Schedule A* – Entitled "Calculation of Arm's Length R&D Allocation to each Participant," Schedule A states that the "purpose" of the Schedule is "to provide clarity as to how each Participant is to be compensated" under the

---

[83]    Dep. Ex. 21003, MRDA at NNC-NNL06001514/2.

[84]    Dep. Ex. 21003, MRDA, Art. 3(a) at NNC-NNL06001514/5.

[85]    Dep. Ex. 21003, MRDA, Art. 3(b) at NNC-NNL06001514/5.

MRDA.[86]   Schedule A (as originally written and as amended in December 2008) recognizes that the "development and maintenance" of Nortel's IP is the "key profit driver in the Nortel business."[87]

Like the MRDA, Schedule A confirms that the compensation provided to the Entrepreneurs under the RPSM "reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology.  Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business."[88]

Accordingly, as discussed above, the calculation provides that the "Participants" (*i.e.*, the Entrepreneurs):   (1) pool all of their profits, (2) distribute routine returns, and (3) divide the remaining profits (or losses) according to each Participant's contribution to R&D.[89]

- *Legal Title* – Under Article 4(a) of the MRDA, "legal title" to all existing, acquired, or developed Nortel IP was "vested in NNL."[90]

Under transfer pricing principles, the mere holding of legal title pursuant to the MRDA cannot be determinative of economic entitlement to the proceeds generated from Nortel's IP.  As demonstrated in the MRDA, legal title was irrelevant to the division of proceeds from the exploitation of IP.

Thus, after the Entrepreneurs received the agreed routine return for their distribution functions, NNL, as the legal title holder, was not entitled to keep all of the residual profits from the exploitation of Nortel's IP.  Rather, income earned in all of the Entrepreneurs' territories was pooled.  That pool of income was then split, pursuant to the RPSM and the MRDA, based on the Entrepreneurs' respective contributions to R&D.[91]

---

[86]   Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18.

[87]   Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18, 30.

[88]   Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18, 30, 48.

[89]   Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18, 30, 48.

[90]   Dep. Ex. 21003, MRDA, Art. 4 at NNC-NNL06001514/6; *see also* Angela de Wilton's deposition dated November 20, 2013, at pp. 32-33 (explaining how patents were assigned to NNL).  As explained in Section 5.1, this was done for administrative convenience.

[91]   Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18-19, 48-49.

Put simply, in return for taking "the full entrepreneurial risk of the Nortel business," the Entrepreneurs were entitled to "all the upside risk in the Nortel business."[92] Under the RPSM and the MRDA, that upside would be split in proportion to each Entrepreneur's contribution to the group's R&D.[93]   The EMEA Debtors' allocation position is entirely consistent with this arrangement.

### 4.3.2   Consistency with Nortel's Prior Practice

The consistency of the EMEA Debtors' allocation position with the Entrepreneurs' understanding of their rights and their business arrangements is further exemplified by how Nortel split certain non-recurring income derived from the group's jointly created IP.   Following the pre-insolvency asset sale of Nortel's Universal Mobile Telecommunications System ("UMTS") radio access business to Alcatel in December 2006, Nortel divided the proceeds from the divestiture of IP assets according the Entrepreneurs' relative R&D contributions.   The divestiture of UMTS represented Nortel's first global disposal of IP arising under the MRDA.[94]

Although the proceeds from the IP sold to Alcatel were deemed not subject directly to the MRDA or the RPSM, the Entrepreneurs opted to allocate them in accordance with their relative R&D contribution percentages nonetheless.   This was explained in an internal Nortel memorandum dated Feb. 15, 2007:   "While NNL generally is the legal owner of the technology, the Master R&D Agreement determines the economic ownership of it and thus allocation of the consideration by proportionate R&D Capital Stock is appropriate."[95]

---

[92]   Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18, 48.

[93]   Dep. Ex. 21003, MRDA, Art. 3 at NNC-NNL06001514/5-6; Dep. Ex. 21003, MRDA, Schedule A at NNC-NNL06001514/18.

[94]   *See* EMEAPRIV0204736, RE:   Nortel Internal IP Agreement, 1 (EMEAPRIV0204736).

[95]   Dep. Ex. 21018 (NNC-NNL06056509), at NNC-NNL06056509/2; *accord* Dep. Ex. 21160 (BHG0137543), FW: UMTS Alcatel Allocation, 1 (BHG0137543) (Louis Farr writing to Timothy Pickering in an email dated Jan. 29, 2007:   "The value for IPR was allocated using RPS percentages.   RPS determines how profits and losses are shared.   If UMTS access was not sold, all of the RPS members would share profits and losses associated with the business.   Since RPS determines the economic relationships between the parties, all rights associated with the IPR should be shared based on RPS percentages.   This is also consistent with Nortel's view that all Nortel IPR is indistinguishable such that all value should be shared among the RPS members."); *see also* Kerry Stephens' deposition dated November 7, 2013, at pp. 67-68 (stating that allocation of intangibles according to RPS ratio was "the only logical answer" and that intangibles were ultimately allocated on that basis); Mark Weisz's deposition dated November 25, 2013, at pp. 139-140.

The Alcatel transaction is highly comparable to the post-petition Business Sales in the present case. Contrary to the Canadian Debtors' allocation position, the proceeds of the IP sold to Alcatel were not allocated solely to NNL on the basis that NNL held legal title to that IP. Rather, the IP proceeds were allocated according to the Entrepreneurs' relative R&D contributions as measured by R&D spend.

Similarly, in the Foundry patent litigation, the $35 million settlement amounts received by Nortel were not retained entirely by NNI or NNL.[96] Rather, like the Alcatel proceeds, the settlement payment from Foundry was allocated among the Entrepreneurs in accordance with R&D contributions as measured by R&D spend.[97]

## 4.4   Nortel's Underestimate of Useful Life

I understand that the Malackowski Report concludes that Nortel underestimated the useful life of its IP. Useful life was a key component in measuring each Entrepreneur's contribution to R&D. It determined how far back Nortel would look in evaluating an Entrepreneur's proportionate contribution to the group's pool of R&D.

As noted above, Nortel switched from the R&D Capital Stock method that was used for determining profit shares in 2001-2005 to a simple five-year look back that was used for the years 2006-2008.[98] The five-year look back assumes that Nortel's IP is completely valueless after five years. The Malackowski Report explains in detail why this was not the case at Nortel. As that report explains, certain of Nortel's older patents had high and enduring value. Such patents covered, for example, technology essential to complying with industry standards having a long lifetime, or otherwise had broad claims to fundamental techniques that turned out to be used in a wide range of later technologies.[99]

The Residual IP sale demonstrates the severe shortcomings of Nortel's five-year look back. In that sale, as illustrated in the Malackowski Report, a significant portion of

---

[96]  *See* Dep. Ex. 21167 (NNC-NNL11029235), Foundry Settlement, NNC-NNL11029235/1-2 (outlining the terms of the Foundry settlement and the settlement's accounting treatment).

[97]  *See* Dep. Ex. 21167 (NNC-NNL11029235), Foundry Settlement, NNC-NNL11029235/1-2; EMEAPRIV0204736, RE: Nortel Internal IP Agreement, 1-2 (EMEAPRIV0204736-37).

[98]  The five-year look back method was phased in over three years.

[99]  The concept of earlier IP providing a foundation for later IP and later technological developments still within the broad scope of the earlier IP is also given great credence and emphasis by the IRS in its cost sharing regulations and is what the IRS refers to as "platform contributions." See IRC § 1.482-7(c). The concept of platform contributions applies to both cost sharing and RPSM.

the more valuable ("High Interest") patents sold in 2011 were actually filed before 2006.[100]  Under Nortel's five-year look back, Nortel would have deemed those High Interest patents completely valueless.

If the Entrepreneurs' respective contributions to R&D spend remained relatively constant over time, then the understatement of IP useful life would have little or no impact on transfer pricing.  However, if these contribution shares changed over time, as they in fact did, then those entities that gave proportionately more in the past are short changed by the understatement of useful life.

As shown in Exhibit 1, two important examples serve to illustrate the importance of the above.  First, NNL's share of Nortel's total R&D spend rose from 41.6% in 2001-2002 to 51.1% in 2007-2008, a nearly 10 percentage point jump.  Conversely, NNUK's share fell from 9.6% to 2.4% and NNSA's share fell from 8.4% to 3.9% over the same 2001-2002 to 2007-2008 period.[101]  Using a useful life that is understated therefore favors NNL in terms of R&D contribution relative to NNUK and NNSA.

Nortel's underestimate has to do with the difference between the *ex ante* and *ex post* perspectives mentioned earlier.  By *ex ante*, I mean how taxpayers contemporaneously report their transfer pricing payments on their annual returns.  A simple formulaic method, such as Nortel's 30% per year amortization of annual R&D spend, is a good example of a good faith *ex ante* approach.

However, when a major taxable event occurs, such as the initiation of a cost sharing arrangement or, as in Nortel's case, a substantial sale of IP, tax authorities will, in my experience, almost always demand a much more thorough and in-depth *ex post* evaluation.  It is my understanding from the Malackowski Report that the *ex ante* approach led to a substantial underestimate of the actual value of Nortel's older IP.  In the circumstances here, it is therefore reasonable to consider an *ex post* evaluation.

## 5    Canadian Debtors' Allocation Position

The Canadian Debtors argue that possession of legal title entitles them to essentially all proceeds generated from the IP.  This position is not consistent with established transfer pricing and arm's length principles, Nortel's representations to the tax authorities, or the Entrepreneurs' business arrangements.

---

[100]  Malackowski Report, Section 11.1.3, Figure 1.

[101]  NNIR's share rose from 0.5% in 2001-2002 to 1.6% in 2007-2008.

January 24, 2014                                                    Charles River Associates

## 5.1    Inconsistency with Transfer Pricing and Arm's Length Principles

The Canadian Debtors claim that they are entitled to 100% of the proceeds from the Residual IP sale, and that they are presumptively due all of the IP-related proceeds from the Business Sales.[102]  Their claim is contrary to established transfer pricing and arm's length principles.

Although the Canadian Debtors assert that they "owned" all of the IP,[103] it is important to note that the MRDA states only that "legal title" is held by NNL.[104]  Nomination to hold legal title to IP serves administrative purposes in an enterprise such as Nortel.[105]  For example, it designates which company is administratively responsible for paying the various governmental maintenance fees, taxes, and annuities that come due during the term of IP protection.  Such arrangements are operationally useful and help prevent the confusion that might otherwise result from having a multitude of responsible parties, where their lines of responsibility might be difficult to discern.  But such arrangements in the interests of administrative convenience do not determine the economic consequences in the exploitation (including the sale) of the IP.

The distinction between legal title and ultimate economic entitlement is very important in the field of transfer pricing.  Under transfer pricing principles, the allocation of economic gain across borders is determined *not* by legal ownership, which (as here) is usually chosen as a matter of convenience, but rather by the ***economic contributions*** to the factors that led to the creation of that gain, and who made those contributions.  This is reflected in the following passage in the draft OECD[106] guidelines:

---

[102]  The Canadian Debtors' position on the IP proceeds from the Business Sales is that the Canadian Debtors are presumptively entitled to 100% of the value, with the other parties having the burden to prove the value of the licenses they relinquished, with that offset capped in turn by the party's maximum interest under the MRDA.

[103]  Allocation Position of the Monitor and Canadian Debtors dated May 16, 2013 at ¶ 50 (2013).

[104]  Dep. Ex. 21003, MRDA, Art. 4 at NNC-NNL06001514/6.

[105]  *See* Dep. Ex. 22143 (NNC-NNL06491238), Modification of Cost Sharing Arrangement ("While it is not required by the new model, for administrative simplicity it is expected that all of Nortel's IPR will continue to be owned by Nortel Networks Limited."); Dep. Ex. 11114 (NNC-NNL06542925), FW:  Modification of Nortel Networks' R&D Cost Sharing Arrangement at NNC-NNL06542925/1 ("Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity.").

[106]  As transfer pricing became a bigger issue during the 1980s and 1990s, the Organisation for Economic Co-operation and Development (OECD) coordinated an effort among its member nations to develop a framework to reflect the principles that the member nations agreed upon.  The initial result of these efforts was the OECD Transfer Pricing Guidelines issued in 1995.  Discussions continued following these first Guidelines, the result being the OECD Transfer Pricing Guidelines issued in 2010.

> The question of legal ownership is separate from the question of remuneration under the arm's length principle.  It is important to note that, for transfer pricing purposes, legal ownership of intangibles, by itself, does not confer any right ultimately to retain any return from exploiting the intangible that may initially accrue to the legal owner as a result of its legal or contractual right to exploit the intangible.[107]

The Canadian Debtors ignore this distinction between legal title and the ultimate economic entitlements that each of the Entrepreneurs held with respect to the group's IP. Under the RPSM as adopted by Nortel with the approval of the tax authorities, the non-routine income stream generated by the Entrepreneurs' IP belongs to the Entrepreneurs in proportion to their respective contributions to its development.  As I concluded above, this income stream is not limited to current operations but includes *all* income generated by the IP and is subject to the same allocation key described in Section 3.2.2.2.

Moreover, arm's length parties never would have agreed to the arrangement that the Canadian Debtors now put forward.  In order properly to claim the proceeds of all of the IP Sale Proceeds, NNL would had to have paid for all of the R&D that created that IP, not just its cost share from 1992 through 2000 and RPSM share from 2001 through 2008.  The other Entrepreneurs contributed billions of dollars to the R&D that created the group's IP.[108]  If the Canadian Debtors' argument that they are entitled to 100% of the IP Sale Proceeds were taken as correct, then the other Entrepreneurs would have given the Canadian Debtors the benefit of their investment and received nothing in return.  Of course, such a give-away cannot be reconciled with the arm's length principle.  Nor is it remotely consistent with the Entrepreneurs' representations to tax authorities or their business arrangements, as will be discussed below.

## 5.2  Inconsistency with Tax Representations

The Canadian Debtors' position ignores the repeated representations Nortel made to the tax authorities.  To justify the RPSM (adopted by the MRDA) in accordance with applicable tax requirements, the Entrepreneurs had to rely on economic facts, not the holding of legal title.  In particular, to make the case for using RPSM and the R&D contribution allocation key, Nortel consistently represented in its submissions to tax authorities around the world (particularly, the Canadian, U.S., U.K., and French tax

---

[107]  OECD, Revised Discussion Draft On Transfer Pricing Aspects Of Intangibles (July 30, 2013), ¶ 73.

[108]  *See* Exhibit 1.

authorities) that non-routine income was attributable all or virtually all to its IP, that the Entrepreneurs bore the full entrepreneurial risks and benefits of the Nortel business, and that the group's IP was created jointly by the Entrepreneurs such that no one research group, and no single entity's budget lines, could necessarily be associated with given items of IP.[109]  Indeed, Nortel directly represented to the tax authorities that "each [Entrepreneur] maintains an economic ownership in the IP."[110] Nortel's position was accepted by the tax authorities, and each of the Entrepreneurs benefited as a result.

In light of Nortel's representations, if Nortel had sold its IP prior to commencing an insolvency proceeding, it is my opinion that the tax authorities would not have treated NNL as the only entity entitled to the proceeds from the sale for purposes of assessing tax on the gain on sale.  Local tax authorities, including the IRS and HMRC, would not permit value to be transferred out of their jurisdictions without compensation. They would thus impute consideration to the U.S. and EMEA Entrepreneurs.  If the Nortel group were solvent, this dispute between the tax authorities would likely be dealt with by the Competent Authority process.[111]  In the Competent Authority process, I am of the opinion that the CRA would not insist on NNL obtaining full economic entitlement to the Nortel IP for no consideration, and would agree to payments by NNL to the other Entrepreneurs consistent with Nortel's RPSM.

## 5.3    Inconsistency with Business Arrangements

The principles embodied in the RPSM and the MRDA and Nortel's prior practice further undermine the Canadian Debtors' allocation position that it should receive virtually all of the IP Sale Proceeds.

The status of an Entrepreneur as legal title holder defined rights and responsibilities vis-à-vis third parties, *e.g.*, governmental patent offices, accused third-party infringers

---

[109]  *See* Section 3.2.2.1.

[110]  Dep. Ex. 22078, 2008 US-Canada Bilateral APA Application at PC0184911.

[111]  When the tax authorities in two different nations that have a joint tax treaty each tax a particular entity in such a way that double taxation results, the tax authorities may attempt to resolve the problem of double taxation through a process known as Competent Authority.  Each nation has one or more people in its Competent Authority section who are authorized to carry out the negotiations.  The process can be very lengthy, however – indeed, I have seen some that have gone on for more than a decade.  This is one important reason why tax authorities and taxpayers typically do their best to sort things out together, in order to avoid having to rely on a lengthy Competent Authority.

and licensees.[112]  As among the Entrepreneurs themselves, the mere holding of legal title had little – if any – practical significance.  When it came to relations as among themselves, such provisions concerning rights as against third parties were entirely subordinate to the Entrepreneurs' mutual understanding and arrangement that benefits flowing from the joint creation of the IP would be shared based on their respective contributions.[113]

Accordingly, Nortel's senior tax leaders have testified that legal title was "irrelevant," and that the RPSM and the MRDA reflected the "economic realities" of the company's operations:

- Mark Weisz, a senior tax employee who held the position Director of International Tax responsible for Latin America, Asia and Europe from 2004-2007 and who had significant involvement in the drafting of the MRDA, confirmed at his deposition that "the question of who owned legal title to the intellectual property at Nortel was irrelevant . . . to the way in which the proceeds from exploiting that IP were allocated."  Mr. Weisz testified that in his mind, "there was always a separation between legal title and economic ownership of the technology," and that "[t]he legal IP ownership was irrelevant."[114]

- John Doolittle, a twenty-year Canadian Nortel employee who served as, among other things, global head of Tax, global head of Treasury and post-petition CFO of NNL, testified that the RPSM "mirrored the business," and he agreed that "the objective in the MRDA was to accurately reflect the economic realities of how Nortel operated."[115]

---

[112] *See* Dep. Ex. 11107 (US_Canada_PRIV_00015574), Legal Agreements for IP at US_Canada_PRIV_00015574 ("[I]n the US, only patent owners and true exclusive licensees that hold an interest tantamount to ownership in the patent can sue on a patent. Which entity can sue may affect the damages or remedies that can be sought."); Giovanna Terese Sparagna's deposition dated December 10, 2013, at p. 80 (explaining that IP law or local law might require that IP be registered in a certain way and that one could "diverge from" these legal requirements by granting exclusive licenses); Giovanna Terese Sparagna's deposition dated December 10, 2013, at p. 146 (explaining her understanding that one Nortel entity owned "bare legal rights" to the IP and that economic ownership was "spread throughout" the Nortel group).

[113] *See* Dep. Ex. 21409 (NNC-NNL11012502), RE: Nortel Interco Arrangement at NNC-NNL11012502/2 (discussing the RPSM and the fact that it created a "single worldwide pool of residual profits" without regard to legal rights).

[114] Mark Weisz's deposition dated November 25, 2013, at pp. 118-119.

[115] *See* John Doolittle's deposition dated December 5, 2013, at pp. 76-77, 107, 113-114, 159-160.

- Walter Henderson, who at various times advised Nortel as an attorney for Sutherland, Asbill & Brennan LLP and intermittently held positions at NNI as Global Tax Director and Senior Tax Counsel, testified that, in most jurisdictions, the maintenance of legal title and nothing else in a particular jurisdiction has no "legal implication with respect to tax."[116]

Recognizing that the Entrepreneurs bore the risk of developing the jointly held IP, the MRDA provides them with economic interests in the IP: licenses and profit split-ting.[117]  As explained above, these economic rights apply on top of the rights that would otherwise flow from holding legal title.  Thus, the right to legal title under the MRDA never existed in isolation; it only appeared in the context of the entire agree-ment.  It would grossly inflate the Canadian Debtors' interests to treat the provision for legal title as if it were the only provision in the MRDA and value the legal title without taking into account any other rights or interests provided for under the MRDA and the Entrepreneurs' business arrangements.

Further, the Canadian Debtors' position cannot be reconciled with the manner in which Nortel allocated the Alcatel sale proceeds, in which sales proceeds attributed to IP were allocated based on R&D contribution percentages.[118]  Nor can it be recon-ciled with the manner in which Nortel's patents were litigated in the U.S. (as dis-cussed above) and licensed worldwide.[119]  The practice with regard to Nortel's U.S.

---

[116]  *See* Walter Henderson's deposition dated October 4, 2013, at p. 290.

[117]  I am advised that U.S. legal decisions also treat an exclusive license as providing a form of "beneficial ownership."  While I accept this as correct, from the tax and transfer pricing perspective, terms such as "beneficial," "economic," and "equitable" ownership (which I view as essentially synonymous) represent a broader range of potential interests in IP than what results in the particular case of holding an exclusive license.

[118]  *See* Section 4.3.2.

[119]  Individual Nortel entities had and exercised authority to grant licenses to Nortel IP.  *See* Dep. Ex. 21003, MRDA, Art. 5(a) at NNC-NNL06001514/6-7, 21; *see, e.g.,* Angela Anderson's deposition dated October 31, 2013, at pp. 45-47 (discussing license by NNUK to British Telecommunications); *see also* NNI_00850697, License Agreement at NNI_00850697 (Nortel IP was licensed to Huawei by NNL "on behalf of itself and its Subsidiaries"); Dep. Ex. 22080 (US_EMEA_Canada_PRIV_00071352), RE: Patent License Question at US_EMEA_Canada_PRIV_00071353 (Lead counsel for Nortel's Optical Business Line, Timothy Collins states:  "Rather than specifically adding each of the entities as parties to license agreements, we tended to fudge things. . . . The theory is that in each of the relevant jurisdictions, the licenses were being granted by the subsidiary which is the exclusive licensee for that jurisdiction."); Dep. Ex. 11111 (EMEAPRIV0155093), RE: Tax Form at EMEAPRIV0155095 (Nortel's tax leader Karino O states:  "the problem is that NN U.K. has the rights to the U.K. market (not NNL);" Nortel's IP Law and Tax Leaders agree that licensing agreement should be structured as "NNL, on behalf of itself and its Subsidiaries, as it seems to cover all scenarios").

patent litigation was to join both NNL and NNI in such suits.[120]  This practice further confirms that NNL is not the sole holder of all rights and economic interests flowing from the group's IP.[121]

Finally, prior to the Business Sales and the Residual IP sale, the parties entered into an Interim Funding and Settlement Agreement ("IFSA").  Despite language (*e.g.*, in Section 10(a)) to the effect that the IFSA would not impact allocation, Section 11(a) of the IFSA clearly provided that the Entrepreneurs were giving up their licenses "in consideration of a right to an allocation"[122] – a clear recognition that, at a minimum, parties beyond NNL were entitled to share in the IP Sale Proceeds.

## Appendices

A.     **Richard V.L. Cooper's CV**

B.     **Summary of Richard V.L. Cooper's Deposition and Trial Testimony**

C.     **Documents Considered or Relied Upon**

D.     **Acknowledgment of Expert's Duty**

## Exhibit 1:  R&D Spend, 2001-2008

*[signature]*                                              **January 24, 2014**

**Richard V.L. Cooper**

---

[120]  *See* Dep. Ex. 22084, Complaint, Nortel Networks Inc. and Nortel Networks Ltd. v. Foundry Networks, Inc. (filed March 14, 2001) (No. 01-10442DPW); Dep. Ex. 22151 (US_EMEA_Canada_PRIV_00010700), Cost Sharing Agreement and the Effect on Patent Infringement Litigation at US_EMEA_Canada_PRIV_00010700 ("Assuming this retroactive termination [of the CSA] is valid, I believe that we can proceed as planned, that is, naming Nortel Networks Limited ("NNL") and Nortel Networks Inc. ("NNI") as plaintiffs since they are the owner and exclusive licensee, respectively, of the US patents at issue in the proposed action against Kyocera.").

[121]  *See also* Christopher James Cianciolo's deposition dated October 15, 2013, at p. 111; Dep. Ex. 22083 (US_EMEA_Canada_PRIV_00009402), RE: NNI's Rights Under NNL's Patents at US_EMEA_Canada_PRIV_00009403 (NNI in-house patent attorney Richard Weiss states: "From a litigation perspective, if NNI is an exclusive licensee, then it must be involved in all US patent litigation.").

[122]  IFSA, executed June 9, 2009, at ¶¶ 10(a), 11(a).



**Appendix A**

# Richard V.L. Cooper
Vice President

PhD, Economics
University of Chicago

MA, Economics
University of California at Los Angeles

BA, Economics
University of California at Los Angeles

Dr. Richard V.L. Cooper is a vice president in the Transfer Pricing Practice of Charles River Associates. He is a transfer pricing and valuation expert with more than 30 years of experience. Dr. Cooper has testified as an expert witness before various bodies, including the US Tax Court, the US International Trade Commission, and the US Congress (including the Senate Armed Services Committee, House Armed Services Committee, and House Budget Committee). He has been named "one of the world's leading transfer pricing advisors" by International Tax Review/Legal Media Group every year since their *Expert Guides* series was first published in 1999. Dr. Cooper is a member of the Chicago Council on Global Affairs and the National Committee on United States-China Relations.

Prior to joining Charles River Associates, Dr. Cooper was a managing director with Houlihan Lokey where he built and managed the transfer pricing and analytics-based consulting practice. Prior to that role, he was a senior managing director at FTI Consulting and a managing partner with Ernst & Young, where he headed E&Y's worldwide transfer pricing practice. He spent the first eight years of his professional career at the Rand Corporation. Dr. Cooper has taught more than 20 undergraduate and graduate courses in international business, international tax, econometrics, money and banking, price theory, and manpower policy at Georgetown University, UCLA, University of California at Santa Barbara, University of Hawaii, and the Rand Graduate Institute. He has given more than 250 speeches and seminars on such topics as transfer pricing, valuation, international business strategy, international finance, countertrade, joint ventures, doing business in China, and export trading companies.

## Professional history

| | |
|---|---|
| 2009–Present | *Vice President*, Charles River Associates, Chicago, IL |
| 2007–2009 | *Managing Director*, Business Analytics and Transfer Pricing Group, Houlihan Lokey Howard & Zukin |
| | Responsible for building and managing Houlihan Lokey's transfer pricing and analytics-based consulting practice. Named as "one of the world's leading transfer pricing advisors" by International Tax Review/Legal Media Group. |
| 2005–2006 | *Senior Managing Director*, Economic Consulting Services, FTI Consulting |
| | Responsible for building FTI's analytics-based consulting practice. The practice included revenue and growth strategies, performance improvement, and transfer pricing solutions. |

Charles River Associates

| | |
|---|---|
| 1990–2004 | Ernst & Young LLP |
| | *Managing Partner*, Economics & Business Analytics, 2003–2004 |
| | Responsible for developing and building E&Y's analytics-based consulting practice. Worked in four industry sectors: energy, life sciences, media & communications, and retail and consumer products. |
| | *Co-Head*, Transfer Pricing, 1993–2002 |
| | Grew E&Y's transfer pricing practice from the smallest in the then Big 6 accounting firms to the largest in the Big 4 with revenues greater than $100 million and more than 400 professional staff in more than 40 countries. Became an internationally known expert in transfer pricing and has been recognized by practitioners and in-house corporate tax counsel as "one of the world's top transfer pricing specialists." Pioneered the development of Tax Effective Supply Chain Management. |
| 1989—1990 | *Senior Manager,* Transfer Pricing, Price Waterhouse |
| 1979–1989 | *Partner-in-Charge of Economics and International Trade Services*, Coopers & Lybrand |
| | Developed and built C&L's economics and international trade consulting practice. Led C&L's China consulting practice beginning in 1985. |
| 1971–1979 | *Program Manager for Defense Manpower Studies*, Rand Corporation |
| | Built and grew Rand's Defense Manpower Research Program to the second largest research program at Rand. Became one of the country's leading experts on the All-Volunteer Army, including testimony before the US Congress and numerous appearances before the media. Youngest person ever promoted to program director at Rand. |
| 1975–Present | *Public speaker* |
| | Given more than 250 speeches and seminars on such topics as international business strategy, transfer pricing, international finance, countertrade, joint ventures, doing business in China, and export trading companies. |
| 1969–1995 | *Lecturer* |
| | Taught more than 20 undergraduate and graduate courses in international business, international tax, econometrics, money and banking, price theory, and manpower policy at Georgetown University, UCLA, University of California at Santa Barbara, University of Hawaii, and the Rand Graduate Institute. |

## Expert witness

Testified as an expert witness before various bodies, including the US Tax Court (*Riggs National Bank v. Commissioner of Internal Revenue,* 1996; *H Group Holding, Inc. v. Commissioner of Internal Revenue,* 1999), the US International Trade Commission (United States-Canada Softwood Lumber dispute, 1985), the US Congress (Senate Armed Services Committee, House Armed Services Committee, and House Budget Committee), and in courts of law (*Goodrich vs. U.S).*

## Selected civic and professional activities

- Board of Visitors, Economics Department, UCLA, 2005–Present

- Chicago Council on Global Affairs, Chicago Committee, 1991–Present

- National Committee on United States-China Relations, 1986–Present

- Treasurer, Village of Kenilworth, Illinois, 2005–2009

- Treasurer, Kenilworth Police Pension Board, 2006–2009

- Board of Governors, Metropolitan Club, 1999–2009

- Global Economic Council, National Planning Association, 1989–1998

- Industry Sector Advisory Committee on Trade in Services, US Department of Commerce, 1986–1993; Chairman, Subcommittee on "Europe in 1992," 1988-1990

- Board of Advisors, National Center for Industrial Science and Technology Management Development in China (also known as Dalian Management Institute), 1986–1991

- Editorial Board, ORBIS, A Journal of World Affairs, 1981–1989

Charles River Associates

## Publications

"Some thoughts on the future of the arm's-length standard—a US perspective," with M. Granfield, *Euromoney Yearbooks*, 2006.

"Can Retailers 'Afford' Not to Have Science in Pricing?" with D. Ghosh, *Retail News*, Ernst & Young, Fall 2002.

"Implications of Licensing for Tax Directors," with E. Aud. *Licensing Economics Review*, Vol. 1, No. 12, September 1991.

"Foreign Exchange Issues in Transfer Pricing," in E. Neuman (ed.), *Transfer Pricing*, Business International, 1991.

"Joint Venturing in Japan," in R. Cushman (ed.), *The Handbook of Joint Venturing*, Dow Jones Irwin, 1988.

"Which Strategic Alliance and Why?" as told to Margaret Lawrence, *Strategic Direction*, October 1988.

"The China Market: Brighter Prospects after the Second Wave of Reforms," *Directors and Boards*, October 1987.

"China Opens Its Doors," *Leaders Magazine*, April 1986.

"The All-Volunteer Force: Five Years Later," *International Security*, Vol. 2, No. 4, Spring 1978.

MILITARY MANPOWER AND THE ALL-VOLUNTEER FORCE, The Rand Corporation, 1977.

"Efficient Capital Markets and the Quantity Theory of Money," *Journal of Finance*, Vol. 29, June 1974.

*The Additionality Factor in Tied US Development Assistance*, The Rand Corporation, June 1972.

**Appendix B**

---

Summary of Richard V. L. Cooper's Deposition and Trial Testimony

---

1. <u>Goodrich</u> v. U.S., 2012
2. <u>H Group Holding, Inc</u>. v. Commissioner of Internal Revenue, U.S. Tax Court, 1999
3. Testimony before the US Congress (Senate Armed Services Committee, House Armed Services Committee, and House Budget Committee) on the Cost of Military Personnel and the All-Volunteer Force, 1976 – 1978
4. <u>Riggs National Bank</u> v. Commissioner of Internal Revenue, U.S. Tax Court, 1996
5. <u>United States Softwood Lumber Manufacturers</u> v. Canadian Softwood Lumber Manufacturers,  U. S. International Trade Commission, 1985

# APPENDIX C: DOCUMENTS CONSIDERED OR RELIED UPON

The following documents have been considered or relied upon by Richard V. L. Cooper in connection with this matter.
All documents referenced in the report of Richard V. L. Cooper dated January 24, 2014, and attached exhibits and appendices are incorporated herein.

**Non-Bates Stamped Documents and Information Sources**

**Books, Websites, Laws, Regulations and Other Professional Resources**

- SEC Website (www.sec.gov)
- Nortel Sale is Biggest in Booming Patent Market, Marketwatch (June 27, 2011, 11:36 AM), *available at* marketwatch.com
- Apple Joins Microsoft, RIM in $4.5 Billion Buy of Nortel Patents (July 1, 2011, 4:18 PM), *available at* Bloomberg.com
- Apple and Microsoft Beat Google for Nortel Patents, NY Times (July 1, 2011, 4:58 AM), *available at* nytimes.com
- Courts OK Nortel Patent Sale to Apple/RIM Group, Reuters (July 1, 2011, 5:10 PM) , *available at* reuters.com
- Nortel $4.5-Billion Patent Sale to Apple, Microsoft, Others Approved (July 11, 2011, 3:14 PM), *available at* WSJ.com
- 35 U.S.C. § 261
- 1995 OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations
- 2010 OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations
- OECD Revised Discussion Draft dated July 2013
- Treasury Regulation 1.6662-6
- IRC 1.482-7

**Testimony**

- Deposition of Angela Anderson dated 10/31/2013
- Deposition of Angela DeWilton dated 11/20/2013
- Deposition of Brian McFadden dated 10/21/2013
- Deposition of Christopher Cianciolo dated 10/15/2013
- Deposition of Dr. Ron Horn dated 9/24/2013
- Deposition of Gareth Pugh dated 10/08/2013
- Deposition of Gilles Fortier dated 10/10/2013
- Deposition of Gillian McColgan dated 11/8/2013
- Deposition of Giovanna Sparagna dated 12/10/2013
- Deposition of Iain Morgan dated 10/22/2013
- Deposition of Ian Widdowson dated 11/26/2013
- Deposition of James Gatley dated 11/7/2013 - 11/8/2013
- Deposition of Jeff Wood dated 11/1/2013
- Deposition of John Doolittle dated 12/5/2013
- Deposition of John Roese dated 11/12/2013
- Deposition of John Veschi dated 11/7/2013
- Deposition of Karina O dated 11/9/13
- Deposition of Kerry Stephens dated 11/7/2013 - 11/8/2013
- Deposition of Laurie Krebs dated 10/7/2013
- Deposition of Malcolm Collins dated 10/10/13
- Deposition of Mark Weisz dated 11/25/2013
- Deposition of MaryAnne Pahapill dated 10/03/2013
- Deposition of Michael Orlando dated 11/5/2013 - 11/6/2013
- Deposition of Michelle Lee dated 10/28/2013
- Deposition of Murray McDonald dated 11/26/2013
- Deposition of Pascal Debon dated 11/25/2013
- Deposition of Peter Currie dated 10/15/13
- Deposition of Peter Look dated 11/12/2013 - 11/13/2013
- Deposition of Peter Newcombe dated 10/2/13
- Deposition of Philippe Albert-Lebrun dated 11/21/2013 - 11/22/2013
- Deposition of Roy James MacLean dated 10/23/13
- Deposition of Ryan Smith dated 10/21/2013 - 10/22/2013
- Deposition of Sharon Rolston dated 11/20/13
- Deposition of Simon Freemantle dated 12/14/13
- Deposition of Stephen Pusey dated 11/18/13
- Deposition of Timothy Collins dated 11/15/2013
- Deposition of Vincent Raimondo dated 10/4/2013
- Deposition of Walter Henderson dated 10/4/2013
- Deposition of William (Bill) Lasalle dated 10/10/2013
- Deposition of William Donovan dated 10/28/13

# APPENDIX C: DOCUMENTS CONSIDERED OR RELIED UPON

**SEC Filings (inclusive of any related attachments and/or exhibits)**

- Nortel Networks Corporation Form 10-K for the year ended December 31, 2000
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2001
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2002
- Nortel Networks Corporation Form 10-K/A for the year ended December 31, 2002
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2003
- Nortel Networks Corporation Form 10-K/A filed with the SEC on December 23, 2003
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2004
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2005
- Nortel Networks Corporation Form 10-K/A for the year ended December 31, 2005
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2006
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2007
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2008
- Nortel Networks Corporation Form 10-K for the year ended December 31, 2009
- Nortel Networks Corporation Form 8-K dated June 30, 2011
- Nortel Networks Corporation Form 8-K dated July 11, 2011
- Nortel Networks Corporation Form 8-K dated July 29, 2011

**Agreements**

- Interim Funding and Settlement Agreement

**Legal Filings**

- Allocation Position of the  Monitor and Canadian Debtors dated May 16, 2013.
- Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings of the Other Core Parties dated May 29, 2013
- Joint Administrators' Statement Regarding the Allocation Enitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 16, 2013
- Joint Administrators' Response Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 29, 2013

**Other Expert Reports**

- The Expert Report of James E. Malackowski dated January 24, 2014

# APPENDIX C: DOCUMENTS CONSIDERD OR RELIED UPON

The following documents have been considered or relied upon by Richard V. L. Cooper in connection with this matter. All documents referenced in the report of Richard V. L. Cooper dated January 24, 2014, and attached exhibits and appendices are incorporated herein.

## Exhibits and Bates Stamped Documents

| | Bates Range | |
|---|---|---|
| **Exhibit Number** | **Beginning** | **Ending** |
| Exhibit 11051 | NNI_00715620 | NNI_00715621 |
| Exhibit 11074 | NNC-NNL016069 | NNC-NNL016097 |
| Exhibit 11107 | US_Canada_PRIV_00015574 | US_Canada_PRIV_00015578 |
| Exhibit 11111 | EMEAPRIV0155093 | EMEAPRIV0155096 |
| Exhibit 11114 | NNC-NNL06542925 / 1 | NNC-NNL06542925 / 2 |
| Exhibit 11150 | CCC0001356 | |
| Exhibit 11169 | NNC-NNL002707 | NNC-NNL002753 |
| Exhibit 11345 | SUTHERLAND 00004771 | SUTHERLAND 00004774 |
| Exhibit 21002 | NNC-NNL006440 | NNC-NNL006452 |
| Exhibit 21003 | NNC-NNL 06001514 / 1 | NNC-NNL 06001514 / 66 |
| Exhibit 21007 | NNI_00430039 | |
| Exhibit 21011 | NNC-NNL11144208 / 1 | NNC-NNL11144208 / 2 |
| Exhibit 21013 | NNC-NNL11144207 | NNC-NNL11144207 |
| Exhibit 21018 | NNC-NNL06056509 / 1 | NNC-NNL06056509 / 3 |
| Exhibit 21026 | NNI_00373228 | NNI_00373292 |
| Exhibit 21160 | BHG0137543 | BHG0137544 |
| Exhibit 21167 | NNC_NNL11029235 / 1 | NNC_NNL11029235 / 3 |
| Exhibit 21167 | NNC_NNL11029236 / 1 | |
| Exhibit 21167 | NNC_NNL11029237 / 1 | NNC_NNL11029237 / 14 |
| Exhibit 21167 | NNC_NNL11029238 / 1 | NNC_NNL11029238 / 2 |
| Exhibit 21384 | NNL00697106 | |
| Exhibit 21407 | NNI_01333113 | |
| Exhibit 21407 | NNI_01333116 | |
| Exhibit 21409 | NNC-NNL11012502 / 1 | NNC-NNL11012502 / 5 |
| Exhibit 21410 | EMEAPRIV0236224 | |
| Exhibit 21410 | EMEAPRIV0236225 | |
| Exhibit 21410 | EMEAPRIV0236229 | EMEAPRIV0236235 |
| Exhibit 21410 | EMEAPRIV0236236 | EMEAPRIV0236241 |
| Exhibit 21447 | US_EMEA_Canada_PRIV_00036489 | US_EMEA_Canada_PRIV_00036498 |
| Exhibit 21448 | | |
| Exhibit 21449 | | |
| Exhibit 21451 | NNC-NNL06607282 / 1 | NNC-NNL06607282 / 3 |
| Exhibit 22020 | NNI_00327110 | NNI_00327150 |
| Exhibit 22078 | PC0184853 | PC0185061 |
| Exhibit 22080 | US_EMEA_Canada_PRIV_00071352 | US_EMEA_Canada_PRIV_00071355 |
| Exhibit 22083 | US_EMEA_Canada_PRIV_00009402 | US_EMEA_Canada_PRIV_00009407 |
| Exhibit 22084 | | |
| Exhibit 22085 | NNI_00825094 | NNI_00825204 |
| Exhibit 22123 | EY-NRTL-000023 | EY-NRTL-000089 |
| Exhibit 22143 | NNC-NNL06491238 / 1 | NNC-NNL06491238 / 1 |
| Exhibit 22151 | US_EMEA_Canada_PRIV_00010700 | US_EMEA_Canada_PRIV_00010702 |

# APPENDIX C: DOCUMENTS CONSIDERD OR RELIED UPON

**Bates Range**

| Exhibit Number | Beginning | Ending |
|---|---|---|
| Exhibit 31016 | NNC-NNL08000141 | NNC-NNL08000141 |
| Exhibit 31120 | | |
| Exhibit 31304 | NNC-NNL06521384 / 1 | |
| Exhibit 31304 | NNC-NNL06521385 / 1 | NNC-NNL06521385 / 2 |
| Exhibit 31355 | EMEAPROD2189880 | EMEAPROD2190060 |
| Exhibit 32145 | US_Canada_PRIV_00199548 | US_Canada_PRIV_00199553 |
| Exhibit 33067 | NNI_00794545 | NNI_00794556 |
| | | |
| | EMEAPRIV0204736 | EMEAPRIV0204739 |
| | EMEAPRIV0311047 | EMEAPRIV0311049 |
| | EMEAPRIV0311234 | |
| | EMEAPROD02318028 | |
| | NNC-NNL015507 | NNC-NNL015507 |
| | NNC-NNL015508 | NNC-NNL015514 |
| | NNC-NNL05527590 | NNC-NNL05527590 |
| | NNC-NNL05529325 | |
| | NNC-NNL06038722 / 1 | NNC-NNL06038722 / 30 |
| | NNC-NNL06128094 / 1 | NNC-NNL06128094 / 5 |
| | NNC-NNL06373071 / 1 | NNC-NNL06373071 / 50 |
| | NNC-NNL07491142 / 1 | NNC-NNL07491142 / 1 |
| | NNC-NNL10106283 / 1 | NNC-NNL10106283 / 2 |
| | NNC-NNL10957720 / 1 | NNC-NNL10957720 / 5 |
| | NNC-NNL11656151 / 1 | NNC-NNL11656151 / 8 |
| | NNI_00050748 | NNI_00050762 |
| | NNI_00432842 | |
| | NNI_00442576 | NNI_00442772 |
| | NNI_00630021 | NNI_00630028 |
| | NNI_00634252 | NNI_00634296 |
| | NNI_00850697 | NNI_00850726 |
| | NNI_01041640 | NNI_01041669 |
| | NNI_01041734 | |
| | NNI_0104734 | |
| | NNI_01492892 | NNI_01492895 |
| | NNI_01503031 | NNI_01503038 |
| | NNI_01534132 | NNI_01534133 |
| | NNI_00794545 | |
| | NOR_54402902 | NOR_54402902 |
| | UCC0155745 | UCC0155782 |
| | US_EMEA_Canada_PRIV_00213789 | US_EMEA_Canada_PRIV_00213794 |
| | US_EMEA_Canada_PRIV_00214146 | |
| | US_EMEA_Canada_PRIV_00214833 | US_EMEA_Canada_PRIV_00214840 |
| | NOR_53648312 | |
| | NOR_53648037 | |
| | NOR_53648041 | |
| | NOR_53648508 | |
| | NOR_53648130 | |

# APPENDIX C: DOCUMENTS CONSIDERD OR RELIED UPON

| Exhibit Number | Bates Range | |
| --- | --- | --- |
| | Beginning | Ending |
| | NOR_53648133 | |
| | NOR_53648323 | |
| | NOR_53648048 | |

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

## ACKNOWLEDGMENT OF EXPERT'S DUTY

1.  My name is Richard V. L. Cooper. I live at the Kenilworth, Cook County, of the Illinois U.S.A.

2.  I have been engaged by or on behalf of the Lawyers for the Joint Administrators for the EMEA Debtors to provide evidence in relation to the above-noted court proceeding.

3.  I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

    (a)  to provide opinion evidence that is fair, objective and non-partisan;

    (b)  to provide opinion evidence that is related only to matters that are within my area of expertise; and

    (c)  to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.  I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

January 24, 2014

## Exhibit 1: R&D Spend, 2001-2008

*($ in millions)*

| Years | Total NNL | % of Total R&D | NNI | % of Total R&D | FDC / BAY | % of Total R&D | FDC - Shannon | % of Total R&D | NN Ireland | % of Total R&D | France | % of Total R&D | Brazil | % of Total R&D | NNUK | % of Total R&D | NNJI | % of Total R&D | NN Australia | % of Total R&D | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 [a] | 1,463.0 | 42.7% | 1,181.2 | 34.5% | 162.7 | 4.7% | 15.7 | 0.5% | 11.7 | 0.3% | 223.1 | 6.5% | 4.3 | 0.1% | 352.3 | 10.3% | 0.2 | 0.0% | 13.3 | 0.4% | 3,427.5 |
| 2002 [a] | 879.6 | 39.9% | 868.3 | 39.3% | 1.6 | 0.1% | - | - | 14.8 | 0.7% | 245.6 | 11.1% | 2.5 | 0.1% | 183.8 | 8.3% | - | | 10.5 | 0.5% | 2,206.7 |
| 2003 [a] | 821.5 | 40.8% | 793.1 | 39.4% | 0.5 | 0.0% | - | - | 18.1 | 0.9% | 266.9 | 13.3% | 6.6 | 0.3% | 95.3 | 4.7% | - | | 10.3 | 0.5% | 2,012.1 |
| 2004 [a] | 841.7 | 42.0% | 768.2 | 38.3% | 0.2 | 0.0% | - | - | 17.8 | 0.9% | 267.3 | 13.3% | 8.6 | 0.4% | 95.6 | 4.8% | 0.0 | 0.0% | 6.4 | 0.3% | 2,005.7 |
| 2005 [b] | 804.0 | 42.8% | 719.5 | 38.3% | 0.1 | 0.0% | - | - | 17.9 | 1.0% | 256.8 | 13.7% | 8.4 | 0.4% | 66.4 | 3.5% | - | - | 4.5 | 0.2% | 1,877.5 |
| 2006 [c] | 902.4 | 48.3% | 679.2 | 36.4% | - | - | - | - | 19.7 | 1.1% | 223.2 | 11.9% | - | - | 43.6 | 2.3% | - | - | - | - | 1,868.0 |
| 2007 [c] | 841.9 | 51.0% | 677.7 | 41.1% | - | - | - | - | 25.0 | 1.5% | 67.1 | 4.1% | - | - | 39.0 | 2.4% | - | - | - | - | 1,650.7 |
| 2008 [d] | 770.3 | 51.3% | 614.8 | 41.0% | - | - | - | - | 24.4 | 1.6% | 55.4 | 3.7% | - | - | 36.5 | 2.4% | - | - | (0.1) | 0.0% | 1,501.3 |
| **Total** | **7,324.4** | **44.3%** | **6,301.9** | **38.1%** | **165.0** | **1.0%** | **15.7** | **0.1%** | **149.3** | **0.9%** | **1,605.3** | **9.7%** | **30.4** | **0.2%** | **912.4** | **5.5%** | **0.2** | **0.0%** | **44.9** | **0.3%** | **16,549.6** |

*Sources:*

[a] 2004 RPSM - NOR_53648508  Tab: "Capitalized R&D - Declining Bal"
[b] 2005 RPSM - NOR_53648130 - Tab: "Capitalized R&D - Declining Bal"
[c] 2008 RPSM - NOR_53648048 - Tab: "IP owner R&D"
[d] EMEAPROD02318028 - Tab: 2006-2008

*CRA International*