

Court File No. 09-CL-7950

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al*., | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

## REBUTTAL EXPERT REPORT OF RICHARD V.L. COOPER

(Submitted by the EMEA Debtors)

February 28, 2014

REDACTED VERSION

February 28, 2014                                                                 Charles River Associates

Table of Contents

Table of Contents ........................................................................................................... i

1    Introduction and Scope of Review ........................................................................1
     1.1    Assignment .................................................................................................1
     1.2    Documents and Other Information Considered or Relied Upon ..........................1
     1.3    Summary of Opinions ...................................................................................2

2    The Appropriateness of the Residual Profit Split Method (RPSM) as a Transfer Pricing
     Methodology ........................................................................................................5

3    The Appropriateness of Measuring Relative Contribution by R&D Spend ...................10

4    Determination of the Appropriate "Look Back" Period for Measuring Relative R&D
     Spend .................................................................................................................13

5    The Defects in Dr. Reichert's Analysis ......................................................................15

6    The Defects in Dr. Eden's Analysis ...........................................................................21

7    Dr. Reichert's and Dr. Eden's Failure to Account for Nortel's Own Prior Practice and
     Internal Analysis ................................................................................................25

Appendix 1:  Documents Considered or Relied Upon.............................................................29

Exhibit 2:  Nortel Networks Corporation, Income Statement Data .......................................29

February 28, 2014                                                    Charles River Associates

# 1 Introduction and Scope of Review

## 1.1 Assignment

I previously submitted a report on January 24, 2014 in connection with this matter (the "Opening Allocation Report"). The Opening Allocation Report sets out the background of these proceedings, the terms of my retention by the Joint Administrators, and my opinions concerning the allocation of the IP Sale Proceeds.[1]

Counsel for the Joint Administrators have requested that I prepare this supplemental report for the purposes of evaluating and, where appropriate, responding to the opinions in the reports submitted on January 24, 2014 by: (a) Dr. Timothy Reichert of Economics Partners, LLC on behalf of the Canadian Debtors (the "Reichert Report"); and (b) Lorraine Eden, Ph.D. on behalf of the U.S. Debtors (the "Eden Report").[2]

I understand and acknowledge that, although I have been retained by the Joint Administrators for the EMEA Debtors, my over-riding duty is to the courts and includes the obligations (a) to provide opinion evidence that is fair, objective, and non-partisan; (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and (c) to provide such additional assistance as the courts may reasonably require to determine a matter in issue.

## 1.2 Documents and Other Information Considered or Relied Upon

In connection with my work on the Opening Allocation Report, I and/or members of my staff have reviewed and analyzed, among other things, certain documents and information produced in this case, contemporaneous business records, depositions taken in the case to date, and certain information derived from publicly available sources and other subscription services. A listing of those documents and information is attached to my Opening Allocation Report at **Appendix C**. In addition to the items in Appendix C, for the purposes of this report, I have also considered or relied upon the documents listed in **Appendix 1**, attached hereto.

---

[1]   Unless otherwise defined, capitalized terms shall have the same meaning as provided in my Opening Allocation Report.

[2]   While I have addressed in this report what I consider to be the most salient deficiencies in Dr. Reichert's and Dr. Eden's analyses and the conclusions they derived from their analyses, I have not attempted to address each and every opinion or related observation set forth in their reports. Not doing so, however, should *not* be construed as my agreement with, or endorsement of, those opinions.

The opinions expressed in this report are based on information available to me as of the date of this report.  If documents or other information that might affect the opinions and conclusions expressed herein become available subsequent to the submission of this report, I reserve the right to supplement and/or amend this report on that basis, or for other reasons.

## 1.3    Summary of Opinions

Based upon my knowledge of transfer pricing principles generally and in particular of those applicable to the Residual Profit Split Method (RPSM) used by Nortel during the period of January 1, 2001 through December 31, 2008, the work I have performed to date in reviewing the business arrangements among the relevant Nortel entities, and the representations made by Nortel to the relevant tax authorities, I have concluded the following:

   a.   As Dr. Reichert and Dr. Eden concede, RPSM is an acceptable transfer pricing methodology.

       i.    RPSM was appropriate for Nortel because it fit Nortel's business practices, business model, and circumstances.

       ii.   Even if Nortel was motivated by its desire to minimize its global tax burden, as Dr. Eden contends, such motivation is not improper and does not change the fact that RPSM was appropriate for Nortel.

       iii.  Even if Nortel's implementation of its RPSM was flawed, as Dr. Eden contends,[3] the principle underlying Nortel's RPSM – that the Entrepreneurs' shares of residual profits should be determined based on their relative contribution to R&D spend – was appropriate in Nortel's case.

   b.   As Dr. Reichert and Dr. Eden concede, relative contribution to the creation of IP as measured by R&D spend is an acceptable allocation key for the purposes of dividing profits and losses under an RPSM.

       i.    As Nortel represented to tax authorities, R&D spend was appropriate for Nortel, particularly because IP was a key profit driver of Nortel's business.

---

[3]   For the reasons provided in my Transfer Pricing Expert Report dated January 24, 2014, submitted in connection with the Canadian proceedings (the "Transfer Pricing Report"), I agree that Nortel made certain errors in the implementation of its RPSM.

ii.   Contrary to Dr. Eden's contention, the settlement between the IRS and the CRA, which resulted in Nortel's agreement to increase NNI's income by $2 billion over the January 1, 2001 to December 31, 2005 period (the "$2 Billion Settlement"), is not a basis to reject Nortel's allocation key for the allocation of the IP Sale Proceeds. That settlement did not attribute the $2 billion to any particular defect in the RPSM and did not provide any basis to question the use of R&D spend as an allocation tool.

c.   In calculating the Entrepreneurs' contribution to IP, it is appropriate to deviate from the "look back" period specified in the MRDA because that "look back" has been shown to be inaccurate by reference to the actual useful life of the IP that was sold in the Business Sales and the Residual IP sale.

d.   Dr. Reichert takes the position that only NNL is entitled to the proceeds from the sale of the group's IP, less any value attributed to the EMEA and U.S. Entrepreneurs' exclusive licenses, which he asserts were limited to the making and selling of products that embodied the group's shared R&D. This position is flawed for at least eight reasons:

i.   Under Nortel's RPSM and as also confirmed in the MRDA, each of the Entrepreneurs that spent money on R&D and bore the risk of its success or failure is equally entitled to share in the financial benefits realized from the IP. Notwithstanding the assignment of legal title to NNL, NNL had no greater right to enjoy the benefits of ownership of the IP than any of the other Entrepreneurs.

ii.   Dr. Reichert does not point to any evidence that the Entrepreneurs relinquished the right to proceeds from the sale of the group's IP. Rather, contemporaneous documentation shows that the Entrepreneurs expected that they would all share in the proceeds.

iii.   From an economic perspective, no rational entrepreneur would have given up a right to proceeds from the sale of jointly created IP while retaining only the right to share in profits generated from year to year through the making and selling of products that embody the group's IP, particularly in light of Nortel's continuing and mounting losses.

iv.   Dr. Reichert misunderstands the "defensive value" of the Residual IP to Nortel's business and fails to account for the fact that value generated from the Residual IP in the 2001-2008 period was divided in accordance with Nortel's RPSM.

Case 09-10138-KG   Doc 13654   Filed 05/28/14   Page 6 of 34

February 28, 2014                                                      Charles River Associates

    v.    Dr. Reichert fails to reconcile his assertion that the Entrepreneurs' economic ownership was limited to making and selling Nortel products with the provision in the MRDA that provided the Entrepreneurs with the right to assert actions and recover damages with respect to any of the group's IP.

    vi.    Dr. Reichert ignores that bare legal title was divorced from the economic rights flowing from the group's IP; pursuant to those economic rights, the economic benefits from the exploitation of the group's IP were divided in accordance with the Entrepreneurs' relative contributions to the creation of that IP.

    vii.    The limitations Dr. Reichert seeks to impose on the Entrepreneurs' economic interests in the Residual IP are not consistent with Nortel's allocation key, which took in R&D spend on all IP, not just that IP that was embodied in Nortel products.

    viii.    Dr. Reichert fails to consider the tax implications of his opinion. If Dr. Reichert were correct, the EMEA and U.S. Entrepreneurs would have transferred significant value to NNL without compensation and the tax authorities would have imputed income to them. This did not happen.

e.    Dr. Eden takes the position that the relative value of the Entrepreneurs' exclusive licenses, rather than the principles in Nortel's RPSM, should be used to allocate the IP Sale Proceeds. This position is flawed, at a minimum, for the following reasons:

    i.    Dr. Eden concedes that "profits are allocated among entities consistent with the economic substance of the transaction,"[4] but then ignores the economic substance of the Entrepreneurs' transactions, as represented to the tax authorities, for the purpose of allocating sales proceeds. In those representations, Nortel explains why RPSM was best suited for Nortel and how RPSM would be used to split residual profit.

    ii.    Dr. Eden concedes that the Entrepreneurs were the economic owners of the IP but then incorrectly limits the benefits of that ownership to the license rights granted under the MRDA. The Entrepreneurs' business arrangement, however, preceded the MRDA. Moreover,

---

4    Eden Report at paragraph 65.

consideration of the Entrepreneurs' entire business arrangement – including the sharing of profits through the RPSM – rebuts Dr. Eden's contention.

iii. The economic substance of the Entrepreneurs' business arrangement confirms that the Entrepreneurs' ownership interests were based on their relative contributions to the creation of IP, as opposed to their exclusive licenses. Indeed, pursuant to this business arrangement, an Entrepreneur could not keep the income generated from its exclusive license but shared that income with the other Entrepreneurs pursuant to Nortel's RPSM calculation.

iv. If Dr. Eden were correct, the EMEA and Canadian Entrepreneurs were conducting their businesses irrationally, as the amounts they spent on R&D would have provided a disproportionate benefit to the U.S. Entrepreneur.

f. Finally, Dr. Reichert's and Dr. Eden's opinions fail to account for Nortel's own prior practice. That practice confirms the understanding that the Entrepreneurs held economic interests in proceeds generated from the exploitation of the group's IP, regardless of the manner of exploitation.

## 2 The Appropriateness of the Residual Profit Split Method (RPSM) as a Transfer Pricing Methodology

Dr. Reichert and Dr. Eden concede, as they must, that RPSM is an accepted transfer pricing methodology.[5] OECD guidelines explain that transactional profit methods – including RPSM – are more appropriate than other "traditional" methods "where each of the parties makes valuable and unique contributions in relation to the controlled transaction, or where the parties engage in highly integrated activities."[6] As discussed in my Opening Allocation Report,[7] both of these conditions prevailed at Nortel.

---

[5] Reichert Report at p. 3; Eden Report at paragraphs 47-48.

[6] OECD Guidelines Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations (July 2010) at paragraphs 2.4, 2.109; *see also* Eden Report at pp. 22-23 n.60 (citing the same); 26 C.F.R. § 1.482-6(c)(3) (2009); Revenue Canada Information Circular 87-2R at paragraphs 1, 97-102.

[7] Opening Allocation Report at Sections 3.2.2.1, 3.3.

February 28, 2014                                          Charles River Associates

Dr. Reichert further concedes that RPSM was "the most appropriate" method for Nortel: "[t]he residual profit split method was *the most appropriate transfer pricing method for Nortel*, taking into account the nature of Nortel's enterprise, the central role of R&D in Nortel's business, the relationship of the Nortel entities, Nortel's global operating model, the inherent nature of Nortel's R&D, and the different functions engaged in by Nortel entities (particularly R&D, distribution and/or manufacturing)."[8]

Although Dr. Eden tries to characterize RPSM as a method of "last resort,"[9] she acknowledges that a multinational enterprise must select the "best method" or the "most appropriate method" under the circumstances.[10]  Dr. Eden later cites to the OECD guidelines discussed above,[11] and tellingly, does not – and cannot – claim that Nortel failed to comply with these requirements by implementing RPSM.

In fact, RPSM was adopted "at the request of" and with the support of the CRA and the IRS.  This is memorialized in the MRDA:

> Nortel uses the residual profit split method ("RPSM") embodied in the calculation described below, which was originally adopted as of January 1, 2001 *at the request of certain Revenue Authorities* as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity provided pursuant to the Agreement.[12]



---

[8]   Reichert Report at p. 5 (emphasis added); *see also* Reichert Report at pp. 27-34.

[9]   Eden Report at paragraphs 46, 53, 146.

[10]  Eden Report at paragraph 35.

[11]  Eden Report at pp. 22-23 n.60.

[12]  Dep. Ex. 21003 (NNC-NNL06001514), MRDA, Second Amendment to Schedule A, at NNC-NNL06001514/48 (emphasis added).

████████████████████ The IRS ████████ stated that its "APA Team agreed with Nortel that the residual profit split method (RPSM) is the best method."[14]

For the reasons discussed in my Opening Allocation Report, I likewise agree that Nortel's use of RPSM was reasonable; indeed, in Nortel's circumstances, no other method made more sense.[15]  The various Nortel entities engaged in a variety of intercompany transactions including ones involving tangible property, services, and, of course, intangible property.  If not for Nortel's intangible property transactions, Nortel could have considered the other transfer pricing methods that Dr. Eden outlines in her report (*e.g.*, comparable uncontrolled price method, resale price method, cost-plus method, comparable profit method, transaction net margin method).[16]  As Horst Frisch's economic analysis found, Nortel did not have the data to apply these other methods to its intangible property transactions.[17]  Further, Nortel's intercompany transactions involving its intangibles were simply too complicated to apply these other methods.  Nortel originally tried cost sharing,[18] but the number of entities conducting R&D and Nortel's numerous significant acquisitions made it difficult from an administrative and tax perspective to continue

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[14]  Dep. Ex. 11237 (NNC-NNL061995), IRS Memorandum re: Nortel Networks Inc. (APA-148919-02) Proposed U.S.-Canada Bilateral APA dated Mar. 22, 2006, at 23.

[15]  Opening Allocation Report at Section 3; *see also* Dep. Ex. 22078 (PC0184853), Joint Request for US-Canada Bilateral APA dated Oct. 31, 2008 ("2008 US-Canada Bilateral APA Application"), at PC0184865, PC0184887-88 (considering and rejecting alternative transfer pricing methods).

[16]  Eden Report at paragraphs 40-44.

[17]  *See* Dep. Ex. 22123 (EY-NRTL-000023), Thomas Horst et al., Economic Analysis of Nortel Networks' Intercompany Transactions (2002) at 17, 19-21, 23-24, 29, 33.

[18]  *See* Opening Allocation Report at Section 3.2.1.

cost sharing.[19]   In Nortel's circumstances, RPSM was not only the most practical transfer pricing methodology, but was also a good transfer pricing methodology, because it fit Nortel's business practices, business model, and circumstances.  In fact, Nortel represented to tax authorities in the U.S. and Canada that RPSM was the best method for Nortel.[20]

Dr. Eden explains that "there may be a range of 'equally reliable' prices that results from the application of the 'best method.'  Accordingly, when setting its transfer pricing policies, it is rational, legal, and normal for [a multinational enterprise] to choose the method that will minimize the [multinational enterprise's] global tax burden."[21]   Dr. Eden then concludes that "Nortel set up and applied its transfer pricing policy so as to reduce Nortel's global tax burden," but she concedes that Nortel remained "compliant with the constraints imposed by national tax regulations."[22]

---

[19]  For example, if Nortel acquired a French company, it could leave it as either a stand-alone company or integrate it into NN France (*i.e.*, the French Entrepreneur).  With regard to the acquired company's IP, Nortel would have to decide whether to include it in the cost sharing arrangement ("CSA").  If it was made part of the CSA, then each of the CSA participants would have to make a buy-in payment (which could be done in lump sum or a series of annual payments).  If it was not made part of the CSA, then any CSA participant that used the acquired company's IP would have to obtain a license to do so and pay royalties accordingly.  This situation may be manageable when there are a few acquisitions, but can quickly become unmanageable when there are many.

[20]  *See, e.g.*, Dep. Ex. 22078 (PC0184853), 2008 US-Canada Bilateral APA Application, at PC0184865, PC0184887-93 ("Residual Profit split is the best method to test Nortel's intercompany transactions.").

[21]  Eden Report at paragraph 130 (citations omitted).

[22]  Eden Report at paragraph 137.  Dr. Eden acknowledges that "Canada had a tax rate of roughly 40%," but states further that "Nortel was able to use R&D tax credits generated in Canada to offset those taxes, resulting in a much lower effective tax cost on Canadian income than on NNI or NNUK income . . . ."  Eden Report at paragraph 138.  Dr. Eden is correct that Canada's R&D tax credits would have reduced Nortel's tax rate had it had any income to report – because it was incurring significant losses, Nortel's effective tax rate was zero during this period.  The actual effective tax rate in Canada depends on net income and the amount of qualified R&D.  At least from the mid-2000s through 2013, Canada's R&D tax credit was 20%.  Income Tax Act (2011), R.S.C. 1985, c. 1 (5th Supp.) § 127(9) definition of "investment tax credit" (a)(i), *available at* http://laws.justice.gc.ca/eng/acts/I-3.3/20111215/P1TT3xt3.html#s-127 (last visited Feb. 28, 2014); *see also* Canada Revenue Agency, SR&ED Investment Tax Credit Policy, at Section 2.2.1 ("The basic rate of SR&ED [Income Tax Credit] is 20%.") (last updated Dec. 19, 2012), http://www.cra-arc.gc.ca/txcrdt/sred-rsde/clmng/srdnvstmnttxcrdt-eng.html#N10505 (last visited Feb. 28, 2014).  Based on my review of Canadian R&D tax credits, however, the effective tax rate for NNL would probably have been in the neighborhood of 25%-30% if Nortel returned to profitability, rather than the 11% claimed by Dr. Eden.

As Dr. Eden agrees, an enterprise's transfer pricing methodology is constrained by the arm's length principle.[23]  Nortel represented – and the tax authorities required – that Nortel's transfer pricing methodology was appropriate in its circumstances and provided a reasonable approximation of an arrangement to which arm's length parties would agree.  In fact, as explained above, Nortel's adoption of RPSM was at the request of and with the support of the CRA and the IRS.  Thus, Dr. Eden's claim that Nortel "was motivated primarily by tax avoidance in choosing its transfer pricing policy"[24] does not change the fact that RPSM was appropriate for Nortel.

Dr. Eden contends further that, because Nortel's use of RPSM was motivated by its desire to minimize its global tax burden, the principles underlying the RPSM do not provide a suitable basis for allocation of the sale proceeds attributable to IP.[25]  But the reason why the RPSM was suitable for tax purposes is because it reflected the commercial substance of the relationships and agreements between the parties, as represented to the tax authorities in multiple jurisdictions on multiple occasions over the years.  The central concern of the tax authorities and the guiding principle of transfer pricing policies is directly relevant to the allocation of the sale proceeds, *i.e.*, ensuring that the value derived from the operations of the business is attributed to the correct geographic entity.

Dr. Eden also claims that Nortel's implementation of its RPSM was flawed.[26]  I agree.  Indeed, my Transfer Pricing Report, submitted in connection with the Canadian proceedings, indicates several areas where Nortel's implementation of its RPSM was flawed.  But a flawed implementation of a transfer pricing method does not invalidate the method itself.  The principle underlying Nortel's RPSM – that the Entrepreneurs' shares of residual profits should be defined by their relative contribution to R&D

---

To illustrate, if NNL's income was $2 billion, and its Canadian R&D was $800 million, then its R&D tax credit would be $160 million (20% of $800 million).  NNL's tax on its $2 billion net income would be $680 million (34% of $2 billion).  Plus, it would owe tax at the statutory rate of 34% on the tax credit that it received – 34% of $160 million is $54.4 million.  So, NNL's total Canadian tax would be $680 million on NNL's Canadian income plus $54.4 million on the R&D tax credit that it received, less its $160 million tax credit, yielding a net tax due of $574.4 million.  This equates to an effective tax rate of 28.7%.  Following the same logic, if NNL's income was much less, its effective tax rate would fall.  For example, if its net income equaled its R&D spend, then its effective tax rate would be 20.8%.  Thus, as NNL's income declines as compared with its R&D spend, its effective tax rate also declines.  Indeed, NNL was able to achieve a zero percent tax rate, but incurred huge losses to do so.

[23]   Eden Report at paragraphs 26-30.

[24]   Eden Report at paragraph 145.

[25]   Eden Report at paragraphs 136-137.

[26]   Eden Report at paragraphs 149-157.

spend – was appropriate in Nortel's case for the reasons discussed here and in my Opening Allocation Report.

## 3    The Appropriateness of Measuring Relative Contribution by R&D Spend

As discussed in my Opening Allocation Report, participants in an RPSM must select an "allocation key" to divide profits (or losses).  Nortel determined that IP was the "key profit driver" in its business, and therefore, that the profits or losses of the business should be divided based on the Entrepreneurs' relative contributions to that IP measured by R&D spend.[27]  In my opinion, given Nortel's representations and my understanding of Nortel's business, this allocation key was appropriate.

Dr. Reichert agrees that Nortel's RPSM, which "provided a simple way, consistent with Nortel's facts, to treat all of the investors in R&D as sharing equally in the profits associated with making and selling products that embodied the R&D," was "entirely consistent with intercompany transfer pricing regulations and guidance."[28]

Dr. Eden also concedes that Nortel's allocation key, in principle, is acceptable.[29]  However, Dr. Eden takes the position that Nortel's RPSM should not be considered for allocation purposes.  As a reason for this view, Dr. Eden points to the $2 Billion Settlement with the tax authorities,[30] although Dr. Eden acknowledges that "[n]o specific transfer pricing calculation could be agreed upon by the IRS, CRA, and

---

[27]  Dep. Ex. 21003 (NNC-NNL06001514), MRDA, Schedule A at NNC-NNL06001514/18, 48.

[28]  Reichert Report at p. 34; *see also* Reichert Report at pp. 27-33.  For the reasons discussed in Section 5, Dr. Reichert reaches the incorrect conclusion that this allocation key should not be applied to the IP Sale Proceeds.

[29]  Eden Report at paragraph 52.  Dr. Eden later states that "R&D spending does not necessarily bear any relation to the value of each entity's intangible assets and rights."  Eden Report at paragraph 55.  The question, of course, is not whether R&D spend can be used to value any property, but rather, whether relative R&D spend provides a basis to allocate proportionate value.  Moreover, Dr. Eden concedes that "the OECD Transfer Pricing Guidelines permit the use of an allocation key based on each affiliated entity's expenses, such as its R&D spending, but only where the taxpayer can show a 'strong correlation between relative expenses incurred and relative value added' by each related party . . . ."  Eden Report at paragraph 56.  Dr. Eden does not provide any basis to challenge the showing that Nortel made to the tax authorities in support of its allocation key.  *See* Dep. Ex. 22078 (PC0184853), 2008 US-Canada Bilateral APA Application, at PC0184865, PC0184886-905.

[30]  Eden Report at paragraph 150;

Nortel, so the $2 billion adjustment was negotiated between the CRA and IRS, and Nortel, in turn, accepted that adjustment."[31]  In fact, the IRS and the CRA did not disclose any breakdown of the reasons or basis for the $2 billion figure.  Nortel's Vice President of Tax, Peter Look – who oversaw Nortel's APA efforts and served as Nortel's spokesperson during APA discussions with the tax authorities[32] – stated that Nortel was "not given any indication as to the rationale for the settlement between the governments."[33]   Similarly, NNL's CFO (post-insolvency) John Doolittle acknowledged that he did not have "any understanding" of "how that $2 billion figure was arrived at."[34]

Further, the $2 Billion Settlement does not mean that Nortel's allocation key for residual profits – R&D spend – was unreasonable or flawed.  Indeed, none of the arguments raised by the IRS in the documents preceding the settlement had anything to do with the allocation key.  The only question any tax authority appears to have raised that in any way related to the principles underlying Nortel's split of residual profits or losses was a question from the IRS regarding whether R&D spend percentages should have been calculated separately for each line of business.  Based on my review of Nortel's representations about its business, particularly how Nortel performed its R&D, the line of business approach suggested by the IRS was inconsistent with the operations of Nortel's business and not a reliable basis for allocation.  As Nortel and its independent tax advisors – the Canadian and U.S. Ernst & Young firms – consistently represented to the CRA and the IRS, RPSM could not

---

[31]   Eden Report at paragraph 152.

[32]   Peter Look's Deposition dated November 13, 2013, at pp. 269-270.

[33]   Peter Look's Deposition dated November 13, 2013, at p. 271.

[34]   John Doolittle's Deposition dated December 5, 2013, at p. 236; *see also* Michael Orlando's Deposition dated November 6, 2013, at p. 263 ("Q.  And you don't know, sir, how the $2 billion figure was reached, do you, sir?  A.  I do not."); Rosanne Culina's Deposition dated October 17, 2013 at p. 182 ("Q.  Do you know what the basis for the adjustment was, generally speaking, why there was an adjustment?  A.  No.  I don't recall the details of how the tax authorities came to where they came to.").

be separately applied to Nortel's individual lines of business.[35]  Even when a product could be attributed to a specific line of business, Nortel's "highly coordinated and interdependent" R&D efforts ensured that "not one single R&D location or region [was] solely responsible for all project components that [made] up a product."[36]  Further, due to the structure of its R&D function, Nortel was only able to maintain high level financial data for the individual lines of business that did not meet the relevant transfer pricing reporting requirements.[37]  It is my opinion, therefore, that Nortel's decision to use a single RPSM was appropriate.[38]

---

[35]  *See* Dep. Ex. 11352 (NNI_01534866), RE: Nortel Networks, Inc. (APA-148919-02) Proposed U.S.-Canada Bilateral APA, at NNI_01534869-70 (outlining the reasons why Nortel objected to the line of business approach and concluding that "under Nortel's facts and circumstances, the single RPSM will provide the most reliable measure of arm's length results as intended under §§ 1.482-1(b) (Arm's Length Standard) and 1.482-1(f)(2)(v) (Application Applies to Results, Not Methods) and is fully in compliance with §§ 1.482-1(c) (Best Method Rule) and 1.482-6 (Profit Split Method)."); NNI_01534132, Email dated September 22, 2006 from Ernst & Young (the U.S. affiliate) to the IRS (copying the Canadian Ernst & Young ("EY") affiliate and attaching NNI_01534134); NNI_01534134, Draft Nortel Multilateral APA Responses to Joint IRS/CRA "Factual Questions to NNL" and "Agreed Material Facts" dated September 22, 2006, at NNI_01534145 (copying the CRA and noting that "Nortel developed its transfer pricing methodology by considering its business as a whole, which ultimately captures all migration of the business segment's investment in R&D and communal platforms, leading to the most equitable result."); EY-NRTL-061501, Email dated October 18, 2007 from EY Canada's Bob Turner to EY U.S.'s David Canale, "N" ("The [line of business approach] is inconsistent with the relevant facts," and this approach would fail to meet the preconditions for its use by U.S. regulators because the required information was not available, estimates by line of business were "made on a somewhat arbitrary basis," and the lines of business "changed several times" over the APA period); EY-NRTL-061512, Email dated October 18, 2007 from EY U.S.'s David Canale to Michael Orlando, "Confirmation of IRS Position," at EY-NRTL-061513-14 (explaining why the line of business approach would be inconsistent with U.S. regulations).

[36]  NNC-NNL015508, Nortel Multilateral APA Responses dated Feb. 18, 2008, at NNC-NNL015511.

[37]  EMEAPRIV0025813, Email dated April 10, 2006 from Kerry Stephens to KPMG U.K.'s Andrew Hickman, "FW: Response to RNP" (forwarding EMEAPRIV0025816); EMEAPRIV0025816, Letter dated April 6, 2006 from Mark Weisz to Tom Ralph, "RE: Nortel Networks, Inc. (APA-148919092) Proposed U.S.-Canada Bilateral APA," at pp. EMEAPRIV0025819-20 ("Nortel does not keep statutory financial statements in accordance with U.S. GAAP for its various lines of business. High level [line of business] financials are kept for management evaluation purposes only to make informed management decisions. Accordingly, the existing [line of business] financial data is not reliable under application of Reg. § 1.482-1(c)(2)(ii) (Data and Assumptions) and does not correctly reflect true taxable income as described in § 1.482-1(f)(2)(i) (Aggregation of Transactions).").

[38]  For the purposes of measuring the Entrepreneurs' relative contribution to the IP sold in each of the Business Sales, I understand that Mr. Malackowski considered the patents sold in each of the Business Sales to determine the appropriate look back period for R&D spend. Although Mr. Malackowski applied separate "look back" periods for each of the business lines, he did not allocate each R&D dollar spent to an individual line of business, as contemplated by the IRS. For the reasons discussed in this section, such an exercise would not be possible for Nortel.



Similarly, it appears that the IRS ██ dropped any claim based on the line of business approach.[41]

## 4   Determination of the Appropriate "Look Back" Period for Measuring Relative R&D Spend

As discussed in Section 4.4 of my Opening Allocation Report, the five year "look back" period for measuring relative R&D spend specified in the Second Amendment to Schedule A, which was attached to the Third Addendum to the MRDA (executed by the Entrepreneurs on various dates within the period December 19, 2008 to January 13, 2009, although effective as of January 1, 2006) does not reflect the actual useful life of the IP that was sold in the Business Sales and the Residual IP sale. There is no reason to apply the estimated figure for useful life that was used in drafting the MRDA now that the useful life of the IP for each sale can be calculated with greater precision.  Dr. Reichert concedes that this "look back" period should be based on the useful life of Nortel's IP.[42]

---

[41]   In September 2009, the United States, on behalf of the IRS, filed a motion in the NNI bankruptcy proceedings that described its claim arising out of Nortel's transfer pricing methodology, and that description makes no mention of the line of business approach.  *See* NNI_00207708, United States' Memorandum of Law in Support of Its Motion for Withdrawal of Reference of All Issues Relating to Debtor NNI's Objection to Proof of Claim Filed by the Internal Revenue Service, dated September 24, 2009.

[42]   Reichert Report at pp. 7-8, 72-73.

In my opinion, it is appropriate to deviate from the "look back" period specified in the MRDA for the purpose of calculating each Entrepreneur's contribution to the IP that was sold,[43] because that "look back" period does not provide the correct measure of contribution to the valuable IP that was actually sold.[44]  Dr. Reichert and Dr. Eden concede that Nortel's application of RPSM pre-dated the MRDA.[45]  In fact, Nortel's RPSM preceded the MRDA by more than three years.[46]  Further, the MRDA had to be amended from time to time in order to catch up with the actual practices being followed at Nortel,[47] and the Entrepreneurs' practice makes clear that they were free to adjust the RPSM calculations.[48]

Nortel's calculation of useful life during the course of its operations and for purposes of filing annual tax returns was, at best, based on estimates.  Major events such as a sale of IP, entering into a cost sharing arrangement, exiting a cost sharing arrangement, *etc.*, will almost always trigger a much more in-depth review by tax authorities than tax authorities would normally conduct in their examinations of annual returns.  I believe the reason for this is twofold:  (1) the magnitudes involved

---

[43]  Dep. Ex. 21003 (NNC-NNL06001514), MRDA, Schedule A at NNC-NNL06001514/19; 30, 49.

[44]  Expert Report of James E. Malackowski, dated January 24, 2014, at Sections 11.1, 11.2.

[45]  *See* Reichert Report at p. 37; Eden Report at paragraphs 99, 110; Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL06001514/1; 39.

[46]  The MRDA states that it was "made and entered into on December 22, 2004, confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the 'Effective Date')."  Dep. Ex. 21003 (NNC-NNL06001514), MRDA at NNC-NNL006001514/1.

[47]  *See* Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL006001514/27, 39.

[48]  For example, in 2002 but in no other year, NNL determined that the Entrepreneurs would reimburse 75% of distributor restructuring costs, amounting to a cost of $65.4 million.  *See* NOR_53648037, 2002 RPSM calculation, tab labeled "Comparison to status quo."  This amount was taken out of the pool of the Entrepreneurs' operating income calculated under the first step of Nortel's RPSM.  NNL's decision to reimburse these restructuring costs, therefore, resulted in an increase of residual losses from $2,359.5 million to $2,424.9 million.  *See* NOR_53648037, 2002 RPSM calculation, tab labeled "Rona"; *see also* Reichert Report at p. 46 n.55.  Under Nortel's RPSM, as discussed in my Opening Allocation Report, all of the Entrepreneurs split these losses in accordance with their relative share of R&D spend.  Opening Allocation Report at Section 3.2.2.2.  Similarly, also in 2002, NNL determined to reduce the minimum "routine returns" paid to distributors (*i.e.*, the guaranteed percentage of operating margin that the distributors are entitled to under Nortel's RPSM calculation), based on third party sales, from 1% to 0%.  *See* Dep. Ex. 21084 (NNI_00420998), Email dated December 7, 2002 from Mark Weisz to Ian Widdowson, "Taxable Income Before Yr End."  As a result of this decision, distributors would receive less under the first step of the RPSM calculation, thereby resulting in a decrease to the residual losses borne by the Entrepreneurs.

in major events are almost always much larger (very much larger in many cases); and
(2) more information is almost always available.

With regard to my second point, consider the present situation involving the sales of
Nortel's IP. Prior to the actual sales, one could only guess as to the final value
(indeed, my understanding is that "guestimates" as to value differed by an order of
magnitude prior to the sales[49]). Thus, before the occurrence of a sale transaction, the
tax authorities would have to estimate both the value of the IP and the allocation
among participants. With the "more information" (*i.e.*, value) known from the sale,
they could focus solely on the allocation.

In the present circumstances, it is my opinion that a more thorough and in-depth
analysis should be conducted at this point – *i.e.*, an "*ex post*" analysis such as that
performed by Mr. Malackowski. Based on my experience, this is what I expect the
tax authorities would have done following a sale of the magnitude of Nortel's.

## 5    The Defects in Dr. Reichert's Analysis

As Dr. Reichert correctly explains, the purpose of transfer pricing arrangements is to
ensure that entities within a multinational enterprise record their entity level profits
and losses as if their intercompany transactions were performed at arm's length.[50] To
do so, as Dr. Reichert concedes, their arrangements must reflect how economically
rational third parties would transact with one another, and take account of the
substance of their commercial relationships and relative ownership rights.[51] Dr.
Reichert's analysis, however, fails to adhere to these foundational principles.
Additionally, as discussed in Section 7 of this report, Dr. Reichert fails to account for
Nortel's own prior practice and internal analysis.

Dr. Reichert concedes that the Entrepreneurs were the beneficial or economic owners
of the group's IP. Dr. Reichert states that "Nortel's transfer pricing reflected a
particular, though commonly observed, form of 'economic ownership' of technology.
That is, most of the [Entrepreneurs] were licensees, obtaining rights to make and sell

---

[49]  For example, Nortel began the negotiations for its Residual IP with a "stalking horse bid" from Google of
$900 million. *See* Sixty-Third Report of the Monitor, April 14, 2011 (attaching Google's stalking horse bid
for Nortel's Residual IP). A bankrupt company uses a stalking horse bid to establish a minimum purchase
price.

[50]  Reichert Report at pp. 2-3, 16.

[51]  Reichert Report at pp. 3-4, 16, 23-25.

February 28, 2014                                                    Charles River Associates

products that embodied their R&D investments."[52]  Dr. Reichert thus recognizes that the Entrepreneurs were the economic owners of the IP, but minimizes the value of this ownership by focusing on the geographic licenses rather than the right each Entrepreneur had to a share of the proceeds from exploiting the jointly created IP in the entire world.[53]  According to Dr. Reichert, under the MRDA, NNL granted the other Entrepreneurs a license limited:  (a) in scope to making or selling "Products" that included the group's IP; and (b) in duration based on the IP's "finite economic life."[54]  Dr. Reichert asserts further that the Entrepreneurs' "'economic ownership' did not encompass any rights to sell technology assets nor entitlement to share in the proceeds of a sale of those assets."[55]

In my opinion, Dr. Reichert's assertion that the EMEA and U.S. Entrepreneurs do not have the right to any of the IP Sale Proceeds that were jointly created with NNL is fundamentally wrong.[56]  Instead, the entire value of the group's IP, as realized, should be allocated in proportion to the Entrepreneurs' relative beneficial ownership of those assets, *i.e.*, their rights to receive the proceeds derived from the IP.  This makes sense for at least eight reasons.

First, it is important to recognize that the very document that Dr. Reichert cites for his position, the MRDA, plainly states that "each Participant bears the full entrepreneurial risks **and benefits** for the Nortel Networks business."[57]  The benefits to be received from selling the jointly created IP must surely be included in this; nor is there any exception from what is included in such benefits.  Indeed, this passage does not say "full benefits except for . . . ."  In fact, as discussed in my Opening Allocation Report and in Section 7, Nortel did not apply any such exception with respect to at least two significant events, *i.e.*, the Alcatel transaction and the Foundry litigation.

Second, Dr. Reichert asserts that an agreement by the EMEA and U.S. Entrepreneurs to relinquish their rights to IP sale proceeds and give a huge windfall to NNL would have been rational based on the expected rate of return on their R&D investment, but

---

52   Reichert Report at p. 4.

53   Reichert Report at p. 4.

54   Reichert Report at pp. 5-6.

55   Reichert Report at p. 6.

56   For the 2001-2008 period, as shown on Exhibit 1 of my Opening Allocation Report, the EMEA and U.S. Entrepreneurs paid for more than 50% of the R&D.

57   Dep. Ex. 21003 (NNC-NNL06001514), MRDA at NNC-NNL06001514/2 (emphasis added).

Dr. Reichert does not point to any evidence that such relinquishment was ever considered and approved by the Entrepreneurs.  The record shows the opposite.  For example, as indicated in my Opening Allocation Report, contemporaneous evidence shows that the Entrepreneurs, with the assistance of their outside consultants, considered what would happen if Nortel sold the jointly created IP and determined that the sale proceeds would be allocated to all of the Entrepreneurs based on their R&D spend.[58]

<u>Third</u>, from an economic perspective, Dr. Reichert is wrong.  In footnote 42 of his report, Dr. Reichert states that "[i]t is important to recognize that the rationality of an arrangement is determined at the time that parties enter into the arrangement."  But he then fails to follow this principle:

1)  Exhibit 2 shows that from 1994 through 2000 (the last year before RPSM was implemented), Nortel as a whole had reported revenues of greater than $110 billion, had spent more than $15 billion on R&D, but had recorded losses of more than $2 billion.

2)  Moving to the end of 2004, when the MRDA was actually drafted and "entered into," Exhibit 2 shows further that Nortel's total revenue from 1994 through 2004 was $162 billion, its R&D spend totaled nearly $25 billion, but reported losses ballooned to more than $30 billion.

3)  Finally, at the end of 2008, the Entrepreneurs finalized the MRDA's Third Addendum – the one that stated that "gain/loss on the sale of business" would not be considered part of operating income for purposes of applying Nortel's RPSM.[59]   Exhibit 2 shows that, from 1994 through 2008, Nortel's total revenue was nearly $200 billion, its R&D spend totaled more than $30 billion, but its losses had increased further to more than $40 billion.

In short, whether you look at 2001 (when RPSM was first implemented), 2004 (when the MRDA was "entered into"), or especially 2008 (when the Third Addendum was finalized on the eve of insolvency proceedings), no economically rational person or entity would have given away rights to share in the proceeds of future sales of IP in exchange for only the rights to share in current streams of "income," which were in

---

[58]  Dep. Ex. 22020 (NNI 00327110), APA Kick Off Meeting: Potential Questions and Sample Answers, at NNI_00327148.

[59]  Dep. Ex. 21003 (NNC-NNL06001514), MRDA, Second Amendment to Schedule A at NNC-NNL06001514/49.

fact huge and continuing residual losses.  The EMEA and U.S. Entrepreneurs (along with NNL) spent billions of dollars to create that IP.

I note that the Entrepreneurs and the group's limited risk entities enjoyed returns – without any significant risk – on their routine activities (*e.g.*, distribution functions). However, only the Entrepreneurs accepted the risk of performing R&D, with all of the potential downside (*i.e.*, the residual losses allocated under the second step of Nortel's RPSM[60]).  In Dr. Reichert's opinion, the Entrepreneurs would have accepted this downside risk while giving up a key component of potential upside – the proceeds from a sale of the valuable assets they helped create.  Dr. Reichert's conclusion simply does not make sense from an economic perspective.

Fourth, I understand from the Malackowski Rebuttal Report that even Nortel IP that was not used in a product helped Nortel generate profits that were shared under its RPSM.[61]  Thus, under Nortel's RPSM, the Entrepreneurs had in fact received returns on the Residual IP throughout the eight years that RPSM was used.  Denying the Entrepreneurs a share of the lump sum of profits that was received through the sale of the Residual IP would, therefore, not be consistent with their prior practice.

Fifth, Article 4(e) of the MRDA provided the Entrepreneurs with "the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others."[62]  Significantly, as explained in the Malackowski Rebuttal Report, this provision does not limit the EMEA and U.S. Entrepreneurs' rights to IP included in Nortel products.[63]  It expressly provides rights to the Entrepreneurs to "NN Technology," which is broadly defined to include "any and all intangible assets . . . produced or conceived as a result of research and development by, or for, any of the [Entrepreneurs] . . . ."[64]

Sixth, under Nortel's RPSM, as confirmed in the MRDA, the parties agreed that the right to receive the economic benefits from exploitation of jointly created IP was divorced from legal title of the IP.  Even though NNL had legal title to the group's IP, the profits and the losses resulting from the group's IP were shared among all of the

---

60  *See* Opening Allocation Report, Section 3.2.2.2.

61  *See* Rebuttal Report of James E. Malackowski (the "Malackowski Rebuttal Report"), at Sections 3.2.1, 3.2.2.

62  Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL06001514/6.

63  *See* Malackowski Rebuttal Report at Section 3.3.2.

64  Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL06001514/3.

Entrepreneurs.[65]  As explained in the OECD's Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, dated July 30, 2013, "legal ownership . . . does not confer any right ultimately to retain any return from exploiting the intangible that may accrue to the legal owner . . . ."[66]  The OECD guidance provides three examples to illustrate this principle.  In the first example, the "legal owner" performs only administrative functions but does not contribute to R&D.[67]  In these circumstances, the legal owner "should receive arm's length compensation for its patent administration services, but should not be entitled to any other income attributable to the patents."[68]  In the second example, the legal owner earns royalties on licenses it grants to third parties.[69]  Here, again, the legal owner "should not be entitled ultimately to retain income from its licensing arrangements over and above the arm's length compensation for its patent registration functions."[70]  Finally, in the third example, the legal owner sells the patents to a third party.[71]  As with the first two examples, the legal owner "should be compensated for the registration functions it performs, but should not otherwise share in returns attributable to the intangible, including the returns generated from the disposition of the intangibles."[72]

---

[65] Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL06001514/5-7, 18, 48-49; *see also* Dep. Ex. 21409 (NNC-NNL11012502), Email dated September 8, 2008 from Giovanna Sparagna to Peter Look et al., "RE: Nortel Interco Arrangement," at NNC-NNL11012502/2 ("So like an easement on land, the value of the nominal legal rights (thru ownership or license) in the [N]ortel IP are subject to the profit/loss sharing rights in the Agreement."); Giovanna Terese Sparagna's Deposition dated December 10, 2013, at pp. 80-81, 146-148.

[66] OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles (July 30, 2013), at paragraph 73.

[67] OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles (July 30, 2013), at paragraphs 224-225.

[68] OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles (July 30, 2013), at paragraph 227.

[69] OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles (July 30, 2013), at paragraph 228.

[70] OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles (July 30, 2013), at paragraph 229.

[71] OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles (July 30, 2013), at paragraph 231.

[72] OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles (July 30, 2013), at paragraph 232.

Thus, while NNL held legal title for administrative purposes, as I discuss in my Opening Allocation Report,[73] NNL had no greater right to receive the economic benefits from the exploitation of jointly created IP than any of the other four Entrepreneurs.   Rather, the MRDA and Nortel's RPSM confirmed that the Entrepreneurs bore the risk of the Nortel business and they would all share in the "upside."[74]

The fact that the MRDA does not expressly address how to allocate proceeds from sales of a business does not, as Dr. Reichert suggests, preclude the application of the principles embodied in Nortel's RPSM to the portion of those proceeds attributable to IP created jointly by the parties.  In the MRDA, the Entrepreneurs agreed to share the economic benefits from exploitation of jointly created IP in accordance with their relative contributions to R&D.[75]   Exploitation of IP plainly includes not only manufacture and sale of products incorporating the IP, but also proceeds from the sale of the IP itself.  As I discuss in Section 7, this is confirmed by Nortel's pre-insolvency actions.

<u>Seventh</u>, Dr. Reichert's assertion that the economic ownership of the EMEA and U.S. Entrepreneurs was limited to licenses to make and sell Nortel products is not consistent with Nortel's allocation key.[76]   In the allocation key, Nortel did not distinguish between R&D spend that was "embodied" in products and the R&D spend that led to the Residual IP.  The split of residual profit was based on all R&D spend.

<u>Eighth</u>, Dr. Reichert fails to consider the tax implications of his opinion.  Dr. Reichert takes the position that the EMEA and U.S. Entrepreneurs should be rewarded for their entrepreneurial risks only to the extent their efforts resulted in profits on a year-to-year basis through the sale of Nortel products.[77]   Accordingly, to the extent Nortel capitalized on its jointly created IP directly through the sale of that IP, the EMEA and U.S. Entrepreneurs would receive no reward for their efforts.   For the reasons discussed in my Opening Allocation Report, arm's length parties would not have agreed to such an arrangement.  Further, if, by allowing NNL to be given legal title to IP they created or helped to create, the EMEA and U.S. entities thereby surrendered

---

[73]   Opening Allocation Report at Section 5.1.

[74]   Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL06001514/2, 18, 30, 48.

[75]   Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL06001514/2, 5-6, 18-19, 48-49.

[76]   Additionally, I understand from the Malackowski Rebuttal Report that Dr. Reichert misconstrues the license grant as provided in the MRDA.  *See* Malackowski Rebuttal Report at Section 3.

[77]   Reichert Report at pp. 37-38.

their rights to the proceeds to be received from sale of those patents without arm's length compensation, this would have had, at a minimum, potential tax implications. Once the EMEA and U.S. tax authorities had discovered such transactions, they would, in my experience, have likely deemed there to be income coming into the EMEA and U.S. jurisdictions as consideration for the transfers of value from those entities to NNL (and/or disallowed any R&D expenses made in connection with the transferred IP that the EMEA and U.S. Entrepreneurs recorded as their own expenses[78]), which in turn would have resulted in additional tax being levied in those jurisdictions (possibly with penalties).[79]  Although the IRS claimed that Nortel failed to credit NNI with more than $3 billion of income, that claim made no mention of the type of value transfer asserted by Dr. Reichert.[80]

## 6        The Defects in Dr. Eden's Analysis

Dr. Eden fails to show why the principles applied by the parties to allocate profits from exploitation of IP in ongoing business operations should not also apply to allocation of proceeds from the sale of jointly created IP.  Although an RPSM might not expressly address the "value" of the IP that was sold, as Dr. Eden asserts,[81] it is appropriate to use the principles in Nortel's RPSM to determine the proportional economic interest each of the Entrepreneurs held in the assets that were sold. Additionally, as discussed in Section 7, Dr. Eden fails to account for Nortel's own prior practice and internal analysis.

Like Dr. Reichert, Dr. Eden concedes that the "touchstone for transfer pricing regulations is the 'arm's length' standard," and that "[u]nder the arm's length

---

[78]  In making its 2007 tax computations, for example, NNUK treated the amounts it spent on R&D as its own expense, rather than amounts expended on behalf of NNL.  *See* NNC-NNL06379529, Nortel Networks U.K. Limited Corporation Tax Computations Based on the Accounts for the Year Ended 31 December 2007, at NNC-NNL06379529/3, 13, 14 (showing that R&D expense was deducted from NNUK's profit subject to tax).

[79]  *See* Finance Act 1998, Section 108, "New regime for transfer pricing etc.," and Schedule 16, "Transfer pricing etc:  new regime," part 5 ("Advantage in relation to United Kingdom taxation"); *see also* HMRC International Manual, INTM483120, Transfer pricing: operational guidance: working a transfer pricing case: penalties: negligence or carelessness.

[80]  *See* Dep. Ex. 11237 (NNC-NNL061995), IRS Memorandum dated March 22, 2006, "Nortel Networks Inc. (APA-148919-02) Proposed U.S.-Canada Bilateral APA"; NNI_00207708, United States' Memorandum of Law in Support of its Motion for Withdrawal of Reference of All Issues Relating to Debtor NNI's Objection to Proof of Claim Filed by the Internal Revenue Service, dated September 24, 2009.

[81]  Eden Report at paragraph 147.

standard, the affiliated entities that are part of [a multinational enterprise] are treated as if they were unrelated entities."[82]  Like Dr. Reichert, Dr. Eden concedes that "the division of legal title and economic ownership is acceptable as long as profits are allocated among entities consistent with the economic substance of the transaction (i.e., the functions performed, assets used, and risks borne)."[83]  Dr. Eden then fails to consider the "economic substance" of Nortel's business arrangement.

As discussed in my Opening Allocation Report, Nortel repeatedly represented the "economic substance" of its business relationship to the tax authorities.  As Dr. Eden acknowledges, tax regulations are designed to ensure that economic value stays with the legal entity that would be entitled to it in an uncontrolled, arm's length situation.[84]  In their submissions to the tax authorities, the Entrepreneurs described in detail the "economic substance"[85] of their transactions.[86]  They explained:  (a) that each of the Entrepreneurs bore the risk of the Nortel business because each of the Entrepreneurs performed significant R&D functions, and (b) that R&D was the key profit driver for Nortel's business.[87]  They also explained why RPSM was best suited for Nortel and how RPSM would be used to split residual profit among the Entrepreneurs.[88]  Based on the way Nortel's RPSM was presented to tax authorities, in my opinion, the tax authorities would have expected that the "economic substance" of the Entrepreneurs' business arrangement would have required the proceeds from the sale of IP to be allocated in accordance with RPSM principles.  Indeed, as noted in my Opening Allocation Report, if the tax authorities had directly asked how IP sale proceeds would be allocated, Nortel was prepared to confirm this very expectation.[89]

---

[82]   Eden Report at paragraph 26.

[83]   Eden Report at paragraph 65.

[84]   Eden Report at paragraphs 18-20, 64-68.

[85]   Eden Report at paragraphs 64-66.

[86]   *See*, *e.g.*, Dep. Ex. 21407 (NNI_01333113), Nortel Networks Functional Analysis for the Years Ended December 31, 2000-2004; Dep. Ex. 22078 (PC0184853), 2008 US-Canada Bilateral APA Application.

[87]   *See*, *e.g.*, Dep. Ex. 21407 (NNI_01333113), Nortel Networks Functional Analysis for the Years Ended December 31, 2000-2004, at p. 7; Dep. Ex. 22078 (PC0184853), 2008 US-Canada Bilateral APA Application, at PC0184863; Opening Allocation Report at Section 3.2.2.1.

[88]   *See*, *e.g.*, Dep. Ex. 22123 (EY-NRTL-000023), Thomas Horst et al., Economic Analysis of Nortel Networks' Intercompany Transactions, at pp. 3, 12-34, 55-56 (2002); Dep. Ex. 22078 (PC0184853), 2008 US-Canada Bilateral APA Application, at PC0184865.

[89]   Dep. Ex. 22020 (NNI_00327110), APA Kick Off Meeting: Potential Questions and Sample Answer, at NNI_00327148; Opening Allocation Report at p. 25.

Nortel's representations to tax authorities and to each other also make clear that all of the Entrepreneurs were the actual beneficial and economic owners of the IP.[90] Like Dr. Reichert, Dr. Eden agrees that the Entrepreneurs were the beneficial and economic owners of the group's IP.[91] Dr. Eden, however, appears to limit the Entrepreneurs' ownership interests to the license rights granted under the MRDA. This ignores the Entrepreneurs' profit sharing arrangement, as reflected in the RPSM, pursuant to which they shared "the full entrepreneurial risks and benefits for the Nortel Networks business."[92]

Allowing the U.S. Debtors to keep the full value of NNI's exclusive license, as Dr. Eden suggests, would give the U.S. Debtors a windfall that they were not entitled to under the group's pre-insolvency arrangements. Although the licenses represented a form of beneficial ownership, using the licenses to allocate the IP Sale Proceeds does not take account of the full economic substance of the Entrepreneurs' arrangement. Under their arrangement, the economic benefits from the exclusive licenses were pooled together and enjoyed by the entire Nortel group, with residual profits (or losses) falling to the Entrepreneurs based on each Entrepreneur's proportionate contribution to R&D. In other words, an Entrepreneur could not keep all of the residual profits generated from its exclusive license; the income had to be shared with the other Entrepreneurs who helped make that income possible through their R&D contributions. An Entrepreneur's economic rights under the license, therefore, cannot be divorced from Nortel's RPSM. Indeed, an Entrepreneur's license rights were subordinate to the division of profits and losses calculated under Nortel's RPSM.[93]

Further, Nortel as a whole, not only the individual Entrepreneurs, benefited from the exclusive territorial licenses. In addition to the profit-splitting described above,

---

[90]   Opening Allocation Report at Section 5.

[91]   Eden Report at paragraphs 111, 116-117, 119, 123.

[92]   Dep Ex. 21003 (NNC-NNL06001514), MRDA at NNC-NNL06001514/2; *see also* Dep. Ex. 21003 (NNC-NNL06001514), MRDA, Schedule A at NNC-NNL06001514/18, 48.

[93]   Nortel's outside counsel, Giovanna Sparagna, who was a key player in the drafting of the MRDA, explained that "the apparent legal ownership of the intangibles in the name of NNL and the exclusive licenses to the Territories of the respective RPS participants are subject to the rights and restrictions in the R+D Agreement (which requires a sharing of the residual profit in those territories). So like an easement on land, the value of the nominal legal rights (thru ownership or license) in the nortel IP are subject to the profit/loss sharing rights in the Agreement." Dep. Ex. 21409 (NNC-NNL11012502), Email dated September 8, 2008 from Giovanna Sparagna to Peter Look et al., "RE: Nortel Interco Arrangement," at NNC-NNL11012502/2; Giovanna Terese Sparagna's Deposition dated December 10, 2013, at pp. 75-79, 142-148.

pursuant to Article 4(e) of the MRDA, "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others."[94]  This provision benefited Nortel as a whole as exemplified by the Foundry settlement.[95]  Nortel believed Foundry infringed on its patents.[96]  Because this happened in the U.S., both NNL and NNI sued Foundry for patent infringement.[97]  In settlement of the case, Foundry agreed to pay Nortel $35 million, and the proceeds from the settlement were distributed among all the Entrepreneurs according to their RPS spend percentages.[98]

Moreover, if the U.S. Entrepreneur was entitled to the full value of its exclusive license, the EMEA and Canadian Entrepreneurs were conducting their businesses irrationally, as the amounts they spent on R&D would have provided a disproportionate benefit to the U.S. Entrepreneur.  Indeed, the majority of IP created outside the U.S. was only patented in the U.S.[99]  No rational entrepreneur would spend on R&D only to have the fruits of its labor enjoyed disproportionately by another entity.

As support for their positions, Dr. Eden and Dr. Reichert both cite to the MRDA's retirement payment provisions (*i.e.*, a provision measuring an Entrepreneur's retirement payment based on the fair market value of the retiree's exclusive license,

---

[94]  Dep. Ex. 21003 (NNC-NNL06001514), MRDA, at NNC-NNL06001514/3.

[95]  Dep. Ex. 21167 (NNC-NNL11029235), Email dated January 13, 2005 from Louis Farr to Laurie Krebs et al., "Foundry Settlement," at NNC-NNL11029235/1-2.

[96]  Dep. Ex. 21167 (NNC-NNL11029235), Email dated January 13, 2005 from Louis Farr to Laurie Krebs et al., "Foundry Settlement," NNC-NNL11029235/1.

[97]  Dep. Ex. 21167 (NNC-NNL11029235), Email dated January 13, 2005 from Louis Farr to Laurie Krebs et al., "Foundry Settlement," at NNC-NNL11029237/1.

[98]  Dep. Ex. 21167 (NNC-NNL11029235), Email dated January 13, 2005 from Louis Farr to Laurie Krebs et al., "Foundry Settlement," at NNC-NNL11029235/1-2.

[99]  *See* Dep. Ex. 31304 (NNC-NNL06521384), Email dated December 12, 2000 from Angela de Wilton to Tim Collins et al., "FW: Issuance of Foreign Filing Practice Note" (outlining Nortel's proposed foreign filing strategy for 2000 and recommending that Nortel "[k]eep filing all cases in the US" and file only "best 25% of cases" in Europe and Canada); Dep. Ex. 21447 (US_EMEA_Canda_PRIV_0036489), Email dated May 11, 2006 from Bill Junkin to Brianna Hinojosa-Flores et al., "Further Filing Proposal – In Words and Detailed Reasoning" (attaching Dep. Ex. 21448 and proposing Nortel's foreign filing policy for 2006, including a recommendation to "[c]ontinue to first file all cases meeting value threshold in the US" and "[f]urther file 30%" of cases in other jurisdictions); Dep. Ex. 21448; Dep. Ex. 21407 (NNI_01333113), Nortel Networks Functional Analysis for the Years Ended December 31, 2000-2004, at 30; Dep. Ex. 22078 (PC0184853), 2008 US-Canada Bilateral APA Application, at PC0184944.

and a provision that provides a retiring Entrepreneur with its share of residual profits for the 5 years following the Entrepreneur's retirement, *i.e.*, a "5-year runoff").[100]  In an amendment to the MRDA, however, the Entrepreneurs made clear that, if an Entrepreneur became insolvent, that Entrepreneur would not be subject to the MRDA's retirement provisions.[101]  That amendment provides that the Entrepreneurs "shall be in the same position as if the [MRDA] did not originally provide for termination upon" an event of insolvency.[102]   The U.S. Debtors concede that the MRDA's termination provision was not triggered, and further, that U.S. law "prevented application of the termination provision of the MRDA."[103]

In any event, these retirement provisions did not supersede or eliminate each Entrepreneur's actual economic interest in the group's IP.  As discussed above, an Entrepreneur's economic ownership in the group's IP was not limited to its license rights.   Rather, the Entrepreneurs were entitled to a piece of the group's global residual profits based on their relative contribution to R&D.

Using the 5-year runoff retirement provision to value an Entrepreneur's ownership interest in the group's IP would also not be appropriate in the circumstances here, where all of the Entrepreneurs essentially "retired" together and entered insolvency proceedings.  Moreover, with the sale of the Entrepreneurs' IP occurring within the 5 year window, even under this provision, the question remains as to how to divide those sale proceeds.  For the reasons discussed in my Opening Allocation Report and in this report, in my opinion, the allocation key used in Nortel's RPSM provides the answer.

# 7   Dr. Reichert's and Dr. Eden's Failure to Account for Nortel's Own Prior Practice and Internal Analysis

Consistent with the principles of Nortel's RPSM, the Nortel Entrepreneurs themselves elected to apply the R&D spend percentages to:  (a) the allocation of proceeds from the sale of IP in the UMTS business to Alcatel; (b) the allocation of proceeds from a patent infringement litigation commenced by NNI and NNL in the

---

[100]  Eden Report at paragraph 118; Reichert Report at p. 39.

[101]  Dep Ex. 21003 (NNC-NNL06001514), MRDA at NNC-NNL06001514/10, 59-60.

[102]  Dep Ex. 21003 (NNC-NNL06001514), MRDA at NNC-NNL06001514/60.

[103]  *See* Notice of Motion to Approve Allocation Position of US Debtors and Official Committee of Unsecured Creditors dated May 16, 2013, at p. 13 n.13.

U.S.; and (c) the allocation of royalty income.  Further, at least for financial reporting purposes, it appears that NNL and Nortel's transfer pricing team allocated the IP Sale Proceeds for certain of the Business Sales consistent with the principles of Nortel's RPSM and the methodology used in the UMTS business sale allocation.  In sum, the Entrepreneurs did not ignore their RPSM, as Dr. Eden proposes they should, when determining how to divide similar pools of cash and even the very pools of cash at issue here.

First, as discussed at Section 4.3.2 of my Opening Allocation Report, in 2006, Nortel sold its UMTS business to Alcatel.  Of the total $293 million in net proceeds, $162 million was attributed to the group's IP.[104]  The Entrepreneurs determined that the IP should be divided based on their relative R&D spend percentages as calculated at that time.[105]  NNI tax employee Louis Farr explained that:

> The value for [intellectual property rights ("IPR")] was allocated using [residual profit split ("RPS")] percentages.  RPS determines how profits and losses are shared.  If UMTS access was not sold, all of the RPS members would share profits and losses associated with the business.  **Since RPS determines the economic relationships between the parties, all rights associated with the IPR should be shared based on RPS percentages.**  This is also consistent with Nortel's view that all Nortel IPR is indistinguishable such that all value should be shared among the RPS members.[106]

---

[104] EMEAPRIV0045785, UMTS Purchase Price Allocation Worksheet ("Developed Tech & Know How" and "In-Process R&D").

[105] Dep. Ex. 21160 (BHG0137543), Email dated January 29, 2007 from Louis Farr to Deloitte's Timothy Pickering, "RE: UMTS Alcatel Transaction"; Dep. Ex. 21165 (NNC-NNL06121234), Email dated Feb. 16, 2007 from Michael Orlando to Peter Look, "RE: Customer Relationship intangible" (forwarding memorandum re: "Treatment of Customer Relationship Intangible in Purchase Price Allocation"); EMEAPROD2285659, Email dated August 1, 2007 from Kerry Stephens to HMRC, "UMTS Sale" (attaching EMEAPROD2285660 and EMEAPROD2285662) (attached memorandum states that IP was allocated "amongst the participants in the Nortel Master R&D Agreement, which governs their individual interest in the IP and their participation in the profits derived from its exploitation.  The actual allocation is proportionate [to] their individual share in Residual Profits as at 31 December 2006, which is found by the proportionate individual historic contribution to group R&D spend."); EMEA1000000721, Email dated August 3, 2007 from Kerry Stephens to HMRC, "RE:  UMTS Sale"; *see also* Michael Orlando's Deposition dated November 5, 2013 at pp. 141-162; John Doolittle's Deposition dated December 5, 2013, at pp. 191-192; Mark Weisz's Deposition dated November 25, 2013, at pp. 142-145.

[106] Dep. Ex. 21160 (BHG0137543), Email dated January 29, 2007 from Louis Farr to Timothy Pickering, "RE: UMTS Alcatel Transaction" (emphasis added).

February 28, 2014                                                      Charles River Associates

Dr. Eden points to an amendment of "Schedule A" to the MRDA entered into on the eve of insolvency proceedings which states that "gain/loss on the sale of business" would be deducted from the Entrepreneurs' operating profits that were subject to Nortel's RPSM calculation.[107]   This provision, however, does not preclude the Entrepreneurs from applying the principles embodied in their RPSM to the proceeds from the sale of a business, or more specifically to the portion of the proceeds of a business sale attributable to IP.   In fact, when Nortel sold the UMTS business, the Entrepreneurs likewise amended the MRDA so that their RPSM would not mechanically apply to the proceeds of that sale.[108]   The Entrepreneurs then, nevertheless, divided the proceeds into asset classes and applied their RPSM to the allocation of the IP proceeds.[109]

Additionally, in Section 6, I discuss how the litigation proceeds in the Foundry IP infringement matter were divided based on R&D spend percentages.[110]  Similarly, as reflected in Nortel's RPSM calculations, Nortel's royalty income was shared among the Entrepreneurs for the 2006-2008 period, at a minimum.[111]

Finally, as late as September 2010, I note that NNL and Nortel's transfer pricing team had agreed that the principles of the RPSM and the methodology used in the UMTS

---

[107]  Eden Report at paragraph 135, n.183.

[108]  NNC-NNL06001516, Agreement with Respect to Certain NN Technology, at NNC-NNL06001516/2.

[109]  In a memorandum prepared by Nortel's tax department for the company's auditor Deloitte, Nortel explained:   "While NNL generally is the legal owner of the technology, the Master R&D Agreement determines the economic ownership of it and thus allocation of the consideration by proportionate R&D Capital Stock is appropriate."   Dep. Ex. 21165 (NNC-NNL06121234), re: "Treatment of Customer Relationship Intangible in Purchase Price Allocation," at NNC-NNL06121235/2.  This memorandum was approved by Nortel's Vice President of Tax, Peter Look, who was "in charge of global tax."  Peter Look's Deposition dated November 12, 2013, at p. 16; Dep. Ex. 11261 (NNC-NNL06121236), Email dated February 16, 2007 from Peter Look to Michael Orlando (approving memorandum describing Nortel's allocation of intangibles from the UMTS sale).

[110]  See also Opening Allocation Report at Section 4.3.2; EMEAPRIV0213135, Manual Journal Entry Cover Sheet dated December 8, 2004, at 3-6 (Nortel accounting journal entry, approved by Nortel CFO Bill Kerr, allocating the $35M Foundry settlement according to RPS percentages); EMEAPRIV0213136, Email dated December 28, 2004 from Nortel CFO Bill Kerr to Catherine Shane, "FW:  Foundry Cover Sheet for Approval" (approving allocation of $35 million Foundry settlement according to RPS percentages); EMEAPRIV0213137, Email dated November 5, 2004 from Louis Farr to Pam Peleato, "RE: Foundry Wire Received," at EMEAPRIV0213137.

[111]  See NOR_53648048, 2008 RPSM Model, tabs labeled "Explanations," "RPS Participants" (adjusting operating income to include royalty income in the RPSM calculations); NOR_53648323, 2007 RPSM Model, tabs labeled "Explanations," "RPS Participants" (same); NOR_53648133, 2006 RPSM Model, tab labeled "Operating Income Adjustments" (same).

business sale allocation (described above) were appropriate at least for certain of the Business Sales for financial reporting purposes.  For "financial reporting purposes," members of Nortel's transfer pricing team prepared draft purchase price allocations ("PPAs") for at least four of the Business Sales.[112]  In these PPAs, Nortel allocated the sales proceeds over asset classes and among the Nortel entities.[113]  As to the IP asset class, Nortel allocated these amounts based on the Entrepreneurs' R&D spend percentages.[114]  NNL's CFO (post-insolvency), John Doolittle, who had previously held positions as global head of tax and global head of treasury, testified that it was his decision, with input from the Canadian Monitor, legal counsel, and auditors, to use Nortel's R&D contribution calculations under the MRDA to allocate the proceeds of the Business Sales.[115]

After these PPAs were prepared, Nortel Networks Australia's outside accountant requested management's "best estimate of expected allocation of proceeds from the divestment of business lines (including relevant assumptions), relied upon for the purpose of lodging tax returns."  The Nortel group's "Leader" of Transfer Pricing, Michael Orlando,[116] forwarded the PPAs and noted that he was "fine with this approach since it is consistent with the global transfer pricing model."[117]

---

[112]  At his deposition, NNI's Michael Orlando stated that he and two other members of Nortel's transfer pricing team – NNL's Sadiq Naqvi and NNI's Michael Gaglione – prepared Nortel's PPAs.  Michael Orlando's Deposition dated November 5, 2013 at pp. 189-200.  Mr. Orlando did not recall why he prepared these PPAs, but the PPA spreadsheets indicate that they were prepared "FOR FINANCIAL REPORTING PURPOSES ONLY" and most state that "[a]ctual proceeds allocation is subject to negotiation amongst estates."  Dep. Ex. 11264 (NNI_01432896), Email dated Sept. 28, 2010 from Michael Orlando to David Chapman, "RE: NNA – FY 2008 and 2009 Annual Compliance Review Documents," at NNI_01432902, NNI_01432903, NNI_01432904, NNI_01432905.

[113]  *See* Dep. Ex. 11264 (NNI_01432896), Email dated Sept. 28, 2010 from Michael Orlando to David Chapman, "RE: NNA – FY 2008 and 2009 Annual Compliance Review Documents."

[114]  *See* Dep. Ex. 11264 (NNI_01432896), Email dated Sept. 28, 2010 from Michael Orlando to David Chapman, "RE: NNA – FY 2008 and 2009 Annual Compliance Review Documents."

[115]  John Doolittle's Deposition dated December 5, 2013, at pp. 200-202.

[116]  Mr. Orlando was an employee of NNI but reported to NNL's Peter Look and later NNL's John Doolittle, and he had staff reporting to him who were employees of NNI and NNL.  Michael Orlando's Deposition dated November 5, 2013, at pp.26-28, 42-43.  As the group's transfer pricing "Leader," Mr. Orlando was responsible for the design and application of Nortel's transfer pricing policies as they applied to the group. Michael Orlando's Deposition dated November 5, 2013, at pp. 114-115.

[117]  Dep. Ex. 11264 (NNI_01432896), Email dated Sept. 28, 2010 from Michael Orlando to David Chapman, "RE: NNA – FY 2008 and 2009 Annual Compliance Review Documents."

As this prior experience shows, the principles embodied in the MRDA and in Nortel's RPSM do not preclude – indeed, they are entirely consistent with – application of Nortel's RPSM to the proceeds from sales of jointly created IP.

## Appendix 1:  Documents Considered or Relied Upon

## Exhibit 2:  Nortel Networks Corporation, Income Statement Data

**Richard V.L. Cooper**                                   **February 28, 2014**

## APPENDIX 1: DOCUMENTS CONSIDERED OR RELIED UPON

The following documents have been considered or relied upon by Richard V. L. Cooper in this report.

All documents, exhibits, and appendices referenced in the Expert Report of Richard V. L. Cooper dated January 24, 2014 and in the Rebuttal Expert Report of Richard V. L. Cooper dated February 28, 2014 are incorporated herein.

## Non-Bates Stamped Documents and Information Sources

### Books, Websites, and Professional Databases
- Standard and Poor's Capital IQ

### Miscellaneous Non-Bates Stamped Documents
- 26 C.F.R. § 1.482
- Finance Act 1998 (U.K.)
- HMRC International Manual, INTM483120
- Income Tax Act (2011), R.S.C. 1985, c.1 (5th Supp.)
- Canada Revenue Agency, SR&ED Investment Tax Credit Policy
- Sixty-Third Report of the Monitor

### Testimony
- Deposition of Rosanna Culina dated October 17, 2013

### Legal Filings
- Notice of Motion to Approve Allocation Position of US Debtors and Official Committee of Unsecured Creditors dated May 16, 2013

### Other Expert Reports
- The Expert Report of Richard V. L. Cooper dated January 24, 2014
- The Expert Report of Dr. Timothy Reichert dated January 24, 2014
- The Expert Report of Lorraine Eden, PH.D. dated January 24, 2014
- The Rebuttal Report of James E. Malackowski dated February 28, 2014

# APPENDIX 1: DOCUMENTS CONSIDERED OR RELIED UPON

The following documents have been considered or relied upon by Richard V. L. Cooper in this report.

All documents, exhibits, and appendices referenced in the Expert Report of Richard V. L. Cooper dated January 24, 2014 and in the Rebuttal Expert Report of Richard V. L. Cooper dated February 28, 2014 are incorporated herein.

## Bates Stamped Documents and Information Sources

| Exhibit Number | Bates Range | |
|---|---|---|
| | Beginning | Ending |
| Exhibit 11237 | NNC-NNL061995 | NNC-NNL061995 |
| Exhibit 11261 | NNC-NNL06121236/1 | NNC-NNL06121236/2 |
| Exhibit 11264 | NNI_01432896 | NNI_01432905 |
| Exhibit 11352 | NNI_01534866 | NNI_01534873 |
| Exhibit 21084 | NNI_00420998 | NNI_00420999 |
| Exhibit 21160 | BHG0137543 | BHG0137544 |
| Exhibit 21165 | NNC-NNL06121234/1 | NNC-NNL06121235/3 |
| Exhibit 21407 | NNI_01333113 | NNI_01333116 |
| Exhibit 21408 | NNC-NNL06002952 | NNC-NNL06002952 |
| Exhibit 31304 | NNC-NNL06521384 | NNC-NNL06521385/2 |
| | EMEA1000000721 | |
| | EMEAPRIV0025813 | EMEAPRIV0025815 |
| | EMEAPRIV0025816 | EMEAPRIV0025823 |
| | EMEAPRIV0045785 | |
| | EMEAPRIV0213135 | |
| | EMEAPRIV0213136 | EMEAPRIV0213136 |
| | EMEAPRIV0213137 | EMEAPRIV0213139 |
| | EMEAPROD2285659 | EMEAPROD2285659 |
| | EMEAPROD2285660 | EMEAPROD2285661 |
| | EMEAPROD2285662 | EMEAPROD2285665 |
| | EY‑NRTL-061501 | EY‑NRTL-061501 |
| | EY-NRTL-061512 | EY-NRTL-061518 |
| | NNC-NNL06001516 | NNC-NNL06001516/8 |
| | NNC-NNL06319294 | NNC-NNL06319294/37 |
| | NNC-NNL06379529 | NNC-NNL06379529/22 |
| | NNC-NNL11756213 | NNC-NNL11756213/15 |
| | NNI_00018349 | |
| | NNI_00207708 | NNI_00207723 |
| | NNI_01299724 | NNI_01299724 |
| | NNI_01534134 | |
| | NOR_53648048 | |
| | NOR_53648133 | |
| | NOR_53648323 | |
| | NOR_54417706 | |

**Exhibit 2**

Nortel Networks Corporation

Income Statement Data [a]

*(USD in millions)*

| | Dec94 | Dec95 | Dec96 | Dec97 | Dec98 | Dec99 | Dec00 | Dec01 | Dec02 | Dec03 | Dec04 | Dec05 | Dec06 | Dec07 | Dec08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 8,874 | 10,672 | 12,847 | 15,449 | 17,575 | 19,628 | 27,931 | 18,900 | 11,008 | 9,932 | 9,478 | 10,509 | 11,418 | 7,959 | 7,623 |
| R&D Expenses | 1,156 | 1,579 | 1,813 | 2,147 | 2,453 | 2,724 | 3,637 | 3,116 | 2,083 | 1,968 | 1,975 | 1,874 | 1,939 | 1,299 | 1,141 |
| Net Income | 408 | 473 | 623 | 829 | (569) | (351) | (3,443) | (25,722) | (2,994) | 293 | (247) | (2,610) | 28 | (957) | (5,799) |

| Totals | 1994 - 2000 | 1994 - 2004 | 1994 - 2008 |
|---|---|---|---|
| Revenue | 112,976 | 162,294 | 199,803 |
| R&D Expenses | 15,509 | 24,651 | 30,904 |
| Net Income | (2,030) | (30,700) | (40,038) |

*Source:*

[a] All data taken from Capital IQ as of February 26, 2014. This data reconciles to the audited financials presented in Nortel's Form 10-Ks
for the years 2000 - 2008. 10-Ks were unavailable before the year 2000.