**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

— and —

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

In re Nortel Networks Inc., *et al.*

## Expert Report of Paul P. Huffard

Submitted by the EMEA Debtors

Originally Submitted January 24, 2014
Reissued April 11, 2014

In re Nortel Networks Inc., *et al.*
## Table of Contents

I.     Introduction ........................................................................................................1

II.    Assignment ........................................................................................................2

       Question 1:   What are the different types of classes or assets sold in each of the
                     Business Sales and the Residual Patents Sale? ..........................................2

       Question 2:   With respect to the purchase price in each of the Asset Sales, what
                     is the value attributable to each class of assets in each of the
                     Business Sales and the Residual Patents Sale? ..........................................2

       Question 3:   How should the proceeds attributable to each class of assets be
                     allocated to the Selling Debtors in respect of each of the Business
                     Sales and the Residual Patents Sale? ........................................................3

III.   Summary of Conclusions ..................................................................................3

IV.    Qualifications ....................................................................................................5

V.     Basis of My Opinion ........................................................................................7

VI.    Factual Background ..........................................................................................9

       A.    Legal Entities Within The Nortel Group ...........................................10

       B.    Nortel's Matrix Organization ..............................................................12

       C.    Nortel's Geographic Sales Regions .....................................................14

       D.    Research & Development at Nortel ......................................................16

       E.    Nortel's Pre-Petition Business Units ...................................................18

       F.    Post-Petition Asset Sales .....................................................................22

VII.   Approach to Allocation ..................................................................................27

       Question 1:   What are the different types or classes of assets sold in each of the
                     Business Sales and the Residual Patents Sale? ........................................27

       Question 2:   With respect to the purchase price in each of the Asset Sales, what
                     is the value attributable to each class of assets in each of the
                     Business Sales and the Residual Patents Sale? ........................................27

       Question 3:   How should the proceeds attributable to each class of assets be
                     allocated to the Selling Debtors in respect of each of the Business
                     Sales and the Residual Patents Sale? ........................................................27

VIII.  Conclusion ......................................................................................................56

I, PAUL P. HUFFARD, declare under penalty of perjury that the following is true and correct:

## I.     INTRODUCTION

1.     I am a Senior Managing Director in the Restructuring & Reorganization Group of Blackstone Advisory Services L.P. ("Blackstone"), a financial advisory services firm retained by the court-appointed administrators and authorized foreign representatives in insolvency proceedings before the High Court of Justice of England and Wales (the "Joint Administrators") for the twenty-three Nortel entities whose offices are registered in EMEA, comprised of Europe, the Middle East and Africa (collectively, "EMEA Debtors").[1]  I have been retained as an expert witness to provide an expert opinion regarding the fair allocation of proceeds from the sale of assets of the former Nortel group's global businesses (the "Sale Proceeds") among the various Nortel debtors in Canada, the United States, and EMEA, for distribution to their respective creditors (the "Allocation Dispute").

2.     I understand that the Allocation Dispute is to be determined by a joint hearing before Judge Gross of the U.S. Bankruptcy Court for the District of Delaware, and Justice Morawetz of the Ontario Superior Court of Justice (Commercial List) (together, the "Courts"). Except as otherwise indicated, all facts set forth in this report are based upon my personal knowledge, experience, public information and review of relevant business records and information of Nortel.  I have also relied on the work of Blackstone employees, who I have supervised in the preparation of this report.  I am authorized to submit this report on behalf of Blackstone, and if called upon to testify, I would testify competently to the facts set forth in this report.  Except where I state otherwise, the opinions expressed in this report are my own.

---

1.     See Appendix 1 for a complete list of EMEA Debtors.

## II.     ASSIGNMENT

3.      I have been asked to provide my expert opinion regarding (i) what approach would be appropriate for the Courts to use in determining how to allocate the proceeds of the Nortel asset sales among the various legal entities that transferred interests or relinquished rights in each sale (the "Selling Debtors"), and (ii) based on the application of that approach, how much each of the Selling Debtors is entitled to receive from the Sale Proceeds of each of eight sales of operating global business lines of the Nortel group (the "Business Sales") and from the sale of Nortel's residual patents (the "Residual Patents Sale," and together with the Business Sales, the "Asset Sales").

4.      Based on the allocation position papers submitted in this case, I understand it to be common ground among the parties that the Sale Proceeds of the Business Sales and Residual Patents Sale should be allocated among the Selling Debtors according to the value of the interests each of them transferred and rights each of them relinquished in connection with each sale.

5.      In order to provide this opinion I have been instructed to consider the following three questions:

> Question 1:     What are the different types or classes of assets sold in each of the Business Sales and the Residual Patents Sale?
>
> Question 2:     With respect to the purchase price in each of the Asset Sales, what is the value attributable to each class of assets in each of the Business Sales and the Residual Patents Sale?

Question 3:    How should the proceeds attributable to each class of assets be allocated to the Selling Debtors in respect of each of the Business Sales and the Residual Patents Sale?

## III.    SUMMARY OF CONCLUSIONS

6.    For the purposes of this opinion, I have identified the following three relevant classes of assets as having been transferred from the Selling Debtors to the purchasers in each of the Business Sales and in the Residual Patents Sale: (i) tangible assets, such as inventory, real estate and monetary assets ("Tangible Assets"); (ii) Intellectual Property ("IP"); and (iii) a residual category of customer-related assets ("Customer-Related Assets") and goodwill not otherwise attributable to IP ("Goodwill"). Assets in each of these classes were transferred to the purchasers in each of the Business Sales. In the Residual Patents Sale, the only category of assets sold was IP.

7.    As described in more detail and for the reasons set forth below, I have valued Tangible Assets based on the net book value and have allocated the value of the Tangible Assets in each Business Sale to the Selling Debtor that carried those assets on its balance sheet.

8.    I have been asked to consider two different approaches with respect to how the assets attributable to IP should be allocated among the Selling Debtors. Under the "Contribution Approach," the portion of the Sale Proceeds attributable to IP should be allocated among the Selling Debtors in accordance with their relative contribution to research and development ("R&D"). Under the "License Approach," the portion of the Sale Proceeds attributable to IP should be allocated among the Selling Debtors in accordance with the relative fair market value of the license rights to the IP held by each of those entities at the date of the Asset Sales (the "Licenses").

3

9.      With respect to the residual category of Customer-Related Assets and Goodwill, I have allocated the value of that asset class to each Selling Debtor according to its relative percentage of global historic revenue for the fiscal year ending December 31, 2008.

10.      I have set forth the alternate results of allocation depending on whether the Courts ultimately adopt the Contribution Approach or the License Approach.

*Allocation Conclusions:  Contribution Approach*

11.      In my opinion, if the Courts adopt the Contribution Approach, which allocates value attributable to IP based on contribution to R&D, the EMEA Debtors should receive 18.2% of the Sale Proceeds, the Canadian Debtors should receive 31.9%, and the U.S. Debtors should receive 49.9%, as summarized in the table below, detailing both the overall allocation and the allocation by each Asset Sale, calculated in accordance with the methodology outlined in this report.

| CONTRIBUTION APPROACH | | | | $ in millions |
|---|---|---|---|---|
| Total Allocation by Contribution Approach:  Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | |
| | Canada | US | EMEA | Total |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.5% | 42.9% | 17.6% | 100.0% |
| **Total Allocation** | **31.9%** | **49.9%** | **18.2%** | **100.0%** |
| **Total Value** | **$ 2,320** | **$ 3,636** | **$ 1,325** | **$ 7,280** |

*Allocation Conclusions:  License Approach*

12.      Alternatively, if the Courts adopt the License Approach, which allocates value in proportion to the value of licenses that Nortel entities surrendered as conditions of the sale of the IP, the EMEA Debtors should receive 30.9% of the Sale Proceeds, the Canadian Debtors should receive 11.5%, and the U.S. Debtors should receive 57.7%, as summarized in the table below,

detailing both the overall allocation and the allocation by each Asset Sale, calculated in

accordance with the methodology outlined in this report.

| LICENSE APPROACH | | | $ in millions |
|---|---|---|---|
| **Total Allocation by License Approach** | | | |
| | **Canada** | **US** | **EMEA** | **Total** |
| CDMA | 9.9% | 79.1% | 11.0% | 100.0% |
| Enterprise | 11.3% | 52.3% | 36.5% | 100.0% |
| MEN | 18.4% | 48.0% | 33.5% | 100.0% |
| CVAS | 12.1% | 47.4% | 40.5% | 100.0% |
| GSM | 9.9% | 55.7% | 34.4% | 100.0% |
| MSS | 10.5% | 40.6% | 48.9% | 100.0% |
| Layer 4-7 | 4.8% | 81.8% | 13.4% | 100.0% |
| Next Gen | 12.2% | 49.1% | 38.7% | 100.0% |
| Residual IP | 11.0% | 55.4% | 33.6% | 100.0% |
| **Total Allocation** | **11.5%** | **57.7%** | **30.9%** | **100.0%** |
| **Total Value** | **$ 836** | **$ 4,198** | **$ 2,247** | **$ 7,280** |

## IV.   QUALIFICATIONS

13.     I hold a Bachelor of Arts in Economics from Harvard College and a Master of

Management from the Kellogg Graduate School of Management at Northwestern University.

14.     Prior to joining Blackstone in 1995, I was a Vice President of Hellmold

Associates, Inc., an investment banking firm specializing in financial restructurings.  Prior to

working at Hellmold Associates, I was a member of the corporate finance department of Smith

Barney, Harris Upham & Co., Inc.

15.     I have considerable experience advising distressed companies, including advising

both debtors and creditors in chapter 11 restructurings.  In almost every assignment, I have led

valuation analyses for companies and their assets and have frequently provided testimony on

valuation.  I have overseen various asset sale processes and advised on distressed asset sales for

companies such as Flying J Inc.; LTV Corp.; Winn-Dixie Stores, Inc. and Fleming Companies,

among others.  A number of the chapter 11 restructurings that I have worked on have included

issues relating to the allocation of value among various legal entities including Patriot Coal

Corp., Winn-Dixie Stores, Inc. and LTV Corp.  LTV Corp. specifically involved a contested case

with lengthy multi-party deposition hearings regarding the allocation of Sale Proceeds among debtor estates where I was the expert witness for the debtor.  Industry relevant experience includes advisory work on Adelphia Communications Corp. and Legerity Inc., two leading technology and communications firms.  In the last five years I have submitted sworn statements or testified as an expert in GE – Homer City (Homer City Funding LLC);[2] Houghton Mifflin Harcourt Publishing Co.;[3] Lee Enterprises Inc.;[4] Patriot Coal Corp.;[5] Flying J Inc.;[6] and Philadelphia Newspapers LLC.[7]  I co-authored a chapter on comparable transaction multiples in Contested Valuation in Corporate Bankruptcy (2011).[8]  I have been named one of the country's leading restructuring financial advisors by K&A Restructuring Register in my duties as Senior Managing Director at Blackstone.

16.     Blackstone's restructuring and reorganization advisory operation is one of the leading advisory services providers to companies and creditors in restructurings and bankruptcies.  Since 1991, Blackstone has advised on more than 325 distressed situations, both in and out of bankruptcy proceedings, involving approximately $1.3 trillion of total liabilities.

---

2.      In *In re Homer City Funding LLC*, No. 12-13024 (KG) (Bankr. D. Del.), Blackstone was an advisor to Weil, Gotshal & Manges LLP, counsel to GE Capital and the owner lessors.

3.      In *In re Houghton Mifflin Harcourt Publ. Co.*, No. 12-12171 (REG) (Bankr. S.D.N.Y.), Blackstone was retained as financial advisor to the debtors (D.I. 96, June 13, 2012).

4.      In *In re Lee Enters. Inc.*, No. 11-13918 (KG) (Bankr. D. Del.), Blackstone was retained as financial advisor for the Debtors (D.I. 151, Jan. 11, 2012).

5.      In *In re Patriot Coal Corp.*, No. 12-51502-659, No. 12-12900 (SCC) (Bankr. E.D. Mo.), Blackstone was retained as investment banker to the debtors (D.I. 523, Sept. 5, 2012).

6.      In *In re Flying J Inc.*, No. 08-13384 (MFW) (Bankr. D. Del.), Blackstone was retained as investment banker and financial advisor for the debtors (D.I. 926, Apr. 3, 2009; D.I. 927, Apr. 3, 2009; D.I. 1830, Aug. 26, 2009).

7.      In *In re Philadelphia Newspapers*, *LLC*, No. 09-11204-JKF, No. 09-11204-SR (Bankr. E.D. Pa.), Blackstone was the financial advisor to the prepetition secured lenders and the steering group of secured lenders.

8.      Available at http://www.lexisnexis.com/store/catalog/booktemplate/productdetail.jsp ?pageName=relatedProducts&prodId=prod14960498#.

The members and senior executives of Blackstone's restructuring and reorganization practice have assisted and advised numerous chapter 11 debtors in the development of plans of reorganization and are experienced in analyzing restructuring and related chapter 11 issues.  The members and senior executives of Blackstone's restructuring and reorganization practice have been particularly active in large, complex and high-profile bankruptcies and restructurings, having advised in the following matters, among others, in chapter 11 reorganizations: AbitibiBowater Inc.; Delta Air Lines, Inc.; Enron Corp.; Global Crossing Ltd.; Flag Telecom Holdings Ltd.; Flying J. Inc.; Houghton Mifflin Harcourt Publishing Co.; Lee Enterprises Inc.; Los Angeles Dodgers; LyondellBasell Industries; Mirant Corp.; SemGroup; NTK Holdings, Inc.; and W.R. Grace & Co.  In addition, the restructuring group has provided general restructuring advice to such major companies as Ford Motor Co., The Goodyear Tire & Rubber Co. and Xerox Corp.  Blackstone has also advised both debtors and creditors in transactions where IP assets accounted for a significant amount of value, including Eastman Kodak Co., Legerity Inc., Paragon Trade Brands and Taro Pharmaceuticals Industries.

17.     The compensation paid to Blackstone for its work in providing this report, any subsequent reports and any related testimony, is comprised of a monthly retainer fee of $166,667, which is capped at $2,000,000 in total.  The compensation paid to Blackstone is in no way dependent upon the outcome of the trial.

## V.     BASIS OF MY OPINION

18.     My evaluation and opinion is informed by the specific factors that are unique to the industry in which the Nortel debtors operated.  In particular, the technology-driven nature of Nortel's enterprise and emphasis on IP are factors that require specific expertise to appropriately evaluate their impact on any determination of an allocation of the Sale Proceeds.  While I have

extensive prior experience regarding asset sales in the context of reorganization and liquidations of distressed companies, including intangible assets such as IP, my opinion is also informed by analysis undertaken by individuals with the necessary expertise in order to appropriately evaluate issues specific to the operations of Nortel and the telecommunications industry.

19.     In particular, given the substantial proceeds attributable to the sale of telecommunications IP in the present case, my opinion has been advised by the expert report of James E. Malackowski, Chairman and Chief Executive Officer of Ocean Tomo, LLC ("Ocean Tomo"), an independent firm with expertise in the valuation of IP, who was retained by the Joint Administrators.  Specifically, I have relied on Mr. Malackowski's report ("Mr. Malackowski's Report") with respect to any observations made regarding Nortel's IP and IP in the telecommunications industry more generally, including valuation of Nortel's IP, valuation of licenses to exploit the IP, valuation of the right to prosecute IP infringement, the useful or commercial life of the IP and the territorial value of the IP.  Given my years of experience, I am able to form my own view as to the approach that Mr. Malackowski has taken and whether and to what extent that approach is consistent with typical valuation within a distressed environment.

20.     Furthermore, given the complex transfer pricing arrangements in place between Nortel entities, with regards to the background of Nortel's transfer pricing arrangements including the Master Research and Development Agreement (the "MRDA") and the classification of entities within the Nortel group, I have relied on excerpts of the report prepared by Richard V. L. Cooper of Charles River Associates International (the "CRAI Report," prepared by "CRAI"), which are appended hereto in Appendices 6 and 7.

21.     In preparing this report, I have also relied on various documents related to the issues discussed herein, including the documents set forth in Appendix 3 to this report.

22.     I understand and acknowledge that while I have been retained by the Joint

Administrators, my overriding duty is to the Courts, and includes the obligations (i) to provide

opinion evidence that is fair, objective and non-partisan; (ii) to provide opinion evidence that is

related only to matters that are within my area of expertise; and (iii) to provide such additional

assistance as the Courts may reasonably require to determine a matter in issue.

## VI.    FACTUAL BACKGROUND

23.     To the extent necessary to inform my opinion regarding allocation of Sale

Proceeds, my understanding of the relevant background of Nortel's operations is summarized

below and based on Appendices 4, 6, 7 and 10-19.  I have relied on these facts and the

documents cited for the factual propositions set forth therein.[9]

24.     Prior to filing for bankruptcy in Canada, the United States and the United

Kingdom on January 14, 2009 (the "Petition Date"), Nortel was a global supplier of

telecommunications and computer networking solutions including hardware and software

products and services.[10]  It provided end-to-end solutions for its customers from designing,

---

9.     Citations to any document, admission or statement contained in another document does
not mean I agree with or am relying on any other matter, fact or thing in that document,
admission or statement other than the one cited.  Similarly, citations herein and in the
Appendices to reports of the Monitor appointed by the Ontario Superior Court of Justice with
respect to administration of Nortel Networks Corporation and Nortel Networks Limited are
intended to cite only to descriptions of uncontroversial facts.  Reference to those reports does not
mean I agree with the Monitor's approach to the Allocation Dispute, that I agree with any
position of the Canadian Debtors, or that the Monitor's reports carry more weight than any other
facts of evidence referred to herein. Unless otherwise noted, the Appendices were prepared by or
in consultation with counsel for the Joint Administrators.
10.    Northern Telecom Annual Report 1994, (NNC-NNL06136896/80-82).

engineering and marketing, through to selling, installing and supporting these network solutions,[11] and it employed approximately 30,000 people globally in 2008.[12]

### A. Legal Entities Within The Nortel Group

25. Nortel was a large corporate group, consisting of many different legal entities incorporated in countries all over the world. These entities were classified according to their function and with respect to the transfer pricing arrangements that they had in place.

26. There were two main types of entities. First, there were the Residual Profit Entities (the "RPEs"), which shared all of the risks of the group, including the development of IP. The RPEs were the most significant entities in the Nortel group and performed almost all R&D as well as significant sales and distribution functions. Second, there were other entities, which handled day-to-day relationships with customers and the sales, service, installation and distribution of products within their own jurisdictions. With limited exceptions, these entities, referred to in Nortel's transfer pricing system as LREs, CPEs and AREs,[13] depending on the nature of their specific arrangements within the Nortel group (collectively, the "Distribution Entities"), did not contribute to the creation of IP. Their role was confined to simpler tasks in Nortel's operation such as sales and distribution. One notable exception is that certain of the AREs, which often originated as joint ventures of the Nortel group and third-parties, performed R&D and obtained patents in their own name, which were held independent of Nortel's transfer pricing arrangements. The allocation entitlement of these entities is described below in paragraph 104.

---

11. Nortel Networks Corp., Annual Report (Form 10-K), for the Fiscal Year Ended Dec. 31, 2008 (Mar. 2, 2009) at 1.
12. Nortel Networks Corp., Annual Report (Form 10-K), for the Fiscal Year Ended Dec. 31, 2008 (Mar. 2, 2009) at 15.
13. The Limited Risk Entities, Cost Plus Entities and At Risk Entities, respectively.

Case 09-10138-MFW   Doc 13535   Filed 05/28/14   Page 14 of 258

27.    As of the Petition Date, there were five RPEs:

- NNL, was the direct or indirect parent of over 100 Nortel subsidiaries, including NNI, a Delaware company; NNUK, a U.K. corporation; NNSA, a French corporation; and NNIR, an Irish corporation;[14]

- NNI, the lead U.S. Debtor in this case;

- NNUK, which was responsible for and controlled and managed on a day to day basis the majority of the operations in the EMEA region.[15]  NNUK was a direct subsidiary of NNL and itself owns directly or indirectly all but three[16] of the EMEA region companies.[17]  NNUK served as the headquarters of the EMEA region and, among all the EMEA entities, had the widest coverage across Nortel's business segments;[18]

- NNSA, a French corporation; and

- NNIR, an Irish corporation.

28.    As of the date of this report, within the EMEA region, there are twenty Distribution Entities maintaining an entitlement to Sale Proceeds in this Allocation Dispute.[19] As I explained above, these companies were focused on day-to-day relationships with customers and other sales-type activities within their own jurisdictions.

---

14.    Doolittle Aff. (CA), paragraph 21.
15.    Nortel Networks UK Ltd. Administrators' Statement of Proposals (Feb. 2009), Bloom Dep. Ex. 31626, at PC0194681.
16.    Being the French entities, NNSA, Nortel France SAS, and NNIR.
17.    Nortel Networks UK Ltd. Administrators' Statement of Proposals (Feb. 2009), Bloom Dep. Ex. 31626, at PC0194681.
18.    Doolittle Aff. (CA), paragraph 27.
19.    See Appendix 1 for details of the entities' designations.

29.     Nortel France SAS and Nortel Germany arose as a result of joint ventures between Nortel and what eventually became the European Aeronautic Defence and Space Company (EADS, today known as the Airbus Group).  These entities were AREs that conducted their own R&D and held IP in their own names.[20]

30.     NNI and NNL also have ARE and LRE subsidiary entities within their own holding groups.  I understand that those entities' allocations, if any, should be consolidated with the other respective U.S. and Canadian entities.  As such, when allocating value to the Canadian and the U.S. Debtors, I have not separated out the allocation for those entities.

## B.     Nortel's Matrix Organization

31.     Nortel employed a "matrix" organizational structure.  Its business units and individual businesses comprising each unit were not operated through dedicated legal entities or standalone divisions.[21] Nortel instead employed a "global integrated business model" under which "[Nortel's] main operating subsidiaries around the world operate[d] in each of Nortel's four main business segments."[22]

---

20.     See Appendix 5 for full factual background.  The EMEA AREs and certain subsidiaries of the U.S. and Canadian Debtors, for the reasons given in Mr. Malackowski's Report, are entitled to their own separate allocations in respect of patents owned and sold by them in the Asset Sales, including the Residual Patents Sale.

21.     NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006) dated October 31, 2008 at page 13 (NNI_01015095).

22.     Doolittle Aff. (CA), paragraph 26.

32.     Each business segment operated on a global basis and was responsible for various aspects of that business, including finance, R&D, supply chain management and marketing.[23] Business segments also supported local organizations in sales and support functions.[24]

33.     Profit and loss statements were reported and maintained by the business units.[25] The revenues and assets of each Nortel business unit were distributed among Nortel's various legal entities and joint ventures around the world.[26]  Each legal entity could have revenue, expense and operations relating to some or all of Nortel's business units.[27]  Layered across the lines of business were functional groups such as finance, legal, regulatory compliance and business strategy.[28]

34.     The matrix system also governed intra-company transactions.  When a customer placed a sales order with one of the regional sales offices, the Nortel entity in the country originating the sale generated a purchase order.[29]   The purchase order was then routed to one of Nortel's four transaction control centers ("TCCs") depending on the business segment and the geographic region involved (e.g., Enterprise Voice orders from the Americas and the Asia-Pacific were handled by NNL's TCC; Enterprise Voice orders from EMEA countries were

---

23.     NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006) dated October 31, 2008 at page 13 (NNI_01015095).
24.     Nortel Networks Corp., Annual Report (Form 10-K), for the Fiscal Year Ended Dec. 31, 2007 at 11.
25.     See, e.g., MEN P&L Results Call (as per July 17, locked down results, version 2.0) [Presentation], NNI_00283321.
26.     Prefiling Report of the Monitor dated January 14, 2009 (CA), 22.
27.     Prefiling Report of the Monitor dated January 14, 2009 (CA), 22.
28.     Appendix E to the Joint Request for a Bilateral Advance Pricing Agreement dated October 31, 2008 (NNC-NNL06120689)
29.     Doolittle Aff. (CA), paragraphs 87-88.

routed to NNUK's TCC).[30]   Upon receiving the purchase order the TCCs based in Canada, the United States, the United Kingdom and France would contract directly with Nortel's equipment and design manufacturers to facilitate the ultimate product delivery to the customer.[31]   Upon completion of the order, the TCC paid the manufacturer and invoiced the regional Nortel company at a marked-up price.[32]

35.     The organization structure of Nortel supports the view that the Nortel business lines were cohesive global operations where entities in different geographies shared responsibility for development of IP, know-how, and customer relationships.  My proposed allocation approaches reflect this cohesive global structure by considering the way in which various entities contributed to Nortel as a whole.

### C.     Nortel's Geographic Sales Regions

36.     Between 2001 and 2008, Nortel reported revenues by geographic sales region in addition to revenues by business unit.[33]   These sales regions were:

- EMEA;

- Caribbean and Latin America ("CALA");

- Canada;

- the United States; and

- Asia Pacific ("APAC").[34]

---

30.     Doolittle Aff. (CA), paragraphs 87-88.
31.     Doolittle Aff. (CA), paragraphs 87-88.
32.     Doolittle Aff. (CA), paragraphs 87-88.
33.     Source for the period 2006–2008 is Nortel Networks Corp., Annual Report (Form 10K) for the Fiscal Year Ended Dec. 31, 2008 (Mar. 2, 2009), at 54; source for period 2003–2005 is Nortel Networks Corp., Annual Report (Form 10K) for the Fiscal Year Ended Dec. 31, 2008 (Mar. 2, 2009), at 78; and for 2000–2002 is Nortel Networks Corp., Annual Report (Form 10K) for the Fiscal Year Ended Dec. 31, 2008 (Mar. 2, 2009), at 34..

37.     The EMEA region contributed between twenty-one and thirty percent of the

Nortel group's revenues between 2000 and 2008, and was consistently Nortel's second largest

market by reported revenues after the United States in the 2000 to 2007 time period.[35]

38.     Nortel used the following description to describe the function of these sales

regions in its Annual 10-K filings between 2003 and 2007:

> *All of our reportable segments use our direct sales force to market
> and sell to customers around the world.  This sales force operates
> on a regional basis and markets and sells Nortel products and
> services to customers located in Canada, the U.S., CALA, EMEA
> and the Asia region.  Our sales offices are aligned with customers
> on a country and regional basis.  For instance, we have dedicated
> sales account teams for certain major service provider customers
> located near the customers' main purchasing locations.   In
> addition, teams within the regional sales groups work directly with
> top regional enterprises, and are also responsible for managing
> regional distribution channels.    We also have centralized
> marketing, product management and technical support teams
> dedicated to providing individual product line support to the
> global sales and support teams.  In some regions, we also use sales
> agents who assist us when we interface with our customers.  In
> addition, we have some non-exclusive distribution agreements with
> distributors in all of our regions, primarily for enterprise products.
> Certain service providers, system integrators, value-added
> resellers and stocking distributors act as our non-exclusive
> distribution channels under those agreements.[36]*

---

34.     Source for the period 2006–2008 is Nortel Networks Corp., Annual Report (Form 10K)
for the Fiscal Year Ended Dec. 31, 2008 (Mar.2, 2009), at 54; source for period 2003–2005 is
Nortel Networks Corp., Annual Report (Form 10K) for the Fiscal Year Ended Dec. 31, 2008
(Mar.2, 2009), at 78; and for 2000–2002 is Nortel Networks Corp., Annual Report (Form 10K)
for the Fiscal Year Ended Dec. 31, 2008 (Mar.2, 2009), at 34.

35.     Source for the period 2006–2008 is Nortel Networks Corp., Annual Report (Form 10K)
for the Fiscal Year Ended Dec. 31, 2008 (Mar.2, 2009), at 54; source for period 2003–2005 is
Nortel Networks Corp., Annual Report (Form 10K) for the Fiscal Year Ended Dec. 31, 2008
(Mar.2, 2009), at 78; and for 2000–2002 is Nortel Networks Corp., Annual Report (Form 10K)
for the Fiscal Year Ended Dec. 31, 2008 (Mar.2, 2009), at 34.

36.     For fiscal years 2003–2007 ended December 31, *see respectively* Nortel Networks Corp.,
Annual Report (Form 10K) (Jan. 11, 2005) at 17; Nortel Networks Corp., Annual Report (Form
10K) (May 2, 2005) at 21; Nortel Networks Corp., Annual Report (Form 10K/A) (May 1, 2006)

39.     The EMEA region was headquartered in Maidenhead, U.K.; the CALA region

was headquartered in Sunrise, Florida; and the APAC region reported, with respect to Greater

China, to an executive based in Beijing and, for the remainder of the APAC region, to an

executive based in Tokyo.[37]

40.     This nature and scope of Nortel's global sales and marketing operations provides

evidence of the importance of customer relationships and a robust product distribution network

to Nortel's ability to generate sales on a global basis.

### D.     Research & Development at Nortel

41.     R&D operations were a critical part of the Nortel organization.  Globally Nortel

employed over 10,000 people in R&D roles,[38] who worked out of laboratories primarily located

in Canada, the United States and EMEA.[39]  In EMEA specifically, approximately 1,110

employees were involved in R&D activities in EMEA facilities, including laboratories in the

United Kingdom, France and Ireland.[40] The U.K. laboratories included major facilities in

Monkstown and Maidenhead, as well as the Harlow laboratories that Nortel acquired in the early

1990s from its acquisition of Standard Telephones and Cables (STC), a company that had

---

at 14; Nortel Networks Corp., Annual Report (Form 10K) (Mar.16, 2007) at 11; Nortel Networks
Corp., Annual Report (Form 10K) (Feb.27, 2008) at 11.
37.     Nortel Networks Corp., Annual Report (Form 10-K), for the Fiscal Year Ended Dec. 31,
2002 (Mar. 10, 2003) at 21.
38.     NNL reported having 10,053 R&D employees in total as of December 31, 2007 Nortel
Networks Corp., Annual Report (Form 10-K), for the Fiscal Year Ended Dec. 31, 2007.
39.     NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
Agreement/Arrangement 2007-2011 (with rollback to 2006), Appendix B: Functional Analysis
of R&D Activities dated October 31, 2008, NNC-NNL06120690/3.
40.     Based on percentages at NNL and NNI Joint Request for U.S.-Canada Bilateral Advance
Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Appendix B: Functional
Analysis of R&D Activities dated October 31, 2008, NNC-NNL06120690/3-4.

pioneered key developments in optical fiber-based networking.[41]  In Ireland, Nortel had also

separately developed a laboratory in Galway.[42]

42.     The European laboratories described above, together with Nortel's laboratories in

Canada and the United States, gave the Nortel group an enormous worldwide infrastructure for

R&D in all aspects of telephony and networking.  This global R&D network operated as an

integrated system, with different labs all around the globe working on projects in a coordinated

fashion.

43.     R&D at Nortel was organized and directed, like the rest of the business, on a

global matrix basis.[43]  Budgets and priorities for the R&D facilities were determined centrally,

either by Business Line (product line management) or, in later years, by the Common

Engineering Department under the Group Chief Technology Officer.[44]

44.     Notwithstanding the integrated and globally-directed nature of R&D at Nortel,

individual employees were still typically employed by the local Nortel entity located in the

---

41.     2005 R&D Site Strategy Discussion, Jan. 6, 2005, EMEAPROD1137447, at 5;  Nortel
Networks: Transfer Pricing Report: Nortel Networks U.K. Ltd., July 18, 2003, NNC-
NNL06001549/20; Global R&D News and Information, E-mail from Communications
Technology (January 30, 2006), NNC-NNL06604374; Charles K. Kao, Nobel Lecture at The
Chinese University of Hong Kong, "Sand From Centuries Past: Send Future Voices Fast," Dec.
8, 2009, *available at*
http://www.nobelprize.org/nobel_prizes/physics/laureates/2009/kao_lecture.pdf, at 71–74, 78
(last accessed Jan. 24, 2014).

42.     2005 R&D Site Strategy Discussion, Jan. 6, 2005, EMEAPROD1137447, at 3.

43.     *See* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
Agreement/Arrangement 2007–2011: Appendix B: Functional Analysis of R&D Activities
(October 31, 2008), NNC-NNL06120690/2, 11.

44.     *See* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
Agreement/Arrangement 2007–2011: Appendix B: Functional Analysis of R&D Activities
(October 31, 2008), NNC-NNL06120690/8–12.

geographic jurisdiction in question.[45]  In other words, with the exception of occasional

secondments, employees performing R&D in Canada were employed by NNL, those located in

the U.K. were employed by NNUK, and so on.[46]

     45.     Patent applications at Nortel were centrally managed by the IP legal team.[47]

Though management of this team was a central function, there were patent agents and attorneys

situated at individual R&D facilities and assigned to distinct business segments.[48]  Within the

twelve-month grace period for priority permitted under international conventions (e.g., the Paris

Convention), those applications deemed most important would be filed in various countries,

depending on their relevance to the activities and expected activities of Nortel and its principal

competitors in each country.[49]

### E.    Nortel's Pre-Petition Business Units

     46.     By the 2000s, Nortel designed, developed, manufactured, assembled, marketed,

sold, licensed, installed, serviced and supported communications technology and infrastructure to

enable internet protocol, data, voice and multimedia communications using wireless and wireline

---

45.     *See* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007–2011: Appendix B: Functional Analysis of R&D Activities (October 31, 2008), NNC-NNL06120690/20.

46.     *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006) dated October 31, 2008 at page 13 (NNC-NNL06120693) at page 20, 22.

47.     *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184943–PC0184943.

48.     *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184943–PC0184943.

49.     *See* Nortel Networks Foreign Filing Practice Note (Dec. 12, 2000), Anderson Dep. Ex. 31,304, at NNC-NNL06521385.

technologies.[50]  Nortel's business required significant ongoing investment in R&D in order to keep pace with and anticipate evolving technologies, industry standards and customer needs.[51]

47.    Immediately prior to the Petition Date, Nortel conducted its business through four reportable segments: Carrier Networks, Enterprise Solutions, Metro Ethernet Networks and Global Services (the "Business Units").[52]  The Business Units provided products and services to telecommunications carriers and enterprise customers worldwide.[53]  As described in more detail below, the four Business Units were ultimately further divided into the eight Business Lines for purposes of implementing the eight Business Sales.

- **Carrier Networks ("CN")** provided technology related to wireless mobile communication infrastructure and wireless networking solutions that enabled telecommunication service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises.[54]  Nortel's CN segment offered or was in the process of developing a variety of wireless technologies, including second generation (or 2G) technologies such as GSM, 3G technologies such as CDMA2000 and UMTS, and 4G technologies such as LTE.[55]  At the time

---

50.    Nortel Networks Corp., Annual Report (Form 10-K) for the fiscal year ending Dec. 31, 2008 (Mar. 2, 2009), at 7.

51.    Nortel Networks Corp., Annual Report (Form 10-K) for the fiscal year ending Dec. 31, 2008 (Mar. 2, 2009), at 30.

52.    Nortel Networks Corp., Annual Report (Form 10-K) for fiscal year ended Dec. 31, 2008 (Mar. 2, 2009), at 6.

53    Further discussion on the Business Lines and the Business Sales is set out at Appendices 12 to 19.

54.    Nortel Networks Corp., Annual Report (Form 10-K) for the fiscal year ending Dec. 31, 2008 (Mar. 2, 2009), at 50

55.    Nortel Networks Corp., Annual Report (Form 10-K) for the fiscal year ending Dec. 31, 2008, (Mar. 2, 2009), at 7.

of the Petition Date, CN was Nortel's largest Business Unit by reported revenue, representing approximately forty percent of Nortel's revenue for the fiscal years ending December 31, 2006, 2007 and 2008.[56]   The CN Business Unit accounted for four of the eight Business Lines sold in the Business Sales including (i) CDMA and LTE, (ii) GSM and GSM-R, (iii) Next Generation Packet Core and (iv) CVAS.

- **Enterprise Solutions ("ES")** provided voice, data, security, multimedia networking and conferencing solutions to large and small businesses and government agencies in a variety of industries.  ES products and services were used to build new networks into more cost effective, packet-based networks supporting data, voice and multimedia communications.[57]   ES represented approximately twenty-four percent of Nortel's revenue for the fiscal years ending December 31, 2006, 2007 and 2008.[58]   The ES Business Unit was sold in one Business Sale, Enterprise.

- **Global Services ("GS")** provided a broad range of services and solutions to large business enterprises and carriers worldwide.  The GS segment offered implementation, support, management and applications which were designed to reduce costs, improve efficiency and performance, and

---

56.      Nortel Networks Corp., Annual Report (Form 10-K) for fiscal year ended December 31, 2008, pages 54 and 65.
57.      Nortel Networks Corp., Annual Report (Form 10-K) for the fiscal year ending December 31, 2008, page 50.
58.      Nortel Networks Corp., Annual Report (Form 10-K) for fiscal year ended December 31, 2008, pages 54 and 67.

capitalize on new revenue opportunities.[59]  GS represented approximately twenty percent of Nortel's revenue for each of the fiscal years ending December 31, 2006, 2007 and 2008.[60] The GS Business Unit was sold in one Business Sale, Layer 4-7 Assets.

- **Metro Ethernet Networks ("MEN")** provided carrier-grade wired networking infrastructure, including optical, Ethernet and Carrier Voice over Internet Protocol technology and solutions to make the government agencies, carriers and large enterprise customers' networks more scalable and reliable for the high-speed delivery of diverse multimedia communications services.[61]  MEN represented approximately fourteen percent of Nortel's revenue for each of the fiscal years ending December 31, 2006, 2007 and 2008.[62]  The MEN Business Unit accounted for two of the eight Business Sales: Metro Ethernet Networks and Multi-Service Switch.

48.    The following table summarizes Nortel's revenue by Business Unit between 2006 and 2008:

---

59.    Nortel Networks Corp., Annual Report (Form 10-K)for the fiscal year ending December 31, 2008, page 50.

60.    Nortel Networks Corp., Annual Report (Form 10-K) for fiscal year ended December 31, 2008, pages 54 and 70.

61.    Nortel Networks Corp., Annual Report (Form 10-K)  for fiscal year ending December 31, 2008, page 50.

62.    Nortel Networks Corp., Annual Report (Form 10-K) for fiscal year ended December 31, 2008, pages 54 and 69.

| NORTEL OPERATING SEGMENTS | | | | | | $ in millions |
| --- | --- | --- | --- | --- | --- | --- |
| | Fiscal Year Ending December 31, | | | | | |
| | 2006 | | 2007 | | 2008 | |
| Original Nortel Segment | Revenue | % Revenue | Revenue | % Revenue | Revenue | % Revenue |
| Carrier Networks | $ 5,157 | 46.2% | $ 4,493 | 41.9% | $ 4,312 | 42.3% |
| Enterprise Solutions | 2,292 | 20.5% | 2,620 | 24.4% | 2,402 | 23.6% |
| Global Services | 2,132 | 19.1% | 2,087 | 19.5% | 2,089 | 20.5% |
| Metro Ethernet Networks | 1,591 | 14.2% | 1,525 | 14.2% | 1,393 | 13.7% |
| **Total** | **$ 11,172** | **100.0%** | **$ 10,725** | **100.0%** | **$ 10,196** | **100.0%** |

## F.    Post-Petition Asset Sales

49.    Under the Interim Funding and Settlement Agreement (the "IFSA") entered by the Selling Debtors in June 2009, and the escrow agreements signed following various asset disposals, the various parties currently before the Courts agreed to a coordinated program of asset disposals in order to maximize the remaining value in the business for the benefit of Nortel's creditors while postponing the allocation of the resulting Sale Proceeds until after the sales were completed.[63]  This issue of allocation is now before the Courts.

50.    Access to a share of the Sale Proceeds was made conditional on either an entity selling some or all of its business as part of the sale or executing an "Appropriate License Termination."[64]  The allocation of Sale Proceeds to which each Selling Debtor would be entitled was left to a future resolution.

51.    The sales conducted under the IFSA consisted of eight separate sales of various functioning Business Lines, which were carved out from the four Business Units described above.  A ninth sale, which generated more Sale Proceed than the eight Business Sales

---

63.    Motion for an Order Approving the Interim Funding and Settlement Agreement, Ex. B ¶ 12(b), June 9, 2009 [D.I. 874].
64.    IFSA ¶ 11.

combined,[65] consisted solely of more than 7,000 patent assets.[66]  The table below summarizes the

Asset Sales:

---

[65].    The vast majority of the patent value in the Residual Patents Sale was derived from a minority of the patents (collectively the "High Priority Patents", developed over a different period of time in the case of each sale, the "Priority Dates").  Mr. Malackowski's Report § 11.1.2.

[66].    *See* Order Authorizing and Approving Sale of Residual Patents Portfolio, July 11, 2011 [D.I. 5935] (hereinafter "Residual Patents Sale Order").

| Original Nortel Segment | Business Sales | Purchase Price [1] | Escrow Balance [2] | Description |
|---|---|---|---|---|
| **Carrier Networks** | CDMA | $ 1,120 | $ 1,053 | Included 2G/3G mobility networking solutions based on CDMA channel access method; Nortel R&D efforts included innovative technologies focused on areas of 4G broadband, including LTE. |
| | GSM | 118 | 106 | GSM is a mobile technology providing global wireless coverage with more than 2.6 billion users worldwide. Nortel's GSM business includes GSM network access products that provide nationwide coverage and significantly increase the access to networks. GSM-R provides a secure wireless communications system for railways operators, was also based on GSM technology. |
| | Next Gen | 10 | 10 | Sub-unit of Nortel's broader wireless business that developed network components designed to provided data network connectivity and increase network bandwidth for multimedia content and applications. |
| | CVAS | 159 | 140 | Delivered both products and services principally to telecommunications services providers and multi-system operators that enable them to provide voice, data and multi-media telecommunications solutions to their end clients. |
| **Enterprise Solutions** | Enterprise | 933 | 843 | Business addressed the communication needs of large and small businesses across various industries by providing products and services that integrate voice, email, conferencing, video and instant messaging. |
| **Global Services** | Layer 4-7 | 18 | 18 | Sold certain application delivery products, primarily the Nortel Application Switch and Nortel Application Accelerator products, which improve application availability, performance and security and reduce server and bandwidth needs to improve the responsiveness of web-based applications. |
| **Metro Ethernet Networks** | MEN | 680 | 610 | Delivers and services communications infrastructure and solutions for the transport of voice, video and data signals for the "Metropolitan" and "Long-Haul" communications markets using innovating optical networking capabilities |
| | MSS | 49 | 46 | Division of Nortel's MEN business. Delivered a high capacity, high reliability multi-service switch that can aggregate and route different kinds of traffic (data, video, voice and various other protocols) and provided related services principally to telecommunications service providers and multi-system operators. |
| **R&D Not Attributable to Business Line** | Residual IP | 4,505 | 4,454 | Nortel's extensive research and developed generated intellectual property that was not specifically attributable to its segments or not sold as part of the business sales. This included over 6,000 granted patents, patent applications and invention disclosures thought worthy of protection by patent application that were sold separately from the business sales. |
| | **Total** | **$ 7,592** | **$ 7,280** | |

**BUSINESS SALE DESCRIPTIONS**                                                                                            *$ in millions*

(1) "Purchase Price" is defined the as the escrow balance for each transaction plus (i) value distributed to Nortel entities, plus (ii) costs paid for by the purchaser unrelated to the value of the business as a whole, plus (iii) payments from the purchaser to satisfy claims against the estate and deduct (iv) escrow releases back to the purchaser.

(2) "Escrow Balance" is defined as the cash balance available for distribution for each business sale held within the escrow accounts as reported on the escrow account balance summary from NNL's Treasury dated July 25,2013.

52.     Six of the nine sales were conducted by auction, and all of the sales were in accordance with section 363 of the U.S. Bankruptcy Code.[67]  By agreement dated January 13, 2009, the Nortel group retained Lazard Frères & Co. LLC ("Lazard"), a global investment bank, to assist in marketing the businesses.[68]  The Nortel estates also retained Global IP Law Group to advise them with respect to the valuation of the assets sold in the Residual Patents Sale.[69]

*Nortel's Post-petition Asset Sale of Residual Patents*

53.     The most significant single sale undertaken by the Nortel estates was that of the group's residual patent assets (the "Residual Patents Portfolio") sold in the Residual Patents Sale. This sale consisted of more than 7,000 patent assets (including granted patents, pending patent

---

67.     *See* the Residual Patents Sale Order; Order Authorizing and Approving Sale of Multi-Service Switch Business Line, Sept. 30, 2010 [D.I. 4054]; Order Authorizing and Approving Sale of Carrier Voice Over IP and Application Solutions Business Line, Mar. 4, 2010 [D.I. 2632]; Order Authorizing and Approving Sale of Metro Ethernet Networks Business Line, Dec. 3, 2009 [D.I. 2070]; Order Authorizing and Approving Sale of GSM/GSM-R Business Line, Dec. 3, 2009 [D.I. 2065]; Order Authorizing and Approving Sale of Next Generation Packet Core Network Components Business Line, Oct. 28, 2009 [D.I. 1760]; Order Authorizing and Approving Sale of Enterprise Solutions Business Line, Sept. 16, 2009 [D.I. 1514]; Order Authorizing and Approving Sale of CDMA and LTE Business Line, July 28, 2009 [D.I. 1205]; Order Authorizing and Approving Sale of Layer 4-7 Business Line, Mar. 26, 2009 [D.I. 539]; see also Notice of Cancellation of Auction of Carrier Voice Over IP and Application Solutions Business Line, Feb. 25, 2010 [D.I. 2527]; Notice of Cancellation of Auction of Layer 4-7 Business Line, Mar. 20, 2009 [D.I. 506]; Notice of Cancellation of Auction of Next Generation Packet Core Network Components Business Line, Oct. 26, 2009 [D.I. 1723].
68.     Application for an Order Authorizing Employment & Retention of Lazard Frères & Co. LLC, Feb. 13, 2009 [D.I. 294] (attaching Letter Agreement dated January 13, 2009, as Exhibit C); *see also* Order Authorizing Retention & Employment of Lazard Frères & Co. LLC, Mar. 20, 2009, [D.I. 507].
69.     Application for an Order Authorizing Employment & Retention of Global IP Law Group, Oct. 30, 2009 [D.I. 1796] (attaching Master Consulting Agreement dated October 15, 2009, as Exhibit D); Order Authorizing Employment & Retention of Global IP Law Group, LLC, Nov. 11, 2009 [D.I. 1928].

Case 09-10138-MFW   Doc 13651   Filed 05/28/14   Page 29 of 258

applications, and invention disclosures thought worthy of protection by patent application).[70]
This sale generated $4.5 billion, more than the eight Business Sales combined.[71]

54.     According to an information memorandum prepared by Nortel and its
independent advisors – Lazard and Global IP Law Group – and sent to potential buyers of the
portfolio between May and September 2010, the Residual Patents Portfolio consisted of 4,040
granted patents, 2,045 patent applications and 145 invention disclosures that could form the basis
of a patent application (in excess of 7,000 total patent assets, since patents in multiple
jurisdictions may stem from the same application).[72]  The information memorandum noted that
the value in the Residual Patents Portfolio comes from the fact that it covered a broad range of
technology areas and that it contained many foundational patents that were viewed as being
essential to many different technologies.[73]

55.     The sales presentations delivered by the Nortel Residual Patents team to potential
bidders in late 2010 detailed the fact that the Residual Patents Portfolio was composed of patents
not "predominantly used" by any one Business Line.[74]  The only material licenses granted were
said to be those granted to the Business Line buyers in their respective product line or the "field

---

70.     Mr. Malackowski's Report §§ 7.2, 7.3; *see also* Motion for an Order Authorizing and
Approving Sale of Residual Patents Portfolio ¶¶ 8–10, Apr. 4, 2011 [D.I. 5202] (hereinafter
"Residual Patents Sale Motion").
71.     Mr. Malackowski's Report § 10; *see also* Residual Patents Sale Order Ex. A § 2.2.1.
72.     GIP_Nortel_00093161; *see* Executive Summary: Project Iceberg, May 2010, NNC-
NNL06096750.
73.     GIP_Nortel_00093161; *see* Executive Summary: Project Iceberg, May 2010, NNC-
NNL06096750.
74.     *See* Overview Nortel Patents Presentation given to Iceberg buyers,
NNI_ICEBERG_00196153 at 8.

of use" of the business to enable them to use Nortel IP that was required, but not predominantly used within, that Business Line.[75]

## VII.   APPROACH TO ALLOCATION

56.     As is noted above, in providing my opinion I have answered the following three questions:

Question 1:   What are the different types or classes of assets sold in each of the Business Sales and the Residual Patents Sale?

Question 2:   With respect to the purchase price in each of the Asset Sales, what is the value attributable to each class of assets in each of the Business Sales and the Residual Patents Sale?

Question 3:   How should the proceeds attributable to each class of assets be allocated to the Selling Debtors in respect of each of the Business Sales and the Residual Patents Sale?

57.     In order to address these three questions, it was also necessary to ascertain the balance of Sale Proceeds available to be allocated for each Asset Sale (the "Purchase Price").  In order to determine (as best we are able) this Purchase Price, we started with the escrow balance for each transaction as of the completion date and made adjustments to that amount to account for various payments to and from that escrow balance.  The details of these adjustments are set forth in Appendix 2.

---

75.     *See* Nortel's Patent Portfolio: An Overview, July 2010, GIP_Nortel_00142929 at 3; Overview Nortel Patents Presentation given to Iceberg buyers, NNI_ICEBERG_00196153 at 8.

## Question 1
### What are the different types or classes of assets sold in each of the Business Sales and the Residual Patents Sale?

58.     The first step in determining how to allocate the Sale Proceeds of the Asset Sales among the Selling Debtors is to determine what general classes of assets were included in each sale.  Allocating the proceeds of a business sale among various asset classes is consistent with what the Nortel group did in the one major pre-petition sale of a line of business – the sale of the UMTS business to Alcatel, described in more detail in Appendix 11.  Making such an allocation among asset classes is particularly appropriate for the present exercise because the factors relevant to the determination of how the Sale Proceeds should be divided among the Selling Debtors are different for the different classes of assets that were included in each Business Sale.  A necessary step prior to performing such an allocation is the identification of the various asset classes to be valued and allocated.  For reasons discussed further below, I believe that the relevant classes of assets to be examined with respect to each of the Business Sales are (i) Net Tangible Assets, (ii) IP, and (iii) Customer-Related Assets and Goodwill not otherwise encompassed in IP.  I believe that the purchasers of the Business Lines were interested in acquiring, and would have attributed substantial value to, each of these classes of assets with respect to each of the Business Sales.

59.     As described above, there were nine major Asset Sale transactions, which consisted of the eight Business Sales and the Residual Patents Sale.  The eight Business Sales were sold as going-concern businesses, and the assets and liabilities sold and transferred to the buyers consisted of Tangible Assets, Intangible Assets, as well as certain Assumed Liabilities, as described below.  In the Residual Patents Sale, the only asset transferred consisted of IP.

60.     In order to identify which specific assets and liabilities transferred to the purchasers of each of the eight Business Sales, subject to certain limited exceptions,[76] we reviewed the Asset Sale Agreements ("ASAs") for each of the Business Sales, which describe the specific assets and liabilities transferred and assumed by a buyer.  The remaining categories are comprised of other Intangible Assets such as Customer-Related Assets and Goodwill.  The assets and liabilities transferred in each Business Sale may be summarized into the categories set forth below.

**A.      Net Tangible Assets**

61.     As described further below, we group Tangible Assets and Assumed Liabilities together as "Net Tangible Assets" for purposes of valuation and allocation.

*Tangible Assets*

62.     As is set out in the ASAs, the Tangible Assets sold generally included (i) Monetary Assets, consisting primarily of certain transferred accounts receivable and prepaid expense, (ii) Inventory, consisting of raw materials, manufactured and purchased parts, work-in-process, packaging, stores and supplies, unassigned finished goods inventories (which were finished goods not yet assigned to a specific customer order), "excess" or "obsolete" inventory, assets on loan and merchandise that the selling entities maintained as they continued to run their

---

76.     These exceptions include: 1) Next-Gen: an entity within CDMA sold for $10.0 mm.  4Q 2009 financials are not available, so instead we relied on NNI_00824910, which reported $1.9 mm tangible assets as of 3Q 2009.  The remaining $8.1 mm in value represents software IP, which was allocated consistent with other IP associated with the CDMA business. 2) Enterprise: allocation of value associated with shares in NGS and Diamondware, see Appendix 22 for detail. 3) APAC and CALA Settlement: See appendix 5 for detail.  To the extent the calculated allocation for APAC and CALA differs from the settlement amount, the difference is place back in the general allocation pool for allocation to the other estates.  4) Enterprise: NGS cash distribution, discussed in Appendix 2.

businesses in the period between the Petition Date and completion of the Business Sales, and (ii)

<u>Fixed Assets</u>, consisting of physical plant machinery, equipment and real estate.

*Assumed Liabilities*

63.     As described in the ASA of each Business Sale, and is typical in such

transactions, certain liabilities were assumed by the buyer including Contractual Liabilities,

Royalty Liability, Warranty Provision, Accrued Vacation, Product Defect Provisions, Net

Deferred Revenue ("<u>Assumed Liabilities</u>").[77]  In my experience with various asset and business

sales, it is in the normal course to have a buyer assume certain liabilities in the context of a sale.

These need to be accounted for and relate to the value and operations of the Business Sales.

64.     The assumption of liabilities by a buyer is effectively additional consideration

provided by the buyer to the seller.  Given the information provided in the ASAs, financial

statements and other documents identified in Appendix 4, the assumption of liabilities by the

purchasers of the Assets Sales should be reflected in an increase in the ultimate sale price of the

assets.  For allocation purposes, the Assumed Liabilities can then be thought of as a fourth asset

class, but one with negative values, which are netted against the value allocable to each entity out

of the gross value of the assets transferred.

---

77.     <u>Contractual Liability</u> generally represents liability associated with contracts as part of the sale.  Royalty <u>Liability</u> generally represents the amount of royalty liabilities as of a given date.  <u>Warranty Provision</u> generally means the provision for potential warranty related claims by customers as of a given date.  <u>Accrued Vacation</u> generally means the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to transferred employees as of the transaction date.  <u>Product Defect Provisions</u> generally represents the provision for known product defects related to products and/or services sold by the company, as of the transaction date.  <u>Net Deferred Revenue</u> generally represents deferred revenues for services to be performed or products to be provided by the business after the transaction closing date, but for which an account receivable has been recorded (or cash received) prior to closing, minus the associated deferred costs associated with the deferred revenues, to the extend incurred prior to the closing date.

65.     For our purposes, we group Tangible Assets and Assumed Liabilities because they are valued and allocated in the same fashion to determine a Net Tangible Asset value.  As we describe later, both can be valued based on their recorded book value and allocated directly to the Selling Debtor that had them on its balance sheet.

**B.      Intangible Assets**

66.     It is typical in the sale of an operating business that a proportion of the value lies not in the Tangible Assets that are conveyed but in Intangible Assets.  With respect to a technology company like Nortel, in addition to IP, other Intangible Assets, such as value attributable to customer relationships and Nortel's distribution network are a factor.  There are various ways to define Intangible Assets depending on the business.  In the case of Nortel, the Intangible Assets can, and in my opinion should, be grouped into three categories: (i) IP, (ii) Customer-Related Assets (which includes Customer Relationships and Nortel's Distribution Network) and (iii) Goodwill not already considered under IP.

*Intellectual Property*

67.     The IP is, in my opinion, clearly a distinct and important aspect of each Business Sale.  Within Nortel, IP was considered the driver of revenue in each of the businesses.[78]  This is expected of a technology company, where customers consider the functionality and technological attributes of the products as critical factors, all of which are driven by the embedded IP.  In my view, purchasers would have considered the acquisition of IP in each of the Business Lines as a critical aspect of each of the Business Sales.

---

78.     Binning Dep. 125:3–13, Oct. 24, 2013; Weisz Dep. 97:11–98:8, Nov. 25, 2013.; Dep. Ex. 21407 (NNI_01333113), at 17 ("Research, design and development are the primary contributor to the success of Nortel's operations").

68.     Each of the ASAs makes clear that the purchasers were acquiring the material IP that covered or was used in connection with the conduct and operation of the relevant businesses, along with the right to license other IP necessary for the business to operate.[79]  The acquisition of certain patents would give the purchaser not only the right to use the IP within the acquired business, but also the right to use those patents in relation to other businesses the purchaser may own.  In addition, the buyer has the ability to enforce the exclusivity of the patents against third parties, which provides the opportunity to monetize the patents outside of the buyer's own business.

*Customer-Related Assets*

69.     Another important group of Intangible Assets was Nortel's Customer-Related Assets, which was comprised of (i) Nortel's Customer Relationships, and (ii) Nortel's sales, distribution and customer-support infrastructures that enabled the distribution of products to customers (the "Distribution Network.").

70.     Customer Relationships acquired in the purchase of an operating business might be contractual, such as existing service contracts or license agreements.  They could also include non-contractual elements such as a history of collaboration and institutional knowledge that positions a purchaser to better serve customer needs and win future business.  The transfer of the active employees who foster the relationship with a customer preserves the value associated with anticipated revenues from future opportunities with that customer.

71.     With respect to Nortel's Distribution Network, each Business Line had a comprehensive distribution and sales network that enabled products to be customized, sold and

---

79.     See Appendices 11 through 19 for details of the assets transferred pursuant to each of the ASAs.

serviced across a wide variety of different markets worldwide.  The buyers of the Business Lines acquired access to this distribution function, separate and distinct from any physical assets involved in the distribution function, by acquiring the employees who were associated with distribution operations, and who could utilize the existing structure of the Business Line to continue to provide the support function, thereby enabling the purchaser entity to realize revenues associated with those functions.

72.      Customer-Related Assets transferred in each of the Business Sales, other than the Next Generation Packet Core sale. In my opinion, Customer-Related Assets have significant value and purchasers paid more in each of the Business Sales than they would have paid solely to acquire just the Net Tangible Assets and IP.

73.      My opinion is based on both my experience regarding sales of operating businesses and the facts I have discerned regarding Nortel's specific operations.  Nortel had an extensive network through which it could service customers not only transnationally but locally in many significant markets, particularly in Europe.  This network enabled Nortel to establish long-standing Customer Relationships with some of the largest global telephone communications and technology companies, which produced significant recurring revenue over time, including BCE, Motorola, Sprint, AT&T, Verizon, BT, and HSBC to name a few.  Nortel's relationships with many of its clients spanned multiple Business Lines and geographies highlighting the depth of the relationships and services provided to its customers.[80]

74.      Former Nortel employees have testified to the importance of Customer Relationships and the Distribution Network in deposition testimony.  Additionally, the

---

80.      *See* Pusey Dep. 64:11–66:6, Nov. 18, 2013; Watkins Dep. 39:6–42:11, Nov. 8, 2013; Zafirovski Dep. 91:23–92:10, Nov. 6, 2013.

management presentations made to the potential purchasers of the Business Sales, as well as

declarations filed with the Sale Motion to the U.S. Bankruptcy Court for the District of Delaware

to approve each of the Business Sales, identified and emphasized the existence and importance

of this asset class. These testimonies, documents and other evidence supporting the value of

Customer-Related Assets are discussed further in Appendix 20.

75.     Finally, attributing value to Customer Relationships is consistent with the

treatment of this asset class in certain pre-petition asset sales, including in particular the sale of

Nortel's UMTS business to Alcatel in 2006. The history of the UMTS transaction and a

discussion of how it provides a useful allocation methodology precedent is set forth in

Appendices 9 and 10. In that case, the buyer and Nortel allocated a meaningful portion of the

sale price to the Customer Relationships based on the purchaser's view of value associated with

its acquisition of those relationships.

*Goodwill*

76.     Finally, value may be attributable in each Business Sale to Goodwill not

otherwise associated with IP. In most cases involving the purchase of a going concern, there is

generally additional residual value in an enterprise in excess of specifically identifiable Tangible

or Intangible Assets. This residual value is generally defined for accounting purposes as

"Goodwill."[81]

---

81.     The presence of goodwill in the purchase price allocation of an acquirer is independent of
whether or not the seller of the same assets had any goodwill recorded on their balance sheet at
the time of the sale. The seller's goodwill is reflective of their historical basis in the assets,
whether any goodwill was recorded when they acquired assets, and any write-downs of goodwill
over time. The buyer records a separate independent evaluation when they acquire the asset,
based on the price paid and the ability to allocate value to identifiable, non-goodwill asset
classes.

## Question 2
## What is the value attributable to each class of assets in each of the Business Sales and the Residual Patent Sale?

77.     Having identified the categories of assets sold in each Asset Sale, the second step is to allocate the sale price achieved to each of the asset classes identified within each Business Sale (the "Blackstone Methodology").  The combined value of the assets sold has to reconcile with the net sale price paid in each sale per the Closing Statements.

78.     Broadly, the Blackstone Methodology allocates value among asset classes for the Business Sales by:

- First, valuing the Net Tangible Assets (Tangible Assets and Assumed Liabilities) by reference to how each of the Nortel entities valued those assets on its own books as of 4Q 2009; then

- Second, based on Mr. Malackowski's Report, valuing the IP that was sold in each Business Sale; and

- Third, deducting the values ascribed to the Net Tangible Assets and IP from the sale price of each Business Sale, per the Closing Statements, resulting in a residual balance encompassing Customer-Related Assets and Goodwill.

## I.      The Business Sales

### A.      Net Tangible Assets

79.     In my experience with asset sales, the ideal approach would be to conduct an appraisal of the Tangible Assets in order to determine the value of each individual asset.  The appraisal is typically conducted by a firm specializing in detailed asset valuations and is done based on detailed internal information provided by management, usually a general ledger that

Case 09-10138-MFW   Doc 13653   Filed 05/28/14   Page 39 of 258

details each asset, the current carrying book value, depreciation and remaining useful life (the "Appraisal Approach").  Similarly, the ideal approach for valuing Assumed Liabilities would be to perform a detailed analysis of the fair value of those liabilities.

80.     In the case of Nortel, however, given that the Tangible Assets and Assumed Liabilities were transferred years ago, the assets and liabilities are no longer available for an appraiser to assess, there is no management team to contact and we do not have significant detail to view each asset and liability category in detail, therefore the Appraisal Approach cannot be used.

81.     As an alternative, book values of Net Tangible Assets can be used to approximate the value of such assets at any given point in time, which we believe is reasonable approach given the circumstances.

82.     In determining the relevant book value for Net Tangible Assets, the most recent set of data would be the preferred information set.  We have considered using the details described in the ASA, Closing Statements and escrow account statements (which provide the sale price).  However, given that our exercise is not only to value the assets but to ultimately allocate them to the rightful owner, asset level detail is needed by asset category for each legal entity within each Business Line for each Business Sale.  The ASAs, Closing Statements and escrow account statements present information on an aggregate basis at the Business Line level and not the entity level, and so they do not provide the detail needed to conduct such an exercise. Furthermore, no reasonable assumption can be made in order to use the figures from the ASAs, Closing Statements and escrow account statements to determine the correct value of Net Tangible Assets for each entity in any given Business Sale.

83.     It should be noted that the buyers of the Nortel assets were permitted to make their own apportionment of the sale price across various different asset classes for their own accounting purposes.  Some of those buyer purchase price allocations ("PPAs") have been filed publicly with the U.S. Securities and Exchange Commission.  We did not consider those buyer PPAs in our analysis, however, because the various ASAs make clear that the buyers' PPAs are not determinative of the values of the assets in question, nor the asset classes sold in the sales,[82] and "shall not, or shall not be deemed to determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds" among the Selling Debtors.[83] We also consider that the buyers who have published their PPAs are likely to have been motivated by their own individual tax and accounting circumstances, meaning that the PPAs are an unreliable guide to the classes of assets or true values transferred in the Asset Sales.

84.     In lieu of the ASA, Closing Statement, PPA and Appraisal Approaches set forth above, we have relied on the 4th Quarter 2009 ("4Q 2009") financial statements because they are the latest complete set of financial statements with the level of entity specificity needed to ultimately allocate the Closing Statements Adjusted Price to each Tangible Asset and Assumed Liability. Of note, due to the lack of better information, we have assumed that the timing difference and any changes in working capital balances between the Closing Statements, which are the basis for determining the percentage of value for Tangible Assets and Assumed Liabilities across entities, and the 4Q 2009 book value of such items, are indeterminable. Further, given the limited information available, we have made the assumption that the entire

---

82.     *See* CDMA and LTE ASA clause 6.7; Enterprise and NGS ASA clause 2.2.7; MEN ASA clause 2.2.6; GSM/GSM-R ASA clause 6.7; CVAS ASA clause 6.9; MSS ASA clause 2.2.6, Layer 4-7 ASA clause 3.2, and Next Generation Packet Core ASA clause 6.7.
83.     *See, e.g.*, NNI_00812035, ¶ 2.7.

balance of the liability is assumed by the buyer.  The Tangible Assets and Assumed Liabilities are netted against one another at the entity level to determine the net percentage to be allocated to any specific entity, which is then applied to the Sale Proceeds held in escrow, described in further detail below.

85.     I note that in most of the Business Sales the value of the Net Tangible Assets is small relative to the total Sale Proceeds from that Business Sale.  As such, even if there were small deviations between the book value of those assets and their fair market value, it would be immaterial to the allocation exercise in the aggregate.

86.     Applying the 4Q 2009 as discussed above, I attribute value to the Net Tangible Assets in each Business Sale as follows:[84]

*Monetary Assets*

| | Accounts Receivable | | Prepaid Expenses | | Total | | Business |
|---|---|---|---|---|---|---|---|
| **BUSINESS SALES: MONETARY ASSETS** | | | | | | | *$ in millions* |
| Sale | Value | % Bus. Val. | Value | % Bus. Val. | Value | % Bus. Val. | Value |
| CDMA | $ 1 | 0.1% | $ – | – | $ 1 | 0.1% | $ 1,140 |
| Enterprise | – | – | – | – | – | – | 943 |
| MEN | 15 | 2.0% | – | – | 15 | 2.0% | 744 |
| CVAS | 22 | 10.7% | 0 | 0.1% | 22 | 10.8% | 207 |
| GSM | 20 | 8.1% | – | – | 20 | 8.1% | 240 |
| MSS | 13 | 20.3% | – | – | 13 | 20.3% | 63 |
| Layer 4-7 | – | – | – | – | – | – | 18 |
| Next Gen | – | – | – | – | – | – | 10 |
| **Total** | **$ 70** | **2.1%** | **$ 0** | **0.0%** | **$ 70** | **2.1%** | **$ 3,365** |

---

84.     Business Value represents the purchase price in each sale plus any capitalized assumed liabilities (also, abbreviated "Bus. Val." for presentation purposes).

*Inventory*

| BUSINESS SALES: INVENTORY | | | $ in millions |
|---|---|---|---|
| Sale | Value | % Bus. Val. | Business Value |
| CDMA | $ 14 | 1.2% | $ 1,140 |
| Enterprise | 14 | 1.5% | 943 |
| MEN | 119 | 16.0% | 744 |
| CVAS | 21 | 10.2% | 207 |
| GSM | 17 | 7.3% | 240 |
| MSS | 27 | 42.1% | 63 |
| Layer 4-7 | 1 | 5.0% | 18 |
| Next Gen | – | – | 10 |
| **Total** | **$ 213** | **6.3%** | **$ 3,365** |

*Fixed Assets*

| BUSINESS SALES: FIXED ASSETS | | | $ in millions |
|---|---|---|---|
| Sale | Value | % Bus. Val. | Business Value |
| CDMA | $ 4 | 0.3% | $ 1,140 |
| Enterprise | 45 | 4.8% | 943 |
| MEN | 38 | 5.1% | 744 |
| CVAS | 17 | 8.2% | 207 |
| GSM | 11 | 4.5% | 240 |
| MSS | 3 | 4.6% | 63 |
| Layer 4-7 | 1 | 3.2% | 18 |
| Next Gen | 2 | 19.1% | 10 |
| **Total** | **$ 120** | **3.6%** | **$ 3,365** |

*Assumed Liabilities*

| BUSINESS SALES: ASSUMED LIABILITIES | | | | | | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Deferred Revenue | | Vacation Accruals | | Contractual Liabilities | | Product Exposures | | Royalties | | Warranty | | Total | | Business Value |
| Sale | Value | % Bus. Val. | Value | % Bus. Val. | Value | % Bus. Val. | Value | % Bus. Val. | Value | % Bus. Val. | Value | % Bus. Val. | Value | % Bus. Val. | |
| CDMA | $ – | – | $ 0 | 0.0% | $ 15 | 1.3% | $ – | – | $ 3 | 0.3% | $ 1 | 0.1% | $ 19 | 1.7% | $ 1,140 |
| Enterprise | 2 | 0.2% | 2 | 0.2% | 2 | 0.2% | (0) | (0.0%) | 5 | 0.5% | (0) | (0.0%) | 10 | 1.1% | 943 |
| MEN | 25 | 3.4% | 13 | 1.7% | 10 | 1.4% | 2 | 0.3% | – | – | 14 | 1.9% | 65 | 8.7% | 744 |
| CVAS | – | – | 15 | 7.0% | 1 | 0.7% | 1 | 0.4% | 1 | 0.7% | 30 | 14.6% | 49 | 23.4% | 207 |
| GSM | 99 | 41.1% | 8 | 3.4% | 9 | 3.7% | 0 | 0.0% | (0) | (0.0%) | 7 | 2.9% | 123 | 51.0% | 240 |
| MSS | 9 | 14.7% | 1 | 2.1% | 1 | 1.3% | 0 | 0.2% | – | – | 2 | 3.3% | 14 | 21.7% | 63 |
| Layer 4-7 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 18 |
| Next Gen | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 10 |
| **Total** | **$ 135** | **4.0%** | **$ 38** | **1.1%** | **$ 38** | **1.1%** | **$ 3** | **0.1%** | **$ 9** | **0.3%** | **$ 55** | **1.6%** | **$ 279** | **8.3%** | **$ 3,365** |

## B.    Intangible Assets

### *Intellectual Property*

87.    Unlike the Tangible Assets described above, book value is not an appropriate

basis for determining the fair market value of IP.  R&D expenditure, the investment that

generates IP, is either not capitalized at all (as under U.S. GAAP) or only partially capitalized (as under IFRS), so is not in any meaningful way reflected in a company's balance sheet accounts.

*IP Valuation:  Business Sales*

88.     As discussed above, Mr. Malackowski has been retained by the Joint Administrators to value the IP sold in each Business Sale.  In preparing this report, I have reviewed Mr. Malackowski's Report and its valuation of IP within each Business Line and I rely on it.

89.     As described further in his report, Mr. Malackowski splits the value of IP into "defensive" and "synergistic" value components.  The "defensive" component is the relief from royalty value of the IP due to its use in the acquired Nortel business.  This is the value a buyer would expect to pay in lieu of acquiring an asset but instead paying a stream of royalties to use that asset, with the value of that royalty stream discounted back to the time of purchase.  The "synergistic" component is the relief from royalty payments that a purchaser might be able to achieve using the acquired IP in connection with their existing business.  In aggregate, these two components comprise the total IP value associated with a particular Business Sale.

90.     The relief from royalty approach used by Mr. Malackowski is a commonly accepted method used for valuing IP.  The relief from royalty method calculates the present value of future royalties that would be avoided by owning the IP through a modified discounted cash flow methodology.  Discounted cash flow analysis is a commonly accepted valuation method that I am well-acquainted with in the context of business valuation.  In my opinion and based on my experience, it is a logical method for valuing the IP sold in the Business Sales.  Accordingly, I believe that the relief from royalty methodology is appropriate for valuing Nortel's IP assets for the purpose of this Sale Proceeds allocation exercise.

91.     As further explained in Mr. Malackowski's Report, the charts below summarize the components of IP value associated with each Business Sale:

| OCEAN TOMO IP VALUATION | | | $ in millions |
|---|---|---|---|
| **Sale** | **Defensive** | **Synergistic** | **Total** |
| CDMA | $ 204 | $ 53 | $ 256 |
| *CDMA* | *55* | *16* | *71* |
| *LTE* | *148* | *37* | *185* |
| Enterprise | 237 | 8 | 244 |
| MEN | 83 | 30 | 113 |
| CVAS | 77 | 2 | 80 |
| GSM | 23 | 26 | 49 |
| MSS | 4 | 0 | 4 |
| Layer 4-7 | 5 | 5 | 9 |
| Next Gen | 8 | – | 8 |
| **Total** | **$ 640** | **$ 124** | **$ 765** |

### *Customer-Related Assets and Goodwill*

92.     In each of the Business Sales, there is residual unallocated value remaining after valuing the Tangible Assets and IP.  That residual value is attributable to Customer-Related Assets and Goodwill not otherwise associated with IP.

93.     As noted above, from the evidence I have seen in this case and in my own experience, it is likely that these asset classes would have been of real value to a purchaser and therefore should be allocated an appropriate proportion of value in each of the Business Sales.  I would expect that the residual amount attributable to these asset classes will differ by sale, and that is the case here.  Certain of the Business Lines sold were much more technologically innovative and included more valuable IP than in other Business Sales, whereas in contrast, other Business Lines were invested more heavily in a supporting infrastructure for existing client relationships.

94.     My analysis does not attempt to directly value the Customer-Related Assets.  There are methods available to attempt to value such assets (e.g., the Multi-period Excess Earnings Method ("MEEM") approach, which was used in the UMTS transaction and explained

41

more fully in Appendix 9), but these methods are theoretical and typically used more for post-acquisition accounting purposes, rather than for pre-acquisition value determination. Additionally, they require a number of subjective assumptions[85] and are only appropriate in circumstances where there is extensive access to management to help formulate the necessary assumption values.  In my experience, buyers do not typically use such methodologies to value Customer-Related Assets explicitly as separate and distinct from the general going concern value of the business in the context of preparing bids in sale processes, and so these methodologies do not necessarily represent a buyer's perspective on value.  Given that, and because the necessary level of information is not available, these methodologies are not appropriate in this case.  Rather than use a theoretical valuation methodology, it is more appropriate to group these remaining assets in a single residual group, which should be allocated among debtors on the basis of revenue, so there is no actual analytical benefit in valuing them separately in any event.

### C.    Asset Value Summary

95.     The following chart summarizes the distribution of value to the different asset classes based on the approach elaborated above.

---

85.     Such assumptions include the expected churn rate for customer relationships and distinct costs of capital associated with different Tangible and Intangible Assets employed by a company in generated the earnings associated with Customer-Related Assets.  For example, a separate cost of capital would be applied to Fixed Assets, Inventory, and IP, and such capital cost would then be levied against "customer earnings."

| BUSINESS SALES BY ASSET CLASS | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| Sale | Monetary Assets | Inventory | Fixed Assets | IP | Customer Related Assets & Goodwill | Business Value | Assumed Liabilities | Purchase Price |
| CDMA | $ 1 | $ 14 | $ 4 | $ 256 | $ 865 | $ 1,140 | $ 19 | $ 1,120 |
| | 0.1% | 1.2% | 0.3% | 22.5% | 75.9% | 100.0% | 1.7% | 98.3% |
| Enterprise | – | 14 | 45 | 244 | 639 | 943 | 10 | 933 |
| | – | 1.5% | 4.8% | 25.9% | 67.8% | 100.0% | 1.1% | 98.9% |
| MEN | 15 | 119 | 38 | 113 | 460 | 744 | 65 | 680 |
| | 2.0% | 16.0% | 5.1% | 15.2% | 61.7% | 100.0% | 8.7% | 91.3% |
| CVAS | 22 | 21 | 17 | 80 | 67 | 207 | 49 | 159 |
| | 10.8% | 10.2% | 8.2% | 38.5% | 32.2% | 100.0% | 23.4% | 76.6% |
| GSM | 20 | 17 | 11 | 49 | 143 | 240 | 123 | 118 |
| | 8.1% | 7.3% | 4.5% | 20.5% | 59.7% | 100.0% | 51.0% | 49.0% |
| MSS | 13 | 27 | 3 | 4 | 16 | 63 | 14 | 49 |
| | 20.3% | 42.1% | 4.6% | 7.1% | 26.0% | 100.0% | 21.7% | 78.3% |
| Layer 4-7 | – | 1 | 1 | 9 | 7 | 18 | – | 18 |
| | – | 5.0% | 3.2% | 51.4% | 40.3% | 100.0% | – | 100.0% |
| Next Gen | – | – | 2 | 8 | – | 10 | – | 10 |
| | – | – | 19.1% | 80.9% | – | 100.0% | – | 100.0% |
| Total | $ 70 | $ 213 | $ 120 | $ 765 | $ 2,198 | $ 3,365 | $ 279 | $ 3,087 |
| | 2.1% | 6.3% | 3.6% | 22.7% | 65.3% | 100.0% | 8.3% | 91.7% |

## II.     Residual Patents Sale

### A.     Intellectual Property

96.     It is not necessary to determine the value of the different asset classes in the Residual Patents Sale, because that sale was comprised of only one asset class.   The entire $4.5 billion Sale Proceeds is attributable to IP.  In his Report, Mr. Malackowski does undertake a valuation exercise of the Residual Patents Portfolio using a relief from royalty approach. However, this is done solely to group the patents into franchises, which is relevant for the allocation among the Selling Debtors of Sale Proceeds attributable to those patents under the License Approach.  That allocation methodology is discussed below.

### Question 3
**How should the proceeds attributable to each class of assets be allocated among the Selling Debtors in respect of each of the Business Sales and the Residual Patent Sale?**

*Overview, Approaches and Inferences*

97.     I have explained above how I have identified the appropriate asset classes, and then how I valued each of the asset classes sold in the Business Sales.  I now allocate the value of those assets to the entities that transferred their interests in or relinquished their rights to those

43

assets.  In order to accomplish this, the interest or right of each Selling Debtor in each asset class sold in every Asset Sale must be identified.

98.    As the allocation of Sale Proceeds from the Business Sales involves the allocation among the Nortel entities of Sale Proceeds attributable to different asset classes, I discuss these first.  I then discuss the Residual Patents Sale, which involves the allocation of Sale Proceeds attributable to just one asset class.

99.    In determining what entities receive an allocation, we have assumed when looking at Net Tangible Assets and Goodwill, that those entities that are signatories to the ASA for each business sale are eligible for an allocation.  With respect to IP, we have assumed that in order to receive an allocation in both the Business Sales and the Residual Patents Sale, the entity must be a signatory to either an ASA or a License Termination Agreement for the respective sale.

## I.    Business Sales Allocation

### A.    Net Tangible Asset Ownership

100.    In relation to Net Tangible Assets, I have assumed that each seller that carried Monetary Assets, Fixed Assets, Inventory and Assumed Liabilities on its balance sheet is entitled to the proceeds attributable to those assets (or obligor on any liabilities) and is entitled to receive the fair market value of that portion of the proceeds attributable to that asset.  In the absence of any evidence that the net book values do not reflect the true value of the Monetary Assets, Fixed Assets, Inventory and Assumed Liabilities transferred, I have concluded that values should be apportioned based on the net book value recorded in the statutory books of each selling entity as of 4Q 2009 (collectively, the "Net Tangible Assets Assumptions").  These assumptions apply in the same fashion to both RPEs and Distribution Entities.

101.    The allocation of these Net Tangible Assets are as follows:

| BUSINESS SALES: NET TANGIBLE ASSETS | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| Estate | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Total |
| Canada | $ 3 | $ 8 | $ 22 | $ (1) | $ 4 | $ 2 | $ 0 | $ – | $ 39 |
| US | 10 | 25 | 72 | (1) | (15) | 12 | 1 | 2 | 106 |
| CALA | 0 | 0 | 3 | (0) | (1) | (0) | – | – | 2 |
| EMEA | – | 7 | 10 | 14 | (62) | 3 | 0 | – | (27) |
| APAC | (15) | 9 | (0) | (1) | (1) | 12 | – | – | 4 |
| Total | $ (2) | $ 49 | $ 107 | $ 12 | $ (75) | $ 29 | $ 1 | $ 2 | $ 124 |

## B.    Intangible Asset Ownership

### *Intellectual Property*

102.    Certain background facts are relevant to considering how to allocate the portions of the asset sales that are attributable to IP, particularly those related to (i) how the IP was created, and (ii) how the parties defined their respective rights to the IP.

103.    I understand from the excerpts of the CRAI Report I reviewed, contained in Appendices 6 and 7, that the RPE entities participated jointly in the creation of Nortel's IP, with each of them expending substantial amounts of funds on R&D as part of a global program.  From 2001 onward, the Nortel RPEs adopted the RPS methodology for sharing the economic benefits that resulted from their efforts.[86]  Pursuant to the RPS methodology, each of the RPEs was entitled to receive a portion of the profits that resulted from worldwide exploitation of Nortel's IP according to its relative contribution to the creation of that IP, measured by spending on R&D.[87]  The details of the RPS methodology were amended from time to time.[88]  From 2004 onward the RPS methodology was confirmed in the MRDA, which applied retroactively to 2001.[89]  In relation to the rights of the parties with respect to IP, the salient terms of the MRDA

---

86.    Appendix 6 at 4.3.7.
87.    Appendix 6 at 4.3 and 4.4.
88.    Appendix 6 at 4.2.1.
89.    Appendix 6 at 4.2.

provided that (i) legal title to all Nortel IP would be held by NNL, (ii) each of the RPEs was entitled to a share of global profits based on its relative contribution to the creation of the IP, measured by R&D spending, and (iii) each of the RPEs had a perpetual, exclusive license to Nortel IP in its particular territory, as well as non-exclusive rights with respect to areas that were not within the territory of any of the RPEs.[90]

104.    Regardless of whether the Courts adopt the Contribution Approach or the License Approach, it is important to note that as set forth above at paragraph 26, certain entities are entitled to a small allocation of Sale Proceeds attributable to IP they held in their own names, separate and apart from the Nortel group's transfer pricing arrangement, and such IP not being subject to the Licenses at issue here.  As set forth in Mr. Malackowski's Report, the patents held by the ARE entities have been valued independently at approximately $42.85 million.[91]  Each of Nortel France SAS, Nortel GmBH, NN Applications Management Solutions, Inc., Coretek, Inc., and Xros, Inc. are entitled to an allocation of these Sale Proceeds directly, under any of the parties' proposed allocation approaches.

*Allocation Based on the Contribution Approach: Business Sale IP*

105.    The Contribution Approach assumes that the Nortel entities that contributed to the creation of IP are entitled to a portion of the Sale Proceeds derived from that IP commensurate with their contribution to the creation of those assets.  Mr. Malackowski's Report advises that contribution can be measured by considering each Selling Debtor's share of R&D spending over the period of time in which Nortel's IP was created.[92]  For the reasons stated below, I consider

---

90.    Appendix 6 at 4.2.1.1.
91.    Mr. Malackowski's Report § 11.3.
92.    Mr. Malackowski's Report §§ 11.1, 11.4.

this an appropriate methodology for allocation of Sale Proceeds attributable to IP under the circumstances presented here.

106.    Using relative historical R&D spending as the allocation key for Sale Proceeds attributable to IP is the approach that is most consistent with the principles established by Nortel to govern the rights of the Selling Debtors to the benefits of commercial exploitation of jointly-created IP.  Under the RPS methodology, each of the RPEs was entitled to a share of the profits from worldwide exploitation of Nortel's IP in accordance with its relative contribution to the creation of that IP, measured by historical R&D spending.  The portions of the Sale Proceeds attributable to IP are, in effect, a capitalization of future revenues that would otherwise have been shared among the RPEs in accordance with the RPS methodology.  Allocating the IP portion of the Sale Proceeds in accordance with relative contribution, determined according to historical R&D spending, is therefore in accordance with the rules the parties themselves had established to govern their respective economic rights to profits derived  from jointly-created IP. It is also consistent with the legal rights of the RPEs, as articulated in the allocation position papers submitted by the EMEA Debtors, including the principle that parties who have participated jointly in the creation of IP obtain, by operation of law, a beneficial ownership interest measured by their respective contributions to the creation of the IP.

107.    In his Report, Mr. Malackowski allocated the IP sold in each Business Sale under the Contribution Approach.  In applying the Contribution Approach, Mr. Malackowski has determined the appropriate time period over which to measure contribution will vary between each Business Sale IP portfolio since the portfolios were invented over different time periods. For example, the Priority Dates for the non-expired patents in the MSS portfolio range from 1991 to 2008, while the Priority Dates for the Layer 4-7 Business Line patents range from 1999

to 2007.  Furthermore, the end date of 2008 represents the last date that a high interest patent was developed.

108.    The end date of 2008 also reflects the last year that Nortel's operations were a going concern.  I consider this reasonable.   Post-petition business operations are often impacted by extraordinary circumstances, particularly, as is the case here, when it involves multi-national filings and the appointment of different officers and fiduciaries to act in the interest of each filed Debtor.  As such the operation of a business post-filing often does not reflect the normal course operations of a debtor.  Nortel reduced its R&D spending significantly post-filing, and therefore the exclusion of such data following the Petition Date is reasonable.[93]

109.    As a result, the allocation of IP to the various Nortel Debtors in each of the Business Sales using the Contribution Approach is as follows.

| OCEAN TOMO BUSINESS SALE IP ALLOCATION: CONTRIBUTION  APPROACH | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen |
| Look Back Period: | 1992-2008 | 1989-2008 | 1990-2008 | 1996-2008 | 1991-2008 | 1991-2008 | 1998-2008 | 1992-2008 |
| *Allocation* | | | | | | | | |
| Canada | 40.8% | 40.4% | 40.6% | 44.6% | 40.6% | 40.6% | 44.1% | 40.8% |
| US | 42.6% | 43.8% | 43.4% | 38.6% | 43.0% | 43.0% | 39.5% | 42.6% |
| CALA | – | – | – | – | – | – | – | – |
| EMEA | 16.5% | 15.8% | 16.1% | 16.8% | 16.4% | 16.4% | 16.4% | 16.5% |
| APAC | – | – | – | – | – | – | – | – |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| | | | | | | | | |
| *Value* | | | | | | | | |
| Canada | $ 105 | $ 99 | $ 46 | $ 36 | $ 20 | $ 2 | $ 4 | $ 3 |
| US | 109 | 107 | 49 | 31 | 21 | 2 | 4 | 3 |
| CALA | – | – | – | – | – | – | – | – |
| EMEA | 42 | 39 | 18 | 13 | 8 | 1 | 2 | 1 |
| APAC | – | – | – | – | – | – | – | – |
| **Total** | **$ 256** | **$ 244** | **$ 113** | **$ 80** | **$ 49** | **$ 4** | **$ 9** | **$ 8** |

---

93.    Nortel Networks Corp., Quarterly Report (Form 10-Q) for the Fiscal Quarter Ended Sept. 30, 2009, at 100-01.

*Allocation Based on the License Approach: Business Sale IP*

110.    The License Approach is based on the fact that the RPEs held exclusive and non-exclusive licenses to exploit and sublicense Nortel's IP around the world.  I consider it of particular significance that the exclusive and non-exclusive licenses held by the RPEs afforded each RPE the right to grant sublicenses.  As part of the sale process, the Selling Debtors either executed terminations of their licenses under internal Nortel agreements or entered into agreements granting license rights to the purchasers in the Asset Sales.[94]  Under the License Approach, the entities holding those licenses are entitled to the fair market value of those licenses.  As Mr. Malackowski's Report explains, each of those RPE Licenses had value because they could have been used to hold up the sale of the IP and because they were required to be terminated or assigned under the various ASAs or associated agreements.[95]

111.    To allocate the IP value in each Business Sale under the License Approach, Mr. Malackowski apportions the forecasted revenue derived from third party market data that was used to value the IP in each Business Sale into the various exclusive territories (U.S., Canada, U.K., France and Ireland) and the rest of the world (territories not included in the RPE exclusive geographies).[96]  The value allocated to countries in which a RPE entity is located (and which has an exclusive license to that territory) is allocated to that RPE entity (for example, NNUK is entitled to the full value of the UK).[97]  With respect to the value allocated to the rest of the world,

---

94.    In some cases, the Selling Debtors executed both a License Termination Agreement and also entered into an Intellectual Property Licensing Agreement with the Purchaser.  Appendices 11-19 set out the mechanics of the License Termination Agreements with respect to each Asset Sale.
95.    Mr. Malackowski's Report § 11.5.
96.    Mr. Malackowski's Report § 11.5.
97.    Mr. Malackowski's Report § 11.5.

Mr. Malackowski concludes this value should be allocated equally among the RPEs in consideration of the non-exclusive licenses they held.[98]

112.    I defer to Mr. Malackowski's assessment of the appropriate methodology to allocate this value among the RPEs, and I concur in his conclusion that both the exclusive and non-exclusive licenses terminated by the RPEs in the Asset Sales are entitled to an allocation of value.  What the purchaser obtained by terminating these licenses was essentially exclusivity to operate that business (and sell and distribute the full panoply of products of that business, embedded with the relevant Nortel IP) in every market.  In the exclusive territories, this was by removing the exclusive license from the RPE that held that license.  In the non-exclusive territories, it was by removing the non-exclusive licenses, by which each of the holders of that license could have defeated exclusivity through their right to operate or to sub-license to a competitor.  I consider it highly unlikely that any potential purchaser bidding on the Asset Sales would have paid any meaningful consideration if the IP transferred was subject to either exclusive license rights in a particular region, or non-exclusive rights in the rest of the world, particularly where those non-exclusive licenses included the right to sublicense.  I agree with Mr. Malackowski's assessment that the failure of any of the RPEs to terminate any of their exclusive or non-exclusive licenses would have been sufficient to bar the sale, or at least rendered the IP transferred as part of the sale largely worthless.

113.    The chart below illustrates the allocation of the Business Sale IP under the License Approach described above:

---

98.    Mr. Malackowski's Report § 11.5.

| OCEAN TOMO BUSINESS SALE IP ALLOCATION: LICENSE APPROACH | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|
| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen |
| *Allocation* | | | | | | | | |
| Canada | 15.1% | 12.6% | 12.3% | 12.0% | 12.4% | 19.1% | – | 15.1% |
| US | 37.0% | 48.5% | 48.6% | 49.0% | 21.2% | 26.4% | 100.0% | 37.0% |
| CALA | – | – | – | – | – | – | – | – |
| EMEA | 47.8% | 38.9% | 39.2% | 39.0% | 66.3% | 54.5% | – | 47.8% |
| APAC | – | – | – | – | – | – | – | – |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| | | | | | | | | |
| *Value* | | | | | | | | |
| Canada | $ 39 | $ 31 | $ 14 | $ 10 | $ 6 | $ 1 | $ – | $ 1 |
| US | 95 | 118 | 55 | 39 | 10 | 1 | 9 | 3 |
| CALA | – | – | – | – | – | – | – | – |
| EMEA | 123 | 95 | 44 | 31 | 33 | 2 | – | 4 |
| APAC | – | – | – | – | – | – | – | – |
| **Total** | **$ 256** | **$ 244** | **$ 113** | **$ 80** | **$ 49** | **$ 4** | **$ 9** | **$ 8** |

**Customer-Related Assets and Goodwill- Business Sales**

114.    The value of the Customer-Related Assets and Goodwill should be allocated across the Nortel Debtors based on the value transferred by each entity, as was done with the other Tangible and Intangible Assets classes.  I have concluded that the value of these Residual Assets should be allocated across Nortel entities based on the revenue generated by each entity in the fiscal year 2008.  We source this data from Nortel's internal SAP database, which records detailed sales data at the data at the entity level.  Appendix 22 provides additional detail regarding the process of determining the allocation percentages based on historical revenue.

115.    As a general principle, the value of any asset comes from the future cash flows that asset is expected to generate or could generate if sold.  For each Business Sale, the Customer-Related Assets and Goodwill are the source of all the future cash flows from that sale beyond the value that can be directly attributed to the asset types already discussed.  In the case of Customer-Related Assets, this residual value is the product of the incremental future cash flows from existing Customer Relationships and the Distribution Network.  Goodwill, which is by definition a residual value, reflects all other future cash flows that a buyer attributes to an asset that cannot be directly identified.

116.     To allocate the residual value across the Nortel entities, it is necessary to understand the cash flow generated by each entity.  For a simple stand-alone business, cash flow is revenue minus operating costs.  In Nortel's case, entity-level reported cash flows are influenced by transfer pricing and other inter-company arrangements that influence the costs associated with generating any given revenue.  In my experience, such arrangements are often designed to ensure that profits are generated across entities in a tax-efficient manner, which may not accurately reflect where economic value is created.  As a result, I believe that revenue provides a better proxy for the value generated by the residual assets than other alternative metrics and is an appropriate basis for allocating the value of Customer-Related Assets and Goodwill across entities.

117.     I note that Mr. Malackowski has valued IP based on forecast future revenue at the time of the relevant Asset Sale.  Mr. Malackowski's forecasted revenues use third party market data to territorially allocate that revenue.  I consider Mr. Malackowski's adoption of forecasted revenues relying on market data justified in relation to IP, where the IP that was sold was not limited to its value within the Nortel Business, but also because of its synergistic value to the market.  However, Customer Assets and Goodwill is much more driven by the actual nature of the Nortel business and the ability of the Nortel business as sold to create future revenue from the Customer Relationships and Distribution Network that were in place.  Therefore, in allocating these Customer Assets and Goodwill, I consider Nortel's 2008 historical revenue is the best metric by which to allocate value attributable to these assets.  Furthermore, Mr. Malackowski's methodology for forecasting revenues captures only the RPE entities, and is not down into each of the Distribution Entities that are among the recipients entitled to allocation of this value.  As a result, Mr. Malackowski's methodology for forecasting revenues does not

provide a basis for allocating residual asset value to the entity level required. As a result, using historical revenue data is necessary.

118.    Given the time period of the sales, revenues from the fiscal year of 2008 are appropriate for capturing how value of Customer-Related Assets and Goodwill was distributed across all Nortel entities, both RPEs and Distribution Entities. The fiscal year 2008 provides the most representative, up-to-date historical reference period available. A reference period going back further in time is not appropriate because it might not accurately reflect the distribution of anticipated cash flows that a buyer would expect to see. Using revenues derived from the fiscal year 2009 would also not be appropriate because those results may be unevenly influenced by Nortel's bankruptcy filing in January 2009. Given these alternatives and the lack of a sufficiently granular forecast, 2008 historical revenue is the best choice for allocating Customer-Related Assets and Goodwill.

119.    Based on Nortel's 2008 historical revenue, I conclude that Sale Proceeds attributable to Customer-Related Assets and Goodwill should be allocated as follows:

| GOODWILL ALLOCATION | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|
| **Estate** | **CDMA** | **Enterprise** | **MEN** | **CVAS** | **GSM** | **MSS** | **Layer 4-7** | **Next Gen** | **Value** |
| Canada | $ 68 | $ 45 | $ 78 | $ 10 | $ 0 | $ 0 | $ 1 | $ – | $ 202 |
| | 7.9% | 7.0% | 17.0% | 14.4% | 0.0% | 1.5% | 9.0% | – | 9.2% |
| US | 775 | 338 | 165 | 34 | 57 | 2 | 5 | – | 1,375 |
| | 89.6% | 52.8% | 35.8% | 50.8% | 40.0% | 13.1% | 62.4% | – | 62.6% |
| CALA | 6 | 19 | 21 | 1 | 9 | 0 | – | – | 57 |
| | 0.7% | 3.0% | 4.7% | 1.9% | 6.2% | 0.5% | – | – | 2.6% |
| EMEA | – | 172 | 149 | 17 | 59 | 11 | 2 | – | 409 |
| | – | 26.9% | 32.3% | 25.2% | 41.0% | 67.7% | 28.6% | – | 18.6% |
| APAC | 16 | 66 | 47 | 5 | 18 | 3 | – | – | 155 |
| | 1.9% | 10.3% | 10.1% | 7.6% | 12.9% | 17.2% | – | – | 7.1% |
| **Total** | **$ 865** | **$ 639** | **$ 460** | **$ 67** | **$ 143** | **$ 16** | **$ 7** | **$ –** | **$ 2,198** |

## II.      Residual Patents Sale Allocation

### *Intellectual Property*

120.      As set out above in relation to the Business Sales, a similar analysis must be performed to allocate the value attributed to the Residual Patents, albeit for a single asset class, being IP.  As with IP in the Business Sales, the allocation of the Sale Proceeds from the Residual Patents Sale depends on whether the Contribution Approach or the License Approach is adopted.

### *Allocation Based on the Contribution Approach:  Residual Patents Sale*

121.      Regarding the Residual Patents Portfolio, Mr. Malackowski considers that an appropriate look-back period by which to assess the RPEs contribution to the creation of IP is 1991 to 2006.  This is based on his assessment that within the expansive portfolio sold in the Residual Patents Portfolio, the vast majority of value of the portfolio is derived from a minority of the patents (the so-called "High Priority Patents").  The look back period identified as appropriate by Mr. Malackowski, 1991-2006, encompasses the patent registration date of the majority of the High Priority Patents.

## Priority Date Histogram



| | 1987 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Remainder | 2 | 2 | 10 | 14 | 24 | 25 | 80 | 141 | 176 | 245 | 226 | 331 | 227 | 189 | 332 | 310 | 274 | 303 | 247 | 621 | 552 | 89 | 20 |
| High Priority | 0 | 0 | 23 | 24 | 33 | 45 | 85 | 214 | 416 | 370 | 476 | 303 | 225 | 134 | 133 | 77 | 22 | 19 | 1 | 0 | 0 | 0 | 0 |

122.     As such the four scenarios that were considered by Mr. Malackowski (with Scenario 1 being preferred) were as follows:

• Scenario 1 (1991 to 2006): Start date of 1991 reflects the year before the earliest unexpired High Priority Patent date in the Residual Patents Portfolio, and an end date of 2006 reflects the year before the latest high interest patent priority date in the Residual Patents Portfolio.

• Scenario 2 (1991 to 2008): Start date is the same as the Scenario 1, described above, and an end date of 2008 which reflects Nortel's insolvency date.

• Scenario 3 (2001 – 2006):  Start date corresponds to the implementation of the MRDA and an end date consistent with Scenario 1.

• Scenario 4 (2001 – 2008):  Start date that corresponds to the implementation of the MRDA and an end date consistent with Scenario 2.

The chart below summarizes R&D contribution by the various entities over the four different time periods to measure contribution:

| OCEAN TOMO RESIDUAL PATENTS: CONTRIBUTION APPROACH | | | | | | | | *$ in millions* |
|---|---|---|---|---|---|---|---|---|
| | **Look Back Period** | | | | | | | |
| | **1991-2006** | | **1991-2008** | | **2001-2006** | | **2001-2008** | |
| Canada | 39.5% | $ 1,759 | 40.7% | $ 1,811 | 43.0% | $ 1,916 | 44.9% | $ 2,001 |
| US | 42.9% | 1,910 | 42.6% | 1,898 | 38.5% | 1,716 | 38.8% | 1,730 |
| CALA | – | – | – | – | – | – | – | – |
| EMEA | 17.6% | 785 | 16.7% | 745 | 18.5% | 822 | 16.2% | 723 |
| APAC | – | – | – | – | – | – | – | – |
| **Total** | **100.0%** | **$ 4,454** | **100.0%** | **$ 4,454** | **100.0%** | **4,454** | **100.0%** | **$ 4,454** |

*Allocation Based on the License Approach: Residual Patents Sale*

123.     Mr. Malackowski's Report details the basis on which he allocates Sale Proceeds from the Residual Patents Sale to the various entities pursuant to the License Approach.  In summary, he apportions the Residual Patents into franchises and allocates a value for each franchise using a relief from royalty methodology.  He then uses third party market data to

55

apportion the value of those franchises amongst the territories in which there is at least one High Value Patent that is registered within each franchise.  As with the Business Sales IP, the value of the exclusive territories (U.S., Canada, U.K., France and Ireland) is apportioned to the RPE that has an exclusive license in that territory.  In relation to the rest of the world, the value is apportioned equally amongst the RPEs, who each held a non-exclusive, sub-licensable license that was a bar to exclusivity had the license not been surrendered.  The chart below illustrates the allocation of Sale Proceeds of the Residual Patents Sale based on the License Approach.

| OCEAN TOMO RESIDUAL PATENTS: LICENSE APPROACH | | $ in millions |
|---|---|---|
| | % Allocation | Value |
| Canada | 11.0% | $ 490 |
| US | 55.4% | 2,468 |
| CALA | – | – |
| EMEA | 33.6% | 1,497 |
| APAC | – | – |
| **Total** | **100.0%** | **$ 4,454** |

## VIII.   CONCLUSION

124.    The following section summarizes the results of my analysis.[99]

*Allocation Conclusions:  Contribution Approach*

125.    In my opinion, if the Courts find that the correct basis by which to allocate the Sale Proceeds are the Contribution Approach, which allocates value based on the contribution of R&D over various periods, the EMEA Debtors should receive 18.2% of the Sale Proceeds, the Canadian Debtors should receive 31.9%, and the U.S. Debtors should receive 49.9%, as summarized in the table below.

---

99.    See Appendix 23 for a summary of results at the entity level within EMEA.

| CONTRIBUTION APPROACH | | | | $ in millions |
|---|---|---|---|---|
| Total Allocation by Contribution Approach:  Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | |
| | Canada | US | EMEA | Total |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.5% | 42.9% | 17.6% | 100.0% |
| **Total Allocation** | **31.9%** | **49.9%** | **18.2%** | **100.0%** |
| **Total Value** | **$ 2,320** | **$ 3,636** | **$ 1,325** | **$ 7,280** |

126.     This value allocation is based upon the R&D contribution by the RPE entities from the period of contribution for the earliest relevant IP asset through the latest relevant IP asset.  In the case of the Residual Patents Sale, this period is 1991-2006.  For the Business Sale IP assets, the starting point of this period varies by Business Line, but the ending date in all cases is 2008, the last year prior to Nortel's bankruptcy filing.

*Allocation Conclusion Sensitivity: Contribution Approach*

127.     In addition to the above, if the Courts find that the correct basis by which to allocate the Sale Proceeds is the Contribution Approach, there are alternative R&D contribution periods the Courts could consider in deciding upon an allocation.  These scenarios are (1) 1991 – 2006; (2) 1991 – 2008; (3) 2001 – 2006; or (4) 2001 – 2008.

128.     These results of these various scenarios are detailed the in chart below.  As illustrated in the chart, the choice of R&D contribution period does impact the final allocation percentages, but the percentage allocations to each estate vary by no more than 332 basis points.

## CONTRIBUTION APPROACH $ in millions

**Total Allocation by Contribution Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006)**

|  | Canada | US | EMEA | Total |
|---|---|---|---|---|
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.5% | 42.9% | 17.6% | 100.0% |
| **Total Allocation** | **31.9%** | **49.9%** | **18.2%** | **100.0%** |
| **Total Value** | **$ 2,320** | **$ 3,636** | **$ 1,325** | **$ 7,280** |

**Total Allocation by Contribution Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2008)**

|  | Canada | US | EMEA | Total |
|---|---|---|---|---|
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 40.7% | 42.6% | 16.7% | 100.0% |
| **Total Allocation** | **32.6%** | **49.8%** | **17.6%** | **100.0%** |
| **Total Value** | **$ 2,372** | **$ 3,623** | **$ 1,285** | **$ 7,280** |

58

| CONTRIBUTION APPROACH (CONT.) | | | | $ in millions |
| --- | --- | --- | --- | --- |
| Total Allocation by Contribution Approach:  Business Sale IP (Sale Specific) / Residual IP (2001-2006) | | | | |
| | Canada | US | EMEA | Total |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 43.0% | 38.5% | 18.5% | 100.0% |
| **Total Allocation** | **34.0%** | **47.3%** | **18.7%** | **100.0%** |
| **Total Value** | **$ 2,477** | **$ 3,442** | **$ 1,362** | **$ 7,280** |

| Total Allocation by Contribution Approach:  Business Sale IP (Sale Specific) / Residual IP (2001-2008) | | | | |
| --- | --- | --- | --- | --- |
| | Canada | US | EMEA | Total |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 44.9% | 38.8% | 16.2% | 100.0% |
| **Total Allocation** | **35.2%** | **47.5%** | **17.3%** | **100.0%** |
| **Total Value** | **$ 2,562** | **$ 3,456** | **$ 1,262** | **$ 7,280** |

*Allocation Conclusions:  License Approach*

129.    In my opinion, if the Courts alternatively find that the correct basis by which to allocate the Sale Proceeds is the License Approach, which allocates value in proportion to the value of licenses that Nortel entities surrendered as conditions of the sale of the IP, the EMEA Debtors should receive 30.9% of the Sale Proceeds, the Canadian Debtors should receive 11.5%, and the U.S. Debtors should receive 57.7%, as summarized in the table below.

59

## LICENSE APPROACH

*$ in millions*

**Total Allocation by License Approach**

|  | Canada | US | EMEA | Total |
|---|---|---|---|---|
| CDMA | 9.9% | 79.1% | 11.0% | 100.0% |
| Enterprise | 11.3% | 52.3% | 36.5% | 100.0% |
| MEN | 18.4% | 48.0% | 33.5% | 100.0% |
| CVAS | 12.1% | 47.4% | 40.5% | 100.0% |
| GSM | 9.9% | 55.7% | 34.4% | 100.0% |
| MSS | 10.5% | 40.6% | 48.9% | 100.0% |
| Layer 4-7 | 4.8% | 81.8% | 13.4% | 100.0% |
| Next Gen | 12.2% | 49.1% | 38.7% | 100.0% |
| Residual IP | 11.0% | 55.4% | 33.6% | 100.0% |
| **Total Allocation** | **11.5%** | **57.7%** | **30.9%** | **100.0%** |
| **Total Value** | **$ 836** | **$ 4,198** | **$ 2,247** | **$ 7,280** |

Respectfully Submitted,

Dated: January 24, 2014
     New York, New York

Paul P. Huffard
Senior Managing Director
The Blackstone Group
345 Park Avenue
New York, New York 10154

### SUPPORTING MATERIALS

**Appendices**

1.      EMEA Debtors Instructing Paul P. Huffard in respect of this Report
2.      Accounting of Net Proceeds Available for Allocation
3.      Sources Considered and Relied upon in Preparation of this Report
4.      Nortel Background
5.      Settlements Affecting Allocation
6.      Nortel's Transfer Pricing System
7.      Entities Involved/Classifications
8.      Simplified Nortel Group Structure Chart (as at January 14, 2009)
9.      UMTS Pre-petition Asset Sale
10.     UMTS Pre-petition Asset Sale Details
11.     Details of the CDMA and LTE Sale to Ericsson
12.     Details of the GSM and GSM-R Sale to Ericsson and Kapsch
13.     Details of the Next Generation Packet Core Sale to Hitachi
14.     Details of the CVAS Sale to GENBAND Inc.
15.     Details of the Enterprise and Government Solutions Sale to Avaya
16.     Details of the Layer 4-7 Sale to Radware
17.     Details of the Metro Ethernet Networks Sale to Ciena
18.     Details of the Multi-Service Switch Sale to Ericsson
19.     Details of the Residual Patents Sale to Rockstar BidCo, L.P.
20.     Recognition of Customer-Related Assets for Allocation among the Selling Debtors
21.     Allocation of Value to NNI for the Shares in NGS Sold as Part of the Enterprise Sale
22.     Determining Allocation Percentages Based on Historical Revenue
23.     EMEA Allocation Charts

**Acknowledgment of Expert's Duty**

# APPENDIX 1

## EMEA Debtors[1] Instructing Paul P. Huffard in respect of this Report

|     | Entity Name | Country | Referred to as |
| --- | --- | --- | --- |
| 1. | Nortel Networks UK Limited* | United Kingdom | NNUK |
| 2. | Nortel Networks (Ireland) Limited* | Republic of Ireland | NNIR |
| 3. | Nortel Networks S.A.* | France | NNSA |
| 4. | Nortel Networks (Austria) GmbH* | Austria | Nortel Austria |
| 5. | Nortel Networks N.V.* | Belgium | Nortel Belgium |
| 6. | Nortel Networks, s.r.o.* | Czech Republic | Nortel Czech Republic |
| 7. | Nortel Networks Engineering Service Kft* | Hungary | Nortel Hungary |
| 8. | Nortel Networks S.p.A.* | Italy | Nortel Italy |
| 9. | Nortel Networks B.V.* | The Netherlands | Nortel Netherlands |
| 10. | Nortel Networks Polska Sp. z.o.o.* | Poland | Nortel Poland |
| 11. | Nortel Networks Portugal S.A.* | Portugal | Nortel Portugal |
| 12. | Nortel Networks Romania SRL* | Romania | Nortel Romania |
| 13. | Nortel Networks Hispania, S.A.* | Spain | Nortel Spain |
| 14. | Nortel Networks Slovensko, s.r.o.* | Slovakia | Nortel Slovakia |
| 15. | Nortel Networks A.G. | Switzerland | Nortel Switzerland |
| 16. | Nortel Networks Oy* | Finland | Nortel Finland |
| 17. | Nortel Networks Scandinavia AS | Norway | Nortel Norway |
| 18. | o.o.o. Nortel Networks (dissolved)[†] | Russia | Nortel Russia |
| 19. | Nortel Networks South Africa (Proprietary) Limited | South Africa | Nortel South Africa |
| 20. | Nortel Networks AB* | Sweden | Nortel Sweden |
| 21. | Nortel Networks France S.A.S.* | France | Nortel France SAS |
| 22. | Nortel GmbH* | Germany | Nortel Germany |
| 23. | Nortel Networks International Finance & Holding B.V.*, [†] | The Netherlands | NNIF |

\* All of the entities marked with an asterisk are subject to the Administration Order made on January 14, 2009 by the High Court of Justice of England and Wales (Blackburne, J.) and are under the control of the Joint Administrators.

---

1. The "EMEA Debtors" are comprised of Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in the region known as "EMEA" (Europe, Middle East and Africa), which are under the control of court-appointed administrators and authorized foreign representatives (the "Joint Administrators"), as further described herein. The Joint Administrators for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited ("NNIR"), are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris. The Joint Administrators for NNIR are: Alan Robert Bloom and David Martin Hughes.

[†] The allocation entitlement of Nortel Russia has been assigned to NNIF pursuant to agreements approved by orders of the U.S. Bankruptcy Court for the District of Delaware (Gross, J.) [D.I. 6193] and the Ontario Superior Court of Justice (Commercial List) (Morawetz, J.) dated August 23 and 26, 2011, respectively.  Nortel Russia has subsequently been dissolved under Russian law and its allocation entitlement is asserted by NNIF.

Nortel Norway, Nortel South Africa and Nortel Switzerland are solvent subsidiaries of NNIF and remain under the control of their respective directors.  The Joint Administrators represent the directors in relation to the allocation entitlements of each of Nortel Norway, Nortel South Africa and Nortel Switzerland.

# APPENDIX 2

## Accounting of Net Proceeds Available for Allocation[1]

1.      All of the Sale Proceeds[2] are currently held in escrow with JPMorgan

Chase Bank, N.A. under an individual escrow agreement for each of the Asset Sales.  The total

sum available for allocation between the Selling Debtors from the funds in the escrow accounts

as at July 25, 2013[3] is $7.280 billion.  This is the total maximum amount available for

distribution.[4]

2.      The Sale Proceeds raised from all of the Asset Sales was $7.79 billion in

aggregate.  The escrow account balances therefore totaled $509.3 million less than the headline

sale proceeds, as at July 25, 2013.

3.      The difference of $509.3 million reflects a combination of amounts paid

for working capital and purchase price adjustments, distributions to certain Nortel entities,

transaction costs, break fees paid to unsuccessful stalking horse bidders, taxes and settlements.

4.      Some of these $509.3 million of adjustments are "top slices" (totaling

$386.4 million) meaning that they reduce the amount of money available for distribution to all

parties, pro rata in proportion to their respective Sale Proceeds entitlements.  These types of

---

1.      This Appendix has been prepared jointly by Mr. Huffard's staff and instructing counsel.  Mr. Huffard's staff has provided the dollar values for the adjustments set out in this appendix.  Instructing counsel has drafted the text of this appendix and provided the legal agreements and documentation supporting the dollar values set out herein.

2.      Capitalized terms not explicitly defined herein have the meanings ascribed to them in my report.

3.      This is the latest date for which counsel has been able to identify a produced document giving escrow account balances.  That document is the Escrow Accounts Spreadsheet, NNI_00827586.

4.      An additional $56.9 million is held in tax and property liability escrow funds.  These funds may be available for distribution by the time the Courts hear the Allocation Dispute, depending on whether the contingencies for which funds are held in escrow transpire.

2

adjustments include:

        a.      Working capital and purchase price adjustments (total of $151.7

million):  The majority of the Business Sales were the sales of functioning businesses in which

the amount of working capital varied up or down by several million dollars as a result of the

routine operation of those businesses.  The buyers paid more for the assets, e.g., as in the

Enterprise Business Sale, if working capital was higher than forecast at completion and less, as

in all other Business Sales in which adjustments for working capital were made, if working

capital was less than forecast at completion.  Working capital adjustments were not made in the

case of the Residual Patents Sale, Layer 4-7 Business Sale, Next Generation Packet Core

Business Sale or the EMEA component of the GSM/GSM-R Business Sale.[5]  Additionally, there

were other purchase price adjustments classified outside of working capital, which reflected

movements in value for other assets or liabilities that were assumed.

        b.      Break fees and expense reimbursements under Stalking Horse

Agreements (total of $50.9 million):  These were amounts paid to Nokia Siemens Networks and

Google respectively in accordance with the Stalking Horse Agreements those bidders signed in

---

5.      See the Closing Statements and Funds Flow Memoranda for the deals as follows:  For Enterprise:  Avaya Disagreement Notice, Apr. 19, 2010, NNC-NNL06725705; Order Approving Stipulation By and Among the Sellers and Avaya Inc., Oct. 1, 2010 [D.I. 4058]; Enterprise Sale High Level Estimate of Purchase Price Allocation, June 23, 2010, NNI_01432905.  For MEN:  Closing Statement and Working Capital Calculations, NNI_00215982; Closing Funds Flow Memorandum, Mar. 19, 2010, NNI_00803590.  For GSM and GSM-R:  High Level Estimate of Purchase Price Allocation, Aug. 15, 2010, NNI_00216602; Ericsson Amended and Restated Closing Statement, June 9, 2010, NNI_00873353; Kapsch Amended and Restated Closing Statement, Oct. 3, 2011, NNI_00803681.  For CVAS:  High Level Purchase Price Estimate, Nov. 22, 2010, NNI_00216461; Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving a Settlement Stipulation with Genband Inc., Aug. 11, 2011 [D.I. 6135]; Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving a Settlement Stipulation with Genband Inc., Aug. 23, 2011 [D.I. 6192].  For CDMA:  Ericsson Amended and Restated Closing Statement, Feb. 4, 2010, NOR_53299735; High Level Estimate of Purchase Price Allocation, Aug. 16, 2010, NNI_00216279.  For MSS:  Revised Closing Statement, July 25, 2011, NNI_00803651.  The documents identified as High Level Estimates of Purchase Price Allocation have only been considered in terms of identifying Closing Statements, assessing working capital deductions or identifying funds which did not flow through the sale escrow accounts on deal closing.

relation to the CDMA and LTE Business Sale and the Residual Patents Sale.  The fees were paid

because neither bidder went on to win the auction for those sales.

        c.      Lazard and Global IP Law Group advisory fees (total of $43.0

million):  Lazard Frères & Co. ($36.5 million)[6] advised all of the Selling Debtors on the Business

Sales and the Residual Patents Sale.  Global IP Law Group ($6.5 million) advised on the

Residual Patents Sale only.  These fees covered the costs of that advice.

        d.      Carve-out fees (total of $30.1 million):  PricewaterhouseCoopers

and KPMG were paid fees to create new balance sheets and pro forma financial data for the

Enterprise, MEN and CVAS (in respect of KPMG) and the CDMA and LTE, Enterprise, MSS,

MEN, CVAS and GSM and GSM-R (in respect of PricewaterhouseCoopers) Business Sales.

The businesses sold in the sales had not previously existed as separate lines of business within

Nortel and it was therefore necessary to create supporting financial data to enable the Business

Sales to proceed.[7]

        e.      Settlement with CALA and APAC regions (total of $44.9 million):

As described in Appendix 5, these sales regions settled their entitlement to lock box proceeds in

---

6.    See the Orders of Judge Gross approving Lazard's retention and fee payments (a mixture of monthly retainer fees and success fees as a percentage of the amount raised for completing the Business Sales): Application for an Order Authorizing Employment and Retention of Lazard Freres & Co. LLC *Nunc Pro Tunc* to the Petition Date as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Feb. 13, 2009 [D.I. 294]; Debtors' Application for Entry of an Order Approving an Amendment to the Terms of Compensation of Lazard Freres & Co. LLC as Financial Advisor and Investment Banker to the Debtors, Feb. 9, 2010 [D.I. 2397];  Debtors' Motion for Entry of an Order Approving a Second Amendment to the Terms of Compensation of Lazard Freres & Co. LLC as Financial Advisor and Investment Banker to the Debtors, Oct. 7, 2011 [D.I. 6567].  The Twenty-Eighth Monthly Application of Lazard Freres & Co. LLC, Financial Advisor and Investment Banker to the Debtors, for Allowance of Compensation and Reimbursement of Expenses for the Period July 1, 2011 Through July 31, 2011, Nov. 17, 2011 [D.I. 6810] documents all monthly fees and the remaining Success Fees paid to Lazard.

7.    Total according to Letter from PwC, July 14, 2010, NNI_01454374 and Letter from KPMG, May 31, 2010, NNI_01454374.

4

July 2011 in exchange for a payment from the escrow accounts.[8, 9]

   f. Carling Property Escrow ($33.5 million):  A portion of the purchase price for the MEN Business Sale was escrowed to protect Ciena against any additional cost as a result of Nortel terminating a lease of a property housing a research facility at Carling in Ottawa, Canada.  Nortel sold the facility and terminated the lease in question early, and Ciena was repaid the escrowed funds on December 15, 2010.[10]

   g. There were other additional transaction costs (total of $17.2 million) relating to the preparation of financial statements, taxes and other miscellaneous transaction expenses for which there is no supporting detail readily available.

   h. Distributions from certain Business Sale purchasers directly to certain Nortel entities (total of $14.4 million):  These payments did not pass through the escrow accounts and therefore are not available for distribution.  Nortel de Argentina S.A., Nortel (China) Ltd., Nortel de Colombia S.A., Nortel Technology Excellence Centre Private Limited and NN (India) Private Limited were among the entities who received such payments.[11]

---

8. See Appendix 5 for details of the settlement.

9. The calculations set out below allocate sale proceeds to the CALA and APAC entities as if there had been no settlement.  The total amount paid to those entities is then reduced by the $44.9 million settlement and the $14.4 million paid directly to the CALA and APAC entities (described at paragraph 2(h)) to determine if there is any surplus.  The total amount allocated to the CALA and APAC entities is then shared among the other entities so that they each share any surplus or loss on the settlement pro rata in accordance with their overall shares of the Sale Proceeds.  This is the most equitable way to reflect that the $59.3 million already paid to the CALA and APAC entities has been deducted, or not passed through, the escrow accounts and has therefore already been paid by every other entity pro rata in accordance with their prevailing allocation share.

10. Escrow Accounts Spreadsheet, NNI_00827586 records the escrow movement amount and date.  The North American Agreement (as defined in Appendix 17) defines the amount and purpose of the Carling Property Escrow.

11. These payments are identified in the July 25, 2013 document showing movements on all escrow accounts (Escrow Accounts Spreadsheet, NNI_00827586) and in Funds Flow Memoranda, which document cash movements at closing, in respect of the Enterprise (Enterprise Sale High Level Estimate of Purchase Price

(Footnote continued on next page)

5.      Other adjustments (totaling $56.1 million):  These should be treated as pre-allocations to particular Selling Debtors.  The Selling Debtors benefitting from such adjustments have their pro-rata shares of the escrow proceeds reduced to reflect the amounts already pre-allocated (i.e., money already paid to them from the escrow accounts).  These adjustments reduce the entitlements of the following Selling Debtors by the following amounts:[12]

a.      Release of Nortel Government Solutions ("NGS") cash as part of the Enterprise Business Sale (total of $53.0 million):  This cash was paid to NNI and is therefore to be deducted from NNI's share of the Sale Proceeds attributable to the Enterprise Business Sale.[13]

b.      Release from property escrow funds established as part of the MEN Business Sale in favor of NNL when the liability did not materialize ($2.1 million):  NNL has already received these funds and so its share of any sale proceeds attributable in the MEN Business Sale should be reduced accordingly.

c.      Payments made on behalf of NNI to the U.S. Pension Benefit Guaranty Corporation ($1.0 million):  These payments have been made from the escrow accounts to discharge liabilities of Nortel entities owned directly or indirectly by NNI and who

_____

(Footnote continued from prior page)
Allocation, June 23, 2010, NNI_01432905), MEN (Closing Funds Flow Memorandum, Mar. 19, 2010, NNI_00803590), CDMA (High Level Estimate of Purchase Price Allocation, Aug. 16, 2010, NNI_00216279) and CVAS (High Level Purchase Price Estimate, Nov. 22, 2010, NNI_00216461) Business Sales.

12.    In relation to each of the adjustments set out at paragraphs 5(a), 5(b) and 5(c), the calculations set out below first calculate the Sale Proceeds attributable to every Selling Debtor in each affected Asset Sale and then deduct that amount from the end total of NNL or NNI.  The surplus that would have been allocated to NNL or NNI is then re-allocated pro-rata among all of the other Selling Debtors in accordance with their prevailing percentage share of the Sale Proceeds.

13.    See Appendix 21 below for details of how this has been worked through in the calculation of NNI's share of the Enterprise Sale Proceeds.

were sponsoring employers of certain NNI pension plans.  These payments have been deducted

from NNI's share of the Sale Proceeds in the Enterprise, MEN, CVAS, GSM and GSM-R and

MSS Business Sales.[14]

      6.      Interest of $3.5 million has accrued on the Sale Proceeds held in escrow.

In the allocations of the Sale Proceeds set out in this report, this interest has been shared among

the Selling Debtors pro rata to their overall allocation shares.[15]

      7.      There is an additional $56.9 million of proceeds that remain in purposed

escrow accounts outside of the proceeds available for allocation.  This amount is comprised of

the following:

      a.      Canadian Directors and Officers Cascading Directors' Indenture

Trust Fund (total of $35.0 million):  This fund was taken from the CDMA and LTE Sale

Proceeds and is held for the benefit of current and former Directors and Officers of certain

CALA and APAC subsidiaries of NNC, NNL and NNI to satisfy any claims that may be made

against them in their capacity as Directors and Officers of those companies.[16]

---

14.    Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, Dec. 16, 2009 [D.I. 2157] (approving payment of $500,000 from the Enterprise sale proceeds); Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, Mar. 10, 2010 [D.I. 2676] (approving payment of $250,000 from the MEN sale proceeds); Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, March 29, 2010 [D.I. 2784] (approving payment of $100,000 from the GSM/GSM-R sale proceeds); Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, May 26, 2010 [D.I. 3071] (approving payment of $100,000 from the CVAS sale proceeds); Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, Mar. 3, 2011 [D.I. 5063] (approving payment of $50,000 from the MSS sale proceeds).

15.    The Escrow Agreements currently provide for NNL to receive 100% of this accrued interest but this is expressed not to be a binding determination and is subject to the resolution of the Allocation Dispute.  See, for example, MEN Distribution Escrow Agreement §§ 4(a) and 27 and Exhibit 1, Mar. 19, 2010, NOR_55238025 at 7–8, 21, and 74–75.

16.    Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 for an Order (I) Authorizing and Approving Nortel Network Inc.'s Entry Into the Cascading Directors' Trust Indenture, (II) Authorizing and Approving the

(Footnote continued on next page)

        b.      Other escrow accounts totaling $21.9 million:  These amounts have been set aside to cover liabilities related to taxes and real estate.  These funds may become available for distribution depending on whether the contingencies for which funds are escrowed occur or not.

        8.      In addition to the above, the following adjustments also need to be made to the allocations between the Selling Debtors to reflect agreements reached by them:

        a.      Nortel Israel's entitlement was settled for $2 million in April 2011.[17]  This was funded by NNI and NNUK, with NNI contributing $813,819 and NNUK contributing the remaining $1.186 million.  The allocation entitlement of Nortel Israel to the Sale Proceeds for the Business Sales in which it participated is therefore calculated and shared between NNUK and NNI in proportion to their respective contributions to the settlement sum.  Israel's share of the proceeds in the Enterprise, MEN, MSS and CVAS Business Sales is therefore shared between NNI as to 40.7% of any amount allocated (plus the remaining value of any claim NNI had against Nortel Israel) and NNUK as to the remainder; and

        b.      Nortel Russia's entitlement was settled for a gross total of $8.11 million in March 2011.[18]  Only $578,002.02 actually left the amounts available for distribution

---

(Footnote continued from prior page)
Related Side Agreement and (III) Granting Related Relief, Mar. 10, 2010 [D.I. 2683] and Order (I) Authorizing and Approving Nortel Network Inc.'s Entry Into the Cascading Directors' Trust Indenture, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Related Relief, Mar. 31, 2010 [D.I. 2815].

17.    Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements, June 6, 2011 [D.I. 5603].

18.    Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreement Regarding Nortel Russia and Approving Certain Amendments to the Escrow Agreements, Aug. 23, 2011 [D.I. 6193].

from the lock box because NNIF made up the balance paid to Nortel Russia.  In exchange for

providing the funds, NNIF took an assignment of Nortel Russia's lock-box entitlement in

exchange for the cash payment and should therefore be allocated 100% of any amount allocated

to Nortel Russia in the Enterprise, CVAS, MEN and GSM/GSM-R Business Sales.[19]

       9.      After making all of the cash adjustments to the headline sale prices above

(i.e., excluding the effect of the Israel and Russia settlements described at paragraph 8 of this

Appendix, which affect below-the-line amounts paid to particular entities), my calculations result

in an unexplained difference of $12.9 million dollars between the purchase prices paid in the

Asset Sales and the current escrow balances (i.e., there is more money in the escrow accounts

than I can account for based on documents I have reviewed).  This difference represents 0.17%

of the escrow balances available and is therefore not material enough to affect the calculations

set out in my report.  The Courts are able to rely on the percentages established by my

calculations to allocate the Sale Proceeds among the parties to the Allocation Dispute.  In any

event, the accumulation of interest between the date of my report and the date of any trial of the

Allocation Dispute would mean that the Courts would have to apply the percentages set out here

to reach accurate shares for each legal entity involved.

       10.      Taking into account the adjustments set out above, the headline prices paid

in each of the Asset Sales and the escrow balances available for distribution in that sale as at July

25, 2013 are as set out in the table below:

---

19.    Although Nortel Russia did receive $578,008.22 directly from Avaya as payment for inventory sold in the
Enterprise Business Sale, NNIF paid the full amount paid to Nortel Russia under the settlement agreement
into the MEN escrow account is therefore entitled to take 100% of any allocation to Nortel Russia in the sales
described above.

9

| Sale | Unadjusted Base Price agreed by Seller (millions) | Purchase Price[20] (millions) | Escrow Balance available[21] (millions) |
|---|---|---|---|
| CDMA and LTE | $1,130 | $1,120 | $1,053 |
| Enterprise | $900 | $933 | $843 |
| MEN | $775 | $680 | $610 |
| CVAS | $282 | $159 | $140 |
| GSM and GSM-R | $105 | $118 | $106 |
| MSS | $65 | $49 | $46 |
| Layer 4-7 | $18 | $18 | $18 |
| Next Gen | $10 | $10 | $10 |
| Residual IP | $4,505 | $4,505 | $4,454 |
| **Totals** | **$7,790** | **$7,592** | **$7,280** |

---

20.   The Purchase Price is calculated by taking the escrow balance for each transaction, then add back (i) value distributed to Nortel entities, (ii) costs paid for by the purchaser unrelated to the value of the business as a whole, (iii) payments from the purchaser to satisfy claims against the estate and deduct (iv) escrow releases back to the purchaser.

21.   As described above, this is as at July 25, 2013.  The allocation percentages described in this report can be applied to the most up to date figure available to the Courts when the Allocation Dispute is resolved to assign actual cash values to each Selling Debtor.

# APPENDIX 3

## Sources Considered and Relied upon in Preparation of this Report

| **Allocation Proceedings** |
| --- |
| Amended and Restated Asset and Share Sale Agreement between Selling Debtors and Avaya Inc., Sept. 14, 2009 [D.I. 1514 Ex. A] |
| Notice of Cancellation of Auction of Carrier Voice Over IP and Application Solutions Business Line, Feb. 25, 2010 [D.I. 2527] |
| Side Letter Concerning the [Enterprise] Escrow Agreement, Aug. 2011 [D.I. 6047 Ex. C] |
| Side Letter Concerning the CVAS Distribution Escrow Agreement, Aug. 2011 [D.I. 6047 Ex. E] |
| Side Letter Concerning the GSM/GSM-R Distribution Escrow Agreement, Aug. 2011 [D.I. 6047 Ex. D] |
| Side Letter Concerning the MEN Distribution Escrow Agreement, Aug. 2011 [D.I. 6047 Ex. B] |
| Thirty-Fourth Report of the Monitor, Jan. 3, 2010 [D.I. 2228] |
| Twenty-First Report of the Monitor, 12, Sept. 24, 2009 [D.I. 1550] |
| Twenty-Fourth Report of the Monitor, Oct. 13, 2009 [D.I. 1665 Ex. A] |
| Twenty-Third Report of the Monitor, October 8, 2009 [D.I. 1663] |
| Amended North American Agreement, Dec. 18, 2009 |
| Application for an Order Authorizing Employment and Retention of Global IP Law Group LLC *Nunc Pro Tunc* to October 13, 2009 as Intellectual Property Consultant to the Debtors and Debtors in Possession, Oct. 30, 2009 [D.I. 1796] (attaching Master Consulting Agreement, Oct.15, 2009, as Exhibit D) |
| Application for an Order Authorizing Employment and Retention of Lazard Freres & Co. LLC *Nunc Pro Tunc* to the Petition Date as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Feb. 13, 2009 [D.I. 294] |
| Application for an Order Authorizing Employment and Retention of Lazard Frères & Co. LLC *Nunc Pro Tunc* to the Petition Date as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Feb. 13, 2009 [D.I. 294] |
| Asset and Share Sale Agreement between Selling Debtors and Avaya Inc., July 29, 2009 [D.I. 1131 Ex. A] |

| |
|---|
| Asset Sale Agreement between Selling Debtors and PSP Holdings LLC, Aug. 26, 2010 [D.I. 3832 Ex. A] |
| Debtors' Application for Entry of an Order Approving an Amendment to the Terms of Compensation of Lazard Freres & Co. LLC as Financial Advisor and Investment Banker to the Debtors, Feb. 9, 2010 [D.I. 2397] |
| Debtors' Motion for Entry of an Order Approving a Second Amendment to the Terms of Compensation of Lazard Freres & Co. LLC as Financial Advisor and Investment Banker to the Debtors, Oct. 7, 2011 [D.I. 6567] |
| Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving a Settlement Stipulation with Genband Inc., Aug. 11, 2011 [D.I. 6135] |
| Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements n.6, May 17, 2011 [D.I. 5424]. |
| Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements n.8, May 17, 2011 [D.I. 5424] |
| Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements, May 17, 2011 [D.I. 5424] |
| Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements, July 28, 2011 [D.I. 6047] |
| Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 for an Order (I) Authorizing and Approving Nortel Network Inc.'s Entry Into the Cascading Directors' Trust Indenture, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Related Relief, Mar. 10, 2010 [D.I. 2683] |
| Decl. of G. Riedel ¶ 17, Oct. 7, 2009 [D.I. 1627 Ex. B] |
| Decl. of H. DeAlmeida ¶ 8, Feb. 20, 2009 [D.I. 353 Ex. B] |
| Doolittle Aff., Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.) |
| Doolittle Decl., Jan. 14, 2009 [D.I.3] |
| Eighteenth Report of Monitor, July 31, 2009 [D.I. 1259] |
| Eighty-Sixth Report of the Monitor, June 27, 2012 [D.I. 7950] |
| Administrators' statement of proposals dated February 2009 |

| |
|---|
| Application for an Order Authorizing Employment & Retention of Global IP Law Group, Oct. 30, 2009 [D.I. 1796] |
| Application for an Order Authorizing Employment & Retention of Lazard Frères & Co. LLC, Feb. 13, 2009 [D.I. 294] |
| CDMA and LTE ASA clause 6.7 |
| CVAS ASA clause 6.9 |
| Doolittle Aff. (CA) |
| Enterprise and NGS ASA clause 2.2.7 |
| GSM/GSM-R ASA clause 6.7 |
| Layer 4-7 ASA clause 3.2 |
| MEN ASA clause 2.2.6 |
| Motion for an Order Approving the Interim Funding and Settlement Agreement, Ex. B, June 9, 2009 [D.I. 874] |
| Motion for an Order Authorizing and Approving Sale of Residual Patents Portfolio, Apr. 4, 2011 [D.I. 5202] |
| MSS ASA clause 2.2.6 |
| Next Generation Packet Core ASA clause 6.7 |
| Fifty Second Report of the Monitor,16, Aug. 30, 2010 [D.I. 3843 Ex. A] |
| Fourteenth Report of the Monitor, 2, June 23, 2009 [D.I. 946] |
| IFSA, June 9, 2009 [D.I. 874 Ex. B] |
| Letter of Agreement , Apr. 13, 2011 [D.I. 5424 Ex. B] |
| Nortel Networks UK Ltd. Administrators' Statement of Proposals (Feb. 2009), Bloom Dep. Ex. 31623 |
| Notice of Cancellation of Auction of Carrier Voice Over IP and Application Solutions Business Line, Feb. 25, 2010 [D.I. 2527] |
| Notice of Cancellation of Auction of Layer 4-7 Business Line, Mar. 20, 2009 [D.I. 506] |
| Notice of Cancellation of Auction of Next Generation Packet Core Network Components Business Line, Oct. 26, 2009 [D.I. 1723] |
| Order Authorizing and Approving Sale of Layer 4-7 Business Line, Mar. 26, 2009 [D.I. 539] |

4

| |
|---|
| Order Authorizing and Approving Sale of Residual Patents Portfolio, July 11, 2011 [D.I. 5935] |
| Order Authorizing Employment & Retention of Global IP Law Group, LLC, Nov. 11, 2009 [D.I. 1928] |
| Order Authorizing Retention & Employment of Lazard Frères & Co. LLC, Mar. 20, 2009, [D.I. 507] |
| Prefiling Report of the Monitor dated January 14, 2009 |
| Notice of Cancellation of Auction of Carrier Voice Over IP and Application Solutions Business Line, Feb. 25, 2010 [D.I. 2527] |
| Notice of Cancellation of Auction of Layer 4-7 Business Line, Mar. 20, 2009 [D.I. 506] |
| Notice of Cancellation of Auction of Next Generation Packet Core Network Components Business Line, Oct. 26, 2009 [D.I. 1723] |
| Notice of Cancellation of Auction of Next Generation Packet Core Network Components Business LineSuccessful Bid, Oct. 26, 2009 [D.I. 1723] |
| Order (I) Authorizing and Approving Nortel Network Inc.'s Entry Into the Cascading Directors' Trust Indenture, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Related Relief, Mar. 31, 2010 [D.I. 2815] |
| Order (I) Authorizing and Approving the Non-Filed Entity Settlement Agreement; (II) Authorizing and Approving the Debtors to Take Certain Actions in Connection Therewith; and (III) Granting Related Relief, July 11, 2012 [D.I. 7985] |
| Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving a Settlement Stipulation with Genband Inc., Aug. 23, 2011 [D.I. 6192] |
| Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements, June 6, 2011 [D.I. 5603] |
| Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreement Regarding Nortel Russia and Approving Certain Amendments to the Escrow Agreements, Aug. 23, 2011 [D.I. 6193] |
| Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, Dec. 16, 2009 [D.I. 2157] |
| Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, Mar. 10, 2010 [D.I. 2676] |
| Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, Mar. 3, 2011 [D.I. 5063] |

Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, March 29, 2010 [D.I. 2784]

Order Approving Stipulation Among the Debtors, Certain Affiliates and the Pension Benefit Guaranty Corporation, May 26, 2010 [D.I. 3071]

Order Approving Stipulation By and Among the Sellers and Avaya Inc., Oct. 1, 2010 [D.I. 4058]

Order Authorizing and Approving (A) Sale of Certain Assets of the Debtors' Metro Ethernet Networks Business LineFree and Clear of All Liens, Claims and Encumbrances and (B) Assuption and Assignment of Certain Executory Contracts, Dec. 3, 2009 [D.I. 2070]

Order Authorizing and Approving (A) Sale of Layer 4-7 Business LineCertain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts, Mar. 26, 2009 [D.I. 539]

Order Authorizing and Approving (A) the Sale of Certain Assets of  the Debtors' Carrier Voice Over IP and ApplicationCommunications Solutions Business Line, Mar. 4,Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts, Mar. 3, 2010 [D.I. 2632]

Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch Business Line(Formerly Known as 'Passport') Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts, Sept. 30, 2010 [D.I. 4054]

Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Business LineFree and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the Assumption and Sublease of Certain Leases, July 28, 2009 [D.I. 1205]

Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business Line, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) The Assumption and Sublease of Certain Leases, , Sept. 16, 2009 [D.I. 1514]

Order Authorizing and Approving Sale of Carrier Voice Over IP and Application Solutions Business Line, Mar. 4, 2010 [D.I. 2632]

Order Authorizing and Approving Sale of CDMA and LTE Business Line, July 28, 2009 [D.I. 1205]

Order Authorizing and Approving Sale of Debtors' Next Generation Packet Core Network Components Business LineFree and Clear of All Liens, Claims and Interests, Oct. 28, 2009 [D.I. 1760]

Order Authorizing and Approving Sale of Enterprise Solutions Business Line, Sept. 16, 2009

| |
|---|
| [D.I. 1514] |
| Order Authorizing and Approving Sale of GSM/GSM-R Business Line, Dec. 3, 2009 [D.I. 2065] |
| Order Authorizing and Approving Sale of GSM/GSM-R Business LineFree and Clear of All Liens, Claims and Encumbrances, Dec. 3,2, 2009 [D.I. 2065] |
| Order Authorizing and Approving Sale of Layer 4-7 Business Line, Mar. 26, 2009 [D.I. 539] |
| Order Authorizing and Approving Sale of Metro Ethernet Networks Business Line, Dec. 3, 2009 [D.I. 2070] |
| Order Authorizing and Approving Sale of Multi-Service Switch Business Line, Sept. 30, 2010 [D.I. 4054] |
| Order Authorizing and Approving Sale of Next Generation Packet Core Network Components Business Line, Oct. 28, 2009 [D.I. 1760] |
| Order Authorizing and Approving Sale of Residual Patents Portfolio(A) the Sale of Certain Patent and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections, , July 11, 2011 [D.I. 5935] |
| Order Authorizing and Approving Sale of Residual Patents Portfolio, July 11, 2011 [D.I. 5935] |
| Order Under 11 U.S.C., Mar. 20, 2009 [D.I. 507] |
| Order Under 11 U.S.C., Nov. 11, 2009 [D.I. 1928] |
| Second Report of the Monitor, Feb. 25, 2009 [D.I. 376 Ex. A] |
| Order (Fourth Estate Settlement Agreement), In re Nortel Networks Corp. (July 11, 2012), No. 09-CL-7950 (O.N.S.C.) |
| Order (Re: Certain Inter-Estate Matters), In re Nortel Networks Corp. (Aug. 26, 2011), No. 09-CL-7950 (O.N.S.C.) |
| Order (Re: Israel Settlement), In re Nortel Networks Corp. (June 7, 2011), No. 09-CL-7950 (O.N.S.C.) |
| Report of Ernst & Young Inc., Jan. 14, 2009, Jan. 14, 2009, In re Nortel Networks Corp., No. 09-CL-7950 (O.N.S.C.) |
| **Produced Documents** |
| 2005 R&D Site Strategy Discussion [Presentation], EMEAPROD1137447 |
| 2009 YTD Excluding JV's – Total CVAS, NNC-NNL06001644 |

Allocation Settlement Agreement, June 19, 2012, NNC-NNL06002114

Allocation Settlement Agreement, June 19, 2012,NNC-NNL06002115

Section 7.1.2.(c)(ii) of the Seller's Disclosure Schedule, March 11, 2011, NNI_00822636

Seller's Disclosure Schedule, Annex 1.1(c) Patents That May Require Recordation of One of the Sellers as the Owner, June 30, 2011, NNI_00825621

Seller's Disclosure Schedule, Annex 1.1(d) Listed Jointly Owned Patents,  June 30, 2011, NNI_00825244

Seller's Disclosure Schedule, Annex 1.1(h) Listed Patents, Assets Tab,  June 30, 2011, NNI_00825254

Seller's Disclosure Schedule, Annex A, June 30, 2011 NNI_00825680

Seller's Disclosure Schedule, Annex A.I(h) Abandoned, Expired, Transferred Patents Tab, June 30, 2011, NNI_00825622

Seller's Disclosure Schedule, Chart, June 30, 2011, NNI_00825647

Seller's Disclosure Schedule, June 30, 2011, NNC-NNL06002561

Sellers Disclosure Schedule 4.7(b), Dec. 21, 2009, NNC-NNL06001642

Sellers Disclosure Schedule to Enterprise APA § 4.6(b)(ii), Sept. 14, 2009, NNC-NNL06002086

Sellers Disclosure Schedule to the North American Agreement, Dec. 22, 2009, NNC-NNL06001637

Sellers Disclosure Schedule, NNI_00807247

Sellers Disclosure Schedule, NNI_00807356

Sellers Disclosure Schedule, NNI_00807929

Sellers Disclosure Schedule, NNI_00807931

Seville FA Section 1.1(b) – Appendix A, NNI_00823766

Spreadsheet Regarding Paragon Employees and Functions, NNI_NARNIA_00175024

Telesis Magazine Article at NNC-NNL07450230

UMTS Asset Sale Agreement, Albert-Lebrun Dep. Ex. 31585, at NNC-NNL06026778

Watkins Dep. Ex. 11262, at EMEAPROD2189884

Amended and Restated Asset Sale Agreement between Selling Debtors and Ciena Corp., Nov.

24, 2009, NNI_00216905

Amended EMEA Agreement, Dec. 22, 2009, NNI_00808280

Amended EMEA Agreement, January 26, 2011, NNI_00820982

Amended North American Agreement Sellers Disclosure Schedule, Nov. 7, 2009, NNC-NNL07789371

Amended North American Agreement, March 11, 2011, NNI_00822640

Amendment Agreement (Amendment No. 5) relating to the EMEA Agreement, Mar. 19, 2010, NOR_55238004

Amendment Agreement relating to the EMEA Agreement, March 31, 2010, NOR_56782763

Amendment Agreement relating to the EMEA Agreement, Nov. 24, 2009, NNI_00644355

Amendment No. 1 to the Amended North American Agreement, Dec. 18, 2009, NNI_00807283

Amendment No. 1 to the North American Agreement, Dec. 18, 2009, NOR_53917673

Amendment No. 1 to the North American Agreement, Dec. 3, 2009, NNC-NNL06002190

Amendment No. 1 to the North American Agreement, Oct. 30, 2009, NNI_00804120

Amendment No. 2 to the Amended North American Agreement, Mar. 10, 2011, EMEAPROD2215918

Amendment No. 2 to the North American Agreement, Dec. 23, 2009, NNC-NNL06002191

Amendment No. 2 to the North American Agreement, Nov. 13, 2009, NNI_00804123

Amendment No. 3 to the North American Agreement, Mar. 15, 2010, NNC-NNL06002192

Amendment No. 4 to the North American Agreement, Mar. 15, 2010,  NNC-NNL06002193

Amendment No. 5 to the North American Agreement, Mar. 19, 2010, NNC-NNL06002194

Amendment to Asset Sale Agreement, July 29, 2011, NNI_00825205

Amendment to The North American Agreement, Mar. 31, 2010, at NNI_00810895

Amendment to the North American Agreement, Nov. 27, 2009, NNI_01261805

Amount to be allocated ("Alcatel Allocation Worksheet"), EMEAPRIV0045785

Amount to be allocated, UCC0146640

An Overview, July 2010, GIP_Nortel_00142929

Asset Sale Agreement, June 30, 2011, NNI_00825094

Asset Sale Agreement, June 30, 2011, NNI_00825123

Asset Sale Agreement, June 30, 2011, NNI_00825126

Avaya Disagreement Notice, Apr. 19, 2010, NNC-NNL06725705

Carrier VoIP, Applications & Solutions: Combined Financial Statements for the Years Ended Dec. 31, 2008 & 2007, NNC-NNL06001641

CATT Servers Spreadsheet, NNI_00824910

CDMA & LTE Fixed Asset Summary, Dec. 11, 2009, NNI_00804119

CDMA Presentation to MatlinPatterson, July 7, 2009, NNI_00578024

Certificate of Incorporation, PC0089161

China Asset Sale Agreement between Nortel Networks (China) Limited and Kapsch CarrierCom Hong Kong Limited, Mar. 31, 2010, NNI_00811123

China Asset Sale Agreement, Mar. 9, 2011, NNI_00822139

China Asset Sale Agreement, Nov. 2, 2009, NNI_00805128

Closing Funds Flow Memorandum, Mar. 19, 2010, NNI_00803590

Closing Statement and Working Capital Calculations, NNI_00215982

Confirmation Agreement by and among NNL, NNC, Canadian and U.S. Filed Entities, EMEA Filed Entities, EMEA Non-Filed Entities, the French Liquidator, NNSA Office Holders, and the Joint Israeli Administrators, NNC-NNL06001664

Confirmation Agreement, NOR_55238302

CVAS P&L, Dec. 21, 2009, NNC-NNL06001643

Deed of Amendment (Amendment No. 3) relating to the EMEA Agreement, Dec. 16, 2009, NNI_00819134

Deed of Amendment (Amendment No. 4) relating to the EMEA Agreement, Jan. 13, 2010, NOR_55238003

Deed of Amendment and Restatement relating to the EMEA Agreement, Mar. 8, 2010, NOR_53929099

Deed of Amendment relating to the EMEA Agreement, Oct. 20, 2009, NNI_00820280

Desktop Asset Listing 20091112 Seville, Nov. 12, 2009, NNI_00823767

| |
|---|
| Desktop Asset Listing 20091112 Seville, Nov. 12, 2009, NNI_00824911 |
| DSC Alcatel Appraisal, NNI_00174638 |
| DSC Appraisal Assocs. Inc., Alcatel: Valuation of Certain Assets of Nortel Networks' UMTS Business as of December 31, 2006 ("DSC Alcatel Appraisal"), NNI_00174638 |
| DSC Appraisal Assocs. Inc., Alcatel: Valuation of Certain Assets of Nortel Networks' UMTS Business as of December 31, 2006, NNI_00174638 |
| E-mail from Gordon Davies to Nicholas de Roma et al., Sept. 18, 2003, NOR-CAN00620466 |
| E-mail from Kerry Stephens, Tax Dep't, EMEA, to Michael Orlando, Int'l Tax – Transfer Pricing, NNI, et al.  (Jan. 14, 2007, 9:57 a.m.), EMEAPRIV0034270 |
| E-mail from Kerry Stephens, Tax Dep't, EMEA, to Michael Orlando, Int'l Tax – Transfer Pricing, NNI, et al., "Nortel Internal IP Agreement" (Nov. 6, 2006, 8:44 a.m.), EMEAPRIV0204736 |
| E-mail from Louis Farr, Tax Dep't, NNI, to Ryan Smith, EMEA Tax Leader, et al., "'Heads Up' – Osiris Purchase Price Allocation Process," (Dec. 4, 2006, 11:36 p.m.), NNI_00432290 |
| E-mail from Louis Farr, Tax Dep't, NNI, to Timothy Pickering, Senior Manager, Int'l Tax, Deloitte & Touche LLP, et al., "UMTS Alcatel Transaction" (Jan. 29, 2007, 2:25 p.m.), Culina Dep. Ex. 21160, at BHG0137543 |
| E-mail from Louis Farr, Tax Dep't, NNI, to Timothy Pickering, Senior Manager, Int'l Tax, Deloitte & Touche LLP, et al., "UMTS Alcatel Transaction" (Jan. 29, 2007, 2:25 p.m.), Culina Dep. Ex. 21160, BHG0137543 |
| E-mail from Timothy Pickering, Senior Manager, Int'l Tax, Deloitte & Touch LLP, to Louis Farr, Tax Dep't, NNI, et al. ( Jan. 27, 2007, 11:06 a.m.), NNI_00364699 |
| EMEA Agreement Sellers Disclosure Schedule, Oct. 7, 2009, NNI_00818096 |
| EMEA Agreement, Dec. 23, 2009, NNC-NNL06001613 |
| EMEA Agreement, Mar. 24, 2009, NOR_56781721 |
| EMEA Agreement, Nov. 24, 2009, NNC-NNL11752288 |
| EMEA Agreement, Sept. 14, 2009, NNI_00807958 |
| EMEA Agreement, Sept. 14, 2009, NNI_00807965 |
| EMEA Agreement, Sept. 14, 2009, NNI_00807966 |
| EMEA Agreement, Sept. 14, 2009, NNI_00807969 |
| EMEA Agreement, Sept. 14, 2009, NNI_00808120 |

| |
|---|
| EMEA Agreement, September 24, 2010, BHG0151799 |
| EMEA Sellers' Disclosure Schedule to Asset Sale Agreement September 24, 2010, EMEAPROD2146445 |
| 2005 R&D Site Strategy Discussion, Jan. 6, 2005, EMEAPROD1137447 |
| Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 dated October 31, 2008, NNC-NNL06120693 |
| Appendix E to the Joint Request for a Bilateral Advance Pricing Agreement dated 31 October 2008 NNC-NNL06120689 |
| GSM/GSM-R Side Agreement (March 31, 2010), NNI_00812035 |
| KPMG Transfer Report for NNUK, NNC-NNL06001549 |
| Master R&D Agreement (Dec. 22, 2004), Albert-Lebrun Dep. Ex. 21003 |
| NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006) dated October 31, 2008, NNI_01015095 |
| NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007–2011: Appendix B: Functional Analysis of R&D Activities (October 31, 2008), NNC-NNL06120690 |
| Nortel Global R&D News and Information e-mail of January 30, 2006 NNC-NNL06604374 |
| Nortel Networks  Finance Transformation: Company Coad Hierarchy, Jan. 19, 2011, EMEAPROD0890072 |
| Nortel Networks Foreign Filing Practice Note (Dec. 12, 2000), Anderson Dep. Ex. 31,304, at NNC-NNL06521385 |
| EMEA Sellers' Disclosure Schedule, June 20, 2009, NNI_00808232 |
| EMEAPROD02318642 |
| Employee Transfer Side Agreement, June 30, 2011, BHG0245171 |
| Employees Spread sheet, NNI_NARNIA_00176065 |
| Employees Spreadsheet, EMEAPROD1839541 |
| Enterprise Sale High Level Estimate of Purchase Price Allocation, June 23, 2010, NNI_01432905 |
| Enterprise Solutions, Presentation made to Narnia, Dec. 5, 2008, NNI_00595488 |

| |
|---|
| Ericsson Amended and Restated Closing Statement, Feb. 4, 2010, NOR_53299735 |
| Ericsson Amended and Restated Closing Statement, June 9, 2010, NNI_00873353 |
| Escrow Accounts Spreadsheet, NNI_00827586 |
| Estimated Closing Statement per Section 2.2.2 of the Asset and Share Sale Agreement, NOR_53917850 |
| Executive Summary Project Iceberg, April 2010, GIP_Nortel_00143241 |
| Executive Summary:  Project Iceberg, May 2010, NNC-NNL06096750 |
| Final Nortel UMTS asset allocation spreadsheet, July 27, 2007, NNI_00286115 |
| High Level Estimate of Purchase Price Allocation, Aug. 15, 2010, NNI_00216602 <br> High Level Estimate of Purchase Price Allocation, Aug. 16, 2010, NNI_00216279 <br> High Level Purchase Price Estimate, Nov. 22, 2010, NNI_00216461 |
| High Level Estimate of Purchase Price Allocation, Aug. 15, 2010, NNI_00216602 |
| High Level Estimate of Purchase Price Allocation, Aug. 16, 2010, NNI_00216279 |
| High Level Purchase Price Estimate, Nov. 22, 2010, NNI_00216461 |
| In-scope Employee Spread sheet, NNI_EQUINOX_00067756 |
| In-scope Employees Spreadsheet, NNI_NARNIA_00175555 |
| In-scope Employees Spreadsheet, NNI_NARNIA_00176058 |
| In-scope Employees Spreadsheet, NNI_SNOW_00286993 |
| Intellectual Property License Agreement § 2.01, Nov. 13 2009, NNC-NNL06001811 |
| Intellectual Property License Agreement § 3.01, Dec. 8, 2009, NNI_00782745 |
| Intellectual Property License Agreement in favor of Ericsson dated March 11, 2011 at GIP_Nortel_00086528 |
| Intellectual Property License Agreement, Dec. 18, 2009, NNI_01374970 |
| Intellectual Property License Agreement, Mar. 19, 2010, NOR_55927510 |
| Intellectual Property License Agreement, Mar. 31, 2010, NNI_01259143 |
| Intellectual Property License Agreement, Mar. 31, 2010, NNI_01265512 |
| Intellectual Property License Agreement, March 31, 2009, GIP_Nortel_00000917 |
| Intellectual Property License Agreement, May 28, 2010, NNC-NNL06001658 |

Kapsch Amended and Restated Closing Statement, Oct. 3, 2011, NNI_00803681

Key Messages for Jan 6th Government Meeting [Presentation], NNI_00853498

KPMG Transfer Report for NNUK, NNC-NNL06001549

Letter from Antoine Tchekhoff re Sale of Carrier VoIP Application Solutions Business, Dec. 22, 2009, GIP_Nortel_00101400

Letter from KPMG, May 31, 2010, NNI_01454374

Letter from Nortel Networks Inc. to Emerson Network Power (2009), NNI_00824913

Letter from Nortel Networks Inc. to GE Fanuc Intelligent Platforms (2009), NNI_00824916

Letter from PwC, July 14, 2010, NNI_01454374

License Termination Agreement, BHG0162049

License Termination Agreement, GIP_Nortel_00078256

License Termination Agreement, GIP_Nortel_00101408

License Termination Agreement, GIP_Nortel_00101524

License Termination Agreement, GIP_Nortel_00101572

License Termination Agreement, Sept. 11, 2009, NNI_00805595

Memorandum from the Nortel Global Initiatives Grp. to Project Osiris Files, "Treatment of Customer Relationship Intangible in Purchase Price Allocation" (Feb. 15, 2007) ("Project Osiris File Memo"), NNC-NNL035256

Memorandum from the Nortel Global Initiatives Grp. to Project Osiris Files, "Treatment of Customer Relationship Intangible in Purchase Price Allocation" (Feb. 15, 2007), Orlando Dep. Ex. 11262, NNC-NNL06056509

MEN Distribution Escrow Agreement, Mar. 19, 2010, NOR_55238025

MEN P&L Results Call (As per July 17, 2007 locked down results) version 2.0 [Presentation], NNI_00283321

Met[r]o Ethernet Networks, Project Snow, Presentation made to Ekberg, Mar. 13, 2009, NNI_01287868

Next Generation Packet Core - Project Seville Information Memorandum, July 31, 2009, CCC0001952

NNI_00283321

NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing

Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, PC0184853

Nortel Business Update [Presentation], July 31, 2008, NNC-NNL06240588

Nortel Global R&D News and Information e-mail, Jan. 30, 2006, NNC-NNL0660437

Nortel Networks Foreign Filing Practice, Anderson Dep. Ex. 31304, at NNC·NNL06521385

Nortel Networks Outstanding Bonds, May 18, 2010, NNC-NNL06001639

Nortel Networks, Annual Report (1998), PWC-NRTL-00009195

Nortel Networks, Annual Report (1999), NNC-NNL06001433

Nortel Networks, Sale of UMTS Access Business to Alcatel Lucent, Allocation of Consideration ("Nortel Alcatel Allocation"), EMEAPROD1305279

Nortel Networks, Sale of UMTS Access Business to Alcatel Lucent, Allocation of Consideration, EMEAPROD1305279

Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement (Dec. 29, 2006), NNI_00432293

Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement, July 24, 2007, NNC-NNL06105164

North American Agreement § 2.1.1(g), July 24, 2009, NNC-NNL06001800

North American Agreement § 2.1.1, Oct. 25, 2009, NNI_01261745

North American Agreement § 7.1(a), July 24, 2009, NNI_00803889

North American Agreement § 7.1(a), Oct. 25, 2009, NNI_01261745

North American Agreement § 7.1.1, NNI_00821821

North American Agreement at NNI_00821743

North American Agreement at NNI_00821746

North American Agreement at NNI_00821764

North American Agreement Nov. 24, 2009, NNI_00216950

North American Agreement Sellers Disclosure Schedule § 7.1(1), Nov. 13, 2009, NNI_00803937

North American Agreement Sellers Disclosure Schedule, Nov. 24, 2009, NNC-NNL06002189

North American Agreement Sellers Disclosure Schedule, Nov. 24, 2009, NNI_01259389

Nortel Networks: Functional Analysis for the Years Ended December 31, 2000–2004, EMEA1000000020

Nortel's IP Team and Patent Portfolio, Aug. 2010, NNI_01463572

Northern Telecom Annual Report (1994), NNC-NNL06136896

Project Iceberg: Executive Summary, May 2010, NNC-NNL06735085

Seville FA Section 1 1(b) – Appendix A, NNI_00824910

North American Agreement Sellers Disclosure Schedule, Oct. 25, 2009, BHG0138007

North American Agreement Sellers Disclosure Schedule, Sept. 14, 2009, NNC-NNL06002086

North American Agreement Sellers' Disclosure Schedules, Feb. 19, 2009, NNI_00814970

North American Agreement, Amendment No. 1, May 28, 2010, NNC-NNL06001636

North American Agreement, Dec. 22, 2009, NNC-NNL06001609

North American Agreement, Exhibit O: Additional Employee Related Provisions, NNI_00814632

North American Agreement, Feb. 19, 2009, NNI_00814632

North American Agreement, July 24, 2009, NNI_00803798

North American Agreement, July 24, 2009, NNI_00803832

North American Agreement, July 24, 2009, NNI_00803834

North American Agreement, Nov. 24, 2009, NNC-NNL06002582

North American Agreement, Nov. 24, 2009, NNI_00216905

North American Agreement, Oct. 25, 2009, NNI_01261745

North American Agreement, Sept. 14, 2009, NNI_00806387

North American Agreement, Sept. 14, 2009, NNI_00806443

North American Agreement, Sept. 14, 2009, NNI_00806446

North American Agreement, Sept. 14, 2009, NNI_00806558

North American Agreement, September 24, 2010, NNI_00821708

North American Agreement:  Seller's Disclosure Schedule, September 24, 2010, NNI_00822333

North American ASA at NNI_00803845

North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00812502

North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00812509

North American Sellers Disclosure Schedule, Nov. 13, 2009, NNI_00803937

North American Sellers Disclosure Schedule, Nov. 24, 2009, NNI_01259261

North American Sellers Disclosure Schedule, Sept. 14, 2009, NNI_00807187

Northern Telecom, Annual Report (1994), NNC-NNL06136896

Overview [Nortel Patents Presentation given to Iceberg buyers], NNI_ICEBERG_00196153

Paragon – Schedule 7.1.2(d), Sept. 16, 2010, NNC-NNL06001648

Project Iceberg, May 2010, NNC-NNL06096750

Project Osiris - White Paper, May 29, 2006,  EMEAPROD1243162

Project Osiris, Board of Directors Update, Slide 4, Aug. 29, 2006, NNC-NNL07875245

Project Paragon - Carrier Voice & Application Solutions, Management Presentation, May 2009, NNC-NNL06085707

Project Paragon Management Presentation (November 2009), NNI_00216339

Project Tinos [Presentation], Nov. 12, 2002, NNI_00295277

Project Velocity, Information Memorandum, Feb. 11, 2009, NOR_55314343

Revised Closing Statement, July 25, 2011, NNI_00803651

Rider to Proof of Claim of Nortel Networks UK Ltd, June 3, 2011, EMEAPROD2292750

Schedule 1.1(f): Owned Equipment: Shared Laboratories, June 7, 2009, NNC-NNL06001638

Schedule 1.1(n)(iii)(B) of the Seller's Disclosure Schedule, NNI_00822622

Schedule 4.5(g)(ii)(B) of the Seller's Disclosure Schedule, NNI_00822630

Schedule 4.5(h) of the Seller's Disclosure Schedule, NNI_00822628

Second Amended EMEA Agreement, March 11, 2011,NNI_00821147

Section 1.1(a)-10.16(a)(iii) of the Seller's Disclosure Schedule, NNI_00822569

Section 1.1(b) of the Sellers Disclosure Schedule: Assigned Patents, NNI_00804135

Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix A – Access Gateway Design

Documentation, NNI_00824416

Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix B – Access Gateway Test Documentation, NNI_00824866

Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix C – Access Gateway System Engineering Documentation, NNI_00824902

Section 2.1.1(f) of the North American Agreement at NNI00821743

Section 4.11(b) of the Seller's Disclosure Schedule, March 9, 2011, NNI_00822632

Section 4.11(b) of the Sellers Disclosure Schedule – Paragon, May 28, 2010, NNC-NNL06001645

Section 4.6 of the Sellers Disclosure Schedule – Litigation, June11, 2009, NNC-NNL06001640

Section 4.7(b) of the Sellers Disclosure Schedule – Seville, Oct. 12, 2009, NNI_00824912

Section 7.1.2 (c)(iii) of the Sellers Disclosure Schedule – Paragon, June 7, 2010, NNC-NNL06001646

Section 7.1.2(c)(iv) of the Seller's Disclosure Schedule, March 11, 2011, NNI_00822639

Section 7.1.2(c)(v) – Specified Employee Liabilities, May 28, 2010, NNC-NNL06001647

**Publicly Available Documents**

Avaya Inc., Quarterly Report (Form 10-Q) (Feb. 16, 2010)

Ciena Corp., Quarterly Report (Form 10-Q) (Sept. 8, 2010)

10-K filing for the year ended December 31, 2002

10-K filing for the year ended December 31, 2008

In re Flying J Inc., No. 08-13384 (MFW) (Bankr. D. Del.)

In re Homer City Funding LLC, No. 12-13024 (KG) (Bankr. D. Del.)

In re Houghton Mifflin Harcourt Publ'ishing Co., No. 12-12171 (REG) (Bankr. S.D.N.Y.)

In re Lee Enters.prises Inc., No. 11-13918 (KG) (Bankr. D. Del.)

In re Patriot Coal Corp., No. 12-51502-659, No. 12-12900 (SCC) (Bankr. E.D. Mo.)

In re Philadelphia Newspapers, LLC, No. 09-11204-JKF, No. 09-11204-SR (Bankr. E.D. Pa.)

Nobel Lecture by Professor Charles K. Kao, "Sand From Centuries Past: Send Future Voices Fast" December 8, 2009,

http://www.nobelprize.org/nobel_prizes/physics/laureates/2009/kao_lecture.pdf

Nortel Networks Corp., Annual Report (Form 10-K) year ended December 31, 2003

Nortel Networks Corp., Annual Report (Form 10-K) year ended December 31, 2004

Nortel Networks Corp., Annual Report (Form 10-K) year ended December 31, 2005

Nortel Networks Corp., Annual Report (Form 10-K) year ended December 31, 2006

Nortel Networks Corp., Annual Report (Form 10K), for the Fiscal Year Ended December 31, 2002 (Mar. 10, 2003)

Nortel Networks Corp., Annual Report (Form 10-K), year ended December 31, 2007

Nortel Networks Corp., Annual Report (Form 10-K), year ended December 31, 2008

James Bagnall, Last things first: Bankruptcy protection, Ottawa Citizen, Oct. 31, 2009

Joint Administrators' First Progress Report for NNUK at 14, Aug. 13, 2009, available at http://www.emeanortel.com/collateral/reports/adminprogrpt_uk_en.pdf

LM Ericsson Telephone Co., Annual Report (Form 20-F) (Apr. 21, 2010)

Mr. Malackowski's report at paragraph 9.2.4

NNUK Administrators' statement of proposals, February 2009, at 7, available at http://www.emeanortel.com/collateral/uk_soap.pdf

NNUK Administrators' statement of proposals, February 2009, available at http://www.emeanortel.com/collateral/uk_soap.pdf.

Nobel Lecture by Professor Charles K. Kao, Sand From Centuries Past: Send Future Voices Fast, Dec.8, 2009 , available at http://www.nobelprize.org/nobel_prizes/physics/laureates/2009/kao_lecture.pdf

Nortel Networks Corp., Annual Report (Form 10-K) (Apr. 29, 2005)

Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008)

Nortel Networks Corp., Annual Report (Form 10-K) (Jan. 10, 2005)

Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003)

Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 11, 2002)

Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007)

Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007)

Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009)

| |
|---|
| Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006) |
| Nortel Networks Corp., Current Report (Form 8-K) (Jan. 3, 2007) |
| Nortel Networks Corp., Quarterly Report (Form 10-Q) (Nov. 7, 2006) |
| Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009. |
| Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009. |
| Nortel Networks, Annual Report (1998), at 10, available at http://quote.morningstar.com/stock-filing/Annual-Report/1998/1/1/t.aspx?t=PINX:NRTLQ&ft=&d=c1ec9044820a58e2 |
| Nortel Networks, Functional Analysis for the years ended December 31, 2000-2004 |
| **Depositions** |
| Albert-Lebrun Dep. 46:20–48:18, Nov. 21, 2013 |
| Binning Dep., Oct. 24, 2013 |
| Dadyburjor Dep., Oct. 3, 2013 |
| Drinkwater Dep., Nov. 4, 2013 |
| Binning Dep., Oct. 24, 2013 |
| MacLean Dep., Oct. 23, 2013 |
| Pusey Dep., Nov. 18, 2013 |
| Watkins Dep., Nov. 6, 2013 |
| Weisz Dep., Nov. 25, 2013 |
| Zafirovski Dep., Nov. 6, 2013 |
| Richardson Dep. 57:21–58:9, Oct. 28, 2013 |
| Riedel Dep. 84:12–23, Oct. 10, 2013 |
| Riedel Dep., Oct. 10, 2013 |
| Roese Dep. 157:20–159:6, Nov. 11, 2013 |

| Orlando Dep., Nov. 5, 2013 |
| --- |
| Pusey Dep. 71:16–72:8, Nov. 18, 2013 |

# APPENDIX 4

# **Nortel Background**

*Nortel's Organization*

1.      Nortel Networks Corporation ("NNC") was the ultimate parent of the Nortel Group, with an executive office in Toronto, Ontario.[1]  It was incorporated in Canada on March 7, 2000.[2]  The common shares of NNC were publicly traded on the New York Stock Exchange ("NYSE") and on the Toronto Stock Exchange ("TSX").[3]

2.      Nortel Networks Limited ("NNL"), a direct subsidiary of NNC, is a Canadian company incorporated in 1914.[4]  It was Nortel's operating subsidiary in Canada as well as a holding company for most of its 142 global subsidiary companies.[5]  NNL's executive offices were also in Toronto.[6]  NNC and NNL's respective boards of directors were comprised of the same ten directors and the same non-executive chair.[7]  NNC held all of NNL's outstanding common shares.[8]

3.      NNL was the direct or indirect parent of over 100 Nortel subsidiaries, including Nortel Networks Inc. ("NNI"), a Delaware company, Nortel Networks UK Limited

---

1.      Doolittle Aff. ¶ 2, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

2.      Doolittle Aff. ¶ 21(a), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

3.      Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 1.

4.      Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 1.

5.      NNUK Administrators' statement of proposals, February 2009, at 3, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

6.      Doolittle Aff. ¶ 2, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

7.      Doolittle Aff. ¶ 44, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

8.      Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 1.

2

("NNUK"), a U.K. corporation, Nortel Networks S.A. ("NNSA"), a French corporation, and

Nortel Networks (Ireland) Limited ("NNIR"), an Irish corporation.[9]  The Nortel group's

principal executive offices were located in Brampton, Ontario.[10]

       4.     NNUK was responsible for and controlled the majority of the operations

in the Europe, Middle East and Africa ("EMEA") region.[11]  NNUK was incorporated in England

and Wales on February 25, 2000, under the name Nortel Networks Holdings Limited.[12]  It

changed its name to Nortel Networks plc on May 5, 2000, and on March 2, 2001, re-registered as

a private limited company and was renamed Nortel Networks UK Limited.[13]  NNUK was a

direct subsidiary of NNL, and itself owned directly or indirectly all but three[14] of the EMEA

region companies.[15]  NNUK served as the headquarters of the EMEA region.[16]

       5.     Two entities in the EMEA region began life as joint ventures with third

parties outside Nortel.  These entities conducted research and development ("R&D") and held

intellectual property in their own names. These entities were the following:

---

9.    Doolittle Aff. ¶¶ 21(b), 26, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

10.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 1–2.

11.    NNUK Administrators' statement of proposals, February 2009, at 6, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

12.    Certificate of Incorporation, PC0089161.

13.    *Id.* at PC0089163–PC0089164.

14.    Being the French entities, NNSA and Nortel Networks France S.A.S. ("Nortel France SAS"), together with NNIR.

15.    NNUK Administrators' statement of proposals, February 2009, at 6, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

16.    Doolittle Aff. ¶ 27, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

        a.     Nortel France SAS began in July 1992 as a joint venture called Nortel Matra Cellular ("NMC") between Nortel and Matra Communications, a subsidiary of the Lagardère Group.[17]  Nortel acquired 100% control of Nortel France SAS in September 2003, with effect from September 18, 2003;[18] and

        b.     Nortel GmbH ("Nortel Germany") began in March 1995 as a joint venture, called Nortel DASA, with the Daimler-Benz Aerospace Group.[19]  On September 18, 2003 Nortel acquired 100% control of Nortel Germany.[20]

*Nortel's Historical Business and Markets*

        6.     Nortel began business in 1895 as Bell Telephone Company of Canada.[21] In the 1970s, the company changed its name to Northern Telecom and entered the realm of digital telephony.[22]  It subsequently expanded to the United States and, by 1990, had become one of the leading telecommunications companies in all of North America.[23]  One of its major products from the 1970s onwards was a digital central office switch called the DMS-100.[24]

---

17.   *See* Project Tinos [Presentation], Nov. 12, 2002, NNI_00295277 at 4.

18.   E-mail from Gordon Davies to Nicholas de Roma et al., Sept. 18, 2003, NOR-CAN00620466/1.

19.   Project Tinos [Presentation], Nov. 12, 2002, NNI_00295277 at 7.

20.   Nortel Networks Corp., Annual Report (Form 10-K) (Jan. 10, 2005) at 53.

21.   NNUK Administrators' statement of proposals, February 2009, at 3, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

22.   *See* Project Paragon - Carrier Voice & Application Solutions, Management Presentation, May 2009, NNC-NNL06085707 at 6.

23.   Rider to Proof of Claim of Nortel Networks UK Ltd ¶¶ 2–3, June 3, 2011, EMEAPROD2292750 at EMEAPROD2292752.

24.   Northern Telecom, Annual Report (1994), NNC-NNL06136896/80–82.

7.      Prior to filing for bankruptcy in Canada, the United States and the United

Kingdom on January 14, 2009 (the "Petition Date"), Nortel was a global supplier of

telecommunications and computer networking solutions including hardware and software

products and services.[25]  It provided end-to-end network solutions for its customers from

designing, engineering and marketing, through to selling, installing and supporting these network

solutions,[26] employing approximately 30,000 people globally in 2008.[27]

8.      In the early 1990s Nortel acquired Standard Telephones and Cables

("STC") in the U.K., which had pioneered key developments in optical fiber based networking.[28]

Over the course of the 1990s, Nortel moved strongly into optical networks, and also enhanced

the DMS-100 and related switch products to handle Voice over Internet Protocol ("VoIP")

telephony.[29]  Toward the end of the decade, Nortel expanded its business substantially with the

acquisition of companies including Bay Networks and Periphonics.[30]

9.      The acquisition of STC gave Nortel world-class R&D facilities in Harlow,

England led by the former STC laboratories, where Nobel-prize winning work on high-speed

------

25.    NNUK Administrators' statement of proposals, February 2009, at 3, *available at*
       http://www.emeanortel.com/collateral/uk_soap.pdf.

26.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 1.

27.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 15.

28.    *See* KPMG Transfer Report for NNUK, NNC-NNL06001549/22; Nortel Global R&D News and Information
       e-mail, Jan. 30, 2006, NNC-NNL06604374/2; Nobel Lecture by Professor Charles K. Kao, *Sand From
       Centuries Past: Send Future Voices Fast*, at 71–79, Dec.8, 2009, *available at*
       http://www.nobelprize.org/nobel_prizes/physics/laureates/2009/kao_lecture.pdf.

29.    *See* Project Paragon Management Presentation (November 2009) at Slides 6-8, NNI_00216339.

30.    *See* Nortel Networks, Annual Report (1999), NNC-NNL06001433/11; Nortel Networks, Annual Report
       (1998), PWC-NRTL-00009195 at PWC-NRTL-00009199.

transmission of speech signals over optical fiber had been performed.[31]  In 1998, Nortel absorbed

Bell Northern Research ("BNR"), which it had until then jointly owned with Bell Canada.[32]  The

BNR acquisition brought with it existing R&D facilities around the world, including that at and

Maidenhead, England.[33]  During the 1990s, Nortel also acquired R&D facilities in Monkstown,[34]

and separately developed a laboratory in Galway, Ireland.[35]

*Nortel's Pre-Petition Business Lines*

10.    Nortel has described its business in the period preceding insolvency as

"networking solutions."[36]  By the 2000s, Nortel designed, developed, manufactured, assembled,

marketed, sold, licensed, installed, serviced and supported communications technology and

infrastructure to enable Internet protocol, data, voice and multimedia communications using

wireless and wireline technologies.[37]  Nortel's business required significant ongoing investment

in R&D in order to keep pace with and anticipate evolving technologies, industry standards and

---

31.    *See* Nobel Lecture by Professor Charles K. Kao, *Sand From Centuries Past: Send Future Voices Fast*, at 71-79, Dec. 8, 2009, *available at* http://www.nobelprize.org/nobel_prizes/physics/laureates/2009/kao_lecture.pdf.

32.    *See* Nortel Networks, Annual Report (1998), at 10, *available at* http://quote.morningstar.com/stock-filing/Annual-Report/1998/1/1/t.aspx?t=PINX:NRTLQ&ft=&d=c1ec9044820a58e2 ((listing the December 22, 1998 acquisition of all remaining common and preferred shares of Nortel Technology Ltd. (formerly Bell-Northern Research) as a major acquisition).

33.    *See* Telesis Magazine Article at NNC-NNL07450230.

34.    *See* 2005 R&D Site Strategy Discussion [Presentation], EMEAPROD1137447 at 3.

35.    *See* 2005 R&D Site Strategy Discussion [Presentation], EMEAPROD1137447 at 3.

36.    *See* Nortel Networks, Functional Analysis for the years ended December 31, 2000-2004, Watkins Dep. Ex. 11262, at EMEAPROD2189884.

37.    *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 50.

6

customer needs.[38]

11.     Immediately prior to the Petition Date, Nortel conducted its business through four reportable business unit segments (the "Business Units"):  Carrier Networks, Enterprise Solutions, Metro Ethernet Networks and Global Services.[39]  The respective Business Units provided products and services to telecommunications carriers and enterprise customers worldwide as follows:

a.     Carrier Networks ("CN") provided technology related to wireless mobile communication infrastructure and wireless networking solutions that enabled telecommunication service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises.[40]  Nortel's CN Business Unit offered or was in the process of developing a variety of wireless technologies, including second generation ("2G") technologies such as GSM, third generation ("3G") technologies such as CDMA2000 and UMTS, and fourth generation ("4G") technologies such as LTE.[41]  At the time of filing, CN was Nortel's largest Business Unit by reported revenue, representing approximately forty percent of Nortel's revenue for the fiscal years ending December 31, 2006, 2007 and 2008.[42]

b.     Enterprise Solutions ("ES") provided voice, data, security, multimedia networking and conferencing solutions to large and small businesses and government

---

38.   *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 30.

39.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 6.

40.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 50.

41.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 7.

42.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 65.

agencies in a variety of industries.  ES products and services were used to build new networks and transform existing communications networks into more cost effective, packet-based networks supporting data, voice and multimedia communications (also referred to as "Unified Communications").[43]  ES represented approximately twenty-four percent of Nortel's revenue for the fiscal years ending December 31, 2006, 2007 and 2008.[44]

        c.      Global Services ("GS") provided a broad range of services and solutions to large business enterprises and carriers worldwide.  The GS Business Unit offered implementation, support, management and applications which were designed to reduce costs, improve efficiency and performance, and capitalize on new revenue opportunities.[45]  Global Services represented approximately twenty percent of Nortel's revenue for each of the fiscal years ending December 31, 2006, 2007 and 2008.[46]

        d.      Metro Ethernet Networks ("MEN") provided carrier-grade wired networking infrastructure, including optical, Carrier Ethernet Switching and Carrier Multi-Service Switching technology and solutions to drive scale, cost and simplicity for the high-speed delivery of video-intensive applications.[47]  MEN represented approximately fourteen percent of Nortel's revenue for each of the fiscal years ending December 31, 2006, 2007 and 2008.[48]

---

43.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 8; Doolittle Aff. ¶ 64, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

44.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 67.

45.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 50.

46.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 69.

47.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 10.

48.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54, 70.

*Nortel's Matrix Structure*

12.    Nortel employed a "matrix" organizational structure.  Its Business Units and individual businesses comprising each Business Unit were not operated through dedicated legal entities or standalone divisions.[49]  Nortel instead employed a "global integrated business model" under which "[Nortel's] main operating subsidiaries around the world operate[d] in each of Nortel's four main business segments."[50]

13.    Each Business Unit operated on a global basis and was responsible for various aspects of that business, including finance, R&D, supply chain management and marketing.[51]  Business Units also supported local organizations in sales and support functions.[52]

14.    Profit and loss statements were reported and maintained by the Business Units.[53]  The revenues and assets of each Nortel Business Unit were distributed among Nortel's various legal entities and joint ventures around the world.[54]  Each legal entity could have revenue, expense and operations relating to some or all of Nortel's Business Units.[55]  Layered

---

49.    *See* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184865.

50.    Doolittle Decl. ¶ 26, Jan. 14, 2009 [D.I.3].

51.    *See* NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184858, PC0184863–PC0184864.

52.    Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 11.

53.    *See, e.g.*, MEN P&L Results Call (As per July 17, 2007 locked down results) version 2.0 [Presentation], NNI_00283321.

54.    Report of Ernst & Young Inc. ¶ 22, Jan. 14, 2009, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

55.    Report of Ernst & Young Inc. ¶ 22, Jan. 14, 2009, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

across the Business Units were functional groups such as finance, legal, regulatory compliance and business strategy.[56]

15.    The matrix system also governed intra-company transactions.  When a customer placed a sales order with one of the regional sales offices, the Nortel entity in the country originating the sale generated a purchase order.[57]  The purchase order was then routed to one of Nortel's four transaction control centers ("TCCs") depending on the Business Unit and the geographic region involved (e.g., Enterprise Voice orders from the Americas and the Asia-Pacific region were handled by NNL's TCC; Enterprise Voice orders from EMEA countries were routed to NNUK's TCC).[58]  Upon receiving the purchase order, the TCCs based in NNL, NNI, NNUK and NNSA would contract directly with Nortel's equipment and design manufacturers to facilitate the ultimate product delivery to the customer.[59]  Upon completion of the order, the TCC paid the manufacturer and invoiced the regional Nortel company at a marked-up price.[60]

*Nortel's Geographic Sales Regions*

16.    Between 2001 and 2008, Nortel also reported revenues by geographic

---

56.    *See* Appendix E, NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184908.

57.    Doolittle Aff. ¶ 87(a), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

58.    Doolittle Aff. ¶ 87–88, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

59.    Doolittle Aff. ¶ 87(b), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

60.    Doolittle Aff. ¶ 87(c), Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

sales region in addition to revenues by Business Unit.[61]  These sales regions were:

       a.     EMEA;

       b.     Caribbean and Latin America ("CALA");

       c.     Canada;

       d.     U.S.; and

       e.     Asia Pacific ("APAC").[62]

17.     The EMEA region on the whole contributed between twenty-one and twenty-eight percent of Nortel's revenues between 2000 and 2008.  It was always Nortel's second largest market by reported revenues after the United States in the 2000 to 2008 time period.[63]

18.     Nortel used the following standard form description to describe the function of these sales regions in its Annual 10-K filings between 2003 and 2007:

> *All of our reportable segments use our direct sales force to market and sell to customers around the world.  This sales force operates on a regional basis and markets and sells Nortel products and services to customers located in Canada, the U.S., CALA, EMEA and the Asia region.  Our sales offices are aligned with customers on a country and regional basis.   For instance, we have dedicated sales account teams for certain major service provider customers located near the customers' main purchasing locations.   In addition, teams within the regional sales groups work directly with top regional enterprises, and are also responsible for managing*

---

61.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54 (2006–2008); Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006)  at 78 (2003–2005); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 34 (2000–2002).

62.   Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54 (2006–2008); Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006)  at 78 (2003–2005); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 34 (2000–2002).

63.   *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 54 (2006–2008); Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006)  at 78 (2003–2005); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 34 (2000–2002).

> *regional distribution channels.  We also have centralized*
> *marketing, product management and technical support teams*
> *dedicated to providing individual product line support to the*
> *global sales and support teams.  In some regions, we also use sales*
> *agents who assist us when we interface with our customers.  In*
> *addition, we have some non-exclusive distribution agreements with*
> *distributors in all of our regions, primarily for enterprise products.*
> *Certain service providers, system integrators, value-added*
> *resellers and stocking distributors act as our non-exclusive*
> *distribution channels under those agreements.*[64]

19.    Canada was headquartered in Brampton, Ontario; the U.S. was

headquartered in Richardson, Texas; the EMEA region was headquartered in Maidenhead, U.K.;

the CALA region was headquartered in Sunrise, Florida; and the APAC region reported with

respect to Greater China to an executive based in Beijing and for the remainder of the APAC

region to an executive based in Tokyo.[65]

*R&D at Nortel*

20.    R&D at Nortel was organized and directed, like the rest of the business, on

a global matrix basis.[66]  Budgets and priorities for the R&D facilities were determined centrally,

either by the Business Units ("product line management") or, in later years, by the Common

---

64.    Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 11; Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 11.  For 2003–2007, the language was substantively similar. Nortel Networks Corp., Annual Report (Form 10-K) (May 1, 2006) at 14; Nortel Networks Corp., Annual Report (Form 10-K) (Apr. 29, 2005) at  21; Nortel Networks Corp., Annual Report (Form 10-K) (Jan. 10, 2005) at 17.

65.    *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 10, 2003) at 17 (discussing the head offices for the regional sales forces).

66.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184925, PC0184934.

Engineering Department under the Group Chief Technology Officer.[67]

21.      Globally (as at December 31, 2007),[68] Nortel employed 10,051 people in

R&D roles, who worked out of laboratories primarily located in Canada, the United States and

EMEA.[69]  In EMEA specifically, approximately 1,106 employees were involved in R&D

activities in EMEA facilities, including laboratories in the United Kingdom, France and

Ireland.[70]

22.      Notwithstanding the integrated and globally-directed nature of R&D at

Nortel, individual employees were still typically employed by the local Nortel entity for the

jurisdiction in question.[71]  In other words, with the exception of occasional secondments,

employees performing R&D in Canada were employed by NNL, those located in the U.K. were

employed by NNUK, and so on.[72]

---

67.  *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
     Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at
     PC0184936.

68.  I have no reason to believe that the number of EMEA employees would be materially different at the Petition
     Date because NNC reported having 10,302 R&D employees in total as at December 31, 2008.  *See* Nortel
     Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 14.

69.  *See* Appendix B to the NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
     Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at
     PC0184926.

70.  Based on percentages at page 4 applied to headcount number on page 3 of Appendix B to the NNL and NNI
     Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback
     to 2006) , Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184926–PC0184927.

71.  *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
     Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at
     PC0184943.

72.  *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing
     Agreement/Arrangement 2007-2011 (with rollback to 2006) , Oct. 31, 2008, Lee Dep. Ex. 22078, at
     PC0184943.

23.    Patent applications at Nortel were centrally managed by the intellectual property ("IP") legal team.[73]  Though management of this team was a central function, there were patent agents and attorneys situated at individual R&D facilities and assigned to support other groups within the Nortel legal team.[74]  Within the twelve-month grace period for priority permitted under international conventions (e.g., the Paris Convention), those applications deemed most important would be filed in additional countries, depending on their relevance to the activities and expected activities of Nortel and its principal competitors in each country.[75]

*Nortel's Financial Performance and Entry into Bankruptcy Proceedings*

24.    The late 1990s were a period of tremendous growth and profit for networking solutions companies like Nortel.  The emergence of the Internet prompted significant growth as companies competed to build out their infrastructure for various communications technologies.[76]

25.    However, in 2001, the networking solutions market suffered rapid retrenchment as the economy went into recession and the communications industry found itself with excess capacity.[77]  Nortel suffered along with its principal competitors as it experienced a

---

73.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184943–PC0184943.

74.    *See* Appendix B to NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006), Oct. 31, 2008, Lee Dep. Ex. 22078, at PC0184943–PC0184943.

75.    *See* Nortel Networks Foreign Filing Practice, Anderson Dep. Ex. 31304, at NNC·NNL06521385/1–2.

76.    *See* Doolittle Aff. ¶ 12, Jan. 14, 2009, *In re Nortel Networks Corp.*, No. 09-CL-7950 (O.N.S.C.).

77.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 11, 2002) at 13.

significant decline in revenue, profitability, and market capitalization.[78]  In 2001 alone, Nortel reported losses of US$25.7 billion.[79]  Nonetheless, Nortel still held a material portfolio of foundational patents that had been developed in its laboratories around the world during the late 1990s.[80]

26.     In an attempt to "revive its fortunes, the Nortel Group undertook a major restructuring"[81] in the first half of the 2000s that significantly reduced the size of the Nortel group.  Various other restructurings continued throughout the decade.  By 2008, Nortel had reduced its employee numbers by two-thirds and outsourced its manufacturing.[82]  However, Nortel was still loss making, and its efforts to recover from the market downturn in 2000 were ultimately unsuccessful.  In the years leading up to it entering into an insolvency process, costs had generally exceeded revenues, which resulted in negative cash flow.[83]

27.     Following the widespread economic and financial downturn that occurred starting in the Fall of 2008, Nortel experienced significant pressure on its business and deterioration of its cash and liquidity position.[84]

---

78.   *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 2.

79.   Rider to Proof of Claim of Nortel Networks UK Ltd ¶ 6, June 3, 2011, EMEAPROD2292750 at EMEAPROD2292753.

80.   *See* Executive Summary:  Project Iceberg, May 2010, NNC-NNL06096750/3.

81.   Rider to Proof of Claim of Nortel Networks UK Ltd ¶ 7, June 3, 2011, EMEAPROD2292750 at EMEAPROD2292753.

82.   Rider to Proof of Claim of Nortel Networks UK Ltd ¶ 7, June 3, 2011, EMEAPROD2292750 at EMEAPROD2292753.

83.   NNUK Administrators' statement of proposals, February 2009, at 7, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

84.   *See* Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 1–2.

28.    Between at least July 2008 and January 2009, Nortel sought a sale of its business interests.[85]  Sales negotiations were not concluded prior to the Petition Date.[86]

29.    On January 15, 2009, Nortel was obliged to make an interest payment of US$107 million on its multibillion-dollar, long-term debt.[87]

30.    While Nortel had US$2.4 billion cash, most of this sum was held by Nortel's foreign subsidiaries and committed to joint ventures and such obligations as the pension fund for British workers.[88]  Therefore, it was not possible to repatriate the money.[89]

31.    US$841 million of Nortel's cash was available in North America, with only US$176m of it in Canada.[90]  The interest payment represented a significant portion of available resources.  In three months, another interest payment was to become payable.[91]

32.    On January 6, 2009, Nortel presented the Canadian government with a sustainability plan and requested US$1 billion to achieve a sustainable cash position with continued access to the Export Development Canada support facility up to the full amount.[92]  Without this support, Nortel viewed entering the *Companies' Creditors Arrangement Act*

---

85.    *See, e.g.*, Nortel Business Update [Presentation],  July 31, 2008, NNC-NNL06240588 at 6–10.

86.    NNUK Administrators' statement of proposals, February 2009, at 7, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

87.    James Bagnall, *Last things first: Bankruptcy protection*, Ottawa Citizen, Oct. 31, 2009.

88.    *Id.*

89.    *See id.*

90.    *Id.*

91.    *Id.*

92.    *See* Key Messages for Jan 6th Government Meeting [Presentation], NNI_00853498 at 11.

("CCAA") as a strong possibility to avoid the interest payment.[93]

33.    The request for government funding was dismissed, and on the Petition Date, NNL and NNC applied for bankruptcy protection pursuant to the CCAA.[94]  At the same time, the U.S. entities (including NNI) filed for Chapter 11 proceedings under the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the District of Delaware.[95]

34.    Also on January 14, 2009, the EMEA Debtors[96] entered administration, and five individuals[97] at EY were appointed to act as Joint Administrators.[98]  Nortel Networks Scandinavia AS ("Nortel Norway"), Nortel Networks South Africa (Proprietary) Limited ("Nortel South Africa") and Nortel Networks A.G. ("Nortel Switzerland") remained outside insolvency, albeit their holding companies were in administration.[99]

*Post-petition Asset Sales*

35.    Following the Petition Date, the Nortel group conducted eight separate

---

93.    *Id.* at 13.

94.    Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 2, 2009) at 2.

95.    *See* NNUK Administrators' statement of proposals, February 2009, at 7, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

96.    NNUK, NNSA, NNIR, Nortel Networks (Austria) GmbH, Nortel Networks N.V., Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Portugal S.A., Nortel Networks Romania SRL, Nortel Networks Hispania, S.A., Nortel Networks Slovensko, s.r.o., Nortel Networks Oy, Nortel Networks AB, Nortel France SAS, Nortel Germany, and Nortel Networks International Finance & Holding B.V.

97.    For all of the EMEA Debtors with the exception of NNIR:  Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John Wilkinson Hill.  For NNIR:  Alan Robert Bloom and David Martin Hughes.

98.    *See* NNUK Administrators' statement of proposals, February 2009, at 1, *available at* http://www.emeanortel.com/collateral/uk_soap.pdf.

99.    Joint Administrators' First Progress Report for NNUK at 14, Aug. 13, 2009, *available at* http://www.emeanortel.com/collateral/reports/adminprogrpt_uk_en.pdf.

sales (the "Business Sales") of functioning business lines, which were carved out from the four

Business Units described above (the "Business Lines").  Further details of the Business Sales are

provided in other Appendices.

36.    A ninth sale (the "Residual Patents Sale"), which generated more proceeds

than the eight Business Sales combined, consisted solely of more than 6,000 granted patents,

pending patent applications and invention disclosures thought worthy of protection by patent

application that were held back from the other eight sales (the "Residual Patents Portfolio").

37.    According to an information memorandum prepared by Nortel and its

independent advisors – Lazard Frères & Co. ("Lazard") and Global IP Law Group – and sent to

potential buyers of the portfolio between May and September 2010, the Residual Patents

Portfolio consisted of approximately 4,075 granted patents, and approximately 2,075 patent

applications.[100]  The information memorandum noted that the value in the Residual Patents

Portfolio comes from the fact that the portfolio covered a broad range of technology areas, that it

contained many foundational patents that are deemed to be essential to many different types of

products, and that around one-third of the portfolio was registered outside the United States,

giving global scope.[101]

38.    The sales presentations delivered by the Nortel Residual Patents team to

potential bidders in late 2010 detailed the fact that the Residual Patents Portfolio was composed

of patents not "predominantly used" by any one Business Line.[102]  The only material licenses

granted were said to be those granted to the Business Line buyers in their respective product line

---

100.    *See* Executive Summary:  Project Iceberg, May 2010, NNC-NNL06096750/3.

101.    *See* Executive Summary:  Project Iceberg, May 2010, NNC-NNL06096750.

102.    *See* Overview [Nortel Patents Presentation given to Iceberg buyers], NNI_ICEBERG_00196153 at 8.

or the "field of use" of the business to enable them to use Nortel IP that was required, but not predominantly used within, that Business Line.[103]

     39.     Six of the nine "Asset Sales" (the Business Sales together with the Residual Patents Sale) were conducted by auction, and all of the sales were held in accordance with section 363 of the United States Bankruptcy Code.[104]  By agreement dated January 13, 2009, the Nortel Group retained Lazard, a global investment bank, to assist in marketing the businesses.[105]  The Nortel Group also retained Global IP Law Group to advise it with respect to

---

103.  *See* Nortel's Patent Portfolio: An Overview, July 2010, GIP_Nortel_00142929 at 3; Overview [Nortel Patents Presentation given to Iceberg buyers], NNI_ICEBERG_00196153 at 8.

104.  *See* Order Authorizing and Approving (A) the Sale of Certain Patent and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections, , July 11, 2011 [D.I. 5935]; Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch (Formerly Known as 'Passport') Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts, Sept. 30, 2010 [D.I. 4054]; Order Authorizing and Approving (A) the Sale of Certain Assets of  the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts, Mar. 3, 2010 [D.I. 2632]; Order Authorizing and Approving (A) Sale of Certain Assets of the Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances and (B) Assuption and Assignment of Certain Executory Contracts, Dec. 3, 2009 [D.I. 2070]; Order Authorizing and Approving Sale of GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances, Dec. 2, 2009 [D.I. 2065]; Order Authorizing and Approving Sale of Debtors' Next Generation Packet Core Network Components Free and Clear of All Liens, Claims and Interests, Oct. 28, 2009 [D.I. 1760]; Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) The Assumption and Sublease of Certain Leases, , Sept. 16, 2009 [D.I. 1514]; Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the Assumption and Sublease of Certain Leases, July 28, 2009 [D.I. 1205]; Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts, Mar. 26, 2009 [D.I. 539]; *see also* Notice of Cancellation of Auction, Feb. 25, 2010 [D.I. 2527]; Notice of Cancellation of, Mar. 20, 2009 [D.I. 506]; Notice of Successful Bid, Oct. 26, 2009 [D.I. 1723].

105.  *See* Application for an Order Authorizing Employment and Retention of Lazard Frères & Co. LLC *Nunc Pro Tunc* to the Petition Date as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession, Feb. 13, 2009 [D.I. 294] (attaching Letter Agreement, Jan. 13, 2009, as Exhibit C); *see also* Order Under 11 U.S.C. §§ 327 and 328 Authorizing Retention and  Employment of Lazard Frères & Co. LLC as Financial Advisor and Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date, Mar. 20, 2009 [D.I. 507].

the valuation of the assets sold in the Residual Patents Sale.[106]

40.     Further, the Asset Sales were made under the Interim Funding and
Settlement Agreement (the "IFSA") which was agreed in June 2009.  The various parties
currently before the Courts[107] participated in a coordinated program of asset disposals in order to
maximize the remaining value in the business for the benefit of Nortel's creditors while
postponing the allocation of the resulting proceeds from the sales (the "Sale Proceeds") until
after the Asset Sales were completed.[108]

41.     Access to a share of the Sale Proceeds was made conditional on either an
entity selling some or all of its business as part of the Asset Sale, or where not, executing an
"Appropriate License Termination."[109]  The allocation to which each seller would be entitled was
left to a future resolution.

---

106.   Application for an Order Authorizing Employment and Retention of Global IP Law Group LLC *Nunc Pro Tunc* to October 13, 2009 as Intellectual Property Consultant to the Debtors and Debtors in Possession, Oct. 30, 2009 [D.I. 1796] (attaching Master Consulting Agreement, Oct.15, 2009, as Exhibit D); Order Under 11 U.S.C. §§ 327 and 328 Authorizing Employment and Retention of Global IP Law Group, LLC, *Nunc Pro Tunc* to October 13, 2009 as Intellectual Property Consultant to the Debtors and Debtors in Possession, Nov. 11, 2009 [D.I. 1928].

107.   The U.S. Bankruptcy Court for the District of Delaware (Gross, J.) and the Ontario Superior Court of Justice (Commercial List) (Morawetz, J.), collectively.

108.   *See* IFSA § 11, June 9, 2009 [D.I. 874 Ex. B].

109.   IFSA § 11, June 9, 2009 [D.I. 874 Ex. B].

# APPENDIX 5

## Settlements Affecting Allocation

*APAC and CALA Settlement*

      1.      On June 19, 2012, the U.S. Debtors,[1] Canadian Debtors,[2] EMEA Debtors,[3]

EMEA Liquidation Debtors,[4] APAC Entities,[5] CALA Entities[6] and EMEA NFEs[7] reached an

agreement to allocate US$44.9 million from the proceeds of the sale of eight of Nortel's

operating global business lines and the separate sale of residual patent assets that were not

integrated with any of the lines of business (the "Sale Proceeds") to the CALA Entities and

---

1.    Nortel Networks Inc. ("NNI"); Architel Systems (U.S.) Corporation; CoreTek, Inc.; Nortel Altsystems, Inc.; Nortel Altsystems International Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Cable Solutions Inc.; Nortel Networks Capital Corporation; Nortel Networks (CALA) Inc.; Nortel Networks HPOCS Inc.; Nortel Networks International Inc.; Nortel Networks Optical Components Inc.; Northern Telecom International Inc.; Qtera Corporation; Sonoma Systems; and Xros, Inc.

2.    Nortel Networks Corporation ("NNC"); Nortel Networks Limited ("NNL"); Nortel Networks Global Corporation; Nortel Networks International Corporation; and Nortel Networks Technology Corporation.

3.    Nortel Networks UK Limited ("NNUK"); Nortel Networks (Ireland) Limited; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Services Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, sro; Nortel Networks Romania Srl; Nortel GmbH; Nortel Networks Oy; Nortel Networks AB; Nortel Networks International Finance & Holding BV ("NNIF"); and Nortel Networks France S.A.S.

4.    Nortel Networks (Northern Ireland) Limited; and Nortel Networks Optical Components Limited.

5.    Nortel Networks (Asia) Limited; Nortel Networks Australia Pty. Limited; Nortel Networks (India) Private Limited; PT Nortel Networks Indonesia; Nortel Networks Japan; Nortel Networks Korea Limited; Nortel Networks Malaysia Sdn. Bhd.; Nortel Networks New Zealand Limited; Nortel Networks Singapore Pte. Ltd.; Nortel Networks (Thailand) Limited; Nortel Vietnam Limited; Nortel Networks (China) Limited; Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd.; and Nortel Technology Excellence Centre Private Limited.

6.    Nortel Networks de Argentina S.A.; Nortel Networks Chile S.A.; Nortel Networks del Ecuador S.A.; Nortel Networks de Guatemala Ltda.; Nortel Networks de Mexico, S.A. de C.V.; Nortel Networks Peru S.A.C.; Nortel Networks del Uruguay S.A.; Nortel de Mexico, S. de R.L. de C.V.; and Nortel Trinidad and Tobago Limited.

7.    Nortel Norway, Nortel Switzerland and Nortel South Africa.

APAC Entities (collectively, the "Non-Filed Entities"), settle and resolve various amounts and balances in respect of outstanding amounts owing among the Non-Filed Entities and between the Non-Filed Entities and other Nortel entities, and release any entitlement the Non-Filed Entities had to any future allocation of the Sale Proceeds.[8]  This settlement was approved by orders of Judge Gross and Justice Morawetz on July 11, 2012.[9]

2. The agreed upon settlement shares of the Sale Proceeds allocated to each of the Non-Filed Entities were based upon, among other things, an independent valuation of the assets sold by the Non-Filed Entities in each of the sales, obtained by the directors and officers of the Non-Filed Entities.[10]  The allocations were as follows[11]:

| Entities | | Carrier Voice-Over IP and Application Solutions | Enterprise Solutions | CDMA/LTE Access | GSM/GSM-R | GSM Retained Contracts | Metro Ethernet Networks | Multi-Service Switch | Total Fair Market Value (rounded) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | ESCROW ACCOUNTS Fair Market Value | | | | | |
| **CALA** | | | | | | | | | |
| 3*00 | Nortel de Argentina S.A. | NA | - | NA | NA | - | 2,600,000 | NA | 2,600,000 |
| 3*30 | Nortel Chile S.A. | NA | 50,000 | NA | NA | NA | NA | NA | 50,000 |
| 3*50 | Nortel del Ecuador S.A. | NA | NA | NA | NA | NA | 50,000 | NA | 50,000 |
| 3*60 | Nortel de Guatemala Ltda. | - | NA | NA | NA | 400,000 | 200,000 | NA | 600,000 |
| 3*70 | Nortel Networks de Mexico S.A. | 300,000 | 600,000 | 200,000 | NA | - | 700,000 | - | 1,800,000 |
| 3200 | Nortel Peru S.A.C. | - | NA | NA | NA | NA | 200,000 | - | 200,000 |
| 3210 | Nortel del Uruguay S.A. | NA | NA | NA | NA | 100,000 | NA | NA | 100,000 |
| **CALA Total** | | 300,000 | 650,000 | 200,000 | 0 | 500,000 | 3,750,000 | 0 | 5,400,000 |
| | | | | | | | | | |
| **APAC** | | | | | | | | | |
| 6*00 | Nortel Networks Australia Pty | 2,700,000 | 5,000,000 | NA | NA | NA | 4,000,000 | 400,000 | 12,100,000 |
| 6*20 | Nortel Indonesia | - | NA | NA | NA | NA | 50,000 | - | 50,000 |
| 6*30 | Nortel Japan | 1,200,000 | 1,100,000 | NA | NA | NA | 2,400,000 | - | 4,700,000 |
| 6*60 | Nortel Malaysia Sdn. Bhd. | 200,000 | NA | NA | NA | NA | - | NA | 200,000 |
| 6*80 | Nortel New Zealand Ltd | 200,000 | 300,000 | NA | NA | NA | 400,000 | - | 900,000 |
| 6*90 | Nortel Asia - Pakistan Br | NA | - | NA | NA | NA | - | NA | 0 |
| 6200 | Nortel Philippines Branch | 100,000 | NA | NA | NA | NA | - | NA | 100,000 |
| 6210 | Nortel Networks Singapore Pte | 200,000 | 4,100,000 | NA | NA | NA | 1,000,000 | 50,000 | 5,350,000 |
| 6220 | Nortel (Thailand) Ltd. | - | NA | NA | NA | NA | - | NA | 0 |
| 7*00 | Nortel Networks (Asia) Limited | 350,000 | 1,750,000 | NA | 600,000 | NA | 3,400,000 | 300,000 | 6,400,000 |
| 7*10 | Nortel Asia - Taiwan Branch | 200,000 | 100,000 | 400,000 | 2,900,000 | NA | 100,000 | 100,000 | 3,800,000 |
| 7*12 | Nortel (Asia) Ltd- Offshore | 200,000 | 400,000 | NA | 4,800,000 | NA | - | NA | 5,400,000 |
| **APAC Total** | | 5,350,000 | 12,750,000 | 400,000 | 8,300,000 | 0 | 11,350,000 | 850,000 | 39,000,000 |
| | | | | | | | | | |
| **Total for all entities (rounded)** | | 5,650,000 | 13,400,000 | 600,000 | 8,300,000 | 500,000 | 15,100,000 | 850,000 | 44,400,000 |
| | | | | | | | | | |
| **Local sales agreement adjustment** | | | | | | 0 | | | |
| 6*11 | Nortel (India) Pvt. Ltd. | (50,000) | 800,000 | NA | NA | NA | (250,000) | NA | 500,000 |
| **Total Adjustment** | | (50,000) | 800,000 | 0 | 0 | 0 | (250,000) | 0 | 500,000 |
| | | | | | | | | | |
| **Fair Market Value including adjustments** | | 5,600,000 | 14,200,000 | 600,000 | 8,300,000 | 500,000 | 14,850,000 | 850,000 | 44,900,000 |

---

8.    Allocation Settlement Agreement, June 19, 2012, NNC-NNL06002114/1–2, 4, 10–12.

9.    Order (I) Authorizing and Approving the Non-Filed Entity Settlement Agreement; (II) Authorizing and Approving the Debtors to Take Certain Actions in Connection Therewith; and (III) Granting Related Relief, July 11, 2012 [D.I. 7985]; Order (Fourth Estate Settlement Agreement), *In re Nortel Networks Corp.* (July 11, 2012), No. 09-CL-7950 (O.N.S.C.).

10.   Eighty-Sixth Report of the Monitor ¶ 18, June 27, 2012 [D.I. 7950].

11.   Allocation Settlement Agreement, app. A, June 19, 2012, NNC-NNL06002115/1; *see also* Allocation Settlement Agreement, app. B, June 19, 2012, NNC-NNL06002115/2.

3.	The Escrow Parties (as defined by the various Escrow Agreements executed in connection with the sales) authorized and directed JPMorgan Chase Bank, N.A. to establish a non-interest bearing intermediate distribution account, withdraw the settlement amount from the various escrow accounts in accordance with the chart above, deposit said amount into the intermediate account and disburse the settlement shares to the relevant parties.[12]

4.	In addition to allocating portions of the Sale Proceeds to the Non-Filed Entities, the settlement agreement also settled and resolved the amounts of certain pre-filing and post-filing intercompany payables and receivables due and owing among the parties.  The amounts set forth in the agreement superseded and amended any proofs of claim, allegations or assertions that had been or could have been filed on behalf of the Non-Filed Entities against the U.S. Debtors, Canadian Debtors and EMEA Debtors.[13]  Those amounts were deemed allowed, approved or admitted and would be the only amounts owed by the U.S. Debtors, Canadian Debtors and EMEA Debtors to the Non-Filed Entities with respect to such claims.[14]  The parties agreed that none would object to or appeal any such claims.[15]  Claims that had been or could have been filed against Nortel Networks S.A. ("NNSA") in the French secondary insolvency proceedings, however, were not affected by the agreement.[16]  The settlement constituted a full and final release of all claims by and between the Non-Filed Entities and the other parties except for the amounts described above, obligations arising under the settlement agreement (termed

---

12.	Allocation Settlement Agreement § 1.2(a), June 19, 2012, NNC-NNL06002114/4.

13.	Allocation Settlement Agreement § 2.1, June 19, 2012, NNC-NNL06002114/5–6.

14.	Allocation Settlement Agreement § 2.1, June 19, 2012, NNC-NNL06002114/6.

15.	Allocation Settlement Agreement § 2.1, June 19, 2012, NNC-NNL06002114/7.

16.	Allocation Settlement Agreement § 2.1, June 19, 2012, NNC-NNL06002114/5–6.

"Surviving Obligations"), obligations arising under the APAC Restructuring Agreement, and subject to the U.S. Estate Carve-Out (as described in the settlement agreement).[17]

5.     The Non-Filed Entities released all other parties from any and all claims (except for the Surviving Obligations), including claims in respect of the Sale Proceeds and any future divestitures of assets, and the Non-Filed Entities agreed not to participate in any proceeding to resolve the allocation of the Sale Proceeds.[18]  The other parties similarly agreed to release the Non-Filed Entities from any and all claims (other than the Surviving Obligations) up to the date of the agreement, including claims in respect of the Sale Proceeds.[19]  The agreement did not constitute a waiver of the other Nortel parties' rights to pursue any and all claims against each other, including claims in which the Non-Filed Entities may be or have been jointly, severally or concurrently liable.[20]

6.     The Non-Filed Entities further agreed to enter into any license termination agreement with respect to the licenses and rights granted by other Nortel parties for no further consideration, provided that in exchange the Non-Filed Entities received a sublicense from the relevant Nortel party that provided reasonably equivalent rights to the terminated licenses and

---

17.   Allocation Settlement Agreement § 2.2, June 19, 2012, NNC-NNL06002114/7.  The settlement agreement also amended certain provisions of the APAC Restructuring Agreement.  Allocation Settlement Agreement §§ 3.1-3.5, NNC-NNL06002114/7-10.

18.   Allocation Settlement Agreement § 4.1(a), June 19, 2012, NNC-NNL06002114/10–11.  However, a carve-out was created for the NFE U.S. Subsidiaries, as explained in the agreement.  Allocation Settlement Agreement § 4.1(a), NNC-NNL06002114/11.

19.   Allocation Settlement Agreement § 4.1(b), June 19, 2012, NNC-NNL06002114/11–12.  However, a carve-out was created for the U.S. Debtors, as explained in the agreement.  Allocation Settlement Agreement § 4.1(b), NNC-NNL06002114/11.

20.   Allocation Settlement Agreement § 4.1(c), June 19, 2012, NNC-NNL06002114/12.  Additionally, the agreement did not impact the rights of the parties to assert claims against any Non-Filed Entities in which they held shares, stock or other equity interests to the extent the claims arose from that interest.  Allocation Settlement Agreement § 4.1(b), June 19, 2012, NNC-NNL06002114/11–12.

rights.[21]

7.      The agreement specifically provided that "no Party shall use as evidence, or otherwise rely upon, this Agreement or any part hereof . . . in any way to support its right to a particular allocation of the Sale Proceeds or any other sale proceeds."[22]

*Nortel Russia Settlement*

8.      o.o.o. Nortel Networks ("Nortel Russia") participated in Nortel's sales of its Enterprise Solutions ("Enterprise"), Carrier Voice over Internet Protocol and Application Solutions ("CVAS"), Metro Ethernet Networks ("MEN") and Global System for Mobile communications ("GSM")/Global System for Mobile Communications for Railways ("GSM-R") lines of business, and in or around August 2011, it transferred all of its present and future rights, title and interest, if any, to a share in the Sale Proceeds to NNIF.[23]  In exchange, NNIF paid approximately $6 million[24] into the MEN escrow account and approximately $1.4 million[25] into the CVAS escrow account, which amounts were then distributed to Nortel Russia by JPMorgan

---

21.  Allocation Settlement Agreement § 4.2, June 19, 2012, NNC-NNL06002114/12.

22.  Allocation Settlement Agreement § 8.1(a), June 19, 2012, NNC-NNL06002114/15.

23.  Side Letter Concerning the CVAS Distribution Escrow Agreement ¶ 5, Aug. 2011 [D.I. 6047 Ex. E]; Side Letter Concerning the MEN Distribution Escrow Agreement ¶ 5, Aug. 2011 [D.I. 6047 Ex. B]; Side Letter Concerning the GSM/GSM-R Distribution Escrow Agreement ¶ 4, Aug. 2011 [D.I. 6047 Ex. D]; Side Letter Concerning the [Enterprise] Escrow Agreement ¶ 4, Aug. 2011 [D.I. 6047 Ex. C].

24.  The equivalent amount in U.S. Dollars of RUR 207,060.49 (converted on the basis of the exchange rate published in the Wall Street Journal on the day of the payment) plus US$6,022,659.88.  Side Letter Concerning the MEN Distribution Escrow Agreement ¶ 3, Aug. 2011 [D.I. 6047 Ex. B]; *see also* Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements ¶ 12, July 28, 2011 [D.I. 6047].

25.  The equivalent amount in U.S. Dollars of RUR 434,317.94 (converted on the basis of the exchange rate published in the Russian Central Bank on the day of the payment) plus US$1,404,740.  Side Letter Concerning the CVAS Distribution Escrow Agreement ¶ 3, Aug. 2011 [D.I. 6047 Ex. E]; *see also* Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements ¶ 12, July 28, 2011 [D.I. 6047].

Chase Bank, N.A.[26]  This settlement, transacted in four side letter agreements, was approved by orders of Judge Gross and Justice Morawetz on August 23 and 26, 2011, respectively.[27]

9.      The settlement amounts were based on the value-added tax estimates put forward by the purchasers of the CVAS and MEN assets at the time of those transactions.[28]

10.      At the time of the settlement, Nortel Russia had already received consideration directly from the respective purchasers of the Enterprise and GSM/GSM-R assets, and therefore NNIF did not pay into those escrow accounts.[29]  Pursuant to the agreements, however, NNIF assumed Nortel Russia's rights to argue for an allocation from the Sale Proceeds of the Enterprise and GSM/GSM-R sales.[30]

11.      The agreements provide that upon the final allocation of the Sale Proceeds in accordance with the IFSA, the total amount of the proceeds to be distributed to Nortel Russia, if any, shall be allocated and distributed to NNIF.[31]

---

26.    Side Letter Concerning the CVAS Distribution Escrow Agreement ¶¶ 3-4, Aug. 2011 [D.I. 6047 Ex. E]; Side Letter Concerning the MEN Distribution Escrow Agreement ¶¶ 3-4, Aug. 2011 [D.I. 6047 Ex. B].

27.    Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreement Regarding Nortel Russia and Approving Certain Amendments to the Escrow Agreements, Aug. 23, 2011 [D.I. 6193]; Order (Re: Certain Inter-Estate Matters), *In re Nortel Networks Corp.* (Aug. 26, 2011), No. 09-CL-7950 (O.N.S.C.).

28.    Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 Approving Agreements Regarding Nortel Russia and Approving Amendment of Certain Escrow Agreements ¶ 12, July 28, 2011 [D.I. 6047].

29.    Side Letter Concerning the GSM/GSM-R Distribution Escrow Agreement ¶ 1, Aug. 2011 [D.I. 6047 Ex. D] (describing how Nortel Russia received US$1,949.63 in payment for the sale of certain equipment as part of the GSM business of Nortel Russia); Side Letter Concerning the [Enterprise] Escrow Agreement ¶ 1, Aug. 2011 [D.I. 6047 Ex. C] (describing how Nortel Russia received RUR 12,439,738.35 in payment for the sale of equipment and inventory related to the Enterprise business of Nortel Russia and its affiliates).

30.    Side Letter Concerning the GSM/GSM-R Distribution Escrow Agreement ¶ 4, Aug. 2011 [D.I. 6047 Ex. D]; Side Letter Concerning the [Enterprise] Escrow Agreement ¶ 4, Aug. 2011 [D.I. 6047 Ex. C].

31.    Side Letter Concerning the CVAS Distribution Escrow Agreement ¶ 9, Aug. 2011 [D.I. 6047 Ex. E]; Side Letter Concerning the MEN Distribution Escrow Agreement ¶ 9, Aug. 2011 [D.I. 6047 Ex. B]; Side Letter

(Footnote continued on next page)

12.     The agreements also specifically provide that "no Party shall use as evidence, or otherwise rely upon, this Side Letter . . . in any way to support its right to a particular allocation of the Sale Proceeds."[32]

*Nortel Israel Settlement*

13.     Nortel Networks Israel (Sales and Marketing) Ltd. and Nortel Communications Holdings (1997) Ltd. (collectively, "Nortel Israel") participated in the Nortel's sales of its Enterprise, CVAS, MEN and Multi-Service Switch ("MSS") lines of business,[33] and on April 13, 2011, Nortel Israel transferred its rights to an allocation of a portion of the proceeds of those sales to NNI and NNUK in exchange for $2 million ($813,819 from NNI and $1,186,181 from NNUK).[34]  This settlement was approved by order of Judge Gross on June 6, 2011 and by order of Justice Morawetz on June 7, 2011.[35]

14.     The $2 million amount represented a reasonable estimate of the Sale Proceeds that could have been allocated to Nortel Israel based on the assets transferred by Nortel

---

(Footnote continued from prior page)
Concerning the GSM/GSM-R Distribution Escrow Agreement ¶ 8, Aug. 2011 [D.I. 6047 Ex. D]; Side Letter Concerning the [Enterprise] Escrow Agreement ¶ 8, Aug. 2011 [D.I. 6047 Ex. C].

32.     Side Letter Concerning the CVAS Distribution Escrow Agreement ¶ 10, Aug. 2011 [D.I. 6047 Ex. E]; Side Letter Concerning the MEN Distribution Escrow Agreement ¶ 10, Aug. 2011 [D.I. 6047 Ex. B]; Side Letter Concerning the GSM/GSM-R Distribution Escrow Agreement ¶ 9, Aug. 2011 [D.I. 6047 Ex. D]; Side Letter Concerning the [Enterprise] Escrow Agreement ¶ 9, Aug. 2011 [D.I. 6047 Ex. C].

33.     *See* Appendix 15 (Enterprise Business Sale); Appendix 14 (CVAS Business Sale); Appendix 17 (MEN Business Sale); Appendix 18 (MSS Business Sale); *see also* Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements ¶ 12, May 17, 2011 [D.I. 5424].

34.     Letter of Agreement ¶ 4, Apr. 13, 2011 [D.I. 5424 Ex. B].

35.     Order Approving Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements, June 6, 2011 [D.I. 5603]; Order (Re: Israel Settlement), *In re Nortel Networks Corp.* (June 7, 2011), No. 09-CL-7950 (O.N.S.C.).

8

Israel to the various purchasers.[36]

15.     NNI and NNUK agreed that the assignment of Nortel Israel's allocation rights constituted a full and final payment of Nortel Israel's obligations to NNI and NNUK pursuant to the scheme of arrangement of Nortel Israel's creditors approved by the Tel-Aviv District Court on November 24, 2009.[37]  NNI and NNUK therefore agreed to waive any right to payment from Nortel Israel in relation to their claims pursuant to the scheme of arrangement.[38]

16.     Pursuant to the settlement agreement, Nortel Israel's allocation rights are jointly held by NNI and NNUK.[39]  NNI and NNUK are each entitled to a ratable share of the Sale Proceeds allocated to Nortel Israel proportional to each entity's contribution to the $2 million payment, until NNI has been paid an amount equal to the sum of its share of the $2 million payment and its outstanding claim against Nortel Israel pursuant to the scheme of arrangement, after which all amounts shall be paid solely to NNUK as the sole shareholder of Nortel Israel.[40]

17.     The Canadian Debtors executed a side letter to the Nortel Israel settlement agreement stating that they will have no rights in or entitlements to the Nortel Israel allocation rights or against NNI or NNUK with respect to their rights to Nortel Israel's

---

36.   Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements ¶ 15, May 17, 2011 [D.I. 5424].

37.   Letter of Agreement ¶ 1, Apr. 13, 2011 [D.I. 5424 Ex. B].

38.   Letter of Agreement ¶ 1, Apr. 13, 2011 [D.I. 5424 Ex. B].

39.   Letter of Agreement ¶ 4, Apr. 13, 2011 [D.I. 5424 Ex. B].

40.   Letter of Agreement ¶ 5, Apr. 13, 2011 [D.I. 5424 Ex. B].

allocation.[41]

18.     In its motion seeking court approval of the Nortel Israel settlement agreement, the U.S. Debtors asserted that the settlement agreement "shall have no precedential effect on the negotiations among the parties to the MEN, Radware, CVAS, MSS or Enterprise escrow agreements, and shall not support any party's argument for an entitlement to allocation from the escrowed funds."[42]

---

41.    Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements ¶ 14 n.6, May 17, 2011 [D.I. 5424].

42.    Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 Approving Agreement with Nortel UK and Nortel Israel and Approving Amendment of Certain Escrow Agreements ¶ 18 n.8, May 17, 2011 [D.I. 5424].

# APPENDIX 6

## Nortel's Transfer Pricing System

The following description of Nortel's transfer pricing system is excerpted from the Transfer Pricing Expert Report of Richard V. L. Cooper, Charles River Associates, dated January 24, 2013 (the "Cooper Expert Report"). Mr. Cooper was retained by the court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators") for Nortel Networks UK Limited ("NNUK") and certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors") located in the region known as EMEA (Europe, Middle East and Africa), through their counsel, Herbert Smith Freehills LLP, Hughes Hubbard & Reed LLP, Davies Ward Phillips & Vineberg LLP and Lax O'Sullivan Scott Lisus LLP, in connection with the bankruptcy proceedings under the *Canadian Companies' Creditors Arrangement Act* for Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (collectively, and including NNC and NNL, the "Canadian Debtors"), pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Proceeding").

Excerpt of Cooper Expert Report, pp. 35–55:

# 4    Nortel's Transfer Pricing Policies

## 4.1    CSA Period

Prior to 2001, Nortel's transfer pricing methodology was based on several cost sharing agreements ("CSAs") for pricing intercompany transactions. These included an R&D CSA, a tangible inventory property sales CSA and a headquarter costs CSA. [1],[2],[3] Nortel entered Advanced Pricing Agreements ("APAs") with CRA and the IRS with respect to these CSAs.[4]

---

[1]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297).

### 4.1.1 Nortel's R&D Cost Sharing Agreements effective date January 1, 1995

Northern Telecom Limited, the predecessor of Nortel Networks Limited, and Nortel Limited UK were party to the R&D Cost Sharing Agreement ("R&D CSA") effective as of January 1, 1995 which aimed to allocate costs related to the R&D of technology to Nortel's entities. The R&D CSA served as an alternative to charging royalty and licensing fees to certain Nortel entities that used intangibles, such as R&D, which was owned or developed by other entities. Nortel entities could now legally share in the ownership and costs of Nortel's intangibles.[5]

By sharing the costs of the intangibles, each party to the agreement obtained rights to the R&D by funding a portion of its expense in proportion to the benefit it received. Additional benefits achieved by entering the R&D CSA, among others, included:[6]

- Reduced legal complexity;
- Reduced administrative burden;
- Enhanced knowledge-sharing between participants;
- Avoided duplication of R&D expenses, thereby potentially reducing costs; and
- Used an accepted method recognized by the OECD.

At the request of the CRA and the IRS requirements, the R&D CSA was incorporated within an APA issued by the tax authorities. In 1996, after mutual agreement, the CRA and IRS issued formal APAs to Nortel for the 1992 to 1999 tax years.[7]

### 4.1.1.1 Terms of R&D Cost Sharing

Participants of the R&D CSA shared in the costs of the intangibles in two parts which are outlined in detail below. Part one allocated a portion of total R&D expenses to royalty income

---

(Footnote continued from prior page)

[2] Nortel established several other cost sharing agreements, mostly relating to specific product groups in its EMEA operations such as switching, transmission/optical, enterprise data, enterprise voice, and wireless. Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315308).

[3] Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297).

[4] Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297).

[5] Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315297 - 298).See also, MOU, NNI_00245811 – NNI-_00245817 at NNI_00245811).

[6] Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315298 - 299).

[7] The U.K. tax authorities were not involved in the APA. NNUK signed the R&D CSA on January 1, 1995 (Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315299 - 300)).).

earned by the participants which consequently was split amongst CSA participants. Part two allocated the remaining R&D expenses to CSA participants through different methods.[8]

Part one attributed the total R&D expenses to royalty income for each calendar year. The total royalty income of all participants in the CSA was divided by the sum of the total operating income and royalty income, net of R&D, of all participants to arrive at a percentage that was then multiplied by the total R&D expenses of all participants. The result was the amount of R&D expenses that would be attributed to total royalty income of all participants. This amount was then allocated to each participant in proportion to their share of royalty income over total royalty income. The part one allocation process can be expressed in formulas as shown below:[9]

$$(R / (OI + R)) \times R\&D = P$$

$$(A / R) \times P = S$$

| | |
|---|---|
| R = | Total royalty income of all participants for the calendar year |
| OI = | Total operating income of all participants for the calendar year |
| R&D = | Total R&D expenses for the calendar year |
| P = | R&D Expenses allocated to royalty income, thus (R&D - P) is the residual R&D expense covered by part two |
| A = | Participant's royalty income for the calendar year |
| S = | R&D expenses allocated to participant based on participant's royalty income |

The residual R&D expense not covered by part one, was then allocated to the participants by part two. Part two allocated 10% of the residual R&D expense to CSA participants based on the participant's share of net customer sales versus total net customer sales across all participants in the calendar year. The remaining 90% of the residual R&D expense was allocated based on the participant's share in modified operating income versus total modified operating income, defined below. The part two allocation process can be expressed in formulas provided below:[10]

---

[8]   R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794548 – 550).

[9]   R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794548).

[10]   R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794548 - 550).

| | |
|---|---|
| $(CS / TCS) \times 10\% \times Residual = B$ | |
| $(MOI / TMO) \times 90\% \times Residual = C$ | |
| $OI - ((COGS - IP) \times M) = MOI$ | |
| CS = | Participant's net customer sales for the calendar year |
| TCS = | Total net customer sales for the calendar year |
| Residual = | Total residual R&D expense for the calendar year *not* allocated in part one |
| B = | R&D expenses allocated to participant based on participant's net customer sales |
| MOI = | Participant's modified operating income, as calculated by formula above, for the calendar year |
| TMO = | Total modified operating income for the calendar year |
| C = | R&D expenses allocated to participant based on participant's modified operating income |
| OI = | Participant's operating income for the calendar year |
| COGS = | Participant's cost of goods sold related to net customer sales for the calendar year |
| IP = | Participant's intercompany purchases for the calendar year |
| M = | Participant's intercompany purchases divided by intercompany cost of goods sold for the calendar year |

The R&D CSA also provided CSA participants with a legal title to all intangible assets produced as a result of the R&D expenses during the calendar year. CSA participants were also granted an "exclusive royalty-free license, including the right to sublicense" in return for the participant's sharing of the R&D costs.[11]

### 4.1.2    Tangible Property Pricing Agreement

Since Nortel's inception, the Company manufactured telecommunications equipment. The manufacturing operations grew over time with 38 manufacturing facilities located throughout the world by 1995. These manufacturing facilities often transferred tangible goods to Nortel's LREs, which sold the goods to third parties.[12]   To determine arms-length returns for manufacturing functions, Nortel engaged Horst Frisch, Clowery & Finan to serve as economic advisor on transfer pricing.[13]

Under the Nortel arrangement, manufacturing entities earned an 8% return on full manufacturing costs when they made an intercompany sale.[14] In addition, distribution entities earned a 3% return on third party sales, plus foreign exchange.[15] Mutual agreement was reached with respect

---

[11]    R&D CSA (NNI_00794545 – NNI00794556 at NNI_00794551).

[12]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315305).

[13]    Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315305).

[14]    Exhibit 11067 at p. 9.  See also, Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315305).

[15]    Exhibit 11067 at p. 9.

to the tangible property arrangement between Nortel and the IRS and CRA in July 2003 (covering the 1995 to 1999 tax years).

### 4.1.3    Headquarter Cost Sharing Agreement effective date of January 1, 1996 [16]

Similar to the R&D CSA, the Headquarter CSA between NNL (its direct and indirect subsidiaries) and NNI was established to ensure that headquarter expenses incurred to benefit certain entities were allocated appropriately to the benefiting entity.[17]

In 1998, an APA for such transactions, for the 1996 to 2000 tax years, was executed by Nortel with the IRS and CRA tax authorities, though Nortel continued to implement it through 2001, after which it was terminated.[18] This served as a "formali[z]ation of Nortel's global transfer pricing policy with respect to head office expenses."[19] Incorporating the OECD guidelines, the APA allocated headquarter expenses to Nortel entities throughout the world[20] based on the following methodology:[21]

1.    Determine the cost pool;
2.    Allocate from the cost pool the direct costs to the benefitting entities;
3.    Deduct 20% of the remaining headquarter expenses which are to be treated as stewardship costs; and
4.    Allocate 30% of the remainder based on headcount and 70% of the remainder based on third-party customer sales to Nortel entities worldwide.[22]

### 4.1.4    Termination of the R&D CSA and Nortel's transition to RPSM

The R&D CSA was later terminated by all parties as of January 1, 2001. However, the fully vested and paid rights of each participant remained with the participant even after the

---

[16]    NNI_00215276 to NNI_00215291.

[17]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[18]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[19]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[20]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[21]    Exhibit 11067 at p. 9. See also, Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726).

[22]    Exhibit 21080 (NNC-NNL002707 to NNC-NNL002826 at NNC-NNL002726 to 27).  For example, US$385 million of costs were included in the headquarters cost pool in 1998, of which $30.3 million was allocated to NNUK. As a result, NNUK was charged $14 million in excess of the headquarters costs it had incurred itself.  The costs charged to NNUK included specific headquarters expenses such as global advertising costs, website management and content costs, legal support costs, treasury support costs, among others. NNUK benefitted from all these costs in a variety of ways. For example, the website management and content costs provided NNUK with worldwide sources of information and a means of communication in a global environment (Exhibit 32117 (NNI_00315272 – NNI_00315311 at 00315307)).

termination.[23] Although the original R&D CSA was effective only through 1999, Nortel applied it in practice until December 31, 2000.[24]

Due to the following issues and complexities, among others, the IRS and CRA tax authorities did not want the original R&D CSA to apply after the 1999 tax year:[25]

- Participants were not making "buy-in payments" for utilizing technology of acquired companies, which are generally required under applicable regulations but were not addressed in the CSA;
- Allocation of R&D expenses during loss years was not addressed; and
- Administrative complexity.[26]

As a result, Nortel submitted a new APA request to the taxing authorities to establish Nortel's RPSM. This RPSM was intended to be effective for an indefinite period beginning January 2001.[27]  The participants that held the rights to the R&D intangibles under the R&D CSA received compensation for those rights through Nortel's RPSM.[28]

## 4.2    Execution of the Master R&D Agreement and other transfer pricing-related agreements

In transfer pricing analyses, while a transfer pricing agreement may be one point of reference, it is not determinative of whether the mechanism employed is arm's length.  What controls are the economic principles of transfer pricing, specifically, whether two parties operating at "arm's length" would have agreed to the arrangement between the related parties.  Consistent with that, although the Original MRDA and subsequent amendments may be one point of reference in assessing Nortel's RPSM, they are not controlling of whether or not Nortel's RPSM was arm's length.  It should be noted, though, that Nortel's transfer pricing agreements outlined below do in fact acknowledge that the RPSM was intended to be arm's length.

While Nortel implemented its RPSM on January 1, 2001,[29] Nortel's RPSM was not documented until December 22, 2004, in the form of the Master R&D Agreement which generally outlined Nortel's existing RPSM.  During the Review Period, certain Nortel entities entered into the

---

[23]    MOU, NNI_00245811 – NNI_00245817.

[24]    NNC-NNL000073 – NNC-NNL000091 at NNC-NNL000077.

[25]    Exhibit 11067 at p. 10.

[26]    Exhibit 11067 at p. 10.

[27]    MOU, NNI_00245811 – NNI_00245817 at NNI_00245812. . See also, NNC-NNL000073 – NNC-NNL000091 at NNC-NNL000077.

[28]    NNC-NNL000073 – NNC-NNL000091 at NNC-NNL000077.

[29]    Nortel's RPSM during the Review Period is detailed later in this section of my report.

Original MRDA (as defined below) and its various addenda, as well as various Distribution Agreements (collectively referred to as "Nortel's Transfer Pricing Agreements"):[30]

1.  The Master R&D Agreement, dated December 22, 2004 ("Original MRDA"), effective as of January 1, 2001[31]

    Parties to the MRDA were NNL, NNI, NNUK, NN France, NN Australia and NN Ireland. Schedule A of the Original MRDA detailed Nortel's RPSM and Schedule B outlined the designated territory for each licensed participant (i.e., RPSM participants). A more detailed outline of the Original MRDA is included later in this section of my report.

2.  Addendum to Master R&D Agreement effective January 1, 2001[32]

    This addendum (i) made minor corrections to Original MRDA and (ii) updated Article 5 of the Original MRDA related to the grant of exclusive licenses.

3.  Agreement with respect to certain NN Technology, effective as of December 30, 2006[33]

    This agreement was related to the sale of Nortel's UMTS business to Alcatel.

4.  Addendum to Master R&D Agreement, dated December 14, 2007, effective as of January 1, 2006[34]

---

[30]  Nortel's Transfer Pricing Agreements indicate a variety of dates, including when an agreement was entered into, signed or made effective.  In some instances these agreements state all these dates however, there are instances when only one or combination of these dates are included an agreement.   The appropriate date (entered into, signed or effective or a combination of these) is included in this review.

[31]  Original MRDA, Exhibit 21003 (NNC-NNL06001514/1 – NNC-NNL06001514/20). The Original MRDA was signed by NNL and undated (at NNC-NNL06001514/14), by NNI and appears to be signed around January 14, 2005 (Exhibit 11070, NNI_01494046 – NNI_01494064 at NNI_0149406), by NNUK and undated (at NNC-NNL06001514/16) and by NNIR and undated (at NNC-NNL06001514/17).  NNSA signed sometime between June 2, 2005 and October 25, 2005 (Exhibit 31098, NNI_01532977 – NNI_01532992 at NNI_01532991). NN Australia did not sign the Original MRDA  (US_Canada_PRIV_00355402).

[32]  Exhibit 21003 (NNC-NNL06001514/21 – NNC-NNL06001514/26). This addendum (the "First Addendum") was undated.  It was signed by NNL on November 11, 2005, by NNI on October 18, 2005, by NNUK on June 12, 2006, by NNSA on June 21, 2006, by NNIR on February 1, 2006 and by NN Australia on an illegible date. All signature dates are based on Exhibit 21003.

[33]  Exhibit 21148 (NNI_00433303 – NNI_00433314).  This addendum (the "Alcatel Addendum") was undated.  It was signed by NNL, NNI, NN Australia, NNIR, NNSA and NNUK and all signatures are undated.  Signature dates are based on Exhibit 21148.

This addendum (the "Second Addendum to the Original MRDA") included, among others, the following changes to the Original MRDA and all prior addenda: amendment to Article 11 (Retiring Participants) of the Original MRDA and amendment to Schedule A to the Original MRDA.

5.     Third Addendum to Master R&D Agreement, effective as of January 1, 2006, except with respect to certain provision related to non-exclusive licenses[35]

Changes implemented by the Third Addendum to the Original MRDA as amended included, among others: (i) an amendment to Article 4 - Legal title of NN technology was to be vested in NNL and NNL agreed to enter into exclusive and non-exclusive licenses with licensed participants, (ii) an amendment to Article 5 - NNL granted each licensed participant a *non*-exclusive, royalty-free license, effective January 1, 2009, (iii) a Second Amendment to Schedule A to the Original MRDA and (iv) changes to Schedule B to the Original MRDA.

6.     Fourth Addendum to Master R&D Agreement, effective as of December 31, 2008[36]

This addendum added a standstill provision to the Original MRDA as amended, to prevent the automatic termination of the MRDA Participants from that agreement upon insolvency.[37]

7.     Distribution Agreements between NNL and Nortel's LREs, which appear to be generally effective as of January 1, 2001[38]

---

(Footnote continued from prior page)

[34]   Exhibit 21003 (NNC-NNL06001514/27 – NNC-NNL06001514/38).  The Second Addendum was signed by NNL on December 18, 2007, by NNI on December 18, 2007 (NNI_00505454 – NNI_00505460 at NNI_00505457), by NNUK and undated, by NNSA on December 19, 2007, by NNIR and NN Australia on December 18, 2007. Signature dates, unless otherwise noted, are based on Exhibit 21003.

[35]   Exhibit 21003 (NNC-NNL06001514/39 – NNC-NNL06001514/50).  The Third Addendum was undated.  It was signed by NNL and NNI on December 19, 2008, by NNUK and NNIR on January 9, 2009, by NNUK on January 9, 2009, by NNSA on January 13, 2009 and by NN on December 22, 2008.  Signature dates are based on Exhibit 21003.

[36]   Exhibit 21003 (NNC-NNL06001514/59 – NNC-NNL06001514/66).  The Fourth Addendum was undated.  It was signed by NNL on January 9, 2009, by NNI on January 8, 2009, by NNUK and NNIR on January 9, 2009, by NNSA on January 13, 2009 and by NN Australia on January 9, 2009.  Signature dates are based on Exhibit 21003.

[37]   Exhibit 21003 (NNC-NNL06001514/59 – NNC-NNL06001514/66 at NNC-NNL06001514/59).

In addition to the aforementioned agreements which were between Nortel's RPEs, NNL entered into agreements with Nortel's LREs which outlined LREs' distribution functions for Nortel and the compensation for such functions.

A detailed review of the agreements and addendums that specifically outlined Nortel's RPSM calculation is included in this section of my report. Additionally, a review of the Distribution Agreements entered into by NNL and Nortel's LREs is also included.

### 4.2.1 Master R&D Agreement and subsequent agreements amending Nortel's RPSM with RPEs[39]

#### 4.2.1.1 Original MRDA

Articles of the Original MRDA included, among others:

#### Article 2- Performance of R&D

Under this article, each party to the MRDA agreed to "use it (sic) best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory" and to "account for the R&D Activity by disclosing or otherwise making available to each of the other Participants the relevant results, studies etc. resulting from such R&D Activity."[40]

#### Article 3- R&D Activity Payments

For the performance of R&D Activity, each participant was entitled to receive payment equal to the allocation determined by the RPSM (the "R&D Allocation") as detailed in Schedule A to the

---

(Footnote continued from prior page)

[38]   See, for example, Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240563/142), which includes several distribution agreements between NNL and Nortel's LREs.

[39]   The Original MRDA and its addenda (described at items 1 – 6 section 4.2 are collectively referred to herein as "MRDA Agreements". My review of the MRDA Agreements will only focus on the amendments to the Original MRDA that amended Nortel's RPSM (i.e., amendments to Schedule A of the Original MRDA).

[40]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/4). R&D Activity is defined as "all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products" in the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/4).. Products are defined as "all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" in the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/4).

MRDA which was "the measure of the benefit to which it [a party to the MRDA] is entitled commensurate with its performance of, and contribution to, R&D Activity."[41]

Article 3(c) stated that the R&D Allocation presented in Schedule A to the MRDA was proposed to Revenue Authorities and that parties to the MRDA were aware that Nortel's RPSM was still "the subject of review, discussions and negotiations with the Revenue Authorities."[42]

## Article 4- Legal Title to NN Technology

Legal title to any and all NN Technology "in existence or acquired or developed"[43] was vested in NNL.  NN Technology was defined within the MRDA as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."[44]

## Article 5- Grant of Exclusive Licenses by NNL

Pursuant to Article 4, NNL granted each licensed participant an exclusive, royalty-free license, including the rights to  "(i) …sublicense…(ii)…make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Territory designated for that Licensed Participant, and (iii) all rights to patents, industrial designs (or equivalents) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License")".[45]

## Article 9- Duration and Continuing Rights and Obligations

This agreement was in effect from January 1, 2001 through December 31, 2004 and could be automatically renewed for an unlimited amount of one-year terms until terminated by the mutual consent of all parties.  Upon expiration or termination of the Original MRDA "each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to

---

[41]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/5).

[42]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/5).

[43]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/6).

[44]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/3).

[45]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/6 – 7).

exercise the rights granted [by the Original MRDA] and in particular, the rights granted … in Article 5."[46]

## Schedule A to the Original MRDA

Schedule A to the Original MRDA titled "Schedule A - Calculation of Arm's Length R&D Allocation to each Participant" stated:

> *"The RPSM acknowledge[d] the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property (IP).*
>
> *Accordingly, the compensation provided to Participants under RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business."*[47]

Schedule A to the Original MRDA also set out the specific steps to calculate "entity level adjustments to the (sic) reflect arm's length R&D Allocation calculations of profit or loss for each entity"[48] as follows:

> 1. *"Identify RPSM Participants*
> 2. *Determine Accounting Operating Profit*
>    (a) *add back R&D Expense*
>    (b) *deduct R&D Capital Stock Amortization in order to arrive at the gross economic profit;*
> 3. *From the gross economic profit*
>    (a) *deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)*
>    (b) *deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)*
>    *to arrive at the Residual Profit pool.*
> 4. *Compute each RPSM Participants relative level of R&D Capital Stock*[49]

---

[46]   Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/9).

[47]   Schedule A to the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/18).

[48]   Schedule A to the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/19).  I have summarized the calculation steps outlined in Schedule A to the Original MRDA, and noted that the numbered steps within Schedule A to the Original MRDA do not conform to my numbered steps.

     5.     *Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool with (sic) bears the same ratio as such Participant's ratio of its R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM Participants.*

     6.     *Establish entity level adjustments to the (sic) reflect arm's length R&D Allocation calculations of profit or loss for each entity.*"[50]

### 4.2.1.2 First Amendment to Schedule A of the Original MRDA

Schedule A to the Original MRDA was amended twice prior to the Petition Date.  The first amendment to Schedule A presented in the Second Addendum to Master R&D Agreement dated December 14, 2007 had no significant changes and stated:

     1.     "*Identify RPSM Participants*

     2.     *Determine Accounting Operating Profit (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any relevant taxing authority)*

     3.     *From the Accounting Operating Profit*

          *(a) deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority)*

          *(b) deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority) to arrive at the Residual Profit pool.*

     4.     *Compute each RPSM Participants relative level of R&D Stock (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any Revenue Authority)*

     5.     *Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool which bears the same ratio as such Participant's ratio of its R&D Stock as a percentage of the total R&D Stock for all RPSM Participants.*

     6.     *Establish entity level adjustments to the (sic) reflect arm's length R&D Allocation calculations of profit or loss for each entity.*"[51]

---

(Footnote continued from prior page)

[49]    The Original MRDA did not define how R&D Capital Stock should be calculated.

[50]    Schedule A to the Original MRDA, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/20 at NNC-NNL06001514/18 – 19).

[51]    Exhibit 21038 (NNC-NNL06001514/27 – NNC-NNL06001514/38 at NNC-NNL06001514/30 – 31).

### 4.2.1.3 Second Amendment to Schedule A of the Original MRDA

The Third Addendum to the Master R&D Agreement included the Second Amendment to Schedule A which substantially revised Schedule A to the Original MRDA and came into effect January 1, 2006. Pursuant to the Second Amendment to Schedule A, the R&D Allocation was calculated for RPSM participants as follows:

1.  Identify RPSM participants;
2.  From Nortel's consolidated operating earnings/loss in US GAAP, subtract out the operating earnings/losses of existing joint ventures, former joint ventures that own significant intangibles, and Nortel entities that do not perform distribution of NN Technology products;
3.  Then adjust for:
    a.  Amortization of intangibles (including "goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc."[52])
    b.  Gain/loss on the sale of business
    c.  Restructuring charges
    d.  Stewardship costs;
4.  From this adjusted operating earnings/loss, deduct Functional Routine Return of each Nortel Distribution Entity, and Functional Routine Returns for each RPSM participant, this will yield the "Residual Pool;"
5.  Determine the R&D Allocation for RPSM participants by
    a.  Calculating the relative ratios of each RPSM participant's R&D spending to the R&D Spend of all RPSM participants, by taking each RPSM participant's total R&D spend over the previous five years as a ratio of the total R&D spend over the same period for all RPSM participants; and
    b.  Apply the ratio determined above to the Residual Pool to determine each RPSM participant's R&D Allocation; and
6.  Determine if a "true-up" payment is required by comparing an RPSM participant's R&D Allocation and Functional Routine Return (i.e., Target economic profit or loss) to its adjusted operating earnings/loss.[53]

The changes in Nortel's RPSM as stipulated by the First Amendment to Schedule A of the Original MRDA and Second Amendment to Schedule A are illustrated in **Exhibit 8**.

---

[52]  See footnote 1 of Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/49).

[53]  Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/48 – 49).

### 4.2.2   Distribution Agreements with LREs

NNL entered into Distribution Agreements with LREs "to set forth the terms and conditions pursuant to which, the Parties will ensure that [LREs] earn a reasonable arm's length rate of return for their distribution and service-related activities."[54]   A reasonable return, unless otherwise agreed upon, was established in these agreements as an operating margin between 0% and 4%.

Article 1 of Distribution Agreements stated an LRE's actual return would be calculated as its operating income divided by net customer sales.[55] In the event the LRE's actual return for a year was less than "a reasonable arm's length rate of return" then NNL had to pay a transfer pricing adjustment to the LRE.   This adjustment would be calculated as the difference between the LRE's actual return and a reasonable arm's length rate of return multiplied by the LRE's net customer sales.   In the event that an LRE's actual return was higher than an arm's length return then the LRE had to pay NNL the difference.   Any payable amount was to be adjusted for transactional foreign exchange gains/losses.   Article 1 (a)v. stated that an arm's length return would be determined by NNL with the help of the LRE and would be:

> "based on relevant factors, including: the market and industry conditions in which [the LRE] competes; the functions performed by [the LRE]; the risks undertaken by [the LRE]; the assets employed by [the LRE]; the returns earned by comparable companies to [the LRE]; and the concepts and direction provided by the Organization for Economic Cooperation and Development in its publication entitled 'Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations' July 1995, as amended."[56]

---

[54]   See, for example, Distribution Agreement between Nortel Networks Austria and NNL at Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240562/142 at NNC-NNL07240562/2). This document contains additional Distribution Agreements between NNL and several other LREs.

[55]   Article 1 (a)ii in Distribution Agreements found in Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240562/142).   Agreements also specified that financial statements presented in U.S. dollars in accordance with U.S. GAAP were to be used to calculate LRE returns.

[56]   Article 1 (a)v in Distribution Agreements found in Exhibit 21424 (NNC-NNL07240562/1 – NNC-NNL07240562/142).

## 4.3    The RPSM Model employed by Nortel for the Review Period

As of January 1, 2001, Nortel implemented a new transfer pricing methodology, the RPSM. The RPSM was implemented by way of RPSM models, which were used to calculate quarterly and annual transfer pricing adjustments for RPEs and LREs. Broadly speaking, there were two methods of the RPSM model implemented by Nortel for the Review Period: models used to calculate transfer pricing adjustments for the First RPSM Period, and the model used to calculate transfer pricing adjustments for the Second RPSM Period.

## 4.3.1    The RPSM Model employed by Nortel during the First RPSM Period

My analysis of Nortel's RPSM for the First RPSM Period is based upon the Nortel RPSM Models produced by the Canadian Debtors for the fiscal years ending December 31, 2001 through 2005.[57] The base data for each RPSM Model appears to be a data extract from Nortel's A100 accounting system of the income statement for each Nortel entity.[58] The A100 income statement data in Nortel's RPSM Models is in U.S. dollars and appears to have been generated in accordance with U.S. GAAP.[59] Nortel's RPSM Models indicate that certain adjustments were made to the A100 income statement data for each respective year to, among other things, consolidate legal Nortel entities together and account for the disposition of assets. As an example, the income statement data for the fiscal year ending December 31, 2001 that was used in the 2001 RPSM Model for a select group of Nortel entities can be found at **Exhibit 9**

To review Nortel's RPSM Models employed for the First RPSM Period, I provide an overview of the calculations used in the 2001 RPSM Model.[60] The RPSM Model used by Nortel during the First RPSM Period did not change significantly from year to year.

---

[57]   The specific excel files I have reviewed pertaining to this period are: 2001 RPSM – NOR53648312.xls ("2001 RPSM Model"), 2002 RPSM – NOR_53648037.xls ("2002 RPSM Model"), 2003 RPSM – NOR_53648041.xls ("2003 RPSM Model"), 2004 RPSM – NOR_53648508.xls ("2004 RPSM Model"), 2005 RPSM – NOR_53648130.xls ("2005 RPSM Model"), (together with the Second RPSM Period models: 2006 RPSM - NOR_53648133.xls ("2006 RPSM Model"), 2007 RPSM -NOR_53648323.xls ("2007 RPSM Model"), 2008 RPSM  - NOR_53648048.xls ("2008 RPSM Model") , referred to collectively as, "Nortel's RPSM Models").

[58]   The A100 source data used in each Nortel RPSM Model conformed to general ledger double entry booking standards; therefore, revenues are presented as credit balances, (i.e., positive revenue is shown as a negative balance while losses are shown as a positive balance) and expenses  are presented as debit balances.  To remain consistent with the original Nortel RPSM Models I present my analysis in the same format.

[59]   Nortel's 2001 RPSM Model indicates the income statements are in U.S. GAAP.  Also, the revenue reported in the 2001 RPSM Model has been reconciled to Nortel's revenues reported in its financial statements, prepared in accordance with U.S. GAAP, presented in its Form 10-K for the year ended December 31, 2001 (see **Exhibit 2**).

[60]   See **Exhibits 10 to 11**.

**Step 1: Identification of RPSM participants**

The Nortel entities treated as RPEs in the 2001 RPSM Model are: NNL, NN Ireland, NN France, NN Brazil, NN plc. (i.e., NNUK), NNJI, NN Australia, NNC, NNI, Bay U.S., and Bay Ireland.[61]

**Step 2: Determine accounting operating profit; add back R&D Expense and deduct R&D Capital Stock Amortization in order to arrive at gross economic profit/loss**

Accounting operating (profit) for each RPSM participant is calculated by (i) taking its operating (profit) or loss for the fiscal year from the A100 income statement data, (see **Exhibit 9**) and calculating adjusted operating income. The adjustments made to determine the adjusted 2001 operating income for each RPSM participant are detailed in **Exhibit 10**. More specifically, an RPSM participant's operating income or loss was adjusted for, among other things, the removal of restructuring costs from the RPSM and for the inclusion of transactional foreign exchange costs in the RPSM. Nortel then made additional adjustments for prior quarter transfer pricing adjustments and local GAAP differences to derive "Accounting Operating (Profit)/Loss."

Nortel then calculated Economic Operating (Profit) or Loss for each RPSM participant by:

    i.    Deducting R&D amortization – An entity's total R&D spend to date was amortized using the double declining balance method with a 50% amortization in the first year and a 30% declining balance amortization rate; and

    ii.    Adding R&D expensed (performed) – An entity's current year R&D expense

**Step 3: From gross economic profit deduct the Functional Routine Return of Distributors and RPSM participants to arrive at the Residual Profit Pool**

Functional routine returns for LREs and RPEs were calculated as follows:

    i.    A return on distribution was calculated for each LRE by multiplying its third party sales by a certain percentage. For 2001, this percentage or distribution return earned by each respective Nortel LRE is listed in the table below;[62] and

---

[61]    In Nortel's 2002, 2003, 2004 and 2005 RPSM Models, NNJI, Bay U.S. and Bay Ireland are eliminated as separate RPEs, but instead are consolidated into other RPEs. In addition, in Nortel's RPSM Models for 2004 and 2005 NN Brazil is included in the RPSM calculation, but has no operating income nor does it receive any return. However, NN Brazil is consolidated into NNL's R&D stock calculation in Nortel's 2004 and 2005 RPSM Models.

[62]    In the 2001 RPSM Model each LRE earned a different return for its distribution functions on third party sales. In 2002 all LRE's were given a 0% return on third party sales. For the remaining years of the First RPSM Period LRE's received a 1% return for distribution on third party sales. An assessment of LRE's returns for distribution functions is included in section 7 of my report.

| 2001 LRE Distribution Returns | | | |
|---|---|---|---|
| **Entity** | **%** | **Entity** | **%** |
| 895 (Nortel Communications Israel) | 1.3% | Swiss 390 | 2.9% |
| Italy 370 & Italy 371 | 1.8% | Norway 391 | 1.3% |
| Hungary 374 | 1.3% | Sweden 393 | 4.3% |
| Denmark 375 | 2.4% | Belgium 385 | 1.0% |
| Finland 376 | 1.3% | Holland 395 | 1.0% |
| Czech 377 | 1.3% | CALA 313 | 1.1% |
| Solvenia 378 | 1.3% | New Zealand 475 | 1.0% |
| Poland 379 | 2.2% | Singapore 388 | 1.7% |
| Austria 366 | 1.3% | Hong Kong 336 | 1.7% |
| Spain 715 | 3.1% | Japan 605 | 1.0% |
| Portugal 461 | 4.8% | Brazil 211 | 1.0% |

ii.    A return on net assets ("RONA") for RPEs was calculated for each RPE as the sum of each respective RPE's working capital return and long term assets return. Working capital return was derived by multiplying an entity's net working capital balance by a target working capital return percentage.  Long term assets return was calculated by multiplying an entity's net long term assets by a target long term asset return percentage. The table below shows the percentage returns for working capital and long-term assets RPEs received during the First RPSM Period.

| Returns for RONA: 2001 - 2005 | | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| Working Capital Return | 8.86% | 8.86% | 8.86% | 8.86% | 8.86% |
| Long Term Asset Return | 23.60% | 23.60% | 23.60% | 23.60% | 23.60% |

## Step 4: Compute each RPEs relative level of R&D Capital Stock

An RPE's R&D capital stock was calculated as it average capital stock balance for the respective year of the calculation.  The average capital stock balance for the respective year was derived by calculating the average of the opening and closing balance of an entity's capital stock for that year.[63]

## Step 5: Calculate the R&D Allocation attributable to each RPSM participant equal to that portion of the Residual Profit pool, bearing the same ratio as such Participant's ratio of it R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM participants

---

[63]    During the First RPSM Period, the closing balance of an entity's capital stock was calculated as historical R&D spend yet to be amortized.  The opening balance of an entity's capital stock was then calculated by taking the closing balance capital stock, subtracting the total R&D spend for the current year, and then adding all of the R&D amortization for the current year.

Once the R&D capital stock for each RPE was calculated as discussed in Step 4, these capital stocks were summed to give the total R&D capital stock for all RPEs.  The R&D allocation percentage for each respective RPE was then calculated as its RPE's R&D capital stock divided by the total R&D capital stock for all RPEs.[64]  In 2001 NNUK's R&D Allocation percentage was 7.4%.[65]

**Step 6: Determine the entity level transfer pricing adjustments**

To calculate the transfer pricing adjustment for each respective RPE, Nortel first determined its total residual profit pool as follows: Total Economic (Profit)/loss for all RPEs minus the total routine returns for RPEs (i.e., RONA) and LREs (i.e., the distribution return).  For 2001 Nortel's residual loss was $5.56 billion.[66]

The total residual (profit)/loss pool was then allocated to each RPE by its respective R&D Allocation percentage determined in Step 5.  NNUK's share of the residual loss was determined as $5.56 billion multiplied by 7.4% and amounted to a loss of $411.4 million.[67]

The transfer pricing adjustment was determined by Nortel for each entity by:

(i)     Calculating the Target Economic Profit/Loss for each entity by combining its routine return with its Allocated Residual (profit)/loss;[68] and

(ii)    Then, deducting an entity's Economic Operating Profit/Loss, determined in Step 2, from its Target Economic Profit.

For NNUK in 2001 its Target Economic Loss equaled $120.3 million and was calculated as the total of its $291.1 million RONA return and its allocated residual loss of $411.4 million.[69]  NNUK's 2001 Economic Operating Loss in Nortel's 2001 RPSM was calculated as $1.02 billion.  NNUK's 2001 transfer pricing adjustment was calculated by subtracting its Target Economic Loss of $120.3 million from its Economic Operating Loss of $1.02 billion and resulted in a transfer pricing adjustment owed to NNUK of $902.7 million.[70]

---

[64]   Within the 2001 RPSM Model the R&D Allocation percentage is referred to as the "Allocated Residual Profit %" (See **Exhibit 11**).

[65]   See **Exhibit 11.**

[66]   See **Exhibit 11**.

[67]   See **Exhibit 11.**

[68]   Within the 2001 RPSM Model target economic profit is referred to as "Profit split 'economic' profit," see **Exhibit 11.**

[69]   Within the 2001 RPSM Model target economic profit is referred to as "Profit split  'economic' profit," see **Exhibit 11.**

[70]   See **Exhibit 11.**

### 4.4     The RPSM Model employed by Nortel during the Second RPSM Period

My analysis of Nortel's RPSM for the Second RPSM Period is based upon the Nortel RPSM Models produced by the Canadian Debtors for the fiscal years ending December 31, 2006 to 2008.[71]  To review Nortel's RPSM Models employed for the Second RPSM Period, I provide an overview of the calculations used in the 2006 RPSM Model.[72]  The RPSM Models used by Nortel during the Second RPSM Period did not change significantly from year to year.[73]

### 2006 RPSM Step 1: Identification of RPSM participants

RPEs in Nortel's 2006 RPSM Model included NNL, NN Ireland, NN France, NNUK, NN Australia and NNI.[74]

### 2006 RPSM Step 2: From Nortel's consolidated operating earnings/loss in US GAAP, subtract out the operating earnings/losses of existing joint ventures, former joint ventures that own significant intangibles, and Nortel entities that do not perform distribution of NN Technology products;

### and Step 3: Then adjust for: (a) Amortization of intangibles (including "goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc."[75]), (b) gain/loss on the sale of business, (c) restructuring charges, and (d) stewardship costs.

Nortel's 2006 RPSM Model adjusted operating earnings/loss for various elements detailed in **Exhibit 13**, such as restructuring and stewardship costs.

### 2006 RPSM Step 4: From this adjusted operating earnings/loss, deduct Functional Routine Return for each Nortel Distribution Entity, and Functional Routine Returns for each RPSM participant, this will yield the "Residual Pool"

During the Second RPSM Period, LREs received a distribution return calculated as 1% of their respective third party sales.  RPEs received (i) a 15% return on excess costs (a more detailed explanation of this return is included in section 8 of my report) and (2) a 1% return for

---

[71]   The specific excel files I have reviewed pertaining to this period are: 2006 RPSM - NOR_53648133.xls ("2006 RPSM Model"), 2007 RPSM –NOR53648323.xls ("2007 RPSM Model"), 2008 RPSM – NOR_53648048.xls ("2008 RPSM Model").

[72]   See **Exhibits 12 to 13**.

[73]   2006 RPSM Model.

[74]   See **Exhibits 12 to 13**.

[75]   See footnote 1 of Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/49).

distribution functions calculated as 1% of third party sales. These aforementioned LRE and RPE returns were deducted from "the full year total operating income" to calculate Nortel's residual pool.[76]

**2006 RPSM Step 5: Determine the R&D Allocation for RPSM participants by**

a.  **Calculating the relative ratios of each RPSM participant's R&D spending to the R&D Spend of all RPSM participants, by taking each RPSM participant's total R&D spend over the previous five years as a ratio of the total R&D spend over the same period for all RPSM participants; and**

b.  **"Apply the ratio determined above to the Residual Pool to determine each RPSM participant's R&D Allocation"[77]**

Nortel's RPSM during the Second RPSM Period specifically defined the allocation key by which Nortel's residual profits or losses would be allocated to each RPSM participant. In practice, in Nortel's 2006 RPSM the allocation key was derived by taking a weighted average of an RPE's "Capital Asset (old method) percentage" used during the First RPSM Period to allocate Nortel's residual pool and the "R&D Asset (new method) percentage."[78] The "Capital Asset (old method) percentage" for an RPE was calculated by dividing an entity's "R&D Capital Stock Balance Pre UMTS Sale" as of December 31, 2005 by the total R&D Capital Stock Balance Pre UMTS for all RPS entities (NNL, NNI, NNUK, NN France, NN Australia, and NN Ireland). The "R&D Asset (new method) percentage" was calculated as an RPE's historical five year R&D spend (with a one year lag) over the total R&D spend for all RPEs over the same time period.

**2006 RPSM Step 6: Determine if a "true-up" payment is required by comparing an RPSM participant's R&D Allocation and Functional Routine Return (i.e., Target economic profit or loss) to its adjusted operating earnings/loss.**
As detailed in **Exhibit 12**, an RPE's transfer pricing adjustment was calculated for each RPE by comparing its target economic profit or loss to its adjusted operating income.

---

[76]  See **Exhibit 12**.

[77]  Exhibit 21038 (NNC-NNL06001514/39 – NNC-NNL06001514/50 at NNC-NNL06001514/49).

[78]  The weighting was 50% for the "Capital Asset (old method)" and 50% for the "R&D Asset (new method)" in Nortel's 2006 RPSM. In Nortel's 2007 RPSM the weighting was 75% for the "R&D Asset (new method)" and 25% for the "Capital Asset (old method)." By 2008 Nortel only applied the R&D Allocation method specified in the Second Amendment to Schedule A in the Third Addendum to the Original MRDA. See **Exhibit 14**.

**APPENDIX 7**

**Entities Involved/Classifications**

   The following description of classification of Nortel entities is excerpted from the Transfer Pricing Expert Report of Richard V. L. Cooper, Charles River Associates, dated January 24, 2013 (the "Cooper Expert Report").  Mr. Cooper was retained by the court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators") for Nortel Networks UK Limited ("NNUK") and certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors") located in the region known as EMEA (Europe, Middle East and Africa), through their counsel, Herbert Smith Freehills LLP, Hughes Hubbard & Reed LLP, Davies Ward Phillips & Vineberg LLP and Lax O'Sullivan Scott Lisus LLP, in connection with the bankruptcy proceedings under the *Canadian Companies' Creditors Arrangement Act* for Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (collectively, and including NNC and NNL, the "Canadian Debtors"), pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Proceeding").

Excerpt of Cooper Expert Report, pp. 27–34:

# 3 Description of NNC, NNI, NNUK, Other EMEA RPEs, LREs and other entities

## 3.1 Nortel Networks Corporation: 2000 – 2009

### 3.1.1 NNC description

NNC traces its roots back to 1895 when Bell Telephone Company of Canada founded Northern Electric and Manufacturing Company Limited which was a telecommunications equipment provider to the Canadian telephone system.  By the 1980s this company became Northern

Telecom Limited ("Northern Telecom") and had expanded its global reach by developing its U.S., Chinese, and Japanese markets.[1]  In 1998 Northern Telecom changed its name to NNC.

NNC was incorporated in Canada on March 7, 2000 and its common shares were then traded publicly as "NT" on the New York and Toronto stock exchanges.  NNC was the ultimate direct or indirect parent company of 142 subsidiaries located throughout the world.[2] NNL was its principal Canadian operating subsidiary. The organizational structure of Nortel at the Petition date is depicted in **Exhibit 1** and shows that Nortel consisted of the following types of entities: RPEs, LREs, Cost Plus Entities ("CPEs"), At Risk entities ("AREs"), and holding companies.[3] Nortel supplied end-to-end networking products and solutions to customers to improve communications and gained "a well-deserved reputation for innovation and creativity through the development of ground-breaking technology – including many industry firsts – in such fundamental technologies as digital, optical, wireless, internet protocol, voice-over internet protocol, broadband, multimedia, and ethernet."[4]  Its customer base varied from small companies to multinational corporations that provided services to federal, state and local government agencies and the military and included "cable operators, wireline and wireless telecommunication service providers, and Internet service providers."[5]   Nortel's global operations (1) supplied hardware with embedded or bundled software through its four business lines: Global Services ("GS"), Carrier Networks ("CN"), Enterprise Solutions ("ES"), and Metro Ethernet Networks ("MEN") and (2) also, deployed and supported the hardware systems through the CN, ES and MEN business lines.[6]

### 3.1.1.1 Nortel RPEs

Nortel RPEs were entities with integrated operations that generated revenues from both the distribution and sale of Nortel products.  Their customer base included both third parties and other Nortel companies. Some RPEs conducted business support functions for Nortel, including

---

[1]     The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and in the Matter of the Insolvency Act 1986 at paragraph 17.

[2]     The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and in the Matter of the Insolvency Act 1986 at paragraph 12.

[3]     The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and in the Matter of the Insolvency Act 1986 at paragraph 40.

[4]     Declaration of John Doolittle, Vice President of Nortel Networks Inc. In Support of Chapter 11 Petitions and First Day Motions at p. 4.

[5]     Nortel Form 10-K for the years ended December 31, 2007, 2008, and 2009 at p. 1.

[6]     The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 57.

among other things, treasury, legal and human resource functions, but more importantly, all RPEs funded and conducted Nortel's R&D Activities which was a "key profit driver in the Nortel business."[7,8]

### 3.1.1.2 Nortel LREs

A Nortel LRE performed, among other things, routine distribution functions for Nortel but did not perform any R&D Activities for Nortel and therefore, was not party to the MRDA Agreements.[9] Each respective LRE entered into a Distribution Agreement with NNL and pursuant to this agreement, LRE's were to receive an arm's length return for their distribution and service related activities. [10] Nortel's LREs covered the following geographical regions: Europe, Asia, Central and Latin America and North America.[11]

### 3.1.1.3 Nortel CPEs

Nortel's CPEs were service companies that marketed and installed Nortel products, managed customer relations, and provided training. They provided these services directly to other Nortel entities as well as to third party customers. The CPEs were compensated for the services they provided to other Nortel entities on a cost plus basis, which covered the cost of providing the services (inclusive of overhead) and included a mark-up of typically 10%.[12]

---

[7]   Original MRDA and subsequent amendments, Exhibit 21038 (NNC-NNL06001514/1 – NNC-NNL06001514/65 at NNC-NNL06001514/18). A more detailed analysis of the precise functions performed by RPEs can be found in **Appendix D** of this report.

[8]   At the Petition Date, Nortel's EMEA RPEs were NNUK, NN Ireland and NN France.

[9]   A more detailed analysis of the precise functions performed by LREs can be found in **Appendix D** of this report.

[10]  The financial performance of Nortel's distributors has been determined by reviewing Nortel's RPSM Models produced by the Canadian Debtors ("2001 – 2008 RPSM Models") which were reconciled to Nortel Form 10-K filings (see **Exhibit 2**). From 2001 to 2008 total revenue for Nortel's distributors declined from $3.0 billion in 2001 to $1.9 billion in 2008. Distributor revenue consisted of both third party revenue and intercompany revenue. A segment analysis of distributor revenue illustrates that during the period 2001 to 2008 Nortel distributors saw a sharp decline of 49% in third-party revenue while intercompany revenue increased by 320% from $94.9 million to $398.7 million (see **Exhibits 3A and 3B**).

[11]  2001 RPSM Model: Distribution entities are listed by entity number and country; countries listed in model fall under all of the aforementioned regions.

[12]  The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 46.

### 3.1.1.4 Nortel AREs

Nortel's AREs were joint venture operations and as such, their operations were governed by joint venture agreements.  These entities provided distribution and sales functions primarily to third party customers and to other Nortel entities.[13]

### 3.1.1.5 Nortel Holding Companies

Nortel's holding companies were simply holding companies for subsidiaries and had no operational activities.[14]

## 3.2     NNI

NNI, a direct wholly owned subsidiary of NNL, was Nortel's principal operating subsidiary in the U.S. and was incorporated in the state of Delaware on September 16, 1971.  NNI was the direct or indirect parent of a number of Nortel's U.S. companies and acted as one of the main purchasing hubs for all Nortel regional sales entities, accounting for two thirds of all purchases in combination with NNL.[15]    Along with NNL and NNUK, NNI was one of the main manufacturing houses for the Nortel group.[16] It also was "able to perform a full scope of distribution activities, since [NNI has] technical and other regional sales and marketing personnel and general and administrative personnel who support the sales effort both locally and globally. These activities included marketing strategy, tactical marketing and advertising…"[17]

## 3.3     NNUK[18]

In 1990 Nortel acquired 100% ownership of STC Plc ("STC"), a supplier of telecommunications products with a significant presence in the U.K.[19]   Under Nortel's control, STC went through a

---

[13]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 49.

[14]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 55.

[15]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraphs 77-78.

[16]   2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189932).

[17]   2008 APA Request, Exhibit 22078 (PC0184853 – PC0185061 at PC0184874)

[18]   The financial performance of NNUK has been determined by reviewing the 2001 – 2008 RPSM Models (**see Exhibits 5A and 5B**).

5

series of divestitures to align its business and products to Nortel's and as a result, by 1994 NNUK conducted the following businesses: transmission systems, terminals, telephone sets, customer consoles, defence systems, and R&D among other things. Following the STC acquisition, NNUK became the largest Nortel operation in Europe.[20]  By 1995, NNUK's roots were established in the U.K. and it was a "fully integrated business with manufacturing, sales and marketing, R&D and support functions[.]"[21]   NNUK's "principal activity [was] the development and supply of telecommunications equipment, software and services."[22]   The directors of NNUK viewed its R&D activity "as necessary for the continuing success in the medium to long term future"[23] for NNUK and the Nortel Group.

Among its various support roles, NNUK supported EMEA sales groups as a Marketing Support Group and Product Line Management Group ("MSG/PLM").[24]   NNUK also developed into "the centre of operations and head office functions for the EMEA Region"[25] and performed, among other activities, human resources, finance and control, treasury, banking and lease portfolio management functions for Nortel's EMEA Region.[26,27]

---

(Footnote continued from prior page)

[19]    KPMG Nortel Networks Transfer pricing report on Nortel Networks U.K. Ltd dated July 18, 2003 ("2003 KPMG NNUK Report"), Exhibit 32117 (NNI_00315272 – NNI_00315311 at NNI_00315293).  Prior to 1990, Nortel owned a 28% equity stake in STC.

[20]    2003 KPMG NNUK Report, Exhibit 32117 (NNI_00315272 – NNI_00315311 at NNI_00315293).

[21]    2003 KPMG NNUK Report, Exhibit 32117 (NNI_00315272 – NNI_00315311 at NNI_00315293).

[22]    NNUK' Directors' Report and Financial Statements, Exhibit 31142 (NNC-NNL11667398/1 – NNC-NNL11667398/39 at NNC-NNL11667398/3).

[23]    NNUK' Directors' Report and Financial Statements, Exhibit 31142 (NNC-NNL11667398/1 – NNC-NNL11667398/39 at NNC-NNL11667398/3).

[24]    2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189950).

[25]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 6.

[26]    The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 15.

[27]    The "EMEA Region," at the Petition Date consisted of: NNUK, Nortel Networks S.A. (France), Nortel GmbH (Germany), Nortel Networks (Ireland) Limited (Ireland), Nortel Networks N.V. (Belgium), Nortel Networks S.p.A. (Italy), Nortel Networks B.V. (Netherlands), Nortel Networks Polska Sp. z.o.o. (Poland), Nortel Networks Hispania, S.A. (Spain), Nortel Networks International Finance & Holding B.V. (Netherlands), Nortel Networks (Austria) GmbH (Austria), Nortel Networks s.r.o. (Czech Republic), Nortel Networks Engineering Service Kft. (Hungary), Nortel Networks Portugal S.A. (Portugal), Nortel Networks Slovensko, s.r.o. (Slovakia), Nortel Networks France S.A.S

(Footnote continued on next page)

At the Petition Date NNUK was located in Maidenhead, U.K and was a wholly owned subsidiary of NNL and its parent NNC.  As detailed in **Exhibit 1,** NNUK had a number of subsidiaries in Europe and had a branch in Saudi Arabia.

## 3.4    Other EMEA Entities

### 3.4.1   EMEA RPE: NN Ireland[28]

NN Ireland was incorporated in January 1973 and was primarily involved in global distribution and sales functions, with only 10% of its revenues coming from within Ireland.[29] NN Ireland was a wholly owned subsidiary of NNIF until December 2007 when, prior to Nortel's restructuring initiative, it was sold to NNL which then became its sole owner.[30] NN Ireland was "the core legal entity for EMEA Enterprise sales"[31] and Nortel "ha[d] most of the EMEA sales for that business line passing through"[32] this legal entity. However, primary decision making and key management functions were controlled in England and flowed through the EMEA group.[33] NN Ireland also served supporting EMEA sales groups as a MSG and PLM.[34]

---

(Footnote continued from prior page)
(France), Nortel Networks Oy (Finland), Nortel Networks Romania SRL (Romania), Nortel Networks AB (Sweden), NN AS (Norway) and Nortel Networks AG (Switzerland).  The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 at paragraph 14, pp. 4-5.

[28]   The financial performance of NN Ireland has been determined by reviewing the 2001 – 2008 RPSM Models (**see Exhibits 6A and 6B).**

[29]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks Ireland and In the matter of the Insolvency Act 1986 at paragraph 30.

[30]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 in the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 39.

[31]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 38.

[32]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 38.

[33]   The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks Ireland and In the matter of the Insolvency Act 1986 at paragraphs 36-39.

[34]   2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189950).

### 3.4.2   **EMEA RPE: NN France**[35]

NN France was incorporated in 1992 as Nortel Matra Cellular and was a former joint venture until 1999, when Nortel took 100% control.  In 2000 it was renamed Nortel Networks and became Nortel Networks SA after merging with Nortel Networks Europe SA.[36] NN France was primarily focused in Nortel's wireless – GSM business segment and was "responsible for the procurement of GSM products throughout the entire Nortel Group… whenever a Nortel sales company require[d] GSM products to fulfil a customer's order, they [would] order that product from [NN France]."[37]

NN France conducted R&D activities, primarily relating to wireless operations and also supported EMEA sales groups as a MSG/PLM, in addition to performing various headquarter functions such as treasury and finance.[38]  NN France maintained two sales offices in Algeria and Malta as well as a distribution subsidiary, Nortel Networks France SAS, which shared management and support functions. In January of 2009, NNL owned 91.17% of NN France.[39]

### 3.4.3   **EMEA LREs**

EMEA LREs as of the Petition Date are presented in the table below. [40]

---

[35]   The financial performance of NN France has been determined by reviewing the 2001 – 2008 RPSM Models (**see Exhibits 7A and 7B**).

[36]   The Witness Statement of Michel Clement dated January 14, 2009 In the matter of Nortel Networks S.A. and In the matter of the Insolvency Act 1986 at paragraph 13.

37   The Witness Statement of Michel Clement dated January 14, 2009 In the matter of Nortel Networks S.A. and In the matter of the Insolvency Act 1986 at paragraph 10.

[38]   2000-2004 Functional Analysis, Exhibit 31355 (EMEAPROD2189880 – EMEAPROD2190060 at EMEAPROD2189950, EMEAPROD2189959, EMEAPROD2189903).

[39]   The Witness Statement of Michel Clement dated January 14, 2009 In the matter of Nortel Networks S.A. and In the matter of the Insolvency Act 1986 at paragraph 16.

[40]   I understand that Nortel Networks AG (Switzerland) and NN AS (Norway) have made transfer pricing claims as LREs.

| EMEA Limited Risk Entities (LREs) [a] | |
|---|---|
| Nortel Networks N.V. (Belgium) | Nortel Networks, s.r.o. (Czech Republic) |
| Nortel Networks S.p.A. (Italy) | Nortel Networks Engineering Service Kft. (Hungary) |
| Nortel Networks B.V. (Netherlands) | Nortel Networks Portugal S.A. (Portugal) |
| Nortel Networks Polska Sp. z o.o. (Poland) | Nortel Networks Slovensko, s.r.o. (Slovakia) |
| Nortel Networks Hispania, S.A. (Spain) | Nortel Networks A.G. (Switzerland) [b] |
| Nortel Networks Austria GmbH (Austria) | |

Sources/Notes:
[a] Witness Statement of Sharon Rolston dated January 14, 2009 at paragraph 50, page 12.
[b] Unlike the other 10, no administration application was made for this entity.

### 3.4.4  EMEA CPEs

EMEA CPEs as of the Petition Date are presented in the table below.

| EMEA Cost Plus Entities (CPEs) [a] | |
|---|---|
| Nortel Networks Oy (Finland) | Nortel Telecom International Ltd (Nigeria) [b] |
| Nortel Networks (Scandinavia) AS (Norway) [b] | Nortel Networks Romania SRL (Romania) |
| Nortel Networks O.O.O. (Russia) [b] | Nortel Networks South Africa (Proprietary) Limited (South Africa) [b] |
| Nortel Networks AB (Sweden) | Nortel Networks Ukraine Limited (Ukraine) [b] |

Source:
[a] Witness Statement of Sharon Rolston dated January 14, 2009 at paragraph 44, pp. 10-11.
[b] No administration application was made for these entities.

### 3.4.5  EMEA AREs

EMEA AREs as of the Petition Date included:

- Nortel GmbH (Germany);

- Nortel Networks France S.A.S (France); and

- Nortel Networks Israel (Sales and Marketing) Limited (Israel).[41]

### 3.4.6  EMEA Holding Companies

EMEA holding companies as of the Petition Date included:

---

[41]  The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 47.  Nortel GmbH (Germany) and Nortel Networks France S.A.S (France) have filed for administration.  Nortel Networks Israel (Sales and Marketing) Limited (Israel) is seeking the local equivalent of an administration, also at paragraph 47.

- Northern Telecom France S.A. (France);

- Nortel Networks International Finance & Holdings B.V. (Netherlands); and

- Nortel Communications Holdings (1997) Limited (Israel).[42]

---

[42] The Witness Statement of Sharon Lynette Rolston dated January 14, 2009 In the matter of Nortel Networks UK Limited and In the Matter of the Insolvency Act 1986 at paragraph 54.  Northern Telecom France S.A. (France) has filed for administration; Nortel Communications Holdings (1997) Limited (Israel) is seeking the local equivalent of an administration.  Nortel Networks International Finance & Holdings B.V. (Netherlands) has not filed for administration, also at paragraph 54.

# APPENDIX 8

## Simplified Nortel Group Structure Chart (as at January 14, 2009)



# APPENDIX 9

## UMTS Pre-petition Asset Sale

1.         Nortel's pre-petition business sales are relevant to any analysis of which assets existed in Nortel's business and how the Selling Debtors[1] themselves previously allocated sale proceeds attributable to sales of those assets.

2.         In preparing my report, I have considered information about the pre-petition asset sale of Nortel's Universal Mobile Telecommunications System ("UMTS") radio access business in December 2006 to Alcatel.  A summary of the relevant history of that sale is set forth in Appendix 10.  The UMTS sale represents a precedent of the Selling Debtors recognizing certain asset classes and allocating sale proceeds among themselves.  The divestiture of UMTS represented Nortel's first global disposal of IP arising under the MRDA.[2]  The UMTS sale was also of a comparable value and scale to the post-petition Business Sales.  In common with the UMTS sale, each of the post-petition Business Sales was also structured as an asset sale.  As is set forth in my report, for the ES Business Sale only, a share sale also took place alongside the asset sale.  Also in common with the UMTS sale, each of these asset sales consisted of multiple Nortel sellers.  As many as fifty-five different sellers were required to sell the assets in each of the eight Business Sales.

3.         As such, I consider the UMTS pre-petition sale a reliable precedent to guide the allocation of Sale Proceeds among the parties to the Allocation Dispute.  However, in

---

1.   Capitalized terms not explicitly defined herein have the meanings ascribed to them in my report.

2.   *See* E-mail from Kerry Stephens, Tax Dep't, EMEA, to Michael Orlando, Int'l Tax – Transfer Pricing, NNI, et al., "Nortel Internal IP Agreement" (Nov. 6, 2006, 8:44 a.m.), EMEAPRIV0204736 at EMEAPRIV0204736  ("We will be confronted, in practice I think for the first with time with the global disposal of IP arising under the master agreement.").

certain respects, the allocation of sale proceeds from the UMTS sale differs from this current

exercise, particularly in that the UMTS sale was a divestiture from an ongoing business as

opposed to a disposition of substantially all of the assets of a liquidating estate.  In particular, this

difference impacts my access to certain information and other considerations that weigh on my

determination of an appropriate allocation methodology.  I have summarized herein the

allocation methodology utilized in the UMTS sale and identified where it conforms to my

proposed methodology.  Where the UMTS allocation differs from my proposed methodology, I

have identified the reason that the UMTS methodology is not appropriate for the present

exercise.

   4. Proceeds from the UMTS sale were allocated into four distinct categories:

(i) tangible assets, (ii) technology assets (developed technology and know-how and in-process

R&D), (iii) customer relationships (contractual and non-contractual) and (iv) goodwill.[3]  Each

category was valued and allocated as follows.

   5. Tangible Assets ($53.1 mm, net):  Tangible assets were valued based on

the book value of the net assets transferred.[4]  The proceeds were allocated among the Nortel

---

3. *See* Memorandum from the Nortel Global Initiatives Grp. to Project Osiris Files, "Treatment of Customer Relationship Intangible in Purchase Price Allocation" (Feb. 15, 2007), Orlando Dep. Ex. 11262, at NNC-NNL06056509/1 (referencing "Tangible assets" and then noting that "Alcatel had the right to allocate intangible consideration over asset categories" and listing those categories as Technology (IP/in process R&D), Goodwill and Customer Contracts).

4. DSC Appraisal Assocs. Inc., Alcatel: Valuation of Certain Assets of Nortel Networks' UMTS Business as of December 31, 2006 ("DSC Alcatel Appraisal"), NNI_00174638 at NNI_00174644 ("As part of the transaction, Alcatel acquired approximately $53.1 million in net tangible assets, resulting in approximately $237.8 million of intangible assets to be allocated.").

3

entities based upon the entities' ownership of those assets prior to the transfer to Alcatel.[5]  The

approach matches the approach taken in the present allocation methodology.

      6.     Technology Assets ($131.5 mm):  Developed technology and know-how

were valued using an income-based approach – the relief from royalty method[6] described in

greater detail in my report.  While specific assumptions may vary, this general approach

conforms to the approach used by Mr. Malackowski in his analysis of the Nortel IP and

described in my report.

      7.     Technology assets were allocated among the active RPEs at the time of

sale in accordance with their respective residual profit shares under the MRDA as of December

31, 2006.[7]  This approach generally conforms with the contribution-based approach to IP

allocation we use, described in the analysis in my report.  Our approach does vary, however, in

that measurement of the share contributed by the different RPEs is based over different time

periods than the five-year period used in the MRDA calculation.  While five years may have

been an appropriate look-back period for the divestiture of certain assets for an ongoing

enterprise, we feel that the periods adopted by Mr. Malackowski, as summarized in the

discussion in my report, better reflect the relative contributions of the RPEs in the case of a

---

5.     Nortel Networks, Sale of UMTS Access Business to Alcatel Lucent, Allocation of Consideration ("Nortel Alcatel Allocation"), EMEAPROD1305279 at EMEAPROD1305281 ("The consideration for the tangible assets was allocated to the individual entity owning those assets.").

6.     DSC Alcatel Appraisal, NNI_00174638 at NNI_00174644  (listing "Developed Technology & Know-How" as $131,500,000),  NNI_00174654 ("The acquired technology and customer relationships were value[d] using the income approach."), NNI_00174659  ("In concluding fair values for the acquired Developed Technology and In-Process R&D assets, a relief-from royalty approach was employed.").

7.     Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305281 ("Intellectual property consideration was allocated to the participants in the Master R&D agreement to be shared amongst them in their proportionate share in the group residual profit at the time of Closing as they are the economic owners of the intellectual property under that Agreement.").

distressed sale of substantially all of the assets of a liquidating business in an insolvency
proceeding.

8.      Customer Relationships ($57.4 mm):  Customer relationships were valued
using an income-based approach – the multi-period excess earnings method ("MEEM").[8]  The
MEEM is further described below.  The residual approach adopted for allocating value here, and
explained at further in my report, differs from the MEEM.  While the MEEM is a commonly
used accounting method, we did not feel it was appropriate in this case for the following reasons.

9.      The MEEM approach attempts to isolate the portion of a company's
earnings solely attributable to its customer relationships, both contractual and non-contractual.
To do so, it performs a discounted cash flow style analysis of the returns to customer
relationships.  To isolate the customer relationships, it is necessary to make assumptions
regarding the duration of those relationships and their changes over time, as well as assumptions
regarding the other expenses and investments necessary to generate those relationships, so that
the earnings stream may be charged an appropriate cost of capital.

10.     I do not consider the MEEM an appropriate method to use in this case for
a number of reasons.  Most significantly, for the purposes of value allocation, the MEEM is not
reflective of how we believe any real buyer would value customer assets when valuing a
potential acquisition.  Rather, the MEEM is an accounting technique used for purposes of
purchase price allocation after a deal has been completed.  As a general matter, post-deal
purchase price allocation is an exercise guided as much, or more, by tax considerations, rather
than evaluations of market value.  Given that the objective of this exercise is the allocation of the

---

8.      DSC Alcatel Appraisal, NNI_00174638 at NNI_00174663 (listing "Customer Relationships (contractual &
non-contractual)" at $57,400,000), NNI_00174654 ("The acquired technology and customer relationships
were value[d] using the income approach.").

5

value of assets transferred based on market value, the MEEM is not appropriate.

11.    Even if the MEEM were an appropriate methodology to consider the allocation of Nortel Sale Proceeds, it would still be inappropriate to use it in this instance because I do not have the degree of management access or other information necessary to perform a proper MEEM analysis.  Properly applying the MEEM requires close interaction with management of the selling company and an ability to discuss in great detail the nature of the customer relationships and the incremental expenses and investments associated with creating those relationships.  Without that access, it would be necessary to make very material assumptions with limited factual basis, which I do not believe is warranted.  The MEEM was used to value customer relationships in the UMTS sale, but in that case the appraisal experts retained to perform the purchase price allocation had significant access to the appropriate members of management to properly inform their analysis and to make the necessary material assumptions.  Lacking that access here, I believe that including the value of Customer Relationships in a residual assets class was a more appropriate decision.

12.    For purposes of allocating customer value, the UMTS sale value was apportioned among the various sellers by identifying which entity held the primary relationship.[9] In this case, that approach was not practicable.  Properly allocating the customer value to the owners of the relationships would require extensive access to management – something that was available in the case of the UMTS sale, but, as described above, is not possible for our analysis.

---

9.    E-mail from Louis Farr, Tax Dep't, NNI, to Timothy Pickering, Senior Manager, Int'l Tax, Deloitte & Touche LLP, et al., "UMTS Alcatel Transaction" (Jan. 29, 2007, 2:25 p.m.), Culina Dep. Ex. 21160, at BHG0137543 ("The value of the Customer Relationship Intangible was allocated to those entities that have the face-to-face relationship with the customer.").

13.     Instead, in our analysis we allocate customer value based on the historical revenue attributable to each Selling Debtor.  As I explain my report, we believe that historical revenue is an appropriate measure of the extent to which each entity contributed to the customer relationships.

14.     The final asset group allocated in UMTS was goodwill, the residual value left after allocation of the asset groups described above.[10]  In that case, the goodwill amount was allocated primarily based upon the MRDA's calculation percentages because the residual was seen largely as being attributable to IP value, in light of the fact that the customer values had already been specifically allocated.[11]  In this case, we include Goodwill along with value attributable to Nortel's Customer Relationships and Distribution Network in the Other Intangible Assets value allocation.  As with the balance of the residual Other Intangible Assets value, we allocate Goodwill based on the historical revenue of the Selling Debtors, as described in my report.

---

10.     Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305280 (listing "Goodwill (the balance of the consideration after the foregoing allocations)").

11.     Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305280 ("The balancing goodwill figure is allocated amongst all Nortel vendors by reference firstly to a three factor formula of revenues, assets and people for each vending entity to determine a proportionate split for each vendor (its percentage of the total of its three factors against the total of those factors for all vendors.  That proportion of the Goodwill consideration was found for each vendor, but LRD vendors were only allocated 1% of that, representing their historic margin on customer revenues as found by the Distributor agreements referred to above, that balance being allocated to the participants in the Master R&D Agreement in the same ratio as applied to the Intellectual property proceeds.").

# APPENDIX 10

## UMTS Pre-petition Asset Sale Details

1.        On or about August 31, 2006, Nortel entered into a non-binding memorandum of understanding to sell certain assets related to its Universal Mobile Telecommunications System ("UMTS") access business to Alcatel-Lucent.[1]  The parties signed a definitive agreement on December 4, 2006 and the sale closed on December 31, 2006, for a nominal purchase price of US$320 million, less certain significant deductions, restructuring and transaction related costs.[2]   In addition, Nortel provided Alcatel-Lucent with a $23 million promissory note in lieu of transferring working capital, which was paid in the first quarter of 2007.[3]

2.        The UMTS access business included products and services within Nortel's wireless business related to third generation ("3G") wireless, a standards-based technology globally implemented to provide high data rate mobile service.[4]

3.        The majority of the UMTS business was located outside of North America, predominantly in Europe, with some presence in Latin America, Mexico, and Korea, and a number of engineers in Canada and China.[5]

---

1.     Nortel Networks Corp., Quarterly Report (Form 10-Q) (Nov. 7, 2006) at 30.

2.     Nortel Networks Corp., Current Report (Form 8-K) (Jan. 3, 2007) at Ex. 99.1.

3.     Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 43, 141.

4.     Dadyburjor Dep. 48:8–15, Oct. 3, 2013.

5.     Riedel Dep. 141:10–17, Oct. 10, 2013; see also Project Osiris - White Paper, May 29, 2006, EMEAPROD1243162 at EMEAPROD1243168–69 (identifying preliminary list of key customer accounts in Spain, Italy, Portugal, U.K., Germany, France, Belgium, Poland, Slovakia, Austria, Korea and Israel, and workforce details reflecting approximately 70% of the workforce in EMEA, 11% of the R&D workforce in China, and 34% of the R&D workforce in North America, including 371 employees in Canada).

4.      Twenty-two different Nortel entities were designated as sellers in the UMTS transaction as follows:  Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR") and Nortel Networks S.A. ("NNSA"), together with entities for Austria, Australia, Belgium, China, Germany, Hong Kong, Israel, Italy, Malta, the Netherlands, Northern Ireland, Peru, Poland, Portugal, Slovakia and Spain, and Nortel Networks Technology Corporation.[6]

5.      With the completion of this sale, Alcatel-Lucent acquired Nortel's UMTS access product portfolio, associated patents and tangible assets as well as customer contracts from Nortel.[7]  Specifically, Alcatel received an assignment of all patents and other intellectual property ("IP") mainly used in the UMTS access business, including standard essential patents.[8] Alcatel also received a license for IP that was not assigned outright because it was needed by other aspects of Nortel's business, but which was still needed to run the UMTS access business.[9] As part of the asset sale, approximately 1,700 of Nortel's UMTS access employees transferred to

---

6.      *See* Final Nortel UMTS asset allocation spreadsheet, July 27, 2007, NNI_00286115.

7.      DSC Appraisal Assocs. Inc., Alcatel: Valuation of Certain Assets of Nortel Networks' UMTS Business as of December 31, 2006 ("DSC Alcatel Appraisal"), NNI_00174638 at NNI_00174645 ("Under the transaction, Alcatel acquired Nortel's UMTS radio access technology and product portfolio (made up of the Radio Network Controller ('RNC') and Node B products and OAM solutions), as well as all associated patents, tangible assets and customer contracts.  It is anticipated that a significant majority of employees of Nortel's UMTS access business will be transferred to Alcatel.").

8.      *See* Nortel Networks Corp., Current Report (Form 8-K) (Jan. 3, 2007) at Ex. 99.1 ("With the completion of this sale, Alcatel-Lucent acquired the UMTS access product portfolio, associated patents and tangible assets as well as customer contracts from Nortel."); Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 43 ("We have committed to . . . providing Alcatel-Lucent the right to use all proprietary intellectual property used in our UMTS access products and services which are also common to other Nortel products and services.").

9.      *See* Project Osiris, Board of Directors Update, Slide 4, Aug. 29, 2006, NNC-NNL07875245 ("ALA [Alcatel Lucent] gets a license for the IPR that is not transferred but still needed by them to run the business.  Nortel gets a royalty free license back on the IPR it has assigned subject to an exclusion for UMTS Access.").

Alcatel-Lucent, primarily in France, Ottawa and Beijing.[10]

      6.     The terms of the UMTS Asset Sale Agreement granted Alcatel the right to allocate the consideration to classes of assets, subject to the condition that tangible assets (owned equipment and inventory) were valued at Nortel net book value.[11]  Alcatel retained an independent appraiser, DSC Appraisal Associates Inc. ("DSC") to conduct an analysis and estimation of the fair market value of certain intangible assets associated with the acquisition of Nortel's UMTS radio access business as of December 31, 2006, to assist Alcatel in allocating the purchase price among the acquired assets for financial reporting purposes.[12]  DSC determined the fair value of technology assets (developed technology and in-process R&D) and customer relationships (contractual and non-contractual).[13]  Based on the valuation analysis conducted by DSC and in accordance with the terms of the UMTS Asset Sale Agreement, Alcatel allocated its purchase price to tangible assets (comprised of fixed assets and inventory), customer relationships, IP and goodwill.[14]

---

10.    Nortel Networks Corp., Current Report (Form 8-K) (Jan. 3, 2007) at Ex. 99.1; Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 14.

11.    *See* UMTS Asset Sale Agreement Ex. 2.2.7 ¶ (i), Albert-Lebrun Dep. Ex. 31585, at NNC-NNL06026778/57 (stating that Alcatel "will provide to [Nortel] with [Alcatel's] proposed allocation among the Assets . . . (the 'Asset Acquisition Statement').  . . . The Asset Acquisition Statement will use net book value for the Owned Equipment and the Inventory . . . ."); e-mail from Louis Farr, Tax Dep't, NNI, to Ryan Smith, EMEA Tax Leader, et al., "'Heads Up' – Osiris Purchase Price Allocation Process," (Dec. 4, 2006, 11:36 p.m.), NNI_00432290 at NNI_00432290 (noting that the "signed agreement provides that Alcatel is to do an allocation of price among the assets"); Memorandum from the Nortel Global Initiatives Grp. to Project Osiris Files,  "Treatment of Customer Relationship Intangible in Purchase Price Allocation" (Feb. 15, 2007) ("Project Osiris File Memo"), NNC-NNL035256 at NNC-NNL035256.

12.    DSC Alcatel Appraisal, NNI_00174638 at NNI_00174638.

13.    *Id.* at NNI_00174644 (listing fair market values for the following assets: Developed Technology & Know-How, Customer relationships (contractual & non-contractual) and In-Process Research and Development).

14.    Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement, July 24, 2007, NNC-NNL06105164; Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256.

7.     The total purchase price for the UMTS access business was $320 million, which after various adjustments resulted in net proceeds of approximately $293 million.[15]  Of this latter amount, $68 million was allocated to tangible assets and inventory at book value.[16]  This left approximately $225 million to be assigned to intangible assets for tax and financial statement purposes.[17]  Based on an independent appraisal by DSC, Alcatel assigned approximately $162 million to IP, $52 million to customer relationships and $11 million to goodwill.[18]

8.     Nortel was then required to allocate the sale proceeds among the twenty-two Nortel sellers.[19]  The values Alcatel attributed to fixed assets and inventory were assigned to the entity transferring those assets to Alcatel in accordance with the values recorded on that entity's books as of December 31, 2006.[20]  The value attributed to IP was apportioned to the

---

15.   Amount to be allocated ("Alcatel Allocation Worksheet"), EMEAPRIV0045785 at 1 (listing Gross Consideration at $320,000,000 and Amount to be allocated at $292,745,290).

16.   *Id.*  (listing Tangible Assets at $68,407,637); Nortel Networks, Sale of UMTS Access Business to Alcatel Lucent, Allocation of Consideration ("Nortel Alcatel Allocation"), EMEAPROD1305279 at EMEAPROD1305280 ("The structure of the sale agreement was such that Alcatel had the right to allocate the agreed price over asset classes, subject to the provision that tangible assets, machinery & equipment and inventories, were to be valued at Nortel US GAAP book value at closing.").

17.   *See* Alcatel Allocation Worksheet, EMEAPRIV0045785 at 1 (remaining asset classes are Developed Tech & Know How, Customers Relationships & Contracts, In-Process R&D, and Goodwill); UMTS Asset Sale Agreement Ex. 2.2.7 ¶ (v) ("[T]he Seller shall and shall cause the other Designated Sellers, respectively . . . to file all Tax Returns and reports consistent with the allocation provided in the Asset Allocation Statement.").

18.   Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256; *see also* Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement (Dec. 29, 2006), NNI_00432293 at 1.

19.   UMTS Asset Sale Agreement Ex. 2.2.7 ¶ (v) ("[T]he Seller shall and shall cause the other Designated Sellers, respectively . . . to file all Tax Returns and reports consistent with the allocation provided in the Asset Allocation Statement.").

20.   Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305280 ("[T]angible assets, machinery & equipment and inventories, were to be valued at Nortel US GAAP book value at closing. . . . Nortel had the right under the sale agreement to allocate the consideration by asset class to each vending entity in the group.").

participants in the MRDA at the time the sale completed (NNL, NNI, NNUK, NNIR, NNSA and

Nortel Networks Australia Pty. Limited) in accordance with their respective proportionate share

in the group residual profit pursuant to the Master Research and Development Agreement

("MRDA") assessed as of December 31, 2006, as "economic owners of the intellectual property

under that Agreement."[21]  The value Alcatel attributed to customer assets was apportioned

among the various different sellers by identifying which entity held the primary customer

relationship.[22]  Alcatel deemed the remaining balance of the purchase price (after allocating the

value of the other asset classes) to be attributable to goodwill.[23]  This was allocated first to the

Limited Risk Entity ("LRE") sellers, who each received the same 1% return as paid under the

transfer pricing arrangements for 2006, with the balance shared among the Residual Profit

Entities ("RPEs") in accordance with their respective percentage stake in the R&D capital stock

under the MRDA as of December 31, 2006.[24]

---

21.    *Id.* at EMEAPROD1305281 ("Intellectual property consideration was allocated to the participants in the
       Master R&D Agreement to be shared amongst them in their proportionate share in the group residual profit at
       the time of Closing as they are the economic owners of the intellectual property under that Agreement.");
       Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035257 ("While NNL generally is the legal owner
       of the technology, the Master R&D Agreement determines the economic ownership of it and thus allocation
       of the consideration by proportionate R&D Capital Stock is appropriate.").

22.    Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305281 ("Customer contract consideration
       was allocated pro rata to external customer revenues for the [sic] 2006 by reference to the Nortel entity that
       had the true customer relationship."); *see also* e-mail from Kerry Stephens, Tax Dep't, EMEA, to Michael
       Orlando, Int'l Tax – Transfer Pricing, NNI, et al.  (Jan. 14, 2007, 9:57 a.m.), EMEAPRIV0034270 at
       EMEAPRIV0034270  ("The allocation on our part was that customer contract monies were attributed to the
       entity with the substantive customer relationship, so the UK for example picked up a large share because of
       the revenues derived from Vodafone and O2."); *see also* Project Osiris File Memo, NNC-NNL035256 at
       NNC-NNL035256 (noting the Nortel's allocation determination for customer contracts was "by reference to
       the entities owning the contracts, the allocation being based on proportionate 2006 UMTS revenues").

23.    Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305280 (listing "Goodwill (the balance of
       the consideration after the foregoing allocations)").

24.    *Id.* at EMEAPROD1305281 ("LRD vendors were only allocated 1% of [the balance goodwill figure],
       representing their historic margin on customer revenues as found by the Distributor agreements . . . [the]

(Footnote continued on next page)

9.      In summary, Nortel decided to assign value as follows (figures rounded):

a.      $68 million attributable to tangible assets and inventory was allocated to the Nortel company that held those assets at the value recorded on that entity's books as at December 31, 2006;[25]

b.      $162 million attributable to IP was allocated to the various RPEs in proportion to their Residual Profit Share ("RPS") percentages, calculated based on the five previous years of R&D spending;[26]

c.      $52 million attributable to customer assets was allocated to the various entities that held the primary customer relationship, based on proportionate 2006 UMTS revenue;[27] and

d.      $11 million attributable to goodwill was allocated by first assigning to each entity a percentage based on a three factor formula considering assets, employees and revenue.[28] The LREs then received 1% of the initial calculated percentage,

---

(Footnote continued from prior page)
balance being allocated to the participants in the Master R&D Agreement in the same ratio as applied to the Intellectual property proceeds.").

25.    *See id.* at EMEAPROD1305281 ("The structure of the sale agreement was such that Alcatel had the right to allocate the agreed price over asset classes, subject to the provision that tangible assets, machinery & equipment and inventories, were to be valued at Nortel US GAAP book value at closing."); Alcatel Allocation Worksheet, EMEAPRIV0045785 at 1 (listing Tangible Assets at $68,407,637).

26.    *See supra* note 21; Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256 (listing Technology (IP/in process R&D) at $161.9 million).

27.    *See supra* note 22; Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256 (listing customer contracts at $51.8 million).

28.    *See* Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement (Dec. 29, 2006), NNI_00432293 at 1 (listing total Goodwill as $10,637,653.); Project Osiris File Memo, NNC-NNL035256 at NNC-NNL035256 (listing Goodwill at $10.6 million); Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305281 ("The balancing goodwill figure is allocated amongst all Nortel vendors by reference firstly to a three factor formula of revenues, assets and people for each vending entity to determine a

(Footnote continued on next page)

which was the amount paid under the relevant distribution agreements for 2006.[29]  The remaining 99% which was not allocated to the LREs was then divided among the RPEs in the same proportions as IP.[30]

10.    The net result of this allocation was the following[31]:

**UMTS Access Sale Proceeds Allocation**

|  | IP | | Customers | | Goodwill | |
|---|---|---|---|---|---|---|
| NNL | $65.5MM | 40.45% | $0 | 0.00% | $3.02MM | 28.35% |
| NNI | $68.1MM | 42.05% | $0.04MM | 0.08% | $1.71MM | 16.08% |
| NNUK | $8.8MM | 5.45% | $42.8MM | 82.62% | $1.12MM | 10.50% |
| NNSA | $17.6MM | 10.86% | $7.3MM | 14.10% | $4.66MM | 43.81% |
| NNIR | $1.4MM | 0.86% | $0 | 0.00% | $0.08MM | 0.78% |
| Other EMEA | $0 | 0.00% | $1.17MM | 2.26% | $0.03MM | 0.30% |
| Other | $0.5MM | 0.33% | $0.5MM | 1% | $0.017MM | 0.18% |

11.    The final values apportioned to each Nortel selling entity were audited by Deloitte.[32]

---

(Footnote continued from prior page)
proportionate split for each vendor (its percentage of the total of its three factors against the total of those factors for all vendors.  That proportion of the Goodwill consideration was found for each vendor, but LRD vendors were only allocated 1% of that, representing their historic margin on customer revenues as found by the Distributor agreements referred to above, the balance being allocated to the participants in the Master R&D Agreement in the same ratio as applied to the Intellectual property proceeds.").

29.    *See* Nortel Alcatel Allocation, EMEAPROD1305279 at EMEAPROD1305281 ("That proportion of the Goodwill consideration was found for each vendor, but LRD vendors were only allocated 1% of that, representing their historic margin on customer revenues as found by the Distributor agreements referred to above. . . .").

30.    *Id.*

31.    Amount to be allocated, UCC0146640 at 1.

12.    Internally, Nortel decided to allocate the various asset classes among the
Nortel entities based on the following assumptions:

a.    Customer Relationship Intangibles – The value of the Customer
Relationship Intangible was allocated to those entities that had the face-to-face relationship with
the customer.  The allocation was based on the revenue that the associate customer contract
produced.  The fact that the other Nortel entities may have had revenue from a particular
customer contract was disregarded – the only reason why these entities had revenue was due to
Nortel's internal, local-to-local sales process.[33]

b.    IPR – The value for IPR was allocated using RPS percentages.
RPS determined how profits and losses are shared.  If UMTS access was not sold, all of the RPS
members would share profits and losses associated with the business.  Since RPS determined the
economic relationships between the parties, all rights associated with the IPR should be shared
based on RPS percentages.  This was also consistent with Nortel's view that all Nortel IPR is
indistinguishable such that all value should be shared among the RPS members.[34]

c.    Goodwill – Going concern value is a function of the elements of
value in a business – assets, people, and revenue.  Each of the factors was given an equal one-

---

32.    *See* Orlando Dep. 153:17–21, Nov. 5, 2013 (agreeing that Nortel's auditors reviewed the Alcatel/UMTS sale);
       Nortel Networks Corp., Annual Report (Form 10-K) (Mar. 16, 2007) at 43, 141 (inclusion of the
       Alcatel/UMTS transaction in Nortel's audited annual financial statements); e-mail from Timothy Pickering,
       Senior Manager, Int'l Tax, Deloitte & Touch LLP, to Louis Farr, Tax Dep't, NNI, et al. ( Jan. 27, 2007, 11:06
       a.m.), NNI_00364699 at NNI_00364700 ("Please find attached the information that we will require to assist
       in the audit of this transaction.").

33.    E-mail from Louis Farr, Tax Dep't, NNI, to Timothy Pickering, Senior Manager, Int'l Tax, Deloitte &
       Touche LLP, et al., "UMTS Alcatel Transaction" (Jan. 29, 2007, 2:25 p.m.), Culina Dep. Ex. 21160, at
       BHG0137543 (stating assumptions concerning customer relationship intangibles).

34.    *Id*. (stating assumptions for IPR).

third weighting in allocating the goodwill, but the economic effects of RPS were also included.

The Distributor Companies participated, but their economic upside and downside were capped

under RPS.  Therefore, the goodwill was shared among the RPS members after the Distributors

received their 1% payments in acknowledgement of their participation in the Nortel/Alcatel

transaction.[35]

---

35.    *Id*. (stating assumptions for goodwill).

# APPENDIX 11

## Details of the CDMA and LTE Sale to Ericsson

*Overview of the Sale*

1.       Carrier Networks ("CN"), one of Nortel's four reportable business segments, offered wireline and wireless networks that helped service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops and other wireless computing and communications devices.[1]

2.       The Code Division Multiple Access and Long Term Evolution Access ("CDMA and LTE") business fell within the CN reportable business segment.[2]

3.       The CN portfolio included 2G/3G mobility networking solutions based on the CDMA channel access method used by various radio communication technologies, and Nortel's research and development efforts included innovative technologies focused in the areas of 4G broadband wireless, including LTE, an evolving networking standard designed to increase network bandwidth for multimedia content and applications.[3]  The LTE business is the business in which the Nortel Group designed, marketed and distributed LTE access products.[4]

---

1.     Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009.

2.     Fourteenth Report of the Monitor ¶ 12, June 23, 2009 [D.I. 946].

3.     *Id.* ¶ 14.

4.     *Id.* ¶ 16.

*Details of the CDMA and LTE Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| June 19, 2009 | Nokia Siemens Networks B.V. signs Stalking Horse Agreement |
| June 30, 2009 | Court order approves sale and bid procedures |
| July 21, 2009 | Last date for submission of qualified bids |
| July 24, 2009 | Auction commenced |
| July 24, 2009 | Auction ended |
| **Details of the Sale** | |
| July 24, 2009 | Ericsson signs North American Agreement[5, 6] |
| July 28, 2009 | Court order approves sale through winning bid |
| November 13, 2009 | Completion date |

*Sale Documents*

4.      The main documents governing the sale are the Asset Sale Agreement

dated July 24, 2009 (the "North American Agreement")[7] and the Sellers Disclosure Schedule.[8]

---

5.      As defined below.

6.      The purchase price is set out at Appendix 2.

7.      North American Agreement, July 24, 2009, NNI_00803798; Amendment No. 1 to the North American Agreement, Oct. 30, 2009, NNI_00804120; Amendment No. 2 to the North American Agreement, Nov. 13, 2009, NNI_00804123.

8.      North American Sellers Disclosure Schedule, Nov. 13, 2009, NNI_00803937; *see also* Amendment No. 2 to the North American Agreement, Nov. 13, 2009, NNI_00804123; CDMA & LTE Fixed Asset Summary, Dec. 11, 2009, NNI_00804119; Section 1.1(b) of the Sellers Disclosure Schedule: Assigned Patents, NNI_00804135.

The assets sold are identified at Section 2.1.1 of the North American Agreement.[9]  The assumed

liabilities are identified at Section 2.1.3 of the North American Agreement.[10]

*Sellers*

5.      The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation ("NNC")

- Nortel Networks Limited ("NNL")

- Nortel Networks Technology Corporation

- Nortel Networks Inc. ("NNI")

- Nortel Networks (CALA) Inc.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co.
  Limited

6.      The sellers pursuant to the China Asset Sale Agreement dated November

2, 2009 were[11]:

- Nortel Networks (China) Limited

---

9.     North American Agreement, July 24, 2009, NNI_00803832–33.  The North American Agreement when read
       in full sets out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or
       liabilities acquired.

10.    North American Agreement, July 24, 2009, NNI_00803834–36.

11.    China Asset Sale Agreement, Nov. 2, 2009, NNI_00805128.

7.    The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the CDMA and LTE sale are[12]:

- NNC

- NNL

- NNI

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

---

12.    License Termination Agreement, Sept. 11, 2009, NNI_00805595.  The License Termination Agreement, under which all of the parties gave up their license rights to Nortel's IP, was required pursuant to Section 11 of the IFSA (as discussed above).

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks o.o.o.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks UK Limited

*Data room*

8.　　Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[13]

　　Pursuant to the North American Agreement

9.　　A minimum of 2500 employees were to be offered employment pursuant to the North American Agreement.[14]

　　EMEA

10.　　No employees were transferred in EMEA.

---

13.　　The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

14.　　North American Agreement § 7.1(a), July 24, 2009, NNI_00803889–90; *see also* North American Agreement Sellers Disclosure Schedule § 7.1(1), Nov. 13, 2009, NNI_00803937 at NNI_00804114.

6

Case 09-10138-MFW   Doc 13735   Filed 05/30/14   Page 175 of 258

<u>In-scope Employees</u>

11.     A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[15]

*Intellectual Property*

12.     Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under the North American Agreement in two main ways.  First, the Sellers under the North American Agreement transferred patents, software and trademarks at the November 13, 2009 closing date.[16]  Second, at the closing date of November 13, 2009, Nortel granted[17] a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the CDMA and LTE Access business acquired from Nortel.[18] The patents subject to this license were among those sold to Rockstar as part of the Residual Patents Sale.

---

15.     In-scope Employees Spread sheet, NNI_NARNIA_00176065.

16.     Section § 2.1.1(g) of the North American Agreement provided that the buyer would obtain 253 patents, as well as the software and trademarks listed in sections 1.1(a), 1.1(b) and 1.1(c) of the North American Agreement Sellers' Disclosure Schedule.  *See* North American Agreement § 2.1.1(g), July 24, 2009, NNC-NNL06001800/35.

17.     See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The CDMA Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ericsson at closing under Section 2.3.2 of the North American Agreement.  *See* North American ASA § 2.3.2 at NNI_00803845.

18.     Intellectual Property License Agreement § 2.01, Nov. 13 2009, NNC-NNL06001811/5–6.

# APPENDIX 12

## Details of the GSM and GSM-R Sale to Ericsson and Kapsch

*Overview of the Sale*

1.     Carrier Networks ("<u>CN</u>"), one of the Nortel Group's four reportable business segments, offered wireline and wireless networks that helped service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops and other wireless computing and communications devices.[1]

2.     The Global System for Mobile communications ("<u>GSM</u>") and GSM for Railways ("<u>GSM-R</u>") business fell within the CN reportable business segment.[2]

3.     GSM is a mobile technology providing global wireless coverage with more than 2.6 billion users worldwide.[3]  Nortel's GSM business solutions includes:  GSM network access products that offer a wide range of solutions to provide nationwide coverage and significantly increase the access to networks (and, as a result, the subscriber base); voice core solutions that focus on network optimization for cost efficiencies and better voice quality; and packet core solutions that offer network optimization for cost efficiencies for higher capacity to support data needs.[4]

---

1.     Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009.

2.     Twenty-Third Report of the Monitor ¶ 12, October 8, 2009 [D.I. 1663].

3.     *Id.* ¶ 13.

4.     *Id.*

4.       GSM-R provides a secure wireless communications system for railways

operators, and is based on GSM technology.[5]

5.       Nortel's GSM products are installed and supported in more than 100 GSM

public operations around the globe.[6]  Nortel was a leader in the GSM-R market segment with an

approximate 60% share of global railway track kilometers awarded to date.[7]

6.       The GSM business had 2008 revenues of approximately $1.36 billion,

representing approximately 13% of Nortel's 2008 revenues.[8]

*Details of the GSM and GSM-R Sale Process*

| Date | Event |
|------|-------|
| **Bidding Process** | |
| October 15, 2009 | Court order approves sale and bid procedures |
| November 16, 2009 | Last date for submission of qualified bids |
| November 24, 2009 | Auction commenced |
| November 24, 2009 | Auction ended |
| **Details of the Sale** | |
| November 24, 2009 | Ericsson signs North American Agreement[9] and Kapsch signs EMEA Agreement[10, 11] |

---

5.       *Id.*

6.       *Id.* ¶ 14.

7.       *Id.*

8.       *Id.* ¶ 15.

9.       As defined below.

| December 2, 2009 | Court order approves sale through winning bid |
| March 31, 2010 | Completion date |

*Sale Documents*

7.      The main documents governing the sale are the Asset Sale Agreement dated November 24, 2009 (the "<u>North American Agreement</u>"),[12] the Asset Sale Agreement relating to the Sale and Purchase of the EMEA Assets dated November 24, 2009 (the "<u>EMEA Agreement</u>")[13] and the North American Sellers Disclosure Schedule.[14]  The assets sold are identified at Section 2.1.1 in respect of the North American Agreement and 2.1 in respect of the EMEA Agreement.[15] The assumed liabilities are identified at Section 2.1.3 in respect of the

---

(Footnote continued from prior page)

10.    As defined below.

11.    The purchase price is set out at Appendix 2.

12.    North American Agreement, Nov. 24, 2009, NNC-NNL06002582; *see also* Amendment to The North American Agreement, Mar. 31, 2010, at NNI_00810895.  The sellers of the CALA business were party to a separate ASA, but because this relates to a sub-set of the North American business it is not discussed separately and both the CALA and North American Agreements are treated as being a single agreement with Ericsson.

13.    EMEA Agreement, Nov. 24, 2009, NNC-NNL11752288; *see also* Deed of Amendment and Restatement relating to the EMEA Agreement, Mar. 8, 2010, NOR_53929099; *see also* Amendment Agreement relating to the EMEA Agreement, March 31, 2010, NOR_56782763; *see also* Consolidated EMEA Agreement, NOR_56781721.

14.    North American Sellers Disclosure Schedule, Nov. 24, 2009, NNI_01259261; *see also* Amendment to the North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00810895; Updated Section 4.10(b) of the North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00812502; Updated Section 7.1.1(c)(i) of the North American Sellers Disclosure Schedule, Mar. 31, 2010, NNI_00812509.

15.    North American Agreement, Nov. 24, 2009, NNC-NNL06002582/37-38; EMEA Agreement, Mar. 24, 2009, NOR_56781721.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

North American Agreement and at Section 2.3 in respect of the EMEA Agreement.[16]

8.      The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation ("NNC")

- Nortel Networks Limited ("NNL")

- Nortel Networks Inc. ("NNI")

- Nortel Networks (CALA) Inc.

- Nortel Networks de Argentina S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel del Paraguay

- Nortel Networks del Uruguay S.A.

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

9.      The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

---

16.     North American Agreement, Nov. 24, 2009, NNC-NNL06002582/40-41; EMEA Agreement, NOR_56781721.

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks (Northern Ireland) Limited

10.     The sellers pursuant to the China Asset Sale Agreement dated March 31, 2010 were[17]:

- Nortel Networks (China) Limited

11.     The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the GSM/GSM-R sale are[18]:

- Nortel Networks Corporation

- Nortel Networks Limited

---

17.     China Asset Sale Agreement between Nortel Networks (China) Limited and Kapsch CarrierCom Hong Kong Limited, Mar. 31, 2010, NNI_00811123.

18.     License Termination Agreement, GIP_Nortel_00101524.

- Nortel Networks Technology Corporation

- Nortel Networks Global Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks (Northern Ireland) Limited

*Data room*

12.     Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[19]

<u>Pursuant to the North American Agreement</u>

13.     A minimum of 350 employees were to be offered employment pursuant to the North American Agreement.[20]

<u>Pursuant to the EMEA Agreement</u>

14.     Approximately 218 employees transferred by operation of law, by offer from the Purchaser or otherwise pursuant to the EMEA Agreement[21] as follows:

| Country | Approximate Transfers |
|---------|----------------------|
| Austria | 1 |
| Germany | 44 |
| Hungary | 4 |
| Ireland | 3 |
| Italy | 2 |
| Poland | 9 |
| Slovakia | 4 |
| Spain | 13 |
| UK | 18 |
| China | 15 |

19.     The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

20.     North American Agreement § 7.1.1(a), Nov. 24, 2009, NNC-NNL06002582/100; *see also* North American Agreement Sellers Disclosure Schedule § 7.1, Nov. 24, 2009, NNI_01259389.

21.     EMEA Agreement, Schedule 5, NOR_56781721 at 93.

| France (NNFSAS) | 10 |
| France (NNTF) | 1 |
| Romania | 2 |
| Russia | 7 |
| Taiwan | 18 |

<u>In-scope Employees</u>

15.     A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[22]

*Intellectual Property*

16.     Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[23]  First, the Sellers under each agreement transferred patents, software and trademarks at the March 31, 2010 closing date.[24]  Second, at the closing date of March 31, 2010, Nortel granted[25] both Ericsson and Kapsch a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the GSM and

---

22.    In-scope Employees Spreadsheet, NNI_NARNIA_00175555.

23.    The EMEA Agreement also transferred IP held by Nortel France SAS (*see* Consolidated EMEA Agreement § 2.1.7).

24.    North American Agreement § 2.1.1(f), Nov. 24, 2009 (together with EMEA Agreement  § 2.1.7) provided that the buyers would obtain 61 patents, as well as the software and trademarks listed in North American Agreement Sellers Disclosure Schedule § 1.1(j) and 1.1(l), Nov. 24, 2009.

25.    See Mr. Malackowski's Report at section  9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ericsson at closing under clause 2.3.2 of the North American Agreement. The equivalent requirement in relation to Kapsch CarrierCom is contained in clause 4.3.1 of the EMEA Agreement.

GSM-R business acquired from Nortel.[26]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

26.   Intellectual Property License Agreement § 2.01, Mar. 31, 2010, at NNI_01265512 (in favor of Kapsch CarrierCom); Intellectual Property License Agreement § 2.01, Mar. 31, 2010, at NNI_01259143 (in favor of Ericsson).

# APPENDIX 13

## Details of the Next Generation Packet Core Sale to Hitachi

*Overview of the Sale*

1.      Carrier Networks ("CN"), one of the Nortel Group's four reportable business segments, offered wireline and wireless networks that helped service providers and cable operators supply mobile voice, data and multimedia communications services to individuals and enterprises using cellular telephones, personal digital assistants, laptops and other wireless computing and communications devices.[1]

2.      The Next Generation Packet Core ("NG-PC") business fell within the CN reportable business segment.[2]

3.      The NG-PC business developed network components designed to provide data network connectivity for GPRS (General Packet Radio Service), UMTS (Universal Mobile Telecommunications Systems) and LTE wireless technologies and increase network bandwidth for multimedia content and applications over wireless networks.[3]

---

[1]     Nortel Networks Limited, Unaudited Condensed Combined and Consolidated Financial Statements for the Three Months ended March 31, 2009 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months ended March 31, 2009.

[2]     Twenty-First Report of the Monitor ¶ 12, Sept. 24, 2009 [D.I. 1550].

[3]     *Id.*

2

*Details of the Next Generation Packet Core Sale Process*

| Date | Event |
|------|-------|
| **Bidding Process** | |
| September 30, 2009 | Court order approves sale and bid procedures |
| October 16, 2009 | Last date for submission of qualified bids |
| **Details of the Sale** | |
| October 25, 2009 | Hitachi signs North American Agreement[4, 5] |
| October 28, 2009 | Court order approves sale through winning bid |
| December 8, 2009 | Completion date |

*Sale Documents*

4.      The main documents governing the sale are the Transaction Agreement

dated October 25, 2009 (the "North American Agreement")[6] and the Sellers Disclosure

Schedule.[7]  The assets sold are identified at Section 2.1.1 in respect of the North American

---

4.      As defined below.

5.      The purchase price is set out at Appendix 2.

6.      North American Agreement, Oct. 25, 2009, NNI_01261745; *see also* Amendment to the North American
        Agreement, Nov. 27, 2009, NNI_01261805.

7.      North American Agreement Sellers Disclosure Schedule, Oct. 25, 2009, BHG0138007; *see also* Amended
        North American Agreement Sellers Disclosure Schedule, Nov. 7, 2009, NNC-NNL07789371;  *see also* Seville
        FA Section 1.1(b) – Appendix A, NNI_00823766; Desktop Asset Listing 20091112 Seville, Nov. 12, 2009,
        NNI_00823767; Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix A – Access Gateway Design
        Documentation, NNI_00824416;  Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix B – Access
        Gateway Test Documentation, NNI_00824866; Section 1.1.(a)(i) of the Sellers Disclosure Schedule, Appendix
        C – Access Gateway System Engineering Documentation, NNI_00824902; CATT Servers Spreadsheet,
        NNI_00824910; Desktop Asset Listing 20091112 Seville, Nov. 12, 2009, NNI_00824911; Section 4.7(b) of the
        Sellers Disclosure Schedule – Seville, Oct. 12, 2009, NNI_00824912; Letter from Nortel Networks Inc. to
        Emerson Network Power (2009), NNI_00824913; Letter from Nortel Networks Inc. to GE Fanuc Intelligent
        Platforms (2009), NNI_00824916.

Agreement.[8]  The assumed liabilities are identified at Section 2.1.2 in respect of the North

American Agreement.[9]

*Sellers*

5.      The sellers pursuant to the North American Agreement were:

- Nortel Networks Limited ("NNL")

- Nortel Networks Inc. ("NNI")

6.      The parties which entered into the License Termination Agreement as

required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became

"Selling Debtors" and who therefore have a claim to some amount of the proceeds of the Next

Generation Packet Core sale are[10]:

- Nortel Networks Corporation

- NNL

- NNI

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

---

8.    North American Agreement, Oct. 25, 2009 NNI_01261745 at NNI_01261763–64.  The North American
      Agreement when read in full sets out (where appropriate) any exceptions, limitations and caveats in respect of
      the assets sold and/or liabilities acquired.

9.    *Id.* at NNI_01261764–65.

10.   License Termination Agreement, GIP_Nortel_00101408.

- Architel Systems (U.S.) Corporation

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks UK Limited

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal SA

- Nortel Networks Romania Srl

*Data room*

7.      Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information and employee information.

*Employees*[11]

<u>Pursuant to the North American Agreement</u>

8.      A minimum of fifteen employees were to be offered employment pursuant to the North American Agreement.[12]

<u>EMEA</u>

9.      No employees were transferred within EMEA.

<u>In-scope Employees</u>

10.      All of the in-scope employees include employees focused on research, design and development.[13]

---

11.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

12.    North American Agreement § 7.1(a), Oct. 25, 2009, NNI_01261745 at NNI_01261788; *see also* Amended North American Agreement Sellers Disclosure Schedule § 7.1, Nov. 27, 2009, NNC-NNL07789371/18.

*Intellectual Property*

      11.    Intellectual Property consisting solely of software used in the business transferred under the North American Agreement in two main ways.  First, the Sellers under the North American Agreement transferred the software at the October 25, 2009 closing date.[14] Second, at the closing date of October 25, 2009, Nortel granted[15] Hitachi a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the Next Generation Packet Core business acquired from Nortel.[16]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

(Footnote continued from prior page)

13.    In-scope Employees Spreadsheet, NNI_NARNIA_00176058.

14.    North American Agreement § 2.1.1, Oct. 25, 2009, NNI_01261745 at NNI_01261763–64 (provides that the buyers would purchase or accept assignment of the software and software documentation listed in Sections 1.1(a)(i) and 1.1(a)(ii) of the Sellers' Disclosure Schedule).

15.    See Mr. Malackowski's Report at section  9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Hitachi at closing under clause 2.3.2(a) of the North American Agreement.

16.    Intellectual Property License Agreement § 3.01, Dec. 8, 2009, NNI_00782745 at 6 (contains license grant in favor of Hitachi).

# APPENDIX 14

## Details of the CVAS Sale to GENBAND Inc.

*Overview of the Sale*

     1.     The Carrier Voice Application Solutions ("CVAS") business was one of the Nortel Group's reportable business segments[1] and was comprised of the carrier voice and applications solutions segment of Nortel's Carrier Networks ("CN") business unit.[2]  The CVAS business delivered both products and services principally to telecommunications services providers and multi-system operators that enabled them to provide voice, data and multimedia telecommunications solutions to their end clients.[3]  Prior to its divestiture, Nortel was the leading global provider of CVAS products and services in its market segment.[4]

     2.     The CVAS business operated approximately 774 deployment sites across approximately 48 countries.[5]  It had a base of over 100 million voice over internet protocol ports shipped world-wide and 21 million internet protocol telephone lines shipped.[6]  Fiscal 2008 revenues were over $870 million, representing nearly 9% of Nortel's 2008 revenues.[7]

---

1.     Since September 30, 2009. *See* Thirty-Fourth Report of the Monitor ¶ 13, Jan. 3, 2010 [D.I. 2228 Ex. A].

2.     *Id.* ¶ 16.

3.     *Id.* ¶ 17.

4.     *Id.*

5.     *Id.* ¶ 19.

6.     *Id.*

7.     *Id.*

*Details of the CVAS Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| December 22, 2009 | GENBAND Inc. signs Stalking Horse Agreement |
| January 8, 2010 | Court order approves sale and bid procedures |
| February 23, 2010 | Last date for submission of qualified bids |
| **Details of the Sale** | |
| December 22, 2009 | GENBAND Inc. signs the North American Agreement and the EMEA Agreement[8, 9] |
| March 4, 2010 | Court order approves sale through winning bid |
| May 28, 2010 | Completion date |

*Sale Documents*

3.      The main documents governing the sale are the Asset Sale Agreement dated December 22, 2009 (the "North American Agreement"),[10] the Asset Sale Agreement relating to the Sale and Purchase of the EMEA Assets dated December 23, 2009 (the "EMEA Agreement")[11] and the respective Sellers' Disclosure Schedules.[12]  The assets sold are identified

---

8.    As defined below.

9.    The purchase price is set out at Appendix 2.

10.  North American Agreement, Dec. 22, 2009, NNC-NNL06001609; Amendment No. 1 to the North American Agreement, May 28, 2010, NNC-NNL06001636.

11.  EMEA Agreement, Dec. 23, 2009, NNC-NNL06001613 (as amended on May 28, 2010).

12.  Sellers Disclosure Schedule to the North American Agreement, Dec. 22, 2009, NNC-NNL06001637; *see also* Schedule 1.1(f): Owned Equipment: Shared Laboratories, June 7, 2009, NNC-NNL06001638; Nortel Networks

(Footnote continued on next page)

at Section 2.1.1 in respect of the North American Agreement and 2.1 in respect of the EMEA

Agreement.[13]  The assumed liabilities are identified at Section 2.1.3 in respect of the North

American Agreement and Section 2.3 in respect of the EMEA Agreement.[14]

*Sellers*

4.      The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Networks International Inc.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

---

(Footnote continued from prior page)

Outstanding Bonds, May 18, 2010, NNC-NNL06001639; Section 4.6 of the Sellers Disclosure Schedule – Litigation, June11, 2009, NNC-NNL06001640; Carrier VoIP, Applications & Solutions: Combined Financial Statements for the Years Ended Dec. 31, 2008 & 2007, NNC-NNL06001641; Sellers Disclosure Schedule 4.7(b), Dec. 21, 2009, NNC-NNL06001642; CVAS P&L, Dec. 21, 2009, NNC-NNL06001643; 2009 YTD Excluding JV's – Total CVAS, NNC-NNL06001644; Section 4.11(b) of the Sellers Disclosure Schedule – Paragon, May 28, 2010, NNC-NNL06001645; Section 7.1.2 (c)(iii) of the Sellers Disclosure Schedule – Paragon, June 7, 2010, NNC-NNL06001646; Section 7.1.2(c)(v) – Specified Employee Liabilities, May 28, 2010, NNC-NNL06001647; Paragon – Schedule 7.1.2(d), Sept. 16, 2010, NNC-NNL06001648.  For the EMEA Agreement: EMEA Agreement, at NNC-NNL06001613.

13.   North American Agreement, at NNC-NNL06001609/42–43; EMEA Agreement, at NNC-NNL06001613/7–9. The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

14.   North American Agreement, at NNC-NNL06001609/45–47; EMEA Agreement, at NNC-NNL06001613/11–12.

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- Nortel Networks (India) Private Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co Limited

- Nortel Networks Technology Corporation

5.   The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

6.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("<u>IFSA</u>"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the CVAS sale are:

- Nortel Networks S.A.[15]

*Data room*

---

15.    Letter from Antoine Tchekhoff re Sale of Carrier VoIP Application Solutions Business, Dec. 22, 2009, GIP_Nortel_00101400; Confirmation Agreement by and among NNL, NNC, Canadian and U.S. Filed Entities, EMEA Filed Entities, EMEA Non-Filed Entities, the French Liquidator, NNSA Office Holders, and the Joint Israeli Administrators, NNC-NNL06001664.  I understand that each of the Sellers under the North American and EMEA Agreement respectively is also to be treated as a Selling Debtor under the IFSA for this sale.

7.     Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[16]

Pursuant to the North American Agreement

8.     A minimum of 1,638[17] employees were to be offered employment pursuant to the North American Agreement dated December 22, 2009[18] with minimum offers as follows:

| Country or Region | Minimum Offer |
|---|---|
| EMEA Region | 301 |
| Canada | 404 |
| United States | 798 |
| Australia and Japan | 46 |
| Rest of the World | 89 |

Pursuant to the EMEA Agreement

---

16.  The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

17.  North American Agreement § 7.1.1(a), at NNC-NNL06001609/118–20 (such figure to include any EMEA transferring employees).

18.  *Id.*; *see also* Sellers Disclosure Schedule to the North American Agreement § 7.1.1(a), Dec. 22, 2009, NNC-NNL06001637/201.

9.      Approximately 301 employees transferred by operation of law, by offer from the Purchaser or otherwise pursuant to the EMEA Agreement dated December 23, 2009[19] as follows:

| Country | Approximate Transfers |
|---------|----------------------|
| Austria | 1 |
| Belgium | 4 |
| France | 31 |
| Germany | 30 |
| Ireland | 3 |
| Israel | 25 |
| Italy | 15 |
| Netherlands | 16 |
| Portugal | 2 |
| Russia | 10 |
| Spain | 24 |
| Switzerland | 5 |
| Sweden | 1 |
| UK | 122 |

19.   EMEA Agreement Schedule 6, at NNC-NNL06001613/112–26 (as amended at 143–89); *see also* Sellers Disclosure Schedule to North American Agreement § 7.1.1(a), at NNC-NNL06001637/201.

<u>In-scope Employees</u>

10.    A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[20]

*Intellectual Property*

11.    Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[21]  First, the Sellers under each agreement transferred patents, software and trademarks at the May 28, 2010 closing date.[22]  Second, at the closing date of May 28, 2010, Nortel granted[23] Genband a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the CVAS business acquired from Nortel.[24] The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

20.    *See* Spreadsheet Regarding Paragon Employees and Functions, NNI_NARNIA_00175024.

21.    The EMEA Agreement also transferred IP.  *See* EMEA Agreement § 2.1.7, at NNC-NNL06001613/7–8.

22.    Section 2.1.1(h) of the North American Agreement (together with Section 2.1.7 to the EMEA Agreement) provided that the purchasers would purchase 206 patents, as well as the software and trademarks listed in Sections 1.1(k) and 1.1(m) of the Sellers Disclosure Schedule.  *See* North American Agreement § 2.1.1(h), NNC-NNL06001609/43; EMEA Agreement § 2.1.7, at NNC-NNL06001613/7–8.

23.    See Mr. Malackowski's Report at section 9.2.4 for the value that the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Genband at closing under clause 2.4.2(b)(iii) of the North American Agreement.  North American Agreement § 2.4.2(b)(iii), May 28, 2010, NNC-NNL06001609/59.

24.    The license grant in favor of Genband is contained at Intellectual Property License Agreement § 2.01, May 28, 2010, NNC-NNL06001658/13.

# APPENDIX 15

## Details of the Enterprise and Government Solutions Sale to Avaya

*Overview of the Sale*

1.      The Enterprise Solutions ("ES") business was one of the Nortel Group's reportable business segments[1] and addressed the communication needs of large and small businesses across various industries by providing products and services that integrate voice, email, conferencing, video and instant messaging.[2]  The ES portfolio included products spanning Unified Communications, Ethernet routing and multiservice switching, Internet Protocol and digital telephony (including phones), wireless Local Area Networks, security, Internet Protocol and Session Initiation Protocol ("SIP") contact centers, self service solutions, messaging, conferencing and SIP-based multimedia solutions.[3]

2.      ES operated globally in approximately 121 countries.[4]  It had an installed base with over 75 million voice lines and 75 million data ports.[5]

3.      ES provided large businesses with the equipment and know-how necessary to design and operate data communications networks.

4.      The North American Agreement[6] records that the 100% stock of Nortel Government Solutions, Inc. ("NGS") and DiamondWare was also sold to the purchaser.

---

1.      As at June 30, 2009. *See* Eighteenth Report of Monitor ¶ 12, July 31, 2009 [D.I. 1259].

2.      *Id.* ¶ 15.

3.      *Id.*

4.      *Id.* ¶ 17.

5.      *Id.*

*Details of the Enterprise Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| July 20, 2009 | Avaya signs Stalking Horse Agreement |
| August 4, 2009 | Court order approves sale and bid procedures |
| September 4, 2009 | Last date for submission of qualified bids |
| September 11, 2009 | Auction commenced |
| September 14, 2009 | Auction ended |
| **Details of the Sale** | |
| September 14, 2009 | Avaya signs North American Agreement and EMEA Agreement[7, 8] |
| September 16, 2009 | Court order approves sale through winning bid |
| December 18, 2009 | Completion date |

*Sale Documents*

5.    The main documents governing the sale are the Amended and Restated

Asset and Share Sale Agreement dated September 14, 2009 (the "North American Agreement"),[9]

---

(Footnote continued from prior page)

6.    As defined below.

7.    As defined below.

8.    The purchase price is set out at Appendix 2.

9.    North American Agreement, Sept. 14, 2009, NNI_00806387; *see also* Amendment No. 1 to the Amended North American Agreement, Dec. 18, 2009, NNI_00807283; Amendment No. 2 to the Amended North American Agreement, Mar. 10, 2011, EMEAPROD2215918.

the Amended and Restated Asset Sale Agreement dated September 14, 2009 (the "EMEA
Agreement")[10] and the respective Sellers' Disclosure Schedules.[11]  The assets sold are identified
at Section 2.1.1 in respect of the North American Agreement and Section 2.1 in respect of the
EMEA Agreement.[12]  The assumed liabilities are identified at Section 2.1.3 in respect of the
North American Agreement and Section 2.3 in respect of the EMEA Agreement.[13]

*Sellers*

    6.    The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation
- Nortel Networks Limited
- Nortel Networks Technology Corporation
- Nortel Networks Inc.
- Nortel Networks (CALA) Inc.
- Nortel Altsystems Inc.
- Nortel Networks International Inc.

---

10.    EMEA Agreement, Sept. 14, 2009, NNI_00807958; Amendment to EMEA Agreement, Sept. 14, 2009; *see also* Amendment to EMEA Agreement, Dec. 22, 2009, NNI_00808280.

11.    North American Agreement Sellers Disclosure Schedule, Sept. 14, 2009, NNI_00806963; *see also* Amended North American Agreement, Dec. 18, 2009; Amendment No. 1 to the North American Agreement, Dec. 18, 2009, NNI_00807283; Amendment No. 2 to the North American Agreement, Mar. 10, 2011, EMEAPROD2215918; Sellers Disclosure Schedule § 1.1(r)(iv), NNI_00807194; Sellers Disclosure Schedule § 1.1(e), NNI_00807356–916; Sellers Disclosure Schedule § 5.25(a), NNI_00807929; Sellers Disclosure Schedule § 7.1.2, NNI_00807931-39; EMEA Sellers' Disclosure Schedule, June 20, 2009, NNI_00808232.

12.    North American Agreement, Sept. 14, 2009, NNI_00806443–45; EMEA Agreement, Sept. 14, 2009, NNI_00807965–67.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

13.    North American Agreement, Sept. 14, 2009, NNI_00806446–49; EMEA Agreement, Sept. 14, 2009, NNI_00807969–72.

- Nortel Networks de Argentina S.A.

- Nortel Networks Telecomunicacoes do Brazil Ltda.

- Nortel Networks Chile S.A.

- Nortel Networks de Colombia S.A.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Australia Pty. Limited

- Nortel Networks (India) Private Limited

- Nortel Technology Excellence Centre Private Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co
  Limited

7.      The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Communication Holdings (1997) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks South Africa (Proprietary) Limited

8.     The parties which entered into the License Termination Agreement as

required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became

"Selling Debtors" and who therefore have a claim to some amount of the proceeds of the

Enterprise sale are[14]:

- Nortel Networks S.A.

*Data room*

      9.     Prior to the conclusion of the sale, a data room was set up for the purpose

of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial

information, information in respect of customers and/or customer contracts and employee

information.

*Employees*[15]

    Pursuant to the North American Agreement

      10.    A minimum of 2,397 employees were to be offered employment pursuant

to the North American Agreement[16] with minimum offers as follows:

| Country or Region | Minimum Offer |
| --- | --- |
| China / Hong Kong / Taiwan | 56 |
| Canada | 571 |
| United States | 1040 |

---

14.   Confirmation Agreement, NOR_55238302. I understand that NNSA is deemed to be a Selling Debtor for the purposes of the IFSA because it entered into this agreement and because it also transferred assets to Avaya.

15.   The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

16.   North American Agreement § 7.1.1, Sept. 14, 2009, NNI_00806558; *see also* North American Sellers Disclosure Schedule § 7.1.1, Sept. 14, 2009, NNI_00807187.

| Remaining APAC Countries[17] | 400 |
|------------------------------|-----|
| Remaining CALA Countries[18] | 90  |

    Pursuant to the EMEA Agreement

    11.    Approximately 1,098 employees transferred by operation of law or by

offer from the Purchaser pursuant to the EMEA Agreement[19] as follows:

| Country | Approximate Transfers |
|---------|----------------------|
| Austria | 8 |
| Belgium | 7 |
| Czech Republic | 3 |
| Denmark | 7 |
| Finland | 4 |
| France | 57 |
| Germany | 74 |
| Ireland | 272 |
| Israel | 22 |
| Italy | 44 |
| The Netherlands | 34 |
| Norway | 9 |

---

17.    Indonesia, Malaysia, New Zealand, Philippines, Thailand, Vietnam, Pakistan, United Arab Emirates, India, Singapore, Egypt, Australia and Japan.

18.    Peru, Trinidad and Tobago, Mexico, Chile, Columbia and Argentina.

19.    EMEA Agreement, Sept. 14, 2009, NNI_00808120–43.

8

| Poland | 7 |
|---|---|
| Portugal | 2 |
| South Africa | 11 |
| Spain | 16 |
| Sweden | 14 |
| Switzerland | 17 |
| UK | 490 |

<u>In-scope Employees</u>

12.     A significant number of the in-scope employees include employees focused on technology, sales and marketing.[20]

*Intellectual Property*

13.     Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[21]  First, the Sellers under each agreement transferred patents, software and trademarks at the December 18, 2009 closing date.[22]  Second, at the closing

---

20.     In-scope Employee Spread sheet, NNI_EQUINOX_00067756.

21.     The EMEA Agreement also transferred IP.  *See* EMEA Agreement § 2.1.7, Sept. 14, 2009, NNI_00807966.

22.     Section 2.1.1(h) of the North American Sale Agreement (together with Section 2.1.5 to the EMEA Agreement) provided that the buyers would obtain 878 patents, including those owned by Nortel France SAS, as well as the software and trademarks listed in Sections 4.6(b)(i) and 4.6(b)(ii) of the North American Sellers' Disclosure Schedule and Sections 1(d), 1(e) and 1(f) of the EMEA Sellers' Disclosure Schedule.

date of December 18, 2009, Nortel granted[23] Avaya a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the Enterprise Solutions business acquired from Nortel.[24]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

23.  See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Avaya at closing under clause 5.26(c) of the North American Agreement.

24.  The license grant is contained in Article 2.01 of the Intellectual Property License Agreement in favor of Avaya.  Intellectual Property License Agreement, Dec. 18, 2009, NNI_01374970.

# APPENDIX 16

## Details of the Layer 4-7 Sale to Radware

*Overview of the Sale*

1.      The Layer 4-7 business fell within the Enterprise Solutions reportable business segment.[1]

2.      The Layer 4-7 business sold certain application delivery products, primarily the Nortel Application Switch and Nortel Application Accelerator products.[2]  The Nortel Application Switch was a product designed to improve application availability, performance and security through load balancing and acceleration of network traffic, giving IT managers greater control over their networks.[3]  The Nortel Application Accelerator was designed to reduce server and bandwidth needs and improve the responsiveness of web-based applications, thereby reducing overall network costs.[4]

3.      The Layer 4-7 business had an installed base of more than 1000 customers.  Product and service revenue in 2008 was approximately $50 million.[5]

---

1.      Second Report of the Monitor ¶ 17, Feb. 25, 2009 [D.I. 376 Ex. A].

2.      *Id.* ¶ 18.

3.      *Id.*

4.      *Id.*

5.      *Id.* ¶ 22.

*Details of the Layer 4-7 Sale Process*

| Date | Event |
| --- | --- |
| **Stalking Horse Bid** | |
| February 19, 2009 | Radware signs Stalking Horse Agreement |
| February 27, 2009 | Court order approves sale and bid procedures |
| March 19, 2009 | Last date for submission of qualified bids |
| **Details of the Sale** | |
| February 19, 2009 | Radware signs North American Agreement[6, 7] |
| March 26, 2009 | Court order approves sale through winning bid |
| March 31, 2009 | Completion date |

*Sale Documents*

> 4.      The main documents governing the sale are the Asset Purchase Agreement dated February 19, 2009 (the "North American Agreement")[8] and the Sellers' Disclosure Schedules.[9]  The assets sold are identified at Section 2.1 of the North American Agreement.[10]  The assumed liabilities are identified at Section 2.3 of the North American Agreement.[11]

---

6.      As defined below.

7.      The purchase price is set out at Appendix 2.

8.      North American Agreement, Feb. 19, 2009, NNI_00814632.

9.      North American Agreement Sellers' Disclosure Schedules, Feb. 19, 2009, NNI_00814970.

10.      North American Agreement, Feb. 19, 2009, NNI_00814632 at NNI_00814652–54.  The North American Agreement when read in full sets out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and or/ liabilities acquired.

11.      *Id.* at NNI-0814656.

*Sellers*

5.  The sellers pursuant to the North American Agreement were:

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Altsystems Inc.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

*Employees*[12]

<u>Pursuant to the North American Agreement</u>

6.      Each of the U.S. employees, the Indian employees and the Japanese employees[13] were to be offered employment pursuant to the North American Agreement.[14]

<u>EMEA</u>

7.      No EMEA employees were transferred to the Purchaser.

<u>Layer 4-7 Employees</u>

8.      A significant number of the employees utilized by the business included employees focused on research and development.[15]

*Intellectual Property*

9.      Intellectual Property consisting solely of the patents, trademarks and software used in the business transferred under the North American Agreement in two main ways.  First, the Sellers under the North American Agreement transferred the IP at the March 31, 2009 closing date.[16]  Second, at the closing date of March 31, 2009, Nortel granted[17] Radware a

---

12.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

13.    As defined in the North American Agreement, Feb. 19, 2009, NNI_00814632 at NNI_00814644–45, NNI_00814649.

14.    *See* North American Agreement, Exhibit O: Additional Employee Related Provisions, NNI_00814632 at NNI_00814947–57.

15.    Project Velocity, Information Memorandum, Feb. 11, 2009, NOR_55314343 at slide 42.

16.    North American Agreement § 2.1(d), Feb. 19, 2009, NNI_00814632 at NNI_00814653  (provides that the buyers would acquire six patents, together with software, software documentation and trademarks listed in Schedule 2.1(d) of the Sellers' Disclosure Schedules).

worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the Layer 4-7 business acquired from Nortel.[18]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

(Footnote continued from prior page)

17.   See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for Business Line IP.  The Intellectual Property License Agreement was identified as an agreement the Sellers were required to enter with Radware at closing by Recital G to, and under clause 4.2(b) of, the North American Agreement.

18.   Intellectual Property License Agreement § 2.01, Mar. 31, 2009, GIP_Nortel_00000917 at GIP_Nortel_00000922 (contains license grant in favor of Radware).

# APPENDIX 17

## Details of the Metro Ethernet Networks Sale to Ciena

*Overview of the Sale*

1.      The Metro Ethernet Networks ("MEN") business was one of the Nortel Group's reportable business segments[1] and delivered and serviced communications infrastructure and solutions for the transport of voice, video and data signals for the "Metropolitan" and "Long-Haul" communications markets using innovating optical networking capabilities.[2]  The MEN business' solutions are designed to deliver carrier-grade Ethernet transport capabilities, higher performance and lower cost communications for emerging video-intensive applications.[3]

2.      The MEN business operated globally in approximately 44 countries.[4]  It had an installed base with over 400,000 network elements.[5]

3.      Its 2008 revenues were $1.3 billion, representing approximately 13% of the Nortel Group's revenues that year.[6]

---

1.      As at June 30, 2009. *See* Twenty-Fourth Report of the Monitor ¶ 12, Oct. 13, 2009 [D.I. 1665 Ex. A].

2.      *Id.* ¶ 16.

3.      *Id.*

4.      *Id.* ¶ 18.

5.      *Id.*

6.      *Id.*

*Details of the MEN Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| October 7, 2009 | Ciena signs Stalking Horse Agreement |
| October 16, 2009 | Court order approves sale and bid procedures |
| November 9, 2009 | Last date for submission of qualified bids |
| November 20, 2009 | Auction commenced |
| November 24, 2009 | Auction ended |
| **Details of the Sale** | |
| November 24, 2009 | Ciena signs North American Agreement and EMEA Agreement[7, 8] |
| December 3, 2009 | Court order approves sale through winning bid |
| March 19, 2010 | Completion date |

*Sale Documents*

4.      The main documents governing the sale are the Amended and Restated

Asset Sale Agreement dated November 24, 2009 (the "North American Agreement"),[9] the Asset

Sale Agreement relating to the Sale and Purchase of the EMEA Assets dated October 7, 2009

---

7.      As defined below.

8.      The purchase price is set out at Appendix 2.

9.      North American Agreement, Nov. 24, 2009, NNI_00216905; *see also* Amendment No. 1 to the North American Agreement, Dec. 3, 2009, NNC-NNL06002190; Amendment No. 2 to the North American Agreement, Dec. 23, 2009, NNC-NNL06002191; Amendment No. 3 to the North American Agreement, Mar. 15, 2010, NNC-NNL06002192; Amendment No. 4 to the North American Agreement, Mar. 15, 2010, NNC-NNL06002193; Amendment No. 5 to the North American Agreement, Mar. 19, 2010, NNC-NNL06002194.

3

(the "EMEA Agreement")[10] and the respective Sellers' Disclosure Schedules.[11]  The assets sold are identified at Section 2.1.1 in respect of the North American Agreement and Section 2.1 in respect of the EMEA Agreement.[12]  The assumed liabilities are identified at Section 2.1.3 in respect of the North American Agreement and Section 2.4 in respect of the EMEA Agreement.[13]

*Sellers*

5.    The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- XROS, Inc.

- QTERA Corporation

- CoreTek Inc.

---

10.    EMEA Agreement, Oct. 7, 2009, NNI_00818097; *see also* Deed of Amendment relating to the EMEA Agreement, Oct. 20, 2009, NNI_00820280; Amendment Agreement relating to the EMEA Agreement, Nov. 24, 2009, NNI_00644355; Deed of Amendment (Amendment No. 3) relating to the EMEA Agreement, Dec. 16, 2009, NNI_00819134; Deed of Amendment (Amendment No. 4) relating to the EMEA Agreement, Jan. 13, 2010, NOR_55238003; Amendment Agreement (Amendment No. 5) relating to the EMEA Agreement, Mar. 19, 2010, NOR_55238004.

11.    *See* North American Agreement Sellers' Disclosure Schedule, Nov. 24, 2009, NNC-NNL06002189; EMEA Agreement Sellers' Disclosure Schedule, Oct. 7, 2009, NNI_00818266.

12.    *See* North American Agreement, Nov. 24, 2009, NNI_00216949-51; EMEA Agreement, Oct. 7, 2009, NNI_00818103–4.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

13.    *See* North American Agreement, Nov. 24, 2009, NNI_00216952-54; EMEA Agreement, Oct. 7, 2009, NNI_00818106–7.

- Nortel Networks de Argentina S.A.

- Nortel Networks de Colombia S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks (Asia) Limited - Pakistan Branch

- Nortel Networks Singapore Pte. Limited - Philippines Branch

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

6.      The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks O.O.O.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks (Northern Ireland) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

7.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became

"Selling Debtors" and who therefore have a claim to some amount of the proceeds of the MEN

sale are[14]:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks de Argentina S.A.

---

14.    License Termination Agreement, BHG0162049.

- Nortel Networks de Colombia S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks International Finance & Holding B.V.

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Optical Components Limited

- Nortel Networks (Northern Ireland) Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks (Asia) Limited - Pakistan Branch

- Nortel Networks Singapore Pte. Limited - Philippines Branch

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co

  Limited

*Data room*

8.       Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[15]

<u>Pursuant to the North American Agreement</u>

9.       A minimum of 2,000[16] employees were to be offered employment pursuant to the North American Agreement.[17]

<u>Pursuant to the EMEA Agreement</u>

10.       Approximately 323 employees transferred by operation of law, by offer from the Purchaser or otherwise pursuant to the EMEA Agreement[18] as follows:

| Country | Approximate Transfers |
|---------|----------------------|
| Austria | 1 |
| Denmark | 4 |
| France | 24 |
| Germany | 24 |

---

15.     The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

16.     Such figure to include all EMEA Transferring Employees.  *See* North American Agreement § 7.1.1(a), Nov. 24, 2009, NNI_00217035–36.

17.     *Id.*

18.     EMEA Agreement Schedule 6, Oct. 7, 2009, NNI_00818234–50.

| Ireland | 2 |
| The Netherlands | 16 |
| Italy | 6 |
| Israel | 10 |
| Poland | 1 |
| Russia | 10 |
| Spain | 7 |
| Switzerland | 6 |
| UK | 212 |

<u>In-scope Employees</u>

11.    A significant number of the in-scope employees include employees focused on research, design and development, sales and marketing.[19]

*Intellectual Property*

12.    Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[20]  First, the Sellers under each agreement transferred patents, software and trademarks at the March 19, 2010 closing date.[21]  Second, at the closing

---

19.    In-scope Employees Spreadsheet, NNI_SNOW_00286993.

20.    The EMEA Agreement also transferred IP including patents owned by Nortel France SAS.  *See* EMEA Agreement § 2.1.7, Oct. 7, 2009, NNI_008180104.

21.    Section 2.1.1(e) of the North American Agreement (together with Section 2.1.5 to the EMEA Agreement) provided that the purchasers would purchase 878 patent (including those owned by Nortel France SAS) as well as the software and trademarks listed in Section 4.5(b) of the North American Sellers' Disclosure

(Footnote continued on next page)

date of March 19, 2010, Nortel granted[22] Ciena a worldwide, royalty-free non-exclusive license

to all patents related to, but not predominantly used in, the MEN business acquired from

Nortel.[23]  The patents subject to these licenses were among those sold to Rockstar as part of the

Residual Patents Sale.

--------

(Footnote continued from prior page)

Schedule.  *See* North American Agreement § 2.1.1(e), Nov. 24, 2009, NNI_00216950; EMEA Agreement § 2.1.5, Oct. 7, 2009, NNI_008180103–4; North American Agreement Sellers' Disclosure Schedule § 4.5(b), Nov. 24, 2009, NNC-NNL06002189/351.

22.    See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ciena at closing under clause 2.3.2(a) of the North American Agreement.

23.    The license grant is contained in Article 2.01 of the Intellectual Property License Agreement in favor of Ciena.  *See* Intellectual Property License Agreement art. 2.01, Mar. 19, 2010, NOR_55927510.

# APPENDIX 18

## Details of the Multi-Service Switch Sale to Ericsson

*Overview of the Sale of Metro Ethernet Networks ("MEN") Business*

1.      The Metro Ethernet Networks ("MEN") business segment was split and led to the MEN and Multi-Service Switch ("MSS") sales.

2.      MSS operated as a division of Nortel's MEN business.[1]  The MSS business delivered a high capacity, high reliability multi-service switch that can aggregate and route different kinds of traffic such as data, video, voice and various other protocols for transmission in a combined fashion, and related services principally to telecommunications service providers and multi-system operators, and was also used by other former Nortel business units within various network products they sold.[2]

3.      The MSS business had global revenues of approximately $350 million in fiscal 2009.[3]

*Details of the MSS Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| August 26, 2010 | PSP Holding LLC signs Stalking Horse Agreement |
| September 1, 2010 | Court order approves sale and bid procedures |

---

1.      Fifty Second Report of the Monitor ¶ 16, Aug. 30, 2010 [D.I. 3843 Ex. A].

2.      *Id.* ¶¶ 14-15.

3.      *Id.* ¶ 16.

| | |
|---|---|
| September 21, 2010 | Last date for submission of qualified bids |
| September 24, 2010 | Auction commenced |
| September 24, 2010 | Auction ended |
| **Details of the Sale** | |
| September 24, 2010 | Ericsson signs North American Agreement and EMEA Agreement[4, 5] |
| September 30, 2010 | Court order approves sale through winning bid |
| March 11, 2011 | Completion date |

*Sale Documents*

4.     The main documents governing the sale are the Asset Sale Agreement dated September 24, 2010 (the "North American Agreement"),[6] the Asset Sale Agreement dated September 24, 2010 (the "EMEA Agreement")[7] and the respective Sellers' Disclosure Schedules.[8]  The assets sold are identified at Section 2.1.1 in respect of the North American

---

4.     As defined below.

5.     The purchase price is set out at Appendix 2.

6.     North American Agreement, September 24, 2010, NNI_00821708; *see also* Amended North American Agreement, March 11, 2011, NNI_00822640.

7.     EMEA Agreement, September 24, 2010, BHG0151799; *see also* Amended EMEA Agreement, January 26, 2011, NNI_00820982; *see also* Second Amended EMEA Agreement, March 11, 2011, NNI_00821147.

8.     For the North American Agreement:  Seller's Disclosure Schedule, September 24, 2010, NNI_00822333; *see also* Section 1.1(a)-10.16(a)(iii) of the Seller's Disclosure Schedule, NNI_00822569;  Schedule 1.1(n)(iii)(B) of the Seller's Disclosure Schedule, NNI_00822622; Schedule 4.5(h) of the Seller's Disclosure Schedule, NNI_00822628; Schedule 4.5(g)(ii)(B) of the Seller's Disclosure Schedule, NNI_00822630; Section 4.11(b) of the Seller's Disclosure Schedule, March 9, 2011, NNI_00822632; Section 7.1.2.(c)(ii) of the Seller's Disclosure Schedule, March 11, 2011, NNI_00822636; Section 7.1.2(c)(iv) of the Seller's Disclosure Schedule, March 11, 2011, NNI_00822639. For the EMEA Agreement:  EMEA Sellers' Disclosure Schedule to Asset Sale Agreement September 24, 2010, EMEAPROD2146445.

Agreement and Sections 2.1 and 2.2 in respect of the EMEA Agreement.[9]  The assumed

liabilities are identified at Section 2.1.3 in respect of the North American Agreement and Section

2.4 in respect of the EMEA Agreement.[10]

*Sellers*

     5.     The sellers pursuant to the North American Agreement were:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Global Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems Inc.

- Nortel Networks International Inc.

- Nortel Networks de Argentina S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

---

9.    North American Agreement at NNI_00821743-44; EMEA Agreement at BHG0151804–06.  The North American Agreement and the EMEA Agreement when read in full set out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

10.    North American Agreement at NNI_00821746-49; EMEA Agreement at BHG0151808–10.

Case 09-10138-KG    Doc 13651    Filed 05/28/14    Page 228 of 258

4

- Nortel Networks del Uruguay S.A.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Korea Limited

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co Limited

6.    The sellers pursuant to the EMEA Agreement were:

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

7.      The sellers pursuant to the China Asset Sale Agreement dated March 9, 2011 were[11]:

- Nortel Networks (China) Limited

8.      The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds of the MSS sale are[12]:

---

11.    China Asset Sale Agreement, Mar. 9, 2011, NNI_00822139.

12.    License Termination Agreement, GIP_Nortel_00101572.

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Technology Corporation

- Nortel Networks Global Corporation

- Nortel Networks Inc.

- Nortel Networks (CALA) Inc.

- Nortel Altsystems International Inc.

- XROS, Inc.

- Sonoma Systems

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks Optical Components Inc.

- Nortel Networks Capital Corporation

- Nortel Networks HPOCS Inc.

- Nortel Networks International Inc.

- Northern Telecom International Inc.

- Nortel Networks Cable Solutions, Inc.

- Nortel Networks de Argentina S.A.

- Nortel Networks del Ecuador S.A.

- Nortel Networks de Guatemala Ltda.

- Nortel Networks de Mexico, S.A. de C.V.

- Nortel de México, S. de R.L. de C.V.

- Nortel Networks Peru S.A.C.

- Nortel Networks del Uruguay S.A.

- Nortel Networks Trinidad and Tobago Limited

- Nortel Networks (Austria) GmbH

- Nortel Networks N.V.

- Nortel Networks, s.r.o.

- Nortel Networks Oy

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks Engineering Service Kft

- Nortel Networks (Ireland) Limited

- Nortel Networks S.p.A.

- Nortel Networks B.V.

- Nortel Networks AS

- Nortel Networks Polska Sp. z.o.o.

- Nortel Networks Portugal S.A.

- Nortel Networks Romania SRL

- Nortel Networks O.O.O.

- Nortel Networks Slovensko, s.r.o.

- Nortel Networks Hispania, S.A.

- Nortel Networks AB

- Nortel Networks A.G.

- Nortel Networks UK Limited

- Nortel Networks Israel (Sales and Marketing) Limited

- Nortel Networks Australia Pty. Limited

- PT Nortel Networks Indonesia

- Nortel Networks Kabushiki Kaisha

- Nortel Networks Korea Limited

- Nortel Networks Malaysia Sdn. Bhd.

- Nortel Networks New Zealand Limited

- Nortel Networks Singapore Pte. Limited

- Nortel Networks (Thailand) Limited

- Nortel Vietnam Limited

- Nortel Networks (Asia) Limited

- Nortel Networks (Asia) Limited - Taiwan Branch

- Nortel Networks (China) Limited

- Nortel Networks Telecommunications Equipment (Shanghai) Co Limited

*Data room*

9.     Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.  Within this data room there existed, *inter alia*, financial information, information in respect of customers and/or customer contracts and employee information.

*Employees*[13]

        Pursuant to the North American Agreement

        10.    At least ninety-five percent (95%) of employees were to be offered

employment pursuant to the North American Agreement[14] with minimum offers as follows:

        Pursuant to the EMEA Agreement

        11.    Approximately fifty-nine employees transferred by operation of law or by

offer from the Purchaser pursuant to the EMEA Agreement[15] as follows:

| Country | Approximate Transfers |
|---|---|
| Belgium | 3 |
| France | 6 |
| Germany | 6 |
| Italy | 5 |
| The Netherlands | 1 |
| Poland | 4 |
| Portugal | 1 |
| Spain | 13 |
| UK | 20 |

---

13.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

14.    North American Agreement § 7.1.1, NNI_00821821–22.

15.    EMEA Agreement, Schedule 6, BHG0151934–44.

In-scope Employees

12.     A significant number of the in-scope employees include employees focused on research, design and development and sales.[16]

*Intellectual Property*

13.     Intellectual Property consisting of registered patents, software and certain trademarks used in the business transferred under both the North American Agreement and the EMEA Agreement in two main ways.[17]  First, the Sellers under each agreement transferred patents, software and trademarks at the March 11, 2011 closing date.[18]  Second, at the closing date of March 11, 2011, Nortel granted[19] Ericsson a worldwide, royalty-free non-exclusive license to all patents related to, but not predominantly used in, the MSS business acquired from Nortel.[20]  The patents subject to these licenses were among those sold to Rockstar as part of the Residual Patents Sale.

---

16.   In-scope Employees Spreadsheet, EMEAPROD1839541.

17.   The EMEA Agreement also transferred IP (*see* Section 2.1.7 to the Second Amended EMEA Agreement at NNI_00821183), including patents owned by Nortel France SAS.

18.   Section 2.1.1(f) of the North American Agreement at NNI00821743–44 (together with Section 2.1.5 to the Second Amended EMEA Agreement at NNI_00821182–83) provided that the purchasers would purchase 96 patents as well as the software and trademarks listed in Section 1.1(n) of the North American Sellers Disclosure Schedule, NNI_00822571–78.

19.   See Mr. Malackowski's Report at section 9.2.4 for the value the "predominant use" standard generates for business line IP.  The Intellectual Property License Agreement was defined as an Ancillary Agreement the Sellers were required to enter with Ericsson at closing under clause 2.3.2(a)(viii) of the North American Agreement at NNI_00821764.

20.   The license grant is contained in Article 2.01 of the Intellectual Property License Agreement in favor of Ericsson dated March 11, 2011 at GIP_Nortel_00086528, 33.

# APPENDIX 19

## Details of the Residual Patents Sale to Rockstar BidCo, L.P.

*Overview of the Sale*

1.      The largest single bankruptcy sale undertaken by Nortel was that of its Residual Patents assets.  This sale consisted of more than 6,000 granted patents, patent applications and invention disclosures thought worthy of protection by patent application.  This sale raised $4.5 billion, which is more than the rest of the Business Sales combined.  The assets in this sale consisted solely of IP in the form of patents and patent applications.

2.      According to the information memorandum document prepared by Nortel and its independent advisors – Lazard and Global IP Law Group – and sent to potential buyers of the portfolio between May and September 2010, the Residual Patents Portfolio consisted of 4,040 granted patents, 2,082 patent applications and 145 invention disclosures that could form the basis of a patent application.[1]

3.      The information memorandum notes that the value in the portfolio comes from the fact that it covers a broad range of technology areas; contains many foundational patents that are deemed to be essential to many different types of products; and around one-third of the portfolio is registered outside the United States, giving global scope.[2]

4.      The information memorandum also specifically draws attention to the fact that the portfolio was a largely unencumbered by licenses and unique in the market because other

---

1.      Executive Summary Project Iceberg, April 2010, GIP_Nortel_00143241 at 3.

2.      *Id.*

similar portfolios were privately held by corporations still in business.[3]

*Details of the Residual Patents Sale Process*

| Date | Event |
|------|-------|
| **Stalking Horse Bid** | |
| April 4, 2011 | Ranger Inc. and Google Inc. sign Stalking Horse Agreement |
| May 2, 2011 | Court order approves sale and bid procedures |
| June 13, 2011 | Last date for submission of qualified bids |
| June 27, 2011 | Auction commenced |
| June 30, 2011 | Auction ended |
| **Details of the Sale** | |
| June 30, 2011 | Rockstar BidCo, L.P.  signs Asset Sale Agreement[4, 5] |
| July 11, 2011 | Court order approves sale through winning bid |
| July 29, 2011 | Completion date |

*Sale Documents*

     5.     The main documents governing the sale are the Asset Sale Agreement

dated June 30, 2011 (the "Asset Sale Agreement")[6] and the Sellers' Disclosure Schedule.[7]  The

---

3.     *Id.* at 6.

4.     As defined below.

5.     The purchase price is set out at Appendix 2.

6.     Asset Sale Agreement, June 30, 2011, NNI_00825094; *see also* Amendment to Asset Sale Agreement, July 29, 2011, NNI_00825205 at NNI_00825205.

assets sold, which are all either granted patents, patent applications or disclosed inventions thought worthy of protection by patent application, are identified at Section 2.1.1 in respect of the Asset Sale Agreement.[8]  The assumed liabilities are identified at Section 2.1.3 in respect of the Asset Sale Agreement.[9]

*Sellers*

>    6.    The sellers pursuant to the Asset Sale Agreement were:
>
>    - Nortel Networks Corporation
>
>    - Nortel Networks Limited
>
>    - Nortel Networks Inc.
>
>    - XROS, Inc.
>
>    - QTERA Corporation
>
>    - CoreTek Inc.
>
>    - Nortel Networks Applications Management Solutions Inc.
>
>    - Nortel Altsystems Inc.

---

(Footnote continued from prior page)

7.    Seller's Disclosure Schedule, June 30, 2011, NNC-NNL06002561; *see also* Amendment to Asset Sale Agreement, July 29, 2011, NNI_00825205; Seller's Disclosure Schedule, Annex 1.1(d) Listed Jointly Owned Patents, June 30, 2011, NNI_00825244; Seller's Disclosure Schedule, Annex 1.1(h) Listed Patents, Assets Tab, June 30, 2011, NNI_00825254; Seller's Disclosure Schedule, Annex 1.1(c), Patents That May Require Recordation of One of the Sellers as the Owner, June 30, 2011, NNI_00825621; Seller's Disclosure Schedule, Annex A.I(h), Abandoned, Expired, Transferred Patents Tab, June 30, 2011, NNI_00825622; Seller's Disclosure Schedule, Chart, June 30, 2011; NNI_00825647 and Seller's Disclosure Schedule, Annex A §2.1.1(a), June 30, 2011 NNI_00825680.

8.    Asset Sale Agreement § 2.1.1, June 30, 2011, NNI_00825123-25.  The Asset Sale Agreement when read in full sets out (where appropriate) any exceptions, limitations and caveats in respect of the assets sold and/or liabilities acquired.

9.    Asset Sale Agreement § 2.1.3, June 30, 2011, NNI_00825126-27.

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

- Nortel Networks UK Limited

7.    The parties which entered into the License Termination Agreement as required by the Interim Funding and Settlement Agreement ("IFSA"), who thereby became "Selling Debtors" and who therefore have a claim to some amount of the proceeds from the Residual Patents Sale are[10]:

- Nortel Networks Corporation

- Nortel Networks Limited

- Nortel Networks Inc.

- XROS, Inc.

- QTERA Corporation

- CoreTek Inc.

- Nortel Networks Applications Management Solutions Inc.

- Nortel Altsystems Inc.

- Nortel Networks S.A.

- Nortel Networks France S.A.S.

- Nortel GmbH

- Nortel Networks (Ireland) Limited

---

10.    License Termination Agreement, GIP_Nortel_00078256.

- Nortel Networks UK Limited

*Data room*

8.      Prior to the conclusion of the sale, a data room was set up for the purpose of potential purchasers' due diligence.

*Employees*[11]

Pursuant to the Asset Sale Agreement

9.      In North America (and the rest of the world), a minimum of sixteen employees were to be offered employment pursuant to Exhibit H (Employee Transfer Side Agreement)[12] to the Asset Sale Agreement.  Each such employee was based in either Canada or the United States.

---

11.    The number of employees who in fact transferred to the Purchaser will depend on, where relevant, acceptance by employees of any offer from the Purchaser.

12.    Employee Transfer Side Agreement, June 30, 2011, BHG0245171.

# APPENDIX 20

## Recognition of Customer-Related Assets for Allocation among the Selling Debtors

1.      As set forth in my report, the assets divested in Nortel's Business Sales included value attributable to Nortel's Customer Relationships and Distribution Network.  These intangible assets include the existing relationships between the Nortel Group and its customers and anticipated revenue from future opportunities with those customers, and the sales function, distribution and customer-support infrastructures within the Nortel Group.  In addition to customer contracts that may have transferred in the sales,[1] specific services that a Business Line provides for a particular customer or a particular product on which that customer relies, and the transfer of active employees who foster the relationship, preserve the value associated with anticipated revenues from future opportunities with that customer.  Each Business Line also had comprehensive distribution and sales networks that enabled products to be sold and serviced across a wide variety of markets worldwide.  The purchasers of the Business Lines acquired both the distribution infrastructure and the employees who could continue to foster existing customer relationships and provide distribution support to allow for continued and immediate revenue realization.

2.      As I describe in my analysis, my experience leads to my opinion that this asset class has significant value that the Courts should allocate among the Selling Debtors.  My

---

1.    *E.g.*, Asset Sale Agreement between Selling Debtors and PSP Holdings LLC §§ 1.1 (defining "Business" to include the Multi-Switch Service business as well as "Employees, customer and supplier relationships"), 5.14 (providing procedures for transferring and rejecting customer contracts), Aug. 26, 2010 [D.I. 3832 Ex. A]; Amended and Restated Asset Sale Agreement between Selling Debtors and Ciena Corp. § 5.15 (providing procedures for "transitioning each customer" from Selling Debtors to purchaser), Nov. 24, 2009, NNI_00216905 at NNI_00216994; Asset and Share Sale Agreement between Selling Debtors and Avaya Inc. §§ 1.1 (defining "Business" to include the ES Business Line as well as "Employees, partner, customer and supplier relationships"), 5.14 (providing procedures for transferring and rejecting customer contracts), July 29, 2009 [D.I. 1131 Ex. A].

opinion is further supported by the testimonies of former Nortel employees, the pre-petition

UMTS sale, court documents in the Business Sales, the information management memoranda

made to potential purchasers of the Business Sales and other documentary evidence.  This

Appendix further describes this evidence.

3.      The testimony of Nortel employees confirms that former employees would

transfer to purchasers of the Business Sales, and thereby provide continuity in Nortel's Customer

Relationships and its Distribution Network.  After filing and in preparation for the Business

Sales, Nortel "had to organize" to align along different business units in a "huge carve-out

process" that aligned the Business Lines by geography, R&D and employees.[2]  After alignment,

employees would transfer along with the Business Sales.[3]

4.      During their depositions, Nortel employees also testified about how

Nortel's Customer Relationships were important assets to the Nortel Group.  Each Business Sale,

divided along Business Lines and geographic areas, included customers.[4]  In the sale of the ES

Business Line, for example, Avaya Inc. ("Avaya") "most importantly" purchased "a plethora" of

customer accounts across "a lot of market segments" that would provide access through various

channels and distributions.[5]  To purchase Nortel's Customer Relationships was to purchase "an

---

2.      Binning Dep. 134:10–135:15, Oct. 24, 2013; *see also* Riedel Dep. 84:12–23, Oct. 10, 2013.

3.      Drinkwater Dep. 99:11–22, Nov. 4, 2013.

4.      *See* Albert-Lebrun Dep. 46:20–48:18, Nov. 21, 2013 (describing the importance of major customers of
        NNSA); Pusey Dep. 71:16–72:8, Nov. 18, 2013 (describing the importance of major customer relationships
        as sold along geographic lines).

5.      *See* MacLean Dep. 22:3–23:17, Oct. 23, 2013.

extremely valuable asset" that Nortel found important and strived to develop.[6]  Indeed, Nortel
employees testified how, during the bidding process, Nortel continued to maintain its
relationships with its customers and articulated to potential buyers that its customer base was a
"very important" feature.[7]

     5.     This understanding was evident in the pre-petition sale of Nortel's UMTS
line to Alcatel-Lucent.  As explained in Appendix 10, the Nortel Group sold its UMTS business
to Alcatel in December 2006 for approximately $293 million.  Following the advice of its
valuations expert, Alcatel determined that the UMTS assets consisted not only of fixed assets,
inventory and IP, but also of customer relationships.  In recognition of this asset class, the
twenty-one selling entities received allocations for customer relationships based on which entity
held the primary relationships with various customers.

     6.     Post-petition sales required approval from the U.S. Bankruptcy Court for
the District of Delaware, which entertained Sale Motions and their supporting documentation.
The supporting declarations also discuss the importance of Customer Relationships as an asset
class.  In documents seeking approval of the Layer 4-7 Business Sale, Hyacinth DeAlmeida,
Leader of Corporate Business Development at NNI, explained that

> One of the most valuable Assets involved in the proposed
> transaction was and continues to be the established relationships
> that the Debtors maintain with hundreds of customers with whom
> it has entered into the contracts at issue in the Sale Motion.  These
> contracts are valuable not only in terms of current relationships,
> but also in the potential they represent for future sales, as

---

6.   *See* Roese Dep. 157:20–159:6, Nov. 11, 2013; *see also* Richardson Dep. 57:21–58:9, Oct. 28, 2013 (agreeing
that Nortel "always strived" to develop "close relationships" with its customers").

7.   Zafirovski Dep. 117:12–118:14, Nov. 6, 2013.

technology advances and equipment comes due for replacement.[8]
Calling customer contracts "of critical value," George Riedel, Chief Strategy Officer of NNL and
NNC, reiterated the importance of these Customer Relationships in subsequent Business Sales.[9]

7.       Such a proposition similarly appears in the information memoranda
provided to potential purchasers in connection with the Business Sales.  The business
management presentations consistently pitched prospective purchasers with details on Nortel's
major customers:  of Nortel's "CDMA Top Customer Base" with revenues by region;[10] of
Nortel's major clients and global market presence in packet core technology;[11] of "Premier
Customer Growth Opportunities" and customer collaboration with its MEN technology;[12] and of
Nortel's "Major Account Footprint" and its revenue and staff by region for its Enterprise
Solutions Business Line.[13]

8.       Publicly available evidence further confirms that the purchasers assigned
significant value to Customer-Related Assets.  Ericsson, for example, purchased Nortel's assets
in CDMA and LTE technology.  In its subsequent SEC Form 20-F, Ericsson noted that, "With
the acquisition of the Nortel assets for CDMA and LTE, the Company strengthened its ability to
serve North America's mobile operators.   The acquisition significantly expands Ericsson's

---

8.    Decl. of H. DeAlmeida ¶ 8, Feb. 20, 2009 [D.I. 353 Ex. B].

9.    *See* Decl. of G. Riedel ¶ 17, Oct. 7, 2009 [D.I. 1627 Ex. B].

10.   CDMA Presentation to MatlinPatterson, July 7, 2009, NNI_00578024 at 18–19.

11.   Next Generation Packet Core - Project Seville Information Memorandum, July 31, 2009, CCC0001952 at 9–11.

12.   Met[r]o Ethernet Networks, Project Snow, Presentation made to Ekberg, Mar. 13, 2009, NNI_01287868 at 10, 22.

13.   Enterprise Solutions, Presentation made to Narnia, Dec. 5, 2008, NNI_00595488 at 5, 10.

footprint in this market, particularly as operators in this region are emerging as early adopters of LTE technology."[14]   Avaya, which acquired Nortel's ES Business Line, noted that the transaction "expand[ed] Avaya's global customer base, enhances its technology portfolio, broadens its indirect sales channel, and provides greater ability to compete globally."[15]   This evidence that Purchasers recognized the value of Customer Relationships and the Distribution Network further supports recognition and allocation of the Customer-Related Assets class.

---

14.   LM Ericsson Telephone Co., Annual Report (Form 20-F) (Apr. 21, 2010) at 19.

15.   Avaya Inc., Quarterly Report (Form 10-Q) (Feb. 16, 2010) at 6.

## APPENDIX 21

### Allocation of Value to NNI for the Shares in NGS Sold as Part of the Enterprise Sale[179]

1. In addition to the adjustment to IP allocation necessary to compensate the AREs for IP they owned, an additional adjustment is necessary to compensate NNI for IP similarly held independent of the transfer pricing arrangement between the Selling Debtors.  As part of the Enterprise Business Sale, NNI divested shares in two of its wholly-owned subsidiaries, DiamondWare, Ltd. ("DiamondWare") and Nortel Government Solutions Inc. ("NGS"), as well as NGS's two subsidiaries, Integrated Information Technology Corp. and AC Technologies, Inc.[180]

2. With respect to the shares of NGS and its two subsidiaries, I have concluded that no adjustment to allocation is necessary to compensate NNI for these shares in NGS and its two subsidiaries, but that an adjustment is necessary in respect of DiamondWare.  The allocation methodology already applied to each asset class should adequately compensate NNI for the transfer of shares in NGS.  Our evaluation of the business assets does not reflect any fixed assets or inventory associated with NGS; however any fixed assets of NGS or its subsidiaries that transferred in the asset sale would be credited to NNI.  Similarly, with respect to IP, I am not aware of any patents owned or attributable to NGS

---

179. This Appendix has been prepared jointly by Mr. Huffard's staff and instructing counsel.  Mr. Huffard's staff has provided the dollar values for the adjustments set out in this Appendix.  Instructing counsel has drafted the text of this Appendix and provided the legal agreements and documentation supporting the dollar values set out herein.

180. Amended and Restated Asset and Share Sale Agreement between Selling Debtors and Avaya Inc. ("Enterprise APA") ¶¶ 1.1, 2.1.1, Sept. 14, 2009 [D.I. 1514 Ex. A].

that sold in the post-petition Asset Sales.[181]  Finally, my understanding is that NGS was an exclusively North American-based operation, related to service contracts for the U.S. government.[182]  As a result, all revenue associated with NGS and its subsidiaries should be included in revenue reported for the U.S. geographic region, which will ensure that NNI receives credit for any residual intangible assets.  Notably, the book value of NGS's total shareholders' equity as of the fourth quarter of 2008 was negative $20.3 million,[183] further confirming my determination that no adjustment to allocation with respect to NGS and its subsidiaries is necessary or appropriate.

        3.      My analysis with respect to the transferred shares of DiamondWare tracks closely with my analysis of compensation associated with the shares of NGS, except that I understand that ten (10) patents owned or attributable to DiamondWare transferred in the Enterprise Business Sale that were never assigned to NNL.[184]  In order to appropriately credit NNI for the value of these patents, I have concluded that the pro rata value of DiamondWare's IP based on the total value of Enterprise IP is $3.0 million which should be deducted from the value of Enterprise's IP and allocated to NNL.  The remaining Enterprise IP value would then be

---

181.   Seven (7) NGS trademarks transferred in the post-petition Asset Sales, but Mr. Malackowski's Report advises that these trademarks likely had very minimal value, if any.  *See* Sellers Disclosure Schedule to Enterprise APA § 4.6(b)(ii), Sept. 14, 2009, NNC-NNL06002086/125–126; Mr. Malackowski's Report at § 7.1 & n.55.

182.   Nortel Networks Corp., Annual Report (Form 10-K) (Feb. 27, 2008) at 134.

183.   Estimated Closing Statement per Section 2.2.2 of the Asset and Share Sale Agreement, NOR_53917850 at 10.

184.   I understand that one DiamondWare trademark transferred in the Enterprise Business Sale, but that this trademark likely had very minimal value, if any.  *See* Sellers Disclosure Schedule to Enterprise APA§ 4.6(b)(ii), Sept. 14, 2009, NNC-NNL06002086/125–126; Mr. Malackowski's Report at § 7.1 & n.55.

allocated pursuant to the same methodology for allocation of IP sold in the Business Sales as set forth in my report.

# APPENDIX 22

## Determining Allocation Percentages Based on Historical Revenue

1. As described in my report, I have concluded that the value of Customer-Related Assets[1] and Goodwill[2] should be allocated across the Selling Debtors[3] based on the revenue generated by each Selling Debtor in the fiscal year 2008. This Appendix sets out further detail regarding the process of determining the allocation percentages based on historical revenue.

2. We source this data from Nortel's internal SAP database, which records detailed sales data at the entity level. This data was reported on a regional level separately for 2008.[4]

3. To reach 2008 overall percentages, we aggregated all of the 2008 regional data into a single database. The aggregate values were mapped to Nortel entities using EMEAPROD0890072 and to market geographies using EMEAPROD02323161.

4. For allocation purposes, we allocated residual value to each entity based on its share of "Market Revenue." Market Revenue is the revenue generated from sales in a particular geography, regardless of which entity actually recorded the sales. Once the Market

---

1. A residual category of assets sold in the eight sales of Nortel's operating global lines of business (the "Business Sales"), comprised of (1) the customer relationships fostered contractually and non-contractually between Nortel and its customers, including the transfer of active employees (Nortel's "Customer Relationships") and (2) Nortel's sales, distribution and customer-support infrastructures that enabled the distribution of products to customers (Nortel's "Distribution Network").

2. A residual category of assets sold in the Business Sales, comprised of goodwill not otherwise associated with Nortel's intellectual property ("IP").

3. The various Nortel entities that transferred interests or relinquished rights in the Business Sales and in the sale of Nortel's residual IP (the "Residual Patents Sale," and together with the Business Sales, the "Asset Sales").

4. EMEAPROD02318642.

Revenue was calculated for each geography, it was mapped to the entity domiciled in that geography, or the most significant entity domiciled in a geography in cases where there were multiple entities.  If no entity was domiciled in the geography, then the revenues were allocated to the entity that booked the sale, even if in a separate geography.

     5.     The net effect of this is that entities receive an allocation generally proportional to the size of the Nortel end market in their home geography, regardless of which entity legally booked the sales, which might be influenced by other factors, such as relative tax rates in the different geographies.  For example, by this calculation, less than 5% of sales booked by Nortel Networks (Ireland) Limited ("<u>NNIR</u>") were delivered to the Irish market.  For purposes of allocating Customer Related Assets and Goodwill, sales of a given entity are allocated to those markets, domestic or foreign, in which those sales were delivered.

# APPENDIX 23

## EMEA Allocation Charts

## Chart 23.1

| EMEA ENTITY ALLOCATIONS | | | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Business IP/Residual Patent Method: | | R&D Contribution (Sale Specific) / R&D Contribution - 1991-2006 | | | | | | | | | |
| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Residual IP | Total Allocation | Total Value |
| **EMEA** | 3.8% | 29.0% | 29.2% | 28.8% | 10.1% | 44.3% | 21.8% | 13.4% | 17.6% | 18.2% | $ 1,325 |
| | | | | | | | | | | | |
| **Entities** | | | | | | | | | | | |
| Nortel (Luxembourg) SA | – | – | – | – | – | – | – | – | – | – | – |
| NNIF&H BV | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Austria) GmbH | – | 0.4% | 0.4% | 0.1% | 0.7% | 0.0% | 0.0% | – | – | 0.1% | 6 |
| Nortel N.V. | – | 0.5% | 1.3% | 0.7% | 0.8% | 1.2% | 0.1% | – | – | 0.2% | 15 |
| Nortel (Bulgaria) EOOD | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Czech Republic | – | 0.1% | 0.0% | 0.0% | 0.1% | 0.2% | 0.1% | – | – | 0.0% | 1 |
| Nortel AB - Denmark Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Oy | – | – | – | – | – | 0.0% | – | – | – | 0.0% | 0 |
| Nortel Networks S.A. | 1.7% | 4.5% | 3.6% | 7.0% | 1.6% | 6.5% | 4.6% | 6.0% | 7.6% | 5.9% | 431 |
| Nortel France SAS | – | 0.3% | – | – | 0.1% | – | 0.1% | – | 0.4% | 0.3% | 22 |
| Nortel GmbH | – | 3.0% | 0.6% | 1.3% | – | 3.5% | 1.9% | – | 0.0% | 0.5% | 34 |
| Nortel Hungary | – | 0.1% | – | – | – | – | – | – | – | 0.0% | 1 |
| Nortel (Ireland) Ltd | 0.2% | 3.7% | 0.8% | 0.7% | 0.2% | 0.6% | 1.0% | 0.8% | 1.0% | 1.1% | 83 |
| NNL - EMEA sales | – | – | – | – | – | – | – | – | – | – | – |
| Nortel S.p.A. | – | 1.1% | 0.5% | 1.9% | 0.1% | 1.0% | 0.0% | – | – | 0.2% | 15 |
| Nortel B.V. | – | 1.1% | 3.7% | 0.6% | 0.2% | 1.5% | 0.1% | – | – | 0.5% | 33 |
| Nortel Networks AS | – | 0.6% | – | – | – | 0.6% | – | – | – | 0.1% | 5 |
| Nortel Polska Sp. zo.o. | – | 0.1% | 0.2% | 0.0% | 0.8% | – | 0.0% | – | – | 0.0% | 3 |
| Nortel Portugal S.A. | – | 0.2% | 0.0% | 0.1% | – | 0.5% | – | – | – | 0.0% | 2 |
| Nortel Romania SRL | – | 0.2% | – | 0.0% | 0.2% | 1.9% | 0.0% | – | – | 0.0% | 3 |
| Nortel Russia | – | – | 0.0% | – | 0.0% | – | – | – | – | 0.0% | 0 |
| Nortel Slovensko, s.r.o. | – | 0.0% | – | 0.0% | 0.4% | 0.2% | – | – | – | 0.0% | 1 |
| Nortel Hispania, S.A. | – | 0.6% | 1.2% | 1.0% | – | 4.7% | – | – | – | 0.2% | 17 |
| Nortel AB | – | 0.7% | 1.1% | – | – | 0.6% | – | – | – | 0.2% | 12 |
| Nortel AG | – | 1.1% | 0.8% | 0.7% | 0.1% | 0.3% | 0.0% | – | – | 0.2% | 15 |
| NETAS | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Ukraine | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Networks UK Ltd | 1.9% | 10.1% | 15.0% | 14.7% | 4.7% | 21.2% | 14.0% | 6.5% | 8.6% | 8.5% | 619 |
| Nortel Optical Comp Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Northern Ireland) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| NCH (1997) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Israel Ltd | – | 0.0% | 0.0% | – | – | – | – | – | – | 0.0% | 0 |
| Nortel Inc (Egypt Branch) | – | – | – | – | – | – | – | – | – | – | – |
| NNSA (Malta Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel UK - Saudi Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel South Africa Ltd | – | 0.7% | – | – | – | – | – | – | – | 0.1% | 6 |
| Nortel Inc. (Tunisia Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Intl Inc. (Dubai Branch) | – | – | – | – | – | – | – | – | – | – | – |
| **Total** | 3.8% | 29.0% | 29.2% | 28.8% | 10.1% | 44.3% | 21.8% | 13.4% | 17.6% | 18.2% | $ 1,325 |

## Chart 23.2

**EMEA ENTITY ALLOCATIONS** _$ in millions_

Business IP/Residual Patent Method: **R&D Contribution (Sale Specific) / R&D Contribution - 1991-2008**

| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Residual IP | Total Allocation | Total Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EMEA** | **3.8%** | **29.0%** | **29.2%** | **28.8%** | **10.1%** | **44.3%** | **21.8%** | **13.4%** | **16.7%** | **17.6%** | **$ 1,285** |
| | | | | | | | | | | | |
| **Entities** | | | | | | | | | | | |
| Nortel (Luxembourg) SA | – | – | – | – | – | – | – | – | – | – | – |
| NNIF&H BV | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Austria) GmbH | – | 0.4% | 0.4% | 0.1% | 0.7% | 0.0% | 0.0% | – | – | 0.1% | 6 |
| Nortel N.V. | – | 0.5% | 1.3% | 0.7% | 0.8% | 1.2% | 0.1% | – | – | 0.2% | 15 |
| Nortel (Bulgaria) EOOD | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Czech Republic | – | 0.1% | 0.0% | 0.0% | 0.1% | 0.2% | 0.1% | – | – | 0.0% | 1 |
| Nortel AB - Denmark Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Oy | – | – | – | – | – | 0.0% | – | – | – | 0.0% | 0 |
| Nortel Networks S.A. | 1.7% | 4.5% | 3.6% | 7.0% | 1.6% | 6.5% | 4.6% | 6.0% | 7.2% | 5.7% | 415 |
| Nortel France SAS | – | 0.3% | – | – | 0.1% | – | – | 0.1% | 0.4% | 0.3% | 22 |
| Nortel GmbH | – | 3.0% | 0.6% | 1.3% | – | 3.5% | 1.9% | – | 0.0% | 0.5% | 34 |
| Nortel Hungary | – | 0.1% | – | – | – | – | – | – | – | 0.0% | 1 |
| Nortel (Ireland) Ltd | 0.2% | 3.7% | 0.8% | 0.7% | 0.2% | 0.6% | 1.0% | 0.8% | 1.0% | 1.2% | 85 |
| NNL - EMEA sales | – | – | – | – | – | – | – | – | – | – | – |
| Nortel S.p.A. | – | 1.1% | 0.5% | 1.9% | 0.1% | 1.0% | 0.0% | – | – | 0.2% | 15 |
| Nortel B.V. | – | 1.1% | 3.7% | 0.6% | 0.2% | 1.5% | 0.1% | – | – | 0.5% | 33 |
| Nortel Networks AS | – | 0.6% | – | – | – | 0.6% | – | – | – | 0.1% | 5 |
| Nortel Polska Sp. z o.o. | – | 0.1% | 0.2% | 0.0% | 0.8% | – | 0.0% | – | – | 0.0% | 3 |
| Nortel Portugal S.A. | – | 0.2% | 0.0% | 0.1% | – | 0.5% | 0.0% | – | – | 0.0% | 2 |
| Nortel Romania SRL | – | 0.2% | – | 0.0% | 0.2% | 1.9% | 0.0% | – | – | 0.0% | 3 |
| Nortel Russia | – | – | 0.0% | – | 0.0% | – | – | – | – | 0.0% | 0 |
| Nortel Slovensko, s.r.o. | – | 0.0% | – | 0.0% | 0.4% | 0.2% | – | – | – | 0.0% | 1 |
| Nortel Hispania, S.A. | – | 0.6% | 1.2% | 1.0% | – | 4.7% | – | – | – | 0.2% | 17 |
| Nortel AB | – | 0.7% | 1.1% | – | – | 0.6% | – | – | – | 0.2% | 12 |
| Nortel AG | – | 1.1% | 0.8% | 0.7% | 0.1% | 0.3% | 0.0% | – | – | 0.2% | 15 |
| NETAS | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Ukraine | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Networks UK Ltd | 1.9% | 10.1% | 15.0% | 14.7% | 4.7% | 21.2% | 14.0% | 6.5% | 8.0% | 8.1% | 593 |
| Nortel Optical Comp Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Northern Ireland) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| NCH (1997) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Israel Ltd | – | 0.0% | 0.0% | – | – | – | – | – | – | 0.0% | 0 |
| Nortel Inc (Egypt Branch) | – | – | – | – | – | – | – | – | – | – | – |
| NNSA (Malta Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel UK - Saudi Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel South Africa Ltd | – | 0.7% | – | – | – | – | – | – | – | 0.1% | 6 |
| Nortel Inc. (Tunisia Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Intl Inc. (Dubai Branch) | – | – | – | – | – | – | – | – | – | – | – |
| **Total** | **3.8%** | **29.0%** | **29.2%** | **28.8%** | **10.1%** | **44.3%** | **21.8%** | **13.4%** | **16.7%** | **17.6%** | **$ 1,285** |

3

## Chart 23.3

| EMEA ENTITY ALLOCATIONS | | | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Business IP/Residual Patent Method:  R&D Contribution (Sale Specific) / R&D Contribution - 2001-2006 | | | | | | | | | | | |
| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Residual IP | Total Allocation | Total Value |
| **EMEA** | 3.8% | 29.0% | 29.2% | 28.8% | 10.1% | 44.3% | 21.8% | 13.4% | 18.5% | 18.7% | $ 1,362 |
| | | | | | | | | | | | |
| **Entities** | | | | | | | | | | | |
| Nortel (Luxembourg) SA | – | – | – | – | – | – | – | – | – | – | – |
| NNIF&H BV | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Austria) GmbH | – | 0.4% | 0.4% | 0.1% | 0.7% | 0.0% | 0.0% | – | – | 0.1% | 6 |
| Nortel N.V. | – | 0.5% | 1.3% | 0.7% | 0.8% | 1.2% | 0.1% | – | – | 0.2% | 15 |
| Nortel (Bulgaria) EOOD | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Czech Republic | – | 0.1% | 0.0% | 0.0% | 0.1% | 0.2% | 0.1% | – | – | 0.0% | 1 |
| Nortel AB - Denmark Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Oy | – | – | – | – | – | 0.0% | – | – | – | 0.0% | 0 |
| Nortel Networks S.A. | 1.7% | 4.5% | 3.6% | 7.0% | 1.6% | 6.5% | 4.6% | 6.0% | 11.0% | 8.0% | 582 |
| Nortel France SAS | – | 0.3% | – | – | 0.1% | – | 0.1% | – | 0.4% | 0.3% | 22 |
| Nortel GmbH | – | 3.0% | 0.6% | 1.3% | – | 3.5% | 1.9% | – | 0.0% | 0.5% | 34 |
| Nortel Hungary | – | 0.1% | – | – | – | – | – | – | – | 0.0% | 1 |
| Nortel (Ireland) Ltd | 0.2% | 3.7% | 0.8% | 0.7% | 0.2% | 0.6% | 1.0% | 0.8% | 0.7% | 1.0% | 73 |
| NNL - EMEA sales | – | – | – | – | – | – | – | – | – | – | – |
| Nortel S.p.A. | – | 1.1% | 0.5% | 1.9% | 0.1% | 1.0% | 0.0% | – | – | 0.2% | 15 |
| Nortel B.V. | – | 1.1% | 3.7% | 0.6% | 0.2% | 1.5% | 0.1% | – | – | 0.5% | 33 |
| Nortel Networks AS | – | 0.6% | – | – | – | 0.6% | – | – | – | 0.1% | 5 |
| Nortel Polska Sp. zo.o. | – | 0.1% | 0.2% | 0.0% | 0.8% | – | 0.0% | – | – | 0.0% | 3 |
| Nortel Portugal S.A. | – | 0.2% | 0.0% | 0.1% | – | 0.5% | 0.0% | – | – | 0.0% | 2 |
| Nortel Romania SRL | – | 0.2% | – | 0.0% | 0.2% | 1.9% | 0.0% | – | – | 0.0% | 3 |
| Nortel Russia | – | – | 0.0% | – | 0.0% | – | – | – | – | 0.0% | 0 |
| Nortel Slovensko, s.r.o. | – | 0.0% | – | 0.0% | 0.4% | 0.2% | – | – | – | 0.0% | 1 |
| Nortel Hispania, S.A. | – | 0.6% | 1.2% | 1.0% | – | 4.7% | – | – | – | 0.2% | 17 |
| Nortel AB | – | 0.7% | 1.1% | – | – | 0.6% | – | – | – | 0.2% | 12 |
| Nortel AG | – | 1.1% | 0.8% | 0.7% | 0.1% | 0.3% | 0.0% | – | – | 0.2% | 15 |
| NETAS | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Ukraine | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Networks UK Ltd | 1.9% | 10.1% | 15.0% | 14.7% | 4.7% | 21.2% | 14.0% | 6.5% | 6.3% | 7.1% | 515 |
| Nortel Optical Comp Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Northern Ireland) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| NCH (1997) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Israel Ltd | – | 0.0% | 0.0% | – | – | – | – | – | – | 0.0% | 0 |
| Nortel Inc (Egypt Branch) | – | – | – | – | – | – | – | – | – | – | – |
| NNSA (Malta Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel UK - Saudi Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel South Africa Ltd | – | 0.7% | – | – | – | – | – | – | – | 0.1% | 6 |
| Nortel Inc. (Tunisia Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Intl Inc. (Dubai Branch) | – | – | – | – | – | – | – | – | – | – | – |
| **Total** | 3.8% | 29.0% | 29.2% | 28.8% | 10.1% | 44.3% | 21.8% | 13.4% | 18.5% | 18.7% | $ 1,362 |

4

## Chart 23.4

| EMEA ENTITY ALLOCATIONS | | | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Business IP/Residual Patent Method: | R&D Contribution (Sale Specific) / R&D Contribution - 2001-2008 | | | | | | | | | | |
| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Residual IP | Total Allocation | Total Value |
| **EMEA** | **3.8%** | **29.0%** | **29.2%** | **28.8%** | **10.1%** | **44.3%** | **21.8%** | **13.4%** | **16.2%** | **17.3%** | **$ 1,262** |
| | | | | | | | | | | | |
| **Entities** | | | | | | | | | | | |
| Nortel (Luxembourg) SA | – | – | – | – | – | – | – | – | – | – | – |
| NNIF&H BV | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Austria) GmbH | – | 0.4% | 0.4% | 0.1% | 0.7% | 0.0% | 0.0% | – | – | 0.1% | 6 |
| Nortel N.V. | – | 0.5% | 1.3% | 0.7% | 0.8% | 1.2% | 0.1% | – | – | 0.2% | 15 |
| Nortel (Bulgaria) EOOD | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Czech Republic | – | 0.1% | 0.0% | 0.0% | 0.1% | 0.2% | 0.1% | – | – | 0.0% | 1 |
| Nortel AB - Denmark Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Oy | – | – | – | – | – | 0.0% | – | – | – | 0.0% | 0 |
| Nortel Networks S.A. | 1.7% | 4.5% | 3.6% | 7.0% | 1.6% | 6.5% | 4.6% | 6.0% | 9.4% | 7.1% | 513 |
| Nortel France SAS | – | 0.3% | – | – | 0.1% | – | 0.1% | – | 0.4% | 0.3% | 22 |
| Nortel GmbH | – | 3.0% | 0.6% | 1.3% | – | 3.5% | 1.9% | – | 0.0% | 0.5% | 34 |
| Nortel Hungary | – | 0.1% | – | – | – | – | – | – | – | 0.0% | 1 |
| Nortel (Ireland) Ltd | 0.2% | 3.7% | 0.8% | 0.7% | 0.2% | 0.6% | 1.0% | 0.8% | 0.9% | 1.1% | 80 |
| NNL - EMEA sales | – | – | – | – | – | – | – | – | – | – | – |
| Nortel S.p.A. | – | 1.1% | 0.5% | 1.9% | 0.1% | 1.0% | 0.0% | – | – | 0.2% | 15 |
| Nortel B.V. | – | 1.1% | 3.7% | 0.6% | 0.2% | 1.5% | 0.1% | – | – | 0.5% | 33 |
| Nortel Networks AS | – | 0.6% | – | – | – | 0.6% | – | – | – | 0.1% | 5 |
| Nortel Polska Sp. zo.o. | – | 0.1% | 0.2% | 0.0% | 0.8% | – | 0.0% | – | – | 0.0% | 3 |
| Nortel Portugal S.A. | – | 0.2% | 0.0% | 0.1% | – | 0.5% | 0.0% | – | – | 0.0% | 2 |
| Nortel Romania SRL | – | 0.2% | – | 0.0% | 0.2% | 1.9% | 0.0% | – | – | 0.0% | 3 |
| Nortel Russia | – | – | 0.0% | – | 0.0% | – | – | – | – | 0.0% | 0 |
| Nortel Slovensko, s.r.o. | – | 0.0% | – | 0.0% | 0.4% | 0.2% | – | – | – | 0.0% | 1 |
| Nortel Hispania, S.A. | – | 0.6% | 1.2% | 1.0% | – | 4.7% | – | – | – | 0.2% | 17 |
| Nortel AB | – | 0.7% | 1.1% | – | – | 0.6% | – | – | – | 0.2% | 12 |
| Nortel AG | – | 1.1% | 0.8% | 0.7% | 0.1% | 0.3% | 0.0% | – | – | 0.2% | 15 |
| NETAS | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Ukraine | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Networks UK Ltd | 1.9% | 10.1% | 15.0% | 14.7% | 4.7% | 21.2% | 14.0% | 6.5% | 5.4% | 6.5% | 477 |
| Nortel Optical Comp Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Northern Ireland) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| NCH (1997) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Israel Ltd | – | 0.0% | 0.0% | – | – | – | – | – | – | 0.0% | 0 |
| Nortel Inc (Egypt Branch) | – | – | – | – | – | – | – | – | – | – | – |
| NNSA (Malta Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel UK - Saudi Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel South Africa Ltd | – | 0.7% | – | – | – | – | – | – | – | 0.1% | 6 |
| Nortel Inc. (Tunisia Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Intl Inc. (Dubai Branch) | – | – | – | – | – | – | – | – | – | – | – |
| **Total** | **3.8%** | **29.0%** | **29.2%** | **28.8%** | **10.1%** | **44.3%** | **21.8%** | **13.4%** | **16.2%** | **17.3%** | **$ 1,262** |

## Chart 23.5

| EMEA ENTITY ALLOCATIONS | | | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Business IP/Residual Patent Method: | License Approach (Sale Specific) / License Approach | | | | | | | | | | |
| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Residual IP | Total Allocation | Total Value |
| **EMEA** | **11.0%** | **36.5%** | **33.5%** | **40.5%** | **34.4%** | **48.9%** | **13.4%** | **38.7%** | **33.6%** | **30.9%** | **$ 2,247** |
| | | | | | | | | | | | |
| **Entities** | | | | | | | | | | | |
| Nortel (Luxembourg) SA | – | – | – | – | – | – | – | – | – | – | – |
| NNIF&H BV | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Austria) GmbH | – | 0.4% | 0.4% | 0.1% | 1.4% | 0.0% | 0.0% | – | – | 0.1% | 7 |
| Nortel N.V. | – | 0.5% | 1.3% | 0.7% | 1.7% | 1.2% | 0.1% | – | – | 0.2% | 16 |
| Nortel (Bulgaria) EOOD | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Czech Republic | – | 0.1% | 0.0% | 0.0% | 0.3% | 0.2% | 0.1% | – | – | 0.0% | 2 |
| Nortel AB - Denmark Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Oy | – | – | – | – | – | – | – | – | – | 0.0% | 0 |
| Nortel Networks S.A. | 3.9% | 7.2% | 4.9% | 10.2% | 8.4% | 7.8% | 0.4% | 13.5% | 12.1% | 9.6% | 697 |
| Nortel France SAS | – | 0.3% | – | – | 0.2% | – | – | 0.1% | 0.4% | 0.3% | 22 |
| Nortel GmbH | – | 3.0% | 0.6% | 1.3% | – | 3.5% | 1.9% | – | 0.0% | 0.5% | 34 |
| Nortel Hungary | – | 0.1% | – | – | – | – | – | – | – | 0.0% | 1 |
| Nortel (Ireland) Ltd | 3.2% | 6.0% | 2.4% | 5.2% | 3.7% | 2.2% | 0.6% | 11.1% | 7.9% | 6.4% | 464 |
| NNL - EMEA sales | – | – | – | – | – | – | – | – | – | – | – |
| Nortel S.p.A. | – | 1.1% | 0.5% | 1.9% | 0.1% | 1.0% | 0.0% | – | – | 0.2% | 15 |
| Nortel B.V. | – | 1.1% | 3.7% | 0.6% | 0.3% | 1.5% | 0.1% | – | – | 0.5% | 33 |
| Nortel Networks AS | – | 0.6% | – | – | – | 0.6% | – | – | – | 0.1% | 5 |
| Nortel Polska Sp. zo.o. | – | 0.1% | 0.2% | 0.0% | 1.6% | – | 0.0% | – | – | 0.1% | 4 |
| Nortel Portugal S.A. | – | 0.2% | 0.0% | 0.1% | – | 0.5% | 0.0% | – | – | 0.0% | 2 |
| Nortel Romania SRL | – | 0.2% | – | 0.0% | 0.5% | 1.9% | 0.0% | – | – | 0.0% | 3 |
| Nortel Russia | – | – | 0.0% | – | 0.0% | – | – | – | – | 0.0% | 0 |
| Nortel Slovensko, s.r.o. | – | 0.0% | – | 0.0% | 0.9% | 0.2% | – | – | – | 0.0% | 1 |
| Nortel Hispania, S.A. | – | 0.6% | 1.2% | 1.0% | – | 4.8% | – | – | – | 0.2% | 17 |
| Nortel AB | – | 0.7% | 1.1% | – | – | 0.6% | – | – | – | 0.2% | 12 |
| Nortel AG | – | 1.1% | 0.8% | 0.7% | 0.2% | 0.3% | 0.0% | – | – | 0.2% | 15 |
| NETAS | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Ukraine | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Networks UK Ltd | 4.0% | 12.5% | 16.4% | 18.7% | 15.2% | 22.6% | 10.2% | 14.1% | 13.2% | 12.2% | 890 |
| Nortel Optical Comp Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel (Northern Ireland) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| NCH (1997) Ltd | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Israel Ltd | – | 0.0% | 0.0% | – | – | – | – | – | – | 0.0% | 0 |
| Nortel Inc (Egypt Branch) | – | – | – | – | – | – | – | – | – | – | – |
| NNSA (Malta Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel UK - Saudi Branch | – | – | – | – | – | – | – | – | – | – | – |
| Nortel South Africa Ltd | – | 0.7% | – | – | – | – | – | – | – | 0.1% | 6 |
| Nortel Inc. (Tunisia Branch) | – | – | – | – | – | – | – | – | – | – | – |
| Nortel Intl Inc. (Dubai Branch) | – | – | – | – | – | – | – | – | – | – | – |
| **Total** | **11.0%** | **36.5%** | **33.5%** | **40.5%** | **34.4%** | **48.9%** | **13.4%** | **38.7%** | **33.6%** | **30.9%** | **$ 2,247** |

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

## ACKNOWLEDGMENT OF EXPERT'S DUTY

1.   My name is Paul P. Huffard. I live in **Darien**, **Connecticut, USA**.

2.   I have been engaged by or on behalf of the Lawyers for the Joint Administrators for the EMEA Debtors to provide evidence in relation to the above-noted court proceeding.

3.   I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a)   to provide opinion evidence that is fair, objective and non-partisan;

   (b)   to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c)   to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.     I acknowledge that the duty referred to above prevails over any obligation which
I may owe to any party by whom or on whose behalf I am engaged.

Dated: January 24, 2014
       New York, New York

Senior Managing Director
The Blackstone Group
345 Park Avenue
New York, New York 10154

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,
AS AMENDED.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**ACKNOWLEDGEMENT OF EXPERT'S DUTY**

LAX O'SULLIVAN SCOTT LISUS LLP
SUITE 2750, 145 KING STREET WEST
TORONTO, ONTARIO M5H 1J8

Matthew P. Gottlieb  (LSUC#: 32268B)
TEL:       (416) 644-5344
FAX:       (416) 598-3730

DAVIES WARD PHILLIPS & VINEBERG LLP
155 Wellington Street West
Toronto, ON  M5V 3J7

Robin B. Schwill (LSUC #38452I)
Tel:       416.863.0900
Fax:       416.863.0871

Lawyers for Nortel Networks UK Limited
(In Administration) et. al.