**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

— and —

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,
AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL
CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL
NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED.

---

# REBUTTAL REPORT OF JAMES E. MALACKOWSKI
### February 28, 2014

### Revised March 24, 2014

## REDACTED VERSION

1.  INTRODUCTION ........................................................................................................................ 1

2.  REBUTTAL TO THE GENERAL METHODOLOGIES OF THE OPPOSING EXPERTS ........................... 2

3.  REBUTTAL TO THE CANADIAN EXPERT REPORTS ...................................................................... 8

4.  REBUTTAL TO THE U.S. EXPERT REPORTS ............................................................................... 33

5.  INVENTIVE CONTRIBUTION TO NORTEL'S PATENT PORTFOLIO ............................................... 40

6.  CONCLUSION .......................................................................................................................... 43

7.  STATEMENT OF LIMITING CONDITIONS .................................................................................. 44

8.  CERTIFICATION ...................................................................................................................... 45

All figures in USD. Capitalized terms and acronyms used but not otherwise defined have the meaning ascribed to them in the Expert Report.

## 1. INTRODUCTION

I incorporate by reference my expert report served on January 24, 2014 (the "Expert Report," or the **"Malackowski Report"**).  Since serving my Expert Report, I have reviewed and assessed the following reports served on January 24, 2014 on behalf of the Selling Debtors (collectively referred to as the "Opposing Reports") by the parties' expert advisors (the "Opposing Experts")[1]:

**Table 1:**
**Opposing Report Summary**

| # | Opposing Experts | Expert Firm | Expert For | Reference |
|---|---|---|---|---|
| 1 | Jeffrey H. Kinrich | Analysis Group, Inc. | U.S. Debtors | the "Kinrich Report" |
| 2 | Raymond Zenkich | Red Chalk Group | U.S. Debtors | the "Zenkich Report" |
| 3 | Timothy Reichert | Economics Partners, LLC | Canadian Debtors | the "Reichert Report" |
| 4 | Mark L. Berenblut and Alan J. Cox | NERA Economic Consulting | Canadian Debtors | the "Berenblut and Cox Report" |
| 5 | Philip Green | Hoffman Alvary & Company LLC | Canadian Debtors | the "Green Report" |
| 6 | Thomas Britven | Duff & Phelps | Canadian Creditors Committee | the "Britven Report" |

The central question addressed by me and the Opposing Experts is this:  What is the most appropriate method for allocating the cash proceeds of the Nortel liquidation (the "Subject Assets")?

This report provides my rebuttal arguments with respect to the Opposing Reports.  In preparing this report, I have considered various facts and data related to the issues discussed herein, as cited in the text and footnotes in this report and in the Appendices and Exhibits hereto.

I reserve the right to alter or amend this report and any of the opinions expressed herein to take into account any factual predicates of my opinions or any rulings or interpretations by competent authorities that render any opinion expressed herein incorrect or in need of qualification.

This report is to be used by the Courts for purposes of the above-mentioned matter.  It is not to be used for any other purpose without the express, written consent of Ocean Tomo.

---

[1] I take no position herein, but reserve the right to express a view, on whether the Courts should accept these individuals as experts, and/or accept their opinions as reliable.

## 2. REBUTTAL TO THE GENERAL METHODOLOGIES OF THE OPPOSING EXPERTS

### 2.1. Valuation and Allocation Comparison

In this section, I contrast the value and allocation opinions put forth in the Opposing Reports. The following chart identifies the relevant parties associated with each Debtor Group as set out in the parties' various filings.

| U.S. Debtors |
|---|
| Nortel Networks Inc. (NNI) |
| 15 other Nortel entities in the United States |
| **EMEA Debtors** |
| Nortel Networks UK Limited (NNUK) |
| Nortel Networks (Ireland) Limited (NNIR) |
| Nortel Networks S.A. (NNSA) |
| 20 other Nortel entities in Europe, the Middle East, and Africa |
| **Canadian Debtors** |
| Nortel Networks Corporation (NNC) |
| Nortel Networks Limited (NNL) |
| Nortel Networks Global Corporation |
| Nortel Networks International Corporation |
| Nortel Networks Technology Corporation |

The chart and tables below summarize my Expert Report and the Opposing Reports:

**Figure 1:**
**Summary of Expert Opinions – Allocation and Proceeds**



Rebuttal Report of James E. Malackowski

**Table 2:**
**Expert Reports – Summary Results – Business Sales Proceeds**

| | Canada | U.S. | EMEA |
|---|---|---|---|
| EMEA – Ocean Tomo[2] | $541 | $1,707 | $532 |
| Canada – Duff & Phelps[3] | $1,438 | $979 | $432 |
| Canada – Green[4] | $1,616 | $1,032 | $236 |
| U.S. – Kinrich[5] | $340 | $1,990 | $510 |
| | | | |
| *EMEA – Ocean Tomo[6]* | 19.5% | 61.4% | 19.1% |
| *Canada – Duff & Phelps[7]* | 50.5% | 34.4% | 15.2% |
| *Canada – Green[8]* | 56.0% | 35.8% | 8.2% |
| *U.S. – Kinrich[9]* | 11.9% | 70.0% | 18.0% |

**Table 3:**
**Expert Reports – Summary Results – Residual Patent Sale Proceeds**

| | Canada | U.S. | EMEA |
|---|---|---|---|
| EMEA – Ocean Tomo[10] | $1,777 | $1,930 | $793 |
| Canada – Duff & Phelps[11] | $4,368 | $30 | $57 |
| Canada – Green[12] | $4,453 | $0 | $0 |
| U.S. – Kinrich[13] | $430 | $3,310 | $710 |
| | | | |
| *EMEA – Ocean Tomo[14]* | 39.5% | 42.9% | 17.6% |
| *Canada – Duff & Phelps[15]* | 98.0% | 0.7% | 1.3% |
| *Canada – Green[16]* | 100.0% | 0.0% | 0.0% |
| *U.S. – Kinrich[17]* | 9.7% | 74.3% | 16.0% |

---

[2] Huffard Report at 58; Malackowski Report Ex. S.1.0 (All Proceeds – Residual IP Proceeds = Business Sale Proceeds).

[3] Britven Report ¶ 3.4.

[4] Green Report at 7.

[5] Kinrich Report ¶ 8 and Table 1.

[6] Huffard Report at 58; Malackowski Report Ex. S.1.0 (All Proceeds – Residual IP Proceeds = Business Sale Proceeds).

[7] Britven Report ¶ 3.4.

[8] Green Report at 7.

[9] Kinrich Report ¶ 8 and Table 1; <u>see also</u> Kinrich Report Ex. 15.  Note that Nortel relinquished less than 0.1% of the total value relinquished in the Business Sales.

[10] Malackowski Report Ex. S.1.0.

[11] Britven Report ¶ 3.4.

[12] Green Report at 7.

[13] Kinrich Report ¶ 8 and Table 1.

[14] Malackowski Report Ex. S.1.0.

[15] Britven Report ¶ 3.4.

[16] Green Report at 7.

[17] Kinrich Report ¶ 8 and Table 1.

**Table 4:**
**Expert Reports – Summary Results – All Proceeds**

|  | Canada | U.S. | EMEA |
|---|---|---|---|
| EMEA – Ocean Tomo/Blackstone[18] | $2,318 | $3,637 | $1,325 |
| Canada – Duff & Phelps[19] | $5,805 | $1,009 | $488 |
| Canada – Green[20] | $6,069 | $1,032 | $236 |
| U.S. – Kinrich[21] | $770 | $5,300 | $1,230 |
|  |  |  |  |
| *EMEA – Ocean Tomo/Blackstone[22]* | 31.8% | 50.0% | 18.2% |
| *Canada – Duff & Phelps[23]* | 79.5% | 13.8% | 6.7% |
| *Canada – Green[24]* | 82.7% | 14.1% | 3.2% |
| *U.S. – Kinrich[25]* | 10.6% | 72.6% | 16.8% |

## 2.2.    Highest and Best Use

In my Expert Report, I explained in detail my approach to valuing and allocating the proceeds of the sale of Nortel's IP.  In short, allocating the proceeds of the sale of IP in the Business Sales and the Residual Patent Sale requires considering the beneficial and economic ownership interests of the RPE entities.  For the reasons described in my Expert Report, the Nortel RPEs' respective ownership interests are best measured by the historical R&D spending by each RPE that contributed towards the creation of the Nortel IP sold in the Business Sales and the Residual Patent Sale.

Alternatively, if one assumes that the interests of the Licensed Participants (i.e., the RPEs excluding NNL) in Nortel IP were limited to the licenses they held under the MRDA, the valuation and allocation of the IP should be consistent with the valuation principle that intangible assets will be utilized according to their highest and best use ("HBU").  The concept of HBU was originally utilized in real estate valuation, but has become more prevalent for valuing nonfinancial assets in recent years.  The definition of HBU is provided below:

> The highest and best use of a nonfinancial asset takes into account the use of the asset that is physically possible, legally permissible, and financially feasible.[26]

The HBU concept maximizes value based on how similar market participants would likely act to maximize value of a productive asset.  To that end, the Financial Accounting Standards Board asserts that the HBU must establish that an asset's use is physically possible, legally permissible, and financially feasible.  In most circumstances, the use of an asset as a going concern is presumed to be its HBU; however, in the case of

---

[18] Huffard Report at 58.

[19] Britven Report ¶ 3.4.

[20] Green Report at 7.

[21] Kinrich Report ¶ 8 and Table 1.

[22] Huffard Report at 58.

[23] Britven Report ¶ 3.4.

[24] Green Report at 7.

[25] Kinrich Report ¶ 8 and Table 1.

[26] Financial Accounting Standards Board:  Accounting Standards Update, Fair Value Measurement (Topic 820), May 2011, at 22, 206.

Nortel, the HBU is demonstrably better in the "safe hands"[27] of a financially secure buyer. It is much more financially feasible to assume that the assets would best be utilized by a going concern that is financially stable.

Unlike the Opposing Reports, my method directly values Nortel's IP under the HBU concept and then allocates it based on the parties' respective contributions to the creation and development of the IP. In the next two sections I explain why this is the case.

## 2.3.    Contributions to R&D Activity

Total R&D spending by Nortel exceeded $30 billion dating back to 1989. The R&D spending was the primary building block for the creation of IP at Nortel. As the Britven Report states, "Intellectual property formed the backbone of Nortel and its Lines of Business and value."[28] That said, however, the Opposing Reports mostly ignore R&D contributions to the development of IP, which should be a key component in allocating the proceeds among the RPEs (even if the total value of the IP is significantly less than the R&D spending that created it). The development of IP occurred in Canada, the United States, and EMEA, and the contributions to that development can be measured a number of ways.

The Reichert Report, the Green Report, the Britven Report, and the Berenblut and Cox Report (collectively, the "Canadian Experts") assume that NNL's legal title to Nortel IP includes all equitable or beneficial ownership except to the extent of limited exclusive and non-exclusive licenses, and therefore ignore the contributions of the Licensed Participants to the creation of IP as a metric for allocating ownership interests. Said differently, the economic returns of the IP enjoyed by the RPEs are a relevant consideration in assessing how the parties themselves allocated attributes of ownership, which can then be allocated based on the contributions by all parties that helped to develop the IP. The Canadian Experts' approach also understates the value of the exclusive and non-exclusive licenses held by the Licensed Participants.

As described in my Expert Report, there are a number of ways to value contributions to the creation of IP. However, in Nortel's circumstances, the most reasonable way to measure contribution to IP development is through the actual R&D performed by each RPE. This method reflects the true underlying efforts associated with the development of the IP.

I recognize that R&D spending data is not granular enough to determine which groups of patents each entity's spending was directed towards. In these circumstances, I believe that measuring relative R&D spending by country from the oldest priority date of the non-expired patents in the Residual Patent portfolio or Business Line portfolios is the most reasonable method for measuring contribution.

## 2.4.    Allocation

The Canadian approach to allocating proceeds is based upon an assumption about NNL's bare legal title. As I will discuss in more detail later in this report, this method is not tenable for a number of reasons, the most important being that it gives one party (the Canadian Debtors) substantial economic value at the expense of the others, in exchange for nothing.

The U.S. approach to allocation relies upon two data points.  For the Residual Patents, the Kinrich Report relies upon the IPCo Model provided by Lazard and Global IP to allocate by projected revenue in RPS countries. This data is over eighteen months old relative to the transaction date of the Residual Patent Sale. For the Business Sales, the proceeds were allocated pro-rata on the basis of historical revenue at each of the

---

[27] In the Green Report, "Safe Hands" is defined as "revenues, expenses and operating profits based on an assumption that the operating business was sold to an acquiring company viewed by the customers as safe and well capitalized. The Safe Hands forecasts are found in presentations prepared for potential investors and in certain of the valuations prepared by Lazard."  Green Report at 57.

[28] Britven Report ¶ 3.20.

Nortel businesses by country.  This approach relies on revenue when cash flow is a better measure of value, and historical performance as a proxy for expected future performance when better data were available. Moreover, it ignores contributions to the development of the IP.

In contrast, my Expert Report mirrors the most reasonable and likely economic outcome that is associated with the liquidation of a multinational corporation with a large amount of IP.  First, I determined the going concern value of the IP based on the specifics of how the IP is actually monetized.  In the case of the Residual Patents, that required valuing the franchise groupings in a method similar to how Rockstar Consortium, Inc. ("Rockstar") is actually monetizing the IP today.  For the Business Sales, that required valuing the IP as part of a going concern that will use the IP at its HBU.  Having done so, I allocated the proceeds based on the RPEs' relative economic contributions to the development of the IP through reviewing their cash R&D spending.

As an alternative, I allocated the proceeds on a license theory based on the geographic source of the IP value, which I derived in the manner described above.

My analysis relies on information that demonstrates the HBU in an economically rational way.  By contrast, the Opposing Experts rely on assumptions, at least one of which appears to be unfounded given the facts of which I am aware.

## 3.   REBUTTAL TO THE CANADIAN EXPERT REPORTS

The central valuation assumptions that form the foundation of each of the Canadian Expert reports are as follows:

A.   The Canadian Experts assume that the Licensed Participants have no ownership interest in Nortel IP, and that their economic interest is limited to contractual license rights provided under the MRDA;

B.   The Canadian Experts assume that the Licensed Participants' entitlement is limited to the present value of operating profits attributable to the use of Nortel's IP within certain businesses of the Nortel Group; and

C.   The Canadian Experts assume that, had Nortel continued to operate, it would have abandoned the licensing business that John Veschi was hired to lead, and which was sold by Nortel as part of the Residual Patent Sale.

In my opinion, each of these assumptions is incorrect. Reliance on these erroneous assumptions by the Canadian Experts leads to an extreme undervaluation of the Licensed Participants' interests.

### 3.1.   The Canadian Debtors Rely on Legal Title, Which Was Held By NNL as a Matter of Convenience Only

The EMEA Debtors' position is that they (and each of the other RPE MRDA "Participants") had an ownership interest in Nortel's IP, based on their contributions to R&D activity during the period in which it was created. In my opinion, the best way to value the proportions of such ownership is by the relative proportion of each RPE's contribution to the creation of that IP through R&D spending.

In contrast to EMEA's approach derived from the manner in which Nortel's IP was created, the Canadian Experts principally based their analyses of RPE entitlement on the provisions of the MRDA concerning legal title. In my view, the MRDA's grant of bare legal title to NNL does not limit the Licensed Participants' economic entitlement to the proceeds of the sale of IP based on their relative contributions to its creation. Instead, legal title is a mere administrative choice that may be (and in this case is) wholly independent of economic contributions.

The documents and testimony I have reviewed in this case are consistent with this view, and reflect that the assignment of legal title to NNL was provided for in the MRDA for purposes of administrative convenience, rather than to define economic entitlement.[29] Indeed, the assignment of legal title to NNL provided a useful convention, under which all Nortel employees worldwide could commonly assign their inventions to a single entity, which could administer the IP through a single, worldwide, administrative department. The same individuals (from NNL) could sign off on submissions to various national patent offices, and the staff in the worldwide operations could easily determine who had to sign such documents. This is common practice

---

[29]   See Dep. Ex. 22143 (NNC-NNL06491238), Modification of R&D Cost Sharing Arrangement, at NNC-NNL06491238/1 ("While it is not required by the new model, for administrative simplicity it is expected that all of Nortel's IPR will continue to be owned by Nortel Networks Limited."); Dep. Ex. 11114 (NNC-NNL06542925), FW: Modification of Nortel Networks' R&D Cost Sharing Arrangement, at NNC-NNL06542925/1 ("Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity."); Collins Dep. 94:13-96:17 (explaining that spreading IP ownership among legal entities would make filing patent applications, paying maintenance fees, and filing foreign patents more complicated, would increase the likelihood of error, and could lead to the duplication of IP law group work).

within large, multinational corporate families as a means of capitalizing on economies of scale across the R&D function.

### 3.2. The Canadian Experts' Analysis of RPE Economic Entitlement Is Inconsistent with their Position on the Licensed Participants' IP Ownership Rights

The Canadian Experts present two different calculations of the EMEA Debtors' economic entitlement with respect to allocation. Both are developed only with respect to the Business Sales and omit any allocation to the EMEA Debtors in respect of the Residual Patent Sale.[30] The first approach values the licenses held by the RPEs, and assumes that 1) Nortel abandoned its licensing business and continued to operate its remaining businesses, and 2) each Licensed Participant would retain the profits generated in its exclusive jurisdiction.[31] The second approach assumes that 1) the entire excess of the sales price over the value of the tangible assets can be treated as the present value of the amounts that could have been earned by the remaining businesses, and 2) the IP proceeds from the Business Sales are allocated in accordance with RPS percentages (which would generate a higher payout for the U.S. and EMEA Debtors).[32] The focus of my rebuttal in this section will be the former "continued Nortel operations" approach that appears to be the preferred Canadian approach to allocation. While I will focus principally on the Green Report, I note that similar criticisms could be applied to the other Canadian Experts' reports.

### 3.2.1. Allocating an RPS-Adjusted Share of Future Profits to the Licensed Participants Is Consistent with Ownership Rights, Not License Rights

The Canadian Experts take the position that the licenses granted under the MRDA only covered the use of Nortel IP by the Licensed Participants in the operating Nortel Business Lines (but excluding the licensing business). As a result, the Green Report (for example) concludes that to value the licenses surrendered by the Licensed Participants in connection with the sale of IP, he need only consider the operating profits that the RPEs themselves would have earned had those operating businesses continued.[33] It is instructive to compare 1) what Green says the licenses do and do not cover, with 2) his calculation of what the Licensed Participants are entitled to. There is a mismatch between the two.

---

[30] Green Report at 62.

[31] Green Report at 57, 61–65.

[32] I agree with the general thrust of Green's alternative calculation for the Business Sales (though I disagree with details of his calculation, such as the five-year look back period Green applies from Q1 2010). My principal disagreement is that Green does not apply this same alternative approach to the Residual Patent Sale. Instead, Green questioned the validity of the logic of this approach even in connection with the Business Sales. Green Report at 62. Although he denigrates his own alternative analysis as a mere "data point," his inclusion of this "alternative" approach is indicative of the weakness of his lead approach based on Nortel-only future benefits.

[33] Green's views on this are summarized as follows:

> The value of the surrendered license rights is directly related to the profits that the license holders (i.e. the US and EMEA Debtors) could have earned, had they retained those rights. Because of the non-transferable nature of the license rights, their value is not related to the profits that some well-capitalized competitor could earn exploiting that IP, but rather is derived from the operating profits that the US and EMEA Debtors could have earned had they continued to operate the sold businesses. Accordingly, the assumption inherent in the Safe Hands forecasts (i.e. that the rights to the IP would be exercised by a non-Nortel entity) is inapplicable to a valuation of the license rights surrendered. Deriving the values of the surrendered license rights using the Safe Hands projections would necessarily overvalue the rights, because it would assume operation of the businesses by someone other than Nortel – someone who had financial capabilities that were beyond Nortel's, and someone for whom the business in question might operate synergistically with other operations. Therefore, the appropriate set of forecasts to use to value the license rights surrendered are the Retained by Nortel scenarios, when available.

Green Report at 59.

Green's favored "continued Nortel operations" approach states that, in giving up their licenses pursuant to the Interim Funding and Settlement Agreement ("IFSA") and the License Termination Agreements ("LTAs"), the Licensed Participants relinquished an RPS-adjusted stream of future profits that would have resulted from Nortel's businesses, had those businesses continued to operate. However, as will be explained below, Green does so in an inconsistent manner as between the Business Sales and the Residual Patent Sale.

Fundamentally, Green overlooks what IP has to do with operating profit. Green assumes that IP is the principal "driver" of Nortel's business (as Nortel repeatedly claimed), but he does not address what IP interests are at work in driving this value. Part of the answer is know-how related to Nortel's products and business, and part of it is permission to use that know-how and all other Nortel IP to the extent legal title is held by NNL (or in reality owned by all of the RPEs in combination). This much is consistent with Green's calculations. But there is another component of IP value that is implicitly included in his allocation of Business Sales IP, and which necessarily implies that the Licensed Participants held a broader interest in both Business Sales IP and Residual Patents than Green allows: defensive value of IP. Defensive value contributed to Nortel's operating profits, even as Nortel itself conducted its businesses, and was an incident of ownership. By including defensive value in his calculations of Business Sales IP, Green implicitly concedes the Licensed Participants' ownership interests. I am aware of no basis on which to treat the Residual Patents any differently.

### 3.2.2. Defensive Value of IP

The defensive value of IP is a factor that contributed value both when the IP was in the hands of Nortel, and after the IP was sold. Traditionally, companies in the telecommunications, software, electronics, and semiconductor industries considered the value in their IP to be primarily defensive. While copyrights, know-how, trade secrets, and the like also exist, the stronger IP rights in these industries are manifested in patents. Products in these fields tend to be complex and each product tends to be covered by a multitude of patents (each of which covers some small aspect, characteristic, or use of the product). Each patent may also be relevant to a multitude of products. In addition, there is great diversity in the ownership of the patents among the players in the industry. Consistent with other companies in these fields, one component of the value of Nortel's IP portfolio was defensive, as universally acknowledged by both leading authorities and the witnesses in this case. This is because, as a practical matter, patents (or any other IP) do not confer the right to make, use, or sell any product; they only confer a right to exclude others. The ability to actually make something may be subject to the IP rights of others.[34] In other words, Nortel's IP portfolio cannot give it the right to do anything if a competitor's IP prohibits it from doing so and, in light of this defensive value, referring to the patents conveyed to Rockstar as "residual" is something of a misnomer.

The web of patent rights surrounding the typical product in these industries is often called a "patent thicket." Patent thickets exist in each of the industries I have mentioned. "Defensive patenting" is the primary tool for dealing with the patent thicket in these industries because industry participants use the threat of asserting their IP against competitors as a defense against a reciprocal assertion of IP by the competitors. Having a large patent portfolio creates a form of "mutually assured destruction" should any one party try to assert its patents against competitors.

Without a large and dense collection of patents, a company in any of these fields will be vulnerable to multiple overlapping royalty demands for patent infringement from others who do have such portfolios. Such obligations are referred to as "royalty stacking." Left unabated, royalty stacking can seriously erode profits. Therefore, companies in these fields deliberately aggregate large quantities of patents to deter the assertion of royalty demands, and to be able to respond to those demands that are made by asserting and/or cross-licensing their own patents. A successful defensive position provides these companies with "freedom

---

[34] See Carl Shapiro, Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting, Innovation Policy and the Economy, at 119–44 (2001).

to operate."[35]   Assuming the underlying business is robust, the cost of establishing IP rights is far less than the profits that are protected by having the defensive IP position.  Thus, it is valuable for these companies to aggregate the defensive portfolio, and the portfolio has considerable ongoing value for their businesses.[36]

Based on my experience with licensing, having patents covering a competitor's products is an incident of ownership.[37]  Possession of a mere license to *use* IP has no defensive value whatsoever.[38]  Only *ownership* of a right to *exclude* third parties from practicing what is covered by IP accounts for the defensive value of Nortel IP.[39]  And indeed, Art. 4(e) of the MRDA gives Licensed Participants the right to bring enforcement actions to prevent infringement of Nortel IP in their respective territories.

Critically, the defensive value of IP was inherently included in both Nortel's profit allocations under the MRDA and in Green's profit allocation for the Business Sales.  Green's analysis, by parcelling out operating profit to the RPEs, actually takes defensive value into consideration, as far as those categories of value were realized in Nortel's hands.  If the Licensed Participants had only a narrow license to use Nortel IP in existing Nortel products, and no economic ownership interest, he should have carved out the defensive value.  That he did not do so is an implicit concession of an economic ownership interest, and a recognition that a mere license to use Nortel IP in Nortel products is unworkable in practice.  The right to use Nortel IP is inseparable from the defensive value that an IP portfolio provides, and it is telling that Nortel made no attempt to distinguish between which RPE revenues related to Products and which did not while Nortel was in business.  In other words, Green's analysis, which reflected the way Nortel operated, credits to each Licensed Participant increments of profit that can only be accounted for if the Licensed Participants hold beneficial ownership, or license rights broad enough to be the same as beneficial ownership in their territory.

Ultimately, in my opinion the problem with Green's approach is not an error of calculation, but an inconsistency:  The preferred approach of allocating operating profit is implicitly predicated on the Licensed Participants having an ownership interest in Nortel's IP – contrary to Green's assumptions, and contrary to the conclusions that Green bases on those assumptions, i.e., that the Licensed Participants do not own any IP rights and that the Licensed Participants' licenses only relate to Nortel "Products."  There is no principled way to provide compensation for that ownership when it is given up in the Business Sales, but then to assume no ownership interest when assessing Residual Patents.

---

[35] See Roese Dep. 211:21-216:2, 227:13-228:14, Nov. 12, 2013; Collins Dep. 62:11-63:11, Nov. 15, 2013; Dep. Ex. 11154 (NNC-NNL06651042), Cianciolo Remarks, at NNC-NNL06651042/4–5.

[36] This effect was demonstrated by Nortel's counter-assertion of patents in litigation against Vonage and Ciena, among others.  See, e.g., Nortel's Answer & Counterclaims [D.I. 28], Case No. 07-cv-00507-GMS (D. Del. Dec. 14, 2007); Original Complaint for Patent Infringement [D.I. 1], Case No. 06-cv-00164-LED (E.D. Tex. Apr. 17, 2006).

[37] See WiAV Solutions LLC v. Motorola Inc., 631 F.3d 1257, 1265–66 (Fed. Cir. 2010) ("Because the legally protected interests in a patent are the exclusionary rights created by the Patent Act, a party holding one or more of those exclusionary rights – such as an exclusive licensee – suffers a legally cognizable injury when an unauthorized party encroaches upon those rights and therefore has standing to sue."); My First Shades v. Baby Blanket Suncare, 914 F. Supp. 2d 339, 345–56 (E.D.N.Y. 2012) (holding that a patent owner, including assignees and exclusive licensees with all substantial rights to the patent, may sue alone in their own right while holders of a non-exclusive or "bare" license may not exclude others from using the patent and thus do not possess standing).

[38] Such a mere license is only a "defense" against the licensor – which, in the Canadian view, is NNL.  However, "defensive value" does not concern "defense" against an affiliated entity (such as NNL) that is granting a royalty-free license.  Rather, defensive value concerns deterrence of third parties by having patents that can be asserted against the third parties, based on *their* products and activities, not one's own.

[39] The MRDA's inclusion of "all rights to patents . . . as necessary or appropriate in connection" with the licenses granted is also consistent with this defensive value.  Dep. Ex. 21003 (NNC-NNL06001514), MRDA Art. 5(a), at NNC-NNL06001514/6–7.

### 3.2.3. The Licensed Participants' Beneficial Ownership Interests Must Be Valued Based on Fair Value and Not Limited to their Value in Nortel's Hands

Even if one were to accept the Canadian Experts' assumption that the Licensed Participants hold no ownership interest in Nortel IP, their valuation of those Participants' licenses still dramatically undervalues the interests of the EMEA and U.S. Debtors.

When an asset is sold in an arm's-length transaction, particularly after an auction, a fair value is established. Allocation of sale proceeds should be in accordance with the proportionate ownership or interest in the assets sold. In other words, the value to be allocated is not a function of what the asset was worth in the seller's hands. The value to be allocated is the amount realized. Accordingly, the proceeds realized necessarily should be valued and allocated based on the values that were determined through the auction process. Further, ignoring the "safe hands" in the valuation and allocation process is contrary to the financial feasibility principle expected of the HBU of the Nortel assets that were liquidated.

The Canadian Experts do not deny these principles. Instead, they are instructed to make different assumptions. First, Green assumes that the MRDA confers no ownership rights in the Nortel IP to the Licensed Participants and that the only interest the other RPEs held was a limited license: "NNL granted the Participants to the MRDA an exclusive license (and not ownership) to the NN Technology."[40] Having reduced the Licensed Participants' rights to their licenses under the MRDA, Green then adopts a narrow interpretation of the licenses. Specifically, he claims that the exclusive licenses were 1) limited to "specific fields of use as required to operate the Nortel operating business as managed by the licensee," and 2) non-assignable.[41] In my opinion, neither assumption is warranted.

If the EMEA Debtors' contribution approach is correct, as I believe it to be, then Green's first assumption is incorrect and his entire analysis is irrelevant. The Licensed Participants' entitlement to an allocation of sale proceeds is not based on a "grant" from NNL – the Licensed Participants already had their ownership interest by virtue of their contributions to the creation of Nortel IP. Indeed, as already discussed above, Green's ownership assumption is inconsistent with his own valuation of the Licensed Participants' licenses with respect to Business Sale IP, which inherently credits the fruits of IP ownership.

However, even if one assumes that legal title and ownership were co-extensive for Nortel's IP, as will be addressed below, Green (and the other Canadian Experts) are still wrong in their characterization of the purported "limitations" of the licenses granted under the MRDA.

The flaw in the Canadian Experts' logic is seeing the Licensed Participants' rights as limited "license" rights with no incidents of ownership. First, they ignore the Licensed Participants' ability to block any sale of Nortel IP. Second, they overlook the importance of the right to sublicense granted under the MRDA. Third, they adopt an unduly restrictive interpretation of the field of use of the license grant under the MRDA.

### 3.2.4. The Non-Assignability of the RPEs' License Rights Is Irrelevant Because as a Practical Matter NNL Could Not Have Sold Nortel IP Unless the Licensed Participants Relinquished their License Rights

I note that the Canadian Experts cite Art. 14(a) of the MRDA, which provides that the MRDA is not assignable other than pursuant to mutual consent. In my opinion, their reliance on this provision is mistaken. It was not the Licensed Participants that sought to transfer their license rights; it was the Nortel Group, including NNL, that wished to transfer clean and marketable title to the Nortel IP, and in order to do that, the Licensed Participants' licenses had to be retired.

---

[40] Green Report at 55.

[41] Green Report at 55.

The Licensed Participants' ability to participate in the sales and receive value on account of the assets sold was independent of their ability to transfer their license rights. The licenses were perpetual. Had NNL sold its interest in Nortel IP without terminating the licenses, the purchasers would have taken the IP subject to the existing licenses. Since the Licensed Participants held exclusive licenses to the IP in their respective territories, the purchasers would have taken with no right to use the IP for those key territories (the United States, the United Kingdom, France, and Ireland), along with non-exclusive rights in the rest of the world due to the continuing sublicensability of the non-exclusive licenses. As will be discussed in more detail below, this is why it was necessary for the Licensed Participants to execute the LTAs in connection with the Business Sales and Residual Patent Sale – it is fundamental that NNL could not sell that which it did not own.

### 3.2.5. The Licensed Participants' License Rights Were Transferable Because the Licensed Participants Had the Ability to Sublicense to Third Parties

The Canadian Experts assume that because the sublicensable RPE licenses granted under the MRDA could not be *assigned* to another party, those license rights were not *transferable*.[42] Based on my experience with IP licenses, that is incorrect. This means that in the Canadian Expert reports, the incremental value of Nortel's IP in the "safe hands" of a purchaser – which of course is what drove the prices paid by the various purchasers – is entirely ignored other than to award it as a windfall to NNL. The Licensed Participants were entitled to sublicense their interests to third parties who could achieve a higher value than Nortel was capable of, and there is no valuation principle of which I am aware that would deny the Licensed Participants that higher value. The assumption that the licenses were not transferable ignores the key fact that both the exclusive and non-exclusive license rights were sublicensable.

When granting an exclusive license or sublicense, a licensor or sublicensor may transfer all of its rights to use the IP in question to a sublicensee, which would be economically equivalent to a "sale," and permissible under the terms of the MRDA, despite the general limitation therein on the right to "assign."

The following schematic illustrates the transfer of rights that can occur through the grant of an exclusive license or sublicense.

**Figure 2:**
**Transfer of License Rights Through an Exclusive Sublicense**



In the scenarios outlined above, the rights granted in both the license and the sublicense are the same. This represents a true transfer of the rights owned by the licensee, since, when an exclusive sublicense is granted, the sublicensor (referred to as the licensee in Figure 2) can no longer exercise the granted rights or grant those rights to any other parties. Importantly, these license rights are transferred even though the license agreement has not been assigned to the sublicensee. Therefore the Licensed Participants had the power to transfer the same rights that they held to a third party.

---

[42] For example, Berenblut and Cox state that "the value of the non-transferable license rights surrendered by the U.S. and EMEA Debtors depends only on, and is limited to, the present value of their share of the expected future operating profits of Nortel but for the decision to sell its assets." Berenblut and Cox Report at 5.

### 3.3.    Scope of the MRDA License Rights

Each of the three Canadian Expert reports assumes that the RPEs' license rights were restricted to exploitation of Nortel IP in the context of the Nortel Group as a going concern. Given my experience as a licensing expert and having reviewed hundreds of license agreements, in my opinion the license rights owned by the RPEs were significantly broader than what has been assumed by the Canadian Experts.

The main business terms of the licenses granted by the MRDA are summarized in the table below.

**Table 5:**
**Summary of MRDA License Terms**

| | |
|---|---|
| Exclusivity | Exclusive in each RPE's home country, non-exclusive in non-RPE countries |
| Royalties | None |
| Sublicense rights | Yes, for both exclusive and non-exclusive licenses |
| Term | In perpetuity |
| Enforcement | Each RPE had "the right to assert actions and recover damages or other remedies in their respective Exclusive Territories" |

The key factors that substantially expand the scope of the MRDA license rights beyond what has been assumed by the Canadian Experts are discussed in the following subsections.

### 3.3.1.    The MRDA's Definition of "Products" Is Broader than the Canadian Experts Acknowledge

Each of the three Canadian Experts assumes that the licenses granted in the MRDA are limited to Nortel "Products," and further that "Products" are effectively limited to products actually marketed by Nortel at the date of bankruptcy.[43]  This assumption would render the licenses virtually meaningless with respect to the Residual Patents, which is inconsistent with the parties' recognition of the Licensed Participants' interests in all Nortel IP through the MRDA.

The MRDA defines Products as "all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured, or marketed, at any time by, or for, any of the Participants."[44]  In my experience reviewing IP licenses, this language is extremely broad.  For example, the references to products that are merely "proposed to be designed," illustrates that "Products" is not restricted to existing Nortel products.  Notably, the patenting process typically involves drafting a patent application, which describes as many different embodiments of the invention as possible.  Since Nortel's IP group worked with Nortel inventors to draft applications, this process would have required Nortel to propose and describe many different product designs that incorporated each invention, regardless of whether they were actually incorporated into an existing Nortel product.

Moreover, based on my industry experience reviewing licenses, this definition and the license grant in which it appears must be read together.  The MRDA grants (among other rights) an "exclusive license" with respect to "Products using or embodying NN Technology."  In my opinion, this gives the license holder the right to prevent third parties from making their own products that infringe Nortel's IP.  From a business perspective, the contention that these grants are limited to "Nortel" products and are thus solely operative with respect to business activities conducted in Nortel's hands reading an unwarranted limitation into these grants.  Third parties whose products were of the same type as those designed (or even proposed) by Nortel are within the scope of the exclusive IP rights covered by this license grant.  Since the license can exclude third party products, the right to sublicense means the Licensed Participants can sell the valuable right to

---

[43] See Green Report at 64; Berenblut and Cox Report ¶¶ 49, 60(b), 71, 78; Britven Report ¶¶ 3.45, 4.2(b), 6.33.

[44] MRDA Art. 1(g).

demand licenses from any infringing products. Similarly, the sublicense right in connection with the non-exclusive license must include the right to sublicense in respect of non-Nortel products. A sublicense would not be necessary for a Licensed Participant to have a third party make Nortel products for it. The Canadian Experts' interpretation would render the sublicense in respect of non-exclusive licenses a nullity.

### 3.3.2.  The Canadian Interpretation of the Enforcement Right in Art. 4(e) Makes No Sense

I note that Art. 4(e) of the MRDA provides as follows:

> (e) Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others.

The Green Report characterizes this provision as follows:

> The MRDA Participants were granted the *limited* right to assert actions and recover damages in their exclusive territories for infringement or misappropriation of Nortel's Technology.[45]

If we adopt the Canadian Experts' interpretation that the license rights do not apply to products made by third parties using Nortel IP, then the right to bring an infringement action is not only "limited," it loses all effect whatsoever.

In my opinion, the enforcement right granted to the Licensed Participants under Art. 4(e) only makes sense if the Licensed Participants can assert Nortel's patents against "others" that are infringing or misappropriating Nortel technology.  Under the Canadian Experts' view of the exclusive license rights, the only possible enforcement action would be a suit by one Licensed Participant against another Licensed Participant because, according to the Canadian Debtors' interpretation, the exclusive licenses would be limited specifically to Nortel products, not infringing products by third parties.

Putting aside the implausibility of such a thing ever occurring, the word "others" as used in Art. 4(e) cannot reasonably be interpreted as referring to one of the parties to the very agreement in which it appears.  This leaves the class of infringers that might be the target of an action under Art. 4(e) as a completely empty set. This makes no sense and, based on my experience, is not how the enforcement rights would be interpreted in the industry.  The entire economic benefit of such a clause is to permit enforcement against third parties, and so it would be economically absurd if the exclusivity conferred under the license did not extend to infringing products by third parties, as Green assumes. I also note that my interpretation of the enforcement right is supported by Nortel's practice to name both NNL and NNI in U.S. patent litigation and to state that NNI was the exclusive licensee of the asserted patents.[46]

### 3.4.  The License Termination Agreements

On June 9, 2009, each of the RPEs and NNL entered into the IFSA.  Under this agreement, the U.S. and EMEA Debtors agreed that they would execute appropriate LTAs "with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and *in consideration of a right to an allocation* . . . of portions of the sale proceeds from, the sale of any material assets of any of the Canadian

---

[45] Green Report at 25 (emphasis added).

[46] See Nortel's Complaint [D.I. 1], Case No. 01-cv-10442, at 2 (D. Mass. Mar. 14, 2001); Nortel's Complaint [D.I. 1], Case No. 01-10443, at 2 (D. Mass. Mar. 14, 2001); Nortel's Amended Complaint [D.I. 4], Case No. 02-cv-00032, at 3 (N.D. Tex. Mar. 15, 2002).

Debtors and/or the U.S. Debtors to a third party."[47]   Approximately two years later and following the execution of the Rockstar Asset Sale Agreement on June 30, 2011, each of the MRDA participants signed a license termination agreement which terminated the RPE license rights to the Residual Patent portfolio (the "Rockstar LTA").[48]

The fact that LTAs had to be signed by the RPEs in order to facilitate the sale of the Residual Patent portfolio to Rockstar indicates that the RPE license rights were not limited strictly to use by Nortel as a going concern.  This is because if NNL or Rockstar did not believe that the RPE licenses could be used outside of the specific Business Lines that had already been sold, then the Residual Patent portfolio should have been viewed as unencumbered by the RPE licenses and no LTAs would have been required.

It is also worth noting that, from a business perspective, it would only make sense for the U.S. and EMEA Debtors to agree to sign the Rockstar LTA with the understanding that it was "in consideration of a right to an allocation" from the sale of the Residual Patent portfolio.  In fact, had either Debtor Group been aware that it would receive effectively none of the proceeds from the sale of the Residual Patent portfolio, as the Canadian Debtors now propose, the commercially reasonable approach would certainly have been not to sign the Rockstar LTA.  This is because by not signing the Rockstar LTA, either Debtor Group could have, at the very least, reduced the sales price of the portfolio or, more likely, blocked the sale entirely.

For example, had the U.S. and EMEA Debtors been aware that NNL intended not to share any of the Residual Patent Sale proceeds, they could have not signed the Rockstar LTA, and using the approach outlined in my Expert Report, the resulting value of the portfolio to Rockstar would have been reduced by 89%.[49]  This reduced value is due to the fact that, without the Rockstar LTA, the encumbrances on the Residual Patent portfolio would have prevented NNL from transferring anything but exclusive rights to the portfolio in Canada and non-exclusive rights in territories outside of the United States, the United Kingdom, France, and Ireland.  Had NNL attempted to sell a non-exclusive license for territories outside of the United States, the United Kingdom, France, and Ireland, moreover, the U.S. and EMEA Debtors could have sublicensed a competitor in those same territories, eliminating the economic value of the license sold by NNL.  The entire business model for a purchaser of the Residual Patents depends on exclusivity, and NNL could not deliver that without the Rockstar LTA.  Based on my experience, I have never seen an example of a company relinquishing comparable license rights, or a comparable ability to block a transaction, for effectively no compensation.

### 3.5.    Nortel Would Not Have Abandoned its Licensing Business Had it Continued to Operate

As mentioned above, I consider the Canadian Experts' assumption about the transferability of the licenses to be incorrect both in terms of license interpretation and in terms of commercial reality.  This error results in the licenses being valued in the context of only Nortel's operating businesses, which overlooks its licensing business and therefore depresses the value of those licenses, in particular for the Residual Patents.

To demonstrate how excluding the licensing business understates the value of the Licensed Participants' licenses, in this section of my rebuttal I will assume for the sake of argument that the interests of the Licensed Participants were restricted to their licenses, and that those license rights could only be used within the

---

[47] NNI_00207321, IFSA § 11(a), at NNI_00207329 (emphasis added).

[48] I am instructed by counsel that the IFSA is incorporated by reference in the Rockstar LTA and therefore that each of the parties to the Rockstar LTA is a "Selling Debtor" with an entitlement to sale proceeds to be determined in accordance with the terms of the IFSA.

[49] As shown in my Expert Report, the value of the exclusive and non-exclusive licenses of the U.S. and EMEA Debtors equals ~89% of the total Residual Patent portfolio value.

context of existing Nortel businesses ("Value in Use Assumption")[50] and not in the "safe hands" of a potential purchaser. As described above, I do not believe this to be an accurate assumption. However, with this assumption in place, the Canadian Experts then make a further erroneous assumption, that had Nortel not filed for bankruptcy, or had it restructured and emerged from bankruptcy, it would have abandoned the licensing business that John Veschi was hired to launch in 2008 ("No Licensing Business Assumption").[51] The No Licensing Business Assumption is used in combination with the Value in Use Assumption as a justification for 1) allocating effectively all of the Residual Patent Sale proceeds to NNL, and 2) limiting the U.S. and EMEA Business Sale IP allocations by assuming IP was used only defensively by the Business Lines as they were performing under Nortel management.

As discussed above, the Licensed Participants had the power to transfer the same rights that they held to a third party, via sublicenses. Similarly, NNL could not transfer unencumbered title to Nortel IP, and therefore achieve the premium associated with a sale to a "safe hands" buyer, without getting LTAs from the Licensed Participants. I therefore do not accept the implications of the Value in Use Assumption drawn by the Canadian Experts, namely that NNL is entitled to the entire "safe hands" premium.

In any event, the No Licensing Business Assumption pertains to an economic question about what Nortel would have done in the hypothetical scenario in which it did not file for, or had restructured and emerged from, bankruptcy. Several of the factors that make the No Licensing Business Assumption implausible are discussed in the following subsections.

### 3.5.1.  Nortel Was Already Launching its Licensing Business Before Bankruptcy

In order to determine "value in use" of Nortel's IP, we must look at the company's business and strategic plans before insolvency and the eventual sale. In 2008, the last year of Nortel's normal course of business, the company was organized according to four reportable segments (Carrier Networks, Enterprise Solutions, Global Services, and Metro Ethernet Networks) and had hired John Veschi to lead Nortel's new licensing business. It is important to note that licensing was not intended to be simply one of the various legal functions of Nortel's general counsel's office but, instead, was intended to be a full-fledged business. This has been explained by Mr. Veschi in deposition[52] and in various public interviews. For example, Mr. Veschi's comments in the following excerpt from a 2013 article demonstrate that Nortel's intention, had it continued to operate, was to run a licensing business:

> "Nortel's original plan was that I would be the VP of IP reporting to the general counsel," Veschi explains. It was something to which he could not agree: "I felt that would mean IP would be viewed as a cost centre. To do what I wanted to do, we could not be subordinate to other business units. We were going to need a free rein to assert patents against whoever it was necessary to take on – we could not have people telling us that we could not because it might damage such and such a relationship.
>
> His plan, Veschi continues, was to make intellectual property less of a legal function. "In the end, it was agreed that I would be appointed as chief IP officer (CIPO), initially reporting to

---

[50] Defined as "the present value of estimated future cash flows expected to arise from the continuing use of an asset and from its disposal at the end of its useful life." International Financial Reporting Standards Database and Textbook, available at http://annualreporting.info/definiciones/value-in-use.

[51] The Canadian Expert reports assume the only context in which the U.S. and EMEA license rights could be used was in the Layer 4-7, CDMA/LTE, Next-Gen Packet Core, Enterprise Solutions, MEN/Optical, GSM/GSM-R, CVAS, and MSS Business Lines.

[52] Veschi Dep. 38:16–23 ("[N]ot knowing Nortel was going to go bankrupt, the plan was that the business I now run would have, if things went the way I thought they were going to go, would be one of the business units within Nortel going forward, similar to Texas Instruments or Qualcomm or IBM or Ericsson or a lot of other companies that have licensing businesses that are important to the success of the company.").

both the general counsel and the chief technology officer, and then reporting directly to the CEO once the licensing business was established."[53]

Mr. Veschi's comments demonstrate that, prior to bankruptcy, Nortel fully intended that its new licensing business would function as an independent segment with its own reporting line.

### 3.5.2.   The Licensing Business Had the Greatest Value of All of Nortel's Business Lines

The licensing business, either in the hands of Nortel, or as a stand-alone enterprise, had greater profit potential than any of Nortel's other businesses.  This is reflected both in the final sales prices of the nine businesses sold by Nortel (i.e., the eight Business Lines sold between March 31, 2009 and March 11, 2011 plus the licensing business sold to Rockstar on June 30, 2011) and in the projections for each of these nine businesses.

While it is possible that in 2008 some executives at Nortel were unaware of how valuable the licensing business would be, Mr. Veschi, who was charged with leading the business, was aware of how critical the business would be in helping turn around the company.[54]   Additionally, in 2008 there were many other operating companies with profitable licensing divisions.  For example, ARM Holdings, Qualcomm, and Texas Instruments had licensing divisions that contributed an average of 43-44% of total revenue from 2008 to 2011 (see Appendix 1 for additional details). These examples would have made the potential of Nortel's licensing business even more evident to Nortel's management.

The Residual Patents were of course ultimately sold to Rockstar for $4.5 billion.  Rockstar has essentially pursued a licensing business.  While it is impossible to know if such a business would have been more or less valuable if pursued by Nortel, I have set out in Section 3.6.1 of this report a number of reasons it could have been more valuable in Nortel's hands.  Regardless, there is no reason to effectively discount to zero its "value in use" to Nortel, as the Canadian experts have done.

### 3.6.   Valuation of License Rights Using the Canadian Experts' Methodologies and Rational Economic Assumptions About Nortel's Business, Had it Continued to Operate

The factors described in the previous sections illustrate why, from a business perspective, the optimal "value in use" for Nortel would have been to continue building its licensing business.  With this understanding of what Nortel would have reasonably done had it not gone bankrupt, it is now possible to determine the "value in use" of the license rights held by the U.S. and EMEA Debtors using the methodologies described in the Canadian Experts' reports.  In the following sections I will focus primarily on the Green Report.  While I have not specifically performed the Britven methodology, the magnitude of the reduction in allocations to the U.S. and EMEA Debtors, which is achieved by ignoring Nortel's licensing business in that report will be similar.[55]

### 3.6.1.   The Results of the Canadian Methodology for Valuing License Rights and IP

The methodology for valuing the license rights proposed in the Green Report can be summarized as follows:

---

[53] Joff Wild, <u>Star Man</u>, Intellectual Asset Management July/August, 64 (2013).

[54] Joff Wild, <u>Star Man</u>, Intellectual Asset Management July/August, 64 (2013) ("'The idea of having what was essentially a green field in order to build a licensing programme that would not only be successful and enriching, but also be critical to the company was immensely appealing,' [Veschi] explains.  It would, he believed, be a chance to create a legacy: 'I saw Nortel as another Texas Instruments or Qualcomm. I was thinking that in the future, people would be writing stories about how important licensing was to turning the company around . . . .'").

[55] Britven applies a similar approach to Green, but since Britven's methodology requires the publicly available purchase price allocations only three of the Business Sales can be analyzed.  My rebuttal analysis is therefore focused on the Green Report, but the conclusions I draw apply equally to the Britven Report since both experts rely heavily on the two central valuation assumptions described above in Section 3.1.

sales price of the Business Lines
- tangible asset values obtained from "carve out" financials
- value of work force (as calculated by Green)
- value of wholly owned businesses
- U.S. and EMEA license rights/customer relationships[56]
= Canadian IP value/customer relationships

After determining the sales price of the Business Lines, the tangible asset values, and workforce values, Green calculates the value of the U.S. and EMEA license rights as follows:

- Step 1: Project Nortel operating profits for each Business Line, excluding Nortel's licensing business.

- Step 2: Determine net present value of aggregate operating profits.

- Step 3: Apply MRDA RPS percentages as of 2010 using a five-year look back period.

There are deficiencies associated with this methodology, aside from the omission of Nortel's licensing business – thereby effectively cutting out all Residual Patents. The first is that by applying the 2005-2009 RPS percentages to future revenue, Green assumes that the relative R&D expenditures of the MRDA participants will remain unchanged in perpetuity. This is unrealistic given that expenditures in 2009 were post-insolvency and therefore outside the ordinary course of business.

The second deficiency with Green's methodology is that it improperly combines the unrelated asset categories of licenses (or IP) and customer relationships. This is particularly problematic given that while the MRDA acknowledges the transfer of legal title of IP from the RPEs to NNL, it does not transfer customer relationships. Regardless of one's assumptions about the nature of the licenses, there is no basis for applying a "value in use" or MRDA approach to customer relationships. Indeed, in the Alcatel transaction, customer assets were allocated directly to the RPE holding the prime relationship.

The third deficiency is that, even if Green calculated the U.S. and EMEA license rights and customer relationships appropriately, the residual value calculated using this method would not represent Canada's IP and customer relationships. Additional asset categories which were not transferred to NNL under the MRDA (examples include goodwill, trademarks, and other contractual rights) are not accounted for, were jointly owned by the various RPEs, and therefore should not be included in the final residual amount assigned to Canada.

Setting aside these issues, the most important problems with Green's methodology, as mentioned above, is that it omits Nortel's licensing business and treats NNL's interest as a residual. To demonstrate these problems, I have used Green's methodology to allocate the value of the IP sold in each of the businesses sold by Nortel, including its licensing business. I do not do so as a means of offering a viable allocation approach. Instead, I do so to demonstrate the inherent problems with a residual-based approach that does not attribute any value to Nortel's pre-existing licensing business.

It is worth noting that, while the traditional operating Business Lines had lower potential value in the hands of Nortel, the potential value of the licensing business would have been greater in the hands of Nortel, had it continued to operate, than the Residual Patents would be in the hands of a third-party non-practicing entity (NPE) like Rockstar.[57] This is because:

---

[56] Green considers license rights and IP to be the same as or inseparable from customer relationships.

[57] This is not to suggest that Nortel erred in selling the Residual Patents, which was a reasonable business decision at the time.

A. As Business Lines were sold off in bankruptcy, Nortel's patent portfolio available for licensing was reduced by 2,588 patents.[58]

B. The purchasers of those Business Lines received non-exclusive rights to the Residual Patents, which would not have happened had Nortel continued to operate.

C. The discount rate for an operating company is typically lower than that of an NPE, indicating a lower risk.[59]

The purchaser of the licensing business received 7,057 patents, some of which were encumbered by the non-exclusive licenses granted to the buyers of the Business Lines. In contrast, the licensing business in the hands of Nortel, had it continued to operate, would have had the opportunity to monetize the full portfolio of 9,645 patents without the encumbrances of those non-exclusive licenses.[60] The total value of the IP in a licensing business in the hands of Nortel could have been worth as much as $10,367 million according to the calculations set out in Exhibit 1.[61]

As described above, Green does not value the IP owned by each estate. He simply values the EMEA and U.S. interests (omitting any value attributable to the licensing business), subtracts them from the total sale price, and assigns the residual to NNL. I have calculated the allocation of IP value that results from replicating Green's methodology while including the value of the licensing business in the hands of Nortel. Therefore, even though under the Green approach the U.S. and EMEA interests are based on a percentage derived from the 2009 RPSM, EMEA and the U.S. are entitled to $1,203 million and $3,991 million based on the higher total value of IP attributable to the licensing business. These dollar amounts become 18.7% and 62.0% of the actual $6,436 million sales price. These results are represented graphically in the figure below.

---

[58] Malackowski Report at 16 (calculating patents sold in Business Sales based on Sellers Disclosure Schedules and Asset Purchase Agreements for each sale).

[59] In my original valuation of the Residual Patent portfolio, which assumes the portfolio is monetized by an NPE such as Rockstar, the discount rate was 30%. In contrast, Green assumes that the discount rate associated with existing Nortel technology in the hands of Nortel is 12.1%.

[60] I have also considered the possibility that certain parts of Nortel's patent portfolio might not generate as much revenue for an operating company as would be generated in the hands of an NPE due to counter assertion by infringers and subsequent settlement via cross-licensing. However, I consider the larger licensable portfolio, reduced encumbrances, lower cost of capital, and the fact that Nortel would continue to invent new licensable technologies, to more than compensate for any increased risk of cross-licensing. Further, I believe it is highly unlikely that Nortel would have continued all of its operating businesses had it continued as a going concern. A much more likely scenario is that it would have continued to operate only the profitable Business Lines like the CDMA/LTE business and its licensing business.

[61] See Exhibit 1 for details.

Rebuttal Report of James E. Malackowski

**Figure 3:**
**Total IP Rights Allocations Using Green's Methodology: Impact of Including Nortel's Licensing Business**



I have also calculated the allocation of the total sale proceeds, not just for IP. Figure 4 below describes the total allocation of sale proceeds under Green's methodology under two scenarios: on the left is Green's assumption that Nortel abandoned its licensing business; on the right is the same methodology, but assuming that Nortel continued its licensing business using the entire portfolio held by Nortel before the Business Sales and the Residual Patent Sale, as I described above.

**Figure 4:**
**Results of Green Methodology With and Without Nortel's Licensing Business**



While I do not believe the approach proposed in the Green Report is a valid methodology, the results summarized in the above figure demonstrate the magnitude of the effects of 1) ignoring (as Green did) or including (as I have done here), Nortel's licensing business, and 2) treating NNL's interest as a residual instead of valuing it directly.  By simply omitting the licensing business that Nortel launched in 2008 (prior to insolvency) Green manages to reduce the allocation to the U.S. and EMEA Debtors by over 70% and 80%, respectively.

Importantly, the final values obtained using Green's methodology and acknowledging the existence of Nortel's licensing business, may still understate the U.S. and EMEA allocations.  This is due in part to the fact that Nortel as a going concern, as assumed by the "value in use" approach, may have continued to create new licensable technologies and the valuation of the licensing business does not include this additional value.

### 3.7.    The Economic Life of Nortel's Patents

The Reichert Report provides a definition for the economic life of technology.  However, "technology" is not defined in the Reichert Report and the majority of Reichert's analysis is focused on the economic life of Nortel products or the economic life of a firm's total R&D capital.  Given the fact that the vast majority of Nortel technology sold in the asset sales consisted specifically of patents, *the relevant economic life one must determine for valuation purposes is the economic life of Nortel's patent portfolio, not its products or its R&D capital*.  This is because, as described below, the economic life of a product or of total R&D expenses would be substantially shorter than the economic life of a patent.

In the following sections I will discuss 1) Reichert's analysis and the information relied upon in that report, 2) factors determining the income generating potential of a patent, 3) the evidence regarding the economic life of the Business Line patent portfolios, and 4) the evidence regarding the economic life of the Residual Patent portfolio.

### 3.7.1.    The Reichert Report

As discussed above and in my Expert Report, Nortel calculated each RPE's share of residual profits and losses based on that RPE's relative contributions to IP measured by R&D expenditures over a period of time.[62]  That period of time, or "look back" period, was determined based on Nortel's estimate of the economic life of its technology (as Nortel called it, the technology's "useful life").  The economic life of an asset is the period of time over which it can be used by its owner to generate income.

Nortel calculated "useful life" using two methods.[63]  Under the first method, Nortel amortized the RPEs' R&D spend by 30% per year, which meant that R&D that was more than five years old had little to no impact on the RPEs' relative share of profits and losses.  Under the second method, Nortel considered the full value of all R&D spending over the prior five years with a one-year gestation lag.

The Reichert Report states that "a gestation lag of 6 months coupled with either a 3 to 5 year economic life, or an amortization rate of 30 percent per annum, are economically reasonable for Nortel's technology."[64]  In reaching these opinions, Reichert relies on economic literature discussing generic categories of technology and certain contemporaneous analyses with respect to Nortel's technology.

In my opinion, Reichert errs by failing to account for the time between when the R&D was performed and when the technology was ultimately adopted in the market.  For this reason, looking at the "useful life" of technology in isolation, as Reichert has done, simply does not work.  The flaws in Reichert's analysis are illustrated by the factual record in this case.  As I discussed in my Expert Report, and as illustrated below,

---

[62] Malackowski Report § 11.2.

[63] Malackowski Report § 11.2.

[64] Reichert Report at 82.

some of the high interest patents were filed well over five years before they were sold.  Based on Nortel's calculations, however, the R&D that was expended to create this high interest IP would not have been considered at all under Nortel's methods of calculating contribution to IP.

The following subsections describe why the data used in the Reichert Report is not relevant to the question of the economic life of Nortel's patent portfolio.

### 3.7.1.1.    Economic Literature Relied Upon in the Reichert Report

As part of Reichert's analysis, he reviews various economic studies of R&D capital depreciation rates.  These studies do not speak to the depreciation rates of patent portfolios or to Nortel's technology.  Indeed, one of the four studies was published in 1984 and was based on studies from 1958 and 1968.[65]

Reichert refers to a paper written by Wendy Li for the U.S. Bureau of Economic Analysis[66] that is focused on calculating R&D capital depreciation rates.  However, the depreciation in value of R&D capital is not the relevant question when determining the economic life of a patent portfolio since, as Li points out in her analysis, not all R&D activity is associated with the filing of patents.[67]  In fact, a significant portion of Nortel's R&D was typically focused on product development following the filing of a new patented technology.[68]  Therefore, the depreciation rate and related economic lives she calculates, and which Reichert refers to, do not actually pertain to patents.  Moreover, as Li herself explains, "measuring depreciation rates is extremely difficult because both the price and output of R&D capital are generally unobservable."[69]  Similarly, Reichert relies on a study by Bronwyn Hall, which concludes that "the lack of data from a secondhand market for R&D assets means that an estimate of the market-to-book value ratio is not enough to inform us about market value or book value separately without further assumptions.  This aspect of R&D capital also implies that valuation of the asset it creates can be highly variable across firms and time."[70]  Perhaps most importantly, since all of the economic literature cited in the Reichert Report analyzes the depreciation rate of R&D capital, one cannot draw any meaningful conclusions about the economic life of Nortel's patent portfolio, or any patent portfolio for that matter.

Additionally, Nortel's own economists expressed doubt about the proposal to use a 30% amortization rate.  In preparing its economic analysis to support Nortel's transfer pricing methodology, the Horst Frisch firm

---

[65] Ariel Pakes and Mark Schankerman, The Rate of Obsolescence of Patents, Research Gestation Lags, and the Private Rate of Return on Research Resources, R&D, Patents, and Productivity (Zvi Griliches ed. 1984).

[66] Wendy C.Y. Li, Depreciation of Business R&D Capital, Bureau of Economic Analysis/National Science Foundation (October 2012).

[67] In Li's discussion of other methods for estimating rates of R&D capital depreciation, she refers to a previous paper by Charles Mead which summarized these methods (Charles I. Mead, R&D Depreciation Rates in the 2007 R&D Satellite Account, Bureau of Economic Analysis/National Science Foundation (November 2007)).  Li states that for determining R&D capital depreciation rates it is not appropriate to focus on patent data since it "cannot capture all innovation activities."  Similarly, Mead states that "another limitation is that not all R&D activity is associated with the filing of patents."  In other words, Li and Mead are interested in estimating the economic life of all R&D output, not the economic lives of patents.

[68] "[A]fter the patent application is filed there would be continued R&D related or covered by that application during the grant cycle and also post the grant cycle with other products implementing the technology already covered by the Nortel owned patents." Dep. Ex. 22107 (NNC-NNL06740124), Email from Gillian McColgan sent Monday, January 11, 2010 12:04 PM, at NNC-NNL06740124/3.

[69] Wendy C.Y. Li, Depreciation of Business R&D Capital, Bureau of Economic Analysis/National Science Foundation, at 23 (October 2012).

[70] Bronwyn H. Hall, Measuring the Returns to R&D: The Depreciation Problem, National Bureau of Economic Research, at 20 (October 2007).

relied on Nortel's estimate of useful life rather than apply its own.[71]  Correspondence between Horst Frisch's Bill Morgan and Nortel reveal Horst Frisch's skepticism of Nortel's estimate of a three- to five-year useful life:

> [A]ll of the economic literature I have seen on the subject of technology life cycle tends to indicate a much longer life than 3 to 5 years (e.g., 10 years).  Most of this literature was pre- "New Economy"; however, I am not aware of any articles which discuss current life cycle expectations.

> At the meeting, I may have tried to point out that if Nortel wanted to have its engineers serve as experts and testify to the 3 to 5 year life cycle, it can be difficult for an economist to argue with.  (They certainly know more about the technology than I do.)  However, from an economic perspective, there does appear to be support (albeit relatively old) for a longer life.[72]

In any event, it is my opinion that, in these circumstances, one must consider the actual facts of Nortel, which, as demonstrated above, show that the economic life of Nortel's IP far exceeded Nortel's three- to five-year estimate.

### 3.7.1.2.    Nortel Analyses Relied Upon in the Reichert Report

The Reichert Report also cites various analyses conducted by Nortel to justify a five-year economic life. These include the product lifecycle reported in Nortel's 2007-2011 Joint BAPA Submission,[73] typical industry lease terms for telecommunications equipment,[74] "a publically available document that suggests that the economic life of telecommunications equipment purchased by one of Nortel's customers is approximately four years,"[75] and various amortization rates allowed by certain tax laws.[76]  Each of these analyses relates to the economic useful life of Nortel products or telecommunications equipment rather than underlying IP and, therefore, is not relevant in determining the economic life of Nortel's patents.  Patents will often have a much longer life than products because the same IP will often be incorporated into numerous generations of products.  As Nortel's IP law counsel Michelle Lee explained in 2004:  "As the [lines of business] seem to be integrating more, technology may also be 'reused/recycled' across the products platforms more these days.  Also, as a software company, code is built upon code, release upon software release.  So, I don't know that it can be said there is 'a short lifespan for technology,' at least not across the board for all Nortel R&D technology or generally."[77]  Thus, R&D performed for one product could be used again for another project.  Indeed, Nortel "[e]stablished a common engineering function to centralize . . . key engineering functions, technologies, and platforms that have the greatest potential to be leveraged across the entire Company."[78]  In

---

[71]  See NNC-NNL07494232, Marketing and Amortization Information, at NNC-NNL07494232/1 ("As you know, [Horst Frisch was] never asked to opine on either the existence of Nortel marketing intangibles or the life of Nortel's technology.").

[72]  HORSTFRISCH0005668, Re: Technology life cycle materials, at HORSTFRISCH0005668; see also HORSTFRISCH0007481, Nortel Summary, at HORSTFRISCH0007482 ("R&D amortization rate of 30% -- I have said we could probably defend 25% -- a higher rate must be supported by Nortel."); HORSTFRISCH0003103, R&D and SG&A, at HORSTFRISCH0003103 (memo from Bill Morgan that assumes a 20% R&D amortization rate).

[73]  Reichert Report at 76.

[74]  Reichert Report at 78.

[75]  Reichert Report at 78.

[76]  Reichert Report at 78.

[77]  EY-NRTL-089553, FW: Master R&DSA Clause 6(b), at EY-NRTL-089553.

[78]  Dep. Ex. 22078 (PC0184853), Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement dated Oct. 31, 2008, at PC0184928.

light of this, it is completely inappropriate to equate the economic life of a patent with the economic life of a particular product that embodies that IP.

The Reichert Report also refers to the interviews that Nortel conducted with its R&D staff to determine how much of the company's "R&D expenditures undertaken in 1996 were still in service five years later."[79]  This analysis cannot be relied upon for several reasons.  First, it pertains to the economic life of total R&D expenditures rather than the economic life of Nortel's patents.  For example, if the interviewees indicate that 22.5% of R&D expenditures are still in service five years later, it is quite possible that the 22.5% represents Nortel's patented R&D output and the remaining 77.5% represents unpatented R&D output.

Second, Reichert simply takes on faith that a survey of Nortel R&D personnel, which the company cited to support its tax position, provides a reliable basis for "an economic life of roughly 5.5 years."[80]  There is essentially no reference to the details or methodology of the underlying study, which I understand from counsel has not been produced, and Reichert apparently conducted no analysis to test the scientific parameters of the study (e.g., sample size, selection bias, etc.).  Moreover, there is reason to doubt the reliability of this data because it is seemingly at odds with the survey conducted by Nortel's Ron Horn in October 2001.[81]  That survey of 102 Nortel engineers shows that respondents believed an average of 44% of Nortel's technology remained useful after five years, an average of 29% after seven years, and an average of 18% after ten years.[82]  The results of Horn's survey are further corroborated by the testimony of two of Nortel's most prominent engineers, John Roese and Gillian McColgan.  John Roese, Nortel's chief technology officer ("CTO"), stated that the lifespan of Nortel technology was "wildly diverse," with some modern software products existing in the market for two to three years while others could be deployed for as long as ten to fifteen years.[83]  Gillian McColgan, Nortel's CTO at the time of the Residual Patent Sale and current Rockstar CTO, stated that the useful life of Nortel's technology was seven to ten years.[84]  Accordingly, the Nortel survey data do not provide a basis to cut off R&D spend after approximately three to five years, as Reichert contends.

Reichert next considers Nortel's statement that the "typical industry lease term for telecommunications equipment is three years, after which the equipment is generally sold for a small residual balance," as well as a single statement by one of Nortel's customers that indicated that its "telecommunications equipment should be replaced every four years," but did not address the "question of residual value."[85]  With respect to both of these items, Reichert concedes that measuring useful life with this type of evidence "underestimates economic life (overestimates the depreciation rate)."[86]  In fact, in explaining why he reaches this conclusion with respect to the lease arrangements, Reichert correctly explains, as I discuss above, that "technologies can outlive equipment types.  In other words, some technologies may be embodied in more than one generation of equipment, implying that lease terms are a downward biased estimator of economic life (upward biased

---

[79] Reichert Report at 77.

[80] Reichert Report at 77.

[81] Compare Dep. Ex. 11169 (NNC-NNL002707), Advanced Pricing Arrangement Responses to Questions Posed by Inland Revenue, Internal Revenue Service, and Canada Customs and Revenue Agency dated September 2003, at NNC-NNL002717, with Dep. Ex. 21013 (NNC-NNL11144207), Survey Results; Dep. Ex. 21011 (NNC-NNL11144208), Email from Lrie Hinz sent Wednesday, October 31, 2011 11:42 AM; see also Horn Dep. 127:24-142:23.

[82] Dep. Ex. 21013 (NNC-NNL 11144207); Dep. Ex. 21011 (NNC-NNL11144208).

[83] Roese Dep. 176:15-176:24.

[84] McColgan Dep. 207:21-208:18.

[85] Reichert Report at 78; Dep. Ex. 11169 (NNC-NNL002707), Advanced Pricing Arrangement Responses to Questions Posed by Inland Revenue, Internal Revenue Service, and Canada Customs and Revenue Agency dated September 2003, at NNC-NNL002717–8.

[86] Reichert Report at 78.

estimator of the R&D amortization rate).”[87]   In addition to Reichert’s own admissions regarding potential downward bias, in my opinion, this type of anecdotal evidence does not provide a reliable basis to measure the economic life of IP.

Reichert also considers Nortel’s citation to tax laws regarding amortization rates but finds that “the ranges provided are very wide and have the same potential downward bias as an estimator of economic life as the lease term and the customer value data described above.”[88]

Reichert further cites the economic life of technology determined in purchase price allocations related to various Nortel acquisitions.  Without the definition of “technology” used in each of these purchase price allocations, it is not possible to determine how this information applies to the economic life of Nortel’s patent portfolio.  We can also test the reasonableness of the economic life reported in the purchase price allocations by looking at the acquired patents.  For example, EPICON was acquired by Nortel on September 5, 2000, and the economic life of acquired technology (amortization period) was determined to be three years.  According to the USPTO, there were five U.S. patents owned by EPICON, all of which were assigned to Nortel on September 5, 2000.[89]  All of these patents were subsequently assigned to Rockstar in 2011.  Most significantly, all of the EPICON patents were identified as high interest by Global IP at the end of 2009, more than six years after the economic life of the technology should have ended according to the amortization period used in Nortel’s purchase price allocation.  This demonstrates that the economic life used by Nortel was wrong or, alternatively, that the “technology” for which the economic life was determined was not EPICON’s patent portfolio.



### 3.7.1.3.    Gestation Lag

The Reichert Report also acknowledges that a “gestation lag” should be included in the economic life of Nortel’s technology.  The gestation lag is defined as “the period of time that elapses between initially making an R&D investment and the R&D investment coming into service.”[91]  Reichert concludes that a six-month lag is appropriate and points to certain academic studies to support this.  However, this conclusion is in stark contrast with the comments of Gillian McColgan who has stated that there is “a lag of in most cases 7-10 years minimum from invention before we generate any significant dollars or benefit in kind value.”[92]  Additionally, the three academic studies cited in support of a six-month lag are each over forty years old which, given the tremendous technological change that has occurred in the telecommunications industry over the last forty years, makes these references unreliable in determining an appropriate gestation lag.[93]

---

[87] Reichert Report at 78.

[88] Reichert Report at 78.

[89] http://assignments.uspto.gov/assignments/q?db=pat&reel=013117&frame=0109.

[91] Reichert Report at 81.

[92] NNI_00320890, RE: Significant Patent Awards – Meeting Notes, at NNI_00320890.

[93] Reichert refers to the finding of three studies: Leonore Wagner, Problems in Estimating Research and Development Investment and Stock, Proceedings of the Business and Economic Statistics Section, American Statistical Association, at 189–98 (1968); J. Rapoport, The Anatomy of the Product-Innovation Process: Cost and Time,

### 3.7.2.    Factors Determining the Income Generating Potential of a Patent

In this section I will now describe what factors should be considered when determining the useful economic life of a patent or patent portfolio.

### 3.7.2.1.    Filing Status

One of the primary factors that determines the income generating potential of a patent is the patent's filing status.  The distinction between a patent application and an issued patent is important because only an issued patent can be used to sue an infringer.  Perhaps even more importantly, according to the USPTO less than 50% of patents are allowed,[94] and until a patent application becomes an issued patent, one does not know what the claims of the patent will actually cover.  In other words, until a patent actually issues, you do not know 1) what kinds of products the patent covers, or 2) whether or not you even possess a patent.  This patent risk, combined with the fact that a patent application cannot actually be used to exclude others from practicing the invention, means that, on average, the income generating potential of a patent application is lower than that of an issued patent.

Given the fact that patent applications are worth substantially less than issued patents, it is important to consider the process and timing required to obtain an issued patent. Following the invention of a new technology, in the United States an inventor will often file, as Nortel frequently did, a provisional patent application.  A provisional patent application establishes a priority date but does not begin the examination process. Within twelve months a non-provisional U.S. application can then be filed, which claims priority to the provisional application.[95]  According to the USPTO, the average time for a patent to issue after filing a non-provisional patent application is approximately three years.[96]  This means that it typically takes three (or four, if a provisional application was filed first) years for a patent application to become an issued patent.

The following figure contrasts the patent timeline with the economic useful life and corresponding amortization proposed by Nortel and supported in the Reichert Report.

---

Research and Innovation in the Modern Corporation, at 110–35 (1971); Edwin Mansfield, Industrial Research and Technological Innovation: An Econometric Analysis (1968).

[94] http://www.uspto.gov/about/stratplan/ar/2011/vl_mda02_03_fig8c.html.

[95] An inventor may also pursue a Patent Cooperation Treaty ("PCT") application which "makes it possible to seek patent protection for an invention simultaneously in each of a large number of countries by filing a single 'international' patent application instead of filing several separate national or regional patent applications. The granting of patents remains under the control of the national or regional patent Offices in what is called the 'national phase.'" Protecting your Inventions Abroad: Frequently Asked Questions About the Patent Cooperation Treaty (PCT), WIPO (2012). Importantly,  since the national phase begins thirty months from the filing date of the initial priority application, the time to issuance of national patents originating from a PCT application can often take longer than the issuance of a directly filed U.S. patent.

[96] http://www.uspto.gov/about/stratplan/ar/2011/par_01.html.

**Figure 5:**
**Nortel/Reichert Proposed Economic Life and Amortization Schedules with Patent Timeline**



The above figure illustrates why it is difficult, if not impossible, to support the Canadian Experts' premise that the average useful economic life of Nortel technology is approximately five years when, for the first four years of this time period, most patents will still be pending applications rather than issued patents.  It is equally, if not more, difficult to justify Nortel's original RPSM calculation, which involved calculating each RPE's R&D capital stock using a declining balance method of amortization in which the amortization rate's was 30% (indicated by the red line in Figure 5).  In a declining balance method, the dollar amount of amortization that is charged to an asset declines over time.  This method is appropriate for assets that are most valuable in the first few years of asset life. However, this is precisely the opposite of the expected value of patents since, as explained above, most patents are *least* valuable in the first few years of asset life.

### 3.7.2.2.    Market Adoption

Another critical factor in determining the income generating potential of a patent is the market adoption of the patented technology.  Unlike an established technology, following the invention of a new technology, there is a period of time over which the technology must be incorporated into a product and then another period of time over which, hopefully, that product is accepted by the market.  As explained in my Expert Report, many technologies are adopted by the market slowly over time and do not realize their full value until later in the life of the patent. The following figures show the market adoption of several different technologies and the mean filing year of Nortel Residual Patents in each technology area.

**Figure 6:**
**Market Adoption of Representative Nortel Technologies[97]**







---

[97] NNI_ICEBERG_00000057, Issued Patents and Pending Patent Applications Asset List (VoIP patents as identified by Nortel Technology Assignment, Internet patents identified by Internet Market Assignment, and GSM patents as identified by Nortel Technology Subarea).

As demonstrated by the above figures, the markets for these technologies did not begin to peak until many years after the patented technologies were invented. Therefore, the income that could be obtained from these patents increases over the years as the technologies are adopted. This would certainly not be possible if the economic useful life of these technologies was five years. The fact that the economic potential of the assets grows over time rather than declines equally cannot be reasonably reconciled with a 30% annual amortization schedule.

### 3.7.3.    Evidence Regarding the Economic Life of the Business Line Patent Portfolios

Whether a patent has been maintained or abandoned is a strong indicator of whether the owner of the patent considers it to have any remaining economic life. For example, if the economic useful life of Nortel technology were five years, one would expect to see most filings abandoned when the first maintenance fee becomes due. In the United States, patent maintenance fees are due 3.5 years, 7.5 years, and 11.5 years after issuance. If we assume the economic life of the patents is five years and four are required for issuance (as shown in Figure 5), one would expect Nortel to abandon virtually all patents at ~7.5 years after filing when the first maintenance fee payment becomes due. However, when we look at the Business Line patents we find the majorities of each of the Business Line portfolios are older than 7.5 years. The percentage of each Business Line portfolio older than 7.5 years (maintenance fee payment #1), 11.5 years (maintenance fee payment #2), and 15.5 years (maintenance fee payment #3) is shown in Table 6.

**Table 6:**
**Business Line Patent Portfolio Age**

| BUSINESS ASSET SALE | PERCENTAGE OF PATENTS PER BUSINESS LINE TOTAL | | |
| --- | --- | --- | --- |
| | Older than 7.5 Years | Older than 11.5 Years | Older than 15.5 Years |
| The CDMA Business Asset Sale: | 63.2% | 13.6% | 0.8% |
| The Enterprise Solutions Business Asset Sale: | 58.6% | 22.9% | 3.3% |
| The MEN and Optical Business Asset Sale: | 71.7% | 28.7% | 5.4% |
| The CVAS Business Asset Sale:: | 65.0% | 21.1% | 0.8% |
| The GSM/GSM-R Business Asset Sale: | 75.6% | 25.6% | 3.8% |
| The Multiservice Switch Business Asset Sale: | 90.0% | 75.0% | 12.0% |
| The Layer 4-7 Assets (Alteon) Business Asset Sale: | 58.3% | 0.0% | 0.0% |

In addition to the fact that for each Business Line the majority of the respective portfolio is older than 7.5 years, we also find that a substantial portion of each portfolio is older than 11.5 years in age. The rational explanation for why Nortel continued to pay maintenance fees more than eleven years and in some cases more than fifteen years after patent filings is that the economic life of these assets extended beyond these time frames.

### 3.7.4.    Evidence Regarding the Economic Life of the Residual Patent Portfolio

I have also analyzed the Residual Patent portfolio to determine the percentage of patents older than 7.5 years (maintenance fee payment #1), 11.5 years (maintenance fee payment #2), and 15.5 years (maintenance fee payment #3). The following table presents the results of this analysis for the entire Residual Patent portfolio and for the Residual Patents that were designated as "high interest" by Global IP.

**Table 7:**
**Residual Patent Portfolio Age**

| | ALL RESIDUAL PATENTS | | |
|---|---|---|---|
| | Older than 7.5 Years | Older than 11.5 Years | Older than 15.5 Years |
| Percentage of Total Residual Patent Portfolio | 64.0% | 37.4% | 5.2% |

| | HIGH INTEREST RESIDUAL PATENTS | | |
|---|---|---|---|
| | Older than 7.5 Years | Older than 11.5 Years | Older than 15.5 Years |
| Percentage of High Interest Patents | 95.4% | 64.8% | 8.1% |

Again, if the average economic life of Nortel technology were only five years, one would expect to see virtually no patents in the portfolio older than 7.5 years and none older than 11.5 years. In contrast, the majority of the portfolio is older than 7.5 years and more than a third of the portfolio is older than 11.5 years, indicating that the economic life is far longer than five years. It is also important to recognize that the value distribution of patent portfolios is typically highly skewed.[98] As discussed in my Expert Report, one of the best metrics we have for identifying the valuable patents in the portfolio is the patent scoring system provided by Global IP since it is based on a claim by claim review of thousands of patents conducted by patent attorneys. An analysis of the high interest patents indicates that over 95% of the valuable patents were older than 7.5 years and more than half were older than 11.5 years at the time of sale. These results demonstrate that Nortel technology had an economic life that far exceeded five years and the most valuable patents, which are of particular relevance in the context of a valuation and allocation exercise, had economic lives that were substantially more than double what was proposed by Nortel and reiterated in the Reichert Report.

Another indicator of the economic life of Nortel's patents can be determined by looking at the patents that Rockstar is actively attempting to monetize through litigation. This is because as a patent assertion entity, Rockstar would be expected to litigate what it views as its strongest patents, which are most likely to generate income. The results of this review indicate that in the eleven enforcement actions initiated by Rockstar, its subsidiaries, or other entities that subsequently acquired patents from Rockstar, there is not a single patent currently being litigated that is less than nine years old. In fact, the average priority year for the litigated patents dates to the late 1990s in all but one of the lawsuits. The results of this analysis are presented in the following table.

---

[98] Dietmar Harhoff et al., Exploring the Tail of Patented Invention Value Distributions, Economics, Law and Intellectual Property: Seeking Strategy for Research and Teaching in a Developing Field, at 279 (Ove Granstrand, ed. 2003); F.M. Scherer et al., Uncertainty and the Size Distribution of Rewards from Innovation, 10 J. Evol. Econ. 175 (2000); Mark Schankerman, How Valuable is Patent Protection?  Estimates by Technology Field, 39 RAND J. Econ. 77 (1998).

**Table 8:**
**Average Priority Year of Residual Patents Being Asserted by Rockstar and its Affiliates**

| Licensing or Litigation | Average Priority Year |
|---|---|
| Charter Communications Inc. et al. v. Rockstar Consortium US LP et al. | 1997 |
| Constellation Technologies LLC v. Time Warner Cable Inc et al. | 2000 |
| Rockstar Consortium US LP et al. v. HTC Corporation and HTC America, Inc. | 1998 |
| Rockstar Consortium US LP et al. v. Huawei Investment & Holding Co. et al. | 1998 |
| Rockstar Consortium US LP et al. v. LG Electronics, Inc. et al. | 1998 |
| Rockstar Consortium US LP et al. v. Pantech Co., Ltd. and Pantech Wireless, Inc. | 1998 |
| Rockstar Consortium US LP et al. v. Samsung Electronics Co., Ltd et al. | 1998 |
| Rockstar Consortium US LP et al. v. ZTE Corporation et al. | 1998 |
| Rockstar Consortium US LP et al. v. Google Inc. | 1997 |
| Spherix Incorporated v. Vtech Telecommunications Ltd. and Vtech Communications, Inc. | 1996 |
| Bockstar Technologies LLC v. Cisco Systems, Inc. | 1998 |

The above data demonstrates that the economic useful life of Nortel technology is substantially longer than five years. Perhaps even more significantly, this data demonstrates that the most valuable assets have economic useful lives that are at the very least double and, in some cases, at least three times longer than what was proposed by Nortel and supported in the Reichert Report.

These older, issued Nortel patents cover existing technologies that had already been adopted by the market and which were generating substantial sales at the time of the transaction date. A number of these issued patents had also been successfully litigated or adopted into various technology standards that, in general, further reduced the risk associated with them and increased their value. All of the above evidence demonstrates that the economic useful life of Nortel technology is much greater than five years and is consistent with my conclusion that all R&D spending on Nortel IP transferred in the Business Sales or the Residual Patent Sale should be included in the allocation exercise.

4. **REBUTTAL TO THE U.S. EXPERT REPORTS**

The Kinrich Report employs distinct methodologies for the valuation of the Business Lines and the Residual Patent portfolio.

For the Business Line valuation, Kinrich determines the "value relinquished by" each Debtor Group using the historical revenue of the businesses.[99]  Doing so fails to adequately measure the value "relinquished by each entity."  It is inconsistent with either a fair value or fair market value calculation, both of which would require the determination of the present value of the future benefits that a buyer would obtain through the use of the assets that were sold.  Historical financial performance is relevant to a valuation exercise only insofar as it is predictive of future revenue and better data sources are unavailable.

Furthermore, even if one does adopt this assumption, the allocation of the proceeds must be determined with an eye to the economic relationships between the parties, whereby the various asset classes divested in the Business Sales were legally or beneficially owned by the Debtors in various proportions.  The Kinrich Report fails to distinguish between various asset classes and simply assigns an identical allocation to tangible assets, customer relationships, and IP.  I am aware of no reason to believe that all assets were owned in equal proportions.

The Kinrich Report methodology for the valuation of the Residual Patent portfolio, in contrast to the Business Line methodology, uses a discounted cash flow analysis based on the IPCo Model.[100]  This methodology is similar to the approach I have used to value the Residual Patent portfolio.  However, there are several flawed assumptions made in the Kinrich model, which are detailed in the following subsections.

4.1. **Rebuttal to the U.S. Experts' Treatment of the Business Sales Proceeds**

If the Courts were to allocate the proceeds on a license theory based on the geographic source of the IP value, I prefer the approach taken in my Expert Report, for the reasons set out therein.  For the Business Sales, that required valuing the IP as part of a going concern that will use the IP at its HBU.  In the case of the Residual Patents, that required valuing the franchise groupings in a method similar to how Rockstar is actually monetizing the IP today.

4.1.1. **Historical Revenue Is Not an Appropriate Means of Determining Ownership of All Divested Asset Classes**

Paragraph 22 of the Kinrich Report states:

> I determine the value relinquished by the Debtor Groups by applying generally accepted principles of valuation.  A fundamental principle of economics is that the value of an asset is based on the ability of the asset to generate (or preserve) income.  Hence, a basic principle of valuation is that the current value of an income-generating asset is the present value of future cash flows that the asset is expected to generate.

The Kinrich Report then explains that "the value an entity relinquished in each Line of Business [was determined] based on the revenue that entity earned in the Line of Business relative to total revenue for the line of business."[101]  The Kinrich Report goes on to value and allocate the value of the Business Lines according to this overall entity value.  Thus, the Kinrich Report asserts that historical revenue represents the best available means of determining ownership of all assets divested in the Business Sales.

---

[99] Kinrich Report ¶ 5.

[100] Kinrich Report ¶ 7.

[101] Kinrich Report ¶ 28.

This assertion is incorrect as to tangible assets and IP. Tangible assets are best allocated according to their legal ownership by the various Debtors. Given the license and ownership rights discussed above, proceeds relating to IP are best allocated according to beneficial ownership of them by the various Debtors. If the Courts were to allocate the proceeds on a license theory based on the geographic source of the IP value, and if additional value were created by the conveyance of the Business Line assets into their HBU, and if that HBU differed materially from Nortel's use, then all debtors are entitled to share in that additional value according to their rights in the particular assets put to work in the hands of the buyers. In comparing all estimations of Business Line value available on the record to the sale prices achieved,[102] I must conclude that the Business Sales facilitated the creation of additional value via conveyance of the Business Line assets from an economically impracticable use case in the hands of Nortel ("Retained by Nortel" scenario) to an HBU case in the "safe hands" of the buyers. Accordingly, I prefer to use prospective forecasts, as set out in my Expert Report, as opposed to the historical figures relied on by Kinrich in his report.

The customer/goodwill intangibles are the only class of assets which is appropriately allocated according to historical revenue because revenue is an appropriate proxy for the degree to which the valuable customer relationships were owned by a particular Debtor.[103]

## 4.2. Rebuttal to the U.S. Experts' Treatment of the Residual Patent Sale Proceeds

The Kinrich Report understates the value of the Residual Patent portfolio in jurisdictions outside of North America, asserting that all value exists in Canada, the United States, France, Germany, the United Kingdom, and in one scenario, China.[104] In supporting this assertion, the Kinrich Report notes that 92% of the Residual Patents were registered in these jurisdictions. While the majority of Residual Patents were filed in these jurisdictions, a material number were filed outside of these jurisdictions, particularly in the Asia-Pacific region.[105] Further, over 20% of these filings were designated as high interest by Global IP.[106] When all patent assets (applications and issued patents) are included, the five principal jurisdictions represent less than 80% of the Residual Patent assets.

### 4.2.1. Royalties Obtained from Licenses of Multinational IP Portfolios to Multinational Corporations Are Less Sensitive to Enforcement Issues in a Single Jurisdiction

Although Nortel held hundreds of issued patents and pending applications in numerous countries, the Kinrich Report ascribes no value to patents filed outside of the United States, Canada, the United Kingdom, France, and Germany. The Zenkich Report specifically assigns little to no value to the Chinese patents in the portfolio. Kinrich and Zenkich support these assumptions by pointing to references discussing the relative strength of the IP regimes in various countries. While these assumptions may not be unreasonable in certain contexts, they are misplaced in the current context of the licensing of multinational patent portfolios to a series of multinational corporations.

The revenues included in the IPCo Model used as the basis for Mr. Kinrich's analysis are derived exclusively from multinational corporations, most of which have operations in countries such as China, Japan, and South Korea. In my opinion, it is unreasonable to assume that a multinational corporation that negotiates a license

---

[102] See for example estimations conducted during 2008 setting out a business value of $988 million for the Business Lines (NNC-NNL11665042).

[103] I understand that the Huffard Report uses historical data for allocation of other intangible assets. In that case, prospective data was unavailable, and therefore historical data is the best available evidence and consistent with valuation principles.

[104] Kinrich Report ¶ 102.

[105] 1,084 Residual Patents were filed in Australia, China, Hong Kong, Japan, Singapore, Korea, India, and Taiwan. EMEAPROD02309581.

[106] 229 (21.13%) of the 1,084 APAC Residual Patents are designated as high interest. EMEAPROD02309581 and NNI_ICEBERG00000057.

to a geographically broad patent portfolio will refuse to pay royalties in select jurisdictions based on their IP regimes.[107]  This opinion is informed by 1) my experience analyzing hundreds of license agreements, and 2) the examples of companies such as Qualcomm that generate a significant portion of their revenue by licensing patents in China (see Appendix 2 for additional details and further examples).

In contrast to Mr. Kinrich's assumptions about the ability to obtain royalties outside the United States, the United Kingdom, Canada, France, and Germany, it is possible that a licensor could obtain royalties from licensees on sales in all countries in which there are granted patents.  This is because a licensor may leverage its patents in the major markets (U.S., E.U., Japan, Korea, etc.) to obtain royalties on worldwide sales when the portfolio is sufficiently geographically diverse such that the licensor can substantially disrupt the international supply chain and other operations of an unlicensed infringer via enforcement in licensed jurisdictions.  Additionally, it is quite possible that infringers would be willing to pay royalties in smaller markets in order to obtain a license to operate in the larger markets.

### 4.2.2. The IPCo Model Arbitrarily Omits Revenue Streams and Uses Unsupported Multipliers to Reduce the Size of Markets Outside of North America

The Kinrich Report relies upon the IPCo Model in creating the geographic split of forecast licensing revenues among the United States, Canada, the United Kingdom, France, and Germany.  According to Kinrich:

> The IPCo Model estimates royalty revenues based on product sales in Canada, the U.S., France, Germany, the U.K., and (in one scenario) China.  Canada, the U.S., France, Germany, and the U.K. are the top five countries in terms of the number of registered patents in the Patent Portfolio.  Although the patent portfolio contains patents registered in other countries, the five principal countries in the IPCo Model represent 92% of the patents in the Patent Portfolio.  Therefore, the geographic coverage of the IPCo Model is consistent with the geographic coverage of patents in the Patent Portfolio.[108]

The Kinrich Report mischaracterizes the methodology behind the IPCo Model by suggesting that it simply uses unadjusted product sales figures for the five (or six) named countries.  The IPCo Model actually includes, excludes, and adjusts revenue amounts attributable to various vendors and territories throughout its forecasts.  Several examples include:

- Handsets: the revenues attributable to Western Europe are adjusted downward by 50%, whereas the total North American markets are included.  No justification or citation is provided.  The model indicates that the adjustment reflects population, rather than market size.  Various company-specific adjustments are also made.  For example, Nokia's Western European handset revenues are reduced by a further 81.7% with no support provided.[109]

- Wireless Infrastructure: only 34% of the revenues attributable to EMEA are included, whereas the total North American markets are included.  No revenues are attributed to APAC (Asia Pacific) or CALA (Caribbean and Latin America), and no support is provided.[110]

- Data Networking: only 26% of the revenues attributable to EMEA are included, whereas the total North American markets are included.  No support is provided.[111]

---

[107] Although not specifically proposed by Kinrich, it is worth noting that it is equally unreasonable to assume that a multinational corporation that negotiates a license to a geographically broad patent portfolio will pay different royalty rates in each country based on its perception of the IP regime in each country.  Such an agreement would quickly become overly burdensome from the internal auditing and accounting perspective of the licensee.

[108] Kinrich Report ¶ 102.

[109] GIP_Nortel_00227898, tab "Handset_Licensee_Regional_Mix."

[110] GIP_Nortel_00227898, tab "Infra._Data."

- ▪ <u>Internet</u>: only U.S. revenue is included.  No support is provided.[112]

- ▪ <u>PC</u>: only North American and Chinese revenues are included.  No support is provided.[113]

To demonstrate the divergence between the IPCo Model methodology and a methodology including Canada, the United States, France, Germany, and the United Kingdom, I have removed all other jurisdictions from my licensing model and set out the results for five approaches in the figures below.  The first figure sets out the Kinrich Report allocation excluding China (left) and the results of my licensing model including Canada, the United States, France, Germany, and the United Kingdom.  The second figure sets out the Kinrich Report allocation including China (left) and the results of my licensing model including China, Canada, the United States, France, Germany, and the United Kingdom.  The Kinrich Report's assertion that the IPCo Model includes France, Germany, and the United Kingdom is incorrect.  Rather, the IPCo Model represents selected jurisdictions and vendors across each franchise, and provides no documentation or justification for what is included and what is excluded.

**Figure 7:**
**The Kinrich Report Allocation ex China versus Inclusion of Kinrich's Five Jurisdictions**



**Figure 8:**
**The Kinrich Report Allocation with China versus Inclusion of Kinrich's Five Jurisdictions Plus China**



---

[111] GIP_Nortel_00227898, tab "Data_Net._Data."

[112] GIP_Nortel_00227898, tab "Internet_Data."

[113] GIP_Nortel_00227898, tab "PC_Data."

The following table sets out the allocation using the five jurisdictions included in the Kinrich Report analysis, with and without China:

**Table 9:**
**Allocation Results by Franchise Including the Kinrich Report Jurisdictions (with and without China)**

| | With China | | | Without China | | |
|---|---|---|---|---|---|---|
| | Canada | U.S. | EMEA | Canada | U.S. | EMEA |
| Smartphones | 6.4% | 63.0% | 30.6% | 2.0% | 76.7% | 21.3% |
| Wireless Infrastructure | 9.8% | 61.2% | 29.1% | 6.4% | 74.7% | 18.9% |
| Optical | 9.7% | 60.2% | 30.0% | 6.4% | 73.2% | 20.3% |
| Data Networking | 8.8% | 66.2% | 25.0% | 6.4% | 76.1% | 17.6% |
| PC | 12.8% | 50.8% | 36.4% | 6.3% | 78.4% | 15.3% |
| Internet | 6.7% | 72.0% | 21.3% | 6.1% | 74.5% | 19.5% |
| Enterprise Voice | 8.9% | 63.0% | 28.0% | 6.4% | 72.8% | 20.8% |
| Carrier Voice | 9.6% | 64.7% | 25.7% | 6.3% | 79.0% | 14.6% |
| Other | 8.8% | 63.4% | 27.8% | 5.7% | 75.6% | 18.7% |
| TOTAL | 8.8% | 63.4% | 27.8% | 5.7% | 75.6% | 18.7% |

Given the best market forecasts available at the time of the Residual Patent Sale, and assuming that Germany and China are allocated 3/5 to EMEA (as both the Kinrich Report and my analysis do), EMEA received substantially above the Kinrich Report EMEA allocation of 14.0% across all franchises.

The Kinrich Report provides an extensive narrative on the Chinese patent regime to justify excluding the value of Chinese patents from the analysis. However, other territories are excluded with seemingly no justification. For example, according to Kinrich there were 264 Nortel patents and applications filed in Japan and 234 patents and applications filed in Korea. Neither the Kinrich Report nor the Zenkich Report provides any evidence that the patent regimes of Japan and Korea, two substantial telecommunications markets,[114] are in any way deficient. In the table below I provide patent regime quality ratings obtained from the annual Global Intellectual Property Index[115]:

---

[114] See, e.g., EMEAPROD02318770, IDC Worldwide Blackbook Q1 2011.

[115] Data from Taylor Wessing, Global Intellectual Property Index: The Fourth Report (2011), available at http://www.taylorwessing.com/ipindex/. The Global Intellectual Property Index ("GIPI") is prepared periodically by Taylor Wessing, an international law firm with offices in twenty-two countries. The GIPI relies upon statistical analysis of global survey data reported by senior IP industry participants including large corporations, academic institutions, and law firms. The latest GIPI incorporated 14,000 separate survey assessments.

**Table 10:**
**Patent Regime Quality Ratings**

| Jurisdiction | Rating |
|---|---|
| Canada | 549 |
| China | 528 |
| France | 567 |
| Germany | 602 |
| India | 508 |
| Ireland | 533 |
| Italy | 525 |
| Japan | 536 |
| Russia | 535 |
| South Korea | 540 |
| Spain | 554 |
| United Kingdom | 560 |
| United States | 528 |

These patent regime quality indicators do not justify omitting any of these markets, as differences in enforceability in many countries omitted by Kinrich, like Italy, Japan, South Korea, and Spain, are not extreme. Even more importantly, all patent regime indicators, including those provided in the Kinrich Report, are effectively dimensionless scores which provide a sense of relative "quality" but do not provide any quantitative information on the ability of a licensor to obtain royalty payments in a given territory. Note that both South Korea and Japan scored higher than the United States in this study. In short, I am aware of no evidence to justify valuing Nortel's IP based on projections in only five countries given the global nature of the telecommunications industry, the relative strength in the patent regime of various countries ignored by Kinrich, and the volume of Nortel's patent registrations outside the RPE countries and Germany.

Finally, the discount rates required to equate the Kinrich Report forecast cash flows to the purchase price of $4.5 billion paid for the Residual Patent portfolio indicate that the forecast cash flows are hugely understated. The Kinrich Report indicates that the discount rates implied by these cash flows are 12.2% when China is included and 15.7% when China is excluded.[116] In my opinion and according to the available literature, these discount rates understate the risk associated with investments in portfolios of patent assets. The following table sets out ranges of risk-adjusted hurdle rates required by experienced IP investors for investments in IP assets with various risk characteristics. Both discount rates implied by the Kinrich Report analysis fall within the "risk-free" or "very low risk" asset discount rate ranges. In my experience, the discount rates appropriate in calculating the value of even a very large, broad patent portfolio in the context of a licensing program range from 25% to 60%.

---

[116] Kinrich Report ¶ 118.

**Table 11:**
**Risk-Adjusted Hurdle Rates for Investments in IP[117]**

| Characterization of Risk | Approximate RAHR Range | |
|---|---|---|
| | Low | High |
| "**Risk-free**," such as building a duplicate plant to make more of a currently made and sold product in response to presently high demand | 8% | 18% |
| **Very low risk**, such as incremental improvements with a well-understood technology into making a product presently made and sold in response to existing demand | 15% | 20% |
| **Low risk**, such as making a product with new features using well-understood technology into a presently served and understood customer segment with evidence of demand for such features | 20% | 30% |
| **Moderate risk**, such as making a new product using well-understood technology to a customer segment presently served by other products made by the corporation and with evidence of demand for such a new product | 25% | 35% |
| **High risk**, such as making a new product using a not well-understood technology and marketing it to an existing segment, or a well-understood technology to a new market segment | 30% | 40% |
| **Very high risk**, such as making a new product with new technology to a new market segment | 35% | 45% |
| **Extremely high risk**, such as creating a startup company to go into the business of making a product not presently sold or even known to exist using unproven technologies | 50% | 70% |

The Kinrich Report discount rates fall well below any range of discount rates arguably applicable to the Residual Patent portfolio.  This indicates that either: 1) the purchase price reflects the buyers' misapprehension of the risk surrounding forecast licensing cash flows, or 2) the Kinrich Report analysis materially understates the cash flows that the Residual Patent portfolio will likely generate.  In examining the Kinrich Report analysis in light of my analysis, my prior licensing experience, and the extremely sophisticated composition of the buyer group, I conclude that the Kinrich Report analysis materially understates the cash flows likely to arise from licensing the Residual Patent.  Given the extremely broad product- and service-line applicability attributed to the Residual Patent portfolio in the IPCo Model and in my own analysis, I attribute the understatement of these forecast cash flows to the Kinrich Report analysis' omission of all jurisdictions aside from Canada, the United States, France, Germany, and the United Kingdom.

---

[117] Richard Razgaitis, Valuation and Dealmaking of Technology-Based Intellectual Property: Principles, Methods, and Tools, at 271 (2009).

5.  **INVENTIVE CONTRIBUTION TO NORTEL'S PATENT PORTFOLIO**

Neither the Canadian nor the U.S. Debtors have imposed an allocation metric that attempts to measure the RPEs' relative contributions to the creation of Nortel's IP.  As a check against the various methodologies presented by the different estates, in this section I analyze Nortel's Residual Patent portfolio to first determine the inventive contribution of each of the Debtor Groups based on which company's employees actually invented the various patents in Nortel's portfolio.  I then compare these results with the proposed Residual Patent allocations of each of the Debtor Groups.

### 5.1.    Inventorship Analysis

To determine the percentage of the Residual Patent portfolio created by inventors from each of the three Debtor Group geographies, I identified the home address of each inventor on each Residual Patent.[118]  For patents with more than one inventor, the inventorship credit is split in proportion to the number of inventors from each region.  For example, for a patent with one U.S. inventor and one Canadian inventor, 50% of the inventorship credit is attributable to the U.S. and 50% is attributable to Canada.  The following table shows the results of this analysis for the entire Residual Patent portfolio and the subset of patents identified as high interest by Global IP.  It also breaks the Residual Patent portfolio down into the patents that were non-exclusively licensed to the various Business Lines (referred to as "Shared") and those that were not used in any of the Business Lines (referred to as "Not-Used").[119]

**Table 12:**
**Inventorship of Residual Patent Portfolio[120]**

| High Interest Only | | | | Entire Portfolio | | | |
|---|---|---|---|---|---|---|---|
| Region | Shared | Not-Used | Total | Region | Shared | Not-Used | Total |
| Canada | 46.0% | | 46.3% | Canada | 47.4% | | 51.9% |
| U.S. | 35.1% | | 33.0% | U.S. | 33.8% | | 27.4% |
| EMEA | 16.3% | | 18.7% | EMEA | 16.2% | | 17.7% |
| ROW | 2.6% | | 2.0% | ROW | 2.6% | | 2.9% |

It is worth noting that the inventorship analysis results of the total portfolio of high interest patents are very similar to the results reported in the Bazelon Report submitted by the U.K. Pension Claimants, which also contains an inventorship analysis of Nortel's high interest patents.[121]  There are also several significant findings from this analysis.  The first is that both the U.S. and EMEA Debtors invented a larger portion of the high interest patents than either Debtor Group's portion of the total Residual Patent portfolio.  Another

---

[118] Percentages based on information available from USPTO and EPO websites for home addresses of inventors listed on Nortel's patents and applications.  When home addresses were unavailable, which occurred in less than 2% of the entire portfolio, I omitted those numbers from my calculations.

[119] Data for "Shared" and "Not-Used" patents sourced from NNC-NNL06740125 and does not represent the entire Residual Patent portfolio.

[120] "Total" values based on Nortel's final Residual Patent portfolio.  Percentages may not total due to rounding.

[121] Bazelon finds high interest patent inventorship percentages of 45% for Canada, 35% for the U.S., 19% for EMEA, and 2% for ROW.  Bazelon Report at 19.

important finding is that EMEA invented a larger portion of the patents identified as "Not-Used" than either its portion of the "Shared" patents or the total Residual Patents. This greater inventive contribution to the "Not-Used" category holds true, regardless of whether the analysis is focused specifically on high interest patents or on the broader Residual Patent portfolio. As will be explained below, "Not-Used" patents are of particular interest since the Canadian Experts assign 100% of this value to NNL.

### 5.2. Inventorship Contributions Compared with Allocations Proposed by the Debtor Groups

While I do not consider inventorship to be the appropriate basis for allocation, it is a useful metric for testing the reasonableness of each of the proposed allocations.[122] For example, an allocation outcome in which a Debtor Group that invented 95% of the Residual Patent portfolio receives only 5% of the sale proceeds would be extremely difficult to justify. I will focus my comparison on the inventorship of the high interest Residual Patents since, as discussed in my Expert Report, due to the skewed value distribution of patent portfolios, it is highly likely that these patents represent the vast majority of the valuable patents in the portfolio.

**Table 13:**
**Expert Reports Allocation vs. Inventorship Allocation for Residual Patent Portfolio**

|  | Canada | U.S. | EMEA |
|---|---|---|---|
| EMEA – Ocean Tomo[123] | 39.5% | 42.9% | 17.6% |
| Canada – Duff & Phelps[124] | 98.2% | 0.7% | 1.1% |
| Canada – Green[125] | 100.0% | 0.0% | 0.0% |
| US – Kinrich[126] | 9.7% | 74.3% | 16.0% |
|  |  |  |  |
| High Interest Patent Inventorship | 46.3% | 33.0% | 18.7% |
| Total Patent Inventorship | 51.9% | 27.4% | 17.7% |

First, I will compare the U.S. Debtors' proposed Residual Patent allocation percentages (9.7% Canada, 74.4% U.S., 16% EMEA) to the high interest patent inventorship results. This comparison suggests that the U.S. Debtors' proposed allocation to Canada may not be reasonable given the fact that Canada's inventorship contribution to the development of the high interest patents was nearly five times the allocation percentage that would be received under this approach. Similarly, the allocation that would be received by the U.S. under this approach may be unreasonable given the fact that it is more than double the U.S.'s inventorship contribution. In contrast, the EMEA Debtors' proposed Residual Patent allocation percentages (39.5% Canada, 42.9% U.S., 17.6% EMEA) are substantially closer to each Debtor Group's inventive contribution.

---

[122] As explained in my Expert Report, due to the commingled and cooperative nature of R&D conducted by Nortel, using inventorship as the metric for measuring contribution to the development of the patented technologies would be misleading. Much of Nortel's IP was created through the collaborative efforts of the labs across all geographies, which would not necessarily be reflected by the listed inventor(s). Additionally, basic R&D can often lead to foundational discoveries which may not necessarily be patentable but which would still represent valuable contributions to the development of Nortel's IP as a whole.

[123] Huffard Report at 58; Malackowski Report Ex. S.1.0 (All Proceeds – Residual Patent Sale Proceeds = Business Sale Proceeds).

[124] Britven Report ¶ 3.4.

[125] Green Report at 7.

[126] Kinrich Report ¶ 8 and Table 1; see also Kinrich Report Ex. 15. Note that Nortel relinquished less than 0.1% of the total value relinquished in the Business Sales.

Next, I will compare the Canadian proposed Residual Patent allocation percentages (~100% Canada, 0% U.S., 0% EMEA) to the high interest patent inventorship results. I note that the Canadian Experts argue that the U.S. and EMEA Debtors were compensated for their share of the Residual Patents based on the amounts attributable to the licenses to the patents non-exclusively licensed to the various Business Lines (referred to as "Shared") and that none of the value of the "Not-Used" patents should be allocated to the U.S. or EMEA Debtors. Yet when we compare the Canadian proposed Residual Patent allocation percentages (~100% Canada, 0% U.S., 0% EMEA) to the "Not-Used" high interest inventorship analysis, we find that the U.S. and EMEA Debtors invented 54% of these patents and yet, under the Canadian proposal, these Debtor Groups would receive no compensation for the sale of these assets. Regardless of whether one considers the "Not-Used" category, the total high interest patents, or the total Residual Patent portfolio, it is extremely difficult to justify an allocation of 100% of the sale proceeds to Canada given that half of the patents were invented by the U.S. and EMEA Debtors.

I consider the Canadian proposal to be particularly unreasonable since it seeks to allocate to Canada 100% of the value of assets that were created by employees on the payroll of the U.S. and EMEA RPEs. The problem with the Canadian allocation is well-illustrated when considering the patented output of a prolific inventor such as Simon Brueckheimer, who was on the payroll of NNUK and performed research in NNUK facilities. Nortel engineer and current Rockstar CTO Gillian McColgan described Mr. Brueckheimer as "a seminal person in Nortel's history in terms of his scope and range of inventions, and the patent products that he laid down speak for themselves."[127] Mr. Brueckheimer is listed as an inventor on eighty-one Residual Patents, forty of which were designated as high interest. As mentioned above, the EMEA Debtors invented over 20% of all of the high interest Residual Patents that were not used by the Business Lines. In my opinion it is economically unreasonable to allocate to Canada the entire value of assets that were created and paid for by Licensed Participants.

---

[127] McColgan Dep. 79:9-79:12; see also Dep. Ex. 22150 (NNC-NNL07055454), IP Law Group Technical Fellow Nominations, at NNC-NNL07055454/1–2 (Tim Collins, Assistant General Counsel of Nortel's IP Law Group, nominated Brueckheimer and three others for Nortel's Technical Fellowship Program, in recognition for their contributions to Nortel IP creation through prolific invention disclosures and their cooperation in getting patents filed); Dep. Ex. 21196 (NNC-NNL06900384), RE: Prestigious Award for Harlow Engineer, at NNC-NNL06900384/1 (Nortel's Chief Technology Officer, Brian McFadden, congratulates Mr. Brueckheimer for winning the Royal Academy of Engineering's Silver Medal for his personal contribution to U.K. engineering).

## 6. CONCLUSION

The valuation and allocation methodologies applied by the Opposing Experts are based on incorrect assumptions and are therefore unreliable. Most significantly, the Canadian Experts mistakenly assume that the Licensed Participants had no beneficial ownership interest in Nortel's IP and that the scope of the license rights was narrow. The Canadian Experts also fail to directly value the Canadian assets and instead use an approach that simply calculates the Canadian allocation as a residual value. As explained previously, this is inappropriate because 1) NNL was never treated as a residual entity when Nortel was in business, and 2) the legal assumptions the Canadian Experts have made do not reflect the commercial reality of Nortel's business.

The U.S. Experts use inconsistent valuation and allocation methodologies for the Business Sales and Residual Patent Sale proceeds. For the Business Sales, none of the assets are valued and Nortel's historic geographic revenues are used to allocate proceeds whereas for the Residual Patent Sale, future expected revenues are used as the basis for allocation. While past performance may provide an appropriate metric for allocating proceeds from certain of the assets sold in the Business Sales, there is no basis for the assumption that the past performance of Nortel's operating businesses reflects the RPE ownership interests of all the Business Line assets. The valuation of the Residual Patents is also flawed due to certain incorrect assumptions made by the U.S. Experts, the most significant of which is the unfounded assumption that virtually none of the patent filings outside of the exclusive jurisdictions has any licensing value.

In contrast to the approaches used by the Opposing Experts, in my Expert Report I have applied a methodology that directly values Nortel's IP, is consistent with the fact that Nortel's IP was beneficially owned by the RPEs, and is consistent with Nortel's long history of allocating profits based on relative R&D contributions.

## 7.  STATEMENT OF LIMITING CONDITIONS

- The conclusion of value arrived at herein is valid only for the stated purpose as of the date of the valuation.
- Financial statements, technical information, and other information provided by the Joint Administrators or their representatives, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the enterprise's business condition, except as specifically noted herein.  Ocean Tomo expresses no form of assurance on this information.
- Public information and industry and statistical information have been obtained from sources I believe to be reliable.  However, I have performed no procedures to corroborate the information.
- I do not provide assurance on the achievability of the results forecasted because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.
- The report and conclusion of value are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever.  The conclusion of value represents the considered opinion of Ocean Tomo, based on information furnished to them by the Joint Administrators or their representatives and other sources.
- Neither all nor any part of the contents of this report should be disseminated to the public or any third party via any medium without the prior written consent and approval of Ocean Tomo.
- No change of any item in this appraisal report shall be made by anyone other than Ocean Tomo, and I shall have no responsibility for any such unauthorized change.
- Except as noted, I have relied on the representations of the Joint Administrators or their representatives and other third parties concerning the value and useful condition of the assets that are the subject of this report, except as specifically stated to the contrary in this report.  I have not attempted to confirm whether or not all assets under consideration are free and clear of liens and encumbrances or that the entity has good title to all assets.
- None of the information contained within should be viewed as legal advice or tax advice.

## 8.  CERTIFICATION

It is hereby certified that:

- The statements of fact contained in this report are true and correct.
- The analyses, opinions, and conclusions set forth in this report are limited only by the assumptions and limiting conditions (imposed by the terms of the assignment or by the undersigned) set forth by this report, and are our personal, unbiased, professional analyses, opinions, and conclusions.
- Where applicable, this report has been made in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and the Statement on Standards for Valuation Services.
- Ocean Tomo has no present or contemplated future ownership interest in the Subject Assets nor any personal interest or bias in the subject matter or the parties involved.
- The Engagement of Ocean Tomo in this assignment was not contingent upon developing or reporting predetermined results.
- Neither the appraisal assignment nor the amount of the fee is contingent upon developing or reporting a predetermined value, requested minimum value, a direction in the value that favors the cause of the client, or a specific valuation, nor is our compensation contingent upon an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report, or the occurrence of a subsequent event directly related to the intended use of this report.
- The conclusions referenced herein are representative of my professional opinion. Contributing members on this analysis include Roy D'Souza, Matthew Moyers, Joshua Gammon, Sean Sheridan, Daniel McEldowney, Peter Wilhelm, and Tyler Remick.


Respectfully submitted,


James E. Malackowski                                    Date:  February 28, 2014

**Rebuttal Report of James E. Malackowski**



200 West Madison, 37th Floor
Chicago, Illinois 60606
(312) 327-4400 Ph
(312) 327-4401 Fx
www.oceantomo.com

# Appendix 1
## Patent Licensing Revenues – Comparable Companies

Prior to the bankruptcy filing of Nortel Networks, numerous companies had operating segments for the sole purpose of patent licensing.  The following table summarizes these companies and the associated revenues generated from patent licensing.

| Millions (USD) | Total Revenue | | | | Licensing/Royalty Revenue | | | | Percentage of Revenue | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company | 2008 | 2009 | 2010 | 2011 | 2008 | 2009 | 2010 | 2011 | 2008 | 2009 | 2010 | 2011 |
| ARM Holdings[1] | $546 | $490 | $631 | $785 | $457 | $408 | $500 | $643 | 84% | 83% | 79% | 82% |
| Qualcomm[2] | $11,142 | $10,416 | $10,982 | $14,957 | $3,622 | $3,605 | $3,659 | $5,422 | 33% | 35% | 33% | 36% |
| Texas Instruments[3] | $12,501 | $10,427 | $13,966 | $13,735 | $2,005 | $1,607 | $2,238 | $2,045 | 16% | 15% | 16% | 15% |
| Average | $8,063 | $7,111 | $8,526 | $9,826 | $2,028 | $1,873 | $2,805 | $2,703 | 44% | 44% | 43% | 44% |

There were also many companies that had established patent licensing as part of their core operations, but did not have a designated operating segment. Instead, licensing revenues were disclosed in the footnotes to their financial statements. Other companies were using patent licensing as a way of supplementing their income and maximizing their return on R&D expenditures (these companies disclosed licensing revenue as other income).  Regardless of the operating structure and accounting recognition, the financial performance of these companies demonstrates that patent licensing can generate significant revenues with very high margins.[4]  Most recently, Ericsson landed an agreement with Samsung that will generate SEK 2.1 billion a year with an ongoing margin of 70%.[5]  The following table summarizes patent licensing revenue, as well as patent counts, for companies that had stand-alone patent licensing within their core operating segments or used patent licensing to generate "other" income.

| Millions (USD) | Licensing/Royalty Revenue | | | | Patent Count | | | |
|---|---|---|---|---|---|---|---|---|
| Company | 2008 | 2009 | 2010 | 2011 | 2008 | 2009 | 2010 | 2011 |
| ARM Holdings[6] | $457 | $408 | $500 | $643 | N/A | N/A | N/A | 986 |
| Qualcomm[7] | $3,622 | $3,605 | $3,659 | $5,422 | 17,100 | 22,100 | N/A | N/A |
| Texas Instruments[8] | $2,005 | $1,607 | $2,238 | $2,045 | N/A | N/A | N/A | N/A |
| Ericsson[9] | $1,161 | $627 | $684 | $905 | 24,000 | 25,000 | 27,000 | 30,000 |
| IBM[10] | $1,153 | $1,177 | $1,154 | $1,108 | 32,000 | 36,000 | 41,000 | 47,000 |
| Philips[11] | $492 | $408 | $516 | $431 | 55,000 | 48,000 | 50,000 | 54,000 |
| Microsoft[12] | $2,000 | $2,000 | $2,000 | $2,000 | N/A | N/A | N/A | 26,000 |
| Nokia[13] | N/A | 557 | 552 | 1178 | 11,000 | 11,000 | 10,000 | 10,000 |

---

[1] ARM Holdings 2008-2011 Annual Reports.
[2] Qualcomm 2008-2011 Annual Reports.
[3] Texas Instruments 2008-2011 Annual Reports.
[4] Chris Donegan, What VC and PE Practitioners Need to Know about IP, Intellectual Asset Management Magazine (Aug. 28, 2013), http://www.iam-magazine.com/issues/article.ashx?g=435de052-8afd-4048-b9a2-2cb83397c04d.
[5] Killian Bell, Samsung Agrees Licensing Deal with Ericsson to End Patent Dispute, Cult of Android (Jan. 27, 2014, 8:18 AM), http://www.cultofandroid.com/50557/samsung-agrees-licensing-deal-ericsson-end-patent-dispute/.
[6] ARM Holdings 2008-2011 Annual Reports.
[7] Qualcomm 2008-2011 Annual Reports.
[8] Texas Instruments 2008-2011 Annual Reports.
[9] Ericsson 2008-2011 Annual Reports.
[10] IBM 2008-2011 Annual Reports.
[11] Philips 2008-2011 Annual Reports.
[12] Microsoft 2008-2011 Annual Reports; Jay Yarow, Microsoft Is Making An Astonishing $2 Billion Per Year From Android Patent Royalties, Business Insider (Nov. 6, 2013, 12:36 PM), http://www.businessinsider.com/microsoft-earns-2-billion-per-year-from-android-patent-royalties-2013-11.
[13] Nokia 2008-2011 Annual Reports.

Appendix 2
Qualcomm – Operating & Geographic Revenues[1]

| Product/Brand Segments | | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 5 Yr Avg |
| Integrated Circuits and Software | $5,275 | $6,717 | $6,135 | $6,695 | $8,859 | 59.8% |
| Technology Licensing | $2,772 | $3,622 | $3,605 | $3,659 | $5,422 | 33.8% |
| Wireless & Internet | $828 | $785 | $641 | $628 | $656 | 6.3% |
| Strategic Initiatives | $1 | $12 | $29 | $0 | $0 | 0.1% |
| Adjustments & Eliminations | ($5) | $6 | $6 | $0 | $20 | 0.0% |
| Total | $8,871 | $11,142 | $10,416 | $10,982 | $14,957 | |

| Geographic Segments | | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 5 Yr Avg |
| China | $1,875 | $2,309 | $2,378 | $3,194 | $4,744 | 25.7% |
| South Korea | $2,780 | $3,872 | $3,655 | $2,913 | $2,887 | 28.6% |
| Other Global | $1,527 | $2,393 | $2,653 | $1,942 | $2,714 | 19.9% |
| Taiwan | | | | $1,360 | $2,550 | 6.9% |
| United States | $1,165 | $970 | $632 | $555 | $897 | 7.5% |
| Japan | $1,524 | $1,598 | $1,098 | $1,018 | $1,165 | 11.4% |
| Total | $8,871 | $11,142 | $10,416 | $10,982 | $14,957 | |

---

[1] Historical Qualcomm financial information – Bloomberg Terminal, accessed on February 6, 2014.



*Nortel Licensing Model*
**VALUATION SUMMARY - GREEN METHODOLOGY**
Exhibit 1.1

## Green - with a Licensing Business (1)

| Millions USD | OT Revision | | | |
| --- | --- | --- | --- | --- |
| | Canada | US | EMEA | Total |
| Net Tangible Assets | $122 | $318 | $95 | $534 |
| IP Licensing Business - Business Sales IP (3) | $98 | $1,448 | $436 | $1,982 |
| In-Place Workforce | $79 | $135 | $42 | $255 |
| Wholly-Owned Businesses | $0 | $111 | $0 | $111 |
| Total Allocation Excluding Residual IP | $298 | $2,011 | $573 | $2,883 |
| | | | | |
| Net Tangible Assets | $122 | $318 | $95 | $534 |
| IP Licensing Business - Business Sales IP (3) | $98 | $1,448 | $436 | $1,982 |
| In-Place Workforce | $79 | $135 | $42 | $256 |
| Wholly-Owned Businesses | $0 | $111 | $0 | $111 |
| IP Licensing Business - Residual IP (3) | $1,144 | $2,543 | $766 | $4,453 |
| Total Allocation Including Residual IP | $1,443 | $4,555 | $1,339 | $7,337 |
| | | | | |
| % of Total - Excluding Residual IP | 10.3% | 69.8% | 19.9% | |
| % of Total - Including Residual IP | 19.7% | 62.1% | 18.3% | |

## Green - without a Licensing Business (2)

| Millions USD | Green Analysis | | | |
| --- | --- | --- | --- | --- |
| | Canada | US | EMEA | Total |
| Net Tangible Assets | $122 | $318 | $95 | $534 |
| IP Rights and Customer Relationships | $1,415 | $468 | $100 | $1,982 |
| In-Place Workforce | $79 | $135 | $42 | $255 |
| Wholly-Owned Businesses | $0 | $111 | $0 | $111 |
| Total Allocation Excluding Residual IP | $1,615 | $1,031 | $236 | $2,883 |
| | | | | |
| Net Tangible Assets | $122 | $318 | $95 | $534 |
| IP Rights and Customer Relationships | $1,415 | $468 | $100 | $1,982 |
| In-Place Workforce | $79 | $135 | $42 | $256 |
| Wholly-Owned Businesses | $0 | $111 | | $111 |
| Residual Intellectual Property | $4,453 | | | $4,453 |
| Total Allocation Including Residual IP | $6,069 | $1,032 | $236 | $7,337 |
| | | | | |
| % of Total - Excluding Residual IP | 56.0% | 35.8% | 8.2% | |
| % of Total - Including Residual IP | 82.7% | 14.1% | 3.2% | |

**Notes:**
(1) Nortel valuation conclusions employing Green methodology with a patent licensing business. Valuation conclusions in blue were obtained from the Green Report.
(2) Green methodology without considering licensing business. See the Green Report.
(3) IP licensing business valuation is based on Green methodology - backing into a residual value for Canada (highlighted red) by calculating licensing value of US and EMEA (highlighted green). See Exhibits 1.2, 1.3, 1.4 & 1.5 for my valuation conclusions and assumptions.



*Nortel Licensing Model*
**VALUATION SUMMARY - GREEN METHODOLOGY**
Exhibit 1.2

| | Licensing Model Value | NNI | Ireland | France | NNUK | EMEA |
|---|---|---|---|---|---|---|
| RPSM Allocation Percentage (1) | | 38.50% | 1.40% | 7.70% | 2.50% | 11.60% |
| OT Business Sale IP | $3,761 | $1,448 | $53 | $290 | $94 | $436 |
| OT Residual IP | $6,606 | $2,543 | $92 | $509 | $165 | $766 |
| OT Licensing Division Scenario | $10,367 | $3,991 | $145 | $798 | $259 | $1,203 |

**Notes:**
(1) Green Report at 27 (Q1 2010 RPS Calculation).

Nortel Licensing Model
**VALUATION SUMMARY - GREEN METHODOLOGY**
Exhibit 1.3







*Nortel Licensing Model*
**VALUATION SUMMARY - GREEN METHODOLOGY**
Exhibit 1.4

**Patent Licensing Business (1)**

**Business Line**
*Million USD*

**IP Value (2)**

The CDMA Business Asset Sale:

CDMA

LTE

The Enterprise Solutions Business Asset Sale:

The MEN and Optical Business Asset Sale:

The CVAS Business Asset Sale:

The GSM/GSM-R Business Asset Sale:

The Multiservice Switch Business Asset Sale:

The Layer 4-7 Assets (Alteon) Business Asset Sale:

The Next-Generation Packet Core Business Asset Sale: (3)

**TOTAL**



INPUTS (4)



Discount Rate: (6)                    12.1%

**Notes:**
(1) The patent licensing business is based on the same assumptions made in my initial report. Any differences are noted here.
(2) Valuation conclusions consider the entire market
(3) Valuation conclusion does not affect Next-Gen business line because no patents were transferred in this sale.
(4) Valuation inputs were unchanged from my original analysis except those noted here.
(5) Royalty rates were obtained from the Lazard model - litigation light, low.
(6) Discount rate utilized in Green Report for existing Nortel technology.



*Nortel Licensing Model*
**VALUATION SUMMARY - GREEN METHODOLOGY**
Exhibit 1.5

## Patent Licensing Business (1)

| Franchise | IP Value (2) |
| --- | --- |
| *Millions USD* | |
| Smartphones (2) | |
| Wireless Infrastructure (2) | |
| Optical (2) | |
| Data Networking (2) | |
| PC (2) | |
| Internet (2) | |
| Enterprise Voice (2) | |
| Carrier Voice (2) | |
| Other | |
| TOTAL | |

| INPUTS (3) | |
| --- | --- |
| Discount Rate (4) | 12.1398 |

**Notes**
(1) The patent licensing business follows the same methodology disclosed in my initial report. Any differences are noted below.
(2) Valuation conclusions consider all market participants - no adjustments were made for Rockstar Consortium entities or acquirers of Nortel Business Lines.
(3) Valuation inputs were unchanged from my original analysis except those noted here.
(4) Discount rate utilized in the Green Report for existing Nortel Technology.

*Nortel - Licensing Model*
**ALLOCATION OF RESIDUAL SALE PROCEEDS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.0

*Millions USD*

| Allocation of $4.5 Billion | License (2) | Contribution Lookback Periods (3) | | | |
| --- | --- | --- | --- | --- | --- |
| | | 1991-2006 | 1991-2008 | 2001-2006 | 2001-2008 |
| US Debtors (4) | $2,827.1 | $1,931.6 | $1,919.4 | $1,735.4 | $1,749.8 |
| Canada Debtors (5) | $416.0 | $1,778.2 | $1,831.0 | $1,936.9 | $2,022.8 |
| United Kingdom Debtors | $550.0 | $389.4 | $362.5 | $283.7 | $245.2 |
| Ireland Debtors | $249.3 | $43.4 | $45.8 | $33.2 | $40.9 |
| France Debtors | $440.5 | $340.3 | $324.3 | $493.7 | $424.1 |
| NN SAS (6) | $16.2 | $16.2 | $16.2 | $16.2 | $16.2 |
| NN GmbH (7) | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 |
| Total | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 |
| | | | | | |
| US Debtors | $2,827.1 | $1,931.6 | $1,919.4 | $1,735.4 | $1,749.8 |
| Canada Debtors | $416.0 | $1,778.2 | $1,831.0 | $1,936.9 | $2,022.8 |
| EMEA Debtors | $1,257.0 | $790.2 | $749.7 | $827.7 | $727.3 |
| Total | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 |
| | | | | | |
| US Debtors (4) | 62.8% | 42.9% | 42.7% | 38.6% | 38.9% |
| Canada Debtors (5) | 9.2% | 39.5% | 40.7% | 43.0% | 45.0% |
| United Kingdom Debtors | 12.2% | 8.7% | 8.1% | 6.3% | 5.4% |
| Ireland Debtors | 5.5% | 1.0% | 1.0% | 0.7% | 0.9% |
| France Debtors | 9.8% | 7.6% | 7.2% | 11.0% | 9.4% |
| NN SAS (6) | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| NN GmbH (7) | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | |
| US Debtors | 62.8% | 42.9% | 42.7% | 38.6% | 38.9% |
| Canada Debtors | 9.2% | 39.5% | 40.7% | 43.0% | 45.0% |
| EMEA Debtors | 27.9% | 17.6% | 16.7% | 18.4% | 16.2% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**Notes:**

(1) Based upon NPV of all non-RPE territories allocated 20 percent each to the RPE entities, as per my previous methodology

(2) Total allocated value is equal to the Residual Patent sale proceeds of $4.5B less $42.85M (the values attributable to the patents held by CoreTek, Xros, Nortel Networks Application Management, Nortel GmbH and Nortel Networks France SAS)

(3) Reflects allocation of $4,461.41 according to historical R&D spend with various lookback periods; as per my previous methodology

(4) Value allocated to the US includes approximately $0.00 million related to assets owned by subsidiaries not parties to the MRDA

(5) Value allocated to Canada includes approximately $21.45 million related to assets owned by subsidiaries not parties to the MRDA

(6) Value allocated to NN SAS includes approximately $16.19 million related to assets owned by subsidiaries not parties to the MRDA

(7) Value allocated to NN GmbH includes approximately $0.96 million related to assets owned by subsidiaries not parties to the MRDA



*Nortel - Licensing Model*
**SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.1

*Millions USD*

| Franchise | US | Canada | North America | UK | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Smartphones (1) | $247.32 | $2.67 | $249.99 | $34.35 | $0.00 | $23.34 | $77.65 | $104.64 | $0.00 | $432.28 |
| Wireless Infrastructure (2) | $272.02 | $17.26 | $289.28 | $28.24 | $0.00 | $22.42 | $83.68 | $122.84 | $0.00 | $495.83 |
| Optical (3) | $87.81 | $5.58 | $93.39 | $10.03 | $0.00 | $7.97 | $29.72 | $39.82 | $0.00 | $161.10 |
| Data Networking (4) | $510.91 | $32.45 | $543.36 | $48.28 | $0.00 | $38.35 | $143.06 | $147.13 | $0.00 | $833.55 |
| PC (5) | $159.04 | $12.80 | $171.85 | $31.05 | $0.00 | $0.00 | $31.05 | $181.64 | $0.00 | $384.54 |
| Internet (6) | $339.06 | $19.50 | $358.56 | $37.44 | $0.00 | $27.10 | $108.50 | $22.12 | $0.00 | $489.18 |
| Enterprise Voice (7) | $63.10 | $4.00 | $67.09 | $7.41 | $0.00 | $5.88 | $21.95 | $20.20 | $0.00 | $112.29 |
| Carrier Voice (8) | $22.10 | $1.40 | $23.50 | $1.67 | $0.00 | $1.33 | $4.95 | $9.14 | $0.00 | $36.93 |
| Other (9) | $14.73 | $0.83 | $15.56 | $1.72 | $0.00 | $1.09 | $4.33 | $5.61 | $0.00 | $25.49 |
| TOTAL | $1,716.09 | $96.49 | $1,812.56 | $200.18 | $0.00 | $127.48 | $504.90 | $653.13 | $0.00 | $2,971.19 |

**Notes:**
(1)  Exhibit 2.1.2
(2)  Exhibit 2.1.3
(3)  Exhibit 2.1.4
(4)  Exhibit 2.1.5
(5)  Exhibit 2.1.6
(6)  Exhibit 2.1.7
(7)  Exhibit 2.1.8
(8)  Exhibit 2.1.9
(9)  Values based upon 255 high-interest "Other" patents valued at $100K each, allocated according to the regional allocations of all other franchises



*Nortel - Licensing Model*
**SMART PHONES - SUMMARY OF VALUATION ANALYSIS  - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.2

*Millions USD*

| Market Participant | US | Canada | North America | UK | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Apple | $78.96 | $0.85 | $79.81 | $11.09 | $0.00 | $7.53 | $25.07 | $30.23 | $0.00 | **$135.02** |
| HTC | $25.72 | $0.28 | $26.00 | $3.55 | $0.00 | $2.41 | $8.03 | $11.31 | $0.00 | **$45.36** |
| LG | $3.49 | $0.04 | $3.52 | $0.48 | $0.00 | $0.33 | $1.09 | $1.52 | $0.00 | **$6.13** |
| Motorola | $11.04 | $0.12 | $11.16 | $1.52 | $0.00 | $1.04 | $3.45 | $4.84 | $0.00 | **$19.45** |
| Nokia | $47.70 | $0.51 | $48.21 | $6.61 | $0.00 | $4.49 | $14.93 | $21.35 | $0.00 | **$84.49** |
| RIM | $36.17 | $0.39 | $36.57 | $5.01 | $0.00 | $3.40 | $11.31 | $16.15 | $0.00 | **$64.04** |
| Samsung | $19.18 | $0.21 | $19.39 | $2.64 | $0.00 | $1.80 | $5.97 | $8.33 | $0.00 | **$33.70** |
| Sony Ericsson | $10.33 | $0.11 | $10.44 | $1.42 | $0.00 | $0.97 | $3.21 | $4.44 | $0.00 | **$18.08** |
| Other | $14.74 | $0.16 | $14.90 | $2.03 | $0.00 | $1.38 | $4.60 | $6.48 | $0.00 | **$26.00** |
| Total | **$247.32** | **$2.67** | **$249.99** | **$34.35** | **$0.00** | **$23.34** | **$77.65** | **$104.64** | **$0.00** | **$432.28** |

**Notes:**
(1)  EMEAPROD02318767
(2)  EMEAPROD02318770



*Nortel - Licensing Model*
**WIRELESS INFRASTRUCTURE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.3

Page 1 of 2

*Millions USD*

| Market Participant - 2G/3G ex HLR | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Ericsson | $148.10 | $9.38 | $157.47 | $15.02 | $0.00 | $11.93 | $44.52 | $59.89 | $0.00 | **$261.89** |
| Nokia Siemens Networks | $65.79 | $4.17 | $69.96 | $6.67 | $0.00 | $5.30 | $19.78 | $26.61 | $0.00 | **$116.35** |
| Alcatel-Lucent | $42.43 | $2.69 | $45.11 | $4.30 | $0.00 | $3.42 | $12.76 | $17.16 | $0.00 | **$75.03** |
| Huawei | $45.08 | $2.85 | $47.94 | $4.57 | $0.00 | $3.63 | $13.55 | $18.23 | $0.00 | **$79.73** |
| ZTE | $10.67 | $0.68 | $11.35 | $1.08 | $0.00 | $0.86 | $3.21 | $4.32 | $0.00 | **$18.87** |
| Motorola | $10.69 | $0.68 | $11.37 | $1.08 | $0.00 | $0.86 | $3.21 | $4.32 | $0.00 | **$18.91** |
| Cisco | $3.38 | $0.21 | $3.59 | $0.34 | $0.00 | $0.27 | $1.01 | $1.37 | $0.00 | **$5.97** |
| GENBAND | $0.48 | $0.03 | $0.51 | $0.05 | $0.00 | $0.04 | $0.14 | $0.19 | $0.00 | **$0.85** |
| Datang Mobile | $0.08 | $0.01 | $0.09 | $0.01 | $0.00 | $0.01 | $0.03 | $0.03 | $0.00 | **$0.15** |
| UTStarcom | $0.03 | $0.00 | $0.03 | $0.00 | $0.00 | $0.00 | $0.01 | $0.01 | $0.00 | **$0.05** |
| Other | $20.51 | $1.30 | $21.81 | $2.08 | $0.00 | $1.65 | $6.17 | $8.30 | $0.00 | **$36.28** |
| Total | **$347.25** | **$21.99** | **$369.24** | **$35.22** | **$0.00** | **$27.96** | **$104.39** | **$140.43** | **$0.00** | **$614.07** |
| Less: Ericsson & Genband | **$198.67** | **$12.58** | **$211.25** | **$20.15** | **$0.00** | **$16.00** | **$59.73** | **$80.35** | **$0.00** | **$351.33** |

| Market Participant - 2G/3G HLR | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Ericsson | $0.30 | $0.02 | $0.32 | $0.15 | $0.00 | $0.12 | $0.46 | $0.71 | $0.00 | **$1.45** |
| Nokia Siemens Networks | $0.12 | $0.01 | $0.13 | $0.14 | $0.00 | $0.11 | $0.40 | $0.45 | $0.00 | **$1.06** |
| Alcatel-Lucent | $0.20 | $0.01 | $0.21 | $0.10 | $0.00 | $0.08 | $0.29 | $0.44 | $0.00 | **$0.95** |
| Huawei | $0.01 | $0.00 | $0.01 | $0.23 | $0.00 | $0.18 | $0.68 | $0.15 | $0.00 | **$0.98** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.04 | $0.00 | $0.03 | $0.11 | $0.21 | $0.00 | **$0.37** |
| Motorola | $0.10 | $0.01 | $0.11 | $0.01 | $0.00 | $0.01 | $0.02 | $0.07 | $0.00 | **$0.15** |
| HP | $0.31 | $0.02 | $0.33 | $0.06 | $0.00 | $0.05 | $0.17 | $0.18 | $0.00 | **$0.57** |
| Apertio | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Other | $0.15 | $0.01 | $0.16 | $0.02 | $0.00 | $0.02 | $0.07 | $0.36 | $0.00 | **$0.50** |
| Total | **$1.19** | **$0.08** | **$1.27** | **$0.74** | **$0.00** | **$0.59** | **$2.19** | **$2.56** | **$0.00** | **$6.02** |
| Less: Ericsson | **$0.89** | **$0.06** | **$0.95** | **$0.59** | **$0.00** | **$0.47** | **$1.74** | **$1.86** | **$0.00** | **$4.57** |

**Notes:**
(1) EMEAPROD02318768
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**WIRELESS INFRASTRUCTURE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.3

Page 2 of 2

*Millions USD*

| Market Participant - LTE | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Ericsson | $29.66 | $1.89 | $31.56 | $2.91 | $0.00 | $2.31 | $8.63 | $12.11 | $0.00 | **$52.30** |
| Nokia Siemens Networks | $13.84 | $0.88 | $14.73 | $1.36 | $0.00 | $1.08 | $4.03 | $5.65 | $0.00 | **$24.41** |
| Alcatel-Lucent | $23.17 | $1.48 | $24.65 | $2.27 | $0.00 | $1.81 | $6.74 | $9.46 | $0.00 | **$40.84** |
| Huawei | $5.09 | $0.32 | $5.41 | $0.50 | $0.00 | $0.40 | $1.48 | $2.08 | $0.00 | **$8.97** |
| ZTE | $2.40 | $0.15 | $2.55 | $0.24 | $0.00 | $0.19 | $0.70 | $0.98 | $0.00 | **$4.23** |
| Motorola | $2.23 | $0.14 | $2.37 | $0.22 | $0.00 | $0.17 | $0.65 | $0.91 | $0.00 | **$3.93** |
| Cisco | $0.99 | $0.06 | $1.05 | $0.10 | $0.00 | $0.08 | $0.29 | $0.40 | $0.00 | **$1.74** |
| NEC | $7.63 | $0.49 | $8.12 | $0.75 | $0.00 | $0.60 | $2.22 | $3.11 | $0.00 | **$13.45** |
| Fujitsu | $5.44 | $0.35 | $5.79 | $0.53 | $0.00 | $0.42 | $1.58 | $2.22 | $0.00 | **$9.59** |
| Other | $4.79 | $0.31 | $5.09 | $0.47 | $0.00 | $0.37 | $1.39 | $1.95 | $0.00 | **$8.44** |
| Total | **$95.24** | **$6.08** | **$101.32** | **$9.35** | **$0.00** | **$7.43** | **$27.69** | **$38.89** | **$0.00** | **$167.90** |
| Less: Ericsson | **$65.57** | **$4.19** | **$69.76** | **$6.44** | **$0.00** | **$5.12** | **$19.07** | **$26.78** | **$0.00** | **$115.60** |

| Market Participant - WiMAX | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Huawei | $1.67 | $0.11 | $1.77 | $0.17 | $0.00 | $0.14 | $0.52 | $2.33 | #DIV/0! | **$4.86** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.11 | $0.00 | $0.09 | $0.34 | $1.01 | #DIV/0! | **$1.12** |
| Motorola | $0.86 | $0.05 | $0.92 | $0.07 | $0.00 | $0.05 | $0.20 | $0.26 | #DIV/0! | **$1.74** |
| Samsung | $2.76 | $0.17 | $2.94 | $0.40 | $0.00 | $0.32 | $1.19 | $7.20 | #DIV/0! | **$10.88** |
| Cisco | $0.02 | $0.00 | $0.02 | $0.01 | $0.00 | $0.00 | $0.02 | $0.03 | #DIV/0! | **$0.06** |
| Alvarion | $0.77 | $0.05 | $0.82 | $0.15 | $0.00 | $0.12 | $0.46 | $0.82 | #DIV/0! | **$2.31** |
| Aviat Networks (Harris-Stratex) | $0.00 | $0.00 | $0.00 | $0.05 | $0.00 | $0.04 | $0.14 | $0.65 | #DIV/0! | **$0.63** |
| Airspan | $0.19 | $0.01 | $0.20 | $0.01 | $0.00 | $0.01 | $0.03 | $0.05 | #DIV/0! | **$0.36** |
| NEC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.44 | #DIV/0! | **$0.33** |
| Redline Communications | $0.16 | $0.01 | $0.17 | $0.02 | $0.00 | $0.02 | $0.06 | $0.02 | #DIV/0! | **$0.32** |
| Proxim | $0.12 | $0.01 | $0.12 | $0.02 | $0.00 | $0.01 | $0.05 | $0.07 | #DIV/0! | **$0.29** |
| Tellabs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.04 | #DIV/0! | **$0.03** |
| Other | $0.34 | $0.02 | $0.36 | $0.06 | $0.00 | $0.04 | $0.17 | $0.92 | #DIV/0! | **$1.39** |
| Total | **$6.88** | **$0.43** | **$7.32** | **$1.06** | **$0.00** | **$0.84** | **$3.15** | **$13.86** | **$0.00** | **$24.32** |
| Less: None | **$6.88** | **$0.43** | **$7.32** | **$1.06** | **$0.00** | **$0.84** | **$3.15** | **$13.86** | **$0.00** | **$24.32** |

**Notes:**
(1) EMEAPROD02318768
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**OPTICAL NETWORK & HARDWARE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.4

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Alcatel-Lucent | $13.92 | $0.88 | $14.80 | $3.34 | $0.00 | $2.65 | $9.90 | $4.87 | $0.00 | **$33.61** |
| Huawei | $1.12 | $0.07 | $1.19 | $2.05 | $0.00 | $1.63 | $6.07 | $15.19 | $0.00 | **$33.34** |
| Ciena | $15.34 | $0.97 | $16.32 | $0.78 | $0.00 | $0.62 | $2.31 | $0.85 | $0.00 | **$14.18** |
| Fujitsu | $18.79 | $1.19 | $19.99 | $0.05 | $0.00 | $0.04 | $0.16 | $1.56 | $0.00 | **$13.07** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.39 | $0.00 | $0.31 | $1.15 | $6.96 | $0.00 | **$12.35** |
| NEC | $0.26 | $0.02 | $0.28 | $0.12 | $0.00 | $0.10 | $0.36 | $4.29 | $0.00 | **$6.64** |
| Nokia Siemens | $2.22 | $0.14 | $2.36 | $1.14 | $0.00 | $0.91 | $3.39 | $0.47 | $0.00 | **$7.77** |
| Cisco | $9.95 | $0.63 | $10.58 | $0.31 | $0.00 | $0.25 | $0.93 | $0.57 | $0.00 | **$8.19** |
| ECI | $0.27 | $0.02 | $0.29 | $0.52 | $0.00 | $0.41 | $1.53 | $1.69 | $0.00 | **$5.14** |
| Tellabs | $10.51 | $0.67 | $11.18 | $0.15 | $0.00 | $0.12 | $0.45 | $0.29 | $0.00 | **$7.49** |
| Ericsson | $0.00 | $0.00 | $0.00 | $0.68 | $0.00 | $0.54 | $2.01 | $0.95 | $0.00 | **$4.79** |
| Infinera | $6.56 | $0.42 | $6.97 | $0.21 | $0.00 | $0.17 | $0.62 | $0.07 | $0.00 | **$5.04** |
| ADVA | $2.27 | $0.14 | $2.42 | $0.37 | $0.00 | $0.29 | $1.09 | $0.11 | $0.00 | **$3.20** |
| Transmode | $0.29 | $0.02 | $0.31 | $0.23 | $0.00 | $0.19 | $0.69 | $0.01 | $0.00 | **$1.28** |
| Tyco Telecom | $0.89 | $0.06 | $0.95 | $0.08 | $0.00 | $0.07 | $0.25 | $0.10 | $0.00 | **$1.29** |
| Adtran | $1.68 | $0.11 | $1.79 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.96** |
| Sycamore | $0.42 | $0.03 | $0.45 | $0.02 | $0.00 | $0.01 | $0.05 | $0.05 | $0.00 | **$0.39** |
| Nortel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Other | $3.31 | $0.21 | $3.52 | $0.26 | $0.00 | $0.21 | $0.77 | $2.72 | $0.00 | **$7.15** |
| Total | **$87.81** | **$5.58** | **$93.39** | **$10.71** | **$0.00** | **$8.51** | **$31.73** | **$40.76** | **$0.00** | **$165.88** |
| Less: Ericsson and Nortel | **$87.81** | **$5.58** | **$93.39** | **$10.03** | **$0.00** | **$7.97** | **$29.72** | **$39.82** | **$0.00** | **$161.10** |

**Notes:**
(1) EMEAPROD02318751
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**DATA NETWORKING - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.5

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Cisco | $347.82 | $22.09 | $369.91 | $27.45 | $0.00 | $21.81 | $81.35 | $64.05 | $0.00 | **$515.31** |
| Juniper | $55.25 | $3.51 | $58.77 | $3.68 | $0.00 | $2.92 | $10.89 | $9.10 | $0.00 | **$78.76** |
| Alcatel-Lucent | $33.03 | $2.10 | $35.13 | $4.11 | $0.00 | $3.27 | $12.18 | $4.66 | $0.00 | **$51.97** |
| Huawei | $0.05 | $0.00 | $0.06 | $2.10 | $0.00 | $1.67 | $6.23 | $20.31 | $0.00 | **$26.59** |
| Ericsson | $1.46 | $0.09 | $1.56 | $0.66 | $0.00 | $0.52 | $1.96 | $1.16 | $0.00 | **$4.67** |
| Alaxala | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4.65 | $0.00 | **$4.65** |
| Tellabs | $9.07 | $0.58 | $9.65 | $0.77 | $0.00 | $0.61 | $2.27 | $0.99 | $0.00 | **$12.91** |
| HP | $17.01 | $1.08 | $18.09 | $3.50 | $0.00 | $2.78 | $10.37 | $13.44 | $0.00 | **$41.90** |
| Brocade | $7.20 | $0.46 | $7.65 | $0.47 | $0.00 | $0.37 | $1.39 | $2.67 | $0.00 | **$11.72** |
| NEC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3.37 | $0.00 | **$3.37** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.35 | $0.00 | $0.28 | $1.05 | $4.28 | $0.00 | **$5.34** |
| Fujitsu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3.43 | $0.00 | **$3.43** |
| OneAccess | $0.00 | $0.00 | $0.00 | $0.30 | $0.00 | $0.24 | $0.90 | $0.02 | $0.00 | **$0.92** |
| Adtran | $2.00 | $0.13 | $2.13 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$2.13** |
| Avaya | $4.36 | $0.28 | $4.64 | $0.57 | $0.00 | $0.45 | $1.69 | $0.68 | $0.00 | **$7.01** |
| 3Com/H3C | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Avici | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Siemens | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Nortel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Redback | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Vanguard | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Alcatel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| D-Link | $1.30 | $0.08 | $1.38 | $0.80 | $0.00 | $0.64 | $2.38 | $1.61 | $0.00 | **$5.37** |
| Extreme | $2.99 | $0.19 | $3.18 | $0.49 | $0.00 | $0.39 | $1.44 | $0.88 | $0.00 | **$5.50** |
| Enterasys | $2.87 | $0.18 | $3.05 | $0.46 | $0.00 | $0.36 | $1.36 | $0.22 | $0.00 | **$4.62** |
| NETGEAR | $3.18 | $0.20 | $3.38 | $0.33 | $0.00 | $0.26 | $0.98 | $0.46 | $0.00 | **$4.83** |
| Hitachi Cable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1.98 | $0.00 | **$1.98** |
| Force10 | $2.46 | $0.16 | $2.61 | $0.04 | $0.00 | $0.03 | $0.13 | $0.15 | $0.00 | **$2.89** |
| Nokia Siemens | $0.00 | $0.00 | $0.00 | $0.01 | $0.00 | $0.01 | $0.02 | $1.48 | $0.00 | **$1.51** |
| Orckit-Corrigent | $0.01 | $0.00 | $0.01 | $0.03 | $0.00 | $0.02 | $0.08 | $0.16 | $0.00 | **$0.25** |
| Linksys | $0.24 | $0.02 | $0.25 | $0.00 | $0.00 | $0.00 | $0.01 | $0.01 | $0.00 | **$0.27** |
| Blade | $0.89 | $0.06 | $0.94 | $0.09 | $0.00 | $0.07 | $0.28 | $0.25 | $0.00 | **$1.47** |
| LG Ericsson | $2.08 | $0.13 | $2.21 | $0.06 | $0.00 | $0.05 | $0.18 | $0.09 | $0.00 | **$2.48** |
| Other | $17.64 | $1.12 | $18.76 | $2.00 | $0.00 | $1.59 | $5.92 | $7.01 | $0.00 | **$31.68** |
| | | | | | | | | | | |
| Total | $510.91 | $32.45 | $543.36 | $48.28 | $0.00 | $38.35 | $143.06 | $147.13 | $0.00 | **$833.55** |
| | | | | | | | | | | |
| Less: Ericsson, Avaya, Nortel, Hitachi | $505.09 | $32.08 | $537.17 | $47.05 | $0.00 | $37.37 | $139.41 | $143.31 | $0.00 | **$819.88** |

**Notes:**
(1) EMEAPROD02318752



*Nortel - Licensing Model*
**PC - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.6

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Acer | $15.08 | $1.21 | $16.29 | $2.94 | $0.00 | $0.00 | $2.94 | $17.22 | $0.00 | **$36.46** |
| Apple | $27.55 | $2.22 | $29.77 | $5.38 | $0.00 | $0.00 | $5.38 | $31.47 | $0.00 | **$66.62** |
| Asus | $9.01 | $0.73 | $9.73 | $1.76 | $0.00 | $0.00 | $1.76 | $10.29 | $0.00 | **$21.78** |
| Dell | $33.83 | $2.72 | $36.55 | $6.61 | $0.00 | $0.00 | $6.61 | $38.64 | $0.00 | **$81.80** |
| Founder | $0.86 | $0.07 | $0.93 | $0.17 | $0.00 | $0.00 | $0.17 | $0.99 | $0.00 | **$2.09** |
| HP | $35.51 | $2.86 | $38.37 | $6.93 | $0.00 | $0.00 | $6.93 | $40.56 | $0.00 | **$85.86** |
| Lenovo | $23.05 | $1.86 | $24.90 | $4.50 | $0.00 | $0.00 | $4.50 | $26.32 | $0.00 | **$55.72** |
| Tongfang | $0.72 | $0.06 | $0.77 | $0.14 | $0.00 | $0.00 | $0.14 | $0.82 | $0.00 | **$1.73** |
| Toshiba | $13.43 | $1.08 | $14.51 | $2.62 | $0.00 | $0.00 | $2.62 | $15.34 | $0.00 | **$32.47** |
| Total | **$159.04** | **$12.80** | **$171.85** | **$31.05** | **$0.00** | **$0.00** | **$31.05** | **$181.64** | **$0.00** | **$384.54** |

**Notes:**
(1) EMEAPROD02323147, EMEAPROD02323156, EMEAPROD02323148, EMEAPROD02323149,EMEAPROD02323150, EMEAPROD02323151, EMEAPROD02323152, EMEAPROD02323153, and EMEAPROD02323154
(2) EMEAPROD02318770



*Nortel - Licensing Model*

**INTERNET SEARCH - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**

Exhibit 2.1.7

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| AOL | $8.71 | $0.50 | $9.21 | $0.96 | $0.00 | $0.70 | $2.79 | $0.57 | $0.00 | **$12.57** |
| Ask | $9.67 | $0.56 | $10.22 | $1.07 | $0.00 | $0.77 | $3.09 | $0.63 | $0.00 | **$13.95** |
| Google | $299.81 | $17.24 | $317.05 | $33.10 | $0.00 | $23.96 | $95.94 | $19.56 | $0.00 | **$432.56** |
| Microsoft | $32.91 | $1.89 | $34.80 | $3.63 | $0.00 | $2.63 | $10.53 | $2.15 | $0.00 | **$47.48** |
| Yahoo | $20.87 | $1.20 | $22.07 | $2.30 | $0.00 | $1.67 | $6.68 | $1.36 | $0.00 | **$30.11** |
| Total | **$371.97** | **$21.39** | **$393.36** | **$41.07** | **$0.00** | **$29.73** | **$119.03** | **$24.27** | **$0.00** | **$536.67** |
| Less: Microsoft | **$339.06** | **$19.50** | **$358.56** | **$37.44** | **$0.00** | **$27.10** | **$108.50** | **$22.12** | **$0.00** | **$489.18** |

**Notes:**

(1)  EMEAPROD02323155, EMEAPROD02323156, EMEAPROD02323157, EMEAPROD02323158, and EMEAPROD02323159

(2)  EMEAPROD02318770



*Nortel - Licensing Model*
**ENTERPRISE VOICE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.8

| *Millions USD* | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Avaya | $23.6 | $1.5 | $25.1 | $1.5 | $0.0 | $1.2 | $4.5 | $2.0 | $0.0 | **$23.6** |
| Cisco | $25.0 | $1.6 | $26.5 | $1.1 | $0.0 | $0.9 | $3.4 | $1.6 | $0.0 | **$20.8** |
| NEC | $8.4 | $0.5 | $8.9 | $0.5 | $0.0 | $0.4 | $1.3 | $6.2 | $0.0 | **$17.5** |
| Siemens | $0.0 | $0.0 | $0.0 | $1.6 | $0.0 | $1.3 | $4.7 | $1.3 | $0.0 | **$14.0** |
| Alcatel-Lucent | $0.0 | $0.0 | $0.0 | $1.6 | $0.0 | $1.3 | $4.8 | $1.2 | $0.0 | **$12.5** |
| Aastra | $0.0 | $0.0 | $0.0 | $1.4 | $0.0 | $1.1 | $4.3 | $0.0 | $0.0 | **$9.5** |
| Mitel | $6.8 | $0.4 | $7.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | **$5.6** |
| Microsoft | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | **$1.2** |
| Toshiba | $3.5 | $0.2 | $3.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | **$0.0** |
| Others | $19.5 | $1.2 | $20.7 | $1.2 | $0.0 | $0.9 | $3.4 | $9.9 | $0.0 | **$32.4** |
| Total | **$86.68** | **$5.50** | **$92.16** | **$8.92** | **$0.00** | **$7.09** | **$26.45** | **$22.20** | **$0.00** | **$137.10** |
| Less: Avaya and Microsoft (3) | **$63.10** | **$4.00** | **$67.09** | **$7.41** | **$0.00** | **$5.88** | **$21.95** | **$20.20** | **$0.00** | **$112.29** |

**Notes:**
(1)  EMEAPROD02323788
(2)  EMEAPROD02318770



*Nortel - Licensing Model*
**CARRIER VOICE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS WITH CHINA**
Exhibit 2.1.9

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Acme Packet | - | - | - | - | - | - | - | - | - | $2.93 |
| Alcatel-Lucent | $0.90 | $0.06 | $0.96 | $0.07 | $0.00 | $0.05 | $0.20 | $1.38 | $0.00 | $2.81 |
| AudioCodes | $1.51 | $0.10 | $1.60 | $0.10 | $0.00 | $0.08 | $0.30 | $0.28 | $0.00 | $1.40 |
| Cisco | $1.56 | $0.10 | $1.66 | $0.05 | $0.00 | $0.04 | $0.14 | $0.07 | $0.00 | $1.06 |
| Comverse NetCentrex | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.01 | $0.01 | $0.00 | $0.03 |
| Dialogic | $0.12 | $0.01 | $0.13 | $0.04 | $0.00 | $0.03 | $0.11 | $0.11 | $0.00 | $0.38 |
| Ericsson | $0.16 | $0.01 | $0.17 | $0.09 | $0.00 | $0.07 | $0.27 | $0.25 | $0.00 | $1.35 |
| GENBAND | $9.20 | $0.58 | $9.78 | $0.34 | $0.00 | $0.27 | $1.00 | $0.92 | $0.00 | $6.67 |
| Huawei | $0.00 | $0.00 | $0.00 | $0.30 | $0.00 | $0.24 | $0.89 | $2.56 | $0.00 | $5.47 |
| Italtel | $0.00 | $0.00 | $0.00 | $0.24 | $0.00 | $0.19 | $0.71 | $0.00 | $0.00 | $1.08 |
| Metaswitch | $3.90 | $0.25 | $4.15 | $0.01 | $0.00 | $0.01 | $0.03 | $0.01 | $0.00 | $1.77 |
| Nokia Siemens Networks | $0.09 | $0.01 | $0.09 | $0.11 | $0.00 | $0.09 | $0.34 | $1.60 | $0.00 | $2.64 |
| Nortel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Sonus | $3.71 | $0.24 | $3.94 | $0.06 | $0.00 | $0.05 | $0.19 | $0.28 | $0.00 | $2.50 |
| Technicolor | $0.00 | $0.00 | $0.00 | $0.06 | $0.00 | $0.05 | $0.19 | $0.00 | $0.00 | $0.41 |
| UTStarcom | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.08 | $0.00 | $0.06 |
| Veraz | $0.04 | $0.00 | $0.05 | $0.02 | $0.00 | $0.01 | $0.05 | $0.09 | $0.00 | $0.18 |
| Xener | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.26 | $0.00 | $0.20 |
| ZTE | $0.02 | $0.00 | $0.02 | $0.13 | $0.00 | $0.11 | $0.40 | $0.81 | $0.00 | $1.77 |
| Other | $1.04 | $0.07 | $1.11 | $0.13 | $0.00 | $0.11 | $0.39 | $0.67 | $0.00 | $3.53 |
| Total | $22.26 | $1.42 | $23.67 | $1.76 | $0.00 | $1.40 | $5.22 | $9.39 | $0.00 | $38.28 |
| Less: Ericsson and Nortel (4) | $22.10 | $1.40 | $23.50 | $1.67 | $0.00 | $1.33 | $4.95 | $9.14 | $0.00 | $36.93 |

**Notes:**
(1) EMEAPROD02318769
(2) EMEAPROD02318770
(3) Regional revenues for Acme Packet unavailable, value attributable to company allocated on a global basis only
(4) Values excluded to account for existing license to Residual Patent Portfolio



*Nortel - Licensing Model*
**ALLOCATION OF RESIDUAL SALE PROCEEDS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.0

*Millions USD*

| Allocation of $4.5 Billion | License (2) | Contribution Lookback Periods (3) | | | |
|---|---|---|---|---|---|
| | | 1991-2006 | 1991-2008 | 2001-2006 | 2001-2008 |
| US Debtors (4) | $3,372.6 | $1,931.9 | $1,919.7 | $1,735.6 | $1,750.1 |
| Canada Debtors (5) | $275.7 | $1,778.4 | $1,831.1 | $1,937.1 | $2,023.0 |
| United Kingdom Debtors | $453.7 | $389.4 | $362.5 | $283.7 | $245.3 |
| Ireland Debtors | $68.2 | $43.4 | $45.8 | $33.2 | $40.9 |
| France Debtors | $313.3 | $340.4 | $324.3 | $493.8 | $424.1 |
| NN SAS (6) | $15.6 | $15.6 | $15.6 | $15.6 | $15.6 |
| NN GmbH (7) | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 |
| Total | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 |
| | | | | | |
| US Debtors | $3,372.6 | $1,931.9 | $1,919.7 | $1,735.6 | $1,750.1 |
| Canada Debtors | $275.7 | $1,778.4 | $1,831.1 | $1,937.1 | $2,023.0 |
| EMEA Debtors | $851.8 | $789.7 | $749.2 | $827.3 | $726.9 |
| Total | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 | $4,500.0 |
| | | | | | |
| US Debtors (4) | 74.9% | 42.9% | 42.7% | 38.6% | 38.9% |
| Canada Debtors (5) | 6.1% | 39.5% | 40.7% | 43.0% | 45.0% |
| United Kingdom Debtors | 10.1% | 8.7% | 8.1% | 6.3% | 5.5% |
| Ireland Debtors | 1.5% | 1.0% | 1.0% | 0.7% | 0.9% |
| France Debtors | 7.0% | 7.6% | 7.2% | 11.0% | 9.4% |
| NN SAS (6) | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| NN GmbH (7) | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | |
| US Debtors | 74.9% | 42.9% | 42.7% | 38.6% | 38.9% |
| Canada Debtors | 6.1% | 39.5% | 40.7% | 43.0% | 45.0% |
| EMEA Debtors | 18.9% | 17.5% | 16.6% | 18.4% | 16.2% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**Notes:**
(1) Based upon NPV of all non-RPE territories allocated 20 percent each to the RPE entities, as per my previous methodology
(2) Total allocated value is equal to the Residual Patent sale proceeds of $4.5B less $42.85M (the values attributable to the patents held by
    CoreTek, Xros, Nortel Networks Application Management, Nortel GmbH and Nortel Networks France SAS)
(3) Reflects allocation of $4,462.14 according to historical R&D spend with various lookback periods; as per my previous methodology
(4) Value allocated to the US includes approximately $0.00 million related to assets owned by subsidiaries not parties to the MRDA
(5) Value allocated to Canada includes approximately $21.31 million related to assets owned by subsidiaries not parties to the MRDA
(6) Value allocated to NN SAS includes approximately $15.63 million related to assets owned by subsidiaries not parties to the MRDA
(7) Value allocated to NN GmbH includes approximately $0.93 million related to assets owned by subsidiaries not parties to the MRDA



*Nortel - Licensing Model*
**SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.1

*Millions USD*

| Franchise | US | Canada | North America | UK | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Smartphones (1) | $247.32 | $2.67 | $249.99 | $34.35 | $0.00 | $23.34 | $77.65 | $0.00 | $0.00 | $327.64 |
| Wireless Infrastructure (2) | $272.02 | $17.26 | $289.28 | $28.24 | $0.00 | $22.42 | $83.68 | $0.00 | $0.00 | $372.90 |
| Optical (3) | $87.81 | $5.58 | $93.39 | $10.03 | $0.00 | $7.97 | $29.72 | $0.00 | $0.00 | $121.51 |
| Data Networking (4) | $510.91 | $32.45 | $543.36 | $48.28 | $0.00 | $38.35 | $143.06 | $0.00 | $0.00 | $686.42 |
| PC (5) | $159.04 | $12.80 | $171.85 | $31.05 | $0.00 | $0.00 | $31.05 | $0.00 | $0.00 | $202.90 |
| Internet (6) | $339.06 | $19.50 | $358.56 | $37.44 | $0.00 | $27.10 | $108.50 | $0.00 | $0.00 | $467.06 |
| Enterprise Voice (7) | $63.10 | $4.00 | $67.09 | $7.41 | $0.00 | $5.88 | $21.95 | $0.00 | $0.00 | $94.11 |
| Carrier Voice (8) | $22.10 | $1.40 | $23.50 | $1.67 | $0.00 | $1.33 | $4.95 | $0.00 | $0.00 | $27.88 |
| Other (9) | $18.86 | $1.06 | $19.92 | $2.20 | $0.00 | $1.40 | $5.55 | $0.00 | $0.00 | $25.47 |
| TOTAL | $1,720.22 | $96.72 | $1,816.92 | $200.67 | $0.00 | $127.79 | $506.11 | $0.00 | $0.00 | $2,325.88 |

**Notes:**
(1)  Exhibit 2.2.2
(2)  Exhibit 2.2.3
(3)  Exhibit 2.2.4
(4)  Exhibit 2.2.5
(5)  Exhibit 2.2.6
(6)  Exhibit 2.2.7
(7)  Exhibit 2.2.8
(8)  Exhibit 2.2.9
(9)  Values based upon 255 high-interest "Other" patents valued at $100K each, allocated according to the regional allocations of all other franchises



*Nortel - Licensing Model*
**SMART PHONES - SUMMARY OF VALUATION ANALYSIS  - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.2

*Millions USD*

| Market Participant | US | Canada | North America | UK | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Apple | $78.96 | $0.85 | $79.81 | $11.09 | $0.00 | $7.53 | $25.07 | $0.00 | $0.00 | **$102.34** |
| HTC | $25.72 | $0.28 | $26.00 | $3.55 | $0.00 | $2.41 | $8.03 | $0.00 | $0.00 | **$34.38** |
| LG | $3.49 | $0.04 | $3.52 | $0.48 | $0.00 | $0.33 | $1.09 | $0.00 | $0.00 | **$4.65** |
| Motorola | $11.04 | $0.12 | $11.16 | $1.52 | $0.00 | $1.04 | $3.45 | $0.00 | $0.00 | **$14.74** |
| Nokia | $47.70 | $0.51 | $48.21 | $6.61 | $0.00 | $4.49 | $14.93 | $0.00 | $0.00 | **$64.04** |
| RIM | $36.17 | $0.39 | $36.57 | $5.01 | $0.00 | $3.40 | $11.31 | $0.00 | $0.00 | **$48.54** |
| Samsung | $19.18 | $0.21 | $19.39 | $2.64 | $0.00 | $1.80 | $5.97 | $0.00 | $0.00 | **$25.54** |
| Sony Ericsson | $10.33 | $0.11 | $10.44 | $1.42 | $0.00 | $0.97 | $3.21 | $0.00 | $0.00 | **$13.71** |
| Other | $14.74 | $0.16 | $14.90 | $2.03 | $0.00 | $1.38 | $4.60 | $0.00 | $0.00 | **$19.70** |
| Total | **$247.32** | **$2.67** | **$249.99** | **$34.35** | **$0.00** | **$23.34** | **$77.65** | **$0.00** | **$0.00** | **$327.64** |

**Notes:**
(1) EMEAPROD02318767
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**WIRELESS INFRASTRUCTURE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.3

Page 1 of 2

*Millions USD*

| Market Participant - 2G/3G ex HLR | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Ericsson | $148.10 | $9.38 | $157.47 | $15.02 | $0.00 | $11.93 | $44.52 | $0.00 | $0.00 | **$202.00** |
| Nokia Siemens Networks | $65.79 | $4.17 | $69.96 | $6.67 | $0.00 | $5.30 | $19.78 | $0.00 | $0.00 | **$89.74** |
| Alcatel-Lucent | $42.43 | $2.69 | $45.11 | $4.30 | $0.00 | $3.42 | $12.76 | $0.00 | $0.00 | **$57.87** |
| Huawei | $45.08 | $2.85 | $47.94 | $4.57 | $0.00 | $3.63 | $13.55 | $0.00 | $0.00 | **$61.49** |
| ZTE | $10.67 | $0.68 | $11.35 | $1.08 | $0.00 | $0.86 | $3.21 | $0.00 | $0.00 | **$14.56** |
| Motorola | $10.69 | $0.68 | $11.37 | $1.08 | $0.00 | $0.86 | $3.21 | $0.00 | $0.00 | **$14.59** |
| Cisco | $3.38 | $0.21 | $3.59 | $0.34 | $0.00 | $0.27 | $1.01 | $0.00 | $0.00 | **$4.60** |
| GENBAND | $0.48 | $0.03 | $0.51 | $0.05 | $0.00 | $0.04 | $0.14 | $0.00 | $0.00 | **$0.66** |
| Datang Mobile | $0.08 | $0.01 | $0.09 | $0.01 | $0.00 | $0.01 | $0.03 | $0.00 | $0.00 | **$0.11** |
| UTStarcom | $0.03 | $0.00 | $0.03 | $0.00 | $0.00 | $0.00 | $0.01 | $0.00 | $0.00 | **$0.04** |
| Other | $20.51 | $1.30 | $21.81 | $2.08 | $0.00 | $1.65 | $6.17 | $0.00 | $0.00 | **$27.98** |
| Total | **$347.25** | **$21.99** | **$369.24** | **$35.22** | **$0.00** | **$27.96** | **$104.39** | **$0.00** | **$0.00** | **$473.63** |
| Less: Ericsson & Genband | **$198.67** | **$12.58** | **$211.25** | **$20.15** | **$0.00** | **$16.00** | **$59.73** | **$0.00** | **$0.00** | **$270.98** |

| Market Participant - 2G/3G HLR | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Ericsson | $0.30 | $0.02 | $0.32 | $0.15 | $0.00 | $0.12 | $0.46 | $0.00 | $0.00 | **$0.83** |
| Nokia Siemens Networks | $0.12 | $0.01 | $0.13 | $0.14 | $0.00 | $0.11 | $0.40 | $0.00 | $0.00 | **$0.61** |
| Alcatel-Lucent | $0.20 | $0.01 | $0.21 | $0.10 | $0.00 | $0.08 | $0.29 | $0.00 | $0.00 | **$0.55** |
| Huawei | $0.01 | $0.00 | $0.01 | $0.23 | $0.00 | $0.18 | $0.68 | $0.00 | $0.00 | **$0.56** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.04 | $0.00 | $0.03 | $0.11 | $0.00 | $0.00 | **$0.21** |
| Motorola | $0.10 | $0.01 | $0.11 | $0.01 | $0.00 | $0.01 | $0.02 | $0.00 | $0.00 | **$0.09** |
| HP | $0.31 | $0.02 | $0.33 | $0.06 | $0.00 | $0.05 | $0.17 | $0.00 | $0.00 | **$0.33** |
| Apertio | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Other | $0.15 | $0.01 | $0.16 | $0.02 | $0.00 | $0.02 | $0.07 | $0.00 | $0.00 | **$0.28** |
| Total | **$1.19** | **$0.08** | **$1.27** | **$0.74** | **$0.00** | **$0.59** | **$2.19** | **$0.00** | **$0.00** | **$3.46** |
| Less: Ericsson | **$0.89** | **$0.06** | **$0.95** | **$0.59** | **$0.00** | **$0.47** | **$1.74** | **$0.00** | **$0.00** | **$2.63** |

**Notes:**
(1) EMEAPROD02318768
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**WIRELESS INFRASTRUCTURE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.3

Page 2 of 2

*Millions USD*

| Market Participant - LTE | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Ericsson | $29.66 | $1.89 | $31.56 | $2.91 | $0.00 | $2.31 | $8.63 | $0.00 | $0.00 | **$40.19** |
| Nokia Siemens Networks | $13.84 | $0.88 | $14.73 | $1.36 | $0.00 | $1.08 | $4.03 | $0.00 | $0.00 | **$18.75** |
| Alcatel-Lucent | $23.17 | $1.48 | $24.65 | $2.27 | $0.00 | $1.81 | $6.74 | $0.00 | $0.00 | **$31.38** |
| Huawei | $5.09 | $0.32 | $5.41 | $0.50 | $0.00 | $0.40 | $1.48 | $0.00 | $0.00 | **$6.89** |
| ZTE | $2.40 | $0.15 | $2.55 | $0.24 | $0.00 | $0.19 | $0.70 | $0.00 | $0.00 | **$3.25** |
| Motorola | $2.23 | $0.14 | $2.37 | $0.22 | $0.00 | $0.17 | $0.65 | $0.00 | $0.00 | **$3.02** |
| Cisco | $0.99 | $0.06 | $1.05 | $0.10 | $0.00 | $0.08 | $0.29 | $0.00 | $0.00 | **$1.34** |
| NEC | $7.63 | $0.49 | $8.12 | $0.75 | $0.00 | $0.60 | $2.22 | $0.00 | $0.00 | **$10.33** |
| Fujitsu | $5.44 | $0.35 | $5.79 | $0.53 | $0.00 | $0.42 | $1.58 | $0.00 | $0.00 | **$7.37** |
| Other | $4.79 | $0.31 | $5.09 | $0.47 | $0.00 | $0.37 | $1.39 | $0.00 | $0.00 | **$6.48** |
| Total | **$95.24** | **$6.08** | **$101.32** | **$9.35** | **$0.00** | **$7.43** | **$27.69** | **$0.00** | **$0.00** | **$129.01** |
| Less: Ericsson | **$65.57** | **$4.19** | **$69.76** | **$6.44** | **$0.00** | **$5.12** | **$19.07** | **$0.00** | **$0.00** | **$88.83** |

| Market Participant - WiMAX | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Huawei | $1.67 | $0.11 | $1.77 | $0.17 | $0.00 | $0.14 | $0.52 | $0.00 | $0.00 | **$2.33** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.11 | $0.00 | $0.09 | $0.34 | $0.00 | $0.00 | **$0.29** |
| Motorola | $0.86 | $0.05 | $0.92 | $0.07 | $0.00 | $0.05 | $0.20 | $0.00 | $0.00 | **$1.14** |
| Samsung | $2.76 | $0.17 | $2.94 | $0.40 | $0.00 | $0.32 | $1.19 | $0.00 | $0.00 | **$4.14** |
| Cisco | $0.02 | $0.00 | $0.02 | $0.01 | $0.00 | $0.00 | $0.02 | $0.00 | $0.00 | **$0.03** |
| Alvarion | $0.77 | $0.05 | $0.82 | $0.15 | $0.00 | $0.12 | $0.46 | $0.00 | $0.00 | **$1.26** |
| Aviat Networks (Harris-Stratex) | $0.00 | $0.00 | $0.00 | $0.05 | $0.00 | $0.04 | $0.14 | $0.00 | $0.00 | **$0.12** |
| Airspan | $0.19 | $0.01 | $0.20 | $0.01 | $0.00 | $0.01 | $0.03 | $0.00 | $0.00 | **$0.24** |
| NEC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Redline Communications | $0.16 | $0.01 | $0.17 | $0.02 | $0.00 | $0.02 | $0.06 | $0.00 | $0.00 | **$0.23** |
| Proxim | $0.12 | $0.01 | $0.12 | $0.02 | $0.00 | $0.01 | $0.05 | $0.00 | $0.00 | **$0.17** |
| Tellabs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Other | $0.34 | $0.02 | $0.36 | $0.06 | $0.00 | $0.04 | $0.17 | $0.00 | $0.00 | **$0.53** |
| Total | **$6.88** | **$0.43** | **$7.32** | **$1.06** | **$0.00** | **$0.84** | **$3.15** | **$0.00** | **$0.00** | **$10.47** |
| Less: None | **$6.88** | **$0.43** | **$7.32** | **$1.06** | **$0.00** | **$0.84** | **$3.15** | **$0.00** | **$0.00** | **$10.47** |

**Notes:**
(1) EMEAPROD02318768
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**OPTICAL NETWORK & HARDWARE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.4

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Alcatel-Lucent | $13.92 | $0.88 | $14.80 | $3.34 | $0.00 | $2.65 | $9.90 | $0.00 | $0.00 | **$25.35** |
| Huawei | $1.12 | $0.07 | $1.19 | $2.05 | $0.00 | $1.63 | $6.07 | $0.00 | $0.00 | **$25.15** |
| Ciena | $15.34 | $0.97 | $16.32 | $0.78 | $0.00 | $0.62 | $2.31 | $0.00 | $0.00 | **$10.70** |
| Fujitsu | $18.79 | $1.19 | $19.99 | $0.05 | $0.00 | $0.04 | $0.16 | $0.00 | $0.00 | **$9.86** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.39 | $0.00 | $0.31 | $1.15 | $0.00 | $0.00 | **$9.32** |
| NEC | $0.26 | $0.02 | $0.28 | $0.12 | $0.00 | $0.10 | $0.36 | $0.00 | $0.00 | **$5.01** |
| Nokia Siemens | $2.22 | $0.14 | $2.36 | $1.14 | $0.00 | $0.91 | $3.39 | $0.00 | $0.00 | **$5.86** |
| Cisco | $9.95 | $0.63 | $10.58 | $0.31 | $0.00 | $0.25 | $0.93 | $0.00 | $0.00 | **$6.17** |
| ECI | $0.27 | $0.02 | $0.29 | $0.52 | $0.00 | $0.41 | $1.53 | $0.00 | $0.00 | **$3.88** |
| Tellabs | $10.51 | $0.67 | $11.18 | $0.15 | $0.00 | $0.12 | $0.45 | $0.00 | $0.00 | **$5.65** |
| Ericsson | $0.00 | $0.00 | $0.00 | $0.68 | $0.00 | $0.54 | $2.01 | $0.00 | $0.00 | **$3.61** |
| Infinera | $6.56 | $0.42 | $6.97 | $0.21 | $0.00 | $0.17 | $0.62 | $0.00 | $0.00 | **$3.80** |
| ADVA | $2.27 | $0.14 | $2.42 | $0.37 | $0.00 | $0.29 | $1.09 | $0.00 | $0.00 | **$2.41** |
| Transmode | $0.29 | $0.02 | $0.31 | $0.23 | $0.00 | $0.19 | $0.69 | $0.00 | $0.00 | **$0.97** |
| Tyco Telecom | $0.89 | $0.06 | $0.95 | $0.08 | $0.00 | $0.07 | $0.25 | $0.00 | $0.00 | **$0.97** |
| Adtran | $1.68 | $0.11 | $1.79 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.73** |
| Sycamore | $0.42 | $0.03 | $0.45 | $0.02 | $0.00 | $0.01 | $0.05 | $0.00 | $0.00 | **$0.30** |
| Nortel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Other | $3.31 | $0.21 | $3.52 | $0.26 | $0.00 | $0.21 | $0.77 | $0.00 | $0.00 | **$5.40** |
| | | | | | | | | | | |
| Total | **$87.81** | **$5.58** | **$93.39** | **$10.71** | **$0.00** | **$8.51** | **$31.73** | **$0.00** | **$0.00** | **$125.12** |
| | | | | | | | | | | |
| Less: Ericsson and Nortel | **$87.81** | **$5.58** | **$93.39** | **$10.03** | **$0.00** | **$7.97** | **$29.72** | **$0.00** | **$0.00** | **$121.51** |

**Notes:**
(1) EMEAPROD02318751
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**DATA NETWORKING - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.5

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Cisco | $347.82 | $22.09 | $369.91 | $27.45 | $0.00 | $21.81 | $81.35 | $0.00 | $0.00 | **$451.27** |
| Juniper | $55.25 | $3.51 | $58.77 | $3.68 | $0.00 | $2.92 | $10.89 | $0.00 | $0.00 | **$69.66** |
| Alcatel-Lucent | $33.03 | $2.10 | $35.13 | $4.11 | $0.00 | $3.27 | $12.18 | $0.00 | $0.00 | **$47.31** |
| Huawei | $0.05 | $0.00 | $0.06 | $2.10 | $0.00 | $1.67 | $6.23 | $0.00 | $0.00 | **$6.28** |
| Ericsson | $1.46 | $0.09 | $1.56 | $0.66 | $0.00 | $0.52 | $1.96 | $0.00 | $0.00 | **$3.51** |
| Alaxala | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Tellabs | $9.07 | $0.58 | $9.65 | $0.77 | $0.00 | $0.61 | $2.27 | $0.00 | $0.00 | **$11.92** |
| HP | $17.01 | $1.08 | $18.09 | $3.50 | $0.00 | $2.78 | $10.37 | $0.00 | $0.00 | **$28.46** |
| Brocade | $7.20 | $0.46 | $7.65 | $0.47 | $0.00 | $0.37 | $1.39 | $0.00 | $0.00 | **$9.05** |
| NEC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| ZTE | $0.00 | $0.00 | $0.00 | $0.35 | $0.00 | $0.28 | $1.05 | $0.00 | $0.00 | **$1.05** |
| Fujitsu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| OneAccess | $0.00 | $0.00 | $0.00 | $0.30 | $0.00 | $0.24 | $0.90 | $0.00 | $0.00 | **$0.90** |
| Adtran | $2.00 | $0.13 | $2.13 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$2.13** |
| Avaya | $4.36 | $0.28 | $4.64 | $0.57 | $0.00 | $0.45 | $1.69 | $0.00 | $0.00 | **$6.33** |
| 3Com/H3C | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Avici | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Siemens | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Nortel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Redback | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Vanguard | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Alcatel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| D-Link | $1.30 | $0.08 | $1.38 | $0.80 | $0.00 | $0.64 | $2.38 | $0.00 | $0.00 | **$3.76** |
| Extreme | $2.99 | $0.19 | $3.18 | $0.49 | $0.00 | $0.39 | $1.44 | $0.00 | $0.00 | **$4.62** |
| Enterasys | $2.87 | $0.18 | $3.05 | $0.46 | $0.00 | $0.36 | $1.36 | $0.00 | $0.00 | **$4.41** |
| NETGEAR | $3.18 | $0.20 | $3.38 | $0.33 | $0.00 | $0.26 | $0.98 | $0.00 | $0.00 | **$4.37** |
| Hitachi Cable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Force10 | $2.46 | $0.16 | $2.61 | $0.04 | $0.00 | $0.03 | $0.13 | $0.00 | $0.00 | **$2.74** |
| Nokia Siemens | $0.00 | $0.00 | $0.00 | $0.01 | $0.00 | $0.01 | $0.02 | $0.00 | $0.00 | **$0.02** |
| Orckit-Corrigent | $0.01 | $0.00 | $0.01 | $0.03 | $0.00 | $0.02 | $0.08 | $0.00 | $0.00 | **$0.09** |
| Linksys | $0.24 | $0.02 | $0.25 | $0.00 | $0.00 | $0.00 | $0.01 | $0.00 | $0.00 | **$0.26** |
| Blade | $0.89 | $0.06 | $0.94 | $0.09 | $0.00 | $0.07 | $0.28 | $0.00 | $0.00 | **$1.22** |
| LG Ericsson | $2.08 | $0.13 | $2.21 | $0.06 | $0.00 | $0.05 | $0.18 | $0.00 | $0.00 | **$2.39** |
| Other | $17.64 | $1.12 | $18.76 | $2.00 | $0.00 | $1.59 | $5.92 | $0.00 | $0.00 | **$24.67** |
| Total | **$510.91** | **$32.45** | **$543.36** | **$48.28** | **$0.00** | **$38.35** | **$143.06** | **$0.00** | **$0.00** | **$686.42** |
| Less: Ericsson, Avaya, Nortel, Hitachi | **$505.09** | **$32.08** | **$537.17** | **$47.05** | **$0.00** | **$37.37** | **$139.41** | **$0.00** | **$0.00** | **$676.57** |

**Notes:**
(1) EMEAPROD02318752



*Nortel - Licensing Model*
**PC - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.6

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Acer | $15.08 | $1.21 | $16.29 | $2.94 | $0.00 | $0.00 | $2.94 | $0.00 | $0.00 | **$19.24** |
| Apple | $27.55 | $2.22 | $29.77 | $5.38 | $0.00 | $0.00 | $5.38 | $0.00 | $0.00 | **$35.15** |
| Asus | $9.01 | $0.73 | $9.73 | $1.76 | $0.00 | $0.00 | $1.76 | $0.00 | $0.00 | **$11.49** |
| Dell | $33.83 | $2.72 | $36.55 | $6.61 | $0.00 | $0.00 | $6.61 | $0.00 | $0.00 | **$43.16** |
| Founder | $0.86 | $0.07 | $0.93 | $0.17 | $0.00 | $0.00 | $0.17 | $0.00 | $0.00 | **$1.10** |
| HP | $35.51 | $2.86 | $38.37 | $6.93 | $0.00 | $0.00 | $6.93 | $0.00 | $0.00 | **$45.31** |
| Lenovo | $23.05 | $1.86 | $24.90 | $4.50 | $0.00 | $0.00 | $4.50 | $0.00 | $0.00 | **$29.40** |
| Tongfang | $0.72 | $0.06 | $0.77 | $0.14 | $0.00 | $0.00 | $0.14 | $0.00 | $0.00 | **$0.91** |
| Toshiba | $13.43 | $1.08 | $14.51 | $2.62 | $0.00 | $0.00 | $2.62 | $0.00 | $0.00 | **$17.13** |
| Total | **$159.04** | **$12.80** | **$171.85** | **$31.05** | **$0.00** | **$0.00** | **$31.05** | **$0.00** | **$0.00** | **$202.90** |

**Notes:**
(1) EMEAPROD02323147, EMEAPROD02323156, EMEAPROD02323148, EMEAPROD02323149,EMEAPROD02323150, EMEAPROD02323151, EMEAPROD02323152, EMEAPROD02323153, and EMEAPROD02323154
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**INTERNET SEARCH - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.7

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| AOL | $8.71 | $0.50 | $9.21 | $0.96 | $0.00 | $0.70 | $2.79 | $0.00 | $0.00 | **$12.00** |
| Ask | $9.67 | $0.56 | $10.22 | $1.07 | $0.00 | $0.77 | $3.09 | $0.00 | $0.00 | **$13.32** |
| Google | $299.81 | $17.24 | $317.05 | $33.10 | $0.00 | $23.96 | $95.94 | $0.00 | $0.00 | **$413.00** |
| Microsoft | $32.91 | $1.89 | $34.80 | $3.63 | $0.00 | $2.63 | $10.53 | $0.00 | $0.00 | **$45.34** |
| Yahoo | $20.87 | $1.20 | $22.07 | $2.30 | $0.00 | $1.67 | $6.68 | $0.00 | $0.00 | **$28.75** |
| Total | **$371.97** | **$21.39** | **$393.36** | **$41.07** | **$0.00** | **$29.73** | **$119.03** | **$0.00** | **$0.00** | **$512.39** |
| Less: Microsoft | **$339.06** | **$19.50** | **$358.56** | **$37.44** | **$0.00** | **$27.10** | **$108.50** | **$0.00** | **$0.00** | **$467.06** |

**Notes:**
(1) EMEAPROD02323155, EMEAPROD02323156, EMEAPROD02323157, EMEAPROD02323158, and EMEAPROD02323159
(2) EMEAPROD02318770



*Nortel - Licensing Model*
**ENTERPRISE VOICE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.8

| *Millions USD* | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Avaya | $23.6 | $1.5 | $25.1 | $1.5 | $0.0 | $1.2 | $4.5 | $0.0 | $0.0 | **$19.8** |
| Cisco | $25.0 | $1.6 | $26.5 | $1.1 | $0.0 | $0.9 | $3.4 | $0.0 | $0.0 | **$17.5** |
| NEC | $8.4 | $0.5 | $8.9 | $0.5 | $0.0 | $0.4 | $1.3 | $0.0 | $0.0 | **$14.7** |
| Siemens | $0.0 | $0.0 | $0.0 | $1.6 | $0.0 | $1.3 | $4.7 | $0.0 | $0.0 | **$11.7** |
| Alcatel-Lucent | $0.0 | $0.0 | $0.0 | $1.6 | $0.0 | $1.3 | $4.8 | $0.0 | $0.0 | **$10.5** |
| Aastra | $0.0 | $0.0 | $0.0 | $1.4 | $0.0 | $1.1 | $4.3 | $0.0 | $0.0 | **$7.9** |
| Mitel | $6.8 | $0.4 | $7.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | **$4.7** |
| Microsoft | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | **$1.0** |
| Toshiba | $3.5 | $0.2 | $3.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | **$0.0** |
| Others | $19.5 | $1.2 | $20.7 | $1.2 | $0.0 | $0.9 | $3.4 | $0.0 | $0.0 | **$27.1** |
| | | | | | | | | | | |
| Total | **$86.68** | **$5.50** | **$92.16** | **$8.92** | **$0.00** | **$7.09** | **$26.45** | **$0.00** | **$0.00** | **$114.91** |
| | | | | | | | | | | |
| Less: Avaya and Microsoft (3) | **$63.10** | **$4.00** | **$67.09** | **$7.41** | **$0.00** | **$5.88** | **$21.95** | **$0.00** | **$0.00** | **$94.11** |

**Notes:**
(1)  EMEAPROD02323788
(2)  EMEAPROD02318770



*Nortel - Licensing Model*
**CARRIER VOICE - SUMMARY OF VALUATION ANALYSIS - KINRICH JURISDICTIONS EX CHINA**
Exhibit 2.2.9

*Millions USD*

| Market Participant | United States | Canada | North America | United Kingdom | Ireland | France | EMEA | APAC | CALA | Worldwide |
|---|---|---|---|---|---|---|---|---|---|---|
| Acme Packet | - | - | - | - | - | - | - | - | - | $2.21 |
| Alcatel-Lucent | $0.90 | $0.06 | $0.96 | $0.07 | $0.00 | $0.05 | $0.20 | $0.00 | $0.00 | $2.12 |
| AudioCodes | $1.51 | $0.10 | $1.60 | $0.10 | $0.00 | $0.08 | $0.30 | $0.00 | $0.00 | $1.06 |
| Cisco | $1.56 | $0.10 | $1.66 | $0.05 | $0.00 | $0.04 | $0.14 | $0.00 | $0.00 | $0.80 |
| Comverse NetCentrex | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.01 | $0.00 | $0.00 | $0.02 |
| Dialogic | $0.12 | $0.01 | $0.13 | $0.04 | $0.00 | $0.03 | $0.11 | $0.00 | $0.00 | $0.29 |
| Ericsson | $0.16 | $0.01 | $0.17 | $0.09 | $0.00 | $0.07 | $0.27 | $0.00 | $0.00 | $1.02 |
| GENBAND | $9.20 | $0.58 | $9.78 | $0.34 | $0.00 | $0.27 | $1.00 | $0.00 | $0.00 | $5.03 |
| Huawei | $0.00 | $0.00 | $0.00 | $0.30 | $0.00 | $0.24 | $0.89 | $0.00 | $0.00 | $4.13 |
| Italtel | $0.00 | $0.00 | $0.00 | $0.24 | $0.00 | $0.19 | $0.71 | $0.00 | $0.00 | $0.81 |
| Metaswitch | $3.90 | $0.25 | $4.15 | $0.01 | $0.00 | $0.01 | $0.03 | $0.00 | $0.00 | $1.34 |
| Nokia Siemens Networks | $0.09 | $0.01 | $0.09 | $0.11 | $0.00 | $0.09 | $0.34 | $0.00 | $0.00 | $1.99 |
| Nortel | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Sonus | $3.71 | $0.24 | $3.94 | $0.06 | $0.00 | $0.05 | $0.19 | $0.00 | $0.00 | $1.88 |
| Technicolor | $0.00 | $0.00 | $0.00 | $0.06 | $0.00 | $0.05 | $0.19 | $0.00 | $0.00 | $0.31 |
| UTStarcom | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.05 |
| Veraz | $0.04 | $0.00 | $0.05 | $0.02 | $0.00 | $0.01 | $0.05 | $0.00 | $0.00 | $0.14 |
| Xener | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.15 |
| ZTE | $0.02 | $0.00 | $0.02 | $0.13 | $0.00 | $0.11 | $0.40 | $0.00 | $0.00 | $1.34 |
| Other | $1.04 | $0.07 | $1.11 | $0.13 | $0.00 | $0.11 | $0.39 | $0.00 | $0.00 | $2.66 |
| | | | | | | | | | | |
| Total | $22.26 | $1.42 | $23.67 | $1.76 | $0.00 | $1.40 | $5.22 | $0.00 | $0.00 | $28.89 |
| | | | | | | | | | | |
| Less: Ericsson and Nortel (4) | $22.10 | $1.40 | $23.50 | $1.67 | $0.00 | $1.33 | $4.95 | $0.00 | $0.00 | $27.88 |

**Notes:**
(1) EMEAPROD02318769
(2) EMEAPROD02318770
(3) Regional revenues for Acme Packet unavailable, value attributable to company allocated on a global basis only
(4) Values excluded to account for existing license to Residual Patent Portfolio

