

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, C. C-36, AS AMENDED**
**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION APPLICATION UNDER THE COMPANIES' CREDITORS**
**ARRANGEMENT ACT, R.S.C. 1985, C. C-36, AS AMENDED ("CCAA")**

-and-

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*,<br>Debtors. | Case No. 09-10138 (KG)<br>(Jointly Administered) |

**AFFIDAVIT OF PETER NEWCOMBE**
**(AFFIRMED APRIL 11, 2014)**

REDACTED VERSION

I, **PETER NEWCOMBE**, of 23 Park Avenue South, London, N8 8LU, United Kingdom
**MAKE OATH AND SAY**:

1.       I have previously sworn an affidavit dated November 25, 2010 for the purposes of giving evidence to the Canadian Court in relation to the proof of claim which was submitted by Nortel Networks UK Pension Trust Limited (the Trustee of the Nortel Networks UK Pension Plan) and the Board of the Pension Protection Fund.

2.       I was deposed as a fact witness in connection with these proceedings on October 2, 2013 at the offices of Herbert Smith Freehills LLP in Exchange Square, London.

3.       I make this affidavit for the purposes of giving evidence to the Canadian Court and the United States ("**US**") Court in connection with the allocation positions asserted by the Allocation Group comprising the EMEA Debtors and the UK Pension Claimants.

4.       Unless I specify otherwise, for ease of reference, I refer to the worldwide Nortel group of companies and its various affiliates as "**Nortel**", the "**Group**" or the "**Nortel Group**". Where I refer below to the Nortel Group's operating company in the UK, I do so by referring to "**NNUK**", which is intended to cover both NNUK and its predecessor operating companies in the UK.

5.       I have knowledge of the matters to which I hereinafter depose, which knowledge is either personal to me, obtained from a review of the documents referred to, or, where indicated, is as advised to me by others, in which case I verily believe such information to be true.

**SUMMARY OF FACTS**

6.        As set out below, the research and development ("**R&D**") conducted by the Nortel companies in the Europe, Middle East and Africa ("**EMEA**") region in the 1990s and 2000s was critical to Nortel's global business. The output of such R&D formed the basis of many of Nortel's key products and patents that were sold by Nortel in the same period and in the post-filing sales of Nortel's businesses and assets.

7.        Indeed, inventors located in the EMEA region developed a great number of Nortel's important technologies and patents. Moreover, given the integrated nature of Nortel's R&D activity around the world, it is impossible to determine with precision all of the R&D work that went into every product developed and sold by Nortel.

8.        In addition, Nortel's EMEA region established and maintained large and key customer relationships for Nortel and these relationships were an important part of the Business Sales undertaken by Nortel post-insolvency.

**EMPLOYMENT HISTORY**

9.        I joined STC plc ("**STC**") in 1983 as an apprentice engineer. I obtained a Bachelor of Science in Electrical Engineering in 1988 and worked in STC's optical networks business at New Southgate, UK, until STC was acquired by Nortel in 1991. Shortly afterwards I became an employee of NNUK working in optical sales. I ran Business Development for optical and transmission products in the Caribbean and Latin American ("**CALA**") region from 1993 to 1995 after which I returned to the UK to take up a global marketing role.

10.     In or around 2000, there was a reorganisation of Nortel's business and I became President of Unified Network Solutions for EMEA, a role in which I was responsible for sales in EMEA and forming a bridge between the leaders of the product development organisations (which were based in North America) and the product groups in EMEA.

11.     In around 2001 to 2002 the "product" organisation was broken up again and reorganised and I took up a role titled President of Optical Networks, EMEA which I held until 2004 when I became President of Carrier Networks, EMEA. I continued in this role until 2009 when I became the Nortel Group's leader of Metro Ethernet Networks ("**MEN**") Sales for EMEA. Nortel sold its MEN assets to Ciena Corporation ("**Ciena**") on March 16, 2010 and as of that date I became an employee of Ciena. I left Ciena in December 2012.

12.     I am a deferred member of the NNUK defined benefit pension plan (the "**Plan**"). I served as a Trustee of the Plan from early 2004 for approximately one year.

**THE BENEFITS DERIVED FROM THE ACQUISITION OF STC BY NORTEL**

13.     In 1991, while I was employed at STC, Nortel acquired the outstanding shares in STC which it had not previously held. As a result, it acquired all of STC's customers, technology, intellectual property ("**IP**") and operations.

14.     In the period leading up to its acquisition by Nortel, STC's business had focused on a number of areas, in particular: an optical transmission business; a submarine business which was engaged in creating ultra-long transmission technology and manufacturing cables; a public switching business; a Private Branch Exchange ("**PBX**") business; optical and Radio R&D based at the STL laboratories in Harlow, UK; and an optical components business based in Paignton, UK.

15.     Until 1991 the focus of Nortel's business market had been in North America. In that region technical standards were set by the American National Standards Institute (the **"ANSI standards"**). These standards only applied to Canada and the US, and a small number of other markets. Nortel's products were not compatible with the analogous European standards, **"ETSI"**, which were set by the European Telecommunications Standards Institute. This meant that prior to acquiring STC, Nortel had sold limited Public Networks switching products and was unable to sell its optical products outside the North American market without adapting its products to ETSI. As a result, Nortel's focus outside of North America (through its existing entity in Europe which was called Nortel Networks Europe) had been limited to products aimed at commercial enterprises, and a small amount of switching business through licensees.

16.     Nortel derived a number of benefits from its acquisition of STC which it continued to successfully exploit after the acquisition.

17.     First, Nortel acquired a valuable international optical portfolio of technologies and patents which it absorbed into its Global Optical Business. Optical is a technology that uses lasers to transmit data, is essential to the use of modern telecommunications and computer networks, and is significantly better than copper fibre-based networks. It underpins superfast home broadband internet, for example. The optical products Nortel acquired from STC could be sold to customers outside North America without the need to convert them to different technological standards. This was because they were developed by STC to meet the technological standards applicable in EMEA, CALA and in Asia (with the exception of Japan which had adopted a hybrid ETSI/ANSI standards structure). The portfolio of technologies

and patents acquired from STC was also the basis for considerable further research and development by engineers at Nortel's R&D centres in EMEA.

18.      Second, the acquisition of STC gave Nortel a cadre of development engineers who were capable of, and had experience in, developing products for global markets (including North America). These engineers were experienced in technologies and products that met ETSI standards. STC's engineers were based largely at the STL laboratories at Harlow and also in Monkstown and New Southgate. There were a number of leading scientists and development engineers on the Harlow research campus and it provided Nortel with leading R&D resources.

19.      Third, and most significantly, the absorption of STC into Nortel gave Nortel access to a particular set of valuable products and technologies which formed the basis for a number of technologies developed by the Nortel Group after the 1990s which continued to drive sales into the 2000s. Indeed some of the technologies that Nortel was selling at the time of the insolvency could be tracked back to founding patents and technologies acquired from STC and developed by Harlow and Maidenhead engineers in the 1990s. In many cases, the utility of these underlying technologies, developed by Nortel's engineers in EMEA, continued into the next decade and stretched over multiple product lifecycles.

**THE CONTRIBUTION MADE BY EMEA TO TECHNOLOGY**

20.      Nortel's EMEA operations made a considerable contribution to the Nortel Group's wider IP and product portfolio. Due to my product-related customer role I was aware of Nortel's R&D work across many Product Lines, and particularly in the laboratories at Maidenhead and Harlow. The NNUK laboratories performed significant long term research

directed at what might years later become embodied in products in our industry. This work was significant because it bridged the gap between present marketable products and future innovative technologies. "Development" work was also done on a shorter timeframe with a shorter commercial "product aligned" goal in mind.

21.     A good example of the fruits of the long term research performed in EMEA is the **"100 gigabit"** optical transmission system. This is a system which is used in the core of networks which transmits digital signals (such as for streamed music, video, voice or data) from data centres to distribution points close to users in their homes or close to mobile base stations for connection to their mobile devices. On the basis of STC's technology portfolio, Nortel's engineers at Harlow were able to demonstrate a **"40 gigabit"** and **"80 gigabit"** transmission system at a conference in Geneva around 1992. This had developed from research undertaken at Harlow. Although it was still over a decade away from producing a revenue stream, it was an example of the highly valuable next-generation research that came out of Nortel's acquired R&D assets in the UK. When Nortel finally sold its Optical business in 2009 I recall that one of the potential purchasers was particularly interested in the business because of the 100 gigabit products in the MEN technology portfolio. Ultimately, these assets derived from work undertaken in Harlow in the 1990s. The market for 40 gigabit products was still estimated in the region of $500m a year in 2009. 100 gigabit was seen to be the successor product to 40 gigabit and it was expected to replace it in the market. The technology that underpinned the 40 and 100 gigabit products could be tracked back as far as the optical research carried out in Harlow in the early 1990s. Nortel had been the first into the market with the underpinning technology for 2.5 gigabit, 10 gigabit, 40 gigabit and 100 gigabit

products, which gave it a continuing competitive advantage. Indeed, the product line that Ciena bought after Nortel's insolvency depended significantly on work done in Harlow in the 1990s.

22.     The R&D facility at Harlow remained an influential "hub" for optical and wireless product development and for Advanced Technology research throughout the 1990s and 2000s. For example, the engineers at Harlow were responsible for developing the power amplifier that forms part of the base stations for the wireless systems of GSM and UMTS (technologies which are currently used by mobile phone networks). These systems require antennae around the country or region where they are installed. The bottom of each antenna has a base station containing a power amplifier, which provides the power to transmit over long distances. The power amplifiers and base stations used by the Nortel Group for its GSM and UMTS systems were integrated and developed by Nortel France and sold to a number of carrier customers in Latin America and in the US (I recall, in particular, a large sale to T-Mobile in the US as part of the sale of a large GSM network to them).

23.     Packet Voice Gateway ("**PVG**") was another significant technology developed on technology originating out of Harlow. It enables customers to rely on "Voice Over Packet Networks" rather than circuit-based connections. It developed out of Passport technology which had derived from the Asynchronous Transfer Mode ("**ATM**") technology developed by STC, which was the first essential step made in integrating computers and telephones so that they can be used interchangeably on the same network. PVG was then re-used in code division multiple access ("**CDMA**") technology, which was commercially successful in the US.

24.     In some circumstances, it was necessary to adapt North American technology to European standards (such as ETSI) for sale to European customers. In many cases this involved a large amount of innovation and original thinking and could require a re-design of up to 30% to 40% of a product. The process of adaptation could often enhance a product and end up improving the functionality of the original product. The enriched product could then be sold back to customers in other regions. This was typical of the matrix-like flow of innovation within the Group.

25.     From a customer perspective, my experience was that Nortel was obtaining patents in the interest of securing its position as an "innovator" and long-term supplier to its customers. Neither I nor my colleagues would distinguish between the "geographies" of various patents or in which jurisdiction the patents were registered. Access to all of Nortel's technology and IP was shared across the Group. Typically, in speaking to customers, when I would say *"we hold X thousand patents in this field"* I would mean the Nortel Group as a whole. The R&D and resulting products which we put before customers straddled Nortel's Regional Groups and Product Lines. In my experience, typically we would not link a product and a patent. The point was that we were selling, among other things, future development, future technologies and on-going customer relationships and services. Holding the patents that broadly covered industry developments, as we did, also served to fend off competitors that might otherwise seek to burden our products with royalty obligations to them.

26.     I do not believe that prior to insolvency anyone spoke about legal ownership of patents being held by Nortel Canada: the company only spoke about its patents in the broadest terms, as a whole.

27.     Throughout the 2000s I felt that Harlow's continuing existence was certainly in the interests of the Nortel Group. It ticked all the right boxes as the major facility in EMEA because of its proximity to exceptional talent (the University of Cambridge was nearby) and it deserved to be a global R&D hub for Nortel. Its record in terms of generating intellectual property and (as I describe above) its record in creating advanced technologies which ended up being commercially successful was also very good. It mattered to customers that we were carrying out advanced R&D at Harlow as it demonstrated that Nortel's product portfolio would continue to be state of the art. We would occasionally take customers around our laboratories to see our engineers and our processes. It was often very helpful in cultivating customer relationships to introduce a prolific inventor such as Simon Brueckheimer to a potential or existing client.

28.     A symbol of the thriving EMEA patent process was that Nortel chose to recognise the quantity and quality of patents coming out of EMEA by organising a patent awards ceremony in Cambridge, UK in around 2001. I was tasked with giving out the Patent Awards as a way of recognising the input of Nortel's European inventors and product developers. The technologies that came out of Nortel's EMEA facilities throughout the period had continued to contribute to and generate further new technologies and products, including in North America. As discussed above, technology and patents created many years before would often continue to underpin innovative products that were sold to customers.

29.     Even as Nortel's EMEA R&D operations were pared back gradually towards the end of the 2000s as R&D consolidated in North America and was increasingly outsourced to Asia, EMEA's historical R&D continued to underpin many of the technologies that drove

Nortel's business. EMEA performed valuable R&D work right up until insolvency. To the best of my recollection, the decision by senior management based in North America to begin to close down some EMEA R&D facilities was not based on an evaluation of the quality of R&D work coming out of those facilities, nor was it based on the cost of those facilities or their productivity.

## DECISION-MAKING STRUCTURES IN THE NORTEL GROUP

30.    By the late 1990s, Nortel's emphasis shifted further towards operation on the basis of "global product lines". In my experience, throughout the 2000s significant decisions for the Group were made in North America. The company was run as a "matrix" organisation where there were various reporting lines into functions (the Product Lines) and into geographies (the Regions).

31.    A key aspect of the Group's management structure was the system of "Cabinets". The apex of Nortel's management tree was the Global Cabinet which was headed up by the Group CEO and the managers that directly reported to him. This Cabinet was always based in North America (I recall that it variously sat in Toronto, Ottawa and briefly in Boston) and it had ultimate responsibility and authority for all management decisions affecting the global business of the Nortel Group.

32.    Beneath the CEO's office were the Product Lines and the geographical sales regions. Each of the Product Lines had its own Cabinet which was made up of the President of the Product Line and his senior leadership team. The Product Line Cabinets were all based in North America. I acted as an EMEA regional representative on one or more of the Carrier Networks Cabinets throughout the 2000s.

33.     The Product Line Cabinets made the major decisions in respect of the direction that R&D and product strategy would take, including deciding in which geographical regions R&D dollars should be spent. The regional sales teams would often need to lobby the Product Line Cabinets for money to be diverted to support particular customised features, trials or projects. The Product Line Cabinets were the arbiters of Nortel's business and product choices: they decided which products should be made, which features of products should be developed, how this should be prioritised and how much investment would be made in a particular product or in new product development.

34.     At the regional level, decision-making was concentrated in the Regional Cabinets (North America, CALA, Asia and EMEA). I was part of the EMEA Cabinet from around 1999 to 2009.  The primary responsibilities of the EMEA Cabinet (and I understand that the same is true of the other Regional Cabinets) were to deal with personnel issues, budgets (although allocation of R&D resources was determined by the Product Line Cabinets in North America), entry into new markets and, more generally, how to run the business in that region. In my experience the final say over significant decisions belonged to the Product Lines. Core issues with respect to budget, spending and profitability were determined by Product Line Management teams, which were based in North America.

**BUILDING CUSTOMER RELATIONSHIPS**

35.     Throughout the period of my employment at Nortel there were a number of highly valuable customer relationships which were borne out of and maintained by Nortel's sales force in Europe.

36.     Across Europe there were a number of sales teams based in various cities that were responsible for selling to key clients of the Nortel Group (whether they were existing clients or targeted clients). For example, the Telefónica account had a dedicated team in Madrid. Similarly, I recall that the Deutsche Telekom team (which also comprised T-Mobile) had operations in Frankfurt and Bonn in order to maintain contact with an important customer.

37.     Within these sales teams certain team members were split according to product responsibility. Given the complexity of Nortel's product offering and the size of its potential clients, often the salespeople speaking to customers needed to be specialists in a certain product area rather than "jacks of all trades".

38.     In some cases, sales people would be dedicated to one customer and their entire focus would be on harvesting and maintaining an on-going relationship with that customer. In other cases, a salesperson would have his time split between multiple customers. Whereas one set of staff in the Madrid office would be responsible for working on Enterprise sales to Telefónica, another part of the Madrid team would be responsible for working with Telefónica's tech team on long-term complex procedures and working out what product flow they would need for their next sales cycle. I recall that the Telefónica relationship, run out of Madrid (where the company's headquarters were), was headed up by Gabriella di Domizio and included about 20 people dedicated solely to that account and a further 20 to 30 who worked non-exclusively on the account. In around 2000 to 2001 there were as many as 1300 people reporting to me in Europe who were working on sales and pursuing new business with major clients across all portfolios.

39.     The Telefónica account was consistently one of Nortel's Tier One customer relationships in EMEA and globally up to and including the time of the sales of the business lines after Nortel went into insolvency. I recall that the headquarters for the relationship were based in Madrid but the Group also made significant sales from this account in the Latin American region. Winning business in Latin America usually depended on having strong relationships with telecom providers in Europe due to the Telefónica governance structure. For that reason it was essential to have a technically skilled staff of Spanish speakers on the ground in Madrid so that they could interact with the client and manage the relationship. Without salespeople on the ground in Spain, Nortel would not have been able to sell its products to Telefónica. The sales force in Spain bridged the gap between Nortel's product base and the needs of the customer. An account as significant as Telefónica's required intensive management and focus. The Group's customers expected a bespoke relationship with sales personnel who would provide on-going support. The sales personnel in EMEA were the lynchpins between Nortel's technical engineering expertise and the Group's customers.

40.     Nortel's larger accounts in EMEA typically involved the sale of more than just one product. However, building these customer relationships was often a long and difficult process. In many cases, a sales team would successfully penetrate a customer with one product, leading to knock-on sales of other products. This often resulted from our customer team gaining familiarity with a customer's particular needs.

41.     In the case of Vodafone, our account team was run by Dion Jouannou (who was based in the UK). The Vodafone team initially broke through in around 2002 to 2004 with the sale of PVG in Sweden. Mr Jouannou had spent time building a relationship with

Vodafone's strategic business unit in Newbury. This allowed him to sell "Nortel" as a company and brand to the relevant people at Vodafone and secure the PVG sale. Nortel then had to go through a vendor qualification process before it became an approved vendor. This was a complex process which involved a number of checks of whether Nortel was an appropriate supplier and whether it complied with general commercial, technical and ethical standards, among other things. Once Nortel was established on the approved vendor list it was then able to continue to harvest the relationship with Vodafone and make knock-on sales of other products. This resulted in a profitable and successful long-term partnership.

**CROSSOVER BETWEEN NORTEL'S REGIONS**

42.    The customer relationships that were driven by Nortel's EMEA region often generated revenues in Nortel's other Regions, including North America. This was the nature of Nortel's global business. Generally speaking, revenues generated in EMEA principally derived from customer relationships that were created by EMEA sales staff.

43.    The Deutsche Telekom account, for example, was run out of Germany. The relationships that we had in Germany helped generate the revenue which was booked in the US when the GSM/EDGE network was sold to T-Mobile USA. I have now been shown a presentation dated April 18, 2005 (bearing bates stamp NNI_01382060) which is attached to this Affidavit as Exhibit A. ███████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████ Similarly, in the cases of C&W, Telefónica, and Orange, product penetration in Europe helped develop business in other regions (North America, CALA and Asia).

44.     In some cases, Product Line management in North America pressured EMEA customer teams to push certain technologies. In some circumstances this was highly unsuccessful. For example, WiMAX (a form of 4G) was a technology which was pursued aggressively by the Product Line management (chiefly by Richard Lowe who was the General Manager of Carrier Networks). It was seen as a strategic imperative to successfully test WiMAX with EMEA customers as a means of proving the technology to major US customers such as Sprint-Nextel and Clearwire. WiMAX proved to be a commercial failure. I recall that EMEA management had pushed back strongly against North American management's drive to promote this technology.

## CONTINUING CUSTOMER SERVICE

45.     One service that Nortel provided its customers was customised development which often took place in laboratories such as Maidenhead and Harlow. This work was done beyond the "base" R&D work which was undertaken at those facilities. It was coordinated by Nortel's local sales force which had to seek approval for product customisations and trials from the Product Line management. In this context, the EMEA sales force acted as the interface between the customer and the rest of the Group.

46.     This was a very important part of the Group's sales process in EMEA. I have been shown a copy of an email chain dated May 16, 2008 (bearing bates stamp EMEAPROD0518451) which is attached to this Affidavit as Exhibit B. As it shows, in May 2008 I had to seek approval from senior management based in Richardson, Texas for an LTE trial for Orange. This form of investment in demonstration trials with EMEA customers was designed to gain sales and to build a favourable impression with a customer and the market.

Evidence of successful trials with other market players would reassure customers of the viability of a technology. This was a significant tactic for retaining and building business in EMEA and globally.

47.     Similarly, engineers at the Maidenhead facility worked with British Telecom ("**BT**") on a number of "tailored" design solutions for Nortel's products. Nortel's engineers and sales team worked very closely with BT. Nortel provided workshops, interaction and support to BT.  This work could not just have been outsourced to China, nor was it viable to fly in North American "architects" to interact with a Tier One customer such as BT and maintain the strength of the relationship. We sought to provide a holistic service to Nortel's customers.

48.     In some circumstances Nortel's North American customers were interested in crossing over into the European market. MCI/WorldCom, for example, had an established North American relationship with Nortel but it wanted to invest in a Voice over IP ("**VoIP**") system in EMEA. Despite its relationship with Nortel in the US, the customer still opted to introduce a competitive bidding process for VoIP which Nortel EMEA's sales force eventually won.

## NORTEL'S ENTRY INTO INSOLVENCY AND THE SALE OF THE NORTEL BUSINESSES

49.     Towards the end of 2007, I recall that customer confidence began to shake. There was a perception in the market that the Nortel Group required significant restructuring that would create a supply risk for some of our customers. I recall that France Telecom became nervous and requested reassurance about the debt and cash structures of the company and copies of Nortel's financial statements. Indeed, I also recall that Nortel prepared internal

documents which were designed to educate senior staff and salespeople in case customers asked them difficult questions about Nortel's stability. ███████████████

███████████████████████████

██████████████████████████

███████████████████

50.     Once the Group went into insolvency in January 2009, I became involved in Project Snow, which was the internal codename for the sale of the Metro Ethernet Networks business, known as "**MEN**", which had been carved out of Nortel's Product Lines as a saleable separate business. The MEN business was made up of Nortel's Optical and Carrier Ethernet businesses.

51.     I have now been shown a copy of a Project Snow management presentation dated October 2009 (bearing bates stamp NNI_SNOW_00033567) which is attached to this Affidavit as Exhibit C. I recall reviewing this presentation during the MEN business sale process. This was a teaser presentation that was provided to potential purchasers of the MEN business, and set out its key attributes. One of the key selling points of the business from the perspective of Nortel management was its customer relationships, accounts and contracts which underpinned revenues. ███████████████

██████████████████████████

██████████████████████████

███████████████████ EMEA also made up around 30% of revenue (see page 28 of Exhibit C). Sales people constituted around 30% of the business's headcount and there were 150 sales people and around 50 front end workers in EMEA alone.

52.     As part of the sales pitch process we focused on blue-chip customers. Even though customers had been concerned about the financial position of the Group, we had successfully managed to hold on to many key relationships. We also, therefore, wanted to focus on the crucial customer infrastructure and personnel that underpinned those relationships. In my view, the technology in the MEN business constituted only one aspect of the value which was sold to Ciena. Customer relationships, distribution channels and other assets constituted much of the rest of the value.

53.     From a purchaser's perspective, it was clear that there was value in the customer relationships identified in the management presentation. I recall being aware of around 16 bidders for the MEN business, some of whom I had interaction with on our customer base. Ciena (the successfully bidder) wanted to maintain the majority of the assets in the business as it existed: they were certainly interested in the technology, the people, the market access in Asia, CALA, North America and Europe, as well as the existing customer relationships that Nortel had in this line of business. There was clearly value to be found in securing a berth in the European market with clients such as Golden Telecom, with whom Ciena had no previous relationship. Ciena found several forms of value in the MEN customer assets: the money value of customer contracts; the value of Nortel's customer-facing people and the relationships they had; mutual understandings and intimacy with their customers; and the value of the familiarity and inside knowledge that customer-facing people had with their clients' processes and methods. When the sale to Ciena was completed, many of the customer teams transplanted directly across from Nortel to Ciena and continued to function and create

business just as they had done previously. In my experience, customers were comforted by the continuity that this business transfer provided and, as a result, Ciena realised significant value.

54.     I declare under penalty of perjury under the laws of the United States of America and under the laws of Canada that the foregoing is true and correct.

**AFFIRMED BEFORE ME at**

23 Park Avenue South, London, N8 8LU

**PETER NEWCOMBE**

11/4/14



Affirmed before

Attested By:

Julian Kostick
Notary Public
1 Egerton Road N16 6UE
020 8952 8881

**in England on April 11, 2014**

**Notary Public**

Privileged and Confidential
Attorney Work Product
HSF Draft: 04/04/14

Court File No. 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, et al.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

Proceeding commenced at Toronto

**AFFIDAVIT OF**
**PETER NEWCOMBE**
**(Affirmed April 11 2014)**

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, Ontario  M5V 3J7
Robin Schwill
Tel:    416.863.0900
Fax:    416.863.0871

**LAX O'SULLIVAN SCOTT LISUS LLP**
145 King Street West, Suite 2750
Toronto, Ontario  M5H 1J8
Matthew P. Gottlieb
Tel:    416.598.1744
Fax:    416.598.3730
Lawyers for the Joint Administrators of the EMEA Debtors