Court File No.: 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)
## IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

## AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

## APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

- and -

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>   NORTEL NETWORKS, INC., *et al.*,[1]<br>                                   Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

## AFFIDAVIT OF GEOFFREY STUART HALL
## (AFFIRMED APRIL 10, 2014)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

I, GEOFFREY STUART HALL, of 4 Springfield Park, Twyford, Berkshire, RG10 9JH, United Kingdom SOLEMNLY AND SINCERELY AFFIRM AND SAY as follows:

INTRODUCTION

1.      I previously gave evidence by a witness statement dated December 17, 2009 in connection with steps taken by the Pensions Regulator in the United Kingdom ("UK") to issue "Financial Support Directions" against entities within the Nortel group worldwide.

2.      I previously gave evidence in these proceedings, by an affidavit affirmed on October 27, 2010 and by a deposition that took place on October 29, 2013.

3.      I make this affidavit for the purposes of giving evidence to the Canadian Court and the United States ("US") Court in connection with the allocation position asserted by the UK Pension Claimants.

4.      I believe that the facts stated herein and in my earlier evidence are true.  My personal knowledge of the matters deposed to herein derives from the period during which I was involved with the Nortel Group, as an employee of BNR Limited ("BNR") and subsequently Nortel Networks UK Limited ("NNUK"), which term covers both NNUK and its predecessor operating companies in the UK, from September 1985 to December 2008.  Where any facts deposed to herein are not derived from my personal knowledge, I verily believe them to be true to the best of my information and belief.  I refer to the worldwide Nortel group of companies as "Nortel" or the "Nortel Group".

SUMMARY

5.      Over the course of my 23-year career at Nortel, I served in a variety of research and development ("**R&D**") management and engineering roles, primarily at Nortel's Maidenhead, UK facility.  I also served as Chief Technology Officer ("**CTO**") for the EMEA region, a customer-facing office based in Maidenhead that managed R&D relationships with Nortel's top customers throughout Europe and Asia.

6.      Nortel's presence in the UK and Europe was significant both in terms of its employee headcount and contribution to the group overall. Nortel recognised that the only way it could seek to compete in markets outside the USA and Canada was to have an R&D presence outside of North America. At one time there were almost 2,000 R&D professionals working for Nortel in the UK. Over time these new R&D teams in the UK and across the EMEA region facilitated the creation of Nortel's business outside of North America and by 2000 Europe accounted for approximately 30% of Nortel's business.

7.      Nortel's patent policies and budget were set globally, and decisions regarding whether and where to file patents were determined by review panels organized along technology and business lines.  Nonetheless, employees of NNUK contributed a significant percentage of Nortel's technology and patented intellectual property—directly, as inventors, and indirectly, through foundational research and by interfacing with customers to understand needs that Nortel could address through innovation.  At certain times, NNUK employees contributed more patents per head than their peers at other Nortel facilities around the world, and many of Nortel's technology "gurus" were based in the UK.

- 3 -

8.     R&D performed by NNUK employees played a pivotal role in expanding Nortel's presence in Europe and worldwide.  Significant work by NNUK on the development of Nortel's Digital Multimedia Switch ("DMS") 100 allowed this product to be marketed and sold outside of North America.  In addition to NNUK's work on DMS, and following the success of the DMS 100, NNUK was active in the R&D relating to successor technologies, including the CS2000 internet protocol ("IP") switch and Centrix IP exchange.

9.     NNUK had no direct control over its R&D budget.  Nortel's R&D was organized along line-of-business divisions.  These lines of business were globally integrated and generally headquartered in North America. R&D performed in one Nortel facility was often based upon, or done in collaboration with, work at other Nortel facilities around the globe.  R&D budgets were ultimately controlled by the heads of the business divisions or the Nortel Group CTO.

10.     In the following sections I discuss my employment history with Nortel; the integration of Nortel, particularly with regards to R&D; the strong contribution of the UK R&D teams to Nortel's patent portfolio,  products, and customer relationships; and the control North America exerted over R&D budgeting and the filing of patents.


EMPLOYMENT HISTORY WITH NORTEL

11.     I was initially employed by STC Plc ("STC") at a time before it had been acquired by the Nortel Group.  I then joined BNR in September 1985.  BNR was a UK subsidiary of the Nortel Group based in Maidenhead, UK, which was primarily an R&D company.

12.     I was recruited by BNR as a designer and was based at St Mary's House in Maidenhead, which had about 40 employees when I joined.  I initially worked on developing

hardware     for     Nortel     products     so     that     they     complied     with     the British Approvals Board of Telecommunications ("**BABT**") and European Technical Standards Institute ("**ETSI**") standards, discussed below.  I reported to a first line manager at BNR (who when I joined was a Canadian based in the UK called Bryan McConnell) who reported to the Vice President of R&D at Maidenhead, the most senior person at the Maidenhead Lab.  The Vice President of R&D when I joined BNR was Bruce Gault who was also a Canadian based in the UK.

13.     As I set out in more detail below, I reported either directly or indirectly to a number of Americans and Canadians throughout my time with the Nortel Group but I did not know at the time by which legal entity they were employed.

14.     In around the fourth quarter of 1985, I began to focus primarily on hardware development for Nortel's DMS software, in particular the DMS 100.  As I discuss below, this is Nortel's circuit-based voice "switching" product which directs or "routes" voice from one part of a network to another.  I also became responsible for the software development of DMS 100 in around 1987.  In around the fourth quarter of 1989 I was promoted to senior manager of DMS 100 software and hardware development.  I retained this role after Nortel's acquisition of STC in 1991.

15.     In August 1993, I was transferred temporarily to Ottawa, although I remained an employee of NNUK.  While I was in Ottawa I worked mainly on DMS software based on American National Standards Institute ("**ANSI**") standard systems for DMS products that were to be sold to US clients.  I had around 50 to 60 software designers and researchers working for me.  It was my understanding that I was asked to go to Canada because of my experience with the DMS software and my experience of managing complex software projects and delivering those projects to end

customers. During my time in Ottawa I worked on a number of projects for US customers such as Pacific Bell, MCI (which has now become Verizon), Sprint and Bell South.

16. I was repatriated to the UK in September 1995, when I was promoted to Director of DMS 100 and the DMS Generic Services Framework ("GSF") G-Trunks Project. In around 1997 I became director of DMS 100 European Development. I reported at this time directly to the Vice President of R&D in Maidenhead who at that time was Ian Kerr, an expat from Canada based in the UK. I also reported to the Vice President of R&D for the Carrier division who at the time was Kerry Zoehner who was based in Canada.

17. From around the third quarter of 1999 I was promoted to Vice President of R&D in Maidenhead and was the most senior person at Maidenhead at this time. I reported to the senior executives of the Nortel Group in the Carrier division who were typically based in the USA. I continued to be responsible for the development of DMS 100 hardware and software in a number of Nortel's subsidiaries and joint ventures based in Europe, namely Netas (Turkey), Nortel-Kapsch (Austria) and Friedrichshafen (Germany). I was also a Board Member of Nortel-Kapsch for part of this period.

18. From around the third quarter of 2003 I became CTO for the EMEA region, which was an extra-divisional position. I reported both to the Divisional Sales President of EMEA (who at that time was Peter Newcombe) and the CTO of Nortel (who at that time was Greg Mumford, who was replaced by Brian McFadden and finally John Roese, all of whom were located in Ottawa). I also sat on the CTO's "Cabinet".

19. I arranged my departure from the Nortel Group in October 2008.

20.    I currently receive a pension from the Nortel Networks UK Pension Plan, which was a defined benefit pension plan. When Nortel purchased STC in 1991 it was explained to all STC staff that NNUK would sponsor the pension plan. My understanding was that the Nortel Group was responsible for making sure that NNUK could fund the pension plan in order to support the defined benefits payable to the pensioners.

## THE NORTEL GROUP WAS RUN AS AN INTEGRATED GLOBAL BUSINESS

### NORTEL RUN ALONG LINES OF BUSINESS DIVISIONS

21.    Although there were a number of restructurings of the Nortel Group during the period of my employment, it was generally run along business lines as far as R&D was concerned. This meant that matters such as reporting lines, staff appraisals, the delivery of work product and budgets were all set along business lines ultimately to either the USA or Canada rather than to a particular legal entity.  The names of the business divisions changed on numerous occasions during my time to reflect technology changes in the industry, but I generally reported along the business division associated with switching and carrier network products referred to as the Carrier division. This business division was generally headquartered in the USA.

22.    The STC R&D laboratory in Harlow (known as "**STL Labs**") had its own Managing Directors such as Ian Vance, Allan Fox and Gary Adams, all of whom were employees of NNUK. Mr. Vance was the Managing Director of STL Labs when Nortel acquired STC in 1991.  By 2002, this lab had lost its UK leadership and was, as I recall, managed largely by the relevant business divisions in Canada and the USA.

- 7 -

23.    I originally reported in Maidenhead within the appropriate business division but from 1997/1998 I reported more directly to the head office of the division in the USA (specifically Richardson, Texas and Raleigh, North Carolina).  The people I reported to in the USA moved from time to time but, as a general rule, I reported to the head of the division.

24.    In Maidenhead, the Vice President of R&D was normally from Canada or from the USA, for example Bruce Gault, Mr. Leggett and Mr. Kerr. When I became Vice President of R&D at the Maidenhead Labs from 1999 onwards I was considered an exception in not being an expatriate from either Canada or the USA.  However, I reported to the senior executives of the Carrier division, including Abdul Khawar in Raleigh, NC and Sue Spradley in Richardson, TX.

25.    When I was Vice President of R&D in Maidenhead, I was responsible for approximately 600-700 employees serving two lines of business.  I was also responsible for the non-North American Carrier R&D teams and was accountable for the quality and delivery of their work streams.  At that time, the members of the Carrier R&D teams from across Europe and further afield including Austria, Turkey, India and China reported directly to me.

26.    Up until 2003, when as a result of numerous rounds of layoffs the Nortel R&D teams within Europe had shrunk, every geographic location had a local head of R&D who was the line manager for the local R&D teams. However, by 2003 the smaller residual R&D teams in Europe reported directly into the North American R&D heads. As a result, there was no need for local R&D heads in every geographic location and I ceased to be head of the Carrier division outside of North America. Nonetheless, R&D teams continued to be organised and managed along business lines.

27.    Lines of business heads were located around the world. However, aside from a few transitory periods, the business units were always managed from North America. My recollection is

that the leadership of Carrier and Enterprise was never located outside of North America. There were a few instances, I believe, when lines of business leaders were located outside of North America; Optical at one time was led by an individual outside of North America and Wireless may at one time have been led by an individual located in France. However, even when the leader was located outside of North America, his support team remained in North America and as a result that person was expected to spend considerable time travelling to North America.

CTO ROLE

28.     Between 2003 and my departure from Nortel in 2008, I was CTO of the EMEA region. The role had not existed prior to 2003 and Greg Mumford's vision was to have a CTO presence outside of North America. Greg Mumford had taken on the role of CTO of the Nortel Group some time in 2001 or 2002. The CTO covered all business lines and also included work streams that had no specific business line.

29.     One of my responsibilities as CTO of the EMEA region was to develop a research strategy for Mr. Mumford aimed at markets outside of North America. He believed that in order for Nortel to meet customer needs in the future, it needed to have a team focusing on next generation R&D for products adjacent to those currently in production. The sales teams needed engagement from research in order to ensure they could understand the long term technical needs of key customers. Moreover, Mr. Mumford thought it was important to look at the trends in Nortel's market place, the problems that Nortel's customers were encountering, and to identify ways in which Nortel could conduct research to assist those customers in the future. It was described by one individual at Nortel as "marketecture," a mixture of architecture and marketing.

30.    The only way to find out this type of information was for Nortel to have someone outside North America who spoke directly to Nortel's customers' senior strategic management. As CTO of the EMEA region I travelled extensively to meet with these technical seniors at Nortel's customers across Europe, Australia and China and attended conferences and industry forums. Customers that I engaged with included British Telecommunications plc ("**BT**"), France Telecom, Telewest, Cable & Wireless and Telstra.  Once we had obtained a good understanding of Nortel's customers' perspective, we used Nortel's research and applied it to specific customer issues and products. During Greg Mumford's reign my job involved a lot of travelling back to Ottawa to confer with the CTO team in Canada.

31.    Customer requirements did not always match up to the specific products that Nortel had developed and there were occasions when we needed to adjust products to suit a customer's individual needs. One example of this type of product development was the work we did with HSBC. HSBC wanted to communicate information on conference calls to groups of customers and wanted those customers to have the ability to communicate their reactions to HSBC without the other participants on the call hearing their comments. Nortel initially proposed the Agile Communication Environment ("ACE") based solution, but we realised from talking to the people on the floor at HSBC that it was not meeting their needs. On the basis of our conversations with these individuals we were able to create a solution that exactly matched their requirements. Another example of product development was the work we did for BT, who were generally unwilling to take standard products and would routinely require additional functionality.

32.    When I first took on the role of CTO of the EMEA region I did not have a direct report team of researchers. The European R&D teams continued to report to business divisions and

to concentrate on R&D projects for the specific business lines who at all times accounted for the majority of the R&D budget. The work I was doing for the CTO was never intended to replace that work but merely to focus on the development of products adjacent to those currently in production and therefore, in practice, certain individuals within the global R&D teams with a common interest in particular technologies were drawn into working on my projects. These individuals did not have a direct reporting line to me and so I created a virtual team which was not supported by an official management line.

33.     John Roese became CTO of Nortel in 2006.  He had a different vision for the CTO office than his predecessors and wanted to ensure that Nortel retained customer connectivity and developed a pipeline of future looking innovative technologies. When John Roese became CTO he created a budget for innovative and next generation products, and as a result my way of working changed. Under Mr. Roese's direction, rather than suggesting what a problem was and where to look within Nortel for solutions, I had the ability to create those technical solutions, for example inventing prototypes and commissioning science projects. During the time that I reported to John Roese I had my own team of researchers who reported directly to me.  The team started with approximately four 'gurus' and grew to eleven. It comprised three 'gurus' in Maidenhead, two in Harlow, one in Vancouver, three in Ottawa, one in Detroit and one in Russia. The work that was done by my 'gurus' and my virtual team was focused in the same way as the work done by the business lines' R&D teams on helping customers and eventually creating products.

34.     I was a member of the CTO cabinets of Greg Mumford and John Roese, which meant that I was part of their immediate organisation and attended governance meetings. The CTO cabinet consisted of nine or ten people who were based in various jurisdictions.

NNUK'S R&D TEAMS WERE STRONG CONTRIBUTORS TO NORTEL'S INTELLECTUAL PROPERTY

HISTORY AND STRUCTURE OF R&D IN NNUK

35.     During the 1980s, the Nortel Group had started to establish a footprint in the UK particularly through the supply of SL1 switching equipment (also known as Meridian) to BT. However, in the 1980s Nortel did not have a presence in Europe and had only isolated pockets of business in places such as Austria, Turkey and Israel.

36.     Nortel wanted to expand into Europe and in order to do so had to design part of its portfolio to meet ETSI standards, which are mandatory standards required by customers both in Europe and a number of other countries outside the USA and Canada.  As I explain in more detail below, the conversion of the Nortel products so that they could be used outside the USA and Canada involved an overhaul of Nortel's hardware and software design. Moreover, Nortel recognised that the only way it could seek to compete in these new markets and address these new customers' needs was to have an R&D presence outside of North America.

37.     The EMEA region was hard to penetrate, partly because it was a less uniform market than North America and also because Nortel had a multiplicity of customers across the EMEA region. Nortel needed to work hard to win business and recognised that it was important to Nortel's customers to be close to Nortel's technology teams so that Nortel could develop an understanding of the context and standards the customers required. At one time there were almost 2,000 R&D professionals working for Nortel in the UK. Over time these new R&D teams in the UK and across the EMEA region facilitated the creation of Nortel's business outside of North America and by 2000 Europe accounted for approximately 30% of Nortel's business.

### THE ACQUISITION OF STC

38.     Nortel completed its acquisition of STC in 1991.   The primary purpose of the acquisition was to enable Nortel to establish a stronger and more substantial presence in the UK. STC was in many ways an ideal takeover target for Nortel because it already had significant clients such as BT, which at the time dominated the UK market, and it owned substantial Intellectual Property Rights ("**IPR**") in particular in fibre optics.

39.     STC operated out of a number of different locations in the UK including New Southgate, Harlow and Paignton in England and Monkstown in Northern Ireland.

40.     STL Labs in Harlow had a substantial reputation, particularly in the field of optical technology in the areas of long haul fibre optic cables and associated transport technology such as wireless amplifiers and antennas.   As an example of the level of its expertise in the field of optical technology, in 1999/2000, I recall that STL Labs was congratulated by Clarence Chandran, a senior executive of Nortel Networks Limited ("**NNL**") (who later became Chief Operations Officer of NNL) for its strong contribution toward the development of optical technology in the context of the success of Nortel's investment in the significantly expanded facilities at Harlow.

### THE NORTEL CTO'S ENCOURAGEMENT TO OBTAIN PATENTS

41.     I recall that in the mid-1990s there was a big push from Nortel's CTO in Canada to register patents.   It was made clear to all those involved in R&D in Maidenhead and Harlow that Nortel considered that it was very important that we protect our patentable ideas.   This was supported by a corporate policy to provide awards with financial incentives for both the filing and registering of patents.   Where the patent was obtained by more than one person the award would be

shared by each of the inventors. These awards were regularly shared between inventors that worked together across different jurisdictions.

42.    As Vice-President of R&D at Maidenhead I was responsible for driving the corporate message from the CTO as to the importance of obtaining patents. I usually attended and presented at the awards ceremony in the UK each year. This involved all those who had worked on R&D in the UK and other parts of Europe where such work had resulted in patents, and employees were awarded certificates for their patent submissions. The purpose of these award ceremonies was to ensure that the importance of obtaining patents was recognised publically and that the achievements in this regard were celebrated. I recall that on several occasions the ceremonies would be attended by a senior executive of the Nortel Group such as the CTO. The award ceremonies also assisted in fostering some competition in obtaining patents: there was quite a lot of prestige associated with the obtaining of patents and both the Maidenhead and Harlow Labs were aware of those who were regularly the most productive in this regard.

43.    While John Roese was CTO, a Fellows programme was also created to recognise sustained contribution by inventors over a long period of time. I was on the selection committee for the Fellows programme and I recall that two of the seven fellows selected were from the UK, Simon Brueckheimer and Nigel Bragg.

44.    It was clear to me that this system of incentives used to encourage the obtaining of patents reflected the importance that the Nortel Group placed on patents, particularly given the time and expense involved in patenting an idea.

### THE VOLUME OF PATENTS IN THE UK

45.    STL Labs in Harlow had an excellent history of obtaining patents (particularly in the field of optical technology) and this continued after the acquisition of STC by the Nortel Group. This was a clear reflection of the quality of the work done at Harlow which had a very significant patent to person ratio. My team, which included people in Maidenhead, Harlow and elsewhere, had one of the greatest patent per person ratios that I have ever experienced in my working life.

46.    In terms of the volume of patents generated in the UK, the STL Labs in Harlow have always been significant in this regard but the teams at Maidenhead also started to produce a significant volume of patents from 1991 onwards. I am aware from conversations with members of Nortel's Global IP Law Group in around 2000 that, in general terms, the UK produced substantially more patents per head than elsewhere in the Nortel Group.

### CONTRIBUTION OF NNUK'S GURUS

47.    As I mentioned previously, during the time that I reported to John Roese I had my own team of 'gurus' who reported directly to me. The UK based gurus' contribution to Nortel was significant and included the invention of key products, the creation of solutions for key clients which addressed important business objectives, and the resolution, publication and presentation of key techniques on behalf of Nortel at key forums.

48.    One of these UK based gurus, Nigel Bragg, started reporting to me in 2006. Prior to and during that time he was responsible for inventing a number of patents, among which is patent number US 6,854,013 B2 dated February 8, 2005 which was a method and apparatus for optimizing network service. I attach to this affidavit as Exhibit "A" a copy of the patent, which I understand was sold by Nortel to the Rockstar consortium. Another of these UK based gurus, Simon

Bruckheimer, also made a substantial contribution to the Nortel intellectual property and had a substantial number of patents registered.

OVERVIEW OF THE TECHNOLOGY AND PRODUCTS RESULTING FROM R&D ACTIVITIES IN THE UK

49.    I set out below an overview of some of the main Nortel products that were developed on the basis of the R&D activities in the UK which I was aware of, particularly in my capacity as Vice President of R&D at Maidenhead prior to my becoming CTO of the EMEA region. This list is not exhaustive, and the UK R&D teams continued to work on additional products after these.

50.    As an example of the significant development work being done in the UK, I describe the development of DMS that was done in the UK for the European and global markets. I also discuss two other examples, CS2000 and Centrex IP.

51.    To illustrate the type of work being done in the UK, I also attach to this affidavit as Exhibit "B" a copy of a presentation entitled "European R&D Labs Capabilities" dated 6 October 2000.  This presentation was prepared on my behalf by a member of my team at the request of Mr Khawar, head of R&D for the Carrier division.  The purpose of the presentation was threefold. First, Mr Khawar's objective was to make each of the disparate R&D groups within the EMEA region aware of the scale of R&D capabilities and expertise in EMEA as a whole.  Secondly, he wanted to inform a number of Nortel's senior North American executives about the strength of our R&D capabilities in the EMEA region.  Thirdly the presentation was used to educate Nortel's sales executives within EMEA to enable those executives to market our R&D capabilities to customers.  I gave the presentation a number of times during the course of the year 2000 and I can confirm the contents of this presentation to be true and correct.

#### DEVELOPMENT OF THE DMS FOR THE EUROPEAN AND GLOBAL MARKETS

52.     A major challenge for Nortel was to enable its DMS digital switching product, which was a very successful product for Nortel in North America, to be sold in other markets around the world.  Since this product was originally developed for the North American market it was designed to ANSI technical standards.  For a product to be sold all around the world, it was necessary to transform the products to other international standards, in particular, the European ETSI standards. All the work required to develop the DMS 100 Europe was managed from Maidenhead.

53.     In the UK a great deal was done on standards conversion and we became, I believe, Nortel's main source of expertise on how to develop and deliver large projects to customers where a conversion of standards was required. It was not a simple task to transform DMS to ETSI standards, but rather, was a significant amount of work. In essence, the team in Maidenhead had to redesign and replace certain components within DMS 100 so that such components were ETSI compatible and could then be used by Nortel in Europe (and elsewhere outside of North America). Our work not only enabled DMS 100 to work in Europe, but also introduced additional functionality only required within the European market. The sales teams in Europe understood particular markets and worked closely with the R&D team to create a product that would sell in a variety of new markets.

54.     This conversion of standards was extremely important for the Nortel Group in two respects.  First, it opened up markets and customers to Nortel that would not otherwise have been available.  Before work was carried out in Maidenhead on the conversion of standards, Nortel was not really a global company in that it had a very limited commercial footprint outside of North America.  However, with the successful conversion of products such as the DMS 100 that was carried out in Maidenhead, Nortel was able to sell the product to important European and UK based

telecommunications companies such as BT and companies known as Virgin Media, Cable & Wireless, Energis and COLT. Since ETSI standards also applied in a number of countries outside Europe, Nortel was also able to sell the DMS 100 Multi-Market Product ("MMP") (and subsequently the CS2000) to customers in the Caribbean and Latin American region ("CALA"), such as Cable & Wireless International and to customers in the Asia-Pacific region, such as Telstra and Optus in Australia, Hong Kong Broadband in Hong Kong and IDC in Japan.

55.     Secondly, the conversion of standards was important for Nortel in retaining its existing customer base in the USA and Canada. The reason for this was that a number of Nortel's customers in North America were expanding offices or branches into other countries and these customers were looking for a network system with the same functionality as the one they had in their North American offices. As a result, Nortel developed a strategy which was known as "Friends and Family", which was a deliberate sales strategy adopted by Nortel, pursuant to which the Nortel technology was developed to become compatible with other international standards so as to accommodate their existing client base in North America in addition to driving new customer relationships in new markets.

56.     I recall in particular that WorldCom, one of the Nortel Group's main customers based in the USA, was the key driving force behind our first major tranche of ETSI conversion work in around 1996/1997. WorldCom made it clear to Nortel that it wished to expand its business into a number of different countries and it looked to Nortel to develop the necessary technology to enable it to do so. The development work the Maidenhead teams did for WorldCom was particularly significant because WorldCom was one of the first of Nortel's customers wishing to expand into a number of different markets simultaneously.

- 18 -

THE CS2000

SUMMARY OF THE CS2000

57.    I recall that much of the work carried out in the UK was under the umbrella of what Nortel referred to as "Succession". This was the term used to describe Nortel's next generation of technology that would in particular replace the DMS products. There were a number of products that fell within this heading but the most significant one was the CS2000 that was developed as part of a combined effort from the Harlow and Maidenhead Labs. Harlow had expertise in packet transport technology, Asynchronous Transfer Mode ("**ATM**") and IP and we at Maidenhead had expertise in switching, so the next logical step was to develop what is called Voice over Internet Protocol ("**VoIP**") which became a joint research project with the objective of obtaining a patented technology that would end up as the next generation commercial product in the industry.

58.    VoIP is a generic term for encoding and transmitting voice signals over Internet Protocol. Since the invention of the CS2000 it has been the main product in Nortel's Succession portfolio. The CS2000 combined optical and digital switching technology by replacing the Time Division Multiplex ("**TDM**") switch which is used in DMS with IP technology. Switching is the means by which one caller is connected or "routed" to another. Whereas the DMS was a largely digital switch, the CS2000 uses IP as the medium for routing information from one place to another. This development was perceived as a radical step at the time and went beyond the previous digital switches because rather than simply converting an analogue signal into a digital signal which still required a circuit to get from one place to another, by using VoIP the digital signal was then converted into packets of information that could then be transferred across the internet. This meant that there was no need for a pre-existing circuit to exist between the sender and the recipient of the

information provided both parties were connected to the internet. The CS2000 product is like the brain of the technology which tells a packet switch what to do, for example where to link calls and where to join a three-way conversation.

### IMPORTANCE OF THE CS2000

59.    CS2000 was one of the highest impact products sold by the Carrier division during the time I was there, and the initial development was conducted in the UK.

60.    CS2000 was able to achieve the reliability of the DMS 100, which was the gold standard in telecommunications, whilst adding additional flexibility and functionality. It was a very significant technological development for Nortel and it set the standards that the whole industry works by. This technology enabled a complete change in the way that carrier networks operated. It was also something which enabled Nortel to lead the market for a number of years.

61.    The concept came from a joint working group between Harlow and Maidenhead, and was prototyped in Maidenhead. Initially, between 1996 and 1997, there were 6 of us working on CS2000 in the UK. By 1998 the programme of development grew between Maidenhead and Ottawa and I would estimate that there were between 30 and 40 people working on CS2000 in Maidenhead around this time. By 1999, Raleigh, North Carolina became substantially involved and the numbers of people working on CS2000 grew dramatically on all sites, peaking between 1999 and 2000 when I would estimate that there were around 190 people working on CS2000 in Maidenhead.

62.    Although the USA and Canada worked on the product development for the CS2000, the UK was definitely the trigger for the development of CS2000 as we did the original proof of concept and solved the first set of problems before the USA and Canada became involved. It was the intellectual effort of the people in Maidenhead and Harlow that made the CS2000 a reality for

customers. In fact, because we had not only prototyped the first CS2000 but also extended the product for the market, the product had to a large degree already been "de-risked" as far as Nortel was concerned, which meant that it could quickly be developed into a commercial product.

63.    The first sale of CS2000 was, as I recall it, to Vodafone's Spanish Division in 1999/2000. I believe the first customers were European because of the strong direct customer involvement of R&D staff in the UK, which was significant in building customer confidence in Nortel, particularly given that CS2000 was an emerging technology. I recall that the UK R&D teams were heavily involved with customers for the CS2000 from the initial engagement with customers in relation to the product through to tailored project planning for that customer and answering or solving any technology issues. In Maidenhead we had a customer demonstration facility which enabled us to show the CS2000 in operation to prospective customers. In around 2000/2001 we were hosting around two customers per week at this demonstration facility. This represented a high proportion of the potential market within Western Europe.

64.    The CS2000 was subsequently sold to customers such as Cable & Wireless (in 2000/2001), BT (who installed CS2000 for the UK Government), ISH (which was a German company) and Verizon. It was my understanding that having an installed and successful "base" of CS2000 networks in the UK was a key factor in the development of the North American market, particularly with customers like Verizon who wanted to see how it "worked out" first in Europe.

65.    Furthermore, since the UK R&D team had already been able to integrate the DMS product within 54 new countries using new software concepts, we were able to "hit" the global market quickly with CS2000 because we had the expertise and software facilities for making the CS2000 translate into different countries with different standards.

CENTREX IP

66.     Centrex IP provides a feature rich telephony system which connects to an existing DMS 100 or CS2000 using an IP address.  Centrex IP is an alternative to hosted Private Branch Exchange ("**PBX**") in an IP "world".  Centrex IP is aimed at Enterprise customers, for example large banks, which would normally have a private exchange system to operate their telecommunications. It enables customers to buy a collection of phones which behave like a group and is not location dependent because no fixed circuits are required.  A user can be anywhere in the world but still be able to connect to their own phone line/extension number.

67.     The Centrex IP was invented exclusively in Maidenhead in 1997 and hit the market in 1999/2000.  Since then it has been sold in the USA and all over the world.  I am now aware that the customers of Centrex IP have included Bank of America, Bell Canada, Deutsche Bank, HSBC and the US Federal Government.

NORTH AMERICA CONTROLLED BUDGETS FOR R&D AND PATENT FILING

R&D BUDGET ALLOCATION AND WORK STREAM SELECTION

68.     Despite the fact that I was CTO for the EMEA region, as far as the budget for R&D was concerned, this was generally controlled by the head of the relevant business division in North America.  I was not personally involved in the budget setting process at the top of the Nortel Group structure, although as Vice President of R&D in Maidenhead I was required to manage the budget as far as Maidenhead was concerned.  This required me to collate and assess the budget requests of the directors at Maidenhead for the projects they were working on and to present the budget proposals within the appropriate business division together with any proposal to reduce costs by outsourcing

some of the required R&D to other EMEA subsidiaries and joint ventures. I also controlled the

R&D budgets for part of Nortel's R&D activities in Turkey, China, Austria and Germany.

69.     Projects requiring internal funding from Nortel, rather than being customer funded,

had to be supported by a business case, which documented the financial and strategic analysis of an

R&D project. These business cases were usually produced by the relevant R&D project manager

and product line manager and were the starting point for budget approvals.

70.     It was my understanding that based on the business cases and other input from the

local R&D operations and sales team, each business division would have to decide and justify the

R&D expenditure for the projects identified against projected revenue. As a result, it was invariably

the case that the business divisions would consult with product line managers in their business

division (who were responsible for specific products) and would look to prioritise R&D where a

particular customer was being targeted. This meant that in order to justify the expenditure on a

certain project, the project would often need to be substantially driven by prospective customers or

revenue as perceived by those in charge of the business division.

71.     Subsequent adoption of product technology was similarly controlled by the head of

the relevant business division, who would decide what products should be developed, which

functions these products should have and the identity of the target market. The head of the business

division would use information from product line management and local sales teams and would also

consider local customer relationships in the decision-making process. Where a valuable customer

was concerned, any further work required to make a product match the specific customer's needs

was also an important consideration.

72.    Unusually, the work of the gurus who worked for me during John Roese's time as CTO was not budgeted against a specific piece of research. Moreover, we did not need to produce an individual business case for each individual item to obtain budget approval in the same way as the other development teams, as all our work fell within the remit of John Roese's research budget which originated in Ottawa.

73.    In my experience, the Master Research and Development Agreement did not play a role in the day to day management of the R&D business.

NORTEL POLICY FOR FILING PATENTS

74.    As with R&D, patent policies and budgets at Nortel were set globally.  After a potentially patentable idea was identified, a decision would be made as to whether the idea was both patentable and valuable enough to warrant expenditure of part of the Nortel patent budget.  Patent review panels organized along business and technology lines evaluated inventions to determine whether and in which countries Nortel would file patent applications on those inventions.

75.    The patent budget covered legal and other costs of filing a patent as well as the financial incentives paid to inventors.  It was a global budget that was not split geographically, and each patent idea was judged on its merits.  The patent law group, which had responsibility for patent filings, was headquartered in North America.

76.    Once approved, patents were usually but not exclusively filed in the US unless there was a specific reason to file elsewhere.  This was because Nortel considered it easier to enforce patents in the US.

77.    Nortel's global portfolio of patents was available for use and review by any inventor employed by Nortel, regardless of the specific legal entity by whom they were employed.

- 24 -

DESCRIPTION OF NNUK FROM 2003 ONWARDS

SCALING BACK OF UK R&D

78.     The scaling back of R&D in the UK took place over a number of years and started in around 2001/2002.  This scaling back was not a reflection on the quality of NNUK's R&D work.

79.     The Maidenhead site's Loaded Labour Rate was USD$125,000 to USD$130,000 per employee per annum.  This was lower than in the USA and at the same level as Canada.  The term Loaded Labour Rate was used by Nortel to indicate the cost per employee charged to a particular project, which included the direct costs of an employee as well as the associated costs of providing that employee with an environment, such as the cost of providing a computer and desk space.  NNUK was also very good at outsourcing to low-cost sites (which enabled us to "blend" our Loaded Labour Rate).  We were much better than most of the other Nortel sites at outsourcing because we had practised it and we understood the demands of dealing with different time zones.  As such, we were one of the most cost-effective R&D organisations worldwide.

80.     The key decision makers in respect of the job cuts at the Maidenhead labs were Ms Spradley, the President of the Wireless Division and Mr Khawar, the head of R&D for the Carrier division. Accordingly, the decisions to scale back the R&D activities in the UK came from those based in the USA.

81.     Nortel's management had to decide which R&D sites should be closed. One factor in the decision making process was the comparative Loaded Labour Rates of the different sites. However, another key factor was the desire to maintain good relationships with key Nortel clients and the desire not to upset them by closing their local R&D sites. Nortel's clients were geographically located and had strong links with the R&D teams on the ground. Verizon was a

particularly important Nortel client and one of the reasons that Maidenhead experienced job cuts was to ensure that Verizon's local R&D team could be retained and Nortel's business relationship with Verizon was preserved.

82.    The main Maidenhead Lab (which was located on Concorde Road in Berkshire) was closed down at the end of 2003.  At this time two significant R&D groups were transferred to Nortel's Maidenhead Office Park site.  These groups included the HLR group under Harry Lilleniit and teams working on Centrex IP and Nortel's ACE product under Lydia Chung.  These R&D teams were grouped together into what was called the Regional Technology Centre, which was set up after the main Maidenhead Lab was closed down.

83.    I declare under penalty of perjury under the laws of the United States of America and under the laws of Canada that the foregoing is true and correct.

AFFIRMED BEFORE ME at

Atlantic House, Holborn Viaduct,
London, EC1A 2FG

GEOFFREY STUART HALL

n England on April 10, 2014

otary Public

NOTARY PUBLIC
LONDON, ENGLAND
LUIS N. HYDE-VAAMONDE
(My Commission expires with Life)

CHEESWRIGHTS
NOTARIES PUBLIC
Bankside House, 107 Leadenhall Street
London EC3A 4AF
Telephone: 020 7623 9477
Facsimile: 020 7623 3428

- 26 -