Court File No.: 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

- and -

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>(Jointly Administered) |

Rebuttal Expert Report of Bruce W. Stratton

for U.K. Pension Claimants

February 28, 2014

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

TABLE OF CONTENTS

PART I – Qualifications, Experience, Material Reviewed ...............................................................1

PART II - Scope of Report ...............................................................................................................2

PART III – Opinion - Executive Summary .......................................................................................2

      Ontario Law – MRDA Interpretation ................................................................. 2

      Scope of Patents Licensed ................................................................................ 3

      Sublicense and Enforcement Rights ................................................................. 4

PART IV – Opinion .........................................................................................................................4

   MRDA - Stated Governing Law ...........................................................................................5

   Interpretation of the MRDA under Ontario Law ..................................................................5

   Patent Rights and Licenses to Patents....................................................................................7

   MRDA Terms:  Article 5(a) – Exclusive License ................................................................9

   MRDA Terms - Article 4(e) – Enforcement Rights .........................................................12

   MRDA Terms and the Stand-Still Agreement:  Termination and Perpetual Rights..........13

   Factual Matrix......................................................................................................................14

      The Predecessor Cost Sharing Agreement (CSA) .............................................. 14

      Nortel Networks' Matrix Business Model......................................................... 16

      Nortel Networks R&D Focused on Commercially Promising Technologies....... 17

   Canadian Reports In-Chief:  Scope of Patents Licensed ...................................................18

   Canadian Reports In-Chief:  Sublicensing and Enforcement Rights..................................19

   Extrinsic Evidence and the Interpretation of the MRDA....................................................23

**PART I – Qualifications, Experience, Material Reviewed**

1.  I am a barrister and solicitor, called to the Bar in the Province of Ontario. My home address is 781 Euclid Ave., Toronto, Ontario. I am retained by Thornton Grout Finnigan LLP ("TGF"), Willkie Farr & Gallagher LLP ("Willkie Farr") and Hogan Lovells International LLP ("Hogan Lovells", and collectively with Willkie Farr and TGF, "Counsel") and Counsels' clients, Nortel Networks UK Pension Trust Limited (the "Trustee") and the Board of the Pension Protection Fund (the "PPF" and together with the Trustee, the "UK Pension Claimants") to provide an opinion relating to Ontario law, as set out in more detail below.

2.  In my practice, I have dealt almost exclusively with intellectual property matters. I have represented clients in litigation and provided other intellectual property advice relating to patents, copyright, trade-mark, trade secret and related rights. Due to my technical background, my practice has included legal work relating to intellectual property rights covering computer and information technology subject-matter.

3.  A copy of my curriculum vitae is marked as Exhibit "A" to this Report.

4.  Based on the above qualifications and experience, I believe that I am qualified to give the opinions set out below.

5.  My firm is being compensated at my usual and customary rate of $700.00 CND per hour for my time, and $410.00 CND per hour for my associate, Alan Macek, plus reimbursement for expenses. No part of my compensation depends upon the outcome in this case or any issue in it.

6.  Counsel has provided me with a set of material for review in preparing this Report. A list of all such material is marked as Exhibit "B" to this Report. In preparing this report, I consulted the following research sources: (i) Canadian case law and statutes; (ii) academic publications such as legal texts, journal articles and scholarly papers; and (iii) on-line annotations and digests. A list and copies of all authorities referred to in this Report are marked as Exhibit "C" to this Report.

1

7.      During the last four years I have testified as an expert in only the following case, by making a declaration (on which I was not examined) concerning Canadian law: *Therapearl v. Rapid Aid Ltd.* United States District Court District Of Maryland, Civil Action No. 1: 13-cv-02792-CCB.

**PART II - Scope of Report**

8.      I have been provided with the Green Report[2], the Berenblut/Cox report[3] and the Reichert[4] report on behalf of the Monitor and Canadian Debtors and the Britven report[5] on behalf of the Canadian Creditors Committee ( collectively the "Canadian Reports In-Chief"). I have been asked to review these reports with respect to the statements in the reports that purport to set out or explain the rights defined or granted under the MRDA (as referred to in those reports).

9.      Each of the Canadian Reports In-Chief sets out issues raised by the MRDA but none of the reports sets out how the MRDA rights are to be interpreted under Ontario law.

10.     In this report, I will therefore review Ontario law as it relates to the rights defined or granted in the MRDA and, in particular, the patent rights dealt with in the MRDA. I will then consider certain of the specific issues raised in the Canadian Reports In-Chief in light of the legal principles set out in this report.

**PART III – Opinion - Executive Summary**

**Ontario Law – MRDA Interpretation**

11.     The MRDA is governed by Ontario law. Under Ontario law, the MRDA patent licenses are interpreted based on the intention of the parties - as made apparent

---

[2] The Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities, January 24, 2014.
[3] Report of Mark L. Berenblut and Alan J. Cox, NERA Economic Consulting, January 24, 2014.
[4] Evaluation and Economic Analysis, Dr. Timothy Reichert, January 24, 2014.
[5] Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups, Tom Britven, January 24, 2014.

from the agreement itself and the factual matrix surrounding the agreement. In summary, the MRDA includes the following:

(a)    In consideration for legal title being held in the name of NNL, the Licensed Participants to the MRDA were granted a perpetual, royalty-free exclusive license to the patents held in their respective Exclusive Territories and a perpetual, royalty-free non-exclusive license in respect of the rest of the world other than Canada and the other Exclusive Territories;

(b)    The patent rights granted included rights to sub-license those rights and to independently enforce those rights; and

(c)    The MRDA licenses are for patents covering a range of technologies, including the technology in commercial offerings of Nortel, technology in development, and technology that derived from the commercial offerings and from the development work of Nortel.

**Scope of Patents Licensed**

12.    The MRDA licenses include patents for a widely-defined portfolio of Nortel technology, including technology found in commercial offerings of Nortel in the market, technology in development at Nortel (or for Nortel), and technology that derived from the products or development work of Nortel. The breadth of the definition of "Products" in the MRDA is important to understanding the full scope of the licensed patent rights.

13.    The Canadian Reports In-Chief mischaracterize the MRDA licenses as "limited" – a position arrived at, in part, because the MRDA's broad definition of "Products" is not adequately considered in those reports. In particular, the MRDA provided exclusive licenses to patents in the Nortel portfolio, including patents in the Residual IP. The Canadian Reports In-Chief are therefore incomplete as they do not include the surrender of rights to the Residual IP in their valuations and allocations.

**Sublicense and Enforcement Rights**

14.    The sublicense rights expressly granted to MRDA Licensed Participants are of key importance when considering the bundle of rights granted in the MRDA. Whether or not a license is transferrable by the licensee is a factor that depends directly on whether a sublicense right is also granted. That is, a licensed patent right is effectively transferable if it can be sublicensed.

15.    The Canadian Reports In-Chief miss this point when they focus on whether licenses granted in the MRDA are transferrable without explaining the effect of the sublicensing rights expressly granted in the MRDA. Similarly, the right to enforce NN Technology rights is important in assessing the bundle of rights granted. The Canadian Reports In-Chief do not include an appropriate analysis of the grant of the right to enforce.

**PART IV – Opinion**

16.    Each of the Canadian Reports In-Chief deals with the patent rights referred to in the MRDA. However, the Canadian Reports In-Chief do not set out a basis for how the patent-related terms of the MRDA should be interpreted. I will therefore set out the legal principles for interpreting, and then interpret, patent-related terms of the MRDA.

17.    The first version of the MRDA that was executed was dated as of December 22, 2004 ("the original MRDA"). The original MRDA was successively subject to four Addenda which amended the original agreement. Copies of the original MRDA and these Addenda are marked as Exhibit 21003 in these proceedings (and are referred to in the Canadian Reports In-Chief).

18.    I will begin my analysis below having regard to the terms of the MRDA that were in effect immediately prior to the filings made by the various Nortel entities under the relevant insolvency laws on January 14, 2009. In this Report, below, I will refer to "the MRDA" to signify the agreement as of that date.

**MRDA - Stated Governing Law**

19.     Article 14(f) of the MRDA provides that "This Agreement shall be construed in
        accordance with and governed by the laws of the Province of Ontario, Canada."
        Each of the four Addenda documents similarly defines the laws of Ontario, Canada
        as being the governing law for those Addenda.

**Interpretation of the MRDA under Ontario Law**

20.     The starting point for the interpretation of the MRDA is the Supreme Court of
        Canada *Consolidated Bathurst* case[6]:

> "… the normal rules of construction lead a court to search for an
> interpretation which, from the whole of the contract, would appear to
> promote or advance the true intent of the parties at the time of entry into the
> contract." [[1980] 1 SCR 888, at p. 901]

21.     The "true intent" of the parties is not the subjective intent of the parties. As stated
        by the Supreme Court of Canada in the *Eli Lilly*[7] case (that in turn commented on
        *Consolidated Bathurst*):

> "The contractual intent of the parties is to be determined by reference to the
> words they used in drafting the document, possibly read in light of the
> surrounding circumstances which were prevalent at the time. Evidence of
> one party's subjective intention has no independent place in this
> determination." [para. 54]

22.     The reference to "surrounding circumstances which were prevalent at the time" is
        also referred to in the case law as "context" or the "factual matrix". The Ontario
        Court of Appeal has recently stated[8]:

> "A consideration of the context in which the written agreement was made is
> an integral part of the interpretative process and is not something that is
> resorted to only where the words viewed in isolation suggest some
> ambiguity." [para. 54]

---

[6] *Consolidated Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.*[1980] 1 S.C.R. 888,
32 N.R. 488, 112 D.L.R. (3d) 49 (1979).
[7] *Eli Lilly & Co. v. Novopharm Ltd.*(1998), 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129.
[8] *Dumbrell v. Regional Group of Cos.*, (2008) 279 D.L.R. (4th) 201, 85 O.R. (3d) 616 (Ont. C.A.), at
para. 55, Although concluding that context is to be considered, the Court also acknowledged
that "there is some controversy as to how expansively context should be examined for the
purposes of contractual interpretation."

6

> "Insofar as written agreements are concerned, the context, or as it is
> sometimes called the 'factual matrix', clearly extends to the genesis of the
> agreement, its purpose, and the commercial context in which the agreement
> was made: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*
> (1998), 114 O.A.C. 357 (Ont. C.A.) at 363" [para. 55]

23.     In another recent Ontario Court of Appeal decision[9], the *Dumbrell* decision was

cited with approval and the Court stated:

> "It is important to distinguish what is meant by the factual matrix from
> extrinsic evidence that is admissible to resolve an ambiguity. The factual
> matrix is gleaned from the context of the transaction." [para. 105]

> "...where there is ambiguity in the sense that a phrase is capable of bearing
> two equally reasonable interpretations, the court may consider extrinsic
> evidence..." [para. 107]

> "However, the admission of extrinsic evidence does not mean that the
> parties' subjective views of what was intended by the agreement will be
> used to resolve the ambiguity. On the contrary, the court should adopt the
> interpretation that gives effect to the reasonable expectations or intentions
> of the parties." [para. 108]

24.     In the most recent Ontario Court of Appeal decision speaking to this point

(*McLean*[10]), the Court summarized the approach in Ontario law when the issue is

"simply a question of contractual interpretation":

> "The court begins with the words of the contract and presumes that the
> parties intended what is written in the contract. In construing the intention
> behind a particular provision, the court must consider, among other things,
> the contract as a whole, the factual matrix underlying it, and the need to
> avoid commercial absurdity. The court does not consider the subjective
> intention of the parties." [para. 54]

25.     Applying the above principles to the MRDA, the Ontario law approach is:

(a)     to seek the intention of the parties by beginning with the words of the
        MRDA,

---

[9] *Onex Corp. v. American Home Assurance Co.*, 2013 ONCA 117, 114 O.R. (3d) 161, leave to appeal
refused, S.C.C. October 3, 2013.
[10] *McLean v. McLean*, 2013 ONCA 788, 235 A.C.W.S. (3d) 415. Other cases in which the Ontario Court
of Appeal has adopted a similar approach include *Williams-Sonoma Inc. v. Oxford Properties
Group Inc.*, 2013 ONCA 441 (at para. 27 and footnote 1), citing the Ontario Court of Appeal in
*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205, at para. 24.

(b)     to consider the factual matrix for the MRDA, which includes the genesis of the MRDA, its purpose, and the commercial context in which the MRDA was made,

(c)     to give effect to the intention of the parties, with a view to avoiding commercial absurdity, and

(d)     if a term in the MRDA is identified that is capable of bearing two equally reasonable interpretations then extrinsic evidence may be considered to resolve the ambiguity.

## Patent Rights and Licenses to Patents

26.     Under Ontario law, subject to certain exceptions (primarily as provided by intellectual property rights), a person is entitled to make, use and sell any product, even if the product is a copy of the product of a competitor. One such exception to the freedom to compete is provided under patent law. Patent rights may fetter the ability of a person to use a particular technology. If a patent is held by one person, the ability of another person to make, use, and sell the invention of the patent will be removed, subject to an authorization that the patent owner may give (i.e. subject to license rights).

27.     Under Canadian law, patent rights are defined by the federally-enacted *Patent Act*. Section 42 of the *Patent Act* provides exclusive rights to the patentee and its legal representatives to make, sell, construct and use the invention defined in the patent. The exclusive right to "use" an invention has been held by the Supreme Court of Canada to mean that "if there is a commercial benefit to be derived from the invention, ... it belongs to the patent holder." The rights held by the patent's owner are rights to "full enjoyment of the monopoly granted by the patent." (*Monsanto*[11]). The authorization to derive a commercial benefit from a patent may be provided to a third party by way of a patent license.

28.     The Supreme Court of Canada has cited from the text of Harold G. Fox, to set out the nature of a patent license:

---

[11] *Monsanto Canada Inc. v. Schmeiser*, 2004 SCC 34, 239 D.L.R. (4th) 271, 320 N.R. 201, [2004] 1 S.C.R. 902, 31 C.P.R. (4th) 161 at paras. 38 and 34.

"'... But a license is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A license is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A license prevents that from being unlawful which, but for the license, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that license, would be an infringement of the right of the person who gives the license. A license gives no more than the right to do the thing actually licensed to be done.'"
(*Eli Lilly, supra,* para. 49) [emphasis in the Supreme Court quotation]

29.    This analysis holding that a license provides a "transfer of a beneficial interest", coupled with the acquisition of "an equitable right in the patent", adopted by the Supreme Court of Canada above, is consistent with the words of the MRDA. The MRDA states that under predecessor agreements[12] "each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology". The MRDA expressly provides that the Licensed Participants shall "continue, as of the effective date of this Agreement, to hold and enjoy such rights." The MRDA states that despite being signed on December 22, 2004, it is an agreement "confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the "Effective Date")."

30.    In a passage adopted by the Ontario court [13] Lord Denning in the English Court of Appeal (*Murray v. Imperial Chemical*) defined three different types of license rights, as follows:

"An ordinary "licence" is a permission to the licensee to do something which would otherwise be unlawful. That leaves the licensor at liberty to do it himself and to grant the licences to other persons also. A "sole" licence is a permission to the licensee to do it, and no one else, save that it leaves the licensor himself at liberty to do it. An "exclusive" licence is a permission which is exclusive to the licensee, so that even the licensor is excluded as well as anyone else."

31.    The nature of a sub-license was considered by the Supreme Court of Canada in *Eli Lilly,supra*, as follows:

---

[12] These agreements are considered in more detail below in sections relating to the "CSA".
[13] See *Close Up International Ltd. v. 1444943 Ontario Ltd. 2006 CarswellOnt 5797* at para. 15, citing *Murray v. Imperial Chemical Industries Ltd.* [1967] 2 All E.R. 980 (Eng. C.A.).

> "As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that 'a sublicence is simply another name for the indirect granting of a licence': see Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing* (3rd ed. 1977), at §3.18." [at para. 48]

32.    In the MRDA, a right for the Licensed Participants to enforce licensed rights in their respective Exclusive Territories is expressly provided for in Article 4(e).

**MRDA Terms: Article 5(a) – Exclusive License[14]**

33.    The rights granted in Article 5(a) are defined in two parts. The first part is an "exclusive, royalty-free license, including the right to sublicense", in perpetuity for the Licensed Participant's Exclusive Territory, for "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology". The second part of the license includes "all rights to patents ... as necessary or appropriate in connection therewith ("Exclusive License")".

34.    The term "Products" is one of the set of defined terms in the MRDA and is expressly defined to include all "products, software and services" which are "manufactured or marketed, at any time by, or for, any of the Participants". The "Products" definition also includes all products, software and services "designed, developed", or "proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants". Also included are all "components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other

---

[14] The wording of Article 5 in the MRDA was amended in the First Addendum to remove the lower case roman numerals found in the original version and left all other words and punctuation intact. In my view of Article 5(a), there is no practical difference in interpretation between the original version with the lower case roman numerals, and the amended version, which omits the numbering scheme within the article. This is consistent with the fact that the lower case roman numerals were not removed until more than nine months after the MRDA was signed and that the addendum removing them refers to "certain minor errors" that were being corrected. Lee Transcript 166:10-167:4; Exhibit 21003 at NNC-NNL06001514/21.

derivatives associated with or incorporated in any of the foregoing". The definition of "Products" was not changed during the time that the MRDA was in effect.

35.     Therefore, consistent with the Nortel Networks integrated, matrix business model, the words of the MRDA license, as read with the Products definition, included rights to:

    (i)     all products, software and services (incorporating the NN Technology) made, marketed, designed, developed, by, or for, any MRDA Participant,

    (ii)    all such technology *proposed* to be made or marketed and, all such technology *proposed to be designed or developed* by, or for, any MRDA Participant; and

    (iii)   all improvements, upgrades, updates, enhancements *or other derivatives*.

36.     Further, the rights granted under Article 5(a)(i) are stated to be "perpetual" (see further discussion, below) and relate to development and design work for any product, software or service, developed "at any time by, or for, any of the Participants" (emphasis added) "using or embodying NN Technology". The NN Technology is defined to mean "any and all intangible assets including but not limited to patents…" as they are "produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."

37.     The broad MRDA definition of Products imports into the Exclusive License (i.e. the license of Article 5(a)(i)) perpetual rights relating to any product, software or service developed in any of the R&D facilities (i.e. by any of the Participants) of the larger Nortel Networks "matrix" of entities, whenever developed. The license rights under Article 5(a)(i) are not defined to be restricted to the actual products being commercialized by any Participant at any one time.

38.     The second part of the license granted in Article 5(a)(i) relates expressly to "all rights to patents" (and other IP rights as set out in that article). This second part of the license is defined by reference to the first part of the license:  the grant is of a

license to "all rights to patents ... as necessary or appropriate in connection" with
the license defined for the Products. The second part of the license is included
within what Article 5(a)(i) terms the "Exclusive License" and which rights are
referenced elsewhere by that name in the MRDA (see, for example, Article 4(a)).
The "all rights to patents" term requires a patent license that is commensurate with
the first part of the license grant defined in the Article 5(a) grant – i.e., an
exclusive, paid up license, including the right to sublicense in perpetuity.

39.     In terms of the scope of the exclusive patent license, the necessary scope is broad
        both in terms of subject matter (see above discussion re "Products") and in terms of
        time:  the Exclusive License of Article 5(a)(i) is expressly perpetual (except as
        otherwise provided for in the MRDA – see below). Further, the Products are
        defined in the MRDA to cover eligible subject-matter created or proposed at any
        time. Thus, to give effect to the rights granted to each Licensed Participant to
        exclusively make, use, sell or license the subject-matter (which has been at any
        time designed or developed or is proposed to be designed or developed), the license
        for a particular patent comes into effect when the patent rights are licensable or
        assertable in the relevant Exclusive Territory.

40.     A further point goes to the commercially unrealistic result that would follow if the
        patent rights granted under Article 5(a)(i) were to be tied to products actually
        produced and marketed by a Licensed Participant at any particular time. To
        determine which patents were, at any given time, subject to exclusive rights of a
        Licensed Participant, would require a complete understanding of the product
        offerings of the Licensed Participant as well as which patents were implemented in
        which products. To manage such a temporally fluctuating portfolio of patent rights
        would be, in my view, commercially unreasonable.

41.     Further, the license to the patents under Article 5(a)(i) necessarily extends beyond
        the time during which any sales activity is carried on by a Licensed Participant. The
        Licensed Participant is expressly granted the right to make, use or sell and may also
        license the subject-matter as defined in Article 5(a)(i) – which relates to the broad
        set of defined Products. Thus the grant of rights is not restricted to commercialized

products of the Licensed Participant - the Licensed Participant is expressly given the ability to sublicense others to commercialize the technology. The rights accorded under Article 5 are therefore not contingent on the Licensed Participant bringing any particular product to market in the Exclusive Territory, or indeed having any product on the market at all.  For the Licensed Participant to exercise and enjoy the broadly defined rights fully, including the right to be able to grant its own licenses within its Exclusive Territory, the Licensed Participant must receive exclusive rights under the relevant patents - which exclusive rights necessarily extend for the life of the patents (subject only to the specific terms of the MRDA, discussed below).

42.     Further, and as discussed further below, Nortel Networks R&D activity and patenting programs were centred on developing products, including products that were commercialized, were yet to be commercialized, or had been previously commercialized. As a result, the intention of the parties, as expressed in the agreement, is that the "necessary and appropriate" patent license is for each Participant to be granted an exclusive licence for all such Nortel patents, in its Exclusive Territory.

**MRDA Terms - Article 4(e) – Enforcement Rights**

43.     The MRDA includes a specific grant of rights to "assert actions and recover damages or other remedies" for the appropriate Exclusive Territory in Article 4(e). This reflects an intention of the parties to provide a broad set of rights to the Licensed Participants for their own Exclusive Territories. The independent right to pursue others for "infringement or misappropriation" is consistent with the view that the Licensed Participants had "equitable and beneficial ownership of certain exclusive rights".

44.     As discussed in more detail below, the ability to enforce in their own territory is a significant part of this bundle of rights granted in the MRDA[15]. Further, Article

---

[15] There are non-exclusive rights granted to the Licensed Participants in Article 5(a)(ii) but these are expressly defined to be granted for outside the Exclusive Territory and therefore the provisions of Article 4(e) do not apply to those rights.

4(e) references the right to assert actions and recover damages as it relates to infringement or misappropriation "of NN Technology" by others. This term's reference to NN Technology – as opposed to defining the right with respect to product lines or the business of the Licensed Participant - is consistent with a broad grant of patent rights under Article 5(a)(i). It would be inconsistent if the MRDA were to provide narrower rights under Article 5(a)(i) (grant of license) than are indicated under Article 4(e) (enforcement of license rights).

45.   Both the sublicense rights and the enforcement rights relate to third party activities. Under the MRDA, the Licensed Participants can sublicense their rights to third parties to commercialize their own products, or the Licensed Participants can enforce their rights against unlicensed third parties making their own products. In both cases, the sublicense or enforcement relate to products of the third parties.

**MRDA Terms and the Stand-Still Agreement:  Termination and Perpetual Rights**

46.   The grant in Article 5(a) states that the grant is perpetual, "except as hereinafter provided". The terms of the MRDA did include provisions under which the Exclusive License could be terminated (see Articles 9 and 11) . Absent the invocation of these termination terms, however, the MRDA provided for a perpetual term for the Exclusive License granted.

47.   By the terms of the Fourth Addendum, executed in December 2008 and January 2009, a "Standstill Provision" was agreed to by the parties to the MRDA. This addendum was stated to operate to "prevent any termination or  withdrawal described at (i) above from occurring, so that the Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b)". The Article 11(b) terms dealt with a Forced Retirement due to a Defaulting Event which included any Participant becoming insolvent.

14

**Factual Matrix**

48.     To interpret the terms of the MRDA, Ontario law indicates that the context or
         factual matrix should be considered. This includes the genesis of the MRDA, its
         purpose, and the commercial context in which the MRDA was made.

**The Predecessor Cost Sharing Agreement (CSA)**

49.     The MRDA is a replacement for the Amended Research and Development Cost
         Sharing Agreement entered into on January 1, 1992 (the "CSA").[16]

50.     How the CSA's terminology was incorporated into, and modified within, the
         MRDA are both relevant in analyzing the "genesis" of the successor MRDA.

51.     The MRDA expressly references the rights granted under the CSA. The CSA
         included terms that were very similar to, but not identical to, terms set out in the
         MRDA. Therefore, the characterization of the CSA terms in the terms of the
         MRDA itself provides a strong indication as to the intention of the parties in
         entering the MRDA.

52.     As noted above, the MRDA states that despite being signed on December 22, 2004,
         it is an agreement "confirming and formalizing the operating arrangements of the
         Participants at and from January 1, 2001 (the "Effective Date")."

53.     The MRDA states that under the CSA the Licensed Participant had "equitable and
         beneficial ownership of certain exclusive rights under NT Technology". In the
         context of the CSA, this reference is to the rights granted under Article 5 of that
         agreement. In fact, for reasons set out below, the MRDA provided a bundle of
         rights to the Licensed Participants that was, in respect of patents, more extensive
         than what was held under the CSA. The MRDA's characterization that under the
         CSA the Licensed Participants held "equitable and beneficial ownership" rights
         provides a very strong indicator that the intention of the parties to the MRDA was
         to provide "equitable and beneficial ownership" rights to the Licensed Participants
         under the grant of rights of Article 5 of the MRDA. The reference to rights granted

---

[16] See Exhibit 21002. Although this report references a single "CSA", the cost sharing arrangement was
     implemented with a series of agreements, as referenced in the Canadian Reports In-Chief.

to the Licensed Participants is the only time the word "ownership" is used in the MRDA.

54.    Additionally, the MRDA differed from the CSA in a number of ways:

(a)    the definition of "Products" in the MRDA was broadened from the definition found in the CSA. In contrast to the MRDA, the CSA did *not* expressly recite "design", "development" or proposed "design" or "development" in the definition of "Products". This reflects an intention of the parties to the MRDA to define a broader license – to license more than merely those "products" which were "manufactured or marketed" or "proposed to be manufactured or marketed".

(b)    The definition of NN Technology in the MRDA is also different from the definition of NT Technology in the CSA. In the CSA  there is reference to "intangible" rights. The MRDA makes express that the license to the NN Technology did not include trademark rights or goodwill. This difference shows that the intention of the parties to the MRDA was not, in that agreement, to provide a right to market products under the Nortel *brand* (which requires a license under trademark rights) but rather to provide rights to technology and the related patent rights that went with *technology* being developed or proposed to be developed by the R&D entities at Nortel Networks.

(c)    The CSA had limitations on the patent license granted to the Participant by which NNL was entitled to enter into cross-licenses in the territory of the Participant and the Participant was required to permit certain activities within its territory. These terms were removed in the MRDA. This change indicates that the intention of the parties was to provide the Licensed Participants with a more complete bundle of rights in the technology and the patents to the technology consistent with Nortel's integrated, matrix business model.

55.     A further aspect of the genesis of the MRDA is made apparent in comparison with the predecessor CSA. The former agreement defined an arrangement whereby the costs of R&D for the Participants were shared between the different Participants, based on the relative income of the Participants. In contrast, the MRDA defined a "residual profit split methodology (RPSM)". This was a profit sharing approach in which, as a general matter, the profits of the Participants were (with various adjustments) shared as between the Participants based on the R&D costs incurred[17]. Further, in the original MRDA the method for calculating the RPSM was expressly subject to review by the appropriate tax authorities (see preamble). This tax-driven aspect of the MRDA is also shown by the Third Addendum which stated that "in discussions with certain Revenue Authorities in 2007 that certain amendments" were "necessary or desirable". By the Third Addendum, in December 2008/January 2009, the RPSM mechanism set out in the MRDA Schedule A was again amended. The change from a cost sharing to a profit sharing model, adopted for taxation reasons, is another factor to be considered in interpreting the terms of the MRDA. To the extent that taxation rules required that the Licensed Participants have beneficial ownership in the patents licensed, the tax-driven aspect of the agreement is consistent with an interpretation where the Licensed Participants were granted rights that fit with the beneficial ownership structure.

**Nortel Networks' Matrix Business Model**

56.     The central fact of the commercial context for the MRDA is that the Participants were all part of the global Nortel Networks business. The MRDA expressly references the full entrepreneurial risks and benefits for the Nortel Networks business that each Participant would bear under the MRDA.

57.     All the Nortel Networks business was organized around "business lines" or "business segments" on the basis of product lines (with the exception of certain joint ventures). These business segments operated globally and all of Nortel Networks' business, and each business line or segment was integrated yet capable

---

[17] The mechanism by which the profits were to be split is set out in Schedule A, which was itself subject to amendment by the Second Addendum and by the Third Addendum.

of operating independently from the other business lines or segments.[18] With certain exceptions, the business segments were not segregated by legal entities or geography but were operated across various legal entities and therefore across the Licensed Participants.[19]

58.    The breadth of the MRDA licenses is consistent with, and gives practical and legal effect to, this "matrix" aspect of the Nortel Networks business. Each Licensed Participant was granted rights to the broadly defined design, development and manufactured technology of the other Participants. If the license was somehow limited to current product offerings of a Licensed Participant, the question of which rights were licensed or not at any one time would have been virtually intractable. The practicalities of the "matrix" model for Nortel's business is consistent with an interpretation of the MRDA under which all Participants have authorization to utilize, to enforce and to license all patents that related to the Nortel Networks technology as developed anywhere, any time, within the "matrix".

59.    The MRDA provides that the legal title to the licensed patents will be held in the name of NNL. This is also consistent with the matrix business model of Nortel Networks. For administrative convenience, where all patents are to be shared across the matrix of Nortel Network entities, it is practical to have a single entity "vested" with title in its name. This would permit the orderly management (maintenance and prosecution activities) from a central repository where title is held to the various patents which will be licensed.

**Nortel Networks R&D Focused on Commercially Promising Technologies**

60.    During the time of the MRDA, Nortel developed technology with the goal of, at least eventually, giving rise to a commercially exploitable product.[20] The commercial context to the MRDA, therefore, was that the business of Nortel Networks was to design and develop technology that was intended to be

---

[18] Nortel Networks Functional Analysis for the years ended December 31, 2000-2004 ("Functional Analysis") [Exhibit 31355].
[19] Motion by NNI in the Chapter 11 bankruptcy proceedings, January 14, 2009 at para 32.
[20] See: Exhibit 11352 at NNI_01534868, Exhibit 11074 at NNC-NNL016070 at page 10 of 14, Ex. 22078 at PC0184926.

incorporated in product offerings. Therefore, the patents which are licensed - those related to "Products" as defined in the MRDA – reflect an intention by the parties to encompass effectively all patents created by the Participants.

**Canadian Reports In-Chief:  Scope of Patents Licensed**

61.    Each of the Canadian Reports In-Chief mischaracterizes the scope of the Exclusive License of the MRDA. The mischaracterizations stem from a shared misreading of the Products definition in the MRDA: The license relates to Nortel R&D activities, not to the commercial offerings of Nortel at any one time. The misreading can be seen in the following examples:

   (i)     A misplaced focus on "business operations" leads the Green report to erroneously conclude that the MRDA licenses "did not include rights to patents not used in any of their operating businesses." [p. 64]

   (ii)    The Reichert report states:  "If Nortel stopped making and selling products or if those products were no longer used or no longer embodied the shared R&D ... the licensees would no longer earn profits from their R&D investments." [p. 38].

   (iii)   The Berenblut/ Cox report states:  "The economic benefits foregone by the U.S. Debtors and EMEA Debtors by the surrender of their property interests do not include the value of Nortel's IP assets that were not incorporated into Nortel products." [para. 78]

   (iv)    The Britven report summarizes the MRDA as defining a license "to make, use and sell products of the business." [Table 11, p. 41]

62.    Each of the above mischaracterizations ignores the MRDA Products definition which expressly brings into play "design" and "development" activities that are part of R&D, in addition to the commercialization activities of manufacturing and marketing. Further, proposed design and development activities are included, as well as (for example) "derivatives" from all such activities. These broader R&D

activities of Nortel – which are understood to be at the heart of the value to the Nortel "matrix" of activities – are expressly included in the Products definition in the MRDA. The words of the MRDA define the licensed rights to be much broader than merely those Nortel products which, in fact, were manufactured and marketed. This license breadth, which includes patents in the Residual IP, is not appropriately taken into account in in the Canadian Reports In-Chief. The reports consequently do not provide a value for the licenses as they relate to Residual IP.

63.    The misplaced focus on product offerings in the Canadian Reports In-Chief is exemplified by the fact that all the Canadian Reports In-Chief refer to the MRDA license as being one limited to Products[21]. None of the Canadian Reports In-Chief restates or refers to the fact that MRDA Article 5(a) also expressly grants to the Licensed Participants "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith". In the Canadian Reports In-Chief, this second part of the license grant is passed over, while (as stated above) the references that are made to the defined term "Products" fail to recognize the breadth of the scope of activities covered by the definition.

**Canadian Reports In-Chief: Sublicensing and Enforcement Rights**

64.    MRDA Article 5(a) states that the license granted is "an exclusive, royalty-free license, including the right to sublicense". The grant term also provides rights that include "in perpetuity, rights to … license."

65.    The sublicensing right is important because the right to sublicense is related directly to the transferability of licenses. If a license cannot be sublicensed and is not transferable, the right to make use of the license is effectively restricted to use by the licensee alone. However, if the licensee has an unfettered right to sublicense then a restriction of non-transferability is of limited importance. The rights of the licensee can be effectively passed to a third party – albeit by way of a sublicense, rather than by way of transfer. When patent rights are involved, the difference

---

[21] Green report: p. 25 ; Reichert report: p. 37 ; Berenblut/Cox report:  para. 60(b); Britven report, para. 4.2(b), p. 16.

between a transfer and sublicence may have limited or no commercial importance
(for example, some patents were transferred to buyers of Nortel business units and
some were licensed). The important factor for the purchaser being the authorization
to be able to use the technology – a right made available under either mechanism.

66.    Despite the express reference to sublicensing rights in Article 5(a), the Canadian
Reports In-Chief do not acknowledge its importance. For example:

(a)    The Reichert report states: "In short, the licence was to make and sell
Products and to use the Nortel technology as required for these purposes."
The report also ignores the sub-license rights in referencing the MRDA
license rights as "product make-sell rights". The right to license "Products"
is referenced but the rights are summarized as rights to "make and sell
Products", without reference to licensing or sub-licensing rights.

(b)    The expressly granted sublicensing right is not mentioned in the
Berenblut/Cox para. 60(b) summary – nor in any other part of the report.

(c)    The summary of the provisions of the MRDA that are of "particular
importance" in the Green report does not reference the sub-clause setting
out the sublicensing right in Article 5(a). Green states that the license rights
were "restricted to specific fields of use as required to operate the Nortel
operating business as managed by the licensee." [pp. 25 and 55]

(d)    The Britven report summarizes the "licenses granted by NNL" as being
"limited in scope" and lists some but not all of the rights that were included
in Article 5(a) (at section 4.2(b), p. 16). Missing is the right to sublicense or
license. A further reference to the rights of each Licensed Participant does
define the right to sublicence but states that it is a "limited right" only
"within the scope and field of use of its other license rights." The terms of
the MRDA do not include any such express "scope and field of use"
restriction. Further, the summary provided by the Britven report lists "other
license rights" as being only "making, using and selling and marketing".
Missing from this list are the expressly defined rights granted to the

Licensed Participants to "have made", "lease", and "license". A later summary in the report (section 6.33) reduces the listed rights to be merely rights to "make, use and sell" – again omitting the right to license which is expressly granted in the MRDA.

67.    An example of how this oversight impacts on the analysis in the Canadian Reports In-Chief is found in the Berenblut/Cox report. At paragraph 62, the report states that NNL, as "owner of Nortel's IP", was entitled to "the benefit of that IP in its highest and best use – including from the transfer of those assets to third parties who were prepared to pay more for those assets than the present value of the operating profits Nortel could have been expected to realize from their use in its own operations."[22] However, the type of value identified in this sentence can also be realized through a licence to third parties. In the MRDA, the Licensed Participants were provided with the right to sub-license and, accordingly, were expressly granted the ability to license the rights so as to obtain the "benefit of that IP" in their respective Exclusive Territories. This is a salient omission because the report states that, "importantly", the license rights are not transferable to third parties.

68.    Similarly, the Green report identifies an income approach valuation and states that the methodology is "especially appropriate because the license rights could not be transferred." [p. 54]

69.    In Reichert, the same stress is put on the inability to transfer the license: "there is no provision for a licensee to have the right to any other exploitation interests, including future investment opportunities or sale rights in respect of Nortel technology." [p. 37] The report also identifies the licensed rights as being "product make-sell rights", a characterization that omits the important right to sublicense.

---

[22] The MRDA does not refer to NNL as the "owner" of Nortel's IP. As set out above, the only time "ownership" is used is in relation to the Licensed Participants.

70.    The Britven report lists the "lack of transferability without the consent of the other
       parties to the MRDA" as being one of the factors used to arrive at the value of the
       surrendered licenses. (Section 6.33)

71.    The Canadian Reports In-Chief also mischaracterize the intention of the parties to
       the MRDA in stating that the MRDA included a term that "licenses were non-
       transferable without the consent of all parties to the MRDA" (see Berenblut/Cox at
       para. 61(b), Green at p. 26, Britven at section 4.2(b), p. 16). In fact, the words of
       the MRDA (Article 14(a)) refer to the MRDA agreement itself not being assignable
       without consent of all Participants. The parties to the MRDA did not choose to
       include an express term in the MRDA to restrict the transfer of licenses granted
       under the MRDA. This makes sense as, by allowing the licensees to freely
       sublicence, the MRDA operated to transfer a right to the Licensed Participants that
       was of similar if not identical value as the right to transfer the license itself. There
       was little benefit in the parties stating that the license was not transferrable when
       the rights under the license could be freely transferred by sublicensing.

72.    The broader misunderstanding of the MRDA licensed rights in the Canadian
       Reports In-Chief goes to the heart of the reports. The Canadian Reports In-Chief
       conclude that the valuation and allocation methods proposed were appropriate
       because there was no transferability of the MRDA license rights (see
       Berenblut/Cox at para. 62, Reichert at p. 37, Britven at section 4.2(b), p. 16). In
       fact, the sublicensing right provides an economically equivalent right in the hands
       of the MRDA licensees. This right is not accounted for in the Canadian Reports In-
       Chief.

73.    A related point concerns MRDA Article 4(e) which grants Licensed Participants
       the right "to assert actions and recover damages or other remedies" for
       infringement of "NN Technology." As was the case with the right to sublicense, the
       Canadian Reports In-Chief do not acknowledge that this grant of rights goes
       beyond "make-sell" rights that are purported to be the extent of MRDA license
       rights. The ability to enforce rights is not required to be granted if a license is truly
       a "make-sell" authorization only, nor is the right to enforce referenced to

"Products". The right to enforce the licensed rights is, in itself, potentially a source of revenue and is an indicator that the MRDA's grant of rights to the Licensed Participants was intended to be broad. The unsupported characterization of this as a "limited right to assert actions and recover damages" (Green, p. 25) misses the significance of this grant.

74.     As the above indicates, the MRDA grants rights that are perpetual, paid up, and exclusive, and which include sublicensing rights and include independent rights to enforce. This significant bundle of rights is entirely consistent with the "equitable and beneficial ownership" rights, referred to in the MRDA as being granted to Licensed Participants. In fact, the bundle of rights provides the licensees with an authorization to use the patented rights, a right to allow others to use the patents, and a right to enforce the patents. These are not "limited" license rights, as the Canadian Reports In-Chief have stated, but rather provide a full range of the benefits available under patent rights.

**Extrinsic Evidence and the Interpretation of the MRDA**

75.     As is set out above, it is my opinion that the intention of the parties to the MRDA is able to be found in the words of the MRDA, as interpreted in the context of the factual matrix of the agreement. However, as set out above, the law of Ontario also provides that if a term of the agreement is held to be ambiguous, then recourse may be had to extrinsic evidence to interpret the agreement.

76.     It is my opinion that the MRDA is not ambiguous. Assuming, however, the Courts were to conclude that any ambiguity exists in Article 5 in view of the position taken in the Canadian Reports In-Chief that the licensed patent rights are narrowly tied to current commercial offerings of the Licensed Participant, the Courts could look to extrinsic evidence.

77.     The conduct of NNL under the terms of the MRDA is extrinsic evidence which may bear on the interpretation of the agreement. In particular, after the effective date of the MRDA, NNL commenced patent infringement actions in courts in the United States of America. In these actions, NNL was named as a plaintiff as having

title to the U.S. patents in suit. Further, in the court documents, the Nortel
Networks U.S. subsidiary (and Licensed Participant) Nortel Networks Inc. ("NNI")
was named as an "exclusive licensee" under the patents in suit[23]. In each of these
actions, the Complaint recited NNI as an exclusive licensee. However, I am not
aware of any evidence to suggest that there had been any investigation into whether
the specific patents in suit related to commercialized Nortel products. This
extrinsic evidence supports the interpretation of the MRDA under which the
exclusive patent licenses granted to the Licensed Participants were perpetual and
were not restricted to the commercial offerings of the Licensed Participants.

78.     Further, there are documents generated by NNL which purported to summarize the
effect of the terms of the MRDA. One such document is the "memo to file"
prepared by Giovanna Sparagna in 2006.[24] This document includes the following
summary of the rights granted under the MRDA:

> "As under the cost sharing agreement, each Participant has the beneficial
> ownership of the Nortel intangible property in its own Territory. Although
> NNL (Canada) owns legal title to the intangibles, the Participants are
> granted by NNL exclusive perpetual licenses in their respective jurisdictions
> to exploit and otherwise develop the Nortel intangibles."

79.     The above extrinsic evidence supports the interpretation of the MRDA provided
above, should there be a conclusion that terms of the MRDA are ambiguous. For
the reasons set out above, however, in my view the terms of the MRDA do not
require extrinsic evidence for their proper interpretation.

---

[23] See Complaints in Exhibits 22084, 21456, and 21457.
[24] Exhibit 11345.

Bruce W. Stratton
February 28, 2014