**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| *In re* | ) | Chapter 11 |
|  | ) |  |
| Nortel Networks Inc., et al., | ) | Case No. 09-10138 (KG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
|  | ) |  |

- and the -

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, C. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
**NORTEL NETWORKS CORPORATION,** NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

---

**EXPERT REPORT:**

Leif M. Clark & Jay L. Westbrook

Submitted on Behalf of the Trustee of Nortel Networks U.K. Pension Plan

and the Board of the Pension Protection Fund

---

**TABLE OF CONTENTS**

I       Overview

II      Historical Development of International Insolvency Policies

III     The Implications of the Model Law and Modified Universalism

IV      The Nortel Case

**APPENDICES**

Appendix A    Identification, Qualifications and Statement of Compensation

Appendix B    Publications

Appendix C    Cases Involving Prior Testimony

Appendix D    List of Material / Documents Reviewed

Appendix E    Statement of Assumed Facts

Appendix F    Description of Research

Appendix G    Form 53 (Leif M. Clark)

Appendix H    Form 53 (Jay L. Westbrook)

## I.     Overview

1.     We have been asked to consider the following questions in connection with the proceeds of sale in excess of USD$7 billion currently held in a lockbox (referred to as the "lockbox funds") following the coordinated worldwide realization of the assets of the Nortel group of companies (the "Nortel Group"):

(i)     What are the policy goals sought to be achieved through the articulation of international insolvency principles?

(ii)     What are the sources of international insolvency principles and policy that transcend domestic legal regimes?

(iii)     What elements of traditional domestic insolvency law have inhibited the application of international insolvency principles and policy?

(iv)     What has been the domestic law response to international principles and policy?

(v)     How would international insolvency principles and policy inform the administration of the estate of a functionally integrated multinational corporation?

(vi)     With respect to the Nortel Group, how would international insolvency principles and policy inform the allocation of the lockbox funds (representing the proceeds of sale of coordinated global realizations) among the various estates?

2.     We arrive at our opinion in light of applicable domestic laws, including the Model Law on Cross-Border Insolvency[1], and the principles of international insolvency law as reflected in the American Law Institute ("ALI") Principles of Transnational Insolvency, the guidelines promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"), and other legal instruments—all of which are based on the concept of modified universalism.[2] From our perspective, our work affects the ultimate distribution to creditors primarily as a consequence of a decision to allocate the lockbox funds by entity or territory, or to treat the

---

[1] UNCITRAL Model Law on Cross-Border Insolvency (1997).

[2] See *infra*.

proceeds as a single pool of assets for the benefit of all the Nortel Group's creditors. In our view, that decision is predicate to any consideration of the basis for an allocation.[3]

3.      A basic principle regarding the optimal approach to the administration of a multinational enterprise insolvency, is this: The job of allocation should not be undertaken until there is a demonstrated need to allocate and, if so, how to allocate. On the face of the proceedings so far, and consistent with the results obtained by consent in so many other cases, the presumptive answer in a modified-universalism jurisdiction is that distribution from a global realization should be on a global (single pool) basis. One who would allocate on a corporate basis or, even more repugnant to universalism, on a territorial basis, must come forward with good reasons and solid evidence to support a need to allocate. Limited liability not being an issue in a liquidation, the only policy supporting a commitment to the mantra of corporate form is a vested expectation of creditors. Thus the party claiming that an allocation by entity or by country (or both) is necessary must present evidence of their peculiar reliance interest, beyond a mere *ex post* desire to be preferred.

4.      While we report on the current state of international principles in the realm of multi-national insolvency, and their arc of development, two points should be made at the start. First, there is very little precedent concerning the allocation question facing the Nortel Group in the international context, whether one looks to international law as such or to the legal systems of individual countries with regard to the insolvency of multinational corporations.[4] Indeed, the Nortel matter is in many respects a case of first impression. As discussed below, the law concerning the treatment of corporate groups with regard to the distribution of proceeds in an international insolvency is just now being written. The result in this case is thus of the greatest

---

[3] With regard to the facts of the Nortel case, we rely entirely on the Statement of Assumed Facts provided to us by instructing counsel and appended hereto as Appendix E. We have assumed those facts to be true and, notwithstanding reference to the source or cite for such facts on Appendix E, have not reviewed or independently verified such source documents for the purposes of this report. We do not comment in this report concerning the rights of specific creditors or classes asserting rights against categories of assets or multiple members of the Nortel corporate group *if* the decision is made to allocate among entities or territories.

[4] *See, e.g.,* Jamie Altman, *A Test Case in International Bankruptcy Protocols: The Lehman Brothers Insolvency,* 2011 Norton Ann. Rev. of Intl. Insolvency 11 (2011) (noting the absence of precedent applicable to the *Lehman Brothers* case).

import for reasons transcending the large amounts of money involved, because it may set a crucial precedent for global cases to come. In particular, the maximization of value achieved by a global disposition of Nortel's assets was itself a major advance and the proper disposition of its proceeds could point the way to the future of international insolvency jurisprudence.

5.       Second, we have developed for some years, on the bench, in the academy, and in law reform organizations, the idea that international insolvency cases should be managed as much as possible toward the ideal of a single worldwide proceeding, within the limits established by a pragmatic realization that the ideal is not the actual and that jurisdictions committed to the ideal must advance toward it step by thoughtful step.[5] This idea, generally known as modified universalism, is highly relevant to the current matter, because all three of the jurisdictions governing the Nortel matter have adopted modified universalism as their fundamental policy in managing multinational insolvency cases.  The adoption of the Model Law on Cross-Border Insolvency by all three of the major jurisdictions involved—Canada, the United Kingdom, and the United States—has introduced into their laws the basic elements of modified universalism.[6] The United States has explicitly linked its adoption of the Model Law (in the form of Chapter 15 of the Bankruptcy Code) to the modified universalism policy.[7] One of our mandates in preparing

---

[5] See American Bankruptcy Institute, Cross-Border Insolvency in the United States 13–14 (2008).

[6] See Bankruptcy and Insolvency Act § 271 (1997) (Can.); Rubin v Eurofinance SA, 2012 WL 4866933 (United Kingdom); In re Maxwell Commc'n Corp. plc, 170 B.R. 800, 816 (Bankr. S.D.N.Y. 1994) aff'd, 186 B.R. 807 (S.D.N.Y. 1995) aff'd sub nom. In re Maxwell Commc'n Corp. plc by Homan, 93 F.3d 1036 (2d Cir. 1996) (United States). Canada has also linked its insolvency law to modified universalism. Janis Sarra, Northern Lights, Canada's Version of the UNCITRAL Model Law on Cross-Border Insolvency, 16 Int'l. Insolvency Rev. 19-61 (2007) ("Statute of Canada Chapter 47 . . . will largely adopt the UNCITRAL Model Law on Cross-border Insolvency. . . . [I]t continues Canada's regime as one of modified universalism, with a strong commitment to comity and coordination.").

[7] The Hon. Leif M. Clark, Karen Goldstein, Sacred Cows: How to Care for Secured Creditors' Rights in Cross-Border Bankruptcies, 46 Tex. Int'l L.J. 513, 524 (2011) ("In 2005, when the United States enacted the Model Law as Chapter 15 of the Bankruptcy Code, it continued its commitment to the ideals of modified universalism."); Jay Lawrence Westbrook, An Empirical Study of the Implementation in the United States of the Model Law on Cross Border Insolvency, 87 Am. Bankr. L.J. 247, 268 (2013) ("The Model Law in its United States manifestation--Chapter 15--has achieved a high level of success, in significant part because of the courts' understanding of its enactment as an acceptance by the United States of modified universalism. . . ."); Lynn M. LoPucki, Cooperation in International Bankruptcy: A Post-Universalist Approach, 84 Cornell L. Rev. 696, 702 (1999) (stating the article in part "critiques modified universalism, the approach formally adopted by the United States").

this report is to analyze the relationship between this fundamental concept and the proper approach in the Nortel case.

6.      The adoption of modified universalism through the enactment of the Model Law has a number of implications for a jurisdiction's approach to an international insolvency case.[8] The key to understanding these implications is that many domestic law concepts must necessarily go through a realignment to be workable in the context of a global marketplace.  In the very nature of modified universalism, discussed below, distributions on a territorial basis are strongly disfavored, although exceptionally appropriate for certain claims.  Beyond that obvious point, the policies that underlie modified universalism have important implications for other legal rules as applied to international cases.

7.      The treatment of corporate groups is a notable example of the fact that the international context is quite different.  While an appreciation of domestic law remains important, the policies of the concerned jurisdictions and the needs of global commerce cannot be served by an unreflective application of domestic rules to the very different context of the insolvency of a global corporation.  The same logic that points to maximization of value through a global, nonterritorial realization of assets leads to a strong presumption against both territorial and entity-based distributions of that realization, with narrow exceptions where appropriate. In particular, such a distribution is most likely to correspond to the actual expectations of creditors in dealing with an integrated global enterprise operating under a single brand.  Even more clearly, the difficult task of sorting out inter-corporate claims and avoidance actions within the group and among group members, in order to arrive at a properly adjusted allocation of assets among entities and estates,[9] also compels a single distribution.  Based on the Statement of Assumed Facts, Nortel is the textbook case for the application of the principles of modified

---

[8] Unless the context otherwise requires, references to the Model Law refer to the law as adopted in each of the three countries relevant to the Nortel proceeding.

[9] See Statement of Assumed Facts, ¶¶ 34-36, 72-74. As a general proposition, if assets are to be distributed on an entity and estate basis, then intercompany obligations must be resolved and wrongful transfers need to be unwound. Otherwise, creditors of one entity or estate will profit, at the expense of creditors of another entity or estate. In the international context, a choice of law and choice of forum analysis with respect to each transfer and obligation needs to be done preliminary to their actual resolution.

universalism.

## II.    Historical Development of International Insolvency Policies

8.    For centuries, insolvency was a territorial exercise. Although international commerce exposed the strains of territorialist answers to cross-national questions, for most of that time that solution was not so inadequate as to compel reform. Insurance, maritime rules for the arrest of vessels, bills of lading – all were attempts to answer the problem of enforcement of claims across borders. By the late 19th century, as commerce among nations accelerated, the need for ways to cooperate became more critical.[10] Technological development further pushed the world to devise ever more sophisticated ways to accommodate global enterprise, and by extension, global insolvency.[11] Regional agreements began to emerge among countries whose commerce, laws, and culture placed cross-border agreements within their reach.[12]

---

[10] *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 538-39 (1883); *Hilton v. Guyot*, 159 U.S. 113 (1895). In *Gebhard*, the United States Supreme Court advised American bondholders that they were bound by the debtor's insolvency proceedings in Canada.

[11] *See, e.g. In re Bridge Info. Sys., Inc.*, 321 B.R. 247, 255 (Bankr. E.D. Mo. 2005) (interpreting whether or not wire transfers were a contemporaneous exchange for new value); Melinda Luthin, *U.S. Enforcement of Foreign Money Judgments and the Need for Reform*, 14 U.C. Davis J. Int'l L. & Pol'y 111, 118–25 (2007) (chronicling the development of the recognition of foreign judgments in the United States); LE OR COMMERCIAL T
Lars S. Smith, *General Intangible or Commercial Tort: Moral Rights and State-Based Intellectual Property As Collateral Under U.C.C. Revised Article 9*, 22 Emory Bankr. Dev. J. 95, (2005) (exploring forms of intellectual property that could not be secured as "general intangibles" under the old Article 9 but could be secured as "commercial torts" under revised Article 9).

[12] *See, e.g.*, Convention on the Rights and Duties of States (Montevideo Convention), Dec. 26, 1933, 165 L.N.T.S. 19; Treaty of Co-operation between Denmark, Finland, Iceland, Norway and Sweden (The Helsinki Treaty), *as amended* Jan. 2 1996, *available at* www.norden.org/en/about-nordic-co-operation/agreements/treaties-and-agreements/basic-agreement/the-helsinki-treaty (providing multiple legal mechanisms for cooperation among the countries of Denmark, Finland, Iceland, Norway, and Sweden); Administration of Justice Act 10 & 11 Geo. 5, ch. 81 § 9 (1920) (providing for the United Kingdom's enforcement of judgments that were rendered "in other British dominions"). *See also* Model Law Guide to Enactment, Pt. I, ¶ 18 ("The Model Law takes into account the results of other international efforts, including the Convention on Insolvency Proceedings of the European Union, the European Convention on Certain International Aspects of Bankruptcy (1990), the Montevideo treaties on international commercial law (1889 and 1940), the Convention regarding Bankruptcy between Nordic States (1933) and the Convention on Private International Law (Bustamante Code) (1928). Proposals from non-governmental organizations that have been taken into account include the Model International Insolvency Cooperation Act and the Cross-Border Insolvency Concordat, both developed by Committee J of the Section on Business Law of the International Bar Association.").

9.    How cross-border insolvency matters are handled in a manner that achieves outcomes appropriate to legitimate creditor expectations and to internationally accepted principles continues to pose a challenge to company managers, credit institutions, insolvency professionals, workout specialists, and jurists around the planet. For more than forty years, some of the finest legal minds around the world have labored hard to develop principles and institutions that would bridge the gap between 19th century insolvency notions ringed with territorial barriers and the cross-border needs of a 21st century global economy. And their work has borne fruit in important ways, through the pioneering work of academics, jurists, and international organizations.

10.    For many years, these efforts encountered resistance at the door of insolvency law. It was received wisdom that insolvency solutions are by definition territorial.[13] Nonetheless, the needs of international commerce were such that pressure continued to build for better, more efficient solutions attuned to the realities of global enterprise. Increasingly, purely territorial responses to global insolvency problems were seen as value-destructive, dependent as they were on a liquidation-based model. Preserving going concern value across borders in a territorial environment was (and is) extremely difficult.[14] The quest for coordinated proceedings that crossed borders was borne of the desire to salvage value and reduce cost. It was posited early on that a universalist model, in which a global insolvency was conducted under the insolvency law of a single forum, with its effects to be automatic worldwide, provided the most logical model

---

[13] *See generally, e.g.,* Jay Lawrence Westbrook, *Multinational Financial Distress: The Last Hurrah of Territorialism,* 41 Tex. Int'l L.J. 321 (2006) (reviewing Lynn M. Lopucki, Courting Failure: How Competition for Big Cases Is Corrupting the Bankruptcy Courts (2005) (chronicling the evolution of territorialist arguments and responding to those arguments); Lynn M. LoPucki, *The Case for Cooperative Territoriality in International Bankruptcy,* 98 Mich. L. Rev. 2216 (2000) (arguing in favor of territorialism and asserting that several questions posed to universalists have proven "unanswerable").

[14] Purely territorial solutions made it difficult to coordinate the sale or the restructuring of an enterprise on a going concern basis, because of variations in the *lex concursus* of the various jurisdictions. In addition, territorial approaches honor local interests above the interests of the creditor body as a whole, leading to piecemeal liquidations.  Jay Lawrence Westbrook, *Theory and Pragmatism in Global Insolvencies: Choice of Law and Choice of Forum,* 65 Am. Bankr. L.J. 457, 461 (1991); Andrew T. Guzman, *International Bankruptcy: In Defense of Universalism,* 98 Mich. L. Rev. 2177, 2181 (2000); *see also* Lynn M. LoPucki, William C. Whitford, *Venue Choice and Forum Shopping in the Bankruptcy Reorganization of Large, Publicly Held Companies,* 1991 Wis. L. Rev. 11, 52 (1991) (stating that, to effectuate the policies of bankruptcy, "it is generally recognized that a single bankruptcy court must be able to control, or at least coordinate, all aspects of the reorganization of the business").

for managing the insolvency of a global enterprise.[15] However, it was also acknowledged that, as a practical matter, some accommodation to local interests would be necessary.[16] Thus was born the concept of modified universalism, under which an insolvency proceeding might be centrally coordinated in a single forum, with ancillary proceedings opened in service to the needs of a "main proceeding," but also incorporating means to accommodate strong local interests.[17]

11.    With the development of a theoretical construct, work then accelerated on seeking out mechanisms to put the construct into action. The effort proceeded on multiple fronts, as international organizations of insolvency practitioners wrote up proposals and convened forums and colloquiums.[18] However, the work was far from theoretical. Practitioners and judges were already being forced to invent structures to manage cross-border insolvency cases whose size and complexity challenged the capacity of existing legal mechanisms. The *ad hoc* solutions developed in cases such as *BCCI*[19] and *Maxwell*[20] later became the template for opening the frontiers of international insolvency law, leading to the ground-breaking work of UNCITRAL.  It is fair to say that Canada and the United States have been at the forefront of these developments. It is also fair to say that the reforms reflected in the laws adopting the Model Law were informed

---

[15] Jay Lawrence Westbrook, *A Global Solution to Multinational Default*, 98 Mich. L. Rev. 2276, 2282 (2000); Andrew T. Guzman, *International Bankruptcy: In Defense of Universalism*, 98 Mich. L. Rev. 2177, 2178 (2000); Ronen-Mevorach, The Road to a Suitable and Comprehensive Global Approach to Insolvencies Within Multinational Corporate Groups, 2005 Gold Medal Prize for International Insolvency Research, International Insolvency Institute, at 84.

[16] Jay Lawrence Westbrook, *A Global Solution to Multinational Default*, 98 Mich. L. Rev. 2276, 2282 (2000); American Law Institute, Transnational Insolvency: Cooperation Among the NAFTA Countries 3 (2003).

[17] *Id.*  The ALI project and its Principles were the product of national reporters from each of the NAFTA countries assisted by advisory committees from each country.  Jay Westbrook was national reporter for the United States delegation.

[18] *See, e.g.*, UNCITRAL Model Law on Cross-Border Insolvency (1997); Council of the Int'l Bar Ass'n, Cross-Border Insolvency Concordat (Sept. 17 1995), *reprinted in* Mike Sigal et al., *The Law and Practice of International Insolvencies, Including a Draft Cross-Border Insolvency Concordat*, 1994-1995 Ann. Surv. Bankr. L. 1, 138-54; *see also, generally*, Jay Lawrence Westbrook, *International Developments in Commercial Law and in Civil Procedure and Arbitration*, 46 J. Legal Educ. 579, 583 (1996).

[19] *United States v. BCCI Holdings (Luxembourg) S.A.*, 48 F.3d 551 (D.D.C. 1995).

[20] *In re Maxwell Commc'n Corp. plc*, 170 B.R. 800, 816 (Bankr. S.D.N.Y. 1994) *aff'd*, 186 B.R. 807 (S.D.N.Y. 1995).

and driven by the innovations of judges and lawyers in the expanding number of international cases.

12.     UNCITRAL was established by the United Nations General Assembly by its Resolution 2205 (XXI) on 17 December 1996 "to promote the progressive harmonization and unification of international trade law". As part of this mandate, in 1997, UNCITRAL developed the Model Law. While the Model Law was not binding, it was created as a legislative text that provides a framework for effective cross-border coordination and cooperation in insolvency.

13.     Today, the Model Law has been enacted in some form by 20 nations including Canada, the U.K. and the U.S. and forms part of the insolvency regime in those nations. It is the only relevant statute, for these purposes, in all three countries.[21] Much of this activity has occurred in the past decade and demonstrates the global move towards a modified universalist approach to international insolvency. The Model Law, and the various forms in which it has been enacted by state governments, embody the true essence of modified universalism in international insolvency.[22]

---

[21] In the UK, there are other sources of law regarding international cooperation as well, such as UK §426. Section 426 is less relevant however, given its roots in the United Kingdom's unique relationship with Commonwealth countries.

[22] *In re ABC Learning Centres Limited, n/k/a ZYX Learning Centres Limited*, Case No. 12-2808, at 9-10 (3d Cir. Aug. 27, 2013) the Third Circuit recently articulated the current status of international insolvency law and its acceptance as part of the statutory framework in the United States in this way:

> The Model Law reflects a universalism approach to transnational insolvency. It treats the multinational bankruptcy as a single process in the foreign main proceeding, with other courts assisting in that single proceeding. *Westbrook, supra, at 715.* In contrast, under a territorialism approach a debtor must initiate insolvency actions in each country where its property is found. *Id.* This approach is the so-called "grab rule" where each country seizes assets and distributes them according to each country's insolvency proceedings. *Id.; see also Andrew T. Guzman, International Bankruptcy: In Defense of Universalism, 98 Mich. L. Rev. 2177, 2179 (2000).*

> Chapter 15 embraces the universalism approach. The ancillary nature of Chapter 15 proceedings "emphasizes the United States policy in favor of a general rule" that our courts "act . . . in aid of the main proceedings, in preference to a system of full bankruptcies . . . in each state where assets are found." *H.R. Rep. No. 109–31(I), at 109 (2005) reprinted in 2005 U.S.C.C.A.N. 88, 171.* Congress rejected the territorialism approach, the "system of full bankruptcies," in favor of aiding one main proceeding. *Id.* "The purpose is to maximize assistance to the foreign court conducting the main proceeding." *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 678-79 (S.D.N.Y. 2011) (citing *In re Condor Ins. Ltd.*, 601 F.3d 319, 329 (5th Cir. 2010).

*Id.*

14.    The historic development of modified universalism as the accepted international insolvency approach and its acceptance in Canada, the U.S. and the U.K. is demonstrated by the following timeline of developments in the three nations:

- **1997**: the Model Law was developed.

- **1997**: section 18.6 of the *Companies Creditors' Arrangement Act* (the "CCAA") and Part XIII of the *Bankruptcy and Insolvency Act* are introduced in Canada. These legislative provisions provided Canadian courts with statutory authority to respect and recognize decisions made by foreign bankruptcy courts, similar to former section 304 of the U.S. Bankruptcy Code (title 11). The concept of "centre of main interests" or COMI does not form part of these amendments.

- **2005**: Chapter 15 was added to the U.S. Bankruptcy Code, a codification of the Model Law. Chapter 15 incorporated the concept of modified universalism into U.S. insolvency law.

- **2006**: *The Cross-Border Insolvency Regulations 2006* are enacted in the U.K. This regulation incorporated a substantial portion of the Model Law into the U.K.'s insolvency law. This regulation incorporated the concept of modified universalism into the UK's cross-border insolvency regime.

- **January 14, 2009**:    the Nortel Group filed for insolvency protection in various jurisdictions.

- **September 18, 2009**: amendments to the CCAA formally adopting the Model Law and introducing COMI were enacted in Canada.

- **July 5, 2010**:  the United Nations Commission on International Trade Law adopted Part III of the UNCITRAL Legislative Guide on Insolvency Law, dealing with the treatment of enterprise groups in insolvency.

- **November, 2012:** UNCITRAL Working Group V concluded that it was necessary to look at the issue of COMI as it related to enterprise groups because most commercial activity was currently conducted through such groups.

15.    The Model Law is, at its core, a practical expression of modified universalism, favoring centralized administration of a global proceeding, with ancillary proceedings available to aid in the administration of the main case, subject to protections as needed to accommodate special widely accepted policies. It also encourages cooperation among different jurisdictions, and coordination of parallel proceedings. In many ways, the Model Law is, by today's standards, a modest effort, though it was ground-breaking when it was first adopted by the United Nations in 1997. It all but eliminates the time-consuming hurdles to recognition of a foreign representative, gives the foreign proceeding a stay in the enacting state (even if such a stay is not available under the local law of that state), and obligates the enacting state to cooperate and communicate with the foreign proceeding.

16.    The Model Law had been conservatively drafted, focusing on the cross-border aspects of the insolvency proceeding for a single company. The new cases that were presenting themselves for resolution by the beginning of this century, however, were not confined to this narrow circumstance. Many of the cases involved multiple companies in multiple jurisdictions – not surprising, as many enterprises today are structured through a myriad of corporate entities. Practitioners and courts alike have once again been forced to adapt, creating solutions where existing legal approaches still fall short.

17.    The innovations on the ground, however, have continued to be informed by the concept of modified universalism.[23] Just as often, the worst failures have taken place when those concepts were rejected in favor of territorialist-grounded solutions.[24]

---

[23] In *Maxwell*, for example, a single plan was confirmed in both the United Kingdom and the United States. Distributions were made in accordance with the terms of the plan. *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1042 (2d Cir. 1996). A similar approach was employed in *Everfresh*, a Canadian-U.S. cross border insolvency, as well as in *Livent*, another Canadian-U.S. insolvency. Order Approving the Stipulation Regarding Cross-Border Insolvency Protocol, *In re Everfresh Beverages, Inc.*, Case No. 95-B-45405-06 (Bankr. S.D.N.Y. Dec. 20, 1995); Order Approving Cross-Border Insolvency Protocol, *In re Everfresh Beverages, Inc.*, [1995] No. 32-077978 (Ont. Gen. Div.); Cross-Border Insolvency Protocol, *In re Livent, Inc.*, 98 B. 48312 (Bankr. S.D.N.Y. 1999); Order Approving Cross-Border Insolvency Protocol, *In the Matter of Livent, Inc.*, [1999] No. 98-CL-3162, (Ont. Sup. Ct. of Justice).

### III.    The Implications of the Model Law and Modified Universalism

*A.    A Single Distribution Without Regard to Jurisdictional Asset Control*

18.     While the Model Law does not command a particular approach to either realization or distribution, its foundation in modified universalism means that its adoption signals a commitment to favoring a single administration in a multinational case, subject to necessary exceptions to reflect the lack of global standards and global expectations.[25] Overall, allocation on the basis of territory or entity is undesirable in most liquidation cases involving multinational corporate groups for these reasons:

    A. There is a high likelihood in cases of international corporate groups that entity and territorial lines were largely irrelevant to their finance and operations.

    B. From the fact of integration flows the reality that in most, although not all cases, creditor expectations (the only relevant policy supporting the corporate form in a liquidation) are most likely based on capacities of the global group.

    C. There is enormous waste and difficulty in trying to create pools of value that were never intended to exist, costing creditors time and money a liquidation estate can ill

---

[24] *See, e.g., In re Stanford Int'l Bank.* In *Stanford*, proceedings were opened in Antigua. 8 Norton Bankr. L. & Prac. 3d § 154:13. In the meantime, an SEC receivership was opened in the U.S. The two estates competed for access to assets in Canada and England, and several other jurisdictions, with inconsistent results. *Id.* An effort to open an ancillary proceeding in the U.S. under chapter 15 was rebuffed by the district court presiding over the receivership. *Id.* As a result, an extraordinary amount of money was spent on competing estate administrations, and little or no distributions have been made to creditors. *See* Stanford Financial Group Receivership, http://www.stanfordfinancialreceivership.com (detailing interim distribution plans and progress toward approval by the various courts); Andrew Harris and Tom Korosec, *Allen Stanford's Receiver Fights Investors Over Pay Increase*, Bloomberg Businessweek, April 04, 2012, *available at* http://www.businessweek.com/news/2012-04-04/allen-stanford-s-receiver-fights-investors-for-increase-in-pay (noting over 100 million dollars in litigation costs during a one-and-a-half-year period of litigation).

[25] Jay Lawrence Westbrook, *Breaking Away: Local Priorities and Global Assets*, 46 Tex. Int'l L.J. 601, 603 (2011); Janis Sarra, *An Investigation into Employee Wage and Pension Claims in Insolvency Proceedings Across Multiple Jurisdictions: Preliminary Observations*, 16 J. Bankr. L. & Prac. 5 Art. 8. *See also*, Lynn M. LoPucki, *Cooperation in International Bankruptcy: A Post-Universalist Approach*, 84 Cornell L. Rev. 696, 711-12 (1999) (noting that employees are "unlikely to know enough about foreign insolvency laws to adjust to them").

afford.

D. This expense and delay is greatly increased by the difficult choice of law questions--questions of applicable corporate, tort, contract, and insolvency law just to start--that make the corporate unraveling a lawyer's career and a creditor's nightmare.

19.    These realities lie at the heart of the reasons the three jurisdictions involved in this matter have adopted modified universalism as their fundamental concept in global insolvencies.

20.    We should begin with a basic choice of law point. It is insolvency law, not ordinary contract or corporate law, which determines the proper choice of law for distribution. That is the reason that the international creditor's expectation argument must be an assertion of reliance about the applicable *insolvency* law. For example, contract law governs the nature and amount of the supplier's claim and will often be the law chosen by the parties in their contract, but it is in the nature of insolvency to override contract law as necessary to vindicate the policies underlying a collective proceeding following a general default.[26] Thus it is the proper choice of insolvency law that determines the distribution system to be applied, not the law of the contract. A supplier could reasonably assume that the measure of its damage for the debtor's breach would be found in the law of the contract, but the percentage of the debtor's assets available to satisfy the breach claim is necessarily a function of insolvency law.[27] That result should be consistent with the creditor's reasonable expectation that the filing of a collective proceeding will lead to the

---

[26] *See* Jay Lawrence Westbrook, *The Control of Wealth in Bankruptcy*, 82 Tex. L. Rev. 795, 828 (2004).

[27] *See Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 538-39 (1883). In *Gebhard*, the complaining creditors were investors who purchased the bonds of the Canadian company that had been issued in New York, yet the United States Supreme Court held Canadian insolvency law controlling. *Id.* at 539 ("The fact that the bonds made in Canada were payable in New York is unimportant, except in determining by what law the parties intended their contract should be governed, and every citizen of a country, other than that in which the corporation is located, may protect himself against all unjust legislation of the foreign government by refusing to deal with its corporations.") For a modern ruling consistent with that result, see *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010). *See also* Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227, 249 (1989) (observing that contracts create rights and obligations under state law and also observing that, after insolvency, the effectuation of those rights and obligations depends in part upon bankruptcy law).

application of the insolvency law of that proceeding.[28] All of that fits easily with settled law in most countries around the world regardless of a commitment to universalism or territorialism. The difference between jurisdictions as to universalism versus territorialism is relevant to the choice of the insolvency law to apply, but not to the principle that it is an insolvency law that must be chosen. In a scheme of modified universalism, that choice is reflected in which country's insolvency proceeding, among multiple choices, ought to emerge as the "main proceeding."

21.    It is precisely because of this focus on a single proceeding that a "center of main interests" (COMI) is found in the Model Law. Territorialism requires no such finding, because each proceeding operates individually on the assets it is able to control, which explains why it is often called "the grab rule."[29] But a law committed to modified universalism had to develop a concept like COMI under the Model Law. A major purpose of the Model Law was to permit a worldwide realization of value, either through global reorganization or by functional liquidation. The latter has been the extraordinary achievement of the parties and the courts in Nortel in creating the lockbox funds through coordinated efforts. A single distribution worldwide, transcending the jurisdictional location or control of particular assets, follows as a matter of logic and policy through the self-same mechanism of the COMI.[30]

B.    *A Single Distribution For Most Creditors Of An Integrated Multinational*

---

[28] *Id.* at 539 ("[T]he binding force of [bankruptcy laws], upon those who are subject to the jurisdiction, is recognized by all civilized nations.")

[29] Jay Lawrence Westbrook, *Multinational Insolvency: A First Analysis of Unilateral Jurisdiction*, 2009 Norton Ann. Rev. of Intl. Insolvency 2 (2009).

[30] A multinational insolvency is optimally managed under the Model Law by means of establishing a "main proceeding" in the country that is the enterprise's "centre of main interests." In this way, one nation's insolvency law provides the default rules of *lex concursus*. This mechanism is preferable to other other suboptimal schemes that might be imagined, such as multiple parallel proceedings which introduce additional complications involving multiple and potentially conflicting procedural rules, conflicts of law with regard to the insolvency law rule to be applied in a much larger universe of issues, and additional costs the result of multiple administrations. The Model Law sought to address these other options in Articles 28 and 29. However, even in that circumstance, the Model Law presumes that one of the parallel proceedings will emerge as the "main" proceeding. *See* Model Law, Art. 28; *see also* Guide to Enactment (2013), at ¶¶ 226-227.

22.    The relevance of modified universalism and the Model Law to insolvency distributions by global corporate groups has been the subject of less attention than its impact on territorialist distributions, but an appreciation of the connection between modified universalism and the law of corporate groups has grown greatly in the last few years.    Recent negotiations at UNCITRAL [31] and the development of corporate group guidelines by the International Insolvency Institute[32] are two of the harbingers of this development.    Both bodies have sought to develop workable models for the next logical phase of cross-border insolvency law built on a model of modified universalism, seeking to elaborate on principles that would allow for a unified distribution premised on the nature of claims as opposed to the nationality of those claims.    Thus, for example, in 2010 UNCITRAL promulgated Part III of the Legislative Guide on Insolvency Law, regarding the treatment of enterprise groups in insolvency, in which it recommended standards for a single distribution to creditors.[33]

---

[31] E.g., UNCITRAL Legislative Guide on Insolvency Law, Pt. III: Treatment of Enterprise Groups in Insolvency (2010). In its Note to UNCITRAL's Working Group V preliminary to its meeting in Vienna in December 2013, the Secretariat stated that

"At its forty-second session (2012), the Working Group expressed the following views: it was necessary to look at the issue of COMI as it related to enterprise groups because most commercial activity was currently conducted through such groups; the scope of its mandate with respect to COMI as originally approved included COMI in the context of enterprise groups; and that that topic should be considered upon completion of the revisions proposed for the Guide to Enactment of the Model Law (A/CN.9/763, paras. 13-14)."

UNCITRAL Note by Secretariat, Background Information On Topics Comprising The Current Mandate Of Working Group V And Topics For Possible Future Work, A/CN.9/WG.V/WP.117, at ¶ 5 (United Nations, 25 September 2013). It is worth noting that the UNCITRAL has, if anything, renewed its commitment to the importance of COMI as a concept fundamental to the operation of the Model Law and modified universalism, amending the Model Law Guide to Enactment to more completely elaborate on the concept and the principles that ought to guide its application. See UNCITRAL Model Law Guide to Enactment (2013).

[32] E.g., Ralph R. Mabey, Prospective Principles for Coordination of Multinational Corporate Group Insolvencies (2012).

[33] UNCITRAL Legislative Guide on Insolvency Law, Pt. III, Recommendation 220 and associated text (United Nations, 2010). The Recommendation repeated the then prevalent standards in extant jurisprudence for such consolidation – intermingling to an extent that costs of disaggregation outweighed its benefits, and fraudulent activity that could best be rectified by consolidation.  The Recommendation focused on domestic insolvency cases of enterprise groups. With respect to international insolvency cases involving enterprise groups, the Working Group limited its discussion to cooperation and coordination. It declined to proceed further, instead awaiting further elaboration with regard to cross-border insolvency of enterprise groups as a future agenda item.

The International Insolvency Institute promulgated its Guidelines for Coordination of Multinational Enterprise Group Insolvencies in 2013, but also stopped short of offering guidelines for distributions in that context. "It is

C.    *Corporate Law and Multinational Enterprise Distribution*

<u>Allegiance to the Corporate Form</u>

23.    The sticking point for extending modified universalism principles to the distributional phase of multi-national enterprise group insolvencies has been the inability to bridge the strictures of traditional corporate law. Domestic legal-entity concepts have traditionally governed notions of liability in the domestic context. In the international context, those traditional principles are seriously inconsistent with modified universalism governing insolvency and the ideal of a single worldwide distribution.

24.    The traditional allegiance to the corporate form is both important and deeply flawed in the domestic laws of most jurisdictions.    Application of the law of corporate groups to international insolvency begins with a base of domestic law that has already begun to show serious cracks in its foundational principles.    Principles of traditional corporate liability are increasingly out of step with the actual conduct of modern global business, which has in recent decades tended to move with greater fluidity across both corporate and national boundaries. The constellation of subsidiaries and affiliates, together with the web of guarantees and cross-guaranties both within and among the members of the group, may serve a different function than simply compartmentalization of liability, as traditional corporate theory would suggest.[34]

---

beyond the scope of these Guidelines to address issues of what law should be applied and how distributions to creditors should be made in a multinational enterprise insolvency, although the principles of coordination, cooperation and communication articulated here will often be of assistance to courts and insolvency representatives facing these issues." Guidelines, at Pt. II, Objectives, p. 21.

[34] *See* Richard Squires, *Strategic Liability in the Corporate Group,* 78 U. Chi.L.Rev. 605 (2011). Prof. Squires argues for a theory of corporate groups that attempts to accommodate two strands of thought: (1) the traditional compartmentalization of risk view and (2) the assignment of risk to the group as a whole, through a web of guarantees. His proffered theory is that "the perforated internal structure of the corporate group reflects a type of shareholder opportunism termed *correlation-seeking.* When a corporation engages in correlation-seeking, it intentionally incurs contingent liabilities that are especially likely to come due when the corporation is insolvent." *Id.* at 607. Corporate groups, he posits, tend to fail as a group. Thus, the cross-guarantees function to reduce credit costs, and to transfer value from the group's non-guaranteed creditors to its shareholders for so long as the enterprise is functioning. Upon insolvency, the shareholders are out of the picture, so the outcome is irrelevant to them. Meanwhile, the guarantees function to enhance recoveries for guaranteed creditors, at the expense of non-guaranteed creditors.

25.    Domestic law struggles with this tension, on the one hand honoring the primacy of corporate form for purposes of assigning liability, while at the same time developing concepts for breaking down corporate form (such as corporate veil piercing, trust fund liability, fraudulent conveyance theory, and substantive consolidation) to avoid inequitable outcomes upon default. The result, unfortunately, has been considerable confusion and debate, with less than satisfactory underpinnings for the various competing theories. Domestic law offers less of a firm and well-worked basis for the development of appropriate international rules than in many other areas, including the basics of insolvency law.  In particular, scholarship has demonstrated that domestic law concepts of "piercing the corporate veil" and "respecting the corporate form" are seriously confused and inconsistent even in advanced legal systems and even as applied to the simpler framework presented by domestic transactions.[35]  In particular, the law in the United States and elsewhere with regard to corporate groups is underdeveloped and the subject of severe and widespread criticism, while its flaws have generated an enormous amount of domestic litigation.[36]  In the international context, where legal entity theories will often differ from country to country, adherence to legal entity theory as the principle basis for distribution rules makes even less sense.

26.    The territorialist imperative and the insistence on corporate form have their parallel in the insolvencies of corporate groups filed in the United States where state law entitlements follow the corporate entity. Even domestically, these cases have with great frequency employed some level of enterprise-wide distribution.[37] Many enterprise group insolvency cases in the United States have concluded with an elision of corporate separateness in the format of "deemed

---

[35] *See, e.g.,* Blumberg on Corporate Groups § 10.02[B] ("[T]he rules [regarding veil-piercing and the corporate form] developed by the courts have confused rather than clarified the problem."); J. William Callison, *Rationalizing Limited Liability and Veil Piercing,* 58 Bus. Law. 1063, 1069 (2003) ("[I]t is difficult to discern any overarching doctrine that assists in determining when the limited liability veil will be pierced and when it will not."); *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal. App. 2d 825, 838–40 (1962) (providing twenty-two non-exclusive factors that had been used in California's veil-piercing jurisprudence) (cited for ten of these factors by *Ahcom, Ltd. v. Smeding,* 2011 WL 3443499 at *5 (N.D. Cal. Aug. 8, 2011)).

[36] Robert B. Thompson, Piercing the Corporate Veil: An Empirical Study, 76 Cornell L. Rev. 1036 (1991) (Concluding that "[p]iercing the corporate veil is the most litigated issue in corporate law").

[37] William H. Widen, *Prevalence of Substantive Consolidation in Large Bankruptcies from 2000 to 2004: Preliminary Results,* 14 Am. Bankr. Inst. L. Rev. 47, 53–55 (2006) (finding that more than 10% of all large bankruptcies, including more than 50% of the 21 largest bankruptcies, employed substantive consolidation).

consolidation" at or around the plan stage of the enterprise. The corporate form of the various bits and parts of the group are frequently passed over in favor of a distribution based primarily on type of claim, in cogent recognition of the reality that adherence, literally, to form over substance would be both unfair and unjust, to say nothing of impractical.

27.    The inherent unfairness of allocation as the solution for distribution in an enterprise group context is particularly apparent when one considers the problem of double proof. As a general principle, most modern insolvency laws promote the notion of equity and fairness among creditor groups. Moratoriums on creditor collection prevent a preferential dividend on the part of an unsecured creditor with no legal claim to preference. The right to claw back certain pre-petition payments to creditors follows a similar logic, preventing creditors whose claim to preference arose only from having been more obstreperous, or perhaps more cozy. Priority rules elevate certain creditor groups, but not on the basis of what they did but rather on the basis of who they are – workers, taxing authorities, the children of divorced parents. And they subordinate certain creditor groups on the basis of who they are – equity interests versus creditor claims.

28.    The "double proof" problem was noted by Professor William Widen in an article published in the George Washington Law Review.[38] He describes the situation in which one creditor is a multiple source creditor, with access to more than one source of payment, while another otherwise similarly entitled creditor has but a single source of payment. Were all sources of payment solvent at all times, the situation poses no difficulty. When the sources of payment are not solvent, however, an inequity can result. To quote Professor Widen,

> In some sense, a multiple-source creditor who first pursues a shared source for payment gratuitously harms the single-source creditor. Equity may intervene to stop this result. The principle of fairness that emerges from this general fact pattern is sometimes identified as the solution to the "two funds" problem. ... In the classic multiple-entity scenario, the senior creditor holds a senior claim on the alternate payment source (by virtue of structural seniority to investors and their creditors) but holds a claim ranked *pari passu* with the junior creditor on the assets in the shared payment source. The competition among *pari passu* claims for entitlement to the shared payment source raises

---

[38] William H. Widen, *Corporate Form and Substantive Consolidation*, 75 Geo. Wash. L. Rev. 237 (2007).

the problem known as "double proof." The general rule is that a creditor may prove but a single claim with respect to a particular debt. A double proof results when multiple claims are made with respect to a single debt. <u>The effect of double proof is to dilute the recoveries of other creditors with respect to their debts by multiplying claims with respect to the particular debt that is double proved.</u>

Widen, *Corporate Form and Substantive Consolidation*, 75 GEO. WASH. L.REV. 237 (2007) (emphasis supplied) (citations omitted).[39]

Policies Underlying The Doctrine of Honoring the Corporate Form

29.    Notwithstanding all this confusion and rethinking, it is apparent—and reaffirmed in numerous cases in the United States and elsewhere—that there are two pillars of allegiance to the corporate form: limited liability for investors and preservation of creditor's expectations.[40] In the United States, it is also clear that the strong trend in legislation and scholarship is to look to the underlying policies of the law governing the merits of a claim—tort, contract, securities fraud, etc.—to find the treatment of liabilities of and within corporate groups.[41] That is, legal context is

---

[39] There is a close parallel between the problems posed by adherence to corporate form in the domestic insolvency context discussed by Professor Widen and adherence to territorialism in the international insolvency context. The Model Law offers an antidote in the latter context not dissimilar to the one offered by Professor Widen. It is the hotchpot rule, which provides that a creditor with a claim that can be asserted in two countries should not be able to participate on a *pro rata* basis with creditors with claims that can only be asserted in one of those countries until the latter creditors have received a percentage recovery equal to what the two-country creditor received in the other country. *See* Model Law, Art. 32.

[40] *See Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1227 (9th Cir. 2005) ("Shareholder protection through the corporate form is "ingrained in our economic and legal systems" and, indeed, "no one would claim that the availability of limited liability [has] played an insignificant part in the expansion of industry and in the growth of trade and commerce.") (quoting William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 193 (1929)); *Chem. Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966).

[41] *See, e.g.,* 26 U.S.C.A. §§ 951–965 (tax: providing rules related to ignoring the corporate form through stock ownership and control in the federal tax code); 29 U.S.C.A. § 623 (discrimination: providing rules for ignoring the corporate form through control under the Age Discrimination in Employment Act, ); 29 U.S.C.A. § 1301 (labor law: providing rules for ignoring the corporate form through control under ERISA); Phillip I. Blumberg, *et al.*, Blumberg on Corporate Groups (2d ed., 2005) (multi-volume treatise discussing law relating to corporate groups emphasizing the significance of treating corporate groups as a unit in appropriate circumstances). *See also,* Janis Sarra, *An Investigation into Employee Wage and Pension Claims in Insolvency Proceedings Across Multiple Jurisdictions: Preliminary Observations,* 16 J. BANKR. L. & PRAC. 5 Art. 8 (2007) (surveying the treatment of claims of employees and former employees in insolvency cases around the world).

crucial, rather than the abstractions of "respect for the corporate form." So it is in international insolvency law as well.

30.    That weakness in domestic law is exacerbated on the international stage because international insolvency requires an approach to corporate groups that is consistent with the aims of the Model Law and modified universalism, concerns that are simply not present in domestic law. From that context flow important consequences.

31.    Global enterprise insolvencies, like enterprise insolvencies within the United States and Canada pose the same difficulties, but for a global debtor there are added very complex and unsettled questions of choice of corporate law and insolvency law. These are elevated legal questions that are not only difficult but also are quite unlikely to have governed or even influenced the expectations of creditors. Yet these questions cannot be avoided if the task undertaken is to attempt to allocate realization values to corporate entities in different nations. The rationale for an allocation process is that, somehow, assets and creditors can all be matched up with legal entities, so as to approximate a territorial distribution. However, the process must also include adjustments of intercompany claims and liabilities, as well as intercompany avoidance actions among the various insolvency estates, in which the legal issues are governed by the debatable applicability of national laws sounding in contract, tort, corporate, and insolvency law. These are enormous tasks, but they cannot be avoided in a territorialist world. The difficulty of this task of unraveling all these potential assets and liabilities explains why parties to enterprise insolvencies so often opt for single-plan solutions[42]

32.    In addition to this compelling practical reason for adopting a single pool in most international enterprise cases—akin to a finding that allocation of value in a domestic piercing of the corporate veil case would require an impractical amount of time and expense—the single-pool approach most accurately reflects the expectations of creditors. In a modified universalist world, multinational insolvency proceedings place greater emphasis on the expectations of

---

[42] William H. Widen, *Corporate Form and Substantive Consolidation*, 75 Geo. Wash. L. Rev. 237, 268-69 (2007) (stating that one of the rationales for substantive consolidation is to avoid "entanglement," "[w]hether based on necessity or simply cost savings").

creditors than on the technicalities of territorialism and of disparate corporate law doctrine, and correctly so.[43] The high cost of imposing on a global insolvency the task of unscrambling the egg, attempting to construct what was never the case in the first place is an inefficient and inequitable imposition on equitable creditor recoveries, which goes against the principal purpose of insolvency law.

33.    If one accepts that the undertaking of massive intra-group claims litigation[44] and the essentially arbitrary task of asset allocation are highly undesirable in the insolvency of an integrated global company such as the Nortel Group, it would seem to follow on many different levels that justice and the protection of legal rights require a single distribution.

34.    We thus can summarize these principles as follows:

   a.  In most cases, a multi-national enterprise group insolvency should be centrally administered, to the extent possible, under the insolvency law of a single forum that should correspond to the enterprise group's center of main interests. Other forums in which proceedings are opened should, to the extent possible, cooperate in the administration, following, to the maximum extent possible, the *lex concursus* of the COMI of the enterprise group.

   b.  When the maximum realization of assets of an enterprise group can be most efficiently and effectively accomplished on an enterprise-wide basis, then it should be done without regard to allocation by entity. Therefore *a fortiori* when a realization of assets has resulted in a single undifferentiated fund, then claims should be satisfied from the single fund on an enterprise-wide basis and inter-company claims (both pre-insolvency and insolvency-based) within the enterprise group should be eliminated,

---

[43] See Irit Mevorach, 18 Cardozo J. of Int'l. & Comp. L. 359 at nn. 61-63 (2010).

[44] For that matter, the same principle also eliminates another expensive drain on limited resources – the resolution of *inter*-company claims, *i.e.*, the allowance or disallowance of a given claim with respect to multiple estates. In a multinational enterprise insolvency managed as a single insolvency, subject to modifications and adjustments as necessary (in other words, administered in accordance with the principles of modified universalism), there is no need for such litigation, because the claim is defined in terms of the indebtedness, and not in terms of the remedies it might have under non-bankruptcy law, and is asserted against the single asset pool, and not against multiple sub-pools of assets.

as unnecessary.

c. Claims should be defined, in that circumstance, by indebtedness, rather than by remedy.

d. A given claimholder believing itself entitled to a different or enhanced distribution right should have the burden of establishing the basis for its differential or deferential treatment.

## IV.    The Nortel Case

35.    Although we emphasize that the analysis that follows is based on the Assumed Statement Of Facts attached as Appendix E, we now address the application of these general principles to the concrete facts in Nortel.

36.    Nortel is a global enterprise in every 21st century meaning of the phrase. It benefitted enormously from its ability to think globally, to operate globally, to manage its affairs on a global platform.[45] It was also overcome by global events in many ways, and forced to seek out assistance from a global insolvency system in order to manage its insolvency in a way that paid heed to the global interconnectedness of both its business and its creditors.[46] While Nortel could have chosen to file a main proceeding in Canada, and to have opened ancillary proceedings in other countries, it chose instead to open full insolvency proceedings in multiple jurisdictions, and to coordinate those proceedings.[47] However, the coordination between Canada and the United States was supported by mutual applications for recognition.[48] Applications for recognition with

---

[45] Statement of Assumed Facts at ¶¶ 51, 72.

[46] *See id.* at ¶ 2 ("The asset sales ... resulted from agreements whereby the operating entities ... agreed ... to permit a timely sale and obtain maximum value."), 67(c) ("The creditors, the primary creditors of the overall corporation had a line of sight to the total, integrated public company NNC."), ¶ 72 (describing the integrated nature of Nortel: "the company was "Nortel" to the customer – a one-stop shop from which one could buy from all parts of the company's business").

[47] *See id.* at ¶¶ 11–19.

[48] *Id.* at ¶¶ 15–16.

the EMEA entities and the UK proceeding were pursued in the US.[49] Thus, there are parallel proceedings pending in Canada, the U.S. and the U.K[50]. Neither the Canadian nor the U.S. proceedings sought recognition in the U.K. proceedings, and as a result the U.K. court has not been involved in the cross-border aspects of the Nortel case.[51]

37.    The Nortel enterprise operated on global lines of business, crossing both entity lines and national boundaries.[52] It was managed from Canada.[53] From a cash perspective, it operated on a global basis. [54] Nortel was vertically and horizontally integrated across geographical boundaries.[55] Due to the complexity of the integrated entities, their integrated participation in transactions, and the sharing of intangibles in the covered transactions, the entities strived to make sure that its parent corporation had significant liquidity to fund its operations.[56]

38.    Following insolvency, because of the complex corporate and financial structure, it was not thought possible to establish a new system of accounts and a new cash management system and disbursement system without substantial additional cost and expenses.[57] Court approval of the Interim Funding and Settlement Agreement averted a potential funding crisis amongst the affiliates that otherwise would have seriously harmed the entities' interconnected global business operations and substantially decreased the value of the various estates.[58] Estate resources would have been wasted duplicating efforts and trying to separate out overhead between the intertwined

---

[49] *Id.* at ¶ 17.

[50] *Id.* at ¶ 18.

[51] *Id.* at ¶ 19.

[52] *Id.* at ¶¶ 34, 37–38.

[53] *Id.* at ¶ 57.

[54] *Id.* at ¶ 65.

[55] *Id.* at ¶¶ 72(a),(c).

[56] *Id.* at ¶ 65.

[57] *Id.* at ¶¶ 74, 74(j).

[58] *Id.* at ¶ 76.

affiliates.[59] As a result, post-filing, assets were not sold on a legal entity basis or with regard to individual legal identity.[60] Rather, assets were sold on the basis of business lines or segments, consistent with the manner in which the fully-integrated Nortel Group operated globally prior to insolvency.[61] In all but one of the business sales and in the Rockstar IP transaction, each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors were sellers or deemed sellers.[62] In this way, the players took the first steps in the appropriate administration of a multi-enterprise group – they maximized the realization value of the assets of the enterprise, by moving past the question of asset ownership.[63]

39.     The parties sought to achieve a consensual outcome for the distribution aspect of the administration of Nortel, by attempting mediation.[64] Three court-ordered mediations were held, before two different mediators.[65] No resolution was achieved.[66] A court-ordered process to determine how to disburse the funds realized by the estate's sales, and now held in a lockbox fund, was initiated in April 2013.[67] Professional fees in excess of $20 million per month, chargeable against the lockbox fund have been incurred.[68] Over 2.8 million documents have been produced by the parties.[69] Trial is scheduled to occur over 19 days in May.[70]

---

[59] Id. at ¶ 76.

[60] Id. at ¶ 77.

[61] Id. at ¶ 77.

[62] Id. at ¶ 78.

[63] See id. at ¶ 2 ("The asset sales . . . resulted from agreements whereby the operating entities . . . agreed . . . to permit a timely sale and obtain maximum value.").

[64] Id. at ¶ 20.

[65] Id. ¶ at 20.

[66] Id. at ¶ 21.

[67] Id. at ¶ 22.

[68] Id. at ¶ 7.

[69] Id. at ¶ 24.

[70] Id. at ¶ 24.

40.    Applying the principles discussed above, the Nortel case seems to be the classic opportunity to achieve a proper 21st Century resolution of a global insolvency. The parties and the courts having carried the matter so far toward a universalist solution by means of their asset realization process, it would be a great loss if the matter could not become the model for future multinational cases and the template by which creditors and investors could order their affairs in a reasonably predictable manner at the lowest cost. And this is to say nothing of the extraordinary loss imposed on every creditor of Nortel, the result of continued administrative and litigation costs substantially diminishing the net recoveries on those claims.

41.    The UNCITRAL Model Law on Cross Border Insolvency, adopted in the three principal jurisdictions overseeing the Nortel insolvency, posits that a case ought to be principally managed from the country that is the center of main interests for the company. Based on the Statement of Assumed Facts, Nortel is a company that operated as a single enterprise for virtually its entire corporate existence since its re-formation from Bell Canada, despite technical incorporation of affiliates in various countries. It is apparent that the centre of administration for Nortel, its home country, recognized as such by its creditor body, was Canada.

42.    The first day pleadings in both Canada and the United States agreed that Nortel was essentially a single enterprise, one whose assets, liabilities, operational history, cash management systems, internal accounting, and functional management were so intermingled that, as a practical matter, it was a practical impossibility to tease things apart and reallocate by legal entity. The operation of the group as a single enterprise does not suggest an effort to deceive anyone. The company had simply adopted a common manner of doing business that recognized the reality that in a global enterprise borders and corporate niceties matter far less than perhaps they might have a century or more ago.

43.    The interested parties in the insolvency process accepted the reality that attempting to reorganize all of Nortel's various bits and parts by national identity would be highly inefficient.[71]

---

[71] *See* Statement of Assumed Facts at ¶ 37 ("The Nortel Group's business segments were integrated and interdependent, as no one business segment or geographical location alone could provide solutions to customers.") and ¶ 72 ("Nortel attempted to separate the operational costs . . . . [B]ut the company determined that bifurcated operational cost information was either not available or unreliable.").

They elected to continue the cash management system that had been in place prior to the commencement of the case. Whatever inequalities these choices might have perpetuated, from the standpoint of individual debtor entities, were accepted because, on a consolidated basis, the pursuit of such actions was essentially irrelevant. The choice had the added benefit of reducing administrative costs, though it also had the added downside of depriving creditors of one debtor entity of the potential to enhance recoveries on their behalf (albeit at the expense of creditors of another debtor entity).

44.    It is inevitable in any multinational corporate group that there will be many transfers of funds that must be analyzed as possible preferences or fraudulent conveyances, with the elements of the analysis of each transaction turning on the varying requirements of each arguably applicable insolvency law.[72] Any decision to allocate realization proceeds in Nortel on a territorial or entity basis must reopen those issues so that the assets ultimately come to rest in the entities that are entitled to them under applicable law.

45.    In similar fashion, it was decided to market the assets of Nortel without regard to estate ownership. Everyone recognized that the assets were far more marketable as a unit, this even though on an entity-estate basis one country should not have been permitted to sell assets of another bankruptcy estate. From a territorialist point of view, in fact, such a result should not even have been permitted, much less embraced. Fortunately for all concerned, that pinched and unrealistic approach was not taken.

46.    Even the extended effort to mediate the distributional questions represented yet another recognition that Nortel, as a practical matter, was a global enterprise, one in which borders and corporate forms mattered less than business. The courts that endorsed the mediation effort certainly had high expectations that the globalist approach that had served the estate well to that stage would also serve to everyone's interests at this stage as well.

---

[72] *See, e.g.*, Evelyn H. Biery et. al., *A Look at Transnational Insolvencies and Chapter 15 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 47 B.C. L. Rev. 23, 38 n.99 (2005) (collecting cases in which United States bankruptcy courts granted or denied ancillary petitions based upon the preference and fraudulent transfer law of different countries). Some bodies of nonbankruptcy law might also permit avoidance of intra-enterprise transactions, such as the *Uniform Fraudulent Transfer Act* in the United States and the *Bankruptcy and Insolvency Act* in Canada. *Bankruptcy and Insolvency Act* R.S.C. 1985 chap. B-3 § 42(1)(b).

47.    The Nortel case has proceeded on the basis of the economic realities that so dominate multinational enterprise insolvencies – especially those (like Nortel) whose pre-insolvency affairs are so intermingled and fluid across both corporate and country boundaries.    A universalist approach to a cross-border insolvency proceeding demands that the interests of creditors in the enterprise as a whole be considered first, and that territorial considerations be acceded to only when necessary – only on a showing of cause. The Model Law, by way of example only, allows a court to permit a foreign representative to administer assets within the jurisdiction of the enacting state as though they were in the jurisdiction of the foreign proceeding. Article 22 then permits the court to limit that authority *to the extent necessary* to "adequately protect" the interests of creditors. Even then, the court is expected to consider the interests of *all* creditors, rather than just the creditors within the enacting jurisdiction.

48.    In Nortel, then, the only sensible approach, consistent with modified universalism (and the approach under which Nortel operated for many years prior to its insolvency and even after its insolvency), is to begin with the presumption that the assets of Nortel, having been liquidated on a consolidated basis, should now be distributed on a consolidated basis. If a given creditor believes otherwise, then the burden should be on that creditor to demonstrate how it is that the expectations of creditors prior to the commencement of these proceedings were such that a territorialist or entity-by-entity allocation scheme must instead be pursued, at great continuing cost.

49.    It appears more likely that the expectations of Nortel creditors were based upon the credit of the corporate group rather than any component of that group.  The Nortel Group filed with the United States Securities and Exchange commission on a group basis and its disclosures to investors and the market generally—the prime location for information for creditors and credit bureaus—were made with little attention to distinctions among legal entities.[73] Thus it is not surprising that Moody's downgraded the group as a group, with no variation of the signal to

---

[73] Statement of Assumed Facts, at ¶ 52-54.

creditors based on which Nortel entity was involved.[74] It seems conceded that "the company was 'Nortel' to the customer."[75]

50.    For just this reason, territorial or formal solutions to cross-border problems for corporate groups are inconsistent with creditors' expectations, as well as essentially impractical.

51.    Insolvency outcomes ought to match pre-insolvency expectations. Nortel was managed on a global basis prior to its insolvency and in its early stages in bankruptcy, through post-petition financing and asset realization. There is no just reason to depart from that rule at this stage, absent a compelling showing on the part of an affected creditor.

52.    Adopting an allocation model based on separate legal entities or territories at this late stage of the process would be positively unjust, when measured against international insolvency principles and policies. It upsets the equality of distribution among otherwise similarly entitled creditors and ignores legitimate expectations.

53.    Bankruptcy is perhaps the most practical branch of the law.  It is also distinctly at the cutting edge of international litigation generally. It is not merely coincidental that both those things are true.  The intense need for practical solutions that fit the requirements of global commerce shape this area of the law ahead of all the others. Much of the reform in the courts and at the United Nations has been the product of the Canadians and the Americans and that is not accidental either.  Recognizing that any approach to distribution in the Nortel matter will be precedent-setting and that there are no comfortable solutions based on similar cases, it is our opinion that a single-pool distribution will best reflect the commercial realities and practical imperatives of the Nortel case pursuant to the existing and emergent principles of cross-border insolvency.

---

[74] Statement of Assumed Facts, at ¶ 74(a).

[75] Statement of Assumed Facts, at ¶ 72(e).

Signed: ..........................................................

Leif Clark

January 24, 2014

Signed: ..........................................................

Jay L. Westbrook

January 24, 2014

# Appendix A

## Appendix A

### Identification, Qualifications and Statement of Compensation

Identification and Qualifications

     **LEIF M. CLARK** resides at 142 Treasure Way, in the City of San Antonio, in the State of Texas. Leif obtained a Bachelor of Arts from the University of Maryland College Park in 1968, a Master of Divinity from the Evangelical Lutheran Theological Seminary in 1972 and Juris Doctor from the University of Houston School of Law in 1980. Leif is a former United States Bankruptcy Judge for the Western District of Texas. He served from 1987 to 2012. In his tenure on the bench, he authored over 300 opinions on a broad range of insolvency issues. Leif presided over the *Inverworld* cross-border proceeding (involving the U.S. Mexico, the Cayman Islands, and the U.K.), which put into practice many of the concepts of modified universalism. He also presided over *Fairchild Aircraft* (coordinated with a German proceeding) and *Gandi Innovations* (U.S. operating companies coordinated with a Canadian proceeding, and non-filed petitions in a number of other countries, including India and Dubai). After retiring from the bench in 2012, Leif has continued an active engagement as a mediator and consultant. Leif currently is engaged as a short term consultant for both the World Bank (attached to its Insolvency & Creditors' Rights Initiative) and the International Monetary Fund.

     From 2005 until 2013, Leif served as a member of the U.S. delegation to UNCITRAL's Working Group V. Since 2008, Leif has authored a chapter of Colliers on Chapter 15 of the Bankruptcy Code (Vol I, ch. 13). Leif participated in the ALI-ABA Transnational Insolvency Project, as well as on the *Ad hoc* Advisory Committee to the U.S. delegation for Working Group V as that group was deliberating the Model Law. Leif has participated as a speaker for INSOL International on cross-border judicial cooperation, and has spoken on chapter 15 issues in both the U.S. and Canada. Leif has also taught as an adjunct professor for the University of Texas School of Law, and for the McGeorge International Law Masters Program.

     Leif is an active member of the National Bankruptcy Conference, the American College of Bankruptcy, the International Insolvency Institute, and INSOL International.

     **JAY L. WESTBROOK** resides at 4707 Balcones Drive, in the City of Austin, in the State of Texas. Jay holds the Benno C. Schmidt Chair of Business Law at The University of Texas School of Law. Jay received his Doctor of Jurisprudence degree from The University of Texas School of Law in 1968. Jay engaged in private practice, Washington, D.C. 1969-80 (Associate and Partner, Surrey & Morse), specializing in bankruptcy reorganization and international commercial litigation. Jay has been a member of the University of Texas law faculty since 1980. Jay teaches bankruptcy, commercial law, and international business law and litigation. He was a Visiting Professor at Harvard Law School, 1991-92, and at the University of London, 1990, and was a Visiting Scholar at Humboldt University-Berlin, 2002, and University College London, 2003.

     Jay served as the United States Reporter, American Law Institute Transnational Insolvency Project, as Co-chair, U.S. Delegation to UNCITRAL Conference on Transnational

- 2 -

Insolvency, and as a Senior Advisor, United States National Bankruptcy Review Commission. Jay has also served as a consultant to the International Monetary Fund and the World Bank and as President of the International Academy of Commercial and Consumer Law.

Jay is a member of the American Law Institute; the National Bankruptcy Conference; the American College of Bankruptcy; and the Advisory Board of the INSOL Insolvency Review. In 2009, Jay received the Excellence in Education Award from the National Conference of Bankruptcy Judges.

Statement of Compensation

**LEIF M. CLARK**: retained to prepare expert report concerning legal principles policies of international insolvency law for a non-refundable flat fee of $36,000 (U.S.), paid at the commencement of retention (prior to the preparation and delivery of this report); retained as a testifying expert, at an agreed compensation of $600/hour, plus reimbursement of expenses. Compensation is in no way dependent on the nature of the advice or the outcome of the Nortel matter.

**JAY L. WESTBROOK**: retained to consult concerning legal principles and policies of international insolvency law for a fee of $795 per hour against a non-refundable retainer of $50,000 plus expenses, paid at the commencement of retention. Compensation is in no way dependent on the nature of the advice or the outcome of the Nortel matter.

# Appendix B

## Appendix B

## Publications

<u>Leif M. Clark</u>[1]

**Books:**

Clark, Leif M., Glosband, Daniel (ed.), Collier Monograph: <u>Ancillary and Other Cross-Border Insolvency Cases Under Chapter 15 of the Bankruptcy Code</u> (LexisNexis 2006)

Chapter 15 Bankruptcy Strategies: <u>Leading Bankruptcy Experts on Understanding the Filing Process and Achieving Successful Outcomes in Cross-Border Insolvency Cases (Inside the Minds)</u> (Thompson Reuters/Apastore 2012)[2]

**Articles:**

Clark, Leif M. & Goldstein, Karen,  <u>Sacred Cows: How to Care for Secured Creditors' Rights in Cross-Border Bankruptcies</u>, 46 Tex. Int'l L. J. 513 (2010-2011)

<u>Jay L. Westbrook</u>[3]

**Books:**

<u>A Global View of Business Insolvency Systems</u> (Martinus Nijhoff  2010) (senior editor & co-author)

<u>The Law of Debtors and Creditors: Text, Cases and Problems</u> (Aspen Press 6th ed. 2009) (co-author).

<u>Teachers Manual, The Law of Debtors and Creditors</u> (Aspen 6th ed. 2008) (co-author).

<u>The Fragile Middle Class: Americans in Debt</u> (Yale University Press 2000) (co-author);

<u>As We Forgive Our Debtors: Bankruptcy and Consumer Credit In America</u> (Oxford University Press 1989) (co-author).

---

[1] Judicial opinions as a sitting judge not listed.

[2] Author of Chapter 6 : "Advice for Handling Cross-Border Bankruptcy Cases Effectively".

[*] Selected publications prior to 2000.

- 2 -

Comprehensive Commercial Law: Statutory Supplement (Aspen Law & Business, annual) (co-author).

American Law Institute, International Statement of United States Bankruptcy Law (2003) (Reporter).

American Law Institute, Principles of Cooperation in Transnational Insolvency Cases Among the Members of the North American Free Trade Agreement (2003) (Reporter).

**Articles:**

*Single authored:*

An Empirical Study of the Implementation in the United States of the Model Law on Cross-Border Insolvency, 87 Am. Bankr. L. J. 247 (2013).

Bankruptcy Tourism, 3 Int. J. Proced. L. 159 (2013).

Breaking Away: Local Priorities And Global Assets, 46 Tex. Int'l L.J. 601 (2011).

Introduction, University of Texas International Insolvency Symposium: The Priority Dilemma, 46 Tex. Int'l L.J. XX (2011).

International Arbitration and Multinational Insolvency, 29 Penn State Int'l L.Rev. 635 (2011).

The Elements of Coordination in International Corporate Insolvencies: What Cross-Border Bank Insolvency Can Learn From Corporate Insolvency, in CROSS-BORDER BANK INSOLVENCY (Lastra ed. 2011 Oxford University Press).

Westbrook, Jay. A Comment on Universal Proceduralism, 48 Colum. J. Transnat. L. 503 (2010).

Jacob Ziegel and Going Broke Internationale in ANNUAL REVIEW OF INSOLVENCY LAW (Sarra ed. 2010)

Multinational Insolvency: A First Analysis of Unilateral Jurisdiction, in Norton Annual Review of International Insolvency (2009).

Priority Conflicts as a Barrier to Cooperation in Multinational Insolvencies, 27 Penn. St. Int. L. Rev. 869 (2009).

The Present and Future of Multinational Insolvency, in THE INTERSECTION OF INSOLVENCY AND COMPANY LAWS (2009).

Testimony, Exemption of Financial Assets From Bankruptcy, Subcommittee on Commercial and Administrative Law, Committee on the Judiciary; House of Representatives (September 26, 2008).

Legal Integration Of Nafta Through Supranational Adjudication, 43 Texas Int. L.J. 349 (2008).

Locating The Eye Of The Financial Storm, 32 Brook. J. Int'l L. 1019 (2007).

Avoidance Of Pre-Bankruptcy Transactions In Multinational Bankruptcy Cases, 42 Tex. Int'l L.J. 899 (2007).

National Regulation of MultiNational Default, in Economic Law and Justice in Times of Globalisation: Festschrift for Carl Baudenbacher 777 (2007).

The Multinational Provisions of the New Spanish Law, in Estudios Sobre La Ley Consursal: Libro Homenaje A Manuel Olivencia (copyright 2004).

Multinational Financial Distress: The Last Hurrah Of Territorialism, 41 Tex. Int'l L.J. 321 (2006) (Book Review)

Chapter 15 and Discharge, 13 Am. Bankr. Inst. L. Rev. 503 (2005).

Chapter 15 at Last, 79 Am. Bankr. L. J. 713 (2005).

Universalism and Choice of Law, 23 Penn State Int. L.J. 625 (2005).

The Duty to Seek Cooperation in Multinational Insolvency Cases, in THE CHALLENGES OF INSOLVENCY LAW REFORM IN THE 21ST CENTURY, (Peters, et al ed. 2006) (Geneva), reprinted in ANNUAL REVIEW OF INSOLVENCY LAW 2004 (Sarra ed. 2005) (Canada).

The Control of Wealth in Bankruptcy, 82 Tex. L. Rev. 795 (2004).

Bankruptcy Control Of The Recovery Process, 12 Am. Bankr. I. L. Rev. 245 (2004).

International Judicial Negotiation, 38 Tex. Int. L.J. 567 (2003).

Multinational Enterprises in General Default: the UNCITRAL Model Law and Related Regional Reforms, in Aktuelle Entwicklungen des europäischen und internationalen Zivilverfahrensrechts (2002).

Empirical Research in Consumer Bankruptcy, 80 Tex. L. Rev.2123 (2002) [reprinted in 12 J. Bankr. L. & Prac. 3 (2003).]

Multinational Enterprises in General Default: Chapter 15, The ALI Principles, and The EU Insolvency Regulation, 76 Am. Bankr. L.J. 1 (2002).

The Transnational Insolvency Project of the American Law Institute, 17 Conn. J. Int. L. 99 (2001).

Systemic Corporate Distress: A Legal Perspective, in World Bank Institute, Resolution of Financial Distress (Stijn Claessens et al. eds. 2001).

Managing Defaulting Multinationals Within NAFTA in Foundation and Perspectives of International Law, 465-79 (2001).

Japan's New Cross-Border Insolvency Law, 1112 Kinyu Shoji 86 (2001)(in Japanese).

A Global Solution to Multinational Default, 98 Mich. L. Rev. 2276 (2000); http://papers.ssrn.com/paper.taf?abstract_id=259960.

The Globalization of Bankruptcy Reform, 1999 N.Z. L.Rev. 401.

Comparative Empiricism, 37 Osgoode Hall L.J. 143 (1999).

Modeling International Bankruptcy, 1998-1999 Annual Survey of Bankruptcy Law 465.

Universal Priorities, 33 Texas Int'l L.J. 27 (1998).

Local Legal Culture and the Fear of Abuse, 6 Am. Bankr. I. L. Rev. 25 (1998).

Pierre Loiseaux: A Master Teacher, 32 U.C. Davis L. Rev. 15 (1998).

The Commission's Recommendations Concerning the Treatment of Bankruptcy Contracts, 5 Am. Bankr. I. L. Rev. 463 (1997).

Universal Participation in Transnational Bankruptcies, in Making Commercial Law, Essays in Honour of Roy Goode (Cranston ed. Clarendon Press 1997).

International Developments in Commercial Law and in Civil Procedure and Arbitration, 46 J. Leg. Ed. 579 (1996).

Creating International Insolvency Law, 70 Am. Bankr. L. J. 563 (1996).

The Lessons of Maxwell Communications, 64 Fordham L. Rev. 2531 (1996).

Transnational Bankruptcy, in The Development of Bankruptcy Law in the Second Circuit Court of Appeals (1996).

Developments In Transnational Bankruptcy, 39 St. Louis U.L.J. 745 (1995).

Comment: A More Optimistic View of Cross-Border Insolvency, 72 Wash. U. L. Q. 947 (1994).

A Comparison of Bankruptcy Reorganization in the US with the Administration Procedure in the UK, in Current Issues in Cross-Border Insolvency and Reorganization ( London 1994).

Cross-Border Insolvencies: United States Report in International Symposium on Civil Justice in the Era of Globalization (Tokyo 1994).

Contract Issues In International Insolvencies, in Insolvency and Finance in the Transportation Industry (London 1993).

Fees and Inherent Conflicts of Interest, 1 A. Bankr. I. L. Rev. 287 (1993).

Chapter 11 Reorganization, in Proceedings of the Symposium on Insolvency, Marmura University (Istanbul 1993).

Comparative Insolvency, 28 Texas I. L. J. 675 (1993) (Review).

Clear Thinking About Insider Preferences: A Reply, 77 Minn. L. Rev. 1393 (1993).

Chapter 11 Reorganization in the United States, chapter in Insolvency Law Theory and Practice (Rajak ed. London 1993).

A Comparative Empirical Research Agenda in Consumer Bankruptcy, 21 Canadian Bus. L. J. 30 (1992).

Two Thoughts About Insider Preferences, 76 Minn. L. Rev. 73 (1991).

Choice of Avoidance Law in Global Insolvencies, 17 Brook. J. Int. L. 499 (1991).

Theory and Pragmatism in Global Insolvencies: Choice of Law and Choice of Forum, 65 Am. Bankr. L. J. 457 (1991).

Global Insolvencies in a World of Nation States, chapter in Current Issues in Insolvency Law (London 1991).

A Comparison of United Kingdom Administration and Chapter 11 in the United States, 6 Insol. L. & Prac. 86 (London 1991).

Extraterritoriality, Conflicts of Laws, and Transnational Regulation of Business, 25 Tex. Int. L. J. 71 (1990) (Review essay).

A Functional Analysis of Executory Contracts, 74 Minn. L. Rev. 227 (1989).

Bhopal Symposium: Theories of Parent Company Liability and The Prospects for An International Settlement, 20 Tex. I.L.J. 321 (1985).

Glitch: UCC 9-402(7) and the UCC Revision Process, 52 Geo. L.J. 408 (1984) [Excerpt reprinted in Speidel, Summers, and White, Commercial Law Teaching Materials 123-24 (4th Ed. 1987).]

- 6 -

The Coming Encounter: International Arbitration and Bankruptcy, 67 Minn. L. Rev. 595 (1983).

*Co-authored:*

The Success of Chapter 11: A Challenge to the Critics, 107 Mich. L. Rev. 603 (2009) (with Warren).

Abolition Of The Corporate Duty To Creditors, 107 Colum. L. Rev. 1321 (2007) (with Hu).

Less Stigma or More Financial Distress: An Empirical Analysis of the Extraordinary Increase in Bankruptcy Filings, 59 Stan. L.Rev. 213 (2006) (with Sullivan and Warren).

Contracting Out of Bankruptcy: An Empirical Intervention, 118 Harv. L. Rev. 1197 (2005) (with Warren).

Who Uses Chapter 13 in CONSUMER BANKRUPTCY IN GLOBAL PERSPECTIVE. (Oxford: Hart Publishing Co. 2003).

Une Prospérité Précaire: Sur les situations financieres critiques dans la classe moyenne, 138 Actes de la Recherché en Sciences Sociales (June 2001):19-33 (with abstracts in French, English, German, and Spanish) (excerpted from The Fragile Middle Class).

Financial Characteristics of Businesses in Bankruptcy, 73 Am. Bankr. L.J. 499 (1999); http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?cfid=193929&cftoken=73065547&per_id=1 94993.

Consumer Bankruptcy in the United States: A Study of Alleged Abuse and of Local Legal Culture, 20 J. of Con. Pol. 223 (Netherlands 1997).

The American Law Institute NAFTA Insolvency Project, 23 Brook. J. Int. L. 7 (1997).

Bankruptcy and the Family, 21 Marriage & Family Review 193 (1995) [republished in Families and Law 193 (Lisa J. McIntype & Marvin B. Sussman eds. 1995)].

Conflict of Laws in International Insolvencies, in Current Developments in International and Comparative Corporate Insolvency Law (Ziegel ed. Clarendon Press 1994).

Searching for Reorganization Realities, 72 Wash. U. L. Q. 1257 (1994).

Four Models for International Bankruptcy, 41 Am. J. Comp. L. 573 (1994).

The Persistence of Local Legal Culture: Twenty Years of Evidence From the Federal Bankruptcy Courts, 17 Harv. J. L. & Pub. Pol. 801 (1994).

Consumer Debtors Ten Years Later: A Financial Comparison of Consumer Bankrupts 1981-1991, 68 Am. Bankr. L. J. 121 (1994).

Laws, Models, and Real People, 13 Law & Soc. Inq. 661 (1988).

The Role of Empirical Research In Formulating Bankruptcy Policy, 50 Law & Cont. Prob. 195 (1987).

Folklore and Facts: A Preliminary Report from the Consumer Bankruptcy Project, 60 Am. Bankr. L.J. 293 (1986).

Rejoinder: Limiting Access to the Bankruptcy Discharge, 1984 Wisc. L. Rev. 1069.

Limiting Access to the Bankruptcy Discharge: An Analysis of the Creditors' Data, 1983 Wisc. L. Rev. No. 1091.

# Appendix C

## Appendix C

### Cases Involving Prior Testimony

<u>Leif M. Clark</u>

None

<u>Jay L. Westbrook</u>

**Asarco LLC**
United States Bankruptcy Court
Southern District of Texas (Corpus Christi)
No. 05-21207
April 2009

**Lehman Brothers Commodity Services Inc. and
Crédit Agricole Corporate and Investment Bank**
London, England
High Court of Justice, Queen's Bench Division
Commercial Court, Case No: 2010 Folio 79
March 2011

**Same, Kreditanstalt Für Wiederaufbau and
Euroclear Bank SA/NV**
Claim N. 2010 Folio 1372
June 2012

**Think3 Inc.**
In The United States Bankruptcy Court
For The Western District of Texas
Austin Division
Case No. 11-11925-HCM
September 2011

# Appendix D

## Appendix D

### List of Materials / Documents Reviewed

<u>Leif M. Clark</u>

I reviewed the following documents in connection with the preparation of this report:

| Document (chronological) | Date | Source |
|---|---|---|
| Nortel Networks Corporation Bond Prospectus (NNL Exchange) | December 21, 2007 | |
| DBRS Credit Report for Nortel Networks Corporation | July 18, 2008 | |
| Standard and Poor's Credit Outlook for Nortel Networks Limited | September 17, 2008 | |
| Moody's Investors Service Corporate Family Rating | September 23, 2008 | |
| Moody's changes Nortel's ratings outlook to negative | September 23, 2008 | |
| Standard and Poor's Corporate Credit Rating for Nortel Networks Limited | November 21, 2008 | |
| Moody's downgrades Nortel's CFR to Caa2; outlook still negative | December 15, 2008 | |
| Moody's Investor's Credit Opinion for Nortel Networks Corporation | December 16, 2008 | |
| Moody's Nortel Networks Corporation | December 16, 2008 | |
| Affidavit of John Doolittle | January 14, 2009 | PC0184338 Exhibit 21539 |
| Pre-filing Report of Ernst & Young Inc. | January 14, 2009 | PC0184486 Exhibit 21278 |
| Moody's Ratings, Symbols, and Definitions | June, 2009 | |
| Interim Funding and Settlement Agreement | June 9, 2009 | |
| Nortel Networks International Motion Record (Interim Funding and Settlement Agreement) returnable June 29, 2009 | June 22, 2009 | |
| Fifteenth Report of the Monitor – Interim Funding and Settlement Agreement | June 25, 2009 | |

| Document (chronological) | Date | Source |
|---|---|---|
| Order Granting Recognition and Relief in Aid and Foreign Main Proceeding | July 13, 2009 | |
| Master R&D Agreement | September 1, 2009 | NNI_01533696 Exhibit 11146 |
| Final Canadian Funding and Settlement Agreement | December 23, 2009 | |
| Court of Appeal Order re: Justice Morawetz's Order of February 26, 2010 | June 16, 2010 | |
| Canadian Claims Resolution Order | September 16, 2010 | |
| Canadian Order Approving Cross-Board Claims Protocol | September 16, 2010 | |
| Order Approving Cross-Border Claims Protocol | September 16, 2010 | |
| Order Recognizing Orders of the Canadian Court and Approving the US Debtors' Amended and Consolidated Plan of Compromise and Arrangement and Transaction Agreement. | February 11, 2011 | |
| Seventy-First Report of the Monitor – Sale of Nortel IP to Rockstar | July 6, 2011 | CCC0021822 Exhibit 21282 |
| Amended and Restated Motion Record – Canadian Approval and Vesting Order regarding Certain Patents and other Assets | July 11, 2011 | |
| Canadian Endorsement – Allocation | March 8, 2013 | |
| Court of Appeal Order Dismissing EMEA Leave to Appeal Motion | April 3, 2013 | |
| Amended and Restated Order (Allocation Protocol) | April 3, 2013 | |
| US Order Approving Allocation Protocol (Judge Gross) | April 3, 2013 | |
| Endorsement of Justice Morawetz | May 3, 2013 | |
| Canadian Order – Allocation Protocol – Litigation Timetable and Discovery Plan | May 15, 2013 | |
| US Order Entering Allocation Protocol (Judge Gross) | May 17, 2013 | |
| Canadian Protective Order | June 11, 2013 | |

| Document (chronological) | Date | Source |
|---|---|---|
| Court of Appeal Endorsement re: Ontario Superior Court of Justice dated March 8, 2013 | June 20, 2013 | |
| Canadian Amended and Restated Claims Procedure Order | July 30, 2013 | |
| Transcript of the Deposition of Peter Currie | October 15, 2013 | Prepared by Ellen Grauer Court Reporting Co. LLC |
| Responses to Questions from International Insolvency Experts | December, 2013 | Prepared by TGF at our request |
| Moody's Investors Service Corporate Family Rating | December 15, 2013 | |
| US Debtors' Motion to Approve Settlement of US Claims | December 17, 2013 | |
| Note on Intercompany Claims | January, 2014 | Prepared by TGF at our request |
| Statement of Assumed Facts | undated | Prepared by TGF |
| Overview of Facts Taken from Nortel Group Sources | undated | Prepared by TGF |

<u>Jay L. Westbrook</u>

I reviewed the following documents in connection with the preparation of this report:

| Document | Date | Source |
|---|---|---|
| Responses to Questions from International Insolvency Experts | December, 2013 | Prepared by TGF at our request |
| Note on Intercompany Claims | January, 2014 | Prepared by TGF at our request |
| Statement of Assumed Facts | undated | Prepared by TGF |
| Overview of Facts Taken from Nortel Group Sources | undated | Prepared by TGF |

1031313_1.docx

# Appendix E

**Appendix E**

**Statement of Assumed Facts**

### A.   Overview

1.   The Nortel Group of Companies was a multinational enterprise that, prior to insolvency, operated as a fully integrated, matrix organization in many jurisdictions through 145 corporate entities and eight joint ventures. Its global operations were along four main business lines that crossed geographic boundaries and involved operating subsidiaries in numerous jurisdictions including Canada, the United States ("**US**") and various European, Middle East and African ("**EMEA**") countries.

2.   Insolvency proceedings were commenced in each of Canada, the US and the United Kingdom ("**UK**") on January 14, 2009 based on the jurisdiction of incorporation of each of the debtor companies. The business lines, related intellectual property and residual patent portfolio were sold as part of a coordinated effort among the insolvency estates and parties, generating aggregate proceeds of approximately $7.3 billion that are available to be allocated among the three insolvency estates (the "**Lockbox Funds**"). Other assets were sold in various jurisdictions generating an additional aggregate amount of approximately $2 billion that currently sits in the jurisdiction where it was realized upon (the "**Other Cash**"). The asset sales giving rise to the Lockbox Funds resulted from agreements whereby the operating entities in each of the three insolvency jurisdictions and Nortel Networks S.A. ("**NNSA**") agreed to defer determination of right, title or other entitlement to the assets that were used in the global operations, to permit a timely sale and obtain maximum value.

3.   In addition to the Lockbox Funds, as at January, 2013, Other Cash (unrestricted cash) in the following amounts was held within each of the following Nortel estates[1]:

   (a)   US estate - USD$899 million;

   (b)   Canadian estate – USD$ 257 million; and

   (c)   EMEA estates – USD $751 million.

4.   Amounts set out above are before taking into account fees and expenses incurred since January, 2013, by the various professionals and firms who are indemnified from the insolvency estates.

---

[1] Monitor's 91st Report to the Court, dated January 25, 2013

5.    Three, court-ordered week-long mediation sessions have been held before two different mediators. No resolution on entitlement to the Lockbox Funds among the estates has been reached.

6.    On December 17, 2013, a limited settlement of certain claims filed against the US estate was reached between the EMEA estate, the US estate and the U.K. Pension Claimants. This limited settlement has no impact on the allocation litigation regarding entitlement to the Lockbox Funds, or any claims made against the Canadian estate, the EMEA estate and the U.K. Pension Claimants.

7.    Approximately USD$1 billion in professional fees were incurred and paid from the insolvency estates between January 14, 2009 and April, 2013. A court-ordered litigation process to determine an appropriate allocation of the Lockbox Funds among the three insolvency estates has resulted in additional professional fees being incurred in excess of $20 million per month since April, 2013.

**B.    Insolvency Proceedings**

**Pre-Insolvency Filing Events**

8.    Prior to the Nortel Group's insolvency filings, the Monitor in the Canadian CCAA proceedings, Ernst & Young Inc. ("**EYI**"), was retained by Nortel Networks Limited ("**NNL**") / Nortel Networks Corporation ("**NNC**") in September 2008 to advise the Nortel Group as a whole (NNC and all of its global subsidiaries). The ultimate decision for the Nortel Group to file for creditor protection was made by the board of NNC.

9.    The Monitor was first contacted for financial advice by the Chief Legal Officer of NNL in September, 2008. Upon being retained, the Monitor took instructions from the Chief Legal Officer and the Chief Financial Officer of NNC/NNL. The Monitor did not consult or take instructions from any of NNC/NNL's subsidiaries.

10.    Executives from NNL/NNC and NNI were aware of Nortel's proposed insolvency filing as early as September, 2008. Executives from the EMEA region, including NNUK, were not advised of the potential insolvency filing until mid-December, 2008.[2]

**Filings in Multiple Jurisdictions**

11.    On January 14, 2009, NNC, NNL and certain Canadian incorporated subsidiaries (collectively, the "**Canadian Debtors**") sought and obtained protection under the *Companies' Creditors Arrangement Act* (the "**CCAA Proceedings**"). On that date, certain of NNC's direct and indirect subsidiaries incorporated in the U.S. (the "**U.S. Debtors**") filed voluntary petitions pursuant to Chapter 11 of the *U.S. Bankruptcy Code* (the "**Chapter 11 Proceedings**").

---

[2] McDonald Deposition Transcript at pp 286-290.

12.    On January 14, 2009, nineteen of NNL's and NNC's subsidiaries incorporated in Europe, the Middle East and Africa (collectively referred to as the "**EMEA Debtors**") including Nortel Networks UK Limited ("**NNUK**") commenced administration proceedings pursuant to the *Insolvency Act* 1986 (the "**UK Administration Proceedings**").[3] The U.K. was chosen as the COMI for the EMEA region.

13.    Subsequent to the initial filing date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on insolvency proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

14.    Also subsequent to the filing date, certain other Nortel subsidiaries filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

15.    The Canadian Debtors sought and obtained recognition of the CCAA Proceedings as "foreign main proceedings" under Chapter 15 of the *U.S. Bankruptcy Code*.[4]

16.    NNI sought and obtained recognition of the Chapter 11 Proceedings as "foreign main proceedings" pursuant to Section 18.6 of the CCAA.[5]

17.    The Joint Administrators of the U.K. Administration Proceedings sought and obtained recognition pursuant to Chapter 15 of the *U.S. Bankruptcy Code* as "foreign main proceedings".[6]

18.    There currently exist "silo" or parallel proceedings in three jurisdictions:

   (a)    CCAA Proceedings in respect of the Canadian Debtors;

   (b)    Chapter 11 Proceedings in respect of the U.S. Debtors; and

   (c)    UK Administration Proceedings in respect of the EMEA Debtors, including NNUK.

19.    No recognition of the CCAA Proceedings or the Chapter 11 Proceedings has been sought within the UK Administration Proceedings to date, either by the Monitor appointed in the CCAA Proceedings or the U.S. Debtors in the Chapter 11 Proceedings. As a result, the Court overseeing the UK Administration Proceedings has not been involved in joint hearings or any aspect of the cross-border insolvency proceedings to date. All hearings and Orders issued in respect of the sale of assets, Lockbox Funds and manner of allocating same have been determined by the Canadian and US Courts overseeing the CCAA Proceedings and the Chapter 11 Proceedings respectively.

---

[3] Affidavit of John Doolittle sworn January 14, 2009 filed in support of the Initial Order granted in the CCAA proceedings (the "**Dolittle Affidavit**")  at paras 2 & 3 [PC0184338].

[4] See in *re Nortel Networks Corporation, et al* , Case No. 09-10164 (KG) (Bankr D Del. Feb 27, 2009).

[5] See the Recognition Order of Morawetz J, dated January 14, 2009, Court File No. 09-CL-7951.

[6] See in *re Nortel Networks UK Limited*, Case No. 09-11972 (KG) (Bankr Del June 26, 2009) (chapter 15), ECF No 36 (relating to the UK proceedings).

**No Resolution to Allocation Following Mediations**

20.     Three court-ordered mediations have taken place involving two separate mediators.  On June 7, 2011, a joint motion for approval of an allocation protocol was brought by the Canadian Debtors and the U.S. Debtors before the Canadian Court and the U.S. Court. On June 17, 2011, Orders were issued by the Canadian and U.S. Courts pursuant to which various parties were ordered to mediate the issues raised in the allocation protocol motions, pending the release of the Courts' decisions on same.[7]

21.     On January 24, 2013, Chief Justice Warren K. Winkler, the mediator appointed in the third and final mediation, publicly announced that all efforts to mediate the allocation of proceeds of sale among the various insolvency estates were at an end.[8]

22.     On February 13, 2013, the Canadian Court and the U.S. Court advised that on March 7, 2013 they would hear summary submissions on the allocation protocol motions brought by the Canadian Debtors and the U.S. Debtors.  On March 8, 2013 and on April 3, 2013, the Canadian Court and U.S. Court issued Endorsements in respect of the allocation protocol motions determining that the allocation of the Lockbox Funds and resolution of claims filed by the EMEA Debtors and the U.K. Pension Claimants against the Canadian Debtors and the U.S. Debtors would be resolved through a joint trial of the Canadian Court and the U.S. Court.

23.     On April 17, 2013, the Canadian Court and the U.S. Court ordered that a joint hearing would take place on April 24, 2013 to establish a litigation timetable and discovery plan for the allocation joint trial and the litigation of the EMEA claims and the U.K. Pension claims.  The parties are currently operating under a court-ordered schedule.[9] All core parties to the Nortel litigation were required to deliver Allocation Positions by May 16, 2013.

24.     Between July and December, 2013, approximately 2.8 million documents have been produced by the parties to the Nortel litigation. Fact depositions began in September, 2013 and concluded on December 16, 2013. Over one-hundred individuals have been deposed in more than 15 cities on three continents.  By Order of the Canadian and US Courts dated November 19, 2013, the joint allocation and claims litigation is currently scheduled to start May 12, 2014, continuing for 19 trial days thereafter.

**C.      Corporate Structure of the Nortel Group**

25.     NNC and NNL are the direct and indirect Canadian parent corporations of all subsidiaries and joint ventures operating worldwide.[10]

---

[7] Monitor's Ninety-Fourth Report to the Court, dated April 25, 2013 at paras 69 & 70 [CCC0062269].
[8] See mediation website:  http://www.nortelmediation.com/.
[9] Monitor's Ninety-Fourth Report to the Court, dated April 25, 2013 at paras 69 to 77 [CCC0062269]
[10] Doolittle Affidavit at para 2 [PC0184338].

- 5 -

26.    The current corporate structure of Nortel resulted from the implementation of a Plan of Arrangement on May 1, 2000 pursuant to which BCE Inc., the parent of Bell Canada, spun off substantially all of its shareholdings in Nortel. As a result of this Plan of Arrangement, NNC became the ultimate parent holding company of NNL and its subsidiaries, and NNL became NNC's principal direct operating subsidiary in Canada.[11]

**Canadian Corporate Structure**

27.    The Canadian corporate structure is as follows:[12]

(a)    NNC, originally New Nortel Inc., was incorporated under the *Canada Business Corporations Act* ("**CBCA**") on March 7, 2000, filed articles of arrangement, giving effect to the aforementioned arrangement on May 1, 2000, and filed restated articles of incorporation on October 1, 2000. NNC's most significant asset is its investments in its direct and indirect subsidiaries;

(b)    NNL, Nortel's principal Canadian operating subsidiary, was incorporated in 1914 under predecessor legislation to the CBCA, filed articles of arrangement, giving effect to the aforementioned arrangement on May 1, 2000, and filed restated articles of incorporation on October 1, 2000. NNC holds all of the outstanding common shares of NNL and is the direct or indirect parent of 128 subsidiaries including Nortel's principal foreign operating subsidiaries:

(i)    Nortel Networks Inc. ("**NNI**") in the United States; and

(ii)    NNUK in England;

(c)    Nortel Networks Technology Corporation ("**NNTC**") is a wholly-owned subsidiary of NNL and was an R&D company and employed approximately 3,000 employees at its R&D facility in Ottawa, Ontario at the commencement of the CCAA proceedings. NNTC did not produce any third party revenue and relied on NNL for all of its funding, including payroll. NNTC performed R&D for NNL thereby allowing NNL to receive tax credits;

(d)    Nortel Networks International Corporation ("**NNIC**") is a wholly-owned subsidiary of NNL having no business or assets other than a minority equity interest in a number of foreign Nortel Companies. NNIC was incorporated in 1977 pursuant to the CBCA;

(e)    Nortel Networks Global Corporation ("**NNGC**") is a wholly-owned subsidiary of NNL with representative offices in various countries on behalf of other Nortel companies. It has no business or assets other than a minor amount of revenue from other Nortel entities and a minority interest in certain foreign Nortel entities. Its costs are reimbursed by these companies. NNGC also employs 22 employees

---

[11] Doolittle Affidavit at paras 19 & 20 [PC0184338].
[12] Doolittle Affidavit at para 21 [PC0184338].

in China.  The payroll for these employees is funded by other Nortel entities.
NNGC was incorporated in 1988 pursuant to the CBCA.

28.     Each of the boards of NNC and NNL was comprised of the same directors and had the
same non-executive chair.  Meetings of the boards of NNC and NNL were generally held
together as joint meetings.  NNC and NNL's corporate governance was conducted from
Toronto, board meetings were held there, the majority of the directors were resident in
Canada, and the companies' headquarters were in Toronto.[13]

## U.S. Corporate Structure

29.     Nortel's US business was mainly conducted through its primary US operating subsidiary
NNI, which is a direct wholly-owned subsidiary of NNL.  NNI was incorporated pursuant
to the laws of the State of Delaware on September 16, 1971.  All of the U.S. Debtors are
direct or indirect subsidiaries of the Canadian parents NNL or NNC.[14]

## European Corporate Structure

30.     The regional headquarters for the EMEA entities was NNUK's offices in England.
NNUK was incorporated in England on February 25, 2000 pursuant to the *Companies Act
1985* and its registered office is at Maidenhead Office Park, Maidenhead, Berkshire,
England.[15]

31.     The majority of the EMEA Debtors are subsidiaries of NNUK, with the exception of:[16]

(a)     Nortel Networks SA ("**NN France**") which, due to the failure to complete an
inter-group share transfer to NNUK prior to the global insolvency proceedings as
set out below, remains jointly owned by NNL as to 91.17% and Nortel
International Finance & Holding BV ("**NNIF**") as to 8.83%, and Nortel Networks
France SAS ("**NN France SAS**") which is a subsidiary of NN France.  NNIF is a
company incorporated under the laws of the Netherlands and is a wholly-owned
subsidiary of NNUK; and

(b)     Nortel Networks (Ireland) Limited ("**NN Ireland**"), a wholly-owned subsidiary of
NNL.

32.     NN France was a joint venture until 1999.  As part of a transaction undertaken on
December 18, 2007, the remaining shares in NN France held by NNIF were to be
transferred to NNUK.  Ultimately, the transfer of shares was not included in the
December 18, 2007 transaction.[17]  The completion of that share transaction was delayed

---

[13] Doolittle Affidavit at paras 44 & 189. [PC0184338].
[14] Doolittle Affidavit at para 23 [PC0184338].
[15] Doolittle Affidavit at para 25 [PC0184338].
[16] Doolittle Affidavit at para 26 [PC0184338].
[17] Rolston Deposition Transcript at p 94.

until 2008 and was ultimately not completed at the time of the global insolvency proceedings commenced by the Nortel Group. Notwithstanding the failure to complete that share transfer, at the time of the insolvency filing NN France was considered by Nortel to be "an economic subsidiary" of NNUK.[18]

## D.    Operation through Business Segments

33.    Each legal entity in the Nortel Group (i.e., each statutory entity) had its own:

    (a)    corporate structure and governance documents; and[19]

    (b)    maintained its own books and records for statutory and tax purposes.[20]

34.    That being said, the Nortel Group operated on a global basis.[21] Its businesses were highly complex and global in nature, with an integrated structure.[22] Organization of the Nortel business along these global business segments or lines was not based on individual legal entities within the group. Nortel did not manage its business on a legal entity basis[23]

35.    The pre-filing report of EYI filed in the CCAA proceedings stated: "*As a result of the numerous inter-company transactions related to inventory purchases, provision of services and transfer pricing ..., it is evident that there is a significant interdependence among the Nortel entities.*"[24] EYI also stated that: "*Nortel conducts its business through global business units resulting in a high degree of interdependence among the various legal entities in different countries around the world.*"[25]

36.    Three years after the insolvency proceedings were commenced, and long after all assets of the Nortel Group had been sold on an *en bloc* basis, the Monitor in the CCAA proceedings was still undertaking efforts to separate the integration of the various Nortel entities. This included separating IT functions, including migrating to a standalone accounting and reporting system, to allow each estate to exist on a "standalone" basis.[26]

37.    The Nortel Group's business segments were integrated and interdependent, as no one business segment or geographical location alone could provide solutions to customers.[27] R&D was shared between business segments[28] and across the territories and regions in

---

[18] Doolittle Affidavit at para 27 [PC0184338].
[19] K. Stephens Deposition Transcript at pp 354-355.
[20] Doolittle Deposition Transcript at pp 39-41.
[21] Appendix H to the Nortel Networks Limited and Nortel Networks Inc – Joint Request for US – Canada Bilateral Advance Pricing Agreement /Arrangement 2007-2011, October 31, 2008 (the "**2008 APA**") at p 2 [PC0184853].
[22] Doolittle Affidavit at para 71[PC0184338].
[23] Kerry Stephens presentation to the NNL / NNC board dated October 31, 2005, slide 3 in deck. [EMEA1000000349]
[24] Pre-filing Report of the Monitor, dated January 14, 2009 at para 35 [CCC0018694].
[25] Monitor's Eighth Report to the Court, dated April 24, 2009 at para 46 [UCC0049685].
[26] Monitor's Eighty-Fourth Report to the Court, dated April 5, 2012 at paras 101 - 103 [UCC0065740].
[27] Appendix B to the 2008 APA at p 2 [PC0184853].
[28] Appendix B to the 2008 APA at p 2 [PC0184853].

which the Group operated.[29] For the most part, R&D at a given facility was rolled into more than one business segment.[30] Similarly, the business segments would co-operate with each other, with R&D personnel and with other Nortel organizations to maximize sales opportunities.[31]

38.    The Nortel Group described itself as a "matrix organization, which is integrated across borders".[32]   The Group's business was organized around global "business lines" or "business segments," which were further integrated with Group-wide departments which ran across the business segments (hence the term "matrix").   It was horizontally and vertically integrated, meaning organizations within the group shared information and performed common tasks across geographical boundaries.   Fully integrated entities performing R&D, manufacturing support, and distribution functions interacted within the group to fulfill customer demand for products and services. This structure was integrated across borders, was multinational,[33] and resulted in a high degree of interdependence between the various legal entities in the Group.[34]

39.    The Nortel Group employed a global integrated business model in which:[35]

(a)    the main operating subsidiaries around the world operated across all of the Nortel Group's business lines or segments;

(b)    a complex internal purchasing system was employed whereby sales orders were routed through one of four purchasing hubs[36];

(c)    a transfer pricing method was used to allocate costs and revenues around the global business;

(d)    the integrated business model was financed through a complex intercompany cash management system; and

(e)    responsibility for R&D, sales and operations was shared globally.

40.    All of the Nortel Group's business was organized around "business lines" or "business segments" on the basis of product lines (with the exception of certain joint ventures). These business segments operated globally, and all of the Group's business, and each business line or segment was capable of operating independently from the other business

---

[29] Appendix B to the 2008 APA at p 2 [PC0184853].

[30] Briard Deposition Transcript at pp 33-36.

[31] Appendix C to the 2008 APA at pp 2-3 [PC0184853].

[32] Rees Deposition Transcript at pp 42-43, Kerr Deposition Transcript at p 30,

[33] 2008 APA at pp 13 & 36 [PC0184853] .

[34] Monitor's Eighth Report to the Court, dated April 24, 2009 at para 46 [UCC0049685].

[35] Motion by NNI in the Chapter 11 bankruptcy proceedings, January 14, 2009 at para 26.

[36] Motion by NNI in the Chapter 11 bankruptcy proceedings, January 14, 2009 at para 37.

lines or segments.[37]  With *certain exceptions, the business segments were not segregated by legal entities but operated across various legal entities.*[38]

41.  The four business segments immediately prior to the Nortel Group's insolvency were:[39]

   (a)  *Carrier Networks*, which sold wireless products and services to Carrier network providers, which represented about 40% of the Group's business;

   (b)  *Enterprise Solutions*, which sold communications products and services to businesses and large organizations, which represented about 24% of the Group's business;

   (c)  *Global Services*, which provided a broad range of network support services, including installation, maintenance and technical support, which represented about 20% of the Group's business; and

   (d)  *Metro Ethernet*, which provided optical networking products and Ethernet technology, which represented about 14% of the Group's business.

42.  Although the structure of the business segments had been regularly reorganized during the recent history of the Nortel Group, for the two decades prior to filing, the Group's business has been organized into lines corresponding to families of products or types of customer.


The Role of the Business Segments

43.  The business segments were an integral feature of the Nortel business in two key ways, namely:[40]

   (a)  the supply of physical hardware with related software was conducted through the relevant business segments (i.e., as of the end of 2008, the Carrier Networks, Enterprise Solutions and Metro Ethernet business segments); and

   (b)  that hardware was deployed and supported through the Global Services business segment (as of the end of 2008).

44.  The business segments took on particular importance after 1996 when a "Line of Business" or LOB structure was introduced, whereby each LOB was responsible for

---

[37] Nortel Networks Functional Analysis for the years ended December 31, 2000-2004 ("**Functional Analysis**") [PC0246477].
[38] Motion by NNI in the Chapter 11 bankruptcy proceedings, January 14, 2009 at para 32.
[39] Motion by NNI in the Chapter 11 bankruptcy proceedings, January 14, 2009 at paras 27-31; Doolittle Affidavit at paras 62-66 [PC0184338]. ; See also NNC's Form 10-K filing with the US SEC for 2008 at pp 6 – 11 [NNC-[NNL06001427]; and the Monitor's Pre-filing Report to the Court, dated January 14, 2009 at para 19 [CCC0018694].
[40] Doolittle Affidavit at para 74 [PC0184338].

marketing and business activities in the United States, Canada and EMEA, and product manufacturing, product development and R&D were conducted on a global basis.[41]

45.    The preparation of financial forecasts was never completed on a legal entity basis. Forecasting was completed on a line of business or regional basis.[42]

46.    Internal patent review boards were organized along business lines, which were not organized geographically and could span multiple jurisdictions.[43]

47.    The control, accounting policies and independence of the business segments are summarized below:

   (a)    The heads of the business segments were accountable to the Group CEO. Shared costs were allocated to the segments based on headcount. Each segment had its own accounting policies similar to those of the Group.[44] Each segment was allocated resources and assets based on customer demand.[45] Working capital for each segment was primarily managed by the Nortel Group at the regional and global level.[46]

   (b)    In the Group's SEC filings, each business segment's performance was accounted for separately as if the segments were separate global businesses.[47]

   (c)    Each segment provided its own professional services for matters such as strategic planning, network design and engineering, network operations planning, installation and ongoing technical support.[48]

   (d)    Both prior to and following insolvency, the Nortel Group sought to sell its business segments as separate business units in their own right.[49]

Organization of Departments Across Business Segments

48.    The business segment structure was integrated with Group-wide departments which ran across the business segments. These departments coincided with the extraterritorial services provided by the Residual Profit Entities (parties to the MRDA), namely R&D, operations, sales and marketing and general and administrative services.

---

[41] NNL's Form 10-K filing with the US SEC for 1996 at p 3 & 13 [CCC0054665].
[42] Pahapill Deposition Transcript at pp 297-298.
[43] Cianciolo Deposition Transcript at pp 164-165.
[44] NNC's Form 10-K filing with the US SEC for 2001, Financial Statements at p F43 [NNI_00016022].
[45] NNC's Form 10-K filing with the US SEC for 2003 [NNC-NNL06001422].
[46] NNC's Form 10-K filing with the US SEC for 2004 [CCC0068304].
[47] For an example of detailed breakdowns per segment, see NNL's Form 10-K filing with the US SEC for 1998, Financial Statements for 1999; NNC for 2000; for 2001; for 2002; for 2003 and so on. For an example of the very detailed breakdowns in the later filings, see e.g. NNC's Form 10-K filing with the US SEC for 2005 at p 85-94 [NNI_01026443].
[48] NNC's Form 10-K filing with the US SEC for 2003 [NNC-NNL06001422].
[49] Doolittle Affidavit at para 15[PC0184338] ; Monitor's Fifteenth Report to the Court, June 25, 2009 at paras 75-76 [UCC0050384].

49.    All of the Nortel Group employees fell within one or more of the Group's departmental categories:[50]

(a)    R&D;

(b)    Operations;

(c)    Sales and Marketing; and

(d)    Corporate Services.[51]

50.    In its submissions to transfer pricing tax authorities, the Nortel Group stressed that each of its above functions collaborated with the others, across functions and across borders as best suited the customer, product, project or other defined need.[52]  The Residual Profit Entities operated in a manner reflective of the Nortel Group's matrix organization and were integrated across borders.[53]

51.    The Nortel Group made a conscious decision to adopt its transnational matrix structure because it believed that it would be beneficial to the Group as a whole, for example, by sharing technological know-how, achieving economies of scale and avoiding duplication of functions.[54]

**Financial Reporting by Business Segments**

52.    NNC annually filed Form 10-K returns with the Securities and Exchange Commission (the "**SEC**"), setting out its activities and financial results for the year.  The Nortel Group also issued detailed Annual Reports which, in large part, followed the content of the Form 10-Ks.

53.    Consistent with the Nortel Group having been organized and operated on global lines with a greater emphasis being placed on the business segments as compared to separate corporate entities:

(a)    The Form 10-Ks and Annual Reports generally paid **no regard** to individual companies within the Group or their financial performance or activities.  The emphasis was on reporting by business segment on a global basis, by geographical region or on a consolidated Group-wide basis.[55]  The main exceptions to this were:

---

[50] Functional Analysis at p 9 [PC0246477].
[51] 2008 APA at pp 32-33 [PC0184853].
[52] 2008 APA at pp 37-38 [PC0184853].
[53] 2008 APA at p 35 [PC0184853].
[54] 2008 APA at pp 37-40 [PC0184853].
[55] K. Stevenson Deposition Transcript at pp 416-418.

(i)      joint venture companies where there was usually a more detailed description of the year's activities, and the reporting of deferred tax assets for Residual Profit Entities, from 2006;[56] and

(ii)     2007 and 2008 10-Ks, where there was some entity level reporting by NNC and NNL (as bond obligors) and NNI (as a bond guarantor) being reported separately.[57]

Otherwise, the Form 10-Ks and Annual Reports were not concerned with the affairs of individual companies.

(b)    The Nortel Group adopted a number of Group-wide policies, business programs and restructurings.

54.    Prior to the early 2000s, for financial reporting purposes, revenues were initially attributed to geographical regions both by (i) "point of origin" (i.e., location of a business entity within the Nortel Group) and location of assets and (ii) by destination of customer revenues.[58]  From around the early 2000s, revenues were attributed to geographical regions based on the location of the customer.[59]

## E.    Management and Control of the Group

55.    The Group's global approach to the conduct of its business, in which legal entity distinctions were of minimal importance, was also reflected in the actual management of the global operations.

56.    While regional management (e.g., executives located in the EMEA region) had a certain level of autonomy, final or ultimate decision making authority for closing research facilities or reducing headcount resided with top management in Canada.[60] Regional Management controlled the applicability of Nortel's global strategy which was devised by NNL. Regional management, such as management for the EMEA entities, was considered "one step down" in authority from the Nortel Group's global management located in NNL.[61] For example:

(a)    top management in Canada would determine that one R&D lab in the EMEA region would need to be shut down and would direct management in EMEA to select a particular lab in the EMEA region for closure.[62]

---

[56] E.g. NNC's Form 10-K filing with the US SEC for 2006 at pp 76-77 [NNC-NNL06001426] .
[57] See NNC's Form 10-K filings with the US SEC for 2007 at p 157 and for 2008 at p 206.
[58] See e.g. NNL's Form 10-K filing with the US SEC for 1996, Financial Statements at pp F22 – F23 [CCC0054665].
[59] E.g. NNC's Form 10-K filing with the US SEC for 2001 at p F45 [NNI_00016022]; NNC's Form 10-K filing with the US SEC for 2004 at p F-26 [CCC0068304].
[60] Ricaurate Deposition Transcript at pp 77-78.
[61] Rolston Deposition Transcript at pp 122-123.
[62] Newcomb Deposition Transcript at pp 133-135.

- 13 -

(b)     on at least one occasion, the General Counsel for the EMEA region was directed to reduce the size of the legal department in the EMEA region by the Chief Legal Officer of NNL.[63]

(c)     on multiple occasions, the President of the EMEA region was directed to reduce workforce in the EMEA region by the Nortel Group's CEO.[64]

(d)     HR Vice Presidents (regional HR executives) reported directly to the Senior Vice President of HR, who was located in North America (NNI).[65]

57.     Executive leadership of the Nortel Group was in the hands of the officers of NNC/NNL. The Nortel Group was organized so that a significant portion of its global support activities such as executive leadership, operations and corporate services were located within NNL.[66] Thus:

(a)     NNL was described by NNI as the historic and actual operational parent of the global Nortel enterprise.  NNL provided, from its Toronto headquarters, corporate overhead support to its affiliates throughout the world.  In particular, the Chapter 11 filings state that a substantial portion of Nortel's legal, finance, strategic, insurance, procurement, human resources and real estate functions are directed on a group-wide basis from NNL's Toronto offices.[67]

(b)     The CEO and CFO were employed by NNL.[68]

(c)     The Common Engineering function for R&D was located primarily in NNL.[69] The Chief Technology Officer resided in Canada.[70]

(d)     A significant portion of the Nortel Group's general and administrative support function was performed centrally by NNL.[71]  Substantial parts of the Group's Finance organization were situated in NNL,[72] including the Group Controller's office and important features of the Treasury function.[73]  Generally, top treasury executives such as the treasurer and assistant treasurer, were Canadian or resided in Canada.[74]  The Group's Information Services organization was primarily

---

[63] LaSalle Deposition Transcript at pp 46-47.
[64] Pusey Deposition Transcript at p 85.
[65] Donovan Deposition Transcript at pp 48-49.
[66] Appendix A to the 2008 APA at p 1 [PC0184853].
[67] Motion by NNI in the Chapter 11 bankruptcy proceedings, June 9, 2009 at para 16.
[68] Appendix A to the 2008 APA at p 11 [PC0184853].
[69] Appendix A to the 2008 APA at p 15 [PC0184853].
[70] Appendix B to the 2008 APA at p 13 [PC0184853].
[71] Appendix A to the 2008 APA at p 9 [PC0184853].
[72] Appendix A to the 2008 APA at p 11 [PC0184853].
[73] Appendix E to the APA at pp 6-7 [PC0184853].
[74] Pahapill Deposition Transcript at pp 82-85.

- 14 -

located in NNL.[75]  The corporate Strategy Team was based in North America, mostly in Canada.[76]

(e)    During his tenure as CFO, Doug Beatty and NNL more generally, weighed in on credit issues with customers who were located outside of Canada and were doing business with non-Canadian Nortel entities.[77]

(f)    While regional executives had input into customer finance and credit issues, ultimate decision making authority with respect to customer finance rested with the Credit Committee, Treasury (based in NNL) or the board of NNL.[78]

(g)    Global intercompany funding was co-ordinated and managed in Canada.[79] Senior management of the Nortel Group considered liquidity and cash issues on a Group wide basis.[80]

(h)    The executive leadership of the Group's marketing team was based in NNL.[81]

(i)    Many of the Nortel Group's primary contractual external relationships with suppliers/vendors were through NNL.[82]    Similarly, NNL was usually the contracting party with outsourced equipment manufacturers and component suppliers.[83]

58.    Since at least the early 1990s, the overall management of the Group has been in the hands of the Executive Officers of NNL/NNC (who shared the same Executive Officers).  The Executive Officers were appointed by the boards of NNL and, where applicable, NNC.[84]

59.    Although the precise allocation of responsibilities and the names of positions changed over the years, the Executive Officers of NNC/NNL held the key posts in the Group, including:

(a)    President and CEO;

(b)    CFO;

(c)    Controller;

(d)    Treasurer;

(e)    General Counsel;

---

[75] Appendix A to the APA at p 11 [PC0184853].

[76] Appendix E to the APA at p 8 [PC0184853].

[77] Pahapill Deposition Transcript at pp 113-116.

[78] Morgan Deposition Transcript at pp 31-33,  Pusey Deposition Transcript at pp 131-136.

[79] Appendix E to the APA at p 7 [PC0184853].

[80] Williams Deposition Transcript at  pp 44.

[81] Appendix A to the APA at p 6 [PC0184853].

[82] Doolittle Affidavit at para 72 [PC0184338]; Functional Analysis at p 54 [PC0246477].

[83] Doolittle Affidavit at para 75 [PC0184338].

[84] See e.g. NNL's Form 10-K filing with the US SEC for 1990 at pp 12-13.

(f)     Vice-President, Taxation;

(g)     heads of various business segments.

60.     From around the early 2000s, the CEO was designated as the chief operating decision maker in assessing the performance of the Nortel Group's business segments and the allocation of resources to the segments. Each business segment was managed separately with each segment manager reporting directly to the CEO.[85]

61.     The directors of NNUK included senior North American officers of NNC/NNL such as Douglas Beatty, Michael Gollogly and Peter Currie.[86]

62.     Similarly, Gary Donahee was the Director and President of NNI between 1993 and 1995 and NNL's Senior Vice-President, Major Account between 1994 and 1996. William Lasalle was NNC and NNL's General Counsel for Operation between 2005 and 2007 and NNI's Secretary between 2003 and 2009.

63.     Ultimate decision making authority over pension plan funding, including the NNUK pension plan, rested with the NNL Pension Fund Policy Committee or the board of NNL/NNC.[87]

64.     Nortel had a number of regional Pension Fund Policy Committees. It was common for executives based in NNL to sit on Pension Fund Policy Committees for entities outside of North America such as NNUK.[88]

## F.    Global Integration

65.     In furtherance of its integrated global business operations, the Nortel Group operated both Group-wide and regional cash management systems that transferred cash around the Group as part of the transfer pricing arrangements and to meet the cash needs of the Group generally.[89] From a cash perspective, Nortel operated on a global basis.[90] Nortel strived to make sure that its parent corporation had significant liquidity to fund its operations.[91] Having global operations was considered important for the Nortel Group's long-term survival.[92]

---

[85] NNC's Form 10-K filing with the US SEC for 2001, Financial Statements at p F43[NNI_00016022].
[86] NNUK financial statements to December 31, 2002 at p 1, cf. NNC's Form 10-K filing with the US SEC for 2002 at p 24 [NNC-NNL06001437]; NNC's Form 10-K filing with the US SEC for 2006 at pp 210-211 [NNL06001426].
[87] Donovan Deposition Transcript at p 123.
[88] LaSalle Deposition Transcript at pp 19-28.
[89] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009 at paras 44-47.
[90] K. Stevenson Deposition Transcript at pp 177-178.
[91] K. Stevenson Deposition Transcript at p 146.
[92] Gatley Deposition Transcript at pp 93-95.

66.    The Nortel Group's treasury function was operated on a global basis. While various members of the Treasury Department were located around the world, they were all part of one global team. All Treasury staff reported to the treasury function located in NNL.[93]

67.    The global nature of the Nortel Group's financial integration was as follows:

(a)    The organization had a comprehensive treasury organization which monitored cash flows on a worldwide basis and sources of cash, some in terms of operations and some in terms of accessing capital markets;[94]

(b)    Cash summaries would be prepared on a subsidiary or responsibilities centre basis and then consolidated into overall summaries that were shared on the basis of the total Nortel Group;[95]

(c)    Nortel operated as an integrated global enterprise and as such, it flowed various activities through a number of subsidiaries. The creditors, the primary creditors of the overall corporation had a line of sight to the total, integrated public company NNC. The former CFO of NNC/NNL was not aware of specific creditors that had a concern relative to the liquidity of subsidiaries. The focus was primarily on the creditors of the group in total;[96]

(d)    Decision making about global cash management and how cash would be deployed around the world was within the responsibility of the CFO, in the context of a global liquidity plan which would have been shared with and endorsed by the Board of Directors of NNC;[97]

(e)    Funds paid to satisfy certain liabilities [for example payments into the UK Pension Scheme] would have been from various sources around the world, as it was for the satisfaction of debts for the corporation worldwide;[98]

(f)    NNUK and NNI in the context of their geographic location were global hubs for managing cash. NNUK and NNI were essentially distribution companies...and as a result cash flowed to both those entities from a variety of sources and was distributed based upon the liquidity plan that was put in place for the overall organization. It flowed in there as a consolidation point and flowed out again. It did not necessarily reflect what one would have seen as the underlying or core business of each of those subsidiaries;[99]

(g)    Although there were individual legal entities in the various jurisdictions in which Nortel operated, the source of cash had little to do with the disposition of cash. Cash was generated globally from various operations and deployed globally for

---

[93] K. Stevenson Deposition Transcript pp 176-177.
[94] Currie Deposition Transcript at p 28.
[95] Currie Deposition Transcript at p 29-30.
[96] Currie Deposition Transcript at p 65.
[97] Currie Deposition Transcript at pp 69-70.
[98] Currie Deposition Transcript at p 102.
[99] Currie Deposition Transcript at p 152.

- 17 -

requirements around the world. Cash generated in one jurisdiction would not mean it was earmarked for utilization in that jurisdiction. Cash was considered totally fungible;[100]

(h)    Cash generated by NNUK's business activities were for the use of the global group, including all cash generated there if necessary. No amounts would be reserved solely for NNUK's use;[101]

(i)    All cash recorded as earned by NNUK [$352 million in 2006] was available for the global enterprise and none of it was reserved to the individual legal entities;[102]

(j)    Any material dedication of cash by the Company anywhere in the world would revert to the NNC/NNL Board of Directors;[103]

(k)    The direct reports to the CEO of the parent company came from Canadian executives including the Chief Financial Officer, Chief Legal Officer, Treasurer, Corporate Secretary, VP of Mergers and Acquisitions."[104]

**Tax and Transfer Pricing**

68.    While various Nortel entities had regional tax and transfer pricing policies, the Nortel Group's global tax and transfer pricing strategies were formulated and promulgated by a group of senior employees and executives based in Canada and the US.[105]

69.    The Nortel Group's VP of Tax was based in NNL. The VP of Tax oversaw global tax compliance in every country in which Nortel conducted business. The VP of Tax reported to the Nortel Group's CFO. The VP of Tax's direct reports consisted of 40-60 global tax team employees based in various countries around the world including Canada, the US, the UK, Singapore and Hong Kong.[106] The leader of the Nortel Group's transfer pricing function also reported directly to the VP of Tax.[107]

70.    Subject to the needs of its subsidiaries, Nortel's global tax and transfer pricing strategy sought to direct cash to NNL/NNC in the most tax efficient manner. Ultimately, the movement of cash around the Nortel group was governed by tax efficiency.[108]

71.    On October 31, 2008, NNL and NNI submitted a joint request for a US/Canada bilateral advance pricing agreement for the period 2007 to 2011, with rollback effect to 2006 (the

---

[100] Currie Deposition Transcript at p 183.
[101] Currie deposition Transcript at pp 183-184.
[102] Currie Deposition Transcript at p 187, Exhibit 21124.
[103] Currie Deposition Transcript at p 99.
[104] Currie Deposition Transcript at p 75.
[105] Krebs Deposition Transcript at pp 148-153 & 246-248; Schofield Deposition Transcript at pp 20-22.
[106] Look Deposition Transcript at p 17.
[107] Look Deposition Transcript at pp 63-64.
[108] R. Smith Deposition Transcript at pp 68-70 & 258-260.

"**2008 APA**").[109]  The 2008 APA application was signed by NNI and the IRS in the US, and NNL and the Minister of National Revenue of Canada ("**CRA**").  NNL and NNI made detailed representations to the IRS and CRA as to the integrated nature of the global operations in support of the APA and described the fully integrated entities as NNL, NNI, NNUK, NNSA, Nortel Ireland and Nortel Networks Australia Limited.  As of December 31, 2007 Nortel Networks Australia Limited ceased to operate as an integrated entity.

72.    NNL and NNI stated the following with respect to the integrated nature of these entities:

(a)    They are fully integrated, and perform all functions related to the customer fulfillment process including manufacturing support and distribution functions both inside and outside of their respective geographic markets.[110]

(b)    Selling / marketing ("**S&M**"), general and administration ("**G&A**") activities performed by Nortel's integrated entities played an important role in supporting revenues in territories other than the geographic location where the costs were incurred.  Each company performed these functions to varying degrees in a very united and reliant manner.  By funding S&M and G&A activities in jurisdictions other than their own, Nortel's integrated entities were performing a value added service that supported the fulfillment process outside their own jurisdiction.[111]

(c)    Nortel was vertically and horizontally integrated, meaning that organizations within Nortel share information and performed common tasks across geographic boundaries.  Fully integrated entities performing R&D, manufacturing support and distribution functions interacted together to fulfil customer demand for products and services.  Each of the integrated entities performed similar functions and assumed similar risks and together performed all of the critical activities of Nortel's value chain.[112]

(d)    Due to the complexity of the integrated entities, their integrated participation in transactions and the sharing of intangibles in the covered transactions, the "comparable profits method" was not an appropriate method to evaluate transactions for transfer pricing purposes.[113]

(e)    Although Nortel products were divided into lines of business or business segments, the company was "Nortel" to the customer -- a one-stop shop from which one could buy from all parts of the company's business.[114]

---

[109] Nortel Networks Limited and Nortel Networks Inc – Joint Request for US – Canada Bilateral Advance Pricing Agreement /Arrangement 2007-2011, October 31, 2008 (the "**2008 APA**") [PC0184853].
[110] 2008 APA at p 11 [PC0184853].
[111] 2008 APA at p 12 [PC0184853].
[112] 2008 APA at p 13 [PC0184853].
[113] 2008 APA at p 13 [PC0184853].
[114] 2008 APA at p 32 [PC0184853].

(f)  The value of functional contributions within the Nortel Group could not be reliably valued using a transfer pricing method other than a residual profit sharing method, due to cross-border interactions and organizational activities to support other worldwide operations.

(g)  The primary functional activities of R&D, sales, operations and corporate services involved teams that collaborated across various functions and cross-border according to the customer, product, project or other defined need.[115]

(h)  Each of the integrated entities was actively involved in activities which contributed valuable technology (i.e., patents, inventions, designs, research teams in place). The integrated entities produced R&D-related intangibles and strong customer relationships through the use of globally consistent sales processes, customer relationship management tools and executive briefing centres.[116]

(i)  The functions were integrated and interrelated in a manner that separate treatment would have introduced unreliability into an evaluation of the transactions. Each of the companies [parties to the MRDA] performed the functions of R&D, manufacturing support, distribution, and intercompany services. Each company performed these functions to varying degrees, but yet in an integrated fashion.[117]

(j)  Nortel attempted to separate the operational costs incurred by each integrated entity between cost centres that support in-country sales and cost centres that support extraterritorial sales. Ultimately, the company determined that bifurcated operational cost information was either not available or unreliable.[118]

(k)  Each integrated entity performed fulfillment activities, such as R&D, operations, selling and marketing and general and administrative services to varying degrees in a very united and interdependent manner.[119]

(l)  Each integrated entity performed research and development for the benefit of Nortel as a group.[120]

(m)  All intellectual property created from the investment in R&D by the integrated entities is registered by NNL. Each integrated entity maintains an economic ownership in the IP.[121]

(n)  The integrated nature of Nortel's R&D function drives the Company's business.[122]

---

[115] 2008 APA at p 38 [PC0184853].
[116] 2008 APA at p 40 [PC0184853].
[117] 2008 APA at p 41 [PC0184853].
[118] 2008 APA at p 46 [PC0184853].
[119] Appendix "A" to the 2008 APA at p 1 [PC0184853].
[120] Appendix "A" to the 2008 APA at p 3 [PC0184853].
[121] Appendix "A" to the 2008 APA at p 4 [PC0184853].
[122] Appendix "A" to the 2008 APA at p 13 [PC0184853].

- 20 -

(o)     Nortel R&D activities were conducted on a global scale across Canada, US, Europe and Asia regions. On a highly coordinated and integrated basis, R&D projects were structured and executed across the regions with products delivered to various lines of businesses. Not one single R&D location or region was solely responsible for all project components that made up a product. R&D activities were highly distributed but executed in a coordinated fashion. This type of highly integrated R&D coordination at Nortel has been in practice for a long time.[123]

(p)     The majority of patents were issued in the US (52%). However, the choice of location to file a patent application was often based upon markets and competitor presence. Patent protection laws were also given some consideration. There is no correlation between the choice of location to file a patent application and where the efforts were undertaken to develop the invention.[124]

(q)     R&D at Nortel was often characterized by a collaboration between inventors in different countries and joint inventorship. Thus, counting inventions by "country of origin" can be misleading. Further, much of Nortel's R&D was interrelated, and one specific project might be developed based upon older R&D projects or platforms. "For example, if the UK undertook certain R&D that was not patented (e.g., possibly because it was not yet in a patentable form, or it would not meet the legal requirements to be patented). A year later, a portion of the information and intellectual property from the UK's R&D may be utilized by R&D personnel in Canada. Canada could then patent the results of its efforts. In this example, the patentable invention was not purely the result of Canada's efforts. Clearly, the UK's R&D efforts contributed to the patentable invention[125]..."

73.    The Master Research and Development Agreement ("**MRDA**") contained a residual profit sharing methodology and outlined the rights of the residual profit entities that were parties to it.[126] The MRDA governed the transfer pricing arrangement between the Nortel Group's entities. The MRDA was amended several times, most recently on December 31, 2008, days before the global insolvency filings of the Nortel Group.[127]

## G.    Integration Necessitated Global Sale of Assets

74.    In a motion filed by the U.S. Debtors in the Chapter 11 proceedings on June 29, 2009, the integrated and inter-dependent nature of the Nortel Companies (defined collectively as the 145 legal entities operating worldwide) was described as follows:

---

[123] Appendix "A" to the 2008 APA at p 17 [PC0184853].
[124] Appendix "A" to the 2008 APA at p 21 [PC0184853].
[125] Appendix "A" to the 2008 APA at p 22 [PC0184853].
[126] Master Research and Development Agreement dated December 22, 2004 (with effect from January 1, 2001 – including amendment and MOU) [Exhibit 21003].
[127] Amendment to MRDA dated December 31, 2008 [Exhibit 21003].

- 21 -

(a)     The credit rating agency Moody's issued downgrades to the Nortel's corporate family rating as a whole[128];

(b)     The U.S. Debtors, the Canadian Debtors, the EMEA Debtors and their affiliates employed a global integrated business model. In particular:[129]

    (i)     The main operating subsidiaries around the world operated in each of Nortel's four (4) main business segments;

    (ii)     Nortel substantially outsourced its manufacturing, relying on contract manufacturers with affiliates across the world to supply the Nortel Companies globally;

    (iii)     The Nortel Companies employed a complex internal purchasing system where sales orders were placed at the local, in-country level and internal purchase orders were routed to one of four purchasing hubs (located in four separate countries), which entities place orders with suppliers around the world;

    (iv)     The Nortel Companies used a complex transfer pricing model, periodically submitted to global taxing authorities for approval, to allocate costs and revenues throughout the global enterprise and ensure the proper allocation of tax payment among relevant jurisdictions;

    (v)     Nortel's integrated business model was financed through a complex inter-company cash management system that itself was integrated with Nortel sales, purchasing, supply and distribution networks;

    (vi)     Nortel employees around the world shared responsibility for the R&D, sales and operations of the global enterprise;

(c)     With certain exceptions, the business segments were not segregated by legal entities but were operated across various legal entities;

(d)     Given the integrated business on which the Nortel Companies operated, certain of the Nortel Companies reached agreements and engaged in certain practices to properly allocate profits and costs across the various affiliates. The Nortel Companies utilized a residual profit sharing methodology that was designed to reflect that certain Nortel affiliates, designated as profit sharing entities, are the source of the research and development that has created Nortel's global technology footprint.[130]

---

[128] Paragraph 17 of the declaration of John Doolittle executed January 14, 2009 filed in support of Chapter 11 petitions and first day motions (the "**Doolittle Declaration**") [CCC0031058].
[129] Doolittle Declaration at para 26 [CCC0031058].
[130] Doolittle Declaration at para 40 [CCC0031058].

- 22 -

(e)    The U.S. Debtors' and their Canadian parents' interests were united in their integrated, codependent business relationship. Such overlapping assets and obligations of the U.S. Debtors and Canadian Debtors will be relevant in the development of a reorganization plan for any and all of the debtors even outside of an asset sale context. [131]

(f)    The Nortel Companies operated an integrated, multinational business, providing networking and communications technology and services to customers in the US, Canada and around the world. [132]

(g)    The U.S. Debtors operated their businesses and managed their assets on a global integrated basis with the Canadian Debtors. [133]

(h)    In furtherance of Nortel's integrated global business operations, in the ordinary course of business the Nortel Companies use a cash management system to transfer funds between and among the Nortel Companies to manage operations, their cash needs and the cash needs of Nortel generally.  The cash management system is managed as part of Nortel's integrated business operations. [134]

(i)    The cash management system utilized by the Nortel Companies allowed Nortel to control corporate funds centrally.  A coordinated cash management system was also necessary due to the integration of the businesses of the various entities on an operational level. [135]

(j)    Because of the complex corporate and financial structure, it was not possible to establish a new system of accounts and a new cash management and disbursement system without substantial additional cost and expenses. [136]

(k)    The Nortel Companies' complex and interconnected global supply chain required that the companies regularly transact with each other, generating intercompany payables and receivables. [137]

(l)    Intercompany transactions were essential to the U.S. Debtors' business given the integrated nature of the Nortel Companies' operations. [138]

(m)    As a global enterprise, from time to time Nortel assigned certain highly qualified and highly compensated employees to locations outside of their home country

---

[131] Doolittle Declaration at para 42 [CCC0031058].
[132] Doolittle Declaration at para 44 [CCC0031058].
[133] Doolittle Declaration at para 50 [CCC0031058].
[134] Doolittle Declaration at para 41 [CCC0031058].
[135] Doolittle Declaration at para 75 [CCC0031058].
[136] Doolittle Declaration at para 76 [CCC0031058].
[137] Doolittle Declaration at para 68 [CCC0031058].
[138] Doolittle Declaration at para 83 [CCC0031058].

- 23 -

either temporarily or permanently. These individuals were responsible for spearheading Nortel's global efforts.[139]

(n)     NNC maintained a number of third party insurance policies on behalf of all of its subsidiaries including the U.S. Debtors and the EMEA Debtors. These policies were in NNC's name, and the premium for these policies were paid by NNL. These policies covered all of NNC's subsidiaries generally, and covered, among other things, Errors and Omissions, Fiduciary Liability, Directors' and Officers' liability, Employment Practices liability, Comprehensive General Liability and Property coverage.[140]

75.     As outlined by the U.S. Debtors in a Motion approving the interim funding and settlement agreement ("**IFSA**") heard June 29, 2009:

(a)     The Nortel entities operated on an integrated basis across multiple jurisdictions. Certain of the Nortel Companies, including NNL, NNI, NNUK, NNIR and NNSA had been the primary source of the research and development that created Nortel's global technology footprint, the benefits of which were shared worldwide across multiple corporate entities.[141]

(b)     Any definitive and binding determination regarding the interpretation and applicability of the Nortel transfer pricing regime similarly would be extremely time consuming and potentially contentious.[142]

76.     Court approval of the IFSA averted a potential funding crisis amongst the affiliates that otherwise would have seriously harmed the entities' interconnected global business operations and substantially decreased the value of the various estates. Estate resources would have been wasted duplicating efforts and trying to separate out overhead between the intertwined affiliates.[143]

77.     Post-filing, assets were not sold on a legal entity basis or with regard to individual legal identity. Rather, assets were sold on the basis of business lines or segments, consistent with the manner in which the fully-integrated Nortel Group operated globally prior to insolvency.[144]

78.     In all but one of the business sales and in the Rockstar IP transaction, each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors were sellers or deemed sellers.[145]

---

[139] Doolittle Declaration at para 122 [CCC0031058].
[140] Doolittle Declaration at paras 171-172 [CCC0031058].
[141] U.S. Debtors' Motion heard June 29, 2009 at para 10.
[142] U.S. Debtors' motion heard June 29, 2009 at para 19.
[143] U.S. Debtors' motion heard June 29, 2009 at para 30.
[144] For example, see the Monitor's Thirty-Fourth Report to the Court, dated January 3, 2010 at para 15 [CCC0034367 ] and the Monitor's Twenty-Eighth Report to the Court, dated November 27, 2009 at para 37 [NNC-NNL11755932].
[145] For example, see the Monitor's Seventy-First Report to the Court, dated July 6, 2011 at para 9 [CCC0060647].

- 24 -

## H.    The Nortel Networks UK Pension Plan

### General Background

79.    The Nortel Networks UK Pension Plan (the "**Plan**") was the defined benefit pension plan for employees of Nortel in the U.K. and NNUK was the sponsor employer of the Plan. NNUK was required to fund the Plan in a sufficient amount to meet the balance of the cost of the pension benefits after taking into account the members' own contributions. As at January 14, 2009 the Plan had approximately 42,000 members. The Plan is governed by U.K. law.[146]

80.    NNUK was the Nortel Group's operating company in the U.K.  NNUK is the successor in interest to Nortel's previous two main U.K. operating companies, STC plc and Nortel Networks Optical Components Limited.  Each of these entities was, at different times, the sponsoring employer of the Plan before NNUK and, like NNUK, was a direct or indirect wholly-owned subsidiary of NNL.  Upon the Nortel Group's acquisition of NNUK's predecessors, the Nortel Group also acquired the Plan, any surplus in the Plan and the obligations thereunder.[147]

81.    As at January 14, 2009, the Plan had a funding deficit of approximately £2.1 billion (although the estimate of the deficit was £2.6 billion / USD$4.258 billion on a buy-out basis as at March 31, 2013). As a result, the pensions of approximately 40,000 NNUK employees were, at the Filing Date, only 40% funded on a buy-out basis. This funding level has been approximately maintained (as at March 31, 2013) notwithstanding the increase in the deficit to approximately £2.6 billion / USD$4.258 billion, due to investment growth in the Plan's assets since 2009.[148]

### The Funding Guarantee

82.    In 1991, when NNL acquired STC plc, the Plan was in a surplus position, being 150% funded on an on-going basis. The Nortel Group took an employer "contribution holiday" from 1991 until 2002, which consumed the Plan's 150% surplus and reduced it to a funding deficit.[149]

---

[146] Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund, May 16, 2013 at para 8 [Exhibit 11135].
[147] Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund, May 16, 2013 at para 14 [Exhibit 11135].
[148] Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund, May 16, 2013 at para 24 [Exhibit 11135].
[149] Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund, May 16, 2013 at para 98 [Exhibit 11135].

- 25 -

83. Nortel did not commit to a regular schedule of contributions during the period of 2002 to 2005 despite the Plan's increasing deficit. Instead, NNC/NNL permitted NNUK to make only *ad hoc* contributions to the Plan.[150]

84. On August 25, 2005, NNC/NNL issued a comfort letter to the Trustee of the Plan to the effect that it would continue to make funds available to NNUK to enable NNUK to meet its ongoing financial commitments.[151]

85. The Plan Actuary's valuation report as at April 6, 2005 was finalized on April 4, 2006. The report stated that, as at April 6, 2005, the deficit was £356 million on an on-going basis.

86. Following lengthy negotiations by the Trustee of the Plan with NNL:

(a)    NNUK was permitted to enter into an agreement with the Trustee dated November 21, 2006 (the "**Funding Agreement**") pursuant to which NNUK agreed to make contributions between that date and April 5, 2008 of no less than £150 million, followed by contributions from April 5, 2008 to April 5, 2012 based on an updated valuation of the deficit at April 5, 2008; and

(b)    NNL guaranteed these on-going funding obligations up to June 30, 2012 by way of guarantee in favour of the Trustee of the Plan (the "**Funding Guarantee**").[152]

**Project Swift and the Insolvency Guarantee**

87. In late 2007, the Nortel Group decided that, for tax reasons, part of a large intercompany loan for outstanding transfer pricing payments made in the amount of USD$ 1 billion owing by NNL to NNUK should be repaid in kind to NNUK. In a transaction named "Project Swift", NNL repaid part of the loan by transferring to NNUK all of the outstanding shares of NNL's Dutch subsidiary NNIFH. NNIFH, a holding company, owned all of the outstanding shares in each of the EMEA companies except NNSA and NN Ireland, which were wholly or largely owned by NNL ("**Project Swift**").[153]

88. NNL and NNUK entered into Project Swift on or about December 21, 2007. Pursuant to its terms:

(a)    NNUK acquired the share capital of NNIFH from NNL; and

---

[150] Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund, May 16, 2013 at para 192 [Exhibit 11135].
[151] Comfort Letter dated August 25, 2005 [NOR-CAN01387303].
[152] Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund, May 16, 2013 at para 195 [Exhibit 11135].
[153] Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and The Board of the Pension Protection Fund, May 16, 2013 at para 157 [Exhibit 11135].

(b)     in return for the acquisition, NNUK discharged £327.6 million (approximately USD$654 million at the then applicable exchange rate) of NNL's indebtedness to NNUK for intercompany loans.

89.     As part of Project Swift, on December 21, 2007, NNL executed and delivered to the Trustee of the Plan a written guarantee in connection with amounts owing by NNUK for the Plan's deficit in the event of a future insolvency (the "**Insolvency Guarantee**").

90.     The amount payable under the Insolvency Guarantee is limited to the lesser of: (i) U.S.$150 million; and (ii) the amount of the Plan's buy-out deficit.

I.      **Major Claims in the Nortel Group's Insolvency Proceedings**

**Bonds Outstanding at Insolvency Filing Date (January 14, 2009)**

91.     The following chart provides an **overview** of Nortel's outstanding bonds as at January 14, 2009:[154]

| ISSUER | DESCRIPTION (principal and interest rate) | GUARANTOR | MATURITY DATE | TRUSTEE AND INDENTURE DATE |
|---|---|---|---|---|
| Nortel Networks Corporation | USD$575 million 1.75% Convertible Senior Notes | Nortel Networks Limited  Nortel Networks Inc. | April 2012 | The Bank of New York Mellon – March 28, 2007 |
| Nortel Networks Corporation | USD$575 million 2.125% Convertible Senior Notes | Nortel Networks Limited  Nortel Networks Inc. | April 2014 | The Bank of New York Mellon – March 28, 2007 |
| Nortel Networks Limited | USD$1 billion Floating Rate Senior Notes (LIBOR + 4.25%) | Nortel Networks Corporation  Nortel Networks Inc. | July 2011 | The Bank of New York Mellon – July 5, 2006 |

---

[154] Pre-filing Report of the Monitor, dated January 14, 2009 at paras 52-53 [CCC0018694].

| ISSUER | DESCRIPTION (principal and interest rate) | GUARANTOR | MATURITY DATE | TRUSTEE AND INDENTURE DATE |
|---|---|---|---|---|
| Nortel Networks Limited | USD$550 million 10.125% Fixed Rate Senior Notes | Nortel Networks Corporation<br><br>Nortel Networks Inc. | July 2013 | The Bank of New York Mellon – July 5, 2006 |
| Nortel Networks Limited | USD$1.125 billion 10.750% Fixed Rate Senior Notes | Nortel Networks Corporation<br><br>Nortel Networks Inc. | July 2016 | The Bank of New York Mellon – July 5, 2006 |
| Nortel Networks Limited | USD$200 million 6.875% Notes | — | September 2023 | Wilmington Trust N.A. as successor Indenture Trustee – November 30, 1988 |
| Nortel Networks Capital Corporation | USD$150 million 7.875% Notes | Nortel Networks Limited | June 2026 | Law Debenture Trust Company New York – February 15, 1996 |

92.     As trustee for certain bonds, the Bank of New York Mellon and Law Debenture Trust Company have asserted claims against NNC, NNL and NNI for contractual rates of interest with respect to a number of outstanding bonds.

**USD$2 Billion Settlement**

93.     In 2002, the Nortel Group sought to implement a series of bilateral advance pricing agreements for the period of 2001- 2005 with the Canada Revenue Agency ("**CRA**"), the Internal Revenue Service in the U.S. ("**IRS**") and Her Majesty's Revenue and Customs in the U.K. ("**HRMC**").

94.     After the Nortel Group's insolvency filing (late 2009 and early 2010), NNL and NNI finalized these bilateral advance pricing agreements with the CRA and the IRS respectively (the "**CRA and IRS APAs**"). As part of the CRA and IRS APAs, NNI and NNL agreed that certain transfer pricing overpayments were made by NNI to NNL between 2001-2005 (the "**APA Settlement**"). As part of the APA Settlement, NNL and NNI agreed to a USD$2 billion intercompany adjustment by NNL in favour of NNI and NNI was granted an unsecured pre-petition claim of USD$2 billion into NNL's estate.

- 28 -

95.    These purported transfer pricing overpayments were made pursuant to the MRDA, the document which governed the Nortel Group's transfer pricing regime.

96.    Based on the APA Settlement, the CRA and IRS APAs provided for a negative adjustment to NNL's income of USD$2 billion and a corresponding positive adjustment to NNI's income of USD$2 billion. Many of the facts surrounding the CRA and IRS APAs and the APA Settlement are under court seal attached to a Monitor's report to the Court and have not been publicly disclosed. The CRA and IRS did not disclose the method by which they determined that the Nortel Group's transfer pricing arrangements had caused NNI to overpay NNL by USD$2 billion.

## Claims of the U.K. Pension Claimants

97.    The U.K. Pension Claimants have asserted a direct contractual claim against NNUK for approximately £2.6 billion / USD$4.258 billion, which reflects the buy-out deficit of the Plan as at March 31, 2013.

98.    The U.K. Pension Claimants have asserted direct contractual claims against NNL for amounts owing under the Insolvency Guarantee and the Funding Guarantee.

99.    The U.K Pension Claimants have asserted financial support direction ("**FSD**") claims against NNC, NNL, NNI and a number of the Nortel Group's EMEA entities. These FSD claims are based on the ability of the Determinations Panel of the U.K. Pensions Regulator to secure financial support for the Plan from NNUK's affiliated companies under applicable U.K. pension legislation.

100.   The U.K. Pension Claimants have asserted a claim for unjust enrichment against NNL on the basis that NNUK was inadequately compensated:

(a)    for its restructuring costs;

(b)    under Nortel's transfer pricing arrangements for the true costs of its pension liabilities;

(c)    for interest that would have been paid by NNL to NNUK for certain intercompany loans; and

(d)    for claims related to the value exchanged in Project Swift;

and that that these amounts would otherwise have been available to NNUK to fund the Plan if not for NNL's conduct.

101.   The U.K. Pension Claimants have asserted a claim against NNC and NNL on the basis that NNC and NNL carried on the affairs of NNUK and/or acted in relation to the Plan in a manner that was oppressive, unfairly prejudicial to, or unfairly disregarded the interests of the Trustee and the Plan beneficiaries, contrary to section 241 of the CBCA

**Claims of the EMEA Entities**

102.   The Joint Administrators on behalf of the filed EMEA entities have asserted claims against the Nortel Group's Canadian entities. These claims have been made on the basis that, *inter alia*:

    (a)    NNUK was underfunded for amounts owing to the Plan;

    (b)    certain EMEA entities were inadequately compensated under the Nortel Group's transfer pricing arrangements;

    (c)    NNUK was inadequately compensated for Project Swift;

    (d)    amounts are owing to certain EMEA entities for outstanding intercompany trade debts; and

    (e)    NNUK was inadequately compensated for certain interest-free intercompany loans.

**Claims of the Canadian Creditors Committee ("CCC")**

103.   The CCC represents the interests of more than 20,000 Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of the Nortel Group's Canadian entities who in the aggregate, have asserted approximately USD$3 billion in Claims against the Nortel Group's Canadian entities.[155]

**Settlement of Claims Against NNI**

104.   In December, 2013, the U.K. Pension Claimants, Nortel's EMEA entities and the liquidator of NNSA (the "**French Liquidator**") settled all of their claims against NNI. The U.K. Pension Claimants had filed a proof of claim against NNI for an FSD claim. The FSD claim was the only claim that the U.K. Pension Claimants had asserted against NNI.

105.   The U.K. Pension Claimants and the Joint Administrators on behalf of Nortel's EMEA entities each received an allowed administrative expense claim, pursuant to section 503 of the *Bankruptcy Code*, against NNI at a level of priority afforded under section 507(a)(2) of the *Bankruptcy Code*.

---

[155] Allocation Position of the Canadian Creditors' Committee, May 16, 2013 at para 1 [Exhibit 21511].

# Appendix F

**Appendix F**

**Description of Research**

<u>Leif M. Clark & Jay L. Westbrook</u>

In forming the opinion contained in this report, we consulted the following sources:

(i)   case law;
(ii)  academic texts;
(iii) legal journals and law reviews; and
(iv)  international conventions, models laws and other documents produced by bodies with an interest in international insolvency including, but not limited to, UNCITRAL and the ALI.

# Appendix G

E.CA

FORM 53

*Courts of Justice Act*

ACKNOWLEDGMENT OF EXPERT'S DUTY

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | ) | Chapter 11 |
| Nortel Networks Inc., et al., | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

- and the -

***ONTARIO***
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)
IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT,*
**R.S.C. 1985, C. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

ACKNOWLEDGMENT OF EXPERT'S DUTY

1.  My name is Leif Clark. I live at 142 Treasure Way, San Antonio *(city)*, in the State *(province/state)* of Texas *(name of province/state)*.

2.  I have been engaged on behalf of the Trustee of Nortel Networks U.K. Pension Plan and the Board of the Pension Protection Fund to provide evidence in relation to the above-noted court proceeding.

3.  I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

    (a)  to provide opinion evidence that is fair, objective and non-partisan;

    (b)  to provide opinion evidence that is related only to matters that are within my area of expertise; and

    (c)  to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4.  I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date: January 24, 2014

_____
Signature

RCP-E 53 (November 1, 2008)

# Appendix H

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | ) |
| | ) Chapter 11 |
| | ) |
| Nortel Networks Inc., et al., | ) Case No. 09-10138 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| | ) |

- and the -

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT,*
**R.S.C. 1985, C. C-36, AS AMENDED**
**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

ACKNOWLEDGMENT OF EXPERT'S DUTY

1. My name is Jay L. Westbrook. I live at 4707 Balcones Drive, in the City of Austin, in the State of Texas.

2. I have been engaged on behalf of the Trustee of Nortel Networks U.K. Pension Plan and the Board of the Pension Protection Fund to provide evidence in relation to the above-noted court proceeding.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a) to provide opinion evidence that is fair, objective and non-partisan;

   (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c) to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date: January 24, 2014

_____
*Signature*

RCP-E 53 (November 1, 2008)