Court File No.: 09-CL-7950

## ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

- and -

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**Rebuttal Expert Report of Coleman D. Bazelon**

**for U.K. Pension Claimants**

February 28, 2014

# *REDACTED*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

# Contents

I.    Introduction .................................................................................................. 1

II.   Summary of Conclusions ............................................................................ 1

III.  Approaches to the Allocation Issue before the Courts ............................ 4

    A.    The MRDA Does Not Govern The Allocation Of Proceeds Upon A Global Dissolution Of Nortel ........................................................................ 4

        1.    The MRDA's Economic Purpose Was Not To Allocate Lockbox Funds .............. 4

        2.    The MRDA Does Not Provide for an Economically Rational Allocation of Lockbox Funds ................................................................ 7

        3.    The Amortization Rate Assumed By The MRDA Is Unsuitable For Allocating Proceeds In A Global Dissolution .......................................... 9

    B.    The Parties Have Proposed Divergent Allocation Positions ......................................... 12

        1.    The Parties Disagree on the Methods and Assets to be Valued ........................... 12

        2.    The Proposed Methodologies Lead To Vastly Different Results ......................... 14

IV.   The Legal Title Approach (Monitor, Canadian Debtors, and CCC) ..................................... 20

    A.    The Legal Title Approach Is Economically Irrational ...................................................... 20

    B.    The Legal Title Approach Undervalues Licensee Rights ................................................. 23

    C.    The Legal Title Approach Suffers From Serious Flaws In Implementation ................. 25

        1.    Rebuttal Summary of Green Report (Monitor and Canadian Debtors) .............. 26

        2.    Rebuttal Summary of Britven Report (CCC) ......................................................... 30

V.    The Revenue-Based Allocation Approach (U.S. Debtors) .................................................... 33

    A.    The U.S. Approach Relies On A Selective Interpretation Of The MRDA .................... 33

    B.    The U.S. Approach Suffers From Serious Implementation Flaws ................................. 35

        1.    Inconsistent Value Assigned to the Rest of World (RoW) in the Business Sales ............................................................................................... 35

        2.    The U.S. Approach Errs by Relying on 2009 Revenues ........................................ 37

        3.    Under-Appreciation of Chinese IP Market Value in the Residual IP Sale .......... 39

VI.   The R&D Contribution Approach (EMEA Debtors) ............................................................. 45

VII.  Revisions to Initial Report ...................................................................................................... 48

## I.    Introduction

My name is Coleman Bazelon, and I submitted an initial report on behalf of the UK Pension Claimants ("UKPC") on January 24, 2014.  In my initial report, I presented, from an economist's perspective, evidence about Nortel's business operation, technology, and intellectual property ("IP") value creation process.  On the basis of strong evidence of IP asset entanglements, which make it infeasible to properly parse out each entities' value contribution, I concluded that a consolidated Pro Rata Distribution Model is most consistent with Nortel's integrated operation and is the most economically rational method for dispersing the lockbox funds to Nortel's ultimate creditors.  In addition, I demonstrated that Nortel's globally dispersed but collaborative research and development ("R&D") activities were not dictated or affected by Nortel's transfer pricing arrangement and the associated Master Research and Development Agreement ("MRDA").

In this rebuttal report, I respond to the positions and conclusions reached in the reports of:

- Mr. Jeffrey Kinrich and Raymond Zenkich (the U.S. Debtors);
- Mr. Philip Green, Drs. Alan Cox and Mark Berenblut ("Cox-Berenblut") (the Monitor and Canadian Debtors);
- Mr. James Malackowski, Dr. Richard Cooper, and Mr. Paul Huffard (the EMEA Debtors);
- Mr. Thomas Britven (the Canadian Creditors Committee, or "CCC").

I also address some of the issues raised in the following transfer pricing expert reports regarding the economic purpose of the MRDA and its applicability to allocation of the lockbox funds:

- Dr. Timothy Reichert (the Monitor and Canadian Debtors);
- Dr. Lorraine Eden (the U.S. Debtors);
- Dr. Richard Cooper (the EMEA Debtors).

Given the numerous reports, exhibits, and appendices in the first round of submission and the limited time to respond, I only comment on and rebut the most salient opinions of the other experts.  Lack of discussion on any particular topics in this rebuttal report, however, does not indicate my agreement or disagreement with the opinions.  I reserve the right to address any other issues at depositions and trial.  Additional documents I have reviewed and relied upon since my initial report are listed in **Appendix R1**.

## II.    Summary of Conclusions

Review of the reports submitted by the experts for the Monitor, the Canadian, U.S., and EMEA Debtors, and the CCC (hereinafter, the "Parties") reaffirms my conclusion that the Pro Rata Distribution Model is economically rational and the appropriate formula for allocation of the lockbox funds.  In large part, the experts for the Parties performed certain calculations to allocate

the lockbox funds, but did not explain why the approach they were taking was economically justified. In many instances, those experts rely on selective interpretations of a transfer pricing arrangement which was developed primarily for tax compliance purposes. Developing allocations based on such selective interpretations leads to a wide disparity among proposed recovery rates for the different geographic groupings of creditors, as shown in Table 1 below.

**Table 1.  Comparison of Lockbox Allocations by Various Experts for the Parties**

|  | Legal Title Approach | | Revenue Approach | | Contribution Approach |
|---|---|---|---|---|---|
|  | Green | Britven | Kinrich | Huffard | Huffard |
| Canadian Debtors | 83% | 79% | 11% | 12% | 32% |
| EMEA Debtors | 3% | 7% | 17% | 31% | 18% |
| U.S. Debtors | 14% | 14% | 73% | 58% | 50% |
| Total | 100% | 100% | 100% | 100% | 100% |

The often diametrically opposite allocation positions advocated by the Parties in this prolonged and expensive multijurisdictional bankruptcy are strongly contrary to the manner and spirit under which Nortel operated. Therefore, for both the affirmative reasons presented in my initial report and the rebuttal provided in this report, I continue to conclude that a Pro Rata Distribution Model is the most appropriate and economically rational allocation methodology for this case.

Each of the Parties relies upon expert reports implementing a methodology for allocation that produces a result with the highest recovery to that particular geography or Debtor Estate. This is not coincidental, and makes transparent an underlying flaw in each method as being based on a group of debtor companies registered in a particular geography who are subject to a bankruptcy proceeding in that jurisdiction. This is inconsistent with the "One Nortel" that existed prior to bankruptcy. In effect, the Parties' current positions reflect a geographic "tug-of-war" among bankruptcy Estates where no economically rational basis exists for doing so.

This rebuttal report describes the economic flaws of the approaches advanced by the Parties in principle, as well as some of the flaws in the implementation of those approaches. My key conclusions are summarized as follows:

- I cannot opine on the legal interpretation of the MRDA, but based on my consideration of the evidence from an economic perspective, in my opinion the economic purpose of the MRDA was not to allocate the proceeds from the sale of assets occurring during a global insolvency proceeding involving all Parties to the agreement. Rather, its economic purpose was as a tax-motivated vehicle for sharing periodic net profits or losses from integrated, ongoing operations of the firm, on average, over time. If the MRDA were to be used as an allocation tool, and I disagree that it should, certain significant adjustments would be required, and still would not necessarily produce a reliable or economically correct result.

- Each of the Parties has proposed at least one allocation approach that assumes the existence of an agreement among the Parties to distribute proceeds according to a different aspect of the MRDA, yielding results that the Parties would not have agreed to at any point *ex ante*. In fact, the extreme disparity across the allocation methodologies by itself is evidence of the absence of any agreement among Nortel's Residual Profit Entities ("RPEs") concerning the distribution of lockbox funds.

- The <u>Legal Title Approach</u> proposed by the Monitor, Canadian Debtors, and CCC results in a very extreme allocation of the lockbox funds in favor of the Canadian Estate, although in reality it relates to only one of the Canadian Debtors, NNL. It would have been economically irrational for the non-Canadian RPEs to accept, in exchange for substantial R&D contribution, a future payoff truncated on the upside in the event of a bankruptcy or insolvency. Absent any *ex ante* compensation of equivalent market value, any allocation position that so minimizes the economic value of the license rights to the non-Canadian RPEs should be rejected as economically irrational and implausible.

- The <u>Revenue Approach</u> proposed by the U.S. Debtors would allocate proceeds on the basis of estimated territorial revenues, ignoring provisions of the MRDA governing, among other things, distribution of *ex post* operating profits. Under the MRDA, the RPEs were not entitled to retain the entire revenues generated through the license granted for their geographic region. Again, it would be economically irrational for RPEs who participated in substantial IP-creating activities to agree to a method of allocation of the proceeds of asset sales in a liquidation that would not cover their liabilities from such activities. While the license approach proposed by the EMEA Debtors corrects some of the problems with the U.S. approach, it still depends on an improper territorial revenue-based model.

- The <u>R&D Contribution Approach</u> proposed by the EMEA Debtors would allocate proceeds based on R&D spending as a proxy for R&D contribution. While splitting revenue or profits based on R&D spending may be convenient in an ongoing enterprise, it may not be the most accurate proxy for measuring R&D value creation and contribution. For example, NNUK consistently "fought above its weight" by contributing significantly more patentable inventions than R&D spending alone would indicate.

- As compared to the other approaches, the consolidated Pro Rata Distribution Model is economically rational from each of the Estates' perspective, as it: 1) reflects the fully integrated manner in which Nortel operated its business prior to insolvency and created the value that funded the lockbox; and 2) reflects the manner in which, through the Interim Funding & Settlement Agreement ("IFSA"), Nortel disposed of its assets upon insolvency in order to generate the highest value. Put simply, Nortel created its assets (with their corresponding liabilities) and operated in a highly integrated manner—as "One Nortel"—

which should be taken into account when allocating the proceeds in a bankruptcy proceeding.

- Finally, the experts for the Monitor and the Canadian Debtors and the U.S. Debtors made significant implementation errors in determining the allocations of the lockbox funds among the RPEs even under their own proposed approaches. I adjusted for some of these errors and recalculated the allocation percentages following their own allocation methodologies—even though I disagree with their proposed methodologies for the reasons summarized above and articulated throughout my report.

## III.  Approaches to the Allocation Issue before the Courts

The key issue before the Courts in the Allocation Proceeding is how to distribute the lockbox funds to Nortel's global creditors through the three bankruptcy Estates. Since each of the Parties proposes at least one theory that relies on select portions of the MRDA as at least a partial justification for their allocation methods, it is important to examine the actual, not hypothetical, role played by the MRDA and Nortel's transfer pricing arrangements when they were implemented. I discuss the economic purpose of the MRDA in Section III.A, and then summarize and explain the divergent allocations resulting from the Parties' proposed methodologies in Section III.B.

### A.  The MRDA Does Not Govern The Allocation Of Proceeds Upon A Global Dissolution Of Nortel

I am not a transfer pricing expert in this matter and I understand that the UKPC will be submitting a rebuttal report to discuss transfer pricing topics in more detail. However, as an economist, I considered the economic purpose of the MRDA and whether it provides an economically rational basis for allocating the lockbox funds.

#### 1.  The MRDA's Economic Purpose Was Not To Allocate Lockbox Funds

All experts in this matter agree that Nortel transitioned its transfer pricing arrangement from an R&D cost sharing agreement ("CSA") to a residual profit split method ("RPS" or "RPSM"), which became effective January 1, 2001,[2] following requests from the U.S. IRS and Canada's CCRA. The RPS method facilitated Nortel's desire to lower its global effective tax rate and move cash to Canada. Nortel submitted a multilateral advanced pricing agreement ("APA") application to the Canadian, U.S., and U.K. taxing authorities in March 2002. Around the same time, Nortel's CSA

---

[2]    Expert Report of Dr. Timothy Reichert (Monitor and Canadian Debtors), p. 22 ("Reichert Report"); Expert Report of Dr. Lorraine Eden (U.S. Debtors), pp. 44–46 ("Eden Report"); Transfer Pricing Expert Report of Dr. Richard Cooper (EMEA Debtors), pp. 35 and 39 ("Cooper Report").

participants terminated the CSA, but a new internal agreement documenting the RPS transfer pricing arrangement was not developed and formalized until December 2004.[3]

The original MRDA assigned legal title to Nortel patents to NNL, but granted the other RPEs royalty-free and perpetual exclusive licenses to their own markets. (A later revision to the MRDA explicitly granted all the RPEs non-exclusive licenses to territories outside the RPEs' home markets as well.) An important component of the MRDA was its profit sharing provision: Nortel's residual operating profits were to be split among the RPEs in proportion to their respective capitalized R&D "stock" (later changed to their R&D spending over the preceding five years), irrespective of where the revenues or profits originated.

The MRDA went through four revisions, each (apparently) meant to more accurately reflect Nortel's transfer pricing practices or agreed upon arrangements.[4] For example, there is evidence to suggest that the RPSM was modified, in December 2008, to reflect Nortel's exit from manufacturing activities as well as the company's perception that the useful life of some of its technology had shortened.[5] The MRDA was also modified to more accurately reflect Nortel RPEs' geographic license. Schedule B of the MRDA ("Exclusive Territory for Each Licensed Participant") originally granted the RPEs exclusive licenses to their home markets only. It was amended in December 2008, effective January 1, 2009, to grant the five RPEs non-exclusive licenses in territories outside their home market. Throughout the 2001–2008 period, the RPSM continued to split profits among the RPEs in proportion to their capitalized R&D stock (later their five-year R&D spending), irrespective of where the revenues or profits originated.

The economic purpose of Nortel's RPSM was to fulfill its tax obligations. In practice, Nortel operated as a single firm and did not organize its business around the borders associated with taxing jurisdictions. As discussed throughout my initial report, Nortel conducted its R&D activities through its global research centers or labs located in five RPEs which collectively contributed to the creation of value for the company overall. This disconnect between Nortel's business operations and the geographic nature of taxing jurisdictions necessitated the adoption of a method, such as the RPSM, to allocate profits.

Factual evidence demonstrates that Nortel never envisioned that its RPSM would be applied to the dissolution of all of the Nortel companies. This was directly addressed in a dialogue between

---

[3]   Exhibit 21038 (MRDA), p. NNC-NNL06001514/1.

[4]   Two of these revisions were completed on the eve of Nortel's bankruptcy filings. Exhibit 21038 (MRDA), p. NNC-NNL06001514/42 and 60.

[5]   Schedule A to the MRDA, entitled "Calculation of Arm's Length R&D Allocation to Each Participant," was amended in December 2007, and then again in December 2008. The new transfer pricing model was included in a new bilateral APA application to the IRS and CRA in October, 2008. *See* NNC-NNL011359.

Mr. Walter Henderson, a key member of the 2001-2004 APA team, and an attorney during his deposition:

> Q. So is it fair to say that the RPSM APA submission was not prepared contemplating a liquidation event for all of the participants?
> A. That's fair to say. It was not. That was not part of our thinking.[6]

This understanding is further supported by Ms. Karina O, a long-time member of Nortel's tax team that was involved in the transition from the CSA to the RPS, who explained that "[t]ypically when we constructed these [transfer pricing] agreements, it was supposed to be on an ongoing basis, like that it is ongoing business.  It is not supposed to be in contemplation of bankruptcy."[7]

The RPSM metric, R&D capital stock or five-year R&D spending, was imperfect.  It was based on rough estimates of the useful lives of technology and ignored any differences in quality and/or lifespan among the patents that made up the stock of R&D.  The dollar value of Nortel's R&D stock could not account for the value of individual patents to the company overall.  R&D resulted in Nortel patents that provided it with a competitive advantage (*i.e.*, in being responsive to its customers' needs) as well as patents that provided "defensive" value.[8]  Defensive patents provide leverage that prevents other IP holders from blocking sales of products; having a large portfolio of such patents may defend against being blocked from access to entire markets, and against being sued for IP infringements.[9]

Such an imprecise basis for profit sharing among Nortel's RPEs may have been acceptable to Nortel as a whole because management incentives and investment decisions were largely, if not wholly, independent of transfer pricing issues.  Many of Nortel's senior managers were only barely aware of the existence of the MRDA.[10]  For example, John Veschi, Nortel's chief IP officer,

---

[6]   Deposition of Walter Henderson, October 4, 2013, pp. 298:16–20 ("Henderson Deposition").

[7]   Deposition of Karina O, pp. 207:13–17 ("O Deposition").

[8]   Exhibit 11102, IP Law Group Business Analysis, June 15, 2006, NNC-NNL07022190.   This presentation, lists one value of Nortel's IP assets is that fact that "IP provides Nortel with protection - Freedom to Operate."

[9]   "A strong patent portfolio may even prevent a company from being accused of patent infringement in the first place, because a competitor may see too much risk in suing a company holding a strong patent portfolio."  Gideon Parchomovsky & R. Polk Wagner, *Patent Portfolios,* 154 U. Pa. L. Rev. 1, 35 (2005) (quoting John J. Egan & Ray Lupo, *Protecting Venture Investments Against Patent Litigation*, Venture Cap. J., Dec. 1, 2002, at 40, 41).

[10]  Deposition of John Veschi, November 7, 2013, p. 58:15–59:4 ("Veschi Deposition"); Deposition of John Roese, November 11, 2013, pp. 416:25–417:10 ("Roese Deposition"); Deposition of Brian McFadden, October 21, 2013, pp. 201:8–17 ("McFadden Deposition"); Deposition of Gregory Mumford, October 24, 2013, pp. 214:19–215:10 ("Mumford Deposition"); Deposition of Khush Dadyburjor, October 3, 2013, pp. 46:22–47:24 ("Dadyburjor Deposition").

noted that no one even mentioned the MRDA while he was being recruited in 2008 to establish a separate, license-based business for Nortel.[11]

The imprecision of the RPSM was also of little if any importance to Nortel's equity holders. Nortel's equity holders had an interest in Nortel as a single and unified company, not in separate interests in the various RPEs, and the company's transfer pricing agreement served to minimize global tax liabilities and maximize returns to Nortel shareholders. Nortel's shareholders could be well served by an allocation system that was economically supportable over the long run for a going concern business, even though it was not necessarily accurate with respect to specific entities at any specific point in time.

The process through which the RPSM was adjusted over time was abruptly truncated when Nortel filed for bankruptcy protection. The "One Nortel" approach that was so prevalent prior to bankruptcy was replaced by a focus by the Estates on their individual interests. Somewhat ironically, the MRDA was attributed a significance in insolvency that it was not accorded when Nortel was an ongoing concern. This is because the MRDA was used by the Estates, particularly Canada and the U.S., to try to substantiate their rights in bankruptcy. According to Mr. Veschi:

> once we filed for bankruptcy, because of what this document [the MRDA] did to everybody, emerging, it was an illusion, that it wasn't going to happen because nobody was thinking … I don't think anyone else was thinking about Nortel as Nortel.[12]

### 2.    The MRDA Does Not Provide for an Economically Rational Allocation of Lockbox Funds

As discussed above, Nortel's residual profit split models and the attendant MRDA were not meant to address allocation issues in asset sales, let alone bankruptcy sales. The RPSM and MRDA provided a vehicle for allocating Nortel's annual operating profits and losses when Nortel was a going concern. The residual profits or losses to be allocated among the RPEs are operating profits, *i.e.*, revenues less operation costs such as costs of goods sold, general and administrative expenses, marketing expenses, *etc.*[13]

Despite this evidence, experts for the Monitor, the Canadian and U.S. Debtors, and the CCC (legal title approach) nonetheless advance the MRDA as the only basis for their analyses.[14]

---

[11]    Veschi Deposition, pp. 237:23–238:9.

[12]    Veschi Deposition, pp. 61:3–8.

[13]    R&D costs were excluded from the residual operating profits between 2001 and 2005, and were included between 2006 and 2008. The decision was made by Nortel in conjunction with its transfer pricing advisors. Exhibit 22077, 2008 Request for Advance Pricing Agreement/Arrangement, pp. NNC-NNL011401–2.

[14]    Dr. Eden and the U.S. Debtors seem to distinguish between Nortel's RPS transfer pricing model and the concomitant MRDA that documented Nortel's transfer pricing practice. Mr. Kinrich's (U.S.

Continued on next page

Contrary to the essence of the transfer pricing arrangement documented in the MRDA, these experts neglected to include critical economic operating costs incurred in the creation of Nortel's assets. Most notably, they did not account for Nortel's pension and other deferred liabilities such as product warranties and contractual obligation under some service contracts,[15] which were, for accounting reasons, not recognized as operating expenses immediately and reflected in Nortel's RPE and consolidated balance sheets. However, these deferred liabilities would be amortized onto operating profits (their income statements) over time. If Nortel had been able to remain a viable business and realize the value from its patents, Nortel's deferred pension costs would have to have been accounted for and credited against its future profits. Unfortunately, bankruptcy truncated any gradual adjustment of these pension costs, thus these costs need to be accounted for at one time in bankruptcy.

#### Table 2.  Nortel Pension Benefit Obligation (US$ in millions)

|  | Under U.S. GAAP (December 31, 2008) | Under Economic Value (January 2009) |
| --- | --- | --- |
| Nortel Pension Assets | 5,187 | 5,187 |
| Nortel Pension Liability | 6,786 | 9,834 |
| Unfunded Pension Liability | 1,599 | 4,647 |

Sources and Notes:  Pension assets (as of end of 2008) and GAAP pension liabilities from Nortel's 2008 10-K; Economic value of pension liability from Bowie Report (converted to U.S. dollars).

As indicated in the above table, there were roughly $6.8 billion in deferred pension liabilities on Nortel's books as of 2008. However, the economic value of these deferred liabilities was estimated by Mr. Ronald Bowie, an actuarial expert retained by the UKPC, to be considerably higher; that is, approximately $9.8 billion. Net of pension assets, the unfunded pension liabilities are $1.6 billion and $4.6 billion, respectively. Even if the RPSM and MRDA could be used as the basis for allocating the lockbox funds, the unfunded liabilities summarized above would at the very least have to be deducted from the proceeds amount **before** any allocation is made to the RPEs.

Deferred liabilities aside, there is simply no economic justification concerning the use of the RPSM and MRDA to guide Nortel in a global dissolution. Nor is there any basis to suggest that

---

Continued from previous page

    Debtors) valuation of "value relinquished" by each Estate is based exclusively on Article 5 of the MRDA (see Section III.B).

[15]  Some of these employment and product-related liabilities were assumed by buyers of Nortel's business sale assets. *See, e.g.*, Green (Monitor and Canadian Debtors) Report, p. 11.

the Estates understood and agreed to the way that the RPSM and MRDA would be applied in dissolution. This was demonstrated by the IFSA signed in June 2009, before commencement of Nortel's liquidation of its collective assets. The Estates could not agree at the time on how to divide up the proceeds from the liquidation of Nortel and voluntarily put off its resolution until after the sales were completed. That is, the knowledgeable and self-interested Parties at the time recognized the lack of clear and common agreement over the allocation of sale proceeds; even if the MRDA was considered to be a candidate, the Parties could not agree on how to apply it.

Finally, any assertion that an Estate relinquished all of its rights while clearly understanding that they were not entitled to any (or nearly any) of the proceeds from the dissolution of Nortel is economically inconceivable. In particular, had the U.S. and EMEA Estates expected that they would be precluded from sharing in the proceeds of the Rockstar sale, as is proposed under the Monitor's, Canadian Debtors', and CCC's (legal title) allocation approaches, it would have been irrational for the U.S. and EMEA Estates to have agreed to the IFSA.[16] Rationality would suggest quite a contrary course of behavior: that the U.S. and EMEA Estates would have required appropriate and adequate consideration for their agreement to the IFSA, and in the process would have bargained for as much of the proceeds of the line of business sales and residual IP sale as possible.[17]

### 3.    The Amortization Rate Assumed By The MRDA Is Unsuitable For Allocating Proceeds In A Global Dissolution

The rate of amortization for Nortel's R&D stock is an important component of the R&D spending metric that was used in the RPSM in 2001–2005. Lower amortization rates means that R&D spending by an RPE remains in the allocation metric for longer, thereby reflecting longer asset lives.

I agree with Mr. Malackowski and Dr. Cooper, experts for the EMEA Debtors, that the MRDA did not accurately reflect the life span of Nortel's technology in amortizing the R&D "stock." I am also of the opinion that the life span of technology may be significantly longer than the life

---

[16]    There is also evidence that the Canadian Debtor initially endorsed the R&D contribution allocation, as suggested by Mr. Peter Look's email to his transfer pricing staff in October 2009 "[e]veryone is adding issues to make deals contingent on various matters … And, NNL says respect R&D capital stock proceeds allocation or we won't sign APA." Exhibit 22133.

[17]    Another example is the process of purchase price allocation regarding Nortel's sale of its UMTS assets in 2006. Although the RPS R&D allocation ratios were used as a basis to allocate the UMTS sales proceeds to Alcatel-Lucent in 2006, factual evidence shows that the choice of the RPS and MRDA was the result of a careful and elaborated process involving Nortel's internal tax and accounting staff, and Nortel's outside auditor. This is a clear sign that the MRDA does not apply to business sales, unless under special circumstances, and in any event does not automatically apply. *See* Deposition of Mark Weisz, November 25, 2013, 134:22–135:2 ("Weisz Deposition").

span of a particular product. Accordingly, I disagree with the conclusion of Dr. Reichert, expert for the Monitor and Canadian Debtors, that Nortel's use of a rate of 30% for amortization of its R&D capital stock was a reasonable one.[18]    A lower rate of amortization would have had an impact on the profit sharing among the RPEs when Nortel was a going concern. It is of greater importance if the RPSM were to be used as the basis for allocating the lockbox funds (which I do not believe it should).

This distinction between product and technology life span is confirmed by conventional wisdom and empirical research. Indeed, a large and growing base of economic literature studying the useful life of technology indicates that the life span of telecom IP is substantially longer than the five-year life for R&D expenditures that Nortel assumed in its MRDA—in fact, a rule-of-thumb amortization rate commonly used in many seminal papers in the literature on R&D is 15%.[19] Following from this, it is more likely that the annual amortization rate from Nortel's R&D investments in IP is closer to 15% than it is to 30%—the rate that Nortel previously used in the 2001 through 2005 time period and the rate that Dr. Reichert for the Monitor and Canadian Debtors found to be reasonable. At a 30% depreciation rate R&D capital loses 80% of its value in less than 5 years, whereas at a 15% depreciation rate 80% is "consumed" in about 10 years.

This lower amortization rate from the industry statistics is also borne out by examining the Nortel data itself. First, I examined Nortel's R&D investment between 1986 and 2011. These investments created the value that the company ultimately monetized when it sold its lines of business and its residual patent portfolio. The value of the IP sold ranges from an absolute

---

[18]    Expert Report of Dr. Timothy Reichert (Monitor and Canadian Debtors), p. 8. ("Reichert Report").

[19]    Hall (1999), for example, states that "researchers […] generally conclude that R&D spending in the current year is capitalized into the market value at a rate between about 2.5 and 8 (with most estimates centered at 5 to 6) and that the stock of R&D (*which is usually constructed from a perpetual inventory formula using a depreciation rate of 15 percent*) is valued between 0.5 to 2 times the value of ordinary assets." The same 15% annual depreciation rate was used in a recent study by Belenzon (2012).    Accounting researchers have further attempted to determine the annual depreciation rate of R&D spending through statistical studies. For example, Lev and Sougiannis (1996) estimated a useful life of 8 years for R&D in the Electronic and Other Electric Equipment industry and amortized R&D spending at rates varying from 3.4 to 19.7%. More recently, Lev, Nissim, and Thomas (2008) determined that the amortization period that best match the value generation of the R&D spending for to be Electronic and Other Electric industry is over 8 years (for an average of amortization of 12.5% per year). *See* Bronwyn H. Hall, "Innovation and Market Value," NBER Working Paper 6884, 1999, p. 10; Sharon Belenzon, "Cumulative Innovation and Market Value: Evidence from Patent Citations," *The Economic Journal* 122, 265-285; Baruch Lev and Theodore Sougiannis, "The Capitalization, Amortization, and Value-Relevance of R&D," *Journal of Accounting and Economics* 21, 1996, pp. 107-138; and Lev, Baruch, Doron Nissim, and Jacob Thomas, "On the informational usefulness of R&D capitalization and amortization," in *Visualising Intangibles: Measuring and Reporting the Knowledge Economy*, Chapter 5, 97-128, Ashgate Publishing 2008.

minimum of $4.5 billion for the Rockstar patents only, to close to $7.0 billion.[20]  For illustrative purposes, I assumed an IP value of $4.5 billion and solved for the amortization rate under which the value of Nortel's capitalized R&D stock would equal the $4.5 billion price.  I present this analysis graphically in Figure 1, which shows that Nortel's R&D stock would equal the IP sales price if an amortization rate of 21.4% was applied.  All else equal, a lower IP value implies a higher amortization rate.  At $7.0 billion IP value, the amortization rate is 16.5%.  This is much lower than the 30% amortization Nortel used between 2001 and 2005, and even slightly lower than the industry averages.[21]  This may be explained by the high quality of Nortel patents, a point raised by Mr. Veschi as a reason that he was interested in joining Nortel as its chief IP officer.[22]

**Figure 1.  Nortel R&D Amortization Rate Implied by Liquidation Sales**



Sources and Notes: 1992–2008 annual R&D spend from Nortel TP models and  2009–2011 R&D spend from Malackowski Report, Exhibit B.1.7.1. R&D capital stock was accumulated since 1986.

---

[20]  This is the sum of Rockstar IP sale of $4.5 billion and $2.5 billion from the business sales.  The latter is a rough average of values assigned to IP-related asset categories (including goodwill and customer relationships) by Messrs. Green ($2.0 billion), Britven ($2.7 billion), and Huffard ($2.7 billion).

[21]  A 2007 review of the literature from the Bureau of Economic Analysis found R&D depreciation rates of 11% to 18% with the majority of industries (including Electronic and Other Electric Equipment) having a depreciation rate of 15%.  (Charles I. Mead, "R&D Depreciation Rates in the 2007 R&D Satellite Account," *Bureau of Economic Analysis / National Science Foundation* 2007 R&D Satellite Account Background Paper, November 2007, pp. 1-2.)

[22]  John Veschi appraised Nortel's patents as "Bell-Lab quality."  Veschi Deposition, 40:12–18.

I also examined the filing dates of the patents that were included in Nortel's IPCo model. These patents were projected to produce royalty revenues through 2020 (at least). The number of patents filed in the U.S. by year is shown in

Figure 2.



Figure 2.  IPCo. U.S. Patent Filings by Year

Sources and Notes: EMEAPROD2214888. This includes U.S. granted patents only.

As is indicated in the figure, the bulk of the Nortel patents included in the Rockstar portfolio which were filed in the U.S. were filed before 2004, with the highest concentration of filings occurring in the late 1990's. As projected in the IPCo model, Nortel expected that these patents would produce income through 2020. This provides a strong indication that the useful lives for these patents exceeded ten years. Thus, under both my areas of analysis, it is clear that the amortization rate used in the RPSM is overstated, which would undoubtedly have an impact on the allocations among the RPEs.

### B.  THE PARTIES HAVE PROPOSED DIVERGENT ALLOCATION POSITIONS

#### 1.  The Parties Disagree on the Methods and Assets to be Valued

Experts for the Monitor and the Canadian Debtors, the U.S. Debtors, the EMEA Debtors (with respect to their licensing approach), and the CCC (with respect to their legal title approach) each attempt to value some interest or right that was transferred or relinquished, yet the results of

their analyses are strikingly different.  Particularly in the case of experts for the Monitor, the Canadian and U.S. Debtors, and the CCC, this is because they have been instructed to base their analyses on selective clauses of the MRDA and assume that the agreement is interpreted in a specific way.  Thus, they are valuing different assets.[23]  It is not surprising that the results are disparate.

None of these experts offer any opinion concerning whether (or not) the asset characterizations that they used to inform their analyses are supportable from an economic perspective.  As a result, their analyses do not offer an opinion concerning what the proper **allocation** methodology for this case is in the first place—which is the predicate question before the Courts.  This is a fundamental difference from the approach I have taken in my initial report and confirmed in this rebuttal report.

The experts for the Monitor and Canadian and U.S. Debtors have taken the MRDA out of context.  Mr. Kinrich on behalf of the U.S. Debtors stated simply that he has been retained "to determine the value relinquished by each of the Nortel entities for each of the Post-Petition Sales."[24]  His "value relinquished" is premised on Article 5(a) of the MRDA, under which the residual profit entities (other than NNL) were (he asserts) granted **perpetual, royalty-free exclusive licenses** to exploit each RPE's specified territory and a non-exclusive license to the rest of the world outside the RPEs' exclusive territories.

This is in stark contrast to the asset characterizations provided to Mr. Philip Green on behalf of the Monitor and the Canadian Debtors.  Mr. Green sought to quantify "the value of the assets transferred or surrendered,"[25] which he further defined to be the "property interests in the assets" (*i.e.,* held by NNL) and **non-transferrable license rights** (that were surrendered by the U.S. and the EMEA Debtors).[26]  His understanding is based on Article 4 of the same MRDA, under which residual profits from **Nortel products** should be shared among the RPEs, but that legal title to IP is held in the name of NNL (*i.e.*, Canada).  Mr. Green allocates the entirety of the Rockstar sales proceeds to the Canadian Debtors, because these patents "either [were] not used in any operating businesses or [their] value had already been realized in the Business Sales."[27]  Messrs. Cox and Berenblut on behalf of the Monitor and Canadian Debtors express almost identical opinions to Mr. Green's.

Each of the Canadian and U.S. approaches stems from a view that different clauses in the MRDA (viewed in isolation) should govern the results.  The Monitor's and Canadian Debtors' proposal

---

[23]  See **Appendix R2** for details.
[24]  Kinrich (U.S. Debtors) Report, p. 1.
[25]  Green (Monitor and Canadian Debtors) Report, p. 3.
[26]  Green (Monitor and Canadian Debtors) Report, p. 15.
[27]  Green (Monitor and Canadian Debtors) Report, pp. 16–17.

would have all of the RPEs, other than Canada, working to create value knowing that they would not be compensated for their efforts. Similarly, the U.S. Debtors' proposal would have all of the RPEs working as one Nortel in creating value largely for the benefit of the U.S. Debtors due to the latter's large geographic market size.

The experts for the CCC and for EMEA each provide multiple alternate analyses, but do not provide the Courts with an opinion as to which is suited for this allocation proceeding. First, the CCC's expert, Mr. Britven, presented calculations under both the legal title approach (as advocated by the Monitor and Canadian Debtors) and a pro rata approach (similar to the allocation approach that I proposed in my initial report). Application of these two approaches produced very different results. However, Mr. Britven did not opine as to which method was more appropriate for this proceeding.

Second, Mr. Malackowski on behalf of the EMEA Debtors also presented two allocation methods for the IP assets: the "Contribution Approach" and a "License Approach" that is somewhat analogous to Mr. Kinrich's revenue-based methodology. Mr. Malackowski opined that both approaches "are reasonable in the circumstances."[28] However, they too give rise to dramatically different results. To suggest that such different allocations are both reasonable fails to provide clear economic guidance to the Courts as to how they should allocate the lockbox funds.

As I explain more fully in Sections IV, V, and VI of this report, most of the approaches proposed by the Parties to allocate the lockbox funds are selective legalistic approaches that are not supported by any economic rationale.

### 2.    The Proposed Methodologies Lead To Vastly Different Results

Table 3 below presents final allocation recommendations under the different methodologies developed by experts for the Parties.[29] The differences in results, although striking, are inevitable when the valuations are based on different asset characterizations.

---

[28]    Expert Report of James Malackowski (EMEA Debtors), p. 6 ("Malackowski Report").

[29]    See **Appendix R3** for details.

**Table 3.  Summary of Allocation by Estate ($ in Millions)**

| Experts | Approach | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|---|
| **Panel A.  US$, mil** | | | | | |
| Green (Monitor and Canadian Debtors) | Legal Title | 6,069 | 1,032 | 236 | 7,337 |
| Britven (CCC) | Legal Title | 5,805 | 1,009 | 488 | 7,302 |
| Huffard / Malackowski | R&D Contribution | 2,318 | 3,637 | 1,325 | 7,280 |
| / Cooper (EMEA Debtors) | License | 834 | 4,200 | 2,247 | 7,280 |
| Kinrich (U.S. Debtors) | Revenue-based | 773 | 5,303 | 1,226 | 7,301 |
| **Panel B.  % of Total** | | | | | |
| Green (Canadian Debtors) | Legal Title | 83% | 14% | 3% | 100% |
| Britven (CCC) | Legal Title | 80% | 14% | 7% | 100% |
| Huffard / Malackowski | R&D Contribution | 32% | 50% | 18% | 100% |
| / Cooper (EMEA Debtors) | License | 11% | 58% | 31% | 100% |
| Kinrich (U.S. Debtors) | Revenue-based | 11% | 73% | 17% | 100% |

Notes:
1. The Cox and Berenblut Report, while taking an approach similar to that of the Green Report, does not provide specific allocation amounts.
2. The Britven Report also contains a pro rata allocation method.  The results are not shown above because the method is fundamentally different from the valuation approaches from the other experts.
3. Nortel Colombia is excluded from the total for the Kinrich Report.

The table shows the extreme positions taken by the Monitor and Canadian Debtors and by the U.S. Debtors.  Mr. Green for the Monitor and Canadian Debtors calculated that they are entitled to $6.1 billion out of the total $7.3 billion in lockbox funds.  Mr. Kinrich for the U.S. Debtors calculates that they are entitled to $5.3 billion out of a total of $7.3 billion in lockbox funds.

Each Estate's proposal to allocate the Rockstar portion of the sale proceeds explains a large portion of the differences among overall allocations.  I present the proposed allocations of the Rockstar sales graphically in Figure 3.

15



Figure 3.  Allocation Results of Rockstar Proceeds

Mr. Green's analysis for the Monitor and Canadian Debtors results in all of the proceeds from the Rockstar transaction going to the Canadian Estate, while the majority of proceeds from this same sale go to the U.S. Debtors under Mr. Kinrich's analysis.  Mr. Malackowski's license approach for the EMEA Debtors as applied to the Rockstar proceeds is conceptually similar to the approach taken by Mr. Kinrich.   However, Mr. Malackowski and Mr. Kinrich used different revenue streams which resulted in different net present values and, in turn, percentage allocations.  (Mr. Malackowski for the EMEA Debtors derived his own royalty incomes for Rockstar, while Mr. Kinrich for the U.S. Debtors relied on the revenue stream included in the IPCo model prepared by Nortel and its advisors prior to the Rockstar auction.)

The experts also differ in how to allocate Nortel's lines of business sales, as presented in Figure 4 below.[30]

---

[30] "Surrendered Licenses" and "Residual IP" are used in Figures 4 and 5 to properly distinguish between the value of the "license rights" from the value of the "legal title"—a distinction relevant only for Mr. Green's and Mr. Britven's analyses.   For Mr. Green, they represent "IP Rights and Customer Relationships," whereas for Mr. Britven they represent "IP."   In the Figure I include in the "surrendered licenses" the value of the Canadian licenses as equal the present value of the business lines' revenues implied in Mr. Green's projections, or Canada's relative revenue share in each business line as per schedules 2.5 and 7.4 of Mr. Britven's report.   Percentages for Mr. Huffard reflect the asset class *value* as a percentage of purchase price.   Note that for the business sales' final *allocation* Mr. Huffard uses the escrow balance after making some adjustments.



Figure 4.  Differences in Allocation of Business Sale Proceeds

Figure 4 demonstrates that the various experts also took disparate approaches to their treatment of the assets underlying Nortel's lines of business.[31] Mr. Kinrich (U.S. Debtors) values all of the assets together, while the other experts differentiate among asset types (*e.g.*, tangible, licenses, customer relations, goodwill, *etc.*) and select allocation methods that they find to be appropriate for each class of assets.

Figure 4 also shows that the experts could not even agree on the net book value for tangible assets.  In dollar terms, Mr. Green (Monitor and Canadian Debtors) valued the tangible assets at $534 million, Mr. Britven (CCC) $169 million, and Mr. Huffard (EMEA Debtors) $113 million. Tangible assets are generally easy to define and value (*e.g.*, property, plant and equipment), yet the experts' opinions in this case appear to differ greatly.[32]   The valuation of intangible assets

---

[31]    There are only four pies in this figure, because the EMEA expert, Mr. Huffard, only uses one method to allocate the business sales proceeds, whereas the EMEA expert Mr. Malackowski presented two alternative allocations for the Rockstar proceeds.

[32]    The main difference between Mr. Green's high value for tangible assets and Messrs. Britven and Huffard's low values is the assumed liabilities associated with the business sales.  According to Mr. Green, "not all of the liabilities [associated directly with the tangible assets being sold] recorded on the books of the Nortel legal entities were transferred to the purchasers.  Therefore, **without further information it is not possible to accurately determine** the appropriate value of the liabilities that

Continued on next page

(*e.g.*, IP) frequently presents a bigger challenge, and here the expert reports provide divergent approaches to classifying and valuing Nortel's intangible assets.  I compare the classifications and associated allocation approaches used by the various experts in Table 4.

**Table 4.  Allocation Method by Asset Category**

|  | Green | Britven | Huffard | Kinrich |
|---|---|---|---|---|
| Tangible Assets | | Legal Title | | |
| In-Place Workforce | Legal Title | n/a | n/a | |
| Wholly-owned Businesses | Legal Title | n/a | n/a | Revenue Based |
| Surrendered License Value | RPSM + Revenue | RPSM | RPSM or | |
| Residual IP  Value | 100% NNL | 100% NNL | Revenue | |
| Customer Relationship Intangible | RPSM | Revenue | Revenue | |
| Goodwill | n/a | Based on share of OIA | | |

Note: OIA refers to Other Intangible assets.

As a result of the above differences among experts, the allocation of business sales varied widely by Debtors and Asset Categories as is shown in Figure 5.

---

Continued from previous page
  actually transferred and on which legal entity's books those liabilities were recorded." (Green Report Appendix H, p. 1)  As a result, he chose not to net any assumed liabilities from the book value of tangible assets, whereas the other experts net them out.

**Figure 5.  Comparison of Allocation by Debtors and Asset Categories**



**Huffard License (EMEA Debtors)**

- Net Tangible Assets — 5%
- Goodwill — 71%
- Residual IP (License) — 25%

**Green (Monitor and Canadian Debtors)**

- Net Tangible Assets — 19%
- Wholly-Owned Businesses — 4%
- Workforce — 9%
- Surrendered Licenses — 26%
- Residual IP — 43%

**Kinrich (U.S. Debtors)**

- Total Value

Legend: ■ Canada  ■ US  ■ EMEA

**Britven (CCC)**

- Net Tangible… — 6%
- Goodwill — 30%
- Customer… — 24%
- Surrendered… — 11%
- Residual IP — 29%

**Huffard Contribution (EMEA Debtors)**

- Net Tangible Assets — 5%
- Goodwill — 71%
- Residual IP (Contribution) — 25%

Notes: See footnote 30.

19

The divergent approaches and disparate results demonstrate the extent to which asset characterization determines the allocation percentages. They also highlight the importance of economically justified characterizations and allocation methodologies in assisting the Courts in this proceeding. The analysis provided by the experts for the Parties include detailed calculations laden with assumptions, but they do not assist the Courts in deciding on an allocation methodology that is economically sound. The characterization of the asset produces a result that is favorable in each case to its particular proponent.

## IV.  The Legal Title Approach (Monitor, Canadian Debtors, and CCC)

### A.  THE LEGAL TITLE APPROACH IS ECONOMICALLY IRRATIONAL

The Monitor, Canadian Debtors and the CCC advocate an allocation methodology of the lockbox funds based on "property interests in the assets" that were transferred and/or surrendered by each of the three Debtor groups in order to effect the sales of Nortel's lines of business and patent portfolio.[33] With regard to the IP and other intangible assets, they base their allocation approach specifically upon Article 4 of the MRDA, which confers legal title to NNL (*i.e.*, Canada). Under this interpretation, the other RPEs were only entitled to the value of their transferred or surrendered MRDA licensing rights that were capped by their shares of the operating profits involving Nortel IP embedded in product sales. Accordingly, the Monitor, Canadian Debtors and CCC contend that NNL is entitled to the entirety of the Rockstar sales proceeds.

Experts for the Monitor and Canadian Debtors (Mr. Green, Messrs. Cox and Berenblut) and for the CCC (Mr. Britven) were asked by their instructing Counsel to estimate the value of the property interests for each of the Nortel entities with respect to the assets that were transferred and/or surrendered. For example, Mr. Green was instructed to consider two primary property interests: 1) Nortel's IP for which NNL held title, and 2) the non-transferable licenses held by the RPEs to "make, license and sell Products" that embodied the Nortel IP owned by NNL. Following these assumptions, Mr. Green concluded that the legal title holder of Nortel's IP (*i.e.*, NNL) is entitled to: 1) all of the IP value associated with the lines of business sales except for the present value of the cash flows of the license rights for a hypothetical case under which those licenses would have been used assuming Nortel remained in business, and 2) virtually all of the proceeds from the Rockstar transaction.

The legal title approach proposed by the Monitor and Canadian Debtors and the CCC via their experts is flawed from a number of economic perspectives. First, it would have been incompatible with Nortel's matrix organization and operation as an ongoing multinational company: Nortel's ongoing success relied upon creating value through collaborative R&D, with

---

[33]    Allocation Position of the Monitor and Canadian Debtors (May 16, 2013), pp. 2–3.

each R&D facility around the world working to promote the long-term interests of Nortel as a whole.   If the non-Canadian RPEs had understood the implications of the MRDA, as **now** interpreted by the Monitor and Canadian Debtors, they would have had no incentive to create value for the overall group.   Clearly, it would not have been in any of the other RPEs' best interests to pursue research that would eventually lead to the development of commercially exploitable intellectual property if they would be precluded from sharing in the vast majority of the rewards under a technology sale or bankruptcy scenario.   It is difficult to find any economic justification for such an arrangement.

Second, the Monitor's and Canadian Debtors' legal title approach artificially separates the patent rights in Nortel products from the other rights.[34]   This ignores the synergistic value conferred by Nortel's large-scale and Bell-lab quality patent portfolio to its R&D productivity and business operation.   The patent portfolio benefited Nortel not just by its direct use in products and services, but also by its uses in stimulating future innovation, avoiding costly litigation, improving market position / brand name, negotiating better licensing terms, *etc.*   A 2005 Pennsylvania Law Review article, cited by the U.S. Debtors' allocation expert, summarizes the following benefits of a large and diversified patent portfolio:

#### Table 5.  The Many Uses of Large and Diverse Patent Portfolios

| The Scale-Features of Patent Portfolios | The Diversity-Features of Patent Portfolios |
|---|---|
| a.  Eases Subsequent In-house Innovation | a.  Addresses Ex Ante Uncertainty Related to Technology |
| b.  Attracts Related External Innovations | |
| c.  Avoids Costly Litigation | b.  Expands the Freedom of Research Inquiry |
| d.  Improves Bargaining Position | c.  Addresses Uncertainty Related to Future Market Conditions |
| e.  Improves Defensive Positions | |
| f.  Increases the Voice in the Politics of the Patent System | d.  Addresses Uncertainty Related to Future Competitors |
| g.  Enhances Efforts to Attract Capital | e.  Addresses Uncertainty in the Patent Law |

Source: Gideon Parchomovsky and R. Polk Wagner, 2005, "Patent Portfolios," *University of Pennsylvania Law Review*, pp. 1 – 77.

These indirect uses of patent portfolio were reflected in operating results through higher sales (industry leadership, reputation and brand name), lower operating costs (avoidance of costly litigation), and so on.   In other words, these patents were integrated components of Nortel's operation, regardless of their direct or indirect uses in Nortel products.   The above concepts are not just academic; they reflected Nortel's own thinking. For example, the former vice president of Nortel's IP Law Group, Tim Collins, summarized Nortel's mission and vision for IP as is shown in the following slide from a June 2006 presentation:

---

[34]   In order to be transferred in the business sales, patents had to meet a so-called "predominant use" standard.  Veschi Deposition, pp. 122:6–127:2.

Figure 6.  Excerpt from Nortel IP Law Group Presentation (June 2006)

Source: Exhibit 11102, p. 4 (underline added).

Third, even if the Monitor and Canadian Debtors' interpretation of the MRDA is upheld, had any of the Residual IP been utilized by a Nortel business line in the future, the U.S. and EMEA RPEs would have received license rights to that IP under the Monitor and Canadian Debtors' interpretation the MRDA, and presumably would have benefitted.   Therefore, it could reasonably be argued that the MRDA gave the U.S. and EMEA Debtors more than just "value in use" as Mr. Green's interpretation suggests.[35]  Rather, the MRDA also provided an "option value" to the extent the residual IP became embodied in future products and that this option value was surrendered with the termination of their license rights.  The U.S. and EMEA Debtors should therefore be compensated for this surrendered option value associated with their license rights. To argue that the U.S. and EMEA Debtors should have not expected any future economic benefit from the residual IP is to effectively imply that Nortel would have never utilized any of the residual IP itself.  This is an absurd suggestion for a business whose *raison d'etre* was to use research and development to generate marketable products.

Despite the above reasons, the Monitor and Canadian Debtors' transfer pricing expert Dr. Reichert attempted to justify their allocation approach as economically rational for all of the RPEs.[36]  As I have discussed throughout my initial report as well as is acknowledged by other experts, Nortel was managed and operated as a single highly integrated multinational

---

[35]   *E.g.*, Green (Monitor and Canadian Debtors) Report, pp. 15–16.

[36]   *E.g.*, Reichert (Monitor and Canadian Debtors) Report, pp. 40–41.

corporation; legal structure, IP title, and transfer pricing arrangement had no bearing upon management behavior and decision making. If this legal title-based interpretation of the MRDA were correct, it would have been wholly irrational for the non-Canadian RPEs to accept the terms and conditions of the RPSM and associated MRDA while Nortel was a going concern, much less to have agreed to the IFSA after Nortel's bankruptcy. Under this circumstance, in the event that Nortel was sold or dissolved, the RPEs would have been precluded from sharing in the rewards of the IP that they created as well as the rewards associated with IP that was created by Nortel overall. It also suggests that the RPEs would have been happy to cover any deferred liabilities, such as deferred pensions, on their own, while any upside realized in the bankruptcy sales would inure to NNL and its creditors alone. Such an imbalance would be entirely irrational for the non-Canadian RPEs to accept because it would not treat any of these RPEs as "risk sharing entrepreneurs," which is exactly what all of the RPEs were described as under the MRDA.

### B.    THE LEGAL TITLE APPROACH UNDERVALUES LICENSEE RIGHTS

Under the legal title allocation approach, the Monitor and Canadian Debtors assert that the Canadian Estate should receive almost all of the lockbox funds except for a small number of tangible assets located in each Estate and the value of the MRDA licenses relinquished by the RPEs if Nortel were to have continued to operate as a going concern. The experts for the Monitor and Canadian Debtors estimated that these relinquished licenses were of low value, thereby entitling the Canadian Debtors to 80% or more of the lockbox funds. Such a low valuation flies in the face of the importance that was placed upon the RPEs relinquishing their licenses in order for Nortel to effectuate the sales of the lines of business. These sales were facilitated by the voluntary relinquishments of the RPE licenses; if the RPEs had been informed about the allegedly low value that Nortel placed upon their licenses, it would have been more rational for them to hold out for a higher percentage of the proceeds than to willingly relinquish their assets in order to facilitate Nortel's line of business sales. Conversely, it would have been completely irrational for the RPEs to surrender their license in exchange for virtually nothing in return.

Specifically, Dr. Reichert for the Monitor and Canadian Debtors asserts that the application of his interpretation of the MRDA is consistent with the arm's length principle.[37] Application of the arm's length principle hypothetically assumes that each RPE is an independent actor. This, of course, is contrary to the evidence of how Nortel was operated. The MRDA supposes the RPEs are independent, risk sharing entities, but Dr. Reichert's analysis does not treat the non-Canadian RPEs that way. He then characterizes the MRDA as a trading arrangement: the RPEs received rights to market products that embody Nortel's IP in exchange for 1) the transfer of interests (in the IP that they developed through their R&D efforts) to NNL and 2) sharing in

---

[37]    Reichert (Monitor and Canadian Debtors) Report, pp. 36–41.

residual profits or losses (earned through exploiting their "product make-sell" rights) based on their respective shares of R&D stock.  Dr. Reichert argues that this agreement was evidenced by the RPEs continuing to make investments in R&D, thereby proving that their investments were economically rational.    But his test is unfailable—any hypothesized transfer pricing interpretation could be justified by pointing to Nortel's behavior *ex post* and concluding that it was the result of his hypothesis.   In this case, the RPEs were not making the investment decisions Dr. Reichert relies on—the integrated management of Nortel made those decisions— undermining the use of such investments as evidence of the rationality of the MRDA, itself a profit sharing and tax minimizing, not investment decision-oriented, agreement.  In addition, the RPEs were not aware of NNL's interpretation of the MRDA until years after the R&D was done, in this bankruptcy case.[38]

Dr. Reichert's analysis fails because he arbitrarily assumes NNL to be the residual economic beneficiary of Nortel.  The arm's length principle assumes willing buyers and willing sellers, but Dr. Reichert distorts what NNL and the RPEs were bargaining over.  Dr. Reichert assumes that NNL has the right to dispose of the IP and does not need to compensate the RPEs for relinquishing their rights.  Even if the RPEs had not lost money in their investments (*i.e.*, their investments were NPV>0), Dr. Reichert presents no evidence that the alleged arm's length exchange was a fair one.  He accepts the assignment of interests and rights as given but does not provide any analysis concerning whether such an assignment would be economically rational to the Parties involved.  In short, Dr. Reichert does not take into consideration that the RPEs are risk sharing entities and, accordingly, would make economically rational decisions under arm's length circumstances.

Second, Dr. Reichert has developed a tautological argument based on nested assumptions.  First, he reaches his conclusion by assuming the set of rights he argues each RPE was operating under. That is, he assumes that each RPE was mindfully giving up its ownership in IP rights in exchange for the "product make-sell" rights in its territory and a share of residual profits.  He provides no evidence that this was the case and simply assumes away the possibility that the RPEs had an economic interest in licensing rights or the benefit from selling IP.   Put another way, Dr. Reichert assumes a set of expectations and then relies upon the fact that the RPEs participated in the MRDA and RPSM as "evidence" that their participation was rational with that set of expectations.  Such an argument would only work if also he disproved the rationality of all other sets of explanations.  The obvious alternative explanation as to why the RPEs continued to invest in R&D is that they thought they would benefit from a larger set of rights than those specified by Dr. Reichert.  Furthermore, he does not show that the RPEs' behavior was in fact rational.  To do so would require an analysis of each RPEs' contributions to Nortel and expected benefits to show that they were maximizing the value of the transaction, not just meeting some bare minimum threshold for behavior to not be value destroying.

---

[38]    Deposition of Murray McDonald, November 26, 2013, pp. 124:12–125:23 ("McDonald Deposition").

Third, Dr. Reichert improperly dismissed evidence that directly contradicts his expectations. Specifically, he notes that it would be irrational for the RPEs to continue to make investments if they found themselves in an NPV<0 situation unless "Nortel would be able to sell the technology for a gain in some future period (*i.e.*, Nortel expected to lose money on product sales but would make money on some future sale of its technology portfolio)",[39] and the RPEs could share in any gains (thereby converting the NPV<0 investment into one equal to or exceeding 0.)  Dr. Reichert found this possibility to be unreasonable.  However, Nortel did in fact sell IP rights from time to time and would probably continue to do so in the future.[40]  Such an outlook by the RPEs— investing in a near term NPV<0 area with the expectation that it would turn positive following a sale—thus appears to be quite reasonable indeed.

Mr. Green's arguments are equally flawed.  For example, the unreasonably low value which Mr. Green attributes to the U.S. and EMEA's license rights in the business sales flows directly from his adoption of an inappropriate "value-in-use" basis of valuation of those rights.  His premise seems to be that, with the rights afforded by their licenses under the MRDA and RPSM, the U.S. and EMEA Debtors could only have earned a restricted set of cash flows from Nortel's businesses continuing as going concerns.  That, according to Mr. Green, is the most they were giving up.

This is an unreasonable valuation basis in the context of allocating proceeds from the actual market transactions which occurred, in which the relevant question must be to ask what the value of those license rights were to the third parties who bid for the businesses—or alternatively to ask what those third parties would have bid for the businesses if the U.S. and EMEA had not given up their rights prior to the sales.

It seems highly likely that had this question been resolved prior to the business sales taking place, a negotiation would have ensued between the license holders (U.S. and EMEA) and the legal title holder (NNL).  The U.S. and EMEA Debtors would not have rationally settled for any amount based on a "value in use" concept, but would have leveraged their strong negotiating positions accordingly.

### C.  THE LEGAL TITLE APPROACH SUFFERS FROM SERIOUS FLAWS IN IMPLEMENTATION

Since both Mr. Green (Monitor and Canadian Debtors) and Mr. Britven (CCC) adopt the legal title approach for the IP assets they, by definition, assign 100% of the Rockstar proceeds to the Canadian Estate.  My discussions above have addressed the conceptual flaws in the legal title approach and the flawed use of the "value in use" concept for the business sales.  In relation to business sale allocations, even were one to use the Monitor and Canadian Debtors' inappropriate valuation basis, there are some fundamental implementation errors, favorable to the Canadian

---

[39]    Reichert (Monitor and Canadian Debtors) Report, p. 39.
[40]    For example, Nortel sold its UMTS assets including the associated patents in 2006 to Alcatel.

Estate, which I describe below.  Given my fundamental disagreement with the legal title approach, I focus my criticisms on major errors and glaring mistakes.[41]  I emphasize, however, that even if these particular flaws were corrected, there are additional flaws and I do not agree that this is an appropriate or economically rational approach to allocation.

### 1.   Rebuttal Summary of Green Report (Monitor and Canadian Debtors)

The largest asset category included in Mr. Green's analysis of Nortel's line of business sales is "IP Rights and Customer Relationship," which is the residual after allocating the business sales proceeds to tangible assets, in-place workforce and wholly-owned businesses.  For the IP component, he: 1) values the IP licenses surrendered by the U.S. and EMEA Estates under Nortel's existing business model and management (a basis which he terms "value in use"), and 2) then assigns the remainder of the IP rights and customer relationship to the Canadian Estate, because it is the legal title holder and licensor under the MRDA.

There are three major flaws in Mr. Green's valuation of these surrendered license rights, which serve to produce erroneous results.  First, under Mr. Green's own analysis of the business sales, Nortel would continue operating two negative-NPV businesses (Enterprise and Carrier Voice and Application Solutions ("CVAS")) instead of shutting them down. Including such negative NPV businesses in his analysis makes no economic sense and highlights the flaw in using such MRDA and RPSM-driven "value in use" cash flows.  Why, for example, would the U.S. and EMEA accept zero or even negative value allocations with respect to a business for which a third party paid significant positive value?  The answer is, they would not.

Second, Mr. Green's valuation results are distorted because he bases them on Nortel's 2009 operating results as the starting point for his projections.  This starting point is unreasonably low because the base year reflected the impacts of Nortel's own bankruptcy and was also the beginning of the Great Recession.

Lastly, Mr. Green does not follow accepted valuation practice, as he double counts the value of tangible assets and workforce, does not include a terminal value, uses inappropriate discount rates, and does not incorporate a tax effect in his forecasted cash flows.[42]  Although I have not sought to correct Mr. Green's allocation for this methodology flaw on materiality grounds, it does cause me to question his understanding of basic valuation concepts.

---

[41]   Additional details of my criticisms of Mr. Green (Monitor and Canadian Debtors) and Mr. Britven (CCC) can be found in:  **Appendices R4** (Rebuttal of Mr. Green's IP License Valuation) and **R5** (Rebuttal of Mr. Britven's Business Sales Valuation).

[42]   See **Appendix R4** for details.

Mr. Green's mistakes can be seen in Figure 7, where I plot the projected operating earnings by business line from Mr. Green's own model. (In Mr. Green's Excel model, he only calculates one NPV for all lines of business combined. However, he has provided all the necessary components for the NPV calculations by line of business.)

**Figure 7.  Projected Operating Earnings from Green Model (US$ in Millions)**



Source:  Appendix R4.

As is shown in the figure, it is very clear that the projected operating earnings for the CVAS business line are consistently negative throughout the projection period, resulting in a significantly negative NPV.  Similarly, the projected operating earnings for the Enterprise business line are significantly negative during the first year, and barely positive throughout 2018, resulting in a negative NPV (see **Appendix R4** for further details).  Continuing operation of a negative-NPV business makes no economic sense.  If an operation has a negative NPV, it should be shut down.[43]  In addition, Figure 7 displays the 2009 operating earnings with those in 2007

---

[43]    I adopt this simple rule just to illustrate the impact of his mistake.  In real business situations, the negative NPV business may not be shut down immediately.  Also a money-losing division may not

Continued on next page

and 2008.  What is not shown in the figure is the regional disparity in sales, where the EMEA region was hit particularly hard by the global recession.  **Appendix R4** shows that adjusting the starting values for the NPV analysis has a large impact on the surrendered license rights in the U.S. and EMEA.

Adjusting for the NPV and starting point issues identified above has a material impact on the allocation of the lockbox funds among the Estates:  the value of the surrendered license rights will increase and residual IP value due to NNL will decline.  To facilitate the comparison, I first reproduce Mr. Green's original summary table as Panel A of Table 6 below.  My correction of the two mistakes is included in Panel B of the same table.

---

Continued from previous page

    invest heavily in R&D, contrary to both Green's (Monitor and Canadian Debtors) assumption that the Enterprise and CVAS would invest about between 15% and 25% of their sales in R&D.

**Table 6.  Allocation of Business Sales Proceeds as per Green Report (US$ in millions)**
**Panel A: Green Original (US$, mil)**

|  | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 122 | 318 | 95 | 534 |
| IP Rights and Customer Relationships |  |  |  |  |
| Major Business Sales | 1,380 | 456 | 97 | 1,933 |
| Minor Business Sales | 35 | 12 | 2 | 49 |
| Total | 1,415 | 468 | 100 | 1,982 |
| In-Place Workforce | 79 | 135 | 42 | 255 |
| Wholly-Owned Businesses | 0 | 111 | 0 | 111 |
| Total Allocation | 1,615 | 1,031 | 236 | 2,883 |
| % of Total | 56% | 36% | 8% | 100% |

Source: Reproduced from Green Report, pp. 60-61.

**Panel B: Modified Green (US$, mil)**

|  | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 122 | 318 | 95 | 534 |
| IP Rights and Customer Relationships |  |  |  |  |
| Major Business Sales | 1,138 | 584 | 212 | 1,933 |
| Minor Business Sales | 35 | 12 | 2 | 49 |
| Total | 1,173 | 595 | 214 | 1,982 |
| In-Place Workforce | 79 | 135 | 42 | 255 |
| Wholly-Owned Businesses | 0 | 111 | 0 | 111 |
| Total Allocation | 1,373 | 1,158 | 351 | 2,883 |
| % of Total | 48% | 40% | 12% | 100% |

Source: Reproduced from Green Report, pp. 60-61. See Table R4-3.

The corrections that I made affect the allocation of the Major Business Sales, so the other categories of assets identified by Mr. Green (*i.e.*, Tangible Assets and the other categories of IP Rights and Customer Relationships) remain unchanged.  As a result of my adjustments to Mr. Green's calculations, the Canadian Debtors would be allocated a total of $1,373 million (instead of $1,615 million) from the business sales proceeds. At the same time, the allocations to the U.S. and EMEA Debtors would increase by roughly $125 and $115 million, respectively.

I then recalculated the allocations applicable to the total lockbox funds (*i.e.*, including the proceeds from the lines of business and Rockstar portfolio), summarized in Table 7 below.  As is apparent in the table, I applied the legal title approach followed by Mr. Green in his analysis, and

therefore did not change the allocation of proceeds from the Rockstar transactions—although, as
I have stated throughout my reports, I strongly disagree with such an approach.

**Table 7.  Comparison of Lockbox Allocation—Green Report**

|  | Line of Business | | Patent Portfolio | | Total | |
|---|---|---|---|---|---|---|
|  | US$, mil | % | US$, mil | % | US$, mil | % |
| **Green** | | | | | | |
| Canadian Debtors | 1,615 | 56% | 4,453 | 100% | 6,069 | 83% |
| EMEA Debtors | 236 | 8% | - | 0% | 236 | 3% |
| U.S. Debtors | 1,031 | 36% | - | 0% | 1,031 | 14% |
| Total | 2,883 | 100% | 4,453 | 100% | 7,336 | 100% |
| **Revised** | | | | | | |
| Canadian Debtors | 1,373 | 48% | 4,453 | 100% | 5,827 | 79% |
| EMEA Debtors | 351 | 12% | - | 0% | 351 | 5% |
| U.S. Debtors | 1,158 | 40% | - | 0% | 1,158 | 16% |
| Total | 2,883 | 100% | 4,453 | 100% | 7,336 | 100% |

Sources: Green Report, p. 7. See also Appendix R-4.

As shown in the above table, the total allocation of the lockbox funds due to the Canadian
Debtors declines from 82.7% to 79.4% due solely to the adjustments that I made to Mr. Green's
treatment of the major lines of business sales category alone.  While at first glance this may not
appear to be a relatively large change, it demonstrates one of the significant economic flaws in
Mr. Green's argument and, as noted above, does not include changes to the Rockstar transaction.

## 2.   Rebuttal Summary of Britven Report (CCC)

Mr. Britven's valuation of Nortel's lines of business sales also includes a negative-NPV business in
his analysis.  Accordingly, the same criticism of Mr. Green's analysis discussed in Section IV.C.1
applies here, because a rational economic agent would most certainly shut down such a losing
proposition.   (Mr. Britven calculates a negative NPV for Nortel's Metro Ethernet Networks
("MEN") line of business, as compared to Enterprise and CVAS by Mr. Green.)

In addition, for two of the other lines of business sales (Global Services, or "GS," and Carrier
Networks, or "CN"), Mr. Britven uses arbitrary terminal values, and in the case of Global Services
the mid-point falls inexplicably outside of the range that he identifies as the source.[44]  I show this

---

[44]   The mistakes appear to be Nortel's, but Mr. Britven (CCC) adopted them without correction.

discrepancy in Figure 8 below, which is a snapshot from the workpapers underlying Mr. Britven's analysis.

**Figure 8.  Britven's Valuation of Global Services and Carrier Networks (US$ in millions)**

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Total PV of Cash Flows |
|---|---|---|---|---|---|---|---|---|---|
| **GLOBAL SERVICES - Not Required** | | | | | | | | | |
| Cash Flow | $ 149.2 | $ 89.5 | $ 301.9 | $ 173.9 | $ 162.9 | | | | |
| Year | - | 0.50 | 1.50 | 2.50 | 3.50 | | | | |
| Discount Factor | 1.00 | 0.91 | 0.74 | 0.61 | 0.50 | | | | |
| Present Value of Cash Flow | $ 149.2 | $ 81.1 | $ 224.1 | $ 105.8 | $ 81.2 | | | | |
| | | LOW | MID | HIGH | | | | | |
| Terminal Value | | $ 404 | $ 100 | $ 455 | | | | | |
| Present value of Termianal value | | $ 165 | $ 27 | $ 186 | | | | | |
| Implied value | | $ 763 | $ 625 | $ 784 | | | | | |

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Total PV of Cash Flows |
|---|---|---|---|---|---|---|---|---|---|
| **CARRIER NETWORKS** | | | | | | | | | |
| Cash Flow | | | | | $ 315.0 | | | | |
| Year | - | | | | 0.50 | | | | |
| Discount Factor | 1.00 | 1.00 | 1.00 | 1.00 | 0.92 | | | | |
| Present Value of Cash Flow | $ - | $ - | $ - | $ - | $ 288.8 | | | | |
| | | LOW | MID | HIGH | | | | | |
| Terminal Value | | $ - | $ - | $ - | | | | | |
| Present value of Termianal value | | $ - | $ - | $ - | | | | | |
| Implied value | | $ 502 | $ 502 | $ 502 | | | | | |

Source: NNC-NNL11665042.

As indicated in the first panel, Mr. Britven identifies a range of terminal values from $404 to $455 million in 2015 for Global Services, although he arbitrarily identifies the midpoint of this range as $100 million.[45]  In the second panel, he assumes a zero terminal value for Carrier Network business, inconsistent with his assumption of a range of perpetual growth rates between 1% and 3%. Using 2% as the mid-point growth rate, the terminal value should be worth $539 million in 2015.[46]

Finally, Mr. Britven uses unreasonably high discount rates to calculate the NPVs by line of business (ranging from 19% to 22%) relative to comparable benchmarks.  Therefore, I have recalculated Mr. Britven's numbers by removing the negative-NPV MEN line of business, changed the terminal values for the GS and CN lines of business to match the midpoints included in Mr. Britven's workpapers, and assumed a more reasonable 15% discount rate across all business lines.[47]  The results of my recalculation are shown in Table 8 below.

---

[45]  Under his assumptions of the mid-point perpetual growth rate and discount rate, the corrected terminal value should be $428 million.  *See* **Appendix R5**.

[46]  *See* **Appendix R5**.

[47]  *See* **Appendix R5**.

**Table 8.  Business Sales Allocation under Britven's Legal Title Approach (US$ in millions)**
**Panel A.  Britven Allocation (US$, mil)**

| Operating Assets | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 59 | 42 | 68 | 169 |
| Intangible Assets | | | | |
|    Customer Relationships | 93 | 393 | 197 | 683 |
|    IP (including Residual IP) | 858 | 228 | 57 | 1,143 |
|    Purchaser Goodwill | 427 | 316 | 110 | 853 |
| Total | 1,437 | 979 | 432 | 2,848 |
|   % of Total | 50% | 34% | 15% | 100% |

Source: Reproduced from Britven Report, Table 7.

**Panel B.  Revised Britven Allocation (US$, mil)**

| Operating Assets | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 59 | 42 | 68 | 169 |
| Intangible Assets | | | | |
|    Customer Relationships | 93 | 393 | 197 | 683 |
|    IP (including Residual IP) | 576 | 454 | 114 | 1,143 |
|    Purchaser Goodwill | 427 | 316 | 110 | 853 |
| Total | 1,155 | 1,205 | 489 | 2,848 |
|   % of Total | 41% | 42% | 17% | 100% |

As indicated in the table, the revised allocation for the Canadian Estate's IP falls by more than $280 million ($858 million in Panel A less $576 million in Panel B), while the allocations for the U.S. and EMEA Estates increase by approximately $226 million and $57 million, respectively.

I then incorporated these revised allocations applicable to the proceeds for the lines of business sales into a recalculation of the allocations for the total lockbox funds, which I summarize in Table 9 below.

**Table 9.  Comparison of Lockbox Allocation—Britven Report**

|  | Line of Business | | Patent Portfolio | | Total | |
|---|---|---|---|---|---|---|
|  | US$, mil | % | US$, mil | % | US$, mil | % |
| **Britven** | | | | | | |
| Canadian Debtors | 1,437 | 50% | 4,368 | 98% | 5,805 | 79% |
| EMEA Debtors | 432 | 15% | 57 | 1% | 489 | 7% |
| U.S. Debtors | 979 | 34% | 30 | 1% | 1,009 | 14% |
| Total | 2,848 | 100% | 4,455 | 100% | 7,303 | 100% |
|  | | | | | | |
| **Revised** | | | | | | |
| Canadian Debtors | 1,155 | 41% | 4,368 | 98% | 5,523 | 76% |
| EMEA Debtors | 489 | 17% | 57 | 1% | 546 | 7% |
| U.S. Debtors | 1,205 | 42% | 30 | 1% | 1,235 | 17% |
| Total | 2,848 | 100% | 4,455 | 100% | 7,303 | 100% |

As was the case concerning my recalculation of the allocations in Mr. Green's analysis, I did not change the allocation of proceeds from the Rockstar transactions, even though I strongly disagree with such an approach.  Following Mr. Britven's general approach, the adjustments that I made to Mr. Green's treatment of the major lines of business sales category resulted in a decline to the allocation of lockbox funds to the Canadian Debtors from 79.5% to 75.6% and an increase in the allocation to the EMEA Debtors from 6.7% to 7.5%.

In conclusion, for the reasons stated above, I disagree in principle with the legal title approach advanced by the Monitor, Canadian Debtors, and CCC.  Further, even following their own approach, those experts' reports demonstrate implementation flaws and inconsistencies that have significant impacts on the allocation.

# V.   The Revenue-Based Allocation Approach (U.S. Debtors)

## A.   The U.S. Approach Relies On A Selective Interpretation Of The MRDA

The expert for the U.S. Debtors (Mr. Kinrich) was asked to estimate the value relinquished by each of the Nortel entities when Nortel sold its lines of business and its patent portfolio (*i.e.*, Rockstar), predicated on the assumption that the shares of territorial rights to the patents solely dictates the relative position of the Estates as residual claimants.  He used historic revenues (for the lines of business transactions) and forward looking revenue streams (for the patent portfolio) to determine the present value of the income streams of the patent license rights which the entities had to relinquish to order to accommodate the sales.  He then used the ratio of relative values relinquished as the basis for allocating the lockbox funds.

Such a revenue-based approach to allocation is premised on Article 5(a) of the MRDA, under which the RPEs (other than NNL) were granted perpetual, royalty-free exclusive licenses to

33

exploit the RPE's specified territory (as defined in Exhibit B of the MRDA) and a non-exclusive license to the rest of the world outside the RPEs' exclusive territories. The U.S. Debtors argue that these rights to revenues—exclusive within home geographic territories and jointly with respect to the rest of the world—are what each RPE contributed to the asset sales and are therefore what they are entitled to as their share of the proceeds from the sales. Clearing the license rights in all territories globally (*i.e.*, removing encumbrances) was certainly critical to completing the sales of Nortel's lines of business and residual patent portfolios.[48] However, it is not correct, conceptually or factually, that the RPEs (and, notably, the U.S. RPE) were entitled to the entirety of the revenue generated in a particular territory. Sales in the U.S., although the single biggest market for Nortel, would not have been nearly as remunerative if it were not for Nortel's global R&D efforts and its overall IP portfolio. As discussed in my opening report, the U.S. patents in Nortel's portfolio were developed by inventors all over the world, including NNUK. Moreover, in the mind of Nortel senior management and consistent with Nortel's matrix organization, Nortel's legal entities in different countries were not independent operating companies.[49]

Furthermore, the operation of the RPSM and the MRDA itself made clear that profits were to be pooled and shared based on Nortel's estimated metric of each RPE's contribution to value for annual profit- and loss-sharing purposes. That is, any RPE was expressly **not** entitled to treat any revenue stream and profits generated within a geographic region in which it held an exclusive license as its own. Article 3 and Exhibit A of the MRDA specifies that Nortel's residual profits were to be allocated in proportion to each RPE's R&D capital stock (or later, spending) regardless of their geographic origin. Thus, even though the U.S. Debtors' expert purports to follow an MRDA-based approach, using revenues (realized by the RPEs) as a basis for allocation, this cannot be supported under Nortel's MRDA. Mr. Mark Weisz, Nortel's former director of international tax who was intensively involved in the drafting of the MRDA in 2004, confirms this conclusion; he agreed that "the geography or territory in which sales were generated or earned was not relevant" to calculating shares of residual profits and losses.[50] Nortel's outside counsel, who helped draft the MRDA, also concurred that each RPE's exclusive rights would be

---

[48] Veschi Deposition, 52:13–54:3.

[49] Peter Currie, Nortel's chief financial officer between 2005 and 2007 testified that "[t]he United States is the market. NNI is a subsidiary, and products were sold in that market that were outside the purview of NNI. They may have been produced elsewhere . . . . [NNI] was the functional subsidiary of the company in the United States. It ended up being the repository for the employee agreements for the employees . . . but it was **not an integrated subsidiary that did business in its own right**." Currie Deposition, 261:5–18 (explaining the distinction between the U.S. market and NNI).

[50] Weisz Deposition, 133:15–134:2. Under the MRDA, as opposed to the CSA, "the residual profit split participants no longer had the right to keep the proceeds of the exclusive license in its own exclusive territory." Weisz Deposition, pp. 133:4–7.

subject to the obligations to share profits and losses.[51]  Consequently, allocating the lockbox funds on the basis of the revenue-based territorial marketing rights is internally inconsistent, and merely "cherry-picks" the license provisions from the MRDA while ignoring the other provisions.

### B.    THE U.S. APPROACH SUFFERS FROM SERIOUS IMPLEMENTATION FLAWS

In addition to the fundamental flaws by Mr. Kinrich in relying on the MRDA as the basis for allocation and cherry-picking one provision that is favorable to the U.S. Debtors, there are several other implementation mistakes in his valuation exercise, to which I will turn in this sub-section.

#### 1.    Inconsistent Value Assigned to the Rest of World (RoW) in the Business Sales

Mr Kinrich uses two revenue-based approaches to determine the value relinquished in the line of business sales.[52]

- In the first approach, Mr. Kinrich values an entity based on the relative revenue it generated in each line of business regardless of whether the entity was an integrated entity ("IE") (the five RPEs) or a non-IE.
- In the second approach, Mr. Kinrich differentiates between IEs and non-IEs by valuing non-IEs using a market-based revenue multiple for comparable firms whose primary business is product distribution.[53]  Mr. Kinrich then deducts the total value relinquished by the non-IEs from the net sales proceeds and allocates the remaining proceeds in each line of business to each of the IEs based on their relative revenue share in each line of business.

These approaches yielded approximately 2% different valuations across some of the Debtor Groups, leading Mr. Kinrich to take a simple average of the percentage of total proceeds that each Debtor Group is entitled to under each approach as his final result.

However, Mr. Kinrich made a significant mistake in this regard, which inflates the U.S. Debtors' share of business sale proceeds and highlights a fundamental inconsistency in the way he allocates rest of world (non-RPE) value.  In the business sales, Mr. Kinrich effectively allocates

---

[51]    Deposition of Giovanna Sparagna, December 10, 2013, pp. 61:24–62:12 ("Sparagna Deposition").

[52]    Kinrich (U.S. Debtors) Report, p. 12.

[53]    This multiple (0.15) is obtained from Nortel's transfer pricing agreements.  This lower multiple is applied because many of the non-IEs were simply resellers of Nortel products and took minimal business risks compared to the IEs.  See, Kinrich Report, pp. 23–24.

rest of world value pro-rata to relative RPE revenues, while in the residual IP sale he splits it equally between RPEs.

The way these mistakes manifest themselves in the approach is as follows.  First, he failed to include the revenues from Nortel's Central America and Latin America ("CALA") and Asia-Pacific ("APAC") regions (rest of world).  Second, Mr. Kinrich is incorrect concerning his treatment of the revenues from rest of world entities.

The buyers of Nortel's lines of business were not interested in whether the Nortel entity in a territory was an RPE or distributor.  As the buyers were purchasing the entire business in a territory (including IP rights, distribution rights, *etc.*) they paid a multiple for that territory reflecting the entirety of those assets.  The price paid for the rest of world territories can therefore be thought of as comprising a component of value for routine distribution and a component of value for IP.  Mr. Kinrich used a revenue multiple of 0.15 to account for the value associated with the routine distribution function that is carried out by the non-IEs.  However, Mr. Kinrich (in his second approach) implicitly allocates the non-IEs' excess value in proportion to the revenues projected only for Nortel's five RPEs.  He should have included all of the rest of world territories and allocated the IP values related to those territories evenly among the RPEs.  Such an approach would then be consistent with the way he allocated the revenues from the rest of the world when allocating the proceeds from the Rockstar sale; *i.e.*, he split the rest of world value evenly among the RPEs, consistent with their license rights.

I therefore modified Mr. Kinrich's approach as follows.  First, I estimated the values relinquished by all of the various Nortel entities, segmenting values for IP and for routine distribution functions.  Second, I grouped the revenues from Nortel's non-IEs into a "Rest of World" ("RoW") category.  Third, I divided this "RoW" value relinquished into two sub-categories:  "Distribution Value Relinquished" and "R&D Value Relinquished."[54]  This modified approach yielded the results shown below in Table 10 below.

---

[54]   R&D Value Relinquished is equal to the total value relinquished by the "RoW" group less Distribution Value Relinquished.

**Table 10.  Correction to Kinrich's Business Sales Allocation – RoW Adjustment**

|  | Kinrich Approach 1 | | Kinrich Approach 2 | | Revised Approach - RoW | |
|---|---|---|---|---|---|---|
|  | US$, mil | % | US$, mil | % | US$, mil | % |
| Canadian Debtors | 316 | 11% | 362 | 13% | 375 | 13% |
| EMEA Debtors | 541 | 19% | 487 | 17% | 693 | 24% |
| U.S. Debtors | 1,989 | 70% | 1,999 | 70% | 1,735 | 61% |
| RoW | 0 | 0% | 0 | 0% | 45 | 2% |
| Total | 2,846 | 100% | 2,848 | 100% | 2,848 | 100% |

Source: Kinrich Report and Revised Approach. Kinrich Approach 1 and 2 Totals differ due to value due to Nortel Colombia.

As is shown in the table, correcting Mr. Kinrich's calculations as I discussed above had a significant impact on his allocation percentages.  The allocation of the proceeds from Nortel's lines of business sales to the EMEA Debtors increased to 24.3% and the allocations to the U.S. Debtors decreased to roughly 61%.

## 2.    The U.S. Approach Errs by Relying on 2009 Revenues

Mr. Kinrich's calculation of value relinquished by the business sales is based on 2009 revenues. However, fiscal year 2009 was an anomalous year because of both the Great Recession and Nortel's own bankruptcy filing.  Mr. Kinrich's analysis leaves no room for analysis of trends within the data points which show a different picture.

Clear trends, however, can be identified in Mr. Kinrich's revenue dataset which strongly suggests that 2009 is an unreliable year to use.  For example, there is an obvious trend of growth with respect to the EMEA Debtors' relative share of the Debtor Groups' revenues (Figure 9).  Between FY2001 and FY2008, the final year prior to Nortel's entry into insolvency proceedings, the EMEA Debtors' relative revenue share nearly doubled from 12.8% to 22.7%.  At the same time, between FY2001 and FY2008, the U.S. Debtors' relative share of the Debtor Groups' revenues fell nearly ten percentage points from 74.3% to 64.9%. While the EMEA Debtors appear to have gained revenue share, the U.S. Debtors appear to have lost a similar amount.  Although the average share of revenues over the time period shown is in line with the U.S. Debtors' relative revenue share in FY2009, it would be inappropriate to ignore the downward trend in the U.S. Debtors' relative revenue share over time and the increase in the EMEA Debtors' share.

37

### Figure 9.  Market Share by Debtors



Source: Kinrich Exhibit 6.

Lastly, given the fact that the Debtor Groups began insolvency proceedings in January 2009, I believe it is not appropriate to utilize FY2009 results as any changes in revenues could be attributed to multiple factors which are outside the ordinary course of business (*i.e.,* exceptional). Bankruptcy filing is likely to have changed the behaviors of customers and those changes would distort the underlying value of the business on a going-concern basis.  In fact, as sophisticated customers may have been in tune with the Debtor Groups' financial distress, a portion if not all of the reversal in sales contribution trend in FY2009 relative to the pre-petition period could potentially be attributed to the financial distress of Nortel.

As such, I replaced the FY2009 data used by Mr. Kinrich with FY2008 as summarized in Table 11 below.

### Table 11.  Correction to Kinrich's Business Sales Allocation – RoW and FY2008 Adjustments

|  | Kinrich Approach 1 | | Kinrich Approach 2 | | Revised Approach - 2008 Revenue/RoW | |
|  | US$, mil | % | US$, mil | % | US$, mil | % |
|---|---|---|---|---|---|---|
| Canadian Debtors | 316 | 11% | 362 | 13% | 383 | 13% |
| EMEA Debtors | 541 | 19% | 487 | 17% | 768 | 27% |
| U.S. Debtors | 1,989 | 70% | 1,999 | 70% | 1,652 | 58% |
| RoW | 0 | 0% | 0 | 0% | 45 | 2% |
| Total | 2,846 | 100% | 2,848 | 100% | 2,848 | 100% |

Source: Kinrich Report and Revised Approach. Kinrich Approach 1 and 2 Totals differ due to value due to Nortel Colombia.

### 3.    Under-Appreciation of Chinese IP Market Value in the Residual IP Sale

Beyond issues with the basic approach, I also disagree with Mr. Kinrich, and the opinion of Mr. Zenkich (U.S. Debtors) on which he relies, that the Chinese patents were of little or at most limited value to the Rockstar portfolio.  As shown in Table 9 of Mr. Kinrich's report and Table 13 below, the inclusion (or exclusion) of royalty revenues from sales in China has a very significant impact on the allocation results calculated under the U.S. Debtors' revenue-based allocation methodology.  Including royalty revenues from China can change the allocation of the proceeds from the Rockstar transaction by as much as $440 million.

Mr. Kinrich uses a weighted average of the allocation results (*i.e.*, royalty revenues including and excluding royalty payments from sales in China), which effectively discounts the value attributable to the Chinese market by 75%.  As I will demonstrate below, Mr. Kinrich's weightings undervalue the royalty revenues that are expected to come from the Chinese market and as a result under-allocate the proceeds from the Rockstar transaction to all but the U.S. Debtors.

As an initial matter, it is clear that Nortel ascribed value to its Chinese patents, both prior to and after bankruptcy.  Due to budgetary constraints, Nortel was highly selective regarding the jurisdictions in which it chose to file and maintain patents and patent applications.[55] Nonetheless, by 2006 Nortel sought to file as many as 50% to 60% of eligible new inventions in China—at least as high a rate as in any other jurisdiction outside of the United States.[56]  As Table 2 shows, almost all of its Chinese filed patents (92% to 100%, depending on the year) were from patent families that were also filed in the U.S.  Clearly, Nortel saw value in extending its global IP protection into China.  As also summarized in Table Table 12, Chinese patents ultimately comprised 15% of Nortel's non-U.S. patent portfolio.

---

[55]    Deposition of Angela de Wilton, November 20, 2013, pp. 63:11–22 ("de Wilton Deposition").

[56]    Exhibit 21463, p. US_Canada_PRIV_00082621; Exhibit 21464.

**Table 12.  Nortel's IPCo Patent Filings in Non-U.S. Jurisdictions**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Total Patents** | | | | | | | | | |
| Chinese Patents | 18 | 23 | 19 | 19 | 8 | 19 | 22 | 25 | 153 |
| Total Non-U.S. Patents | 150 | 164 | 141 | 89 | 74 | 128 | 95 | 185 | 1,026 |
| % Chinese | 12% | 14% | 13% | 21% | 11% | 15% | 23% | 14% | 15% |
| **U.S. Patent Families** | | | | | | | | | |
| Chinese Patents | | | | | | | | | |
| # | 17 | 23 | 17 | 18 | 8 | 18 | 22 | 23 | 146 |
| % of Total | 94% | 100% | 89% | 95% | 100% | 95% | 100% | 92% | 95% |
| Total Non-U.S. Patents | | | | | | | | | |
| # | 139 | 156 | 133 | 73 | 67 | 123 | 92 | 171 | 954 |
| % of Total | 93% | 95% | 94% | 82% | 91% | 96% | 97% | 92% | 93% |

Source: EMEAPROD2214888, 'Assets' tab.

Contrary to the assertions made by Messrs. Kinrich and Zenkich, these patents provided value to Nortel and to a potential acquirer of the company's residual patent portfolio.  In my opinion, both Mr. Kinrich and Mr. Zenkich, on whose opinions Mr. Kinrich relies in part, understate the value of China patents to such prospective acquirers.

The first error in the Kinrich/Zenkich analysis is that it does not recognize the relevant timeframe for IP enforcement in China.  Simply put, the issue is not IP enforcement in 2011 at the time of the Rockstar transaction (much less in the 2009/2010 timeframe used in Mr. Zenkich's analysis)[57] but at the time the royalties would be collected, which is 2015 and after as modeled in Nortel's IPCo analysis.  I provide a graphic depiction of the royalty revenues projected in Nortel's IPCo model in Figure 10 below.

---

[57]    Zenkich (U.S. Debtors) Report, p. 2.

**Figure 10: Projected Chinese Rockstar Revenues by Year**



Source: Kinrich IPCo model v3.1.

In the years leading up to the Nortel patent sale in 2011, China experienced an explosion in patent applications and grants, including those filed by foreigners (*i.e.*, non-Chinese.) In 2010, nine percent (112,858) of Chinese patent applications were filed by foreigners.[58] When utility models and design patents and applications are excluded from this pool, 25 percent (98,111) of applications and 41 percent (55,343) of grants in 2010 were made to foreigners.[59] This level of increased foreign filings was expected to be accompanied by higher levels of patent enforcement. For example, in the 2010–2011 timeframe, the win rate for foreign parties suing Chinese parties over IP infringement **in China** was fully 60%.[60] In my opinion, by 2015 and later, any owner of Chinese IP could expect to be able to enforce their rights much more so than would have been the case in 2009, 2010, or 2011.

---

[58]    State Intellectual Property Office (SIPO) Statistics, available at http://english.sipo.gov.cn/statistics.

[59]    *Id.*

[60]    Yang, 2011, Patent Enforcement in China, available at
http://www.americanbar.org/content/dam/aba/publications/landslide/landslide_november_2011/yang
_landslide_novedec_2011.authcheckdam.pdf

The second error in the Kinrich/Zenich analysis is that it attempts to value "on the open market"[61] the Chinese patents in the Rockstar portfolio on a stand-alone basis. Similar to the selective nature of the rights that Mr. Kinrich and other experts value in their overall allocation analyses, the Chinese patents were not sold to Rockstar on a stand-alone basis, but rather were part of a large multinational patent portfolio. This means that the licensor would have enormous leverage over most multinational licensees who operated in North America and Europe as well as China.

I report the shares of royalty revenues from outside China that could be used as leverage against vendors' sales in China projected for key licensees (as provided in Nortel's IPCo model) in Figure 11 below.

**Figure 11.  Leverage of IPCo Royalty Revenue by Vendor and Geography**



Source: Kinrich IPCo model v3.1.

As can be seen in the figure, the licensing revenue from China is projected to come from companies such as ███████████████████████████████—non-Chinese companies that are unlikely to avoid their legal obligations in any country. Nearly all of the

---

[61]    Zenich (U.S. Debtors) Report, p. 9.

licensees with revenues from China are also projected to provide royalty revenues through their operations in North America and Europe. Any firm licensing these vendors in China would have significant leverage to ensure compliance with patent obligations because they could threaten to deny licenses in the North American and/or Europe markets if the licensees failed to comply in China.

Figure 11 shows that the only firms that were not expected to provide royalty revenue in China that did not also provide royalty revenue in North America and/or Europe were ██████████ ████████████████████████ licensees included under the PC franchise. Of these, ██████ has significant sales outside of China[62] (although they were not modeled in the IPCo model) and therefore they also have good reason to honor IP rights in China so as not to jeopardize their sales overseas. The only other firms with less than half their revenues outside of China are ████████ and ████ Both firms still have significant sales outside of China and are expecting those sales to increase in the future.[63]

As an extreme case, all of the royalty revenues for the three vendors in the PC franchise without any significant non-Chinese sales could be excluded from the IPCo analysis. This is an extreme case because, as Mr. Kinrich and Mr. Zenkich recognize, even on a standalone basis Chinese IP has some value. These three firms—████████████████—account for only about 2% of the IPCo model's total revenues and less than 13% of its Chinese revenues. In Table 13 below I report the results of this extreme case where all of the revenues from these firms are excluded. This leads to only a modest discount of the royalty revenues projected to come from China.

### Table 13: IPCo Model with Revised Result

|  | Canadian Debtors | | EMEA Debtors | | U.S. Debtors | |
|---|---|---|---|---|---|---|
|  | US$, mil | % | US$, mil | % | US$, mil | % |
| IPCo Model without China | 413 | 9% | 623 | 14.0% | 3,418 | 77% |
| IPCo Model with China | 495 | 11% | 979 | 22.0% | 2,980 | 67% |
| Kinrich Original Results (75% without China) | 434 | 10% | 712 | 16.0% | 3,309 | 74% |
| Revised Results (Without Exclusive Chinese Vendors, Except Lenovo) | 487 | 11% | 942 | 21.1% | 3,026 | 68% |

Source: Revised results exclude Founder, Tongfang and Asus from the analysis; Kinrich Report, at p. 61.

The table indicates that corrected treatment of Chinese royalty revenues increases the allocation of the proceeds from the Rockstar transaction to the EMEA Debtors to about 21%, and results in a decrease of allocation to the U.S. Debtors to roughly 68%.

---

■ ████████████████████████████
■ ████████████████████████████████████████████████
████████████████████████████████

I summarize the combined effects of revising Mr. Kinrich's calculation of allocation percentages in Table 14.

**Table 14.  Comparison of Lockbox Allocations - Kinrich Report (US$ in Billion)**

|  | Line of Business | | Patent Portfolio | | Total | |
|---|---|---|---|---|---|---|
|  | US$, mil | % | US$, mil | % | US$, mil | % |
| **Kinrich** | | | | | | |
| Canadian Debtors | 339 | 12% | 434 | 10% | 773 | 11% |
| EMEA Debtors | 514 | 18% | 712 | 16% | 1,226 | 17% |
| U.S. Debtors | 1,994 | 70% | 3,309 | 74% | 5,302 | 73% |
| Total | 2,847 | 100% | 4,454 | 100% | 7,301 | 100% |
| **Revised** | | | | | | |
| Canadian Debtors | 383 | 13% | 487 | 11% | 870 | 12% |
| EMEA Debtors | 768 | 27% | 942 | 21% | 1,709 | 24% |
| U.S. Debtors | 1,652 | 58% | 3,026 | 68% | 4,678 | 64% |
| Total | 2,848 | 100% | 4,454 | 100% | 7,302 | 100% |

Source: Kinrich Report, at p. 4; Revised analysis of Rockstar and LOB proceeds. Revised Line of Business total percentage includes APAC and CALA, which are not shown here.

Table 4 is in the same format as the summary table that Mr. Kinrich provides in his report (*i.e.*, Table 1 in the Kinrich report).  As shown in the table, Mr. Kinrich estimated that the EMEA Debtors are entitled to approximately 17% of the lockbox funds, based on the weighted average of 18% allocation from Nortel's lines of business sales and 16% from the Rockstar sale.  These percentages change considerably after appropriate adjustments are made.  I calculated that the overall allocation to the EMEA Debtors should be roughly 23% when I follow Mr. Kinrich's revenue based methodology but adjust his treatment of the RoW revenues (for the lines of business sales) and more realistically account for the royalty revenues from China (for the Rockstar sales).

In conclusion, I disagree with the revenue approach advanced by the U.S. Debtors and the similar license approach advanced by the EMEA Debtors in the alternative.  Even if revenues were an appropriate basis for allocation, which I contend they are not, such an approach must at least be adjusted to be internally consistent and to be consistent with the value that Nortel placed on the rest of the world and China.

## VI.  The R&D Contribution Approach (EMEA Debtors)

The EMEA Debtors have put forward two methodologies to allocate the lockbox funds, one based on R&D contribution, measured using R&D spending (the "Contribution Approach"), and in the alternative, one based on revenue in each territory (the "License Approach"), somewhat analogous to the Revenue Approach advocated by Mr. Kinrich (U.S. Debtors).

For some of the same reasons discussed above in Section V, I disagree with taking a revenue-based approach to allocation.  However, the license approach advanced by Mr. Malackowski for the EMEA Debtors does not suffer the same flaws as the approach advanced by Mr. Kinrich for the U.S. Debtors.  First, he takes into account all potential markets covered by Nortel's residual high value patent portfolio.  Second, he consistently allocated the revenue from the rest of the world evenly among the five RPEs.  In the remainder of this section, I address the Contribution Approach as proposed by Dr. Cooper and implemented by Mr. Malackowski on behalf of the EMEA Debtors.

Dr. Cooper was asked by Counsel for the EMEA Debtors to opine on whether the allocation positions proffered by the Parties are consistent with: established transfer pricing and arm's length principles; prior representations by Nortel to tax authorities, including the MRDA; and the business arrangements among the Nortel entities.  He concluded that the RPEs were the economic and beneficial owners of Nortel's IP and, as such, the RPEs are entitled to share in any resulting economic benefits following based on their respective investment in R&D.

Nortel's R&D activities unquestionably were the primary driver of the company's value.  However, determining a metric that accurately reflects the value contributed by an RPE's R&D investments at any point in time is quite challenging.  R&D spending is a relatively easy metric to measure, but spending does not necessarily reflect historic value contribution.  This disconnect has been highlighted in the transfer pricing guidelines for the Organization for Economic Cooperation and Development when it noted that "there is no necessary link between the costs and value" for intangible assets.[64]  Over the long term and in economic equilibrium, with a continual sharing of all benefits from all R&D, a cost-based distribution metric may be very reasonable—but this will not be true at any single point in time.

As I discussed earlier in this report, the imperfection of the R&D spending metric may not have presented an overwhelming challenge when Nortel was a going concern because it was not necessarily essential to have internal valuations of specific entities be "right" at any particular point in time.  Allocations of residual profits on a going concern basis would be approximate and tax efficient.   Furthermore, the generally acceptable allocations did not negate the RPEs'

---

[64]    Dr. Lorraine Eden, the transfer pricing expert for the U.S. Debtors, provides additional citations to the transfer pricing literature on this point.  Eden Report, pp. 23–27.

incentives to work together and efficiently create value for Nortel as a whole. However, such approximations would be less acceptable in the case of dissolution, when allocations are final and cannot be readjusted in the future. Thus, a more accurate indication of R&D contribution is required than the more general R&D spending metric.

The analysis that I presented in my initial report provides a strong indication that using the percentage of R&D spending as currently defined to allocate the lockbox funds would most likely significantly understate the actual IP value contributed by NNUK and thus understate the amount from the lockbox funds that is due to NNUK if an contribution approach was applied. I have not completed a full analysis of R&D spending and value creation at Nortel which would be required to fully specify a more accurate R&D contribution allocation metric. This would require completing the compilation of data for the patents sold by Nortel, as well as completing analysis on Nortel's pending patents and on the non-U.S. patents. Thus, while I believe that there is evidence that NNUK "fought above its weight" in terms of R&D productivity, I have not quantified just how far above its weight it fought.

For a point of comparison, I examined the patents included in the Rockstar transaction. The price that the Rockstar Consortium paid for the Nortel patents that it acquired can be deconstructed from a cash flow model developed by Nortel when it was considering entering the patent licensing business. Specifically, the company planned to launch an "IPCo" and developed a model which projected the royalty revenues and cash flows that could be expected from such a licensing focused business. The details underlying Nortel's revenue and cash flow projections were included in its "IPCo model."

The IPCo model provides a breakdown of royalty revenues for eight market groupings of patents. When summed and discounted, the cash flows included in this model calibrate to the transaction price paid by Rockstar to Nortel. I was able to trace over 3,000 of the patents that Nortel sold to Rockstar to the patent groupings included in the IP Co. cash flows. From this, I was able, on a preliminary basis, to estimate the value that the patents originating in each RPE contributed to the value ultimately realized by Nortel in the Rockstar transaction.

I used the analysis that I included in my initial report concerning the locations where Nortel's patents originated and the revenue and cash flow projections included in the IPCo model to estimate the value that each RPE contributed to the proceeds that Nortel received from the Rockstar transaction. I provide a comparison of the R&D spending by Estate and my estimate of value contributed in Table 15.

**Table 15. Comparison of R&D Cost and Value Based Allocation**

|         | % R&D Spend | Patents Invented | | Value of Patents | |
|---------|-------------|-------|------|----------|-----|
|         |             | #     | %    | US$, mil | %   |
| US      | 39%         | 1,132 | 32%  | 1,418    | 32% |
| Canada  | 45%         | 1,633 | 47%  | 2,331    | 52% |
| EMEA    | 16%         | 735   | 21%  | 752      | 17% |
| *UK*    | *4%*        | *564* | *16%*| *477*    | *11%*|
| *France*| *11%*       | *147* | *4%* | *176*    | *4%*|
| *Ireland*| *1%*       | *25*  | *1%* | *99*     | *2%*|
| Total   | 100%        | 3,501 | 100% | 4,500    | 100%|

The table indicates that the percentage of R&D spending is not an accurate indicator of the relative contribution to the creation of the value realized by Nortel during its liquidation.  For example, the patents originating in NNUK accounted for about 11% of the value realized by Nortel from the Rockstar transaction, while its R&D spending was less than 4% of the Nortel's total R&D spending.  As a result, I conclude that using the percentage of R&D spending as currently defined to allocate the lockbox funds would most likely significantly understate the amount due to NNUK.

February 28, 2014

_____          _____

Coleman D. Bazelon                                Date

# VII. Revisions to Initial Report

After further reviewing my initial report, I have made the following minor corrections:

1. Table 2
   a. Original

Table 2: Nortel High Value, Granted Patents Sold to RockStar

| | U.S. Granted | | | | Non-U.S. Granted | | | | Total Granted | |
| | Two Stars | | One Star | | Two Stars | | One Star | | | |
| | # | % | # | % | # | % | # | % | # | % |
|---|---|---|---|---|---|---|---|---|---|---|
| U.S. | 162 | 39% | 425 | 41% | 66 | 17% | 134 | 32% | 788 | 35% |
| Canada | 191 | 46% | 425 | 41% | 215 | 54% | 182 | 43% | 1,013 | 45% |
| U.K. | 43 | 10% | 146 | 14% | 64 | 16% | 72 | 17% | 325 | 14% |
| France | 9 | 2% | 23 | 2% | 33 | 8% | 18 | 4% | 83 | 4% |
| Ireland | 1 | 0% | 7 | 1% | 3 | 1% | 8 | 2% | 19 | 1% |
| Rest of World | 6 | 1% | 14 | 1% | 18 | 4% | 7 | 2% | 44 | 2% |
| Total | 412 | 100% | 1,040 | 100% | 399 | 100% | 421 | 100% | 2,272 | 100% |

Sources and Notes: EMEAPROD2214888, tab "Assets", and the USPTO.
This includes three patents which were pending at the time but are now granted (U.S. patent numbers 7,738,437, 8,626,241, and 8,179,864), and one patent that was never filed in the U.S. (Nortel disclosure number 13961FR).
Percentages may not appear to sum to 100% due to rounding.

   b. Revised: A correction to inventor location information for four patents, results in a small change to the total number of patents by country, but does not materially impact the percentages reported in this table

Table 2: Nortel High Value, Granted Patents Sold to RockStar

| | U.S. Granted | | | | Non-U.S. Granted | | | | Total Granted | |
| | Two Stars | | One Star | | Two Stars | | One Star | | | |
| | # | % | # | % | # | % | # | % | # | % |
|---|---|---|---|---|---|---|---|---|---|---|
| U.S. | 162 | 39% | 425 | 41% | 66 | 17% | 134 | 32% | 788 | 35% |
| Canada | 192 | 46% | 425 | 41% | 215 | 54% | 182 | 43% | 1,013 | 45% |
| U.K. | 43 | 10% | 146 | 14% | 64 | 16% | 72 | 17% | 325 | 14% |
| France | 8 | 2% | 23 | 2% | 33 | 8% | 18 | 4% | 82 | 4% |
| Ireland | 1 | 0% | 7 | 1% | 3 | 1% | 8 | 2% | 19 | 1% |
| Rest of World | 6 | 1% | 14 | 1% | 18 | 4% | 7 | 2% | 44 | 2% |
| Total | 412 | 100% | 1,040 | 100% | 399 | 100% | 421 | 100% | 2,272 | 100% |

Sources and Notes: EMEAPROD2214888, tab "Assets", and the USPTO.
This includes three patents which were pending at the time but are now granted (U.S. patent numbers 7,738,437, 8,626,241, and 8,179,864), and one patent that was never filed in the U.S. (Nortel disclosure number 13961FR).
Percentages may not appear to sum to 100% due to rounding.

Note: This Table contains minor differences from the same Table in the Bazelon Initial Report. All backup material provided will produce these updated results.

2. Table 3
   a.  Original

Table 3: Nortel Granted Patents Sold to RockStar by Inventor Location

|  | U.S. Granted | Non-U.S. Granted* | Total Granted | % of Total Granted |
|---|---|---|---|---|
| U.S. | 934 | 244 | **1,179** | 31% |
| Canada | 1,250 | 554 | **1,804** | 47% |
| U.K. | 376 | 211 | **587** | 15% |
| France | 75 | 74 | **148** | 4% |
| Ireland | 14 | 11 | **25** | 1% |
| Rest of World | 36 | 33 | **69** | 2% |
| **Total** | **2,684** | **1,127** | **3,811** | 100% |
| **U.K. % of Total** | **14%** | **19%** | **15%** | |

Sources and Notes: EMEAPROD2214888, tab "Assets", and the USPTO.
*This excludes non-U.S. granted patents which were never granted in the U.S.

   b.  Revised:  A correction to inventor location information for four patents results in a small change to the total number of patents by country, but does not materially impact the percentages reported in this table

Table 3: Nortel Granted Patents Sold to RockStar by Inventor Location

|  | U.S. Granted | Non-U.S. Granted* | Total Granted | % of Total Granted |
|---|---|---|---|---|
| U.S. | 935 | 244 | **1,179** | 31% |
| Canada | 1,252 | 554 | **1,806** | 47% |
| U.K. | 374 | 211 | **585** | 15% |
| France | 74 | 74 | **148** | 4% |
| Ireland | 14 | 11 | **25** | 1% |
| Rest of World | 36 | 33 | **69** | 2% |
| **Total** | **2,684** | **1,127** | **3,811** | 100% |
| **U.K. % of Total** | **14%** | **19%** | **15%** | |

Sources and Notes: EMEAPROD2214888, tab "Assets", and the USPTO.
*This excludes non-U.S. granted patents which were never granted in the U.S.

Note: This Table contains minor differences from the same Table in the Bazelon Initial Report. All backup material provided will produce these updated results.

3. Figure 4
   a. Original
   b. Revised:  The direction of one arrow (bottom left) is corrected to better illustrate my point.

# Original

# Updated




4. Footnote 58 on p. 18
   a. **Original:** "which assigned one or two-star rankings to 1,439 of the patents Nortel sold to Rockstar."

   b. **Updated:** "which assigned one or two-star rankings to 1,453 of the patents Nortel sold to Rockstar."

**Appendix R1: Additional Documents Considered for Bazelon Rebuttal Report**

**Academic Literature**

Gideon Parchomovsky & R. Polk Wagner, Patent Portfolios,  154 U. Pa. L. Rev. 1, 35 (2005) (quoting John J. Egan & Ray Lupo, Protecting Venture Investments Against Patent Litigation, Venture Cap. J., Dec. 1, 2002, at 40, 41).

Baruch Lev and Theodore Sougiannis, "The Capitalization, Amortization, and Value-Relevance of R&D," *Journal of Accounting and Economics*  21, 1996, pp. 107-138.

Baruch Lev, Doron Nissim, and Jacob Thomas, "On the informational usefulness of R&D capitalization and amortization," in *Visualising Intangibles: Measuring and Reporting the Knowledge Economy*, Chapter 5, 97-128, Ashgate Publishing

Bronwyn H. Hall, "Innovation and Market Value," NBER Working Paper 6884, 1999. (For documents considered)

Griliches, Z. (2000): R&D, Education, and Productivity: A Retrospective, Cambridge, MA: Harvard University Press.

Sharon Belenzon, "Cumulative Innovation and Market Value: Evidence from Patent Citations," *The Economic Journal* 122, 265-285.

**Depositition Transcripts and Exhibits**

Donovan Deposition.

Currie Deposition.

Horn Deposition.

Jensen Deposition.

McDonald Deposition.

O Deposition.

Roese Deposition.

Stevenson Deposition.

**Expert Reports**

Berenblut and Cox Report.

Bowie Report.

Britven Report.

Cooper Report (allocation).

Cooper Report (transfer pricing).

Eden Report.

Felgran Report.

Green Report.

Ham Report.

Huffard Report.

Kinrich Report.

Malackowski Report.

Reichert Report.

Reynertson Report.

Siefert Report.

Westbrook Report.

Zenkich Report.

**Financial Statements**

Lenovo 2012/2013 Annual Report.

Asustek Computers 2011/2012 Annual Report.

**Case Documents**

Allocation Position of the Monitor and Canadian Debtors (May 16, 2013), pp. 2–3.

Enterprise and Government Solutions Combined Financial Statements for 2007 and 2008 (NNC-NNL06001458).pdf

GIP_Nortel_00071997.xls
IP Co. Model 2.2 Update (US_EMEA_Canada_PRIV_00207290).ppt
IP Co. Model 4.0 Update (NNI_01326188).ppt
IP Co. Update to Nortel Leadership Team (NNI_01479224).ppt
Joint Meeting of the Boards of Directors of NNC and NNL June 2, 2006 (NNC-NNL07013929).pdf
Minutes of the Investment Committee Meeting September 7, 2004  (NNI_01248229).pdf
NNC-NNL011359
NNC-NNL06001440.xlsx
NNC-NNL06001450.xls
NNC-NNL06001452.xls
NNC-NNL06001454.xlsx
NNC-NNL06001456.xlsx
NNC-NNL11665042.xls
NNI_00577735.xls
NNL Meeting of the Pension Fund Policy Committee December 14, 2004 (NNC-NNL085282).pdf
NNL Meeting of the Pension Fund Policy Committee December 14, 2004 (NOR-CAN00214360).pdf
NOR_56971224.xls
NOR-CAN00071723.pdf
NOR-CAN00175104
Nortel Networks UK Pension Fund Policy Committee Extracts from Meeting on September 13, 2002 (PC0143687).pdf
Nortel Networks UK Pension Plan – Common Platform (NOR-CAN00032308).pdf
Nortel Networks UK Pension Trust Limited Minutes of the Board Meeting September 4, 2003 (PC0082652).pdf
Nortel Pension Plans Introductory Package – PFPC Briefing December 14, 2004 (NOR-CAN00175104).ppt
Pension Fund Policy Committee UK Funding Update June 2, 2006 (NOR-CAN00074616).PPT
Pension Funding - Phase 2 - PFPC Dec. 14th (NOR-CAN00633882).pdf

**Websites**

State Intellectual Property Office (SIPO) Statistics. Available at http://english.sipo.gov.cn/statistics.

**Miscellaneous**

"Huawei Seeks to Double Smartphone Sales While Boosting Price", Bloomberg News, February 26, 2014. Available at http://www.bloomberg.com/news/2014-02-26/huawei-sees-smartphone-sales-doubling-amid-push-to-boost-
Shengping Yang, Patent Enforcement in China, Landslide Volume 4, Number 2, November/December 2011. Available at http://www.americanbar.org/content/dam/aba/publications/landslide/landslide_november_2011/yang_landslide_nove dec_2011.authcheckdam.pdf.

### Appendix R2. Panel A:  Summary of Court Orders and Allocation Positions

| Court | Sources | Order |
|---|---|---|
| U.S. Court | [A] | "The issues which remain for decision are imposing. They include the allocation of proceeds from the sale of business units and other assets (the "Allocation Issue"). There are actually two subsets of the Allocation Issue. The first is who should determine allocation, the U.S. Court and Canadian Court, or an arbitrator. The second is the allocation itself." |
| Canadian Court | [B] | "This court orders that the allocation protocol in the form appended as Schedule "A" to this Order (the "Allocation Protocol") is approved." |
| Allocation Protocol (approved by both the U.S. and the Canadian Courts) | [C] | "The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors" <br> "The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of the U.S. and Canadian Courts. There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation." |

| Party | Sources | Position / Question For The Courts |
|---|---|---|
| Canadian Debtors | [D] | "What portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or U.S. Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?" |
| Canadian Creditors Committee | [E] | "For the reasons set out below, the CCC seeks the following relief: a) an Order (the "Ownership Allocation Order") allocating, administering and effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets, as set out below and as will be more particularized in advance of trial; b) in the alternative, an Order (the "Equitable Allocation Order") allocating, administering and effecting the distribution of the Global Assets of the Nortel Debtors, including the Sale Proceeds, in accordance with equitable principles, so as to effect a pro rata distribution among Creditors, rateably by valid Claims; and c) such other orders or declarations as may be necessary to give effect to the Ownership Allocation Order or the Equitable Allocation Order, as applicable, including, as may be necessary, orders or directions that the Sale Proceeds and other Global Assets are only distributable in respect of valid Claims, the Global Assets be administered as if Nortel were a single consolidated estate, and all guarantees and Intercompany Claims among the Nortel Debtors be stayed and/or eliminated." |
| U.S. Debtors | [F] | "Each Selling Debtor is entitled to receive the fair market value of the assets and rights it sold or relinquished in connection with the sale of Nortel's businesses and residual patent portfolio (collectively, the "Sales"). The Courts must determine the value of the assets and rights transferred by each of the separate and legally distinct Selling Debtors to allocate over $7 billion in sale proceeds now sitting in escrow." |
| UK Pension Plan | [G] | "The UK Pension Claimants support an allocation of the Lockbox Funds in a manner that produces a fair and equitable result, after due consideration of the relevant legal and jurisdictional issues. That position is set out more fully in Part 3 of this submission. In summary, the UK Pension Claimants' position is that the allocation should enable a broadly common dividend to be paid to the Group's creditors from each relevant debtor's insolvency." |
| EMEA Debtors | [H] | "The EMEA Debtors contend that allocation of the Sale Proceeds should be determined by analyzing the entitlement of each Selling Debtor to the proceeds of the specific assets that were conveyed to the purchaser in each Asset Sale. To determine the proper allocation of the Sale Proceeds, first the classes of assets sold in a particular Asset Sale must be identified, then the proportion of Sale Proceeds attributable to each class of assets should be determined, and finally it should be determined which Selling Debtor owned (or had an entitlement to or interest in) which assets." |

Sources:

[A]: Scheduling Order For Allocation Issues, filed on 02/13/2013, p. 1.

[B]: Order (Allocation Protocol), dated 04/03/2013, p. 2.

[C]: Schedule 'A' of Order (Allocation Protocol).

[D]: Allocation Position Of The Monitor And Canadian Debtors, filed on 05/16/2013, pp. 2-3.

[E]: Allocation Position Of The Canadian Creditors Committee, filed on 05/16/2013, p. 4.

[F]: Motion To Approve Allocation Position Of US Debtors And Official Committee Of Unsecured Creditors, filed on 05/16/2013, p. 1.

[G]: Allocation Position Of The Trustee Of Nortel Networks UK Pension Plan And The Board Of The Pension Protection Fund, filed on 05/16/2013, p. 3.

[H]: Joint Administrators' Statement Regarding The Allocation Entitlement Of The EMEA Debtors To Proceeds Of The Sales Of The Business And Residual Patent Assets, filed on 05/16/2013, p. 2.

## Appendix R2.   Panel B:   Summary of Experts' Assignment and Approach

| Expert (Debtor Group) | Position | Assignment (Legal Instructions) | Expert Approach (Basis / Justifications / Assumptions) |
|---|---|---|---|
| Bazelon (UK Pension Plan) | Pro Rata | Asked by Counsel for the U.K. Pension Claimants to opine on, from an economist's perspective, the most appropriate method for allocating the lockbox funds among the three estates based on Nortel's business model and operations and the nature of the assets that generated those funds. (Bazelon Report, Section 1.B) | The Pro Rata Distribution Model is the most consistent with the economics underlying Nortel's business model.  The other methods require strong assumptions that are inconsistent with the operations of Nortel's business.  This conclusion in based on three observations about the economics of Nortel:  First, Nortel operated as a highly integrated, multinational company.  Second, Nortel and its industry peers touted hyperconnected or converging technologies developed around the world and the interconnectedness of the patents makes it highly subjective and artificial to disaggregate value.  Third, Nortel's interwined IP assets were created over the course of many years through a highly collaborative R&D process, which was integrated geographically and across different technologies.  Any efforts to now disentangle the IP and attribute it to one or more of the estates would necessarily entail making considerable assumptions that may not fully reflect the contributions, ownership interests, and other rights to the IP by the different estates. (Bazelon Report, Section 1.A) |
| Berenblut & Cox (Canadian Debtor) | Ownership | Retained by the Monitor for the Canadian Debtors to provide opinions and analysis from a valuation and economic perspective with respect to:<br>1) what approach and methodology should be followed; and<br>2) what factors would be relevant in the application of that approach and methodology, in order to determine what portion of the proceeds was due to the transfer or surrender of property interests by each Debtor Group. (Berenblut & Cox Report, Section 1.1) | The economically appropriate basis for allocating the Sales proceeds would compensate each of the Debtor Groups for the property interests each surrendered or transferred.<br><br>While the license rights of the U.S. and EMEA Debtors under the MRDA were not transferable to third parties, the Canadian Debtors were entitled to the benefit of that IP in its highest and best use—including from the transfer of those assets to third parties.<br><br>The fair market value ("FMV") of the U.S. and EMEA Debtors' property interests is bounded at the high end by the amounts implied by the Business Sales proceeds apportioned based on the RPSM.  First, because the purchase prices for the Business Sales exceeded the present value of the expected future operating profits and are not indicative of the FMV of the U.S. and EMEA Property Interests.  Second, because for the Rockstar Transaction, it seems likely that, at the Valuation Date, there were no expected future operating profits from the use of the Residual IP in Nortel's business from which the U.S. Debtors and/or the EMEA Debtors would have benefited. (Berenblut & Cox Report, Sections 3 and 6) |
| Britven (CCC) | Ownership / Pro Rata | Retained by the Canadian Creditors Committee to determine each Debtor Group's share of the Sales proceeds, based on:<br>1) the value of the assets owned and/or relinquished (the Ownership approach), and<br>2) the objective that each unsecured Nortel creditor receives a common recovery percentage on its claims (the Pro-Rata approach). (Britven Report, Sections 1.0 and 2.0) | The value of an asset inures to the owner of the asset, in accordance with fundamental business valuation principles.  Accordingly, the share of the Sales proceeds should be based on the value of the assets owned and/or relinquished by the three estates.<br><br>The value of the licenses surrendered by the U.S. and EMEA estates is bounded to the value of the rights to make, use and sell Products that used the patents and other technology of Nortel because of their lack of transferability and limited scope.<br><br>Since in the Business Sales the purchasers of the Lines of Business received new licenses and transfers of patents and other technology that enabled them to carry on the businesses sold, the Business Sales proceeds subsumed the value of all the surrendered licenses.  Taking into account that the Rockstar assets were almost entirely owned by NNL and that the value of the surrendered licenses was captured within the Business Sales proceeds, the Rockstar Transaction proceeds almost entirely inure to NNL.  (Britven Report, Section 3.0) |

| Expert (Debtor Group) | Position | Assignment (Legal Instructions) | Expert Approach (Basis / Justifications / Assumptions) |
|---|---|---|---|
| Cooper (EMEA Debtor) | Contribution | Retained by the EMEA Debtors to opine on the allocation of the IP Sale Proceeds. In particular, to provide opinion on the consistency of the allocation positions of EMEA and Canadian Debtors with: 1) established transfer pricing and arm's length principles 2) prior representations by Nortel 3) the business arrangements among the Nortel entities from 2001 forward (RPSM and MRDA). (Cooper Report, Sections 2.1 and 2.2) | The EMEA allocation position is consistent with 1) established transfer pricing and arm's length principles, 2) prior representations by Nortel, and 3) the business arrangements among the Nortel entities. Conversely, the Canadian position is fundamentally flawed, and not consistent with 1) established transfer pricing and arm's length principles, 2) prior representations by Nortel to various tax authorities, and 3) the business arrangements within Nortel. <br><br> Given the integrated nature of Nortel's enterprise and technology, and the fact that a number of legal entities within the Nortel group shared the costs and bore the risks of jointly developing the IP, the use of the RPSM to allocate residual profits (or losses) among the Entrepreneurs was a reasonable choice for Nortel. It was reasonable for Nortel to use the relative monetary contributions by the Entrepreneurs to R&D as the criterion for dividing the residual profits among them. However, Nortel used a method that resulted in an understatement of the useful life of its IP for determining what amounts spent on R&D would be considered in calculating each Entrepreneur's contribution to R&D. As implemented, the RPSM either disregarded altogether or undervalued earlier investments in IP that were highly valuable at the time of sale. Therefore, it is reasonable to use a more accurate measure of the Entrepreneurs' respective contributions. (Cooper Report, Section 2.5) |
| Eden (US Debtors) | Revenue | Requested by counsel to the U.S. Debtors to opine on whether Nortel's transfer pricing arrangement, as set forth in the MRDA, would be an appropriate basis for valuing the assets and rights sold or relinquished by the U.S. Debtors and other Nortel entities in the post-petition Sales. <br><br> Asked to assume that a bankrupt entity's assets must be liquidated and paid first to creditors, with equity holders having the lowest priority. (Eden Report, Sections I.B. and II.) | There is no basis to use Nortel's transfer pricing policy to determine allocation of Sales proceeds for a number of reasons: <br> 1) Transfer pricing arrangements address entirely different policy considerations <br> 2) Transfer pricing policies are aimed at minimizing the overall tax burden of a group (under the "arm's length" standard) <br> 3) The RPSM, of all recognized transfer pricing methods, is the one furthest away from market-based pricing <br> 4) Nortel applied its RPSM in a manner consistent with group tax avoidance <br> 5) The manner in which Nortel applied the RPSM was flawed and inconsistent with the arm's length standard, as evidenced by criticisms from tax authorities (Eden Report, Section II.) |
| Green (Canadian Debtor) | Ownership | Retained by Goodmans LLP, counsel to the Monitor for the Canadian Debtors, to provide an independent and objective opinion regarding the allocation of financial recoveries obtained from the Sales proceeds. Specifically, he addressed the question: <br><br> " *What portion of the proceeds realized in each (sale) transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or U.S. Debtors, as the case may be, of property interests in the assets that were the subject of that transaction?*" (Green Report, Section I.) | NNL legally owned Nortel's most valuable asset, intellectual property. The U.S. and EMEA Entities held licenses granted to them by NNL in respect of intellectual property. These licenses granted to the Licensed Participants perpetual, royalty-free, defined territory exclusive and non-exclusive licenses to make, license and sell "Products" and to Nortel's intellectual property connected with such "Products." The licenses did not grant the licensees the right to sell the underlying intellectual property or to share in the proceeds of such a sale. The licenses were not transferable, except upon the consent of all Participants. <br><br> Because the licenses surrendered in the business sales were not transferable, the appropriate method to value the licenses is to consider what income the relevant U.S. and EMEA Debtors could have generated if Nortel continued to operate the businesses with the MRDA continuing in effect. Accordingly, the values of the license rights surrendered and customer relationships transferred by the U.S. and EMEA Entities are determined using projections for the future operations of the businesses sold, and any Business Sale proceeds in excess of the aggregate of the foregoing values is attributed to NNL. Furthermore, the entirety of the proceeds from the Residual IP Sale are allocated to the owner of the intellectual property, in light of the assumptions made about the scope of the licenses. (Green Report, Section III.) |

| Expert (Debtor Group) | Position | Assignment (Legal Instructions) | Expert Approach (Basis / Justifications / Assumptions) |
|---|---|---|---|
| Huffard (EMEA Debtor) | Contribution / License | Retained by the EMEA Debtors to provide expert opinion regarding: 1) what approach would be appropriate for the Courts to use in determining how to allocate the proceeds of the Norted asset sales among the various legal entities that transferred interests or relinquished rights in each sale, and 2) based on the application of that approach, how much each of the Selling Debtors is entitled to receive. Asked to consider both the Contribution Approach, and the License Approach. (Huffard Report, Sections I., II., and III.) | Based on the allocation position papers submitted in this case, it appears to be common ground among the parties that the Sale Proceeds of the Business Sales and Residual Patents Sale should be allocated among the Selling Debtors according to the value of the interests each of them transferred and rights each of them relinquished in connection with each sale. There are three relevant classes of assets transferred in the Sales: 1) Tangible Assets, 2) IP and 3) customer-related Assets and Goodwill. 1) Tangible Assets are valued based on their net book value. 2) Sale Proceeds attributable to IP are allocated based on the Selling Debtors' relative contribution to R&D under the Contribution Approach, and based on the relative fair market value of the license rights to the IP held by each of the Selling Debtors at the date of the Asset Sales under the License Approach. 3) The value of customer-related Assets and Goodwill is allocated to each Selling Debtor according to its relative percentage of global historic revenue for the fiscal year ending December 31, 2008. (Huffard Report, Sections II. and III.) |
| Kinrich (US Debtor) | Revenue | Retained by Counsel to the U.S. Debtors to determine the value relinquished by each of the Norted entities for each of the Post-Petition Sales. (Kinrich Report, Section II.) | The appropriate economic basis to determine the value relinquished by each of the Debtor Groups is the relative value of assets relinquished by each Debtor Group. A fundamental principle of economics is that the value of an asset is based on the ability of the asset to generate (or preserve) income. Accordingly, the value an entity relinquished is determined based on the relative revenue that entity earned by applying generally accepted principles of valuation. For the Patent Portfolio Sale the value of a license is driven by the profits a licensee could obtain by using the patented technology. If a patent owner were to grant a perpetual, exclusive, royalty-free license to exploit the patent in a particular territory, the licensee, not the patent owner, would be the sole entity that could license or exploit that technology in that region. Under the MRDA the rights granted were exclusive, perpetual, and royalty-free. (Kinrich Report, Sections VII.A., VII.B., and IX.A.) |
| Malackowski (EMEA Debtor) | Contribution / License | Retained by the EMEA Debtors to provide expert analysis and opinions regarding the valuation of IP and other intangibles in connection with the allocation of the Sale proceeds. Asked to address three questions: 1) How much of the consideration paid in each of the Business Sales should properly be regarded as attributed to the IP sold in the transactions? 2) What allocation and valuation methodologies are appropriate on the facts of this case in light of valuation theory and economic principles related to IP? 3) How much of the proceeds of sales of IP should be allocated to each of the Debtor Groups under both a contribution and a license approach? (Malackowski Report, Sections 1.1, 2.) | The Sales proceeds should be allocated to the various legal entities according to the value of the interests transferred of rights relinquished by each relevant party in connection with the sales. The parties have offered two principled ways in which the portion of the sale proceeds attributable to IP should be allocated among the Selling Debtors: 1) under the Contribution Approach in accordance with the relative contributions to the creation of the IP by each of those entities; and 2) under the License Approach in accordance with the relative fair market value at the date of sale of the license rights to the IP held by each of those entities. (Malackowski Report, Section 3.) |

| Expert (Debtor Group) | Position | Assignment (Legal Instructions) | Expert Approach (Basis / Justifications / Assumptions) |
|---|---|---|---|
| Reichert (Canadian Debtor) | Ownership | Retained by Goodmans LLP, counsel to the Monitor for the Canadian Debtors, to provide a description of transfer pricing objectives, characteristics, guidance and regulation, and to review and analyze Nortel RPS and provide opinion as to whether Nortel RPS was consistent with the arm's length principle. (Reichert Report, Section I.A.) | Nortel employed a residual profit split method under which the net residual profit was allocated among NNL and the licensees pro-rata, using their capitalized R&D stocks as the basis for the allocation. Nortel's transfer pricing reflected a particular form of "economic ownership" in which most of the RPE entities were licensees, obtaining rights to make and sell products that embodied their R&D investments. Nortel's RPS was the most appropriate transfer pricing method for Nortel.<br><br>The MRDA codified the arrangement of the parties. The license grant from NNL was (i) limited in scope and (ii) duration. These license grants, therefore, constitute the extent and limits of the licensees' "economic ownership." Their "economic ownership" did not encompass any rights to sell technology assets nor entitlement to share in the proceeds of a sale of those assets.<br><br>There is no reason to believe that the terms governing the parties were NPV<0 for the licensees. To assume this would be tantamount to assuming either that: 1) Nortel expected to lose money on its R&D investments (the R&D investments were NPV<0); or 2) Nortel expected the R&D investments to be NPV>0, but only insofar as Nortel would be able to sell the technology for a gain in some future period. This means that the licensees' position was economically rational. (Reichert Report, Sections I.C.3, I.C.4, and I.C.5.) |

## Appendix R3:  Summary of Experts' Allocation Approach

| Expert (Debtor Group) | Business Sales Allocation | Residual IP (Rockstar Portfolio) Allocation | Additional Comments |
|---|---|---|---|
| Green (Canadian Debtor) | Values and allocates four classes of assets. 1. Tangible assets are allocated based on book value; 2. Workforce transferred are allocated based on replacement cost incurred by each entity; 3. Licenses surrendered and customer relationships are allocated based on revenue and cost projections aggregated across lines of business, which are allocated by region based on the 2009 carve-out financial statements, and then discounted to a present value of profits by region as of 2009; 4. Business sales proceeds in excess of all the above goes 100% to Canada. | Allocated 100% to Canada | Uses a discount rate of 12% for existing technology and 30% for future technology.  No taxes or terminal values are incorporated in the model. Uses 2009 carve-out statements by estate and entity.  Includes NPV-negative business lines (Enterprise and CVAS) to allocate business sales proceeds to EMEA and the U.S. |
| Britven (CCC) | Considers the FMV of the assets  for the three largest sales. Non-tangible assets include IP, Goodwill and Customer Relations.  Uses the Purchase Price Allocation ("PPAs") to value assets. The IP portion of the business sales comprises Surrendered Licenses (based on the IP portion of the "Business Value" projected by Nortel as of 2008) and residual IP, that is attributed based on ownership. | Allocated Based on Ownership (almost 100% to Canada) | Includes NPV-negative business line (MEN) from Nortel's 2008 projection to allocate the Business Sales proceeds to EMEA and the U.S. Nortel's 2008 projections use a discount rates for post-tax operating cash flows ranging from 19% to 22% across four key business lines.  The NPVs incorporate terminal values. |
| Kinrich (US Debtor) | Considers the FMV of the assets. Non-tangible assets include IP, Goodwill, workforce and Customer Relations.  To determine the value relinquished by each Debtor Group from each sale, uses the carve-out income statement for business lines. In a second approach uses a market-based multiple to value the non integrated entities ("IEs") first, and then uses the carve-out statements. Pools the value relinquished by non-IEs into Debtor Groups based on location of non-IEs. | Considers the FMV of the assets.  Uses the projected cash flows from Nortel's IPCo Model to perform a DCF analysis of the Patent Portfolio assets relinquished by business line and Exclusive and non-Exclusive Territories. Determines the share of revenues to attribute to the U.S. and Canada using relative telecom infrastructure expenditures.  Attributes one-fifth of the revenue in Germany and China, when it is included, equally to the IEs. | Revenues from the rest of the world are allocated equally among the 5 RPEs for the Residual IP, and based on location proximity for the Lines of Business.  Discount Rate for the Residual IP are retrieved through all of the envelope calculation based on IPCo cash flows. Found 12.2% (15.7% when China is included).  Uses a tax rate of 30% to earnings before tax to yield cash flow. |
| Huffard / Malackowski / Cooper (EMEA Debtor) | Business Sales assets include 1) Net Tangible Assets, 2) IP, and 3) Customer-Related Assets and Goodwill. 1) Tangible Assets are allocated based on the net book value as of 4Q 2009. 2) IP Valuation:  Allocated based on either A) a historical R&D contribution approach or B) a license approach. (Malackowski). A) Under the contribution approach: Select appropriate look-back period for each line of business and use the overall R&D contribution. B) Under the license approach: NPV calculated from future royalty payments/income (relief from royalty approach) to generate business sales value by line of business and region. 3) Customer-Related Assets and Goodwill constitute the residual value and are allocated using the relative revenue generated by each entity in 2008. | Rockstar Portfolio consisted of IP, which is allocated across entities based on either a contribution or a license approach, analogously to the IP portion of business sales (Malackowski). Under the license approach, apportion Residual Patents into franchises and calculate NPV for each franchise using a relief from royalty methodology. Residual IP value is based on franchise revenue growth forecasts. Forecasted revenues include industry revenues from countries with at least one high interest patent in a given franchise, and exclude revenues of business sale purchasers from the royalty base calculations.  Licensing expenses are also incorporated (20% of royalty revenues). | Valuation of contribution to IP done on a transaction by transaction (for line of business), and portfolio by portfolio basis (for residual IP).  Future revenue for IP (by line of business or Rockstar franchise)  is forecast through to the end of the last year of the average patent life in the portfolio. |

## Appendix R4: Rebuttal of Mr. Green's IP License Valuation

## Rebuttal Summary

During my review of Mr. Green's analysis I uncovered several errors in the implementation of his approach. In particular, I have found three major flaws in Mr. Green's valuation of the surrendered IP license rights associated with Nortel's business sales, all leading to biased and erroneous results:

1) Under Mr. Green's own analysis of the business sales, Nortel is assumed to continue operating two negative-NPV businesses (Enterprise Solutions and CVAS) instead of shutting them down immediately;
2) Mr. Green's valuation results are distorted because he uses the year of Nortel's bankruptcy, 2009, as the starting point for his projections;
3) Mr. Green does not follow standard valuation practice, as he double counts the value of tangible assets and workforce, does not include a terminal value, uses inappropriate discount rates, and does not incorporate a tax effect in his forecasted cash flows.

In this Appendix I provide a brief overview of Mr. Green's methodology and then correct and adjust his calculations by (i) eliminating from the valuation the negative-NPV lines of business, and (ii) using a more reasonable average of historical financial statements as a starting point for the projections. After making such adjustments, the Canadian Debtors would receive about $240 million less from the business sale proceeds as compared to Mr. Green's original allocation. Further, the U.S. Debtors are allocated approximately $125 million more in IP value from the major business sales—equivalent to a 28% increase—and the EMEA Debtors are allocated $115 million more—equivalent to a 118% increase.

I have also addressed Mr. Green's double counting of tangible assets and workforce, and conducted analyses varying assumptions on taxes, discount rates, and terminal value. These alternative specifications do not impact the resulting allocations significantly, and, therefore, I do not display these results here. However, although I have not sought to correct Mr. Green's allocation for this methodology flaw on materiality grounds, it does cause me to question his understanding of basic valuation concepts.

## I.    Overview of Green's IP Valuation Methodology

In valuing the IP portion of Nortel's assets sold, Mr. Green allocates 100% of the Rockstar portfolio proceeds to the Canadian Debtors. Therefore, the only IP value he allocates across regions is the value of the business sales. Mr. Green allocates the business sales proceeds based on the four asset classes he identifies as follows:

1. Tangible assets are allocated across entities based on book value;
2. Workforce transferred is allocated based on replacement costs incurred by each entity;

3. License rights surrendered and customer relationships transferred by the U.S. and EMEA Estates are allocated based on projections of future operations of businesses sold;

4. Any business sales proceeds in excess of the above are attributed 100% to the Canadian Debtors.

In order to allocate the value of the surrendered licenses and customer relationships transferred (point 3 above) Mr. Green takes the following steps:

1. Revenue and cost projections are made for *each* line of business, assuming Nortel operations would be ongoing;

2. Projections are aggregated across lines of business to generate a "Combined" forecast (2010-2018);

3. Growth rates from the Combined forecast are then applied to the 2009 Nortel 'carve-out' financial statements *by region* (aggregated across lines of business) to generate a projection of operating profit by region (2010-2018);

4. Transfer pricing adjustments are made via the RPS model to generate operating profits post-transfers for each region;[1]

5. Operating profits for each region are finally discounted to generate present values as of 2009.

Mr. Green applies the methodology above to retrieve the value of the license rights surrendered and customer relationships transferred by the U.S. and EMEA Estates. He then allocates all the residual IP value—including that realized by the rest of the world—to the Canadian Debtors.

## II.    Rebuttal of Green's IP Valuation Methodology

### A.    MR. GREEN UNDERSTATES THE VALUE OF THE BUSINESS LINES BY ASSUMING THAT NORTEL WOULD CONTINUE OPERATING TWO NEGATIVE-NPV BUSINESSES

Mr. Green aggregates revenue and cost projections across the lines of business. However, if one considers the NPV of these projections separately, the net present value is negative for two of the lines of business. I plot the underlying projected operating earnings by business line in Figure R4-1 below (reproduced from my rebuttal report).

---

[1]    The RPS model percentages used are as of Q1 2010 and are kept fixed throughout the projection period, despite the fact that R&D expenses are forecasted to change over time by region. See 'RPSM Support (NOT PRINTED)' tab in Appendix J of Mr. Green's native files.



**Figure R4-1. Projected Operating Earnings from Green Model (US$, mil)**

As is shown in the figure, it is clear that the projected operating earnings for the CVAS business line are consistently negative throughout the projection period, resulting in a significantly negative NPV. Similarly, the projected operating earnings for the Enterprise business line are significantly negative during the first year (2010), and barely positive throughout 2018, resulting in a negative NPV. Absent some special circumstance, continuing operation of a negative-NPV business makes no economic sense.

The first adjustment I make to Mr. Green's calculations is to remove the negative-NPV business lines. I adopt this simple rule just to illustrate the impact of his mistake. While in real business situations a negative NPV business may not be shut down in real time, it is reasonable to imagine that a money-losing division will not invest heavily in R&D (and Mr. Green assumes that Enterprise and CVAS will invest about 15% and 23% of their sales in R&D respectively on average).[2]  I illustrate the results of this adjustment in Table R4-1 below. The total NPV across

---

[2]     See Appendices B and D, Exhibit 1, of Green Report.

the lines of business and regions (including Canada[3]) increases from approximately $760 million to over $1 billion when the negative-NPV businesses are eliminated.[4]

**Table R4-1: License NPV by LOB and Region Removing the Negative-NPV Lines of Business (US$, mil)**

|  | NPV using Green Approach (2009 Start Year) | |
| --- | --- | --- |
|  | NPV < 0 Allowed | NPV $\geq$ 0 |
| **By Line of Business** | | |
| CDMA | 737 | 737 |
| *Enterprise Solutions* | *(60)* | - |
| MEN | 167 | 167 |
| *CVAS* | *(201)* | - |
| GSM | 117 | 117 |
| Total | 760 | 1,021 |
| **By Region** | | |
| U.S. | 456 | 395 |
| EMEA | 97 | 156 |
| Canada | 201 | 471 |
| Total | 754 | 1,022 |

Note: Adapted from Mr. Green's Analysis.  Only the major business sales classified by Mr. Green are included above.

---

[3]   I calculate an NPV of licenses for Canada (aggregated across all lines of business) analogous to that calculated for the U.S. and EMEA under Mr. Green's methodology. Mr. Green does not present an NPV for Canada separately in his analysis, showing instead the total residual IP (including license value) that is assigned to Canada.

[4]   Under Mr. Green's approach, the total IP license NPVs by line of business and region should match. The line of business and region totals in Table R4-1 above match approximately; the minor discrepancies observed are due to rounding errors in Mr. Green's analysis.

### B.  MR. GREEN DISTORTS THE VALUE OF THE BUSINESS LINES BY USING THE YEAR OF NORTEL'S BANKRUPTCY AS THE STARTING POINT FOR HIS PROJECTIONS

Mr. Green applies the combined business projections to the 2009 aggregate financial statements by region.  However, Nortel's bankruptcy affected its financials significantly in 2009, which in turn negatively impacted the projections of regional operating profits under Mr. Green's analysis. Therefore, a more reasonable and less biased approach would be to take an average of historical financial statements by region, to construct a more 'smoothed' starting point for the valuation analysis.  I illustrate the effect of using the 2007-2009 average of historical financial statements and eliminating from the valuation the negative-NPV lines of business in Table R4-2 below.[5]

**Table R4-2**: License NPV by LOB and Region Using the 2007-2009 Average of Historical Financial Statements (US\$, mil)

|  | NPV using Green Approach (NPV $\geq$ 0) | |
|---|---|---|
|  | 2009 Start Year | 2007-2009 Average Start Year |
| **By Line of Business** | | |
| CDMA | 737 | 744 |
| Enterprise Solutions | - | 29 |
| MEN | 167 | 162 |
| CVAS | - | - |
| GSM | 117 | 361 |
| Total | 1,021 | 1,296 |
| **By Region** | | |
| U.S. | 395 | 584 |
| EMEA | 156 | 212 |
| Canada | 471 | 511 |
| Total | 1,022 | 1,307 |

Note: Adapted from Mr. Green's Analysis

---

[5]   The consolidated CDMA carve-out financial statements include the operations of LTE from 2007 to 2009. Since LTE was a new product line and generated no revenues during this time period, Mr. Green adjusts the 2009 consolidated financial statements to remove LTE's portion of total SG&A and R&D costs. Since LTE's proportion of total operating costs is unknown for 2007 and 2008, I do not eliminate any LTE costs from the consolidated CDMA statements in these two years, even though LTE generated no revenues. This is the most conservative assumption to make.

The first column of Table R4-2 reproduces column 2 of Table R4-1 above, and displays the NPV across the lines of business and regions using 2009 as the start year for the valuation analysis. The second column displays the corresponding results using the average 2007-2009 financial statement.  As Table R4-2 shows, the results from Mr. Green's valuation analysis vary substantially when I apply a more reasonable approach.  Switching from a 2009 to an average 2007-2009 start year for the valuation analysis has a sizeable positive impact on the NPV of the surrendered IP, increasing from approximately $1.0 billion to $1.3 billion.[6]  This result is to be expected, given that Nortel's 2009 financials were negatively affected by the bankruptcy, especially in the U.S. and EMEA.  As a result of the adjustments, the U.S. and EMEA are both better off using the average 'smoothed' starting point, as can be seen by comparing the NPVs by region between column 1 and column 2 above.

### C.  MR. GREEN DOES NOT FOLLOW STANDARD VALUATION PRACTICE

Mr. Green does not follow standard valuation practice.  I identify the following additional problems with his implementation.

1. **Double counting of asset value in the business sales allocation:** Mr. Green uses business operating cash flows—which valuation theory says should capture the value of all the operating assets used to create those cash flows—to value IP and customer relationships. This approach, however, also implicitly captures the value associated with operating tangible assets and in-place workforce.  By separately evaluating tangible assets and workforce, and then adding them to the results from the DCF analysis, Mr. Green is therefore double counting these assets' value;

2. **Tax rates:**  Mr. Green does not incorporate any tax effects in his analysis (i.e. he only discounts pre-tax operating earnings by region);

3. **Terminal value**:  Mr. Green does not incorporate terminal value in any of his valuations by region;

4. **Discount rates**:  Mr. Green uses a uniform 12% discount rate for profits derived from 'current' technology and 30% for those derived from future technology. These assumptions do not conform with those of Mr. Malackowski for the EMEA Debtors, whose selected discount rates vary across the lines of business from 9.5% to 12%.

---

[6]   The increase in NPVs by line of business under the assumption of an average 2007-2009 start point explains why only CVAS is eliminated as a negative-NPV business under this scenario, (second column of Table R4-2), whereas both Enterprise and CVAS are eliminated when using 2009 as the start year (first column of Table R4-2).

Furthermore, the purchase price of $900 million for the Enterprise Solutions business line implies an internal rate of return of approximately 16% for this business, assuming "safe hands" projections for Enterprise's growth (but keeping all other original assumptions as in Mr. Green's analysis).[7]  This evidence does not support Mr. Green's chosen discount rates.

### D.   CONCLUSION

In conclusion, removing the negative-NPV lines of business and adjusting the start year for the analysis from 2009 to an average of 2007-2009 results in the U.S. Debtors being allocated $584 million (as opposed to $456 million under Mr. Green's original method; see first column of Table R4-1 above), and the EMEA Debtors being allocated $212 million (versus $97 million) for the value of surrendered IP licenses associated with the major business sales.

Assuming Mr. Green's values for the minor business sales are unchanged from those in his report, (he states that these sales account for only 2.5% of the net proceeds to be allocated in the business sales and only 1% of the net proceeds to be allocated overall),[8] my adjustments result in the revised allocation of business sale proceeds illustrated in Table R4-3 below (reproduced from my rebuttal report).  As can be seen by comparing Panels A and B, after revising Mr. Green's approach, the Canadian Debtors are allocated only $1.14 billion of the major business sales IP rights and customer relationships (Panel B), versus $1.38 billion under Mr. Green's original methodology (Panel A).  As a result of my adjustments the Canadian Debtors would be allocated a total of only $1.37 billion from the business sales proceeds, $242 million less than under Mr. Green's proposed allocation. Similarly, the U.S. and EMEA Debtors' position would improve respectively by approximately $127 and $115 million.

---

[7]   Safe hands projections assume that the Enterprise business is sold to an external acquirer who would improve the business's performance beyond Nortel's own management forecasts.

[8]   Green Report, p. 60 (footnote 210).

**Table R4-3.  Allocation of Business Sales Proceeds as per Mr. Green's Report (US$, mil)**
**Panel A: Green Original**

|  | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 122 | 318 | 95 | 534 |
| IP Rights and Customer Relationships |  |  |  |  |
| Major Business Sales | 1,380 | 456 | 97 | 1,933 |
| Minor Business Sales | 35 | 12 | 2 | 49 |
| Total | 1,415 | 468 | 100 | 1,982 |
| In-Place Workforce | 79 | 135 | 42 | 255 |
| Wholly-Owned Businesses | 0 | 111 | 0 | 111 |
| Total Allocation | 1,615 | 1,031 | 236 | 2,883 |
| % of Total | 56% | 36% | 8% | 100% |

Source: Reproduced from Green Report, pp. 60-61.

**Panel B: Modified Green**

|  | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 122 | 318 | 95 | 534 |
| IP Rights and Customer Relationships |  |  |  |  |
| Major Business Sales | 1,138 | 584 | 212 | 1,933 |
| Minor Business Sales | 35 | 12 | 2 | 49 |
| Total | 1,173 | 595 | 214 | 1,982 |
| In-Place Workforce | 79 | 135 | 42 | 255 |
| Wholly-Owned Businesses | 0 | 111 | 0 | 111 |
| Total Allocation | 1,373 | 1,158 | 351 | 2,883 |
| % of Total | 48% | 40% | 12% | 100% |

## Appendix R5: Rebuttal of Mr. Britven's Business Sales Valuation

## Rebuttal Summary

During my review of Mr. Britven's analysis I uncovered several errors in the implementation of his approach. In particular, I have found three major flaws in Mr. Britven's valuation of Nortel's business sales, and specifically in his valuation of the license rights surrendered by the U.S. and EMEA Estates and the residual IP which he allocates mostly to the Canadian Debtors.[1]  These flaws all lead to biased and erroneous results:

1) Under Mr. Britven's own analysis of the business sales, Nortel would continue operating a negative-NPV business (Metro Ethernet Networks, or "MEN") instead of shutting it down immediately;

2) Mr. Britven's analysis uses an arbitrary terminal value ("TV"), outside the range identified in the source workpapers from Nortel,[2] in his valuation of two of the other lines of business (Global Services, or "GS", and Carrier Networks, or "CN");

3) Mr. Britven's discounted cash flow analysis for the lines of business uses unreasonably high discount rates which leads to an understatement of total business value.

In this Appendix, I correct and adjust Mr. Britven's analysis for the flaws I identified in his implementation.  After making these adjustments, Mr. Britven's total "Business Value" increases from $988 million to $1,963 million—equivalent to a 99% increase—leading to an increase in the value of surrendered licenses allocated to the U.S. and EMEA Debtors from $285 million to $565 million, and a decrease in the residual IP value allocated to the Canadian Debtors from $858 million to $576 million.

## I.    Rebuttal of Mr. Britven's Business Sales Valuation Methodology

### A.    Mr. Britven Understates the Total Business Value by assuming that Nortel would continue operating a negative-NPV business

Mr. Britven generates a total Business Value of $988 million obtained by summing the net present value of the four major lines of business sold by Nortel which he derives through a discounted cash flow ("DCF") analysis.[3]  These net present values from the DCF analysis are displayed in the first column of Table R5-1 below.  The table indicates that MEN has a negative NPV value of $184 million.  Continuing operation of a negative-NPV business makes no

---

[1]    See Table 6 and Table 7 of Britven Report.

[2]    NNC-NNL11665042.

[3]    Mr. Britven does not value the NGS business.

economic sense.  As the second column of Table R5-1 shows, the total Business Value increases from $988 million to $1,172 million when the negative-NPV business is removed.

**Table R5-1: NPV by LOB Removing the Negative-NPV Line of Business (US$, mil)**

|  | Britven DCF Value Summary (MID) Britven's Original TVs and Discount Rates | |
| --- | --- | --- |
| Lines of Business | NPV < 0 Allowed | NPV $\geq$ 0 |
| Enterprise Solutions | 45 | 45 |
| Carrier Networks | 502 | 502 |
| *Metro Ethernet Networks* | *(184)* | - |
| Global Services | 625 | 625 |
| NGS | - | - |
| Total Business Value | 988 | 1,172 |

Note: Adapted from Mr. Britven's Analysis. See Mr. Britven's original numbers from NNC-NNL11665042.

## B.    MR. BRITVEN UNDERSTATES THE TOTAL BUSINESS VALUE BY USING ARBITRARY TERMINAL VALUES FOR TWO BUSINESS LINES

In performing his valuation of the Global Services ("GS") business line, Mr. Britven generates a range of TVs based on a range of perpetual cash flow growth rate assumptions: from a "Low" TV of $404 million based on a 1% perpetual growth rate, to a "High" TV of $455 million based on a 3% perpetual growth rate (not in present value terms).  The "Mid" perpetuity growth rate assumption would in this case be 2%, resulting in a "Mid" TV of $428 million.[4]  However, in his DCF valuation for GS, Mr. Britven selects a much lower and seemingly arbitrary TV of $100 million.  Using this arbitrary TV, Mr. Britven calculates the DCF value for the GS business line of $625 million which he incorporates to calculate the total business value of $988 million above.  Similarly, performing his valuation of the Carrier Networks ("CN") business line, Mr. Britven assumes a "Mid" TV of 0, resulting in a final DCF value of $502 million, although he assumes a range of perpetual growth rates ranging from 1% to 3% and the cash flow for CN in the final forecast year of 2015 is positive.  Calculating the TV for CN under the "Mid" perpetuity growth

---

[4]    $428 million = 83.9 * (1 + 2%) / (22% - 2%), where $83.9 million is the final-year projected cash flow for GS and 22% is Mr. Britven's discount rate for this business line.

rate assumption would instead result in a "Mid" TV of $539 million.[5]  I show these discrepancies in Figure R5-1 below (reproduced from my rebuttal report).

**Figure R5-1.  Mr. Britven's Valuation of Global Services and Carrier Networks (US$, mil)**

| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Total PV of Cash Flows |
|---|---|---|---|---|---|---|---|---|---|---|
| **GLOBAL SERVICES - Not Required** | | | | | | | | | | |
| Cash Flow | $ | 149.2 | $ 89.5 | $ 301.9 | $ 173.9 | $ 162.9 | | | | |
| Year | | - | 0.50 | 1.50 | 2.50 | 3.50 | | | | |
| Discount Factor | | 1.00 | 0.91 | 0.74 | 0.61 | 0.50 | | | | |
| Present Value of Cash Flow | $ | 149.2 | $ 81.1 | $ 224.1 | $ 105.8 | $ 81.2 | | | | |
| | | | LOW | MID | HIGH | | | | | |
| Terminal Value | | | $ 404 | $ 100 | $ 455 | | | | | |
| Present valueof Termianal value | | | $ 165 | $ 27 | $ 186 | | | | | |
| Implied value | | | $ 763 | $ 625 | $ 784 | | | | | |

| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Total PV of Cash Flows |
|---|---|---|---|---|---|---|---|---|---|---|
| **CARRIER NETWORKS** | | | | | | | | | | |
| Cash Flow | | | | | | $ 315.0 | | | | |
| Year | | - | | | | 0.50 | | | | |
| Discount Factor | | 1.00 | 1.00 | 1.00 | 1.00 | 0.92 | | | | |
| Present Value of Cash Flow | $ | - | $ - | $ - | $ - | $ 288.8 | | | | |
| | | | LOW | MID | HIGH | | | | | |
| Terminal Value | | | $ - | $ - | $ - | | | | | |
| Present valueof Termianal value | | | $ - | $ - | $ - | | | | | |
| Implied value | | | $ 502 | $ 502 | $ 502 | | | | | |

Source: NNC-NNL11665042.

## C.   Mr. Britven Understates the Total Business Value by Using Unreasonably High Discount Rates For All Business Lines

In performing his DCF valuation of all business lines, Mr. Britven applies a discount rate to post-tax operating cash flows ranging from 19% to 22%, (as reflected in the source Nortel workpapers). For the CN and GS lines of business, Nortel provides a Weighted Average Cost of Capital ("WACC") analysis to support these discount rates. The final WACCs of 19% to 22% across the lines of business are, however, high compared to WACC estimates for comparable businesses of around 15%.[6]  As a result, I re-calculate Mr. Britven's Business Value using a more reasonable discount rate assumption of 15% across all lines of business, (except for MEN, given that it has a negative NPV as discussed above).

---

[5]   The "Mid" perpetuity growth rate of 2% generates a terminal value of 89.8 * (1 + 2%) / (19% - 2%) = $539 million (where $89.8 million is the final-year projected cash flow for CN, and 19% is Mr. Britven's discount rate for this business line).

[6]   See Ibbotson cost of capital estimates for SIC code 36 (Electronic and Electrical Equipment and Components).

### D.    RESULTS OF ADJUSTMENTS

Table R5-2 below illustrates the effects of making the terminal value and discount rate adjustments described above.   In both columns below, the negative-NPV MEN business is eliminated from the valuation. The first column displays the results of the discounted valuation using Mr. Britven's original discount rates and terminal values, matching column 2 of Table R5-1 above.  The second column displays the corresponding results using a 15% discount rate and the mid terminal values for the CN and GS businesses instead that would be consistent with Mr. Britven's own assumptions.   Adjusting the discount rates and the two terminal values has a sizeable positive impact on the total Business Value, increasing it from $1,172 million in the first column to $1,963 million in the second column.

**Table R5-2: NPV by LOB Adjusting Terminal Values and Discount Rates (US$, mil)**

|  | Britven DCF Value Summary (MID) NPV $\geq$ 0 | |
| --- | --- | --- |
| Lines of Business | Original TVs and Discount Rates | CN and GS TVs Adjusted and 15% Discount Rates |
| Enterprise Solutions | 45 | 46 |
| Carrier Networks | 502 | 958 |
| Metro Ethernet Networks | - | - |
| Global Services | 625 | 960 |
| NGS | - | - |
| Total Business Value | 1,172 | 1,963 |

Note: Adapted from Mr. Britven's Analysis.

## E.  CONCLUSION

Removing the negative-NPV line of business and adjusting discount rates and terminal values results in an increase in Business Value of almost $1 billion, equal to a 99% increase, from $988 million (first column of Table R5-1), to $1,963 million (second column of Table R5-2).  This in turn results in a different allocation of the value of the IP licenses surrendered by the U.S. and EMEA Estates.  I illustrate the revised allocation in Table R5-3 below.  As can be seen by comparing Panels A and B of the table, after revising Mr. Britven calculations the total value of surrendered IP licenses attributable to the U.S. and EMEA Debtors is $565 million (Panel B), an increase of $280 million over Mr. Britven's corresponding value (Panel A).

**Table R5-3**: **Value of the Surrendered Licenses Conveyed in the Business Sales (US$, mil)**

**Panel A: Britven Allocation**

| | |
|---|---|
| Business Value | 988 |
| RPSM share of the combined U.S. and EMEA Debtor Groups | 50% |
| Business Value of U.S. and EMEA Debtor Groups | 496 |
| Percentage of Business Value represented by IP | 57% |
| Value of Surrendered Licenses to U.S. and EMEA Debtor Groups | 285 |

**Panel B: Revised Britven Allocation**

| | |
|---|---|
| Business Value | 1,963 |
| RPSM share of the combined U.S. and EMEA Debtor Groups | 50% |
| Business Value of U.S. and EMEA Debtor Groups | 986 |
| Percentage of Business Value represented by IP | 57% |
| Value of Surrendered Licenses to U.S. and EMEA Debtor Groups | 565 |

Source: Table 6 of Britven Report.

Finally, incorporating this revised value of surrendered licenses into the overall allocation of business sale proceeds results in the revised allocation displayed in Table R5-4 (reproduced from my rebuttal report).  As indicated in the table, the revised allocation for the Canadian Estate's residual IP falls by $280 million ($858 million in Panel A less $576 million in Panel B), while the allocations for the U.S. and EMEA Estates increase by $220 million and $60 million respectively.

**Table R5-4.  Business Sales Allocation under Mr. Britven's Legal Ownership Approach (US$, mil)**

**Panel A.  Britven Allocation**

| Operating Assets | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 59 | 42 | 68 | 169 |
| Intangible Assets | | | | |
|   Customer Relationships | 93 | 393 | 197 | 683 |
|   IP (including Residual IP) | 858 | 228 | 57 | 1,143 |
|   Purchaser Goodwill | 427 | 316 | 110 | 853 |
| Total | 1,437 | 979 | 432 | 2,848 |
|   % of Total | 50% | 34% | 15% | 100% |

Source: Reproduced from Britven Report, Table 7.

**Panel B.  Revised Britven Allocation**

| Operating Assets | Canadian Debtors | U.S. Debtors | EMEA Debtors | Total |
|---|---|---|---|---|
| Tangible Assets | 59 | 42 | 68 | 169 |
| Intangible Assets | | | | |
|   Customer Relationships | 93 | 393 | 197 | 683 |
|   IP (including Residual IP) | 576 | 454 | 114 | 1,143 |
|   Purchaser Goodwill | 427 | 316 | 110 | 853 |
| Total | 1,155 | 1,205 | 489 | 2,848 |
|   % of Total | 41% | 42% | 17% | 100% |