**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

**REPORT OF MARK L. BERENBLUT AND ALAN J. COX,
NERA Economic Consulting**

**JANUARY 24, 2014**

# PUBLICALLY FILED VERSION

---

[1]      The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

# REPORT OF MARK L. BERENBLUT AND ALAN J. COX,
## NERA Economic Consulting

**January 24, 2014**

**Contains Highly Confidential Information. Subject to Protective Order.**

NERA Economic Consulting

# Contents

1.      Mandate and Qualifications                                                    1
        1.1.      Mandate                                                             1
        1.2.      Qualifications                                                      2

2.      Scope of Review                                                              4

3.      Summary of Opinions                                                          4

4.      The Nortel Group                                                             8
        4.1.      Nortel's Business                                                  8
        4.2.      Nortel Technology and R&D Expenditures                            10
        4.3.      Bankruptcy of Nortel                                             13

5.      The Transactions                                                           16
        5.1.      The Business Sales                                                16
        5.2.      Rockstar Transaction                                              18

6.      The Property Interests                                                      19
        6.1.      Property Interests in the Assets Sold in the Business Sales       20
        6.2.      Property Interests in the Residual IP                             24

7.      Proceeds Due to the Transfer of the Canadian Property Interests            25
        7.1.      The Proportion of the Proceeds in the Business Sales that is due to
                  the Transfer of the Canadian Property Interests is Determined as the
                  Total Proceeds Less the Total Value of the U.S. Property Interests
                  and the EMEA Property Interests                                   25
        7.2.      Purchasers in the Business Sales Likely Paid More than the Value
                  the Nortel Group Could Have Realized from its Own Operations      27
        7.3.      Proceeds from the Rockstar Transaction are Attributable to the
                  Canadian Debtors                                                  30

8.      Proceeds Due to the Surrender of the U.S. Property Interests and the EMEA
        Property Interests                                                          31
        8.1.      The Lower Bound                                                    31
        8.2.      The Upper Bound                                                    31

9.      Restrictions                                                                32

Appendix A. C.V.s                                                                   35

Appendix B. Materials Reviewed and/or Relied Upon                                   51

Appendix C. NNC Financial Statements                                                58

Appendix D. Rationale of Purchasers of Nortel Assets in the Business Sales          64

Contains Highly Confidential Information. Subject to Protective Order.

NERA Economic Consulting

# 1.    Mandate and Qualifications

## 1.1.    Mandate

1.      Counsel for Ernst & Young, Inc., in its capacity as the Monitor for Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation ("NNGC"), Nortel Networks International Corporation ("NNIC"), and Nortel Networks Technology Corporation ("NNTC") (collectively, the "Canadian Debtors" or "Nortel Canada"), requested that we prepare this report setting out our opinions and analysis in relation to the question set out below regarding the allocation of the proceeds of certain transactions (described below) among the Canadian Debtors and the estates of certain former direct and indirect subsidiaries of NNC and NNL in the U.S. (the "U.S. Debtors") and Europe, Middle East, and Africa (the "EMEA Debtors"). For the purposes of this report, we refer to (i) NNC, NNL and their various subsidiaries collectively as "Nortel" or the "Nortel Group"; (ii) the Canadian Debtors, the U.S. Debtors and the EMEA Debtors as the "Debtor Groups"; and (iii) the Monitor for the Canadian Debtors as the "Monitor".

2.      The proceeds in question are those received in respect of sales of certain of Nortel's business segments (the "Business Sales", as described further below) and the sale of Nortel's residual patent portfolio to (what is now) Rockstar Consortium Inc. (the "Rockstar Transaction"). (We refer to the Business Sales and the Rockstar Transaction collectively as the "Transactions", and the net proceeds from these transactions as the "Proceeds").

3.      Counsel for the Monitor has requested that we provide our opinions and analysis from a valuation and economic perspective with respect to (i) what approach and methodology should be followed; and (ii) what factors would be relevant in the application of that approach and methodology, in order to answer the following question:

> *What portion of the proceeds realized in the transactions was due to the transfer or surrender by the Canadian Debtors, EMEA Debtors or U.S. Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?*

4.      This report is prepared in anticipation of a trial to be held simultaneously before the Ontario Superior Court and the United States Bankruptcy Court (the "Courts") currently scheduled for May, 2014.

Contains Highly Confidential Information. Subject to Protective Order.

## 1.2.    Qualifications

### 1.2.1.    *Mark Berenblut*

5.      Mark Berenblut is a Senior Vice President of NERA Economic Consulting ("NERA") and is a member of NERA's Securities and Intellectual Property practices. NERA provides expert economic and financial analysis to firms and government bodies on a variety of issues.

6.      Mr. Berenblut is a graduate of The London School of Economics and holds professional designations as a CPA - CA, Fellow Chartered Business Valuator, Investigative Forensic Accountant, Certified Fraud Examiner, Accredited Senior Appraiser (Business Valuation) and a Fellow Chartered Accountant in the U.K. Mr. Berenblut provides expertise in valuation, and financial investigation, intellectual property valuation and commercial IP disputes. This includes the valuation of brands, establishing royalty rates, patent portfolio valuation, valuation of intangibles and other IP valuation in industries including the media, manufacturing, technology and resources. Mr. Berenblut has spoken on "Patent Remedy Quantification" at the annual conference of the Intellectual Property Institute of Canada.

7.      He has 30 years of experience in securities and business valuation for complex claims and tax purposes including economic damage quantification, intellectual property, and major securities and antitrust class actions.

8.      Mr. Berenblut provides expertise in insolvency and restructuring matters, especially at their intersection with forensic investigation, business valuation and the quantification of economic damages. He has been retained for leading insolvency cases including matters related to the bankruptcy of Enron, the Stanford Investment Bank (including testimony) Olympia and York, and *KDS vs. Chiang* (including testimony).

9.      Mr. Berenblut is recognized by the Academy of Experts. He is a member of the Editorial Board of *The Journal of Business Valuation* and is the co-author/author of two books: *The Litigator's Guide to Expert Witnesses* and *Proving Economic Loss*. He has been qualified as an expert witness by courts and other tribunals in Canada, the U.S., and the U.K.

Contains Highly Confidential Information. Subject to Protective Order.

### 1.2.2.  Dr. Alan Cox

10.      Alan J. Cox is a Senior Vice President of NERA, where he participates in the Intellectual Property, Antitrust and Securities Practices.  He is the Chair of NERA's Global Intellectual Property Practice.

11.      Dr. Cox received a B.Sc. degree in Environmental Science from York University in Toronto in 1976 and an M.A. in Economics from the University of British Columbia in 1978. From 1978 to 1981, he served as a Visiting Economist at the Energy Laboratory at the Massachusetts Institute of Technology in Cambridge, MA. In 1989, he received a Ph.D. in Economic Analysis and Policy from the Haas School of Business Administration at the University of California at Berkeley where he concentrated on competition issues and where he also worked as a researcher in the Department of Economics and at various University of California research institutes. His thesis analyzed the residential demand for telephone services. From 1988-1994, he was a Senior Economist, Vice President, and Senior Vice President at Law and Economics Consulting Group. Since 1994, he has been a Senior Consultant, and then a Vice President and Senior Vice President at NERA.

12.      Intellectual property matters in which Dr. Cox has calculated damages include cases involving alleged infringement of semiconductor process and design patents, intellectual property related to smart phones, contract disputes over technology sharing agreements in microprocessors, and infringement of software and patent fraud in both telecommunications and biotechnology. He has also testified on antitrust allegations arising out of licensing practices. He provides patent valuation services in connection with NERA's management advisory services. He has also testified and consulted on antitrust allegations in a variety of industries. He has appeared in US Federal Court in California, New Jersey and Delaware and in California State Court, before the California Public Utilities Commission and the Federal Energy Regulatory Commission. He was part of a group brought together by then Federal Circuit Chief Judge Michel that prepared *Compensatory Damages Issues in Patent Infringement Cases: A Handbook for Federal District Court Judges*.

13.      Dr. Cox also lectures frequently on damages calculations in breach of contract, antitrust, and intellectual property matters and on the application of rigorous economic techniques for intellectual property valuation. He has published several papers on a range of damages, competition, and intellectual property issues.

Contains Highly Confidential Information. Subject to Protective Order.

14.     NERA is being compensated for our services in this matter at our hourly rates of $750, and for the services of consultants and researchers at their customary rates. The opinions expressed in this report are the opinions of both Mark Berenblut and Alan Cox.

15.     C.V.s for Mark Berenblut and Alan Cox are provided in **Appendix A**.

## 2.     Scope of Review

16.     In preparing this report, we have reviewed and/or relied upon information, including the following:

   a.   Allocation positions of the Monitor and other parties to the present matter;

   b.   Reports of the Monitor;

   c.   Transcripts from the depositions of fact witnesses;

   d.   The Master R&D Agreement, as amended (the "MRDA");[1]

   e.   NNC financial statements and other public filings; and

   f.   Other publicly available information and publications, including analyst reports, press releases, and industry reports as cited in this report.

17.     A list of the specific documents and information which we have reviewed is provided in **Appendix B**.

## 3.     Summary of Opinions

18.     Based on our analysis of the available information in this case, we outline here an economically appropriate basis and method for allocating the Proceeds among the Canadian Debtors, U.S. Debtors, and EMEA Debtors that would compensate each of those groups for the property interests each surrendered or transferred. In particular, for the reasons explained further in this report, from an economic perspective, the portion of the Proceeds that is due to the transfer or surrender of the U.S. Property Interests and EMEA Property Interests is the present value of the expected

---

[1] Master R&D Agreement, as amended to January 9, 2009 ("MRDA") [NNC-NNL06001514_0001 to NNC-NNL06001514_0066].

Contains Highly Confidential Information. Subject to Protective Order.

economic benefits forgone by the U.S. Debtors and EMEA Debtors, respectively, as a result of the decision to sell the assets of Nortel rather than continue in operation. The remaining portion of the Proceeds in excess of the present value of the forgone economic benefits of the U.S. Debtors and EMEA Debtors is attributable to the transfer of the Canadian Property Interests.

19.     Put another way, the proportion of the Proceeds that is due to the transfer or surrender of the property interests by each of the three debtor groups is determined by the Fair Market Value of those property interests. Fair Market Value ("FMV"), is defined as:

> "*The highest price available in an open and unrestricted market between informed and prudent parties, acting at arm's length and under no compulsion to act, expressed in terms of cash.*"[2]

20.     For the purposes of this report, we use the term FMV with respect to the property interests synonymously with the present value of expected future economic benefits to the holder of those property interests. This FMV definition of value applies notwithstanding the fact that some of those property interests were non-transferable. The FMV of non-transferable property interests is the present value of the expected future economic benefits of holding those property interests—i.e., the amount an arm's-length party would be prepared to pay in order to "stand in the shoes" of, and receive the economic benefits as the holder of those property interests, having regard for the fact that the holder of such property interests cannot benefit from the subsequent transfer of those assets to a third-party.[3]

21.     More specifically with respect to this case, as explained further herein, the value of the non-transferable license rights surrendered by the U.S. and EMEA Debtors depends only on, and is limited to, the present value of their share of the expected future operating profits of Nortel but for the decision to sell its assets. The value of those rights would not reflect any benefit from the possibility of transferring those license rights (since they were non-transferable), and would not

---

[2] Berenblut, M., "Business Valuation", in *The Litigator's Guide to Expert Witnesses,* Ch. 13, p.211. See also Campbell, I.R., H.E. Johnson, H.C. Nobes, *Canada Valuation Service*, March 2011, p.3-16; and *Black's Law Dictionary*, 7th ed., 1999, p.1549. See also ASA Business Valuation Standards, p.27 for a similar definition of FMV commonly adopted in the U.S.

[3] This is sometimes referred to as a "value-in-use" measure of value. This measure of value is the same as the FMV of non-transferable assets (or property interests in assets) provided that FMV is determined as the amount an arm's length party would pay to receive the benefit of holding those rights, without regard to the fact that such a transaction was not possible (sometimes expressed as "lifting" the non-transferability restrictions for the purposes of the notional valuation). The FMV of such rights would still reflect the fact that the value to a notional purchaser would be lower than otherwise would be the case, because the property interests could not be subsequently transferred to another party. See, for example, *Crossman v. Commissioners of Inland Revenue*, 37 A.C. 26 (1935), 1 K.B. 26., and *Buttrum v. Buttrum*, 2001 CanLII 28187 (ON SC).

Contains Highly Confidential Information. Subject to Protective Order.

reflect the value of the IP assets which were the subject of those licenses in excess of the present value of their share of the expected future operating profits of Nortel. Any such additional value is attributable to the legal owners of the IP—i.e., the Canadian Debtors.

22.     The Proceeds are equal to total FMV of the assets sold in the Transactions because those proceeds are the total of the prices for actual market transactions. The determination of what portion of those Proceeds are attributable to the Canadian Property Interests, U.S. Property Interests, and EMEA Property Interests is by its nature a notional exercise because there are no actual separate transactions for the specific property interests of the three debtor groups.[4]

23.     The value of the economic benefits forgone by the U.S. Debtors and the EMEA Debtors is determined at the date, or dates, at which their respective property interests were transferred or surrendered. The decision to break up and sell the assets of Nortel, rather than restructure its capital and continue to operate the business, was made during the second quarter of 2009.[5] The Transactions occurred on various dates between the third quarter of 2009 and the second quarter of 2011. For convenience, in this report we refer to the relevant date or dates for that notional valuation exercise as the "Valuation Date."

24.     The FMV of each of the Canadian Property Interests, the U.S. Property Interests, and the EMEA Property Interests, and thus the allocation of the Proceeds, depends on, among other things, the legal relationship among the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors. More specifically, the allocation of the Proceeds depends on:

  a.   the nature and scope of the property interests of the three debtor groups, including the ownership of, and the license rights to use, Nortel's intellectual property ("IP") that was sold in the Transactions;

  b.   the final prices at which the assets of Nortel were sold in the Transactions;

  c.   the alternatives available to the three debtor groups had they not transferred or surrendered their property interests to facilitate the Transactions; and

---

[4] By "notional" we mean without an actual market transaction.

[5] See, for example, "Nortel to Sell CDMA Business and LTE Assets; Company Advancing in Its Discussions with External Parties to Sell Other Businesses", Nortel Networks Press Release, June 19, 2009; and Interim Funding and Settlement Agreement, June 9, 2009 ("IFSA").

Contains Highly Confidential Information. Subject to Protective Order.

d.   the residual profit split methodology ("RPSM") employed by the Nortel Group
pursuant to the MRDA.

25.      Based on our understanding of the business and structure of Nortel (described in
**Section 4**), the assets sold in the Transactions (described in **Section 5**) and the nature and scope of
the Property Interests (described in **Section 6**), it is our opinion that the portions of the Proceeds that
were due to the transfer or surrender of each of the Canadian Property Interests, U.S. Property
Interests, and EMEA Property Interests can be determined as follows:

a.   The proportion of the Proceeds due to the transfer of the Canadian Property
Interests is determined as the Proceeds less the FMV of the U.S. Property
Interests and the EMEA Property Interests. This reflects the fact that the
fundamental driver of value in Nortel's business was its IP and that the Canadian
Debtors, as owners of the IP, are entitled to the value of that IP subject only to the
value of the license rights of the U.S. and EMEA Debtors, as explained in
**Section 7** below;

b.   The FMV of the U.S. Property Interests and the EMEA Property Interests are
determined based on their respective shares of the present value of the expected
future operating profits of Nortel but for the decision to break up and sell its
assets. The FMV of those property interests is bounded by the following, as
explained in **Section 8**:

i.   at the low end, the value of the tangible assets legally owned by the U.S.
Debtors and the EMEA Debtors, respectively; and

ii.   at the high end, the amounts implied by the total proceeds in the Business
Sales (i.e., $2.9 billion) apportioned on the basis of the formula for the
allocation of Nortel operating profits under the RPSM.

Contains Highly Confidential Information. Subject to Protective Order.

NERA Economic Consulting

# 4.    The Nortel Group

## 4.1.    Nortel's Business

26.    Nortel was in the business of designing, building, and delivering enterprise telephone and wireless network products and solutions to telecommunications service providers and enterprises around the world. Nortel described itself as a global communications company supplying "end-to-end networking products and solutions that help organizations enhance and simplify communications."[6]

27.    Nortel's customers ranged from small businesses to multi-national corporations, and included government agencies. The Company's corporate customers included cable operators, telecommunications providers and internet service providers.[7] Nortel customers included BCE, China Telecom, Deloitte, HSBC, IBM, Microsoft, the U.S. Social Security Administration, and Verizon Communications.[8] Verizon was its largest customer, accounting for more than 10 percent of Nortel's revenues during 2006, 2007, and 2008.[9]

28.    Prior to its filing for bankruptcy in January 14, 2009 (the "Filing Date"), the Nortel Group operations were organized into four main business segments:[10]

   a.    Carrier Networks ("CN"), which designed, developed, produced, and sold products (and related services) for wireline and wireless networks through which telecommunications service providers and cable operators (such as Verizon, AT&T, Sprint Nextel, and T-Mobile in the U.S., and Rogers and TELUS in Canada, among others) provided mobile voice, data, and multimedia communication services to business and individual customers. This segment (1) sold products relating to legacy 2G wireless technology (CDMA and GSM), GSM-R, GPRS, EDGE technologies, (2) provided Carrier VoIP solutions, and (3)

---

[6] Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2008, p.1.

[7] *Ibid.*

[8] Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2008, pp.7-11.

[9] Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2006, p.5; Nortel Networks Corporation 2007 Annual Report filed February 27, 2008, p.5; and Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2008, p.6.

[10] Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2008, pp.6-10.

Contains Highly Confidential Information. Subject to Protective Order.

was developing next generation technology including technology relating to LTE wireless networks.

b.  Enterprise Solutions ("ES"), which marketed products and services relating to communications solutions for private businesses telecommunications networks. Nortel's ES portfolio included Unified Communications solutions (i.e., integration of communications systems across IP networks through one integrated platform), Ethernet routing and multi-service switching, IP and digital telephony, wireless LANs, security, IP and SIP contact centers, self-service solutions, messaging, conferencing, and SIP-based multimedia solutions.[11]

c.  Metro Ethernet Networks ("MEN") which sold products and services to telecommunications service providers for their Ethernet-based metropolitan area networks which connected subscribers to larger service networks or the Internet.

d.  Global Services ("GS") which was responsible for serving both carrier and enterprise customers by providing services through all versions of their networks and products. Subsequent to the Filing Date, the functions of the GS business were re-distributed among the other major business segments into a more vertical structure.[12]

29.  Nortel's business was organized and managed in these global business segments, rather than by geographic regions, to better serve its customers and compete in the markets in which it participated. However, the functions of these business segments were carried out through several operating entities (in addition to certain non-operating entities) domiciled in the various jurisdictions in which Nortel operated. The Canadian Debtors, U.S. Debtors and EMEA Debtors are the estates of several of those legal entities. A simplified diagram of the organizational relationship between these entities is set out in **Figure 1** below.[13]

---

[11] Nortel Networks Corporation's Form 10-k for the fiscal year ended December 31st, 2008 p. 8.

[12] *Ibid.*

[13] A more detailed diagram of the entity structure of Nortel as at January 5, 2009 is set out in "NNC-NNL06001104 - 1.4 NNC Structure Chart-Jan5'09 v7.ppt."

Contains Highly Confidential Information. Subject to Protective Order.

NERA Economic Consulting

**Figure 1: Simplified Entity Structure of the Nortel Group**



## 4.2.    Nortel Technology and R&D Expenditures

30.    Nortel's business was technology-based and its ability to generate profits depended on its IP that was related to and provided legal protections of the technology that it developed. The central importance of the IP to Nortel's business is reflected in the structure of the MRDA and its adoption of the RPSM for the allocation of its global operating profits.[14]

31.    In a technology driven businesses such as Nortel, the development of IP through significant investments in R&D represents an essential driver of value. This fact is demonstrated by Nortel's customers' needs and purchasing responses and its competitors' efforts to develop competing technology. Nortel's own assessment confirms that "R&D is the primary contributor to the success of Nortel's business. Nortel's customers choose Nortel products and services because Nortel is viewed as a technology leader and innovator in its market."[15] Indeed this point was emphasized in testimony by the former Nortel CFO Paviter Binning:

> "*Obviously, both play a role, but at the heart of a business like this, my own personal view is it is technology that is the driver. And the reason I sort of say that is that*

---

[14] See, for example, MRDA, Schedule A.

[15] "Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006)," October 31, 2008 [NNC-NNL06001560_0001-6001560_0055 at 6001560_0011]

Contains Highly Confidential Information. Subject to Protective Order.

*telecom operators are working in a very competitive environment. And they look for two things when they chose technology. One of those things is can they create a competitive advantage in the industry by having technology that isn't available to some of their, you know, competitors. And this is certainly what Rogers, for example, did in the Canadian market. The second thing that they look for is cost efficiency. Can they buy the technology at a cheaper cost? Or, secondly, can they use the technology to lower their own infrastructure cost? And so these are the sort of primary drivers, but certainly one of the sort of things that, you know, if you don't have the technology, then over the long term protecting customer relationships is very difficult.*"[16]

32.    In 2008, as result of the pace of technological change, Nortel calculated its "overall technology lifecycle" to be less than four and a half years.[17] Consistent with its focus of the development and sale of technology, Nortel had divested itself of "substantially all of its manufacturing assets."[18]

33.    Nortel characterized the specific technology-based environment in which it competed as one in which technology was "converging" such that it took "multiple business segments to provide the converged service offerings to customers" and that "[n]o one business segment or geographic location … [could] provide the solutions alone."[19] In this vein, Nortel described itself as a "Matrix Organization."[20] Specifically, this was meant to signify that the "organizations within Nortel share[d] information and perform[ed] common tasks across geographic boundaries."[21] Included in this matrix are the entities that compose the debtor groups. Nortel referred to these entities as "integrated entities" (which are also known as IEs or Residual Profit Splitting Entities

---

[16] Deposition of Paviter Binning, October 24, 2013, pp. 125-126. See also the Deposition of Pascal Debon, November 25, 2013, pp. 41-42 ("Q. In the wireless business for which you were responsible, how important was the development of patents and technology to that business? A. It was key. It is absolutely the key things, because otherwise you use patents of your competitor, you have to pay royalties, and you don't have a business. Q. How important was the development of patents and technology to your customers? … A. Very important, because then they see that we are ahead of the technology, and Nortel in wireless and in optical have always gained market share through its technology.")

[17] "Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006)," October 31, 2008 [NNC-NNL06001560_0001-6001560_0055 at 6001560_0011].

[18] *Ibid.*

[19] "Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006)," October 31, 2008 [NNC-NNL06001560_0001-6001560_0055 at 6001560_0008 and 6001560_0029]. See also S&P's Industry Surveys: Communications Equipment, by Ari Bensinger, August 6th 2009, p. 13.

[20] Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006)," October 31, 2008 [NNC-NNL06001560_0001-6001560_0055 at 6001560_0013].

[21] *Ibid.*

Contains Highly Confidential Information. Subject to Protective Order.

("RPS Entities"), as discussed in **Section 6** below).[22] In 2008, Nortel described the IEs as producing "R&D related intangibles and strong customer relationships through the use of globally consistent sales processes, Customer Relationship Management tools, and Executive Briefing Centers."[23] At that time, it found that "[t]his strong relationship with the customer, underpinned by research and development, drives Nortel's revenues."[24]

34.      It is in this context that Nortel adopted the RPSM transfer pricing structure that is reflected in the MRDA.[25] This structure rewards the various Nortel entities for routine functions and "allocates the residual profit attributable to the IEs based on the relative value of each IE's contribution to the intangible property creating the residual profit that was not accounted for as a routine contribution."[26] This is the structure that was in place at the time of Valuation Date and thus would have reasonably been expected to direct the allocation of the operating profits of Nortel, if any, to the various debtor groups if Nortel had continued to operate.

35.      R&D expenditures by RPS Entity for the period 2004 to 2009 are illustrated in **Figure 2** below.

---

[22] Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006)," October 31, 2008 [NNC-NNL06001560_0001-6001560_0055 at 6001560_0011-6001560_0012].

[23] Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006)," October 31, 2008 [NNC-NNL06001560_0001-6001560_0055 at 6001560_0040].

[24] *Ibid.*

[25] Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006)," October 31, 2008 [NNC-NNL06001560_0001-6001560_0055 at 6001560_0041].

[26] *Ibid.*

Contains Highly Confidential Information. Subject to Protective Order.

NERA Economic Consulting

**Figure 2: Proportion of Nortel Annual R&D Expenditures, by RPS Entity, 2004 to 2009**



Notes and Sources

Annual R&D spending by RPS Entity, prior to adjustments for the UMTS business sale, obtained from "R&D Capital Stock.xls" [NNC-NNL06001536]

*2009 spending amounts based on Q1-Q2 actual spending and Q3-Q4 forecast spending "per Aug OL."

## 4.3.     Bankruptcy of Nortel

36.     On January 14, 2009 (i.e., the Filing Date), the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors each filed for bankruptcy protection (or the equivalent) in their respective jurisdictions.[27] Nortel's financial performance had been inconsistent during the several years prior to bankruptcy and its prospects as for continuing to operate at the time of the Transactions were limited.

37.     In 2000, at the peak of the dot-com bubble, Nortel employed over 94,000 people and had a market capitalization of nearly $250 billion on the New York Stock Exchange. Following the collapse of the dot-com bubble, Nortel frequently had operating costs that exceeded revenues and its stock price declined.[28] The deepening of the global credit crisis in the second half of 2008 had

---

[27] Allocation Position of the Monitor and Canadian Debtors, May 16, 2013, ¶¶14-16.

[28] Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2008, p.1.

Contains Highly Confidential Information. Subject to Protective Order.

further detrimental effects on Nortel's business.[29] By the end of 2008, Nortel had approximately 30,000 employees and had a market capitalization of just over $100 million.[30]

38.     Prior to the Filing Date, Nortel considered and pursued various options for improving its financial performance, including the sale of certain of its business segments. For example, in June 2008 Nortel began to pursue a sale of its Layer 4-7 business.[31] In late 2008, Nortel began to explore the possibility of selling it Enterprise Solutions business.[32] Nortel had also sought strategic buyers for its MEN business segment[33] and had discussed the possibility of selling its CDMA and LTE assets prior to the Filing Date.[34] However, none of these potential sales was concluded prior to the Filing Date.

39.     In August 2008, one analyst covering Nortel described its business situation and prospects as follows:[35]

    a.   limited growth prospects due to internal and external factors;

    b.   growth outlook affected by weakness in end markets prior to onset of the Great Recession;

    c.   mostly concentrated in 2G CDMA; and

    d.   betting on investments on 4G wireless, enterprise networking, and optical networking taking off in the future.

---

[29] Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2008, p.2.

[30] *Ibid*, p.1.

[31] Second Report of the Monitor, February 25, 2009, pp. 4-5.

[32] Eighteenth Report of the Monitor, July 31, 2009, p. 6.

[33] Twenty-fourth Report of the Monitor, October 13, 2009, ¶23 ("In the fall of 2008, Nortel approached "approximately fifty financial investors and strategic buyers likely to be interested in and able to acquire the MEN Business. An information memorandum was provided to the twenty-one parties that executed confidentiality agreements. Management presentations were conducted with those parties that submitted expressions of interest and that Nortel deemed able to consummate a transaction for the MEN Business… five parties submitted non-binding proposals and Nortel commenced serious discussions with three of those parties. However, as a result of the commencement of the insolvency proceedings on January 14, 2009, the sale process was subsequently put on hold.")

[34] Fourteenth Report of the Monitor, June 23, 2009, p. 6.

[35] CIBC World Markets: Nortel Networks Corporation Should You Act Now or Can you Wait, August 18, 2008, p. 3.

Contains Highly Confidential Information. Subject to Protective Order.

40.     As noted above, the deepening of the credit crisis throughout the second half of 2008 only worsened the prospects for Nortel.

41.     Initially, Nortel was expected to restructure and emerge from bankruptcy as a going-concern business with a more manageable capital structure. After the Filing Date, Nortel continued to operate on a "business as usual basis," maintaining all customer programs and actively engaging with existing and potential customers on new projects.[36] It also began cost cutting actions including reductions to its global workforce, a review of its real estate assets, a review of its equipment leases, contracts, and licenses, a review of other supplier contracts, and was developing a plan to reduce its discretionary spending.[37] However, the bankruptcy process had a negative impact on Nortel's operations. For example, in February 2009, Verizon chose Ericsson over Nortel as its supplier for the development of its LTE network, in part, because of Verizon's concerns about Nortel's financial viability.[38]

42.     During the second quarter of 2009, it was determined that Nortel would attempt to sell its various business segments and assets in order to maximize value for its creditors. Examples of these decisions include the following:

a.  In May 2009, Nortel granted a non-exclusive license to Hitachi of MME and NEM technology (components of LTE) after it was determined that it was doubtful that Nortel could perform its obligations under its joint venture with Hitachi.[39]

b.  On June 9, 2009, the various estates of Nortel entered into the Interim Funding and Settlement Agreement ("IFSA") which, among other things, contemplated that the Nortel subsidiaries would surrender their property interests in order to facilitate any sales of the assets of Nortel.

[36] First Report of the Monitor, February 5, 2009, pp. 11-15.

[37] First Report of the Monitor, February 5, 2009, pp. 22-23.

[38] "Verizon Wireless Fosters Global LTE Ecosystem as Verizon CTO Dick Lynch Announces Deployment Plans", Verizon Press Release, February 18, 2009. (Available online at: http://www.verizonwireless.com/news/2009/02/pr2009-02-18.html). Deposition of George Riedel, p. 144 (noting that although Nortel "got great reviews on the technical aspects of the product", Nortel was "not selected or ultimately not selected [by Verizon] for commercial deployment largely because of the concerns about financial viability.")

[39] Eleventh Report of the Monitor, May 28, 2009, pp. 2-4. "MME" refers to Mobility Management Entity, and "NEM" refers to Network Element Manager.

Contains Highly Confidential Information. Subject to Protective Order.

    c.   On June 19, 2009, Nortel issued a press release in which it disclosed that it had determined that selling its business segments was the best path for maximizing value for its creditors.[40]

43.    NNC financial statements for 2004 to 2009 are reproduced for convenience in **Appendix C**.

# 5.    The Transactions

## 5.1.    The Business Sales

44.    As noted above, subsequent to the Filing Date, it was determined that the best course of action for Nortel was to sell its assets, rather than continue to operate.

45.    Nortel sold the assets relating to each of its business segments in the Business Sales which closed on various dates, primarily between March 2009 and March 2010.[41] The dates of, and proceeds received in, these Business Sales are summarized in **Table 1** below.

---

[40] "Nortel to Sell CDMA Business and LTE Assets; Company Advancing in Its Discussions with External Parties to Sell Other Businesses", Nortel Networks Press Release, June 19, 2009.

[41] The one exception is the sale of the MSS assets for $46 million which closed in March 2011.

Contains Highly Confidential Information. Subject to Protective Order.

NERA Economic Consulting

## Table 1: Summary of Nortel Business Sales

| Transaction | Date of Final Bid[42] | Transaction Closing Date[43] | Acquirer[44] | Net Sales Proceeds Available for Allocation (millions)[45] |
|---|---|---|---|---|
| CDMA & LTE | July 24, 2009 | November 13, 2009 | Ericsson | $1,088 |
| Enterprise | September 15, 2009 | December 18, 2009 | Avaya | $843 |
| MEN | November 24, 2009 | March 19, 2010 | Ciena | $632 |
| CVAS | December 22, 2009 | May 28, 2010 | GENBAND | $140 |
| GSM | November 25, 2009 | March 31, 2010 | Ericsson (N.A., CALA) Kapsch (EMEA) | $106 |
| MSS | September 24, 2010 | March 11, 2011 | Ericsson | $46 |
| Layer 4-7 | February 19, 2009 | March 31, 2009 | Radware | $18 |
| Next-Gen | October 25, 2009 | December 8, 2009 | Hitachi | $10 |
| **Total** | | | | **$2,883** |

46.     Most of the Business Sales were the result of sales processes (approved by the Courts) in which Nortel initially negotiated an asset sale agreement with a purchaser (a "stalking horse" agreement), for a specified price subject to Nortel receiving a higher price in a subsequent auction among parties deemed by the seller to be "qualified bidders."[46] In several cases, the auction process resulted in actual transaction prices that were significantly higher than the prices in the

---

[42] See Reports of the Monitor regarding final sale agreements for CDMA/LTE (17th Report, July 27, 2009), Enterprise (20th Report, September 15, 2009), MEN (28th Report, November 27, 2009), CVAS (40th Report, February 26, 2010), GSM (23rd Report, October 13, 2009), MSS (54th Report, September 28, 2010), Layer 4-7 (2nd Report, February 25, 2009; 5th Report, March 26, 2009) and Next-Gen (26th Report, October 26, 2009).

[43] Nortel Form 10-K for the fiscal year ended Dec. 31, 2011, pp. 60-61; 5th Report of the Monitor, March 26, 2009.

[44] *Ibid*.

[45] Net proceeds from the Business Sales as shown in the Global Cash sheet in EMEAPROD2171248.

[46] 14th Report of the Monitor, June 23, 2009,¶ 58.

Contains Highly Confidential Information. Subject to Protective Order.

stalking horse agreements. The sale of the GSM and Next-Gen businesses were sold through asset sale agreements without any subsequent bidding processes.[47]

47.     The net proceeds shown in Table 1 above are after certain deductions, including break-fees paid to purchasers in the stalking horse agreements, other purchase price adjustments (e.g., for changes in working capital), and payments to the estates of certain Nortel entities that are not a part of the present proceeding (i.e., the Fourth Estate Settlement).

## 5.2.     Rockstar Transaction

48.     Following the Business Sales, Nortel retained significant IP that was not conveyed in those transactions (the "Residual IP" or the "Rockstar IP").

> "*Nortel retained significant Residual IP, including approximately 6,000 Canadian, U.S. and foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. Legal title to substantially all such patents [was] held by and registered in the name of NNL.*" [48]

49.     Counsel for the Monitor informs us that the patents and patent applications transferred to the purchasers in the Rockstar Transaction were of two categories: (i) patents that were not used in any of Nortel's operating businesses; and (ii) patents that had been used in more than one operating business and in respect of which licenses have been granted to the purchasers in the Business Sales.

50.     Approximately two-thirds of the patent families in the Residual IP were not the subject of licenses to the purchasers in the Business Segments. These patents included those relating to industry standards and covered a broad range of technologies related to both the telecommunications industry and technology for use in businesses in which Nortel did not operate (including "Optical, Data Networking, Wireless (Handsets, WiMAX/LTE), Ecommerce/Search, Social Networking and some potential in Consumer Electronics and other related markets").[49]

---

[47] See the 5th (March 26, 2009), 26th (October 26, 2009), 40th and 2nd (February 25, 2009) reports of the Monitor for details of the GSM, Next-Gen , CVAS and Layer 4-7 sales, respectively.

[48] 63rd Report of the Monitor, April 14, 2011, ¶¶14-15.

[49] *Ibid*. Also, see Deposition of Gillian McColgan, November 8, 2013, pp. 125-127, and Exhibit 22107 to the Deposition of John Veschi, November 7, 2013.

Contains Highly Confidential Information. Subject to Protective Order.

51.     After exploring various alternatives, Nortel ultimately determined that the best way for it to realize value from the Residual IP was through a sale of the portfolio.

"*Over the course of 2010, Nortel, in consultation with its financial and legal advisors and various stakeholders, considered different methods of monetizing the Residual IP, including licensing the Residual IP to third parties to generate revenues and conducting a sale process for all of the Residual IP. Nortel ultimately concluded that a sale of the Residual IP was the best method of monetizing the Residual IP for the benefit of its stakeholders.*"[50]

52.     Nortel reached a stalking horse agreement with Google, Inc. ("Google") for $900 million in April 2011.[51] The winning bidder in the subsequent auction process was a consortium of technology and telecommunications companies (through what is now called Rockstar Consortium Inc. ("Rockstar") that included Apple, Inc., Microsoft, Sony, BlackBerry (then, Research in Motion), and Ericsson. Rockstar paid a final purchase price of approximately $4.5 billion for the Residual IP.

53.     The final purchase price in the Rockstar Transaction appears to reflect the perceived value to the purchasers in that transaction of the technology that was unrelated to Nortel's prior business.[52]

## 6.      The Property Interests

54.     The economic benefits forgone by the U.S. Debtors and the EMEA Debtors in surrendering their property rights depends on the nature and scope of those property interests which, in turn, are dictated by the organization and legal arrangements of the Nortel Group at the time the decision was made to sell its assets rather than to continue its operations.

55.     The facts of this case indicate that the Canadian Debtors are entitled to all the Proceeds, net of the value of the U.S. and EMEA Property Interests, including the limited license rights to use Nortel's IP (described further in this section). In effect, NNL (one of the Canadian

---

[50] 63rd Report of the Monitor, April 14, 2011, ¶¶14-15.

[51] *Ibid*, pp.6, 9 (¶¶ 19, 27)

[52] See, for example, Deposition of George Riedel (Nortel's Chief Strategy Officer), pp. 135-136. ("Q. How important do you think having Google as the stalking horse was to the dynamic at the auction that generated the ultimate sale price? A. It was very important. There is the hand set business and all of the associated elements of it was a very large global business and they through their Android partnerships were competing against Apple and others so it was very significant in terms of driving the value up on that strategic value bucket that I talked about.").

Contains Highly Confidential Information. Subject to Protective Order.

Debtors) was the appropriate claimant to all the economic benefits derived from its IP, less only the benefits of the limited license rights surrendered by the US Debtors and the EMEA Debtors.

56.    This allocation of the economic benefits of the Property Interests is reinforced by the central role of the IP in driving the value of the business of the Nortel Group. The property interests in the IP that were responsible for the ability of the U.S. Debtors and EMEA Debtors to compete were the limited license rights granted by NNL. Therefore, these license rights were required to generate the operating profits that determine the FMV of the property interests they surrendered. Payment to the U.S. Debtors and the EMEA Debtors equal to that FMV is, therefore, appropriate compensation for the property interests that they surrendered.

57.    The remainder of the proceeds, being the residual value of the IP after accounting for the value of the limited license rights, is appropriately allocated to the Canadian Debtors as the legal owners of the IP.

## 6.1.    Property Interests in the Assets Sold in the Business Sales

### 6.1.1.    *Residual Profit Splitting Entities*

58.    As described in **Section 4** above, the Nortel Group was managed in global business segments and the functions of these business segments were carried out through several operating entities (in addition to certain non-operating entities) domiciled in the various jurisdictions in which Nortel operated. We understand that these operating entities generally fall into the following two categories (which still apply in the bankruptcy context):[53]

a.    **Residual Profit Splitting Entities ("RPS Entities")**, which engaged in R&D activities in addition to carrying out the routine functions associated with each of Nortel's business segments (i.e., manufacturing, sales, and distribution of Nortel products and services). These entities shared the global profits and losses of the Nortel Group pursuant to the MRDA and the RPSM (described further below).

---

[53] See Nortel Networks Limited Transfer Pricing Report for the taxation year ended December 31, 2009 [NNC-NNL06001553_0001 - NNC-NNL06001553_0203 at NNC-NNL06001553_0037 - NNC-NNL06001553_0038]. We understand that there was also a third category called At Risk Entities ("ARE's") that applied to a small number of Nortel entities. AREs performed distribution and service activities for the Nortel Group in their respective countries, but were not parties to the MRDA.

Contains Highly Confidential Information. Subject to Protective Order.

b. **Limited Risk Distributors ("LRD's")**, which were primarily engaged in the distribution of products within particular geographic regions and were guaranteed a profit of one percent of their sales revenues.

59.      The RPS Entities are the principal entities of each of the three main debtor groups. They include NNL, the operating entity in Canada, Nortel Networks Inc. ("NNI") in the U.S. (being the principal entity among the U.S. Debtors), Nortel Networks U.K. Limited ("NNUK") in the United Kingdom, Nortel Networks SA ("NNSA") in France and Nortel Networks (Ireland) Limited ("NN Ireland") (NNUK, NNSA and NN Ireland being the principal entities of the EMEA Debtors.[54] In addition, the Nortel Group consisted of approximately 25 to 30 distributors, each of which was a direct or indirect subsidiary of one or more of the RPS Entities.[55]

### 6.1.2.  The MRDA

60.      The RPS Entities operated under the contractual terms of the MRDA.We are advised that the MRDA (among other things) provides:

a. that legal title to "NN Technology", which includes various forms of intellectual property, such as patents and patent applications, was that of NNL;[56]

b. for a licence granted to Licensed Participants (as defined in the MRDA) by NNL, which is a perpetual, royalty-free licence to make, use, lease, license, offer to sell and sell Products (as defined in the MRDA, which definition includes services designed, or marketed, or proposed to be designed, developed or manufactured by an MRDA Participant) that used or embodied "NN Technology". Such licences were exclusive in each MRDA Participant's territory and non-exclusive elsewhere.

c. that each of the RPS Entities will engage in R&D, at their own cost, in order to be eligible to benefit from the MRDA;[57] and

---

[54] Nortel Networks Australia PTY Limited retired from the MRDA effective Dec. 31, 2007.  See Nortel Networks Limited Transfer Pricing Report for the taxation year ended December 31, 2009 [NNC-NNL06001553_0001 - NNC-NNL06001553_0203 at NNC-NNL06001553_0037 - NNC-NNL06001553_0038].

[55] See, for instance, the "Distributors" sheet in "Q4 2008 TP Calculation-FINAL_-v01.xlsx" [NNC-NNL06001547]; "NNC Entity Structure Chart-Jan5'09 v7.ppt" [NNC-NNL06001104].

[56] We are also advised that legal title and legal ownership are synonymous.

Contains Highly Confidential Information. Subject to Protective Order.

d.  that Nortel would allocate operating profits among the various legal entities through the application of a RPSM.[58]

61.     We are also advised of the following:

a.  Licensed Participants to the MRDA are provided with rights to sue within the scope of their licences;

b.  the licences were non-transferable without the consent of all parties to the MRDA;

c.  all other rights to the NN Technology were held by NNL;

d.  the MRDA was at all times in full force and effect, including rights and obligations it imposed on all parties to be subject to the RPSM provided for in the MRDA; and

e.  pursuant to the Interim Funding and Settlement Agreement ("IFSA"), the Licensed Participants agreed, in connection with each Business Sale, to terminate their licences under the MRDA in respect of the NN Technology used in that business, and executed Licence Termination Agreements to effect this termination.

62.     Importantly, for the purposes of the allocation analysis (as explained further below), the license rights of the U.S. Debtors and EMEA Debtors under the MRDA were not transferable to third parties. In contrast, as owner of Nortel's IP, the Canadian Debtors (specifically, NNL) were entitled to the benefit of that IP in its highest and best use—including from the transfer of those assets to third parties who were prepared to pay more for those assets than the present value of the operating profits Nortel could have expected to realize from their use in its own operations.

---

[57] MRDA, Article 1(b) ("Admission Eligibility Requirements" and (c) ("Eligible Party") and Article 2 ("Performance of R&D Activity"), and Article 3 ("R&D Activity Payments").

[58] MRDA, Article 3 ("For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM … as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity."), and Schedule A.

Contains Highly Confidential Information. Subject to Protective Order.

### 6.1.3.    The RPSM

63.    Nortel adopted the RPSM as best reflecting the economic substance of its business, including the central importance of its IP in that business, and the way the operations of the business were organized. This is reflected in Schedule A to the MRDA.

64.    The steps involved in the application of the RPSM can be summarized as:[59]

> a.    determine the consolidated Nortel operating earnings/loss in accordance with U.S. GAAP;

> b.    adjust Nortel operating earnings/loss for earnings and losses related to joint ventures, amortization of intangibles, gains/losses on the sales of businesses or assets, restructuring charges, stewardship costs, which results in an amount termed to be the "Adjusted Operating Earnings/Losses";

> c.    from the Adjusted Operating Earnings/Loss allocate functional routine returns (based on a percentage of sales revenues and certain expenses) to each of the operating entities; and

> d.    allocate the difference between Adjusted Operating Earnings/Loss and the total of the allocated functional routine returns (the "Residual Profit/Loss") to each RPS Entity according to the relative spending of each RPS Entity on R&D during the previous five years.

### 6.1.4.    Economic Implications of the MRDA and the RPSM

65.    There are economic implications of the MRDA and the RPSM, and of the technology-based nature of Nortel's business. For instance, the economic benefits forgone by the U.S. Debtors and the EMEA Debtors from the surrender of each of their respective property interests (including their license rights under the MRDA) depend on, and are limited by, that portion of expected future operating profits of Nortel, if any, to which those entities would have been entitled had Nortel continued to operate its business.

---

[59] Second Amendment to Schedule A of the Third Addendum to Master R&D Agreement in: MRDA, December 22, 2004 and subsequent amendments (PDF page 48).

Contains Highly Confidential Information. Subject to Protective Order.

66.     Another economic implication of these arrangements and facts is that the value of the U.S. and EMEA Property Interests associated with intangible assets *other than Nortel's IP* also depends on, and is limited by, the allocation of operating profits under the RPSM. Those intangible assets were economically comingled with license rights to use Nortel's IP under the MRDA because the value from those non-IP intangibles (such as Nortel customer relationships) depended on the ability to sell products and services embodying the Nortel technology. In addition, Nortel's business was organized and managed in global business segments, rather than by geographic regions. Consequently, most or all of the value, if any, of the non-IP intangible assets of Nortel was not separately realizable by particular Nortel entities in specific jurisdictions, other than through their share of the global operating profits of Nortel through the application of the RPSM. Therefore, the present value of the U.S. Debtors' and EMEA Debtors' respective shares of the expected operating profits of Nortel, if any, would reflect and incorporate both the value of any property interests in non-IP intangible assets and the value of the license rights in the IP assets.[60]

67.     Importantly, the fact that the purchase prices for Nortel's assets almost surely exceeded the present value of the expected future operating profits of Nortel had it continued to operate its business does not imply the U.S. Property Interests and the EMEA Property Interests had any greater value. Since the economic benefits of those property interests consisted of only the portions of Nortel operating profits as determined by the application of the RPSM, the FMV of those interests (and thus the portion of the proceeds attributable to their transfer or surrender) is limited to the present value of the share of any such expected operating profits had Nortel continued to operate.

## 6.2.    Property Interests in the Residual IP

68.     As is the case for the property interests in the IP that was the subject of the Business Sales, the property interests of the three debtors groups in the Residual IP are dictated by the terms of the MRDA. That is, the Canadian Debtors (specifically, NNL) were the legal owners of that IP, and the U.S. Debtors and EMEA Debtors had license rights to use the technology protected by that IP for the purposes of carrying out Nortel's business in their respective geographies. Any resulting operating profits or losses from the use of that IP in Nortel's business would be allocated among the RPS Entities based on the RPSM.

---

[60] Similarly, the value of any tangible assets owned by the U.S. and EMEA Debtors would be subsumed in this value.

Contains Highly Confidential Information. Subject to Protective Order.

69.     We are advised that for the Rockstar Transaction, the Licensed Participants (as defined in the MRDA) agreed to terminate their licences under the MRDA and executed the Rockstar Licence Termination Agreement and the parties entered into an IP Transaction Side Agreement to the effect that the Rockstar Licence Termination Agreement did not enhance or limit any allocation positions to be argued.

70.     We are also advised that with respect to the patents transferred in the Rockstar Transaction which had been used in Nortel's businesses, licences were granted in the Business Sales to the purchasers of the operating businesses that had similar scope to the licences granted under the MRDA.

71.     Given that the Residual IP was in respect of technology that either was not used in the business of the Nortel Group or was subject to licenses granted to purchasers in the Business Sales, it seems likely that, at the Valuation Date, there were no expected future operating profits from the use of the Residual IP in Nortel's business from which the U.S. Debtors and/or the EMEA Debtors would have benefited. Absent a demonstration that the license rights of the U.S. or EMEA Debtors in the Residual IP had value as of the Valuation Date, the entirety of the proceeds from the Rockstar Transaction would properly be allocated to the Canadian Debtors, as discussed in Section 7.2 below. We reserve the right to comment on any expert reports addressing this issue that might be submitted in this case and on any new information that comes to our attention in the process of reviewing those reports.

# 7.     Proceeds Due to the Transfer of the Canadian Property Interests

## 7.1.     The Proportion of the Proceeds in the Business Sales that is due to the Transfer of the Canadian Property Interests is Determined as the Total Proceeds Less the Total Value of the U.S. Property Interests and the EMEA Property Interests

72.     The Canadian Debtors were the legal owners of the IP and certain of the tangible and other intangible assets (possibly including customer contracts, customer relationships, and assembled workforces) that were conveyed in the Business Sales.

Contains Highly Confidential Information. Subject to Protective Order.

73.     As the legal owners of the IP, the Canadian Debtors had the right and the ability to transfer those assets. Therefore, the Canadian Debtors were entitled to the benefit of any proceeds from the sale of those assets to a third party in excess of the value of the tangible assets owned by its subsidiaries and the value of the rights to use the IP assets that had been granted to certain Nortel subsidiaries as part of its operations. The value to the subsidiaries of the rights to use those IP assets was the present value of the expected operating profits to which those entities would have been entitled had the Nortel Group itself continued to operate. Consequently, any proceeds from the Transactions in excess of the present value of the future profits that were expected from the continued operations of the Nortel Group itself are attributable to the Canadian Debtors as owners of the IP.

74.     The actual prices received in the Business Sales are not indicative of the FMV of the U.S. Property Interests and the EMEA Property Interests since the license rights in the IP, which was central to Nortel's business, were non-transferable. Rather, as noted above, the FMV of the U.S. Property Interests and the EMEA Property Interests can be no greater than the expected future operating profits that would flow to those entities from the operation of Nortel's business under the RPSM, but for the decision to break up the business and sell the assets. In fact, the actual proceeds realized in the Business Sales exceed the present value of the expected future operating profits of the Nortel Group if it had continued to operate, as discussed in **Section 7.2** below.

75.     Consequently, in order to allocate the Proceeds it is necessary to first determine the present value of the expected future profits that would have been expected to flow to the U.S. Property Interests and EMEA Property Interests had the Nortel Group continued to operate, as determined by the RPSM methodology. The FMV of the Canadian Property Interests is then determined as the excess of the Proceeds over the sum of the FMV of the U.S. Property Interests and the FMV of the EMEA Property Interests. Determining the FMV of the property interests in this way reflects that the Canadian Debtors were entitled to the benefits that were realized from the transfer of Nortel's IP to third parties, while the U.S. Debtors and EMEA Debtors were not.

76.     The relationship between the Proceeds and the FMV of the property interests of each of the three debtor groups is illustrated in **Figure 3** below.

Contains Highly Confidential Information. Subject to Protective Order.

26

NERA Economic Consulting

**Figure 3: Illustration of the Relationship between the Proceeds and FMV of each of the Property Interests\***



\*Note: Figure not to scale.

## 7.2.    Purchasers in the Business Sales Likely Paid More than the Value the Nortel Group Could Have Realized from its Own Operations

77.     For the reasons set out below, and based on the information available, the value that Nortel could have realized from the use of its assets in its own business is almost surely less than the total of the actual net proceeds in the Business Sales. That shortfall suggests that the purchasers in the Business Sales placed greater value on the assets of the Nortel Group than could have been realized by the Nortel Group if it had continued to operate.

78.     The economic benefits forgone by the U.S. Debtors and EMEA Debtors by the surrender of their property interests do not include the value of Nortel's IP assets that were not

Contains Highly Confidential Information. Subject to Protective Order.

incorporated into Nortel products. Therefore, the excess of the total proceeds in the Business Sales over the present value of the expected future operating profits had Nortel continued to operate is not attributable to the surrender of the U.S. Property Interests and EMEA Property Interests.

79.     There are several reasons why purchasers in the Business Sales paid more in total than the value of the expected operating profits of Nortel had it continued to operate. These reasons include that purchasers may have expected to be able to realize synergies or economies of scale with their own business that Nortel could not have realized and that Nortel's own ability to operate was impaired by weakened customer relationships and other factors resulting from the challenges it faced leading up to and following the Filing Date.

80.     Indeed, the stated motivations of the purchasers in the Transactions for their acquisitions of Nortel assets include several reasons that would not apply to Nortel as a going-concern business. These include, for example:

   a. **Synergies with, and enhancements to, existing operations of the purchasers.**
      For example, Avaya's rationale for its purchase of the Enterprise Solutions business as "…expand[ing] Avaya's technology portfolio, enhances its customer base, broadens its indirect sales channel, and provides greater ability to compete globally."[61] Similarly, Ciena indicated that the acquisition of the MEN business would achieve "acceleration of the company's growth strategy and… extension of Ciena's geographic reach."[62]

   b. **Preventing competitors from gaining access to Nortel Group assets**. For example, Ericsson appears not to have initially been interested in Nortel's LTE assets, but later bid in the auction after hearing Nokia was the stalking horse bidder, ███████████████████████████████████████████

   c. **Using scale, financial resources and market position to capitalize on existing and emerging technologies**. For example, in testimony regarding the CDMA/LTE business sale before the House of Commons Standing Committee on

---

[61] Avaya Inc. Form 10-K for the fiscal year ended September 30, 2010, p.1.

[62] "Ciena Corp. We've Seen This Movie Before; Initiating with Underweight", J.P.Morgan Global Equity Research, July 15, 2010.

[63] Deposition of Paviter Binning, October 24, 2013, pp. 123-126.

Contains Highly Confidential Information. Subject to Protective Order.

Industry, Science and Technology, Richard Lowe explained this accretive value to the purchaser by stating:

> "*Ericsson would likely view… their customers, the evolution of their customers in the network and how they would utilize this current technology, CDMA, and the future technology to grow their business because of the scale they have and the international stature that they have and the strong balance sheet that they have*." [64]

81.     Other purchasers in the Transactions have made similar public comments regarding their rationale for the acquisition of Nortel Assets. A summary of the publicly stated rationales of the purchasers for the Business Sales is provided in **Appendix D**.

82.     In addition, the bankruptcy of Nortel and its financial uncertainty preceding the Filing Date negatively impacted Nortel's customer retention and general expectations about its ability to meet pre-bankruptcy forecasts. Thus, if Nortel were to have continued to operate, its prospects appear to have been limited by several factors, including:

a. **Customer attrition due to loss of confidence in the Nortel's ability to execute its technological vision.** For example, in testimony before the House of Commons Standing Committee on Industry, Science and Technology regarding the sale of the CDMA/LTE business, George Riedel indicated "while our major customer operators really appreciated our technology and what we had done, given our situation as Nortel, they were not prepared to purchase this technology from us." [65] Similarly, in his deposition, Paviter Binning stated that:

> "*…analysts began to speculate, and nothing more than speculation at that stage, as to what the future of Nortel would be. And in the November time frame, one of the most damaging things that happened, from a company point of view, was there was an article in the Wall Street Journal that said that Nortel may move into bankruptcy. And that lead to customers in particular, you know, being extremely concerned about the viability of the company which began to put more pressure in terms of the top line of the company.*" [66]

---

[64] Deposition of George Riedel, Exhibit 12004, NNC-NNL06223226, p. 23.

[65] Deposition of George Riedel, Exhibit 12004, NNC-NNL06223226, p. 23.

[66] Deposition of Paviter Binning, October 24, 2013, p. 30.

Contains Highly Confidential Information. Subject to Protective Order.

    b.  **Loss of CDMA customers in the transition to LTE technology**. For example, Nortel was facing a "secular decline in CDMA business, coupled with loss of key customers."[67] This is evidenced by the fact that Ericsson wanted to execute the acquisition of the CDMA/LTE business quickly to prevent the loss of existing Nortel CDMA customers transitioning to competing LTE technology.[68]

    c.  **Challenges relating to the scope and potential of Nortel's product offering.** These include, for example, "lack of growth and profitability outside CDMA", "[p]roduct gaps/weaknesses in several key areas (e.g., access, enterprise data networking)" and "[m]arket declines in legacy product categories creat[ing] a drag on overall growth."[69]

83.    Therefore, the total proceeds from the Business Sales exceed the present value of any operating profits that would have been expected had the Nortel business continued to operate and that determine the FMV of the U.S. Property Interests and the EMEA Property Interests. We are advised that another expert witness will address the quantification of this excess.

## 7.3.    Proceeds from the Rockstar Transaction are Attributable to the Canadian Debtors

84.    As is the case for the allocation proceeds in the Business Sales, the portion of the proceeds from the Rockstar Transaction that are due to the transfer of the Canadian Property Interests is the actual proceeds (approximately $4.5 billion) less the value, if any, of the U.S. Property Interests and EMEA Property Interests in the Residual IP.

85.    Given our understanding of the Residual IP (as described in **Sections 5.2** and **6.2** above), it seems likely that, at the Valuation Date, there were no expected future operating profits

---

[67] Credit Suisse Presentation to Nortel, September 11, 2008, p. 11, "Summary of Nortel's current situation", NNC-NNL07909626.

[68] Deposition of George Riedel, October 10, 2013, p. 98. ("*Q. Could you tell us who Mr. Oscarson was? A. Mr. Oscarson is the head of M&A for Ericcson. Q. Was this sent to you in the context of the sale of the CDMA business to Ericcson? A. It was. Q. In the third paragraph of the e-mail Mr. Oscarson expresses certain concerns about the impact that delay in consummating the transaction would have on customer loyalty, you noted that? A. Yes. Q. How did you understand or did you have an understanding as to how delay would impact on customer loyalty?... A. CDMA was a 3G technology, third generation technology. Most of the major carriers that we had customers of CDMA were planning on moving to fourth generation LTE technology and the principal concern they had was the run off of the very profitable CDMA revenue stream yielding to a new revenue stream perhaps that might be less profitable.* ▮▮▮▮▮▮▮*)

[69] Credit Suisse Presentation to Nortel, September 11, 2008, p. 11, "Summary of Nortel's current situation", NNC-NNL07909626.

Contains Highly Confidential Information. Subject to Protective Order.

from the use of the Residual IP in Nortel's business from which the U.S. Debtors and/or the EMEA Debtors would have benefited, as explained in **Section 6.2** above.

86.    In that case, all of the proceeds from the Rockstar Transaction are due to the transfer of the Canadian Property Interests since no economic benefits were forgone by the U.S. Debtors and EMEA Debtors as a result of the Rockstar Transaction (i.e., the FMV of the property interests of those entities in the Residual IP was $nil).

# 8.    Proceeds Due to the Surrender of the U.S. Property Interests and the EMEA Property Interests

## 8.1.    The Lower Bound

87.    The value of the economic benefits forgone by the U.S. Debtors and EMEA Debtors is not less than the value of the tangible assets of which they were the legal owners. This is the case because, as an alternative to the Transactions, those entities could have unilaterally sold their tangible assets.

## 8.2.    The Upper Bound

88.    Putting aside the possibility that the U.S. Debtors and EMEA Debtors could have sold their tangible assets, the value of the economic benefits forgone by the U.S. Debtors and the EMEA Debtors from the surrender of their rights are equal to the present values of their respective shares of the operating profits, if any, that would have been expected from the alternative of Nortel continuing its business.

89.    The total of the proceeds received in the Business Sales (i.e., $2.9 billion) is an upper bound on the present value of the expected future operating profits of Nortel (had it continued to operate) to which the U.S. Debtors and EMEA Debtors would have been entitled to share according to the RPSM formula.

90.    The present value of the expected future operating profits of Nortel must be lower than the total of the proceeds in the Business Sales because the purchasers in the Business Sales likely placed significantly greater value on the assets that were the subject of those transactions than Nortel itself could have realized from continuing the operation of its own business, as explained in **Section 7.2** above.

Contains Highly Confidential Information. Subject to Protective Order.

NERA Economic Consulting

91.    We have not been asked to express an opinion on the expected future operating profits of Nortel had it continued to operate. However, given such an estimate, the portion of the proceeds in the Business Sales attributable to the holders of the U.S. Property Interests and the EMEA Property Interests would then be determined by the present value of the corresponding share of those expected operating profits that would have been allocated to the U.S. Debtors and EMEA Debtors under the RPSM.

## 9.    Restrictions

92.    This report is not intended for general circulation or publication, nor is it to be reproduced, referred to, or used for any purpose other than that outlined above, without the written consent of NERA Economic Consulting, for any purpose whatsoever. We shall not assume any responsibility of liability for losses to any party as a result of the circulation, reproduction, reference to or use of this report contrary to the provisions of this paragraph.

Mark L. Berenblut                 Alan J. Cox

Contains Highly Confidential Information. Subject to Protective Order.

FORM 53
*Courts of Justice Act*
ACKNOWLEDGMENT OF EXPERT'S DUTY

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION*

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1. My name is Mark Berenblut. I live at 27 Shelborne Avenue in the city of Toronto, in the province of Ontario.

2. I have been engaged by or on behalf of Ernst & Young, Inc. to provide evidence in relation to the above-noted court proceeding.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a) to provide opinion evidence that is fair, objective and non-partisan;

   (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c) to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date ___January 24, 2014___ *Signature* _____

**NOTE:** This form must be attached to any report signed by the expert and provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure*.

RCP-E 53 (November 1, 2008)

33

FORM 53
*Courts of Justice Act*
ACKNOWLEDGMENT OF EXPERT'S DUTY

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,*
*R.S.C. 1985, c. C-36, AS AMENDED*

*AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF*
*NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,*
*NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS*
*INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY*
CORPORATION

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1. My name is Alan Cox. I live at 755 SILVER CREST CT.  LAFAYETTE, CA ........................................... *(city)*, in the
........STATE........................ *(province/state)* of
..............CALIFORNIA........................................... *(name of province/state)*.

2. I have been engaged by or on behalf of Ernst & Young, Inc. to provide evidence in relation to the above-noted court proceeding.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a) to provide opinion evidence that is fair, objective and non-partisan;

   (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c) to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date  JAN. 21, 2014        *Signature* _____

**NOTE:** This form must be attached to any report signed by the expert and provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure.*

RCP-E 53 (November 1, 2008)

34

# Appendix A.    C.V.s



**Mark L. Berenblut**
Senior Vice President

NERA Economic Consulting
Direct dial: +1 416 868 7311
mark.berenblut@nera.com
www.nera.com

# Mark L. Berenblut
## Senior Vice President

## Education and Professional Designations

London School of Economics and Political Science, B.Sc. (Econ.), 1977

Fellow Chartered Accountant (England and Wales)

Chartered Professional Accountant (CPA, CA)

Specialist in Investigative and Forensic Accounting (IFA)

Fellow Chartered Business Valuator (F.C.B.V.)

Accredited Senior Appraiser (Business Valuation) (A.S.A.)

Certified Fraud Examiner (C.F.E.)

## Professional Memberships

Institute of Chartered Accountants in England and Wales, 1981 (Fellow)

Canadian Institute of Chartered Accountants, 1984

Institute of Chartered Accountants of Ontario, 1984

Canadian Institute of Chartered Business Valuators, 1987 (Fellow)

American Society of Appraisers, 1989

Association of Certified Fraud Examiners, USA, 1992

Academy of Experts, England, 1995

Chicago International Dispute Resolution Association, 1998

Member, Canadian Economic Association

A division of Oliver, Wyman Limited

**NERA**
ECONOMIC CONSULTING

Member, American Economic Association

Member, American Law and Economics Association

Member, Editorial Board of *The Journal of Business Valuation.*

Member, American Bar Association, Sections - Dispute Resolution, Intellectual Property Law and Litigation

## Professional Experience

|              | |
|--------------|--|
| 2008-present | **NERA Economic Consulting**<br>Senior Vice President. Member of the Securities, Anti Trust and Intellectual Property Practices. |

2008-present
**NERA Economic Consulting**
Senior Vice President. Member of the Securities, Anti Trust and Intellectual Property Practices.

2000-2008
**Berenblut Consulting, Inc.**
President
Provided expertise in financial investigations and economic and valuation matters to the legal and business communities and to government.

2000
**Carnegie Hill Venture Partners**
Managing Director
Investment fund in information technology and life sciences.

1992-2000
**Arthur Andersen**
Worldwide Equity Partner
1997-2000:  Partner Chicago office, Strategy, Finance and Economics division. Member of "technology, communications, and media" industry team and "intellectual property" knowledge team.

1992-1997: Practice Director for the Economic and Financial Consulting division and member of the Management Board. Involved in acquisition and integration into Andersen of other practices in Canada and Israel.

1983-1992
**Berenblut and Rosen Limited**
Co-Founder and Managing Partner
Specialist business and securities valuation consulting practice. Acquired in 1992 by Arthur Andersen.

1977-1983
**Laventhol and Horwath**
Chartered Accountant
1982-1983: Toronto, Canada. Managed and restructured companies in receivership, financial valuation, and financial investigation.

1977-1983: London, England: Experience in audit, financial investigations, and insolvency.

37



## Publications

**Books**

*The Litigator's Guide to Expert Witnesses*, co-authored with Dr. M. Freiman, (Canada Law Book, 1997)

*Proving Economic Loss* (Carswell, 2006)

*Ontario Insurance Commission: Law & Practice*, contributing author (Canada Law Book, 1994)

**Papers**

"Trends in Canadian Securities Class Actions: 2012 Update Pace of Filings and Settlements Falls; Auditor Risk and Court Rulings Take Centre Stage", with Bradley A. Heys, *NERA Economic Consulting*, January 2013.

"Trends in Canadian Securities Class Actions: 2011 Update, Pace of Filings Grows, Pace of Settlements Slows", with Bradley A. Heys, *NERA Economic Consulting*, January 2012.

"Trends in Canadian Securities Class Actions: 2010 Update, Climbing to New Heights—the Number of Active Cases is at its Highest", with Bradley A. Heys and Tara K. Singh, *Journal of Business Valuation*, The Canadian Institute of Chartered Business Valuators, 2011 Vol. 2., pp. 45-54.

 "Trends in Canadian Securities Class Actions: 2009 Update, new wave of Canadian Securities Class Actions Reaches the Certification Stage", with Bradley A. Heys, *NERA Economic Consulting*, January 2010.

"Trends in Canadian Securities Class Actions: 1997-2008, Canada Strikes its Own Course," with Bradley A. Heys and Svetlana Starykh, *Journal of Business Valuation,* The Canadian Institute of Chartered Business Valuators, 2009 Vol. 2, pp.1-12.

 "Forensic Economics in Cartel Investigations," with Bradley A. Heys, *The Marker*, The Criminal Matters Committee of the CBA National Competition Law Section (April 2008)

"Subprime Impact: Litigation and Financial Markets Update II," (March 2008)

"The Subprime Mortgage Crisis," (Fall 2007)



## Speeches and Presentations

"Valuation for Estate Planning Purposes" Creative Planning Financial Group, Toronto (2013)

"Recognizing Differences in Presenting Expert Testimony at Trial," Defense Research Institute (DRI), Prague (2013)

"Uncovering the Layers: An Economic Approach to Litigation Risk in Insurance," London & International Insurance Brokers Association (2013)

"Uncovering the Layers: An Economic Approach to Litigation Risk in Insurance," Insurance Institute of London (2013)

"Managing Securities Class Actions in Courts of Law and Public Opinion" Heenan Blaikie LLP (2011)

"Achieving Professionalism and Proficiency as an Expert Witness." Faculty Member: Osgoode-IPTI Expert Witness Certificate Program (2011-Present)

"International Trends in Securities Fraud Litigation and the Impact on Chinese Companies," The Hong Kong Society of Financial Analysts, Seminar, Hong Kong (2011)

"Economic Analysis in Financial Products Litigation: Recent trends, valuation issues and case examples," Chadbourne & Park LLP, London (2011)

"Patent Remedy Quantification", Intellectual Property Institute of Canada (IPIC) 84th Annual Meeting (2010)

"Deals gone bad – Liability, Mac Clauses, Solvency and Damages", NERA Economic Consulting, 13th Finance, Law & Economics Securities Litigation Seminar (2010)

"International Issues in Securities litigation and regulation", NERA Economic Consulting, 13th Finance, Law & Economics Securities Litigation Seminar (2010)

Damage Quantification in Patent Litigation: Putting the "Reasonable" in Reasonable Royalty Rate Determinations (2009)

When Competition Looks Like Coordination: What Can We Learn from the US Experience? (2009)

"Trends in Canadian Securities Class Actions" NERA on the Road, Securities Conference New York (2009)

"Fair Market Value, Financial Statements & Market Price" (2007) Department of Justice Legal Seminar



## <u>TESTIMONY FOR MARK BERENBLUT</u>
## <u>FOR PAST FOUR YEARS</u>

| <u>Date</u> | <u>Appearance Type</u> | <u>Court File #</u> | <u>Case</u> | <u>Court</u> |
|---|---|---|---|---|
| 2013 | Deposition | 10-CV-00954-LTS-GWG | Severstal Wheeling INC. Retirement Committee et. al. v. WPN Corporation et al | District Court, Southern District of New York |
| 2011 | Testimony | 00-CL-3835 31-352841 | Korea Data Systems v. Chiang | Ontario Superior Court |
| 2010 | Testimony | 00-CL-3835 31-352841 | Korea Data Systems v. Chiang | Ontario Superior Court |
| 2010 | Testimony | H-09-3712 | Laura Pendergest-Hold; R. Allen Stanford; Gilbert Lopez, Jr.; Mark Kuhrt, v. Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Co. | District Court, Southern District of Texas, Houston Division |
| 2010 | Deposition | H-09-3712 | Laura Pendergest-Hold; R. Allen Stanford; Gilbert Lopez, Jr.; Mark Kuhrt, v. Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Co. | District Court, Southern District of Texas, Houston Division |
| 2010 | Deposition | 2008-5517 | Frankel Offshore Energy Inc., Frankel Resources Llc Vs. Texas Standard Oil & Gas, LP, Grimes Energy Company, Petroval. Inc., Timothy Roberson, Kim Mccullough, David M. Grimes, Michael Grimes, And Warburg Pincus, Llc. | District Court of Harris County, Texas |
| 2010 | Deposition | 09 civ.8386 (LTS) (AJP) | Bayerische Hypo-Und Vereinsbank Ag, Merkurhof Grundstucksgeselleschaft Mbh, Savatorplatz Grundstucksgeselleschaft Mbh & Co Ohg Verwaltungszentrum, Tivoli Grunstucks Ad Hvb Gesellschaft Fur Gebaude Mbh & Co. Kg Vs. Aig Matched Funding Corporation And American International Group Inc. | District Court, Southern District of New York |

40



**Alan J. Cox**
Senior Vice President
Chair of NERA's Intellectual Property Practice

National Economic Research Associates, Inc.
4 Embarcadero Center, Suite 400
San Francisco, California  94111-4156
+1 415 291 1000 Fax +1 415 291 1020
Direct dial +1 415 291 1009
alan.cox@nera.com
www.nera.com

# Alan J. Cox
## Senior Vice President
## Chair of NERA's Intellectual Property Practice

## Education

**University of California, Berkeley**
Ph.D., Business Administration, Economic Analysis and Policy Program, 1989
Major Fields: Industrial Organization, Finance, Econometrics

**University of British Columbia**
M.A., Economics, 1978

**York University, Toronto**
B.S., Environmental Science, 1976

## Professional Experience

|         | |
|---------|-------------------------------------------|
| 2013-   | **NERA Economic Consulting** <br> Chair of NERA's Global Intellectual Property Practice |
| 1994-   | **NERA Economic Consulting** |
| 1998- 1994 | **Law & Economics Consulting Group, Inc.** |
| 1983-1989 | **University of California, Berkeley** <br> Research Assistant |
| 1985-1986 | **Minimax Research Corporation** <br> Economist |
| 1978-1981 | **Massachusetts Institute of Technology** <br> Visiting Economist |
| 1978    | **University of British Columbia** <br> Research Associate |

Alan J. Cox

# Expert Testimony, Affidavits, and Reports

*In re NCAA Student-Athlete Name and Likeness Licensing Litigation*, USDC for the Northern District of California Case No. 09-cv-1967-CW
*Expert Report* on September 25, 2013 on behalf of defendant, <u>Electronic Arts, Inc.</u> responding to plaintiffs' Third Consolidated Amended Class Action Complaint alleging an anticompetitive conspiracy to license and sell the names, images, and likeness of current and former student-athletes. *Deposition* on April 4, 2013 and *Declaration of Alan J. Cox Regarding Class Certification*, dated March 14, 2013, on behalf of defendant, <u>Electronic Arts, Inc.</u>, responding to plaintiffs' expert's class certification report with regard to collegiate video games.

*Granite Gaming Group I, LLC, et al. v. The Fremont Street Experience LLC, et al.*, District Court for Clark County, Nevada, Case No. A609440
Deposition on September 25, 2012 and Expert Report dated August 31, 2012 on behalf of defendants on liability issues regarding loss of sales due to defendants' alleged competitive operation of portable bars outside and in front of plaintiffs' casinos.

*L-3 National Security Solutions, Inc. v. Innovative Wireless Technologies, Inc.*, USDC Case No. 1:12-CV-00059 (LMB/TRJ)
Deposition on September 18, 2012, Expert Rebuttal Reports on behalf of plaintiff and on behalf of counterclaimant/defendant, both dated August 13, 2012 and Expert Report dated June 29, 2012 on behalf of plaintiff regarding lost sales and profits of plaintiff's underground mine emergency communication system due to defendant's alleged interference, breach of contract and alleged false advertisement under the Lanham Act.

*Life Technologies Corporation and Applied Biosystems, LLC v. Biosearch Technologies, Inc. and Eurofins MWG Operon Inc.*, USDC for the Northern District of California Case No. 3:12-cv-00852-WHA (JCS)
Deposition on August 30, 2012 and Expert Report dated August 3, 2012 on behalf of plaintiffs regarding damages suffered as a result of alleged patent infringements by defendants.

*FormFactor, Inc. v. Micro-Probe Incorporated and David Browne*, USDC Case No. CV10-03095 PJH
Deposition on May 25, 2012 and Expert Rebuttal Report dated May 18, 2012 on behalf of defendants regarding unjust enrichment damages to plaintiff from alleged conspiracy and misappropriation of trade secrets.

*Gen-Probe Incorporated v. Becton, Dickinson and Company*, USDC Case Nos. 09-CV-2319 BEN (NLS) and 10-CV-0602 BEN (NSL).
Deposition on June 15, 2012, Expert Rebuttal Report on May 29, 2012  on behalf of defendant regarding lost profits, price erosion and reasonable royalty damages from alleged patent infringement, and Expert Report on May 7, 2012 on behalf of defendant regarding whether plaintiff's alleged inventions achieved "commercial success" indicative of a non-obvious advance over prior art processes and caps.

42

*In the Matter of:  Certain DC-DC Controllers and Products Containing the Same*
U.S. International Trade Commission Investigation No. 337-TA-698
Testimony on March 2, 2012, Expert Rebuttal Report on January 12, 2012, Deposition on
December 27, 2011 and Expert Report on December 2, 2011 on behalf of enforcement
complainants, RichTek Technology Corporation and RichTek USA regarding economic benefits to
respondent as a result of respondent's non-compliance with Consent Order and respondent's ability
to pay fine, and on the need for a general exclusion order.

*Oracle America, Inc. v. Google Inc*., USDC, Northern District of California, San Francisco, Case
No. CV 10-03561 (WHA).
Supplemental Expert Report dated February 17, 2012, Deposition on October 26, 2011 and Expert
Reply Report dated October 3, 2011 on behalf of defendant regarding damages to plaintiff from
alleged infringement of a copyright claim.

*International Fireproof Technology, Inc., et al v. Flame Seal Products, Inc., et al.*, USDC for the
Southern District of Texas, Houston Division Case No. 2011-cv-419.
Trial testimony on May 20 and 23, 2011, Deposition on May 11, 2011 Expert Report on behalf of
plaintiffs dated April 19, 2011.  False claims.

*Pegasus Imaging Corporation v. Northrop Grumman Corporation, et al.*, USDC (Middle District
of Florida, Tampa Division) Case No. 8:07-cv-01937
Deposition on July 2, 2010 and Rebuttal Expert Report dated June 3, 2010 on behalf of defendants
regarding economic damages allegedly suffered by plaintiff as a result of defendants' breach of
license agreement and copyright infringement.

*BlueGem Security, Inc. v. Trend Micro Incorporated*, USDC (C.D. Cal), Case No. CV08-01492
ODW (FFMx)
Trial testimony on September 28, 2010, Deposition on August 27, 2010 and Expert Report on
March 30, 2010 on behalf of defendant regarding damages arising out of defendant's alleged
infringement of plaintiff's technology.

*MedImmune, LLC v. PDL Biopharma, Inc*., USDC (N.D. Cal) Case No. CV 08 5590 JF
Deposition on October 7, 2010, Expert Rebuttal Report on September 15, 2010, Expert Report on
August 23, 2010 and Expert Report on February 16, 2010, on behalf of defendant/counterclaimant
regarding reasonable royalties owed for plaintiff's/counter defendant's alleged patent infringement.

*Veronica Gutierrez, et al. v. Wells Fargo & Company, et al*., USDC (N.D. Cal) Case No. C 07-
05923 WHA (JCSx)
Trial testimony on May 7, 2010, Deposition on February 5, 2010 and Expert Report dated January
27, 2010 on behalf of defendant, in response to plaintiffs' experts' calculation of damages suffered
as a result of defendant's methods of charging overdraft fees on its customers' checking accounts.

43

*In re Application of San Pablo Bay Pipeline Company LLC for Approval of Tariffs for San Joaquin Valley Crude Oil Pipeline* (Application No. 08-09-024 before the Public Utilities Commission of the State of California)
Testimony and Cross Examination on May 18, 2010, Rebuttal testimony on April 15, 2010 and Direct testimony on behalf of Chevron Products Company regarding the market power of San Pablo Bay Pipeline Company, a division of Shell Oil, dated November 16, 2009.

*Ricardo Alfonso Leon, et al. v. Jose Francisco Leon, et al*., Los Angeles County Superior Court Case No. BC 376704, related to Case No. BP 069765
Deposition on August 21, 2009, on behalf of plaintiffs, assessing of damages for misappropriated assets.

*Mike Alexandros, et al. v. KOR Electronics, Inc.*, et al., Orange County Superior Court Case No. 06-CC-07881.
Trial testimony on January 27, 2010, deposition testimony on April 29, 2009, regarding damages to minority shareholder plaintiffs as a result of alleged fraud and breach of fiduciary duty by controlling shareholder defendants.


# PUBLICATIONS

"The Demise of Junk Science And The 25% Rule," column published in *IPLaw360*, 29 July 2010, with Stephen Rusek.  It discusses the use of the so-called 25 Percent Rule which the writers point out has no rational, scientific, or business basis.  This lack of principal combined with the *ad hoc* manner in which the purported rule is implemented can also give wildly unpredictable results.

 "Three Cases Reshaping Patent Licensing Practice," article published in *Managing Intellectual Property*, 1 March 2010, with Dr. Elizabeth M. Bailey and Dr. Gregory K. Leonard.

 "Compensatory Damages Issues in Patent Infringement Cases: A Handbook for Federal District Court Judges."  Participation, with committee members, which included legal practitioners, trial judges, damages experts, and academics, in the development of a handbook for trial courts to consult on procedural practices that may be helpful in the management and adjudication of damages issues in patent cases.  20 January 2010.

"2 Economists' Take On i4i V. Microsoft," column published in *Law360*, 23 November 2009, with Mario Lopez, reviewing the damages raised in the CAFC's hearings in the I4I case and the appropriate standards for estimating damages in patent infringement cases.

"Intellectual Property Rights Protection in China: Economic Damages Still Need Improving," Oliver Wyman Journal, pp. 93-94, Spring 2009, with Kristina Sepetys.

 "Intellectual Property Rights Protection in China:  Trends in Litigation and Economic Damages," working paper, 13 February 2009, with Kristina Sepetys (English and Chinese versions).

44

Alan J. Cox

 "Intellectual Property Rights Protections Emerging in China: System Far from Perfect," Executive Counsel, pp. 42-45, July/August 2006, with Kristina Sepetys.

 "Intellectual Property Rights Protection in China: Litigation, Economic Damages, and Case Strategies," Thompson/West (197 Supp. 4), pp. 401-421, with Kristina Sepetys.

 "Intellectual Property Rights Protection in China: Litigation, Economic Damages, and Case Strategies," *Economic Approaches to Intellectual Property Policy, Litigation, and Management,* (White Plains: National Economic Research Associates, 2005), *pp*. 293-313 with Kristina Sepetys.

 "The Frequently Forgotten Benefits of Price Discrimination," *Economics of Antitrust - New Issues, Questions, and Insights*, ed. Dr. Lawrence Wu (White Plains: National Economic Research Associates, 2004), 99-107.

# PRESENTATIONS AND WORKING PAPERS

"Intangibles: The Challenge of Understanding Value Creation within Multinational Enterprises." In this NERA seminar, held in Paris on 12 December 2013, Dr. Cox and NERA colleagues, Dr. Emmanuel Llinares and Vice President Sébastien Gonnet discussed how to identify and map intangibles within multinational enterprises (MNEs), and presented the economic framework for intangibles valuation.

Presentation to Gibson Dunn & Crutcher, LLP titled "Determining Whether a Stock (or Stocks) Traded Efficiently and the Deutsche Bank Decision," in San Francisco on December 4, 2013. Discussed issues involved in Securities 10b5 cases as they relate to efficient markets and explored the US District Court's interesting decision in *Deutsch Bank*.

Presentation to Latham & Watkins, LLP titled "Determining Whether a Stock (or Stocks) Traded Efficiently," in San Francisco on October 15, 2013.

Participation, in *Economics Analysis of Business Disputes*, seminar hosted by NERA in Tokyo on July 19, 2013. Dr. Cox and Economists from NERA's Japan and US offices examined recent economic analyses in complex business disputes and litigation in Japan and the United States. Dr. Cox presented "Trends in Patent Litigation in the United States: Consequences for Global Companies."

Presentation to Haynes and Boone, LLP titled "Patent Trolls or Patent Angels: Who are They and How do They Affect Innovation?" in Dallas, Texas on June 12, 2013.

Participation in the *IP Strategy Summit: Enforcement*, hosted by IGlobal Forum in Washington, DC on 29-30 May 2013. "Standard Essential Patents (SEPS) and Your Enforcement Strategy," moderated by NERA colleague, Dr. David Blackburn, and panelists Dr. Alan Cox, Paul Michel, retired Chief Judge of the Federal Circuit and Laura Beth Miller of Brinks Hofer Gibson & Lion discussed the current SEPs landscape in light of recent disputes among smartphone technology owners, the recent RAND decision in the *Microsoft v. Motorola* case and trends in both federal courts and the US International Trade Commission. Dr. Cox also took part on a panel entitled "International Enforcement: Globalization and Your IP," which covered intellectual property enforcement issues in China, India and Europe.

Dr. Cox was invited to address the course in "Intellectual Property Legal Practice" at Beijing University School of Law on 3 March 2013. The course, managed by the Beijing office of King & Wood Mallesons, is designed to enable students to master the basic theory and practices of intellectual property law. Dr. Cox discussed issues of intellectual property valuation, damages assessment, and possible anticompetitive uses of intellectual property incorporated into standards.

Participation, in the 2012 *Cross-Border IPR Dispute Resolution Conference*, hosted by ASCo: Seoul, Korea on October 17-18, 2012. NERA sponsored this conference, where Dr. Cox led a master class entitled "IPR Negotiation: Effective Calculation of Patent Damages and Negotiation Tactics."

Presentation, a GIL 2012: The Global Community of Growth, Innovation and Leadership, hosted by the GIL Community: San Jose, California. Dr. Cox gave a presentation on "Developments in IP Protection in China" on September 12, 2012.

Presentation to Latham & Watkins, LLP titled "Current Use of Economic Analyses in Class Certification in Securities Fraud Matters" with NERA colleague Stefan Boettrich in New York City on January 17, 2012.

Participation, in "The Lifecycle of a US 'Class Action' Lawsuit: What Chinese Companies Need to Know," hosted by Marsh: Beijing, China, November 1, 2011.

"Recent trends in US patent litigation and the impact on non-US companies" at the 8th Annual Asia-Pacific IP Forum in, Kowloon, Hong Kong on September 29, 2011.

"International Trends in Securities Fraud Litigation and the Impact on Chinese Companies," presentation with NERA colleague Mark Berenblut, hosted by the Hong Kong Society of Financial Analysts on September 27, 2011 in Hong Kong. Dr. Cox discussed the economics of damages claims in lawsuits alleging securities fraud by directors and officers of companies listed on the US and other stock exchanges.

"Comparables: the use and misuse of benchmark royalty rates for patent damages," hosted by Dewey LeBeouf, San Francisco on July 12, 2011. Dr. Cox addressed the role of licenses and industry benchmarks in the determination of reasonable royalties.

Panelist at the "Stanford IP Seminar for Intellectual Property Judges from The People's Republic of China," hosted by Stanford Law School May 23-27, 2011. Dr. Cox and co-panelist, USDC for the Northern District of California, Elizabeth D. Laporte, Magistrate Judge, discussed current United States intellectual property law and patent damages.

"Licensing and Litigating Reasonable Royalties for the Patents in Technical Standards," hosted by the Austin Chapter of Licensing Executives Society (LES) on May 31, 2011. Dr. Cox discussed the difficulties in defining a Fair, Reasonable, and Non-Discriminatory (FRAND) royalty, an issue that often results in litigation.

"Implications of Recent Legal Developments on the Handling of Patent Cases in the Trial Court." Dr. Cox discussed the evolving standards in damages estimation at the patent litigation presentation to the District Judicial Council for the Southern District of California on April 25, 2011 in Dana Point, CA.

"The Convergence of Recent Case Law and How the *Uniloc*, *ResQnet* and *Cornell* Federal Circuit Decisions May Impact the Value of Your IP," hosted by the San Francisco Chapter of Licensing Executives Society (LES) on March 30, 2011. Dr. Cox participated in a discussion of the CAFC's rulings in *Uniloc*, *ResQnet*, *Cornell*, and other cases.

"Unlocking *Uniloc*: Meeting the Court's New Evidentiary Standards for Reasonable Royalties," one of a series of roundtable discussions hosted by NERA in San Francisco on March 3 and Palo Alto, California on March 4, 2011.

Moderator, "*Uniloc v. Microsoft*: A Key New Ruling For Patent Damages," expert analysis telebriefing hosted by Law Seminars International on January 21, 2011.

Presentation to Allen and Overy LLP and to Ashurst LLP titled "The Simple Economics of Reasonable Royalties for Patents Incorporated into a Technical Standard," in London on December 6, 2010.

"Trends in Intellectual Property Protection and Antitrust Enforcement in China," seminar hosted by NERA in San Francisco on November 3, 2010.

Presentation at Foley & Lardner LLP's "Eye on China Roundtable Series," by Dr. Cox with Victor Xue, Executive Vice-President, US-China Green Energy Council and Catherine Sun, Managing Partner, Foley & Lardner Shanghai Offices, titled "IP Enforcement in China 2010: Myth or Reality?" given in Palo Alto on November 1, 2010.

Silicon Valley Chapter of Licensing Executives Society, Panelist, "Licensing and Litigating Reasonable Royalties for the Patents in Technical Standards," September 22, 2010.

"Tips for Determining 'Reasonable' Royalties: The impact of recent case law on the economic analysis." Presentations at conference on "Legal Issues In Software Development," sponsored by Law Seminars International on June 16, 2010, in Seattle, WA.

47

Presentation to ZTE Corporation on June 4, 2010 in ShenZhen, China on patent infringement damage calculations in the United States.

Presentation to the Supreme People's Court of the People's Republic of China, including Chief Justice Kong Xiangiun, on May 26, 2010. Dr. Cox, together with NERA colleague, Dr. Fei Deng, discussed the methods used in the United States to calculate damages in patent, trade secret, and trademark infringement litigation. They also discussed antitrust issues related to intellectual property.

"Infringement Decisions and Judgments:  Important Lessons from High Profile Cases," presented at the 2nd Annual Anti-Monopoly & Competition Law Summit held May 25-27 in Beijing. Dr. Cox discussed the differing treatment of *Intel* in jurisdictions around the world.

Panelist, "Trade Secret Remedies—Getting Creative," one-hour webinar hosted by the Intellectual Property Owners Association IP Chat Channel on April 1, 2010.

"Using Economics to Accurately Valuate IP," presentation with colleagues, Stephen Rusek and Dr. Mario Lopez, given at the Fenwick & West  LLP Mountain View office on February 25, 2010.

"Damage Quantification in Patent Litigation:  Putting the 'Reasonable' in Reasonable Royalty Rate Determinations," seminar hosted by NERA in Toronto, Canada on December 9, 2009. Dr. Cox and colleague, Mark Berenblut discussed patent valuation and reasonable royalties.

"Groundhog Day: Recurring Themes on Reasonable Royalties in Recent IP Damage Cases," NERA working paper, December 7, 2009, with colleagues Dr. Elizabeth M. Bailey and Dr. Gregory K. Leonard.

"Economic Basis for Damages Awards in United States Patent Litigation," a lecture on damages in patent infringement matters given at the University of Washington, School of Law, on October 20, 2009.

"Damages and Economic Analysis of Liability in International Context," presented by Dr. Alan Cox at the ABTL's 36th Annual Conference, "Lost in Translation:  Cross-Border Litigation Tactics and Strategies." The conference took place at The Broadmoor, Colorado Springs, CO on October 1-4, 2009.

48

Moderator, "Trying Damages in a Patent Case:  The Impact of Some Recent Decisions," teleconference organized by Law Seminars International on September 29, 2009.  Dr. Cox, joined by colleagues Dr. David Blackburn (NERA); Richard F. Cauley of Wang, Hartmann; James W. Morando of Farrella Braun, and Darin W. Snyder of O'Melveny & Myers, discussed trends in Federal Circuit patent damages decisions.


 "Entire Market Value Rule and Apportionment in Calculating Patent Damages."  Presentation with Gregory Leonard given at Latham & Watkins LLP in San Francisco, CA on August 6, 2009.

"Impact of Patent Purchase and Patent Reform on Enforcement Damages," presented by Dr. Alan Cox at the ICAP / Ocean Tomo 2009 IP Markets Conference and Patent Auction held in Chicago, IL on July 22-23, 2009.

"Patent Damages," a conference presented by Law Seminars International on April 20, 2009 in San Francisco, CA, co-chaired by Alan Cox and Alexander Brainerd, Esq., Sonnenschein Nath & Rosenthal LLP.

"Antitrust and Intellectual Property Economics and Litigation in China" seminar, sponsored by NERA Economics Consulting.  Dr. Cox, with Fei Deng and Gregory Leonard presented an overview of recent trends in the Chinese business and legal climate in Washington, D.C. on April 16, 2009, and in San Francisco on April 23, 2009.

"Hot Topics in Copyright Trademark and Patent Law."  Session organized and moderated at the ABA's 24th Annual Intellectual Property Conference in Arlington, VA:  "The Supreme Court's Effect on patent Licensing and Litigation Practice."  April 4, 2009.

"Trends in Damage Awards for Intellectual Property Infringement in the People's Republic of China."  Presentation to the American Society of International Law at its March 25, 2009 annual meeting in Washington, D.C.  Dr. Cox discussed the current status of judicial enforcement of intellectual property rights and the impact of revisions in the Patent Law.

"Shareholder Class Action Litigation – Recent Trends."  Presentation to the Arizona Chapter of the National Association of Corporate Directors Institute, on March 3, 2009 in Scottsdale, Arizona. Dr. Cox discussed recent trends in shareholder class action litigation and the ways in which Board members can be on top of this issue.

"Basic Economic Analysis in Securities Class Action," a lecture on damages in securities fraud matters given at the University of Washington, School of Law, on February 25, 2009.

"An Economic View on Current Issues in Reasonable Royalty Analyses," Presentation to Wilson Sonsini Goodrich & Rosati, Palo Alto, California on January 29, 2009.

"A Short Course in Economics:  Lecture 1, Supply and Demand," at O'Melveny & Myers LLP of San Francisco on January 28, 2009.

"Antitrust Problems in Standard-Setting" presented at the conference on China's Antimonopoly Law and Regulation on Abuse of Intellectual Property Rights, hosted by the China Society for World Trade Organization Studies under MOFCOM, on April 27, 2008 in Beijing, China.

Panelist, "Recent Antitrust Enforcement Activity in the Payment Card Industry: A TransAtlantic View," telephone Brownbag Program hosted by The Financial Services Committee of the American Bar Association Section of Antitrust Law on February 22, 2008 in Washington, DC.

"Trends in Securities Class Actions and Issues in Subprime Litigation," a conference presented by the Oregon State Bar Regulations Section in Portland, Oregon on January 16, 2008.

"Innovative Strategies for Litigating Class Action Suits," a conference presented by Law Seminars International on November 12-13, 2007 in Los Angeles, California. Presentation by Alan Cox entitled "Role of Expert Testimony – Economic Experts: Strategies to employ experts, when and how to effectively use them."

"Standards Bodies & Patent Pools – Key Legal and Business Developments," a conference presented by Law Seminars International on October 11-12, 2007, in Arlington, VA. Dr. Alan Cox delivered a presentation entitled "Tips for Determining 'Reasonable' Royalties," with Gil Ohana, Esq., of Wilmer, Cutler, Pickering, Hale and Door LLP.

"Calculating & Proving Patent Damages," Law Seminars International Advanced Workshop. Program Co-Chair with Darylyn Durie. Presentation entitled, "Getting the Data You Want From the Other Side through Discovery and 30(b)(6) Depositions," given in San Francisco, February 27-28, 2006.

"Standard Setting, Market Power and Intellectual Property Value," given in Portland, Oregon on April 26, 2005; Seattle, Washington on April 27, 2005 and in San Francisco on April 28, 2005.

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Bingham McCutchen for boards of directors and their advisors at a session in Santa Clara, CA on March 4, 2004.

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Akin, Gump, Strauss, Hauer & Feld for boards of directors and their advisors at a session in San Francisco, CA on January 13, 2004.

"Advanced IP Licensing Transactions - Business and Legal Issues," Law Seminars International Comprehensive Workshop. Presentation by Alan Cox about Valuing Intellectual Property, held in Seattle, WA on January 12, 2004.

# Appendix B.    Materials Reviewed and/or Relied Upon

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Allocation Positions and Related Documents** | | |
| Allocation Position of the Monitor and Canadian Debtors | 16-May-2013 | |
| Allocation Position of the Canadian Creditors' Committee | 16-May-2013 | |
| Allocation Position of Nortel Networks Inc. and the Other U.S. Debtors and the Official Committee of Unsecured Debtors | 16-May-2013 | |
| Opening Allocation Position of *Ad Hoc* Group of Bondholders | 16-May-2013 | |
| Allocation Position of the Joint Administrators Regarding the Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets | 16-May-2013 | |
| Allocation Position of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund | 16-May-2013 | |
| Joint Response of the Monitor and Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants and Accompanying Schedules | 29-May-2013 | |
| Canadian Creditors' Committee Response to the Core Parties' Opening Allocation Positions | 29-May-2013 | |
| Response of U.S. Debtors and Official Committee of Unsecured Creditors to the Core Parties' Allocation Positions | 29-May-2013 | |
| Response of *Ad Hoc* Group of Bondholders to Allocation Positions of Other Core Parties | 29-May-2013 | |
| Responding Allocation Position of the Joint Administrators Regarding the Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets | 29-May-2013 | |
| Allocation Response of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund | 29-May-2013 | |
| Responding Submission of Wilmington Trust, National Association | 29-May-2013 | |
| Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings of the Other Core Parties | 29-May-2013 | |
| **Agreements** | | |
| Nortel Distribution Agreements | 2001-2013 | NNC-NNL06001464 - NNC-NNL06001513 |
| Master R&D Agreement and Addenda | 2004 - 2009 | NNC-NNL06001514 - NNC-NNL06001516 |
| Interim Funding and Settlement Agreement | 9-Jun-2009 | |
| **Depositions and Deposition Exhibits** | | |
| Transcripts and Exhibits for the Deposition of Ron Horn | 24-Sep-2013 | |
| Transcripts and Exhibits for the Deposition of Khush Dadyburjor | 3-Oct-2013 | |
| Transcripts and Exhibits for the Deposition of Eric Philip Jensen | 8-Oct-2013 | |
| Transcripts and Exhibits for the Deposition of George Riedel, including: | 10-Oct-2013 | |
| Exhibit 12004 to the Deposition of George Riedel: "Standing Committee on industry, Science and Technology, Evidence Number 32, Unedited Copy, Public Part Only" | 7-Aug-2009 | |
| Transcripts and Exhibits for the Deposition of Clive Allen | 11-Oct-2013 | |
| Transcripts and Exhibits for the Deposition of Christopher James Cianciolo, including: | 15-Oct-2013 | |
| Exhibit 11150 to the Deposition of James Cianciolo: "IP Aspects of Residual Co." | 8-Jul-2009 | |
| Transcripts and Exhibits for the Deposition of Brian McFadden | 21-Oct-2013 | |
| Transcripts and Exhibits for the Deposition of Pavi Binning | 24-Oct-2013 | |
| Transcripts and Exhibits for the Deposition of Michelle Lee | 28-Oct-2013 | |
| Transcripts and Exhibits for the Deposition of Angela Anderson | 31-Oct-2013 | |
| Transcripts and Exhibits for the Deposition of John P. Veschi | 7-Nov-2013 | |
| Transcripts and Exhibits for the Deposition of Gillian McColgan | 8-Nov-2013 | |
| Transcripts and Exhibits for the Deposition of John J. Roese | 11-Nov-2013 | |
| Transcripts and Exhibits for the Deposition of John J. Roese | 12-Nov-2013 | |
| Transcripts and Exhibits for the Deposition of Timothy Collins | 15-Nov-2013 | |
| Transcripts and Exhibits for the Deposition of Angela DeWilton | 20-Nov-2013 | |
| Transcripts and Exhibits for the Deposition of Pascal Debon | 25-Nov-2013 | |

52

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Financial Statements and Annual Reports** | | |
| Nortel Networks Corporation Form 10-K (including amended versions) for the fiscal years ended December 31, 2000-2006, 2008-2009 | | NNC-NNL06001435- NNC-NNL06001438; NNC-NNL06001422- NNC-NNL06001428 |
| Nortel Form 10-K for the fiscal year ended December 31, 2011 | | |
| Summaries of Nortel 10-K Data, *Factset* | | |
| Nortel Networks Corporation Annual Report for the years 1996-1999, 2007 | | NNC-NNL06001431 - NNC-NNL06001433; NNC-NNL06001421, NNC-NNL06001429 |
| Avaya Inc. Form 10-K for the fiscal year ended September 30, 2010 | | |
| Ciena Corporation Form 10-K for the fiscal year ended October 31, 2010 | | NNC-NNL06001135 |
| Kapsch Group, Annual Report for Fiscal Year 2010/11 | | |
| LM Ericsson Form 20-F for the fiscal year ended December 31, 2009 | | NNC-NNL06001133 |
| LM Ericsson Form 20-F for the fiscal year ended December 31, 2010 | | NNC-NNL06001132 |
| **Financial Data** | | |
| Nortel US GAAP Trial Balances: | 2005 | NNC-NNL06136864 |
| | 2006 | NNC-NNL06136866 |
| | 2007 | NNC-NNL06136868 |
| | 2008 | NNC-NNL06136870 |
| | 2009 | NNC-NNL06136872 |
| Nortel Revenue by Customer, Portfolio, Region, Entity and Market Data | 2000-2009 | NNC-NNL11428742 - NNC-NNL11428751 |
| Nortel Transfer Pricing Residual Profit Split Models, including: | 2001-2008 | NNC-NNL06001535; NNC-NNL06001537 - NNC-NNL06001548 |
| File named "2006 TP Calculation-MLTN_-v01.xls" | | NNC-NNL06001539 |
| File named "2007 TP Calculation-MLTN_-v01.xlsx" | | NNC-NNL06001540 |
| File named "Q4 2008 TP Calculation-FINAL_-v01.xlsx" | | NNC-NNL06001537 |
| Nortel Goodwill Impairment Memoranda and Analyses | 2007 - 2009 | NNC-NNL06136975;NNC-NNL06137057; NNC-NNL06137093; NNC-NNL06137096; NNC-NNL06137100; NNC-NNL06375855 |
| Carve-Out Financial Statements for Nortel Business Lines | 2007 - 2010 | NNC-NNL06001439 - NNC-NNL06001458 |
| Carrier Networks - Wireless Business Plan | 15-Apr-2009 | NNL06001463 |
| Project Equinox Summary of Assumptions for 2009 Monthly Cash Flow Model DRAFT | 22-Apr-2009 | NNI_00068079 |
| Nortel Transaction Accounting Memoranda for Business Sales | February 2009, January - June 2010 | NNC-NNL10016393; NNC-NNL10017526; NNC-NNL10017893; NNC-NNL10017898; NNC-NNL10017903; NNC-NNL11676530; NNC-NNL11676647; NNI_00216465 |
| 2010 Nortel Consolidated Budget - Preliminary | 26-Mar-2010 | NNL06001462 |
| Nortel Escrow Account Summary, sheet named "Global Cash". | 31-May-2013 | EMEAPROD2171248 |
| Nortel Transfer Pricing Adjustments (TPA) Forecast, file named "2010 R&D Capital Stock.xls", sheet named "IP owner R&D". | | NNC-NNL06001536 |
| File named "2009-11 Gain-Loss by company full-expand-no-compare.xlsx" | | NNC-NNL11152149 |
| Data on Customer Revenues by Business Line and Customer Contracts Acquired by Purchasers in the Business Sales | | NNC-NNL06001587- NNC-NNL06001593 |
| Nortel Government Solutions Unaudited Net Assets For Evaluation of Goodwill Carrying Value | | NNL06127766 |
| Forecasts and BU Allocation, Goodwill Analysis | | NNL06137100 |
| Forecasts and BU Allocation, Goodwill Analysis | | NNL06375855 |
| Project Equinox Forecasts DRAFT | | NNL07931886 |
| 2008-2011 Equinox portfolio PL trends final | | NNL07982049 |

53

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Transfer Pricing-Related Documents** | | |
| Economic Analysis of Nortel Networks' Intercompany Transactions, Horst Frisch Incorporated | 14-Mar-2002 | NNC-NNL004608 |
| Nortel Networks Functional Analysis For the years ended December 31, 2000-2004 | 14-Mar-2002 | NNC-NNL06001102 |
| Memoranda and Background Regarding Nortel Technology's Useful Life | 2003-2008 | NNC-NNL06001114 - NNC-NNL06001117 |
| Transfer Pricing Reports, Submissions, Government Responses, Advance Pricing Agreement Documents and Functional Interviews, including: | | NNC-NNL06001549 - NNC-NNL06001582; NNC-NNL06001602 - NNC-NNL06001607 |
| Nortel Networks Limited and Nortel Networks Inc., Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, 2007-2011 (with rollback to 2006) | 31-Oct-2008 | NNC-NNL06001560 |
| Nortel Networks Limited Transfer Pricing Report for the taxation year ended December 31, 2009 | | NNC-NNL06001553 |
| **Nortel Management Presentations for Business Sales** | | |
| Metro Ethernet Networks Project Snow Management Presentation | 1-Mar-2009 | NNL06001113 |
| Equinox Management Presentation | 14-Mar-2009 | NNL06001105 |
| Carrier Networks – Wireless Business | 15-Apr-2009 | NNL06001110 |
| Paragon Management Presentation | 1-May-2009 | NNL06001111 |
| Nortel LTE – Project MilkyWay Information Memorandum | 7-Jul-2009 | NNL06001107 |
| Nortel CDMA - Project Zenith Information Memorandum | 9-Jul-2009 | NNL06001106 |
| Nortel Government Solutions Management Presentation | 1-Aug-2009 | NNL06001108 |
| Enterprise Solutions Business Update | 12-Aug-2009 | NNL06001109 |
| Project Pluto (MSS) Management Presentation | 1-Feb-2010 | NOR_54180450 |
| Project Isis Information Memorandum | | NNL06001112 |
| **Analyst Reports** | | |
| Credit Suisse, Nortel Networks Initiating with Underperform Rating | 8-Jun-2007 | NNL06001164 |
| CIBC World Markets, "Nortel Networks Corporation Should You Act Now or Can you Wait". | 18-Aug-2008 | NNC-NNL06001162 |
| Datamonitor, Nortel Networks Corporation Company Profile | 29-Aug-2008 | NNL06001165 |
| CIBC World Markets, Nortel Networks Corporation Q3 Results In Line, The Focus Turns To Cost Cutting And Cash Preservation | 11-Nov-2008 | NNL06001163 |
| TD Newcrest, Nortel Networks Corp. Don't Expect Bankruptcy in 2009; Asset Sales Critical | 19-Dec-2008 | NNL06001169 |
| RBC Capital Markets, And Now the Counterparties Event: Lateral Implications from Nortel's Bankruptcy | 14-Jan-2009 | NNL06001168 |
| RBC Capital Markets, Nortel Networks Corp. No Sunshine After the Rain | 14-Jan-2009 | NNL06001167 |
| OneSource One-Stop Report, Nortel Networks Corporation | 24-Aug-2009 | NNL06001166 |
| Analyst Coverage of Nortel's Competitors, Purchasers of Nortel Businesses and the telecommunications industry, including: | 2000 - 2009 | NNC-NNL06001139 - NNC-NNL06001158; NNC-NNL06001170 - NNC-NNL06001270 |
| "Ciena Corp. We've Seen This Movie Before; Initiating with Underweight", J.P.Morgan Global Equity Research. | 15-Jul-2010 | NNC-NNL06001145 |

54

Appendix B
Documents and Information Reviewed

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Monitor Reports** | | |
| 1st Report of the Monitor. Court File No. 09-CL-7950 | 5-Feb-2009 | |
| 2nd Report of the Monitor. Court File No. 09-CL-7950 | 25-Feb-2009 | |
| 5th Report of the Monitor. Court File No. 09-CL-7950 | 26-Mar-2009 | |
| 11th Report of the Monitor. Court File No. 09-CL-7950 | 28-May-2009 | |
| 12th Report of the Monitor. Court File No. 09-CL-7950 | 28-May-2009 | |
| 14th Report of the Monitor. Court File No. 09-CL-7950 | 23-Jun-2009 | |
| 17th Report of the Monitor. Court File No. 09-CL-7950 | 27-Jul-2009 | |
| 18th Report of the Monitor. Court File No. 09-CL-7950 | 31-Jul-2009 | |
| 20th Report of the Monitor. Court File No. 09-CL-7950 | 15-Sep-2009 | |
| 23rd Report of the Monitor. Court File No. 09-CL-7950 | 13-Oct-2009 | |
| 24th Report of the Monitor. Court File No. 09-CL-7950 | 13-Oct-2009 | |
| 26th Report of the Monitor. Court File No. 09-CL-7950 | 26-Oct-2009 | |
| 28th Report of the Monitor. Court File No. 09-CL-7950 | 27-Nov-2009 | |
| 34th Report of the Monitor. Court File No. 09-CL-7950 | 3-Jan-2010 | |
| 40th Report of the Monitor. Court File No. 09-CL-7950 | 26-Feb-2010 | |
| 52nd Report of the Monitor. Court File No. 09-CL-7950 | 30-Aug-2010 | |
| 54th Report of the Monitor. Court File No. 09-CL-7950 | 28-Sep-2010 | |
| 63rd Report of the Monitor. Court File No. 09-CL-7950 | 14-Apr-2011 | |
| **Other Materials Prepared by Nortel and/or its Advisors** | | |
| Nortel Presentation entitled "Valuation of Nortel Networks Japan's Intellectual Property Rights as of January 1, 2001" | 1-May-2003 | NNI_00376035 |
| Nortel Networks, "Project Swift, Summary for the auditors" | December 2007 | NNC-NNL06001601 |
| Credit Suisse Presentation to Nortel entitled: "Summary of Nortel's current situation". | 11-Sep-2008 | NNC-NNL07909626 |
| Ernst & Young: Report for Nortel Networks (UK) Limited, Valuation of EMEA Subsidiaries | 6-Nov-2008 | NNC-NNL06001600 |
| NNC Entity Structure Chart-Jan5'09 v7.ppt | 5-Jan-2009 | NNC-NNL06001104 |
| Lazard Draft Discussion Materials | 25-Mar-2009 | LAZ-NRTL-0037463 |
| McKinsey & Company Discussion Draft Presentation | 27-Mar-2009 | NNC-NNL06273841 |
| Lazard Draft Snow Valuation Discussion Materials | 12-May-2009 | LAZ-NRTL-00037522 |
| Lazard Draft Discussion Materials | 12-May-2009 | LAZ-NRTL-00037522 |
| Lazard Draft CVAS Valuation Discussion Materials | 13-May-2009 | LAZ-NRTL-00037491 |
| Lazard Discussion Materials | June 2009 | LAZ-NRTL-00037453 |
| Nortel Presentation entitled "First Cut and Equinox Intellectual Propoerty Valuation, Patents and Non-Patent IP" by Gillian McColgan, David Smith and Chris Cianciolo. | 13-Jul-2009 | NNI_01462708 |
| Lazard Draft Discussion Materials | August 2009 | LAZ-NRTL-00037502 |
| Nortel Presentation Entitled "Project Snow - Total Assets at Dec 31, 2008" by Mark Hamilton | 17-Sep-2009 | LAZ-NRTL-00007165 |
| Nortel Presentation Entitled "Update on Project Snow" | 23-Sep-2009 | LAZ-NRTL-00039499 |
| Nortel Presentation Entitled "Update on Project Snow" | 23-Sep-2009 | LAZ-NRTL-00039506 |
| Project Snow Valuation Table | 1-Dec-2009 | LAZ-NRTL-00039396 |
| Global IP Law Group Presentation to Nortel entitled: "Patent Portfolio Analysis Phase One" | 16-Dec-2009 | NNC-NNL06001121 |
| Lazard Draft Discussion Materials | 1-Mar-2010 | LAZ-NRTL-00037507 |
| Lazard Draft Discussion Materials | March 2010 | LAZ-NRTL-00037507 |
| Nortel Working Draft Presentation Entitled "Cost of Capital Backup Materials" | 1-Mar-2010 | LAZ-NRTL-00037516 |
| Presentation entitled "IP Co. - Preliminary Summary Valuation" | 27-Apr-2010 | NNC-NNL06001118 |
| Presentation entitled "IP Co. Update to Nortel Leadership Team" | 27-Apr-2010 | NNC-NNL06001119 |
| Lazard IP Co. Preliminary Summary Valuation | 28-Apr-2010 | LAZ-NRTL-00018811 |
| Lazard IP Co. Preliminary Summary Valuation | 28-Apr-2010 | LAZ-NRTL-00037522 |

55

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Other Materials Prepared by Nortel and/or its Advisors (continued)** | | |
| Lazard Presentation Entitled "Project Pluto: Round 2 Bids Overview" | 1-May-2010 | LAZ-NRTL-00033279 |
| Lazard IP Co. Preliminary Summary Valuation Version 2.2 | 6-May-2010 | LAZ-NRTL-00018812 |
| Presentation Entitled: "Nortel's IP Team and Patent Portfolio" | 1-Aug-2010 | LAZ-NRTL-00018845 |
| Presentation Entitled: "Nortel's IP Team and Patent Portfolio" | 1-Aug-2010 | LAZ-NRTL-00018879 |
| Deloitte: Nortel Networks Proceeds Allocation - "The Fourth Estate" | 25-Oct-2010 | NNC-NNL06101936 |
| Deloitte: Nortel Networks, Fair Market Value of Net Assets Transferred by the "Fourth Estate" | 25-Oct-2010 | NNC-NNL06001599 |
| Email from Colin Keenan to Kevin Ackhurst re: "Fw: Iceberg" | 7-Jan-2011 | LAZ-NRTL-00007164 |
| Lazard Model 3.0 Preliminary Valuations | [Undated] | LAZ-NRTL-00018813 |
| Lazard Model 3.0 Preliminary Valuations | [Undated] | LAZ-NRTL-00018814 |
| Lazard Preliminary Summary Valuation Spreadsheet | [Undated] | LAZ-NRTL-00018817 |
| Lazard IPR Model, Input Scenarios | [Undated] | LAZ-NRTL-00018337 |
| Nortel Presentation entitled "IP Migration, IP Sale Analysis" | [Undated] | EMEAPRIV0150321 |
| Presentation entitled "Valuation of NN Ireland, NN Australia, NNUK and NNSA (The Participants) Intellectual Property Rights/Participation in RPS as of December 31, 2005" | [Undated] | NNC-NNL06001120 |
| UMTS Business Sale Valuations, Memoranda, Intangible Allocation Calculations and the Share and Asset Sale Agreement | 2006 - 2007 | NNC-NNL034788; NNC-NNL06001583 - NNC-NNL06001586; NNC-NNL06030757 |
| Data Regarding Nortel Workforce by Business Line | 2008 - 2010 | NNC-NNL06001122 - NNC-NNL06001125 |
| Materials for Meetings of the Nortel Board of Directors | January - June 2009 | NNC-NNL06004195 - NNC-NNL06004211; NNC-NNL06242240; NNC-NNL06242243; NNC-NNL06242250 - NNC-NNL06242253; NNC-NNL06242316 - NNC-NNL06242324; NNC-NNL06242502 - NNC-NNL06242506; NNC-NNL06242552 - NNC-NNL06242579; NNC-NNL06242585 - NNC-NNL06242600 |
| Project Pluto Summary of Principal Issues Based on Bid Documentation Received from Mercury, Earth and Ganymede | | LAZ-NRTL-00033217 |
| Nortel Presentation Slides Entitled "Preliminary Summary Valuation" | | LAZ-NRTL-00037520 |
| List of Nortel Entities | | NNC-NNL06322794 |
| List of Nortel Entities | | NNC-NNL06733143 |
| Closing CDs for each of the Transactions | | NNC-NNL06001608 - NNC-NNL06002630; NNC-NNL07789312 - NNC-NNL07789401 |
| **Expressions of Interest from Potential Purchasers** | | |
| Expression of Interest, Ciena Corporation | 4-Dec-2008 | LAZ-NRTL-00022877 |
| Expression of Interest, Cisco Systems, Inc. | 12-Dec-2008 | LAZ-NRTL-00022903 |
| Expression of Interest, Platinum Equity Advisors, LLC | 29-Oct-2008 | LAZ-NRTL-00022919 |
| Expression of Interest, Polynate Software and Consulting Inc. | 28-Oct-2009 | LAZ-NRTL-00022925 |
| Expression of Interest, Tellab | 5-Dec-2008 | LAZ-NRTL-00022930 |
| Expression of Interest, Cisco Systems, Inc. | 12-Dec-2008 | LAZ-NRTL-00022939 |
| Preliminary Illustrative Snow Bid Analysis, Jefferies & Company, Inc. | 19-Nov-2009 | LAZ-NRTL-00039572 |
| Expression of Interest, Telefonaktiebolaget LM Erricsson | 25-Mar-2010 | LAZ-NRTL-00022881 |
| Expression of Interest, Francisco Partners | 25-Mar-2010 | LAZ-NRTL-00022890 |
| Expression of Interest, Silver Lake Sumeru Fund, L.P. | 25-Mar-2010 | LAZ-NRTL-00022897 |
| Expression of Interest, One Equity Parnters IV, L.P., GENBAND, Inc., and ANDA Networks Inc. | 26-Mar-2010 | LAZ-NRTL-00022921 |
| Expression of Interest, Francisco Partners | 25-Mar-2010 | LAZ-NRTL-00022926 |
| Expression of Interest, Silver Lake Sumeru Fund, L.P. | 25-Mar-2010 | LAZ-NRTL-00022933 |

56

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Press Releases** | | |
| Genband Press Release, "GENBAND's G6 Universal Media Gateway Completes Compatibility Testing With Nortel Communications Server 2000" | 20-Dec-2006 | |
| Verizon Press Release, "Verizon Wireless Fosters Global LTE Ecosystem as Verizon CTO Dick Lynch Announces Deployment Plans" | 18-Feb-2009 | |
| Nortel Networks Press Release, "Nortel to Sell CDMA Business and LTE Assets; Company Advancing in Its Discussions with External Parties to Sell Other Businesses" | 19-Jun-2009 | |
| Genband Press Release, "GENBAND Signs Agreement to Purchase Nortel's Carrier VoIP and Application Solutions Business Assets" | 23-Dec-2009 | |
| Kapsch Group Press Release, "Closing of the acquisition of parts of Nortel" | 1-Apr-2010 | |
| **News Stories** | | |
| Marisa Torrieri, *TMCnet*, "Interview: Ciena's Senior VP of Strategic Planning Discusses 'Stalking Horse' Bid for Nortel's Assets" | 13-Oct-2009 | |
| Greg Meckbach, *IT World Canada*, "Ciena buys Nortel metro Ethernet, optical units" | November 2009 | |
| Hugo Miller, Marcel van de Hoef, and Serena Saitto, *Bloomberg*, "Ciena Wins Nortel's Optical-Networks Unit at Auction" | 23-Nov-2009 | |
| Kevin Fitchard, *Connected Planet*, "Ericsson: Nortel GSM deal about the voice core" | 25-Nov-2009 | |
| Ray Horak, *Telecom Reseller*, "Avaya + Nortel = Exponentially Better…for Whom?" | 16-Feb-2010 | |
| Ionut Arhire, *Softpedia*, "Ericsson Completes Acquisition of Nortel's GSM Business" | 2-Apr-2010 | |
| **Books and Academic Articles** | | |
| Berenblut, M., "Business Valuation", in *The Litigator's Guide to Expert Witnesses*, Ch. 13. | | |
| Campbell, I.R., H.E. Johnson, H.C. Nobes, *Canada Valuation Service* . | March 2011 | |
| *Black's Law Dictionary* , 7th ed. | 1999 | |
| Campbell, I.R., H.E. Johnson, "The Valuation of Business Interests", *Canadian Institute of Chartered Accountants*. | 2001 | |
| **Accounting and Valuation Standards** | | |
| Statement of Financial Accounting Standards No. 157 - Fair Value Measurements | September 2006 | |
| ASA Business Valuation Standards. | 2009 | |
| **Cases Cited** | | |
| *Crossman v. Commissioners of Inland Revenue* , 37 A.C. 26 (1935), 1 K.B. 26. | 1935 | |
| *Buttrum v. Buttrum* , 2001 CanLII 28187 (ON SC) | 6-Apr-2001 | |

57

**Appendix C.    NNC Financial Statements**

**Appendix C-1**
**Nortel Networks Corporation**
**Consolidated Statements of Operations for the Years Ended December 31**

| | 2009[1] | 2008[2] | 2007[2] | 2006 | 2005[3] | 2004[3] |
|---|---|---|---|---|---|---|
| **Total Revenue** | $ 3,446 | $ 7,623 | $ 7,959 | $ 11,418 | $ 10,509 | $ 9,478 |
| Cost of Revenue | $ 1,926 | $ 4,464 | $ 4,621 | $ 6,979 | $ 6,231 | $ 5,556 |
| | 56% | 59% | 58% | 61% | 59% | 59% |
| Selling, General, and Administrative Expense | $ 585 | $ 1,152 | $ 1,476 | $ 2,503 | $ 2,429 | $ 2,146 |
| | 17% | 15% | 19% | 22% | 23% | 23% |
| Workforce reduction - SG&A | $ 48 | | | | | |
| | 1% | | | | | |
| Research and Development Expense | $ 680 | $ 1,141 | $ 1,299 | $ 1,939 | $ 1,874 | $ 1,975 |
| | 20% | 15% | 16% | 17% | 18% | 21% |
| Workforce reduction - R&D | $ 23 | | | | | |
| Amortization of Acquired Technology | | $ 21 | $ 24 | $ 26 | $ 17 | $ 9 |
| Goodwill Impairment | | $ 1,571 | $ - | $ - | | |
| Special Charges | | $ 251 | $ 199 | $ 105 | $ 169 | $ 181 |
| Sale of Business | | $ (11) | $ (31) | $ (206) | $ 47 | $ (91) |
| Shareholder Litigation Settlement Recovery | | $ - | $ (54) | $ (219) | $ 2,474 | $ - |
| Regulatory Investigation Expense | | $ - | $ 35 | $ - | $ - | |
| Royalty License Income, Net | $ (4) | $ (7) | $ (20) | $ (21) | $ (13) | |
| Litigation Recovery | $ 1 | $ 11 | $ (2) | $ 9 | $ (10) | |
| Billings under transition services agree | $ (15) | | | | | |
| Other Operating Expense (Income), Net | $ 101 | $ 45 | $ (2) | $ (1) | $ - | |
| In Process Research and Development Expense | | | | $ 22 | $ - | $ - |
| Sale & Write Down of Securities | | | | | | $ (19) |
| Restructuring | $ (971) | $ - | $ - | | | |
| **Total Operating Expense** | $ 2,374 | $ 8,638 | $ 7,545 | $ 11,136 | $ 13,218 | $ 9,757 |
| | 69% | 113% | 95% | 98% | 126% | 103% |
| **Operating Income** | $ 1,072 | $ (1,015) | $ 414 | $ 282 | $ (2,709) | $ (279) |
| | 31% | -13% | 5% | 2% | -26% | -3% |
| Interest and Dividend Income | | $ 110 | $ 219 | $ 140 | $ 115 | $ 92 |
| Interest Long Term Debt | $ (298) | $ (308) | $ (352) | $ (272) | $ (209) | $ (192) |
| Other Interest Expense | $ (1) | $ (14) | $ (28) | $ (68) | $ (10) | $ (10) |
| Rental income | $ 5 | | | | | |
| Gain on Loss on Sale of WD of Investment | $ (3) | $ 1 | $ (5) | $ (6) | $ 67 | |
| Foreign Currency Gains | $ 43 | $ (38) | $ 176 | $ (12) | $ 59 | $ 65 |
| Billings Under Transition Services Agreement | | $ - | $ - | | | |
| Other Income (Expense) | $ (9) | $ (17) | $ 14 | $ 77 | $ 31 | $ 41 |
| **Net Income Before Taxes** | $ 809 | $ (1,281) | $ 438 | $ 141 | $ (2,656) | $ (283) |
| Provision for Income Taxes | $ 101 | $ 3,193 | $ 1,122 | $ 60 | $ (81) | $ (20) |
| **Net Income After Taxes** | $ 708 | $ (4,474) | $ (684) | $ 81 | $ (2,575) | $ (263) |
| Non-controlling Interest | $ (17) | $ (152) | $ (114) | $ (59) | $ (39) | $ (33) |
| Equity Net Loss Associated Companies | $ (3) | $ 2 | $ 2 | $ (3) | $ 3 | $ - |
| Equity in net loss of Equity Investees | $ (445) | $ - | $ - | | | |
| **Net Income Before Extraordinary Items** | $ 243 | $ (4,624) | $ (796) | $ 19 | $ (2,611) | $ (296) |
| Discontinued Operations | $ 245 | $ (1,175) | $ (161) | $ - | $ 1 | $ 49 |
| Accounting Change | | | | $ 9 | $ - | $ - |
| **Net Income** | $ 488 | $ (5,799) | $ (957) | $ 28 | $ (2,610) | $ (247) |

**Notes and Sources:**
Data obtained from Factset.

[1] As restated in Nortel Form 10-K for the fical year ended December 31, 2010.

[2] As restated in Nortel Form 10-K for the fical year ended December 31, 2009.

[3] As restated in Nortel Form 10-K for the fical year ended December 31, 2006.

NERA Economic Consulting

**Appendix C-2**
**Nortel Networks Corporation**
**Consolidated Balance Sheets, as of December 31**

| | 2009[1] | 2008[2] | 2007[2] | 2006 | 2005[3] | 2004[3] |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash | $ 857 | $ 1,073 | | | | |
| Cash Equivalents | $ 1,141 | $ 1,324 | $ 813 | $ 748 | $ 767 | $ 773 |
| Short Term Investments | $ 18 | $ 65 | $ 2,719 | $ 2,744 | $ 2,184 | $ 2,912 |
| Restricted Cash | $ 92 | $ 36 | $ 76 | $ 639 | $ 77 | $ 80 |
| Prepaids | $ 54 | $ 98 | $ 152 | $ 175 | | $ 177 |
| Taxes Recoverable | $ 30 | $ 107 | $ 77 | $ 64 | | $ 38 |
| Current Investment | $ 10 | $ 21 | $ 15 | $ 51 | | |
| Other Current Assets | $ 254 | $ 229 | $ 223 | $ 452 | $ 798 | $ 129 |
| Deferred Taxes | $ 24 | $ 44 | $ 487 | $ 276 | $ 377 | $ 255 |
| Accounts Receivable | $ 593 | $ 1,930 | $ 2,277 | $ 2,464 | $ 2,966 | $ 2,619 |
| Notes Receivable | $ 3 | $ 3 | $ 12 | $ 7 | | |
| Contracts in Process | $ 45 | $ 257 | $ 356 | $ 402 | | |
| Provision for Doubtful Accounts | $ (16) | $ (36) | $ (62) | $ (88) | $ (140) | $ (109) |
| Raw Materials | $ 53 | $ 249 | $ 610 | $ 725 | $ 781 | $ 933 |
| Work in Progress | $ 2 | $ 4 | $ 10 | $ 11 | $ 50 | $ 123 |
| Finished Goods | $ 157 | $ 721 | $ 800 | $ 727 | $ 817 | $ 1,079 |
| Deferred Inventory Costs | $ 144 | $ 1,130 | $ 1,698 | $ 1,952 | $ 2,048 | $ 1,512 |
| Provision for Inventory | $ (129) | $ (481) | $ (907) | $ (1,007) | $ (1,043) | $ (1,143) |
| Long-term Deferred Costs | $ (44) | $ (146) | $ (209) | $ (419) | $ (573) | $ (542) |
| Assets Held For Sale | $ 272 | $ - | | | | |
| Discontinued Operations | $ 148 | $ - | | | | |
| **Total Current Assets** | **$ 3,708** | **$ 6,628** | **$ 9,147** | **$ 9,923** | **$ 9,109** | **$ 8,850** |
| | | | | | | |
| Restricted Cash | $ 1,928 | $ - | | | | |
| Investments | $ 117 | $ 127 | $ 194 | $ 204 | $ 244 | $ 299 |
| Goodwill | $ 9 | $ 180 | $ 2,559 | $ 2,529 | $ 2,586 | $ 2,303 |
| Intangibles | | | | | | $ 78 |
| Deferred Taxes | $ 10 | $ 12 | $ 2,868 | $ 3,863 | $ 3,664 | $ 3,738 |
| Long-term Deferred Costs | $ 44 | $ 146 | | | | |
| Long-term Inventories | $ 6 | $ 22 | | | | |
| Debt Issuance Costs | $ 49 | $ 61 | | | | |
| Derivative Assets | | $ 126 | | | | |
| Financial Assets | $ 49 | $ 41 | | | | |
| Other | $ 29 | $ 79 | $ 555 | $ 689 | $ 800 | $ 867 |
| Land | | $ 31 | $ 38 | $ 35 | $ 45 | $ 48 |
| Building | $ 686 | $ 991 | $ 1,137 | $ 1,185 | $ 1,261 | $ 1,278 |
| Machinery & Equipment | $ 752 | $ 1,761 | $ 2,176 | $ 2,048 | $ 2,191 | $ 2,444 |
| Capital Lease | $ 153 | $ 193 | $ 215 | $ 215 | $ 213 | $ 176 |
| Sale Lease Back Assets | $ 49 | $ 90 | $ 97 | $ 92 | $ 80 | $ 59 |
| Depreciation | $ (952) | $ (1,794) | $ (2,131) | $ (2,045) | $ (2,230) | $ (2,365) |
| Intangibles | $ 103 | $ 294 | $ 338 | $ 307 | $ 164 | |
| Accumulated Intangibles Amortization | $ (52) | $ (151) | $ (125) | $ (66) | $ (29) | |
| Pension Intangible | | | | $ - | $ 37 | |
| **Total Assets** | **$ 6,688** | **$ 8,837** | **$ 17,068** | **$ 18,979** | **$ 18,135** | **$ 17,775** |

60

**Appendix C-2**
**Nortel Networks Corporation**
**Consolidated Balance Sheets, as of December 31**

| | 2009[1] | 2008[2] | 2007[2] | 2006 | 2005[3] | 2004[3] |
|---|---|---|---|---|---|---|
| **Liabilities** | | | | | | |
| Trade & Accounts Payable | $ 294 | $ 1,001 | $ 1,187 | $ 1,125 | $ 1,181 | $ 989 |
| Payroll | $ 128 | $ 453 | $ 690 | $ 640 | $ 803 | $ 515 |
| Contractual Liabilities | $ 93 | $ 213 | $ 272 | $ 243 | $ 348 | $ 571 |
| Restructuring | $ 4 | $ 146 | $ 100 | $ 97 | $ 99 | $ 254 |
| Outsourcing Selling, General & Admin. | $ 67 | $ 246 | $ 306 | $ 400 | $ 298 | |
| Customer Deposits | $ 6 | $ 10 | $ 52 | $ 78 | $ 38 | |
| Product Related Provision | $ 22 | $ 225 | $ 126 | $ 93 | $ 51 | |
| Warranty provisions | $ 58 | $ 186 | $ 214 | $ 217 | $ 206 | |
| Deferred Revenue | $ 138 | $ 972 | $ 1,219 | $ 1,127 | $ 1,275 | |
| Advance Bilings In Excess of Revenues | $ 76 | $ 751 | $ 1,490 | $ 1,352 | $ 1,229 | |
| Miscellaneous Taxes | $ 8 | $ 29 | $ 32 | $ 75 | $ 61 | |
| Income Taxes Payable | $ 41 | $ 65 | $ 96 | $ 72 | $ 77 | |
| Deferred Income Tax | $ 14 | $ 13 | $ 15 | $ - | | |
| Tax Uncertainties | $ 83 | $ 15 | $ 21 | $ - | | |
| Interest Payable | | $ 112 | $ 91 | $ 114 | $ 67 | |
| Other Accrued Liabilities | $ 147 | $ 50 | $ 163 | $ 261 | $ 126 | $ 3,592 |
| Shareholder Litigation Settlement | | | $ - | $ 814 | $ 804 | |
| Current Portion of Long Term Debt | | $ 19 | $ 698 | $ 18 | $ 1,446 | $ 14 |
| Discontinued Operations | $ 205 | $ - | | | | |
| Liabilities of Discontinued Operations | $ 53 | $ - | | | | |
| **Total Current Liabilities** | **$ 1,437** | **$ 4,506** | **$ 6,772** | **$ 6,726** | **$ 8,109** | **$ 5,935** |
| **Total Long Term Debt** | **$ 41** | **$ 4,501** | **$ 3,816** | **$ 4,446** | **$ 2,439** | **$ 3,852** |
| Investment in Net Liabilities of Equity Investment | $ 534 | $ - | | | | |
| Deferred Taxes | $ 7 | $ 11 | $ 17 | $ 97 | $ 104 | $ 144 |
| Pension Benefit Liabilities | $ 6 | $ 1,557 | $ 1,109 | $ 1,965 | $ 1,533 | |
| Post Employment Liabilities | $ 8 | $ 670 | $ 893 | $ 794 | $ 936 | |
| Restructuring liabilities | $ 4 | $ 161 | $ 180 | $ 177 | $ 198 | |
| Deferred Revenue | $ 71 | $ 271 | $ 400 | $ 919 | $ 1,081 | |
| Tax Uncertainties | $ 89 | $ 92 | $ 71 | $ - | | |
| Derivative liabilities | | $ 62 | | | | |
| Other Long Term Provision | $ 48 | $ 135 | $ 222 | $ 275 | $ 290 | |
| Other Liabilities | | | | | | $ 3,578 |
| Shareholder Litigation Settlement | | | $ - | $ 1,680 | $ 1,899 | |
| Minority Interest | $ 729 | $ 822 | $ 830 | $ 779 | $ 783 | $ 626 |
| Discontinued Operations | | | | | | |
| Liabilities Subject to Compromise | $ 7,487 | $ - | $ - | $ - | $ - | $ - |
| **Total Liabilities** | **$ 10,461** | **$ 12,788** | **$ 14,310** | **$ 17,858** | **$ 17,372** | **$ 14,135** |
| **Shareholders' Equity** | | | | | | |
| Common Shares | $ 35,604 | $ 35,593 | $ 34,028 | $ 33,938 | $ 33,932 | $ 33,840 |
| Paid-in-Capital | $ 3,623 | $ 3,547 | $ 5,025 | $ 3,378 | $ 3,281 | $ 3,283 |
| Retained Earnings | $ (41,876) | $ (42,362) | $ (36,532) | $ (35,574) | $ (35,602) | $ (32,950) |
| Comprehensive Income | $ (1,124) | $ (729) | $ 237 | $ (621) | $ (848) | $ (533) |
| Deferred Stock Compensation | | | | | $ - | $ - |
| **Total Equity** | **$ (3,773)** | **$ (3,951)** | **$ 2,758** | **$ 1,121** | **$ 763** | **$ 3,640** |
| **Total Liabilities & Shareholders' Equity** | **$ 6,688** | **$ 8,837** | **$ 17,068** | **$ 18,979** | **$ 18,135** | **$ 17,775** |

**Notes and Sources:**
Data obtained from Factset.
[1] As restated in Nortel Form 10-K for the fical year ended December 31, 2010.
[2] As restated in Nortel Form 10-K for the fical year ended December 31, 2009.
[3] As restated in Nortel Form 10-K for the fical year ended December 31, 2006.

61

**Appendix C-3**
**Nortel Networks Corporation**
**Consolidated Statements of Cash Flows for the Years Ended December 31**

| | 2009[1] | 2008[2] | 2007[2] | 2006 | 2005[3] | 2004[3] |
|---|---|---|---|---|---|---|
| **Operating Cash Flows** | | | | | | |
| Net Income | $ 488 | $ (5,799) | $ (957) | $ 28 | $ (2,610) | $ (247) |
| Depreciation | $ 167 | $ 280 | $ 276 | $ 290 | $ 302 | $ 341 |
| Net (earnings) loss from discontinued operation | $ (245) | $ 1,175 | $ 161 | | | |
| Goodwill Impairment | | $ 1,571 | $ - | $ - | | |
| Non-cash Portion of shareholder litigation settlement recovery | | $ - | $ (54) | $ (219) | $ 1,899 | $ - |
| Non-cash Portion of cost reduction activities | $ 18 | $ 18 | $ 13 | | | |
| Associated Equity | $ 3 | $ (3) | $ (2) | $ 3 | $ (3) | $ - |
| Equity in net loss of Equity Investees | $ 445 | $ - | $ - | | | |
| Stock Option Compensation | $ 56 | $ 49 | $ 73 | $ 112 | $ 88 | $ 77 |
| Deferred Taxes | $ 7 | $ 3,053 | $ 1,019 | $ 31 | $ (116) | $ (47) |
| Pension & Accruals | $ 256 | $ 129 | $ 277 | $ 346 | $ 299 | $ 220 |
| Gain on sales of businesses and impairments of assets | $ 1 | $ (1) | $ (26) | $ (200) | $ (20) | $ (110) |
| Minority Interest | $ 17 | $ 152 | $ 115 | $ 59 | $ 39 | $ 33 |
| Restructuring | $ (1,058) | $ - | $ - | $ (21) | $ (149) | $ (57) |
| Other | $ 424 | $ (480) | $ (357) | $ 220 | $ 123 | $ 274 |
| In process research and development expense | | | | $ 22 | $ - | $ - |
| Special Charges- Non Cash | | | | $ 3 | $ 38 | $ 6 |
| Cumulative effect of accounting change | | | | $ (9) | $ - | $ - |
| Net earnings from discontinued operation | | | | $ - | $ (1) | $ (49) |
| Customer Advances | | | | $ (229) | $ 161 | $ 573 |
| Advance Billings | | | | $ 120 | $ 102 | $ 331 |
| Accounts Receivable | $ 603 | $ 371 | $ 198 | $ 51 | $ (280) | $ (16) |
| Ineventies | $ 87 | $ (46) | $ (39) | $ (42) | $ 285 | $ (241) |
| Deferred Cost | $ 79 | $ 509 | $ 125 | $ 97 | $ (538) | $ (536) |
| Taxes Payable | $ 74 | $ (18) | $ 23 | $ (20) | $ (58) | $ (63) |
| Accounts Payable | $ (77) | $ (184) | $ (17) | $ (79) | $ 189 | $ 94 |
| Payroll, Accrued & Contractual Liabilities | $ 246 | $ (312) | $ (1,001) | $ (257) | $ 213 | $ (664) |
| Deferred Revenue | $ 98 | $ (208) | $ (174) | | | |
| Advance Billings in Excess of Revenues Recognized | $ (249) | $ (706) | $ 165 | | | |
| Restructuring Liabilities | $ (41) | $ (202) | $ (187) | | | |
| Other | $ (127) | $ 56 | $ (51) | | | |
| Working Capital | | | | $ (69) | $ (142) | $ (104) |
| Global Class Action Settlement Net | | | | $ - | $ - | |
| Discontinued Operations | $ (937) | $ 29 | $ 17 | $ - | $ 33 | $ 22 |
| **Cash from Operating Activities** | $ 335 | $ (567) | $ (403) | $ 237 | $ (146) | $ (163) |
| **Investing Cash Flows** | | | | | | |
| Capital Expenditures | $ (31) | $ (126) | $ (210) | $ (316) | $ (258) | $ (276) |
| Assets Sold | $ 96 | $ - | $ 90 | $ 143 | $ 10 | $ 10 |
| Restricted Cash | $ (1,983) | $ 39 | $ 563 | $ (557) | $ 3 | $ (11) |
| Increase in short term and long term investment | | $ (362) | $ - | $ - | | |
| Decrease in short term and long term investment | $ 46 | $ 286 | $ - | $ - | | |
| Acquisitions of investments and businesses | $ (2) | $ (75) | $ (77) | | | |
| Proceeds from the sales of investments, businesses, and assets, r | $ 1,091 | $ (11) | $ 23 | | | |
| Purchase of Investments | | | | $ (146) | $ (651) | $ (5) |
| Sale of Investments | | | | $ 603 | $ 470 | $ 150 |
| Discontinued Operations | $ 889 | $ (61) | $ 19 | | | |
| **Cash from Investing Activities** | $ 106 | $ (310) | $ 408 | $ (273) | $ (426) | $ (132) |

62

NERA Economic Consulting

Appendix C-3
**Nortel Networks Corporation**
**Consolidated Statements of Cash Flows for the Years Ended December 31**

**Financing Cash Flows**

| | Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 |
|---|---|---|---|---|---|---|
| Dividends | $ (6) | $ (35) | $ (52) | | | |
| Capital repayment to minority owners | | $ (36) | $ - | $ - | | |
| LT Debt Issued | | $ 668 | $ 1,150 | $ 3,300 | $ - | $ - |
| LT Debt Paid | | $ (675) | $ (1,125) | $ (2,725) | $ - | $ (107) |
| Debt Issue Cost | | $ (13) | $ (23) | $ (42) | $ - | |
| Capital Leases Repaid | $ (9) | $ (21) | $ (23) | $ (17) | $ (10) | $ (9) |
| Other financing activities | | $ - | $ - | | | |
| Common Stock Issued | | $ - | $ 10 | $ 1 | $ 6 | $ 31 |
| Net cash used in financing activities | | $ (1) | $ (1) | | | |
| Dividends Paid by Subsidiaries | | | | $ (60) | $ (43) | $ (33) |
| Increase in capital leases obligations | | | | $ 1 | $ - | |
| Common share consolidation costs | | | | $ (1) | $ - | $ - |
| Notes Payable | $ (41) ## | $ 39 | $ (5) | $ 26 | $ (13) | $ 8 |
| Net cash used in financing activities | $ (73) | | | | | |
| **Cash from Financing Activities** | **$ (129)** | **$ (74)** | **$ (69)** | **$ 483** | **$ (60)** | **$ (110)** |
| | | | | | | |
| **Foreign Exchange Effects** | **$ 50** | **$ (184)** | **$ 104** | **$ 94** | **$ (102)** | **$ 88** |
| | | | | | | |
| **Net Change in Cash** | **$ 362** | **$ (1,135)** | **$ 40** | **$ 541** | **$ (734)** | **$ (317)** |
| | | | | | | |
| **Net Cash - Beginning Balance** | $ 1,636 | $ 3,532 | $ 3,492 | $ 2,951 | $ 3,685 | $ 4,002 |
| **Net Cash - Ending Balance** | **$ 1,747** | **$ 2,353** | **$ 3,455** | **$ 3,492** | **$ 2,951** | **$ 3,685** |

**Notes and Sources:**
Data obtained from Factset.

[1] As restated in Nortel Form 10-K for the fical year ended December 31, 2010.

[2] As restated in Nortel Form 10-K for the fical year ended December 31, 2009.

[3] As restated in Nortel Form 10-K for the fical year ended December 31, 2006.

63

**Appendix D.**    **Rationale of Purchasers of Nortel Assets in the Business Sales**

**Appendix D**
**Rationale of Purchasers of Nortel Assets in the Business Sales**

| Purchaser | Business Line | Source | Quote |
|---|---|---|---|
| Ericsson | CDMA/LTE | **Deposition of Paviter Binng,** October 24, 2013 p. 124. | "Q. And what did you learn from Ericsson regarding its motivations and interests?  A. In terms of Ericsson were not initially interested in having a dialogue with us. And I knew the Ericsson team extremely well having dealt with them previously in my career. When it emerged that Nokia Siemens was the stalking horse for the CDMA business and certainly the LTE R&D that we had in place, Ericsson -- Ericsson were very concerned. They had already done some great work on LTE, and alongside Nortel were probably leading the pack on LTE development. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " |
| | | **Richard Lowe Testimony before the House of Commons Standing Committee on Industry, Science and Technology** *Riedel Deposition Exhibit 12004, p. 23.* | "Mr. Brian Masse: Right. I understand that. But it seemed quite a deal though. If you think it's only worth $149 million U.S. and you get a billion dollars for it, that's quite a discrepancy. Why would Ericsson bid so high for something you believe is so low? Mr. Richard Lowe: I think, again, to come back to George Riedel's points around the market value is based on certain intangibles, which is how Ericsson would likely view-you'd likely have with speak to them directly-they would view their customers, the evolution of their customers in the network and how they would utilize this current technology, CDMA, and the future technology to grow their business because of the scale they have and the international stature that they have and the strong balance sheet that they have." |
| | | **LM Ericsson Telephone Company 2009 Form 20-F** p. 6. | "The acquisition of Nortel's CDMA business during 2009, on the heels of important breakthrough contract wins in North America, positioned Ericsson as the leading provider of telecoms technology and services in the United States and Canada." |
| | | **LM Ericsson Telephone Company 2009 Form 20-F** p. 26. | "With a number of breakthrough contracts for LTE, fixed access and services and the acquisition of Nortel's CDMA and LTE businesses, the Company is well positioned for continued growth and is now the largest supplier of technology and services to network operators in the region." |
| | | **LM Ericsson Telephone Company 2009 Form 20-F** p. 27. | "With the acquisition of the Nortel assets for CDMA and LTE, the Company strengthened its ability to serve North America's mobile operators. The acquisition significantly expands Ericsson's footprint in this market, particularly as operators in this region are emerging as early adopters of LTE technology. The agreement "also includes certain patents and patent licenses relating to CDMA and LTE. Going forward, R&D expenses are expected to be relatively low in CDMA compared with other technologies." |
| | | **LM Ericsson Telephone Company 2009 Form 20-F** p. 28. | "Ericsson won several milestone contracts for managed services during the year. These include Sprint and Zain, the first full- scope managed services contracts in North America and Africa- not only firsts for Ericsson but also for the industry. The acquisition of Nortel's CDMA and LTE businesses creates opportunities for synergies in the services operations in North America." |
| | | **LM Ericsson Telephone Company 2009 Form 20-F** p. 38. | "Convergence of the telecom, datacom and media industries results in new forms of competition and customers. Ericsson will focus on competitive offerings for mobile broadband, converged core solutions, network management systems and systems integration. The competitive landscape is constantly changing, as consolidation continues among customers and vendors. Continued investments in R&D for premium, cost- effective and future- proof solutions are essential. Customer intimacy for network planning and migration is key for forging customer partnerships. Ericsson's installed base is an important asset for sales of upgrades, network convergence and systems integration. Now also Nortel's US customer base is added, providing additional opportunities in CDMA and LTE. Continuous follow- up of quality of delivered products and services to be maintained to ensure customer satisfaction." |
| | | **LM Ericsson Telephone Company 2009 Form 20-F** p. 119. | "The acquisition strengthens Ericsson's ability to serve North America's leading wireless operators in the evolution to LTE. Nortel employs approximately 2,500 persons. Net sales for acquired Nortel business amounted to approximately SEK 2,711 million for the period November 13December 31, 2009. The acquired Nortel business had a positive impact on the result." |
| Ericsson | GSM | **"Ericsson: Nortel GSM deal about the voice core"** *Kevin Fitchard via Connected Planet, 2009* | "[T]oday Ericsson announced it would also take a piece of Nortel's GSM business, despite the fact it is already the world's largest GSM access vendor. Why? The answer, said Angel Ruiz, Ericsson head of North American operations, doesn't lie with Nortel's GSM business but rather with the legacy switching business that comes with it.... 'The idea is more to leverage the core assets,' Ruiz said. 'We want to help customers migrate their legacy switching infrastructure to into [sic] LTE.' In doing so, Ericsson is filling in the only remaining hole in the company's growing North American wireless empire." |
| | | **LM Ericsson Telephone Company 2010 Form 20-F** p. 146. | "On November 25, 2009, the Company announced it had entered to acquire certain assets of the Carrier Networks division of Nortel relating to Nortel's GSM business in the US and Canada. Nortel GSM was consolidated by the Company as of March 3 1 , 2010. The acquisition further strengthens the Company's ability to serve North Americas leading wireless operators." |

65

NERA Economic Consulting

**Appendix D**
**Rationale of Purchasers of Nortel Assets in the Business Sales**

| Purchaser | Business Line | Source | Quote |
|---|---|---|---|
| | | **"Nortel now 'finished' with GSM sale: Forrester"** *Greg Meckbach via IT World Canada, 2009* | "Nortel and the buyers are scheduled to seek court approval of the deal Dec. 2. Kapsch and Ericsson plan to offer jobs to a total of 680 Nortel workers worldwide. Of those, Ericsson Canada president Mark Henderson estimated fewer than 10 would be based in Canada. This really pertains to the existing GSM business in North America and that is in the United States,' Henderson said. 'Along with the recent acquisition of (Nortel) CDMA and LTE, the emphasis is on Ericsson's commitment to the North American market.'" |
| Kapsch | GSM | **"Ericsson Completes Acquisition of Nortel's GSM Business"** *Ionut Arghire via Softpedia, 2010* | "The addition of Nortel's skilled GSM experts adds additional depth to Ericsson's newest business unit,' said Rima Qureshi, head of Ericsson's CDMA unit. 'The CDMA team acquired from Nortel late last year has built a strong foundation already, and this new acquisition places us in a great position to support our growing list of North American and International customers.'" |
| | | **Kapsch Group Annual Report for FY 2010/11** *p. 19.* | "By acquiring the Carrier Networks division of Nortel, Kapsch CarrierCom took on significant customer contracts with more than ten of the largest international mobile telephony operators. Key customers include not only the Telekom Austria Group but also other businesses such as the Orange Group, Bouygues Telecom in France, Cellcom in Liberia, Baikalwestcom in Russia and Chunghwa Telecom in Taiwan." |
| | | **"Closing of the acquisition of parts of Nortel"** *Kapsch Group Press Release, 2010* | "This acquisition is a 'natural' complement to the Kapsch CarrierCom portfolio following decades of co-operation with Nortel, and has extensive strategic significance for the company. The co-operation between Kapsch CarrierCom's development team for the Nortel products and the newly acquired development centres provides the optimal prerequisites for the further development of the GSM portfolio, including the strategically important migration to future mobile technologies such as LTE." |
| | | **"Closing of the acquisition of parts of Nortel"** *Kapsch Group Press Release, 2010* | "The number of employees doubles from 330 to approximately 700 people. 'This global focus poses a big challenge for the entire organisation, because suddenly the company doubles in size. Our close past co-operation with Nortel as well as the complementary focus of the acquired companies simplifies the integration immensely. From 'Day 1' we can act as a powerful group on the international market', says Ingolf Planer, Kapsch CarrierCom's CFO." |
| | | **"Closing of the acquisition of parts of Nortel"** *Kapsch Group Press Release, 2010* | "Kapsch CarrierCom is definitely focused on future growth. The forecasted revenues of the newly acquired companies will more than double Kapsch CarrierCom's revenues in the next years. The broad base of installed GSM networks and the resulting maintenance and service contracts provide a good revenue base for the future. The GSM-R business is among the most future-oriented sectors." |
| Ciena | MEN | **Ciena Corporation 2010 Form 10-K** *p. 3.* | "The MEN Business that we acquired is a leading provider of next- generation, communications network products, with a significant global installed base and a strong technology heritage. The MEN Business is a leader in high- capacity 40G and 100G coherent optical transport technology that enables network operators to seamlessly upgrade their existing 2.5G and 10G networks, thereby enabling a significant increase in network capacity without the need for new fiber deployments or complex reengineering. The product and technology assets that we acquired include Nortel's: long- haul optical transport portfolio; metro optical Ethernet switching and transport solutions; Ethernet transport, aggregation and switching technology; multiservice SONET/SDH product families; and network management software products. In addition to these products, we also acquired the network implementation and support service resources related to the MEN Business. We believe that our acquisition of the MEN Business represents a transformative opportunity for Ciena. We believe that this transaction strengthens our position as a leader in next- generation, converged optical Ethernet networking and accelerates the execution of our corporate and research and development strategies. We believe that the additional geographic reach, expanded customer relationships, and broader portfolio of complementary network solutions derived from the MEN Business allow us to better compete with traditional, larger communications network equipment vendors. We "also believe that our broadened product and services portfolio positions us to address a wider range of customer segments, applications and service delivery opportunities. As a result of the MEN Acquisition, we added approximately 2,000 employees, including significant additional engineering talent, which nearly doubled our headcount. We expect our increased scale will enable additional operating leverage and optimize our research and development investment toward next- generation technologies and product platforms." |

66

NERA Economic Consulting

**Appendix D**
**Rationale of Purchasers of Nortel Assets in the Business Sales**

| Purchaser | Business Line | Source | Quote |
|---|---|---|---|
| | | **"Ciena Corp. We've Seen This Movie Before; Initiating with Underweight"** *J.P.Morgan Global Equity Research, July 15, 2010* | "According to Ciena, the primary motivation for the Nortel acquisition was two-fold: 1) acceleration of the company's growth strategy; and 2) extension of Ciena's geographic reach. The company believes that it is the only company "focused solely on optical Ethernet network innovation." From a geographic standpoint, the company expanded its presence in Asia and in Latin America from the transaction. Ciena also added a number of carriers to its customer roster from the transaction, including Bell Canada, Telefonica, Telstra, Telus. Beyond growth and geographic reach, the company also sees opportunity to deliver operating model synergies. Finally, Ciena is significantly increasing its scale as a result of the merger – the company's revenue will more than double post the combination." |
| | | **"Ciena Wins Nortel's Optical-Networks Unit at Auction"** *Hugo Miller, Marcel van de Hoef, and Serena Saitto via Bloomberg, 2009* | "Ciena will use the business to help bolster video transmission and other Web traffic in cities as carriers seek more ways to add bandwidth for their subscribers…. Ciena Chief Executive Officer Gary Smith told CNBC in an interview today that the Nortel assets "will add an awful lot of value to the business" and increase earnings in 2011." |
| | | **"Interview: Ciena's Senior VP of Strategic Planning Discusses 'Stalking Horse' Bid for Nortel's Assets"** *Marisa Torrieri via TMCnet, 2009* | "The biggest reason for the bid is it helps us get to where we want to go quickly,' Tom Mock, Ciena's senior vice president of strategic planning, told TMCnet. 'It's basically the technology that allows existing telecoms to evolve networks to handle increased capacity.' Mock told TMCnet that with optical networking technology like Nortel's, operators can provide advanced video, voice and advanced services to end users. This would boost Ciena's presence in the marketplace among its target market, which includes large enterprises with their own private voice and data networks, as well as large operators. A bigger presence isn't the only thing Ciena would gain should the bid go through; at least 2,000 Nortel employees would get offers to join Ciena's global team of network specialists. The proposed acquisition would significantly enhance Ciena's existing Canadian-based development resources, too, according to the company." |
| | | **"Ciena buys Nortel metro Ethernet, optical units"** *Greg Meckbach via Tech World, 2009* | "The main products Ciena will inherit include the Metro Ethernet Routing Switch 8600 and the Optical Multiservice Edge 6500, [Ciena's Senior Vice-President of Corporate Development James] Frodsham said. The OME 6500 is designed to manage and transport voice and data services, and to provide multi-span links of more than 2,000 km without requiring in-line dispersion compensation equipment. The MERS 8600 is designed to provide virtual private networking and video services at 1 or 10 Gigabits per second. Frodsham said most of the business is with service providers, but it also sells to enterprise and government customers. Buying Nortel's carrier Ethernet and optical units will help Ciena sell to carriers who want to carry packet-based services, including video, over their networks. 'Look at what's happening in video applications and the development of new services,' Frodsham said. 'A good example is Cisco TelePresence.' He added consumers using YouTube and cellular carriers upgrading to fourth-generation will place 'tremendous stress' on carrier networks." |
| GENBAND | CVAS | **"GENBAND's G6 Universal Media Gateway Completes Compatibility Testing With Nortel Communications Server 2000"** *GENBAND Press Release, 2006* | "This is another important step in GENBAND's strategy to provide industry leading IMS solutions while maintaining softswitch neutrality,' said Charles Vogt, president and chief executive officer of GENBAND. 'Service providers migrating networks to IMS or softswitch-controlled next-generation networks must be afforded the confidence of seamless interoperability for their key applications and infrastructure selections. As a company, GENBAND is focused on delivering this promise by ensuring our IMS solutions are proven to be interoperable with all key softswitch vendors. Nortel is obviously one of the most important and we look forward to working with Nortel and customers that choose Nortel's Communication Server 2000 softswitch as their next generation call control.'" |
| | | **"GENBAND Signs Agreement to Purchase Nortel's Carrier VoIP and Application Solutions Business Assets"** *GENBAND Press Release, 2009* | "The proposed transaction combines GENBAND's next-generation access, trunking, session and security gateway technology and Nortel's widely used softswitch and application technology, offering global service providers a comprehensive VoIP portfolio." |

67

NERA Economic Consulting

**Appendix D**
**Rationale of Purchasers of Nortel Assets in the Business Sales**

| Purchaser | Business Line | Source | Quote |
|---|---|---|---|
| | | **"GENBAND Signs Agreement to Purchase Nortel's Carrier VoIP and Application Solutions Business Assets"** *GENBAND Press Release, 2009* | "'From a customer and partner standpoint, we believe our vision behind this acquisition is aligned with the industry's desired evolution path to IP,' said Charles D. Vogt, Chief Executive Officer of GENBAND. 'This transaction, although potentially subject to a competitive bidding process, represents an opportunity to fuel affordable network migration to cutting-edge VoIP technology. As a leader in next generation VoIP solutions today, our aim will be to empower service providers and their partners to access a range of leading VoIP solutions to interoperate with Nortel's installed base, without having to replace existing infrastructure and investment.'" |
| | | **"GENBAND Signs Agreement to Purchase Nortel's Carrier VoIP and Application Solutions Business Assets"** *GENBAND Press Release, 2009* | "GENBAND will continue its commitment to OEM partnering activity and anticipates it will expand product, service and support relationships following the proposed Nortel CVAS transaction." |
| Avaya | Enterprise | **"Avaya + Nortel = Exponentially Better…for Whom?"** *Ray Horak via Telecom Reseller* | "The misfortunes of Nortel presented Avaya with a one-in-a-lifetime opportunity to not only plug some gaps in the Avaya product line, but also gain both a strong distribution channel and a large and loyal customer base. According to [Avaya's President and CEO Kevin] Kennedy, Avaya was able to use the power of its balance sheet to acquire Nortel Enterprise Solutions and, thereby, accelerate the structural elements of its strategy by a good 3 years." |

68