# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

**REPLY REPORT OF MARK L. BERENBLUT AND ALAN J. COX,**
**In Reply to the Reports of Jeffrey H. Kinrich and Paul P. Huffard, dated**
**January 24, 2014**
**NERA Economic Consulting**

**February 28, 2014**

**Revised: March 4, 2014**

# PUBLICALLY FILED VERSION

---

[1]      The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

# REPLY REPORT OF MARK L. BERENBLUT AND ALAN J. COX,
**In Reply to the Reports of and Jeffrey H. Kinrich and Paul P. Huffard, dated
January 24, 2014
NERA Economic Consulting**

**February 28, 2014**

**Revised: March 4, 2014**

**Contains Highly Confidential Information. Subject to Protective Order.**

# Table of Contents

| | | |
|---|---|---:|
| 1. | Introduction | 1 |
| | 1.1. Purpose of This Report | 1 |
| | 1.2. Glossary of Defined Terms | 1 |
| 2. | Scope of Review | 1 |
| 3. | Summary of Our Opinions | 1 |
| 4. | Allocation Methodology of the Kinrich Report | 1 |
| | 4.1. Kinrich Report Allocation of the Proceeds from the Business Sales | 2 |
| | 4.2. Kinrich Report's Allocation of the Proceeds from the Rockstar Transaction | 3 |
| 5. | The Kinrich Report Incorrectly Allocates Significant Proceeds to the U.S. and EMEA Debtors from the Sale of the Residual IP | 5 |
| | 5.1. Even if the U.S. and EMEA Debtors Had Property Interests in the Residual IP, the Kinrich Report Significantly Overstates their Value | 6 |
| | 5.2. Economic Considerations Indicate that Kinrich's Assumption that the U.S. and EMEA Debtor Groups Had Property Interests in the Residual IP is Incorrect | 14 |
| | 5.3. The Kinrich Interpretation of the Sub-Licensing Rights is Inconsistent with the Economic Organization of Multinational Businesses | 15 |
| 6. | The Kinrich Report Overstates the Value of the Property Interests Surrendered by the U.S. and EMEA Debtors in the Business Sales | 16 |
| | 6.1. The Kinrich Report Inappropriately Applies Relative Geographic Revenue Shares to the Full Amount of the Proceeds from the Business Sales | 17 |
| | 6.2. The Kinrich Report Ignores the RPSM | 18 |
| 7. | Allocation Methodology of the Huffard Report | 19 |
| | 7.1. The Huffard Report's Allocation of the Proceeds from the Business Sales | 20 |
| | 7.2. The Huffard and Malackowski Reports' Allocation of the Proceeds from the Rockstar Transaction | 22 |
| 8. | The Huffard and Malackowski Reports Incorrectly Allocate Significant Proceeds to the U.S. and EMEA Debtors from the Sale of the Residual IP | 23 |
| | 8.1. Even if the U.S. and EMEA Debtors Had Property Interests in the Residual IP, the Huffard and Malackowski Reports Significantly Overstate their Value | 23 |
| | 8.2. If the Assumptions of the Huffard and Malackowski Reports with Respect to the Nature of the Licences are Incorrect, the U.S. and EMEA Debtors are Not Entitled to Any Allocation of the Proceeds from the Rockstar Transaction | 26 |

9.    The Huffard Report Overstates the Value of the Property Interests
      Surrendered by the U.S. and EMEA Debtors in the Business Sales          27
            9.1.    The Huffard Report Inappropriately Applies Relative Geographic
                    Revenue Shares and R&D Expenditures to the Full Amount of the
                    Proceeds from the Business Sales                          27
            9.2.    The Huffard Report Ignores the RPSM                       28

10.    Restrictions                                                          29

Appendix A.  Glossary of Terms                                              31

Appendix B.  Scope of Review                                               32

NERA Economic Consulting

# 1.    Introduction

## 1.1.    Purpose of This Report

1.    We previously prepared a report in this matter, dated January 24, 2014 (our "Prior Report").

2.    Counsel for the Monitor requested that we prepare this supplementary report setting out our comments on the report of Mr. Jeffrey H. Kinrich, dated January 24, 2014, submitted by the U.S. Debtors (the "Kinrich Report" or "Kinrich"), and the report of Mr. Paul P. Huffard, also dated January 24, 2014, submitted by the EMEA Debtors (the "Huffard Report" or "Huffard"). We also reviewed and make reference herein to the Report of Mr. James E. Malackowski, also dated January 24, 2014 (the "Malackowski Report" or "Malackowski"), on which the Huffard Report relies.

3.    The descriptions of our experience, independence and compensation contained in our Prior Report remain accurate.

## 1.2.    Glossary of Defined Terms

4.    A list of defined terms used in this report is set out in **Appendix A**.

# 2.    Scope of Review

5.    A list of the additional documents and information which we have reviewed is provided in **Appendix B**.

# 3.    Summary of Our Opinions

6.    Having reviewed the Kinrich, Huffard and Malackowski Reports, we disagree with the conclusions expressed in those reports and the manner in which those conclusions were reached. We see no reason to change the opinions expressed in our Prior Report. Our reasons for disagreeing with the Kinrich, Huffard and Malackowski conclusions and methodologies are discussed below.

# 4.    Allocation Methodology of the Kinrich Report

7.    To provide context for our responses to the Kinrich Report set out in **Sections 5 and 6** below, we briefly describe the allocation methodology of that report in the following sub-sections.

NERA Economic Consulting

8.      For convenience, we provide a summary of the allocation conclusion of the Kinrich Report in **Table 1** below.

**Table 1: Summary of Proposed Allocation of the Kinrich Report**

| | Kinrich | |
| | Amount | Percentage |
| | (millions) | |
| **Business Sales** | | |
| **Canadian Debtors** | $     338.87 | 11.9% |
| **U.S. Debtors** | $   1,993.94 | 70.0% |
| **EMEA Debtors** | $     514.00 | 18.0% |
| **Total** | **$ 2,847.92** | **100.0%** |
| | | |
| **Rockstar** | | |
| **Canadian Debtors** | $     433.91 | 9.7% |
| **U.S. Debtors** | $   3,308.61 | 74.3% |
| **EMEA Debtors** | $     711.86 | 16.0% |
| **Total** | **$ 4,454.37** | **100.0%** |
| | | |
| **Total** | | |
| **Canadian Debtors** | $     772.78 | 10.6% |
| **U.S. Debtors** | $   5,302.55 | 72.6% |
| **EMEA Debtors** | $   1,225.87 | 16.8% |
| **Total** | **$ 7,302.30** | **100.0%** |

## 4.1.      Kinrich Report Allocation of the Proceeds from the Business Sales

9.      The Kinrich Report allocates the proceeds from the Business Sales based on its calculations of what it purports to be "the fair market value of the assets relinquished by each Debtor Group in each of the Line of Business sales."[1]

10.      Kinrich determines what he calls the "value relinquished" by each of the Debtor Groups in each of the Business Sales as the relative proportion of Nortel sales revenues for 2009 that was generated in each of their respective geographic territories.[2] For example, in approximate terms, the proportion of the sale proceeds of the CDMA business that Kinrich attributes to the Canadian Debtors is equal to the 2009 CDMA revenues earned by Canadian entities, expressed as a percentage of the 2009 worldwide

[1] Kinrich Report, ¶6. The Kinrich Report does not define fair market value, but we presume it is intended to be defined similar to the definition provided in our Prior Report (at ¶19).

[2] Kinrich Report, ¶28. We note that the Kinrich Report also considers an alternative approach in which it ascribes a less than proportionate interest to the sales of Nortel's distributor entities (see Kinrich Report, ¶29).

CDMA revenues of Nortel.[3] He then simply multiplies that share by the net amount of the proceeds from that transaction to determine his proposed allocation to the Canadian Debtor Group.[4]

## 4.2.    Kinrich Report's Allocation of the Proceeds from the Rockstar Transaction

11.    Similarly, the Kinrich Report allocates the proceeds from the Rockstar Transaction based on its calculation of what it purports to be the "fair market value relinquished by each Debtor Group in the Patent Portfolio sale."[5]

12.    Kinrich determines the value relinquished by each of the Debtor Groups in the Rockstar Transaction based on the "IP Co Model."[6] The IP Co Model is a series of spreadsheets developed by Nortel, with assistance from Global IP and Lazard, to forecast and value the cash flows that it could expect to generate from its own licensing and enforcement of the Residual IP under various alternative scenarios. We understand that there are several iterations of the IP Co Model, which describe a range of possible outcomes, and that these were created following the Filing Date to assist in the development of a strategy to monetize the Residual IP.[7] The Kinrich Report relies on one version of the IP Co Model, and specifically on one of the scenarios contemplated in that version of the model.[8]

---

[3] Mathematically we can write this approximately as:

$$\begin{matrix} \text{Canadian Share} \\ \text{of CDMA Sale} \\ \text{Proceeds} \end{matrix} = \frac{\text{Sales in Canada of CDMA}}{\text{Sales in Canada of CDMA} + \text{Sales in the US of CDMA} + \text{Sales in EMEA in CDMA}}$$

Sales in Canada of CDMA stands for sales of CDMA product and services in Canada.

[4] That is, the allocation to the Canadian debtors equals: $\begin{matrix}\text{Canadian Share} \\ \text{of CDMA Sale} \\ \text{Proceeds}\end{matrix} \times \begin{matrix}\text{Asset Sale} \\ \text{Price for} \\ \text{CDMA}\end{matrix}$

[5] Kinrich Report, ¶31.

[6] In particular, the Kinrich Report relies on IP Co Model 3.1, BHG0124158 ("IPCo Model (Model v3.1 Distributed)"), Kinrich Report, ¶7 and footnote 4.

[7] See, for example, the Deposition of John Veschi, November 7, 2013, p.270. We note that the model itself has technical problems and is not well-documented. For example, the Kinrich Report's Tables 28A and 28B rely on a version of the Excel spreadsheet model that has "Circular References." A Circular Reference is a formula in a cell (that is, a calculation) that refers back to that same cell. (See http://office.microsoft.com/en-us/excel-help/allow-or-correct-a-circular-reference-HP005200285.aspx, accessed February 16, 2014). It is not explained in the Kinrich Report why it elected to rely on certain scenarios, but not others that are incorporated into the IP Co Model.

[8] Kinrich Report, ¶¶100-103.

NERA Economic Consulting

13.     Accepting the forecasts and royalty rates contained in that version of the IP Co Model, the Kinrich Report purports to show that the $4.5 billion price paid in the Rockstar Transaction is equal to the discounted present value of the cash flows of that business plan.[9] Kinrich does this by calculating the discount rate implied by the $4.5 billion price paid in the Rockstar Transaction given the forecasted cash flows of the IP Co Model.[10]

14.     Based on two alternative assumptions relating to the inclusion or exclusion of forecasted revenues from China, the Kinrich Report infers discount rates of between 12.2 percent (when revenues from China are not included) and 15.7 percent (when revenues from China are included).[11] Kinrich concludes that these discount rates are reasonable because he finds that they are within the range of Weighted Average Cost of Capital ("WACC") for established publicly traded companies in the communications industry (being between 11.3 percent and 16.5 percent).[12]

15.     Given its claim that the implied discount rates are reasonable, the Kinrich Report is suggesting that the $4.5 billion received in the Rockstar Transaction is consistent with the value of the cash flows that Nortel could have expected to generate from its own licensing and enforcement of the Residual IP.

16.     The Kinrich Report then uses the geographic breakdown of the cash flows in the IP Co Model and the discount rates that it infers to allocate the proceeds from the Rockstar Transaction to the Debtor Groups. Effectively, this allocation of the proceeds from the Rockstar Transaction is based on geographic shares of the world-wide information technology market.[13]

---

[9] Kinrich Report, ¶¶118-119.

[10] Mathematically, the Kinrich Report determines the implied discount rate be determining the value of $R$ required to make the following equality true:

$$\text{Proceeds from} \atop \text{Rockstar Sale} = \frac{CF_1}{(1+R)^{0.5}} + \frac{CF_2}{(1+R)^{1.5}} + \cdots + \frac{CF_{11}}{(1+R)^{10.5}}$$

[11] Kinrich Report, ¶118.

[12] Kinrich Report, ¶119.

[13] This is not actually described in the report but can be seen by tracing through from the worksheet displaying table 29A. We note that the Kinrich Report also discusses various characteristics of the patent portfolio that he appears to consider relevant to its value (e.g., the number of patents (¶¶130-133), the size of the market in which they can be exercised (¶¶134-136), and the remaining term of the patents (¶137)), but there is little indication of how, or if, these factors affect its allocation conclusions.

NERA Economic Consulting

# 5.    The Kinrich Report Incorrectly Allocates Significant Proceeds to the U.S. and EMEA Debtors from the Sale of the Residual IP

17.    Kinrich asserts that the rights granted to U.S. and EMEA Debtors under the MRDA included "an exclusive, royalty-free license in perpetuity to all NN Technology in its own territory […] which included the exclusive right to exploit and sub-license the NN Technology in its Exclusive Territory."[14]  He claims that these licence rights include the rights to carry out activities that would yield the values realized on the sale of the Residual IP.

18.    A simple reading of the MRDA indicates that this is a mischaracterization by Mr. Kinrich of the rights that were granted, and there is no economic support for his interpretation, as we discuss in **Section 5.2** below.

19.    Even if it were true that the MRDA granted the rights that he claims, Mr. Kinrich is incorrect that the value of the rights  in respect of the Residual IP surrendered by the U.S. and EMEA Debtors can be derived from the proceeds from the Rockstar Transaction.[15]  In the rest of this section we enumerate why this is incorrect.  To do so we assume, for the sake of argument only, that the U.S. and the EMEA Debtor Groups have a claim to the value of the Rockstar Portfolio.  In **Section 5.1**, we demonstrate that the value Nortel itself could have realized from its own licensing of the Residual IP was significantly lower than the proceeds from the Rockstar Transaction.

20.    Therefore, the value of the rights relinquished by the U.S. and EMEA Debtors must have been much lower than the value the Kinrich Report suggests, even taking as given his incorrect assumption about the scope of those rights. Any excess of the proceeds from the Rockstar Transaction over the value Nortel itself could have realized from its own licensing of the Residual IP is attributable to the Canadian Debtors as the legal owners of the IP.

21.    Further, for any estimate of the value of the cash flows that Nortel could have generated from the activities contemplated in the IP Co Model, the allocation of that value among the Debtor Groups must be determined with reference to the RPSM.

---

[14] Kinrich Report, ¶12.

[15] Kinrich Report, ¶7.

NERA Economic Consulting

## 5.1.    Even if the U.S. and EMEA Debtors Had Property Interests in the Residual IP, the Kinrich Report Significantly Overstates their Value

22.    If we assume, for the sake of argument only, that Mr. Kinrich's assumptions that the U.S. and EMEA Debtors' rights would have allowed them to participate in an IP Co type of business and that they relinquished the value of the benefits that they would have received from such a business in connection with the Rockstar Transaction are correct,  Mr. Kinrich is incorrect that the value of the rights that they relinquished in the Patent Portfolio sale is equal to the allocation of the proceeds of sale he assigns them.  In the rest of this section we enumerate why he is incorrect in this regard and why the value of the rights relinquished has to be much lower than that value.

### 5.1.1.    Mr. Kinrich is Incorrect When he Claims That the Value of the Rockstar Portfolio was Predicted by the IP Co Model

23.    Mr. Kinrich relies for some of his conclusions on one scenario of one version of the IP Co Model.  The model itself has technical problems and is inadequately documented to be relied upon for a final award in this matter.[16] The IP Co Model also appears to allow for several scenarios in terms of litigation strategies and possible royalty rates, but Mr. Kinrich does not explain why he accepts certain scenarios and not others.

24.    The Kinrich Report equates the present value of the IP Co Model expected cash flows with the proceeds from the Rockstar Transaction. To do so, he reverse engineers two discount rates for two separate cash flows under two different alternatives.  These are 12.2 percent when revenues from China are not included and 15.7 percent when they are included.

25.    Discount rates of 12.2 percent or 15.7 percent are too low for a potential value of a portfolio of largely unused patents in Nortel's hands. He finds that these rates are reasonable because they are within the range of 11.3 percent to 16.5 percent for the Weighted Average Cost of Capital ("WACC") for established publicly traded companies in the communications industry.  From that he concludes that the $4.5 billion payment for Rockstar is consistent with the cash flows that were predicted for IP Co, managing the Rockstar Portfolio as part of Nortel.

---

[16] For example, Mr. Kinrich's Tables 28A and 28B rely on a version of the Excel spreadsheet model that has "Circular References." A Circular Reference is an indication that a cell (that is, a calculation) contains a variable that is in the same cell (same formula) or to another cell that itself depends on the cell being calculated.  (See http://office.microsoft.com/en-us/excel-help/allow-or-correct-a-circular-reference-HP005200285.aspx, accessed February 16, 2014).

NERA Economic Consulting

26.      The Kinrich Report's use of discount rates for established publicly traded companies in the communications industry as benchmarks for its selection of discount rates for its valuation of a yet-to-be-established business to exploit the Residual IP is not supportable.[17] A discount rate of 30 percent or more for this type of business is consistent with our understanding and experience and is also consistent with the discount rates used in the IP Co Model.  The academic literature reports venture capital discount rates in the range of 30 to 70 percent.[18] We note that Mr. Malackowski, an expert for EMEA, also uses a discount rate of 30 percent in his modelling of cash flows from the licensing and enforcement of the Residual IP.[19]

27.      If a 30 percent discount rate is used to discount the cash flows used by Mr. Kinrich, the resulting net present value of the expected cash flows from the IP Co Model is $1.8 billion.[20]

28.      Even this amount likely overstates the value of the cash flows that could have been expected from an IP Co. For example, the range of values generated by the various versions of the IP Co Model, which are based on a range of discount rates between 25 percent and 45 percent, also indicates that the value of those expected cash flows was significantly lower than the proceeds from the Rockstar Transaction. Several of these estimated values are summarized in **Table 2** below.

---

[17] Kinrich Report, ¶119.

[18] Sahlman, William, "The structure and governance of venture-capital organizations" Journal of Financial Economics 27, December, 1990, p. 511; Bhagat, Sanjai, "Why do venture capitalists use such high discount rates?" Journal of Risk Finance, Vol. 15, No.1, p. 94; Ewing, Tom and Robin Feldman, "The Giants Among Us" *Stanford Technology Law Review*, 2012, 1. Bhagat, Sanjai, "Why do venture capitalists use such high discount rates?" Journal of Risk Finance, Vol. 15, No.1, pp. 97-98.

[19] Malackowski Report, Table 13, p.38.

[20] This is the value that result from using a 30 percent discount rate in Kinrich's model in his "Exhibit 28A: IP Co Model without China."

Contains Highly Confidential Information. Subject to Protective Order.                7

NERA Economic Consulting

**Table 2: IP Co Valuation Summary Presentations**

| Date (1) | Model Number (2) | Litigation Success Adjustment[a] (3) | Valuation Range Min (4) | Valuation Range Max (5) | Source Bates Number[b] (6) |
|---|---|---|---|---|---|
| | | | ---------($ Millions)--------- | | |
| 4/27/2010 | 2.0 | Yes | 424 | 2,142 | LAZ-NRTL-00036864 |
| 4/28/2010 | 2.0 | Yes | 407 | 2,208 | LAZ-NRTL-00018811 |
| 5/6/2010 | 2.2 | Yes | 393 | 2,180 | LAZ-NRTL-00018812 |
| 7/28/2010 | 3.0 | No | 749 | 2,160 | LAZ-NRTL-00018805 |
| 10/21/2010[c] | 3.0 | No | 883 | 2,693 | LAZ-NRTL-00018807 |
| Undated | 3.0 | No | 868 | 2,608 | LAZ-NRTL-00018813 |
| Undated | 3.0 | No | 884 | 2,694 | LAZ-NRTL-00018814 |

Notes: [a] Those models with a Litigation Success Adjustment present three scenarios in which the valuation is calculated with adjustments for a litigation success rate of 60%, 70%, and 100%.

[b] All documents are presentations showing preliminary valuation summaries on Nortel letterhead.

[c] Document is dated October 21 with no given year. Assumed to be October 21 of 2010.

29.     Therefore, at most, even if the U.S. and EMEA Debtors were entitled to any of the proceeds from the Rockstar Transaction, it would be for only a fraction of those sale proceeds.

### 5.1.2.    *Mr. Kinrich's Valuation Allocation to the U.S and EMEA Debtors Ignores the Profit Allocation of the MRDA*

30.     As we described above, Mr. Kinrich allocates what he claims is the value relinquished by the Debtor Groups among the Canadian, U.S. and EMEA Debtors on the basis of shares of revenue. His allocations are 9.7 percent, 74.3 percent and 16.0 percent, respectively. Multiplying the U.S. percentage by the value of $1.8 billion gives $(0.743 \times \$1.8=) \$1.3$ billion, another number we present only for the sake of argument. Doing the same calculations for the EMEA Debtors, gives $(0.16 \times \$1.8=) \$0.3$ billion. Under this set of numbers, which we do not accept, the U.S. and the EMEA Debtors would receive a total of $1.6 billion, with the remainder of proceeds from the sale of the Rockstar Portfolio ($2.8 billion) going to the Canadian Debtors.

31.     But $1.6 billion overstates the value of the property rights relinquished by the U.S. and EMEA Debtor Groups at the time of the closing of the Rockstar Transaction. As we explained in our Prior Report, the MRDA obligated its Licensed Participants to share any operating profits or losses with the rest of the Nortel Group through the application of the RPSM. Therefore, the value of the property

Contains Highly Confidential Information. Subject to Protective Order.

interests surrendered by each of the U.S. and EMEA Debtors following the logic of the Kinrich Report would depend on the expected future profits which would flow to them from the business, had it continued to operate, and be subject to the allocation of profits under the RPSM.

### 5.1.3.    *Mr. Kinrich's Allocation Fails to Account for the Profound Differences Between the Rockstar Consortium and IP Co*

32.     Even if it were assumed that the rights surrendered by the U.S. and EMEA Debtors would have entitled them to participate in any profits that might have been generated by Nortel itself from licensing and enforcing the Residual IP, such a strategy was not expected to have been able to generate the same value as is reflected by the total price paid in the Rockstar Transaction.[21]

33.     As a company holding only a portfolio of intellectual property, Rockstar is correctly described as a Patent Assertion Entity ("PAE") or a Non-Practicing Entity ("NPE"). An NPE is a firm or individual that owns patents but, unlike a Practicing Entity ("PE") does not produce or sell a product.[22] NPEs who are aggressive in licensing exploit a comparative advantage against PEs in monetizing patents through licensing or litigation since "they are practically invulnerable to the threat of patent counterclaims and have no need to cross-license."[23] The increase in the number of NPEs around the world is a well-documented trend that has resulted in response from government officials. In the United States this has included legislative responses and executive orders from the Office of the President.[24]

34.     PEs, on the other hand, must balance the expected benefits from their patent enforcement efforts against the negative impacts such activity can have on their operating businesses. For a PE, portfolio monetization is only one contributor to profits and is usually much less important than product sales. Other aspects of a PE's business will constrain how aggressively a PE can pursue litigation against

---

[21] Riedel Deposition, p.128 (lines 18-23: "Q. Why wasn't an IP Co formed. A. Two reasons. I think at the end of the day there was a sense that we could get more for it by testing the market through a sales process. That was probably the principal driving reason.").

[22] NPEs can also develop patents either in the course of other activities or for the purpose of licensing to earn royalty payments. A university is an example of the former. Typically, these types of NPEs are not exploitive or predatory in how they assert their patent rights. I exclude them from this discussion.

[23] Orr p. 525 and Allen W. Wang, Rise of the Patent Intermediaries, 25 *Berkeley Tech. L.J*. 159, 165–82 (2010).

[24] President Obama said in February 2013, "[Patent trolls] are a classic example. They don't actually produce anything themselves… They're just trying to essentially leverage and hijack somebody else's idea and see if they can extort some money out of them." http://www.pcmag.com/article2/0,2817,2415469,00.asp

infringers and will have an impact on settlements values.  Consequently, PEs  will tend to earn less than NPEs in their licensing and enforcement efforts.[25]

35.    A corollary of the use of patents as a vaccine to immunize against patent attacks is, of course, that companies may need patents that may be relevant in industries in which they do not operate. Such patents may provide protection if a firm from that other industry attempts to assert patent against it. They may also collect such patents because they want the freedom to enter in that industry in the future or protect their position in an industry that they just entered.[26]

36.    PEs may also seek to own or control patents that they believe might be valuable in their own industry.  Purchasing patents defensively in this manner effectively isolates and quarantines them since such patents cannot, of course, be asserted against the new owners.  Often such preemptive, defensive acquisitions are made through collaborations that buy patents and use them to provide protection to subscribers. Such a defensive aggregation[27] allows PEs to combine their demand for patent protection and possibly outbid a NPE for defensive purposes.[28]

37.    A feature of defensive patent aggregators is that they are often financed from several sources, often through joint ownership.  This makes sense in the case of patents and other IP since they can be used for defensive purposes simultaneously by more than one company.  Consequently the amount that can be paid by a collection of companies interested in defensive use of patents can often be a great deal more than can be paid by an individual company.  In short, as more companies that participate in the

---

[25] For example, as Lemley and Melamed point out, "Practicing entities that assert patents might have or anticipate having a business relationship with the alleged infringer and might thus act more cautiously in asserting patents for fear of damaging an actual or potential business relationship. In other words, the practicing entity patent holder might be maximizing a portfolio of assets that includes more than just patents." Lemley, Mark A and A. Douglas Melamed, "Missing the Forest for the Trolls," *Columbia Law Review* Vol. 113:2117, p. 2132.

[26] The last appears to have been the case with Apple, Google, and Microsoft.  "The early years (2011- 2012), however, is when these "dwarves" [Apple, Google, and Microsoft] are at their most vulnerable to patent litigation from each other and from the industry "giants" – the more established wireless players who already have a large portfolio of patents essential for the wireless telecom standards and who compete directly with the Apple, Android, and Windows wireless platforms in the downstream marketplace." Layne-Farrar, Anne "The Brothers Grimm Book of Business Models: A Survey of Literature and Developments in Patent Acquisition and Litigation, March 21, 2012, pp. 20-21] Electronic copy available at: http://ssrn.com/abstract=2030323

[27] "Defensive aggregators offer an incomplete insurance policy against patent troll risk to large operating companies." Hagiu, Andrei and David B. Yoffie "The New Patent Intermediaries: Platforms, Defensive Aggregators, and Super-Aggregators" *Journal of Economic Perspectives*, V. 27, N. 1Winter 2013. Pp. 45–66 p. 56

[28] "When patents are critical to their business, operating companies will often buy them on their own.  The issue for many firms is what to do about marginally relevant patents: the expected value of the potential damage may not be sufficient to justify the cost of buying the patent unilaterally, but it might be worth the membership fee paid to RPX, who in turn can aggregate payments across multiple subscribers."  *Ibid.,* et al. p. 57.

purchasing consortium for a portfolio of IP patents the price paid is expected to increase. Companies that provide such services include RPX and Applied Security Trust (APT).

38.    Such aggregators often act as aggressive NPEs. This enforcement can often be against competitors of the companies that own the aggregator. Such litigation through third parties, referred to as "privateering," provides the appearance that the owner is not involved.[29] Thus, in addition to providing protection, they generate revenue for their owners, defraying the cost the initial purchase.

39.    Many of the circumstances surrounding the Rockstar Transaction are consistent with the creation of a defensive patent aggregator. When Nortel's patents went up for sale, Apple, Google, and Microsoft, were vulnerable to industry "giants" as well as to each other due to their relatively small portfolios of relevant patents.[30] Google wanted the Nortel portfolio to provide ammunition against this assertion.[31]

40.    Rockstar both operates as a defensive aggregator and practices as an aggressive NPE. Its strategy is controlled and operated through a single CEO and a unified management structure.[32]

41.    The record that we have reviewed in this case provides considerable evidence that corroborates this point. Nortel's management appeared to start with the idea of establishing an IP Co that would license patents as a Nortel entity. However, it became clear to them that there was more to be gained by selling off the patent portfolio as an independent company. For example, Mr. George Riedel, former Chief Strategy Officer for NNL and President of Business Units at NNI, was asked whether he knew what role Global IP Law Group played in the IP Co plan. He answered:

> A.    Yes, they were advisors brought on in October of '09 I believe with a brief to assess the value of the IP portfolio that Nortel held. Their role changed as we moved to build a business plan around what IP co. could become as a licensing entity and then it changed

---

[29] Ewing, Thomas L., "Indirect Exploitation of Intellectual Property Rights by Corporations and Investors: IP Privateering & Modern Letters of Marque & Reprisal," *Hastings Sci. & Tech. L.J.*, 1 (2012).

[30] "The three new mobile entrants that emerged in the new millennium created a disruption to the ecosystem equilibrium," mentioning Microsoft entry into the smart phone industry in 2002, Apple in 2007, and Google in 2008. "These three firms are not fragile start ups – they are established entities, well-funded and well positioned to compete strongly in the wireless marketplace. What they all lacked in 2011, however, were significant patent portfolios specific to the wireless space. When seen in this light, Apple's, Microsoft's, and Google's scramble to acquire patents, and each entity's efforts to prevent the other from doing so, is economically understandable, even with the multi-billion dollar portfolio price tags. Layne-Farrar, *Op. cit.* pp. 20-21

[31] http://googleblog.blogspot.com/2011/08/when-patents-attack-android.html

[32] http://www.ip-rockstar.com/people/corporate-leaders, viewed Feb. 24, 2014.

again in the support of the sales process where they were involved in management
presentations and various aspects of monetizing the IP through the sales process.[33]

42.     Mr. Riedel was also asked about the solicitation of a large number of companies that
participated in the consortium.  His testimony indicates that Nortel management came to understand that
more participants in the winning coalition would tend to increase the price of the sale of the Rockstar
Asset.

> Q.  Did anyone explain to you why it was expanded to include those three companies?
> A.  It was designed to get the highest value for the residual IP.[34]

43.     Clearly, as a single company, Nortel was less likely to be able to derive defensive benefits
equal to the combined and cumulative defensive benefits that could be gained by several large companies
with extensive product and service lines that ranged well beyond what Nortel offered.  Several members
participating in the Rockstar portfolio are more likely to find patents contained in the Residual IP that will
be useful to responses to litigation.  Furthermore, as a company in financial difficulty, Nortel was less
likely to be an attractive target for patent litigation and therefore less in need of patents to assert in
response.

44.     Error! Reference source not found. illustrates the point.  The owners of the Rockstar
consortium collectively had substantially more revenue than Nortel and thus significantly greater
infringement exposure than Nortel.

---

[33] Riedel Deposition, Oct. 19, 2013.  p. 118 l. 16  to  p. 119, l. 1.

[34] Riedel Deposition, Oct. 19, 2013.  p. 74 l. 17  to  11.

NERA Economic Consulting

**Figure 1**



**Revenue**
**Rockstar Consortium Companies and Nortel**
**Fiscal Year 2008**

Revenue
($US Billions)

Apple $32.5
EMC $14.9
Ericsson $31.5
Microsoft $60.4
RIM $11.1
Sony $76.8
Nortel $10.4

**Sources:**
Apple Inc. Form 10-K for the fiscal year ended September 27, 2008; EMC Corporation Form 10-K for the fiscal year ended December 31, 2008; LM Ericsson Telephone Company Form 20-F for the fiscal year ended December 31, 2008; Microsoft Corporation Form 10-K for the fiscal year ended June 30, 2008; Research in Motion Limited Audited Consolidated Financial Statements for the fiscal year ended February 28, 2009; Sony Corporation Form 20-F for the fiscal year ended March 31, 2009; Nortel Networks Corporation Form 10-K for the fiscal year ended December 31, 2008.

Contains Highly Confidential Information. Subject to Protective Order.

## 5.2.    Economic Considerations Indicate that Kinrich's Assumption that the U.S. and EMEA Debtor Groups Had Property Interests in the Residual IP is Incorrect

45.    In allocating the proceeds from the Rockstar Transaction, the Kinrich Report assumes away some of the important realities of this matter.  One such reality is that the Residual IP sold in the Rockstar Transaction included patents that were not used in Nortel's own business.  Other patents included in the Rockstar Transaction were encumbered by licences granted to the purchasers in the Business Sales. In other words, all IP (whether patents or license rights to patents) that was related to Nortel's business was sold in the Business Sales. Consequently, and contrary to the assumptions of the Kinrich Report and as we considered for the sake of argument only in Section 5.1 above, the sale of the Residual IP in the Rockstar Transaction did not result in any loss of expected operating profits to the U.S. and EMEA Debtors.  If this is the case, the Canadian Debtors, as the legal owner of that IP, are entitled to the full amount of the proceeds from the Rockstar Transaction.

46.    The Kinrich Report, on the other hand, proposes allocations of the proceeds from the Rockstar Transaction that are based on the assumption that the U.S. and EMEA Debtors were entitled to all of the economic benefits relating to the IP in respect of their exclusive territories.  This assumption of the Kinrich Report is in conflict with the fact that the licence rights under the MRDA were non-transferable, were limited to IP relating to technology used in Nortel's businesses and that the patents were owned by NNL.  Mr. Kinrich does not take into account the economic consequences that these constraints place on the U.S. and EMEA Debtor Groups.

47.    Mr. Kinrich assumes that an exclusive licence held by U.S. and EMEA Debtors covered any and all Nortel patents which those entities could sub-license to anyone in their exclusive territories.  This differs from our understanding that:

    a.    the sub-licence rights under the MRDA relate only to the sale of Products embodying NN Technology and not to products and services that were beyond the scope of Nortel's actual or contemplated businesses; and

    b.    the Residual IP was Nortel IP that was not sold or licenced in the Business Sales and that, therefore, represented rights in technology that was not used, or expected to be used, by Nortel itself in its business.

48.    Put simply, the approach of the Kinrich Report depends upon its assumption that the U.S. and EMEA Debtors have the right to freely license any Nortel patent, whether or not the invention claimed therein is used in Nortel Product. For example, the Kinrich report interprets the sub-license provision to mean that the U.S. Debtor Group could sub-license NNL's technology to "allow other firms to exploit the technology."[35] In addition, the Kinrich Report takes a broad interpretation of the right to enforce Nortel's IP in their exclusive territories,[36] construing it to be an unfettered right.  Such an expansive interpretation is required for the U.S. and EMEA Debtors to be able to claim that their license rights extended to the right to engage in the activities that were contemplated in the IP Co Model and that they surrendered the value of those rights in connection with the Rockstar Transaction. However, this interpretation of the MRDA is not consistent with our understanding and is inconsistent with the economic organization of Nortel's business.

## 5.3.    The Kinrich Interpretation of the Sub-Licensing Rights  is Inconsistent with the Economic Organization of Multinational Businesses

49.    In pursuit of a worldwide business plan, it would be logical for a corporate parent to grant to its subsidiaries the right to make sell products and services that utilized the IP owned by the parent. Such licensing would permit the parent to increase its profits by taking advantage of its intellectual property to drive sales around the world, finding new markets and taking advantage of economies of scale. In order to do this, corporations frequently establish entities in various countries in which they operate.

50.    A sub-licensing right would normally be included so as to allow the subsidiaries to organize the production of products by third parties.  Such sub-licensing provisions would also allow third parties to distribute, install such products.  Having third parties provide such services is a common feature of markets for telecommunications and computer equipment.  The provision of such services frequently involves the use of intellectual property.  Such vendors would tend to want an assurance that their use of Nortel's intellectual property was authorized. Granting its subsidiaries the right to sublicense for this limited purpose would facilitate this efficiency.

51.    Customers would also want a license to any intellectual property, such as method patents or copyrighted software needed to use the equipment they acquired.

---

[35] Kinrich Report, ¶68.

[36] Kinrich Report, ¶12, citing the Third Addendum to the MRDA and p. 6 of the MRDA.

NERA Economic Consulting

52.     Such sub-licensing rights are economically rational. However, providing blanket rights to subsidiaries to sublicense for any purpose, without the involvement of the corporate parent and beyond the terms of the licence itself, is generally not economically rational.  A corporate parent would have  an interest in controlling the licensing of its technology.

53.     If it had been Nortel's intention when it established the MRDA to pursue such a licensing strategy, we would expect to see provisions that called for cooperative management and review of any such licensing. Such provisions and documents would ensure that such licensing met overall corporate objectives. Certainly, Mr. Kinrich does not discuss or point to any such documents that would justify his expansive view of these sub-licence rights.

54.     Kinrich, and the experts for the EMEA Debtors, has presented an expansive view of this clause in the MRDA in apparent justification for the allocation of billions of dollars.  Yet he does no economic analysis to determine whether such a view makes sense.


## 6.     The Kinrich Report Overstates the Value of the Property Interests Surrendered by the U.S. and EMEA Debtors in the Business Sales

55.     The Kinrich Report's proposed allocations of the proceeds from the Business Sales also likely significantly overstate the value of the property interests that the U.S. and EMEA Debtors had in the assets that were sold, and significantly understate the value of the property interests transferred by the Canadian Debtors, for the following two fundamental reasons:

a.     The allocation conclusion of the Kinrich Report is based on its application of geographic breakdown of NNC's 2009 sales revenues to the full amount of the proceeds in the Business Sales. In contrast, the value of the property interests surrendered by the U.S. and EMEA Debtors depends on their respective shares of the value of the operating profits Nortel could have expected had it continued to operate, which is likely significantly lower than the total proceeds in the Business Sales. See **Section 6.1** below.

Contains Highly Confidential Information. Subject to Protective Order.                16

b.     In using relative geographic territory revenues as a basis for allocating proceeds, the Kinrich Report fails to take into account the fact that the operating profits forgone by the U.S. and EMEA Debtors are those to which they would have been entitled given the allocation of Nortel's operating profits under the RPSM. See **Section 6.2** below.

56.     The Kinrich Report provides no rationale for its use of proportionate revenues to determine the "value relinquished" by the Debtor Groups, contrary to its own suggestion that value is a function of expected cash flows.[37] In order to value the property interests surrendered by the U.S. and EMEA Debtors it is necessary to consider their forgone cash flows and not their foregone revenues. Those foregone cash flows depend on the operation of the RPSM, as discussed further in **Section 6.2**.

## 6.1.     The Kinrich Report Inappropriately Applies Relative Geographic Revenue Shares to the Full Amount of the Proceeds from the Business Sales

57.     The value of the property interests the U.S. and EMEA Debtors surrendered in connection with the Business Sales, including their non-transferable licence rights in Nortel's IP, depends on the present value of the expected future operating profits those entities would have received if Nortel had continued to operate, as we explained in our Prior Report.[38] The value of the property interests transferred by the Canadian Debtors, as the legal owners of the IP, is the difference between the total proceeds in the Business Sales and the value of the property interests of the U.S. and EMEA Debtors. This approach recognizes the fact that the proceeds received in the Business Sales are likely significantly greater than the value of Nortel's business had it continued to operate, as we explained in our Prior Report (see Section 7.2 of that report).[39]

58.     The Kinrich Report does not conduct the required valuation analysis to determine the value of the property interests surrendered by the U.S. and EMEA Debtors. Instead it proposes that the "value relinquished" by each of the Nortel entities in the Business Sales depends on their respective proportions of the revenues from each of the corresponding segments of Nortel's business, as described in Section 5

---

[37] Kinrich Report, ¶¶22 and 88 to 90.

[38] See our Prior Report, Section 6.

[39] We explained that there are several reasons why the purchasers may have paid more than the value of the profits Nortel could have expected to generate had it continued to operate. These include synergies with, and enhancements to, existing operations of the purchasers; preventing competitors from gaining access to Nortel Group assets; using scale, and financial resources and market position to capitalize on existing and emerging technologies. See our Prior Report, ¶80.

above.[40] These relative proportions of Nortel's 2009 sales revenues for each of its business segments are then applied to the full amount of the proceeds for each of the Business Sales. By applying relative proportions of revenues to the full amount of the proceeds from the Business Sales, the Kinrich Report ignores the fact that the value of operating profits that Nortel could have expected from its own operations, had it continued to operate, was likely significantly lower than the amounts paid by the purchasers. The assumption of the Kinrich Report that the use of revenue proportions is an appropriate basis for allocating the entire proceeds from the Business Sales depends on its expansive interpretation of the licence rights, including the sub-licence rights and rights to enforce Nortel's IP, granted under the MRDA. We have already described why that interpretation is inconsistent with the economic organization of a high-tech multinational corporation in Section 5.3 above.

## 6.2.    The Kinrich Report Ignores the RPSM

59.    As we explained in our Prior Report, and as further noted in Section 4 above, the MRDA obligated its Licensed Participants to share any operating profits or losses with the rest of the Nortel Group through the application of the RPSM. Therefore, the value of the property interests surrendered by each of the U.S. and EMEA Debtors depends on the expected future profits which would flow to them from Nortel's operations, had it continued to operate, and given the allocation of profits under the RPSM.

60.    The Kinrich Report assumes that each dollar of Nortel revenues in the territories of each of the Debtor Groups for a particular business segment had the same value to those entities. This assumption ignores the fact that the operating profits (or losses) corresponding to the revenues from those business segments, which determine the value of the property interests, were allocated among the Nortel entities according to the RPSM.[41] Curiously, despite otherwise ignoring the RPSM, the revenue multiples considered by the Kinrich Report are those for the set of comparable third party resellers used in Nortel's transfer pricing documents.[42]

61.    The Kinrich Report does consider an alternative assumption that "a dollar of revenue earned by the [RPS Entities] likely reflects a greater value compared to a dollar of revenue earned by

---

[40] Kinrich Report, ¶6 ("To determine the fair market value of the assets relinquished by each Debtor Group in each of the Line of Business sales, I use standard valuation techniques based on measures of revenue.").

[41] Kinrich Report, ¶¶28, and 38 to 43.

[42] Kinrich Report, ¶47.

[other types of Nortel entities]."[43] However, even under this alternative, the Kinrich Report still ignores the RPSM which determined the return on revenues for the Nortel entities and, instead, applies a multiple of revenues based on public market prices for "comparable resellers."[44]

# 7.    Allocation Methodology of the Huffard Report

62.    To provide context for our responses to the Huffard Report set out in **Sections 8 and 9** below, we briefly describe the allocation methodology of that report in the following sub-sections. The calculations and findings of the Huffard Report depend heavily on the Malackowski Report. Therefore, we address the Malackowski Report along with the Huffard Report.

63.    For convenience, we provide a summary of the allocation conclusion of the Huffard Report in **Table 3** below.

**Table 3: Summary of Proposed Allocations of the Huffard Report**

|  | Huffard (License) | | Huffard (Contribution) | |
|---|---|---|---|---|
|  | Amount | Percentage | Amount | Percentage |
|  | (millions) | | (millions) | |
| **Business Sales** |  |  |  |  |
| **Canadian Debtors** | $    346.00 | 12.2% | $    561.00 | 19.9% |
| **U.S. Debtors** | $  1,730.00 | 61.2% | $  1,725.00 | 61.0% |
| **EMEA Debtors** | $    750.00 | 26.5% | $    540.00 | 19.1% |
| **Total** | **$ 2,826.00** | **100.0%** | **$ 2,826.00** | **100.0%** |
| **Rockstar** |  |  |  |  |
| **Canadian Debtors** | $    488.00 | 11.0% | $  1,757.00 | 39.4% |
| **U.S. Debtors** | $  2,470.00 | 55.4% | $  1,912.00 | 42.9% |
| **EMEA Debtors** | $  1,497.00 | 33.6% | $    785.00 | 17.6% |
| **Total** | **$ 4,454.00** | **100.0%** | **$ 4,454.00** | **100.0%** |
| **Total** |  |  |  |  |
| **Canadian Debtors** | $    834.00 | 11.5% | $  2,318.00 | 31.8% |
| **U.S. Debtors** | $  4,200.00 | 57.7% | $  3,637.00 | 50.0% |
| **EMEA Debtors** | $  2,247.00 | 30.9% | $  1,325.00 | 18.2% |
| **Total** | **$ 7,280.00** | **100.0%** | **$ 7,280.00** | **100.0%** |

---

[43] Kinrich Report, ¶44.

[44] Kinrich Report, ¶¶44 to 48.

## 7.1.    The Huffard Report's Allocation of the Proceeds from the Business Sales

64.    The Huffard Report allocates the proceeds from each of the Business Sales based on its determination of "the value of the interests each of [the Debtor Groups] transferred and rights each of them relinquished in connection with each sale."[45] It determines the value of the interests of each of the Debtor Groups in respect of the following three categories of assets that it suggests were transferred to the purchasers in the Business Sales:[46]

        a.      tangible assets net of liabilities assumed by the purchasers ("Net Tangible Assets");

        b.      intellectual property ("IP"); and

        c.      residual customer-related assets and goodwill, ("Residual Intangible Assets").[47]

65.    The Huffard Report determines the value of the Net Tangible Assets sold by each of the Debtor Groups based on their net book values and the liabilities of those entities that were assumed by the purchasers in each transaction as shown in from Nortel's financial statements for the fourth-quarter of 2009.[48] The Huffard Report calculates a value of Net Tangible Assets totalling 3.7 percent of the total value of the Business Sales.[49]

66.    The Huffard Report relies on the Malackowski Report for the value it ascribes to the IP sold in the Business Sales and for its allocation of that value among the Debtor Groups.[50] The Malackowski Report determines the value of the IP as the sum of its estimates of the "defensive value" and the "synergistic value" of the patents.

        a.      "Defensive value" is described in the Malackowski Report as measuring "the amount the Nortel business would have to pay to license the transferred IP."[51]  It is the

---

[45] Huffard Report, ¶4.

[46] Huffard Report, ¶¶5 and 6. We note that this approach appears to be dictated by the mandate of the Huffard Report to determine the allocation of proceeds based on its assessment of the value attributable to each of the different "classes" of assets sold.

[47] The term "Residual Intangible Assets" is not used in the Huffard Report but a term we use for easy reference.

[48] Huffard Report, ¶84.

[49] Huffard Report, pp.38-39. Net Tangible Assets as a percentage of business value is the sum of Monetary Assets (2.1%), Inventory (6.3%), and Fixed Assets (3.6%), less Assumed Liabilities (8.3%), i.e., 3.7% = 2.1% + 6.3% + 3.6% - 8.3%.

[50] For example, Huffard Report, ¶19.

[51] Malackowski Report, p.24.

discounted present value of the royalty revenue that Nortel would otherwise have had to pay, had it not owned that IP.[52]

      b.      "Synergistic value" is described as "how much a hypothetical market participant would have to pay to license the transferred IP."[53]

67.      The Malackowski Report concludes that the total value of the IP sold in the Business Sales is $765 million (84 percent from the defensive value and 16 percent from the synergistic value), or approximately 22.7 percent of the value of those transactions.[54]

68.      The Malackowski Report allocates among the Debtor Groups the value it ascribes to the IP sold in the Business Sales under two alternative approaches: the "Contribution Approach" and the "License Approach."[55]

      a.      The Contribution Approach allocates the value of IP in the Business Sales based on the share of R&D spending by each of the Debtor Groups in the period "the year before the earliest unexpired patent priority date in each Business Line" (ranging from 1989 to 1998) through 2008.[56]

      b.      The License Approach allocates the value of IP in the business sales based on the revenues estimated for the relief-from-royalties approach.[57]

69.      The Huffard Report ascribes the remainder of the proceeds from each of the Business Sales—approximately $2.2 billion (or 65 percent of the value of those transactions)—to the Residual

---

[52] Inputs to the calculation of defensive value include: Nortel's historical and forecasted revenue, growth rates for each business's industry, royalty rates for the "Litigation Light" scenario from the IP Co Model,  and discount rates based on Industry WACCs for the SIC codes for each of the business sales.

[53] Malackowski Report, p.24.

[54] Malackowski Report, Table 9, p.30, and Huffard Report, p.43.

[55] The Huffard Report (at ¶ 8) states that "I have been asked to consider two different approaches with respect to how the assets attributable to IP should be allocated among the Selling Debtors."

[56] Malackowski Report, pp.44 and 47 and Table 17, p.48.

[57] Revenues for entities that do not roll up in to one of the debtors were divided evenly among the RPS Entities. That is, one-fifth of revenues were allocated to each of NNSA, NNIR, NNUK, NNL, and NNI. Malackowski Report, pp.49 and 52.

Intangible Assets.[58] The value of these Residual Intangible Assets is allocated among the Debtor Groups based on their respective relative shares of Nortel's 2008 sales revenue.[59]

## 7.2.    The Huffard and Malackowski Reports' Allocation of the Proceeds from the Rockstar Transaction

70.    The Huffard Report relies on the Malackowski Report for its allocation of the proceeds from the Rockstar Transaction, as it does for its allocation of the proceeds attributable to the IP sold in the Business Sales.

71.    The Malackowski Report purports to provide a valuation of the Residual IP based on discounted cash flow calculations using its own forecasts of royalty revenues for each of eight different industries (or "Franchises"). These eight industries are those identified by Global IP in their work evaluating Nortel's patent portfolio.[60] For each of these industries, the Malackowski Report generates revenue forecasts for the Residual IP by applying the royalty rates from the "Litigation Light" scenario of the IP Co Model to the size of the entire global market for those industries.[61] Applying a discount rate of 30 percent to these cash flow forecasts,[62] the Malackowski Report calculates a value for the Residual IP of $3.5 billion.[63]

72.    Having arrived at this value for the Residual IP, the Malackowski Report then allocates the total proceeds from the Rockstar Transaction ($4.5 billion) among the Debtor Groups under its License Approach and Contribution Approach alternatives (describe in Section 4.2.1 above in respect of the IP in the Business Sales). More specifically:

a.    Under its License Approach, the Malackowski Report allocates the full amount of the proceeds from the Rockstar Transaction based on the relative portions  of its cash

---

[58] Huffard Report, ¶92 and p.43.

[59] Huffard Report, ¶117.

[60] Malackowski Report, p.31.

[61] Malackowski Report, pp.31 to 32 and 36.

[62] Other assumptions include licensing expenses of 20 percent of royalty revenue, taxes of 40 percent, discount rate of 30 percent is assumed. Malackowski Report, Table 13, p.38.

[63] Malackowski Report, Table 21, p.50.

Contains Highly Confidential Information. Subject to Protective Order.

flow forecasts that relate to each of the geographic territories of each of the Debtor Groups.[64] and

b.    Under its Contribution Approach, the Malackowski Report allocates the total proceeds of $4.5 billion among the Debtor Groups based on their relative shares of historical R&D spending.[65] This allocation approach does not depend on the Malackowski Report's $3.5 billion estimated value the Residual IP.

## 8.    The Huffard and Malackowski Reports Incorrectly Allocate Significant Proceeds to the U.S. and EMEA Debtors from the Sale of the Residual IP

73.    Huffard and Malackowski assume that the MRDA license conferred upon the U.S. and EMEA Debtors "full beneficial ownership of and economic entitlement"[66] to Nortel IP in their respective exclusive territories and, on that basis, would have been entitled to carry on an IP Co type of business. As we noted with respect to Kinrich's analysis, this assumption is incorrect.  However, even if this assumption were correct, the analysis in those reports still would not support the opinion that they express with respect to allocation of the proceeds from the Rockstar Transaction.

### 8.1.    Even if the U.S. and EMEA Debtors Had Property Interests in the Residual IP, the Huffard and Malackowski Reports Significantly Overstate their Value

#### 8.1.1.    *The Malackowski Report Allocations are Improperly Based on the Full Amount of the Rockstar Proceeds Despite Its Lower Estimate of the Value the Residual IP*

74.    Even we were to assume, for the sake of argument, that the  U.S. and EMEA Debtors have a claim to an allocation of the proceeds from the Rockstar Transaction (which in our view is inconsistent with the MRDA and with the economic organization of Nortel's business), the proposed allocations of the

---

[64] The portion of the value that relates to sales revenue that the Malackowski Report projects for the non-exclusive territories of the RPS Entities were divided evenly among the RPS Entities. That is, one-fifth of that value was allocated to each of NNSA, NNIR, NNUK, NNL, and NNI. Malackowski Report, pp.49-52, and Exhibit R.3.1.

[65] The Malackowski Report considers four alternative look-back periods for measuring relative R&D spending by the RPS Entities: 1991-2006 ("most appropriate"), 1991-2008, 2001-2006, and 2001-2008. Malackowski Report, p.54 and Table 19, p.49.

[66] Malackowski Report, p. 5.

NERA Economic Consulting

Huffard and Malackowski Reports that are based on a pro-rata share of the total proceeds from the Rockstar Transaction overstates the value of their respective property interests, if any.

75.     The value of the property interests of the U.S. and EMEA Debtors in Nortel's IP depends on their share of the future operating profits that Nortel itself could have expected to generate had it continued to operate, since their licence rights were non-transferable. The value of the property interests of the Canadian Debtors, as legal owner of Nortel's IP, is the difference between the total proceeds received in the Transactions and the total of the values of the property interests of the U.S. and EMEA Debtors, as we explained in our Prior Report.[67]

76.     In contrast to the analysis that is required, the Malackowski Report allocates the proceeds from the Rockstar Transaction based on its assessment of pro rata shares of the full amount of the proceeds to each of the Debtor Groups despite the fact that its own analysis suggests that the value of the IP Co cash flows was no more than $3.5 billion.

77.     Even if the $3.5 billion figure had been properly calculated (which, as discussed below, it was not), the Huffard and Malackowski Reports' allocations of the proceeds from the Rockstar Transaction overstate the value of any property interests of the U.S. and EMEA Debtors in the Residual IP because they have allocated value to those entities that, even based on their own calculations, Nortel itself could not have realized from its own operations.

### 8.1.2.    *The Malackowski Report Ignores the RPSM*

78.     In allocating the proceeds from the Rockstar Transaction, the Malackowski Report further errs in ignoring the operation of the RPSM. Since the value of the economic benefits forgone, if any, by the U.S. and EMEA Debtors as a result of surrendering their licence rights in connection with the Rockstar Transaction depends on the operating profits forgone, it is necessary in determining that value to take into account the fact that Nortel's operating profits were allocated according to the RPSM.

79.     Under its License Approach alternative, the Malackowski Report allocates proceeds based on geographic revenue shares. This is inappropriate because within the Nortel Group the operating profits of an entity, as determined by the RPSM, were not directly proportional to the revenues it generated.

---

[67] See our Prior Report, Section 7.

80.     Under its Contribution Approach alternative, the Malackowski Report allocates proceeds based on R&D expenditures of the RPS Entities. Although R&D expenditures are a component of the formula used in the RPSM, such expenditures are not alone an appropriate basis for allocating proceeds. Rather, the relationship between R&D expenditures and the value of any property interests in the Residual IP depends on the way those expenditures would have impacted the operating profits, if any, that would have been expected to flow to those entities, including the way that those operating profits would have been shared under the RPSM.

81.     Further, the Malackowski Report does not consider the R&D expenditures over the trailing five-year period that is part of the RPSM formula, but instead uses average R&D expenditure over look-back periods of 1991-2006, 1991-2008, 2001-2006, and 2001-2008.[68] This is inconsistent with the RPSM.

### 8.1.3.    *The Malackowski Report's $3.5 Billion Valuation of the Residual IP Overstates the Value that Nortel Itself Could Have Realized from the Operation of IP Co*

82.     The Malackowski Report's estimate of the present value of the IP Co cash flows is significantly greater than the value implied by the contemporaneous analyses. The following ranges of values generated by the various versions of the IP Co Model span a considerable range (set out in Section 5 above), all of which are significantly less than the value calculated in the Malackowski Report

83.     Similarly, the forecasts considered in Kinrich Report (Exhibit 28B) but corrected to use a more appropriate discount rate of 30 percent (see Section 5.1.1above) suggests a present value for the IP Co expected cash flows of only $1.8 billion.

84.     Additionally, the Malackowski Report's $3.5 billion valuation of the Residual IP assumes that this IP would have generated revenues of $0.8 billion in 2011 and $2.0 billion in 2012 (i.e., a total of $2.8 billion in those two years).[69] This assumption that Nortel would have been able to earn such a high level of royalty income so rapidly is not supported by the forecasts in the IP Co Model: the Kinrich

---

[68] Malackowski Report, Table 19, p.49.

[69] Malackowski Report, Exhibits R.4.1, R.4.2 (p.6), R.5.1, R.5.2 (p.6), R.5.3 (p.6), R.5.4 (p.6), R.5.5 (p.6), R.6.1, R.6.2 (p.10), R.7.1, R.7.4 (p.9), R.7.5 (p.10), R.8.1, R.8.2 (p.6), R.9.1, R.9.2 (p.6), R.10.1, R.10.2 (p.6), R.11.1, and R.11.2 (p.6).

Report's estimates based on the IP Co Model estimate total royalty revenues of $241 million in 2011 and 2012, and only $2.3 billion in total in the five years from 2011 through 2015.[70]

85.     The Malackowski Report's estimate is also based on its cash flow estimates of $0.4 billion in 2011 and $1.0 billion in 2012 (i.e., a total of $1.4 billion in those two years).[71] These forecasts are significantly higher than those projected in the IP Co Model. For example, the estimates from the IP Co Model that are used by the Kinrich Report forecast a *__loss__* of $44 million in 2011 and income of only $120 million in 2012 (i.e., total net income of $76 million for those two years), and only $1.2 billion in the five years from 2011 through 2015.[72]

### 8.1.4.    *The Rockstar Purchase Price of $4.5 billion Does Not Reflect the Value of the IP Co Business*

86.     The total of the proceeds from the Rockstar Transaction reflects the economic benefits that Rockstar, and the consortium of companies who own it, expected to realize from owning that IP. There are numerous reasons why this would significantly exceed the value that Nortel itself could have expected to realize had it retained the Residual IP, as explained in Section 5 above.

## 8.2.     If the Assumptions of the Huffard and Malackowski Reports with Respect to the Nature of the Licences are Incorrect, the U.S. and EMEA Debtors are Not Entitled to Any Allocation of the Proceeds from the Rockstar Transaction

87.     We understand that the scope of the licence rights the U.S. and EMEA Debtors held under the MRDA were such that they had no property interests in the Residual IP, since that IP was not used in Nortel's business. If this is the case, then all of the proceeds from the Rockstar Transaction are attributable to the transfer of the legal ownership of that IP by the Canadian Debtors for the reasons discussed in our Prior Report and in **Section 5.2** above.

---

[70] Kinrich Report, Exhibit 28B.

[71] Malackowski Report, Exhibits R.4.1, R.4.2 (p.6), R.5.1, R.5.2 (p.6), R.5.3 (p.6), R.5.4 (p.6), R.5.5 (p.6), R.6.1, R.6.2 (p.10), R.7.1, R.7.4 (p.9), R.7.5 (p.10), R.8.1, R.8.2 (p.6), R.9.1, R.9.2 (p.6), R.10.1, R.10.2 (p.6), R.11.1, and R.11.2 (p.6).

[72] Kinrich Report, Exhibit 28B.

NERA Economic Consulting

## 9.    The Huffard Report Overstates the Value of the Property Interests Surrendered by the U.S. and EMEA Debtors in the Business Sales

### 9.1.    The Huffard Report Inappropriately Applies Relative Geographic Revenue Shares and R&D Expenditures to the Full Amount of the Proceeds from the Business Sales

88.    The value of the property interests the U.S. and EMEA Debtors surrendered in connection with the Business Sales, including their non-transferable licence rights in the IP, depends on the present value of the expected future operating profits those entities would have received if Nortel had continued to operate, as we explained in our Prior Report and as summarized in Section 4 above. The value of the property interests transferred by the Canadian Debtors, as the legal owners of the IP, is the difference between the total proceeds in the Business Sales and the value of the property interests of the U.S. and EMEA Debtors. This approach recognizes the fact that the proceeds received in the Business Sales are likely significantly greater than the value of Nortel's business had it continued to operate, as we explained in our Prior Report (see Section 7.2 of that report).[73]

89.    Neither the Huffard Report, nor the Malackowski Report, conducts the required valuation analysis to determine the value of the property interests surrendered by the U.S. and EMEA Debtors.

90.    The Huffard Report proposes allocations of the proceeds from the Business Sales based on its analysis of the value of three classes of assets sold in the Transactions (tangible assets, IP, and a residual category of "Customer-Related Assets and Goodwill", as described in Section 5 above) where the residual category is determined as the difference between the actual proceeds in each of the Business Sales and its (and the Malackowski Report's) calculated value of the other two asset categories. Having allocated the values of the tangible assets and IP (based on book values and the Malackowski Report allocations of the value of the IP), the Huffard Report allocates the remainder of the proceeds in the

---

[73] We explained that there are several reasons why the purchasers may have paid more than the value of the profits Nortel could have expected to generate had it continued to operate. These include synergies with, and enhancements to, existing operations of the purchasers; preventing competitors from gaining access to Nortel Group assets; using scale, and financial resources and market position to capitalize on existing and emerging technologies. See our Prior Report, ¶80.

Business Sales based on its assumption that "the value of these Residual Assets should be allocated across Nortel entities based on the revenue generated by each entity in the fiscal year 2008."[74]

91.    This approach of the Huffard Report rests on its implicit assumption that the U.S. and EMEA Debtors are entitled to a proportionate interest the total proceeds from each of the Business Sales and ignores the fact that the value of the assets in Nortel's own operations, had it continued to operate, was likely significantly lower than the amounts paid by the purchasers.

92.    The Huffard Report does not take into account the fact that the U.S. and EMEA Debtors were not entitled to transfer their licence rights under the MRDA. It also does not take into account the fact that the non-IP intangibles sold in the Business Sales were economically comingled with the IP, as explained in our Prior Report, and therefore also could not have been sold separately (or, if they had been, not for the amounts the Huffard Report ascribes to those assets).[75]

93.    The fact that the IP and non-IP intangible assets of Nortel were economically comingled (due to the technology-based nature of Nortel's business and the operation of the RPSM) means that the valuation of the IP separate from Nortel's other assets (i.e., the analysis provided by the Malackowski Report) is not relevant or helpful for the allocation issue.

94.    The only assets of any value which the U.S. and EMEA Debtors had the unilateral ability to sell were their tangible assets. An allocation of the Proceeds based only on the tangible assets owned by each of the Debtor Groups corresponds to the lower bound of possible allocations set out in our Prior Report.[76]

## 9.2.    The Huffard Report Ignores the RPSM

95.    Even if it had been the case that the total proceeds in the Business Sales were representative of the value of the profits that Nortel itself could have generated had it continued to operate, the allocations of those proceeds proposed by the Huffard Report would still significantly overstate the value of the U.S. and EMEA Debtors' property interests and understate the value of the property interests

---

[74] Huffard Report, ¶114.

[75] See our Prior Report, ¶66.

[76] See our Prior Report, Section 8.1.

of the Canadian Debtors. This is because the Huffard Report ignores the RPSM in determining the proportionate shares of the Debtor Groups in Nortel's operating profits (or losses).

96.     As we explained in our Prior Report, and as further noted in Section 4 above, the MRDA obligated its Licensed Participants to share any operating profits or losses with the rest of the Nortel Group through the application of the RPSM. Therefore, the value of the property interests surrendered by each of the U.S. and EMEA Debtors depends on the expected future profits which would flow to them from Nortel's operations, had it continued to operate, and given the allocation of profits under the RPSM.

97.     The allocations proposed by the Huffard Report depend significantly on its counterfactual assumption that the economic benefits forgone by the U.S. and EMEA Debtors as a result of the Transactions are independent of the RPSM.

a.     The Huffard Report's proposed allocation under its "License Approach" is similar to the allocation proposed in the Kinrich Report in that it rests primarily (with the exception of its allocation relating to the tangible assets) on the relative share of total Nortel revenues generated in each geographic territory. Consequently, that proposed allocation is significantly different from the allocation that would result if the differing operating profits of the entities given the application of the RPSM were recognized, for the same reasons as set out above in respect of the Kinrich Report.

b.     The Huffard Report's proposed allocation under its "Contribution Approach" also depends significantly on this assumption in that it also allocates a large portion of the Proceeds (the portion it ascribes to the non-IP intangibles) based on the relative revenue shares in each geographic territory.[77]

## 10.    Restrictions

98.     This report is not intended for general circulation or publication, nor is it to be reproduced, referred to, or used for any purpose other than that outlined above, without the written consent of NERA

---

[77] The proposed allocation under this approach is closer numerically to an allocation that would result from the recognition that the RPSM delineated the economic benefits associated with the licence because, similar to the RPSM, it allocates the value of the IP according to (the Malackowski Report's calculation of the) relative R&D expenditures of the Debtor Groups. However, it is still based on an inappropriate assumption that the value of the property interests depends directly from the contributions to the underlying assets associated with those property interests, rather than on the cash flows to which the holder of those property interests is entitled.

NERA Economic Consulting

Economic Consulting, for any purpose whatsoever. We shall not assume any responsibility of liability for losses to any party as a result of the circulation, reproduction, reference to or use of this report contrary to the provisions of this paragraph.

_____
Mark L. Berenblut

_____
Alan J. Cox

NERA Economic Consulting

# Appendix A.    Glossary of Terms

| | |
|---|---|
| Business Sales | Sales of certain of Nortel's business segments |
| Canadian Debtors/Nortel Canada | Collectively "NNC", "NNL", "NNGC", "NNIC" and "NNTC" |
| Courts | The Ontario Superior Court and the United States Bankruptcy Court |
| Debtor Groups | The Canadian Debtors, the U.S. Debtors and the EMEA Debtors |
| EMEA Debtors | The estates of certain former direct and indirect subsidiaries of NNC and NNL in Europe, Middle East, and Africa |
| FMV | Fair Market Value |
| IFSA | Interim Funding and Settlement Agreement |
| MEN | Metro Ethernet Networks |
| MME | Mobility Management Entity |
| Monitor | The Monitor for the Canadian Debtors |
| MRDA | The Master R&D Agreement, as amended |
| NERA | NERA Economic Consulting |
| NN Ireland | Nortel Networks (Ireland) Limited |
| NNC | Nortel Networks Corporation |
| NNGC | Nortel Networks Global Corporation |
| NNI | Nortel Networks Inc. |
| NNIC | Nortel Networks International Corporation |
| NNL | Nortel Networks Limited |
| NNSA | Nortel Networks SA |
| NNTC | Nortel Networks Technology Corporation |
| NNUK | Nortel Networks U.K. Limited |
| Nortel/Nortel Group | NNC, NNL and their various subsidiaries collectively |
| Parties | The Canadian Debtors, the EMEA Debtors and the U.S. Debtors |
| Residual Profit/Loss | The difference between Adjusted Operating Earnings/Loss and the total of the allocated functional routine returns |
| Rockstar | Rockstar Consortium Inc. |
| Rockstar Transaction | The sale of Nortel's residual patent portfolio to Rockstar Consortium Inc. |
| RPS Entities | Residual Profit Splitting Entities |
| RPSM | Residual profit split methodology |
| Transactions | Business Sales and the Rockstar Transaction collectively |
| U.S. Debtors | The estates of certain former direct and indirect subsidiaries of NNC and NNL in the U.S. |
| Valuation Date | The relevant date or dates for the notional valuation exercise |

Contains Highly Confidential Information. Subject to Protective Order.

NERA Economic Consulting

# Appendix B.    Scope of Review

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Reports of Other Experts** | | |
| Report of Thomas Britven | 24-Jan-2014 | |
| Report of Richard V.L. Cooper | 24-Jan-2014 | |
| Report of Philip Green | 24-Jan-2014 | |
| Report of Paul P. Huffard | 24-Jan-2014 | |
| Report of Jeffrey H. Kinrich | 24-Jan-2014 | |
| Report of Gervase MacGregor | 24-Jan-2014 | |
| Report of James E. Malackowski | 24-Jan-2014 | |
| Report of David Mitchell | 24-Jan-2014 | |
| Report of Timothy Reichert | 24-Jan-2014 | |
| Report of Roger D. Siefert | 24-Jan-2014 | |
| Report of Raymond Zenkich | 24-Jan-2014 | |
| | | |
| **Declarations, Depositions, Witness Statements and Deposition Exhibits** | | |
| Declaration of John Doolittle, Vice President of Nortel Networks Inc. in Support of Chapter 11 Petitions and First Day Motions | 14-Jan-2009 | |
| Witness Statement of Gareth Alan David Pugh | 17-Dec-2009 | |
| Witness Statement of David Ball | 18-Dec-2009 | |
| Witness Statement of Sharon Lynette Rolston | 30-Dec-2009 | NNC-NNL06695580 |
| Bloom Declaration | 18-Oct-2010 | EMEAPROD2299714 |
| Transcripts for the Deposition of Peter Currie | 15-Oct-2013 | |
| Transcripts for the Deposition of Roy James McLean | 23-Oct-2013 | |
| Transcripts for the Deposition of David Drinkwater | 4-Nov-2013 | |
| Transcripts for the Deposition of Michael Orlando | 5-Nov-2013 | |
| Transcripts for the Deposition of Mike Zafirovski | 6-Nov-2013 | |
| Transcripts for the Deposition of Timothy Watkins | 8-Nov-2013 | |
| Transcripts for the Deposition of Stephen Pusey | 18-Nov-2013 | |
| Transcripts for the Deposition of James Gatley | 7-Nov-2013 | |
| Exhibit 21381 from the Deposition of James Gatley, memorandum entitled "Dispositions of businesses and impact on the profit split methodology" | 7-Nov-2013 | NNI 00208244-NNI 00208247 |
| Transcripts for the Deposition of Philippe Albert-Lebrun | 21-Nov-2013 | |
| Transcripts for the Deposition of Mark Weisz | 25-Nov-2013 | |
| | | |
| **Miscellaneous Documents** | | |
| Model v3.1 Distributed.xls | | BHG0124158 |
| FW: UMTS Alcatel Transaction | | BHG0137543 |
| Apple-Rockstar Sellers Disclosure Schedules and Annexes.zip?Annex A.I(h).DOC | 6/30/2011 | BHG0245595 |
| 11 - Proposed disclosure statement.pdf | | CCC0019142 |
| 2007_TP_by_Quarter.zip?Q2 2007 TP Final Calculation.xls | | CCC0021295 |
| - | 11/6/2006 | EMEAPRIV0204736 |
| Insolvency Act 1986 c.45 | | EMEAPROD02338556 |
| Ocean Tomo - World Enterprise Telephony Platform and Endpoints Markets 2011.pdf | 2/21/2014 | EMEAPROD02340002 |
| 2011-Infonetics-1Q11-SP-Rtrs-Switches-Mkt-Fcst-Updated-06-30-11.xls | 2/26/2014 | EMEAPROD02340086 |
| Consolidated Comparative Profit and Loss Spreadsheets | | EMEAPROD1685106 |
| Functional Analysis _Final_30Nov04.doc | 4/12/2007 | EMEAPROD2189880 |
| ARB8 - Tab 10.pdf | 11/10/2013 | EMEAPROD2292750 |
| Nortel_001.pdf | 10/1/2010 | EMEAPROD2302500 |
| | | EX21468 |
| APA Kick Off Meeting: Potential Questions and Sample Answers | | EX22020; NNI_00327148 |
| - | | EY-NRTL-000023 |
| Sortable Asset List with Assignee for Rockstar.xlsx | | GIP_Nortel_00063576 |
| Fw: Apple Overview package & Wired/PC slides | 6/6/2011 | GIP_Nortel_00064228 |
| 2492107_2(Iceberg-Ranked Asset List (last update)).XLS | | GIP_Nortel_00071997 |
| Nortel Patent Assets Portfolio Teaser.pdf | 5/6/2011 | GIP_Nortel_00080080 |
| LTA (June 4 2010).pdf | 4/1/2011 | GIP_Nortel_00101436 |
| Confirmation Agreement (March 19, 2010).pdf | 4/1/2011 | GIP_Nortel_00101634 |
| Changes Made to Annexes Post Signing to Auction (Listed, JOP, A-E).docx | 6/25/2011 | GIP_Nortel_00132745 |
| Model v2.0 with GIPLG.xls | | GIP_Nortel_00227898 |
| Nortel Phase One BOD Presentation (Toronto 10-01-29) 2.pdf | | GIP_Nortel_00230256 |
| IP Co. Model May 5, 2010.pdf | | GIP_Nortel_00233023 |
| Lazard IP Co. Models | | LAZ-NRTL-00018805; |
| | | LAZ-NRTL-00018807; |
| | | LAZ-NRTL-00018811; |
| | | LAZ-NRTL-00018812; |
| | | LAZ-NRTL-00018813; |
| | | LAZ-NRTL-00018814; |
| | | LAZ-NRTL-00036864 |
| - | | LAZ-NRTL-00018901 |

Contains Highly Confidential Information. Subject to Protective Order.

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| - | | LAZ-NRTL-00038046 |
| Nortel Networks Multilateral APA - Responses to IRS Information and Document Request | 4/26/2004 | NNC-NNL000073 |
| Nortel Networks Summary of Proceeds as at August 7, 2010 | 8/7/2010 | NNC-NNL012706 |
| Project Isis IM - Final.pdf | 10/15/2009 | NNC-NNL05153143 |
| sasa executed full copy.pdf | 12/23/2006 | NNC-NNL06026778 |
| Spartan.msg | 11/15/2007 | NNC-NNL06056508 |
| Summary of Customer Relationship Intangible.doc | 11/15/2007 | NNC-NNL06056509 |
| Nortel EMEA 9.zip?Nortel Germany.pdf | 10/5/2009 | NNC-NNL06113735 |
| Execution Version-MOU Dec 2008.pdf | 1/8/2009 | NNC-NNL06128094 |
| Nortel Goodwill Impairment Memoranda, Analyses and Correspondence | 1998 - 2009 | NNC-NNL06136975;NNC-NNL06137057; NNC-NNL06137093; NNC-NNL06137096; NNC-NNL06137100; NNC-NNL06375855; EMEAPROD0022382; EMEAPROD0023661; EMEAPROD1014403; EMEAPROD1014404; EMEAPROD1473840; EMEAPROD1474951; EMEAPROD1474954; EMEAPROD1633733; EMEAPROD2065453; KPMG_0000496; KPMG_0000504; KPMG_0000506; KPMG_0000523; NNC-NNL11678693; NNC-NNL11678700; NNC-NNL11678701; NNC-NNL11678718; NNC-NNL11678735; NNC-NNL11678804; NNC-NNL11678866; |
| | | NOR_54169662 (including embedded excel sheet titled "October 1 2007 Valuation"); EMEAPROD0022381; EMEAPROD0023659; EMEAPROD1014402; EMEAPROD1472124 - EMEAPROD1472127; EMEAPROD1473839; EMEAPROD1472951 - EMEAPROD1472953; NNC-NNL11678719; NNC-NNL11678722 |
| CSA Summary.doc | 8/9/2002 | NNC-NNL06491238 |
| FW: Modification of Nortel Networks' R&D Cost Sharing Arrangement.msg | 8/13/2004 | NNC-NNL06542925 |
| Pages 1 to 15.pdf | 1/30/2009 | NNC-NNL06695580 |
| Distribution Agreements.msg | 4/7/2003 | NNC-NNL07240562 |
| 2[1].2.3.5 FIN-43 MEN_Reven...ion_Q1 2006 to 2010.ppt | 3/1/2011 | NNC-NNL07586448 |
| Snow - Draft Documentation - 04-09-2009.ZIP?Snow Scope Mar 30 2009.pdf | 4/9/2009 | NNC-NNL07947317 |
| BOILERPLATE.doc | 1/14/2009 | NNC-NNL08173984 |
| RE: Nortel Interco Arrangement.msg | 9/18/2008 | NNC-NNL11012502 |
| Foundry Settlement .msg | 1/13/2005 | NNC-NNL11029235 |
| ASSIGNMENT OF PATENTS | 3/31/2009 | NNC-NNL11152233 |
| BILL OF SALE (EMEA SELLERS) | 3/31/2009 | NNC-NNL11152277 |
| - | | NNC-NNL11428752 |
| - | | NNC-NNL11428753 |
| 0216192244100000000489.zip?DOCSTOR-#1814973-v4-(Post-Auction)_Snow_Schedules_-_Master_Sellers_Disclosure_Schedule_(revised_March_19).DOC | 3/25/2010 | NNC-NNL11676495 |
| - | 6/9/2009 | NNC-NNL11756408 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000676 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000678 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000680 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000684 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000687 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000689 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000691 |
| 10-K Trial Balance Reconciliation | | NNC-NNL20000693 |
| Project Equinox | | NNI_00070446 |
| ISIS - 2007-2011 Revenues & Margin by Quarter - GSM Total - Nov 09 Forecast | | NNI_00136997 |
| 2007 - 2011 Product Versus Services Revenue by Region RevenueL Financial Doc# 405 | | NNI_00142448 |
| CVAS Finance - Project Paragon EDR Un-Restricted P&L | 6/4/2009 | NNI_00144685 |
| Services Revenue by Customer and Type CDMA EDR Fin Doc# 407 | | NNI_00147795 |
| 2[1].2.5 2008-2011 Americas...revenue and margins.xls | | NNI_00216237 |
| 2009_Q4_Avaya_Accounting_Memo.doc | | NNI_00216465 |
| | | NNI_00216565 |
| Final Nortel UMTS asset allocation - 27 July 2007.xls | | NNI_00286115 |
| UK.zip?UK\Nortel Report 12 - 18 July RSM LATEST 04.doc | | NNI_00315272 |
| RE: IP Milestone & Metrics - February, 2011.msg | 2/11/2011 | NNI_00324033 |
| | | NNI_00327110 – NNI_00327150 |
| FW: UMTS Alcatel Transaction.msg | 2/2/2007 | NNI_00364699 |
| Internal IP Agreement .msg | | NNI_00433303 |
| Nortel 2009 carve out P&Ls 10.5.10 CHILMARK.xls | | NNI_00577735 |
| FW: Nortel IP ; Follow-Up Information Request.msg | 1/24/2011 | NNI_00612845 |
| IP ROYALTIES MASTER ES MEN Carrier 2 33.xls | 6/25/2013 | NNI_00799378 |
| 01. Asset Sale Agreement.pdf | 11/17/2009 | NNI_00803798 |
| 59. IP License Termination Agreement (IPTLA).pdf | 11/17/2009 | NNI_00805595 |
| 01. Amended & Restated ASSA.pdf | 1/21/2010 | NNI_00806387 |
| 03. .Amended & Restated ASSA Sellers Disclosure Schedule.pdf | 9/15/2009 | NNI_00806963 |

Contains Highly Confidential Information. Subject to Protective Order.

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| 09. EMEA Asset Sale Agreement.pdf | 2/8/2010 | NNI_00807958 |
| 16a. Revised Schedules to the Master Subcontract Agreement.pdf | 2/3/2010 | NNI_00808591 |
| Isis Closing Docs - 01 - Asset Sale Agreement.PDF | 6/1/2010 | NNI_00810458 |
| Isis Closing Docs - 125 - Side Agreement.PDF | 6/1/2010 | NNI_00812035 |
| Isis Closing Docs - 37 - Kapsch - Intellectual Property License Agreement.PDF | 6/1/2010 | NNI_00812712 |
| Isis Closing Docs - 99 - Local Asset Transfer Agreement (Hong Kong and Taiwan).PDF | 6/1/2010 | NNI_00814609 |
| Tab 01.pdf | 4/28/2009 | NNI_00814632 |
| Tab 49.PDF | 4/28/2009 | NNI_00815758 |
| Tab 65.PDF | 4/28/2009 | NNI_00815839 |
| Tab 66.PDF | 4/28/2009 | NNI_00815844 |
| Snow - Amendment No. 5 to Amended and Restated Asset Sale Agreement dated March 19, 2010.PDF | 4/25/2011 | NNI_00816040 |
| Snow - Exhibit B - EMEA Sellers.DOC | 3/23/2010 | NNI_00816247 |
| Snow - Exhibit F - Intellectual Property License Agreement.DOC | 3/23/2010 | NNI_00816252 |
| Snow Signing Docs - Amended and Restated Asset Sale Agreement, November 24, 2009.PDF | 5/16/2011 | NNI_00817023 |
| 1. Asset Sale Agreement.pdf | 6/9/2011 | NNI_00821708 |
| 2a. Signing Sellers' Disclosure Schedule.pdf | 6/9/2011 | NNI_00822333 |
| 2b. Pluto Closing Schedules.pdf | 6/9/2011 | NNI_00822569 |
| Seville Closing Docs - 01 - Transaction Agreement.pdf | 6/14/2010 | NNI_00823699 |
| Seville Closing Docs - 38. IP License Termination Agreement.PDF | 12/14/2009 | NNI_00825055 |
| 2. Amendment to Asset Sale Agreement.pdf | 8/29/2011 | NNI_00825205 |
| A. SDS Annex 1.1(d).pdf | 8/29/2011 | NNI_00825244 |
| B. SDS Annex 1.1(h).pdf | 8/29/2011 | NNI_00825254 |
| APPENDIX Q-2 Search for Comparable NA Resellers.doc | 10/29/2008 | NNI_00867914 |
| APPENDIX Q-3 Search for Comparable EMEA Resellers.doc | 10/29/2008 | NNI_00867979 |
| APPENDIX Q-4 Search for Comparable APAC Resellers.pdf | 10/30/2008 | 01015781 |
| Project Iceberg - Mkt Data - Summary Output.pdf | 1/5/2011 | NNI_01290195 |
| Nortel IP Business Plan - IP Co Update to NLT (Apr 27 2010)_with AN notes.ppt | 5/12/2010 | NNI_01323495 |
| - | 11/30/2004 | NNI_01333113 |
| Global IP Law Group MCA_Executed.pdf | 10/23/2009 | NNI_01393131 |
| Final Funding Agreement Executed Version.pdf | 7/29/2013 | NNI_01455612 |
| RE: Materials for Wednesday morning pre-meeting.msg | | NNI_01487088 |
| FW: Final Master R&D.msg | | NNI_01494046 |
| Audit NNSA_March 9 Presentation_Final English.ppt | | NNI_01503360 |
| FW Master R&D Agreement Dec 22 2004.msg | 1/17/2006 | NNI_01532977 |
| Nortel Limited Risk Distributors & Service Entities List | | NNI_EQUINOX_00003390 |
| Nortel Corporate Structure Chart - Jan 5, 2009 | | NNI_EQUINOX_00067481 |
| Company code map | | NNI_EQUINOX_00084242 |
| Nortel CDMA (363) v11c FINAL | | NNI_NARNIA_00197426 |
| 2007-2011 CDMA P&S Revenue by Customer | | NNI_NARNIA_00200413 |
| 158 MRD MOU - NNL, multiple | | NNI_NARNIA_00303979 |
| NOR_53648037.xls | | NOR_53648037 |
| NOR_53648041.xls | | NOR_53648041 |
| Nortel Residual Profit Split Model - Explanation of Tabs within Model | 2/26/2009 | NOR_53648048 |
| Residual Profit Model - Purpose of Spreadsheets | | NOR_53648130 |
| Residual Profit Split Model - Explanation of Tabs within Model | 4/20/2007 | NOR_53648133 |
| Microsoft Excel Spreadsheet - Produced in Native Format Only | | NOR_53648312 |
| NOR_53648323.xls | | NOR_53648323 |
| Residual Profit Model - Purpose of Spreadsheets | | NOR_53648508 |
| Nortel Networks Inc - PM/DTC Code: M-5578 | 10/27/2009 | NOR_53926476 |
| Bill of Sale | 7/14/2009 | NOR_53928208 |
| FY09 Nortel Consolidated P&L by Company Code [Excludes Elimination Entries] | | NOR_54099216 |
| B - Companies Net Working Capital - February 16 Final Computation | | NOR_54179043 |
| Equinox Final Closing Statement - February 16 | | NOR_54179573 |
| Nortel - Residual Profit Split Model - Explanation of Tabs within Model | 5/12/2009 | NOR_54206531 |
| NOR_54206531.xls | | NOR_54206531 |
| Nortel LTE - Project MilkyWay Information Memorandum | 7/7/2009 | NOR_54275577 |
| Project Paragon - Information Memorandum | | NOR_54380696 |
| Nortel Residual Profit Split Model - Explanation of Tabs within Model | 5/12/2009 | NOR_56971224 |
| Email from Johannus Poos to Michael McCorkle and others re: "UK Funding--PWC Discussion" | 23-Mar-2006 | NOR-CAN00033507 |
| - | | PWC-NRTL-00036863 |
| - | | UCC0166151 |
| Equinox (Avaya) IPLA.PDF | 6/10/2011 | US_EMEA_Canada_PRIV_00086159 |
| Nortel IP Business Plan (12 Feb 2010).ppt | | US_EMEA_Canada_PRIV_00184539 |
| Nortel IP Business Plan - IP Co. Update to NLT (Mar 10).pdf | | US_EMEA_Canada_PRIV_00191069 |

EMC Corporation Form 10-K for the fiscal year ended December 31, 2008
LM Ericsson Telephone Company Form 20-F for the fiscal year ended December 31, 2008
Microsoft Corporation Form 10-K for the fiscal year ended June 30, 2008
Research in Motion Limited Audited Consolidated Financial Statements for the fiscal year ended
February 28, 2009
Sony Corporation Form 20-F for the fiscal year ended March 31, 2009

**Appendix B**
**Documents and Information Reviewed**

| Document | Date or Date Range | Bates Number or Bates Number Range |
|---|---|---|
| **Publications** | | |
| Albanesius, Chloe, "Obama Slams Patent Trolls During Google+ Hangout," http://www.pcmag.com/article2/0,2817,2415469,00.asp | 2/14/2013 | |
| Bhagat, Sanjai, "Why do venture capitalists use such high discount rates?" *Journal of Risk Finance* , Vol. 15. | | |
| Ewing, Tom, "Indirect Exploitation of Intellectual Property Rights By Corporations and Investors," *Hastings Science & Technology Law Journal* , Vol. 4 (Winter 2012). | | |
| Ewing, Tom and Feldman, Robin, "The Giants Among Us," *Stanford Technology Law Review* (2012). | | |
| *Google* , "When patents attack Android," http://googleblog.blogspot.com/2011/08/when-patents-attack-android.html | 3-Aug-2011 | |
| Hagiu, Andrei and Yoffie, David B., "The New Patent Intermediaries: Platforms, Defensive Aggregators, and Super-Aggregators," in *Journal of Economic Perspectives* Vol. 27, Number 1, Winter 2013, pp. 45-66. | 2013 | |
| Layne-Farrar, Anne, "The Brothers Grimm Book of Business Models: A Survey of Literature and Developments in Patent Acquisition and Litigation." | 3/21/2012 | |
| *Microsoft* , "Allow or correct a circular reference," http://office.microsoft.com/en-us/excel-help/allow-or-correct-a-circular-reference-HP005200285.aspx | 2/16/2014 | |
| Orr, Justin, "Patent Aggregation: Models, Harms, and the Limited Role of Antitrust," http://www.btlj.org/data/articles/28_AR/0525-0568_Orr_081313_Web.pdf | 2003 | |
| *Rockstar IP* "Corporate Leaders," http://www.ip-rockstar.com/people/corporate-leaders | 2/24/2014 | |
| Sahlman, William A., "The structure and governance of venture-capital organizations," Journal of Financial Economics, Vol. 27 (December 1990). | 2006 | |
| Sag, Matthew and Rohde, Kurt, "Patent Reform and Differential Impact" in *Minn J.L. SCI. & Tech.* | 2006 | |
| Wang, Allen, "Rise of the Patent Intermediaries," in *25 Berkeley Tech L.J. 159, 165–82,* http://www.btlj.org/data/articles/25_1/0159-0200%20Wang_Web.pdf | 2010 | |

Contains Highly Confidential Information. Subject to Protective Order.